Slip Copy                                                                                    Page 18

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

questionable propriety of Ms. Barnett's continued correspondence with Ms. Richardson, Barnett should not have unilaterally communicated with her for such an extended period. *See e.g., id.* Instead, Ms. Barnett should have informed the Hotel's or Marshall's counsel of her intent to speak with Ms. Richardson. *See University Patents,* 737 F.Supp. at 329; *Cagguila v. Wyeth Labs., Inc.,* 127 F.R.D. 653, 654 (E.D.Pa.1989). Similarly, using Richardson as the cornerstone for urging EEOC action without having considered Richardson's obvious credibility issues bespeaks a recklessness that bodes ill. *Cf.* Restatement (Third) of the Law Governing Lawyers § 57, comment f; § 110

Here, unlike the result in *Belote,* disqualification is warranted because the record clearly shows that the Defendants have been sufficiently prejudiced by being unaware of and without the ability to control the Barnett-Richardson communications to the extent permitted by both the rules of discovery and professional conduct. *See United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir.1980) (disqualification appropriate only when it serves the purposes of the relevant disciplinary rule); *cf. University Patents,* 737 F.Supp. at 328.

**\*18** Furthermore, the Court has weighed heavily the proposition that Ms. Beverly might suffer substantial hardship if Ms. Barnett is disqualified. *See* Pa. R.P.C. 3.7(a)(3). However, the Court is confident that Ms. Beverly's federal claims will be adequately represented by the EEOC and its counsel. Furthermore, the Court will give Ms. Beverly the opportunity to find new counsel with regard to her state claim. Nevertheless, because of the apparent ethical violations by Ms. Barnett, consistent with the law in this circuit, with regard to any doubts as to the existence of a violation of the rules, it is prudent to resolve those doubts *in favor of* disqualification. *See J & J Snack Foods,* 2000 WL 562736 at \*2, citing *Int'l Bus. Mach. Corp.,* 579 F.2d at 283.

**IV. CONCLUSION**

The Court finds that Defendants have provided ample evidence to substantiate Ms. Barnett's

disqualification. Ms. Barnett has engaged in and exhibited what can be termed nothing less than reckless behavior, with regard to respecting the legal rights of others, including her client's adversaries. Therefore, for the reasons stated above, attorney Jana Barnett is disqualified from representing Intervenor Manessta Beverly in this case. Ms. Beverly shall be permitted Ms. Barnett's assistance in locating substitute counsel, and Ms. Barnett is expressly permitted to cooperate fully in the prompt transfer of the case to new counsel to whom she may impart the whole of her knowledge of the case, including her file as it exists as of the date of the accompanying Order, with the express exception of any notes Barnett may have made concerning any discussions with Richardson or Schneider which have not been disclosed to Defendants.

An appropriate Order follows.

*ORDER*

AND NOW, this __ th day of June, 2005, upon consideration of the Defendants' Joint Motion to Disqualify Jana R. Barnett, Esq., as Counsel for Intervenor (Docket No. 43), Intervenor's Response to the Joint Motion to Disqualify (Docket No. 45), the EEOC's Letter Response in Opposition to the Joint Motion to Disqualify (Docket No. 46), and each of the parties' supplemental memoranda of law (Docket Nos. 55, 56 and 58) submitted following the hearing and oral argument held on April 15, 2005, IT IS ORDERED that because the Court finds violations of Pennsylvania Rules of Professional Conduct 4.2, 4.4 and 8.4, consistent with the reasoning discussed in the accompanying memorandum, Jana R. Barnett is DISQUALIFIED from further involvement in this matter, save her necessary assistance in locating substitute counsel. Thus, Ms. Barnett is expressly permitted to cooperate fully in the prompt transfer of the case to new counsel to whom she may impart the whole of her knowledge of the case, including her file as it exists as of the date of the accompanying Order, with the express exception of any notes Barnett may have made concerning any discussions with Richardson or Schneider which have not been disclosed to Defendants.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 19

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

**\*19** It is further ORDERED that, with due consideration of the pending Defendants' Motion for Summary Judgment (Docket No. 44) and to permit new counsel for the Intervenor to familiarize herself or himself with this matter and to determine whether to file supplemental materials with regard to the Motion and the docket responses, all parties to the above-captioned matter shall have until September 1, 2005 to file supplemental materials with regard to the pending Motion.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23639101 (Trial Pleading) Answer of Defendant, Hora, Inc., d/b/a Days Inn to Intervenor Manessta Beverly's Complaint (Oct. 29, 2003)

• 2003 WL 23639102 (Trial Pleading) Answer of Defendant Marshall Management, Inc. to Plaintiff/Intervenor Manessta Beverly's Complaint (Oct. 28, 2003)

• 2003 WL 23639097 (Trial Pleading) Answer of Defendant Marshall Management, Inc. to Plaintiff's Complaint (Apr. 22, 2003)

• 2003 WL 23639098 (Trial Pleading) Answer of Defendant, HORA, Inc., to Plaintiff's Complaint (Apr. 22, 2003)

• 2003 WL 23640022 (Trial Pleading) Complaint (2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                    Page 1

Not Reported in F.Supp., 1998 WL 136523 (E.D.Pa.), 1998 A.M.C. 1781

**(Cite as: 1998 WL 136523 (E.D.Pa.))**

▷

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
Richard A. BELOTE,
v.
MARITRANS OPERATING PARTNERS, L.P.
**No. CIV. A. 97-3993.**

March 20, 1998.

*MEMORANDUM AND ORDER*

YOHN, J.

*1 The plaintiff, Richard Belote ("Belote"), claims that he was injured while on board the "OCEAN-115," the defendant's barge. Invoking the Jones Act, 46 U.S.C. § 688 (Supp.1997), he filed suit against the defendant, Maritrans Operating Partners ("Maritrans"), to recover for his injuries. During the discovery period, the plaintiff's counsel sent an investigator to speak with Captain Whitmore ("Whitmore"), the captain of the barge upon which Belote was injured. Maritrans then filed the instant motion to disqualify the plaintiff's counsel and assess costs and fees against him, arguing that this interview violated Rule 4.2 of the Pennsylvania Rules of Professional Conduct. I will grant in part and deny in part the defendant's motion.

BACKGROUND

Maritrans claims that, after the plaintiff filed a complaint against Maritrans and Maritrans filed an answer through counsel, plaintiff's counsel sent an investigator to speak with Whitmore, an employee of Maritrans and the captain of the barge on which the plaintiff was allegedly injured. (Def.'s M. Dsqlfn.) The plaintiff's counsel undertook this interview without providing notice to or obtaining

the consent of Maritrans' counsel. (*Id.*) Moreover, the defendant claims that the investigator did not reveal that he was working for the plaintiff until he completed the interview. (*Id.*) [FN1]

> FN1. The plaintiff claims that the investigator revealed that he worked for the plaintiff prior to conducting this interview. (Pl.'s Resp. Def.'s Reply.)

The plaintiff's counsel's efforts proved quite fruitful. During the interview, Whitmore made and signed a statement describing how the conditions of the barge contributed to the plaintiff's injury. (*Id.* Ex. C, Witness Statement.) Whitmore specifically noted that on the night of Belote's accident, the temperature was below freezing, the deck was wet and, though there were salt pebbles on board, Whitmore did not use them on deck that night. (*Id.*) In fact, the statement perfectly complements the plaintiff's expert's opinion that Belote's injury was caused by the captain's failure to use de-icing measures on the barge. (*See id.* Ex. E, Expert's Report.)

According to the defendant, this conduct allegedly violated Rule 4.2 of the Pennsylvania Rules of Professional Conduct which governs a lawyer's communications with adverse parties. The plaintiff raises two defenses. First, he alleges that Whitmore is not a represented party within the meaning of Rule 4.2. Second, he claims that § 60 of the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51 et seq. (1986), preempts Rule 4.2, thereby allowing this type of conduct.

DISCUSSION

I. Whitmore constitutes a "party" under Rule 4.2 of the Pennsylvania Rules of Professional Conduct

Rule 4.2 provides, in full:
  In representing a client, a lawyer shall not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1998 WL 136523 (E.D.Pa.), 1998 A.M.C. 1781

**(Cite as: 1998 WL 136523 (E.D.Pa.))**

communicate about the subject matter of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

*2 Pa. Rules of Professional Conduct Rule 4.2 (1997). The Eastern District has adopted Pennsylvania's Rules of Professional Conduct. *See* Loc. R. Civ. P. E.D. Pa. 83.6 (Rule IV)(1995).

The Comment to Rule 4.2 addresses how it applies to organizations:

[T]his Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability, or whose statement constitutes an admission on the part of an organization.

Pa. Rules of Professional Conduct Rule 4.2 cmt. (1997).

Although many courts have attempted to distill the Rule and its comment into a single standard, *see e.g.*, Pa. B.A. Comm. on Professional Ethics and Professional Responsibility, Formal Op. 90-142 (1990), [FN2] this district, in the absence of guidance from the Third Circuit or the Pennsylvania Supreme Court, has opted to employ the tests laid out in the plain language of Rule 4.2 and its comment. *See e.g., Berryman v. Consolidated Rail Corp.,* No. CIV.A. 94-3668, 1995 WL 517642, *2 (E.D.Pa. Aug.28, 1995); *Coleman v. National R.R. Passenger Corp.,* No. CIV.A. 94-4526, 1995 WL 395924 (E.D.Pa.1995); *Lochead v. AMTRAK,* No. CIV.A. 93-1707, 1994 WL 558874 (E.D.Pa.1994); *Garrett v. National R.R. Passenger Corp.,* No. 89-8326, 1990 U.S. Dist. LEXIS 10868 (E.D.Pa. Aug. 14, 1990). As such, I have analyzed the issue of Whitmore's status according to the guidelines laid out in Rule 4.2, its comment, and the interpretative case law.

FN2. In the case of current employees, rules for *ex parte* contacts range from "blanket" bars, to the "scope of

employment" test, to the "managing-speaking-agent" test and its variant, the "alter-ego" test, the "control group" test, and the "case-by-case balancing" test, which balances the need for the information against the dangers of generating evidentiary admissions. Pa. B.A. Comm. on Professional Ethics and Professional Responsibility, Formal Op. 90-142 (1990). Although the plaintiff argues that the "control group" test applies here he fails to identify any case from this district which uses this test. (*See* Pl.'s Response Mem. at 8.) Nevertheless, Whitmore meets the criteria of all of the tests, except, possibly, for the control group test. The application of this test requires more information than is currently available to the court.

