# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CORPORAL B. KURT PRICE, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **C.A.No.04-956-GMS** |
| | : | |
| **COLONEL L. AARON CHAFFINCH, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

---

| | | |
|---|---|---|
| **SERGEANT CHRISTOPHER D. FORAKER,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **C.A.No.04-1207-GMS** |
| | : | |
| **COLONEL L. AARON CHAFFINCH, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO BAR CERTAIN COMMUNICATIONS OF COUNSEL OR, IN THE ALTERNATIVE, TO DISQUALIFY COUNSEL

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**MARTIN D. HAVERLY, ATTORNEY AT LAW**
**MARTIN D. HAVERLY, ESQ. (#3295)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Attorneys for Plaintiffs

Dated: November 14, 2005

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING.........................................................................1

SUMMARY OF THE ARGUMENT....................................................................................1

STATEMENT OF FACTS..............................................................................................2

    A.      Captain Davis' Prior Lawsuit................................................................2

    B.      Captain Davis Has Good Reason to Invoke His First Amendment Right to Counsel.........2

          1.      Defendants Regularly Retaliate Against Those Who File Lawsuits.....................2

               a.      Hostility Towards Sgt. Foraker Who Filed a Lawsuit............................3

               b.      Hostility Towards Master Corporals Price and Warren Who Also Filed a Lawsuit.........4

               c.      Hostility Towards Captain Conley Who Filed Another Lawsuit.............4

               d.      Hostility Towards Captain Davis Who Filed a Lawsuit.........................4

          2.      Defendants' Close Friendship Also Gives Rise to a Motive to Retaliate.............5

          3.      Troopers Fear Chaffinch Because He is "Very Vindictive" and Demands "Blind" Personal Loyalty.................................................................5

          4.      Troopers Also Fear Chaffinch Because of His Powerful Political Connections........................................................................6

          5.      Fear of the Good Old Boy Network..............................................7

    C.      Defense Counsel's Conduct in Threatening a Witness.........................................7

    D.      Captain Davis Reasonably Fears Retaliation..................................................8

          1.      The Record Evidence.......................................................................8

          2.      Defendants Are Setting Capt. Davis Up For Blame..................................8

                a.      The Broken and Historically Troubled Firearms Training Unit..............8

                b.      Defendants Blame the Whistleblowers....................................10

                c.      Defendants Continue and Blame Even More Innocent Parties Who Invoked Their First Amendment Rights................................................11

       3.      Defendants Tried to Set Capt. Davis Up for an I.A. Charge................................12

           a.     Dereliction of Duty.................................................................................12

           b.     Giving a Document to His Attorney.......................................................12

E.     Captain Davis Has Already Been Retaliated Against For Filing Suit.............................12

F.     Captain Davis Clearly Invoked His Right to Counsel at His Deposition.........................13

G.    Captain Davis is Represented by The Neuberger Firm.....................................................13

       1.      Defense Counsel's Misrepresentations................................................................14

           a.     First Notice.............................................................................................14

           b.     Second Notice.........................................................................................14

           c.     Third Notice............................................................................................14

H.    Counsel Never Discussed the Substance of the Present Litigation With Captain Davis, So Rule 4.2 Does Not Come Into Play.......................................................................14

I.     Captain Davis' Deposition Testimony Clearly Supports Plaintiffs' Case........................15

       1.      Defendants Violated Judge Farnan's Reinstatement Order................................15

       2.      The Range Was a Disaster Area on December 1, 2003.......................................16

       3.      Plaintiffs Are Highly Regarded and Truthful Officers.......................................16

       4.      Plaintiffs Were Acting in Good Faith As They Pled For Help............................16

       5.      Due to Severe Understaffing, Safety Was a "Nightmare"...................................17

       6.      Plaintiffs Spoke Out and Capt. Davis Responded and Sent Their Concerns Up the Chain of Command..................................................................17

       7.      The State of Delaware Refused Free Offers of Help From NIOSH....................17

       8.      The State Deceived Plaintiffs and Falsely Told Them the Bullets They Used Were Non-Toxic.............................................................................................17

J.      No Conflict of Interest Exists Between Capt. Davis and Plaintiffs..................................18

K.    Defense Counsel Attempt to Violate Rule 4.2 and Directly Contact Captain Davis Despite Their Awareness that He is Represented by Counsel............................................18

ARGUMENT...................................................................................................................19

    I.      STANDARD OF REVIEW..............................................................................19

    II.     INTRODUCTION............................................................................................19

         A.     Defendants Have Obscured the True Issues..........................................19

         B.     The Defense Theory of the Case is Already Widely Known...............20

    III.    CAPTAIN DAVIS HAS AN ABSOLUTE FIRST AMENDMENT RIGHT TO COUNSEL AND HE HAS UNEQUIVOCALLY INVOKED THIS RIGHT, THUS, DEFENSE COUNSEL ARE BARRED FROM CONTACT WITH HIM UNDER MRPC 4.2...........................................................................................................22

         A.     The First Amendment Right to Counsel...............................................22

         B.     Captain Davis Has Clearly Invoked His First Amendment Right to Counsel.................................................................................................24

         C.     Rule 4.2 Forbids Defense Counsel From Meeting With Capt. Davis Outside The Presence of His Attorneys...................................................24

              1.     Regardless of the Outcome of This Motion, Defense Counsel Still May Not Meet With Capt. Davis Outside the Presence of His Attorneys........................................................................24

              2.     Capt. Davis Does Not Challenge Defendants' Authority to Meet With Him.............................................................................25

    IV.    THE LAW ENFORCEMENT OFFICERS' BILL OF RIGHTS ALSO FORBIDS DEFENSE COUNSEL FROM MEETING WITH CAPTAIN DAVIS OUTSIDE THE PRESENCE OF HIS ATTORNEY.........................................................25

    V.    RULE 4.2 HAS NOT BEEN VIOLATED BECAUSE COUNSEL HAS NOT 'COMMUNICATED' WITH CAPTAIN DAVIS ABOUT THE SUBSTANCE OF THE CURRENT LITIGATION AND CONTINUED REPRESENTATION OF HIM IS PROPER..............................................................................................26

         A.     Rule 4.2 has Not Been Violated...........................................................26

              1.     There Has Been No 'Communication'...................................26

                   a.     Communications With Davis About Other Matters Are Proper.................................................................27

               2.     The Intent Required by the Rule is Lacking...........................27

3.      Defendants Also Have Waived the Issue of The Neuberger Firm Representing Captain Davis.....................................................................28

B.      The True Issue Presented by Defendants.............................................................29

      1.      Under the Model Rules, Capt. Davis Has a Clear Right to Counsel When Being Interrogated by Defendants.................................................29

      2.      The Neuberger Firm Can Represent Captain Davis................................29

            a.      Defendants Are Not Barred From Meeting with Capt. Davis.............................................................................30

            b.      Defendants Trial Strategy is Already Known...........................30

            c.      The Defense Concerns of Privilege Are In Error......................30

C.      Capt. Davis' First Amendment Protected Activity Cannot Serve as a Basis For a Violation of Rule 4.2..............................................................................31

      1.      Defendants Have Unclean Hands Because of Their Illegal Actions.......32

      2.      These Communications Also Were Protected Speech and Petition of Government for Redress of Grievances...............................................33

VI.      ALTERNATIVELY, NO PRIOR PRECEDENT IS ON POINT AND OURS IS A CASE OF FIRST IMPRESSION UNDER MRPC 4.2......................................................34

A.      No Case Has Applied the New Language of the Comment.................................34

B.      All of the Cases Cited Apply the Old Language and Test....................................34

C.      The Closest Precedent is Fatally Deficient..........................................................35

VII.      MRPC 1.7 HAS NOT BEEN VIOLATED BECAUSE THE INTERESTS OF PLAINTIFFS AND CAPT. DAVIS ARE ALIGNED.........35

A.      The Record Demonstrates That Their Interests Are Aligned...............................35

B.      Defendants Have Already Questioned Davis at His Deposition..........................36

C.      Any Conflict of Interests Has Been Waived........................................................36

D.      Defense Counsel Have a Conflict of Interest.......................................................36

VIII.      DISQUALIFICATION IS NOT AN APPROPRIATE REMEDY...................................37

A.      Factors.................................................................................................................37

       B.     Remedy.............................................................................................................40

CONCLUSION.........................................................................................................................40

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

American Airways Charters, Inc. v. Regan, 746 F.2d 865 (D.C.Cir. 1984)................................................23

Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997)...............................................................................33-34

Arizona v. Fulminante, 499 U.S. 279 (1991)........................................................................................21

Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001)........................................................................34

Bates v. State Bar of Arizona, 433 U.S. 350 (1977)..............................................................................22

Brotherhood of Railroad Trainmen v. Virginia, 377 U.S. 1 (1964)....................................22, 23-24, 25, 30

Burkybile v. Bd. of Educ. of the Hastings-on-Hudson Union Free Sch. Dist.,
    411 F.3d 306 (2d Cir. 2005).......................................................................................................34

Cipriani v. Lycoming County Housing Authority, 177 F.Supp. 2d 303 (M.D.Pa. 2001)..........................23

Conley v. Chaffinch, 2005 WL 2678954 (D.Del. March 4, 2005)............................................................40

Darchia v. Ashcroft, 101 Fed.Appx. 373 (3d Cir. 2004)........................................................................36

DeLoach v. Bevers, 922 F.2d 618 (10th Cir. 1990)...............................................................................23

Denius v. Dunlap, 209 F.3d 944 (7th Cir. 2000).............................................................................22, 23

Doe v. District of Columbia, 697 F.2d 1115 (D.C.Cir. 1983)..................................................................23

EEOC v. Hora, 2005 WL 1387982 (E.D.Pa. June 8, 2005)....................................................................35

Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir. 1985)..............................................................................31

Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.,
    142 F.Supp.2d 579 (D.Del. 2001)....................................................................19, 28, 35, 37, 39, 40

End of Road Trust v. Terex Corp., 2002 WL 242464 (D.Del. Feb 20, 2002)..............................19, 37, 39

First Defense Legal Aid v. City of Chicago, 209 F.Supp.2d 935 (N.D.Ill. 2002)......................................23

Freeman and Bass, P.A. v. State of N.J. Commission of Investigation,
    359 F.Supp. 1053 (D.N.J. 1973)................................................................................................22

Government of Virgin Islands v. Joseph, 685 F.2d 857 (3d Cir. 1982).....................................................31

Hanes v. Liggett Group Inc., 975 F.2d 81 (3d Cir. 1992)......................................................................31

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993)......................................................................34

*vi*

In re Dinnan, 661 F.2d 426 (5th Cir. 1981)................................................................21

In re Primus, 436 U.S. 412 (1978)...........................................................22, 23, 30

In re TI.B., 762 A.2d 20 (D.C.App. 2000)................................................................23

Jones v. Daily News Pub. Co. Inc., 2001 WL 378846 (D.V.I. March 16, 2001).......................35

Jones v. Sheahan, 2002 WL 959814 (N.D.Ill. May 9, 2002).........................................23

Martin v. Lauer, 686 F.2d 24 (D.C.Cir. 1982)............................................................23

Monsanto Co. v. Aetna Casualty and Surety Co., 593 A.2d 1013 (Del.Super. 1990)..........21, 25

Mothershed v. Justices of the Supreme Court, 410 F.3d 602 (9th Cir. 2005)..........................23

NAACP v. Button, 371 U.S. 415 (1963)....................................................................22

Poole v. County of Otero, 271 F.3d 955 (10th Cir. 2001)...............................................23

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994)...............................................34

Sheet Metal Workers International Ass'n v. Sweeney, 29 F.3d 120 (4th Cir. 1994).................31

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996)........................21

Thompto v. Coborn's Inc., 871 F.Supp. 1097 (N.D.Iowa 1994)....................................30

United Mine Workers v. Ill. State Bar Ass'n, 389 U.S. 217 (1967)................................22

United Transp. Union v. State Bar of Michigan, 401 U.S. 576 (1971).............................22

Upjohn Co. v. U.S., 449 U.S. 383 (1981)..................................................................31

U.S. v. Furst, 886 F.2d 558 (3d Cir. 1989)................................................................31

Velazquez v. Legal Services Corp., 349 F.Supp.2d 566 (E.D.N.Y. 2004).........................33

## Constitutions, Statutes and Rules

U.S. Constitution Amendment I...................................................................passim

11 Del.C. § 9200(c).............................................................................25-26

ABA Model Rule of Professional Conduct 1.13..............................................29

ABA Model Rule of Professional Conduct 1.13(f)...........................................29

ABA Model Rule of Professional Conduct 1.13, Comment 10..............................................29, 31

ABA Model Rule of Professional Conduct 1.7....................................................................18, 35

ABA Model Rule of Professional Conduct 4.2......................................................................passim

ABA Model Rule of Professional Conduct 4.2, Comment 1.....................................................25

ABA Model Rule of Professional Conduct 4.2, Comment 2.....................................................24

ABA Model Rule of Professional Conduct 4.2, Comment 4.....................................................27

ABA Model Rule of Professional Conduct 4.2, Comment 5.....................................................33

ABA Model Rule of Professional Conduct 4.2, Comment 6.....................................................28

ABA Model Rule of Professional Conduct 4.2, Comment 7.................................................29, 34

ABA Model Rule of Professional Conduct 4.2, Comment 8.....................................................27

ABA Model Rule of Professional Conduct 4.3........................................................................25

**Other Authorities**

Hazard & Hodes, The Law of Lawyering: A Handbook on the Model
        Rules of Professional Conduct, at 434 (Supp.1989).....................................................25

## NATURE AND STAGE OF THE PROCEEDING

This is Plaintiffs' Answering Brief and Appendix in opposition to the defendants' disqualification motion. The record includes: extensive declarations from plaintiffs' counsel Stephen J. Neuberger, each of the three plaintiffs, and Capt. Ralph H. Davis; deposition testimony of retired Major David Baylor, Capt. Davis, Capt. Glenn Dixon, Lt. Joseph Aviola, retired Major Joe Swiski; and defendants Chaffinch and MacLeish;[1] plaintiffs' Answers to Interrogatories;[2] as well as assorted e-mails between counsel for the parties.

## SUMMARY OF THE ARGUMENT

Model Rule 4.2 has not been violated as counsel has never 'communicated' with Capt. Davis about the present litigation as necessary to trigger the Rule's application.

Capt. Davis has a clear right to counsel under the First Amendment, the Law Enforcement Officers' Bill of Rights and the Model Rules of Professional Conduct when being questioned by defendants and he has unequivocally invoked that right. As a result, Rule 4.2 bars defense counsel from meeting with him outside the presence of his attorneys.

The Firm's representation of Davis at any interview by defense counsel is just and proper because: (1) the interview is not a privileged communication because defendants' interest are antagonistic to Davis', whose interests are instead aligned and consistent with plaintiffs'; (2) the defense trial strategy is already widely known; and (3) defendants have failed to carry their heavy First Amendment burden necessary to deprive Capt. Davis of his chosen counsel.

---

[1] In addition to their deposition testimony in this case, the record also includes the deposition testimony of Chaffinch, MacLeish, Baylor and Dixon from the case of Conley v. Chaffinch, MacLeish, et al., C.A.No. 04-1394-GMS. Aviola's testimony is solely from the Conley case and Swiski's testimony is solely from the case of Dillman v. Chaffinch, et al., C.A. No. 02-509-KAJ. Neither Aviola nor Swiski were deposed in our present action. An excerpt from Chaffinch's trial testimony in the case of Foraker v. Chaffinch, et al., C.A. No.02-302-JJF also is included.

[2] References to Plaintiffs' Answers to Interrogatories in Price, et al. v. Chaffinch, et al., will be referenced as "Price Inter. # __" and Plaintiff's Answers to Interrogatories in Foraker v. Chaffinch, et al., will be referenced as "Foraker Inter. # __").

**STATEMENT OF FACTS**

**A.  Captain Davis' Prior Lawsuit.**  Then Lieutenant Ralph H. Davis III received the

highest promotional testing score on both the oral and written tests for promotion to Captain, yet

Chaffinch and then Cabinet Secretary Ford refused to promote him in favor of numerous lesser

qualified candidates. Captain Davis then invoked the protections of the First Amendment's

speech and petition clauses when on February 20, 2004 he filed a lawsuit against Chaffinch and

Ford, challenging their repeated violations of the Fourteenth Amendment equal protection clause.

(See Davis v. Chaffinch, et al., C.A.No. 04-106-JJF, at D.I. 1).  Six months later, before any

discovery was taken, the case was settled.  (See B1297 - Judge Farnan's Order).  Shortly

thereafter, he  was promoted to Captain.  (Davis 6-7; B251).

The Court specifically retained jurisdiction to enforce the confidential settlement

agreement which to no surprise barred retaliation.  (Neuberger Decl.¶¶ 16-17,19; B1322-23).  As

Capt. Davis has testified, the attorney/client relationship then continued to protect him from

expected retaliation.  (Davis Decl. ¶¶ 7-9; see Neuberger Decl. ¶¶ 19-22; B1313,1322-23).

**B.  Captain Davis Has Good Reason To Invoke His First Amendment Right to**

**Counsel.**

**1.  Defendants Regularly Retaliate Against Those Who File Lawsuits.**

Including the present Foraker action, there are currently two lawsuits pending before this Court

involving retaliation by both defendants Chaffinch and MacLeish against individual Troopers

who, like Capt. Davis, previously dared to file lawsuits challenging Chaffinch's illegal actions.

See Foraker v. Chaffinch, MacLeish, et al., C.A.No. 04-1207-GMS; Conley v. Chaffinch,

MacLeish, et al., C.A.No. 04-1394-GMS.

Chaffinch admittedly does not like it when Troopers invoke their First Amendment rights

to file lawsuits against the DSP.  (See, e.g. Chaffinch 175,40; B204,170).  MacLeish has

acknowledged the same.  (See, e.g. MacLeish 31; B340).  But more importantly, the present

2

record has revealed extensive evidence of defendants' admitted hostility towards individual

Troopers who invoke their First Amendment rights.

        **a. Hostility Towards Sgt. Foraker Who Filed a Lawsuit.**  Sgt.

Foraker's present action is based upon retaliation against him by Chaffinch and MacLeish

because he successfully prosecuted an earlier First Amendment retaliation lawsuit against

Chaffinch beginning in April 2002.

        Chaffinch was "upset" and "unhappy" that Sgt. Foraker had filed his lawsuit.  (Chaffinch

40; B170).  He regularly stated that Sgt. Foraker is a "real pain in the ass" and is a "f-cking

a–hole."  (Dixon 16,76,74; B294,309).[3]  Moreover, because of his hostility over the filing of the

suit, Chaffinch openly bragged throughout the DSP - "**I'm going to get that son of a bitch**."

(Dixon 17-18,77; B294-95,309).  "[I]f people f-ck with Chaffinch, I'm going to f-ck back."

(Dixon 10,53-54; B293,303-04).[4]  In the same way, MacLeish was admittedly "irritated" and

"not happy" that Sgt. Foraker had filed a lawsuit.  (MacLeish 34,31; B340-41).  He too swore

under oath that he thinks plaintiff Sgt. Foraker is a "real pain in the ass" because he had invoked

his First Amendment rights.  (MacLeish 164-165; B373).

        Chaffinch has been "angry" at Sgt. Foraker "for a very long time," "since the lawsuit

began."  (Dixon 14,22-23,52,55; B294,296,303-04).  He regularly mocked Sgt. Foraker and joked

about his injuries from his initial lawsuit.  (Dixon 14-15,74-75; B294,309).  He was angry the

entire life of Sgt. Foraker's suit.  (Dixon 20,75; B295,309).  His "anger increased" after Sgt.

Foraker's successful jury verdict and after Judge Farnan reinstated him to his prior position at the

FTU.  (Dixon 20-21; B295).  It was regularly discussed among commanders that Chaffinch was

"going after Sgt. Foraker."  (See Dixon 69; B307).

_____

   [3]  Notably, Chaffinch refused to refer to Sgt. Foraker by his rank.  Instead, he substituted the
word "f-cking" for the word 'sergeant.'  (Dixon 9-10,53; B292-93,303).

   [4]  Chaffinch also said this about other Troopers who filed lawsuits.  (Dixon 10; B293).

**b. Hostility Towards Master Corporals Price and Warren Who Also Filed a Lawsuit.**  In the same way, MacLeish testified that he thinks that plaintiff Master Corporals Price and Warren also are a "real pain in the ass." (MacLeish 164-165; B373).  He is "not happy" and emphatically expressed that he is very "disappointed" in the fact that they filed suit. (MacLeish 214-217,211-213; B385-86).  Chaffinch has expressed the same feelings (MacLeish 218-219), and is "not happy" about their suit. (Chaffinch 142; B196).  He refers to the suit as "f-cking bull-sh-t." (Dixon 79; B310).  Chaffinch also cruelly joked about, mocked and made fun of these two dedicated veteran's injuries.  (Dixon 25-26,23-24,79; B296,310).

**c. Hostility Towards Captain Conley Who Filed Another Lawsuit.**
Capt. Conley also filed suit against Chaffinch in October 2004.  Shortly thereafter, she amended her initial lawsuit to include the unprecedented retaliatory actions taken against her by Chaffinch and MacLeish - including releasing statutorily protected internal affairs information about her to the Delaware news media within hours of the filing of her lawsuit.  (See Conley v. Chaffinch, MacLeish, et al., C.A.No. 04-1394-GMS at D.I. 7).

Moreover, that case has revealed a wealth of evidence of defendants' hostility towards Capt. Conley because she filed her lawsuit.  For example, there is abundant testimony that Chaffinch was "mad," "ang[ry]," "displeased," "pissed off," "upset," and "unhappy" about the suit.  (See, e.g. Dixon 69-71, MacLeish 120-121, Aviola 79,82 84; B1265-66,1165,866-67). He very well may have used some colorful language and other profanity to describe it.  (Aviola 79; B866).   In the same way, MacLeish was "annoyed by her actions" in filing a lawsuit.  (MacLeish 179-180; B1165).  He was "unhappy," "upset," "displeased," "disappointed," and "disgusted" by her suit.  (MacLeish 179-180,125-127,131-132,180-181, Aviola 82,84; B1165,1151-53,867). Defendants were out to get her, and would stop at nothing until they did.

**d. Hostility Towards Captain Davis Who Filed a Lawsuit.**  Even though no discovery has been taken on this issue, the record has nonetheless revealed Chaffinch

and MacLeish's hostile feelings towards Capt. Davis because of his suit. Now retired Major David Baylor served on the DSP Executive Staff with Chaffinch and MacLeish. (Baylor 6,12,20-21; B1232-33,1235). Under questioning by defendants, while discussing Chaffinch and MacLeish's loathing of Sgt. Foraker and other officers who had filed suit, Major Baylor testified that defendants also had hostility towards Capt. Davis because he had filed a suit. They "didn't like" him because of it. (Baylor 364; B116).

### 2. Defendants' Close Friendship Also Gives Rise To a Motive to Retaliate.

Chaffinch and MacLeish are admittedly "buddies" and "friends." (Chaffinch 16-17; MacLeish 7; B164,334). MacLeish publicly brags that he and Chaffinch are "joined at the hip." (MacLeish 9; B334). He "feel[s] very strongly" that his good friend Chaffinch is an "honorable man," a "good trooper," a "good person," and a "good man" who was "a good leader" for the DSP. (MacLeish 9-12; B334-35). MacLeish is so close to Chaffinch that despite the fact that he was not a defendant, he nonetheless attended the mediation in Capt. Davis' lawsuit to support his "close" friend Chaffinch. (Davis 73-74; B267-68). He thinks that the numerous suits, jury verdicts, and court opinions upholding these jury verdicts are meritless. (See MacLeish 107-114; B1147-49).[5]

### 3. Troopers Fear Chaffinch Because He Is "Very Vindictive" and Demands "Blind" Personal Loyalty.

Chaffinch has always expected "blind loyalty" from all those in the DSP. (Dixon 24; B296; Dixon 105; B1274). "You have to just follow him ... and if you don't, he is done with you. You may suffer any consequences from that." (Dixon 105; B1274; Dixon 85; B311). Chaffinch himself has repeatedly admitted that "personal loyalty" is a factor he considers when making personnel decisions. (Chaffinch 158-159; B200; Chaffinch 179; B985).

---

[5] MacLeish testified that despite the June 2003 jury verdict that Chaffinch had violated Sgt. Foraker's First Amendment rights, DSP legal counsel advised them that the jury verdict could be ignored and really was not a finding that the First Amendment had been violated. (MacLeish 112-113; B1148). Perhaps this explains why defendants think they are above the law. This also dovetails well with Chaffinch's trial testimony during Sgt. Foraker's first case - that he could do whatever he wants, whenever he wants, because he is the Colonel. (See Chaffinch at D17; B1301).

Several other witnesses, including MacLeish have confirmed this. (MacLeish 64; Baylor 20-21; B11136, 1235).

Captain Dixon worked closely with Chaffinch in Sussex County for 17 years. (Dixon 77, 90,92,4; B309,313,291; Dixon 7-10; B1250-51). He testified that Chaffinch "is very vindictive" and "use[s] his rank or office in the state police to be vindictive." "[I]t is common knowledge ... you would not cross him ... because of his vindictiveness. You knew that your career would pretty much stop." (Dixon 71-72; B1266; Dixon 24,44; B296,301). "He goes after people ... if he feels that anyone has betrayed him. That's his makeup." (Dixon 44; B301).

In the same way, Plaintiff Price has served with Col. MacLeish for many years. In his own words, MacLeish also "is a very vindictive man. I would go so far as to say that he is the definition of the word vindictive." (Price. Decl. ¶ 13; B1304).

### 4. Troopers Also Fear Chaffinch Because Of His Powerful Political Connections.
Chaffinch believes he can get away with anything because, as he openly brags, his close relationship with Delaware State Senator Thurman Adams will protect him. (Dixon 64-65; B1264; Dixon 91; B313). "Uncle Thurman ... would take care of him no matter what." (Dixon 64-65; B1264). "[I]f he needed anything done, he would just go to ... the Thurmanator, and it would be done." (Dixon 65; B1264).[6] Chaffinch is "a very powerful person, he has political ties that are very strong." (Dixon 72-73; B308). As Chaffinch admitted, politics play a role in the day to day operations of the DSP. (Chaffinch 157; B199). Because of this, as one commander stated, opposing Chaffinch "would be the start of ending my career with the State Police." (Dixon 73; B308).

Captain Dixon even expressed concern that despite Chaffinch's retirement, he would still find a way to retaliate against him because of Dixon's truthful subpoenaed deposition testimony,

---

[6] "Thurmanator" is Chaffinch's affectionate nickname for his political patron and "powerful protector." (Dixon 91,103; B313,316).

