Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

Briefs and Other Related Documents

Only the Westlaw citation is currently available.
  United States District Court,E.D. Pennsylvania.
                  Kenneth CHOTINER
                          v.
   THE PHILADELPHIA HOUSING AUTHORITY, et
                         al.
                 No. Civ.A.02-9504.

                    Dec. 15, 2004.

Nancy D. Wasser, Law Offices of Nancy Wasser, Philadelphia, PA, for Plaintiff.
Peter H. Levan, Jr., Hangley, Aronchick, Segal & Pudlin, Christopher J. Rusek, Klett, Rooney, Lieber and Schorling, Philadelphia, PA, for Defendants.

                    MEMORANDUM

DALZELL, J.

**\*1** This case requires us to balance a public agency's need to manage its employees against the employees' right to express themselves. Plaintiff Kenneth Chotiner here has sued his former employer, the Philadelphia Housing Authority (the "PHA"), for firing him because he spoke out on two matters of alleged public concern. We now consider defendants' motion for summary judgment.

              A. *Factual and Procedural Background*

In December of 1998, Chotiner began working for the PHA as Assistant Legal Counsel. Def.'s Mem., Ex. 1. After a year in the PHA's transactional group, the PHA shifted Chotiner's caseload to mostly litigation matters. Pl.'s Dep. at 168-70. In March of 2002, the PHA promoted him one grade to the position of Counsel. Def.'s Mem. at 3.

From then until July of 2002, the period in which the events giving rise to this lawsuit occurred, Chotiner had two primary supervisors, defendant Marc Woolley and defendant Helen Ferris. Woolley served as the PHA's Acting General Counsel; Ferris served as the PHA's Acting Associate General Counsel. Second Am. Compl. at ¶¶ 6-7; Pl.'s Dep. at 377-78; Woolley Dep. at 130-31; Ferris Dep. at 65. Chotiner viewed both as grossly unqualified to supervise him.

Second Am. Compl. at ¶¶ 17, 18; Pl.'s Dep. at 100-101; Wright Dep. at 89-92.

Between March and July of 2002, Chotiner made oral reports to Ferris and Gloria Wright, the PHA's Deputy General Counsel, about two kinds of improprieties Woolley engaged in. First, he reported that Woolley appeared to be violating the PHA's residency policy. Def.'s Mem., Ex. 32; Pl.'s Dep. 30-31, 141-42, 114-15; Second Am. Compl. at ¶¶ 51-52; Wright Dep. at 114, 255, 257, 306, 332-33. This policy requires employees to live in Philadelphia, and Chotiner reported that Woolley lived in Delaware. Pl.'s Dep. at 30, 114-15.

Chotiner also mentioned that the PHA's Human Resources Department, which Woolley led before taking over as General Counsel, breached its duty to report employment discrimination cases to the U.S. Department of Housing and Urban Development ("HUD"). Pl.'s Dep. at 11-25, 29. Because of this breach, in January of 2002 HUD allegedly reprimanded the PHA and withheld about $2 million in legal fees and expenses. Pl.'s Dep. at 14-15.

Ferris and Wright both swore that they never revealed Chotiner's reports to Woolley or to anyone else. Def.'s Mem., Ex. 9, at ¶ 7-10; Wright Dep. at 98, 111, 118-20.

In April of 2002, the PHA assigned Chotiner to defend an action that PHA tenant Alethia Reddy filed in this Court against the PHA and former PHA Police Officer Jake Bolden. Reddy claimed that then-Officer Bolden had falsely arrested and charged her with unlawful drug possession. Def.'s Mem., Ex. 11. Reddy also asserted a *Monell* claim against the PHA, claiming that it engaged in a pattern of allowing officers to infringe on tenants' civil rights. *Id.*

Bolden's interests clashed with the PHA's. Indeed, a jury subsequently convicted Bolden of perjury for lying at Reddy's preliminary hearing. Def.'s Mem., Ex. 12; Def.'s Mem., Ex. 11, at ¶¶ 19-23. Thus, the PHA's best defense was to argue that Bolden acted willfully, outside the scope of his responsibilities. In contrast, Bolden's best defense was to contend that he acted within the scope of his responsibilities so that the PHA would indemnify him.

**\*2** Despite this conflict, Chotiner filed an entry of

Not Reported in F.Supp.2d                                                                                                      Page 2
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

appearance on behalf of both the PHA and Bolden. FN1 Def.'s Mem., Ex. 16; Pl.'s Dep. at 196-98. At the time, Chotiner had never talked with Bolden but knew that a jury convicted him of perjury for lying at Reddy's preliminary hearing. Pl.'s Dep. at 189, 244.

> FN1. Prior to his termination in April of 2002, former PHA attorney Michael Pileggi handled *Reddy*. Pileggi subsequently sued the PHA for retaliation, arguing that it fired him for disclosing that "Marc Woolley, PHA's former General Manager of Human Resources, failed to notify the Housing Authority Risk Retention Group of approximately 20 to 25 pending employment cases." *See* Shannon P. Duffy, *Ex-Counsel to Housing Agency Files Federal Whistleblower Suit: Alleges He Was Fired for Refusing to Hide "Misuse of Public Funds,"* The Legal Intelligencer, Oct. 1, 2002, at 1. This case, docketed as Civ. No. 02-7537, is currently pending before Judge Joyner.
> Judge Brody recently disqualified Pileggi from representing a former PHA police officer in a civil rights suit. *See* Shannon P. Duffy, *Former PHA Counsel Disqualified in Civil Rights Case,* The Legal Intelligencer, Oct. 4, 2004, at 1.

