# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

B. KURT PRICE, et al.,           :
                                 :
                Plaintiff,      :
                                 :     C.A. No. 04-956-GMS
        v.                   :
                                 :
L. AARON CHAFFINCH, et al.,   :
                                 :
              Defendants.    :

## OPENING BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Date: January 25, 2006

Noel C. Burnham (DE Bar # 3483)
Richard M. Donaldson (DE Bar I.D. #4367)
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
(302) 504-7840

*Counsel for Defendants L. Aaron Chaffinch,*
*Thomas F. MacLeish, David B. Mitchell, and the*
*Division of State Police, Department of Safety and*
*Homeland Security, State of Delaware*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .................. 2

III.    SUMMARY OF THE ARGUMENT ................................................................... 3

IV.     CONCISE STATEMENT OF FACTS ................................................................. 3

        A.      The Parties ............................................................................................... 3

        B.      The DSP Firing Range ............................................................................ 5

        C.      Blood Lead Levels .................................................................................. 7

        D.      The Bullet Trap ....................................................................................... 7

        E.      Range Maintenance ................................................................................. 9

        F.      Frangible Ammunition Affected The Bullet Trap ................................ 10

        G.      The FTU Staff Ceased Maintenance On The Bullet Trap, With Disastrous
                Results For The Bullet Trap And HVAC System ................................ 10

        H.      The FTU Staff Requested Medical Evaluation ..................................... 13

        I.      MacLeish Sent All Four Troopers For A Second Opinion ................... 16

        J.      The Media Tour:  April 6, 2004 ............................................................ 17

        K.      The Investigation By The Auditor Of Accounts ................................... 19

V.      ARGUMENT: THE COURT SHOULD ENTER SUMMARY JUDGMENT FOR
        DEFENDANTS BECAUSE THERE IS NO GENUINE ISSUES AS TO ANY
        MATERIAL FACT AND DEFENDANTS ARE ENTITLED TO JUDGMENT
        AS A MATTER OF LAW .............................................................................. 21

        A.      Defendants Are Entitled To Summary Judgment On Count I (Free Speech
                Clause) ................................................................................................... 21

                1.      Standard Of Review For Retaliation Claim Under The First
                        Amendment .............................................................................. 22

                2.      The Defendants Do Not Dispute That The Plaintiffs Reported To
                        Their Superiors And To The State Auditor On Matters Of Public
                        Concern .................................................................................... 22

                3.      Plaintiffs Cannot Show That Their Speech On A Matter Of Public
                        Concern Was A "Motivating" Factor In Any Retaliatory Action ........... 23

                        a.      Plaintiff Foraker has suffered no adverse action as a matter
                                of law ........................................................................ 23

                        b.      Plaintiffs Price and Warren cannot show that Defendants
                                acted because of anything they said about the conditions at
                                the firing range .......................................................... 28

# TABLE OF CONTENTS
(continued)

**Page**

    4.     Defendants would have taken the same actions absent the allegedly protected conduct ................................................................................. 33

B.    The Court Should Grant Summary Judgment On Count II (Petition Clause) Because The Plaintiffs Have Not Petitioned The Government ............. 34

C.    Defendants Are Entitled To Qualified Immunity Against Plaintiffs' Retaliation Claims .............................................................................................. 36

VI.    CONCLUSION ...................................................................................................... 38

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page**</u>

<u>**CASES**</u>

<u>Baldassare v. New Jersey</u>, 250 F.3d 188 (3d Cir. 2001)........................................................ 22, 37

<u>Bart v. Teford</u>, 677 F.2d 622 (7th Cir. 1992)............................................................................ 27

<u>Bradshaw v. Twp. of Middletown</u>, 296 F. Supp. 2d 526 (D.N.J. 2003)...................................... 35

<u>Brennan v. Norton</u>, 350 F.3d 399 (3d Cir. 2003)................................................................. 25, 37

<u>Connick v. Myers</u>, 461 U.S. 138 (1983) ................................................................................... 22

<u>Eichenlaub v. Twp. of Indiana</u>, 385 F.3d 274 (3d Cir. 2004)...................................................... 35

<u>Green v. Phila. Housing Auth.</u>, 105 F.3d 882 (3d Cir. 1997) ...................................................... 22

<u>Hafer v. Melo</u>, 502 U.S. 21 (1991) ......................................................................................... 36

<u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982).............................................................................. 36

<u>Hill v. City of Scranton</u>, 411 F.3d 118 (3d Cir. 2005).......................................................... 34, 35

<u>Hunter v. Bryant</u>, 502 U.S. 224 (1991).................................................................................... 36

<u>Malley v. Briggs</u>, 475 U.S. 335 (1986).................................................................................... 36

<u>McKee v. Hart</u>, --- F.3d ----, No. 04-1442, 2006 WL 27474 (3d Cir. Jan. 6, 2006)............. passim

<u>McLaughlin v. Watson</u>, 271 F.3d 566, 571 (3d Cir. 2001)........................................................ 37

<u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977)........................... 34

<u>San Fillipo v. Bongiovanni</u>, 30 F.3d 424 (3d Cir. 1994) ........................................................... 35

<u>Saucier v. Katz</u>, 533 U.S. 194 (2001) ...................................................................................... 36

<u>Schneck v. Saucon Valley Sch. Dist.</u>, 340 F. Supp. 2d 558 (E.D. Pa. 2004) ........................ 23, 28

<u>Shehee v. City of Wilmington</u>, 67 Fed. Appx. 692 (3d Cir. 2003).............................................. 22

<u>Suppan v. Dadonna</u>, 203 F.3d 228 (3d Cir. 2000) ........................................................ 24, 34, 37

<u>X-Men Securities, Inc. v. Pataki</u>, 196 F.3d 56 (2d Cir. 1999) ................................................... 24

## <u>TABLE OF AUTHORITIES</u>
(continued)

<u>**Page**</u>

<u>**STATUTES**</u>

42 U.S.C. § 1983 ................................................................................................................. 2, 4

I.     __INTRODUCTION__

Defendants in this action are L. Aaron Chaffinch, the retired Superintendent of the Delaware State Police, Thomas F. MacLeish, currently the Superintendent, and David B. Mitchell, Secretary of Safety and Homeland Security for the State of Delaware.  The plaintiffs are three of the four state troopers assigned to the Firearms Training Unit ("FTU") of the DSP at the point the DSP shut down its indoor firing range in March 2004.  Their complaint is essentially that in responding to environmental, mechanical, medical, and political problems that developed around the firing range in the Spring of 2004, Defendants violated their rights to report workplace problems through the DSP chain of command and to the State Auditor of Accounts.

Defendant MacLeish was the lieutenant colonel and second-in-command during the Spring of 2004.  He has since become the colonel and is now the Superintendent of the DSP. The firing range was part of the DSP Training Section, and therefore fell within MacLeish's area of responsibility within the organization.  He made all employment decisions affecting Plaintiffs with their welfare and that of the DSP in mind.  He did not act in derogation of the rights of Plaintiffs to report problems at the firing range through the chain of command or to the State Auditor.  Accordingly, he seeks summary judgment.

Defendant Chaffinch was the superintendent of the DSP during the Spring of 2004.  He was not involved in any of the personnel decisions that are alleged to have affected the three Plaintiffs.  On April 6, 2004, he, along with the State Secretary of Administrative Services, attended a media tour of the shut-down range during which he offered his opinion that the range had been in better condition under Plaintiff Foraker's predecessor because that predecessor was willing to perform certain maintenance functions that Foraker was not willing to perform.

Chaffinch's statements, as quoted in the Delaware State News and elsewhere, were entirely

accurate and not actionable under 42 U.S.C. § 1983. Chaffinch retired on May 5, 2005. Because

he took no part in the personnel decisions and because his comments during the media tour are

not actionable, Chaffinch also moves for summary judgment.[1]

## II.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This case arises under 42 U.S.C. § 1983. Plaintiffs filed their Complaint on August 19,

2004, alleging violations of the First Amendment's Free Speech Clause (Count I). (D.I. # 1.) On

October 14, 2005, Plaintiffs filed an Amended Complaint, adding a claim that Defendants'

conduct violated the First Amendment's Petition Clause (Count II). (D.I. # 45; Combined

Appendix to Defendants' Opening Briefs in Support of Motions for Summary Judgment ("CA")

at A-24 – A-26).[2])

Pursuant to the Court's Order entered February 17, 2005, discovery in this matter ended

on December 30, 2005. By stipulation of the parties and with the agreement of the Court, the

parties took depositions of additional witnesses in January 2006.

Through discovery, it has become clear that there is no genuine issue as to any material

fact, and that the defendants have not retaliated against the plaintiffs in violation of the First

Amendment. Defendants ask the Court to enter summary judgment in their favor and against

Plaintiffs on both counts of the Complaint.

---

[1] Defendant Mitchell is named only as the head of the state agency responsible for the DSP. He is not alleged to
have violated the plaintiffs' constitutional rights.

