## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORPORAL B. KURT PRICE; | : | |
| CORPORAL WAYNE WARREN; and | : | |
| SERGEANT CHRISTOPHER D. FORAKER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A.No.04-956-GMS |
| | : | |
| COLONEL L. AARON CHAFFINCH, | : | |
| individually and in his official capacity as | : | |
| Superintendent of the Delaware State Police; | : | |
| LIEUTENANT COLONEL THOMAS F. | : | |
| MACLEISH, individually and in his official | : | |
| capacity as Deputy Superintendent of the | : | |
| Delaware State Police; DAVID B. MITCHELL, | : | |
| in his official capacity as the Secretary of the | : | |
| Department of Safety and Homeland Security of | : | |
| the State of Delaware; and DIVISION OF | : | |
| STATE POLICE, DEPARTMENT OF SAFETY | : | |
| AND HOMELAND SECURITY, STATE OF | : | |
| DELAWARE, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II**

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**MARTIN D. HAVERLY, ATTORNEY AT LAW**
**MARTIN D. HAVERLY, ESQ. (#3295)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Attorneys for Plaintiffs

Dated: January 25, 2006

## **TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING................................................................................1

SUMMARY OF THE ARGUMENT...........................................................................................2

STATEMENT OF FACTS........................................................................................................2

    A.    Plaintiffs.....................................................................................................................2

        1.    Master Corporal B. Kurt Price.....................................................................2

        2.    Master Corporal Wayne Warren...................................................................3

        3.    Sgt. Christopher D. Foraker.........................................................................5

    B.    The Longstanding Health and Safety Concerns at the FTU....................................5

    C.    Plaintiffs Sound the Alarm and Plea for Help........................................................5

        1.    Poisoning of Police Officers with Lead, Copper, Arsenic, Nitroglycerine, and Other Heavy Metals...........................................................6

        2.    Dangerously Low Staffing Levels.................................................................7

        3.    Malfunctioning HVAC System......................................................................8

        4.    Malfunctioning Bullet Trap and Conveyor System......................................9

        5.    Hazardous Armorers Room...........................................................................9

        6.    Defective Headsets.......................................................................................10

        7.    No Protective Training or Equipment..........................................................10

        8.    Need for Professional Hazmat Crews.........................................................10

        9.    The Huge Number of Law Enforcement Officers Being Exposed to the Hazardous Conditions at the Range....................................................11

    D.    Knowledge - Defendants Were Aware That Plaintiffs Were Speaking Out....................11

    E.    The FTU is Shut Down in Because of Environmental Contamination............................12

    F.    The Disastrous Conditions at the FTU Attract Widespread Media Coverage.................12

    G.    Legislators Call for Hearings and Investigations..................................................13

    H.    Plaintiffs Speak Out and Petition the State Auditor's Office..................................13

*i*

      1.      First Meeting......................................................................................13

      2.      Second Meeting..................................................................................14

I.      Knowledge - Defendants Were Aware that Plaintiffs Had Spoken to the Auditor..........14

J.      Plaintiffs' Speech to the Auditor Attracts Even More Media Attention...........................14

K.      Repeated Retaliation Against Plaintiffs.........................................................................14

      1.      Falsely Blamed for Destroying the FTU...............................................14

      2.      Other Adverse Action.........................................................................15

      3.      Defendants Send Plaintiffs for Numerous Fitness for Duty Hearing Exams
            When All They Had Requested Was Blood Testing..............................15

      4.      The DSP Historically Runs Away From Hearing Issues......................16

      5.      Defendants Refuse to Accommodate Plaintiffs in Violation of their Long
            Established Practice.............................................................................17

            a.      Troopers With Hearing Problems Always Are Accommodated.............17

            b.      Troopers With Other Physical Injuries Also Are Accommodated..........18

      6.      Defendants Place Plaintiffs on Light Duty..........................................19

      7.      Defendants Send Plaintiffs Suspension Letters, Not Light Duty Letters.............19

      8.      Defendants Violate their Historic Practice and Refuse to Give Plaintiffs
            Two Years of Light Duty.....................................................................20

            a.      Troopers Are Always Given At Least Two Years of Light Duty...........21

            b.      Defendants Refuse To Give Plaintiffs Two Years of Light Duty...........22

            c.      MacLeish's Justification For His Refusal to Give Plaintiffs Two
                 Years of Light Duty.............................................................................22

            d.      Plaintiffs Back Defendants Off During Discovery and Plaintiffs Are
                 Now in Limbo.....................................................................................23

      9.      Defendants Violate their Historic Practice and Refuse to Let Plaintiffs
            Work Overtime While On Light Duty..................................................23

L.      Evidence of Causation....................................................................................................23

      1.      Knowledge of the Protected Conduct..................................................23

2.      Demonstrated Anger, Hostility and Antagonism.................................................23

3.      Temporal Proximity.........................................................................................24

4.      Intentional Destruction of Evidence.................................................................25

5.      Violations of Laws, Rules, Policies and Procedures..........................................25

6.      Disparate Treatment.........................................................................................25

7.      Pretext and Coverup.........................................................................................26

8.      Falsehoods.......................................................................................................26

9.      Selective Enforcement.....................................................................................26

10.     Underinclusiveness of a Proffered Reason.......................................................26

ARGUMENT.............................................................................................................................27

I.      STANDARD OF REVIEW...........................................................................................27

II.    PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED SPEECH
BY SPEAKING OUT ABOUT THE PROBLEMS AT THE FTU, AND THAT
SPEECH WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE
RETALIATION AGAINST THEM..............................................................................28

A.    Protected Activity.....................................................................................28

1.     Matter of Public Concern...................................................................28

a.    Content..................................................................................28

(1).    Health Issues............................................................28

(2).    Mismanagement and Corruption...................................29

b.    Form and Context...................................................................30

(1).    News Coverage...............................................................30

(2).    Legislative Concern.........................................................30

(3).    The Police Department Setting.....................................30

(4).    Official Reports...............................................................30

(5).    Internal Nature of the Speech.......................................31

(6).     Motive..........................................................................31

2.     Balancing of Interests.................................................31

B.     Substantial or Motivating Factor..............................................32

1.     Knowledge of Protected Conduct...........................................32

2.     Demonstrated Anger, Hostility and Antagonism.....................32

3.     Temporal Proximity.............................................................33

4.     Violations of Law, Policies and Procedures...........................33

5.     Disparate Treatment.............................................................34

6.     Selective Enforcement..........................................................34

7.     Pretext and Coverup.............................................................34

8.     Falsehoods.............................................................................34

9.     Intentional Destruction of Key Evidence...............................34

10.     Underinclusiveness of a Proffered Reason.............................35

11.     The Big Picture.....................................................................35

12.     Summary................................................................................36

C.     Same Decision Anyway Affirmative Defense.....................................36

III.     PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING
OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES AND THEIR
PETITIONING WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE
RETALIATION AGAINST THEM...............................................................37

A.     The Big Picture.............................................................................37

B.     The Activities Protected..................................................................38

C.     The Specifics..................................................................................38

D.     Substantial or Motivating Factor and Same Decision Anyway............39

CONCLUSION.......................................................................................................39

*iv*

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

Adkins v. Rumsfeld, 389 F.Supp.2d 579 (D.Del. 2005).............................................28-29,33-34

Adler v. Pataki, 185 F.3d 35 (2d Cir. 1999)...................................................................36

Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997).........................................................37,39

Andrews v. City of Phila., 895 F.2d 1469 (3d Cir. 1990)..................................................35

Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997) (en banc)..............................31

Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001)..................................................30

Bedford v. SEPTA, 867 F.Supp. 288 (E.D.Pa. 1994).......................................................32

Bieregu v. Reno, 59 F.3d 1445 (3d Cir. 1995)...............................................................37

Boyle v. County of Allegheny, Pa., 139 F.3d 386 (3d Cir. 1998).......................................27

Brady v. Fort Bend County, 145 F.3d 691 (5th Cir. 1998)................................................36

Bray v. Marriott Hotels, 110 F.3d 986 (3d Cir. 1997)......................................................33

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003).....................................28,31,33-34,38-39

Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972).................................38

Caver v. City of Trenton, 420 F.3d 243 (3d Cir. 2005).....................................................30

Charpentier v. Godsil, 937 F.2d 859 (3d Cir. 1991) ......................................................36

City of San Diego v. Roe, 543 U.S. 77, 125 S.Ct. 521 (2004) (per curiam).............................30

Connick v. Myers, 461 U.S. 138 (1983)........................................................................28

Cox v. Louisiana, 379 U.S. 536 (1965)..........................................................................34

Czurlanis v. Albanese, 721 F.2d 98 (3d Cir. 1983)..........................................................31

Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387 (M.D.Pa. 2003).....................................32

Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005)................................................................33

Feldman v. Phila. Hous. Auth., 43 F.3d 823 (3d Cir. 1994)................................................34

Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410 (1979)..........................................31

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005)........................................28,32,34-36,38

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993)................................................29-30,34

Howard v. Bd. of Educ. of City of East Orange, 90 Fed.Appx. 571 (3d Cir. 2003)...................32

Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173 (3d Cir. 1997)..........................................33

Keenan v. City of Phila., 983 F.2d 459 (3d Cir. 1992)..............................................................32

Lewis v. Casey, 518 U.S. 343 (1996)......................................................................................37

McDonald v. Smith, 472 U.S. 479 (1985).................................................................................37

McGreevy v. Stroup, 413 F.3d 359 (3d Cir. 2005)...............................................................29,31

McKnatt v. State of Del., 369 F.Supp.2d 521, 523 (D.Del. 2004)............................................15

Miller v. Cigna, Corp., 47 F.3d 586 (3d Cir. 1995) (en banc)..................................................32

Mitchell v. Street, 2005 WL 1993774 (E.D.Pa. Aug. 16, 2005)................................................32

Monsanto v. Quinn, 674 F.2d 990 (3d Cir. 1982).....................................................................31

Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977).............................................32

Nicholas v. Pa. State Univ., 227 F.3d 133 (3d Cir. 2000).........................................................36

O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir. 1989)............................................................30

Ostad v. Oregon Health Sciences Univ., 327 F.3d 876 (9th Cir. 2003).....................................36

Pickering v. Bd. of Educ., 391 U.S. 563 (1968).......................................................................30

Powell v. Alexander, 391 F.3d 1 (1st Cir. 2004) .....................................................................38

Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996)........................................................................28

Rankin v. McPherson, 483 U.S. 378 (1987).............................................................................31

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).........................................34

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988)................................................................30

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994)................................................32-34,37-38

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc)............34

Springer v. Henry, -- F.3d --, 2006 WL 121942 (3d Cir. Jan. 18, 2006).............................28-29

Springer v. Henry, 2002 WL 389136 (D.Del. March 11, 2002)............................................29-30

*vi*

Stanley v. City of Dalton, Georgia, 219 F.3d 1280 (11th Cir. 2000)..................................36

Stewart v. Rutgers, the State Univ., 120 F.3d 426 (3d Cir. 1997)..................................33

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000)..................................32

Thomas v. Collins, 323 U.S. 516 (1945)..................................37

United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217 (1967)..................................37

Vazquez-Valentin v. Santiago-Diaz, 385 F.3d 23 (1st Cir. 2004)..................................36

Village of Arlington Heights v. Metropolitan Hous. Develop. Corp., 429 U.S. 252 (1977)..................................33

Waters v. Churchill, 511 U.S. 611 (1994) (plurality opinion)..................................31

Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995)..................................29-31

We, Inc., v. City of Phila., 174 F.3d 322 (3d Cir. 1999)..................................38

Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997)..................................33

Yalowizer v. Town of Ranchester, Wyoming, 18 Fed.Appx. 745 (10th Cir. 2001)..................................36

Zamboni v. Stamler, 847 F.2d 73 (3d Cir. 1988)..................................31

**Constitutions, Statutes and Rules**

U.S. Const., Amend. I..................................passim

Fed.R.Civ.P. 8(c)..................................36

Fed.R.Civ.P. 56(c)..................................27

## NATURE AND STAGE OF THE PROCEEDING

This is a civil action for compensatory and punitive damages and injunctive relief for retaliatory violations of the free speech and petition clauses of the First Amendment. Plaintiffs exercised their First Amendment rights by: (1) reporting to defendants that the health and safety of Delaware State Troopers and others were being endangered by hazardous conditions at the Delaware State Police's Firearms Training Unit ("FTU"); and (2) speaking to the Delaware State Auditor's Office about health hazards, safety concerns and other problems at the FTU, as well as mismanagement and other root causes of those dangerous conditions. Defendants retaliated against plaintiffs for their protected activities, materially changed the conditions of their employment and have made concerted retaliatory efforts to create pretextual reasons to terminate their employment.

The record includes the depositions of defendant Ret. Col. L. Aaron Chaffinch, defendant Col. Thomas MacLeish, Major Joseph Papili, Major Randall Hughes, Ret. Major David Baylor, Ret. Major Joseph Swiski, Ret. Major Joseph Forester, Capt. Glenn Dixon, Capt. Ralph H. Davis, III, Capt. Nathaniel McQueen, Jr., Ret. Capt. Gregory A. Warren, Lt. Joseph Aviola, John Dillman, plaintiffs, the interrogatory answers of plaintiffs, various documents, e-mails and the Amended Complaint and Answer. ("Compl. & Ans.").[1]

This is plaintiffs' opening brief in support of their motion for summary judgment on Counts I and II - their First Amendment retaliation claims. Plaintiffs incorporate by reference and rely upon the voluminous unsealed and sealed appendix filed in the companion Foraker action, C.A.No. 04-1207-GMS.

---

[1] The record includes testimony from the following cases - the companion case of Foraker v. Chaffinch; Dillman v. Chaffinch, et al., C.A. No. 02-509- KAJ, Conley v. Chaffinch, et al., C.A.No. 04-1394-GMS. References to Plaintiff's Answers to Interrogatories in the companion Foraker case will be referenced as "Foraker Inter. # __" and Plaintiff's Answers to Interrogatories in the present case will be referenced as "Price Inter. # __"

1

## SUMMARY OF THE ARGUMENT

Plaintiffs engaged in First Amendment protected activity by speaking out and petitioning the government about the dangerous conditions at the FTU. In light of the overwhelming record evidence, as a matter of law, no reasonable jury could conclude that plaintiff's speech and petitioning about these hazardous conditions did not play a substantial role in the retaliation against them. Because defendants have waived their Mt. Healthy affirmative defense, summary judgment should be entered against them on Counts I and II.

## STATEMENT OF FACTS

**A. Plaintiffs.**

**1. Master Corporal B. Kurt Price.** Master Corporal B. Kurt Price has been a Delaware State Trooper since 1985. Prior to joining the DSP, he was a police officer for the City of Dover and served as a Correctional Officer. He also served honorably in the U.S. Marine Corps. He has excelled during his DSP career and worked a wide range of assignments. In addition to patrol, he has worked undercover, in the K-9 Unit and he also served for many years on the Special Operations Response Team ("SORT") as a sniper and on the entry teams. Since 1996, he has worked at the FTU as a firearms instructor and certified armorer. (Compl. & Ans. ¶ 3; FTU3916; Price 28-30,33-34; A1612,1651,2938,1267-69).

As his evaluations spanning several leadership changes at the FTU make clear, he has excelled there. (A2939-79). "Cpl. Price is an outstanding classroom instructor." (A2953, 2962,2944). "He possesses a vast amount of experience and knowledge, and demonstrates this on a daily basis in the classroom and during practical training. He leads by example and is an asset to the Division and the [FTU]." (A2954,2963,2945).

> Cpl/3 Price has a committed work ethic dedicated to the survival of his students. He embraces the thought that the finished product, the students' survival of a deadly encounter, is a direct reflection of his performance as a teacher and instructor. Cpl/3 Price prides himself in providing his students with tactical training as a blue print to survive the dangers they may encounter in real world situations.

* * *

-2-

> Cpl/3 Price has devoted his entire career to the protection, advancement and survival of others. He is able to maintain a very safe range by controlling the movement of students with proper dialog and voice inflection conducive for learning. His calm demeanor under high stress has been a standard and guide for future instructors. Many Troopers look to Cpl/3 Price and respect him for his many years of dedicated service and his commitment to train others so that they may survive any and all dangers encountered from life as a Trooper.

(A2979). "Cpl. Price is always on top of Safety." (A2952,2961). He "conveys a genuine concern over the safety and well being of all his students and fellow instructors." (A2973). "Stress is ever present in Firearms Training and in the instruction of same. Cpl. Price is able to reduce stress to himself and others by presenting a safe and learning environment for all persons attending this facility." (A2955).

In the same way, he has always received the highest ratings for his care of divisional equipment. (A2939,2948,2957,2969). His "[e]quipment is always kept in excellent condition substantially exceeding the standards set by the Division." (A2946,2966). "Cpl. Price's care of Equipment always and substantially exceeds the Expectations. He maintains the Firearms Training Facility equipment and his issued equipment in exemplary fashion." (A2955).

As his final evaluation laments, "Cpl/3 Price's initiative and work ethic will be greatly missed and obviously absent in all areas where his positive impact and influence was evident and witnessed by many." (A3991).

        **2. Master Corporal Wayne Warren.** Master Corporal Wayne Warren has been a Trooper since 1983. He has excelled throughout his DSP career as he worked a wide variety of assignments, including high risk drug assignments such as the Special Investigations Tactical Unit and the Governor's Task Force. He also has served on the SORT team for at least 18 years, including as its second in command. Since 2001, he has worked at the FTU as a firearms instructor in addition to his other duties. (Compl. & Ans. ¶ 4; W. Warren 20-22, 26-39; Forester 79-80; A1613,1651, 2980-85, 2633,2623,2614, 1394-99,644-45).

As his evaluations make clear, Master Corporal Warren is an "outstanding Firearms

Instructor" (A2615), who "possesses a vast amount of experience and knowledge, and demonstrates this on a daily basis. He leads by example and is an asset to the Division and the Firearms Training Unit." (A2634,2624,2611). "His work is of the highest qualit[y], while very few can produce the quantity." (A2626). He "is excellent at communications, and this enables him to excel in his duties as an instructor." (A2625). "Cpl. Warren takes a lead in all aspects of Training ... His communications and character are such that he is able to provide a relaxed and educational environment for others to learn." (A2633,2623). Leadership "is a skill in which Cpl. Warren excels. Due to his knowledge, communications skills and relationships with others he is blessed with the ability to be a true and respected leader." (A2626).

He is the kind of Trooper who "frequently performs more duties than are expected of him. In every instance his performance has been exemplary." (A2638). His "initiative and work ethic as a self-starter is evident as he continually seeks to improve upon the overall look and condition of the Firearms Training Facility." (A2614,2616). He "accepts direction of any and all tasks that may be assigned to him. He does not let ego or pride stand in the way of providing a safe and educational environment." (A2626). His "decision making is unquestionable." (A2626).

As his supervisors consistently explain, Cpl/3 Warren "Far Exceeded Expected Results" when it came to safety at the FTU. (A2632,2622,2599). "Cpl. Warren is always on top of Safety. He ensures that all persons follow the approved safety procedures." (A2632,2622). He has "shown the ability to approach a problem, research all possible aspects, and render a sound and safe decision." (A2632,2622). "Stress is ever present in Firearms Training and [its] instruction. Cpl. Warren has the ability to reduce the stress to himself and others by presenting a safe and educational environment in which to learn." (A2625).

His "care of equipment is impeccable.... Each piece of equipment is given the ultimate in care." (A2625). He has always received the highest ratings in this regard. (A2628,2618,2609,

2598).  He "maintains all equipment related to Firearms Training and all assigned [SORT] gear in an exceptional manner."  (A2637,2616).

     **3.  Sgt. Christopher D. Foraker.**  His distinguished background is found in the summary judgment opening brief in the companion case of <u>Foraker v. Chaffinch, et al.</u>, C.A.No. 04-1207-GMS, that is being contemporaneously filed, and which is incorporated by reference herein.

     **B.  The Longstanding Health and Safety Concerns at the FTU.**  The longstanding health and safety concerns that have plagued the FTU are discussed in great detail in the contemporaneously filed summary judgment brief in the companion case, which is incorporated by reference herein.

     **C.  Plaintiffs Sound the Alarm and Plea for Help.**  On December 1, 2003, when Sgt. Foraker assumed command as NCOIC of the FTU, he observed and learned from Cpls/3 Price and Warren about the many health and safety problems at the FTU.   Sgt. Foraker individually and on behalf of Cpls/3 Price and Warren (<u>Price</u> Inter. #9 p.22; A2287), immediately began to speak out, both orally and in writing, about the many problems at the FTU discussed below.[2]  In his Captain's words, "there was rarely a day went by Chris didn't tell us something" about the problems at the range.  (G. Warren 74; A1941).  "Chris did a pretty admirable job of keeping us informed."  (G. Warren 87; A1944).

     In order to better help those to whom they were speaking and petitioning, plaintiffs also began to investigate the sources of the many problems discussed below so that they could better understand how to resolve and fix them and they also brought in experts to help them get a handle on these problems. (W. Warren 253-55, 164-73; Price 81-82; Foraker 51-53, 60-63,

---

    [2] (Davis 17-18; <u>Price</u> Inter. #13; <u>Foraker</u> Inter. #6 p.15, #10; MacLeish ex. 11-16; W. Warren 112-18,160-62, 175; Price 74; Foraker 57-58, 84-85, 91-92, 122, 279-80; G. Warren 60-61,63-70, 73-80, 87, 90, 114; A487-88,2301-02,067,73-77,226-27,229-36,1417-19,1429-30,1433,1279,694-95,701,703, 711,794-95,1937-42,1944-45,1950).

158,160-61, 163-65, 260-62; A1475-76,1430-32,1280-81,693,695-96,720-21,790).[3]

In their supervisor's words, plaintiffs were "basically pleaing for help" and "waiving a flag going 'help'" as they spoke out about the hazards at the FTU discussed below. (Davis 30,17-18, 28-29; G. Warren 75; A491,487-88,490,1941).

> [T]hey were being honest and sincere whenever they raised a concern. Honest and sincere for their own health, the health and safety of their families, but I think overall the health and safety of us who had occasion to visit [the FTU on] at least two occasions [a year] to shoot.

(Davis 29; A490). "[T]hey were trying to protect the health and safety of those who worked and trained there, as well as their families." (Davis 29; A490).[4]

> **1. Poisoning of Police Officers with Lead, Copper, Arsenic, Nitroglycerine, and Other Heavy Metals.** Lead exposure and sky-rocketing blood lead levels were one of the areas of serious concern for plaintiffs. DSP doctors had told the FTU staff that much of the work they were doing at the FTU to keep the mechanical systems from falling apart involved using chemicals that acted as "a penetrating agent" and which were transporting lead directly through their skin and into their bloodstream. (MacLeish ex. 11 p.2; Price Inter. #10 p.26; Price 63-66,72-73; Foraker 99; A227,2291,1276-78,705). The blood lead levels of Cpls Price and Warren had spiked and the numbers were not coming down back down. (MacLeish ex. 11 p.2; Price Inter. #10 p.25; A227,2290). As plaintiffs spoke out and explained, doing the specialized mechanical range upkeep for which they were not trained "is an unnecessary health risk ... [which] should be left to the trained professionals who can operate in this environment safely."

---

[3] As Capt. Warren testified, plaintiffs were doing the right thing by investigating and gathering as much data as they could in this regard because the first thing that the higher-ups would ask for when health concerns were raised was corroborating data. (G. Warren 70; A1940).

[4] Cpls Price and Warren had previously spoken out and raised health and safety concerns during Sgt. Ashley's tenure, but their concerns fell on deaf ears as Sgt. Ashley "did not want to make any waves." (Price Inter. #11 p. 28; A2293). He told them that "you got to die from something." (Price 65; MacLeish ex. 14; Price Inter. #10 p.25; A1276,232,2290). At his deposition, Captain Warren commended Sgt. Foraker for being willing to try to protect his men and blow the whistle, even if it meant angering those at headquarters. (G. Warren 78-79; A1942).

(MacLeish ex. 11 p.2; A227). In addition to their own safety, plaintiffs also were "extremely concerned over our health and the health of those who we train." (MacLeish ex. 14; A232).[5]

As Sgt. Foraker pleaded in one e-mail, "I am overwhelmed with concern for the health and safety of my staff and their wives and children." (MacLeish ex. 15; A233). He explained that as NCOIC of the unit, "I have spent much less time on the range when compared to my staff and yet my copper and lead levels are the same as the others. My lead level shot up from a 3 to a 9 and my copper is at 971 in just two months." (MacLeish ex. 15; A233).[6] He explained that the "entire building is contaminated with the lead and copper and that the ventilation is circulating the contamination throughout the entire facility." (Id.). Despite the best efforts to decontaminate themselves at the end of the day, "we do not have a safe haven to escape and shed the contamination, then we are taking the contamination home to contaminate homes and expose the hazards to our wives and children." (Id.).

Eventually plaintiffs discovered that the State had lied to them and that their ammunition was not made of ceramic materials and was instead made of toxic materials such as copper, zinc, arsenic and nitroglycerine. (Davis 37-40; Price Inter. #12 p.34-36; A492-93,2299-2301).[7] Plaintiffs also brought in an environmental testing company which revealed that the results were off the charts for many of these heavy metals. Plaintiffs pled with their superiors for advanced medical screenings to determine whether they were being poisoned and whether their homes and families were being contaminated. (Price Inter. #12 p.35-36; A2300-01)

**2. Dangerously Low Staffing Levels.** The FTU was "dramatically

---

[5] In addition to concerns about their blood lead levels at any one time, plaintiffs also were concerned with the "time weighted averages of exposure" due to their being continuously exposed to this environment over such a long period of time. (Foraker 155-56; A719).

