previous position.   The appeal in that case also was resolved by a written Settlement Agreement.   But upon his reinstatement defendants then set out to drive plaintiff from his employment and within three months orchestrated a local and international media campaign riddled with malicious falsehoods which have totally destroyed plaintiff's professional reputation.   Plaintiff also asserts supplemental state law claims for defamation and false light invasion of privacy.

## I.   JURISDICTION

2.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendments to the U.S. Constitution.   More specifically, paragraph 3 of this Court's November 20, 2003 Stipulated Order in the case of Foraker v. Chaffinch, et al., C.A. No. 02-302-JJF (D. Del.), states that "the Court shall retain jurisdiction over this matter to enforce its order of reinstatement should that become necessary," which precondition now has arisen.   (See Exhibit A, ¶ 3).   The cause of action arises under 42 U.S.C. § 1983. The claims arose in this judicial district.   This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 which provides for supplemental jurisdiction.

## II.   THE PARTIES

3.   Plaintiff Sergeant Christopher D. Foraker is a citizen

of the United States and a resident of New Castle County, Delaware. He is a 19 year veteran of the Delaware State Police ("DSP") and is currently a section chief and the non-commissioned officer in charge ("NCOIC") of the Firearms Training Unit ("FTU"). He is less than one year short of the right to retire with full pension benefits and the option to consider other career opportunities. At all times material hereto, his job performance has been outstanding. He is an excellent police officer.

4. Defendant Colonel L. Aaron Chaffinch is currently the Superintendent of the DSP and its highest-ranking officer. He is sued both individually and in his official capacity. He has committed repeated civil rights violations against Troopers under his command.

5. Defendant Lieutenant Colonel Thomas F. MacLeish is currently the Deputy Superintendent of the DSP and its second-highest ranking officer. He is sued both individually and in his official capacity.

6. Defendant David B. Mitchell is currently Secretary of the Department of Safety and Homeland Security of the State of Delaware and he is the superior to Chaffinch and MacLeish in the chain of command. He is sued in his official capacity to obtain injunctive relief which will prohibit Chaffinch and MacLeish from continuing to violate plaintiff's constitutional rights.

-3-

A - 32

7.   Defendant Division of State Police, Department of Public Safety, State of Delaware is an agency of the State of Delaware, which is only joined in this action for purposes of collecting attorneys' fees and costs.

### III.   FACTS GIVING RISE TO THE ACTION

A.   Plaintiff's Protected Speech and Petition.

8.   From August 1, 2001 through February 22, 2002, plaintiff previously served as the non-commissioned officer in charge of the DSP's Firearms Training Unit in Smyrna, Delaware.

9.   In April of 2002, defendant Chaffinch illegally retaliated against plaintiff for exercising his free speech rights and transferred him out of the FTU.

10.   Plaintiff then exercised his First Amendment rights to freedom of speech and to petition the government for redress of grievances and filed a federal lawsuit against defendant Chaffinch.   That case was docketed as <u>Foraker v. Chaffinch</u>, et al., C.A. No. 02-302-JJF (D:Del.).

11.   In June 2003 a jury found that defendant Chaffinch had violated plaintiff's First Amendment free speech rights by illegally transferring him from the FTU in retaliation for engaging in protected speech activity.   The jury awarded plaintiff $40,120 in compensatory damages and also $60,000 in punitive damages to punish defendant Chaffinch for his malicious and oppressive conduct.

-4-

A - 33

12. The case subsequently settled pursuant to a Settlement Agreement dated November 19, 2003, and a Stipulated Order of this Court dated November 20, 2003 (Exhibit A attached which is incorporated herein by reference). As part of the Settlement Agreement, plaintiff was placed back into the position of NCOIC of the FTU.

13. It was agreed that "there shall be no retaliation against plaintiff in violation of his civil rights once he assumes the duties of (the NCOIC) position."

14. It was agreed that "the Delaware State Police will reinstate Sergeant Christopher D. Foraker to his prior position as the Non-Commissioned Officer-in-Charge of the Firearms Training Unit with all of the rights, privileges, duties, and responsibilities and supervisory authority previously held by him when he earlier occupied that position on February 20, 2002."

15. Paragraph 1 of this Court's November 20, 2003, Stipulated Order also states that "Sergeant Christopher D. Foraker is ordered reinstated to his prior position as the Non-Commissioned Officer-in-Charge of the Firearms Training Unit of the Delaware State Police with all of the rights, privileges, duties, responsibilities and supervisory authority previously held by him when he earlier occupied that position on February 20, 2002." (Exhibit A, ¶ 1).

