attendance at these meetings. Some of these e-mails state that they were sent pursuant to either Chaffinch and/or MacLeish's authority. Accordingly, Sgt. Foraker is in an unenviable position. On the one hand, he has been ordered not to attend these meetings. On the other hand, he has been ordered to attend these very same meetings.

(2) Since his return to the FTU, Sgt. Foraker has been deprived of the Trooper personnel required to fully staff and safely operate the FTU. He has been repeatedly forced to attempt to justify the necessity of a fifth full-time firearms instructor which is required due to student-to-instructor ratio safety concerns and to enable the effective and efficient administration of the unit. However, he has been denied the Trooper personnel required to fulfill the FTU's mandate and responsibilities. Conversely however, Sgt. Ashley (who didn't file a lawsuit against defendants) was given the required Trooper personnel following Sgt. Foraker's original transfer out of the FTU in April 2002. However, this responsibility was stripped from the position upon Sgt. Foraker's return.

(3) Since his return to the FTU, Sgt. Foraker's authority has been diminished by Major Eckrich, Captain Homiak, Lt. Hagan, subsequent commanders and others as they aggressively monitor many of his actions. Previously, Sgt. Foraker had a greater autonomy and authority to take certain actions and make certain types of budgetary decisions.

(4) Relatedly, Sgt. Ashley previously was allowed to bypass Lt. Davis and Capt. Warren when making many types of decisions, such as, for example Ashley's decision to purchase the $33,000 conveyor system for the bullet trap. Ashley was allowed to bypass them and go directly to Major Eckrich on the issue. But as just discussed, Sgt. Foraker's immediate superiors have been aggressively tasked to monitor and micromanage many of his previously routine responsibilities. For example, if Sgt. Foraker needs to buy work t-shirts for his men, he is now

-28-

**A - 64**

required to seek approval from both his lieutenant and his captain for even such small expenditures of money.

13. Describe in detail the means and manner in which the position held by Plaintiff has been a jump off point on retirement into lucrative employment in the firearms industry and the means and manner in which media publicity will make it impossible for Plaintiff to work in the firearms industry, as alleged in paragraph 68 of the Complaint.

**Answer:** Objection. Discovery is just beginning and the record in this regard remains to be developed. To the extent this question may be answered by expert testimony it is premature under the Rules of Civil Procedure and the Scheduling Order of this case. Subject to and without waiving the aforementioned objections:

DSP history demonstrates that Troopers in charge of the FTU, in addition to serving there for long periods of time and/or retiring while occupying that position also subsequently see beneficial advances to their police careers or post retirement income. For example, Captain Cunningham retired from his position of running the FTU and was soon after hired by Smith & Wesson, a major gun company. Although he has subsequently retired from Smith & Wesson, he is currently an independent contract hired by DNREC to oversee hunter safety facilities and programs. Lt. Bryson also retired from the FTU and is currently the Chief of the Camden, DE police department and is an engineering consultant for JAED Corp. Lt. Lawson opened an independent, private firearms training facility in Dover, DE.

Throughout his time in the DSP, it has been one of Sgt. Foraker's career goals to become an expert in firearms and firearms related issues. He believed that in doing so, he could better

**A - 65**

Tupman was acting at the time in his official capacity as a representative of the DSP and at the behest of defendants Chaffinch and MacLeish in a malicious effort to further destroy Sgt. Foraker's reputation in the close-knit firearms industry.

14. Identify any instance of protected speech upon which Plaintiff bases his cause of action for free speech retaliation, as alleged in paragraph 81 of the Complaint.

**Answer:** Objection. Calls for a legal conclusion. Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3). Subject to and without waiving said objections:

Sgt. Foraker's protected First Amendment speech and petitioning activity includes the following:

(1) The filing, prosecution, successful jury verdict and settlement of Sgt. Foraker's initial lawsuit,

(2) All of plaintiff's speech in which he spoke out about the many problems at the FTU and his efforts to correct them and to protect the health and safety of his men and all of the other personnel who trained at the FTU, and

(3) All of plaintiff's speech in speaking to the State Auditor's office about the many problems at the FTU.

15. Identify any adverse action taken by defendants against Plaintiff as a result of and in retaliation for Plaintiff's protected speech, as alleged in paragraph 81 of the Complaint.

-33-

**A - 66**

**Answer:** Objection. Calls for a legal conclusion. Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3). Subject to and without waiving said objections:

See Price et al. v. Chaffinch, et al., Answers to Interrogatories at Exhibit 1 - FTU Rough Timeline of Events.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

See Answer to Interrogatory # 5 above.

The adverse action taken by defendants against Sgt. Foraker as a result of and in retaliation for his protected First Amendment speech and petitioning activity includes the following:

(1) Defendants defamed Sgt. Foraker on a local, national and international scale by falsely blaming him for destroying the multi-million dollar Firearms Training Unit,

(2) Defendants materially and significantly altered and decreased Sgt. Foraker's job responsibilities and duties as the NCOIC of the FTU,

(3) Defendants materially violated the conditions of Judge Farnan's reinstatement Order, which ended Sgt. Foraker's first successful free speech retaliation suit against defendants and resulted in his reinstatement to the FTU,

(4) Defendants sent Sgt. Foraker for numerous retaliatory fitness for duty exams in a blatant attempt to find a pretext to retaliate against him,

(5) Defendants and their agents have bad-mouthed and spread false rumors about Sgt. Foraker in the close-knit, DSP community and in the firearms community,

(6) Defendants falsely blamed Sgt. Foraker for the destruction of the FTU in interviews

-34-

A - 67

with the State Auditor's office.

(7) Defendants and their agents have actively exerted pressure on plaintiff down through the chain of command in an effort to retaliate against Sgt. Foraker and force him to quit and/or retire from the DSP.

16. Have you sought and/or received any mental health, psychiatric, and/or psychological treatment, and/or professional counseling for your alleged injuries? If so, please identify the nature of the injury, disease or impairment, the name of every practitioner and institution who treated or examined you in connection with the injury, disease or impairment, and state the dates of treatment or examinations received.

**Answer:**  Answer to sentence # 1 - yes, Sgt. Foraker has sought treatment.

Answer to sentence # 2 - see the medical records which are being produced subject to appropriate protective order or confidentiality agreement.

See also Answer to Interrogatory #3 above. See also the report of Carol A. Tavani, M.D., plaintiff's forensic psychiatrist that will be produced in accord with the requirements of the scheduling order and the Federal Rules of Civil Procedure.

17. State whether you intend to call any persons as expert witnesses at trial. If so, separately as to each person:

(a) Identify the person;

(b) State the subject matter as to which the person is expected to testify;

(c) State the substance of the facts and opinions to which the person is expected to testify and a summary of the grounds for each opinion;

-35-



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Price, et al.

## v.

# Chaffinch, et al.

### C.A. # 04-956-GMS

---

## Transcript of:

## B. Kurt Price

## October 18, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Price, et al.
B. Kurt Price
                                v.
                        C.A. # 04-956-GMS
                                            Chaffinch, et al.
                                            October 18, 2005

                                                        Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

B. KURT PRICE, et al.          )
                               )
     Plaintiffs,               )
                               )
     v.                        ) C.A. No. 04-956-GMS
                               )
L. AARON CHAFFINCH, et al.,    )
                               )
     Defendants.               )
                               )
                               )
                               )
CHRISTOPHER FORAKER,           )
                               )
     Plaintiff,                )
                               )
     v.                        ) C.A. No. 04-1207-GMS
                               )
L. AARON CHAFFINCH, et al.,    )
                               )
     Defendants.               )

          Deposition of B. KURT PRICE taken pursuant
to notice at the law offices of Montgomery McCracken
Walker & Rhoads, LLP, 300 Delaware Avenue, Suite 750,
Wilmington, Delaware, beginning at 9:35 a.m., on Tuesday,
October 18, 2005, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

          THOMAS S. NEUBERGER, ESQUIRE
          THE NEUBERGER FIRM, P.A.
            2 East 7th Street - Suite 302
            Wilmington, Delaware 19801
            for the Plaintiffs

                                              **A - 70**

                WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

Price, et al.
B. Kurt Price

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 2

1  APPEARANCES (cont'd):
2       EDWARD T. ELLIS, ESQUIRE
          ROBERT J. FITZGERALD, ESQUIRE
3       MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
          123 South Broad Street
4         Avenue of the Arts
          Philadelphia, Pennsylvania 19109
5         for the Defendants
6  ALSO PRESENT:
7       CHRISTOPHER D. FORAKER
          WAYNE H. WARREN
8
                - - - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1            B. KURT PRICE,
2        the witness herein, having first been
3        duly sworn on oath, was examined and
4        testified as follows:
5  BY MR. ELLIS:
6     Q.   Corporal Price, in reviewing your medical
7  records, which I did before taking your deposition, I
8  noticed that there is comment in there that you
9  occasionally have problems with your memory.
10    A.   Yes.
11    Q.   Can you describe the problems to me?
12    A.   Sometimes I just can't remember things -- it's
13  ironic I can remember things that happened 20 or 30 years
14  ago, but there's some issues that I cannot recall.
15    Q.   You mean you can remember things that are
16  remote in time but not things that happened recently?
17    A.   Sometimes, yes, sir.  Not all the time.
18    Q.   Are you taking any medication today?
19    A.   Yes.  Today I'm taking Enalapril, which is for
20  blood pressure.
21    Q.   Do you know how to spell that?
22    A.   E-n-a-l-p-r-i-l, I think.  And then I'm also
23  taking -- I found out about three or four weeks ago that
24  my blood pressure has spun out of control, and I'm also

Page 4

1  on a diuretic, and the only thing I know is on the
2  bottle, the prescription bottle, I think their initials
3  for the medication are ACL, and maybe a U in there.  I
4  also take Prilosec.
5     Q.   Anything else?
6     A.   Not that I have taken today, no.
7     Q.   Anything else you've taken within the last
8  week?
9     A.   I take medication that my family doctor
10  prescribed to me for nerves, and it's I-e-p and I can't
11  remember how that name -- I looked at the bottle today
12  because I knew you were going to ask me how to spell it,
13  and I must have stage fright.  I don't recall.  I
14  apologize for that.
15    Q.   When you say it's for your nerves, I'm not sure
16  what you mean by that.
17    A.   There are times that I shake and I also have
18  muscle spasms.  That's happened probably within the last
19  six months.
20    Q.   I noticed also in your medical records that you
21  were taking a drug called Ziac for a long time?
22    A.   Yes.
23    Q.   When did you first start taking that, do you
24  remember?

Page 5

1     A.   I want to say somewhere in the mid to early
2  1990s, and that was for high normal blood pressure, and I
3  am blessed in my family history with blood pressure
4  issues.
5     Q.   I'm sorry to hear that.
6          Do you currently take Ziac?
7     A.   No.  The doctor switched me off of that
8  sometime after March of 2004.
9     Q.   Enalapril is the current blood pressure
10  medicine you're taking?
11    A.   That and then the new diuretic that I started
12  taking.
13    Q.   That's the one you couldn't remember --
14    A.   It's on the prescription bottle.  There's only
15  four letters.
16    Q.   What's Prilosec for?
17    A.   I have been diagnosed with acid reflux.  That
18  started in January of this year.
19    Q.   I'm sorry if I already asked you this, but
20  what's the name of the medication you're taking for your
21  nerves?  You said you don't remember the name.
22    A.   I apologize.  I would guess at it, but it is
23  I-e-p something.
24    Q.   That's fine.  I will look at the records and

A - 71

2 (Pages 2 to 5)

Price, et al.
B. Kurt Price

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 6

1  figure that out.
2      A.  Dr. Quiroga was the one who prescribed that for
3  me.
4      Q.  I think he's the guy whose handwriting I can't
5  read.
6          MR. ELLIS:  Off the record.
7          (Discussion off the record.)
8  BY MR. ELLIS:
9      Q.  Has the condition that you have that you
10  described as nerves and muscle spasms been diagnosed by a
11  doctor?
12      A.  Yes.
13      Q.  What are they calling it?
14      A.  Stress-induced issues.  It started -- well,
15  it's started a while ago but finally came to a head in
16  January, I think, and I may be wrong on the exact date,
17  but it was sometime in the winter.
18      Q.  Has the medication that you are taking for what
19  you described as stress-induced issues been prescribed to
20  you first since July of this year?
21      A.  It may have been.  I started with the Prilosec
22  sometime after my stress test and all the other tests.
23      Q.  You had a stress test.  Was that for your
24  heart?

