Case 1:04-cv-00956-GMS    Document 92-8    Filed 02/02/2006    Page 1 of 14

Price, et al.                                                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS    December 13, 2005

Page 6

1  mistakes. I'm specifically referring to where people
2  make statements that you believe to be defamatory
3  towards you.
4    A.  I don't think it is a mistake. I think it is
5  defamatory. I think she's taking the responsibility
6  off of facilities management and laying blame with me
7  and my men.
8    Q.  Okay. That's fine. Keep going.
9    A.  The quote that says, "The people who have
10 complained about the facility are also the same people
11 who are in charge of the facility.'"
12        They were pointing in my opinion to me and
13 my men again there.
14   Q.  Do you understand that to have been a statement
15 that Mrs. Homer made?
16   A.  It says it's a quote from Mrs. Homer.
17   Q.  Okay. Thanks. Keep going, please.
18   A.  Also a quote from Secretary Homer: "'We're
19 looking for the test results later this week,' she
20 said. 'I haven't seen any indication yet that those"
21 and then in brackets "that used the range) have had
22 higher than standard lead levels in their blood. The
23 proof is in the blood tests, not in how well the
24 equipment works.'"

Page 7

1    Q.  That's the third paragraph on page 2.
2        MR. NEUBERGER: That's the fourth
3  paragraph.
4    Q.  I'm sorry. The fourth paragraph on page 2.
5    A.  That's correct.
6        Another statement, "'Ventilation can only
7  do so much,' she said. 'The hygiene of the facility
8  is just as important.'"
9    Q.  Okay. Please continue.
10   A.  The next paragraph, it says, "Mrs. Homer and
11 Mr. Furman pointed to material scattered on the floor
12 or on shelves."
13   Q.  Why do you think that statement is defamatory?
14   A.  Because she's indicating that we maintained a
15 mess or we created a mess there. By the time she took
16 her tour, there had been numerous people come through
17 that facility and we had to get out of there in a
18 hurry and move out. And there were many people in and
19 out of that facility, many people, from facilities
20 management personnel to State Police personnel, and
21 there were things moved about in there.
22       And I had no responsibility with the
23 condition that she found it in that particular day.
24   Q.  Were you present on April 6th when this

Page 8

1  interview of Secretary Homer took place?
2    A.  No, I was not.
3    Q.  Were any of your subordinates present that day?
4    A.  No. They weren't invited.
5    Q.  Go ahead. Please continue.
6    A.  "She pointed to a propane gas tank on the floor
7  at the back of the range."
8    Q.  Okay. Was there a propane gas tank in the
9  building while you were in charge there?
10   A.  No, sir. It was outside.
11   Q.  What type of a tank was it? How big of a tank?
12   A.  It's a small propane tank for a gas grille.
13   Q.  Okay. About the size you would use on a
14 barbecue grille?
15   A.  Correct. It was outside and then when the move
16 took place, we moved it inside so it didn't come up
17 missing and stolen.
18   Q.  What was it used for?
19   A.  Cooking on a gas grille.
20   Q.  It actually was used to cook on a gas grille?
21   A.  Correct.
22   Q.  Okay. Why were you cooking on a gas grille at
23 the --
24   A.  I wasn't.

Page 9

1    Q.  Who was?
2    A.  I believe Sergeant Ashley was doing some
3  cooking on some grille.
4    Q.  Was there a grille there during the time you
5  were in charge?
6    A.  No, sir.
7    Q.  So there was a tank that would be used on a
8  grille but there was no grille while you were in
9  charge?
10   A.  That's correct. The tank was outside.
11   Q.  Right. But there was no grille attached to it?
12   A.  Not anymore.
13   Q.  Okay. So whosever grille it was had removed
14 the grille and left the tank?
15   A.  Correct.
16   Q.  That's fine. I'm sorry. Keep going through
17 the article, please.
18   A.  Again, "These individuals who have complained
19 about non-ballistic doors have stored a propane tank
20 back there. Look at the cardboard piled up here. As
21 you can see, there's quite a lot of flammable material
22 stored in this facility. That wasn't in the original
23 plans.'"
24       "'The bullet trap wasn't cleaned

A - 196

3 (Pages 6 to 9)

Case 1:04-cv-00956-GMS   Document 92-8   Filed 02/02/2006   Page 2 of 14

Price, et al.                                                    v.                                            Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                          December 13, 2005

Page 10

1  properly,' Mrs. Homer said. 'The back, where the
2  track is, was so poorly maintained that it became
3  unworkable.'"
4  Q.  Thank you.  Please continue.
5  A.  The quote from Colonel Chaffinch: "'I knew
6  there was ammunition in this building but I didn't
7  know it wasn't supposed to be here,' he said. 'When I
8  was here in the fall, everything was going as well as
9  the previous times I'd been here.'"
10  Q.  Please continue.
11  A.  The top of page 3, "'There was some
12  discoloration in the bullet trap but that was about
13  it,' he said. 'I think people who live in glass
14  houses shouldn't throw stones. It's a lot dirtier
15  now. Things seemed in their proper places in the
16  fall. I've never seen it like this.'"
17      "Asked what 'people' he was referring to,
18  Colonel Chaffinch said he was referring to 'the people
19  that provided (the media) with the information in the
20  first place.'"
21      "'The previous sergeant in charge did a
22  good job,' he continued. 'Things changed in December
23  when another sergeant came in. That's at least a
24  portion of where the ball was dropped.'"

Page 11

1      "The 'previous sergeant' was Sergeant
2  Richard Ashley, who was picked by the colonel in April
3  2002 to replace Sergeant Christopher D. Foraker as
4  range supervisor."
5  Q.  Just with respect to that sentence that you
6  just read, do you believe that sentence is defamatory?
7  A.  Yes. Because he's referring to me as not doing
8  my job and Richard Ashley did.
9  Q.  Okay. He's referring to you as dropping the
10  ball from the previous paragraph, right?
11  A.  Correct.
12  Q.  That's what you're referring to, right?
13  A.  And it makes it very clear in the second, that
14  sentence, the second sentence that I read to you of
15  what he's trying to say.
16  Q.  Is it factually accurate that Ashley was picked
17  by the colonel in April 2002 to replace you as range
18  supervisor?
19  A.  Yes.
20  Q.  Okay. I understand. I'm just trying to get
21  clear what you're talking about.
22      Keep going, please.
23  A.  "'If the people that are assigned here now
24  don't feel that protocol is part of their protocol,

Page 12

1  they will be assigned elsewhere.'"
2      "Contacted later, Colonel Chaffinch said
3  Sergeant Ashley has retired. He would not permit the
4  Delaware State News to interview Captain Warren or
5  Sergeant Foraker."
6      "'I have the authority to say yes or no,'
7  he said. 'I'm not going to allow those people to be
8  interviewed at this point in regard to this particular
9  situation. I'm not trying to create any more of a
10  mess than we already have.'"
11      "He praised Sergeant Ashley for his work
12  at the range."
13      "'Because of the frangible ammunition we
14  were using, the bullet trap required hands-on, daily
15  cleaning,' he said. 'Sergeant Ashley was willing to
16  do that.'"
17      "'I cannot say Sergeant Foraker was
18  willing to do that. He was interested in instruction
19  and teaching people how to shoot. He did not feel
20  (bullet trap cleaning) was part of his purview. He
21  felt that was putting him in harm's way.'"
22      I believe that's about it.
23  Q.  Thank you.
24      Now I would like to go back to the

