Case 1:04-cv-00956-GMS    Document 92-10    Filed 02/02/2006    Page 1 of 14

Price, et al.                             v.                      Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS          December 13, 2005

Page 138

1  Q. This assigns three troopers as range
2  instructors on what's called a TAD basis, does it not?
3  A. That's what it says.
4  Q. That would be Kracyla, Boulerice and Morris,
5  right?
6  A. Correct.
7  Q. What's a TAD basis mean?
8  A. Temporary assigned duty.
9  Q. That's different from a permanent assignment,
10 right?
11 A. It depends on who you ask, but it's supposed to
12 be, yes.
13 Q. What's the difference between a TAD assignment
14 and a permanent assignment at least in your view?
15 A. A TAD is only for a short period of time and
16 then they will be transferred back to their origin.
17 Q. Was it your understanding based on your
18 discussion with Lieutenant Colonel MacLeish that Kurt
19 Price and Wayne Warren had further testing to undergo?
20 A. I wasn't clear on anything from Lieutenant
21 Colonel MacLeish.
22 Q. Well, Lieutenant Colonel MacLeish told you that
23 they weren't supposed to be exposed to live fire. Is
24 that correct?

Page 139

1  A. That's correct.
2  Q. Did he tell you anything else in that meeting
3  with respect to Price and Warren?
4  A. He said something to the effect that "You have
5  to expect hearing loss. You work at a range. It's
6  like working in the infantry."
7  Q. You mean the artillery?
8  A. Artillery. Okay.
9  Q. Did Lieutenant Colonel MacLeish tell you that
10 he was having more testing done on Wayne Warren and
11 Kurt Price?
12 A. I don't recall him saying that, in those words,
13 no.
14 Q. Was it your understanding that Wayne Warren and
15 Kurt Price were going to have further testing done to
16 determine whether they could stay at the firearms
17 training unit given their hearing loss?
18 A. I didn't have any understanding of what was
19 going on and who was going to be where.
20 Q. Did you ask anybody?
21 A. Yes.
22 Q. Who did you ask?
23 A. I asked Captain Warren and Captain Warren
24 didn't know anything either. He wasn't being kept

Page 140

1  informed of what was going on.
2  Q. When did you have this conversation with
3  Captain Warren?
4  A. There was a meeting that was supposed to be
5  held, and I'm trying to think when it was. And
6  Lieutenant Colonel MacLeish canceled it, but I think
7  we still got together and had a meeting of ourselves
8  since we had already planned to have that meeting.
9  And I said to him "I don't know what's going on. Do
10 you know?"
11    And he said no, that he's not being kept
12 in the loop either.
13 Q. Who was at that meeting that you have just
14 described? You said a meeting of us.
15 A. The FTU staff and Captain Warren.
16 Q. Was Davis there?
17 A. I don't think he was there.
18 Q. Was MacLeish there?
19 A. No. That's who canceled.
20 Q. Aside from asking Captain Warren, did you ask
21 anybody else what the status of your two subordinates
22 was?
23 A. I don't recall at this time if I did.
24 Q. Do you recall any conversation with John

Page 141

1  Yeomans?
2  A. That I had with John Yeomans?
3  Q. Yes. About the status of your two
4  subordinates?
5  A. I don't recall any.
6  Q. So you've got two of your three subordinates
7  you have been told can't be exposed to live fire and
8  the only person you asked questions about concerning
9  their status was Captain Warren?
10 A. He's in my chain of command, yes, sir.
11 Q. I understand.
12 A. This is a paramilitary organization and I am
13 only a sergeant. There are plenty of people above me
14 and Lieutenant Colonel MacLeish was running this whole
15 situation as far as I could tell, everything was being
16 run through him. So he's the one that sent the
17 e-mails and letters and communicated only in meetings
18 to us in the beginning and then that communication
19 kind of fell away after a while.
20    MR. ELLIS: Now let me show you 26.
21    (Defendant's Deposition Exhibit No. 26 was
22 marked for identification.)
23 BY MR. ELLIS:
24 Q. I'm sorry. But let's go back one to Exhibit 25

A - 229

Case 1:04-cv-00956-GMS   Document 92-10   Filed 02/02/2006   Page 2 of 14

Price, et al.  v.  Chaffinch, et al.
Christopher D. Foraker, Volume 1   C.A. # 04-956-GMS   December 13, 2005

**Page 142**

1  before you get to 26, Sergeant Foraker.
2         The top e-mail on D-25 is an e-mail from
3  you to the three people who were assigned TAD, plus
4  the three existing members of the FTU. And it says,
5  "Just an FYI, take note of the time it was sent to me,
6  I opened the e-mail this morning."
7         Why did you include that statement?
8  A.  Because there was question as to what was
9  happening and who was going where because that's the
10 first time that I had heard that Rob Kracyla was
11 coming and Rob actually found out through someone else
12 and called me. And I said, "I have not heard anything
13 of that sort."
14        And I understood Colonel MacLeish to say
15 that Tim Morris and possibly even Don Boulerice would
16 be transferred permanently and not TAD. And I was
17 responsible for calling them and we had conversations
18 with all of these people earlier that day. And then I
19 didn't know about this e-mail until the following day.
20 Q.  I understand.
21        Going over to 26 now, the bottom e-mail
22 which is from you to Lieutenant Colonel MacLeish on
23 Exhibit D-26 is you describing to Lieutenant Colonel
24 MacLeish problems with the TAD assignments, right?

