Not Reported in A.2d                                                                                      Page 20
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Hospital in Harrisburg on February 2, 1975 and released on February 21, 1975. The medical records indicate family problems. Martin claims that he had announced to his parents that he was going to drop out of high school. Consequently, the police were called from whom Martin was attempting to escape. The records note that, "The patient screamed and rambled in his speech and around the house and said that he had been transformed and resurrected and had super-natural powers." ID p. 10-BJ, CITE [sic] Martin characterizes these records as "inaccurate and greatly exaggerated."

*24 The second admission from April 2nd to May 10th was to Philhaven Hospital. This confinement allegedly was due to Martin's behavior which, at that time, was deemed, "[sic] .. irrational, bizarre, hyperactive and violent." ID. p. 10-BJ.

Martin claims that the attending psychiatrist at Philhaven advised him to answer "no" to the question. Martin also alleges that the confinements were illegal which he feels justifies his negative answer to the question.

To complicate matters, Martin is pursuing another federal lawsuit against the bar examining committee in New Jersey. Apparently, after passing the New Jersey bar, Martin was sent the official certificate recognizing him as an attorney in New Jersey in April, 1984. Shortly thereafter, however, Martin received a letter from the New Jersey Supreme Court clerk stating that the certificate issued was a mistake. The letter further explained that Martin's character was still under review. As of February of this year (1990), the case was pending before the New Jersey Supreme Court.

In addition to the "knowing misrepresentation," the New Jersey bar examiners are also concerned with Martin's alleged propensity to file law suits.

"Any potential problem which Mr. Martin has encountered in his life seems to be answered by a lawsuit rather than by any other method of attempting to deal with it, "[sic] said Mary Maudsley of the New Jersey Supreme Court's Committee on Character. ID. P. 10-BJ.

Other law schools are not certain whether they would have pursued the same course of action as that of DLS. Robert Weisberg, law professor and former dean of Stanford University was quoted by the Philadelphia Inquirer [sic] as saying, "This is not only an inappropriate question, this is cruel. It's putting cruel pressure on people to lie. I would be very reluctant to tell the bar." Id. 10-BJ. Dean Santoro was asked to comment on this case, but was obviously not at liberty to do so.

APPENDIX C

STATEMENT OF RELATED CASES

*Martin v. ETS, Inc.,* C3909-79, 179 NJSuper. 317 (1981)

*Martin v. PA Real Estate Commission,* 9 C.D.1983

*Martin v. PA State Real Estate Commission, et. al.,* 85-2349 ED

*Martin v. Mrvos and Sinibaldi,* 3rd Cir. 88-5005, *IN RE: James Lee Martin,* 87-6622, Man./Proh. den., 108 S.Ct. 1756 (1988), *reh. den.,* 108 S.Ct. 2889 (1988) *reh. den.,* 6-27-88.

*Martin v. PA State Real Estate Commission, et. al.,* 89-5271, *cert. den.,* 110 S.Ct. 220 (1989) [Justice Brennan took no part in the consideration or decision of this petition], *reh. den.,* 11-27-89, at 110 S.Ct. 532 (1989)

*Martin v. PA State Real Estate Commission, et. al.,* --- U.S. ----, *cert. pet. pending.*

*Martin v. Sample, et. al.,* 81-1114, filed on 9-25-81, Middle Dist. PA, *cert. den.,* 459 US 850, *reh. den.,* 459 US 1024 (1982)

*IN RE: APPEAL OF JAMES L. MARTIN from PennDOT, Bureau of Traffick Safety Operations;* Civil Action-Law, Trust Book 47, p. 30, Lancaster County Court of Common Pleas, PA (2 cases).

*25 *IN RE: James Lee Martin,* 87-278, DC Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 583

Not Reported in A.2d                                                                 Page 21
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

of App., *den., reh. en banc pending.*

*Martin v. DC Court of App., et. al.,* 89-2789 (TPJ)

*Martin v. PA Board of Law Examiners,* 143 E.D.PA Sup. 84, *cert. den.,* 471 US 1022, *reh. den.,* 471 US 1120 (1985)

*Martin v. PA Board of Law Examiners, et. al.,* 86-1363, E.Dist. PA., 3rd Cir. *app.* at 86-1719, *consolidated with DLS et. al.,* 85-53 (JJF), *app.* to 3rd Cir. at 88-3428. Both *app. dis. w/o prejudice* for lack of juris. on 3-24-87, with *sua sponte* amendment on 4-22-87 to specify that dismissal related exclusively to DLS at 85-53. In interim, I wrote to Judge Huyett to request that the matter be finally resolved, but he refused, so I app. to 3rd Cir. at 87-1440. My app. was dismissed as "frivolous," but the recusal and disqualification on 12-7-87 rendered it rather dubious. Pet. for Writ of Cert. filed on 12-17-87 at 87-6072, *cert. den.,* 2-22-88; *reh. den.,* 3-28-88; supplemental brief was returned. Rule 60(b) Motion filed in E. Dist. of PA on 7-16-88. Huyett denied it on 8-15-88. [Motion for Reopen and to Certify for Interlocutory Appeal.]

*Martin v. Supreme Court of PA, et. al.,* app. to 3rd Cir. at 89-1088, 877 F.2d 56,

*cert. den.,* 89-5211, 110 S.Ct. 213 (1989), *reh. den.,* 89-5211, 11-13-89, 110 US 421 (1989)

2nd time, *cert. den.,* 89-7118, on 5-29-90, *reh. den.,* 89-7118, on 6-28-90.

*IN RE: James Lee Martin,* Misc.Dkt. 89-0207, E. Dist. of PA, Pet. for Writ of *Man./Proh.* against Kunz; app. to 3rd Cir. at 89-1618;

pet. for Man./Proh. in US on 1-24-90 at 89-6551, *man./proh. den.,* 3-19-90, *reh. den.,* 5-14-90,

pet. for cert. in US on 3-2-90 at 89-6839, *cert. den.,* 4-30-89, *reh. den.,* 6-11-90.

*IN RE: Application of James Lee Martin,* No. 17,835-17, NJ Committee on Character

*Martin v. Townsend, et. al.,* 86-1352, NJ DC,

87-5270, 826 F.2d 1056, *cert. den.,* 108 S.Ct. 191 (1987)

*Martin v. Townsend, et. al.,* 88-7435, 875 F.2d 311, *cert. den.,* 110 S.Ct. 212 (1989), *reh. den.,* 110 S.Ct. 524 (1989).

*IN RE: James L. Martin,* US, rec'd on 3-22-90 but returned to me on 3-23-90. I resubmitted it as a Writ of Cert. on 3-26-90, but it was returned to me again on 3-29-90. I resubmitted it on 3-30-90, but they were returned to me again on 4-4-90, without filing.

*Martin v. Townsend, et. al.,* Mot to Reinstate denied again, *app.* to 3rd Cir. 90-5417, *app. aff., reh. en banc den., cert. den.,* 90-6230, --- U.S. ----, 1-7-91, *reh. pending.*

*Martin, et. al., v. Townsend, et. al.,* (CSF), 90-2616, NJ Dist., *dis., reh. pending.*

*IN RE Application of James M. for Adm. to MD Bar,* Misc. No. 3-Sept. Term 1988, app. to US, 88-5084, appeal dis. for want of juris., reformed as cert. pet., *cert. den.,* 10-3-88, *reh. den.,* 11-7-88.

*MD Court of Appeals, et. al.,* 88-1999 DC MD, app. to 4th Cir., 88-1749 870 F.2d 655; 88-7103, *cert. den.,* 109 S.Ct. 3195, *reh. den.,* 110 S.Ct. 14 (1989), Motion for Stay rec'd on 7-3-89 is returned 7-7-89; stay motion resub. on 7-31-89 is returned again on 7-19-89; resubmitted stay motion is returned for 3rd time on 8-11-89.

*\*26 IN RE: Application of James Lee Martin for Adm to VA Bar.* Passing score deemed failure.

*Martin v. VA Board of Bar Examiners, et. al.,* 88-0269-R, *app.* to 4th Cir. at 88-1752, consolidated with MD Court of Appeals for disposition in 4th Cir. 870 F.2d 655; pet. for writ of cert, US, 88-7103, *cert. den.,* 109 S.Ct. 3195, *reh. den.,* 110 S.Ct. 14 (1989), Motion for Stay rec'd on 7-3-89 is returned 7-7-89; stay motion resub. on 7-31-89 is returned again on 7-19-89; resubmitted stay motion is returned for 3rd time on 8-11-89.

