1  Brian FitzPatrick to Captain Thomas Dinetta dated
2  April 29th, 1999?
3  A. Yes, sir, it is.
4  Q. And does the "Re:" line say "range project"?
5  A. Yes, it does.
6  Q. Now, I'd like to direct your attention to item
7  No. 4 in the memo; do you see that?
8  A. Yes, sir.
9  Q. Does this appear to indicate that on April
10  26th, 1999, the rear of the range was found to have a
11  large amount of lead dust on the floor and on the
12  equipment?
13  A. Yes, it does.
14  Q. Now, independent of this memo, did you ever
15  recall hearing about there being problems with dust
16  accumulation in the rear of the range?
17  A. No, sir.
18  Q. All right, Colonel, you can put that document
19  down.
20  A. Thank you.
21  Q. Colonel, I'd like to put another document in
22  front of you which -- I am not sure if this was
23  previously marked in a deposition or not, so I am just
24  going to call this Chaffinch Deposition Exhibit No. 2.

1  (Chaffinch Exhibit No. 2 which is a
2  memorandum to Lt. Ralph Davis from Sgt. Alfred W.
3  Parton, Jr. was marked for identification.)
4  BY MR. NEUBERGER:
5  Q. Now, Colonel, do you have this document in
6  front of you?
7  A. Yes, sir, I do.
8  Q. Does this appear to be an undated memorandum
9  from Sergeant Al Parton of the special operations
10  response team to Lieutenant Ralph Davis, the deputy
11  director of training?
12  A. Yes, sir, it does.
13  Q. And is this a two-page document?
14  A. Yes, sir, it is.
15  Q. Does the second page appear to be some kind of
16  an e-mail that was sent in the year 2000?
17  A. Yes, sir, it does.
18  Q. Do you know who Sergeant Al Parton is?
19  A. Yes, I do.
20  Q. Was he running the special operations response
21  team while you were colonel?
22  A. Yes, he was.
23  Q. Did he do a good job at that?
24  A. To the best of my knowledge.

1  Q. I'd like to direct your attention to the eighth
2  line down on the first page, the sentence that begins
3  with, "As the NCOIC of the range"; do you see that?
4  A. I sure do.
5  Q. Does that say that, "As the NCOIC of the range,
6  I reported continuously regarding the lead
7  contamination, personal lead levels and the recurring
8  problems with the ventilation"; does it say that?
9  A. Yes, it does.
10  Q. Then skipping to the second to the last line
11  from the bottom, do you see that, where it says, "I
12  have a very vivid memory"?
13  A. Yes, sir.
14  Q. Does that say, quote, I have a very vivid
15  memory of my tenure at the range and the problems that
16  were encountered on a regular basis, period, close
17  quote; does it say that?
18  A. Yes, sir, it does.
19  Q. Does it appear that Sergeant Parton was
20  indicating in this memo that he encountered problems
21  while he was the NCOIC of the range on a regular
22  basis?
23  A. He says he reported continuously, you know,
24  regarding the lead contamination and personnel lead

1  levels.
2  Q. And have you ever seen this memo before?
3  A. No, sir, I have not.
4  Q. I think you testified a little earlier that you
5  recalled some problems with the HVAC system and the
6  FTU historically; isn't that right?
7  A. Yes, sir.
8  Q. And you recalled some issues with the lead
9  levels and the personnel of the range?
10  A. I know that they were keeping close watch on
11  them, yes.
12  Q. And Sergeant Parton, in this memo, appears to
13  be touching on some of those same concerns that you
14  have voiced a little earlier; is that right?
15  A. That's correct.
16  Q. Now, let's turn to the second page of this
17  document.
18  A. (Witness complies.)
19  Q. Now, this appears to be an e-mail from Sergeant
20  Parton to, I guess it would be then Colonel Waggaman?
21  A. Yes, sir.
22  MR. ELLIS: Lieutenant colonel.
23  THE WITNESS: It is lieutenant colonel.
24  MR. ELLIS: I thought you said "then

8/30/2005 Chaffinch, L. Aaron

1  colonel."
2  BY MR. NEUBERGER:
3  Q.  I am sorry, was he the colonel or lieutenant
4  colonel?
5  A.  Lieutenant colonel.
6  Q.  Even though it says superintendent at DSP?
7  A.  Well, that's because everybody that's in the
8  superintendent's office gets the same e-mail.  But he
9  is LTC Waggaman, as you can see.  That stands for
10 lieutenant colonel.
11 Q.  Well, in the first sentence of the first
12 paragraph of that e-mail, it says, "As you know, we
13 are constantly monitoring the lead problems here at
14 the range to include personnel lead levels"; does it
15 say that?
16 A.  Yes.
17 Q.  I think you indicated a little while ago that
18 that was one of the areas that you were aware of while
19 you were a colonel of the State Police, the monitoring
20 of the personnel lead levels; isn't that right?
21 A.  That's correct.
22 Q.  Now, going to the second paragraph, does that
23 say, "Master Corporal Eddie Cathell was first to have
24 his completed.  Other members will be complete this

105

8/30/2005 Chaffinch, L. Aaron

1  week.  On today's date, I received notification that
2  Eddie's level has elevated from a 20 MCG/DL to a 30
3  MCG/DL, a rise of ten points since the last test of
4  May 1st, 2000"?
5  A.  Yes, it does.
6  Q.  Does that appear to be indicating that Trooper
7  C's lead levels are elevated from a 20 to a 30?
8  A.  Yes, it sure does.
9  Q.  Now, I'd like to direct your attention to the
10 fourth paragraph.
11 A.  Okay.
12 Q.  The last sentence of that paragraph.  I'd like
13 to read that to you.
14 A.  Sure.
15 Q.  Does that say, "We have now reached a point
16 where an instructor has reached a critical level of
17 contamination and the problem needs to be resolved";
18 does it indicate that?
19 A.  Yes, sir.
20 Q.  Does it indicate that?
21 A.  Yes.
22 Q.  Now, still in that fourth paragraph, I'd like
23 to direct your attention to the second sentence.  Do
24 you see where it says, "We are still experiencing"?

106

8/30/2005 Chaffinch, L. Aaron

1  A.  Yes, sir.
2  Q.  Does that say that we are still experiencing
3  lead dust contamination behind the bullet trap with
4  the source being the ceiling where the center eye
5  beams were installed?  And does it go on and say that
6  this (sic) a large contamination that has been cleaned
7  up twice since I have been here?
8  A.  Yes, it does.
9  Q.  And there appears to be some grammatical
10 problems with that sentence, but, otherwise, does that
11 seem to indicate there have been contamination
12 problems behind the bullet trap?
13 A.  Yes, sir.
14 Q.  And they have had to be cleaned up several
15 times?
16 A.  I think they said twice since he had been
17 there.
18 Q.  Now, do you ever recall hearing anything about
19 these lead contamination problems behind the bullet
20 trap prior to December of '03?
21 A.  No, sir.  I was never behind the bullet trap
22 until I went on one of those tours for the media.
23 Q.  All right, Colonel.  You can put that document
24 down.

107

8/30/2005 Chaffinch, L. Aaron

1  A.  Thank you.
2  Q.  Now, let's change gears a little bit again and
3  get off of some of the historical problems that we
4  have been talking about.
5  A.  Okay.
6  Q.  When did you first learn about the problems at
7  the FTU in the, say, beginning in December of '03?
8  What was the first that you heard about the problems
9  there?
10        MR. ELLIS:  I am sorry.  When is the first
11 he learned about problems there after December 1st?
12        MR. NEUBERGER:  Of 2003.
13        MR. ELLIS:  Okay.
14        THE WITNESS:  Well, I am not exactly sure.
15 I would say shortly after, the lieutenant colonel
16 probably had given me an update every once in a while.
17 BY MR. NEUBERGER:
18 Q.  Do you think he would have given you the update
19 sometime in December of 2003?
20 A.  I am not sure.  Probably not.  But I don't
21 know.  I can't tell you for sure.  I know that we
22 closed it at March and I heard about it just prior to
23 it being closed.
24 Q.  That was the first that you had heard about it?

A - 296

108

1    A.  I knew that he was dealing with some problems

2  up there, but he was still with Captain Warren, and I

3  assume that, you know, they were -- they were taking

4  care of whatever needed to be taken care of.

5    Q.  Did then Lieutenant Colonel MacLeish give you

6  any periodic updates on the progress of what was

7  happening at the FTU?

8    A.  He may have mentioned it, but not -- you know,

9  he didn't go into deep detail or anything.

10    Q.  For example, did he tell you that members of a

11  recruit class were having nosebleeds and having a

12  copper penny taste in their mouths?

13    A.  That was all over the media after all that

14  information got out to whoever.  It eventually got to

15  the auditor's office and also got to the media.

16    Q.  How about before it got to the media, isn't

17  that something you would have heard about as the

18  colonel of the State Police?

19    A.  I probably would have, but, you know, I don't

20  recall exact conversation by the lieutenant colonel to

21  me.  I know that there was one time when there was a

22  conversation with him and Captain Warren and he asked

23  Captain Warren, Do we need to shut the place down?,

24  and Captain Warren said no.

---

1    Q.  Do you recall when that was?

2    A.  I am going to say January.

3    Q.  Of?

4    A.  Of '04.  I am going to guess January of '04.

5    Q.  But you are guessing?

6    A.  Yeah.  But I am in close proximity.  It wasn't

7  March.  It either had to be -- I am pretty sure it was

8  January.

9    Q.  Colonel, I'd like to put another document in

10  front of you, one which was previously marked as

11  MacLeish Deposition Exhibit 11; okay?

12    A.  Yes, sir.

13    Q.  Now, Colonel, I'd like to direct -- this is a

14  two-page document, is it not?

15    MR. ELLIS:  I am sorry, MacLeish 11?

16    MR. NEUBERGER:  Yes.

17    MR. ELLIS:  I got it.

18  BY MR. NEUBERGER:

19    Q.  It's a two-page document, I am sorry?

20    A.  Yes, it is.

21    Q.  I'd like to direct your attention on the first

22  page, do you see where it says, "Original message" a

23  little bit down on the first page?

24    A.  Yes.  Well, it's there twice.

---

1    Q.  I got you.

2    How about the second time?

3    A.  Okay.  I see that one, too.

4    Q.  Does that appear to be an e-mail that was sent

5  from Sergeant Christopher Foraker to Tom MacLeish and

6  Paul Eckridge and was copied to Greg Warren and Ralph

7  Davis on Friday, December 19th, 2003?

8    A.  Sure does.

9    Q.  And is the subject of that e-mail "Emergency

10  Range Issues"?

11    A.  That's what it says.

12    Q.  I'd like to direct your attention to the second

13  paragraph of that e-mail, the sixth line up in the

14  second paragraph.

15    A.  Okay.

16    Q.  At the very end of the line, it begins a new

17  sentence with the word "the"; do you see that?

18    A.  Yes.

19    Q.  I'd like to read that.  Does that say, "The

20  mechanical operation of this very expensive equipment

21  should not be left to amateurs in the mechanical field

22  to tweak but for professionals who have the training

23  and experience to make proper scientific and

24  calculated adjustments and measurements when

---

1  necessary"; does it say that?

2    A.  Yes.

3    Q.  Does it go on to say, "My expertise, as well as

4  the entire FTU staff, relies on firearms, officer

5  safety, and force training.  We do not possess the

6  training, skill, the knowledge or the time necessary

7  to properly maintain the system at it optimal

8  performance"; does it say that?

9    A.  Yes, it does.

10    Q.  Have you ever seen this e-mail before?

11    A.  No, I have not.

12    Q.  Did then Lieutenant Colonel MacLeish ever tell

13  you that he had received an e-mail about emergency

14  range issues?

15    A.  I would imagine that he did.  I don't

16  specifically recall, but I would imagine that he did

17  tell me he was dealing with it.

18    Q.  Would that be because of the nature of the

19  problem, because it's been categorized as an

20  emergency?  It's not just a day-to-day problem?

21    A.  It would be because he tried to keep me

22  up-to-date on all the different things that, you know,

23  that came under his purview.

24    Q.  And was then Lieutenant Colonel MacLeish good

1  at keeping you up-to-date on the other aspects of his
2  job?
3  A.  Yes, sir.
4  Q.  Now, did this paragraph, at least the part of
5  the paragraph that I just read to you, did that appear
6  to be indicating that Sergeant Foraker appeared to be
7  -- did Sergeant Foraker appear to be indicating that
8  there was some equipment which he and this man were
9  not qualified to fix or tinker with?
10     MR. ELLIS:  Object to the form of that
11  question.
12     THE WITNESS:  That's what it indicates.
13  BY MR. NEUBERGER:
14  Q.  And does he say that neither he nor his men
15  possess the training, the skills, or the knowledge
16  necessary to maintain that equipment"?
17  A.  That's what you just said.  That's what you
18  just read.
19  Q.  Now, apart from this e-mail, in the Delaware
20  State Police, while you were colonel, the troopers
21  drive police cars; would that be fair to say?
22  A.  Yes.
23  Q.  And are they Crown Vics, usually?
24  A.  Road cars are Crown Vics, yeah.

