Price, et al.  v.  Chaffinch, et al.
Thomas F. MacLeish    C.A. # 04-1207    July 19, 2007

Page 66

1  A. Yes.
2  Q. Is the date on this March 4, 2004?
3  A. Yes.
4  Q. Does it say, "Re: Firearms Range"?
5  A. Yes.
6  Q. Have you ever seen this memo before?
7  A. Yes, I have.
8  Q. Was this a memo which was prepared for you by
9  Captain Homiak?
10 A. Yes, it is.
11 Q. Are you familiar with this memo without looking
12 at it at all?
13 A. I am familiar with it.
14 Q. Was this a memo that Captain Homiak prepared in
15 response to a request you made of him?
16 A. Yes.
17 Q. Do you recall what you had asked him to look
18 into?
19 A. I asked him -- the planning section does a lot
20 of research from other state agencies. There's a list
21 served that they put questions on, and other state
22 agencies typically will respond and provincial agencies,
23 and I asked him to look into what other places were doing
24 with regards to their ranges, from maintenance to

Page 67

1  personnel to health-related issues. I was trying to get
2  more informed with regards to the issues we were having
3  at our range.
4  Q. Could you turn to the second page, please?
5  A. (Complied.)
6  Q. If you take a look at the third full paragraph
7  down, the one that begins "Routine range maintenance," do
8  you see that?
9  A. Yes, I do.
10 Q. Could you read that to me?
11 A. "Routine range maintenance, except in very few
12     cases, was conducted by range personnel. This
13     may involve minor things such as changing lights
14     to putting salt on icy sidewalks. Some of the
15     more proactive agencies clean their ranges daily
16     with range officers, but they require their
17     officers to use a vacuum with a HEPA filter.
18     Dallas PD conducts routine and scheduled
19     maintenance that their personnel are capable of
20     doing, however they wear protective gear and
21     respirators. Some agencies require protective
22     slippers to be worn when conducting even the most
23     minor repairs. They are discarded when
24     finished."

Page 68

1  Q. Does the very first sentence of that paragraph
2  indicate that routine range maintenance is usually
3  conducted by range personnel?
4  A. Yes, it does.
5  Q. Does the second sentence go on to indicate that
6  routine range maintenance are types of minor things such
7  as changing lightbulbs and putting salt on icy sidewalks?
8  A. It does indicate that, yes.
9  Q. It says that some of the more proactive agencies
10 clean their ranges daily using range officers and they
11 use a vacuum with a HEPA filter?
12 A. Yes.
13 Q. It goes on to say that Dallas Police Department
14 have their personnel wear protective gear and respirators
15 when they clean the range.
16 A. Yes.
17 Q. Did the Delaware State Police have its range
18 officers wear protective gear and respirators when
19 cleaning the range?
20 A. No, they did not.
21 Q. To the best of your knowledge?
22 A. To the best of my knowledge, no.
23 Q. After you read this memo, did you think that's
24 something that perhaps the range personnel should be

Page 69

1  equipped with if they were responsible for cleaning?
2  A. Yes.
3  Q. Let's go on to the next paragraph. Does the
4  first sentence say, "Someone other than range personnel
5  handle scheduled maintenance and removal of lead and
6  other toxins in all cases"?
7  A. Yes.
8  Q. Does it say that?
9  A. Yes, it does.
10 Q. Does this sentence indicate to you in all of the
11 ranges surveyed by Captain Homiak, that someone other
12 than range personnel removed the lead and other toxins
13 from the range environment?
14 A. That's what it indicates, yes.
15 Q. It appears to indicate that that was that way as
16 to all the police departments or other law enforcement
17 agencies that he surveyed?
18 A. Yes.
19 Q. Could you just read the rest of the paragraph
20 quietly to yourself?
21 A. (Complied.)
22 Q. Tell me when you're finished.
23 A. I'm finished.
24 Q. Does the rest of the paragraph indicate that

A - 342

18 (Pages 66 to 69)

Case 1:04-cv-00956-GMS    Document 92-16    Filed 02/02/2006    Page 2 of 19

Price, et al.                               v.                          Chaffinch, et al.
Thomas F. MacLeish                   C.A. # 04-1207                     July 19, 2007

Page 70

1  some agencies have outside vendors come in or other
2  outsiders come in to actually clean up the range of lead
3  and other toxins and heavy metals?
4      A.  That's correct.
5      Q.  Was that done at the Delaware State Police in
6  recent years, to the best of your knowledge?
7      A.  Yes, it was.
8      Q.  An outside agency regularly came in?
9      A.  It came in to remove the lead and they came in
10 and removed the toxins. When I say that, I mean it's my
11 understanding that, when we were shooting lead, an
12 outside group would come in and take care of the spent
13 ammunition. The frangible ammunition, I'm not sure who
14 was called in to remove that sludge, but I know that at a
15 point in time it would have been removed by someone other
16 than range personnel. That's my understanding.
17     Q.  Do you know if it was done on a regular basis?
18     A.  I can't say what the -- no, I can't say what the
19 regular basis was.
20     Q.  Do you think that the people who would know the
21 specifics of what did and did not occur were the people
22 who worked at the range on a daily basis?
23     A.  Yes.
24     Q.  And that would include Sergeant Foraker and

Page 71

1  corporals Price and Warren?
2      A.  Yes. And the filters that are referred to, that
3  type of thing, I know was done by Facilities Management.
4  On what basis, I'm not sure.
5      Q.  Do you know if they always put in the required
6  HEPA filters?
7      A.  I'm not aware of that. At that point in time I
8  wasn't aware. Subsequent to that, I think when we
9  switched to frangible ammunition, they stopped using the
10 HEPA filters. I believe that's what I have heard had
11 happened, but I know that that -- our range personnel
12 were responsible for the air handling -- the filters in
13 the air-handling system. That was the responsibility of
14 Facilities Management.
15     Q.  To the best of your knowledge, with the
16 air-handling system, that was responsible for removing
17 all of the I think you mentioned copper, tin, and several
18 other types of metals from the air?
19     A.  No. I said that the frangible ammunition is
20 made up of copper, tin, and zinc, and the air-handling
21 system is supposed to push those products away from the
22 shooter and down range and then they subsequently are
23 either removed through the air-handling system as it's
24 exhausted and run through those filters. I'm not

Page 72

1  intimately familiar with it. That's my assumption of how
2  this all would work. What projectile struck and broke
3  into the dust and went into the system, that was taken
4  back to the -- into the bullet trap recovery system.
5      Q.  Were the men responsible for maintaining the
6  bullet trap?
7      A.  Making sure it was operational and I believe
8  cleaning the filters is what they were responsible for,
9  to make sure that the system worked properly, because
10 there's spray heads that wet -- it's a wet system.
11         MR. ELLIS: You're referring to water
12 filters at this point as opposed to air filters?
13         THE WITNESS: Yes, I am.
14         MR. NEUBERGER: Yes. He mentioned the
15 bullet trap.
16         MR. ELLIS: I want to make sure the record
17 was clear.
18 BY MR. NEUBERGER:
19     Q.  Were there any written policies regarding
20 cleaning of the bullet trap or the water filters?
21     A.  I don't believe there was.
22     Q.  Do you think there should have been?
23     A.  Yes.
24     Q.  Were there any written or oral directives about

Page 73

1  how to safely clean the bullet trap or the water filters
2  on the bullet trap?
3      A.  I think it's come to our attention that there
4  were not, but there were things routinely done, because
5  we didn't have this problem before.
6      Q.  Did any other memos like this, like Deposition
7  Exhibit 3, ever come to your attention or any other memos
8  like that ever sent to you?
9          MR. ELLIS: I object to the form of the
10 question.
11         MR. NEUBERGER: Compound?
12         MR. ELLIS: When you say like this
13 document, like in what way? Like in three pages? Like
14 addressed to MacLeish from Homiak? Like what?
15 BY MR. NEUBERGER:
16     Q.  Did you ever receive any other memos or other
17 communications from staff regarding range issues who were
18 responding to your request to research how other agencies
19 handled things?
20     A.  Yes.
21     Q.  Do you recall when you received those?
22     A.  In or about this same time. I asked
23 Sergeant Foraker to research what maintenance
24 responsibilities he saw the FTU unit being responsible

A - 343

Case 1:04-cv-00956-GMS    Document 92-16    Filed 02/02/2006    Page 3 of 19

Price, et al.                              v.                          Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                         July 19, 2007

Page 74

1  for. I had our HR director, Captain Yeomans, prepare a
2  report for me on blood lead levels so I could look at
3  those. I think the third item that I saw was a report
4  prepared by retired Major Swiskey (phonetic) on range
5  operations that went to Colonel Pepper that I found in
6  the armoire of the colonel's office -- this was well
7  after the fact -- with recommendations for maintenance
8  and so forth in that.
9     Q.  Which colonel?
10    A.  Colonel Pepper. It was sent to Colonel Pepper.
11         MR. NEUBERGER: I'd like to put another
12 exhibit in front of you. We will call this MacLeish
13 Deposition Exhibit No. 4.
14         (MacLeish Deposition Exhibit No. 4 was
15 marked for identification.)
16 BY MR. NEUBERGER:
17    Q.  Colonel, do you have that exhibit in front of
18 you?
19    A.  Yes, I do.
20    Q.  Does the letterhead on this indicate that it
21 came from the State of Delaware, Department of Labor,
22 Division of Industrial Affairs?
23    A.  Yes.
24    Q.  Is the title on this document "RECOMMENDATIONS

