Case 1:04-cv-00956-GMS   Document 92-19   Filed 02/02/2006   Page 1 of 19

| | | |
|---|---|---|
| Price, et al.<br>John A. Yeomans | v.<br>C.A. # 04-956-GMS | Chaffinch, et al.<br>October 3, 2005 |

### Page 66

1  A. Right.
2  Q. "And eventually we could communicate." Okay?
3  A. Right.
4  Q. Did you observe -- I can't ask you to read his
5  mind or whatever. But did you observe in
6  communicating with Major Forrester that you would have
7  to get closer to him to effectively communicate?
8  A. Not in my contact with him.
9  Q. Not in your contact?
10 A. No.
11 Q. Did you ever look at his records to indicate
12 whether he wore one or two hearing aids?
13 A. I don't recall seeing that.
14 Q. All right. We will see if it's in the records.
15 Here's this next one then. Okay?
16 A. Okay.
17 Q. We have got a Lieutenant Charles Klim, K-l-i-m.
18 Okay?
19 A. Yes, sir.
20 Q. Do you know if he had hearing issues?
21 A. I do not.
22 Q. You don't?
23 A. No. Now, I'm not familiar with his history.
24 Q. You are or you are not?

### Page 67

1  A. I am not familiar with his history at all.
2  Q. Was he one of the individuals that your staff
3  summarized any records relating to whether he had any
4  medical issues?
5  A. He may have been, but I don't recall reviewing
6  him. I really kind of tried to focus on people who
7  there were medical issues with since I have been the
8  HR director.
9  Q. Okay. Would Lieutenant Charles Klim have been
10 someone before your time?
11 A. I believe so, yes, sir.
12 Q. Do you remember that he was a deputy troop
13 commander at Troop 1? Do you remember anything about
14 his career?
15 A. The only thing I remember is that he did a
16 brief stint in IA.
17 Q. Yes.
18 A. But other than that, I really don't know much
19 about Charlie.
20 Q. Was he in IA when you were there?
21 A. No. No.
22 Q. But you do know because you worked in IA that
23 he had served in IA?
24 A. Right. I had a friend that worked in IA at the

### Page 68

1  time that I believe was working for Charlie, so I
2  would pop in periodically and Charlie was in there.
3  So that's really the only way I came to know the man.
4  Q. So you don't know one way or the other whether
5  he wore hearing aids?
6  A. I don't, no. I couldn't tell you.
7  Q. And if his annual physical reflected hearing
8  issues, that would be shown in the records that you're
9  the custodian of, right?
10 A. Yes, sir.
11 Q. Since I have you, let's just spend a moment
12 about records. Okay? If a person is serving at Troop
13 1 and he's been with the State Police let's just say
14 ten years or so, what kind of records will there be
15 out there? Will there be records in your office,
16 Troop 1? Tell me what kind of records are kept on
17 people.
18 A. There's a general personnel file on each of our
19 members, sworn and civilian, which we maintain at
20 headquarters in a locked room, the personnel file
21 room.
22     In addition to that -- well, within that
23 file are typically biographical information, their
24 residence, marital status, dependents. We maintain

### Page 69

1  all of their health insurance information, life
2  insurance, their work history, performance appraisals.
3      There's also typically a sheet in there
4  that gives a very brief synopsis of any prior
5  disciplinary actions that were taken against an
6  officer or civilian, what we call a censure form.
7      In most cases their preemployment
8  background investigation and/or personnel history
9  statement that was completed when they applied for the
10 position is contained in that file. Periodically you
11 might come across what we call an attaboy or a letter
12 of recommendation or commendation from a commander or
13 a citizen within the file.
14     If they're in the career development
15 program, you will see documents related to their
16 career development history, progress.
17 Q. That's all in this personnel file?
18 A. Yes.
19     And then there's a file that's maintained
20 actually within a file in conjunction with another
21 file, which is their medical history file. And we
22 maintain that in a color-coded jacket next to their
23 personnel file which contains all of their medical
24 documentation from preemployment, incumbent level

A - 408

Price, et al.                    v.                    Chaffinch, et al.
John A. Yeomans         C.A. # 04-956-GMS              October 3, 2005

Page 70

1 testing, anything regarding their medical history
2 status is maintained there.
3     At the troops the personnel files may
4 contain some performance appraisals, may contain those
5 attaboys or commendation letters, monthlies, what we
6 call monthlies or quarters, whatever the troop is
7 doing their performance appraisals on, like first-line
8 supervisor, shift commanders, you know, anything
9 really at the troop level that's worthy of documenting
10 is supposed to be maintained in the troop level
11 personnel file and is supposed to be maintained in a
12 locked cabinet typically in the commander's office or
13 perhaps in a secretary's office.
14   Q.  So there's that file too?
15   A.  Right.
16   Q.  If you go to a different troop, does that file
17 just transfer to the new troop commander?
18   A.  It's supposed to, yes.
19   Q.  So the old guy doesn't keep that stuff, he just
20 passes it along, the old commander?
21   A.  Right.
22   Q.  How about -- I have seen this like, it's like a
23 jacket. Is it an IA thing? It's got your discipline
24 history, you know, you were late for duty three times

Page 71

1 and you were docked two days.
2     What kind of file is that?
3   A.  That's usually within that personnel file that
4 I referred to earlier. It's what we call a censure
5 sheet. And then actually what you just brought up if
6 the officer does have a disciplinary history and it
7 involved IA, the internal affairs bureau maintains a
8 file on officers. If there was a prior IA or
9 significant discipline imposed, they maintain a file
10 as well.
11   Q.  And that's under their lock and key?
12   A.  Right.
13     Then there's also the files that retired
14 officers have that are maintained in the basement at
15 the headquarters, that everything that I just talked
16 about for retired officers is maintained in a locked
17 vault in the basement.
18   Q.  Okay.
19   A.  So we have got them in a couple of different
20 locations, yeah.
21   Q.  That's helpful.
22     We will move off of him. I got to go back
23 to a question.
24     When we were talking about hearing testing

Page 72

1 and everything a few minutes ago, you did mention that
2 there was sort of like a distinction that happened in
3 December of 2003 for people at the range. I think
4 were you trying to indicate that because of range
5 issues, hearing issues at the range began to be
6 treated differently?
7   A.  Yes.
8   Q.  For example, my three clients, they were
9 tested. Is that what you're telling us?
10   A.  I believe so, yeah.
11   Q.  Now, there have been other people who worked at
12 the range, right?
13   A.  Right.
14   Q.  Besides my three clients?
15   A.  Yes.
16   Q.  For example, did you know Sergeant Parton?
17   A.  Yes.
18   Q.  And he was the NCOIC of the range before
19 Sergeant Foraker. Are you aware of that?
20   A.  Yes.
21   Q.  And Eddie Cathell, he had worked at the range,
22 right?
23   A.  Yes.
24   Q.  Of course he's retired now, right?

Page 73

1   A.  Right.
2   Q.  Sergeant Parton and some others are still on
3 active duty who worked at the range, correct?
4   A.  Correct.
5   Q.  Sergeant Parton and these others who are on
6 active duty, they weren't asked to be independently
7 tested for hearing loss after December of 2003, were
8 they?
9     MR. FITZGERALD: I object to form.
10   A.  If they were no longer assigned there, they
11 probably weren't.
12   Q.  Yes.
13   A.  And you're saying they weren't?
14   Q.  Right. I mean, are you aware of whether
15 Sergeant Parton or anyone else who had previously been
16 assigned to the range but is no longer working at the
17 range were required by the State Police to have their
18 hearing tested?
19   A.  I don't believe they were.
20   Q.  So --
21   A.  Other than what they might get in their annual
22 physical.
23   Q.  I understand that.
24   A.  Okay. But specific to them, no, I don't

A - 409

19 (Pages 70 to 73)

Wilcox & Fetzer, Ltd.         Professional Court Reporters         (302)655-0477

Case 1:04-cv-00956-GMS   Document 92-19   Filed 02/02/2006   Page 3 of 19

Price, et al.                                    v.                    Chaffinch, et al.
John A. Yeomans                          C.A. # 04-956-GMS              October 3, 2005

Page 74

1  believe so.
2  Q. Yes.
3  A. Right.
4  Q. So between December of 2003 and today, October
5  of 2005, Sergeant Parton and any others who are still
6  on active duty who worked at the range, their hearing
7  is only being tested annually in their physical. Is
8  that correct?
9  A. Probably so.
10 Q. Let's try another name. Okay?
11 A. Okay.
12 Q. A Corporal Bruce Peachey.
13 A. Yes.
14 Q. There's been testimony in this case that he was
15 injured in February of 2002.
16     Are you aware of that?
17 A. Yes.
18 Q. What do you know about his injuries?
19 A. I know he received an injury to one of his
20 ankles, I believe it was, as a result of gunfire in an
21 altercation with several suspects.
22 Q. And do you know the nature of -- well, do you
23 know anything about the severity of the injuries he
24 received to his ankles?

