IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CORPORAL B. KURT PRICE, et al., : | |
| : | |
| Plaintiffs, : | |
| : | C.A. No. 04-956-GMS |
| v. : | |
| : | |
| COLONEL L. AARON CHAFFINCH, et al., : | |
| : | |
| Defendants. : | |

| | |
|---|---|
| SERGEANT CHRISTOPHER FORAKER, : | |
| : | |
| Plaintiff, : | |
| : | C.A. No. 04-1207-GMS |
| v. : | |
| : | |
| COLONEL L. AARON CHAFFINCH, et al., : | |
| : | |
| Defendants. : | |

**DECLARATION OF ROBERT J. FITZGERALD**

Robert J. Fitzgerald, Esq., makes the following declaration pursuant to 28 U.S.C. § 1746:

1.  I am an attorney at law in the State of Pennsylvania and have been admitted pro hac vice in the above-captioned cases. I am an associate with law the firm of Montgomery, McCracken, Walker & Rhoads, LLP, attorneys for Defendants.

2.  In December 2005, Martin Haverly, Esq., counsel for Plaintiffs, provided me a videotape copy of a WBOC-TV (Salisbury, Maryland) on-air news cast concerning the indoor firing range of the Delaware State Police.

3.  I have reviewed that videotape and declare that the attached document is a true and correct transcript of the WBOC news cast.

A - 553.1

I declare under penalty of perjury that the foregoing is true and correct.

_____
Robert J. Fitzgerald, Esq.

Date: January 24, 2006

# TRANSCRIPT OF WBOC REPORT

[Inaudible]... Firing range used by Delaware State police. As we have been reporting in recent months, high levels of lead were found. Well, now we're learning it all could have been prevented very easily. WBOC's Talitha Vickers takes us inside:

The doors are shut and police officials say there is a valid reason why:

> *(MacLeish) The fire arms training unit began experiencing some problems – some health problems that cooper taste in their mouth – runny nose, stuffiness, things of that nature.*

Those symptoms forced the state to shut the range in Smyrna down leaving, many people wondering how something like this could happen:

> (DAS Sec. Gloria Homer) You can look at the bullet trap you see that its not clean and then you go behind the bullet trap and that's also where it's not clean as well.

Officials say a machine like this should have been used regularly in the clean up process. Instead brooms were used and that lead to bigger problems.

> (Homer) You can see they used those brooms and that protocol says you don't do that because it stirs the dust up. The idea is to when your cleaning you should keep the dust contained.

State officials say state troopers are responsible for the clean up, and Homer says in the end a poor job of cleaning resulted in high levels of lead. Now, changes will be made.

> *(MacLeish) On the Delaware State Police's side there will be a very sound, strict, standard operating procedure that will be done and followed.*
>
> *(Chaffinch) Our concern first is with the people that will be in here training. So, until such time as we know that it's safe and healthy to be here, we won't be here.*

And until the cleanup process is totally completed, troopers will have to travel to the national guard facility in New Castle. Talitha Vickers – WBOC News Smyrna

2038229v1

A - 553.3

We are told that that clean up should begin in early August. The state estimates it will cost over $100,000.00.

Westlaw.

--- F.3d ----   Page 1
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.))
(Cite as: --- F.3d ----)

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States Court of Appeals,Third Circuit.
Dwight L. MCKEE; Allen L. Jones
v.
Henry HART; Wesley Rish; Albert Masland; James Sheehan; Daniel P. Sattelle Daniel P. Sattele,
Appellant.
**No. 04-1442.**

Argued March 10, 2005.
Jan. 6, 2006.

Appeal from the United States District Court for the Middle District of Pennsylvania, (D.C. Civil Action No. 02-cv-01910), District Judge: Honorable Richard Caputo.

Charles W. Rubendall, II, (Argued), Donald M. Lewis, III, Keefer, Wood, Allen & Rahal, LLP, Harrisburg, PA, for Appellant.
Donald A. Bailey, (Argued), Bailey Stretton & Ostrowski, Harrisburg, PA, for Appellee.

Before SCIRICA, Chief Judge, ROTH and AMBRO, Circuit Judges.

OPINION OF THE COURT

AMBRO, Circuit Judge.
*1 Daniel Sattele appeals the District Court's denial of his summary judgment motion seeking qualified immunity in a suit brought by Allen Jones alleging that Sattele, among others, had retaliated against him for exercising his First Amendment rights. Because Jones did not allege that Sattele deprived him of a constitutional right-and because even if he had, that right was not clearly established at the time Sattele engaged in the alleged conduct-we conclude that Sattele is entitled to qualified immunity. We therefore reverse the decision of the District Court and remand for further proceedings.

I. Factual and Procedural History

In May 2002, Jones was hired as a special investigator for the Pennsylvania Office of Inspector General ("OIG"). [FN1] The OIG is responsible for investigating allegations of fraud, waste, misconduct, and abuse in executive agencies of the Commonwealth. At the time of the events at issue in this case, Sattele was an Investigations Manager at OIG and was Jones's supervisor.

> FN1. Jones had previously been employed by OIG. He left that position in 1991.

In mid- to late-July 2002, Jones was given a lead role in the investigation of Steve Fiorello, the chief pharmacist at Harrisburg State Hospital. There was only one other person assigned to the investigation. A few weeks after the investigation began, Jones told Sattele that he was concerned about problems in the pharmaceutical industry that went beyond the Fiorello investigation-specifically that he believed the industry was routinely bribing state officials. Jones informed Sattele that he wanted to broaden the Fiorello investigation to include the entire pharmaceutical industry. Thereafter, Jones continued to inform Sattele about his concerns regarding the industry.

In response, Sattele told Jones to stay focused on the Fiorello investigation and not to investigate corruption in the pharmaceutical industry as a whole. Sattele subsequently removed Jones from his lead role in the Fiorello investigation in September 2002 [FN2] because Jones had, in Sattele's words, " lost focus." Sattele based this conclusion on the fact that Jones continued to voice concerns about the entire pharmaceutical industry even after Sattele had told him to concentrate only on Fiorello.

> FN2. Jones was still assigned to that investigation even though his role had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 554

--- F.3d ----  
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.))  
(Cite as: --- F.3d ----)

Page 2

changed.

