Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2004 WL 1368847 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Ivan M. TAYLOR, Plaintiff,
v.
DIVISION OF STATE POLICE, Department of Public Safety, State of Delaware, Defendant.
No. Civ.03-252-SLR.

June 15, 2004.

Jeffrey S. Goddess, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware. Geraldine Sumter, and Amy C. Reeder of Ferguson, Stein, Chambers, Adkins, Gresham & Sumter, P.A., Charlotte, North Carolina, for Plaintiff.
W. Michael Tupman, Deputy Attorney General, Delaware Department of Justice, Dover, Delaware, for Defendant.

### MEMORANDUM OPINION

ROBINSON, Chief J.

### I. INTRODUCTION

*1 Plaintiff Ivan Taylor filed suit against defendant, the Division of State Police, Department of Public Safety of the State of Delaware, alleging discrimination and retaliation under Title VII of the Civil Rights Act of 1964 with respect to his 1995 termination as a Delaware State Police Officer. At the close of discovery, defendant filed the pending motion for summary judgment. This court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons that follow, said motion shall be granted.

### II. BACKGROUND

Plaintiff was hired as a member of the State Police on January 21, 1989. During the course of his employment, plaintiff was generally assigned to Troop 7 in Lewes, Delaware. During the years 1990 to 1995, plaintiff served as a Trooper (1989 to 1992), a Trooper First Class (1992 to 1993), and a Corporal (1993 to 1995). (D.I.19, ex. 7)

On August 19, 1994, the Superintendent of the State Police (Colonel Ellingsworth at the time) [FN1] was notified about a citizen complaint alleging that plaintiff had made sexual overtures to a young woman whom he had stopped for a traffic violation. The matter was referred to Internal Affairs and an investigation of the incident was thereafter initiated. (D.I.19, exs.2, 5) The investigator interviewed the complainant, who related the following:

> FN1. Colonel Ellingsworth was Deputy Superintendent with the rank of Lieutenant Colonel from January 1992 to May 1994. From May 1994 to September 1999, he was Superintendent of the Delaware State Police with the rank of Colonel. (D.I.19, ex. 2)

On August 17, 1994, while driving home alone from work around midnight, a State Trooper (subsequently identified as plaintiff) pulled along side her car twice and then blocked her entry to her residence. Plaintiff asked if she had been drinking, and she said no. He asked if she had argued with her boyfriend because he had heard on his police radio that a woman was driving north on Route 1 and crying. She said she was fine, and plaintiff let her go without issuing a ticket. Plaintiff did not call the traffic stop in to the Sussex County Emergency Operations Center, as required by State Police procedures.

Two nights later, on August 19, 1994, the complainant was driving out of Rehoboth Beach towards Dewey Beach when she made an improper left turn. A Rehoboth Beach police officer stopped her but, before he could issue a citation, plaintiff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 2
Not Reported in F.Supp.2d, 2004 WL 1368847 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

arrived. The complainant recognized plaintiff as the State Trooper who had stopped her previously. Although the Rehoboth Beach police officer told plaintiff that there were no indications that the complainant had been drinking, plaintiff said he was taking over and ordered the complainant to drive into the rear of the parking lot of a nearby restaurant. Because it was after midnight, the restaurant was closed and the parking lot was unlit and dark. The complainant drove her car to the rear of the parking lot and plaintiff pulled in behind her so that neither car was visible from Route 1. Plaintiff thereafter administered field sobriety tests, which the complainant passed. No drugs were found when plaintiff asked the complainant to pull up her sweatshirt and pull open her boxer shorts. Plaintiff then ordered the complainant into his patrol car. Plaintiff told the complainant that she was beautiful and he wanted to date her. He asked whether she had ever dated a black man and showed her pictures of himself in a photo album while sharing details about his personal life. The complainant was in plaintiff's patrol car for over an hour. Plaintiff did not issue a traffic citation to complainant. (D.I.19, ex. 5)

*2 After conducting the above interview, the investigator checked the files at Internal Affairs. He found two prior complaints, both made by women plaintiff had arrested in 1992 and both involved allegations that he had made sexual overtures to them. The Internal Affairs investigations of these allegations had been inconclusive. Nevertheless, the investigator of the 1994 complaint was concerned that a pattern of conduct was emerging and determined to follow up. (D.I.19, ex. 5)

The investigator asked plaintiff's Troop Commander if he knew of any other complaints against plaintiff by women. The Troop Commander remembered one incident that occurred in 1993 but was never formally reported. The investigator interviewed the 1993 complainant, who reported that plaintiff had stopped her one evening on a dark side road, ostensibly because her car fit the description of a vehicle involved in a high-speed chase earlier that day. When the investigator checked police records, there was no report of any high-speed chase on the date in question involving a vehicle that matched the complainant's vehicle. (D.I.19, ex. 5)

Through information offered by the 1993 complainant, the investigator interviewed two other women who had been stopped by plaintiff [FN2] and subject to his sexual overtures. Both of these women were 16 years old at the time of their interaction with plaintiff. One of them actually went out on a date with plaintiff, after plaintiff failed to appear at her trial and the case against her was dismissed. (D.I.19, ex. 5)

>   FN2. One young woman was stopped for a traffic violation and one for underage drinking.

The investigator subsequently obtained all of plaintiff's traffic cases for 1992-1994. The data showed 25 cases dismissed, nolle prossed, reduced, or with a "not guilty" finding. The investigator contacted some of the female drivers involved. Two of the women interviewed indicated that plaintiff had broached with them the subject of dating. (D.I.19, ex. 5)

During the course of analyzing plaintiff's traffic stops, the investigator discovered that plaintiff had failed to appear for court six times in 1992-1993, and had failed to submit disposition explanation forms for 37 traffic cases in 1992-1994. After case review with Superintendent Ellingsworth, plaintiff was charged with seven counts of conduct unbecoming an officer, four counts of neglect of duty, and one count of official misconduct. (D.I.19, ex. 5)

Plaintiff exercised his rights under the State Police Rules and Regulations and the Law Enforcement Officer's Bill of Rights to have his case heard by a Divisional Trial Board. The charge sheet contained a list of names of potential board members and plaintiff had the right to strike three of the names. From the remaining names on the list, the Superintendent selected Major William H. Waggaman, III (as Presiding Officer), Captain Thomas F. Marcin (Commander of Troop 6), and Captain Thomas P. DiNetta (Commander of Troop 9) as the Trial Board. None of these officers were in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 603

Not Reported in F.Supp.2d                                                                                                              Page 3
Not Reported in F.Supp.2d, 2004 WL 1368847 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

plaintiff's chain-of-command. (D.I.19, ex. 4)

