IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CORPORAL B. KURT PRICE, et al., : | |
| : | |
| Plaintiffs, : | |
| : | C.A. No. 04-956-GMS |
| v. : | |
| : | |
| COLONEL L. AARON CHAFFINCH, et al., : | |
| : | |
| Defendants. : | |

| | |
|---|---|
| SERGEANT CHRISTOPHER FORAKER, : | |
| : | |
| Plaintiff, : | |
| : | C.A. No. 04-1207-GMS |
| v. : | |
| : | |
| COLONEL L. AARON CHAFFINCH, et al., : | |
| : | |
| Defendants. : | |

APPENDIX
TO ANSWERING BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SANCTIONS AND OTHER RELIEF

Date: February 8, 2006

Noel C. Burnham (DE Bar No. 3483)
Richard M. Donaldson (DE Bar No. 4367)
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
(302) 504-7840

*Counsel for Defendants*

## **TABLE OF CONTENTS**

Affidavit of Robert C. Moses..................................................................................B-1 – B-3

Excerpts from Deposition of L. Aaron Chaffinch ..................................................B-4 – B-8

Excerpts from Deposition of Thomas F. MacLeish................................................B-9 – B-13

E-mail from S. Neuberger to E. Ellis......................................................................B-14

*Paramount Pictures Corp. v. Davis*, Civ. A. No. 05-0316, 2005 WL 3303861
    (E.D. Pa. Dec. 2, 2005) .....................................................................................B-15 – B-24

*Positran Mfg, Inc. v. Diebold, Inc.*, Civ. A. No. 02-466 GMS, 2003 WL 21104954
    (D. Del. May 15, 2003) ....................................................................................B-25 – B-28

*Skeete v. McKinsey & Co., Inc.*, Civ. A. No. 91-8093 (PKL), 1993 WL 256659
    (S.D.N.Y. July 7, 1993) ...................................................................................B-29 – B-35

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| B. KURT PRICE, et al., | : | |
| Plaintiff, | : | |
| | : | C.A. No. 04-956-GMS |
| v. | : | |
| L. AARON CHAFFINCH, et al., | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| CHRISTOPHER FORAKER, | : | |
| Plaintiff, | : | |
| | : | C.A. No. 04-1207-GMS |
| v. | : | |
| L. AARON CHAFFINCH, et al., | : | |
| Defendants. | : | |

DECLARATION OF ROBERT C. MOSES

1. I am a Lieutenant in the Delaware State Police. I have been a police officer since 1981, and a Detective since 1986. I am the officer-in-charge of the Delaware State Police High Technology Crimes Unit.

2. I have been involved in numerous computer-related investigations and have drafted and executed search warrants pursuant to those investigations. I have extensive training in computer related investigations. I am certified by the International Association of Computer Investigative Specialists to conduct forensic examination on computers used in the commission of a crime.

3. The information contained in this declaration is based upon my own experience and expertise in the field, as well as information provided to me by other State of Delaware employees with knowledge about the issues addressed here.

B-1

-2-

4.  I was asked to provide information about DSP's computer practices regarding the creation and storage of electronic documents and communications. All desktop computers owned by DSP are connected to a local area network (LAN) server. All DSP users have personal profiles, which contain settings identifying the LAN server, which contains a personal folder for each user. Based upon rules established in the personal profile, documents created by a user will be saved by default to the user's personal folder on the LAN server, unless the user specifically designates another file path. Server files are not part of the "hard drive" of each desktop computer, but rather are saved to the LAN network – specifically, saved within each user's folder. Users are advised to store documents to their personal server folders so that they can be accessed statewide.

5.  DSP, like most major corporations, maintains a standard practice of maintaining a computer "image" of the basic computer settings, operating system and programs. Any new computer, problem computer or computer being re-assigned to a new user has the basic "image" re-loaded onto that computer. This has the effect of overwriting most information previously contained within the computer. This does not affect email or LAN server documents. This is done for reasons of security and efficiency due to the number of computers (approximately 925) within our organization. For example, repairing individual computers would not be as efficient as simply re-imaging it. Any computer which is no longer going to be used by DSP is "wiped" of all data.

