```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
CORPORAL B. KURT PRICE,     )
CORPORAL WAYNE WARREN,      )
and SERGEANT CHRISTOPHER    )
D. FORAKER,                 )
                            )
        Plaintiffs,         )
                            )
        v.                  )  C.A. No. 04-1207
                            )
COLONEL L. AARON CHAFFINCH, )
individually and in his     )
official capacity as        )
Superintendent of the       )
Delaware State Police;      )
LIEUTENANT COLONEL THOMAS   )
F. MacLEISH, individually   )
and in his official         )
capacity as Deputy          )
Superintendent of the       )
Delaware State Police;      )
DAVID B. MITCHELL, in his   )
official capacity as the    )
Secretary of the Department )
of Safety and Homeland      )
Security of the State of    )
Delaware; and DIVISION OF   )
STATE POLICE, DEPARTMENT OF )
SAFETY AND HOMELAND         )
SECURITY, STATE OF          )
DELAWARE,                   )
                            )
        Defendants.         )
```

          Deposition of COLONEL THOMAS F. MacLEISH
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 9:30 a.m., on Tuesday,
July 19, 2005, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.
                      WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
                      (302) 655-0477

Case 1:04-cv-00956-GMS   Document 93-3   Filed 02/08/2006   Page 2 of 13

Price, et al.                                                        Chaffinch, et al.
Thomas F. MacLeish           C.A. # 04-1207                          July 19, 2007

Page 2

```
 1  APPEARANCES:
 2       STEPHEN J. NEUBERGER, ESQUIRE
         MARTIN HAVERLY, ESQUIRE
 3       THE NEUBERGER FIRM, P.A.
           2 East 7th Street - Suite 302
 4         Wilmington, Delaware 19801
           for the Plaintiffs
 5
         EDWARD T. ELLIS, ESQUIRE
 6       MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
           123 South Broad Street
 7         Avenue of the Arts
           Philadelphia, Pennsylvania 19109
 8         for the Defendants
 9  ALSO PRESENT:
10       SERGEANT CHRISTOPHER D. FORAKER
         CORPORAL B. KURT PRICE
11       ALISON LASSETER
12               - - - - -
```

Page 3

```
 1          COLONEL THOMAS F. MacLEISH,
 2          the witness herein, having first been
 3          duly sworn on oath, was examined and
 4          testified as follows:
 5  BY MR. NEUBERGER:
 6   Q.  Colonel, my name is Steve Neuberger, and I'm an
 7  attorney representing Master Corporal Price and Master
 8  Corporal Wayne Warren. Are you aware of that?
 9   A.  Yes.
10   Q.  Have you ever testified in court before?
11   A.  Yes, I have.
12   Q.  Have you ever had your deposition taken before?
13   A.  Yes, I have.
14   Q.  I'm going to ask you some questions, and the
15  court reporter here is going to type up your answers to
16  those questions. Okay?
17   A.  Yes.
18   Q.  We have to take turns talking because if we talk
19  at the same time, although the court reporter is very,
20  very good, she can't get everything down. So we have to
21  take turns.
22   A.  I understand.
23   Q.  You have to verbalize your answers. For
24  example, instead of nodding your head, just say yes.
```

Page 4

```
 1  Instead of shaking your head, just say no.
 2          Do you understand that?
 3   A.  Yes, I do.
 4   Q.  After we're done here today, you will have an
 5  opportunity to review the transcript of the deposition to
 6  correct any typographical errors that may be made. Do
 7  you understand that?
 8   A.  Yes, I do.
 9   Q.  If I ask you a question and you don't understand
10  the question, just ask me to rephrase that question. I
11  will be more than happy to do that. Do you understand?
12   A.  Yes.
13   Q.  Do you understand that I don't want you to guess
14  at any answers?
15   A.  Yes.
16   Q.  Are you taking any medications or is there
17  anything else that would prevent you from testifying
18  truthfully or remembering accurately today?
19   A.  No, I'm not.
20   Q.  If you need any breaks, if you need to go to the
21  john, need to stretch your back out, need to take five
22  minutes, let me know and I'll be happy to take a
23  five-minute break.
24   A.  Yes.
```

Page 5

```
 1   Q.  You have taken an oath to tell the truth today?
 2   A.  Yes, I have.
 3   Q.  Do you understand the significance of that oath?
 4   A.  Yes, I do.
 5   Q.  You understand that I'm going to be asking you
 6  questions today concerning events arising out of two
 7  separate lawsuits?
 8   A.  Yes.
 9   Q.  Foraker v. Chaffinch, MacLeish, and the DSP?
10   A.  Yes.
11   Q.  And then Price, Warren, and Foraker versus
12  Chaffinch, MacLeish, and the DSP?
13   A.  Yes.
14   Q.  Your current position is Colonel of the Delaware
15  State Police; isn't that right?
16   A.  Yes, it is.
17   Q.  Is that the highest-ranking position in the
18  Delaware State Police?
19   A.  Yes, it is.
20   Q.  When were you promoted to colonel?
21   A.  May 6 of 2005.
22   Q.  What was your position prior to that?
23   A.  I was lieutenant colonel.
24   Q.  What are the job responsibilities of the
```

