**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

B. KURT PRICE, et al.,                    :
                                          :
            Plaintiff,                    :
                                          :        C.A. No. 04-956-GMS
      v.                                  :
                                          :
L. AARON CHAFFINCH, et al.,               :
                                          :
            Defendants.                   :

**ANSWERING BRIEF
IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II**

Date:  February 8, 2006              Noel C. Burnham (DE Bar # 3483)
                                     Richard M. Donaldson (DE Bar I.D. #4367)
                                     Montgomery, McCracken, Walker & Rhoads, LLP
                                     300 Delaware Avenue, Suite 750
                                     Wilmington, DE  19801
                                     (302) 504-7840

                                     *Counsel for Defendants L. Aaron Chaffinch,
                                     Thomas F. MacLeish, David B. Mitchell, and the
                                     Division of State Police, Department of Safety and
                                     Homeland Security, State of Delaware*

2046979v1

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ................... 1

II.    SUMMARY OF THE ARGUMENT ................................................................. 1

III.   CONCISE COUNTER-STATEMENT OF FACTS ........................................... 2

IV.   ARGUMENT: THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT BECAUSE THE UNDISPUTED MATERIAL FACTS ESTABLISH THAT THE DEFENDANTS – NOT THE PLAINTIFFS – ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ...................................... 9

    A.    Plaintiffs' Protected Activity ............................................................. 10

    B.    Plaintiffs Are Not Entitled To Summary Judgment Because Plaintiffs' Speech Was Not A Motivating Factor In Defendants Actions ........................... 10

        1.    Plaintiffs have not suffered an adverse action as a result of Col. Chaffinch's media comments ........................................... 10

        2.    Plaintiffs' protected activity was not a substantial or motivating factor in Defendants' decisions about fitness-for-duty exams and Plaintiffs' work status ....................................... 13

            a.    Defendants were not motivated to act by Plaintiffs' speech ........ 14

            b.    Defendants have properly enforced the DSP policies regarding injury and rehabilitation leave ..................................... 14

                (1)    Plaintiffs Price and Warren have impaired hearing ......... 15

                (2)    The "Light Duty" Letters ................................................. 16

                (3)    Injury, Disability, and Rehabilitation Policy .................. 17

        3.    Plaintiffs' other allegations do not amount to adverse action ................. 23

    C.    Plaintiffs Are Not Entitled To Summary Judgment Because Defendants Would Have Treated Them The Same Way, Regardless Of Plaintiffs' Allegedly Protected Activity ................................................................ 23

        1.    Defendants have not waived this defense ................................. 23

        2.    The record shows that Defendants would have treated Plaintiffs in the same way even if they had not engaged in protected activity ........... 26

    D.    Plaintiffs are not entitled to summary judgment on the Petition Clause Claim Of Retaliation (Count II) .......................................................... 27

V.    CONCLUSION ............................................................................................ 28

2046979v1

# TABLE OF AUTHORITIES

**Page**

## CASES

Anderson v. United States, Civ. A. No. 93-589-MMS, 1996 WL 490262,
(D. Del. Aug. 23, 1996) ................................................................................... 24, 26

Aubrey Rogers Agency, Inc. v. AIG Life Ins. Co., 55 F. Supp. 2d 309 (D. Del. 1999)............... 24

Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found., 402 U.S. 313 (1971)..................................... 26

Bradshaw v. Twp. of Middletown, 296 F. Supp. 2d 526 (D.N.J. 2003)........................................ 27

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003).................................................................... 12

Charpentier v. Godsil, 937 F.2d 859 (3d Cir. 1991) .................................................................. 24, 26

Connick v. Myers, 461 U.S. 138 (1983) ....................................................................................... 10

Curry v. City of Syracuse, 316 F.3d 324 (2d Cir. 2003)............................................................... 26

Green v. Phila. Housing Auth., 105 F.3d 882 (3d Cir. 1997) ....................................................... 10

Guzman-Ruiz v. Hernandez-Colon, 406 F.3d 31 (1st Cir. 2005) ............................................... 23, 24

International Poultry Processors, Inc. v. Wampler Foods, inc., No. Civ. A. 98-4612,
1999 WL 33456488 (E.D. Pa. Apr. 29, 1999) .................................................... 23

Kleinknecht v. Gettysburg College, 989 F.2d 136 (3rd Cir. 1993) ............................................. 24

McKee v. Hart, --- F.3d ---, No. 04-1442, 2006 WL 27474 (3d Cir. Jan. 6, 2006)...................... 12

San Fillipo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994) ............................................................. 27

Sanderson-Cruz v. United States, 88 F. Supp. 2d 388 (E.D. Pa. 2000)........................................ 26

Schneck v. Saucon Valley Sch. Dist., 340 F. Supp. 2d 558 (E.D. Pa. 2004) ......................... 10, 11

Shehee v. City of Wilmington, 67 Fed. Appx. 692 (3d Cir. 2003)......................................... 10, 23

Smith v. Sushka, 117 F.3d 965 (6th Cir. 1997) .......................................................................... 26

Suarez Corp. Indus. v. McGraw, 202 F.3d 676 (4th Cir. 2000) ............................................ 12, 13

X-Men Securities, Inc. v. Pataki, 196 F.3d 56 (2d Cir. 1999) ................................................ 13, 14

## TABLE OF AUTHORITIES
(continued)

**Page**

### STATUTES

42 U.S.C. § 1983............................................................................................................ 1, 11, 12

## I.    <u>STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING</u>

This case arises under 42 U.S.C. § 1983.  Plaintiffs filed their Complaint on August 19, 2004, alleging violations of the First Amendment's Free Speech Clause (Count I).  (D.I. # 1.)  On October 14, 2005, Plaintiffs filed an Amended Complaint, adding a claim that Defendants' conduct violated the First Amendment's Petition Clause (Count II).  (D.I. # 45; Combined Appendix to Defendants' Opening Briefs in Support of Motions for Summary Judgment ("CA") at A-24 – A-26).[1])

Pursuant to the Court's Order entered February 17, 2005, discovery in this matter ended on December 30, 2005.  On January 25, 2006, Plaintiffs filed and served a Motion for Summary Judgment on Counts I and II.  (D.I. # 82.)  Plaintiffs also filed and served an Opening Brief in support of their Motion (D.I. # 84) and an Appendix (<u>see</u> D.I. ## 85 & 86).  Pursuant to the Federal Rules of Civil Procedure and the Local Rules of Civil Practice and Procedure, Defendants file this Answering Brief.

## II.    <u>SUMMARY OF THE ARGUMENT</u>

1.    Defendants did not retaliate against Plaintiffs in that Defendants' actions, considered individually or in their totality, were not adverse to Plaintiffs.

2.    Plaintiffs' allegedly protected speech was not a "substantial" or "motivating" factor in any of Defendants' allegedly retaliatory actions.

3.    Defendants would have taken the same actions absent the allegedly protected conduct.

---

[1] Defendants have moved for summary judgment on both counts in this case (D.I. # 80) and have filed a Combined Appendix in support of that Motion.  (D.I. ## 83 & 92.)  To prevent unnecessary duplication, Defendants, where possible and appropriate, cite to their Combined Appendix.  Defendants also submit with this brief an answering appendix containing additional evidence not included in their Combined Appendix or in Plaintiffs' Appendix to their Opening Brief.

4.      Defendants have not waived their affirmative defense to argue that they would have treated Plaintiffs the same way even in the absence of Plaintiffs' allegedly protected activity.

