**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CORPORAL B. KURT PRICE, et al., | : |
| | : |
| Plaintiffs, | : |
| | : C.A. No. 04-956-GMS |
| v. | : |
| | : |
| COLONEL L. AARON CHAFFINCH, et al., | : |
| | : |
| Defendants. | : |

**APPENDIX TO ANSWERING BRIEF**
**IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II**

**VOLUME I**

Date: February 8, 2006

Noel C. Burnham (DE Bar # 3483)
Richard M. Donaldson (DE Bar I.D. #4367)
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
(302) 504-7840

*Counsel for Defendants*

## TABLE OF CONTENTS

### Volume I

Emails ...........................................................................................................................B-1 – B-4

DSP Physical Examination Program ...........................................................................B-5 – B-8

Excerpt of Deposition of Maj. Joseph Papili,
    Foraker v. Chaffinch. No. 04-1207-GMS (July 22, 2005).......................................................B-9

McKee v. Hart, --- F.3d ----, NO. 04-1442, 2006 WL 27474
    (3d Cir. Jan. 6, 2006)Medical Documents of B. Kurt Price.............................B-10 – B-18

Johnson v. Heimbach, No. Civ. A. 03-2483, 2003 WL 22838476
    (E.D. Pa. Nov. 25, 2003)..................................................................................B-19 – B-24

Anderson v. United States, Civ. A. No. 93-589-MMS, 1996 WL 490262,
    (D. Del. 1996) ...................................................................................................B-25 – B-34

Int'l Poultry Processors, Inc. v. Wampler Foods, inc., No. Civ. A. 98-4612,
    1999 WL 33456488, at *3 & n.6 (E.D. Pa. Apr. 29, 1999) ..............................B-35 – B-41

Santos v. Port Authority of New York and New Jersey, 94 Civ. 8427,
    1995 WL 431336 (S.D.N.Y. July 20, 1995) ................................................B-41.1 – B.41.4

**Volume II -- Confidential Documents**
**Pursuant To Stipulation And Order Regarding Confidentiality (Dated Oct. 4, 2005)**

Personnel Document of Joseph Condron **(Under Seal)** ..............................................B-42 – B-43

Personnel/Medical Documents of Jahn Hitchens **(Under Seal)**..................................B-44 – B-47

Personnel/Medical Documents of Robert S. Warner **(Under Seal)** ............................B-48 – B-52

Personnel/Medical Documents of Jeffrey G. David **(Under Seal)**..............................B-53 – B-56

Personnel/Medical Documents of David Henderson **(Under Seal)** ............................B-57 – B-60

Personnel/Medical Documents of Michael J. Jordan **(Under Seal)**............................B-61 – B-67

Personnel/Medical Documents of Joseph Forester **(Under Seal)** ...............................B-68 – B-78

Personnel/Medical Documents of Steve T. Swain **(Under Seal)**................................B-79 – B-92

**Yeomans John A (DSP)**

---

**From:** Price Kurt K (DSP)
**Sent:** Wednesday, July 21, 2004 10:51
**To:** Yeomans John A (DSP)
**Subject:** RE: Medicals

John, my concern about the TK group testing is the protocol was not followed. According to TK decibel level testing was not conducted at the work site, and in my opinion an unqualified person made a determination based on limited information. No physical examination was conducted or other testing. I guess this is now part of my medical records in which a medical determination was made without a hands on examination. What other information was sent to the TK group? I feel it necessary not to pick and choose which reports are sent just ones that are medically sound and ethical. I'm in fight for my career and life as I know it. My entire world is now upside down and my families future is unknown.

-----Original Message-----
**From:** Yeomans John A (DSP)
**Sent:** Tuesday, July 20, 2004 4:27 PM
**To:** Price Kurt K (DSP)
**Cc:** Hughes Randall L (DSP)
**Subject:** RE: Medicals

Kurt, thanks for your response. I discussed this issue about the TK group last night. I think everyone has the same concerns about the TK group. I have asked Omega to respond to these concerns in writing. I will share All concerns as expressed by everyone with Dr. Emmett when he conducts his examination or orders up any additional testing. However I think we should not start picking and choosing which reports we send or not send.

In the event you would apply for a disability all prior tests or reports are subject to being requested by the Pension office or medical review board.

I will send the letter with reports and documents to Dr. Emmett. He will then have an opportunity to review the previous test data and will have the discretion to order new tests. An appointment will then be scheduled for you to meet with Dr. Emmett.

If you have any questions give me a call.
JY

-----Original Message-----
**From:** Price Kurt K (DSP)
**Sent:** Monday, July 19, 2004 12:30
**To:** Yeomans John A (DSP)
**Subject:** RE: Medicals

Good afternoon. In regards to my medical records being sent to Dr. Emmett I have some issues. I would ask that the TK group information not be sent. Proper protocol was not followed since there was no employee TWA level for noise exposure. Further review indicates that Dr. Williams is not a medical doctor, and I was not examined by him or a qualified person from the TK group to make a determination on my hearing loss. Given my concerns I respectfully request the TK group information not be sent to Dr. Emmett.

-----Original Message-----
**From:** Yeomans John A (DSP)
**Sent:** Thursday, July 15, 2004 8:28 AM
**To:** Price Kurt K (DSP); Warren Wayne H (DSP)
**Cc:** Davis Ralph H (DSP)
**Subject:** Medicals

Kurt and Wayne, have you both had the opportunity to review your files and the letter I drafted for Dr. Emmett? If so please advise so I can submit the paperwork to Dr. Emmett.
Thanks, JY

B-1

D0412

## Yeomans John A (DSP)

**From:** Warren Wayne H (DSP)
**Sent:** Friday, July 23, 2004 14:08
**To:** Yeomans John A (DSP); Hughes Randall L (DSP)
**Subject:** RE: Medicals

Captain, I hope you can appreciate the fact that I don't want my medical records tainted by a questionable company. Dr. Greene was very concerned about the survey, the fact that no one examined me for the determination and the fact that he did not receive the additional answer sheet I provided to Omega at the time the questionnare was being completed. I hope the medical review board will ask the same questions about the questionnare.
Thanks, Wayne

-----Original Message-----
**From:** Yeomans John A (DSP)
**Sent:** Tuesday, July 20, 2004 4:40 PM
**To:** Warren Wayne H (DSP)
**Cc:** Hughes Randall L (DSP)
**Subject:** RE: Medicals

Wayne thanks for your response and concerns. I have asked Omega to respond in writing to these concerns you have raised about the testing as administered by the TK group. While I can certainly understand and appreciate some of these concerns I don't believe we should start picking and choosing which reports to send and not to send. In the event you would apply for a disability all of this information is essentially discoverable by the Pension office or medical review board. I will share all the concerns you listed with Dr. Emmett. In your meeting (appt.) with him you will have the same opportunity as well.

