

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577
**(Cite as: Not Reported in F.Supp.2d)**

**H**

Briefs and Other Related Documents

United States District Court,E.D. Pennsylvania.
Brad R. JOHNSON, Dr., Plaintiff,
v.
Raymond O. HEIMBACH, et al., Defendants.
**No. Civ.A. 03-2483.**

Nov. 25, 2003.

Brad R. Johnson, pro se, Kankakee, IL, for Plaintiff.
Beth Anne Smith, Office of Attorney General, Philadelphia, PA, for Defendants.

### MEMORANDUM AND ORDER

SCHILLER, J.

**\*1** Dr. Brad R. Johnson, a faculty member of Kutztown University of the Pennsylvania State System of Higher Education ("Kutztown"), brings this action against Raymond O. Heimbach, Theodore A. Hartz, Thomas J. Grant, Linda K. Goldberg, Norman C. Sigmond, David D. Wagaman, Jonathan K. Kramer, Keshav Gupta, Phillip R. Evans, and Donald L. Werley (collectively "Defendants" [FN1]) regarding a dispute that arose between the parties regarding Plaintiff's peer evaluation process. Plaintiff alleges violations of the civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), (d) (2003), the First and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983, and breach of contract under state law. Presently before the Court is Defendants' motion to dismiss Plaintiff's Amended Complaint. For the reasons set forth below, I grant Defendants' motion.

> FN1. Plaintiff has identified Defendants Heimbach, Sigmond, Wagaman, Kramer, Gupta, Evans, and Werley as professors at

Kutztown. (Am.Compl.¶¶ 3, 7-12.) Defendant Hartz is the Dean of the College of Business (Am.Compl.¶ 4), Defendant Grant is the Chair of the Department of Accounting and Finance, and Defendant Goldberg is the Provost/Vice President Academic Affairs (Am.Compl.¶¶ 5,6). In the Amended Complaint, Plaintiff often refers to "Defendants" without specifying which of the Defendants carried out the alleged action.

### I. BACKGROUND

Plaintiff alleges that between May 1, 2002 and July 16, 2002, Defendants induced Plaintiff, via wire and mail communications, to leave his job at Governors State University, University Park, Illinois and join the faculty at Kutztown. (Am.Compl.¶ 20.) Kutztown is a member of the Pennsylvania State System of Higher Education that has a collective bargaining agreement ("CBA") with the Association of Pennsylvania State College and University Faculties. (Id. ¶ 13.) In September 2002, Plaintiff joined the Department of Accounting and Finance in Kutztown's College of Business. (Id. ¶ 20.)

Thereafter, Plaintiff alleges, due to conflicting views regarding teaching methodology and accreditation of Kutztown's College of Business, Defendants attempted to force Plaintiff out of his position by establishing a series of evaluative processes that failed to adhere to the technical requirements of the procedure for peer evaluations. ( Id. ¶ 21.) Additionally, Defendants submitted negative evaluations of Plaintiff based on "false perceptions of in-class observations" and ultimately recommended non-renewal of his employment contract. (Id.) Plaintiff objected in writing to the process by which Defendants conducted their peer evaluation and reached the decision to recommend non-renewal, stating that this process violated the CBA. (Id. ¶ 21(b)(4).) Despite these objections,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 2

Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577
**(Cite as: Not Reported in F.Supp.2d)**

Defendant Grant, the Chairperson of the Department of Accounting and Finance, prepared a Performance Rating Report (the "Performance Report") in which Plaintiff was given a rating of unsatisfactory. (*Id.* ¶ 21(c)(3).)

Defendant Grant provided Plaintiff an opportunity to discuss this evaluation but ultimately, declined to reconsider his overall rating of unsatisfactory. (*Id.* ¶ 21(c)(4).) Shortly thereafter, Plaintiff objected in writing to the entire process leading up to his Performance Report, including Mr. Grant's reliance on the peer evaluations. (*Id.* ¶ 21(c)(3)(a).) Based on the peer evaluations and the negative Performance Report, Defendant Hartz, Dean of Kutztown's College of Business, recommended that Plaintiff's contract not be renewed. (*Id.* ¶ 21(d)(2)(a).) Plaintiff asserts that Defendant Hartz's decision was exclusively based on Plaintiff's perceived lack of congeniality and the negative peer evaluations and that Defendant Hartz failed to take into consideration his classroom materials or his " significant and substantive" activities. (*Id.* ¶ 21(d)(2)(b) & (c).)

**\*2** Pursuant to the CBA, Plaintiff appealed Defendant Hartz's evaluation to Kutztown's Provost, Defendant Goldberg. (*Id.* ¶ 21(d)(3).) Defendant Goldberg and the faculty union Grievance Chairperson met with Plaintiff to discuss the grievance. (*Id.* ¶ 21(e)(1).) Defendant Goldberg stated that she would review Plaintiff's retention portfolio and examine his allegations. (*Id.*) She also advised Plaintiff that she would meet with department faculty and report her findings at a later meeting. (*Id* .) Thereafter, the President of Kutztown renewed Plaintiff's contract. (*Id.* ¶ 21(e)(2).) Defendant Goldberg never held the meeting as promised because she contended that while "the evaluations conducted by members of [Plaintiff's] department and the Dean were conducted in an arbitrary and capricious manner," ( *Id.* ¶ 21(e)(2)), the issue became moot when the President renewed Plaintiff's contract (*Id.* ¶ 21(e)(3).)

Since the renewal of Plaintiff's contract, members of the department have "exhibited conduct toward Plaintiff extending from hostile and condescending to uncontrolled rage." (*Id.*) Plaintiff alleges that Defendants' conduct "has resulted in damage to Plaintiff's professional reputation and Plaintiff's ability to perform his duties as an Associate Professor of Accounting." (*Id.*) Furthermore, Plaintiff states that "[u]pon information and belief, through wire communications, Goldberg influenced said department members to engage in such conduct. " (*Id.* ¶ 21(e)(4)(a).) Plaintiff contends that this conduct includes the following acts: (1) Defendant Grant interrupted a conversation and criticized Plaintiff in a "hostile and condescending tone" accompanied by "aggressive mannerisms" (*Id.*); (2) Defendant Gupta called Plaintiff "an idiot" in front of students (*Id.* ¶ 21(e)(4)(a)); (3) When Plaintiff confronted Defendant Evans about not being a neutral evaluator, Defendant Evans responded, "Get the fuck out of my office" (*Id.* ¶ 21(e)(4)(d)); and (4) Defendant Sigmond also exhibited a variety of hostile and condescending mannerisms toward Plaintiff (*Id.*).

As a result, Plaintiff filed his Amended Complaint, alleging that Defendants: (1) acted as an enterprise and engaged in racketeering activity to fraudulently induce Plaintiff to leave his job and join the faculty of Kutztown; (2) conspired to commit such activity; (3) violated Plaintiff's "Constitutional Guarantee of Procedural Fairness flowing from the Due Process Clause of the Fourteenth Amendment"; and (4) violated Plaintiff's constitutionally protected right to free speech with their negative performance evaluations. (*Id.* at ¶¶ 22-85.) Accordingly, Plaintiff brings claims under the civil RICO statute, 18 U.S.C. § 1962(c) (Count One) and 18 U.S.C. § 1962(d) (Count Two), 42 U.S.C. § 1983 for violations of his Fourteenth Amendment Due Process rights (Count Three) and his First and Fourteenth Amendment rights (Count Four); and state law for breach of contract (Count Five).

## II. STANDARD OF REVIEW

**\*3** In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. *Bd. of Trs. of Bricklayers &*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577
**(Cite as: Not Reported in F.Supp.2d)**

*Allied Craftsman Local 6 of N.J. Welfare Fund v. Wettlin Assoc., Inc.,* 237 F.3d 270, 272 (3d Cir.2001). A motion to dismiss will only be granted if it is clear that relief cannot be granted to the plaintiff under any set of facts that could be proven consistent with the complaint's allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (*citing Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). While keeping this standard in mind, a court must read a complaint submitted by a pro se plaintiff liberally and apply a less stringent standard. *Haines v. Kerner,* 404 U.S. 519, 520-521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Gibbs v. Roman,* 116 F.3d 83, 86 n. 6 (3d Cir.1997).

### III. DISCUSSION

#### A. Counts One and Two: Civil RICO

In Counts One and Two, Plaintiff alleges that Defendants have violated the civil RICO statute, 18 U.S.C. § 1962(c) and (d). Section 1962(c) of the RICO statute provides that:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]

18 U.S.C. § 1962(c) (2003). Similarly, 18 U.S.C. § 1962(d) makes it unlawful to "conspire" to violate § 1962(c). Thus, to make out a claim under § 1962(d), a plaintiff must first establish his § 1962(c) claim. *Annulli v. Panikkar,* 200 F.3d 189, 198 (3d Cir.1999).

In order to state a claim under § 1962(c), Plaintiff must allege each of the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." ' *Camiolo v. State Farm Cas. Co.,* 334 F.3d 345, 364 (3d Cir.2003) (*quoting Sedima, S.P.R. v. Imrex Co.,* 473 U.S. 479, 496 (1985)). "A pattern of racketeering activity ' requires at least two acts of racketeering activity[.]" ' *Id.* (*citing* 18 U.S.C. §§ 1341, 1343, 1961). Under

18 U.S.C. § 1961(1), racketeering activity is defined as " 'any act which is indictable' under several provisions of the federal crimes code, including mail and wire fraud under 18 U .S.C. §§ 1341, 1343." ' *Id.* (*citing* 18 U.S.C. § 1961(1)). When a plaintiff alleges the predicate acts of racketeering activity that sound in fraud, such as mail or wire fraud, the pleading requirement of Federal Rule of Civil Procedure 9(b) applies and a court must determine whether plaintiff has plead with particularity the "circumstances" of the alleged fraud "in order to place defendants on notice of the precise misconduct with which they are charged, and to safeguard against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984); *see also Rose v. Bartle,* 871 F.2d 331, 356 n. 33 (3d Cir.1989).

**\*4** Additionally, "a RICO plaintiff 'only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." ' *Camiolo,* 334 F.3d. at 365 n. 15 (*quoting Sedima,* 473 U.S. at 496). Such injury excludes damages as a result of personal or emotional injury, *Gentry v. Resolution Trust Corp.,* 937 F.2d 899, 918 (3d Cir.1991), must be specific or quantifiable, *Maio v. Aetna Inc.,* 221 F.3d 472, 495 (3d Cir.2000), and must have resulted in "tangible financial loss to plaintiff." *Maio,* 221 F.3d at 483 (*citing Berg v. First State Ins. Co.,* 915 F.2d 460, 464 (9th Cir.1990) (en banc)). As such, a complaint does not adequately plead a RICO violation unless it shows damage to business or property with some certainty; if the claimed injury is speculative, it is not ripe for adjudication. *See id.* at 495 (stating dismissal is appropriate when injury was "too speculative" in nature).

