IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORPORAL B. KURT PRICE; | : | |
| CORPORAL WAYNE WARREN; and | : | |
| SERGEANT CHRISTOPHER D. FORAKER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A.No.04-956-GMS |
| | : | |
| COLONEL L. AARON CHAFFINCH, | : | |
| individually and in his official capacity as | : | |
| Superintendent of the Delaware State Police; | : | |
| LIEUTENANT COLONEL THOMAS F. | : | |
| MACLEISH, individually and in his official | : | |
| capacity as Deputy Superintendent of the | : | |
| Delaware State Police; DAVID B. MITCHELL, | : | |
| in his official capacity as the Secretary of the | : | |
| Department of Safety and Homeland Security of | : | |
| the State of Delaware; and DIVISION OF | : | |
| STATE POLICE, DEPARTMENT OF SAFETY | : | |
| AND HOMELAND SECURITY, STATE OF | : | |
| DELAWARE, | : | |
| | : | |
| Defendants. | : | |

PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

| | |
|---|---|
| THE NEUBERGER FIRM, P.A. | MARTIN D. HAVERLY, ATTORNEY |
| THOMAS S. NEUBERGER, ESQ. (#243) | AT LAW |
| STEPHEN J. NEUBERGER, ESQ. (#4440) | MARTIN D. HAVERLY, ESQ. (#3295) |
| Two East Seventh Street, Suite 302 | Two East Seventh Street, Suite 201 |
| Wilmington, DE 19801 | Wilmington, DE 19801 |
| (302) 655-0582 | (302) 654-2255 |
| TSN@NeubergerLaw.com | Martin@HaverlyLaw.com |
| SJN@NeubergerLaw.com | |

Attorneys for Plaintiffs

Dated: February 8, 2006

## **TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING................................................................1

SUMMARY OF THE ARGUMENT.............................................................................1

STATEMENT OF FACTS........................................................................................1

    A.     Introduction.................................................................................1

    B.     Defendants Admit the Long Standing Health and Safety Problems at the FTU.................1

    C.     The Decision to Stop Doing Hazardous Maintenance....................................2

         1.     Plaintiffs Informed the Chain of Command........................................2

         2.     Lack of Training........................................................................3

         3.     Plaintiffs Are Not At Fault for the Failure of the Bullet Trap and the Destruction of the FTU...................................................4

    D.     Medical Issues..............................................................................6

ARGUMENT......................................................................................................7

    I.     STANDARD OF REVIEW..............................................................7

    II.     PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED SPEECH BY SPEAKING OUT ABOUT THE PROBLEMS AT THE FTU.........................8

    III.     PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES.....................9

         A.     The Big Picture.............................................................................9

         B.     The Activities Protected..................................................................10

              1.     Executive and Legislative Petitions...............................................11

             2.     Judicial or Quasi-Judicial Petitions..............................................12

         C.     The Specifics.............................................................................12

         D.     Discussion.................................................................................13

    IV.     DEFENDANTS' RETALIATION AGAINST PLAINTIFFS WOULD CHILL A PERSON OF ORDINARY FIRMNESS FROM EXERCISING THEIR FIRST AMENDMENT RIGHTS.............................................................15

*i*

A.  The "Chill a Person of Ordinary Firmness" Standard............................................15

    1.   Light Duty is Adverse Action..................................................................15

    2.   Sending Plaintiffs For Fitness for Duty Exams Also is Adverse
         Action..................................................................................................16

B.  Defendants' Long Course of Retaliation Against Plaintiffs Would Chill a
    Person of Ordinary Firmness.............................................................................17

C.  The Cases Cited by Defendants..........................................................................19

D.  Summary...........................................................................................................19

V.  THE RECORD IS OVERFLOWING WITH CAUSAL EVIDENCE WHICH
    DEMONSTRATES THAT PLAINTIFF'S PROTECTED FIRST AMENDMENT
    ACTIVITY WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE
    RETALIATION AGAINST HIM.........................................................................20

    A.  Substantial or Motivating Factor.................................................................20

        1.   Motive in General................................................................................20

        2.   Knowledge of Protected Conduct..........................................................21

             a.   MacLeish's Involvement..............................................................22

             b.   Chaffinch's Authorization............................................................22

        3.   Demonstrated Anger, Hostility and Antagonism.....................................24

        4.   Temporal Proximity.............................................................................24

        5.   Violations of Law, Policies and Procedures............................................25

        6.   Disparate Treatment............................................................................26

             a.   The Law of Similarly Situated Employees.....................................26

             b.   The Categories of Disparate Treatment Evidence In Which
                  Comparisons Should Be Made.....................................................27

                  (1).   Troopers With Hearing Problems Who Were
                         Accommodated..................................................................27

                         (a).   Major Joseph Forester.......................................27

                         (b).   Cpl. John Powell..............................................27

(2).     Troopers With Other Serious Physical Injuries Who Were Accommodated.......................................................28

    (a).     Sgt. Steve Swain...............................................28

    (b).     Capt. David Citro..............................................28

    (c).     Sgt. David Henderson.......................................29

    (d).     Cpl. Michael Jordan..........................................29

    (e).     Cpl. XYZ (a pseudonym)..................................29

    (p).     Lt. Paul Sczubelek............................................29

(3).     Troopers Who Were Given Two or More Years on Light Duty....................................................................30

    (a).     Cpl. Bruce Peachey...........................................30

    (b).     Lt. ABC (a pseudonym)....................................30

    (c).     Cpl. Scott Warner.............................................30

    (d).     Cpl. Jerome Loveless........................................30

    (e).     Lt. Jeff David....................................................31

    (f).     Cpl. Anthony DiAllesandro..............................31

    (g).     Sgt. Shawn Nowrey...........................................31

    (h).     Cpl. Everett Jackson..........................................31

    (i).     Sgt. James Romanelli........................................31

    (j).     Sgt. Jahn Hitchens............................................31

    (k).     Cpl. Christine Price...........................................31

    (l).     Cpl. Bo Sarley...................................................31

    (m).     Cpl. James Mosley............................................32

    (n).     Cpl. Joseph Condron.........................................32

    (o).     Trooper Randy Armistead..................................32

7.     Selective Enforcement.......................................................32

        8.     Underinclusiveness of a Proffered Reason.................................................33

        9.     Pretext and Coverup.................................................................................33

        10.    Falsehoods.................................................................................................34

        11.    Intentional Destruction of Evidence........................................................34

        12.    The Big Picture........................................................................................34

        13.    Summary...................................................................................................35

     B.     Same Decision Anyway....................................................................................35

 V.     DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.......................36

     A.     The Health Care Line of Cases.........................................................................36

CONCLUSION.................................................................................................................................37

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

Adkins v. Rumsfeld, 389 F.Supp.2d 579 (D.Del. 2005)................................................22,24,26,33

Allah v. Seiverling, 229 F.3d 220 (3d Cir. 2000).........................................................16,19,21

Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997).............................................9,10,12,13,14,16,21

Andrews v. City of Phila., 895 F.2d 1469 (3d Cir. 1990)....................................................34

Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001)................................................19,20,21

Bieregu v. Reno, 59 F.3d 1445 (3d Cir. 1995)..............................................................10

Boyle v. County of Allegheny, Pa., 139 F.3d 386 (3d Cir. 1998)..............................................7

Bray v. Marriott Hotels, 110 F.3d 986, 992 (3d Cir. 1997)...............................................25-26

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003)...................................................12,13,18,24,26,36

C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159 (3d Cir. 2005)............................................22,23

C.H. v. Olivia, 226 F.3d 198 (3d Cir. 2000) (en banc)......................................................22

Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972)...................................11,12

Caver v. City of Trenton, 420 F.3d 243 (3d Cir. 2005)....................................................15-16

Cox v. Louisiana, 379 U.S. 536 (1965).....................................................................32

Durham Life Insur. Co. v. Evans, 166 F.3d 139 (3d Cir. 1999)...............................................17

Elrod v. Burns, 427 U.S. 347 (1976).......................................................................18

Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005).............................................................24

Feldman v. Phila. Housing Auth., 43 F.3d 823 (3d Cir. 1994)................................................33

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005)...........................................7-8,12,13,20,23,32,33,35

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993)...................................................32

Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989)..........................................................24

Jensen v. Potter, — F.3d —, 2006 WL 224002 (3d Cir. Jan. 31, 2006)......................................24,34

Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173 (3d Cir. 1997).........................................21,24

Keenan v. City of Phila., 983 F.2d 459 (3d Cir. 1992)....................................................21-22

Krouse v. American Sterilizer Co., 126 F.3d 494 (3d Cir. 1997)...................................................24

Kunda v. Muhlenberg College, 621 F.2d 532 (3d Cir. 1980)........................................................26

McDonald v. Smith, 472 U.S. 479 (1985)...............................................................................10-12

McKee v. Hart, — F.3d —, 2006 WL 27474 (3d Cir. Jan. 6, 2005)........................................18,19

Miller v. Cigna, Corp., 47 F.3d 586 (3d Cir. 1995) (en banc)....................................................20

Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)................................................20

Powell v. Alexander, 391 F.3d 1 (1st Cir. 2004)..........................................................................11

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)...................................7,23,34

Resident Advisory Bd. v. Rizzo, 564 F.2d 126 (3d Cir. 1977).....................................................26

Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997).....................................................22

Robinson v. SEPTA, 982 F.2d 892 (3d Cir. 1993)........................................................................24

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994)......................................................9-14,26

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc)......................33,34

Stewart v. Rutgers, the State Univ., 120 F.3d 426 (3d Cir. 1997)................................................25

Suarez Corp. v. McGraw, 202 F.3d 676 (4th Cir. 2000)..............................................................19

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000)...................................................................18-20

Swartzwelder v. McNeilly, 297 F.3d 228 (3d Cir. 2002)..............................................................18

Thomas v. Collins, 323 U.S. 516 (1945)......................................................................................10

United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217 (1967)....................10,11

U.S. v. Cruikshank, 92 U.S. 542 (1876)......................................................................................10

U.S. v. Nat'l Treasury Employees Union, 513 U.S. 454 (1995)...................................................18

Village of Arlington Heights v. Metropolitan Hous. Develop. Corp., 429 U.S. 252 (1977)......................25

Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995)..................................................................36

We, Inc. v. City of Phila., 174 F.3d 322 (3d Cir. 1999)...............................................................13

Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997)..........................................................24

**<u>Constitutions, Statutes and Rules</u>**

U.S. Const., Amend. I...................................................................................................................<u>passim</u>

Fed.R.Civ.P. 56(c)...............................................................................................................................7

## NATURE AND STAGE OF THE PROCEEDING

Plaintiffs rely upon the Nature and Stage of the Proceedings set forth in their Opening Brief in Support of their Motion for Summary Judgment. (D.I. 84). This is plaintiffs' answering brief and appendix ("B___"), in opposition to defendants' motion for summary judgment.[1]

## SUMMARY OF THE ARGUMENT

Plaintiffs engaged in a long course of protected First Amendment speech and petitioning of government for redress of grievances beginning in December 2003 and continuing well into 2004. Supreme Court and Third Circuit precedent conclusively establishes that plaintiffs are legally entitled to the protections of both the speech and petition clauses. There is abundant record evidence that plaintiffs' protected activities were a substantial or motivating factor in the retaliation against them. Additionally, defendants' long and continuing course of retaliatory harassment against them is more than sufficient to chill a person of ordinary firmness from exercising their First Amendment rights. Likewise, long established First Amendment retaliation law makes it clear that the defense claims of qualified immunity in this regard also without merit.

## STATEMENT OF FACTS

**A. Introduction.** In the interests of brevity and judicial economy, plaintiffs rely upon and incorporate by reference the exhaustive Statement of Facts contained in their opening brief in this case and in the companion Foraker action.

**B. Defendants Admit the Long Standing Health and Safety Problems at the FTU.**
Aside from its remarkable dearth of record cites, the most notable things about the defense brief are the items it admits and concedes. Defendants concede that the design and building process for the FTU was flawed from its very inception. They admit that the bidding, design and building of the FTU was flawed. They admit corners were cut. They admit that government

---

[1] Defendants' summary judgment opening brief will be cited as "DOB" and plaintiffs' own summary judgment opening brief will be cited as "POB."

incompetence played a role in the problems the facility has experienced. They admit that blood lead levels have always been a concern. They admit that the switch to frangible ammunition helped destroy the bullet-trap. (DOB at 6-7).

**C. The Decision to Stop Doing Hazardous Maintenance.** However, defendants wrongly fault plaintiffs' decision to stop conducting dangerous hazardous material maintenance at the FTU. (DOB at 9).

Sgt. Foraker testified about this at length in his deposition and indicated that the decision to stop doing maintenance was done for two reasons - both related to health and safety. First, it was done because of the dramatic spike in blood lead levels that occurred when plaintiffs conducted the hands on maintenance despite their lack of training and protective equipment. For example, plaintiff Price's lead levels quickly spiked 6 points and DSP doctors told plaintiffs that their bullet-trap maintenance was the cause of the dramatic lead spikes. Second, it was done because the facility was so severely understaffed, it was impossible to try to keep the recruits in their charge properly and safely supervised while also doing the time intensive maintenance the specialized bullet-trap required. (Foraker 82-84, 61, 75,79; Price 62-67; MacLeish ex. 11; A701,695,699,700,1276-77,226-27).

**1. Plaintiffs Informed the Chain of Command.** Defendants wrongly claim that plaintiffs never told anyone that they had stopped conducting expert and hazmat maintenance at the FTU. (DOB at 10-11). This is plainly false. Both Sgt. Foraker and his direct supervisor Captain Warren testified that plaintiffs told Captain Warren in December 2003 that they had stopped performing maintenance on the bullet-trap for health reasons. (G. Warren 81-83; Foraker 84-85, 75, 91-92; Price 74; MacLeish ex. 11; A1942-43,701,699,703,1279,226-27). Capt. Warren then immediately tried to schedule a meeting with MacLeish to fill him in on what was occurring and tell him that maintenance had ceased because of health and safety concerns. (G. Warren 81-82; A1942-43). Unfortunately, MacLeish kept canceling the scheduled meetings

for personal reasons, so it took Capt. Warren weeks before MacLeish finally granted him the privilege of an audience. (G. Warren 81-84, 106-07; A1942-43,1949).[2]  So although plaintiffs immediately passed this information up the chain of command in December 2003, it was not until approximately the third week of January when MacLeish finally found the time to sit down with Capt. Warren and Lt. Davis to talk about the matter. (G. Warren 82-83; A1943).  Thus, the record reveals the exact opposite of the defense contention - despite MacLeish's best efforts to blow him off, Capt. Warren discussed the decision to stop doing maintenance with Lt. Col. MacLeish in numerous meetings and passed up the chain of command the information that plaintiffs had given him earlier in December 2003 about the maintenance decision. (G. Warren 93; A1945).[3]

     **2. Lack of Training.**  Also, the defense claim is false that plaintiffs received training in the operation and maintenance of the bullet trap. (DOB at 9).  There is a significant and notable distinction between receiving specialized technical and mechanical training in how to maintain a complex million dollar piece of equipment,[4] and lay persons just doing their best to unclog clogged screens and replace broken pumps as part of a desperate effort to keep the system functional.  The very deposition testimony defendants have cited reveals that plaintiffs received no formal training.  It was catch as catch can at the FTU.  No doubt bullet-trap training and repair was one of the numerous corners the State cut when it contracted for the facility and gave the contract to an inexperienced local builder.

---

[2]  MacLeish was just "blowing us off." (G. Warren 106, A1949).  "[I]t's really inexcusable that it should take a captain a month and a half to meet with his boss over something as important as people's health." (G. Warren 106-07, A1949).

[3]  No doubt MacLeish was blowing off Capt. Warren because he had failed to heed MacLeish's warning from several months before when MacLeish told him that he "needed to back off and ...lay down and ... quit being so boisterous about things within the division that weren't going the way they should have been and about policy that's being violated and rules and regulations that are being violated and things of that nature." (G. Warren 108; A1949).

[4]  This is a piece of equipment whose intricacies it takes defendants more than a page to describe. (DOB at 7-8).

Moreover, the defense claim that plaintiffs were responsible for conducting upkeep on the hazardous bullet trap is contradicted by their own internal memos which found that upon conducting a nationwide survey of firing ranges, "[s]omeone other than range personnel handle scheduled maintenance and removal of lead and other toxins in all cases." (MacLeish ex. 3 p.2; A209). Similarly, as Sgt. Foraker related to MacLeish on numerous occasions, upon investigating the hazardous material issues related to bullet-trap maintenance and consulting with experts in the field, these experts invariably advised that "professionals would be needed for the safe and efficient operation of the entire bullet trap system." (MacLeish ex. 11 p.2; Foraker 76,74,78,82; A227, 699-701). Indeed, many companies simply refused to come in and even try to maintain or repair the bullet-trap because of the dangers of lead exposure arising from it. (Foraker 76; A699). Yet defendants assert that plaintiffs, with no specialized mechanical training, no hazmat training and no protective equipment whatsoever (Chaffinch 60-62; MacLeish 64-65; Price Inter. #10 p.24-27; W. Warren 151-52; Foraker 24; G. Warren 164-65; A440-41,109,2289-92, 1427,686,1963), should have been responsible for maintaining the bullet trap.[5]

    **3. Plaintiffs Are Not At Fault for the Failure of the Bullet Trap and the Destruction of the FTU.** Contrary to the defense mantra (DOB at 11), plaintiffs did not cause the destruction of the bullet trap and the FTU. Plaintiffs did not design the bullet trap. They were not trained in maintaining the bullet trap. Plaintiffs did not make the change to frangible ammo which defendants themselves admit destroyed the bullet trap as the bullet residue turned to concrete upon impact. (DOB at 10). They did not design the ventilation system that would

---

[5] The passing defense references to the zamboni and the HEPA-VAC also are misleading. (DOB at 9). For example, the zamboni had not worked since summer 2003. (Foraker 116; A709). And even when it worked, there was the continuing problem of what to do with the toxic water residue that it generated. (See W. Warren 156-57; A1428). The zamboni was to replace the HEPA-VAC which was literally the width of a regular vacuum cleaner and which would take forever to clean a floor the size of the massive firing range. (Foraker 222; A780).

inevitably fail.  Plaintiffs did not build a broken building.  They did not allow political cronyism and the good old boy network to take precedence over health and safety.

