## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CORPORAL B. KURT PRICE, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **C.A.No.04-956-GMS** |
| | : | |
| **COLONEL L. AARON CHAFFINCH, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

| | | |
|---|---|---|
| **SERGEANT CHRISTOPHER D. FORAKER,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **C.A.No.04-1207-GMS** |
| | : | |
| **COLONEL L. AARON CHAFFINCH, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFFS' APPENDIX TO THEIR ANSWERING BRIEFS IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**MARTIN D. HAVERLY, ATTORNEY AT LAW**
**MARTIN D. HAVERLY, ESQ. (#3295)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Attorneys for Plaintiffs

Dated: February 8, 2006

## <u>TABLE OF CONTENTS</u>

Letter from Thomas Neuberger, Esq. to Capt. John Yeomans, Oct. 10, 2005
  regarding Temporary Total Disability Application for Sgt. Foraker............................B001

Letter from Frederick Kozma, Ph.D. to Thomas Neuberger, Esq., Oct. 7, 2005
  regarding Sgt. Foraker..................................................................................................B003

Letter from Thomas Neuberger, Esq. to Capt. John Yeomans, Oct. 10, 2005
  regarding Temporary Total Disability Application for Cpl/3 Price............................B004

Letter from Frederick Kozma, Ph.D. to Thomas Neuberger, Esq., Sept. 30, 2005
  regarding Cpl/3 Price...................................................................................................B006

Letter from Thomas Neuberger, Esq. to Capt. John Yeomans, Oct. 10, 2005
  regarding Temporary Total Disability Application for Cpl/3 Warren.........................B007

Letter from Frederick Kozma, Ph.D. to Thomas Neuberger, Esq., Sept. 30, 2005
  regarding Cpl/3 Warren................................................................................................B009

Castro Expert Report - Sgt. Foraker..............................................................................B010

Castro Expert Report - Cpls/3 Price and Warren...........................................................B018

Fitness for Duty Letter addressed to Sgt. Foraker from Col. MacLeish, Nov. 21, 2005...........B025

Fitness for Duty Letter addressed to Cpl/3 Price from Col. MacLeish, Nov. 21, 2005............B026

Fitness for Duty Letter addressed to Cpl/3 Warren from Col. MacLeish, Nov. 21, 2005.........B027

*American Police Beat* article - "Contaminated shooting range shut down" (CF66-68)............B028

Fini Expert Report - Sgt. Foraker..................................................................................B031

# THE NEUBERGER FIRM
## ATTORNEYS AND COUNSELLORS AT LAW

### TWO EAST SEVENTH STREET
### SUITE 302
### WILMINGTON, DELAWARE 19801-3707

WWW.NEUBERGERLAW.COM
EMAIL: INFO@NEUBERGERLAW.COM

THOMAS S. NEUBERGER, ESQUIRE
STEPHEN J. NEUBERGER, ESQUIRE

PHONE: (302) 655-0582
FAX: (302) 655-9329

October 10, 2005

**VIA E-Mail Only**

Captain John Yeomans
Director, Human Resources
Delaware State Police
Dover, DE 19903

Re: Temporary Total Disability Application for Sergeant Christopher Foraker

Dear Captain Yeomans:

As you know this office represents Sgt. Christopher Foraker.

This letter is an application on his behalf for temporary total disability status with full pay and benefits because he is unfit for duty as a Delaware State Trooper.

Attached is a letter from his treating psychologist Frederick Kozma, of Christiana Psychiatric Services, dated October 7, 2005 which indicates that this patient is temporarily totally disabled and is unfit for duty as a Trooper because of his numerous job related emotional injuries.

I am in the process of obtaining a similar letter from my client's treating physician to the same effect. When it is received I will forward it to you.

Consequently you will have before you letters from both a treating physician and a treating psychologist that my client is unfit for duty and is temporarily totally disabled.

Lawyers for the State Police also have in their possession a confidential report, under court protective order, by another esteemed psychiatrist, Carol A. Tavani, M.D., which indicates that Chris has the following diagnosis for the injuries he has received at work:

1. Major depression, second episode, severe, without psychosis.

2. Posttraumatic stress disorder, now in exacerbation

3. Psychological factors affecting physical condition.

Importantly, she indicates that the level of his global assessment of functioning is only a 60 which indicates moderate difficulty functioning.

This record is more than sufficient to establish that Chris is temporarily totally disabled and unfit for duty under the policies, practices and customs of the State Police.

The precise classification he is awarded is immaterial as long as his status is with full pay and benefits.

As you know, on October 3, 2005 you and I explored various policies, practices and customs of the State Police regarding being unfit for duty because of psychiatric injuries and also other injuries or events. You explained at that time that troopers often suffer from psychiatric injuries and, for example, they are placed on light duty during the period needed for their medication and treatment. Otherwise, they also are simply sent home for the period needed to recover.

We also know from the detailed questioning the other day that there is much precedent for continuing the income and benefits of troopers in various situations.

You should remember the trooper accused of rape who was suspended with full pay and benefits for several years. Then there was the trooper bank robber who also received full pay and benefits for several years while he was suspended.

Then there are the troopers who have suffered temporary or permanent physical disabilities who have received full pay and benefits through light duty status, job restructuring or job reassignment, all with the goal of preserving income and benefits for their family units.

Considering this precedent and the various policies, practices and customs of the Delaware State Police, I respectfully request that my client be sent home with full pay and benefits where he can continue his course of medical treatment and psychological counseling without the stress of the workplace, until his treating health care providers agree he is again fit for duty.

Please let me know of any additional information you require to evaluate his application.

Very truly yours,

/s/ Thomas S. Neuberger

Thomas S. Neuberger, Esq.

TSN:tsn

enclosure

cc: Sgt. Christopher Foraker

Foraker/Letters/Yeomans.03.

-2-

**CHRISTIANA PSYCHIATRIC SERVICES, P.A.**
4745 Ogletown-Stanton Road
Suite 124, Medical Arts Pavilion I
Newark, DE 19713

Frederick Kozma, PH.D.                                    **Adult and Consultation Psychiatry**
Clinical Psychologist                                     Phone  (302) 454-9900
                                                          Fax    (302) 454-9905

October 7, 2005

The Neuberger Firm
Thomas S. Neuberger, Esquire
2 East Seventh Street Suite 302
Wilmington, DE  19801

To Whom It May Concern:

Mr. Christopher Foraker is a patient of mine.  He was seen by me today, October 7, 2005.  He is suffering from major depressive disorder and exhibits features of posttraumatic stress disorder.

He is presently unfit for duty as a police officer.  He is temporary totally disabled.

The conflicts he experiences in his work environment as a state police officer are major contributors to his depression and stress.

He is likely to benefit both generally and psychologically and in his treatment if he is not further disabled by his ongoing source of stress.  A disability leave is recommended.

Please feel free to contact me if you have any further questions.

