**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CORPORAL B. KURT PRICE; | : | |
| CORPORAL WAYNE WARREN; and | : | |
| SERGEANT CHRISTOPHER D. FORAKER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A.No.04-956-GMS |
| | : | |
| COLONEL L. AARON CHAFFINCH, | : | |
| individually and in his official capacity as | : | |
| Superintendent of the Delaware State Police; | : | |
| LIEUTENANT COLONEL THOMAS F. | : | |
| MACLEISH, individually and in his official | : | |
| capacity as Deputy Superintendent of the | : | |
| Delaware State Police; DAVID B. MITCHELL, | : | |
| in his official capacity as the Secretary of the | : | |
| Department of Safety and Homeland Security of | : | |
| the State of Delaware; and DIVISION OF | : | |
| STATE POLICE, DEPARTMENT OF SAFETY | : | |
| AND HOMELAND SECURITY, STATE OF | : | |
| DELAWARE, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT ON COUNTS I AND II**

| | |
|---|---|
| **THE NEUBERGER FIRM, P.A.** | **MARTIN D. HAVERLY, ATTORNEY** |
| **THOMAS S. NEUBERGER, ESQ. (#243)** | **AT LAW** |
| **STEPHEN J. NEUBERGER, ESQ. (#4440)** | **MARTIN D. HAVERLY, ESQ. (#3295)** |
| Two East Seventh Street, Suite 302 | Two East Seventh Street, Suite 302 |
| Wilmington, DE 19801 | Wilmington, DE 19801 |
| (302) 655-0582 | (302) 654-2255 |
| TSN@NeubergerLaw.com | Martin@HaverlyLaw.com |
| SJN@NeubergerLaw.com | |

Attorneys for Plaintiffs

Dated: February 17, 2006

**TABLE OF CONTENTS**

ARGUMENT................................................................................................................................1

    I.    PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED SPEECH
        BY SPEAKING OUT ABOUT THE PROBLEMS AT THE FTU, AND THAT
        SPEECH WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE
        RETALIATION AGAINST THEM................................................................................1

        A.    Protected Activity...................................................................................1

                1.    Matter of Public Concern.........................................................1

                2.    Balancing of Interests..............................................................2

        B.    Substantial or Motivating Factor...........................................................2

                1.    Plaintiffs Suffered Adverse Action..........................................2

                2.    Plaintiffs' Protected Activity Was a Substantial or Motivating
                      Factor in the Retaliation Against Them....................................3

                       a.    Disparate Treatment.....................................................4

                           (1).    The DSP Always Accommodates.................................4

                           (2).    The Comparators..........................................................7

                             (3).    The Light Duty Letters...................................................9

                             (4).    Summary.......................................................................10

                     b.    The Wealth of Other Causal Evidence.......................10

        C.    Same Decision Anyway Affirmative Defense.....................................10

    II.    PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING
        OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES AND THEIR
        PETITIONING WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE
        RETALIATION AGAINST THEM..............................................................................12

ARGUMENT CONCLUSION......................................................................................................12

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

Adkins v. Rumsfeld, 389 F.Supp.2d 579 (D. Del. 2005)...................................................................1-2

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003)...........................................................................1-2

Charpentier v. Godsil, 937 F.2d 859 (3d Cir. 1991)........................................................................11

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005)......................................................................3

McGreevy v. Stroup, 413 F.3d 359 (3d Cir. 2005)...........................................................................2

Miller v. Cigna, Corp., 47 F.3d 586 (3d Cir. 1995) (en banc)..........................................................3

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)...............................................6

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc).............6

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000)........................................................................2-3

Village of Arlington Heights v. Metropolitan Hous. Develop. Corp., 429 U.S. 252 (1977).......5

Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995).....................................................................2


**Constitutions and Rules**

U.S. Const., Amend. I....................................................................................................passim

Fed.R.Civ.P. 8(c).....................................................................................................................11

