IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

B. KURT PRICE, et al.,                    :
                                          :
                  Plaintiff,              :
                                          :        C.A. No. 04-956-GMS
          v.                              :
                                          :
L. AARON CHAFFINCH, et al.,               :
                                          :
                  Defendants.             :


**REPLY BRIEF
IN SUPPORT OF DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**


Date:  February 17, 2006          Noel C. Burnham (DE Bar # 3483)
                                  Richard M. Donaldson (DE Bar I.D. #4367)
                                  Montgomery, McCracken, Walker & Rhoads, LLP
                                  300 Delaware Avenue, Suite 750
                                  Wilmington, DE 19801
                                  (302) 504-7840

                                  *Counsel for Defendants L. Aaron Chaffinch,
                                  Thomas F. MacLeish, David B. Mitchell, and the
                                  Division of State Police, Department of Safety and
                                  Homeland Security, State of Delaware*

2048392v3

# TABLE OF CONTENTS

**Page**

I.  THE PLAINTIFFS ADMIT TWO CRITICAL FACTS THAT ALLOW THE COURT TO ENTER JUDGMENT IN FAVOR OF THE DEFENSE .............................. 1

    A.  Plaintiffs' Failure To Continue Maintenance At The Firing Range ..................... 1

    B.  Plaintiffs Experienced Injuries That Required Defendants' Response ................. 2

II.  MACLEISH ACTED AS THE STATE POLICE RULES AND PROCEDURES REQUIRED WHEN PRICE AND WARREN PRESENTED HIM WITH EVIDENCE OF PERMANENT INJURY ......................................................................... 3

    A.  Plaintiffs Suffered Injuries That Required MacLeish To Apply The DSP Policy Concerning Injury And Rehabilitation Leave ............................................. 3

    B.  The DSP Injury/Rehabilitation Policy As Written And As Applied .................... 4

        1.  The DSP Does Not Have A Policy Of Running Away From Hearing Problems ............................................................................................ 5

        2.  The DSP Does Not Have A Policy Of Retaining Troopers With Hearing Loss Who Are Not Capable Of Performing As Troopers ........... 6

        3.  The DSP Does Not Have A Policy Of Accommodating Troopers With Other Types Of Physical Injuries ...................................................... 6

        4.  The DSP Does Not Have A Policy Of Giving Troopers Two Or More Years On Rehabilitation Status ......................................................... 8

        5.  Plaintiffs Do Not Have Admissible Evidence Of Their Alternative Practices ............................................................................................. 9

    C.  Plaintiffs Have Misrepresented The Motivation Evidence ................................. 11

III.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY WOULD HAVE TREATED PLAINTIFFS THE SAME WAY, REGARDLESS OF PLAINTIFFS' ALLEGEDLY PROTECTED ACTIVITY ............ 13

    A.  Defendants Have Not Waived Their Mt. Healthy Defense ................................. 13

    B.  The Record Shows That Defendants Would Have Treated Plaintiffs In The Same Way Even If They Had Not Engaged In Protected Activity ..................... 15

IV.  DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE IT WAS NOT CLEARLY ESTABLISHED THAT THEIR ACTIONS COULD BE DEEMED SUFFICIENTLY ADVERSE TO BE ACTIONABLE ................................. 16

V.  PLAINTIFFS DID NOT ENGAGE IN PROTECTED ACTIVITY UNDER THE PETITION CLAUSE OF THE FIRST AMENDMENT ................................................. 17

VI.  CONCLUSION ................................................................................................................. 20

2048392v3

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>CASES</u>

Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997) ................................................................. 18, 19

Anderson v. United States, Civ. A. No. 93-589-MMS,
    1996 WL 490262 (D. Del. Aug. 23, 1996) ....................................................... 13, 15

Aubrey Rogers Agency, Inc. v. AIG Life Ins. Co., 55 F. Supp. 2d 309 (D. Del. 1999).............. 13

Baldassare v. New Jersey, 250 F.3d 188 (3d Cir. 2001)................................................. 16

Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found., 402 U.S. 313 (1971) ........................... 15

Bowman v. City of Middletown, 91 F. Supp. 2d 644 (S.D.N.Y. 2000) ............................ 18

Bradshaw v. Township of Middletown, 296 F. Supp. 2d 526 (D.N.J. 2003) ..................... 18

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003)................................................... 17, 19

California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972) ................... 19

Charpentier v. Godsil, 937 F.2d 859 (3d Cir. 1991) .............................................. 13, 15

Cooper v. Cape May County Bd. of Social Servs., 175 F. Supp. 2d 732 (D.N.J. 2001) .......... 19

Guzman-Ruiz v. Hernandez-Colon, 406 F.3d 31 (1st Cir. 2005) ................................ 13

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005)............................................. 19

Int'l Poultry Processors, Inc. v. Wampler Foods, Inc., No. Civ. A. 98-4612, 1999
    WL 33456488 (E.D. Pa. Apr. 29, 1999) ..................................................... 14

Izquierdo v. Sills, 68 F. Supp. 2d 392 (D. Del. 1999) ......................................... 11, 12

Kleinknecht v. Gettysburg College, 989 F.2d 1360 (3rd Cir. 1993) ............................ 13

McKee v. Hart, --- F.3d ---, No. 04-1442, 2006 WL 27474 (3d Cir. Jan. 6, 2006)............... 16, 17

Safas Corp. v. Etura Premier, L.L.C., 293 F. Supp. 2d 442 (D. Del. 2003) ................... 11

San Fillipo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994) ........................................ 17, 18

Sanderson-Cruz v. United States, 88 F. Supp. 2d 388 (E.D. Pa. 2000) ........................ 14

Shehee v. City of Wilmington, 67 Fed. Appx. 692 (3d Cir. 2003)................................ 13

## TABLE OF AUTHORITIES
(continued)

**Page**

Smith v. Sushka, 117 F.3d 965 (6th Cir. 1997) ............................................................... 15

