# EXHIBIT - I

# CURRICULUM VITAE

JOSE R. CASTRO, JR., M.S., C.R.C., L.P.C., L.R.C., A.B.D.A.

## EDUCATION

**M.S.**  Florida State University – Rehabilitation Counseling – 1973

**B.S.**  University of South Alabama – Secondary Education – 1969

## CERTIFICATIONS

**C.R.C.**  Certified Rehabilitation Counselor, Board for Rehabilitation Certification, Chicago, Illinois, 1975

**R.C.C.**  Rehabilitation Counselor Certification, U.S. Department of Labor, Office of Workers' Compensation Programs, 1983, 1996

**A.B.D.A.**  Senior Disability Analyst & Diplomat, American Board of Disability Analysts, 1996

**VR 4759**  Registered Practitioner, State of Maryland, Workers' Compensation Commission 1997

**V.E.**  Approved by Pennsylvania Department of Labor and Industry as Expert in Earning Power Assessments

## LICENSURE

**L.P.C.**  Licensed Professional Counselor, State of Pennsylvania, 2002

**L.R.C.**  Licensed Rehabilitation Counselor, State of New Jersey, 1999

**L.E.C.**  Licensed Employment Counselor, State of Pennsylvania, 1988

**L.M.H.C.**  Licensed Mental Health Counselor, State of Florida Department of Professional Regulations, Tallahassee, Florida, 1982

## PROFESSIONAL EXPERIENCE

**11/01 to present**

**Vocational Consultant – Jose R. Castro, Vocational Services** –PO Box 1186 Edgemont, PA 19028
Provide all facets of vocational services that include vocational assessments to determine wage earning capacity, vocational counseling, job placement, job analyses and expert vocational testimony. Accepted as vocational expert before Federal, Superior, Family and the Court of Common Pleas, as well as worker's compensation judges and boards in Pennsylvania, Delaware, New Jersey and Maryland.

**01/92 to 11/01**

**Associate Manager, Vocational Department/Senior Rehabilitation Consultant**
DEL-VAL Care Management, Wilmington, Delaware. Responsible for program development and management for clients. Evaluation, counseling, testing and job placement of disabled clients. Consult with physicians, physical therapists, psychologists and others in coordinating the medical and treatment needs of clients. Conducting vocational assessments, wage earning capabilities and provision of expert testimony. Supervise Rehabilitation Consultants and job developers.

**04/89 to 01/92**

**Director of Case Management Services/Senior Specialist**
Hamilton & Jordan, Inc., West Chester, Pennsylvania. Provide vocational counseling and assessment, job placement, and comprehensive case management for individuals with work-related injuries. Facilitate medical coordination to determine injured worker's current physical capacity. Supervise Rehabilitation Specialists and job developers. Provision of vocational testing and expert vocational testimony.

Jose R. Castro, Jr.                                                                              Page 2

03/88 to          **Senior Rehabilitation Coordinator**
04/89             Wenmar Associates, Inc., King of Prussia, Pennsylvania.    Vocational counseling, job
                  development, job placement and case management for individuals with work-related disabilities.
                  Provide vocational testing and expert testimony.

10/83 to          **Senior Rehabilitation Coordinator**
12/87             Continental Rehab Resources, York, Pennsylvania.   Counseling and evaluation of the injured
                  worker.    Assessing medical treatment plans and determining suitable therapy and/or work
                  hardening programs.  Assisting the injured worker in obtaining employment or re-employment
                  that is within their vocational and physical capabilities.

02/69 to          **Rehabilitation Counselor II**
10/83             State of Florida Vocational Rehabilitation, Pensacola, Florida.  Assisting physically, mentally and
                  emotionally handicapped individuals in obtaining proper medical or psychological treatment.
                  Assisted these clients to obtain suitable training and/or job placement.

### PROFESSIONAL AFFILIATIONS

National Rehabilitation Association (N.R.A.)
National Association of Rehabilitation Professionals in the Private Sector, (NARPPS)
Philadelphia Workers' Compensation Claims Association
Delaware Claims Association
Pennsylvania Self Insurers Association
American Board of Disabilities Analysts

### ADDITIONAL TRAINING

Seminars – "Counseling with Severely Disabled" – held at various National Rehabilitation
Counseling Association Conferences
Counselor certification training activities including seminars related to vocational rehabilitation of
severely injured workers through N.R.A.
U.S. Department of Labor – Employment Standards Administration – Office of Workers'
Compensation – Programs Counselor Certification – Workshops, 1983-1996
Delaware – Division of Industrial Affairs "Workers' Compensation Seminars"
Pennsylvania – Various seminars and training programs relating to the rehabilitation of workers'
compensation recipients through Pennsylvania Claims Association
Vocational Evaluation of Traumatic Brain Injury – through Commission of Work Adjustment and
Vocational Evaluation Specialists (CCWAVES)

### PRESENTATION/PUBLICATIONS

Several articles pertaining to Disability Management for Pennsylvania Self-Insured Professional
Publications.

Co-authored article for Delaware Trial Lawyers Publication pertaining to use of Vocational
Rehabilitation Consultants for Personal Injury cases.

Presentations before Workers' Compensation organizations and carriers in Pennsylvania and
Delaware regarding Disability Management and the provision of Rehabilitation Services.
Seminars on Act 57, Pennsylvania Legislation, July 1996 – "Rehabilitation Earning Capacity and
Job Availability under Senate Bill 801 (Act 57).

Presentation to employers regarding job restructuring and return to work strategies.