A. Managerial Employee

As an employee with managerial responsibility on behalf of Maritrans, Whitmore is a party within the meaning of Rule 4.2. *Carter-Herman v. City of Philadelphia,* 897 F.Supp. 899, 904 (E.D.Pa.1995), held that employees who supervise a large number of subordinates and who must exercise a significant amount of individual discretion to carry out their duties are "managerial employees." For example, police lieutenants are managerial employees because they command an assigned shift within a police district, a responsibility that entails both the supervision of many employees and the use of substantial discretion. *Id.; see also Berryman v. Consolidated Rail Corp.,* No. CIV.A. 94-3668, 1995 WL 517642, at *2 (E.D.Pa. Aug.28, 1995) (railroad foreperson in charge of a group of employees is a "managerial employee").

Maritrans' Fleet Operations Manual bestows Whitmore with significant responsibility. As captain of a barge, Whitmore

has responsibility for and authority over all persons on board his vessel; therefore, all persons on board must obey his orders. His authority extends to areas such as vessel maintenance and upkeep; cargo transfer operations; safety; ...;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 3

Not Reported in F.Supp., 1998 WL 136523 (E.D.Pa.), 1998 A.M.C. 1781

**(Cite as: 1998 WL 136523 (E.D.Pa.))**

interpreting and complying with local, national and international laws, rules, and regulations; and the proper care and custody of all cargoes carried.
*3 (Def.'s M. To Disqualify Ex. C, Maritrans' Fleet Operations Manual ¶ 5.4.1). Like the police lieutenant, Whitmore supervises employees and all other individuals on board. Moreover, as the ultimate authority on board, Whitmore must exercise substantial discretion. Whitmore, therefore, is a managerial employee within the meaning of Rule 4.2.

B. Imputed Liability

The comment to Rule 4.2 also defines a party as an individual whose act or omission in connection with the plaintiff's injury can be imputed to the defendant organization. In *Berryman,* 1995 WL 517642, at *2, the plaintiff, a Conrail employee, claimed that he was injured by the negligence of his co-employees and sued his employer, under FELA, for failing to provide a safe workplace. Specifically, the plaintiff claimed that his two co-employees, Donovan and West, "were doing something to the end spring at the time of the accident." *Id.* at *4. FELA renders an employer liable for the injuries negligently inflicted on its employees by the employer's officers, agents, or employees. *See Hopson v. Texaco, Inc.,* 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740 (1966). Because the events surrounding the end spring were at issue, Donovan and West's acts "might be imputed to Conrail for the purpose of civil liability." *Berryman,* 1995 WL 517642, at *7-8. Thus, the court held that the plaintiff's attorney must contact Conrail prior to speaking with either of these employees. *See id.*

Invoking the Jones Act, [FN3] Belote also claims that his injuries were caused by "the negligence of the defendant, its agents, servants, workmen, and employees...." (Pl.'s Compl.) The plaintiff's expert opined that the plaintiff "was injured due to the failure of the barge captain to use de-icing measures to remove the ice on the deck of the barge." (Def.'s M. Dsqlfn. Ex. E., Expert's Report.) As the highest authority on the barge, Whitmore is

responsible for vessel maintenance and upkeep. ( *See* Def.'s Reply Mem. Ex B, Maritrans' Fleet Operations Manual ¶ 5.4.1). In light of these responsibilities, it is his actions with respect to the maintenance of the barge which will be at issue. Whitmore, therefore, is a person whose act or omission in connection with the plaintiff's injury may be imputed to the organization.

> FN3. The Jones Act, the liability scheme applicable to the instant case, incorporates FELA's standards. *See* 45 U.S.C. § 688. FELA renders an employer liable for the injuries negligently inflicted on its employees by its "officers, agents, or employees." *Hopson v. Texaco, Inc.,* 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740 (1966).

C. Admissions

Whitmore also meets the third prong of Rule 4.2's test, which prohibits *ex parte* contact with persons whose statement may constitute an admission on the part of the organization. An admission is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D); *see also University Patents, Inc. v. Kligman,* 737 F.Supp. 325, 328 (E.D.Pa.1990) (adopting 801(d)(2)(D)'s definition of "admission" for Rule 4.2's purposes). [FN4]

> FN4. The plaintiff, in fact, agrees that *ex parte* contact with a person whose statements may constitute admissions is prohibited. In his reply memorandum, he states that the underlying purposes of Rule 4.2 are "threatened when the subject of the interview is the corporation itself, that is, when the subject ... *may make statements in the interview or execute documents in the interview which will legally bind the corporation.*" (Pl.'s Reply Mem. at 11) (emphasis supplied). Thus, the plaintiff admits that *ex parte* contacts with employees whose statements could legally

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1998 WL 136523 (E.D.Pa.), 1998 A.M.C. 1781

**(Cite as: 1998 WL 136523 (E.D.Pa.))**

bind the corporation are prohibited.

**\*4** Whitmore's statement addresses the conditions of the deck when the plaintiff injured himself. (Def.'s M. Dsqlfn. Ex. C., Witness Statement). As the barge captain, vessel maintenance and safety were matters within the scope of his employment. ( *See* Def.'s Reply Mem. Ex. B, Maritrans' Fleet Operations Manual ¶ 5.4.1). Whitmore's statement, therefore, constitutes an admission. *See Garrett,* 1990 U.S. Dist. LEXIS 10868, at \*4 n. 2 (statement of railroad defendant's employee concerning his actions on the date of the accident constitute an admission).

As captain of the barge, Whitmore is a represented party within the meaning of Rule 4.2. The plaintiff's counsel, therefore, may not contact Whitmore unless he has the defendant's counsel's consent or is otherwise authorized by law to do so.

**II. 45 U.S.C. § 60 does not preempt Rule 4.2 of the Pennsylvania Rules of Professional Conduct**

The plaintiff argues that the *ex parte* communications at issue are "otherwise authorized" under FELA. [FN5] The relevant FELA provision provides, in part, as follows:

> FN5. The Jones Act incorporates FELA's provisions. *See* 46 U.S.C. § 688(a).

§ 60. Penalty for suppression of voluntary information incident to accidents; separability of provisions
Any contract, rule, regulation, or device whatsoever, the purpose, intent, or effect of which shall be to prevent employees of any common carrier from furnishing voluntarily information to a person in interest as to the facts incident to the injury or death of any employee, shall be void, and whoever, by threat, intimidation, order, rule, contract, regulation, or device whatsoever, shall attempt to prevent any person from furnishing voluntarily such information to a person in interest, or whoever discharges or otherwise disciplines or attempts to discipline any employee for furnishing voluntarily such information to a

person in interest, shall, upon conviction thereof, be punished....
45 U.S.C. § 60.

The plaintiff argues that § 60 preempts Rule 4.2 because it prevents employees from voluntarily furnishing information by allowing the employer's attorney to withhold his or her consent to an interview. *See e.g., Blasena v. Consolidated Rail Corp.,* 898 F.Supp. 282, 285 (D.N.J.1995). This reasoning, however, misunderstands Rule 4.2. The Rule allows an attorney to communicate with an adverse party if the attorney has opposing counsel's consent or is "otherwise authorized by law" to do so. In the event opposing counsel withholds consent to an interview, the attorney can access the desired information through traditional discovery methods, such as depositions or other statements taken in the presence of counsel. *See e.g., Queensberry v. Norfolk and W. Ry. Co.,* 157 F.R.D. 21, 25 (E.D.Va.1993). These communications with adverse parties are permissible because they are "otherwise authorized by law." *See e.g.,* Fed. R. Civ. P. 30(a). Thus, contrary to the plaintiff's understanding, Rule 4.2 does not prevent parties from gaining desired information. Instead, it merely prescribes the conditions under which that information can be accessed.

**\*5** The second argument put forth as to why § 60 preempts Rule 4.2 is that the presence of the company's attorney at employee interviews would intimidate employees, thereby infringing on their ability to provide information voluntarily. *See e.g., Blasena v. Consolidated Rail Corp.,* 898 F.Supp. 282, 286 (D.N.J.1995). Thus, § 60 excuses plaintiff's attorneys from notifying opposing counsel of their intentions to speak with adverse parties. *See id.*

Addressing this argument requires the court to resort to § 60's legislative history. When interpreting statutes, courts should refer to legislative history only if a statute is ambiguous. *See Patterson v. Shumate,* 504 U.S. 753, 761, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). A statute is ambiguous if it is susceptible to more than one reasonable interpretation. *See Brown v. Gardner,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 5

Not Reported in F.Supp., 1998 WL 136523 (E.D.Pa.), 1998 A.M.C. 1781

**(Cite as: 1998 WL 136523 (E.D.Pa.))**

513 U.S. 115, 117, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994). Ultimately, however, ambiguity is not "a creature of definitional possibilities but of statutory context." *Brown v. Gardner,* 513 U.S. 115, 117, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994).

Considered in the context of Rule 4.2, § 60 is ambiguous. The statute prohibits laws and rules that "prevent employees ... from furnishing *voluntarily* information to a person in interest...." 45 U.S.C. § 60 (emphasis supplied). *Smith v. United States,* 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), instructs courts to construe the words of a statute according to their common and ordinary meaning. "Voluntarily," using its most common definition, means "of one's own free will." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2564 (1981). While an attorney's presence in an interview may be limiting, it is a substantial leap to hold that this presence deprives an employee from offering information of his or her own free will. [FN6] As such, the statute's ambiguity with respect to its preemptive effect on Rule 4.2 must be resolved through resort to its legislative history. *See Patterson v. Shumate,* 504 U.S. 753, 761, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).