(Dixon 72; B1266), perhaps by way of Chaffinch's "close" friendship with MacLeish and Senator Adams. (Chaffinch 16-17,190-191; MacLeish 7; B164,208,334). In Capt. Dixon's words, despite the fact that Chaffinch is retired, "I'm afraid of him now" because of how "politically entangled" he is and because of what he did to Sgt. Foraker, who had dared to file a suit against him. (Dixon 90-91; B313).[7]

      **5. Fear of the Good Old Boy Network.** Lastly, a good old boy network also exists within the DSP. (Dixon 45-46; see Baylor 16; B301-02,1234). Politics play a role in day to day operations of the Division. (Chaffinch 157; Baylor 16; B199,1234). In today's State Police, actions "are more based on who you know and who your connections are with and who your friends are than on merit." (Baylor 16; B1234). This also gives rise to a strong motive to retaliate when someone rocks the boat.

      **C. Defense Counsel's Conduct in Threatening a Witness.** The testimony in this case also has unfortunately revealed that defense counsel have threatened a witness. Perhaps this is yet another reason why Capt. Davis refuses to meet with defense counsel outside the presence of his attorneys, who will most assuredly protect him from any bullying or browbeating.

      For example, Capt. Glenn Dixon is a 17 year veteran who currently is Commander of Troop 5 in Bridgeville, Delaware. (Dixon 4; B291). He is responsible for law enforcement activities for western Sussex County. This high ranking officer was subpoenaed to testify in this case. (Dixon 3; B291).

      Under questioning by defense counsel at his deposition, a remarkable piece of testimony became part of the record. Capt. Dixon testified that defense counsel had "threatened" him

---

    [7] Capt. Dixon's fear is well justified and he testified that Chaffinch is currently angry at him for two reasons. First, because Dixon refused to perjure himself and instead has testified truthfully under subpoena. (Dixon 42-44; B301). Second, because Dixon repeatedly refused Chaffinch's direction to cover up a crime committed by a state trooper - which also involved an officer on Chaffinch's Executive Staff and at least one other captain. (Dixon 46-47,85-89,103-107,108-112; B302,311-12,316-18). Sadly, this appears to be standard operating procedure in the State Police. Testimony revealed that MacLeish also interferes in criminal investigations to protect his personal friends. (MacLeish 116; B1149).

during telephone conversations prior to his deposition. (Dixon 32; B298). Indeed, Capt. Dixon was so intimidated by defense counsel's threatening actions that he cancelled a meeting that had been scheduled between them in order to avoid their unpleasant and "threaten[ing]" behavior. (Dixon 32-34; B298-99).[8]

Plaintiffs note that during his 17 year police career, Dixon no doubt has dealt with a great many unpleasant individuals. In light of this hardened background, it is notable that he nonetheless felt "threatened" by defense counsel's actions and words. (Dixon 32; B298).

**D. Captain Davis Reasonably Fears Retaliation.**

**1. The Record Evidence.** In light of the conduct of defense counsel already, as well as the extensive record evidence of Chaffinch and MacLeish's shameless efforts to destroy Troopers who filed suit against Chaffinch in the past, it is quite reasonable that Capt. Davis fears being retaliated against for his successful lawsuit against Chaffinch, and so he has invoked his First Amendment right to the protection of counsel. (See Davis Decl. ¶¶ 15-17; B1314-1314a). At his deposition, Capt. Davis testified that one of the reasons he did this is because he fears being retaliated against by MacLeish. (Davis 70-72; Davis Decl. ¶ 15; B267,1314).

**2. Defendants Are Setting Capt. Davis Up For Blame.** Additionally, even a passing analysis of the record reveals that defendants are attempting to set Capt. Davis up to take the blame for the problems at the FTU. (See Davis Decl. ¶ 16; B1314-15).

**a. The Broken and Historically Troubled Firearms Training Unit.**

The Firearms Training Unit (FTU) is a $3.3 million dollar facility that opened in 1998. (Chaffinch 114; B189). In defendants' words, the FTU has had a "long history of problems" affecting health and safety since its very inception. (Chaffinch 52,59; MacLeish 40; B173,175,

---

[8] Those threats were born out later during defense counsel's examination. (Dixon 98-101; included in sealed portion of appendix - B1350).

342).[9]  A Captain who was involved with the facility since its planning stages was publicly quoted in the media as stating that the FTU has been "[t]he absolute epitome of a project from hell since its very inception."  (MacLeish 150; B370).  An unqualified builder who had never before constructed a firearms range was hired, despite the fact that it had finished dead last in the bidding rankings. (Price Inter. #5; B710-16).  More problems soon followed.

For example, in 1996 an expert firearms range builder reviewed the specifications and blueprints for the FTU's ventilation system.  In a letter to the State Police, the expert stated that:

> We have evaluated the ventilation system design for the proposed State Police Facility.  We have evaluated the design of the fan, heating & cooling equipment, duct, filter, air flow and control systems and have concluded that this system, as designed **will not work**.
>
> The definition of "will not work" is simply that the present design **will not perform as it is required** to under the present requirements of OSHA & NIOSH.
> * * *
> We have concluded that the designed system **will inevitably fail** if it is constructed as designed.

(MacLeish depo.ex. #6; B485) (emphasis added).  This warning was disregarded, and the facility has been plagued by health and safety problems ever since.  Tens of thousands of dollars have been poured into this multi-million dollar facility but to no avail.  As the previous footnote demonstrates, the record is overflowing with evidence that the FTU was doomed since its very inception.  Rather then give a comprehensive list, plaintiffs list the following areas as representative of the many health and safety problems at the FTU.

•    Unsafe levels of lead in the air, levels above the safety standards set by the National Institute of Occupational Safety and Health, (MacLeish depo. ex. #8; B489),

•    Unsafe levels of lead, copper, and other heavy metals in the bloodstream of the staff at the facility, (Price Inter. #5,10; Chaffinch 55,106; Chaffinch depo.ex. #2; MacLeish

---

[9]  There is a plethora of both record testimony and documents in this regard.  (See, e.g. Price Inter. # 5,9-12, and Ex.1; Foraker Inter. #6,9-10; MacLeish 39-59; MacLeish depo.ex. #6-16; Chaffinch 52-64; Chaffinch depo.ex. #2; Baylor 182-230; Davis 9-34,36-39; B710,717,746,820,825,342-47,485-503,173-76,233,71-83,251-59).

depo.ex. #15,11; B710,718,174,187,233,500,493),[10]

• Clouds of smoke and haze containing bullet residue consisting of lead and other heavy
  metals that hover throughout the range and which those who work and train there were
  forced to breathe, (MacLeish depo.ex. #13,7; Price Inter. #11,12;Chaffinch 56;
  B497,723,728,174),[11]

• Nosebleeds and a penny taste in the mouths of officers who train and work at the range,
  (Price Inter. #12; B728).

The FTU "was a hazardous situation for [plaintiffs] and for anybody who trained in that facility
at all, including myself." (Baylor 207; B77). And it is because plaintiffs spoke out about and
exposed these many health and safety hazards that they were retaliated against.

        **b. Defendants Blame the Whistleblowers.** Of course, as a result,
defendants blamed the whistleblowers. (MacLeish depo.ex. #5; Foraker Inter. #5; B481,818-20).
And as is apparent from the recently filed defense brief, their Answer to the Complaint, and from
their depositions of plaintiffs Price and Warren, defendants' official position in this case is that it
is the whistleblower plaintiffs who destroyed the FTU. They claim that the facility was
destroyed because plaintiffs did not carry out hazardous material abatement and removal of lead
and other toxins from the facility. Indeed, defendant MacLeish saw fit to place 50% of the blame
for the destruction of the facility on the whistleblowers who reported that the facility was broken
and was poisoning and otherwise injuring those who worked and trained there. (MacLeish 58;
B347). But as Major Baylor succinctly explained (Baylor 209-210; B77-78), blaming plaintiffs
for destroying the FTU -

        would be the equivalent of blaming troopers for operating a Ford vehicle in which the
        gas tank exploded when they were hit from the rear because ... somebody decided to run
        into them. You can't blame the trooper for that and I don't think you can blame the

---

    [10] Notably, one of the areas of speech at issue in Sgt. Foraker's first suit was his speech about
unsafe lead levels of an officer under his command. (Chaffinch 20; B165).

    [11] Plaintiffs were repeatedly told by Facilities Management and the DSP that the bullets they
were firing were non toxic. (Davis 37-38; Price Inter. #12; B258-59, 731-32). However, it turned out
that they were deceived as the bullets were in fact made out of toxic heavy metals such as nitroglycerine,
arsenic, tin, copper and zinc. (Davis 38-40; Price Inter. #12; B259, 731-32).

troopers for this.

The defense blame tactic will not hold water. In the DSP, a Trooper is brought up on charges and disciplined for something as minor as backing into a telephone pole or dinging the bumper on his car. (MacLeish 48; B344).[12] Thus, it is notable that despite the present defense claim that plaintiffs destroyed a multi-million dollar training facility, they have never been brought up on charges for their alleged misconduct. (MacLeish 48; B344).

### c. Defendants Continue and Blame Even More Innocent Parties Who Invoked Their First Amendment Rights.

In addition to blaming plaintiffs for the destruction of the FTU, defendants also have blamed retired Captain Greg Warren[13] who, along with plaintiffs, raised the alarm and blew the whistle on the health and safety problems at the FTU. (See, e.g. MacLeish depo.ex. #5; Chaffinch 123; MacLeish 42-43,128; B481,191,343,364).[14] Defendants claim that plaintiffs and Capt. Warren caused the problems at the FTU and endangered the health and safety of the thousands of officers who train there annually. (See Price Inter. at ex. #2; B788).

So defendants have publicly blamed everyone below then Lt. Davis for destroying the FTU - meaning plaintiffs Foraker, Price and Warren. They also have publicly blamed then Lt. Davis' immediate superior for destroying the FTU - meaning Capt. Warren.

---

[12] Similarly, if a Trooper has a problem with his $22,000 patrol car, he is not allowed to tinker with the engine, tweak the transmission or make any other repairs. Instead, only a fully trained and equipped divisional mechanic is authorized to do so. (Chaffinch 113-115; MacLeish 63-64; B188-89, 348). Yet it is defendants' position that despite a total lack of protective equipment or training (Chaffinch 60; MacLeish 64-65; B175,348), plaintiffs were responsible for maintaining this $3,300,000 facility.

[13] Capt. Greg Warren is no relation to plaintiff Wayne Warren.

[14] Capt. Greg Warren previously had a successful suit against Governor Minner and defendant Chaffinch. (See Warren v. Minner, Chaffinch, et al., C.A. No.03-908-SLR). In retaliation for holding an off duty fundraiser for the unsuccessful Republican gubernatorial candidate in 2000, Democratic Governor Minner and Chaffinch ordered that Captain Warren - who at the time held five degrees, taught at several universities and writes police department textbooks in his spare time - never be promoted to the rank of Major. That case settled the morning of Minner's deposition. (Id. at D.I. 1; Neuberger Decl. ¶ 13; see MacLeish 73-75; B1138-39, 1321).

11

The writing on the wall is clear. As Capt. Davis is well aware - defendants are setting him up to take the blame for the destruction of the FTU. (Davis Decl. ¶ 16; B1314-15). Indeed, the defendants already points the finger of blame at him. (See OB at 9-10). Defense counsel thus have a clear conflict of interest in representing defendants and Capt. Davis. (Davis Decl. ¶ 19; B1314a).

### 3. Defendants Tried to Set Capt. Davis Up For an I.A. Charge.

**a. Dereliction of Duty.** It also is clear that defendants seek to set Capt. Davis up for an internal affairs charge of dereliction of duty or something similar for destroying the FTU. (Davis Decl. ¶ 16; B1314-1314a).

**b. Giving a Document to His Attorney.** The DSP attempts to bring Internal Affairs charges against troopers to discourage them from free and open communication with their lawyers. (Neuberger Decl. ¶ 12; B1321). Specifically, the DSP stands ready to claim that internal DSP documents have been released to counsel in violation of a DSP Rule and Regulation. Defendants tried this tactic at Capt. Davis' deposition. (See Davis 60; B264). But counsel prevented that from occurring because that particular question was inappropriate on attorney/client privilege grounds. (Davis 60; B264).

### E. Captain Davis Has Already Been Retaliated Against For Filing Suit.

Additionally, as Capt. Davis testified, he has already been retaliated against and treated differently because he filed his suit. For example, the announcement of his transfer and promotion to Captain were handled in an unprecedented way in the DSP. (Davis 72-73; Davis Decl. ¶ 15; B267;1314). With the exception of the politically appointed positions of Colonel and Lt. Col., every position in the DSP is announced via an e-mail which states that pursuant to the Colonel's authority, you are being promoted. But Chaffinch refused to authorize Capt. Davis' promotion! Instead, Cabinet Secretary Mitchell had to intervene and the promotion e-mail stated that Capt. Davis was promoted pursuant to his authority instead. This is an "unheard of" action

in the DSP that was noticed and commented on by numerous other Troopers. (Davis 72-73, 75-77; B267-68).

Capt. Davis also expressed his fear of retaliation by Col. MacLeish because of his prior lawsuit. (Davis 67, 70-72; Davis Decl. ¶ 15; B266-67,1314). In response to a defense challenge for any proof he had that MacLeish wanted to get him because he had sued Chaffinch, Davis testified that Major Baylor told him about a conversation in which MacLeish stated that if he had to promote Davis to Captain, then he would transfer him to Troop 1A (Brandywine Town Center), just short of the Delaware/Pennsylvania line. (Davis 74-75; B268). Davis lives at the other end of Delaware, in Lewes. (Davis 5; B250).

In the same way, Chaffinch and MacLeish immediately downgraded the position that Davis was promoted into. (Davis 7; B251). No longer was it a direct report to the Colonel. Instead, it was downgraded two levels to a Major report. (Davis 7; B251). This was a diminution in the prestige of the hard fought promotion.

**F. Captain Davis Clearly Invoked His Right to Counsel at His Deposition.** Under questioning from defense counsel, Capt. Davis was asked whether he would meet privately with defense counsel to discuss the FTU suit outside the presence of his attorney. Capt. Davis again asserted his right to counsel and refused to do so. (Davis 66-67; accord Davis Decl. ¶¶ 13,17-19, 30,36,38; B266,1314-1314a,1316-17).

**G. Captain Davis Is Represented by The Neuberger Firm.** Captain Davis has been represented by The Neuberger Firm since November 2003. (Davis Decl. ¶ 3; B1312).[15] That representation was initially focused on the repeated discriminatory refusal to promote him.

---

[15] Initially attorney client privilege was invoked on this date issue. (See Davis 61-63; B264-65). However, at the conclusion of the deposition, counsel researched the issue and determined that the date the representation began is not privileged. Accordingly, counsel then revoked the assertion of privilege on this issue by telephone, and then followed up with an e-mail to defense counsel supplying that information. (Neuberger Decl. ¶¶ 56-59; T. Neuberger e-mail; B1329,1347-48). Defendants ignore this fact in their brief.

However, the attorney client relationship has subsequently developed into a representation related to Davis' employment and also preventing retaliation against him for his earlier protected activities. (Davis Decl. ¶¶ 3, 7-9; Neuberger Decl. ¶¶ 19-22; B1312-13,1322-23). In fact, Judge Farnan's order which dismissed Capt. Davis' earlier lawsuit explicitly retained jurisdiction to enforce the settlement agreement which included a non-retaliation provision. (Order; Davis Decl. ¶¶ 5,7; Neuberger Decl. ¶¶ 16-17,19; B1297,1313,1322-23).

   **1. Defense Counsel's Misrepresentations.** The temporal sequence claimed by defense counsel - that they were surprised and only became aware of the Firm's continued representation of Capt. Davis in September 2005 - is simply wrong. (See OB at 6-7).

    **a. First Notice.** In an e-mail from counsel to Robert Fitzgerald, dated July 26, 2005, in reference to scheduling the deposition of Capt. Davis, defense counsel was put on notice that Capt. Davis was represented by the Firm - "As a heads up, Capt. Davis is a client of ours." In an e-mail that same day, defense counsel responded "Thanks for the warning." (Neuberger Decl. ¶¶ 25-28; S. Neuberger and R. Fitzgerald e-mails; B1324,1332-33).

    **b. Second Notice.** Then, in a telephone conference between plaintiffs attorneys Thomas and Stephen Neuberger and defense attorney Ed Ellis which occurred on August 9, 2005, plaintiffs counsel once again informed defense counsel that the Firm represented Capt. Davis in the present actions and that defense counsel was not permitted to contact Capt. Davis because he was represented by counsel. (Neuberger Decl. ¶¶ 31-34; B1324-25).

    **c. Third Notice.** Lastly, on August 30th, during a conversation between counsel and defense attorney Ellis, counsel believes that he once again stated that the Firm represented Davis. (Neuberger Decl. ¶ 39; B1326).

  **H. Counsel Never Discussed the Substance of the Present Litigation with Captain Davis, So Rule 4.2 Does Not Come Into Play.** Capt. Davis was subpoenaed to testify in the present cases. (Davis 8; B251). And as he testified at his deposition under pointed questioning

by defendants, he has **never** discussed the substance of the FTU litigation with either of his

attorneys. (Davis 60-61,66; see Neuberger Decl. ¶¶ 40-41, 24; B264,266,1326-27,1323).

Notably, defendants refuse to acknowledge the existence of this testimony in their brief, save

their final footnote. (OB at 18 n.6). Given defendants' apparent unfamiliarity with this

testimony, it bears repeating here.

> Q. Have you had communications with Mr. Neuberger, and I'm referring to Stephen
> Neuberger at least for the time being, about the substance of the lawsuit that brings us
> here today?
>
> A. No, sir.

(Davis 60-61; B264).

> Q. Have you ever, and by that I mean ever, discussed with Tom Neuberger or Steve
> Neuberger the circumstances at the Firearms Training Unit?
>
> A. I do not recall an occasion when we discussed it.

(Davis 66; B266). In case his deposition testimony was not clear enough -

> And as I testified at my deposition, I have not had communications with my attorneys
> about the substance of the present lawsuits .... My attorneys have not questioned me
> about these lawsuits.

(Davis Decl. ¶ 11; B1314). Given that there have been no communications with Capt. Davis

about the substance of the lawsuits, Rule 4.2 is not triggered and does not come into play.

**I. Captain Davis' Deposition Testimony Clearly Supports Plaintiffs' Case.** Capt.

Davis is a 19 year veteran. (Davis 5; B250). Prior to that, he honorably served in the U.S.

Marine Corps for four years on active duty and then for two years in the Reserves. (Davis 5;

B250). He is currently the director of planning for the DSP. (Davis 7; B251). Prior to that, he

served as assistant director of training and special projects coordinator. (Davis 6-8; B251).

Capt. Davis is a fact witness to several matters in the present case. Despite apparent defense

assertions to the contrary (see OB at 9-10), the record reveals that both plaintiffs and defendants

fully questioned him at his deposition.

**1. Defendants Violated Judge Farnan's Reinstatement Order.** Capt. Davis

testified and confirmed plaintiffs' account that defendants' violated Judge Farnan's reinstatement order when they threw Sgt. Foraker out of and barred him from all future section chief's meetings despite the fact that he is the section chief of the FTU - thereby reducing his job duties and responsibilities. (Davis 34-36; <u>see</u> Foraker Inter. #12; MacLeish depo.ex. #20; B258,832, 512, 519).

      **2. The Range Was a Disaster Area on December 1, 2003.** Capt. Davis toured the FTU on December 1, 2003 - Sgt. Foraker's first day back after being reinstated. (Davis 8-9; B251). He testified that the FTU was an absolute mess and in near total disarray when he toured the facility that morning and that there was a dust or powder covering everything in the building. (Davis 9-14; B251-53). This confirms plaintiffs' account (<u>see</u> Price Inter. #12; B728), and contradicts the defense position that everything at the range was rosy, clean and spotless upon Sgt. Foraker's reinstatement and that he is responsible for its poor condition.

      **3. Plaintiffs Are Highly Regarded and Truthful Officers.** Upon review of plaintiffs' detailed account of the condition of the FTU on December 1st (<u>Price</u> Inter. #12; B728), Capt. Davis testified that he had no reason whatsoever to disagree with or dispute their testimony. (Davis 15-16; B253). In fact, Capt. Davis had high praise for plaintiffs' reputations for truthfulness and honesty. (Davis 16-17; B253).

> I believe that they're, all three, held in very high regard by all members of the division, not only junior people but senior people as well. They're respected for their knowledge of firearms training and just their integrity as a whole.

(Davis 17; B253). Capt. Davis also had high praise for his then commanding officer - Capt. Warren. He is a "man of honor" and truthfulness who went above and beyond in trying to get help for plaintiffs and get the problems at the FTU fixed. (Davis 32; B257).[16]

      **4. Plaintiffs Were Acting in Good Faith As They Pled for Help.** Capt. Davis

---

[16] The contrast to defendants in this regard is striking. For example, now retired Major Joseph Swiski, who was a member of Chaffinch's own inner circle Executive Staff, has previously testified that Col. Chaffinch "has a reputation for not being very truthful." (Swiski 57; B1294).

testified that plaintiffs were acting in good faith and trying to protect the health and safety of the men and women who trained at the FTU when they spoke out. (Davis 29-32; B256-57). He testified that plaintiffs were "basically pleaing for help." (Davis 30; B257).

    **5. Due to Severe Understaffing, Safety Was a "Nightmare."** He also confirmed the understaffing concerns raised by plaintiffs (See, e.g. MacLeish depo.ex. #12; Foraker Inter. #12; B495,832), when he testified that the facility was "sorely understaffed," with student to instructor firearms safety ratios that fell far below nationally required standards which resulted in officer safety being a "nightmare" (Davis 14; B253), and that he brought these serious problems to the attention of Chaffinch and MacLeish. (Davis 21-23; B254-55).

    **6. Plaintiffs Spoke Out and Capt. Davis Responded and Sent Their Concerns Up the Chain of Command.** Capt. Davis also testified that plaintiffs were speaking out about the conditions at the FTU and that he sent their concerns up the chain of command and personally raised some of them with defendants and their Executive Staff. (See Davis 17-39; B253-59).

    **7. The State of Delaware Refused Free Offers of Help from NIOSH.** Capt. Davis confirmed plaintiffs' accounts that the state refused free offers of help from the National Institute of Occupational Safety and Health which offered to come in and conclusively determine the sources of the health problems at the range. (Davis 26-28; MacLeish depo.ex. #15; see Price Inter. #5; B256,500,710).

    **8. The State Deceived Plaintiffs and Falsely Told Them The Bullets They Used Were Non-Toxic.** Capt. Davis also testified that Facilities Management responded to plaintiffs' concerns about the toxic makeup of the bullets being used by assuring them that they were instead simply ceramic and perfectly healthy. He later found that the State had lied and the bullets contained numerous toxic substances that had been hidden from the Troopers working there. (Davis 36-40; B258-59).

**J. No Conflict of Interest Exists Between Capt. Davis and Plaintiffs.** The record demonstrates that counsel take conflict of interest issues very seriously and consult extensively with their clients when such issues potentially could arise. (See Foraker, Price and Warren Decls. ¶¶ 4-7; Davis Decl. ¶¶ 20-21; Neuberger Decl. ¶¶ 60-66; B1303,1306-07,1309-10, 1314a,1329-30). Yet despite extensive discussions with counsel, neither plaintiffs nor Capt. Davis have ever seen any conflict of interest arising from the Firm's representation of each of them. But to the extent that the Court believes that a conflict of interest exists, plaintiffs and Capt. Davis have waived it in writing as permitted by Rule 1.7. (Foraker, Price and Warren Decls. ¶¶ 6-11; Davis Decl. ¶¶ 20-24,12; B1303-04,1307-08,1310-11,1314a-1315).

**K. Defense Counsel Attempt to Violate Rule 4.2 and Directly Contact Captain Davis Despite Their Awareness that He is Represented By Counsel.** As discussed above, Capt. Davis is a longtime client of the Firm. Defense counsel were aware of and on notice of this. (See Facts at section **G** above).

Yet despite their knowledge that he is a party represented by counsel, on Sept. 2, 2005, Capt. Davis received an e-mail order from Col. MacLeish's office. In his own words -

> That e-mail stated that Robert Fitzgerald, one of the attorneys for the defendants in the present litigation, would be contacting me about the present litigation.
> * * *
> I was very concerned by this e-mail ... I was very concerned about the fact that it stated that Mr. Fitzgerald would be contacting me directly outside the presence of my attorneys.
> * * *
> It is my understanding that prior to the date on which I received the e-mail from Col. MacLeish's office, that my attorneys asserted my right to legal representation to the lawyers for the state police in these cases.
>
> I was very concerned about the e-mail I received from Col. MacLeish's office because it stated that the state's attorneys would be contacting me directly about this litigation despite the fact that I was represented by counsel.
>
> I was alarmed by this....
>
> Because of my alarm and concern, I contacted Stephen J. Neuberger, one of my attorneys and asked him for advice as to how I should respond to the e-mail.
>
> I contacted my attorney because I wanted legal representation if I was to be contacted by

one of the state's attorneys and I was unsure how to respond given that it was my understanding that the state's attorneys could not contact me directly because I was represented by counsel.

(Davis Decl. ¶¶ 25-26, 30-34; B1315-1316).

## ARGUMENT

### I.    STANDARD OF REVIEW.

"[M]otions to disqualify are generally disfavored." Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc., 142 F.Supp.2d 579, 581 (D.Del. 2001). They "are viewed with caution because of the potential for their misuse." Id. at 584. "It is well known to this court, and many others, that motions for disqualification are frequently filed as dilatory tactics intended to divert the litigation from attention to the merits." Id. (internal punctuation omitted).

"The party seeking disqualification must clearly show that continued representation would be impermissible." Id. at 581 (internal punctuation omitted). "As such, vague and unsupported allegations are not sufficient to meet this standard." Id. (internal punctuation omitted). "[D]isqualification is not automatic." End of Road Trust v. Terex Corp., 2002 WL 242464, *2 (D.Del. Feb. 20, 2002). A "district court has wide discretion in framing its sanctions to be just and fair to all parties involved." Elonex, 142 F.Supp.2d at 583 (internal punctuation omitted).

### II.    INTRODUCTION.

**A. Defendants Have Obscured the True Issues.** Defendants have framed their motion as whether Rule 4.2 has been violated. But this is a red herring since it is undisputed that because there has been no 'communication' regarding the substance of the present litigation, there is no violation of the Rule.