In late April or early May of 2002, Ferris learned that Chotiner was jointly representing Bolden and the PHA. Ferris Dep. at 97-99. Concerned about the apparent conflict, Ferris and Woolley decided that outside counsel should review the case; thus, they referred it to Patrick Harvey, a partner at the law firm of Ballard, Spahr, Andrews, & Ingersoll. Ferris Dep. at 100-01, 106.

On May 29, 2002, Judge Robreno held a hearing in *Reddy.* Def.'s Mem., Ex. 13. While Harvey appeared on the PHA's behalf, Chotiner sat on a back bench; hence, no lawyer appeared on Bolden's behalf. Pl.'s Dep. at 240, 245. This caused Judge Robreno to ask, "Now, who is going to represent the individual police officer?" Def.'s Mem., Ex. 17, at 2. After questioning Harvey and Reddy's lawyer to identify Bolden's lawyer, Judge Robreno asked, "Now, who is Kenneth Chotiner?" *Id.* at 5. From the back bench, Chotiner stood and answered Judge Robreno's call: "Good afternoon, your Honor, Kenneth Chotiner speaking." *Id.* He then came forward and explained, "I entered my appearance on behalf of both Mr. Bolden in his individual official capacity and as well as the PHA."

*Id.* at 5. This prompted Judge Robreno to reprimand Chotiner:

Well, let me say that I don't think that what has happened in this case fills anybody with glory so far. Entering appearances on behalf of individuals is not really a routine matter, [and] it really requires that there be some evaluation.... You have to be sure that you're not entering an appearance where there is a conflict of interest ... unless you know that the client has authorized the representation, your representation of him. You never met Mr. Bolden, never laid eyes on him, there's nothing in the file that seems to indicate that he has ever authorized anybody to represent him in this case, and it is your name that is here, Mr. Paleggi [*sic* ] is now gone, and you're left holding the bag and that's not pretty.... I think there is no question that there is a conflict, so I think that Mr. Chotiner should be allowed to withdraw from the case....

*Id.* at 11-12. Consequently, Judge Robreno ordered Chotiner to file a motion to withdraw as Bolden's counsel. *Id.* at 6. FN2

> FN2. Also during the hearing, Harvey agreed to provide Bolden's address to Reddy's lawyer to facilitate proper service. *Id.* at 9.

To comply with Judge Robreno's order, Harvey drafted a withdrawal motion on Chotiner's behalf and sent it to the PHA. Def.'s Mem., Ex. 18. FN3 Chotiner refused to sign or file it, however, and demanded an accompanying brief. Def.'s Mem., Ex. 19; Def.'s Mem., Ex. 20. Surprisingly, Chotiner also questioned whether a conflict existed, noting on June 22, "To this date, I still do not understand why there is a conflict or why it is illegal to provide representation for him." Def.'s Mem., Ex. 20.

> FN3. In the accompanying letter, Harvey wrote, "You will note that I kept the motion basic and did not list the multiple reasons for the withdrawal.... Judge Robreno acknowledged that there was a conflict at the July [*sic* ] 29th hearing and most likely will not require Ken to list the reasons why PHA cannot represent Jake Bolden." Def.'s Mem., Ex. 18 (Jun. 6, 2002 1tr. from Patrick J. Harvey to Helen Ferris, cc to Chotiner).

**\*3** On June 28, 2002, Chotiner sent Bolden a letter on behalf of the PHA:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00956-GMS   Document 59-2   Filed 11/28/2005   Page 3 of 12

Not Reported in F.Supp.2d                                                                                              Page 3
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

As you are aware, I have entered my appearance as your attorney in the above referenced matter.
It is important that you contact me upon receipt of this letter so that we may discuss the case. My telephone number is 215.684.1379. Please contact me as soon as possible.
Thank you for your attention to this matter.

Def.'s Mem., Ex. 21.

On July 2, 2002, Woolley convened a meeting to discuss *Reddy,* with Ferris, Harvey, and Chotiner present. Pl.'s Dep. at 282. Woolley opened by asking Harvey and Chotiner each to opine whether a conflict barred Chotiner from jointly representing Bolden and the PHA. Pl.'s Dep. at 283-84. While Harvey argued that a conflict precluded joint representation, Chotiner claimed that all concerned parties had waived any conflict. *Id.;* Def.'s Mem., Ex. 22. Finding a conflict, Woolley decided that the PHA would hire outside counsel for Bolden. Pl.'s Dep. at 286; Def.'s Mem., Ex. 12; Def.'s Mem., Ex. 22.

Harvey then asked Chotiner whether he had communicated with Bolden. Pl.'s Dep. at 285-86; Def.'s Mem., Ex. 22. Chotiner revealed that he had recently sent Bolden a letter. Pl.'s Dep. at 286, 287. Woolley requested to see it. *Id.* at 286, 288. Chotiner refused. *Id.* at 285-89. Repeatedly-and each time more forcefully-Woolley demanded that Chotiner produce the letter, but Chotiner repeatedly refused. *Id.;* Def.'s Mem., Ex. 23; Def.'s Mem., Ex. 12; Def.'s Mem., Ex. 22. Finally, Woolley warned, "Either give me the letter or pack your office." Pl.'s Dep. at 288-89. Chotiner didn't budge, and Woolley suspended him for insubordination, with the "immediate intent to terminate." Def.'s Mem. at 11; Pl.'s Dep. at 289.

At least twice during this exchange, Chotiner asked for permission to call his lawyer. *Id.* at 287, 288. Chotiner sought his lawyer's advice because "he felt that ... [Bolden's] address was confidential." *Id.* at 280.