[2] Under the Court's February 17, 2005 Order, this case was combined for discovery purposes with the companion
case of Foraker v. Chaffinch, No. 04-1207-GMS (D. Del. filed August 30, 2004). Defendants have separately filed a
Motion for Summary Judgment in Foraker. To prevent redundancy and unnecessary overrun of paper, Defendants
submit a Combined Appendix for the two cases.

### III.    SUMMARY OF THE ARGUMENT

1.        Defendants are entitled to summary judgment on Count I (Free Speech Clause) and Count II (Petition Clause) because Defendants did not retaliate against Plaintiffs in that Defendants' actions, considered individually or in their totality, were not adverse to Plaintiffs.

2.        Defendants are entitled to summary judgment on Counts I and II because Plaintiffs' allegedly protected speech was not a "substantial" or "motivating" factor in any of Defendants' allegedly retaliatory actions.

3.        Defendants are entitled to summary judgment on Counts I and II because Defendants would have taken the same actions absent the allegedly protected conduct.

4.        Defendants are entitled to summary judgment on Count II (Petition Clause) because Plaintiffs did not engage in activity protected by the Petition Clause.

5.        Defendants are entitled to qualified immunity on Counts I and II because, at the time Defendants engaged in the allegedly retaliatory acts against Plaintiff, it was not clearly established that such conduct might violate the First Amendment.

### IV.    CONCISE STATEMENT OF FACTS

#### A.    The Parties

As noted in the Introduction, Defendants in this action are the present and immediate past superintendents of the Delaware State Police.

Plaintiffs Price, Warren, and Foraker are DSP troopers who were assigned to the Firearms Training Unit ("FTU") in the Spring of 2004.  Foraker is a sergeant designated the non-commissioned officer in charge ("NCOIC") of the FTU.  He is the immediate supervisor of Plaintiffs Price and Warren, both of whom are corporals.

Foraker is a twenty-year veteran of the DSP assigned to the FTU initially in 1998.  On August 1, 2001, Gerald Pepper, then Superintendent of the DSP, promoted Foraker to sergeant and made him the NCOIC.  On April 8, 2002, Col. Chaffinch, as a newly appointed Superintendent, transferred Foraker from the FTU and replaced him with Sgt. Richard Ashley. Foraker challenged the lateral reassignment in an action under 42 U.S.C. § 1983, captioned Foraker v. Chaffinch, No. 02-302-JJF (D. Del.), contending that Chaffinch was retaliating against him for excessively criticizing a subordinate range officer who happened to be close friends with Chaffinch.  In June 2003, a jury found that Col. Chaffinch had violated Foraker's free-speech rights by transferring him from the FTU, and awarded Foraker over $100,120 in compensatory and punitive damages.

While post-verdict motions were pending, the parties settled the case, agreeing that, among other things, Chaffinch would return Foraker to his position at the FTU.  (CA at A-55.) Foraker returned to the FTU on December 1, 2003.  The events giving rise to this action then began.

Kurt Price is a twenty-year veteran of the DSP.  He was first assigned to the FTU in 1996 and has worked there continuously since that date.  It is undisputed that Price has suffered severe noise-induced hearing loss.  Two physicians have issued reports to the DSP that Price is not fit for duty as a state trooper.  (CA at A-678 – A-680, A-705.)  For that reason, the DSP assigned him to light duty in June 2004 (CA at A-685 – A-686); he has been on medical leave since March 2005 for stress.  On May 11, 2005, Defendant MacLeish directed him to separate from service in the DSP, an order that has since been rescinded.  (CA at A-707 – A-708.)

Wayne Warren is a twenty-three-year veteran of the DSP, first assigned to the FTU in 2001.  Like Price, he has suffered severe noise-induced hearing loss, and two physicians have

reported that he is not capable of performing the duties of a state trooper. (CA at A-754 – A-756; A-769.) He has been on light duty since June 2004 (CA at A-758 – A-759), and on medical leave for stress since May 2005. On May 11, 2005, MacLeish also directed Warren to separate, and the order was rescinded.

### B.      The DSP Firing Range

This case is about the DSP's indoor firing range, located in Smyrna, Delaware. The DSP has more than 600 sworn officers, each of whom must be tested and certified twice a year on the use of police weapons. The DSP trains a recruit class each year, and municipal classes on a regular basis. The DSP also conducts weapons training for its Special Operations Response Team (SORT) and other specialized police units. Much of this training involves shooting guns.

The FTU is responsible for all firearms training and certification, in addition to recordkeeping and field activities associated with DSP weapons and body armor. Before its closing in March 2004, most of the DSP firearms training occurred at the indoor range in Smyrna. The Firearms Training Unit ("FTU") reports to the Assistant Director of Training at the DSP Training Academy, who in turn reports to the Director of Training, who is responsible for all training and certification within the DSP.

To carry out the functions of the FTU, the State Department of Administrative Services ("DAS"), Division of Facilities Management, in cooperation with the DSP, constructed a "state-of-the-art" indoor firing range in Smyrna that opened in September 1998. During its six years of operation, the firing range saw the discharge of between 500,000 and 750,000 rounds of ammunition per year, and hosted training shoots from a myriad of federal, state and local law enforcement agencies as well as the DSP training and certification described above. The range closed in March 2004 due to environmental contamination. (See CA at A-526 – A-527.) It

remains closed pending modifications to its mechanical systems.  During the six years the range operated, it was the subject of numerous complaints by DSP personnel.  The biggest complaints were about the heating, ventilating and air conditioning ("HVAC") systems.

The Auditor of Accounts for the State of Delaware ("State Auditor") issued an audit report on October 12, 2004, covering many of the events that are the subject of this lawsuit.  (CA at A-512 – A-525.)  The State Auditor reviewed the history of the firing range, from its inception in 1992, through the construction in the mid-1990s, the opening in 1998, and its operation until the DSP shut it down.  The State Auditor found that the process for bidding, designing, and building the firing range was flawed.  Bureaucratic errors occurred and the State compromised on design features because it lacked funding for the original design.  The Division of Facilities Management was responsible for soliciting bids from architectural firms, selecting project managers and construction firms, and overseeing construction of the facility.  The State Auditor concluded that, in the competitive bid process for selection of an architect/engineer, the Facilities Management project manager made an arithmetic error in computing the scores of two of the bidding architectural/engineering companies.  As a result, a Delaware company with no experience in designing and building firing ranges was awarded the contract over an out-of-state company preferred by DSP.  The State Auditor also found that, unbeknownst to the DSP representatives participating in the process, the project manager had already decided to award the contract to a Delaware firm regardless of the outcome of the competition.

The State Auditor reported that "all parties involved were operating under the premise that the project was under funded and that concessions to the original plans would have to be made in order to complete the project."  (CA at A-514.)  As a result, the final project did not look

much like what its advocates had intended.  Decisions were made to eliminate bullet deflectors, a fire suppression system, and the original bullet trap system.

State troopers and others have complained about the HVAC system since 1998. Notwithstanding the complaints, it also appears that the HVAC worked effectively for substantial periods of the existence of the range.  (CA at A-520.)

### C.     Blood Lead Levels

The DSP has regularly monitored the blood lead levels of troopers assigned to the FTU. By mid-2000, the DSP became concerned about elevated blood lead levels in certain troopers. Then-Col. Gerald Pepper assigned then-Maj. Joseph Swiski to study the problem.  Swiski concluded that the DSP could reduce blood lead levels in troopers assigned to the range by switching from lead bullets to "frangible ammunition," which did not contain lead.  (CA at 505-508.)  The theory was that the removal of lead from the training ammunition in handguns would reduce lead contamination in the range.[3]  Col. Pepper adopted Maj. Swiski's recommendations and, in 2000, the DSP switched from lead to non-leaded "frangible ammunition" in the firing range.  Unfortunately, the switch from leaded to frangible ammunition had an adverse affect on the bullet trap.

### D.     The Bullet Trap

At the time of the original feasibility study for the firing range, it was recommended that the firing range use a "composite rubber material" as a back stop, meaning that bullets shot on the range would pass through the target area, hit the rubber material and come to rest in the

---

[3] The change to frangible ammunition in handguns did not completely eliminate lead from the firing range because law enforcement officers also shot leaded shotgun rounds at the range, and frangible ammunition was not available for shotguns in 2000.

composite rubber. (CA at A-520.) Unfortunately, the composite rubber material system was expensive to maintain, and it became a victim of the state's budgetary limitations. The DSP decided on a Savage Range Systems, Inc. Snail Trap System in lieu of the composite rubber material system. The DSP also decided to economize by using its own personnel (i.e., troopers) in the installation of the bullet trap. None of the current DSP management was involved in either of these decisions.

The Savage system is a 140-foot, welded steel-lined horizontal cylinder that functions as a backstop for rounds that have passed through the target area. One side of the cylinder has an opening that points at the shooters, and is called the "front." The steel apron in the range in the front of the trap and the configuration of the trap opening itself direct bullets into the trap, which catches them in a steel deceleration chamber. Once inside the chamber, the bullet loses energy and, upon being spent, falls out of the chamber onto a conveyor belt that takes it to the end of the bullet trap and deposits it into a steel drum for disposal. The front of the bullet trap, i.e., the angled ramps that direct the bullets into the chamber, are covered with water cascading from a nozzle at the top of the trap. The water serves two functions: first, it causes the bullet to hydroplane, improving its ricochet into the bullet trap itself; second, it washes away lead dust, thereby eliminating a source of potential environmental contamination. The water from the cascade system recirculates. It flows into a water tank underneath the length of the bullet trap. Electric pumps feed the water from the tank to the spray nozzles, which feed the water cascades, which begins the water's return journey through the system. The Savage bullet trap system was originally designed for use in firing ranges in which lead is the standard ammunition.