[6] As Cpl/3 Warren's doctor told him, copper is not his "liver's friend." (W. Warren 173; A1432).

[7] Information regarding the toxic health affects of lead, copper and arsenic are in the record and were included in the information plaintiffs later provided to the State Auditors. (A2854-76)

understaffed" (Davis 14; A487), and plaintiffs continually spoke out about these problems and how more personnel were needed in order to safely operate the range.  (See MacLeish ex. 12; Foraker 74; A228,699).  Industry instructor to student safety ratios require 1 instructor for every 2 or 3 students.  (Davis 14; A487).  At the FTU, the ratio was 1 instructor for every 10 students. (Id.).  Because of these dangerously low levels of staffing, "as far as safety goes, [it was] just a nightmare." (Id.).

     **3.  Malfunctioning HVAC System.**  The State of Delaware's own standards require that the air supply be blowing 75 cfm down range at the firing line.  (MacLeish ex. 4; A211).  As the record cited in the companion case makes clear, the ventilation system fails to meet the state's own standards.  It has never worked as required, cannot remove toxins from the air and in fact blows air and toxins 180 degrees in the wrong direction into the respiratory zones of the shooters.  So plaintiffs sounded the alarm about these problems.  (Price Inter. #12 p.33-34; A2298-99).  For example, "[w]e are experiencing significant air flow problems at the range," problems which have "only been 'band aided' over time when complaints have been made." (MacLeish ex. 13 p.1; A230).  The smoke on the firing line was so dense that one instructor could barely see the student in his charge. (Id.).

     Plaintiffs also explained that there was a "reddish haze" suspended in the air which was being "inhaled by the instructors and students.  When anyone blows their nose, a large amount of reddish debris is discharged.  Students and instructors also complain of a copper penny taste in their mouth" as well as other serious health problems such as nosebleeds, headaches and chronic fatigue.  (MacLeish ex. 13 p.1; Price Inter. #12 p.35; A230,2300).  After contacting experts, plaintiffs explained that they were told "you don't want to walk into the reddish cloud and you definitely do not want" to breathe it in. (MacLeish ex. 13 p.1; Foraker 50-51; A230,693). Continuing, plaintiffs explained that "this problem constitutes a potentially unsafe and unhealthy working environment detrimental to our good health and inconsistent with departmental goals

and objectives." (MacLeish ex. 13 p.1; A230).

    **4. Malfunctioning Bullet Trap and Conveyor System.** The bullet trap also

was not working properly. There was a "major problem" with its conveyer belt system which

had been broken and destroyed due to the DSP not using professionals to maintain the system.

(MacLeish ex. 14; W. Warren 69-70; A232,1406-07). As plaintiffs explained, the

> mechanical operation of this very expensive equipment should not be left for amateurs in
> the mechanical field to tweak but for professionals who have the training and experience
> to make proper scientific and calculated adjustments and measurements when necessary.
> My expertise as well as the entire FTU staff lies in firearms, officer safety and force
> training. We do not possess the training, skills and knowledge or the time necessary to
> properly maintain the system at its optimal performance.

(MacLeish ex. 11 p.1; A226). This complicated system was breaking down in numerous

respects. (<u>Price</u> Inter. #10 p.22-24, #11 p.29-30, #12 p.33-34; MacLeish ex. 13 p.1-2; Foraker 35-

38; G. Warren 49,100-101; A2287-89,2294-95,2299-2303,230-31,689-90,1401,1414).[8] When

the machine would break down, the bullet residue would harden and turn to concrete, which

causes even more problems for the already beleaguered system. (Foraker 80, 113; A700,708).

    Relatedly, many companies simply refused to come in and even try to repair the bullet-

trap because of the dangers of lead exposure arising from it. (Foraker 76; A699). Other

professionals indicated to Sgt. Foraker that maintaining the bullet-trap was a full time job that

should be done by highly trained professionals, not by amateurs. (Foraker 76,74,78,82; A699-

701).[9]

    **5. Hazardous Armorers Room.** Similarly, plaintiffs were being sickened by

---

   [8] Many of these problems were caused by the change from non-frangible ammunition (ammo made of lead) to frangible ammunition (non-leaded ammo, made of copper, zinc, arsenic and nitroglycerine) and the fact that the trap only was designed for non-frangible ammunition. (Price 56-57, 51, 48; Davis 38-40; A1272-74,493).

   [9] As Sgt. Foraker testified, everything was breaking down at once at the range and this was causing even more problems. "It was getting to where it was too time consuming what was going on and there were so many other things, so many other things at the facility that was going on that was wrong or that was broken or that needed attention and so forth." (Foraker 79,96-97; A700,704). As discussed above, there were not enough staff to safely run the facility.

the toxic fumes in the armorer's room when cleaning weapons. (Price Inter. #11 p.31-32, #12 p.34; W. Warren 82-85; A2295-96,2299,1410).

**6. Defective Headsets.**  Plaintiffs also spoke out about unsafe headsets that they were being forced to use at the range which were causing safety problems on the range itself. (Foraker Inter. #10 p.22-23; Price Inter. #11 p.32-33, #12 p.34-36; W. Warren 82, 86-89; Foraker 127; A74-75,2296-97,2299-2301,1410-11,712).

**7. No Protective Training or Equipment.**  In Chaffinch's own words, the FTU was "not a safe place to work."  (Chaffinch 153; A463).  It "was a hazardous situation for [plaintiffs] and for anybody who trained in that facility at all."  (Baylor 207; A314).   Yet despite these admitted hazards, plaintiffs were never given training in hazardous material cleanup, disposal or abatement. They were never given protective equipment to wear such as Tyvex suits, moon suits, respirators or even little booties for their feet (Chaffinch 60-62; MacLeish 64-65; Price Inter. #10 p.24-27; W. Warren 151-52; Foraker 24; G. Warren 164-65; A440-41,109,2289-92, 1427,686,1963), all of which violates the State of Delaware's own standards that require, for example, the use of a respirator when cleaning firing range lead. (MacLeish ex. 4; A212).

**8. Need for Professional Hazmat Crews.**  As plaintiffs repeatedly explained to defendants, even the State was telling them that "lead contamination will always be present and a health danger" at the range.  (MacLeish ex. 11 p.1; A226).  Plaintiffs told MacLeish that to properly operate the bullet trap "would require a full time professional that would also need to be equipped with the proper protective gear and trained in the handling of hazardous lead and other heavy metals."  (Id. at p.1-2; A226-27).  Plaintiffs explained that they had called in experts, who "concurred that professionals would be needed for the safe and efficient operation of the entire bullet trap system."  (Id. at p.2; A227).  In one report that plaintiffs submitted to defendants, they explained that one expert had stated that "any range, whether green or lead, should be attended to by professionals certified and trained in the safe cleaning, handling and disposal of any

hazardous materials present, thereby minimizing the risk to all parties."  (MacLeish ex. 16 p.1, 3;

A234-36).  MacLeish's own internal memos attest to this.  (MacLeish ex. 3 p.2; A209).

>    **9.  The Huge Number of Law Enforcement Officers Being Exposed to the**

**Hazardous Conditions at the Range.** In addition to the training of recruit Troopers and the

twice annual firearms qualifications for the 600+ active troopers (Foraker 64, 145; Aviola 23;

A696, 716,1675), numerous additional law enforcement agencies and individuals also were

exposed to the hazardous conditions at the range.  A partial list of  the agencies, groups and the

names of the many police officers who have trained there is in the record.  (See Price Inter. at

Ex.2; A2357-75).  It includes the FBI, Secret Service, numerous municipal agencies, as well as

young children and citizens as part of public outreach initiatives.  (Id.).[10]

>    **D.  Knowledge - Defendants Were Aware That Plaintiffs Were Speaking Out.**

MacLeish admits that he knew that plaintiffs were speaking out about problems at the range and

raising their concerns through the chain of command. (MacLeish 41-44,54-56, 122-23, 126, 131,

133, 143-44, 149; A103-04,107,124-26,129-30).  For example, within weeks of his return, on

December 19, 2003 Sgt. Foraker e-mailed MacLeish about "Emergency Range Issues," in which

he brought many of the problems at the FTU directly to MacLeish's attention.  (MacLeish ex. 11;

A226).  Additionally, MacLeish briefed Chaffinch on what he was hearing and learning.

(MacLeish 143-44, 152-53; Chaffinch 108-09,112-13,125-27; A129,131,452-53,456-57)

>    Plaintiffs also raised these health and safety issues directly with MacLeish in addition to

sending them up through the chain of command.  (W. Warren 130-40, 201-205; Price 102-

10,114-116; Foraker 54-56, 128, 141, 159, 166, 240-41, 253; MacLeish ex. 15; Price Inter. #14;

---

[10]  The record indicates that on a yearly basis, the total number of rounds fired as part of the
training given to Federal, State and Local law enforcement officers at the FTU was approximately
558,000.  (A2852-53).

A1422-24,1439-40,1286-89,694,712,715,720,722,785,788,233,2302-03).[11]  Indeed, MacLeish

was taken aback and surprised by the fact that at some meetings, all three of plaintiffs showed up

to try to get the problems addressed.  (Price 116; A1289).[12]

Both Capt. Davis and Capt. Warren also testified that they raised plaintiffs' concerns

directly with defendants.  (Davis 20-23; G. Warren 71-73,87,90-91,114-21,123,129-30, 136-37,

140-42,180-81,220; A488-89,1940,1944-45,1951-58,1967,1977).   As Capt. Davis testified,

health and safety concerns "of this magnitude absolutely would be sent through the chain of

command."  (Davis 21; A488).  Capt. Davis also wrote to Sgt. Foraker in response to an e-mail

about the serious problems caused by under-staffing, stating I "will continue to address your

concerns with the staff," meaning the Executive Staff which includes defendants.  (MacLeish ex.

12; Davis 22-23; A228,489).  Capt. Warren began to raise plaintiffs' concerns with MacLeish

within a week of Sgt. Foraker being reinstated to the FTU.  (G. Warren 72; A1940).  But he had

trouble getting MacLeish's attention as MacLeish kept avoiding him and cancelling their

meetings.  (G. Warren 81-84,105-06,115,220; A1942-43,1948-49,1951,1977).

**E.  The FTU is Shut Down in Because of Environmental Contamination.**  On March

19, 2004, the FTU was shut down because of environmental contamination.  (Compl.& Ans. ¶

35; A1629,1656).

**F.  The Disastrous Conditions at the FTU Attract Widespread Media Coverage.**

The disastrous conditions at the FTU attracted widespread media attention throughout the State

---

[11]  But as Sgt. Foraker explained, very often, MacLeish simply did not want to talk about the problems at the range.  He would say, "I'm not here for that."  (Foraker 56, 240-41; A694,785).  As Cpl. Price testified, MacLeish responded to him by saying that because they worked in a firing range, they should expect to have high levels of lead, copper and other toxins in their bloodstream and should expect to have hearing loss.  (Price 110,104; Foraker 139, 255, 258-59; G. Warren 171-73; A1288,1286,715, 788-89,1965).

[12]  Sgt. Foraker's performance evaluation for this time period also praises him for immediately bring these many problems to the attention of the Executive and Academy Staffs upon his return to the FTU. (A838-39).   He was praised for his "Distinguished" performance in this regard for "immediately identifying safety issues" that jeopardized the health and safety of all who trained there.  (A839).

of Delaware. (MacLeish ex. 17; Chaffinch ex. 3; Compl. & Ans. ¶ 37; MacLeish 151,157; Chaffinch 131; A131-32, 458,1630,1656,2639-41,2704-2800). As one local paper wrote, the FTU is "an embarrassing white elephant the state has tried to ignore." (A2712). Chaffinch admittedly "wasn't happy" that plaintiffs' speech about the conditions at the FTU caused the DSP to receive negative media attention. (Chaffinch 146, 144; A461-62). He wanted these negative stories to stop and felt plaintiffs were causing them. (Id.). Similarly, MacLeish also admittedly does not like any adverse media attention brought to bear on the DSP. (MacLeish 133-34; A1219-20). In Capt. Yeomans' words, MacLeish was "frustrated" and "upset" with plaintiffs. (A2021).

**G. Legislators Call for Hearings and Investigations.** Numerous state legislators also publicly called for legislative probes and other intervention. (See A2714-17,2719-22,2729-31, 2734-38).

**H. Plaintiffs Speak Out and Petition the State Auditor's Office.** Following immediately on the heels of the media and legislative attention, Governor Minner and members of the General Assembly asked the State Auditor's Office to investigate the problems at the FTU. (Compl. & Ans. ¶ 38; Price Inter. #5 p.19; MacLeish 154, 157; Price 142-43,153-55; G. Warren 214; A1630,1657,2284,2739-43, 132,1296,1298-99,1976). Plaintiffs at two interviews then spoke out to and petitioned the Auditors about the problems at the FTU.

**1. First Meeting.** On May 9, 2004, plaintiffs met with several investigators from the State Auditor's Office. (Price Inter. #5 p.19; Compl. & Ans. ¶ 39; W. Warren 211-225; Price 141-44; Foraker 272; A2284,2739-43,1630-31,1657,2801,2804,1442-45,1295-96,793). (1) They gave the investigators lengthy, detailed written statements that are in the record. (W. Warren 215-17; Price 144-47; Foraker 272; A2805-23,1443,1296-97,793). These statements addressed the many, many health and safety problems plaguing the FTU. (Id.). (2) They also spoke and gave the Auditor lengthy oral statements, answered many questions and explained the

FTU's many problems.  (See Price Inter. #5; Price 144-47; Foraker 272-73; A2284, 1296-97,793).  (3) They then gave the investigators a concise packet of documents, addressing many key facets of the long history of problems that had plagued the facility (Price 155; A2824-51, 1299).  (4) They also delivered 11 large volumes and binders of documentation, addressing: the long history of problems at the FTU, beginning in the early 1990s; irregularities in the bidding process; reports regarding the contaminated facility; correspondence from Facilities Management; innumerable e-mails and other reports related to the broken facility.  (See W. Warren 218-19; Price 142, 155; A2802-03, 1444, 1296,1299)

    **2. Second Meeting.**  Plaintiffs met with the Auditor a second time on July 28, 2004.  At this meeting, they continued to speak out, answer questions and address the many problems at the FTU.  (Price Inter. #16 p.39; Compl. & Ans. ¶ 39; Price 141-42, 157-61; Foraker 272; A2304,1630,1657,1295-96,1299-1300,793).

    **I. Knowledge - Defendants Were Aware that Plaintiffs Had Spoken to the Auditor.**

Defendants were aware that plaintiffs had spoken out to the Auditor.  (MacLeish 158-62; Chaffinch 131-34; Price 135-37; A133-34,458-59,1294).

    **J. Plaintiffs' Speech to the Auditor Attracts Even More Media Attention.**

Plaintiffs' speech to the Auditor also attracted widespread media attention, including front page headlines.  (Compl. & Ans. ¶ 42; A1631,1657, 2761-65,2757).  Chaffinch was admittedly unhappy that plaintiffs' speech resulted in the media running negative stories about the DSP. (Chaffinch 134-36, 145; A459,461).  In the same way, MacLeish was "dismayed" by the fact that plaintiffs had spoken to the Auditor and the media had reported on it. (MacLeish 162; A134).

    **K. Repeated Retaliation Against Plaintiffs.**

    **1. Falsely Blamed for Destroying the FTU.**  As discussed in the summary judgment brief being filed in the companion case, defendants first launched a local, national and international media campaign, falsely blaming plaintiffs for destroying the FTU.  As Major

Baylor testified, when Chaffinch publicly attacked the men, he understood that he was referring to the "whole group of individuals" at the range, including plaintiffs. (Baylor 389,391; A399). Plaintiffs certainly understood Chaffinch to be attacking them. (See, e.g. Price Inter. #3 p.10, 12, #17; A2275,2277,2305-06).

       **2. Other Adverse Action.**  See also the retaliatory actions described in the companion case in the opening brief at section **I** of the Facts therein.

       **3. Defendants Send Plaintiffs for Numerous Fitness for Duty Hearing Exams When All They Had Requested Was Blood Testing.**  In early 2004, after speaking out about the hazardous conditions at the FTU, plaintiffs sought blood testing to determine their levels of lead and other heavy metal exposure from working at the FTU.  Plaintiffs did not request hearing tests.   Yet the DSP sent them for hearing tests anyway, despite the fact that they were not requested.  (Price Inter. #12 p.36; Foraker Decl. ¶¶ 4-7; A2301, 2987).  If a trooper requested blood tests to address lead and heavy metal exposure, the DSP would not also send them for hearing tests.  As the 25 year former DSP Director of Personnel testified, if this was done, it would be "unusual."  (Dillman 149-151, 159, 157-58, 3-5,110-13; A2525-27,2535,2533-34,2379-81,2486-89).

       Subsequently, defendants continued and ordered them to undergo at least three unprecedented fitness for duty hearing exams to try to retire them.  (Compl. & Ans. ¶ 63-64; Foraker Decl. ¶3; A1636-37, 1661,2986).[13]  In fact, Sgt. Foraker was repeatedly cleared by DSP doctors, yet defendants continued to order him for more in order to find a pretext to retaliate against and get rid of him. In other words, Sgt. Foraker was repeatedly cleared and found to be fit for duty, yet defendants continued to send him for multiple additional fitness for duty exams because they were not happy with the answer they kept receiving. (Foraker 264-66; Foraker

---

[13]  The retaliatory use of fitness for duty exams by the DSP is already well-known in our District. See McKnatt v. State of Del., 369 F.Supp.2d 521, 523 (D.Del. 2004)  (noting the jury's finding that the DSP had sent an officer for a retaliatory fitness for duty exam).

Inter. #15; Foraker Decl. ¶ 10; A791,87-88,2988).[14]

4. **The DSP Historically Runs Away From Hearing Issues.**  The DSP does not have a policy, practice or custom of requiring Troopers to get their hearing regularly tested once they graduate from the Academy.  (Baylor 168-69; Yeomans 54,61-62; A281,2025-27).[15] The evidence reveals that the DSP has historically run away from hearing loss issues and avoids them at all costs out of fear that a large percentage of the Division will be found to have hearing loss. (Dillman 145; Dillman ex. 1; Foraker 136; A2521,2877,714).  It does not require physicians to even test hearing in annual physicals.  (Dillman 22,144; A2398,2520).  As Major Baylor testified, the DSP does not look into hearing issues - your family doctor simply had to check a box on the form, and the DSP would not look into it further.  (Baylor 38; Dillman ex.1; Dillman 143-44; A249, 2877, 2519-20).  As the former 25 year DSP Director of Personnel explained, "we stayed away from the [hearing] issue completely."  (Dillman ex. 1; Dillman 143-44; A2877, 2519-20).  DSP HR does not require looking into hearing issues.  (Baylor 167-69; A281).  In the present personnel director's words, "our hearing testing ... leaves a lot to be desired."  (Yeomans 60; A2026).  In addition to the DSP's fear that testing hearing would end up with a large number of injured officers, the Division also never could find any appropriate hearing standards on the topic, and this was another reason hearing loss was avoided.  (Dillman ex.1; Dillman 143-44; Yeomans 55-58; A2877, 2519-20, 2025-26).[16]

---

[14]  Defendants also withheld from examining physicians and others exculpatory medical records which could prevent the slanted results they were seeking.  (Price Inter. #20 p.42-43; A2307-08; see, e.g. A3880-82).

[15]  There has never been a requirement of the DSP "that you had to see their doctor or your family doctor to see if your hearing had been impaired from listening to the loud explosions" of weapon discharges. (Baylor  37; Dillman 145; A248,2521).  The DSP was afraid that otherwise "we could lose a whole bunch of people."  (Dillman 145; A2521).

[16]  An illustrative example in keeping with the DSP's aversion to hearing issues, is found in the medical records of plaintiff Cpl/3 Warren who received a hearing test on December 4, 2003.  The DSP's own doctor found that although he had some high frequency hearing loss, it was not sufficient to refer him to an audiologist or an ear specialist.  (A3883-84).  It was not until later, after he and his fellow plaintiffs spoke out about the hazardous conditions at the FTU that the DSP rushed to send them for

**5. Defendants Refuse to Accommodate Plaintiffs in Violation of their Long Established Practice.** Historically, the DSP always tries to accommodate any injured trooper by finding or creating a job within the Division in order to keep them on the payroll. (Baylor 85-86,105-06; Price 173-74, 191-92; Price Inter. #3 p.9; Dillman 47; A260-61,265-66,1303-04, 1308, 2274,2423). It is the "practice and custom" of the DSP "to try to take care of people who have been hurt on the job." (Baylor 85; A260). It is the "policy," "practice and custom" of the DSP "to try to avoid" a Trooper having to lose his job because of an on-the-job injury. (Baylor 86, 105-06; A261,265-66). An injured Trooper who can still perform a job can be placed in numerous available positions throughout the DSP aside from patrol. (Baylor 86; A261). Major Baylor listed dozens of such positions where Troopers with hearing injuries can be placed and accommodated. (Baylor 55-85, 118-19; A253,260,269). One of the factors in this decision to accommodate an injured trooper is where their specialties and expertise lies. (Dillman 161-62; A2537-38).[17]

**a. Troopers With Hearing Problems Always Are Accommodated.**
The DSP practice as to troopers with hearing loss bears this out. As its own medical records reveal, Major Joseph Forester had serious hearing problems from the time he was a corporal in 1980, yet he was accommodated for 20 years. Eventually, he simply wore hearing aids. The Superintendent told him that his hearing issues did not "create a problem" and he was never sent for a fitness for duty exam, never sent for a second or third opinion, and his police powers were never diminished. None of his hearing problems apparently interfered with his abilities to perform his particular duties. (Forester 66-100, 26-28,48-49,50,52-54,56-57,60-61; Forester ex.1; Dillman 169; Compl. & Ans. ¶ 69; A631-65,591-93,613-15, 617-19, 621-22, 625-26, 3600-

---

numerous fitness for duty exams and audiological testing.

[17] In fact, as Dillman testified, the FTU might be the best place to put an officer with hearing injuries because if appropriate hearing protection is used, the noise levels can be controlled. (Dillman 166; A2542).

17, 2545, 1637-38, 1661) (See Tab A and Sealed Appendix - A3600-18, 3620-21).[18] As numerous officers testified, even with the hearing aids, Forester still could not hear, yet the DSP never got rid of him.  (Baylor 87-96; Papili 25-26; A261-63, 1826-27).  In fact, very often his hearing aids shorted out on hot and humid Delaware days and would not work at all.  (Forester 82; A647).

MacLeish himself also testified about Cpl. John Powell and how this former artillery officer was nearly deaf.  "Every other word you said to him, he said huh."  He had serious hearing loss, but he was kept on the job anyway and not forced out like plaintiffs.  (MacLeish 172-73; A136).  Yet neither Forester nor Powell were ever placed on light duty, nor were their police powers suspended as defendants have done to plaintiffs.  Instead, they were accommodated.[19]

### b. Troopers With Other Physical Injuries Also Are Accommodated.

Additionally, the record reveals that numerous troopers with other injuries comparable to those of plaintiffs have been accommodated by the DSP and not forced out.

As the medical records summarized in Tab A and the Sealed Appendix explain (A3618, 3623-24, 3657-70), Sgt. Steve Swain was injured on the job in July 1983 as a result of a traffic accident.  He suffered severe vocal dysfunction, along with back and neck injuries.  As a result, he is unable to vocally articulate and communicate with others.  Yet the DSP has taken care of and accommodated him for 23 years - up to and including the present day - by placing him as an

---

[18]  Plaintiffs have prepared a summary/survey pursuant to Fed.R.Evid. 1006 that is attached at Tab A and also is in the appendix at A3618-19.  This two page document also serves as a table of contents to the summary survey contained in the sealed appendix at A3620-56.  This summary pulls together key portions of the voluminous medical records (A3657-3847) and deposition testimony regarding the accommodation comparators and the 2+ years of light duty comparators and further demonstrates how plaintiffs have been singled out and not accommodated in violation of DSP practice.

[19]  Plaintiffs simply want "to be accommodated as a lot of other troopers are in the [DSP] who have injuries." (W. Warren 196; A1438).  Plaintiffs want "the same treatment as other troopers" before them. (W. Warren 199; Price 173; A1439,1303).  This is what they have done "in the past.  They have set a precedent." (W. Warren 209; A1441).

Evidence Technician where he is able to work despite his vocal limitations and inability to communicate.  (W. Warren 199-200; Price 171; Baylor 158-59; Papili 76; Yeomans 154; A1439,1303,279,1839, 2050).

Similarly, Sgt. David Henderson also suffered from a severe and permanent back injury. He was accommodated and permitted to work as a supply officer, where his physical limitations would not put him in a position where he would have to make arrests.  (Yeomans 95-98; Baylor 117-19,313; A2035-36, 268, 340) (Tab A, Sealed Appendix - A3644).