16. Paragraph 3 of this Court's November 20, 2003

-5-

A - 34

Stipulated Order states that "the Court shall retain jurisdiction over this matter to enforce its order of reinstatement should that become necessary." (Exhibit A, ¶ 3).

17. Pursuant to the Settlement Agreement, on December 1, 2003, plaintiff returned to his previous position as NCOIC at the FTU.

18. Defendants Chaffinch and MacLeish were aware that plaintiff had engaged in protected speech and had petitioned the government for redress of grievances by filing and ultimately winning his initial lawsuit against defendant Chaffinch. Additionally, plaintiff's lawsuit, the trial, jury verdict and subsequent settlement received extensive media coverage throughout the State of Delaware, including numerous stories in the Delaware State News and the News Journal.

19. At all times plaintiff spoke out on issues of public concern and petitioned the government for redress of grievances under the First Amendment and sought to bring to light actual or potential wrongdoing or breach of the public trust by high public officials and also sought to bring to light defendant Chaffinch's illegal actions which violated the U.S. Constitution.

20. By its content, form and context, at all times plaintiff spoke out about matters of public concern.

21. All of plaintiff's speech and petitioning was non-disruptive of any legitimate interest of his employer and was on

-6-

matters of public concern to the DSP, as well as the General
Assembly, the Governor of Delaware, the news media, voters and
the public at large. His speech and petitioning related to
matters of political, social and other concern to the community.

22. Plaintiff was acting in good faith and with honest
motive at all times when he exercised his First Amendment rights
to freedom of speech and to petition the government. At all
times, plaintiff believed that his speech was true and, as the
jury found, his speech was in fact true.

23. Plaintiff was not being disloyal by speaking out and
petitioning the government. Instead, he sought to bring to light
blatant violations of the U.S. Constitution by the highest
ranking police officer in the State of Delaware.

24. The public concern in and value to the community at
large of being free to hear plaintiff's speech and petition
outweighs any asserted government interest in the effective and
efficient provision of services.

25. Nothing plaintiff said interfered with the regular
operations of the DSP. Plaintiff's speech did not interfere with
the DSP's interests in: crime fighting; fostering trust and
confidence among officers; protecting the safety of officers or
other members of the community.

26. Plaintiff's speech did not threaten the authority of
defendants to run the DSP. Nothing plaintiff said damaged his

A - 36

relationship with defendants or with any of his superior officers. Plaintiff did not impugn the integrity of his supervisors.

27. Plaintiff's speech did not have a detrimental impact on any close working relationship for which personal loyalty, trust and confidence are necessary. Plaintiff is not the alter ego of defendants. Organizationally, plaintiff is five ranks below defendant Chaffinch and four ranks below defendant MacLeish in the chain of command. Defendants are the Colonel and Lieutenant Colonel. Plaintiff is a mere sergeant.

28. Any disruption that was caused in the DSP was not caused by plaintiff's speech but was instead caused by the very problems that plaintiffs' speech was in fact intended to address – defendant Chaffinch's illegal conduct.

29. In his position as a sergeant in the DSP, plaintiff did not make or formulate DSP policy. Rather, formulation of DSP policy is left up to the Superintendent and Deputy Superintendent of the DSP.

**B. Defendant Chaffinch's Resulting Animus Towards Plaintiff.**

30. As a direct and proximate result of plaintiff's successful lawsuit against him, defendant Chaffinch carries a personal vendetta against plaintiff. Defendant Chaffinch has told family, friends, political mentors, members of his Executive Staff and others that he will do everything in his power to

-8-.

A - 37

inflict injury on and destroy plaintiff.

31. For example, Chaffinch orchestrated several media events where he made false and defamatory statements about plaintiff's job performance. Immediately after one such event, he advised his executive staff "I got my shots in. People who live in glass houses shouldn't throw stones. The mess at the range is all Foraker's fault. I got him back."

C. The Long Term Historic Preexisting Problems at the FTU.

32. The FTU is a multimillion dollar facility that was built under the supervision and direction of the Department of Administrative Services of the State of Delaware and its Division of Facilities Management ("Facilities Management") which is currently headed by Cabinet Secretary Gloria W. Homer. Facilities Management is responsible for maintenance of the FTU and is the landlord for the DSP.

33. Since its construction in 1998, the FTU has been plagued by problems that have affected, endangered and impaired the health and safety of those who work and train there. The root cause of these problems are a faulty design and improper construction of the facility. Due to improprieties, financial irregularities, breach of the public trust, fraud and/or corruption by public officials, Facilities Management also improperly awarded the contract to build the FTU to an unqualified bidder. As a result, a substandard facility was

-9-

A - 38

built.