Page 7

1      A.  Yes.
2      Q.  Did you pass the stress test?
3      A.  Yes, sir.
4      Q.  Do you have some pulmonary problem?
5      A.  When I went for my physical at Omega Medical in
6  March, they said that my pulmonary function test was not
7  where it needed to be.  I don't know what the exact
8  readings were.
9      Q.  Have you been treated for that?
10      A.  Not since then, no.
11      Q.  What is your date of birth, please?
12      A.  January the 2nd, 1963.
13      Q.  Are you married?
14      A.  Yes.
15      Q.  What's your wife's name?
16      A.  Lynn, L-y-n-n.
17      Q.  What is your wife's occupation?
18      A.  She is a physical therapist.
19      Q.  Where does she work?
20      A.  She works for the Colonial School District with
21  the special-needs children.
22      Q.  What type of work does she do with
23  special-needs children?
24      A.  She is a specialist in the transportation field

Page 8

1  in regards to how to properly secure handicapped children
2  in buses.  She comes up with programs for that, in
3  addition to she medically treats, she does her physical
4  therapy to these special-needs kids.
5      Q.  What range of ages?
6      A.  I know she goes to a high school, an
7  intermediate school, and an elementary school.  She has
8  three schools she goes to, in addition to the
9  transportation center for the Colonial School District.
10      Q.  You have children?
11      A.  Yes, sir.
12      Q.  How many?
13      A.  Two.
14      Q.  What are their names and ages?
15      A.  Jim, or James, he is 14, and Katie is 12, my
16  daughter.  Our daughter.
17      Q.  Where is James in school?
18      A.  He goes to school at Smyrna High School.
19      Q.  Is that in the Colonial School District?
20      A.  No, sir.  That's in Kent County.
21      Q.  Would he be a freshman?
22      A.  Yes, sir.
23      Q.  How about Katie, where does she go to school?
24      A.  She goes to school at Smyrna Middle School, in

Page 9

1  Smyrna, Delaware, as well.
2      Q.  Are they doing well in school?
3      A.  Yes, sir.
4      Q.  When is the last day that you reported to work
5  as a Delaware state trooper?
6      A.  It was sometime in March.
7      Q.  Why did you stop reporting to work?
8      A.  I had a meeting -- I was summoned to a meeting
9  by Captain Homiak and, again, I can't be specific as a
10  date, but I do know it was in March, that he and
11  Captain Yeomans needed to go over my University of
12  Pennsylvania report and some other paperwork.
13      Q.  So did you go to a meeting?
14      A.  Yes, sir.
15      Q.  Who was at the meeting?
16      A.  It was Captain Homiak, who was the director of
17  training at the academy, Captain Yeomans from the HR
18  department, and we also had Sergeant Vincent Fiscella
19  from the DSTA.
20      Q.  Where was the meeting?
21      A.  It was in Captain Homiak's office in the
22  academy.
23      Q.  Can you describe what happened at the meeting?
24      A.  They told me I could no longer perform as a

3 (Pages 6 to 9)

Price, et al.                                     v.                    Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS              October 18, 2005

---

**Page 10**

1 Delaware state trooper.
2 Q. Did they tell you why?
3 A. They said it was because of the amount of
4 hearing loss that I had incurred at the range.
5 Q. Were you aware that you had a hearing loss?
6 A. I was told on March 1st -- I knew I had some,
7 but I did not know as to what degree it was until they
8 started sending us for testing.
9 Q. Had you been tested on your own?
10 A. Yes.
11 Q. For hearing loss?
12 A. Yes.
13 Q. How long ago were you first tested for hearing
14 loss?
15 A. It was sometime in the late '90s I went to see
16 Dr. Cooper -- actually, I'm sorry, it was not Dr. Cooper.
17 It was Dr. Joseph Giletto at the time.
18 Q. Why did you go see Dr. Giletto?
19 A. I had just a real faint ring in my ear and I
20 thought that it may be related to allergies or something
21 to that effect, because I do have allergies.
22 Q. Are you taking allergy medication today?
23 A. No, sir. It doesn't work.
24 Q. So you went to see Dr. Giletto you said it was?

---

**Page 11**

1 A. Yes, sir.
2 Q. In the late '90s?
3 A. Yes.
4 Q. Did he give you a hearing test?
5 A. Yes, he did.
6 Q. What was the result of the hearing test?
7 A. He said that I had a very light or very slight
8 case of high-frequency hearing loss.
9 Q. I'm going to get a copy of a document made to
10 show you, Corporal Price, but before we get to that, the
11 meeting in March of 2005 with Captain Homiak and
12 Captain Yeomans, did they present you with a copy of a
13 report from the University of Pennsylvania?
14 A. I believe so, yes. This was an addendum or a
15 second report that we had received.
16 Q. Do you recall in January receiving a longer
17 report, like maybe a seven- or eight-page report?
18 A. Something to that effect, yes, sir.
19 Q. And then in March you got a second report that
20 confirmed the results of the first report?
21 A. I believe so.
22 Q. What else was said in the meeting that you were
23 at with captains Homiak and Yeomans and
24 Sergeant Fiscella?

---

**Page 12**

1 A. Well, when they told me what the outcome was, I
2 was shocked. I'll be honest with you. As far as I felt
3 pretty much that my career was over and that I was out
4 the door. I remember Captain Yeomans telling me that I
5 had options, and one option was to start using my sick
6 time that I had accrued over the years. He said that I
7 had earned it, and that I may use it.
8 Q. At the point that you had this meeting with
9 Homiak, Yeomans, and Fiscella, had you noticed that you
10 were having difficulty in hearing people?
11 A. In certain settings I would have difficulty,
12 but most of the time I would not.
13 Q. What settings would cause difficulty for you?
14 A. Background -- noisy background.
15     MR. ELLIS: I'm going to ask you to take a
16 look at DX 11.
17     (Defendants' Deposition Exhibit No. 11 was
18 marked for identification.)
19 BY MR. ELLIS:
20 Q. This document has a Bates number on it,
21 FTU4376, and I'll tell you, Corporal Price, this was
22 pulled out of your medical records that were produced by
23 you in the course of this case.
24     Have you had a chance to look at this

---

**Page 13**

1 material before? This is one page out of a number of
2 pages that you have produced.
3 A. I believe I have looked at this. I can't be
4 100 percent sure because there's been so much
5 documentation. I don't know if I have looked at this
6 specifically.
7 Q. I believe that this is Dr. Giletto's report on
8 you or at least his notes of having checked out your
9 hearing in 1997. Do you see where it begins at the top,
10 "This state trooper presents on April 17, 1997,
11 complaining of," and then there's some copying trouble
12 there on the next line, but I believe that that word is
13 "tinnitus," t-i-n-n-i-t-u-s.
14     Do you recognize the term "tinnitus"?
15 A. Yes.
16 Q. That's ringing in your ear?
17 A. Yes.
18 Q. I'd like you to go down looks like about the
19 fourth paragraph, begins on the left-hand side with the
20 words "The left ear might be the ear to sustain more
21 damage." Do you see that?
22 A. Yes, sir.
23 Q. I'm going to read the next couple sentences to
24 you. It says, "The left ear might be the ear to sustain

4 (Pages 10 to 13)

Price, et al.
B. Kurt Price

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 14

1 more damage. However we are talking about abnormalities
2 here that are much greater than anticipated. He is in
3 the 20s, 30s and 40s on the right side, and is in the
4 70s, 80s and 85s on the left side. This is too
5 abnormal."
6        Do you recall Dr. Giletto telling you that
7 you had significant abnormalities in your hearing in
8 1997?
9    A.  I don't recall where he stated it was
10 significant to me.
11   Q.  You can see that he does here. He says it's
12 "much greater than anticipated," right?
13   A.  That's what I read, yes.
14   Q.  As a result of your examination by Dr. Giletto,
15 did you tell anybody at the State Police that you were
16 having hearing problems?
17   A.  No, I did not.
18   Q.  Did you have your hearing tested every year as
19 part of an annual physical?
20   A.  I was supposed to, yes.
21   Q.  When you say you were supposed to, does that
22 mean that it didn't always happen?
23   A.  I know that I had not received a hearing test
24 from 2001 until March of 2004.

Page 15

1    Q.  Did you understand that you were supposed to be
2 tested every year because you were in the Firearms Unit?
3    A.  No, I did not.
4    Q.  Who did your annual physical?
5    A.  I'm assuming that would have been HealthWorks,
6 Dr. Green's crew down at State Street in Dover.
7    Q.  So you have the choice of either having
8 Dr. Green do it or having your private physician do it?
9    A.  Yes.
10   Q.  And you chose to have Dr. Green do it?
11   A.  Yes.
12   Q.  Do you recall the results of your hearing test
13 in 2001?
14   A.  HealthWorks I believe stated that I had normal
15 hearing.
16   Q.  Do you believe that your hearing was
17 deteriorating between 2001 and 2005?
18   A.  I don't know. From what my research has
19 indicated, it's a slow process.
20   Q.  I'm really trying to ask you about your
21 personal observation. Have you noticed that it's become
22 harder to hear people or that you have more trouble
23 hearing in a crowded room, for example?
24   A.  I do notice I have a harder time hearing in a

Page 16

1 crowded room.
2    Q.  Do you believe that you would be capable of
3 performing the job of a patrol trooper given the current
4 state of your hearing?
5    A.  No, I do not.
6    Q.  Do you believe that you would be capable of
7 performing the job of a range officer, the job that you
8 had at the FTU for the past --
9    A.  According to Dr. Emmett, I believe that he
10 stated that I could.
11   Q.  Dr. Emmett stated you could?
12   A.  Yes. He said that with the hearing protection
13 we had discussed in my meeting, he said you don't need to
14 go to hearing at a range. That's what he verbally told
15 me. I don't know if that's written down, but that's what
16 the man told me.
17   Q.  Aside from what Dr. Emmett told you, do you
18 believe that you would be capable of doing the job of a
19 range officer?
20   A.  I don't know that I'm qualified to make that
21 statement.
22   Q.  Going back to the March 2005 meeting you had
23 with Captain Homiak and Captain Yeomans and
24 Sergeant Fiscella, you said that Yeomans told you you

Page 17

1 should start using your sick time.
2    A.  He said that that was one of my options, yes.
3    Q.  What else happened at that meeting?
4    A.  Again, my recollection of that meeting, I was
5 stunned at what I was being told. I had a 20-year career
6 that was now, the way I looked at it, coming to a halt,
7 and I was shocked and kind of thrown for a loop on that.
8        He said that I could maybe apply for a
9 disability pension, and that was pretty much about all
10 that I can independently recall.
11   Q.  Do you recall Sergeant Fiscella saying anything
12 at the meeting?
13   A.  Sergeant Fiscella asked of Captain Yeomans if
14 Lieutenant Colonel -- I don't know if Lieutenant Colonel
15 MacLeish was named colonel yet or not. I can't remember
16 when that happened. But Fiscella asked if Yeomans would
17 make comment to Colonel MacLeish to send a letter
18 supporting any type of application that was made in
19 regards to a pension. As did he asked the same from
20 Secretary Mitchell.
21   Q.  What did Yeomans say to that?
22   A.  Yeomans said that he would ask.
23   Q.  Have you applied for a pension?
24   A.  No, sir.

A - 74

5 (Pages 14 to 17)

Price, et al.                                                              v.                                              Chaffinch, et al.
B. Kurt Price                                              C.A. # 04-956-GMS                                              October 18, 2005

Page 18

1    Q.   Anything else happen at that meeting that you
2    can remember?
3    A.   Not right offhand, no, sir.
4    Q.   I take it whatever date that was in March 2005
5    was the last day that you reported for work?
6    A.   No, sir. I think I continued to go to work
7    until sometime into March. I think. I can't recall the
8    exact date.
9    Q.   I'm sorry. I thought you said that March was
10   when that meeting occurred.
11   A.   Right. It was sometime after that meeting I do
12   believe that I started to use my sick time. I think. I
13   can't be specific. I don't remember the dates without
14   looking at documentation.
15   Q.   What have you been doing on a daily basis?
16   A.   Well, I try to stay physically active because I
17   find if I'm not, I get extremely depressed and emotional.
18   I try to work out every day either on my treadmill or my
19   bike or with my weights.
20   Q.   So you walk or run on the treadmill?
21   A.   I walk, yes, sir.
22   Q.   How much time do you spend working out in a
23   day?
24   A.   I try to spend an hour.

Page 19

1    Q.   Every day?
2    A.   I try to, yes, sir.
3    Q.   What else have you been doing?
4    A.   I have the luxury of having a friend that owns
5    a farm, and I spend a lot of time out there on this farm
6    mowing grass or cutting -- working with reeds for the
7    duck blinds and so forth.
8    Q.   Where is the farm?
9    A.   The farm is located northeast of Smyrna.
10   Q.   What else have you been doing as a matter of
11   daily activity?
12   A.   Try to --
13       MR. NEUBERGER: I'm sorry. You're asking
14   if he's out there mowing the grass every day or -- I
15   think he interpreted that as anything else you have done.
16       MR. ELLIS: Yes.
17       MR. NEUBERGER: Maybe I'm --
18       MR. ELLIS: He said that he works out
19   every day and he spent a lot of time working on a farm.
20       MR. NEUBERGER: But was your question does
21   he do that every day?
22       MR. ELLIS: No. I assume you don't work
23   on the farm every day.
24       THE WITNESS: No, sir.

Page 20

1       MR. NEUBERGER: He said weights, too.
2       MR. ELLIS: I'm sorry?
3       MR. NEUBERGER: I think he tried to give
4    you what he does daily. That was weights, the treadmill,
5    that kind of stuff. And then I think he took your
6    question as what other kinds of things have you done
7    since.
8    BY MR. ELLIS:
9    Q.   That's what I meant to ask. What other types
10   of things have you done since you have not been working?
11   A.   That's pretty much it on a daily basis.
12   Q.   Do you have any hobbies?
13   A.   Yes.
14   Q.   What?
15   A.   I love archery and I love to hunt and I love to
16   fish. I love to crab. I just like being outside in
17   general. It's healthier for you.
18   Q.   Have you been hunting since March?
19   A.   Yes.
20   Q.   What have you been hunting?
21   A.   Mourning doves.
22   Q.   Where do you go to hunt dove?
23   A.   A friend of mine owns about a 40-acre field in
24   Leipsic, Delaware, and he invites us out on occasion to

Page 21

1    go hunt there.
2    Q.   What do you hunt them with?
3    A.   A shotgun.
4    Q.   Do dove have a season?
5    A.   Yes, sir.
6    Q.   What's dove season in Delaware?
7    A.   I know it's September 1st until this year it
8    went to September 30th.
9    Q.   Supposed to be the month of September this
10   year?
11   A.   Yes, sir.
12   Q.   Have you hunted anything else?
13   A.   No, sir.
14   Q.   I understand you're going deer hunting this
15   weekend?
16   A.   I'm going to start the track to Montana this
17   weekend.
18   Q.   You're going to do what?
19   A.   I'm going to start out West, yes, sir.
20       MR. NEUBERGER: Whatever he finds.
21   Q.   How long do you plan on being in Montana?
22   A.   Our actual hunt is for five days.
23   Q.   What are you going to hunt in Montana?
24   A.   We are going to hunt deer.