Page 13

1  beginning of the article and ask you some questions
2  about the paragraphs that you referred to, that you've
3  identified in your testimony today.
4      Going back to the first page, the first
5  statement that you identified as being defamatory is
6  the statement "Flammable materials are stored in the
7  shooting area."
8      The first question I have for you is: Do
9  you have an understanding of what Mr. Eldred meant by
10  "the shooting area"?
11  A.  The range itself.
12  Q.  The area in which trainees would discharge
13  their weapon towards the target?
14  A.  Correct.
15  Q.  That's what you would refer to as the shooting
16  area?
17  A.  That's correct.
18  Q.  Do you know what he means by "flammable
19  materials"?
20  A.  He's going off what Gloria Homer and Aaron
21  Chaffinch have said.
22  Q.  I understand that. But what do you understand
23  to be, what do you understand the phrase "flammable
24  materials" in that sentence to refer to?

Case 1:04-cv-00956-GMS   Document 92-8   Filed 02/02/2006   Page 3 of 14

Price, et al.                                        v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 1      C.A. # 04-956-GMS      December 13, 2005

Page 14

1  A. Well, I think it's referred later on in the
2  article about that propane tank being there and the
3  cardboard targets. The cardboard targets are up
4  against the back wall. They're not actually in the
5  actual shooting area.
6  Q. When you use the phrase "back wall," which part
7  of the range are you referring to?
8  A. The wall that would be to your back when you're
9  facing down range to shoot.
10  Q. So is that a place where you normally stored
11  targets?
12  A. That was moved from a designated room that was
13  called the target room, that was moved from that room
14  back I believe by either Sergeant Fitzpatrick or
15  Sergeant Parton. We started storing the cardboard
16  targets out there on the range so they were closer,
17  much closer and easier access, and we could use the
18  target storage room for interactive training.
19  Q. Just so I make sure it's clear what you're
20  saying here, when the range first opened I take it
21  there was a room that was intended to be a target
22  room?
23  A. Correct.
24  Q. And that's where you stored all the targets?

Page 15

1  A. Correct.
2  Q. What are the targets made of?
3  A. Cardboard.
4  Q. At some point you said prior to when you became
5  the NCOIC somebody decided to move the targets out
6  onto the range itself so they would be easier to get
7  at?
8  A. Correct.
9  Q. Would you consider the targets flammable?
10  A. Certainly they'll burn, but they're not in the
11  actual shooting area. We don't shoot from back there.
12  Q. I understand that. They're in the same room as
13  the shooting goes on though, correct?
14  A. Correct.
15  Q. They're just behind where the shooter is
16  supposed to be?
17  A. Correct.
18  Q. The propane gas tank that Secretary Homer
19  refers to as being on the floor at the back of the
20  range, again is that the back of the range meaning
21  behind where the shooter stands or is that behind the
22  bullet trap back of the range?
23  A. No. It's behind the shooter.
24  Q. So it's in the shooting area itself but behind

Page 16

1  where the shooter would stand?
2  A. Correct.
3  Q. How many feet would you estimate it would be
4  from what I think you called the starting line for the
5  shooters to the area where the targets are stored?
6  A. It's like 30 feet.
7  Q. On the first page of Exhibit MacLeish 5, going
8  back to the document, there's a statement that you
9  said you felt was defamatory and it's from Mrs. Homer
10  and it's, I quote, "'We are not responsible for the
11  equipment or cleanup of the range,'" unquote.
12      What is it you believe facilities
13  management was responsible for in terms of the
14  equipment and cleanup of the range?
15  A. Well, like was established in my first trial,
16  we were just considered tenants of that building.
17  They didn't consider me a manager of that facility.
18  With regard to the health and safety of that building,
19  that is the responsibility of facilities management.
20  They have to ensure that the equipment, the
21  ventilation system, in particular, is working
22  properly. That's their responsibility. They are
23  responsible for maintaining and testing to ensure that
24  that's a healthy facility.

Page 17

1      I am only in charge of the firearms end of
2  things. I'm in charge of making sure that the firing
3  line is safe, tactical training and that sort of
4  thing. That building belongs to facilities management
5  and that was made quite clear to me in my first trial.
6  Q. When you say that facilities management is
7  responsible for the building, does that mean that you
8  and your staff at the firearms training unit have no
9  responsibility for cleaning up target debris or bullet
10  casings?
11  A. No. We were responsible for collecting the
12  bullet casings and -- you're talking about debris that
13  accumulated where?
14  Q. In the shooting area in front of the bullet
15  trap.
16  A. Correct.
17  Q. In other words, between where the shooter is
18  and where the bullet trap is?
19  A. That's correct.
20  Q. So as I understand the way the range works, the
21  trainee would point the weapon at the target and
22  behind the target is the bullet trap. When the bullet
23  goes through the target, it creates debris. Is that
24  correct?

Case 1:04-cv-00956-GMS   Document 92-8   Filed 02/02/2006   Page 4 of 14

Price, et al.                                             v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS               December 13, 2005

Page 18

1  A. Correct. That is correct.
2  Q. So the debris gets all over the front of the
3  range, correct?
4  A. Correct.
5  Q. Then who is responsible for cleaning that up?
6  A. That would be us or our students, depending on
7  what we're doing that day.
8  Q. Who is it that you understand to be responsible
9  for maintaining the bullet trap?
10 A. Apparently we were supposed to be responsible
11 entirely for cleaning the bullet trap.
12 Q. You used the word "apparently." What do you
13 mean by "apparently"?
14 A. Well, we also have Savage Range System come in
15 and completely clean it, drain it. They have a
16 one-year or an annual visit where they clean out the
17 debris and make sure everything is running properly.
18 Q. Between the annual visits from Savage Range, is
19 it the FTU's responsibility, by "FTU" I mean you and
20 your subordinates, to maintain the bullet trap?
21 A. I guess it would have to be broken down into
22 what you mean as far as maintain. If certain things
23 break or what exactly are you asking me?
24 Q. Well, let me just ask you a couple of questions

Page 19

1  about the bullet trap.
2       It's my understanding that the bullet trap
3  is what you call a wet system. Is that correct?
4  A. Correct.
5  Q. What does it mean to be a wet system?
6  A. There's a lower ramp underneath of the
7  deceleration chamber that is wet. A water and oil
8  mixture sprays down on that bottom ramp.
9  Q. What's the purpose of the water spraying down
10 onto the bottom ramp?
11 A. My understanding is that a projectile strikes
12 the water and that ramp and it hydroplanes up into the
13 deceleration chamber, rotates around until it loses
14 its energy, drops down onto a conveyor belt. It
15 transports it to a bucket and dumps it into the
16 bucket.
17 Q. Let's list some of the things that can go wrong
18 with the bullet trap.
19       Number one, there have been situations,
20 have there not, when the bullet trap is dry, there's
21 no water coming out of the nozzles?
22 A. When I came back on December 1st, when I was
23 Court ordered back by Judge Farnan from the federal
24 court, when I arrived on December 1st, 2003 there were