**Page 143**

1  A.  Yes.
2  Q.  And the top e-mail is Lieutenant Colonel
3  MacLeish responding to you, right?
4  A.  Yes.
5  Q.  Now, he uses the phrase in the beginning of his
6  e-mail to you "until we can confirm the status of
7  Corporals Warren and Price."
8         What did you understand that to mean?
9  A.  That things were up in the air with them.
10 Q.  And what things might be up in the air with
11 Corporals Warren and Price?
12 A.  Obviously their medical status.
13 Q.  Do you agree with Lieutenant Colonel MacLeish
14 that it would be unfair to either Price and Warren or
15 to those who would replace them to make permanent
16 assignments while Price's and Warren's status was up
17 in the air?
18 A.  The way I understood him in our earlier meeting
19 was that he was transferring them in permanently. He
20 asked me who do you want and I told him and he said
21 give them a call. But the way the conversation --
22 that was my understanding, was that they were going to
23 be permanently assigned.
24        And I'm all for my unit growing in number,

**Page 144**

1  not diminishing in number. So I was absolutely fine
2  with that to keep Warren and Price and have these guys
3  as well. That's what I understood it to be.
4         Then I got this e-mail (indicating) and it
5  says TAD, of course, and these three guys. I didn't
6  know anything about Rob Kracyla.
7  Q.  When you say, "this e-mail" you're talking
8  about D-25 now, right?
9  A.  Yes.
10 Q.  Then you found out you were getting Kracyla
11 too. Is that right?
12 A.  Yes. But it was very difficult to get them at
13 the same time and it was -- it's always been a problem
14 when you don't have someone assigned assigned to the
15 FTU because they get pulled back to their other
16 assignment, especially when you're talking about SIU
17 personnel.
18 Q.  And SIU personnel, are they primarily the drug
19 unit?
20 A.  Don Boulerice was in the drug unit and Sergeant
21 Kracyla was working with the FBI task force at the
22 time.
23 Q.  Would it be fair to say that getting the
24 adjunct instructors has been a headache for whoever is

**Page 145**

1  running the FTU for years?
2  A.  Yes.
3  Q.  And that was a headache for you back in 2001
4  and 2002, right?
5  A.  Yes.
6  Q.  Would it be accurate to say that in 2001 and
7  2002 you would have as many as two or three adjunct
8  instructors?
9  A.  It all depends on whether it's recruit training
10 or it's in-service training.
11 Q.  I take it that recruits require more than
12 in-service?
13 A.  Correct.
14 Q.  Is Captain Simpson the person in charge of the
15 SIU?
16 A.  Yes, he is.
17        It was also an issue in that particular
18 e-mail that you pointed out where Lieutenant Quig from
19 Troop 6 told Tim Morris that he was permanently
20 assigned to the FTU. How he got that information, I
21 don't know. And then he made him give up his car and
22 then I had to find him a car. And it's just an
23 absolute nightmare at this point in time to try and
24 get things straightened out when I'm trying to conduct

Price, et al. v. Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS    December 13, 2005

Page 146

1 a shoot and recruits and do this all at the same time.
2   Q. Do you remember when the spring shoot started
3 in 2004?
4   A. May, I believe.
5   Q. Once it got started, who did you have for live
6 fire, who did you have to supervise live fire
7 exercises?
8   A. Who did I have?
9   Q. Yes. Who was under your supervision to
10 supervise live fire exercises? Obviously Warwick was
11 one.
12   A. Corporal Warwick, corporal Morris and Corporal
13 Boulerice most of the time. I would have every now
14 and then Sergeant Kracyla, Sergeant Parton.
15   Q. Al Parton?
16   A. Yes.
17     I don't know if I had supervised Corporal
18 Danny Wright during that time. I don't believe so. I
19 don't recall seeing him at this time.
20   Q. Were Corporals Price and Warren able to assist
21 you in classroom instruction?
22   A. Some, yes, they did. But, then again, when I
23 tried to use Corporal Price, he was at a facility
24 where he was at a classroom and then stepped out of

Page 147

1 the classroom while the recruits were cleaning up
2 brass and the lieutenant colonel came up and was angry
3 that he was there at that facility. But he had been
4 in the classroom and then up in the tower where he was
5 protected and he even had hearing protection, but he
6 was cornered by the colonel, Lieutenant Colonel
7 MacLeish at the time, and basically berated him about
8 "What didn't you understand about my command?"
9   Q. Were you present during that encounter?
10   A. No, I wasn't.
11   Q. You heard about it from Kurt Price?
12   A. Correct.
13     MR. NEUBERGER: Could we take our break
14 now? It's 3:00 o'clock.
15     MR. ELLIS: Absolutely.
16     (A brief recess was taken.)
17     (Defendant's Deposition Exhibit No. 27 was
18 marked for identification.)
19 BY MR. ELLIS:
20   Q. Could you take a look at Exhibit 27? Just take
21 a look at that and tell me if that's a document that
22 you recognize.
23   A. (Reviewing document) What was your question,
24 sir?

Page 148

1   Q. Do you recognize the document?
2   A. I believe that I may have prepared this.
3   Q. Do you remember when?
4   A. It would have to be sometime between January
5 5th afterwards, because it's talking about the
6 recruits and their experience, January 5th of 2004.
7   Q. Is this document something you could have
8 prepared after the range had stopped shooting?
9   A. I think this was maybe justification for our
10 air quality test.
11   Q. Is the handwriting that's on the bottom your
12 handwriting?
13   A. It looks like it, yes.
14   Q. Could you read it for me?
15   A. "Greg no problem going to ramrod it through."
16   Q. Is that Greg Warren, presumably?
17   A. Probably, yes.
18   Q. What does that sentence mean, "Greg no problem
19 going to ramrod it through"?
20   A. He wants to get it approved so we can get the
21 testing done since facilities management isn't doing
22 it.
23   Q. And did you give this document to Greg Warren?
24   A. I may have. I don't recall at this time.

Page 149

1   Q. Did he tell you that he would approve the air
2 testing? I guess let me back up a second.
3     Whose responsibility is it to get the air
4 testing done within the State Police or was this
5 something that just had never come up before?
6   A. I would imagine this would go up the chain of
7 command to the executive staff. It's not our
8 building, so I guess they have to work out the details
9 at that level.
10   Q. Who arranged for -- the air was tested in the
11 building sometime in early 2004, wasn't it?
12   A. I was given approval to have Environmental
13 Solutions come in for a certain price and they did
14 just that. They came in to do swipe samples and did
15 air sampling.
16   Q. You say you were given approval. Who gave you
17 the approval?
18   A. Inevitably it came I believe from Faye Veal.
19 Faye Veal said, "Go ahead and do it. Here's the money
20 for it. Here's the purchase order for it."
21   Q. Who is Faye Veal?
22   A. Faye Veal is a civilian. She falls underneath
23 of Major Eckrich in reference to the budgetary
24 responsibilities.