*IN RE Application of James Lee Martin to the DE*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 22
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*Bar;*

(1) app. filed with DE Sup. on 4-19-89, 190, 1989; *IN RE: James Lee Martin,* 88-7221, *Man./Proh. den.,* 110 S.Ct. 222 (1989), *reh. den.,* 110 S.Ct. 420 (1989);

(2) app. again filed with DE Sup. on 7-2-90, *app. dismissed* 10-22-90, *reh. en banc den.,* 11-5-90, *cert. pending* at No. 90-6229, --- US ----.

*Martin v. Sparks, et. al.,* 90-235, D.DE, pending.

*Martin v. DLS, et. al.,* 85-53 (JJF), 625 F.Supp. 1288, 884 F.2d 1384, *cert. den.,* 110 S.Ct. 411 (1989), *reh. den.,* 110 S.Ct. 766 (1990)

*Martin v. DLS, et. al.,* 88-768 DC Dist, app. to DC Court of App. for DC Cir. at 89-7024, 89-5210, *cert. den.,* 110 S.Ct. 212 (1989), *reh. den.,* 110 S.Ct. 421 (1990)

*IN RE: James L. Martin,* 88-5988, --- US ----, pet for *man./proh. den.* on 2-21-89, motion for leave to file *reh. den.,* 11-6-89.

*Martin v. DLS, et. al.,* 88-3420, E.Dist. of PA., pending.

*Martin v. Shank, et. al.,* 86-2205, Dist. of MD,

(1) app. to 4th Cir. at 87-2039,

(2) app. to 4th Cir. at 87-2040,

(3) app. to 4th Cir. at 87-2100; pet. for writ of cert., 89-7126, *cert. den.,* 5-29-90, *reh. den.,* 6-28-90

(4) app. to 4th Cir. at 87-2162, *IN RE: James Lee Martin,* 87-6616, *Man./ Proh. den.,* on 5-16-88, 108 S.Ct. 1757 (1988), *reh. den.* on 6-27-88, 108 S.Ct. 2888 (1988).

(5) app. to 4th Cir. at 87-2177, 838 F.2d 1210;

(a) *IN RE: James Lee Martin,* 87-6790, *Man./Proh. den.* on 6-6-88, 108 S.Ct. 2045 (1988), *reh. den.,* on 6-30-88, 108 S.Ct. 2921 (1988)

(b) *Martin v. Shank, et al.,* 87-6903, *cert. den.* 6-27-88, *reh. den.,* on 9-15-88

*Martin v. Shank, et. al.,* 86-1748, DC, *app.* to DC Cir., 87-7088, pet. for writ of *cert. den.* on 10-3-88 at 87-7005; *reh. den.,* 11-7-88 at 87-7005

*Martin v. Shank, et. al.,* DC Cir. 87-7008, pet. for writ of *cert. den.* on 2-21-89 at 88-6145, *reh. den.* on 3-27-89 at 88-6145 [re costs for appendix and briefs]

*In the Matter of James Lee Martin,* Case Ref. No. 03852042, US Dept. of Education, *app.* to DC Dist. 88-1788, app. to DC Cir., pet. for *cert.* 89-7669, *den.,* 10-1-90, *reh. den.*

*Martin v. US Dept. of Education,* No. 90-2492 (TPJ), DC Dist., *pending.*

*Martin v. Wilson, PA State Police, et. al.,* 88-2300 (ED Pa.), *pending.*

*Martin v. Farnan,* 89-8008, 3rd Cir.; *IN RE: James Lee Martin,* 89-6594, *man./ proh. den.,* 3-19-90; *reh. den.,* 4-30-90.

*27 *Martin v. Farnan,* 90-8035, 3rd Cir.;

(1) 89-7446, *cert. den.,* 6-28-90, *reh. den.*

(2) 89-7700, *cert. den.,* 10-1-90, *reh. pending.*

*Martin v. Farnan,* 89-8088, 3rd Cir.; *v. Farnan,* 89-7817, --- US ---- pet. for writ of *cert. den.,* 10-1-90, *reh. den.*

*Martin v. Farnan,* 90-8102, 3rd Cir., *man. den., reh. en banc pending.*

*Martin v. Huyett,* 89-8011, 3rd Cir.; *IN RE: James Lee Martin,* 88-7157, *Man./ Proh. den.,* 109 S.Ct. 3231 (1988), *reh. den.,* 110 S.Ct. 15 (1989)

*Martin v. Huyett,* 89-8076, 3rd Cir.;

(1) *James Lee Martin v. US Court of Appeals for the 3rd Cir.,* 89-6098, *cert. den.,* 1-16-90, *reh. den.,* 3-5-90

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 23

(2) *Martin v. Huyett,* 89-7449, *cert. den.,* 6-28-90, *reh. den.,* 8-13-90;

*Martin v. Huyett,* No. 90-8101, 3rd Cir., *man. den., reh. en banc pending.*

*Martin v. Fisher,* No. 90-8103, 3rd Cir., *man. den., reh. en banc pending.*

*IN RE: James L. Martin,* No. 4, 1989, Leb. Orphans Ct., app. to PASuper., 118 HBG 89, pet. for allow. of app. to PA Sup., 233 M.D.Alloc. Dkt. 89, *cert. den.* at 89-7119 on 5-29-90 in *Martin v. PA Supreme Court, reh. den.,* 6-28-90.

*Martin v. Walmer, et. al.,* 90-2752 (E.Dist. of PA), *dis.* on 9/26/90, *recon. den.* (Huyett ignored unopposed Motion to Recuse), app. to 3rd Cir. pending at No. 91-1010.

*Joyce E. Richards and James L. Martin v. Medical Center of DE, Inc., et. al.,* No. 90-6373, --- US ----, *pet. for writ of cert. pending.*

*Bucher, Martin, et. al. v. Omega Medical Center Assoc., L.P.,* No. 90-3461, 3rd Cir., *aff., reh. en banc den., pet. for writ of cert.* for filing in US has been served.

I view the "related cases" section narrowly and therefore do not include many other cases that could otherwise be considered "related.".

APPENDIX D

MEDICAL AUTHORIZATION AND RELEASE

I, James L. Martin, soc. sec. no. 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, 5/31/53 birthdate, hereby authorize Dr. Eric S. Copeland, 513 Twadell Mill Rd.; Wilm., DE, 19807 to procure any medical records pertaining to neuropsychiatric impairment about me from Rebecca Jaffe, M.D., 1941 Limestone Rd.; Suite 107; Wilmington, DE 19808. To the extent no such impairment has been diagnosed, this request may be satisfied with a signed statement suggested below.

This authorization is good for ninety (90) days.

DATE /s/June 24, 1989

/s/JAMES LEE MARTIN

STATEMENT OF REBECCA JAFFE, M.D.

I have no reason to believe James Martin is mentally or neuropsychiatrically impaired and have been his doctor for the past five (5) years.

DATE /s/last seen 11/15/88, /s/signed 7/5/89

/s/Rebecca Jaffe, M.D.

APPENDIX E

WAIVER OF CONFIDENTIALITY

I, James L. Martin, at 912 McCabe Ave.; Wilm., DE 19802 (soc. Sec. # 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) hereby waive any confidentiality rights to the file about me at the Delaware Law School (now Widener University School of Law) under 20 USC Sec. 1232 [Buckley Amendment], and that Dr. Eric S. Copeland may obtain copies of all such records and/or access to them at such time as may be arranged between the School and him. This waiver shall remain effective for as long as may be necessary to access all such records.

*28 DATED: August 30, 1989

BY: /s/James L. Martin

MEMORANDUM OPINION

*Upon Motion of Plaintiff for Reargument-DENIED*

Plaintiff, James L. Martin [Martin] has filed a motion for reargument of this Court's opinion of June 4, 1992. In that opinion, the Court denied Martin's motion for summary judgment and granted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 586

Not Reported in A.2d                                                                                                Page 24
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

the defendants' motion to dismiss on the pleadings.