1  Q.  If a trooper has a problem with his Crown
2  Victoria and it breaks down, is the trooper authorized
3  to tinker with the engine?
4  A.  No, he is not.
5  Q.  Is he authorized to mess around with the
6  carburetor?
7  A.  No, he is not.
8  Q.  Is he authorized to tweak the transmission?
9  A.  No, he is not.
10  Q.  Is he authorized to do his own little repairs
11  on the engine?
12  A.  No, he is not.
13  Q.  What does a trooper have to do when there is a
14  problem with his patrol car?
15  A.  Get in touch with the mechanic at whatever
16  troop facility he works.
17  Q.  And then the mechanic --
18  A.  Takes care of it from there.
19  Q.  -- takes care of it from there?  Okay.
20     Do you have any idea how much a Delaware
21  State Police cruiser costs, the patrol cars?
22  A.  Twenty-one, $22,000, probably, just guessing.
23  Q.  Do you know how much it cost to build the FTU?
24  A.  $3.3 million, I think it cost initially.

1  Q.  Is it your position in this case that the staff
2  of the FTU are responsible for fixing the equipment
3  and the upkeep of the equipment in this $3.3 million
4  facility?
5  A.  It's not my position one way or the other.
6  It's, you know, it had been being done and then it
7  wasn't being done.  It wasn't my position as to
8  whether -- I didn't open the range.  I didn't have
9  anything to do with opening the range in 1998.  I
10  didn't know what the procedures were and the protocol
11  was for the range.  I never worked at the range.  I
12  only went there to re-qualify and did that fine each
13  time and went about to my duties.  So, it's not my
14  position one way or the other.
15  Q.  Do you think that the men should have been
16  maintaining the range and keeping up all of the
17  equipment there?
18  A.  I don't know if they should or they shouldn't.
19  I don't know the answer to that.
20  Q.  You don't know either way?
21  A.  I don't have the answer to that.  I don't know.
22  Q.  Now, do you know who someone named Mark
23  D'Allesandro is?
24  A.  No, I don't.

1  Q.  Have you ever heard his name before?
2  A.  No, I have not.
3  Q.  I'd like to direct your attention to the third
4  paragraph down on the first page; do you see that?  It
5  begins on the first page and goes over onto the second
6  page?
7  A.  Yes, sir.
8  Q.  The very last line?
9  A.  Okay.
10  Q.  Actually, the third to the last line.
11  A.  Okay.
12  Q.  The sentence that begins with, "He has also
13  noted"?
14  A.  Yes, sir.
15  Q.  I am going to read that to you; all right?
16  A.  Okay.
17  Q.  Does that say that, "He has also noted that
18  regardless of completing the transition to frangible
19  ammunition, lead contamination will always be present
20  and a health danger due to the lead-lined deceleration
21  chamber.  Mr. D'Allesandro stated that the smooth
22  operation of the bullet trap maintenance would require
23  a full-time professional that would also need to be
24  equipped with the proper protective gear and trained

**A - 298**

1   in the handling of hazardous lead and other
2   materials."
3       Does it say that?
4   A.  Yes, it does.
5   Q.  Do you know if full-time professionals came
6   into the range on a regular basis wearing protective
7   gear and handled the cleanup and abatement and
8   hazardous lead and other toxic heavy metals?
9   A.  Not to my knowledge.
10  Q.  Could you read the very next paragraph quietly
11  to yourself, the one that begins with "Master Corporal
12  B. Kurt Price," and tell me when you are finished?
13  A.  I am finished.
14  Q.  Now, does that paragraph indicate that Master
15  Corporals Price and Warren were expressing concern
16  about the rise in their lead levels as a result of
17  their conducting maintenance on the bullet trap and on
18  the bullet recovery system?
19  A.  Yes, it does.
20  Q.  And then in the, I guess it's the third line
21  from the bottom of that paragraph, where it begins
22  with, "I concur"; do you see that?
23  A.  Yes, I do.
24  Q.  Does Sergeant Foraker appear to state that,

1   quote, I concur with my colleagues that this is an
2   unnecessary health risk and that the maintenance of
3   the bullet trap and recovery system would be left to
4   the trained professionals who can operate in this
5   environment safely; does it say that?
6   A.  Yes, it does.
7   Q.  Do you have any knowledge as to how other
8   firing ranges throughout the country handle lead
9   cleanup and cleanup and abatement of other toxic
10  materials at firing ranges?
11  A.  Not really.
12  Q.  Colonel, still on this MacLeish Deposition
13  Exhibit No. 11, had you ever seen the original e-mail
14  dated December 19th, 2003, here?
15  A.  No, I have not.
16  Q.  You can put that document down, Colonel.
17  A.  Thank you.
18  Q.  Do you recall, at any point, hearing that there
19  were unsafe levels of staffing at the FTU?  This was
20  beginning in December of 2003 forward.
21  A.  No, I do not.
22  Q.  Do you ever recall hearing that, given the
23  industry standards of teacher versus instructor
24  ratios, that the FTU did not have enough instructors

1   to safely operate the range?
2   A.  No, I didn't hear any of that.  I know that
3   they had people come from the troops and help them up
4   there, but I haven't heard what you are asking.
5   Q.  If a concern about unsafe staffing levels was
6   raised, do you think that would be a serious concern
7   that the State Police would need to address?
8   A.  Could you repeat that again, please?
9   Q.  Sure.  If concerns about unsafe staffing levels
10  at the FTU were raised by the personnel working at the
11  FTU, do you think that's a serious concern that the
12  State Police would need to address?
13  A.  I think it needed to be looked into.
14  Q.  Because safety is a big deal in the Delaware
15  State Police?
16  A.  Sure.
17  Q.  I'd like to put another document in front of
18  you, one which was previously marked as MacLeish
19  Deposition Exhibit No. 13.
20       Colonel, do you have this document in
21  front of you?
22  A.  Yes, I do.
23  Q.  Does this appear to be an e-mail from Sergeant
24  Foraker to Captain Warren dated January 9th, 2004?

1   A.  Yes, it does.
2   Q.  And does the subject line say, "Range health
3   issues and departmental liability"?
4   A.  Yes, it does.
5   Q.  Now, does the first sentence of this e-mail say
6   that we are experiencing significant air flow problems
7   at the range?
8   A.  That's what it says.
9   Q.  Does it go on and state that I have personally
10  witnessed the problem since I have returned to the FTU
11  on December 1st, 2003; does it say that?
12  A.  Yes, it does.
13  Q.  Does it then continue and say that Corporals
14  Warren and Price have expressed that this problem has
15  been in existence for many months and has only been
16  Band-Aided over time when complaints have been made?
17  A.  That's what it says.
18  Q.  Let's skip down two more lines to the end of
19  that line where it begins with "Corporal Warwick"?
20  A.  Yes, sir.
21  Q.  Does that say, "Corporal Warwick expressed
22  that, at one point, the smoke was so dense that he was
23  barely able to see a shooter on the firing line"; does
24  it say that?

**A - 299**

1    A.  Yes, it does.

2    Q.  Now, from parts of that paragraph that we just

3    read, do they appear to indicate that there had been

4    problems with air flow and with dense smoke at the

5    FTU?

6    A.  That's what it says, per Corporal Warwick.

7    Q.  Now, in your opinion, at the time you were the

8    colonel of the DSP, would it be a concern to you that,

9    at the FTU, the instructors couldn't see the students

10   on the firing line because of the dense smoke?

11   A.  I'd say it's time to shut the place down.

12   Q.  Now, let's skip down to the third paragraph of

13   this e-mail.

14        Do you see it has a No. 1 at the very

15   beginning of it?

16   A.  Okay.

17   Q.  Does that state that a reddish haze in the air

18   that is suspended throughout the range when the bullet

19   strikes the bullet trap?

20   A.  That's what it says.

21   Q.  And does it go on and say that the airborne --

22   and you can't read the next word -- are inhaled by the

23   instructors and the students?

24   A.  Yes, sir.

1    Q.  Does it continue and say that when anyone blows

2    their nose, a large amount of a reddish debris is

3    discharged?

4    A.  Yes, it does.

5    Q.  Does it continue and say that students and

6    instructors also complain of a copper penny taste in

7    their mouth after shooting and describe a significant

8    eye mucus present when awaking the following morning

9    after a day on the range?

10   A.  Yes, it does.

11   Q.  Now, let's skip down to the last sentence of

12   the same paragraph; okay?

13   A.  Yes, sir.

14   Q.  Does that state that the range staff is under

15   the impression that without the rapid exhaust and

16   removal of the copper frangible particulates from our

17   breathing air, this problem constitutes a potentially

18   unsafe and unhealthy working environment detrimental

19   to our good health and inconsistent with departmental

20   goals and objectives?

21   A.  Yes, it does say that.

22   Q.  Now, did you ever hear about the issues raised

23   that we just ran through?  Were they ever brought to

24   your attention?

1    A.  I heard about the copper penny taste in the

2    mouth.  I didn't know anything about what we ran

3    through with Corporal Warwick saying he could barely

4    see the shooter on the firing line, I wasn't familiar

5    with that.  I haven't seen this document ever until

6    now.

7    Q.  Did then Lieutenant Colonel MacLeish ever bring

8    these issues to your attention and discuss them with

9    you?

10   A.  I believe he had a conversation with Greg

11   Warren, and he told me, when Greg Warren was

12   explaining this to him, that he asked Greg Warren

13   straight up, Do we need to shut the facility down?,

14   and Greg Warren said no.

15        So, at that point, I would imagine if I

16   would have heard that, I would have thought, Well, it

17   must not be as bad as it sounds on this paper, but, of

18   course, I didn't read this paper until now, so I don't

19   have any knowledge of this.

20   Q.  Were you a party to this conversation with Greg

21   Warren?

22   A.  No.

23   Q.  So, you are relying on, I guess, what MacLeish

24   told you about his conversation with Greg Warren?

1    A.  Yes.  And I don't remember all the specifics

2    that he told me, but I do know that he asked Greg

3    Warren if he should shut it down.

4    Q.  Colonel, you can put that document down.

5    A.  Thank you, sir.

6    Q.  Colonel, were you ever advised that Sergeant

7    Ashley had responded to some health concerns raised by

8    Master Corporals Price and Warren by telling them,

9    quote, You have to die from something, closed quote?

10   A.  I don't think I was advised of it.  I might

11   have read it in some -- I don't know if that was in

12   the auditor's report or not.  I may have read it in

13   something, but I wasn't advised of it, no.

14   Q.  Now, speaking as a former colonel of the --

15   A.  No.  I read it in the suit.

16        MR. ELLIS:  You read it in the complaint

17   or some document associated with the litigation?

18        THE WITNESS:  Yes.

19   BY MR. NEUBERGER:

20   Q.  Now, speaking as the former colonel of the

21   Delaware State Police, in your opinion, is it a good

22   thing when a supervisor responds to health concerns

23   raised by a subordinate and tells them, "You have to

24   die from something"?

**A - 300**

1   A. He probably should not have said that.

2   Q. For example, if a road trooper went to his

3   lieutenant or his captain and his troop and said, My

4   bulletproof vest isn't working, would, You have to die

5   from something, be an appropriate response for his

6   lieutenant or his captain to give him?

7      MR. ELLIS: Objection to the form.

8      THE WITNESS: No. I don't think he meant

9   anything because you tell people, You better quit

10  smoking, they are going to kill you; they say, I am

11  going to die from something. You know, I mean -- I

12  don't know that that's an appropriate answer, but

13  that's what people say.

14  BY MR. NEUBERGER:

15  Q. But you are telling me that's not an

16  appropriate answer?

17  A. No, it's not.

18  Q. Beginning in December of 2003, did you ever

19  hear that Sergeant Foraker and then Master Corporals

20  Price and Warren were concerned about the health and

21  safety of the conditions at the FTU?

22  A. I am sure I did through the lieutenant colonel.

23  Q. The State Police is a paramilitary

24  organization; isn't it?

---

1   A. Well, whenever the lieutenant colonel would

2   bring me up-to-date on it, he would say, We are doing

3   this, this, and this, or whatever. He wouldn't just

4   say that they have a concern, so -- he would say that

5   they have a concern about this, so we are doing X, Y,

6   and Z with regards to taking care of whatever it was.

7   Q. What's X, Y, and Z?

8   A. When he would come to me and explain to me that

9   there has been some things come up at the range -- we

10  will just use that, since that's what we are talking

11  about -- with regards to lead levels or whatever, he

12  would say, Well, we are doing, and we are sending them

13  to be tested, or we are, you know, that's what X, Y,

14  and Z is.

15  Q. Got you. Okay.

16     Do you think the concerns about health and

17  safety raised by troopers under your command should be

18  taken seriously?

19  A. I sure do.

20     (Recess taken.)

21  BY MR. NEUBERGER:

22  Q. Now, Colonel, do you recall, let's focus on the

23  first half of the year 2004.

24  A. Okay.

---

1   A. Yes, sir.

2   Q. And there is a chain of command?

3   A. Yes, sir.

4   Q. And, at the time, you were at the top of the

5   chain of command?

6   A. Yes, sir.

7   Q. You were the top dog on the food chain?

8      MR. ELLIS: Objection to the form.

9      THE WITNESS: It wasn't a food chain. I

10  don't know if that's an appropriate comment at this

11  time.