Page 75

1  AND DESIGN CONSIDERATIONS FOR INDOOR RIFLE RANGES"?
2     A.  Yes.
3     Q.  Underneath that does it say, "taken from various
4  OSHA and NIOSH publications"?
5     A.  Yes.
6     Q.  Do you know what OSHA and NIOSH are?
7     A.  Yes.
8     Q.  What are they?
9     A.  Occupational Safety and Health Administration,
10 and NIOSH is --
11    Q.  Could it be the National Institute of --
12    A.  Occupational Safety and Health.
13    Q.  Yes. Down below that does it say, "To reduce
14 and/or eliminate the health hazards associated with
15 indoor firing ranges the following design considerations
16 and work practices are recommended:"?
17    A.  Yes.
18    Q.  Do you know if the Delaware State Police at the
19 FTU instituted these recommendations and design
20 considerations?
21    A.  I'm sorry. I don't know the answer to that
22 question.
23    Q.  Do you think they should have?
24         MR. ELLIS: I'm going to object to the form

Page 76

1  of the question. You have to establish the basis for him
2  to be able to answer that question. That's a highly
3  technical question, as you can see from the document.
4     A.  Once again, it says, "RECOMMENDATIONS AND DESIGN
5  CONSIDERATIONS," and many times when we have seen the
6  75 feet per minute at the firing line, that is based upon
7  for a static line. Ours is a tactical line. Our
8  shooters move. The targets remain stationary. That was
9  recommended, I take it, by firearms personnel in the past
10 to more actively reflect what the type of tactical
11 situations we would be involved in versus us just
12 standing in one spot and having the target move to or
13 from us as many ranges are.
14        So as I look at this document, I take it
15 just as it says at the top they're recommendations and
16 considerations to be taken. So I would think that the
17 people that were doing the design, the engineers that
18 were hired and so forth, would be far more knowledgeable
19 than I and would design a range that would be safe for
20 our people to shoot at and our instructors to instruct
21 at.
22    Q.  You're indicating that you really had no
23 involvement in the construction of the range, right?
24    A.  I had none.

Page 77

1     Q.  I believe probably about an hour or so ago you
2  mentioned something about 75 feet per minute being -- I
3  believe your testimony was something to the effect that's
4  the recommended air flow. Did you testify about that
5  about an hour ago?
6         MR. ELLIS: An hour ago?
7         MR. NEUBERGER: I think so. I'm asking if
8  he remembers that.
9     A.  I have talked a lot in the last couple hours.
10    Q.  I can narrow the question down.
11    A.  I'm not trying to be evasive. There's been a
12 lot I have said. I do recall having knowledge of that
13 particular standard, 75 feet per -- feet per minute.
14    Q.  How did you learn about that?
15    A.  Subsequent to all this occurring at the range,
16 that that was a recommendation from -- I believe that's a
17 NIOSH recommendation that is made for a static range, and
18 subsequent to that we have done a lot of travel and found
19 that some ranges have that on a -- pretty much most of
20 them have -- maintain a static range, have that standard.
21 Other ones, it's recommended. It's not always applicable
22 on a tactical range to maintain that type of air flow
23 during the entire length of your range.
24    Q.  Let's turn to the second page. Item No. 17, do

A - 344

20 (Pages 74 to 77)

Price, et al.  
Thomas F. MacLeish  
v.  
C.A. # 04-1207  
Chaffinch, et al.  
July 19, 2007

Page 78

1 you see that?
2    A.  Yes, sir.
3    Q.  Does that indicate that "All air being exhausted
4 from the range should be filtered using a High Efficiency
5 Particulate Filter," a HEPA filter, "or equivalent"?
6    A.  Yes.
7    Q.  That's another recommendation made by OSHA or
8 NIOSH?
9    A.  Yes.
10   Q.  It's in this document which was apparently
11 published by the Division of Industrial Affairs?
12   A.  Yes.
13   Q.  Do you see a little farther down on that page
14 where it says, "RECOMMENDED WORK PRACTICES"?
15   A.  Yes.
16   Q.  Do you see that item No. 2?
17   A.  Yes.
18   Q.  Does that indicate that sweeping the range
19 should not be done with like a hand-broom or things like
20 that?
21   A.  Yes.
22   Q.  Does that indicate there's a specialized method
23 for sweeping the range using certain types of machinery?
24   A.  Yes.

Page 79

1    Q.  Do you see item No. 3 right below that?
2    A.  Yes, I do.
3    Q.  Does that indicate that, when working on the
4 bullet trap, a NIOSH-approved respirator for the removal
5 of lead, dust, and fumes must also be worn?
6    A.  Yes, it does.
7    Q.  Are you aware that the bullet trap at the FTU is
8 partially composed of a lead substance?
9    A.  I wasn't aware of that.
10   Q.  Then No. 4 right below that, does that say that
11 "Proper ear protection should be provided for and worn by
12 all individuals inside the firing area"?
13   A.  Yes.
14   Q.  Does that also indicate that "The ear protectors
15 should be selected on the basis of offering maximum
16 protection"?
17   A.  Yes.
18   Q.  That last sentence, would you agree with that
19 statement, that the ear protection worn by those at the
20 DSP firing range should provide maximum protection?
21   A.  Yes.
22   Q.  You can put that document down.
23       Were you in attendance at a press
24 conference held at the FTU on April 6 of 2004?

Page 80

1    A.  No, I was not.
2    Q.  Do you know if there was a press conference held
3 on April 6 of 2004 at the FTU?
4    A.  I'm aware, yes, there was.
5    Q.  Do you know who was there?
6    A.  I know that the colonel was there and
7 Major Eckrich was there. There was a representative from
8 Facilities Management, I believe it was Secretary Homer,
9 Secretary of Administrative Services, and she was
10 accompanied by people from her group, but I couldn't say
11 specifically who.
12   Q.  How did you learn about that meeting or that
13 press conference?
14   A.  I had received a call from the colonel that they
15 were going to be holding that up there. I was on
16 vacation. He was going -- he was going to attend and be
17 accompanied by Major Eckrich, and it was called -- if I'm
18 not mistaken, it was called by the Secretary of
19 Administrative Services, by Secretary Homer, not by the
20 division.
21   Q.  Were you on vacation locally or out of state?
22   A.  I was local.
23   Q.  Were you reachable by a camera crew?
24   A.  If they knew where I lived, I could imagine they

Page 81

1 would have come to my house, yes.
2    Q.  Were you interviewed that day by a TV camera
3 crew from WBOC TV in Salisbury, Maryland?
4    A.  No, I was not. I answered no, I was not. You
5 said April the 6th. I was there on another occasion with
6 WBOC crew. I wasn't there on the date the colonel made
7 the statement about the FTU staff. I apologize for
8 making that assumption. There was a subsequent date when
9 I was there at the firing range, and I apologize for not
10 recalling the specific date, but I was there on another
11 occasion.
12   Q.  Would that have been after April 6?
13   A.  Sir, I can't recall. I know there was another
14 occasion. It was after the initial press conference that
15 was done that I was there with the colonel at the firing
16 range and BOC was there.
17   Q.  Do you recall what was said during that press
18 conference?
19   A.  It was more of a walk-through. Once again, I
20 want to say Secretary Homer was there again. We were
21 accompanying her. She was doing most of the talking and
22 pointing out.
23       The thing I specifically recall was I got
24 back in behind the bullet trap and they were looking at

A - 345

21 (Pages 78 to 81)

Case 1:04-cv-00956-GMS   Document 92-16   Filed 02/02/2006   Page 5 of 19

Price, et al.                                              Chaffinch, et al.
Thomas F. MacLeish    v.   C.A. # 04-1207                  July 19, 2007

Page 82

1  the debris that was back there and so forth, and I
2  remember them specifically asking me who was responsible
3  for this condition and what was back there. I said I
4  was.
5      Q. Sir, are you indicating that there were two
6  press conferences held at the range at various times?
7      A. You're using the term "press conference." I
8  know that the initial one that the colonel went to I
9  believe had more reporters there and so forth. I know we
10 returned there on a second occasion, and if you have me
11 locked in on April the 6th, I'd have to say yes because I
12 know I was there on a second date. I was not there for
13 an initial press conference.
14     Q. So for the date that you were there, you
15 mentioned Colonel Chaffinch being there?
16     A. Yes.
17     Q. And yourself?
18     A. Yes.
19     Q. Was Major Eckrich there?
20     A. I don't believe he was there with me on that
21 occasion, no.
22     Q. Was Secretary Homer there?
23     A. I believe she was.
24     Q. Was there anyone else from Secretary Homer's --

Page 83

1  I guess it's her department, her bailiwick?
2      A. Her department. I believe she was accompanied
3  by others from her department, but I can't tell you who.
4  I don't recall.
5          MR. NEUBERGER: I'd like to put another
6  document in front of you. This will be 5.
7          (MacLeish Deposition Exhibit No. 5 was
8  marked for identification.)
9  BY MR. NEUBERGER:
10     Q. Colonel, do you have this document in front of
11 you right now?
12     A. I do.
13     Q. At the top of this page does it say from
14 Stephen J. Neuberger to sjn@NeubergerLaw.com?
15     A. Yes.
16     Q. Does it say sent Wednesday, April 7, 2004, at
17 10:25 a.m.?
18     A. Yes, it does.
19     Q. In the bottom right-hand corner of the page does
20 it say FTU2863?
21     A. I'm sorry. Where were you asking me to look?
22     Q. The bottom right-hand corner.
23     A. Yes.
24     Q. Does it say four-page document?