Page 75

1  A. I know it was pretty severe to the point that
2  it caused him to have to leave the job.
3  Q. Right. He was injured in February 2003 and he
4  had to leave the job in February of 2004. Is that
5  correct?
6  A. That sounds right, yes, sir.
7  Q. So two years after his injury he was directed
8  that he had to retire. Is that correct?
9  A. I believe so.
10         MR. FITZGERALD: I object to the form.
11 A. Yes.
12 Q. I mean, he was told he would have to sever his
13 active duty status with the Delaware State Police?
14 A. I think his doctor or surgeon notified our
15 office that he had irreparable damage and he was
16 directed to apply for a pension, right.
17 Q. Are you aware of when the Delaware State Police
18 learned that his injuries were irreparable?
19 A. I seem to recall it was not too long before he
20 applied for a disability pension.
21 Q. Okay. Are you saying that your records would
22 show that?
23 A. Yes.
24 Q. So your records would be the best evidence of

Page 76

1  this?
2  A. Right.
3  Q. He was a road trooper when he was injured. Is
4  that correct?
5  A. Yes.
6  Q. Now, there's been testimony in this case that
7  after two or three months into his injury it was
8  apparent that he would not be able to fully recover
9  and resume the duties of a road trooper.
10    Do your records show that or not?
11 A. No, sir.
12 Q. Were you personally familiar with his
13 situation? Did you deal with him?
14 A. I mean, I know the officer. I mean, I know the
15 circumstances that led up to him having to separate.
16     But as far as that notification or that
17 information, I'm not aware of that. I'm not saying it
18 didn't happen. I'm just operating off the records I
19 have.
20 Q. No. I understand.
21     Was he put on light duty, given a light-
22 duty assignment at the FTU while he was trying to
23 recover?
24 A. Yes, sir.

Page 77

1  Q. And Colonel Chaffinch agreed that he could be
2  given that assignment and sent to the FTU. Is that
3  correct?
4  A. That's my understanding, yes, sir.
5  Q. And do you recall his also being assigned desk
6  duties at Troop 9 during that two-year period?
7  A. I don't recall that.
8  Q. No?
9  A. No.
10 Q. Do you recall the nature of his injury was that
11 the bullets had shattered his foot?
12 A. Yes, sir. Yeah.
13 Q. Do you recall that prevented him from being
14 able to run or chase people, things like that?
15 A. That's correct.
16 Q. Are you aware that it was Major Baylor who went
17 to Colonel Chaffinch about getting Bruce Peachey
18 assigned to the FTU?
19 A. I wasn't aware of that.
20 Q. No?
21 A. (Witness shakes head).
22 Q. So you weren't privy to any conversations Major
23 Baylor had with Colonel Chaffinch about getting him
24 assigned to the FTU?

A - 410

Case 1:04-cv-00956-GMS   Document 92-19   Filed 02/02/2006   Page 4 of 19

Price, et al.                                                    Chaffinch, et al.
John A. Yeomans          C.A. # 04-956-GMS                       October 3, 2005

Page 78

1  A. No.
2  Q. Colonel Chaffinch didn't report to you on any
3  of the conversations?
4  A. No.
5  Q. If Major Baylor testified that he indicated to
6  Colonel Chaffinch that Bruce Peachey was not going to
7  be able to be returned to active duty but that he
8  asked that he be given light duty at the FTU for two
9  years, you wouldn't be able to dispute that testimony?
10 A. No. I can't dispute that testimony.
11    MR. FITZGERALD: I object only to the
12 extent it mischaracterizes the testimony.
13 BY MR. NEUBERGER:
14 Q. How about a Corporal Jerome Loveless, do you
15 know anything about any medical conditions he faced?
16 A. I seem to recall that Jerry Loveless had
17 sustained a back and/or neck injury.
18 Q. And do you recall was that during your tenure
19 in HR?
20 A. It might have been when I was in the assistant
21 capacity. I know he had -- yeah, I think that may
22 have started when I was the assistant.
23    I know he had neck, back injury, pain,
24 off/on light duty. I think he had a couple of

Page 79

1  different procedures perhaps and then he ultimately
2  separated from the department.
3  Q. Do you know, was he a patrol trooper? Do you
4  know what his assignment was?
5  A. He was patrol. I know he also did, he had an
6  assignment at Troop 3 criminal investigation unit as a
7  fraud investigator. And I think that's where he was
8  prior to separating from the division, yeah.
9  Q. So you do recall that he was put on light duty?
10 A. At various points during that time when he was
11 dealing with this injury, that's correct.
12 Q. And is it true that after two years on light
13 duty that he also retired or applied for disability?
14 A. I don't know the exact time period, if it was
15 two years or less, without referring to the records.
16 Q. Okay. Now, where would we go there? Do we
17 have to look in payroll for that or, once again, is
18 that in your records? We didn't talk about payroll
19 records.
20 A. Right.
21 Q. Let's go back to payroll records here.
22    So there's a payroll function at the State
23 Police, right?
24 A. Yes. It's an automated system called The First

Page 80

1  System. It's a statewide payroll system.
2  Q. And can that generate reports which indicate
3  the types of duty a person was on when he was getting
4  paid, that he was using sick leave, that he was using
5  comp, that he was using a combination of those?
6  A. Not so much The First System as I could
7  generate that internally just by our lead tracking
8  with a couple of people in my office that track that
9  through a couple of computer databases. Actually,
10 that would be the better road to go than to try to go
11 through The First System.
12    The First System is a statewide generic
13 payroll system that's not, quite frankly, all that
14 helpful sometimes with research.
15 Q. So if we wanted to find out after Jerome
16 Loveless's injury when he retired, that date will be
17 easily available to you when he went off of active
18 duty?
19 A. Right.
20 Q. That date is easily available, right?
21 A. Yes.
22 Q. And if we wanted to find out whether he was on
23 light duty, is that apparent in your records?
24 A. Yes.

Page 81

1  Q. And if we wanted to find out how much light
2  duty he had temporally, is that easy to find out or
3  not?
4     MR. FITZGERALD: I object to form.
5  A. It can be found out. It can be, depending on
6  the circumstances, the length of time, how long ago
7  we're talking, it can be relatively labor intensive.
8  A lot of this is manual lookup by my staff, but it can
9  be done.
10 Q. So that would have to be calculated you're
11 saying?
12 A. Right. A lot of this has been done.
13 Q. Okay. Now, was this done in some of these
14 summaries your staff has prepared for you?
15 A. Yes. Right. And I just can't recollect them
16 all because there's literally -- there's a lot of
17 them.
18 Q. Yes. Now, when we seek to see the records kept
19 by your office about these individuals, will those
20 calculations be included in the records that are going
21 to be made available for us?
22    MR. FITZGERALD: No.
23    MR. NEUBERGER: Okay.

A - 411

21 (Pages 78 to 81)

Case 1:04-cv-00956-GMS   Document 92-19   Filed 02/02/2006   Page 5 of 19

Price, et al.                    v.                    Chaffinch, et al.
John A. Yeomans         C.A. # 04-956-GMS         October 3, 2005

Page 82

1  BY MR. NEUBERGER:
2    Q.  Are you saying that for all of the comparators
3  that you looked at prior to testifying today that the
4  specific amount of time they were on light duty has
5  been calculated by your staff?
6    A.  Correct.
7        MR. NEUBERGER:  Just off the record for a
8  second here.
9        (Discussion off the record.)
10 BY MR. NEUBERGER:
11   Q.  If I looked at the personnel files that are
12 going to be made available relating to these
13 comparators, would I be able to calculate from that
14 raw data the amount of time that people were on light
15 duty?
16   A.  I think it's going to be a combination of
17 looking at the medical file coupled with the data that
18 we capture in HR relative to staffing. We generate a
19 staffing report. I have a specialist in my office
20 whose primary job is to track when people are in and
21 out of the workplace. She maintains a database
22 relative to that.
23       So you're going to look at the medical
24 file and you're going to take that report that she

Page 83

1  generates when they're out of the office and they
2  should be in synch and that's basically what they have
3  done at his request, so that's what I have been
4  looking at.
5    Q.  So what you're saying is that unless I have
6  this staffing report I really won't be able to do the
7  final calculation of --
8    A.  It would be difficult.
9        MR. NEUBERGER:  Could we agree, Counsel,
10 that those staffing reports will be made available to
11 me?
12       MR. FITZGERALD:  Yes. I guess we will
13 talk about the best scope. I'm not sure how these
14 staffing reports are created or what goes into it or
15 what sort of garbage in you need to get the garbage
16 out.
17       So we will produce staffing reports to get
18 you the answer that you want such as that stuff
19 exists. So I mean we will get you what you want. I
20 just want to make sure we give the HR staff the right
21 request.
22       MR. NEUBERGER:  Yes. Okay.
23 BY MR. NEUBERGER:
24   Q.  What's the appropriate title of this staffing

Page 84

1  report? Just the staffing report? The yearly,
2  monthly, weekly? What do we call it when we're
3  looking for this?
4    A.  I would call it the staffing report,
5  specifically light duty, medical, rehab categories
6  within the quarterly staffing report. Actually, it
7  even gets a little more intensive than that because
8  she -- the data that goes into the system is based on
9  activity sheets. Activity sheets are submitted from
10 the field.
11       The technician takes the data off the
12 activity sheets and plugs it in, hours in the
13 workplace, hours out and it's typically indicated on
14 an activity sheet if someone is out sick or if they're
15 out on FMLA or if they're whatever. So it can be
16 generated.
17   Q.  Okay. We're still on Corporal Loveless. And I
18 think you told us that yes, he was on light duty?
19   A.  Yes.
20   Q.  And as far as the duration, let's just try to
21 focus on that.
22       Can we agree that from your looking at the
23 records he was on light duty for over a year?
24   A.  I believe so. Yeah.