In October 2002, Dwight McKee, one of Jones's colleagues at OIG, filed a complaint against other OIG employees, alleging that they had retaliated against him for exercising his First Amendment rights. In November 2002, an amended complaint was filed, joining Jones as a plaintiff and Sattele as a defendant. Jones brought a cause of action under 42 U.S.C. § 1983, alleging that Sattele and the other defendants had also retaliated against him for exercising his First Amendment rights. Jones claimed generally that he was retaliated against-through intimidation and harassment by his supervisors-for complaining to his supervisors that public corruption investigations were being obstructed and delayed for reasons that were not legitimate.

In particular, at his deposition Jones identified three comments by Sattele that he perceived as harassment in retaliation for his refusal to stop voicing his concerns about the pharmaceutical industry. [FN3] First, he testified that Sattele told him that

> FN3. Jones also identified a fourth incident that he alleged was harassment, involving Henry Hart, another defendant. Hart, however, is not a party to this appeal, and as that incident is not relevant to our decision, we do not discuss it here.

*2 Mac [McKee] was torpedoed. Some of the things that he got maybe he deserved, but a lot of them he didn't. He was torpedoed. You keep your mouth shut.... Mac has been torpedoed, keep your mouth shut or the same thing can happen to you.
In a similar vein, Jones recalled that Sattele told him, in early October 2002, that if Jones could not adjust to the way OIG operated, he would have to leave his employment there.

Second, Jones testified that Sattele told him to "quit being a salmon," by which he meant that Jones should "quit swimming against the current with the pharmaceutical case." (Sattele testified at his deposition that he told Jones to "go with the flow" and not "swim against the current" because he was concerned that Jones was not working with the lawyers in the office and was not operating within a "team concept.")

Third, Jones related an incident that occurred in October 2002, after he had been removed as co-leader of the Fiorello investigation. Jones stated that thereafter he was not allowed to speak to anyone about the investigation without Sattele's permission. He nevertheless went to pick up documents from Fiorello, the target of the investigation, while Sattele and another of his supervisors were out of the office. Jones testified that, when he got back, Sattele met him "first thing," took him into a room with another OIG colleague, " and demanded to know why [he] went ... without [Sattele's] permission to pick up papers." Jones also stated that Sattele and his colleague accused Jones of having had an interview with the Director of the Department of Public Welfare, something Jones denied.

All defendants moved for summary judgment in August 2003, and the District Court granted the motion with respect to all defendants except Sattele in February 2004. As for Jones's claims against Sattele, the District Court determined, based on the three comments identified by Jones, that (1) "with respect to Mr. Sattele, Mr. Jones has presented evidence that could lead a reasonable jury to conclude that his requests to investigate the pharmaceutical industry were a substantial or motivating factor in the retaliatory harassment or intimidation he may have suffered" and (2) it could not decide whether Sattele had qualified immunity absent a factual determination as to whether Sattele's conduct constituted retaliatory harassment. In its decision, the District Court also determined that Jones was not disciplined in connection with voicing his concerns about the pharmaceutical industry and that "[a]t no time during his employment has Mr. Jones's job classification, pay, or benefits been reduced or altered." Sattele now appeals from the denial of summary judgment on qualified immunity grounds.

II. Jurisdiction & Standard of Review

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 555

--- F.3d ----  
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.))  
(Cite as: --- F.3d ----)

Page 3

The District Court had federal question jurisdiction over Jones's 42 U.S.C. § 1983 claim pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine. *See Doe v. Groody,* 361 F.3d 232, 237 (3d Cir.2004) ("[A] denial of qualified immunity that turns on an issue of law-rather than a factual dispute-falls within the collateral order doctrine that treats certain decisions as 'final' within the meaning of 28 U.S.C. § 1291." (citing, *inter alia, Behrens v. Pelletier,* 516 U.S. 299 (1996))); *Forbes v. Twp. of Lower Merion,* 313 F.3d 144, 147 (3d Cir.2002) ("When a defendant moves for summary judgment based on qualified immunity, the denial of the motion may be appealed immediately under the collateral-order doctrine because '[t]he entitlement is an *immunity from suit* rather than a mere defense to liability[ ] and ... is effectively lost if a case is erroneously permitted to go to trial.' " (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)) (alterations, emphasis, and omission in original)).[FN4]

> FN4. Sattele contends that there is no factual dispute preventing us from exercising jurisdiction over this appeal, and Jones does not dispute that position.

*3 We exercise plenary review over the District Court's conclusions of law in its qualified immunity analysis. *Doe,* 361 F.3d at 237. In addition, "we may review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right, but we may not consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove." *Forbes,* 313 F.3d at 147 (internal quotation marks omitted).

We note also that at this stage of the litigation we are looking at the facts as presented by Jones, *i.e.,* Satelle's statements were retaliatory, rather than the exercise by Satelle of appropriate supervisory limits on Jones's performance of his assignment.

III. Discussion

Qualified immunity insulates government officials performing discretionary functions from suit " insofar as 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* at 148 (quoting *Anderson v. Creighton,* 483 U.S. 635, 638 (1987)). To determine whether an official has lost his or her qualified immunity, we must first "decide 'whether a constitutional right would have been violated on the facts alleged....' " *Doe,* 361 F.3d at 237 (quoting *Saucier v. Katz,* 533 U.S. 194, 200 (2001)) (omission in original). If the answer to that question is "yes," we must then "consider whether the right was 'clearly established.' " *Id.* at 238 (quoting *Saucier,* 533 U.S. at 201)). If we also answer "yes" to the second question, we must conclude that the official does not have qualified immunity.

Sattele contends that he is entitled to qualified immunity because (1) his three statements to Jones about his work on the Fiorello investigation did not deprive Jones of his First Amendment rights, and (2) even if Jones did allege a violation of a constitutional right, that right was not clearly established at the time Sattele made the comments. We address each argument in turn.