*3 The Trial Board held a three-day evidentiary hearing on February 21-23, 1995. The Trial Board heard testimony from four of the seven female complainants. Plaintiff was represented by counsel at the hearing and had the opportunity to present evidence and cross-examine defendant's witnesses. Plaintiff did not call any witnesses, but testified on his own behalf. (D.I.19, ex. 4)

The Trial Board unanimously found plaintiff guilty of nine of the ten charges against him. For all of these violations, it was the unanimous decision of the Trial Board to recommend to the Superintendent that plaintiff be suspended without pay with intent to dismiss. (D.I.19, ex. 4)

Consistent with the State Police Rules and Regulations, the Superintendent reviewed the Trial Board's factual findings and recommended penalty. The Superintendent concurred with the recommended penalty of termination, based on the following considerations: Plaintiff had targeted young women who were driving alone and at night. Whether he stopped them for pretextual traffic violations or based on bona fide charges, he had abused his authority as a police officer to try to coerce them into sexual favors. According to Superintendent Ellingsworth: "This was one of the most severe violations of the public trust that I had ever seen, and I was shocked by the disrepute such misconduct brought upon the Division." (D.I.19, ex. 2) Consequently, consistent with the State Police Rules and Regulations, the Superintendent wrote to the Secretary of the Department of Public Safety to recommend plaintiff's termination from employment. By state statute, 29 Del. C. § 8203(6), only the Secretary can terminate an employee of the Department of Public Safety. (D.I.19, ex. 2)

Plaintiff exercised his right of appeal to the Secretary. In a written decision dated May 24, 1995, the Secretary concurred with the recommendation of the Superintendent and terminated plaintiff's employment with the defendant. The Secretary found that the testimony of the complainants was not disputed or contradicted by plaintiff. She, therefore, found the evidence in the record to be "overwhelming and unrefutable" that plaintiff had "traded his badge ... in return for dates and/or personal gain." She concluded that dismissal was an appropriate remedy for such conduct. (D.I.19, ex. 7)

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are ' genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with ' specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 604

Not Reported in F.Supp.2d                                                                                     Page 4

Not Reported in F.Supp.2d, 2004 WL 1368847 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocomb Indus.*, 814 F.Supp. 1209, 1215 (D.Del.1993) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir.1987)).

## IV. DISCUSSION

### A. Title VII Discrimination Claim

**\*4** Discrimination claims under Title VII are analyzed under the framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff at bar must first establish a prima facie case of discrimination by proving that: (1) he is a member of a protected class; (2) he is qualified for the former position; (3) he suffered an adverse employment action; and (4) either non-members of the protected class were treated more favorably than the plaintiff, or the circumstances of the plaintiff's termination give rise to an inference of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Once a prima facie case is established, the burden of production shifts to the defendant (the former employer) to produce a legitimate nondiscriminatory reason for the adverse employment action taken against the plaintiff. *Id.* Because the burden of persuasion does not shift at this stage, the defendant's legitimate nondiscriminatory reason is not evaluated insofar as its credibility is concerned. *Id.* Once a legitimate nondiscriminatory reason is proffered, the presumption of discrimination created by the prima facie case "disappear[s]." *Id.* At this point, the plaintiff must proffer sufficient evidence for the factfinder to conclude by a preponderance of the evidence that the legitimate nondiscriminatory reasons offered by the defendant were not true, but were a pretext for unlawful discrimination. "That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.' " *Id.* In this regard, the prima facie case and the inferences drawn therefrom may be considered at the pretext stage, as the Supreme Court has explained that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147. Nevertheless, the ultimate question remains whether the employer intentionally discriminated. "[P]roof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct.' " *Id.* at 147 (quoting *St. Mary's Honor Center v.. Hicks*, 509 U.S. 502, 524 (1993)). "In other words, '[i]t is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." ' *Id.* (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. at 519).

#### 1. Plaintiff's prima facie case

In the case at bar, defendant does not challenge plaintiff's proof regarding the first three elements of his prima facie case, but contends that there is no evidence of record to show that defendant treated similarly situated white State Troopers more favorably, or otherwise to support the inference that defendant terminated plaintiff's employment because of his race.

##### a. Plaintiff's evidence relating to comparators

**\*5** Plaintiff provides evidence relating to eight white comparators. In order to raise an inference of discrimination based on the failure to discharge non-minority employees, plaintiff must demonstrate that: (1) the acts of the non-minority employees were of a "comparable seriousness," *McDonnell Douglas v. Green*, 411 U.S. at 804; and (2) the decision to discharge must have been made by the same supervisors, *Taylor v. Proctor & Gamble Dover Wipes*, 184 F.Supp.2d 402, 410 (D.Del.2002) , *aff'd*, 2002 WL 31716395 (3d Cir. Dec. 4, 2002).

(1) Trooper 1

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d   Page 5

Not Reported in F.Supp.2d, 2004 WL 1368847 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

In 1990, Trooper 1 was suspended for 8 hours for failing to appear for a scheduled trial, resulting in speeding charges being dismissed. That same year, Trooper 1 was officially reprimanded for yelling at and grabbing the arm of a citizen. The supervisors who reviewed and imposed the penalties did not include Colonel Ellingsworth. (D.I. 19, ex. 6; D.I. 23 at 1535-36)

(2) Trooper 2

In 1997, Internal Affairs investigated Trooper 2 for having improper sexual relations with a woman he had arrested during a domestic violence complaint. He ultimately was charged with conduct unbecoming an officer. Rather than face discipline, Trooper 2 resigned. The State Police referred the matter to the Attorney General's Office for possible criminal prosecution, and to the Council on Police Training to de-certify Trooper 2 as a police officer. Colonel Ellingsworth was the Superintendent at the time. (D.I. 19, ex. 2)

(3) Trooper 3

In 1992, after an Internal Affairs investigation, Trooper 3 was charged with conduct unbecoming an officer for taking nude photos of himself in his office. He waived his right to a Divisional Trial Board and pled guilty. The Superintendent (Colonel Graviet) demoted and transferred Trooper 3 and ordered him to get counseling. [FN3] (D.I. 19, ex. 3)

> FN3. Although plaintiff avers in an affidavit that Trooper 3 engaged in inappropriate behavior with a 17-year-old girl for whom he was a softball coach, the court will not consider such allegations in its analysis. First, there is no evidence of record to support plaintiff's averment; second, even if this conduct occurred, it did not relate to conduct undertaken as a police officer while on duty and, therefore, is not comparable to the charges against plaintiff.