6.  The procedures described in the paragraph above have been in use at DSP since at least 1999.

7.  In accordance with these procedures, shortly after Colonel Aaron Chaffinch retired in May of 2005, his computer was re-imaged and/or wiped. I did not personally perform this procedure. It would have been performed by an employee of the DSP Information Systems Support (ISS) who routinely perform these procedures. ISS re-images approximately 75 desktop and laptop computers per month.

8.  Email is the primary communication medium among DSP personnel and other state and local agencies. Email is processed through mail servers at the Delaware Department of Technology and Information (DTI) and does not involve the hard drive or desktop computer.

Many documents (e.g. Word, PDF files) that are shared between users are sent vial email. I requested and obtained from DTI the electronic mail account of Colonel Chaffinch, as well as Colonel MacLeish and Secretary Mitchell. This has been provided to me in a standard Microsoft Exchange format and is currently in my possession in a secure location at DSP HTCU.

9. DSP has contracted with Arch Paging to provide paging services to certain DSP employees. Arch provides pagers and maintains a website, www.arch.com, where anyone with an internet connection can connect to this webpage and send an alphanumeric page of up to 200 characters to any Arch customer that has a pager with alphanumeric capability. These messages are not stored by Arch. This information is not logged by DSP because it is only used for informal communications.

10. Blackberry provides wireless handheld email/communication to its users. All State email is sent or received through DTI's exchange mail servers. Blackberry devices are synchronized with the profile which has been created for the user on the DTI mail server. Emails sent to or from Blackberries are stored by DTI in the user's exchange mail folder in same manner as all other emails processed through the mail servers.

11. Colonel Chaffinch was assigned a Blackberry in October 2004. Colonel Chaffinch's emails obtained from DTI would include emails sent from and received by his Blackberry device.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: 2-2-06

Robert C. Moses

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE, et al.,   )
                                  )   Civil Action No.
            Plaintiffs,           )   04-956-GMS
                                  )
v.                                )
                                  )
COLONEL L. AARON CHAFFINCH, et al.,)
                                  )
            Defendants.           )
-----------------------------------
SERGEANT CHRISTOPHER D. FORAKER,  )
                                  )   Civil Action No.
            Plaintiff,            )   04-1207-GMS
                                  )
v.                                )
                                  )
COLONEL L. AARON CHAFFINCH, et al.,)
                                  )
            Defendants.           )

            Deposition of L. AARON CHAFFINCH pursuant to notice at the law offices of The Neuberger Firm, P.A., 2 East 7th Street, Wilmington, Delaware, beginning at 9:35 a.m. on Tuesday, August 30, 2005, before Renee A. Meyers, Registered Professional Reporter and Notary Public.

APPEARANCES:

            MARTIN D. HAVERLY, ESQ.
            STEPHEN J. NEUBERGER, ESQ.
            THE NEUBERGER FIRM, P.A.
              2 East 7th Street - Suite 302
              Wilmington, Delaware  19801
              for the Plaintiffs,

                    WILCOX & FETZER
         1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477

Case 1:04-cv-00956-GMS    Document 93-2    Filed 02/08/2006    Page 7 of 10

Price, et al.                              v.                       Chaffinch, et al.
L. Aaron Chaffinch              C.A. # 04-956-GMS                   August 30, 2005