Page 50

1  period from December the 1st to the end of January, that
2  one person could have been responsible for all that?
3  Just didn't seem -- were there certain things that
4  weren't done? Yes, they weren't done. I found out
5  through the course of January to April. Once again,
6  during that time period the main thought in the process
7  was to work with Facilities Management. It was not to
8  assign blame. It was to fix the facility.
9      Q. Blame has been assigned subsequently, hasn't it?
10     A. The division has taken no action.
11     Q. Isn't it your position in this case that
12  Sergeant Foraker, Master Corporal Wayne Warren, and
13  Kurt Price destroyed the FTU?
14          MR. ELLIS: I object to the form of the
15  question.
16          MR. NEUBERGER: You can answer.
17     A. That is not my position. My position was to fix
18  the range and get it open.
19     Q. So are you telling me that's not a position or
20  defense you're taking in this case --
21          MR. ELLIS: I object to the form of the
22  question.
23  BY MR. NEUBERGER:
24     Q. -- that those troopers destroyed the FTU?

Page 51

1          MR. ELLIS: I object to the form of the
2  question.
3      A. My position is from the beginning was to fix the
4  problems at the range to get it open. It was not one to
5  assign blame. There has been an auditor's report that
6  was ordered by the Governor that indicated a lack of
7  maintenance being conducted resulted in the failure of
8  the range.
9          My position as the lieutenant colonel and
10 now as superintendent is and was to get the range fixed,
11 get it fixed right, get it done safely, and reopen the
12 doors.
13     Q. Do you believe that Sergeant Foraker, corporals
14 Price and Warren put recruits and other personnel in
15 harm's way in December of 2003 through the closing of the
16 range?
17     A. Chris was the NCOIC of the facility, and if he
18 felt it was unsafe for them to be there, he would shut
19 the range done. He had that authority to do so as the
20 NCOIC.
21     Q. You're indicating that Sergeant Foraker had the
22 authority to shut down the FTU?
23     A. If he needed to. If he felt it was unsafe for
24 his employees and those recruits that were shooting, then

Page 52

1  he had the authority to do so.
2      Q. Is it your position that Sergeant Foraker,
3  corporals Price and Warren did not care about the safety
4  of their students?
5          MR. ELLIS: I object to the form of the
6  question.
7      A. Would you please repeat the question.
8      Q. Is it your position that Sergeant Foraker,
9  Corporal Price, and Corporal Warren did not care about
10 the safety of the students they trained at the FTU?
11     A. No, I don't feel that way.
12     Q. Is it your position that Sergeant Foraker,
13 Corporal Price, and Corporal Warren were incompetent?
14     A. In the training of the firearms? No.
15     Q. Is it your position that they were incompetent
16 in their management of the FTU?
17         MR. ELLIS: Could we have a time frame on
18 that?
19         MR. NEUBERGER: December 2003 through the
20 closing of the FTU.
21     A. Their actions and subsequent knowledge that no
22 maintenance was being conducted comes into question, but,
23 once again, I questioned the equipment that we had in
24 there at that point in time that was six years old and

Page 53

1  broken down and that things weren't functioning properly.
2  I haven't done a full in-depth analysis of -- I guess,
3  Mr. Neuberger, that I never looked at this to assign
4  blame for what occurred there. It was to fix what went
5  wrong and move on. That was the position that I adopted
6  from the beginning and it still is today.
7      Q. Did Colonel Chaffinch look at it to assign
8  blame?
9          MR. ELLIS: I object to the form of the
10 question.
11     A. We never conducted an -- there was never an
12 Internal Affairs investigation conducted. The closest
13 that that came to was when I told Captain Warren that
14 Sergeant Foraker had submitted an e-mail alluding to
15 sabotage of equipment, and I asked Captain Warren to look
16 into that and make a determination if we had somebody
17 sabotaging the equipment, was it sabotage to me as a
18 direct -- taking direct action in order to create a
19 problem, and I think that's the closest that --
20 if Captain Warren had come back and said yes, we have got
21 an issue of that manner, we need to conduct an
22 investigation, I would have done so. But everything
23 subsequently to that, that's not the direction I was
24 going or leading.

Price, et al.                                    v.                    Chaffinch, et al.
Thomas F. MacLeish            C.A. # 04-1207                           July 19, 2007

Page 54

1     Colonel Chaffinch did not play a role in
2  the decision-making process of how this was going to be
3  handled. He never told me to launch a criminal
4  investigation -- or an Internal Affairs investigation of
5  what was going on. He let me handle it.
6     Q. That's because you were the operational officer
7  for the Delaware State Police at the time?
8     A. That's correct.
9     Q. You were lieutenant colonel at the time, right?
10    A. Yes.
11    Q. So as operational officer for the DSP, you're
12 telling me that the personnel at the FTU did not do
13 anything wrong at the FTU?
14         MR. ELLIS: I object to the form of the
15 question.
16    A. I had worked through the chain of command,
17 directed Captain Warren to look into the problems that
18 were associated with the range and what were those
19 problems and what were we going to do to correct them.
20 He submitted a report that did not indicate any behavior
21 by Sergeant Foraker or anyone on his staff that they had
22 done anything wrong. He indicated there was an issue
23 with the air system, the fact that the bullet recovery
24 system had failed, and that is the direction I went in.