5.      Plaintiffs did not engage in activity protected by the Petition Clause.

## III.    CONCISE COUNTER-STATEMENT OF FACTS

Defendants incorporate the Concise Statement of Facts set forth in their Opening Brief in Support of Defendants' Motion for Summary Judgment.  (D.I. # 80 (see id. Part IV).)  For purposes of answering Plaintiffs' Motion for Summary Judgment, Defendants make particular note of the following undisputed material facts that Plaintiffs excluded from their Opening Brief:

**The Firearms Training Unit:**  Plaintiff Foraker is a sergeant presently designated the non-commissioned officer in charge ("NCOIC") of the Firearms Training Unit ("FTU").  He is the immediate supervisor of Plaintiffs Price and Warren, both of whom are corporals.

The FTU falls within the DSP's Training Section.  As the NCOIC, Foraker reports to the Assistant Director of Training, who in turn reports to the section's chief, the Director of Training, who is responsible for all training and certification within the DSP.  During the time period at issue here, Foraker reported to Lt. Ralph Davis, the Assistant Director of Training, who in turn reported to Captain Greg Warren, Director of Training.  Both Davis and Warren were suing Defendant Aaron Chaffinch for missed promotions while the events in this case were transpiring.

**The DSP Firing Range and Bullet Trap:**  In 1998, the State Department of Administrative Services ("DAS"), Division of Facilities Management constructed an indoor firing range for the FTU to conduct firearms training.  Over the next two years, the DSP monitored the blood lead levels of troopers assigned to the new facility, and management became concerned about elevated levels in certain troopers.  In an effort to reduce the amount of

lead in the range environment, in late 2000, the DSP switched from leaded ammunition to non-leaded "frangible ammunition." Unfortunately, the use of frangible ammunition had an adverse affect on the bullet trap, the part of the range designed to catch and dispose of spent ammunition. Specifically, the frangible ammunition, rather than simply being caught inside the bullet trap, splattered into fragments and dust (see CA at A-521), forming a hard, clay-like substance that, when mixed with water, proved difficult for FTU personnel to handle. (Id. at A-521; see also id. at A-136 (Warren Dep. 53).) It clogged the bullet trap's pumps, filters, and spray nozzles and caused the bullet trap conveyor system to freeze up. (Id.; see also id. at A-222 (Foraker Dep. 113).) Despite these problems, from late 2000 until December 2003, the FTU staff, including all three Plaintiffs, performed cleaning and other maintenance to keep the bullet trap functioning. (Id. at A-80, A-82 – A-83, A-86 (Price Dep. 40-41, 48-52, 62); A-136 – A-142 (Warren Dep. 51-55; 61-65; 67; 69; 73-76); A-199 – A-200, A-214 (Foraker Dep. 20-23, 81).)

In December 2003, Foraker resumed command of the FTU. He and his staff, including Plaintiffs Price and Warren, decided almost immediately to stop doing the maintenance necessary to keep the bullet trap operational. (Id. at A-89 (Price Dep. 75); A-154 (Wayne Warren Dep. 124); A-214 – A-215 (Foraker Dep. 81-82); see also id. at A-522 (State Auditor's Report).) As a result, the pumps and filters on the bullet trap became clogged, shooting areas became dry, and more frangible ammunition dust filled the air. (Id. at A-511.5; see id. at A-89 (Price Dep. 76); A-154 (Wayne Warren Dep. 123).) Moreover, Foraker began to encounter additional mechanical difficulties (see id. at A-504.1 – A-504.5), which he reported up the chain of command. (See id. at A-504.1 – A-504.5.)

On March 20, 2004, the Delaware State News carried a news article describing problems at the firing range and quoting Capt. Greg Warren for the proposition that the range "is the

absolute epitome of a project from hell since its very inception." (Id. at A-528.) Other news articles followed.

On or around March 21, 2004, the DSP formally closed the range because the bullet trap system was completely broken, the ventilating system was not working as intended, and the entire building was contaminated with lead and other hazardous materials.

**The Media Tour:** On April 6, 2004, DAS Secretary Gloria Homer conducted a media tour through the shut-down range. Defendant Superintendent Chaffinch attended the tour, after which he was asked questions by the media and was quoted as follows in the State News:

He [Chaffinch] said he attended a "staff shoot" in September.

"There was some discoloration in the bullet trap but that was about it," he said. "I think people who live in glass houses shouldn't throw stones. It's a lot dirtier now. Things seemed in their proper places in the fall. I've never seen it like this."

Asked what "people" he was referring to, Col. Chaffinch said he was referring to "the people that provided (the media) with this information in the first place."

"The previous sergeant in charge did a good job," he continued. "Things changed in December when another sergeant came in. That's at least a portion of where the ball was dropped."

The "previous sergeant" was Sgt. Richard Ashley, who was picked by the colonel in April 2002 to replace Sgt. Christopher D. Foraker as range supervisor.

After Sgt. Foraker successfully sued the colonel in U.S. District Court last year, the court ordered Sgt. Foraker returned to his old job. Capt. Warren has a federal job discrimination lawsuit against Col. Chaffinch pending.

"We will work collectively with Administrative Services to make corrections and establish a standard operating procedure protocol," Col. Chaffinch said.

"If the people that are assigned here now don't feel that protocol is part of their protocol, they will be assigned elsewhere."

Contacted later, Col. Chaffinch said Sgt. Ashley has retired. He would not permit the Delaware State News to interview Capt. Warren or Sgt. Foraker.

-4-

"I have the authority to say yes or no," he said.  "I'm not going to allow those people to be interviewed at this point in regard to this particular situation.  I'm not trying to create any more of a mess than we already have."

He praised Sgt. Ashley for his work at the range.

"Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning," he said.  "Sgt. Ashley was willing to do that."

"I cannot say Sgt. Foraker was willing to do that.  He was interested in instruction and teaching people how to shoot.  He did not feel (bullet trap cleaning) was part of his purview.  He felt that was putting him in harm's way."

(CA at A-533 – A-538.)

**Auditor's Report:**  On April 21, 2004, the Governor requested the Auditor of Accounts for the State of Delaware ("State Auditor") to review "the issues surrounding the closing of the DSP Firing Range in March 2004."  (Id. at A-512.)  On May 12, 2004, investigators interviewed Capt. Greg Warren and Plaintiffs Foraker, Price, and Warren, at the office of their common attorney in Wilmington.  The Auditor's investigators re-interviewed Capt. Warren, Sgt. Foraker, and Cpl. Price at their attorney's office on July 28, 2004.

The State Auditor issued his report on October 12, 2004.  He made the following conclusions pertinent to this case:

> On December 1, 2003, a new Sergeant took over command of the firing range.  In an interview he informed us that shortly thereafter he met with the current staff and as a result of that meeting a decision was made not to perform any maintenance at the range. The staff made the decision not to continue performing maintenance and custodial functions due to health related issues and not being qualified to perform those functions.

> On December 19, 2003, the Sergeant in charge sent an e-mail to his superiors noting that the conveyor system was not functional and expressing his and his staff's concern with health related issues pertaining to their performing maintenance on the bullet trap and recovery system.  The Sergeant also indicated he had contacted the conveyor system supplier and an environmental group to resolve the current problems.

> We found <u>no evidence in the documentation made available to us where DSP command was notified that range staff would not be performing duties related to the maintenance and custodial functions historically accomplished by range staff</u>.  The DSP provided us with information that identified 42 days of firearms training from December 2003 until February 2004.  In addition, the DSP Lieutenant Colonel stated that he spoke to the Captain in charge of the range and asked him whether or not the range should be closed and he was told by the Captain that the range did not need to be closed.
>
> * * *
>
> <u>We can only surmise that with the failing of the conveyor system, no maintenance performed on the bullet recovery system, and no custodial maintenance being performed to clean the firing range, that these situations contributed to an unhealthy and unclean environment leading to the ultimate closing of the firing range</u>.