Dr. Emmett will be provided a copy of all test data and reports. He will be asked to conduct any additional testing as he deems necessary.

On another issue I have asked that decibel level testing be conducted at the range.

If you are seeking reimbursement for any blood tests that were conducted on members of your family please forward the bills to me or Lisa Mcnatt. Or in the event the Dr. Office is looking for a billing address send it here to HQ.

You will be receiving correspondence in the near future about your appointment date and time.

Thanks for your patience in all these matters.
                                           JY


-----Original Message-----
**From:** Warren Wayne H (DSP)
**Sent:** Thursday, July 15, 2004 14:19
**To:** Yeomans John A (DSP)
**Subject:** RE: Medicals

Captain,

    I have several concerns with the submission of the paperwork to Dr. Emmett.

    1.    I am not certain that the Determiner from the TK Group you refer to as Dr. Williams is a medical doctor. The literature you provided indicates the Determiner holds a Masters Degree in Education (M. Ed). During my review, I was unable to identify the Detrminers qualifications.

    2.    The questionnaire used by the Determiner from the TK Group to asses my hearing loss and determine the cause was not complete.

    3.    A review of the TK Group website states that work relatedness determinations **require** an accurate employee time weighted noise exposure level measurement be provided in an effort to make an accurate assessment. To my knowledge, this measurement has not been completed.

    4.    Finally, I have not been personally examined by a representative of the TK Group, be it a medical doctor or an individual possessing a Master's Degree in Education.

    Because of the above concerns, I respectfully request that no representative of the Delaware State Police forward the medical questionnaire nor any information contained within the questionnaire used by the TK Group to

assess and determine my fitness for duty to Dr. Emmett. Additionally, I respectfully request that the conclusions reached by the TK Group not be forwarded to Dr. Emmett for the above stated reasons.

-----Original Message-----
**From:** Yeomans John A (DSP)
**Sent:** Thursday, July 15, 2004 8:28 AM
**To:** Price Kurt K (DSP); Warren Wayne H (DSP)
**Cc:** Davis Ralph H (DSP)
**Subject:** Medicals

Kurt and Wayne, have you both had the opportunity to review your files and the letter I drafted for Dr. Emmett? If so please advise so I can submit the paperwork to Dr. Emmett.
Thanks, JY

D0414

**McNatt Lisa E (DSP)**

| | |
|---|---|
| From: | Yeomans John A (DSP) |
| Sent: | Tuesday, June 22, 2004 7:58 PM |
| To: | McNatt Lisa E (DSP) |
| Subject: | FW: FTU issues |

Lisa, read Ralph's remarks below. Correct me if I'm wrong but I don't recall sending Troopers light duty letters. Is that something that was done in the past and I'm not aware of?

-----Original Message-----

| | |
|---|---|
| From: | Davis Ralph H (DSP) |
| Sent: | Tuesday, June 22, 2004 10:01 AM |
| To: | Yeomans John A (DSP) |
| Cc: | Hughes Randall L (DSP); Warren Gregory A (DSP); Warren Wayne H (DSP); Foraker Christopher D (DSP); Warwick James P (DSP); Price Kurt K (DSP) |
| Subject: | FTU issues |

Captain Yeomans,

    I recently spoke to the members of the FTU regarding their individual health issues and they collectively and individually had questions/concerns.

    First, Cpls Warren and Price were notified by me and Major Hughes that they were currently in a restricted duty status due to the identified reduction in hearing abilities. Both notifications were made verbally. Will there be written notification made regarding their work status?

    Secondly, the members of the FTU would like an opportunity to review and discuss the contents of all documents, records, and files maintained by the Division in relation to their current work status. During recent examinations by Dr. Green, Cpls Warren and Price discovered that documentation they believed relevant to a determination of their medical/fitness-for-duty status may have been omitted. Cpls Warren and Price, as well as Sergeant Foraker and Corporal Warwick would like to review the aforementioned files to ensure the completeness of those files.

    Please notify each of the above troopers with a date, time, and location when a meeting to review and discuss their respective file would be available.

    Thank you in advance for your assistance.

Lt. Ralph H. Davis, III
Delaware State Police
Assistant Director of Training
1453 N. duPont Hwy
Dover, DE. 19901
(302) 739-5906
email - ralph.davis@state.de.us

2. When predictable, an employee must provide a 30-day advance written request for FMLA leave to the Director of Human Resources through his/her supervisor. In addition, a completed "FMLA Medical Certification" form must accompany the request.

3. Approval for all requests will be verbally granted by a Human Resources Office representative within 2 business days, but will be followed up in writing from the Director of Human Resources.

3. User guide booklets are available to all employees from the Human Resources Office.

**PHYSICAL EXAMINATION PROGRAM** (22.3.1)(22.3.2)

1. Physical Examination Program

   A. All sworn members of the Division must participate in this program or have a comparable examination performed at their own expense. If an officer elects to have a physical done outside the Division, the completed physical examination forms must be obtained and provided to the Human Resources Office.