Even construing his Amended Complaint in a light most favorable to Plaintiff, assuming all facts in the Amended Complaint to be true, and affording him all leeway as a pro se plaintiff, [FN2] Plaintiff has failed to state a claim under RICO. First, Plaintiff has failed to allege that he has standing to bring suit under RICO because he has failed to allege injury sufficient to make out a claim. In his Amended Complaint, Plaintiff admits that despite the alleged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-21**

Not Reported in F.Supp.2d                                                                                           Page 4

Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577
**(Cite as: Not Reported in F.Supp.2d)**

racketeering conduct, his contract was renewed for another year. (Am.Compl.¶ 21(e)(2).) Furthermore, Plaintiff does not allege any specific or quantifiable pecuniary loss. At most, Plaintiff asserts that the "conduct by Defendants is intolerable and has made working conditions so miserable for Plaintiff that Plaintiff was forced to acquire another position and will shortly resign his position at KU." (*Id.* ¶ 21(e)(5).) Similarly, in his response to Defendants' motion to dismiss, Plaintiff asserts he has been injured as he will lose the Kutztown University fringe benefit of paid tuition for spouse and dependants when (and if) he resigns. (Pl.'s Resp. at 2.) Finally, Plaintiff also contends that he "decided to wait" to resign to ensure the continuation of his medical benefits. (Am.Compl.¶ 21(e)(5).) As Plaintiff has not alleged any specific pecuniary loss and the loss alleged-his potential resignation-is entirely speculative in nature, his Amended Complaint does not meet the standing requirements of RICO. *Maio,* 221 F.3d at 495.

>   FN2. While Plaintiff is indeed proceeding pro se, the Court notes that he has obtained a juris doctor degree from Northwestern School of Law of Lewis and Clark College. (Defs.' Mem. of Law at 1 n. 1.) However, Plaintiff's response to Defendants' Motion to Dismiss provides a mere superficial tour of the law, very little of which was applied to the facts of this case.

Second, even if Plaintiff alleged some specific injury, he has failed to plead fraud with the required particularity. Plaintiff seems to allege that the racketeering activity at issue in this case is mail and wire fraud, repeating throughout his Amended Complaint that Defendants have "executed schemes and artifices through mail and wire communications and fraud." Despite repeating these allegations, Plaintiff does not specify the circumstances or communications that would implicate any such fraud. For example, while Plaintiff contends that he was brought to Kutztown from his former job at Governors State University in part owing to messages carried to him through the mail and by wire, he failed to specify any such pieces of mail,

telephone calls, or emails. Nor does he give any indication as to when or with whom such exchanges occurred. With respect to these allegations of mail and wire fraud, other than averring that Defendants carried on their alleged scheme through the mail and wire, Plaintiff's claims lack any specificity or particularity detailing the nature of the alleged fraud.

*5 Plaintiff is not entitled to the inference that essential elements of mail and wire fraud occurred when the Rule 9(b) standard applies, as it does in this case. *Allen Neurosurgical Assoc., Inc. v. Lehigh Valley Health Network,* No. 99-4653, 2001 WL 41143, at *3, 2001 U.S. Dist. LEXIS 284 at *12 (E.D.Pa. Jan.18, 2001). The Third Circuit has counseled that the Rule 9(b) requirement can be satisfied by means other than delineating "date, place, or time" and can be fulfilled using " alternative means of injecting precision and some measure of substantiation into allegations of fraud." *Seville Indus.,* 742 F.2d at 791. However, even under this broad standard, the Amended Complaint fails to offer anything more than that Plaintiff and Defendants negotiated his salary and fringe benefits, and fails to connect this communication to some misrepresentation or scheme to defraud Plaintiff of money or property. 18 U.S.C. § 1341, 1343 (2003) (stating elements of mail and wire fraud). Similarly, although Plaintiff describes with detail each Defendant's respective participation in the peer review evaluation process, he does not allege how these reviews were a scheme or artifice to defraud him rather than simply performed in the normal operation of Kutztown University. This Circuit has held that where a plaintiff's RICO claim contains allegations of fraud that are "simply ' normal business communications" ' which contain no deceptive elements, and which may amount to a breach of contract but do not contain any " ' deception that would bring it within the purview of the mail fraud statute," ' these claims should be dismissed. *Camiolo,* 345 F.3d at 365 (*quoting Kehr Packages, Inc. v. Fidelcor, Inc.,* 962 F.2d 1406, 1416-17 n. 15 (3d Cir.1991)). Thus, even taking into account that the Plaintiff is pro se, Plaintiff's failure to plead with *any* particularity is fatal to his claims under § 1942(c), and, consequently, Plaintiff's § 1962(d) claim also fails for this reason.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577
**(Cite as: Not Reported in F.Supp.2d)**

### B. Counts Three and Four: 42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983, Plaintiff alleges violations of his procedural due process rights under the Fourteenth Amendment and his right to free speech as a public employee under the First and Fourteenth Amendments. As discussed above, Plaintiff did not lose his job and consequently has suffered no financial or quantifiable loss. Rather, Plaintiff seems to allege that his reputation has been damaged in some way. Therefore, as discussed below, Plaintiff's § 1983 claims must also be dismissed.

First, the Supreme Court has held that "injury to reputation by itself was not a 'liberty' interest protected under the Fourteenth Amendment." *Siegert v. Gilley,* 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *see also Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 401-4 (3d Cir.2000) (discussing applicability of *Siegert* in substantive due process violations as well as procedural due process violations); *Kelley v. Borough of Sayreville,* 107 F.3d 1073, 1078 (3d Cir.1997) ("Even financial injury due solely to government defamation does not constitute a claim for deprivation of a constitutional liberty interest."). Further, while a claim of defamation might be actionable under state law, it is not a constitutional deprivation. *Siegert,* 500 U.S. at 233; *Boyanowski,* 215 F.3d at 401-4 (discussing that harm flowing from defamatory statements is not liberty interest protected by Due Process Clause). The Third Circuit has declared that "[e]mployment decisions ... which do not terminate or abridge [a Plaintiff's] employment contract, and which could be litigated in state tribunals, do not constitute deprivations of property interests under the Fourteenth Amendment." *Rode v. Dellarciprete,* 845 F.2d 1195, 1205 (3d Cir.1988).

**\*6** Second, in order to state a retaliation claim under the First and Fourteenth Amendments, Plaintiff must allege that he engaged in protected speech and that this activity was a substantial factor in an adverse employment action against him. *Green v. Phila. Hous. Auth.,* 105 F.3d 882, 885 (3d Cir.1997). "Retaliatory conduct other than discharge or refusal to rehire is [prohibited] only if

it ... 'adversely affects his status as an employee." ' *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1301 (3d Cir.1997) (holding that "the alleged ' unsubstantiated oral reprimands' and 'unnecessary derogatory comments' suffered by plaintiff following her complaint do not rise to the level of what our cases have described as 'adverse employment action' "). Again, while Plaintiff has alleged a deteriorating work relationship with his colleagues as a result of the negative evaluations and recommendations for non-renewal of contract, these actions alone are not sufficiently adverse to alter terms, conditions or privileges of employment.

While some courts hold that "retaliatory harassment could, under certain circumstances, constitute an ' adverse employment action' which is actionable under the rubric of a First Amendment cause of action," these courts also hold the acts of harassment must "likely deter a person of ordinary firmness from the exercise of his or her First Amendment rights." *Zugarek v. S. Tioga Sch. Dist. .,* 214 F.Supp.2d 468, 476 (M.D.Pa.2002) (discussing applicable case law). Evaluations that contain "false perceptions" from in-class observations, "derogatory written comments," and " conclusions of teaching effectiveness without first discussing their classroom observations with [Plaintiff]," [FN3] (Am.Compl.¶ 21(a)), in addition to some unkind words from colleagues do not rise to the level of an adverse employment action that would deter a person of ordinary firmness from exercising his or her First Amendment right. *Id.* As this Circuit has noted, " '[n]ot everything that makes an employee unhappy' qualifies as retaliation, for 'otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a ... suit." ' *Robinson,* 120 F.3d at 1301 (internal quotations omitted). Therefore, Plaintiff has failed to state a claim for retaliation under the First and Fourteenth Amendment.

FN3. When examining the Amended Complaint and the exhibits attached thereto, it is unclear whether the comments made about Plaintiff during his evaluation process were negative or whether they

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                     Page 6

Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577
**(Cite as: Not Reported in F.Supp.2d)**

were merely constructive criticism.

### C. Count Five: Plaintiff's Remaining State Law Claim

Plaintiff asserts a state law claim of breach of contract. A federal district court's decision to exercise supplemental jurisdiction over state law claims is a matter of discretion and the exercise of jurisdiction should be avoided whenever possible " as a matter of comity and to promote justice between parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see also* 28 U.S.C. § 1367(c) (granting district court authority to decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction"). In deciding to dismiss state law claims, a district court must take into consideration principles of judicial economy, convenience, fairness, and comity. *Rosado v. Wyman,* 397 U.S. 397, 403-5, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Bearing such principles in mind, and in light of the dismissal of Plaintiff's federal claims, Plaintiff's breach of contract claim is more appropriately resolved in state court. Thus, I dismiss the breach of contract claim without prejudice to Plaintiff's filing it in the appropriate state court. [FN4]

FN4. To the extent that a claim for defamation could be read liberally from Plaintiff's Amended Complaint, this claim also would be more appropriately decided in state court in light of the dismissal of Plaintiff's federal claims.

### IV. CONCLUSION

*7 The Amended Complaint does not state a claim upon which relief could be granted under RICO or § 1983. As such, Defendants' motion to dismiss with respect to those claims is granted. Any state law claims contained in Plaintiff's complaint are dismissed without prejudice, and, pursuant to 28 U.S.C. § 1367(d), Plaintiff has thirty days to file any surviving claims in state court. An appropriate Order follows.

### ORDER

AND NOW, this 25th day of November, 2003, upon consideration of Defendants' motion to dismiss, Plaintiff's response thereto, and for the foregoing reasons, it is hereby ORDERED that:
1. Defendants' Motion to Dismiss (Document No. 16) is GRANTED as follows:
a. Plaintiff's claims with respect to 18 U.S.C. § 1964(c), 18 U.S.C. § 1964(d), and 42 U.S.C. § 1983(c) are DISMISSED.
b. Any remaining state law claims are DISMISSED WITHOUT PREJUDICE. Pursuant to 28 U.S.C. § 1367(d), Plaintiff has thirty (30) days from the date of this order to file any surviving state law claims in the appropriate state court.
2. The Clerk of the Court is directed to close this case for statistical purposes.