What were plaintiffs to do?   As discussed above, DSP doctors told them they were being poisoned by doing maintenance on the bullet trap, maintenance for which they had no training or protective equipment.  Even properly equipped professionals refused to come in and work on the system.  Plaintiffs informed the chain of command that they were ceasing to conduct maintenance for health and safety reasons, but then defendant MacLeish hides his head in the sand for over a month and refuses to address the issue.

In the interim, as discussed in plaintiffs' opening brief (POB at 5-6), plaintiffs were diligently trying to bring in environmental and hazmat experts to help them determine the specifics and the causes of the numerous problems that were occurring at the FTU.  Whenever plaintiffs went to the in-house 'experts' at the State's division of Facilities Management, they were no aid at all.  They routinely offered responses like "I wish I could tell you it's working, but all I can tell you is it's working as best it can." (Foraker 154-55; A719), and there is nothing to worry about, your bullets are non-toxic and cannot possibly harm you, (Davis 37-38; Price Inter. #12; A492-93,2300), which of course was plainly false. (Davis 38-40; Price Inter. #12; A493,2300-01).  When Facilities Management refused to conduct environmental testing, plaintiffs paid for the testing out of their own budget.  (Foraker 51-52; A694).

Plaintiffs are low ranking Troopers in the DSP.  They do not have the power, authority or political connections of defendants.  In this hierarchical paramilitary organization, they did not have the authority to shut the facility down.  (Foraker 49-50, 257, 268; A693,789,792).  Plaintiffs did the best they could under the circumstances.  They raised health and safety concerns.  They informed their chain of command.  They went to Facilities Management for help.  Then on top of all of their other job duties, they took it upon themselves to investigate and gather all of the information and expert opinions they could to present to defendants and conclusively determine

that the facility was broken, and that their worst fears were well-founded in fact.

Plaintiffs did all they could to protect the health and safety of those who work and train at the

FTU. And the thanks they got was two years worth of harassment. They are being run out of the

DSP like lepers. Their professional lives are destroyed. Their good names were taken away

from them. Their personal lives are in shambles.

     **D. Medical Issues.** The defense claim that plaintiffs requested audiological testing is

flatly denied. The record evidence demonstrates the opposite conclusion. As discussed in

plaintiffs' opening brief, plaintiffs had solely requested blood and urine testing to determine the

levels of lead and other heavy metals in their bodies. They did not request hearing tests. (POB

at 15). The falsity of the defense claim that plaintiffs requested hearing tests (DOB at 13) is

quickly revealed by looking at the very e-mail they misleadingly cite for that proposition. The e-

mail from plaintiff Price to Sgt. Foraker explains that he is requesting a medical evaluation to

determine whether he has been exposed to "heavy metals and other airborne" contaminants.

(Defendants Combined Appendix at A506.6). As the former Director of Personnel for the DSP

testified, to send the men for hearing testing when only blood and urine testing was requested is

highly "unusual," (Dillman 149-151, 159, 157-58, 3-5,110-13; A2525-27,2535,2533-34,2379-

81,2486-89), all the more so in light of the historic DSP practice of running away from hearing

issues out of a well-founded fear that a large percentage of the active force would be found to

have serious hearing problems. (POB at 15-17). This was the first step in the defense efforts to

run plaintiffs out of the Division. Everything else, the numerous fitness for duty exams, light

duty, everything flows from this unprecedented initial retaliatory act of ordering that hearing

tests be conducted when only lead and heavy metal testing was sought.

     Defendants make much of the fact that plaintiffs subsequently applied for workers

compensation benefits. But who can blame them? As discussed in plaintiffs' briefing in this and

the companion <u>Foraker</u> action, with the DSP making it clear that they refuse to accommodate and

take care of them in violation of its historical policies, plaintiffs are trying to do the best they can to protect their families as defendants prepare to throw them out on the trash heap of injured workers. The worker's compensation issue is a red herring designed to avoid the fact that it would never have arisen had unprecedented hearing tests not been ordered.

## ARGUMENT

### I.    STANDARD OF REVIEW.

A motion for summary judgment shall be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998); Fed.R.Civ.P. 56(c). "All facts and inferences are construed in the light most favorable to the non-moving party." Boyle, 139 F.3d at 393. At summary judgment, "a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." Id. To raise a genuine issue of material fact, "the [summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant, but simply must exceed the 'mere scintilla' standard." Id. (internal punctuation omitted).

The Third Circuit recently revisited summary judgment standards in the First Amendment retaliation context. The recent opinion in Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005), held that when an employer moves for summary judgment, even the uncontradicted testimony of interested witnesses supporting the employer, such as supervisors, employees and other workers, should not be considered or otherwise weighed in the summary judgment balancing. "[W]hen evaluating a summary judgment motion a court should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant." Hill, 411 F.3d at 131 n.22 (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 149-151 (2000)); see also Hill, 411 F.3d at 129 n.16.

Thus, the Hill decision reaffirms long existing Third Circuit and Supreme Court

precedent and dictates that the defense reliance herein upon testimony and affidavits from its

own employees is misplaced at the summary judgment stage due to their obvious bias, fear of

losing their jobs or other retaliation. Thus, their testimony should be excluded from the Court's

analysis of summary judgment issues. Additionally, defendants' own testimony should be

disregarded because, as defendants, they certainly are "interested witness[es]" under Hill. 411

F.3d at 131 n.22.

## II.    PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED SPEECH BY SPEAKING OUT ABOUT THE PROBLEMS AT THE FTU.

Defendants do not contest that plaintiffs engaged in First Amendment protected free

speech on matters of public concern when they met with defendants in numerous meetings in

February and March of 2004 and when they twice spoke to the State Auditors Office in May and

July of 2004. (DOB at 22-23).

Notably however, defendants refuse to make any mention of plaintiffs' long course of

written and oral speech beginning in early December 2003 and continuing into January 2004 and

after, in which they continuously raised grave health and safety concerns about the hazardous

conditions at the FTU, up the chain of command, and directly in e-mails and meetings with

defendants.[6] Instead, defendants limit their concession of protected activity solely to meetings

that occurred in February and March 2004. They have not conceded that plaintiffs continued to

raise health and safety concerns in those same months and throughout this entire time period by

other methods - be it orally, or through the numerous e-mails that are in the record.

The extensive record of plaintiffs' speech in this regard is discussed at length in

plaintiffs' opening brief. (POB at 5-12). That record explains that plaintiffs were constantly

speaking out about the problems at the FTU, immediately upon Sgt. Foraker's reinstatement on

---

[6] For example, defendants ignore the existence of plaintiffs' December 19, 2003 e-mail entitled "Emergency Range Issues" which was sent directly to MacLeish and in which they brought many of their health and safety concerns directly to his attention. (MacLeish ex. 11; A226).

December 1, 2003.  The record makes clear that even when plaintiffs were not sending e-mails or meeting directly with defendants, that they were speaking out to Lt. Davis and Capt. Warren in their chain of command, each of whom then raised plaintiffs' concerns and speech directly with the defendants and their Executive Staff.   The record cited in plaintiffs' opening brief thus conclusively establishes that (1) plaintiffs were constantly speaking out and raising health and safety concerns from early December 2003 onward; and (2) that defendants had personal knowledge of plaintiffs' speech, because it was either spoken directly to them, or because the chain of command in this paramilitary organization brought it directly to their attention. (Id.).

As discussed in plaintiffs' opening brief, it is clear that all of plaintiffs' speech from December 2003 onward, was clearly on  matters of public concern.  And given that defendants have offered no disruption defense, it is now undisputed that plaintiffs' speech is protected by the First Amendment.  (POB at 28-32).

**III.    PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES.**

Defendants assert that plaintiffs' petitioning of the DSP to fix the broken FTU which was endangering the health and safety of all who worked and trained there, as well as their petitioning of the State Auditor, does not qualify as protected activity under the First Amendment's Petition Clause.  (DOB at 34-35).  As discussed below, defendants crabbed reading of the petition clause is wrong under decades of Supreme Court and Third Circuit authority.

**A.  The Big Picture.**  The First Amendment protects the "right to petition the Government for a redress of grievances."  U.S. Const., Amend. I.  "The right to petition the government for grievances is a fundamental component of a just and orderly society."  Anderson v. Davila, 125 F.3d 148, 164 (3d Cir. 1997).  "[W]hen one files a 'petition' one is addressing the government and asking government to fix what ... government has broken or has failed in its duty to repair," San Filippo v. Bongiovanni, 30 F.3d 424, 442 (3d Cir. 1994), such as plaintiffs'

petitions to fix the broken and hazardous FTU in our present case.

"The historical roots of the Petition Clause long antedate the Constitution." <u>McDonald v.</u> <u>Smith</u>, 472 U.S. 479, 482 (1985); <u>see also</u> <u>Bieregu v. Reno</u>, 59 F.3d 1445, 1453 (3d Cir. 1995) (observing that the independent pedigree of the Petition Clause goes back to colonial times). It is even "more ancient than -- the freedoms of speech and press." <u>Bieregu</u>, 59 F.3d at 1453. The Petition Clause "was not intended to be a dead letter - or a graceful but redundant appendage" to the rest of the First Amendment clauses. <u>San Filippo</u>, 30 F.3d at 442. Instead, it ranks "among the most precious of the liberties safeguarded by the Bill of Rights" and is "intimately connected, both in origin and purpose with the other First Amendment rights of free speech and free press." <u>United Mine Workers of America v. Ill. State Bar Ass'n</u>, 389 U.S. 217, 222 (1967). "All these, though not identical, are inseparable." <u>Id.</u> (quoting <u>Thomas v. Collins</u>, 323 U.S. 516, 530 (1945)). The "right to petition is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular form of expression." <u>McDonald</u>, 472 U.S. at 482. As stated above, "when one files a 'petition' one is addressing the government and asking government to fix what ... [it] has broken or has failed in its duty to repair." <u>San Filippo</u>, 30 F.3d at 442.

"[T]he values in the right of petition as an important aspect of self-government are beyond question." <u>McDonald</u>, 472 U.S. at 483. The right to petition "is implicit in the very idea of government, republican in form." <u>Id.</u> at 482 (quoting <u>U.S. v. Cruikshank</u>, 92 U.S. 542, 552 (1875)) (internal punctuation omitted). The "fundamental importance of the right to petition [is] as a check against the government's abuse of power." <u>Anderson</u>, 125 F.3d at 162.

**B. The Activities Protected.** In the words of James Madison, the "people 'may communicate their will' *through direct petitions to the legislature and government officials*." <u>McDonald</u>, 472 U.S. at 482 (quoting 1 Annals of Cong. 738 (1789)) (emphasis added). Indeed, "[f]or decades, the Supreme Court has consistently recognized the right to petition *all branches*

-10-

*of the government* ... for redress of grievances as among the most precious of the liberties safeguarded by the Bill of Rights." Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004) (emphasis added) (internal punctuation and citation omitted) (citing Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972) and United Mine Workers, 389 U.S. at 222). Accordingly, "the right to petition extends to *all departments of Government.*" Cal. Motor Transport, 404 U.S. at 510 (emphasis added).[7] It extends to "administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government." Id.; see also id. at 513 (noting that a party "ha[s] the right of access to the agencies and courts"). Thus, plaintiffs' petitions to the State Auditors Office and to the leadership of the DSP about the hazardous conditions at the FTU are clearly protected. As is their right, plaintiffs were petitioning branches of the Executive and administrative agencies, activities which the Supreme Court has recognized as protected conduct.

     **1. Executive and Legislative Petitions.** In McDonald v. Smith, the petitions at issue were petitions directed to the President of the United States. Subsequent petitions also were addressed to members of Congress, as well as other officials in both the Executive and Legislative branches. See 472 U.S. at 481. Similarly, the petitions at issue in Cal. Motor Transport, were addressed to state and federal agencies. See 404 U.S. at 511. As the Third Circuit has recognized, the right of citizens to petition the Executive and Legislative branches dates back to William Blackstone and continues and finds its origins in the Magna Carta. See San Filippo, 30 F.3d at 443 and n.22, 23. Plaintiffs need not belabor this point. As just discussed, by petitioning the State Auditor and the leadership of the DSP, plaintiffs were plainly

---

    [7] As Blackstone wrote long ago, "there still remains a ... right, appertaining to every individual, namely, the right of petitioning the king, or either house of parliament, for the redress of grievances." San Filippo, 30 F.3d at 443 n. 23 (quoting 1 William Blackstone, Commentaries * 143). Recognizing this, the Third Circuit has explained that "*[t]here is no persuasive reason for the right of petition to mean less today than it was intended to mean in England three centuries ago.*" Id. at 443 (emphasis added).

engaging in protected petition clause activity.

**2. Judicial or Quasi-Judicial Petitions.** Thus, and contrary to the defense assertions (DOB at 35), the well-known "right of access to the courts is indeed but one aspect of the right to petition." Cal. Motor Transport, 404 U.S. at 510; accord San Filippo, 30 F.3d at 436; see McDonald, 472 U.S. at 484. Of course it "is undisputed that filing lawsuits and grievances ... implicate[s] the Petition Clause of the First Amendment." Brennan v. Norton, 350 F.3d 399, 417 (3d Cir. 2003); see Anderson, 125 F.3d at 161; Hill, 411 F.3d at 126.

The petition clause "imposes on the [government] an obligation to have at least some channel open for those who seek redress for perceived grievances." San Filippo, 30 F.3d at 442. Importantly, it is beyond dispute that the petition clause applies with even greater force when the "government - federal or state - formally adopts a mechanism for redress of grievances for which the government is allegedly accountable." Id. As the Third Circuit has observed, it would

> undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious "petition" invoking that mechanism may be disciplined for such invocation by the very government that in compliance with the petition clause has given the particular mechanism its constitutional imprimatur.

Id. But of course, as discussed above, this is by no means the only type of petitions that receive First Amendment protection.[8]

**C. The Specifics.** The protected status of petition is a matter of law. Hill, 411 F.3d at 127. Like free speech claims, petition clause claims also are analyzed using the same three-

---

[8] Although not necessary under the case law just discussed, assuming *arguendo* the defense position that the adoption of a formal mechanism is in fact necessary, the defense argument is merely a red herring as the State has adopted such formal mechanisms that directly bear upon our present case. First, the State established the State Auditors office whose sole purpose is to ferret out impropriety in government - the very mechanism that plaintiffs invoked. Second, the Governor and the members of the legislature formally requested that the Auditor investigate the conditions at the FTU - thus establishing the very specific mechanism that plaintiffs invoked. Third, and more fundamental, is the establishment of a formal chain of command in the DSP which is the functional equivalent of the internal grievance procedures discussed by the Third Circuit in San Filippo. 30 F.3d 424. In the DSP, where the chain of command is paramount, formal grievances are lodged by raising issues up through the chain of command, as plaintiffs did in our present case.

pronged protected activity analysis. Id. at 125.  Importantly, the protected activity analysis

under the petition clause is different than that under the free speech clause.  In the petition arena,

there is no disruption balancing nor is there a public concern analysis.  Instead, matters of purely

private concern are protected, as long as the petition is not a sham.  Hill, 411 F.3d at 126; San

Filippo, 30 F.3d at 440, 443; We, Inc., v. City of Phila., 174 F.3d 322, 330 n.2 (3d Cir. 1999);

Brennan, 350 F.3d at 417; see also San Filippo, 30 F.3d at 434-43 (the Third Circuit's extensive

analysis of the issue).  As the Circuit stated in Brennan, a plaintiff need only show that the

petition "was not frivolous in order to make out a prima facie claim for retaliation under the

Petition Clause."  Brennan, 350 F.3d at 417; see Hill, 411 F.3d at 126 (any lawsuit is a protected

petition, so long as it is not "sham litigation").  Defendants have not contended that plaintiffs'

petitions were not made in good faith or were frivolous nor could they in light of the record in

this regard.  Simply put, the making of a "petition is not a constitutionally permissible ground

for" adverse action against anyone.  San Filippo, 30 F.3d at 443.  The government simply may

not retaliate against those who petition it as such a result "is hardly consistent with the

fundamental principles of orderly protest, which our Constitution sought to preserve by

protecting our right to petition the government for redress."  Anderson, 125 F.3d at 163.

    **D. Discussion.**  In our present case, it is clear that plaintiffs' petitions to the State

Auditor and to the leadership of the DSP are protected by the petition clause.  Plaintiffs did not

go out and stand on a park bench and raise their health and safety concerns directly to the

citizenry.  If they had, only the free speech clause would provide them with First Amendment

protection from retaliation.  But instead, plaintiffs raised their concerns directly to the

government, the very government that had caused the problems, and the very government that

had the power to fix the problems.  This distinction is key.  As the Third Circuit has explained,

> [W]hen one files a "petition" one is not appealing over government's head to the general
> citizenry:  when one files a "petition" one is addressing government and asking
> government to fix what, allegedly, government has broken or has failed in its duty to
> repair.

<u>San Filippo</u>, 30 F.3d at 442; <u>accord</u> <u>Anderson</u>, 125 F.3d at 162-63. This is exactly what plaintiffs were doing.