Sincerely,

Frederick Kozma, Ph.D
Clinical Psychologist

# THE NEUBERGER FIRM
## ATTORNEYS AND COUNSELLORS AT LAW

### TWO EAST SEVENTH STREET
### SUITE 302
### WILMINGTON, DELAWARE 19801-3707

WWW.NEUBERGERLAW.COM
EMAIL: INFO@NEUBERGERLAW.COM

THOMAS S. NEUBERGER, ESQUIRE
STEPHEN J. NEUBERGER, ESQUIRE

PHONE: (302) 655-0582
FAX: (302) 655-9329

October 10, 2005

**VIA E-Mail Only**

Captain John Yeomans
Director, Human Resources
Delaware State Police
Dover, DE 19903

Re: Temporary Total Disability Application for Master Corporal B. Kurt Price

Dear Captain Yeomans:

As you know this office represents Master Corporal B. Kurt Price.

This letter is an application on his behalf for temporary total disability status with full pay and benefits because he is unfit for duty as a Delaware State Trooper.

Attached is a letter from his treating psychologist Frederick Kozma of Christiana Psychiatric Services, dated September 30, 2005 which indicates that this patient is temporarily totally disabled and is unfit for duty as a Trooper because of his numerous job related emotional injuries.

I am in the process of obtaining a similar letter from my client's treating physician to the same effect. When it is received I will forward it to you.

Consequently you will have before you letters from both a treating physician and a treating psychologist that my client is unfit for duty and is temporarily totally disabled.

Lawyers for the State Police also have in their possession a confidential report, under court protective order, by another esteemed psychiatrist, Carol A. Tavani, M.D., which indicates that Kurt has the following diagnosis for the injuries he has received at work:

1. Major depression, single episode, severe, without psychosis.

2. Some aspects of chronic posttraumatic stress disorder.

3. Psychological factors affecting physical condition.

Most importantly, she indicates that the level of his global assessment of functioning is only a 50 which indicates serious impairment in social and occupational functioning.

This record is more than sufficient to establish that Kurt is temporarily totally disabled and unfit for duty under the policies, practices and customs of the State Police.

The precise classification he is awarded is immaterial as long as his status is with full pay and benefits.

As you know, on October 3, 2005 you and I explored various policies, practices and customs of the State Police regarding being unfit for duty because of psychiatric injuries and also other injuries or events. You explained at that time that troopers often suffer from psychiatric injuries and, for example, they are placed on light duty during the period needed for their medication and treatment. Otherwise, they also are simply sent home for the period needed to recover.

We also know from the detailed questioning the other day that there is much precedent for continuing the income and benefits of troopers in various situations.

You should remember the trooper accused of rape who was suspended with full pay and benefits for several years. Then there was the trooper bank robber who also received full pay and benefits for several years while he was suspended.

Then there are the troopers who have suffered temporary or permanent physical disabilities who have received full pay and benefits through light duty status, job restructuring or job reassignment, all with the goal of preserving income and benefits for their family units.

Considering this precedent and the various policies, practices and customs of the Delaware State Police, I respectfully request that my client be sent home with full pay and benefits where he can continue his course of medical treatment and psychological counseling without the stress of the workplace, until his treating health care providers agree he is again fit for duty.

Please let me know of any additional information you require to evaluate his application.

Very truly yours,

/s/ Thomas S. Neuberger

Thomas S. Neuberger, Esq.

TSN:tsn

enclosure

cc: Master Cpl. Kurt Price

FTU/Letters/Yeomans.02

**CHRISTIANA PSYCHIATRIC SERVICES, P.A.**
4745 Ogletown-Stanton Road
Suite 124, Medical Arts Pavilion I
Newark, DE 19713

**Frederick Kozma, PH.D.**                                    **Adult and Consultation Psychiatry**
**Clinical Psychologist**                                      **Phone (302) 454-9900**
                                                               **Fax    (302) 454-9905**

September 30, 2005

The Neuberger Firm
Thomas S. Neuberger, Esquire
2 East Seventh Street Suite 302
Wilmington, DE  19801

To Whom It May Concern:

Mr. Brian Price entered treatment with me on September 27, 2005.  He is suffering from major depressive disorder and exhibits features of posttraumatic stress disorder.

He is presently unfit for duty as a police officer.  He is temporary totally disabled.

The conflicts he experiences in his work environment as a state police officer are major contributors to his depression and stress.

He is likely to benefit both generally and psychologically and in his treatment if he is not further disabled by his ongoing source of stress.  A disability leave is recommended.

Please feel free to contact  me if you have any further questions.

Sincerely,

Frederick Kozma, Ph.D
Clinical Psychologist

# THE NEUBERGER FIRM
## ATTORNEYS AND COUNSELLORS AT LAW

### TWO EAST SEVENTH STREET
### SUITE 302
### WILMINGTON, DELAWARE 19801-3707

WWW.NEUBERGERLAW.COM
EMAIL: INFO@NEUBERGERLAW.COM

THOMAS S. NEUBERGER, ESQUIRE
STEPHEN J. NEUBERGER, ESQUIRE

PHONE: (302) 655-0582
FAX: (302) 655-9329

October 10, 2005                                    **VIA E-Mail Only**

Captain John Yeomans
Director, Human Resources
Delaware State Police
Dover, DE 19903

Re: Temporary Total Disability Application for Master Corporal Wayne Warren

Dear Captain Yeomans:

As you know this office represents Master Corporal Wayne Warren.

This letter is an application on his behalf for temporary total disability status with full pay and benefits because he is unfit for duty as a Delaware State Trooper.

Attached is a letter from his treating psychologist Frederick Kozma, of Christiana Psychiatric Services, dated September 30, 2005 which indicates that this patient is temporarily totally disabled and is unfit for duty as a Trooper because of his numerous job related emotional injuries.

I am in the process of obtaining a similar letter from my client's treating physician to the same effect. When it is received I will forward it to you.

Consequently you will have before you letters from both a treating physician and a treating psychologist that my client is unfit for duty and is temporarily totally disabled.

Lawyers for the State Police also have in their possession a confidential report, under court protective order, by another esteemed psychiatrist, Carol A. Tavani, M.D., which indicates that Wayne has the following diagnosis for the injuries he has received at work:

1.    Major depression, single episode, moderate to severe, without psychosis.

2.    Psychological factors affecting physical condition.

Importantly, she indicates that the level of his global assessment of functioning is only a 60 which indicates moderate difficulty functioning.

This record is more than sufficient to establish that Wayne is temporarily totally disabled and unfit for duty under the policies, practices and customs of the State Police.

The precise classification he is awarded is immaterial as long as his status is with full pay and benefits.

As you know, on October 3, 2005 you and I explored various policies, practices and customs of the State Police regarding being unfit for duty because of psychiatric injuries and also other injuries or events. You explained at that time that troopers often suffer from psychiatric injuries and, for example, they are placed on light duty during the period needed for their medication and treatment. Otherwise, they also are simply sent home for the period needed to recover.

We also know from the detailed questioning the other day that there is much precedent for continuing the income and benefits of troopers in various situations.

You should remember the trooper accused of rape who was suspended with full pay and benefits for several years. Then there was the trooper bank robber who also received full pay and benefits for several years while he was suspended.

Then there are the troopers who have suffered temporary or permanent physical disabilities who have received full pay and benefits through light duty status, job restructuring or job reassignment, all with the goal of preserving income and benefits for their family units.

Considering this precedent and the various policies, practices and customs of the Delaware State Police, I respectfully request that my client be sent home with full pay and benefits where he can continue his course of medical treatment and psychological counseling without the stress of the workplace, until his treating health care providers agree he is again fit for duty.