*ii*

<u>ARGUMENT</u>

I.    **PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED SPEECH BY SPEAKING OUT ABOUT THE PROBLEMS AT THE FTU, AND THAT SPEECH WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION AGAINST THEM.**

    **A.  Protected Activity.**

        **1.  Matter of Public Concern.**  Defendants do not seriously contest that plaintiffs' speech about health and safety is a matter of paramount public concern.  Instead, they begrudgingly acknowledge that "complaints that the range conditions presented a danger to state troopers and law enforcement agents from other agencies have a public component and are protected under the First Amendment."  (DAB at 10).[1]  However, defendants claim that any speech by plaintiffs that they themselves, personally were being poisoned and contaminated are instead matters of purely personal interest undeserving of First Amendment protection.  (See DAB at 10 - noting that "all this speech is probably not protected.").

    Yet as discussed in plaintiffs' opening brief (POB at 28-29), both Third Circuit and District of Delaware law squarely hold to the contrary.  In <u>Brennan v. Norton</u>, 350 F.3d 399, 415 (3d Cir. 2003), the Third Circuit was decidedly unimpressed by and flatly rejected a similarly weak claim that speech addressing health risks in the work place did not touch on a matter of public concern because only those public employees were affected.

> [W]e are not impressed by the "limitation" that "only" firefighters may be harmed by the presence of asbestos in the firestation . . . Residents of the Township clearly had an interest in knowing that their tax dollars were being spent on an asbestos contaminated firestation that endangered the health and lives of its firefighters.  *This is such a basic proposition that we need not belabor the point.*  Quite simply, the statements regarding exposure of public employees to hazards such as asbestos can be fairly considered as relating to a matter of concern to the community.

<u>Id.</u> at 415 (internal punctuation omitted) (emphasis added); see <u>Adkins v. Rumsfeld</u>, 389

---

[1] All references to "POB" are to Plaintiffs' Summary Judgment Opening Brief.  References to "PAB" are to Plaintiffs' Summary Judgment Answering Brief.  Similarly, references to "DOB" are to Defendants' Summary Judgment Opening Brief and references to "DAB" are to Defendants' Summary Judgment Answering Brief.

F.Supp.2d 579, 586 (D.Del. 2005) (speech by an Air Force sergeant to his Flight Surgeon questioning whether his serious health problems were caused by exposure to a tainted anthrax vaccine was protected); McGreevy v. Stroup, 413 F.3d 359 (3d Cir. 2005) (speech by a school nurse addressing unlicensed pesticide spraying that caused students and teachers to become ill was protected); Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995) (police department employee who spoke about problems with health services designed to aid police officers was protected). The defense claims that such speech is only a matter of private concern is without merit.[2] Accordingly, it is clear that plaintiffs' speech was clearly on a matter of public concern.

    **2. Balancing of Interests.** Defendants also fail to offer any weights on the scale for the Pickering balancing. Thus, as discussed in plaintiffs' opening brief, it is clear that defendants have waived any disruption or balancing defense. (POB at 31-32). Accordingly, plaintiffs' speech up the chain of command and to the State Auditor is clearly protected by the free speech clause of the First Amendment.

    **B. Substantial or Motivating Factor.**

    **1. Plaintiffs Suffered Adverse Action.** As discussed in great detail in plaintiffs' earlier briefs, the record is overflowing with evidence that plaintiffs' suffered from numerous forms of retaliatory conduct sufficient to chill persons of ordinary firmness from exercising their First Amendment rights. (PAB at 15-20; Foraker AB at 3-14). The defense efforts to try to view individual instances of adverse action in isolation are insufficient under the case law which recognizes that liability also may be established "based upon a continuing course of conduct even though some or all of the conduct complained of would be *de minimis* by itself or if viewed in isolation." Brennan, 350 F.3d at 419 n.16; see Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000) (noting that what is "trivial in detail may have been substantial in gross").