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000) ......................................................... 16

U.S. v. Lanier, 520 U.S. 259 (1997) ............................................................................... 16

We, Inc. v. City of Phila., 174 F.3d 322 (3d Cir. 1999) ................................................. 19


## **RULES**

Fed. R. Civ. P. Rule 15(a) .............................................................................................. 15

I.    **THE PLAINTIFFS ADMIT TWO CRITICAL FACTS THAT ALLOW THE COURT TO ENTER JUDGMENT IN FAVOR OF THE DEFENSE.**

Despite the extensive briefing and weighty appendices, this case comes down to two material facts.  First, Plaintiffs stopped doing routine maintenance at the indoor firing range, which resulted in foreseeable environmental troubles that led to its closing.  Second, Plaintiffs Price and Warren have suffered hearing loss, which did not affect Plaintiff Foraker's employment, but which, under applicable injury policies, has led Price and Warren to the end stage of their careers with the Delaware State Police ("DSP").

Plaintiffs' attempt to confuse the Court and hide these two critical facts among many others is to no avail because, in the end, Plaintiffs admit that (1) they stopped the maintenance and thereby contributed to the shut down of the range and (2) they suffered hearing loss that demanded a response from the DSP.  Given these undisputed facts, no reasonable jury could find that Defendants Chaffinch and MacLeish were motivated to act by a retaliatory intent or that they would have acted differently if Plaintiffs had not engaged in protected activity. Accordingly, Defendants are entitled to summary judgment on Plaintiffs First Amendment retaliation claims.

A.    **Plaintiffs' Failure To Continue Maintenance At The Firing Range**

As they must, given the Auditor's Report and their own deposition testimony, Plaintiffs admit they stopped doing routine maintenance at the firing range.  They now argue that they had good reasons for doing so, that Foraker told his supervisors about this decision, and that range staff never should have been doing the maintenance in the first place.  (Plaintiffs' Answering Brief 2-4.)  The Plaintiffs' argument is a smoke screen.  The crucial issue is not whether Plaintiffs' decisions were reasonable or good, but whether, in fact, they ceased performing the routine maintenance that FTU staff had been doing for five years and whether that maintenance

was necessary to prevent the environmental problems that were the proximate cause of the closing of the firing range. Out of the Plaintiffs' own mouths, there is no dispute on these points. (See Defendants' Opening Brief, Parts IV.E & G.)

**B.      Plaintiffs Experienced Injuries That Required Defendants' Response.**

The record is indisputable that Plaintiffs have hearing loss and that they themselves brought these injuries to Defendant MacLeish's attention. (Defs.' Opening Br. 28-33.) Plaintiffs Price and Warren admit that their injuries interfere with their ability to be troopers. Plaintiffs, however, seek to blame Defendants' alleged ill will for the discovery of Plaintiffs' hearing problems, as if, absent Defendants' conduct, Plaintiffs would still have adequate hearing.

Plaintiffs contend, for example, that when they requested that the DSP pay for medical exams at Omega on March 1, 2004, they asked "solely" for blood tests. (Pls.' Ans. Br. 6, 34.) Omega, of course, did more than blood tests, and it was at Omega that Plaintiffs' hearing loss was first discovered. Plaintiffs insinuate, without any evidence at all, that Omega expanded the number and types of tests on the orders of Defendants Chaffinch or MacLeish. The record, however, clearly shows that Plaintiffs – not Defendants or anyone else at the DSP – demanded "physical examinations," in addition to blood tests. (See Appendix to Defendants' Reply Brief ("Defs.' Reply App.") at C-1 (Price's fax to Omega).) Omega proceeded to conduct a battery of tests on all four FTU member, including EKGs, pulmonary function tests, chest x-rays, and hearing tests. (See, e.g., Combined Appendix to Defendants' Opening Briefs in Support of Motions for Summary Judgment ("CA") at A-652.) Only their hearing was found abnormal. Plaintiffs did not complain about any of the tests. They proceeded to use the results of the hearing test to file workers compensation claims. It is only now, as they seek to find something "unusual" (Pls.' Ans. Br. 6) about these exams, that they ignore the scope of their own requests and the obvious intent on the part of the DSP management to help them.

2048392v3

Plaintiffs are now trying to blame Defendant MacLeish for the Omega hearing exam because they acknowledge that "[e]verything else, the numerous fitness for duty exams, light duty, everything flows from" the initial testing at Omega that found hearing loss. (Pls.' Ans. Br. 6.) If those first tests are legitimate medical inquiries that the Plaintiffs themselves requested, then Plaintiffs' entire "campaign of harassment" disappears, and the DSP leadership's actions appear in their true light -- a reasonable, appropriate, and necessary response to the health problems of the troopers. Plaintiffs, having asked for the first hearing tests, cannot now argue that the treatment that resulted from the hearing tests was the result of the Defendants retaliatory motive.

## II.    MACLEISH ACTED AS THE STATE POLICE RULES AND PROCEDURES REQUIRED WHEN PRICE AND WARREN PRESENTED HIM WITH EVIDENCE OF PERMANENT INJURY.

Unlike the Foraker action, which includes claims of other inconsequential employment action, this case concerns MacLeish's decision to send Plaintiffs to fitness-for-duty exams?[1] As a result of that one decision, Price and Warren were deemed permanently unfit for duty and were placed on rehabilitation status; they ultimately will be separated from the DSP because of their hearing loss. Plaintiffs fail to genuinely dispute that MacLeish's medical decisions were motivated by good policy and common sense, not retaliation.

### A.    Plaintiffs Suffered Injuries That Required MacLeish To Apply The DSP Policy Concerning Injury And Rehabilitation Leave.

Price and Warren have hearing loss that prevents them from "effectively utilizing sense perception [to] discern various stimuli of danger and to maximize operational effectiveness."