# EXHIBIT - J

# JOSE R. CASTRO VOCATIONAL SERVICES

♦♦♦

P.O. BOX 1186 ♦ EDGEMONT, PA 19028
Phone 484-422-8019 ♦ Fax 610-355-0327
Cell 610-716-0788
Email jr12c@aol.com

October 28, 2005

Martin D. Haverly, Esquire
2 East 7th Street, Ste. 302
Wilmington, DE 19801

Re:        Sgt. Christopher D. Foraker

## VOCATIONAL ASSESSMENT/EXPERT REPORT

## INTRODUCTION

You have requested that I produce a vocational assessment report that will provide my opinion, within a reasonable degree of vocational probability, as to the ramifications of the ongoing litigation matter with Sgt. Foraker and the Delaware State Police have impacted his future earning capacity.

Sgt. Foraker has indicated in his litigation that slander and/or First Amendment retaliation on the part of the Delaware State Police has negatively impacted his ability to obtain employment in the firearms industry or at a high-level law enforcement position at the completion of his career with the Delaware State Police.

In preparation for this report I have reviewed numerous file materials forwarded to me that include:

1. Sgt. Foraker's Resume/Credentials
2. Various media articles from the American Police Beat, The News Journal, The Delaware State News
3. Copy of two Complaints filed in Delaware District Court on behalf of Sgt. Foraker after the Firearms Training Unit facility in Smyrna, DE was shut down.
4. Sgt. Foraker's Answers and Objections to First Set of Interrogatories.
5. Report provided by Mr. Bud Fini (Intermark).

Martin D. Haverly, Esquire
Re: Christopher Foraker

October 28, 2005
Page 2

In addition to the file review I was able to speak at length with Mr. Fini, an expert in the firearms industry, who produced a report providing his expert opinion.

As a result of my file review and conversation with Mr. Fini, I conducted labor market research which has enabled me to provide for you my opinion, within a reasonable degree of vocational probability, as to whether the alleged slander and/or First Amendment retaliation has in fact impacted Mr. Foraker's future job prospects and if, as a result of the slander, he has suffered a loss or diminishment in his earning capacity.


## BACKGROUND INFORMATION

Sgt. Foraker is a 20-year veteran of the Delaware State Police, Division of Public Safety in Dover, DE. I have enclosed as a reference, Sgt. Foraker's resume that includes his extensive experience, including the positions he has held as a Delaware State Trooper, the programs in which he has been involved, his education, his continuing studies, his professional development, his honors and accomplishments, as well as his affiliations.

Although Sgt. Foraker has served in numerous capacities, his passion and expertise is in firearms operation, training expertise. His most recent position was with the Delaware State Police Firearms Training Unit in Smyrna, DE where he was the Noncommissioned Officer in Charge and Sections Chief of the unit.

He became a full-time Firearms Instructor in October of 1997 when he was assigned to the Ordinance Unit, later referred to as the Firearms Training Unit.

His in-service began at the outside DSP range on Denney's Road and then to the Clark Farm Road FTU construction site to assist there. On 8/1/01 Sgt. Foraker was promoted to Sergeant and NCOIC of the Firearms Training Unit.

Sgt. Foraker spoke of problems of public concern with the new facility, which eventually led to his removal from his position. Following the initial litigation, the Federal Court found that Sgt. Foraker's First Amendment rights had been violated. He was reinstated as the NCOIC of the FTU with all of his previous duties and responsibilities. (12/1/03)

Following his reinstatement Sgt. Foraker, according to records, reported the FTU to be in disarray. Sgt. Foraker reported problems in the facility, which he considered a dangerous situation for the health and safety of those working at the training facility.

Martin D. Haverly, Esquire
Re: Christopher Foraker

October 28, 2005
Page 3

The gist of the first litigation on Sgt. Foraker's part was that he has been retaliated against by the Delaware State Police, specifically the Department Col. Aaron Chaffinch for speaking up on issues of public concern.

As a result of this problem, Sgt. Foraker has had physical and emotional problems and has indicated distress about his bleak future prospects. It had been Sgt. Foraker's plans to obtain a position in the firearms industry once he had retired from the Delaware State Police.

It is his opinion and that of the expert, Bud Fini, that his hopes to become employed in that market have been severely damaged, given the adverse publicity surrounding the closing of the range.

As a result, Sgt. Foraker is seeking damages for diminished earning capacity and economic losses.

## EXPERT REPORT OF MR. BUD FINI OF INTERMARK

I had the opportunity to review the report authored by Bud Fini of Intermark. Mr. Fini is an expert in the firearms industry, having served 30 years in that line of work.

He is currently self-employed, but had over 20 years with Remington Arms advancing to the position of Director of Worldwide Firearms Business. He also served 6 years as an Executive Management Consultant to firearm producers SIGARMS, O. F. Mossberg, Perazzi, Beretta, and Heckler & Koch. He also served 2 years with Savage Arms as Vice President, Sales & Marketing.

Mr. Fini provided a brief summation of the job market situational analysis for the firearms industry. He indicated that he would use the current hiring practices of Remington Arms as well as Smith & Wesson as examples.

Both companies have a similar marketing hierarchy and Mr. Fini indicated a Senior Product Manager directs all of the marketing and research development efforts. He notes that sales initiatives are garnered by three Sales Managers, the eastern, mid-west, and western director of law enforcement sales. He indicates that they manage independent rep groups throughout the U. S. who provide feedback and knowledge to be used for new product development and competitiveness of current products.

Mr. Fini further explained that because the industry is relatively small, the candidates for open positions are usually industry knowlegible individuals that have had prior working relationships with these companies. This was the case with Sgt. Foraker who had dealt directly with industry representatives as the

Martin D. Haverly, Esquire
Re: Christopher Foraker

October 28, 2005
Page 4

NCOIC of the shooting range and by his participation at industry seminars/training.

He advised that the major companies conduct and/or attend law enforcement or government agency exhibitions and shows, and he notes that it is at these shows where industry sales representatives, marketing personnel, etc. develop relationships with individuals such as someone like Sgt. Foraker.

Mr. Fini indicated that relationships are built over a period of time and give rise to potential employment positions within the industry. He explained that these shows and the representative sales calls constitute the primary form of interaction between the industry and law enforcement agency personnel.