> FN6. Section 60's susceptibility to differing interpretations in the context of Rule 4.2 is also borne out by the conflicting outcomes from the many courts considering the issue. *Compare Garrett v. National R.R. Passenger Corp.,* No. CIV.A. 89-8326, 1990 U.S. Dist. LEXIS 10868 (E. D.Pa. Aug. 14, 1995) (§ 60 does not void Rule 4.2) *and Coleman v. National R.R. Passenger Corp.,* No. CIV.A. 94-4526, 1995 WL 395924 (E.D.Pa. June 28, 1995) (same), *and White v. Illinois Cent. Ry. Co.,* 118 F.R.D. 118 (S.D.Miss.1995) (same), *and Tucker v. Norfolk and W. Ry. Co.,* 849 F.Supp. 1096 (E.D.Va.1994) (same), *and Branham v. Norfolk and W. Ry. Co.,* 151 F.R.D. 67 (S.D.W.Va.1993) (same) *with Blasena v. Consolidated Rail Corp.,* 898 F.Supp. 282 (D.N.J.1995) (§ 60 preempts Rule 4.2),

*and Shaffer v. Union Pac. R.R.,* No. CIV.A. 95-631, 1996 WL 76157 (D.Or. Feb.14, 1996) (same), *and United Transp. Union Local 385 v. Metro-North Commuter R.R.,* No. CIV.A. 94-2979, 1995 WL 634906 (S.D.N.Y. Oct.30, 1995) (same), *and Mayfield v. Soo Line R.R.,* No. CIV.A. 95-2394, 1995 WL 715865 (N.D.Ill.Dec.4, 1995) (same).

Based on the legislative history, § 60 was not intended to preempt Rule 4.2. *See Garrett v. National Rail Passenger Corp.,* No. CIV.A. 94-4526, 1995 WL 395924 (E.D.Pa. June 28, 1995) . First, the objective of the bill was to prohibit "the promulgation or enforcement of rules which penalize railroad employees for giving information concerning accidents to the injured person or his representative." Sen. R. No. 76-661, at 2 (1939). In other words, Congress understood an employee to be voluntarily furnishing information if that employee would be free from penalty or a threat of penalty for cooperating with an investigation. *Cf. Gonzalez v. Southern Pac. Transp. Co.,* 755 F.2d 1129 (5th Cir.), *opinion withdrawn on other grounds,* 773 F.2d 637 (5th Cir.1985) (discharging an employee for furnishing information violated § 60); *Sheet Metal Workers Intern. Ass'n v. Burlington N. Ry. Co.,* 736 F.2d 1250, 1253 (8th Cir.1984) (railroad's articles suggesting arbitration as desirable alternative to suit contained nothing coercive or threatening and, therefore, railroad did not violate § 60); *Hendley v. Central Ga. Ry. Co.,* 609 F.2d 1146, 1150-51 (5th Cir.1980) (conducting a disciplinary investigation solely for the purpose of punishing an employee for furnishing information was sufficiently coercive such that it violated § 60), *cert. denied,* 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981). Rule 4.2, however, does not penalize nor does it threaten to penalize employees for offering information. It merely ensures that interviews between an adverse party and opposing counsel will be conducted according to procedures authorized by law.

\*6 This prohibition on penalizing employees was actually a tool to effect the Act's broader goals. Responding to the railroad's domination of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1998 WL 136523 (E.D.Pa.), 1998 A.M.C. 1781

**(Cite as: 1998 WL 136523 (E.D.Pa.))**

information surrounding personal injury suits, the Senate Report stated:

> When an employee is injured, the claim agent promptly endeavors to procure statements from all witnesses to the infliction of the injury, ..., and obtains all available information considered necessary to protect the railroad company against a possible suit for damages.
>
> On the other hand, the claimant may be seriously handicapped in his attempt to procure the information necessary to the determination of the question of liability. For example, a substantial number of the railroads subject to the Employer's Liability Act have promulgated rules which prohibit employees from giving information concerning an accident to anyone excepting certain specified company officials and claim agents.
>
> *The purpose of the amendment under consideration is to prohibit the enforcement of such rules* and permit those who have information concerning the facts and circumstances ... to give a statement.... In relation to the investigation of facts upon which claims for injuries are based, humanity and justice demand that injured railroad men be accorded as much freedom of action as their employers enjoy.

S.Rep. No. 76-661, at 5 (1939) (emphasis added). In sum, Congress passed § 60 in order to "equalize access to [the] information available to the highly efficient claims departments of the railroads and to the individual FELA claimants." *Cavanaugh v. Western Md. Ry. Co.,* 729 F.2d 289, 293 (4th Cir.1984) (citing S.Rep. No. 76-661, at 5 (1939)).

Rule 4.2 does not undermine this goal. As explained, Rule 4.2 does not prevent plaintiffs from obtaining the desired information, it merely prescribes the proper procedures for accessing it. *See infra* at 8. Thus, any apparent tension between this statute and the rule can be easily resolved without doing violence to the language or spirit of either.

In sum, when applied to the instant situation--that is, when the plaintiff's attorney contacts a represented party after the complaint and answer have been filed--I find that 45 U.S.C § 60 does not

preempt Rule 4.2 of the Pennsylvania Rules of Professional Conduct.

III. Sanctions

One of the inherent powers of any federal court is the discipline of attorneys practicing before it. *See Matter of Abrams,* 521 F.2d 1094, 1099 (3d Cir.), *cert. denied,* 423 U.S. 1038, 96 S.Ct. 574, 46 L.Ed.2d 413 (1975). As part of this power, the court has the ability to prohibit or remedy litigation practices which constitute ethical violations. *See University Patents, Inc. v. Kligman,* 737 F.Supp. 325, 327 (E.D.Pa.1990). While the court's authority in disciplinary matters is quite broad, it is not without limits. *See Matter of Abrams,* 521 F.2d at 1099 (citing *In re Ruffalo,* 390 U.S. 544, 547, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968)). Its proper exercise must strike a balance between several competing considerations. *See Ex parte Burr,* 9 Wheat. 529, 22 U.S. 529, 529-30, 6 L.Ed. 152 (1824). First, the unfettered practice of law is of great importance and it should not be intruded upon lightly. *See id.* On the other hand, it is the judiciary's responsibility to ensure that the integrity of the profession is maintained. *See id.* Finally, the court must balance the plaintiff's right to retain counsel of his or her choice against the opposing party's right to prepare and try a case without prejudice. *See University Patents, Inc. v. Kligman,* 737 F.Supp. 325 (E.D.Pa.1990).

*7 When imposing sanctions for ethical violations in unclear areas of law, the relevant issue to consider is not whether the plaintiff's counsel incorrectly interpreted the law, but whether counsel ignored the unsettled nature of the law. *See University Patents, Inc. v. Kligman,* 737 F.Supp. 325, 329 (E.D.Pa.1990). As shown, given the conglomeration of conflicting cases on this question, *see infra* n. 6, this issue is clearly unsettled. Moreover, the plaintiff's counsel actually represented a party in *Garrett v. National R.R. Passenger Corp.,* 1990 U.S. Dist. LEXIS 10868. In that case, counsel was the recipient of an adverse decision which held that § 60 does not exempt attorneys from Rule 4.2's requirements. *See id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 7

Not Reported in F.Supp., 1998 WL 136523 (E.D.Pa.), 1998 A.M.C. 1781

**(Cite as: 1998 WL 136523 (E.D.Pa.))**

In light of the question surrounding the propriety of this interview, plaintiff's counsel should not have unilaterally contacted Whitmore. *See e.g., id.* at *7. Instead, counsel should have informed opposing counsel of his intent to speak with the captain or sought leave of court to do so. *See University Patents,* 737 F.Supp. at 329; *Cagguila v. Wyeth Labs.,* 127 F.R.D. at 654. In spite of this violation of Rule 4.2, there is not sufficient evidence to conclude that the defendant has been so severely prejudiced that disqualification is warranted. *See University Patents* 737 F.Supp. at 328; *cf. United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir.1980) (disqualification appropriate only when it serves the purposes of the relevant disciplinary rule). Rather, the problem may be cured by precluding the plaintiff from using during the course of the trial any information obtained through counsel's or his representative's *ex parte* contacts with any represented parties, including Whitmore. *See Berryman,* 1995 U.S. Dist. LEXIS 12768, at *8; *Garrett,* 1990 U.S. Dist. LEXIS 10868, at *7. To ensure that these statements will not be put to such use, the court also directs plaintiff's counsel to destroy both Whitmore's original statement and any copies of it that he has knowledge of. Being mindful of the plaintiff's right to prepare and try his case, the court will not preclude the plaintiff from calling Whitmore as a witness or attempting to discover comparable information through the discovery process. *See Garrett,* 1990 U.S. Dist. LEXIS 10868, at * 7. [FN7]

> FN7. Maritrans also requests that this court order plaintiff's counsel to reimburse the defendant for the costs and fees associated with the motion. The defendant does not cite any authority authorizing the court to impose monetary sanctions in this situation. Although 28 U.S.C. § 1927 allows the court to assess legal costs and fees in instances of unreasonable delay, *see Poulis v. State Farm Fire and Casualty Co.,* 747 F.2d 863, 869 (3d Cir.1984), it does not address whether the court may impose these sanctions in the absence of dilatory conduct. In the absence of any argument for the imposition of costs and

fees, this court, at this time, declines to impose them.

As a final note, I caution the parties, who have now had the benefit of my judgment on the law applicable to plaintiff's counsel's conduct, that further violations of Rule 4.2 that occur in cases before this court may incur stronger penalties.

*ORDER*

AND NOW, this 20th day of March, 1998, upon consideration of the defendant's Motion to Disqualify and for Sanctions, the plaintiff's response thereto, the defendant's reply, and the plaintiff's surreply, it is hereby ORDERED that the defendant's motion is GRANTED IN PART and DENIED IN PART, as follows:

*8 (1) The defendant's Motion to Disqualify Marvin I. Barish, Esq., from representing the plaintiff, Richard A. Belote, in this action is denied;

(2) The plaintiff will be precluded from using any information obtained through *ex parte* contacts with Captain Harley Whitmore;

(3) The plaintiff must destroy both Whitmore's original statement and any copies of that statement within ten days of the date of this order;

(4) The plaintiff will not be precluded from calling Captain Harley Whitmore as a witness at trial or from obtaining comparable information through the discovery process;

(5) The defendant's Motion for Sanctions is denied.

Not Reported in F.Supp., 1998 WL 136523 (E.D.Pa.), 1998 A.M.C. 1781

**Motions, Pleadings and Filings (Back to top)**

• 2:97cv03993 (Docket)

(Jun. 12, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                Page 1

Not Reported in F.Supp.2d, 2001 WL 378846 (D.Virgin Islands)

**(Cite as: 2001 WL 378846 (D.Virgin Islands))**

▷

Only the Westlaw citation is currently available.