Instead, a close reading of the defense brief reveals that the true issue presented is actually twofold: (1) whether Capt. Davis has a right to counsel when being interrogated and questioned by defendants; and (2) whether The Neuberger Firm can be his counsel during that

19

interrogation.  As will be discussed in the Arguments below, Capt. Davis clearly has a First Amendment and statutory right to counsel.  And defendants can articulate no legitimate reason why the Neuberger Firm cannot represent him during his interrogation, beyond mere purported inconvenience regarding revelation of their widely known trial strategy.

**B.  The Defense Theory of the Case is Already Known.**  At the recent depositions of plaintiffs Warren and Price, and in their current Brief, the defendants have revealed their theory of the case and trial strategy.  They intend to prove that plaintiffs destroyed the multi million dollar Firearms Training facility. It was not the fault of the generals, it was the fault of the privates that the battle was lost. (See, e.g. OB at 12).

Their Brief plainly states "[t]he sources of the contamination and the cause of the general deterioration of conditions at the range are issues in these consolidated actions."  (OB at 5).  Then there is a very revealing litany of the areas they wish to question Captain Davis upon, all the while emphasizing that he was "the supervisor responsible for the FTU during most of the events involved in this lawsuit."  (OB at 9).  So he will apparently face charges of dereliction of duty for allegedly allowing the mess to happen.

The trial strategy is confirmed in the ten areas of proposed questioning.  (OB at 9-10).  This includes:  the "catastrophic[]" deterioration of the range which was allowed (item 2); permitting training when Sgt. Foraker "knew it was unsafe," all while "Davis was Foraker's immediate supervisor" (item 3); whether the noise levels were unacceptable "when Davis was responsible for the range" (item 9); "what steps [Davis] took to remedy [staffing] levels he thought inadequate (item 10); and whether Davis' direct report who he "supervised ... was incompetent." (Item 8).

So Captain Davis faces genuine jeopardy from the DSP from the admitted trial strategy of the defendants.  Consequently, he asserts the right to legal counsel of his choosing: experienced in the labyrinth of the DSP, successful and unintimidated by the power and

influence of the defendants, and unflinching in the face of defense counsel's threats. But

defendants want him to meet alone with their lawyers while they set him up for retaliatory

dereliction of duty charges under the guise of preparing their case.

To this end and to disarm him, they assert a conflict between his right to the counsel of

his choosing and the Model Rules of Professional Conduct. But as discussed above, there has

been no 'communication' which is required to trigger Rule 4.2. Thus, as demonstrated below, on

our facts the rules do not come into play since <u>counsel has never discussed the substance of the</u>

<u>litigation with him</u>. But even if the rules do apply, in the particular circumstances of this case the

First Amendment interests asserted by Captain Davis require the defense to demonstrate

something more than a rote assertion that his interests are somehow trumped. Instead a careful

balancing of his constitutional and statutory interests must be weighed against a compelling and

narrowly drawn interest offered by the State. And here the State's argument fails.

It is overbroad and overblown for the State to assert that unless it can get Captain Davis

alone, or perhaps with inexperienced and timid counsel, it will reveal its trial strategy. For that

strategy is already on the table. It was revealed at the extensive depositions of Warren and Price

and in the current brief in the litany of areas addressed to Davis.

Neither can the State's interest be considered narrow in any constitutional sense. Here it

must demonstrate that the State cannot be protected any other way. But this does not bear up

under analysis. If the truth is really what the State seeks,[17] all it has to do is depose Captain

Davis and take the truth as it comes out, unvarnished by woodshedding or threats of intimidation

---

[17]  And that is what the judicial process is all about. <u>See</u> <u>Arizona v. Fulminante</u>, 499 U.S. 279,
295 (1991) ("The search for truth is indeed central to our system of justice"); <u>In re Dinnan</u>, 661 F.2d 426,
427 (5th Cir. 1981) ("The basis of justice is the truth and our system frowns upon impediments to
ascertaining that truth"); <u>Sheridan v. E.I. DuPont de Nemours and Co.</u>, 100 F.3d 1061, 1069 (3d Cir.
1996) (en banc) ("We routinely expect that a party give honest testimony in a court of law..."); <u>Monsanto
Co. v. Aetna Casualty and Surety Co.</u>, 593 A.2d 1013, 1022 (Del.Super. 1990) ("In the courts of
Delaware, the hallmark of justice under law in civil litigation cannot be expediency marred by deception,
but must rather be truth - to accept or require anything less would ... debase the system of justice and
belittle all who serve it").

directed to him.  (Cf. Dixon 32-34; B298-99).  Davis was actually deposed, and all the defense had to do was question him on the ten areas indicated, and take the truth as it was revealed.  This was more than fair, for the record reveals that plaintiffs counsel has never spoken to Davis on any aspect of the current cases.  So the playing field was level but that was not enough for the State.

However, when Captain Davis' First Amendment rights are balanced against the best case scenario for the State, its interests are neither weighty enough nor narrowly drawn to survive scrutiny.

**III.    CAPTAIN DAVIS HAS AN ABSOLUTE FIRST AMENDMENT RIGHT TO COUNSEL AND HE HAS UNEQUIVOCALLY INVOKED THIS RIGHT, THUS, DEFENSE COUNSEL ARE BARRED FROM CONTACT WITH HIM UNDER MRPC 4.2.**

**A.  The First Amendment Right to Counsel.**  The looming backdrop to the true issues defendants have chosen to present is the First Amendment right to counsel.  Indeed, Captain Davis has an absolute First Amendment right to consult with his attorney.  This right finds its origins in a well known line of Supreme Court cases.  See NAACP v. Button, 371 U.S. 415 (1963); Brotherhood of Railroad Trainmen v. Virginia, 377 U.S. 1 (1964); United Mine Workers of Amer. v. Ill. State Bar Ass'n, 389 U.S. 217 (1967); United Transp. Union v. State Bar of Michigan, 401 U.S. 576 (1971); In re Primus, 436 U.S. 412 (1978).  In these cases, the Supreme Court "speaks ... of an inviolate First Amendment right to be represented by counsel...." Freeman and Bass, P.A. v. State of N.J. Commission of Investigation, 359 F.Supp. 1053, 1056 (D.N.J. 1973) (Judge Garth).  Underlying these cases "was the Court's concern that the aggrieved receive information regarding their legal rights and the means of effectuating them."  Bates v. State Bar of Arizona, 433 U.S. 350, 376 n.32 (1977).[18]

---

[18]  "This concern applies with at least as much force to aggrieved individuals as it does to groups."  Id.; accord Denius v. Dunlap, 209 F.3d 944, 954 (7th Cir. 2000) ("the First Amendment protects the right of an individual or group to consult with an attorney on any legal matter"); Freeman and Bass, 359 F.Supp. at 1057 ("the existence of the associational *group* right necessarily implies a like right for

Although it appears that the Third Circuit has not had opportunity to address this issue, numerous other Courts of Appeals have. Indeed, as the Seventh and Ninth Circuits have recently held, "[t]he right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition." Denius v. Dunlap, 209 F.3d 944, 953 (7th Cir. 2000); accord Mothershed v. Justices of the Supreme Court, 410 F.3d 602, 611 (9th Cir. 2005). Similarly, in the Tenth Circuit's words, "[t]he right to retain and consult with an attorney ... implicates ... clearly established First Amendment rights of association and free speech." DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990); accord Poole v. County of Otero, 271 F.3d 955, 961 (10th Cir. 2001). As the D.C. Circuit has observed, individuals "have an undeniable right to retain counsel to ascertain their legal rights." Martin v. Lauer, 686 F.2d 24, 32 (D.C.Cir. 1982); American Airways Charters, Inc. v. Regan, 746 F.2d 865, 873 (D.C.Cir. 1984); see Doe v. District of Columbia, 697 F.2d 1115, 1119 (D.C.Cir. 1983) ("every litigant has a powerful interest in being able to retain and consult freely with an attorney").[19]

As discussed in Argument V below, the defense motion operates on the false premise that Rule 4.2 has been violated. Nonetheless, defendants admittedly seek to use the ethical rules to deprive Capt. Davis of his First Amendment rights. But the Supreme Court has cautioned against efforts to justify such plainly unconstitutional actions by clothing that wolf in the sheep's clothing of the ethical rules. "[I]n regulating the practice of law a State cannot ignore the rights of individuals secured by the Constitution." Brotherhood, 377 U.S. at 6.[20] One of the purposes

---

individuals") (emphasis in original).

[19] Other courts have held the same. See Cipriani v. Lycoming County Hous. Auth., 177 F.Supp.2d 303, 323-24 (M.D.Pa. 2001); Jones v. Sheahan, 2002 WL 959814, *3 (N.D.Ill. May 9, 2002); First Defense Legal Aid v. City of Chicago, 209 F.Supp.2d 935, 940 (N.D.Ill. 2002); In re TI.B., 762 A.2d 20, 28 (D.C.App. 2000).

[20] See In re Primus, 436 U.S. at 426 ("broad rules framed to protect the public and to preserve respect for the administration of justice must not work a significant impairment of the value of associational freedoms") (internal punctuation omitted); Brotherhood, 377 U.S. at 7 ("A State could not, by invoking the power to regulate the professional conduct of attorneys, infringe in any way the right of individuals and the public to be fairly represented in lawsuits authorized by Congress to effectuate a

served by the First Amendment right to counsel is to protect individuals from overreaching by government defendants and their lawyers. For as the Supreme Court has observed, "[l]aymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries." Id. at 7.

**B. Captain Davis Has Clearly Invoked His First Amendment Right to Counsel.** As discussed in the Facts at section **F** above, Capt. Davis clearly invoked his First Amendment right to counsel.

**C. Rule 4.2 Forbids Defense Counsel From Meeting With Capt. Davis Outside the Presence of His Attorneys.** Defendants are on legal notice that Capt. Davis is being represented by counsel. Thus, MRPC 4.2 bars defense counsel from contact with him outside the presence of his attorneys. MRPC 4.2 states:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter.

Comment 2 continues - "[t]his Rule applies to communications with any person who is represented by counsel concerning the matter to which the communication relates." Accordingly, defense attorneys simply cannot get past the prohibitions of the very rule they hang their hats upon. They cannot communicate with Capt. Davis outside the presence of his attorneys.

**1. Regardless of the Outcome of This Motion, Defense Counsel Still May Not Meet With Capt. Davis Outside the Presence of His Attorneys.** Regardless of the outcome of this motion, Capt. Davis has clearly invoked his right to counsel. The plain text of the rule <u>bars</u> them from meeting or communicating with him outside the presence of his attorneys. In other words, whether he is ultimately represented by The Neuberger Firm or by other legal counsel, Capt. Davis has still asserted his right to counsel, regardless of who his attorney is. (Davis Decl. ¶ 38; B1317). Accordingly, defense counsel are <u>barred</u> from meeting

---

basic public interest").

24

with him.

Notably, the First Amendment and Rule 4.2 share similar purposes in this regard. For the Supreme Court has stated that "[l]aymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries." Brotherhood, 377 U.S. at 7. Similarly, Rule 4.2 "contributes to the proper functioning of the legal system by protecting a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter." MRPC 4.2, cmt. 1. Rule 4.2 "[i]n tandem with Rule 4.3, [ ] prevents a lawyer from taking advantage of a lay person to secure admissions against interest." Monsanto, 593 A.2d at 1017 (quoting Hazard & Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct, at 434 (Supp.1989)).

> The scheme of the two Rules is that while Rule 4.3 prevents a lawyer from overreaching an *unrepresented* person, Rule 4.2 prevents a lawyer from nullifying the protection a *represented* person has achieved by retaining counsel ...Under either Rule, of course, the third party retains ultimate control.

Id. (emphasis in original). Regardless of the outcome of this motion, Capt. Davis has asserted his right to the protection of counsel. (Davis Decl. ¶ 38; B1317). Both the First Amendment and Rule 4.2 bar defendants from nullifying Capt. Davis' assertion of representation.

**2. Capt. Davis Does Not Challenge Defendants' Authority to Meet With Him.** Contrary to the defense contentions (OB at 15), Capt. Davis does not contest defendants' right to meet with him. However, he does assert his rights to be accompanied and protected by counsel during his interrogation. (Davis Decl. ¶ 38; B1317).

**IV.    THE LAW ENFORCEMENT OFFICERS' BILL OF RIGHTS ALSO FORBIDS DEFENSE COUNSEL FROM MEETING WITH CAPTAIN DAVIS OUTSIDE THE PRESENCE OF HIS ATTORNEY.**

Putting aside the protections granted by the First Amendment, state law also provides another independent basis for Capt. Davis' right to counsel. The Law Enforcement Officers' Bill of Rights ("LEOBOR") requires that Capt. Davis not be questioned about this matter outside the presence of his attorney. 11 Del.C. § 9200(c) provides that:

Whenever a law-enforcement officer is under investigation or is subjected to questioning <u>for any reason that could lead to disciplinary actions</u> ... the investigation shall be conducted under the following conditions:

* * *

(9) Upon request, any officer under questioning shall have the right to be represented by counsel ....  (emphasis added).

As discussed above, the record is clear that defendants are attempting to set Capt. Davis up for disciplinary actions - specifically, to bring internal affairs and/or other charges against him.  Capt. Davis is well aware of the rights granted him by this state statute and he has invoked them.  (Davis Decl. ¶¶ 27, 38,13-14,33; B1314-17).  Thus, LEOBOR also independently bars defendants from meeting with Capt. Davis outside the presence of his attorneys. (<u>See</u> Facts at section **F**).

**V.    RULE 4.2 HAS NOT BEEN VIOLATED BECAUSE COUNSEL HAS NOT 'COMMUNICATED' WITH CAPTAIN DAVIS ABOUT THE SUBSTANCE OF THE CURRENT LITIGATION AND CONTINUED REPRESENTATION IS THEREFORE PROPER.**

**A.  Rule 4.2 Has Not Been Violated.**  As discussed above, Rule 4.2 states that

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter.

**1.  There Has Been No 'Communication.'**  The plain text of Rule 4.2 clearly requires a 'communication.'  Without a 'communication,' the Rule is never triggered.  Unfortunately for defendants, even assuming *arguendo* that Capt. Davis is somehow a covered employee of theirs under Rule 4.2, the undisputed record demonstrates that counsel has never 'communicated' with Capt. Davis about the substance of this litigation.  (<u>See</u> Facts at section **H** above).  Capt. Davis testified to this at his deposition (Davis 60-61,66; B264,266), and also swore to it in his declaration.  (Davis Decl. ¶ 11; B1314).  Counsel represents the same, defense counsel has acknowledged the same in writing and in various oral communications with counsel (Neuberger Decl. ¶¶ 40-41, 34; B1325-27), and defendants also acknowledged this in the final footnote in their brief.  (OB at 18 n.6).  Accordingly, because there has been no 'communication'

as required to trigger the rule, 4.2 does not come into play.

### a. Communications With Davis About Other Matters Are Proper.

Again assuming *arguendo* that Capt. Davis is a covered employee by Rule 4.2, the Rule explicitly states that counsel are only barred from communicating with him about "the matter" - here, the present litigation. However, the Rule explicitly permits counsel to communicate with Davis about other matters.

> This Rule does not prohibit communication with a represented person, or an employee or agent of such a person, concerning matters outside the representation. For example, the existence of a controversy between a government agency and a private party ... does not prohibit a lawyer for either from communicating with nonlawyer representatives of the other regarding a separate matter.

MRPC 4.2, cmt. 4. Thus, counsel's continued representation of Davis on all other matters is permissible.

### 2. The Intent Required by the Rule is Lacking. Rule 4.2 also has a specific

intent requirement. It requires that a lawyer may only be punished for violating this rule if the lawyer contacts someone he "knows to be represented by another lawyer." Comment 8 continues and explains that the lawyer must have "actual knowledge of the fact of the representation." He must "know that the person is in fact represented." Id. (emphasis added).

The facts of our case demonstrate that there is no intent to violate the rule because there was no knowledge that Capt. Davis "in fact" was represented by anyone other than the Firm. He has been a longtime client and all are well aware of the fact that the Firm represents him in all aspects of his employment. (Davis Decl. ¶¶ 3, 7-8; Neuberger ¶ 19; B1312-13,1322-23). Thus, the Firm did not know that Davis was represented by the government's lawyers and thus lacked the intent required to violate the rule.

To the extent that defense counsel claim to represent Capt. Davis, such a claim is in error as Capt. Davis has repeatedly and emphatically rejected their representation (see, e.g. Davis Decl. ¶¶ 18-19; B1314a), and he has instead exercised his rights to be represented by counsel of

his own choosing. As a matter of law, Capt. Davis cannot be represented by an attorney whose representation he rejects, all the more so when that rejected attorney has a clear and obvious conflict of interest in undertaking such a representation. (Davis Decl. ¶ 19; B1314a).

At the very least, under the particular facts of our case, this is a very large gray area in which it was impossible for the Firm to have knowledge that Capt. Davis "in fact" was represented by anyone else other than the Firm. Indeed, defendants have acknowledged this gray area by invoking the right discussed under Comment 6 to seek an order from the Court in uncertain circumstances. Thus, because of this uncertainty, sanctions of any kind would be inappropriate.

**3. Defendants Also Have Waived The Issue of The Neuberger Firm Representing Captain Davis.** It is well established that an objection to a conflict of interest can be waived by the actions of a party asserting the conflict. See Elonex, 142 F.Supp.2d at 582-583. So by sitting on this issue and only springing it at this late stage of discovery, it is apparent that defendants have waived the issue.

First, plaintiffs identified Capt. Davis as a witness in their Rule 26 disclosures on March 4, 2005. Plaintiffs did not hide that they would depose Capt. Davis. Second, defendants are all well aware of the non-retaliation provisions of the settlement agreement to Davis' first case and thus the continued involvement of The Firm to ensure that its provisions are obeyed. Indeed, Chaffinch and Cabinet Secretary Mitchell are parties to that agreement. And although he was not a party, MacLeish, for whatever reason, attended and participated in the settlement negotiations and also sat around the conference table as the final terms were agreed to by the parties. Chaffinch, MacLeish and Mitchell all were represented by counsel at the mediation. Even legal counsel for Governor Minner was involved in the settlement. (Neuberger ¶¶ 15-16; B1322). Thus, it should come as no surprise that due to the continuing oversight required as a result of the settlement agreement, the Firm continues to represent Davis, and most assuredly would represent

28

him during any retaliatory interrogation or interview defendants seek to force. Defendants have been well aware of this fact for many months now, yet did not make an issue of it until recently. Accordingly, defendants have waived their ability to raise this issue now.

    **B. The True Issue Presented by Defendants.** As previously discussed, the true issues presented by the defense brief are: (1) whether Capt. Davis has a right to counsel when being interrogated by defendants; and (2) whether The Firm can be his counsel.

        **1. Under the Model Rules, Capt. Davis Has a Clear Right to Counsel When Being Interrogated by Defendants.** As discussed in Arguments III and IV above, Capt. Davis has a right to counsel under both the First Amendment and LEOBOR. Indeed, the Model Rules of Professional Conduct explicitly recognize his right to counsel.

    For example, the plain text of the comment to Rule 4.2 recognizes that an employee of a represented organization can have his own separate counsel. Comment 7 states that "If a constituent of an organization is represented by his ... own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule." (Emphasis added). In the same way Rule 1.13 - Organization as a Client - recognizes that a conflict of interest can arise from adversity of interests between the employer and the employee, as in our case. MRPC 1.13(f). Comment 10 elaborates, stating that under such circumstances, the employer's "lawyer should advise any constituent ... that such person may wish to obtain independent representation" and the "discussions between the lawyer for the organization and the individual may not be privileged." Id. (emphasis added). These rules expressly recognize Capt. Davis' right to be represented by his own attorney, even if he is a "constituent."

        **2. The Neuberger Firm Can Represent Captain Davis.** Defendants have offered no legal authority for the proposition that a public employer can dictate to a public employee who his attorney can be when that employee is interviewed. In addition to violating the First Amendment, counsel also respectfully suggests that such a proposition violates public

29

policy. See Thompto v. Coborn's Inc., 871 F.Supp. 1097, 1119-1121 (N.D.Iowa 1994) (acts that impede an individual from seeking legal advice violate public policy).

Given the weighty First Amendment interests involved and the Supreme Court's repeated admonitions that "in regulating the practice of law a State cannot ignore the rights of individuals secured by the Constitution," Brotherhood, 377 U.S. at 6; see In re Primus, 436 U.S. at 426, defendants need to articulate a compelling state interest that somehow outweighs Capt. Davis' First Amendment right to counsel of his choosing.[21]  But defendants have failed to carry their burden in this regard.

Instead, defendants merely claim that the Firm's representation would reveal trial strategy and hinder their ability to conduct discovery.  (OB at 10, 14, 11, 17).  But the record does not bear this out as a narrowly drawn compelling state interest, or a least restrictive means.

**a. Defendants Are Not Barred From Meeting With Capt. Davis Provided Counsel Is Present.**  As discussed above, Capt. Davis does not contest that defendants have a right to meet with him, provided this attorney is present.  (Davis Decl. ¶ 13; B1314).  The defense claim to the contrary is a red herring.  (OB at 15).

**b. Defendants Trial Strategy Is Already Known.**  As discussed, the defense strategy of blame the whistleblowers is already well known and has even been trumpeted on the front page of a Delaware newspaper by Chaffinch. (MacLeish depo.ex. #5; B481).

**c. The Defense Concerns of Privilege Are In Error.**  Thus, defendants are left with the claim that the Firm cannot represent Davis during the meeting because the conversations would be privileged.  (OB at 15).  This is a weak reed, and both the Model Rules and settled Third Circuit case law dictate the opposite conclusion.

As discussed above, the Model Rules anticipated our present situation where the

---

[21]  Given that the Delaware Legislature has explicitly chosen to give police officers the right to counsel as contained in LEOBOR, counsel notes that this right to counsel is unaffected by any First Amendment analysis.

organization's interests are adverse to those of the employee.  Comment 10 to Rule 1.13 states that when an employer's interests are adverse to those of the employee, those conversations "may not be privileged."  This is because the the of the adversity of interests between the organization's attorney and the employee, as in our present case.

The defense argument appears to be more based upon what is known as the 'common interest' or 'joint defense' privilege.  (See OB at 16).  But this claim also fails because there is no unity of interest between defendants and Capt. Davis.  See Sheet Metal Workers International Ass'n v. Sweeney, 29 F.3d 120, 124 (4th Cir. 1994); Hanes v. Liggett Group Inc., 975 F.2d 81, 94-95 (3d Cir. 1992).[22]  In other words, privilege does not attach because the interview will be an adversarial encounter.

The Third Circuit has repeatedly recognized this.  For example, in Eisenberg v. Gagnon, 766 F.2d 770, 788 (3d Cir. 1985), the Court took note of the line of cases in which "there is no privilege for communications with another's attorney where the parties interests are completely adverse ...."  In Government of Virgin Islands v. Joseph, 685 F.2d 857, 862 (3d Cir. 1982), the Court refused the privilege because the one party's "interests were at all times completely antagonistic to the interests of" the other party.  Then, in U.S. v. Furst, 886 F.2d 558, 575 (3d Cir. 1989), the Court found the privilege did not apply because "the meeting was an adversarial encounter" between the organization's attorney and an employee.  Thus, privilege would not attach to the meeting between defense counsel and Capt. Davis.  As a result, there is no legally cognizable prejudice to defendants as a result of the Firm's protection of Capt. Davis during such an interview.[23]

**C.  Capt. Davis' First Amendment Protected Activity Cannot Serve As A Basis For**

---

[22]  Defense citation of Upjohn Co. v. U.S., 449 U.S. 383 (1981), is inapposite because it only addressed the typical situation where a corporation interviews its loyal employees, but did not address the situation where the interview is between parties with antagonistic interests.

[23]  And because no privilege applies, all of this information would be discoverable anyway.

**a Violation of Rule 4.2.**  Thus, the remainder of the defense claim hangs on a contention that when MacLeish ordered Capt. Davis to speak with his defense lawyers, Davis told his own lawyer of the illegal order and thus violates the rules.  Here the record reveals that defendants have unclean hands and their own improper actions in trying to force a forbidden and retaliatory interview caused the very First Amendment protected communications they now challenge.  Contrary to the defense representations that they have been content to not talk to Capt. Davis until the Court resolves any questions (OB at 14), the documentary record reveals the opposite conclusion.

        **1.  Defendants Have Unclean Hands Because of Their Illegal Actions.**  A review of the communications referenced by defendants as the "document collection e-mail" (OB at 18 n.6), reveals that these communications were only made because Col. MacLeish's office ordered and informed Capt. Davis that defense counsel would be directly contacting him to interview him about the present cases.  This retaliatory attempt took place well after defense counsel were formally notified several times that Capt. Davis was represented by counsel.  (See Facts at section **G** above).  In other words, Capt. Davis was informed that his right to counsel was about to be flagrantly violated.  And in light of his extensive knowledge of his legal rights in this area (Davis Decl. ¶¶ 27-29; B1315-16), he was justifiably "alarmed" and "very concerned" that his rights were to be thrown upon the trash heap. (Id. at ¶¶ 26,30-32).

        Counsel respectfully submits that defendants should not be allowed to rely upon these communications as a basis for disqualification or sanctions of any kind given that it was their own improper conduct in attempting to directly communicate with a party represented by counsel which caused the frightened communications from Capt. Davis to his longstanding attorneys.  Interpreting Capt. Davis' desperate plea for help under these  unique circumstances as an improper communication would elevate form over substance and undermine the very interests that Rule 4.2 was designed to protect.  He would be left defenseless and without an advocate in

such a situation where his right to counsel has already been unequivocally asserted, and yet defense counsel flagrantly disregarded that assertion and instead made every effort to subvert the rules and meet with him anyway.[24]

**2. These Communications Also Were Protected Speech and Petition of Government For Redress of Grievances.** "[W]hen the government imposes upon the time-honored functions of the lawyer ... it treads deeply in waters bound up in First Amendment sensibilities." <u>Velazquez v. Legal Services Corp.</u>, 349 F.Supp.2d 566, 604 (E.D.N.Y. 2004). Thus, even if the Court finds that despite defendants' unclean hands, the communications should still be considered, they still fall under a First Amendment exception to Rule 4.2 which acknowledges that its general prohibitions do not apply if an attorney "is authorized to do so by law." Comment 5 continues and explains that this includes "communications by a lawyer on behalf of a client who is exercising a constitutional or other legal right to communication with the government."