On July 11, 2002, defendant James A. Jones, the PHA's then-General Manager of Human Resources, terminated Chotiner for "insubordination." Def.'s Mem., Ex. 25. On July 23, 2002, Chotiner filed his own motion to withdraw as Bolden's counsel. Def.'s Mem., Ex. 29. FN4

> FN4. Despite Chotiner's asserted belief that Bolden's address may have been confidential, he listed it on the attached certificate of service. Def.'s Mem., Ex. 29.

On May 9, 2003, Chotiner filed a second amended complaint against the PHA, Jones, Ferris, Woolley, and Carl R. Greene, the PHA's Executive Director. In count one, he claims that defendants violated the First Amendment by firing him for speaking on matters of public import. In count two, he alleges that defendants violated Pennsylvania's Whistleblower Law, 43 Pa.C.S.A. § § 1421-28. Defendants have filed a motion for summary judgment, which we will grant as to count one and dismiss without prejudice as to count two.

B. *Legal Analysis*

Public employees, like all citizens, have a First Amendment right to express themselves. FN5 *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205,* 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Public employees have an "interest in addressing matters of public concern and enabling the electorate to make informed decisions." *Curinga v. City of Clairton,* 357 F.3d 305, 310 (3d Cir.2004). Because they work for public bodies as employees, however, a countervailing policy-inapplicable to other citizens-limits the scope of their First Amendment freedoms: "[T]he government has an interest in regulating the speech of its employees to promote 'efficiency and integrity in the discharge of official duties, and in maintaining proper discipline in the public service.' " *Id.* at 309 (quoting *Connick v. Myers,* 461 U.S. 138, 150-51, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (internal brackets omitted)).

> FN5. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In resolving a motion for summary judgment, the Court must draw all reasonable inferences in the nonmovant's favor and determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where, as here, the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may meet its burden

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00956-GMS    Document 59-2    Filed 11/28/2005    Page 4 of 12

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

by showing that the evidentiary materials of record, if admissible, would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies its burden, the nonmoving party must go beyond its pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324.

**\*4** To balance these competing concerns, a court must apply a three-step test when confronted with a public employee's retaliation claim for engaging in protected activity. First, the employee must show that (1) the speech involves a matter of public concern and (2) his interest in speech outweighs the public employer's countervailing interest in providing efficient and effective services to the public. *Curinga,* 357 F.3d at 310 (citing *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996)). If the employee makes this showing, he must then demonstrate that (3) the speech was a "substantial or motivating factor in the alleged retaliatory action." *Id.* (citing *Baldassare v. New Jersey,* 250 F.3d 188, 194-95 (3d Cir.2001); *Green v. Philadelphia Hous. Auth.,* 105 F.3d 882, 885 (3d Cir.1997)). Finally, the employer can escape liability by showing "that it would have taken the adverse action even if the employee had not engaged in protected conduct." *Id.* (citing *Pro,* 81 F.3d at 1288). When balancing, courts should focus on "the content, form, and context of the activity in question." *Brennan v. Norton,* 350 F.3d 399, 413 (3d Cir.2003).

In his brief, Chotiner first claims that defendants terminated him for asking to call his lawyer, which, according to Chotiner, constituted protected speech. Second, Chotiner claims that defendants terminated him for reporting Woolley's misdeeds to supervisors. We address each argument in turn.

1. *Request to Consult Personal Counsel*

At the July 2 meeting, Woolley demanded that Chotiner produce the Bolden letter. Chotiner repeatedly refused and, at least twice, asked to call his lawyer. Chotiner now claims that this request was constitutionally protected and that defendants fired him for it. Pl.'s Mem. at 22.

Viewing the evidence in the light most favorable to Chotiner, his claim fails for three reasons.

First, Chotiner's request to consult personal counsel had no bearing on any matter of public concern. To involve a matter of public concern, speech must be "fairly considered as relating to any matter of political, social or other concern to the community." *Curinga,* 357 F.3d at 313. In other words, to touch on a matter of public concern, speech must enrich, or, at least, provide some "value" to the community. *Brennan v. Norton,* 350 F.3d 399, 413 (3d Cir.2003) ("Instead, we concentrate on the value of the speech itself") (quoting *Baldassare v. New Jersey,* 250 F.3d 188, 197 (3d Cir.2001)). FN6 Hence, even if motivated by private gain, "speech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Id.* at 412 (quoting *Connick v. Myers,* 461 U.S. 138, 148, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

> FN6. With locutions like "concern to the community" and "value of the speech itself", it did not surprise us when, just nine days ago, the Supreme Court itself underscored that "the boundaries of the public concern test are not well-defined...." *City of San Diego, California et al. v. John Roe,* No. 03-1669, 2004 WL 2775950, at \*4 (Dec. 6, 2004) (discussed at note 12, *infra* ). On the one hand, because the public supports government agencies with taxes and uses the ballot to control the conduct of elected officials and influence public policy, every word uttered in a government office arguably "concerns" the public. On the other hand, because a public body's "interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer," courts must impose limits. *Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). Distinguishing the protected from the unprotected has vexed many federal courts, leading at times to inconsistent and unpredictable results. *See generally* Stephen Allred, *From Connick to Confusion: The Struggle to Define Speech on Matters of Public Concern,* 64 Ind. L.J. 43 (1988); D. Gordon Smith, Comment, *Beyond Public Concern: New Free Speech Standards for Public Employees,* 57 U. Chi. L.Rev. 249 (1990).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 5
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Here, that simply is not the case. Even if Chotiner reasonably believed that Woolley wanted him to act unethically, his speech was still unprotected because rather than attempting to "bring to light actual or potential wrongdoing" by protesting Woolley's allegedly improper demand or reporting it through higher channels, Chotiner merely asked to call his lawyer. In other words, not only was he motivated by private concern-the desire to preserve *his* ethical standing-but his request "addresse[d][no] matter that concern[ed] the public as well as the speaker." *Brennan,* 350 F.3d at 412. FN7