E.     **Range Maintenance**

When the firing range opened in the fall of 1998, troopers assigned to the FTU received

instruction in the maintenance of the bullet trap.  Among other things, maintenance tasks

included removing shotgun waddings and paper target "blow back" from the water tank below

the bullet trap, unclogging the pumps that circulated water from the tank through hoses to the

nozzles that fed the cascade system in the front of the bullet trap, and replacing filters on the

water system. (CA at A-199 – A-200, A-214 (Foraker Dep. 20-23, 81); A-80, A-82 – A-83, A-86

(Price Dep. 40-41, 48-52, 62); A-136 – A-142 (Warren Dep. 51-55; 61-65; 67; 69; 73-76).)  This

routine maintenance prevented the water system from becoming too clogged to allow water to

flow.  Plaintiffs Foraker and Price were in of the FTU in the fall of 1998 and performed this

routine maintenance regularly.  (CA at A-22 – A-23.)  Each new range officer, including Plaintiff

Wayne Warren, received instruction in these tasks.  (CA at A-135 – A-138 (Warren Dep. 46-

58).)

Facilities Management purchased two pieces of equipment to be used by FTU officers to

keep the range clean.  (CA at A-521.)  One was a battery powered motorized floor scrubber,

sometimes called a "Zamboni" by the troopers.  A trooper could sit on the floor scrubber to drive

it and clean the floor after a shooting session.  The second was a HEPA-VAC, an industrial

vacuum cleaner with filters designed to trap airborne particulates.  Both pieces of equipment

remain on the firing range today.  The FTU personnel used them sporadically over the six years

the range operated.

When the DSP switched from lead to frangible ammunition in 2000, it expected that the

Savage bullet trap would be compatible with frangible ammunition.  (CA at A-511.)  This turned

out not to be quite as true as expected.

**F.     Frangible Ammunition Affected The Bullet Trap**

The frangible ammunition, rather than decelerating inside the bullet trap, simply splatters into bullet fragments and dust wherever it hits.  (See CA at A-521.)  The particles that hit the water cascade in the front of the trap and the particles that hit the deceleration chamber itself are washed by the water down onto the conveyor belt and into the tank that feeds the water system. The ammunition formed a hard clay-like substance when in water that proved difficult for FTU personnel to handle.  (CA at A-521; A-136 (Warren Dep. 53).)  It clogged the pumps, filters and spray nozzles, and caused the conveyor system to freeze up.  (Id.; see also CA at A-222 (Foraker Dep. 113).)  In September 2003, NCOIC Ashley hired the conveyor company to replace the metal conveyor belt, originally designed to transport spent lead projectiles, with a drag belt system designed to scoop the clay-like substance out of the water tank and carry it to the end of the belt where it could be pushed into drums for disposal.  The drag belt system had difficulties, too, and broke down in December 2003, three months after its installation.  By the time it broke down, Ashley had been replaced by Foraker.  (CA at A-504.2.)

**G.     The FTU Staff Ceased Maintenance On The Bullet Trap, With Disastrous Results For The Bullet Trap And HVAC System**

Plaintiff Foraker returned to the FTU on December 1, 2003.  His staff was Kurt Price, Wayne Warren, and James Warwick, a veteran trooper whose assignment to the range began only two weeks before Foraker returned.  At a staff meeting during the first week after Foraker's return, the FTU staff decided collectively to stop doing the maintenance necessary to keep the water system of the bullet trap operational.  (CA at A-214 – A-215 (Foraker Dep. 81-82); A-89 (Price Dep. 75); A-154 (Wayne Warren Dep. 124).)  According to the State Auditor's report, "the staff made the decision not to continue performing maintenance and custodial functions due

to health related issues and not being qualified to perform those functions." (CA at A-522.)
The FTU staff had performed those functions – qualified or not – for more than five years.

When they stopped performing the maintenance functions, Plaintiffs understood that their
failure to perform those functions would cause the bullet trap system to fail. Plaintiff Wayne
Warren, for example, testified that if maintenance and repair of the bullet trap were to stop, the
trap would "eventually clog up and stop," creating "more of a problem" with "dust and smoke"
inside the range building. (CA at A-154 (Wayne Warren Dep. 123).) Plaintiff Price backed up
Warren's testimony, stating that he "would assume that [the bullet trap] would fail." (CA at A-
89 (Price Dep. 76).)

According to the State Auditor's Report, the FTU conducted 42 days of firearms training
between December 2003 and early February 2004 without performing any maintenance on the
bullet trap. (CA at A-522.) The result was as predicted by Price and Warren: clogged pumps,
clogged filters, dry shooting areas, and more dust in the air. Then-Captain Greg Warren, then the
DSP director of Training, a one-time plaintiff himself against Col. Chaffinch,[4] and a vocal
supporter of the Plaintiffs in this lawsuit, described the situation in a report he authored on
January 30, 2004. He stated:

> To complicate the air handling/filtration concerns, the bullet
> stopped/catch system is now operating dry, due to the dispersion
> system for the liquid lubricant that normally covers the front of the
> bullet trap system is not functioning properly. Apparently the
> material the "non-toxic, frangible" bullets are made of pulverizes
> upon impact with the bullet stop system by design, which would
> generate some dust at any rate, however, with the backstop
> operating dry, the amount of dust being generated upon each bullet

---

[4] During the time of the events that give rise to this lawsuit, Foraker's direct supervisor, Lt. Ralph Davis, was suing
Col. Chaffinch. Davis's supervisor, Greg Warren, was also suing Chaffinch. Foraker, of course, had already sued.
The Foraker-Davis-Warren chain of command reported to then- Lt. Col. MacLeish, who reported to Chaffinch.

> hitting this backstop area and disintegrating has been compounded
> dramatically.

(CA at A-511.5.)

Foraker began to encounter mechanical difficulties with the bullet trap system soon after

he stopped maintaining it.  On December 19, 2003, he reported in an e-mail to Defendant Lt.

Col. MacLeish and Major Paul Eckrich (with copies to his chain of command Greg Warren and

Lt. Ralph Davis) that the drag belt that removed the spent ammunition from the bullet trap had

broken.  (CA at A-504.2 – A-504.3.)  He blamed his predecessor Sgt. Ashley for tinkering with

it.  MacLeish, who was on vacation over the Christmas holidays in 2003, returned to work on

January 5, 2004, and responded to Foraker by asking him to obtain cost estimates for necessary

repairs.  (CA at A-504.1 – A-504.2.)  MacLeish also asked Capt. Greg Warren, who, as Director

of Training was responsible for the range, to prepare a written report addressing Foraker's

concerns and proposing possible solutions.  (See also CA at A-336 (MacLeish Dep. at 44).)

On Friday January 9, 2004, Foraker reported to Warren and Davis (but not to MacLeish)

that "we are experiencing significant air flow problems at the range."  (CA at A-504.4 – A-

504.5.)  Foraker went on to describe the following circumstances:

> "A reddish haze in the air that is suspended throughout the range
> when the bullet strikes the bullet trap.  The airborne particles are
> inhaled by the instructors and students.  When anyone blows their
> nose, a large amount of the reddish debris is discharged.  Students
> and instructors also complained of a copper penny taste in their
> mouth after shooting and described a significant eye mucus present
> when awakened the following morning after a day on the range . . .

> \*        \*        \*

> "The air quality problem is surely compounded by the fact that the
> wet ramp is dry in some areas due to the frangible material when
> wet turns to a pudding type mud that in short order causes the filter
> screens and the sprayer heads to clog and causes the pumps to fail
> as well . . .

*     *     *

"The drag conveyer has failed once again . . . ."

(Id.)

Plaintiffs contend that these conditions persisted throughout January, and they admit that they did no maintenance on the bullet trap.

The FTU was active in January 2004, training a recruit class despite the deteriorating conditions within the building.  (CA at A-205 (Foraker Dep. 44).)  Despite the "air flow problems," the broken conveyor belt, and the complaints of recruits, the FTU staff and Captain Greg Warren decided not to close the range until after they had finished training the recruit class. (CA at A-522; A-456.2 – A-456.3 (G. Warren Dep. 129-133).)

On February 11, 2004, an industrial hygienist conducted a comprehensive indoor air quality analysis of the firing range, and sampled the carpet in the office area and the floors, walls, and other surfaces in other parts of the building for hazardous substances.  The industrial hygienist gave a preliminary report to the FTU staff, Capt. Warren, Lt. Col. MacLeish and Maj. Eckrich on February 25, 2004, stating that the bullet trap system was completely broken, the ventilating system was not working as intended, and the entire building was contaminated with lead and other hazardous materials.  The industrial hygienist recommended that the building be shut down as an active shooting range.  No shooting occurred after February 11, 2004.  After the DSP received the final report of the industrial hygienist dated March 21, 2004, the DSP formally closed the range and removed the FTU personnel from the building.