**6.  Defendants Place Plaintiffs on Light Duty.**  Six weeks after they spoke to the Auditor, in a letter dated June 25, 2004, defendants placed plaintiffs Price and Warren on 50 weeks of light duty and they were ordered to separate from the Division one year later by June 10, 2005.  (MacLeish 195-97; Baylor 160-61; Baylor ex. 1-2; Price 189; W. Warren 206-07; Yeomans ex. 2-3; Yeomans 194,165, 169-70, 172, 184-85; A142,279,301-04,1307,1441,2100-02,2060, 2052-54, 2057).[20]  Ordering plaintiffs to retire when they have not had two years on light duty is "unusual."  (Baylor 169; A281).   Following several requests for short extensions, MacLeish then ordered that plaintiffs had to retire by August 10, 2005, 58 weeks later. (MacLeish 201-02; A143-44).

**7.  Defendants Send Plaintiffs Suspension Letters, Not Light Duty Letters.** MacLeish sent plaintiffs letters, ostensibly placing them on light duty.  (Baylor ex. 1-2; A).  But these letters are not the norm in the DSP.  (Dillman 170; A2546).  Plaintiffs were forbidden: from wearing their uniforms; from using their weapons; from preventing crimes in progress; and from exercising their police powers.  (Baylor ex. 1-2; W. Warren 207-08; A301-04, 1441).  In Major Baylor's words, these letters are "unusual."  (Baylor 151-52; A277).  Former Director of Personnel Dillman testified that these types of letters are not usually used to place a trooper on

---

[20]  Failure to follow such an order to retire can have grave consequences to a Trooper - such as jeopardizing their pension.  (Baylor 122-23; A270).

light duty. (Dillman 170; A2546). Many of these restrictions are ones that are imposed on troopers who are on "suspended status" for some type of wrongdoing, not those on light duty. (Baylor 146; A276; cf. A3702 - an example of such a suspension notification containing similar restrictions such as suspending an officer's police powers and taking away an officer's weapons, uniform and vehicle). This includes ordering plaintiffs to violate their oaths to protect and serve, ordering them not to use their divisional weapon and ordering them not to wear their uniforms. (Baylor 146-48; A276). When you are put on light duty, your arrest powers are never taken away from you nor do you lose your ability to carry a gun. (Baylor 144; A275). These letters are ordering the men "not to uphold [their] oath" that they took as police officers. (Baylor 147; A276). It is a very significant thing to relieve a police officer of his police powers, it is not a step "to be taken lightly." (Dillman 174-75; A2550-51). The letters are "totally in conflict" with their oaths as police officers. (Baylor 149; Dillman 171,174-76; A276, 2547,2550-52).[21] Dillman testified that in his 25 years of working as the DSP Director of Personnel, he could not ever remember suspending the police powers of an officer being placed on light duty for injuries. (Dillman 171; A2547).

**8. Defendants Violate their Historic Practice and Refuse to Give Plaintiffs Two Years of Light Duty.** It is the "practice" of the DSP to allow an injured Trooper who has been hurt on the job to have a light duty assignment for two years. (Baylor 107,162; A266,280). As the current DSP Director of Personnel explained, "[o]ur policy is that we can only keep officers in light duty capacity for two years." (Yeomans 191-99; Yeomans ex. 4; A2059-61, 2103-06). If plaintiffs were ordered to retire any time short of June 25, 2006, they would be treated differently from the way the DSP has treated innumerable officers in the past. (Baylor 161-62). MacLeish's order to plaintiffs to retire in August 2005 after only 58 weeks on light

---

[21] For example, as MacLeish admitted, if plaintiffs tried to help and protect a woman being raped by a gun-totting maniac, they would be in violation of his order. (MacLeish 200-01; Baylor 149; A143, 276).

duty is treatment much different from that of past Troopers. (Baylor 164-65; A280). Such an order is "highly unusual." (Baylor 165-166; A280-81). Such an order is not consistent with the "practices," "customs," or "policies" of the DSP. (Baylor 169; A2881).

### a. Troopers Are Always Given At Least Two Years of Light Duty.

As the medical records and deposition testimony summarized in Tab A and the Sealed Appendix make clear, after troopers are placed on light duty, they are always given at least two years regardless of whether they are on light duty because they have been injured on the job, or even because they have been charged with and convicted of serious crimes.

For example, in addition to the medical records summarized in Tab A, Major Baylor testified about Cpl/3 Bruce Peachey's injuries in great detail. Peachey was shot and injured in the line of duty in 2002. Within 2-3 months of his injury, it was apparent that he would not be able to recover and would never serve as a road trooper again. Yet the DSP, Chaffinch and MacLeish gave him two years of light duty, and accommodated him by giving him desk duties and later assigning him to the FTU so that he could get at least two years pay and benefits. (Baylor 98-107, 302-08; A264-66, 338-39).

Another illustrative example is that of Captain David Citro. He suffered permanent injuries to his back and neck in 1987 when he was a Corporal which left him with limited motion and he was entirely unable to even take the required trooper physical fitness tests. Yet he continued to serve and be promoted up through the ranks. (Baylor 126-32; Papili 50-51,61-64; Yeomans 115-16; Dillman 45-47,66-69,92-97; A271-72, 1833, 1835-36, 2040, 2421-23, 2442-45, 2468-73) (Sealed Appendix - A3633-34). Notably however, despite the fact that he was permanently disabled and unable to fulfill the requirements of trooper, he was not run out of the Division. Instead, "because our policy was to accommodate wherever we could," despite the fact that his injuries were "permanent" and he could no longer fulfill essential job functions, Capt. Citro was accommodated because he had "highly specialized skills that were very important to

the department" and his duties did not include the patrol function, much like plaintiffs in our present case.  (Dillman 45-47,66-69,92-97; A2421-23,2442-45,2468-73).  After serving for many years in the Division despite his injuries, he was finally placed on light duty in 2001, where he was kept for at least two years.  (Yeomans 115-16; Baylor 130; A2040, 272).[22]

### b. Defendants Refuse To Give Plaintiffs Two Years of Light Duty.

Yet despite this historic practice, defendants refused to give plaintiffs two years.  After being placed on light duty as described above, plaintiffs Price and Warren were ordered to leave the DSP after 50 weeks by June 10, 2005, as MacLeish swore to under oath in July 2005.  (MacLeish 195-97; Baylor ex. 1-2; Baylor 160-61; Price 174,189; W. Warren 206-07; Yeomans 194,165, 169-70,172,184-85; A142, 301-04, 279,1304,1307,1441,2060,2052-54,2057).  Following several requests for short extensions, MacLeish ordered that plaintiffs had to retire from the DSP after just 58 weeks by August 10, 2005.  (MacLeish 201-02; A143-44).

### c. MacLeish's Justification For His Refusal to Give Plaintiffs Two Years of Light Duty.  
MacLeish attempted to justify his refusal to give plaintiffs two years of light duty (1) because "their injury is permanent" and (2) "it cannot be accommodated." (MacLeish 202-03; A144).  Yet as discussed above, Major Baylor testified about innumerable jobs that plaintiffs could be placed into and accommodated where their hearing loss would not be an issue.  (Baylor 55-85, 118-19; A253-60, 269).  Moreover, as Mr. Dillman testified was an important factor in the favorable treatment Capt. Citro received, plaintiffs also have highly specialized job functions as expert firearms instructors, special skills in (1) firearms, (2) officer safety, and (3) force training.  (Dillman 45,67,69,94; A2421,2443,2445,2470; MacLeish ex. 11 p.1; A226). Like Capt. Citro, as a result of their specialized duties as firearms instructors and trainers, who also were not out on patrol, plaintiffs easily could have been accommodated.

---

[22]  Numerous additional comparators who received two years of light duty and/or were otherwise accommodated are summarized in Tab A and the Sealed Appendix.  (A3618-56).

Then, on the permanency issues, neither plaintiffs Price or Warren have hearing loss of the magnitude that it makes it impossible for them to work as police officers.  For example, Cpl. Price's own doctor who is a hearing specialist told him that he is not even a candidate for a hearing aid. (Price 139; A1295).  But more importantly, as discussed above from the testimony of Mr. Dillman, Capt. Yeomans and Major Baylor, the DSP does not have any standards when it comes to hearing ability.  So how can a determination of permanent injury be made when there is no baseline standard to explain the hearing abilities needed to perform specifics job functions within the DSP?

   **d.  Plaintiffs Back Defendants Off During Discovery and Plaintiffs Are Now in Limbo.**  As a result of the prosecution of this Court case and what discovery tellingly revealed as to the DSP's historic practice in this regard, on August 9, 2005, defendants suddenly reversed course, backed off and tentatively lifted the 58 week firing order, which had already inflicted so much emotional turmoil on plaintiffs and their families.  (Mr. Ellis 8/9/05 e-mail to Mr. S. Neuberger; Yeomans 218; A2703,2066).

   **9.  Defendants Violate their Historic Practice and Refuse to Let Plaintiffs Work Overtime While On Light Duty.**  Defendants also have ordered that plaintiffs are barred from working any overtime while on light duty, an order which has an enormous financial impact on plaintiffs and their families.  (W. Warren 225,227,223; A1445-46).  Yet review of the activity sheets and overtime records for other officers on light duty reveals that they have been permitted to work overtime, including paid overtime.  (A3885-93).

  **L.  Evidence of Causation.**

   **1.  Knowledge of the Protected Conduct.**  See sections **D** and **I** above.

   **2.  Demonstrated Anger, Hostility and Antagonism.**  Plaintiffs incorporate by reference the factual discussion in this regard in the companion brief.  Additionally, MacLeish admitted that the thinks that plaintiff Master Corporals Price and Warren , and Sgt. Foraker all

are a "real pain in the ass" for speaking out. (MacLeish 164-165; A134; <u>accord</u> Baylor 253;
A325). As discussed above, both Chaffinch and MacLeish were admittedly unhappy that
plaintiffs' speech caused the DSP to get back on the front pages of the newspapers in a negative
way.

Next, as Major Baylor testified, it was discussed among the defendants and the
Executive Staff that plaintiffs were being pulled out of the FTU and "decisions were muddied
over personal feelings more than what was actually taking place." (Baylor 170-72, 174, 46-47;
A282-83, 251). Plaintiffs "weren't being allowed to teach at the range because they had raised
some issues ... about the working conditions in the range and their own health." (Baylor 171;
A282).

MacLeish also told Cpl. Price that he was not going to "f-ck" him. (Price 127-28;
A1292). But since plaintiffs are highly trained police officers, the import of that comment was
clear. It was a "personal threat." It is "interrogation 101" that when someone makes a comment
denying an intent to do something like that, that is exactly what they are planning to do. (Price
129-30; Foraker 68-69; A1292-93,697).

Similarly, during at least one of plaintiffs' meetings with MacLeish to try to address
some of the many problems plaguing the FTU, Sgt. Foraker testified that it was clear from
MacLeish's body language that he was "visibly angered and frustrated" at them when he spoke
out and opposed MacLeish's stated position that plaintiffs should simply expect to and accept
having serious health problems as a result of their working at the FTU. (Foraker 256-57; <u>Price</u>
Inter. #14; A789, 2302-03).

   **3. Temporal Proximity.** As discussed above, within mere months of plaintiffs
long course of speaking out which began in December 2003 through mid-2004, they were
publicly blamed for destroying the FTU in April 2004. Then just six weeks after speaking to the
Auditor, they were sent for numerous retaliatory fitness for duty exams, they were placed on light

duty and ordered to retire in June 2005, and all their police powers revoked.

**4. Intentional Destruction of Evidence.** As discussed in greater detail in plaintiffs' sanctions brief that is being contemporaneously filed, despite the pendency of this litigation, defendants intentionally destroyed Chaffinch's computer hard drive to prevent plaintiffs from gaining access to the incriminating evidence it contained.

**5. Violations of Laws, Rules, Policies and Procedures.** As discussed above, and as revealed by the testimony of Major Baylor, John Dillman, and by the medical records, defendants have violated their long standing practices and procedures when it comes to accommodating injured Troopers - both those with hearing loss, as well as those who have sustained other types of injuries.

Similarly, the DSP Administrative Manual requires commanders to call troopers on light duty once a week, to check in on them and see how they and their families are holding up. (Baylor ex. 7 p.4; A391). Plaintiffs respectfully note that they are still waiting for any weekly calls of concern about they and their families' well being.

Lastly, Capt. Warren testified at length about how the chain of command in the DSP was completely altered and restructured in anticipation of Sgt. Foraker's December 1, 2003 reinstatement to the FTU. (G. Warren 33-44; A1930-33). "The superintendent changed the rules." (G. Warren 33-34; A1930-31). As he explained, both he and his lieutenant were brought back into the formal chain of command at that time because defendants Chaffinch and MacLeish did not want anything to do with Sgt. Foraker who as NCOIC would otherwise be directly reporting to them and the Executive Staff. (G. Warren 40-44; A1932-33).

**6. Disparate Treatment.** Again, as discussed above, plaintiffs have been singled out and treated differently from all other Troopers who have been injured in the history of the State Police. They have not been accommodated. They have not been given two years of light duty. Their police powers have been suspended. They are being run out of the division like

they have the plague.

**7. Pretext and Coverup.** Despite their repeated denials of retaliatory motive and intent, the record reveals that defendants are blatantly hostile towards officers who speak out against them and the DSP. Thus, as discussed in the companion case, defendants' denials of retaliatory intent can be disbelieved and instead, pretext and a coverup can be inferred as revealed by defendants hostility towards those members of the protected class - those who speak out.

**8. Falsehoods.** Defendants falsely accused Sgt. Foraker and his men of destroying the FTU, despite the overwhelming record evidence that the FTU was doomed since its very inception and has always been a hazardous place to work. Additionally, defendants claimed for a long time that plaintiffs were not entitled to two years of light duty. They claimed that DSP policy and practice dictated otherwise. But as discussed above, plaintiffs have demonstrated the falsity of such a claim. Moreover, defendants have claimed an overwhelming concern for the health and safety of plaintiffs because they worked at the FTU. Yet as discussed below, that concern rings hollow and is demonstrably false in light of the fact that defendants have never expressed any concern over the health and safety of any of the officers who served at the FTU in the past and were exposed to the same dangers as plaintiffs. Instead, it is only the plaintiff whistleblowers who are the 'targets' of defendants concerns.

**9. Selective Enforcement.** Additionally, as discussed above, defendants have selectively enforced numerous practices and policies against plaintiffs. For example, they have violated their long standing practice and policy and refused to accommodate and take care of plaintiffs. They have violated their practice of ignoring hearing problems. They have violated their practices regarding always giving injured Troopers two years of light duty.

**10. Underinclusiveness of a Proffered Reason.** Finally, MacLeish testified that he cares deeply about plaintiffs' health and safety, so much so that he worries about them and

takes them to bed with him every night.  (MacLeish 166, 186; A135,140).  He claims he was "especially concerned" about plaintiffs' "health and hearing" because they had served at the FTU which has had a "long history of problems" since its very inception.  (MacLeish 186, 40; A140, 103).  He claims that everything he has done to plaintiffs was done out of a deep concern for their health and general well-being and not out of retaliatory animus.  (Id.).  But his actions do not bear this out.  Despite his purportedly deep concern, as well as his present knowledge that working at the FTU is hazardous, he has never called or ordered that any of the many other officers who have served at the FTU for many years in the recent past be called or warned to have their health or hearing checked.  (MacLeish 186-92, 206-07; Yeomans 72-74; A140-41,145, 2029-30).  No one has ever inquired into the health or hearing of Sgt. Fitzpatrick, Sgt. Engler, Sgt. Parton, Cpl. Cathell, Cpl. Peachey, Sgt. Rhoades, Sgt. Ashley, or Lt. Bryson, despite the fact that all served at the FTU for many years.  (Id.; Price 31-33; A1268).  In fact, MacLeish was the best man in Lt. Bryson's wedding and yet has never said a word to him about this (MacLeish 105-06, 206-07; A119-20,145), and both Cpl. Cathell and Sgt. Ashley are close friends of Chaffinch, to whom MacLeish is proudly "joined at the hip." (MacLeish 189, 9,19; Chaffinch 13, 15-16; Foraker 42, 44-45; Seifert 40-42; Marcin 11; see G. Warren 53; A140,95,98,1068,1109-10, 958,1036,1935).  Yet no calls or inquiries have ever been made into their health - despite defendants belated claims to 'care deeply' about Troopers who have served at the FTU and be "proactive" on health issues.  (MacLeish 193, 166; A141,135).

## ARGUMENT

## I.    STANDARD OF REVIEW.

A motion for summary judgment shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998); Fed.R.Civ.P. 56(c).

**II.     PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED SPEECH BY SPEAKING OUT ABOUT THE PROBLEMS AT THE FTU, AND THAT SPEECH WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION AGAINST THEM.**

Public employee claims of retaliation for engaging in protected First Amendment activity are analyzed using a three-step process.  Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005); Springer v. Henry, -- F.3d --, 2006 WL 121942, *4 (3d Cir. Jan. 18, 2006).

**A.  Protected Activity.**  The protected status of speech is a question of law.  Hill, 411 F.3d at 127.

**1.  Matter of Public Concern.**  "An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'"  Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996).  This is determined by reference to the "content, form, and context of a given statement, as revealed by the whole record."  Connick v. Myers, 461 U.S. 138, 147-48 (1983).

**a.  Content**.

**(1).  Health Issues.**  In Brennan v. Norton, 350 F.3d 399, 415 (3d Cir. 2003), the Third Circuit was decidedly unimpressed by and flatly rejected an argument that speech addressing health risks in the work place did not touch on a matter of public concern because only public employees were affected.

> [W]e are not impressed by the "limitation" that "only" firefighters may be harmed by the presence of asbestos in the firestation . . . Residents of the Township clearly had an interest in knowing that their tax dollars were being spent on an asbestos contaminated firestation that endangered the health and lives of its firefighters.  *This is such a basic proposition that we need not belabor the point.*  Quite simply, the statements regarding exposure of public employees to hazards such as asbestos can be fairly considered as relating to a matter of concern to the community.

Id. at 415 (internal punctuation omitted) (emphasis added).  Similarly, as the District of Delaware recently held, speech relating to "the health of military personnel and the potential wrongdoing of military officials in allegedly administering tainted anthrax vaccines to military personnel as part of an experimental program ... are matters of public concern."  Adkins v. Rumsfeld, 389

F.Supp.2d 579, 586 (D.Del. 2005). The numerous health and safety issues raised by plaintiffs clearly fall within this and the following precedent.

In <u>McGreevy v. Stroup</u>, 413 F.3d 359 (3d Cir. 2005), the Third Circuit recently held that speech by a school nurse who, among other things, spoke out about unlicensed pesticide spraying that caused many students and teachers to become ill, "were matters of true public concern." <u>Id.</u> at 365. In <u>Watters v. City of Phila.</u>, 55 F.3d 886 (3d Cir. 1995), a civilian employee of the Philadelphia police department was terminated from his employment as manager of the Philadelphia Employee Assistance Program (EAP) after he made statements to a newspaper, expressing concern over the lack of formal policies in place for the EAP to fulfill its directive of providing stress management and psychological, drug and alcohol counseling services to officers. The Third Circuit held that Watter's speech was on a matter of public concern as the "public had a significant interest in learning about problems which may have impaired the effective functioning of the EAP and which, in turn, could have affected the delivery of police services." <u>Id.</u> at 895. It was observed that Watter's speech did not concern "day-to-day minutiae" but instead addressed "fundamental problems going to the heart" of the government service and thus addressed issues of "political, social, or other concern to the community." <u>Id.</u> at 894 (internal punctuation omitted). Analogously, speech by physicians and other professionals in the hospital setting critical of threats to safety, **<u>unsafe working conditions</u>** and similar problems are matters of undoubted public concern.[23]

   **(2). Mismanagement and Corruption.** Speech also may be of public concern when "the speaker seeks to 'bring to light actual or potential wrongdoing or breach of public trust' on the part of government officials." <u>Holder v. City of Allentown</u>, 987 F.2d 188, 195 (3d Cir. 1993). Plaintiffs' speech to the Auditors and up the chain of command

---

[23]  <u>See e.g.</u>, <u>Springer v. Henry</u>, 2002 WL 389136, *4 (D.Del. March 11, 2002); <u>Springer v. Henry</u>, -- F.3d --, 2006 WL 121942, *5 (3d Cir. Jan. 18, 2006).

about mismanagement and political cronyism that led to the building of a defective building that was injuring and poisoning those all those who worked and trained there is on a matter of public concern because plaintiffs "attempted to expose specific wrongs and abuses" within state government. Baldassare v. State of N.J., 250 F.3d 188, 196 (3d Cir. 2001) (internal punctuation omitted). It is well established that speech that seeks "to bring to light actual or potential wrongdoing or breach of the public trust" by public officials is of the utmost public concern. Id. at 197; accord id. at 196 ("Disclosing corruption, fraud and illegality in a government agency is a matter of significant public concern."). Accordingly, plaintiffs speech in this regard is clearly on a matter of public concern.

### b. Form and Context.

**(1). News Coverage.** Whether a particular issue receives news coverage also is relevant in determining the public import of speech.[24] In the Supreme Court's words, "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." City of San Diego v. Roe, 543 U.S. 77, 125 S.Ct. 521, 525-26 (2004) (per curiam). The widespread media coverage reports the FTU received are telling.

**(2). Legislative Concern.** Moreover, legislative interest may also be used to demonstrate the public value of speech. See Rode, 845 F.2d at 1201-02.

**(3). The Police Department Setting.** It also is well established that speech occurring in the police department setting raises the public's level of concern. See Caver v. City of Trenton, 420 F.3d 243, 256 n.11 (3d Cir. 2005).

**(4). Official Reports.** Furthermore, reports to officials or

---

[24] See, e.g. Pickering v. Bd. of Educ., 391 U.S. 563 (1968) (newspaper); O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir. 1989) (television); Holder, 987 F.2d 188 (newspaper); Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) (newspaper); Watters, 55 F.3d 886 (newspaper); Springer v. Henry, 2002 WL 389136 (D.Del. March 11, 2002) (newspaper).

bodies in appropriate positions to redress the subject matter of the speech, such as the State

Auditor, has been found to be protected.  See Zamboni v. Stamler, 847 F.2d 73, 78 (3d Cir.

1988); Czurlanis v. Albanese, 721 F.2d 98, 104 (3d Cir. 1983).

 **(5).  Internal Nature of the Speech.**  It has long been

recognized that speech that is raised internally and not publicly also is protected.  See Monsanto

v. Quinn, 674 F.2d 990, 994 (3d Cir. 1982); Givhan v. Western Line Consol. Sch. Dist., 439 U.S.

410, 415-16 (1979).

 **(6).  Motive.**  Plaintiffs' noble motives to protect the thousands

of law enforcement officers being exposed to the hazardous conditions at the range also are a

relevant consideration.  See Brennan, 350 F.3d at 413.

 **2.  Balancing of Interests.**  Second, the trial court must next balance the

interests of the government as an employer in promoting the effective and efficient fulfillment of

its public responsibilities against the public employee's interest as a citizen in speaking out on

matters of public concern and the value to the community at large of being free to hear such

speech.  Azzaro v. County of Allegheny, 110 F.3d 968, 980 (3d Cir. 1997) (en banc).  The burden

is on the employer here to make a "substantial showing."  Waters v. Churchill, 511 U.S. 611, 674

(1994) (plurality opinion); Watters v. City of Phila., 55 F.3d at 816.

 "The more tightly the First Amendment embraces the speech the more vigorous a

showing of disruption must be made."  McGreevy, 413 F.3d at 365 (internal punctuation

omitted).  As the Supreme Court has warned, "[v]igilance is necessary to ensure that public

employers do not use authority over employees to silence discourse, not because it hampers

public functions but simply because superiors disagree with the content of employees' speech."

Rankin v. McPherson, 483 U.S. 378, 384 (1987).

 Importantly however, "[t]his balancing test comes into play only if the public employer

concedes that it dismissed an employee because of the employee's protected speech but contends

that it was justified in doing so." San Filippo v. Bongiovanni, 30 F.3d 424, 434 n.11 (3d Cir. 1994) (emphasis added).[25]  If the employer denies that it dismissed the employee because of his protected speech, the balancing test "has no application." Id.  Accordingly, because defendants flatly deny that they retaliated against plaintiffs because of their speech, the balancing test "has no application." Id.  Consequently, plaintiffs' speech is protected by the First Amendment.

    **B.  Substantial or Motivating Factor.**  Following the determination that his conduct was constitutionally protected, plaintiff must demonstrate that this conduct was a "substantial" or "motivating factor" in the relevant decision.  Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000); Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). "But for" causation is not needed. Suppan, 203 F.3d at 236.  "'Substantial factor' does not mean 'dominant' or 'primary' factor." Hill, 411 F.3d at 126 n.11.  Instead, a plaintiff need only show that his protected First Amendment rights "played any substantial role in the relevant decision." Suppan, 203 F.3d at 236; see Miller v. Cigna, Corp., 47 F.3d 586, 597 n.9 (3d Cir. 1995) (en banc) ("played a role" in the adverse decision).  This is a question of fact. Hill, 411 F.3d at 127.  As discussed at section **K** and **L** of the Facts above, the record is overflowing with evidence more than sufficient to meet plaintiff's burden.

    **1.  Knowledge of Protected Conduct.**  Sufficient evidence must be produced to demonstrate that the defendants knew of the protected activity.  Keenan v. City of Phila., 983 F.2d 459, 466 (3d Cir. 1992).  Here, as discussed above, all defendants were aware of the fact that plaintiffs were speaking out.