34.    When defendant Chaffinch illegally transferred plaintiff out of the FTU in April 2002, he simultaneously improperly transferred a personal friend into plaintiff's former position as NCOIC.    This friend was inexperienced and unqualified to run a firearms facility, especially a historically troubled facility like the FTU.

35.    The conditions at the FTU worsened and steadily deteriorated while defendant Chaffinch's friend was in charge of the FTU.

36.    Defendant Chaffinch was aware of these worsening conditions but purposefully chose to cover them up in order to save face.

37.    The true causes of the problems at the FTU were known at all times by defendants Chaffinch and MacLeish.

38.    Immediately upon his return to the FTU on December 1, 2003, plaintiff became aware of the problems and worsening conditions at the FTU and he immediately began to take steps to try to fix the facility.

39.    Unfortunately, the deterioration of the FTU was too far gone and on March 19, 2004, the FTU was shut down due to environmental contamination.

40.    The local media reported extensively on the forced closure of this government facility.

-10-

A - 39

**D.    Defendants' Defamatory Retaliation Against Plaintiff.**

41.   Shortly thereafter, defendants Chaffinch and MacLeish, with Secretary Homer, gave guided tours of the FTU to members of the local media, including reporters from the Delaware State News, the News Journal and WBOC-TV Salisbury, Maryland.  During these tours, defendants Chaffinch and MacLeish falsely, recklessly and maliciously blamed plaintiff for the problems that had contaminated, shut down and effectively destroyed the FTU. They accused plaintiff of mismanagement, dereliction of duty and destroying this multimillion dollar facility.

**E.    Publication and Circulation of Defendants'**
**False Accusations.**

42.   Defendants' false, reckless and malicious accusations resulted in numerous newspaper articles being published in the Delaware State News and the News Journal, the newspapers of general circulation in the State of Delaware.  In these articles, defendants' false, reckless and malicious accusations were published to an audience of hundreds of thousands of readers.

43.   Similarly, WBOC-TV in Salisbury, Maryland ran numerous television news stories about the cause of the closure of the FTU.  WBOC has a viewing audience and distribution market totaling hundreds of thousands of people, in areas such as Kent County, Sussex County, Eastern Maryland, Dover and Smyrna, Delaware.  In these news stories, defendants' false, reckless and malicious accusations again were published to an audience of

-11-

A - 40

hundreds of thousands of viewers.

44.  In addition to local and regional circulation and distribution, defendants' false, reckless and malicious accusations also were published nationally and internationally. AMERICAN POLICE BEAT is an international police and public safety industry trade magazine with a circulation throughout the United States and Canada.  Defendants' false, reckless and malicious accusations also were published in one of its magazines with a circulation of thousands of persons, including persons in the firearms manufacturing, law enforcement and public safety communities.

45.  As discussed above, defendants false accusations were contained in and were the subject of numerous newspaper articles in the Delaware press.  One such article was published on the front page of the Delaware State News.  This particular article has been widely circulated in the local community in which plaintiff lives.

46.  For example, there is a popular, well-known seafood restaurant in Smyrna, Delaware called Sambo's.  As part of its decor, Sambo's purchases copies of newspapers and places them on the tables in the restaurant.

47.  The aforementioned edition of the Delaware State News with the front page story was purchased in bulk by Sambo's on the day defendants' defamatory accusations towards plaintiff were

-12-

A - 41

published.  Copies of this article were placed on every table in

Sambo's.  Innumerable patrons of Sambo's read this article while

it sat on their tables.

### F.  Defendants' Accusations are Absolutely False and Injurious.

48.  Defendants' accusations are absolutely false.

Plaintiff is and has always been an excellent supervisor at the

FTU.  As discussed above, the problems at the FTU have been

longstanding and were only exacerbated by defendant Chaffinch's

inexperienced friend.  Plaintiff is not guilty of mismanagement,

dereliction of duty or of destroying the FTU in any way shape or

form.  For example, the statement Chaffinch made to his Executive

Staff that "the mess at the range is all Foraker's fault" is

absolutely false.

49.  Defendants knew or recklessly disregarded the knowledge

that their outrageous accusations were false and would cause

plaintiff severe emotional distress and also severely injure

plaintiff's reputation.

50.  Plaintiff was hurt, wounded, distressed, shocked,

anguished, stunned, appalled, floored, taken aback, offended,

traumatized, scandalized and otherwise outraged by these false

accusations against him

51.  The accusations that plaintiff was guilty of

mismanagement, dereliction of duty and destroying a multimillion

dollar firearms facility have injured and tend to injure

plaintiff's reputation in the popular sense; diminish the esteem, respect, goodwill or confidence in which plaintiff was previously held as well as excite adverse, derogatory or unpleasant feelings or opinions against him.