A - 75

6 (Pages 18 to 21)

Price, et al.                                                                          Chaffinch, et al.
B. Kurt Price                                         v.                              October 18, 2005
                                    C.A. # 04-956-GMS

Page 22

1    Q.    With what type of weapon?
2    A.    A rifle.
3    Q.    How long do you expect to take to get you to
4    Montana?
5    A.    Well, I want to spend some time with my son,
6    and we want to go by Mount Rushmore and just generally
7    sightsee.
8    Q.    You're taking your son on the trip?
9    A.    Yes, sir.
10   Q.    How does he get out of school for that?
11   A.    There's a policy with the Smyrna School
12   District that if your child's in good standing and you
13   get prior permission from all of his teachers and
14   administrators, that you can take them out of school.
15   Q.    Anybody else going with you on the trip other
16   than your son?
17   A.    No, sir.  Just us.
18   Q.    How long do you expect to be gone altogether?
19   A.    I'm going to try to take about three days going
20   out, and then coming home, I'm going to have to push
21   because I want to get him back in school.  I'm going to
22   assume it's going to be two days to come back.  So I
23   would assume that would be what, ten days?
24   Q.    Have you done any other hunting other than the

Page 23

1    dove hunting and the deer hunting that you're about to
2    do?
3    A.    Not this year, no.
4    Q.    You testified a few minutes ago that you were
5    helping a friend build duck blinds.
6    A.    Yes, sir.
7    Q.    Do you expect to hunt in those duck blinds at
8    some point this fall?
9    A.    Yes, sir.
10   Q.    When would that be?  Would that be during duck
11   season?
12   A.    Yes.
13   Q.    When's duck season in Delaware?
14   A.    I know they just had, I think, a week of it,
15   and then I think this coming weekend -- no.  I can't
16   recall.  There's two weeks coming up I think the end of
17   October until the 5th of November.  There's a season.
18   And then it goes out for a while and comes back in again
19   and then goes out and then comes back in again.  I would
20   have to look at the regulations to give you the specific
21   dates.
22   Q.    But you expect whatever those dates are that
23   you will be hunting some duck this year?
24   A.    God willing.

Page 24

1    Q.    What do you hunt the ducks with?
2    A.    Shotgun.
3    Q.    Do you wear hearing protection when you're
4    hunting with rifles or shotguns?
5    A.    Yes.
6    Q.    How long have you been doing that?
7    A.    On a steady basis now for about the last, oh --
8    since about the late '90s.  I wasn't that smart prior
9    to --
10   Q.    Prior to your consultation with Dr. Giletto?
11   A.    That's correct.
12   Q.    Do you coach any sports teams?
13   A.    I am certified through the 4H as an archery
14   instructor.  And I do that occasionally.
15   Q.    Have you done that since March of this year?
16   A.    No.  Actually last winter I gave it up.
17   Q.    Why?
18   A.    Depression.
19   Q.    Why did depression make you want to give that
20   up?
21   A.    I had no desire to do it any longer.
22   Q.    Have you given up other things because of
23   depression?
24   A.    Yes.

Page 25

1    Q.    What?
2    A.    Social events.
3    Q.    Can you give me examples of social events that
4    you have given up because of depression?
5    A.    Well, I just find it hard out around crowds
6    anymore.  I don't go out to eat near as often as what we
7    used to.
8    Q.    What is it about crowds that makes you
9    uncomfortable?
10   A.    Answering questions about what has happened
11   with the State Police.  Just you can't get away from it.
12   It's like a monster.
13   Q.    What do you mean by "it's like a monster"?
14   A.    Just every facet of my life I get questioned
15   about what's going on with the State Police, and I get
16   tired of trying to answer questions, and I find it easier
17   to stay home.
18   Q.    Can you give me an example of somebody who's
19   asked you questions about the State Police?
20   A.    A lot of people that -- even people from
21   different agencies due to the very nature that we train a
22   lot of municipal officers.  I also did two years with the
23   City of Dover Police Department prior to coming to the
24   State Police, and I know a lot of people, and I have

7 (Pages 22 to 25)

Price, et al.                                    v.                          Chaffinch, et al.
B. Kurt Price                        C.A. # 04-956-GMS                    October 18, 2005

Page 26

1  lived in the area all my life basically since I was two
2  in the Kent County, Delaware, area, and I know a lot of
3  folks, and every time I go somewhere, somebody asks how
4  you doing, this, that, and the other, and it gets very,
5  very old.
6      Q.   When's the last time that you had a
7  conversation with somebody where they asked you about the
8  State Police?
9      A.   I can't give you a specific date, but it was
10 last week sometime.
11     Q.   Who was it that asked you about it?
12     A.   It may have been somebody -- oh goodness.  At
13 the bank in Smyrna, at the PNC Bank in Smyrna.
14     Q.   So you went to the bank in Smyrna?
15     A.   Yes.
16     Q.   Who was it that you talked to that asked you
17 about the State Police?
18     A.   I believe -- I don't remember her last name,
19 but it's Marcie.  I don't know her last name.
20     Q.   What's her job?
21     A.   I'm sorry?
22     Q.   What is her job?
23     A.   She works with the Smyrna School District, I
24 think.

Page 27

1      Q.   This is just somebody you encountered in the
2  bank?
3      A.   Yes.
4      Q.   What did she say to you?
5      A.   She just asked how things were going and how I
6  was doing, and, again, you just get hammered with that
7  every time you go anywhere.
8      Q.   What did you say when she asked you how things
9  were going?
10     A.   I told her that I was just awful down.
11     Q.   Was that the end of the conversation you had
12 with her?
13     A.   Yes, sir.  I'm terrible on last names.  I will
14 tell you that, too.
15     Q.   That's fine.  Not a problem.
16          So she said to you how is it going, and
17 what else did she say to you?
18     A.   I don't recall the specifics of it because it's
19 just -- I just kind of ignore anything after that, to be
20 honest with you.  As soon as they start asking me, I just
21 ignore it.  Attempt to.
22     Q.   If you meet a friend and the friend says how
23 are you doing, you interpret that as a question about the
24 State Police?

Page 28

1      A.   Yes.
2      Q.   Why don't you review for me your work history
3  with the State Police beginning with when you started at
4  the academy.
5      A.   I actually went through the Delaware State
6  Police Academy in September of 1983 with the City of
7  Dover Police Department as a municipal officer.  I
8  completed two years with the City of Dover, and I applied
9  with the Delaware State Police sometime in March or early
10 spring of 1985, and I was selected -- September 3rd,
11 1985, I was assigned to the 51st Delaware State Police
12 recruit class.
13     Q.   So did you go through another training period
14 at the academy?
15     A.   No, I did not at that time because the training
16 that we received when I initially went through the
17 academy was the exact same thing.  I had some firearms
18 familiarization training, I believe two weeks of accident
19 investigation and report writing, and then we went to
20 field training.
21     Q.   What was your first assignment?
22     A.   I was assigned to Troop 5 in Bridgeville as a
23 recruit on the FTO Program, the Field Training Officer
24 Program.

Page 29

1      Q.   Where did you go next?
2      A.   I went to Troop 3, which is located in Camden,
3  Delaware, Kent County.
4      Q.   What was your assignment there?
5      A.   Patrol.
6      Q.   How long did you stay there?
7      A.   I stayed there until August of 1989.
8      Q.   What happened then?
9      A.   I went to the Special Investigations Unit, and
10 that year, April of that year, I was also selected to be
11 on the SORT team.
12     Q.   April of '89?
13     A.   Yes, sir.
14     Q.   While you were on patrol in Troop 3 you joined
15 the SORT team?
16     A.   Yes.
17     Q.   How long did you stay with the Special
18 Investigations Unit?
19     A.   Not very long.  Quite honestly, I did not like
20 the work.
21     Q.   When you say "not very long," are you speaking
22 less than a year?
23     A.   Yes, sir.
24     Q.   Why didn't you like the work?

**A - 77**

8 (Pages 26 to 29)

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 30

1    A.   I didn't like looking like a bum, quite
2 honestly.
3    Q.   This is a job where you had to go undercover?
4    A.   Yes, sir, I was undercover, that's correct.
5 And I was newly married at the time and we did not have a
6 set schedule, and that was hard for the home.
7    Q.   What's your next job?
8    A.   I went back to patrol at Troop 3. I believe
9 that was sometime in the late spring -- I'm going to
10 say -- the end of March, first part of April of 1990 I
11 went back to patrol at Troop 3.
12    Q.   How long did you stay there?
13    A.   I stayed in the patrol field at Troop 3 until
14 December 16th, 1996.
15    Q.   That's when you went to the Firearms Training
16 Unit?
17    A.   Right. At that time it was called the
18 ordinance section.
19    Q.   You remained in that for the rest of your time
20 at the State Police?
21    A.   I believe so.
22    Q.   Prior to being assigned there on a permanent
23 basis, were you what you call a guest instructor?
24    A.   Yes, sir. In January of 1991 I became

Page 31

1 certified as a firearms instructor with the division.
2    Q.   When you started at the Firearms Training Unit,
3 who was the person in charge of the unit?
4    A.   Lieutenant William Bryson.
5    Q.   Who was his successor?
6    A.   Sergeant Fitzpatrick, Brian Fitzpatrick.
7    Q.   After Fitzpatrick, does that bring us to
8 Al Parton?
9    A.   Yes.
10    Q.   When did Fitzpatrick replace Bryson, do you
11 remember?
12    A.   I want to say it was sometime in November of
13 1998.
14    Q.   Was that about the time that the new range
15 opened?
16    A.   We actually opened -- started shooting
17 September, the end of September of 1998.
18    Q.   When you started at the range, who were the
19 other instructors?
20    A.   There was, like I said -- already mentioned,
21 there was Bryson, Fitzpatrick, there was Matt Engler,
22 myself, Bill Rhoades was also -- Sergeant William Rhoades
23 was assigned to -- I believe he was assigned at ordinance
24 section, but his actual job function was the NCOIC of

Page 32

1 SORT, and he would help us out occasionally.
2    Q.   I take it when Bryson left, Fitzpatrick took
3 his place?
4    A.   Yes, sir.
5    Q.   Do you remember who moved into the unit to
6 replace Fitzpatrick when he was promoted?
7    A.   I don't believe anybody did. Again, that's a
8 long time ago and a lot of water under the bridge.
9    Q.   When did Eddie Cathell first come to the
10 Firearms Training Unit, do you remember?
11    A.   I believe it was September, and, again, this is
12 a guess. It would have been sometime in September of '98
13 I do believe. I'm not 100 percent on that.
14    Q.   Do you remember who he replaced?
15    A.   He replaced Sergeant Matt Engler.
16    Q.   When did Rhoades leave, do you remember?
17    A.   I don't know when he retired, but he pretty
18 much ran the SORT team, and we saw him occasionally. He
19 may have helped us out three or four times a year. The
20 rest of the time he was extremely busy with our Special
21 Operations team.
22    Q.   Do you know if anybody replaced him?
23    A.   I think Sergeant Parton took his spot.
24    Q.   Do you remember the names of any other

Page 33

1 corporals who have served in the Firearms Training Unit
2 while you were there?
3    A.   Corporal Peachey, Corporal Foraker until he got
4 promoted to sergeant.
5    Q.   Do you know who Corporal Foraker replaced when
6 he first came into the Firearms Training Unit?
7    A.   No, I do not.
8    Q.   Anybody else you can think of?
9    A.   I believe that's it.
10    Q.   How about James Warwick, do you know who he
11 replaced?
12    A.   Yes, sir. I think they may have brought him in
13 to replace Peachey. I apologize for that.
14    Q.   That's okay.
15         I would like for you to describe to me,
16 please, your duties as a corporal in the Firearms
17 Training Unit.
18    A.   To train recruits of all different agencies and
19 background, and to conduct and service training for the
20 division of State Police, and, of course, with that was
21 the all-encumbering safety also goes with that. That's
22 the primary concern, we're dealing with a firearm.
23    Q.   Anything else?
24    A.   We would -- I think it was Sergeant Parton gave

9 (Pages 30 to 33)

Price, et al.                                v.                      Chaffinch, et al.
B. Kurt Price                      C.A. # 04-956-GMS              October 18, 2005

Page 34

1    me the task of revising recruit lesson plans and also
2    performing user maintenance, what he described as user
3    maintenance on the Savage bullet trap. What that
4    entailed, I don't know. I was never instructed as to
5    what proper maintenance would be. I received absolutely
6    no training at all.
7        Q.   I'll get to that in a minute.
8             Are there any other tasks that you believe
9    were part of your assignment as an instructor in the
10   Firearms Training Unit?
11       A.   We conducted armors breakdown on our issued
12   handguns and shotguns. That was done on an annual basis.
13       Q.   Does that mean that you had to break down every
14   one of the guns that was assigned to the Delaware state
15   trooper?
16       A.   Yes, sir.
17       Q.   Did you do that in conjunction with the other
18   instructors?
19       A.   Yes. And we also provided interactive training
20   or simmunitions training, whatever you want to call it.
21   That was scenario-based realistic training.
22       Q.   That's training that's done using --
23       A.   A marking cartridge. Similar to paintball,
24   yes, sir.