Page 20

1  three dry spots.
2  Q. During your first tour as NCOIC at the firearms
3  training unit, did you ever have the situation occur
4  where the nozzles were not shooting water out the way
5  they were supposed to?
6  A. Yes.
7  Q. And how often would that occur? We're talking
8  now July 2001 through April 2002, right?
9  A. Yes.
10 Q. How often would that occur that one or more of
11 the nozzles was not shooting water out in the manner
12 that it was designed to do?
13 A. Fairly often, a few times a month.
14 Q. Whose responsibility was it to fix that?
15 A. We would try to diagnose the problem to see
16 what was wrong, from whether it's a thrown breaker for
17 that particular pump, whether the plug is bad on the
18 pump, whether the impeller is stuck on the pump, if
19 the pump is burned out, if it's the screen, the filter
20 screen that's clogged, if it's the valve that's stuck
21 or broken or it needs to be adjusted or if it is, in
22 fact, the sprayer head that's clogged.
23 Q. When you say, "we would try to diagnose it,"
24 who is the "we"?

Page 21

1  A. All of us in the firearms training unit.
2  Q. So between August of 2001 and February of 2002,
3  that would include yourself, correct?
4  A. What were the dates again?
5  Q. Between August 2001 and April 2002, the
6  firearms training unit would include yourself, right?
7  A. Correct.
8  Q. Also Corporal Price?
9  A. Correct.
10 Q. And Corporal Warren?
11 A. Correct.
12 Q. And Eddie Cathell?
13 A. Correct.
14 Q. Was there anybody else?
15 A. I don't believe so, no.
16 Q. You would during that period have temporary --
17 what do you call them? Part-time trainers come in to
18 help out during peak loads, wouldn't you?
19 A. Adjunct instructors.
20 Q. Is that what you would call them? Okay.
21      Did you have the adjunct instructors work
22 on the bullet trap too?
23 A. No.
24 Q. So suppose that you had this problem with the

A - 199

Case 1:04-cv-00956-GMS    Document 92-8    Filed 02/02/2006    Page 5 of 14

Price, et al.                                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS    December 13, 2005

Page 22

1  bullet trap and you diagnosed that it was a bad pump,
2  what would you do?
3      A.  We would have to unplug the pump, reach into
4  the water trough, pull the pump out, disconnect it
5  from the tubing, reconnect it to another, reconnect
6  another pump to the tubing, plug it in and put it back
7  in the water-oil mixture and see if that would repair
8  it, if that would correct the problem.
9      Q.  Is what you've just described to us the process
10 of replacing the pump?
11     A.  Yes.
12     Q.  Did you actually replace pumps yourself?
13     A.  Yes.
14     Q.  You were at the firing range when it first
15 opened in 1998, weren't you?
16     A.  Yes.
17     Q.  During the time between 1998 when it opened and
18 2001 when you became the NCOIC, did you perform the
19 task of replacing the pump that you just described?
20     A.  Between what dates?
21     Q.  Between the time the range opened in '98 and
22 the time you became the NCOIC in 2001, did you perform
23 the task of replacing the pump like you just described
24 to me?

Page 23

1      A.  Yes.
2      Q.  How about filters, did you change filters
3  during that time period?
4      A.  Yes, I did.
5      Q.  Did you clean the like shotgun waddings out of
6  the tank that's below the bullet trap?
7      A.  Yes, I did.
8      Q.  And you did all of these things yourself?
9      A.  I did them, yes.
10     Q.  Did Corporal Price do it?
11     A.  I believe so.
12     Q.  How about Corporal Warren?
13     A.  I believe he did also.
14     Q.  How about Eddie Cathell?
15     A.  Yes, sir.
16     Q.  When you became the NCOIC, did you continue to
17 perform the maintenance of the water system in the
18 bullet trap?
19     A.  Yes.
20     Q.  Now, would you agree with me that the firearms
21 training unit personnel were responsible for the
22 maintenance of the water system in the bullet trap?
23     A.  Those parts that I mentioned, yes.
24     Q.  And facilities management was not responsible

Page 24

1  for that, right?
2      A.  No.
3      Q.  Now, facilities management was clearly
4  responsible for the HVAC system, correct?
5      A.  Correct.
6      Q.  During the time that -- let me back up a
7  second.
8          I want to refer back to what Mrs. Homer
9  has said here on the first page of Exhibit No. 5.
10     A.  Can I qualify something?
11     Q.  Yes.
12     A.  But I do believe it's facilities management's
13 responsibility to let us know what environment we're
14 working in with that bullet trap.
15     Q.  What do you mean by that?
16     A.  What type of hazards we're being exposed to in
17 that water.  No one is testing the water.  No one is
18 keeping an eye on it to make sure it doesn't have any
19 pathogens growing in it.  No one is keeping up to tell
20 us what levels of contamination is behind the bullet
21 trap that we're working in.  No one is testing it to
22 see what we're being exposed to.  No one is giving us
23 respirators, Tyvek suits to protect us from hazards.
24     Q.  Do you know what information was provided by

Page 25

1  the State Police to facilities management as to what
2  the projectiles are composed of that are being shot
3  into the bullet trap?
4      A.  I didn't understand your question.
5      Q.  What does facilities management know about
6  what's going into the bullet trap in terms of bullets?
7      A.  They should know everything of what's going on
8  in that building.  It's their building.
9      Q.  Well, I guess maybe you can say they should,
10 but my question to you is:  Do you have any
11 information as to what anybody at the State Police
12 told them?
13     A.  (Pause).
14     Q.  Do you understand the question?
15     A.  No, not yet.
16     Q.  Did you ever tell anybody at facilities
17 management whether you were the NCOIC or at any time
18 what was in the bullets that were going into the
19 bullet trap?
20     A.  I would think that they already knew from prior
21 to me taking over.
22     Q.  I understand that's what your position is.  I'm
23 simply asking whether you ever told them.
24     A.  No.  But I also think that it's incumbent upon

Page 26

1  them to know what's going on.
2  Q.  It may well be. I'm just trying to establish
3  the facts and the question is whether you ever told
4  anybody at facilities what was in the bullets.
5     I take it the answer is no?
6  A.  Eventually, yes. I provided them with an MSDS
7  sheet of the bullets.
8  Q.  And that would have been when?
9  A.  January of 2004, a month after I took over.
10 Q.  At any point prior to that, and you were the
11 NCOIC in 2001 and 2002, at any point prior to 2004 did
12 you provide an MSDS to the folks at facilities?
13 A.  No, I did not.
14 Q.  You have talked to people at facilities while
15 you were working at the range, right?
16 A.  Yes.
17 Q.  Like people like Mark D'Allesandro?
18 A.  Correct.
19 Q.  Who else did you deal with from facilities?
20 A.  Doyle Tiller.
21 Q.  Who else?
22 A.  Mark DeVore.
23 Q.  Did you deal with Tiller and DeVore prior to
24 December 2003?