A - 231

38 (Pages 146 to 149)

Page 150

1  Q. So is the ultimate person who gives approval
2  for that Major Eckrich?
3  A. It would have to be at least at his level,
4  maybe higher. I don't know whether it has to go
5  through the cabinet secretaries because the building
6  isn't ours and there was some question as to whether
7  that could be done or not.
8      I know that we have had conversations with
9  Doyle Tiller and he's the hygienist from facilities
10 management and that's who we were trying to get to
11 come in and test our facility. And he was telling us
12 that he wasn't going to do that at this point in time;
13 that that wasn't the first step. And he kept putting
14 us off and putting us off and finally I want to get it
15 done. I want to get it tested to see what we're being
16 exposed to.
17 Q. Okay. Let me ask you this, first of all. Who
18 told you that it was okay to contract with
19 Environmental Solutions and get the testing done?
20 A. Captain Warren I guess put it through the
21 executive staff and the executive staff okayed me to
22 use the funds in my budget to pay for it.
23 Q. Where did you get the funds in your budget? I
24 thought everything was already committed at this

Page 151

1  point.
2  A. I don't recall at this time where, what may
3  have been deleted to get that. I don't know.
4  Q. So back to the question I asked you: Who was
5  it who told you it was okay to pay for the testing? I
6  think your answer is Greg Warren? Is he the person
7  who communicated to you the decision that it was okay
8  to get the testing done?
9  A. I believe so, but I'm not 100 percent sure at
10 this time.
11 Q. You believe that somebody above him had to
12 approve it?
13 A. I believe so.
14 Q. And you think it would have been at least at
15 the Major Eckrich level and possibly higher?
16 A. Correct. And the purpose behind this is
17 because you have two different entities of government
18 and you don't want to do something wrong when you
19 should have done it another way and I'm trying to do
20 it the right way.
21 Q. You have two parallel cabinet departments? Is
22 that what you're saying?
23 A. Correct.
24 Q. I take it that at some point you had a

Page 152

1  conversation with Doyle Tiller in which you asked him
2  to come in and test the air?
3  A. We have had a number of conversations with him
4  where he stopped in and telephone calls that we have
5  made to him.
6  Q. Do you recall when the first conversation was
7  after your return in which you said that you wanted to
8  have the air tested because you didn't think it was
9  safe? When I say, "after your return," I'm talking
10 about after December 1, 2003.
11 A. We had been contacting facilities management
12 since I came back on December 1st for various things,
13 one of which each time we called it had to do with the
14 ventilation system not working.
15 Q. Okay.
16 A. We even so much -- Corporal Warren asked for a
17 copy of the log. When we call in there, they're
18 supposed to write down when we call in. They refused
19 to provide it to us.
20 Q. And who was it that you asked to provide you a
21 copy of the log?
22 A. I believe he asked Mark DeVore.
23 Q. I want to focus on the communication you had
24 directly with Doyle Tiller, so this is not anything

Page 153

1  you heard somebody else tell you.
2      But did you have a conversation with Doyle
3  Tiller in which you asked him to come in and test the
4  air, the air quality inside the building and he
5  refused to do so?
6  A. Yes.
7  Q. Approximately when did that take place?
8  A. That was that first week with recruits in
9  January, January 5th.
10 Q. And did he say why?
11 A. He was basically saying that that's not, that's
12 not -- "We're not at that step yet."
13 Q. What did you understand him to mean by "We're
14 not at that step yet"?
15 A. I don't really understand. He's very good at
16 talking in circles and I just -- he talks above you,
17 well, above me anyway at times.
18 Q. Was anybody present at that discussion you had
19 with him other than you and Mr. Tiller?
20 A. I believe Corporal Warren was with me.
21 Q. Did either you or Corporal Warren ask him what
22 it would take to get the testing, the air testing done
23 by the department of facilities management or the
24 division of facilities management?

39 (Pages 150 to 153)

Case 1:04-cv-00956-GMS   Document 92-10   Filed 02/02/2006   Page 5 of 14

Price, et al.                                    v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS          December 13, 2005

Page 154

1  A. What I can remember him saying, at this point
2  in time what I can remember him saying is that we
3  weren't at that stage or step yet and there were other
4  things that needed to happen, other things that we
5  could try. And I remember he brought in Mark
6  D'Allesandro and called Trane because Doyle Tiller
7  witnessed the ventilation system, he witnessed the
8  debris floating backwards. I mean, I'm not an
9  engineer, so I don't know what's going on, but I do
10 know that the breeze is supposed to go to the bullet
11 trap and up into the filters. It's not supposed to go
12 backwards. And that's what was happening.
13       Doyle Tiller and Mark DeVore were able to
14 see that. Mark DeVore spent a good bit of time, like
15 30, 40 minutes on the computer in the control booth
16 and then Mark D'Allesandro came in, along with I think
17 it's Whitehouse or Whitehead.
18 Q. The guy from Trane?
19 A. The technician from Trane. They came in and
20 they looked it over. And I think the guy from Trane
21 said that there was some leakage, air leakage around
22 the door, but it wasn't significant to cause any
23 problems.
24       And Mark D'Allesandro said that "I wish I

Page 155

1  could tell you it's working, but all I can tell you is
2  it's working as best it can."
3       But it's not working when it's going
4  backwards.
5  Q. Is this a meeting where all of these people
6  from the state are in the building at the same time?
7  By "all of these people" I mean Tiller, DeVore and
8  D'Allesandro and then Whitehouse from Trane are all in
9  the building at the same time?
10 A. They may have been.
11 Q. What did you do as a result of the discussion
12 that you had with D'Allesandro, DeVore and Tiller in
13 which they said that they weren't going to test the
14 air quality in the range?
15 A. Basically, they're telling me that the
16 ventilation system is working as best it can and that
17 we're just not going to do that testing. So I think
18 it was necessary to have it done and I consulted with
19 Captain Warren. He felt the same way. My guys felt
20 the same way.
21       We wanted to know what -- when you look up
22 lead and exposure, there's time weighted averages of
23 exposure and we wanted to know what is our time
24 weighted average of exposure and what we're being

Page 156

1  exposed to.
2  Q. Just give me a minute here. I'm trying to find
3  the exhibit that I think was used already.
4       See if you have Exhibit D-17.
5       MR. NEUBERGER: You said 17?
6       MR. ELLIS: Yes, 17.
7       MR. NEUBERGER: Here it is.
8  BY MR. ELLIS:
9  Q. Look at paragraph number 1 that begins in the
10 beginning of the page and read that and tell me if
11 that is describing the occasion in which all these
12 people were at the range looking at the problem.
13 A. (Reviewing document).
14 Q. Is that the meeting you're referring to? I'm
15 sorry. You just spent some time describing some
16 activity at the range involving Doyle Tiller, Mark
17 DeVore and Mark D'Allesandro and also a guy named
18 Whitehouse, who was from the Trane Corporation.
19      Is the description of what they did
20 something you memorialized in paragraph 1 of Exhibit
21 D-17?
22 A. It could be.
23 Q. Now, I don't see any -- I see a description
24 here of what D'Allesandro and Whitehouse are doing.