Martin now seeks reargument on the basis of various federal legislation involving discrimination and disabilities. The role of this legislation in Martin's current claims against the defendants was reviewed by the United States District Court for Delaware in its opinion of *Martin v. Delaware Law School of Widener University,* D.Del., 625 F.Supp. 1288 (1985), *aff'd.* 884 F.2d 1384 (3rd Cir.1989), *cert. denied,* 493 U.S. 966, 110 S.Ct. 411, 107 L.Ed.2d 376 (1989), *rehearing denied,* 493 U.S. 1038, 110 S.Ct. 766, 107 L.Ed.2d 781 (1990). It was also considered in the case of *Martin v. Walmer,* D.C.E.D.Pa., C.A. No. 90-2752, Huyett, J. (September 26, 1990).

For all of the reasons discussed in this Court's opinion of June 4, 1992 dealing with the issue of claim and issue preclusion, Martin's arguments in his motion to reargue have been explored thoroughly by courts of competent jurisdiction and now cannot be raised again. In addition, the points which he makes in his current motion for reargument were considered by the Court in reaching its decision announced on June 4, 1992.

Accordingly, James L. Martin's motion for reargument is DENIED.

IT IS SO ORDERED.

  FN1. Formerly Delaware Law School.

  FN2. *See Martin v. Delaware Law School of Widener University,* D.C.Del, 625 F.Supp. 1288, 1293 n. 1 (1985) detailing litigation on this issue.

  FN3. This letter has not been made a part of the record.

  FN4. Copeland was or is a co-plaintiff of Martin's in another lawsuit. *Copeland, et al. v. Omega Medical Center Associates,* D.C.Del. C.A. No. 91-193. Copeland is or was a co-plaintiff with Martin in a consolidated appeal involving the boards of bar examiners of several states, including Delaware and the New Jersey Supreme Court and Widener. *Martin, Copeland v. Townsend,* No. 91-5085, (3rd Cir. June 3, 1991) (ORDER).

  FN5. The *Inquirer* article itself indicates that a controversy exists over whether Widener should or should not have communicated to the various boards of bar examiners Martin's incorrect answer.

  FN6. Refer to Appendix C.

  FN7. There is no indication Martin sued the *Inquirer* for the article which formed the basis of the *Forum* article.

  FN8. The *Lund* court referred to the four-part test found in *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1302 (8th Cir.1986), *cert. denied* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). *Janklow* adopted the *Ollman* four-part test.

  FN9. In *Harte-Hanks,* actual malice has been defined to include a high degree of awareness of probable falsity, or the media defendant entertained serious doubts as to the truth of his publication. *Harte-Hanks,* 491 U.S. at 667; 109 S.Ct. at 2685-86, 105 L.Ed.2d at 576.

  FN10. *See footnote 9, supra.*

Del.Super.,1992.
Martin v. Widener University School of Law
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                                 Page 1
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
   Superior Court of Delaware, New Castle County.
   **Q-TONE** BROADCASTING, CO., a Delaware corporation, and Anthony J. Quartarone, Plaintiff,
v.
MUSICRADIO OF MARYLAND, INC., a Maryland corporation, Donald Duckman, and Donald O'Brian, Defendants.
**No. CIV. A. 93C-09-021.**

Submitted: Aug. 1, 1994.
Decided: Aug. 22, 1994.

Upon Defendant's Motion to Dismiss-GRANTED in Part DENIED in Part.

David L. Finger, Biggs & Battaglia, Wilmington, for plaintiffs.
Daniel F. Wolcott, Jr., Gayle P. Lafferty, Potter, Anderson & Corroon, Wilmington, for defendants.

OPINION

SILVERMAN, Judge.
*1 This is a case of defamation. The parties compete in the field of radio broadcasting. Plaintiffs say Defendants went too far in Defendants' disparagement of Plaintiffs, some of which occurred on the air. Defendants have moved to dismiss. The Court must now consider whether Defendants' alleged statements are defamatory. If they are, the Court must consider whether they are libel or slander. If they are slander, the Court must further consider whether they are slander *per se* and if they are not, whether Plaintiffs have pleaded sufficient special damages.

I.

On September 3, 1993, Plaintiffs filed their initial complaint alleging libel, slander, and false light invasion of privacy. On January 6, 1994, Defendants filed this Motion to Dismiss for failure to state a claim. After reviewing the motion, the Court ordered briefs. In the meantime, on February 8, 1994, Plaintiffs filed a Motion to Amend their complaint in order to plead special damages. The Court granted Plaintiffs' Motion to Amend on February 18, 1994. On July 8, 1994, after the parties briefed the instant motion, Plaintiffs submitted the recently decided *Ward v. Zelikovsky*, N.J.Supr., No. A-48, 1994 WL 275341, Garibaldi, J. (June 20, 1994). With the Court's permission, Defendants responded by letter on August 1, 1994. This is the Court's decision on Defendants' Motion to Dismiss.

II.

In determining, under Super.Ct.Civ.R. 12(b)(6), whether to grant a motion to dismiss for failure to state a claim, the Court must accept all well-pleaded allegations as true. *Spence v. Funk,* Del.Supr., 396 A.2d 967 (1978). If plaintiff can recover "under any reasonably conceivable set of circumstances susceptible of proof under the complaint," the motion must be denied. *Id.* The Court is mindful that Plaintiffs have yet to develop the facts fully through discovery and that dismissal forecloses any possibility of Plaintiffs' establishing a claim.

III.

Viewing the facts in the light most favorable to Plaintiffs, it appears that Plaintiffs are owners of WRKE, a 3,000 watt radio station broadcasting over Sussex County in Delaware, several adjacent counties in Maryland and a portion of the coast of Virginia. Defendant, MusicRadio of Maryland, Inc., owns and operates WOCQ, another 3,000 watt station broadcasting over an area almost identical to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 588

Not Reported in A.2d                                                                                                          Page 2

Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

WRKE. Planitiff Quartarone is a WRKE on-air personality, "Tony Q." Defendant Duckman is program director and an on-air personality for WOCQ. Defendant O'Brian is an on-air personality for WOCQ. WRKE and WOCQ are " urban contemporary" stations. They compete for the same demographic audience and for advertisers in the same radio market.

Apparently, this case started in the summer of 1993 when WOCQ agreed to act as a sponsor of a contemporary musical concert at the Wicomico Youth and Civic Center in Salisbury, Maryland. WRKE made a deal with the Civic Center for free tickets in exchange for free radio advertising for the concert. According to WRKE, when WOCQ learned that WRKE was giving away tickets to the concert WOCQ was sponsoring, WOCQ went ballistic. Specifically, WRKE alleges that:

*2 WOCQ engaged in an on-air campaign of false and defamatory statements aimed at WRKE and Quartarone, designed to injure the reputation and standing of WRKE and Quartarone among listeners, advertisers and others in the community.

According to Plaintiffs' Second Amended Complaint, Defendants disparaged Plaintiffs in two, general ways. Defendants allegedly made defamatory comments about Plaintiffs over the air. Defendants also allegedly made disparaging remarks about Plaintiffs to advertisers and other individuals with whom Plaintiffs did business.

A. On-Air Remarks

The Plaintiffs allege:
On more than one occasion, Duckman stated on the air that WRKE was "the biggest liar in town" for stating that it had concert tickets to offer to its listeners, thereby suggesting that WRKE was intentionally deceiving its listeners. Duckman also stated on at least one occasion that WRKE had lied to personnel at the Civic Center to obtain the concert tickets, thereby suggesting that WRKE obtained property under false pretenses.
On or about June 22, 1993, O'Brian, while on the air, placed a telephone call to Duckman at his home, to inquire about WRKE's advertising that they had concert tickets to give away. Duckman asked O'Brian "Are we on the air?", to which O'Brian replied "Yes, we are." Duckman then went on to say "they are saying that they are the station with the [concert] tickets, when we are the ones bringing them down here in the first place and the tickets say OC-104, ahh, they are just a bunch of homosexuals over at that station anyway." After a moment, O'Brian added, "Tony Q, I wonder what the 'Q' stands for, Queen?" In making those statements, Duckman and O'Brian intended to, and did, suggest that the staff and management of WRKE in general, and Quartarone in particular, were homosexuals.
Thereafter, Duckman continued his defamatory on-air attacks on the staff of WRKE, continuing to suggest that they are homosexuals by stating that they want to "touch [Duckman's] butt," they "wear lace on their drawers," and by speaking in an effeminate voice and then stating that that voice sounds like the announcers at WRKE.
On August 26, 1993, Duckman, after discussing on the air the popular artist Michael Jackson was being accused of child abuse, said, on the air, "you can't do that at this station, so go see the man at the other baby station." Duckman and O'Brian have, in the past, repeatedly used the phrase "baby station" to refer to WRKE. In that context, and in light of Duckman's and O'Brian's previous accusations regarding Quartarone, Duckman's comment intended to, and did, suggest that Quartarone sexually abused children.