12  BY MR. NEUBERGER:

13  Q. There is like a pyramid and you were at the top

14  of it; would that be fair to say?

15  A. I was a superintendent of State Police, yes.

16  Q. And concerns came to your attention as they

17  were raised by people lower in the chain of command up

18  through the chain of command?

19  A. Yes.

20  Q. And are you indicating that, somehow, through

21  the chain of command, it was brought to your attention

22  that Sergeant Foraker and Master Corporal Price and

23  Master Corporal Warren were voicing their concerns

24  about the conditions at the FTU?

---

1   Q. Do you recall whether the Firearms Training

2   Unit was in the media on a regular basis?

3   A. During the first half of '04?

4   Q. Yes.

5   A. I don't know if you would say on a regular

6   basis. They were in the media a few times.

7   Q. Do you recall a time when, I guess that would

8   be the director of training for the Delaware State

9   Police described the FTU to Tom Eldred of the State

10  News as being, quote, the absolute epitome of a

11  project from hell, close quote?

12  A. Yes, I do.

13  Q. Do you recall seeing that in the media?

14  A. Yes, I do.

15  Q. And I'd like to introduce another exhibit.

16  This will be Chaffinch Exhibit No. 3.

17     (Chaffinch Exhibit No. 3 bates stamped

18  FTU2849 through FTU2940 was marked for

19  identification.)

20  BY MR. NEUBERGER:

21  Q. Now, Colonel, do you have this document in

22  front of you?

23  A. Yes, I do.

24  Q. Does this appear to be a multi-page document?

1  A.  Sure does.

2  Q.  If you could just thumb through it and take a

3  look at this and tell me if it would be fair to say

4  that this is a large number of media articles from

5  various newspapers and news outlets about the FTU in

6  general?

7       MR. ELLIS:  Rather than saying "a large

8  number," wouldn't it be better to count them?  Never

9  mind.

10      THE WITNESS:  Some of the pages don't have

11  anything at all about the FTU.

12 BY MR. NEUBERGER:

13 Q.  Do some of those pages appear to be maybe the

14 top half of a part of the newspaper and then the story

15 may be a little bit down further on the page?

16      MR. ELLIS:  Doesn't look like it.

17      THE WITNESS:  Doesn't look like it to me.

18 BY MR. NEUBERGER:

19 Q.  Just thumb through that and see if you find any

20 articles about the FTU in there?

21 A.  That's the same one.  I can't count them

22 because they are duplicate.

23 Q.  I am not asking you to count them.

24 A.  I know, but I am just seeing the same one twice

129

1  with your executive staff?

2  A.  I may just ask the lieutenant colonel if he saw

3  it.  If not, I would say you probably ought to take a

4  look at it.  I don't know that I specifically sat down

5  and tweaked it or anything, no.

6  Q.  Did there come a time when the governor ordered

7  an investigation of the FTU by the state auditor?

8  A.  That's my understanding.

9  Q.  How did you learn about that?

10 A.  Through the paper.

11 Q.  Did you ever talk to Lieutenant Colonel

12 MacLeish about it?

13 A.  I may have.  I don't know -- I don't remember

14 or recall any exact conversations about it, but I may

15 have.

16 Q.  Do you recall if you ever expressed your

17 personal feelings about the investigation to

18 Lieutenant Colonel MacLeish?

19 A.  I don't see where I would have had any problem

20 with it.

21 Q.  Did he ever express to you his personal

22 feelings on the investigation?

23 A.  If he did, I don't recall.

24 Q.  Now, did there come a time when you learned

131

1  I have already found.  That would lead you to believe

2  there was more than there was.

3  Q.  Okay.

4  A.  Same one again.

5  Q.  Colonel, have you finished thumbing through the

6  documents?

7  A.  Yes.

8  Q.  Instead of questioning you about each of these

9  documents, would it be fair to say that, in general,

10 when there is a story about the Delaware State Police

11 and the Firearms Training Unit in the local

12 newspapers, that those stories are brought to your

13 attention?

14 A.  They don't have to be brought to my attention.

15 I read the paper every day.  I did when I was active

16 as well.

17 Q.  So, by some means, you would come across this

18 story and probably read it?

19 A.  If it was in the State News or the Journal,

20 yes.

21 Q.  You can put that document down.

22 A.  Thank you, sir.

23 Q.  When there was an article about the FTU in the

24 local newspapers, would you talk about the article

130

1  that Sergeant Foraker and Master Corporals Price and

2  Warren had spoken to the state auditor?

3  A.  Yes.

4  Q.  How did you find out about that?

5  A.  I think I found out about that in the paper as

6  well.

7  Q.  Did you talk to Lieutenant Colonel MacLeish

8  about that?

9  A.  I can't recall an exact conversation, but I

10 probably did.

11 Q.  Colonel, I'd like to put another document in

12 front of you.  This one was previously marked as

13 MacLeish Deposition Exhibit 17.

14 A.  Thank you.

15 Q.  You are welcome.

16      Now, Colonel, do you have that document in

17 front of you?

18 A.  Yes, I do.

19 Q.  Could you just thumb through these couple pages

20 and tell me if this appears to be an article from The

21 State News and then an article from the News Journal?

22 A.  That's what it appears to be.

23 Q.  Do you think you have ever seen these articles

24 before?

132

**A - 302**

**Page 133**

1  A.  I am sure that I have.
2  Q.  And the first page of this exhibit appears to
3  be a front page story from the Delaware State News;
4  isn't that right?
5  A.  Sure does.
6  Q.  And are you familiar with this article at all
7  without reading it?
8  A.  I can't remember exactly what it says, no.  I
9  mean, I read them all, but I couldn't tell you what it
10  says.
11  Q.  Okay.
12  A.  I see what the headlines say.
13  Q.  And let me direct your attention to the second
14  paragraph of this article, the one that begins, "The
15  troopers made their comments"?
16  A.  Yes, sir.
17  Q.  Do you see that?
18  A.  Yes, sir.
19  Does it say, "The troopers made their comments
20  Wednesday and prepared statements to investigators
21  from the state auditor's office which is probing the
22  range situation at the behest of Governor Ruthann
23  Minner"?
24  A.  Yes, sir.

**Page 135**

1  their speaking to the auditors?
2  MR. ELLIS:  Object to the form of that
3  question.
4  THE WITNESS:  Was I happy?
5  BY MR. NEUBERGER:
6  Q.  Yes.
7  A.  I wouldn't say I was happy.  I wouldn't say I
8  was sad.
9  Q.  Were you unhappy?
10  A.  With regards to them speaking to the auditors?
11  That was part of the investigation.  They needed to
12  speak to the auditors.
13  Q.  Are you --
14  A.  Auditors, I would assume the auditors go and
15  talk to them if they are conducting an investigation,
16  so I didn't see a problem with it.
17  Q.  Were you happy that the media found out about
18  it and reported on it?
19  A.  I wasn't excited about it, I can tell you.
20  Q.  Were you unhappy about that?
21  A.  Yeah.  I probably was a little unhappy.
22  Q.  Let's see.  Were you displeased by it?
23  A.  Yes.
24  Q.  Were you angry?

**Page 134**

1  Q.  I think you indicated that you learned that my
2  clients had spoken to the auditor by way of newspaper
3  stories?
4  A.  Might have been by reading this article right
5  here.
6  Q.  It possibly could have been, do you think --
7  A.  Could have been.
8  Q.  -- without actually reading it?  I am not
9  asking you to read it.
10  A.  Could have been.
11  Q.  Independent of the article, you think you
12  learned about it from newspaper stories?
13  A.  I believe that I did.
14  Q.  Colonel, you can put the document down, please.
15  Thank you.
16  A.  Absolutely.
17  Q.  Do you recall if you talked to anyone on your
18  executive staff about the fact that Sergeant Foraker
19  and Master Corporals Price and Warren had spoken to
20  the auditor's office?
21  A.  I don't recall an exact conversation, but I am
22  sure I had a conversation with the lieutenant colonel
23  at least.
24  Q.  Were you happy with the media reports about

**Page 136**

1  A.  No.
2  Q.  How about irritated?
3  A.  No.
4  Q.  How about just disgusted in general?
5  A.  No.
6  Q.  Now, did you ever talk to Colonel MacLeish
7  about how you wanted to discipline Sergeant Foraker as
8  well as Master Corporals Price and Warren because they
9  had spoken to the auditor?
10  MR. ELLIS:  Object to the form of that
11  question.
12  THE WITNESS:  To the auditor, no.  I don't
13  believe so.
14  BY MR. NEUBERGER:
15  Q.  Did you ever talk to Lieutenant Colonel
16  MacLeish about wanting to discipline Sergeant Foraker
17  and Master Corporals Price and Warren in general?
18  A.  Can you help me a little bit more?  I don't
19  remember having a conversation with him, but if you --
20  if there is something you are not telling me that
21  maybe I should know right now --
22  Q.  I think the record will reflect that Colonel
23  MacLeish testified that he and you had talked about
24  wanting to discipline the men because the media had

1  reported on their speaking to the auditor.

2        MR. ELLIS: I don't believe that's what

3  the record is going to show. You can make whatever

4  representation you want, but the witness should

5  understand that, you know, that's your recollection of

6  something that happened a while ago.

7        THE WITNESS: I don't have a recollection,

8  then.

9  BY MR. NEUBERGER:

10  Q. So, you just don't recall one way or the other?

11  A. Restate the question, please.

12  Q. Did you and Lieutenant Colonel MacLeish talk

13  about wanting to discipline Sergeant Foraker and

14  Master Corporals Price and Warren because they had

15  spoken to the auditor or because the media had

16  reported on them speaking to the auditor?

17  A. I know that we did not discuss about

18  disciplining with regards to those officers with

19  regards to talking with the auditor's office.

20        I am not sure -- I can't recall a

21  conversation with regards to the media, but according

22  to State Police policy, in order to speak with the

23  media, you need to go through the public information

24  office. And since I already testified to the fact

1  that I didn't know about this until I read it in the

2  paper, I would imagine that could have upset me

3  somewhat, yes.

4  Q. But do you have a specific recollection today

5  of whether or not you and Lieutenant Colonel MacLeish

6  talked about that?

7  A. I sure don't.

8  Q. Now, did you ever speak to the state auditor's

9  office as part of their investigation into the FTU?

10  A. I am sure I did.

11  Q. Were you interviewed?

12  A. I think I was.

13  Q. Were you interviewed in person or by telephone?

14  A. I think I was interviewed -- I was interviewed

15  by the auditor's office on numerous occasions about a

16  lot of different things, not just the range. So, it's

17  -- it's not all, you know, real clear in my mind as to

18  -- I am pretty sure I was interviewed in person, not

19  on the telephone. My only question would be whether

20  or not I was interviewed by myself or whether the

21  lieutenant colonel was there at the same time. I

22  don't know.

23        I would say -- I would guess, and I

24  shouldn't guess, so I won't say that.

1  Q. Do you know if anyone else was interviewed by

2  the auditor's office from your executive staff?

3  A. I am sure they were.

4  Q. Do you know if then Lieutenant Colonel MacLeish

5  was interviewed by the auditor?

6  A. Sure he was.

7  Q. Did he ever talk to you about that?

8  A. I am not sure if he did or not. He may have.

9  I don't recall, you know, if -- what the conversation

10  was if he did, but he probably did.

11  Q. Would he have had to get your authorization to

12  speak to the auditor because you were the colonel?

13  A. It was a -- it was an open investigation by the

14  auditor's office, and we, as an agency of the State

15  Police, were going to cooperate with the auditor's

16  office for them to complete their investigation. So

17  anybody that was wanting to be -- that the auditor's

18  office wanted to interview would be interviewed. It's

19  that simple. So I don't know who all they interviewed

20  off the top of my head, but we made sure that they

21  all, you know, that they would be interviewed if the

22  auditors wanted to interview them.

23  Q. So, I think you are indicating that Colonel

24  MacLeish and -- then Lieutenant Colonel MacLeish did

1  not need to seek your authorization to speak to the

2  auditor's office?

3  A. He sure didn't.

4  Q. Did you give the auditor's office any

5  documents?

6  A. Personally, I don't believe I did, no.

7  Q. Do you know if anyone --

8  A. I am sure --

9  Q. -- other than my clients gave the auditor's

10  office documents?

11  A. I am sure that we did. I mean, I can't tell

12  you exactly what we gave them, but I am sure that if

13  -- they probably requested documents from our H.R.,

14  human resources section, and if they requested them, I

15  am sure they got them.

16        They may have requested documents from the

17  lieutenant colonel. I didn't give them any documents

18  personally, but I am sure they got documents. I don't

19  remember giving them any documents. I am pretty sure

20  I didn't.

21  Q. Who do you think would know if the State Police

22  gave documents to the auditors? I think you mentioned

23  Lieutenant Colonel MacLeish?

24  A. Yes.

**A - 304**

**Page 141**

1  Q. And you mentioned H.R., so that would be
2  Captain John Yeomans?
3  A. Yes, it would.
4  Q. Can you think of anyone else who I might want
5  to talk to if I could -- who might be able to answer
6  that question?
7  A. The lieutenant colonel.
8  Q. So, those are the only two names that you can
9  come up with?
10  A. And Captain Yeomans.
11  Q. Did you ever see any of the documents that may
12  have been given to the auditor by the DSP?
13  A. Not that I can recall. I don't believe so.
14  Q. Now, let's change gears again.
15       Now, isn't it true that you have never
16  liked Kurt Price?
17  A. No, it certainly is not.
18  Q. Isn't it true you have never liked Wayne
19  Warren?
20  A. I played ball with Wayne Warren. Why would I
21  not like him?
22  Q. You played ball with him?
23  A. That's right. I played softball with Wayne
24  Warren.