Page 84

1      A. Is it a -- page 1 of 4, yes.
2      Q. Does this appear to be a newspaper article from
3  Tom Eldred of the Delaware State News?
4      A. Yes.
5      Q. Have you ever seen this article before?
6          MR. ELLIS: The notations on the top of the
7  first page of Exhibit 5 are a little bit confusing. Is
8  this an article that appeared in the paper on April 7th,
9  2004? Is that what they mean?
10         MR. NEUBERGER: Yes.
11         MR. ELLIS: That's fine.
12 BY MR. NEUBERGER:
13     Q. Colonel, does this appear to be an article that
14 was written by Tom Eldred of the Delaware State News?
15     A. Yes, it does.
16     Q. Is the title of this article "Debate rages on
17 blame at range"?
18     A. Yes, that's the title.
19     Q. The first paragraph mentions a media tour of the
20 closed Delaware State Police firing range; isn't that
21 right?
22     A. Yes.
23     Q. There's a picture to the right of that of
24 Secretary Homer and Colonel Chaffinch; isn't that

Page 85

1  accurate?
2      A. Yes.
3      Q. You indicated you have read this article before.
4  Right?
5      A. Yes.
6      Q. Do you recall if you read it around the time it
7  was published or whether it was just something you have
8  seen more recently?
9      A. No, I read it after -- probably on April the
10 7th.
11     Q. You were on vacation at that point?
12     A. Yes.
13     Q. And the fourth paragraph down says, "Determining
14 who is at fault is another matter." Is that correct?
15     A. Yes.
16     Q. Taking a quick look at the couple paragraphs
17 before that, does that sentence reference who was at
18 fault for the conditions of the FTU?
19     A. Following that or prior to it?
20     Q. Prior to it. Just so you can get the context.
21         MR. ELLIS: Where are you asking him to
22 read from?
23         MR. NEUBERGER: The first four paragraphs.
24     A. I have read to "Determining who is at fault is

A - 346

Price, et al.
Thomas F. MacLeish
v.
C.A. # 04-1207
Chaffinch, et al.
July 19, 2007

Page 86

1  another matter."
2  Q. Does that sentence reference who is responsible
3  for the conditions at the FTU?
4  A. Yes.
5  Q. Could you go down three more paragraphs, the one
6  that begins "Mrs. Homer said"?
7  A. Yes.
8  Q. Could you read that paragraph quietly to
9  yourself?
10  A. (Complied.)
11       Okay.
12  Q. Does the second sentence of that paragraph state
13  that "Col. Chaffinch acknowledged problems but indicated
14  the blame lies only with one or two troopers under his
15  command"?
16  A. Yes.
17  Q. Is that consistent with your understanding of
18  where Colonel Chaffinch places the blame for the
19  conditions at the FTU?
20  A. Yes.
21  Q. Do you know who those two troopers are that he's
22  referring to?
23  A. I would assume one being Sergeant Foraker and
24  one being Captain Warren.

Page 87

1  Q. Do you place blame for those conditions on those
2  same people that Colonel Chaffinch places blame on?
3  A. No.
4  Q. If you turn to the third page -- I'm sorry.
5  Just to get the context, can you please turn to the
6  second page? Actually begins on the bottom of the second
7  page. Four lines up where it says, "Col. Chaffinch said
8  he was unaware." Do you see that?
9  A. Yes, I do.
10  Q. Could you read from that point to the top of the
11  next page just so you can have the context of what I'm
12  about to read to you?
13  A. (Complied.)
14  Q. I'm going to actually read this to you. Do you
15  understand that these statements at the top are
16  statements from Colonel Chaffinch as reported by the
17  paper?
18       MR. ELLIS: I object to the form of the
19  question. Are you asking him whether Chaffinch actually
20  made these statements?
21       MR. NEUBERGER: I'm asking him does the
22  newspaper article indicate that these are statements made
23  by Colonel Chaffinch. I'm not asking him if he has
24  personal knowledge.

Page 88

1  A. Yes. The way I'm reading this, the newspaper is
2  saying these are statements by Colonel Chaffinch.
3  Q. At the top of the third page, does that say,
4  "'There was some discoloration in the bullet trap but
5  that was about it'"? Does it say that?
6  A. Yes, it does.
7  Q. Does it go on to say that "'I think people who
8  live in glass houses shouldn't throw stones. It's a lot
9  dirtier now. Things seemed in their proper places in the
10  fall. I've never seen it like this'"? Does it indicate
11  that?
12  A. Yes.
13  Q. You mentioned this people in glass houses
14  throwing stones thing a little earlier in your testimony;
15  isn't that right?
16  A. Yes, I did.
17  Q. Then this newspaper article appears to be saying
18  that Colonel Chaffinch said that; isn't that right?
19  A. Yes.
20  Q. Do you know what he meant by that?
21       MR. ELLIS: I object to the form of the
22  question.
23  A. I think he was referring to Captain Warren and
24  Sergeant Foraker.

Page 89

1  Q. Does it also appear that he's indicating that
2  he's never seen the range in the conditions that they
3  were currently in as of when he was giving this tour?
4  A. I'm sorry. One more time.
5  Q. The last sentence says, "'I've never seen it
6  like this.'" is that correct?
7  A. Yes, it does.
8  Q. Would that appear to you to be indicating that
9  he had never seen the range in those types of conditions?
10  A. Yes.
11  Q. Skipping down two more paragraphs, do you see
12  that the paragraph starts with "'The previous sergeant in
13  charge'"?
14  A. Yes.
15  Q. Does that say that, quote, "'The previous
16  sergeant in charge did a good job'"? Does it state that?
17  A. I'm sorry. I was looking at --
18  Q. It's the third paragraph down.
19  A. All right.
20  Q. Does that state that "'The previous sergeant in
21  charge did a good job'"?
22  A. Yes, it does.
23  Q. Does it go on to state that "'Things changed in
24  December when another sergeant came in. That's at least

A - 347

Page 90

1  a portion of where the ball was dropped'"?
2  A. Yes.
3  Q. Do you know who he's referring to there?
4  A. Sergeant Foraker.
5  Q. Do you know who the previous sergeant was?
6  A. Sergeant Ashley.
7  Q. Does it appear he's indicating here Sergeant
8  Richard Ashley did a good job?
9  A. Yes.
10 Q. Does it appear to you that he's indicating that
11 Sergeant Foraker did not do a good job?
12 A. That's what it appears.
13 Q. He's saying that Sergeant Foraker dropped the
14 ball?
15 A. Yes.
16 Q. Would you read this as saying that
17 Sergeant Foraker was not doing his job very well?
18 A. With regards to the condition of the range, yes.
19 Q. Do you think that's pretty clear from reading
20 that?
21 A. Yes.
22 Q. And the article goes on in the next four
23 paragraphs to identify who the previous sergeant was,
24 right?

Page 91

1  A. Yes, it does.
2  Q. It goes on to identify who the current sergeant
3  was, right?
4  A. Yes, it does.
5  Q. Going down one more paragraph, the paragraph
6  that starts "Contacted later," do you see that?
7  A. Yes, I do.
8  Q. Does that say, "Contacted later, Col. Chaffinch
9  said Sgt. Ashley has retired. He would not permit the
10 Delaware State News to interview Capt. Warren or
11 Sgt. Foraker"? Does it state that?
12 A. Yes.
13 Q. Does that appear to be indicating that
14 Colonel Chaffinch would not allow Captain Warren or
15 Sergeant Foraker to respond?
16 A. Yes.
17 Q. Does this appear to indicate that a gag order
18 was being placed?
19       MR. ELLIS: I object to the form of the
20 question.
21 A. He was not allowing them to be interviewed.
22 Q. Do you know why he was not allowing them to be
23 interviewed?
24       MR. ELLIS: I object to the form of the

Page 92

1  question.
2        MR. NEUBERGER: What's wrong with that
3  question?
4        MR. ELLIS: You're asking him for
5  Chaffinch's statement of mind.
6        MR. NEUBERGER: I'm asking if he knows it.
7        MR. ELLIS: You can ask him did Chaffinch
8  tell him. You can't ask him what's in Chaffinch's head.
9        MR. NEUBERGER: Go ahead.
10 A. At this point in time -- I don't know what the
11 colonel was thinking when he said don't give -- I can
12 give you what my opinion is as to why he would have said
13 that.
14 Q. Did Colonel Chaffinch ever tell you why he gave
15 that order?
16 A. To protect the division.
17 Q. Going on to the next paragraph, does that state,
18 "'I have the authority to say yes or no,' he said. 'I'm
19 not going to allow those people to be interviewed at this
20 point in regard to this particular situation. I'm not
21 trying to create any more of a mess than we already
22 have'"? Does it state that?
23 A. Yes, it does.
24 Q. Does that at least appear to be part of his

Page 93

1  explanation for not allowing the Delaware State News to
2  interview Sergeant Foraker and Captain Warren?
3  A. Yes.
4  Q. Just keep following with me. I'm going to keep
5  reading. Does it say, "He praised Sgt. Ashley for his
6  work at the range"? Goes on to say that "'Because of the
7  frangible ammunition we were using, the bullet trap
8  required hands-on, daily cleaning,' he said"? Does it
9  state that?
10 A. Yes.
11 Q. Does it go on to say that Sergeant Ashley was
12 willing to do that?
13 A. Yes.
14 Q. Going on to the next paragraph, does it state
15 that "'I cannot say Sgt. Foraker was willing to do that.
16 He was interested in instruction and teaching people how
17 to shoot. He did not feel (bullet trap cleaning) was
18 part of his purview. He felt that was putting him in
19 harm's way'"? Does it state that?
20 A. Yes.
21 Q. So based on reading that, does that appear to
22 indicate to you that he was saying that Sergeant Foraker
23 was a coward?
24       MR. ELLIS: I object to the form of the

A - 348

Page 94

1  question.
2    A.  I don't read that, Mr. Neuberger. I think he
3  just made a clear statement that Sergeant Foraker wasn't
4  willing to do it and he wasn't going to do it.
5    Q.  He's contrasting that with stating that
6  Sergeant Ashley was willing to do that, right?
7    A.  Yes. By the previous statement.
8    Q.  You've read this entire article sometime in the
9  past, correct?
10    A.  Yes. Long time ago.
11    Q.  Are you generally familiar with it?
12    A.  Generally, yes.
13    Q.  Have you ever seen this article out in a public
14  place anywhere?
15        MR. ELLIS: I object to the form of the
16  question.
17    A.  I saw it in my house.
18    Q.  Did you ever see it at Sambo's?
19    A.  I have heard it was in Sambo's, but Sambo's uses
20  newspapers to line their tables with.
21    Q.  You're aware that Sambo's is a crab shack in
22  Leipsic Delaware?
23    A.  Yes.
24    Q.  It's a place you have been to before?