Page 85

1    Q.  From the records you saw, can we agree that it
2  was known from the beginning of his injuries that he
3  wasn't going to be able to return to full duty?
4    A.  That I don't know. I don't know.
5    Q.  From the records you saw, do you recall whether
6  it was known six months into his injuries that he
7  wouldn't be able to return to full duty?
8    A.  I don't know.
9    Q.  So you don't remember when that was determined?
10   A.  No.
11   Q.  And I've been given some indications that he
12 was on light duty for two years. You don't know
13 whether that's correct or not?
14   A.  I don't know.
15   Q.  You don't know either way, right?
16   A.  No.
17   Q.  We just know it was for over a year?
18   A.  Over or pretty close to a year is my
19 recollection, yeah.
20   Q.  And I don't know if I asked you this. I mean,
21 what time period are we talking about for Corporal
22 Loveless? Was this while you were the HR director or
23 before you became the HR director?
24   A.  I think it started before I became the HR

A - 412

Case 1:04-cv-00956-GMS    Document 92-19    Filed 02/02/2006    Page 6 of 19

Price, et al.                                                    Chaffinch, et al.
John A. Yeomans          v.                                      October 3, 2005
                        C.A. # 04-956-GMS

Page 86

1 director. I'm going to say it was 2001.
2 Q. And then did he retire after you became the HR
3 director in April of 2002 or thereabouts?
4 A. Don't know. Don't know. I wish I had the file
5 to refer to. I don't know. I don't want to say the
6 wrong thing.
7   MR. NEUBERGER: And I guess for the sake
8 of the record at the end of the deposition today I
9 don't expect we will have to call him back, but I will
10 recess the deposition in case there are some follow-up
11 questions in light of however we play it out with the
12 files.
13   I just want the record to be clear on
14 that.
15 BY MR. NEUBERGER:
16 Q. Let's move off of him and go to a Sergeant
17 James Romanelli. All right? Are you aware of a
18 Sergeant James Romanelli that was serving in the
19 Delaware State Police?
20 A. Yes.
21 Q. Was he injured in some sort of motorcycle
22 accident?
23 A. I know it was an accident. I didn't know it
24 was a motorcycle.

Page 87

1   Yeah, I know he was involved in an
2 accident. Yeah.
3 Q. Did he have to be placed on light duty?
4 A. Yes.
5 Q. Do you recall that his time on light duty was
6 while Aaron Chaffinch was the lieutenant colonel of
7 the State Police?
8 A. I don't know, but it's possible, yeah.
9 Q. Do you recall anything about the time that this
10 man, well, when his injury occurred?
11 A. I don't know the actual time frame.
12 Q. Do you know it was after 2000, January 1st of
13 2000?
14 A. Don't know.
15 Q. But we can agree that he was on light duty?
16 A. Yes.
17 Q. And can we agree that he had physical injuries
18 because of some kind of vehicle accident?
19 A. Yes.
20 Q. And is it true that he served on light duty for
21 more than a year?
22 A. I believe so, yes. Yeah.
23 Q. Is it true that he served on light duty for two
24 years?

Page 88

1 A. Probably pretty close to it, yes.
2 Q. Do you remember anything about the nature of
3 his injuries, broken knees, arms, back?
4 A. I thought it was a back injury.
5 Q. You think it was back. Do you remember
6 anything about reconstructive surgery?
7 A. Yes. I know he had at least one surgery, maybe
8 more. I know there was a lot of consultation back and
9 forth between different doctors and surgeons between
10 those individuals and our office about his ability to
11 function.
12 Q. So you're saying you do remember correspondence
13 like that in the file?
14 A. Yes.
15 Q. Do you know if he was assigned to New Castle
16 County? He was a New Castle County trooper?
17 A. I think the bulk of his career was up there.
18 As a matter of fact, I think at one time he was
19 actually in the drug unit.
20 Q. Yes. There may be testimony that he was
21 injured during the course of some kind of a drug
22 investigation.
23   Does that ring any bell with you?
24 A. Yes. I think so. Yeah.

Page 89

1 Q. All right. Let's go to another one, a Sergeant
2 Sean Nowery. Are you aware of a Sergeant Sean Nowery
3 serving on the force?
4 A. Yes.
5 Q. Did he receive some sort of a back injury?
6 A. Yes. Automobile crash.
7 Q. Was it on or off duty? Personal time or job
8 time?
9 A. I think it was on duty, yeah.
10 Q. So he was in some sort of a vehicle collision
11 and had back injuries is what you're saying?
12 A. Yes.
13 Q. Was this around 2000 the injury?
14 A. It might have been, yeah.
15 Q. Your records would show that?
16 A. Yes.
17 Q. Was he placed on light duty?
18 A. Yes.
19 Q. Was he a sergeant out of Troop 3 in Dover?
20 A. Yes.
21 Q. Did he also serve in the homicide unit, if you
22 remember?
23 A. Yes, he did.
24 Q. And do you know the nature of the back injuries

A - 413

23 (Pages 86 to 89)

Page 90

1  he sustained?
2  A. I don't. I know it was really significant. I
3  know he had a really tough time with it.
4  Q. Had you served with him over the years when you
5  were a trooper?
6  A. Yes.
7  Q. And do you recall whether he had numerous back
8  surgeries?
9  A. I know he had several, yeah.
10 Q. And was he placed on light duty?
11 A. Yes.
12 Q. What kind of light-duty assignments do you
13 remember that he got?
14 A. He was on light duty but he still worked within
15 Troop 3 CI in different capacities.
16 Q. What's CI mean? I don't know.
17 A. Criminal investigation unit, detective bureau.
18 And he may have continued on light duty while assigned
19 to homicide. So he was still in an investigative
20 capacity but in a light-duty status.
21 Q. And was he on light duty for two years?
22 A. Probably pretty close to it.
23 Q. He wasn't in your academy class, was he?
24 A. No.

Page 91

1  Q. Was he younger than you or older than you?
2  A. I think he's probably pretty close to the same
3  age as me.
4  Q. Who was more senior?
5  A. I was more senior than him.
6  Q. You were more senior?
7  A. Yes.
8  Q. All right. Next is Master Corporal Joseph
9  Condron. Do you remember him shooting his knee at the
10 range?
11 A. I remember Joe Condron having a bad knee. I
12 actually worked with him as a detective, yeah.
13     But I don't remember the time period he
14 was in and out. I know he had a lot of knee problems.
15 Q. So you remember he had knee problems because
16 you were working with him?
17 A. Right.
18 Q. Do you know whether he had a later injury in
19 his knee from having shot himself at the range?
20 A. I do recall hearing that, yes.
21 Q. By "hearing" I'm sort of talking about records
22 that you have seen.
23 A. No. No. I haven't seen that, no.
24 Q. So you don't --

Page 92

1  A. I'm not real familiar with his medical record,
2  no.
3  Q. Do you know if he was placed on light duty
4  because of an injury?
5  A. I'm sure he was, yes.
6  Q. So you're sure he was on light duty?
7  A. Yeah.
8  Q. He was on light duty. Is it true that he was
9  on light duty for about two years?
10 A. That I don't know.
11 Q. You don't know the term?
12 A. No.
13 Q. Do you recall that he was on light duty because
14 of the knee injury?
15 A. I believe so, yes.
16 Q. And do you recall that his light-duty status
17 was while you were serving in the HR office starting
18 in 2000 or so when you went in and sometime after
19 that?
20 A. It could have been.
21 Q. Was it in the nineties or was it in the new
22 century?
23 A. I don't know. I don't know.
24 Q. But it's either the end of the nineties or the

Page 93

1  beginning of 2000?
2  A. I don't know.
3  Q. You don't know?
4  A. I don't recall, no.
5  Q. That's fine.
6      Is he retired from the force?
7  A. Yes.
8  Q. All right. Next is -- let me just check
9  something here.
10     Just from what you remember about him,
11 we're back on Joseph Condron, you remember he had knee
12 problems? Is that what you're saying?
13 A. Yes.
14 Q. You're saying at Troop 3 you had worked with
15 him?
16 A. Yes.
17 Q. And since he was a corporal was he like a
18 patrol officer or what?
19 A. He was a detective and a polygraph operator and
20 I seem to recall he had problems with a knee or knees
21 and an elbow.
22 Q. But that didn't disable him so that he couldn't
23 be on active duty, full duty?
24 A. No, it didn't.