A. *Did Sattelle Violate a Constitutional Right of Jones?*

"A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Brennan v.. Norton,* 350 F.3d 399, 412 (3d Cir.2003) (internal quotation marks omitted). In light of this fundamental principle, we have held that, in certain circumstances, a public employee may bring a cause of action alleging that his or her First Amendment rights were violated by retaliatory harassment for the employee's speech about a matter of public concern even if he or she cannot prove that the alleged retaliation adversely affected the terms of his or her employment. *See Suppan v. Dadonna,* 203 F.3d 228, 234-35 (3d Cir.2000). In *Suppan,* we indicated that when the "plaintiffs' complaint allege[d] a campaign of retaliatory harassment culminating in ... retaliatory rankings [low ratings on promotion lists]," then a "trier of fact could determine that a violation of the First

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 556

--- F.3d ----
Page 4
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.))
(Cite as: --- F.3d ----)

Amendment occurred at the time of the rankings on the promotion lists and that some relief [was] appropriate even if plaintiffs [could not] prove a causal connection between the rankings and the failure to promote." *Id.* This holding is premised on the idea that being the victim of petty harassments in the workplace as a result of speaking on matters of public concern is in itself retaliation-even if the employee cannot prove a change in the actual terms of his or her employment-and thus could be actionable under the First Amendment. *Id.* at 235.

*4 In this context, the key question in determining whether a cognizable First Amendment claim has been stated is whether "the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights ...." *Id.* at 235 (internal quotation marks omitted). The effect of the alleged conduct on the employee's freedom of speech " 'need not be great in order to be actionable,' " but it must be more than *de minimis. Id.* (quoting *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) (Posner, J.)); *see also Brennan,* 350 F.3d at 422 n. 17 (noting that "incidents of what might otherwise be trivial 'harassment' " may be actionable through their "cumulative impact ... even though the actions would be *de minimis* if considered in isolation"). As stated earlier, the District Court determined that Jones's allegation that Sattele retaliated against him for speaking out about the pharmaceutical industry met the standards set out in *Suppan.*

Sattele does not dispute the District Court's conclusion that Jones sufficiently alleged that he was speaking out on a matter of public concern. Sattele does argue, however, that the District Court's conclusion (by pointing to the three statements Sattele made to Jones, the latter alleged a retaliatory harassment claim under the First Amendment) was incorrect. In particular, Sattele contends that his three allegedly retaliatory comments were trivial and insufficient to deter a person of ordinary firmness from exercising his First Amendment rights. We agree.

Despite our holding in *Suppan* that a plaintiff's allegation of a "campaign of retaliatory harassment" by a public employer as a result of the plaintiff's speech created a cognizable First Amendment claim even without an alleged causal connection to a change in the plaintiff's terms of employment, not every critical comment-or series of comments-made by an employer to an employee provides a basis for a colorable allegation that the employee has been deprived of his or her constitutional rights. *See Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000) (stating that "not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation"); *Bart,* 677 F.2d at 625 (holding that plaintiff had alleged an actionable First Amendment claim when she claimed that "an entire campaign of harassment[,] which though trivial in detail may have been substantial in gross," had been mounted against her, but cautioning that "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise"). We have noted that " 'courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands.' " *Brennan,* 350 F.3d at 419 (quoting *Suarez,* 202 F.3d at 686) (holding that allegations that a supervisor stopped using the plaintiff's job title and did not capitalize the plaintiff's name as a result of plaintiff's speech, even if true, did not rise to the level of a constitutional violation because they were *de minimis* ). The comments made by Sattele fall into this category.

*5 Sattele's statements to Jones in the fall of 2002 were all aimed at getting Jones to focus on the investigation to which he was assigned-looking into the activities of a particular person in a particular state agency-instead of focusing on Jones's own wide-ranging concerns about the pharmaceutical industry as a whole, something that OIG was not investigating. There is no question Sattele's statements were critical of Jones's job performance, and they may be construed as reprimands for Jones's continued expressions of concern about potential corruption in the pharmaceutical industry. However, even looking at the record in the light most favorable to Jones (as we must at this stage in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 557

--- F.3d ----  
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.))  
(Cite as: --- F.3d ----)

Page 5

proceedings), we cannot conclude that Sattele's comments, taken together, would have deterred a person of ordinary firmness from exercising his First Amendment rights.

In *Suppan,* the plaintiffs allegedly were subjected to repeated chastisements and threats from their superiors over a period of more than a year based on their membership in a union negotiating team, and they alleged that they were given low ratings on their promotion eligibility evaluations in retaliation for those activities. 203 F.3d at 230-31. By contrast, Jones was admonished a few times for straying from the scope of the task he was assigned. The District Court explicitly found that, despite Jones's changed role in the Fiorello investigation, he suffered no alteration in his employment benefits, pay, or job classification as a result of speaking out about potential corruption in the pharmaceutical industry. Based on the set of facts identified by the District Court, Jones's allegations about Sattele's conduct simply do not rise to the level of a retaliatory harassment claim under the First Amendment.

Because Jones has not alleged the deprivation of a constitutional right, Sattele is entitled to qualified immunity. For the sake of completeness however, we now turn to the second prong of the qualified immunity analysis and determine whether-assuming that Jones had sufficiently alleged the violation of a constitutional right-that right was clearly established at the time of Sattele's alleged conduct.

B. *Assuming Sattele Violated a Constitutional Right of Jones, Was that Right Clearly Established at the Time of the Alleged Conduct?*

" '[C]learly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McLaughlin v. Watson,* 271 F.3d 566, 571 (3d Cir.2001). Put another way, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Id.* at 572. The Supreme Court has recently reiterated this point, stating that "[i]t is important to emphasize that this [clearly established] inquiry 'must be undertaken *in light of the specific context of the case,* not as a broad general proposition." ' *Brosseau v. Haugen,* 543 U.S. 194, 125 S.Ct. 596, 599 (2004) (*per curiam* ) (quoting *Saucier,* 533 U.S. at 201) (emphasis added).

*6 Before Sattele allegedly engaged in the conduct at issue in this case, we held, as discussed at Section III(A), *supra,* that a public employee states a First Amendment claim by alleging that his or her employer engaged in a "campaign of retaliatory harassment" in response to the employee's speech on a matter of public concern, even if the employee could not prove a causal connection between the retaliation and an adverse employment action. *Suppan,* 203 F.3d at 234-35. We then reiterated, in *Baldassare v. New Jersey,* 250 F.3d 188 (3d Cir.2001), that "[a] public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Id.* at 194 (citing, *inter alia, Rankin v. McPherson,* 483 U.S. 378, 383-84 (1987)). Jones contends that *Suppan* and *Baldassare,* taken together, were sufficient precedent to put Sattele on notice that his conduct-making harassing comments to Jones arising out of Jones's voicing of concerns about corruption in the pharmaceutical industry-was constitutionally prohibited.