(4) Trooper 4

In 1993, after an Internal Affairs investigation, Trooper 4 was charged with conduct unbecoming an officer for his trying to have continued contact with a woman who had ended their romantic relationship. Trooper 4 waived his right to a Divisional Trial Board and pled guilty. The Deputy Superintendent (Lt. Colonel Ellingsworth) suspended Trooper 4 for ten days, placed him on probation for one year, and ordered him not to have any contact with the woman. In 1994, Trooper 4 was disciplined for violating the no-contact order. Trooper 4 again waived his right to a Divisional Trial Board and pled guilty. The Deputy Superintendent (Lt. Colonel Pepper) suspended Trooper 4 for fifteen days. (D.I.19, ex. 3)

(5) Trooper 5

In 1993, Trooper 5 was investigated after the Department of Motor Vehicles reported he might be changing traffic tickets to reduce points for the drivers involved. Trooper 5 waived his right to a Divisional Trial Board and pled guilty to violating the State Police Rules and Regulations. The Superintendent (Colonel Graviet) suspended Trooper 5 for five days and placed him on probation for one year. (D.I.19, ex. 3)

(6) Trooper 7

*6 In 1993, Trooper 7 was investigated for use of excessive force in the case of a woman arrested for driving under the influence of alcohol. In the course of that investigation, the woman claimed that, while driving her to Troop 5 for processing, Trooper 7 offered to drop the DUI charge against her in exchange for oral sex. Internal Affairs concluded that these allegations were unfounded. After case review, the Superintendent (Colonel Graviet) agreed. (D.I.19, ex. 6)

In 1994, Trooper 7 was investigated for agreeing with a defense attorney to reduce a DUI charge, and for agreeing with another defense attorney to get a motor vehicle violation nolle prossed. Trooper 7

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d   Page 6
Not Reported in F.Supp.2d, 2004 WL 1368847 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

pled guilty to the charges and went to a penalty hearing before the Superintendent (Colonel Ellingsworth), who demoted Trooper 7 two ranks (from Corporal to Trooper), placed him on probation for one year, and transferred him from Troop 5 to Troop 3. (D.I.19, ex. 2)

### (7) Trooper 13

In 1995, Trooper 13 was charged with misconduct for pursuing a romantic relationship with a woman whose criminal complaint he was investigating. A Divisional Trial Board found Trooper 13 guilty of conduct unbecoming an officer, and recommended discipline to the Superintendent, but not his termination. Under the State Police Rules and Regulations, the Superintendent does not have the authority to suspend a State Trooper with intent to terminate unless the Divisional Trial Board recommends termination. Although the Superintendent (Colonel Ellingsworth) believed there were grounds for termination, he did not have the authority to do more than suspend the Trooper and impose additional, more severe, penalties, including transfer, remedial training, and a psychological evaluation. (D.I.19, ex. 2)

### (8) Trooper 14

In 2001, Internal Affairs investigated Trooper 14 for having a relationship with a 17-year old woman who was the victim of a crime Trooper 14 investigated. The Superintendent (Colonel Pepper) suspended Trooper 14 pending the outcome of the investigation. Internal Affairs found the charge of conduct unbecoming an officer substantiated. However, Trooper 14 resigned before the matter went forward to a disciplinary hearing. The State Police referred the matter to the Attorney General's Office for possible criminal prosecution, and Trooper 14 voluntarily gave up his police certification. (D.I.19, ex. 3)

Having reviewed the record, the court concludes that the circumstances of each of the above identified comparators are not sufficiently similar to plaintiff's circumstances so as to create an inference that plaintiff was terminated as a result of racial discrimination. With respect to Troopers 1, 3, 4, and 5, neither the charges nor the decision makers are comparable to those of plaintiff. With respect to Trooper 7, although Colonel Ellingsworth was a decision maker as to some of the charges, those charges clearly were not of comparable seriousness. With respect to Troopers 2 and 14, because these Troopers resigned before any disciplinary measures were imposed, there is no way of comparing the ultimate outcomes of their cases to that of plaintiff. Finally, with respect to Trooper 13, Colonel Ellingworth did not have the authority to terminate the employment of Trooper 13; therefore, Trooper 13's circumstances and those of plaintiff are not comparable.[FN4]

> FN4. In connection with his discussion of the white comparators, plaintiff asserts that "[w]hite officers who were accused of conduct unbecoming an officer were not subjected to extensive search and interrogation as plaintiff. For instance, the department shows no evidence that once it received a charge of inappropriate behavior involving a female with any of the white officers that it went through their arrest records and began calling female drivers to question whether they had had any problems with those officers." (D.I. 22 at 5) The record does not demonstrate that any of the other comparators had previous Internal Affairs investigations related to similarly serious citizen complaints, thus justifying further inquiry. Therefore, the court finds this argument unpersuasive evidence of discriminatory treatment.

### b. Plaintiff's generalized evidence of past racial discrimination at Troop 7

*7 Plaintiff contends that the record supports an inference of racial discrimination from the generalized evidence of past conduct at Troop 7. In 1990, there was an Internal Affairs investigation into the work environment for minority State Troopers stationed at Troop 7. As a result of that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 607

Not Reported in F.Supp.2d                                                                                                           Page 7
Not Reported in F.Supp.2d, 2004 WL 1368847 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

investigation, four State Troopers were implicated as having conducted themselves improperly; two State Troopers were charged and disciplined. Trooper 2 was charged with conduct unbecoming an officer and suspended 16 hours, with the option to forfeit vacation. Trooper 3 was charged with use of poor judgment and ordered to undergo counseling. (D.I. 23 at 1543-1602) Thereafter, in 1992, Trooper 1 was charged with conduct unbecoming an officer and suspended for 24 hours, with the option to forfeit vacation. (D.I. 23 at 1532)

The above evidence of misconduct does not constitute persuasive evidence of discriminatory treatment in the case at bar. The instances of misconduct are remote in time from the events at issue and, but for the 1992 incident, did not involve Colonel Ellingsworth as a decision maker.

2. Pretext

Even if the court were to conclude that plaintiff's evidence was sufficient to establish a prima facie case of racial discrimination, the court further concludes that plaintiff has not "cast sufficient doubt " upon defendant's proferred reasons for plaintiff's termination from employment to permit a reasonable factfinder to conclude that the reasons were fabricated. *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir.1996) (en banc). Defendant at bar has articulated legitimate nondiscriminatory reasons for the adverse employment action it has taken against plaintiff, in particular, the charges [FN5] that plaintiff abused his position of trust by targeting young women in the capacity of a police officer and making sexual overtures to them.

> FN5. Although plaintiff was charged with several violations of the State Police Rules and Regulations, the court has focused on the most serious of those charges involving conduct unbecoming an officer. Plaintiff denied the allegations made against him, but did not present any evidence to rebut these allegations.

A plaintiff can cast sufficient doubt on a defendant's legitimate nondiscriminatory reasons by showing " weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them 'unworthy of credence.' " *Id* . (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764-765 (3d Cir.1994)).