Page 2

1  APPEARANCES (Continued):
2          EDWARD T. ELLIS, ESQ.
           MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
3          123 South Broad Street
           Philadelphia, Pennsylvania 19109
4          for the Defendants.
5  ALSO PRESENT:
6  WAYNE J. WARREN
7          L. AARON CHAFFINCH,
8       the witness herein, having first been
9       duly sworn on oath, was examined and
10      testified as follows:
11 BY MR. NEUBERGER:
12 Q.  Colonel, my name is Steve Neuberger and I am a
13 lawyer for Sergeant Chris Foraker and for Master
14 Corporals Wayne Warren and Kurt Price; do you
15 understand that?
16 A.  Yes, sir.
17 Q.  You have testified in court before, haven't
18 you?
19 A.  Yes, sir.
20 Q.  And you have had your deposition taken before,
21 haven't you?
22 A.  Yes, sir.
23 Q.  I am going to ask you some questions and the
24 court reporter here is going to type up your answers

Page 3

1  to those questions; do you understand that?
2  A.  Yes, sir.
3  Q.  And we have to take turns talking. If we each
4  talk at the same time, the court reporter, although
5  she is very good, can't get everything down; do you
6  understand that?
7  A.  Yes, sir.
8  Q.  And you have to verbalize your answers. For
9  example, instead of nodding your head, say yes, or
10 instead of shaking your head, say no.
11 A.  Yes, sir.
12 Q.  And after we are done here today, you will have
13 an opportunity to review the transcript of your
14 answers and correct any typographical errors that may
15 occur; do you understand that?
16 A.  Yes, sir.
17 Q.  If I ask you a question and you don't
18 understand that question, just ask me to rephrase it
19 and I would be happy to rephrase it; okay?
20 A.  Yes, sir.
21 Q.  It's very important, I do not want you to
22 guess; do you understand that?
23 A.  Yes, sir.
24 Q.  Are you taking any medications today that would

Page 4

1  prevent you from testifying truthfully or remembering
2  accurately?
3  A.  No, sir.
4  Q.  If you need any breaks, if you need to go to
5  the john, if you need to stretch out your back, if you
6  need to do some yoga, just let me know and I will be
7  happy to take a five-, ten-minute break?
8  A.  Yes, sir.
9  Q.  You have taken an oath to tell the truth?
10 A.  Yes, sir.
11 Q.  And you understand the significance of that
12 oath?
13 A.  Yes, sir.
14 Q.  And you understand that today I am going to be
15 asking you some questions arising out of the events
16 related to two different lawsuits; do you understand
17 that?
18 A.  Yes, sir.
19 Q.  There is the lawsuit of Foraker v. Chaffinch
20 and MacLeish; do you understand that?
21 A.  Yes.
22 Q.  And then there is a lawsuit Price, Warren, and
23 Foraker v. Chaffinch and MacLeish; do you understand
24 that?

Page 5

1  A.  Yes, sir.
2  Q.  What's your full name?
3  A.  Leonard Aaron Chaffinch.
4  Q.  And where were you born?
5  A.  Milford, Delaware.
6  Q.  And where were you raised?
7  A.  Bridgeville, Delaware.
8  Q.  What's your education?
9  A.  Bachelor's degree from the University of
10 Delaware.
11 Q.  Where did you go to high school at?
12 A.  Woodbridge High School.
13 Q.  And what was your first year with the Delaware
14 State Police?
15 A.  1978, I started.
16 Q.  And you recently retired; correct?
17 A.  May the 5th, 2005, was my last day.
18 Q.  Now, when were you promoted to colonel?
19 A.  February the 8th, 2002.
20 Q.  When were you promoted to lieutenant colonel?
21 A.  May 30th, 2001.
22 Q.  Do you recall when you were promoted to major?
23 A.  October 15th, 1999.
24 Q.  Were you ever troop commander down at Troop 5?