Page 55

1  It was to fix what the problems were, not to assign
2  blame.
3         If he would have indicated that there were
4  issues there with the personnel that worked for him and
5  recommended action, we would have done so.
6     Q. Is the State Police a paramilitary organization?
7     A. Yes, it is.
8     Q. So you have to rely on, I guess, the reports of
9  those who are below you in the chain of command?
10    A. Yes, you do.
11    Q. Are you indicating that you relied on
12 Captain Warren's report that there was no wrongdoing at
13 the FTU?
14         MR. ELLIS: I object to the form of the
15 question.
16    A. I relied on Captain Warren to do his job and
17 report -- and to take appropriate action where he felt
18 was necessary, yes.
19    Q. As of today, July of 2005, I'm not sure of the
20 exact date, do you believe that Captain Warren did his
21 job?
22    A. I believe he did not fully answer all the
23 questions that were presented in 2005. What I asked for
24 as far as what occurred and what went on, he went through

Page 56

1  an historical perspective of what occurred at that range.
2  He submitted a report to me in late January that I had
3  asked for on the 6th of January with what issues
4  Sergeant Foraker had brought to our attention, and that
5  report was a large report on history and what happened
6  here -- there was no assessment of blame in the body of
7  that report.
8     Q. Was Captain Warren ever disciplined?
9     A. No, he was not.
10    Q. Was he ever disciplined for not following your
11 order, as I believe you indicated?
12    A. No, he was not.
13    Q. Just to be clear, because we have been all over
14 the place here -- would you agree with me?
15    A. Yes.
16    Q. -- it's your position that Sergeant Foraker,
17 Corporal Price, and Corporal Warren were not responsible
18 for the problems that caused the shutdown of the FTU?
19         MR. ELLIS: I object to the form of the
20 question.
21         MR. NEUBERGER: You can answer.
22    A. It is my -- I think their lack of maintenance
23 resulted in some of the conditions that occurred at that
24 range, resulted in some of the problems that we saw, but

Page 57

1  I also feel that there was equipment failures in there
2  that they did not have control of. So what came first,
3  the chicken or the egg? To specifically assign blame, I
4  didn't go into this -- into this from the very beginning
5  looking to assign blame to anyone. I looked to fixing
6  the problem.
7     Q. Are you telling me that they had any culpability
8  at all?
9     A. Their culpability would have been their lack of
10 conducting general maintenance, but I believe there's the
11 contributing factors of the age of the equipment and the
12 air-handling system and those type of things were
13 equally -- equally contributory to the shutdown of the
14 range.
15    Q. If you had to assign a percentage to their
16 culpability, what would that percentage be?
17         MR. ELLIS: Objection. He just did.
18    A. I think I used the term --
19         MR. NEUBERGER: I'm sorry. What's your
20 objection?
21         MR. ELLIS: He just did. He said equally
22 culpable. That's 50/50.
23         MR. NEUBERGER: He named more than two
24 things.

15 (Pages 54 to 57)

Page 202

1  retirement pension papers by that date, would the
2  division fire them?
3     A.  That course needs -- remains to be determined
4  through HR and our attorneys, but they have been asked to
5  submit their pension paperwork and asked to separate from
6  the division.
7     Q.  You used the word "asked." Isn't it true they
8  have been ordered to do that by that date?
9     A.  They have been directed to submit -- I don't
10 have that document in front of me, but they have been --
11 I'm sure you have it. But they have been asked -- they
12 have been directed, too. They have been given an
13 extension to August 10th to have their paperwork
14 submitted, yes, for disability pension.
15    Q.  In March of 2005 did you receive an e-mail from
16 Corporal Price requesting that he be allowed to stay on
17 light duty for two years?
18    A.  Yes.
19    Q.  Why aren't you allowing them to stay on the
20 light duty for two years? By "them," I mean corporals
21 Warren and Price.
22    A.  By our policy, by what it's interpreted by our
23 policy, by our HR director, in researching that, that
24 their disability -- their injury is permanent, it cannot

Page 203

1  change, it cannot be accommodated. Therefore, the policy
2  is set to give the second year in the event that a
3  trooper would be able to return to full-duty capacity.
4  We know now that they do not have the ability to return
5  to full-duty capacity. So by the advice I was given from
6  HR and our attorney through the application of this
7  policy, indicated that separation was the proper course.
8     Q.  By "attorney" you mean Deputy Attorney General
9  Mike Tupman or Ralph Durstein?
10    A.  Mike Tupman.
11    Q.  Are there any other reasons for your refusal to
12 grant Corporal Price and Corporal Warren two years of
13 light duty?
14    A.  No.
15    Q.  Was this your decision to make or was this
16 Colonel Chaffinch's decision?
17    A.  It was my decision to make.
18    Q.  Did Colonel Chaffinch have any involvement in
19 that decision?
20    A.  No, he did not.
21    Q.  Was he notified of that decision?
22    A.  He was off at that time. I was the acting
23 superintendent.
24    Q.  When was the decision made?