(CA at A-522 (emphasis added).)  In other words, Price, Warren, and Foraker played a role in the demise of the firing range because they stopped performing maintenance on the bullet trap but kept using it, knowing that, if they did so, failure would be the certain result.

**The FTU Staff Requested Medical Evaluations:**  On February 3, 2004, Plaintiff Kurt Price asked Plaintiff Foraker by e-mail for a "medical evaluation and testing performed by Omega Medical Service."  (<u>Id.</u> at A-504.6.)  Plaintiffs' request was not limited to blood lead testing.  On March 1, 2004, physicians at Omega took blood and urine samples, primarily to determine the troopers' exposure to heavy metals, and performed standard physicals, including, among other things, hearing exams.  (<u>See, e.g.</u>, <u>id.</u> at A-652.)  The results were essentially normal except that the examinations revealed that all three Plaintiffs had suffered hearing loss.[2] (<u>Id.</u> at A-636 – A-640; A-713 – A-717; A-775 – A-785.)

---

[2] Plaintiffs express concern about their exposure to lead, copper, and other heavy metals and represent that they have experienced "unsafe levels" of that material in the bloodstreams.  (<u>See, e.g.</u>, Plaintiff's Opening Brief, <u>Foraker v. Chaffinch</u>, No. 04-1207 (D. Del.), at 8.)  In fact, Omega concluded that Plaintiffs levels were within a normal or

Continued…

Plaintiff Price went on March 11, 2004, to Dr. Steven Cooper, his personal ear, nose, and throat specialist to have his hearing tested again.  (Id. at A-661, A-666.)  Defendants did not request or direct Price to go to Dr. Cooper.  Cooper confirmed that Price had hearing loss in both ears.  Price immediately filed a First Report of Occupational Disease or Injury on March 16, 2004.[3]  (Id. at A-647 – A-649.)

Plaintiff Warren also filed a First Report of Occupational Disease or Injury for hearing loss on March 16, 2004.  (Id. at A-724 – A-726.)  Of his own accord, Warren saw Dr. Cooper on April 7, 2004, and Cooper confirmed Omega's report that Warren had significant hearing loss. (Id. at A-739 – A-741.)

Plaintiff Foraker filed his First Report of Injury for hearing loss on April 22, 2004.  (Id. at A-786 – A-788.)  The fourth FTU trooper, James Warwick, filed a First Report of Injury for hearing loss on May 25, 2004.

At a March 17, 2004 meeting of DSP personnel involved in range problems, FTU personnel reported to Lt. Col. MacLeish that Warren and Price had been tested and found to have hearing loss.  (Id. at A-457 – A-458; A-461.)  Based on this information and Plaintiffs' own claims of injury, Lt. Col. MacLeish[4] directed all four permanent FTU personnel to return to

----

….Continued

satisfactory range.  (see, e.g., CA at A-625 (letter from Omega Medical Center stating that Price's "[b]lood levels of Copper, Zinc, Lead and Zinc Protoporphyrin are all within normal limits"); A-650 (Letter from Omega concluding that whole blood lead levels for all FTU officers were "within normal limits").)  In fact, although Plaintiffs have been tested repeatedly, no medical opinion has ever concluded that they had "unsafe" levels of lead or any other heavy metal in their blood.

[3] A first report of occupational injury or disease is a predicate for a workers compensation claim against the State.

[4] Defendant Chaffinch played no role in any of the decisions on testing of the FTU troopers or their assignments after the testing.  Chaffinch was on administrative suspension and not working from October 27, 2004, through March 25, 2005.

Omega for a re-test.[5] (See, e.g., id. at A-731, A-804.)  All four FTU officers were again determined to have suffered hearing loss.  (Id. at A-668 – A-673; A-732 – A-738; A-804 – A-808; A-979 – A-983.)

Lt. Col. MacLeish then directed all four FTU officers to undergo formal fitness-for-duty examinations with Dr. Aaron Green of Health Works in Dover.  (Id. at A-678; A-753; A-816; A-984.)  Green regularly conducts physical examinations for the DSP, including fitness-for-duty examinations.  Green concluded that Plaintiffs Price and Warren had suffered sufficient noise-induced hearing loss that each was "not fit to perform as an ordnance officer without anticipated compromise in his impaired hearing," and that because of the dependence of a police officer on optimal hearing ability, they could not function safely as state troopers.  Green also noted that hearing aids would not effectively remediate Price's and Warren's hearing loss.  MacLeish put both Plaintiffs on rehabilitation, or "light duty," status on June 25, 2004.  (Id. at A-685 – A-686; A-758 – A-759.)  Dr. Green also saw Plaintiff Foraker, but determined that Foraker was fit for duty.  (Id. at A-817 – A-819.)

MacLeish then sent all four FTU officers to Dr. Edward A. Emmett, Director of Academic Programs in Occupational Medicine at the University of Pennsylvania Medical Center, for a second opinion on both hearing loss and whether any of the four had suffered from excessive exposure to lead or other toxic substances.  (Id. at A-502 – A-503; A-692; A-764; A-827; A-995.)  Dr. Emmett examined all four in October 2004.  He concluded fairly quickly that Plaintiff Foraker and James Warwick were capable of working as state troopers.  (Id. at A-834; A-1006.)  On the other hand, Dr. Emmett concurred with Dr. Green that both Price and Warren

---

[5] Cpl. James Warwick was the fourth permanent member of the FTU staff, having been assigned to the FTU in November 2003.  Unlike Plaintiffs Foraker, Price, and Warren, he did not make statements to or answer questions from the Auditor's investigators.  Nevertheless, he was directed to have his hearing examined.  (CA at A-978.)

did not meet the essential job requirements for a trooper because they appeared unable "to acutely utilize sensory systems to discern various stimuli of danger, and to maximize operational efficiency." (Id. at A-694 – A-700; A-765.1 - A-765.7.) However, Dr. Emmett also recommended that Price and Warren undergo "functional hearing testing" by a Penn audiologist. (Id. at A-701; A-766.)

Price and Warren returned to Penn in February 2005 for the functional hearing test. The functional hearing test confirmed the findings for Price. (Id. at A-704 – A-705.) With respect to Warren, however, Dr. Emmett found that his "functional hearing ability would meet the job requirements for a Delaware State Trooper." (Id. at A-767 – A-768.) When the DSP informed Plaintiff Warren that he was cleared to return to full duty, Warren objected. (Id. at A-769.) On March 16, 2005, Warren met with Emmett yet again and explained that, in his own opinion, he was not fit for duty. (Id.; see also id. at A-772.) Considering Warren's objections, Dr. Emmett revised his opinion and declared Warren unfit for duty due to hearing loss. (Id. at A-769.)

Thus, by March 18, 2005, a year after Plaintiffs' hearing problems first arose, Foraker remained the NCOIC of the FTU, Warwick worked in the FTU, and Price and Warren were on rehabilitation status.

## IV.  ARGUMENT:  THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT BECAUSE THE UNDISPUTED MATERIAL FACTS ESTABLISH THAT THE DEFENDANTS – NOT THE PLAINTIFFS – ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.

Plaintiffs claim that Defendants Chaffinch and MacLeish took retaliatory, adverse action against them because of their speech about conditions at the indoor firing range. They now move for summary judgment. Plaintiffs, however, have failed to establish the elements of their First Amendment retaliation claims. In fact, for the reasons set forth in their own motion, Defendants – not Plaintiffs – are entitled to judgment as a matter of law.