   B. The following is a schedule of the laboratory testing that will be completed at the final applicant selection:

   single vision chest x-ray

   audiogram

   optical exam

   urinalysis

   electrocardiogram

   complete blood count with differential

   lipid profile B

   hands-on examination by physician

C.  The following laboratory testing will be completed every 5th year up to age 35, every other year up to age 40, and every year after age 40:

    Urinalysis

    complete blood count with differential

    lipid profile B

    hands-on examination by physician

    audiogram (only given to Aviation Section and Ordnance Section officers)

    serum lead blood test (Ordnance Section only)

    prostatic specific antigen (age 40 and up)

    a.  An audiogram, optical exam, x-rays, or other tests may be performed if, in the opinion of the physician, the information is necessary to diagnose the individual's state of health and/or ability to perform necessary work requirements.

D.  The Division will provide a list to each troop and section of physicians or their associates that will be conducting the physical examinations and laboratory testing. Once an officer has been to one particular physician, on the occasion of a transfer, that officer may elect to return to that physician.

E.  The following is a listing of the laboratory tests and a brief description of each test:

**Audiogram** - to detect hearing loss

**Chest X-ray** - to detect tuberculosis, pneumonia, lung tumors, heart disease, chronic lung disease and certain bone conditions.

**Complete Blood Count (CBC)**

1.  Hematocrit - to determine the volume of oxygen-carrying red blood cells in the blood; can detect anemia and bleeding conditions.

2.  White Blood Cell Count (WBC) - to determine the level of white blood cells which guard against infection.

III-6-23

B-6

D8453

3. Red Blood Cell Count (RBC) - to determine the level of oxygen-carrying cells in the blood; can help determine anemia.

4. Hemoglobin (HGB) - to determine the level of oxygen-carrying pigment in the blood; can help detect anemia and other blood or lung conditions.

5. Mean Corpuscular Hemoglobin (MCH) and Mean Corpuscular Hemoglobin Concentration (MCHC) - calculations of the oxygen carrying pigment (Hemoglobin) in each red blood cell used to characterize the type of anemia.

6. Differential White Blood Count - to determine the different types of white blood cells; test done only if CBC is abnormal.

**Electrocardiogram** - to detect heart disease, especially coronary artery disease. An EKG is particularly important in establishing a baseline from which to compare future test results in order to establish deterioration or improvement of a heart disease condition.

**Stress EKG** - as performed by Cardio-Kinetics

**Lipid Profile B** -

1. **Cholesterol** - low values sometimes seen in wasting diseases like tuberculosis and terminal cancer. Elevated values linked to coronary artery disease.

2. **Triglycerides** - elevated values found in disturbances of lipid metabolism and coronary artery disease. Values below normal range are of little clinical significance.

3. **High Density Lipoprotein (HDL)**
   **Low Density Lipoprotein (LDL)**
   **Very Low Density Lipoprotein (VLDL)**
   **Coronary Heart Disease Risk Index Calculation**

**Cholesterol Fractions** - Studies have indicated when HDL is less than 45 mgldl in men and lower than 55 mgldl in women, there is an increased risk for heart disease and the relative risk increases with lower HDL concentrations LDL + VLDL have normal ranges.

**Urinalysis** - to determine the level of kidney function by examination of the urine. Specifically, the urine should be examined for the following:

III-6-24

D8454

1.  Blood - blood in the urine is indicative of bladder and kidney disease.

2.  Protein - protein in the urine is an early indicator of bladder and kidney disease.

3.  Glucose - to detect sugar, a factor in diabetes mellitus.

4.  Ph - to determine the acidity of the urine, a test for kidney disease.

5.  Ketones - elevated levels may indicate prolonged fasting or diabetes.

6.  Specific Gravity - abnormal levels may indicate renal disease.

7.  Appearance - abnormal results may indicate kidney or bladder infections or other disorders.

8.  Microscopic - an analysis of cells in the urine to indicate infection of the bladder and kidneys.

    a.  White blood count

    b.  Red blood count

    c.  Casts

9.  Prostatic Specific Antigen - a blood test to detect prostate cancer.

**PHYSICAL FITNESS REQUIREMENTS & CONDITION TEST** (22.3.2)

1.  Physical testing is to help promote a more complete approach to the divisional health standards and assure that the sworn members of the Division comply with some basic standards of muscular strength and aerobic fitness.

2.  The physical testing requirements will work in conjunction with the weight program by encouraging an individual to maintain a low percentage of body fat in order to more easily comply with the physical test standards. The physical fitness standards are designed to meet the essential police functions as described on page III-6-38.

Page 74

1  A. I think he had surgery, if I'm not mistaken. So
2  I know he was out for a while, and I can't remember if he
3  came back to work or not.
4  Q. How about a Corporal Thomas Robbins, helicopter
5  crash, know anything about that?
6  A. Prior to me coming on, I believe.
7  Q. How about a Corporal Michael Linz, L-i-n-z?
8  A. I don't even know the name.
9  Q. Might have been the '80s.
10 A. Okay.
11 Q. How about a Mark Givens?
12    MR. ELLIS: V or B?
13    MR. NEUBERGER: G-i-v-e-n-s.
14 A. No. I don't know who he is.
15 Q. A Herb Murray?
16 A. No.
17 Q. Rick Van Brunt?
18 A. Going back. No. Those guys predate me.
19 Q. How about a Lieutenant Jeff David?
20 A. Yes, I know Jeff.
21 Q. Is that somebody who works under you?
22 A. No. He works at the State Bureau of
23 Identification, SBI.
24 Q. Are you aware of him suffering a stroke?

Page 75

1  A. Yes.
2  Q. When would that have happened?
3  A. 2003.
4  Q. What was his status after he had the stroke?
5  A. He was off for a while. He was off work for a
6  while. And then when he came back, he came back to light
7  duty or rehabilitative status. I believe he's back
8  full-duty status now.
9  Q. You think he's back on full duty?
10 A. I believe so. I could be wrong, but I believe
11 he is.
12 Q. So you believe he's still a trooper, he's still
13 serving?
14 A. Yes. He's assigned to State Bureau of
15 Identification.
16 Q. How about a -- I don't think I used this name --
17 Steve Swain?
18 A. I know Steve Swain.
19 Q. Did he have any sort of impairment that's
20 prevented him from doing his job at all during his
21 career?
22 A. I don't know. I know he's a sergeant in Troop 4
23 in our Evidence Detection Unit.
24 Q. He works under you?