E.D.Pa.,2003.
Johnson v. Heimbach
Not Reported in F.Supp.2d, 2003 WL 22838476 (E.D.Pa.), RICO Bus.Disp.Guide 10,577

Briefs and Other Related Documents (Back to top)

• 2003 WL 23903026 (Trial Motion, Memorandum and Affidavit) Order (Jun. 19, 2003)
• 2:03cv02483 (Docket) (Apr. 25, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 490262 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Danny L. ANDERSON, Plaintiff,
v.
UNITED STATES of America, Defendant.
**Civ. A. No. 93-589 MMS.**

Aug. 23, 1996.

Richard P.S. Hannum, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington (Michael W. Wagman, of Wagman, Ashworth, Kreider & Wright, of counsel), Lancaster, Pennsylvania, for plaintiff.
Patricia C. Hannigan, Assistant United States Attorney, Wilmington, for defendant.

MEMORANDUM OPINION

MURRAY M. SCHWARTZ, Senior District Judge.
*1 Plaintiff Danny L. Anderson has brought this medical malpractice action against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* He seeks recovery for injuries he allegedly sustained as a patient at a Veterans' Administration ("VA") medical facility in Wilmington, Delaware. After a two day bench trial, the parties submitted written proposed findings of fact and conclusions of law; post-trial argument was held on August 14, 1996. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, based upon the testimony, documentary and live, including assessment of the demeanor of witnesses and positions presented at trial and the post-trial submissions.

I.

Plaintiff Danny L. Anderson is an adult presently 43 years of age, with date of birth on February 6, 1953. Exhibit ("Exh.") 2A, p. 2. He is a citizen of Pennsylvania, residing with his wife and two minor children in the town of Peach Bottom. Trial Transcript ("Tr.") A-13-14. Plaintiff has been married for 22 years. Tr. A-13. He graduated from high school on June 11, 1971 and entered military service three days later in the United States Air Force. Tr. A-14. During this initial military stint, plaintiff served as a security policeman. *Id.* Other than his security police training, attendance at a CETA (Comprehensive Employee Training Act) program, and a five month electronics and missile repair program during a later military enlistment, plaintiff has no formal education beyond high school. Tr. A-15-16.

Plaintiff's other work history consists of employment as a printing press operator, gas station attendant, civilian security officer at a naval training center, and retail store work as a security officer and shipping/receiving clerk. Tr. A-15. At the present, and for the recent past, plaintiff has been involved in the construction business. Tr. A-15-16. Following his discharge from military service, plaintiff utilized the facilities of the VA for the majority of his health care needs. Tr. A-16-17. He used the VA as his primary health care provider, both for minor problems such as the flu, and for other conditions requiring medical treatment. Tr. A-17, 19-20.

Plaintiff's relevant medical history before 1990 includes a childhood inguinal hernia repair on the left side. Exh. 1, p. 4; Tr. 17. Plaintiff also underwent an elective vasectomy in April, 1987, performed by Dr. C. Edward Pohl, who is a private physician not affiliated in any way with the VA. Tr. A-17; Exh. 1, p. 4; Exh. 2A, p. 1. Before performing the vasectomy, Dr. Pohl informed plaintiff of the possible adverse effects from the procedure; however, at trial, plaintiff had no current recollection of what was said. Tr. A-18.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 2

Not Reported in F.Supp., 1996 WL 490262 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Dr. Pohl advised plaintiff at the time of the vasectomy that one of the possible side effects of the procedure is chronic epididymitis. Tr. A-75-76. This condition is characterized by intermittent or recurrent swelling and pain in the epididymis, the structure that surrounds the testicle. Tr. A-74-76; A-113.

**\*2** Following his initial recovery from the vasectomy, plaintiff experienced no problem with his genitalia during the balance of 1987 or 1988. Tr. A-18. After serving as a pallbearer at his father's funeral on February 8, 1989, however, plaintiff began experiencing a "continual nuisance" pain or ache in his groin. Tr. A-19, 24. [FN1]

> FN1. At trial, he testified that he had not been able to distinguish which side of his groin was the source of the problem. Tr. A-20. However, he later conceded that the medical records that were contemporaneously generated are a more accurate source of evidence than his current recollection, which comes seven years after the relevant events in this case. Tr. A-56-57.

Plaintiff sought treatment on February 21, 1989 at the Perry Point, Maryland VA Medical Center where he normally was seen for his routine medical care. Tr. A-19. The VA physician obtained plaintiff's history and specifically noted plaintiff's history of left inguinal hernia. Exh. 1, p. 2. The medical records generated at that visit show that plaintiff's chief complaint was pain in the left groin. *Id.* The physician observed a slight bulge in plaintiff's left groin and a healed surgical scar, and diagnosed plaintiff as having a left inguinal hernia. *Id.* Consequently, plaintiff was referred for a surgical consult at the Elsemere VA facility in Wilmington, Delaware ("Elsemere VA"). Tr. A-20, 21; Exh. 1, p. 2-4. Plaintiff checked his medical records out of the Perry Point records department so that he could present them to the doctors in Wilmington. Tr. A-59.

One week later, plaintiff was examined by Dr. John Fisher at the Elsemere VA. Exh. 1, p. 4. Dr. Fisher found the left testicle to be normal. *Id.* He recorded his clinical impression that plaintiff was suffering from a recurrent left inguinal hernia and advised hernioplasty. *Id.;* A-124. Plaintiff has no memory of being informed of this diagnosis. Tr. A-22. Plaintiff's medical chart details his next doctor's visit as occurring two months later at the Perry Point VA on April 17, 1989, where he was seen by a Dr. Miller. Exh. 1, p. 6. Dr. Miller referred plaintiff back to the Elsemere VA facility to be seen again by the surgical staff. *Id.*

Four days later, plaintiff was examined at the Elsemere VA by Dr. Karl Ahlsweed. *Id.* Dr. Ahlsweed recorded that the plaintiff presented with a noticeable bulge in the left groin and complained that it worsened after being a pallbearer. *Id.* Plaintiff also reported increased frequency of urination and burning on urination in the previous week. *Id.* On physical examination, Dr. Ahlsweed found no hernia and concluded that plaintiff was possibly suffering from prostatitis. *Id.* He ordered a urinalysis, recommended scrotal support, and told plaintiff to return in two weeks for follow up. *Id.* Plaintiff's urinalysis showed nothing remarkable. Exh. 1, p. 7-8.

On May 5, 1989, plaintiff returned to the surgical clinic at the Elsemere VA, still complaining of left testicular pain. Exh. 1, p. 7. He was examined this time by Dr. Stephen Strupp. On physical examination, Dr. Strupp found a swollen left testicle, with a firm epididymis and no discrete mass. *Id.* He also concluded that plaintiff had no hernia and that he was most probably suffering from epididymitis that, in Dr. Strupp's view, was resolving. In plaintiff's chart, Dr. Strupp noted that plaintiff "states that his L [left] groin pain has improved over the last week." *Id.* Plaintiff also reported some lower back pain, which Dr. Strupp thought was muscular in origin. Dr. Strupp recommended Motrin, an anti-inflammatory medicine, and moist heat for the back pain.

**\*3** Dr. Strupp filled out a consultation request for plaintiff to be seen at the Elsemere VA Urology Clinic for further evaluation of plaintiff's testicular pain. In his consultation request, Dr. Strupp described plaintiff as a 36 year old white male with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3

Not Reported in F.Supp., 1996 WL 490262 (D.Del.)
(Cite as: Not Reported in F.Supp.)

a two week history of resolving left testicular pain. Exh. 1, p. 8. He also stated that there was no indication of a present left inguinal hernia. *Id.* Dr. Strupp advised that the consulting urologist should consider ruling out prostatitis, but that the recent urinalysis showed no significant abnormality; also, there was the possible diagnosis of epididymitis. *Id.* He also suggested obtaining a testicular ultrasound for plaintiff's enlarged left testicle. *Id.;* Tr. A-130.

Plaintiff was next examined in the Elsemere VA Urology Clinic on May 12, 1989 by Dr. Alex Raney. Dr. Raney, a urologist, described plaintiff as a 36 year old white male who has had vague scrotal pain on both sides off and on for the last few years. Exh. 1, p. 8. Dr. Raney also was the first to elicit plaintiff's history of vasectomy. *Id.;* Tr. A-26. On physical examination, Dr. Raney detected weakness on plaintiff's right inguinal ring, but no existence of a hernia; and the left ring to be normal. Exh. 1, p. 8. Dr. Raney also observed both of plaintiff's testes and vas deferens to be normal. Dr. Raney found plaintiff's left epididymitis tender, which he attributed as possibly due to the vasectomy. *Id.* Dr. Raney explained to plaintiff that as a result of the vasectomy, plaintiff " had all those little bitty babies trying to get out." Tr. A-26. Dr. Raney further told plaintiff that "no treatment could be advised," but he could "return if necessary." Tr. A-27; Exh. 1, p. 8.

Plaintiff testified that he believed that he would have to live with the condition. Tr. A-51. Following this May 12, 1989 visit, plaintiff sought no additional medical care until August, 1990. Tr. A-27. Plaintiff did not return his VA medical records to Perry Point. Tr. A-29, 85.

Plaintiff's groin pain continued to be a "nuisance at times" between May, 1989 and August, 1990 at about the same level as during his series of VA appointments. Tr. A-27. The pain seemingly became aggravated by physical exertion such as mowing the grass or working with stilts, equipment plaintiff used while hanging drywall. Tr. A-27-2 28, 49, 51. During these 15 months, plaintiff missed only a day or two from work, and attributed this to of occasional back pain. Tr. A-66. He did not miss any work due to his scrotal condition. *Id.*

By July, 1990, plaintiff noticed swelling of his other, right testicle; in fact, it had swollen to more than twice its normal size. At this same time, he also developed excruciating back pain and more intense scrotal pain. Tr. A-29, 85. In the beginning of August, 1990, on plaintiff's behalf, plaintiff's wife scheduled two doctor's appointments with private physicians. Tr. A-29. Plaintiff would be seen at the Family Practice Quarryville Medical Center for his back pain; and with Dr. Pohl, the urologist in Lancaster who performed the vasectomy, for the scrotal pain. Tr. A-29-30. Plaintiff was advised at the Quarryville Medical Center that his back pain was caused by muscle spasm. Tr. A-30.