As plaintiffs' opening briefs both in this case and the companion <u>Foraker</u> case make clear (and as defendants tellingly concede in the factual sections of their respective opening briefs), the FTU is broken. It has been broken since before the foundation was even laid on day one as the State of Delaware picked an unqualified builder to build the building and ignored expert studies warning that the proposed building would inevitably fail as designed. And things only got worse from there. It has never worked as promised. Instead, it has endangered the lives of thousands of officers who have worked and trained there since the facility opened in 1998. And the problems with the HVAC system, blood lead levels, the bullet trap, the heavy metal composition of the ammunition and all of the other problems have only continued and worsened over time. If there was ever a broken facility crying out for desperately needed help and repairs, it was the FTU. And it is plaintiffs who cried out for help. It is plaintiffs who petitioned the very government that violated its duty to build a safe facility in the first place. It is plaintiffs who petitioned the government to fix what it had broken and failed in its duty to repair. Under Third Circuit case law, case law that finds its origins not only in Supreme Court precedent but traces its history all the way back to the Magna Carta, the petition clause clearly protects plaintiffs' petitions. <u>See</u> <u>San Filippo</u>, 30 F.3d at 442 n.22; <u>Anderson</u>, 125 F.3d at 162-63. As the Third Circuit explained in the police department context in <u>Anderson</u>,

> Anderson [a police officer] was petitioning the government to "fix" a problem within the Virgin Islands Police Department. Instead of engaging in such repair, the Government compounded Anderson's grievances by initiating its [retaliatory] surveillance operation. Were we to ignore the Government's retaliation, we would render Mr. Anderson's First Amendment petition right effectively useless. Officials could simply engage in harassment any time an individual [petitions the government]. This result is hardly consistent with the fundamental principles of orderly protest, which our Constitution sought to preserve by protecting our right [to] petition the government for redress.

<u>Anderson</u>, 125 F.3d at 162-63. In the same way, plaintiffs were desperately petitioning the government to fix the hazardous conditions at the FTU that were endangering the health and

safety of all those who worked and trained there.  In their supervisor's words, plaintiffs were "basically pleaing for help" and "waving a flag going 'help'" as they spoke out about the hazards at the FTU and the dire need to fix them. (Davis 30,17-18, 28-29; G. Warren 75; A491,487-88,490,1941).  To ignore defendants' long course of retaliatory harassment against plaintiffs in response to their good faith petitions is hardly consistent with the protections that the petition clause was designed to provide.

For the aforementioned reasons, plaintiffs' petitions to the government about the hazardous conditions at the FTU are protected by the petition clause.

**IV.    DEFENDANTS' RETALIATION AGAINST PLAINTIFFS WOULD CHILL A PERSON OF ORDINARY FIRMNESS FROM EXERCISING THEIR FIRST AMENDMENT RIGHTS.**

Not surprisingly, no where in the defense brief have defendants discussed or even set forth the well-established legal standards governing adverse action in the First Amendment retaliation context.

**A. The "Chill a Person of Ordinary Firmness" Standard.**   In the interest of brevity and judicial economy, plaintiffs incorporate by reference the extensive and thorough discussion of First Amendment adverse action law contained in the companion <u>Foraker</u> action.  In addition to that law, plaintiffs set forth the following which is specific to the FTU case.

**1. Light Duty is Adverse Action.**  Defendants concede that placing plaintiffs on light duty is an adverse action and would deter a person of ordinary firmness from exercising their First Amendment rights.  (DOB at 29).  No doubt they concede this because Third Circuit law is clear in this regard.  In <u>Caver v. City of Trenton</u>, 420 F.3d 243 (3d Cir. 2005), applying the even stricter Title VII statutory adverse action standard, the Third Circuit held that the placing a plaintiff on "administrative duty was an adverse employment action under [Title VII standards] in that it significantly altered his duties and status as an officer." <u>Id.</u> at 256.  Thus it is clear that placing plaintiffs on light duty, in and of itself (and entirely independent of the long course of

retaliatory harassment), is more than sufficient to meet the First Amendment adverse action standard.

**2. Sending Plaintiffs For Fitness for Duty Exams Also is Adverse Action.**

Although merely sending an employee for a psychiatric evaluation "without more" is not adverse action under Title VII standards, Caver, 420 F.3d at 256, it has long been established that "an otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech." Anderson v. Davila, 125 F.3d at 161. As far as it relates to the First Amendment, "motives of government officials are indeed relevant, if not dispositive, when an individual's exercise of speech precedes government action affecting that individual." Id. "[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000). Motives are key in this context. Thus, in light of the overwhelming evidence of MacLeish and Chaffinch's antagonism and hostility towards plaintiffs, it is clear that they have illicit motives.[9] If sending them for fitness for duty audiological exams in and of themselves is not adverse action, certainly sending them with the intent of finding a pretext to retaliate against them certainly would chill a person of ordinary firmness.

---

[9] For example, MacLeish testified that he thinks plaintiffs are a "real pain in the ass" for speaking out. (MacLeish 164-165; A134; accord Baylor 253; A325). Similarly in reference to Sgt. Foraker, Chaffinch publicly brags that - "I'm going to get that son of a bitch." (Dixon 17-18,77; A527-28,542). Capt. Yeomans testified that MacLeish was "frustrated" and "upset" with plaintiffs because of their speech. (Yeomans 39; A2021). Both MacLeish and Chaffinch were admittedly unhappy that plaintiffs' speech was causing the DSP to be portrayed in a negative light in the media. (Chaffinch 134-36, 144-46; A459,461-62; MacLeish 162, 33-34; A134, 101-02). Lastly, as Major Baylor testified, it was discussed among the defendants and the Executive Staff that plaintiffs were being pulled out of the FTU and "decisions were muddied over personal feelings more than what was actually taking place." (Baylor 170-72, 174, 46-47; A282-83, 251). Plaintiffs "weren't being allowed to teach at the range because they had raised some issues ... about the working conditions in the range and their own health." (Baylor 171; A282).

**B.  Defendants' Long Course of Retaliation Against Plaintiffs Would Chill a Person of Ordinary Firmness.**  As discussed in greater detail in plaintiffs' opening brief, and in plaintiff's opening and answering briefs in the companion <u>Foraker</u> action, defendants' long course of retaliatory harassment and acts of adverse action against plaintiffs include the following

- Placing plaintiffs on light duty, thereby dramatically altering their job duties and responsibilities.  (POB at 19-20).  As discussed above, this independently constitutes adverse action.

- Suspending plaintiffs' police powers, forbidding them from wearing their uniforms, using their weapons and from preventing crimes in progress.  (POB at 19-20).  Taking away the police powers of a police officer is a dramatic alteration and reduction in job responsibilities, even under stricter Title VII standards.  <u>See, e.g.</u> <u>Durham Life Insur. Co. v. Evans</u>, 166 F.3d 139, 152-53 (3d Cir. 1999).

- Sending plaintiffs for numerous retaliatory fitness for duty exams, as a means to find a pretext to get rid of them in retaliation for their speech.  (POB at 15).  As discussed above, when a defendant sends a plaintiff for a fitness for duty exam with the malicious intent of retaliating against them for exercising their First Amendment rights, this independently is adverse action.

- Repeatedly withholding exculpatory medical records from DSP physicians when sending Sgt. Foraker for these fitness for duty and other medical examinations.  (<u>Price</u> OB at 16 n.14) (Defendants' Combined Appendix at A684).

- Refusing to apply the historic DSP policy of running away from and not looking into hearing issues.  (POB at 16).

- Refusing to accommodate plaintiffs in violation of the DSP's long established practices.  (POB at 17-19).  As a result of this refusal to accommodate, plaintiffs are being run out of the Division and forced to retire.

- Refusing to accommodate plaintiffs and their hearing loss despite the fact the DSP has historically accommodated every Trooper who has ever had hearing problems.  (POB at 17-18).  As a result of this refusal to accommodate, plaintiffs are being run out of the Division and forced to retire.

- Refusing to accommodate plaintiffs and their limitations despite the fact that the DSP has historically always accommodated Troopers with physical injuries, other than hearing.  (POB at 18-19).  As a result of this refusal to accommodate, plaintiffs are being run out of the Division and forced to retire.

- Refusing to give plaintiffs two years of light duty, despite the long time historical practice of giving Troopers two years of light duty.  (POB at 20-23).  As a result of this refusal to accommodate, plaintiffs are being run out of the Division and forced to retire.

-17-

- Even though plaintiffs are on light duty, sending them suspension letters instead of light duty letters. (POB at 19-20).

- Refusing to let plaintiffs work overtime while on light duty, in violation of DSP's past practices. (POB at 23). Defendants themselves admit that plaintiffs' inability to work overtime is an actionable adverse action. (DOB at 29).

- Despite the long period of time that plaintiffs have been on light duty, the DSP's refusal to call plaintiffs once a week to check in on them to see how they and their families are holding up in accord with DSP rules and regulations. (POB at 25).

- As discussed in greater detail in the Answering Brief being filed in the companion Foraker case, the launching of a local, regional, national and international media campaign against plaintiffs in which they blamed them for the destruction of the multi-million dollar firearms training facility.

- As discussed in greater detail in the Answering Brief being filed in the companion Foraker case, Chaffinch and MacLeish's imposition of absolute gag orders to prevent plaintiffs from responding to Chaffinch's defamatory personal and professional attacks accusing them of cowardice, incompetence and of destroying the FTU. This unconstitutional prior restraint and gag order on plaintiffs' First Amendment free speech rights is a clear unconstitutional prior restraint on plaintiff's First Amendment right to freedom of speech under the Supreme Court's decision in U.S. v. Nat'l Treasury Employees Union, 513 U.S. 454, 468 (1995); see Swartzwelder v. McNeilly, 297 F.3d 228, 235-41 (3d Cir. 2002). Thus, defendants again violated and deprived Sgt. Foraker and his men of their First Amendment rights. As then Judge, now Justice Alito explained, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," Swartzwelder, 297 F.3d at 241 (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)), and *a fortiori* is adverse action. As a matter of law, gagging employees and depriving them of their First Amendment right to freedom of speech (especially when they are being publicly, falsely and maliciously attacked) is sufficient to chill a person of ordinary firmness and keep him from trying to exercise his rights.

- Plaintiffs hereby adopt and incorporate by reference the remainder of the adverse action listed in detail in the Answering Brief being filed in the companion Foraker action.

As the foregoing list makes clear, under Suppan v. Dadonna, 203 F.3d 228, 234-35 (3d Cir. 2000), Brennan, 350 F.3d at 419 n.16, and McKee v. Hart, – F.3d –, 2006 WL 27474, *3-5 (3d Cir. Jan. 6, 2005), this long "campaign of retaliatory harassment," against plaintiffs is more than "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." Suppan, 203 F.3d at 234-35. All the more so given that numerous items of the long campaign of retaliatory harassment, independently constitute adverse action under governing

-18-

Third Circuit authority.   At the very least, given that this is a factual determination, see id. at 235; Allah, 229 F.3d at 225; Baldassare v. State of N.J., 250 F.3d 188, 195 (3d Cir. 2001), it is up to a jury of plaintiffs' peers to determine this issue.

**C.  The Cases Cited by Defendants.**  Plaintiffs incorporate by reference the remainder of the legal argument contained in the Answering Brief being filed in the companion Foraker action, including, but not limited to, the discussion of the inapplicability of McKee, Suarez Corp. v. McGraw, 202 F.3d 676 (4th Cir. 2000), and the remainder of the cases cited by defendants.

**D.  Summary.**  As the evidence listed above (and the causal evidence discussed below) makes clear, by embarking on their long course of retaliatory harassment of plaintiffs, defendants intended to maliciously punish and humiliate them for exercising their First Amendment rights. They intended to ensure that they exacted a heavy price from them for daring to successfully speak out and petition the government in a way that admittedly angered and upset defendants. Such a long course of retaliatory harassment is certainly sufficient to make a person of ordinary firmness think twice about exercising their First Amendment rights, all the more so when many of the instances of retaliatory harassment independently meet the First Amendment adverse action standard.  Any reasonably hardy individual would think twice about speaking out if they knew that defendants would suspend their police powers, publicly destroy them and turn their lives into a nightmare, all the while gagging and harassing them to the point of psychological breakdown.[10]  Indeed, who would dare to stand up and speak out under these circumstances? Importantly however, the adverse action standard is satisfied if the "retaliatory conduct [is] sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." Suppan, 203 F.3d at 235.  All that is needed is a chill, and the defense efforts certainly meet this standard.  To the extent that the Court has any doubts in this regard, again, because the question

---

[10]  In fall of 2005, all three plaintiffs were declared to be psychologically unfit for duty as a result of the harassment and stress from the workplace.  (Unfit for Duty Medical Records; B1-9,25-27).

of whether a retaliatory action would chill a person with an ordinary backbone from exercising their rights is a question for the fact finder, this is uniquely a question to be resolved by a jury. Additionally, in light of the standard of review in which plaintiffs receive all the inferences, it is clear that plaintiffs have met and surpassed their burden and that summary adjudication for lack of adverse action is inappropriate. For the above mentioned reasons, there is overwhelming record evidence of adverse action. Accordingly, defendants' motion for summary judgment on this ground should be denied.

**V.    THE RECORD IS OVERFLOWING WITH CAUSAL EVIDENCE WHICH DEMONSTRATES THAT PLAINTIFF'S PROTECTED FIRST AMENDMENT ACTIVITY WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION AGAINST HIM.**

**A.  Substantial or Motivating Factor.** Following the determination that their conduct was constitutionally protected, plaintiffs must demonstrate that this conduct was a "substantial" or "motivating factor" in the relevant decision. <u>Suppan</u>, 203 F.3d at 235; <u>Mount Healthy City Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977). "But for" causation is not needed. <u>Suppan</u>, 203 F.3d at 236. "'Substantial factor' does not mean 'dominant' or 'primary' factor." <u>Hill</u>, 411 F.3d at 126 n.11. Instead, a plaintiff need only show that his protected First Amendment rights "played any substantial role in the relevant decision." <u>Suppan</u>, 203 F.3d at 236; <u>see</u> <u>Miller v. Cigna, Corp.</u>, 47 F.3d 586, 597 n.9 (3d Cir. 1995) (en banc) ("played a role" in the adverse decision). This is a question of fact, not one of law. <u>Baldassare</u>, 250 F.3d at 195. Plaintiffs note that the overwhelming causal evidence in this regard was discussed in great detail in their opening brief in this case and in the companion <u>Foraker</u> action. However, in light of the defense position that there no evidence of causation, plaintiff will again address this issue below.

**1.  Motive in General.** The defense repeatedly claims that defendants were deeply concerned with nothing more than the plaintiffs' health and safety, and that all actions they took were taken because defendants care about them deeply. (<u>See, e.g.</u> DOB at 28-29). As a practical matter, such a claim is nothing more than jury argument on the issues of motive and

intent.  Unfortunately for defendants, they cannot avoid the record in this regard, a record that is exceedingly unfavorable to them in numerous ways.

But first, to the extent defendants claim that they were simply taking actions that they had a plain legal right to take, it is clear that they have missed a very fundamental point of First Amendment jurisprudence.  As discussed above, it has long been established that "an otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech." Anderson, 125 F.3d at 161.  As far as it relates to the First Amendment, "motives of government officials are indeed relevant, if not dispositive, when an individual's exercise of speech precedes government action affecting that individual." Id.  "[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Allah, 229 F.3d at 224-25.  Motives are key in this context.  "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context specific." Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997).  That is why causal determinations such as this are reserved for the province of the fact-finder. See Baldassare, 250 F.3d at 195.  Thus, to the extent defendants claim that their motives are pure, this issue is certainly not ripe for summary adjudication in their favor in light of the overwhelming record evidence to the contrary.  Accordingly, summary judgment should be denied to defendants on this point.

**2. Knowledge of Protected Conduct.**  Sufficient evidence must be produced to demonstrate that the defendants knew of the protected activity.  Keenan v. City of Phila., 983 F.2d 459, 466 (3d Cir. 1992).  Here, all defendants were aware that plaintiffs were speaking out. (POB at 11-12, 14).

Supervisor liability also may be established 1) "through allegations of personal direction or of actual knowledge and acquiescence," or 2) "through proof of direct discrimination by the

supervisor." Id.  Importantly, "[w]here a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in (i.e., tacitly assented to or accepted) the subordinate's conduct." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997); accord Adkins v. Rumsfeld, 389 F.Supp.2d 579, 585-86 (D.Del. 2005).  "To impose liability on the individual defendants, Plaintiffs must show that each one individually participated in the alleged constitutional violation or approved of it." C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005) (citing C.H. v. Olivia, 226 F.3d 198, 201-02 (3d Cir. 2000) (en banc)).

        **a. MacLeish's Involvement.**  Defendants have not contended that MacLeish was not involved in the retaliatory decisions at issue.  For example, defendants' opening brief concedes that it is MacLeish who ordered plaintiffs for the fitness for duty audiological exams.  (DOB at 15-16, 29-30, 34; see MacLeish 184-85; A139).

        **b. Chaffinch's Authorization.**  The defense contention that Chaffinch had no involvement in any of the retaliatory actions against plaintiffs (DOB at 1) also is without merit.

        Chaffinch himself testified that he was aware that plaintiffs were being sent for fitness for duty exams and being put on light duty, that MacLeish ran these decisions by him and that although he had the authority to overrule the decisions, he chose not to do so.  (Chaffinch 160-61, 163-65; A465,466).  In the same way, Chaffinch also was aware that MacLeish was throwing Sgt. Foraker out of the Commanders and Section Chiefs meetings, yet did not stop him from doing so.  (Chaffinch 167-68; A467).