Please let me know of any additional information you require to evaluate his application.

Very truly yours,

/s/ Thomas S. Neuberger

Thomas S. Neuberger, Esq.

TSN:tsn

enclosure

cc: Master Cpl. Wayne Warren

FTU/Letters/Yeomans.01

-2-

**CHRISTIANA PSYCHIATRIC SERVICES, P.A.**
4745 Ogletown-Stanton Road
Suite 124, Medical Arts Pavilion I
Newark, DE 19713

Frederick Kozma, PH.D.                    Adult and Consultation Psychiatry
Clinical Psychologist                     Phone  (302) 454-9900
                                          Fax     (302) 454-9905

September 30, 2005


The Neuberger Firm
Thomas S. Neuberger, Esquire
2 East Seventh Street Suite 302
Wilmington, DE  19801


To Whom It May Concern:

Mr. Wayne Warren entered treatment with me on September 27, 2005.  He is suffering from
major depressive disorder and exhibits features of posttraumatic stress disorder.

He is presently unfit for duty as a police officer.  He is temporary totally disabled.

The conflicts he experiences in his work environment as a state police officer are major
contributors to his depression and stress.

He is likely to benefit both generally and psychologically and in his treatment if he is not further
disabled by his ongoing source of stress.  A disability leave is recommended.

Please feel free to contact me if you have any further questions.

Sincerely,


Frederick Kozma, Ph.D
Clinical Psychologist

B009

# JOSE R. CASTRO VOCATIONAL SERVICES

♦♦♦

P.O. BOX 1186 ♦ EDGEMONT, PA 19028
Phone 484-422-8019 ♦ Fax 610-355-0327
Cell 610-716-0788
Email jr12c@aol.com

October 28, 2005

Martin D. Haverly, Esquire
2 East 7th Street, Ste. 302
Wilmington, DE 19801

Re:        Sgt. Christopher D. Foraker

## VOCATIONAL ASSESSMENT/EXPERT REPORT

## INTRODUCTION

You have requested that I produce a vocational assessment report that will
provide my opinion, within a reasonable degree of vocational probability, as to
the ramifications of the ongoing litigation matter with Sgt. Foraker and the
Delaware State Police have impacted his future earning capacity.

Sgt. Foraker has indicated in his litigation that slander and/or First Amendment
retaliation on the part of the Delaware State Police has negatively impacted his
ability to obtain employment in the firearms industry or at a high-level law
enforcement position at the completion of his career with the Delaware State
Police.

In preparation for this report I have reviewed numerous file materials forwarded
to me that include:

1. Sgt. Foraker's Resume/Credentials
2. Various media articles from the American Police Beat, The News Journal,
   The Delaware State News
3. Copy of two Complaints filed in Delaware District Court on behalf of Sgt.
   Foraker after the Firearms Training Unit facility in Smyrna, DE was shut
   down.
4. Sgt. Foraker's Answers and Objections to First Set of Interrogatories.
5. Report provided by Mr. Bud Fini (Intermark).

Martin D. Haverly, Esquire
Re: Christopher Foraker

October 28, 2005
Page 2

In addition to the file review I was able to speak at length with Mr. Fini, an expert in the firearms industry, who produced a report providing his expert opinion.

As a result of my file review and conversation with Mr. Fini, I conducted labor market research which has enabled me to provide for you my opinion, within a reasonable degree of vocational probability, as to whether the alleged slander and/or First Amendment retaliation has in fact impacted Mr. Foraker's future job prospects and if, as a result of the slander, he has suffered a loss or diminishment in his earning capacity.

## BACKGROUND INFORMATION

Sgt. Foraker is a 20-year veteran of the Delaware State Police, Division of Public Safety in Dover, DE. I have enclosed as a reference, Sgt. Foraker's resume that includes his extensive experience, including the positions he has held as a Delaware State Trooper, the programs in which he has been involved, his education, his continuing studies, his professional development, his honors and accomplishments, as well as his affiliations.

Although Sgt. Foraker has served in numerous capacities, his passion and expertise is in firearms operation, training expertise. His most recent position was with the Delaware State Police Firearms Training Unit in Smyrna, DE where he was the Noncommissioned Officer in Charge and Sections Chief of the unit.

He became a full-time Firearms Instructor in October of 1997 when he was assigned to the Ordinance Unit, later referred to as the Firearms Training Unit.

His in-service began at the outside DSP range on Denney's Road and then to the Clark Farm Road FTU construction site to assist there. On 8/1/01 Sgt. Foraker was promoted to Sergeant and NCOIC of the Firearms Training Unit.

Sgt. Foraker spoke of problems of public concern with the new facility, which eventually led to his removal from his position. Following the initial litigation, the Federal Court found that Sgt. Foraker's First Amendment rights had been violated. He was reinstated as the NCOIC of the FTU with all of his previous duties and responsibilities. (12/1/03)

Following his reinstatement Sgt. Foraker, according to records, reported the FTU to be in disarray. Sgt. Foraker reported problems in the facility, which he considered a dangerous situation for the health and safety of those working at the training facility.

Martin D. Haverly, Esquire
Re: Christopher Foraker

October 28, 2005
Page 3

The gist of the first litigation on Sgt. Foraker's part was that he has been retaliated against by the Delaware State Police, specifically the Department Col. Aaron Chaffinch for speaking up on issues of public concern.

As a result of this problem, Sgt. Foraker has had physical and emotional problems and has indicated distress about his bleak future prospects. It had been Sgt. Foraker's plans to obtain a position in the firearms industry once he had retired from the Delaware State Police.

It is his opinion and that of the expert, Bud Fini, that his hopes to become employed in that market have been severely damaged, given the adverse publicity surrounding the closing of the range.

As a result, Sgt. Foraker is seeking damages for diminished earning capacity and economic losses.

## EXPERT REPORT OF MR. BUD FINI OF INTERMARK

I had the opportunity to review the report authored by Bud Fini of Intermark. Mr. Fini is an expert in the firearms industry, having served 30 years in that line of work.

He is currently self-employed, but had over 20 years with Remington Arms advancing to the position of Director of Worldwide Firearms Business. He also served 6 years as an Executive Management Consultant to firearm producers SIGARMS, O. F. Mossberg, Perazzi, Beretta, and Heckler & Koch. He also served 2 years with Savage Arms as Vice President, Sales & Marketing.

Mr. Fini provided a brief summation of the job market situational analysis for the firearms industry. He indicated that he would use the current hiring practices of Remington Arms as well as Smith & Wesson as examples.

Both companies have a similar marketing hierarchy and Mr. Fini indicated a Senior Product Manager directs all of the marketing and research development efforts. He notes that sales initiatives are garnered by three Sales Managers, the eastern, mid-west, and western director of law enforcement sales. He indicates that they manage independent rep groups throughout the U. S. who provide feedback and knowledge to be used for new product development and competitiveness of current products.

Mr. Fini further explained that because the industry is relatively small, the candidates for open positions are usually industry knowlegible individuals that have had prior working relationships with these companies. This was the case with Sgt. Foraker who had dealt directly with industry representatives as the

Martin D. Haverly, Esquire
Re: Christopher Foraker

October 28, 2005
Page 4

NCOIC of the shooting range and by his participation at industry seminars/training.