_____

    [2] Additionally, defendants do not challenge plaintiffs' noble motives or the media interest, legislative interest or other public concern considerations. (See POB at 29-31).

2

Thus this defense effort, like all the rest, is plainly without merit.[3]

       **2. Plaintiffs' Protected Activity Was Substantial or Motivating Factor in the Retaliation Against Them.** The law in this regard is discussed in plaintiffs' earlier briefs. (See PAB at 20; POB at 32). However, it appears that defendants misunderstand this law. It is not plaintiffs' burden to prove 'but for' causation. Suppan, 203 F.3d at 236. Instead, plaintiffs need only demonstrate that their protected activity was a "substantial" or "motivating factor" in the relevant decision. Id. at 235. "'Substantial factor' does not mean 'dominant' or 'primary' factor." Hill v. City of Scranton, 411 F.3d 118, 126 n.11 (3d Cir. 2005). Instead, a plaintiff need only show that his protected First Amendment rights "played any substantial role in the relevant decision." Suppan, 203 F.3d at 236; see Miller v. Cigna, Corp., 47 F.3d 586, 597 n.9 (3d Cir. 1995) (en banc) ("played a role" in the adverse decision).

       All plaintiffs have to do is demonstrate that their speech played a substantial role. Not the only role. Not the but for role. Not the determinative role. Not the dominant role. Not the primary role. Just a substantial one. And in light of the overwhelming record evidence in this regard discussed at length in plaintiffs' earlier briefing - ranging from overt hostility and antagonism, to temporal proximity, to violations of numerous rules, practices and procedures, selective enforcement of policies, disparate treatment and singling plaintiffs out and all the rest of the causal evidence, it is clear that, at the very least, plaintiffs' protected speech played a substantial role in the adverse actions being taken against them. No reasonable jury could conclude otherwise. That is plaintiffs' burden and they have clearly met it.

       In addition to the numerous categories of evidence discussed by plaintiffs in their earlier

---

   [3] The defense claim that defendant Chaffinch never blamed plaintiff Cpl/3s Price and Warren for the problems at the FTU (DAB at 11), is equally without merit. It is understood throughout the DSP that defendants, although only blaming Sgt. Foraker by name, also were leveling blame and fault at the rest of the Troopers at the FTU - attacking plaintiffs Price and Warren. Plaintiff Price and Warren certainly understood Chaffinch to be attacking them and their competence and integrity in performing their duties. (See, e.g. Price Inter. #3 p.12, 10, #17; A2277, 2275, 2305-06).

briefing, plaintiffs note the following.

         **a. Disparate Treatment.**  Defendants make much of the fact that plaintiffs Price and Warren have suffered from some hearing loss and then continue and rest on the unfounded claim that, of course defendants were acting solely to protect the citizens of Delaware from injured police officers.  (DAB at 27).  Yet this simplistic approach ignores the voluminous record evidence of disparate treatment and selective enforcement of policies and practices that this case has revealed.

         **(1). The DSP Always Accommodates.**  As testimony from numerous high ranking police officers and other officials with extensive experience in the DSP personnel function reveals (these witnesses include Major Baylor, Mr. Dillman and Capt. Yeomans, among others), in addition to running away from hearing issues, the DSP accommodates injured Troopers. (POB at 16-19; PAB at 27-32).  The DSP makes every effort to take care of their own, all the more so when their own are injured in the line of duty as plaintiffs have been.  Historically, the DSP does not throw their injured Troopers onto the trash-heap. Instead, they make every effort to accommodate them by finding internal DSP jobs where those officers' physical limitations will not interfere with the performance of their duties.  (POB at 17, 20-21).[4]  Although it is clear that defense counsel do not like this historic practice and find it exceedingly unhelpful in defending their clients' unprecedented actions, it cannot be backhanded and ignored.