---

[1] Plaintiffs purport to identify fifteen adverse acts. (Pls.' Ans. Br. 17-18.) Twelve of those acts concern the medical treatment of Plaintiffs. The last three acts on Plaintiffs' list – the "media campaign," the so-called "gag orders," and a catch-all reference to the allegations in the Foraker action – concern only Plaintiff Foraker, not Price and Warren, and Defendants address those actions in their Foraker reply brief.

(CA at A-678 – A-680; A-754 – A-757.)  They are permanently unable to perform the essential

job functions of a state trooper.[2]  This undisputed fact – presented to Defendant MacLeish by the

Plaintiffs themselves – forced the DSP as an institution to take steps to protect the troopers and

the public.  This fact also distinguishes Price and Warren from almost all the injured troops to

whom they compare themselves because those comparators experienced injuries that were

considered subject to rehabilitation.  Moreover, that their injuries are permanent is the opinion of

two doctors who considered the results of their own tests as well as the results of tests of three

other medical professionals.[3]  It is absurd for Plaintiffs to compare this level of medical scrutiny

and certainty to David Baylor's layman's opinion that, for example, Cpl. Peachy or

Cpl. Romanelli were never coming back to work, even though their doctors were not prepared to

say so.  (Plaintiffs' Appendix (Vol. I) at A338 – A340 (Baylor Dep. 302-03, 309-10).)

**B.**     **The DSP Injury/Rehabilitation Policy As Written And As Applied**

The DSP policy provides that a trooper who suffers an injury that only temporarily

prevents him from doing the job is put on rehabilitation or "light-duty" status for up to two years.

(CA at A-449 (Yeomans Dep. 232); A-504.)  This is a temporary accommodation provided in the

hope the trooper can recover and return to full duty.  There is no permanent light duty, and

troopers cannot be accommodated indefinitely.  If the trooper's injury is permanently disabling

and cannot be rehabilitated, the trooper is required to separate from the DSP.[4]  (Id. at A-504; A-

---

[2] Plaintiffs understand "permanent" to mean that a trooper has suffered an injury that has lasting effects.  The proper consideration, however, is whether the injury is permanent in the sense that it cannot be rehabilitated to a point were the trooper can return to full duty.  Thus, it is irrelevant if a trooper suffers a back injury that, while continuously causing pain or discomfort, does not impinge on his functionality.

[3] Dr. Aaron Green and Dr. Edward Emmett had before them the results of the first and second Omega exams, the test results of Dr. Stephen Cooper, and the opinion of the TK Group.

[4] Given the nature and extent of their injuries, the written policy requires that Plaintiffs separate from the DSP.  MacLeish, however, has extended Plaintiffs' time on "light duty" to two years.

465; see also id. at A-448 (Yeomans Dep. 228).) This has been the policy of the DSP since 1992, and it is the policy that has been applied to Plaintiffs. (Id. at A-473; A-481 – A-482; A-490.)

1.    The DSP Does Not Have A Policy Of Running Away From Hearing Problems.

Plaintiffs contend that, irrespective of the written policy, the DSP has a practice of "always running away from hearing issues." (Pls.' Ans. Br. 26.) Plaintiffs' description of DSP practice has no support in the record. After considerable efforts, the DSP adopted a hearing standard: "effectively utilizing sense perception [to] discern various stimuli of danger and to maximize operational effectiveness." (CA at A-469; see also Pls.' App. (Vol. VI) at A2482 – A2486 (Dillman Dep. 106-110).) The DSP tests the hearing of all new recruits against this standard and requires an audiological exam for ordnance officers. (See Appendix in Support of Defendants' Answering Brief at B-5 – B-6.) There is no evidence in the record that the DSP has ignored hearing loss that affected a trooper's ability to do his job. (Pls.' App. (Vol. VI) at A2555 - A2556 (Dillman Dep. 179-80).) In this case, of course, whether the DSP used to run away from hearing loss is immaterial because Plaintiffs themselves brought their hearing issues to MacLeish and demanded that the DSP address their concerns; in short, there was nowhere for the DSP to run.

2.    The DSP Does Not Have A Policy Of Retaining Troopers With Hearing Loss Who Are Not Capable Of Performing As Troopers.

Plaintiffs argue that the DSP "always accommodat[es] Troopers with hearing loss."[5] (Pls.' Ans. Br. 26.) In support of this claim, Plaintiff cite but two examples, neither of which

---

[5] It is unclear what Plaintiffs mean by "accommodate." If they mean that a trooper with an injury is treated according to policy and given time to rehabilitate, if possible, then Defendants agree that the DSP would accommodate a trooper with disabling hearing loss. If, however, Plaintiffs mean that a trooper is given preferential
Continued…

support their contention. Maj. Joseph Forester had a hearing problem that appears to have been satisfactorily resolved with a hearing aid.[6] Dr. Green determined that Forester was "fit for duty" and "medically qualified" with "normal" hearing. (CA at A-842.) The DSP did nothing to change his duties or separate him from employment. (See Pls.' App. (Vol. II) at A671 (Forester Dep. 106).) Plaintiffs also rely on the testimony of Defendant Col. MacLeish, who stated that he remembered "many, many years ago" a corporal – John Powell – whose hearing "[o]bviously wasn't [bad] enough to keep him off the job." (CA at A-368 (MacLeish Dep. 172-73).) In fact, there is no evidence that Corporal Powell was medically unqualified to do the job or that he was somehow accommodated. No reasonable juror could find this is evidence sufficient to establish disparate treatment of Price and Warren.

> 3.    The DSP Does Not Have A Policy Of Accommodating Troopers With Other Types Of Physical Injuries.

Plaintiffs further assert that the DSP has a practice of accommodating troopers with "injuries far more serious than those that plaintiffs received." (Pls.' Ans. Br. 28.) Plaintiffs, of course, have not suffered the type of bloody or disfiguring injury that occurs occasionally in police work. Nevertheless, Price's and Warren's injuries are significant, permanent, and disabling. Thus, their injuries are as "serious" as they can be.