It is Mr. Fini's expert opinion that, based on Sgt. Foraker's resume as well as his personal interaction with him, that he would undoubtedly have been a prime candidate for a position within the firearms industry.

He further emphasizes that Sgt. Foraker's background in firearms operation, product knowledge, training expertise and product usage would make him an asset to any firearms company.

In conclusion Mr. Fini opines that Sgt. Foraker's ability to be hired within the industry has been severely damaged given the adverse publicity surrounding the closing of the range. He further emphasized the words *severely damaged* and indicated that a company given several candidates of Sgt. Foraker's background and expertise, would pass on him fearing the excess baggage his past would bring along.


## SALARY RANGES WITHIN THE FIREARMS INDUSTRY

Mr. Fini opined that the most likely scenario for Mr. Foraker was to enter the firearms industry in an entry-level position in either field sales, product management or training. The sales rep jobs start at approximately $55,000 annually. Many companies also offer bonus compensation of 10% to 20% if target goals are achieved. Field service reps also get compensation for travel and meals.

The training (instructor) positions for the gun company's range in pay from 445,000 to $55,000 per annum and Directors earn from $50,000 to $60,000.

Mr. Fini noted that Sales Director positions could have compensation as high as $90,000 per year plus bonus. He opined that it was unlikely that Sgt. Foraker would initially begin at this level but could work toward that over the next ten years.

Martin D. Haverly, Esquire
Re: Christopher Foraker

October 28, 2005
Page 5

## ALTERNATIVE EMPLOYMENT OPPORTUNITIES/TRANSFERABLE SKILLS

As I have described, Sgt. Foraker had positioned himself over a period of years to seek employment within the firearms industry once he retired from the Delaware State Police Department.

His particular expertise had been within the knowledge of firearms and the training of law enforcement personnel.

Based on my review of records as well as the report from Mr. Fini, it would appear that Sgt. Foraker's window of opportunity has been, for all practical purposes, shut.

Sgt. Foraker will now be faced with trying to obtain work in other areas that his law enforcement skills would come into play.

## TRANSFERABLE SKILLS ANALYSIS

The functional definition of transferable skills/worker traits are those that have been obtained through the course of an individual's education/training as well as work history that may be utilized in alternative vocational categories.

The Code of Federal Regulations defines skills transferred as follows: "A person is considered to have skills that can be used in other jobs than those performed previously when the skilled or semi-skilled work activities from past jobs can be utilized to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work."

The goal of skills transfer is to identify occupations a person could step into immediately that would require the same amount, or less, training than a person's previous jobs.

Sgt. Foraker's work history has been with the Delaware State Police Department where he served in several categories, most recently as the head of a firearms range.

Obviously his most marketable skills, once he left the Delaware State Police, would be to work in other law enforcement or firearms environments.

According to the Complaint filed on Sgt. Foraker's behalf and the expert report by Mr. Fini that corroborates those claims, Sgt. Foraker, as a result of adverse

Martin D. Haverly, Esquire                                        October 28, 2005
Re: Christopher Foraker                                                    Page 6

publicity, would be relegated to positions of a lesser capacity than what would
have been his planned career path.

## WAGE EARNING CAPACITY

You have requested that I provide an opinion as to Sgt. Foraker's current wage
earning capacity once he leaves the Delaware State Police Department.    To
accomplish the task I have divided this section into several scenarios.

### Scenario #1

Based on Mr. Fini's report and my conversation with him, the adverse publicity
surrounding the closing of the firing range and the subsequent litigations would
preclude Sgt. Foraker from entering the firearms industry. It is most likely that he
would have entered the field in a sales rep position at approximately $55,000 per
year plus expenses and 10% to 20% of your salary in bonus's if goals are met or
in a trainer/instructor status at $45,000 to $55,000.

There are other higher paying positions within the hierarchy such as product
management or training that are similar in pay to the aforementioned sales reps.
Most of these companies have Sales Managers/Supervisors who function
between the Sales Reps and The Regional Directors. Per my conversations with
Mr. Fini he feels that $65,000 to $75,000 would be a reasonable salary estimate.
Mr. Fini feels that it would be reasonable to expect that Sgt Foraker would
eventually be promoted to that position.

Although the possibility exists that Sgt. Foraker could eventually be promoted to
a Regional Director or VP, these jobs are more difficult to obtain. Director level
positions have compensation as high as $90,000 per year plus bonus's in the
20% range.

I am aware through Mr. Fini that the benefit packages available with the afore
mentioned positions are extremely lucrative and would in addition to medical
benefits, include car allowances (possibly a company car) expense credit card, a
401K plan and in many companies an additional pension plan.

Of interest was my review of the Smith and Wesson web site where three
positions were available, including a Law Enforcement Sales Rep.

### Scenario #2

Martin D. Haverly, Esquire
Re: Christopher Foraker

October 28, 2005
Page 7

Mr. Fini explained that the significant background checks performed by larger companies (including the firearms companies) would reveal Sgt. Foraker's recent problems and the adverse publicity surrounding them.

I have therefore limited my research to mid-level positions that would take into consideration Sgt. Foraker's background, but which may not be prejudiced by the above-mentioned publicity.

I have utilized two research vehicles including: (1) State of Delaware Occupational Employment Statistics, and (2) ERISA which provides salary parameters for specific vocational categories based on a person's geographic location and amount of experience.