District Court of the Virgin Islands, Division of St.
Croix.
Will JONES, Plaintiff,
v.
DAILY NEWS PUBLISHING CO. INC.,
Innovative Communication Corp. and Lowe Davis,
Defendants
**No. Civ.1999/138.**

March 16, 2001.

ORDER GRANTING THE DAILY NEWS'
MOTION TO DISQUALIFY PLAINTIFF'S
ATTORNEY

RESNICK, Magistrate J.

**\*1** THIS MATTER came for consideration on
Defendant, Daily News Publishing Co. Inc.'s (Daily
News) Motion to Disqualify Plaintiff's Attorney.
Plaintiff filed opposition to the motion and Daily
News filed a reply to such opposition. Because the
determinative facts are not contested, no hearing is
required.

The Daily News' motion asserts that Plaintiff's
attorney, The Law Offices of Lee J. Rohn,
(hereafter Attorney Rohn), [FN1] has incurred an
impermissible     conflict     of     interest     through
representation of Plaintiff in this matter while also
representing Andy Gross against Daily News
Publishing Company, Inc. in Territorial Court, St.
Croix, Civil No. 376/99. [FN2] In particular Daily
News contends that:

> FN1. It is undisputed that Attorney Rohn is
> the embodiment of the firm for purpose of
> this motion.

> FN2. The Court does not consider Daily
> News' lengthy iteration of Attorney Rohn's
> past other cases except to the extent that
> the cited cases of *Saldana v. Banco
> Popular,*    D.Ct.    Civ.1996/1    and
> *Encarnacion v. Kmart,* D.Ct. Civ.1997/63
> are germane hereto.

1. Andy Gross was terminated from his
employment at the Daily News by letter dated
June 6, 1999 written by Acting City Editor, Will
Jones (Exhibit "C" to Daily News' reply).
2. On June 24, 1999, Attorney Rohn filed a
complaint on behalf of Andy Gross against Daily
News (Terr.Ct.Civ. No. 376/99).
3. Attorney Rohn represented Plaintiff Will Jones
with regard to his claims of discrimination against
Daily News as early as February 26, 1999
(Exhibit "B" to Daily News' reply).
4. On August 18, 1999, Attorney Rohn filed the
Complaint in this matter on behalf of Plaintiff,
Will Jones.
5. Attorney Rohn continues to represent Jones
and Gross.

Daily News maintains that Attorney Rohn's
representation of Jones is in violation of Rules 1.7
and 4.2 of the American Bar Association's Model
Rules of Professional Conduct. [FN3] Daily News
argues that Jones was Gross' superior and had direct
involvement in the decision to terminate Gross and
that by representing Jones before and after
undertaking representation of Gross (concerning
Gross' termination) Attorney Rohn has incurred an
impermissible conflict of interest. [FN4]

> FN3. The ABA Model Rules have been
> adopted by the Virgin Islands. See LRCi
> 83.2(a)(1); *V.I. Bar Association v.
> Boyd-Richards,* 26 V .I. 299 (D.V.I.1991).

> FN4. Daily News cites the December 8,
> 2000 Order of Territorial Court Judge

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 378846 (D.Virgin Islands)

**(Cite as: 2001 WL 378846 (D.Virgin Islands))**

Edgar D. Ross in *Gross v. ICC et al.,* Terr. Ct. Civ. 376/99. Jones states that such Order was rescinded by Judge Ross and Daily News does not contend otherwise in its reply. Per Judge Ross, the December 8, 2000 Order has not been rescinded. That Order granted Plaintiff's Motion to Quash a subpoena duces tecum issued to Attorney Rohn and issued a Protective Order with regard to Attorney Rohn's testimony. The Order noted that,

"Moreover, it appears that Attorney Rohn has created an inherent conflict by choosing to represent Will Jones and Andy Gross in separate actions against Daily News Publishing Co., Inc. Since, Will Jones as a part of management and was directly involved in the termination of Andy Gross, it is apparent that Will Jones may be the principal actor/witness for the corporate defendant. Thus, Andy Gross and Will Jones have adverse interests.

Pursuant to ABA Model Rule 1.7, if a conflict of interest is apparent before the lawyer takes the case, the lawyer should not accept representation. If the conflict becomes apparent after representation has begun, then the lawyer should withdraw representation."

Although not precedential, Judge Ross' reasoning appears valid. Plaintiff does not dispute Daily News' assertion that subsequent to Judge Ross' Order, Attorney Rohn has continued to represent Gross in that matter.

In his opposition to the motion, Jones asserts that he did not consider himself to be Gross' supervisor; that he did not agree with much of the contents of the letter of termination of Gross which was dictated to him; and that Jones voiced such objections. Plaintiff concludes that, "... Jones is simply a fact witness in the Gross matter and is not involved as Gross' supervisor, or the decision-maker with respect to the Gross termination. Gross plays no role whatsoever in Jones' lawsuit.." In support thereof, Jones cites to deposition testimony given by him in the Gross case on December 13, 2000.

Plaintiff does not offer that Attorney Rohn will discontinue representation of Gross.

In its reply, Daily News emphasizes that Jones was employed as Acting City Editor for the Daily News and that while so employed Attorney Rohn had impermissible discussions with him concerning Gross. Daily News also provided the following exhibits:

1. *Exhibit A*
The May 14, 1999 letter assigning Jones to the position of Acting City Editor and defining his duties which included supervision and assignments to all news reporters (such as Gross).
*2 2. *Exhibit B*
Attorney Rohn's letter to Jeffrey Prosser dated February 26, 1999 setting out Rohn's representation of Jones' discrimination claims (and including a copy of Jones' EEOC discrimination complaint and Jones' February 26, 1999 affidavit with regard thereto).
3. *Exhibit C*
_____ Jones' February 26, 1999 letter to Gross terminating Gross' employment with the Daily News.
4. *Exhibit D*
_____ Jones' July 2, 1999 affidavit detailing his involvement in the investigation and termination of Gross.

Upon review of the documents submitted by the parties, it is clear that at material times herein, Jones had at least some supervisory responsibility over Gross; that Jones performed significant functions concerning the investigation of Gross' conduct; that Jones had a material role in the decision making process and ultimate termination of Gross; and that Jones will undoubtedly be an important witness in the Gross case. The fact that Jones' December 13, 2000 deposition testimony diminishes his role with regard to Gross only highlights the Daily News' concern that at the time of such deposition, Jones was represented by Gross' attorney. The Court need not now decide whether Jones was, in fact, a major or lesser factor in the Gross affair as it is only material for purpose hereof that Jones' involvement therein was significant and will be fairly at issue.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 378846 (D.Virgin Islands)

**(Cite as: 2001 WL 378846 (D.Virgin Islands))**

Page 3

*Regarding ABA Model Rule 1.7*

Rule 1.7 provides:
CONFLICT OF INTEREST: GENERAL RULE
a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
(2) each client consents after consultation.
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after consultation.
The Disciplinary Rules of the Model Code of Professional Responsibility requires an attorney to decline proffered employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by the proffered employment or if it would be likely to involve him in representing differing interests. DR5-105(A).

Daily News has asserted a conflict because of Attorney Rohn's representation of its managerial employee (Jones) prior to and during her representation of Gross in a matter which Jones had significant factual involvement. Traditionally, Jones may have the sole right to consent to his attorney representing another party, however, Daily News as Jones' employer (and later former employer) has a valid pecuniary interest in a suit in which Jones is an embodiment of its corporate presence. This is not unlike a situation where an attorney sues a current client on behalf of another party arising from an automobile accident. The current client, (fully insured) may not object to being sued, however, the actual pecuniary interest in such litigation belongs to the insurer. Although Jones is not a named Defendant in Gross' suit, the principle that the right to object should belong to the one at risk (Daily News) is analogous. [FN5]

FN5. It was so ruled with equivalent language in the order granting motion to disqualify dated May 31, 1996 in *Eulalie Saldana v. Banco Popular de Puerto Rico,* STX. Civ.1996/1.
In *Saldana,* the court found that it presented a conflict of interest for Saldana's attorney to represent her in a suit against Banco Popular while also representing Ms. Dariel Ruiz, an officer of Banco Popular in an unrelated case, because Ms. Ruiz played a significant role and was a likely witness in the *Saldana* matter.

*3 Daily News is entitled to the testimony of its former manager, Jones, (with regard to the Gross litigation) unencumbered by the untrammeled access of Gross' attorney to such witness. Attorney Rohn has continued as counsel for Gross subsequent to notice of such conflict (*i.e.* Judge Ross' December 8, 2000 Order) On the particular facts herein, there is sufficient conflict of interest to warrant disqualification for such reason.

*Regarding ABA Model Rule 4.2*

_____ Rule 4.2 provides:

_____ COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL
In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.
Comment (4) to Model Rule 4.2 provides:
[4] In the case of an organization, this Rule prohibits communications by a lawyer for another person or entity concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2001 WL 378846 (D.Virgin Islands)

(Cite as: 2001 WL 378846 (D.Virgin Islands))

In this matter, Attorney Rohn commenced representation of Jones prior to her representation of Gross. Attorney Rohn represented Jones when Gross was fired on June 6, 1999 and when she filed suit on behalf of Gross in the Territorial Court on June 24, 1999. Attorney Rohn has had open access to discuss with Jones the substance of the Gross case and Plaintiff has not denied Daily News' assertion that such contact took place. [FN6] In any event, Attorney Rohn was counsel of record for Jones when he was deposed in the Gross case on December 13, 2000.

> FN6. As noted by Daily News, it attempted to depose Attorney Rohn regarding her conversations with Jones about Gross but was ordered not to do so (see Judge Ross Order dated December 8, 2000, Exhibit "A" to Daily News' motion). Daily News' requests that the Court infer that such conversations in fact occurred. (Daily News Motion to Disqualify at ftn.12, p. 17).