Capt. Davis' communication to counsel about the alarming efforts of defense counsel to make an end run around his constitutional and statutory rights to representation and instead directly contact him outside the presence of his attorney cannot be considered to have violated Rule 4.2. This communication was an integral part and thus part and parcel of the subsequent petition from counsel to defense counsel for the government, telling the government to cease and desist in its illegal efforts in violating Davis' rights. (Neuberger Decl. ¶¶ 50-53; B1328). Such a communication is protected speech and petition of government for redress of grievances under the First Amendment.

As our present case clearly demonstrates, the "fundamental importance of the right to petition [is] as a check against the government's abuse of power." <u>Anderson v. Davila</u>, 125 F.3d

---

[24] Thus, as stated, defendants are left to hang their hat upon these communications. If the Court finds it necessary, counsel would be more than happy to submit those communications to the Court for an *in camera* review so that it may make its own determinations.

148, 162 (3d Cir. 1997). "[W]hen one files a 'petition' one is addressing the government and asking government to fix what ... government has broken or has failed in its duty to repair." San Filippo v. Bongiovanni, 30 F.3d 424, 442 (3d Cir. 1994). And here, the government had a clear duty not to violate Capt. Davis' rights. MacLeish's order was illegal and the government violated its duty. But because of Capt. Davis' communication, counsel was thus able to call them on the carpet for this abuse and stop any further illegal efforts. (Neuberger Decl. ¶¶ 50-53; B1328). Without the ability to contact his attorney and inform him of defendants' illegal actions, Capt. Davis would have been left without a remedy and his attorneys would have been unable to petition the government for redress of grievances on his behalf.[25]

## VI.    ALTERNATIVELY, NO PRIOR PRECEDENT IS ON POINT AND OURS IS A CASE OF FIRST IMPRESSION UNDER MRPC 4.2.

To the extent that the Court believes that Rule 4.2 comes into play, a review of the case law cited by defendants reveals that ours is a case of first impression under the rules.

**A.  No Case Has Applied the New Language of the Comment.**  First, none of the cases discuss, analyze or construe the significant 2002 amendments to comment 7 which removed the words "managerial responsibility" because it was "vague and overly broad." See Reporter's Explanation of Changes www.abanet.org/cpr/e2k- rule42rem.html (visited on November 11, 2005). As of yet, no case has discussed the meaning, parameters or application of the comment's new language.

**B.  All of the Cases Cited Apply the Old Language and Test.**  The only post-2002 case cited by defendants, although acknowledging the new language, refused to apply it and instead applied the pre-2002 managerial responsibility language and test which the new rule

---

[25]   The free speech clause also protects these communications. See Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993) (speech that seeks "to bring to light actual or potential wrongdoing or breach of the public trust" by public officials protected); Baldassare v. State of N.J., 250 F.3d 188, 196 (3d Cir. 2001) (speech which seeks to "expose specific wrongs and abuses" by government protected); Burkybile v. Bd. of Educ. of the Hastings-on-Hudson Union Free Sch. Dist., 411 F.3d 306, 313 (2d Cir. 2005) ("accusations of improper governmental actions" protected).

explicitly abandoned.  See EEOC v. Hora, 2005 WL 1387982, *11-12 (E.D.Pa. June 8, 2005).
The remainder of the cases apply the old comment which was revised and is no longer in effect.

**C.  The Closest Precedent is Fatally Deficient.**  Of all the cases cited by defendants,
Jones v. Daily News Pub. Co. Inc., 2001 WL 378846 (D.V.I. March 16, 2001), appears to be
factually the closest.  However, it is fatally distinguishable and deficient on the key fact
necessary to find a violation of Rule 4.2 - whether a 'communication' about the matter has taken
place.

In Jones, defendants alleged that the plaintiff's attorney "had impermissible discussions
with" one client who was the supervisor of the plaintiff.  Id. at * 1.  Despite the opportunity to do
so in a deposition and in affidavits, both the client supervisor and the plaintiff's attorney refused
to deny that they had discussed the plaintiff's case with each other.  See id. at *3 ("Attorney
Rohn has had open access to discuss with Jones the substance of the Goss case and Plaintiff has
not denied Daily News' assertion that such contact took place").  Thus, it was undisputed that the
parties had engaged in impermissible communications.  Conversely, in our present case, Capt.
Davis has been examined in a deposition by defendants, and also has submitted a declaration,
each denying that any such communications have taken place. (Davis 60-61,66; Davis Decl. ¶ 11;
B264,266,1314).  Counsel has stated the same.  (Neuberger Decl. ¶¶ 40-41, 24; B1326-27,1323),
and defense counsel do not allege otherwise.  (OB at 18 n.6).

**VII.    MRPC 1.7 HAS NOT BEEN VIOLATED BECAUSE THE INTERESTS OF
          PLAINTIFFS AND CAPT. DAVIS ARE ALIGNED.**

**A.  The Record Demonstrates That Their Interests Are Aligned.**  The defense
argument in this regard is conclusory.  (OB at 16-17). Cf. Elonex, 142 F.Supp.2d at 581 ("vague
and unsupported allegations are not sufficient").  Rule 1.7's prohibitions do not kick in because
there is no factual predicate for a conclusion that plaintiffs and Davis have adverse interests.
Notably absent from the defense brief are any record cites to the voluminous discovery record
that is nearly complete with discovery set to end on December 31st.  Defendants have offered no

factual predicate for their baseless assertion that the interests of plaintiffs and Davis are adverse in any way, shape or form.  Perhaps plaintiff Price said it best, Capt. Davis was "our champion[]. [He] went to bat for us."  (Price Decl. ¶ 9; B1303).  Defendants ask the Court to deprive citizens of their attorneys based on no more than speculation and conjecture.  But as the Third Circuit has noted, legal "determinations must be based on evidence in the record, rather than speculation or conjecture." Darchia v. Ashcroft, 101 Fed.Appx. 373, 376 (3d Cir. 2004).  Moreover, the factual record evidence discussed above as well as the declarations actually dictate the conclusion that the interests of plaintiffs and Davis are aligned and are not adverse in any way. (See Facts at section **J** above).

**B. Defendants Have Already Questioned Davis at His Deposition.**  As to the ten areas defendants claim a need to question Davis about (OB at 9-10), they inexplicably fail to explain why they did not simply ask about these areas at his deposition.  Defendants asked Davis approximately 34 pages worth of questions.  They certainly could have continued and asked more, but chose not to do so.  Indeed, Davis actually testified about one of the areas - staffing levels - when he testified that the facility was so "sorely understaffed" that safety was a "nightmare" and that he brought these concerns to the attention of the Executive Staff.  (Davis 14).  (See Facts at **I.5.** above).  Counsel respectfully submits that this attempt to play fast and loose with the Court should be rejected and that defendants have waived their right to question Davis on these areas now.  Alternatively, defendants remain free to question Capt. Davis in a meeting, provided that his attorney is there to protect him.

**C. Any Conflict of Interest Has Been Waived.**  To the extent that the Court finds a conflict of interest to exist - it has been waived by plaintiffs and Davis.  (See Facts at **I.5.** above).

**D. Defense Counsel Have a Conflict of Interest.**  As discussed at length in the Facts, to the extent defense counsel claim to represent Capt. Davis, they have a clear conflict of interest in doing so. Capt. Davis is keenly aware of the same. (Davis Decl. ¶¶ 19,15-17; B1314-1314a).

36

## VIII.    DISQUALIFICATION IS NOT AN APPROPRIATE REMEDY.

**A.  Factors.**  When considering a disqualification motion, this Court has identified numerous factors that should be considered in the required balancing which demonstrate that disqualification is not an appropriate remedy.

**1.**  Whether the situation presents a risk of divided loyalty by the attorneys.  See Elonex, 142 F.Supp.2d at 583-84.  Here, there is no risk of divided loyalties so the concerns underlying the conflict rules are satisfied.  Simply put, the interests of plaintiffs and Capt. Davis are aligned. The facts discussed at length above attest to this fact, as do the declarations submitted by the parties on this issue.

**2.**  The amount of time the attorneys have represented the party, the amount of time and effort that the attorneys have invested in the case, the experience the attorneys have in prosecuting these types of suits, and the attorneys' extensive familiarity with the factual and legal issues, in such complex cases. See Elonex, 142 F.Supp.2d at 584; End of Road Trust, 2002 WL 242464, *3.  Here, the Firm has represented the parties for anywhere from 2-4 years - including successful suits for Capt. Davis and Sgt. Foraker.  The value of legal services for plaintiffs and Davis exceeds $240,000.  Indeed, Sgt. Foraker's first successful suit serves as the factual basis for his present one.  Due to these long relationships with all the parties, a deep bond of trust, confidence and respect has developed - which is especially important in the present cases in light of the extensive psychological and emotional devastation that defendants have wrought upon plaintiffs.  Similarly, the Firm has been intimately involved in the factual underpinnings of plaintiffs' current cases since long before suits were actually filed in August 2004.  The Firm understands the big picture, as well as the temporal sequence of retaliatory events because the Firm was there when they occurred.  In other words, the Firm has a unique knowledge and perspective that cannot be duplicated from reading a dry paper record. (Neuberger Decl. ¶¶ 8-11, 68-73; Foraker, Price, Warren and Davis Decls. ¶ 3; B1320-21,1330-31,1302,1306,13091312).

Additionally, due to the sheer number of cases that the Firm has handled for state police employees over the last 3½ years, it has developed a unique niche and expertise in this area. It has an extensive factual knowledge of the inner-workings of the organization, as well as deep familiarity with the decision-makers, and also with the various personalities involved, be they from Troopers within the organization or from politicians outside of it. The Firm understands how all of the cases are interrelated - be they cases of retaliation or discrimination - all involve players who believe themselves to be above the law and who have forgotten the oaths they took many years ago when they swore to uphold the very Constitution on which they now trample. (Neuberger Decl. ¶¶ 9-11, 69-70; B1320-21,1330-31).

Counsel also have a unparalleled grasp on the voluminous record that has developed from the prosecution of these many cases. By way of example, positions taken by defendants in more recent suits oftentimes contradict positions they took in prior suits and counsel are able to exploit this knowledge to the advantage of their clients. (Neuberger Decl. ¶¶ 9-11,70; B1320-21, 1331).

Additionally, the Firm's area of practice is in the civil rights arena. But the Firm's true niche lies in the highly specialized world of public employee law and then in the even more specific context of free speech and other First Amendment retaliation. The Firm has long represented numerous government employees in whistleblower and other retaliation suits which has only served to hone the Firm's expertise in this area. (Neuberger Decl. ¶¶ 3-6; B1319-20).

Counsel respectfully submits that their expertise in this area, both factually and legally, is unmatched by attorneys in the State of Delaware. In light of this wealth of accumulated knowledge, the Firm is in a unparalleled position to continue to represent and protect Capt. Davis pursuant to the non-retaliation agreement that successfully ended his first suit. The Firm's knowledge of the facts, the players, the organization, and mastery of retaliation law puts the Firm in powerful position that also serves as a deterrent to future retaliatory efforts. (Neuberger Decl.

38

¶¶ 3-11; B1319-21).

   3.   The prejudice the party would suffer in being deprived of its chosen counsel.  Elonex, 142 F.Supp.2d at 584; End of Road Trust, 2002 WL 242464, *2-3.  In light of #2 above, both plaintiffs and Capt. Davis "would certainly be more than merely inconvenienced if the court were to accede to [defendants'] request" to disqualify counsel.  Elonex, 142 F.Supp.2d at 584.  Indeed, they would suffer grave prejudice if this were to occur and can hardly afford to duplicate $240,000 of effort.  In the same way, plaintiffs' fragile emotional and psychological condition will be shattered by disqualification.  (Neuberger Decl. ¶¶ 72-73,68; B1330-31).

   4.   Delay will be caused by disqualification, because of the great difficulty that new counsel will have in mastering the complex issues in the case. End of Road Trust, 2002 WL 242464, *3.  Because defendants have sat on this issue until this late date - discovery in this case is near completion.  By the time the present motion is decided, trial will be looming and it will be impossible for new counsel to master the complex issues these cases present.

   5.   Any prejudice that would be suffered by the defendant.  End of Road Trust, 2002 WL 242464, *3.  As discussed in earlier arguments above, defendants will suffer no legally cognizable prejudice.  The Firm has not discussed the present litigation with Capt. Davis.  Defendants questioned Davis already at his deposition, and have not been prevented from meeting with him.

   6.   The Court's interest in protecting the integrity of the proceedings and in maintaining public confidence in the judicial system.  Elonex, 142 F.Supp.2d at 584.  In light of discussion above, depriving plaintiffs and Capt. Davis of their longstanding counsel will actually decrease the integrity of and public confidence in these proceedings.

   7.   Whether the disqualification motion is being used for illicit reasons.  Elonex, 142 F.Supp.2d at 585.  As this court has stated, "motions for disqualification are frequently filed as dilatory tactics intended to divert the litigation from attention to the merits."  Id. (internal

punctuation omitted).  Defendants' past practice bears this out as they regularly seek to harass

counsel in retaliation for their vigorous representation of state police employees.  See Conley v.

Chaffinch, 2005 WL 2678954 (D.Del. March 4, 2005).  Under these circumstances, "it seems

highly unlikely that [defendants'] motion is primarily motivated by a sense of betrayal or a

concern for the vindication of the integrity of the bar."  Elonex, 142 F.Supp.2d at 585.

     **B.  Remedy.**  If the Court believes that limited remedial action is necessary, plaintiff

respectfully submits that it should be confined to the limits of the representation that counsel and

Capt. Davis have already self imposed - that they not communicate about the present litigation.

<u>**CONCLUSION**</u>

     For the above stated reasons, the Court should deny defendants' motion in its entirety.[26]

However, if the Court finds a conflict to exist and also decides that disqualification of counsel is

necessary, Capt. Davis has authorized counsel to represent to the Court that he has chosen to step

aside from having The Firm represent him in the present litigation.  He makes this choice so that

plaintiffs may continue with their representation of the Firm and not suffer prejudice during this

most difficult time.  Capt. Davis then will retain other counsel.

     Respectfully Submitted,

     **THE NEUBERGER FIRM, P.A.**

     /s/ Thomas S. Neuberger
     **THOMAS S. NEUBERGER, ESQ. (#243)**
     **STEPHEN J. NEUBERGER, ESQ. (#4440)**
     Two East Seventh Street, Suite 302
     Wilmington, Delaware 19801
     (302) 655-0582
     TSN@NeubergerLaw.com
     SJN@NeubergerLaw.com

---

    [26]  If the Court finds some arguable merit to the defense position, counsel requests oral argument on the matter, and also a hearing at which the Court may personally question plaintiffs and Capt. Davis about the impact disqualification will have on they, their families and on whether justice will be done. (Foraker Decl. ¶ 13, Warren Decl. ¶ 12, Price Decl. ¶ 14, Davis Decl. ¶ 37; B1304-05,1308,1311,1317).

**MARTIN D. HAVERLY, ATTORNEY AT LAW**
**MARTIN D. HAVERLY, ESQ. (#3295)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Dated: November 14, 2005          Attorneys for Plaintiffs

# Unreported
# Opinions



Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Captain Barbara CONLEY, Plaintiff,
v.
Colonel L. Aaron CHAFFINCH, individually and in
his official capacity as the
Superintendent, Delaware State Police; Lieutenant
Colonel Thomas F. Macleish,
individually and in his official capacity as the Deputy
Superintendent,
Delaware State Police; David B. Mitchell,
individually and in his official
capacity as Secretary of the Department of Safety and
Homeland Security, State
of Delaware; and Division of State Police,
Department of Safety and Homeland
Security, State of Delaware, Defendants.
No. 04-1394-GMS.

March 4, 2005.
Stephen J. Neuberger, The Neuberger Firm, P.A.,
Wilmington, DE, for Plaintiff.

Ralph K. Durstein, III, Stephani J. Ballard, Department
of Justice, Alyssa M. Schwartz, Chad Michael
Shandler, Richard G. Elliott, Jr., Richards, Layton &
Finger, Wilmington, DE, James E. Liguori, Liguori,
Morris & Yiengst, Dover, DE, for Defendants.

*ORDER*

SLEET, J.

I. INTRODUCTION

*1 On October 27, 2004, Captain Barbara Conley
("Conley") filed this lawsuit, alleging gender
discrimination by Colonel L. Aaron Chaffinch
("Chaffinch"), David B. Mitchell ("Mitchell"), and

Division of State Police, Department of Safety and
Homeland Security, State of Delaware ("Delaware State
Police") (collectively, the "defendants"), in violation of
the Fourteenth Amendment to the United States
Constitution and 42 U.S.C. § 1983. [FN1]

FN1. On December 6, 2004, Conley filed a
first amended complaint, adding Lieutenant
Colonel Thomas F. Macleish ("Macleish") as
a defendant to the case.

Presently before the court is the defendants' motion for
an order limiting pretrial publicity. For the following
reasons, the court concludes that the order the
defendants seek is not constitutionally permissible
because they have failed to demonstrate a substantial
likelihood that statements from counsel and the parties
would materially prejudice the case. Additionally, the
proposed order is neither narrowly tailored nor the least
restrictive corrective measure available to ensure a fair
trial. [FN2]

FN2. On February 18, 2005, the court heard
oral argument on the defendants' motion and
issued an oral opinion denying the motion.
This is the court's written opinion on the
motion.

II. DISCUSSION

The defendants seek an order that would require
counsel and the parties to "cease any and all
extrajudicial communications" concerning this
lawsuit--that is, a gag order. (D.I. 9, at 8.) A gag order
is a prior restraint on speech that "raises rights under
the First Amendment of the United States Constitution."
*United States v. Scarfo*, 263 F.3d 80, 92 (3d Cir.2001).
A gag order also carries with it "a heavy presumption
against its constitutional validity." *Bailey v. Sys.
Innovation, Inc.*, 852 F.2d 93, 98 (3d Cir.1988)
(quoting *New York Times Co. v. United States*, 403 U.S.
713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)). As
such, the party moving for the gag order must present
evidence that demonstrates the need for the prior

restraint on both the lawyer and the litigants. *Nebraska Press Assoc. v. Stuart,* 427 U.S. 539, 562, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Bailey,* 852 F.2d at 99. [FN3] The moving party must also demonstrate that the order is narrowly tailored and that other measures short of prior restraint cannot effectively address the perceived danger. *See* *Nebraska Press,* 427 U.S. at 564-65. "If any method other than a prior restraint can effectively be employed to further the governmental or private interest threatened ... then the order is invalid." *Bailey,* 852 F.2d at 99.

> FN3. As a general rule, "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press" because "lawyers have special access to information through discovery and client communications [and] their extrajudicial statements [, therefore,] pose a threat to the fairness of a pending proceeding." *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1074, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1990). The court, however, cannot impose the ethical rules governing a lawyer's pretrial comments on litigants unless: (1) the litigants' pretrial comments are likely to interfere with the moving party's right to a fair trial; (2) other measures would not likely mitigate the effects of unrestrained pretrial publicity; and (3) the prior restraint would effectively prevent the perceived danger. *Bailey,* 852 F.2d at 99-100.

Intense publicity surrounding a proceeding poses significant and well-known dangers to a fair trial. *United States v. Brown,* 218 F.3d 415, 423 (5th Cir.2000). These dangers include the potential that pretrial publicity may prejudice the jury pool, as well as the actual outcome of a trial by, for example, disseminating to the press inadmissible evidence. *See, e.g., Gentile,* 501 U.S. 1030, 1075, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1990); *Scarfo,* 263 F.3d at 94; *Brown,* 218 F.3d at 423 (quoting *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)). [FN4] Under Third Circuit case law, the court must examine the record to determine whether a gag order would prevent a "substantial likelihood of material

prejudice" to the judicial proceeding. *See* *Scarfo,* 263 F.3d at 93-94 (applying the "substantial likelihood of material prejudice" standard that the Supreme Court held constitutionally permissible to balance an attorney's interest in free speech against the state's interest in fair judicial determinations in *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1990)). [FN5] If the court determines that an order limiting extrajudicial communication is proper, the "limitation [that the court imposes] on the ... speech must be narrow and necessary, carefully aimed at comments likely to influence the trial or judicial determination." *Scarfo,* 263 F.3d at 93.

> FN4. Indeed, "fairness in a jury trial, whether criminal or civil in nature, is a vital constitutional right." *Bailey,* 852 F.2d at 98.

> FN5. This standard is incorporated into the ABA Model Rules of Professional Conduct Rule 3.6 and the Delaware Lawyer's Rules of Professional Conduct Rule 3.6. *See infra* note 6.

 **2** The defendants maintain that Conley's lawyers, the Neuberger Firm (the "Firm"), have "promoted this lawsuit through public statements, the release of correspondence to the press, and media interviews." (D.I. 9 ¶ 4.) The defendants then list various statements that the Firm released to *The News Journal* and the *Delaware State News,* newspapers of general circulation in Delaware, and contend that these statements lacked civility and reflected verbal intemperance, scorn, and superiority. (*Id.*) Additionally, the defendants claim that the statements are "a calculated effort to influence the outcome of [the] plaintiff's lawsuit through manipulation of the media accounts of the litigation." (*Id.*)

 After reviewing the articles and statements, the court concludes that they do not rise to the level of creating a substantial likelihood of material prejudice, or of any harm sufficient to support a gag order. The statements at issue can be characterized as follows: (1) statements made to protect the plaintiff from substantial undue prejudicial effect of recent publicity not initiated by her counsel; (2) statements criticizing the Delaware State

Police and the Delaware government for alleged misconduct; (3) statements involving the plaintiff's claims and offense; (4) information contained in the public record; (5) statements that were made by a reporter, not the Firm; and (6) benign statements. These types of statements either fall within the "safe harbors" of the ABA Model Rules of Professional Conduct Rule 3.6 and the Delaware Lawyer's Rules of Professional Conduct Rule 3.6, or are protected under the First Amendment. [FN6] For example, the defendants cite a *News Journal* article, dated November 6, 2004, in which the Firm made the following comments:

> FN6. The ABA Model Rules of Professional Conduct Rule 3.6, adopted by Local Rule 83.6 for the District of Delaware, states, in pertinent part:
> (a) A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding.
> (b) A statement referred to in paragraph (a) ordinarily is likely to have such an effect when it refers to a civil matter triable to a jury ... and the statement relates to: (1) the character, credibility, reputation or criminal record of a party suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness; ...
> (5) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial ...
> (c) Notwithstanding paragraphs (a) and (b) a lawyer involved in the investigation or litigation of a matter may state without elaboration: (1) the general nature of the claim or defense; (2) information contained in the public record ... (4) the scheduling or result of any step in the litigation; ...
> The Delaware Lawyer's Rules of Profession Conduct Rule 3.6(c) further states:
> (c) Notwithstanding paragraph (a), a lawyer

> may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity.

"The law is the law. I don't care what they said, they violated it. Now they have to be held accountable." D.I. 9 ¶ 5; Ex. D, at 4. These statements do not pose a threat of prejudice to the jury. To the contrary, the statements were made to protect the plaintiff from the substantial undue prejudicial effect of recent publicity initiated when someone allegedly released an email containing her confidential Internal Affairs file to a Delaware newspaper, thereby violating the confidentiality provisions of Del.Code Ann. tit. 11 § 9200(c)(12). [FN7] Thus, the statements fall under the "safe haven" of the Delaware Lawyer's Rules of Professional Conduct Rule 3.6.

> FN7. Del.Code Ann. tit. 11 § 9200(c)(12) provides:
> (c) Whenever a law-enforcement officer is under investigation or is subjected to questioning for any reason which could lead to disciplinary action, demotion or dismissal, the investigation or questioning shall be conducted under the following conditions: ...
> (12) All records compiled as a result of any investigation subject to the provisions of this chapter and/or a contractual disciplinary grievance procedure shall be and remain confidential and shall not be released to the public.

Likewise, statements including the alleged Internal Affairs coverups of the defendants, specifically Chaffinch and MacLeish, arise out of independent matters concerning alleged misconduct and abuse of office within the Delaware State Police and the Delaware government. [FN8] These statements are protected by the First Amendment because they are criticisms of alleged governmental corruption, an issue of great public concern that lies at the core of the First

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 4
Slip Copy, 2005 WL 2678954 (D.Del.)
**(Cite as: 2005 WL 2678954 (D.Del.))**

Amendment. *See* [Gentile, 501 U.S. at 1034-35](#) ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment.... [A]lleged governmental misconduct ... [is] 'speech which has traditionally been recognized as lying at the core of the First Amendment.' "); [Baldassare v. New Jersey, 250 F.3d 188, 196 (3d Cir.2001)](#) ("Disclosing corruption, fraud and illegality in a government agency is a matter of significant public concern.") Indeed, "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" are public issues protected by the First Amendment. [New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)](#).

> [FN8.](#) These statements include:
> [t]his is the way it is with certain good old boys who happen to be in charge of our Delaware State Police.... [The Governor] condones and coddles a serial constitutional violator like the colonel.... This is ridiculous.... This is a travesty. This must be the Delaware way.... I will not be party to another coverup of misdeeds in the DSP.

**\*3** Other statements that the defendants list refer to the plaintiff's claims or matters previously published. One of the statements, in addition to being a matter of public record, was not made by the Firm, but by a reporter for the *Delaware State News.* [FN9] In addition, some of the criticized statements are benign, including: "[t]here's some stuff that we wouldn't even put in the complaint because we were concerned with the decorum of the court. It's so offensive we won't put it in court papers." (D.I. 9 ¶ 5.) The statements at issue in the present case are innocuous when compared, for example, to extrajudicial statements in *Mu'Min v. Virginia,* a capital murder case in which the Supreme Court did not issue a gag order. The Court held that even though the community had been subjected to a barrage of publicity prior to the trial, including news articles containing details of the crime and prejudicial information inadmissible at trial, and eight of the twelve jurors admitted some exposure to pretrial publicity, the publicity did not rise even to a level requiring questioning of individual jurors. [500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991)](#).

> [FN9.](#) The *Delaware State News* article, dated November 16, 2004, states that the Firm "called for an open investigation of Col. Chaffinch and released the names of more than a dozen current or retired troopers who allegedly witnessed improper behavior on the part of the colonel." (D.I. 9 ¶ 5.) In addition to the fact that the statement was made by the news reporter, the Firm's release of witnesses relates to the Internal Affairs investigation of Colonel Chaffinch, not the present case. Under Delaware law, the investigation into Colonel Chaffinch is not confidential. *See* [Del.Code Ann. tit. 11 § 9200(b)](#) ("this chapter shall not apply to the Superintendent or Deputy Superintendent of the Delaware State Police, or to any officer above the rank of Captain in the Delaware State Police").