> FN7. Perhaps this explains why Chotiner makes no attempt in his brief to explain why his request constituted protected speech.
> A comparison of Chotiner's speech with speech that our Court of Appeals found worthy of constitutional protection bolsters our conclusion that Chotiner's speech was unprotected. *See Brennan v. Norton,* 350 F.3d 399, 415 (3d Cir.2003) (fireman informed New Jersey Department of Labor and Health about the presence of asbestos in city's fire stations); *Baldassare v. New Jersey,* 250 F.3d 188, 195-97 (3d Cir.2001) (criminal investigator in county prosecutor's office performed internal investigation that led to administrative charges against chief prosecutor's cronies); *Green v. Philadelphia Hous. Auth.,* 105 F.3d 882, 885-87 (3d Cir.1997) (Housing Authority police officer appeared as character witness for criminal defendant); *Azzaro v. County of Allegheny,* 110 F.3d 968, 978-79 (3d Cir.1997) (*en banc*) (county employee reported sexual harassment); *Watters v. City of Philadelphia,* 55 F.3d 886, 893-95 (3d Cir.1995) (employee's statements in newspaper article expressed concern over lack of official policies covering counselling services for employee assistance program); *Feldman v. Phila. Hous. Auth.,* 43 F.3d 823, 829 (3d Cir.1994) (former employee's highly critical internal audit report exposed governmental wrongdoing); *O'Donnell v. Yanchulis,* 875 F.2d 1059, 1061 (3d Cir.1989) (chief of police reported to local television station that township supervisors asked department to withdraw citations against supervisors' cronies); *Zamboni v. Stamler,* 847 F.2d 73, 75 (3d Cir.1988) (public criticism of proposed reorganization of prosecutor's office); *Johnson v. Lincoln Univ.,* 776 F.2d 443, 452 (3d Cir.1985) (letters by university professor to accreditation body that alleged low academic standards at university); *Czurlanis v. Albanese,* 721 F.2d 98, 100-01 (3d Cir.1983) (speeches at Board of Chosen Freeholders meetings criticized practices of Division of Motor Vehicles); *Monsanto v. Quinn,* 674 F.2d 990, 996-97 (3d Cir.1982) (letters to tax commissioner criticized management of tax division). In all of these cases, the plaintiffs' speech provided, or had the potential to provide, value to the community. This recurring theme-public value-was simply lacking when Chotiner requested to call a lawyer.

**\*5** One could argue that Chotiner's request enriched the public, which has an interest in public lawyers acting ethically. On this theory, permitting public agency lawyers to call their own lawyers during working hours would advance this interest.

For us to accept this most expansive theory, however, Chotiner's request must, at the very least, have been reasonable. Undisputed evidence demonstrates that it was not. Defendants' expert, John W. Morris, Esq., analyzed Chotiner's purported ethical quandary and concluded, "Chotiner had no reasonable ethical grounds for not disclosing his recent letter to Bolden. The refusal impeded the discharge of Woolley's own duties and ... Chotiner was entitled to act in accordance with Woolley's determination." Def.'s Mem., Ex. 24, at 7. As the non-moving party, Chotiner has an obligation to "present *affirmative* evidence-whether direct or circumstantial-to defeat summary judgment...." *Estate of Smith v. Marasco,* 318 F.3d 497, 514 (3d Cir.2003). Thus, the unsupported argument in his brief that Mr. Morris's expert opinion is "factually and legally incorrect," see Pl.'s Mem., at 13 n. 15, fails to rebut the only expert evidence in the record concerning this issue. FN8

> FN8. Furthermore, Chotiner appears to confuse the attorney-client privilege and the ethical duty of confidentiality. In footnote 15 of his brief, Chotiner begins by emphasizing-correctly-that "the issue in this case is whether plaintiff had the right to consult counsel to resolve an *ethical quandary* ...." (emphasis added). But he then cites two cases from lower Pennsylvania

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00956-GMS    Document 59-2    Filed 11/28/2005    Page 6 of 12

Not Reported in F.Supp.2d                                                                                Page 6
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

courts holding that, in some circumstances, a client's address is privileged. *Brennan v. Brennan,* 281 Pa.Super. 362, 422 A.2d 510 (Pa.Super.1980); *Gould v. City of Aliquippa,* 750 A.2d 934 (Pa.Cmwlth.Ct.2000). The extent to which client addresses are privileged under Pennsylvania discovery jurisprudence has no bearing on the "ethical quandary" Chotiner claims to have faced. The attorney-client privilege allows a client to refuse to testify and prevents his lawyer from testifying in court about communications between the two; the ethical duty of confidentiality bars a lawyer from revealing information relating to the representation of a client. Pennsylvania Rule of Professional Conduct 1.6.

Even absent Mr. Morris's expert report, we would conclude that Chotiner unreasonably thought Woolley wanted him to act improperly. When he appeared on behalf of the PHA and Bolden, Chotiner breached Pennsylvania Rule of Professional Conduct ("RPC") 1.7(b) by (1) representing two clients with diametrically opposed interests, (2) absent waiver, and (3) without explaining to each "the implications of the common representation and the advantages and risks involved." Because he palpably violated RPC 1.7(b), it comes as no surprise that at the May 29, 2002 hearing Judge Robreno rebuked Chotiner and *directed* him to withdraw from representing Bolden. FN9 Def.'s Mem., Ex. 17, at 6, 11-12. Chastised by a federal judge, Chotiner knew at this point that he had violated the RPC. This awareness triggered a duty to withdraw. *See* RPC 1.16(a)(i).