### H.     The FTU Staff Requested Medical Evaluation

On February 3, 2004, Plaintiff Kurt Price asked Plaintiff Foraker by e-mail for a "medical evaluation and testing performed by Omega Medical Service."  (CA at A-504.6.)  They selected

-13-

Omega on the recommendation of Joe Farrell, from Environmental Solutions, the company that tested the range. (CA at A-99 – A-100 (Price Dep. 117-18).) Omega is not a health care provider that the DSP had used previously for examination or treatment of troopers. (CA at A-447 (Yeomans Dep. 233-34).) The DSP arranged for Price, Warren, Foraker, and Warwick to be examined at Omega Healthcare in Christiana, Delaware on March 1, 2004. Physicians took blood and urine samples, primarily to determine the troopers' exposure to heavy metals, and performed physicals, including checks of their vital signs, chest x-rays, EKGs, pulmonary-function tests, and hearing exams. (See, e.g., CA at A-652.) The results were essentially normal except that the examinations revealed that all three Plaintiffs – as well as the non-plaintiff Warwick – had suffered hearing loss. (CA at A-636 – A-640; A-713 – A-717; A-775 – A-785; A-958 – A-967.)

Apparently unsatisfied with the Omega testing, Plaintiff Price went on March 11, 2004, to Dr. Steven Cooper, his personal ear, nose, and throat specialist. (CA at A-661, A-666.) Cooper's testing on March 11 confirmed that Price had hearing loss in both ears, worse in the left than in the right. Price filed a First Report of Occupational Disease or Injury on March 16, 2004, supported by a March 12, 2004, "Supervisor's Report of Investigation," signed by Plaintiff Foraker.[5] (CA at A-647 – A-649.)

Plaintiff Warren also filed a First Report of Occupational Disease or Injury on March 16, 2004. (CA at A-724 – A-726.) Warren's Report was supported by an identical Supervisor's Report of Investigation, also signed by Foraker on March 12, 2004. Warren had not yet seen Dr. Cooper, but his Report noted that he was going to do so. He did in fact see Dr. Cooper on April

---

[5] A first report of occupational injury or disease is a predicate for a worker's compensation claim against the state.

7, 2004, and Cooper confirmed Omega's report that Warren had significant hearing loss. (CA at A-739 – A-741.)

Plaintiff Foraker filed a First Report of Injury on April 22, 2004, supported by a Report of Investigation signed by his immediate supervisor, then-Lt. Ralph Davis. (CA at A-786 – A-788.)

The last member of the FTU staff, James Warwick, filed a First Report of Occupational Disease or Injury on May 25, 2004. (CA at A-968 – A-970.) He, too, saw Dr. Cooper. (CA at A-975 – A-977.)

At a meeting of DSP personnel involved in the range problem on March 17, 2004, FTU personnel reported to Lt. Col. MacLeish that Warren and Price had been tested and found to have hearing loss. (CA at A-457 – A-458; A-461.)

Lt. Col. MacLeish directed all four permanent FTU personnel to return to Omega, the provider that Plaintiffs had selected and had evaluated them on March 1, for a re-test. (See, e.g., A-731, A-804.) The four did so on different dates beginning on May 24, 2004. The Omega results were consistent with earlier testing. All four FTU officers had suffered hearing loss. (CA at A-668 – A-673; A-732 – A-738; A-804 – A-808; A-979 – A-983.)

Lt. Col. MacLeish then directed all four FTU officers to undergo formal fitness-for-duty examinations with Dr. Aaron Green of Health Works in Dover. (CA at A-678; A-753; A-816; A-984.) Green regularly conducts physical examinations for the DSP, including fitness-for-duty examinations. Green examined Kurt Price on June 17, 2004, and Wayne Warren on June 18, 2004. (CA at A-678 – A-680; A-754 – A-757.) He concluded that both had suffered sufficient noise-induced hearing loss that each was "not fit to perform as an ordnance officer without anticipated compromise in his impaired hearing," and that because of the dependence of a police

-15-

officer on optimal hearing ability, they could not function safety as state troopers. Green also noted that hearing aids would not effectively remediate Price's and Warren's hearing loss. MacLeish put both Plaintiffs on rehabilitation, or "light duty," status on June 25, 2004. (CA at A-685 – A-686; A-758 – A-759.)

Dr. Green also saw Plaintiff Foraker and Warwick. (CA at A-817 – A-819; A-990 – A-992.) While both showed signs of hearing loss, Dr. Green found them to be fit for duty.

### I.    MacLeish Sent All Four Troopers For A Second Opinion

MacLeish then sent all four FTU officers to Dr. Edward A. Emmett, Director of Academic Programs in Occupational Medicine at the University of Pennsylvania Medical Center, for a second opinion on both hearing loss and whether any of the four had suffered from excessive exposure to lead or other toxic substances. (CA at A-5-2 – A-503; A-692; A-764; A-827; A-995.) Emmett examined all four in October, 2004. He concluded fairly quickly that while Warwick and Plaintiff Foraker had some hearing problems, they were capable of working as state troopers. (CA at A-834; A-1006.) He concurred with Dr. Green's findings in that respect.

Dr. Emmett finished his reports on Price and Warren on January 21, 2005. In both cases, he concurred with Dr. Green that each of the Plaintiffs did not meet the essential job requirements for a trooper "specifically because he does not appear to meet the requirement to acutely utilize sensory systems to discern various stimuli of danger, and to maximize operational efficiency." (CA at A-694 – A-700; A-765.1 - A-765.7.) However, Dr. Emmett also recommended that Price and Warren undergo "functional hearing testing" by a Penn audiologist to determine whether their functional impairment was different from what the "pure tone audiogram" results predicted. (CA at A-701; A-766.)

-16-

Price and Warren returned to Penn in February 2005 for the functional hearing test. The functional hearing test confirmed the findings for Price. (CA at A-704 – A-705.)   With respect to Warren, however, Dr. Emmett found that:

> Despite his moderate degree of high frequency hearing loss, he has good discrimination of word recognition, both without background noise, and importantly, in the presence of background noise. This functional hearing ability would meet the job requirements for a Delaware State Trooper.

(CA at A-767 – A-768.) When the DSP informed Plaintiff Warren that he was cleared to return to full duty, he objected and demanded a third meeting with Dr. Emmett, which occurred on March 16, 2005. (CA at A-769.) At this third meeting, Warren told Emmett that he did not think the functional test adequately reflected the environment a trooper experienced, and that, in his own opinion, he was not fit for duty. (Id.; see also CA at A-772.) Considering Warren's objections, Dr. Emmett revised his opinion on Warren, finding him unfit for duty due to hearing loss. (CA at A-769.)

Thus, by March 18, 2005, a year after the problem first arose, Foraker and Warwick were working as FTU officers, using outdoor firing ranges in New Castle County while waiting for the indoor range in Smyrna to reopen. Price and Warren were on rehabilitation status.[6]

**J.     The Media Tour:  April 6, 2004**

During February and March 2004, a series of consultants reported to the DSP and Facilities Management on the problems with the HVAC, the bullet trap, the conveyor system, and general contamination at the firing range. The DSP and Facilities Management held a series of meetings culminating in the decision by the Department of Administrative Services that it

---

[6] Defendant Chaffinch played no role in any of the decisions on testing of the FTU troopers or their assignments after the testing. Chaffinch was on administrative suspension and not working from October 27, 2004, through March 25, 2005.

would direct the remediation process for the contaminated site and its rehabilitation as a firing range.  (See, e.g., CA at A-461 –A-462.)

On March 20, 2004, the Delaware State News carried a news article describing problems at the firing range, and quoting Captain Greg Warren for the proposition that the range "is the absolute epitome of a project from hell since its very inception."  (CA at A-528.)  Other news articles followed.

During the newspaper coverage, DAS Secretary Gloria Homer and Defendant Superintendent Chaffinch conducted a media tour through the shut down range.  During the media tour, Secretary Homer made a number of comments to the effect that the facility had been poorly maintained by DSP personnel.  (CA at A-533 – A-538.)  She also noted that the bullet trap had not been cleaned properly, and that the back of the trap 'where the track is, was so poorly maintained that it became unworkable."  Chaffinch was also quoted as follows:

> He [Chaffinch] said he attended a "staff shoot" in September.
>
> "There was some discoloration in the bullet trap but that was about it," he said.  "I think people who live in glass houses shouldn't throw stones.  It's a lot dirtier now.  Things seemed in their proper places in the fall.  I've never seen it like this."
>
> Asked what "people" he was referring to, Col. Chaffinch said he was referring to "the people that provided (the media) with this information in the first place."
>
> "The previous sergeant in charge did a good job," he continued.  "Things changed in December when another sergeant came in.  That's at least a portion of where the ball was dropped."
>
> The "previous sergeant" was Sgt. Richard Ashley, who was picked by the colonel in April 2002 to replace Sgt. Christopher D. Foraker as range supervisor.
>
> After Sgt. Foraker successfully sued the colonel in U.S. District Court last year, the court ordered Sgt. Foraker returned to his old

job.  Capt. Warren has a federal job discrimination lawsuit against Col. Chaffinch pending.