    **2.  Demonstrated Anger, Hostility and Antagonism.**  "[A] plaintiff [also] can establish a link between his or her protected behavior and subsequent discharge if the employer

---

    [25]  Accord Howard v. Bd. of Educ. of City of East Orange, 90 Fed.Appx. 571, 575 n.6 (3d Cir. 2003); Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387, 399, 399 (M.D.Pa. 2003); Mitchell v. Street, 2005 WL 1993774, *2 n.5 (E.D.Pa. Aug. 16, 2005); Bedford v. SEPTA, 867 F.Supp. 288, 295 n.8 (E.D.Pa. 1994).

engaged in a pattern of antagonism in the intervening period." Woodson v. Scott Paper Co., 109

F.3d 913, 920-21 (3d Cir. 1997); accord Adkins, 389 F.Supp.2d at 586. For example, evidence

that a defendant is "irritated" or otherwise angered by a plaintiff can be compelling evidence of

causation. See Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005) (defendant "irritated" by

protected conduct). Even "a significant delay between the expressive activity and the retaliation

[will] not preclude finding the required nexus where there is evidence of continuing hostility to

connect events that would not otherwise appear to be related to each other." Brennan, 350 F.3d

at 420. See Facts at section **L.2.** above.

   **3. Temporal Proximity.** Temporal proximity "is an obvious method by which

a plaintiff can proffer circumstantial evidence sufficient to raise the inference that [his] protected

activity was the likely reason for the adverse action." Kachmar v. Sungard Data Sys., Inc., 109

F.3d 173, 177 (3d Cir. 1997) (internal punctuation omitted). When a plaintiff engages in a

pattern of protected activity and is

> dismissed shortly after the final episode of such protected activity, a fact-finder may
> reasonably infer that it was the aggregate of the protected activities that led to retaliatory
> dismissal. This inference would be particularly strong if the plaintiff can show that the
> decision maker lacked a pretext on which to dismiss the plaintiff until shortly before the
> time of dismissal.

San Filippo, 30 F.3d at 444. Here, plaintiffs were retaliated both during and mere weeks after

they spoke out to the Auditors and up the chain of command. See Facts at section **L.3.** above.

   **4. Violations of Law, Policies and Procedures.** Violations of laws, rules

policies and procedures also are proof of wrongdoing. See Village of Arlington Heights v.

Metropolitan Hous. Develop. Corp., 429 U.S. 252, 267 (1977); Stewart v. Rutgers, the State

Univ., 120 F.3d 426, 434 (3d Cir. 1997); Bray v. Marriott Hotels, 110 F.3d 986, 992, 994 (3d Cir.

1997). Here, defendants have materially violated numerous DSP practices and policies when it

comes to taking care of and accommodating injured Troopers, and on another level, giving all

such Troopers two years of light duty.

**5. Disparate Treatment.** Similarly, evidence of disparate treatment also can demonstrate causation. San Filippo, 30 F.3d at 444; Brennan, 350 F.3d at 421; Adkins, 389 F.Supp.2d at 586. Such evidence of singling out abounds on our record.

**6. Selective Enforcement.** The state simply may not selectively enforce a statute or rule to punish an individual for exercising his First Amendment rights. See Cox v. Louisiana, 379 U.S. 536, 557-558 (1965); Holder, 987 F.2d at 197-99; Hill, 411 F.3d at 131-32. As just discussed, defendants have selectively enforced rules, policies and practices when it comes to taking care of injured troopers.

**7. Pretext and Coverup.** Pretextual explanations by a defendant also are proof of causation. Feldman v. Phila. Hous. Auth., 43 F.3d 823, 831 (3d Cir. 1994); Adkins, 389 F.Supp.2d at 586. This is because "[r]esort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct." Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1069 (3d Cir. 1996) (en banc). Pretext evidence is abundant on our record as discussed above and in the companion case.

**8. Falsehoods.** As the Supreme Court has held, it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000). "We routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful [retaliation]." Sheridan, 100 F.3d at 1069. Record evidence is overwhelming in this regard. See Facts at **L.8.** above.

**9. Intentional Destruction of Key Evidence.** As the Third Circuit has explained, a party's destruction of evidence is evidence of guilt and illegal conduct. Id. As explained in great detail in plaintiff's destruction of evidence sanctions brief that is being contemporaneously filed, defendants destroyed defendant Chaffinch's entire work hard drive to

-34-

deny plaintiffs access to key evidence contained therein.

**10. Underinclusiveness of a Proffered Reason.** Underinclusiveness of a proffered reason for an adverse action also can demonstrate retaliation. The Third Circuit has most recently applied this concept in Hill, 411 F.3d at 127-130. In Hill, several police officers claimed that the city was enforcing a residency ordinance against them in retaliation for the filing of an earlier lawsuit. The Third Circuit observed that "[t]he officers' strongest evidence suggests that several non-resident employees who did not participate in the 1997 lawsuit were not terminated despite the city's knowledge or unrebutted suspicions that they lived outside the city." Id. at 127; see id. at 128-130 (discussing some of the specifics of the comparators who were treated differently). And despite even the forced retirement of one of the comparators, the Court found "the fact that the city delayed enforcing the ordinance against him for over a year nonetheless supports the officers' position." Id. at 129 n.16. As to other comparators, the Court found the city's failure to reasonably investigate their suspicions to be probative. Id. at 129-130. In our present case, as discussed in the Facts at **L.10.** above, defendants professed reason for sending plaintiffs for numerous fitness for duty exams reveals too much. The only individuals defendants have sent for such exams are plaintiffs who spoke out. They have not sent, warned or even contacted any of the numerous other officers who served at the same hazardous facility in the past.

**11. The Big Picture.** "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not only on individual incidents, but on the overall scenario." Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990). The big picture in our case makes clear that defendants illicitly sought to destroy plaintiffs because they had exposed the conditions at the FTU and spoke to the Auditor about the government mismanagement that was endangering the health and safety of law enforcement officers and others.

**12. Summary.** Thus, in light of the overwhelming record evidence discussed above, it is clear that plaintiffs' speech about problems at the FTU and speech to the Auditors, <u>at the very least</u> "played a substantial role" in the retaliation against them. As a matter of law, due to the overwhelming antagonism and disparate treatment evidence, no reasonable jury could conclude otherwise.

**C. Same Decision Anyway Affirmative Defense.** The burden of proof then "shifts to the defendant to show 'by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.'" <u>Nicholas v. Pa. State Univ.</u>, 227 F.3d 133, 144 (3d Cir. 2000). This last step is an "affirmative defense" to be met by the defendants <u>id.</u>,[26] and also is a question of fact. <u>Hill</u>, 411 F.3d at 127.

But defendants failed to plead this affirmative defense in their Answer to the Complaint as required under the Federal Rules, <u>see</u> Fed.R.Civ.P. 8(c) (a party must plead any "matter constituting an avoidance or affirmative defense"), so no discovery was needed on this issue. Accordingly, it has been waived and plaintiff seeks such a ruling from the Court at this time. <u>See Charpentier v. Godsil</u>, 937 F.2d 859, 863 (3d Cir. 1991) (noting the general rule that "[f]ailure to raise an affirmative defense by response pleading or by appropriate motion generally results in the waiver of that defense.") (internal footnotes omitted).

Accordingly, summary judgment should be granted for plaintiffs on their First Amendment free speech count. They have clearly engaged in protected conduct. As a matter of law, in light of the overwhelming record evidence, their speech has certainly played a role in the unprecedented retaliation that occurred. Lastly, because defendants chose not to assert their affirmative defense, liability has been established and all that is needed is a trial on damages.

---

[26] Accord <u>Vazquez-Valentin v. Santiago-Diaz</u>, 385 F.3d 23, 30 (1st Cir. 2004); <u>Adler v. Pataki</u>, 185 F.3d 35, 47 (2d Cir. 1999); <u>Brady v. Fort Bend County</u>, 145 F.3d 691, 712 (5th Cir. 1998); <u>Ostad v. Oregon Health Sciences Univ.</u>, 327 F.3d 876, 885 (9th Cir. 2003); <u>Stanley v. City of Dalton, Georgia</u>, 219 F.3d 1280, 1292 (11th Cir. 2000); <u>Yalowizer v. Town of Ranchester, Wyoming</u>, 18 Fed.Appx. 745, 754 (10th Cir. 2001) (all noting that this <u>Mt. Healthy</u> prong is an affirmative defense).

III.    **PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES AND THEIR PETITIONING WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION AGAINST THEM.**

A.  **The Big Picture.**  The First Amendment protects the "right to petition the Government for a redress of grievances."  U.S. Const., Amend. I.  "The right to petition the government for grievances is a fundamental component of a just and orderly society."  Anderson v. Davila, 125 F.3d 148, 164 (3d Cir. 1997).  "[W]hen one files a 'petition' one is addressing [the] government and asking government to fix what ... government has broken or has failed in its duty to repair."  San Filippo, 30 F.3d at 442.  "[T]he values in the right of petition as an important aspect of self-government are beyond question."  McDonald v. Smith, 472 U.S. 479, 483 (1985).  The right to petition "is implicit in the very idea of government, republican in form."  Id. at 482 (internal punctuation omitted).  The "fundamental importance of the right to petition [is] as a check against the government's abuse of power."  Anderson, 125 F.3d at 162.

"The historical roots of the Petition Clause long antedate the Constitution," McDonald, 472 U.S. at 482; see also Bieregu v. Reno, 59 F.3d 1445, 1453 (3d Cir. 1995) (overruled on other grounds by Lewis v. Casey, 518 U.S. 343 (1996)) (observing that the independent pedigree of the Petition Clause goes back to colonial times).  It is even "more ancient than -- the freedoms of speech and press." Bieregu, 59 F.3d at 1453.  The Petition Clause "was not intended to be a dead letter - or a graceful but redundant appendage" to the rest of the First Amendment clauses.  San Filippo, 30 F.3d at 442.  Instead, it ranks "among the most precious of the liberties safeguarded by the Bill of Rights" and is "intimately connected, both in origin and purpose with the other First Amendment rights of free speech and free press."  United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967).  "All these, though not identical, are inseparable."  Id. (quoting Thomas v. Collins, 323 U.S. 516, 530 (1945)).  The "right to petition is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular freedom of expression."  McDonald, 472 U.S. at 482.  As stated above, "when one files a

'petition' one is addressing [the] government and asking government to fix what ... [it] has broken or has failed in its duty to repair.," San Filippo, 30 F.3d at 442.

**B. The Activities Protected.** "For decades, the Supreme Court has consistently recognized the right to petition all branches of the government ... for redress of grievances as among the most precious of the liberties safeguarded by the Bill of Rights." Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004) (internal punctuation and citation omitted). "[T]he right to petition extends to all departments of Government." Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972). It extends to "administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government." Id.; see also id. at 513 (noting that a party "ha[s] the right of access to the agencies and courts"). The petitions at issue in Cal. Motor Transport, were addressed to state and federal agencies. Id. at 511. As the Third Circuit has recognized, the right of citizens to petition the Executive branch dates back to William Blackstone and continues and finds its origins in the Magna Carta. See San Filippo, 30 F.3d at 443 and n.22, 23. Plaintiffs need not belabor this point, but it is clear that their petitions to the State Auditors Office and to State government about the hazardous conditions at the FTU and the causes of those conditions clearly are protected.

**C. The Specifics.** The protected status of petition is a matter of law. Hill, 411 F.3d at 127. Like free speech claims, petition clause claims also are analyzed using the same three-part protected activity analysis. Id. at 125. Importantly, the protected activity analysis under the petition clause is different than that under the free speech clause in that there is no disruption balancing nor is there a public concern analysis. Instead, matters of purely private concern are protected, as long as the petition is not a sham. Hill, 411 F.3d at 126; San Filippo, 30 F.3d at 440, 443; We, Inc., v. City of Phila., 174 F.3d 322, 330 n.2 (3d Cir. 1999); Brennan, 350 F.3d at 417; see San Filippo, 30 F.3d at 434-43. As the Circuit stated in Brennan, a plaintiff need only

show that their petition "was not frivolous in order to make out a prima facie claim for retaliation under the Petition Clause." 350 F.3d at 417.  The government simply may not retaliate against those who petition it as such a result "is hardly consistent with the fundamental principles of orderly protest, which our Constitution sought to preserve by protecting our right [to] petition the government for redress."  Anderson, 125 F.3d at 163. And as the factual record set forth above demonstrates, plaintiffs' petitioning of the State to fix what was broken at the FTU and petitioning of the Auditor about the broken FTU and the mismanagement and corruption that doomed the facility were clearly not a sham.  Thus, they are protected by the petition clause.

**D.  Substantial or Motivating Factor and Same Decision Anyway.**  Plaintiffs incorporate by reference their analysis discussed in the free speech argument above as to these two causal factors.  As a result, summary judgment should be granted for them.

## CONCLUSION

For the above stated reasons, the Court should grant summary judgment for plaintiffs on liability for their First Amendment speech and petition clause counts and order a trial on damages alone.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

-39-

**MARTIN D. HAVERLY, ATTORNEY AT LAW**

/s/ Martin D. Haverly
**MARTIN D. HAVERLY, ESQ. (#3295)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Dated: January 25, 2006              Attorneys for Plaintiff

-40-

# Tab A

FED.R.EVID. 1006 SUMMARY ANALYSIS OF DOCUMENTS AND TESTIMONY OF DISPARATE TREATMENT COMPARATORS

Major Joseph Forester – permanent bilateral hearing loss completely accommodated for 20 years, under Col. Simpson through Col. Ellingsworth, ending in 2000.

Corporal John Powell – severe hearing injuries from years in the artillery. Accommodated and permitted to continue to work despite his inability to hear.

Sgt. Steve Swain – permanent vocal dysfunction completely accommodated for 22 years, under Col. Simpson through Col. MacLeish currently in 2005.

Cpl. Bruce H. Peachey, Jr. – permanently damaged left ankle, received two years light duty from Col. Chaffinch ending in 2004.

Lt. Robert Schlifer – permanent neurological injury and left arm injury which was accommodated for two years on a light duty list under Col. Chaffinch until 2004.

Cpl. Scott Warner – back injuries placed him on and off light duty for more than three years through 2004 under Col. Chaffinch.

Cpl. Jerome A. Loveless – permanent back injury, received two years light duty under Col. Pepper and Lt. Col. Chaffinch ending in 2001.

Cpl. William R. Merritt – anxiety and major depression, suspended with full pay for two years under Col. Pepper and Col. Chaffinch ending in 2002.

Capt. David Citro – permanent back/neck injuries starting at the rank of Corporal, accommodated under Col. Pepper and Col. Chaffinch until 2003 when light duty status ended.

Lt. Jeff David – stroke, received two years light duty while he recovered, under Col. Chaffinch ending in January 2005.

Cpl. Anthony DiAllesandro – lung transplant candidate accommodated with light duty beginning in 2005 under Col. Chaffinch who will possibly be kept on light duty beyond two years.

Sgt. Shawn Nowrey – permanent back injury, received two years of light duty under Col. Chaffinch ending in 2004.

Cpl. Everett Jackson – permanent back injury, accommodated with desk duty for almost 2.5 years under Col. Pepper, and Lt. Col. Chaffinch, ending in 2001.

Sgt. James Romanelli – permanent leg injury and accommodated with two years of light duty under Col. Pepper and Lt. Col. Chaffinch.

Sgt. Jahn Hitchens – permanent back injury, accommodated with at least two years of light duty,  under Col. Ellingsworth  ending in 1999.

Sgt. David Henderson – severe back injury which was accommodated throughout his career as a supply officer until retirement in the late 1990s.

Cpl. Michael Jordan – undefined injury which was accommodated with a court liaison officer assignment in the mid-1990s under Col. Ellingsworth.

Cpl. Christine Price – permanent back injury which was accommodated with two years light duty ending in 1995.

Cpl. Bo Sarley – severe back injury which was accommodated with two years of light duty in the mid 1990s.

Cpl. James Mosley – permanent neck/back injury, accommodated with at least three years of light duty, under Col. Graviet ending in 1993.

Cpl. Joseph Condron – permanent knee injury, accommodated with 10 years of light duty, under Col. Cochran, Col. Simpson and Col. Graviet, ending in 1993.

Lt. Paul G. Sczubelek – post traumatic cervical and lumbar strain and stress, accommodated for six years, under Col. Graviet, ending in 1993.

Trooper Randy Armistead – severe head injuries which were accommodated with two years of light duty status off the job until 1988.

# Unreported Opinions

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Robert J. MITCHELL, Plaintiff,
v.
Mayor John F. STREET and The City of Philadelphia, Defendants.
**No. Civ.A. 04-3213.**

Aug. 16, 2005.

James E. Beasley, William T. Hill, The Beasley Firm, Philadelphia, PA, for Plaintiff.
Shelley R. Smith, City of Philadelphia Law Department, Philadelphia, PA, for Defendants.

MEMORANDUM

KELLY, J.

I. *INTRODUCTION*

***1** Presently pending before this Court is the Defendants', Mayor John F. Street ("Mayor Street") and the City of Philadelphia, Motion for Summary Judgment. On July 7, 2004, Mitchell filed his Complaint with this Court. Mitchell's Complaint contains three counts. Specifically, the counts are: Violation of the First & Fourteenth Amendment and 42 U.S.C. § 1983 (Count I); Violation of Article I, Section I, of the Pennsylvania Constitution (Count II); and Violation of Article I, Section XI, of the Pennsylvania Constitution (Count III). Defendants have moved for summary judgment on all three counts. For the following reasons, Defendants' Motion is denied. However, as will be explained in *infra* Part IV.B, Counts II and III of the Complaint will be dismissed without prejudice.

II. *BACKGROUND*

Plaintiff, Robert J. Mitchell ("Mitchell") is the former Deputy Police Commissioner for the City of Philadelphia. Mitchell held that title from 1996 until 2004. In early 2004, a rumor began to circulate that Mitchell had obtained an illegal gun permit. In late February, 2004, the media picked up the story and reported that Mitchell allegedly possessed an illegal gun permit. Initially, Police Commissioner Sylvester Johnson ("Johnson") announced his support for Mitchell at a press conference on February 26, 2004. That same day, Mayor Street called a meeting to discuss the gun permit issue. Present at this meeting were Mayor Street, Johnson, Mitchell, Mayor Street's Chief of Staff Joyce Wilkerson ("Wilkerson"), Communications Director Barbara Grant ("Grant") and Police Counsel Karen Simmons, Esquire ("Simmons"). At the meeting, Mitchell denied any wrongdoing with respect to the gun permit. The parties dispute the actual outcome of this meeting as it related to Mitchell's continued employment, however, what is certain is that on February 27, 2004, at a press conference, Mayor Street stated that Mitchell would be taking a leave of absence from his position as Deputy Police Commissioner. An investigation then commenced into the gun permit issue.

On March 11, 2004, Mitchell filed a complaint in Equity with the Court of Common Pleas of Philadelphia County. The complaint sought to enjoin Mayor Street and the City of Philadelphia from removing him from his post as Deputy Police Commissioner pending the results of the investigation regarding the gun permit. FN1

FN1. That complaint was dismissed as moot by the Court of Common Pleas on June 11, 2004. (*See* Defs.' Mot. Summ. J. Ex. E).

On May 26, 2004, Philadelphia District Attorney Lynne Abraham announced the results of her investigation into the gun permit issue. The District Attorney concluded that Mitchell had engaged in no wrongdoing whatsoever.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

On May 27, 2004, Mitchell appeared on the Michael Smerconish ("Smerconish") radio program. [FN2] During this appearance, Smerconish and Mitchell discussed the District Attorney's public announcement regarding the gun permit issue and her findings that Mitchell engaged in no wrongdoing. On June 1, 2004, Mitchell received a letter from Johnson terminating his employment. Mitchell subsequently filed his Complaint with this Court approximately one month later.

> FN2. Mitchell previously appeared on the Smerconish show on March 4, 2004 after the announcement by Street that Mitchell was suspended from his position as Deputy Police Commissioner.

### III. *STANDARD*

**\*2** "Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.' " *Hines v. Consol. Rail Corp.,* 926 F.2d 262, 267 (3d Cir.1991) (citations omitted). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. [FN3] *Big Apple BMW, Inc. v. BMW of N. Am. Inc.,* 974 F.2d 1358, 1362 (3d Cir.1992). Once the moving party has produced evidence in support of summary judgment, the non-movant must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates there is a genuine issue of fact for trial. *Id.* at 1362-63. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> FN3. "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.' " *Compton v. Nat'l League of Prof'l Baseball Clubs,* 995 F.Supp. 554, 561 n. 14 (E.D.Pa.1998) (citations omitted), *aff'd,* 172 F.3d 40 (3d Cir.1998).

### IV. *DISCUSSION*

Defendants have moved for summary judgment on all three counts. Under Count I, Defendants assert that no genuine issue of material fact exists regarding Plaintiff's claim for retaliation under both his First Amendment right to free speech and his right to petition. Second, under Counts II and III, Defendants assert that there is no cause of action for damages under the Pennsylvania Constitution. Finally, Mayor Street asserts he is shielded from liability based upon the doctrine of qualified immunity. These arguments will be considered in turn. [FN4]

> FN4. The Defendants do not contest that the Plaintiff has met the threshold for there to be municipal liability under *Monell v. Dep't of Social Servs. of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, I will not engage in a discussion of this issue.

### A. COUNT I

Count I actually contains two separate causes of action. First, Mitchell asserts that the Defendants retaliated against him and terminated his employment based upon the filing of his equity complaint with the Court of Common Pleas of Philadelphia County. Mitchell asserts this violated his right to petition the government for a redress of grievances. Additionally, Mitchell asserts that he was fired in retaliation for exercising his free speech rights by appearing on the Smerconish radio program. The parties are in agreement as to the elements that make up both of these claims. Both claims require the following three-step analysis:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[f]irst, plaintiff must show that he engaged in a protected activity. Second, plaintiff must show that the protected activity was a substantial factor motivating the dismissal decision. Finally, defendant may defeat plaintiff's claim by demonstrating that the same action would have taken place even in the absence of the protected conduct.

*San Filippo v. Bongiovanni,* 30 F.3d 424, 430 (3d Cir.1994) (citations omitted). [FN5] I will consider these elements as they relate to Plaintiff's right to petition and free speech causes of action.

> FN5. As set out in *San Filippo,* "a public employer may dismiss an employee for speech addressing a matter of public concern if the state's interest, as an employer, in promoting the efficiency of its operations outweighs the employee's interest, as a citizen, in commenting upon matters of public concern." 30 F.3d at 434 n. 11 (citation omitted). However, "[t]his balancing test comes into play only if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so." *Id.; see also, Dennison v. Pa. Dep't of Corr.,* 268 F.Supp.2d 387, 399 (M.D.Pa.2003). The Defendants deny that they fired Mitchell because of his allegedly protected speech so as to deem the balancing test inapplicable. Furthermore, neither party asserts that the balancing test should be utilized in this case.

### 1. Protected Activity

**\*3** The first step requires this Court to consider whether Mitchell engaged in a protected activity under his right to petition and free speech claims. As to his right to petition, Defendants concede that the filing of Mitchell's equity complaint with the Court of Common Pleas of Philadelphia County was a protected activity. However, Defendants vigorously contest that Mitchell engaged in any protected activity under his free speech claim.

The United States Court of Appeals for the Third Circuit ("Third Circuit") has noted that in a claim for retaliatory discharge from government employment, the plaintiff "must establish that the conduct which triggered the discharge was protected under the first amendment." *San Filippo,* 30 F.3d at 434. Specifically: [w]here the alleged retaliation is based on expressive conduct constituting speech, a court must first determine whether or not the speech can be fairly characterized as addressing a 'matter of public concern,' for a governmental employee who makes public comments about problems not of 'public concern' has no first amendment immunity against employer discipline.

*Id.* "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community." *Baldassare v. N.J.,* 250 F.3d 188, 195 (3d Cir.2001)(internal quotation marks and citation omitted). Thus, a court must focus on the "content, form, and context of the activity in question." *Id.* (citing *Connick v. Myers,* 461 U.S. 138, 147-48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Watters v. City of Phila.,* 55 F.3d 886, 892 (3d Cir.1995)). Furthermore, "[t]he content of the speech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Id.* (internal quotation marks and citations omitted). Determining whether the public employee's speech involved a matter of public concern is a question of law for the court. *Id.* (citing *Watters,* 511 U.S. at 668; *Green v. Phila. Hous. Auth.,* 105 F.3d 882, 885 (3d Cir.1997)).

The parties dispute whether Mitchell's appearance on the Smerconish radio program to discuss the gun permit issue and the District Attorney's findings constituted a matter of public concern. Defendants assert that this case is similar to *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708, and that I should therefore find as a matter of law that Mitchell's speech did not involve a matter of "public concern." However, for the following reasons, I find that *Connick* is distinguishable from the instant case.