52.  In the same way, these false accusations have harmed plaintiff's reputation and lowered him in the estimation of the community or deterred third persons from associating or dealing with him.

53.  Plaintiff has been isolated from society as a result of defendants' false accusations.  Plaintiff may never know the extent of his lost opportunities to relate and associate with others because he could be avoided without knowing the reason and without having a chance to rebut the false accusations against him.

54.  These false accusations have exposed plaintiff to public contempt or ridicule in the minds of right thinking persons or among a considerable and respectable class of people.

55.  Any third party would understand accusations of mismanagement, dereliction of duty and destroying a multimillion dollar facility to be injurious to the reputation of the accused.

**G.  Defendant Chaffinch Maliciously Muzzled Plaintiff So He Could Not Respond to the False Accusations Being Made Against Him.**

.56.  In order to further injure plaintiff's reputation, defendant Chaffinch maliciously ordered that neither plaintiff

-14-

A - 43

nor his supervisor could speak with the media to rebut the
outrageously false allegations which were being publically
leveled against plaintiff.

### H.    Continued Retaliatory Reduction of Plaintiff's Rights, Privileges, Duties, and Responsibilities.

57.    Defendants Chaffinch and MacLeish also have stripped
away plaintiff's rights, privileges, duties, responsibilities,
and supervisory authority which were protected by paragraph 1 of
this Court's November 20, 2003 Order.   (Exhibit A).

58.    For example, on June 29, 2004 and July 15, 2004,
plaintiff received several e-mails, inviting him to attend a
scheduled July 20th Commanders and Section Chiefs meeting.   As
the NCOIC of the FTU, plaintiff is the commander and section
chief of the FTU.   Plaintiff had previously attended these
meetings during his first stint as the NCOIC of the FTU.

59.    Upon arriving at the meeting, defendant MacLeish
publically humiliated plaintiff and indicated that plaintiff was
not welcome at the meeting and ordered him to leave the meeting
and never return.

60.    The number of individuals who plaintiff supervises also
has decreased since he returned to the FTU as the NCOIC.

### IV.    CAUSAL CONNECTION

61.    The totality of retaliatory adverse action taken by
defendants against plaintiff are sufficient to deter a person of
ordinary firmness from exercising their First Amendments right to

-15-

A - 44

freedom of speech and to petition the government for redress of grievances.

62. A reasonable person of ordinary firmness would be deterred from exercising his First Amendments right to freedom of speech and to petition the government for redress of grievances if he was falsely accused of mismanagement, dereliction of duty, destroying a multimillion dollar government facility and if he was publically defamed on a local, regional, national and international scale.

63. There is a causal link between First Amendment protected activity on matters of public concern and the adverse actions of materially altering plaintiff's job responsibilities and launching a campaign of false accusations of dereliction of duty and other misconduct by plaintiff. This is demonstrated by:

> (a)    the temporal proximity of events, since within three months of his reinstatement defendants orchestrated a local, national and international media attack on plaintiff's professionalism and reputation;

> (b)    circumstantial evidence of a pattern of antagonism following protected activity, for example, when defendant Chaffinch stated "I got him back" and "I got my shots in" to his executive staff after a media event;

> ( c)    personal knowledge and awareness of protected

-16-

A - 45

activity by the individual defendants, since defendant Chaffinch attended the trial against him and defendant MacLeish was a trial witness;

(d)     violation of paragraph 1 of this Court's Order of November 20, 2003 in that the rights, privileges, duties, responsibilities and supervisory authority previously held by plaintiff have been materially altered;

(e)     the fact that the accusations against plaintiff are a cover-up or a pretext since the problems with the FTU were preexisting and were not caused in any way by plaintiff who only had been reinstated to the facility three months before it was closed down;

(f)     the fact that defendant Chaffinch had abundant motive to take revenge on plaintiff who had publically humiliated him by obtaining an unprecedented and well publicized federal court jury verdict against him;

(g)     the fact that plaintiff was publically singled out by the individual defendants as being responsible for the safety and health problems at the FTU; and

(h)     the evidence viewed as a whole.

64.     First Amendment protected activity was a substantial or motivating factor in the adverse action taken against plaintiff. The natural probative force of the evidence demonstrates

-17-

A - 46

causation.

65. The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation, plaintiff would have had adverse employment action taken against him anyway.

66. Any non-retaliatory reasons cited by the defendants to defeat causality are a pretext.

67. As a direct and proximate result of the actions of the defendants as detailed herein, plaintiff has suffered and is suffering diminished earning capacity now and upon his retirement, decreased employment and earnings opportunities, and other pecuniary losses, emotional pain, suffering, disappointment, anger, inconvenience, mental anguish, loss of enjoyment of life, mental and physical pain, anguish, humiliation, embarrassment, injury to reputation, and other non-pecuniary losses and injury.