Page 35

1        Q.   Can you think of any other duties that you had
2    as part of the Firearms Training Unit?
3        A.   I may, but right now that's all I've got.
4        Q.   That's fine.
5             Now, you used the phrase "user
6    maintenance" on the Savage bullet trap --
7        A.   Yes.
8        Q.   -- I think in your prior testimony. And you
9    said something about Sergeant Parton being the person who
10   assigned you to do that.
11       A.   Yes.
12       Q.   When did that occur? When did he assign you to
13   do that?
14       A.   It was shortly after -- sometime after he took
15   command of the range. I can't -- if I gave you a date,
16   I'd be guessing, and I don't want to do that.
17       Q.   Can I back up just a second here? When
18   Lieutenant Bryson was in charge of the Firearms Training
19   Unit, was Fitzpatrick a sergeant there?
20       A.   Yes.
21       Q.   When Bryson left, they didn't replace him with
22   a lieutenant, right?
23       A.   No, they did not.
24       Q.   So Fitzpatrick became the person in charge of

Page 36

1    the unit?
2        A.   Yes.
3        Q.   Prior to the opening of the new facility in
4    1998, were you involved in the construction of the
5    facility?
6        A.   Yes.
7        Q.   What did you do as part of the construction?
8        A.   We assembled the bullet trap.
9        Q.   When you say "assembled the bullet trap,"
10   physically what does that mean? What did it look like
11   when it got there, and what did you do to assemble it?
12       A.   The trap arrived on a flatbed trailer, I
13   believe, and it was in pieces, so we had to bolt that
14   together.
15       Q.   How big were the pieces?
16       A.   Probably as big as this table. So I guess that
17   would be 14, 16 feet. I don't know. But it was big.
18       Q.   When you say as big as the table, you're
19   talking about as long as the table which I'm guessing is
20   about 14 feet long?
21       A.   Yes, sir.
22       Q.   Is it as wide as the table, as well?
23       A.   Just about, yes, sir.
24       Q.   You and I are sitting about what, eight feet

Page 37

1    apart?
2        A.   I would assume so.
3             MR. NEUBERGER:  These are usually two
4    feet, the ceiling tiles. They're a good way of measuring
5    things.
6        Q.   When you say the pieces had to be bolted
7    together, is that so that -- in other words, the bullet
8    trap comes in sections that were more or less round?
9        A.   Yes.
10       Q.   And they had to be bolted together so that you
11   end up with a tube that runs what, 140 feet from one end
12   to the other?
13       A.   Something like that, yes, sir. I know it was
14   over 100 feet.
15       Q.   What tasks did you perform in the assembly of
16   the bullet trap?
17       A.   One specific task that I remember, when they
18   shipped the conveyor belt, it was all together, but it
19   was upside-down. So we had to flip section by section of
20   that conveyor belt. And that like to kill me.
21       Q.   Why is that?
22       A.   It was heavy. Yes, sir.
23       Q.   When you said it was shipped in one piece, does
24   that mean that the entire length of the conveyor belt was

A - 79

10 (Pages 34 to 37)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 38

1  all hooked together in one piece?
2      A.  I think there was a break in one end so that we
3  could feed it through the system over -- again, I don't
4  know.  This was all, hey, do this.  The only thing -- the
5  only background that I had in construction was building
6  deer stands and duck blinds.  I had no idea how to do all
7  this stuff.  But Savage had one man that came down and
8  kind of told us what to do to put it together.
9      Q.  You got it together?
10      A.  Yes.
11      Q.  What was the conveyor belt made of when it was
12  originally installed?
13      A.  It was like a steel chain in that it had links
14  built into it, but it was -- there was a metal piece that
15  ran -- I believe this is horizontal.  It ran horizontal,
16  but it could turn and move.  It was almost built like a
17  centipede.
18      Q.  But like a tank track?
19      A.  Yes, sir.  That would be a good way to describe
20  it.
21      Q.  But it was made of metal?
22      A.  Yes.
23      Q.  Were you one of the people who fed the belt
24  into the system?

Page 39

1      A.  I believe so.
2      Q.  When Bryson left, Fitzpatrick took over,
3  correct?
4      A.  Yes.
5      Q.  Was Parton a sergeant or a corporal then?
6      A.  I'm assuming he would have been a corporal
7  then.
8      Q.  So how long after the range opened did Parton
9  give you instructions to do maintenance on the bullet
10  trap?
11      A.  I never received instructions.  I was given a
12  directive in my evaluation that that was part of my
13  duties.
14      Q.  When was that?  How long after the range
15  opened?
16      A.  I'd have to look at my evaluation to give you a
17  specific date.
18      Q.  Was it within the first year, do you recall?
19      A.  That would be a guess of mine.  I don't recall
20  when Fitzpatrick got moved out and Parton got promoted.
21      Q.  Prior to Parton giving you this instruction, do
22  you know whether anybody did maintenance on the bullet
23  trap?
24      A.  I don't recall.

Page 40

1      Q.  When you got this instruction or, as you called
2  it, directive to do maintenance, did you ask Al Parton
3  what you were supposed to do?
4      A.  Yes.
5      Q.  What did he say to you?
6      A.  He said to keep the screens that are on the
7  pumps clean.
8      Q.  Anything else?
9      A.  That was pretty much it.
10      Q.  Did you have any part in installing the pumps
11  when the system was assembled?
12      A.  I don't recall specifically installing the
13  pumps where I went and put actual -- I remember watching
14  it being done, but I don't recall actually getting a hand
15  on it.
16      Q.  Do you remember how many pumps there were in
17  the system?
18      A.  Somewhere around maybe 20, because I know there
19  was one piece that had to be modified for the thing to
20  fit in the building.
21      Q.  What do you mean --
22      A.  A piece of the bullet trap itself.
23      Q.  The bullet trap was too big?
24      A.  Yes.  And there was a piece that had to be

Page 41

1  specifically made for our range by Savage.
2      Q.  Did you as part of your duties at the range
3  begin to unclog the pumps?
4      A.  Yes.
5      Q.  Do you remember what year you first started
6  doing that?
7      A.  That would be a guess.
8      Q.  Did you do any other work on the water system
9  for the Savage bullet trap other than unclogging the
10  pumps?
11      A.  If I noticed that the trap was low in water, we
12  would stick a garden hose in it, in the trough itself,
13  and turn the water on and let it fill up again.
14      Q.  Did you do anything else?
15      A.  I think one time I operated the forklift while
16  Savage was there to hold a 55-gallon drum of oil up while
17  they put oil into the water.
18      Q.  Did you clean shotgun wadding out of the water?
19      A.  Yes.
20      Q.  What did you use to do that?
21      A.  We had a couple things.  We had a strainer at
22  one time and a small I called it a guppy net, just
23  something that you would use in an aquarium setting.
24      Q.  Basically to strain the water through to keep

11 (Pages 38 to 41)

Price, et al.                                v.                              Chaffinch, et al.
B. Kurt Price                       C.A. # 04-956-GMS                  October 18, 2005

Page 42

1  the shotgun wadding in the net?
2      A.   Yes.
3      Q.   Did you do anything with the filters?
4      A.   **We used a garden hose to blow those out, and**
5  **sometimes we would use either a nylon or a bronze brush**
6  **to get the -- I don't know what it was, but it would**
7  **collect on there and get pretty hard and we would use**
8  **that to knock it out.**
9      Q.   Just so the record's clear as to what you're
10  doing here, it's my understanding that there is a pan or
11  a tank of water that sits below the conveyor belt in the
12  bullet trap.  Is that right?
13     A.   Yes.
14     Q.   And the pump that we have been talking about is
15  something that pumps water out of the tank and into the
16  sprayer heads that are actually on the front of the
17  bullet trap.  Is that right?
18     A.   Yes.
19     Q.   And the sprayer heads release water into the
20  front of the bullet trap, right?
21     A.   **That's correct.**
22     Q.   And at least in theory, the water is supposed
23  to wash the residue and bullets down into the conveyor
24  system.  Do I have that right?

Page 43

1      A.   **What the water is designed for on that lower**
2  **ramp, as it was explained to me when I first started**
3  **there, was to hydroplane the bullet as it impacted the**
4  **lower ramp so that when it went into the deceleration**
5  **chamber which is located on the back of the trap, that's**
6  **where it would spin, lose its energy and then drop onto**
7  **the conveyor belt.**
8      Q.   When you talk about the filters, the filters
9  are somewhere between the pump and the sprayer nozzle,
10  right?
11     A.   Yes.
12     Q.   And what you would have to do is to stop the
13  pump and then unscrew the cap and pull the filter out and
14  clean it?
15     A.   Yes.
16     Q.   You were at the range when the State Police
17  changed from lead bullets to frangible ammunition,
18  weren't you?
19     A.   Yes, sir.
20     Q.   Were you involved in the decision-making
21  process at all?
22     A.   No, sir.
23     Q.   Did the maintenance that you had to do behind
24  the bullet trap on the water system change after the

Page 44

1  State Police changed from lead to frangible ammunition?
2      A.   **We had to clean the filters out more and the**
3  **pumps.  The pumps would go down quite often.**
4      Q.   More often than when you shot bullets?
5      A.   **Yes.  Leaded ammo.**
6      Q.   I'm sorry.  Leaded ammo.
7           Are you able to give me an estimate as to
8  how long a pump would last when you were shooting leaded
9  ammo prior to the year 2000?
10     A.   **It would all be a guess.  You want me to guess**
11  **at it?**
12     Q.   I don't want you to guess.  If you have any
13  recollection of how frequently you had to replace a pump,
14  I would appreciate that.
15     A.   **I can't recall exactly, and I would hate to**
16  **give you an answer that would be incorrect.**
17     Q.   That's fine.  I don't want you to guess.
18           Would you say that the pumps had to be
19  replaced more frequently once you started shooting
20  frangible?
21     A.   **Yes.**
22     Q.   And the filters needed to be cleaned more
23  often?
24     A.   **Yes.**

Page 45

1      Q.   When the range first opened, were there
2  ventilation problems?
3      A.   **Yes.**
4      Q.   What did you observe that you believe to be a
5  ventilation problem?
6      A.   **I was present when they conducted the only test**
7  **that I ever saw, was just a simple smoke test where they**
8  **had a smoke-creating machine, and I think it got to a**
9  **point where they were doing that so often, that I think**
10  **either the State Police or Facilities Management**
11  **purchased one of these machines that was one that they**
12  **use in theatrical settings to create a fog.**
13           **And they ran smoke tests, plus when you**
14  **were on the line, sometimes there would be no -- you**
15  **could not feel any air blowing out there, and you could**
16  **see the smoke -- as a weapon would discharge, you could**
17  **see the smoke billowing up and actually moving to the**
18  **rear of the range.**
19     Q.   When you say "sometimes," what does that mean?
20  Does it mean it didn't happen all the time?
21     A.   **It happened a lot more than it did not happen.**
22  **To give you an exact estimate, I would -- again, that**
23  **would be a guess.  But being out there every day for as**
24  **long as I was, we had more problems with it than when it**

12 (Pages 42 to 45)

Price, et al.                v.                Chaffinch, et al.
B. Kurt Price         C.A. # 04-956-GMS        October 18, 2005

Page 46

1  would work.
2      Q.   Let me go back a second to something you said a
3  few minutes ago.  You said you were there when they did a
4  test.
5      A.   Yes.
6      Q.   Was this when the range was first being opened
7  in September 1998?
8      A.   No, sir.  This was after our blood lead levels
9  started to elevate.
10     Q.   What year was that?
11     A.   That would have been somewhere between --
12  again, I can't be specific, but it would be somewhere
13  between October and December of '98, I believe, our lead
14  levels began to climb.  Plus we were -- just little
15  things.  You would blow black soot out of your nose back
16  then.
17     Q.   Were changes made to the range after
18  November 1998?
19     A.   Sometime in that area I know they brought in an
20  environmental company that conducted some air testing on
21  instructors, and through various parties, I believe it
22  was Batta, B-a-t-t-a, and they found that the levels
23  exceeded the OSHA limits, and I think they rebalanced the
24  system.  I don't know what that entailed, but --

Page 47

1      Q.   Was there a point when more ducts were put in
2  or baffles were put into the shooting area?
3      A.   I don't recall the baffling.  The only issue in
4  regards to the baffling, I remember when they had to
5  remove some of the baffling on the roof due to the roof
6  beginning to sag.
7      Q.   Do you remember when that occurred
8      A.   I think that was done prior to again, but again
9  that is a guess.
10     Q.   Do you remember changes being made to the HVAC
11  system after it opened?
12     A.   There were so many changes made, I can't give
13  you an exact date, but I do recall people coming in and
14  working on the system.
15     Q.   When you say there were a lot of changes made,
16  who is it that's making the changes?
17     A.   I believe that would have been either Trane or
18  Facilities Management or a combination between the two.
19     Q.   So Facilities Management being a part of the
20  Delaware state government?
21     A.   I believe so.
22     Q.   And then Trane is an outside contractor that's
23  brought in to deal with the air-handling system?
24     A.   Yes.  It was their system that they put on the

Page 48

1  roof.
2      Q.   How did you learn that the State Police would
3  start shooting frangible ammunition instead of lead
4  ammunition at the range?
5      A.   I believe we had attempted to use an ammunition
6  that was called Clean Fire, but we found that our lead
7  levels were still going up even with the Clean Fire, and
8  it was presented at the time, as I can recall, and again,
9  I was not in that loop, but I do remember hearing
10  discussion that it came out that frangible was nontoxic.
11     Q.   Do you remember who told you that you were
12  going to start using frangible?
13     A.   I believe that started when Sergeant Parton was
14  there.  There may have been some discussion when
15  Fitzpatrick was there.  But again -- but I know that's
16  about in the time period that we switched.
17     Q.   I want to focus on the time period after you
18  started to use frangible ammunition.  Were there other
19  instructors at the range who did maintenance of the water
20  system in the bullet trap?
21     A.   I think we all shared some responsibility there
22  as far as who would go back and check on -- we would talk
23  just in the office setting, hey, did anybody check, no.
24  Then one guy would get up and -- again, that was my

Page 49

1  recollection of it.  It varied.
2      Q.   Can you tell me other people that you know who
3  did work on the water system behind the bullet trap?
4      A.   I know Corporal Wayne Warren did,
5  Sergeant Foraker.
6      Q.   Are we talking about Sergeant Foraker when he's
7  a corporal or a sergeant?
8      A.   Probably both.
9      Q.   Do you remember actually seeing him do the work
10  when he was a sergeant?
11     A.   I know he would be back there.  I can't recall
12  specifics, but I know we would all go back and look and
13  inspect as best that we could.  You have to understand,
14  we had absolutely no training to know what we were
15  looking at.  Basically just user-type issues as far as
16  well, that looks clogged.  You could see when the screens
17  would clog.
18     Q.   You could see that?
19     A.   Yes, sir.
20     Q.   You didn't need training to be able to tell it
21  was clogged?
22     A.   No.
23     Q.   Who else did you see doing work on the water
24  system of the bullet trap?