Page 27

1  A.  Yes.
2  Q.  When would that have been?
3  A.  Back when I was in charge the first time.
4  Q.  What was your purpose for having interaction
5  with Doyle Tiller back in 2001-2002?
6  A.  Ventilation problems.
7  Q.  How about DeVore?
8  A.  Same thing. He's the engineer.
9  Q.  I'm sorry if I asked you this question already.
10 But at any point prior to January 2004 did you provide
11 to anybody at facilities the MSDS's for the bullets
12 you were using at the range?
13 A.  No, I did not.
14 Q.  Is there anybody else that you dealt with from
15 facilities other than the three names we already have
16 mentioned during the period prior to December 2003?
17 A.  Tom Faison.
18 Q.  What was his job?
19 A.  I don't know what his title was, but he was
20 kind of like the everyday maintenance guy.
21 Q.  Okay.
22 A.  Give me just a minute.
23 Q.  Take your time.
24 A.  An electrician by the name of Elliott.

Page 28

1  Q.  Elliott Harding?
2  A.  Yes.
3     Mr. Bell.
4  Q.  Is that B-e-l-l?
5  A.  Correct. I can't think of the other guy that
6  was a maintenance guy before Tom Faison. I can't
7  believe it. I can see him in my mind.
8  Q.  So there was another, your routine maintenance
9  guy you referred to him as?
10 A.  Correct.
11 Q.  Did Mark D'Allesandro replace Tom Faison?
12 A.  No.
13 Q.  They were working at the same time?
14 A.  Correct. They have two different job
15 functions.
16 Q.  What's Faison's job?
17 A.  Like I said, I believe he's the everyday
18 maintenance guy.
19 Q.  What is your understanding of D'Allesandro's
20 job?
21 A.  I believe he's like a supervisor, a level above
22 him.
23 Q.  Going down again on the first page of MacLeish
24 5, there is a statement "'The people who have

Page 29

1  complained about the facility are also the same people
2  who are in charge of the facility.'"
3     At this point, and this is April 6th when
4  this discussion with the press occurred, who was
5  complaining about the facility?
6  A.  We have. We spoke out about problems with the
7  range. We spoke about problems and we brought them to
8  the forefront.
9  Q.  Who is the "we," Sergeant Foraker?
10 A.  Myself and my men. And I explained this in my
11 interrogatories.
12 Q.  Is it accurate what Mrs. Homer says is that the
13 people who are complaining are the same people who are
14 in charge of the facility?
15 A.  Yes. She's indicating myself, my men and
16 Captain Warren.
17 Q.  Go over to the next page, please. The fourth
18 paragraph down is a paragraph that you said you
19 thought was defamatory and it has to do with I think
20 blood lead levels.
21    Would you agree with that?
22 A.  Yes, I do.
23 Q.  Do you know what Gloria Homer meant, do you
24 have any idea what she meant when she uses the

A - 201

Case 1:04-cv-00956-GMS   Document 92-8   Filed 02/02/2006   Page 7 of 14

Price, et al.                                                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS               December 13, 2005

Page 30

1  phrase "higher than standard lead levels"?
2  A. I believe the standard is a 4 or a 5.
3  Q. My question is: Do you know what she meant?
4  A. No matter what our levels were, she's saying
5  that they're okay, they're standard.
6  Q. Okay. When you were the NCOIC in 2001 and
7  2002, is it true that you tried to keep the blood lead
8  levels somewhere between 6 and 12?
9  A. Correct. I actually wanted to be below a 10
10 because that's what Johns Hopkins, Dr. Schwartz from
11 Johns Hopkins according to Major Swiski, he wanted us
12 to stay a 10 or below.
13 Q. Dr. Schwartz said 10 or below would be
14 desirable, right?
15 A. That's what you want to shoot for. You want to
16 stay below a 10.
17 Q. Didn't he also say to Major Swiski that none of
18 the blood lead results that the Delaware State Police
19 had shown him, other than Eddie Cathell's, presented
20 any sort of danger to the troopers?
21 A. I don't know that he said that.
22 Q. So you do know that he said that he wanted it
23 under 10, but you don't know anything else that he
24 said?

Page 31

1  A. I'm telling you what Major Swiski told me. I
2  never talked to Mr. Schwartz.
3  Q. Okay. Did you receive test results for blood
4  lead levels in April of 2004 for you and your men?
5  A. Yes.
6  Q. Were any of them higher than a 12?
7  A. I don't believe so.
8  Q. Were any of them higher than 10?
9  A. I don't believe so.
10 Q. Two paragraphs down from the paragraph I was
11 just asking you about is one that begins with the
12 phrase "'Ventilation can only do so much. The hygiene
13 of the facility is just as important.'"
14    Why do you believe that that statement is
15 defamatory?
16 A. Because it's indicating that the closing of
17 that range was due to our lack of upkeep, which is
18 totally a fabrication and is totally false.
19 Q. Okay. That's what you believe she means by
20 that?
21 A. That's exactly what she means by that.
22 Q. In the next paragraph down you have stated that
23 you found the following statement defamatory, and I'll
24 quote: "Mrs. Homer and Mr. Furman pointed to material

Page 32

1  scattered on the floor or on shelves."
2     Do you know whether there was, in fact,
3  material scattered on the floor or on shelves the day
4  that Mrs. Homer and Mr. Furman went through the range?
5  A. I believe that I went there a day or two after
6  that to pick up some weapons and, like I explained,
7  there were many people in and out of that range and
8  there were things there that I didn't leave there and
9  my men didn't leave there.
10    So there had been other people in that
11 building in and out and there were other things
12 around. There was ammunition that wasn't even our
13 ammunition, some of which wasn't what we use on a
14 regular basis, here and there. We didn't leave it in
15 that condition that they're saying.
16 Q. Okay. I understand that and you have said that
17 before, but my question is: Do you know whether the
18 statement that is made in this article that there was
19 material scattered on the floor and shelves is correct
20 or not?
21 A. I think it's false what she's saying. I didn't
22 do that. We didn't do that. We didn't leave it that
23 way.
24 Q. The article doesn't say anything about who put

Page 33

1  the debris or material there.
2  A. It's insinuating that it was me and my men.
3  Q. Okay. That's what you believe to be defamatory
4  about that statement?
5  A. Yes.
6  Q. Now, you said that there was ammunition there
7  that wasn't your ammunition?
8  A. Not that we were using, no.
9  Q. Do you know how it got there?
10 A. I have no idea.
11 Q. What kind of ammunition was it?
12 A. A different caliber, I believe. It was either
13 a different caliber or a different make.
14 Q. Did you have an educated guess as to how the
15 ammunition got there that wasn't yours?
16 A. I don't.
17 Q. Was it there the last time -- well, was it
18 there when the range was in operation in February of
19 2004?
20 A. No. Just like I said before, there were things
21 there that weren't there when my men and I left the
22 range.
23 Q. So you believe that at some point between the
24 time the range stopped operating and the point that