Page 157

1       Were Tiller and DeVore also in the meeting
2  that you described in paragraph 1 of Exhibit D-17?
3  A. They may have been there on that day. I'm not
4  exactly sure.
5  Q. Do you recall ever putting in writing in any
6  e-mail or other document the fact that Doyle Tiller
7  was refusing to do this testing, the air testing that
8  you wanted done?
9  A. I don't recall at this time if I did.
10      MR. ELLIS: Let me show you Exhibit 28.
11      (Defendant's Deposition Exhibit No. 28 was
12 marked for identification.)
13 BY MR. ELLIS:
14 Q. Have you taken a look at D-28, Sergeant
15 Foraker?
16 A. Yes.
17 Q. First of all, you have identified who Mark
18 D'Allesandro is here. But what's your understanding
19 of what Mark DeVore's responsibility was with respect
20 to the exhaust hood?
21 A. Mark DeVore was in touch with outside engineers
22 that were pricing out the job to move that vent.
23 Q. So that was done by people outside the Delaware
24 state government?

A - 233

Case 1:04-cv-00956-GMS   Document 92-10   Filed 02/02/2006   Page 6 of 14

Price, et al.                                                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1      C.A. # 04-956-GMS                December 13, 2005

Page 158

1  A. It was never done.
2  Q. Do you know why it was never done?
3  A. Probably since the building was closed.
4  Q. This e-mail that's dated December 15, 2003 that
5  goes from you to Ralph Davis has in the subject line
6  "FTU Bullet Trap/Exhaust Hood. There's no discussion
7  in this e-mail about the bullet trap, is there?
8  A. No, there's not.
9  Q. Do you know why you put bullet trap there?
10 A. No, I don't.
11 Q. I'm just curious.
12     Are you the person who arranged with
13 Environmental Solutions Group to have the air quality
14 testing done?
15 A. Yes, I believe so.
16 Q. And did you deal directly with Mr. Farrell?
17 A. Yes, I did.
18     MR. ELLIS: This is 29.
19     (Defendant's Deposition Exhibit No. 29 was
20 marked for identification.)
21 BY MR. ELLIS:
22 Q. Have you had a chance to look at Exhibit D-29?
23 A. Yes.
24 Q. This refers to a meeting that appears to have

Page 159

1  occurred on Wednesday, February 25th.
2      Is that a correct characterization of the
3  first sentence?
4  A. Yes.
5  Q. Do you know who was present at the February
6  25th, 2004 meeting?
7  A. No, I don't recall at this time.
8  Q. Was this a meeting that Lieutenant Colonel
9  MacLeish was at, do you remember?
10 A. It may have been.
11 Q. You don't remember?
12 A. I don't recall at this time.
13 Q. Do you remember who it was that assigned you
14 the task of contacting Clark Nexsen?
15 A. I think these are two things that I said I
16 would do, I volunteered to do.
17 Q. Do you remember who was running the meeting?
18 A. It may have been Captain Warren. It may have
19 been Lieutenant Colonel MacLeish. I don't recall at
20 this time.
21 Q. During the period from January 2004 through,
22 say, April 2004, did Lieutenant Colonel MacLeish give
23 you assignments to do?
24 A. What was the beginning date?

Page 160

1  Q. The beginning of the year, beginning of January
2  of 2004.
3      Did Lieutenant Colonel MacLeish give you
4  assignments?
5  A. Yes. There were numerous things that he wanted
6  us to research or find. There were numerous things.
7  Q. What do you remember that he asked you to do?
8  A. At some point in time, and I don't recall dates
9  and times, but he wanted like MSDS sheets, research
10 ammunitions.
11 Q. What do you mean by "research ammunitions"?
12 A. Research other ammunitions that are out there
13 that we could shoot other than frangible ammunitions.
14 I believe he wanted to get SOP's from other ranges,
15 things like that.
16 Q. Did he ask you to prepare or did he ask you to
17 get an estimate of the cost of repairing what was
18 wrong with the range?
19 A. I know he asked me to bring in an independent
20 expert that was not a contractor that was -- that had
21 no vested interest because when I did bring in Bill
22 Prodencher, who is the expert from the U.S. Navy on
23 building range ventilations, he was considered a
24 contractor and they didn't like the fact that they

Page 161

1  thought he had a vested interest so they didn't take
2  him at his word apparently.
3      So I had to do research and find an
4  independent expert from the Federal Law Enforcement
5  Training Center. So he was a government entity and --
6  I'm trying to think of his name.
7  Q. Metcalf?
8  A. Yes, William Metcalf. And I worked out with
9  getting him, getting approval to get him in. I
10 contacted Faye Veal again at headquarters and she then
11 talked with Major Eckrich on getting the funds to pay
12 the man when he came in, but I don't believe that they
13 ever followed up on that.
14 Q. Well, didn't Metcalf have a problem with his
15 own management letting him do the job?
16 A. He had to get approval through his management
17 and that he did.
18 Q. He told you he had that approval?
19 A. Yes, he did.
20 Q. Going back to Exhibit D-1, which I think is
21 somewhere in front of you, if you look at the second
22 page of D-1, this is MacLeish's e-mail to you of
23 January 5, 2004. He's asking you to get cost
24 estimates for the repairs, isn't he?