B. Remarks to Business Associates

Plaintiffs allege that, in addition to the on-air comments presented above, Defendants made the following actionable statements to business associates and potential advertisers of WRKE:
In late July or early August, 1993, in a meeting with [representatives of] of RCA Records, Duckman falsely stated that (i) WRKE did so poorly in the last ratings that it did not show up on the charts, (ii) WRKE does not play RCA Records, and (iii) WRKE does not play the advertising spots contracted for with RCA Records. In so stating, Duckman intended to, and did, cause undue

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 589

Not Reported in A.2d                                                                                                           Page 3
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

embarrassment to WRKE and suggest that WRKE was deceiving its client, RCA, was intentionally breaching its contractual obligations to RCA, and was generally not competent in its business.

*3 [The representatives of RCA] subsequently contacted Quartarone and informed him of Duckman's statements, and expressed their concern about the validity of those statements. To satisfy their concern and to prove the falsity of Duckman's statements, Quartarone was obliged to provide a complete list of the records on its play list, the latest rating reports and the log of advertisements.

Quartarone also received a telephone call from [the] Co-National Director of Motown Records stating that Duckman told him that WRKE was not playing Motown Records. That statement is false, and was intended by Duckman to deter Motown Records from doing business with WRKE.

On or about August 20, 1993, ... the owner of Roundtable Management, an advertising agency that places advertisements for their clients on WRKE, visited the offices of WOCQ, where he met Duckman. Duckman asked [the owner of the advertising agency] why he was placing his client's adverting on WRKE. When [the owner of the agency] explained he was pleased with the results, Duckman said, "Don't you know he's a little 'funny' ?" [The owner of the adverting agency] asked, " Who?" "Tony," Duckman replied, holding up his hand and making his wrist limp. When [the owner of the advertising agency] told Duckman that he had seen Quartarone recently, Duckman asked, "and he didn't put the move on you?" In making these statements and gestures Duckman intended to, and did, suggest that Quartarone was a homosexual who had a sexual interest in [the owner of the advertising agency].

As mentioned above, on February 8, 1994, Plaintiffs amended their complaint to add allegations of special damages totaling $19,336.84. Those allegations are:

As a result of defendant's pattern of libelous and slanderous attacks, Quartarone was subject to tremendous mental anguish and stress over potential damage of his economic investment in WRKE resulting from defendant's actions. This stress contributed to Quartarone suffering heart problems resulting in an episode of atrial fibrillation which required hospitalization on November 3, 1993. Hospital and related medical bills total $5,644.84.

To minimize the mental anguish and stress caused by defendants' pattern of libelous and slanderous attacks, Quartarone engaged a psychiatrist for treatment. The psychiatrist bills to date total $600.00.

In early January, 1994, Arbitron issued its latest ratings report, covering the period during and following defendants' on-air onslaught of false and defamatory accusations, Arbitron reported that WRKE suffered a loss of 0.8, with its rating dropping from 2.18 to 2.0. For the same period, WOCQ experienced a gain of 0.8 with its rating from 7.9 to 8.7.

To mitigate the harm, WRKE has signed contracts for additional promotional billboard and mass mailing advertising, at a cost of $13,092.00. WRKE would not have incurred this additional expense but for the ratings drop.

IV.

*4 According to the generally accepted definition of "defamation" in Delaware:

A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

Restatement (Second) of Torts § 559 (1977); *quoted in Spence,* 396 A.2d at 969. Stated slightly differently, defamation is:That which tends to injure the reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.

W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts,* § 111 (1971); *quoted in Spence,* 396 A.2d at 969. It is not enough that a plaintiff is merely annoyed or embarrassed; plaintiff's standing in the community must be "grievously fractured." *Guyer v. Greer,* Del.Super., C.A. No. 82C-DE-84, Bifferato, J. (Sept. 8, 1983), Mem.Op. at 2 (citations omitted). A statement is not defamatory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 590

Not Reported in A.2d                                                                                          Page 4
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
(Cite as: Not Reported in A.2d)

if it offends but a single person. The plaintiffs' reputation in the entire community must be affected. *Id.* Finally, a defamed corporate plaintiff must show that the defamatory statements tend to prejudice the corporation in its business or to deter others from dealing with it. Restatement (Second) of Torts § 561.

Although *Ward* is not on point factually, it is a timely, comprehensive consideration of the modern law of defamation. *Ward* serves as a companion to Delaware's defamation law fountainhead, *Spence.* The Court adopts here the Supreme Court of New Jersey's general analysis of the defamatory nature of challenged statements, along with the Restatement (Second) of Torts §§ 558-576.

In determining whether a statement is defamatory, the Court must consider at least three factors: the content, verifiability, and context of the statement. *Ward,* No. A-48 at *4. With respect to the first *Ward* factor, content, *Ward* points out that no matter how vulgar or offensive certain statements may be, name calling, ephitats, and abusive language are not actionable as defamation since those statements do not have a defamatory content so that harm to the reputation can be shown. *Id.* at *5. *Ward* explains that "[n]o matter how obnoxious, insulting or tasteless such name-calling, it is regarded as a part of life for which the law of defamation affords no remedy." *Id.* quoting Rodney A. Smolla, *Law of Defamation,* § 4.03 at 4.11 (1986).

The Restatement also distinguishes actionable defamation from non-actionable name-calling:
There are some statements that are in form statements of opinion, or even of fact, which cannot reasonably be understood to be meant literally and seriously and are obviously mere vituperation and abuse. A certain amount of vulgar name-calling is frequently resorted to by angry people without any real intent to make a defamatory assertion, and it is properly understood by reasonable listeners to amount to nothing more.

*5 Restatement (Second) of Torts § 566 cmt. e. In its analysis of the content of an allegedly defamatory statement, the Court must look to the " fair and natural meaning which will be given it by reasonable persons of ordinary intelligence." *Ward,* No. A-48 at *4; *Riley v. Moyed,* Del.Supr., 529 A.2d 248, 253 (1987).

As listed above, the second factor in determining whether a statement is defamatory is its verifiability. Factual statements are uniquely capable of objective proof of truth or falsity while opinion statements generally are not since they reflect the maker's state of mind. *Ward,* No. A-48 at *5. Expressions of opinion are given broad protection under the First Amendment. *Id.* By requiring that a statement be verifiable in order to be defamatory, courts can ensure that defendants are not punished for exercising their First Amendment right to free speech. Therefore, unless a statement explicitly or impliedly rests on false facts that damage a person's reputation, the statement will not be actionable as defamation. *Id.*

Finally, the third *Ward* factor the Court must consider is the context in which the speaker made the allegedly defamatory statement. The listener's reasonable interpretation of the statement will be based, in part, on the context in which the speaker made the statement. *Id.* at *7; Restatement (Second) of Torts § 563, cmt. e.

The law has not treated defamation as a monolith. Courts have broken defamation into two parts: the torts of libel and slander. As set out in *Spence,* the history and pleading requirements for the two torts differ. In general, the scope of liability is greater, and the pleading requirements are less strict, for libel. *Spence,* 396 A.2d at 970. Libel is actionable *per se,* that is, it is not necessary to plead special damages in order to recover nominal or compensatory damages. *Id.* Slander, on the other hand, generally is not actionable without proof of special damages. *Id.* The exception is where the defamation is found to be slander *per se,* in which case proof of special damages is not necessary. As discussed below, in the past, Delaware has recognized four categories of slander *per se. Id.*

V.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 591

Not Reported in A.2d                                                                                       Page 5
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

a.