**Page 142**

8/30/2005 Chaffinch, L. Aaron

1  Q. When?
2  A. Mid '80s. Maybe late '80s. Maybe late '80s.
3  Q. Isn't it true that you bear ill will towards
4  Wayne Warren and Kurt Price?
5  A. No, I do not.
6  Q. So you deny that?
7  A. Yes.
8  Q. Isn't it true that --
9  A. I am not happy that they filed a civil suit,
10  but, I mean, I would imagine if somebody came in and
11  said, You just got sued, you probably wouldn't be
12  happy with whoever sued you. I don't bear no ill will
13  with either one of them.
14  Q. Isn't it true that you were angry at both of
15  them?
16       MR. ELLIS: Time frame?
17       MR. NEUBERGER: December of 2003.
18       THE WITNESS: I don't -- no, I wasn't
19  angry with them. I was upset with them.
20  BY MR. NEUBERGER:
21  Q. Why were you upset with them?
22  A. Well, both of them sent me messages that they
23  weren't going to sue me, but then they did.
24  Q. And what do you mean, they sent you messages?

**Page 143**

1  A. They made sure that they told the right person
2  that would come and tell me that, Aaron, we are not
3  going to sue Aaron, but then they sued me anyway and
4  they sued me individually, so that was upsetting. Why
5  would you go about making sure that you get the
6  message to me and then go ahead and do it anyway?
7  Q. Who is the person who relayed the message?
8  A. What difference does it matter?
9  Q. You are under oath, Colonel.
10  A. I am?
11  Q. You are.
12  A. Well, in one case, it's Bruce VonGoeerres, and
13  I can't remember the other case. It might be Bruce
14  VonGoeerres in the both cases.
15  Q. Is he a lieutenant?
16  A. He is.
17  Q. Now, isn't it true that you bear animosity
18  between Kurt and Wayne because they spoke out about
19  the issues of the firing range?
20  A. No, it's not.
21  Q. Isn't it true that you don't like Kurt, Wayne,
22  or Chris Foraker because they spoke out about health
23  and safety issues specifically at the firing range?
24  A. No, it's not true.

**Page 144**

8/30/2005 Chaffinch, L. Aaron

1  Q. Isn't it true that you don't like that they
2  kept speaking out continuously about problems at the
3  firing range?
4  A. No, it's not true.
5  Q. Isn't it true that you didn't like that they
6  had spoken out and that bad publicity for the Delaware
7  State Police resulted in the Delaware media?
8  A. Could you repeat that one?
9       (The reporter read back as requested.)
10       MR. ELLIS: Object to the form of the
11  question.
12       THE WITNESS: I believe that it was a
13  disruption to agency, so I wouldn't be real happy
14  about the fact that there was a disruption to the
15  agency, no.
16  BY MR. NEUBERGER:
17  Q. What was a disruption to the agency?
18  A. The fact that they spoke out and contained, you
19  know, became disruptive to the agency because it's in
20  the media.
21  Q. Would you agree that the disruption to the
22  agency is really caused by the problems at the FTU and
23  not by their speech about those problems?
24  A. Part of it is, yes.

**A - 305**

1   Q.  Now, isn't it true that you were unhappy that

2   their speech to the auditor, as well as their speech

3   about the conditions at the FTU, caused the State

4   Police to get back on the front pages of the Delaware

5   State News and the News Journal?

6   A.  Your questions are very long.  I am having a

7   little trouble sticking with them.

8   Q.  I can rephrase it for you.

9   A.  Thank you.

10  Q.  Isn't it true that you are unhappy that their

11  speech to the auditor got the State Police back on the

12  front page of the News Journal and the State News?

13  A.  There is not a problem with being on the front

14  page of the State News and the News Journal as long as

15  it's positive for the agency.  But when you are

16  running an agency, you like for it to be positive as

17  opposed to negative.  So, I wasn't real happy about

18  that, yeah.

19  Q.  Is that because most of the stories were

20  negative about the agency?

21  A.  Yes, portions of them were.

22  Q.  And that's something that you weren't happy

23  about?

24  A.  Right.

145

1   Q.  Now, isn't it true that you were unhappy that

2   their speech about the conditions at the FTU caused

3   the DSP to be back on the front pages of the two local

4   papers?

5   A.  Yeah.  I wasn't happy.

6   Q.  Now, isn't it true that you wanted the State

7   Police to get off of the front pages of the local

8   newspapers?

9       MR. ELLIS:  Object to the form of that

10  question.

11      THE WITNESS:  Only from a negative

12  standpoint.

13  BY MR. NEUBERGER:

14  Q.  So, you are telling me that you didn't want

15  negative stories about the Delaware State Police to be

16  on the front pages of the local papers?

17  A.  That's correct.  I mean, you know, it only

18  makes sense that if you are in charge of an agency,

19  you would like things to be positive.

20  Q.  For example, I think back in the spring of '05,

21  there was a real nice community interest story about

22  Captain Downes, about how he is involved in the

23  community with some kind of -- I think it was a

24  community policing story?

146

1   A.  Probably was.

2   Q.  Is that the type of story that you think would

3   reflect positively on the agency?

4   A.  Sure.  That's a positive article.  There has

5   been a lot of positive articles through the year.

6   Q.  Right.  And the stories that were in the local

7   newspapers from December of 2003, forward, about the

8   Delaware State Police and the FTU, those have been

9   primarily negative articles?

10  A.  I would say that's a fair statement.

11  Q.  Now, has MacLeish ever talked to you about his

12  personal feelings toward Kurt Price and Wayne Warren

13  and Chris Foraker?

14  A.  Not that I can remember.

15  Q.  Has he ever told you that he bears them ill

16  will?

17  A.  You know, you continue to say "bears ill will."

18  I have never heard that in my entire life until today,

19  so I wouldn't use "bears ill will."  That's something

20  I don't say.  I don't know that I remember anybody

21  else saying it in front of me.

22  Q.  Then I will try, in the future, in these

23  questions, to maybe bring the language a little closer

24  to something you might use.

147

1       Has he ever told you that he is pissed off

2   at them?

3       MR. ELLIS:  Object to the form of that

4   question.

5       THE WITNESS:  Not that I can recall.

6   BY MR. NEUBERGER:

7   Q.  How about that he is angry at them?

8   A.  Not that I can recall.

9   Q.  Did he ever tell you that he really wished that

10  they would just shut up?

11  A.  Not that I can recall.

12  Q.  Now, have you ever told anyone that Chris

13  Foraker is like a bad penny that just won't go away?

14  A.  No, I have not.

15  Q.  Have you ever said that about Kurt Price or

16  Wayne Warren?

17  A.  I sure haven't.

18  Q.  Have you ever told anyone that Chris Foraker is

19  a real thorn in your side?

20  A.  No, I have not.

21  Q.  Have you ever said something similar to that

22  effect about Kurt Price or Wayne Warren?

23  A.  No, I have not.

24  Q.  Have you ever told anyone -- I think I asked

148

**Page 149 / 151 (top columns)**

1   you this earlier -- have you ever told anyone that
2   Chris Foraker is a real pain in the ass?
3   A. No, I have not.
4   Q. Have you ever told anyone that you think Kurt
5   Price or Wayne Warren are a real pain in the ass?
6   A. No, I have not.
7   Q. Now, in reference to either of those three
8   officers, have you ever said that you were going to
9   get that SOB?
10   A. No, I have not.
11   Q. Now, I believe you just told me that you have
12   never told anyone those things; correct?
13   A. That's correct.
14   Q. In your personal opinion, do you think that
15   Kurt Price or Wayne Warren or Chris Foraker are a real
16   pain in the ass?
17   A. No, I don't.
18   Q. Do you think that they are just like a bad
19   penny that just won't go away?
20   A. No, I do not.
21   Q. Have you told people in the past that either
22   Kurt Price, Wayne Warren, or Chris Foraker are a,
23   quote, fucking asshole, close quote?
24   A. No, I have not.

149

1   A. Yes. I have heard of it, yes.
2   Q. Are you aware that they are a subset or sub
3   department of the Center for Disease Control?
4   A. Not really. I didn't know that.
5   Q. Are you aware that in April of 2004, they came
6   to the State Police and to facilities management and
7   offered to analyze the FTU free of charge and
8   determine what all of its problems were?
9   A. I don't remember knowing anything about that.
10   Q. Do you recall that in April of 2004, or
11   thereabout, that they came to the DSP and facilities
12   management and offered to provide free medical
13   analysis and consultation and treatment for all of the
14   officers serving at the FTU?
15   A. That wasn't shared with me.
16   Q. If a national agency came in to make that kind
17   of an offer to the DSP, who do you think they would
18   contact? Who would be the contact person?
19   A. I have no idea. They didn't contact the
20   colonel.
21   Q. So if someone wasn't going to contact the
22   colonel, do you know who they would -- is there like a
23   set person who --
24   A. I would guess maybe they would contact the

151

**Page 150 / 152 (bottom columns)**

1   Q. Have you ever said that you think those three
2   officers are, quote, a dick head, close quote?
3   A. No, I have not.
4   Q. Have you ever said that you hate those
5   officers?
6   A. No, I have not.
7   Q. Have you ever said that, in reference to those
8   three officers, that I am done with this mother
9   fucker?
10   A. No, I have not.
11   Q. So, you have never said anything like that to
12   anyone, period; is that your testimony?
13   A. That's right.
14   Q. So, if someone said that you had said something
15   to that effect, would they be lying?
16   A. That's correct.
17   Q. Now, Colonel, do you know what the National
18   Institute of Occupational Safety & Health is?
19   A. Not for sure.
20   Q. How about the acronym NIOSH, does that ring any
21   bell for you?
22   A. I was going to ask you if that was the same
23   one.
24   Q. Have you ever heard of that group?

150

1   Cabinet Secretary. I don't know. I am only guessing.
2   I don't know. I shouldn't guess.
3   Q. You shouldn't guess.
4   So, is it your testimony that you never
5   heard anything about that during that time period?
6   A. That's my testimony.
7   Q. Did anyone from facilities management ever talk
8   to you about that during that time period?
9   A. No, sir.
10   Q. Did you later hear that they had came back -- I
11   guess you retired -- was it April or May of 2005?
12   A. May the 5th.
13   Q. Did you ever hear that, in early 2005, Master
14   Corporal Wayne Warren requested a health hazard
15   evaluation from NIOSH of the facility of the FTU?
16   A. I was on administrative leave.
17   Q. Did you ever hear about that?
18   A. No, I did not.
19   Q. In light of everything that you have learned
20   since December of 2003, do you think that the FTU is a
21   safe place to work?
22   MR. ELLIS: Object to the form of that
23   question. Do you have a time frame on that?
24   MR. NEUBERGER: I gave him a time frame.

152

8/30/2005 Chaffinch, L. Aaron

1  MR. ELLIS:  What?

2  MR. NEUBERGER:  I gave him a time frame.

3  MR. ELLIS:  You said based on the things

4  he's learned since December of 2003.  You didn't say

5  when you were asking the question as -- you didn't

6  specify a time frame as to when it was safe.

7  MR. NEUBERGER:  I will rephrase the

8  question.

9  BY MR. NEUBERGER:

10  Q.  The time frame I am going to give you is from

11  December of 2003 forward.

12      Do you recall that, based on everything

13  you have learned during that time frame and since this

14  time frame began, that the FTU was a safe place to

15  work?

16  A.  Well, when you say "FTU," the Firearms Training

17  Unit is -- you must be talking specifically about the

18  building.

19  Q.  I am.

20  A.  If you are talking about the building, then the

21  answer is no, it's not a safe place to work.

22  Q.  The building is on -- it's on Clark Road or

23  something like that?

24  A.  Yes.

153

8/30/2005 Chaffinch, L. Aaron

1  Q.  It's north of Smyrna?

2  A.  That's correct.  Clark Farm Road, I think it

3  is.

4  Q.  Thank you.

5      Are you aware that NIOSH has evaluated

6  firing ranges for safety issues in the past for other

7  police departments throughout the country?

8  A.  No, I am not.

9  MR. ELLIS:  Object to the form of that

10  question.

11  BY MR. NEUBERGER:

12  Q.  Colonel, I'd like to put another document in

13  front of you.  I believe this was MacLeish Deposition

14  Exhibit No. 18.

15      Ed, do you have that?

16  MR. ELLIS:  If it's a MacLeish exhibit, I

17  have it.

18  BY MR. NEUBERGER:

19  Q.  Now, Colonel, does this appear to be an e-mail

20  from -- I guess it would be Master Corporal Warwick?