Page 95

1    A.  Yes.
2    Q.  You think it's a popular place in I guess that's
3  Kent County?
4    A.  Yes, I would say so. That and the Boondocks.
5  You go back and forth.
6    Q.  On occasion does the Delaware State Police have
7  out-of-state police officers come in to help with certain
8  testing procedures?
9    A.  Yes.
10    Q.  Do you know if the Delaware State Police has
11  ever taken those out-of-state police officers to Sambo's
12  to eat?
13    A.  Yes, we have. Well, in recent years it was on
14  our dime, but this year, in this particular case we
15  aren't allowed to do that with them anymore because of
16  perceptions of impropriety. So we went there with them
17  and had dinner. They paid for theirs. We paid for ours.
18  It's kind of a local custom. We eat crabs.
19    Q.  What particular case were you referencing?
20    A.  In the particular case -- when this article, if
21  or when it was on the tables, if it was around the same
22  time, we were doing testing, promotional testing, and --
23  I can't remember when, but we went with the people that
24  were in doing the testing, we went to Sambo's for crabs.

Page 96

1    Q.  Putting the article aside, I'd like to focus on
2  your recollection of what was said during the time you
3  were at the FTU with Colonel Chaffinch, Secretary Homer,
4  and the WBOC camera crew.
5    A.  Yes.
6    Q.  Do you recall any statements that were made by
7  Colonel Chaffinch?
8    A.  No, I don't. Not at that time.
9    Q.  Do you recall any statements that were made by
10  Secretary Homer?
11    A.  Specific things, no. I remember her pointing
12  around -- pointing her finger at the condition of the
13  range. We were on the range. We were behind the bullet
14  trap. We were in the gun-cleaning area. Her indication
15  of the debris that was left around indicating that that
16  was not typical of the way it should be done and that
17  that's not a reflection on her people because they don't
18  have responsibility for that. In a general sense, that's
19  what she was doing.
20    Q.  Do you recall if Colonel Chaffinch indicated
21  that he agreed with what Secretary Homer was saying?
22    A.  I don't recall him agreeing or not. I know that
23  I indicated that -- at that point in time we had shut
24  down the facility. We were leaving. It was left as is.

Page 97

1  That's not the normal state. They made a point of where
2  the men and women from the FTU -- men of the FTU -- we
3  didn't have any women assigned there at that time. But
4  were they normally on that last week, they are going to
5  break down all the weapons and clean them and do their
6  armors work on them, and due to the nature of us leaving
7  that facility, there were things left out that normally
8  wouldn't have been left out. I indicated that that is
9  not -- that's not the way it normally is; that due to the
10  nature of what had happened, that's why it was -- that's
11  why that particular area was left in the condition it was
12  in.
13        Basically, we abandoned the facility at
14  that point. We left it and we left it as is. And that
15  shouldn't be reflected on the men from the FTU unit.
16    Q.  Do you recall anything else that you said that
17  day?
18    A.  Yes. Back behind the bullet trap, I was asked
19  by a reporter who was responsible for this, and I said I
20  was.
21    Q.  Do you recall anything else that was said that
22  day --
23    A.  No.
24    Q.  -- by you? I'm sorry.

A - 349

25 (Pages 94 to 97)

Case 1:04-cv-00956-GMS   Document 92-16   Filed 02/02/2006   Page 9 of 19

Price, et al.
Thomas F. MacLeish
v.
C.A. # 04-1207
Chaffinch, et al.
July 19, 2007

Page 98

1  A. By me, no, I don't.
2  Q. In general, I think you indicated a few minutes
3  ago that you didn't recall any specifics of what
4  Colonel Chaffinch said in the media that day. Is that
5  correct?
6  A. That's correct.
7  Q. Do you recall anything he may have said
8  generally, topics he may have addressed, people he may
9  have blamed, things of that nature?
10  A. I don't recall, Mr. Neuberger.
11  Q. Colonel Chaffinch blamed Sergeant Foraker and
12  the staff at the FTU, as well as Captain Warren for the
13  problems at the FTU; isn't that correct?
14      MR. ELLIS: I object to the form of the
15  question.
16  A. According to the newspaper articles and my
17  general knowledge, yes.
18  Q. You have had conversations with him about that,
19  haven't you?
20  A. Yes.
21  Q. You've heard him talk about that topic before,
22  haven't you?
23  A. Yes.
24  Q. During those conversations did Colonel Chaffinch

Page 99

1  state that he blamed Captain Warren and Sergeant Foraker
2  and the staff at the FTU for the problems at the FTU?
3  A. Yes. He assigned blame in that way, yes.
4  Q. You're indicating that you disagreed with that
5  assignment of blame, aren't you?
6  A. I think they had a responsibility to do certain
7  things, and if they weren't going to do them, they had a
8  responsibility to report the fact that they weren't going
9  to do them. The overall condition of that range was a
10  combination, as I have stated earlier, of that lack of
11  reporting, lack of conducting what was considered at that
12  point in time to be routine maintenance to the
13  air-handling system and the bullet trap system at that
14  point in time, and those two things combined created the
15  problems at the range. There was a responsibility there,
16  yes, but total responsibility? No.
17  Q. You indicated that you had had some
18  conversations and had spoken with Colonel Chaffinch about
19  this topic. Correct?
20  A. Yes.
21  Q. Do you recall who was present for those
22  conversations?
23  A. Major Eckrich could have been. I handled the
24  range. The colonel can have his opinion and he can

Page 100

1  assign -- I never launched an investigation by Internal
2  Affairs into what occurred at that range because that
3  wasn't what we were setting out to do. We were setting
4  out to fix what was going on at that range and get it
5  back open and operational safely.
6  Q. Do you recall if anyone else other than
7  Major Eckrich was present for those conversations?
8  A. I can't recall anyone being there.
9  Q. Do you recall when those conversations took
10  place?
11  A. In that time period of February/March/April.
12  February the colonel was pretty much gone. He was in
13  Florida. Usually took two weeks. He was in Florida in
14  February. So I would say March/April time frame.
15  Q. That's of 2004?
16  A. Yes.
17  Q. I believe we talked a little a few minutes ago
18  about a gag order being placed on Captain Warren and
19  Sergeant Foraker. Isn't that right?
20      MR. ELLIS: I object to the form of the
21  question.
22  A. You used the term "gag order." I stated that it
23  was -- they were ordered -- they weren't allowed to speak
24  to the media.

Page 101

1  Q. And the not allowed to speak to the media order
2  was placed by Colonel Chaffinch?
3  A. Yes. And I agreed with it.
4  Q. For example, there's a rule and regulation in
5  your rules and regs book which talks about dealing with
6  the media?
7  A. Yes.
8  Q. It says that officers can't speak to the media
9  unless they have been authorized by either the colonel,
10  the lieutenant colonel, or the PIO?
11  A. Yes.
12  Q. Captain Warren wasn't allowed to speak to the
13  media about this topic; is that right?
14  A. Yes.
15  Q. Sergeant Foraker wasn't allowed to speak to the
16  media about this topic?
17  A. Yes.
18  Q. Master Corporal Price wasn't allowed to speak to
19  the media about this topic, right?
20  A. That's correct.
21  Q. Master Corporal Warren wasn't allowed to speak
22  to the media about this topic, right?
23  A. Yes.
24  Q. Corporal Warwick, I'm not sure what type of

A - 350

Case 1:04-cv-00956-GMS   Document 92-16   Filed 02/02/2006   Page 10 of 19

Price, et al.                                                                    Chaffinch, et al.
Thomas F. MacLeish           v.  C.A. # 04-1207                                  July 19, 2007

Page 102

1  corporal he was, but he also wasn't allowed to speak to
2  the media about this topic, correct?
3     A.  No, he was not.
4     Q.  Did the media request to speak to any of those
5  officers?
6     A.  Yes.
7     Q.  Colonel Chaffinch made the decision not to allow
8  them to respond, correct?
9     A.  Yes.
10    Q.  Does the DSP strive to treat all people equally?
11        MR. ELLIS: I object to the form of the
12  question.
13    A.  Yes, we do.
14    Q.  You're the superintendent of the Delaware State
15  Police; isn't that right?
16    A.  That's correct.
17    Q.  You're the highest-ranking officer?
18    A.  Yes, I am.
19    Q.  In April of 2004 you were the operations officer
20  of the Delaware State Police; isn't that right?
21    A.  I was the deputy superintendent.
22    Q.  You were responsible for day-to-day operations?
23    A.  Yes, sir.
24    Q.  Does the DSP try to treat people equally

Page 103

1  regardless of whether they are black or white?
2     A.  Yes.
3     Q.  How about if they're male or female?
4     A.  Yes.
5     Q.  How about if their Protestant or Catholic?
6     A.  Yes.
7     Q.  How about Muslim or Jew?
8     A.  Yes.
9     Q.  How about if they're rich or poor?
10    A.  Yes.
11    Q.  How about powerful or weak?
12    A.  Yes.
13    Q.  Be fair to say the DSP strives to treat all
14  people fairly in addition to equally?
15    A.  Yes, we do.
16    Q.  Is that something that's important in the
17  Delaware State Police?
18    A.  Yes, it is.
19    Q.  Is that something that is important to you
20  personally?
21    A.  Yes, it is.
22    Q.  Colonel Chaffinch was blaming staff at the FTU
23  for some of the problems at the FTU; isn't that right?
24    A.  Yes.