A - 414

Case 1:04-cv-00956-GMS   Document 92-19   Filed 02/02/2006   Page 8 of 19

Price, et al.                                     v.                                Chaffinch, et al.
John A. Yeomans                          C.A. # 04-956-GMS                          October 3, 2005

Page 94

1  Q. So you do remember that?
2  A. Right.
3  Q. While he had some physical problems, that
4  didn't disable him?
5  A. Right. Correct.
6  Q. All right. So next is a Corporal James Mosley,
7  who may have injured his neck.
8      Do you know anything about Corporal James
9  Mosley's time with the force or any injuries?
10 A. No. I worked with Jim.
11 Q. You did know James Mosley?
12 A. Sure. I worked with him on a shift when I
13 hadn't been on real long, but I wasn't aware -- I
14 don't even remember seeing his name on the list.
15 Q. So this could have been in the eighties when
16 you started on the force?
17 A. Yes.
18     As far as his injury, I don't know. But
19 that's in the early eighties is when I worked with
20 him, yeah.
21 Q. So you worked with a James Mosley when you were
22 at Troop 3 in the early eighties?
23 A. Yes.
24 Q. You're unaware of any injuries he sustained

Page 95

1  during his career?
2  A. Correct.
3  Q. And do you know whether or not he was on light
4  duty at sometime during his career?
5  A. No.
6  Q. So you haven't looked at any records about
7  James Mosley, have you, prior to today?
8  A. No.
9  Q. Then let's move on to Dave Henderson, a
10 Sergeant David Henderson.
11     Are you aware of a Sergeant Dave Henderson
12 who served in the State Police?
13 A. Yes.
14 Q. And did he injure his back due to some sort of
15 automobile crash?
16 A. I know he had a back injury. I don't know what
17 it was as a result of.
18 Q. So he had some kind of a back injury?
19 A. Right.
20 Q. Did he sustain some permanent injuries because
21 of that?
22 A. I believe so. What I recall about Dave was he
23 had an injury. He applied for a disability pension.
24 As far as I know, he got it.

Page 96

1  But beyond that, I don't know the time
2  frames.
3  Q. Do you know whether he was placed on light duty
4  or not after he was injured?
5  A. I don't know.
6  Q. Do you know whether he was just simply
7  reassigned to a job that would allow him to continue
8  working on the force without being put on light duty?
9  A. I know he had been back and forth between being
10 a patrol sergeant and working in youth aid, so I don't
11 know if that served as an accommodation at the time
12 then when he was working in youth aid. I don't know.
13 Q. Well, the back injury, do you know that his
14 injury was a severe injury?
15 A. I do know that, yes.
16 Q. So he did have a severe back injury. We can
17 agree on that, right?
18 A. Right.
19 Q. Do you recall that Colonel Pepper put him into
20 a unit where he would not have to perform law
21 enforcement functions?
22 A. I don't recall that.
23     Do you know what unit it was?
24 Q. Yes. It was called supply. He retired out of

Page 97

1  supply.
2  A. Yeah, I do. Yeah, I do recall that now, yes.
3  Right. Right.
4  Q. Is supply like the quartermaster in the
5  military? I mean, do you have a supply function --
6  A. Yes.
7  Q. -- at the State Police?
8  A. Right.
9  Q. Where is that headquartered?
10 A. It's actually on the headquarters complex back
11 in the garage area. There's an office area. We no
12 longer have a uniformed officer working in there.
13 It's all civilians.
14 Q. But your memory has been jogged and you do
15 remember that Colonel Pepper assigned Sergeant
16 Henderson to supply, right?
17 A. Yes. I do remember him working back there,
18 yes.
19 Q. And this was after he had sustained this back
20 injury, right?
21 A. Right.
22 Q. I think I might have asked you this question
23 already. I think we said that it was a severe back
24 injury?

Case 1:04-cv-00956-GMS   Document 92-19   Filed 02/02/2006   Page 9 of 19

| Price, et al. | v. | Chaffinch, et al. |
| --- | --- | --- |
| John A. Yeomans | C.A. # 04-956-GMS | October 3, 2005 |

Page 98

1  A. I believe it was, yes.
2     MR. FITZGERALD: I object to form.
3  Q. And is it true that he retired out of supply?
4  A. I believe so, yes, sir.
5  Q. And when he retired do you recall whether that
6  was while you were working in the HR function?
7  A. Don't know.
8  Q. How about the headquarters building?
9  A. Yes. Definitely.
10 Q. So you would know because you were in the
11 headquarters building and he was behind the building?
12 A. Right. Right.
13 Q. So you knew he was working back there?
14 A. Yes.
15 Q. And after his injury he worked in supply and
16 then eventually retired?
17 A. Correct.
18 Q. And you're unaware of him ever serving on light
19 duty?
20 A. I wasn't aware of that, no.
21 Q. Now, how about a Lieutenant Robert Schlifer,
22 S-c-h-l-i-f-e-r?
23 A. Yes.
24 Q. Did you know him?

Page 99

1  A. Yes, I did.
2  Q. Now, was he a lieutenant up in Troop 1?
3  A. Yes.
4  Q. And was he injured in a crash while he was in
5  his police vehicle?
6  A. Yes.
7  Q. And was he supposedly drinking on the job when
8  the crash occurred?
9  A. That's what I understand, yes.
10 Q. And do you remember, do you recall that he
11 overturned his vehicle on Route 1 south of Red Lion
12 around January of 2002?
13 A. Yes.
14 Q. So that was just a couple of months before you
15 took over operational responsibility for the HR
16 function, right?
17 A. Yes.
18 Q. Okay. And do you recall that he had severe
19 injuries?
20 A. Yes.
21    MR. FITZGERALD: I object to form.
22 Q. I'm sorry. Do you recall he had neurological
23 injuries?
24 A. Neurological and I think he sustained a pretty

Page 100

1  serious injury to one of his arms and hand.
2  Q. Right. His arm and his hand?
3  A. Right.
4  Q. Okay. And do you recall that he ended up with
5  permanent injuries?
6  A. Yes.
7  Q. Permanent disabilities. Is that correct?
8  A. Correct.
9  Q. When you say neurological, you understand that
10 he had sustained head traumas, for example, right?
11 A. That's correct.
12 Q. And you talked about his arm, right?
13 A. Right.
14 Q. And now he was not able to return to performing
15 his normal police duties after those injuries. Is
16 that correct?
17 A. Yeah. I don't think Bob ever came back.
18 Q. Right.
19 A. Right.
20 Q. Now, he was a traffic lieutenant up at Troop 1,
21 right?
22 A. Correct.
23 Q. And is it true that it was recognized within a
24 few months after his being released from the hospital

Page 101

1  that his injuries were going to be permanent?
2  A. Are you referring to the arm and hand or the
3  neurologic?
4  Q. Well, that he wasn't going to be able to return
5  to full-duty status, that it was recognized within a
6  few months after being released from the hospital?
7  A. That I'm not sure about because he also had an
8  ongoing investigation pending.
9  Q. Right. There was a criminal investigation?
10 A. Right. But I don't know -- I can't say
11 definitively that it was deemed permanent. I don't
12 know.
13 Q. Let's take it in little pieces.
14    He was put on light-duty status. Is that
15 correct?
16 A. Right.
17 Q. He was facing investigation and criminal
18 charges because of drinking while on duty, right?
19 A. Right.
20 Q. And they eventually resolved themselves,
21 however they did, right? That took a while?
22 A. Yeah, that took a while.
23 Q. Additionally, he had the various injuries he
24 had sustained in the crash?

A - 416

26 (Pages 98 to 101)

Case 1:04-cv-00956-GMS   Document 92-19   Filed 02/02/2006   Page 10 of 19

Price, et al.                                                        Chaffinch, et al.
John A. Yeomans          C.A. # 04-956-GMS                           October 3, 2005

Page 102

1  A. Right.
2  Q. He was kept on light duty for two years. Isn't
3  that correct?
4  A. I don't believe he was on for two years. I
5  think it was short of two years.
6  Q. Almost two years?
7  A. I don't even think it was over a year.
8  Q. Really?
9  A. Yeah.
10 Q. Would we have to look on the records on that?
11 A. Yeah. I think so. Yeah.
12 Q. As a --
13 A. Maybe I'm getting confused with light duty
14 versus being out of the workplace because my
15 recollection was he never came back.
16 Q. Yes.
17 A. Right. Because he never really served light
18 duty. He was just out of the workplace, also under
19 investigation and he never came back.
20     And I guess what I am trying to make the
21 clarification is whether he left specifically for the
22 disability or injury or in lieu of termination I guess
23 is where I'm headed with this because we had both
24 things going on.

Page 103

1  Q. Well, David Baylor would have been the
2  commander with operational responsibility for New
3  Castle County during this time. Is that correct?
4  A. Yes.
5  Q. I mean, he assumed operational command in I
6  think it was April, around April of 2002. Is that
7  correct?
8  A. Okay. Right.
9  Q. And Troop 1 was under his command?
10 A. Right.
11 Q. Now, David Baylor has testified that he
12 believes that Lieutenant Schlifer was held on
13 light-duty status for two years.
14     Are you saying there are records that we
15 could check on that?
16 A. I think the record would clarify that. I don't
17 seem to recall it being quite that long, sir.
18 Q. I think he indicated he believed he retired
19 around January of 2004, which would have been two
20 years from the January 2002 incident.
21     Does that jog your memory?
22 A. I would have to look at the record.
23 Q. Once again, we could find out when he retired,
24 right?