In *Suppan,* however, we gave little guidance as to what the threshold of actionability is in retaliatory harassment cases. Instead, we merely held that such a claim existed. *Suppan,* 203 F .3d at 235. Moreover, the alleged conduct in *Suppan* spanned more than a year and involved the supposed lowering of ratings on employees' promotion evaluations and the admonishment of employees because of their union activities and support for a particular mayoral candidate. *Id.* at 230-31. Based only on our acknowledgment of a retaliatory harassment cause of action in *Suppan* and the facts of that case, a reasonable official in Sattele's position would not have been aware that making a few comments over the course of a few months (the gist of which was asking an employee to focus on his job) might have run afoul of the First Amendment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 6
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.))
(Cite as: --- F.3d ----)

*Baldassare* also does not further Jones's argument that his First Amendment right to be free from retaliatory harassment was clearly established at the time of Sattele's alleged conduct. That case involved a straightforward retaliation claim brought under the First Amendment in which the plaintiff alleged a direct causal connection between his speech on a matter of public concern and his demotion, *see Baldassare*, 250 F.3d at 194 (plaintiff claimed he was demoted because of his statements regarding his investigation and report about conduct of his co-workers), not that he was subject to a campaign of retaliatory harassment such as the one involved in *Suppan* and alleged by Jones in this case. Thus, *Baldassare* would not have helped Sattele understand that his conduct might be constitutionally prohibited. [FN5]

   FN5. Moreover, we note that even if *Baldassare* were relevant to determining whether Jones's right to be free from retaliatory harassment was clearly established at the time of Sattele's alleged conduct, that case would not necessarily put a reasonable official in Sattele's position on notice that making comments such as Sattele's would violate the First Amendment. Under the traditional retaliation analysis articulated in *Baldassare,* the second inquiry, after the plaintiff has established that he or she was engaging in activity protected by the First Amendment, is whether the plaintiff's " interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees."  250 F.3d at 195. We have stated that, in determining the interest of the employer for purposes of this balancing test, "we must consider 'whether the [expression] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." ' *Id.*

at 198 (quoting *Rankin,* 483 U.S. at 388) (alteration in original). The District Court determined in this case that there was no evidence that OIG's interest in conducting an efficient investigation was impaired by Jones's speech. However, given our precedent on this issue, a reasonable official in Sattele's position could have *understood* his actions toward Jones as being justified because the need to maintain efficient working relationships and to improve Jones's performance of his duties on the Fiorello investigation outweighed his interest in speaking generally about potential corruption in the pharmaceutical industry, a matter outside the scope of the investigation OIG was conducting. *Cf. Sprague v. Fitzpatrick,* 546 F.2d 560, 565 (3d Cir.1976) (holding that, even though speech leading to public employee's discharge "concerned matters of grave public import," the balance weighed against finding that speech protected by the First Amendment when it had "completely undermined" the effectiveness of the employer-employee relationship).

We did touch on the retaliatory harassment theory again in our *Brennan* decision, noting once more that "a plaintiff may be able to establish liability under § 1983 based upon a continuing course of conduct even though some or all of the conduct complained of would be *de minimis* by itself or if viewed in isolation." 350 F.3d at 419 n. 16. *Brennan* provided some additional guidance about what types of conduct would support such a claim, holding that some of the plaintiff's allegations (that he had been taken off the payroll for some time and given various suspensions as a result of his speech) would support a retaliation claim, whereas other of his allegations (including his claim that his supervisor stopped using his title to address him) would not because of their triviality. *Id.* at 419. However, *Brennan* was not decided until 2003, after Sattele's alleged conduct, which occurred in the fall of 2002, had already taken place. Thus, to the extent that *Brennan* added some specificity to the contours of the retaliatory harassment cause of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 559

--- F.3d ----                                                                                                                    Page 7
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

action, an employee's First Amendment right to be free from such harassment was still not clearly established at the time of Sattele's conduct. *See Brosseau,* 125 S.Ct. at 600 n. 4 (noting that the parties had pointed the Court to "a number of ... cases ... that postdate the conduct in question" and that "[t]hese decisions, of course, could not have given fair notice to [the official] and are of no use in the clearly established inquiry").

*7 Moreover, as discussed at Section III(A), *supra,* we also stated in *Brennan* that courts have not found violations of employees' First Amendment rights "where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." 350 F.3d at 419 (internal quotation marks omitted). *Brennan* therefore lends support to Sattele's argument that his critical comments to Jones did not violate Jones's First Amendment rights.

Accordingly, because of the dearth of precedent of sufficient specificity (and factual similarity to this case) regarding a public employee's First Amendment right to be free from retaliatory harassment by his or her employer at the time of Sattele's conduct, we cannot say that the constitutional right Jones alleged Sattele violated was clearly established. Sattele is therefore entitled to qualified immunity under the second, as well as the first, prong of our *Saucier* analysis.

IV. Conclusion

The three comments made by Sattele in response to Jones's voicing of his concerns about potential corruption in the pharmaceutical industry, although critical of Jones's speech, were all intimately related to Jones's job performance and would not have deterred a person of ordinary firmness from exercising his or her First Amendment rights. As the District Court found, the comments were also unaccompanied by any change in Jones's employment benefits or wages. We cannot conclude, based on this factual situation, that Jones alleged a deprivation of a constitutional right.

Moreover, even if there had been such a deprivation, Jones's constitutional right to be free from a campaign of retaliatory harassment was not clearly established at the time of Sattele's alleged conduct. *Suppan* (and *Baldassare* to the extent it is applicable), although they were decided before the events at issue in this case, did not define the bounds of a retaliatory harassment cause of action with sufficient specificity, nor were their facts sufficiently similar to those alleged here, such that Sattele would have been on notice that his conduct was constitutionally prohibited.

Accordingly, Sattele is entitled to qualified immunity, and we reverse the contrary decision of the District Court and remand for further proceedings.

C.A.3 (Pa.),2006.
McKee v. Hart
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.))

Briefs and Other Related Documents (Back to top)

• 04-1442 (Docket) (Feb. 23, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                    Page 1

Not Reported in A.2d, 1992 WL 148002 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

C
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware, New Castle County.
Thomas R. **WYSHOCK**, Plaintiff,
v.
Abdollah **MALEKZADEH** and Deborah A. Malekzadeh, Defendants.
**Civ. A. No. 91C-09-22.**

Submitted: Feb. 20, 1992.
Decided: June 10, 1992.