In this case, plaintiff presents the same evidence in the pretext stage as he proffered in support of his prima facie case. Having found that the evidence of record does not establish an inference of discrimination, it follows that the same evidence does not establish a pretext for racial discrimination. Plaintiff's employment was terminated because of serious charges related to his abuse of the public trust. None of the comparator evidence demonstrates that there were similarly situated white State Troopers who were treated more leniently. Likewise, the evidence of racial remarks made in the past by co-workers does not cast sufficient doubt on the disciplinary process at issue, because the co-workers were "outside the chain of decision-makers who had the authority to hire and fire plaintiff." *Gomez v. Allegheny Health Services, Inc.,* 71 F.3d 1079, 1085 (3d Cir.1995). In sum, plaintiff has not demonstrated any " weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" related to the charges lodged against him, such that a reasonable factfinder could rationally find them "unworthy of credence."

*8 For these reasons, the court concludes that the evidence offered by plaintiff in support of both his prima facie case and the pretext stage is insufficient to withstand defendant's motion for summary judgment.

B. Title VII Retaliation Claim

To establish a prima facie case of retaliation under Title VII, a plaintiff must establish that: (1) he engaged in protected activity; (2) defendant took adverse employment action against him; and (3) a causal link exists between the adverse employment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 8
Not Reported in F.Supp.2d, 2004 WL 1368847 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

action taken by defendant and the protected activity engaged in by plaintiff. *Kachmar v. SunGard Data Systems, Inc.,* 109 F.3d 173, 177 (3d Cir.1997).

Plaintiff at bar alleges that, after he complained about racially disparaging remarks by co-workers in 1990 and 1991, defendant retaliated against him by making him bring in a doctor's note before required under existing policy (1990; D.I. 23 at 1556-1557); making him salute a supervising officer at Troop 7 when others were not required to do so (1991); taking away his take home vehicle privileges when a white officer was not so deprived (1994); and giving him a written reprimand for failing to file a proper accident report when a white officer was not so disciplined (1994). Plaintiff maintains that the record, taken as a whole, shows a history of antagonism directed towards him and, from this evidence, a reasonable factfinder could conclude that defendant was motivated by retaliation to discharge him. (D.I. 22 at 17)

The record demonstrates that plaintiff did file official complaints about his treatment by co-workers during the period 1990 to 1992. Further, there is no dispute that plaintiff was subject to an adverse employment action by his termination of employment in 1995. [FN6] The question remains whether plaintiff has adduced any evidence of a causal connection between his complaints of discrimination in the early 1990s and his discharge in 1995.

> FN6. Plaintiff does not specifically allege, and the court does not consider, his other allegations of retaliation (the doctor's note, saluting, losing vehicle privileges, getting a written reprimand) to be adverse employment actions.

In this regard, the court notes that discovery has closed and, aside from the incident involving the doctor's note, the remaining events cited by plaintiff in connection with his retaliation claim are based on his declaration alone, with no supporting documentation from defendant's records. To put the point differently, plaintiff's proof of a "pattern of antagonism" is based on the timing of his accusations and little more. Generally, in the absence of "extremely close timing between the alleged protected activity and the adverse employment action, a plaintiff cannot rely on mere temporal proximity to establish a claim of retaliation." *Taylor v. Proctor & Gamble Dover Wipes,* 184 F.Supp.2d at 417 (citing *Clark County School District v. Breeden,* 532 U.S. 268, 273-274 (2001)). Plaintiff maintains that his first complaint in 1990 "began a series of events where the plaintiff was treated differently than similarly situated persons who had not made complaints about discrimination." (D.I. 22 at 17) *See Kachmar,* 109 F.3d at 178 ("[W]here there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference."). However, the court has found that plaintiff's proof in this regard is legally insufficient. Assuming that the events occurred, there were different decision makers involved in the events alleged and the comparators were not otherwise similarly situated. Therefore, the court finds that plaintiff has failed to provide evidence "sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Id.* at 177 (quoting *Zanders v. National R.R. Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir.1990)).

### V. CONCLUSION

\*9 For the reasons stated, the court concludes that defendant has demonstrated that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Therefore, defendant's motion for summary judgment shall be granted. An appropriate order shall issue.

D.Del.,2004.
Taylor v. Division of State Police
Not Reported in F.Supp.2d, 2004 WL 1368847 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03CV00252 (Docket) (Mar. 05, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 1949545 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Frederic M. STINER, Jr., Plaintiff,
v.
THE UNIVERSITY OF DELAWARE, Kent St. Pierre, the American Association of University Professors and Gerald M. Turkel, Defendants.
No. Civ. 02-312-SLR.

Aug. 27, 2004.

Laurence V. Cronin, and Roger D. Anderson, of Smith, Katzenstein & Furlow, LLP, Wilmington, Delaware, Mark B. Frost, and Bess Madway Collier, of Frost & Zeff, Philadelphia, Pennsylvania, for Plaintiff, of Counsel.
William E. Manning, and James D. Taylor, Jr., of Klett, Rooney, Lieber & Schorling, Wilmington, Delaware, for Defendants The University of Delaware and Kent St. Pierre, James N. Boudreau, and David A. Hitchens, of Morgan, Lewis & Bockius, LLP, Philadelphia, Pennsylvania. of counsel.
Benjamin C. Wetzel, III, and Natalie M. Ippolito, of Bailey & Wetzel, P.A., Wilmington, Delaware, for Defendants The American Association of University Professors and Gerald M. Turkel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On April 29, 2002, plaintiff Frederic M. Stiner, Jr. filed this action against defendants the University of Delaware (the "University"), Kent St. Pierre ("St.Pierre"), The American Association of University Professors ("AAUP"), Gerald M. Turkel ("Turkel") and David L. Colton ("Colton"), claiming: (1) violations by the University and St. Pierre of plaintiff's First Amendment rights under 42 U.S.C. § 1983; (2) retaliation against plaintiff by the University; (3) violations of the Due Process Clause of the Fourteenth Amendment by the University and St. Pierre under 42 U.S.C. § 1983; (4) breach of fiduciary relations by AAUP, Turkel and Colton; (5) self-dealing by AAUP, Turkel and Colton; (6) breach of contract by all defendants; and (7) defamation by the University and St. Pierre. (D.I.1)

On January 16, 2003, the court granted in part the University's and St. Pierre's joint motion to dismiss. (D.I.19) In that memorandum opinion, the court dismissed plaintiff's First Amendment retaliation claims and breach of contract claim. Plaintiff subsequently filed an amended complaint alleging a violation of the Federal Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Presently before the court are defendants' motions for summary judgment as to all of plaintiff's remaining claims. (D.I. 70; D.I. 77) For the reasons stated, the court will grant defendants' motions.