Page 158

1  colonel of the Delaware State Police, is one of the
2  factors that you considered whether the person you are
3  making the decision about had been personally loyal to
4  you as an individual?
5     A.  Well, you see, when you are a superintendent of
6  the State Police, you make decisions about all kinds
7  of things.
8     Q.  Okay.
9     A.  Everything is not personnel issues. There is
10 all kinds of things that you make decisions about
11 daily.
12        If you are talking about putting someone
13 in a high position or something like that, any person
14 certainly would properly lean towards somebody who has
15 been loyal to them as opposed to somebody who has been
16 disloyal. That's just common sense.
17    Q.  So, is that a factor that you would consider
18 when making personnel decisions, if we can narrow that
19 focus?
20        MR. ELLIS:  Object to the form of the
21 question.
22        THE WITNESS:  That would be one part of
23 the decision.
24 BY MR. NEUBERGER:

Page 159

1     Q.  Right. That would be --
2     A.  Depending on what you are filling -- if you are
3  filling a position, depending on the -- the
4  qualifications of the different ones that are -- that
5  you are looking at and the experience and -- there is
6  all kinds of different things that come into play.
7  But if everything -- everything else being equal,
8  sure, personal loyalty may -- may kind of tip the
9  scale, if you will.
10    Q.  Got you. Okay.
11        Now, did there come a time when you sent
12 Chris Foraker, Wayne Warren, and Kurt Price for
13 fitness for duty exams?
14    A.  Not me.
15    Q.  Are you saying you did not make that decision?
16    A.  That's right. The lieutenant colonel made
17 those decisions.
18    Q.  Would that be --
19    A.  Tom MacLeish. Yeah. He is the colonel now.
20    Q.  Did he talk to you about that decision?
21    A.  He just told me that they are going to be sent.
22 But now we need probably to know what the time frame
23 is because there is like five months when I wasn't
24 even working. From October 27th of '04, until March

Page 160

1  25th of '05, I wasn't working, so I wasn't kept
2  up-to-date.
3     Q.  We will focus on the time period from April of
4  2004 through September of 2004.
5     A.  Okay. Yes, sir.
6     Q.  Are you aware that, during that time frame, my
7  clients were sent for fitness for duty exams?
8     A.  I am aware that they were sent, but as far as
9  the time frame, I am not real, you know, I am not real
10 -- I have no idea exactly when it was.
11    Q.  But at some point during -- you are aware that
12 they were sent?
13    A.  I am aware that they were sent. I couldn't
14 even tell you if it was during that time frame that
15 you just enumerated.
16    Q.  Do you know why they were sent for fitness for
17 duty exams?
18    A.  Not exactly. I don't know all the, you know,
19 the details.
20    Q.  I think you indicated --
21    A.  I know that decision was made.
22    Q.  And you indicated that then Lieutenant Colonel
23 MacLeish made that decision?
24    A.  That's right. See, the lieutenant colonel's

Page 161

1  position, the range -- the training, personnel,
2  discipline all comes under the deputy superintendent,
3  so --
4     Q.  Did he have to run that decision by you?
5     A.  No.
6     Q.  Did he run that decision by you?
7     A.  He just let me know about it.
8     Q.  Did you have the authority to say, No, don't do
9  that?
10    A.  Sure.
11    Q.  Did you tell him, No, don't do that?
12    A.  No, I did not. And I didn't know all the
13 particulars that he knew. I wasn't -- I wouldn't do
14 that without knowing what's going on.
15    Q.  Okay.
16    A.  I have no reason to believe that he wasn't
17 making the right decision. If I had had a reason to
18 believe he wasn't making the right decision, maybe I
19 would have looked into it farther, but I have no
20 reason to believe that. He was working with human
21 resources and whoever else was involved in it.
22    Q.  And are you indicating that you don't know why
23 he made that decision?
24    A.  Right. I don't know all the particulars.

| Price, et al. | | Chaffinch, et al. |
|---|---|---|
| L. Aaron Chaffinch | v.<br>C.A. # 04-956-GMS | August 30, 2005 |