Page 204

1     A.  In March 2005.
2     Q.  Was he subsequently notified about that decision
3  after he came back in March or April of 2005?
4     A.  He returned the end of March. I was in Hawaii
5  at the time. He was informed at that point in time.
6     Q.  Did he say don't do that, give them two years?
7     A.  No, he did not.
8     Q.  Had you and Colonel Chaffinch talked about that
9  at any other time since that one conversation you just
10 referenced?
11    A.  I talked to him sporadically during this time
12 that he was on administrative leave, but I did not recall
13 the specifics of that because it evolved to the point of
14 trying to make that determination and that was between
15 HR, our attorneys, and myself.
16    Q.  Did Colonel Chaffinch have the authority to
17 overrule your determination because he was the colonel of
18 the Delaware State Police after he came back from was it
19 administrative leave?
20    A.  Yes.
21    Q.  Did he have that authority to overrule your
22 determination and give them the two years?
23    A.  He was the colonel. He could have if he elected
24 to or if it was brought to his attention.

Page 205

1     Q.  You're indicating that it was brought to his
2  attention, wasn't it?
3     A.  He was informed of the decision, yes.
4     Q.  Did he overrule your decision?
5     A.  No, he did not.
6     Q.  I'd like to put this e-mail in front of you,
7  this e-mail from Corporal Price to you. Call it MacLeish
8  Deposition Exhibit No. 19.
9        (MacLeish Deposition Exhibit No. 19 was
10 marked for identification.)
11 BY MR. NEUBERGER:
12    Q.  Colonel, do you have this e-mail in front of
13 you?
14    A.  Yes.
15    Q.  Does this appear to be an e-mail from Kurt Price
16 to you dated Saturday, March 5th, 2005, at 12:02 p.m.?
17    A.  Yes.
18    Q.  Did you read this e-mail before?
19    A.  Yes, I have.
20    Q.  Are you familiar with its contents?
21    A.  Relatively familiar, yes.
22    Q.  Could you take a look at it and just read it
23 quietly to yourself and then tell me when you're done?
24    A.  (Complied.)

**Ellis, Edward**

| | |
|---|---|
| From: | Stephen J. Neuberger [SJN@NeubergerLaw.com] |
| Sent: | Monday, January 23, 2006 10:27 PM |
| To: | Ellis, Edward; Fitzgerald, Robert |
| Cc: | Thomas S. Neuberger |
| Subject: | Foraker/FTU |

Ed & Robert,

Pursuant to our local rule 7.1.1, please let me know by the end of the day tomorrow whether you consent to a default judgment being entered against your clients in the Foraker and FTU cases as a sanction for their admitted destruction of Col. Chaffinch's work hard drive in approximately May 2005 despite the pendency of this litigation since August 2004.

Until recently, I had never previously run into or dealt with any destruction of evidence issues. If you have any creative ideas that you think would adequately sanction your clients, deter similar illegal acts and help remedy the grave prejudice plaintiffs have suffered, I am open to suggestions.

Please let me know.

-Steve

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Stephen J. Neuberger, Esq.
The Neuberger Firm
Attorneys and Counsellors at Law
Two East Seventh Street, Suite 302
Wilmington, DE 19801-3707
Phone: 302-655-0582
Fax: 302-655-9329
E-Mail: SJN@NeubergerLaw.com

2/7/2006

B-14

Westlaw.

Slip Copy
Slip Copy, 2005 WL 3303861 (E.D.Pa.)
(Cite as: Slip Copy)

Page 1

C

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
PARAMOUNT PICTURES CORP.
v.
John DAVIS
**No. Civ.A. 05-0316.**

Dec. 2, 2005.

Alexandra N. Deneve, Loeb & Loeb LLP, New York, NY, Cheryl A. Krause, Paul W. Kaufman, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA, for Paramount Pictures Corp.
John Davis, Philadelphia, PA, pro se.

MEMORANDUM

ONEILL, J.
*1 Plaintiff, Paramount Pictures Corp., filed a John Doe complaint on January 21, 2005 under the Copyright Act of 1976, 17 U.S.C. § 101, et seq., claiming that defendant, later identified as John Davis, pro se, violated its exclusive rights to reproduce and distribute plaintiff's motion picture, "Lemony Snicket's: A Series of Unfortunate Events," by willfully and knowingly obtaining an illegal digital copy of the motion picture and making the motion picture available for digital distribution via an internet distribution system named eDonkey one week after the motion picture's theatrical release date. Plaintiff seeks a permanent injunction precluding defendant from infringing upon its motion picture copyrights under 17 U.S.C. § 502(a), $50,000 in statutory damages under 17 U.S.C. § 504(c), and $38,437.68 in attorneys' fees and costs under 17 U.S.C. § 505. Neither party has requested a jury trial. Before me now are the parties' cross motions for summary judgment.

BACKGROUND

*I. The Internet*

Prior to discussing the specific facts of this case, I find it necessary to place this case in the technological context. The internet is a vast collection of interconnected computers and computer networks that communicate with each other. It allows hundreds of millions of people around the world to exchange ideas and information freely and easily. For example, users of the internet freely exchange academic research, literary works, financial data, music, audiovisual works, graphics, and other digital data. With the aid of other technological developments, the internet also has afforded users with opportunities to infringe on the rights of owners of copyrighted works, including motion pictures. Given the open and digital nature of the internet, once a motion picture has been transformed into an unsecured digital format, it can be copied further and distributed an unlimited number of times over the internet without degradation in picture or sound quality.