A claim of First Amendment retaliation "is analyzed under a three-step process." Green v. Phila. Housing Auth., 105 F.3d 882, 885 (3d Cir. 1997) (citations omitted). First, Plaintiffs must demonstrate that each of them engaged in protected activity, i.e., exercised his constitutional right to free speech. Shehee v. City of Wilmington, 67 Fed. Appx. 692, 693 (3d Cir. 2003). Second, they "must show the protected activity was a substantial or motivating factor in the alleged retaliatory action." Green, 105 F.3d at 885 (citing Swineford v. Snyder County Pa., 15 F.3d 1258, 1270 (3d Cir. 1994)). Lastly, Defendants may defeat Plaintiffs' claims "by showing that the same actions would have been taken even absent the protected conduct." Shehee, 67 Fed. Appx. at 693-94.

### A.    Plaintiffs' Protected Activity

The Defendants accept that enough of the Plaintiffs' "speech" during the time period relevant to this action was about "public concerns" to satisfy the requirement that they have engaged in a protected activity. Defendants point out that much of the "speech" was about personal health issues and how and when the DSP had them tested medically, and that all this speech is probably not protected. See Connick v. Myers, 461 U.S. 138, 147 (1983). However, complaints that the range conditions presented a danger to state troopers and law enforcement agents from other agencies have a public component and are protected under the First Amendment.

### B.    Plaintiffs Are Not Entitled To Summary Judgment Because Plaintiffs' Speech Was Not A Motivating Factor In Defendants Actions.

Whether Plaintiffs' protected activity was a substantial or motivating factor in retaliatory action requires two analyses. Schneck v. Saucon Valley Sch. Dist., 340 F. Supp. 2d 558, 568 (E.D. Pa. 2004). First, Plaintiffs must show that Defendants took adverse action against them. Id. (citation omitted). Second, Plaintiffs must show that Defendants took the adverse actions to

retaliate for Plaintiffs' protected activity.  Id.  The record in this case does not establish beyond dispute and for purposes of Plaintiffs' Motion that the Defendants took materially adverse actions against them out of retaliatory motives.

>    1.    **Plaintiffs have not suffered an adverse action as a result of Col. Chaffinch's media comments.**

All three Plaintiffs argue that, because of their "pleas for help" with the range, Defendants "launched a local, national and international media campaign, falsely blaming plaintiffs for destroying the FTU."  (Plfs.' Op. Brief 14.)  Plaintiffs rely specifically on comments made by Col. Chaffinch at an April 6, 2004, media tour of the range.  (Id.)  The Plaintiffs now admit that Col. MacLeish was not present at this tour (Pl.'s Foraker Op. Brief 15), and they cannot identify anything that MacLeish did or said that could be construed as "falsely blaming" them for the shut down of the range.  Thus, the Court should grant summary judgment on any claim against MacLeish arising out of the April 6, 2004 media tour.

Turning to Chaffinch, the claim that his statements on the media tour is actionable under the First Amendment and 42 U.S.C. § 1983 is legally insufficient.  First, a review of the news article that contained Chaffinch's statements shows no reference to Plaintiffs Price or Warren; therefore, their claims against him should fall by the way side.  Chaffinch said "people who live in glass houses shouldn't throw stones," which referred to the DSP Academy personnel who were suing him, i.e., Capt. Warren and Lt. Davis.[6]  (CA at A-286, A-316 (Chaffinch Dep. 68, 186).)  This comment does not implicate Price and Warren.

Second, contrary to Plaintiffs' suggestion that Defendants "orchestrated" a scheme to publicly attack Plaintiffs, the evidence is clear that neither Col. Chaffinch nor MacLeish sought

---

[6] Baylor testified that he assumed Chaffinch was talking about the Academy staff because "all of them had suits" against Chaffinch.  (Pls.' App. at A399 (Baylor Dep. at 389).)  At this time, Greg Warren and Ralph Davis were suing Chaffinch, and Foraker had already sued Chaffinch.

to interest the media in the indoor firing range.  The first DSP official to comment on the range was Plaintiffs' supervisor (and fellow litigant) Capt. Greg Warren.  Warren's comments were inflammatory in the extreme.  (Id. at A-528 – A-532.)  Defendants, on the other hand, had every reason to avoid publicity.  (See, e.g., CA at A-306 (Chaffinch Dep. at 146); A-334 (MacLeish Dep. 35).)

Third, Col. Chaffinch did not, and never has, "falsely blamed" Plaintiffs for the shut down of the range.  (Id. at A-283 – A-284 (Chaffinch Dep. at 56-57); cf. id. at A-336 – A-337 (MacLeish Dep. at 45-46).)  The problems at the range were admittedly related to a "whole bunch" of issues.  (Id. at A-284 (Chaffinch Dep. 59).)  One of those issues, according to the State Auditor, was Plaintiffs' refusal to perform the routine maintenance that FTU troopers had performed on the bullet trap since 1998.  (Id. at A-512 – A-513.)  Chaffinch merely explained that Plaintiffs played a role in the problems at the range.  While some might disagree with Chaffinch's choice of words, those words are substantially accurate.

Lastly, Chaffinch's statements are at most the type of "criticism, false accusation, or verbal reprimands" that do not, as a matter of law, adversely affect an employee in the exercise of his First Amendment rights.  Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003) (citation omitted); see McKee v. Hart, --- F.3d ----, No. 04-1442, 2006 WL 27474, at *4-*5 (3d Cir. Jan. 6, 2006) ("[N]ot every critical comment – or series of comments – made by an employer to an employee provides a basis for a colorable allegation that the employee has been deprived of his or her constitutional rights.") (citing Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000)).  None of the Plaintiffs have been disciplined by the DSP.[7]  Prior to his medical leave

---

[7] Plaintiffs argue that the lack of disciplinary proceedings proves that Chaffinch's comments at the range were "malicious falsehoods."  (Pl.'s Foraker Op. Brief. 19-20.)  On the contrary, that neither Col. Chaffinch not Col. MacLeish have sought to punish Plaintiffs for their work at the range indicates that, while they consider Plaintiffs'

Continued…

beginning in November 2005, Foraker remained a full-duty trooper in charge of the FTU. He will presumably continue to be a trooper until he reaches the mandatory retirement age of 55 in 2017. As discussed below, Price and Warren have been placed on light duty, but for legitimate, necessary, and obvious reasons unrelated to anything Chaffinch said on April 6, 2004.

To show that their rights have been adversely affected, Plaintiffs must identify some part of Chaffinch's statements that contains "a threat, coercion, or intimidation intimating that punishment, sanction or adverse regulatory action will imminently follow." Suarez Corp., 202 F.3d at 687 (citation omitted). Accord X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 67-72 (2d Cir. 1999). To allow the Plaintiffs to sue Chaffinch for making non-threatening but true statements about them implicates Chaffinch's own First Amendment rights, as well as his duty to address matters of public concern. Chaffinch's comments, of course, do not contain a threat or coercive remark. Thus, Chaffinch's comments are not actionable.