Page 76

1  A. No. He works for Troop 4.
2  Q. But you're unaware of any physical disabilities
3  he would have?
4  A. He's full-duty status, as far as I know.
5  Q. Going back to Swain, does he have trouble
6  communicating vocally because of some injury to his
7  larynx and his vocal cords years ago?
8  A. He's got -- not to be judgmental, he's got a
9  different voice or whatever. He's hard to understand at
10 times, but -- I have had conversations with him where I
11 can understand what he's trying to articulate. But I
12 know he does have a different -- a different voice, a
13 different speech pattern.
14 Q. We're not doctors. Is it a speech impediment?
15 A. I don't know.
16 Q. A different pattern. You have to sort of --
17 A. You have to be attentive and try to listen to
18 what he's trying to say.
19 Q. Was that as a result of some sort of accident he
20 had years ago?
21 A. I don't know.
22 Q. Do you know how long he's been serving as a
23 trooper, approximately?
24 A. Steve got more time on than I do. Longer than

Page 77

1  20 years I would say.
2  Q. I think you said Troop 9. Right?
3  A. He was in Troop 4 in Evidence Detection. I am
4  not aware of any problems he's had testifying in court or
5  anything like that. As far as I know, he's full duty.
6  Q. The person doing these evidence functions at the
7  troop, they get called to go to court?
8  A. They're not just evidence functions at the
9  troop. They're out doing crime scenes, evidence
10 collection. They will testify how they collected the
11 evidence, what they did with it.
12 Q. Has he been in that assignment for a long time?
13 A. He's been there a good bit. I would say three,
14 four years. At least.
15 Q. To move off of that, the State Police has
16 something called a dishonesty rule, might be Rule 15 in
17 the manual, right?
18 A. Yes, sir.
19 Q. You're aware that the Attorney General of the
20 state has advised the various law enforcement agencies
21 throughout the state that, if troopers have dishonesty
22 issues in their personnel files, they shouldn't be
23 assigned to duties such as they be called to testify in
24 court. You're aware of that, right?

**Westlaw.**

2006 WL 27474                                                                                           Page 1

--- F.3d ----, 2006 WL 27474 (3rd Cir.(Pa.)), 23 IER Cases 1527

**(Cite as: 2006 WL 27474 (3rd Cir.(Pa.)))**

H

**Briefs and Other Related Documents**

United States Court of Appeals,
Third Circuit.
Dwight L. MCKEE; Allen L. Jones
v.
Henry HART; Wesley Rish; Albert Masland; James Sheehan; Daniel P. Sattelle
Daniel P. Sattele, Appellant.
No. 04-1442.

Argued March 10, 2005.
Jan. 6, 2006.

**Background:** Investigator for the state office of inspector general sued supervisor under § 1983 alleging supervisor had retaliated against him for his refusal to stop voicing his concerns about the pharmaceutical industry, in violation of the First Amendment. The United States District Court for the Middle District of Pennsylvania, 2004 WL 1454108, Richard Caputo, J., denied supervisor's motion for summary judgment on qualified immunity basis, and appeal was taken.

**Holdings:** The Court of Appeals, Ambro, Circuit Judge, held that:
(1) supervisor's allegedly retaliatory comments to employee did not rise to level of retaliatory harassment under First Amendment, and
(2) even if supervisor violated employee's First Amendment rights, such rights were not clearly established at time of alleged conduct.
Reversed and remanded.

**[1] Federal Courts** ☞754.1

170Bk754.1 Most Cited Cases
An appellate court exercises plenary review over a district court's conclusions of law in its qualified immunity analysis.

**[2] Federal Courts** ☞763.1
170Bk763.1 Most Cited Cases
In reviewing a district court's qualified immunity analysis, an appellate court may review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right, but may not consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove.

**[3] Civil Rights** ☞1376(2)
78k1376(2) Most Cited Cases
Qualified immunity insulates government officials performing discretionary functions from suit insofar as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.

**[4] Civil Rights** ☞1376(1)
78k1376(1) Most Cited Cases

**[4] Civil Rights** ☞1376(2)
78k1376(2) Most Cited Cases
To determine whether an official has lost his or her qualified immunity, a court must first decide whether a constitutional right would have been violated on the facts alleged, and if the answer to that question is "yes," the court must then consider whether the right was clearly established.

**[5] Constitutional Law** ☞90.1(7.2)
92k90.1(7.2) Most Cited Cases
A public employee has a First Amendment constitutional right to speak on matters of public concern without fear of retaliation. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law** ☞90.1(7.2)
92k90.1(7.2) Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 27474                                                                                      Page 2

--- F.3d ----, 2006 WL 27474 (3rd Cir.(Pa.)), 23 IER Cases 1527

(Cite as: 2006 WL 27474 (3rd Cir.(Pa.)))

In determining whether a cognizable First Amendment claim has been stated by a public employee, the effect of the alleged conduct on the employee's freedom of speech need not be great in order to be actionable, but it must be more than de minimis. U.S.C.A. Const.Amend. 1.

**[7] Constitutional Law** ☞90.1(7.2)
92k90.1(7.2) Most Cited Cases
Supervisor's allegedly retaliatory comments to special investigator for Pennsylvania Office of Inspector General (OIG), including telling him to go with the flow and not permitting him to speak to anyone about investigation into pharmacist without supervisor's permission, did not rise to level of harassment, under First Amendment, in retaliation for his speaking out about pharmaceutical industry; comments were aimed at getting investigator to focus on investigation to which he was assigned instead of focusing on his own wide-ranging concerns about pharmaceutical industry as a whole, and investigator suffered no alteration in his employment benefits, pay, or job classification as a result of speaking out about potential corruption in pharmaceutical industry. U.S.C.A. Const.Amend. 1.