*4 On August 3, 1990, a Friday, Dr. Pohl examined plaintiff and immediately ordered a testicular ultrasound. Tr. A-30, 31. The ultrasound revealed a solid mass in plaintiff's right testicle, measuring at 47 cubic centimeters ("cm"). Exh. 2A, p. 4. In contrast, plaintiff's normal sized left testicle measured 19 cubic cm. *Id.* Based on Dr. Pohl's assessment of plaintiff's condition, he scheduled surgery on the next business day, August 6, 1990. Tr. A-30, 31. Dr. Pohl performed an orchiectomy procedure during which he removed plaintiff's right testicle. Tr. A-31, Exh. 2A, p. 2. Biopsy of the removed testicle showed that plaintiff had contracted cancer in the form of a pure seminoma. Exh. 2B, p. 14; Exh. 2A, p. 2. Following the surgery, Dr. Pohl also determined that plaintiff's cancer had metastasized, *i.e.,* spread to a site in plaintiff's lower back, forming a retroperitoneal tumor that blocked the functioning of plaintiff's right kidney. Tr. A-79; Exh. 2A, p. 6.

The metastatic tumor consisted of a solid mass measuring 8 cm x 5 cm, indicative of Stage IIC cancer. Exh. 2B, p. 30; Tr. A-100, 140, 141; Tr. B-21. The generally recognized stages of testicular cancer, including seminoma, are: Stage I-cancer localized to the testicle; Stage IIA-cancer has metastasized to the abdomen, but only in microscopic proportions; Stage IIB-cancer has metastasized but with the metastatic tumor measuring less than 5 cm in size; Stage IIC-metastatic tumors greater than 5 cm; Stage III-metastatic tumors beyond the abdomen. Tr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B-27

Not Reported in F.Supp.                                                                 Page 4

Not Reported in F.Supp., 1996 WL 490262 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

A-111-12, B-20. Because plaintiff was diagnosed with Stage IIC metastatic disease, he underwent further invasive procedures, one of them performed as an outpatient, to maintain the function of his right kidney, and received intravenous chemotherapy to eradicate all traces of the cancer from his body. Tr. A-79, A-113-14; Tr. B-22, 68-69, 89, 140, 141. The course of chemotherapy, done in four stages over the next few months, required four inpatient stays on plaintiff's part, the first of which was initiated immediately post-orchiectomy. Exh. 2B, Tr. A-79, B-22, 68-69, 89, 140, 141; Exh. 2C. If plaintiff had been diagnosed as Stage I, or at Stage IIA, he would have been treated with the orchiectomy and a course of outpatient radiation therapy for a duration of approximately two and one-half weeks. Tr. A-152-53, B-23-24, 140.

It is undisputed that the treatment provided to plaintiff upon diagnosis of his cancer was appropriate and the expenses incurred in that treatment were reasonable. Docket Item ("D.I.") 55, ¶ 54; D.I. 56, ¶ 37. Plaintiff has been under continuous surveillance by a medical oncologist, Dr. Robert Gottlieb, and has remained cancer-free since his 1990 orchiectomy and chemotherapy. Tr. B-120.

## II.

### A.

At the heart of plaintiff's malpractice claim is his assertion that Dr. Raney, the urologist at the Elsemere VA, should have scheduled follow-up visits and further evaluation of plaintiff's condition. Pre-trial Order, D.I. 50, p. 4. Plaintiff argues that Dr. Raney's omission constituted a violation of the degree of skill and care ordinarily employed, under similar circumstances, by physicians in good standing in Wilmington in 1989. *Id.* Plaintiff further contends that this violation of the standard of care was a proximate cause of his damages, *i.e.,* if plaintiff had been monitored with follow-up care for his epididymitis, his right testicular tumor would have been diagnosed at an earlier stage, requiring less onerous treatment. In addition, plaintiff claims that because the treatment of his cancer was delayed, he suffers from an increased risk of cancer recurrence. *Id.* at p. 5.

*5 The United States counters by arguing that Dr. Raney's failure to schedule definitive follow-up did not violate the standard of medical care. In the alternative, the government also contends that even if Dr. Raney's omission was a violation of the standard of care, plaintiff cannot show how that violation proximately caused plaintiff any injury. The government also asserts that plaintiff himself was negligent when he failed to follow Dr. Raney's advise to return if necessary, thus effectively precluding the VA physicians from diagnosing his cancer when it eventually developed. *Id.* at pp. 11-12. In the alternative, the government argues that if the Court finds malpractice on the part of Dr. Raney, then plaintiff's delay in seeking further treatment should be evaluated under comparative negligence principles. *See* Letter Memorandum by United States, August 12, 1996.

### B.

The Federal Tort Claims Act ("FTCA") extends to claims brought against the United States for money damages arising from the negligent acts or omissions of federal employees. 28 U.S.C. §§ 2671-2680. The Department of Veterans Affairs is a federal agency within the meaning of 28 U.S.C. § 2671. Complaint, ¶ 2, Answer, ¶ 2. All physicians who examined, consulted with, treated, or advised plaintiff during the period of February 1, 1989 through May 12, 1989 were employees of the government within the meaning of 28 U.S.C. § 2671 . Complaint, ¶¶ 2, 3; Answer ¶¶ 2, 3. All physicians who examined, consulted with, treated, or advised plaintiff at the identified VA facilities herein were acting within the scope of their office or employment within the meaning of 28 U.S.C. § 2671. Complaint, ¶¶ 2, 3; Answer, ¶¶ 2, 3.

Venue is proper within this Court, as the acts and omissions complained of occurred in the District of Delaware. 28 U.S.C. § 1402(b). The liability of the United States under the FTCA is determined by the law of the state in which the tortious conduct

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 490262 (D.Del.)
(Cite as: Not Reported in F.Supp.)

occurred. *Molzof v. United States,* 502 U.S. 301, 305 (1992); *United States v. Muniz,* 374 U.S. 150, 153 (1963); 28 U.S.C. § 1346(b). Because the acts or omissions alleged to constitute malpractice occurred at the Elsemere VA in Delaware, the Court will apply Delaware law to determine the respective rights and liabilities of the parties to this action.

Under Delaware law, in rendering professional services or health care to plaintiff, the VA physicians owed plaintiff the duty to exercise "that degree of skill and care ordinarily employed, under similar circumstances, by members of the medical profession in good standing" in Wilmington, Delaware in 1989, and to exercise reasonable care and diligence. 18 *Del.C.* § 6801(7). [FN2] Plaintiff bears the burden of proving with expert medical testimony the alleged deviation from the applicable standard of care in the specific circumstances of the case and its proximate causation of his personal injury. *See* 18 *Del.C.* § 6853; [FN3] *Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991), *cert. denied,* 504 U.S. 912 (1992). To prove proximate cause in this case, plaintiff has to show through expert testimony that Dr. Raney's alleged negligence was the probable cause of plaintiff's delay in seeking and obtaining treatment for his right testicular cancer. *See Shively v. Klein,* 551 A.2d 41, 43 (Del.1988). "Probable" means any likelihood greater than 50 percent, *i.e.,* more probable than not. *Id.*

> FN2. Delaware law defines malpractice as the following:
> "Malpractice" means any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient. The standard of skill and care required of every health care provider in rendering professional services or health care to a patient shall be that degree of skill and care ordinarily employed, under similar circumstances, by members of the profession in good standing in the same community or locality, and the use of reasonable care and diligence.

18 *Del.C.* § 6801(7).

> FN3. 18 *Del.C.* § 6853 provides:
> No liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death, except that such expert medical testimony shall not be required if a malpractice review panel has found negligence to have occurred and to have caused the alleged personal injury or death and the opinion of such panel is admitted into evidence; provided, however, that a rebuttable inference that personal injury or death was caused by negligence shall arise where evidence is presented that the personal injury or death occurred in any 1 or more of the following circumstances: (1) A foreign object was unintentionally left within the body of the patient following surgery; (2) an explosion or fire originating in a substance used in treatment occurred in the course of treatment; or (3) a surgical procedure was performed on the wrong patient or the wrong organ, limb or part of the patient's body. Except as otherwise provided herein, there shall be no inference or presumption of negligence on the part of a health care provider.

### C.

*6 Plaintiff presented medical testimony by four physicians: three who were involved in plaintiff's treatment, and one who was explicitly qualified as an expert. [FN4] Plaintiff's expert, Dr. Barry Singer, is board certified in internal medicine, with a specialty in oncology and hematology. The great majority of Dr. Singer's practice involves medical oncology; about 15-20 percent of his practice, however, involves basic internal medicine. Tr. B-62. He has worked since 1973 in three small community hospitals in Montgomery County, Pennsylvania. Tr. B-3-4, 53-54. [FN5] Almost all of the testicular cancer patients treated by Dr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 6

Not Reported in F.Supp., 1996 WL 490262 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Singer are referred by primary physicians such as urologists or general practitioners. Tr. B-39-40.

> FN4. With respect to physician qualifications, the parties stipulated that " all of the physicians who are involved in this matter are qualified to testify with respect to the standard of care that existed in Delaware in 1989. And we all agree that everyone's physicians are qualified to do so." Tr. A-9.

> FN5. Dr. Singer is also affiliated with the Medical College of Pennsylvania ("MCP" ), as a Clinical Assistant Professor. Tr. B-53. He has adjunct teaching responsibility over medical Fellows from MCP who rotate through Dr. Singer's clinic in Norristown, Pennsylvania. *Id.*

Dr. Singer participates in cancer screening clinics, where some patients present to him directly with possible testicular tumor disease. Tr. B-40. Dr. Singer refers such patients to urologists for further treatment. *Id.* However, other than in the screening clinics, Dr. Singer does not usually have occasion to diagnose testicular cancer. Tr. B-53. A medical oncologist such as Dr. Singer does not play a role unless the cancer has advanced to Stage IIB or greater, and is generally referred advanced testicular cancer cases by other clinicians, such as urologists. Tr. A-110, 113, 114; B-40.