        Thus, it is clear that Chaffinch "acquiesced in (i.e., tacitly assented to or accepted)" and otherwise "fail[ed] to act to stop" MacLeish's retaliatory actions despite Chaffinch's clear ability and authority to do so.  Robinson, 120 F.3d at 1294; Adkins, 389 F.Supp.2d at 585-86.  Under

settled Third Circuit law, Chaffinch's failure to stop MacLeish's actions despite his clear ability, opportunity and authority to do so, is sufficient to establish that Chaffinch "individually participated in the alleged constitutional violation or approved of it." C.N., 430 F.3d at 173.

Plaintiffs also note that there would be a great deal more evidence of Chaffinch's involvement in various of the retaliatory decisions if defendants had not erased Chaffinch's computer hard drive and forever destroyed the Arch system messages that plaintiffs had expected to use to prove his involvement with direct evidence.

However, there is more than sufficient circumstantial evidence to demonstrate Chaffinch's involvement despite his self-serving denials - denials that are to be disregarded given our present summary judgment posture and the standard of review. See Hill, 411 F.3d at 131 n.22; Reeves, 530 U.S. at 149-151; Hill, 411 F.3d at 129 n.16.

In addition to all of the evidence of defendants' displeasure towards plaintiffs (see POB at 23-24; Foraker OB at 6-7,26-28), it is undisputed that there is a great deal of record evidence that Chaffinch and MacLeish are "buddies" and "friends." (Chaffinch 16-17; MacLeish 7; A429,95). In fact, MacLeish publicly brags that he and Chaffinch are "joined at the hip." (MacLeish 9; A95). Thus, it is a fair inference that Chaffinch's good buddy MacLeish was acting at Chaffinch's direction when he instituted many of the retaliatory actions against plaintiffs, the individuals who upset his good friend. This inference is strengthened all the more in light of the record evidence that Chaffinch expects "blind loyalty" from all those under his command and his history of vindictiveness and vengefulness towards those who oppose him. (See Foraker OB at 27). Additionally, in light of defendants' destruction of evidence, the compelling temporal proximity, the violation of numerous DSP policies, practices and customs and the other categories of causal evidence discussed below and in plaintiffs' opening brief, it is a fair inference that Chaffinch was in fact involved in even more of the retaliation against plaintiffs then he is willing to admit.

-23-

**3. Demonstrated Anger, Hostility and Antagonism.** Evidence of anger, hostility and other antagonism also demonstrates causation. It is well established that "a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997); accord Adkins, 389 F.Supp.2d at 586 ("antagonism toward Plaintiff" proof of causation); see Robinson v. SEPTA, 982 F.2d 892, 895 (3d Cir. 1993). For example, evidence that a defendant is "irritated" or otherwise angered by a plaintiff can be compelling evidence of causation. See Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005) (defendant "irritated" by protected conduct).[11] As discussed in plaintiff's opening brief in this and the companion Foraker action, there is truly a remarkable amount of compelling record evidence demonstrating defendants' anger and hostility towards plaintiffs because they were speaking out. (POB at 23-24, 14; Foraker OB at 6-7,26-28).

**4. Temporal Proximity.** "Timing alone raises the requisite inference [of causation] when it is unusually suggestive of retaliatory motive." Jensen v. Potter, – F.3d –, 2006 WL 224002, *4 (3d Cir. Jan. 31, 2006) (internal punctuation omitted); see Woodson, 109 F.3d at 920 ("temporal proximity between the protected activity and the [retaliation] is sufficient to establish a causal link"). The Third Circuit has found that the temporal link alone is "unusually suggestive" and can establish causation when the retaliation occurs within two days of the protected conduct. See Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989); Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997). This "is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." Kachmar, 109 F.3d at 177 (internal punctuation omitted).

---

[11] Even "a significant delay between the expressive activity and the retaliation [will] not preclude finding the required nexus where there is evidence of continuing hostility to connect events that would not otherwise appear to be related to each other." Brennan, 350 F.3d at 420.

As discussed above, and in plaintiffs' opening brief, plaintiffs began to speak out about and raise numerous health and safety issues in December 2003 and continued doing so every month for at least the next six months. But soon after they began speaking, in early 2004 defendants began to send them for unprecedented hearing tests in order to find a pretext to retaliate against and get rid of them. Thus, the temporal proximity reveals that within one month of when plaintiffs began to speak out, defendants began to retaliate against them.[12]

Additionally, plaintiffs spoke to the State Auditors on May 9, 2004. (POB at 13).[13] A mere 4 days later, defendant MacLeish ordered that plaintiffs receive audiological fitness for duty exams. (Defendants' Combined Appendix at A731,803). Additional retaliatory fitness for duty exams soon followed in the next month. (Id. at A753,853). This timing is unusually suggestive and when combined with the overwhelming evidence of antagonism of defendants MacLeish and Chaffinch towards plaintiffs, and the numerous procedural violations, this evidence becomes compelling.

     **5. Violations of Law, Policies and Procedures.** Violations of laws, rules and procedures also are proof of causation and wrongdoing. See Village of Arlington Heights v. Metropolitan Hous. Develop. Corp., 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that *improper purposes are playing a role.* Substantive departures, too, may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."); Stewart v. Rutgers, the State Univ., 120 F.3d 426, 434 (3d Cir. 1997) (departures from the normal procedural sequence afford evidence that *improper purposes are playing a role*); see Bray v.

---

[12] This is why defendants refuse to acknowledge that plaintiffs long course of protected speech began in December 2003 and continued into January 2004. They came to the unpleasant realization that with the correct timing, suddenly they lose the ability to claim that they lacked illicit motives for sending plaintiffs for the retaliatory hearing tests.

[13] It appears that the May 12th date given by defendants is simply wrong. (DOB at 19). However, even if the date is May 12th, this only makes the temporal proximity at issue even more compelling.

-25-

Marriott Hotels, 110 F.3d 986, 992, 994 (3d Cir. 1997); Kunda v. Muhlenberg College, 621 F.2d

532, 539 (3d Cir. 1980); Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 143-44 (3d Cir. 1977);

Adkins, 389 F.Supp.2d at 586 (violations of Air Force policies are probative of causation in First

Amendment retaliation context).  As discussed in plaintiff's opening brief and in greater detail in

the disparate treatment section below, the record is overflowing with abundant evidence of the

numerous longstanding DSP policies and practices when it comes to taking care of and

accommodating injured Troopers.  (POB at 15-23).  These practices and policies include, among

other things: (1) always running away from hearing issues and never pursuing them; (2) always

accommodating Troopers with hearing loss; (3) always accommodating Troopers with other

types of physical injuries; (4) always finding an internal DSP job for injured Troopers so that

they do not lose their income and can stay on the payroll; (5) and always giving injured Troopers

two years of light duty. (Id.).[14]

      **6.  Disparate Treatment.**  Similarly, evidence of disparate treatment also can

demonstrate causation.  San Filippo, 30 F.3d at 444; Brennan, 350 F.3d at 421; Adkins, 389

F.Supp.2d at 586.  Here there is a clear and striking contrast between the way plaintiffs have

been treated and how numerous injured Troopers have been treated in the past by the DSP.

      **a.  The Law of Similarly Situated Employees.**  Last summer, in

Miller-El v. Dretke, – U.S.–, 125 S.Ct. 2317 (2005), the Supreme Court issued its most recent

opinion addressing the issue of similarly situated comparators.[15]  In Miller-El, the Supreme Court

---

   [14]  Major Baylor explained the DSP's justification for taking care of Troopers who are injured in
the line of duty.  "I'm a decision-maker and I came up through the ranks proudly.  And if somebody
stands next to me and puts their life on the line in any capacity that's envisioned and gets hurt while
performing their job, that's good enough [reason] for me" to accommodate them.  (Baylor 304-05;
A338).  Importantly, this applies even if the Trooper is declared "permanently unfit for duty" if they were
injured "in the line of duty."  (Baylor 305; A338).

   [15]  Although Miller-El is a case addressing race discrimination in jury selection, the Supreme
Court has long recognized that discrimination in the context of jury selection and employment both
involve proving the existence of purposeful discrimination. See Batson v. Kentucky, 476 U.S. 79, 93-95
(1986) (noting the shared analysis applicable in jury selection and employment discrimination actions

rejected efforts to set the similarly situated bar too high and explicitly rejected the dissent assertion that a similarly situated comparator must be identical or on all fours. Id. at 2329 n.6. Instead, "[n]one of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one." Id. As the Supreme Court explained, "potential [comparators] are not products of a set of cookie cutters." Id.

**b.  The Categories of Disparate Treatment Evidence In Which Comparisons Should Be Made.**  There are numerous categories of disparate treatment comparators with whom probative comparisons can be made for causal purposes.

**(1).  Troopers With Hearing Problems Who Were Accommodated.**

**(a).  Major Joseph Forester.**  Major Joseph Forester suffered serious permanent bilateral hearing loss and was completely accommodated for more than 20 years.  Despite knowledge of his condition, the DSP permitted him to wear hearing aids, which numerous witnesses testified plainly did not work.  He simply could not hear.[16]  Despite the fact that it was apparent to all around him that he could not hear, the DSP nonetheless accommodated him for more than 20 years.  (POB at 17-18; see A3620-21).[17]  Yet defendants refused to accommodate plaintiffs in the same way.

**(b).  Cpl. John Powell.**  MacLeish himself testified

_____

and discussing the applicability of the standards set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1974)).

[16]  The defense claim that no one knew of Forester's hearing problems is without merit.  The testimony reveals that it was obvious to all that he was wearing hearing aids and nonetheless still could not hear.  (See, e.g. Baylor 90-92, 95-96, A262,263).

[17]  The fact that the DSP accommodated Forester by allowing him to wear hearing aids is all the more noteworthy in light of the fact that at the same time DSP policy stated "if you needed a hearing aid [ ] you cannot be a Delaware State Trooper" due to the risk that wearing such a hearing aid entails. (Baylor 300-01; A337).

about how Cpl. John Powell was nearly deaf as a result of his years in the artillery. He had serious hearing loss, yet was never forced out like plaintiffs. (POB at 18; see A3622).

### (2). Troopers With Other Serious Physical Injuries Who Were Accommodated.

Many of these comparators suffered from injuries far more serious than those that plaintiffs received, yet they were accommodated and kept on nonetheless.

### (a). Sgt. Steve Swain.

Sgt. Steve Swain was injured on the job in July 1983 as a result of a traffic accident. He suffered severe vocal dysfunction, along with back and neck injuries. As a result, he is unable to vocally articulate and communicate with others. (Indeed, being able to speak and communicate is as important as being able to hear). Yet the DSP has taken care of and accommodated him for 23 years - up to and including the present day - by placing him as an Evidence Technician where he is able to work despite his vocal limitations and inability to communicate. (POB at 18-19; see A3623-24). Yet defendants have refused to accommodate plaintiffs in the same way, despite the availability of numerous positions into which they could be placed despite their minor hearing loss.

### (b). Capt. David Citro.

Captain Citro suffered permanent injuries to his back and neck in 1987 when he was a Corporal which left him with limited motion and he was entirely unable to even take the required trooper physical fitness tests, one of the basic requirements of being a Trooper. Yet the DSP accommodated him and he continued to serve and be promoted up through the ranks. Notably however, despite the fact that he was permanently disabled and unable to fulfill the requirements of trooper, he was not run out of the Division. Instead, because of the DSP accommodation policy, despite the fact that his injuries were "permanent" and he could no longer fulfill essential job functions, Capt. Citro was accommodated because he had "highly specialized skills that were very important to the department" and his duties did not include the patrol function, much like plaintiffs in our present case. After serving for many years in the Division despite his injuries, he was finally placed on

light duty in 2001, where he was kept for at least two years. (POB at 21-22; see A3633-34).

**(c). Sgt. David Henderson.** Sgt. Henderson also suffered from a severe and permanent back injury and (like Sgt. Swain) was accommodated throughout his career and permitted to work as a supply officer, where his physical limitations would not put him in a position where he would have to make arrests. Notably, he was not put back out on patrol, instead he was accommodated and given a job where his physical injuries did not stand in the way of his serving the Division. (POB at 19; see A3644). Defendants have refused to treat plaintiffs the same.

**(d). Cpl. Michael Jordan.** Cpl. Jordan suffered an undefined injury and was accommodated with a court liaison officer assignment in the mid-1990s under Col. Ellingsworth. (A3645). No such position has been offered to plaintiffs.

**(e). Cpl. XYZ (a pseudonym)** Cpl. XYZ was suspended for more than two years for alleged criminal conduct. He suffered from anxiety and major depression. Yet the DSP accommodated him and gave him full pay for two plus years under Col. Pepper and Col. Chaffinch, ending in 2002. (See A3631-32). The DSP accommodates officers who commit alleged criminal acts, yet does not accommodate plaintiffs whose only 'crimes' were being injured in the line of duty at the FTU.

**(p). Lt. Paul Sczubelek.** Lt. Sczubelek is well known to the District of Delaware. See U.S. v. Sczubelek, 255 F.Supp.2d 315 (D.Del. 2003); U.S. v. Sczubelek, 402 F.3d 175 (3d Cir. 2005). Immediately prior to being convicted of bank robbery and sentenced to prison, Lt. Sczubelek was a Trooper. Despite the charges the DSP accommodated him and kept him on light duty. (Baylor 142-44; A275; see A3655).

Yet even prior to his crimes, Lt. Sczubelek had serious medical problems which are found in the sealed appendix and was accommodated for six years under Col. Graviet, ending in 1993. (See A3652-54).

**(3). Troopers Who Were Given Two or More Years on Light Duty.**  Review of the medical records reveals the DSP's long time historic practice of always giving officers at least two years of light duty, regardless of the severity of their injuries. As Major Baylor testified, "[t]here are similarities" between plaintiffs' injuries and those of these comparators. (Baylor 162, A280).  All have physical injuries, and all end up on the light duty list and all are found similar enough to be eligible for light duty.  (Baylor 163-64, A280).

**(a). Cpl. Bruce Peachey.**  Cpl/3 Peachey was shot and injured in the line of duty in 2002.  Within 2-3 months of his injury, it was apparent that he would not be able to recover and would never serve as a road trooper again.  Yet the DSP, Chaffinch and MacLeish gave him two years of light duty, and accommodated him by giving him desk duties and later assigning him to the FTU so that he could get at least two years pay and benefits.  (POB at 21; see A3625-26).  Notably, Peachey who served at the FTU for several years and yet did not speak out about the hazardous conditions there -  received two years of light duty while his fellow FTU Troopers have not.

**(b). Lt. ABC (a pseudonym).** After crashing his police vehicle while allegedly driving under the influence of alcohol, Lt. ABC suffered permanent neurological and left arm injuries and was unable to perform police functions.  Yet he was accommodated for two years on light duty under Col. Chaffinch until 2004.  (See A3627).  So Troopers who get into accidents while allegedly drinking and driving in their police vehicles receive two years, yet plaintiffs who have outstanding service records and were injured through no fault of their own are thrown on the trash-heap after they speak out.

**(c). Cpl. Scott Warner.**  Cpl. Warner suffered various back injuries and was placed on and off light duty for more than three years through 2004 under Col. Chaffinch.  (See A3628).

**(d). Cpl. Jerome Loveless.**  Cpl. Loveless suffered a

-30-

permanent back injury and received two years of light duty as a court liaison officer and a desk officer under Col. Pepper and Lt. Col. Chaffinch, ending in 2001.  (See A3628).

**(e). Lt. Jeff David.**  Lt. David suffered from a stroke, and received two years of light duty under Col. Chaffinch while he recovered.  (See A3635).

**(f). Cpl. Anthony DiAllesandro.**  Cpl. DiAllesandro is a lung transplant candidate accommodated with light duty beginning in 2005 under Col. Chaffinch.  It appears that he will be kept on light duty beyond two years due to the transplant waiting list.  (See A3636).

**(g). Sgt. Shawn Nowrey.**  Sgt. Nowrey suffered a permanent back injury and received two years of light duty from Col. Chaffinch, ending in 2004. (See A3637-38).

**(h). Cpl. Everett Jackson.**  Cpl. Jackson suffered a permanent back injury and was accommodated with desk duty for almost 2 ½ years under Col. Pepper and Lt. Col. Chaffinch, ending in 2001.  (See A3639).

**(i). Sgt. James Romanelli.**  Sgt. Romanelli suffered a permanent leg injury and was accommodated with two years of light duty under Col. Pepper and Lt. Col. Chaffinch.  (See A3640).

**(j). Sgt. Jahn Hitchens.**  Sgt. Hitchens suffered a permanent back injury due to an on the job injury and was accommodated with at least two years of light duty under Col. Ellingsworth, ending in 1999.  Unlike plaintiffs, Sgt. Hitchens was permitted to work overtime while on light duty.  (See A3641-43).

**(k). Cpl. Christine Price.**  Cpl. Price suffered a permanent back injury and was accommodated with two years of light duty where she served in the HR department, ending in 1995.  (See A3646).

**(l). Cpl. Bo Sarley.**  Cpl. Sarley suffered a severe back

-31-

injury and was accommodated with two years of light duty in the mid-1990s. (See A3647).

    **(m). Cpl. James Mosley.** Cpl. Mosley suffered a permanent neck/back injury while weight lifting at Troop 3. He was accommodated and served as a Warrant Officer and was given at least three years of light duty under Col. Graviet ending in 1993. (See A36448-49).

    **(n). Cpl. Joseph Condron.** Cpl. Condron suffered a permanent knee injury when he shot himself. He was accommodated with 10 years of light duty under Colonels Cochran, Simpson and Graviet, ending in 1993. (See A3650).

    **(o). Trooper Randy Armistead.** Trooper Armistead suffered severe head injuries and was accommodated with two years of light duty, ending in 1988. (See A3656).