He advised that the major companies conduct and/or attend law enforcement or government agency exhibitions and shows, and he notes that it is at these shows where industry sales representatives, marketing personnel, etc. develop relationships with individuals such as someone like Sgt. Foraker.

Mr. Fini indicated that relationships are built over a period of time and give rise to potential employment positions within the industry. He explained that these shows and the representative sales calls constitute the primary form of interaction between the industry and law enforcement agency personnel.

It is Mr. Fini's expert opinion that, based on Sgt. Foraker's resume as well as his personal interaction with him, that he would undoubtedly have been a prime candidate for a position within the firearms industry.

He further emphasizes that Sgt. Foraker's background in firearms operation, product knowledge, training expertise and product usage would make him an asset to any firearms company.

In conclusion Mr. Fini opines that Sgt. Foraker's ability to be hired within the industry has been severely damaged given the adverse publicity surrounding the closing of the range. He further emphasized the words *severely damaged* and indicated that a company given several candidates of Sgt. Foraker's background and expertise, would pass on him fearing the excess baggage his past would bring along.

## SALARY RANGES WITHIN THE FIREARMS INDUSTRY

Mr. Fini opined that the most likely scenario for Mr. Foraker was to enter the firearms industry in an entry-level position in either field sales, product management or training. The sales rep jobs start at approximately $55,000 annually. Many companies also offer bonus compensation of 10% to 20% if target goals are achieved. Field service reps also get compensation for travel and meals.

The training (instructor) positions for the gun company's range in pay from 445,000 to $55,000 per annum and Directors earn from $50,000 to $60,000.

Mr. Fini noted that Sales Director positions could have compensation as high as $90,000 per year plus bonus. He opined that it was unlikely that Sgt. Foraker would initially begin at this level but could work toward that over the next ten years.

Martin D. Haverly, Esquire
Re: Christopher Foraker

October 28, 2005
Page 5

## ALTERNATIVE EMPLOYMENT OPPORTUNITIES/TRANSFERABLE SKILLS

As I have described, Sgt. Foraker had positioned himself over a period of years to seek employment within the firearms industry once he retired from the Delaware State Police Department.

His particular expertise had been within the knowledge of firearms and the training of law enforcement personnel.

Based on my review of records as well as the report from Mr. Fini, it would appear that Sgt. Foraker's window of opportunity has been, for all practical purposes, shut.

Sgt. Foraker will now be faced with trying to obtain work in other areas that his law enforcement skills would come into play.

## TRANSFERABLE SKILLS ANALYSIS

The functional definition of transferable skills/worker traits are those that have been obtained through the course of an individual's education/training as well as work history that may be utilized in alternative vocational categories.

The Code of Federal Regulations defines skills transferred as follows: "A person is considered to have skills that can be used in other jobs than those performed previously when the skilled or semi-skilled work activities from past jobs can be utilized to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work."

The goal of skills transfer is to identify occupations a person could step into immediately that would require the same amount, or less, training than a person's previous jobs.

Sgt. Foraker's work history has been with the Delaware State Police Department where he served in several categories, most recently as the head of a firearms range.

Obviously his most marketable skills, once he left the Delaware State Police, would be to work in other law enforcement or firearms environments.

According to the Complaint filed on Sgt. Foraker's behalf and the expert report by Mr. Fini that corroborates those claims, Sgt. Foraker, as a result of adverse

Martin D. Haverly, Esquire                                    October 28, 2005
Re:  Christopher Foraker                                              Page 6

publicity, would be relegated to positions of a lesser capacity than what would
have been his planned career path.

## WAGE EARNING CAPACITY

You have requested that I provide an opinion as to Sgt. Foraker's current wage
earning capacity once he leaves the Delaware State Police Department.   To
accomplish the task I have divided this section into several scenarios.

### Scenario #1

Based on Mr. Fini's report and my conversation with him, the adverse publicity
surrounding the closing of the firing range and the subsequent litigations would
preclude Sgt. Foraker from entering the firearms industry. It is most likely that he
would have entered the field in a sales rep position at approximately $55,000 per
year plus expenses and 10% to 20% of your salary in bonus's if goals are met or
in a trainer/instructor status at $45,000 to $55,000.

There are other higher paying positions within the hierarchy such as product
management or training that are similar in pay to the aforementioned sales reps.
Most of these companies have Sales Managers/Supervisors who function
between the Sales Reps and The Regional Directors. Per my conversations with
Mr. Fini he feels that $65,000 to $75,000 would be a reasonable salary estimate.
Mr. Fini feels that it would be reasonable to expect that Sgt Foraker would
eventually be promoted to that position.

Although the possibility exists that Sgt. Foraker could eventually be promoted to
a Regional Director or VP, these jobs are more difficult to obtain. Director level
positions have compensation as high as $90,000 per year plus bonus's in the
20% range.

I am aware through Mr. Fini that the benefit packages available with the afore
mentioned positions are extremely lucrative and would in addition to medical
benefits, include car allowances (possibly a company car) expense credit card, a
401K plan and in many companies an additional pension plan.

Of interest was my review of the Smith and Wesson web site where three
positions were available, including a Law Enforcement Sales Rep.

### Scenario #2

Martin D. Haverly, Esquire
Re: Christopher Foraker

October 28, 2005
Page 7

Mr. Fini explained that the significant background checks performed by larger companies (including the firearms companies) would reveal Sgt. Foraker's recent problems and the adverse publicity surrounding them.

I have therefore limited my research to mid-level positions that would take into consideration Sgt. Foraker's background, but which may not be prejudiced by the above-mentioned publicity.

I have utilized two research vehicles including:   (1) State of Delaware Occupational Employment Statistics, and (2) ERISA which provides salary parameters for specific vocational categories based on a person's geographic location and amount of experience.

A. Delaware OES Wage Data

1. Firearms Experts/Forensic Science Technicians, 2003 statewide - $42,980
2. Private Detective and Investigators, statewide - $30,660
3. Dispatcher/Security Guard, statewide - $32,140
4. Security Guards, statewide - $22,470

B. ERISA (all at 1 year of experience)

1. Sales Manufacturers Rep - $33,486
2. Detective - $28,907 ($38,721 with 7 years of experience)
3. Investigator - $28,907
4. Fraud Investigatory - $31,488
5. Surveillance System Monitor - $21,127

IMPRESSIONS/OPINION

Based on the Complaints as well as conversations and the report of firearms expert, Bud Fini, Sgt. Foraker's plans to enter the firearms department of private industry such as Smith & Wesson or Remington have been effectively derailed due to the adverse publicity as result of defendant's action against Sgt. Foraker.

Mr. Fini explains that the large firearms manufacturers are a small, closed entity that performs extensive background checks on their applicants. It is Mr. Fini's opinion that Sgt. Foraker would not be able to enter that industry due to the fact that his reputation has been sullied. This adverse publicity may even pose problems in him securing positions within local agencies in Delaware that he normally would have sought.

Martin D. Haverly, Esquire
Re: Christopher Foraker

October 28, 2005
Page 8

Mr. Fini provided salary ranges that would have been available to Sgt. Foraker in the firearms industry. He opined that the most likely scenario would have been for Sgt. Foraker to have entered at a sales rep level at Approximately $55,000 per year plus expenses and bonus potential of 10% to 20% of your salary for meeting goals or a trainer/instructor at $45,000 to $55,000 per year ($50,000 to $60,000 as a Director).