         Thus, the existence of some minor hearing loss is irrelevant.  The DSP accommodates Troopers with hearing loss (and those with even more serious physical injuries) and finds

---

    [4]  For example, as to Capt. Citro who suffered serious permanent injuries to back and neck that prevented him from even taking the required physical fitness tests, Dillman testified that he was accommodated "because our policy was to accommodate wherever we could," despite even permanent injuries, especially when the Trooper has  "highly specialized skills that were very important to the department" and his duties did not include the patrol function, much like plaintiffs with their highly specialized skills in force and tactical training and firearms instruction in our present case.  (Dillman 45-47,66-69,92-97; A2421-23,2442-45,2468-73).  (See POB at 21-22).

internal jobs for them to perform, and when the extent of such injuries prevents a Trooper from even performing such internal jobs, they are then given at least two years of light duty, at the conclusion of which they must retire. Each of which - accommodation and two years of light duty - have been denied to plaintiffs. As to accommodation, Major Baylor had operational command and control for New Castle County during the relevant time period of our case. (Baylor 5, 44; A240,250). He listed dozens of such positions where Troopers with hearing injuries can be placed and accommodated, in accord with the DSP's longstanding historical practice. (Baylor 55-85, 118-19; A253,260,269). Similarly, the record evidence discussed in plaintiffs' earlier briefing demonstrates that defendants have refused to give plaintiffs two years of light duty, and only this past fall temporarily suspended their order that they must retire.

The repeated defense mantra that it is plaintiffs who originally asked for hearing testing is meritless. (See, e.g. DAB at 6). Although *argumentum ad nauseam* or argument from repetition may be an effective technique used by politicians and by those interested in brainwashing, false proof of a statement by prolonged repetition does not work in a Court of law where all determinations are made based upon the evidence in the record. As repeatedly discussed in plaintiffs' own Opening and Answering Briefs (with supporting record cites), plaintiffs only requested blood and urine testing to determine the levels of lead and other heavy metals they were being exposed to at the FTU. (Foraker Decl. ¶¶ 4-7; Price Inter. #12 p.36; A2987,2301) (see PAB at 34; POB at 15). They did not request hearing tests. (Id.). As the 25 year former Director of Personnel for the DSP testified, if a trooper requested blood tests to address lead and heavy metal exposure, the DSP would not also send them for hearing tests. If in fact this was done, it would be "unusual." (Dillman 149-151, 159, 157-58, 3-5,110-13; A2525-27,2535,2533-34,2379-81,2486-89). And it is defendants' unusual actions in violation of historic DSP practices and procedures that give rise to a causal inference of retaliatory motive. See Village of Arlington Heights v. Metropolitan Hous. Develop. Corp., 429 U.S. 252, 267 (1977).

Additionally, this repeated false defense claim is further evidence of defendants' guilt.[5]

Similarly, the repeated defense attack on plaintiff Warren also is without merit. Master Corporal Warren did not ask to be declared unfit for duty. Instead, after the DSP doctor found him to be fit for duty, instead of accommodating him, defendants threatened to put him back out on patrol as a road trooper or back on the front lines of the SORT team where optimal hearing is paramount.[6] As Master Corporal Warren explained at his deposition, he was afraid that in such a capacity, he would endanger his comrades due to his hearing loss. He testified that he was fully able to come off of light duty, ready to be assigned within the force and serve the DSP, but that he did not feel he could safely perform certain duties such as road trooper. He was ready to serve, but asked to be placed into one of the many positions where his hearing loss would not impact on the performance of his duties. He just "wanted to be accommodated as a lot of other troopers are in the [DSP] who have injuries." (W. Warren 195-97, 191-94; A1437-38). This is the overall context that defendants have neglected to discuss.