More to the point, Plaintiffs are misrepresenting the record when they argue that some of the so-called comparators had more "serious" injuries that were ignored:

- Steve Swain injured his vocal chords in 1983. Swain has been and is "medically qualified with no limitations." He has had no problems performing any of the

---

....Continued

treatment and not subjected to the written policy, then Defendants disagree, and there is no support in the record for such a statement.

---

[6] Plaintiffs Price and Warren, in contrast, have suffered an injury that cannot be remediated by hearing aids. (CA at A-678 – A-680; A-754 – A-756.)

duties required of him.  (CA at -853 – A-866; Defs.' Ans. App. at B-9 (Papili Dep. 75-77).)

- David Citro was initially injured in 1987.  It was not until 2001, however, that he suffered injuries significant enough to interfere with his full-duty work.  Once it became clear that his injuries were permanent, Citro filed for a disability pension in October 2002, after about twenty-one months on light duty.  (CA at A-867 – A-899.)

- David Henderson sustained an injury in 1983.  He worked full time with no restrictions until 1998, at which time he became disabled and applied for a state disability pension, which he received in March 1999.  (Defs.' Ans. App. at B-57 - B-60.)

- Michael Jordan sustained a knee injury on duty in December 9, 1998.[7]  (Id. at B-61.)  The DSP placed him on the light duty list and assigned him to the job of court liaison officer for less than two years.  In March 2000, Jordan applied for a disability pension, which he received.  (Id. at B-62 – B-67.)

- "XYZ" was suspended in January 2000.  In March 2001, he was diagnosed as being unfit for duty.  He immediately filed for a disability pension.  He then withdrew that application, and sought separation from the DSP by applying for a service, rather than disability, pension in September 2001.  (Pls.' App. (Sealed Vol.) at A3700 – A3706.)  There is no evidence that he was accommodated under the injury leave policy in a way contrary to that dictated by the written policy.  That he was at the same time subject to criminal proceedings by local prosecutors has nothing to do with whether or how the DSP applied its rehabilitation policy to his case.

- Paul Sczubelek began his rehabilitation status in October 1992.  He sought separation from the DSP a mere three months later, applying for a disability pension in January 1993.

    4.      The DSP Does Not Have A Policy Of Giving Troopers Two Or More Years On Rehabilitation Status.

Lastly, Plaintiffs misrepresent the record when they say that the DSP does not actually apply its two-year rehabilitation policy, but, by "historic practice," always gives "officers at least two years of light duty, regardless of the severity of their injuries." (Pls.' Ans. Br. 30.)  The record is to the contrary.

---

[7] Plaintiffs describe Jordan's injury as "undefined." (Pls.' Ans. Br. 29.)  Plaintiffs do not explain how an injury they cannot define can nonetheless be considered more "serious" than Plaintiffs' hearing loss.

- Bruce Peachy began his rehabilitation status on February 9, 2002. He was determined to have achieved maximum medical improvement on December 8, 2003. He then sought separation from the DSP by applying for his pension on December 29, 2003. (Pls.' App. (Sealed Vol.) at A3671 – A3682.)

- "ABC" began his rehabilitation status in January 2002. He sought separation from the DSP fifteen months later, applying for a disability pension in April 2003.

- Scott Warner returned to full duty after his rehabilitation period, and he remains a full duty trooper. (Defs.' Ans. App. at B-48 – B-52.)

- Jerome Loveless began his rehabilitation status in October 1999. In June 2001, it was determined that he would need surgery to return to full duty. Loveless opted for separation, applying for his pension on July 6, 2001. (Pls.' App. (Sealed Vol.) at A3683 – A3699.)

- Jeffrey David returned to full duty after his rehabilitation period, and he remains a full duty trooper. (Defs.' Ans. App. at B-53 – B-56.)

- Anthony DiAllesandro suffers from cancer. He has not been deemed permanently unfit for duty by a doctor and has been on light duty for only 13 months; it is impossible to determine how his situation will ultimately be resolved.

- Sean Nowrey began his rehabilitation status in March 2003. He sought separation from the DSP after only eleven months, applying for his pension on February 20, 2004. (Pls.' App. (Sealed Vol.) at A3683 – A3699.)

- Everett Jackson began his rehabilitation status in June 1999. In August 2001, then-Col. Pepper revoked Cpl. Jackson's light-duty status and placed him on sick leave. Jackson sought separation from the DSP, applying for a service, rather than a disability, pension in October 2001. He was never deemed permanently disabled.

- James Romanelli began his rehabilitation status in July 1999. He sought separation from the DSP after 23 months, applying for his pension on June 28, 2001. He was never deemed permanently disabled.

- Jahn Hitchens returned to full duty after his rehabilitation period, and he remains a full duty trooper. (Defs.' Ans. App. at B-44 – B-47.) [8]

---

[8] Plaintiffs also claim that Bo Sarley was "accommodated with light duty for two years" and Christine Price was "accommodated with two years light duty in the H.R. department." (Pls.' App. (Sealed Vol.) at A3647, A3646.) This proves nothing. Such treatment is entirely consistent with the written DSP rehabilitation policy. There is no
Continued…

2048392v1

Thus, troopers with injuries that prevented a return to full duty before the expiration of two years applied for pensions; troopers whose injuries did not permanently prevent a return to full duty took two years to rehabilitate, in some cases successfully coming back to work. In none of the above cases did the DSP allow a trooper with an injury that was deemed permanent by a medical professional to stay on the job and retain full salary and benefits or allow a trooper to exceed to the two year limit. In other words, Price and Warren have been treated no less favorably under the DSP policy and practice than have the comparators.