### A. Delaware OES Wage Data

1. Firearms Experts/Forensic Science Technicians, 2003 statewide - $42,980
2. Private Detective and Investigators, statewide - $30,660
3. Dispatcher/Security Guard, statewide - $32,140
4. Security Guards, statewide - $22,470

### B. ERISA (all at 1 year of experience)

1. Sales Manufacturers Rep - $33,486
2. Detective - $28,907 ($38,721 with 7 years of experience)
3. Investigator - $28,907
4. Fraud Investigatory - $31,488
5. Surveillance System Monitor - $21,127

### IMPRESSIONS/OPINION

Based on the Complaints as well as conversations and the report of firearms expert, Bud Fini, Sgt. Foraker's plans to enter the firearms department of private industry such as Smith & Wesson or Remington have been effectively derailed due to the adverse publicity as result of defendant's action against Sgt. Foraker.

Mr. Fini explains that the large firearms manufacturers are a small, closed entity that performs extensive background checks on their applicants. It is Mr. Fini's opinion that Sgt. Foraker would not be able to enter that industry due to the fact that his reputation has been sullied. This adverse publicity may even pose problems in him securing positions within local agencies in Delaware that he normally would have sought.

Martin D. Haverly, Esquire
Re: Christopher Foraker

October 28, 2005
Page 8

Mr. Fini provided salary ranges that would have been available to Sgt. Foraker in the firearms industry. He opined that the most likely scenario would have been for Sgt. Foraker to have entered at a sales rep level at Approximately $55,000 per year plus expenses and bonus potential of 10% to 20% of your salary for meeting goals or a trainer/instructor at $45,000 to $55,000 per year ($50,000 to $60,000 as a Director).

A reasonable expectation would be that in time he would be promoted to Sales Manager position at $65,000 to $75,000 per year. In addition the benefit packages associated with these positions would be far more lucrative than those associated with entry to mid-level positions I described as available to Sgt. Foraker in the jobs he would now be expected to obtain.

I conducted research into entry to mid-level positions within the State of Delaware where Sgt. Foraker's expertise could be utilized. There is a large range with a low of working as a Surveillance Monitor to that of Private Detective. Based on his expertise and notwithstanding the adverse publicity, I would feel comfortable indicating that he would be able to make in the $30,000 to $35,000 range, which would be far less than what he would earn in the firearms industry or in a managerial position within the security department of some large company.

The above opinions have all been provided within a reasonable degree of vocational probability. If any additional information becomes available, I will be in position to review it and determine if it impacts my current opinion.

Respectfully submitted,

José R. Castro, Jr., MRC, LRC, LPC, CRC, RCC, ABDA

Enclosure(s):        Invoice

# EXHIBIT - K

# JOSE R. CASTRO VOCATIONAL SERVICES
◆◆◆

P.O. BOX 1186 ◆ EDGEMONT, PA 19028
Phone 484-422-8019 ◆ Fax 610-355-0327
Cell 610-716-0788
Email jr12c@aol.com

October 27, 2005

Martin D. Haverly, Esquire
2 East 7th Street, Ste. 302
Wilmington, DE 19801

Re:        **Curt Price and Wayne Warren v. Delaware State
           Police Department**

## EARNING CAPACITY REPORT

### INTRODUCTION

You have requested that I provide an opinion, within a reasonable degree of vocational probability, as to Cpl. Price's and Cpl. Warren's current and future earning capacity and how this has been impacted by the litigation with the Delaware State Police Department.

It is my understanding that as a result of physicals taken by Cpls. Price and Warren that a slight hearing loss was discovered and they were placed on light-duty status as of 6/18/04. Based on the complaint filed on their behalf, this slight hearing loss is not sufficient grounds for being placed on light duty and others who remain on the staff have similar problems.

The complaint goes on to charge that these two officers were being retaliated against by the Department for speaking out on public issues regarding the condition of the shooting range.

It is also my understanding that it is the normal practice for the Delaware State Police to keep officers on light-duty for only a 2-year period and after that time they are dismissed from the department.

As a result of being placed on light-duty, Cpls. Warren and Price have had reduced earnings due to their being unavailable for overtime or extra duty assignments. In addition, once the 2 years have been completed they will no

Martin D. Haverly, Esquire
Re: Price/Warren

October 27, 2005
Page 2

longer be earning a State Trooper salary, but will have to find alternate employment.

It is my understanding that there is precedence within the Department to place Cpl. Warren and Cpl. Price in jobs for which they are suited, for an indefinite period of time.

In preparation for this report I have reviewed file materials that include:

1. Resume and Training Certificates of Cpl. Wayne Warren.
2. Resume and Training Certificates of Cpl. Kurt Price.
3. A copy of the joint Complaints of Cpls. Price and Warren as well as Sgt. Foraker against the State of Delaware.

As a result of the file review I conducted labor market research, which has enabled me to provide for you my opinion, within a reasonable degree of vocational probability, as to whether Cpls. Warren and Price have suffered lost earnings and/or a diminished earning capacity.

## BACKGROUND INFORMATION

### Cpl. Wayne Warren:

A. Education:

- received Associate's degree in Criminal Justice from Del Tech in Georgetown, DE - 1979

- received a Bachelor's degree in Criminal Justice from Delaware State College - 1982

- Graduated from the Delaware State Police Academy - 1983

B. Work History:

- Became a Delaware State Trooper in 1983 and worked with Troop 7 in Lewes, DE until 1986.

- From 1986 to 1991 Mr. Warren was assigned to the Special Investigations Unit, Delaware State Police Troop 9 Odessa (Detective).

Martin D. Haverly, Esquire                                      October 27, 2005
Re: Price/Warren                                                          Page 3

- From 1991 to 1996 served with Delaware State Police Troop 7 in Lewes as a Senior Cpl.

- From 1996 to 1999 he worked for the Special Investigations Tactical Unit (SITU) Troop 9 Odessa, Master Cpl. NCOIC – Supervisor

- From 1999 to 2001 served with the Governor's Task Force, Delaware State Police Troop 4 Georgetown, Assistant Non Commissioned Officer In Charge

- From 2001 to 8/18/04 Firearms Training Unit Academy Headquarters Dover, DE, Firearms Training Officer.