By unpublished Order dated November 14, 2000 in *Idealfonso "Pancho" Encarnacion v. Kmart Corp.,* STX Civ.1997/63, Chief Judge Finch ordered disqualification of Plaintiff's attorney for having communication with Kmart's employee concerning the matters at issue (citing *Inorganic Coating, Inc. v. Falberg,* 926 F.Supp. 517, 520 (E.D.Pa.1995), "... disqualification is required where the substance of the *ex parte* discussion went to the nub of the lawsuit ..." and *Faison v. Thornton,* 863 F.Supp. 1204, 1217 (D.Nev.1993).

At the time of Jones' deposition in Gross' case, Jones was no longer employed by Daily News. The Standing Committee on the Rules of Professional Responsibility had taken the position that Rule 4.2 does not apply to former employees. A majority of the courts adhered to this view. However, the committee conceded that "the concerns reflected in the Comment to Rule 4.2 may survive the termination of the employment relationship" and that "persuasive policy arguments can be and have been made for extending the ambit of [the Rule] to cover some former corporate employees."

*4 The Comment to the rule defines a "corporate party" as:

> (1) persons having a managerial responsibility on behalf of the organization;
> (2) any other person whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability or;
> (3) any person whose statement may constitute an admission on the party of the organization.

In *Curley v. Cumberland Farms,* 134 F.R.D. 77, 82 (D.N.J.1991), the court reasoned that imputation should be examined on a case by case basis and cautioned against claims of imputation which were hypothetical and remote.

Subsequently, the American Bar Association's committee on Ethics and Professional Responsibility issued a formal opinion that ostensibly clarified that Rule 4.2 does not apply to former employees. A.B.A. Formal Op. 91-359 (1991). Notwithstanding such opinion a number of courts in our circuit have continued to recognize the viability of inquiry into the particular status of such former employees as relevant.

In *Goff v. Wheaton Industries,* 145 F.R.D. 351, 356 (D.N.J.1992), the court cited *Curley v. Cumberland Farms'* holding that the corporation could present facts indicating that if a former employee,

> ... (1) had managerial responsibilities; (2) could impute liability on the corporation; or (3) could make statements which could constitute an admission on the party of the organization then Rule 4.2 would afford party-like status to the former employee and forbid *ex parte* communication ...,

noting that that decision "offers guidance in directing an analysis of Rule 4.2's application ..." [emphasis added].

Recognizing that there are inconsistent decisions in this area, D .J. Kelly stated,

> If there is a real or perceived risk of disclosure of confidential information protected by the privilege which is or may be damaging to the party in interest due process considerations may prohibit *ex parte* contact by adverse counsel with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2001 WL 378846 (D.Virgin Islands)

**(Cite as: 2001 WL 378846 (D.Virgin Islands))**

a current or former employee. *Stabilus v. Haynsworth,* 1992 WL 68563 (E.D.Pa.) . See also, *Dillon Companies, Inc. v. Sico Co.,* 1993 WL 492746 (E.D.Pa.); *Marinnie v. Nabisco Brands, Inc.,* 1993 WL 267453 (E.D.Pa.); *Police Officer Joy Carter-Herman et al. v. City of Philadelphia et al.,* 897 F.Supp. 899, 902 (E.D.Pa.1995); *In Re: The Prudential Ins. Co. of America Sales Practice Litigation,* 911 F.Supp. 148, 153 (D.N.J.1995); *Michaels v. Woodland,* 988 F.Supp. 468 (D.N.J.1997).

It is readily apparent from a review of Jones December 13, 2000 deposition (Exhibit "1" to Plaintiff's opposition) that the emphasis of Jones' testimony is divergent from that suggested by Daily News' reply Exhibits "A", "C", and "D," with regard to Jones' authority over Gross; Jones' participation in the investigation, decision making process and ultimate firing of Gross; and the underlying facts of the Gross affair. Jones also participated in confidential communications concerning Gross with Daily News' attorney and Executive Editor Lowe Davis (Exhibit "D" to Daily News' reply). Attorney Rohn has continued to represent Gross in the Territorial Court case.

**\*5** Although the extent of Jones' managerial responsibilities is fairly at issue, it is beyond dispute that Jones' testimony concerning Gross goes to the heart of Gross' suit and that the continued representation of Jones by Gross' attorney is violative of Model Rule 4.2.

Accordingly, for reasons above stated, it is hereby;

ORDERED as follows:
1. Daily News' motion is GRANTED and the Law Offices of Lee J. Rohn is disqualified as Plaintiff's counsel.
2. This Order and all further action in this matter are STAYED pending any appeal to the District Judge.
3. Further to ruling on such appeal, if then appropriate, the Court will provide for appearance of new counsel and revised scheduling.

Not Reported in F.Supp.2d, 2001 WL 378846 (D.Virgin Islands)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                          Page 1

Not Reported in F.Supp.2d, 2002 WL 242464 (D.Del.), 27 Employee Benefits Cas. 2295

**(Cite as: 2002 WL 242464 (D.Del.))**

United States District Court, D. Delaware.
END OF ROAD TRUST., et al., Plaintiffs,
v.
TEREX CORPORATION, Randolph W. Lenz and
Marvin Rosenberg, Defendants.
**No. 99-477 (GMS).**

Feb. 20, 2002.

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

*1 On September 22, 1999, plaintiff End of the Road Trust ("ETR") filed its complaint in this court. Discovery began in November 2000, but was stayed for 90 days after defendants were required to obtain new counsel due to a conflict. The defendants are now represented by Weil, Gotshal, and Manges. The plaintiffs are represented by Greenberg Traurig. The case is set for trial before this court on June 3, 2002.

Presently before the court is defendant Randolph Lenz's Motion to Disqualify Greenberg and Traurig. Lenz argues that Greenberg Traurig violated Rule 1.7(a) of the Model Rules of Professional Conduct by simultaneously representing Lenz in a Florida proceeding while representing ETR in this action. In its reply, ETR argues that the simultaneous representation was the result of an oversight as a result of the merging of Greenberg Traurig with the firm that initially represented Lenz. ETR further states that the Florida matter is ended and that the attorney who represented Lenz has been screened from this representation. Finally, ETR argues that Lenz will suffer no prejudice as a result of Greenberg Traurig's continued representation, but that ETR may suffer prejudice if forced to find new counsel due to the complexity and age of the case. The court agrees with ETR and will, therefore, deny

Lenz's motion for disqualification.

II. FACTS

ETR filed this complaint on behalf of Fruehauf Trailer Corporation, a bankrupt debtor. Defendant Lenz served as chair of Fruehauf's board of directors during the relevant period. ETF alleges that Lenz operated Fruehauf for his own interests and is asserting several causes of action against him. Most important for the present motion, ETR alleges that Lenz breached his fiduciary duties under the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2).

When this action commenced, ETR was represented by Camhy, Karlinsky & Stein ("Camhy"). By July 2000, Greenberg Traurig and Camhy had entered into negotiations to discuss the possibility of merger. The firms agreed to merge on August 21, 2000. Camhy began winding up its affairs and both firms began a computerized conflicts check to determine any potential conflicts of interest between Greenberg Traurig and Camhy clients.

On July 12, 2000, prior to the Greenberg Traurig/Camhy merger, Lenz was sued by Equity Merchant Banking Corporation and the Connecticut Bank of Commerce in Florida state court ("the Florida action"). Lenz hired the Miami office of Greenberg Traurig to represent him. On August 15, 2000, the Greenberg Traurig attorneys filed motions to dismiss the Florida action. Greenberg Traurig's Miami office continued to represent Lenz until he terminated the representation on October 12, 2000. Lenz was never aware--and Greenberg Traurig never notified him--that there was a potential conflict of interest in his continued representation.

Lenz allegedly learned of the conflict when his former counsel--Skadden, Arps, Slate, Meagher & Flom--notified him on March 14, 2001. Lenz's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 242464 (D.Del.), 27 Employee Benefits Cas. 2295

**(Cite as: 2002 WL 242464 (D.Del.))**

Page 2

personal attorney, Thomas Gallagher, wrote Greenberg Traurig on that same day regarding the conflict. Greenberg Traurig responded that there had been no simultaneous representation, and that it did not seek a waiver from Lenz because he had terminated the representation. Greenberg Traurig asserts that the conflict was inadvertently overlooked in the conflicts check process.

### III. DISCUSSION

A. The Ethical Standard & The Court's Disciplinary Power

*2 An attorney's conduct is measured by the ethical standards of the court before which the attorney appears. *See In re Corn Derivatives Antitrust Litig.,* 748 F.2d 157, 160 (3d Cir.1984). Pursuant to Local Rule 83.6(d)(2), the District of Delaware has adopted the Model Rules of Professional Conduct. Model Rule 1.7(a) provides that an attorney may not represent two clients when representation of one would be "directly adverse" to or would "materially limit" representation of the other, unless the attorney "reasonably believes" that the representation of the other would not be "adversely affected" and both clients consent to the representation. *See Elonex I.P. Holdings v. Apple Computer,* 142 F.Supp.2d 579, 582 (D. Del 2001) (citing *Lease v. Rubacky,* 987 F.Supp. 406, 407 (E.D.Pa.1997)).

The court has the power to supervise the professional conduct of attorneys appearing before it. *See United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir.1980). This includes the power to disqualify an attorney. *Id.* Nevertheless, motions to disqualify are generally disfavored. *See Cohen v. Oasin,* 844 F.Supp.1965, 1067 (E.D.Pa.1994). The party seeking disqualification must clearly demonstrate that "continued representation would be impermissible." *Id.* Thus, "[v]ague and unsupported allegations are not sufficient to meet this standard." *Id.*

Greenberg Traurig does not argue that its conduct was appropriate under Rule 1.7(a). Rather, the firm argues that "[d]isqualification is not an appropriate

sanction for what, at most, was a brief, harmless, and unintended oversight of the rules of professional responsibility." (D.I. 91 at 2.) Thus, the court's inquiry is limited to whether disqualification is appropriate in this case.

B. Greenberg Traurig Should not be Disqualified

Although Greenberg Traurig admits that it violated Rule 1.7(a), this alone will not warrant disqualification. Contrary to Lenz's arguments, disqualification is not automatic. *See Elonex,* 142 F.Supp.2d at 583 ("Although disqualification is ordinarily the result of a finding that an ethical rule has been violated, disqualification is never automatic.") (quoting Miller, 624 F.2d at 1201.) Indeed, the court has "wide discretion in framing its sanctions to be just and fair to all parties involved." *Id.*

In *In re Corn Derivatives Antitrust Litigation,* the Third Circuit indicated that it had "often employed a balancing test in determining the appropriateness of disqualification of an attorney." *Corn Derivatives,* 748 F.2d at 162. In the Miller case, the Third Circuit noted that:
> [T]he court should disqualify an attorney only when it determines, on the facts of a particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. It should consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain counsel of his choice and enabling attorneys to practice without excessive restrictions.