 In addition, the defendants do not explain any specific or general prejudice they would suffer if the court did not impose a gag order. They list statements and characterize them as prejudicial. However, they have presented no evidence, and the court cannot find any support in the record, as to why the statements are a "calculated effort to influence the outcome of [the] plaintiff's lawsuit through manipulation of the media accounts of the litigation," as the defendants contend. Thus, the defendants have not demonstrated a substantial likelihood that extrajudicial statements by the Firm or the parties would materially prejudice the case.

 Moreover, even assuming that the record demonstrates a substantial likelihood of material prejudice, the court finds that the defendants' proposed gag order is not "narrow [and] carefully aimed at comments likely to influence the trial or judicial determination." [Scarfo, 263 F.3d at 91](#). As previously stated, the proposed order would require counsel and the parties to "cease any and all extrajudicial communications" concerning this lawsuit. The defendants would have the court impose a "no comment" rule without leaving open avenues of expression, including statements that are protected under the "safe harbor" provisions of the ABA Model Rules of Professional Conduct and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 5
Slip Copy, 2005 WL 2678954 (D.Del.)
**(Cite as: 2005 WL 2678954 (D.Del.))**

Delaware Lawyers' Rules of Professional Conduct, as well as protected criticisms of alleged government misconduct and corruption. Accordingly, the defendants' proposed order is not narrow and would therefore, if implemented, be unconstitutional. *Compare Brown,* 218 F.3d at 419 (upholding the constitutionality of a gag order and because "[t]he order expressly does not prevent the parties from discussing ... (1) the general nature of any allegations or defenses; (2) information contained in the public record; (3) scheduling information; (4) any decisions or order by the court that is a matter of public record; and (5) 'the contents or substance' of any motion filed in the case, to the extent the motion is a matter of public record"). Nor is the proposed gag order the least restrictive means available to prevent the "evils" against which a gag order may appropriately apply. After reviewing the record and case law, the court concludes at the present time that alternative measures to prior restraint, including a careful *voir dire* of prospective jurors and/or emphatic jury instructions from the court would blunt the impact of any pretrial publicity and alleviate the defendants' concerns about a fair trial. *See Bailey,* 852 F.2d at 100. [FN10] Accordingly, the court will deny the defendants' motion.

> FN10. This is especially true in light of the fact that the court has not yet determined a trial date for this case. *See Gentile,* 501 U.S. at 1044 ("A statement which reaches the attention of the venire on the eve of *voir dire* might require a continuance or cause difficulties in securing a impartial jury," ... while "exposure to the same statement six months prior to trial would not result in prejudice, the content fading from memory long before the trial date.")

III. CONCLUSION

**\*4** For the aforementioned reasons, IT IS HEREBY ORDERED that:
   1. The defendants' Motion for an Order Limiting Prejudicial Pretrial Publicity (D.I.9) is DENIED without prejudice.

Slip Copy, 2005 WL 2678954 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                  Page 1
Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

H

**Motions, Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Plaintiff,
and
Manessa BEVERLY, Intervenor,
v.
HORA, INC. (d/b/a "Days Inn") and Marshall
Management, Inc., Defendants.
**No. Civ.A. 03-CV-1429.**

June 8, 2005.

Dawn M. Edge, Jacqueline H. McNair, Judith A. O'Boyle, Equal Employment Opportunity Commission, Philadelphia, PA, for Plaintiff.

Andrew N. Howe, Samantha M. Peirce, Hartman, Hartman, Howe & Allerton, Reading, PA, Beth A. Friel, Montgomery McCracken Walker & Rhoads LLP, Philadelphia, PA, Howard Kurman, Laura L. Hoppenstein, Offitt Kurman Yumkas & Denick PA, Owings Mills, MD, for Defendants.

Anne L. Carroll, Reading, PA, for Movant.

Jana R. Barnett, Wyomissing, PA, for Intervenor.

*MEMORANDUM and ORDER*

PRATTER, J.

I. INTRODUCTION AND SUMMARY OF DECISION

**\*1** The pending motion to disqualify the Intervenor's counsel from participation in this case as an attorney and advocate presents the Court with the unwelcome task of considering whether a lawyer's conduct merits

her removal from this case over her client's objection.

Defendants HORA, Inc. ("HORA") and Marshall Management, Inc. ("Marshall"), have filed a Joint Motion to Disqualify Jana R. Barnett, Esq., as counsel for Intervenor Plaintiff Manessa Beverly ("Intervenor" or "Ms. Beverly"). Defendants' motion has two basic features: first, that Ms. Barnett's pre-litigation tactics far over-stepped ethical boundaries and principles, and, second, that as a result of this conduct she is now likely to be called by Defendants as a witness at trial to undercut the validity of the Plaintiffs' claims. [FN1] Thus, the motion posits Ms. Barnett's disqualification on the basis of Pennsylvania's Rules of Professional Conduct, specifically Rules 3.7, 4.2, 4.4 and 8.4. Not surprisingly, Ms. Barnett disputes the allegations and accusations and argues that disqualification is neither appropriate nor warranted. The Equal Employment Opportunity Commission (the "EEOC"), as primary plaintiff, argues against Ms. Barnett's disqualification, primarily on the grounds that her removal would be prejudicial to the Intervenor.

> FN1. As discussed *infra*, the Court has by no means concluded that Defendants will be permitted to call Ms. Barnett as a witness or, if they are, what will be the permissible scope of questioning. Those decisions must await at least the final pretrial conference, if not the actual trial.

The Court accords heavy deference to a party, such as Intervenor Beverly, in choosing her own counsel. Nonetheless, that right necessarily must be equitably balanced against the rights of the other parties and the ethical considerations and concepts discussed herein. The Court has both the power and obligation to protect and promote the integrity of the legal system and legal profession and to monitor the conduct of counsel appearing before it.

Reluctantly, for the reasons discussed in some detail below, the Court grants the motion to disqualify. The evidence presented to the Court demonstrates that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

counsel for the Intervenor, perhaps succumbing to her unrestrained ardor to advance her client's interests, lost sight of her other duties during the initial pre-pleading stages of this dispute and thereafter failed to respect the legal rights of others and disregarded her obligation to comport herself with professional dignity and independence. As a result, her continued involvement as trial counsel for a party in this case would pose either actual or potential conflicts of interest that risk further impeding the fair and orderly progress of the case. Therefore, Ms. Barnett will be precluded from future formal involvement in this litigation, other than to facilitate the efficient and expeditious transfer of the representation of Intervenor Beverly to new counsel and to remain available to be a witness at trial, if necessary.

## II. FACTUAL BACKGROUND AND EVIDENTIARY CONCLUSIONS

This litigation concerns allegations brought by the EEOC against HORA and Marshall. HORA owns, and Marshall managed, the Days Inn Hotel (the "Hotel") in Reading, Pennsylvania. The EEOC claims that HORA and Marshall engaged in unlawful employment practices by subjecting Ms. Beverly and other female employees at the Hotel to a sexually hostile work environment and then wrongfully terminating Ms. Beverly's employment. The claim is that Ms. Beverly's supervisor/trainer, Nelson Garcia, a male employee with bookkeeping and accounting duties at the Hotel, made unwanted sexual advances toward Ms. Beverly and other women on the Hotel office staff, but neither HORA nor Marshall took steps to prevent such acts even though they knew of them or knew of complaints about them. The EEOC also alleges that HORA and Marshall retaliated against Ms. Beverly by terminating her employment after she complained of the alleged sexual harassment. Ms. Beverly individually also asserts a Pennsylvania Human Relations Act claim. Ms. Barnett is Ms. Beverly's counsel in connection with that claim.

**\*2** Some seven months before this suit was filed and before commencement of any EEOC investigation into the matters at issue, Jana Barnett, as counsel for Ms. Beverly, began to communicate with Deborah Richardson who was the administrative assistant to the

Hotel's General Manager, Daryl Carr, and to HORA's part-owner and senior on-site officer, Anna Koutroulelis. These communications are documented in a series of e-mails sent and received between approximately August 1, 2002 and September 12, 2002. [FN2] At the time, other than Ms. Richardson, Ms. Koutroulelis and Mr. Carr, the Hotel had only several other administrative or office employees. Mr. Garcia, whose alleged conduct is the subject of Ms. Beverly's and the EEOC's claims, was one of those employees. At the time in question, Ms. Barnett was Ms. Beverly's legal counsel, but she was not, at that time or ever, Ms. Richardson's legal counsel or legal counsel for any other HORA or Marshall employee. Ms. Richardson herself has voiced no personal claim of sexual harassment or retaliation and, according to her deposition testimony, apparently did not personally witness any such actionable or objectionable conduct.

> FN2. These e-mail communications began essentially at the same time Ms. Barnett transmitted notice of her client's claim to the EEOC. Information from these e-mails later made its way, largely without attribution or qualification, into a lengthy letter of November 18, 2002 from Ms. Barnett to the EEOC that purported to be background factual information supporting Ms. Beverly's claim and was intended to spur the EEOC to initiate significant litigation against HORA and Marshall.

Immediately following Ms. Beverly's July 23, 2002 termination as a trainee for the Hotel administrative staff, Richardson decided to help Ms. Beverly pursue a claim against HORA and Marshall. Thus, sometimes acting alone, and at other times with the help of co-worker Tammy Schneider, Richardson began to gather information about other HORA employees, about Mr. Garcia and about her employer's knowledge of Mr. Garcia's background. For example, Ms. Richardson and Ms. Schneider looked for a copy of the HORA sexual harassment policy that Ms. Beverly had signed and also looked for evidence pertaining to the reasons that Ms. Beverly had been sent home before the end of her shift on the day of her complaint to Hotel management about Mr. Garcia. Ms. Richardson also

Slip Copy                                                                                                                    Page 3
Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

reviewed her personal copy of TV Guide to locate the listing for "Dangerous Touch", the HBO movie that Beverly said Mr. Garcia purportedly was watching during Ms. Beverly's last night at the Hotel and that Ms. Beverly found offensive.

Ms. Barnett suggests that Ms. Richardson did all of these things before either Ms. Beverly or Ms. Richardson ever contacted Ms. Barnett. Barnett Verified Statement, ¶ 1. Ms. Barnett suggests that Ms. Richardson was acting on her own initiative throughout the investigatory process rather than at the instigation of Ms. Barnett. Ms. Barnett apparently believes that if such a characterization could be supported by the record thus presented, it should insulate her from criticism inasmuch as Richardson could be seen as a self-motivated conduit for unsolicited, albeit helpful, information relative to Ms. Beverly's complaint. However, the record before the Court presents a significantly different version of events. Ms. Barnett's claim that the information she received was unsolicited and provided without her encouragement is seriously undermined and contradicted by the documented written e-mail exchanges between Barnett and Richardson in which Barnett *explicitly* encouraged Richardson's disclosures.

**\*3** In the lengthy e-mail exchanges that apparently prompted this motion, Ms. Barnett either sought or received information from Ms. Richardson that Ms. Barnett, as an attorney practicing in the field of employment law, knew or should have known was the Hotel's and Marshall's confidential business and personnel information. As an attorney familiar with employment litigation, Ms. Barnett also knew or should have know that some of that information was directly related to the Hotel's and Marshall's defense of Ms. Beverly's complaint. Furthermore, Ms. Barnett knew or should have known at the time of these communications that Ms. Richardson was a secretly, but vehemently, disgruntled Hotel employee who occupied a position of intimate business trust at the high level of Hotel management. Richardson was the sole and direct, personal assistant to senior HORA and Marshall managers who, unlike Ms. Barnett, apparently were then unaware of Richardson's negative attitude about the Hotel operations and management. In many ways

relating to the day-to-day operation of the Hotel, Ms. Richardson was the eyes, ears, voice and legs of on-site Hotel management, and as such, while she did not independently wield management powers or have the institutional power to technically bind either of the Defendants, as a legal evidentiary matter, she did have continuous exposure and direct access to extensive and relevant confidential and privileged information of the Defendants and Hotel personnel.

The evidence supports a conclusion that Ms. Barnett knew, or surely should have known, that Richardson had the means and motivation to share secretly with Ms. Barnett, *inter alia,* (a) her embellished surmises about her employers and Hotel personnel and litigation defense issues, (b) negative goals with regard to the efficacy of both HORA's and Marshall's management and business practices and, more problematically, (c) certain documents (or detailed descriptions of such documents) and other confidential and privileged information learned by Richardson, or told to Richardson by others, in the course of her employment and to which she had been entrusted with access. From a review of the e-mail traffic alone, it seems that Ms. Barnett must have recognized that Ms. Richardson was a well-placed, potentially useful "mole." She also was viewed by Barnett as a potential client and referral source for other potential clients. In any case, on the record here, Ms. Barnett was unabashed and unreserved in her exploitation of Ms. Richardson's position and of Ms. Richardson's obvious personal agenda.

As mentioned above, Ms. Barnett describes herself as the fortuitous recipient of unsolicited information, most of which she emphasizes would be and in fact was produced later during the regular, somewhat more orderly, discovery process. These are insufficient excuses for Barnett's conduct in this Court's view, given what the available evidence discloses. The Court is constrained also to acknowledge that nothing has been presented to the Court to indicate that Ms. Barnett ever *discouraged* Ms. Richardson from providing materials and information to her well before and outside the normal rules and channels of discovery. It also appears to be an inescapable conclusion that Ms. Barnett had or should have had a complete and accurate appreciation of the motivations for Ms. Richardson's assembling this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 4
Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

information, thus raising what should have been cautionary concerns about Richardson's "information" and information gathering methods. The Court has no doubt that had Defendants in the summer of 2002 known of such behavior by their trusted administrative assistant for senior Hotel management, including the subsequent disclosure by her of private defense information to Ms. Barnett, they very likely would have sought to sever or otherwise close off this information pipeline, leaving the process of appropriate disclosures for the inevitable litigation process.

**\*4** It bears emphasizing that Ms. Richardson testified during her deposition that she never personally observed Mr. Garcia acting inappropriately toward any Hotel employee, including Ms. Beverly:

Q: Do you know whether Mr. Garcia made any sexual overtures to any employee at Days Inn, from your own personal knowledge?

A: No

...

Q: What is the factual basis for your belief that Manessta [Beverly] was fired because she complained of Nelson Garcia's sexual harassment?

A: Because of the note that she left for Anna, Daryl, and myself and that is where it has in there the sexual harassment.

Q: So your belief that she was fired because she complained about Mr. Garcia's sexual harassment is predicated upon the note that Manessta wrote; is that correct?

A: That's correct.

Q: But you don't have personal knowledge of any of the incidents that comprised that note, do you?

A: No.

...

Q: Now, during the time that Manessta Beverly worked [at the Hotel], did you have an opportunity to evaluate her performance?

A: No.

(Def. Motion, Ex. 2, at 56-58, 62-63) (emphasis added).

Richardson also admitted to having no first hand knowledge of anything that transpired between Garcia and Beverly:

Q: My question is, since you weren't on the shift with Ms. Beverly and Mr. Garcia, you have no firsthand information about anything that transpired between those two employees, do you?

A: I have no idea what went on between Nelson and Manessta.

(Def. Motion, Ex. 2, at 65) (emphasis added).

Moreover, Ms. Richardson admitted to behaving disloyally due to her intense dislike for her superiors at the Hotel:

Q: Is it fair to say, by the way, that as of the date of this e-mail, which is August 31, 2002, is it fair to characterize your attitude towards Days Inn as fairly bitter?

A: Towards management, yes.

Q: That's a fair statement?

A: I was very upset with what was going on there, yes, because I thought it was very unfair.

Q: You were angry towards management?

A: Yes.

(Def. Motion, Repl. Ex. 2, at 18) (emphasis added).

Specifically, Ms. Richardson did not like her boss, the Hotel General Manager, Daryl Carr. Richardson described her relationship with Carr as "stormy," that they "never s[aw] eye to eye on anything," and that she was of the opinion that Mr. Carr performed his job poorly. (Def. Motion, Repl. Ex. 2, at 30).

The significance of the foregoing testimony disclosing the limits on Richardson's *bona fides* as a source of information is that either Ms. Barnett made no effort to assess Richardson's credibility before mining her for information, or Barnett knew, but ignored, that Richardson presented very significant credibility and competence issues.

Additional specific excerpts from the e-mail exchange will explain the context of the Court's concerns and the basis for the seemingly severe evaluation and ruling here.

In her first e-mail message, dated August 1, 2002, 4:10 p.m., Ms. Barnett thanked Ms. Richardson for her "encouraging letter" and for providing Barnett with a copy of the Hotel's employment handbook. Ms. Barnett also educated Richardson to Barnett's views as to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

conditions under which the two of them could continue communications about Ms. Beverly and inside information about the Hotel, telling Richardson that they could freely communicate if (1) Richardson became Barnett's client or (2) Richardson was not in a "management position." Richardson did not accept Barnett's legal representation solicitation, but she obviously understood the hinted management/non-management distinction and quickly told Barnett she was not a "manager." Therefore, she apparently and immediately accepted the invitation to feel "free to communicate" with Barnett, stating:

**\*5** I am willing to help Manessta in any way that I can. I have made copies of her time sheets showing that [Manessta] left early on several occasions.... I am probably on limited time there now so if I can help with anything let me know. Perhaps I will be hopping on Manessta's wagon too.... Thank you for helping us out.

(Def. Motion, Ex. 1, at 13-15.) [FN3]

>       FN3. Copies of Ms. Beverly's actual time
>       sheets were not provided by Richardson to
>       Ms. Barnett, but the information contained in
>       them was communicated.

Less than a week later, on August 7, 2002, Ms. Barnett e-mailed Ms. Richardson with an update on the status of Ms. Beverly's EEOC administrative charge. (Def. Motion, Ex. 1, at 13.) [FN4] In that e-mail, Ms. Barnett expressly encouraged Ms. Richardson to remind the Hotel that retaliation is prohibited and again pressed the question of whether Richardson wanted Barnett to represent her. Ms. Barnett closed this e-mail by offering: "[l]et me know what I can do to protect you." (Def. Motion, Ex. 1, at 13). At no time did Ms. Barnett inform Richardson the extent to which Richardson might be jeopardizing her job by acting counter to her fiduciary duties to her employer. Likewise, it appears from the extensive e-mail exchanges that Ms. Barnett did not bother to explain to Richardson that Richardson and Beverly well could have conflicting interests as matters continued to develop.

>       FN4. The Court can only assume for present
>       purposes that Barnett had her client's authority
>       to share this--and other--information with

Richardson, although Barnett has provided no evidence to confirm that assumption. However, in the absence of any submission to the contrary, the Court is not considering that there has been any violation of R.P.C. 1.6 concerning the maintenance of client confidences.

After the Defendants were served with the EEOC Charge of Discrimination, they initiated an internal investigation during which several Hotel employees, including Richardson, were interviewed by senior Marshall and Hotel personnel as guided by counsel. These private interviews became one of the subjects of the lengthy e-mail discussion between Ms. Barnett and Ms. Richardson, including a recounting of much of the content of the interviews and the resulting feedback from the Hotel's management. For example, Ms. Richardson wrote to Ms. Barnett:

I want to add here that [Anna Koutroulelis, HORA's Treasurer] was in on all the interrogations and she is also aware of my complaint to Mike Marshall [of Marshall Management] ... She wanted to know why I didn't come to her with this and I told her because I'm not sure which way she would go with it ... Anna did state that the outcome on the 22nd (the night they fired Manessta[) ] was not the outcome that she wanted. What she exactly meant by that I don't know ... I left there feeling that they are not going to believe anything Manessta said ... I'm sorry but I have to go now. Wil [sic] try to keep you posted unless I get a GAG [sic] order.

(Def. Motion, Ex. 1, at 10-12) (emphasis added).

Ms. Barnett's response to this information was to reply to Richardson on August 8 by asking Ms. Richardson to increase her efforts to provide additional and more detailed information:

If you think of anything else that was said during the interviews, or if you find out that additional people were interviewed, would you make notes?

(Def. Motion, Ex. 1, at 8). [FN5]

>       FN5. This statement seriously undermines Ms.
>       Barnett's response to Defendants' argument
>       that she did not encourage Ms. Richardson to
>       disclose "all information she learned on the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

job, including a privileged client-lawyer conversation, and ... that [Ms. Barnett] could not ethically receive the intercepted communications." To the contrary, from the e-mail traffic one can conclude that Ms. Barnett went to some length to plant the seeds of encouragement for Ms. Richardson to report to Ms. Barnett everything Richardson deemed helpful to Ms. Beverly's case.

Ms. Barnett contends that there was "nothing improper" with regard to this request because she was thinking at the time that "memories do fade", and she "wanted to make sure that there was a complete record of who was interviewed and what was said during the interviews." *See* Intervenor's Response to Defendants' Motion to Disqualify, at 5. However, at that point in time, Barnett, as an experienced lawyer familiar with the litigation process, should have recognized Richardson as a likely future deponent and, possibly, trial witness. Nevertheless, rather than leaving such a potential witness in a "pristine" state, in this same e-mail to Richardson, Barnett endeavored to further encourage and manipulate Richardson by telling her

　　*6 Anna [Koutroulelis, Richardson's boss and a Hotel owner and officer,] apparently turned a blind eye to previous complaints of discrimination, and someone took personnel files, so you shouldn't be embarrassed or [feel] guilty by your lack of trust in her.

(Def. Motion, Ex. 1, at 8-9). Barnett apparently sensed that Richardson was concerned about possibly losing her job because she then listed in the e-mail a number of reasons why loss of a job may actually be beneficial. In addition, Barnett attempted to stir up more litigation by suggesting to Richardson the option of filing a "charge of discrimination (retaliation is a form of discrimination) with the EEOC and PHRC."

　In the course of the e-mail exchanges, Ms. Richardson also disclosed to Ms. Barnett that she, Richardson, had reviewed Mr. Garcia's personnel file at least twice for evidence of written discipline, but did not discovery any such evidence. (Def. Motion, Ex. 1, at 11-12). [FN6] Richardson also had earlier revealed to Barnett the following tidbit when she reported to Barnett that Garcia had been fired:

FN6. Ms. Barnett claims that "Ms. Richardson never told me that she reviewed the personnel file of Nelson Garcia for written disciplines but did not locate any. She did tell me that it was her job to file such documents, and that she had not filed any for Mr. Garcia." (Barnett Verified Statement, ¶ 8). However, the e-mail correspondence between Richardson and Barnett provides a somewhat different story. In Ms. Richardson's August 31, 2002, e-mail to Barnett, Richardson states:
Letting you know again that there is nothing in Nelson's file pertaining to any written warning that he supposedly received from Manessta and Myndi's complaints. So nothing better show up there all of a sudden.
(Def. Motion, Ex. 1, at 1) (emphasis added). In a previous e-mail to Barnett, Richardson also indicated that she had direct knowledge of Garcia's personnel file:
Why give a written warning if there was [no basis for previous allegations against Nelson Garcia]? [Mike Getzy] also stated that Daryl gave Nelson another written warning in Manessta's case. Another written warning after he already has given one seems unusual because that is something I do believe should be kept in their personnel file.
(Def. Motion, Ex. 1, at 11-12) (emphasis added). Together, these statements to Ms. Barnett, at a minimum, intimate that Ms. Richardson was informing Barnett that she had, at some time in the past, maintained and/or reviewed Nelson Garcia's personnel file.

Are you aware that Nelson is apparently on parole? From what I have gathered it was in New Jersey that a woman had a restraining order out on him for harassment.
(Def. Motion, Ex. 1, at 4).

　Barnett's August 9, 2002 e-mail reply to this obvious office gossip shows, at a minimum, her unlawyer-like disregard for the reputation of a third party, namely, Nelson Garcia, or the legitimate hospitality industry business interests of the Defendants. Barnett wrote:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                         Page 7
Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

Thanks for the update. I'm very glad that they took this step. Although it's clear that you cared about your co-workers, you were most concerned about *the unsuspecting [Hotel] female guests who were sleeping and unaware of the fact that an ex-con had been given access to the keys to their rooms. While we don't know what he was convicted of, his behavior towards his co-workers indicated that he didn't respect boundaries,* so your fears had free reign.

(Def. Motion, Ex. 1, at 3-4). (emphasis added). Richardson's e-mails had made no prior mention of such concern about "female guests," and no evidence has been presented that the Hotel had ever had complaints from its clientele in such regard. [FN7]

> FN7. Because the discovery process later produced documentation that Mr. Garcia apparently had been convicted on a stalking charge, Ms. Barnett contends that the information provided to her by Ms. Richardson proved to be "consistent" with certain allegations against Mr. Garcia, and there was nothing improper about Ms. Richardson sharing the information about Mr. Garcia's personnel file. Regardless of what one might think about Richardson's intermeddling, the primary issue here is Ms. Barnett's responsibility as a lawyer, not Richardson's behavior, except as it was encouraged and exploited by Ms. Barnett without any apparent effort of restraint.

While Richardson was away on vacation in mid-August 2002, the e-mail traffic slowed, resuming when she returned. Ms. Barnett's e-mail of August 20, 2002, to Richardson requested that Richardson photocopy the TV Guide containing the title and description of the movie the alleged harasser purportedly had playing on the television in the Hotel lobby during the last night of Ms. Beverly's employment there. (Def. Motion, Ex. 1, at 2). Ms. Beverly had reportedly found the program to be a disquieting part of the alleged harassment. Ms. Barnett repeated this request in a September 1 e-mail to Richardson in which she also invited Richardson to come to her home office. (Def. Motion, Ex. 1, at 20). Ms. Richardson complied. (Def. Motion, Ex. 1 at 21;

Def. Motion, Repl. Ex. 2, at 14, 19).

**\*7** On August 31, 2002, Ms. Richardson wrote to Ms. Barnett disclosing the substance of an apparently private attorney-client conversation between HORA's owners and HORA's legal counsel. Apparently, this conversation had been reported to Richardson by Tammy Schneider, a co-worker who eavesdropped on the three-hour legal consultation between Hotel management and counsel:

> On Thursday evening Anna, her father and her brother had a 3 hour meeting at the hotel with an attorney. Tammy overheard part of it that being Anna stating that she knew there was a problem with Nelson at one time but she didn't realize that it was an ongoing situation.

(Def. Motion, Ex. 1, at 1) (emphasis added). Thus, Barnett knew what she was receiving via Richardson (i.e., her opponents' client confidences communicated to opposing counsel) and the dubious nature of the filters through which the information made its way to her. The subsequent e-mails show no effort by Barnett to disabuse Richardson or her other secret sources of this means of funneling the opponents' privileged information to her.

That same day, Richardson also described to Ms. Barnett a confidential document from Marshall addressed to HORA in response to the EEOC charge. Richardson wrote:

> Oh and by the way ... the little bit that I did see of the fax on Wednesday gave specifics that need to be forwarded to EEOC ( [i.e.,] written warnings, any written documentation from an employee regarding their complaint[,] etc) by Marshall and/or Daryl. [FN8]

> FN8. Daryl Carr was a Marshall employee serving as the General Manager of the Hotel at the time in question.