> FN9. It will be recalled that Judge Robreno said in open court, "I think there is no question that there is a conflict, so I think that Mr. Chotiner should be allowed to withdraw from the case." *See* p. 5, *supra.* He also said, "I guess what you need to do then is file a motion to withdraw your entry of appearance." Def.'s Mem. Ex. 17 at 6.

Astonishingly, even after the May 29 hearing, Chotiner still questioned whether jointly representing the PHA and Bolden was unethical. On June 22, 2002, he sent a memorandum to Ferris in which he wrote, "To this date, I still do not understand why there is a conflict or why it is illegal to provide representation for him." Def.'s Mem., Ex. 20. Apparently based in part on this continuing doubt, in late June, Chotiner refused to sign the withdrawal motion Harvey prepared unless Harvey also wrote an accompanying brief. *See* Def.'s Mem., Ex. 19; Def.'s Mem., Ex. 20.

Thus, by the July 2 meeting, Chotiner had guided himself and the PHA Legal Department onto ethical shoals, and he showed no willingness to extricate-or attempt to extricate-either. As PHA's chief legal counsel, Woolley had a duty to intervene and promptly take remedial action. *See* RPC 5.1(b) ("A lawyer having direct supervisory authority over another lawyer should make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct"); RPC 5.1(c)(2) ("A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if ... the lawyer ... has direct supervisory authority over the other lawyer, and knows in either case of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action").

**\*6** Most notably, Woolley had a duty to ensure that Bolden had been informed about the status of his case. *See* RPC 1.4(a) & (b). Thus, when he learned at the July 2, 2002 meeting that Chotiner recently wrote Bolden a letter, Woolley was *obliged* to review it. He needed to determine whether the letter adequately apprised Bolden about the case and whether it further prejudiced either Bolden or the PHA. Also, Woolley needed to learn Bolden's address so that the PHA could comply with its promise to Judge Robreno at the May 29 hearing (see Def.'s Mem., Ex. 17, at 9) to provide it to opposing counsel.

Under RPC 5.2(b), "A subordinate lawyer does not violate the Rules of Professional Conduct if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty." FN10 Chotiner caused himself and the PHA to face (at a minimum) an "arguable question of professional duty," *i.e.,* how to transfer Bolden's case to outside counsel in a way that would minimize prejudice. *See* RPC 1.16(b) and (d). Woolley's desire to read the Bolden letter was completely reasonable and, in fact, necessary to his "resolution" of this arguable question. Conversely, Chotiner's demand to talk with counsel was unreasonable; as supervising attorney, Woolley took responsibility for the decision to read the letter. Thus, Woolley also took responsibility for any potential breach of client confidence that Chotiner feared. Chotiner's demand to consult personal counsel being meritless, FN11 it had no First Amendment protection.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00956-GMS   Document 59-2   Filed 11/28/2005   Page 7 of 12

Not Reported in F.Supp.2d                                                                                        Page 7
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

> FN10. The Comment to RPC 5.2 is quite pertinent here:
> When lawyers in a supervisor-subordinate relationship encounter a matter involving professional judgment as to ethical duty, the supervisor may assume responsibility for making the judgment. Otherwise a consistent course of action or position could not be taken.... *For example, if a question arises whether the interests of two clients conflict under Rule 1.7, the supervisor's reasonable resolution of the question should protect the subordinate professionally if the resolution is subsequently challenged.*
> (emphasis added).
>
> FN11. Remarkably, in his June 23, 2003 deposition-nearly one year after the July 2, 2002 meeting-Chotiner still had no idea whether disclosing the Bolden letter would have been ethical or unethical:
> Q. Do you think that a party to a lawsuit can keep his address confidential from other parties to the same suit?
> A. I don't know.
> Pl.'s Dep. at 281.

Chotiner's reliance on *Cipriani v. Lycoming County Hous. Auth.,* 177 F.Supp.2d 303 (M.D.Pa.2001) is misplaced. In *Cipriani,* the Director of Operations for the Lycoming Housing Authority encouraged subordinates to protest the Authority's personnel actions. *Id.* at 312. In addition to encouraging a "walkout" by the entire department, the plaintiff also discussed the possibility that, after work, department members meet a lawyer to discuss legal options. *Id* After telling his superiors that he intended to attend the meeting, they suspended, and ultimately terminated, him. *Id.*

In their motion for judgment as a matter of law, defendants contended that the court erred in submitting to the jury the issue that defendants violated the plaintiff's constitutional right to confer with an attorney. *Id.* at 323. The district court held that, under the Petition Clause of the First Amendment, "plaintiff's intent to meet with an attorney was entitled to protection...." *Id.* at 324.

Chotiner's reliance in *Cipriani* misses the mark for two reasons. First, *Cipriani* is grounded in the First Amendment's Petition Clause, not the Free Speech Clause. This distinction is important because *Cipriani* considered a public employee's general right to consult with counsel; here, we consider the extent to which such an employee's oral request to call counsel constitutes protected speech. For the latter inquiry-speech protection (rather than conduct protection as in *Cipriani* )-the *Pickering* balancing methodology governs.

**\*7** The second reason Chotiner's reliance on *Cipriani* is misplaced is that in *Cipriani* the plaintiff intended to consult an attorney after work, while here Chotiner sought to do so during business hours and, indeed, in the middle of a business meeting. This demand disrupted the July 2 meeting and impeded the PHA's ability to resolve the Bolden conflict that Judge Robreno more than a month before identified. Governmental agencies would grind to a halt if employees could ignore their superiors' lawful directives simply by asking to call counsel on the spot.