"We will work collectively with Administrative Services to make corrections and establish a standard operating procedure protocol," Col. Chaffinch said.

"If the people that are assigned here now don't feel that protocol is part of their protocol, they will be assigned elsewhere."

Contacted later, Col. Chaffinch said Sgt. Ashley has retired.  He would not permit the Delaware State News to interview Capt. Warren or Sgt. Foraker.

"I have the authority to say yes or no," he said.  "I'm not going to allow those people to be interviewed at this point in regard to this particular situation.  I'm not trying to create any more of a mess than we already have."

He praised Sgt. Ashley for his work at the range.

"Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning," he said.  "Sgt. Ashley was willing to do that."

"I cannot say Sgt. Foraker was willing to do that.  He was interested in instruction and teaching people how to shoot.  He did not feel (bullet trap cleaning) was part of his purview.  He felt that was putting him in harm's way."

(Id.)

### K.    The Investigation By The Auditor Of Accounts

On April 21, 2004, the Governor requested the State Auditor to review "the issues surrounding the closing of the DSP Firing Range in March 2004."  (CA at A-512.)  The State Auditor began work immediately, and on May 12, 2004, interviewed Captain Greg Warren and the Plaintiffs Foraker, Price and Warren, at the office of their common attorney in Wilmington. Each gave the State Auditor's investigators a lengthy prepared statement complaining about the firing range facility, its conception and construction, the HVAC system, the lack of

soundproofing, the environmental contamination, and a host of other issues.  After further

investigation, the Auditor's investigators re-interviewed Captain Warren, Sgt. Foraker and

Cpl. Price at their attorney's office on July 28, 2004.

The State Auditor issued his report on October 12, 2004.  He made the following

conclusions pertinent to this case:

> On December 1, 2003, a new Sergeant took over command of the
> firing range.  In an interview he informed us that shortly thereafter
> he met with the current staff and as a result of that meeting a
> decision was made not to perform any maintenance at the range.
> The staff made the decision not to continue performing
> maintenance and custodial functions due to health related issues
> and not being qualified to perform those functions.

> On December 19, 2003, the Sergeant in charge sent an e-mail to his
> superiors noting that the conveyor system was not functional and
> expressing his and his staff's concern with health related issues
> pertaining to their performing maintenance on the bullet trap and
> recovery system.  The Sergeant also indicated he had contacted the
> conveyor system supplier and an environmental group to resolve
> the current problems.

> We found no evidence in the documentation made available to us
> where DSP command was notified that range staff would not be
> performing duties related to the maintenance and custodial
> functions historically accomplished by range staff.  The DSP
> provided us with information that identified 42 days of firearms
> training from December 2003 until February 2004.  In addition, the
> DSP Lieutenant Colonel stated that he spoke to the Captain in
> charge of the range and asked him whether or not the range should
> be closed and he was told by the Captain that the range did not need
> to be closed.

> * * *

> We can only surmise that with the failing of the conveyor system,
> no maintenance performed on the bullet recovery system, and no
> custodian maintenance being performed to clean the firing range,
> that these situations contributed to an unhealthy and unclean
> environment leading to the ultimate closing of the firing range.

(CA at A-522 (emphasis added).)  In other words, Price, Warren, and Foraker played a role in the demise of the facility when they stopped performing maintenance on the bullet trap but kept using it, knowing that if they did so failure would be the certain result.

V.     **ARGUMENT: THE COURT SHOULD ENTER SUMMARY JUDGMENT FOR DEFENDANTS BECAUSE THERE IS NO GENUINE ISSUES AS TO ANY MATERIAL FACT AND DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

A.     **Defendants Are Entitled To Summary Judgment On Count I (Free Speech Clause)**

Plaintiffs assert that Defendants Chaffinch and MacLeish "took action adverse to [them] … in retaliation for [their] First Amendment protected speech."  (CA at A-24 – A-25 (Am. Compl. ¶ 94).)  Specifically, Plaintiffs contend that, in retaliation for describing conditions at the indoor firing range to their superiors and to the State Auditor, Chaffinch and MacLeish commented negatively to the press about their job performance, sent them to fitness-for-duty exams, altered the conditions of their employment, and in the case of Plaintiffs Price and Warren, planned to separate them from service because they are not fit for duty.  There is no dispute as to facts sufficient to make summary judgment appropriate on these claims.  The comments Chaffinch made to the media were factually accurate responses to media inquiries about a matter of public concern – the reason the range was no longer operating.  MacLeish sent the Plaintiffs (and James Warwick) for fitness-for-duty examinations because they themselves informed him, both at meetings called by MacLeish to discuss conditions at the range, and by filing workers compensation claims against the DSP, that they suffered hearing problems and that the working conditions of the range were to blame.  If, indeed, Price and Warren are separated from service, it will be because two doctors have said their hearing is so bad they can no longer serve safely as troopers.  The "changes" to Foraker's conditions of employment are either trivial or not the result

of Defendants' actions.  Finally, Chaffinch has taken no action to subject himself to liability to

any of these Plaintiffs.

### 1.    Standard Of Review For A Retaliation Claim Under The First Amendment

A claim of First Amendment retaliation "is analyzed under a three-step process."  Green

v. Phila. Housing Auth., 105 F.3d 882, 885 (3d Cir. 1997) (citations omitted).  First, Plaintiffs

must demonstrate that each of them engaged in protected activity, i.e., exercised his

constitutional right to free speech.  Shehee v. City of Wilmington, 67 Fed. Appx. 692, 693 (3d

Cir. 2003).  Second, they "must show the protected activity was a substantial or motivating factor

in the alleged retaliatory action."  Green, 105 F.3d at 885 (citing Swineford v. Snyder County

Pa., 15 F.3d 1258, 1270 (3d Cir. 1994)).  Lastly, Defendants may defeat Plaintiff's claims "by

showing that the same actions would have been taken even absent the protected conduct."

Shehee, 67 Fed. Appx. at 693-94.

### 2.    The Defendants Do Not Dispute That The Plaintiffs Reported To Their Superiors And To The State Auditor On Matters Of Public Concern.

Speech is a protected activity only if it relates to a matter of public concern.  Connick v.

Myers, 461 U.S. 138, 146–47 (1983) (holding that a matter of public concern is "any matter of

political, social or other concern to the community"); Baldassare v. New Jersey, 250 F.3d 188,

195 (3d Cir. 2001).  The three Plaintiffs and Cpl. Warwick attended a number of meetings with

DSP management in February and March 2004 in which they voiced, usually at management's

prompting, concerns about the range's HVAC system, the presence of environmental

contaminants, noise, and the adequacy of Facilities Management's response to these concerns.

Plaintiff Foraker also prepared, or assisted in preparing, several internal reports on range

operations, and these reports went to Col. MacLeish during the months of February and March,

2004.  It is perhaps noteworthy that the Plaintiffs remember almost nothing about these meetings, but they clearly occurred and they contained discussions about matters of public concern.  (CA at A-96 – A-98 (Price Dep. 103-110).)

It is also clear that each of the Plaintiffs, as well as Cpl. Warwick, spoke to the State Auditor about the range, which by then had become a matter of public concern because the Governor had asked the State Auditor to investigate and report publicly on it.

Accordingly, the Defendants do not contest that the Plaintiffs made statements on matters of public concern in February, March, May and July 2004.

### 3.    Plaintiffs Cannot Show That Their Speech On A Matter Of Public Concern Was A "Motivating" Factor In Any Retaliatory Action.

Whether Plaintiffs' protected activity was a substantial or motivating factor in the alleged retaliatory action is actually "two distinct inquiries: 'did the defendants take an action adverse to the public employee, and, if so, was the motivation for the action to retaliate against the employee for the protected activity.'"  Schneck v. Saucon Valley Sch. Dist., 340 F. Supp. 2d 558, 568 (E.D. Pa. 2004) (citation omitted).  In Foraker's case, neither Chaffinch nor MacLeish have taken any employment action adverse to Foraker.  In Price's case, the adverse action was common sense and necessary, and not at all associated with Price's statements on matters of public concern.  In Warren's case, not only was the adverse action common sense and necessary, but Warren actually requested it.

### a.    Plaintiff Foraker has suffered no adverse action as a matter of law.

Foraker has suffered no alteration in his employment, benefits, pay, or job classification since he returned to the range in December 2003.  He is under no discipline from the DSP, and

he will presumably continue to be a trooper until he reaches the mandatory retirement age of 55

in 2017.  Accordingly, he has suffered no adverse employment action.