In *Connick,* the plaintiff, Shiela Myers ("Myers"), was

employed as an Assistant District Attorney in New Orleans for five and one half years. *461 U.S. at 140*. Myers was informed that she would be transferred to prosecute cases in a different section of the criminal court. *Id.* Myers opposed this transfer and she then "prepared a questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141. She then distributed the questionnaire to her co-workers the next day. *Id.* Later that day, Myers was terminated by Harry Connick ("Connick") the District Attorney for Orleans Parish for refusing the transfer. Myers brought suit under *42 U.S.C. § 1983*, asserting that she was wrongfully terminated because she had exercised her constitutionally protected right to free speech by distributing the questionnaire. *Id.*

**\*4** The United States Supreme Court ("Supreme Court") noted that practically all of Myers questions did "not fall under the rubric of matters of 'public concern.' " *Id.* at 145. The Supreme Court noted that the questionnaire did not seek to inform the public that the District Attorney's office was discharging its governmental responsibilities in the investigation or prosecution of criminal cases in an improper manner nor did the questionnaire seek to bring to light actual or potential wrongdoing on the part of Connick or others. *Id.* The Supreme Court continued by noting that the questions posed by Myers reflected her dissatisfaction with her transfer and her "attempt to turn that displeasure into a cause celebre." *Id.*

Unlike the majority of the questions posed in *Connick,* however, I find that the issues discussed on the Smerconish radio program did involve matters of public concern. Unlike *Connick,* the gun permit issue involved possible illegal activity and corruption on the part of a high ranking government official, namely Mitchell. As previously noted, the courts have stated that matters of public concern can include attempts to bring to light actual or potential wrongdoing on the part of government officials. *See Baldassare,* 250 F.3d at 195 (citations omitted). Thus, it follows that the discussion on the Smerconish radio program regarding the District

Attorney's investigation and findings regarding the possible wrongdoing and/or illegality of how Mitchell received the gun permit involved matters of "public concern." The instant case goes beyond the intra-office dissatisfaction in *Connick* since there is the additional element of potential wrongdoing/illegality that brought the gun permit issue to the forefront of the pubic sphere in the first place. Therefore, as Mitchell's appearance on the Smerconish radio program involved a matter of "public concern," Mitchell engaged in a protected activity under the law.

### 2. Substantial Factor Motiving the Dismissal

The next step in the analysis is to determine whether Mitchell's protected activities were a substantial factor which motivated the decision to terminate Mitchell's employment. The Defendants assert that Mitchell cannot satisfy this element. The Plaintiff asserts that he can survive summary judgment with respect to this element by discrediting the Defendants' reasons for his termination. For the following reasons, I agree with Plaintiff's position.

To survive summary judgment, "a plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) (citations omitted). In this case, Mitchell attempts to discredit the Defendants reason for his termination. [FN6]

> **FN6.** While *Fuentes* was a Title VII case, courts have noted that "[p]retext analysis used in Title VII cases is also useful in deciding First Amendment retaliation claims." *Cavicchia v. Phila. Hous. Auth.,* No. 03-0116, 2003 WL 22595210, at *9 n. 2 (E.D.Pa. Nov.7, 2003),* aff'd, 2005 WL 1506038 (3d Cir. June 27, 2005)(non-precedential)(citing *Azzaro v. County of Allegheny,* 110 F.3d 968, 981 (3d Cir.1997)(en banc); *Feldman v. Phila.*

*Hous. Auth.,* 43 F.3d 823, 831 (3d Cir.1994); *Zappan v. Pa. Bd. of Prob. & Parole,* No. 00-1409, 2002 WL 32174230, at *11 (E.D.Pa. Nov.25, 2002); *Rodriguez v. Torres,* 60 F.Supp.2d 334, 340 n. 2 (D.N.J.1999) *Fogarty v. Boles,* 938 F.Supp. 292, 299 n. 4 (E.D.Pa.1996), *aff'd,* 121 F.3d 886 (3d Cir.1997)).

**\*5** The Defendants assert that the decision to fire Mitchell was made at the February 26, 2004 meeting. Thus, it is the Defendants' position that Mitchell could not be retaliated against for his protected activities because the decision to fire him occurred before any of the protected activities occurred. However, I find that there are factual inconsistencies in the record that would allow a reasonable fact finder to find Defendants' proffered reason unworthy of credence. *See Fuentes,* 32 F.3d at 765 (citations and footnote omitted). For example, the Defendants assert that the decision to fire Mitchell was made at the February 26, 2004 meeting. This meeting was called to discuss the gun permit issue. No party suggests that budgetary concerns were discussed at this meeting as it related to Mitchell's further employment as Deputy Police Commissioner. Yet, Johnson's press conference on June 1, 2004 detailing Mitchell's termination and the corresponding news coverage explains that Mitchell was fired for budgetary reasons. (*See* Pl.'s Resp. Defs.' Mot. Summ. J., Ex. O). This and other inconsistencies in the record discredit Defendants' proffered theory of Mitchell's termination enough so as to create material issues of fact as to this element. [FN7]

> **FN7.** Additionally, with respect to the free speech retaliation claim, the Third Circuit has noted that the temporal proximity between the employee's protected activity and the adverse employment action "is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997)(internal quotation marks and citations omitted). In this case, Mitchell

appeared on the Smerconish radio program and was terminated less than one week later. It is worth noting, however, that Mitchell's termination was also soon after the District Attorney made her findings with respect to the gun permit issue.

### 3. Same Action Would have been Taken Absent the Protected Activity

Defendants do not address this third element of Plaintiff's right to petition and free speech claims. Therefore, I find it unnecessary to address it in the context of deciding Defendants' Summary Judgment Motion. As there are material issues of fact remaining as to all three elements of Plaintiff's right to petition and free speech retaliation claims, I find summary judgment is inappropriate as it relates to Count I of Mitchell's Complaint.

### B. COUNTS II AND III

Counts II and III seek money damages under the Pennsylvania Constitution, Article I, Section I and Article I, Section XI respectively. The Defendants assert that summary judgment should be granted in their favor because Plaintiff cannot maintain a cause of action under the Pennsylvania Constitution for money damages. For the following reasons, based upon the discretion given to me as stated under 28 U.S.C. § 1367(c)(1), I will decline to exercise supplemental jurisdiction over these two counts and dismiss them without prejudice.

Section 1367(c)(1) states that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if the claim raises a novel or complex issue of state law." As one court in this District has recently noted, "[t]he question of whether there exists a 'right of action for money damages against government officials of the Pennsylvania Constitution' is unclear." *Gremo v. Karlin,* 363 F.Supp.2d 771, 794 (E.D.Pa.2005)(quoting *Robbins v. Cumberland County Children & Youth Serv.,* 802 A.2d 1239, 1251 (Pa.Cmwlth.Ct.2002)); *compare Erdman v. Mitchell,* 207 Pa. 79, 90-91, 56 A. 327, 331 (1903)(holding that there is a right of action

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 6
Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

for injunctive relief under the first article of the Pennsylvania Constitution); *Harley v. Schuylkill County*, 476 F.Supp. 191, 195-96 (E.D.Pa.1979)(extending *Erdman* to apply to claims for damages); *Jones v. City of Phila.*, 68 Pa. D. & C.4th 47, 68-75 (writing in support of its determination that Article I of the Pennsylvania Constitution is self-executing and permits private parties to seek civil remedies for constitutional violations); *with Millar v. Windsor Township*, No. 04-2529, 2005 WL 1513120, at *3-4 (M.D.Pa. June 24, 2005)(stating that there is a dearth of case law on the issue and declining to exercise jurisdiction over the state constitutional claims because deference to the state appellate courts is appropriate); *Tillman v. Alonso*, No. 04-4391, 2005 WL 1311588, at *5-6 (E.D.Pa. May 31, 2005)(explaining the uncertainty of the state of the law on the issue of bringing a state constitutional claim under Article I and declining to exercise jurisdiction over state constitutional claims because of this uncertainty); *Mulgrew v. Fumo*, No. 03-5039, 2004 WL 1699368, at *2-4 (E.D.Pa. July 29, 2004)(explaining that the issue of whether a direct right of action under Article I of the Pennsylvania Constitution is unclear and declining to exercise supplemental jurisdiction over these state constitutional claims).

**\*6** In light of the unclear state of the law on Mitchell's state constitutional claims, I find that the most appropriate course of action in this particular case is to decline supplemental jurisdiction over Counts II and III of the Complaint pursuant to 28 U.S.C. 1368(c)(1). [FN8] Therefore, Counts II and III will be dismissed without prejudice.

FN8. This decision is particularly prudent in light of the fact that it appears that the issue of "whether a cause of action for money damages arises under the state constitution is an issue currently pending before the Commonwealth Court of Pennsylvania." *Millar*, 2005 WL 1513120, at *3 n. 5 (citing *City of Phila. v. Jones*, No. 795-CD-2004 (Pa. Commw. Ct. filed Apr. 19 2004). "Argument was heard by the [Commonwealth] court *en banc* on June 8, 2005." *Id.*

## C. QUALIFIED IMMUNITY

Finally, Defendant Mayor Street asserts that he is entitled to qualified immunity. "Qualified immunity is available to government officials performing discretionary functions." *Lodato v. Ortiz*, 314 F.Supp.2d 379, 385-86 (D.N.J.2004)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 816, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818 (citing *Procunier v. Navarette*, 434 U.S. 555, 565, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)). A court required to rule upon the qualified immunity issue must consider ... this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [government official's] conduct violated a constitutional right? This must be the initial inquiry.... If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties's submissions, the next, sequential step is to ask whether the right was clearly established.

*Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)(internal citation omitted).

Regarding the first part of the qualified immunity test, as set out in *supra* Part IV.A., I have found that Mitchell has alleged a violation of his constitutional rights to be free from retaliation for filing his equity complaint and for speaking out on a matter of public concern. Therefore, the first part of overcoming Mayor Street's qualified immunity has been satisfied by Mitchell.

Next, I note that the Defendants do not attempt to make any type of argument as to the second part of the qualified immunity test. Specifically, the Defendants sole argument with respect to qualified immunity is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 7
Slip Copy, 2005 WL 1993774 (E.D.Pa.)
**(Cite as: Slip Copy)**

that, "[b]ecause the plaintiff cannot establish that his constitutional rights were violated, Defendant Mayor Street is entitled to qualified immunity, and, therefore, judgment in his favor." (Mem. Law. Supp. Defs.' Mot. Summ. J., at 11). Thus, Mayor Street does not attempt to contest that both of these rights were clearly established at the time he acted. However, it is clear that both of these rights were established at the time Mayor Street acted. See *Watters,* 55 F.3d at 891 (stating that "it is essential that public employees be able to speak out freely on questions of public concern without fear of retaliatory dismissal.... Judicial vigilance is required to ensure that public employers do not use their authority to silence discourse on matters of public concern simply because they disagree with the content of the employee's speech.") (citations omitted); *San Filippo,* 30 F.3d at 441-443 ("The mere act of filing a non-sham petition is not a constitutionally permissible ground for discharge of a public employee."); *Bennis v. Gable,* 823 F.2d 723, 733 (3d Cir.1987)(stating that the law was clearly established that a public employee could not be retaliated against for exercising his rights under the First Amendment). Thus, I find Defendant Mayor Street shall not be entitled to qualified immunity.

### V. *CONCLUSION*

**\*7** In conclusion, I find that summary judgment is improper as to Count I of the Complaint. I find that material issues of fact remain in Mitchell's claims for retaliation under the First Amendment's free speech and right to petition clauses. Additionally, I conclude that because Counts II and III raise novel and complex issues of state law, I will decline supplemental jurisdiction over these state constitutional claims and dismiss them without prejudice. Finally, I have concluded that Defendant Mayor Street is not entitled to qualified immunity.

An appropriate Order follows.

### ORDER

AND NOW, this 16th day of August, 2005, upon

consideration of the Defendants' Motion for Summary Judgment (Doc. No. 11), and the Response and Replies thereto, it is hereby ORDERED that:
1. the Motion is DENIED; and
2. Counts II and III of the Complaint are DISMISSED WITHOUT PREJUDICE.

E.D.Pa.,2005.
Mitchell v. Street
Slip Copy, 2005 WL 1993774 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2150103 (Trial Motion, Memorandum and Affidavit) Order (Jul. 12, 2005)
• 2:04cv03213 (Docket) (Jul. 07, 2004)
• 2:04cv01110 (Docket) (Mar. 15, 2004)
• 2004 WL 2695311 (Trial Pleading) Complaint (2004)

END OF DOCUMENT



--- F.3d ----
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States Court of Appeals,Third Circuit.
David T. SPRINGER, M.D.
v.
Renata J. HENRY, individually and in her official
capacity as Director of the Division of Alcoholism,
Drug Abuse and Mental Health of the Department of
Health and Social Services of the State of Delaware;
Gregg C. Sylvester, M.D., in his official capacity as
Secretary of the Department of Health and Social
Services of the State of Delaware; Delaware
Department of Health & Social Services Appellant.
**No. 04-4124.**

Argued Oct. 26, 2005.
Jan. 18, 2006.

**Background:** Psychiatrist who worked as independent
contractor at state mental hospital brought action
against state official, alleging that his contract was not
renewed in retaliation for his memoranda criticizing
state of care at the hospital. The United States District
Court for the District of Delaware, Gregory M. Sleet,
entered judgment on jury verdict in favor of
psychiatrist, and officials appealed.

**Holdings:** The Court of Appeals, Sloviter, Circuit
Judge, held that:

6(1) plaintiff's memoranda addressed matters of public
concern and thus contained protected speech under the
First Amendment;

8(2) official was not entitled to qualified immunity;

10(3) whether plaintiff's contract would have been
renewed but for his memoranda, so as to support award
of economic damages, was question of fact for jury; and

14(4) evidence was sufficient to support of award of

punitive damages.

Affirmed.

**[1] Federal Civil Procedure 170A ⟲2339**

170A Federal Civil Procedure
    170AXVI New Trial
        170AXVI(B) Grounds
            170Ak2338 Verdict or Findings Contrary to
Law or Evidence
                170Ak2339 k. Weight of Evidence. Most
Cited Cases
New trial should be granted only where the great weight
of the evidence cuts against the verdict and where a
miscarriage of justice would result if the verdict were to
stand.

**[2] Constitutional Law 92 ⟲90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and
Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public Employment.
Most Cited Cases
Public employee who files a claim of retaliation for
engaging in protected First Amendment activity must
first demonstrate that he engaged in protected activity,
i.e. speech that addresses a matter of public concern;
court then employs the balancing test to determine
whether employee's interest in the speech outweighs the
state's countervailing interest as an employer in
promoting workplace efficiency and avoiding
workplace disruption. U.S.C.A. Const.Amend. 1.

**[3] Civil Rights 78 ⟲1405**

78 Civil Rights
    78III Federal Remedies in General

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 2
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

78k1400 Presumptions, Inferences, and Burdens of Proof
78k1405 k. Employment Practices. Most Cited Cases

**Constitutional Law 92 ⊂⇒82(11)**

92 Constitutional Law
  92V Personal, Civil and Political Rights
    92k82 Constitutional Guaranties in General
      92k82(6) Particular Rights, Limitations, and Applications
        92k82(11) k. Public Employees; Military Personnel. Most Cited Cases
Public employee who files a claim of retaliation for engaging in protected First Amendment activity must prove that the protected activity was a substantial or motivating factor in the allegedly retaliatory action; thereafter, the burden shifts to the employer to demonstrate that the allegedly retaliatory action would have been taken absent the protected conduct. U.S.C.A. Const.Amend. 1.

Public employee who files a claim of retaliation for engaging in protected First Amendment activity must prove that the protected activity was a substantial or motivating factor in the allegedly retaliatory action; thereafter, the burden shifts to the employer to demonstrate that the allegedly retaliatory action would have been taken absent the protected conduct. U.S.C.A. Const.Amend. 1.

**[4] Constitutional Law 92 ⊂⇒45**

92 Constitutional Law
  92II Construction, Operation, and Enforcement of Constitutional Provisions
    92k44 Determination of Constitutional Questions
      92k45 k. Judicial Authority and Duty in General. Most Cited Cases
Whether an employee's speech is protected under the First Amendment is a question of law. U.S.C.A. Const.Amend. 1.

**[5] Constitutional Law 92 ⊂⇒90.1(1)**

92 Constitutional Law

92V Personal, Civil and Political Rights
  92k90 Freedom of Speech and of the Press
    92k90.1 Particular Expressions and Limitations
      92k90.1(1) k. In General. Most Cited Cases
First Amendment's protection of an employee's right to speak on matters of public concern extends to independent contractors. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law 92 ⊂⇒90.1(1)**

92 Constitutional Law
  92V Personal, Civil and Political Rights
    92k90 Freedom of Speech and of the Press
      92k90.1 Particular Expressions and Limitations
        92k90.1(1) k. In General. Most Cited Cases

**Health 198H ⊂⇒275**

198H Health
  198HI Regulation in General
    198HI(C) Institutions and Facilities
      198Hk268 Staff Privileges and Peer Review
        198Hk275 k. Actions and Judicial Review. Most Cited Cases
Five memoranda prepared by psychiatrist who worked at state mental facility as independent contractor, raising concerns on the state of healthcare at the facility, addressed matters of public concern and thus contained protected speech under the First Amendment. U.S.C.A. Const.Amend. 1.

Five memoranda prepared by psychiatrist who worked at state mental facility as independent contractor, raising concerns on the state of healthcare at the facility, addressed matters of public concern and thus contained protected speech under the First Amendment. U.S.C.A. Const.Amend. 1.

**[7] Constitutional Law 92 ⊂⇒90.1(1)**

92 Constitutional Law
  92V Personal, Civil and Political Rights
    92k90 Freedom of Speech and of the Press

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 3
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

92k90.1 Particular Expressions and Limitations
92k90.1(1) k. In General. Most Cited Cases

**Health 198H ☞275**

198H Health
198HI Regulation in General
198HI(C) Institutions and Facilities
198Hk268 Staff Privileges and Peer Review
198Hk275 k. Actions and Judicial Review. Most Cited Cases
Statements of psychiatrist employed as independent contractor at state mental hospital, that the hospital hired an unlicensed physician to work there, were not made recklessly, so as to preclude First Amendment free speech protection; physician had been granted temporary credentials to work at the hospital, but was not independently licensed. U.S.C.A. Const.Amend. 1.

Statements of psychiatrist employed as independent contractor at state mental hospital, that the hospital hired an unlicensed physician to work there, were not made recklessly, so as to preclude First Amendment free speech protection; physician had been granted temporary credentials to work at the hospital, but was not independently licensed. U.S.C.A. Const.Amend. 1.

**[8] Civil Rights 78 ☞1376(3)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(3) k. States and Territories and Their Officers and Agencies. Most Cited Cases
State official responsible for operation of state mental hospital was not entitled to qualified immunity with regard to violation of First Amendment free speech rights occurring when she failed to renew contract of psychiatrist who worked at hospital as independent contractor, allegedly in retaliation for his memoranda raising concerns on state of care at the facility; although official relied on new state bidding requirements when she did not renew the contract, she did not send

non-renewal letters to other independent contractor physicians, and provided no plausible reason for her targeting of the physiatrist. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ☞1376(3)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(3) k. States and Territories and Their Officers and Agencies. Most Cited Cases
In determining whether state official is entitled to qualified immunity, court should ask whether the official acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

**[10] Civil Rights 78 ☞1431**

78 Civil Rights
78III Federal Remedies in General
78k1425 Questions of Law or Fact
78k1431 k. Other Particular Cases and Contexts. Most Cited Cases
Whether contract of psychiatrist at state mental hospital would have been renewed but for his memoranda criticizing state of healthcare at the hospital, so as to support award of economic damages, was question of fact for jury in psychiatrist's § 1983 action arising when his contract was not renew in alleged retaliation for exercising his First Amendment free speech rights. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[11] Federal Civil Procedure 170A ☞2127**

170A Federal Civil Procedure
170AXV Trial
170AXV(F) Taking Case or Question from Jury
170AXV(F)1 In General
170Ak2126 Determination
170Ak2127 k. Construction of Evidence. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 4
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

**Federal Civil Procedure 170A ☞2609**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(E) Notwithstanding Verdict
         170Ak2608 Evidence
            170Ak2609 k. Construction of Evidence.
Most Cited Cases
On a motion for judgment as a matter of law, a district court must disregard all evidence favorable to the moving party that the jury is not required to believe. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[12] Damages 115 ☞91.5(1)**

115 Damages
   115V Exemplary Damages
      115k91.5 Grounds for Exemplary Damages
         115k91.5(1) k. In General. Most Cited Cases
Jury may award punitive damages when it finds reckless, callous, intentional or malicious conduct.

**[13] Damages 115 ☞91.5(1)**

115 Damages
   115V Exemplary Damages
      115k91.5 Grounds for Exemplary Damages
         115k91.5(1) k. In General. Most Cited Cases
To support award of punitive damages, defendant's conduct must be, at a minimum, reckless or callous; punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard.

**[14] Civil Rights 78 ☞1465(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1458 Monetary Relief in General
         78k1465 Exemplary or Punitive Damages
            78k1465(1) k. In General. Most Cited Cases
Evidence that psychiatrist at state mental hospital was the only independent contractor physician whose contract was non-renewed after he wrote memoranda criticizing state of healthcare there, received

non-renewal notice only two days before proposal deadline, was not given extension that would have allowed him sufficient time to fill out requisite 30 page application form, and that state official that operated hospital was unhappy and unset with psychiatrist was sufficient to support of award of punitive damages in official's § 1983 action against the official. 42 U.S.C.A. § 1983.

On Appeal from the United States District Court for the District of Delaware, (D.C. No. 00-cv-00885), District Judge: Honorable Gregory M. Sleet.

Phebe S. Young (Argued), Marc P. Niedzielski, Department of Justice, Wilmington, DE, for Appellant.

Thomas S. Neuberger (Argued), Stephen J. Neuberger, Wilmington, DE, for Appellee.

Andrew L. Schlafly, New York, NY, for Amicus-Appellee Association of American Physicians and Surgeons, Inc.

Before SLOVITER, FISHER, and GREENBERG, Circuit Judges.

OPINION OF THE COURT

SLOVITER, Circuit Judge.
**\*1** The case before us can be viewed on two levels. On one level, we have an appeal by an employer from an adverse verdict in favor of an employee (here independent contractor) on his claim of unlawful termination in retaliation for speech protected by the First Amendment. On the other level, the amicus curiae, the Association of American Physicians and Surgeons, argues that the issue transcends the relationship between the parties and instead impacts thousands of patients damaged as a result of hospital errors, incompetence, wrongdoing, and cover-ups. On either level, our task is to review the law applied by the District Court on a plenary basis and ascertain whether there is sufficient evidence to support the jury verdict.

I.

The Appellant (defendant in the District Court), Renata

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                              Page 5
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

Henry, has been the Director of the Division of Alcoholism, Drug Abuse, and Mental Health ("Division"), the division of the State of Delaware's Department of Health and Social Services ("DHSS") responsible for the Delaware Psychiatric Center ("DPC" or "Center") since July 1, 1999. Dr. Gregg Sylvester was the Secretary of DHSS from October, 1997 through January, 2001, the time period at issue here.

Plaintiff/Appellee, Dr. David T. Springer, a psychiatrist, was an independent contractor at the DPC from July 1, 1991 until June 30, 2000 pursuant to nine successive one-year contracts. Although each contract specified that Dr. Springer could be terminated without cause upon fifteen days' notice, and none of the contracts guaranteed renewal, at the end of each contract year Dr. Springer received and signed a proposed contract for the following year.

Each of Dr. Springer's yearly contracts since July 1, 1996 specified his duties as "[t]o provide psychiatric services to patients at Delaware Psychiatric Center." App. at 1431. The parties agree that in practice Dr. Springer also served as the director of the DPC psychiatric residency training program from 1993 until 2000, the elected president and the chairperson of its Medical Staff Executive Committee from 1999 to 2000, and a member of its credentials committee from 1993 to 2000.

In a series of five memoranda dated from October 21, 1999, to January 26, 2000, Dr. Springer voiced his critical opinions on matters relating to the policies, procedures and administration of the DPC. These were introduced into evidence at trial as Plaintiff's Exhibits PX-1 through 5. Other physicians, medical residents, and staff members signed onto these memoranda. We summarize them below but because they are central to the issues before us they are included verbatim in the Appendix to this opinion.

PX 1, a memorandum dated October 21, 1999 entitled "Concerns about Delaware Psychiatric Center," contains a long list of inadequacies on patient care and safety issues. App. at 1384. It describes the DPC as failing in the task of treating psychiatric patients with high quality care in a respectful and safe environment. The memorandum charges that there was "gross understaffing of the hospital;" that experienced psychiatrists had left because "they declined to compromise the patient care and safety;" that security was poor; that members of the staff had subjected patients to demeaning comments; that patients had complained of being physically abused; that "the patient units lack[ed] discipline due to lack of training provided to the aides and technicians;" and that "[s]taff [was] afraid to speak out on issues affecting patient care and safety." App. at 1384-86. In the final paragraph, the memorandum states that as "hospital administration has shown lack of concern over this it is time that these issues were put in front of legislature and electorate of Delaware whose family members come here for treatment and whose tax money is put into work." App. at 1387. Although the memorandum was signed by 11 psychiatric residents, Dr Springer conceded that he helped to edit the language of PX 1. The memorandum shows copies going to Governor Carper, the Secretary of Health & Social Services Sylvester, the Hospital Director Simono, the Medical Director Dr. Smayer, the Training Director Dr. Springer, Senators of Delaware, the DHCC, the Department of Public Safety, and the News Journal, and there was testimony that it was handed to Governor Carper during one of his visits to the hospital.

**\*2** PX 2, a memorandum dated November 23, 1999 (just one month after the earlier memorandum), from Dr. Springer, in his capacity as president of the DPC Medical Staff Executive Committee and co-signed by five other physicians, is captioned "Critical Issues in the Care of the Mentally Ill in Delaware" and is addressed to the DPC Governing Body.App. at 1388. It summarizes the earlier "plea for help" for the beleaguered program previously outlined by the DPC medical residents, and, in Dr. Springer's own words, "was basically a plea to the Governor, the hospital director, Ms. Henry, and other people." App. at 780. It states, inter alia, that "the capacity of DPC to provide [Delaware citizens with severe and/or long term mental illness] with treatment is deteriorating and facing collapse as of July 2000." App. at 1388.