68. For example, plaintiff intended to obtain a job in the firearms industry after he retires from the DSP. The position held by plaintiff also has been a jump off point on retirement into lucrative employment with the firearms industry. One former Trooper who headed the FTU on retirement was hired by Smith and Wesson Company as a Vice-President. The negative media publicity, which includes statements in an international trade magazine, will make it impossible for plaintiff to work in the firearms industry. Moreover, any police officers he would

-18-

A - 47

interact with as part of any firearms industry employment will be aware of the FTU range problems and wrongly believe that plaintiff was responsible.

## V. ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT

69. The actions of the defendants and their agents or employees were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federal constitutional rights and because of the exercise of those rights. The defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights. Their actions were outrageous and taken with evil motive, in bad faith, out of personal animus and without any reasonable grounds to support them. Their actions were wanton and malicious or taken with reckless indifference to federal constitutional rights and as to the truth.

70. The exercise of rights under the U.S. Constitution made a difference in all actions adverse to plaintiff. The exercise of these rights was a motivating or determinative factor in all actions adverse to plaintiff.

71. The individual defendants' actions violated clearly established federal constitutional rights of which any reasonable official would have known, including more than three decades of Supreme Court and Third Circuit case law prohibiting retaliation

-19-

A - 48

against public employees for protected speech.

72.   At all times material hereto the individual defendants participated in, authorized, and sanctioned the federal constitutional deprivations described above which illegally retaliated against plaintiff.

73.   At all times material hereto the individual defendants and their agents were acting under color of law.  The federal constitutional deprivations described herein are fairly attributable to the State.

74.   The defendants' actions were motivated by bias, bad faith, and improper motive.

75.   The defendants' actions constitute an abuse of governmental power.

76.   The defendants did not reasonably believe that the actions they took were necessary to accomplish any legitimate governmental purpose.

77.   The defendants' actions are not so reasonable as to further any governmental interest asserted and do not closely fit the goal of serving those governmental interests.

78.   The defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

79.   Defendant Chaffinch's vendetta and animus against plaintiff indicates that he cannot effectively and fairly make employment decisions and statements concerning plaintiff's

-20-

A - 49

employment performance without oversight by a monitor.

### COUNT I - (Free Speech Retaliation)

80. Plaintiff repeats and realleges paragraphs 1 - 79 set out above and incorporates them by reference.

81. The defendants took action adverse to plaintiff as a direct and proximate result of and in retaliation for his First Amendment protected speech on matters of public concern. There is a temporal and causal relationship between plaintiff's aforementioned protected speech, and adverse employment action. First Amendment protected activity was a substantial or motivating factor in the adverse employment action. The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had grounds to adversely treat plaintiff.

82. Plaintiff's constitutional right to freedom of speech has been denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

### COUNT II - (Petition Clause Retaliation)

83. Plaintiff repeats and realleges paragraphs 1 - 82 set out above and incorporates them by reference.

84. The defendants took action adverse to plaintiff as a direct and proximate result of and in retaliation for his exercise of his First Amendment right to petition the government for redress of grievances. There is a temporal and causal

-21-

A - 50

relationship between plaintiff's aforementioned protected petitioning and adverse employment action. First Amendment protected activity was a substantial or motivating factor in the adverse employment action. The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had grounds to adversely treat plaintiff.

### COUNT III - (Defamation)

85. Plaintiff repeats and realleges paragraphs 1 - 84 set out above and incorporates them by reference.

86. Plaintiff's right to live his life free of defamatory falsehood has been denied in violation of the common law of the State of Delaware.

### COUNT IV - (False Light Invasion of Privacy)

87. Plaintiff repeats and realleges paragraphs 1 - 86 set out above and incorporates them by reference.

88. Defendants sought out media sources and publicized the shutdown of the FTU in a manner which places plaintiff before the public in a false light.

89. Similar publicity about a reasonable person would be highly offensive to that reasonable person under similar circumstances.

90. Defendants knew the manner in which they conveyed the information about plaintiff was false, or they recklessly

-22-

A - 51

disregarded whether it was false.

91.  Defendants' actions would outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.

92.  The context, conduct and circumstances discussed at length above do not justify the public statements made about plaintiff.

93.  The motives of defendants were malicious.

94.  Plaintiff's reputation and ability to find employment have suffered as a direct and proximate result of defendants' actions.

95.  Plaintiff's right to live his life free from having his privacy cast in a false light has been denied in violation of the common law of Delaware.