13 (Pages 46 to 49)

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 50

1    A.   I would hate to even guess at that. I don't
2    know -- with all the personnel changes in and out of
3    there, it's hard to say.
4    Q.   How about Peachey?
5    A.   I cannot say.
6    Q.   How about Cathell?
7    A.   That would be a guess. I don't want to do
8    that.
9    Q.   So the only people you remember for sure doing
10   work back there were Warren and Foraker?
11   A.   And myself.
12   Q.   And yourself, sure.
13   A.   Yes, sir. And Sergeant Ashley in his tenure
14   would go back there, as well, and work on the bullet
15   trap.
16   Q.   Did Al Parton ever work on the bullet trap?
17   A.   I don't recall.
18   Q.   And how about Fitzpatrick?
19   A.   I don't recall. That was a long time ago.
20   Q.   Did you in the course of the work you did on
21   the bullet trap ever do any cleaning of the belt? I'm
22   talking about the first belt that was installed.
23   A.   Lieutenant Bryson, when we first turned the
24   belt on, he gave me a wire brush and I stood there as the

Page 51

1    belt turned to knock some of the wood chips and debris
2    off of it.
3    Q.   Did you continue to use a wire brush on it
4    during the following years that you worked at the range?
5    A.   As I can recall, the leaded ammo was no problem
6    with it. After the frangible ammo hit it, it pretty much
7    destroyed that belt.
8    Q.   You were given the wire brush at the point you
9    were using leaded ammunition?
10   A.   Yes. Prior to us even opening the facility.
11   Just to knock the debris off.
12   Q.   Did you continue to use the wire brush after
13   the facility opened?
14   A.   No.
15   Q.   So you didn't do it at all once you actually
16   started shooting there?
17   A.   No.
18   Q.   During the time frangible ammunition was being
19   shot, did you do anything with the belt itself?
20   A.   No, sir. I was not qualified to do that.
21   Q.   I'm just asking whether you did it.
22   A.   Not that I can recall, no.
23   Q.   What did you observe Sergeant Ashley doing with
24   the water system behind the bullet trap?

Page 52

1    A.   He would help us change pumps as they would go
2    down.
3    Q.   Anything else?
4    A.   I remember he had a torch back there and he was
5    actually cutting holes with the torch in the bullet trap.
6    Q.   Did he ever tell you why he was cutting the
7    holes?
8    A.   Something in regards -- again, the gist of it,
9    as I can recall, was to help increase the water flow.
10   Q.   Where on the bullet trap was the hole being
11   cut?
12   A.   It was being cut just above the trough where
13   the drag belt and the chain had once been. If you have
14   the deceleration chamber, underneath the deceleration
15   chamber there is -- that's where the belt would go down.
16   As I understood it, it would go down this way, so to
17   speak, and then come back up through the trough. He cut
18   underneath the deceleration chamber.
19   Q.   You mean he was cutting into the bottom of the
20   deceleration chamber?
21   A.   No, sir.
22        MR. NEUBERGER:  Off the record.
23        (Discussion off the record.)
24        MR. ELLIS:  Why don't we give a number

Page 53

1    there.
2        (Defendants' Deposition Exhibit No. 12 was
3    marked for identification.)
4    BY MR. ELLIS:
5    Q.   I have put a picture in front of you,
6    Corporal Price. Am I correct that we are looking at the
7    back of the bullet trap?
8    A.   Yes, sir.
9    Q.   I take it down at the bottom of the structure
10   that appears on the right side of the picture is the tank
11   that we have been talking about that holds the water?
12   A.   Yes, sir. The very bottom?
13   Q.   Yes.
14   A.   Yes.
15   Q.   And the hoses that we see running out of the
16   tank and up to the top of the bullet trap are the hoses
17   that carry the water to the sprayer nozzle?
18   A.   Yes.
19   Q.   And those things that look like little cans or
20   jars that are partway up the hose from the tank to the
21   sprayer nozzle, is that where the filter is?
22   A.   Yes, sir.
23   Q.   Can you describe to me where Sergeant Ashley
24   was cutting the holes with the torch?

14 (Pages 50 to 53)

Price, et al.                                                        Chaffinch, et al.
B. Kurt Price                        v.                             October 18, 2005
                              C.A. # 04-956-GMS

Page 54

1    A.  If you see -- the easiest way for me to
2   describe it, if you see the first screen or pump,
3   whatever you want to call it that houses the pump from
4   the right, go straight down and you will see a continual
5   line of what looks to be steel.
6    Q.  Yes.
7    A.  You will note that there are some holes that
8   are located in that trough.
9    Q.  Sort of round holes that look like they were
10  cut by a torch?
11   A.  Yes, sir.
12   Q.  That's the hole that was cut by the torch?
13   A.  That's what I'm talking about, that is correct.
14   Q.  What was your understanding as to what was
15  supposed to flow through those holes?
16   A.  As I understood it, water. Water, oil,
17  solution, whatever was in the trough.
18   Q.  When did Sergeant Ashley cut those holes, do
19  you remember?
20   A.  No, sir. That would be --
21   Q.  Obviously between April 2002 and December 2003?
22   A.  Yes, sir. Sometime in that frame.
23   Q.  You don't remember any more specifically than
24  that?

Page 55

1    A.  No. I wish I could, but I can't.
2    Q.  You want to take a break for a minute?
3        MR. NEUBERGER: Yes. It's time.
4        (A recess was taken.)
5   BY MR. ELLIS:
6    Q.  During the course of the time that you worked
7   at the firing range in Smyrna, do you recall the range
8   being shut down to do environmental remediation?
9    A.  Yes.
10   Q.  How many times?
11   A.  I can recall specifically twice, and there may
12  have been more, but I do remember two times that we shut
13  down.
14   Q.  Do you remember when the first one was?
15   A.  It was either -- I want to say it was sometime
16  early in -- I think it was the turn of the century, 2000
17  area, somewhere in there.
18   Q.  Do you remember what was done?
19   A.  Back behind the bullet trap, this area that you
20  see in this picture, if I can reference that, is that all
21  right?
22   Q.  Sure. That's Exhibit 12.
23   A.  That area had to be environmentally cleaned in
24  addition to -- I do know that one for sure. There's

Page 56

1   another time that they did -- they repeated the same
2   cleanup, but they also did the front deflectors at the
3   target system itself in the lights there on the front
4   side of the bullet trap. I don't remember if they did
5   that one the first time or if that was done on the second
6   time.
7    Q.  Was there any environmental cleanup done in the
8   office area during the time you were assigned there?
9    A.  Not that I can recall.
10   Q.  I'd like you to describe for me what effect the
11  change in the ammunition had on the operation of the
12  bullet trap. Your observation.
13   A.  Just a layperson observation was that it
14  created a lot more problems with the bullet trap. The
15  initial conveyor, it seized -- that material seized that
16  conveyor -- or that belt up, from what I was told and
17  understand it. The pumps failed more often or had to be
18  unclogged. It just created an absolute -- trying to
19  think of the word. It made the maintenance of the bullet
20  trap impossible to try to stay up on.
21   Q.  My understanding is that the State Police went
22  to frangible ammunition either late in 2000 or early in
23  2001. Does that correspond with your recollection?
24   A.  I know it was sometime in that time frame. I

Page 57

1   can't tell you the exact date.
2    Q.  You've testified that the change to frangible
3   caused the pumps to fail more often.
4    A.  Yes.
5    Q.  It caused the belt to seize up?
6    A.  Right.
7    Q.  Did you ever actually see the belt seize up?
8    A.  I know it was coated with that material and
9   would not turn. So I'm assuming that would have been the
10  seize, as I understand things.
11   Q.  Did it cause the sprayer heads to clog?
12   A.  Yes.
13   Q.  You've testified that it made it, in your
14  words, impossible to maintain.
15   A.  A lot harder, yes, sir.
16   Q.  If that's the case, how was it that you were
17  able to keep the equipment running for almost three years
18  after you switched over to frangible ammunition?
19   A.  That would be a guess at my point. We just
20  tried to keep working on it as best we could with no
21  training at all. We did the best we could with it.
22       And at some point in time, I can't
23  remember under whose -- which supervisor's tenure, they
24  finally got a contract, as I understand it, with Savage

15 (Pages 54 to 57)

Price, et al.                          v.                    Chaffinch, et al.
B. Kurt Price                  C.A. # 04-956-GMS              October 18, 2005

Page 58

1  Arms to come once a year, usually in the August or
2  September area, to perform maintenance on the trap.  I
3  can't remember which sergeant it was because there was --
4  I think in almost as many years we had that many
5  supervisory changes at the range.  But it was somewhere
6  after we had gone to frangible ammo that we adopted a
7  contract, as I was told, with Savage Arms to come once a
8  year.
9     Q.   When the Savage Arms people came, did somebody
10 from Mayfran Corporation come, as well?
11    A.   Not all the time.  No.  In fact, I can only
12 remember those people being there the last time.  That
13 would have been when Sergeant Ashley was there.
14    Q.   Did the Savage people, the people from Savage
15 Arms, actually do work on the belt system?
16    A.   I don't know.  That would have -- you have to
17 look at the records on that.  I do not know.
18    Q.   What did you see the Savage Arms personnel do
19 when they came to the range?
20    A.   I observed them removing the debris -- can I
21 make reflection to the picture?
22    Q.   Certainly.  Exhibit 12.
23    A.   Yes, sir.  The trough where all the water was
24 housed, they would use shovels and so forth to clean the

Page 59

1  debris from there, and I remember them on the front side
2  of the bullet trap, there's a trough on the front side of
3  the lower impact ramp, if you will, where the water comes
4  out of the sprayer heads and cascades down, that impact
5  ramp there, there was a trough that was located on the
6  front of that and they would clean that trough.
7     Q.   Anything else that you saw the Savage Arms
8  employees do when they came to the range?
9     A.   No, sir.  Not that I have any independent
10 memory of.
11    Q.   Do you know whether they replaced the pumps?
12    A.   Not to my recollection.
13    Q.   How about the filters?
14    A.   No, sir.
15    Q.   Did they do anything with the nozzles, the
16 sprayer nozzles?
17    A.   I don't know.
18    Q.   What is the effect on the shooting side of the
19 range if the sprayer nozzle doesn't send any water out?
20    A.   The effect as far as the ramp itself?
21    Q.   Right.
22    A.   That would dry.  That would go dry.
23    Q.   If you're shooting dry and you're shooting lead
24 ammunition, what effect does that have on the lead

Page 60

1  bullets when it comes into the bullet trap?
2     A.   The effects if it came into -- I'm assuming it
3  would go up the impact ramp as it would have anyway,
4  would not hydroplane possibly.  I don't know.  I'm not
5  trained in that.  That's just a guess.
6     Q.   What effect does shooting dry have if you're
7  using frangible ammunition?
8     A.   I would assume the bullet would degenerate.
9     Q.   When you shoot frangible ammunition at the
10 bullet trap and it impacts, can you see it disintegrate?
11    A.   No.
12    Q.   When you shoot it at a dry bullet trap, can you
13 see clouds of dust from the ammunition striking the
14 bullet trap?
15    A.   I suppose you could.  I know at times, if that
16 were the case, we would move the shooters away from the
17 dry ramp.
18    Q.   So that they would be shooting at a wet part of
19 the trap?
20    A.   Yes, sir.  I can tell you from experience that
21 I never had to and nor did I know how to take the sprayer
22 heads off, but usually with the dry portion of the ramp,
23 it was created by the --
24    Q.   By the filter being clogged?

Page 61

1     A.   By the filter, and that could be remedied.
2     Q.   Were you able to determine that if you shot
3  frangible ammunition at a dry part of the ramp, that it
4  would cause an increase in dust?
5     A.   I would assume it would.  But that's an
6  assumption.  I could not see or watch a bullet impact.  I
7  could not see that.
8     Q.   I recognize that you can't see the bullet
9  impact, but on occasions, when you saw people shooting at
10 a dry part of the ramp, did you notice that there was
11 more dust in the air around the bullet trap than there
12 would be if the trap were wet?
13    A.   I can't make that determination.
14    Q.   Why did you move the shooter from a dry part of
15 the ramp to a wet part of the ramp when you noticed that
16 somebody was shooting at a dry area?
17    A.   We attempted to accommodate the system until we
18 could perform maintenance on it.
19    Q.   What do you mean "accommodate the system"?
20    A.   So that we wouldn't shoot into the dry area.
21 Because it's not designed to shoot dry.
22    Q.   So what's the effect if you shoot frangible
23 ammunition into a dry area?
24    A.   That would be an assumption on my part.

A - 85

16 (Pages 58 to 61)

Price, et al.                              v.                    Chaffinch, et al.
B. Kurt Price                    C.A. # 04-956-GMS               October 18, 2005

Page 62

1    Q.   You just knew you didn't want to do it?
2    A.   Right.  It's a wet system.  It's designed to be
3    shot wet.
4    Q.   Did the maintenance that you performed on the
5    bullet trap change when Al Parton left the range and was
6    replaced by Chris Foraker as the sergeant?
7    A.   I don't believe so, no.
8    Q.   So you were essentially doing the same things
9    that you had done under Parton?
10   A.   Yes, sir.
11   Q.   When Foraker left and was replaced by
12   Rich Ashley, did the maintenance work that you did on the
13   bullet trap change?
14   A.   Can you rephrase that again?  I'm sorry.
15   Q.   It's the same question I asked you about going
16   from Parton to Foraker.  When Foraker left in April of
17   2002 and was replaced by Ashley, did the maintenance on
18   the bullet trap change?
19   A.   No, sir.
20   Q.   When Foraker returned to replace Ashley in
21   December 2003, did the maintenance on the bullet trap
22   change?
23   A.   I'm going to tell you yes, but I would like to
24   qualify my answer, if I may.