Case 1:04-cv-00956-GMS   Document 92-8   Filed 02/02/2006   Page 8 of 14

Price, et al.                                    v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS    December 13, 2005

Page 34

1  this tour occurred in April of 2004 somebody came in
2  and put ammunition there that didn't belong to the
3  Delaware State Police?
4  **A. I don't know that it belonged to the Delaware**
5  **State Police. It wasn't what we were using at the**
6  **time.**
7  Q. Are you saying that that ammunition that you
8  were not using at the time appeared at the firing
9  range between the time that you stopped operating
10 there and the time of this story?
11 **A. Correct. I don't know how it appeared there.**
12 **I don't know how it got there.**
13 Q. That's fine. But your deduction is it appeared
14 at some point between the last time you were using it
15 and the time that the cabinet secretary went through
16 for the tour?
17 **A. Correct.**
18 Q. Going farther down on page 2 of Exhibit
19 MacLeish 5 is the paragraph that says, "'The bullet
20 trap wasn't cleaned properly. The back, where the
21 track is, was so poorly maintained that it became
22 unworkable.'"
23         At the point that you stopped using the
24 range -- and I gather this is sometime in February

Page 35

1  2004 -- and by "stopped using" it I mean stopped
2  shooting in the building, was the bullet trap working?
3  **A. (Pause).**
4  Q. That's a bad question.
5          Was the conveyor system or the drag chain,
6  whatever you call it that operated in the tank of the
7  bullet trap, was that functional?
8  **A. No.**
9  Q. Do you know why not?
10 **A. Because I believe the pivot shaft they called**
11 **it was pulled out of its socket.**
12 Q. Is the pivot shaft on the motor end of the belt
13 or on the far end?
14 **A. It's the far end.**
15 Q. And I take it that's the piece of equipment
16 that holds the end of the belt in place so that it can
17 turn around it, turn from going in one direction to
18 back going the opposite direction?
19 **A. That's my understanding.**
20 Q. You have watched it operate, right?
21 **A. I've seen the belt move. I haven't seen that**
22 **end. I have no idea what that end looks like.**
23 Q. How did you know that it wasn't working
24 properly?

Page 36

1  **A. Because the technician that came in January**
2  **discovered that.**
3  Q. Okay. So had the belt stopped operating in
4  January?
5  **A. It stopped operating in December.**
6  Q. At any point from December to the time the
7  range closed was the belt operating?
8  **A. I don't believe on a regular basis, no.**
9  Q. Maybe this would be a good time to ask you some
10 questions about that.
11         I'm going to show you a document that has
12 been marked D-1.
13         MR. NEUBERGER: Excuse me?
14         MR. ELLIS: D, as in defendant, 1.
15         MR. NEUBERGER: Are you saying this is in
16 the record or we're going to make it in the record?
17         MR. ELLIS: No. It's already in the
18 record. It was in -- I forget -- one of the other
19 plaintiff's deposition.
20         MR. NEUBERGER: All right.
21 BY MR. ELLIS:
22 Q. Sergeant Foraker, I would like you to take a
23 look. The document I have shown you is actually three
24 e-mails in a chain. The first one is the one in the

Page 37

1  back, which is dated Friday, December 19, 2003 at 7:20
2  p.m. and it goes from you to Thomas MacLeish and Paul
3  Eckrich with copies to Greg Warren and Ralph Davis.
4          There is then Colonel McLeish's reply on
5  January 5th and then you reply to that on January 5th
6  later in the day.
7          I'm going to ask you a number of questions
8  about this exhibit, but for present purposes if you
9  could just look at the earliest of the e-mails which
10 is the one that begins on the second page and that's
11 the one that starts on Thursday, December 18, 2003.
12         Do you see that?
13 **A. Yes.**
14 Q. This states that on December 18 you discovered
15 that the clutch pulley sprocket of the conveyor drag
16 or dredge system has been damaged and the drive chain
17 has been broken. And then you then go on to say that
18 this has brought the dredging system to a complete
19 stop.
20         When you refer to the dredging system, is
21 that the same thing as we have been talking about here
22 today calling it the belt?
23 **A. The drag belt, yes.**
24 Q. The drag belt, okay.

A - 203

Case 1:04-cv-00956-GMS    Document 92-8    Filed 02/02/2006    Page 9 of 14

Price, et al.                                                              Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS               December 13, 2005

Page 38

1  As I understand it, as of December 2003
2  the belt that was in use was a metal belt with cleats
3  on it that were designed to drag the residue of the
4  ammunition down towards the end of the tank?
5  A. Yes.
6  Q. Is that right?
7  A. Yes.
8  Q. So as of December 18 this drag system was not
9  working, right?
10 A. Correct.
11 Q. Now, if you go to the first page of this
12 exhibit, D-1, and this is your January 5th e-mail to
13 Lieutenant Colonel MacLeish, you also talk, you talk
14 in this one about repair work that was done on the
15 clutch pulley and chain.
16     You were present to see that work done,
17 right?
18 A. Yes.
19 Q. And it was done by a guy named Toplack from the
20 Mayfran Corporation?
21 A. Yes.
22 Q. After Mr. Toplack completed his repair, was
23 there a point when the system was working correctly?
24 A. It was running when he left.

Page 39

1  Q. How long did it stay running?
2  A. Not very long.
3  Q. A matter of I mean days, weeks?
4  A. Days, I believe.
5      MR. ELLIS: I'm going to ask the reporter
6  to mark this as D-17. I think that's what we're up
7  to.
8      (Defendant's Deposition Exhibit No. 17 was
9  marked for identification.)
10     THE WITNESS: Did you want me to read
11 this?
12 BY MR. ELLIS:
13 Q. Yes, please. I'm particularly interested at
14 this point in you reading the second paragraph, the
15 paragraph that has the number 2 in front of it. This
16 is an e-mail from you to Greg Warren, copied to Ralph
17 Davis dated January 9, 2004.
18     And also paragraph 3 on the next page.
19 Sorry.
20 A. (Reviewing document) Okay.
21 Q. Now, does this e-mail document, this is dated
22 January 9, document that the conveyor is, once again,
23 no longer working?
24 A. That's correct.