A - 234

41 (Pages 158 to 161)

Case 1:04-cv-00956-GMS   Document 92-10   Filed 02/02/2006   Page 7 of 14

Price, et al.                           v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 1   C.A. # 04-956-GMS   December 13, 2005

Page 162

1  A. I'm not exactly clear on what he wants cost
2  estimates on, whether it's the cost to fix the
3  conveyor system, drag system or what.
4  Q. Or the HVAC system?
5  A. Right.
6  Q. Did you ask him?
7  A. I don't recall at this time whether I did or
8  not.
9  Q. Let me maybe try to simplify this.
10     You got an estimate from a company called
11 Carey's Heating and Air Conditioning for something
12 like $2.3 million to fix the problems with the HVAC
13 and the bullet trap at the range?
14 A. Correct.
15 Q. And that was the company that you identified as
16 being the Navy contractor?
17 A. That's correct.
18 Q. And that's Bill Prodencher's company?
19 A. That's correct.
20 Q. Was the reason that you went and got that
21 estimate because somebody said to you go find out how
22 much it will cost to fix the problem?
23 A. Probably so because I know I was also getting
24 Clark Nexsen's report in of what they estimated the

Page 163

1  problem was in 1999. So I was doing that
2  simultaneously, bringing that in as I was getting the
3  information from Carey's.
4  Q. Now, Carey's is not a government agency, right?
5  It's not the Navy itself?
6  A. No. It's an independent contractor.
7  Q. So it's a contractor that does work for the
8  Navy?
9  A. That's correct.
10 Q. Was the question you asked Clark Nexsen in
11 terms of what was wrong with the place the same
12 question you were asking Carey's?
13 A. I believe so.
14 Q. Why were you asking two different engineering
15 companies the same question?
16 A. I guess actually I'm not. I'm asking Clark
17 Nexsen for their report that they put out in '99 to
18 compare to something new that we're going to get in.
19 Q. So you --
20 A. So they could make an intelligent decision
21 again with comparators.
22 Q. I'm sorry. Who could make an intelligent
23 decision?
24 A. So any of the upper echelon, the cabinet

Page 164

1  secretaries and those people.
2  Q. Was the reason you went out and got Carey's
3  estimate because Colonel MacLeish had asked you to get
4  a cost estimate for how much it would cost to fix the
5  problem?
6  A. I believe he was talking about the conveyor
7  system.
8  Q. Okay. Then the question --
9  A. I don't believe that he was talking about
10 anything more than the conveyor system at this point.
11 Q. Under whose authority did you go to talk to
12 Carey's about getting an estimate for fixing the whole
13 range?
14 A. We came up with Carey's Ventilation through Jim
15 Warwick attending a class up in New Hampshire for
16 SIGARMS. He talked to their director of training and
17 their director of training and him conversed over the
18 problems that we were having at the range.
19     He subsequently told Jim Warwick give this
20 number to Chris and have him call out west and
21 eventually get a hold of Carey's. They're apparently
22 one of the best in the business in range ventilation.
23 Q. And was the purpose so that you could figure
24 out what it would cost to fix the problem?

Page 165

1  A. The purpose of me calling him?
2  Q. Yes. Why did you call Prodencher?
3  A. I wanted to try to talk to someone that knows
4  what they're doing because I know that facilities
5  management obviously doesn't and Trane doesn't know
6  what's going on and JAED, who built and engineered the
7  ventilation system, doesn't understand what's going on
8  and how to make a range work.
9  Q. Did Lieutenant Colonel MacLeish also ask you to
10 do something called a responsibility analysis?
11 A. Yes, he did.
12 Q. How did you receive that assignment? Was that
13 over the phone, in person, by e-mail?
14 A. I thought that may have been in a meeting.
15 Q. Do you remember who was at that meeting?
16 A. I know Captain Warren was. I'm not exactly
17 sure who else was there.
18     MR. ELLIS: Let me mark this as No. 30.
19     (Defendant's Deposition Exhibit No. 30 was
20 marked for identification.)
21 BY MR. ELLIS:
22 Q. Have you had a chance to look at Exhibit 30?
23 A. Yes.
24 Q. First of all, do you recall when it was that

A - 235

Case 1:04-cv-00956-GMS   Document 92-10   Filed 02/02/2006   Page 8 of 14

Price, et al.                                                              Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS              December 13, 2005

Page 166

1  you received the assignment to prepare the
2  responsibility status analysis?
3  A. Obviously sometime prior to February 9, 2004.
4  Q. Do you recall how much before February 9, 2004
5  you received the assignment?
6  A. No, I don't recall the exact date at this time.
7  Q. Do you recall -- I think you said earlier that
8  you thought you got the assignment in a meeting with
9  Lieutenant Colonel MacLeish?
10 A. I believe so.
11 Q. Do you remember who else was at the meeting?
12 A. I believe Captain Warren was at the meeting. I
13 don't remember anybody else.
14 Q. Do you remember where the meeting was?
15 A. We have had so many meetings off and on.
16 Q. I understand.
17 A. It could have been at the academy. It could
18 have been at headquarters. I'm sure if it was a
19 meeting it was probably at headquarters.
20 Q. Do you recall whether it was after Captain
21 Warren turned in his current range status and analysis
22 report that we have marked as Exhibit D-2?
23 A. I actually thought that they were due like at
24 the same time. Maybe they weren't.