Count I of Plaintiffs' complaint alleges libel as a result of the statements Defendants made during radio broadcasts at WOCQ. Specifically, as quoted above, Duckman and O'Brian allegedly suggested or implied that Quartarone is a homosexual and a child molester. Defendants also accused WRKE of lying to obtain concert tickets to give away to listeners and of lying to its listeners about the availability of the concert tickets.

Defendants argue that Count I must be dismissed because the statements are not defamatory. The comments Defendants allegedly made on the air were spontaneous and made to a limited audience in response to a specific event and were not of the type to "permanently blot" Defendants' reputation. Alternatively, Count I must be dismissed because it fails to allege libel; the statements Defendants made during their radio broadcasts, at most, are slander because they were spoken. Moreover, Plaintiffs fail to make out a *prima facie* case for slander because they do not plead special damages.

*6 Plaintiffs respond that defamatory radio broadcasts are libel because of the wide dissemination of radio broadcasts to listening audiences. Therefore, the complaint sets forth a *prima facie* case for libel, and it does not matter whether Plaintiffs pleaded special damages. The statements made by Duckman over the radio that Plaintiffs lied to their listeners and obtained concert tickets by false pretenses are libelous because Duckman and O'Brian maligned Plaintiffs' professional conduct and suggested the commission of the crime of obtaining property under false pretenses. Duckman's and O'Brian's allegations over the air that Quartarone is a homosexual and a child molester damaged Quartarone's reputation because homosexuality, according to Plaintiffs, is widely condemned by society. The comments also suggest criminal conduct with respect to child molestation.

Without addressing the libel/slander distinction, the Court finds that, after applying the factors set out in *Ward* and the Restatement, Defendants' comments over the air that arguably imply that Quartarone is a homosexual or a child molester do not amount to actionable defamation. Although the Court recognizes that a jury could conclude that a listener might reasonably interpret O'Brian's references to "queen" and "wearing lace on their drawers" as derogatory references to transvestitism or homosexuality, and that Duckman's reference to Michael Jackson was intended to refer to child molestation, a reasonable listener would take those comments as name-calling and no more. Duckman suggested no specific facts to support his accusations about Quartarone, much less that the entire staff of WRKE was composed of homosexuals. No reasonable listener could interpret the statements as to impute underlying facts to support them so as to believe the statements literally. This finding is supported by the context in which these statements were made, namely, of one radio station dissing a rival station and its announcer over the air.

As discussed below, the Court recognizes that not all accusations of homosexuality are non-defamatory automatically, since there are instances when such an accusation may be made in a harmful context as an assertion of fact intended to cause harm. *See Schomer v. Smidt,* Cal.Ct.App., 170 Cal.Rptr. 662 (1980). The statements made by Duckman, however, do not amount to such an accusation. Because these statements are non-actionable, the claims in Count I referring to these statements must be dismissed.

Defendants' on-air comments that Plaintiffs lied to their listeners about the availability of concert tickets and that Plaintiffs obtained the tickets by false pretenses, on the other hand, are actionable. The content of these statements could be interpreted by a reasonable listener as true, even when viewed in the same context as the comments set forth above, and a reasonable listener could be deterred from associating with the station and participating in its promotions if the listener believed the statements were true. These are statements of fact and not of opinion and they are susceptible to proof or disproof by Plaintiffs. Since these statements are actionable, the issue becomes whether Plaintiffs must meet the less stringent pleading requirements

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 592

Not Reported in A.2d                                                                                                          Page 6
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

of libel or the stricter standards for slander, which invokes consideration of the sufficiency of Plaintiffs' special damages.

*7 While distinguishing libel from slander in 1978, *Spence* did not consider "the relatively new methods of communication such as radio and television broadcasts." *Id.* at 970 n. 2. Although the distinction between libel and slander as it applies to radio or television broadcasts has not been addressed in Delaware, the Restatement (Second) of Torts § 568A states that "[b]roadcasting of defamatory matter by means of radio or television is libel, whether or not it is read from a script." Defendants observe that the rationale of the Restatement has not been accepted universally. Nevertheless, a string of authorities has developed along the lines of the Restatement. *See Camp v. Yeager,* Ala.Supr., 601 So.2d 924, 927, n. 1 (1992), *cert. denied,* 113 S.Ct. 967 (1993); *Brown v. K.N.D. Corp.,* Conn.App., 509 A.2d 533, 534 n. 1 (1986), *rev'd on other grounds,* Conn.Supr., 529 A.2d 1292 (1987); and *Matherson v. Marchello,* N.Y.App.Div., 473 N.Y.S.2d 998, 1004 (1984). As discussed above, because of its inherent reasoning, and consistency with the spirit of *Spence,* the Court accepts the Restatement (Second) of Torts § 568A as the law of Delaware. Therefore, the Court finds that the comments made by Defendants that Plaintiffs lied to their listeners and lied to the Civic Center to obtain tickets support a *prima facie* case of libel. Accordingly, the Court need not reach the issue of Plaintiffs' special damages.

b.

Count II of Plaintiffs' complaint alleges that Duckman's statements, quoted above, to the record companies' representatives are slander *per se.*
Count II further alleges that Duckman's statements to the owner of the advertising agency, also quoted above, are slander *per se.*

As mentioned above, there are four categories of slander that, historically, have been held actionable without proof of special damages, that is, as slanderous *per se.* These categories are statements that (1) malign a person in that person's business, trade, or profession, (2) impute a crime, (3) imply that one has a loathsome disease, or (4) impute unchastity to a woman. *Id.;* Restatement (Second) of Torts § 570. The common characteristic of these categories of slander is the tendency to isolate the object of the defamation from society so that the person defamed might never know the reason for, and the extent to which, the person has been shunned. Nor would the person have the chance to rebut the defamation. *Spence,* 396 A.2d at 970.

Defendants argue that Count II of Plaintiffs' complaint fails to state a claim upon which relief can be granted because the alleged comments do not constitute slander *per se* and because Plaintiffs failed to plead sufficient special damages. Plaintiffs respond that Duckman's remarks are slander *per se;* Duckman's comments to the record companies that WRKE does not play their records and the remaining comments made to RCA malign Defendants in their business and profession. The allegations made to the owner of the advertising agency are slanderous *per se* because they not only suggest that Quartarone is a homosexual but that he propositions his male clients. Plaintiffs argue that allegations of homosexuality are slander *per se* because such allegations can have a severe stigmatizing effect. In addition, Plaintiffs argue that the statements are slander *per se* because they malign Quartarone in his professional conduct. Alternatively, Plaintiffs argue that their amended complaint sets out sufficient special damages.

*8 Continuing to apply the *Ward* factors, the Court finds that the statements allegedly made by Duckman to the record companies' representatives amount to actionable defamation because a reasonable juror could conclude that the representatives might believe Duckman had specific facts to support his accusations and thus, be deterred from associating with Plaintiffs. Duckman allegedly made the statements during a presumably serious conversation with the record companies' representatives so that the representatives reasonably could have believed the statements.

The Court finds that Duckman's alleged comments to the owner of the advertising agency are also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 593

Not Reported in A.2d                                                                                                               Page 7
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

actionable. Both the content and context of these comments differ from Duckman's on-air name-calling. In this case, Duckman's comments, viewed in the context of a presumably serious conversation with a business associate of Quartarone's, could have been construed by the advertising executive as based on fact and the advertising executive could infer from the comments that Quartarone was a homosexual who had designs on him. The comments went further than mere name calling. Although not every person hearing these comments would be deterred from associating with Quartarone, a significant number might choose to disassociate themselves. Moreover, the comments may well have been intended to harm Quartarone, who is Duckman's business competitor. Since the comments made by Duckman are slander, the Court must determine whether they are slander *per se* or whether the Court must consider the sufficiency of Plaintiffs' special damages.

Duckman's statements to the record companies' representatives support a *prima facie* case of slander *per se* because they malign Plaintiffs in their business of operating a radio station. The statements suggest that Plaintiffs breached their contracts with the record companies [FN1] and that Plaintiffs' small audience made Plaintiffs' station unattractive to the record companies. As these statements are slanderous *per se,* there is no need to reach the issue of whether the special damages alleged in the complaint are sufficient.

> FN1. The complaint is somewhat vague as to the exact nature of Plaintiffs' contractual relationship with the record companies. The Court assumes, subject to a future dispositive motion, that Plaintiffs will clarify their claim as the case proceeds.