21  A.  I am not sure.

22  Q.  From Corporal Warwick to Captain Greg Warren?

23  A.  It does.

24  Q.  And is the date April 21st, 2004?

154

1  A.  Yes, it is.

2  Q.  And it's subject is NIOSH?

3  A.  Yes, it is.

4  Q.  Now, I'd like to direct your attention to the

5  third paragraph of this e-mail, and I am going to read

6  that to you; okay?

7  A.  Sure.

8  Q.  Does that say that, "On Tuesday, April 20th,

9  2004, I received a call from Dr. Randy Tubbs who told

10  me that Mr. Doyle Tiller had just called him and said

11  that a, quote, political block, close quote, is now

12  preventing him from allowing NIOSH to come in and

13  conduct testing on the air handling system.  He said

14  Mr. Tiller told him that the State Police could give

15  NIOSH permission to come in and conduct testing,

16  however, he could not due to politics."

17      Now, did you ever hear anything, while you

18  were serving there as the colonel of the State Police,

19  about politics were preventing NIOSH from coming in to

20  fix the -- or to evaluate the FTU?

21  A.  No, I did not.

22  Q.  Do politics play a role in decisions that are

23  made in the Delaware State Police?

24  A.  I wouldn't say on the day-to-day decisions.  On

155

1  the big decisions.  The cabinet secretary the State

2  Police falls under is certainly a political appointee,

3  so you can't throw political or politics out, but, you

4  know, politics don't dictate whether or not you shoot

5  or don't shoot or all different kinds of things

6  involved in law enforcement.

7  Q.  You mentioned politics are involved in the big

8  decisions.

9      What would qualify as a big decision?

10  A.  Who the colonel is going to be.

11  Q.  Things of that magnitude?

12  A.  Yes.

13  Q.  So, the position of colonel, the position of

14  lieutenant colonel, maybe?

15  A.  Yes.

16  Q.  But you are saying the day-to-day operations,

17  politics don't play a role?

18  A.  Not -- not to the degree that they do what we

19  have already discussed.

20  Q.  So you are saying that they do play somewhat of

21  a role?

22  A.  Politics plays a role in everything.  I have

23  had this conversation with many people.  Politics

24  plays a role in day-to-day activities of your family.

156

**A - 308**

1   I mean, it has nothing to do with the State Police.
2   So, to a degree, politics is involved in everything.
3   Q.  So, are you saying that politics do play a role
4   in the day-to-day operations of the Delaware State
5   Police?
6   A.  Yes.
7   Q.  Do politics play a role in the day-to-day
8   operations of the Delaware State Police when it comes
9   to the health and safety of the troopers under your
10  command?
11  A.  No.
12  Q.  Did personal loyalty to you, as colonel, play a
13  role in the decisions you made while you were colonel
14  of the State Police?
15  MR. ELLIS:  Object to the form of that
16  question.
17  THE WITNESS:  You will have to explain
18  what you mean by "personal loyalty." Are you
19  signalling out anyone or -- I mean, I don't know what
20  you are telling me or asking me.
21  BY MR. NEUBERGER:
22  Q.  I will rephrase it.
23  A.  Thank you.
24  Q.  When you had to make decisions while you were

1   colonel of the Delaware State Police, is one of the
2   factors that you considered whether the person you are
3   making the decision about had been personally loyal to
4   you as an individual?
5   A.  Well, you see, when you are a superintendent of
6   the State Police, you make decisions about all kinds
7   of things.
8   Q.  Okay.
9   A.  Everything is not personnel issues.  There is
10  all kinds of things that you make decisions about
11  daily.
12  If you are talking about putting someone
13  in a high position or something like that, any person
14  certainly would properly lean towards somebody who has
15  been loyal to them as opposed to somebody who has been
16  disloyal.  That's just common sense.
17  Q.  So, is that a factor that you would consider
18  when making personnel decisions, if we can narrow that
19  focus?
20  MR. ELLIS:  Object to the form of the
21  question.
22  THE WITNESS:  That would be one part of
23  the decision.
24  BY MR. NEUBERGER:

1   Q.  Right.  That would be --
2   A.  Depending on what you are filling -- if you are
3   filling a position, depending on the -- the
4   qualifications of the different ones that are -- that
5   you are looking at and the experience and -- there is
6   all kinds of different things that come into play.
7   But if everything -- everything else being equal,
8   sure, personal loyalty may -- may kind of tip the
9   scale, if you will.
10  Q.  Got you.  Okay.
11  Now, did there come a time when you sent
12  Chris Foraker, Wayne Warren, and Kurt Price for
13  fitness for duty exams?
14  A.  Not me.
15  Q.  Are you saying you did not make that decision?
16  A.  That's right.  The lieutenant colonel made
17  those decisions.
18  Q.  Would that be --
19  A.  Tom MacLeish.  Yeah.  He is the colonel now.
20  Q.  Did he talk to you about that decision?
21  A.  He just told me that they are going to be sent.
22  But now we need probably to know what the time frame
23  is because there is like five months when I wasn't
24  even working.  From October 27th of '04, until March

1   25th of '05, I wasn't working, so I wasn't kept
2   up-to-date.
3   Q.  We will focus on the time period from April of
4   2004 through September of 2004.
5   A.  Okay.  Yes, sir.
6   Q.  Are you aware that, during that time frame, my
7   clients were sent for fitness for duty exams?
8   A.  I am aware that they were sent, but as far as
9   the time frame, I am not real, you know, I am not real
10  -- I have no idea exactly when it was.
11  Q.  But at some point during -- you are aware that
12  they were sent?
13  A.  I am aware that they were sent.  I couldn't
14  even tell you if it was during that time frame that
15  you just enumerated.
16  Q.  Do you know why they were sent for fitness for
17  duty exams?
18  A.  Not exactly.  I don't know all the, you know,
19  the details.
20  Q.  I think you indicated --
21  A.  I know that decision was made.
22  Q.  And you indicated that then Lieutenant Colonel
23  MacLeish made that decision?
24  A.  That's right.  See, the lieutenant colonel's

**A - 309**

1  position, the range -- the training, personnel,
2  discipline all comes under the deputy superintendent,
3  so --
4  Q.  Did he have to run that decision by you?
5  A.  No.
6  Q.  Did he run that decision by you?
7  A.  He just let me know about it.
8  Q.  Did you have the authority to say, No, don't do
9  that?
10  A.  Sure.
11  Q.  Did you tell him, No, don't do that?
12  A.  No, I did not.  And I didn't know all the
13  particulars that he knew.  I wasn't -- I wouldn't do
14  that without knowing what's going on.
15  Q.  Okay.
16  A.  I have no reason to believe that he wasn't
17  making the right decision.  If I had had a reason to
18  believe he wasn't making the right decision, maybe I
19  would have looked into it farther, but I have no
20  reason to believe that.  He was working with human
21  resources and whoever else was involved in it.
22  Q.  And are you indicating that you don't know why
23  he made that decision?
24  A.  Right.  I don't know all the particulars.

1  Q.  Do you know if Wayne Warren and Kurt Price
2  passed their fitness for duty exams?
3  A.  No, I don't.
4  Q.  Do you know if Chris Foraker passed his fitness
5  for duty exam?
6  A.  I am thinking I remember that he did, but I am
7  not 100 percent sure.  I think he did.
8  Q.  Do you know that Chris Foraker was sent for a
9  second opinion on his fitness for duty exam?
10  A.  I do now.
11  Q.  Did you know it then?
12  A.  I am not sure.  Another thing was the time
13  period.
14  Q.  So, today, the end of August, 2005, are you
15  aware of the fact that Chris Foraker was sent for
16  three fitness for duty exams?
17  A.  No.
18  Q.  Do you think that's normal to send an officer
19  for three fitness for duty exams?
20  A.  I have no reason to -- to believe it's normal
21  or abnormal.  I don't know.
22  Q.  Have you ever been sent for three consecutive
23  fitness for duty exams?
24  A.  No.  I have never been sent for one.

1  Q.  Do you know why Sergeant Foraker was sent for
2  three fitness for duty exams?
3  A.  No, I do not.
4  Q.  Now, did there come a time when you put Kurt
5  Price and Wayne Warren or light duty?
6  A.  Lieutenant colonel did.
7  Q.  So, you are telling me that you did not make
8  that decision?
9  A.  That's correct.
10  Q.  Were you involved in that process at all?
11  A.  No.
12  Q.  As colonel, did Lieutenant Colonel MacLeish run
13  that decision by you?
14  A.  He may have run it by me after the fact.
15  Q.  So, you are telling me --
16  A.  I am sure he was working hand-in-hand with
17  human resources and Captain Yeomans.
18  Q.  So you are indicating to me that he only ran it
19  by you after the fact?
20  A.  Yes.  And that -- and I am not sure of that
21  because it depends on when that was.
22  Q.  So, he could have run it by you before he did
23  it; you just don't remember?
24  A.  No.  I am saying when this occurred, depending

1  on what date that was, because, like I said, I wasn't
2  there a lot --
3  Q.  I will represent to you that Kurt Price and
4  Wayne Warren were put on light duty on June 18th of
5  2004.
6  A.  Okay.
7  Q.  So, focus around that time --
8  A.  Thank you.
9  Q.  -- time frame.
10  A.  Yes, sir.
11  Q.  Do you know if Lieutenant Colonel MacLeish ran
12  that decision by you before --
13  A.  No.  He told me that -- that that had occurred.
14  Q.  So he told you after the fact?
15  A.  Yeah.
16  Q.  He did not tell you before the fact?
17  A.  No.
18  Q.  So, when you found out about it after the fact,
19  did you say, That's the wrong decision?
20  A.  No.
21  Q.  Did you say, You made a mistake, Tom MacLeish?
22  A.  I sure didn't.
23  Q.  Did you think he had made the right decision?
24  A.  I had no reason to believe anything different

8/30/2005  Chaffinch, L. Aaron

1   from that.
2       Q.  As the colonel of the State Police, you had the
3   authority to overrule that decision if you wanted to;
4   isn't that right?
5       A.  Sure.
6       Q.  Because you are the colonel and you can -- you
7   are the ultimate, I guess, decision maker in the State
8   Police; would that be fair to say?
9           MR. ELLIS:  Object to the form of that
10  question.
11          THE WITNESS:  The ultimate decision maker?
12  I have never actually heard it said that way before,
13  but --
14  BY MR. NEUBERGER:
15      Q.  How would you phrase it?
16      A.  I am the superintendent of the State Police.
17      Q.  And inherent in that position, you are the --
18  you have the final say on --
19      A.  A lot of things.
20      Q.  And would whether someone goes on light duty be
21  one of those things?
22      A.  Not necessarily because the way it's set up,
23  the lieutenant colonel, that comes under the
24  lieutenant colonel's purview, just, like I said, all

165

8/30/2005  Chaffinch, L. Aaron

1   discipline, all personnel issues, and all training
2   issues come under the lieutenant colonel.
3       Q.  Are you aware that in the spring of 2005, Kurt
4   Price and Wayne Warren were ordered to separate from
5   the division?
6       A.  No, I am not.
7       Q.  Are you telling me that you knew nothing about
8   that?
9       A.  The spring -- when in the spring?  Do you know?
10      Q.  May 12th of 2005.
11      A.  I was retired.
12      Q.  Did you hear about that before you retired?
13      A.  No.
14      Q.  I think you said you retired on May 5th of
15  2005?
16      A.  Mm-hmm.
17      Q.  So, was that decision run by you prior to your
18  retirement?
19      A.  No.
20      Q.  Did then Lieutenant Colonel MacLeish talk to
21  you about it prior to your retirement?
22      A.  No.
23      Q.  I believe you were back on full duty in the end
24  of March?

166

8/30/2005  Chaffinch, L. Aaron

1       A.  March 24th.
2       Q.  Of 2005?
3       A.  Mm-hmm.
4       Q.  And then you were on full duty until May 5th of
5   2005?
6       A.  Yes.
7       Q.  So, is it your testimony that during that time
8   period, Lieutenant Colonel MacLeish never told you
9   about his order to Kurt Price and Wayne Warren to
10  separate from the division?
11      A.  I don't remember him telling me that, and
12  during those six weeks or so that I was back, I was
13  out of state two different weeks.
14      Q.  So, you are telling me that you had no
15  involvement in that process?
16      A.  That's correct.
17      Q.  Now, Colonel, did you ever become aware of
18  Sergeant Foraker being thrown out of the commanders
19  and section chief meetings by then Lieutenant Colonel
20  MacLeish?
21      A.  Could you restate the first part of that?
22      Q.  Did you ever find out that Sergeant Foraker was
23  thrown out of a commanders and section chiefs meeting
24  by then Lieutenant Colonel MacLeish?