Page 104

1     Q.  Then he refused to allow them to speak to the
2  media to defend themselves; isn't that right?
3     A.  Yes.
4     Q.  Does that strike you as unfair?
5     A.  I think he did what was in the best interest of
6  the division at that point.
7     Q.  So it does not strike you as unfair?
8     A.  Put in your context, yes, it does seem unfair,
9  but put in the context of what was best for the division
10  at that point, I feel it was the right course of action.
11    Q.  Does it strike you as an abuse of power?
12    A.  No, it does not.
13    Q.  Does it strike you as an abuse of discretion?
14    A.  No, it does not.
15    Q.  Does it strike you as dishonorable?
16    A.  No, it does not.
17        MR. ELLIS: I object to the form of the
18  question.
19    Q.  Does it strike you as cowardly?
20    A.  No, it does not.
21        MR. ELLIS: I object to the form of the
22  question.
23    Q.  Colonel, I'd like to show you a couple more
24  documents. Okay?

Page 105

1     A.  Okay.
2         MR. NEUBERGER: I'd like to mark this as
3  MacLeish Deposition Exhibit No. 6.
4         (MacLeish Deposition Exhibit No. 6 was
5  marked for identification.)
6  BY MR. NEUBERGER:
7     Q.  Colonel, do you have this document in front of
8  you?
9     A.  Yes, I do.
10    Q.  At the bottom right-hand corner of the page does
11  it say "FTU2756"?
12    A.  Yes, it does.
13    Q.  At the top of the page does it say "Range Tech"?
14    A.  Yes, it does.
15    Q.  A little bit below that does it say,
16  "Recommendation for construction of the Delaware State
17  Police Firing range"?
18    A.  Yes, it does.
19    Q.  Is it dated March 27th of 1996?
20    A.  Yes, it does.
21    Q.  Is it addressed to Lieutenant William E. Bryson?
22    A.  Yes.
23    Q.  Do you know who Lieutenant Bryson is?
24    A.  Yes, I do.

A - 351

Case 1:04-cv-00956-GMS   Document 92-16   Filed 02/02/2006   Page 11 of 19

Price, et al.                                v.                          Chaffinch, et al.
Thomas F. MacLeish                    C.A. # 04-1207                     July 19, 2007

Page 106

1  Q. Who is he?
2  A. He's a retired member of the division. He's
3  currently chief of the Camden Police Department in
4  Delaware.
5  Q. Is he a friend of yours?
6  A. Yes, he is.
7  Q. Was he best man in your wedding?
8  A. No. I was best man in his.
9  Q. Got you. I'd like you to take a look at the
10 first paragraph on page 1. Could you read that quietly
11 to yourself?
12 A. (Complied.)
13    Okay.
14 Q. Does that paragraph indicate that range tech has
15 evaluated the ventilation system for the proposed State
16 Police firearms facility and concluded that, as designed,
17 it will not work?
18 A. That's what it says.
19 Q. Then the next paragraph, does that state that
20 "The definition of 'will not work' is simply that the
21 present design will not perform as it is required to
22 under the present requirements established by OSHA &
23 NIOSH"?
24 A. Yes, it does.

Page 107

1  Q. Can you turn to the second page, please?
2  A. (Complied.)
3  Q. Do you see the section where it says "Findings"?
4  A. Yes.
5  Q. I'd like to read the first paragraph to you.
6  Okay?
7  A. Yes, sir.
8  Q. Does that state that "We have concluded that the
9  designed ventilation system will inevitably fail if it is
10 constructed as designed"?
11 A. Yes.
12 Q. It goes on to list some findings, does it not?
13 A. Yes.
14 Q. Have you ever seen this letter before?
15 A. I have read a lot of correspondence between
16 January of '04 and now, and, yes, I believe I have seen
17 this before.
18 Q. Have you read it before?
19 A. I believe I scanned it.
20 Q. A statement that the ventilation system will not
21 work, would that raise a red flag in your mind if you
22 were to receive this letter?
23 A. Yes, it would.
24 Q. You can put the document down.

Page 108

1     MR. NEUBERGER: I'd like to mark this next
2  document as MacLeish Deposition Exhibit No. 7.
3     (MacLeish Deposition Exhibit No. 7 was
4  marked for identification.)
5  BY MR. NEUBERGER:
6  Q. Do you have this document in front of you?
7  A. I do.
8  Q. At the bottom right-hand corner of the page does
9  it stay "FTU2956"?
10 A. Yes, it does.
11 Q. Does this appear to be a memo to Lieutenant
12 William Bryson?
13 A. Yes, it does.
14 Q. Is it from Sergeant Brian Fitzpatrick?
15 A. Yes.
16 Q. It's copied to a Captain Thomas DiNetta?
17 A. Yes.
18 Q. It's dated November 8 of 1998?
19 A. Yes, sir.
20 Q. It says, "Re: Range ventilation problem"?
21 A. Yes.
22 Q. Does the first sentence of this memo state that
23 "Since the first day of the in-service shoot, the
24 Firearms Training Staff occasionally noticed an excessive

Page 109

1  odor of gun smoke on the range"?
2  A. Yes.
3  Q. Could you skip down three more sentences to the
4  sentence that begins "On 11/05/98"?
5  A. Yes.
6  Q. Do you see that?
7  A. Yes.
8  Q. Does that state that on November 5th, 1998,
9  "Jim Ferguson of Trane responded and identified that the
10 ventilation system is causing a horizontal tornado (best
11 way to describe it) swirling the smoke from floor level
12 to the ceiling"?
13 A. Yes.
14 Q. Does the next sentence then state that
15 Lieutenant Bryson contacted Jade Engineering about this
16 problem?
17 A. Yes.
18 Q. Does the sentence after that state that "Mr. Ide
19 stated the problem is because the deflectors that were
20 identified in the blue prints were not installed
21 therefore the system is not working properly"?
22 A. Yes.
23 Q. Does this memo appear to indicate that something
24 that was identified in the blueprints was not installed

A - 352

Price, et al.  
Thomas F. MacLeish  
v.  
C.A. # 04-1207  
Chaffinch, et al.  
July 19, 2007

Page 110

1  as part of the range ventilation system?  
2  A. Yes, that's what it states.  
3  Q. Let's go to the last sentence on the page. Do  
4  you see that?  
5  A. Yes.  
6  Q. Does it say, "However, the range staff is  
7  exposed daily and there is a potential for serious health  
8  problems"?  
9  A. Yes.  
10  Q. You indicated that you're friends with  
11  Lieutenant William Bryson; isn't that right?  
12  A. Yes, sir.  
13  Q. Do you think Lieutenant Bryson would cry wolf,  
14  so to speak, about the serious health problems if there  
15  wasn't a serious cause for concern?  
16  A. I don't think he's crying wolf. I think he  
17  would state specifically that there was an issue and we  
18  needed to address it.  
19  Q. Thank you. You can put that document down?  
20      MR. ELLIS: Bryson didn't write this.  
21      MR. NEUBERGER: I'm sorry. Let me ask that  
22  question again, then.  
23  BY MR. NEUBERGER:  
24  Q. Do you know Sergeant Brian Fitzpatrick?

Page 111

1  A. Yes, I do.  
2  Q. Is he currently a Delaware state trooper?  
3  A. Yes, he is.  
4  Q. Do you think Sergeant Fitzpatrick would have  
5  flagged these concerns if they weren't serious?  
6  A. Yes, I think Sergeant Fitzpatrick would have  
7  forwarded his concerns in the appropriate manner as he  
8  did in this document.  
9      MR. NEUBERGER: I'd like to mark this next  
10  document as MacLeish Deposition Exhibit No. 8.  
11      (MacLeish Deposition Exhibit No. 8 was  
12  marked for identification.)  
13  BY MR. NEUBERGER:  
14  Q. Colonel, do you have that document in front of  
15  you?  
16  A. I do.  
17  Q. At the bottom right-hand corner does it say  
18  "FTU2973"?  
19  A. Yes, sir, it does.  
20  Q. At the very top does it say "Batta," B-a-t-t-a?  
21  A. Yes, it does.  
22  Q. Below that does it say, "Batta Environmental  
23  Associates, Inc."?  
24  A. Yes.

Page 112

1  Q. Does this appear to be a letter that was sent to  
2  Mr. Doyle Tiller of the facilities program administrator?  
3  A. Yes.  
4  Q. On December 1st of 1998?  
5  A. Yes.  
6  Q. I would like to direct your attention to the  
7  body of the letter. If you take a look at the third  
8  paragraph, the fourth line down in the third paragraph.  
9  Starts with "Levels in the firing range area."  
10  A. Yes.  
11  Q. Do you see that?  
12  A. Yes, I do.  
13  Q. Does that state that "Levels in the firing range  
14  area taken at the firing points during small arms firing  
15  were analyzed as being above the OSHA limit of 0.05 MG/M"  
16  either squared or cubed.  
17  A. Yes.  
18  Q. Does that at least appear to indicate that  
19  levels of something in the firing range were above the  
20  OSHA limit?  
21  A. Yes, it does.  
22  Q. Let's skip down two more paragraphs to the  
23  paragraph that begins "Batta recommends." Do you see  
24  that?