Page 104

1  A. Yes.
2  Q. And he has testified that within a few months
3  after his being released from the hospital it was
4  recognized that his injuries were going to be
5  permanent.
6      MR. FITZGERALD: I object to the form.
7  Did you finish the question? If you have finished the
8  question, I object.
9      And you can answer. I object to form.
10     MR. NEUBERGER: Sure.
11 BY MR. NEUBERGER:
12 Q. Dave Baylor on page 122 of his deposition
13 stated "Question: You're saying within a few months
14 after his being released from the hospital it was
15 recognized that his injuries were going to be
16 permanent?
17     And Major Baylor testified "Right." Okay?
18     What I would like to ask you is would you
19 have any, do you have any personal knowledge to the
20 contrary that it was recognized that his injuries were
21 going to be permanent at that time?
22 A. I guess the thing is where I'm stuck is he may
23 have had permanent injuries, but I don't know if
24 you're talking about the hand, the arm, the

Page 105

1  neurological, if it was to the point where he would
2  never be able to do the job again. That's where I am
3  not clear.
4      He may have sustained permanent scarring.
5  I don't know if that would prevent him from still
6  doing the job of a trooper. And knowing that he was
7  also under investigation and all that was going on,
8  I'm not real, real clear on what the motivation was of
9  him leaving the workplace is what I am saying at that
10 time.
11 Q. A moment or two ago you were trying to figure
12 out what list he was on.
13 A. Right.
14 Q. What were you trying to tell us there?
15 A. He wasn't on light duty. He was just off. He
16 was out. He was home trying to recuperate.
17 Q. And was he being paid?
18 A. Yeah.
19 Q. So where does that come from? What's the
20 status? What would his status have been?
21 A. He was just out on medical rehab using sick
22 leave.
23 Q. Okay. I guess that's the question.
24     Are you saying that --

A - 417

27 (Pages 102 to 105)

Page 106

1  A.  Wait. Let me correct myself. Unless the IA,
2  unless -- I don't know because it could have been
3  either that or if he was on, if he was suspended,
4  that's the part I'm not sure about, if he was
5  suspended with or without pay. I don't know where
6  that factors in.
7       So that's where my confusion lies. I
8  don't really know the disciplinary record in terms of
9  what leave he was out on. I don't know at this time.
10 Q.  Dave Baylor testified at page 122 of his
11 deposition as follows: "Question: Was he put on
12    light duty?
13    "Answer: See, he never came back to work.
14 His status would have been light duty, yes. He
15 would have been held on a light-duty list.
16    "Question: There's a thing called the
17 light-duty list?
18    "Answer: Yes, maintained by HR.
19    "Question: Are people on the light-duty
20 list drawing their regular pay for a normal
21 work week?
22    "Answer: Yes, sir.
23    "Question: Even if he didn't come back on
24 the job, he was still being paid?

Page 107

1    "Answer: Yes, sir."
2       Now, he seems to be indicating there that
3  he was put on a light-duty list and he was still
4  continuing to be paid even though he wasn't coming in.
5  Isn't that possible? Can't the light-duty list be
6  used for that purpose?
7       MR. FITZGERALD: I object to form.
8       Go ahead.
9  A.  Light duty means you're in the workplace in
10 some capacity, usually a diminished capacity. You're
11 on payroll. You're getting a check.
12      What I am referring to with Lieutenant
13 Schlifer is that he wasn't on light duty. He wasn't
14 in the workplace. He was at home attempting to
15 recuperate, which there's this report and I think this
16 is where some of the confusion comes in because a lot
17 of officers, including Major Baylor is probably
18 referring to this as a light-duty list. It's a report
19 that contains light-duty personnel, medical rehab or
20 medical absence like Lieutenant Schlifer, FMLA,
21 military deployments, et cetera. It's one huge list.
22      So not knowing or having a recollection
23 about whether he was suspended with or without pay in
24 lieu of the criminal and/or IA investigation, I would

Page 108

1  say he was at home on a medical using sick time.
2  Q.  Well, Major Baylor also was the second in
3  command in the HR function during his career. You're
4  aware of that?
5  A.  Right.
6  Q.  And Major Baylor during the investigation of
7  this trooper or whatever was the major in command of
8  New Castle County and this trooper. Is that correct?
9  A.  Yes.
10 Q.  So he would have knowledge of how this trooper
11 was being treated. Isn't that true?
12 A.  Probably in terms of, yeah, his treatment or
13 where he was located and that sort of thing, sure.
14 Q.  He would have knowledge of his assignment,
15 right?
16 A.  Right.
17 Q.  He would have knowledge whether he was facing
18 IA investigations?
19 A.  Right.
20 Q.  He would have knowledge of how HR was handling
21 this person. Isn't that true?
22 A.  Yes. Yeah.
23 Q.  Did you look at records relating to this
24 Lieutenant Schlifer prior to your testimony today? Is

Page 109

1  this one of the ones that was abstracted for you?
2  A.  Yes.
3  Q.  Are you telling us that you don't believe that
4  he was ever placed on light duty?
5  A.  I don't believe he was, no.
6  Q.  So we will have to look at the records in that
7  regard?
8  A.  Yes, sir.
9  Q.  Let's go on to the next one, who is Master
10 Corporal Michael Jordan.
11      Do you know a Master Corporal Michael
12 Jordan who served on the Delaware State Police?
13 A.  I do.
14 Q.  Okay. Where was he assigned?
15 A.  He was assigned to Troop 3 patrol.
16 Q.  Troop 3?
17 A.  Right.
18 Q.  And did he ever have an injury?
19 A.  I believe he had sustained a knee injury a
20 couple of times. I think there was one occasion where
21 he sustained a knee injury while going through some
22 sort of physical fitness simulation for one of our
23 testing companies, Landy Jacobs. He actually injured
24 himself kind of going through a window or simulated

A - 418

Case 1:04-cv-00956-GMS   Document 92-19   Filed 02/02/2006   Page 12 of 19

Price, et al.
John A. Yeomans
v.
C.A. # 04-956-GMS
Chaffinch, et al.
October 3, 2005

Page 110

1  window at the training academy and injured his leg,
2  knee specifically. I don't know the time parameter.
3  I know he had a lot of problems with it.
4  I'm sure he was on and off light duty and I know he
5  had, I'm pretty sure he had applied for disability and
6  then separated from the division.
7  Q. So you're saying because of his injury he was
8  on and off light duty?
9  A. Right.
10 Q. Right?
11 A. Right.
12 Q. Do you remember what years we're talking about?
13 A. I don't, no, sir.
14 Q. Would there be records about him?
15 A. Yes.
16 Q. And do you remember anything about his
17 assignment after he had this knee injury? Did he go
18 from patrol to a different assignment?
19 A. I think at one point he was working as a court
20 liaison officer out of Troop 3.
21 Q. What does a court liaison officer do?
22 A. Serves as a liaison between the troopers
23 assigned to the troop and the court regarding court
24 appearances, trials, the scheduling of trials, the

Page 111

1  distribution of subpoenas, placing officers on standby
2  for trial and making sure the proper paperwork for
3  payment, compensation for on-call lists, all those
4  things are on place.
5  Q. Does each troop have a court liaison officer?
6  A. They used to. I think they changed that, but
7  they did at one time.
8  Q. Because officers testify in court so often
9  that's probably a busy job?
10 A. Yes, definitely. Yes, it is.
11 Q. So are we saying that he had knee injuries,
12 right?
13 A. Right.
14 Q. And that as an accommodation he was given this
15 assignment as a court liaison officer?
16 A. I believe so, yes, sir.
17 Q. And that assignment would have had to be
18 approved by whoever the colonel or lieutenant colonel
19 was at the time?
20 A. Correct.
21 Q. That would have had to have been approved by HR
22 at the time or just --
23 A. We really don't have anything to do with
24 assignments.

Page 112

1  Q. You don't have anything to do with assignments?
2  A. No. Promotions, transfers, we're not in that.
3  Q. The colonel has the absolute authority to
4  assign any trooper wherever he wishes, right?
5  A. Absolutely.
6  Q. Okay. And did he then retire after --
7  A. I believe he did, yes.
8  Q. Was he the court liaison officer for two years
9  and then he retired?
10 A. I don't know. I don't know the exact duration.
11 We would have to look at the record.
12 Q. So we're just discussing Michael Jordan, the
13 patrol officer.
14 A. Okay.
15 Q. And he had had some sort of knee surgery you
16 indicated, right?
17 A. Yes, sir.
18 Q. And we know that after his injury he became the
19 court liaison officer, right?
20 A. Yes.
21 Q. We don't know whether or not he was placed on
22 light duty, right? Is that what you're telling me? I
23 think you said he was on and off on light duty? What
24 were you telling me?