On Defendants' Motion to Dismiss-Granted in part, Denied in part.

Robert Jacobs, Jacobs & Crumplar, for plaintiff.
Richard G. Elliott, Jr., and David L. Finger, Richards, Layton & Finger, for defendants.

ORDER

TAYLOR, Judge.

*1 Thomas Wyshock [plaintiff] has filed a complaint against Abdollah and Deborah Malekzadeh [defendants] alleging the torts of defamation, false light invasion of privacy, and interference with professional and business relations. According to the complaint, defendants are limited partners in Meadowood II Enterprises, L.P. [Meadowood project]; plaintiff is the general partner in the project (complaint at ¶¶ 7, 12). Defendants have moved to dismiss the complaint under Superior Court Civil Rule 12(b)(6), contending that plaintiff's failure to plead special damages is fatal to the first two claims and that plaintiff's failure to plead facts demonstrating the elements of interference with prospective business relations and/or existing contractual relations is fatal to the third.

On a motion to dismiss, the Court reviews the complaint and accepts all well-pleaded allegations as true. *Spence v. Funk,* Del.Supr., 396 A.2d 967, 968 (1978). The motion must be denied if the " plaintiff may recover under any reasonable conceivable set of circumstances susceptible of proof under the complaint." *Id.* In general, a complaint need only set forth a short and plain statement of the claim. Superior Court Civil Rule 8(a). Only claims involving fraud, negligence or mistake must set forth circumstances with particularity. Superior Court Civil Rule 9(b).

I.

The complaint alleges that defendant indicated in a conversation with Roger Turk, a contractor hired by plaintiff for the Meadowood project, that "money from [the project] was being spent on other projects done by" plaintiff and that money was missing from the Meadowood project accounts, which the contractor understood to mean that plaintiff was stealing money from the partnership, and that defendant's attorney, acting at the direction of defendant, called plaintiff's other business partners to state that plaintiff had improperly appropriated $250,000. The complaint also alleges that defendants have communicated statements of a similar nature to David M. Miller, CPA, " representatives of major lending institutions in Delaware," and suppliers and tenants of the Meadowood project, as well as "numerous other individuals." The complaint states further that plaintiff is engaged in the business and profession of real estate developer and investor, the pursuit of which depends in large part upon his good name and reputation.

Defendants have moved for dismissal of Count I for the plaintiff's failure to plead special damages in his claim for slander. Plaintiff counters that special damages need not be pled in an action for slander *per se,* contending that the statements made by defendant and his agent maligned the plaintiff in his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 561

Not Reported in A.2d  Page 2

Not Reported in A.2d, 1992 WL 148002 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

business or imputed to him the commission of a crime of theft.

The categories of slander *per se,* which do not require proof of special damages, "are statements which: (1) malign one in a trade, business or profession, (2) impute a crime, (3) imply that one has a loathsome disease, or (4) impute unchastity to a woman" *Spence v. Funk, supra* at 970. Applying the standards described above for evaluating a complaint on a motion to dismiss, I find that Count I sufficiently alleges matters within categories (1) and (2) of slander *per se.* Therefore, plaintiff is not required to plead special damages for Count I of the Complaint.

*2 Defendants raise two other matters in connection with Count I. First, they contend that plaintiff's claim of libel for allegations made in a Chancery Court action of theft or mishandling of $250,000 by plaintiff cannot be actionable here, because statements in a complaint are absolutely privileged. Second, they contend that the statements allegedly made by defendant's attorney do not state a claim because, according to an affidavit filed in another action, this attorney was working for a third party, and furthermore that the statements were made in connection with litigation and therefore are privileged.

Statements are absolutely privileged if made in connection with judicial proceedings and the alleged defamation is relevant to some issue in that case. *Nix v. Sawyer,* Del.Super., 466 A.2d 407 (1983). Therefore, the allegations of statements made in another court proceeding are not a basis for a libel or slander claim.

The statements allegedly made by defendant's attorney may or may not be related to a judicial proceeding. In furtherance of this position, defendants have filed with their motion to dismiss a copy of a non-party affidavit originally filed in a Chancery action and ask the Court to take judicial notice of it. The affidavit sheds no light on this action at this time, since it says only that Williams apparently has another client connected with the business disagreement and it repeats verbatim the alleged slander. At best, defendants have raised a

another question of absolute privilege.

II.

With respect to Count II labelled "False Light Invasion of Privacy", which alleges the tort of " false light" invasion of privacy, defendants contend that plaintiff's failure to plead special damages is fatal to this claim. Plaintiff relies on the Restatement (Second) of Torts § 652E for the proposition that special damages are not necessary in this type of claim when the statements constituting the portrayal of plaintiff in a false light are slander *per se.*

The tort of false light invasion of privacy, recognized by the Delaware Supreme Court in *Barbieri v. News Journal Company,* Del.Supr., 189 A.2d 773 (1963), is defined in the Restatement (Second) of Torts § 652E (1977) as the tort of giving publicity to something that places the plaintiff in a false light before the public, the false light being highly offensive to a reasonable person, and knowing of or acting "in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." [FN1] Comment e to § 652E states that the restrictions for defamation are also applicable to this tort, using the example that "special damages [must] be pleaded and proved by the plaintiff in any case in which the defamatory words *are not actionable per se"* [emphasis added]. *See Martin Luther King v. American Heritage Products,* Ga.Supr., 296 S.E.2d 697 (1982).

Here, where plaintiff has alleged the elements of the tort of false light invasion of privacy based upon statements that are slanderous (and therefore defamatory) *per se,* plaintiff is not required to plead special damages.

III.

*3 With respect to Count III, which alleges tortious business interference with prospective and existing professional and business relations, defendants contend that plaintiff "must plead facts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 562

Not Reported in A.2d                                                                                           Page 3

Not Reported in A.2d, 1992 WL 148002 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

demonstrating" the elements of both claims. Plaintiff relies on the same position as he does in the foregoing contentions, namely that special damages need not be pled in a case that involves slander *per se.* The complaint alleges that statements intentionally made by defendants to the entities and individuals named in Count I caused those business entities and individuals 1) not to enter into business and/or contractual relations with the plaintiff and 2) to not to continue in actual contractual and/or business relations with the plaintiff.