II. BACKGROUND

A. Plaintiff's Employment History

Plaintiff joined the faculty of the University in September 1982 as an associate professor of accounting. (D.I. 79 at 241-43) In 1984, plaintiff received tenure. (*Id.*) Throughout his employment with the University, plaintiff did not qualify for and did not seek a promotion to the position of full professor. (*Id.* at 240-41) On May 15, 2001, plaintiff retired from the University, effective December 31, 2001. (*Id.* at 118) Following the completion of the spring 2001 semester, plaintiff did not teach any additional courses at the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 610

Not Reported in F.Supp.2d                                                                                                     Page 2
Not Reported in F.Supp.2d, 2004 WL 1949545 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

University.

While on faculty at the University, plaintiff belonged to the AAUP, the union representing faculty members at the University. Between the years 1988 and 1990, plaintiff served as treasurer of the AAUP and later as a department representative to the AAUP. During the final two years of plaintiff's employment, his employment was governed by a collective bargaining agreement, which covered the period of July 1, 1999 through June 30, 2002 ("CBA"). (D.I. 79 at 38-55)

After leaving the University, plaintiff held consulting jobs while he searched for other teaching positions. (*Id.* at 253-54) In March 2002, plaintiff accepted a position as a full professor and department chairman at Long Island University. (*Id.* at 137, 255-56) His present salary is higher than the salary he received at the University and he anticipates receiving formal tenure. (*Id.* at 134, 255)

### B. Department Evaluation of Faculty Members

\*2 During the relevant time period, St. Pierre served as chairman of the accounting department at the University. As chairman, St. Pierre was responsible for scheduling workloads, assigning faculty to teach courses, addressing student concerns, evaluating department faculty, interacting with outside recruiters, department fundraising and coordinating with University administrators. (*Id.* at 188-92)

When St. Pierre arrived at the University in September 1993, the department had a written faculty evaluation procedure. (*Id.* at 1-6, 180-81) This document, the Promotion and Tenure Procedures & Criteria ("P & T document"), outlined three areas for faculty evaluation: teaching, scholarship and service. (*Id.* at 1-6) The principal purpose of the document was to guide promotion and tenure decisions. The use of the P & T document was consistent with the CBA's requirement which states that "[i]n the absence of [ ] written criteria, the chair/dean shall use the department's criteria for promotion and tenure." (D.I. 79 at 50)

### C. Grievance Procedure

The CBA establishes a procedure for AAUP members to assert grievances related to the "interpretation, application or claimed violation of any provision" of the CBA. (*Id.* at 44) That grievance procedure has four steps. First, a grievant must initiate action by filing a written grievance to the grievant's department chairperson ("Step 1 grievance"). (*Id.*) The written grievance must be filed within twenty-five days of the event giving rise to the grievance. Following receipt of the Step 1 grievance, a meeting must be held between the department chairperson and the grievant during which the issues may be addressed and a remedy, if possible, determined. In the event the grievant is not satisfied with the outcome of Step 1, he may file a written appeal to the dean or director ("Step 2 grievance"). (*Id.*) At Step 2, the dean or director must meet with the grievant in an effort to resolve the asserted grievance. If, following that meeting, the grievant remains unsatisfied with the resolution of his grievance, his recourse is to seek a formal grievance hearing ("Step 3 grievance"). (*Id.*) The Step 3 grievance appeal is conducted before a panel consisting of the vice president and two faculty members selected in a manner detailed in the grievance procedure. (*Id.*) Under the CBA in force at the relevant time period, a grievant could not pursue a Step 3 grievance without the concurrence of the AAUP. (*Id.*) Lastly, if the grievant is not satisfied with the outcome of the Step 3 grievance, and the AAUP concurs, the grievant may appeal for a hearing before a neutral arbitration panel selected in a manner detailed in the grievance procedure (" Step 4 grievance"). (*Id.* at 45)

### D. Plaintiff's 1997 Grievance

In the summer of 1997, plaintiff filed his first grievance relating to an annual evaluation. (*Id.* at 11-14) On that evaluation, he received a "below criteria" evaluation with respect to the teaching category but "at criteria" in his overall evaluation. The thrust of plaintiff's grievance, besides being malcontent with the actual evaluation, was that St. Pierre failed to meet with plaintiff prior to finalizing the evaluation. After St. Pierre met with plaintiff,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 3

Not Reported in F.Supp.2d, 2004 WL 1949545 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the matter was resolved without further progression in the grievance procedure. (*Id.* at 247, 252)

### E. Plaintiff's 1998 Grievance

*3 In 1998, plaintiff again received a "below criteria" evaluation with respect to teaching, but an "at criteria" evaluation overall. (*Id.* at 15-20) St. Pierre based the teaching evaluation on plaintiff's student-teacher evaluations. (*Id.* at 15-20, 224-25) Plaintiff filed a Step 1 grievance on the basis that neither the evaluation criteria nor the weight given each criterion had been shown to or explained to him. (*Id.* at 21) Plaintiff also complained that the student evaluations were not effective mechanisms for assessing the quality of teaching. (*Id.* at 21)

On June 1, 1998, St. Pierre denied plaintiff's Step 1 grievance. Plaintiff appealed that decision to the dean, who denied plaintiff's Step 2 grievance. On October 12, 1998, plaintiff filed a Step 3 grievance with the vice president for administration for the University. As this Step 3 grievance occurred under the previous CBA, concurrence from AAUP was not required. Plaintiff's grievance was resolved informally between him and the vice president prior to holding the Step 3 formal hearing.

In resolving the grievance, St. Pierre agreed to explain in writing his teaching evaluation methods which he did in a letter dated October 28, 1998. (*Id.* at 26) St. Pierre also agreed to permit plaintiff to address his concerns with the existing evaluation methods at an accounting department meeting. (*Id.* at 28-29)

On November 11, 1998, plaintiff addressed the department concerning the methods employed by St. Pierre. At that meeting, St. Pierre distributed the criteria he employed in evaluating faculty members. St. Pierre declined plaintiff's request to elaborate further on the method St. Pierre employed. The conversation then devolved into a group discussion of plaintiff's student evaluations and his teaching ability. [FN1] As a result of what plaintiff believed to be an improper discussion of his performance evaluation, he filed a complaint with the Faculty Welfare and Privileges Committee. (D.I. 75 at 122)

St. Pierre was asked to write a letter of apology to plaintiff. (*Id.* at 121)

> FN1. According to plaintiff, other faculty members were responsible for turning the discussion to plaintiff's evaluation. (D.I. 75 at 18)

### E. Plaintiff's Retirement

In the following two academic years, 1998 and 1999, plaintiff received annual evaluations indicating that he was "at criteria." (D.I. 79 at 37-37, 56-65, 278-79) On March 29, 2001, plaintiff received his 2000 annual evaluation in which he received a "below criteria" review for both teaching and research. (D.I. 75 at 11; D.I. 79 at 260-61)

On May 15, 2001, plaintiff signed a statement announcing his intent to retire from the University. (*Id.* at 118) According to plaintiff, he did so because of the evaluations he received and the harassment he endured. [FN2] (D.I. 75 at 10)

> FN2. Plaintiff characterizes this harassment as "public humiliation," "unfair teaching evaluations," assignment to teach lower-level courses, removal as chair of the Promotion and Tenure committee ("P & T committee"), and phone calls from St. Pierre in 1998 in which St. Pierre would curse and leave "snide" messages in his mailbox. (D.I. 75 at 10-10) The record does not reflect that plaintiff ever filed a grievance or other complaint with respect to his course assignments or the allegedly offensive calls from St. Pierre. Further, as plaintiff, by his option, did not hold the position of Full Professor, he was not technically eligible to be chairman of the P & T committee. (D.I. 79 at 1) It is not clear how he was originally elected chairman of that committee if he was not eligible.