Page 162

1   Q.   Do you know if Wayne Warren and Kurt Price
2   passed their fitness for duty exams?
3   A.   No, I don't.
4   Q.   Do you know if Chris Foraker passed his fitness
5   for duty exam?
6   A.   I am thinking I remember that he did, but I am
7   not 100 percent sure.  I think he did.
8   Q.   Do you know that Chris Foraker was sent for a
9   second opinion on his fitness for duty exam?
10  A.   I do now.
11  Q.   Did you know it then?
12  A.   I am not sure.  Another thing was the time
13  period.
14  Q.   So, today, the end of August, 2005, are you
15  aware of the fact that Chris Foraker was sent for
16  three fitness for duty exams?
17  A.   No.
18  Q.   Do you think that's normal to send an officer
19  for three fitness for duty exams?
20  A.   I have no reason to -- to believe it's normal
21  or abnormal.  I don't know.
22  Q.   Have you ever been sent for three consecutive
23  fitness for duty exams?
24  A.   No.  I have never been sent for one.

Page 163

1   Q.   Do you know why Sergeant Foraker was sent for
2   three fitness for duty exams?
3   A.   No, I do not.
4   Q.   Now, did there come a time when you put Kurt
5   Price and Wayne Warren or light duty?
6   A.   Lieutenant colonel did.
7   Q.   So, you are telling me that you did not make
8   that decision?
9   A.   That's correct.
10  Q.   Were you involved in that process at all?
11  A.   No.
12  Q.   As colonel, did Lieutenant Colonel MacLeish run
13  that decision by you?
14  A.   He may have run it by me after the fact.
15  Q.   So, you are telling me --
16  A.   I am sure he was working hand-in-hand with
17  human resources and Captain Yeomans.
18  Q.   So you are indicating to me that he only ran it
19  by you after the fact?
20  A.   Yes.  And that -- and I am not sure of that
21  because it depends on when that was.
22  Q.   So, he could have run it by you before he did
23  it; you just don't remember?
24  A.   No.  I am saying when this occurred, depending

Page 164

1   on what date that was, because, like I said, I wasn't
2   there a lot --
3   Q.   I will represent to you that Kurt Price and
4   Wayne Warren were put on light duty on June 18th of
5   2004.
6   A.   Okay.
7   Q.   So, focus around that time --
8   A.   Thank you.
9   Q.   -- time frame.
10  A.   Yes, sir.
11  Q.   Do you know if Lieutenant Colonel MacLeish ran
12  that decision by you before --
13  A.   No.  He told me that -- that that had occurred.
14  Q.   So he told you after the fact?
15  A.   Yeah.
16  Q.   He did not tell you before the fact?
17  A.   No.
18  Q.   So, when you found out about it after the fact,
19  did you say, That's the wrong decision?
20  A.   No.
21  Q.   Did you say, You made a mistake, Tom MacLeish?
22  A.   I sure didn't.
23  Q.   Did you think he had made the right decision?
24  A.   I had no reason to believe anything different

Page 165

1   from that.
2   Q.   As the colonel of the State Police, you had the
3   authority to overrule that decision if you wanted to;
4   isn't that right?
5   A.   Sure.
6   Q.   Because you are the colonel and you can -- you
7   are the ultimate, I guess, decision maker in the State
8   Police; would that be fair to say?
9          MR. ELLIS:  Object to the form of that
10  question.
11         THE WITNESS:  The ultimate decision maker?
12  I have never actually heard it said that way before,
13  but --
14  BY MR. NEUBERGER:
15  Q.   How would you phrase it?
16  A.   I am the superintendent of the State Police.
17  Q.   And inherent in that position, you are the --
18  you have the final say on --
19  A.   A lot of things.
20  Q.   And would whether someone goes on light duty be
21  one of those things?
22  A.   Not necessarily because the way it's set up,
23  the lieutenant colonel, that comes under the
24  lieutenant colonel's purview, just, like I said, all

42 (Pages 162 to 165)

Case 1:04-cv-00956-GMS   Document 93-2   Filed 02/08/2006   Page 10 of 10

Price, et al.                                    v.                              Chaffinch, et al.
L. Aaron Chaffinch              C.A. # 04-956-GMS                August 30, 2005