*A. P2P Networks*

Many individuals seeking to copy and distribute copyrighted motion pictures over the internet use online media distribution systems called "peer-to-peer" ("P2P") networks. P2P networks, in their most common form, are computer systems that enable internet users to make files stored on each user's computer available for copying by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

other users, to search for files stored on other users' computers, and to transfer exact copies of files from one computer to another via the internet. Although P2P networks allow the copying and transfer of many different types of digital files, I focus my discussion on copyrighted motion pictures at issue in this case. Here, Paramount has never authorized any of its motion pictures to be distributed via P2P networks.

*B. First Propagator*

For any one copy of a motion picture to be made available without authorization of a copyright owner on a P2P network, there must be a "first propagator" (also known as an "early propagator" or a "first mover") of that copy of that motion picture. A first propagator is the particular P2P user who is the first to obtain (via some means) an illegal digital copy of a motion picture. He or she then places that copy in a publicly shared directory that he makes available to the P2P users around the world over the internet. But for the infringing acts by a first propagator, an infringing copy of a motion picture would never appear on P2P networks and the chain of infringing copies would never commence. All means of obtaining a digital file of a motion picture without authorization of the copyright owner are illegal. One method of obtaining such a file is to sneak a camcorder into the movie theater after an opening weekend and illegally film the motion picture. Once the recording of the motion picture is converted into a digital film, it can be distributed on the internet.

*2 The motion picture industry (along with the recording industry and other producers and distributers of copyrighted media) takes particular offense to the activities of first propagators because their ability to obtain and offer an illegal digital copy of a motion picture on a public P2P network for widespread unauthorized copying and distribution sets off a chain reaction that enables millions of people to copy and further distribute that motion picture to others. Paramount claims that such activity damages the value of their copyrights, particularly when the first propagator distributes the motion picture on a P2P network while the motion picture is still in the theatrical release stage of distribution and has not yet reached the home video (DVD and VHS) stage of distribution. Paramount claims that such illegal distribution can severely diminish or destroy the profitability of the motion picture because the revenue from the theatrical and home video releases are necessary to recover a motion picture's substantial production and marketing costs.

*C. BayTSP*

In an effort to combat such activities, Paramount hired BayTSP, an antipiracy technology specialist, to identify direct infringers and first propagators of its motion pictures over P2P networks. BayTSP has developed a specific technology platform to detect unauthorized distribution of digital motion pictures (and other digital content) over several P2P networks, including eDonkey. BayTSP also has developed a method to identify first propagators of specific digital content on the eDonkey network (and other P2P networks). Paramount provides BayTSP with lists of copyrighted motion pictures it believes may be the subject of infringing activity, particularly those motion pictures that are about to begin their theatrical release.

To determine whether certain specific motion pictures are being offered on the eDonkey network, BayTSP connects to the network and searches for users who are offering copies of the motion picture. BayTSP uses the same basic technical processes that are used by eDonkey users to identify users who are making Paramount's motion pictures available over the internet. Once BayTSP locates an eDonkey network user who is offering for download a specific motion picture, a BayTSP employee downloads the motion picture file and executes an evidence gathering software program that obtains the Internet Protocol address of that user while the motion picture is downloading.

An IP address is a unique numerical identifier that is automatically assigned to a user by its Internet Service Provider each time a user logs on to the network. Although a subscriber may be assigned a different IP address each time he or she logs on, ISPs are assigned certain blocks or ranges of IP addresses and ISPs keep track of the IP addresses assigned to its subscribers at any given moment and retain user logs of their activity. Therefore, if provided with a user's IP address and the date and time of the infringing activity, an ISP can use its user logs to identify the name and address of the ISP subscriber who was assigned that IP address at that date and time.

© Copyright 2006 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

Westlaw.

*3 In addition to the motion picture file and IP address, BayTSP simultaneously downloads other publicly available identifying information from the network user. For example, BayTSP downloads and records for each file downloaded from each user: (a) the video file's metadata (digital data about the file), such as its title and file size, which is not part of the actual video content but that is attached to the digital file and helps identify the content of the file; (b) the time and date at which the file was downloaded from the user; (c) the IP address assigned to each user at the time of activity; and (d) the percentage of the file the eDonkey user is offering on his or her computer. BayTSP then creates evidence logs for each user and stores this information. Paramount then confirms that the file downloaded is in fact one of its motion pictures.

Digital copies of motion pictures are very large computer files and take anywhere from several hours to several days to download from one network user to another. In order to speed up this process, eDonkey software (provided free of charge to network users) enables a user to obtain a particular copy of a motion picture from many different users. When a user searches for a particular motion picture, the eDonkey network finds many different people who have a copy or portions of a copy of that motion picture on their shared directory and enables the user to download different pieces of the motion picture from more than one user. Downloading the motion picture in different pieces from different sources increases the likelihood that the user will obtain the whole motion picture file and decreases that period of time necessary to download the entire file. Once a user obtains a portion of a motion picture file, that portion of that motion picture becomes available for download by another user.