> **2.**  **Plaintiffs' protected activity was not a substantial or motivating factor in Defendants' decisions about fitness-for-duty exams and Plaintiffs' work status.**

Faced with Plaintiffs' own claims of compensable hearing loss, then Lt. Col. MacLeish directed all three Plaintiffs and the fourth FTU member James Warwick to undergo fitness-for-duty exams. (See supra pp. 6-8.) Foraker and Warwick were determined to be fit for full duty, and both continued to serve in the FTU, Foraker as the NCOIC. Dr. Aaron Green found Price and Warren not fit for duty, and MacLeish placed them on light duty. After a second opinion confirmed Dr. Green's findings, MacLeish directed Price and Warren to seek separation from the DSP. Col. MacLeish later suspended that directive, and Price and Warren remain troopers

---

….Continued

failure to clean the range to be one of the factors leading eventually to the range's closing, they do not consider it the solely determinative one. That is, Defendants do not "blame" Plaintiffs for the destruction of the range, and Col. Chaffinch's comments are to be understood in this light.

within the two-year maximum light-duty period set forth in the DSP administrative manual.  The manual calls for them to separate on or about June 25, 2006.

Plaintiffs contend that Col. MacLeish's actions in sending them for testing, placing them on light duty, and directing them to separate are retaliatory acts.  To be awarded summary judgment, however, Plaintiffs must prove beyond dispute that Col. MacLeish acted because of Plaintiffs' protected speech.  Plaintiffs have identified eleven types of evidence to establish Defendants' retaliatory motive towards Plaintiffs, including Defendants' purported anger, violations of law and policies, alleged falsehoods, and something they call the "big picture." (Pls.' Op. Brief 32-36.)  However, summary judgment requires Plaintiffs to prove causation, as well as motive.  In this case, Col. MacLeish says that he acted for legitimate reasons unrelated to Plaintiffs' speech.  Thus, Plaintiffs have failed to prove as a matter that Defendants violated their First Amendment rights.

a.    <u>Defendants were not motivated to act by Plaintiffs' speech.</u>

Plaintiffs point out that Col. MacLeish was "unhappy that plaintiffs' speech caused the DSP to get back on the front pages of the newspapers" and that he appeared to Foraker at times to be "visibly angered and frustrated."  (Pls.' Op. Brief 24.)  It cannot be doubted that Col. MacLeish preferred not to have the DSP in the papers.  (<u>See, e.g.</u>, <u>Id.</u> at A-334 (MacLeish Dep. at 35).)  MacLeish, however, has specifically denied that "personal animosity" played a role in how he and Chaffinch addressed the range and Plaintiffs' treatment.  (<u>Id.</u> at A-371 (MacLeish Dep. at 184).)  He has explained that he sent Plaintiffs to fitness-for-duty exams because of their "hearing-related issues" (<u>id.</u> at A-366 (MacLeish Dep. 163-164)) and that he put Price and Warren on light duty out of concern for "their welfare and the welfare of the public."  (<u>Id.</u> at A-373 (MacLeish Dep. 193).)  Thus, MacLeish acted to protect Plaintiffs' health, not to punish them for speaking out about the range.  (<u>See, e.g.</u>, <u>id.</u> at A-367 (MacLeish Dep. at 168-69);

-14-

A-372 (MacLeish Dep. 186); A-373 – A-374 (MacLeish Dep. 193-94).) Defendants submit that the record in its entirety shows that no reasonable jury could find that Col. MacLeish was motivated by a retaliatory purpose. At the very least, there is a genuine dispute of fact on this point, and Plaintiffs are not entitled to summary judgment.

> **b.** <u>Defendants have properly enforced the DSP policies regarding injury and rehabilitation leave.</u>

Plaintiffs Price and Warren attempt to prove improper motive by arguing that Col. MacLeish violated or selectively enforced DSP policies to their detriment and that other similarly situated troopers have been treated more favorably. The records that Plaintiffs themselves have attached in the sealed volume to their Appendix establish that there is no basis for this contention. In some cases, Plaintiffs have even misrepresented the facts in their own Appendix in an effort to make their case.

> *(1)    Plaintiffs Price and Warren have impaired hearing.*

As an initial matter, both Price and Warren have admitted in their deposition testimony that their hearing is too impaired for them to function in the range or in police patrol or SORT team functions. (<u>See, e.g.</u>, <u>id.</u> at A-74 (Price Dep. 16); A-171 (Warren Dep. 190-93).) The medical testimony is undisputed. The question is what to do about it. Citing an e-mail from the former Director of Human Resources John Dillman, Plaintiffs make the somewhat vague contention that the DSP has, in the past, "run away from hearing issues." (Pls.' Op. Brief 17; <u>see also</u> Pls.' App. at A2877.) Plaintiffs' admission and acceptance of their hearing loss makes this argument irrelevant, but the DSP tests the hearing of all new recruits and requires an audiological exam for ordnance officers. (<u>See</u> Appendix to Defendant's Answering Brief ("Defs.' Ans. App.") at B-5 – B-6 (DSP Physical Examination Program).) When specifically asked whether it was DSP policy to "stay away from determining the hearing ability of troopers," Mr. Dillman

-15-

explained the difficulty the DSP had in locating the precise point at which an officer's deteriorating hearing interferes with his performance. (Pls.' App. at A2482 – A2483 (Dillman Dep. 106-07).) He agreed, however, that hearing was an "important attribute" for a trooper and that, even though it was difficult, a doctor ultimately could determine whether a given individual was qualified to do the job. (Id. at A2483, A2486 (Dillman Dep. 107, 110).) Thus, contrary to Plaintiffs' insinuation, the DSP has not ignored hearing problems in its uniformed force. In the case of Price and Warren's hearing problems, MacLeish could not have ignored them even if he wanted to because Price and Warren brought it to his attention. They applied for workers' compensation on March 16, 2004, and they told MacLeish at a meeting on March 17, 2004, that they were losing their hearing. Plaintiff Warren even objected when Dr. Emmett's testing suggested that he could return to full duty. Warren went back and argued with Dr. Emmett until Emmett found him unqualified. In their depositions, Price and Warren have admitted that their hearing loss precludes them from acting as police officers. Having raised the hearing issue and demanded that it be addressed, they cannot now contend that Col. MacLeish violated their rights by doing his job.

Because Price and Warren have admitted to hearing impairment that disqualified them from police duty, their claim that the DSP never developed "any appropriate hearing standards" is irrelevant. (Pls.' Op. Brief 16, 23.) Dr. Green and Dr. Emmett applied the DSP hearing standard: "effectively utilizing sense perception [to] discern various stimuli of danger and to maximize operational effectiveness."[8] (CA at A-469.) The Plaintiffs have not tried to argue that

---

[8] Dillman stated that this standard for "sense perception" was a hearing standard. (Pls. App. at A-2483 (Dillman Dep. 107).)

the medical examiners are wrong – indeed, Plaintiff Warren agreed with Dr. Emmett that he

should be found unfit.  The issue, then, is how MacLeish handled the medical diagnoses.

*(2)    The "Light Duty" Letters*

After Dr. Green declared Price and Warren unfit for duty in June 2004, MacLeish sent

form letters to Price and Warren explaining their rehabilitation status.  (CA at A-685 – A-686; A-

758 – A-759.)  Plaintiffs argue that, by sending these letters, MacLeish violated a DSP "norm"

for retaliatory purposes.  (Pls.' Op. Br. at 19.)  While not every trooper placed on rehabilitation

status receives written confirmation of that status, the Plaintiffs in this case, through their

supervisor Lt. Davis, asked for written confirmation of their situation. (Defs.' Ans. App. at B-4;

CA at A-450 (Yeomans Dep. 234-35).) Given what they did next, they apparently needed a

written document to fuel their litigation machine.  To provide Price and Warren with letters upon

this request is not retaliation.