**[7] States** ☞53
360k53 Most Cited Cases
Supervisor's allegedly retaliatory comments to special investigator for Pennsylvania Office of Inspector General (OIG), including telling him to go with the flow and not permitting him to speak to anyone about investigation into pharmacist without supervisor's permission, did not rise to level of harassment, under First Amendment, in retaliation for his speaking out about pharmaceutical industry; comments were aimed at getting investigator to focus on investigation to which he was assigned instead of focusing on his own wide-ranging concerns about pharmaceutical industry as a whole, and investigator suffered no alteration in his employment benefits, pay, or job classification as a result of speaking out about potential corruption in pharmaceutical industry. U.S.C.A. Const.Amend. 1.

**[8] Civil Rights** ☞1376(10)
78k1376(10) Most Cited Cases
Supervisor of special investigator for Pennsylvania Office of Inspector General (OIG) was entitled to qualified immunity from investigator's § 1983 claim that supervisor retaliated against him, in violation of First Amendment, for speaking out against pharmaceutical industry, since constitutional right allegedly violated was not clearly established; reasonable official in supervisor's position would not have been aware that making a few comments over the course of a few months, the gist of which was asking an employee to focus on his job, could violate First Amendment. U.S.C.A. Const.Amend. 1 ; 42 U.S.C.A. § 1983.

**[9] Constitutional Law** ☞90.1(7.2)
92k90.1(7.2) Most Cited Cases
A public employee states a First Amendment claim by alleging that his or her employer engaged in a campaign of retaliatory harassment in response to the
employee's speech on a matter of public concern, even if the employee could not prove a causal connection between the retaliation and an adverse employment action. U.S.C.A. Const.Amend. 1.
Appeal from the United States District Court for the Middle District of Pennsylvania, (D.C. Civil Action No. 02-cv-01910), District Judge: Honorable Richard Caputo.

Charles W. Rubendall, II, (Argued), Donald M. Lewis, III, Keefer, Wood, Allen & Rahal, LLP, Harrisburg, PA, for Appellant.

Donald A. Bailey, (Argued), Bailey Stretton & Ostrowski, Harrisburg, PA, for Appellee.

Before SCIRICA, Chief Judge, ROTH and AMBRO, Circuit Judges.

OPINION OF THE COURT

AMBRO, Circuit Judge.

*1 Daniel Sattele appeals the District Court's denial of his summary judgment motion seeking qualified immunity in a suit brought by Allen Jones alleging that Sattele, among others, had retaliated against him for exercising his First Amendment rights. Because Jones did not allege that Sattele deprived

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 27474                                                                                                   Page 3

--- F.3d ----, 2006 WL 27474 (3rd Cir.(Pa.)), 23 IER Cases 1527

**(Cite as: 2006 WL 27474 (3rd Cir.(Pa.)))**

him of a constitutional right--and because even if he had, that right was not clearly established at the time Sattele engaged in the alleged conduct--we conclude that Sattele is entitled to qualified immunity. We therefore reverse the decision of the District Court and remand for further proceedings.

I. Factual and Procedural History

In May 2002, Jones was hired as a special investigator for the Pennsylvania Office of Inspector General ("OIG"). [FN1] The OIG is responsible for investigating allegations of fraud, waste, misconduct, and abuse in executive agencies of the Commonwealth. At the time of the events at issue in this case, Sattele was an Investigations Manager at OIG and was Jones's supervisor.

In mid- to late-July 2002, Jones was given a lead role in the investigation of Steve Fiorello, the chief pharmacist at Harrisburg State Hospital. There was only one other person assigned to the investigation. A few weeks after the investigation began, Jones told Sattele that he was concerned about problems in the pharmaceutical industry that went beyond the Fiorello investigation-- specifically that he believed the industry was routinely bribing state officials. Jones informed Sattele that he wanted to broaden the Fiorello investigation to include the entire pharmaceutical industry. Thereafter, Jones continued to inform Sattele about his concerns regarding the industry.

In response, Sattele told Jones to stay focused on the Fiorello investigation and not to investigate corruption in the pharmaceutical industry as a whole. Sattele subsequently removed Jones from his lead role in the Fiorello investigation in September 2002 [FN2] because Jones had, in Sattele's words, "lost focus." Sattele based this conclusion on the fact that Jones continued to voice concerns about the entire pharmaceutical industry even after Sattele had told him to concentrate only on Fiorello.

In October 2002, Dwight McKee, one of Jones's colleagues at OIG, filed a complaint against other OIG employees, alleging that they had retaliated against him for exercising his First Amendment rights. In November 2002, an amended complaint was filed, joining Jones as a plaintiff and Sattele as a defendant. Jones brought a cause of action under 42 U.S.C. § 1983, alleging that Sattele and the other defendants had also retaliated against him for exercising his First Amendment rights. Jones claimed generally that he was retaliated against--through intimidation and harassment by his supervisors--for complaining to his supervisors that public corruption investigations were being obstructed and delayed for reasons that were not legitimate.

In particular, at his deposition Jones identified three comments by Sattele that he perceived as harassment in retaliation for his refusal to stop voicing his concerns about the pharmaceutical industry. [FN3] First, he testified that Sattele told him that

*2 Mac [McKee] was torpedoed. Some of the things that he got maybe he deserved, but a lot of them he didn't. He was torpedoed. You keep your mouth shut.... Mac has been torpedoed, keep your mouth shut or the same thing can happen to you.

In a similar vein, Jones recalled that Sattele told him, in early October 2002, that if Jones could not adjust to the way OIG operated, he would have to leave his employment there.

Second, Jones testified that Sattele told him to "quit being a salmon," by which he meant that Jones should "quit swimming against the current with the pharmaceutical case." (Sattele testified at his deposition that he told Jones to "go with the flow" and not "swim against the current" because he was concerned that Jones was not working with the lawyers in the office and was not operating within a "team concept.")