Dr. Singer conceded that his area of expertise is medical oncology, and that his opinion as to the standard of care in this case is in regard to another area of expertise, *i.e.,* urology. Tr. B-44. Dr. Singer agreed that based on plaintiff's presenting symptomatology in May, 1989, a diagnosis of epididymitis was warranted. Tr. B-57. However, Dr. Singer admitted that in his experience with epididymitis, he did not know whether this condition could be chronic. Tr. B-43. Notwithstanding this limited knowledge of the attributes of epididymitis, Dr. Singer opined on the standard of care with respect to this condition. He did not agree that "return if necessary" or "come back if anything changes" was sufficient to meet

that standard. Tr. B-57. In Dr. Singer's opinion, the standard of care required that the VA urologist should have scheduled plaintiff for follow-up visits at one to two month intervals. Tr. B-13, 14-17. None of plaintiff's other testifying physicians presented an opinion as to the skill and care ordinarily employed, under similar circumstances, by physicians in good standing in the Wilmington, Delaware area in 1989 with respect to Dr. Raney's recommendation. FN6

> FN6. Plaintiff's treating urologist, Dr. Pohl, testified that it would be his "normal standard practice" to schedule for follow-up monitoring a patient who exhibited the symptoms plaintiff exhibited to the VA physicians, including Dr. Raney. Tr. A-102. He also testified that he would have ordered an ultrasound, and then conceded that perhaps his standard practices are a "little ahead" of what is required. Tr. A-103. Testimony as to " standard practice" does not equate with standard as to the skill and care ordinarily employed, under similar circumstances, by physicians in good standing in Wilmington in 1989.
> Dr. Pohl explicitly refrained from rendering an expert opinion on the care that plaintiff received at the VA. Tr. A-97. He testified that it was "too difficult for me as the attending physician to make any firm statement as to whether [Dr. Raney's action or omission] met the standard of care. I think it could best be handled by an expert witness." Tr. A-97.

The United States presented expert medical testimony by two physicians, a urologist and a medical oncologist. The urologist, Dr. Stephen Jacobs, is a professor and Chairman of Urology at the University of Maryland in Baltimore, Maryland. Tr. A-108. He maintains a large private practice, seeing up to 35 patients in the office per day, and sometimes performing one to two surgical procedures per day. Tr. A-109. As Chairman of the Urology department, he has direct oversight for the university's residency program of 12 urology

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 7

Not Reported in F.Supp., 1996 WL 490262 (D.Del.)
(Cite as: Not Reported in F.Supp.)

residents. *Id.*

*7 The evidence adduced at trial through Dr. Jacobs showed that a urologist, such as Dr. Raney, is the physician on the front line, who generally sees patients and diagnoses their urological conditions. *Id.* A urologist is the one who performs physical exams for diseases of the testicle, including tumor disease, and who surgically excises those tumors. Tr. A-110.

The most common cause of testicular pain is epididymitis, an inflammation of the epididymis which surrounds the testes. Tr. A-118. Plaintiff's history of vasectomy was significant to Dr. Raney's consideration and diagnosis of his symptoms. Tr. A-118, 131. During his spring 1989 visits to the VA clinics, plaintiff was more probably than not suffering from epididymitis secondary to his vasectomy. Exh. 1, Tr. A-132. The testes of one such as plaintiff who has undergone a vasectomy still produce secretions; however, these secretions encounter an anatomical "dead-end" in the vas that was severed in the vasectomy procedure. Tr. A-132. Back pressure of these spermatic secretions can build up in the epididymis, causing inflammation. *Id.* Dr. Raney's statement about "the little bitty babies trying to get out" causing plaintiff's discomfort is consistent with a physician attempting to explain in lay terms a description of the spermatic congestion and inflammation caused by epididymitis.

Epididymitis can be a chronic disorder, and after initial acute manifestation, it may chronically plague a man such as plaintiff off and on for the duration of his life. [FN7] Tr. A-131. In the acute phase, the patient's epididymis feels swollen and hurt. Tr. A-130. Then, later on, it becomes firmer than normal. *Id.* While some cases of epididymitis are bacterial in origin and treated by antibiotics, most chronic epididymitis is not caused by bacterial infection. Tr. A-132. Patients who suffer from this condition are generally recommended symptomatic relief using scrotal support, as was the plaintiff. *Id.;* Exh. 1, p. 6. Chronic epididymitis causes scrotal pain symptoms that fluctuate over time, getting alternately worse and then better. Tr. A-133. There is not much therapeutically that can

be done for these patients, other than offer them scrotal support, short of orchiectomy. Tr. A-132. If such a patient gets better, there is no need for follow-up physician monitoring. Tr. A-133. If the condition worsens, such as by an increased level of pain or the appearance of a lump, then the patient would be seen again. *Id.*

> FN7. There is evidence that three years after his orchiectomy, plaintiff exhibited the same symptoms as occurred in 1989 and was again diagnosed with epididymitis-this time in his remaining testicle. Tr. A-94. He also testified that he still experiences occasional scrotal pain. Tr. A-62.

The record shows that plaintiff presented with an acute onset of symptoms during his initial VA visits, and that after two months, his symptoms appeared to be "resolving." Exh 1, p. 7. The " vague scrotal pain on both sides off and on for the last few years" and "left tender epididymis ... due to vasectomy" recorded by Dr. Raney is indicative of his diagnosis of epididymitis. Tr. A-140. There is no evidence that during his visit with Dr. Raney, plaintiff exhibited any diagnosable symptom of his seminoma; neither is there evidence that plaintiff's left groin pain in the spring of 1989 could have been related to the right-sided testicular tumor that later developed. Tr. A-120.

*8 Because chronic epididymitis is well known to be an adverse effect of vasectomy, Dr. Raney was justified in his assessment that plaintiff's epididymitis was related to his vasectomy. Dr. Raney documented his advice to plaintiff that he should "return if necessary," and that "no treatment could be advised." Exh. 1, p. 8. A reasonable interpretation of this instruction is that plaintiff was informed that if his condition continued to resolve, no follow-up would be necessary; [FN8] if plaintiff's condition changed for the worse, for example, with increased pain or swelling, then plaintiff should be seen for follow-up. Tr. A-133. Because plaintiff's epididymitis appeared to be resolving and getting better, Dr. Raney had no reason believe that the epididymitis would require a definite future

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 490262 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

follow-up visit. However, plaintiff had the option of reporting back if anything changed. Accordingly, the Court credits Dr. Jacobs' expert testimony that there was no violation in the standard of care in not scheduling plaintiff for a follow-up visit. *See* Tr. A-134.

> FN8. At the post-trial hearing during which the parties argued their proposed findings of fact and conclusions of law to the Court, plaintiff conceded that Dr. Raney's note meant, "return if necessary-come back if you have to."

Additionally, the Court notes that even assuming Dr. Raney violated the standard of care by not scheduling plaintiff for follow-up, plaintiff would be nonetheless barred from recovery in this case under 10 *Del.C.* § 8132, Delaware's comparative negligence statute. That statute provides:
In all actions brought to recover damages for negligence which results in death or injury to person or property, the fact that the plaintiff may have been contributorily negligent shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the negligence of the defendant or the combined negligence of all defendants against whom recovery is sought, but any damages awarded shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

*Id.* Pursuant to this modified comparative negligence statute, if the plaintiff's contributory negligence is 51% or greater, it is an absolute bar to recovery. *In re Asbestos Litigation Pusey Trial Group,* 669 A.2d 108, 112 (Del.1995) (citing *Culver v. Bennett,* 588 A.2d 1094, 1098 (Del.1991) ). In the instant case, the Court would find plaintiff's negligence to be greater than that of the defendant's. The evidence showed that testicular tumor can be felt when it is as small as a pea, or about one to two cubic cm in size. Tr. A-135. This, of course, is subject to where the tumor originates; it is more readily noticeable if the cancer cells start growing on the surface, rather than the core, of the testis. *Id.*

Plaintiff, whose normal testicular volume measured 19 cubic cm, delayed seeking treatment until his right testicle grew to 47 cubic cm, *i.e.,* two and one-half times normal size. On biopsy, approximately 80 percent of plaintiff's right testis was solid tumor tissue. Exh. 2B, p. 14. Working out the arithmetic, if plaintiff's tumor comprised 80 percent of 47 cubic cm, then approximately 37.6 cubic cm of the right testicle was seminoma. In addition, as stated by Dr. Robert Gottlieb, plaintiff's treating medical oncologist, seminomas like that of plaintiff's usually demonstrate a growth rate where they double in size every 30 to 60 days. Tr. B-121. Based on these calculations, plaintiff's seminoma may have been approximately 19 cubic cm in June or July, 1990. Extrapolating further, it would have been approximately 9 cubic cm as early as April, 1990, greatly in excess of the one to two cm threshold of palpability. Based on the numbers, and even if it was not known where in the testis the tumor originated, the testicular tumor was measurably palpable well before August, 1990.

*9 Plaintiff had been advised to return if necessary, *i.e.,* come back if anything changes. He did not do so until months after the testicular tumor would have, or at least should have been noticed by him. Plaintiff has made the claim that because of the delay in treatment, his cancer was allowed to metastasize into Stage IIC, and his injury and risk of recurrence were consequently increased. However, this delay was a result of plaintiff's failure to follow his physician's order to return if necessary; it was plaintiff who effectively prevented the VA from diagnosing his cancer when it eventually developed. Consequently, even assuming a violation of the standard of care by Dr. Raney, plaintiff would not prevail because the Court conclude plaintiff's negligence as being greater than the defendant's. [FN9]

> FN9. Plaintiff has argued that the United States failed to plead contributory or comparative negligence as an affirmative defense under Fed.R.Civ.P. 8(c) and therefore such a defense has been waived. However, in the Pre-Trial Order, the parties stipulated as an issue to be litigated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 490262 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

the following:

[W]hen Plaintiff was last seen at the VA he was told to return if necessary. He was, in fact, expected to return to the Perry Point VA facility, at the very least to return his medical records. Instead, the Plaintiff took his records home and over the next fifteen months, as a large tumor developed in the right testicle, he failed to follow the direction to 'return if necessary.' The Plaintiff effectively prevented the VA from diagnosing his cancer when it eventually developed.

D.I. 50, pp. 11-12. The parties also stipulated that the Pre-Trial Order "shall control the subsequent course of the action unless modified by the Court to prevent manifest injustice." *Id.* at p. 13. *See* Fed.R.Civ.P. 16(c) ("pre-trial order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.").

It is hornbook law that failure to raise an affirmative defense in a responsive pleading does not automatically result in waiver. *Kleinknecht v. Gettysburg College,* 989 F.2d 1360, 1373 (3d Cir.1993); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1278 (1990). Fed.R.Civ.P. 15(a) provides that a responsive pleading may be amended at any time by leave of court to include an affirmative defense, and "leave shall be freely given when justice so requires." *Charpentier v. Godsil,* 937 F.2d 859, 863 (citations omitted). The government has requested leave to amend its pleading to include a defense based on plaintiff's negligence; such leave is generally allowed unless doing so would prejudice the opposing party. *See id.*

Moreover, "a defendant does not waive an affirmative defense if he raised the issue at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond." *Id.* Thus, the issue of plaintiff's

contributory negligence, litigated by the express consent of the parties pursuant to the Pre-Trial Order will be treated in all respects as it had been raised in the pleadings. *See id.* (citing *Lucas v. United States,* 807 F.2d 414, 418 (5th Cir.1986)); *see also Management Investors v. United Mine Workers of Am.,* 610 F.2d 384, 390 n. 17 (6th Cir.1979) ("Since the issue was raised at the pretrial and included in the jointly drafted pretrial order, any suggestion of preclusion here is clearly meritless").