    **7. Selective Enforcement.** The state simply may not selectively enforce a statute or rule to punish an individual for exercising his First Amendment rights. See Cox v. Louisiana, 379 U.S. 536, 557-558 (1965); Holder v. City of Allentown, 987 F.2d 188, 197-99 (3d Cir. 1993); Hill, 411 F.3d at 131-32. As discussed above and in plaintiffs' opening brief, defendants have selectively enforced rules, policies and practices when it comes to taking care of injured troopers.

    For example, in Hill, the evidence revealed that previously, a "residency ordinance had been enforced half-heartedly and sporadically at best" and no employee had ever been disciplined or terminated for non-compliance. 411 F.3d at 131-132. Yet the Third Circuit held that the "city's sudden vigilance in enforcing the statute against the plaintiffs could suggest that the city was motivated at least in part by the officers' participation in the 1997 lawsuit." Id. at 132. The sudden interest in enforcing the statute created a causal inference. This parallels the situation in our present case where defendants' sudden marked interest in plaintiffs' hearing abilities tellingly reveals that defendants were motivated, at least in part, by plaintiffs' protected

free speech which had just begun to take place in the weeks and months before.

        **8. Underinclusiveness of a Proffered Reason.** Underinclusiveness of a proffered reason for an adverse action also can demonstrate retaliation. The Third Circuit has most recently applied this concept in <u>Hill</u>, 411 F.3d at 127-130. In <u>Hill</u>, several police officers claimed that the city was enforcing a residency ordinance against them in retaliation for the filing of an earlier lawsuit. The Third Circuit observed that "[t]he officers' strongest evidence suggests that several non-resident employees who did not participate in the 1997 lawsuit were not terminated despite the city's knowledge or unrebutted suspicions that they lived outside the city." <u>Id.</u> at 127; <u>see</u> <u>id.</u> at 128-130 (discussing some of the specifics of the comparators who were treated differently). And despite even the forced retirement of one of the comparators, the Court found "the fact that the city delayed enforcing the ordinance against him for over a year nonetheless supports the officers' position." <u>Id.</u> at 129 n.16. As to other comparators, the Court found the city's failure to reasonably investigate their suspicions to be probative. <u>Id.</u> at 129-130. In our present case, as discussed in plaintiffs' opening brief (POB at 26-27), defendants professed reason for sending plaintiffs for numerous fitness for duty exams reveals too much. The only individuals defendants have sent for such exams are plaintiffs who spoke out. They have not sent, warned or even contacted any of the numerous other officers who served at the same hazardous facility in the past. (<u>See</u> POB at 26-27).

        **9. Pretext and Coverup.** Pretextual explanations by a defendant also are proof of causation. <u>Feldman v. Phila. Hous. Auth.</u>, 43 F.3d 823, 831 (3d Cir. 1994); <u>Adkins</u>, 389 F.Supp.2d at 586. This is because "[r]esort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct." <u>Sheridan v. E.I. DuPont de Nemours and Co.</u>, 100 F.3d 1061, 1069 (3d Cir. 1996) (en banc). Pretext evidence is abundant on our record as discussed in the opening briefs in this case and the companion case. (POB at 26; <u>Foraker</u> OB at 29-31).

-33-

**10. Falsehoods.** As the Supreme Court has held, it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." Reeves, 530 U.S. at 147. "We routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful [retaliation]." Sheridan, 100 F.3d at 1069. Record evidence is overwhelming in this regard. In addition to the record evidence discussed in plaintiffs' opening brief (POB at 26), the record also reveals that defendants have falsely claimed that it was plaintiffs who requested hearing tests. (DOB at 13). Yet the record reveals the opposite - that plaintiffs solely requested blood and urine testing to determine the presence of lead and other heavy metals in their bodies from prolonged exposure at the FTU. (POB at 15). As already discussed, the falsity of this defense claim is revealed by looking at the very e-mail they misleadingly cite for that proposition. The e-mail from plaintiff Price to Sgt. Foraker explains that he is requesting a medical evaluation to determine whether he has been exposed to "heavy metals and other airborne" contaminants. (Defendants Combined Appendix at A506.6). Plaintiff Price was not requesting hearing tests, which is in accord with the record in this regard. (Price Inter. #12 p.36; Foraker Decl. ¶¶ 4-7; A2301, 2987).

**11. Intentional Destruction of Evidence.** As the Third Circuit has explained, a party's destruction of evidence is evidence of guilt and illegal conduct. Sheridan, 100 F.3d at 1069. As explained in great detail in plaintiff's destruction of evidence sanctions brief, defendants destroyed defendant Chaffinch's entire work hard drive to deny plaintiffs access to key evidence contained therein.

**12. The Big Picture.** "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not only on individual incidents, but on the overall scenario." Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990); accord Jensen, – F.3d –, 2006 WL 224002, *4. The big picture

in our case makes clear that defendants illicitly sought to destroy plaintiffs because they had exposed the conditions at the FTU and spoke to the Auditor about the government corruption and mismanagement that was endangering the health and safety of law enforcement officers and others.

     **13. Summary.** Thus, in light of the overwhelming record evidence discussed above, it is clear that plaintiffs' speech about problems at the FTU and speech to the Auditors, <u>at the very least</u> "played a substantial role" in the retaliation against them.

     **B. Same Decision Anyway.** The burden of proof then "shifts to the defendant to show 'by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.'" <u>Nicholas v. Pa. State Univ.</u>, 227 F.3d 133, 144 (3d Cir. 2000). This last step is an "affirmative defense" to be met by the defendants <u>id.</u>,[18] and also is a question of fact. <u>Hill</u>, 411 F.3d at 127.

     Despite their belated claim of asserting their affirmative defense (DOB at 33-34), defendants have waited far too long to assert it. Defendants failed to plead this affirmative defense in their Answer to the Complaint as required under the Federal Rules. <u>See</u> Fed.R.Civ.P. 8(c) (a party must plead any "matter constituting an avoidance or affirmative defense"). Because defendants failed to plead it, plaintiffs did not take any discovery on this issue and are prejudiced by the belated defense assertion. Accordingly, defendants have waived their affirmative defense and plaintiffs seek such a ruling from the Court at this time. <u>See</u> <u>Charpentier v. Godsil</u>, 937 F.2d 859, 863 (3d Cir. 1991) (noting the general rule that "[f]ailure to raise an affirmative defense by responsive pleading or by appropriate motion generally results in the waiver of that defense.") (internal footnotes omitted).

---

    [18] Accord <u>Vazquez-Valentin v. Santiago-Diaz</u>, 385 F.3d 23, 30 (1st Cir. 2004); <u>Adler v. Pataki</u>, 185 F.3d 35, 47 (2d Cir. 1999); <u>Brady v. Fort Bend County</u>, 145 F.3d 691, 712 (5th Cir. 1998); <u>Ostad v. Oregon Health Sciences Univ.</u>, 327 F.3d 876, 885 (9th Cir. 2003); <u>Stanley v. City of Dalton, Georgia</u>, 219 F.3d 1280, 1292 (11th Cir. 2000); <u>Yalowizer v. Town of Ranchester, Wyoming</u>, 18 Fed.Appx. 745, 754 (10th Cir. 2001) (all noting that this <u>Mt. Healthy</u> prong is an affirmative defense).

## V.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

In the interest of brevity and judicial economy, plaintiffs incorporate by reference the extensive and thorough discussion of First Amendment qualified immunity law contained in the companion Foraker action.  In addition to that law, plaintiff also sets forth the following which is specific to the FTU case.

**A. The Health Care Line of Cases.**  It has long been clearly established in the Third Circuit that a public employee cannot be retaliated against for exposing health and safety problems in the workplace.

For example, in 1995, the Third Circuit held that speech affecting the health of police officers was clearly speech on a matter of public concern as the "public had a significant interest in learning about problems which may have impaired the effective functioning of the EAP and which, in turn, could have affected the delivery of police services." Watters v. City of Phila., 55 F.3d 886, 895 (3d Cir. 1995).

Then, on December 5, 2003, before the long course of retaliatory harassment against plaintiffs began, the Third Circuit squarely held that speech addressing asbestos and hazardous working conditions for a public employer was speech on a matter of public concern.  The Court noted that

> [W]e are not impressed by the "limitation" that "only" firefighters may be harmed by the presence of asbestos in the firestation . . . Residents of the Township clearly had an interest in knowing that their tax dollars were being spent on an asbestos contaminated firestation that endangered the health and lives of its firefighters. *This is such a basic proposition that we need not belabor the point.*  Quite simply, the statements regarding exposure of public employees to hazards such as asbestos can be fairly considered as relating to a matter of concern to the community.

Brennan, 350 F.3d at 415 (internal punctuation omitted) (emphasis added).[19]  In light of this

---

[19]  Notably, at their depositions, Chaffinch and MacLeish both admitted they know that the First Amendment forbids them from retaliating against a Trooper who, for example, "reported that State Police headquarters down in Dover was contaminated with asbestos."  Defendants admittedly know they "can't retaliate against that officer for bringing that to" their attention.   (MacLeish 236; Chaffinch 8-9; A152, 427).  Thus it is apparent that defendants themselves are already well aware of clearly established law in

binding Third Circuit precedent, it was clearly established for the relevant time period in this case that plaintiffs could not be retaliated against for raising health and safety concerns at the FTU.

Accordingly, defendants cannot hide behind qualified immunity to spare them from the consequences of their illegal actions.

## CONCLUSION

For the above stated reasons, the Court should deny the defense motion for summary judgment.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**


/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com


**MARTIN D. HAVERLY, ATTORNEY AT LAW**


/s/ Martin D. Haverly
**MARTIN D. HAVERLY, ESQ. (#3295)**
Two East Seventh Street, Suite 201
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Dated: February 8, 2006          Attorneys for Plaintiffs

---

this regard.

# Unreported Opinions



--- F.3d ----
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States Court of Appeals,Third Circuit.
Anna M. JENSEN, Appellant
v.
Jack E. POTTER, Postmaster General U.S. Postal
Service.
No. 04-4078.

Argued Sept. 29, 2005.
Jan. 31, 2006.

**Background:** Postal employee brought Title VII action
against employer alleging retaliation and sex
discrimination. The United States District Court for the
Middle District of Pennsylvania, Richard P. Conaboy,
J., granted employer's motion for summary judgment.
Employee appealed.

**Holdings:** The Court of Appeals, Alito, Circuit Judge,
held that:

1(1) retaliatory harassment which is severe and
pervasive enough to create a hostile work environment
is cognizable as retaliatory adverse employment action
under Title VII;

6(2) employee established intentional discrimination
element of prima facie case of Title VII retaliatory
harassment claim; and

7(3) issue of material fact existed regarding whether
conditions of employee's employment changed after she
made report.

Reversed and remanded.

**[1] Civil Rights 78 ⊙——1250**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1250 k. Harassment; Work Environment.
Most Cited Cases
Retaliatory harassment which is severe and pervasive
enough to create a hostile work environment is
cognizable as retaliatory adverse employment action
under Title VII. Civil Rights Act of 1964, § 704, 42
U.S.C.A. § 2000e-3(a).

**[2] Civil Rights 78 ⊙——1250**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1250 k. Harassment; Work Environment.
Most Cited Cases
To prevail on a claim of retaliatory harassment under
Title VII, employee must prove that: (1) she suffered
intentional discrimination because of her protected
activity; (2) the discrimination was severe or pervasive;
(3) the discrimination detrimentally affected her; (4) it
would have detrimentally affected a reasonable person
in like circumstances; and (5) a basis for employer
liability is present. Civil Rights Act of 1964, § 704, 42
U.S.C.A. § 2000e-3.

**[3] Civil Rights 78 ⊙——1251**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1251 k. Motive or Intent; Pretext. Most
Cited Cases
The ultimate question in any retaliation case under Title
VII is an intent to retaliate vel non. Civil Rights Act of
1964, § 704, 42 U.S.C.A. § 2000e-3.

**[4] Civil Rights 78 ⊙——1541**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes

--- F.3d ----                                                                    Page 2
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

[78k1534](#) Presumptions, Inferences, and Burden of Proof

    [78k1541](#) k. Retaliation Claims. [Most Cited Cases](#)

Temporal proximity between protected activity and alleged discrimination can raise the requisite inference of retaliation under Title VII when it is unusually suggestive of retaliatory motive, but even if temporal proximity is missing, courts may look to the intervening period for other evidence of retaliatory animus. Civil Rights Act of 1964, § 704, [42 U.S.C.A. § 2000e-3](#).

**[5] Civil Rights 78 ⟜1137**

[78](#) Civil Rights
  [78II](#) Employment Practices
    [78k1137](#) k. Motive or Intent; Pretext. [Most Cited Cases](#)

Because it is often difficult to determine the motivations of an action, the discrimination analysis under Title VII must concentrate not on individual incidents, but on the overall scenario. Civil Rights Act of 1964, § 701 et seq., [42 U.S.C.A. § 2000e](#) et seq.

**[6] Civil Rights 78 ⟜1251**

[78](#) Civil Rights
  [78II](#) Employment Practices
    [78k1241](#) Retaliation for Exercise of Rights
      [78k1251](#) k. Motive or Intent; Pretext. [Most Cited Cases](#)

**Postal Service 306 ⟜5**

[306](#) Postal Service
  [306I](#) Postal Service in General
    [306k3](#) The Postal Service
      [306k5](#) k. Officers, Clerks, and Employees. [Most Cited Cases](#)

Postal employee established intentional discrimination element of prima facie case of Title VII retaliatory harassment claim based on her prior report of unwanted sexual proposition which resulted in supervisor being transferred and terminated; coworker's habitual insults directed at employee expressly referenced transfer of supervisor, another coworker who had previously been a friend began menacing employee with heavy

equipment after supervisor was transferred and expressed disagreement with transfer decision, and employee's car was repeatedly vandalized after report. Civil Rights Act of 1964, § 704, [42 U.S.C.A. § 2000e-3](#).

Postal employee established intentional discrimination element of prima facie case of Title VII retaliatory harassment claim based on her prior report of unwanted sexual proposition which resulted in supervisor being transferred and terminated; coworker's habitual insults directed at employee expressly referenced transfer of supervisor, another coworker who had previously been a friend began menacing employee with heavy equipment after supervisor was transferred and expressed disagreement with transfer decision, and employee's car was repeatedly vandalized after report. Civil Rights Act of 1964, § 704, [42 U.S.C.A. § 2000e-3](#).

**[7] Federal Civil Procedure 170A ⟜2497.1**

[170A](#) Federal Civil Procedure
  [170AXVII](#) Judgment
    [170AXVII(C)](#) Summary Judgment
      [170AXVII(C)2](#) Particular Cases
        [170Ak2497](#) Employees and Employment Discrimination, Actions Involving
          [170Ak2497.1](#) k. In General. [Most Cited Cases](#)

Genuine issues of material fact existed regarding whether retaliatory harassment permeated the workplace and changed the conditions of employee's employment after she made report of unwanted sexual proposition which resulted in supervisor being transferred and terminated and whether employer failed to take prompt remedial action, precluding summary judgment in employee's Title VII retaliatory harassment claim against employer. Civil Rights Act of 1964, § 704, [42 U.S.C.A. § 2000e-3](#).

**[8] Civil Rights 78 ⟜1250**

[78](#) Civil Rights
  [78II](#) Employment Practices
    [78k1241](#) Retaliation for Exercise of Rights
      [78k1250](#) k. Harassment; Work Environment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                           Page 3
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

Most Cited Cases

In determining whether harassment was severe or pervasive enough to support hostile work environment claim, the court must determine whether employee suffered retaliatory harassment severe or pervasive enough to alter the conditions of her employment and create an abusive working environment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[9] Civil Rights 78 ☞1147**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
Factors to be weighed in determining whether harassment was severe or pervasive enough to a support hostile work environment claim include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[10] Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
Under Title VII, if supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e-2.

**[11] Civil Rights 78 ☞1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat

Superior. Most Cited Cases

Under Title VII, when coworkers are the perpetrators of creating a hostile work environment, the plaintiff must prove employer liability using traditional agency principles. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e-2.

**[12] Civil Rights 78 ☞1149**

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1149 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
In order to establish employer negligence in a coworker harassment case, the plaintiff must show that management knew or should have known about the harassment, but failed to take prompt and adequate remedial action. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e-2.

On Appeal from the United States District Court for the Middle District of Pennsylvania, (Dist.Ct. No. 03-cv-01201), District Court Judge: Hon. Richard P. Conaboy.

Kimberly D. Borland, David P. Tomaszewski (Argued), Borland & Borland, Wilkes Barre, PA, for Appellant.

J. Justin Blewitt, Jr. (Argued), Assistant United States Attorney, Scranton, PA, for Appellee.

Before ALITO and AMBRO, Circuit Judges, and RESTANI, FN* Chief Judge, United States Court of International Trade.

OPINION OF THE COURT

ALITO, Circuit Judge.
**\*1** Appellant Anna Jensen is a letter carrier with the Kingston, Pennsylvania branch of the United States Post Office. In this action against her employer, she brings claims for retaliation and sex discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The District Court granted the Postmaster General's motion for summary judgment as to both claims, and Jensen appealed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                              Page 4
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

We will reverse and remand. With respect to retaliation, the District Court incorrectly held that coworker harassment cannot violate 42 U.S.C. § 2000e-3(a). As to sex discrimination, the record contains evidence sufficient to support a finding that the alleged retaliatory harassment was also discrimination "because of ... sex." *See* 42 U.S.C. § 2000e-2(a).


                              I.