A reasonable expectation would be that in time he would be promoted to Sales Manager position at $65,000 to $75,000 per year. In addition the benefit packages associated with these positions would be far more lucrative than those associated with entry to mid-level positions I described as available to Sgt. Foraker in the jobs he would now be expected to obtain.

I conducted research into entry to mid-level positions within the State of Delaware where Sgt. Foraker's expertise could be utilized. There is a large range with a low of working as a Surveillance Monitor to that of Private Detective. Based on his expertise and notwithstanding the adverse publicity, I would feel comfortable indicating that he would be able to make in the $30,000 to $35,000 range, which would be far less than what he would earn in the firearms industry or in a managerial position within the security department of some large company.

The above opinions have all been provided within a reasonable degree of vocational probability. If any additional information becomes available, I will be in position to review it and determine if it impacts my current opinion.

Respectfully submitted,

José R. Castro, Jr., MRC, LRC, LPC, CRC, RCC, ABDA

Enclosure(s):        Invoice

# JOSE R. CASTRO VOCATIONAL SERVICES
♦♦♦

P.O. BOX 1186 ♦ EDGEMONT, PA 19028
Phone 484-422-8019 ♦ Fax 610-355-0327
Cell 610-716-0788
Email jr12c@aol.com

October 27, 2005

Martin D. Haverly, Esquire
2 East 7th Street, Ste. 302
Wilmington, DE 19801

Re:        **Curt Price and Wayne Warren v. Delaware State
           Police Department**

## EARNING CAPACITY REPORT

### INTRODUCTION

You have requested that I provide an opinion, within a reasonable degree of
vocational probability, as to Cpl. Price's and Cpl. Warren's current and future
earning capacity and how this has been impacted by the litigation with the
Delaware State Police Department.

It is my understanding that as a result of physicals taken by Cpls. Price and
Warren that a slight hearing loss was discovered and they were placed on light-
duty status as of 6/18/04. Based on the complaint filed on their behalf, this slight
hearing loss is not sufficient grounds for being placed on light duty and others
who remain on the staff have similar problems.

The complaint goes on to charge that these two officers were being retaliated
against by the Department for speaking out on public issues regarding the
condition of the shooting range.

It is also my understanding that it is the normal practice for the Delaware State
Police to keep officers on light-duty for only a 2-year period and after that time
they are dismissed from the department.

As a result of being placed on light-duty, Cpls. Warren and Price have had
reduced earnings due to their being unavailable for overtime or extra duty
assignments. In addition, once the 2 years have been completed they will no

Martin D. Haverly, Esquire
Re: Price/Warren

October 27, 2005
Page 2

longer be earning a State Trooper salary, but will have to find alternate employment.

It is my understanding that there is precedence within the Department to place Cpl. Warren and Cpl. Price in jobs for which they are suited, for an indefinite period of time.

In preparation for this report I have reviewed file materials that include:

1. Resume and Training Certificates of Cpl. Wayne Warren.
2. Resume and Training Certificates of Cpl. Kurt Price.
3. A copy of the joint Complaints of Cpls. Price and Warren as well as Sgt. Foraker against the State of Delaware.

As a result of the file review I conducted labor market research, which has enabled me to provide for you my opinion, within a reasonable degree of vocational probability, as to whether Cpls. Warren and Price have suffered lost earnings and/or a diminished earning capacity.

## BACKGROUND INFORMATION

### Cpl. Wayne Warren:

A. Education:

- received Associate's degree in Criminal Justice from Del Tech in Georgetown, DE - 1979

- received a Bachelor's degree in Criminal Justice from Delaware State College - 1982

- Graduated from the Delaware State Police Academy - 1983

B. Work History:

- Became a Delaware State Trooper in 1983 and worked with Troop 7 in Lewes, DE until 1986.

- From 1986 to 1991 Mr. Warren was assigned to the Special Investigations Unit, Delaware State Police Troop 9 Odessa (Detective).

Martin D. Haverly, Esquire
Re: Price/Warren

October 27, 2005
Page 3

- From 1991 to 1996 served with Delaware State Police Troop 7 in Lewes as a Senior Cpl.

- From 1996 to 1999 he worked for the Special Investigations Tactical Unit (SITU) Troop 9 Odessa, Master Cpl. NCOIC -- Supervisor

- From 1999 to 2001 served with the Governor's Task Force, Delaware State Police Troop 4 Georgetown, Assistant Non Commissioned Officer In Charge

- From 2001 to 8/18/04 Firearms Training Unit Academy Headquarters Dover, DE, Firearms Training Officer.

**Cpl. Brian Price**

A. Education

- Delaware State Police Training Academy -- September 1985 to December 1985

B. Training

- Marine Corp Recruit Training, Parris Island, SC -- June 1981 to September 1981

- Fleet Marine Corps Communications School -- September 1981 to November 1981

- United State Marine Corps Reserve 4th Combat Engineers -- November 1981 to February 1985

C. Work History:

- Uniformed Correctional Officer, Delaware Correctional Center -- August 1982 to September 1983

- Department of Corrections of Delaware -- July 1982 to August 1982

- Uniformed Patrol, City of Dover Police Department -- December 1983 to September 1985

Martin D. Haverly, Esquire
Re: Price/Warren

October 27, 2005
Page 4

- City of Dover, Delaware Police Department Municipal Class — September 1983 to December of 1983

- Delaware State Police Training Academy — September 1985 to December 1985

- Field Training/Uniformed Patrol 5, Bridgeville, DE — December 1985 to March 1986

- Uniformed Patrol Troop #3, Dover, DE — March 1986 to 1989

- Undercover Operations — 1989 to 1990

- Delaware State Police K-9 Unit — 1990 to 1993

- Uniformed Patrol Troop #3 Dover, DE — 1990 to 1996

- Assistant Shift Commander, assigned to supervise and conduct roll call at shift lineup. Supervised field operations of troopers assigned to the shift.

- Delaware State Police Special Operations Response Team — April 1989 to March 1995

- Delaware State Firearms Training Unit, Smyrna, DE — December 1996 to June 18, 2004

## TRANSFERABLE SKILLS ANALYSIS

The functional definition of transferable skills/worker traits are those that have been obtained through the course of an individual's education/training as well as work history that may be utilized in alternative vocational categories.

The Code of Federal Regulations defines skills transferred as follows: "A person is considered to have skills that can be used in other jobs than those performed previously when the skilled or semi-skilled work activities from past jobs can be utilized to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work."

Martin D. Haverly, Esquire
Re: Price/Warren

October 27, 2005
Page 5

The goal of skills transfer is to identify occupations a person could step into immediately that would require the same amount, or less, training than a person's previous jobs.

Cpls. Price and Warren have years of experience as Delaware State Troopers and in the recent past as Firearms Range Instructors.

Albeit they have suffered a small loss of hearing, they would still be able to utilize the skills obtained from their police training to do other jobs with related required tasks.

These jobs would include working in the Security or Surveillance fields, as a Private Detective or possibly even as a Firearms Instructor for private industry.