In the same way, the defense assertions that plaintiff Price claims that he is unable to serve as a Trooper are similarly deceptive. Master Corporal Price instead testified that he did not believe he could serve as a road trooper, but for example, DSP doctors told him he could continue to serve as a firearms instructor. (Price 16, 170; A1264,1303). There are "plenty of places that they could put me and accommodate me like they have done in the past with other troopers" such as an instructor at the Academy. (Price 170; A1303). Again, defendants neglect

---

[5] See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1069 (3d Cir. 1996) (en banc) ("Resort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct."); id. ("We routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful [retaliation]."); Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) (it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.").

[6] Plaintiffs note that threatening to put a 23 year veteran Trooper like Cpl/3 Warren back on shift-work and back out on the front-lines of patrol after more than two decades of already serving in such a front-line capacity, is an independent threat to a trooper, irrespective of any hearing loss.

to mention this and instead try to paint these decorated and dedicated Troopers as lazy malingers.

**(2). The Comparators.**  As to the repeated defense claim that none of the light duty and accommodation comparators are appropriate for comparisons because few were sent for fitness for duty exams or otherwise examined in depth as plaintiffs were, this argument makes plaintiffs' disparate treatment case.  It is the fact that these other Troopers had severe physical limitations, and yet the DSP did not dig into their medical problems, send them for numerous medical tests and run them out of the Division, that makes them such apt comparators.

Major Forester had hearing problems for approximately 20 years, yet even with the use of a hearing aid, the testimony reveals that it was perceived by those around him that he still could not hear his fellow officers talk - yet he was not run out.[7]  Instead, he was accommodated and allowed to retire in due course.[8]

Capt. Citro could not even perform the yearly required physical fitness tests due to his severe injuries - yet he was not run out.  Instead, he was accommodated for many years, before finally being given two years of light duty when he could be accommodated no more.

Sgt. Swain cannot vocally communicate, making him an excellent comparator for plaintiffs who suffer from some hearing loss.  The defense claim that plaintiffs are not aware of the extent of Sgt. Swain's injuries are without merit.  Plaintiffs train and communicate with every Trooper, at least three times a year as part of the tri-annual firearms certifications.  Plaintiff Price testified that he has trained Sgt. Swain and has personal knowledge of his inability to speak and communicate as well as the severe car accident that resulted in his injuries. (Price 171; A1303).  Similarly, in response to defense challenges to how he knows about the extent of Sgt. Swain's

---

[7]  By way of comparison, plaintiffs sat through days of grueling deposition examination at the hands of defense counsel and yet had no problems hearing the questions posed.

[8]  Plaintiffs' own doctors tell them that they are simply not candidates for hearing aids.  Their hearing is not that bad.  (Price 139; A1295).

injuries, in plaintiff Warren's words, "from personal observation I know he can't speak that well."
(W. Warren 200; A1439). Defendants rely on Major Papili's testimony in this regard, claiming
that Swain has "no problems performing the duties required of him." (DAB at 21).[9] But as Major
Papili testified in the very pages cited by defendants, he was trying very hard "not to be
judgmental" when discussing Swain's limitations. (Papili 76; A1839). Swain is "hard to
understand at times." (Id.). "You have to be attentive and try to listen to what he's trying to say"
because as a result of the accident, he now has "a different voice, a different speech pattern."
(Id.). Papili's testimony instead clearly supports plaintiffs.

As to the defense claim that plaintiffs are receiving two years of light duty so they are
not being singled out (DAB at 19-20) - defendants conveniently ignore their own actions and
words over the last year and a half. As discussed in plaintiffs' opening brief (POB at 19-23),
plaintiffs were originally scheduled to be fired in June 2005 as defendants adamantly refused to
give plaintiffs two years of light duty.[10] Even at their depositions last summer, MacLeish and his
underlings testified at length as to the reasons why they would **not** give plaintiffs two years of
light duty. (POB at 22-23).[11] The fact that plaintiffs eventually forced defendants to back off
during discovery and defendants temporarily rescinded their retirement order and have left

---

[9] Plaintiffs also would have no problem performing the duties of an evidence technician. In fact,
they are ready, willing and able to be assigned as evidence technicians, desk officers, court liaison
officers or any of the other jobs identified by Major Baylor and are more than willing to serve in them for
the many years that Swain has been accommodated and served as such.