5.      Plaintiffs Do Not Have Admissible Evidence Of Their Alternative Practices.

As set forth above, a great mass of undisputed evidence in the form of medical records and personnel information shows that the DSP has consistently allowed injured troopers up to two years to rehabilitate their injuries that could be rehabilitated. Those who suffer permanently disabling injuries, like Price and Warren, are required to separate and file for a pension. Those whose injuries are not serious enough to hamper the trooper's performance, like Foraker, are returned to full-duty status.

Plaintiffs' argument against the weight of this undisputed evidence is to put up retired Maj. David Baylor to say what he thinks or heard happened to particular troopers. (See, e.g.,

---

....Continued

evidence that, like Price and Warren, either Sarley or Price suffered an injury that required early separation or that they were somehow "accommodated" in ways more favorable than Plaintiffs.

Plaintiffs also cite the examples of Randy Armistead who, according to Baylor, suffered severe head injuries in 1986 in a head on collision and received two years of light duty status at home;" Joseph Condron who injured himself in 1982 and eventually left the DSP with a service pension applied for in 1992; and James Mosely who injured himself in 1990. (Id. at A3656, A3650-A3651; A3648-A3649.) They also claim that Paul Sczubelek was "accommodated for six years," beginning in 1987. (Id. at A3652 – A3655.) Different Superintendents and a different HR director applied a different injury leave policy to those situations. Moreover, there is no evidence that Defendant MacLeish even knew about the existence of those cases, much less the details concerning how and why certain administrative policies were applied to them. Armistead, Condron, Mosley, Sczubelek, therefore, are simply not relevant to Price and Warren.

2048392v3

Pls.' Ans. Br. 26 n. 14 (citing Baylor's explanation of what reasons are "good enough" for him to accommodate a trooper); id. at 27 nn. 16, 17; id. at 30 (quoting Baylor's opinion that "'there are similarities' between plaintiffs' injuries and those of these comparators").)

It is Baylor who claims that the treatment of Plaintiffs is "highly unusual." (Pls.' App. (Vol. I) at A280 (Baylor Dep. 165).) Baylor acknowledges, however, that he does not know the nature or extent of the injuries suffered by Plaintiffs Price and Warren. (Id. at A345, A349 (Baylor Dep. 331-32; 346-47).) His testimony is based on his assumptions. (Id. at A346 (Baylor Dep. 334).)

It is also Baylor who claims that the DSP always gives troopers two years of light duty, regardless of the nature and extent of their injuries and that the comparators in this case all received two years. (See Pls.' Op. Br. 17, 19-20; Pls.' Ans. Br. 30.) But Baylor has no personal or direct knowledge of the medical experience of the comparators, and his testimony is contradicted by the medical evidence. Baylor admits, for example, that he does not know whether anyone on Plaintiffs' list was declared permanently disabled by a doctor – as Price and Warren have been. (See, e.g., Pls.' App. (Vol. I) at A338, A339 – A-341, A344 (Baylor Dep. 302, 303-04, 309-16, 327-28).) He also does not know when the "comparators" were injured or when they separated from the DSP, rendering his conclusion that everyone got two years pure speculation. (See, e.g., id. at A339 – A-341 (Baylor Dep. 309-16).)

Lastly, it is Baylor who claims that the light-duty letters sent to Plaintiffs were unusual and were more akin to suspension letters. (Pls.' Ans. Br. 18 (referring to Opening Brief 19-20; Baylor Dep. 146-48).) As Defendants have explained, however, the light duty letters are form letters in use since at least 1992 that were sent at Plaintiffs' request. (Defs. Ans. App. at B-42 – B-43; Defs.' Reply App. at C-2 – C-3.) Baylor, however, did not know that this form letter had

-10-

been used before for light-duty situations. (Pls.' App. (Vol. I) at A276 – A277, A347 (Baylor Dep. 149-151, 338-39.) He did not know that Plaintiffs had actually asked for the letters. (Id. at A348 (Baylor Dep. 345).) Moreover, while testifying that the letters "basically … put [Plaintiffs] in a suspended status," Baylor did not realize that the DSP has a separate form used for suspension cases that is different than the letter sent to Plaintiffs. (Defs.' Reply App. at C-4; see, e.g., Pls.' App. (Sealed Vol.) at A3702.) To put it in the vernacular, Baylor doesn't know what he is talking about.

Plaintiffs rely on the testimony of Baylor, former trooper who lacks personal knowledge about the treatment of medical situations and the application of DSP policies and procedures, but who is willing to speculate and extrapolate about them. Baylor would not be allowed to testify about DSP personnel actions in court because, with the exception of Cpl. Bruce Peachy, whom he actually commanded, he lacks the personal knowledge required under Rule 602 of the Federal Rules of Evidence to testify. If he could not testify about it in court, the Plaintiffs cannot use his testimony to oppose a Rule 56 motion. See Safas Corp. v. Etura Premier, L.L.C., 293 F. Supp. 2d 442, 446-47 (D. Del. 2003); Izquierdo v. Sills, 68 F. Supp. 2d 392, 415 n.27 (D. Del. 1999); Fed. R. Civ. P. 56(e).

### C. Plaintiffs Have Misrepresented The Motivation Evidence.

In their attempt to show that MacLeish was acted from "illicit motives," Plaintiffs resort to serious distortions of the testimonial evidence. (Pls.' Ans. Br. 16.) For example, they claim that MacLeish thinks Plaintiffs are a "pain in the ass." (Id. at 16 n.9 (citing MacLeish Dep. 164-65).) MacLeish did not so testify. He merely stated that he may have expressed frustration as a result of Plaintiffs' refusal to be straightforward about their health issues. This view had nothing to do with Plaintiffs' speech.