## Cpl. Brian Price

A. Education

- Delaware State Police Training Academy – September 1985 to December 1985

B. Training

- Marine Corp Recruit Training, Parris Island, SC – June 1981 to September 1981

- Fleet Marine Corps Communications School – September 1981 to November 1981

- United State Marine Corps Reserve 4th Combat Engineers – November 1981 to February 1985

C. Work History:

- Uniformed Correctional Officer, Delaware Correctional Center – August 1982 to September 1983

- Department of Corrections of Delaware – July 1982 to August 1982

- Uniformed Patrol, City of Dover Police Department – December 1983 to September 1985

Martin D. Haverly, Esquire                                  October 27, 2005
Re:  Price/Warren                                                      Page 4

- City of Dover, Delaware Police Department Municipal Class – September 1983 to December of 1983

- Delaware State Police Training Academy – September 1985 to December 1985

- Field Training/Uniformed Patrol 5, Bridgeville, DE – December 1985 to March 1986

- Uniformed Patrol Troop #3, Dover, DE – March 1986 to 1989

- Undercover Operations – 1989 to 1990

- Delaware State Police K-9 Unit – 1990 to 1993

- Uniformed Patrol Troop #3 Dover, DE – 1990 to 1996

- Assistant Shift Commander, assigned to supervise and conduct roll call at shift lineup.  Supervised field operations of troopers assigned to the shift.

- Delaware State Police Special Operations Response Team – April 1989 to March 1995

- Delaware State Firearms Training Unit, Smyrna, DE – December 1996 to June 18, 2004

## TRANSFERABLE SKILLS ANALYSIS

The functional definition of transferable skills/worker traits are those that have been obtained through the course of an individual's education/training as well as work history that may be utilized in alternative vocational categories.

The Code of Federal Regulations defines skills transferred as follows:  "A person is considered to have skills that can be used in other jobs than those performed previously when the skilled or semi-skilled work activities from past jobs can be utilized to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work."

Martin D. Haverly, Esquire                                      October 27, 2005
Re: Price/Warren                                                       Page 5

The goal of skills transfer is to identify occupations a person could step into
immediately that would require the same amount, or less, training than a
person's previous jobs.

Cpls. Price and Warren have years of experience as Delaware State Troopers
and in the recent past as Firearms Range Instructors.

Albeit they have suffered a small loss of hearing, they would still be able to utilize
the skills obtained from their police training to do other jobs with related required
tasks.

These jobs would include working in the Security or Surveillance fields, as a
Private Detective or possibly even as a Firearms Instructor for private industry.

## WAGE EARNING CAPACITY/IMPLICATIONS

You have requested that I provide an opinion as to Cpl. Warren's and Cpl. Price's
current wage earning capacity once they are forced to leave the Delaware State
Police Department.  To accomplish the task I have divided this section into
several scenarios.

### Scenario #1

It is my understanding that as of 6/18/04 Cpls. Warren and Price were placed on
light-duty status.  It is also my understanding that the Troopers are only allowed
to remain with the De. State Police and/or on light-duty for at least 2 years.

Cpl. Price's date of birth is 1/2/63 (current age 42 years 7 months), which would
leave him a substantial amount of time before he would retire at age 55.

Cpl. Warren's date of birth is 5/22/58 (age 47 years 3 months) and his expected
age of retirement was also 55.

Had they not been placed in a light-duty assignment and continued with their
normal duties they would have continued serving until age 55. Therefore from the
time of their termination until their retirement they would not be earning the State
Trooper's salary, extra off-duty assignments, nor would they garner full pension
benefits that they would have commanded had they retired at their own choosing.

Martin D. Haverly, Esquire                                  October 27, 2005
Re: Price/Warren                                                      Page 6

## Scenario #2

Once they are dismissed as Delaware State Troopers, they would continue to have an earning capacity, although lower than the alternative positions I have researched below.

My research includes data obtained through Delaware State Office of Employment Statistics (2003 salaries) as well as ERISA's Competitive Salary Assessor, which provide salary parameters for specific vocational categories based on a person's geographic location as well as experience.

### A. Delaware OES Wage Data

1. Firearms Experts/Forensic Science Technicians, 2003 statewide - $42,980
2. Private Detective and Investigators, statewide - $30,660
3. Dispatcher/Security Guard, statewide - $32,140
4. Security Guards, statewide - $22,470

### B. ERISA

1. Sales Manufacturers Rep – at 1 year of experience $33,486
2. Detective - at 1 year of experience $28,907 ($38,721 with 7 years of experience)
3. Investigator - at 1 year of experience $28,907
4. Fraud Investigator - at 1 year of experience $31,488
5. Surveillance System Monitor - at 1 year of experience $21,127
6. Armored Car Guard and Driver - at 5 years of experience $26,046, at 10 years $30,205

## IMPRESSIONS/OPINION

I have provided a background on the current litigation surrounding Cpls. Warren and Price's litigation against the Delaware State Police Department for unjustly removing them from their positions.

I am aware that normally State Troopers are able to obtain additional income by functioning in off-duty work. However in this situation since Cpls. Price and Warren have been removed from regular duty, they may not be eligible for these extra duty assignments.

Martin D. Haverly, Esquire
Re: Price/Warren

October 27, 2005
Page 7

Insofar as loss of earning capacity, it is my opinion, within a reasonable degree of vocational probability, that although employable outside the Delaware State Police Department, they would not garner the type of salary, benefits or pensions in private employment that they would if they were allowed to continue with the State.

It is my professional opinion that they would be able to earn in the range of $30,000 to $35,000 and the difference between that and their current earnings would be a fair measure of their loss of earning capacity outside the Department for the remainder of years that they had planned on being Delaware State Troopers.

All of the opinions provided in this report have been within a reasonable degree of vocational probability. In addition, should other records become available, I would be in a position to review them and determine if this data impacts my opinion.