*3 Miller, 624 F.2d at 1201.

Rule 1.7(a) was enacted to prevent divided loyalties and to protect against the disclosure of client confidences. *See IBM v. Levin,* 579 F.2d 271, 280 (3d Cir.1978). Neither policy is implicated here. Lenz alleges that Greenberg Traurig's loyalty was divided during the simultaneous representation. Although this is arguably true, Greenberg Traurig has not represented Lenz since October 2000. If Greenberg Traurig currently represented both clients, its loyalty might be more questionable. Since Lenz is no longer represented by Greenberg

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2002 WL 242464 (D.Del.), 27 Employee Benefits Cas. 2295

**(Cite as: 2002 WL 242464 (D.Del.))**

Traurig, however, the danger of divided loyalty is not as great, if it is present at all.

Lenz also argues that there is a danger that confidential information will be exchanged between the attorneys that represented him in the Florida action and ETR's attorneys. His concern arises from his assertion that the Florida action is connected to the ERISA claims in this case. Nevertheless, the court finds that the potential for breached confidences is minimal. First, the attorneys that represented Lenz worked in Greenberg Traurig's Miami office, whereas ETR is represented by attorneys in the New York office. The geographic separation militates against a finding that confidential information will be shared. *See Elonex,* 142 F.Supp.2d at 584 (noting that work was "done out of different offices in different cities"). Second, although Lenz argues that the ethical screen employed by Greenberg Traurig will be ineffective, a party seeking disqualification cannot rest on "[v]ague and unsupported allegations." *Id.* In this case, Lenz has not alleged sufficient facts that would permit the court to find that there is a specific or immediate danger that confidential information will be released, or that it has been released in the past. In the absence of such allegations, the court gives Lenz's arguments little weight.

The court further finds that strong countervailing policies weigh against disqualification. First, although Greenberg Traurig arguably did violate Rule 1.7(a), the violation was of an extremely short duration, and was, apparently, inadvertent. Moreover, Lenz has not put forward a single fact or argument that would permit the court to find that he would be prejudiced by Greenberg Traurig's continued representation of ETR. Conversely, great prejudice will result to ETR if Lenz's motion is granted. This is a complex case. It is over two years old, and Greenberg Traurig has invested a substantial amount of time and effort. Moreover, the trial date is imminent. At this point, disqualifying Greenberg Traurig would further delay this case because new counsel will incur great difficulty in reviewing the case, completing discovery, writing any dispositive motions, and preparing for trial by

June 3, 2002. This difficulty implicates the interests of both fairness and judicial economy. On balance, therefore, even if the policy concerns raised by Rule 1.7(a) were implicated, the countervailing policy arguments weigh heavily against disqualification.

IV. CONCLUSION

**\*4** For the foregoing reasons, the court concludes that disqualification is inappropriate and unnecessary. The court will, therefore, deny Lenz's Motion to Disqualify Greenberg Traurig.

NOW, THEREFORE, IT IS HEREBY ORDERED that:
   1. Defendant Lenz's Motion to Disqualify Greenberg Traurig (D.I.81) is DENIED.

Not Reported in F.Supp.2d, 2002 WL 242464 (D.Del.), 27 Employee Benefits Cas. 2295

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-39



Not Reported in F.Supp.2d                                                                                 Page 1

Not Reported in F.Supp.2d, 2003 WL 22225579 (S.D.Miss.)

**(Cite as: 2003 WL 22225579 (S.D.Miss.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Mississippi, Southern Division.
Thelma DAURO Plaintiff
v.
ALLSTATE INSURANCE COMPANY Defendant
**No. Civ.A. 1:00CV138RO.**

Sept. 17, 2003.
Mariano J. Barvie and Alben N. Hopkins, Hopkins,
Barvie & Hopkins, PLLC, Gulfport, MS, for
Plaintiff.

Ronald D. Getchey, Peter H. Klee, Luce, Forward,
Hamilton & Scripps, LLP, San Diego, CA, Jimmie
B. Reynolds, Jr., Michael Verdier Cory, Jr.,
Reynolds, Cory & Rikard, LLP, Jackson, MS, for
Defendant.

*MEMORANDUM OPINION*

ROPER, Magistrate J.

**\*1** This cause comes before the Court on the
motion of the Defendant, Allstate Insurance
Company ("Allstate") for summary judgment or in
the alternative for partial summary judgment on the
issue of punitive damages [239- 1, 239-2], pursuant
to Rule 56 of the Federal Rules of Civil Procedure,
on       the     Plaintiff,    Thelma     Dauro's
("Dauro")allegations concerning Allstate's alleged
bad faith failure to pay for insurance coverage
which Dauro alleges she was owed as the result of a
car accident and on motion of the Allstate to
Disqualify Plaintiff's Counsel[246-1] due to their
decision to represent former employees of Allstate
who are key witnesses whose credibility is

paramount issue in this case and who possess
confidential information. After due consideration of
the evidence of record, the briefs of counsel, the
applicable law and being otherwise fully advised in
the premises, the Court finds as follows.

*Standard of Review*
A grant of summary judgment is appropriate when,
viewed in the light most favorable to the nonmoving
party "the pleadings, depositions, answers to
interrogatories and admissions on file, together with
the affidavits, if any, show that there is no genuine
issue as to any material fact." Fed.R.Civ.P. 56(c).
The moving party initially carries the burden of
demonstrating the absence of a genuine issue of
material fact. *Celotex Corp. v. Catrett,* 477 U.S.
317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
Materiality connotes disputes over facts that might
affect the outcome of the case under the governing
law. *Anderson v.. Liberty Lobby, Inc.,* 477 U.S.
242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
Further, "summary judgment will not lie if the
dispute about a material fact is 'genuine,' that is, if
the evidence is such that a reasonable jury could
return a verdict for the nonmoving party." *Id.* at 248.

The moving party bears the initial burden of
establishing the absence of evidence to support the
nonmovant's cause of action. *Celotex,* 477 U.S. at
325; *Hirras v. National R.R. Passenger Corp.,* 95
F.3d 396, 399 (5th Cir.1996). Should this burden be
met by the moving party, the nonmoving party then
must establish sufficient facts beyond the pleadings
to show that summary judgment is inappropriate.
*Exxon Corp. v. Burglin,* 4 F.3d 1294, 1297 (5th
Cir.1993). The Court examines applicable
substantive law to determine which facts and issues
are material. *King v. Chide,* 974 F.2d 653, 655-56
(5th Cir.1992). The nonmoving party must oppose
the summary judgment motion either by referring to
evidentiary material already in the record or by
submitting additional evidentiary documents which
set out specific facts indicating the existence of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 2

Not Reported in F.Supp.2d, 2003 WL 22225579 (S.D.Miss.)

**(Cite as: 2003 WL 22225579 (S.D.Miss.))**

genuine issue for trial. Fed.R.Civ.P. 56(e). If the opponent fails in his duty, after the Court has viewed the evidence in the light most favorable to the non movant, summary judgment is implicated. *Id.; Exxon,* 4 F.3d at 1297. Assertions unsupported by facts are insufficient to oppose a summary judgment motion, *Williams v. Weber Management Services,* 839 F.2d 1039 (5th Cir.1987).

*Statement of Facts*

**\*2** This suit arises from an uninsured motorist (UM) claim that plaintiff, Thelma Dauro made to Allstate Insurance Company (Allstate). On August 2, 1999, Dauro's car was rear ended by Heath Cuevas, an uninsured motorist. Dauro testified that she was driving between 0-5 miles per hour while Cuevas was traveling approximately 5 miles per hour. Dauro and her mother, her passenger, were wearing their seat belts. No ambulance or paramedics were called to the scene. (Allstate's Mot. for Summ. Jgmt, Exhibits A, B). At the time of the accident, Dauro was insured under two Allstate auto policies which provided bodily injury coverage with a total limit of $20,000.00 per person and $1,000.00 in medical payment coverage. Dauro contacted Allstate and notified them that she had been in an accident with an uninsured motorist. The impact in question caused $1,380.00 of property damage to the plaintiff's vehicle as charged by Harry Dauro of Dauro's Auto Repair. (Dauro Response to Allstate's Mot. for Summ. Jgmt, Exhibit G)

On August 3,1999, an Allstate adjuster, John McCoy, spoke with Dauro about the accident. McCoy performed a statement of the insured by phone inquiring about the facts surrounding the accident. (Dauro's response to Allstate's Mot. for Summ. Jgmt, Exhibit D)McCoy claims that Dauro told him that she had visited Memorial Hospital's emergency room for x-rays and tests but she didn't anticipate any further medical treatment. Dauro contends that she told him of her head and neck injuries at the time. Upon receiving this information an Allstate adjuster anticipated that Dauro's emergency room bills would not exceed $1,000.00. Therefore, he advised Dauro that the bills would be handled under her medical payment coverage. He

also advised Dauro that Allstate would pay her $500.00 to settle the claim. Dauro testified that the Allstate's adjuster told her that the five hundred payment was for inconvenience Dauro claims that she specifically requested that Allstate allow her a couple of days to evaluate the extent of her injuries for settlement purposes.

On August 4, 1999, two days after the accident, a check was issued to Dauro to settle the claim for $500.00 which was issued under her UM coverage on August 5,1999. (Allstate's Mot. for Summ. Jgmt, Exhibit C).. Allstate alleges that because the claim appeared to be resolved it closed the file. The Allstate settlement check received by Dauro had the printed language stating "For the final statement of any and all claims for bodily injuryUninsured motorists coverage."

In October of 1999, Dauro's son called Allstate to notify it that Dauro was still being treated for the accident. Her son recounted her treatment with a chiropractor and the fact that she also wanted to visit an orthopedic surgeon. Allstate contends that after this call, it immediately reopened Dauro's UM claim to investigate the new treatment and determine whether additional benefits were owed. On October 29, 1999, Dauro informed Allstate concerning her referral to a neurosurgeon. Allstate also received a bill for $595.00 for a TENS unit purchased by Dauro but claims it never received a medical report explaining the necessity for its purchase. Allstate submits that ten days later it received a Memorial Hospital bill from Dauro showing a $617.00 balance. Allstate contends that no bills or records were ever sent by Dauro from her chiropractor or neurosurgeon.