(Def. Motion, Ex. 1, at 1) (emphasis added). Ms. Richardson also had previously recounted to Barnett an earlier fax from Marshall to the Hotel General Manager about the receipt of the EEOC notice, reporting that she was "ecstatic" as a result of that development. (Def. Motion, Ex. 1, at 1-2).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In the final Barnett-Richardson e-mail produced to Defendants, Richardson wrote to Ms. Barnett on September 12, 2002, regarding certain confidential information that Marshall was preparing to send to the EEOC. Defendants contend that this information was not subject to disclosure to the Intervenor Plaintiff under EEOC regulations. The EEOC's protocols on the proper handling of such a disclosure is open to interpretation on this point. While it is conceivable that the EEOC might at some point disclose a witness's statement to a complainant or complainant's counsel, at the time she received Richardson's rendition of the information, Barnett had no way of knowing what the EEOC would eventually decide to share and what would be withheld. In fact, Barnett could not even then know whether what was being disclosed to her by Richardson was a draft of a respondent's reply to the EEOC that had yet to be discussed with or reviewed by counsel:

> Today a fax came through to Daryl from Mike Getzy [FN9] that had Daryl's reply to the EEOC. I only got a brief glance but what I did see was Daryl stating that on the 20th he received several calls at home from both Manessta and Nelson and one of the calls from Manessta was regarding the TV incident. He also states that he spoke with Manessta several times about her attitude and her appearance. He states that because of her attitude he had decided that she was not proper material to be working the desk representing the hotel and that she was terminated during her probationary period.

> FN9. Michael Getzey is the Executive Vice-President of Marshall Management, Inc.

**\*8** (Def. Motion, Ex. 1, at 18). Ms. Barnett contends that Ms. Richardson did not provide a copy of Mr. Carr's statement to her, she merely had knowledge of its utterance. Barnett also argues that Mr. Carr's statement was later disclosed by counsel for the Hotel during the discovery process.

As a result of the above factual information learned during discovery regarding the relationship between Ms. Barnett and Ms. Richardson, defense counsel formally notified Ms. Barnett in a joint letter dated February 25, 2005, that if she failed to voluntarily

withdraw from this case, Defendants would move for her disqualification. Offered the opportunity to voluntarily withdraw, Ms. Barnett chose not to do so. The filing of the disqualification motion followed. Given the nature of the dispute, the Court provided all parties the opportunity for a hearing, oral argument and briefing.

### III. ANALYSIS

*A. Standard of Review*

The Court has "substantial latitude" when deciding whether to disqualify an attorney. *Wheat v. United States,* 486 U.S. 153, 163-64, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The Court's power to disqualify an attorney is derived from its inherent authority to supervise the professional conduct of attorneys appearing before it.

The party seeking to disqualify opposing counsel bears the burden of showing clearly that continued representation would be impermissible. *J & J Snack Foods Corp. v. Kaffrissen,* 2000 WL 562736 at *2 (E.D.Pa. May 9, 2000),* citing *Cohen v. Oasin,* 844 F.Supp. 1065, 1067 (E.D.Pa.1994). Nevertheless, our circuit court has suggested that if the district court has any doubts regarding the existence of a violation of the professional conduct rules, those doubts should be resolved *in favor of* disqualification as a response to the need to maintain public confidence in lawyers and other participants in the administration of justice. *See Imbesi v. Imbesi,* 2001 WL 1352318, at *2 (E.D.Pa.2001); *J & J Snack Foods,* 2000 WL 562736 at *2,* citing *Int'l Bus. Mach. Corp. v. Levin,* 579 F.2d 271, 283 (3d Cir.1978) (emphasis added).

The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid *even the appearance of* impropriety. *Kramer v. Scientific Control Corp.,* 534 F.2d 1085, 1088-1089 (3d Cir.1976); *Richardson v. Hamilton International Corp.,* 469 F.2d 1382, 1385-1386 & n. 12 (3d Cir.1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). *See also, Cinema 5, Ltd. v.*

*Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir.1976). Indeed, the courts have gone so far as to suggest that doubts as to the existence of an asserted conflict of interest *should be resolved in favor of* disqualification. *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.1975); *Chugach Elec. Ass'n v. United States D.C. for Dist. of Alaska,* 370 F.2d 441, 444 (9th Cir.),* cert. denied,* 389 U.S. 820, 88 S.Ct. 40, 19 L.Ed.2d 71 (1967).

**\*9** *Int'l Bus. Mach. Corp.,* 579 F.2d at 283 (emphasis added). The Court of Appeals for the Third Circuit has also advised that a district court

should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. It should consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions.

*Miller,* 624 F.2d at 1201, citing *United States* ex rel. *Sheldon Electric Co. v. Blackhawk Heating & Plumbing Co.,* 423 F.Supp. 486 (S.D.N.Y.1976); *Baglini v. Pullman, Inc.,* 412 F.Supp. 1060 (E.D.Pa.1976), *affirmed,* 547 F.2d 1158 (3d Cir.1977). While Ms. Barnett argues that the controlling case law does not support a court's reliance exclusively upon violations of professional rules to disqualify counsel, the Court disagrees. Indeed, as indicated above, in some instances courts have found that even the *appearance* of ethical impropriety can support disqualification. [FN10] Here, the Court finds not only the appearance, but also the existence of improper professional behavior by Ms. Barnett.

FN10. The Court is mindful that, unlike some other states' ethics rules and unlike many judicial codes of conduct, the Pennsylvania Rules of Professional Conduct do not presently contain an express "appearance of impropriety" proscription. However, the Court's evaluation of a lawyer's conduct must give consideration to inescapable "appearances" if the Court is to be attentive to the duty to help maintain "public confidence in the propriety of the conduct of those

associated with the administration of justice ..." *See IBM v. Levin, supra* at 283. The Court must also acknowledge an inescapable and overarching purpose of the Rules of Professional Conduct, namely, to promote a high level of recognizable integrity and confidence in the persons licensed to practice law so that observers of lawyers will not have cause to see a profession peopled by practitioners for whom the ends always justify the means.

By using Ms. Richardson as an informational mole and subsequently representing the information from Ms. Richardson's reports as factually true as part of her campaign with the EEOC, Ms. Barnett has not only violated her adversaries' legal rights that permit an appropriately calculated and sometimes negotiated flow of information through the traditional discovery process, but she also contemporaneously risked undermining the EEOC's official role and thwarted policies underlying a number of ethical rules.

Ms. Barnett conducted a surrogate-like EEOC investigation without the knowledge of the Hotel, Marshall or their lawyers. Had the Hotel's or Marshall's lawyers known of Ms. Barnett's actions, they very likely would have taken appropriate action to attempt to govern the flow of information to both Ms. Barnett and the EEOC. [FN11] They are entitled to undertake such efforts if they are undertaken honestly and in compliance with applicable rules. The Hotel or Marshall should have been given this opportunity.

FN11. Defendants have not specified the exact misrepresentations that were made by Ms. Barnett to the EEOC, but it is clear from the record before the Court that a significant amount of information that was gleaned by Ms. Barnett to support the allegations in her November 18, 2002 letter to the EEOC resulted from improper communications (mostly e-mails) with Ms. Richardson and that Ms. Barnett surely should have known that much of Ms. Richardson's information was either improperly disclosed or based only on second- or third-hand office gossip. Ms.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 10
Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

Barnett's letter to the EEOC, however, gives no hint of the actual nature or reliability of her sources of information. Ms. Barnett concedes that on November 18, 2002, approximately two months after the last e-mail with Ms. Richardson, she "sent the EEOC's investigator a nine page letter which recommended that the EEOC interview various women, shared her understanding of what various people knew, and transmitted various documents." Intervenor's Response to the Joint Motion to Disqualify at 8.

Every litigator knows that the discovery process has certain formal and informal rules. Ms. Barnett broke or ignored many of them. While some lawyers look at discovery with something of a Darwinian eye, the ethical rules should not be perused as if they were on an à la carte menu. Ms. Barnett is not permitted to pick and choose which ethical rules to ignore or misinterpret simply because avoidance or abuse of those rules seems conveniently more beneficial to her client.

*B. Standards for Lawyer Conduct*

Lawyers admitted to practice in Pennsylvania take an oath, *inter alia,* to

Employ, for the purpose of maintaining the causes confided to me, such means only as are consistent with truth and honor ...
**\*10** [and]
... abstain from all offensive personality and advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which I am charged ...
Supreme Court of Pennsylvania Attorney's Oath.

The Rules of Professional Conduct adopted and promulgated by the Pennsylvania Supreme Court [FN12] apply to all Pennsylvania-admitted attorneys and are made operative in this Court by Local Rule of Civil Procedure 83.6, R. IV. As expressly stated in the Preamble to the Rules, the Rules themselves are rules of reason, to be "interpreted with reference to the purposes of legal representation and of the law itself." While some of the Rules set forth specific "do's and don't's", many of them are less precise. Some are aspirational

instead of mandatory. This makes the Rules perhaps less easy to apply in some circumstances, but it does not make them any less efficacious for gauging lawyer conduct. Often, the ethics rules identify occasions on which a lawyer has some discretion, even though the Rules themselves provide no guidance on how to exercise that discretion. [FN13] However, as is also recognized in the Preamble to the Rules, the nature of the legal profession is to present lawyers with conflicting responsibilities "to clients, to the legal system and to the lawyer's own interest in remaining an upright person" which "must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying these Rules." Preamble to the Rules of Professional Conduct ¶ 8. [FN14]

FN12. The present formulation of the Pennsylvania Rules of Professional Conduct was adopted by the Pennsylvania Supreme Court by order dated August 23, 2004, with an effective date of January 1, 2005. The conduct at issue here predates the 2004 amendments, but none of those amendments changes the text of the rules referred to in this Memorandum and Order.

FN13. In this regard, lawyers can often glean greater specificity-- and, in some respects, more restrictive guidance--from the American Law Institute's RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS.

FN14. *See also* RPC 2.1 (in counseling a client "a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant ...").

A lawyer who exalts his or her responsibility as a client's agent to the point of ignoring the lawyer's responsibilities flowing from the lawyer's simultaneous, and equally important, role as officer of the court and as a professional whose conduct affects the quality of justice and public perception of the legal profession does not meet the letter or spirit of the rules of ethics or the expectations of the Court. Such a lawyer contributes

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

to the causes for the scorn so many laypersons now seem to have for lawyers and the reportedly widespread distrust of our legal system. The standards of conduct applicable to and expected of lawyers require more than merely comporting oneself to escape discipline. Stated differently, the ethical rules ought not be read as an intellectually meager, uninspiring statement of minimum standards to be abused by those who would argue that lawyers need only meet those minimum standards. Escaping discipline is not the measure of professionalism. The Rules represent a framework or floor for absolute minimum standards of professional conduct. Unlike corporate law theory's ongoing ideological debate whether companies engage in a race to the "top" (or perhaps, the "bottom") with regard to corporate governance, because a lawyer's professional conduct obligations include the corollary duty of earnest advocacy, a race to achieving the pinnacle of the standards of professionalism should be a lawyer's only competitive concern. Thus, calculating one's behavior to merely comply with the wording of the professional rules, while doing violence to their spirit, is fundamentally inconsistent with a lawyer's responsibilities to the parties, to the community at large and to the Court.

*11 A discussion of the rules and principles that Ms. Barnett transgressed in this case follows.

*C. Communication with Person Represented by Counsel--*Pennsylvania Rule of Professional Conduct 4.2

Pennsylvania Rule of Professional Conduct 4.2 and its annotated comments state:

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

*See also,* Local R. Civ. P. 83.6, R. IV. With regard to organizations, the comments state:

...

[6] A lawyer who is uncertain whether a communication with a represented person is permissible may seek a court order. A lawyer may

also seek a court order in exceptional circumstances to authorize a communication that would otherwise be prohibited by this Rule, for example, where communication with a person represented by counsel is necessary to avoid reasonably certain injury.

[7] In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

...

[9] In the event the person with whom the lawyer communicates is not known to be represented by counsel in the matter, the lawyer's communications are subject to Rule 4.3.

In turn, Rule 4.3, "Dealing with Unrepresented Person," states:

(a) In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested.

(b) During the course of a lawyer's representation of a client, a lawyer shall not give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the lawyer knows or reasonably should know the interests of such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client.

(c) When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer should make reasonable efforts to correct the misunderstanding.

In the absence of specific guidance on this particular issue from the Court of Appeals for the Third Circuit or the Pennsylvania Supreme Court, district courts have employed tests consistent with the plain language of Rule 4.2 and its comment. *See Belote v. Maritrans Operating Partners, L.P.,* 1998 WL 136523 at *2 (E.D.Pa. Mar.20, 1998) (citations omitted). The purpose of Rule 4.2 is to prevent attorneys from taking advantage of "uncounselled lay persons and to preserve the efficacy and sanctity of the lawyer-client

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

relationship." *Dondore v. NGK Metals Corp.,* 152 F.Supp.2d 662, 666 (E.D.Pa.2001); *Carter-Herman v. City of Phila.,* 897 F.Supp. 889, 901 (E.D.Pa.1995) (citing G.C. Hazard, Jr. & W.W. Hodes, *The Law of Lawyering* 730 (2d ed.1990); C.W. Wolfram, *Modern Legal Ethics* § 11.6 at 612-13 (1986)). *See also,* Restatement (Third) of the Law Governing Lawyers § 99.

   **\*12** Here, the correspondence between Ms. Barnett and Ms. Richardson is somewhat analogous to the issues presented in *Belote.* [FN15] In *Belote,* plaintiff's counsel sent an investigator to speak to the captain of a ship on which the plaintiff had been injured. However, the interview was conducted without providing notice to or obtaining the consent of counsel for defendant Maritrans. *Id.* at *1. Maritrans also claimed that the plaintiff's investigator failed to reveal to the interviewee, Captain Whitmore, that the investigator was working for the plaintiff, Belote. As is true in the instant matter, in *Belote,* "plaintiff's counsel's efforts proved quite fruitful."

   > FN15. The instant matter is inapposite to the issues presented in *Faragher v. National Railroad Passenger Corp.* ("AMTRAK"), 1992 WL 25729 (E.D.Pa. Feb.7, 1992). In *Faragher,* the court found that no parties existed at the time of the allegedly *ex parte* communications because, at the time plaintiff's counsel spoke to the Amtrak employees, no complaint had been filed. Here, however, Ms. Barnett continued to correspond with Ms. Richardson after Barnett filed a complaint with the Pennsylvania Human Relations Commission on behalf of her client, current Intervenor, Manessta Beverly, and after she had initiated the EEOC's processes. *See id.* at * 1-2. Litigation against HORA and Marshall was foreseeable

   It is clear here that Barnett at least sensed that she was trekking in ethically challenging terrain by communicating with Richardson. Barnett's consideration of the issue, however, was limited to a "control group" test that she used to lead Richardson away from a self-description of being a member of

Hotel management. The Comment to Rule 4.2 focuses on individuals whose act or omission with regard to the Plaintiff's injury can be imputed to Defendants. *See also,* Belote, 1998 WL 136523 at *3. Here, as discussed above, the broad nature of Ms. Richardson's responsibilities as the close assistant to the Hotel General Manager may have placed Richardson in such a position as to impute liability to Defendants. [FN16] To be sure, as a threshold analysis, one of the concerns in assessing the instant matter was determining Ms. Richardson's level of responsibility consistent with her employment at the Hotel. From the record, it does not appear that the Hotel is a large operation. It does not have many employees. Therefore, it is reasonable to assume that "managerial" responsibilities and discretion are spread amongst workers who may not necessarily have traditional titles given to those in managerial roles. This is not an organization with a large, hierarchical command structure, such as a police department, where the lines of managerial responsibility are clearly delineated. *See cf. Carter-Herman,* 897 F.Supp. at 904. From her repeated references to her role *vis á vis* Hotel personnel files, Ms. Richardson had responsibilities that might be consistent with someone with human resources oversight. Moreover, Richardson obviously occupied a position central to management operations given the fact that she was the sole assistant to the most senior managers responsible for the Hotel's day-to-day operations and had access to confidential information and materials as a result. While the standard for determining who has "speaking authority" or "authority to bind" a business entity is somewhat imprecise,

   > FN16. On August 1, 2002, Ms. Barnett indicated to Ms. Richardson that "[i]f you agree that you do not hold a management position, then we're free to communicate with each other.... If we can communicate ethically, I look forward to it." (Def. Motion, Ex. 1, at 16). As discussed *supra,* because of the small, intimate nature of the Hotel's staff and Ms. Richardson's demonstrated level of access and responsibility, Barnett's reliance on Richardson for such an ethical determination, without further investigation, was not appropriate.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                  Page 13
Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
(Cite as: 2005 WL 1387982 (E.D.Pa.))

it includes employees below the level of corporate management because otherwise the third category of employees mentioned in Rule 4.2 would be redundant to the employees described in the first category of Rule 4.2 ("persons having a managerial responsibility on behalf of the organization").

**\*13** *See Weeks v. Indep. Sch. Dist.,* 230 F.3d 1201, 1209 (10th Cir.2000). Thus, the issue does not evaporate with a dismissive inquiry about job titles. Ms. Barnett should have proceeded with much greater caution. Section 102 of the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, which precludes a lawyer seeking information from non-clients who are under some duty not to reveal such information, raises at least cautionary flags that should have tempered Barnett's giddy exchanges with Richardson. *See* § 102, comment d. At a minimum, Ms. Barnett should have considered awaiting the institution of proper discovery procedures, notifying the Hotel or Marshall or her interest to speak with Ms. Richardson without representation (after advising Richardson of her right to representation) or considering other appropriate actions to prevent possible spoliation of evidence.

*D. Legal Rights of Defendants-Pennsylvania Rule of Professional Conduct 4.4*

Rule 4.4, "Respect for Rights of Third Persons" states:
(a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.
(b) A lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender.
Here, the Defendants and their employees, including Nelson Garcia, are considered third persons.

It is clear to this Court that Ms. Barnett obtained evidence by methods that violated the legal rights of the Defendants. Specifically, through Ms. Richardson, Ms. Barnett obtained purported confidential and proprietary information belonging to the Hotel and Marshall, as well as Nelson Garcia, such as (1) the employee handbook, (2) the contents of Garcia's personnel file,

(3) Daryl Carr's statement to the EEOC, (4) the EEOC's inquiries to Defendants, and (4) other attorney-client privileged information that Ms. Schneider, one of Ms. Richardson's co-workers, learned while eavesdropping on a lengthy conversation between Defendants and their legal counsel. That the improperly obtained information was provided in hard copy or its substantive elements were relayed by paraphrasing in an e-mail or voice communication does not alter the fact that the information was improperly obtained. [FN17]

> FN17. Ms. Barnett alleges that this Court should question Defendants' credibility with regard to the employee handbook because they made no such claims when the EEOC requested it and Defendants did not object to its disclosure during discovery. Such an argument belies the fact that, at the time of Ms. Beverly's complaint, it is clear from their submissions to this Court that Defendants were entitled to assess the propriety of Ms. Barnett using an internal mole to gather information in an attempt to bolster Ms. Beverly's claims, without Defendants' being able to protect their legal rights.

With regard to Ms. Schneider overhearing, or as Defendants' counsel describes it, "eavesdropping", on Defendants' attorney-client communications, Ms. Barnett cannot rely on her unusual theory that Ms. Schneider may be considered a "stranger" under the law, thereby vitiating Defendants' privilege argument. *See Montgomery County,* 175 F.3d at 301, citing *Rhone-Poulenc,* 32 F.3d at 862. At the time, Ms. Schneider was Defendants' employee.

The comment to Rule 4.4 states that an attorney's responsibility to her client requires the attorney to subordinate the interests of others to those of the client, but that responsibility does not imply that an attorney is entitled to disregard the rights of third persons. The rights of third persons include "legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusions into privileged relationships, such as the client-lawyer relationship."

**\*14** It is clear from the e-mails produced to this Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

that Ms. Barnett encouraged Ms. Richardson to disclose to her *all* information she learned while working with the Hotel. There is no evidence in this record, other than Ms. Barnett's verified statement, that Ms. Barnett told Ms. Richardson and Ms. Schneider that relaying an opponent's attorney-client conversation is improper. Nor did Ms. Barnett discourage Ms. Richardson from such continued improprieties. *See* (Def. Motion, Ex. 1, at 8) (where Ms. Barnett requested of Ms. Richardson, "if you think of anything else that was said during the interviews, or if you find out that additional people were interviewed, would you make notes?"). Thus, on this record, it is not clear to this Court that Ms. Barnett properly disclosed or emphasized to Ms. Richardson that it was, in fact, an ethical violation for her to receive or relay such intercepted communications.

Consistent with this rule, Ms. Barnett should have refrained from maintaining correspondence with Defendants' employee, Ms. Richardson, instead giving Defendants the opportunity to determine their legal rights *vis á vis* Ms. Barnett's justifiable desire to gather evidence with regard to her submission(s) to the EEOC. Furthermore, the discovery rules are necessary because once information has been improperly obtained, it is nearly impossible to return the parties to the equitable position that existed prior to the improper disclosure. Here, the Court is in the position of requiring the barn to be locked after much of the livestock has been given away by a farmhand and butchered.

In the instant matter, Defendants may be seeking the opportunity at trial for the jury to determine whether Ms. Barnett misrepresented Ms. Richardson's admittedly hearsay evidence to the EEOC, and thus to the Defendants and this Court, because such information was previously presented as factual, first-hand evidence of Ms. Beverly's accusations against Mr. Garcia. In fact, as Ms. Richardson admitted during her deposition: (1) she had no first-hand knowledge of any interaction between Ms. Beverly and Nelson Garcia; (2) she never witnessed Mr. Garcia harassing any employee; and (3) her correspondence may have been tainted by her hostility toward her employers at the Hotel.

Another aspect of Barnett's violation of the rights of

others merits mention, namely, the gossipy approach she pursued to tar Mr. Garcia's reputation by her thinly-veiled suggestion that Hotel guests were at serious risk of harm by Garcia--even though Barnett had absolutely no knowledge of Garcia's background. She virtually accused him of being a dangerous prowler lurking at the doors to guests' rooms. Such commentary was unwarranted and out of order. [FN18]

> FN18. *Cf.* Restatement (Third) of the Law Governing Lawyers § 106, comments b, c and d. Another ethics rule, Rule 3.4, "Fairness to Opposing Party and Counsel", is implicated here as well. As a technical matter, the Court is not aware of any violation by Ms. Barnett of the specific prohibitions set out in that Rule. While one might argue under Rule 3.4(a) that the Barnett-Richardson communications operated to so manipulate Richardson's potential as a witness that they amount to an obstruction of Defendants' access to evidence, the Court makes reference to Rule 3.4 here because its "basic fairness" tenor reminds advocates that, in the words of the comment to the Rule, "[t]he procedure of the adversary system contemplates that the evidence in a case is to be marshaled competitively by the contending parties. Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery, and the like."

In conclusion, this Court shares Defendants' deep concerns that Ms. Barnett misrepresented Ms. Richardson's allegations as factual and those statements have been repeated to the parties and to the Court; thus, it is also appropriate that Ms. Barnett should be disqualified pursuant to Rule 4.4.

*E. Inducement to Engage In Ethical Violations-Pennsylvania Rule of Professional Conduct 8.4*

**\*15** Rule 8.4, "Misconduct" states:

It is professional misconduct for a lawyer to:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
...
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
....

Here, Ms. Barnett knowingly violated Rule 8.4 by surreptitiously inducing Richardson to assist Barnett in violating the ethical rules by providing privileged documents and information without Defendants' permission. Ms. Barnett's repeated manipulation of Ms. Richardson, as is apparent to this Court from the record, is a blatant violation of Pennsylvania's professional rules. Thus, disqualification of Ms. Barnett pursuant to this Rule is also appropriate.

*F. Defendants Intend to Call Attorney Jana Barnett as a Trial Witness*

Defendants also raise the possibility that Ms. Barnett may be a material witness in this case because, during the initial stages of her investigation on behalf of her client, Ms. Barnett was not only gathering information but also formulating facts with Ms. Richardson's assistance, who was not (and never has been) her client. Defendants also likely would intend to argue that Barnett's extensive commentary and communication with Richardson irrevocably colored at least Richardson's (and possibly others') testimony.

Even though a discussion of Ms. Barnett's possible role as a trial witness and the applicable ethical Rule is included here, the Court has by no means concluded that Defendants will be permitted to call her as a witness or, if they are, what the scope of questioning of her may be. Defendants do argue that it will be important for the jury to be able to learn, first-hand, how Ms. Barnett investigated and generated certain purported pieces of factual information, including (a) how and why Barnett contacted Richardson and (b) other information Barnett may have learned from the numerous contacts with Richardson, but the content of which (i) are not contained in the e-mail exhibits, (ii) have not been borne out during depositions, or (iii) cannot be testified to by Ms. Richardson. Defendants have also stated their intention to present evidence that

the information elicited by Ms. Barnett from Ms. Richardson had a material effect on (and possibly negatively colored) both the EEOC processes and proceedings as well as the litigation itself.

As long as Defendants' theories and arguments are relevant and not overly prejudicial, it is not for this Court to question or dictate pre-trial litigation strategy to the Defendants. They may be earnestly intending to try to present evidence to the jury consistent with their belief that the EEOC relied upon Ms. Barnett's representations, whether factually-based or not, in bringing its claims against Defendants. However, the Court is singularly wary of the opportunity for mischief--or worse--by being too quick to allow counsel to try to turn opposing counsel into a witness unless there is an undeniably compelling need for her testimony. Thus, no decision about Barnett being a witness has been made. The applicable ethical rule bears discussion, however.

**\*16** With certain specific exceptions not pertinent here, Rule 3.7 prohibits a lawyer from acting as an advocate at trial in which she is likely to be a necessary witness. The Restatement also addresses this situation. Restatement (Third) of the Law Governing Lawyers § 108. Consistent with this rule, the Court of Appeals for the Third Circuit recently observed that "it is often impermissible for an attorney to be both an advocate and a witness." *United States v. Merlino,* 349 F.3d 144, 152 (3d Cir.2003). Additionally, "disqualification may also be appropriate where it is based solely on a lawyer's personal knowledge of events likely to be presented at trial, even if the lawyer is unlikely to be called as a witness." *Id.* (emphasis added); *see also, United States v. Locascio,* 6 F.3d 924, 933 (2d Cir.1993). Nevertheless, Rule 3.7 may only bar the lawyer-witness's participation at trial. *See George v. Wausau Insurance Co.,* 2000 WL 276915 at *2 (E.D.Pa. Mar.13, 2000). Thus, if the only matter at hand was to determine whether Ms. Barnett is a potential trial witness, without the implication of the professional conduct rules, discussed *supra,* the plain language of Rule 3.7 supports the conclusion that an attorney presumably may continue to represent a client in an action where the attorney may be called as a witness, until the actual trial. *See id.* (citing *Lebovic v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Nigro, 1997 WL 83735 (E.D.Pa. Feb.26, 1997); accord Rounick v. Fireman's Fund Ins. Co. of Wisconsin, 1996 WL 269495 (E.D.Pa. May 20, 1996); Electronic Laboratory Supply Co., Inc. v. Motorola, Inc., 1990 WL 96202 (E.D.Pa. July 3, 1990)).