Chotiner's argument that Woolley unconstitutionally fired him for asking to call his lawyer also fails for a second reason. Even if Chotiner's request concerned the public, the PHA's interest in running an efficient and effective workplace far exceeded his limited speech interest and therefore his speech lacked constitutional protection. Specifically, for speech to merit protection, the employee's interest in speaking about a matter of public concern must exceed the public agency's interest, as an employer, in running an efficient, effective workplace. FN12 *Connick v. Myers,* 461 U.S. 138, 150-51, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Curinga v. City of Clairton,* 357 F.3d 305, 309 (3d Cir.2004).

> FN12. After all, like any employer, a public body "must have wide discretion and control over the management of its personnel and internal affairs." *Connick,* 461 U.S. at 151 (quoting *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring)). Quoting Justice Powell, *Connick* continued:
> This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the workplace, foster disharmony, and ultimately impair the efficiency of an office or agency.
> *Id.* (quoting *Arnett,* 416 U.S. at 168 (Powell,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                                                                  Page 8
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

J., concurring)).

In doing this balancing, courts consider (1) "whether the statement impairs discipline by superiors or harmony among co-workers", (2) "has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary", or (3) "impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Curinga,* 357 F.3d at 310 (quoting *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)) (internal numbering added). Courts also consider (4) "the extent of the authority entailed in the employee's position." *Id.* (quoting *Rankin,* 483 U.S. at 390).

Applying these factors, the PHA's interest in an efficient and effective workplace far exceeded Chotiner's interest in asking to call his lawyer. First, Chotiner's request impaired discipline. Woolley, Chotiner's boss, repeatedly directed Chotiner to produce the Bolden letter. Chotiner repeatedly refused. Compounding Chotiner's insubordination, Ferris, Woolley's subordinate (but Chotiner's supervisor) sat in the same room. Thus, his disobedience also undermined Ferris's confidence in her boss.

Second, it was important for Chotiner and Woolley to have personal loyalty toward, and confidence in, each other. As our Court of Appeals recently emphasized, "In calibrating the significance of the disruption, the relationship between the employer and the employee is particularly important." *Brennan v. Norton,* 350 F.3d 399, 413-14 (3d Cir.2003). By questioning Woolley's ethical decision to review the Bolden letter-in front of Harvey and Ferris-Chotiner impaired his relationship with Woolley. He demonstrated no personal loyalty toward, or confidence in, Woolley, and Chotiner thus forfeited Woolley's support for him.

**\*8** Third, Chotiner's request interfered with the regular operation of the PHA, with short-term and long-term consequences. In the short-term, because he refused to produce the letter, he hindered the PHA's ability to resolve the Bolden conflict that Judge Robreno identified. Because of his insubordination at the July 2 meeting, three more weeks elapsed before Chotiner at last withdrew as Bolden's counsel. See Def.'s Mem., Ex. 29. From a long-term perspective, had Woolley allowed Chotiner's actions to go unpunished, he would have set a precedent for employees ignoring supervisors' directives without fear of discipline through the stratagem of asking to call counsel.

Finally, we consider the extent of the authority associated with Chotiner's position. As the Supreme Court underscored in *Rankin,* 483 U.S. at 390, the extent to which an employee's speech threatens a public agency correlates to the seniority of the employee:

[I]n weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where, as here, an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal. We cannot believe that every employee in Constable Rankin's office, whether computer operator, electrician, or file clerk, is equally required, on pain of discharge, to avoid any statement susceptible of being interpreted by the Constable as an indication that the employee may be unworthy of employment in his law enforcement agency. At some point, such concerns are so removed from the effective functioning of the public employer that they cannot prevail over the free speech rights of the public employee.

*Id.* at 390-91. As the PHA's Counsel, unlike *Rankin's* computer operator, electrician, or file clerk, Chotiner served confidential and public contact roles. In representing the PHA in litigation, he routinely dealt with confidential client information, and he acted as PHA's representative to the courts.

Even if we concluded that Chotiner's request to consult his lawyer merited constitutional protection, his claim would fail because he could not show that his request was a "substantial or motivating factor in the alleged retaliatory action." *Curinga v. City of Clairton,* 357 F.3d 305, 310 (3d Cir.2004) (citing *Baldassare v. New Jersey,* 250 F.3d 188, 194-95 (3d Cir.2001); *Green v. Philadelphia Hous. Auth.,* 105 F.3d 882, 885 (3d Cir.1997)). Woolley fired Chotiner for refusing to produce the letter, not for his request to consult an attorney. In other words, the mere fact that Woolley fired Chotiner *after* he asked to call his lawyer does not mean he fired Chotiner *because* he asked; temporality is not causality. If courts accepted Chotiner's theory, it would permit public employees-who already enjoy markedly more job stability that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00956-GMS    Document 59-2    Filed 11/28/2005    Page 9 of 12

Not Reported in F.Supp.2d                                                                Page 9
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

private-sector employees-to immunize themselves from discipline merely by coupling insubordination with a simultaneous request to consult outside counsel.

**\*9** Accordingly, we reject Chotiner's argument that the PHA unconstitutionally terminated him in retaliation for his request to call his lawyer. FN13

> FN13. The Supreme Court's most recent pronouncement on the First Amendment rights of Government employees-issued this month-supports this conclusion.
> In *City of San Diego, California et al. v. John Roe,* No. 03-1669, 2004 WL 2775950, at \*5 (Dec. 6, 2004) (*per curiam* ), the Court held that a police officer's online sale of films featuring himself-masturbating in uniform-touched on no matter of public concern. The Court reasoned, "Roe's activities did nothing to inform the public about any aspect of the SDPD's functioning or operation. Nor were Roe's activities anything like the private remarks at issue in *Rankin,* where one co-worker commented to another co-worker on an item of political news." *Id.* at 5.
> While *Roe* arose in a different factual setting, it nevertheless supports our conclusion that Chotiner's request to call his lawyer was unprotected. Like Roe's activities, Chotiner's request did nothing to inform the public about his employer's functioning or operation. Also, like Roe's activities, and unlike Rankin's disparagement of President Reagan, Chotiner's request concerned no matter of interest to the public at large.