The Third Circuit has held that a "campaign of retaliatory harassment" against an

employee for speaking on matters of public concern might be actionable.  Suppan v. Dadonna,

203 F.3d 228, 234-35 (3d Cir. 2000) (citing Rutan v. Republican Party of Ill., 497 U.S. 62, 75-76

& n. 8 (1990)).  However, "not every critical comment – or series of comments – made by an

employer to an employee provides a basis for a colorable allegation that the employee has been

deprived of his or her constitutional rights."  McKee v. Hart, --- F.3d ----, No. 04-1442, 2006 WL

27474, at *4 (3d Cir. Jan. 6, 2006) (citing Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685

(4th Cir. 2000)).  Furthermore, if the alleged harassment is itself the speech of one of the public

actors/defendants, than the court must also consider the First Amendment rights of the speaker,

and

> in the absence of a threat, coercion, or intimidation intimating that
> punishment, sanction or adverse regulatory action will imminently
> follow, such speech does not adversely affect a citizen's First
> Amendment rights, even if defamatory.

Suarez Corp., 202 F.3d at 687 (citation omitted).  Accord X-Men Securities, Inc. v. Pataki, 196

F.3d 56, 67-72 (2d Cir. 1999).

As the Fourth Circuit held in Suarez Corporation,

> The requirement that public official's speech include a threat,
> coercion, or intimidation, to adversely affect a citizen's First
> Amendment rights recognizes that a balance must be struck
> between the citizen's right to exercise his First Amendment rights
> and the public official's personal First Amendment rights, as well
> as his duty to the public to speak out about matters of public
> concern.

202 F.3d at 688, n.13 (citation omitted).  It is under these standards that we must analyze

Foraker's claims against Chaffinch.

-24-

In this case, Foraker asserts that Defendants retaliated against him as follows:

(1) Chaffinch blamed Foraker for the shut down of the facility during the April 6, 2004, media tour of the firing range (CA at A-61 – A-62);

(2) Chaffinch gave him an "absolute hateful stare" (CA at A-244 (Foraker Dep. 188-89);

(3) MacLeish growled at Foraker (CA at A-245 – A-246 (Foraker Dep. 195-96));

(4) MacLeish asked Foraker to leave the July 2004 section chiefs and troop commanders meeting (CA at A-244; A-247 (Foraker Dep. 203); A-62 – A-63);

(5) MacLeish refused to allow Foraker to speak at a recruit graduation ceremony (CA at A-246 – A-247 (Foraker Dep. 197-200));

(6) MacLeish attempted to convince a troop captain not to use Foraker as an "echo" in the honor guard at a trooper's funeral in July 2004 (CA at A-247); and

(7) MacLeish micromanaged Foraker by requiring that he justify manpower requests and budget allocations.  (CA at A-248 – A-251 (Foraker Dep. 204-16).)

None of these allegations are serious enough, alone or in combination, to amount to a "campaign of retaliatory harassment."  See McKee, --- F.3d ----, 2006 WL 27474, at *5 (3d Cir. Jan. 6, 2006) (noting that plaintiff "suffered no alteration in his employment benefits, pay, or job classification as a result of speaking out").

Col. Chaffinch's comments on April 6, 2004, are not sufficient under Third Circuit law to raise an issue of retaliation and, because they do not threaten, coerce or intimidate Foraker, they are themselves protected by the First Amendment.  Plaintiff Foraker argues that Chaffinch essentially said that he was incompetent.  Assuming the validity of this interpretation, this is the type of "criticism, false accusation, or verbal reprimands" that do not, as a matter of § 1983 law, adversely affect an employee in the exercise of his First Amendment rights.  Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003) (citation omitted); see McKee, --- F.3d ----, 2006 WL 27474, at

\*5. Perhaps more importantly, a careful review of Chaffinch's comments, as reported in the State News, does not yield a threat or coercive remark. Chaffinch simply said that the range was in such sorry shape because Foraker would not do what his predecessor did. It is a true statement, confirmed later by the State Auditor's report. See supra Part IV.E. Under Suarez Corporation, X-Men Securities, and related cases, Chaffinch's comments are not actionable.

The remainder of Foraker's alleged retaliatory acts are too trivial for constitutional recognition. MacLeish asked Foraker to leave the July 2004 meeting of section chiefs and troop commanders because he was a non-commissioned officer in charge of a training unit. (CA at A-62 – A-63; A-244 (Foraker Dep. 188-89); A-380 (MacLeish Dep. 220-21).) There is no evidence that, as a matter either of official policy or practice, the head of the FTU is to attend these meetings.[7] Foraker was neither a section chief, nor a person reporting to a section chief, and he was certainly not a troop commander (i.e., a Captain). Foraker and other subordinate troopers occasionally attended section chief meetings to report on a matter within their purviews. They did not attend all meetings. (CA at A-380 – A-381 (MacLeish Dep. 220-23).) Removal of Foraker from the meeting is not sufficient to be retaliation under the First Amendment. McKee, --- F.3d ----, 2006 WL 27474, at \*5 (holding that defendants' decision to remove plaintiff as "co-leader" of an investigation was not a "deprivation of a constitutional right").

Eliminating Foraker's graduation speech, so-called micromanaging, and participation in a funeral honor guard are trivial variations in Foraker's day-to-day job functions. Foraker testified

---

[7] Foraker claims that he received monthly "invitations" or order to attend these meetings, suggesting that attendance was one of his job responsibilities. In fact, the e-mail notices that announce the meetings are not invitations or directions to attend. Rather, they merely serve to notify a certain group that the meeting will take place. (CA at A-456 (McQueen Dep. 39).) There is no expectation that every recipient on the e-mail list attend. Foraker's name was on the e-mail distribution list used for the distribution of general information other than announcing the monthly meetings. Even after the July 2004 incident, Foraker's name remained on the list, and he still received information about the monthly meetings as well as other matters.

that Capt. Albert Homiak eliminated Foraker's speech for the recruit best-shooter award to

reduce the length of the ceremony.  (CA at A-247 (Foraker Dep. 200).)  Foraker attributes

micromanagement to Capt. Harry Downs, the head of the training academy after Capt. Greg

Warren retired, Capt. Albert Homiak, Downs's successor, and Lt. Ronald Hagans, the second-in-

command at the academy in 2005.  (CA at A-248 – A-251 (Foraker Dep. 204-16).)  He says

those superiors asked him to submit activity reports and to justify manpower requests and

budgets.  There is no evidence that anyone higher than these officers (e.g., MacLeish) was

responsible for Foraker being asked to justify his budget or his manpower.  Furthermore, the

"micromanaging" did not involve anything more than asking Foraker to do his job as those

superior officers saw it.  It is not actionable conduct on the part of MacLeish or Chaffinch.

Finally, with respect to the honor guard issue, the record is clear that Foraker was in fact, part of

the honor guard at the funeral.  (CA at A-247 (Foraker Dep. 203); A-545 – A-455 (McQueen

Dep. 28-31).)

      Lastly, Plaintiff Foraker asserts that Col. Chaffinch gave him a "hateful stare" and that

Col. MacLeish "growled" at him.  The First Amendment was not meant to protect the

hypersensitive plaintiff from looks, body language, or other subjective expressions of displeasure

that cannot be tied to any real harm.  See McKee, --- F.3d ----, 2006 WL 27474, at *3 (citing

Bart v. Teford, 677 F.2d 622, 625 (7th Cir. 1992) (cautioning that "[i]t would trivialize the First

Amendment to hold that harassment for exercising the right of free speech was always actionable

no matter how unlikely to deter a person of ordinary firmness from that exercise")).

      These allegedly retaliatory acts, many of which were committed by persons other than

Defendants, did not alter Plaintiffs' job status.  Even when viewed together, no reasonable jury

could find that these actions amount to a course of conduct that would "deter a person of

ordinary firmness from the exercise" of his rights.  McKee, --- F.3d ----, 2006 WL 27474, at *4;

see also, e.g., Schneck, 340 F. Supp. 2d at 569.

> **b.    Plaintiffs Price and Warren cannot show that Defendants acted because of anything they said about the conditions at the firing range.**

Defendant MacLeish sent Price and Warren to fitness-for-duty examinations because the

Plaintiffs themselves informed him that they had suffered hearing loss.  Moreover, MacLeish

directed their separation from service because the policies and practice of the DSP require

separation from service if the trooper has suffered permanent injury that renders him incapable of

performing the duties of the job.

### It Is Undisputed That Price And Warren Suffered Hearing Loss.

Price and Warren submitted workers compensation claims to the State of Delaware on

March 16, 2004.  See supra Part IV.H.  At a meeting with Lt. Col. MacLeish on March 17, 2004,

they informed him that they had suffered hearing loss as a result of conditions at the range.  At

the point they had already submitted their workers compensation claims, Price and Warren knew

the results of their testing at Omega (at their own request) on March 1, 2004.  Plaintiff Price had

received the results of the testing by Dr. Cooper a week later.  Warren saw Dr. Cooper a few

weeks after he filed the workers compensation claim.  All four FTU Troopers knew by March 17

that they had suffered hearing loss, but none knew whether the hearing loss impaired his ability

to serve as a state trooper.[8]

Upon learning that the four troopers had suffered hearing loss, MacLeish directed them to

return to Omega, the source of the original testing, to see whether a second round of tests would

---

[8] Foraker submitted his workers compensation claim for hearing loss on April 22, 2004; Warwick submitted his on May 25, 2004.

confirm the results of the first round.  The second round did, in fact, confirm that all four

troopers had suffered some measure of hearing loss.