The third memorandum, PX 3, is dated December 2,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                      Page 6
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

1999, less than two weeks later, and was written by Dr. Springer on behalf of the DPC Medical Staff Executive Committee. Dr. Springer testified that it was handed to a Medicare reviewer who was on campus "in hopes that the Medicare folks would help us in terms of some of the concerns that we had with patients." App. at 784-85. It was signed by four physicians in addition to Dr. Springer, and, in its own words, sought to bring attention to the unresolved issues at DPC, and "proposed actions that may begin us on the road to protecting and preserving patient care and safety." App. at 1390. The solutions proposed were to "Address Safety Issues as Soon as Possible;" "Fix Understaffing/Personnel Issues as Soon as Possible;" and "Increase Physicians' Authority to Ensure Quality and Safe Patient Care." *Id.*

PX 4, dated December 16, 1999, two weeks later, was written by Dr. Springer, in his capacity as President of the DPC Medical Staff, and Psychiatric Residency Training Director, and is addressed to the DPC Governing Body Members and consists of a proposed agenda for the December 22, 1999 Governing Body Meeting. That agenda lists some of the areas that the medical staff believed needed to be addressed under the headings "Need for a Psychiatric Residency Program at DPC," "Need to Attract and Retain Dedicated and Qualified Teaching Attendings" and "Contingency Plans." App. at 1392-93. Under the latter heading, the proposal urges that "if a decision is made to close the residency program, the current residents should be given the option of completing their entire training at DPC." App. at 1393.

The fifth memorandum, PX 5, was Dr. Springer's report to the DPC Governing Body, entitled "Medical Staff President Report to the Governing Body Meeting of January 26, 2000." App. at 1394. The evidence reflects that it was not presented until the March 21, 2000 DPC meeting. The Report summarized the issues of concern affecting patient care at DPC that the Medical Staff Executive Committee Officers proposed be addressed by the Governing Body. The Report stated that "[t]he most glaring issue at hand is that the DPC medical staff is now in open disagreement with the hospital administration about how the patients should be treated." App. at 1400. It notes, inter alia, that "the

situation has deteriorated to the point that physicians are essentially being asked to practice medicine at below their own minimum ethical standards on a routine basis" and lists "New Concerns Around Patient Care, Credentialling [sic] and Liability Issues for DPC." *Id.* It also discusses "New Patient Care Issue," "Ethical Issues," and "Continued Concerns Around Patient Care and Safety." App. at 1400-04. PX 5 additionally contains the two statements that Henry argues are "falsities" that allegedly deprive the communications of their First Amendment protection-one that she describes as alleging Medicare fraud and the other referring to an applicant as "unlicensed." Those statements will be discussed at length hereafter.

**\*3** On May 12, 2000, less than two months after Dr. Springer's presentation of the fifth memorandum, Henry notified Dr. Springer by letter that his contract at DPC would not be renewed upon its expiration on June 30, 2000, and that the Division would be publishing Requests for Proposals (RFP), to which Dr. Springer was "free to respond." App. at 1405.

Delaware state law had changed in 1996 to require that contracts for professional services exceeding $50,000 per year, such as those under which Dr. Springer worked, be awarded through a process of public bidding. 29 Del.Code Ann. tit. 29, §§ 6913, 6981 (2005). Dr. Sylvester instructed his Division Directors, including Henry, in accordance with these changes. Since May, 1999, the Division has published Requests for Proposals for the provision of psychiatric services to various Division programs, including the DPC. Dr. Springer did not respond to any of those Requests for Proposals.

It is Dr. Springer's position that he was the only physician whose contract was not renewed before or during the year 2000, ostensibly because of the new state requirement. Although Henry relies on this 1996 state law revision as one of the bases for non-renewal of Dr. Springer's contract, she produced no evidence that she had sent any such notice to anyone else. [FN1]

On October 6, 2000, Dr. Springer initiated the instant action under 42 U.S.C. § 1983, seeking monetary damages and injunctive relief [FN2] for the non-renewal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 7
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
(Cite as: --- F.3d ----)

of his contract, claiming that said non-renewal constituted retaliation for his engagement in speech protected under the First Amendment. On November 9, 2001, Henry moved for summary judgment. She argued that Springer's speech was not protected because it addressed his personal concerns, it was disruptive, he would have been terminated because he failed to bid for renewal, he suffered no damages, and that Henry was entitled to qualified immunity. Dr. Springer moved for partial summary judgment on the ground that his speech was protected by the First Amendment, and argued that Henry was not entitled to qualified immunity because his First Amendment right was clearly established.

In a Memorandum and Order entered March 12, 2002 (the "March Order"), the District Court denied Henry's motion for summary judgment and granted Dr. Springer's motion. The Court held that (1) Dr. Springer's "speech was protected under the First Amendment" because "[t]he content of Springer's speech clearly addressed a matter of public concern" and (2) Henry "is not entitled to qualified immunity" because "Springer's right to engage in speech was clearly established at the time he was terminated," and there were no facts to show that Springer's comments had any disruptive effect. App. at 49. The court stated, in conclusion, "a jury must decide whether his protected speech motivated his termination, whether he would have been terminated in the absence of the speech, and whether he suffered damages." App. at 16. The case proceeded to trial.

*4 On April 1, 2004, the jury returned a verdict for Dr. Springer. In response to special interrogatories, it found the following: (1) Dr. Springer had "proven by a preponderance of the evidence that his protected activity under the First Amendment reflected in Plaintiff's Exhibits 1, 2, 3, 4 and 5 was a substantial or motivating factor in the decision to not renew or offer him a new contract," App. at 18-19; (2) PX 2, 3, 4, and 5 were the instances of protected activity for the decision not to renew Henry's contract; (3) Henry had failed to prove "by a preponderance of the evidence that regardless of plaintiff's exercise of his First Amendment rights, [that she] would ... not have renewed his contract in July 2000," App. at 19; (4) Dr. Springer suffered actual injury from the non-renewal of his contract; (5)

the damages that Dr. Springer had suffered which were proximately caused by the nonrenewal of his contract were $285,464 to the present and $588,431 into the future, App. 20; and (6) $100,000 in non-economic damages. In an additional interrogatory, the jury found that (7) Henry "acted recklessly, intentionally or maliciously with regard to plaintiff," App. at 22, and awarded Dr. Springer $25,000 in punitive damages in connection with the latter finding.

On September 17, 2004, the District Court entered a memorandum opinion and order on the parties' motion for post-trial relief ("September Opinion") in which it upheld the jury verdict in all respects but struck the $100,000 award of non-economic reputation damages. Henry filed this timely appeal.

II.

A.

[1] The standards by which we review the trial court's rulings are well-settled. We exercise "plenary review over the District Court's denial of judgment as a matter of law," applying "the same standard as the District Court." *Johnson v. Campbell,* 332 F.3d 199, 204 (3d Cir.2003). We also exercise plenary review of a district court's grant of summary judgment. *McGreevy v. Stroup,* 413 F.3d 359, 363 (3d Cir.2005). We review the denial of a new trial for abuse of discretion. *Foster v. Nat'l Fuel Gas Co.,* 316 F.3d 424, 429-30 (3d Cir.2003). A new trial should be granted only where the "great weight" of the evidence cuts against the verdict and "where a miscarriage of justice would result if the verdict were to stand." *Sheridan v. E.I. Dupont de Nemours & Co.,* 100 F.3d 1061, 1076 (3d Cir.1996) (en banc).

B.

[2] [3] We have recently reviewed the analysis applicable when a public employee files a claim of retaliation for engaging in protected First Amendment activity. *McGreevy,* 413 F.3d at 364. The plaintiff must

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

first demonstrate that s/he engaged in protected activity, i.e. speech that addresses a matter of public concern. We then employ the balancing test derived from *Pickering v. Board of Educ. of Township High School Dist. 205*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), "to determine whether an employee's interest in the speech outweighs the state's countervailing interest as an employer in promoting workplace efficiency and avoiding workplace disruption." *McGreevy*, 413 F.3d at 364 (quoting *Pickering*, 391 U.S. at 568). Next, the plaintiff must prove that the protected activity was a substantial or motivating factor in the allegedly retaliatory action. Thereafter, the burden shifts to the employer to demonstrate that the allegedly retaliatory action would have been taken absent the protected conduct. *Id.*

**\*5** [4] [5] [6] Whether an employee's speech is protected under the First Amendment is a question of law. *Azzaro v. County of Allegheny*, 110 F.3d 968, 975 (3d Cir.1997) (en banc); *Baldassare v. New Jersey*, 250 F.3d 195 (3d Cir.2001). The First Amendment's protection of an employee's right to speak on matters of public concern extends to independent contractors. *Bd. of Comm'rs, Wabaunsee v. Umbehr*, 518 U.S. 668, 686, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). FN3 *See also O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 721, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996). Henry has not seriously disputed that the contents of Dr. Springer's speech (i.e., a physician's critique of patient safety and unsafe working conditions) constitute matters of public concern. In several cases cited by the District Court the courts held that statements by health care providers regarding patient care involved matters of public concern. *Scheiner v. New York City Health and Hospitals*, 152 F.Supp.2d 487, 495-96 (S.D.N.Y.2001); *Kattar v. Three Rivers Area Hosp. Auth.*, 52 F.Supp.2d 789, 799 (W.D.Mich.1999). We adopt the District Court's determination that Dr. Springer's speech raising concerns on the state of healthcare at the DPC facility addressed matters of public concern. The distribution of the five communications to persons within the hospital and those responsible for governing the hospital as well as to public officials and the general public through the media was not inappropriate.

Henry's appellate brief lists sixteen issues but essentially they condense to Henry's claim that the District Court erred in holding that Dr. Springer's speech was protected under the First Amendment without analyzing whether the five memoranda contained false statements that are allegedly unprotected FN4 and in holding that Henry was not entitled to qualified immunity. We consider each issue in turn.

### 1. The alleged false statements

Henry's claim asserting that material containing falsities is unprotected under the First Amendment must be considered in the context of now well-established principles. In *Pickering*, where the principles relating to a government employee's free speech right were first enumerated, a teacher was dismissed by the Board of Education for writing and publishing in a newspaper a letter criticizing, inter alia, the Board's allocation of school funds between educational and athletic programs. The Supreme Court unequivocally rejected the view of the Illinois Supreme Court "that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work...." *Pickering*, 391 U.S. at 568. The Court repeated its earlier statement made the preceding year that "[t]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." *Id.* at 568 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 605-06, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)).

**\*6** It was in its discussion of the required balancing "between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees," *id.* at 568, that the *Pickering* Court made any reference to false statements. The Court reviewed Pickering's speech and determined that some of the statements were erroneous. It did not hold that the speech was therefore unprotected, as Henry would have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

us do. The Court stated:

What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public.

391 U.S. at 572-73 (footnote omitted). It continued:The public interest in having free and unhindered debate on matters of public importance-the core value of the Free Speech Clause of the First Amendment-is so great that it has been held that a State cannot authorize the recovery of damages by a public official for defamatory statements directed at him *except when such statements are shown to have been made either with knowledge of their falsity or with reckless disregard for their truth or falsity.*

391 U.S. at 573 (emphasis added) (citations omitted).

Unlike the *Pickering* Court's acceptance that Pickering's communication included false assertions, we are not prepared to accept without question Henry's assertion that PX 5 contained false statements. They may be more accurately viewed as exaggerations in the context in which they were made.

[7] One of the two statements Henry alleges was false, that the hospital hired a physician who was not licensed, was discussed by the District Court in its September Opinion. PX 5 states that "[t]wo Acting Medical Directors were appointed by the administration in one week, including an unlicensed psychiatrist." App. at 1401. Henry objects to the statement that the Administration appointed an "unlicensed psychiatrist." Henry argues that the psychiatrist referred to was actually licensed to practice at DPC. Dr. Springer testified that the basis for his statement was that the psychiatrist in question was "not an independently

licensed psychiatrist" or physician but rather had only a DPC institutional license, granted by Henry herself. The District Court's September Opinion states that Henry requested temporary credentialing for a particular physician applicant. Dr. Springer objected, three members of the Credentialing Committee voted to grant the physician partial privilege and two, including Dr. Springer, voted not to do so. Henry refused to sign the physician applicant's credentialing unless he was given full unrestricted privileges. At the conclusion of the discussion of that incident in one half of a page on PX 5, the Report states that "[t]he Medical Staff requests that the Governing Body pass a motion supporting adherence to the Medical Staff Bylaws, especially in regard to matters of credentialing [sic] physicians to the DPC Medical Staff." App. at 1401. Dr. Springer's asserted bases for his statements do not support a contention that they were recklessly made.

*7 The other falsity Henry alleges relates to the section of the same Report headed "Ethical Issues" and alleges that "[i]n order to give the appearance to Medicare reviewers that DPC had adequate staffing," nurses, psychologists, and staff were brought in from elsewhere. The Report denominates this action as unethical, states that it might bring future negative actions against the hospital and requests that the Governing Body pass a motion that DPC must "follow ethical principles in dealing with state, federal or other regulations or other overseeing bodies." App. at 1401. This discussion hardly accuses Henry or DPC with Medicare fraud, as Henry contends.

Even if these statements contain a somewhat one-sided view, their recounting, totaling no more than one page in the 141/2 pages of PX 1 through PX 5, does not support Henry's characterization of the exhibits as containing falsities. They represent a small portion of the evidence presented.

The District Court permitted counsel for Henry to present testimony at trial as to falsity, yet evidence elicited from Henry on direct examination establishes that she believed there to be no untrue allegations in PX 3 or PX 4. The trial transcript demonstrates that the "falsities" counsel for Henry tried to elicit through his client's testimony were merely Henry's disagreements

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with Dr. Springer as to what policies would best improve the DPC:

[Counsel for Henry]: Okay. Turning to Exhibit 3-and again, this is one that you have seen quite a bit in the past few days, I think-are there allegations contained in this document which you believe are untrue?

[Henry]: No.

[Counsel for Henry]: Are there recommendations in this document with which you disagree, that is, that you would believe are not a good idea?

[Henry]: Yes.

....

[Counsel for Henry]: No. 4, Exhibit 4, are there allegations contained in this that you believe are, let's start with true?

[Henry]: Are there allegations that are true? A lot of these are recommendations. Allegations, I don't see allegations that are true.

[Counsel for Henry]: Do you see allegations that are false or is it just a matter of recommendations?

[Henry]: The majority of these are recommendations.

[Counsel for Henry]: Are they recommendations that were consistent with the plan that you had for correcting the problems at the hospital?

[Henry]: There is one suggestion that I would not agree with on this, that would not fit in my plans with how I thought the problems needed to be fixed.

[Counsel for Henry]: Otherwise, you had no big problem with this?

[Henry]: No.

App. at 1180-81.

Such "recommendations," by definition, cannot be false. The testimony before the court was unequivocal: Henry answered "[n]o" to every question about whether she could find false allegations in PX 3 or PX 4. *Id.*

Henry additionally argues that the District Court did not allow her to present sufficient testimony to support her falsity argument. She adduces a page of bullet-pointed "[s]tatements contained in Plaintiff's Exhibits 1-5 upon which Ms. Henry's full testimony would have been helpful." Appellant's Br. at 18-19. However, every one of these statements is devoid of factual assertions except the last, and this last statement relates to PX 5 discussed above, not PX 3 or 4.

**\*8** Henry's argument that the District Court failed to fulfill its duty by submitting the five documents to the jury as protected despite Henry's contention that there was undisputed evidence that each contained statements which were untrue or believed to be untrue misses its mark. The issue is not falsity *vel non* but whether such statements, even if untrue, were knowingly or recklessly made. *See Pickering,* 391 U.S. at 574 (1968). [FN8] There was no such evidence. On the contrary, the District Court stated that "[i]t is apparent that [Dr. Springer] was motivated by a desire to improve conditions at the DPC and was frustrated that, in his view, he was encountering resistance." App. at 46-47. Because we reject Henry's argument that the communications were unprotected because of alleged falsities, it is irrelevant whether the District Court submitted two of the memoranda to the jury as protected and decided post-trial that the remaining were protected. After examination of the documents as the Supreme Court did in *Pickering,* we hold that all five exhibits are protected under the First Amendment.

2. *Reiteration of Qualified Immunity Defense*

[8] Henry's other argument reiterates her pre-trial argument that she was entitled to qualified immunity, an argument the District Court rejected in its March Order denying Henry's motion for summary judgment on that ground. Henry now argues that in view of the evidence presented at trial, the District Court erred in failing to reconsider its ruling rejecting her claim of entitlement to qualified immunity as a matter of law.

The District Court held that Dr. Springer's right to speak on various problems confronting hospital administration was clearly established. The court also rejected Henry's contention that Springer's right was not clearly established because his contract was not certain to be renewed under the new bidding process.

Promptly after this ruling, Henry filed an interlocutory appeal. This court dismissed the appeal for lack of jurisdiction, holding that "disputes of fact preclude this court from exercising jurisdiction." *Springer v. Henry,* No. 02-1776 at 3 (3d Cir. Nov. 27, 2002) (citing *Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 11
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

L.Ed.2d 238 (1995)). [FN6] We identified only one such dispute of fact in said order: "[T]he parties dispute whether appellee, David T. Springer, was treated differently than other physicians with respect to rebidding for their positions." *Id.* We deferred our review of qualified immunity pending "appeal at the conclusion of the case," i.e., the instant appeal. [FN7] *Forbes,* 313 F.3d at 147-48.

We exercise plenary review of the District Court's determination that Henry was not entitled to qualified immunity. [FN8] *Leveto v. Lapina,* 258 F.3d 156, 161 (3d Cir.2001); *see also Forbes,* 313 F.3d at 148 ("In assessing a claim of qualified immunity, we must review the law relevant to the official's behavior and ask whether the official could have believed that his or her actions were justified by law.").

**\*9** Henry relies on the Sixth Circuit's decision in *Gossman v. Allen,* 950 F.2d 338 (6th Cir.1991), where the court held that the employer was entitled to qualified immunity on a claim that it violated the employee's rights because a reasonable official could have believed that Gossman knowingly or recklessly made false statements, and could be terminated on the basis of those unprotected statements. *Id.* at 341-42. *Gossman* does not support Henry's claim of qualified immunity because Henry, unlike the employer in that case, failed to proffer any persuasive evidence that Springer made false statements or that any of the statements he made were made with his knowledge or with recklessness as to their falsity. Therefore, no reasonable official could have fired Springer on the basis of those statements.

[9] As the Supreme Court has noted, "the court should ask whether the [official] acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact." *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). Henry raises the issues of knowledge and recklessness for the first time in the instant appeal; [FN9] she never sought to present evidence as to Dr. Springer's mental state with regard to allegedly false statements.

Because Dr. Springer's First Amendment right to speak out was clearly established at the time of his non-renewal, we consider whether, viewing the evidence in the light most favorable to Dr. Springer, it would be clear to a reasonable official in Henry's position that s/he could not properly refuse to renew Dr. Springer's contract because of the new state bidding requirement. *See Saucier v. Katz,* 533 U.S. 200, 202 (2001); *Karnes v. Skrutski,* 62 F.3d 485, 494 (3d Cir.1995). In our Interlocutory Order of November 27, 2002, we stated that whether a reasonable official could have sent the non-renewal notice depends primarily upon whether "appellee, David T. Springer, was treated differently than other physicians with respect to rebidding for their positions." *Springer,* No. 02-1776 at 3 (Interlocutory Order).

Both at trial and on appeal, Henry has failed to refute evidence tending to show that Dr. Springer was the only independent contractor physician whose contract was non-renewed in 2000 and the only such physician to have ever received a non-renewal letter during his nine years of working at the hospital. Viewing this record in the light most favorable to Dr. Springer, no reasonable official could have sent a non-renewal letter to only one of at least five other independent contractor physicians at the hospital.

Henry nonetheless argues that "[a] reasonable official in [ ] Henry's position could have believed that requiring [Dr. Springer] to comply with state procurement laws did not violate [Dr. Springer's] rights." Appellant's Br. at 41. We view the question before us somewhat differently. As our order denying the interlocutory appeal suggests, the relevant question is whether a reasonable official in Henry's position could have believed that there was any constitutional basis for requiring only Dr. Springer and no other independent contractor physician to comply with state procurement laws. Because Henry provided no plausible reason for her targeting of Dr. Springer to the exclusion of other independent contractor physicians, the answer to this question is in the negative. Henry's rationale that she began to enforce the bidding requirement with Dr. Springer because he was the independent contractor physician who was at DPC the longest is not plausible. On the facts viewed in the light

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                      Page 12
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

most favorable to Dr. Springer, *see* _Karnes,_ 62 F.3d at 494, no reasonable official could have believed that the decision to target solely Dr. Springer could be based on any reason other than retaliation for protected speech.

C.

**\*10**  [10] Henry challenges the judgment for both economic damages and punitive damages. The jury awarded Dr. Springer $873,895 for his economic loss notwithstanding Henry's counsel's argument that Dr. Springer did not suffer any economic injury as a result of losing his job. She argues that there was no assurance that his contract would have been renewed and that he was never promised that it would be. Her claim is unpersuasive.

Dr. Andrisani, Dr. Springer's expert witness, gave testimony sufficient to serve as the basis for the jury's finding that Dr. Springer's contract would have been renewed absent the non-renewal letter. [FN10] The only contradictory evidence was the testimony of Dr. Link, Henry's expert witness. It was the jury's role to determine which expert was more credible, and the jury reasonably could have adopted the view of Dr. Springer's expert witness.

 [11] On a Rule 50 motion for judgment as a matter of law, a district court "must disregard all evidence favorable to the moving party that the jury is not required to believe." _Reeves v. Sanderson Plumbing Products, Inc.,_ 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The District Court correctly observed in its September Opinion that "[w]hether Springer's contract would have been renewed but for his memos was a question of fact properly before the jury." App. at 39. Drawing all inferences in favor of Dr. Springer, a reasonable juror could infer that he would work many years at the DPC. The evidence was sufficient to support the jury's economic damages award.

 [12] [13] [14] A jury may award punitive damages when it finds reckless, callous, intentional or malicious conduct. *See* _Alexander v. Riga,_ 208 F.3d 419, 430-31 (3d Cir.2000); *see also,* _Smith v. Wade,_ 461 U.S. 30,

54-56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). This standard is disjunctive: "[T]he defendant's conduct must be, at a minimum, reckless or callous. Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard." _Savarese v. Agriss,_ 883 F.2d 1194, 1204 (3d Cir.1989). In response to special interrogatories, the jury specifically found $25,000 in punitive damages appropriate because Henry acted "recklessly, intentionally or maliciously with regard to [Dr. Springer]." App. at 22.

Although we might not have reached the same verdict as the jury, the record contains sufficient evidence to support the jury's conclusion that Henry singled out Dr. Springer for intentional disparate treatment. As we noted above, Dr. Springer produced unrefuted evidence that he was the only independent contractor physician whose contract was non-renewed in 2000. The District Court ruled that "[a] reasonable jury could have concluded that Henry was motivated by evil intent or reckless indifference." App. at 41.

The jury's finding of reckless or intentional behavior is supported by consideration of the circumstances under which Dr. Springer received Henry's non-renewal notice which informed him that his contract would not be renewed and that "the Division will be publishing Requests for Proposals." App. at 1405. Although an RFP with a submission deadline of 11:00 a.m. on Wednesday, May 17 ("May 17 RFP") was issued on April 10, 2000, (App.1472-73), Henry did not send the non-renewal notice to Dr. Springer's home address until Friday, May 12. Henry testified-and the jury was entitled to believe-that he received the notice of non-renewal on the evening of Monday, May 15, less than two days before the proposal deadline. [FN11] As the District Court noted, "Henry notified Springer only five days, at best, before the proposal deadline despite the fact that the position had been advertised for over a month." App. at 41.

**\*11** On May 16, 2000, Dr. Springer tried fruitlessly to obtain an extension that would have allowed him sufficient time to fill out the requisite thirty page application form by the May 17 RFP's proposal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 13
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

deadline, which form Henry had failed to attach to the non-renewal letter. On the same day, Henry was notified of Dr. Springer's attempt to secure an extension in filling out the application, but there is no evidence that she attempted to assist him despite the fact that the timing of her non-renewal notice was the source of his impediment. Even Dr. Sylvester testified that Henry followed "unusual" procedures in ending Dr. Springer's employment. [FN12] App. at 681.

The jury finding of callous or malicious behavior also is supported by Henry's attitude toward Dr. Springer and the medical staff in general. Dr. Sylvester testified that Henry viewed her interactions with the medical staff, including Dr. Springer, as "adversarial." App. at 666. Three witnesses-Henry, Dr. Sylvester, and Dr. Springer-testified that Henry was upset and unhappy with Dr. Springer. Dr. Springer testified that during meetings of the DPC Governing Body Henry was "angry and spoke [to him] with a lot of emotion," App. at 780. Based on its observations at trial, the jury could have concluded that Henry acted vindictively.

The evidence supports the jury finding that Henry acted at least recklessly or callously, if not intentionally or maliciously, with respect to Dr. Springer's constitutionally protected rights. [FN13] The District Court did not err in affirming the jury's punitive damages award. [FN14]

IV.

We see no error of law. Nor can we conclude that the verdict was against the weight of the evidence. For the foregoing reasons, we will affirm the judgment of the District Court in its entirety.