Wherefore, plaintiff prays that the Court:

A.  Enter judgment against the defendants.

B.  Enter a declaratory judgment declaring the acts of the defendants to be a violation of plaintiff's constitutional and common law rights.

C.  Enter a judgment against defendants Chaffinch and MacLeish, both jointly and severally, for compensatory damages, including lost wages, back pay, benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation,

-23-

A - 52

embarrassment, and injury to reputation.

D.   Enter a judgment against the defendants Chaffinch and MacLeish, both jointly and severally,  for punitive damages.

E.   Award plaintiff costs, interest and attorneys' fees for this suit, and pre and post judgment interest.

F.   Issue a mandatory injunction directing defendant Mitchell to act as a monitor of defendants Chaffinch and MacLeish to prohibit any retaliation or harassment of plaintiff by overseeing and approving any action or statements made by defendants Chaffinch and MacLeish concerning plaintiff upon penalty of finding Mitchell in contempt of Court.  Such injunction is to run for so long as defendants Chaffinch and MacLeish remain State employees.

G.   Issue a permanent injunction requiring the defendants to:

(1)  Notify everyone who learned of defendants' treatment of plaintiff that their conduct was illegal, and

(2)  Expunge plaintiff's personnel file of any derogatory information relating to this matter.

-24-

A - 53

(3)   Place a signed document in plaintiff's
personnel file apologizing for their illegal
violations of plaintiff's constitutional rights.

H.   Enjoin the defendants from retaliating against
plaintiff now or in the future.

J.   Issue a reparative injunction directing that
individual defendants Chaffinch and MacLeish issue
public written apologies to plaintiff and run
their apologies in the Delaware State News, the
News Journal and WBOC-TV.

K.   Require such other and further relief as the Court
deems just and proper under the circumstances.

THE NEUBERGER FIRM, P. A.

THOMAS S. NEUBERGER, ESQUIRE (#243)
STEPHEN J. NEUBERGER, ESQUIRE (#4440)
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582

MARTIN D. HAVERLY, ATTORNEY AT LAW

MARTIN D. HAVERLY, ESQUIRE (#3295)
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 654-2255

Dated: August 30, 2004    Attorneys for Plaintiff

-25-

A - 54

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2003 NOV 20  AM 10: 38

CHRISTOPHER D. FORAKER,          )
                                 )
                Plaintiff,        )
                                 )
vs.                              )          Civil Action No. 02-302-JJF
                                 )
COLONEL L. AARON CHAFFINCH,       )
individually and in his official capacity as )
Superintendent of the Delaware State Police, )
DIVISION OF STATE POLICE,         )
DEPARTMENT OF PUBLIC SAFETY,      )
STATE OF DELAWARE,                )
                                 )
                Defendants.       )

## STIPULATED ORDER

The parties to this case, acting through their authorized counsel, hereby stipulate and agree as follows, subject to approval of the Court:

1.    Sergeant Christopher D. Foraker is ordered reinstated to his prior position as the Non-Commissioned Officer-in-Charge of the Firearms Training Unit of the Delaware State Police with all of the rights, privileges, duties, responsibilities and supervisory authority previously held by him when he earlier occupied that position on February 20, 2002.

2.    Plaintiff withdraws his post-trial motion for reinstatement.

3.    The Court shall retain jurisdiction over this matter to enforce its order of reinstatement should that become necessary.

A - 55

4. The judgment entered by the Court in this case on July 2, 2003 is vacated.

5. Plaintiff withdraws his two Rule 50 motions filed before the submission of the case

to the jury.

Dated: November _18_, 2003

_Thomas S. Neuberger_
Thomas S. Neuberger, Esquire
Bar # 243
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
Counsel for Plaintiff

Dated: November _19_, 2003

_W. Michael Tupman_
W. Michael Tupman, Esquire
Bar # 3040
Deputy Attorney General
Department of Justice
102 West Water Street, 3rd Floor
Dover, DE 19904
(302) 739-7641
Counsel for Defendants

Dated: November _19_, 2003

_Martin D. Haverly_
Martin D. Haverly, Esquire
Bar # 3295
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Counsel for Plaintiff

IT IS SO ORDERED, this _20_ day of _November_, 2003

_Joseph J. Farnan, Jr._
Joseph J. Farnan, Jr.
United States District Judge

I:\TUPMAN\Files\foraker.stip.ord.wpd

-2-

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE et al.,   :
              :
   Plaintiff,       :
              :
 v.            :
              :
COLONEL L. AARON CHAFFINCH, et al., :  C.A.No.04-956-GMS
              :
   Defendants.     :

## PLAINTIFFS' ANSWER AND OBJECTIONS TO DEFENDANTS' FIRST SET INTERROGATORIES

Plaintiffs, by their attorneys, hereby object to Defendants' First Set of Interrogatories

("Discovery") in accordance with the numbered paragraphs as set forth below. Plaintiff reserves

the right to amend or supplement the responses contained herein as may be necessary or

appropriate in the future.