Page 63

1    Q.   Sure.
2    A.   I can't be specific on the date without looking
3    at the document itself.  I had been performing large
4    amounts of maintenance on the bullet trap.  I received a
5    blood test, a notice to go for blood work.  I went and I
6    did that, and the results of that test prompted me to
7    have an extreme amount of concern in regards to lead
8    being in my blood.
9    Q.   Was this before or after Foraker returned?
10   A.   This was before.
11   Q.   How long before?
12   A.   I want to say it was sometime in the summer or
13   fall of '03.  Again, that's a guess.  I don't recall
14   specific dates without having to look at the form.  And
15   it prompted a phone call from Dr. Green to me from
16   HealthWorks.
17        I essentially went where my blood lead
18   levels had been in the single digits, somewhere between
19   4 to 6, somewhere in that area, my lead level was now at
20   an 11.  And in my discussion with Dr. Green, he asked
21   what I had been doing, and I specifically told him that
22   nothing any different; I have just been working on the
23   bullet trap.  And then he asked about that, and he asked,
24   well, what does the bullet trap contain, and I explained

Page 64

1    to him a mixture of oil and water which is in the bottom
2    part of the trough there, the tank itself, and he said
3    that what would happen is that any petroleum product is
4    actually a penetrator of human skin and that would --
5    that would carry into my bloodstream any type of
6    contaminants.
7        That was the first time that anybody had
8    ever explained that to me or that I was made aware of
9    that.
10   Q.   What happened next?
11   A.   I voiced my concerns verbally with
12   Sergeant Ashley and Lieutenant Davis and Captain Warren
13   at the academy.
14   Q.   You talked to all three of them at the same
15   time?
16   A.   No, sir.
17   Q.   Why don't you tell me who you talked to first.
18   A.   I can't remember, but I do remember I talked to
19   all three.
20   Q.   Did you talk to them individually or in a
21   group?
22   A.   I know I talked to Captain Warren and
23   Captain Davis while they were in the administrative
24   office during at the academy.

Page 65

1    Q.   Where did you talk to Ashley?
2    A.   I'm going to assume it was in the office of the
3    range.
4    Q.   You're assuming, but you don't remember?
5    A.   No, sir.  I can't be specific.
6    Q.   What is it that you said to him?
7    A.   I told him that I had a concern about how my
8    blood lead levels increased 6 points just by performing
9    maintenance on the bullet trap.
10   Q.   What did he say?
11   A.   He said, "Well, you got to die from something."
12   Q.   What did you say to that?
13   A.   I said, "Well, I would prefer to die of old
14   age," and I turned around and walked away from the man.
15   Q.   That was the end of the conversation?
16   A.   Yes, sir.
17   Q.   Was your conversation with Davis and Warren
18   before your conversation with Ashley or was it after your
19   conversation with Ashley?
20   A.   As I stated earlier, I can't recall who I
21   talked to first.  I was, again, shaken because that was
22   the second highest -- I'm sorry.  That's the second time
23   that my blood lead levels have been over 10.
24   Q.   I'll get to that in a minute, but describe your

17 (Pages 62 to 65)

Price, et al.                              v.                    Chaffinch, et al.
B. Kurt Price                    C.A. # 04-956-GMS              October 18, 2005

Page 66

1  conversation with Ashley and Davis. I'm sorry. With
2  Davis and Warren.
3      A.   I just explained to them my concerns in regards
4  to the lead level and our lack of training and any type
5  of protective equipment that we had, and they understood
6  my concerns.
7      Q.   What did Davis say at the meeting?
8      A.   He just, " well, I would be concerned, as
9  well," something to that effect.
10     Q.   Did he tell you he was going to do anything
11 about it?
12     A.   I don't recall.
13     Q.   What did Warren say?
14     A.   I don't recall what his comments were.
15     Q.   Was anybody else present at the meeting?
16     A.   It was not a meeting. They were there and I
17 was there and I wanted to mention it to them. I don't
18 recall if anybody else was in there or not.
19     Q.   Where was it in the academy?
20     A.   The administrative office.
21     Q.   As a result of getting this blood lead level
22 that you said was 11, did you stop doing work on the
23 bullet trap?
24     A.   I explained to Sergeant Ashley that I was going

Page 67

1  to back off of it, yes.
2      Q.   What did he say to that?
3      A.   He said no problem.
4      Q.   Beginning whenever this blood lead level result
5  came back, did you stop doing work on the bullet trap
6  system altogether?
7      A.   No, sir. Not totally.
8      Q.   What is it that you continued to do, and what
9  did you not do anymore?
10     A.   I would go back and help replace the pumps on
11 an occasion.
12     Q.   So you would still replace the pumps?
13     A.   Yes.
14     Q.   What is it that you stopped doing?
15     A.   I don't recall that I -- again, this would be a
16 guess on my point. I probably shouldn't even give an
17 answer because it would be a guess.
18     Q.   I don't want you to guess, but to your
19 recollection, did you stop doing anything?
20     A.   I know that I backed --
21     Q.   That's a bad question. Was there anything that
22 you stopped doing as a result of getting the blood lead
23 level back?
24     A.   I did not go back as often and clean the

Page 68

1  filters.
2      Q.   So you continued to do it, you just didn't do
3  it as much?
4      A.   Correct.
5      Q.   You have been tested for blood lead levels ever
6  since 1998. Would that be correct?
7      A.   Somewhere in there, yes, sir.
8      Q.   I'm using 1998 because that's when the range
9  opened.
10     A.   Yes.
11     Q.   Were you tested for blood lead levels when you
12 were shooting at the outdoor range?
13     A.   No.
14     Q.   What's the highest result you ever had on a
15 blood lead test?
16     A.   11.
17     Q.   Was that the one that occurred in 2003?
18     A.   No. There was another one somewhere -- in
19 either -- again, it would be a guess, but I remember one
20 coming back where it was an 11, as well, when we were
21 still shooting leaded ammo at that time.
22     Q.   So prior to going to frangible?
23     A.   Yes, sir.
24     Q.   Were you doing anything different in 2003 than

Page 69

1  you had been doing in 2002 in terms of working on the
2  bullet trap?
3      A.   No, sir.
4      Q.   Is there some activity you were engaged in in
5  2003 that you attribute the higher blood lead level to
6  that you weren't doing in 2002?
7      A.   Not that I can recall. Again, I continued to
8  try to keep that bullet trap working.
9      Q.   I understand that. Were you working more on
10 the bullet trap in 2003 than you had been in 2002?
11     A.   I don't recall. That would be -- I don't know.
12     Q.   Were you doing more hunting in 2003 than you
13 had done, say, in 2002 or 2001?
14     A.   No, sir. And if I'm not mistaken, that period
15 of time of year is no open season.
16     Q.   I would have imagined that, but not being a
17 hunter, I wasn't sure.
18     A.   Yes, sir.
19     Q.   What you're telling me is that you modified
20 your behavior after you got the score of 11 back and had
21 the conversation with Dr. Green?
22     A.   Yes.
23     Q.   Did your blood lead level go down after that?
24     A.   I believe it did. Again, I know we got tested

18 (Pages 66 to 69)

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 70

1  at Omega March 1st, but I would have to look at those
2  results to give you an answer. I don't recall what those
3  were.
4          MR. NEUBERGER: Did you mean March 1st --
5          THE WITNESS: Of 2004. Yes, sir. I'm
6  sorry.
7      Q.  That's what I understood you to mean.
8          After Sergeant Foraker returned to the
9  range in 2003, were you involved in discussions about
10 whether the instructors at the Firearms Training Unit
11 should continue to do maintenance of the bullet trap?
12     A.  Yes.
13     Q.  Where did those discussions take place?
14     A.  I believe they were in our office.
15     Q.  Who was involved in those discussions?
16     A.  I believe it was Sergeant Foraker -- I know it
17 was Sergeant Foraker, Corporal Warren, myself, and I'm
18 going to assume that it was Corporal Warwick.
19     Q.  I guess I should ask you the question. Why are
20 you assuming Corporal Warwick?
21     A.  I just have more memory of us three being
22 together than I do Corporal Warwick, because I worked
23 longer with Corporal Warren and Sergeant Foraker than I
24 did with Corporal Warwick. He kind of came in at the

Page 71

1  time that I was removed.
2      Q.  About the time you were removed?
3      A.  Yes.
4      Q.  What is the time you were removed?
5      A.  I believe that was sometime in April.
6      Q.  Of 2004?
7      A.  Yes.
8      Q.  My understanding from some records I have seen
9  is that Corporal Warwick was assigned to the range in
10 either October or November of 2003. Does that correspond
11 to your recollection?
12     A.  If that's what you're telling me, I'm going to
13 assume --
14     Q.  I don't want you to assume it, but do you
15 remember him being there while Sergeant Ashley was still
16 there?
17     A.  Yes.
18     Q.  So that had to be 2003 because Ashley left in
19 December 2003.
20     A.  Yes, sir.
21     Q.  How did the subject of maintenance of the
22 bullet trap come up in the discussions with the staff at
23 the Firearms Training Unit?
24     A.  One, we discussed -- I remember the discussion

Page 72

1  about we really don't know what we're doing back there as
2  far as any type of formal training with the
3  health-related risks of our rise in lead levels and no
4  protective gear or training, that was a huge issue with
5  us.
6      Q.  Do you remember which of the four of you first
7  raised the issue?
8      A.  I do not.
9      Q.  Do you remember, was this something that you
10 talked about together in a meeting?
11     A.  I know it was in the office. It was not a
12 meeting, so to speak. We just started -- struck up a
13 conversation on it and discussed our concerns.
14     Q.  Do you remember anything you said to any of the
15 other three people about your concerns?
16     A.  I was concerned about my lead level in
17 particular going to an 11, and I was afraid that, if we
18 continued, I did not know how high a lead level I was
19 going to attain.
20     Q.  Do you remember whether Corporal Warren's lead
21 levels had gone up in 2003?
22     A.  I believe his had. I believe recalling -- I do
23 recall a conversation where he said his lead level had
24 gone up.

Page 73

1      Q.  Do you remember what it went up to?
2      A.  No, I do not.
3      Q.  Do you remember anything that any of the other
4  three people said in your discussions about whether you
5  would continue to do maintenance of the bullet trap?
6      A.  I don't recall specifics in regards to what we
7  would do with the bullet trap, the maintenance of it.
8  Our primary issue and concern was the health-related
9  risks. That's what I remember the bulk of the
10 conversation about.
11     Q.  Do you remember there being any discussion of
12 possible reasons for rise in blood lead level other than
13 maintaining the bullet trap?
14     A.  No.
15     Q.  Was it your assumption at the time that the
16 reason your blood lead level had risen was because you
17 were doing the maintenance of the bullet trap?
18     A.  That is what the doctor who treated me in
19 regards to my elevation in lead, that is what he advised
20 me. And I would have no reason to doubt what he said.
21     Q.  Did the group collectively of Firearms Training
22 Unit instructors decide to stop doing maintenance of the
23 bullet trap?
24     A.  I don't recall if we just said that's it, we're

19 (Pages 70 to 73)

Price, et al.                               v.                        Chaffinch, et al.
B. Kurt Price                    C.A. # 04-956-GMS              October 18, 2005

Page 74

1  not going to do it anymore, or if it went up the chain of
2  command.  I don't know.
3      Q.   What do you mean it going up the chain of
4  command?
5      A.   I know Sergeant Foraker was feverishly working
6  and talking with folks in regards to issues regarding the
7  range and the bullet trap.
8      Q.   Did you participate in any of these feverish
9  discussions with Sergeant Foraker?
10     A.   No, sir, I did not.
11     Q.   So what you knew was that he was telling you
12 that he was discussing range issues with people above him
13 in the chain of command?
14     A.   He was always on the phone and always on his
15 computer.
16     Q.   And he told you that, when he was on the phone
17 or on the computer, he was having these discussions with
18 people above him in the chain of command about the firing
19 range?
20     A.   That's what he said.
21     Q.   Did you cease altogether doing maintenance on
22 the bullet trap in December of 2003?
23     A.   We collectively decided that, until we received
24 formal training -- or even better than that, I know we

Page 75

1  had discussed with a vendor, and I believe that was
2  Joe Farrell, of what options we would have in regards to
3  getting an outside vendor to tend to the bullet trap,
4  because we did not have the training, nor the equipment
5  or the background to provide any educated maintenance of
6  that bullet trap.
7      Q.   Let me break down the question, because you
8  have given me more than I really asked for.
9      A.   I'm sorry.
10     Q.   Did you collectively make a decision to stop
11 doing the maintenance on the water system on the back of
12 the trap?
13     A.   Yes.
14     Q.   Were all four of you involved, meaning by the
15 four of you I mean Foraker, Price, Warren, and Warwick,
16 were you all involved in making that decision?
17     A.   As best as I can recall, yes.
18     Q.   And the reason for making that decision is that
19 what you have just described to me about lack of training
20 and the concern about the health effects?
21     A.   Yes, sir.
22     Q.   Now, when you made that decision, I'm asking
23 you now as one of the four, what effect did you expect
24 that to have on the operation of the bullet trap?  By

Page 76

1  "that decision" I mean what effect did you expect the
2  decision to stop doing the maintenance of the water
3  system to have on the operation of the bullet trap?
4      A.   Well, only thing that I can tell you is what I
5  saw there every day prior to this decision being made,
6  that it was becoming more and more of a nightmare to try
7  to keep it running.  We were spending a lot more time,
8  myself and other instructors, trying to keep that thing
9  going.
10     Q.   But what did you personally expect would happen
11 to the operation of the system if you stopped doing the
12 maintenance?
13     A.   That would be an assumption on my part.  You
14 want me to give you that answer, an assumption?
15     Q.   I want your expectation.
16     A.   My expectation would have been --
17     Q.   You had been working with that system by then
18 for what, six, seven years?
19     A.   Sometime in there.  I would assume that it
20 would fail.
21     Q.   What would be the consequence of it failing?
22     A.   I don't know.
23     Q.   Would you expect the environmental conditions
24 in the shooting area to deteriorate?