Page 40

1  Q. And the third, the paragraph numbered 3 on the
2  second page of Exhibit D-17 says the drag conveyor has
3  failed once again. You don't indicate here what day
4  it failed.
5      Do you recall it failing on the date that
6  you sent this e-mail or was it someday prior to that?
7  A. I don't recall at this time if this was the
8  actual day that I discovered it or not.
9  Q. Well, according to Exhibit D-1 it would have
10 been fixed as of December 29, right?
11 A. Correct. When he left it was running, it was
12 working at that particular moment.
13 Q. Now, am I correct that between Christmas and
14 New Year's that you were not doing any shooting on the
15 range, it was basically shut down?
16 A. Correct.
17 Q. So the first day of operation after the
18 holidays would have been Monday, January 5th, right?
19 A. Correct.
20 Q. Did shooting start on Monday, January 5th or
21 was it someday later in that week?
22 A. I believe recruit training started on that
23 Monday, the 5th, and depending on where they are in
24 the curriculum that particular day, they may start

Page 41

1  shooting in the afternoon.
2  Q. So at some point between Monday, the 5th and
3  Friday, the 9th the conveyor belt broke down again.
4  Is that a fair statement?
5  A. That or maybe it broke down prior to us coming
6  back. I don't know. I'm not 100 percent sure at this
7  point in time.
8  Q. Was it running when the range was closed, the
9  conveyor system I mean?
10 A. Yes. They said it had to run continuously.
11 Q. So as of December 29th it got turned on even
12 though there was nobody in the building?
13 A. Correct. Both Savage and Mayfran said that
14 they had, they requested that the water system and the
15 conveyor belt continue to run 24/7.
16     MR. ELLIS: Let me mark this as Exhibit
17 D-18.
18     (Defendant's Deposition Exhibit No. 18 was
19 marked for identification.)
20 BY MR. ELLIS:
21 Q. Now take a look at the bottom. This is two
22 e-mails, the first one being January 23, 2004 from you
23 to Greg Warren and Ralph Davis and then Greg Warren's
24 response of January 26 to you.

Price, et al.                                  v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 1      C.A. # 04-956-GMS          December 13, 2005

Page 42

1  And I really only want to ask you about
2  the earlier of the two e-mails on the 18th and ask you
3  if this documents the fact that the conveyor system
4  was not operational as of Friday, January 23rd?
5  A. (Reviewing document) Your question again?
6  Q. I think the question was whether this January
7  23rd e-mail documents the fact that the belt, the
8  conveyor system, in other words, is not operational as
9  of that date?
10 A. Correct. That's fair to say.
11 Q. I recognize there are other things in that
12 e-mail. But can we take it from the e-mail that by
13 the 23rd it's not working again?
14 A. Correct.
15 Q. Do you remember whether it was working at any
16 point between January 9th and January 23rd?
17 A. It was working when Mr. Toplack left. The next
18 time I viewed it I believe it was broken again. It
19 had ceased operation.
20 Q. When you say that when Mr. Toplack left, that's
21 December 29th, correct?
22 A. I believe so, thinking back.
23 Q. That's based on Exhibit D-1?
24 A. Yes.

Page 43

1  Q. Now, when was the next time you looked at it,
2  if you remember?
3  A. At this point in time I don't recall exactly
4  when I looked at it. It was sometime that week when
5  we came back. I don't know whether it was actually
6  Monday or Tuesday.
7  Q. That would be the week that ended with Friday,
8  January 9th?
9  A. Correct.
10 Q. Are you able to tell me whether between the 9th
11 and the 23rd it was ever operational?
12 A. I don't believe that it was.
13 Q. Now, D-18, which I think is still in front of
14 you, has in the second paragraph of the January 23rd
15 e-mail a reference to air quality testing that's to
16 occur on February 10th or 11th.
17    Do you see that?
18 A. Yes.
19 Q. Am I correct that the testing that occurred on
20 the 10th or 11th was done with the SORT team?
21 A. Correct.
22 Q. And that the SORT team shot in the range and
23 while they were shooting the air testing went on?
24 A. That's correct.

Page 44

1  Q. Was there any shooting that occurred at the
2  range, in training that occurred at the range that
3  occurred between February 11th and the time it was
4  shut down?
5  A. Not that I'm aware of.
6  Q. Now, between the 23rd, which is the date of
7  your e-mail to Greg Warren and Ralph Davis, between
8  the 23rd and the day of the shoot of the SORT team,
9  February 11th, was there shooting going on?
10 A. Yes.
11 Q. Was that the completion of the training class
12 at the academy?
13 A. Yes.
14 Q. So from the beginning of January to sometime in
15 the beginning of February, the range was in use every
16 day?
17 A. Monday through Friday, I believe so.
18 Q. At the time all this is going on, and I'm
19 talking January and early February 2004, did you have
20 a belief as to what the effect was of the conveyor
21 system going down, what the effect that would have on
22 the environment in the shooting range?
23 A. The dredge system?
24 Q. Yes.

Page 45

1     In other words, did you believe that it
2  was bad for the bullet trap system to have the dredge
3  belt inoperable?
4  A. In the shooting range itself would it be bad?
5  Q. Well, was it bad for the bullet trap system to
6  have the conveyor belt inoperable?
7  A. I don't know that I can answer it as to whether
8  it would be bad or not.
9  Q. As to the environment in the area where the
10 shooters were, do you think the conveyor belt being
11 inoperable had any effect on that environment?
12 A. On the shooters?
13 Q. Yes.
14 A. No.
15 Q. Do you believe there was any effect on the
16 environment of the building by the bullet trap
17 conveyor system not being operable?
18 A. No.
19 Q. What was your understanding as to what the
20 purpose of the bullet trap conveyor system, what was
21 the purpose of it?
22 A. It's to transport leaded projectiles and dump
23 them into a barrel.
24 Q. What purpose does it serve if you're not

A - 205

12 (Pages 42 to 45)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Price, et al.
Christopher D. Foraker, Volume 1
v.
C.A. # 04-956-GMS
Chaffinch, et al.
December 13, 2005

Page 46

1  shooting leaded projectiles?
2  A. To drag the debris, leaded projectiles from
3  shotguns and whatever else debris that you have from
4  the frangible, dredge it out and dump it into a
5  barrel.
6  Q. Do you have an understanding of why that's
7  necessary?
8  A. It's a convenient way to get rid of the spent
9  rounds.
10  Q. Do you understand that it prevents the pumps
11  from getting clogged?
12  A. No. I don't believe it does that, no.
13  Q. Did you ever talk to any of the Mayfran
14  personnel that were sent to the State Police range,
15  did you ever discuss with them the purpose of the
16  conveyor system?
17  A. There's two different systems that you're
18  talking about. There's a conveyor system that
19  originated. The conveyor system transports solid
20  projectiles.
21      A dredge system drags debris and to me
22  that's two different, two different systems, two
23  different animals.
24  Q. I'm really referring to the dredge system that

Page 47

1  was in effect, in place in January 2004.
2      Did you ever talk to any of the Mayfran
3  people about what the purpose of it was?
4  A. Not what the purpose of it was, no. We know
5  that it was to dredge the debris and dump it into a
6  barrel.
7  Q. Go back to D-17, please. Look at paragraph 2,
8  please, for a minute. I would like you to read the
9  first sentence to yourself.
10  A. (Reviewing document) Okay.
11  Q. In this sentence you're reporting to Captain
12  Warren that the wet ramp was dry in some areas, right?
13  A. Right. There were three areas when I arrived
14  there December 1, there were three points that were
15  dry.
16  Q. Well, this is January 9th. Were there more
17  than three?
18  A. It was the same.
19  Q. It was the same three?
20  A. Correct.
21  Q. And did it ever happen that there were more
22  than three places that were dry?
23  A. Not during this time frame, no.
24  Q. This sentence refers to the filter screens and

Page 48

1  the sprayer jet heads. It says it causes the filter
2  screens and the sprayer jet heads to do something and
3  I can't see what that is because there was a hole in
4  the paper when it was photocopied.
5      Do you believe that word might be "clog"?
6  A. It could be.
7  Q. The filter screens and the sprayer jet heads
8  clogged because of the frangible ammunition, right?
9  A. Correct.
10  Q. And what was the effect of them clogging?
11  A. It would become dry on the other side.
12  Q. And do you believe that that caused a problem
13  with air quality?
14  A. We didn't shoot in the dry ramps. We shot in
15  the wet ramps. We would locate our shooters in front
16  of wet ramps.
17  Q. In this e-mail you sent to Greg Warren you
18  said, "The air quality problem is surely compounded by
19  the fact that the wet ramp is dry in some areas."
20      Did you believe that to be a problem at
21  the point you sent Greg Warren this e-mail?
22  A. There may at certain times be a round that may
23  hit there, just like it would hit the upper ramp that
24  is also dry. It's permanently dry, the upper ramp.