Page 167

1  Q. Warren's report appears to have been turned in
2  ten days before yours. That's not what you remember?
3  A. That may have happened.
4  Q. My question was really whether you believe that
5  the lieutenant colonel's request for your report on
6  responsibility status analysis was an outgrowth of
7  Greg Warren's report on the current status of the
8  range.
9       In other words, did Warren's report lead
10 to the request that you prepare your report?
11 A. You're asking me that he asked, that Lieutenant
12 Colonel MacLeish asked him -- I guess ask the question
13 again. I'm not following you.
14 Q. Warren's report is dated January 30th.
15 A. I see that, yes, sir.
16 Q. I think that in an earlier e-mail we saw that
17 Captain Warren may have shown you a copy of the report
18 before he turned it into Colonel or Lieutenant Colonel
19 MacLeish.
20       Do you remember that?
21 A. You said there was an e-mail from Captain
22 Warren?
23 Q. I thought I remember this. Just give me a
24 minute here and I will try to find it. I thought I

Page 168

1  remember Captain Warren showing you something.
2       Well, if you look at D-18, the top e-mail
3  on D-18 which is a January 26th, 2004 e-mail from Greg
4  Warren to you says, "I want to review some items with
5  you, prior to submitting my final report to MacLeish."
6       Do you remember him -- I think you
7  testified that you didn't remember actually seeing the
8  report but you were pretty sure that Greg Warren
9  discussed parts of the report with you before he
10 turned it into Colonel MacLeish.
11 A. Yeah. I believe he had some questions to ask
12 me.
13 Q. Do you remember any of the questions?
14 A. Not that I recall at this time.
15 Q. Now, ten days after Warren's report comes out
16 you submit your report to Lieutenant Colonel MacLeish.
17 My question to you was: Do you believe there was
18 something in Greg Warren's report that led the
19 lieutenant colonel to ask you to prepare the
20 responsibility status analysis?
21 A. I don't know what the colonel thought at that
22 particular time.
23 Q. Do you remember anything he said to you when he
24 gave you the assignment?

Page 169

1  A. No. But I do remember talking to Captain
2  Warren afterwards, after receiving the assignment, and
3  I told him "I don't feel comfortable writing this
4  because it's not my expertise. I don't know what we
5  should and shouldn't do. There's other agencies out
6  there that have outside vendors come in."
7       And he said, "Just do the best you can,
8  write it up as best you can," and this is Captain
9  Warren, "because the colonel wants it."
10 Q. What did you understand the colonel to be
11 asking you to tell him?
12 A. What responsibilities at the range would fall
13 on the staff at the range, I guess. That was my
14 thought process in preparing this.
15 Q. Well, as I read your report, which we have
16 marked now as Exhibit D-30, you divided up
17 responsibility for the maintenance of the systems at
18 the range in this report. In other words, you told
19 Lieutenant Colonel MacLeish what you thought would be
20 the most desirable division of responsibility among
21 the various involved entities.
22      Is that an accurate way to characterize
23 the document?
24 A. Okay.

A - 236

Case 1:04-cv-00956-GMS   Document 92-10   Filed 02/02/2006   Page 9 of 14

Price, et al.                         v.                    Chaffinch, et al.
Christopher D. Foraker, Volume 1   C.A. # 04-956-GMS        December 13, 2005

Page 170

1  Q. One of the items involved would be facilities
2  management and in each of your proposals you have a
3  proposal for what facilities management should be
4  responsible for. Isn't that right?
5  A. Correct.
6  Q. And the next line down in both of these options
7  is the Trane Company's responsibility for maintaining
8  filters and that sort of thing, right?
9  A. Correct.
10 Q. And then you propose to retain an outside
11 contractor to maintain the conveyor belt and the
12 mechanical systems related to the operation of the
13 conveyor system, right?
14 A. Right.
15 Q. And you also want another local contractor to
16 handle the hazardous materials that are produced by
17 what goes on at the range. Is that right?
18 A. Correct.
19 Q. And then the last thing you do is you assign
20 certain responsibilities for the cleaning of the
21 target system and the range floor to people that were
22 actually under your command?
23 A. Correct.
24 Q. Now, what is it about that division of

Page 171

1  responsibilities that you don't think is within your
2  area of expertise as a guy who was the head of the
3  firearms training unit?
4  A. What isn't my responsibility?
5  Q. What in this assignment that you got is beyond
6  what you're capable of doing as the firearms training
7  unit NCOIC?
8       In other words, what in this allocation of
9  responsibilities is outside your area of expertise?
10 A. Anything to do with the ventilation system, the
11 issue with the bullet trap.
12 Q. I'm sorry.
13 A. I'm not following you.
14 Q. Maybe you're not following me.
15      The lieutenant colonel didn't ask you to
16 do any of these things, right? He's just asking you
17 to allocate responsibility for who will do them in the
18 future?
19 A. I'm not following you.
20 Q. Is it your understanding that the colonel, the
21 lieutenant colonel at the time wanted you to make a
22 recommendation as to how to divide up responsibility
23 for the various mechanical systems at the range going
24 forward?

Page 172

1  A. Yes.
2  Q. Now, why do you say that that wasn't within
3  your area of expertise?
4  A. Because I hadn't done enough research and I
5  don't think that I'm qualified to say who does what at
6  a range. I just know that we shouldn't be doing
7  certain things at the range. That's what I put in
8  this. This is divvying up responsibilities between
9  organizations. I don't know who's going to do what.
10 Q. Is there anyone under the command of the
11 lieutenant colonel at this time period who is more
12 qualified than you to make a recommendation as to who
13 will be responsible for the various mechanical
14 components of the range?
15 A. I don't think any of us are qualified to make
16 that. I think you need to contact people that are
17 experts in the field and you need to make the
18 corrections to the ventilation system and the systems
19 there and ensure that they work in order to know what
20 responsibilities and how those responsibilities can be
21 divvied up.
22      I felt very uncomfortable creating this
23 because I don't know what they're going to do. I
24 don't know if they're ever going to fix that range and

Page 173

1  it sounds like they're not.
2  Q. In the first page of your report you set forth
3  the conditions under which you believe your
4  recommendations would be valid, don't you?
5  A. Right.
6  Q. In other words, you say that this document is
7  prepared and based on the completion of all
8  renovations and all structural and cosmetic
9  alterations in accordance with Carey's specifications,
10 right?
11 A. Correct.
12 Q. So you did, in fact, go to people who you
13 thought knew what they were doing in order to prepare
14 your recommendation, didn't you?
15 A. But I don't know what the state is going to do.
16 Q. Well, you weren't asked to answer that
17 question, were you? I mean, you were asked to make a
18 recommendation as to how you as the head of the FTU
19 would divide responsibility, right?
20 A. I guess you can characterize it that way, yes.
21 Q. And that's what you did, right?
22 A. I did the best I could with little knowledge.
23 Q. Now, prior to making the recommendation you had
24 talked to the representative from Carey's, right?