As for Duckman's comments to the owner of the advertising agency, the Court will not find that the comments support a case for slander *per se* simply because they suggest that Quartarone is a homosexual. The modern trend of tort law is to focus on the injury resulting from a wrong and the traditional categories of slander *per se* have come under criticism. *Ward,* No. A-48, 1994 at *12; Keeton, § 112 at 793. In 1994, the Court will not expand the categories of slander *per se.* This includes now adding to the longstanding categories the imputation of homosexuality.

However, as stated above, Duckman's comments to the owner of the advertising agency not only imply that Quartarone is a homosexual, but that he propositions his male clients. Therefore, these comments support a *prima facie* case of slander *per se* because they malign Quartarone in his professional conduct.

c.

*9 Count III of Plaintiffs' complaint alleges false light invasion of privacy as a result of Duckman's and O'Brian's false accusations, discussed above, that Quartarone was a homosexual and a child molester. False light invasion of privacy is giving publicity to something that places plaintiff in a false light before the public where the false light is highly offensive to a reasonable person, and knowing of or acting "in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Wyshock v. Malekzadeh,* Del.Super., C.A. No. 91C-09-22, Taylor, J. (June 10, 1992), Mem.Op. at 5; *quoting* Restatement (Second) of Torts § 652E. Where statements are actionable under either tort, the same restrictions that apply to defamation also apply to false light invasion of privacy. Therefore, plaintiffs must plead and prove special damages when alleging false light invasion of privacy in any case where the defamatory words are not actionable *per se.* Id.

Defendants argue that Count III must be dismissed because the alleged statements are not slander *per se* and Plaintiffs failed to plead special damages. Plaintiffs respond that, as argued in support of their claim for slander, allegations of homosexuality and child molestation are slander *per se,* and so pleading special damages is not required.

Consistent with its holdings above, the Court finds that the statements made by Defendants that do not make out an actionable cause of action for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 594

Not Reported in A.2d

Page 8

Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

defamation also do not support a *prima facie* case of false light invasion of privacy. Although a jury could find that a listener hearing the comments would find them highly offensive, a reasonable listener would interpret them as name-calling and no more; no reasonable listener would interpret the comments as the truth. Thus, Defendants did not place Quartarone in a false light so that damages could have resulted. Therefore, Count III of Plaintiffs' complaint must be dismissed.

V.

In closing, the Court strongly emphasizes the fact that this ruling comes at the case's threshold. The Court has given Plaintiffs the benefit of every reasonable doubt. Whether the Complaint can survive future dispositive motions or support an award of damages after trial remains to be seen.
The Court requests that the parties confer and submit a form of Order consistent with this decision. The Court further requests that the parties advise the Court as to whether they agree to submit this case to mediation in October.

Del.Super.,1994.
Q-Tone Broadcasting, Co. v. Musicradio of Maryland, Inc.
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 595

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents

United States District Court,E.D. Pennsylvania.
Brad R. JOHNSON, Dr., Plaintiff,
v.
Raymond O. HEIMBACH, et al., Defendants.
**No. Civ.A. 03-2483.**

Nov. 25, 2003.

Brad R. Johnson, pro se, Kankakee, IL, for Plaintiff.
Beth Anne Smith, Office of Attorney General, Philadelphia, PA, for Defendants.

MEMORANDUM AND ORDER

SCHILLER, J.
*1 Dr. Brad R. Johnson, a faculty member of Kutztown University of the Pennsylvania State System of Higher Education ("Kutztown"), brings this action against Raymond O. Heimbach, Theodore A. Hartz, Thomas J. Grant, Linda K. Goldberg, Norman C. Sigmond, David D. Wagaman, Jonathan K. Kramer, Keshav Gupta, Phillip R. Evans, and Donald L. Werley (collectively "Defendants" [FN1]) regarding a dispute that arose between the parties regarding Plaintiff's peer evaluation process. Plaintiff alleges violations of the civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), (d) (2003), the First and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983, and breach of contract under state law. Presently before the Court is Defendants' motion to dismiss Plaintiff's Amended Complaint. For the reasons set forth below, I grant Defendants' motion.

> FN1. Plaintiff has identified Defendants Heimbach, Sigmond, Wagaman, Kramer, Gupta, Evans, and Werley as professors at Kutztown. (Am.Compl.¶¶ 3, 7-12.) Defendant Hartz is the Dean of the College of Business (Am.Compl.¶ 4), Defendant Grant is the Chair of the Department of Accounting and Finance, and Defendant Goldberg is the Provost/Vice President Academic Affairs (Am.Compl.¶¶ 5,6). In the Amended Complaint, Plaintiff often refers to "Defendants" without specifying which of the Defendants carried out the alleged action.

I. BACKGROUND

Plaintiff alleges that between May 1, 2002 and July 16, 2002, Defendants induced Plaintiff, via wire and mail communications, to leave his job at Governors State University, University Park, Illinois and join the faculty at Kutztown. (Am.Compl.¶ 20.) Kutztown is a member of the Pennsylvania State System of Higher Education that has a collective bargaining agreement ("CBA") with the Association of Pennsylvania State College and University Faculties. (*Id.* ¶ 13.) In September 2002, Plaintiff joined the Department of Accounting and Finance in Kutztown's College of Business. (*Id.* ¶ 20.)

Thereafter, Plaintiff alleges, due to conflicting views regarding teaching methodology and accreditation of Kutztown's College of Business, Defendants attempted to force Plaintiff out of his position by establishing a series of evaluative processes that failed to adhere to the technical requirements of the procedure for peer evaluations. (*Id.* ¶ 21.) Additionally, Defendants submitted negative evaluations of Plaintiff based on "false perceptions of in-class observations" and ultimately recommended non-renewal of his employment contract. (*Id.*) Plaintiff objected in writing to the process by which Defendants conducted their peer evaluation and reached the decision to recommend non-renewal, stating that this process violated the CBA. (*Id.* ¶ 21(b)(4).) Despite these objections,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 596

Not Reported in F.Supp.2d                                                                                                  Page 2
Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577
**(Cite as: Not Reported in F.Supp.2d)**

Defendant Grant, the Chairperson of the Department of Accounting and Finance, prepared a Performance Rating Report (the "Performance Report") in which Plaintiff was given a rating of unsatisfactory. (*Id.* ¶ 21(c)(3).)

Defendant Grant provided Plaintiff an opportunity to discuss this evaluation but ultimately, declined to reconsider his overall rating of unsatisfactory. (*Id.* ¶ 21(c)(4).) Shortly thereafter, Plaintiff objected in writing to the entire process leading up to his Performance Report, including Mr. Grant's reliance on the peer evaluations. (*Id.* ¶ 21(c)(3)(a).) Based on the peer evaluations and the negative Performance Report, Defendant Hartz, Dean of Kutztown's College of Business, recommended that Plaintiff's contract not be renewed. (*Id.* ¶ 21(d)(2)(a).) Plaintiff asserts that Defendant Hartz's decision was exclusively based on Plaintiff's perceived lack of congeniality and the negative peer evaluations and that Defendant Hartz failed to take into consideration his classroom materials or his "significant and substantive" activities. (*Id.* ¶ 21(d)(2)(b) & (c).)

*2 Pursuant to the CBA, Plaintiff appealed Defendant Hartz's evaluation to Kutztown's Provost, Defendant Goldberg. (*Id.* ¶ 21(d)(3).) Defendant Goldberg and the faculty union Grievance Chairperson met with Plaintiff to discuss the grievance. (*Id.* ¶ 21(e)(1).) Defendant Goldberg stated that she would review Plaintiff's retention portfolio and examine his allegations. (*Id.*) She also advised Plaintiff that she would meet with department faculty and report her findings at a later meeting. (*Id.*) Thereafter, the President of Kutztown renewed Plaintiff's contract. (*Id.* ¶ 21(e)(2).) Defendant Goldberg never held the meeting as promised because she contended that while "the evaluations conducted by members of [Plaintiff's] department and the Dean were conducted in an arbitrary and capricious manner," (*Id.* ¶ 21(e)(2)), the issue became moot when the President renewed Plaintiff's contract (*Id.* ¶ 21(e)(3)).