167

8/30/2005  Chaffinch, L. Aaron

1       A.  I saw the lieutenant colonel -- I was at that
2   meeting.  I saw the lieutenant colonel go over to
3   Sergeant Foraker and talk to Sergeant Foraker, and
4   then I saw Sergeant Foraker get up and leave the room.
5       Q.  Were you --
6       A.  And subsequently -- I wasn't a part of it until
7   after the fact when the lieutenant colonel came and
8   told me.
9       Q.  Was Lieutenant Colonel MacLeish acting at your
10  direction?
11      A.  No.
12      Q.  Did you tell Lieutenant Colonel MacLeish to get
13  Sergeant Foraker out of the room?
14      A.  No, I did not.
15      Q.  What did Lieutenant Colonel MacLeish say to you
16  when he came back after Sergeant Foraker left the
17  room?
18      A.  Well, I think I probably asked him, Why is
19  Sergeant Foraker here?, because we didn't have
20  sergeants come to the commanders meeting, and he said
21  he took care of it or whatever.  But I hadn't had any
22  conversation prior to the lieutenant colonel going
23  over and talking to him.
24      Q.  Are you aware that Sergeant Foraker's job

**A - 311**

168

1  responsibilities at the FTU have been decreased since
2  he was reinstated there in December of 2003?
3        MR. ELLIS:  Objection to the form of the
4  question.
5        THE WITNESS:  No, I am not aware, and I
6  don't believe that they have.
7  BY MR. NEUBERGER:
8     Q.  Is that something which you think you would
9  normally be aware of if something like that were to
10 occur?
11    A.  Yes.
12    Q.  And you are indicating that you did not order
13 that and that that did not happen, period?
14    A.  I am saying that I was not aware of the fact
15 that they have been diminished.  No, I did not order
16 it.  And if they were diminished, I am not aware of
17 it.
18    Q.  So, you are indicating that it's possible that
19 it could have happened but you just have no personal
20 knowledge one way or the other?
21    A.  I have no knowledge one way or the other.  I
22 don't believe that it did, but I have no knowledge of
23 it one way or the other.
24    Q.  Are you aware that beginning in December of

169

1  speaking about?
2  BY MR. NEUBERGER:
3     Q.  Any commanders that you are aware of, Colonel?
4     A.  No.  No.
5     Q.  Are you aware that when Sergeant Ashley was the
6  NCOIC of the FTU, that he was given greater autonomy
7  when making financial decisions than Sergeant Foraker
8  has had since he was reinstated beginning in December
9  of 2003?
10       MR. ELLIS:  Objection to the form.
11       THE WITNESS:  No, I am not aware of any of
12 that.
13 BY MR. NEUBERGER:
14    Q.  Are you aware that Sergeant Ashley was allowed
15 to bypass the chain of command when it came to
16 particular issues, such as fixing the bullet trap?
17       MR. ELLIS:  Objection to the form of that
18 question.
19       THE WITNESS:  No, I am not aware of it
20 BY MR. NEUBERGER:
21    Q.  Did Sergeant Ashley come and update you on his
22 efforts while he was NCOIC of the FTU to fix the
23 bullet trap?
24    A.  No, sir, he did not.

171

1  2003, Sergeant Foraker was deprived of the required
2  fifth full time firearms instructor he needed to
3  safely operate the FTU?
4        MR. ELLIS:  Object to the form of that
5  question.
6        THE WITNESS:  No, I am not.
7  BY MR. NEUBERGER:
8     Q.  Since Sergeant Foraker's return to the FTU in
9  December of 2003, did you ever order any of his
10 commanders to sit on him and hassle him in the
11 fulfillment of his duties?
12    A.  I sure didn't.
13    Q.  Did you ever become aware that that was
14 occurring?
15    A.  His commanders were sitting on him?
16    Q.  I will rephrase the question.  I think you are
17 indicating that you don't understand it or that it's a
18 little unclear.
19    A.  I have never heard anybody sitting on somebody.
20    Q.  Did you ever become aware that his commanders
21 were hassling him and nitpicking him in the
22 performance of his duties?
23       MR. ELLIS:  What commanders?
24       THE WITNESS:  What commanders are you

170

1     Q.  He didn't come to headquarters and speak to you
2  once a week?
3     A.  No, he did not.
4     Q.  Is Sergeant Ashley a friend of yours?
5     A.  Not really.  He happened to work at the same
6  troop as I.
7     Q.  What troop was that?
8     A.  Troop 5.
9     Q.  And that's Bridgeville?
10    A.  That's correct.
11    Q.  Colonel, would it be fair to say that the State
12 Police has been in the paper a lot over the last
13 several years?
14       MR. ELLIS:  Objection to the form of that
15 question.
16       THE WITNESS:  I guess so.
17 BY MR. NEUBERGER:
18    Q.  Would it be fair to say that they have been --
19 that the State Police has been in the paper a lot in a
20 negative way over the past several years?
21    MR. ELLIS:  Objection to the form of that
22 question.
23       THE WITNESS:  I think so.
24 BY MR. NEUBERGER:

A - 312

172

1    Q.  For example, there was media coverage of the
2    jury verdict in June of 2003, arising from Sergeant
3    Foraker's lawsuit against you; isn't that right?
4    A.  Yes, there was.
5    Q.  And there was media coverage arising out of a
6    separate trial in January of 2004; isn't that right?
7    A.  Yes, there was.
8    Q.  And then you have been sued individually and
9    personally by a lot of either troopers or other
10   Delaware State Police employees and those suits have
11   received media coverage; isn't that right?
12       MR. ELLIS:  Objection to the form.
13       THE WITNESS:  I don't know if you would
14   say "a lot," but there has been some.
15   BY MR. NEUBERGER:
16   Q.  More than two?
17   A.  More than two is a lot?
18   Q.  How about more than three?
19   A.  More than three is not a lot either.
20   Q.  How about more than four?
21   A.  Okay.  There has been more than four.
22   Q.  How about more than five?
23   A.  Are we going to stop any time soon?  It's kind
24   of childish.

1    Q.  It depends what your answer is to this more
2    than five question?
3    A.  What was the timetable again?
4    Q.  April of 2002 to the present?
5    A.  Yes, more than five.
6    Q.  And there has been a lot of media coverage of
7    various Internal Affairs investigations and
8    investigations by outside investigatory agencies into
9    either you and/or Lieutenant Colonel MacLeish during
10   that same time period; isn't that correct?
11       MR. ELLIS:  Objection to the form.
12       THE WITNESS:  A lot of internal
13   investigations.
14   BY MR. NEUBERGER:
15   Q.  Media coverage of Internal Affairs
16   investigations?
17   A.  I am trying to think -- two.
18   Q.  So, there has been media coverage of those
19   investigations?
20   A.  Yes.
21   Q.  And would it be fair to say that you don't like
22   this negative publicity?
23   A.  As I answered a few times before, yeah, nobody
24   would like negative publicity.

1    Q.  Do you have a preference as to whether Delaware
2    State troopers raise issues internally or externally
3    by filing lawsuits?
4        MR. ELLIS:  Object to the form of that
5    question.
6        THE WITNESS:  Sure, I have a preference.
7    BY MR. NEUBERGER:
8    Q.  What is your preference?
9    A.  I would rather them try to take care of it
10   in-house first.
11   Q.  Would it be fair to say that you don't like it
12   when troopers sue the agency?
13   A.  That would be like -- yeah, I don't like it
14   when people sue the agency.  I don't like that.
15       MR. NEUBERGER:  I think this is a good
16   spot for a break.
17       (Recess taken.)
18   BY MR. NEUBERGER:
19   Q.  Colonel, we talked a little bit before about
20   the first media tour you gave of the FTU.
21       Do you recall testifying about that at
22   some length?
23   A.  That I gave?
24   Q.  The first media tour that you attended?

1    A.  Yes, we did talk about that.
2    Q.  And I'd like to focus and ask you some
3    questions about some things that happened immediately
4    before the tour and some things that happened
5    immediately after the tour, just so you have some
6    focus in your own mind of where your questions are
7    going to be going.
8    A.  Yes, sir.
9    Q.  Now, the day of the first tour, you went to
10   headquarters before you went to the FTU on Clark Farm
11   Road?
12   A.  I am sure I did, yes.
13   Q.  And while you were at headquarters, before you
14   left for the tour, you went down to the traffic
15   section, didn't you?
16   A.  I don't know.  Maybe I did.
17   Q.  Are you indicating that you just are not sure;
18   you just don't remember?
19   A.  I don't remember.
20   Q.  Well, I am going to try to jog your memory a
21   little bit.
22   A.  Okay.
23   Q.  Do you recall if you went down into the traffic
24   section and talked to Captain Glen Dixon?

1    A.  Do you know the date of this?

2    Q.  This would have been about April 6th of 2004.

3    He may have been a lieutenant.  I am not exactly sure

4    when he was promoted.

5    A.  He was a captain in April of '04, but he

6    wouldn't have been in the traffic section unless he

7    just accidently stopped up there because September of

8    '03, he went to be a troop commander at Troop 5 in

9    Bridgeville.

10   Q.  Is that your home troop?

11   A.  Yes, it is.

12   Q.  So, on April 6th of 2004, do you recall whether

13   you went down to the traffic section and talked with

14   Captain Glen Dixon?

15   A.  No, I don't, because I don't think he would be

16   there.

17   Q.  Do you recall if on April 6th of 2004, before

18   you went on the media tour, did you go down to the

19   traffic section and talk with Captain Barbara Conley?

20   A.  I may have, but I don't remember it.

21   Q.  I will keep trying to jog your memory.

22   A.  All right.

23   Q.  In conversations with Captain Conley and

24   Captain Dixon in the traffic section, did you say that

177

1    Q.  So you deny that statement?

2    A.  That's correct.

3    Q.  Do you recall that conversation?

4    A.  No, I do not.

5    Q.  But you deny that statement anyway?

6    A.  I don't recall the conversation, and I deny

7    what you are saying.

8    Q.  So, you are denying that you ever said that?

9    A.  That's right.

10   Q.  Even though you are testifying you don't

11   remember having that conversation?

12   A.  That's right.  I never had that conversation.

13   Q.  So now you are -- it's not that you don't

14   remember it, it's that you deny it ever occurred?

15   A.  I never had that conversation.

16   Q.  Did you have a similar conversation?

17   A.  Not that I know of.

18   Q.  During that same conversation with Captain

19   Conley and Captain Dixon in the traffic section, did

20   you say, quote, I am going to stick it up their ass,

21   closed quote?

22   A.  No, I did not, and it seems strange to me that

23   Captain Conley and Captain Dixon would be in the

24   traffic section because you only have one captain in

179

1    you were getting ready to go to the FTU to, quote,

2    stick it to Chris Foraker and Greg Warren?

3    A.  No, I did not.

4    Q.  So you deny that?

5    A.  That's exactly right, I deny that.

6    Q.  I thought you said you didn't remember whether

7    you had said that or not?

8    A.  No.  I didn't remember whether I went to the

9    traffic section or not.  I know very well I didn't say

10   that.

11   Q.  And how do you know that if you are not sure

12   you even had the conversation in the first place?

13   A.  Because I never have said that.

14   Q.  So you deny that you have ever said that you

15   were going -- you were getting ready to go to the FTU

16   to, quote, stick it to Chris Foraker and Greg Warren?

17   A.  That's correct, I deny that.

18   Q.  And if Captain Conley and Captain Dixon testify

19   otherwise, would they be lying?

20   A.  That's correct.

21   Q.  During those same conversations with Captain

22   Conley and Captain Dixon, did you say, quote, I am

23   going to show them what I am all about, closed quote?

24   A.  No, I did not.

178

1    the traffic section, and in April of '04, when you

2    said this occurred, he was no longer in the traffic

3    section.

4    Q.  Okay.

5    A.  So now you continue to tell me things that I

6    have supposedly said when two captains have never been

7    in the traffic section at the same time.

8    Q.  I thought you said a few minutes ago that maybe

9    Captain Dixon could have been just stopping by to pick

10   something up?

11   A.  Well, he may have.

12   Q.  For example, you go down to Captain Dixon's

13   office in Troop 5 all the time just to chat, don't

14   you?

15   A.  No.

16   Q.  Do you deny that you went down to Captain

17   Dixon's office all the time to chat while you were on

18   administrative leave?

19   A.  Yes, I do deny that.

20   Q.  Do you deny you spent a lot of your time down

21   at Troop 5 talking in the presence of Captain Dixon

22   and Lieutenant Rust and Lieutenant, I think, Brown?

23   A.  All the time?  I just stopped there all the

24   time; is that what you are saying?

**A - 314**

180

1  Q. Sure.
2  A. I was in there three or four times during the
3  time that I was on administrative leave, but in five
4  months, I don't think three or four times is all the
5  time.
6  Q. Okay.
7  A. I was in Florida a lot of that time.
8  Q. At your vacation home down there?
9  A. Yes, sir.
10  Q. So, I think you are telling me that -- and I
11  apologize I am still a little unclear on this -- are
12  you telling me that this conversation with Captain
13  Dixon and Captain Conley never occurred or that you
14  don't remember it occurring?
15  A. I am telling you that with regards to what you
16  are saying was in the conversation never occurred.
17  Q. But do you remember --
18  A. I don't know if a conversation occurred or not.
19  I may have gone down there and he may have stopped in
20  and I may have talked to him, but I didn't go down
21  there before I went up to the firing range for the
22  first meeting because I knew Gloria Homer was going to
23  be up there and tell all these things that you are
24  saying that I have said.