Page 113

1  A. Yes.  
2  Q. Does that paragraph state that "Batta recommends  
3  having the HVAC systems adjusted to evacuate the airborne  
4  contamination in a more efficient manner, and have follow  
5  up monitoring performed in order to provide documentation  
6  of the response and corrective action"?  
7  A. Yes, it does.  
8  Q. Have you ever seen this letter before?  
9  A. No.  
10      MR. NEUBERGER: I'd like to mark this next  
11  document as MacLeish Deposition Exhibit No. 9.  
12      (MacLeish Deposition Exhibit No. 9 was  
13  marked for identification.)  
14  BY MR. NEUBERGER:  
15  Q. Colonel, do you have that document in front of  
16  you?  
17  A. Yes, I do.  
18  Q. At the bottom right-hand corner of the page does  
19  it say "FTU2983"?  
20  A. Yes.  
21  Q. At the top of the page does it say, "Delaware  
22  State Police Firearms Training Unit Memorandum"?  
23  A. Yes, it does.  
24  Q. Does this appear to be a memo to Captain

29 (Pages 110 to 113)

Case 1:04-cv-00956-GMS   Document 92-16   Filed 02/02/2006   Page 13 of 19

Price, et al.                                                    Chaffinch, et al.
Thomas F. MacLeish          C.A. # 04-1207                       July 19, 2007

Page 114

1  Thomas DiNetta, cc'd to a Ms. Elritta Annett from
2  Sergeant Brian Fitzpatrick?
3     A.  Yes.
4     Q.  Is it dated December 3rd, 1998?
5     A.  Yes.
6     Q.  Does the re line say, "Range Ventilation"?
7     A.  Yes.
8     Q.  Could you take a look at the first sentence of
9  the first paragraph and read that quietly to yourself,
10 please?
11    A.  (Complied.)
12    Q.  Does that sentence indicate that the range was
13 shut down until the air-handling system could be fixed?
14    A.  That's correct.
15    Q.  Do you recall that there was a time when the
16 range was shut down prior to March of 2004?
17    A.  Yes, I do.
18    Q.  Put that document down. Are you aware of the
19 engineering firm who designed the FTU?
20    A.  JAED, J-A-E-D.
21        MR. ELLIS: All caps.
22    Q.  Do you know if they had ever built an indoor
23 firing range before?
24        MR. ELLIS: Does he know from his personal

Page 115

1  knowledge or does he know from all the media attention
2  and all the memos that have been written?
3         MR. NEUBERGER: His personal knowledge.
4     A.  I apologize for my dismay here, but from my
5  personal knowledge, at that time did I know that they had
6  not? No, I did not. Subsequent to that, beginning in
7  January of '04, did I then learn that they had never
8  designed another range? Yes, I did learn that.
9         MR. NEUBERGER: I'd like to put another
10 document in front of you have. We will call this
11 MacLeish Deposition Exhibit No. 10.
12        (MacLeish Deposition Exhibit No. 10 was
13 marked for identification.)
14 BY MR. NEUBERGER:
15    Q.  Colonel, do you have that document in front of
16 you?
17    A.  Yes, I do.
18    Q.  At the bottom right-hand corner does it say
19 "FTU3040"?
20    A.  Yes, sir.
21    Q.  At the top does it say, "Firearms Training Unit
22 Memorandum"?
23    A.  Yes.
24    Q.  Does this say memo from Sergeant

Page 116

1  Brian Fitzpatrick to Captain Thomas DiNetta, cc'd to
2  Major McDerby?
3     A.  Yes, sir.
4     Q.  Is it dated April 29th, 1999?
5     A.  Yes.
6     Q.  Is it "Re: Range Project"?
7     A.  Yes.
8     Q.  Could you take a look at item No. 4? Do you see
9  item No. 4 on that page?
10    A.  Yes, I do.
11    Q.  I'd like to read part of that to you. Okay?
12    A.  Yes, sir.
13    Q.  Does the first sentence indicate that "April 26,
14 1999 the rear of the range was found to have a large
15 amount of lead dust on the floor and equipment"? Does it
16 state that?
17    A.  Yes, sir.
18    Q.  Do you know what he's referring to by "rear of
19 the range"?
20    A.  Yes. Well, I'll assume that that is the bullet
21 trap area of the range.
22    Q.  Does the next sentence indicate that Master
23 Corporal Eddie Cathell showed his lead level rose from a
24 14 to a 21?

Page 117

1     A.  Yes.
2     Q.  And that Corporal Price went from an 8 to an 11?
3     A.  Yes.
4     Q.  Would this appear to indicate that the lead
5  levels of corporals Cathell and Price were rising?
6     A.  That would indicate that, yes.
7     Q.  Was Sergeant Brian Fitzpatrick the NCOIC of the
8  FTU at the time, to the best of your knowledge?
9     A.  To the best of my knowledge.
10    Q.  You can put that document to the side.
11        MR. ELLIS: I need to take a brief recess.
12        MR. NEUBERGER: It's 10 after 12:00. Do
13 you all want to eat? We will take a break.
14        (A lunch recess was taken at 12:10 p.m.)
15        (The deposition resumed at 1:00 p.m.)
16 BY MR. NEUBERGER:
17    Q.  Colonel MacLeish, let's keep going. I want to
18 run you through a couple more exhibits, and I'd like to
19 put those in front of you and we will go from there.
20 Okay?
21    A.  Sure.
22        MR. NEUBERGER: I'll mark this as MacLeish
23 Deposition Exhibit No. 11.
24        (MacLeish Deposition Exhibit No. 11 was

A - 354

Case 1:04-cv-00956-GMS    Document 92-16    Filed 02/02/2006    Page 14 of 19

Price, et al.                          v.                            Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                       July 19, 2007

Page 118

1  marked for identification.)
2  BY MR. NEUBERGER:
3     Q.   Colonel, do you have that document in front of
4  you?
5     A.   Yes, I do.
6     Q.   In the bottom right-hand corner does it say
7  "FTU3881"?
8     A.   Yes.
9     Q.   At the very top, top left-hand corner, does it
10 say, "Warren Gregory A (DSP)"?
11    A.   Yes.
12    Q.   Does this say, "To: MacLeish Thomas F (DSP)"?
13    A.   Yes.
14    Q.   Does it say, "Subject: RE: Emergency Range
15 Issues"?
16    A.   Yes.
17    Q.   Does this appear to be several different
18 e-mails?
19    A.   Three e-mails, yes.
20        MR. ELLIS: Is there some reason why the
21 top e-mail is not dated?
22        MR. NEUBERGER: For some reason I noticed
23 in going through some of the documents, some of them just
24 don't have a date on them. Some of them will have a date

Page 119

1  right here and some don't. Some will have all the date
2  stuff right here. I don't know why that is.
3        MR. ELLIS: I think it is because Outlook
4  doesn't put a date on it until it's sent. I'm not saying
5  that this wasn't sent. I'm only saying that you may have
6  a copy of it that was generated before it was sent,
7  meaning the one that was sent could have been changed.
8        MR. NEUBERGER: I'm only going to be asking
9  about the ones which were sent.
10 BY MR. NEUBERGER:
11    Q.   Colonel, do you see a little bit down from the
12 top on the first page it says "Original Message"?
13    A.   Yes, I do. Sorry.
14    Q.   Do you see it says, "From: MacLeish Thomas F"?
15    A.   Yes.
16    Q.   And the date is January 5th, 2004, at 7:06 a.m.?
17    A.   Yes.
18    Q.   It's being sent to Chris Foraker and
19 Greg Warren?
20    A.   Yes.
21    Q.   Also copied to several people?
22    A.   Yes.
23    Q.   The text of that e-mail says, "Sgt. Foraker, I
24 read this email this morning." And does it go on from

Page 120

1  there?
2     A.   Yes.
3     Q.   The e-mail that's referring to, is that the next
4  e-mail down on the same page?
5     A.   Yes, it is.
6     Q.   Is that an e-mail from Sergeant Foraker dated
7  December 19th, 2003, at 7:20 p.m.?
8     A.   Yes.
9     Q.   Is it sent to you and to Major Paul Eckrich?
10    A.   Yes, it is.
11    Q.   Is the subject of that e-mail the emergency
12 range issues?
13    A.   Yes, it is.
14    Q.   So this is an e-mail that you once received,
15 correct, the bottom e-mail?
16    A.   That's correct.
17    Q.   When you received it, did you read it?
18    A.   I didn't -- I received it on the day he sent it.
19 I didn't read it until January the 5th when I responded
20 to it.
21    Q.   That's helpful. Thank you. You can put that
22 document down.
23        MR. NEUBERGER: I'd like to mark another
24 document as Deposition Exhibit 12.

Page 121

1        (MacLeish Deposition Exhibit No. 12 was
2  marked for identification.)
3  BY MR. NEUBERGER:
4     Q.   Do you have that document in front of you right
5  now?
6     A.   Yes, I do.
7     Q.   At the bottom right-hand corner does it say
8  "FTU2348"?
9     A.   Yes, it does.
10    Q.   At the top does it appear to say it's an e-mail
11 from Davis, Ralph H.?
12    A.   Yes.
13    Q.   And the date on it appears to be January 9th,
14 2004?
15    A.   Yes.
16    Q.   And it appears to be Sergeant Chris Foraker,
17 right?
18    A.   Yes.
19    Q.   There's an original message a little farther
20 down, correct?
21    A.   Yes, there is.
22    Q.   That's an e-mail from Chris Foraker to
23 Ralph Davis and Greg Warren?
24    A.   Yes.

A - 355

Case 1:04-cv-00956-GMS    Document 92-16    Filed 02/02/2006    Page 15 of 19

Price, et al.                                                    Chaffinch, et al.
Thomas F. MacLeish          C.A. # 04-1207                       July 19, 2007

Page 122

1    Q.  Do you see the subject line says, "Standard
2  Operating Procedures & issues"?
3    A.  Yes, I do.
4    Q.  I'd like to direct your attention to the second
5  paragraph which begins, "I would also like to point out
6  that." Do you see that?
7    A.  Yes, I do.
8    Q.  I'd like to read this to you.  "I would also
9  like to point out that the firearms industry standard for
10 instructor to student ratio is 1 instructor for every 4
11 students of in-service personnel and 1 instructor to
12 every 2 recruit students (MAXIMUM NUMBER OF STUDENTS ON
13 EACH COUNT)."  Do you see that?
14   A.  Yes, I do.
15   Q.  Does that appear to be referring to some sort of
16 safe staffing level concerns?
17   A.  It appears to me is they're telling me what --
18 that the firearms industry standard for
19 instructor-to-student ratio is 1 to 4 for inservice and 1
20 to 2 recruit students.
21   Q.  Did you ever hear Sergeant Foraker or any of the
22 other personnel at the FTU raise concerns as to the
23 staffing levels at the FTU?
24   A.  Yes, I have.