Page 113

1  A. I think he was on it for intermittent periods.
2  I think he was on it, off it, back on it, depending on
3  rehab, surgery, that sort of thing.
4  That's my recollection, yeah.
5  Q. But we do know he ended his career as the court
6  liaison officer?
7  A. I'm pretty sure of that, yes.
8  Q. Let's try a Master Corporal Christine Price.
9  Are you aware of such an officer serving
10 in the Delaware State Police?
11 A. Yes.
12 Q. Are you aware that she had sustained some kind
13 of a back injury in the 1990's, mid-1990's?
14 A. I'm aware she had a back injury, yes.
15 Q. And it was around the mid-1990's?
16 A. That sounds about right, yes.
17 Q. Did she get assigned to human resources after
18 her injury?
19 A. I believe she was assigned there for some
20 period of time. I don't recall when it started and
21 when it ended, but I know she worked in there for a
22 while. I think she was assisting with recruiting.
23 Q. Okay. Major Baylor has testified that when he
24 was in human resources she did work in there with him.

Page 114

1  A. Okay. Sure.
2  Q. He indicated that this was in the midnineties,
3  '94, '95. That sounds about right?
4  A. Yes.
5  Q. And I think he's indicating that the injury she
6  had was a back injury?
7  A. Right.
8  Q. That accords with your memory, right?
9  A. Correct.
10 Q. And do you recall whether she worked there for
11 about two years and then retired?
12 A. Yeah. I would say that's pretty accurate, two
13 years.
14 Q. Would this have been called light duty when
15 they put her in human resources?
16 A. Yeah. Right.
17 Q. Do you remember where she was coming from? Was
18 she a patrol officer before her back injury or do you
19 know?
20 A. I don't know. I know she worked patrol in
21 Sussex County for some time, but prior to coming to HR
22 I don't know where she was assigned.
23 Q. Next would be a Captain David Citro?
24 A. Yes.

Page 115

1  Q. Did you know Captain David Citro?
2  A. Yes, I do.
3  Q. What did you know about his situation?
4  A. He had been out on light duty or on light duty
5  status for some time. He had an injury, I believe it
6  was neck, back, that he had sustained. I'm a little
7  more familiar with this one than the others because
8  when he -- near the end of his career I remember that
9  he wasn't, you know, taking his P.T. test because he
10 was on light duty. And it was probably about three to
11 maybe five, six months out of that two-year window
12 that I called him. I know Dave and I called him and I
13 said, "Dave, you're coming up on this two-year window.
14 You know, what's going on?"
15       And he said that he was looking at some
16 different surgeries and alternatives. And I know
17 probably two to three months, maybe even a little
18 closer to that two-year period we talked on the phone
19 one day and he said that there was a type of surgery
20 that he could undergo, but he felt as though the risk
21 might be too high. It was one of those things it
22 could help him or it could go the other way and be
23 more debilitating than what he was already going
24 through. So he also said that the ailment was

Page 116

1  degenerative, that it was just getting worse.
2        And I told him that we had the two-year
3  policy and he submitted his paperwork and left the
4  organization.
5  Q. Right. So do you remember what year it was he
6  was retiring and he submitted his paperwork? Were you
7  in HR at the time?
8  A. Yes, I was in HR. I was actually the HR
9  director.
10 Q. So his happened sometime after April of 2002?
11 A. Yes, sir.
12 Q. He submitted his paperwork?
13 A. Yes.
14 Q. It was coming up to the two years?
15 A. Yes.
16 Q. Now, was he in some sort of a light-duty
17 assignment because of these neck and other injuries?
18 A. Well, he was, he was I guess deemed light duty
19 but working in his OIC, officer in charge capacity of
20 our high-tech crimes unit, forensic computer unit and
21 that's where he retired from.
22 Q. Right. Before his injuries he was working in
23 that unit, is that what you're saying, and then he
24 continued in that duty but in a light-duty status or

Page 117

1  was he placed in the unit after his injuries?
2  A. I would have to refer to the records. I know
3  he was in the public information office for a while
4  and then I want to say he then went to this high-tech
5  crimes unit, but I don't know when the actual injury
6  occurred. I just know that he had been on this
7  light-duty status for almost two years when I called
8  him and he wasn't, he wasn't taking his P.T. test
9  because if you're injured, obviously you shouldn't be
10 on the treadmill doing push-ups, sit-ups and some of
11 these other things.
12       So that's when I called him up and said,
13 "What's going on in your life? What are we doing with
14 this? Do you think you're going to be able to get
15 better? What's the case?"
16       And then we corresponded a couple of
17 times. And I think he actually sought a position in
18 the organization as a civilian to stay as the officer
19 in charge. That was denied and he separated from the
20 department.
21 Q. Are we saying he was on light-duty status or
22 not? I think you're saying he was coming up to the
23 two years so you're talking about --
24 A. I'm pretty sure he was on light duty, yeah.

A - 420

30 (Pages 114 to 117)

Case 1:04-cv-00956-GMS    Document 92-19    Filed 02/02/2006    Page 14 of 19

Price, et al.
John A. Yeomans                              v.                Chaffinch, et al.
                              C.A. # 04-956-GMS                October 3, 2005

Page 118

1  I'm pretty sure for almost a two-year period, yes.
2  Q. Right. And what do you recall more
3  specifically about the nature of the injuries he was
4  being treated for?
5  A. I don't really recall at this point what caused
6  it, but I know it was in the neck and I guess the
7  upper vertebrae of the back that he was having this
8  problem with that he couldn't, he couldn't P.T. He
9  couldn't run. There were a lot of physical things
10 that he could not do apparently because of this
11 injury.
12         He said he had a lot of discomfort and
13 pain from it, so I don't have any reason to doubt that
14 coming from him.
15 Q. And you told him that since the injuries
16 weren't resolving themselves he would have to leave
17 after the two years?
18 A. Basically if he couldn't bring it around and
19 rehab or did well, then he would have to separate from
20 the division.
21 Q. How about a Master Corporal Everett Jackson, do
22 you know anything about him?
23 A. I don't. I mean, I know Everett. I've worked
24 with him as well, but I really don't know his medical

Page 119

1  history. I haven't had a chance to review it.
2  Q. Are you aware that he retired about August of
3  2001?
4  A. That sounds about right, yeah.
5  Q. Are you aware that he was put in a light-duty
6  status for two years prior to August of 2001?
7  A. Where was he assigned?
8  Q. Major Baylor has testified that he worked under
9  him at Troop 9, but I guess that wouldn't be true. He
10 wasn't in charge of -- wait. Maybe I'm confused here.
11 Major Baylor of course took operational command in
12 2002.
13         I think he testified he worked at Troop 9.
14 Does that ring any bell with you?
15 A. That sounds plausible, yeah.
16 Q. Troop 9 is what? Odessa?
17 A. Yes. Yeah.
18 Q. Do you know whether he had a back injury?
19 A. I didn't know the extent of his injuries, no.
20 Q. Are you aware of whether he was on light-duty
21 status at all?
22 A. No.
23 Q. So you don't know what his status was?
24 A. No, sir.

Page 120

1  Q. And is that one of the records you reviewed
2  prior to today?
3  A. No. I don't remember doing any sort of
4  analysis of his record.
5  Q. You wouldn't be aware of his being given desk
6  duties at Troop 9 after an injury. Does that ring any
7  bell?
8  A. No, not really. I mean, for him to be at or
9  with your saying he was at Troop 9, I think I do
10 recall him being up there at one point. I didn't know
11 that was right before retirement.
12 Q. Major Baylor was the troop commander at Troop 9
13 at some point in his career?
14 A. Right.
15 Q. So he was in Odessa and he was a troop
16 commander?
17 A. Right.
18 Q. So Major Baylor testified that this individual,
19 Mr. Jackson, did have a permanent back injury. As a
20 troop commander he would have knowledge of that,
21 right?
22 A. Sure.
23 Q. If he testified that he was given two years of
24 light-duty status, as a troop commander Major Baylor

Page 121

1  would have knowledge of that, right?
2  A. He should, yes.
3  Q. If he testified that the light-duty assignment
4  that was given to Officer Jackson was desk duty
5  daywork at Troop 9, he would have firsthand knowledge
6  of that, right?
7  A. Correct.
8  Q. And your records would show whatever
9  communications you had, your office had from his
10 doctors about his medical condition, right?
11 A. Yes.
12 Q. But this is not one of the files you reviewed
13 prior to today?
14 A. No.
15 Q. The next one is a William Merritt. Did you
16 know anything about William Merritt, Corporal William
17 Merritt?
18 A. Right. Nothing pertaining to his medical
19 history. I understand that's one of the comparator
20 names, but I haven't looked at his medical history. I
21 know he had a situation where he was out of the
22 workplace pending a criminal investigation and/or IA
23 investigation. I know he was out for quite a while.
24 Then he retired.

Case 1:04-cv-00956-GMS    Document 92-19    Filed 02/02/2006    Page 15 of 19

| Price, et al. | v. | Chaffinch, et al. |
| --- | --- | --- |
| John A. Yeomans | C.A. # 04-956-GMS | October 3, 2005 |

Page 122

1  I didn't know it was a medical other than
2  seeing his name as a comparator. I don't know what
3  the underlying problem was or whatever. I don't know.
4  Q. Is it true that he retired sometime in 2002?
5  A. That sounds correct, yeah.
6  Q. Is it true that sometime in 2000 an
7  investigation was being conducted about him?
8  A. Yes.
9  Q. And is it true that during the investigation he
10 was required to stay at home?
11 A. Yes.
12 Q. He wasn't allowed back in the workplace?
13 A. That's correct.
14 Q. Now, during the investigation is it true he was
15 still receiving a salary and benefits?
16 A. Yes.
17 Q. Right?
18 A. Yes.
19 Q. And he was kept on some sort of a list, right?
20 A. Yeah.
21 Q. Right?
22 A. Right.
23 Q. He was getting paid?
24 A. He was on a list.