The elements of the tort of business interference with prospective business relations are defined as
(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to complete or protect his business interests in a fair and lawful manner, [citations omitted]

*DeBonaventura v. Nationwide Mut. Ins. Co.,* Del.Ch., 419 A.2d 942, 947 (1980), *aff'd* Del.Supr., 428 A.2d 1151, 1153 (1981). The elements of the tort of business interference with a contract are (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury. [citations omitted]

*Irwin & Leighton v. W.M. Anderson Co.,* Del.Ch., 532 A.2d 983, 992 (1987).

With respect to the allegation of interference with a contract, the complaint fails to identify the parties to the contract or the contract which was breached because of defendant's alleged statements. With respect to the allegation of interference with prospective business relations, the complaint fails to identify the parties and the subject matter of the business opportunity as to which there was a reasonable probability of fruition which ended because of defendant's alleged statements. Since each of these allegations requires a showing of particular business dealing, special damages would be required to be alleged.

IV.

Based upon the foregoing considerations, defendants' motion to dismiss is GRANTED with respect to Count III, plaintiff's claim for interference with prospective and actual business relations, and is DENIED with respect to Counts I and II.

IT IS SO ORDERED.

> FN1. Publicity "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D, comment a (1977).

Del.Super.,1992.
Wyshock v. Malekzadeh
Not Reported in A.2d, 1992 WL 148002 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 563

https://print.westlaw.com/delivery.html?dest=atp&format=HTMLE&dataid=B0055800000...   1/24/2006

Westlaw.

Not Reported in A.2d                                                                                                 Page 1

Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

H
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware, New Castle County.
James L. MARTIN, Plaintiff,
v.
WIDENER UNIVERSITY SCHOOL OF LAW,
Anthony J. Santoro and Mitchell S. Bierman,
Defendants.
Civ.A. No. 91C-03-255.

Submitted: Aug. 29, 1991.
Decided June 4, 1992.
Memorandum Opinion Submitted: Aug. 12, 1991.
Decided June 17, 1992.

Upon Motion of Plaintiff for Summary Judgment-Denied,
Upon Motion of Defendants to Dismiss-Granted.

James L. Martin, pro se.
Somers S. Price, Jr., of Potter, Anderson & Corroon, for defendants.

OPINION

HERLIHY, Judge.
*1 Presently before the Court are two motions. The first motion filed is defendants' motion to dismiss for failure to state a claim under Superior Court Rule 12(b)(6). The second motion filed is plaintiff's motion for summary judgment.

Plaintiff James L. Martin [Martin] has filed suit in this Court against Widener University School of Law [FN1] [Widener], its dean Anthony J. Santoro [Santoro] and a Widener newspaper writer Mitchell S. Bierman [Bierman] [collectively "defendants"]. This last suit stems from a long-standing dispute between Martin and Widener.

When applying to Widener in 1979, Martin answered "no" to a question asking if he had ever been a patient in a mental, penal or correctional institution. This was not a correct answer as Martin had been institutionalized in 1975. [FN2] Widener later communicated to various state bar examiners Martin's incorrect answer. An avalanche of litigation, including this matter, has ensued.

FACTS

Some of the claims raised in this litigation result from events which occurred in the last several years since Widener's communication to various boards of bar examiners. On July 14, 1989 Dr. Eric Copeland [Copeland], who refers to himself as a client of Martin, called Santoro and tape-recorded their phone conversation. Martin claims Santoro slandered him in this conversation. Martin supplied transcribed portions of the conversation with his complaint. The details of that conversation will be discussed as necessary to resolve the allegations.

On February 18, 1990, *The Philadelphia Inquirer [Inquirer]* published an article detailing the controversy, "1 answer thwarts his law career" [Appendix A]. The article was sympathetic to Martin in that it highlighted the opinion of professors from two other law schools who stated they would have overlooked Martin's lack of candor and would not have communicated any related facts to the various bar examiners. The article also gave full detail to Martin's explanation of the events. Defendants claim Martin solicited the article by approaching the reporters. Martin denies he voluntarily sought the publicity.

The *Delaware Law Forum [Forum ]* is a small topical newspaper with circulation to Widener's students, faculty, alumni and the local legal community. Staff writer Bierman authored an article that summarized the *Inquirer* article. Bierman quoted extensively from and repeatedly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 564

Not Reported in A.2d                                                                                                    Page 2
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

referenced the *Inquirer* article to the degree of precise page number per quote. *Delaware Law Forum,* May 1990, Vol. 17, No. 6 [Appendix B]. Pertinent portions of the article will be discussed as is necessary to resolve the issues herein.

Martin seeks various forms of relief: (1) an injunction against Widener preventing any further dissemination of information about him without his consent; (2) a "declaratory judgment" to purge Widener's files on him which he contends are defamatory; (3) damages for alleged libel by the defendants Widener and Bierman; (4) damages against Widener and Santoro for slander; and (5) damages from all defendants for invading his privacy.

The basis of Martin's action is that several or all of the defendants (1) falsely reported his Widener graduation date, (2) recast his personal and academic history, (3) misrepresented his litigation against the law school, (4) falsely wrote about his contacts with certain hospitals which are the subject matter of other litigation, (5) falsely described his high school career, (6) falsely wrote about police contacts he had, and (7) falsely described his litigation in New Jersey and his bar status there. These claims will be detailed later as is necessary to resolve them.

*2 Defendants argue that the doctrine of *res judicata* or collateral estoppel and/or lack of merit to Martin's complaint entitle them to judgment in their favor. They also contend this Court lacks jurisdiction to grant Martin's request for equitable relief. Believing no genuine issues of material fact exist, Martin, in turn, contends he is entitled to summary judgment.

### STANDARD

A motion to dismiss for failure to state a claim upon which relief can be granted made pursuant to Superior Court Rule 12(b)(6) will not be granted if the plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint. *Spence v. Funk,* Del.Supr., 396 A.2d 967 (1978). In considering this motion, all well-pleaded allegations in the complaint must be accepted as true. *American Ins. Co. v. Material Transit, Inc.,* Del.Super., 446 A.2d 1101 (1982).