Prior to announcing his retirement, plaintiff did not file a grievance regarding his 2000 annual evaluation and, under the CBA, any grievance

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 4
Not Reported in F.Supp.2d, 2004 WL 1949545 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

would have to be filed within twenty-five days of aggrieved event. (D.I. 79 at 44) According to the University's vice president for administration, plaintiff initially indicated that his decision to retire was due to an illness in the family. (D.I. 79 at 148-49)

*4 On June 17, 2001, in a letter to the University's vice president for labor relations, plaintiff for the first time stated that his retirement was actually the result of the harassment by St. Pierre. (*Id.* at 119-20) In that June 17, 2001 letter, plaintiff recounted his history with St. Pierre, asserting that this harassment stemmed from plaintiff's role as a whistle blower regarding an office lottery plan. [FN3] (*Id.*)

>   FN3. This lottery, to which plaintiff has frequently referred, relates to a proposal by St. Pierre for selecting faculty offices in the accounting department's newly renovated building. Apparently, St. Pierre's plan involved auctioning off the offices to the highest bidder as a way to resolve who would obtain the most choice office spaces. The money that would be raised from this lottery would go into the accounting department's discretionary fund. Following plaintiff's alerting the administration to this plan, St. Pierre abandoned the lottery for a less capitalistic selection method.

F. Plaintiff's 2001 Grievance

After announcing his retirement, plaintiff was informed of his final merit related pay raise. Consistent with his 2000 evaluation, plaintiff received a low merit pay increase of 0.35%. On August 28, 2001, plaintiff filed a Step 1 grievance regarding the merit pay increase he received in connection with his 2000 evaluation. (*Id.* at 122-23) In his August 28, 2001 grievance, plaintiff also repeated his claim that St. Pierre failed to disclose sufficiently the faculty evaluation criteria and his claims of harassment by St. Pierre. (*Id.*) He indicated, however, that his grievance related only to his pay increase. (*Id.* at 121)

At the same time, plaintiff sent a letter to the University's vice president of administration raising several issues relating to his pending retirement. In addition to the merit pay increase, plaintiff expressed his concern that St. Pierre and an associate dean would defame his character while he sought new employment, and requested that he be granted emeritus status with the University. (*Id.* at 121)

Because plaintiff's claims related to the department chairperson, he was directed to bypass Step 1 in the grievance procedure and meet directly with the dean. (*Id.* at 121, 146-47) On August 30, 2001, plaintiff and the dean met to discuss plaintiff's grievance and related concerns. These concerns were later summarized by plaintiff in a September 3, 2001 letter to the dean. (D.I. 79 at 124)

The dean offered to raise plaintiff's merit pay from 0.35% to 1.00%. (*Id.*) The dean, however, would not agree to change plaintiff's 2000 performance evaluation. [FN4] Plaintiff refused the dean's offer of a salary adjustment and chose to pursue a Step 3 grievance. (*Id.* at 284-85)

>   FN4. The court notes that, at the time he filed his grievance in August 2001, plaintiff's time for challenging his 2000 performance evaluation under the CBA had passed by several months.

Consistent with the terms of the CBA, to pursue a Step 3 grievance, plaintiff required the support of the AAUP. Following receipt of his grievance, the AAUP sent a letter to the University stating the following:
At their September 28, 2001 meeting, members of the AAUP Executive Council considered [plaintiff's] request for a Step 3 Grievance. As you know from plaintiff's Step 1 Grievance Statement ... [he] is requesting that the criteria for annual evaluations in his department be fully stated and published in the department.
The Executive Council would like to have this matter resolved by having [plaintiff's] request honored. Should this not come to pass after fourteen days after your receipt of this letter, the Executive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 613

Not Reported in F.Supp.2d

Page 5

Not Reported in F.Supp.2d, 2004 WL 1949545 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Council will permit [plaintiff] to file a Step 3 Grievance.

*5 (D.I. 79 at 128) Following receipt of the AAUP letter, the University requested that St. Pierre provide the criteria he employed in performing faculty evaluations. On October 16, 2001, in a letter to the University's vice president for administration, St. Pierre provided an explanation for his evaluation methodology. (*Id.* at 129)

The AAUP considered this response and, on November 14, 2001, met with University representatives. Plaintiff was not present for the November 14, 2001 meeting. In a letter dated November 15, 2001, the University's vice president for administration summarized the outcome of that meeting. First, she stated that "we agreed that the individual issues raised by [plaintiff] concerning his merit evaluation for the 2001-2002 year were tangibly addressed by [the dean]." (*Id.* at 135) Second, she indicated that an understanding had been reached that the then existing faculty evaluation metrics for the accounting department were not "well-defined" and that the P & T document lacked a clear method for applying general standards to specific cases. (*Id.*) Third, she stated that the University and AAUP agreed that the dean would ask for a complete review of the current evaluation system prior to the next merit evaluation cycle in 2002. Finally, she indicated that the AAUP would be involved in the process of developing the criteria and informed of the final outcome. (*Id.* at 135-36) Consistent with the agreement between the AAUP and the University, a new evaluation system was implemented in 2002. (*Id.* at 139, 150, 157-58)

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

IV. DISCUSSION

A. Section 1983 Claim

*6 Plaintiff alleges, pursuant to 42 U.S.C. § 1983, that he was unlawfully deprived of a property interest in violation of the Due Process Clause of the Fourteenth Amendment. Plaintiff claims that his retirement in May 2001 constitutes a constructive discharge. He then argues that he was denied due process because the grievance procedures were not followed.