Page 166

1  discipline, all personnel issues, and all training
2  issues come under the lieutenant colonel.
3   Q.  Are you aware that in the spring of 2005, Kurt
4  Price and Wayne Warren were ordered to separate from
5  the division?
6   A.  No, I am not.
7   Q.  Are you telling me that you knew nothing about
8  that?
9   A.  The spring -- when in the spring?  Do you know?
10   Q.  May 12th of 2005.
11   A.  I was retired.
12   Q.  Did you hear about that before you retired?
13   A.  No.
14   Q.  I think you said you retired on May 5th of
15  2005?
16   A.  Mm-hmm.
17   Q.  So, was that decision run by you prior to your
18  retirement?
19   A.  No.
20   Q.  Did then Lieutenant Colonel MacLeish talk to
21  you about it prior to your retirement?
22   A.  No.
23   Q.  I believe you were back on full duty in the end
24  of March?

Page 167

1   A.  March 24th.
2   Q.  Of 2005?
3   A.  Mm-hmm.
4   Q.  And then you were on full duty until May 5th of
5  2005?
6   A.  Yes.
7   Q.  So, is it your testimony that during that time
8  period, Lieutenant Colonel MacLeish never told you
9  about his order to Kurt Price and Wayne Warren to
10  separate from the division?
11   A.  I don't remember him telling me that, and
12  during those six weeks or so that I was back, I was
13  out of state two different weeks.
14   Q.  So, you are telling me that you had no
15  involvement in that process?
16   A.  That's correct.
17   Q.  Now, Colonel, did you ever become aware of
18  Sergeant Foraker being thrown out of the commanders
19  and section chief meetings by then Lieutenant Colonel
20  MacLeish?
21   A.  Could you restate the first part of that?
22   Q.  Did you ever find out that Sergeant Foraker was
23  thrown out of a commanders and section chiefs meeting
24  by then Lieutenant Colonel MacLeish?

Page 168

1   A.  I saw the lieutenant colonel -- I was at that
2  meeting.  I saw the lieutenant colonel go over to
3  Sergeant Foraker and talk to Sergeant Foraker, and
4  then I saw Sergeant Foraker get up and leave the room.
5   Q.  Were you --
6   A.  And subsequently -- I wasn't a part of it until
7  after the fact when the lieutenant colonel came and
8  told me.
9   Q.  Was Lieutenant Colonel MacLeish acting at your
10  direction?
11   A.  No.
12   Q.  Did you tell Lieutenant Colonel MacLeish to get
13  Sergeant Foraker out of the room?
14   A.  No, I did not.
15   Q.  What did Lieutenant Colonel MacLeish say to you
16  when he came back after Sergeant Foraker left the
17  room?
18   A.  Well, I think I probably asked him, Why is
19  Sergeant Foraker here?, because we didn't have
20  sergeants come to the commanders meeting, and he said
21  he took care of it or whatever.  But I hadn't had any
22  conversation prior to the lieutenant colonel going
23  over and talking to him.
24   Q.  Are you aware that Sergeant Foraker's job

Page 169

1  responsibilities at the FTU have been decreased since
2  he was reinstated there in December of 2003?
3      MR. ELLIS:  Objection to the form of the
4  question.
5      THE WITNESS:  No, I am not aware, and I
6  don't believe that they have.
7  BY MR. NEUBERGER:
8   Q.  Is that something which you think you would
9  normally be aware of if something like that were to
10  occur?
11   A.  Yes.
12   Q.  And you are indicating that you did not order
13  that and that that did not happen, period?
14   A.  I am saying that I was not aware of the fact
15  that they have been diminished.  No, I did not order
16  it.  And if they were diminished, I am not aware of
17  it.
18   Q.  So, you are indicating that it's possible that
19  it could have happened but you just have no personal
20  knowledge one way or the other?
21   A.  I have no knowledge one way or the other.  I
22  don't believe that it did, but I have no knowledge of
23  it one way or the other.
24   Q.  Are you aware that beginning in December of