When a first propagator makes a complete copy of a motion picture file available on eDonkey by placing it in a special shared folder on his or her computer, the eDonkey software automatically assigns a unique Hash Identifier or number to that file, which is how that file and portions thereof are identified within the network. The hash identifier is a binary number eighty characters long. Therefore, the probability of two files sharing the same hash number is $2^{80}$, i.e. more than one septillion (one followed by twenty four zeros) to 1. The probability of two files sharing the same hash number and the same file size is even smaller. Any eDonkey user who holds a portion of a file with the same hash number as the hash number assigned to the first propagator's complete file obtained that file (either directly or indirectly) from the first propagator.

To find a first propagator of a motion picture on the eDonkey network, BayTSP makes a constant search of the network until it finds the first instance of a particular digital copy of a motion picture identified by a specific hash number. There are two key characteristics to BayTSP's search that allow BayTSP to confirm its determination that a user is a first propagator of a specific digital copy of a motion picture on the eDonkey network. First, BayTSP's constant search for a particular title on the eDonkey network begins before the motion picture is released in theaters. This ensures that BayTSP will find the digital copy at the precise time or within a short time after the first propagator makes the pirated motion picture available on the network. Second, BayTSP determines the percentage of the total file a user holds when detected by the system. This ensures that the user identified as the first propagator has the entire file available for download. If a particular user is both the first in time to appear on the network with a unique copy (identified by a unique hash number) of the motion picture and appears on the network with the complete digital file, then that user is the first propagator and was the first person to place that copy of the motion picture on the P2P network. If a user were shown to be offering less than the complete motion picture, then that user would still be downloading the motion picture from another user, who would therefore not be a first propagator.

*II. John Davis*

*4 Prior to the motion picture's theatrical release on December 17, 2004, Paramount instructed BayTSP to search the eDonkey network for the motion picture and identify first propagators of the motion picture on the eDonkey network. The motion picture was one of Paramount's 2004 December holiday releases. It cost more than $120 million to produce.

*A. Finding the Infringer*

Using the method described above, BayTSP began searching for the motion picture on eDonkey in early December 2004. On December 23, 2004 at 04:49:52 PM Eastern Standard Time, [FN1] BayTSP located an eDonkey user offering

© Copyright 2006 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

Westlaw.

for download 100% of a file labeled "lemony snickets 'jim carey' .mpg" with the IP address 69.141.202.170. BayTSP downloaded segments of the digital file, saved the relevant identifying information described above, and created an evidence log for this infringer. BayTSP also concluded that this infringer was a first propagator because he or she was the first to offer a digital copy of the motion picture with a unique hash identifier not previously assigned to other files on the eDonkey network and he or she offered for download a file that had 100% of the picture. Paramount claims that this evidence collected and prepared by BayTSP proves that this individual was infringing on Paramount's copyright and was a first propagator. Paramount later confirmed that this file was its motion picture.

> FN1. Confusingly, Paramount asserts a different time of infringing activity (11:49:52 AM Eastern Standard Time) in its motion for summary judgment. For the sake of simplicity, I will use the time asserted in Paramount's complaint.

*B. Identifying John Davis*

Based on the infringer's IP address, BayTSP determined that Comcast Cable Communications was the infringer's ISP. In order to identify this infringer, Paramount filed a John Doe lawsuit in this Court on January 21, 2005 against the infringer because Comcast resides in this District. Paramount simultaneously filed a motion to serve discovery prior to the Rule 26(f) conference seeking leave from the Court to serve Comcast with a subpoena for the infringer's true identity by use of the IP address and date and time of infringement. My deceased colleague, Judge Kelly granted this motion, and on March 3, 2005, Paramount served Comcast with the subpoena. Before responding to the subpoena, Comcast informed the infringer (its subscriber) in writing on March 9, 2005 of the lawsuit against him and its intention to respond to the subpoena by revealing his identity.

After checking its subscriber logs and notifying Davis of the lawsuit and subpoena, Comcast identified Davis as the suspected infringer on March 30, 2005. On May 26, 2005, Paramount filed an amended complaint naming Davis as the John Doe defendant. Davis was served with the complaint and summons on June 2, 2005.

*C. Answer by John Davis*

Davis filed an answer to the complaint on July 27, 2005. In his answer, Davis parrots the language of Paragraphs Four and Five of plaintiff's complaint:
4. Plaintiff Paramount is among the world's leading creators and distributors of motion pictures. Paramount is a Delaware corporation, with its principal place of business at 5555 Melrose Avenue, Los Angeles, California. Paramount is engaged in the production, acquisition and distribution of motion pictures for theatrical exhibition, home entertainment and other forms of distribution. Paramount is the owner of the copyrights and/or the pertinent exclusive rights under copyright in the United States in motion pictures, including the motion picture *Lemony Snicket's: A Series of Unfortunate Events* (the "Copyrighted Motion Picture"), which has been unlawfully distributed over the Internet by Davis. (emphasis added)
*5 5. John Davis is an individual who resides in this District at 1523 19th Street, Apt. B, Philadelphia, Pennsylvania, 19121. Davis is also known to Paramount by the Internet Protocol ("IP") address assigned to him by his ISP on the date and time at which the infringing activity of Davis was observed (69.141.202.170 12/23/2004 04:49:52 PM (EST)). Davis' identity was confirmed through the expedited discovery this Court allowed in this case as originally filed. (emphasis added)

At first glance it would appear that he admits as much. However, Davis later "denies using an online media distribution system to distribute to the public, including by making available to others, the Copyrighted Motion Picture. Davis denies violating Paramount's exclusive rights to reproduction and distribution." Davis further "denies being a 'first propagator' of the unauthorized distribution of the Copyrighted Motion Picture" and "denies committing the alleged foregoing acts of infringement." In short, Davis answers that he has been misidentified as the infringer of Paramount's copyright.