Price and Warren next contend that the form letter demeans them and restricts them, and

is retaliatory in content.  However, the content of the letters was created by former HR director

Dillman more than ten years before they went out to Price and Warren.  (Pls.' App. at A2473

(Dillman Dep. at 97).)  Contrary to Plaintiffs' assertion that these letters are "unusual,"

Mr. Dillman stated that it "was not unusual" to send a letter like the ones sent to Plaintiffs to

other troopers going on light-duty status.  (Id. at A2475 (Dillman Dep. 99).)  In fact, Defendants

made available to Plaintiffs a letter with identical restrictions sent by another Colonel of the State

Police in 1992.  (Defs.' Ans. App. at B-42 – B-43.)  Thus, MacLeish did not subject Plaintiffs to

a unique, inappropriate, or retaliating practice when he sent letters explaining their work status.

*(3)    Injury, Disability, and Rehabilitation Policy*

The DSP policy regarding disability leave states, "In the event that the illness or injury is

or becomes permanent … and the employee is unable to perform essential job functions, the

-17-

policies regarding pension or separation shall apply." (CA at A-465.) Thus, if a trooper suffers an injury that cannot be rehabilitated, he or she is required to separate from the DSP. (Id. at A-504; A-887; A-900 – A-901; A-905 – A-906; see also id. at A-448 (Yeomans Dep. 228); A-504.) On the other hand, troopers who have sustained injuries that do not permanently prevent them from doing the full job are given up to two years to rehabilitate. (Id. at A-449 (Yeomans Dep. 232); A-504.) Rehabilitation or "light-duty" status is a temporary accommodation that injured troopers are allowed in the hope that they can overcome their injuries and return to full duty. There is, however, no permanent light duty, and troopers cannot be accommodated indefinitely.[9] This has been the policy of the DSP since 1992, and it is the policy that has been applied to Plaintiffs. (CA at A-473; A-481 – A-482; A-490.)

Once Dr. Green found that Price and Warren had suffered so much hearing loss that they were not able to function as ordnance officers or troopers, then-Lt. Col. MacLeish had no choice but to remove them from regular duty at the range and place them on rehabilitation status. Placement on rehabilitation status is an adverse employment action to the extent it restricts the ability of troopers to accept overtime or special pay assignments. A trooper's pay, benefits, seniority, and status are not otherwise affected. MacLeish's decision was forced by circumstances.

Although Warren and Price admit that they have suffered hearing loss that renders them unfit, they contend that, contrary to the separation policy, MacLeish should find them jobs somewhere in the DSP where they can continue to serve until age 55 without encountering the

---

[9] Under the ADA, an employer is entitled to require its employees to be capable of performing all of the essential functions of a position, even if each employee is not required to perform each function on a regular basis. Santos v. Port Authority of New York and New Jersey, 94 Civ. 8427, 1995 WL 431336, at *2 (S.D.N.Y. July 20, 1995) (holding that Port Authority was not required to create permanent light duty status for police officer because it "would require redefinition of the essential functions of the job").

need to perform as police officers.  (Id. at A-113 (Price Dep. 170-73); A-173, A-175 (Warren Dep. 198-99, 209)).)  In Warren's case, this would be until the year 2013; in Price's case, it would be the year 2018.

Plaintiffs Price and Warren contend that the DSP is treating them less favorably than other troopers who have sustained injuries from time to time over the past twenty years and that they "simply want 'to be accommodated'" as they believe these other troopers have.  (Pls.' Op. Brief 18 n.19 (citation omitted).)  Plaintiffs have identified twenty-three troopers they think are similarly situated.

Of the twenty-three troopers Plaintiffs have identified, the DSP carried fourteen on light-duty status for two years or less, directing them to separate from service at or before the end of the two year period.  This is consistent with the policy cited above.  If the trooper's pension was not approved by the end of the two years, the DSP carried the trooper in a pay status until the state pension board acted on the pension application.  None received permanent light-duty assignments.

The treatment afforded these fourteen troopers – Citro, Condron, Jackson, Loveless, Merritt, Mosley, Nowrey, Peachey, Romanelli, Sczubelek, Armistead, Price, Sarley and Schleifer – is precisely what has been afforded to Price and Warren, who also are classified as on rehabilitation status, known as "light duty," and are within the two-year limit for that classification.  Price and Warren are free to apply for their pensions at any time, but they must be separated at the end of two years if they have not improved to the point where they can resume full duty.  The only difference between the Plaintiffs and the officers in the group of fourteen is that doctors found Plaintiffs' disabling injuries to be permanent less than a year after they first went on rehabilitation status.

Of the twenty-three troopers Price and Warren have identified in their summary chart (Pls.' App. at A3618-3619), three – Jahn Hitchens, Scott Warner and Jeff David – returned to full duty after periods of two years (more or less) on light duty. (Defs.' Ans. App. at B-44 - B-56.) They are active troopers today and therefore are not comparable to Price or Warren.[10]

Plaintiffs include on their list Cpl. Anthony DiAllesandro, who suffers from cancer and has been on light duty since January 2005. Because he has been on light duty for only 13 months and because it is impossible to determine how his situation will ultimately be resolved, his status provides no support for Plaintiffs' argument.

Price and Warren contend that five of the twenty-three injured troopers over the past twenty-three years have been "accommodated" with assignments that did not call for them to use the injured part of their body. It is noteworthy that there is no documentary evidence of accommodation of this type, nor is it allowed by the policy quoted above. The oral testimony Plaintiffs use in support of these assignments does not support their theory.

David Henderson, it is alleged, was assigned to "Supply" after a back injury and worked there until retirement. No one with any personal knowledge of Henderson's situation has testified that this assignment was made because of the injury. Henderson was never deemed permanently unfit for duty not placed on the light duty list. The records establish the following:

- Henderson sustained an injury in 1983;

- Henderson worked full time with no restrictions until 1998; and

- Henderson became disabled in 1998 and applied for a state disability pension, which he received in March 1999.

---

[10] Warren could have been comparable to Sgt. Hitchens, who spent two years on the rehabilitation list from 1997 to 1999. When faced with the prospect of retirement, Hitchens changed doctors, received approval for an unrestricted return to duty, and, in fact, returned. (Defs.' Ans. App. at B-45 – B-47.) Wayne Warren received approval from Dr. Emmett at the University of Pennsylvania for an unrestricted return to duty on February 28, 2005. Warren asked for another appointment with Dr. Emmett and persuaded Emmett to change his mind.

(Defs.' Ans. App. at B-57 - B-59.)  There is no basis in the factual record – as opposed to the Plaintiffs' well-stocked rumor mill – to conclude that the colonel in 1983 placed Henderson in a fifteen year sinecure because of his bad back.

Steve Swain, it is alleged, sustained an injury to his vocal chords in 1983, and has been accommodated with an assignment as an evidence technician ever since.  None of the witnesses who testified about Swain (Baylor, Price, and Warren) was in a position to know why or how Swain became an evidence technician.  The records Plaintiffs have submitted clearly state that Swain has been and is "medically qualified with no limitations," notwithstanding "recurrent neck, recurrent back pain" and other problems.  Indeed, Maj. Joseph Papilli testified in his deposition that Swain's position as evidence technician demands that he testify in court, work crime scenes, and perform evidence collection functions.  He further stated that Swain has had no problems performing any of the duties required of him.  (Id. at B-9 (Papili Dep. 75-77).)  The admissible evidence about Cpl. Swain does not support the contentions Price and Warren have made.[11]  (See id. at B-79 - B-92.)