Third, Jones related an incident that occurred in October 2002, after he had been removed as co-leader of the Fiorello investigation. Jones stated that thereafter he was not allowed to speak to anyone about the investigation without Sattele's permission. He nevertheless went to pick up documents from Fiorello, the target of the investigation, while Sattele and another of his supervisors were out of the office. Jones testified that, when he got back, Sattele met him "first

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 27474                                                                                                    Page 4
--- F.3d ----, 2006 WL 27474 (3rd Cir.(Pa.)), 23 IER Cases 1527
**(Cite as: 2006 WL 27474 (3rd Cir.(Pa.)))**

thing," took him into a room with another OIG colleague, "and demanded to know why [he] went ... without [Sattele's] permission to pick up papers." Jones also stated that Sattele and his colleague accused Jones of having had an interview with the Director of the Department of Public Welfare, something Jones denied.

All defendants moved for summary judgment in August 2003, and the District Court granted the motion with respect to all defendants except Sattele in February 2004. As for Jones's claims against Sattele, the District Court determined, based on the three comments identified by Jones, that (1) "with respect to Mr. Sattele, Mr. Jones has presented evidence that could lead a reasonable jury to conclude that his requests to investigate the pharmaceutical industry were a substantial or motivating factor in the retaliatory harassment or intimidation he may have suffered" and (2) it could not decide whether Sattele had qualified immunity absent a factual determination as to whether Sattele's conduct constituted retaliatory harassment. In its decision, the District Court also determined that Jones was not disciplined in connection with voicing his concerns about the pharmaceutical industry and that "[a]t no time during his employment has Mr. Jones's job classification, pay, or benefits been reduced or altered." Sattele now appeals from the denial of summary judgment on qualified immunity grounds.

II. Jurisdiction & Standard of Review
The District Court had federal question jurisdiction over Jones's 42 U.S.C. § 1983 claim pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine. *See Doe v. Groody,* 361 F.3d 232, 237 (3d Cir.2004) ("[A] denial of qualified immunity that turns on an issue of law--rather than a factual dispute--falls within the collateral order doctrine that treats certain decisions as 'final' within the meaning of 28 U.S.C. § 1291." (citing, *inter alia, Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996))); *Forbes v. Twp. of Lower Merion,* 313 F.3d 144, 147 (3d Cir.2002) ("When a defendant moves for summary judgment based on qualified immunity, the denial of the motion may be appealed immediately under the collateral-order doctrine because '[t]he entitlement is an *immunity from suit* rather than a mere defense to liability [ ] and ... is effectively lost if a case is erroneously permitted to go to trial." ' (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)) (alterations, emphasis, and omission in original)). [FN4]

*3 [1][2] We exercise plenary review over the District Court's conclusions of law in its qualified immunity analysis. *Doe,* 361 F.3d at 237. In addition, "we may review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right, but we may not consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove." *Forbes,* 313 F.3d at 147 (internal quotation marks omitted).

We note also that at this stage of the litigation we are looking at the facts as presented by Jones, *i.e.,* Satelle's statements were retaliatory, rather than the exercise by Satelle of appropriate supervisory limits on Jones's performance of his assignment.

III. Discussion
[3][4] Qualified immunity insulates government officials performing discretionary functions from suit "insofar as 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* at 148 (quoting *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). To determine whether an official has lost his or her qualified immunity, we must first "decide 'whether a constitutional right would have been violated on the facts alleged....' " *Doe,* 361 F.3d at 237 (quoting *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)) (omission in original). If the answer to that question is "yes," we must then "consider whether the right was 'clearly established." ' *Id.* at 238 (quoting *Saucier,* 533 U.S. at 201)). If we also answer "yes" to the second question, we must conclude that the official does not have qualified immunity.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 27474                                                                                          Page 5

--- F.3d ----, 2006 WL 27474 (3rd Cir.(Pa.)), 23 IER Cases 1527

**(Cite as: 2006 WL 27474 (3rd Cir.(Pa.)))**

Sattele contends that he is entitled to qualified immunity because (1) his three statements to Jones about his work on the Fiorello investigation did not deprive Jones of his First Amendment rights, and (2) even if Jones did allege a violation of a constitutional right, that right was not clearly established at the time Sattele made the comments. We address each argument in turn.

A. *Did Sattelle Violate a Constitutional Right of Jones?*

[5] "A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Brennan v. Norton,* 350 F.3d 399, 412 (3d Cir.2003) (internal quotation marks omitted). In light of this fundamental principle, we have held that, in certain circumstances, a public employee may bring a cause of action alleging that his or her First Amendment rights were violated by retaliatory harassment for the employee's speech about a matter of public concern even if he or she cannot prove that the alleged retaliation adversely affected the terms of his or her employment. *See Suppan v. Dadonna,* 203 F.3d 228, 234-35 (3d Cir.2000). In *Suppan,* we indicated that when the "plaintiffs' complaint allege[d] a campaign of retaliatory harassment culminating in ... retaliatory rankings [low ratings on promotion lists]," then a "trier of fact could determine that a violation of the First Amendment occurred at the time of the rankings on the promotion lists and that some relief [was] appropriate even if plaintiffs [could not] prove a causal connection between the rankings and the failure to promote." *Id.* This holding is premised on the idea that being the victim of petty harassments in the workplace as a result of speaking on matters of public concern is in itself retaliation--even if the employee cannot prove a change in the actual terms of his or her employment--and thus could be actionable under the First Amendment. *Id.* at 235.

*4 [6] In this context, the key question in determining whether a cognizable First Amendment claim has been stated is whether "the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights...." *Id.* at 235 (internal quotation marks omitted). The effect of the alleged conduct on the employee's freedom of speech " 'need not be great in order to be actionable," ' but it must be more than *de minimis. Id.* (quoting *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) (Posner, J.)); *see also Brennan,* 350 F.3d at 422 n. 17 (noting that "incidents of what might otherwise be trivial 'harassment" ' may be actionable through their "cumulative impact ... even though the actions would be *de minimis* if considered in isolation"). As stated earlier, the District Court determined that Jones's allegation that Sattele retaliated against him for speaking out about the pharmaceutical industry met the standards set out in *Suppan.*

[7] Sattele does not dispute the District Court's conclusion that Jones sufficiently alleged that he was speaking out on a matter of public concern. Sattele does argue, however, that the District Court's conclusion (by pointing to the three statements Sattele made to Jones, the latter alleged a retaliatory harassment claim under the First Amendment) was incorrect. In particular, Sattele contends that his three allegedly retaliatory comments were trivial and insufficient to deter a person of ordinary firmness from exercising his First Amendment rights. We agree.