III.

As counsel for the United States commented in her opening statement at trial, the Court agrees that " plaintiff is a nice young man," and "he has had a terrible disease." Tr. A-12. However, plaintiff has failed to show the United States as legally responsible for his injury. The Court holds that plaintiff has failed to carry his burden of proving that the United States, through its agent, violated the degree of skill and care ordinarily employed, under similar circumstances, by physicians in good standing in the Wilmington, Delaware area in 1989. In addition, even if the Court were to hold that the standard of care was violated, the Court also would find plaintiff more negligent than the defendant, and therefore barred from recovery under the Delaware comparative negligence statute.

The Court sincerely hopes that plaintiff has no recurrence of his cancer, and is greatly encouraged by his remaining cancer-free for six years. However, despite the emotional support and sympathy naturally engendered by a cancer patient such as plaintiff, there is no legal basis to hold the government liable for plaintiff's misfortune.

D.Del.,1996.
Anderson v. U.S.
Not Reported in F.Supp., 1996 WL 490262 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:93CV00589 (Docket) (Dec. 27, 1993)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 10

Not Reported in F.Supp., 1996 WL 490262 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


**B-34**



Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 1999 WL 33456488 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
INTERNATIONAL POULTRY PROCESSORS,
INC.
v.
WAMPLER FOODS, INC.
WAMPLER FOODS, INC.
v.
INTERNATIONAL POULTRY PROCESSORS,
INC. and Ernest Milou
**No. Civ.A.98-4612.**

April 29, 1999.

MEMORANDUM

LUDWIG, J.
*1 Defendant/cross-action plaintiff Wampler Foods, Inc. moves for summary judgment on International Poultry's breach of contract and misrepresentation claims and on Wampler's cross-action. [FN1] Fed.R.Civ.P. 56. [FN2] Jurisdiction is diversity. 28 U.S.C. 1332.

> FN1. Summary judgment has been entered in favor of cross-action defendant Ernest Milou. Order, April 8, 1999.

> FN2. "Summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *In re Baby Food Antitrust Litig.,* 166 F.3d 112, 124 (3d Cir.1999) (quoting *Petruzzi's IGA v. Darling-Delaware,* 998 F.2d 1224, 1230 (3d Cir.1993)).

This action involves the sale of turkeys. According to International Poultry Processors, Inc.'s complaint, Wampler Foods, Inc. orally agreed in January 1998 to be its primary turkey supplier. Wampler disputes the existence of the contract and claims $246,864.73 for shipments made in June, 1998, the last month in which it supplied turkeys to plaintiff. In ruling on this motion, the facts must be viewed through the summary judgment prism of nonmovant International Poultry-*i.e.,* from its standpoint. Fed R. Civ. P. 56.

International Poultry, a Pennsylvania corporation, had its principal place of business in Philadelphia. It bought "canner toms"-slaughtered, plucked, whole male turkeys-from wholesalers, cut them up, and resold them. Milou dep. at 12.

Wampler, located in Rockingham County, Virginia, "is in the business of breeding, growing, slaughtering, and then selling poultry, primarily chickens and turkeys." Myran aff. 11. It sells whole turkeys on the wholesale market and also processes turkey into retail products, such as turkey hot dogs and turkey parts. *Id.*

In 1992, Wampler began selling canner toms to International Poultry. Myran aff. 5; Milou dep. at 6. The price was set by reference to the "Urner Barry Price Current," which is a commercial trade publication used in the industry. Myran aff. 8-10; Milou dep. at 37-39. Typically, canner toms are sold by the load, which weighs between 36,000 and 40,000 pounds, or by the half load. Milou dep. at 45; Myran aff. 7.

From January 1995 to June 1996, the parties entered into a series of six-month contracts, consisting of oral agreements confirmed by letter from Wampler's sales manager, and International Poultry's purchase order numbers. Myran aff. 17-24, 55.

In August, 1997 International Poultry stopped

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B-35

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 1999 WL 33456488 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

purchasing from Wampler. Milou aff. 7; Wampler's answer at 7. Some months later, in an effort to regain its business, Wampler proposed becoming International Poultry's primary supplier of turkey product. [FN3] Milou aff. 11; Milou dep. at 33. Wampler would supply one load of turkeys per business day until December 31, 1998 at the Urner Barry rate. Milou aff. 11; Milou dep. at 32-33, 40-41. On January 5, 1998, after expressing concern about the potential effect of an interruption in Wampler's supply, International Poultry orally accepted the proposal. Milou aff. 12, 14; Milou dep. at 33. It also submitted purchase order numbers for January 1998. [FN4] Myran aff. 26-27; Wampler's ex. P.

> FN3. Wampler disputes having made such a proposal or that the parties entered into a one-year contract.

> FN4. International Poultry's president testified that he does not recall having submitted purchase order numbers on any occasion. Milou dep. at 80-89. However, lack of memory does not contradict Wampler's evidence that it received purchase order numbers. *See Dickey v. Baptist Memorial Hosp.-N. MS,* 146 F.3d 262, 266 n. 1 (5th Cir.1998) ("The mere fact that Dr. Washington does not remember the alleged phone conversation, however, is not enough, by itself, to create a genuine issue of material fact."); *Groff v. Continental Ins. Co.,* 741 F.Supp. 541, 548 (E.D.Pa.1990) ("This lack of memory or knowledge alone is insufficient to create a genuine issue of material fact.... Therefore, the evidence presented by [defendant] on this issue remains uncontradicted.").

In return, Wampler sent International Poultry an annual credit application, which was completed and returned. Milou aff. 15, 16; Wampler's ex. L, LL; Curry aff. 2-4. By letter dated February 5, 1998, Wampler advised International Poultry that it qualified for a $100,000 credit line, net 10 days. Milou aff. 18; Wampler's ex. MM.

*2 In January and each month thereafter through May, 1998, International Poultry placed orders for the following month and transmitted corresponding purchase order numbers. Myran aff. 30-32, 38-42, 45-50; Wampler's ex. Q-S, W-Z, and DD-JJ. Before Wampler accepted each order, it confirmed the canner toms' availability. Myran aff. 30, 38, 41, 43, 45, 48, 50; Wampler's ex. AA, GG.

On June 10, 1998 Wampler informed International Poultry that for economic reasons it would not offer turkey product for sale beyond June 29, 1998. Milou aff. 21; Milou dep. at 90-91; Myran aff. 52. After an unsuccessful search for alternative suppliers, International Poultry went out of business. Milou aff. 23. Wampler claims nonpayment of $246,864.73 for canner toms shipped between June 11, 1998 and June 29, 1998. Milou dep. at 60-65; Myran aff. 56; Wampler's ex. I. International Poultry does not dispute receipt or price-but asserts an offset for shrinkage. Milou dep. at 60-65.

On August 25, 1998 Wampler filed an action in the United States District Court for the Western District of Virginia to recover payment for the June 1998 deliveries. C.A. No. 98-59(H) (W.D.Va.). Two days later International Poultry filed the present action. Following transfer from the District of Virginia, the two actions were consolidated.

Wampler's motion for summary judgment involves substantive issues governed by state law. According to Wampler, there was no oral contract; enforcement of such a contract would be barred by the statute of frauds; and there is no evidence of fraudulent intent on Wampler's part or of unfair dealing.

As to matters of state law-in this instance Pennsylvania-it is necessary to "predict what the Pennsylvania Supreme Court would do if presented with this case.... In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." *2-J Corp. v. Tice,* 126 F.3d 539, 541 (3d Cir.1997) (citations omitted). [FN5]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 3

Not Reported in F.Supp.2d, 1999 WL 33456488 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

FN5. At a Rule 16 conference on April 6, 1999 counsel agreed that no choice of law analysis is necessary, inasmuch as the substantive law in this case is the same in both Pennsylvania and Virginia.

### Existence of Oral Contract

A credibility dispute as to the existence of an oral contract cannot be resolved at this stage. Wampler urges that the deposition testimony of International Poultry's president is not worthy of belief. " However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder. " *Boyle v. County of Allegheny Pa.,* 139 F.3d 386, 393 (3d Cir.1998). Because there is a genuine issue of material fact whether the parties entered into an oral one-year contract, summary judgment must be denied as to this issue.

### Waiver of Affirmative Defense

International Poultry also resists the motion on the ground that Wampler waived the affirmative defense of the statute of frauds by not pleading it in its answer. In diversity cases, what qualifies as an affirmative defense is determined by state law. *See Charpentier v. Godsil,* 937 F.2d 859, 864 (3d Cir.1991). Here, under both Pennsylvania and Virginia law, the statute of frauds is considered to be such a defense. *See Bocchicchio v. General Public Utilities Corp.,* 456 Pa.Super. 23, 29, 689 A.2d 305, 309 (1997); *Kwon v. Lee,* 31 Va. Cir. 411 (Cir. Ct. Fairfax County 1993). On the other hand, pleading requirements and waivability, being procedural in nature, are matters of federal law. *See Herremans v. Carrera Designs, Inc.,* 157 F.3d 1118, 1122-23 (7th Cir.1998).

**\*3** While Fed.R.Civ.P. 8(c) requires affirmative defenses to be pleaded in the answer, "failure to raise an affirmative defense in a responsive pleading, however, does not always result in waiver. " *Kleinknecht v. Gettysburg College,* 989 F.2d 1360, 1373 (3d Cir.1993). An affirmative defense is not waived if raised "at a pragmatically sufficient time and [the plaintiff] was not prejudiced in its

ability to respond." *Charpentier v. Godsil,* 937 F.2d 859, 864 (3d Cir.1991) (quoting *Lucas v. United States,* 807 F.2d 414, 418 (5th Cir.1986)). "For example, a party may raise an unpled affirmative defense in an appropriate motion." *Kleinknecht,* 989 F.2d at 1373. A motion for summary judgment, " while not the most appropriate way to raise a previously unpled defense," may nonetheless be appropriate if plaintiff is not prejudiced. FN6 *Kleinknecht,* 989 F.2d at 1374.