Both Jensen's claims arise from a series of events that began with an unwanted sexual proposition. While at work on Saturday morning, September 15, 2001, Jensen received a phone call from supervisor Carl Waters. Waters had the day off, and he asked if Jensen knew the way to his home. When Jensen said she didn't, he gave her directions. As he spoke, Waters struggled with the pronunciation of certain street names. He apologized to Jensen and attributed the slurred speech to an all-night drinking binge.

After completing the directions, Waters said: "Now Anna, I don't care what [obscenity] you go in and tell those guys in the office, get out of there right now [because] I want to make love to you all day long." App. 63. Jensen declined, but Waters persisted, asking her at least to join him for breakfast. Jensen again said no, and Waters responded: "Anna, you put me in a compromising position." App. 63. Jensen made it clear that her decision was final, and the conversation ended.

The next day, Jensen phoned Kingston branch manager Chris Moss and reported the incident. A more detailed discussion occurred when Jensen returned to work on Tuesday the 18th. Waters continued to work at the Kingston branch for two more days, but Jensen and he did not interact. On Thursday the 20th, the Postal Service transferred Waters to the Ashley branch. An investigation followed, and in January 2002 Waters was fired.

Meanwhile, on September 26, 2001, supervisor Rick Honeychurch moved Jensen's workstation from Moss's office to a stand-up desk in an area of the Post Office called Unit 1. Jensen's stay in Moss's office had begun after an injury required the use of crutches and the elevation of Jensen's leg. Moss testified that he instructed Honeychurch to move Jensen for two reasons: her leg had healed and he had confidentiality concerns about the pending Waters investigation. For her part, Jensen heard third-hand that Moss feared being alone with her. Whatever the reason, Jensen's new desk was the former workspace of Carl Waters, and her reception in Unit 1 was not friendly.

Right away, letter carrier Joe Sickler began to pepper Jensen with insults. On September 26, he referred to Jensen as "the [obscenity] who got [Waters] in trouble." App. 65. He then remarked within Jensen's earshot that she would have to get off her "fat [obscenity]" once a new supervisor arrived. The next day, Jensen overheard Sickler discussing a proposed petition to bring Waters back. Sickler also stated that Waters should not have to apologize for anything. Some time later, Sickler crept up behind Jensen and clapped two objects together. Startled, Jensen cringed with fright. She then reported Sickler's behavior to Moss and asked to be removed from Unit 1. Moss said he would talk to Sickler, but he declined to move Jensen despite the availability of another workstation. When asked at his deposition to explain why he did not move Jensen, Moss answered: "Because I didn't." App. 195. Sickler's offensive comments continued at a pace of two to three times per week for about 19 months.

**\*2** Besides Sickler, letter carrier Ed Jones, a friend to Jensen before she reported Waters, now threatened her by driving U-Carts toward her at a rapid pace. He also told Jensen that he disagreed with the decision to terminate Waters. Approximately one year after the Waters incident, unknown vandals twice scratched Jensen's car with a key, spit on the car, and spilled coffee on it. All the incidents occurred in the Post Office parking lot; before the Waters telephone call vandals had never victimized Jensen.

In addition to her initial request to leave Unit 1, Jensen repeatedly complained to Moss and Honeychurch about her coworkers' behavior. At some point during the relevant period-exactly when is unclear-Honeychurch claims to have confronted Sickler about his offensive comments. Conditions did not improve, however, until 19 months after Jensen's first complaint. At that time,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                    Page 5

--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))

**(Cite as: --- F.3d ----)**

Jensen complained to a new supervisor, Melissa White. White brought Jensen into Moss's office, and Jensen again detailed her treatment at the hands of coworkers. Moss, White, and union officials then confronted Sickler, and Jensen's troubles quickly abated.

During this 19-month period, Jensen suffered panic attacks, she used sick time because of stress, and her asthma caused trips to the emergency room. She attributes these problems to working conditions at the Post Office.

Based on these events, Jensen brought two claims: sex discrimination pursuant to 42 U.S.C. § 2000e-2(a), and retaliation under 42 U.S.C. § 2000e-3(a). The District Court granted the defendant's motion for summary judgment on both claims, and this appeal followed. Our review is plenary, and we view the facts in the light most favorable to Jensen. *See United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392, 396 n. 3 (3d Cir.2003). If a reasonable jury could find for her, we must reverse. *Neumeyer v. Beard,* 421 F.3d 210, 213 (3d Cir.2005).

II.

Jensen claims that her employer is liable for her coworkers' actions under Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a). That provision makes it an unlawful employment practice to "discriminate" against an employee "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." [FN1] The parties dispute both the scope of this prohibition and its application to this case. As a result, we must first clarify § 2000e-3(a)'s meaning and then apply those principles to the record before us.

A.

[1] The threshold question is whether a retaliation claim predicated upon a hostile work environment is cognizable under 42 U.S.C. § 2000e-3(a). Jensen says it is, the Postmaster says it isn't, and our sister circuits are split. A majority has held that the statute prohibits

severe or pervasive retaliatory harassment. *See Noviello v. City of Boston,* 398 F.3d 76, 90 (1st Cir.2005); *Von Gunten v. Maryland,* 243 F.3d 858, 866 (4th Cir.2001); *Ray v. Henderson,* 217 F.3d 1234, 1244-45 (9th Cir.2000); *Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999); *Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253, 1264 (10th Cir.1998); *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998); *Knox v. Indiana,* 93 F.3d 1327, 1334-35 (7th Cir.1996); *see also Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 791-92 & n. 8 (6th Cir.2000) (holding that retaliatory harassment by a supervisor is actionable but "tak[ing] no position on whether an employer can be liable for coworkers' retaliatory harassment"). The Fifth and Eighth Circuits, however, limit § 2000e-3(a) to "ultimate employment decisions," and thus do not view harassment to be within the statute's reach. *See Manning v. Metropolitan Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir.1997); *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997).

**\*3** While our Court has never addressed the precise question, the logic of our decision in *Robinson v. City of Pittsburgh,* 120 F.3d 1286 (3d Cir.1997), points toward the majority approach. In *Robinson,* we held that "[r]etaliatory conduct other than discharge or refusal to rehire" violates Title VII when it "alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities', or 'adversely affect[s] his [or her] status as an employee.' " *Id.* at 1300 (quoting 42 U.S.C. § 2000e-2(a)) (alterations in original). Put another way, § 2000e-3(a) prohibits a quantum of discrimination coterminous with that prohibited by § 2000e-2(a). *Id.* at 1300-01; *see also Von Gunten,* 243 F.3d at 865 (rejecting the Fifth Circuit's ultimate employment decision standard because "conformity between the provisions of Title VII is to be preferred") (internal quotation omitted).

Under § 2000e-2(a), the cognizability of a discrimination claim founded upon a hostile work environment is well-established. *See, e.g., Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (sex); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

(1986) (same); *Caver v. City of Trenton,* 420 F.3d 243, 262 (3d Cir.2005) (race); *Cardenas v. Massey,* 269 F.3d 251, 260 (3d Cir.2005) (national origin); *Abramson v. William Paterson Coll. of New Jersey,* 260 F.3d 265, 276-77 n. 5 (3d Cir.2001) (religion). The statutory basis for these claims is the notion that discriminatory ridicule or abuse can so infect a workplace that it alters the terms or conditions of the plaintiff's employment. *See Meritor,* 477 U.S. at 67. If harassment can alter the terms or conditions of employment under § 2000e-2, then *Robinson* teaches that the same is true under § 2000e-3. *See Robinson,* 120 F.3d at 1300-01. We thus hold that both provisions can be offended by harassment that is severe or pervasive enough to create a hostile work environment.

B.

[2] [3] In light of the consistency between the two provisions, our usual hostile work environment framework applies equally to Jensen's claim of retaliatory harassment. Thus, Jensen must prove that (1) she suffered intentional discrimination because of her protected activity; [FN2] (2) the discrimination was severe or pervasive; [FN3] (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. *See Weston v. Pennsylvania,* 251 F.3d 420, 426 (3d Cir.2001); *Robinson,* 120 F.3d at 1300-01.

The test's first element concretely expresses the principle that Title VII is not "a general civility code for the American workplace." *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80-81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief. This first step, therefore, requires us to identify what harassment, if any, a reasonable jury could link to a retaliatory animus. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280-81 (3d Cir.2000); *Shaner v. Synthes,* 204 F.3d 494, 500-01 (3d Cir.2000); *cf. Aman v. Cort Furniture,* 85 F.3d 1074, 1081-83 (3d Cir.1996).

*4 [4] In determining whether conduct was retaliatory, our cases have tended to focus on two factors: (1) the "temporal proximity" between the protected activity and the alleged discrimination and (2) the existence of " 'a pattern of antagonism in the intervening period." ' *See Abramson v. William Paterson Coll. of New Jersey,* 260 F.3d 265, 288 (3d Cir.2001) (quoting *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920-21 (3d Cir.1997)). Timing alone raises the requisite inference when it is "unusually suggestive of retaliatory motive," but even if "temporal proximity ... is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503-04 (3d Cir.1997). Despite this focus, "[t]hese are not the exclusive ways to show causation, as the proffered evidence, taken as a whole, may suffice to raise the inference." *Farrell,* 206 F.3d at 280; *see also Kachmar v. SunGard Data Systems, Inc.,* 109 F.3d 173, 178 (3d Cir.1997) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.").

[5] This same principle applies in our hostile work environment cases under § 2000e-2(a). There, we have deemed it improper to isolate incidents of facially neutral harassment and conclude, one by one, that each lacks the required discriminatory animus. *See, e.g., Cardenas,* 269 F.3d at 260-61; *Aman,* 85 F.3d at 1081-84. Because "it is often difficult to determine the motivations of an action[,] .... [the] discrimination analysis must concentrate not on individual incidents, but on the overall scenario ." *Andrews,* 895 F.2d at 1484.

[6] With these principles in mind, we turn to the summary judgment record before us. The prime antagonist in Jensen's retaliation claim is letter carrier Joe Sickler. Shortly after Waters's transfer to the Ashley office, Sickler called Jensen "the [obscenity] who got [Waters] in trouble;" he also stated that when a new supervisor came Jensen would have to get off her "fat [obscenity]." App. 65. Because these insults directly relate to Jensen's complaint against Waters, they raise an obvious inference of retaliatory animus. *Cf. Andrews,* 895 F.2d at 1482 n. 3 ("The intent to discriminate on the basis of sex in cases involving ... sexually derogatory language is implicit, and thus

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                              Page 7
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

should be recognized as a matter of course."). More important, these statements may provide a window into Sickler's thinking throughout the 19-month barrage of offensive comments. If Sickler's conduct were viewed in isolation, his motives would be unclear, but his earlier statements provide a reasonable basis for thinking that the later abuse resulted from latent hostility to Jensen's whistleblowing. Thus, the record as a whole supports a finding that all of Sickler's harassment was based on a retaliatory animus.

Jensen also alleges physical threats by letter carrier Ed Jones. Like Sickler's loud and frightening clap, Jones's alleged assaults are facially neutral. Nonetheless, the record contains other evidence from which a factfinder could infer motive. First, before the Waters incident, Jensen and Jones were friends; shortly after it, Jones menaced her with heavy equipment. This temporal proximity between the protected activity and Jones's changed behavior is probative of a retaliatory intent. *See Abramson,* 260 F.3d at 288. Second, the record contains evidence that Jones expressed disagreement with the decision to remove Waters. This statement, when combined with the sudden shift in behavior, permits an inference that Jones's newfound hostility resulted from Jensen's protected activity.

**\*5** In addition to Sickler's habitual insults and Jones's threatening use of postal equipment, Jensen alleges that vandals twice keyed her car, spit on it, and spilled coffee on it. Standing alone, these acts of vandalism contain no indicia of retaliation. But as with the other events, the analysis changes significantly upon consideration of the overall scenario. *See Andrews,* 895 F.2d at 1482 n. 3. Though the vandalism did not begin until approximately one year after Jensen reported Waters, Sickler's berating of Jensen allegedly continued even 19 months after the Waters incident. If true, and we assume it to be so on summary judgment, this intervening antagonism tends to show that these seemingly unrelated incidents were components of an integrated pattern of retaliation. *See Abramson,* 260 F.3d at 288-89; *cf. Aman,* 85 F.3d at 1083 (concluding that, in light of racially abusive remarks, a reasonable jury could infer that facially neutral acts like stealing time cards were "part of a complex tapestry of discrimination"). In sum, a reasonable jury could find

that all the alleged coworker harassment-namely, Sickler's insults, Jones's physical threats, and vehicle damage caused by unknown vandals-were the product of intentional discrimination because of Jensen's protected activity.

[7] Having identified the conduct that a reasonable jury could label retaliatory, our next task is to measure the harassment's severity or pervasiveness. As stated earlier, this inquiry has both subjective and objective components. *See Faragher,* 524 U.S. at 787. We can quickly dispense with the subjective prong. At her deposition, Jensen testified that her coworkers' actions caused anxiety attacks, trips to the emergency room, and stress-induced use of her sick leave. App. 129-30, 136-38. This evidence would support a finding that Jensen subjectively viewed the work environment to be hostile. *See Harris,* 510 U.S. at 21-22.

[8] Of course, Jensen's subjective reaction to the discrimination is not enough. She must also show an objectively hostile work environment. Two elements of our test relate to this question. The second prong requires severe or pervasive harassment; the fourth requires discrimination that would have detrimentally affected a reasonable person. *See ante* at 7-8. When applied, they coalesce into a single inquiry: did the plaintiff suffer retaliatory harassment severe or pervasive enough to "alter the conditions of [her] employment and create an abusive working environment"? *See Meritor,* 477 U.S. at 67; *Robinson,* 120 F.3d at 1300-01.

[9] Like the requirement of intentional discrimination, the need for an objectively abusive work environment further distinguishes Title VII from a generalized "civility code." *Oncale,* 523 U.S. at 81. The statute prohibits severe or pervasive harassment; it does not mandate a happy workplace. Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not "permeate" the workplace and change the very nature of the plaintiff's employment. *See Faragher,* 524 U.S. at 788; *Harris,* 510 U.S. at 21. Factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

interferes with an employee's work performance." *Harris,* 510 U.S. at 23. No one factor is dispositive, and the analysis must focus on the "totality of the circumstances." *Andrews,* 895 F.2d at 1482.

**\*6** While the severe or pervasive standard applies equally to § 2000e-2 and § 2000e-3, it is especially crucial in the retaliation context. When one employee makes a charge under Title VII against another, some strain on workplace relationships is inevitable. *See Von Gunten,* 243 F.3d at 870. Sides will be chosen, lines will be drawn, and those who were once the whistleblower's friends may not be so friendly anymore. *See Noviello,* 398 F.3d at 92-93. But what the statute proscribes is retaliation, not loyalty to an accused coworker or a desire to avoid entanglement in workplace controversy. *Id.; see also Brooks v. City of San Mateo,* 229 F.3d 917, 929 (9th Cir.2000) ("Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action."). Thus, while we must consider the totality of the circumstances, some circumstances do not affect our analysis because they are not retaliatory.

For example, at her deposition, Jensen frequently stated that coworkers subjected her to the silent treatment. *See, e.g.,* Doc. 23, Exhibit D, Jensen Deposition at 97 ("I mean, the whole environment was different after I reported it, okay. People who used to talk to me didn't talk to me."). A cold shoulder can be hurtful, but it is not harassment. *See Brooks,* 229 F.3d at 929.

Mere expressions of opinion are also not retaliatory. For example, Jensen overheard Sickler discussing "a petition ... to bring Carl [Waters] back and that Carl shouldn't have to apologize for anything." App. 65-66. On another occasion, Ed Jones told Jensen that he disagreed with the decision to fire Waters. App. 114-16. These statements are useful to Jensen because they tend to show that a retaliatory motive animated *other* behavior by Sickler and Jones. But they have no independent weight in our "severe or pervasive" analysis. If Jones thought Waters had been treated harshly, he was entitled to express his opinion; if Sickler wanted to start a petition, he had every right to do so. Title VII prohibits retaliation against accusers,

not support for the accused.

Nonetheless, the record contains evidence of harassment that a jury might well find severe or pervasive. First, Sickler berated Jensen with retaliatory insults two to three times per week for 19 months, and the significance of these remarks lies in their pounding regularity. *See Harris,* 510 U.S. at 23. Second, the record contains evidence of more than just insults. Jensen also testified to an unspecified number of physical threats by Ed Jones and at least four instances of property damage to her vehicle. These incidents' severity and the insults' frequency combine to raise a material question of fact as to whether retaliatory harassment "permeated" the workplace and changed the terms or conditions of Jensen's employment. *See id.* at 21.

 [10] [11] With that, we come to the fifth and final prong of the analysis: employer liability. Under Title VII, much turns on whether the harassers are supervisors or coworkers. If supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher,* 524 U.S. at 807-08. When coworkers are the perpetrators, the plaintiff must prove employer liability using traditional agency principles. *Weston,* 251 F.3d at 426-27; *Bouton v. BMW of N. Am., Inc.,* 29 F.3d 103, 106-07 (3d Cir.1994). Typically, the plaintiff in a coworker harassment case argues for direct liability on a theory of "negligent failure to discipline or fire, or failure to take remedial action upon notice of harassment." *See Bouton,* 29 F.3d at 106 (citing *Restatement (Second) of Agency* § 219(2)(b)). That is what Jensen argues here, so we will analyze this case as one of coworker harassment. *See* Pl. Br. at 26. [FN4]

**\*7** [12] In order to establish employer negligence, the plaintiff must show that management knew or should have known about the harassment, but "failed to take prompt and adequate remedial action." *Andrews,* 895 F.2d at 1486. An effective remedy-one that stops the harassment-is adequate per se. *Knabe v. Boury Corp.,* 114 F.3d 407, 411-12 n. 8 (3d Cir.1997). Even if not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 9
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

effective, an employer's remedial measure is nonetheless adequate if "reasonably calculated" to end the harassment. *Id.* at 412-13 (internal quotation omitted). Moreover, the remedy need not include discipline to be adequate. In *Knabe,* for example, the employer found insufficient evidence of harassment to justify disciplinary measures against the offending employee. *Id.* at 413. Nonetheless, because the employer promptly met with the alleged harasser and informed him of the company's strong policy against sexual harassment, we found the remedy adequate as a matter of law. *Id.*

Here, as in *Knabe,* the defendant held a meeting with the principal harasser and discussed the allegations. *See id.* Furthermore, this meeting was effective-it stopped the harassment. *See id.* at 412 n. 8. But to be reasonable the remedy must be both adequate *and* prompt. *Andrews,* 895 F.2d at 1486. Though Moss and Honeychurch claim to have had informal discussions with Sickler, the formal meeting between management, union officials, and Sickler did not occur until April or May of 2003. The effectiveness of so modest a remedial measure raises a question as to why, despite Jensen's repeated complaints, it took 19 months of harassment and the intervention of a new supervisor to make it happen. Because of this delay, we cannot deem the Postal Service's response prompt and adequate as a matter of law.