## WAGE EARNING CAPACITY/IMPLICATIONS

You have requested that I provide an opinion as to Cpl. Warren's and Cpl. Price's current wage earning capacity once they are forced to leave the Delaware State Police Department. To accomplish the task I have divided this section into several scenarios.

### Scenario #1

It is my understanding that as of 6/18/04 Cpls. Warren and Price were placed on light-duty status. It is also my understanding that the Troopers are only allowed to remain with the De. State Police and/or on light-duty for at least 2 years.

Cpl. Price's date of birth is 1/2/63 (current age 42 years 7 months), which would leave him a substantial amount of time before he would retire at age 55.

Cpl. Warren's date of birth is 5/22/58 (age 47 years 3 months) and his expected age of retirement was also 55.

Had they not been placed in a light-duty assignment and continued with their normal duties they would have continued serving until age 55. Therefore from the time of their termination until their retirement they would not be earning the State Trooper's salary, extra off-duty assignments, nor would they garner full pension benefits that they would have commanded had they retired at their own choosing.

Martin D. Haverly, Esquire                                    October 27, 2005
Re:  Price/Warren                                                      Page 6

## Scenario #2

Once they are dismissed as Delaware State Troopers, they would continue to
have an earning capacity, although lower than the alternative positions I have
researched below.

My research includes data obtained through Delaware State Office of
Employment Statistics (2003 salaries) as well as ERISA's Competitive Salary
Assessor, which provide salary parameters for specific vocational categories
based on a person's geographic location as well as experience.

### A.  Delaware OES Wage Data

1. Firearms Experts/Forensic Science Technicians, 2003 statewide -
   $42,980
2. Private Detective and Investigators, statewide – $30,660
3. Dispatcher/Security Guard, statewide - $32,140
4. Security Guards, statewide - $22,470

### B.  ERISA

1. Sales Manufacturers Rep – at 1 year of experience $33,486
2. Detective - at 1 year of experience $28,907 ($38,721 with 7 years
   of experience)
3. Investigator - at 1 year of experience $28,907
4. Fraud Investigator - at 1 year of experience $31,488
5. Surveillance System Monitor – at 1 year of experience $21,127
6. Armored Car Guard and Driver - at 5 years of experience $26,046,
   at 10 years $30,205

## IMPRESSIONS/OPINION

I have provided a background on the current litigation surrounding Cpls. Warren
and Price's litigation against the Delaware State Police Department for unjustly
removing them from their positions.

I am aware that normally State Troopers are able to obtain additional income by
functioning in off-duty work.  However in this situation since Cpls. Price and
Warren have been removed from regular duty, they may not be eligible for these
extra duty assignments.

Martin D. Haverly, Esquire
Re: Price/Warren

October 27, 2005
Page 7

Insofar as loss of earning capacity, it is my opinion, within a reasonable degree of vocational probability, that although employable outside the Delaware State Police Department, they would not garner the type of salary, benefits or pensions in private employment that they would if they were allowed to continue with the State.

It is my professional opinion that they would be able to earn in the range of $30,000 to $35,000 and the difference between that and their current earnings would be a fair measure of their loss of earning capacity outside the Department for the remainder of years that they had planned on being Delaware State Troopers.

All of the opinions provided in this report have been within a reasonable degree of vocational probability. In addition, should other records become available, I would be in a position to review them and determine if this data impacts my opinion.

Respectfully submitted,

José R. Castro, Jr., MRC, LRC, LPC, CRC, RCC, ABDA

Enclosure(s):       Invoice

B024

*FTOMedical Sub File*



**STATE OF DELAWARE**
**DEPARTMENT OF SAFETY AND HOMELAND SECURITY**
**DIVISION OF STATE POLICE**
P.O. BOX 430
DOVER, DELAWARE 19903

November 21, 2005

Sergeant Christopher D Foraker
155 Oak Hill School Rd
Townsend, Delaware 19734

Dear Sergeant Foraker:

Following your Fitness for Duty evaluation, Dr. Caren DeBernardo from the Forensic and Law Enforcement Services has concluded that you meet the diagnostic criteria for Adjustment Disorder with Mixed Anxiety and Depressed Mood and has deemed you not fit for duty. Therefore as of November 4, 2005, you have been placed on sick leave.

Dr. DeBernardo would like to you to return for an eight-week re-evaluation, at which time we will be contacting you to schedule an appointment. In the meantime, she has recommended that you seek stress and anger management counseling. If you have any questions, please feel free to contact Captain John A. Yeomans, Director of Human Resources at 739-5981

Sincerely,

Colonel Thomas F. Mac Leish

Colonel Thomas F. Mac Leish
Superintendent

TFM:lcm



*FTU -*
*Price Medical*
*File*

STATE OF DELAWARE
DEPARTMENT OF SAFETY AND HOMELAND SECURITY
DIVISION OF STATE POLICE
P.O. BOX 430
DOVER, DELAWARE 19903

November 21, 2005

Master Corporal B. Kurt Price
91 Dodge Drive
Smyrna, Delaware 19977

Dear Master Corporal Price:

Following your Fitness for Duty evaluation, Dr. Caren DeBernardo from the Forensic and Law Enforcement Services has concluded that you meet the diagnostic criteria for Adjustment Disorder with Mixed Anxiety and Depressed Mood and Alcohol Abuse (in remission) and has deemed you not fit for duty. Therefore as of November 9, 2005, you have been placed back on a leave status requiring that you utilize your accrued leave. As brought to your attention in a letter dated October 18, 2005, we are now charging your vacation and/or accumulated leave in order for you to remain on paid leave.

Dr. DeBernardo would like to you to return for an eight-week re-evaluation, at which time we will be contacting you to schedule an appointment. In the meantime, she has recommended that you seek stress management counseling. If you have any questions, please feel free to contact Captain John A. Yeomans, Director of Human Resources at 739-5981.

Sincerely,

Colonel Thomas F. Mac Leish
Superintendent

TFM:lem

B026



*FTU - Women*
*Medical Sub-File*

**STATE OF DELAWARE**
**DEPARTMENT OF SAFETY AND HOMELAND SECURITY**
**DIVISION OF STATE POLICE**
P.O. BOX 430
DOVER, DELAWARE 19903

November 21, 2005

Master Corporal Wayne H. Warren
16820 Ketch Court
Lewes, Delaware 19958

Dear Master Corporal Warren:

Following your Fitness for Duty evaluation, Dr. Caren DeBernardo from the Forensic and Law Enforcement Services has concluded that you meet the diagnostic criteria for Adjustment Disorder with Mixed Anxiety and Depressed Mood and has deemed you not fit for duty Therefore as of November 3, 2005, you have been placed on sick leave.

Dr. DeBernardo would like to you to return for an eight-week re-evaluation, at which time we will be contacting you to schedule an appointment. In the meantime, she has recommended that you seek stress management counseling. If you have any questions, please feel free to contact Captain John A. Yeomans, Director of Human Resources at 739-5981

Sincerely,

Colonel Thomas F. Mac Leish
Superintendent

TFM:lem

THE VOICE OF THE NATION'S LAW ENFORCEMENT COMMUNITY

# Inside
### News You Can Use

**28 OVERTIME RULES**
The Department of Labor has issued its long-awaited revisions of the Fair Labor Standards Act. See stories on 28, 61, 64, and 67, including an analysis by a labor law expert.