[10] Plaintiffs note that the retaliatory defense refusal to give them two years and instead
repeatedly and callously telling them to pack their bags and get out - in and of itself - has caused severe
injuries to plaintiffs and was a significant factor in their psychological tailspin that resulted in their
ultimately being declared unfit for duty for psychological reasons this past fall. Thus, despite the fact
that the firing order has been temporarily lifted, the long existence and repeated threatened enforcement
of that order independently caused plaintiffs severe injuries.

[11] Defense reliance on the light duty policy as written for their justification for this decision is
misplaced. As Major Baylor testified, the policy as written is different from the historic DSP practice
when it comes to giving Troopers at least two years of light duty. (Baylor 273-77, 281-82; A330-33).
The historical practice is to always give them those two years, despite whatever the written policy says.
(Id.). In other words, the written policy has never been followed. Accordingly, belated defense reliance
upon it is misplaced.

plaintiffs dangling on a string since that time, with no word one way or the other, does not take away from the evidentiary impact of defendants longtime refusal to give them two years.

Plaintiffs all are long time, 20+ year veterans of the DSP. They have served with numerous Troopers over those many years. Additionally, as firearms instructors, they have trained and instructed every Trooper to have served in the DSP since and even before the FTU opened in 1998. They are familiar with the universe of Troopers and the injuries that are accommodated by the DSP. Plaintiffs are not asking for special treatment. Instead, they simply want "to be accommodated as a lot of other troopers are in the [DSP] who have injuries." (W. Warren 196; A1438). Plaintiffs want "the same treatment as other troopers" before them. (W. Warren 199; Price 173; A1439,1303). This is what they have done "in the past. They have set a precedent." (W. Warren 209; A1441).

**(3). The Light Duty Letters.** Defendants also claim that somehow plaintiffs deviously requested that they receive light duty letters. (DAB at 17). The record cited by defendants for this proposition, does not support it. Both Capt. Yeomans' testimony and the e-mail cited by defendants instead demonstrate that plaintiffs' supervisors, from Lt. Davis up to Major Hughes wanted clarification as to what specific restrictions had been imposed, so apparently light duty letters were sent out as a result. How their supervisors' concerns in this regard somehow reflect on plaintiffs or how this demonstrates that plaintiffs requested the letters is a mystery.

As to the defense claims that Mr. Dillman testified that in general the letters plaintiffs received were not "unusual," (DAB at 17), Dillman also testified that these types of letters "were more often not used" to place a trooper on light duty. (Dillman 170; A2546). Continuing:

> Q. Under your tutelage in the personnel function do you ever remember sending a light duty letter to a trooper who had hearing issues and suspending his oath of office?
>
> A. No.

(Dillman 171; A2547). In light of this and several other factors, Major Baylor testified that the

9

letters plaintiffs received were in fact unusual.  (Baylor 151-52; A277).  And as discussed in plaintiffs' opening brief, both Dillman and Baylor testified that suspending the police powers of an officer who is on light duty due to injuries and not due to alleged criminal wrongdoing is inappropriate.  (POB at 19-20).[12]

> **(4).  Summary.**  To the extent defendants' claim that other comparators are not comparable, plaintiffs rely upon their earlier briefs, and the medical records and surveys discussed therein.  Moreover, the historical fact that the DSP has never run a trooper out of the division as a result of hearing loss - as demonstrated by Major Forester and Cpl. Powell (an officer who MacLeish admits could not hear a word that was spoken to him) - has independent evidentiary value.  Similarly, the DSP's historic practice of bending over backwards to accommodate injured Troopers also has such value.  Two long time historic practices were violated when it came to plaintiffs.  In light of the abundant record evidence of defendants' hostility towards plaintiffs and their motives to retaliate, their self-serving denials of knowledge as to how things were done in the past when they were still managers can be disbelieved and retaliatory motive inferred.