Plaintiffs also claim that Capt. John Yeomans, the DSP Director of Human Resources, testified that "MacLeish was 'frustrated' and 'upset' with plaintiffs because of their speech." (Pls.' Ans. Br. 16 n. 9 (citing Yeomans Dep. 39).)  In fact, Yeomans stated that MacLeish was frustrated with (1) attorney Stephen Neuberger's attempt to interfere with MacLeish's communications with his employees (see Ans. to Amended Compl. (D.I. # 51) ¶ 54),[9] (2) attorney Thomas Neuberger's unfair, baseless, and public criticism of him and the DSP, and (3) the difficulty in getting prompt medical treatment for Plaintiffs.

Plaintiffs' distortion of the record notwithstanding, MacLeish has specifically denied that "personal animosity" played a role in how he treated Plaintiffs.  (CA at A-371 (MacLeish Dep. at 184).)  He has explained that he sent Plaintiffs to fitness-for-duty exams because of their "hearing-related issues" (id. at A-366 (MacLeish Dep. 163-164)) and that he put Price and Warren on light duty out of concern for "their welfare and the welfare of the public."  (Id. at A-373 (MacLeish Dep. 193).)  Thus, MacLeish acted to protect Plaintiffs' health, not to punish them for speaking out about the range.  (See, e.g., id. at A-367 (MacLeish Dep. at 168-69); A-372 (MacLeish Dep. 186); A-373 – A-374 (MacLeish Dep. 193-94).)

## III.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY WOULD HAVE TREATED PLAINTIFFS THE SAME WAY, REGARDLESS OF PLAINTIFFS' ALLEGEDLY PROTECTED ACTIVITY.

Defendants may defeat Plaintiffs' retaliation claims "by showing that the same actions would have been taken even absent the protected conduct."  Shehee v. City of Wilmington, 67 Fed. Appx. 692, 693-64 (3d Cir. 2003).  This is often referred to as the "Mt. Healthy defense."

---

[9] Threatening e-mails from counsel, as well as the filing of this lawsuit, are why Defendants have failed to "call Plaintiffs once a week to check on them" – not retaliation for talking to the State Auditor.  (Pls.' Ans. Br. 18; see also Defs.' Motion for Disqualification (D.I. ## 46 & 47) (explaining how Plaintiffs counsel has acted to prevent Defendants' communication with their own employees).)

See, e.g., Guzman-Ruiz v. Hernandez-Colon, 406 F.3d 31, 34 (1st Cir. 2005) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

    A.    **Defendants Have Not Waived Their *Mt. Healthy* Defense.**

Plaintiffs argue that Defendants failed to plead the Mt. Healthy defense and, therefore, have waived it. (Pls.' Ans. Br. 35 (citing Fed. R. Civ. P. 8(c); Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991)).)

A majority of courts, including those in this district, reject Plaintiffs' "unduly restrictive" interpretation of federal pleading rules. 2 James Wm. Moore et al., Moore's Federal Practice § 8.07[2] (3d ed. 1997) (citing cases). A technical failure to raise an affirmative defense by responsive pleading does not always result in waiver of the affirmative defense, particularly where, as here, it was clear from the outset that the issue was central to the case. Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1374 (3rd Cir. 1993); Charpentier, 937 F.2d at 863); see also Anderson v. United States, Civ. A. No. 93-589-MMS, 1996 WL 490262, at *9 n.9 (D. Del. Aug. 23, 1996). A court may consider the merits of the defense if it is raised by motion for summary judgment and the plaintiff has not shown any prejudice. Charpentier, 937 F.2d at 863; Aubrey Rogers Agency, Inc. v. AIG Life Ins. Co., 55 F. Supp. 2d 309, 315 (D. Del. 1999) (citing Smith v. Sushka, 117 F.3d 965, 969 (6th Cir. 1997); Dennis v. General Imaging, Inc., 918 F.2d 496, 499-500 (5th Cir. 1990); Pantzer v. Shields Development Co., 660 F. Supp. 56 (D. Del. 1986)); Int'l Poultry Processors, Inc. v. Wampler Foods, Inc., No. Civ. A. 98-4612, 1999 WL 33456488, at *3 & n.6 (E.D. Pa. Apr. 29, 1999).

Defendants explicitly raised the Mt. Healthy defense in their Opening Brief in support of their own Motion for Summary Judgment, where they established that Col. MacLeish "would have ordered the fitness-for-duty exams, would have put Price and Warren on light-duty or

-13-

rehabilitative status, and would have directed Price and Warren to separate from the DSP even if Plaintiffs had never spoken out about conditions at the range." (Defs.' Opening Br. 34.)

Plaintiffs' claim that they have been prejudiced by Defendants' assertion of this defense because they "did not take any discovery on this issue" is not credible. (Pls.' Ans. Br. 35.) The Mt. Healthy defense is nothing more than a variation of the causation question, which is the heart of any First Amendment case. See Suppan, 203 F.3d at 236 (holding that Mt. Healthy requires defendant to establish that protected activity was not the "but for" cause of retaliatory acts). Plaintiffs had ample opportunity to conduct discovery on causation, and, as evidenced by the enormous record on which they rely, Plaintiffs' ability to ascertain all relevant facts was not inhibited by Defendants' failure to specifically delineate the Mt. Healthy defense in their Answers. As a result, Plaintiffs do not identify what additional information they might have sought. See Sanderson-Cruz v. United States, 88 F. Supp. 2d 388, 392 (E.D. Pa. 2000) (finding that "evidentiary record … is extensive and that discovery to date is sufficient for [plaintiff] to successfully oppose the motion … for summary judgment").

Moreover, Plaintiffs do not – and cannot – claim that they were surprised by Defendants' assertion of the Mt Healthy defense. Plaintiffs themselves raised the defense in their Complaint and Amended Complaint, specifically alleging that "defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had grounds to adversely treat plaintiffs." (See Compl. ¶ 94; Am. Compl. ¶ 94). By denying these assertions, Defendants clearly put the defense in play. (See Ans. to Comp. ¶ 94; Ans. to Am. Compl. ¶ 94.)