Respectfully submitted,

José R. Castro, Jr., MRC, LRC, LPC, CRC, RCC, ABDA

Enclosure(s):        Invoice

# EXHIBIT - L

27 Ball Farm Way
Wilmington, DE 19808

Home: 302 994-4205
Bus:   302 994-4205
Fax:   302 994-4206
Cell:   302 379-0225
E-Mail:  budfini@msn.com

# Ernest "Bud" Fini

**Objective**

To obtain a position utilizing my marketing, sales, financial and administrative experience in the consumer products/outdoor recreational industry.

**Experience**

**2002- 2004      Intermark Sporting Goods Marketing   Wilmington, DE**

**Heckler & Koch, Inc.**                                    **Sterling, VA**

Consultant to H & K. Provide complete marketing communications directions for commercial business. Developed media plan and schedule. Purchased media and developed new ads for insertion. Directed and wrote new 28 page full-line catalog for commercial and law enforcement products, 70M circulation.

**2001- 2002      Intermark Sporting Goods Marketing        Azusa, CA**

**National Sales Manager—Perazzi, USA, Inc.**

Consultant to Perazzi USA. Manage and direct all sales and marketing efforts for Perazzi, USA. Annual sales' volume is $8-9MM. Relocated to Azusa, California.

- Reduced the number of distributors by 40% to add value to partnering with the Perazzi line
- Rewrote old sales' programs to require 4X greater up-front commitment to maintain distributorship status.
- Pricing and programs resulted in 15% increase in profitability for 2001 while increasing volume.

**1999–2001        Savage Arms Co.               Westfield, MA**

**Vice President of Sales & Marketing**

Direct report to President/CEO with seat on the Board of Directors. Acquired a 1% ownership in the holding corporation. Created and developed the business plan encompassing the years 2000-2003. Day-to-day responsibility for managing the outside sales representatives' force, new product development, pricing and profitability of product line and marketing communications. Direct sales responsibility for Wal-Mart and K-Mart.

- Introduced two new rimfire products to Wal-Mart, resulting in an annual incremental increase of 25M units.
- Coordinated the introduction of Savage's first entry in the Black Powder market, achieving first year sales in excess of 4M units.
- Created individualized products for select customers (Jerry's Sports Center, Ellett Bros. Hicks) to reduce direct distributor competition; distributor business increased 26% over the previous year.
- Streamlined the product line by eliminating 47 slow-moving SKU's, while increasing total sales over 5%.

**1998 –1999**     **O. F. Mossberg & Sons Inc.**     **West Haven, CT**

**Vice President Sales & Marketing**

Consultant to O. F Mossberg & Sons with direct report to CEO. Served as V. P. of Marketing with responsibility for the Marketing Plan development and implementation. Directed research in new product development. Direct reports included press relations and communications managers.

- Implemented major sku reduction to product line. Over 50 items removed from current product listing.

- Created 1998 Mossberg Sales' Programs which exceeded the corporate volume objectives by more than 20%. Reduced redundant or slow moving SKU's by 31% (83 line items).

- Separated law enforcement and commercial businesses in terms of communications. Product separate catalogs and targeted each segment with its own advertising.

- Increased presence in vertical publications and TV.

**1996 – 1998 SIGARMS**     **Exeter, NH**

**Vice President Marketing**

Consultant and employee during tenure. Direct report to the CEO with responsibility for development of the marketing sales and product plans. Direct reports included product managers for Hammerli, SIG Sauer rifles, marketing communications manager and support staff.

- Planned, developed sourcing, and managed the sales' introduction for the new SIGARMS hunting shotgun product lines.
- Developed the specifications for the introduction of the SHR 970 wood & synthetic.
- Developed the initial Blaser rifle offering and integration into the product mix.

**1996**     **Intermark Sporting Goods Marketing**     **West Chester, PA**

**President**

Created Intermark Marketing & Communications to provide affordable marketing and marketing communications' assistance, including product management, media placement, ad concept and development and public relations to firearms and related industry clients, allowing them to select specific services and avoid costly agency overhead costs. Total Billings were $1.5MM in 1998. Major accounts included O.F. Mossberg & Sons, Inc. (serving as VP, Marketing), SIGARMS (serving as VP, Marketing); Beretta (Market Study for black powder rifle product introduction); Fort Knox Safe Company (Business Consultant); Tetra Gun Products (Ad Creation).

- Third year gross revenue exceeded $1.5MM

**1976–1996**     **Remington Arms Company**     **Wilmington, DE**

**Director – Marketing Communications 1991-1996**

Specific duties were to coordinate and direct the efforts of Advertising Manager, Merchandising Manager, Publicity/Public Relations Managers, Manager of Conservation Resources, Manager of Consumer Services and Database Manager, with primary responsibility to create and implement the Strategic Communications Plan for all businesses – Firearms, Ammunition, Apparel, Accessories and Stren Fishlines. Responsible for the creation and implementation of a $21MM budget. Efforts contributed to 1994 being the best sales year to date for the 180-year-old company.

- Developed the Remington Sportsman magazine concept as a direct market vehicle, with a circulation of 310M (200M newsstand).
- Developed and implemented the Remington Co-op Plan. Annual budget of $3.2MM.
- Developed Marketing Communications Group from three employees in 1991 to 13 in 1995, including managers in Advertising, Publicity and Public Relations, Merchandising, Conservation and a new 1-800 Consumer Service Group of six people.
- Developed the function of and direction for Database Marketing with annual sales of $3MM in promotions and $1MM in direct marketing in 1995.

**Marketing Manager – Firearms 1984 -1991**

Accountable for planning and worldwide performance (profitability) of firearms. Prepare and maintain a comprehensive worldwide business plan in support of the corporate strategic plan. Coordinate and direct the efforts of the Senior Product Programs Manager –Firearms, Product Manager-Firearms, Product Specialists and key functions in support of existing product and development of new products. Directed business value in 1989 was $200MM.