**\*3** On November 9,1999, Dauro's attorney, Al Hopkins sent Allstate a letter concerning his representation ofDauro in this matter. (Allstate's Mot. for Summ. Jgmt, Exhibit D) On November 22,1999, Allstate alleges that its employee, Carol Stegall requested that Hopkins obtain Dauro's authorization for medical records to evaluate the claim(Def. Mot. for Summ .Jdgt Exhibit E). Allegedly, Hopkins' assistant refused to provide the authorization and Stegall sent Hopkins a letter

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3

Not Reported in F.Supp.2d, 2003 WL 22225579 (S.D.Miss.)

**(Cite as: 2003 WL 22225579 (S.D.Miss.))**

requesting that he provide medical records relating to Dauro's claim. (Allstate's Mot. for Summ. Jgmt, Exhibit E) Plaintiff contends that Allstate had been aware of Dauro's subsequent medical treatment as Allstate received Plaintiff's medical authorization on August 17,1999.( Dauro's Response to Allstate's Mot. for Summ. Jgmt, Exhibit J)Allstate asserts that it is their policy to obtain a new release after an individual retains an attorney.

In January of 2000, Hopkins sent Allstate some chiropractic records as well as a bill for $1050.00 from Davis Chiropractic Clinic. (Allstate's Mot. for Summ. Jgmt, Exhibits F and G) Allstate contends that the chiropractor diagnosed Dauro with soft tissue injuries and that these bills sent were not complete. Specifically, Allstate contends that they never received the records for medical treatment from the Memorial Hospital emergency room visit or the chart notes for some of Dauro's chiropractic visits of October 14,1999 and December 14,1999. Allstate contends that on January 17,2000, its representative informed Hopkins of the need for those records to properly evaluate the claim. Allstate alleges that the records were never sent and instead, this suit was filed on January 20,2000. Plaintiff asserts that Allstate had the medical authorization the entire disputed time and thus, had the right to obtain plaintiff's medical records.

On March 10,2000, Allstate's attorney sent Hopkins a letter asking formally for the Memorial Hospital records and chiropractic treatment notes ( Allstate's Mot. for Summ. Jgmt, Exhibit I). Allstate contends it was faxed the Memorial Hospital records in June of 2000. Allstate asserts based on the medical records it was provided, it evaluated Dauro's claim at $8,335.00 in medical special damages. On June 14,2000, Allstate's counsel sent Hopkins a letter offering $12,000 to settle the UM claim above and beyond the $500 payment and the $1,000 already paid under Dauro's medical payment. (Allstate's Mot. for Summ. Jgmt, Exhibit J)

On July 3, 2000, Hopkins sent Allstate's counsel a letter rejecting the settlement offer. Hopkins advised Allstate that settlement negotiations were premature as Dauro had not completed her medical treatment (Allstate's Mot. for Summ. Jgmt, Exhibit K). On August 2,2000, Dr. Danielson performed back surgery on the Plaintiff for a herniated disc which Plaintiff claims was revealed by the cervical and lumbar MRIs performed in October of 1999.

On September 7,2000, Hopkins sent Allstate medical records and bills for back surgery and treatment provided by Dr. Harry Danielson in July and August of 2000. (Allstate's Mot. for Summ. Jgmt, Exhibit L). Allstate claims that these new records were its first indication that Dauro had a herniated disc or had undergone surgery. Allstate reevaluated the claim and decided to pay the UM policy limits. In October of 2000, Allstate's attorney sent Hopkins a letter advising that Allstate would unconditionally tender the remaining limits.

\*4 Dauro's policy listed two vehicles on the declarations page. Therefore, by "stacking" the two vehicles, the policy provided Dauro a maximum of $20,000 in UM coverage of which Allstate had already tendered $500. When Allstate issued the settlement check, however, it advertently "stacked" a nonmotorized trailer that was also listed on Dauro's policy declarations, even though there was no UM coverage on the trailer. Thus, Allstate paid Dauro $29,500 rather then $19,500 actually remaining under the policy limits. Allstate contends that it did not require Dauro to repay the $10,000 windfall.

### PROCEDURAL HISTORY
The original complaint in this matter was filed by the plaintiff in the Circuit Court of Harrison County, Mississippi on January 20,2000, alleging that Allstate was guilty of bad faith in handling of Plaintiff's uninsured motorist claim. During the course of discovery numerous Allstate employees were identified as having some involvement in the uninsured motorists claim at issue. Some of the key witnesses were John McCoy, Senior Claim Service Adjuster, Martha Cheatham, Senior Claims Service Adjuster and Carol Stegall, Senior Claim Processing Specialist. Plaintiff's Amended Complaint filed on May 26,2000, specifically identifies intentional misconduct conduct performed by these individuals. On October 20,2000, John

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22225579 (S.D.Miss.)

**(Cite as: 2003 WL 22225579 (S.D.Miss.))**

McCoy and Martha Cheatum were deposed by plaintiff's counsel. Carol Stegall's deposition was to take place on that date but was postponed. Prior to their deposition, it is undisputed that Allstate's counsel met with these employees to prepare these witnesses and in doing so revealed confidential information and privileged communications regarding Allstate's defenses and litigation strategy.

On December 11,2000, plaintiff's counsel filed a motion entitled "Motion to Dismiss without Prejudice or In the Alternative leave of Court to Amend Complaint and Remand". In this motion, plaintiff's counsel requested that Martha Cheatum and John McCoy be added as individual defendants because they participated in commission of negligent and/or fraudulent and/or intentional conduct which caused damage to the plaintiff as well as numerous specific allegations against these individuals. The Court denied plaintiff's motion on January 8,2001.

On June 4,2001, Allstate fired McCoy, Cheatum and Stegall. On December 18,2002, plaintiff's counsel filed a lawsuit on their behalf against Allstate. At some point, Allstate became concerned about the apparent conflict and asked whether plaintiff's counsel intended to call these former employees as witnesses. In March of 2003, plaintiff's counsel informed Allstate that plaintiff intended to call McCoy, Stegall, Cheatum and Mike Anthony as witnesses at trial. Anthony handled various types of claims for Allstate including uninsured motorist claims were bad faith was alleged. Anthony has met with various Allstate counsel concerning pending litigation and has had privileged communications concerning issues and litigation strategy in cases similar to the pending matter. On April 10,2003, Allstate wrote plaintiff's counsel to see if there could be any resolution of the disqualification matter. It appears there is no resolution of the disqualification matter by compromise.

### CONCLUSIONS OF LAW

*5 Plaintiff has filed suit in this matter alleging negligence; intentional or negligent infliction of mental and emotional distress; misrepresentation; concealment; oppression; outrage and fraud. Defendant has filed a Motion for Summary Judgement contending that there was no genuine issue of material fact with regard to these issues which a reasonable jury could return a verdict in favor of Dauro. Plaintiff has not opposed Allstate's motion with regard to these issues, thus the Court finds that Allstate's motion should be granted with respect to these issues.

However, plaintiff alleges that the defendant breached its implied covenant of good faith and fair dealing to their insured, Thelma Dauro. To establish bad faith, defendant alleges that Dauro must show that Allstate withheld policy claims benefits without "arguable reason". *Murphee v. Federal Insurance Company,* 707 So.2d 523 (Miss.1997)" In Mississippi, punitive damages should not be awarded unless it is determined that the insurer lacked an arguable or legitimate basis for denying the claim and the insurer committed a wilful or malicious wrong, or acted with gross negligence and reckless disregard for the insured's rights. *Sobley v. Southern Natural Gas Company, et al,* 302 F.3d 325 (5th Cir.2002) citing *Sobley v. Southern Natural Gas Co.* 210 F.3d 561, 563 (5th Cir.2000). In *Andrew Jackson Life Ins. Co. v. Williams,* 566 So.2d 1172, 1187 (Miss.1990); *Dunn v. State Farm Fire and Casualty Company,* 927 F.2d 869 (5th Cir.1991) The arguable reason standard is nothing more than an expression indicating that the act or acts of the insurer do not rise to the heightened level of an independent tort. ." *Caldwell v. Alfa Insurance Company,* 686 So.2d 1092 (S.D.Miss.1996) The Mississippi Supreme Court has explained that:

Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and allowed with caution and within narrow limits. Any plaintiff asking for punitive damages based on bad faith for an insurance company has a heavy burden. Under Mississippi law, a claim for punitive damages will not go to the jury unless (1) there is a finding the insurance company had no legitimate or arguable reason to deny the payment of the claim and (2) the plaintiff has made a showingof malice, gross negligence or wanton disregard of the rights of the insured.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 5

Not Reported in F.Supp.2d, 2003 WL 22225579 (S.D.Miss.)

**(Cite as: 2003 WL 22225579 (S.D.Miss.))**

An "arguable reason" is defined by the Mississippi Supreme Court as one in which there is some credible evidence that supports the conclusion on the basis of which the insurer acts. *Blue Cross & Blue Shield, Inc. v. Campbell,* 466 So.2d 833,851 (Miss.1984) Mississippi courts utilize the "directed verdict" test in making this determination. Under this test, unless the insured would be entitled to a directed verdict on the underlying insurance claim, an arguable reason exists to deny an insurance claim in most instances. *Id.*

Plaintiff contends that Allstate failed to adequately investigate her claim and denied coverage without an arguable basis. (Pla. Brief Resp to Mot. for Summ Judgmt, p17) Allstate intially tendered $500.00 in payment to settle this claim in addition to paying $1,000 .00 for the medical expenses incurred. However, plaintiff asserts two apparent causes of action in which Allstate withheld policy benefits. First, plaintiff contends Allstate used deceptive claims practices in order to leverage themselves against their insureds to obtain undervalued settlements. Further, Allstate awarded adjusters for obtaining devalued settlements. Plaintiff asserts that these settlement value were created by a computer program called Colossus which established baseline values for settlements. Second, plaintiff claims that Allstate had no arguable reason to withhold payment until October of 2000 as it had a continuing duty to investigate Dauro's medical care.