Here, defense counsel states their intention to call Ms. Barnett as a witness to testify about her influence over the facts provided to the EEOC and Barnett's lack of first-hand information with regard to the EEOC investigation. From the record, it appears that Ms. Barnett had personal knowledge of the sources of the allegations (and their genesis) presented to the EEOC because Barnett was intimately involved in cobbling together these allegations with Ms. Richardson's assistance. At this stage and on the established record before the Court, both Ms. Barnett and Ms. Richardson may seem to be material, complementary witnesses in this matter, especially with regard to Defendants' theory that Ms. Barnett's manipulation of Ms. Richardson caused Richardson to take on the role of a corporate informational mole within the Hotel's chain of command, providing Ms. Barnett with information regarding the Hotel and Marshall that the Defendants consider confidential and proprietary. [FN19] The record thus developed also supports Defendants' contention that Ms. Richardson seemed eager to provide any and all information, regardless of the parties' respective rights and the record contains virtually no indication that Ms. Barnett discouraged such behavior.

> FN19. Pursuant to American Bar Association Formal Opinion 92-368 (1992), an attorney who receives documents that are privileged or confidential on their face should avoid reading the materials, notify the attorney who transmitted the materials and obey that attorney's instructions with respect to the confidential information. This Formal Opinion analogizes inadvertent disclosure to the receipt of another person's property, and concludes that the receiving attorney may not make unauthorized use of the confidential / privileged communications. However, the Philadelphia Bar Association, Opinion 91-19 (1991), has concluded that attorneys who

receive confidential information through no fault of their own or of their client's, may use the information at trial. The facts here are distinguishable from the assumption in the Philadelphia Bar opinion, as Ms. Barnett received certain confidential and/or privileged information by her own fault and did little, if anything, to prevent continued disclosure. During oral argument, however, Ms. Barnett suggested, in response to the Court's questions, that she thinks she must have orally admonished the eavesdropper not to do that again. Hr. Tr. at 55-58.

Defendants also make a credible argument that Ms. Barnett's testimony may serve as a crucial supplement to Ms. Richardson's testimony with regard to a presentation to the jury by Defendants that the information provided to the EEOC resulted from Ms. Barnett facilitating or fueling a potential personal vendetta by a disgruntled Ms. Richardson, who testified that she was angry with management and did not get along with the Hotel's General Manager.

*17 In summary, even absent the violations of the professional conduct rules discussed above, the Court, in consideration of Defendants' motion, was mindful of the possible need to disqualify Ms. Barnett because the nature of her representation of Ms. Beverly may have required disqualification, as the parties move closer to trial, as a result of Barnett's role as a potentially necessary witness.

*G. Sanctions*

Federal courts have the inherent power to discipline attorneys practicing before it. See Matter of Abrams, 521 F.2d 1094, 1099 (3d Cir.), cert. denied, 423 U.S. 1038, 96 S.Ct. 574, 46 L.Ed.2d 413 (1975). Consistent with this power, this Court may prohibit or remedy litigation practices which constitute ethical violations or seriously undermine the integrity of a proceeding. See University Patents, Inc. v. Kligman, 737 F.Supp. 325, 327 (E.D.Pa.1990). See also, Restatement (Third) of the Law Governing Lawyers § 6, comment i. While the Court's authority in such matters is quite broad, it does have limits. See Abrams, 521 F.2d at 1099 (citing In re

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 17
Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515
**(Cite as: 2005 WL 1387982 (E.D.Pa.))**

*Ruffalo,* 390 U.S. 544, 547, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968)). The proper exercise of this power must strike a balance between several competing considerations. *See* Ex parte *Burr,* 9 Wheat. 529, 22 U.S. 529, 529-30, 6 L.Ed. 152 (1824). First, the unfettered practice of law is of great importance and it should not be intruded upon lightly. *See id.* Nevertheless, it is the judiciary's responsibility to ensure the integrity of the profession. *See id.* Moreover, the Court must balance plaintiff's right to counsel of her choice against her adversary's right to prepare and try a case without prejudice. *See University Patents,* 737 F.Supp. at 325. Thus, when imposing sanctions "for ethical violations in *unclear* areas of law, the relevant issue to consider is not whether the plaintiff's counsel incorrectly interpreted the law, but whether counsel ignored the unsettled nature of the law." *See Belote, supra* at *6-7 (citing *University Patents,* 737 F.Supp. at 329 (E.D.Pa.1990).

Giving Ms. Barnett the benefit of the doubt, many of the professional conduct issues in the instant matter may be considered by some practitioners to be unsettled. Nonetheless, considering the questionable propriety of Ms. Barnett's continued correspondence with Ms. Richardson, Barnett should not have unilaterally communicated with her for such an extended period. *See e.g., id.* Instead, Ms. Barnett should have informed the Hotel's or Marshall's counsel of her intent to speak with Ms. Richardson. *See University Patents,* 737 F.Supp. at 329; *Cagguila v. Wyeth Labs., Inc.,* 127 F.R.D. 653, 654 (E.D.Pa.1989). Similarly, using Richardson as the cornerstone for urging EEOC action without having considered Richardson's obvious credibility issues bespeaks a recklessness that bodes ill. *Cf.* Restatement (Third) of the Law Governing Lawyers § 57, comment f; § 110

Here, unlike the result in *Belote,* disqualification is warranted because the record clearly shows that the Defendants have been sufficiently prejudiced by being unaware of and without the ability to control the Barnett-Richardson communications to the extent permitted by both the rules of discovery and professional conduct. *See United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir.1980) (disqualification appropriate only when it serves the purposes of the

relevant disciplinary rule); *cf. University Patents,* 737 F.Supp. at 328.

**\*18** Furthermore, the Court has weighed heavily the proposition that Ms. Beverly might suffer substantial hardship if Ms. Barnett is disqualified. *See* Pa. R.P.C. 3.7(a)(3). However, the Court is confident that Ms. Beverly's federal claims will be adequately represented by the EEOC and its counsel. Furthermore, the Court will give Ms. Beverly the opportunity to find new counsel with regard to her state claim. Nevertheless, because of the apparent ethical violations by Ms. Barnett, consistent with the law in this circuit, with regard to any doubts as to the existence of a violation of the rules, it is prudent to resolve those doubts *in favor of* disqualification. *See* J & J Snack Foods, 2000 WL 562736 at *2, citing *Int'l Bus. Mach. Corp.,* 579 F.2d at 283.

**IV. CONCLUSION**

The Court finds that Defendants have provided ample evidence to substantiate Ms. Barnett's disqualification. Ms. Barnett has engaged in and exhibited what can be termed nothing less than reckless behavior, with regard to respecting the legal rights of others, including her client's adversaries. Therefore, for the reasons stated above, attorney Jana Barnett is disqualified from representing Intervenor Manessta Beverly in this case. Ms. Beverly shall be permitted Ms. Barnett's assistance in locating substitute counsel, and Ms. Barnett is expressly permitted to cooperate fully in the prompt transfer of the case to new counsel to whom she may impart the whole of her knowledge of the case, including her file as it exists as of the date of the accompanying Order, with the express exception of any notes Barnett may have made concerning any discussions with Richardson or Schneider which have not been disclosed to Defendants.

An appropriate Order follows.

*ORDER*

AND NOW, this __ th day of June, 2005, upon consideration of the Defendants' Joint Motion to Disqualify Jana R. Barnett, Esq., as Counsel for Intervenor (Docket No. 43), Intervenor's Response to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Joint Motion to Disqualify (Docket No. 45), the EEOC's Letter Response in Opposition to the Joint Motion to Disqualify (Docket No. 46), and each of the parties' supplemental memoranda of law (Docket Nos. 55, 56 and 58) submitted following the hearing and oral argument held on April 15, 2005, IT IS ORDERED that because the Court finds violations of Pennsylvania Rules of Professional Conduct 4.2, 4.4 and 8.4, consistent with the reasoning discussed in the accompanying memorandum, Jana R. Barnett is DISQUALIFIED from further involvement in this matter, save her necessary assistance in locating substitute counsel. Thus, Ms. Barnett is expressly permitted to cooperate fully in the prompt transfer of the case to new counsel to whom she may impart the whole of her knowledge of the case, including her file as it exists as of the date of the accompanying Order, with the express exception of any notes Barnett may have made concerning any discussions with Richardson or Schneider which have not been disclosed to Defendants.

**\*19** It is further ORDERED that, with due consideration of the pending Defendants' Motion for Summary Judgment (Docket No. 44) and to permit new counsel for the Intervenor to familiarize herself or himself with this matter and to determine whether to file supplemental materials with regard to the Motion and the docket responses, all parties to the above-captioned matter shall have until September 1, 2005 to file supplemental materials with regard to the pending Motion.

Slip Copy, 2005 WL 1387982 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 515

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23639101 (Trial Pleading) Answer of Defendant, Hora, Inc., d/b/a Days Inn to Intervenor Manessta Beverly's Complaint (Oct. 29, 2003)

• 2003 WL 23639102 (Trial Pleading) Answer of Defendant Marshall Management, Inc. to Plaintiff/Intervenor Manessta Beverly's Complaint (Oct. 28, 2003)

• 2003 WL 23639097 (Trial Pleading) Answer of Defendant Marshall Management, Inc. to Plaintiff's Complaint (Apr. 22, 2003)

• 2003 WL 23639098 (Trial Pleading) Answer of Defendant, HORA, Inc., to Plaintiff's Complaint (Apr. 22, 2003)

• 2003 WL 23640022 (Trial Pleading) Complaint (2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                      Page 1
Not Reported in F.Supp.2d, 2002 WL 242464 (D.Del.), 27 Employee Benefits Cas. 2295
**(Cite as: 2002 WL 242464 (D.Del.))**

United States District Court, D. Delaware.
END OF ROAD TRUST., et al., Plaintiffs,
v.
TEREX CORPORATION, Randolph W. Lenz and
Marvin Rosenberg, Defendants.
**No. 99-477 (GMS).**

Feb. 20, 2002.

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

*1 On September 22, 1999, plaintiff End of the Road
Trust ("ETR") filed its complaint in this court.
Discovery began in November 2000, but was stayed for
90 days after defendants were required to obtain new
counsel due to a conflict. The defendants are now
represented by Weil, Gotshal, and Manges. The
plaintiffs are represented by Greenberg Traurig. The
case is set for trial before this court on June 3, 2002.

Presently before the court is defendant Randolph
Lenz's Motion to Disqualify Greenberg and Traurig.
Lenz argues that Greenberg Traurig violated Rule
1.7(a) of the Model Rules of Professional Conduct by
simultaneously representing Lenz in a Florida
proceeding while representing ETR in this action. In its
reply, ETR argues that the simultaneous representation
was the result of an oversight as a result of the merging
of Greenberg Traurig with the firm that initially
represented Lenz. ETR further states that the Florida
matter is ended and that the attorney who represented
Lenz has been screened from this representation.
Finally, ETR argues that Lenz will suffer no prejudice
as a result of Greenberg Traurig's continued
representation, but that ETR may suffer prejudice if
forced to find new counsel due to the complexity and
age of the case. The court agrees with ETR and will,
therefore, deny Lenz's motion for disqualification.

II. FACTS

ETR filed this complaint on behalf of Fruehauf Trailer
Corporation, a bankrupt debtor. Defendant Lenz served
as chair of Fruehauf's board of directors during the
relevant period. ETR alleges that Lenz operated
Fruehauf for his own interests and is asserting several
causes of action against him. Most important for the
present motion, ETR alleges that Lenz breached his
fiduciary duties under the Employee Retirement and
Income Security Act ("ERISA"), 29 U.S.C. §
1132(a)(2).

When this action commenced, ETR was represented by
Camhy, Karlinsky & Stein ("Camhy"). By July 2000,
Greenberg Traurig and Camhy had entered into
negotiations to discuss the possibility of merger. The
firms agreed to merge on August 21, 2000. Camhy
began winding up its affairs and both firms began a
computerized conflicts check to determine any potential
conflicts of interest between Greenberg Traurig and
Camhy clients.

On July 12, 2000, prior to the Greenberg
Traurig/Camhy merger, Lenz was sued by Equity
Merchant Banking Corporation and the Connecticut
Bank of Commerce in Florida state court ("the Florida
action"). Lenz hired the Miami office of Greenberg
Traurig to represent him. On August 15, 2000, the
Greenberg Traurig attorneys filed motions to dismiss
the Florida action. Greenberg Traurig's Miami office
continued to represent Lenz until he terminated the
representation on October 12, 2000. Lenz was never
aware--and Greenberg Traurig never notified him--that
there was a potential conflict of interest in his continued
representation.

Lenz allegedly learned of the conflict when his former
counsel--Skadden, Arps, Slate, Meagher &
Flom--notified him on March 14, 2001. Lenz's personal
attorney, Thomas Gallagher, wrote Greenberg Traurig
on that same day regarding the conflict. Greenberg
Traurig responded that there had been no simultaneous
representation, and that it did not seek a waiver from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 2
Not Reported in F.Supp.2d, 2002 WL 242464 (D.Del.), 27 Employee Benefits Cas. 2295
**(Cite as: 2002 WL 242464 (D.Del.))**

Lenz because he had terminated the representation. Greenberg Traurig asserts that the conflict was inadvertently overlooked in the conflicts check process.

III. DISCUSSION

A. The Ethical Standard & The Court's Disciplinary Power

*2 An attorney's conduct is measured by the ethical standards of the court before which the attorney appears. *See* *In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 160 (3d Cir.1984).* Pursuant to Local Rule 83.6(d)(2), the District of Delaware has adopted the Model Rules of Professional Conduct. Model Rule 1.7(a) provides that an attorney may not represent two clients when representation of one would be "directly adverse" to or would "materially limit" representation of the other, unless the attorney "reasonably believes" that the representation of the other would not be "adversely affected" and both clients consent to the representation. *See* *Elonex I.P. Holdings v. Apple Computer,* 142 F.Supp.2d 579, 582 (D. Del 2001) (citing *Lease v. Rubacky,* 987 F.Supp. 406, 407 (E.D.Pa.1997)).

The court has the power to supervise the professional conduct of attorneys appearing before it. *See* *United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir.1980). This includes the power to disqualify an attorney. *Id.* Nevertheless, motions to disqualify are generally disfavored. *See Cohen v. Oasin,* 844 F.Supp.1965, 1067 (E.D.Pa.1994). The party seeking disqualification must clearly demonstrate that "continued representation would be impermissible." *Id.* Thus, "[v]ague and unsupported allegations are not sufficient to meet this standard." *Id.*

Greenberg Traurig does not argue that its conduct was appropriate under Rule 1.7(a). Rather, the firm argues that "[d]isqualification is not an appropriate sanction for what, at most, was a brief, harmless, and unintended oversight of the rules of professional responsibility." (D.I. 91 at 2.) Thus, the court's inquiry is limited to whether disqualification is appropriate in this case.

B. Greenberg Traurig Should not be Disqualified

Although Greenberg Traurig admits that it violated Rule 1.7(a), this alone will not warrant disqualification. Contrary to Lenz's arguments, disqualification is not automatic. *See* *Elonex,* 142 F.Supp.2d at 583 ("Although disqualification is ordinarily the result of a finding that an ethical rule has been violated, disqualification is never automatic.") (quoting *Miller, 624 F.2d at 1201.*) Indeed, the court has "wide discretion in framing its sanctions to be just and fair to all parties involved." Id.

In *In re Corn Derivatives Antitrust Litigation,* the Third Circuit indicated that it had "often employed a balancing test in determining the appropriateness of disqualification of an attorney." *Corn Derivatives, 748 F.2d at 162.* In the Miller case, the Third Circuit noted that:

> [T]he court should disqualify an attorney only when it determines, on the facts of a particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. It should consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain counsel of his choice and enabling attorneys to practice without excessive restrictions.

*3 *Miller, 624 F.2d at 1201.*

Rule 1.7(a) was enacted to prevent divided loyalties and to protect against the disclosure of client confidences. *See* *IBM v. Levin, 579 F.2d 271, 280 (3d Cir.1978).* Neither policy is implicated here. Lenz alleges that Greenberg Traurig's loyalty was divided during the simultaneous representation. Although this is arguably true, Greenberg Traurig has not represented Lenz since October 2000. If Greenberg Traurig currently represented both clients, its loyalty might be more questionable. Since Lenz is no longer represented by Greenberg Traurig, however, the danger of divided loyalty is not as great, if it is present at all.

Lenz also argues that there is a danger that confidential information will be exchanged between the attorneys that represented him in the Florida action and ETR's attorneys. His concern arises from his assertion that the Florida action is connected to the ERISA claims in this case. Nevertheless, the court finds that the potential for breached confidences is minimal. First, the attorneys

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 242464 (D.Del.), 27 Employee Benefits Cas. 2295
**(Cite as: 2002 WL 242464 (D.Del.))**

that represented Lenz worked in Greenberg Traurig's Miami office, whereas ETR is represented by attorneys in the New York office. The geographic separation militates against a finding that confidential information will be shared. *See Elonex, 142 F.Supp.2d at 584* (noting that work was "done out of different offices in different cities"). Second, although Lenz argues that the ethical screen employed by Greenberg Traurig will be ineffective, a party seeking disqualification cannot rest on "[v]ague and unsupported allegations." *Id.* In this case, Lenz has not alleged sufficient facts that would permit the court to find that there is a specific or immediate danger that confidential information will be released, or that it has been released in the past. In the absence of such allegations, the court gives Lenz's arguments little weight.

  The court further finds that strong countervailing policies weigh against disqualification. First, although Greenberg Traurig arguably did violate Rule 1.7(a), the violation was of an extremely short duration, and was, apparently, inadvertent. Moreover, Lenz has not put forward a single fact or argument that would permit the court to find that he would be prejudiced by Greenberg Traurig's continued representation of ETR. Conversely, great prejudice will result to ETR if Lenz's motion is granted. This is a complex case. It is over two years old, and Greenberg Traurig has invested a substantial amount of time and effort. Moreover, the trial date is imminent. At this point, disqualifying Greenberg Traurig would further delay this case because new counsel will incur great difficulty in reviewing the case, completing discovery, writing any dispositive motions, and preparing for trial by June 3, 2002. This difficulty implicates the interests of both fairness and judicial economy. On balance, therefore, even if the policy concerns raised by Rule 1.7(a) were implicated, the countervailing policy arguments weigh heavily against disqualification.

 IV. CONCLUSION

  **\*4** For the foregoing reasons, the court concludes that disqualification is inappropriate and unnecessary. The court will, therefore, deny Lenz's Motion to Disqualify Greenberg Traurig.

  NOW, THEREFORE, IT IS HEREBY ORDERED that:
   1. Defendant Lenz's Motion to Disqualify Greenberg Traurig (D.I.81) is DENIED.

  Not Reported in F.Supp.2d, 2002 WL 242464 (D.Del.), 27 Employee Benefits Cas. 2295

  END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2001 WL 378846 (D.Virgin Islands)
**(Cite as: 2001 WL 378846 (D.Virgin Islands))**

▷

Only the Westlaw citation is currently available.

District Court of the Virgin Islands, Division of St.
Croix.
Will JONES, Plaintiff,
v.
DAILY NEWS PUBLISHING CO. INC., Innovative
Communication Corp. and Lowe Davis,
Defendants
**No. Civ.1999/138.**

March 16, 2001.

ORDER GRANTING THE DAILY NEWS'
MOTION TO DISQUALIFY PLAINTIFF'S
ATTORNEY

RESNICK, Magistrate J.

 **\*1** THIS MATTER came for consideration on
Defendant, Daily News Publishing Co. Inc.'s (Daily
News) Motion to Disqualify Plaintiff's Attorney.
Plaintiff filed opposition to the motion and Daily News
filed a reply to such opposition. Because the
determinative facts are not contested, no hearing is
required.

 The Daily News' motion asserts that Plaintiff's attorney,
The Law Offices of Lee J. Rohn, (hereafter Attorney
Rohn), [FN1] has incurred an impermissible conflict of
interest through representation of Plaintiff in this matter
while also representing Andy Gross against Daily News
Publishing Company, Inc. in Territorial Court, St.
Croix, Civil No. 376/99. [FN2] In particular Daily
News contends that:

> FN1. It is undisputed that Attorney Rohn is
> the embodiment of the firm for purpose of this
> motion.

> FN2. The Court does not consider Daily

News' lengthy iteration of Attorney Rohn's
past other cases except to the extent that the
cited cases of *Saldana v. Banco Popular,*
D.Ct. Civ.1996/1 and *Encarnacion v. Kmart,*
D.Ct. Civ.1997/63 are germane hereto.

1. Andy Gross was terminated from his employment
at the Daily News by letter dated June 6, 1999 written
by Acting City Editor, Will Jones (Exhibit "C" to
Daily News' reply).
2. On June 24, 1999, Attorney Rohn filed a complaint
on behalf of Andy Gross against Daily News
(Terr.Ct.Civ. No. 376/99).
3. Attorney Rohn represented Plaintiff Will Jones
with regard to his claims of discrimination against
Daily News as early as February 26, 1999 (Exhibit
"B" to Daily News' reply).
4. On August 18, 1999, Attorney Rohn filed the
Complaint in this matter on behalf of Plaintiff, Will
Jones.
5. Attorney Rohn continues to represent Jones and
Gross.

 Daily News maintains that Attorney Rohn's
representation of Jones is in violation of Rules 1.7 and
4.2 of the American Bar Association's Model Rules of
Professional Conduct. [FN3] Daily News argues that
Jones was Gross' superior and had direct involvement
in the decision to terminate Gross and that by
representing Jones before and after undertaking
representation of Gross (concerning Gross' termination)
Attorney Rohn has incurred an impermissible conflict
of interest. [FN4]

> FN3. The ABA Model Rules have been
> adopted by the Virgin Islands. See LRCi
> 83.2(a)(1); *V.I. Bar Association v.*
> *Boyd-Richards,* 26 V .I. 299 (D.V.I.1991).

> FN4. Daily News cites the December 8, 2000
> Order of Territorial Court Judge Edgar D.
> Ross in *Gross v. ICC et al.,* Terr. Ct. Civ.
> 376/99. Jones states that such Order was
> rescinded by Judge Ross and Daily News does

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 378846 (D.Virgin Islands)
**(Cite as: 2001 WL 378846 (D.Virgin Islands))**

not contend otherwise in its reply. Per Judge Ross, the December 8, 2000 Order has not been rescinded. That Order granted Plaintiff's Motion to Quash a subpoena duces tecum issued to Attorney Rohn and issued a Protective Order with regard to Attorney Rohn's testimony. The Order noted that,

"Moreover, it appears that Attorney Rohn has created an inherent conflict by choosing to represent Will Jones and Andy Gross in separate actions against Daily News Publishing Co., Inc. Since, Will Jones as a part of management and was directly involved in the termination of Andy Gross, it is apparent that Will Jones may be the principal actor/witness for the corporate defendant. Thus, Andy Gross and Will Jones have adverse interests.

Pursuant to ABA Model Rule 1.7, if a conflict of interest is apparent before the lawyer takes the case, the lawyer should not accept representation. If the conflict becomes apparent after representation has begun, then the lawyer should withdraw representation."

Although not precedential, Judge Ross' reasoning appears valid. Plaintiff does not dispute Daily News' assertion that subsequent to Judge Ross' Order, Attorney Rohn has continued to represent Gross in that matter.

In his opposition to the motion, Jones asserts that he did not consider himself to be Gross' supervisor; that he did not agree with much of the contents of the letter of termination of Gross which was dictated to him; and that Jones voiced such objections. Plaintiff concludes that, "... Jones is simply a fact witness in the Gross matter and is not involved as Gross' supervisor, or the decision-maker with respect to the Gross termination. Gross plays no role whatsoever in Jones' lawsuit.." In support thereof, Jones cites to deposition testimony given by him in the Gross case on December 13, 2000. Plaintiff does not offer that Attorney Rohn will discontinue representation of Gross.

In its reply, Daily News emphasizes that Jones was employed as Acting City Editor for the Daily News and that while so employed Attorney Rohn had

impermissible discussions with him concerning Gross. Daily News also provided the following exhibits:

1. *Exhibit A*
The May 14, 1999 letter assigning Jones to the position of Acting City Editor and defining his duties which included supervision and assignments to all news reporters (such as Gross).

**\*2** 2. *Exhibit B*
Attorney Rohn's letter to Jeffrey Prosser dated February 26, 1999 setting out Rohn's representation of Jones' discrimination claims (and including a copy of Jones' EEOC discrimination complaint and Jones' February 26, 1999 affidavit with regard thereto).

3. *Exhibit C*
_____ Jones' February 26, 1999 letter to Gross terminating Gross' employment with the Daily News.

4. *Exhibit D*
_____ Jones' July 2, 1999 affidavit detailing his involvement in the investigation and termination of Gross.

Upon review of the documents submitted by the parties, it is clear that at material times herein, Jones had at least some supervisory responsibility over Gross; that Jones performed significant functions concerning the investigation of Gross' conduct; that Jones had a material role in the decision making process and ultimate termination of Gross; and that Jones will undoubtedly be an important witness in the Gross case. The fact that Jones' December 13, 2000 deposition testimony diminishes his role with regard to Gross only highlights the Daily News' concern that at the time of such deposition, Jones was represented by Gross' attorney. The Court need not now decide whether Jones was, in fact, a major or lesser factor in the Gross affair as it is only material for purpose hereof that Jones' involvement therein was significant and will be fairly at issue.

*Regarding ABA Model Rule 1.7*

Rule 1.7 provides:
CONFLICT OF INTEREST: GENERAL RULE
a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
(1) the lawyer reasonably believes the representation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation.

The Disciplinary Rules of the Model Code of Professional Responsibility requires an attorney to decline proffered employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by the proffered employment or if it would be likely to involve him in representing differing interests. DR5-105(A).