2. *Reports of Woolley's Faults*

Chotiner reported to Ferris and Wright, his supervisors, that Woolley committed two misdeeds. First, the PHA had a policy that required employees to reside in Philadelphia. Chotiner reported to Ferris and Wright that Woolley breached this policy by living in Delaware. Second, Chotiner reported that "Woolley had been placed in his position as acting General Counsel to cover up for his wrongdoing and waste of taxpayer dollars when he served as Director of Human Resources." Pl.'s Mem. at 23.

Chotiner's reports deserved constitutional protection. As noted earlier, to touch on a matter of public concern, speech must provide "value" to the community. *Brennan v. Norton,* 350 F.3d 399, 413 (3d Cir.2003). Hence, even if motivated by private gain, "speech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Id.* at 412 (quoting *Connick v. Myers,* 461 U.S. 138, 148, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

Unlike Chotiner's request to call a lawyer, his reports to Ferris and Wright concerned "actual or potential wrongdoing or [a] breach of public trust on the part of" Woolley, a senior PHA official. *Id.* Chotiner produced evidence that, contrary to PHA policy, see Def.'s Mem., Ex. 32, Woolley lived in Delaware. Pl.'s Dep. at 30-31, 122-23, 141-42; Troilo Dep. at 56-57, 59-60. Of substantially more import to the public, Chotiner also produced evidence suggesting that the PHA's Human Resources Department, which Woolley led, breached its duty to report employment discrimination cases to HUD. Pl.'s Dep. at 11-25. Because of that breach, in January of 2002 HUD allegedly reprimanded the PHA and withheld about $2 million in legal fees and expenses, Pl.'s Dep. at 14-15, money that presumably came out of the City of Philadelphia's treasury.

Furthermore, Chotiner's reports had little, if any, disruptive impact. As noted earlier, to receive constitutional protection, the employee's interest in speaking about a matter of public concern must exceed the public agency's interest, as an employer, in running an efficient and effective workplace. *Connick v. Myers, id.* at 150-51; *Curinga v. City of Clairton,* 357 F.3d 305, 309 (3d Cir.2004). Because Ferris and Wright never revealed Chotiner's reports to anyone, see Def.'s Mem., Ex. 9, at ¶ ¶ 7-10; Wright Dep. at 98, 111, 118-20, 309, 313, his speech never disrupted his workplace. *Curinga, id.* at 310 (quoting *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). Thus, we conclude that Chotiner's reports to Ferris and Wright-that Woolley had breached the PHA's residency policy and that Woolley had abrogated his oversight duties when he directed Human Resources-merited constitutional protection.

**\*10** Nevertheless, his claim fails the second step of *Pickering* balancing, causation. Specifically, Chotiner must show that his speech was a "substantial or motivating factor in the alleged retaliatory action." *Id.* (citing *Baldassare v. New Jersey,* 250 F.3d 188, 194-95 (3d Cir.2001)). Here, Chotiner has not shown that his reports about Woolley were a substantial or

Not Reported in F.Supp.2d                                                                                                          Page 10
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

motivating factor in his termination.

Chotiner points to no evidence suggesting that Woolley or Jones-the people responsible for firing him-knew about his reports when they terminated him. As our Court of Appeals has emphasized, "It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct." *Ambrose v. Township of Robinson, Pennsylvania,* 303 F.3d 488, 493 (3d Cir.2002) (citing *Allen v. Iranon,* 283 F.3d 1070, 1076 (9th Cir.2002)).

In *Ambrose,* a police officer alleged that the township suspended him because he had provided an affidavit in support of a fellow officer's lawsuit against it. 303 F.3d at 492. All of the commissioners who voted to suspend the plaintiff testified that they knew nothing about the affidavit when they voted. *Id.* at 493. At trial, the plaintiff prevailed, and the district court denied the township's motion for a judgment as a matter of law. *Id.* On appeal, the township argued that, because the commissioners never knew about the affidavit when they voted, the affidavit could not have been a substantial or motivating factor in the vote. *Id.*

Our Court of Appeals agreed. *Id.* First, it emphasized, "if the Commissioners were unaware of Ambrose's affidavit, it could not possibly have been a substantial or motivating factor in their decision to suspend him, and Ambrose's First Amendment retaliation claim would necessarily fail." *Id.* Reasoning that the plaintiff pointed to no evidence showing that the commissioners knew about the affidavit when they voted, it held the plaintiff failed to sustain his burden of proof. *Id.*

The *Ambrose* plaintiff contended that the "temporal proximity" between the township's receipt of his affidavit and his suspension sufficed to permit the jury to conclude that the affidavit was a substantial or motivating factor. *Id.* at 494. The court disagreed. *Id.* While it noted that cases do hold that "suggestive temporal proximity" is relevant to establishing causation, FN14 "[n]one of these cases suggest that temporal proximity can be used to show that an employer was aware of the protected conduct in the first place." *Id.* Causation thus lacking, the court reversed. *Id.*

FN14. In *Estate of Smith v. Marasco,* 318 F.3d 497 (3d Cir.2003), our Court of Appeals clarified the extent to which fact-finders may infer causation from timing. First, "if timing alone could ever be sufficient to establish a causal link, the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Id.* at 512 (internal alterations omitted) (quoting *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir.1997)). Second, when temporal proximity is not so close as to be "unusually suggestive", "timing plus other evidence may be an appropriate test...." *Estate of Smith,* 318 F.3d at 513. Thus, the extent to which the fact-finder may infer causation from timing hinges on the extent to which the timing is "unusually suggestive."