MacLeish next sent all four troopers for fitness-for-duty examinations with Dr. Aaron

Green, a physician who regularly sees members of the DSP for annual physicals, as well as

fitness-for-duty examinations.  A medical examination of this type is not in itself an adverse

employment action because it does not itself affect the status, pay, benefits, seniority, or other

indicia of employment.  It is simply an effort to collect information on which an employment

decision can be based.

Green found, as had the physicians at Omega and Dr. Cooper before him, that all four

FTU troopers had suffered hearing loss, but he was able to differentiate between Foraker and

Warwick, whose hearing loss did not, in his opinion, impair their ability to function as troopers,

and Price and Warren, who had suffered so much hearing loss that their ability to serve was

impaired.  Dr. Green made two specific findings on Price and Warren: first, that they were

unable to serve as ordnance officers without the danger of further damage to already-impaired

hearing; and second, that they were so impaired that they were not able to function as troopers at

all.  (CA at A-678 – A-680; A-754 – A-757.)  Green reached these conclusions on June 18, 2004,

and conveyed them promptly to the DSP.

The DSP immediately placed Price and Warren on rehabilitation status, known to

colloquially as "light duty."  Rehabilitation status is an adverse employment action to the extent

that it restricts the ability of troopers to accept overtime or special pay assignments.  The

troopers' pay, benefits, seniority, and status are not otherwise affected.  Once Dr. Green

informed McLeish that Price and Warren could hurt themselves by remaining in the FTU, and

could hurt others by being placed in routine trooper functions, MacLeish had no choice but to

remove them from regular duty at the firing range. Although this was an adverse employment action, it was compelled by the circumstances and could not possibly have been motivated by a retaliatory intent.

Not content with Green's opinion, MacLeish then directed that all four troopers be examined by Dr. Edward Emmett, an occupational health specialist at the University of Pennsylvania Medical Center. The examination process at Penn was protracted. Examinations were set up for October, and Foraker and Warwick were cleared for regular duty.[9] Dr. Emmett took more time with Price and Warren, delivering his report in January 2005. Even then, Emmett requested that Price and Warren return to Penn for additional audiological testing, which occurred in February 2005. In March, he concluded finally that Price was not fit for duty because of hearing loss. However, he concluded that Warren could do the job, and suggested that he be returned to full duty. It was Warren himself who returned to Dr. Emmett on March 16, 2005, and convinced him to the contrary. By March 18, 2005, both Price and Warren were deemed not fit for duty due to hearing loss. Because MacLeish wanted clarification of Warren's status, which did not happen until May 10, 2005, MacLeish waited until may 11, 2005 to direct them to separate from service.[10]

At the point he learned that Price and Warren were not fit for duty, and that their injuries were permanent, MacLeish decided to separate them from service. This has not yet occurred, but it is clearly action MacLeish must take eventually to discharge (a) his duty to put troopers in the field who are capable of protecting the public, and (b) his duty to protect Price and Warren from

---

[9] Indeed, Foraker and Warwick were not removed from regular duty at any point during this process.

[10] Chaffinch was not at work from October 27, 2004, to March 24, 2005, and retired on May 5, 2005. He made no decisions about Foraker after he returned him to the range on December 1, 2003, and should be dismissed from the case for that reason alone. There is no evidence that he was involved in any "micromanaging."

further injury.  This has its origins in the hearing tests done on Price and Warren on March 1, 2004 at Omega, on March 8, 2004 by Dr. Cooper, and the filing of workers compensation claim on March 16, 2004.  All these events occurred before the Governor asked the State Auditor to investigate the shut down of the firing range and long before Price and Warren met with the State Auditor's investigators on May 12, 2004.

Warren and Price admit that they have suffered hearing loss and that as a result they cannot work at the firing range or in typical trooper functions such as traffic control, apprehension of criminals, SORT work, or other jobs that required optimum hearing.  They contend, however, that MacLeish should find them jobs somewhere in the DSP where they can continue to serve until age 55 without encountering the need to perform as typical police officers. (CA at A-113 (Price Dep. 170-73); A-173, A-175 (Warren Dep. 198-99, 209).)  In Warren's case, this would be until the year 2013; in Price's case, it would be the year 2018.

**Application Of The DSP Disability Leave Policy Calls For Separation From Service.**

To prevent such an imposition on the taxpayers, the DSP has a policy on disability leave. The DSP policy regarding disability leave states, "In the event that the illness or injury is or becomes permanent … and the employee is unable to perform essential job functions, the policies regarding pension or separation shall apply."  (CA at A-465.)  That is, if a trooper suffers an injury that cannot be rehabilitated, he or she is required to separate from the DSP. (CA at A-504; A-887; A-900 – A-901; A-905 – A-906.)  There is no permanent light duty.  This has been the policy of the DSP since 1992.  (CA at A-473; A-481 – A-482; A-490.)  The Plaintiffs have been treated like dozens of other troopers whose ailments have come under the purview of the policy.

In an attempt to identify a similarly situated trooper who was treated more favorably, Plaintiffs appeal to the example of Major Joseph Forester, who retired from the DSP in November 2000.[11]  In a 1992 physical, Maj. Forester's hearing was reported to be "abnormal," but he was determined at that time to be "medically qualified for [the] job."  (CA at A-836.)  In 1997, Dr. Green referred Maj. Forester to a hearing specialist, who recommended that Maj. Forester wear hearing aids.[12]  At Forester's next physical, Dr. Green, noting that Forester was wearing "bilat[eral] hearing aids," nevertheless found his hearing to be "normal."  (CA at A-840.)  At his last physical, Forester was determined "fit for duty" and "medically qualified" with "normal" hearing.  (CA at A-842.)  At no time did any physician who examined Maj. Forester inform the DSP that Forester was not fit for duty.  Accordingly, the DSP did nothing to change his duties or separate him from employment.  (Forester Dep. 106.)  Plaintiffs Price and Warren, in contrast, have suffered an injury that cannot be remediated by hearing aids.  (CA at A-678 – A-680; A-754 – A-756.)  Price and Warren have specifically been found unable to perform the essential functions of the job.  Their situation is different from Forester's.

Plaintiffs have targeted Sgt. Steven Swain as a trooper with permanent injuries who has been accommodated by the DSP for more than two years.  In January 1983, long before Chaffinch or MacLeish reached command positions in the DSP, Swain was involved in an automobile accident as a result of which he suffered, among other injuries, damage to his vocal chords.  (CA at A-853, A-856.)  Within five months, he back to full duty.  (CA at A-855.)  No doctor since has found Sgt. Swain medically unqualified or limited his activities, and he remains a Delaware State Trooper.  (CA at A-857 – A-866.)  There is no evidence that he has been placed

---

[11] Neither Col. Chaffinch nor Col. MacLeish had personnel responsibility at that time.

[12] Dr. Green, who first truly determined the nature and extent of Maj. Forester's hearing loss, is the doctor who performed Plaintiffs' fitness-for-duty evaluations.

in a position and carried for 22 years because of his injury.  The contrast with the Plaintiffs'
situation is obvious.

On the other hand, the experience of Price and Warren is much like that of Captain David
Citro.  The DSP sent Citro for a fitness-for-duty evaluation after he brought an injury to the
attention of the DSP.  (CA at A-882.)  After the initial determination that the injury was most
likely permanent, Citro went on rehabilitation status, but was allowed to get a second opinion.
(CA at A-889.)  Once it became clear that his injuries were permanent (Citro suffered an injury
to his back), Citro left the DSP, filing for a disability pension in October 2002, after about
twenty-one months on light duty.  (CA at A-892.)  About two dozen other troopers over the past
twenty years have had experiences similar to Citro's.

Plaintiffs cannot identify any trooper who remained a trooper indefinitely after suffering
an injury that a qualified medical examiner determined rendered the trooper permanently unfit
for duty.  Because it is the written policy – as well as the established practice – that a trooper is
not carried indefinitely once his injury is permanent and disqualifying, no jury could reasonably
find MacLeish's decision to separate Price and Warren from service to be retaliatory.  Rather,
MacLeish acted because to allow troopers with admittedly impaired senses to continue as state
troopers would recklessly threaten the safety of citizens of Delaware, as well as the health and
safety of the troopers themselves.  The well-documented and well-known evidence showing that
Price and Warren had suffered significant, permanent hearing loss left Col. MacLeish with no
responsible alternative other than to direct them to separate from service.

4.     **Defendants would have taken the same actions absent the allegedly
       protected conduct**

Defendants may be awarded summary judgment if they can establish that the alleged
retaliatory motive was not the "but for" cause of their treatment of Plaintiffs.  Suppan, 203 F.3d

at 236. That is, Defendants may prove that they would have treated Plaintiffs the same way "even in the absence of the protected conduct." Id. at 235 (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). Defendants are afforded this opportunity to prevent Plaintiff from using the exercise of his First Amendment rights to shield himself from a government employer that seeks only to take necessary and proper action against him and thereby effectively obtain a better position than he would have had had he not engaged in allegedly protected activity. Mount Healthy, 429 U.S. at 287.