APPENDIX

CONCERNS ABOUT DELAWARE PSYCHIATRIC CENTER

DATE: 10/21/99

Delaware Psychiatric Center, the only state run hospital

for mentally ill, serving all of Delaware, treats the sickest and most vulnerable segments of our society. As most patients are quite ill, may not have involved families, and have no choice of treatment facility, the state hospital has an enormous responsibility to treat these psychiatric patients with high quality care in a respectful and safe environment. Unfortunately, DPC is failing in this task with the prospects for improvement slim.

PATIENT CARE and SAFETY ISSUES:

1) There is gross understaffing of the hospital. Psychiatrists routinely treat 45 patient each; one psychiatrist is responsible for 85 patients. There is also an inadequate of nurses to safely run the hospital. The hospital treating environment is not conducive to recruiting and retaining qualified personnel.

K3 is the most acute unit in the hospital with a stated capacity of 32 patients. The unit even when it is over-census; at times exceeding 50 patients. This poses a great safety hazard because of overcrowding and understaffing. Patients are unable to be adequately monitored for safety with little or no time for any treatment.

**\*12** Over the course of last few years, at least 6 Board Certified and dedicated psychiatrists have left K3 as they declined to compromise the patient care and safety. It appears that the main function of the administrative Unit Director is to act as a monitor to keep the patient census down; not to promote quality patient care. When staff members do not agree with demands of the Unit Director, he often becomes hostile and threatening, making for an intolerable working environment. This has been brought to the notice of administration repeatedly with no action taken resulting in an extraordinary deterioration of morale.

2) The admission area is almost always understaffed. There is rarely ever a nurse present in the admission area. The nurse who is supposed to cover the admission area is rarely available due to widespread understaffing. Patients who are agitated and need to be medicated immediately are not treated in a timely manner.

3) Security officers are rarely present in the admission area. Though they are present on the hospital campus,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

it may take up to 10 minutes for security to arrive when called in the case of violent patient.

The following are 2 examples of safety concern:

An agitated, intoxicated and psychotic patient barricaded and locked himself in an office of the admission area and attempted to hang himself with a phone cord.

Acutely psychotic and/or severely depressed patients while on arm's length observation are often allowed to go to the restroom unaccompanied by staff.

4) When the unit gets overcrowded, no beds are available for patients, they have to sleep on cots, or on couches in the dayrooms, which compromises the safety of patients and staff. These cots are unsafely stored in the computer room of the unit. A staff member was injured when cots landed on her head.

5) Acutely psychotic patients have been able to escape the unit at will. Patients have been able to walk through doors, climb fence or break window guards to escape.

6) A patient who was on arm's length observation for suicidal intent, at the time went into her room and tied a pillow cover around her neck with an intention to strangle herself. She was found in time before a tragedy happened. The incident was investigated but no action taken.

7) There seems to be too much attention focused on keeping the patient census down. There is often pressure to discharge patients before an adequate and safe treatment plan has been formulated. There is intense pressure to keep the number of suicide watches down.

There are times when a patient voluntarily walks into the admission area with an expectation of seeing a psychiatrist and instead the Unit Director, a social worker, evaluates them. Invariably the patient is asked to leave by the unit director and does not get to see a psychiatrist.

Similarly, when a patient with legal charges is brought into the admissions area the unit director often triages the patient without allowing for a psychiatric evaluation and discharges the patient.

**\*13** 8) There have been a numerous instances when the Unit Director and other staff have subjected the patients in the admission area to demeaning comments. Besides being unethical and disrespectful these comments often result in aggravating a severely mentally ill patients. On numerous instances K3 Unit director has been observed to be demeaning to numerous patients. Patients often become agitated and violent requiring unnecessary medication of the patient. When staff members questioned the Unit Director about the inappropriateness of his comments, the Unit Director has become verbally threatening toward the staff members.

Recently there were 2 cases on the unit when patients had complained of being physically abused by the staff members. Families of the patients were very concerned about the safety of their family members. However, investigations into staff misconduct often do not lead to appropriate disciplinary action.

On one of the units, an HIV pregnant patient had a delivered her baby in the seclusion room of DPC. The patient stated that when she had gone up to the staff and reported that she was in labor, staff asked her to go to the seclusion room instead of arranging for her to be transferred to hospital. Needless to say, the safety of the newborn was also jeopardized in this case.

9) All the patient units lack discipline due to lack of training provided to the aides and technicians before they start working on the unit. There are numerous instances of staff lying, speaking disrespectfully, and in an intimidating manner to other staff and patients. The hospital administration, by its lack of firm response to this, is implicitly supporting that kind of behavior.

Staff is afraid to speak out on issues affecting patient care and safety. As they are afraid of being punished by the administration. Staff has also expressed fear of speaking out and/or disciplining the staff for fear of getting their tires slashed, having feces smeared on their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 15
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

car or worse. The administration has been made repeatedly aware of this problem, with no action to date.

10) Delaware Psychiatric Residency Training Program, the only training program in the state of Delaware began in the late 1950's and grew rapidly to serve Delaware State.

The primary goal of the Delaware Residency Program in Psychiatry was and is ability to develop a broad range of professional skills for the residents so that they can effectively and competently practice psychiatry in a wide variety of settings. The varied activities of the Delaware *Residency* Program in Psychiatry may be seen as composed of concentric circles. The first circle consists of service related to community needs; an example is an intimate working relationship with the DPC, community psychiatry, crisis intervention, and numbers of general hospitals, etc. The second circle consists of teaching, training, research, and continuing education in the Delaware State community. The Delaware Psychiatric Center is responsible for teaching in all four years of the postgraduate training in general psychiatry. That training takes place in the everyday world of medical practice through selfless commitment of residents to the patients with a genuine concern for their interests, needs, and safety.

**\*14** Excellence in psychiatry requires intensive training and experience with a fundamental emphasis on assessment, treatment planning and application of modern therapeutic technology. Individual supervision, educational seminars, rounds, and case conferences are the primary techniques used to convey knowledge, clinical skills, and the professional attitudes appropriate for a clinician. However, during the last few years it became harder and harder to provide excellence in training for residents due to the lack of integrity of staff, increased tenseness among hospital administration and clinical staff, and undermining the physician role in therapeutic process.

Resident doctors are the only physicians providing services to the hospital from 4:30 PM to 8AM on weekdays and all day weekends. During this time frame resident doctors provide not only psychiatric but also all medical care to over 350 patients in addition to admitting patients around the clock. Inability of the hospital administration to retain dedicated teaching psychiatrists has created a void in the training of the residents. Having a residency program is not only a monetary benefit for the hospital but residency provides educational environment within and outside hospital system. The residency program, fully accredited for over 40 years has produced quality psychiatrists that after graduation have settled in the area to function in the Public Mental Health sector, will likely be closed due to insufficient dedicated teaching psychiatrists that hospital administration has not been able to retain.

As hospital administration has shown lack of concern over this it is time that these issues were put in front of legislature and electorate of Delaware whose family members come here for treatment and whose tax money is put into work.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

|  | **NAME** | **SIGNATURE** |
|---|---|---|
| **PGY IV:** | Dr Fahim Fahim. | |
| | Dr. Panna Jolapara. | |
| **PGY III:** | Dr. R. Rizvi. | |
| | Dr. R. Srinivasa. | |
| | Dr. Dilip J. Joshi. | |
| | Dr. G. Sahani. | |
| **PGY II:** | Dr. Shafiqa Azamy. | |
| | Dr. Aleya Karim. | |
| **PGY I:** | Dr. Art Pogre. | |
| | Dr. Sharad Sawant. | |
| | Dr. A. Yarlagadda. | |

CC: Governor, Mr. Thomas R. Carper.

Secretary of Health & Social Services, Gregg C. Sylvester, MD.

Hospital Director, Mr. Jiro Shimono.

Medical Director, Dr. Phyllis Smoyer.

Training Director, Dr. David Springer.

Senators of State of Delaware.

DHCC.

Dept. of Public Safety, Brian J. Bushneller

News Journal.


*DELAWARE HEALTH AND SOCIAL SERVICES*

DIVISION OF ALCOHOLISM, DRUG ABUSE
AND MENTAL HEALTH


© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                          Page 17
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

To:                               Delaware Psychiatric Center Governing Body (Renata
                                  J. Henry, Chairperson, Eugene Wolinsky,
                                  Vice-Chairperson, Gregg C. Sylvester, MD, Cabinet
                                  Secretary, Benjamin Fileti, Isaiah F. Henry, Stephen
                                  Moores, M.C., Dorothy Patterson, Gary L. Wirt, Ed.D.)

Cc:                               Mr. Thomas Carper, Governor
                                  Mr. Jiro R. Shimono, ACSW, Hospital Director

From:                             Delaware Psychiatric Center Medical Staff Executive
                                  Committee Officers (David T. Springer, MD, President,
                                  Cheryl Cantrell, MD, Vice-President, Fawzia Hasan,
                                  MD, Secretary, Ellis Kendle, MD, Medical Staff
                                  Activities Director, Syed Munir, MD, Member-at-large,
                                  Hugo Del Villar, MD, Member at Large)

Date:                             November 23, 1999

Re:                               Critical Issues in the Care of the Mentally Ill in
                                  Delaware

**\*15** Delaware Psychiatric Center (DPC), known as Delaware State Hospital for a century prior to 1996, is the only state psychiatric hospital in Delaware and, as such, the only inpatient facility available to Delaware citizens with severe and/or long term mental illness. The patients' conditions include schizophrenia, depression, bipolar disorder, severe personality disorders, substance abuse, dementia, brain injury, mental retardation, and psychiatric complications of medical illnesses, such as, AIDS. Currently, as the number of people with these problems increases, the capacity of DPC to provide them with treatment is deteriorating and facing collapse as of July 2000.

For several years, we have had difficulty maintaining adequate numbers of psychiatrists at DPC. We are heavily dependent on the physicians in our 50+ year old psychiatry residency program (the only one in Delaware) to provide clinical coverage, both psychiatric and medical. However, residents must be both educated and supervised. Every board certified teaching psychiatrist we have hired in the last five years has resigned after a relatively short stay, citing hostile and unsafe working conditions and understaffing. Since the sixth such resignation in October 1999, it has

seemed unlikely that the residency could be continued after the current academic year, in spite of the fact that no one wants to lose this valuable program. The negative impact of closing or failing to fill the positions in the residency can hardly be overstated: it would mean the loss of all night, weekend and holiday coverage, and daytime admission coverage for the hospital.

On October 21, 1999, the DPC residents wrote a letter to Governor Carper, with copies to state administrators and legislators, that was essentially a plea for help for their beleaguered program. Their letter received attention in the media and spawned a series of interesting responses and editorials. The Governing Body of the hospital should take immediate steps to reverse the current downward spiral, before it is too late. We must hire residents for the academic year beginning in July 2000 no later than March 2000. We have four months to reverse the trends of the last five years.

The Medical Staff requests that the Governing Body schedule a series of emergency meetings with the specific goal of hiring and retaining teaching psychiatrists and maintaining the psychiatry residency program.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*[signatures]*

*DELAWARE HEALTH AND SOCIAL SERVICES*

DIVISION OF ALCOHOLISM, DRUG ABUSE AND
MENTAL HEALTH

TO: WHOM IT MAY CONCERN

FROM: Delaware Psychiatric Center Medical Staff
Executive Committee Officers

DATE: December 2, 1999

We have been trying unsuccessfully to communicate issues
of patient care and safety to the hospital administration for
several years. Unfortunately, often when such issues have
been raised they have been objected to because of the
"process" of bringing attention to these problems at
Delaware Psychiatric Center. The unresolved issues remain.

**\*16** Our oaths as physicians require us to strive for the best
in patient care. To remain silent when the situation has
deteriorated so badly, and as is about to get significantly
worse, would be gross negligence and would seriously
jeopardize the civil rights of the patients.

We look forward to working with the administration to
aggressively deal with these issues before the lives of our
patients and their families are put at serious risk. The chance

to have free and open communication with those who can
and will implement the required changes in the system in a
timely manner is the cornerstone of a solution to these
problems. We must roll up our sleeves and pull together to
deliver the top quality patient care which we know how to
do.

The following is a list of proposed actions that may begin as
on the road to protecting and preserving patient care and
safety. We encourage others to come up with other creative
solutions to some of the problems plaguing Delaware
Psychiatric Center.
1) ADDRESS SAFETY ISSUES AS SOON AS POSSIBLE
a) The patient census reached 367 this week, which are 67
patients over what we can reasonably care for given current
clinical resources.
b) Stop addressing the census problem by accusing
psychiatrists of "keeping too many patients." Address the
census problem by increasing the number of beds, and
staffing for those beds, in the hospital.
2) FIX UNDERSTAFFING/PERSONNEL ISSUES AS
SOON AS POSSIBLE
a) There should be a permanent waiver to the bid process for
contract physicians who apply for positions at DPC.
b) All barriers to hiring Merit system psychiatrists at
competitive rates should be eliminated.
3) INCREASE PHYSICIANS' AUTHORITY TO ENSURE
QUALITY AND SAFE PATIENT CARE
a) Have a chief psychiatrist and charge nurse run each
treatment unit.
b) Appoint, at least, two Board-Certified psychiatrists to the
Governing Body. Schedule an additional meeting of the
Governing Body as soon as possible to discuss issues of
patient care and safety, as well as, to ensure the psychiatric
residency's survival.
c) Give to the Governing Body a complete detailed
accounting of expenditures (including each employee or
contractor's name, position, and amount paid) to evaluate
whether the current allocation of resources reflects the
priority of direct patient care. There appear to be many
employees who are working under clinical sounding job
descriptions, but whose jobs do not include direct clinical
care. Monies identified as superfluous should be spent on
hiring true clinical staff and creating new patient units.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                 Page 19
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

which lists some proposed actions.

| |
|---|

*DELAWARE HEALTH AND SOCIAL SERVICES*

DIVISION OF ALCOHOLISM, DRUG ABUSE AND
MENTAL HEALTH

To: DPC Governing Body Members

From: David T. Springer MD

President, DPC Medical Staff

Psychiatric Residency Training Director

Re: PROPOSED AGENDA FOR DECEMBER 22, 1999
GOVERNING BODY MEETING

Date: December 16, 1999

Thank you for taking the time to meet to discuss critical issues affecting the DPC Psychiatric Residency Program. Your commitment and interest is greatly appreciated. The following is an outline of some of the areas that the Medical Staff believes needs to be addressed to ensure the future of the residency program. In addition, I am enclosing a memo from the DPC Medical Staff Executive Committee Officers

I. NEED FOR A PSYCHIATRIC RESIDENCY
PROGRAM AT DPC

**\*17** - the severity of psychiatric and medical illnesses of DPC patients require 24 hour coverage by psychiatrists
- replacing resident coverage with attending psychiatric coverage would likely cost $800,000 more than having a residency program
- even if extra monies were allocated, the likelihood of finding sufficient numbers of dedicated attending psychiatrists to cover 370 patients, seclusion orders and acute admissions on nights, weekends, and holidays would be remote
- the loss of the academic atmosphere provided by the residency would have a deleterious effect on patient care

II. NEED TO ATTRACT AND RETAIN DEDICATED
AND QUALIFIED TEACHING ATTENDINGS

- Without sufficient numbers of qualified teaching attendings, the residency cannot survive
- qualified teaching attendings will only agree to come and stay at DPC if they feel that they can work in an environment that is safe and where they have an ability to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                          Page 20
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

provide quality care
- having insufficient staffing and overcrowding throughout
the hospital is not conducive to attracting and retaining
teaching psychiatrists
- having an apparent emphasis on keeping the census down
at DPC is demoralizing and confusing for psychiatrists and
staff
- psychiatrists need to have the authority, not just the
responsibility, to treat patients (i.e. psychiatrists should not
be accused of keeping patients too long in the hospital, not
be pressured to take patients off suicidal watch, not have
minimal roles in administrative decisions affecting patient
care, not have to fight for adequate funding for medication
and doctors, not have roadblocks put in the way of hiring
new psychiatrists and not be reproached for questioning the
orthodoxy of the non-medical viewpoint)


### III. CONTINGENCY PLANS

- if a decision is made to close the residency program, the
current residents should be given the option of completing
their entire training at DPC

MEDICAL STAFF PRESIDENT REPORT TO THE
GOVERNING BODY MEETING OF JANUARY 26,
20000

In preparation for the January 29, 2000 Governing Body
meeting, the Medical Staff Executive Committee Officers
propose that the following be discussed in fulfillment of the
Medical Staff's obligation to inform the Governing Body of
issues of concern affecting patient care at DPC.

The most glaring issue at hand is that the DPC medical staff
is now in open disagreement with the hospital administration
about how the patients should be treated. We have for years
had a situation in which the physicians were legally
responsible for making the most important clinical decisions
but at the same time were reporting to lay administrators.
This created a tense situation in which administrative
techniques could be used to pressure physicians into making
a particular decision. At present, the situation has
deteriorated to the point that physicians are essentially being
asked to practice medicine at below their own minimum
ethical standards on a routine basis. Therefore, we are

morally obligated to fight this practice, including
notification of the appropriate regulatory agencies that might
have the power to intervene and demand improvements.


*NEW CONCERNS AROUND PATIENT CARE,
CREDENTIALLING AND LIABILITY ISSUES FOR DPC*

**\*18** 1) New Patient Care Issue
On three separate days, the hospital administration told the
psychiatric residents on call to abruptly transfer patients
either to another unit within the hospital or to another
facility, either on a weekend day or in the middle of the
night. Two transfers were of elderly patients at around 8 PM
on a Friday night. Residents were given direct orders by
non-psychiatric administrators to discharge and transfer the
patients without consultation or approval of the unit
attending psychiatrist or the backup attending psychiatrist.
Transferring patients at off-hours, without adequate planning
and preparation of the patient and their families can be
seriously disruptive to the patient's treatment. This includes
disrupting the patient's relationship with his psychiatrist and
treatment team members, a lack of doctor to doctor transfer
of sick patients, disregard for sick patients' need to get
reoriented to a new treatment team, and disruption of the
discharge planning and family contacts that have occurred
to date.
It is of equal concern that residents, with training licenses,
were instructed against hospital policy and with possible
violation of state regulation, to follow orders of
non-psychiatric administrators.
The Medical Staff requests that the Governing Body pass a
motion that supports the fact that only an attending
psychiatrist may order treatment for a patient at DPC and
that non-psychiatric administrators may not order treatment,
including the discharge of patients.
2) Credentialling
There has been a serious shortage of psychiatric staff at DPC
for years. Little was done about this until Medicare made an
unannounced site visit and discovered the dire staff
shortages. The measures taken by the administration,
unfortunately, showed little concern for the patients' best
interests and were in violation of hospital policies, Medical
Staff bylaws and JCAHO regulations.
A 35 per hour a week contract psychiatrist was placed on the
admissions unit of DPC with "temporary privileges" in
flagrant violation of medical staff by laws.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

There was no meeting of the Credentials Committee or the Medical Staff Executive Committee. The Medical Staff Executive Committee or President of the Medical Staff did not designate anyone to act on their behalf. There was no recommendation of the Credentials Committee or Medical Staff Executive Committee. There was no consideration of the applicant's review of performance and peer recommendation as communicated verbally and by email to Mr. Shimono by Drs. Springer and Cantrell. Two Acting Medical Directors were appointed by the administration in one week, including an unlicensed psychiatrist.

The Medical Staff requests that the Governing Body pass a motion supporting adherence to the Medical Staff Bylaws, especially in regard to matters of credentialling physicians to the DPC Medical Staff.

3) Ethical Issues

In order to give the appearance to Medicare reviewers that DPC had adequate staffing, nurses were brought in from other state facilities, psychologists and other staff were made to work as psychiatric aids in return for compensation time the following week. Recently, at least two nurses have been reassigned from patient care units back to the administrative building.

**\*19** The Medical Staff believes that utilizing staff in a manner, in which they might be put in a position to deceive federal regulators about the permanence of their positions, is unethical and may risk future negative actions against the hospital.

The Medical Staff requests that the Governing Body passes a motion that DPC must follow ethical principles in dealing with state, federal or other regulators or other overseeing bodies.

*CONTINUED CONERNS AROUND PATIENT CARE AND SAFETY*

The administration's written response to both the resident's and medical staff's concerns attempted to portray that all their concerns were addressed. The residents and medical staff believe that few, if any, concerns were adequately addressed and that serious concerns remain which continue to affect patient care and safety at DPC.

1) Patient Care and Safety Issues:

The Medical Staff have been requesting that a nurse be assigned to the admissions unit for over six years, yet the

administration is still only "considering" the assignment. Inadequate security presence in the admissions area has not been addressed. Voluntary "walk-in" patients are routinely turned away by the Unit Director without allowing the patient to be seen by a psychiatrist. Potential patients for admission are accepted by the Unit Director or clerk without a DPC psychiatrist accepting the patient. There remain safety issues for the planned admission area patient unit.

2) Patient Length of Stay:

The Medical Staff oppose the appointment of a consultant to "ensure that patients are receiving the best care possible with the appropriate length of stay." The Medical Staff have not received any notification that their care of individual patients, including the length of time they are treated in the hospital has been inappropriate. It is evident that the purpose of hiring a consultant, at taxpayer's expense, is to try to lower the length of stay. It is the hope that DPC does not go down the failed road of managed care where reduced length of stay becomes more important than quality care for the individual patient.

3) Resignation of teaching psychiatrists in the last five years who have cited hostile unsafe working conditions

The Medical Staff encourages the Governing Body to set up a subcommittee to investigate this matter.

4) Impact of failing to fill positions in residency program

The Medical Staff requests that the Governing Body passes a motion giving explicit support and long-term commitment to the residency program.

5) Personnel Issues

The Medical Staff requests that the Governing Body form a Personnel subcommittee to investigate personnel practices at DPC. It is evident that there is a significant lack of uniformity in the application of disciplinary measures.

In addition, acts of vandalism and threats of vandalism (for example, tires slashed or feces smeared on cars) in retaliation for discipline of staff members has not been adequately addressed.

**\*20** 6) Allocation of Resources

The Medical Staff believes that a gross analysis of administrative costs versus direct service costs would not shed enough light on the actual allocation of resources. Hundreds of thousands of dollars of taxpayer money have been spent on adjunctive activities while the hospital has been understaffed for years. The truth can only been found out in the details. The Medical Staff requests that the entire Governing Body or subcommittee investigate.

The Medical Staff requests the Governing Body investigate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

the exact costs of paying for uninsured patients at Meadow Wood Hospital and Rockford Hospital and whether that money would be better spent in opening up more patient space at DPC.

7) Request for a series of emergency meetings with the DPC Governing Body

The Medical Staff believes that the Governing Body should meet on, at least, a monthly basis at this time, as addressing the above issues and ones that follow demand a lot of time and attention.

8) Proposals not yet addressed:

a) Need for permanent waiver to bid process for hiring contract psychiatrists.

b) Eliminate all administrative barriers to hiring Merit psychiatrists.

c) Have a chief psychiatrist and charge nurse run each treatment unit.

d) Appoint, at least, two board-certified psychiatrists to the Governing Body.

*ADDITIONAL PROPOSED ITEMS FOR THE AGENDA*

1) SHOULD POPULATION-BASED METHODS, SUCH AS, CENSUS OR LENGTH OF STAY BE DETERMINANTS OF QUALITY CARE OR THE INDIVIDUAL TREATMENT OF THE PATIENT?

2) SHOULD THE MENTALLY ILL BE AT GANDER HILL AND WCI OR DPC? (please see enclosed article)

3) WHAT IS DPC'S CONTINGENCY PLAN FOR THE POSSIBILITY THAT MEDICAID MANAGED CARE COMPANIES, WHICH HAVE BEEN GOING BANKRUPT AT AN INCREASING RATE AROUND THE COUNTRY, WILL BE UNABLE TO CARE FOR DELAWARE'S MEDICAID PSYCHIATRIC PATIENTS?

4) WOULD THE NEEDS OF THE CHRONICALLY MENTALLY ILL BE BETTER SERVED BY HAVING A BOARD-CERTIFIED PSYCHIATRIST BE THE DIRECTOR OF THE HOSPITAL?

5) SHOULD PATIENTS (WITH SIGNIFICANT BRAIN DISEASE) AT DPC BE TREATED UNDER A MEDICAL MODEL OR A SOCIAL WORK MODEL OF CARE?

FN1. Henry did not seek Dr. Sylvester's approval

for her non-renewal action.

FN2. Dr. Springer sought a variety of monetary damages and injunctive relief against the defendants. DHSS was dismissed for all purposes by stipulation on June 19, 2001. On the same day all claims for monetary damages against the individual defendants in their official capacities were dismissed. The request for an injunction was moot. Thus, the only remaining claim is against Henry in her individual capacity.

FN3. Accordingly, we refer to Springer as a "public employee" or "employee" interchangeably.

FN4. Dr. Springer contends that Henry waived her falsity defense by failing to raise it in the pretrial order. He relies on our decision in *Ely v. Reading Co.,* where we adopted the proposition that "[t]he pretrial order is generally binding on the parties ... [and] cannot be modified without the permission of the court and a showing of manifest injustice." 424 F.2d 758, 763 (3d Cir.1970) (citing Fed. R. Civ. Pro. 16; 3 Moore's Federal Practice § 16.11). In *Ely,* we upheld the district court's refusal to permit Ely's expert witness to testify where the expert's name was not listed in the pretrial order but was only included in an unauthorized supplemental pre-trial memorandum. *Id.* at 763, n. 13. We held that "[t]he decision of whether or not to permit a change [in a pretrial order] is within the discretion of the trial judge" and that "[a]ppellate interference with this discretion should be kept at a minimum." *Id.* at 763.