Discovery has not concluded in this case. Plaintiffs reserve the right to supplement their

responses at a later time as discovery is completed.

## GENERAL OBJECTIONS

1. Plaintiffs object generally to Discovery insofar as it requests information or

documents which are subject to the attorney-client privilege, or which constitute trial preparation

materials or attorney-client work product, or which are otherwise privileged or protected and not

subject to discovery.

2. Plaintiffs object generally to Discovery to the extent that it seeks information not

relevant to this action or that does not appear reasonably calculated to lead to the discovery of

admissible evidence.

3. Plaintiffs object generally to Discovery insofar as it requests information or

-1-

19. Identify any officer in the DSP whose hearing abilities are similar or worse than Plaintiffs, but has been allowed to operate as a full, active-duty uniformed officer with complete police powers, and describe in detail his or her hearing abilities.

**Answer:** Objection. Discovery is just beginning and this information is in the possession, custody or control of the defendants. Plaintiffs have sought the production of those records and named numerous specific individuals, yet defendants have maliciously refused to produce such records. Without waiving this objection:

Major Joseph Forrester. Lt. Charles Klim. Also see the deposition of Rt. Major David Baylor on July 18, 2005.


20. Identify any medical records that were withheld from medical examiners, as alleged in paragraph 74 of the Complaint.

**Answer:** See Exhibit 1 - FTU Rough Timeline of Events.

One of the medical records that was withheld from the medical examiners was the important attachment to the highly technical questionnaire the FTU staff was ordered to fill out for the TK Group in Illinois. The attachment explained that the men did not understand and found confusing the questions and that many of the questions required expert and highly specialized knowledge that the FTU staff did not possess. However, because the men were ordered to fill out the questionnaire, they were required to do so or risk being brought up on IA charges for insubordination. So, they did fill out the questionnaire, but attached the above discussed attachment to it. But the DSP, specifically Captain Yeomans, refused to send the attachment to the TK Group and thus only sent incomplete medical information.

-42-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SERGEANT CHRISTOPHER D. FORAKER,    :
                                    :
              Plaintiff,            :
                                    :
      v.                            :
                                    :
COLONEL L. AARON CHAFFINCH, et al., :    C.A.No.04-1207-GMS
                                    :
              Defendants.           :

### PLAINTIFF'S ANSWERS AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff, by and through his attorneys, hereby objects to Defendants' First Set of Interrogatories Directed to Plaintiff Foraker ("Discovery") in accordance with the numbered paragraphs as set forth below. Plaintiff reserves the right to amend or supplement the responses contained herein as may be necessary or appropriate in the future.

Discovery has not concluded in this case. Plaintiff reserves the right to supplement his responses at a later time as discovery is completed.

### GENERAL OBJECTIONS

1.    Plaintiff objects generally to Discovery insofar as it requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product, or which are otherwise privileged or protected and not subject to discovery.

2.    Plaintiff objects generally to Discovery to the extent that it seeks information not relevant to this action or that does not appear reasonably calculated to lead to the discovery of admissible evidence.

-1-

**A - 59**

regard remains to be developed.

Without waiving the objections, yes. The persons who made the admissions and the substance of the admissions are found in the depositions, trial testimony, sworn affidavits, Answers and answers to interrogatories in the following cases: <u>Foraker v. Chaffinch</u>, C.A. No.02-302-JJF (D.Del.); <u>Dillman v. Chaffinch, et al.</u>, C.A. No. 02-509-KAJ (D.Del.); <u>Bullen and Giles v. Chaffinch, et al.</u>, C.A. No. 02-1315-JJF (D.Del.); <u>Conley v. Chaffinch et al.</u>, C.A. No. 04-1394-GMS (D.Del.). They are also found in the media articles, TV broadcast, Auditor's Report, emails and other documents concerning the Firearms Training Unit and its personnel.

5. For each statement published by Defendants, or which you believe was published on their behalf, that was false and defamatory, identify:

        (a) the contents of the statement;

        (b) when each statement was made, and

        (c) to whom each statement was made.