Page 77

1      A.   I don't know that.  I have no expertise at all
2  in environmental issues.
3      Q.   I'm not asking for your expertise.  I'm asking
4  for what your expectation was.  Would you have expected
5  because the water system wasn't working for the
6  conditions in the shooting area to deteriorate?
7      A.   I don't know.  I can't give you an answer on
8  that.
9      Q.   What you're saying is that you had no
10 expectation?
11     A.   I didn't know what would happen.
12     Q.   Did you yourself communicate to anyone above
13 you in the chain of command the fact that you were not
14 going to do maintenance of the water system in the bullet
15 trap anymore?
16     A.   I do not recall.
17     Q.   Do you recall when you, meaning you, the group
18 collectively, as the Firearms Training Unit made the
19 decision to stop doing the maintenance of the bullet
20 trap, when in 2003?
21     A.   I'm sorry.  Could you ask me that again?  I'm
22 sorry.
23     Q.   That's probably a bad question.
24          Do you remember when you made the decision

20 (Pages 74 to 77)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

A - 89

Price, et al.                                                    Chaffinch, et al.
B. Kurt Price                                v.                  October 18, 2005
                         C.A. # 04-956-GMS

Page 78

1  to stop doing maintenance on the bullet trap?
2      A.   I don't remember.  I can't give you a date.  I
3  don't know.
4      Q.   Do you remember how long after Sergeant Foraker
5  returned to the Firearms Training Unit you made that
6  decision?
7      A.   I can't recall.  To be specific, I don't
8  remember.
9      Q.   Do you remember whether it was before Christmas
10 of 2003?
11     A.   I'm sorry.  I don't remember.  I don't remember
12 the exact date or even if it was before or after the
13 holiday.  I don't know.
14     Q.   I think your colleague, Corporal Warren,
15 yesterday testified that it occurred within the first
16 week, approximately, of Mr. Foraker's return to the
17 Firearms Training Unit.
18          Do you have any reason to believe that's
19 not an accurate recollection?
20     A.   It may have been.  I don't recall, though.
21          (A recess was taken.)
22 BY MR. ELLIS:
23     Q.   I'm going to show you what I have previously
24 marked Exhibit D-1.

Page 79

1          MR. NEUBERGER:  We have it.
2  BY MR. ELLIS:
3      Q.   This is a chain of e-mails, and the first one
4  on the first page of D-1 is dated January 5th, 2004, at
5  3:47 p.m. and it goes from Foraker to MacLeish.  As you
6  know, e-mails run in reverse order so that the first of
7  the e-mails is actually the one at the bottom which
8  begins on the second page, and it's dated December 19,
9  2003, at 7:20 p.m. from Foraker to MacLeish and Eckrich.
10          Do you see that?
11     A.   Yes, sir.
12     Q.   Have you seen a copy of this e-mail before?
13     A.   I don't recall this specific e-mail.  Again, we
14 have looked through so much information that I don't
15 recall this one.
16     Q.   What I'm really asking is whether you saw it in
17 December 2003.
18     A.   No, I don't recall that.
19     Q.   Take a look at the e-mail that's on the top of
20 D-1, and that's the January 5th, 2004, e-mail to MacLeish
21 from Foraker.
22     A.   Yes, sir.
23     Q.   Did you see that at the time?  By "at the time"
24 I mean around the time it was initially prepared, which

Page 80

1  is January 2004.
2      A.   I do not recall seeing this one.
3      Q.   Did you ever meet Larry Toplack from Mayfran
4  Corporation?
5      A.   No, sir.
6      Q.   Are you familiar with the allegation that
7  someone was trying to sabotage the bullet trap system?
8      A.   Yes, I do remember when that came up.
9      Q.   How did you learn about it?
10     A.   I believe Sergeant Foraker called me --
11 Sergeant Foraker called me at home and advised me that he
12 felt that somebody may have been trying to sabotage the
13 bullet trap.
14     Q.   Did he explain why he believed that?
15     A.   He said there was some type of matter in the
16 trap that he had never seen -- or he had not seen before.
17     Q.   Did he tell you who he thought it might have
18 been?
19     A.   No, sir.
20     Q.   Did you later have an opportunity to review the
21 material that was in the bullet trap?
22     A.   Yes.
23     Q.   Were you able to identify that material?
24     A.   I had seen that material before when the FBI

Page 81

1  utilized our range.  It was their form of what is called
2  nontoxic lead-free ammo.
3      Q.   Do you know whether there was an investigation
4  performed into whether there was sabotage involving the
5  bullet trap?
6      A.   I do not know.
7      Q.   Were you ever questioned by anybody as part of
8  an investigation?
9      A.   I believe I informed Sergeant Foraker that I
10 thought it was the material that came from -- I believe
11 it was a federal ammunition that the FBI utilized.  It
12 almost looked like a corkscrew, like a spring almost.
13 That may be a bad interpretation, but that's what it
14 looked like.
15     Q.   Was there a point when the members of the
16 Firearms Training Unit decided that they were going to
17 attempt to accumulate as much information as possible
18 about conditions at the range?
19     A.   Yes.
20     Q.   When did that occur?
21     A.   It would be -- I can't guess, but it was
22 sometime in that January period, I believe.
23     Q.   How did you come to decide that that's what you
24 were going to do?

21 (Pages 78 to 81)

Price, et al.                                v.                         Chaffinch, et al.
B. Kurt Price                      C.A. # 04-956-GMS                 October 18, 2005

Page 82

1    A.   Through discussion there in the office.
2    Q.   Do you remember what motivated you to do that?
3    A.   Our health concerns, and I know that we had a
4    recruit -- I can't remember his name -- that had a
5    background and told us that we need to be very concerned
6    with the conditions at the range.
7    Q.   Were the conditions in the range in
8    January 2004, and by "the conditions in the range," I
9    mean the conditions on the firing line while the shooting
10   was going on, was it worse than it had been in December
11   2003?
12   A.   Not that I recall.
13   Q.   In December 2003 was it worse than it had been
14   the previous summer?
15   A.   I don't believe we were shooting in the summer.
16   Q.   There was no shooting at all going on?
17   A.   If it was, it was very limited.  If I can
18   remember correctly.  Again, that's a long time ago and a
19   lot of things have happened.
20   Q.   Was there shooting in the fall of 2003?
21   A.   Yes.
22   Q.   Were conditions in December worse than they had
23   been in the fall of 2003?
24   A.   It was dirty.

Page 83

1    Q.   It was dirtier?
2    A.   Yes, sir.
3    Q.   It was dirtier in December than it had been in
4    the fall?  By "the fall" I mean September, October,
5    November.
6    A.   You could see debris, some form of debris, that
7    was on the range.
8    Q.   What I'm really referring to aside from the
9    debris is the smoke, dust from the frangible ammunition
10   and the operation of the HVAC system.  Was it worse in
11   December than it was in the fall?
12   A.   I can't recall exact dates or conditions.  I
13   know we always had problems with the HVAC.
14   Q.   What I'm trying to get at is:  Did it get any
15   worse in December than it had been before that?
16   A.   I would say it would have to be some worse,
17   yes.
18   Q.   After you as a group collectively decided to
19   stop doing the maintenance of the water system behind the
20   bullet trap, did the conditions in the shooting area get
21   worse?
22   A.   I would have to say it probably did.
23   Q.   Do you have an opinion as to why it got worse?
24   A.   No, I do not.

Page 84

1    Q.   Do you have any idea at all?  You have no idea
2    why it got worse?
3    A.   That would be an assumption on my part.
4    Q.   What's your assumption?
5    A.   My assumption would be that it may have gotten
6    worse.
7    Q.   I asked you if it got worse and you said it did
8    get worse.  My question to you is:  Do you have an
9    opinion as to why?
10   A.   I would assume, and, again, that's an
11   assumption and my opinion, that the air-handling system
12   was failing.
13   Q.   Do you believe that, after you stopped doing
14   the maintenance on the bullet trap, there was more stress
15   being placed on the air-handling system?
16   A.   I don't know.  I'm not qualified to make that
17   determination.
18   Q.   Were you able to see visually whether there was
19   more dust or smoke in the shooting area of the range
20   after you had stopped doing maintenance on the bullet
21   trap?
22   A.   Whenever you discharge a firearm there was
23   always smoke.
24   Q.   I understand that.  I'm not asking for your

Page 85

1    opinion or your expertise or your qualifications.  Just
2    visually were you able to observe more dust and smoke in
3    the shooting area after you had stopped doing the work on
4    the bullet trap than there was before you stopped doing
5    work on the bullet trap?
6    A.   I would say there had to be more.
7    Q.   Do you have any opinion as to why that was so?
8    A.   No, sir.
9    Q.   Before we move on, I'd like to show you some of
10   the blood lead test results that you have turned over to
11   us in discovery.
12        MR. NEUBERGER:  We're off the record.
13        (Discussion off the record.)
14        (Defendants' Deposition Exhibit No. 13 was
15   marked for identification.)
16        MR. NEUBERGER:  We have agreed that those
17   exhibits which the court reporter has possession of that
18   are marked "Confidential Attorney's Eyes Only," and there
19   are several, will be separately sealed by the court
20   reporter and treated as documents under seal for purposes
21   of the deposition.  Thank you.
22        MR. ELLIS:  That would be Exhibit 11 and
23   Exhibit 13 today?
24        MR. NEUBERGER:  Let's go back to

22 (Pages 82 to 85)

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 86

1  yesterday. That's 13 and 11. We have got 9 today, DX 9.
2  6 is so marked, also. 5 was also so marked.
3          MR. ELLIS: As is 4.
4          MR. NEUBERGER: As is 4.
5  BY MR. ELLIS:
6    Q.   Take a look at Exhibit D-13, please.
7    A.   Yes, sir.
8    Q.   This is a collection of serum blood lead levels
9  that we have put together out of the material that you
10 have produced as part of the lawsuit.
11         Are these documents that you have seen
12 over the years as your test results have come in?
13   A.   Yes.
14   Q.   The first one in the exhibit, I can't make out
15 what that score is. It looks like a 7 to me. Do you
16 have any recollection of whether that was the blood lead
17 result that you got in --
18   A.   It's actually a 4.
19   Q.   That's a 4. In September 1998.
20   A.   Yes.
21   Q.   So that's before the indoor range opened?
22   A.   Yes.
23   Q.   Now, the next test result you got was in
24 December 1998, and there you have gone to a 9.

Page 87

1    A.   Yes.
2    Q.   But that's still considered normal by any
3  measure, right?
4    A.   From the information that we have been given, I
5  would assume it would be.
6    Q.   Have you seen any threshold number provided by
7  any occupational safety and health organization that
8  would suggest that 9 is outside normal?
9    A.   Not would be outside, no.
10   Q.   I'm sorry?
11   A.   Not outside normal, no.
12   Q.   You have seen some blood lead thresholds at 10,
13 right?
14   A.   Yes.
15   Q.   And you have seen others as high as 40?
16   A.   I have not seen 40, no.
17   Q.   Have you seen the federal Occupational Safety
18 and Health Administration limit?
19   A.   No, sir.
20   Q.   You did research on this and you didn't look at
21 the OSHA limit?
22   A.   I didn't look at that one that I can recall,
23 no.
24   Q.   Looking over at the next one, which is April of

Page 88

1  1999, you went up to 11, right?
2    A.   Yes, sir.
3    Q.   Did you have any discussion with Dr. Green
4  about what an 11 meant? At that point I guess in 1999.
5    A.   I don't recall any specific conversation then.
6    Q.   Do you recall whether you became alarmed in
7  April of 1999 that you had a result that was above 10?
8    A.   Yes, sir.
9    Q.   Did you do anything to change your behavior?
10   A.   I can't recall.
11   Q.   Did you do anything to change the way you did
12 your job?
13   A.   I don't recall.
14   Q.   If you go to the next page, this is the fourth
15 page of the document. It's got FTU4642 on the bottom,
16 and this is a test done in June 1999, is it not?
17   A.   Yes.
18   Q.   Here you're back inside the range two months
19 after you had been outside the range.
20   A.   Yes.
21   Q.   The next page, which is FTU4424, gives your
22 result of 8; is that correct?
23   A.   Yes.
24   Q.   Did you feel any better about having an 8 in

Page 89

1  September than you had about having an 11 in April?
2    A.   Yes.
3    Q.   Why?
4    A.   Because I was under double digits.
5    Q.   Who was it explained to you that that was
6  important?
7    A.   If I may, there had been people that we would
8  have conversations with as these blood results came back
9  over the years would say that we should try to keep it as
10 low as possible, needless to say. So as the numbers
11 lowered, I was happy with that. These were the folks
12 there at HealthWorks that would give us this information.
13   Q.   Could you turn to the next page, please, which
14 4625. That appears to be another report on the same test
15 that's reflected in 4424. On the right-hand side of that
16 report is 0 to 24. What do you understand that to mean?
17   A.   I don't know.
18   Q.   Go to the next test, which is December 1999.
19 That's FTU4626.
20   A.   Yes, sir.
21   Q.   You showed another 8, did you not?
22   A.   Yes.
23   Q.   Had you done anything to change your behavior
24 between the time you had the 11 and the time you got the

A - 92

23 (Pages 86 to 89)

Price, et al.                                v.                           Chaffinch, et al.
B. Kurt Price                         C.A. # 04-956-GMS                   October 18, 2005

Page 90

1   8 score?
2      A.   Not that I can recall.
3      Q.   You're still working as an instructor at the
4   range, right?
5      A.   Yes.
6      Q.   And they're still shooting leaded ammunition at
7   this point, right?
8      A.   I don't know.  I would assume so.  I don't know
9   if we were going to frangible then or not.
10     Q.   My understanding, and I have seen this in
11  documents, is that the Delaware State Police moved from
12  leaded to frangible ammunition in late 2000, early 2001.
13  Does that stand to your recollection?
14     A.   That may be, yes.
15     Q.   Go over to the next page, 4627 --
16     A.   Can I also clarify something, too?
17     Q.   Sure.
18     A.   About the frangible and leaded discussion?  We
19  never -- we always shot leaded shotgun ammo.  We never
20  went totally lead-free.
21     Q.   I do understand that.  I also understand that
22  there's lead in the primer in the frangible ammunition.
23     A.   I believe that they are Clean Fire primers.
24     Q.   Was that always true of the frangible

Page 91

1   ammunition?
2      A.   I believe so.
3      Q.   It's your understanding there was no lead at
4   all in the frangible ammunition?
5      A.   That's what we were led to believe, yes.  I
6   have seen no documentation to suggest otherwise.
7      Q.   The next document is page 4627 on the bottom.
8      A.   Yes, sir.
9      Q.   This is in March 2000 at 9.  You seem to be
10  having pretty consistent blood lead levels over the
11  period 1999 through 2000.  Would you agree with that?
12  They're all just below the 10?
13     A.   Yes.
14     Q.   Go to the next one, which is 4628.  This is May
15  of 2000.  There you have gone up to 10.
16     A.   Yes.
17     Q.   Were you ever told that there was an error
18  range in the test scores?
19     A.   No.
20     Q.   In other words, that, when you see 10, you
21  should really view it as plus or minus?
22     A.   No.  We were never told that.
23     Q.   Go to the next one.  This is July of 2000, page
24  4629.  Here you're back down to 8.  Did you consider it

Page 92

1   significant that you went from 10 in May to 8 in July?
2      A.   I don't believe we were shooting in July.
3      Q.   Did you notice that your blood lead levels
4   tended to rise when you were actually shooting at the
5   range?
6      A.   I would assume that they would.  I don't know
7   that to be fact.  I would have to refer to the dates.
8      Q.   Sitting here, having worked in that environment
9   for seven years or so, do you have a recollection that it
10  would get worse during the times you were shooting or did
11  you not make that correlation?
12     A.   I would like to retract that.  That would be a
13  total assumption on my end, the more I think about it.  I
14  apologize for taking that step.
15     Q.   That's okay.
16          Are there times of the year when you're
17  always shooting?
18     A.   I know the spring and the fall historically has
19  been recruits and inservice training.
20     Q.   So there would tend to be less shooting in the
21  middle of the summer?
22     A.   Yes.
23     Q.   And there would be less shooting in the dead of
24  winter?