Page 49

1  Q. Right.
2  A. But what I do go on to say and I described it
3  in my interrogatories is that when we witnessed the
4  dust cloud that was from the rounds being fired from
5  the gun, the muzzle blast itself was traveling
6  backwards in our faces.
7  Q. That's the subject of paragraph 1 of this
8  e-mail, right?
9  A. Correct.
10  Q. Did the circumstances that you described in
11  this e-mail that's D-17 exist at the range throughout
12  the entire month of January when shooting was going
13  on?
14  A. Yes.
15      MR. NEUBERGER: Why don't we take our
16  break now?
17      MR. ELLIS: That's fine.
18      (A brief recess was taken.)
19  BY MR. ELLIS:
20  Q. Sergeant Foraker, did you believe in January
21  2004 that you had the authority to shut down the range
22  if the circumstances, excuse me, if the environment
23  was not safe for the people working there?
24  A. Absolutely not. That is five or six pay grades

A - 206

Case 1:04-cv-00956-GMS    Document 92-8    Filed 02/02/2006    Page 12 of 14

Price, et al.                                    v.                    Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS    December 13, 2005

Page 50

1  above me. That's at the secretary level, cabinet
2  secretary level or at the colonel of the State Police
3  level.
4    Q. Why do you say that?
5    A. Because it's not our building. It's a facility
6  that's owned by the State of Delaware, not by the
7  Delaware State Police. And I am trained -- I'm a
8  trainer. I'm responsible for the safe operation of
9  training.
10   Q. Well, do you believe that it was safe to train
11 in the circumstances that were present in the range in
12 January 2004?
13   A. From my standpoint from a trainer, things were
14 safe as a trainer.
15   Q. Do you believe that the people that you were
16 training were in danger of inhaling contaminants
17 during January 2004?
18   A. I had a suspicion that it could be a problem
19 and once we found out, and that was January 8th that
20 we found out what the bullet, the frangible bullet was
21 made of, which was copper dust, I contacted the
22 engineer from the manufacturer of the bullet, got that
23 information. He said that "You don't want to eat it"
24 and my response to him was "If we have a penny taste

Page 51

1  in our mouth, then aren't we eating it?" And he said,
2  "Well, don't walk into the dust cloud."
3       So from that point on we would shoot and
4  once the cloud was starting to form, we would cease
5  fire and back off the line. It caused a significant
6  interruption in our training program.
7    Q. At the point that you -- well, in January 2004
8  given the observations you made of physical conditions
9  in the facility, did you believe that your
10 subordinates in the firearms training unit were being
11 placed in harm's way?
12   A. From what?
13   Q. From the conditions you just described, the
14 clouds of dust, the smoke from the discharge of the
15 weapons, the circumstances that you described in
16 Exhibit D-17 in your e-mail to Captain Warren.
17   A. I suspected that there were contaminants. I
18 don't know how dangerous it was. I'm not a chemist.
19 I'm not an industrial hygienist. And that's the
20 responsibility of facilities management.
21      We asked for them to conduct testing. We
22 asked for them to conduct swipe samples of the
23 facility, and they refused to do that. So then myself
24 and my men, we brought in Environmental Solutions and

Page 52

1  actually it came out of the budget. Instead of coming
2  out of the budget of facilities management, it came
3  out of the budget of the firearms training unit to pay
4  for sampling to see what we were being exposed to and
5  at what rate we were being exposed to it because
6  there's limits on exposure.
7    Q. I guess my question to you is: Do you believe
8  that you and the people in the firearms training unit
9  were in harm's way as a result of the environmental
10 conditions at the range in January 2004?
11   A. I believed that the possibility existed at that
12 time.
13   Q. Do you believe that the students, the people
14 you were teaching were in harm's way as a result of
15 the environmental conditions at the range in January
16 2004?
17   A. At that particular time I believed that the
18 possibility existed. That's why I wanted facilities
19 management to test the environment.
20   Q. Now, at any point before February 11, 2004 did
21 you recommend to anyone in the State Police that the
22 range be shut down?
23       MR. NEUBERGER: I'm sorry. What was the
24 date?

Page 53

1       MR. ELLIS: February 11, 2004.
2       MR. NEUBERGER: But before you said from
3  this date to that date. I'm sorry.
4       MR. ELLIS: At any point prior to February
5  11, 2004 I think is what I said.
6       MR. NEUBERGER: Thank you.
7  BY MR. ELLIS:
8    Q. Do you understand the question?
9    A. Can you read it back to me?
10   Q. I will just say it again.
11      At any point prior to February 11, 2004
12 did you recommend to anybody above you in the State
13 Police hierarchy that the range be shut down for
14 shooting purposes?
15   A. No. I asked for it to be tested. I believe
16 that we needed to test the facility to see what was
17 going on in the facility before we could, before
18 anybody at that cabinet level secretary position would
19 make that call because they needed more information.
20      Colonel MacLeish came up on January 21st
21 and he saw the same environment that has all been
22 described here. He had the authority to shut it down,
23 but he did not.
24   Q. How do you know he had the authority?

A - 207

Price, et al.                                      v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS        December 13, 2005

Page 54

1  A. He's the lieutenant colonel of the State
2  Police.
3  Q. Any other reason you think he had the
4  authority?
5  A. He has a whole lot more authority than I do.
6  I'm a sergeant.
7  Q. I understand that.
8  A. But he even waited until test results came in
9  and even when the test results came in, he waited till
10 a piece of paper, a report came in from Art Nielson of
11 Nielson Associates making the statement that the
12 facility is not fit for occupation and in that he also
13 said that it is not a hygiene issue; it is a
14 mechanical issue that's the problem here in this
15 facility.
16 Q. When you met with then Lieutenant Colonel
17 MacLeish -- when did you say it was? January 21st?
18 A. 21st, I believe.
19 Q. How long did you meet with him?
20 A. A short period of time.
21 Q. Less than an hour?
22 A. Yes.
23 Q. Less than a half hour?
24 A. I believe it was.