44 (Pages 170 to 173)

Case 1:04-cv-00956-GMS     Document 92-10     Filed 02/02/2006     Page 10 of 14

Price, et al.                                              Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS    December 13, 2005

Page 174

1  A.  Yes. I talked to him numerous times.
2  Q.  And you also had the benefit of the Clark
3  Nexsen report from 1999, right?
4  A.  As soon as I got it, I handed that over up the
5  chain of command for them, for the executive staff to
6  have it.
7  Q.  Did you read it yourself?
8  A.  I glanced at it to see how it compared to the
9  Carey's report and it was very, very close, very
10 similar.
11 Q.  In other words, both organizations had looked
12 at the problem and analyzed it pretty much the same
13 way?
14 A.  Correct. And the problem that they both
15 analyzed and the problem they come up with was the
16 ventilation problem. The ventilation system is too
17 small. It can't move the air out of the respiratory
18 zone.
19     And when I see the smoke test and when I
20 see the smoke from a muzzle blast traveling backwards
21 I have to tend to agree that they are absolutely
22 correct.
23 Q.  You supported Carey's proposal to fix the
24 range, right?

Page 175

1  A.  I support a fix of the range and nothing short
2  of that. And I know that Carey's would fix the range.
3  Even in a meeting with Mark DeVore, Mark DeVore, an
4  engineer, he said after the presentation with Carey's
5  he said absolutely that would, that would make vast
6  improvements at the range.
7  Q.  Carey's proposal included a change in the
8  bullet trap system, didn't it?
9  A.  Correct.
10 Q.  What was the change in the bullet trap system?
11 A.  To a dry system. With that particular system
12 you can shoot anything and it was also under...
13     It's a vacuum. The deceleration chamber
14 is under vacuum. So it will capture all particulates
15 that are coming off any rounds that go in there. So
16 it would be a much cleaner way than the hazards that
17 we were experiencing with the ventilation system that
18 wouldn't draw out the contaminants and then also on
19 the bullet trap itself it would have a vacuum on it to
20 suck in particulates, airborne particulates.
21 Q.  When you say it has a vacuum, you just mean it
22 has negative pressure, right? You don't mean it's
23 really a vacuum in the deceleration chamber, do you?
24 A.  No. It's under a negative pressure, yes, that

Page 176

1  draws in particulates and it has a HEPA filter on it
2  and everything.
3  Q.  Why did you provide a copy of this report
4  that's D-30 to Greg Warren and Ralph Davis before you
5  submitted it to MacLeish?
6  A.  Because they're in my chain of command.
7  Q.  Did Lieutenant Colonel MacLeish tell you to
8  send it up through the chain of command?
9  A.  No. But I followed the chain of command and
10 that's generally the way you do things. It's a
11 paramilitary organization and I am only a sergeant.
12 Q.  Did you actually have a meeting with Lieutenant
13 Colonel MacLeish on February 10, 2004?
14 A.  What was the date?
15 Q.  Look at D-30.
16 A.  Okay.
17 Q.  Did you actually have a meeting with Lieutenant
18 Colonel MacLeish on February 10th of 2004?
19 A.  I'm not exactly sure, the reason being is I
20 know I was flying either that day or the following day
21 out west. So I'm not exactly sure if we had that
22 meeting. We may have.
23 Q.  Do you remember a meeting with Mark DeVore,
24 Doyle Tiller, Major Eckrich, Lieutenant Colonel

Page 177

1  MacLeish, yourself and Greg Warren?
2  A.  That's quite possible, yes.
3  Q.  At which you discussed things like the cost of
4  cleaning up the range?
5  A.  (Pause).
6  Q.  Do you remember a meeting where all of those
7  things were discussed?
8  A.  Cost of cleanup?
9  Q.  Yes.
10 A.  I wouldn't have anything to do with the cost of
11 cleanup.
12 Q.  I'm not saying that you did. But it was
13 discussed at the meeting that you were present at. Do
14 you remember any of that?
15 A.  That may have been discussed. That wouldn't
16 have pertained to me.
17 Q.  Do you remember a discussion between MacLeish
18 and the facilities people over who would be
19 responsible cost-wise for the cleanup?
20 A.  I don't recall that.
21 Q.  Do you remember any discussion between MacLeish
22 and the facilities people in which the facilities
23 people said that they believed that the air-handling
24 system was working correctly?

Case 1:04-cv-00956-GMS    Document 92-10    Filed 02/02/2006    Page 11 of 14

Price, et al.                                         v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1        C.A. # 04-956-GMS              December 13, 2005

Page 178

1  A. That's what they have always said.
2  Q. Do you remember anything more about that
3  meeting other than that you might have been there?
4  A. At this point in time I don't recall.
5  Q. Do you remember any discussion of this report
6  that you gave to the lieutenant colonel at the
7  meeting?
8  A. No. I don't recall discussing it with him.
9  Q. Well, do you remember being asked by the
10 lieutenant colonel to prepare range standard operating
11 procedures for hygiene at the range?
12 A. Again, I have no expertise in that field. We
13 don't know what kind of system we're going to wind up
14 having. We don't know how it's going to work. We
15 have nothing on any blueprint of how it's going -- all
16 we have is the Clark Nexsen report from '99 and we
17 have the new report from Carey's, which they basically
18 are not going to use.
19       So you have to know what you have in a
20 facility before you can make SOP's and I didn't feel
21 comfortable with making any SOP until you have what
22 you have and now you know what to do with what you
23 have. And I would definitely want someone who is
24 trained in that expertise like, say, hazardous

Page 179

1  material abatement, noise abatement. Those are things
2  that have never been done. There's never been any
3  noise abatement done and facilities management has not
4  kept up on swipe samples to see if the facility is
5  clean the way it should be.
6       We have no standard to follow. So without
7  any standard to follow, I mean it's like the standard
8  for 75 feet per minute of airflow out of the
9  respiratory zone. We don't have any standard.
10 Q. I recognize that you don't have any standard.
11 But who within the State Police in your view is
12 responsible for creating the standard?
13 A. The policymakers.
14 Q. Who are you referring to as "the policymakers"?
15 A. The policymakers are the executive staff.
16 Q. And why do they have any more expertise than
17 you do concerning the range?
18 A. Not that they have any more expertise, but they
19 should be bringing in the experts to tell us how to do
20 it. We have offered to bring in NIOSH for free and
21 they refused NIOSH.
22 Q. Is there any --
23 A. NIOSH will do that for free. They will come in
24 and test your facility, tell you how to fix it if it's