Since the renewal of Plaintiff's contract, members of the department have "exhibited conduct toward Plaintiff extending from hostile and condescending to uncontrolled rage." (*Id.*) Plaintiff alleges that Defendants' conduct "has resulted in damage to Plaintiff's professional reputation and Plaintiff's ability to perform his duties as an Associate Professor of Accounting." (*Id.*) Furthermore, Plaintiff states that "[u]pon information and belief, through wire communications, Goldberg influenced said department members to engage in such conduct. " (*Id.* ¶ 21(e)(4)(a).) Plaintiff contends that this conduct includes the following acts: (1) Defendant Grant interrupted a conversation and criticized Plaintiff in a "hostile and condescending tone" accompanied by "aggressive mannerisms" (*Id.*); (2) Defendant Gupta called Plaintiff "an idiot" in front of students (*Id.* ¶ 21(e)(4)(a)); (3) When Plaintiff confronted Defendant Evans about not being a neutral evaluator, Defendant Evans responded, "Get the fuck out of my office" (*Id.* ¶ 21(e)(4)(d)); and (4) Defendant Sigmond also exhibited a variety of hostile and condescending mannerisms toward Plaintiff (*Id.*).

As a result, Plaintiff filed his Amended Complaint, alleging that Defendants: (1) acted as an enterprise and engaged in racketeering activity to fraudulently induce Plaintiff to leave his job and join the faculty of Kutztown; (2) conspired to commit such activity; (3) violated Plaintiff's "Constitutional Guarantee of Procedural Fairness flowing from the Due Process Clause of the Fourteenth Amendment"; and (4) violated Plaintiff's constitutionally protected right to free speech with their negative performance evaluations. (*Id.* at ¶¶ 22-85.) Accordingly, Plaintiff brings claims under the civil RICO statute, 18 U.S.C. § 1962(c) (Count One) and 18 U.S.C. § 1962(d) (Count Two), 42 U.S.C. § 1983 for violations of his Fourteenth Amendment Due Process rights (Count Three) and his First and Fourteenth Amendment rights (Count Four); and state law for breach of contract (Count Five).

II. STANDARD OF REVIEW

*3 In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. *Bd. of Trs. of Bricklayers &*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 597

Not Reported in F.Supp.2d                                                                                                                Page 3

Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577
**(Cite as: Not Reported in F.Supp.2d)**

*Allied Craftsman Local 6 of N.J. Welfare Fund v. Wettlin Assoc., Inc.,* 237 F.3d 270, 272 (3d Cir.2001). A motion to dismiss will only be granted if it is clear that relief cannot be granted to the plaintiff under any set of facts that could be proven consistent with the complaint's allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). While keeping this standard in mind, a court must read a complaint submitted by a pro se plaintiff liberally and apply a less stringent standard. *Haines v. Kerner,* 404 U.S. 519, 520-521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Gibbs v. Roman,* 116 F.3d 83, 86 n. 6 (3d Cir.1997).

### III. DISCUSSION

#### A. Counts One and Two: Civil RICO

In Counts One and Two, Plaintiff alleges that Defendants have violated the civil RICO statute, 18 U.S.C. § 1962(c) and (d). Section 1962(c) of the RICO statute provides that:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]

18 U.S.C. § 1962(c) (2003). Similarly, 18 U.S.C. § 1962(d) makes it unlawful to "conspire" to violate § 1962(c). Thus, to make out a claim under § 1962(d), a plaintiff must first establish his § 1962(c) claim. *Annulli v. Panikkar,* 200 F.3d 189, 198 (3d Cir.1999).

In order to state a claim under § 1962(c), Plaintiff must allege each of the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." ' *Camiolo v. State Farm Cas. Co.,* 334 F.3d 345, 364 (3d Cir.2003) ( quoting *Sedima, S.P.R.. v. Imrex Co.,* 473 U.S. 479, 496 (1985)). "A pattern of racketeering activity ' requires at least two acts of racketeering activity[.]" ' *Id.* (citing 18 U.S.C. §§ 1341, 1343, 1961). Under 18 U.S.C. § 1961(1), racketeering activity is defined as " 'any act which is indictable' under several provisions of the federal crimes code, including mail and wire fraud under 18 U .S.C. §§ 1341, 1343." ' *Id.* (citing 18 U.S.C. § 1961(1)). When a plaintiff alleges the predicate acts of racketeering activity that sound in fraud, such as mail or wire fraud, the pleading requirement of Federal Rule of Civil Procedure 9(b) applies and a court must determine whether plaintiff has plead with particularity the "circumstances" of the alleged fraud "in order to place defendants on notice of the precise misconduct with which they are charged, and to safeguard against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984); *see also Rose v. Bartle,* 871 F.2d 331, 356 n. 33 (3d Cir.1989).

*4 Additionally, "a RICO plaintiff 'only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." ' *Camiolo,* 334 F.3d. at 365 n. 15 (quoting *Sedima,* 473 U.S. at 496). Such injury excludes damages as a result of personal or emotional injury, *Gentry v. Resolution Trust Corp.,* 937 F.2d 899, 918 (3d Cir.1991), must be specific or quantifiable, *Maio v. Aetna Inc.,* 221 F.3d 472, 495 (3d Cir.2000), and must have resulted in "tangible financial loss to plaintiff." *Maio,* 221 F.3d at 483 (citing *Berg v. First State Ins. Co.,* 915 F.2d 460, 464 (9th Cir.1990) (en banc)). As such, a complaint does not adequately plead a RICO violation unless it shows damage to business or property with some certainty; if the claimed injury is speculative, it is not ripe for adjudication. *See id.* at 495 (stating dismissal is appropriate when injury was "too speculative" in nature).

Even construing his Amended Complaint in a light most favorable to Plaintiff, assuming all facts in the Amended Complaint to be true, and affording him all leeway as a pro se plaintiff, [FN2] Plaintiff has failed to state a claim under RICO. First, Plaintiff has failed to allege that he has standing to bring suit under RICO because he has failed to allege injury sufficient to make out a claim. In his Amended Complaint, Plaintiff admits that despite the alleged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A - 598**

Not Reported in F.Supp.2d                                                                                                       Page 4
Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577
**(Cite as: Not Reported in F.Supp.2d)**

racketeering conduct, his contract was renewed for another year. (Am.Compl.¶ 21(e)(2).) Furthermore, Plaintiff does not allege any specific or quantifiable pecuniary loss. At most, Plaintiff asserts that the "conduct by Defendants is intolerable and has made working conditions so miserable for Plaintiff that Plaintiff was forced to acquire another position and will shortly resign his position at KU." (*Id.* ¶ 21(e)(5).) Similarly, in his response to Defendants' motion to dismiss, Plaintiff asserts he has been injured as he will lose the Kutztown University fringe benefit of paid tuition for spouse and dependants when (and if) he resigns. (Pl.'s Resp. at 2.) Finally, Plaintiff also contends that he "decided to wait" to resign to ensure the continuation of his medical benefits. (Am.Compl.¶ 21(e)(5).) As Plaintiff has not alleged any specific pecuniary loss and the loss alleged-his potential resignation-is entirely speculative in nature, his Amended Complaint does not meet the standing requirements of RICO. *Maio,* 221 F.3d at 495.

> FN2. While Plaintiff is indeed proceeding pro se, the Court notes that he has obtained a juris doctor degree from Northwestern School of Law of Lewis and Clark College. (Defs.' Mem. of Law at 1 n. 1.) However, Plaintiff's response to Defendants' Motion to Dismiss provides a mere superficial tour of the law, very little of which was applied to the facts of this case.

Second, even if Plaintiff alleged some specific injury, he has failed to plead fraud with the required particularity. Plaintiff seems to allege that the racketeering activity at issue in this case is mail and wire fraud, repeating throughout his Amended Complaint that Defendants have "executed schemes and artifices through mail and wire communications and fraud." Despite repeating these allegations, Plaintiff does not specify the circumstances or communications that would implicate any such fraud. For example, while Plaintiff contends that he was brought to Kutztown from his former job at Governors State University in part owing to messages carried to him through the mail and by wire, he failed to specify any such pieces of mail, telephone calls, or emails. Nor does he give any indication as to when or with whom such exchanges occurred. With respect to these allegations of mail and wire fraud, other than averring that Defendants carried on their alleged scheme through the mail and wire, Plaintiff's claims lack any specificity or particularity detailing the nature of the alleged fraud.