1  Q. Do you recall being very happy, animated, and
2  excited about what you had just done at the FTU
3  the media tour?
4  A. No, I do not.
5  Q. Do you recall saying that you had just done a
6  great thing?
7  A. No, I do.
8  Q. Do you recall bragging about what you had just
9  done?
10  A. No, I do not.
11  Q. Do you recall being very proud of yourself for
12  what you had just done?
13  A. No, I do not.
14  Q. Do you recall expressing that verbal --
15  A. No, I do not.
16  Q. Do you recall saying that you really, quote,
17  put it on them, close quote?
18  A. No, I do not.
19  Q. Do you recall saying that you really, quote,
20  took it to him, close quote?
21  A. No, I do not.
22  Q. Do you deny saying those things?
23  A. Yes.
24  Q. Do you think you had a conversation with

1  Q. So, you are denying that you said these things?
2  A. That's correct.
3  Q. But you are saying that you very well may have
4  gone down there to talk to someone?
5  A. I may have.
6  Q. Now, I'd like to focus your attention on after
7  you returned from the tour of the firing range that
8  same day.
9  A. Okay.
10  Q. When you returned to the headquarters, did you
11  go back down to the traffic section?
12  A. I don't remember that I did.
13  Q. Do you think it is a -- is it possible or you
14  just don't remember one way or the other?
15  A. I don't think it's even possible.
16  Q. So it's impossible that you went down to the
17  traffic section after you returned to headquarters
18  that day?
19  A. I never went down after I returned. I am not
20  even sure if I went back to headquarters.
21  Q. Do you recall having a conversation with
22  Captain Conley and/or Captain Dixon after you returned
23  to headquarters?
24  A. No, I do not.

1  Captain Conley or Captain Dixon about these things
2  that day and just that you didn't say these things or
3  just that the conversation never occurred?
4  A. The conversation never occurred.
5  Q. Are you telling me it's out of the ordinary for
6  you to have talked to Captain Dixon or Captain Conley
7  during that time frame?
8  A. They both wouldn't have been down there during
9  that time frame.
10  Q. How about one of them?
11  A. One of them may have been.
12  Q. For example, Captain Conley, I believe, is the
13  director of traffic and was the director of traffic
14  during that time frame?
15  A. Yes, she was, and yes, she is.
16  Q. So she could have been there?
17  A. She could have been.
18  Q. And are you saying that you normally wouldn't
19  have talked to her?
20  A. I talked to her on occasion, but I can't
21  imagine if I talked to her before I went, then I just
22  run right down there as soon as I got back down from
23  the range to talk to her some more. I mean, usually
24  when I went down there, I had something on my mind to

**A - 315**

1  talk to her about with regards to traffic.

2  Q.  Still focusing on the time period after you

3  returned from the media tour of the FTU or -- are we

4  on the same page with that part, at least?

5  A.  Yes, sir.

6  Q.  Did you go and talk to Major David Baylor, I am

7  sorry, now retired David Baylor?

8  A.  I saw David Baylor upstairs, yes.  He was a

9  major and he worked up in the executive staff.

10  Q.  Did you go and tell Major Baylor that, quote, I

11  got my shots in, people who live in glass houses

12  shouldn't throw stones; the mess at the range is all

13  Foraker's fault; I got him back, close quote?

14  A.  No.  I did not.  I said that I said, "People in

15  glass houses shouldn't throw stones," just exactly

16  what I testified to earlier.  The other parts, I did

17  not say.

18  Q.  I believe you testified earlier that you made

19  statements to --

20  A.  Tom Eldred.

21  Q.  Of the Delaware State News?

22  A.  That's right.

23  Q.  Are you telling me that you made those same

24  exact statements to now retired Major David Baylor?

185

---

1  A.  I told David Baylor what I had told Tom Eldred.

2  Q.  And just so we are clear, what exactly did you

3  tell Major David Baylor?

4  A.  "People in glass houses shouldn't throw

5  stones."

6  Q.  And is that all that you said to him?

7  A.  And he asked me who I was talking about, just

8  like Tom Eldred did, and I -- I said I was talking

9  about Greg Warren.

10  Q.  So you denied telling him that the mess at the

11  range is all Foraker's fault?

12  A.  No, I never said that.

13  Q.  You deny telling Major David Baylor that,

14  quote, I got him back?

15  A.  I did not say that.

16  Q.  So, you deny saying those things to Major David

17  Baylor that day?

18  A.  That's correct.

19  Q.  But you do admit you had a conversation with

20  him?

21  A.  That's correct.

22  Q.  And you admit you said to him that people who

23  live in glass houses shouldn't throw stones?

24  A.  That's correct.

186

---

1  Q.  And you deny saying to him that, quote, I got

2  my shots in, close quote?

3  A.  I deny that, yes.

4  Q.  So, if his memory is different than your

5  memory, you think he would be lying?

6  A.  He just doesn't remember the conversation like

7  it happened.

8  Q.  But you remembered that particular

9  conversation?

10  A.  I sure do.

11  Q.  You don't remember the conversation with

12  Captain Conley or Captain Dixon?

13  A.  I sure don't.

14  Q.  But you remember the conversation with Major

15  Baylor?

16  A.  That's correct.

17  Q.  And Major Baylor was a member of your executive

18  staff, was he not?

19  A.  Yes, he was.

20  Q.  For example, he was the second person promoted

21  after you became colonel; isn't that right?

22  A.  That's correct.

23  Q.  And you promoted Tom Marcin to lieutenant

24  colonel and then you promoted Dave Baylor to major?

187

---

1  A.  That's correct.

2  Q.  Was the Baylor conversation that was -- did you

3  say it was on the second floor of the headquarters

4  building?

5  A.  Mm-hmm.

6  Q.  After you returned from the firing range tour

7  that day, did you talk to Lieutenant Colonel MacLeish

8  about the tour?

9  A.  Probably did.  I don't know if I did that same

10  day or not.

11  Q.  Do you recall what you said to him?

12  A.  No.  I probably explained to him who all was

13  there and some of the things that I remembered that,

14  you know, Gloria Homer said and stuff like that.

15  Q.  Do you think you talked to -- would Randall

16  Hughes have been a major at that point, or would he

17  still have been a captain?  This would be April of

18  2004.

19  A.  He would have been a captain.

20  Q.  Who were the other members of the executive

21  staff at that point; do you recall?  It was Major

22  Baylor, Major Seaford, Major Papili?

23  A.  This is April of '04?

24  Q.  Yes, sir.

188

**A - 316**

**[Page 189]**

1  A. No. Major Hughes -- he would be a major.
2  Q. Do you think you talked to Major Hughes after
3  you returned from the media tour of the FTU?
4  A. I don't know if I did or not. Very seldom is
5  everybody up there in headquarters in the staff
6  because, you know, they are all over everywhere doing
7  their duties with whatever they have that day. So, it
8  would have been -- if all of them were there, I would
9  hardly believe it, you know what I mean? I don't
10  remember -- I remember talking to Dave Baylor. That's
11  the only one I remember talking to that day.
12  Q. Okay.
13  A. If Tom MacLeish would have been there, he would
14  have gone with me, so he wasn't there, so I don't know
15  when he returned. So I am not sure if I talked with
16  him that day or whether I talked to him the next day.
17  Q. Do you think you talked to him the next day?
18  Is it possible you talked to him one of those days?
19  A. Yes.
20  Q. Do you recall what you said to him?
21  A. No. I just probably explained to him what
22  occurred at the range and, you know, how it all went
23  down, who all was there, and that kind of stuff.
24  MR. ELLIS: Are you guessing?

**[Page 190]**

1  BY MR. NEUBERGER:
2  Q. Colonel, it's very important, I don't want you
3  to guess. I have said that repeatedly.
4  A. I don't remember when I talked to Tom MacLeish.
5  Q. That's helpful and I appreciate that answer.
6  Have you ever talked to Representative
7  Peter Schwartzkoff about Chris Foraker?
8  A. I don't recall.
9  Q. Did you ever talk to him about Master Corporals
10  Wayne Warren and Kurt Price since December of '03?
11  A. I don't recall.
12  Q. Do you think it's possible that you did?
13  A. I don't think so. I don't have any knowledge
14  of it.
15  Q. Did you ever talk to Senator Thurman Adams
16  about Sergeant Chris Foraker?
17  A. No, I have not.
18  Q. Have you ever talked to Senator Thurman Adams
19  about Master Corporals Price or Warren?
20  A. No, I have not.
21  Q. So you deny ever speaking to those -- to that
22  gentleman about my clients?
23  A. That's correct.
24  Q. And who is Thurman Adams?

**[Page 191]**

1  A. He is a senator in the state of Delaware.
2  Q. And is your friend?
3  A. Yes.
4  Q. Is he your close friend?
5  A. Yes.
6  Q. Would it be fair to say he is your political
7  protector or your political patron?
8  MR. ELLIS: Object to the form.
9  THE WITNESS: He is not my political
10  protector.
11  BY MR. NEUBERGER:
12  Q. Is he your political patron?
13  MR. ELLIS: Objection to the form.
14  THE WITNESS: I am his constituent.
15  BY MR. NEUBERGER:
16  Q. Has he ever told you that he would take care of
17  you no matter what?
18  A. No.
19  Q. That he will protect you no matter what?
20  A. No.
21  Q. Do you know if he was the reason that the state
22  of Delaware decided to pay the money to settle Chris
23  Foraker's first suit even though the state of Delaware
24  said that state law could not pay that?

**[Page 192]**

1  MR. ELLIS: Objection to the form.
2  THE WITNESS: I don't have a clue what you
3  are talking about.
4  BY MR. NEUBERGER:
5  Q. Are you saying you don't understand the
6  question?
7  A. Yeah. I understand the question.
8  Q. And you are saying --
9  A. That's the first time I have ever heard that in
10  my life.
11  Q. So you are saying that you don't know?
12  A. That's right. I don't know. There was a
13  settlement in the Foraker case. And once there was a
14  settlement in the Foraker case, the punitive damages
15  were no longer a part of the settlement. So, I mean,
16  that doesn't go together, I don't believe.
17  Q. You are answering no to the question? You said
18  you just don't know?
19  A. Okay.
20  Q. Is that correct?
21  A. Yes.
22  Q. The reference to the jury verdict in Sergeant
23  Foraker's first suit, did Senator Adams ever say to
24  you that you would not have to pay the money out of

**A - 317**

1    your own pocket?

2    A.   I don't believe so.

3    Q.   You are not sure?

4    A.   I don't remember him saying that.

5    Q.   Is it possible that he could have said it and

6    you just don't remember?

7    A.   I wouldn't think so, but I guess there is a

8    possibility it could have happened.

9    Q.   Do you brag about your association with Senator

10   Thurman Adams?

11   A.   He is just a close friend of mine. I mean, why

12   would I brag about it? I got a lot of close friends.

13   Q.   So, are you saying that you do not brag about

14   your association with Senator Thurman Adams?

15   A.   I wouldn't call it bragging. I am proud that I

16   know him and I am proud that we are friends. He has

17   been good to me and I have been good to him and his

18   family. That's as far as it goes.

19   Q.   Throughout your career, have you bragged in

20   front of other officers that it doesn't matter what

21   you do because Senator Adams will protect you?

22   A.   No.

23   Q.   Do you refer to Thurman Adams as Uncle Thurman?

24   A.   No.

193

1    Q.   Do you refer to Senator Adams as the

2    Thurminator?

3    A.   No.

4    Q.   Do you refer to Senator Adams as big daddy?

5    A.   No. That's his grandson.

6    Q.   I am sorry?

7    A.   His grandson's nickname is big daddy, and his

8    grandson and my son grew up together, so some of your

9    information is not together.

10   Q.   Now, do you remember that there came a time

11   when Major Dave Baylor retired?

12   A.   Yes, I remember that.

13   Q.   Was that towards the end of August of 2004?

14   A.   I believe you are correct.

15   Q.   Did he have a retirement party around that

16   time?

17   A.   Yes, he did.

18   Q.   Now, prior to the retirement party, did you

19   tell Cabinet Secretary David Mitchell that the

20   Thurminator was going to blast Mitchell because

21   Mitchell was trying to stop you from doing your thing,

22   or something to that effect?

23   A.   Did I tell who?

24   Q.   Cabinet Secretary David Mitchell?

194

1    A.   Did I tell him?

2    Q.   That the Thurminator was going to blast

3    Mitchell because Mitchell was trying to stop you from

4    being you, or something to that effect?

5    A.   I don't understand that question. You are

6    asking me about something I told Dave Mitchell about

7    blasting Dave Mitchell.

8    Q.   Did you ever tell Secretary Mitchell that the

9    Thurminator was going to protect you?

10   A.   No, I did not.

11   Q.   Have you ever told any of your friends or

12   coworkers that the Thurminator was going to blast

13   Mitchell because Mitchell was coming down hard on you?

14   A.   You are going to have to give me more than

15   that. I don't know -- I don't know what you are

16   talking about.

17   Q.   So, you are denying that ever occurred?

18   A.   Yes.

19   Q.   Have you ever told any friends or coworkers

20   that the Thurminator was going to tell Mitchell to

21   back the F off because Mitchell was pressuring you?

22   A.   No, I have not.

23   Q.   So you deny that?

24   A.   That's right.

195

1    Q.   Now, Colonel, to change gears again, do you

2    know of a restaurant called Sambos?