Page 123

1    Q.  Did you ever see this e-mail, to the best of
2  your recollection?
3    A.  Not this e-mail I have not.
4    Q.  But you had heard those same concerns raised by
5  Sergeant Foraker and the rest of the staff?
6         MR. ELLIS:  I object to the form of the
7  question.
8  BY MR. NEUBERGER:
9    Q.  Have you heard those same concerns raised by
10 Sergeant --
11   A.  I recall addressing these concerns through
12 Captain Warren.
13   Q.  Do you know if Captain Warren was raising those
14 issues because his subordinates had raised those issues
15 to him?
16   A.  I would assume that's why he brought them to my
17 attention, yes.
18   Q.  You can put that document down.
19        MR. NEUBERGER:  I'd like to mark this next
20 document as MacLeish Deposition Exhibit No. 13.
21        (MacLeish Deposition Exhibit No. 13 was
22 marked for identification.)
23 BY MR. NEUBERGER:
24   Q.  Colonel, do you have that document in front of

Page 124

1  you?
2    A.  Yes, I do.
3    Q.  At the bottom right-hand corner of that document
4  does it say "FTU2351"?
5    A.  Yes, it is.
6    Q.  Does it appear to be an e-mail from
7  Sergeant Foraker to Captain Greg Warren, copied to
8  Lieutenant Ralph Davis?
9    A.  Yes.
10   Q.  Is it dated January 9th, 2004, at 7:58 p.m.?
11   A.  Yes.
12   Q.  Is the subject line of that e-mail "Range Health
13 issues and Departmental liability"?
14   A.  Yes.
15   Q.  Does the first sentence of the first paragraph
16 indicate that "We are experiencing significant air flow
17 problems at the range"?
18   A.  Yes, it does.
19   Q.  Now, skipping on to the third sentence of that
20 same paragraph, does it state, "Corporals Warren and
21 Price have expressed that this problem has been in
22 existence for many months and has only been 'band aided'
23 over time when complaints have been made"?
24   A.  Yes, it does.

Page 125

1    Q.  Is this in keeping with what you testified to
2  earlier about some preexisting problems regarding
3  ventilation?
4         MR. ELLIS:  I object to the form of the
5  question.
6    A.  I testified that, in a general sense, there had
7  been air-handling problems at the range.  Yes.
8    Q.  Did you know about any specifics at the time?
9    A.  At that time?  No.
10   Q.  Were specifics about the air-handling problems
11 at the range subsequently brought to your attention?
12        MR. ELLIS:  I object to the form of the
13 question.  I don't see the time frame.
14        MR. NEUBERGER:  Okay.
15        MR. ELLIS:  Subsequent to this e-mail?
16        MR. NEUBERGER:  No.  I'm trying to use
17 e-mail to bring certain issues to his attention and go
18 from there.
19        MR. NEUBERGER:  For a time frame I'm going
20 to say December of 2003 to April 2004.
21        MR. ELLIS:  What's the question?  Did he
22 know about ventilation issues during that time period.
23        MR. NEUBERGER:  Yes.
24   A.  No, I was not aware of the ventilation issues

A - 356

Page 126

1  from -- the first knowledge I had of issues at the range
2  involved one of the previous e-mails that
3  Sergeant Foraker had sent on December the 19th. That was
4  my first knowledge of issues at the range with the
5  air-handling system. It was later in the month of
6  January that more specific things about the air-handling
7  system were coming out, and it was my understanding we
8  were working with Facilities Management to address them.
9    Q.  Did you ever hear that Sergeant Foraker and the
10 rest of the staff at the FTU were trying to get the
11 ventilation problems at the FTU fixed during that same
12 time period?
13   A.  I knew they were working with Facilities
14 Management in order to address the air-handling problems.
15 That's what I was briefed on by the captain.
16   Q.  Did you ever hear that they were concerned about
17 their health and safety due to problems with the
18 ventilation system?
19   A.  I'm trying to remember the time frame. In the
20 January time frame, I remember the first time that it
21 came glaringly out there that there were problems,
22 significant problems, with health issues was at the end
23 of the month, and that was that phone call I got from
24 Captain Warren on the 29th that said that there were

Page 127

1  problems with nasal discharges and things of that nature,
2  that they needed to -- that there was a cloud, there was
3  a reference to a cloud of dust, and that's when I said,
4  "Do we need to shut it down? Do we need to shut it down?
5  Do we need to get blood work, get physicals for our
6  personnel?"
7    Q.  Could you take a look at the paragraph
8  numbered 1? Do you see that?
9    A.  Yes, I do.
10   Q.  Does that appear to indicate that, quote, "A
11 reddish haze in the air that is suspended throughout the
12 air when the bullet strikes the bullet trap"?
13   A.  Yes.
14   Q.  Does it then say that "The airborne" -- I can't
15 read the next word -- "are inhaled by the instructors and
16 students"? Does it state that?
17   A.  Yes, it does.
18   Q.  Does it go on to state, "When anyone blows their
19 nose, a large amount of the reddish debris is
20 discharged"?
21   A.  Yes.
22   Q.  "Students and instructors also complain of a
23 copper penny taste in their mouth after shooting and
24 described a significant eye mucus present when awaking

Page 128

1  the following morning after a day on the range"?
2    A.  Yes, it does.
3    Q.  Putting the document down, are those some of the
4  health concerns that were related to you by Captain
5  Greg Warren?
6    A.  Yes. I can recall saying to Captain Warren, "Do
7  we need to shut the range down?"
8        "No, we can continue shooting."
9        The recommendation being wear masks,
10 wear -- it's not a surgical mask but a paper-type mask
11 over their face to reduce the amount of reddish cloud
12 that -- this airborne cloud that they were obviously
13 standing in. I likened it to mowing your grass and if
14 you're mowing a lot of grass with dirt and pollen and
15 stuff, it's going to eliminate some of that stuff from
16 getting into your nasal passages and you're ingesting it.
17 If we weren't going to shut it down, they didn't feel we
18 had to shut it down, what precautions could we take to be
19 safe.
20   Q.  Who indicated that a paper mask should be worn?
21   A.  I'm trying to think of the proper terminology
22 for it. It wasn't -- it's not a surgical mask, it's not
23 a ventilator, but it's a device to wear over your face.
24 We have them issued for people that would like to

Page 129

1  expectorate on our troopers. We put them on them so that
2  they're not going to be putting things on our troopers.
3    Q.  Was that your idea or Captain Warren's?
4    A.  That was my idea. It wasn't well received.
5    Q.  By whom?
6    A.  By the firearms training staff, as shared with
7  me by Captain Warren.
8    Q.  Why was it not well received, do you know? Was
9  that told to you?
10   A.  My understanding is that they felt it would
11 infringe upon their ability to communicate with the range
12 personnel. I was told that they needed training in
13 putting that on, in use of that if we were going to
14 mandate that they use it. My only suggestion in using
15 that mask was to cut down on the amount of mucus and the
16 foreign material they were ingesting. If they weren't
17 going to shut it down, they didn't feel it was necessary
18 to shut it down, how could we, while working to fix the
19 system, we their exposure to this dust, the ingesting of
20 this dust? That was my recommendation.
21   Q.  Did anyone tell you that the FTU staff thought
22 it may have been a safety concern wearing that type of a
23 mask?
24   A.  That was where I alluded to their ability to

Case 1:04-cv-00956-GMS   Document 92-16   Filed 02/02/2006   Page 17 of 19

Price, et al.                                    v.                     Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                          July 19, 2007

Page 130

1 give verbal commands and things like that to students.
2 They're the ones that are up there. I understand that.
3    Q. Let's go down to the paragraph numbered 2
4 towards the bottom of the page. Do you see that?
5    A. Yes, I do.
6    Q. Let's skip to the second sentence which starts
7 with the words "Due to the fact." Do you see that?
8    A. Yes, I do.
9    Q. I'd like to read that to you. Okay?
10   A. Yes.
11   Q. "Due to the fact that cleaning out the
12       filters/screens and the sprayer jet heads as well
13       changing out the failed pumps greatly increases
14       the blood lead level, this maintenance should be
15       executed by professionals who are well versed and
16       properly equipped in the prevention of lead
17       exposure in a contaminated environment."
18       Does it say that?
19   A. Yes, it does.
20   Q. Just based on reading this, does it appear that
21 they were trying to raise a safety concern there?
22   A. Yes, it does.
23   Q. Is it a safety concern which you ever heard
24 about independently of this e-mail?