Page 123

1  Q. Major Baylor indicated he was kept on the
2  light-duty list. What list do you think he was kept
3  on?
4  A. I thought he was out on the disciplinary list.
5  I mean, he's out on -- that's terrible. He's
6  suspended. There's actually a line for suspensions on
7  that staffing chart. He was suspended with pay is my
8  understanding.
9  Q. Suspended with pay?
10 A. Right. Right. Or -- yeah. I'm pretty sure it
11 was suspended with pay pending the investigation,
12 yeah. Yeah.
13     I know he was getting paid and he was out
14 and it was regarding discipline, so I can only imagine
15 being suspended with pay.
16 Q. So as part of the discipline process you can be
17 suspended with pay, right?
18 A. Yes, sir.
19 Q. For example, Colonel Chaffinch was investigated
20 sometime let's just say starting in November or so of
21 last year for a period of five months or so?
22 A. Right.
23 Q. And he received pay while he was being
24 investigated?

Page 124

1  A. Correct.
2  Q. Whatever the status was called, it was that
3  status with pay, right?
4  A. I think they refer to it as administrative
5  leave at the time.
6  Q. He got administrative leave with pay?
7  A. Right.
8  Q. You're saying this officer --
9  A. Merritt.
10 Q. We're talking about Merritt here. You believe
11 he was on some sort of a suspension list with pay?
12 A. Correct.
13     MR. FITZGERALD: Asked and answered.
14 A. Suspension or administrative investigation,
15 leave, whatever you want to call it, but he was on the
16 payroll under investigation was my recollection.
17 Q. And he wasn't on a light-duty list is what
18 you're saying?
19 A. Not that I recall, no, sir.
20     MR. NEUBERGER: It's 12:30. Why don't we
21 recess for an hour, take lunch and then we will pick
22 up again with -- let me just make sure I have
23 finished. Okay?
24     Yes. We will pick up with the next one

Page 125

1  when we come back.
2      (Recessed for lunch at 12:30 p.m.)
3      - - - - -
4      AFTERNOON SESSION
5      1:45 p.m.
6  BY MR. NEUBERGER:
7  Q. I think when we broke we were turning to
8  Sergeant Jahn Hitchens. Okay?
9      Did you know a Sergeant Jahn Hitchens who
10 around 2000 had been hit by a bus?
11 A. I'm familiar with him, yes.
12 Q. What can you tell me about him? What was his
13 assignment? Where was he working?
14 A. Jahn has worked in patrol and in the Fatal
15 Accident Investigation Reconstruction team. At the
16 time of that crash I don't know where he was assigned.
17     I do know he sustained a back injury, but
18 beyond that I don't know the extent of the injury or
19 how long he was out of work. I do know he was in and
20 out a couple of times light duty or what have you, but
21 I don't know the specific time frame.
22 Q. Okay. And was he put on light-duty status for
23 some point in time?
24 A. I do know that there were a couple of periods

A - 422

Case 1:04-cv-00956-GMS   Document 92-19   Filed 02/02/2006   Page 16 of 19

Price, et al.                                              Chaffinch, et al.
John A. Yeomans                                            October 3, 2005
                        C.A. # 04-956-GMS

Page 126

1  in time where he was light duty, but I'm not -- I
2  don't know the specifics. Only because I know him and
3  he's talked about it to me, you know, "I've been on
4  light duty a couple of times for this injury."
5    Q.  And is he still serving?
6    A.  Yes.
7    Q.  So he didn't retire or anything?
8    A.  No.
9    Q.  You don't know how long he was on light duty?
10   A.  No, I don't.
11   Q.  Then how about a Corporal Scott Warner, what do
12 you know about him?
13   A.  Corporal Scott Warner? He was working out of
14 Troop 9. I know he had sustained an injury, I want to
15 say it was to his back and/or neck. And he had been
16 in and out of the workplace and or on light duty for
17 some pretty significant periods of time.
18       I don't know the exact amount of time, but
19 he still is on the job and as far as I know he's back
20 to full-duty status.
21   Q.  Right. So you do recall that he was on light
22 duty for, to use your words, significant periods of
23 time?
24   A.  Right.

Page 127

1    Q.  But eventually -- first of all, do you recall
2  it was a back injury he had?
3    A.  I think it was back or neck.
4    Q.  Back or neck?
5    A.  Right.
6    Q.  And is he back on full-duty status now?
7    A.  That's my understanding, yes.
8    Q.  And you believe he was working out of Troop 9?
9    A.  Correct.
10   Q.  For an injury if you have six months of light
11 duty here and you're back for three months, you take
12 another year, you're back for three months, could you
13 exceed two years in that fashion?
14   A.  Sure. Absolutely.
15   Q.  For that same injury?
16   A.  Yeah.
17   Q.  Yes?
18   A.  Yep.
19   Q.  Now, how about a Corporal Anthony DiAllesandro,
20 DiAllesandro?
21   A.  Right. Anthony DiAllesandro is assigned to
22 Troop 3. I think he's presently on light duty. He is
23 actually on the list as a lung transplant recipient, I
24 think. I think he's a recipient and waiting for Johns

Page 128

1  Hopkins University as a result of he had some sort of
2  lymphoma, I believe, some sort of condition, cancerous
3  condition that became problematic for one or both of
4  his lungs. And he's on a waiting list to get a lung
5  transplant.
6    Q.  Okay. And does his medical condition interfere
7  with his being able to perform his duties?
8    A.  As a full-duty officer, yes. He was placed on
9  light duty because of the concern of exertion or, you
10 know, minimized lung capacity, what that could in fact
11 do to him.
12       So, yeah, he's on light duty and as I
13 understand it waiting for a lung transplant which that
14 list can take up to one or two years, maybe beyond
15 before you get a call.
16   Q.  And what's his current assignment? Where is he
17 at? Do you know?
18   A.  Troop 3.
19   Q.  Troop 3?
20   A.  Yes.
21   Q.  Do you know what he's doing at Troop 3?
22   A.  He's in the light-duty capacity and I think
23 they have got him working a desk or other assignments
24 down at the troop.

Page 129

1        I'm not exactly sure.
2    Q.  Do you know when his medical condition was
3  brought to the attention of the State Police?
4    A.  I'm thinking probably nine to twelve months
5  ago.
6    Q.  Nine to twelve months ago?
7    A.  Right.
8    Q.  Would it have been, are you saying the latter
9  part of 2004 or are you saying early part of 2005?
10   A.  Probably early part of 2005 actually.
11   Q.  Early 2005 you think?
12   A.  Right.
13   Q.  Are you saying that's when he was put on
14 light-duty status, when his condition was made known
15 to the State Police?
16   A.  I think there might have been a little lag time
17 between what was known and him actually getting put on
18 light duty. I think he was continuing in a regular
19 capacity. Having known the condition, came to HR's
20 attention and through the chain of command that
21 basically said this guy needs to be on light duty if
22 he's not operating in full capacity with a lung and on
23 a waiting list for a lung, I was just fearful that we
24 might have a tragedy on our hands if this guy is out

Page 130

1  trying to wrestle offenders or push cars off the road
2  and that sort of thing.
3  Q. Okay.
4  A. There may have been a lag period is what I am
5  suggesting sort of between the actual knowing his
6  condition, his chain of command knowing the condition
7  and then I knowing the condition and then him being
8  placed on light duty.
9  Q. And the nine or twelve months ago, nine to
10 twelve months ago is when he would have been put on
11 light duty, not when it was drawn to the attention of
12 his commander or whatever. Is that fair?
13 A. Yeah. That's pretty accurate, right.
14 Q. So he's been on light duty for some time now,
15 right?
16 A. Right.
17 Q. HR knows that he's on a list waiting for a lung
18 transplant?
19 A. Right.
20 Q. And it's your understanding that a person could
21 be on those lists for one or two years or even beyond
22 in your words, right?
23 A. That's correct.
24 Q. And will he be kept on light duty more than two

Page 131

1  years?
2  A. Possibly.
3  Q. Has the State Police obtained some sort of a
4  prognosis from a physician that the transplant could
5  cure his problem?
6  A. Yes.
7  Q. Then we have got a Lieutenant Sue Brady. Does
8  that name ring any bells? Do you remember her?
9  A. I remember her. I know who she is, but I'm not
10 familiar with her file.
11 Q. Now, when you say you remember who she is, is
12 she still a trooper?
13 A. She's retired.
14 Q. She's retired?
15 A. Right.
16 Q. Do you know when she retired?
17 A. I do not.
18 Q. Do you know whether she retired in the
19 eighties, nineties or more recently?
20 A. It wasn't recent. I want to say it was
21 probably in the eighties, maybe early nineties.
22 Q. Okay. And do you know what kind, do you know
23 whether she had an injury or whether she was on light
24 duty or anything like that?