A motion for summary judgment may only be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Pullman, Inc. v. Phoenix Steel Corp.,* Del.Super., 304 A.2d 334 (1973). All facts and inferences are considered in a light most favorable to the non-moving party. *Shultz v. Delaware Trust Co.,* Del.Super., 360 A.2d 576 (1976).

### RES JUDICATA

As noted, Martin has filed a number of law suits involving claims against Widener. The claims he brought against Widener in one of those suits are summarized as follows:

### BACKGROUND FACTS.

The relevant facts, as alleged by Plaintiff [Martin] in his Complaint and various briefs, are as follows. Plaintiff claims that Polyclinic and Philhaven admitted and detained him against his will without cause or hearing. Apparently, this action occurred in 1975. Plaintiff alleges that Philhaven subsequently erroneously informed the Law Examiners that he had voluntarily admitted himself to Philhaven for psychiatric care. He alleges that L.V.C. [Lebanon Valley College], where Plaintiff had been an undergraduate student, falsified his transcripts and supplied "disinformation" to employees of Polyclinic and Philhaven, which was later given to the Law Examiners. Plaintiff alleges that Defendants James Reilly and John Feather, in their capacities as Lebanon County Legal Services attorneys, acted improperly by agreeing to represent Plaintiff in a proceeding against L.V.C., while they were associates of the law firm which was representing L.V.C. Plaintiff alleges that Defendants Judge Gates and Judge Walters improperly "issued orders against him" in his efforts to "get relief from the college's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 565

Not Reported in A.2d                                                                                                                    Page 3
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

disinformation scheme". Plaintiff alleges that [Widener] refused to send his transcript to the U.S. Department of Justice, thus preventing him from obtaining full-time employment. Plaintiff alleges that [Widener] also erroneously concluded that he had falsified his law school application by denying that he had been committed to a mental hospital, and later sent this information to each of the State Boards of Law Examiners to which Plaintiff had applied for admittance. Plaintiff alleges that the Law Examiners refused to admit him to the Bar after he passed the Bar Examination. Plaintiff alleges that the [Pennsylvania] D.O.T. improperly revoked his driver's license in 1981 by relying upon "not [sic] existent medical reports about a neuro-psychiatric condition", and that [Commonwealth National Bank] wrongfully dishonored his checks following his enrollment in law school after agreeing not to do so.

*3 *Martin*, 625 F.Supp at 1293, *aff'd.* 884 F.2d 1384 (3rd Cir.1989), *cert. denied,* 110 S.Ct. 411 (1989), *reh'g denied,* 110 S.Ct. 766 (1990).

In another action, filed in Pennsylvania, Martin made five claims against Widener and Santoro with their dispositions as follows:
]Widener] and [Santoro] are named, either specifically or as one of "the defendants" by plaintiff in five claims arising under federal statutes or the United States Constitution: the first claim (Rehabilitation Act of 1973 29 U.S.C. § 794); second claim (fourteenth amendment equal protection clause); third claim (first amendment right to freedom of association); fourth claim (fourteenth amendment guarantee of due process); and eleventh claim (Family Education Rights and Privacy Act 20 U.S.C. § 1232).
These defendants argue that plaintiff is barred from pursuing these claims, *inter alia,* under the doctrine of res judicata [sic]. The claims recited in plaintiff's instant complaint are based on the law school's determination that plaintiff made a knowing misrepresentation on his law school application and communicated this finding to the Pennsylvania Board of Law Examiners.
In 1985 plaintiff initiated civil action No. 85-53 in the United States District Court for the District of Delaware naming, *inter alia,* [Widener] as a defendant and alleging virtually identical facts and claims recited in the instant complaint. (See plaintiff's complaint filed in CA 85-53 attached as court exhibit B). In particular, plaintiff alleged [Widener] violated his rights provided under the Rehabilitation Act of 1973, 29 U.S.C. § 794; Title 7, 42 U.S.C. § 2000e-2; 42 U.S.C. §§ 1983, 1985 and 1986; Fourteenth amendment; and the Family Educational Rights and Privacy Act of 1976, 20 U.S.C. § 1232g.
All of these claims were dismissed by the District Court in December of 1985, (*Martin v. Delaware Law School of Widener University,* 625 F.Supp. 1288, 1302 (D.Del.1985)). Plaintiff, however, was permitted to file an amended complaint. In October of 1986, the court held that the amended complaint "merely rehashes the allegations in the original Complaint, which this Court has found to be insufficient" [sic] *Martin v. Delaware Law School of Widener University.* [sic], No. 85-53 Civ. 3. (D.Del October 16, 1986). The Amended Complaint was dismissed with prejudice. An appeal was unsuccessful. *Martin v. Delaware Law School of Widener University,* 625 F.Supp. 1288 (D.Del.1985), *aff'd* 884 F.2d 1384 (3rd Cir.1989), *cert. denied* 110 S.Ct. 422, *reh'g. denied,* 110 S.Ct. 766 (1990).
While seeking appellate relief, plaintiff filed civil action 88-0768 on March 22, 1988 in the United States District Court for the District of Columbia naming [Widener] and [Santoro], *inter alia,* as defendants (see court exhibit C). This complaint alleged facts and claims virtually identical to those averred in civil action 85-53 and was dismissed as "barred under the principles of res judicata [sic]." *Martin v. Delaware Law School of Widener University, Inc.,* et al., [sic] No. 88-0768 Civil (D.D.C. July 22, 1988).

*4 *Martin v. Walmer,* D.C.E.D.Pa., C.A. No. 90-2752 at 8-10, Huyett, J. (September 26, 1990).
All five claims were dismissed on grounds of claims or issue preclusion. *Id.* at 10-11; *Napier v. Thirty or More Unidentified Fed. Agents,* 855 F.2d 1080 (3rd Cir.1988).

It is unnecessary to catalogue the multitude of state and federal law suits Martin has filed in Pennsylvania, New Jersey, Delaware, Virginia and the District of Columbia. *See, e.g., Martin v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 566

Not Reported in A.2d   Page 4
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*Delaware Law School of Widener Univ.,* D.C.Del., C.A.No. 88-298-JJF (December 14, 1990) (memorandum opinion); Martin's opening brief before Third Circuit, Appeal No. 91-3026, January 24, 1991 [Appendix C].