A former public employee alleging a due process claim under § 1983 asserts a claim predicated upon a denial of procedural due process, not substantive due process. *See Nocholas v. Pennsylvania State*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 614

Not Reported in F.Supp.2d                                                                                                   Page 6
Not Reported in F.Supp.2d, 2004 WL 1949545 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*University*, 227 F.3d 133, 143 (3d Cir.2000) (holding that a college professor's tenure is not a property right subject to substantive due process protection). The Due Process Clause of the Fourteenth Amendment of the Constitution prohibits a state from depriving individuals of life, liberty or property without due process of law. U.S. Const. amend. XIV, § 1. The University is a state actor and, as a consequence, the Fourteenth Amendment is applicable to it. *See, e.g., Braden v. University of Pittsburgh*, 552 F.2d 948, 955-65 (3d Cir.1977). A plaintiff bringing suit under § 1983 alleging a state actor deprived him of procedural due process must demonstrate the following: (1) the plaintiff has a life, liberty or property interest subject to Fourteenth Amendment protection; and (2) the procedures available did not provide plaintiff with due process of law. *See Alvin v.. Suzuki*, 227 F.3d 107, 116 (3d Cir.2000).

In the context of a discharged public employee, the procedural due process analysis begins with whether the plaintiff's employment constituted a protected property interest. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972). Absent such an interest, there is no basis for a deprivation claim under § 1983. Whether a discharged employee has such a property interest is a question of state law. *Id.* It is well-established, and defendants do not dispute, that a tenured professor has such a property interest in his continued employment. *See Slochower v. Board of Higher Ed. of City of New York*, 350 U.S. 551, 559 (1956).

The second question is whether there was an involuntary separation. *See Leheny v. City of Pittsburgh*, 183 F.3d 220, 227-28 (3d Cir.1999). It is a general rule that a voluntary separation cannot serve as a basis for a due process claim and a resignation is presumed to be voluntary. *See Id.* Courts, however, will permit a plaintiff to show that his resignation had been procured under such circumstances that cannot be fairly characterized as voluntary. *See id.* In such cases, a plaintiff either must show that the resignation resulted from duress or coercion, or that the resignation was procured through misrepresentation or deceit. *See id.* at 228. Where a separated employee alleges that his resignation was coerced, he must show that the resignation resulted from employment conditions which, under an objective standard, are so unpleasant or so difficult that a reasonable employee in plaintiff's position would resign. *See id.* In the case at bar, there are no allegations of misrepresentations upon which plaintiff relied in retiring. Therefore, plaintiff's claim can only rest upon a showing of a coerced retirement.

*7 The sin qua nom of the constructive discharge theory, however, are violations of the law which precipitated the separation. *See Sanchez v. Denver Public Schools*, 164 F.3d 527, 534 (10th Cir.1998) (quoting *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986)) ("Constructive discharge occurs when 'the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." '). For example, where a plaintiff alleges constructive discharge in a Title VII case, the conduct complained of relates to the protected classifications under the statute. *See Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163 (3d Cir.2001) (holding that the employee was not constructively discharged as a result of age discrimination); *Shafer v. Board of Public Educ.*, 903 F.2d 243, 249 (3d Cir.1990) (remanding for factual determination as discriminatory maternity leave policy, which violated Title VII, resulted in a constructive discharge); *Goss v. Exxon*, 747 F.2d 885, 888 (3d Cir.1984) (affirming district court's findings that discrimination in violation of Title VII resulted in employee's constructive discharge). In the case at bar, plaintiff cannot rely upon any special statutory protections, but instead must demonstrate that the conditions leading to his involuntary separation taken as a whole violate procedural norms of due process. Plaintiff's claim must fail in this regard.

First, in considering plaintiff's constructive discharge claim, the court's inquiry is limited to the conditions relating to the voluntariness of his discharge. Consequently, his August 2002 grievance concerning his final merit pay allocation is wholly irrelevant. Even if the University's handling of plaintiff's grievance in the fall of 2002 was flawed or biased, it is inapposite as to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 615

Not Reported in F.Supp.2d                                                                           Page 7
Not Reported in F.Supp.2d, 2004 WL 1949545 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

voluntariness of plaintiff's retirement in the spring of 2002.

Second, plaintiff demonstrates no conduct which violated his right to due process in the events leading up to his retirement. The only possible conduct which might form a basis for such a claim was his 2001 annual evaluation. Plaintiff has repeatedly argued that the methodology employed by St. Pierre in evaluating professors was inappropriate. On more than one occasion plaintiff unsuccessfully sought to challenge that methodology when he was not content with his own evaluation. If the University did not have any system in place to challenge these evaluations, then plaintiff's claim might lie. But where, as here, an adequate procedure existed for addressing the concerns, no violation of due process exists. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532 (1985) ("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee."). In the case at bar, there was a grievance procedure with which plaintiff was quite familiar and that he concedes is not constitutionally inadequate. (D.I. 82 at 26) Instead of filing a timely grievance with respect to his 2001 evaluation, plaintiff retired. Plaintiff may not claim a deprivation of due process where he failed to engage the available procedures. *See Leheny,* 2183 F.3d at 229.

*8 Plaintiff points to other conduct by St. Pierre which he asserts were conditions leading to his retirement decision. The Due Process Clause of the Fourteenth Amendment, however, "is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood,* 426 U.S. 341, 350 (1976). The conduct of which plaintiff complains includes scheduling plaintiff to teach lower-level courses, harassing phone calls, public humiliation and his removal from the chairmanship of the P & T committee. Even if this conduct amounted to actionable harassment under state law, it does not constitute a deprivation of due process.

Consequently, the court finds that plaintiff has failed to put forth evidence by which a reasonable trier of fact could conclude that he was denied due process of law.

### B. LMRA Claim

Plaintiff's second claim is brought pursuant to § 301 of the LMRA, 29 U.S.C. § 195.[FN5] To establish a claim under the LMRA, plaintiff must show that the AAUP breached its duty of fair representation and that the University breached the CBA. *See DelCostello v. Int'l Brotherhood of Teamsters,* 462 U.S. 151, 163 (1983). Plaintiff has not shown evidence by which a reasonable jury could conclude that the AAUP breached its duty of fair representation.

> FN5. Defendants the University and St. Pierre assert that the University is not subject to the LMRA on the basis of Eleventh Amendment immunity. (D.I. 78 at 26) It then concedes that it is a distinction without a difference as the Delaware Public Employment Relations Act ("PERA"), to which it is subject, nonetheless follows federal law. The court notes that defendants' argument is incredible as it was they who first asserted that the LMRA applied to bar plaintiff's state contract claims. (D.I. 6 at 10-11)

The duty of fair representation is akin to that of a fiduciary with an obligation to represent its members "adequately as well as honestly and in good faith." *Air Line Pilots Ass'n, Intern. v. O'Neill,* 499 U.S. 65, 75 (1991). A union breaches its duty when its decision is discriminatory, arbitrary or in bad faith. *See Vaca v. Sipes,* 386 U.S. 171, 190 (1967). Under the CBA, a Step 3 grievance will only proceed if the "AAUP concurs." (D.I. 79 at 44) The crux of plaintiff's argument is that the AAUP breached its duty of fair representation because it concurred with plaintiff's Step 3 grievance, but failed to pursue the Step 3 grievance.