© Copyright 2006 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

*D. Further Investigation*

In response to Davis' denials, Paramount requested access to Davis' Macintosh G4 Cube computer in order to investigate the hard drives of his computer by a third party forensic specialist, Kroll Ontrack Electronic Evidence Services. Upon completion of its analysis, Kroll reported on August 1, 2005 that on March 25, 2005, Davis wiped his hard drive clean of all data, and then reinstalled an operating system. Paramount finds Davis' actions of wiping the hard drive clean of all data to be suspicious because it was sixteen days after Davis received notice from Comcast of the John Doe lawsuit pending against him. The effect of Davis wiping the hard drive clean of all data was to make it impossible to determine whether the motion picture or eDonkey software was on the computer prior to March, 25, 2005. Paramount alleges that Davis' actions were intentional to prevent detection of his infringing activities. Davis denies this allegation and claims that he wiped his hard drive clean in preparation for selling it to Stephanie Seymour for $390 on March 30, 2005. Davis supports his claim with a letter to this Court by Seymour, in which she avers: (1) that she expressed an interest in buying the computer in February 2005; (2) that Davis had emailed her a picture of the computer on February 23, 2005; (3) that she was supposed to pick up the computer on March 30, 2005; (4) that she was precluded from picking up the computer because of this action; and (5) that as a result of her own financial situation did not purchase the computer until September 30, 2005.

Davis further claims that the operating system found on the computer in July 2005, MAC OS 9.2.2, is incompatible with the eDonkey network. Davis supports this claim with a printout of the eDonkey network application download page which states that eDonkey "runs on Windows, Mac OS X, and Linux." Paramount disputes this claim and alleges that while the operating system in place in July 2005 was not compatible with the eDonkey network there is no evidence of what operating system was in place at the time of the alleged infringing activity. Paramount further alleges that it is unlikely that the MAC OS 9.2.2 operating system was installed on the computer at the time of the alleged infringing activity because: (a) MAC OS 9.2.2 was last sold in late 2001, approximately four years ago, and MAC OS X was released earlier that same year; and (b) Davis is a self employed computer consultant who had worked for the government as a computer consultant. Paramount asserts that because it is unlikely for an individual with his proficiency with computers to be using an outdated operating system on his computer, I should infer from this evidence that Davis intentionally wiped the hard drive clean to prevent Paramount from detecting his infringing activities and replaced the compatible operating system with an outdated version that was incompatible with the eDonkey network.

STANDARD OF REVIEW

*6 Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (2004). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions ... which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (2004).

I must determine whether any genuine issue of material fact exists. An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is material only if the dispute over the facts "might affect the outcome of the suit under the governing law." *Id.* In making this determination, I must view the facts in the light most favorable to the non-moving party, and the non-moving party is entitled to all reasonable inferences drawn from those facts. *Id.* However, the nonmoving party may not rest upon the mere allegations or denials of the party's pleading. See *Celotex,* 477 U.S. at 324. The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, mere suspicions. *Williams v. Borough of W. Chester,* 891 F.2d 458, 460 (3d Cir.1989). If the evidence for the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249-50 (citations omitted).

© Copyright 2006 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

Westlaw.

Cross motions are claims by each party that it alone is entitled to summary judgment; they do not constitute an agreement that if one is denied the other is necessarily granted or that the losing party waives judicial consideration and determination of whether genuine issues of material fact exist. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968). If any such issue exists it must be disposed of at trial and not on summary judgment. *Id.* In the present case, I conclude that there are five genuine issues of material fact. I will therefore deny both motions for summary judgment.

I find that the parties' disagreements as to whether Davis engaged in any infringing activity, whether he was a first propagator of the motion picture, whether he was misidentified, whether he intentionally wiped the computer's hard drive clean in order to avoid detection of his infringing activities, and whether the motion picture and the eDonkey compatible operating system were on the computer at the time of the alleged infringing activity create five genuine issues of material fact that preclude summary judgment for either party.

DISCUSSION

*7 To establish its claim of copyright infringement, Paramount must establish: "(1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir.2002). With respect to the first element, Paramount asserts-and Davis does not dispute-that it holds a valid United State Copyright Registration for the motion picture and that it is the exclusive licensee of the motion picture. With respect to the second element, "[c]opying refers to the act of infringing any of the exclusive rights that accrue to the owner of a valid copyright, as set forth at 17 U.S.C. § 106, including the rights to distribute and reproduce copyrighted material." *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 207 (3d Cir.2005) *quoting Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir.1991) (internal quotations omitted). [FN2] Copying "may be demonstrated by showing that the defendant had access to the copyrighted work and that the original and allegedly infringing works share substantial similarities." *Id.*

> FN2. Section 106 of the Copyright Act provides:
> Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
> (1) to reproduce the copyrighted work in copies or phonorecords;
> (2) to prepare derivative works based upon the copyrighted work;
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
> (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.
> 17 U.S.C. § 106 (2005).