Cpl. Michael Jordan, it is alleged, suffered an injury sometime in the 1990's and became a court liaison officer as a permanent accommodation.  Once again, Plaintiffs cite Captain Baylor as their source.[12]  Baylor's "facts" are not borne out by the record.  According to DSP records, Jordan sustained a knee injury on duty in 1998.  (Id. at B-61.)  The DSP placed him on the light

---

[11] Rule 56, Fed.R.Civ.P., requires that a summary judgment motion be supported or opposed with admissible evidence.  A review of the "evidence" Plaintiffs rely on in connection with many of these conspirators reveals it to be without personal knowledge, based on rumors and hearsay.  (See, e.g., Pls.' App. at A279 (Baylor Dep. 158-59); A338 (Baylor Dep. 302); A340 – A341 (Baylor Dep. 313-14).)  The court should ignore testimony that a particular colonel of antiquity made an accommodation assignment of the type alleged in this case unless the witness actually made the assignment.  The Plaintiffs have questioned no such witnesses.

[12] In fact, Baylor admits that he does not know whether the policy concerning rehabilitation status and injury leave was applied to Cpl. Jordan.  (Pls.' App. at A341 (Baylor Dep. 316).)

duty list and assigned him to the job of court liaison officer for a period of less than two years. In March 2000, Jordan applied for a disability pension, which he received.  (Id. at B-62 – B-67.) He did not receive a permanent light-duty accommodation.  His situation is like the fourteen (and Price and Warren) who sustained injuries and were placed on light duty for less than two years in accordance with the written DSP policy.  At some point, they retired.

Plaintiffs allege that Major Joseph Forester suffered from bilateral hearing loss, but was accommodated for a period of 20 years until 2000.  First, there is no evidence that Forester ever received a light-duty assignment or an accommodation assignment of any kind.  Furthermore, Major Forester was never declared by any physician to be unable to perform his duties.  In fact, the records establish the opposite.  (See id. at B-68 - B-75.)  Forester received a service, rather than a disability, pension when he retired.  (See id. at B-76 - B-78.)  Whatever the extent of his hearing impairment, there is neither a record of Forester being unqualified nor a record of an accommodation assignment.  For that reason, he is not comparable to Price or Warren.

Finally, it is alleged that a Corporal Powell was accommodated despite a hearing problem.  The only source for this allegation is Defendant Col. MacLeish, who testified that he remembered "many, many years ago" a corporal who was hard of hearing but that it "[o]bviously wasn't enough to keep him off the job."  (CA at A-368 (MacLeish Dep. 172-73).)  There is no evidence that Powell was not medically qualified to do the job or that he was accommodated.

A final point on the history of light duty and medical accommodations in the DSP is that the failure of Col. MacLeish to handle troopers with injuries in 2005 the same way that predecessor superintendents ten or twenty years ago handled them is not evidence of a retaliatory motive in this case.  Col. MacLeish can certainly be held to consistency in applying the written DSP policies.  If he deviates from those policies or acts inconsistently in dealing with similarly

-22-

situated troopers, a finder of fact is entitled to think he might be acting out of an impure motive. However, it is not probative of an impure motive for MacLeish to act differently from his predecessors when he does not know what those predecessors did. Plaintiffs Price and Warren have speculated mightily in their motion papers about personnel decisions made as early as 1983, contending without any evidentiary support that some other colonel working with another human resources director treated someone better by putting that trooper in a soft job. The Plaintiffs have submitted no proof that Col. MacLeish even knew about most of these situations, let alone the motivation behind them. Even if one could accept that a prior colonel tried, against the best interests of the taxpayers of the State of Delaware, to protect an officer from having to take an early disability retirement, a finder of fact could not reasonably decide that Col. MacLeish's failure to follow suit was retaliatory.

### 3.    Plaintiffs' other allegations do not amount to adverse action.

Plaintiffs Price, Warren, and Foraker claim that they have suffered "other adverse action" because of their range-related speech. (Pls.' Op. Brief 15.) Rather than refer to the record, they direct the Court (and the Defendants) to their Opening Brief in the Foraker case. This is because none of the "other adverse action" was directed towards Price or Warren.

### C.    Plaintiffs Are Not Entitled To Summary Judgment Because Defendants Would Have Treated Them The Same Way, Regardless Of Plaintiffs' Allegedly Protected Activity.

### 1.    Defendants have not waived this defense.

The third step of the applicable legal analysis allows Defendants to defeat Plaintiffs' retaliation claims "by showing that the same actions would have been taken even absent the protected conduct." Shehee v. City of Wilmington, 67 Fed. Appx. 692, 693-64 (3d Cir. 2003). This is often referred to as the "Mt. Healthy defense." See, e.g., Guzman-Ruiz v. Hernandez-Colon, 406 F.3d 31, 34 (1st Cir. 2005) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,

429 U.S. 274, 287 (1977)).  Plaintiffs argue that they are entitled to summary judgment under

this analysis, not because the material facts require judgment in their favor as a matter of law, but

because Defendants "chose not to assert [this] affirmative defense."  (Pls.' Op. Brief 36.)

Relying only on the general rule set forth in Rule 8(c) of the Federal Rules of Civil Procedure,

Plaintiffs conclude that Defendants' failure to plead waives the defense.  (Id. (citing Charpentier

v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991).)

 Plaintiffs' interpretation of federal pleading rules is "unduly restrictive."  2 James Wm.

Moore et al., Moore's Federal Practice § 8.07[2] (3d ed. 1997) (citing cases).  A majority of

courts, including those in this district, have held that a technical failure to raise an affirmative

defense by responsive pleading does not always result in waiver of the affirmative defense,

particularly where, as here, it was clear from the outset that the issue was central to the case.

Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1374 (3rd Cir. 1993); Charpentier v. Godsil,

937 F.2d 859, 863 (3d Cir. 1991); see also Anderson v. United States, Civ. A. No. 93-589-MMS,

1996 WL 490262, at *9 n.9 (D. Del. Aug. 23, 1996) (noting that "[i]t is hornbook law that failure

to raise an affirmative defense in a responsive pleading does not automatically result in waiver")

(citations omitted).  Rather, a court may consider the merits of the defense if it is raised prior to

trial, including by motion for summary judgment, and the plaintiff has not shown any prejudice.

Charpentier, 937 F.2d at 863; Aubrey Rogers Agency, Inc. v. AIG Life Ins. Co., 55 F. Supp. 2d

309, 315 (D. Del. 1999) ("Courts, however, have allowed an affirmative defense to be raised for

the first time in a post-answer motion for summary judgment in instances where no prejudice to

the non-moving party results.") (citing Smith v. Sushka, 117 F.3d 965, 969 (6th Cir. 1997);

Dennis v. General Imaging, Inc., 918 F.2d 496, 499-500 (5th Cir. 1990); Pantzer v. Shields

Development Co., 660 F. Supp. 56 (D. Del. 1986)); Int'l Poultry Processors, Inc. v. Wampler

Foods, Inc., No. Civ. A. 98-4612, 1999 WL 33456488, at *3 & n.6 (E.D. Pa. Apr. 29, 1999)

(holding that a "motion for summary judgment … may nonetheless be appropriate [way to raise

previously unpled affirmative defense] if plaintiff is not prejudiced").

     Defendants raised the Mt. Healthy defense in their Opening Brief in support of their own

Motion for Summary Judgment, where they established that Col. MacLeish "would have ordered

the fitness-for-duty exams, would have put Price and Warren on light-duty or rehabilitative

status, and would have directed Price and Warren to separate from the DSP even if Plaintiffs had

never spoken out about conditions at the range."  (Defs.' Op. Brief 34.)

     Plaintiffs have not – and cannot – claim that they have been prejudiced by Defendants'

assertion of this defense.  First, Plaintiffs were not surprised.  In fact, Plaintiffs raised the Mt.