Despite our holding in *Suppan* that a plaintiff's allegation of a "campaign of retaliatory harassment" by a public employer as a result of the plaintiff's speech created a cognizable First Amendment claim even without an alleged causal connection to a change in the plaintiff's terms of employment, not every critical comment--or series of comments--made by an employer to an employee provides a basis for a colorable allegation that the employee has been deprived of his or her constitutional rights. *See Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000) (stating that "not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation"); *Bart,* 677 F.2d at 625 (holding that plaintiff had alleged an actionable First Amendment claim when she claimed that "an entire campaign of harassment[,] which though trivial in detail may have been substantial in gross," had been mounted against her,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 27474                                                                                              Page 6

--- F.3d ----, 2006 WL 27474 (3rd Cir.(Pa.)), 23 IER Cases 1527

**(Cite as: 2006 WL 27474 (3rd Cir.(Pa.)))**

but cautioning that "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise"). We have noted that " 'courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." ' *Brennan,* 350 F.3d at 419 (quoting *Suarez,* 202 F.3d at 686) (holding that allegations that a supervisor stopped using the plaintiff's job title and did not capitalize the plaintiff's name as a result of plaintiff's speech, even if true, did not rise to the level of a constitutional violation because they were *de minimis* ). The comments made by Sattele fall into this category.

*5 Sattele's statements to Jones in the fall of 2002 were all aimed at getting Jones to focus on the investigation to which he was assigned--looking into the activities of a particular person in a particular state agency-- instead of focusing on Jones's own wide-ranging concerns about the pharmaceutical industry as a whole, something that OIG was not investigating. There is no question Sattele's statements were critical of Jones's job performance, and they may be construed as reprimands for Jones's continued expressions of concern about potential corruption in the pharmaceutical industry. However, even looking at the record in the light most favorable to Jones (as we must at this stage in the proceedings), we cannot conclude that Sattele's comments, taken together, would have deterred a person of ordinary firmness from exercising his First Amendment rights.

In *Suppan,* the plaintiffs allegedly were subjected to repeated chastisements and threats from their superiors over a period of more than a year based on their membership in a union negotiating team, and they alleged that they were given low ratings on their promotion eligibility evaluations in retaliation for those activities. 203 F.3d at 230-31. By contrast, Jones was admonished a few times for straying from the scope of the task he was assigned. The District Court explicitly found that, despite Jones's changed role in the Fiorello investigation, he suffered no alteration in his employment benefits, pay, or job classification as a result of speaking out about potential corruption in the pharmaceutical industry. Based on the set of facts identified by the District Court, Jones's allegations about Sattele's conduct simply do not rise to the level of a retaliatory harassment claim under the First Amendment.

Because Jones has not alleged the deprivation of a constitutional right, Sattele is entitled to qualified immunity. For the sake of completeness however, we now turn to the second prong of the qualified immunity analysis and determine whether--assuming that Jones had sufficiently alleged the violation of a constitutional right--that right was clearly established at the time of Sattele's alleged conduct.

B. *Assuming Sattele Violated a Constitutional Right of Jones, Was that Right Clearly Established at the Time of the Alleged Conduct?*

[8] " '[C]learly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McLaughlin v. Watson,* 271 F.3d 566, 571 (3d Cir.2001). Put another way, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Id.* at 572. The Supreme Court has recently reiterated this point, stating that "[i]t is important to emphasize that this [clearly established] inquiry 'must be undertaken *in light of the specific context of the case,* not as a broad general proposition." ' *Brosseau v. Haugen,* 543 U.S. 194, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (*per curiam* ) (quoting *Saucier,* 533 U.S. at 201) (emphasis added).

*6 [9] Before Sattele allegedly engaged in the conduct at issue in this case, we held, as discussed at Section III(A), *supra,* that a public employee states a First Amendment claim by alleging that his or her employer engaged in a "campaign of retaliatory harassment" in response to the employee's speech on a matter of public concern,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 27474                                                                                          Page 7

--- F.3d ----, 2006 WL 27474 (3rd Cir.(Pa.)), 23 IER Cases 1527

**(Cite as: 2006 WL 27474 (3rd Cir.(Pa.)))**

even if the employee could not prove a causal connection between the retaliation and an adverse employment action. *Suppan,* 203 F.3d at 234-35. We then reiterated, in *Baldassare v. New Jersey,* 250 F.3d 188 (3d Cir.2001), that "[a] public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Id.* at 194 (citing, *inter alia, Rankin v. McPherson,* 483 U.S. 378, 383-84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). Jones contends that *Suppan* and *Baldassare,* taken together, were sufficient precedent to put Sattele on notice that his conduct--making harassing comments to Jones arising out of Jones's voicing of concerns about corruption in the pharmaceutical industry--was constitutionally prohibited.

In *Suppan,* however, we gave little guidance as to what the threshold of actionability is in retaliatory harassment cases. Instead, we merely held that such a claim existed. *Suppan,* 203 F.3d at 235. Moreover, the alleged conduct in *Suppan* spanned more than a year and involved the supposed lowering of ratings on employees' promotion evaluations and the admonishment of employees because of their union activities and support for a particular mayoral candidate. *Id.* at 230-31. Based only on our acknowledgment of a retaliatory harassment cause of action in *Suppan* and the facts of that case, a reasonable official in Sattele's position would not have been aware that making a few comments over the course of a few months (the gist of which was asking an employee to focus on his job) might have run afoul of the First Amendment.