FN6. In numerous decisions in this District, an affirmative defense raised in a motion for summary judgment has been held not to have been waived. *See, e.g., Zhang v. Southeastern Fin. Group, Inc.,* 980 F.Supp. 787, 795-96 (E.D.Pa.1997); *Kenepp v. American Edwards Labs.,* 859 F.Supp. 809, 816 (E.D.Pa.1994); *Shirsat v. Mutual Pharm. Co.,* Civ. A. No. 93-3202, 1996 WL 606297, at *3-4 (E.D.Pa. Oct. 22, 1996); *S.N.A., Inc. v. Hartzell Propeller, Inc.,* Civ. A. No. 95-1397, 1996 WL 283646, at *4 (E. D.Pa. May 29, 1996); *Blizzard v. Motorola, Inc.,* Civ. A. No. 94-0207, 1995 WL 216938, at *2 (E.D.Pa. Apr. 12, 1995); *Surgical Laser Techs., Inc. v. Heraeus Lasersonics, Inc.,* Civ. A. No. 90-7965, 1995 WL 20444, at * 2-6 (E.D.Pa. Jan. 12, 1995); *Mines v. City of Phila.,* Civ. A. No. 93-3052, 1994 WL 386362, at *1-2 (E.D.Pa. July 22, 1994); *see also Turiano v. Schnarrs,* 904 F.Supp. 400, 405-06 (M.D.Pa.1995) (same). *But see Rhoads v. Stein,* Civ. A. No. 93-4699, 1995 WL 339023, at *2-3 (E.D. Pa. June 1, 1995) (motion to amend answer to include affirmative defense was not raised at a "pragmatically sufficient time" because amendment would require reopening discovery and "would substantially delay the disposition" of the case).

International Poultry has not attempted to show and cannot fairly aver any prejudice resulting from Wampler's assertion of the statute of frauds defense in this motion. The reason is that the defense was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 33456488 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

apparent on the face of International Poultry's complaint, which states that the parties "entered into an oral agreement." Am. compl. 9. Better practice is to plead the defense or to raise it by threshold motion. Otherwise, both the Court and plaintiff may be led to believe that defendant is willing to forego the defense and not rely on it, conceivably occasioning undue expense and delay. Here, however, while not conforming with Rule 8(c), defendant gave timely notice that it would file an early summary judgment motion. Moreover, plaintiff was afforded ample opportunity to meet the motion. Accordingly, the defense of the statute of frauds will not be deemed waived.

### Statute of Frauds

An oral contract for the sale of goods in excess of $500 cannot be enforced unless there are writings sufficient to satisfy the statute of frauds. Section 2-201 of the Uniform Commercial Code, adopted by Pennsylvania and Virginia, [FN7] sets forth the statute as follows:

> FN7. 13 Pa. Cons.Stat. Ann. 2201 (West 1999); Va.Code Ann. 8.2-201 (Michie 1998).

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its

contents is given within ten days after it is received.

*4 (3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable:

...

(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

(c) with respect to goods for which payment has been made and accepted or which have been received and accepted.

As explained in the first comment to section 2-201, although the "required writing need not contain all the material terms of the contract, ... it must evidence a contract for the sale of goods; second, it must be 'signed,' a word, which includes any authentication which identifies the party to be charged; and third, it must specify a quantity." Also, it has been held that "when considering the writing requirement, the Court may consider more than one writing if they bear either an express reference one to another or internal evidence of their interrelation." *International Prods. & Techs., Inc. v. Iomega Corp.,* 10 U.C.C. Rep. Serv.2d (CBC) 694 (E.D.Pa.1989) (citations and quotation omitted), *aff'd,* 908 F.2d 962 (3d Cir.1990)).

According to International Poultry, several writings satisfy the statute of frauds: [FN8]

> FN8. International Poultry also contends that (1) it is customary in the turkey industry for producers to enter into one-year oral contracts with turkey processors; (2) because of lower wholesale prices for turkey product, Wampler reduced turkey production and shifted some commodity turkey sales to "in-house" valued-added turkey production; and (3) its credit limit with Wampler is consistent with a one-year contract. However, these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 33456488 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

assertions appear to have no bearing on the statute of frauds issues.

• Handwritten notes showing that the parties on December 24, 1997 discussed "Canners for 1998." [FN9] International Poultry's resp. br. at 21.

> FN9. Although the notes are difficult to decipher, there does not appear to be a reference to "Canners for 1998." Wampler's ex. M, third entry.

o Two letters from Wampler's assistant credit manager, regarding International Poultry's annual credit review.
o A letter from Wampler denying International Poultry's request to extend payment terms.
Those writings are evidence that the parties had an ongoing business relationship and that Wampler extended International Poultry credit. However, none of them, individually or together, specify a quantity of goods or denote other terms of a sale. *See Advent Sys. Ltd. v. Unisys Corp.,* 925 F.2d 670, 677 (3d Cir.1991) ("Courts have generally found that a quantity term must be stated for compliance with the Code, and commentators have agreed."). [FN10] The review of an annual credit line may be consistent with business dealings but is lacking in requisite particulars. Similarly, general statements such as "we look forward to many years of serving you," do not refer to a specific contract or quantity and, consequently, will not satisfy the statute of frauds.

> FN10. International Poultry does not assert-and it does not appear to be the fact-that the alleged oral agreement was a requirements, output, or indivisible contract.

As International Poultry contends, writings between merchants may confirm a contract under U.C.C. 2-201(2). "Between merchants, failure to answer a written confirmation of a contract within ten days of receipt is tantamount to a writing under subsection (2) and is sufficient against both parties under subsection (1). The only effect, however, is to take away from the party who fails to answer the defense of the Statute of Frauds...." U.C.C. 2-201 cmt. 3; *see also United McGill Corp. v. Gerngross Corp.,* 689 F.2d 52, 54 (3d Cir.1982) ("When, between merchants, a writing in confirmation of the oral contract and sufficient to bind the sender is received, the recipient may not raise the statute of frauds as a defense unless he sends written notice of objection within ten days of receipt of the writing." ). Wampler's letters, which were referable to credit terms, do not confirm a contract. Furthermore, section 2-201(2) may be used only to eliminate the recipient's statute of frauds defense-*i.e.,* for International Poultry-not the sender's-Wampler.
*5 International Poultry's position that Wampler concedes the existence of the contract is limited by the *pro tanto* scope of the admission. Wampler's brief states, at page three, that "in 1998, the parties had a month-to-month contract only." If that statement is considered to be a judicial admission, the oral contract would still not be enforceable beyond June 1998. The U.C.C. states that "the contract is not enforceable ... beyond the quantity of goods admitted." U.C.C. 2-201(3)(b).
Because the writings in this case do not establish two elements required by the statute of frauds-an agreement and a quantity-Count II of International Poultry's amended complaint must be dismissed. [FN11]

> FN11. To the extent that International Poultry asserts a theory of promissory estoppel, that contention must also be rejected. In this Circuit, it has been predicted that the Pennsylvania Supreme Court would bar a promissory estoppel claim that did not comply with the requirements of the statute of frauds. *See Atlantic Paper Box Co. v. Whitman's Chocolates,* 844 F.Supp. 1038, 1043 n. 7 (E.D.Pa.1994); *International Prods. & Techs., Inc. v. Iomega Corp.,* 10 U .C.C. Rep. Serv.2d (CBC) 694 (E.D.Pa.1989) (" If estoppel claims were not barred by the application of the statute of frauds, every promise satisfying section 90 of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 6

Not Reported in F.Supp.2d, 1999 WL 33456488 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Restatement, but which was otherwise invalid under the statute of frauds, would be actionable under an estoppel claim. Such a reading would strip the statute of its purpose."), *aff'd,* 908 F.2d 962 (3d Cir.1990).

### Fraud and Deceit [FN12]

FN12. International Poultry's brief does not discuss this issue. Accordingly, the argument may be considered to have been abandoned. In any event, it appears to be without merit.

Under Pennsylvania law, intentional misrepresentation has five elements: (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) resulting damage to the recipient. *See Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs.,* 951 F.2d 1399, 1409 (3d Cir.1991). "[P]romises to do future acts do not constitute a valid fraud claim." *Id.* (quoting *Wood v. R.R. Donnelley & Sons Co.,* 888 F.2d 313, 318 (3d Cir.1989)); *see also Sokoloff v. Strick,* 404 Pa. 343, 348, 172 A.2d 302, 304 (1961) ("We have recently held more than once that a mere breach of good faith, or a broken promise to do or refrain from doing something in the future ... is not .. . fraud."). However, "a statement of present intention which is false when uttered may constitute a fraudulent misrepresentation of fact." *Mellon Bank,* 951 F.2d at 1409 (quoting *Brentwater Homes, Inc. v. Weibley,* 471 Pa. 17, 23, 369 A.2d 1172, 1175 (1977)).

Viewed most favorably to International Poultry, the evidence does not show that Wampler's intent was to defraud its customer. Furthermore, if International Poultry relied on its perception of Wampler's representations, its doing so was unjustified. Given the history of their business contacts, International Poultry should have recognized that what occurred as to 1998 purchases bore scant resemblance to the parties' prior practice. International Poultry is unable to say it provided

purchase order numbers for the entire period, and Wampler did not confirm the agreement in writing, as had occurred with their previous contracts. Accordingly, there appears to be no basis in law or fact for count I of International Poultry's amended complaint, and it must also be dismissed.

### ORDER

AND NOW, this 29th day of April, 1999, the motion of defendant/cross-action plaintiff Wampler Foods, Inc. for summary judgment is granted. The following rulings are entered:
1. Plaintiff International Poultry Processors, Inc.'s amended complaint is dismissed with prejudice.
2. Judgment is entered in favor of Wampler Foods, Inc. and against International Poultry Processors, Inc. in an amount to be assessed at a later date. [FN13]

FN13. At a Rule 16 conference on April 6, 1999 counsel agreed that if Wampler's motion were granted, judgment could be entered against International Poultry.

*6 3. By May 14, 1999 International Poultry will submit a statement of the amount of its claim for shrinkage and a proffer of its evidence on this issue.
4. Before May 19, 1999 counsel shall conduct serious settlement discussions to resolve the remaining disputes, including the offset for shrinkage and Wampler's request for attorney fees.
5. The next Rule 16 conference is rescheduled from May 18, 1999 and shall be held by telephone on May 19, 1999 at 9:30 a.m.
A memorandum accompanies this order.

E.D.Pa.,1999.
International Poultry Processors v. Wampler Foods, Inc.
Not Reported in F.Supp.2d, 1999 WL 33456488 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 7

Not Reported in F.Supp.2d, 1999 WL 33456488 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**


• 2:98cv04612 (Docket) (Aug. 27, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-41**

Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1995 WL 431336 (S.D.N.Y.), 6 NDLR P 421, 4 A.D. Cases 1245, 11 A.D.D. 942
**(Cite as: Not Reported in F.Supp.)**

▷
Briefs and Other Related Documents

United States District Court, S.D. New York.
Angel SANTOS, Plaintiff,
v.
The PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, Defendant.
**No. 94 Civ. 8427 (JSM).**
July 20, 1995.