In sum, the record raises genuine issues of material fact as to all five elements of our hostile work environment test. We therefore reverse the District Court's order granting summary judgment for the defendant on the retaliation claim.

### III.

The District Court also granted summary judgment for the defendant on Jensen's sex discrimination claim. Despite the consistency between § 2000e-2(a) and § 2000e-3(a), and despite the fact that both Jensen's claims arise from a single series of events, separate analysis is still necessary. Section 2000e-2(a) makes it an unlawful employment practice to discriminate based on "race, color, religion, sex, or national origin." As

such, this claim stands or falls on whether Jensen suffered sex discrimination severe or pervasive enough to have changed the terms or conditions of her employment. *Harris,* 510 U.S. at 21.

Our task, then, is to identify the alleged harassment that a reasonable jury might deem intentional discrimination because of sex. *Weston,* 251 F.3d at 426. When harassment is facially sexual, i.e., when it "involv[es] sexual propositions, innuendo, pornographic materials, or sexually derogatory language," an inference of sex-based intent will usually arise. *Andrews,* 895 F.2d at 1482 n. 3; *see also* Oncale, 523 U.S. at 80. But discrimination comes in many forms, and it need not be overtly sexual to be actionable. *See Andrews,* 895 F.2d at 1485. As with our search for a retaliatory animus, we do not view each incident in isolation, but attempt to divine the existence of sex-based intent by considering the "overall scenario." *Id.* at 1484.

**\*8** Both parties agree that Waters's proposition raises an inference of intentional sex discrimination. Waters told Jensen to come to his house for the purpose of "mak[ing] love." The inference that he did so because Jensen is a woman arises as a matter of course. *See id.* at 1482 n. 3.

The disputed terrain is whether any of the harassment that followed the Waters incident-harassment that we have already decided a reasonable jury might find retaliatory-was sex discrimination. Jensen argues that because the Waters phone call triggered all the harassment that followed, it was all "because of ... [her] sex." Pl. Br. at 13-14. The defendant contends that, outside the Waters incident, the record contains no indicia of sex-based intent.

As an abstract matter, retaliation against a person based on the person's complaint about sexual harassment is not necessarily discrimination based on the person's sex. If the individuals carrying out the harassment would have carried out a similar campaign regardless of the sex of the person making the complaint, the harassment, while actionable as illegal retaliation, would not also be actionable as discrimination based on sex. In reality, however, when a woman who complains about sexual harassment is thereafter subjected to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

harassment based on that complaint, a claim that the harassment constituted sex discrimination (because a man who made such a complaint would not have been subjected to similar harassment) will almost always present a question that must be presented to the trier of fact. In such a situation, the evidence will almost always be sufficient to give rise to a reasonable inference that the harassment would not have occurred if the person making the complaint were a man. The difficult task of determining whether to draw such an inference in a particular case is best left to trial.

For these reasons, we hold that the plaintiff's claim of sex discrimination, like her claim of retaliation, should not have been rejected at the summary judgment stage.

IV.

We reverse the District Court's judgment and remand the case for further proceedings.

FN* Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

FN1. The parties agree that Jensen "made a charge ... under [Title VII]" when she reported the Waters phone call to branch manager Chris Moss. *See* 42 U.S.C. § 2000e-3(a).

FN2. This element differs in wording, but not in substance, from our usual retaliation test's requirement of a "causal connection" between the protected activity and the adverse employment action. *See Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir.1995). By showing a causal link, the plaintiff raises an inference of retaliatory intent and satisfies her initial burden under the *McDonnell Douglas* framework. *See Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500-01 (3d Cir.1997). The ultimate question in any retaliation case is an intent to retaliate *vel non* . *See Shaner v.*

*Synthes,* 204 F.3d 494, 501 n. 8 (3d Cir.2000).

FN3. We have often stated that discriminatory harassment must be "pervasive and regular." *See, e.g., Cardenas v. Massey,* 269 F.3d 251, 260 (3d Cir.2001); *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 753 (3d Cir.1995); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990). But the Supreme Court's standard is "severe *or* pervasive." *Pa. State Police v. Suders,* 542 U.S. 129, 133, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) (emphasis added); *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Harris,* 510 U.S. at 21; *Meritor,* 477 U.S at 67. The difference is meaningful, and the Supreme Court's word controls, so we use the severe or pervasive standard here. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[I]solated incidents (*unless extremely serious* ) will not amount to discriminatory changes in the terms and conditions of employment.") (emphasis added, internal quotation omitted); *see also* 2 Charles A. Sullivan, Michael J. Zimmer & Rebecca Hanner White, *Employment Discrimination Law and Practice* 455 (3d ed. 2002) ("The disjunctive phrasing means that 'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive.").

FN4. Though Jensen does not argue that the *Faragher/Ellerth* analysis applies, the proper standard may be an open question. After Waters's transfer to the Ashley office, supervisor Rick Honeychurch (at the apparent direction of Chris Moss) moved Jensen's workspace to Waters's old desk. Jensen claims this was done "to put [her] in a position of extreme vulnerability where coworkers supportive of Waters would foreseeable [sic] harass [her]." Pl. Br. At 8. Assuming

--- F.3d ----                                                                    Page 11
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

*arguendo* that the record contains evidence to support this inference, two questions arise. First, which liability standard applies when a supervisor intentionally facilitates coworker harassment? Second, is Rick Honeychurch (or, perhaps, Chris Moss) a "supervisor" for purposes of *Faragher/Ellerth? See Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1033 (7th Cir.1998) (stating that courts must "distinguish[ ] employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers"); *Compare Id.* at 1034 (holding that a "supervisor" must have "at least some" authority to "hire, fire, demote, promote, transfer, or discipline an employee"), *with Mack v. Otis Elevator Co.,* 326 F.3d 116, 125 (2d Cir.2003) (disagreeing with *Parkins* and holding that a "supervisor" is a person given authority that "enabled or materially augmented [his or her] ability ... to create a hostile work environment"). These are interesting questions, but we need not decide them. The parties do not raise them, and Jensen survives summary judgment under the more onerous coworker harassment standard.

C.A.3 (Pa.),2006.
Jensen v. Potter
--- F.3d ----, 2006 WL 224002 (C.A.3 (Pa.))

Briefs and Other Related Documents (Back to top)

• 04-4078 (Docket) (Oct. 27, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Westlaw.*

--- F.3d ----                                                                                        Page 1
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

H

Briefs and Other Related Documents

United States Court of Appeals,Third Circuit.
Dwight L. MCKEE; Allen L. Jones
v.
Henry HART; Wesley Rish; Albert Masland; James
Sheehan; Daniel P. Sattelle Daniel P. Sattele,
Appellant.
No. 04-1442.

Argued March 10, 2005.
Jan. 6, 2006.

**Background:** Investigator for the state office of
inspector general sued supervisor under § 1983 alleging
supervisor had retaliated against him for his refusal to
stop voicing his concerns about the pharmaceutical
industry, in violation of the First Amendment. The
United States District Court for the Middle District of
Pennsylvania, 2004 WL 1454108, Richard Caputo, J.,
denied supervisor's motion for summary judgment on
qualified immunity basis, and appeal was taken.

**Holdings:** The Court of Appeals, Ambro, Circuit
Judge, held that:

7(1) supervisor's allegedly retaliatory comments to
employee did not rise to level of retaliatory harassment
under First Amendment, and

8(2) even if supervisor violated employee's First
Amendment rights, such rights were not clearly
established at time of alleged conduct.

Reversed and remanded.

[1] **Federal Courts 170B** ⇌**754.1**

170B Federal Courts

170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk754 Review Dependent on Whether
Questions Are of Law or of Fact
170Bk754.1 k. In General. Most Cited
Cases
An appellate court exercises plenary review over a
district court's conclusions of law in its qualified
immunity analysis.

[2] **Federal Courts 170B** ⇌**763.1**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk763 Extent of Review Dependent on
Nature of Decision Appealed from
170Bk763.1 k. In General. Most Cited
Cases
In reviewing a district court's qualified immunity
analysis, an appellate court may review whether the set
of facts identified by the district court is sufficient to
establish a violation of a clearly established
constitutional right, but may not consider whether the
district court correctly identified the set of facts that the
summary judgment record is sufficient to prove.

[3] **Civil Rights 78** ⇌**1376(2)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and
Probable Cause
78k1376 Government Agencies and Officers
78k1376(2) k. Good Faith and
Reasonableness; Knowledge and Clarity of Law;
Motive and Intent, in General. Most Cited Cases
Qualified immunity insulates government officials
performing discretionary functions from suit insofar as
their actions could reasonably have been thought
consistent with the rights they are alleged to have
violated.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                              Page 2
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

[4] **Civil Rights 78** ⟐1376(1)

78 Civil Rights
    78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and
Probable Cause
        78k1376 Government Agencies and Officers
          78k1376(1) k. In General. Most Cited
Cases

**Civil Rights 78** ⟐1376(2)

78 Civil Rights
    78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and
Probable Cause
        78k1376 Government Agencies and Officers
          78k1376(2) k. Good Faith and
Reasonableness; Knowledge and Clarity of Law;
Motive and Intent, in General. Most Cited Cases
To determine whether an official has lost his or her
qualified immunity, a court must first decide whether a
constitutional right would have been violated on the
facts alleged, and if the answer to that question is "yes,"
the court must then consider whether the right was
clearly established.

[5] **Constitutional Law 92** ⟐90.1(7.2)

92 Constitutional Law
    92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
        92k90.1 Particular Expressions and
Limitations
        92k90.1(7) Labor Matters
          92k90.1(7.2) k. Public Employment.
Most Cited Cases
A public employee has a First Amendment
constitutional right to speak on matters of public
concern without fear of retaliation. U.S.C.A.
Const.Amend. 1.

[6] **Constitutional Law 92** ⟐90.1(7.2)

92 Constitutional Law
    92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press

        92k90.1 Particular Expressions and
Limitations
        92k90.1(7) Labor Matters
          92k90.1(7.2) k. Public Employment.
Most Cited Cases
In determining whether a cognizable First Amendment
claim has been stated by a public employee, the effect
of the alleged conduct on the employee's freedom of
speech need not be great in order to be actionable, but
it must be more than de minimis. U.S.C.A.
Const.Amend. 1.

[7] **Constitutional Law 92** ⟐90.1(7.2)

92 Constitutional Law
    92V Personal, Civil and Political Rights
      92k90 Freedom of Speech and of the Press
        92k90.1 Particular Expressions and
Limitations
        92k90.1(7) Labor Matters
          92k90.1(7.2) k. Public Employment.
Most Cited Cases

**States 360** ⟐53

360 States
    360II Government and Officers
      360k53 k. Appointment or Employment and
Tenure of Agents and Employees in General. Most
Cited Cases
Supervisor's allegedly retaliatory comments to special
investigator for Pennsylvania Office of Inspector
General (OIG), including telling him to go with the
flow and not permitting him to speak to anyone about
investigation into pharmacist without supervisor's
permission, did not rise to level of harassment, under
First Amendment, in retaliation for his speaking out
about pharmaceutical industry; comments were aimed
at getting investigator to focus on investigation to which
he was assigned instead of focusing on his own
wide-ranging concerns about pharmaceutical industry as
a whole, and investigator suffered no alteration in his
employment benefits, pay, or job classification as a
result of speaking out about potential corruption in
pharmaceutical industry. U.S.C.A. Const.Amend. 1.

Supervisor's allegedly retaliatory comments to special

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                   Page 3
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

investigator for Pennsylvania Office of Inspector General (OIG), including telling him to go with the flow and not permitting him to speak to anyone about investigation into pharmacist without supervisor's permission, did not rise to level of harassment, under First Amendment, in retaliation for his speaking out about pharmaceutical industry; comments were aimed at getting investigator to focus on investigation to which he was assigned instead of focusing on his own wide-ranging concerns about pharmaceutical industry as a whole, and investigator suffered no alteration in his employment benefits, pay, or job classification as a result of speaking out about potential corruption in pharmaceutical industry. U.S.C.A. Const.Amend. 1.

[8] **Civil Rights 78** ☞1376(10)

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(10) k. Employment Practices.
Most Cited Cases
Supervisor of special investigator for Pennsylvania Office of Inspector General (OIG) was entitled to qualified immunity from investigator's § 1983 claim that supervisor retaliated against him, in violation of First Amendment, for speaking out against pharmaceutical industry, since constitutional right allegedly violated was not clearly established; reasonable official in supervisor's position would not have been aware that making a few comments over the course of a few months, the gist of which was asking an employee to focus on his job, could violate First Amendment. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

[9] **Constitutional Law 92** ☞90.1(7.2)

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and Limitations
            92k90.1(7) Labor Matters
                92k90.1(7.2) k. Public Employment.

Most Cited Cases
A public employee states a First Amendment claim by alleging that his or her employer engaged in a campaign of retaliatory harassment in response to the employee's speech on a matter of public concern, even if the employee could not prove a causal connection between the retaliation and an adverse employment action. U.S.C.A. Const.Amend. 1.

Appeal from the United States District Court for the Middle District of Pennsylvania, (D.C. Civil Action No. 02-cv-01910), District Judge: Honorable Richard Caputo.

Charles W. Rubendall, II, (Argued), Donald M. Lewis, III, Keefer, Wood, Allen & Rahal, LLP, Harrisburg, PA, for Appellant.

Donald A. Bailey, (Argued), Bailey Stretton & Ostrowski, Harrisburg, PA, for Appellee.

Before SCIRICA, Chief Judge, ROTH and AMBRO, Circuit Judges.

OPINION OF THE COURT

AMBRO, Circuit Judge.
**\*1** Daniel Sattele appeals the District Court's denial of his summary judgment motion seeking qualified immunity in a suit brought by Allen Jones alleging that Sattele, among others, had retaliated against him for exercising his First Amendment rights. Because Jones did not allege that Sattele deprived him of a constitutional right-and because even if he had, that right was not clearly established at the time Sattele engaged in the alleged conduct-we conclude that Sattele is entitled to qualified immunity. We therefore reverse the decision of the District Court and remand for further proceedings.

I. Factual and Procedural History

In May 2002, Jones was hired as a special investigator for the Pennsylvania Office of Inspector General ("OIG"). [FN1] The OIG is responsible for investigating allegations of fraud, waste, misconduct, and abuse in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                           Page 4
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

executive agencies of the Commonwealth. At the time of the events at issue in this case, Sattele was an Investigations Manager at OIG and was Jones's supervisor.

In mid- to late-July 2002, Jones was given a lead role in the investigation of Steve Fiorello, the chief pharmacist at Harrisburg State Hospital. There was only one other person assigned to the investigation. A few weeks after the investigation began, Jones told Sattele that he was concerned about problems in the pharmaceutical industry that went beyond the Fiorello investigation-specifically that he believed the industry was routinely bribing state officials. Jones informed Sattele that he wanted to broaden the Fiorello investigation to include the entire pharmaceutical industry. Thereafter, Jones continued to inform Sattele about his concerns regarding the industry.

In response, Sattele told Jones to stay focused on the Fiorello investigation and not to investigate corruption in the pharmaceutical industry as a whole. Sattele subsequently removed Jones from his lead role in the Fiorello investigation in September 2002 [FN2] because Jones had, in Sattele's words, "lost focus." Sattele based this conclusion on the fact that Jones continued to voice concerns about the entire pharmaceutical industry even after Sattele had told him to concentrate only on Fiorello.

In October 2002, Dwight McKee, one of Jones's colleagues at OIG, filed a complaint against other OIG employees, alleging that they had retaliated against him for exercising his First Amendment rights. In November 2002, an amended complaint was filed, joining Jones as a plaintiff and Sattele as a defendant. Jones brought a cause of action under 42 U.S.C. § 1983, alleging that Sattele and the other defendants had also retaliated against him for exercising his First Amendment rights. Jones claimed generally that he was retaliated against-through intimidation and harassment by his supervisors-for complaining to his supervisors that public corruption investigations were being obstructed and delayed for reasons that were not legitimate.

In particular, at his deposition Jones identified three comments by Sattele that he perceived as harassment in

retaliation for his refusal to stop voicing his concerns about the pharmaceutical industry. [FN3] First, he testified that Sattele told him that

**\*2** Mac [McKee] was torpedoed. Some of the things that he got maybe he deserved, but a lot of them he didn't. He was torpedoed. You keep your mouth shut.... Mac has been torpedoed, keep your mouth shut or the same thing can happen to you.

In a similar vein, Jones recalled that Sattele told him, in early October 2002, that if Jones could not adjust to the way OIG operated, he would have to leave his employment there.