**70 HOOKED ON PRISON**
A new study reveals information about the growth in prisons and what it means for the local economy.

**67 CORRECTION**
In the May issue, we made an editing error. See page 67 for the correction.

**PLUS . . .**

20   Opinion/Editorial
36   APB's *Believe it or Not*
62   Employment Listings
40   APB & LAPD Event
65   Buyer's Guide
66   Sweepstakes Contest

## Women take command

More women are heading up big city agencies, but some say it won't last

by **Donna Leinwand**
USA Today

With women heading more big-city departments than ever, some say

# American Police Beat

JUNE 2004 VOLUME XI NO. 6 ▸ PRICE $3.50 ▸ www.APBweb.com

BLUE BLOOD

BLUE BLOOD

BLUE BLOOD



Photo by Dave Fitzpatrick

Tom Scotto is stepping down from the top job at NAPO and the DEA of New York City. His tireless efforts and unusual vision have made historic changes on the police union movement throughout the U.S. Story on page 16.

## Drug abuse evolving

Prescription drugs 2nd only to marijuana

by **Mark Nichols**

When the average American thinks about drug dealers, drug abuse and the war on drugs, Rush Limbaugh, Pfizer, and prescription drugs aren't the images that rush to mind.

But according to new research,

CF66

THE VOICE OF THE NATION'S LAW ENFORCEMENT COMMUNITY





# ide

**Can Use**

**\E RULES**
Labor has issued
visions of the Fair
ct. See stories on
cluding an analy-
xpert.

**ON PRISON**
als information
prisons and what
economy.

**TION**
made an editing
r the correction.

editorial
eve it or Not
nt Listings
PD Event
uide
es Contest

# take
# and

re heading
ncies, but
n't last

nd

ting more big city
ever, some say
s turned the cor-
lity. Others fear
male chiefs has

-Cummings be-
e officer in 1977.
s across the na-
up their efforts
— often because
ere under court
ere being threat-

ntinued on page 56

# American Police Beat

JUNE 2004 VOLUME XI NO. 6 ➤ PRICE $3.50 ➤ www.APBweb.com

BLUE BLOOD

EDWARD CONLON

BLUE

BLUE BLOOD

BLUE

A detective with the NYPD has just written what critics are calling the
memoir ever written    he's still on the job. Story on page 50

Photo b

ion Sh    s stepping do
top    t NAPO and the
York    bi  ess efforts
the police union movemor
the     Story on page 16

# Drug ab
# evolving

Prescription dru
marij

by Mark Nichols

# Contaminated shooting range shut down

A recent media tour of the now-closed Delaware State Police indoor firing range illustrated clearly why the facility was shut down. It's a mess.

In addition to the strong metallic odor that hits you in the face upon entering, the range features floors littered with live ammunition and other dangerous items and there are flammable materials stored in the same area where live rounds were fired. Worst of all is the state of the once "state of the art" bullet-trap, now partially submerged in a sludge-like substance from bullet fragments and other waste.

Delaware's Secretary of the State Department of Administrative Services, Gloria W. Homer, led the tour along with State Police Superintendent Col. L. Aaron Chaffinch and his administrative officer, Maj. Paul Eldrich. Robert Furman, director of the Facilities Management Division, was also along for the bumpy ride.

"We are not responsible for the cleanup of the range," Mr. Homer told the media before the tour started.

"There are several areas that are contaminated here. We don't know how contaminated it is, so you enter at your own risk. A lot of the contaminants are airborne, but we are

unclear if they're at acceptable levels," Mrs. Homer warned the group.

Based on the fact that officers who spent time training at the range suffered headaches, nosebleeds and sore throats, the levels weren't acceptable before the complaints forced the facility to shut down operations.

Delaware State Police Capt. Gregory A. Warren, training director for the agency, met with the media last March after the

**"We don't know how contaminated it is, so you enter at your own risk."**

range was closed. He said that the range had become contaminated with high levels of lead, copper and zinc.

Col. Chaffinch said that he had visited the range for a staff shoot in the fall and things had been a lot better in terms of clean-up and maintenance. Things weren't perfect, but the range wasn't in the state it is now.

"There was some discoloration in the bullet trap but that was about it," Col Chaffinch said as the group moved through the facility.

"It's a lot dirtier now. The previous sergeant in charge did a good job. Things changed in December

when another sergeant came in. That's at least a portion of where the ball was dropped," Chaffinch said.

The previous sergeant was one by Col. Chaffinch in April of 2002 to replace Sgt. Christopher D. Foraker as range supervisor. Sgt. Foraker sued the Col. successfully in District Court last year and got his position back by court order. At issue in the range's deterioration, according to Col. Chaffinch, was the difference in the way the two sergeants approached their duties as range master.

"Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning. Sgt. Ashley was willing to do that." Chaffinch told the Delaware State News in an interview.

"I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel that cleaning was part of his purview. He felt that was putting him in harm's way."

Sgt. Foraker was not allowed to talk with the media on the subject, but

his lawyer said that his client was not to blame.

"Col. Chaffinch is the leader of the state police," said Sgt. Foraker's attorney Thomas S. Neuberger. "He should be outraged. But instead of leading the charge, he is leading the cover-up. The state and Col. Chaffinch will be held fully accountable."

## Overworked dogs

As a result of the recent train bombings in Spain, Madrid's police dogs and their trainers are so overworked that the dogs are losing their ability to detect bombs, according to a police union official.

According to Spanish authorities, Madrid has received an average of 15 bomb threats a day since the train bombings that killed 191 people. Jose Canales, an officer with the Federal Police Union, explained. Before the bombings there had been just one or two threats a day.

"We have dogs. What we need are trainers," Canales said. "Without the trainers, the dogs can't perform. The dogs need one day of training for every two days on duty or five hours of training for every one hour of work." There are around 65 police dogs in Madrid, but there are only 27 trainers.



## Introducing...

### The Next Revolution in Radar!

NEW!

CF68

Intermark
3232 Griggs Drive
Boothwyn, PA 19061

October 28, 2005

Martin D. Haverly, Esq.
2 East 7th Street
Suite 302
Wilmington, DE 19801

RE: <u>Sgt. Christopher D. Foraker</u>
    **Preparation of Expert Report**

Dear Mr. Haverly:

In response to your July 25, 2005 letter request, I offer the following Export Report.

<u>Qualifications</u>

I have spent over thirty years in the firearms business in various capacities as detailed in the attached resume. Particular emphasis has been in the marketing programs of major firearms corporations, i.e. Remington Arms Co., SigArms, O. F. Mossberg & Sons, Savage Arms, Inc., Smith & Wesson Corporation and Heckler & Koch. Each of these companies has specific divisions dealing with the development, manufacture, marketing and sale of law enforcement firearms and related products. In practically every position in which I have served, I have been directly involved with the hiring of key personnel for various position within the company. The work I have done as well as the experience gained over my career qualifies me as an expert witness (See resume attached).

My expertise will be use to identify:
- The likelihood that an individual might be hired in the firearms industry;
- How that individual might progress within the firearms industry;
- Typical compensation that would accompany these positions.