> **b.  The Wealth of Other Causal Evidence.**  The wealth of other causal evidence is discussed and analyzed in great detail in plaintiffs' earlier filed briefs.

> **C.  Same Decision Anyway Affirmative Defense.**  Defendants allege that they are permitted to belatedly assert their affirmative defense at the summary judgment stage.  (DAB at 23-26).  But as the Third Circuit law cited in plaintiffs' opening brief makes clear, such belated amendments are <u>not</u> permitted when the plaintiff is prejudiced by such a late addition.  <u>See</u>

---

[12]  Defense citation to a 1992 letter sent to an injured trooper being brought up on disciplinary charges for shooting himself is unavailing.  (DAB at 17).  The existence of a such a letter being sent to an officer who shot himself and faced disciplinary action for doing so (<u>see</u> A3806 - Sealed Volume of Plaintiffs' Appendix in Support of their Motion for Summary Judgment), does not get around the record testimony that it is highly unusual and inappropriate to suspend the police powers of an officer who was simply injured in the line of duty, with no disciplinary overlay.

Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991).

In our present case, the prejudice is clear.  Because defendants never asserted their Mt. Healthy affirmative defense, plaintiffs never took discovery on the issue.  Plaintiffs did not inquire into what defendants would have done anyway or the usual line of questioning designed to explore such situations.

The defense claim that the affirmative defense was so central to the case that plaintiffs should have been able to read defendants' mind in this regard reveals too much.  (DAB at 24).  If it was so central, it should have been asserted.  Indeed, as revealed by the summary judgment briefing in the companion case, there defendants do not contest that they waived the affirmative defense by not raising it in their Answer.  Yet in an identical situation in our present case, defendants claim that plaintiffs should have magically been aware of their intent in this regard. The defense approach is simply a *post hac* rationalization for their failure to comply with Fed.R.Civ.P. 8(c).

Plaintiffs have taken numerous depositions in this case.  Had defendants raised their affirmative defense, plaintiffs would have deposed those numerous witnesses on this issue.  But because defendants did not assert it, plaintiffs had no need to take such discovery.  And it is this lack of discovery that causes severe prejudice to plaintiffs by the belated defense assertion at this late date.[13]

Similarly, the defense claim that plaintiffs should have conducted 'but for' causation discovery despite their failure to assert their affirmative defense is meritless.  In light of the well established Third Circuit law in this regard, plaintiffs' counsel - who are well versed in the ins and outs of First Amendment retaliation law - are well aware of the fact that proving 'but for' causation is not their burden.  Counsel only set out to prove what the law requires to win their

_____

[13]  The defense claim that plaintiffs were on notice of defendants' assertion because defendants denied plaintiffs' Complaint paragraph in this regard is without merit.  (DAB at 25).  Defendants denied nearly every paragraph in plaintiffs' complaint.  Such blanket denials reveal nothing.

case - substantial or motivating factor.  They do not set out to prove more, and thus unnecessarily drive up the time, costs and expenses involved in litigation in a case which has produced a voluminous and unprecedented discovery record already.

**II.    PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES AND THEIR PETITIONING WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE RETALIATION AGAINST THEM.**

Plaintiffs incorporate by reference the argument contained in their Answering Brief on this issue.  (PAB 9-15).

<u>CONCLUSION</u>

For the above stated reasons, and those set forth in plaintiffs' opening and answering briefs, the Court should grant summary judgment for plaintiffs on liability for their First Amendment speech and petition clause counts and order a trial on damages alone.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**MARTIN D. HAVERLY, ESQ. (#3295)**
**MARTIN D. HAVERLY, ATTORNEY AT LAW**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Dated: February 17, 2006          Attorneys for Plaintiff

12

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

February 17, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

FTU / Briefs / FTU - -SJRB.final

13