Lastly, Defendants raised the Mt. Healthy defense in sufficient time to allow Plaintiffs to fully brief the issue and "to argue, if [they] can, why the imposition of [the defense] would be inappropriate." Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 350 (1971); see

-14-

also <u>Kleinknecht</u>, 989 at 1374 (holding that plaintiffs' ability to respond not prejudiced by receiving notice of affirmative defense in motion for summary judgment); <u>Smith v. Sushka</u>, 117 F.3d 965, 969 (6th Cir. 1997) (finding that defendant's assertion of affirmative defenses in a second motion for summary judgment did not unfairly prejudice plaintiff given "opportunity to fully respond to and brief the issues").[10]  That Plaintiffs elected not to apply the massive record to address Defendants' argument is not evidence of prejudice.

### B.    The Record Shows That Defendants Would Have Treated Plaintiffs In The Same Way Even If They Had Not Engaged In Protected Activity.

It is undisputed that all three Plaintiffs brought their hearing deficiencies to the attention of then-Lt. Col. MacLeish.  MacLeish owed duties to the Plaintiffs, their fellow troopers, and the citizens of Delaware to determine whether the Plaintiffs were fit for duty.  He also had an obligation to protect the integrity and effectiveness of the state police force by directing Plaintiffs Price and Warren to apply for pensions after it became clear that they could not perform the essential job functions of a state trooper.  MacLeish fulfilled these duties.  Accordingly, the reasonable juror must conclude that Col. MacLeish would have acted as he did even if Plaintiffs had not voiced concerns about the firing range.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' retaliation claims.

---

[10] As noted in their Answering Brief in opposition to Plaintiffs' Motion for Summary Judgment (<u>see</u> D.I. # 95), Defendants have established the conditions necessary for leave to amend their Answer to Plaintiffs' Amended Complaint to include expressly the <u>Mt. Healthy</u> defense.  <u>See</u> Fed. R. Civ. P. Rule 15(a); <u>see also</u> <u>Charpentier</u>, 937 F.2d at 863-64 (citation omitted); <u>Anderson</u>, 1996 WL 490262, at *9 n.9.  If the Court deems it necessary, however, Defendants are prepared to submit a formal motion to for leave to amend their Answer to Plaintiffs' Amended Complaint.

IV.  **DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE IT WAS NOT CLEARLY ESTABLISHED THAT THEIR ACTIONS COULD BE DEEMED SUFFICIENTLY ADVERSE TO BE ACTIONABLE.**

Plaintiffs contend that qualified immunity is not available in this case because the right to be free from retaliatory adverse action in response to an exercise of constitutional rights has been "generally established" for more than two decades.  (Pls.' Ans. Br. 20-21.)  This is utterly beside the point.  Defendants know perfectly well that the law prohibits retaliation against troopers who engage in protected First Amendment activity.  The issue here, of course, is not whether the "general constitutional rule" against retaliation had been announced, but whether that rule applied with "obvious clarity to the specific conduct in question."  U.S. v. Lanier, 520 U.S. 259, 271 (1997).

In McKee v. Hart, --- F.3d ---, No. 04-1442, 2006 WL 27474 (3d Cir. Jan. 6, 2006), the Third Circuit recognized that in cases like Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000), and Baldassare v. New Jersey, 250 F.3d 188, 194-95 (3d Cir. 2001), it had clearly established a general rule outlawing retaliatory harassment.  McKee, --- F.3d ---, 2006 WL 27474, at *5-*7.  It held, however, that Suppan "gave little guidance as to what the threshold of actionability is in retaliatory harassment cases" and that Baldassare was nothing more than a "straightforward retaliation claim" which did not address the more contextually specific question of what type or amount of activity would create a cognizable claim of harassment.  Id. at *6.

As was the case in McKee, nothing in the case law of the Third Circuit in 2004 "clearly established" that Defendants' alleged conduct – making truthful, protected comments to the media, removing Foraker from a meeting he was not expected to attend, directing unwanted looks and growls at Foraker, minor modifications of job responsibilities, and application of written policies – would subject Defendants to a trial for retaliation.  That is, at the time of Col. Chaffinch's and Col. MacLeish's conduct, there was a "dearth of precedent of sufficient

-16-

specificity (and factual similarity to this case) regarding a public employee's First Amendment right to be free from retaliatory harassment." Id. at *7.

Plaintiffs argue that, unlike the defendants in McKee, Chaffinch and MacLeish should have learned from the opinion in Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003). (Pls.' Ans. Br. 23-24 n.25 (citing McKee, --- F.3d ---, 2006 WL 27474, at *6)).) In Brennan, however, the court explained that "criticism, false accusations, or verbal reprimands" were not retaliatory acts. McKee, --- F.3d ---, 2006 WL 27474, at *7 (citing Brennan, 350 F.3d at 419). Outside of the decisions related to fitness-for-duty exams and light duty, such insignificant actions are all that Plaintiffs can muster in support of the adverse action claim. Thus, even taking into account the holding in Brennan, the precedent that was available did not clearly establish that Plaintiffs' claims, even when considered in their totality, would amount to a constitutional violation. Accordingly, Defendants are entitled to qualified immunity and summary judgment on both counts of the Amended Complaint.