- Developed Mag-10 concept for Ithaca buy-out and product line introduction.
- Developed 90-T single barrel trap gun concept and managed product line introduction.
- Revised warranty repair procedures for entire product line. First year savings were in excess of $1MM.
- Introduced pricing and strategy for Model 870-Express. Three year sales in excess of 300M units with total revenues of approximately $52MM.
- Revised Custom Shop mission and pricing structure. Volume increased by 4X; revenues up from $500M to $2MM.
- Increased total firearms' business volume by 200M units and $50MM in 4 years.

**Regional Sales Manager – Midwest Region**     **1981-1984**

Managed overall sales function of 41 key accounts in an eight-state Midwestern Region. Trained and coordinated the efforts of four field sales' representatives in territory development through the addition/deletion of accounts, pricing strategies negotiation and implementing sales promotions. Regional sales volume was $21MM in 1982, $26MM in 1983.

- Improved clay target sales from 6MM to 15MM in two years. Target ammunition sales increased from 900M rounds to 1.7MM rounds in same period. Increased overall gun club business 200% in two years.
- Designed and implemented extra barrel promotion with Coast-To-Coast stores, increasing volume from 1500 to 6500 units in one year.
- Successfully negotiated rimfire ammunition pricing with core accounts to raise regional volume to 141MM rounds from 93MM rounds.

- Successfully negotiated with and signed Shopko Stores and Duckwall-Alco stores as new accounts. Total yearly volume of these accounts $3.5MM.
- Reduced territory selling expenses by 7%, while increasing sales' volume in excess of 20%.

### Assistant Manager – National Accounts   1979-1981

Managed all sales aspects (including sales promotion, pricing and product mix) over five national accounts – K-Mart, J.C. Penney, Ace & Cotter (True Value) Hardware Stores and Maurice Sporting Goods. Provided sales training and aid to key personnel within their organizations. Provided Remington management with a line item forecast of major item usage by year.

- Aggregate starting volume in 1979 was $38MM; ending volume in 1981 was $43MM.
- Negotiated a 15,000-rifle closeout sale with K-Mart by devising regional packaging to appeal to their needs.
- Sold K-Mart "Dove and Quail" loads for the first time, a net shotshell sales increase of 35MM rounds and introduced premium rimfire for first year sales volume of 25MM rounds.

### Sales Representative – New England & Michigan Territories   1976-1979

Responsible for all Remington activity within the respective territories, encompassing account management (sales, pricing, promotion and training), law enforcement, education and gun club liaison, as well as dealer and consumer promotions. Dollar volume for Michigan territory was $4MM; New England territory was $10MM.

| | | |
|---|---|---|
| **Education** | 1982–1983          Rockhurst University | Kansas City, MO |
| | - 30 credits toward MBA in Marketing | |
| | 1971-1975          Sacred Heart University | Bridgeport, CT |
| | - Bachelor of Science Degree in Business Administration Major in Marketing; Minor in Advertising | |
| **Interests** | Shooting sports, Hunting, Racquetball and Physical fitness. | |
| **Military Service** | Four years United States Air Force – Honorable Discharge; attained rank of Staff Sergeant. | |

# EXHIBIT - M

**Intermark**
3232 Griggs Drive
Boothwyn, PA 19061

October 28, 2005

Martin D. Haverly, Esq.
2 East 7th Street
Suite 302
Wilmington, DE 19801

**RE:** <u>Sgt. Christopher D. Foraker</u>
    <u>Preparation of Expert Report</u>

Dear Mr. Haverly:

In response to your July 25, 2005 letter request, I offer the following Export Report.

<u>Qualifications</u>

       I have spent over thirty years in the firearms business in various capacities as detailed in the attached resume. Particular emphasis has been in the marketing programs of major firearms corporations, i.e. Remington Arms Co., SigArms, O. F. Mossberg & Sons, Savage Arms, Inc., Smith & Wesson Corporation and Heckler & Koch. Each of these companies has specific divisions dealing with the development, manufacture, marketing and sale of law enforcement firearms and related products. In practically every position in which I have served, I have been directly involved with the hiring of key personnel for various position within the company. The work I have done as well as the experience gained over my career qualifies me as an expert witness (See resume attached).
My expertise will be use to identify:
   ➤  The likelihood that an individual might be hired in the firearms industry;
   ➤  How that individual might progress within the firearms industry;
   ➤  Typical compensation that would accompany these positions.

<u>Job Market Situational Analysis</u>

       To better understand positions available and current hiring practices, I will use the Remington Arms Co. and Smith & Wesson Corp. as examples.
       Remington is the U.S. leader in pump-action shotguns sold for law enforcement and home defense purposes. The Remington Model 870 pump-action shotgun has, for over thirty years, been considered the standard carry shotgun for most law enforcement and government agencies in the U. S. Regardless of that dominant position, law enforcement products account for less than 5% of Remington's $200million annual firearms' sales. Under the guidance of the Vice President and General Manager of Firearms, the Manager of Law Enforcement Sales is also located at Remington's headquarters in Madison, North Carolina. The Law Enforcement

Department consists of the Manager and an Order Services' Specialist to enter orders. Additionally, five company field force representatives cover the U.S. law enforcement market sales' territories. The five representatives and Manager of Law Enforcement Sales provide feedback and competitive information to the Vice President and his staff in order to develop and maintain competitive products for the law enforcement market.