*6 As to the first allegation, plaintiff has presented no proof that Allstate utilized the Colossus program in Dauro's case and even if the program was used, plaintiff has presented no evidence to indicate a quick settlement of her seemingly less then severe medical condition was unreasonable. However, the Court finds that when the defendant attempted to settle with her initially, it did not appear that her injury was severe. In fact, the Court notes that plaintiff's mother, obviously older then Dauro, was sitting in the same car at that time with similar injuries. Dauro's mother settled the claim at approximately the same time as her daughter and did not later sue for deceptive practices. (Def's. Mot for Summ. Jdgt, Exhibit "C") Moreover, plaintiff

was not forced to cash her check, could have waited and never cashed the check or initiated any settlement process. Finally, it is clear that the plaintiff did not believe that she had completely settled her case or was precluded from further payment from this policy because her son called Allstate in October, after cashing the check, and informed them that his mother was still suffering from injuries caused by the accident. It is unrefuted, the defendant immediately reopened the plaintiff's file and requested medical records to support the continued claim after the Dauro's son's phone call. Plaintiff claims the initial sending of the check demonstrated that the Claims Core Process Resign (CCPR) or Colossus, a process which appears to establish guidelines for settlement of claims, was used to "withhold policy benefits without an arguable reason". Even if plaintiff had presented some reliable proof which supported these allegations, the Court fails to see how policy benefits were denied without an arguable reason. Plaintiff was offered a full settlement of her initial injuries. Plaintiff was not forced to take the check and clearly did not believe that the action of cashing the check terminated her right to make a later claim against Allstate which she did through her son's phone call without the advice of counsel. This conduct does not equate to bad faith on the part of the defendant.

Plaintiff has not presented any evidence to explain or otherwise demonstrate a nexus between CCPR and her own insurance claim. If plaintiff wishes predicate a bad faith claim on a general process of adjusting insurance claims, she must-- at a minimum--show how that process affected her claim *Worsham v. Provident Cos. Ins.* 249 F.Supp.2d 1325(N.D.Ga.2002); *Cardiner v. Provident Life* 158 F.Supp.2d 1088, 1105-06(C.D.Cal.2001) Plaintiff alludes to the fact that initially Allstate sent her a check even though she asked the adjuster to wait. Plaintiff did not have to cash the check but she did. Plaintiff also points to the late payment of medicals. However, as early as July of 2000, Allstate expressed a desire to settle the case, approximately one month after they received her full medicals, only to be instructed by her attorney that settlement was premature. Neither of these

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 6

Not Reported in F.Supp.2d, 2003 WL 22225579 (S.D.Miss.)

**(Cite as: 2003 WL 22225579 (S.D.Miss.))**

instances demonstrate that either Colossus or CCPR were used, or more importantly were used to deprive plaintiff of benefits.

*7 As to plaintiff's second allegation, that Allstate had a continuing duty to monitor plaintiff's medical condition and committed bad faith as it had no arguable reason to wait until October of 2000 to tender a check over the policy limits, the Court finds that Allstate had an arguable reason not to tender policy limits until one month after receiving plaintiff's complete medical records. First, plaintiff's counsel rejected Allstate's offer on July 3, 2000, stating in writing that any settlement of the claim was premature. Plaintiff had surgery in August of 2000 and Allstate did not receive complete medical records until September 7,2000 (Def. Mot for Summ Jgt, Exhibit L) There is no question that Allstate promptly issued a check for more then the insured amount within one month from the date all medical records were received. Plaintiff relies on the fact that Allstate could have obtained her medical records because Dauro executed a medical waiver prior to retaining counsel. However, Allstate has stated that it is their policy to have a new waiver executed when a insured has retained counsel and in compliance with that policy, Allstate repeatedly requested the medical records and execution of a new medical waiver. The policy is understandable because of the limitations under Mississippi law regarding a medical waiver (limited to the condition at issue and prohibition of ex parte communication). Moreover, Allstate could not have settled the claim until it received her entire medical bill. The letter was not sent with all the medical records until September 7,2000. The one month Allstate took in processing over $20,000.00 of new medical bills for treatment and back surgery is not withholding payment without an arguable reason. Moreover, plaintiff was apparently compensated by any short wait by the $10,000.00 in overpayment which Allstate has never required to be repaid.

CONCLUSION

Accordingly, the Court finds that Defendant's Motion for Summary Judgment [239-1,239-2] should be granted and finds that because Allstate has overpaid this claim and plaintiff did not oppose

Allstate's motion as other extra contractual claims, there are not any actual damages remaining. Accordingly, this case should be dismissed with prejudice. This decision obviates the necessity of the Court's extensive determination regarding the pending Motion to Disqualify Counsel [246-1]. At this time, the Court denies the Motion to Disqualify Counsel without prejudice to be reurged, if necessary, based upon a successful appeal of this decision and the necessity of a trial in this matter. The Court finds that this issue is not now ripe for determination and would only be so if a key former employee witnesses are then still represented by plaintiff's counsel. [FN1] The Court recognizes that circumstances may change if an appeal of this matter is successful and that this issue may need to be re-examined prior to trial. Nevertheless, the Court notes concerns regarding the propriety of plaintiff's counsel representing plaintiff and former employees of the Allstate who are key witnesses . [FN2]

> FN1. *Karaha Bodas Co. v. Perusahaan Pertambangan* 355 F.3d357,365 (5thCir.2003)

> FN2. "Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying national standards developed under federal law". *In re Dresser Indus. Inc.,* 972 F.2d 540, 543(5th Cir.1992). In ruling on a motion to disqualify the Court must look to state and national ethical standards. *Federal Deposit Ins. Corp. v. United States Fire Ins. Co.,* 50 F.3d 1304-1311-1312 (5th Cir.1995) Motions to disqualify are substantive [that] are decided under federal law. *Id* The Court "must consider the motion governed by the ethical rules announced by the national profession in the light of public interest and the litigants rights." *Id*
> Application of the disqualification rule requires a balancing of the likelihood of public suspicion against a party's right to counsel of choice." *Id* at 1316. Although a party's right to counsel of her choice is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2003 WL 22225579 (S.D.Miss.)

**(Cite as: 2003 WL 22225579 (S.D.Miss.))**

important, it "is secondary in importance to preserving the integrity of the judicial process, maintaining the public confidence in the legal system and enforcing the ethical standards of professional conduct. " *Koch v. Koch Indus.,* 798 F.Supp. 1525, 1530 n. 2 (D.Kan.1992). Preservation of popular faith in the judicial system is a primary consideration, and.. lawyers should avoid even the appearance of impropriety." *US Fire Ins. Co.,.* 50 F.3d at 1316

After careful review of the the depositions of Stegall, Cheatam and McCoy which were taken on June 24,2003 in Gulfport, Mississippi, the Court finds it is clear that the plaintiff's counsel has not engaged in any wrongful discussions or communications with these key former employees about this matter. The sworn testimony demonstrates the character and credibility of the plaintiff's counsel. Moreover, plaintiff's counsel represent that they contacted the Mississippi Bar and advised them of this situation prior to their representation of former Allstate employees. The Mississippi Bar advised counsel that there would not be a conflict in these representations and further cited Mississippi Bar Opinion 215 rendered on March 4,19994 and Mississippi Ethical Rule 4.2 in support of their advice. Mississippi Bar Opinion 215 which states: In representing a client, a lawyer may ethically communicate, ex parte, with an unrepresented individual that was formerly employed by a represented party. Neither the text or the comments to Rule 4.2 prohibits such contact; however, other professional rules of conduct prescribed attorney's conduct in dealing with unrepresented individuals.

Plaintiff alleges that Allstate waived its right to disqualify plaintiff's counsel as it failed to take action for approximately seven months after learning that plaintiff's counsel represented its former Allstate employees who met with Allstate's counsel

during this claim and were given information regarding Allstate's litigation strategy. Plaintiff implies by Allstate failure to object that Allstate waived its right to object. The Court finds there is no evidence that Allstate knowingly or intentionally relinquished the right to object to this conflict. To invoke a waiver, plaintiff must demonstrate that she complied with the disclosure requirements of M.R.P.C.1.7 which requires a conflicted attorney to consult with the party from whom a waiver is sought and obtain that party's knowing and informed consent. *E.F. Hutton Co.. v. .Brown,* 305 F.Supp. 371 (S.D.Tex.1969) In this matter, Allstate avers that it did not know of the conflict and therefore has never given its consent. Moreover, the Court finds that the delay between Allstate might have known of the conflict and the three week delay in filing the motion is not a ground for denying the motion as those three weeks did not add undue burden to the plaintiff have the litigation had been on going for over three years.

The Court finds that while there is no proof offered that the plaintiff's attorneys have had any improper communication with these witnesses. Nevertheless, there are inherent conflicts with the plaintiff's counsel's representation of these key former Allstate employees. For example, should Allstate presently desire to converse or question their former employees, the former employees have a right to have their counsel present during any conversation with Allstate. Their counsel is, of course, plaintiff's counsel. Thus trial strategies might be revealed. When these former key employees are questioned on the stand by their retained counsel about actions that this same counsel thought were reprehensible enough to attempt to have had them individually brought to suit as defendants, what might their answers be? Would presently retained counsel advise them how to answer and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22225579 (S.D.Miss.)

**(Cite as: 2003 WL 22225579 (S.D.Miss.))**

> would the advice be what would be in the best interest of the former employees or what would be in Ms. Dauro's best interest? This inherent conflict will not preserve the integrity of the judicial process or maintain public confidence in the legal system or enforce ethical standards of professional conduct as potential jurors confusion would be unsurmountable as to the credibility as to any of the key witnesses.

**\*8** Accordingly, the Motion to Disqualify is denied without prejudice.

### FINAL JUDGMENT

Pursuant to the memorandum opinion issued on September 16,2003 finding that Defendant's Motion for Summary Judgment and in the alternative for Partial Summary Judgment [239-1,239-2] should be granted.

IT IS, hereby, ORDERED AND ADJUDGED, this matter be, and is hereby, dismissed with prejudice.

Not Reported in F.Supp.2d, 2003 WL 22225579 (S.D.Miss.)

**Motions, Pleadings and Filings (Back to top)**

- 1:00CV00138 (Docket)

         (Mar. 30, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.