Daily News has asserted a conflict because of Attorney Rohn's representation of its managerial employee (Jones) prior to and during her representation of Gross in a matter which Jones had significant factual involvement. Traditionally, Jones may have the sole right to consent to his attorney representing another party, however, Daily News as Jones' employer (and later former employer) has a valid pecuniary interest in a suit in which Jones is an embodiment of its corporate presence. This is not unlike a situation where an attorney sues a current client on behalf of another party arising from an automobile accident. The current client, (fully insured) may not object to being sued, however, the actual pecuniary interest in such litigation belongs to the insurer. Although Jones is not a named Defendant in Gross' suit, the principle that the right to object should belong to the one at risk (Daily News) is analogous. [FN5]

FN5. It was so ruled with equivalent language in the order granting motion to disqualify dated May 31, 1996 in *Eulalie Saldana v. Banco Popular de Puerto Rico,* STX. Civ.1996/1.

In *Saldana,* the court found that it presented a conflict of interest for Saldana's attorney to represent her in a suit against Banco Popular while also representing Ms. Dariel Ruiz, an

officer of Banco Popular in an unrelated case, because Ms. Ruiz played a significant role and was a likely witness in the *Saldana* matter.

**\*3** Daily News is entitled to the testimony of its former manager, Jones, (with regard to the Gross litigation) unencumbered by the untrammeled access of Gross' attorney to such witness. Attorney Rohn has continued as counsel for Gross subsequent to notice of such conflict (*i.e.* Judge Ross' December 8, 2000 Order) On the particular facts herein, there is sufficient conflict of interest to warrant disqualification for such reason.

*Regarding ABA Model Rule 4.2*

_____ Rule 4.2 provides:

_____ COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Comment (4) to Model Rule 4.2 provides:

[4] In the case of an organization, this Rule prohibits communications by a lawyer for another person or entity concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

In this matter, Attorney Rohn commenced representation of Jones prior to her representation of Gross. Attorney Rohn represented Jones when Gross was fired on June 6, 1999 and when she filed suit on behalf of Gross in the Territorial Court on June 24, 1999. Attorney Rohn has had open access to discuss with Jones the substance of the Gross case and Plaintiff has not denied Daily News' assertion that such contact took place. [FN6] In any event, Attorney Rohn was counsel of record for Jones when he was deposed in the Gross case on December 13, 2000.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2001 WL 378846 (D.Virgin Islands)
**(Cite as: 2001 WL 378846 (D.Virgin Islands))**

FN6. As noted by Daily News, it attempted to depose Attorney Rohn regarding her conversations with Jones about Gross but was ordered not to do so (see Judge Ross Order dated December 8, 2000, Exhibit "A" to Daily News' motion). Daily News' requests that the Court infer that such conversations in fact occurred. (Daily News Motion to Disqualify at ftn.12, p. 17).

By unpublished Order dated November 14, 2000 in *Idealfonso "Pancho" Encarnacion v. Kmart Corp.,* STX Civ.1997/63, Chief Judge Finch ordered disqualification of Plaintiff's attorney for having communication with Kmart's employee concerning the matters at issue (citing *Inorganic Coating, Inc. v. Falberg,* 926 F.Supp. 517, 520 (E.D.Pa.1995), "... disqualification is required where the substance of the *ex parte* discussion went to the nub of the lawsuit ..." and *Faison v. Thornton,* 863 F.Supp. 1204, 1217 (D.Nev.1993).

At the time of Jones' deposition in Gross' case, Jones was no longer employed by Daily News. The Standing Committee on the Rules of Professional Responsibility had taken the position that Rule 4.2 does not apply to former employees. A majority of the courts adhered to this view. However, the committee conceded that "the concerns reflected in the Comment to Rule 4.2 may survive the termination of the employment relationship" and that "persuasive policy arguments can be and have been made for extending the ambit of [the Rule] to cover some former corporate employees."

**\*4** The Comment to the rule defines a "corporate party" as:

(1) persons having a managerial responsibility on behalf of the organization;

(2) any other person whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability or;

(3) any person whose statement may constitute an admission on the party of the organization.

In *Curley v. Cumberland Farms,* 134 F.R.D. 77, 82 (D.N.J.1991), the court reasoned that imputation should be examined on a case by case basis and cautioned against claims of imputation which were hypothetical and remote.

Subsequently, the American Bar Association's committee on Ethics and Professional Responsibility issued a formal opinion that ostensibly clarified that Rule 4.2 does not apply to former employees. A.B.A. Formal Op. 91-359 (1991). Notwithstanding such opinion a number of courts in our circuit have continued to recognize the viability of inquiry into the particular status of such former employees as relevant.

In *Goff v. Wheaton Industries,* 145 F.R.D. 351, 356 (D.N.J.1992), the court cited *Curley v. Cumberland Farms'* holding that the corporation could present facts indicating that if a former employee,

... (1) had managerial responsibilities; (2) could impute liability on the corporation; or (3) could make statements which could constitute an admission on the party of the organization then Rule 4.2 would afford party-like status to the former employee and forbid *ex parte* communication ...,

noting that that decision "offers guidance in directing an analysis of Rule 4.2's application ..." [emphasis added].

Recognizing that there are inconsistent decisions in this area, D .J. Kelly stated,

If there is a real or perceived risk of disclosure of confidential information protected by the privilege which is or may be damaging to the party in interest due process considerations may prohibit *ex parte* contact by adverse counsel with a current or former employee.

*Stabilus v. Haynsworth,* 1992 WL 68563 (E.D.Pa.). See also, *Dillon Companies, Inc. v. Sico Co.,* 1993 WL 492746 (E.D.Pa.); *Marinnie v. Nabisco Brands, Inc.,* 1993 WL 267453 (E.D.Pa.); *Police Officer Joy Carter-Herman et al. v. City of Philadelphia et al.,* 897 F.Supp. 899, 902 (E.D.Pa.1995); *In Re: The Prudential Ins. Co. of America Sales Practice Litigation,* 911 F.Supp. 148, 153 (D.N.J.1995); *Michaels v. Woodland,* 988 F.Supp. 468 (D.N.J.1997).

It is readily apparent from a review of Jones December 13, 2000 deposition (Exhibit "1" to Plaintiff's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2001 WL 378846 (D.Virgin Islands)
**(Cite as: 2001 WL 378846 (D.Virgin Islands))**

opposition) that the emphasis of Jones' testimony is divergent from that suggested by Daily News' reply Exhibits "A", "C", and "D," with regard to Jones' authority over Gross; Jones' participation in the investigation, decision making process and ultimate firing of Gross; and the underlying facts of the Gross affair. Jones also participated in confidential communications concerning Gross with Daily News' attorney and Executive Editor Lowe Davis (Exhibit "D" to Daily News' reply). Attorney Rohn has continued to represent Gross in the Territorial Court case.

**\*5** Although the extent of Jones' managerial responsibilities is fairly at issue, it is beyond dispute that Jones' testimony concerning Gross goes to the heart of Gross' suit and that the continued representation of Jones by Gross' attorney is violative of Model Rule 4.2.

Accordingly, for reasons above stated, it is hereby;

ORDERED as follows:
  1. Daily News' motion is GRANTED and the Law Offices of Lee J. Rohn is disqualified as Plaintiff's counsel.
  2. This Order and all further action in this matter are STAYED pending any appeal to the District Judge.
  3. Further to ruling on such appeal, if then appropriate, the Court will provide for appearance of new counsel and revised scheduling.

Not Reported in F.Supp.2d, 2001 WL 378846 (D.Virgin Islands)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois.
Kedron JONES Jr., Plaintiff,
v.
Micheal SHEAHAN, Ernesto Velasco, B. Goodwin,
John Doe Mail Room Employees,
Defendants.
**No. 01C6548.**

May 9, 2002.

MEMORANDUM OPINION AND ORDER

PLUNKETT, District J.

 **\*1** Plaintiff Kedron Jones Jr., a pretrial detainee at Cook County Jail, brings this *pro se* complaint pursuant to 42 U.S.C. § 1983. Defendants Cook County Sheriff Michael Sheahan, [FN1] Executive Director Ernesto Velasco, and Beatrice Goodwin have filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Jones has filed a response, and defendants have filed a reply. For the following reasons, the court grants in part and denies in part defendants' motion to dismiss.

> FN1. Plaintiff has misspelled defendant Michael Sheahan's first name in the caption. The court will use the correct spelling of defendant's name.

I. Standard of Review on a Motion to Dismiss

 The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits. *Gibson v. Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). Federal notice pleading requires only that the plaintiff "set out in her complaint a short and plain statement of the claim that will provide the defendant with fair notice of the claim." *Scott v. City of Chicago,* 195 F.3d 950, 951 (7th Cir.1999). When ruling on a motion to dismiss, the court assumes that well-pleaded allegations are true and draws all reasonable inferences in the light most favorable to the plaintiff. *Henderson v. Sheahan,* 196 F.3d 839, 845 (7th Cir.1999), *cert. denied,* 530 U.S. 1234 (2000). This rule has particular force when considering the allegations of a *pro se* complaint, which are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 (1972). Accordingly, *pro se* complaints are to be liberally construed. *Wilson v. Civil Town of Clayton, Ind.,* 839 F.2d 375, 378 (7th Cir.1988).

 However, while it is often said that a claim may be dismissed only if, as a matter of law, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," *Neitzke v. Williams,* 490 U.S. 319, 327 (1989) (*quoting Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)), the Seventh Circuit has observed that this maxim "has never been taken literally." *Kyle v. Morten High School,* 144 F.3d 448, 455 (7th Cir.1998) (*quoting Sutliff, Inc. v. Donovan Companies, Inc.,* 727 F.2d 648, 654 (7th Cir.1984)). All plaintiffs--whether *pro se* or represented--must include in the complaint allegations concerning all material elements necessary for recovery under the relevant legal theory. *Chowla v. Klapper,* 743 F.Supp. 1284, 1285 (N.D.Ill.1990).

 II. Facts

 In line with the foregoing authorities, the following factual statement is drawn from Jones's complaint.

 Jones has been seeking *pro bono* legal representation in a capital murder case from July 2000 until April 2001. During this time, he has mailed five to ten letters a week through the Cook County Jail mail room to law firms. The letters have been clearly marked privileged mail and sealed. However, this privileged mail has been opened by mail room employees.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 959814 (N.D.Ill.)
**(Cite as: 2002 WL 959814 (N.D.Ill.))**

Jones's incoming mail from the law firms to whom he has written has been opened outside of his presence and has been delivered to him days and sometimes weeks after the date of the postmark.

**\*2** Some of Jones's privileged mail has been opened, read, and stamped "return to sender, detainee discharged." Jones discovered that his privileged mail was being returned to sender when his incoming mail slowed from five to six letters a week to one or two.

Jones has made defendants aware of the situation by filing grievances. He claims that defendants have effectively halted his search for *pro bono* or any other kind of legal representation in a capitol case, which has forced him to accept legal representation from the Public Defenders' program.

Books, magazines, and stamped envelopes have been taken from his mail on different occasions. He has received books, magazines, and legal pads soiled and with pages or articles missing.

III. Analysis

Jones makes three claims: (1) that his First Amendment right of free speech and association were violated; (2) that his Sixth Amendment right of access to the courts and Sixth Amendment right to seek counsel of one's choice were violated; and (3) that items mailed to him were stolen or damaged without due process of law as required by the Fourteenth Amendment.

A. First Amendment Right of Free Speech and Association

Prison officials may open a prisoner's legal mail in his presence. *Wolff v. McDonnell,* 418 U.S. 539, 577 (1974). However, repeated instances of an inmate's legal mail being opened outside of his presence are actionable. *See Antonelli v. Sheahan,* 81 F.3d 1422, 1431-32 (7th Cir.1996) (allegations that legal mail was repeatedly opened and sometimes stolen stated claims); *Castillo v. Cook County Mail Room Dept.,* 990 F.2d 304, 306-07 (7th Cir.1993) (allegations that inmate's legal mail was opened outside of his presence stated claim).

In regard to his outgoing mail, Jones states that he mailed five to ten privileged letters a week from July 2000 until April 2001, that is, approximately 180 to 360 privileged letters in a nine-month period. He claims that mail room employees have been opening and reading this mail. In regard to his incoming mail, Jones states that he received five to six letters a week, that is, 180 to 216 letters during the nine-month period, which slowed to one to two letters a week when his mail was being returned to sender. In his response to the motion to dismiss, Jones attached nine pieces of mail that he claims were legal mail that was opened outside of his presence.

Defendants point out in their reply that of these nine letters, only four are truly privileged. The court agrees that the two letters from the Clerk of the U.S. District Court and the letter from the Clerk of the Circuit Court of Cook County are not privileged mail, although they had been stamped "LEGAL MAIL-OPEN IN PRESENCE OF INMATE." *See Antonelli,* 81 F.3d at 1431; *Martin v. Brewer,* 830 F.2d 76, 78 (7th Cir.1987); *Stone-El v. Fairman,* 785 F.Supp. 711, 716 (N.D.Ill.1991) (letters from the Clerk of the Court and the like are not privileged and may be opened); Tit. 20, Ill. Admin. Code, Ch. I, Subch. F, Pt. 701(f) (incoming privileged mail means mail from sources identified in subsection (e) except for clerks of courts). The letters from the United States Postal Service, the City of Chicago Department of Police, and the Attorney Registration and Disciplinary Commission also do not fit within any of the categories of privileged mail enumerated in Title 20. [FN2]

FN2. Title 20, Chapter 1, Subchapter F, Part 701, of the Illinois Administrative Code reads in pertinent part:
e) Outgoing Privileged Mail
Outgoing letters from detainees to persons or organizations listed below which are clearly marked as "privileged" are considered privileged and may be sealed by the detainee prior to submission for mailing. Such letters shall not be opened by the jail staff before mailing and shall be dispatched promptly.
1) Federal or Illinois legislators; Judges of any court or the Illinois Court of Claims or clerks

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　Page 3
Not Reported in F.Supp.2d, 2002 WL 959814 (N.D.Ill.)
**(Cite as: 2002 WL 959814 (N.D.Ill.))**

of courts; the Attorney General of the United States and Illinois; the Director of the Federal Bureau of Prisons; and the Governor of the State of Illinois.

2) The Director, Deputy Directors, or Assistant Deputy Directors of the Illinois Department of Corrections; the Chief of the Jail and Detention Standards Unit of the Illinois Department of Corrections; members of the Illinois Prisoner Review Board; and county sheriffs.

3) Chief Executive Officers of the Federal Bureau of Investigation, the Drug Enforcement Administration, the Criminal Division of the Department of Justice, and the United States Customs Service.

4) The John Howard Association.

5) Registered attorneys.

6) Any organization which provides direct legal representation to detainees, but not including organizations which provide referrals to attorneys, such as bar associations.

f) Incoming Privileged Mail

Incoming privileged mail means mail from sources identified in subsection (e) of this Section except for clerks of courts. Incoming privileged mail which is clearly marked as "privileged" may be opened only for the purpose of verifying the recipient and the sender and to ascertain that nothing other than privileged mail is enclosed. Privileged mail shall be opened in the presence of the detainee.

**\*3** Citing *Morgan v. Montanye,* 516 F.2d 1367, 1370-71 (2nd Cir.1975), defendants argue that the opening of these four letters are isolated incidents, which state a claim of constitutional significance only if the inmate alleges he suffered some damage as a result of the interference with his mail. Defendants have a major problem with their argument: they have mushed together Jones's First Amendment right of free expression and association and his Sixth Amendment right of access to the court.

The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech,

association, and petition. *Denius v. Dunlap,* 209 F.3d 944, 953-54 (7th Cir.2000). Jones claims that his outgoing privileged mail, in which he was seeking *pro bono* representation, has been opened and read. Although he did not attach any examples to his response, his allegations are sufficient to state a claim at this stage of the litigation. *See Antonelli v. Sheahan,* 81 F.3d 1422, 1431-32 (7th Cir.1996) (allegations that legal mail was opened, delayed for an inordinate amount of time and sometimes stolen was sufficient to state claim). As noted earlier, the purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits. *Gibson v. Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). Considering the number of letters that Jones admits to mailing, he will need to demonstrate, not merely allege, how many of these 180 to 360 letters were actually opened and read before being sent on to the addressees.

As to Jones's incoming mail, he has attached four privileged letters that were opened outside of his presence. However, of the approximately 180 to 216 letters he received, he does not state that these were the only letters that were opened outside of his presence. Jones will be given an opportunity to demonstrate that the opening of his mail constituted an ongoing activity.

The court notes that Jones has come close to pleading himself out of court. A plaintiff can plead himself out of court by alleging additional facts showing that a conclusory allegation is not true. *Jackson v. Marion County,* 66 F.3d 151, 153-54 (7th Cir.1995); *Tregenza v. Great American Communications Co.,* 12 F.3d 717, 718 (7th Cir.1993), *cert. denied,* 114 S.Ct. 1837 (1994); *Early v. Bankers Life & Casualty Co.,* 959 F.2d 75, 79 (7th Cir.1992); *Greer v. Roth,* 1995 WL 476594 *\*1* (N.D.Ill. Aug. 9, 1995). Also, where allegations are inconsistent with a document provided by that party, the document will override the allegation. *See Beam v. IPCO Corp.,* 838 F.2d 242, 245 n. 3 (7th Cir.1988).

In light of the number of letters that Jones states that he mailed out and that he received, if these four letters are all that he can muster up, he will be hard pressed to demonstrate that defendants tampered with his mail. Jones relies on *Bieregu v. Reno,* 59 F.3d 1445 (3rd Cir.1995). In that case, the plaintiff contended that on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 4
Not Reported in F.Supp.2d, 2002 WL 959814 (N.D.Ill.)
**(Cite as: 2002 WL 959814 (N.D.Ill.))**

15 occasions, legal mail was opened outside his presence, and he supplied evidence of five instances during a three-month period in which his legal mail was opened. *Id.* at 1452. The opinion does not reveal how many letters the plaintiff actually mailed or received or what kinds of procedures were in place for dealing with inmates' mail. Likewise, in *Castillo v. Cook County Mail Room Department,* 990 F.2d 304, 306 (7th Cir.1993), the plaintiff alleged that three privileged letters had been opened in a nine-month period. The Court of Appeals reflected that a fact-finder faced with this meager record could not determine whether all of the plaintiff's mail had been opened or merely a fraction. On a more developed record, Jones will need to demonstrate that the alleged tampering with his legal mail went far beyond a few isolated instances.

**\*4** The court accordingly denies defendants' motion to dismiss as to this claim.

B. Sixth Amendment Right of Access to the Courts and Sixth Amendment Right to Seek Counsel of One's Choice

Prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 821 (1977). In order to state a claim, a prisoner must demonstrate that the deprivation he suffered hindered his efforts to pursue a legal claim and resulted in actual injury. *Lewis v. Casey,* 518 U.S. 343, 351 (1996) (an injury exists, for example, where inadequacies at the law library might cause a plaintiff's complaint to be dismissed for failure to satisfy some technical requirement, or where he was unable even to file a complaint).

Jones claims that he was effectively halted in his search for *pro bono* representation and thus was forced to accept legal representation from the Office of the Public Defender.

"[A] defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant." *Wheat v. United States,* 486 U.S.153, 159 (1988). Thus, the right to counsel of choice does not extend to an indigent receiving public representation. *See Caplin & Drysdale,*

*Chartered v. United States,* 491 U.S. 617, 624 (1989); *United States v. Childress,* 58 F.3d 693, 736 (D.C.Cir.1995), *cert. denied,* 516 U.S. 1098 (1996). However, "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." See *Caplin,* 491 U.S. at 624-25.

Although the court has been unable to locate any case law discussing an indigent criminal defendant's right to seek *pro bono* counsel, it would appear that such a right would flow from the Sixth Amendment. The court emphasizes that the right to seek *pro bono* counsel does not translate into a right to be represented by counsel of one's choice if the indigent criminal defendant is unsuccessful in his search. In light of *Lewis v. Casey,* Jones will need to demonstrate actual prejudice to his search for *pro bono* representation. Considering the number of letters that Jones admits to mailing and the number of responses he received, [FN3] this will be a high burden. Jones will have to come forward with more than speculation that he could have secured *pro bono* representation if no mishaps had happened to either his outgoing or incoming mail. However, at this stage of the litigation, the court finds it premature to dismiss this claim.

> FN3. Presumably all the lawyers and firms that Jones approached and whose responses he received declined to represent him or else he would not have been forced to accept representation from the Office of the Public Defender.

The court accordingly denies defendants' motion to dismiss as to this claim.

C. Loss of Property

Jones claims that books, magazines, and stamped envelopes have been taken from his mail on different occasions and that he has received books, magazines, and legal pads in a damaged condition. A loss of property, such as alleged here, does not constitute a deprivation of property without due process of law in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2002 WL 959814 (N.D.Ill.)
**(Cite as: 2002 WL 959814 (N.D.Ill.))**

violation of the Fourteenth Amendment if the government provides an adequate postdeprivation remedy for the loss. *See Hudson v. Palmer,* 468 U.S. 517, 533 (1984); *Parratt v. Taylor,* 451 U.S. 527, 543-44 (1981). Illinois, in fact, provides a remedy for the tort of conversion. See 705 ILCS 505/8(d)(1999); *Clark v. Stahl,* 2000 WL 631306 (N.D.Ill.); *Heimberger v. Village of Chebanse,* 124 Ill.App.3d. 310 (1984). Therefore, any Section 1983 claim regarding the items allegedly taken or damaged cannot stand. *See Bullock v. Barham,* 957 F.Supp. 154, 157 (N.D.Ill.1997); *Slaughter v. Anderson,* 673 F.Supp. 929, 930 (N.D.Ill.1987).

**\*5** The court accordingly grants defendants' motion to dismiss as to this claim.

D. Official Capacity Liability

Defendants argue next that even if the court finds that Jones has stated a claim of constitutional magnitude, they can be held liable in neither their official nor individual capacities.

As defendants pointed out in their motion to dismiss, Jones does not specify whether he is suing defendants in either their official or individual capacities, or both. Based on the presumption in *Baker v. City of Chicago Police Department,* No. 99 C 1821 2000 WL 556619 (N.D.Ill.), [FN4] defendants addressed both defendants; official and individual capacities.

> FN4. When a plaintiff fails to indicate whether he is suing defendants in their individual or official capacities or both, normally there is a presumption that complaints against public officials are official capacity claims. *Kolar v. County of Sangamon,* 756 F.2d 564, 568 (7th Cir.1985). This presumption is overcome when it is clear that the *pro se* plaintiff may not understand the technicalities of pleading Section 1983 liability. *See Hill v. Shelander,* 924 F.2d 1370, 1373 (7th Cir.1991).

An official capacity claim is, in essence, a claim against the governmental entity that employs the defendant. *Kentucky v. Graham,* 473 U.S. 159, 165

(1985). Liability under 42 U.S.C. § 1983 can be imposed on governmental entities only if the underlying constitutional deprivation resulted from the execution of an official custom, policy or practice. *Monell v. Department of Social Servs.,* 436 U.S. 658, 694 (1978). There are three ways in which a municipality can be found to have violated a person's civil rights through its policy or custom: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that is not authorized by written law or express municipal policy but is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policy-making authority. *See Baxter v. Vigo Co. Sch. Corp.,* 26 F.3d 728, 734-35 (7th Cir.1994).

Jones argues that the repeated opening of his legal mail outside his presence constituted a widespread practice. If Jones is able to demonstrate at a later time that not only his legal mail but also all legal mail in general was deliberately tampered with or that no procedures were in place to deal with an inadvertent opening of legal mail, then he conceivably could hold defendants liable in their official capacities. The court accordingly will not dismiss the official capacity claim against defendants at this time.

E. Individual Capacity Liability

Individuals cannot be held liable in a Section 1983 action unless they caused or participated in the alleged constitutional deprivation. *Vance v. Washington,* 97 F.3d 987, 991 (7th Cir.1996), *cert. denied,* 520 U.S. 1230 (1997); *Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir.1995); *Rascon v. Hardiman,* 803 F.2d 269, 273 (7th Cir.1986) (*citing Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983)). Supervisors and others in authority also cannot be held liable for any alleged wrongdoing on the part of subordinates pursuant to the doctrine of *respondeat superior* because that doctrine does not apply to § 1983 actions. *See Pacelli v. DeVito,* 972 F.2d 871, 877 (7th Cir.1992); *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir.1988).

**\*6** However, to survive a motion to dismiss, "a pleading must only contain enough to 'allow the court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2002 WL 959814 (N.D.Ill.)
**(Cite as: 2002 WL 959814 (N.D.Ill.))**

and the defendant to understand the gravamen of the plaintiff's complaint," '*Payton v. Rush Presbyterian-St. Luke's Med.* Ctr., 184 F.3d 623, 627 (7th Cir.1999) (*citing Doherty v. City of Chicago,* 75 F.3d 318, 326 (7th Cir.1996)). *Antonelli v. Sheahan,* 81 F.3d 1422 (7th Cir.1996), gives further guidance as to whether Jones has sufficiently linked the defendants to the opening of his legal mail. In *Antonelli,* the Seventh Circuit recognized that high level officials cannot be held liable in their individual capacities by virtue of the doctrine of *respondeat superior* and explained that high level officials normally cannot be held liable for "clearly localized, non-systemic violations." *Id.* at 1428-29. However, high level officials are expected to have personal responsibility for systemic conditions. *Id.* at 1429.

 At this stage of the litigation, it is difficult to tell if the problem is non-systemic or systemic. If unidentified employees are intentionally opening and reading Jones's legal mail, then it is clearly a non-systemic problem. If proper procedures have not been set up and are not being enforced for dealing with the large volume of mail that enters and leaves Cook County Jail, then it is clearly a systemic problem. The court accordingly finds it premature to dismiss any of the defendants at this time. Moreover, if the problem turns out to be unidentified employees who intentionally opened and read Jones's mail, then the supervisors will be in the best position to identify these employees. *See Antonelli,* 81 F.3d at 1428, *citing Duncan v. Duckworth,* 644 F.2d 653, 655 (7th Cir.1981).

 IV. Conclusion

 For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. It is granted as to Jones's claim of stolen and damaged mail. It is denied as to Jones's claims that his First Amendment right of free speech and association and his Sixth Amendment right of access to the courts and Sixth Amendment right to seek counsel of one's choice were violated. It is denied as to defendants' claim that they should not be held liable in either their official or individual liabilities.

 Defendants are given 20 days to answer or otherwise

plead to the remaining claims in the complaint.

  Not Reported in F.Supp.2d, 2002 WL 959814 (N.D.Ill.)

   **Motions, Pleadings and Filings (Back to top)**

• 1:01CV06548 (Docket) (Aug. 31, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**CERTIFICATE OF SERVICE**

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

November 14, 2005, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

FTU/ Briefs / Disqualification AB.final

42