Defendants have adduced evidence suggesting that Woolley and Jones, who were responsible for firing Chotiner, were unaware of Chotiner's complaints about Woolley. Each so testified, as did PHA's Executive Director, Carl Greene. Def.'s Mem., Ex. 28, at ¶ 12; Def.'s Mem., Ex. 27, at ¶¶ 6-8, 10; Def.'s Mem., Ex. 26 at ¶¶ 5-8. Second, the people to whom Chotiner voiced his reports, Ferris and Wright, also testified that they never passed them to Woolley, or, for that matter, to anyone else. Def.'s Mem., Ex. 9, at ¶¶ 7-10; Wright Dep. at 98, 111, 118-20, 309, 313.

**\*11** In opposing a motion for summary judgment, the non-moving party may not "rest upon mere allegations, general denials, or vague statements. [He must] identify those facts of record which would contradict the facts identified by the movant." *Port Auth. of New York & New Jersey v. Affil. FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir.2002) (internal citations and alterations omitted). Here, Chotiner, like Ambrose, points to no evidence showing that Woolley or Jones knew about his reports to Ferris or Wright. FN15 Like Ambrose, Chotiner asserts that the temporal proximity between his reports and termination suffices to permit a fact-finder to infer causation. Pl.'s Mem. at 28-30. But as our Court of Appeals instructed in *Ambrose,* plaintiffs cannot use naked temporal proximity "to show that an employer was aware of the protected conduct in the first place." 303 F.3d 488.

FN15. In her deposition, Wright was asked, "But you mentioned to Mr. Jones that you had heard that Wooley [*sic*] may not have

Not Reported in F.Supp.2d                                                                                                Page 11
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

been a legal resident of Philadelphia for some time, correct?" Wright Dep. at 333. "Right," she answered. *Id.* Isolated, this statement shows only that Wright "had heard"-from many possible sources-that Woolley resided in Delaware.

Viewing the statement in context strongly suggests that Wright never told Jones about Chotiner's report. Shortly before her above answer, for example, when asked whether "you, in fact, [did] anything about or take action in response to Mr. Chotiner's communication to you about his belief in Mr. Wooley's [*sic*] residency status," Wright answered, "No. No. I wasn't the police officer for residence. No." Wright Dep. at 119-20. At another point in her deposition, Wright said, "Whenever he wanted to talk about whatever was going on, I would give him an audience. But I didn't do anything with the information." *Id.* at 98.

In short, since Woolley and Jones did not know of Chotiner's complaints, those complaints could not have been a substantial or motivating factor in the decision to terminate him. Chotiner's First Amendment retaliation claim thus fails.

### 3. *Whistleblower Claim*

Rejecting Chotiner's First Amendment claim leaves his state law claim under Pennsylvania's Whistleblower Law, 43 Pa.C.S.A. § § 1421-28. Under the supplemental jurisdiction statute, "The district court may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). This decision is left to "the sound discretion of the district court," which should focus on "whether the dismissal of the pendent claims best serves the principles of judicial economy, convenience, fairness, and comity." Annulli v. Panikkar, 200 F.3d 189, 202 (3d Cir.1999), *abrogated on other grounds,* Rotella v. Wood, 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000); *see also* Markowitz v. Northeast Land Co., 906 F.2d 100, 106 (3d Cir.1990) ( "[T]he rule within this Circuit is that once all claims with an independent basis of federal jurisdiction have been dismissed the case no longer belongs in federal court"); Shaffer v. Albert Gallatin Area Sch. Dist., 730 F.2d 910, 912 (3d Cir.1984) ("pendent jurisdiction should be declined where the federal claims are no longer viable, absent 'extraordinary circumstances' ")

(citations omitted).

Here, judicial economy and convenience favor Chotiner prosecuting his state-law claim in state court. Although he has engaged in extensive discovery, he can use this evidence in state court to the same extent he could here. Annulli, 200 F.3d at 203. As to fairness, Chotiner risked dismissal of his state law claim when he filed his lawsuit in federal court and invoked our discretionary supplemental jurisdiction power. *Id.* Lastly, comity favors Chotiner litigating his whistleblower claim in state court because we will avoid guessing how Pennsylvania courts would interpret Pennsylvania law.

**\*12** Original jurisdiction now lacking, we decline to exercise supplemental jurisdiction over Chotiner's state-law claim.

### ORDER

AND NOW, this 15th day of December, 2004, upon consideration of defendants' motion for summary judgment (docket entry # 57), plaintiff's response (docket entry # 59), defendants' motion for leave to file a supplemental reply (docket entry # 60), the supplemental reply attached to that motion, and for the reasons stated in our memorandum, it is hereby ORDERED that:

1. Defendants' motion for leave to file a supplemental reply is GRANTED;

2. Defendants' motion for summary judgment is GRANTED as to Count One;

3. We decline to exercise supplemental jurisdiction over Count Two, and therefore that Count is DISMISSED WITHOUT PREJUDICE; and

4. The Clerk of Court shall CLOSE this case statistically.

### JUDGMENT

AND NOW, this 15th day of December, 2004, upon consideration of our grant of summary judgment as to Count One of plaintiff's complaint and our dismissal of Count Two, JUDGMENT IS ENTERED in favor of defendants Philadelphia Housing Authority, Carl R. Greene, James A. Jones, Marc Wooley, and Helen Ferris and against plaintiff Kenneth Chotiner.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 12
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

E.D.Pa.,2004.
Chotiner v. Philadelphia Housing Authority
Not Reported in F.Supp.2d, 2004 WL 2915296 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:02cv09504 (Docket) (Dec. 30, 2002)

END OF DOCUMENT