In this case, the evidence reasonably admits only one conclusion: MacLeish would have ordered the fitness-for-duty exams, would have put Price and Warren on light-duty or rehabilitative status, and would have directed Price and Warren to separate from the DSP even if Plaintiffs had never spoken out about conditions at the range. In other words, Col. MacLeish had to act exactly as he did. The written and applied policies of the DSP, his professional obligations, and, common sense demanded that Col. MacLeish determine whether Plaintiffs were capable to doing what it takes to protect themselves and the citizens of Delaware. Whatever Price and Warren said in the DSP meetings in February and March 2004 and whatever they said to the State Auditor did not affect the policies or practice of the agency. Defendants' actions were consistent with those expected from public servants, and no reasonable juror could find otherwise. Accordingly, Defendants are entitled to summary judgment on Count I.

**B.** **The Court Should Grant Summary Judgment On Count II (Petition Clause) Because The Plaintiffs Have Not Petitioned The Government**

Plaintiffs also assert that the Defendants retaliated against them because they exercised their First Amendment right to petition the government. This cause of action is subject to the same three-part test that governs Plaintiffs' free-speech claim. Hill v. City of Scranton, 411 F.3d 118, 126-27 (3d Cir. 2005); see also Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282 (3d Cir.

2004) (applying "three-part test" to free speech and petition claims).  For the reasons stated

above, Plaintiffs cannot establish the second prong of the test, i.e., that "the protected activity

was a substantial factor in the alleged retaliatory action."  Hill, 411 F.3d at 125 (citation

omitted).  With respect to the Petition Clause claim, however, Plaintiffs cannot even establish a

"protected activity" because they did not petition the government.

     In San Fillipo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994), the Court explained that not

every "protest [of] governmental acts or omissions" is a protected "petition" under the First

Amendment.  Id. at 442.  To enjoy constitutional protections, a plaintiff must, in good faith,

invoke a "mechanism" that has been formally adopted by the government "for redress of those

grievances for which government is allegedly accountable."  Id.  The court recognized that the

concept of petition included lawsuits, administrative claims and employee grievances as

constitutionally protected.  Id. at 439; see also Bradshaw v. Twp. of Middletown, 296 F. Supp.

2d 526, 546 (D.N.J. 2003), aff'd, 2005 U.S. App. LEXIS 18622 (3d Cir. Aug. 29, 2005) ("[T]he

Petition Clause… only applies to petitions in the nature of a lawsuit or grievance.  If the conduct

at issue 'is not in the nature of a formal grievance procedure that the Petition Clause is designed

to protect, then governmental retaliation is not constitutionally actionable.'") (citations omitted).

     Plaintiffs here contend that their response to a request for an interview by the State

Auditor is a petition.  It is not.  The State Auditor did not investigate to attend to employee

grievances, and the State Auditor has no authority to redress employee complaints.  Accordingly,

Plaintiffs have failed to establish that they engaged in protected activity under the Petition

Clause.  For this reason alone, Defendants are entitled to summary judgment on Count II.

C.    **Defendants Are Entitled To Qualified Immunity Against Plaintiffs' Retaliation Claims.**

To the extent the actions taken by Col. Chaffinch and Col. MacLeish are found to be a "campaign of retaliatory harassment" against Plaintiffs, Defendants are entitled to the defense of qualified immunity.[13]

When a public official is sued in her individual capacity, she may assert personal immunity defenses, such as qualified immunity. Hafer v. Melo, 502 U.S. 21, 27-29 (1991). The purpose of the qualified immunity defense is to provide government officials "some degree of immunity to avoid unacceptable interference with their duties and the hindrances possibly associated with threats of liability." Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982). Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. Malley v. Briggs, 475 U.S. 335, 341 (1986). The United States Supreme Court has "repeatedly … stressed the importance of resolving immunity questions at the earliest possible stage in litigation" because the privilege is "an *immunity from suit* rather than a mere defense to liability." Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (citations omitted). Accordingly, the issue is appropriately resolved by the court at the summary judgment stage. Hunter v. Bryant, 502 U.S. 224 (1991); Harlow, 457 U.S. at 818.

To determine whether a defendant is entitled to qualified immunity, a court must first decide "whether a constitutional right would have been violated on the facts alleged." McKee v. Hart, --- F.3d ----, 2006 WL 27474, at *3 (3d Cir. Jan. 6, 2006) (quotations omitted). Assuming the violation is established, then the court must "consider whether the right was 'clearly

---

[13] Qualified immunity is obviously not a defense against a claim of retaliatory termination. However, Foraker makes no such claim. Price and Warren may contend that Chaffinch's media tour comments were directed at them or that something MacLeish did was really harassment in retaliation for their conduct. Defendants submit that qualified immunity applies to any claim except an adverse employment action.

established.'"  Id. (quotations omitted).  A right is "clearly established" if its "contours are

sufficiently clear that a reasonable official would understand that what he is doing violates that

right."  Id. at *5 (quoting McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001)).  In other

words "there must be sufficient precedent at the time of the action, factually similar to the

plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally

prohibited."  Id. (citation omitted).

        In McKee, decided a few weeks ago, the Third Circuit considered whether its decision in

Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000), which held that evidence of a "campaign

of retaliatory harassment" was sufficient to state a First Amendment claim, and Baldassare v.

New Jersey, 250 F.3d 188, 194-95 (3d Cir. 2001), which reiterated a public employee's right to

be free from retaliation for exercising certain types of speech, established the law of retaliatory

harassment clearly enough that a governmental supervisor would know the limits of his conduct

toward a subordinate.  McKee, --- F.3d ---, 2006 WL 27474, at *5-*7.

        The court held that it had not.  It found that Suppan "gave little guidance as to what the

threshold of actionability is in retaliatory harassment cases."  Id. at *6.  The court further

concluded that Baldassare was a "straightforward retaliation claim" that did not address the more

contextually specific question of what type or amount of activity would create a cognizable claim

of harassment.  Id.  Finally, the court found that its holding in Brennan v. Norton, 350 F.3d 399,

419 (3d Cir. 2003) – that "criticism, false accusations, or verbal reprimands" were not retaliatory

acts – supported the defendant's argument that his actions were permissible.  McKee, --- F.3d ---,

2006 WL 27474, at *7.  Given the state of the precedent, the McKee court held that a reasonable

official in defendant's position "would not have been aware that making a few comments over

-37-

the course of a few months (the gist of which was asking an employee to focus on his job) might have run afoul of the First Amendment." Id. at *6.

The same holding applies here. Nothing in the case law of the Third Circuit in 2004 "clearly established" that the alleged conduct in this case – indirect and truthful comments about Foraker's job performance, unpleasant facial expressions, minor modifications of job responsibilities, and application of written policies – would subject Defendants to a trial for retaliation. That is, at the time of Col. Chaffinch's and Col. MacLeish's conduct, there was a "dearth of precedent of sufficient specificity (and factual similarity to this case) regarding a public employee's First Amendment right to be free from retaliatory harassment." Id. at *7. The precedent that was available did not clearly establish that Plaintiffs' claims, even when considered in their totality, would amount to a constitutional violation. Accordingly, Defendants are entitled to qualified immunity and summary judgment on both counts of the Amended Complaint.

## VI.    <u>CONCLUSION</u>

For the reasons set forth above, Defendants requests that the Court enter summary judgment in their favor and against Plaintiffs on all counts of the Complaint.

Respectfully submitted,


Date: January 25, 2006                    /s/ Noel C. Burnham
                                    Noel C. Burnham (DE Bar No. 3483)
                                    Richard M. Donaldson (DE Bar No. 4367)
                                    Montgomery, McCracken, Walker & Rhoads, LLP
                                    300 Delaware Avenue, Suite 750
                                    Wilmington, DE 19801
                                    Telephone:  (302) 504-7840
                                    Facsimile:  (302) 504-7820

                                    Edward T. Ellis
                                    Robert J. Fitzgerald
                                    Montgomery, McCracken,
                                      Walker & Rhoads, LLP
                                    123 South Broad Street
                                    Philadelphia, PA  19109
                                    (215) 772-1500

                                    *Counsel for Defendants L. Aaron Chaffinch,
                                    Thomas F. MacLeish, David B. Mitchell, and the
                                    Division of State Police, Department of Safety and
                                    Homeland Security, State of Delaware*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that two (2) copies of the Opening Brief in Support of Defendant's

Motion for Summary Judgment were served by first class mail this 25th day of January 2006 on:

> Thomas Stephen Neuberger, Esquire
> Stephen J. Neuberger, Esquire
> The Neuberger Firm, P.A.
> Two East Seventh Street
> Suite 302
> Wilmington, DE  19801

> Martin D. Haverly, Esquire
> Two East Seventh Street
> Suite 302
> Wilmington, DE  19801-3707

> *Attorneys for Plaintiffs*

> _____/s/ Noel C. Burnham_____
> Noel C. Burnham (DE Bar No. 3483)