*Ely* is inapposite to the present facts. Under *Ely,* we review for a "clear abuse of discretion." However, our decision in *Ely* did not hold that an argument automatically is waived if not extant in the pretrial order. Here the District Court allowed Henry to present testimony at trial as to the truth or falsity of statements in PX 1-5. Dr. Springer does not argue that the District Court abused its discretion in so allowing. Instead, his argument appears to suggest that even though Henry presented testimony on the falsity issue at trial she has waived her right to raise the issue *on appeal* because it was not present in the pretrial order. We

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                          Page 23
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

find no legal support for such a proposition and reject Dr. Springer's contention that Henry waived her falsity argument.

FN5. Henry failed to argue in her opposition to Dr. Springer's motion for partial summary judgment that any allegedly false statements made by Dr. Springer were made with knowledge or reckless indifference to their falsity. She addressed the issue only in her discussion of the disruption analysis, stating that allegedly "false statements were crafted to cause disruption." As such, Henry cannot now complain that the District Court failed to consider knowing or reckless falsity in its March Order. *Baldassare,* 250 F.3d at 198 ("The public employer ... bears the burden of justifying the discharge, which varies depending upon the nature of the employee's expression.") (citations omitted).

FN6. This Interlocutory Order was filed some two weeks before our December 11, 2002 decision in *Forbes v. Twp. of Lower Merion,* 313 F.3d 144, 146 (3d Cir.2002), in which we "announce[d] a supervisory rule to be followed in all subsequent cases in which a summary judgment motion based on qualified immunity is denied on the ground that material facts are subject to genuine dispute," which supervisory rule now "require[s] the District Courts to specify those material facts that are and are not subject to genuine dispute and explain their materiality."

FN7. In *Curley v. Klem,* 298 F.3d 271, 278 (3d Cir.2002), we noted that "the imperative to decide qualified immunity issues early in the litigation is in tension with the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right."

FN8. Demonstrating that it did not view our Interlocutory Order as a vacation of its qualified immunity decision at summary judgment, the District Court "construe[d] defendant's [Rule 50] motion as an untimely motion for reconsideration of its previous summary judgment ruling," a procedural disposition under which Henry's motion

would be "granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension." App. at 35-36. Noting that "[n]o additional evidence was introduced at trial to change the court's understanding of the issue," the District Court ruled that "Henry is not entitled to qualified immunity for the reasons stated in the court's [March Order]." App. at 36 (including in a footnote the entire text of the March Order's qualified immunity decision).

FN9. Henry originally based her motivation for sending Dr. Springer a non-renewal letter on the public bidding requirements imposed on her by changes in State law that took effect in 1996. *See* Note 3, *supra* (citing 29 Del.Code Ann. tit. 29, §§ 6913, 6981 (2005)). Indeed, when Henry sought to introduce evidence of falsity at trial, the District Court commented, "I thought [Henry's claimed reason for not renewing Dr. Springer's contract] was because he simply didn't apply for a new contract." App. at 1176.

FN10. Dr. Paul J. Andrisani analyzed economic data and evaluated courtroom testimony and concluded that Dr. Springer had suffered a total economic loss of $1,281,068 based upon a 60 hour work-week. The jury limited Andrisani's calculation of loss to $873,895. There was sufficient expert testimony on loss to support the jury verdict. (App.39-40.)

FN11. The Request for Proposals provided that "QUESTIONS CONCERNING THIS RFP MUST BE SUBMITTED IN WRITING BEFORE THE DEADLINE OF April 19, 2000 AT 4:30 PM," App. at 1472, some four weeks prior to Dr. Springer's receipt of the non-renewal notice.

FN12. In arguing against the punitive damages award, Henry relies in part on *Brennan v. Norton,* 350 F.3d 399 (3d Cir.2003), where the court found insufficient evidence on the record for punitive damages. Henry attempts to portray *Brennan* as a case with far more evidence adverse to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**

defendant than the present case. However, in purporting to cite that evidence, Henry instead cites Brennan's own unsubstantiated allegations. In fact, we concluded that there was insufficient evidence for a punitive damages award specifically because there was insufficient evidence for a jury to find that Brennan's unsubstantiated allegations (of harassment and retaliation) were correct. *See Id.* Brennan's version of the facts had no evidentiary support in the record. *Brennan,* 350 F.3d at 429. By contrast, in the instant case, there is ample evidentiary support for the jury finding.

FN13. We are mindful in our review of whether there was sufficient evidence to support the punitive damages award of the possible conflict of interest the Delaware Department of Justice has in representing Henry regarding this specific issue. A letter from Springer's counsel to the Department of Justice offering to settle the pending matter on appeal references a formal opinion authored by the Delaware Attorney General which explained that state law bars Delaware from paying any portion of a civil judgment against a state official if a jury finds that official is liable for punitive damages. App. at 1954-56. Thus, the practical effect of the punitive damages award in this case would render Henry individually liable for the entire amount. As a result, we note the possible disincentive for the State to represent Henry zealously with respect to the punitive damages award.

In this case, Appellant's voluminous brief devotes two cursory sentences to its analysis that the record is insufficient to support a punitive damages award. *See* Appellant's Br. at 54. We do not suggest that the State intentionally omitted arguments regarding the punitive damages award; rather, we raise the issue to note our concern over the possibility of a conflict. *See, e.g.,* Del. Rules of Prof'l Conduct R. 1.7. We urge the Delaware Department of Justice to look into this issue in the future. Mindful of the possible conflict in this case, we have examined the sufficiency of the evidence de novo, and we are convinced, based upon our independent review, that there is sufficient evidence to uphold the punitive damages award.

FN14. We reject Henry's argument that Dr. Springer's counsel inserted racially inflammatory language during his rebuttal closing argument. Henry failed both to object to the language in question during closing argument and to raise an objection to the allegedly inflammatory statement in her motion for a mistrial. The first time Henry complained of the misconduct was in her motion for a new trial. We therefore apply the plain error standard.

Dr. Springer's counsel stated during rebuttal in his closing argument, that "An octopus, when it's attacked by an enemy, emits a *jet black* inky film throughout the water and in the disarray, confusion, the octopus escapes. In this case, from the very first moment, the defendant has been *emitting black fluid* to cloud the issues in this case." App. at 1369-70 (emphasis added). Thereafter, in discussing damages, counsel referred to Dr. Springer as "a 45-year old-white male professional." App. at 1370. Henry is an African-American female and Dr. Springer is a white male. Race was never raised elsewhere as an issue in the present case.

In his argument to this court Dr. Springer's counsel sought to justify his comments as for identification. We find that unacceptable. We deplore any introduction of race into a case where race is not at issue. Nonetheless, the District Judge, himself an African American, found possible neutral reasons and concluded that "[t]he court is satisfied that the octopus and black ink analogy is common enough and did not likely confuse the issues for the jury." App. at 49.

Inasmuch as the District Court who had an opportunity to view the closing argument in the context of the trial, found the remarks unobjectionable, combined with Henry's failure contemporaneously to object to the language, we will not hold that the District Court abused its discretion in denying Henry's motion for a new trial.

C.A.3 (Del.),2006.
Springer v. Henry
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 25
--- F.3d ----, 2006 WL 121942 (C.A.3 (Del.))
**(Cite as: --- F.3d ----)**


• <u>04-4124</u> (Docket) (Oct. 28, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
David T. SPRINGER, M.D., Plaintiff,
v.
Renata J. HENRY, individually and in her official
capacity, and Gregg C. Sylvester, M.D. in his official
capacity, Defendants.
No. 00-885(GMS).

March 11, 2002.

MEMORANDUM AND ORDER

SLEET, District J.
*1 On October 6, 2000, Dr. David Springer filed this complaint against Renata J. Henry and Dr. Gregg Sylvester. Springer was a physician who had been under contract to provide medical services at the Delaware Psychiatric Center ("DPC"). Springer alleges that Henry and Sylvester refused to renew his contract in retaliation for remarks he made concerning the operation of the DPC facility. Springer contends that his termination therefore violated the First Amendment.

Presently before the court are two motions-Springer's Motion for Partial Summary Judgment and the defendants' Motion for Summary Judgment. Springer's motion asserts that his speech was protected under the First Amendment. He further contends that if the court determines that his speech was protected-a question of law-a jury must decide whether his speech caused his termination. Finally, Springer contends that defendant Henry is not entitled to qualified immunity because his First Amendment right was clearly established prior to his termination.

The defendants' motion argues that Springer's speech was not protected because it addressed his personal concerns. Alternatively, the defendants argue that Springer's speech was disruptive. Additionally, the

defendants contend that Springer would have been terminated regardless of his speech due to his failure to bid for renewal of his contract. Moreover, the defendants argue that Springer has failed to prove that he has suffered damages as a result of their alleged actions. Finally, the defendants argue that Henry is entitled to qualified immunity because it was not certain that Springer's contract would be renewed, and therefore, his rights were not clearly established.

Upon review of the briefs and the law, the court agrees with Springer that his speech was protected under the First Amendment. Moreover, the undisputed facts establish that his speech was not disruptive. Furthermore, the court agrees with the plaintiff that his right to engage in speech was clearly established at the time he was terminated. Therefore, Ms. Henry is not entitled to qualified immunity. Thus, the court will grant the plaintiff's motion for partial summary judgment on the issues of protected speech and qualified immunity. The court must, therefore, deny the defendants' motions on these issues.

Additionally, the court finds that questions of fact remain as to whether Springer's speech was the motivation behind his termination, whether the circumstances required his termination such that his speech was immaterial, and whether he suffered damages. In light of these genuine issues of material fact, summary judgment is inappropriate on these issues. Thus, the court will deny the defendants' motion in its entirety. The court will now explain the reasons for its decision.

II. FACTS

Dr. David Springer began working for the DPC in 1991. [FN1] The hospital was supervised by the Delaware Department of Health and Social Services ("DDHSS"). More specifically, it was supervised by the DDHSS's Division of Alcoholism, Drug Abuse, and Mental Health ("DADAMH"). Renata Henry was the director of the DADAMH. [FN2] Dr. Gregg Sylvester was the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 2
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Secretary of the DDHSS. From August 1992 to June 2000, Springer was the director of the DPC. In that capacity, he was responsible for training psychiatric residents. He was also a member of the credentials committee responsible for hiring new doctors.

> FN1. In 1991, DPC was known as Delaware State Hospital. Nevertheless, Delaware State Hospital and DPC are the same entity.

> FN2. Although she served as director of DADAMH, Ms. Henry is not a physician.

**\*2** The DPC confronted numerous, serious problems. Several patients had committed suicide. Others had escaped. In December 1999, the federal Healthcare Financing Agency threatened to end DPC's federal funding. Moreover, the Delaware News Journal ran several highly critical articles about the DPC.

On November 23, 1999, Springer wrote a memorandum addressed to the Governor, the DPC Governing Board, and Ms. Henry. Springer's memo addressed at least twenty-three separate topics. However, the memo generally described attempted suicides, security failures (including patient escapes), under-staffing, violations of Medicare regulations (including an alleged failure to properly notify Medicare officials of the correct number of staff on hand), and lack of quality medical care. Springer also mentioned the need to continue the medical residency program. On March 21, 2000, Springer filed a report with the DPC Governing Board which addressed concerns similar to those outlined in his memo. In his report, however, he also alleged fraud and threatened to take his concerns to regulatory agencies.

Like the other doctors at the DPC, Springer was an independent contractor under contract with the DPC. From 1991 to 2000, Springer's contracts specified that the contract term was for one year and could be terminated without cause upon fifteen days notice. The contract terms do not guarantee renewal. Nevertheless, Springer's contract-as well as those of the other DPC physicians-was renewed each year.

In 1996, the Delaware General Assembly amended the Delaware Procurement Act, 29 Del. C. ch. 69, to provide that all contracts for professional services exceeding $50,000 per year must be subject to public bidding. In early 2000, Secretary Sylvester instructed his division directors to comply with the new provisions and require public bidding on professional service contracts. The DPC physicians earned more than $50,000 per year.

After Springer wrote his memo to the Governor, the situation at the DPC workplace became progressively worse. On May 12, 2000, Henry notified Springer that his contract would not be renewed. Springer was told that he would have to submit a bid to maintain his employment. Defendants maintain that all fifteen DPC psychiatrists were required to submit bids. Conversely, Springer maintains that he was the only physician who was made to reapply. Moreover, Springer contends that he was not informed of the bidding procedures until the day before the bids were due.

Springer asserts that the non-renewal of his contract was based on his comments to the Governor. However, DPC offered three other reasons. First, they believed that Springer was insubordinate because he failed to return documents relating to the credentials certification of a physician applicant. Springer asserts that he missed the deadline for returning the materials because he wished to consult his attorney. Second, DPC alleged that Springer improperly kept patient records at home. Springer submits that he never kept originals or copies of patient documents in his home office. Finally, DPC told Springer that he had improperly considered his personal feelings in deciding whether a certain physician applicant should be credentialed. Springer contends that he did not act inappropriately in the decision-making process.

### III. STANDARD OF REVIEW

**\*3** Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc.,* 13 F.3d 674, 679 (3d Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.1999). The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence-not mere allegations-for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace,* 101 F.3d 947, 951 (3d Cir.1996) (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F .2d 1224, 1230 (3d Cir.1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson,* 477 U.S. at 249-50.

## IV. DISCUSSION

### A. Springer's Rights under the First Amendment

In order to establish that his First Amendment rights were violated, Springer must demonstrate that his speech was protected. *See Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.1997). He must then establish that his protected speech was a motivating factor behind the alleged retaliation. *See id.* Finally, the burden will then shift to the defendants to demonstrate that the same action would have been taken if the speech had not occurred. *See id.*

### 1. Springer's Speech was Protected

The Third Circuit has outlined a two-part test to determine whether a public employee's speech is protected. First, the speech must pertain to a matter of public concern. *See Azzaro v. County of Allegheny,* 110 F.3d 968, 976 (3d Cir.1997). Second, the court must balance the government's interest in effective administration against the employee's free speech rights. *See id.* This is commonly referred to as the *Pickering* balancing test. *See Pickering v. Board of Ed. of Tp. High School,* 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

### a. Matters of Public Concern

**\*4** Whether speech addresses a matter of public concern is an issue for the court to decide. *See Waters v. Churchill,* 511 U.S. 661, 668 (1994). To ascertain whether speech addresses a matter of public concern, the court must consider whether the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996) (citations omitted). In making this determination, the court can consider the "content, form, and context of a given statement." *Connick v. Myers,* 461 U.S. 138, 147-48 (1983).

The content of Springer's speech clearly addressed a matter of public concern. Speech may be characterized as a matter of political or social concern if the speech reveals "actual or potential wrongdoing." *See Holder v. City of Allentown,* 987 F.2d 188, 195 (3d Cir.1993). The cases cited by the plaintiff clearly establish that health care issues are matters of public concern when addressed by medical professionals. *See Schneiner v. New York City Health and Hospitals,* 157 F.Supp.2d 487, 495-96 (S.D.N.Y.2001) (finding speech protected where physician wrote to Mayor Giuliani's office regarding problems at municipal hospital); *Kattar v. Three Rivers Area Hospital Auth.,* 52 F.Supp.2d 789, 799 (W.D.Mich.1999) ("In several cases, courts have held that statements by health care providers regarding patient care involved matters of public concern.") (collecting cases).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

In the present case, similar to *Schneiner* and *Kattar,* Springer was a health care provider who commented on the state of health care at the DPC facility. All of his statements concerned deficiencies at the facility. Moreover, many of problems Springer addressed involved danger to the lives of patients or the surrounding community (i.e. suicides and escapes). Thus, he raised concerns of a grave nature that would be relevant to the medical community, the community surrounding the DPC facility, the families of DPC patients, and the Delaware taxpayers who financed the operation. The court therefore concludes that the content of Springer's speech addressed issues that would be relevant to many groups of Delaware residents.

The defendants assert that Springer's statements were motivated by his own personal interests and thus did not address a matter of public concern. This allegation is based on the fact that Springer's comments also addressed the medical residency program. The defendants argue that since Springer was in charge of the residency program, only he would benefit from such comments. The court rejects this argument. First, a medical residency program could be beneficial to the DPC even in Springer's absence. Second, and more important, the medical residency program was but one of many points Springer addressed. The record clearly demonstrates that the vast majority of Springer's comments addressed the safety and medical concerns at the DPC. Thus, the court finds that the content of Springer's speech addressed a matter of public concern.

**\*5** The context of Springer's speech also indicates that he was addressing a matter of public concern. First, his comments were addressed to the Governor, the DPC Governing Board, and Ms. Henry. If Springer merely wanted to raise his personal issues, addressing his comments to Henry alone would have sufficed. The fact that his statements were addressed to public officials, however, indicates that was attempting reach an audience that could provide redress for the serious issues he raised. Furthermore, the federal government had already begun to investigate problems at the DPC long before Springer's statements. Additionally, several News Journal articles had also addressed the issues Springer raised. *See Watters v. City of Philadelphia,* 55

F.3d 886, 895 (3d Cir.1995) (noting that news coverage can be relevant to determining whether speech addresses a matter of public concern.) The involvement of the federal government and the press strongly indicates that the public was interested in the operations of the DPC. Thus, the court finds that the content and context of Springer's speech addressed a matter of public concern.

### b. Balancing the Government's and Springer's Interests

The only argument the defendants assert on this point is that Springer's comments were disruptive to the DPC's operation. The defendants assert that Springer's comments were intended to be disruptive. The court has reviewed the defendants' recitations of the facts and neither recitation includes facts that would permit the court to reasonably conclude that Springer's comments had any disruptive effect. Indeed, as far as the court can tell, the only fact that the defendants assert in support of this argument is that after agreeing to return the documents regarding the physician applicant, Springer delayed in producing the documents while he consulted his attorney. First, the defendants have failed to adduce facts demonstrating that the delay was disruptive. More important, even if this delay in returning the documents was disruptive, the defendants have failed to show how this disruption was in any way related to Springer's *speech.* Therefore, the court rejects the defendants' argument and concludes that they have not sufficiently demonstrated a government interest sufficient to outweigh Springer's First Amendment rights.

### 3. The Remaining Prongs of the Test

The court finds that summary judgment is inappropriate as to whether Springer's termination was motivated by his speech or, similarly, whether he would have been terminated in the absence of the speech. First, the record reveals that any number of factors could have motivated the defendants' decision to terminate Springer's contract. Indeed, the defendants have provided at least three reasons that are unrelated to Springer's comments-his insubordination, keeping

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

documents at home, and improperly considering his personal feelings during the physician applicant process. However, issues of fact surround whether plaintiff was truly insubordinate, whether he kept documents at home, or whether he had a "vendetta" against the physician applicant. Springer denies all of these allegations. Thus, the parties do not agree on the facts concerning these issues. The court cannot decide these issues on the record before it because they all involve credibility determinations. The motivation behind the defendants' decision is, therefore, a question of fact that is more properly addressed to the fact-finder than to the court. Moreover, it is unclear whether the plaintiff would have been terminated if he had not spoken. The defendants' assert that all fifteen psychiatrists were required to bid for their contracts. Conversely, Springer contends that he was the only physician made to bid. Additionally, Springer asserts that he was not notified of the bidding process in a timely fashion. Since the parties disagree on this highly relevant fact, the jury, rather than the court, should decide this matter. The court will, therefore, deny summary judgment on these two prongs.

### 4. Damages

**\*6** The court similarly finds that summary judgment on the issue of damages is inappropriate. Based on Singer's tax returns for the years 1997 to 2000, the defendants assert that he suffered no economic loss. Conversely, Springer alleges that his 2001 tax return (not mentioned by defendants) proves a significant economic loss. Moreover, Springer states that he can provide expert testimony to prove that he has, indeed, suffered damages. In light of these conflicting factual interpretations, the court finds that there is a genuine issue of material fact on the damages issue. Therefore, the court will also deny defendants' motion on this point.

### B. The Qualified Immunity Issue

Henry is not entitled to qualified immunity. Although state officials may be sued in federal court, their liability may be limited by the doctrine of qualified

immunity, which permits officials to avoid liability for actions performed in the course of their official duties. The Supreme Court recently affirmed the two part test for qualified immunity. First, the court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, are sufficient to show that the defendant violated a constitutional right. *See Saucier v. Katz,* 121 S.Ct. 2151, 2155-56 (2001). Second, if a constitutional violation can be demonstrated on the facts alleged, the court must next consider whether the right was clearly established at the time of the alleged violation. *See id.* at 2156. In *Saucier,* the court further clarified that the right must be established in a "particularized" sense, meaning that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See id.* Additionally, the court noted that although the court must decide whether the facts alleged-not proved-by the plaintiff amount to a constitutional violation, even where there may be a material issue of fact, if the law did not put the officer on notice that his conduct was unlawful, summary judgment may be permissible. *See id.* at 2156-57.

The parties here contest only whether Springer's rights were clearly established at the time he was terminated. A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ." *See id.* at 2156. More specifically, a right is clearly established where case law speaks "with obvious clarity to the specific conduct in question." *United States v. Lanier,* 520 U.S. 259, 271 (1997).

Relevant Supreme Court precedent establishes that "independent government contractors cannot be terminated for exercising their First Amendment rights." *Board of Comm. Wabaunsee v. Umbehr,* 518 U.S. 668, 686 (1996). *See also O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 721 (1996) (noting same). Thus, the Supreme Court has recognized on at least two occasions that an independent contractor-such as Dr. Springer-- has a constitutional right to free speech. Therefore, it cannot be more clear that this right was clearly established.

**\*7** The defendants assert that this court should be

Not Reported in F.Supp.2d                                                        Page 6
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

persuaded by *Hauge v. Brandywine School District,*
*131 F.Supp.2d 573 (D.Del 2001).* In that case, the court
held that the right to be free from retaliation was not
clearly established because due to the "fact-intensive
nature of the *Pickering* balancing test," the officials
were not on notice that their conduct violated the First
Amendment. *Id.* at 584. The court will not follow
*Hauge* for two reasons. First, the court is persuaded by
the plaintiff's contention that *Hauge,* although it may
have been correctly decided on the record before that
court, is unique. Although the *Hauge* court granted
qualified immunity based on the fact-intensive
balancing required by the *Pickering* test, neither the
plaintiff nor the defendants have presented any
authority to permit this court to conclude that the
*Pickering* balancing test must always lead to a denial of
qualified immunity. [FN3] If the court were to accept the
defendants' position, qualified immunity could never be
denied in First Amendment retaliation cases. This is an
extreme result, one the *Hauge* court probably did not
intend and one that this court will not sanction.

       FN3. Indeed, the *Hauge* court itself cites no
       authority for this novel proposition.

Second, this case is factually distinguishable from
*Hauge.* Hague involved a school district administrator
who brought allegations of fraud against the school
district. *See id.* at 577-578. This case involves a
physician who spoke on the various problems
confronting hospital administration. Under facts very
similar to those in this case, courts have found that the
right to speak was clearly established. *See Schneiner,*
152 F.Supp.2d at 493 ("There is no doubt that the
plaintiff [physician's] rights under both the First
Amendment and the Fourteenth Amendment [to
comment on health care at the hospital] were clearly
established at the time the plaintiff was disciplined."").
Thus, considering the facts before this court, this court
also finds that Springer's right was clearly established at
the time he spoke. [FN4]

       FN4. The court finds that the defendants'
       reliance on *Saucier v. Katz,* 121 S.Ct. 2151
       (2001) for the proposition that there must be

exact congruence between the precedential
facts and the facts of the present case is
misplaced. First, *Saucier* involves a
completely different context-excessive force
under the Fourth Amendment. More
important, *Saucier* does not require that the
facts of each case be identical. The court
therefore rejects the defendants' argument on
this issue.

Finally, the defendants contend that the plaintiff's right
was not clearly established because under the new
bidding process, his contract was not certain to be
renewed. As Springer notes, however, independent
contractors are entitled to First Amendment protection
where there is a *preexisting* contractual relationship.
*See Umbehr,* 518 U.S. at 685 (noting that holding
establishing right to First Amendment speech was
limited to independent contractors with "preexisting
commercial relationship" with government). Springer
had been under contract with the DPC since 1991.
Thus, it is clear that he had a pre-existing commercial
relationship. The court therefore rejects the defendants'
argument on this issue.

For these reasons, the court finds that Ms. Henry is not
entitled to qualified immunity.


                    V. CONCLUSION

For all of the foregoing reasons, the court concludes
that Springer's speech was protected. Nevertheless, a
jury must decide whether his protected speech
motivated his termination, whether he would have been
terminated in the absence of the speech, and whether he
suffered damages. Finally, Henry is not entitled to
qualified immunity. Thus, the court will deny the
defendants' motion for summary judgment and grant
Springer's motion for partial summary judgment.

**\*8** NOW, THEREFORE, IT IS HEREBY ORDERED
that:
1. The Defendants' Motion for Summary Judgment
(D.I.35) is DENIED;
2. The Plaintiff's Motion for Partial Summary Judgment
(D.I.38) is GRANTED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 7
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**



D.Del.,2002.
Springer v. Henry
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00885 (Docket) (Oct. 06, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**CERTIFICATE OF SERVICE**

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

January 25, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

FTU / Briefs / FTU - -SJOB.final

-41-