**Answer:**  Objection. Calls for a legal conclusion. Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3). In addition, discovery is just beginning and the record in this regard remains to be developed. Notwithstanding and subject to said objections:

See Price et al. v. Chaffinch, et al., Answers to Interrogatories at Exhibit 1 - FTU Rough Timeline of Events.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

-12-

All of the statements made by defendants Chaffinch and MacLeish to members and representatives of the Delaware, Maryland, national and international media, before, during and after their April 6, 2004 tour of the FTU, including the following: "Chaffinch acknowledged problems, but indicated the blame lies only with one or two troopers under his command." "When I was here in the fall, everything was going as well as the previous times I'd been here.....I think people who live in glass houses shouldn't throw stones. It's a lot dirtier now. Things seemed in their proper places in the fall. I've never seen it like this.....The previous sergeant did a good job....Things changed in December when another sergeant came in. That's at least a portion of where the ball was dropped." "He praised Sgt. Ashley for his work at the range. 'Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning,' he said. 'Sgt. Ashley was willing to do that. I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel (bullet trap cleaning) was part of his purview. He felt that was putting him in harm's way.'"

These and other similarly defamatory statements were made to representatives of the Delaware State News, the News Journal, WBOC-TV, American Police Beat magazine and other media outlets that are still to be discovered in this case, and were subsequently published by those outlets or in those publications. Some of the defamatory statements were subsequently republished again as well.

Additionally, Chaffinch and MacLeish ratified and adopted the defamatory statements of Secretary Homer as their own.

Moreover, Chaffinch and MacLeish also published their false accusations to members of the DSP. For example, in the presence of members of his Executive Staff, Chaffinch falsely accused Foraker of destroying the FTU, stating "the mess at the range is all Foraker's fault."

-13-

12. Describe in detail the means and manner in which Defendants Chaffinch and MacLeish has stripped away or otherwise altered Plaintiff's rights, privileges, duties, responsibilities and authority, as alleged in paragraphs 57 and 63 of the Complaint.

**Answer:** Objection. The question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3). Subject to and without waiving said objection:

See Price et al. v. Chaffinch, et al., Answers to Interrogatories at Exhibit 1 - FTU Rough Timeline of Events.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

Defendants Chaffinch and MacLeish have stripped away and otherwise altered Sgt. Foraker's rights, privileges, duties, responsibilities and authority in numerous ways, including the following:

(1) On July 20, 2004, Sgt. Foraker attended a Commanders and Section Chiefs meeting to which he had been invited to attend via e-mail, pursuant to the usual practice in the DSP. At approximately 9:00 am, just prior to the beginning of the meeting, Sgt. Foraker was approached by defendant MacLeish who sought to bully, intimidate and retaliate against Sgt. Foraker for exercising his First Amendment rights. MacLeish stated "Sgt. Foraker, is there something that you would like to address or present in this meeting?" Foraker responded "No, not that I am aware of." MacLeish then stated "This is a commanders and section chiefs meeting." Foraker replied "I am the section chief of the FTU." MacLeish then ordered Foraker out into the hallway.

Out in the hallway, MacLeish continued to bully, intimidate and retaliate against Sgt. Foraker, stating, "I want to be clear on this that this meeting is for lieutenants and above, sergeants

-26-

are not invited to attend this meeting. The format on these meetings has been changed some time ago." Foraker replied, "How long ago was the format changed?" MacLeish stated "quite some time ago." Foraker replied, "I attended these meetings prior to my being transferred out of the FTU." MacLeish stated that "this Colonel changed the format when he took over." Foraker replied, "I attended a commanders and section chief meeting after Col. Chaffinch took over, prior to my transfer from the FTU. I also received two e-mails as a section chief to respond to the meeting and to also get my photo taken." MacLeish stated "The Colonel has changed the format and only lieutenants and above will be attending these meetings. You fall under the Academy and you are represented by Lt. Davis here at this meeting." Sgt. Foraker then stated, "Ok, I don't want to break any rules." Later, Lt. Davis advised Sgt. Foraker that he documented his conversation with MacLeish immediately following his removal from the meeting.

Sgt. Foraker then left pursuant to MacLeish's retaliatory order to leave. MacLeish then walked back into the classroom and shut the door behind him.

Attendance at these meetings was one of the important responsibilities of his position as the NCOIC of the FTU during his prior tenure in this position. Denying Sgt. Foraker access to these meetings following his reinstatement has crippled his ability to positively impact the entire division with regard to any and all issues pertinent to firearms and the FTU. As NCOIC of the FTU, Sgt. Foraker has a wealth of knowledge to share about firearms and related issues that he is not being allowed to impart to the commanders and section chiefs of the division.

Additionally, due to defendants' retaliation, Sgt. Foraker is caught between the proverbial rock and a hard place. Despite being a section chief, MacLeish has ordered him not to attend these meetings of section chiefs and other commanders. However, because he is a section chief, for the last year, Sgt. Foraker has continued to receive e-mails inviting and in some cases requiring his

-27-

**A - 63**