Page 93

1      A.   Yes.  Normally.
2      Q.   I understand everything is subject to
3   variation.
4          Go to the next page, please, 4428.  This
5   one is a test taken pretty much in the dead of winter of
6   2001, February 2001, and here you have the same score
7   that you had the previous summer, right?
8          MR. NEUBERGER:  I'm sorry.  Which page are
9   we talking about here?
10         MR. ELLIS:  4428.  In order to arrange
11  them in chronological order, we had to pull them from
12  different parts of the back of the production.
13         MR. NEUBERGER:  Do you have 4428 in yours?
14         THE WITNESS:  Yes.
15         MR. NEUBERGER:  Here we are.  4428.  Thank
16  you.
17  BY MR. ELLIS:
18     Q.   Do you see that you have the same score in
19  early 2001 that you had in the summer of 2000?
20     A.   Yes.
21     Q.   Go to the next one, which is May of 2001.  So
22  that's three months later than 4428.  This is FTU4429.
23  Here you dropped one, correct?
24     A.   It says 7, yes.  At the top I have a hard time

A - 93

24 (Pages 90 to 93)

Price, et al.
B. Kurt Price

v.
C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 94

1  seeing the date.
2  Q.  I do.  If you look at the bottom, you will see
3  that the doctor made a note that they called and left
4  message on May 17th.  Do you see that?
5  A.  Yes, sir.  Thank you.
6  Q.  Going over to the next one, which is
7  August 2001, you've got a blood lead level of 8 again,
8  right?
9  A.  Yes.
10  Q.  By then were you shooting frangible ammunition?
11  A.  I would assume so.
12  Q.  Go to the next page, which is 4431, and this is
13  October 2001.  Do you see that your score there is 7?
14  A.  Yes.
15  Q.  The next page, which will be early 2002, and
16  that's page 4432, you're back down to 7.
17  A.  Yes, sir.
18  Q.  Now go to July of 2002, which is page 4433, and
19  this shows you at a 5.
20  A.  Yes.
21  Q.  Do you have any idea why you went from a 7 down
22  to a 5 over the course of a few months?
23  A.  No, I do not.
24  Q.  I guess it's the course of six months, really.

Page 95

1           Did you do anything consciously to change
2  your behavior?
3  A.  No, sir.
4  Q.  Was the air-handling system working better at
5  the range?
6  A.  I can't make that assumption.
7  Q.  Go to the next one.  This is December 2003 --
8  wait a minute.
9       MR. NEUBERGER:  It looks like there are
10  some missing.
11       MR. ELLIS:  There may well be.
12       MR. NEUBERGER:  There are some notes there
13  as to what they were.  You see that on the exhibit you're
14  talking about now.
15  BY MR. ELLIS:
16  Q.  We have tried to pull all these together out of
17  the file.  We may not have gotten all of them, but if you
18  take a look at the right-hand part of page FTU4434, you
19  see some handwritten notations from Dr. Green, right?
20  A.  Yes.
21  Q.  They record some test results, some of which we
22  have already looked at, but at least one of which we have
23  not, and the one that we haven't looked at is the one
24  April 15th, 2003.  Do you see that one that says an 11?

Page 96

1  A.  Yes.
2  Q.  Is that the one that you have testified about
3  today that got you concerned?
4  A.  Yes.
5  Q.  And the reason that it got you concerned was
6  because you went from 5 to an 11?
7  A.  That would be the way I see it on here, and I
8  know that's what prompted the phone call to me.
9  Q.  The two tests prior to the 5 you had 7, right?
10  A.  Yes.
11  Q.  Then you dropped down to a 5, right?
12  A.  Yes.
13  Q.  And you don't have any explanation in terms of
14  your behavior or conditions at the range that would
15  explain to you having gone from a 7 to a 5, right?
16  A.  No.
17  Q.  Do you have any explanation for why you went
18  from 5 to an 11?
19  A.  That would be conjecture and assumption on my
20  point -- on my part.  I do think, if I can recall
21  correctly I testified earlier, that we were pulling
22  maintenance on the bullet trap itself more often, now
23  that we're into frangible ammo.
24  Q.  If I'm correct that you started using frangible

Page 97

1  ammunition no later than early 2001, then all the scores
2  that are reflected on page 4434 would have been scores
3  that you had during the period that you were using
4  frangible ammunition at the range, wouldn't it?
5  A.  Yes, sir.
6  Q.  So during the time that you were using
7  frangible ammunition, you had a blood lead level of 7 in
8  2001, 7 in early 2002, 5 in mid-2002, then all of a
9  sudden you went up to an 11 in 2003.
10  A.  Yes.
11  Q.  Do you know whether you were doing different
12  things to maintain the bullet trap at any of these time
13  periods that it would cause the fluctuation?
14  A.  Not that I can recall.
15  Q.  The score that you got that's reflected on
16  page 4434 is a 10, right?
17  A.  Yes.
18  Q.  That's down from an 11.  Did you consider that
19  a significant drop?
20  A.  No.
21  Q.  You would have received this result within a
22  matter of days after Sergeant Foraker returned to the
23  range, would you not?
24  A.  I have received, as you can see, so many

25 (Pages 94 to 97)

Price, et al.                          v.                    Chaffinch, et al.
B. Kurt Price                   C.A. # 04-956-GMS            October 18, 2005

Page 98

1   results, I can't remember seeing the 10 or --
2      Q.   Do you recall any discussion with
3   Sergeant Foraker or other members of the Firearms
4   Training Unit in December 2003 about this particular test
5   result?
6      A.   Not this one.
7      Q.   Was there any particular one you recall
8   discussing?
9      A.   The 11. I know I discussed that.
10     Q.   Who did you discuss that with, Sergeant Ashley?
11     A.   I discussed it with him and the other people
12  that I testified to today.
13     Q.   You said that after you got the 11 you talked
14  to Sergeant Ashley and told him that you wanted to back
15  off, I think were your words, on working on the bullet
16  trap.
17     A.   Yes.
18     Q.   You did, in fact, back off?
19     A.   Yes, sir.
20     Q.   The result was to reduce the blood lead level
21  from 11 to 10?
22     A.   Result was to get it lower than that. That's
23  what the result was. But the intent was to bring it down
24  as low as I could possibly get it.

Page 99

1      Q.   In any of the times that you saw Dr. Green, did
2   he ever tell you that you were suffering from lead
3   poisoning? It's not going to be in any of these
4   documents. I'm asking about anything he said to you.
5      A.   Not lead poisoning, but there were times that
6   we had higher-than-normal lead exposures.
7      Q.   Meaning that you had 10 or higher?
8      A.   Yes.
9      Q.   Did he tell you that it was doing you any harm?
10     A.   No.
11     Q.   Look at the next one, please, which is 4633.
12  This is January 29, 2004, and you had a score of 9,
13  right?
14     A.   Yes.
15     Q.   By the time you had this sample drawn in
16  January 2004, am I correct that you had stopped doing the
17  maintenance of the bullet trap altogether?
18     A.   We may have. I don't know.
19     Q.   Look at the next and last document in this
20  package, which is 4359, and I think this is the sample
21  that was drawn at Omega Medical Center. Does that
22  correspond to your recollection?
23     A.   Yes.
24     Q.   Can you see that the blood lead level on this

Page 100

1   test was an 8?
2      A.   Yes.
3      Q.   Over in the far right, look at the second black
4   bar that runs from left to right across the page.
5      A.   Okay.
6      Q.   You see where it says "Units Therapeutic
7   Range"?
8      A.   Yes.
9      Q.   Did you have an understanding of what that
10  meant?
11     A.   No.
12     Q.   Look down below the column that says "Units
13  Therapeutic Range" where it says less than 40.
14     A.   Okay.
15     Q.   Did you have an understanding that 8 was less
16  than 40?
17     A.   Yes.
18     Q.   Did you have an understanding of what the
19  40 meant?
20     A.   No, I did not.
21     Q.   Look down below the blood lead occupational
22  exposure section of this report where it says "OSHA
23  Guideline."
24     A.   Okay.

Page 101

1      Q.   What does that say?
2      A.   "Less than 100 ug/dl."
3      Q.   I'm sorry. One up. You're under the zinc
4   protophorphyrn.
5      A.   I'm sorry. "OSHA Guideline," is that the one?
6      Q.   Yes.
7      A.   "Less than 40 ug/dl."
8      Q.   Does that suggest to you that the OSHA
9   guideline is less than 40?
10     A.   I would assume so. Nobody explained that to
11  me.
12     Q.   You scored 8, right?
13     A.   Yes.
14     Q.   You said nobody explained that to you?
15     A.   No, sir.
16     Q.   Didn't you get a letter from Omega?
17     A.   Yes.
18     Q.   Didn't they tell you that your blood lead level
19  was fine?
20     A.   That's what they said, yes.
21         MR. ELLIS: Let's break.
22         (A lunch recess was taken at 12:30 p.m.)
23         (The deposition resumed at 1:35 p.m.)
24

A - 95

26 (Pages 98 to 101)

Price, et al.
B. Kurt Price

v.

C.A. # 04-956-GMS

Chaffinch, et al.
October 18, 2005

Page 102

1    BY MR. ELLIS:
2      Q.   Have you had contact directly with
3    Thomas MacLeish about safety and health concerns about
4    the firing range?
5      A.   Not that I recall.
6      Q.   Have you been at meetings with MacLeish, either
7    when he was the lieutenant colonel or when he was the
8    colonel, at which the issues of safety and health at the
9    range were discussed?
10     A.   Yes.
11     Q.   How many times?
12     A.   I can specifically recall -- and don't quote me
13   on dates, but there is one time in the conference room at
14   the academy and another time at the State Police museum
15   in Dover which is on the headquarters complex.
16     Q.   Do you recall which one of those occurred
17   first?
18     A.   I believe it was the one at the academy.
19     Q.   Do you remember when that occurred?
20     A.   That would be a guess -- is it okay to guess?
21   I mean, give -- I mean between January and February,
22   maybe.
23     Q.   Why is it that you estimate that it occurred
24   between January and February?

Page 103

1      A.   I remember it was cold.
2      Q.   At the point you had the meeting at the
3    academy, was the range officially shut down at that
4    point?
5      A.   I don't believe so.
6      Q.   Do you recall the date the range was officially
7    shut down?
8      A.   No, sir.
9      Q.   But you believe that that meeting at the
10   academy occurred before the range had been shut down?
11     A.   That's correct.
12     Q.   Do you recall who was there?
13     A.   I believe it was Lieutenant Colonel MacLeish,
14   Major Paul Eckrich, I believe Doyle Tiller from
15   Facilities Management, Mark DeVore, and I think there was
16   another guy there, but I don't remember his name, from
17   Facilities Management.  He had a beard.
18     Q.   Would that be Bob Furman?
19     A.   It could be.  I believe that's who it was.  I
20   know Sergeant Foraker was there, Corporal Warren,
21   Corporal Warwick, myself, Lieutenant Davis, and
22   Captain Warren.
23     Q.   What caused you to be there?
24     A.   We were addressing health concerns at the

Page 104

1    range.
2      Q.   Why were the Facilities people there?
3      A.   I guess to help address the issues.
4      Q.   Who was running the meeting?
5      A.   I think it was Greg Warren and
6    Colonel MacLeish.
7      Q.   Do you recall how long the meeting lasted?
8      A.   No, I do not.
9      Q.   Do you recall anything that was said in the
10   meeting?
11     A.   After the meeting concluded, I recall the
12   comment that was made.
13     Q.   What comment was made after the meeting was
14   concluded, and by whom and to whom?
15     A.   Lieutenant Colonel MacLeish made the comment to
16   me, and I don't know if he said it as a joke, but he
17   said, "Kurt, you have been at the range so long, we don't
18   know what we have done to you," and that just really --
19   and that's why it really stuck out in my mind.  I thought
20   that that was kind of an inappropriate comment to be
21   made.
22     Q.   Was he laughing when he said it?
23     A.   No.
24     Q.   Describe to me his demeanor when he said that.

Page 105

1      A.   Pretty much me sitting here looking at you
2    saying, "Kurt, we don't know" -- "you have been at that
3    range so long, we don't know what we have done to you."
4      Q.   Did you say anything back to him?
5      A.   No.  I was dumbfounded.
6      Q.   Do you remember anything that happened before
7    that comment?
8      A.   There was a lot of discussion as to the
9    air-handling system, and that's really about all that I
10   remember about the meeting.
11     Q.   Do you remember discussion of lead levels?
12     A.   No.
13     Q.   Do you remember discussion of potential
14   modifications of the range to make it safer?
15     A.   No, sir.
16     Q.   Do you remember any discussion of modifications
17   to the HVAC system?
18     A.   No.
19     Q.   Do you remember discussion of any environmental
20   cleanup that will done in the range?
21     A.   I believe it was being discussed as far as they
22   would need to contact a vendor to do that.
23     Q.   Do you remember there being any discussion as
24   between the State Police and Facilities Management who

27 (Pages 102 to 105)