Page 55

1  Q. Less than fifteen minutes?
2  A. I would be guessing.
3  Q. Where did you talk to him?
4  A. I talked to him when he entered the building at
5  the front office area. I talked to him while we
6  walked up to the control booth. I talked to him in
7  the control booth and then we walked back out into the
8  hallway and back into the office and then he left.
9  Q. Was there anybody present during the
10 conversation other than you and Lieutenant Colonel
11 MacLeish?
12 A. At one point in time when we walked into the
13 control booth I believe it was Corporal Price in the
14 control booth.
15 Q. Anybody else?
16 A. I don't recall at this time.
17 Q. What was the purpose, do you have an
18 understanding of why Lieutenant Colonel MacLeish was
19 present at the range that day?
20 A. He said he had stopped by to see the skid pad
21 and then he just dropped by and wanted to just see how
22 the recruits were doing.
23 Q. Did you have a discussion with him about the
24 environmental conditions in the range?

Page 56

1  A. I tried to have a conversation with him.
2  Q. So what did you say to him?
3  A. I started to explain to him about the
4  ventilation problem. And he said, "I'm not here for
5  that."
6      Then I started to explain to him about the
7  bullet trap and the conditions of the bullet trap.
8  And he said, "I am not here for that. I just came
9  here to see the recruits."
10     And then I also asked him about the
11 headsets because we needed new headsets. And he said,
12 "Contact Bill Carroll from communications and see if
13 you can get those retrofitted. That sounds like an
14 awful lot of money to buy new ones."
15 Q. At the point Lieutenant Colonel MacLeish came
16 to the range on January 21st, 2004 were you aware that
17 Captain Warren was preparing a report for Lieutenant
18 Colonel MacLeish on the conditions of the range?
19 A. I know that he was and he did prepare a report
20 for him. I'm not exactly sure on the exact dates.
21 Q. Go back to D-1, which should be in front of you
22 someplace. It may be underneath that.
23     MR. NEUBERGER: Here you go.
24 Q. Again, go to the second page of this exhibit,

Page 57

1  the Friday, December 19 e-mail you sent to MacLeish
2  and Eckrich got a response from MacLeish on January 5.
3  Do you see that?
4  A. Yes, I do.
5  Q. Do you see the third sentence where he says,
6  "Captain Warren, please prepare a written report that
7  addresses the concerns that Sergeant Foraker has
8  presented and propose possible solutions"?
9  A. Yes.
10 Q. And you got a copy of that e-mail, right?
11 A. Yes.
12 Q. Actually, it was directed to you and Captain
13 Warren, right?
14 A. Yes.
15 Q. So you knew in January of 2004 that Colonel
16 MacLeish was expecting a report from Captain Warren on
17 conditions at the range?
18 A. Yes.
19 Q. Did you have any input into what Captain Warren
20 prepared?
21 A. I believe that there was a good bit of
22 information that we had, that I had given the chain of
23 command, put up the chain of command to him through
24 these various e-mails and we talked many times over

A - 208    15 (Pages 54 to 57)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Case 1:04-cv-00956-GMS    Document 92-8    Filed 02/02/2006    Page 14 of 14

Price, et al.                                                      Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS    December 13, 2005

Page 58

1    the phone. So from those conversations and these
2    e-mails I believe that he probably incorporated a good
3    bit of that information in his report.
4    Q.   Take a look at Exhibit D-18.
5         Do you have that in front of you?
6    A.   Mm-hmm.
7    Q.   Referring now to the top of D-18 which is an
8    e-mail from Greg Warren to you of January 26th, 2004,
9    the second sentence says, "I want to review some items
10   with you, prior to submitting my final report to
11   MacLeish."
12        Do you see that?
13   A.   Yes.
14   Q.   Did you actually have a meeting with Captain
15   Warren on January 27th to discuss certain items?
16   A.   We had a lot of meetings. I'm not sure exactly
17   if the 27th we did. I'm not sure at this point in
18   time.
19   Q.   Did Greg Warren show you his report to MacLeish
20   before he submitted it to MacLeish?
21   A.   He may have. I don't recall at this time.
22   Q.   Did you have a pretty good idea what it was
23   going to say before Captain Warren submitted it to
24   Lieutenant Colonel MacLeish?

Page 59

1    A.   I believe so.
2    Q.   Let me show you what's previously been marked
3    D-2. That's a copy of Captain Warren's report dated
4    January 30, 2004, right?
5    A.   Right.
6    Q.   Did you write any part of this report?
7    A.   I don't believe so.
8    Q.   Did you discuss with Captain Warren the
9    contents of the report?
10   A.   Yes, I believe I did.
11   Q.   At any point prior to February 11 did you have
12   a discussion with Greg Warren about the possibility of
13   shutting down the range until the environmental
14   conditions could be fixed?
15   A.   I don't recall at this time.
16   Q.   Did you ever have such a discussion with Ralph
17   Davis?
18   A.   I don't believe so.
19   Q.   Ralph Davis was your immediate supervisor,
20   right?
21   A.   Yes. But Captain Warren took the lead on this
22   particular project, so I was dealing directly with
23   Captain Warren. I believe that the academy and the
24   academy class that was in that that was left for

Page 60

1    Lieutenant Davis to handle while Captain Warren worked
2    on this project.
3    Q.   When you say, "this project," you're referring
4    to the report that we have in front of you as Exhibit
5    D-2?
6    A.   I'm talking about anything to do with the
7    range.
8    Q.   When Tom MacLeish was at the range on January
9    21st, did you tell him that you thought the range
10   should be shut down until the environmental problems
11   could be fixed?
12   A.   No. Because we didn't know exactly what the
13   environment was that we had. We didn't know how
14   contaminated it was, whether it was dangerous or not.
15   We assumed, we had thought that it may be, but we
16   weren't sure. And we were going to provide him with
17   as much information because facilities management
18   wasn't doing it.
19        So we brought in Environmental Solutions
20   to get the samples done to see just what we were being
21   exposed to. That way we could provide that
22   information to the lieutenant colonel and the colonel
23   and the secretary so they could make a decision on
24   what to do.

Page 61

1    Q.   Did it ever occur to you that it might be a
2    good idea to remove your men from the contaminated
3    area, from the possibly contaminated area until you
4    could figure out whether it was, in fact,
5    contaminated?
6    A.   Well, we know that they went back to clean the
7    pumps and sprayer heads and those things, the screens
8    back behind the bullet trap, we knew that they were
9    getting contaminated that way. And we found out from
10   Dr. Green from Health Works about how the water and
11   oil mixture, the oil acts as a penetrator into your
12   bloodstream.
13        So I tried to keep them away from that
14   because we knew that in February we would have
15   downtime because we didn't have any shooters coming in
16   after the recruit class was done. We would have
17   downtime where we could, in turn, have either Savage
18   or another company come in and we could decide on what
19   we're going to do with this facility, with this bullet
20   trap.
21   Q.   Well, did it ever occur to you during that time
22   that it might be a good idea to remove your men and
23   the trainees from an area that might be contaminated?
24   A.   I knew that back behind the bullet trap was a

A - 209

16 (Pages 58 to 61)