Page 180

1  broken. They will tell you what you need as far as
2  SOP's and what guidelines to follow, how to monitor
3  each person, how to monitor the building.
4       We were bringing them in for free. It's a
5  federal agency and they refused them. Facilities
6  management flat-out refused them and so did the State
7  Police.
8  Q. Is there anybody in the State Police who has
9  more familiarity with the operation of the firing
10 range building than you do?
11 A. There's several people that have probably about
12 the same.
13 Q. And who would that be?
14 A. Sergeant Fitzpatrick, Sergeant Parton.
15 Q. People that have been in your job before you?
16 A. Kurt Price. He's been there since it was
17 built. Corporal Warren as well.
18       MR. ELLIS: One more document?
19       MR. NEUBERGER: Yes, one more. He has ten
20 more minutes.
21       MR. ELLIS: I think we're up to Exhibit
22 31.
23       (Defendant's Deposition Exhibit No. 31 was
24 marked for identification.)

Page 181

1  BY MR. ELLIS:
2  Q. Take a look at this, please, Sergeant Foraker,
3  and tell me what it is.
4  A. (Reviewing document). Did you tell me to read
5  the entire document or something in particular?
6  Q. Do you recognize the document, first of all? I
7  don't know that you necessarily need to read the whole
8  thing, but you're welcome to do that if you want to.
9  A. Yes. This was prepared by Jim Warwick.
10 Q. I take it that's why Warwick is sending it to
11 you on March 31, 2004 because he prepared it?
12 A. Yes.
13 Q. Why was Warwick preparing this report? Do you
14 know?
15 A. He had done some research, contacted this
16 company called Ramcor. They are the cleaning and
17 maintenance vendor for the Federal Law Enforcement
18 Training Center in Cheltenham, Maryland. They had
19 some experts in hazardous abatement of heavy metals
20 and so forth.
21       He contacted them, talked to them and then
22 prepared this document as far as responsibilities of
23 this, of what he saw that may -- this is my belief, is
24 that he wrote this in conjunction with what they may

Case 1:04-cv-00956-GMS   Document 92-10   Filed 02/02/2006   Page 12 of 14

Price, et al.                                        v.                    Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS    December 13, 2005

Page 182

1  do and what we don't do at the DSP firing range.
2  Q. Was this report prepared in response to a
3  request by somebody above you in the State Police?
4  A. I believe it may have been.
5  Q. Do you remember who asked for it?
6  A. It may have been Lieutenant Colonel MacLeish.
7  Q. When you say, "It may have been," it may not
8  have been? What makes you say it may have been but
9  you're not sure?
10 A. It may have been him because he was asking for
11 a number of different things at one time.
12 Q. Did you turn this report into Lieutenant
13 Colonel MacLeish?
14 A. I believe so.
15 Q. Were you at a meeting with him where you turned
16 it into him?
17 A. I don't recall at this time.
18 Q. Do you remember having any discussion with him
19 about it?
20 A. No, I don't recall any conversation with him
21 about it.
22        MR. NEUBERGER: We're going to break here?
23        MR. ELLIS: Yes.
24        MR. NEUBERGER: We're going to recess.

Page 183

1       (Deposition recessed at 4:20 p.m.)
2
3              I N D E X
   DEPONENT: CHRISTOPHER D. FORAKER        PAGE
4
       Examination by Mr. Ellis           2
5
6              E X H I B I T S
7  DEFENDANT'S DEPOSITION EXHIBITS         MARKED
8  17 Document Bates stamp numbered FTU2351-
      2352                               39
9
   18 Document Bates stamp numbered FTU2364   41
10
   19 Document Bates stamp numbered FTU2316   92
11
   20 Document Bates stamp numbered FTU3586-
12    3588                              100
13 21 Document Bates stamp numbered FTU2320   121
14 22 Document Bates stamp numbered FTU2317   130
15 23 Document Bates stamp numbered FTU2318   131
16 24 Document Bates stamp numbered FTU2462   135
17 25 Document Bates stamp numbered FTU2640   137
18 26 Document Bates stamp numbered FTU2643   141
19 27 Document Bates stamp numbered FTU2363   147
20 28 Document Bates stamp numbered FTU2321   157
21 29 E-mail to Gregory A. Warren and Ralph H.
      Davis from Christopher D. Foraker dated
22    February 27, 2004                  158
23 30 Document Bates stamp numbered FTU2429-
      2433                              165
24

Page 184

1  DEFENDANT'S DEPOSITION EXHIBITS         MARKED
2  31 Document Bates stamp numbered FTU2599-
3     2602                              180
4
5  ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 185
6
7  CERTIFICATE OF REPORTER                PAGE 186

Page 185

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.


A - 240

Case 1:04-cv-00956-GMS   Document 92-10   Filed 02/02/2006   Page 13 of 14

Price, et al.                                    v.                            Chaffinch, et al.
Christopher D. Foraker, Volume 1    C.A. # 04-956-GMS    December 13, 2005

Page 186

1  State of Delaware    )
                        )
2  New Castle County    )
3
4           CERTIFICATE OF REPORTER
5
        I, Kurt A. Fetzer, Registered Diplomate
6  Reporter and Notary Public, do hereby certify that
   there came before me on Tuesday, December 13, 2005,
7  the deponent herein, CHRISTOPHER D. FORAKER, who was
   duly sworn by me and thereafter examined by counsel
8  for the respective parties; that the questions asked
   of said deponent and the answers given were taken down
9  by me in Stenotype notes and thereafter transcribed by
   use of computer-aided transcription and computer
10 printer under my direction.
11      I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12 examination of said witness.
13      I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16
17      Kurt A. Fetzer, RDR, CRR
        Certification No. 100-RPR
18      (Expires January 31, 2008)
19
   DATED:
20
21
22
23
24

A - 241



**WILCOX & FETZER LTD.**

In the Matter Of:

# Price, et al.

v.

# Chaffinch, et al.

C.A. # 04-956-GMS

---

Transcript of:

# Christopher D. Foraker

Volume # 2

December 22, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A - 242