*5 Plaintiff is not entitled to the inference that essential elements of mail and wire fraud occurred when the Rule 9(b) standard applies, as it does in this case. *Allen Neurosurgical Assoc., Inc. v. Lehigh Valley Health Network,* No. 99-4653, 2001 WL 41143, at *3, 2001 U.S. Dist. LEXIS 284 at *12 (E.D.Pa. Jan.18, 2001). The Third Circuit has counseled that the Rule 9(b) requirement can be satisfied by means other than delineating "date, place, or time" and can be fulfilled using " alternative means of injecting precision and some measure of substantiation into allegations of fraud." *Seville Indus.,* 742 F.2d at 791. However, even under this broad standard, the Amended Complaint fails to offer anything more than that Plaintiff and Defendants negotiated his salary and fringe benefits, and fails to connect this communication to some misrepresentation or scheme to defraud Plaintiff of money or property. 18 U.S.C. § 1341, 1343 (2003) (stating elements of mail and wire fraud). Similarly, although Plaintiff describes with detail each Defendant's respective participation in the peer review evaluation process, he does not allege how these reviews were a scheme or artifice to defraud him rather than simply performed in the normal operation of Kutztown University. This Circuit has held that where a plaintiff's RICO claim contains allegations of fraud that are "simply ' normal business communications" ' which contain no deceptive elements, and which may amount to a breach of contract but do not contain any " ' deception that would bring it within the purview of the mail fraud statute," ' these claims should be dismissed. *Camiolo,* 345 F.3d at 365 (*quoting Kehr Packages, Inc. v. Fidelcor, Inc.,* 962 F.2d 1406, 1416-17 n. 15 (3d Cir.1991)). Thus, even taking into account that the Plaintiff is pro se, Plaintiff's failure to plead with *any* particularity is fatal to his claims under § 1942(c), and, consequently, Plaintiff's § 1962(d) claim also fails for this reason.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 599

Not Reported in F.Supp.2d                                                                                                          Page 5
Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577
**(Cite as: Not Reported in F.Supp.2d)**

### B. Counts Three and Four: 42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983, Plaintiff alleges violations of his procedural due process rights under the Fourteenth Amendment and his right to free speech as a public employee under the First and Fourteenth Amendments. As discussed above, Plaintiff did not lose his job and consequently has suffered no financial or quantifiable loss. Rather, Plaintiff seems to allege that his reputation has been damaged in some way. Therefore, as discussed below, Plaintiff's § 1983 claims must also be dismissed.

First, the Supreme Court has held that "injury to reputation by itself was not a 'liberty' interest protected under the Fourteenth Amendment." *Siegert v. Gilley,* 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *see also Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 401-4 (3d Cir.2000) (discussing applicability of *Siegert* in substantive due process violations as well as procedural due process violations); *Kelley v. Borough of Sayreville,* 107 F.3d 1073, 1078 (3d Cir.1997) ("Even financial injury due solely to government defamation does not constitute a claim for deprivation of a constitutional liberty interest."). Further, while a claim of defamation might be actionable under state law, it is not a constitutional deprivation. *Siegert,* 500 U.S. at 233; *Boyanowski,* 215 F.3d at 401-4 (discussing that harm flowing from defamatory statements is not liberty interest protected by Due Process Clause). The Third Circuit has declared that "[e]mployment decisions ... which do not terminate or abridge [a Plaintiff's] employment contract, and which could be litigated in state tribunals, do not constitute deprivations of property interests under the Fourteenth Amendment." *Rode v. Dellarciprete,* 845 F.2d 1195, 1205 (3d Cir.1988).

*6 Second, in order to state a retaliation claim under the First and Fourteenth Amendments, Plaintiff must allege that he engaged in protected speech and that this activity was a substantial factor in an adverse employment action against him. *Green v. Phila. Hous. Auth.,* 105 F.3d 882, 885 (3d Cir.1997). "Retaliatory conduct other than discharge or refusal to rehire is [prohibited] only if it ... 'adversely affects his status as an employee.' " *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1301 (3d Cir.1997) (holding that "the alleged ' unsubstantiated oral reprimands' and 'unnecessary derogatory comments' suffered by plaintiff following her complaint do not rise to the level of what our cases have described as 'adverse employment action' "). Again, while Plaintiff has alleged a deteriorating work relationship with his colleagues as a result of the negative evaluations and recommendations for non-renewal of contract, these actions alone are not sufficiently adverse to alter terms, conditions or privileges of employment.

While some courts hold that "retaliatory harassment could, under certain circumstances, constitute an ' adverse employment action' which is actionable under the rubric of a First Amendment cause of action," these courts also hold the acts of harassment must "likely deter a person of ordinary firmness from the exercise of his or her First Amendment rights." *Zugarek v. S. Tioga Sch. Dist. .,* 214 F.Supp.2d 468, 476 (M.D.Pa.2002) (discussing applicable case law). Evaluations that contain "false perceptions" from in-class observations, "derogatory written comments," and " conclusions of teaching effectiveness without first discussing their classroom observations with [Plaintiff]," [FN3] (Am.Compl.¶ 21(a)), in addition to some unkind words from colleagues do not rise to the level of an adverse employment action that would deter a person of ordinary firmness from exercising his or her First Amendment right. *Id.* As this Circuit has noted, " '[n]ot everything that makes an employee unhappy' qualifies as retaliation, for 'otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a ... suit.' " *Robinson,* 120 F.3d at 1301 (internal quotations omitted). Therefore, Plaintiff has failed to state a claim for retaliation under the First and Fourteenth Amendment.

FN3. When examining the Amended Complaint and the exhibits attached thereto, it is unclear whether the comments made about Plaintiff during his evaluation process were negative or whether they

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A - 600**

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577
(Cite as: Not Reported in F.Supp.2d)

Page 6

were merely constructive criticism.

### C. Count Five: Plaintiff's Remaining State Law Claim

Plaintiff asserts a state law claim of breach of contract. A federal district court's decision to exercise supplemental jurisdiction over state law claims is a matter of discretion and the exercise of jurisdiction should be avoided whenever possible " as a matter of comity and to promote justice between parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see also* 28 U.S.C. § 1367(c) (granting district court authority to decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction"). In deciding to dismiss state law claims, a district court must take into consideration principles of judicial economy, convenience, fairness, and comity. *Rosado v. Wyman,* 397 U.S. 397, 403-5, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Bearing such principles in mind, and in light of the dismissal of Plaintiff's federal claims, Plaintiff's breach of contract claim is more appropriately resolved in state court. Thus, I dismiss the breach of contract claim without prejudice to Plaintiff's filing it in the appropriate state court. [FN4]

FN4. To the extent that a claim for defamation could be read liberally from Plaintiff's Amended Complaint, this claim also would be more appropriately decided in state court in light of the dismissal of Plaintiff's federal claims.

### IV. CONCLUSION

*7 The Amended Complaint does not state a claim upon which relief could be granted under RICO or § 1983. As such, Defendants' motion to dismiss with respect to those claims is granted. Any state law claims contained in Plaintiff's complaint are dismissed without prejudice, and, pursuant to 28 U.S.C. § 1367(d), Plaintiff has thirty days to file any surviving claims in state court. An appropriate Order follows.

### ORDER

AND NOW, this 25th day of November, 2003, upon consideration of Defendants' motion to dismiss, Plaintiff's response thereto, and for the foregoing reasons, it is hereby ORDERED that:
1. Defendants' Motion to Dismiss (Document No. 16) is GRANTED as follows:
a. Plaintiff's claims with respect to 18 U.S.C. § 1964(c), 18 U.S.C. § 1964(d), and 42 U.S.C. § 1983(c) are DISMISSED.
b. Any remaining state law claims are DISMISSED WITHOUT PREJUDICE. Pursuant to 28 U.S.C. § 1367(d), Plaintiff has thirty (30) days from the date of this order to file any surviving state law claims in the appropriate state court.
2. The Clerk of the Court is directed to close this case for statistical purposes.

E.D.Pa.,2003.
Johnson v. Heimbach
Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577

Briefs and Other Related Documents (Back to top)

• 2003 WL 23903026 (Trial Motion, Memorandum and Affidavit) Order (Jun. 19, 2003)
• 2:03cv02483 (Docket) (Apr. 25, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 601