3    A.   Yes.

4    Q.   And is that located in Leipsic Delaware?

5    A.   Leipsic.

6    Q.   Leipsic?

7    A.   Mm-hmm.

8    Q.   Is that a popular place?

9    A.   I don't know. I have been there about maybe

10   three times in my life.

11   Q.   Is that -- I am sorry. Go ahead.

12   A.   It has good seafood.

13   Q.   Do you know if Delaware state troopers eat

14   there very often?

15        MR. ELLIS: Object to the form of the

16   question.

17        THE WITNESS: No, I don't.

18   BY MR. NEUBERGER:

19   Q.   Do you know if the DSP executive staff, while

20   you were colonel, would take visiting out of state

21   police officers there to eat?

22   A.   We did on one occasion, I remember.

23   Q.   And are you telling me that that only happened

24   on one occasion?

196

**A - 318**

8/30/2005 Chaffinch, L. Aaron

1    A.  While I was colonel?

2    Q.  Yeah.

3    A.  It may have happened more than once, but I

4    remember being there once with out of state people.

5    If, in fact, they went another time, the human

6    resource section took them there, I didn't.  I only

7    remember going one time.  It was when we had officers

8    here from other states involved in our promotional

9    process with the interviews.

10   Q.  That's like the oral boards?

11   A.  Yes.  I remember going one time, and I am not

12   saying there wasn't more than one time, but I only

13   went once.

14        MR. NEUBERGER:  I'd like to take a short

15   break and I think I am almost done.

16        (Recess taken.)

17        MR. NEUBERGER:  Colonel, I have no further

18   questions, but I would like to note for the record

19   that this deposition is subject to recall based on the

20   punitive damages issue that we talked about with

21   Mr. Ellis on the record this morning.  Also, there is

22   some outstanding discovery document requests as well.

23   But subject to that, I don't have any further

24   questions.

---

1        MR. ELLIS:  I don't have any questions.

2        (The deposition was concluded at 2:40

3    p.m.)

4          - - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

1        INDEX TO TESTIMONY

2

L. AARON CHAFFINCH                    PAGE

3

Examination by Mr. Neuberger              2

4

5          - - - - -

6        INDEX TO EXHIBITS

7

8              PAGE

Chaffinch Exhibit No. 1 entitled "Verdict Form" was

9    marked for Identification......................... 21

10   Chaffinch Exhibit No. 2 which is a memorandum to Lt.
     Ralph Davis from Sgt. Alfred W. Parton, Jr. was marked

11   for Identification............................. 102

12   Chaffinch Exhibit No. 3 bates stamped FTU2849 through
     FTU2940 was marked for Identification........... 128

13

14   ERRATA SHEET.......................................200

15

16   CERTIFICATE OF REPORTER............................201

17

18

19

20

21

22

23

24

---

1

2

3

4        REPLACE THIS PAGE

5        WITH THE ERRATA SHEET

6        AFTER IT HAS BEEN

7        COMPLETED AND SIGNED

8        BY THE DEPONENT.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

A - 319

State of Delaware )

      )

New Castle County )

    **CERTIFICATE OF REPORTER**

    I, Renee A. Meyers, Registered Professional

Reporter and Notary Public, do hereby certify that

there came before me on the 30th day of August, 2005,

the deponent herein, L. AARON CHAFFINCH, who was duly

sworn by me and thereafter examined by counsel for the

respective parties; that the questions asked of said

deponent and the answers given were taken down by me

in Stenotype notes and thereafter transcribed into

typewriting under my direction.

    I further certify that the foregoing is a true

and correct transcript of the testimony given at said

examination of said witness.

    I further certify that I am not counsel,

attorney, or relative of either party, or otherwise

interested in the event of this suit.

        Renee A. Meyers

        Certification No. 106-RPR

        (Expires January 31, 2005)

DATED:  September 2, 2005

201

**A - 320**



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Price, et al.

# v.

# Chaffinch, et al.

## C.A. # 04-1207

---

## Transcript of:

## Thomas F. MacLeish

## July 19, 2007

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A - 321

Price, et al.
Thomas F. MacLeish
v.
C.A. # 04-1207
Chaffinch, et al.
July 19, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE,    )
CORPORAL WAYNE WARREN,    )
and SERGEANT CHRISTOPHER   )
D. FORAKER,                )
                           )
     Plaintiffs,           )
                           )
     v.                    )  C.A. No. 04-1207
                           )
COLONEL L. AARON CHAFFINCH,)
individually and in his    )
official capacity as       )
Superintendent of the      )
Delaware State Police;     )
LIEUTENANT COLONEL THOMAS  )
F. MacLEISH, individually  )
and in his official        )
capacity as Deputy         )
Superintendent of the      )
Delaware State Police;     )
DAVID B. MITCHELL, in his  )
official capacity as the   )
Secretary of the Department)
of Safety and Homeland     )
Security of the State of   )
Delaware; and DIVISION OF  )
STATE POLICE, DEPARTMENT OF)
SAFETY AND HOMELAND        )
SECURITY, STATE OF         )
DELAWARE,                  )
                           )
     Defendants.           )

          Deposition of COLONEL THOMAS F. MacLEISH
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 9:30 a.m., on Tuesday,
July 19, 2005, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

**A - 325**

Price, et al.                                        v.                      Chaffinch, et al.
Thomas F. MacLeish                    C.A. # 04-1207                      July 19, 2007

Page 2

```
 1   APPEARANCES:
 2        STEPHEN J. NEUBERGER, ESQUIRE
          MARTIN HAVERLY, ESQUIRE
 3        THE NEUBERGER FIRM, P.A.
            2 East 7th Street - Suite 302
 4          Wilmington, Delaware 19801
            for the Plaintiffs
 5
          EDWARD T. ELLIS, ESQUIRE
 6        MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
            123 South Broad Street
 7          Avenue of the Arts
            Philadelphia, Pennsylvania 19109
 8          for the Defendants
 9   ALSO PRESENT:
10        SERGEANT CHRISTOPHER D. FORAKER
          CORPORAL B. KURT PRICE
11        ALISON LASSETER
12               - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1            COLONEL THOMAS F. MacLEISH,
 2        the witness herein, having first been
 3        duly sworn on oath, was examined and
 4        testified as follows:
 5   BY MR. NEUBERGER:
 6     Q.  Colonel, my name is Steve Neuberger, and I'm an
 7   attorney representing Master Corporal Price and Master
 8   Corporal Wayne Warren.  Are you aware of that?
 9     A.  Yes.
10     Q.  Have you ever testified in court before?
11     A.  Yes, I have.
12     Q.  Have you ever had your deposition taken before?
13     A.  Yes, I have.
14     Q.  I'm going to ask you some questions, and the
15   court reporter here is going to type up your answers to
16   those questions.  Okay?
17     A.  Yes.
18     Q.  We have to take turns talking because if we talk
19   at the same time, although the court reporter is very,
20   very good, she can't get everything down.  So we have to
21   take turns.
22     A.  I understand.
23     Q.  You have to verbalize your answers.  For
24   example, instead of nodding your head, just say yes.
```

Page 4

```
 1   Instead of shaking your head, just say no.
 2            Do you understand that?
 3     A.  Yes, I do.
 4     Q.  After we're done here today, you will have an
 5   opportunity to review the transcript of the deposition to
 6   correct any typographical errors that may be made.  Do
 7   you understand that?
 8     A.  Yes, I do.
 9     Q.  If I ask you a question and you don't understand
10   the question, just ask me to rephrase that question.  I
11   will be more than happy to do that.  Do you understand?
12     A.  Yes.
13     Q.  Do you understand that I don't want you to guess
14   at any answers?
15     A.  Yes.
16     Q.  Are you taking any medications or is there
17   anything else that would prevent you from testifying
18   truthfully or remembering accurately today?
19     A.  No, I'm not.
20     Q.  If you need any breaks, if you need to go to the
21   john, need to stretch your back out, need to take five
22   minutes, let me know and I'll be happy to take a
23   five-minute break.
24     A.  Yes.
```

Page 5

```
 1     Q.  You have taken an oath to tell the truth today?
 2     A.  Yes, I have.
 3     Q.  Do you understand the significance of that oath?
 4     A.  Yes, I do.
 5     Q.  You understand that I'm going to be asking you
 6   questions today concerning events arising out of two
 7   separate lawsuits?
 8     A.  Yes.
 9     Q.  Foraker v. Chaffinch, MacLeish, and the DSP?
10     A.  Yes.
11     Q.  And then Price, Warren, and Foraker versus
12   Chaffinch, MacLeish, and the DSP?
13     A.  Yes.
14     Q.  Your current position is Colonel of the Delaware
15   State Police; isn't that right?
16     A.  Yes, it is.
17     Q.  Is that the highest-ranking position in the
18   Delaware State Police?
19     A.  Yes, it is.
20     Q.  When were you promoted to colonel?
21     A.  May 6 of 2005.
22     Q.  What was your position prior to that?
23     A.  I was lieutenant colonel.
24     Q.  What are the job responsibilities of the
```

A - 326

2 (Pages 2 to 5)

Price, et al.
Thomas F. MacLeish

v.

C.A. # 04-1207

Chaffinch, et al.
July 19, 2007

Page 6

1   lieutenant colonel of the Delaware State Police?
2       A.   Typically, they are -- you have all operations
3   report to you.  You have HR and the academy that fall
4   under you, directly fall under you, and then all the
5   majors report to you.  Take care of all operations,
6   day-to-day operations of the division.
7       Q.   Day-to-day operations of the Delaware State
8   Police are the responsibility of the lieutenant colonel,
9   also known as the deputy superintendent of the Delaware
10  State Police?
11      A.   Yes, that's correct.
12      Q.   Who promoted you to lieutenant colonel?
13      A.   Colonel Chaffinch did.
14      Q.   Before that you were a major on the executive
15  staff, weren't you?
16      A.   That's correct.
17      Q.   And in both of those capacities you worked
18  closely with Colonel Chaffinch on a day-to-day basis?
19      A.   Closer as lieutenant colonel than as major, but,
20  yes, I worked with him closely.
21      Q.   Was it a great honor to be promoted to
22  lieutenant colonel?
23      A.   Yes, it was.
24      Q.   Was it a privilege?

Page 7

1       A.   Yes.
2       Q.   Up until your promotion to colonel and
3   superintendent of the Delaware State Police, was that the
4   high point of your career?
5       A.   I think the high point of my career was being
6   appointed as a trooper.
7       Q.   Was it one of the high points of your career?
8       A.   Yes, it was.
9       Q.   You're on a first-name basis with
10  Colonel Chaffinch, aren't you?
11      A.   Most of the time it's colonel, but, yes, I call
12  him Aaron on occasion.
13      Q.   He's your friend, isn't he?
14      A.   Yes, he is.
15      Q.   For example, there was a profile story about
16  Colonel Chaffinch in the April 2005 edition of The News
17  Journal, wasn't there?
18           MR. ELLIS:  Object to the form of the
19  question.
20           MR. NEUBERGER:  You can answer.
21      A.   Sir, I don't recall if there is.  If you show it
22  to me, I'll probably remember it.
23      Q.   Do you recall that on -- actually, I apologize.
24  Do you recall that on March 27th of 2005, that there may

Page 8

1   have been a profile story about Colonel Chaffinch in the
2   Wilmington News Journal?
3       A.   I was in Hawaii when that article appeared.
4       Q.   Do you recall ever seeing a story about
5   Colonel Chaffinch in The News Journal?
6       A.   There have been several stories about
7   Colonel Chaffinch in the newspaper, Mr. Neuberger.
8       Q.   Have you ever been interviewed by a News Journal
9   reporter about Colonel Chaffinch and say good things
10  about him?
11      A.   Yes.
12      Q.   Would you remember that you were the only
13  trooper quoted in any of those articles actually saying
14  anything good about him?
15      A.   As I already stated, I don't recall reading the
16  article.  I was in Hawaii when that article was
17  published, and I never did find it.  I never read the
18  article.
19      Q.   How about any article published about
20  Colonel Chaffinch?
21           MR. ELLIS:  Object to the form of the
22  question if it's a question.
23      A.   If you're asking me specifically about an
24  article that I would say something good about him, I have

Page 9

1   said good things to him to reporters, but I can't recall
2   specific articles it appeared in.
3       Q.   Are you and Colonel Chaffinch close?
4       A.   Define "close."
5       Q.   More than friends?
6           MR. ELLIS:  Object to the form of the
7   question.
8       A.   Never had any physical relationship with him.
9       Q.   I'll rephrase the question.
10      A.   Mr. Neuberger, I could count on one hand the
11  number of times his wife and my wife and I went out to
12  dinner.  I don't socialize with him typically.  He is my
13  friend.  But close friends?  I feel very strongly about
14  him.  I think he's a good person, yes.
15      Q.   Have you ever publicly bragged at any
16  commanders' meeting that you and Colonel Chaffinch are,
17  quote, joined at the hip, close quote?
18           MR. ELLIS:  Object to the form of the
19  question.
20      A.   I told Colonel Chaffinch that we were joined at
21  the hip, yes, in a professional sense.
22      Q.   Did you ever say that publicly in a meeting of
23  commanders of the Delaware State Police?
24      A.   I may have, yes.

**A - 327**