Page 131

1    A. No, it is not.
2    Q. Did anyone ever tell you that the FTU staff
3 members thought that professionals should be cleaning the
4 range because of the hazardous materials at the range?
5    A. After the fact, yes, that was stated, but not
6 during this time.
7    Q. When is after the fact?
8    A. After the 29th of January.
9    Q. Of 2004?
10   A. 2004.
11   Q. Would that have been in February or March of
12 2004?
13   A. It could have been.
14   Q. You can put that document down.
15       MR. NEUBERGER: I'd like to put another
16 document in front of you. We will mark this as MacLeish
17 Deposition Exhibit 14.
18       (MacLeish Deposition Exhibit No. 14 was
19 marked for identification.)
20 BY MR. NEUBERGER:
21   Q. Do you have that document in front of you,
22 Colonel?
23   A. I do.
24   Q. On the bottom right-hand corner does it say

Page 132

1 "FTU3886"?
2    A. Yes, it does.
3    Q. Does this appear to be something which was
4 printed out from Captain Gregory Warren's e-mail account?
5    A. If by reference to the name at the top it's
6 Captain Gregory Warren or it has Gregory A. Warren, I can
7 assume that is where it originated.
8    Q. At the top it does say Captain Gregory A.
9 Warren, right?
10   A. Yes.
11   Q. It says, "To: Foraker Christopher"?
12   A. Yes.
13   Q. It says, "Re: Bullet Trap Update/Air Handler"?
14   A. Yes.
15   Q. Does it say, "10-4, I'll call you first thing
16 Tuesday morning ref. coming up and meeting with you. I
17 want to review some items with you, prior to submitting
18 my final report to MacLeish. Thanks, Greg"? Does it say
19 that?
20   A. Yes, it does.
21   Q. What report is that referencing, do you know?
22   A. My assumption by reading this is from my
23 reference to the January 5th response to Captain Warren
24 advising him to prepare a report for me on the problems

Page 133

1 at the range.
2    Q. There's another e-mail message right below that.
3 Do you see that? It says "Original Message"?
4    A. Yes, I do.
5    Q. Is that dated January 23rd, 2004?
6    A. Yes.
7    Q. Is that an e-mail from Chris Foraker to Captain
8 Warren, Ralph Davis, and the rest of the staff at the
9 FTU?
10   A. Yes, it is.
11   Q. Does the subject line say, "Bullet Trap
12 Update/Air Handler"?
13   A. Yes.
14   Q. Putting this document down, did anyone ever tell
15 you that there were problems with the bullet trap at the
16 FTU?
17   A. Yes. Sergeant Foraker made me aware of that on
18 December 19th.
19   Q. Were you made aware of subsequent problems with
20 it?
21   A. No. On January the 5th when I responded -- if I
22 could look back, I can tell you a specific date, but it
23 was in that time frame, January the 5th or 6th, when I
24 responded to Sergeant Foraker's original e-mail of

A - 358

34 (Pages 130 to 133)

Case 1:04-cv-00956-GMS   Document 92-16   Filed 02/02/2006   Page 18 of 19

Price, et al.
Thomas F. MacLeish
v.
C.A. # 04-1207
Chaffinch, et al.
July 19, 2007

Page 134

1  December the 19th that said do what you got to do, Greg
2  prepare a report and work on the problems. I assumed
3  that was going on by the director of the academy and his
4  staff along with FTU.
5   Q. At some point a report was submitted to you,
6  correct?
7   A. Yes.
8   Q. Do you know if Captain Warren interviewed the
9  members of the FTU staff as he prepared that report?
10   A. I don't know if he specifically did. I know the
11  report contained information that dealt with the range,
12  but it wasn't specific to the issues in the original
13  e-mail. It was kind of an all-encompassing report.
14   Q. I would like to direct your attention to the
15  second paragraph of this document, the one which begins,
16  "Regarding the air quality testing."
17   A. Yes.
18   Q. Do you see that?
19   A. Yes.
20   Q. I'd like to direct your attention to the third
21  sentence in that paragraph, the one that begins, "I was
22  also advised." Do you see that?
23   A. Yes, I do.
24   Q. I'd like to read that to you. Okay?

Page 135

1   A. Sure.
2   Q. "I was also advised by both Cpl. Price and
3      Cpl. Warren when they had approached Sgt. Ashley
4      regarding maintaining the pumps and the water
5      system as well the spike in the lead levels in
6      their blood causing health problems, Sgt. Ashley
7      responded with 'You have to die from something.'
8      This statement offended them and they as well as
9      Jim Warwick and myself are extremely concerned
10     over our health and the health of those who we
11     train."
12      Does it say that?
13   A. Yes, it does.
14   Q. As the highest-ranking officer of the DSP
15  currently, I'd like to ask you some questions about what
16  this paragraph says. Okay?
17   A. Okay.
18   Q. Should a supervisor respond to a trooper's
19  health and safety concerns by saying you have to die from
20  something?
21      MR. ELLIS: I object to the form of the
22  question.
23   A. I think that Sergeant Ashley in the context in
24  which it was said, was it said in a joking manner? Was

Page 136

1  it said -- the setting in which it was said has to be
2  taken into consideration before you start making a
3  judgment on what those words mean that he said.
4      So the context under which it's presented
5  here, I can see where you would make that assumption, but
6  the context in which the conversation took place between
7  those parties that were there when it was said, all
8  parties would have to be talked to and discuss it.
9   Q. Were you a party to that conversation?
10   A. No, I was not.
11   Q. If it wasn't said in a joking manner, would that
12  be an appropriate response from a supervisor to a
13  subordinate?
14      MR. ELLIS: I object to the form of the
15  question.
16   A. It's not the best way to say, you know, get on,
17  get your work done, but it could be said better.
18   Q. If a trooper on patrol went up to his shift
19  supervisor and said my bulletproof vest isn't working,
20  should the supervisor respond to him that, well, just
21  don't wear it, you have to die from something? Would
22  that be an appropriate response in that context?
23      MR. ELLIS: I object to the form of the
24  question.

Page 137

1   A. The hypothetical that you just gave me, I would
2  anticipate my sergeant saying how do you know it's not
3  functioning properly? What are your concerns, specific
4  concerns? Take it off and don't bother wearing it. It's
5  going to offer you some level of protection anyway, much
6  the same as with this is -- you're working with these
7  things. Is that the appropriate response? Or the
8  appropriate response could have been let's wear gloves,
9  prevent it from touching us, and clean it in that manner.
10  If those are your concerns and that's the area -- that's
11  the basis of it, then take appropriate safety precautions
12  in dealing with it. That would be the appropriate
13  response I would say. And the trooper -- the supervisor
14  telling somebody don't wear your vest because you don't
15  think it's going to work is not an appropriate response.
16   Q. I'd like to show you another document. You can
17  put that one down. We will call this MacLeish Deposition
18  Exhibit No. 15.
19      (MacLeish Deposition Exhibit No. 15 was
20  marked for identification.)
21  BY MR. NEUBERGER:
22   Q. Do you have that document in front of you?
23   A. Yes, I do.
24   Q. In the bottom right-hand corner does it say

Case 1:04-cv-00956-GMS   Document 92-16   Filed 02/02/2006   Page 19 of 19

Price, et al.                                                    Chaffinch, et al.
Thomas F. MacLeish              C.A. # 04-1207                   July 19, 2007

Page 138

1  "FTU3894"?
2  A. Yes, it does.
3  Q. Does this appear to be an e-mail from Sergeant
4  Chris Foraker to Major Paul Eckrich dated February 19,
5  2004?
6  A. Yes, it does.
7  Q. I'd like to direct your attention to the
8  paragraph that is written it looks like in bold. Do you
9  see that?
10  A. Yes.
11  Q. Does that state, "I am overwhelmed with concern
12  for the health and safety of my staff and their wives and
13  children"?
14  A. Yes.
15  Q. Skipping the next sentence, does the next
16  sentence say, "I have spent much less time on the range
17  when compared to my staff and yet my copper and lead
18  levels are the same as the others"? Does it say that?
19  A. Yes, it does.
20  Q. Does it say, "My lead level shot up from a 3 to
21  9 and my copper is at 971 in just 2 months"?
22  A. Yes.
23  Q. Does this paragraph appear to be expressing
24  health and safety concerns about the conditions at the

Page 139

1  range?
2  A. Yes.
3  Q. Do you think that's a valid concern?
4  MR. ELLIS: Object to the form of the
5  question. Do you mean is health and safety a valid
6  concern or is the material in the bold paragraph in
7  Exhibit 15 a valid health and safety concern?
8  BY MR. NEUBERGER:
9  Q. Is health and safety in general a valid concern?
10  A. Yes, it is.
11  Q. How about health and safety when it comes to
12  levels of lead and tin, copper and other things like that
13  in the working environment, independent of that document,
14  Colonel?
15  A. Any exposure of our people to anything that
16  could be hazardous to their health is a concern, and
17  that's why early in the month -- once again, the time
18  frame, it was either on or about this or prior to -- I
19  asked, to have a better understanding of where we were,
20  what levels we were at. And I go back to back on the
21  29th when I said to Captain Warren, "Get blood work done
22  and do physicals."
23  He told me "We're not at the physical point
24  at this time. They are waiting for the blood results to

Page 140

1  come back in to find out where blood levels were in a
2  short amount of time."
3  I had asked our HR person, Captain Yeomans,
4  to prepare a report on the blood lead levels to get an
5  understanding, and with the thought always being out
6  there that I had already offered getting physicals to all
7  these personnel and I even included recruits if they
8  thought it was necessary, and at that point
9  Captain Warren didn't feel it was necessary, and I guess
10  neither did the people in the Firearms Training Unit,
11  because that's where the information was passed on
12  through.
13  Q. How do you know it was passed on and through to
14  them?
15  A. I would assume that the captain would carry that
16  message forward as any individual would in that capacity
17  that oversees that type of a unit, who oversees any unit
18  within the State Police, because the health and safety of
19  our people are always important.
20  Q. Thank you. That's helpful.
21  MR. NEUBERGER: I'd like to put another
22  document in front of you. We will call this MacLeish
23  Deposition Exhibit No. 16.
24  (MacLeish Deposition Exhibit No. 16 was

Page 141

1  marked for identification.)
2  BY MR. NEUBERGER:
3  Q. Colonel, do you have that document in front of
4  you?
5  A. Yes, I do.
6  Q. At the bottom right-hand corner does it say
7  "FTU2593"?
8  A. Yes, it is.
9  Q. At the top does it say, "Firearms Training Unit
10  Indoor Range Maintenance and Service Report"?
11  A. Yes, it does.
12  Q. Does it say, "Prepared by FTU Staff"?
13  A. Yes, it does.
14  Q. I would like to make clear, I don't think this
15  is the report you were just referencing.
16  A. Correct.
17  MR. NEUBERGER: He was referencing a report
18  by Greg Warren.
19  MR. ELLIS: There's a Greg Warren report
20  dated January 30th.
21  MR. NEUBERGER: This is not it. I want to
22  make that clear for the record.
23  THE WITNESS: Yes. This is not the report
24  I'm referencing.

A - 360                       36 (Pages 138 to 141)