Page 132

1  A. I don't.
2  Q. So you just don't know anything at all about
3  her case?
4  A. I really don't.
5  Q. Then we have a Lieutenant Randy Mosley. Do you
6  know anything about him?
7  A. Randy Mosley had a heart attack. I know I was
8  at Troop 3. I believe I was assigned as CI at that
9  time when that occurred. He was a lieutenant. I
10 believe it was in the drug unit. I'm just operating
11 off of what I recall. I haven't reviewed his file
12 either.
13    But I know he had a heart attack and I
14 don't think it was -- you know, I don't know how long
15 after that that he separated, but I know he went on to
16 retire.
17 Q. So you know he separated after a heart attack?
18 A. Yes.
19 Q. And do you know that he was on light duty?
20 A. I don't know that.
21 Q. So all you know is he had a heart attack and
22 that sometime later he retired?
23 A. Yes.
24 Q. You don't know whether he was on or off light

Page 133

1  duty?
2  A. I don't.
3  Q. Even if he was on light duty, you don't know
4  how long?
5  A. I don't.
6  Q. Okay. Now, we have got another one here, a
7  Lieutenant Paul Sczubelek.
8  A. Right.
9  Q. Okay?
10 A. Yes.
11 Q. Is it true that Lieutenant Sczubelek -- I think
12 he's still in a federal penitentiary for bank
13 robberies?
14 A. No.
15 Q. He's gotten out?
16 A. He's out now.
17 Q. He's out?
18 A. Yeah.
19 Q. So Lieutenant Sczubelek was convicted in
20 Federal Court of some bank robberies in New Castle
21 County. Is that correct?
22 A. That's correct.
23 Q. And these bank robberies occurred while he was
24 still in the employ of the Delaware State Police as a

A - 424

Case 1:04-cv-00956-GMS   Document 92-19   Filed 02/02/2006   Page 18 of 19

Price, et al.  
John A. Yeomans                                v.                    Chaffinch, et al.  
                              C.A. # 04-956-GMS                      October 3, 2005

Page 134

1  trooper, correct?
2  A. That's correct.
3  Q. And he was a lieutenant at the time he
4  committed these bank robberies?
5  A. That's correct.
6  Q. Was this sometime in the 1990's?
7  A. Yes.
8  Q. And his employment with -- well, he just
9  retired. He was allowed to retire. Isn't that true?
10 Or was he terminated?
11 A. He went on to collect a service pension.
12 Q. Right. He's receiving a service pension?
13 A. Right.
14 Q. Right. So his employment wasn't terminated by
15 the State Police?
16 A. I don't believe it was. I think it was more of
17 a resignation. I mean, he got...
18 Q. You got to be there 20 years to get a pension?
19 A. Actually, I shouldn't say that. Actually, I
20 shouldn't say that. I don't know what the
21 disciplinary proceedings were.
22      I do know he collected a service pension.
23 I don't know if he was terminated or asked to resign.
24 Q. You can't get a pension unless you have been

Page 135

1  there 20 years, right?
2  A. Correct. Well, you can vest at ten and collect
3  later, but full service pension is typically age 20 --
4  or 20 years of service.
5  Q. Right. So he is receiving a full service
6  pension?
7  A. That's correct.
8  Q. Right. Now, after the charges were brought is
9  it true that he was -- well, was he on light duty for
10 two years?
11 A. I don't know. I'm not familiar with him
12 either.
13 Q. Do you know whether he was on that suspended
14 with pay status that you had explained earlier?
15 A. I believe so, but I'm not 100 percent sure.
16 Q. You believe he was on suspended but pay status?
17 A. Yeah.
18 Q. Major Baylor has testified that, I believe this
19 is when he was working in HR, that Lieutenant
20 Sczubelek was put on the light-duty list.
21      Do you have any information to the
22 contrary?
23 A. No.
24 Q. I may have misspoken there. I think he said

Page 136

1  this was while he was the PIO, so he would have been
2  the one speaking about these things. I stand
3  corrected on that.
4  A. Okay.
5  Q. He indicated that people who were under
6  investigation for crimes were placed on the light-duty
7  list. Has that occurred while you have been the
8  director of HR?
9      MR. FITZGERALD: I object to form.
10 A. Well, when they're under investigation I don't
11 think that the proper classification is light duty
12 because even if you're under investigation you can
13 still remain in the workplace. You wouldn't be deemed
14 light duty.
15      And if you're off suspended or out of the
16 workplace with or without pay, we don't consider that
17 light duty is what I am saying.
18 Q. I understand what you're saying. I'm asking
19 you aside from what Major Baylor has testified.
20      I'm saying while you have been the
21 director of HR, have any officers who have been
22 accused of crimes and/or under investigation been
23 placed on the light-duty list?
24      MR. FITZGERALD: I object to form.

Page 137

1  A. Not that I'm aware of, no.
2  Q. And are you saying that prior to your working
3  in HR you do not believe that any officers accused of
4  crimes have been placed on the light-duty list?
5  A. That I don't know for sure. There may be.
6  Q. So if Major Baylor testified that Lieutenant
7  Sczubelek when he was under investigation was placed
8  on the light-duty list, you don't have any information
9  to the contrary. Is that correct?
10 A. No.
11 Q. Now, after he was accused of the crimes,
12 because we're still on Lieutenant Sczubelek, after he
13 was accused of the crimes and before he went off on
14 his pension, do you know how long he was, do you know
15 how long, how much time passed?
16 A. No, I don't.
17 Q. If he was on suspended with pay status, as you
18 indicated you thought was the case, do you know if he
19 was on suspended with pay status for one or more
20 years?
21 A. I don't.
22 Q. You indicated earlier that there was a trooper
23 we talked about, the one who was drinking and driving
24 and flipped his vehicle over on Route 1. Do you

Page 138

1  remember him?
2  A. Schlifer, yes.
3  Q. And I think the record shows whatever it was.
4  He was on light duty. No. I'm sorry. He was on
5  suspended with pay, right?
6  A. Right.
7  Q. So he was on suspended with pay and then
8  eventually his employment ended, right?
9  A. Correct.
10 Q. Then there was the one that we talked about
11 more recently who was under investigation that we
12 talked about earlier. Do you remember that one?
13 A. Merritt.
14 Q. Merritt, right. It was allegations of rape he
15 was facing, right?
16 A. Right.
17 Q. And he was put on suspended with pay you
18 explained also, right?
19 A. Yes.
20 Q. And he wasn't put on a light-duty list, right?
21 A. Not to my knowledge, no, sir.
22 Q. And then after two years he retired, right?
23 A. Right.
24 Q. And did we establish that the trooper who

Page 139

1  flipped his vehicle over that after two years he
2  retired also?
3  A. I don't think it was two years. I thought it
4  was a little shorter than that.
5  Q. It might have been one of those a little
6  shorter than two years?
7  A. Right. I thought it was closer to a year.
8  Q. We don't know how long Sczubelek was on, right?
9  A. No.
10 Q. But both of these troopers shared the common
11 factor that they were facing criminal charges, right?
12 A. Right.
13 Q. And they were facing severe discipline within
14 the State Police, correct?
15 A. Correct.
16 Q. But they were allowed to be on this suspension
17 with pay status, right?
18 A. Yes.
19 Q. And they could have, at least one of them
20 receive suspension with pay status for two full years
21 before he retired. Isn't that correct?
22 A. You're making reference to Sczubelek or
23 Schlifer?
24 Q. No. It was the one who --

Page 140

1  A. Merritt or Schlifer?
2  Q. Schlifer. He was the one who flipped over
3  drinking and driving.
4  A. I think it was less than two years. I thought
5  it was closer to a year. But without reviewing the
6  file, I don't know. I'm pretty sure it was at least a
7  year.
8  Q. Right. Let me just check my notes here.
9      Okay. Whatever you said you said and then
10 we can see if we get to see those records or whatever.
11 But the point I think you were trying to make with me
12 this morning is that there are troopers who do face
13 criminal charges in the courts and internal
14 discipline, right?
15 A. Yes.
16 Q. And they are put on a status pending the
17 resolution of those charges, right?
18 A. Suspended with pay, suspended without pay.
19 Q. Right. The three we just talked about here,
20 you believe they were all suspended with pay status?
21 A. I believe so, yes.
22 Q. Right. And I think you're aware that my
23 clients, meaning Kurt Price and Wayne Warren, have
24 been seeking placement on light-duty status for up to

Page 141

1  two years. You understand that --
2  A. Right.
3  Q. -- they are seeking that, right?
4  A. Right.
5  Q. Is it true that there are other troopers -- I'm
6  not asking other names -- but in the past haven't
7  other troopers faced discipline or criminal charges in
8  the past?
9  A. Sure. Absolutely.
10 Q. Have other troopers been placed on suspended
11 with pay status?
12 A. Absolutely.
13 Q. Is it fair to say that other troopers have been
14 on that status for one or two years and then retired?
15 A. Yeah.
16 Q. Yes?
17 A. Yes.
18 Q. Okay.
19 A. Yeah.
20 Q. So there would be some troopers out there who
21 you're saying were on suspended with pay status and
22 retired without being on that status for two full
23 years?
24 A. Yes.

A - 426

36 (Pages 138 to 141)