Defendants assert that most of Martin's claims are barred by the principle of *res judicata* now also referred to as claim preclusion or by collateral estoppel, now also known as issue preclusion. The doctrine of claim preclusion holds that a final judgment upon the merits rendered by a court of competent jurisdiction operates as a bar and prevents relitigation of all grounds for, or defenses to, recovery that were then available to the parties before the particular court rendering the judgment in relation to the same claim regardless of whether all grounds for recovery or defenses were judicially determined. *Federated Dept. Stores v. Moitie,* 452 U.S. 394, 398 (1981); *Trans World Airlines, Inc. v. Hughes,* Del.Ch., 317 A.2d 114, 118 (1974) *aff'd,* 336 A.2d 572 (1975).

Defendants argue that the present action is grounded in the "basic transaction of his conduct in submitting his application, the related background and related events thereafter." Defendants contend this action is simply a repackaging of the old underlying claim concerning Widener's communication to various state bar examiners.

The modern transactional view of *res judicata* bars litigation between the same parties if the claims in the later litigation arose from the same "transaction" that formed the basis of the prior adjudication and not on the substantive legal theories or types of relief sought.
The modern transactional view of the doctrine ... does not require that the claim subsequently asserted be based on a same cause of action to be barred, but permits the doctrine to be invoked to bar litigation between the same parties if the claims in the later litigation arose from the same transaction that formed the basis of the prior adjudication....
The determination, therefore, whether the doctrine shall be invoked is now based on the underlying transaction and not on the substantive legal theories or types of relief which are sought. Under the modern rule, ordinarily, a transaction gives rise to only one claim regardless of the number of ways that the claim may be asserted.

*Maldonado v. Flynn,* Del.Ch., 417 A.2d 378, 381 (1980); *rev'd on other grounds sub nom.,* Del.Supr., 430 A.2d 779 (1981). The *Restatement (Second) of Judgments* § 24, comment b (1982) describes a "transaction" as:*5 In general, the expression connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether taken together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of the trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held precluded.

Despite defendants' portrayal of these occurrences as "one lengthy transaction", this Court recognizes a new transaction having occurred upon publishing the article in the school newspaper. The libel and invasion of privacy claims against Widener and Bierman arise from that new transaction. The act of publishing the *Forum* article is remote in time from the initial transaction, creating a new origin for the defamation and invasion of privacy claims. Any attempt to relitigate the initial transaction concerning the Widener communication of Martin's negative response on the law school application is precluded by the doctrine of *res judicata.* Applying this principle, the prayers for injunctive and declaratory relief are barred.

*Injunctive Action*

Martin seeks to enjoin Widener from issuing any statements concerning his medical condition, standing as an attorney or performance as a student. The basis for this claim stems from the initial transaction and despite repackaging with additional defendants and new forms of relief, the claim is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 567

Not Reported in A.2d                                                                                               Page 5
Not Reported in A.2d, 1992 WL 153540 (Del.Super.)
(Cite as: Not Reported in A.2d)

precluded by the doctrine of claim preclusion. A court of competent jurisdiction rendered a final judgment upon the merits. *Martin v. Delaware Law School of Widener University, et al.,* D.Del., C.A.No. 85-53-JJF, Farnan, J. (October 16, 1986). "It is simply not fair to require a defendant to return to court time and time again to defend against the same allegations as plaintiff moves from one theory of recovery to another." *Poe v. Kuyk,* D.Del., 448 F.Supp. 1231, 1234 (1978), *aff'd,* 591 F.2d 1336 (3rd Cir.1979), *cert. denied,* 442 U.S. 943 (1979).

Further, Martin's request for injunctive relief is not within the jurisdiction of this Court. Delaware Constitution, Article IV, §§ 7 and 10. While the request for such relief could be transferred to Chancery Court pursuant to 10 *Del.C.* § 1901, claim preclusion, at a minimum, otherwise prevents it.

*Declaratory Judgment*

Martin also seeks a declaratory judgment to alter and/or delete his school record "to show what actually occurred". "What actually occurred" has been litigated. *Martin v. Delaware Law School of Widener University, supra.* This claim, therefore, is barred by the doctrine of claim preclusion. Despite terming the relief requested as a declaratory judgment, Martin seeks affirmative mandatory relief by asking the Court to alter and/or delete portions of the record. Relief of this type is not within the subject matter jurisdiction of this Court. Further, Martin's request to purge Widener's files on him is in the nature of a request for a mandatory injunction. Such power lies in the Court of Chancery, not this Court. *Cf. Simmons v. Steiner,* Del.Ch., 108 A.2d 173 (1954), *rev'd on other grounds,* Del.Supr., 111 A.2d 574 (1955). However, as with his prayer for injunctive relief, claim preclusion prohibits transfer under 10 *Del.C.* § 1901.

COPELAND CONVERSATION

A

*6 Martin seeks damages from Widener and Santoro. Martin argues that Santoro's remarks were defamatory *per se.* He argues Santoro "tried to justify [Widener's] view that I should not be certified for practicing law ... imputed a mental disease upon me ... and interfered with my law licenses by claiming I am also dishonest...." It is clear that while the telephone conversation occurred in 1989, the underlying complaint against Santoro relates back to the fundamental, oft-litigated dispute between Widener and Martin. Martin has been uniformly unsuccessful in all that litigation. Thus, on this ground alone, his claim against Santoro is issue barred. *Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Neoplan USA Corp. v. Taylor,* D.C.Del., 604 F.Supp. 1540 (1985).

B

Martin's complaint included portions of an apparent transcription of the Santoro-Copeland telephone conversation. An alleged "authenticated", full transcription is included with Martin's motion for summary judgment. While there is insufficient authentication of the transcription, for purposes of the motions, the Court will view the transcription as full and accurate.

Copeland telephoned Santoro and asked to meet with him about alleged deficiencies in Widener's records on Martin. Santoro expressed a willingness to listen to Copeland but remarked that Widener was in litigation with Martin. There is a reference to a letter Copeland previously sent to Santoro with many people copied, including Delaware Governor Castle. [FN3] The conversation boils down to this alleged exchange:
Santoro: Basically, what is it you want?
Copeland: I want to know why the law school has not corrected misrepresentations about Mr. Martin's character. He did not lie on his answer to question number 6 [that is the question which inquired about prior mental institutionalization].

Copeland repeated a number of allegations and claims Martin has made in his numerous law suits.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 568