In support of his argument, plaintiff relies upon

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A - 616

Not Reported in F.Supp.2d                                                                                                                   Page 8
Not Reported in F.Supp.2d, 2004 WL 1949545 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

correspondence he received from Turkel relating to plaintiff's pursuit of a Step 3 grievance on October 4, 2001. (D.I.71, ex. K) Plaintiff's position is that this correspondence expresses the AAUP's concurrence. In the October 4, 2001 email received by plaintiff, Turkel writes, "[t]he Executive Council decided to support your grievance, but to attempt one more time to get the issues you raised resolved before we go to Step 3." (D.I.71, ex. K) To that end, the AAUP would contact the University directly and, if the matter were not resolved within fourteen days, it would support a Step 3 grievance. (D.I. 79 at 128) In its letter to the University, the AAUP indicated that the issue to be resolved was the publication of criteria for faculty evaluations. [FN6] (*Id.*)

> FN6. Notably, the AAUP did not express any concern with respect to plaintiff's final merit pay increase or his request for emeritus status. (*Id.*) Moreover, while the issues of plaintiff's final merit pay increase and emeritus status were apparent topics of conversation at his August 30, 2001 meeting with the college dean, they were not specifically raised as grievances in his August 28, 2001 grievance letter. (D.I. 79 at 121-22)
> The November 15, 2001 letter from the University reinforces the conclusion that the AAUP's conditional support for plaintiff's Step 3 grievance related only to the broad concern about annual evaluation criteria and not to plaintiff's specific evaluation. (D.I.71, ex. N) In that letter, the University stated that the University and AAUP agreed that the dean's meeting with plaintiff had "tangibly addressed" his individual grievances. (*Id.*)

Following a November 14, 2001 meeting between the University and the AAUP, a resolution was reached with respect to the issue regarding criteria for faculty evaluations. (D.I.71, ex. N) Consequently, plaintiff was informed that the AAUP and University jointly believed that the grievance raised by plaintiff was resolved by an agreement between the AAUP and the University.

*9 Regardless of whether the October 4, 2001 email constitutes a statement of concurrence vesting plaintiff with the right to a Step 3 hearing, the AAUP's failure to pursue that remedy is not, without more, a breach of its duty of fair representation. [FN7] To show a breach of its duty of fair representation, plaintiff has the burden of proving that the AAUP's decision to not pursue the Step 3 hearing was arbitrary, discriminatory or in bad faith. *See Vaca,* 386 U.S. at 190; *Hendricks v. Edgewater Steel Co.,* 898 F.2d 385, 388 (3d Cir.1990). Plaintiff has not shown the presence of any impermissible discriminatory factors that influenced the AAUP's decision. Plaintiff has not shown any evidence by which a trier of fact could conclude that the AAUP's decision was in bad faith or for an improper motive. Finally, there is no evidentiary basis to support the conclusion that the AAUP's decision was arbitrary. To the contrary, the evidence shows that the AAUP believed that it had reached a resolution with the University which addressed what it perceived to be the thrust of plaintiff's grievance, the faculty evaluation criteria, or at least resolved the AAUP's basis for supporting plaintiff's Step 3 grievance. Consequently, plaintiff's claim under § 301 of the LMRA fails.

> FN7. The court notes that if in fact the AAUP had concurred but nonetheless simply failed to pursue the Step 3 grievance, plaintiff was not without legal recourse. At that point, plaintiff's remedy would have been to seek an order in state court for specific performance. *See City of Wilmington v. Wilmington Firefighters Local 1590, Intern. Ass'n of Firefighters,* 385 A.2d 720, 724-25 (Del.1978). *See also Dykes v. Southeastern Pennsylvania Transportation Authority,* 68 F.3d 1564 (3d Cir.1995).

C. Defamation Claim

Under Delaware law, the tort of defamation consists of five elements: (1) the defamatory character of the communication; (2) publication; (3) the communication refers to the plaintiff; (4) the third party's understanding of the communication's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 9
Not Reported in F.Supp.2d, 2004 WL 1949545 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

defamatory character; and (5) injury. *See Bickling v. Kent General Hospital,* 872 F.Supp. 1299, 1307 (D.Del.1994).

In the case at bar, plaintiff has put forth no evidence to support a claim of defamation. Plaintiff initially alleged that defendants stated that he was " academically unqualified." (D.I. 82 at 34) Plaintiff has not produced evidence that this statement was ever made. [FN8] It is axiomatic that a statement which has not been made cannot constitute defamation.

> FN8. Plaintiff concedes that to arrive at this "statement," it is necessary to compare defendants' previous application for re-accreditation with its subsequent application for accreditation. (D.I. 83 at 14) On the first application, plaintiff was listed on the roster of professors who were considered "academically qualified." (D.I. 79 at 67) On the second application, plaintiff was not included on the list of " academically qualified" professors. (*Id.* at 91) This reclassification was explained previously in the document responsive to the accreditation team's input. (*Id.* at 84) Plaintiff essentially argues that it was defamatory for him to not be listed as " academically qualified."

Plaintiff also asserts that St. Pierre declined to provide an employment reference to Marshall University citing "legal issues." (D.I. 82 at 34) Plaintiff asserts this alleged defamatory remark for the first time in his answering brief. As plaintiff did not allege this unrelated event as a basis for defamation in either his first complaint or his amended complaint, he cannot now rely upon it to survive summary judgment. Moreover, the fact that plaintiff received an employment offer despite St. Pierre's statement belies plaintiff's claim of injury by defamation. (D.I. 79 at 254)

As plaintiff has produced no evidence to support his claim of defamation, the court concludes that defendants are entitled to summary judgment. [FN9]

> FN9. As the court has found that plaintiff's defamation claim fails, it need not reach the merits of defendants qualified immunity defense.

### D. Self-Dealing Claim

In his amended complaint, plaintiff alleged that Turkel and the AAUP's conduct with respect to the University constituted self-dealing. Plaintiff has conceded, however, that he has no evidence to support this claim and agreed to its dismissal. (D.I. 74 at 1) Consequently, defendants Turkel and AAUP are entitled to summary judgment as to that count.

### V. CONCLUSION

*10 For the reasons stated, the court will grant defendants' motions for summary judgment. An order shall issue.

D.Del.,2004.
Stiner v. University of Del.
Not Reported in F.Supp.2d, 2004 WL 1949545 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:02CV00312 (Docket) (Apr. 29, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.