Paramount argues that the evidence demonstrates that Davis infringed on its copyright to reproduce and distribute the motion picture, "Lemony Snicket's: A Series of Unfortunate Events." Paramount has produced evidence to show that, working on behalf of Paramount, BayTSP located at the time of the infringement (December 23, 2004 at 04:49:52 PM Eastern Standard Time) an eDonkey user with the infringing IP address (69.141.202.170) offering 100% of the motion picture for download. BayTSP identified this infringer as a first propagator because he or she was the first to offer 100% of a unique copy of the motion picture on the eDonkey network. BayTSP determined that the infringer was a Comcast subscriber because the infringer's assigned IP address was within the range of IP addresses assigned to Comcast subscribers. Comcast identified Davis as the suspected infringer because its user logs indicated that Davis was the user with the same IP address at that specific moment in time.

In his answer, Davis denies that he infringed on Paramount's copyrights and argues in his motion for summary

© Copyright 2006 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

Westlaw.

judgment that he has been misidentified as the infringing user. Paramount asserts that Davis offers no evidence for his contention that he was misidentified and argues that Davis cannot rely on a bare denial or unsupported allegation in his motion for summary judgment to create a genuine issue of fact. See *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, AFL-CIO*, 982 F.2d 884, 892 (3d Cir.1992) ( "this court has made it clear that arguments, allegations or 'facts' contained in briefs, and that are not evidentiary because they are not sworn to, are insufficient to overcome a motion for summary judgment based on sworn affidavits. Thus, the allegations raised solely in [defendant's] brief do not suffice to raise any genuine issue of material fact.") *citing Thornton v. United States*, 493 F.2d 164, 167 (3d Cir.1974) ("A statement in a brief or in oral argument does not constitute evidence" for purposes of summary judgment.). Paramount further argues that because Davis admitted in his answer that the infringing IP address was assigned to him at the date and time of the alleged infringement he cannot now deny those allegations at the summary judgment stage. See Fed.R.Civ.P. 8(d) (2005) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading."); *United States v. Merritt-Chapman & Scott Corp.*, 305 F.2d 121, 123 (3d Cir.1962) ("Since the Answer fails to deny the quoted allegations in the Complaint, they are deemed admitted.").

*\*8* However, I am guided by Rule 8(f)'s prescription that "[a]ll pleadings shall be so construed as to do substantial justice" and the principle that pro se pleadings should be construed liberally. See *Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (holding the allegations of a pro se complaint to a less stringent standard than formal pleadings drafted by lawyers); *Alston v. Parker*, 363 F.3d 229, 234 (3d Cir.2004); *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir.2003) ("because [plaintiff] filed his complaint *pro se*, we must liberally construe his pleadings, and we will apply the applicable law, irrespective of whether the *pro se* litigant has mentioned it by name."). Upon review of Davis' answer, I find that the "admissions" in paragraphs four and five of his answer are merely a verbatim parroting of paragraphs four and five of Paramount's complaint. By contrast, in paragraphs eight through thirteen of his answer, Davis specifically denies: (a) using an online media distribution system to make the motion picture available to the public; (b) violating Paramount's exclusive rights to reproduce and distribute the motion picture; (c) being a first propagator; and (d) committing the alleged acts of infringement. Therefore, I will construe Davis' answer as a denial of Paramount's allegations that Davis engaged in the alleged acts of infringement upon its copyright of the motion picture. I will also allow Davis to assert his defense of misidentification. This defense is a logical outgrowth of his general denials: if he claims the infringer was not he, then naturally he is claiming that any infringement was done by someone else. I therefore find there to be genuine issues of material fact as to whether Davis was correctly identified as the infringer, whether he was the first propagator of the motion picture, and whether he engaged in any infringing activity.

*A. Spoliation Inference*

Davis also argues that there is no evidence to suggest that motion picture or eDonkey network software was ever on his computer. Paramount argues that this lack of evidence does not create a genuine issue of material fact because Davis is subject to spoliation sanctions for intentionally wiping his hard drive clean of all data in order to make it impossible to determine whether the motion picture or eDonkey software was on the computer at the time of the infringing activity. "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Mosaid Techs., Inc. v. Samsung Elecs. Co., Ltd.*, 348 F.Supp.2d 332, 335 (D.N.J.2004). A showing of spoliation may give rise to a variety of sanctions: "[1] dismissal of a claim or granting judgment in favor of a prejudiced party; [2] suppression of evidence; [3] an adverse inference, referred to as the spoliation inference; [4] fines; [and][5] attorneys' fees and costs." *Id.* [FN3]

---

FN3. Spoliation sanctions serve three functions:
Spoliation sanctions serve a remedial function by leveling the playing field or restoring the prejudiced party to the position it would have been without spoliation. They also serve a punitive function, by punishing the spoliator for its actions, and a deterrent function, by sending a clear message to other potential litigants that this type of behavior will not be tolerated and will be dealt with appropriately if need be.
*Mosaid*, 348 F.Supp.2d at 335.

---

© Copyright 2006 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.