Healthy defense in their Complaint and Amended Complaint, alleging specifically that

"defendants cannot prove by a preponderance of the evidence that absent a constitutional

violation they would have had grounds to adversely treat plaintiffs."  (See Compl. ¶ 94; Am.

Compl. ¶ 94).  By denying these assertions, Defendants clearly put the defense in play.  (See

Ans. to Comp. ¶ 94; Ans. to Am. Compl. ¶ 94.)

     Second, the Mt. Healthy defense is essentially an argument over the "but-for" cause of

Defendants' actions towards Plaintiffs, which is the essential factual question in any First

Amendment case.  See Suppan, 203 F.3d at 236 (holding that Mt. Healthy requires defendant to

establish that protected activity was not the "but for" cause of retaliatory acts).  Plaintiffs had

ample opportunity to conduct discovery on causation, and, as evidenced by the enormous record

on which they rely, Plaintiffs' ability to ascertain all relevant facts was not inhibited by

Defendants' failure to specifically delineate the Mt. Healthy defense in their Answers.  As a

result, Plaintiffs have sufficient information to fully address Defendants' argument.  See

Sanderson-Cruz v. United States, 88 F. Supp. 2d 388, 392 (E.D. Pa. 2000) (finding that

"evidentiary record … is extensive and that discovery to date is sufficient for [plaintiff] to

successfully oppose the motion … for summary judgment").

Lastly, Defendants have raised the Mt. Healthy defense in sufficient time to allow

Plaintiffs to fully brief the issue and "to argue, if [they] can, why the imposition of [the defense]

would be inappropriate." Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 350

(1971); see also  Charpentier, 937 F.2d at 864 (holding that affirmative defense not waived if

raised in "pragmatically sufficient time"); Kleinknecht, 989 at 1374 (holding that plaintiffs'

ability to respond not prejudiced by receiving notice of affirmative defense in motion for

summary judgment); Curry v. City of Syracuse, 316 F.3d 324, 330-31 (2d Cir. 2003) (holding

assertion of affirmative defense in reply brief did not prejudice plaintiff given opportunity to

brief issue in sur-reply); Smith v. Sushka, 117 F.3d 965, 969 (6th Cir. 1997) (finding that

defendant's assertion of affirmative defenses in a second motion for summary judgment did not

unfairly prejudice plaintiff given "opportunity to fully respond to and brief the issues").[13]

> **2.    The record shows that Defendants would have treated Plaintiffs in the
> same way even if they had not engaged in protected activity.**

It is undisputed that Price and Warren themselves brought their hearing deficiencies to

the attention of then-Lt. Col. MacLeish.  MacLeish owed duties to the Plaintiffs, their fellow

troopers, and the citizenry of Delaware to determine whether the Plaintiffs were fit for duty.  He

---

[13] Rule 15(a) of the Federal Rules of Civil Procedure provides that a responsive pleading "may be amended at any time by leave of court to include an affirmative defense, and 'leave shall be freely given when justice so requires.'" Charpentier, 937 F.2d at 863-64 (citation omitted).  For the reasons set forth above, Defendants have established the conditions necessary for leave to amend their Answer to Plaintiffs' Amended Complaint to include expressly the Mt. Healthy defense.  Given the state of the proceedings and Defendants' present reliance on that defense, the Court has the discretion to treat Defendants' Answer as amended, even in the absence of a written motion seeking that specific result.  See, e.g., Anderson, 1996 WL 490262, at *9 n.9.  If the Court deems it necessary, however, Defendants are prepared to submit a formal motion to for leave to amend their Answer to Plaintiffs' Amended Complaint.

also had an obligation to protect the integrity and effectiveness of the state police force by directing Plaintiffs Price and Warren to apply for pensions after it became clear that they could not perform the essential job functions of a state trooper.  As expected from one in his position, MacLeish fulfilled these duties without reference to Plaintiffs' allegedly protected speech.  Accordingly, the reasonable juror must conclude that Col. MacLeish would have acted as he did even if Plaintiffs had not voiced concerns about the firing range.  Plaintiffs' motion does not attempt to address this point, which precludes Price and Warren from obtaining summary judgment.

> **D.**     **Plaintiffs Are Not Entitled To Summary Judgment On The Petition Clause Claim Of Retaliation (Count II).**

Plaintiffs also assert that the Defendants retaliated against them because they exercised their First Amendment right to petition the government.  However, Plaintiffs cannot even establish a "protected activity" because they did not petition the government within the meaning of the First Amendment.

In San Fillipo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994), the Court explained that not every "protest [of] governmental acts or omissions" is a protected "petition" under the First Amendment.  Id. at 442.  To enjoy constitutional protections, a plaintiff must, in good faith, invoke a "mechanism" that has been formally adopted by the government "for redress of those grievances for which government is allegedly accountable."  Id.  The court recognized that the concept of petition included lawsuits, administrative claims and employee grievances as constitutionally protected.  Id. at 439; see also Bradshaw v. Twp. of Middletown, 296 F. Supp. 2d 526, 546 (D.N.J. 2003), aff'd, 145 Fed. Appx. 763 (3d Cir. Aug. 29, 2005) ("[T]he Petition Clause… only applies to petitions in the nature of a lawsuit or grievance.  If the conduct at issue

'is not in the nature of a formal grievance procedure that the Petition Clause is designed to protect, then governmental retaliation is not constitutionally actionable.'") (citations omitted).

Plaintiff Foraker's prior lawsuit against Chaffinch is a "petition," but it is not the subject of this case. The three Plaintiffs here contend that their response to a request for an interview by the State Auditor is a petition. It is not. The State Auditor does not investigate employee grievances, and the State Auditor had no authority to redress employee complaints. Accordingly, Plaintiffs have failed to establish that they engaged in protected activity under the Petition Clause. For this reason alone, Plaintiffs Motion for Summary Judgment on Count II must be denied, and Defendants' motion on Count II should be granted.

-28-

V.    **CONCLUSION**

For the reasons set forth above, this Court should deny Plaintiffs' Motion for Summary

Judgment on Counts I and II. (D.I. # 82).


Respectfully submitted,


Date:  February 8, 2006                    _/s/ Noel C. Burnham_
                                           Noel C. Burnham (DE Bar No. 3483)
                                           Richard M. Donaldson (DE Bar No. 4367)
                                           Montgomery, McCracken, Walker & Rhoads, LLP
                                           300 Delaware Avenue, Suite 750
                                           Wilmington, DE 19801
                                           Telephone:  (302) 504-7840
                                           Facsimile:  (302) 504-7820

                                           Edward T. Ellis
                                           Robert J. Fitzgerald
                                           Montgomery, McCracken,
                                             Walker & Rhoads, LLP
                                           123 South Broad Street
                                           Philadelphia, PA  19109
                                           (215) 772-1500

                                           _Counsel for Defendants L. Aaron Chaffinch,_
                                           _Thomas F. MacLeish, David B. Mitchell, and the_
                                           _Division of State Police, Department of Safety and_
                                           _Homeland Security, State of Delaware_

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that two (2) copies of the Answering Brief of Defendants in Opposition to Plaintiffs Motion for Summary Judgment on Counts I and II were served by hand delivery this 8th day of February 2006 on:

Thomas Stephen Neuberger, Esquire
Stephen J. Neuberger, Esquire
The Neuberger Firm, P.A.
Two East Seventh Street
Suite 302
Wilmington, DE  19801

Martin D. Haverly, Esquire
Two East Seventh Street
Suite 302
Wilmington, DE  19801-3707

*Attorneys for Plaintiffs*

_____/s/ Noel C. Burnham_____
Noel C. Burnham (DE Bar No. 3483)

2046979v1