*Baldassare* also does not further Jones's argument that his First Amendment right to be free from retaliatory harassment was clearly established at the time of Sattele's alleged conduct. That case involved a straightforward retaliation claim brought under the First Amendment in which the plaintiff alleged a direct causal connection between his speech on a matter of public concern and his demotion, *see Baldassare,* 250 F.3d at 194 (plaintiff claimed he was demoted because of his statements regarding his investigation and report about conduct of his co-workers), not that he was subject to a campaign of retaliatory harassment such as the one involved in *Suppan* and alleged by Jones in this case. Thus, *Baldassare* would not have helped Sattele understand that his conduct might be constitutionally prohibited. [FN5]

We did touch on the retaliatory harassment theory again in our *Brennan* decision, noting once more that "a plaintiff may be able to establish liability under § 1983 based upon a continuing course of conduct even though some or all of the conduct complained of would be *de minimis* by itself or if viewed in isolation." 350 F.3d at 419 n. 16. *Brennan* provided some additional guidance about what types of conduct would support such a claim, holding that some of the plaintiff's allegations (that he had been taken off the payroll for some time and given various suspensions as a result of his speech) would support a retaliation claim, whereas other of his allegations (including his claim that his supervisor stopped using his title to address him) would not because of their triviality. *Id.* at 419. However, *Brennan* was not decided until 2003, after Sattele's alleged conduct, which occurred in the fall of 2002, had already taken place. Thus, to the extent that *Brennan* added some specificity to the contours of the retaliatory harassment cause of action, an employee's First Amendment right to be free from such harassment was still not clearly established at the time of Sattele's conduct. *See Brosseau,* 125 S.Ct. at 600 n. 4 (noting that the parties had pointed the Court to "a number of ... cases ... that postdate the conduct in question" and that "[t]hese decisions, of course, could not have given fair notice to [the official] and are of no use in the clearly established inquiry").

*7 Moreover, as discussed at Section III(A), *supra,* we also stated in *Brennan* that courts have not found violations of employees' First Amendment rights "where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." 350 F.3d at 419 (internal quotation marks omitted). *Brennan* therefore lends support to Sattele's argument that his critical comments to Jones did not violate Jones's First Amendment rights.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Accordingly, because of the dearth of precedent of sufficient specificity (and factual similarity to this case) regarding a public employee's First Amendment right to be free from retaliatory harassment by his or her employer at the time of Sattele's conduct, we cannot say that the constitutional right Jones alleged Sattele violated was clearly established. Sattele is therefore entitled to qualified immunity under the second, as well as the first, prong of our *Saucier* analysis.

## IV. Conclusion

The three comments made by Sattele in response to Jones's voicing of his concerns about potential corruption in the pharmaceutical industry, although critical of Jones's speech, were all intimately related to Jones's job performance and would not have deterred a person of ordinary firmness from exercising his or her First Amendment rights. As the District Court found, the comments were also unaccompanied by any change in Jones's employment benefits or wages. We cannot conclude, based on this factual situation, that Jones alleged a deprivation of a constitutional right.

Moreover, even if there had been such a deprivation, Jones's constitutional right to be free from a campaign of retaliatory harassment was not clearly established at the time of Sattele's alleged conduct. *Suppan* (and *Baldassare* to the extent it is applicable), although they were decided before the events at issue in this case, did not define the bounds of a retaliatory harassment cause of action with sufficient specificity, nor were their facts sufficiently similar to those alleged here, such that Sattele would have been on notice that his conduct was constitutionally prohibited.

Accordingly, Sattele is entitled to qualified immunity, and we reverse the contrary decision of the District Court and remand for further proceedings.

FN1. Jones had previously been employed by OIG. He left that position in 1991.

FN2. Jones was still assigned to that investigation even though his role had changed.

FN3. Jones also identified a fourth incident that he alleged was harassment, involving Henry Hart, another defendant. Hart, however, is not a party to this appeal, and as that incident is not relevant to our decision, we do not discuss it here.

FN4. Sattele contends that there is no factual dispute preventing us from exercising jurisdiction over this appeal, and Jones does not dispute that position.

FN5. Moreover, we note that even if *Baldassare* were relevant to determining whether Jones's right to be free from retaliatory harassment was clearly established at the time of Sattele's alleged conduct, that case would not necessarily put a reasonable official in Sattele's position on notice that making comments such as Sattele's would violate the First Amendment. Under the traditional retaliation analysis articulated in *Baldassare,* the second inquiry, after the plaintiff has established that he or she was engaging in activity protected by the First Amendment, is whether the plaintiff's "interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees." 250 F.3d at 195. We have stated that, in determining the interest of the employer for purposes of this balancing test, "we must consider 'whether the [expression] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.' " *Id.* at 198 (quoting *Rankin,* 483 U.S. at 388) (alteration in original). The District Court determined in this case that there was no evidence that OIG's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00956-GMS    Document 95-2    Filed 02/08/2006    Page 20 of 20

2006 WL 27474                                                                                                Page 9
--- F.3d ----, 2006 WL 27474 (3rd Cir.(Pa.)), 23 IER Cases 1527
(Cite as: 2006 WL 27474 (3rd Cir.(Pa.)))

interest in conducting an efficient investigation was impaired by Jones's speech. However, given our precedent on this issue, a reasonable official in Sattele's position could have *understood* his actions toward Jones as being justified because the need to maintain efficient working relationships and to improve Jones's performance of his duties on the Fiorello investigation outweighed his interest in speaking generally about potential corruption in the pharmaceutical industry, a matter outside the scope of the investigation OIG was conducting. *Cf. Sprague v. Fitzpatrick,* 546 F.2d 560, 565 (3d Cir.1976) (holding that, even though speech leading to public employee's discharge "concerned matters of grave public import," the balance weighed against finding that speech protected by the First Amendment when it had "completely undermined" the effectiveness of the employer-employee relationship).

--- F.3d ----, 2006 WL 27474 (3rd Cir.(Pa.)), 23 IER Cases 1527

**Briefs and Other Related Documents (Back to top)**

• 04-1442 (Docket) (Feb. 23, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.