Michael C. Blickensderfer, Axelrod, Cornachio, Famighetti & Davis, Mineola, NY, for plaintiff.
Richard D. Williams, Office of the Gen. Atty., The Port Authority of New York and New Jersey, New York City, for defendant.

OPINION AND ORDER

MARTIN, District Judge:
**\*1** This action is brought under the Americans with Disabilities Act of 1990 ("ADA"). 42 U.S.C. § 12101 *et seq.* Plaintiff asks the Court to enjoin the Port Authority from taking further steps to discharge him from his employment and to order the Port Authority to make reasonable accommodations for him in his position as a police officer. Now before the Court is defendant's motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because the Court has considered affidavits and other exhibits submitted by the parties, defendants' motion is properly treated as one for summary judgment. *See* Fed. R. Civ. P. 12(b).

### I. *Undisputed Facts*

Plaintiff has been employed as a police officer with the Port Authority since April 1988. On June 6, 1992, plaintiff injured the achilles tendon of his right foot in the line of duty. As a result of his injury, plaintiff was out of work for seven and

one-half months. In January 1993, plaintiff was advised by his physician that he could return to work on light duty status. Since that date, plaintiff has worked in a restricted duty position for the Port Authority at John F. Kennedy International Airport in Jamaica, New York.

By letter dated March 17, 1995, plaintiff was advised that the Port Authority had determined that he could no longer perform the full duties of a police officer and that he was being removed from his position at the Port Authority. Compl., Exh. C. Plaintiff filed a charge of employment discrimination on the basis of disability with the Equal Employment Opportunity Commission, and he received a Notification of Right to Sue dated August 30, 1994. Plaintiff filed the present action on November 18, 1994.

### II. *Discussion*

Defendant contests three elements of plaintiff's claim of disability discrimination under the ADA: (1) that plaintiff is disabled, (2) that plaintiff is a qualified individual, and (3) that defendant can reasonably accommodate his disability. Even if plaintiff could demonstrate that he is "disabled" under the ADA in that he suffers from an impairment that "substantially limits" a major activity [FN1], he is unable to come forward with specific facts showing that there is a genuine issue with respect to his status as a qualified individual. For the reasons stated below, defendant's motion for summary judgment is granted.

### A. *Summary Judgment Standard*

Summary judgment is proper when there is no genuine issue of material fact and, based upon facts not in dispute, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B-41.1**

Not Reported in F.Supp.                                                                                    Page 2

Not Reported in F.Supp., 1995 WL 431336 (S.D.N.Y.), 6 NDLR P 421, 4 A.D. Cases 1245, 11 A.D.D. 942
**(Cite as: Not Reported in F.Supp.)**

S. Ct. 2548, 252 (1986). All inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *United States v. Diebold,* 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962). In order to defeat a motion for summary judgment, the factual dispute must be both material and genuine. In determining genuine facts, the shadow of a doubt is insufficient; the Court must be satisfied that evidence exists upon which the finder of fact could reasonably find for the party opposing the motion. *Anderson v. Liberty Lobby,* 477 U.S. 243, 248-52, 106 S. Ct. 2505, 2510-12 (1986).

### B. *Plaintiff is not a "Qualified Individual"*

*2 Under the ADA, a "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). This inquiry asks whether plaintiff can perform the essential functions of his job as a police officer.

In determining which job functions are essential, the ADA instructs that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). A job function may be considered essential if, *inter alia,* (1) the reason the position exists is to perform the function; (2) there are a limited number of employees available among whom the performance of the job function can be distributed, or (3) the function is highly specialized so that the incumbent in the position is hired for his ability to perform the particular function. 29 C.F.R. § 1630.2(n)(2). [FN2]

Although the regulations suggest that this determination is a factual one, the record before the Court demonstrates that no rational fact-finder could conclude that the essential functions of the job of a police officer do not include duties well beyond the limited clerical work that plaintiff is

capable of performing.

We start with the fact that the job at issue is that of "police officer." The very use of that term suggests a position whose essential functions include far more vigorous activities than the clerical duties plaintiff has been performing since January 1993. By definition, a police officer is hired to preserve law and order and to protect life and property. Defendant has submitted a document, Specification No. 2600, containing the job description of a police officer with the Port Authority. [FN3] Williams Aff., Exh. 3. Specification No. 2600 states that individual police officers may be asked to perform any combination of the following duties: patrol by foot or automobile; apprehend violators; direct traffic; operate tractors, towing equipment, and emergency equipment; enforce traffic regulations; and maintain records. Williams Aff., Exh. 3. The job description also specifically notes that continual standing and/or walking is required on some assignments and that an officer is expected to work on a continuous assignment of rotating shifts. Williams Aff., Exh. 3.

Although defendant's submission is not conclusive evidence of the essential functions of a police officer, the "typical" duties listed in Specification No. 2600 are "functions that bear more than a marginal relationship to the job at issue." *White v. York Int'l Corp.,* 45 F.3d 357, 361 (10th Cir. 1995) (citing *Chandler v. City of Dallas,* 2 F.3d 1385, 1393 (5th Cir. 1993), *cert. denied,* 114 S. Ct. 1386 (1994)); *see* 29 C.F.R. § 1630.2(n). These functions clearly strike at the heart of a police officer's job. Although not every officer must perform each of these functions, the "fluctuating demands" of the police force suggest that tasks based on physical performance are essential. 29 C.F.R. § 1630.2(n), App.

*3 In the complaint, plaintiff alleges that "[h]is daily duties are an important and essential function for the Port Authority, performing necessary duties as a Port Authority police officer." Compl. ¶ 17. That plaintiff's responsibilities as a restricted duty officer are important and essential to the Port Authority is inapposite to the present inquiry. Plaintiff must instead establish that he can perform "the essential functions of the position held or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B-41.2

Not Reported in F.Supp., 1995 WL 431336 (S.D.N.Y.), 6 NDLR P 421, 4 A.D. Cases 1245, 11 A.D.D. 942
**(Cite as: Not Reported in F.Supp.)**

desired," to wit, the job of a police officer.

Plaintiff contends that many positions with the Port Authority do not require the performance of the full duties of a police officer. Plaintiff further argues that because strenuous physical activities are not demanded of every police officer position, these functions are not essential to the job and that "an assessment must be made of the essential functions of the positions actually worked by plaintiff." Compl. ¶ 11.

If the Court were to agree with plaintiff's definition, the designation of a Port Authority employee as a " police officer" would be meaningless. Unlike many other conceivable jobs in the Port Authority, the police officer label is not arbitrary but specifically designates an individual who is prepared to work in any of the capacities identified in Specification No. 2600. Moreover, even if it is true that some positions are not likely to require physical endurance, this is not an appropriate standard by which to judge whether these functions are essential. In fact, all officers are subject to transfer to an assignment that would require the performance of strenuous physical activities, for officers may not be assigned to any single particular task for the duration of a tour of duty. [FN4] Williams Aff., Exh. 3.

Plaintiff alleges only that he can satisfactorily perform restricted duty tasks in the nature of clerical work, and he does not allege that he can do what the Court has found are the essential functions of a police officer. Compl. ¶ 16. Plaintiff is admittedly disabled from performing strenuous physical tasks. Santos Aff. ¶ 19 (implying that plaintiff cannot drive a patrol car or guard a post), ¶ 5 (admitting that plaintiff cannot stand or sit for prolonged period of time and cannot run or jump without extreme pain). A showing by plaintiff that he can satisfactorily perform light duty functions is insufficient, for these duties do not encompass all of the essential duties of a Port Authority police officer. Notwithstanding that the job of police officer for the Port Authority may entail clerical responsibilities, "it does not follow that an individual who can perform clerical duties has the ' capacity to perform essential police duties.'"

*Blissitt v. City of Chicago,* 1990 WL 71315, *8, 1990 U.S. Dist. LEXIS 5132, *18 (N.D. Ill. Apr. 30, 1990).

The undisputed evidence of record demonstrates that the Port Authority has no permanent restricted duty police officer positions. Williams Aff., Exh. 3 (Memorandum of Agreement between Port Authority and PBA). Plaintiff has not made any allegations to the contrary. Notwithstanding plaintiff's assertion that he is "not seeking for the defendant to create a specialized position commensurate with [his] abilities, but merely to continue to accommodate [him] by maintaining [him]" on light duty status, the creation of a permanent restricted duty position is precisely that which plaintiff seeks in this action. Santos Aff. ¶ 24. Accommodating plaintiff's disabilities would require more than just the reassignment of those peripheral tasks that plaintiff is unable to perform; it would require **redefinition** of the essential functions of the job. The ADA does not require employers substantially to restructure their work forces in order to accommodate employees with disabilities. *See Larkins v. CIBA Vision Corp.,* 858 F. Supp. 1572 (N.D. Ga. 1994) (employer not required to eliminate essential functions of position to accommodate employee). Furthermore, "[a]n accommodation that eliminates an essential function of the job is not reasonable." *McDonald v. State of Kansas, Dep't of Corrections,* 880 F. Supp. 1416 (D. Kansas 1995); *Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1250 (6th Cir. 1985).

### III. *Conclusion*

*4 Defendant's motion for summary judgment is granted.

SO ORDERED.

> FN1. Under the ADA, "disability" means (1) a physical or mental impairment that substantially limits one or more of a person's major life activities, (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 431336 (S.D.N.Y.), 6 NDLR P 421, 4 A.D. Cases 1245, 11 A.D.D. 942
**(Cite as: Not Reported in F.Supp.)**

U.S.C. § 12102.

FN2. Other relevant factors include the amount of time an employee spends on the job performing the function, the consequences of the employee not performing that function, the work experience of prior holders of that position and/or the current work experience of those in similar jobs. 29 C.F.R. § 1630.2(n)(3).

FN3. Port Authority police officers are members of the Port Authority Police Benevolent Association (PBA), which collectively negotiates the terms and conditions of employment of police officers. Williams Aff. ¶ 9. The Memorandum of Agreement between the PBA and the Port Authority contains the job description for the position of police officer (Specification No. 2600, November 1983). Williams Aff. ¶ 9 and Exh. 3.

FN4. For example, officers may be called upon either during an emergency situation or as part of a normal rotation.

S.D.N.Y.,1995.
Santos v. Port Authority of New York and New Jersey
Not Reported in F.Supp., 1995 WL 431336 (S.D.N.Y.), 6 NDLR P 421, 4 A.D. Cases 1245, 11 A.D.D. 942

Briefs and Other Related Documents (Back to top)

• 1:94cv08427 (Docket) (Nov. 18, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.