Second, Jones testified that Sattele told him to "quit being a salmon," by which he meant that Jones should "quit swimming against the current with the pharmaceutical case." (Sattele testified at his deposition that he told Jones to "go with the flow" and not "swim against the current" because he was concerned that Jones was not working with the lawyers in the office and was not operating within a "team concept.")

Third, Jones related an incident that occurred in October 2002, after he had been removed as co-leader of the Fiorello investigation. Jones stated that thereafter he was not allowed to speak to anyone about the investigation without Sattele's permission. He nevertheless went to pick up documents from Fiorello, the target of the investigation, while Sattele and another of his supervisors were out of the office. Jones testified that, when he got back, Sattele met him "first thing," took him into a room with another OIG colleague, "and demanded to know why [he] went ... without [Sattele's] permission to pick up papers." Jones also stated that Sattele and his colleague accused Jones of having had an interview with the Director of the Department of Public Welfare, something Jones denied.

All defendants moved for summary judgment in August 2003, and the District Court granted the motion with respect to all defendants except Sattele in February 2004. As for Jones's claims against Sattele, the District Court determined, based on the three comments identified by Jones, that (1) "with respect to Mr. Sattele, Mr. Jones has presented evidence that could lead a reasonable jury to conclude that his requests to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 5
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

investigate the pharmaceutical industry were a substantial or motivating factor in the retaliatory harassment or intimidation he may have suffered" and (2) it could not decide whether Sattele had qualified immunity absent a factual determination as to whether Sattele's conduct constituted retaliatory harassment. In its decision, the District Court also determined that Jones was not disciplined in connection with voicing his concerns about the pharmaceutical industry and that "[a]t no time during his employment has Mr. Jones's job classification, pay, or benefits been reduced or altered." Sattele now appeals from the denial of summary judgment on qualified immunity grounds.

## II. Jurisdiction & Standard of Review

The District Court had federal question jurisdiction over Jones's 42 U.S.C. § 1983 claim pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine. *See Doe v. Groody,* 361 F.3d 232, 237 (3d Cir.2004) ("[A] denial of qualified immunity that turns on an issue of law-rather than a factual dispute-falls within the collateral order doctrine that treats certain decisions as 'final' within the meaning of 28 U.S.C. § 1291." (citing, *inter alia, Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)); *Forbes v. Twp. of Lower Merion,* 313 F.3d 144, 147 (3d Cir.2002) ("When a defendant moves for summary judgment based on qualified immunity, the denial of the motion may be appealed immediately under the collateral-order doctrine because '[t]he entitlement is an *immunity from suit* rather than a mere defense to liability [ ] and ... is effectively lost if a case is erroneously permitted to go to trial." ' (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)) (alterations, emphasis, and omission in original)). FN4

**\*3** [1] [2] We exercise plenary review over the District Court's conclusions of law in its qualified immunity analysis. *Doe,* 361 F.3d at 237. In addition, "we may review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right, but we may not consider whether the district court correctly identified the set of facts that the summary judgment record is

sufficient to prove." *Forbes,* 313 F.3d at 147 (internal quotation marks omitted).

We note also that at this stage of the litigation we are looking at the facts as presented by Jones, *i.e.,* Sattele's statements were retaliatory, rather than the exercise by Satelle of appropriate supervisory limits on Jones's performance of his assignment.

## III. Discussion

[3] [4] Qualified immunity insulates government officials performing discretionary functions from suit "insofar as 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* at 148 (quoting *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). To determine whether an official has lost his or her qualified immunity, we must first "decide 'whether a constitutional right would have been violated on the facts alleged....' " *Doe,* 361 F.3d at 237 (quoting *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)) (omission in original). If the answer to that question is "yes," we must then "consider whether the right was 'clearly established.' " *Id.* at 238 (quoting *Saucier,* 533 U.S. at 201)). If we also answer "yes" to the second question, we must conclude that the official does not have qualified immunity.

Sattele contends that he is entitled to qualified immunity because (1) his three statements to Jones about his work on the Fiorello investigation did not deprive Jones of his First Amendment rights, and (2) even if Jones did allege a violation of a constitutional right, that right was not clearly established at the time Sattele made the comments. We address each argument in turn.

### A. *Did Sattele Violate a Constitutional Right of Jones?*

[5] "A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Brennan v. Norton,* 350 F.3d 399, 412 (3d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 6

--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527

**(Cite as: --- F.3d ----)**

Cir.2003) (internal quotation marks omitted). In light of this fundamental principle, we have held that, in certain circumstances, a public employee may bring a cause of action alleging that his or her First Amendment rights were violated by retaliatory harassment for the employee's speech about a matter of public concern even if he or she cannot prove that the alleged retaliation adversely affected the terms of his or her employment. *See Suppan v. Dadonna,* 203 F.3d 228, 234-35 (3d Cir.2000). In *Suppan,* we indicated that when the "plaintiffs' complaint allege[d] a campaign of retaliatory harassment culminating in ... retaliatory rankings [low ratings on promotion lists]," then a "trier of fact could determine that a violation of the First Amendment occurred at the time of the rankings on the promotion lists and that some relief [was] appropriate even if plaintiffs [could not] prove a causal connection between the rankings and the failure to promote." *Id.* This holding is premised on the idea that being the victim of petty harassments in the workplace as a result of speaking on matters of public concern is in itself retaliation-even if the employee cannot prove a change in the actual terms of his or her employment-and thus could be actionable under the First Amendment. *Id.* at 235.

**\*4** [6] In this context, the key question in determining whether a cognizable First Amendment claim has been stated is whether "the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights...." *Id.* at 235 (internal quotation marks omitted). The effect of the alleged conduct on the employee's freedom of speech " 'need not be great in order to be actionable," ' but it must be more than *de minimis. Id.* (quoting *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982)) (Posner, J.)); *see also Brennan,* 350 F.3d at 422 n. 17 (noting that "incidents of what might otherwise be trivial 'harassment' ' may be actionable through their "cumulative impact ... even though the actions would be *de minimis* if considered in isolation"). As stated earlier, the District Court determined that Jones's allegation that Sattele retaliated against him for speaking out about the pharmaceutical industry met the standards set out in *Suppan.*

[7] Sattele does not dispute the District Court's

conclusion that Jones sufficiently alleged that he was speaking out on a matter of public concern. Sattele does argue, however, that the District Court's conclusion (by pointing to the three statements Sattele made to Jones, the latter alleged a retaliatory harassment claim under the First Amendment) was incorrect. In particular, Sattele contends that his three allegedly retaliatory comments were trivial and insufficient to deter a person of ordinary firmness from exercising his First Amendment rights. We agree.

Despite our holding in *Suppan* that a plaintiff's allegation of a "campaign of retaliatory harassment" by a public employer as a result of the plaintiff's speech created a cognizable First Amendment claim even without an alleged causal connection to a change in the plaintiff's terms of employment, not every critical comment-or series of comments-made by an employer to an employee provides a basis for a colorable allegation that the employee has been deprived of his or her constitutional rights. *See Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000) (stating that "not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation"); *Bart,* 677 F.2d at 625 (holding that plaintiff had alleged an actionable First Amendment claim when she claimed that "an entire campaign of harassment[,] which though trivial in detail may have been substantial in gross," had been mounted against her, but cautioning that "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise"). We have noted that " 'courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." ' *Brennan,* 350 F.3d at 419 (quoting *Suarez,* 202 F.3d at 686) (holding that allegations that a supervisor stopped using the plaintiff's job title and did not capitalize the plaintiff's name as a result of plaintiff's speech, even if true, did not rise to the level of a constitutional violation because they were *de minimis* ). The comments made by Sattele fall into this category.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                        Page 7
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

**\*5** Sattele's statements to Jones in the fall of 2002 were all aimed at getting Jones to focus on the investigation to which he was assigned-looking into the activities of a particular person in a particular state agency-instead of focusing on Jones's own wide-ranging concerns about the pharmaceutical industry as a whole, something that OIG was not investigating. There is no question Sattele's statements were critical of Jones's job performance, and they may be construed as reprimands for Jones's continued expressions of concern about potential corruption in the pharmaceutical industry. However, even looking at the record in the light most favorable to Jones (as we must at this stage in the proceedings), we cannot conclude that Sattele's comments, taken together, would have deterred a person of ordinary firmness from exercising his First Amendment rights.

In *Suppan,* the plaintiffs allegedly were subjected to repeated chastisements and threats from their superiors over a period of more than a year based on their membership in a union negotiating team, and they alleged that they were given low ratings on their promotion eligibility evaluations in retaliation for those activities. 203 F.3d at 230-31. By contrast, Jones was admonished a few times for straying from the scope of the task he was assigned. The District Court explicitly found that, despite Jones's changed role in the Fiorello investigation, he suffered no alteration in his employment benefits, pay, or job classification as a result of speaking out about potential corruption in the pharmaceutical industry. Based on the set of facts identified by the District Court, Jones's allegations about Sattele's conduct simply do not rise to the level of a retaliatory harassment claim under the First Amendment.

Because Jones has not alleged the deprivation of a constitutional right, Sattele is entitled to qualified immunity. For the sake of completeness however, we now turn to the second prong of the qualified immunity analysis and determine whether-assuming that Jones had sufficiently alleged the violation of a constitutional right-that right was clearly established at the time of Sattele's alleged conduct.

*B. Assuming Sattele Violated a Constitutional Right of Jones, Was that Right Clearly Established at the Time of the Alleged Conduct?*

[8] " '[C]learly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McLaughlin v. Watson,* 271 F.3d 566, 571 (3d Cir.2001). Put another way, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Id.* at 572. The Supreme Court has recently reiterated this point, stating that "[i]t is important to emphasize that this [clearly established] inquiry 'must be undertaken *in light of the specific context of the case,* not as a broad general proposition." ' *Brosseau v. Haugen,* 543 U.S. 194, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (*per curiam* ) (quoting *Saucier,* 533 U.S. at 201) (emphasis added).

**\*6** [9] Before Sattele allegedly engaged in the conduct at issue in this case, we held, as discussed at Section III(A), *supra,* that a public employee states a First Amendment claim by alleging that his or her employer engaged in a "campaign of retaliatory harassment" in response to the employee's speech on a matter of public concern, even if the employee could not prove a causal connection between the retaliation and an adverse employment action. *Suppan,* 203 F.3d at 234-35. We then reiterated, in *Baldassare v. New Jersey,* 250 F.3d 188 (3d Cir.2001), that "[a] public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Id.* at 194 (citing, *inter alia, Rankin v. McPherson,* 483 U.S. 378, 383-84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). Jones contends that *Suppan* and *Baldassare,* taken together, were sufficient precedent to put Sattele on notice that his conduct-making harassing comments to Jones arising out of Jones's voicing of concerns about corruption in the pharmaceutical industry-was constitutionally prohibited.

In *Suppan,* however, we gave little guidance as to what the threshold of actionability is in retaliatory harassment cases. Instead, we merely held that such a claim existed. *Suppan,* 203 F.3d at 235. Moreover, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                               Page 8
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

alleged conduct in *Suppan* spanned more than a year and involved the supposed lowering of ratings on employees' promotion evaluations and the admonishment of employees because of their union activities and support for a particular mayoral candidate. *Id.* at 230-31. Based only on our acknowledgment of a retaliatory harassment cause of action in *Suppan* and the facts of that case, a reasonable official in Sattele's position would not have been aware that making a few comments over the course of a few months (the gist of which was asking an employee to focus on his job) might have run afoul of the First Amendment.

*Baldassare* also does not further Jones's argument that his First Amendment right to be free from retaliatory harassment was clearly established at the time of Sattele's alleged conduct. That case involved a straightforward retaliation claim brought under the First Amendment in which the plaintiff alleged a direct causal connection between his speech on a matter of public concern and his demotion, *see Baldassare, 250 F.3d at 194* (plaintiff claimed he was demoted because of his statements regarding his investigation and report about conduct of his co-workers), not that he was subject to a campaign of retaliatory harassment such as the one involved in *Suppan* and alleged by Jones in this case. Thus, *Baldassare* would not have helped Sattele understand that his conduct might be constitutionally prohibited. <sup>FN5</sup>

We did touch on the retaliatory harassment theory again in our *Brennan* decision, noting once more that "a plaintiff may be able to establish liability under § 1983 based upon a continuing course of conduct even though some or all of the conduct complained of would be *de minimis* by itself or if viewed in isolation." 350 F.3d at 419 n. 16. *Brennan* provided some additional guidance about what types of conduct would support such a claim, holding that some of the plaintiff's allegations (that he had been taken off the payroll for some time and given various suspensions as a result of his speech) would support a retaliation claim, whereas other of his allegations (including his claim that his supervisor stopped using his title to address him) would not because of their triviality. *Id.* at 419. However, *Brennan* was not decided until 2003, after Sattele's alleged

conduct, which occurred in the fall of 2002, had already taken place. Thus, to the extent that *Brennan* added some specificity to the contours of the retaliatory harassment cause of action, an employee's First Amendment right to be free from such harassment was still not clearly established at the time of Sattele's conduct. *See Brosseau,* 125 S.Ct. at 600 n. 4 (noting that the parties had pointed the Court to "a number of ... cases ... that postdate the conduct in question" and that "[t]hese decisions, of course, could not have given fair notice to [the official] and are of no use in the clearly established inquiry").

**\*7** Moreover, as discussed at Section III(A), *supra,* we also stated in *Brennan* that courts have not found violations of employees' First Amendment rights "where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." 350 F.3d at 419 (internal quotation marks omitted). *Brennan* therefore lends support to Sattele's argument that his critical comments to Jones did not violate Jones's First Amendment rights.

Accordingly, because of the dearth of precedent of sufficient specificity (and factual similarity to this case) regarding a public employee's First Amendment right to be free from retaliatory harassment by his or her employer at the time of Sattele's conduct, we cannot say that the constitutional right Jones alleged Sattele violated was clearly established. Sattele is therefore entitled to qualified immunity under the second, as well as the first, prong of our *Saucier* analysis.

### IV. Conclusion

The three comments made by Sattele in response to Jones's voicing of his concerns about potential corruption in the pharmaceutical industry, although critical of Jones's speech, were all intimately related to Jones's job performance and would not have deterred a person of ordinary firmness from exercising his or her First Amendment rights. As the District Court found, the comments were also unaccompanied by any change in Jones's employment benefits or wages. We cannot conclude, based on this factual situation, that Jones alleged a deprivation of a constitutional right.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**

Moreover, even if there had been such a deprivation, Jones's constitutional right to be free from a campaign of retaliatory harassment was not clearly established at the time of Sattele's alleged conduct. *Suppan* (and *Baldassare* to the extent it is applicable), although they were decided before the events at issue in this case, did not define the bounds of a retaliatory harassment cause of action with sufficient specificity, nor were their facts sufficiently similar to those alleged here, such that Sattele would have been on notice that his conduct was constitutionally prohibited.

Accordingly, Sattele is entitled to qualified immunity, and we reverse the contrary decision of the District Court and remand for further proceedings.

FN1. Jones had previously been employed by OIG. He left that position in 1991.

FN2. Jones was still assigned to that investigation even though his role had changed.

FN3. Jones also identified a fourth incident that he alleged was harassment, involving Henry Hart, another defendant. Hart, however, is not a party to this appeal, and as that incident is not relevant to our decision, we do not discuss it here.

FN4. Sattele contends that there is no factual dispute preventing us from exercising jurisdiction over this appeal, and Jones does not dispute that position.

FN5. Moreover, we note that even if *Baldassare* were relevant to determining whether Jones's right to be free from retaliatory harassment was clearly established at the time of Sattele's alleged conduct, that case would not necessarily put a reasonable official in Sattele's position on notice that making comments such as Sattele's would violate the First Amendment. Under the traditional retaliation analysis articulated in *Baldassare*, the second inquiry, after the plaintiff has established that he or she was engaging in activity protected by the First Amendment, is whether the plaintiff's "interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees." 250 F.3d at 195. We have stated that, in determining the interest of the employer for purposes of this balancing test, "we must consider 'whether the [expression] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." ' *Id.* at 198 (quoting *Rankin,* 483 U.S. at 388) (alteration in original). The District Court determined in this case that there was no evidence that OIG's interest in conducting an efficient investigation was impaired by Jones's speech. However, given our precedent on this issue, a reasonable official in Sattele's position could have *understood* his actions toward Jones as being justified because the need to maintain efficient working relationships and to improve Jones's performance of his duties on the Fiorello investigation outweighed his interest in speaking generally about potential corruption in the pharmaceutical industry, a matter outside the scope of the investigation OIG was conducting. *Cf. Sprague v. Fitzpatrick,* 546 F.2d 560, 565 (3d Cir.1976) (holding that, even though speech leading to public employee's discharge "concerned matters of grave public import," the balance weighed against finding that speech protected by the First Amendment when it had "completely undermined" the effectiveness of the employer-employee relationship).

C.A.3 (Pa.),2006.
McKee v. Hart
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 10
--- F.3d ----, 2006 WL 27474 (C.A.3 (Pa.)), 23 IER Cases 1527
**(Cite as: --- F.3d ----)**


• 04-1442 (Docket) (Feb. 23, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**CERTIFICATE OF SERVICE**

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

February 8, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

        Robert Fitzgerald, Esquire
        Montgomery McCracken Walker & Rhoads, LLP
        123 South Broad Street
        Philadelphia, PA 19109

        Richard M. Donaldson, Esquire
        Montgomery McCracken Walker & Rhoads, LLP
        300 Delaware Avenue, Suite 750
        Wilmington, DE 19801

        /s/ Stephen J. Neuberger
        **STEPHEN J. NEUBERGER, ESQ.**

FTU / Briefs / FTU - -SJAB.final

-38-