<u>Job Market Situational Analysis</u>

To better understand positions available and current hiring practices, I will use the Remington Arms Co. and Smith & Wesson Corp. as examples.

Remington is the U.S. leader in pump-action shotguns sold for law enforcement and home defense purposes. The Remington Model 870 pump-action shotgun has, for over thirty years, been considered the standard carry shotgun for most law enforcement and government agencies in the U. S. Regardless of that dominant position, law enforcement products account for less than 5% of Remington's $200million annual firearms' sales. Under the guidance of the Vice President and General Manager of Firearms, the Manager of Law Enforcement Sales is also located at Remington's headquarters in Madison, North Carolina. The Law Enforcement

Department consists of the Manager and an Order Services' Specialist to enter orders. Additionally, five company field force representatives cover the U.S. law enforcement market sales' territories. The five representatives and Manager of Law Enforcement Sales provide feedback and competitive information to the Vice President and his staff in order to develop and maintain competitive products for the law enforcement market.

Smith & Wesson Corp is the leading U.S. manufacturer of revolvers and autoloading pistols. Less than 15% of Smith & Wesson's total sales are law enforcement firearms. Their marketing hierarchy is very similar to Remington's. A Senior Product Manager directs all of the marketing research development efforts for all business segments, including law enforcement. Sales' initiatives are guided by three sales managers – the Eastern, Midwest and Western Directors of Law Enforcement Sales. They are company employees, and manage independent reps' groups throughout the U.S. These Managers, along with an International Sales Manager, provide feedback and competitive product knowledge to strategize new product development and assess the competitiveness of current offerings. The Sales Manager usually does hiring for the Sales positions. He receives resumes either through classified advertisements or personal contacts within the industry. Candidates considered for selection are usually brought into the home office and interviewed. Those that would qualify are usually given background checks and then called for a follow-up interview prior to selection. In Chris Foraker's case, the background checks would most certainly reveal the negative articles printed about him.

The hiring of Director level positions has been handled internally in recent times. Because the firearms industry is relatively small, candidates are usually industry people that have worked for major companies within the industry and have been recruited away. However, this recruiting can, and has included candidates from law enforcement and government agencies outside the firearms' industry. Candidates are usually brought in after their resumes have been scanned. They go through a series of five interviews and are evaluated in terms of people skills, background, experience, product knowledge, industry knowledge, contacts within the industry, etc. If the interview is positive, a full background check is initiated to confirm the viability and credibility of the candidate.

As a side note, should a VP level position become available, candidates are generally recruited utilizing an outside agency. In recent times, the agency most used has been the Spencer Stuart firm. They screen the resumes, perform the background checks and then present only the viable candidates to senior management for final selection.

Most major firearms' companies conduct and/or attend law enforcement, governmental agency shows and exhibitions. It is at these shows where industry sales representatives, marketing personnel and other company employees develop relationships with individuals like Chris Foraker. These relationships are built over a period of time and provide a basis for potential employment positions within the industry. These trade shows, along with the rep sales' calls, constitute the primary interaction between the firearms' industry and law enforcement, military and government personnel.

It is the writer's opinion that the Smith & Wesson and Remington Arms scenarios provide a clear insight into the hiring practices currently used within the firearms' industry today. Listed below are some general observations that the industry utilizes to make hiring decisions:

➢ Firearms' companies generally promote from within, whenever possible. It allows the company to install a candidate that is a known commodity and significantly eliminates

2

the down-time required to get a candidate up to speed with regard to product knowledge, customer base and overall company policy and operation.

➢ Hiring from the outside for most manufacturers is usually limited to field sales, product management positions or training.

➢ Good positions are limited within the industry. The only notable exception among the large companies is SigArms. Due to a change in ownership, many changes in senior management and the expansion into new product categories, Sig has hired a number of new employees for training, field sales and market product positions in the last eight years.

## Compensation Analysis

Entry level positions in field sales, product management or training within the law enforcement segment of the industry start at approximately $55,000 annually. Additionally, compensation sometimes includes a company car or auto allowance, 401K/pension fund, health and life insurance. Some offer bonus compensation as high as 20% if performance, sales goals, or overall corporate performance is attained. An industry bonus average for these positions would be in the 10% range. I would expect that Chris Foraker would receive compensation in this range plus at least a 10% bonus. Additionally, it is my opinion that Chris would rise within the next 5-10 years to the level of Sales Manager. Compensation at this level would be in the $65,000-$75,000 range plus at least a 10% bonus.

Senior marketing level Director or VP positions in the firearms' industry is very limited. Compensation can be as high as $90,000 +, annually, plus bonuses in the 20% range. I believe it could be attainable from an entry-level position, given a greater than 10-15 year career span. I know of no one with Chris' level of experience that has been directly hired into a Director or VP position of this level.

Law enforcement training positions offer a broader flexibility in terms of compensation and specific assignments. There are entry-level positions for basic training personnel, with salary expectations of $45,000-$55,000 a year. Additionally, there is usually a Director/Manager level position with compensation of $50,000-$60,000. I am confident that Chris Foraker would qualify for an entry level training position and have the ability to advance to Manager within a 5-10 year period. It should be noted that positions in law enforcement training are fewer than Sales or Marketing positions and are not as often available.

## Conclusion

Based on Chris Foraker's resume and my personal interaction with him, I assessed him to be a prime candidate for a position with a firearms' manufacturer or industry related company. When I met with Chris in 2002, relative to his first lawsuit against Col. L. Aron Chaffinch and the Delaware State Police, I was impressed with his background regarding firearms' operation, function, usage, product knowledge and training expertise. I thought Chris would be an asset to a firearms industry company and that, at that time, a transfer out of training to another department would not negatively impact his future plans for a position within the firearms' industry. Based on my interview with Chris at that time, I did not think that his future in the firearms industry had been jeopardized. Chris' overall personal appearance, demeanor, industry knowledge and presentation skills clearly demonstrated his future potential. I would expect that Chris Foraker would be hired in the firearms industry for either entry-level sales or a training position, absent the negative publicity.

3

More recently, it is the writer's opinion that the adverse publicity regarding the closing of the Delaware State Police Range has severely damaged his ability to be hired by a major company in the firearms' industry. I believe the words "severely damaged" are correct and appropriate for Chris' situation. Numerous articles published regarding the Delaware State Police Range in Smyrna, (i.e., "American Police Beat", a publication read by every major law enforcement agency in the United States, the Delaware State News, and The News Journal), implicated Sgt. Foraker as the person solely responsible for the environmentally unsafe condition of the range and its eventual closing. These articles, appearing over an extended period of time, and being read by so wide an industry audience have undoubtedly cast suspicion on Sgt. Foraker's ability to manage and operate a range. There is no question that, given several candidates with backgrounds and experience comparable to Chris, those charged with hiring would eliminate Chris from consideration, fearing the "excess baggage" accompanying his candidacy.

The opinions expressed in this report are true and correct within a reasonable degree of certainty based on the hiring practices currently used by the major manufacturers in the U.S. firearms industry.

If you have questions, require additional information or clarification, I am available at your convenience.

Very truly yours,
INTERMARK


Bud Fini

4

B034

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on February 8, 2006, I electronically filed this **Appendix** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

Conley/ Appendix/ Foraker -FTU - SJAB Appendix