## V.    PLAINTIFFS DID NOT ENGAGE IN PROTECTED ACTIVITY UNDER THE PETITION CLAUSE OF THE FIRST AMENDMENT.

Plaintiffs argue that their speech about the range to their supervisors and the State Auditor are constitutionally protected petitions. However, not every "communication … so characterized by one who chooses to protest governmental acts or omissions" is a "petition" in the constitutional sense. San Fillipo v. Bongiovanni, 30 F.3d 424, 442 (3d Cir. 1994). Rather, to exercise the First Amendment right to petition, a plaintiff must invoke a "formal mechanism" that has been adopted by the government "for redress of those grievances for which government is allegedly accountable." Id. at 439, 442; see Black's Law Dictionary (8th ed. 2004) (defining "petition" as a "formal written request presented to a court or other official body"). Requiring something more than informal complaints, courts have recognized constitutionally protected

"petitions" in lawsuits, administrative claims, and employee-grievance procedures. Id. at 439 &
n.18 ("[W]hat San Filippo characterizes as 'petitions' are not letters to the government-employer,
but lawsuits and grievances directed at the government-employer or its officials. Submissions of
this sort purport to invoke formal mechanisms for the redress of grievances."); Bradshaw v.
Township of Middletown, 296 F. Supp. 2d 526, 546 (D.N.J. 2003), aff'd 2005 U.S. App. LEXIS
18622 (3d Cir. Aug. 29, 2005) (holding that "the Petition Clause… only applies to petitions in
the nature of a lawsuit or grievance. If the conduct at issue is not in the nature of a formal
grievance procedure that the Petition Clause is designed to protect, then governmental retaliation
is not constitutionally actionable."); cf. Bowman v. City of Middletown, 91 F. Supp. 2d 644, 664
(S.D.N.Y. 2000) (stating that "the administrative remedies for which an inmate enjoys a First
Amendment right of petition are limited to those set forth under state administrative law, such as
sending a complaint to a state bureau of prisons, as opposed to informal or intra-prison
complaints") (citations omitted).

The numerous cases cited by Plaintiffs in their attempt to establish a "petition" are not to
the contrary; they too addressed "petitions" that involved formal grievance procedures. For
example, in Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997), the plaintiff had filed a formal
complaint for discrimination with the EEOC. The court explained that the Petition Clause
protected such activity, otherwise "[o]fficials could simply engage in harassment any time an
individual filed, or announced his intention to file [via an EEOC complaint], a lawsuit against
them."[11] Id. at 163-64; see also California Motor Transport Co. v. Trucking Unlimited, 404 U.S.
508, 513 (1972) (addressing the "right of access to the agencies and courts to be heard on

---

[11] Plaintiffs cite Anderson to explain the scope of the Petition Clause in the "police department" context. (Pls.' Ans.
Br. 14.) With misleading omissions and incomplete quotations, Plaintiffs give the false impression that the court
was addressing a police officer's internal grumblings, rather then the formal EEOC filing that was actually at issue.
(Id.)

applications sought by competitive highway carriers"); Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005) (addressing previously filed lawsuit as a petition under the First Amendment); Brennan v. Norton, 350 F.3d 399, 417 (3d Cir. 2003) (declining to address the merits of the retaliation claim under the Petition Clause, but noting that "filing of lawsuits and grievances under a collective bargaining agreement" were the alleged petitions); We, Inc. v. City of Phila., 174 F.3d 322 (3d Cir. 1999) (discussing defendant's initiation of formal proceeding to have a neighborhood business shut down as a nuisance).

In this case, Plaintiffs' speech to the State Auditor was not a constitutionally cognizable petition. Plaintiffs did not invoke the general authority of or initiate formal proceedings with the State Auditor. Rather, Plaintiffs agreed to submit to an interview as part of an ad hoc investigation that sought to make factual determinations regarding the building, maintenance, and shut down of the range; the investigation did not seek to address employee grievances. Similarly, Plaintiff Foraker's internal protests to the DSP chain of command were the informal criticisms that do not rise to "petitions" in the constitutional sense. Cooper v. Cape May County Bd. of Social Servs., 175 F. Supp. 2d 732, 746 (D.N.J. 2001) (holding that "speech in many informal settings, including letters, phone calls, and meetings with officials" does not "implicate the Right to Petition under the First Amendment because [it] is not in the nature of a formal grievance procedure that the Petition Clause is designed to protect.").

Accordingly, Plaintiffs have failed to establish that they engaged in protected activity under the Petition Clause, and, for this reason alone, Defendants are entitled to summary judgment on Count II.

## VI.    **CONCLUSION**

For the reasons set forth in Defendants' Motion for Summary Judgment (D.I. ## 80 & 81) and set forth above, Defendants request that the Court enter summary judgment in their favor and against Plaintiffs on all counts of the Amended Complaint.

Respectfully submitted,

Date:  February 17, 2006                          _/s/ Noel C. Burnham_
                                                 Noel C. Burnham (DE Bar No. 3483)
                                                 Richard M. Donaldson (DE Bar No. 4367)
                                                 Montgomery, McCracken, Walker & Rhoads, LLP
                                                 300 Delaware Avenue, Suite 750
                                                 Wilmington, DE  19801
                                                 Telephone:  (302) 504-7840
                                                 Facsimile:  (302) 504-7820

                                                 Edward T. Ellis
                                                 Robert J. Fitzgerald
                                                 Montgomery, McCracken,
                                                    Walker & Rhoads, LLP
                                                 123 South Broad Street
                                                 Philadelphia, PA  19109
                                                 (215) 772-1500

                                                 _Counsel for Defendants L. Aaron Chaffinch,_
                                                 _Thomas F. MacLeish, David B. Mitchell, and the_
                                                 _Division of State Police, Department of Safety and_
                                                 _Homeland Security, State of Delaware_

## CERTIFICATE OF SERVICE

This is to certify that two (2) copies of the Reply Brief in Support of Defendants' Motion

for Summary Judgment were served by first class mail this 17th day of February 2006 on:

> Thomas Stephen Neuberger, Esquire
> Stephen J. Neuberger, Esquire
> The Neuberger Firm, P.A.
> Two East Seventh Street
> Suite 302
> Wilmington, DE  19801
>
> Martin D. Haverly, Esquire
> Two East Seventh Street
> Suite 302
> Wilmington, DE  19801-3707
>
> *Attorneys for Plaintiffs*

> _____ */s/ Noel C. Burnham*_____
> Noel C. Burnham (DE Bar No. 3483)