Smith & Wesson Corp is the leading U.S. manufacturer of revolvers and autoloading pistols. Less than 15% of Smith & Wesson's total sales are law enforcement firearms. Their marketing hierarchy is very similar to Remington's. A Senior Product Manager directs all of the marketing research development efforts for all business segments, including law enforcement. Sales' initiatives are guided by three sales managers – the Eastern, Midwest and Western Directors of Law Enforcement Sales. They are company employees, and manage independent reps' groups throughout the U.S. These Managers, along with an International Sales Manager, provide feedback and competitive product knowledge to strategize new product development and assess the competitiveness of current offerings. The Sales Manager usually does hiring for the Sales positions. He receives resumes either through classified advertisements or personal contacts within the industry. Candidates considered for selection are usually brought into the home office and interviewed. Those that would qualify are usually given background checks and then called for a follow-up interview prior to selection. In Chris Foraker's case, the background checks would most certainly reveal the negative articles printed about him.

The hiring of Director level positions has been handled internally in recent times. Because the firearms industry is relatively small, candidates are usually industry people that have worked for major companies within the industry and have been recruited away. However, this recruiting can, and has included candidates from law enforcement and government agencies outside the firearms' industry. Candidates are usually brought in after their resumes have been scanned. They go through a series of five interviews and are evaluated in terms of people skills, background, experience, product knowledge, industry knowledge, contacts within the industry, etc. If the interview is positive, a full background check is initiated to confirm the viability and credibility of the candidate.

As a side note, should a VP level position become available, candidates are generally recruited utilizing an outside agency. In recent times, the agency most used has been the Spencer Stuart firm. They screen the resumes, perform the background checks and then present only the viable candidates to senior management for final selection.

Most major firearms' companies conduct and/or attend law enforcement, governmental agency shows and exhibitions. It is at these shows where industry sales representatives, marketing personnel and other company employees develop relationships with individuals like Chris Foraker. These relationships are built over a period of time and provide a basis for potential employment positions within the industry. These trade shows, along with the rep sales' calls, constitute the primary interaction between the firearms' industry and law enforcement, military and government personnel.

It is the writer's opinion that the Smith & Wesson and Remington Arms scenarios provide a clear insight into the hiring practices currently used within the firearms' industry today. Listed below are some general observations that the industry utilizes to make hiring decisions:

➢ Firearms' companies generally promote from within, whenever possible. It allows the company to install a candidate that is a known commodity and significantly eliminates

2

the down-time required to get a candidate up to speed with regard to product knowledge, customer base and overall company policy and operation.

➢ Hiring from the outside for most manufacturers is usually limited to field sales, product management positions or training.

➢ Good positions are limited within the industry. The only notable exception among the large companies is SigArms. Due to a change in ownership, many changes in senior management and the expansion into new product categories, Sig has hired a number of new employees for training, field sales and market product positions in the last eight years.

## Compensation Analysis

Entry level positions in field sales, product management or training within the law enforcement segment of the industry start at approximately $55,000 annually. Additionally, compensation sometimes includes a company car or auto allowance, 401K/pension fund, health and life insurance. Some offer bonus compensation as high as 20% if performance, sales goals, or overall corporate performance is attained. An industry bonus average for these positions would be in the 10% range. I would expect that Chris Foraker would receive compensation in this range plus at least a 10% bonus. Additionally, it is my opinion that Chris would rise within the next 5-10 years to the level of Sales Manager. Compensation at this level would be in the $65,000-$75,000 range plus at least a 10% bonus.

Senior marketing level Director or VP positions in the firearms' industry is very limited. Compensation can be as high as $90,000 +, annually, plus bonuses in the 20% range. I believe it could be attainable from an entry-level position, given a greater than 10-15 year career span. I know of no one with Chris' level of experience that has been directly hired into a Director or VP position of this level.

Law enforcement training positions offer a broader flexibility in terms of compensation and specific assignments. There are entry-level positions for basic training personnel, with salary expectations of $45,000-$55,000 a year. Additionally, there is usually a Director/Manager level position with compensation of $50,000-$60,000. I am confident that Chris Foraker would qualify for an entry level training position and have the ability to advance to Manager within a 5-10 year period. It should be noted that positions in law enforcement training are fewer than Sales or Marketing positions and are not as often available.

## Conclusion

Based on Chris Foraker's resume and my personal interaction with him, I assessed him to be a prime candidate for a position with a firearms' manufacturer or industry related company. When I met with Chris in 2002, relative to his first lawsuit against Col. L. Aron Chaffinch and the Delaware State Police, I was impressed with his background regarding firearms' operation, function, usage, product knowledge and training expertise. I thought Chris would be an asset to a firearms industry company and that, at that time, a transfer out of training to another department would not negatively impact his future plans for a position within the firearms' industry. Based on my interview with Chris at that time, I did not think that his future in the firearms industry had been jeopardized. Chris' overall personal appearance, demeanor, industry knowledge and presentation skills clearly demonstrated his future potential. I would expect that Chris Foraker would be hired in the firearms industry for either entry-level sales or a training position, absent the negative publicity.

More recently, it is the writer's opinion that the adverse publicity regarding the closing of the Delaware State Police Range has severely damaged his ability to be hired by a major company in the firearms' industry. I believe the words "severely damaged" are correct and appropriate for Chris' situation. Numerous articles published regarding the Delaware State Police Range in Smyrna, (i.e., "American Police Beat", a publication read by every major law enforcement agency in the United States, the Delaware State News, and The News Journal), implicated Sgt. Foraker as the person solely responsible for the environmentally unsafe condition of the range and its eventual closing. These articles, appearing over an extended period of time, and being read by so wide an industry audience have undoubtedly cast suspicion on Sgt. Foraker's ability to manage and operate a range. There is no question that, given several candidates with backgrounds and experience comparable to Chris, those charged with hiring would eliminate Chris from consideration, fearing the "excess baggage" accompanying his candidacy.

The opinions expressed in this report are true and correct within a reasonable degree of certainty based on the hiring practices currently used by the major manufacturers in the U.S. firearms industry.

If you have questions, require additional information or clarification, I am available at your convenience.

Very truly yours,
INTERMARK


Bud Fini