Price, et al.                                        v.                          Chaffinch, et al.
David L. Baylor, Volume 1              C.A. # 04-1207                           July 18, 2005

Page 14

1  that means noncommissioned officer in charge of the unit.
2  Right?
3      A.  Yes, sir.
4      Q.  You were not the NCOIC of the executive
5  protection detail?
6      A.  No.  He was.
7      Q.  You served there through September of '93 for
8  Governor Carper, right?
9      A.  Yes, sir.
10     Q.  You would have reported to the major who had
11 responsibility for operations in Kent and Sussex County?
12     A.  I think it was shifted and at that time we
13 reported to Major Bill Waggaman who was in charge of all
14 special units.
15     Q.  Major Waggaman.  Okay.  He went on to become --
16     A.  Lieutenant colonel.
17     Q.  So then in September of '93 you are assigned
18 back to Troop 6?
19     A.  Yes, sir.
20     Q.  And you become a shift sergeant at Troop 6?
21     A.  Yes, sir.
22     Q.  So that means one of the four shifts of 15 to
23 16 people, you were the sergeant in charge of the shift?
24     A.  Yes, sir.

Page 15

1      Q.  And had the size of Troop 6 decreased at that
2  time or was it still around 60 or so people?
3      A.  Still probably around 60 people.
4      Q.  Then a year later you become a lieutenant in is
5  it called personnel or Human Resources?
6      A.  They're synonymous.  At that time it was
7  personnel and then it was later changed when they did an
8  extreme makeover.
9      Q.  And the extreme makeover changed the title to
10 Human Resources?
11     A.  Yes, sir.
12     Q.  Were you the highest-ranking uniformed officer
13 in the personnel office at that time?
14     A.  Myself and Lieutenant Bill Eubank.
15     Q.  Who was more senior?
16     A.  He was.
17     Q.  He was the highest-ranking uniformed officer?
18     A.  Yes, sir.
19     Q.  At that time there was a civilian director of
20 personnel?
21     A.  Yes, sir.
22     Q.  His name was John Dillman?
23     A.  Yes, sir.
24     Q.  He had held that office since the administration

Page 16

1  of Governor DuPont, I believe.  Wasn't that true?
2      A.  Yes, sir.  No.  I believe it was in
3  Governor Castle's first term.
4      Q.  So Mr. Dillman came in in Governor Castle's
5  first term?
6      A.  It was either the end of DuPont or beginning of
7  Castle.  It was right around there.
8      Q.  He had served as the state director of personnel
9  under Governor DuPont; is that correct?
10     A.  Right.
11     Q.  Before Governor DuPont made him the state
12 director of personnel, he had served as the director of
13 personnel for the State Police back then?
14     A.  Right.
15     Q.  So you were serving under someone with a lot of
16 experience and years in the personnel function of the
17 Delaware State Police?
18     A.  Yes, sir.
19     Q.  When you were transferred into the personnel
20 office in September of '94, was that experience and
21 knowledge and training in the personnel function in the
22 State Police, were you trained in that?  Did you learn
23 how to work in the personnel office?
24     A.  It was all on-the-job training or supposedly

Page 17

1  on-the-job training of which during the course of that
2  time Mr. Dillman only shared with me that information
3  that he wanted to share with me and did not share with me
4  other information or train me on how to do the job.
5      Q.  Were there written policies and procedures of
6  the personnel office that you became familiar with?
7      A.  Yes, sir.
8      Q.  The Delaware State Police, I have seen some
9  little blue books that have, for want of a better word,
10 let's say, policies and procedures of the State Police.
11     A.  Yes, sir.
12     Q.  Are there such books?
13     A.  Yes, sir.
14     Q.  For example, there are standards or directives
15 of conduct that troopers are supposed to follow.  Is that
16 right?
17     A.  Yes, sir.
18     Q.  Like troopers are not supposed to lie in the
19 course of their duties?
20     A.  Yes, sir.
21     Q.  Troopers aren't supposed to commit crimes?
22     A.  Right.
23     Q.  There's organizational stuff in that book about
24 the colonel and his responsibilities, lieutenant colonel,

5 (Pages 14 to 17)

Price, et al.                                    v.                          Chaffinch, et al.
David L. Baylor, Volume 1                  C.A. # 04-1207                    July 18, 2005

Page 94

1    A. 2000. Greg had had a fund-raiser. Then that
2    position laid dormant for a while. Aaron Chaffinch moved
3    over to the operations officer for Kent and Sussex County
4    while Waggaman remained lieutenant colonel. And then
5    after Waggaman retired is when Chaffinch became
6    lieutenant colonel, then Mark Seifert became a major of
7    the technology position.
8        Q. Prior to that Mark Seifert was still working in
9    the Human Resources function?
10       A. Right.
11       Q. As the senior uniformed officer?
12       A. No. Prior to becoming the technology major, he
13   was the troop commander at Troop 1, Penny Hill.
14       Q. Was John Yeomans in there?
15       A. Yes.
16       Q. Let's try to focus on John Yeomans, then.
17   Seifert became a troop commander at Penny Hill.
18       A. Uh-huh.
19       Q. As a captain, right?
20       A. Right.
21       Q. So then Seifert moved out of the Human Resources
22   function?
23       A. Right.
24       Q. And he was replaced by John Yeomans?

Page 95

1    A. Yes, sir.
2        Q. Do you remember what year it was that Seifert
3    becomes the troop commander at Penny Hill?
4        A. I want to say it was sometime in 2000, because
5    in 2001, in February I think is when he got promoted to
6    major.
7        Q. Is it fair to say that Seifert is serving as the
8    troop commander at Penny Hill sometime in early 2000?
9        A. Yes, sir.
10       Q. Is it fair to say that Major Forrester retires
11   after Seifert takes over as troop commander in Penny
12   Hill, sometime after?
13       A. I think so.
14       Q. It's fair to say, then, that while
15   Major Forrester was still working for the Delaware State
16   Police, Captain John Yeomans had assumed his duty in the
17   Human Resources function?
18       A. Yes, sir.
19       Q. While Captain John Yeomans was the
20   highest-ranking uniformed officer in the personnel
21   function, Major Forrester was also serving in the
22   Delaware State Police?
23       A. Yes, sir. I believe.
24       Q. Is it fair that Captain Yeomans would have had

Page 96

1    to have known that Major Forrester was wearing hearing
2    aids because he was working in the same building with
3    him? It's in the front of building?
4        A. I can only answer it this way: That as cops
5    we're all trained observers and that everyone who worked
6    in that facility or came to that facility that dealt with
7    Major Forrester had to see the hearing aids in his ears.
8        Q. Major Forrester was able to do his duties even
9    though he was wearing hearing aids?
10       A. He was able to serve in his position. Yes.
11       Q. Was Major Forrester ever forced out of the
12   Delaware State Police and made to retire against his
13   will?
14       A. To my knowledge, no.
15       Q. It's your understanding that he just retired at
16   age 55 as is the normal career path?
17       A. Yes, sir.
18       Q. Are you aware of any interruption in his career
19   that took place because of the fact that he needed
20   hearing aids?
21       A. No, sir.
22       Q. Are you aware of his being suspended at any
23   point in time because he had hearing issues?
24       A. No, sir.

Page 97

1        Q. Let's go to another one. Lieutenant
2    Charles Klim, K-l-i-m?
3        A. Klim.
4        Q. K-l-e-m?
5        A. K-l-i-m.
6        Q. Are you familiar with Lieutenant Charles Klim?
7        A. Yes, sir.
8        Q. Did he wear hearing aids?
9        A. To my knowledge, I'm not sure.
10       Q. You don't know one way or the other whether he
11   wore hearing aids?
12       A. Right.
13       Q. Do you know when he retired?
14       A. Charlie had to retire sometime around '95.
15       Q. Do you know whether he retired in the normal
16   course?
17           MR. FITZGERALD: Objection to form.
18   BY MR. NEUBERGER:
19       Q. Do you know whether he just took a normal
20   service pension after 20 years at his choosing?
21       A. I believe so.
22       Q. Are you aware of whether he retired on a
23   disability or anything?
24       A. I'm not sure. I don't know.

25 (Pages 94 to 97)

Price, et al.                                     v.                          Chaffinch, et al.
David L. Baylor, Volume 1              C.A. # 04-1207                          July 18, 2005

Page 98

1   Q.  You never heard that, right?
2   A.  No.
3   Q.  Do you know what position he served in as
4   lieutenant?
5   A.  I think he retired in Internal Affairs.
6   Q.  Do you know any other positions he served in?
7   A.  Deputy troop commander, Troop 1.
8   Q.  Deputy troop commander, Troop 1.  Where else did
9   he serve?
10  A.  Troop 6.
11  Q.  Do you know what he did at Troop 6?
12  A.  I think he was a road sergeant.  Then I think he
13  had been a detective.  I'm not sure.
14  Q.  Who would the colonel have been when he retired
15  in 1995?
16  A.  '95 would have been Graviet/Ellingsworth around
17  that era.  That's right.  Ellingsworth.  It was
18  Ellingsworth.
19  Q.  Did you ever observe him to have hearing
20  difficulties in your interactions?
21  A.  I can't remember.
22  Q.  Next is a Corporal Bruce Peachey?
23  A.  Yes, sir.
24  Q.  Do you know who Bruce Peachey is?

Page 99

1   A.  Yes, sir.
2   Q.  Was he shot in the line of duty, had some sort
3   of a bullet wound to his ankles?
4   A.  Yes, sir.
5   Q.  What do you recall about Bruce Peachey's injury?
6   A.  It was the night I got promoted to major, not
7   even 24 hours, he had the shooting where Bruce, who's my
8   classmate from the academy, got shot going to chase which
9   ended up at 95 on 896.  Got shot to the foot and was
10  hospitalized and then later was forced to retire.
11  Q.  You became a major in February of 2002.
12  A.  Uh-huh.
13  Q.  Right?  And you became the operations major for
14  New Castle County?
15  A.  Uh-huh.
16  Q.  And the night you became the operations major
17  one of the men under your command was wounded.
18  A.  Yes, sir.
19  Q.  That was one of the first matters you had to
20  attend to?
21  A.  Yes, sir.
22  Q.  You're telling me that eventually Bruce Peachey
23  retired?
24  A.  Yes, sir.

Page 100

1   Q.  What's corporal 3?
2   A.  Master corporal.
3   Q.  Did he retire two years later?
4   A.  Yes, sir.
5   Q.  Do you remember the month he retired?
6   A.  February I think it was.
7   Q.  Of 2004?
8   A.  Yes, sir.
9   Q.  Let's focus here now.  Bruce Peachey is injured
10  in February 2002, right?
11  A.  Yes, sir.
12  Q.  That is the month you recall Aaron Chaffinch
13  moving from acting superintendent of the State Police to
14  full superintendent of the State Police?
15  A.  Yes, sir.
16  Q.  That was one of his first official acts after
17  becoming the full superintendent was to promote you to
18  major?
19  A.  Yes, sir.
20  Q.  Throughout the time prior to Bruce Peachey going
21  off on retirement in 2004 Colonel Chaffinch was the
22  colonel?
23  A.  Yes, sir.
24  Q.  And at the beginning of that period of time

Page 101

1   Tom Marcin was the lieutenant colonel?
2   A.  Yes, sir.
3   Q.  And sometime during that period Tom Marcin
4   retired, right?
5   A.  Yes, sir.
6   Q.  And then Tom MacLeish became the lieutenant
7   colonel?
8   A.  Yes.
9   Q.  And throughout the time that Tom MacLeish was
10  the lieutenant colonel, Bruce Peachey was continued on
11  light duty through February of 2004?
12  A.  Yes, sir.
13  Q.  You probably visited Bruce Peachey in the
14  hospital, didn't you?
15  A.  Yes, sir.
16  Q.  You probably followed his situation very
17  carefully?
18  A.  Yes, sir.
19  Q.  What was the course of his treatment or attempts
20  at rehabilitation?
21  A.  Well, like I said, corporal Peachey had gotten
22  shot.  I think it was February 8, 2002, or February the
23  9th, 2002, and it was about 3:00 in the morning, and he
24  was transported to Christiana Hospital.  I was called.

26 (Pages 98 to 101)

Price, et al.
David L. Baylor, Volume 1

v.

C.A. # 04-1207

Chaffinch, et al.
July 18, 2005

Page 102

1  I responded in along with Lieutenant
2  Colonel Marcin. Turned out we could have had a staff
3  meeting with everybody who ended up in there. But
4  Peachey had gotten shot on the ridge of his foot and he
5  was in some pain that night, but he still recalled me
6  being there to crack off a joke as only he could do.
7      The next morning the Governor came to
8  visit. They weren't sure of the extent of the injury to
9  his foot, and it wasn't known until two or three months
10  later that his injury was more severe than initially we
11  had all thought. And I think it became even apparent to
12  him at that point in time that he may not totally recover
13  back to full duty.
14      Shortly thereafter, he's my friend, and I
15  went to the colonel and I asked to put him into the
16  range.
17  Q.  Into the what?
18  A.  The range. Because he wouldn't come back.
19  Q.  So he was given a light-duty assignment at the
20  range?
21  A.  Yes.
22  Q.  And the colonel agreed?
23  A.  Yes.
24  Q.  Colonel Chaffinch?

Page 103

1  A.  Right.
2  Q.  You're saying it was apparent three or so months
3  into his recovery that he would not be able to be
4  physically able to be fully performing his duties as a
5  trooper?
6  A.  Yes. He would not be a road trooper again.
7  Q.  He couldn't be a road trooper.
8  A.  Yes.
9  Q.  Is it fair to say that that realization was a
10  heavy thing for Mr. Peachey to be bearing?
11  A.  Yes. This was his life, to a certain extent.
12  We went through our career together. So it was both our
13  lives. And to see him not be able to do this job ever
14  again, I could see how emotionally it affected him. So
15  what I tried to do was ease the pain as much as I could
16  and let him do something while he continued to try to
17  rehab. Do something. That's what happened.
18  Q.  He would have graduated from the academy in
19  September of 1982 like you did?
20  A.  Yes, sir.
21  Q.  This injury was in the middle of his 19th year
22  as a trooper?
23  A.  Yes, sir.
24  Q.  Then in September of 2002 he crossed that

Page 104

1  20-year threshold?
2  A.  Yes, sir. Actually, in February of 2002 we
3  crossed the 20-year threshold.
4  Q.  It's when you go to the academy?
5  A.  The day you're appointed.
6  Q.  You're saying that you fully realized that he
7  wasn't going to recover to full functionality as a road
8  trooper?
9  A.  At this point in time Peach had been assigned
10  back to Troop 9 where he was at the time this incident
11  occurred and he was performing desk duties and he wanted
12  to be useful, and I know that he had some experience in
13  firearms, and if I could put him there or get him there,
14  that would at least make him continue to feel like he was
15  contributing.
16  Q.  Are you saying that sometime in 2002 the colonel
17  did assign him to the FTU?
18  A.  Yes, sir.
19  Q.  That would have been when Sergeant Ashley was
20  the NCOIC of the FTU; is that correct?
21  A.  Yes, sir.
22  Q.  He continued to serve there until February of
23  2004; is that right?
24  A.  Yes, sir.

Page 105

1  Q.  Was he considered to be on light duty?
2  A.  Yes, sir.
3  Q.  Was he trying his best to make it back to be a
4  road trooper?
5  A.  Oh, absolutely.
6  Q.  Are you saying that his foot got shattered and
7  he wasn't able to run anymore and things like that?
8  A.  What I'm saying, based on what he described to
9  me, is that the doctors that he had been to, the pain
10  that he was in, discomfort he was in, the rehab, the foot
11  just wasn't healing the way it needed to heal for a
12  doctor to be able to clear him for full duty.
13  Q.  This was all known prior to your getting him
14  into the FTU, that he wasn't going to be able to bounce
15  back?
16  A.  Yes, sir.
17  Q.  Was Colonel Chaffinch sympathetic when you spoke
18  to him about it?
19  A.  Yes.
20  Q.  Was Colonel Chaffinch trying to follow this
21  policy that you had identified a little earlier of trying
22  to take care of our own?
23      MR. FITZGERALD: Objection to form.
24  A.  I think what Colonel Chaffinch was trying to do

27 (Pages 102 to 105)

Price, et al.
David L. Baylor, Volume 1

v.
C.A. # 04-1207

Chaffinch, et al.
July 18, 2005

Page 106

1  was honor my request and -- honor my request and take
2  into consideration that the individual had been hurt in
3  the line of duty or on the job.
4      Q.  He was on the job.
5      A.  Yes.
6      Q.  Was it a chase?
7      A.  Yes, sir.
8      Q.  There was an exchange of gunfire?
9      A.  At the end of the chase there was an exchange of
10  gunfire.
11     Q.  Was the guy caught?
12     A.  The individual was caught, yes, sir.
13     Q.  So his prior assignment was as a road trooper,
14  Corporal Peachey, right?
15     A.  Yes.
16     Q.  Then he became an instructor at the range?
17     A.  Yes, sir.
18     Q.  Would his foot injury have hindered him in
19  trying to be a patrol officer?
20     A.  I believe so, sir.
21     Q.  As you came up to two years, you're still the
22  executive officer in charge of operations for New Castle
23  County, right?
24     A.  Yes.

Page 107

1      Q.  Did Mr. Peachey try to stay on?  Did he come up
2  with ideas, ways he would be able to stay on?
3      A.  He didn't want to leave.  He did not want to
4  leave.  But the realization set in and I think it would
5  be somewhat better than he had to leave.
6      Q.  Was it the policy of the State Police to allow
7  an injured trooper who had been hurt on the job to have a
8  light-duty assignment for two years?
9      A.  It was the practice, yes.
10     Q.  That was the practice of the State Police,
11  right?
12     A.  Uh-huh.
13     Q.  So he was allowed that full two years?
14     A.  Yes, sir.
15          MR. NEUBERGER:  It's been an hour and 15
16  minutes.  You want to take a break for a quick lunch?
17          (A lunch recess was taken at 12:15 p.m.)
18          (Deposition resumed at 1:00 p.m.)
19  BY MR. NEUBERGER:
20     Q.  I want to continue with the names of some other
21  people, but just two things, I guess.  When
22  Sergeant Foraker was stationed at Troop 6, he would have
23  been under your command?
24     A.  Yes, sir.

Page 108

1      Q.  After you were promoted to major.  Isn't that
2  correct?
3      A.  Yes, sir.
4      Q.  In that long list of names you gave me of
5  different assignments within the State Police -- do you
6  remember that?
7      A.  Yes, sir.
8      Q.  -- you didn't mention Internal Affairs.  Do you
9  have to be a certain rank to be an Internal Affairs
10  investigator?  They don't put corporals in there?
11     A.  They don't put corporals.  Sergeants and above.
12  Usually lieutenants.
13     Q.  Let's go on to another name here and it's a
14  Master Corporal Jerome Lovelace.  Do you know that name?
15     A.  I know the name to be that of a trooper.
16     Q.  A trooper.  Let's just think about it.
17  Jerry Lovelace who had some kind of a back injury.  Do
18  you know anything about that?
19     A.  I think so.  Very little.  Was that around the
20  mid-'90s?
21     Q.  I'm really not going to ask you to guess.
22  You're telling me you do know there is a trooper by the
23  name of Jerome Lovelace?
24     A.  I know there was a trooper by that name, yes.

Page 109

1      Q.  You don't know any of the circumstances about
2  any injury he had?
3      A.  No.
4      Q.  If I told you that he was injured while
5  Aaron Chaffinch was the colonel and Lieutenant Colonel
6  Tom MacLeish was lieutenant colonel and that he was put
7  on some sort of light duty for about two years and two
8  weeks because of a back injury, does that trigger any
9  memories of executive staff conversations?
10     A.  I don't recall that one being discussed.
11     Q.  A Sergeant James Romanelli, does that ring a
12  bell with you?
13     A.  Yes, sir.
14     Q.  Do you know who he is?
15     A.  Yes, sir.
16     Q.  What can you tell me about Sergeant
17  James Romanelli?
18     A.  What I know about Sergeant Romanelli is through
19  some discussions was that he was apparently riding a
20  motorcycle without any approval in the course of some
21  kind of drug investigation in Pennsylvania.
22     Q.  And he got injured?
23     A.  He got injured.  And his injuries were so severe
24  that he wound up being placed on light duty and carried

28 (Pages 106 to 109)

Price, et al.                          v.                    Chaffinch, et al.
David L. Baylor, Volume 1         C.A. # 04-1207                  July 18, 2005

Page 114

1    Shawn Nowery.  Did you know a Sergeant Shawn Nowery?
2    **A.  Yes, sir.**
3    Q.  How did you know him?
4    **A.  Shawn was a sergeant out of Troop 3, I believe,**
5    **and had been in the homicide unit, I think.**
6    Q.  Troop 3 is in Dover, right?
7    **A.  Yes, sir.  Or Kent.**
8    Q.  And the homicide unit, where is that located?
9    **A.  Kent County.  It's either homicide unit or**
10   **lottery unit.  I'm not sure which one, but I think it was**
11   **homicide.**
12   Q.  Do you know whether he retired or went off on
13   disability from the force?
14   **A.  I think he went off on disability for a back**
15   **injury.**
16   Q.  Do you have an idea of when he went off of
17   active duty?
18   **A.  No.**
19   Q.  Do you know if it was in the '90s or 2000s?
20   **A.  I want to say it's 2000.**
21   Q.  You're saying you think if we got his records,
22   we would be able to determine he probably went off of
23   active duty sometime after January of 2000?
24   **A.  Yes, sir.**

Page 115

1    Q.  You said he had back injuries?
2    **A.  To my knowledge, yes.**
3    Q.  Are you aware that he had numerous back
4    surgeries?
5    **A.  No, sir.**
6    Q.  You wouldn't be exactly sure who the colonel and
7    lieutenant colonel were for him, would you?
8    **A.  No.**
9    Q.  Since you don't know when he went out, are you
10   aware that he was put on light duty for two years?
11   **A.  Yes, sir.**
12   Q.  Do you know how many years he had on the force,
13   approximately?  Was he a rookie?
14   **A.  No.  I think he was over the 10-, 12-year**
15   **threshold.**
16   Q.  And Sergeant Romanelli, was he over the 10-,
17   12-year threshold, also?
18   **A.  Yes.**
19   Q.  Let's try another name.  This name is Master
20   Corporal Joseph Condron.  Joseph Condron, do you know
21   him?
22   **A.  Yes.  I know he's a trooper.**
23   Q.  Are you aware of whether or not he sustained a
24   knee injury at the range?

Page 116

1    **A.  I'm not sure.**
2    Q.  That disabled him.
3    **A.  I'm not sure.**
4    Q.  You really don't --
5    **A.  No.**
6    Q.  Do you know whether he went off on disability?
7    **A.  Uh-uh.**
8    Q.  You just know the name and that's it?
9    **A.  That's it.**
10   Q.  Let's try another one.  Master Corporal
11   James Mosley.  Did you know him?
12   **A.  Yes, sir.**
13   Q.  Were you aware that he had broken his neck, I
14   believe, bench pressing?  Does that ring a bell?
15   **A.  No.**
16   Q.  Were you aware that he was injured?
17   **A.  I thought there may be an injury, yes, but I'm**
18   **not sure, because he's a Troop 3 guy.**
19   Q.  Are you aware that he was on light duty for two
20   years?
21   **A.  No, I'm not.  He was senior to me.  He was a lot**
22   **senior to me.**
23   Q.  What time frame are we talking about?
24   **A.  That would have been the late '80s.  I think it**

Page 117

1    would be '90s.
2    Q.  Let's try another one.  A Sergeant
3    David Henderson?
4    **A.  Yes, sir.**
5    Q.  Did you know him?
6    **A.  Yes, sir.**
7    Q.  Were you aware that he sustained a back injury?
8    **A.  Yes.  I was familiar with that.  A little bit.**
9    Q.  Where was he stationed, if you know?
10   **A.  He retired out of supply.**
11   Q.  So he retired from supply.  Around when?
12   **A.  I want to say it was late '90s.**
13   Q.  He just retired in the normal course of his
14   career.  Is that what you're saying?
15   **A.  Yes.  He was good friends with Colonel Pepper.**
16   Q.  He finished the 20-year career at least, right?
17   **A.  Yes, sir.**
18   Q.  Did you know anything about his back injury?
19   **A.  I knew that he had a back injury, and I knew**
20   **that just from what you hear, that it was severe.  But to**
21   **the extent from that, I didn't know.**
22   Q.  "Supply" is a word I haven't heard yet.  What's
23   the supply function?
24   **A.  It's like in the military, would be equivalent**

30 (Pages 114 to 117)

Price, et al.                                    v.                          Chaffinch, et al.
David L. Baylor, Volume 1              C.A. # 04-1207                         July 18, 2005

Page 118

1  of a quartermaster. They handle all the supply material,
2  uniforms, stuff like that. And historically it had been
3  staffed by at least one, maybe two, troopers. After
4  Henderson left, they put a civilian in charge of it and
5  there were no troopers. I'm wrong. After Henderson
6  left, Dave Young went there, but they pulled him out and
7  they put him somewhere.
8      Q. A Sergeant Henderson never went off on light
9  duty or disability, to your knowledge?
10     A. I don't think he retired -- I think he put in
11  for disability pension and got it.
12     Q. After he retired? Is that what you're saying?
13     A. I think that's how he left, with the disability
14  pension.
15     Q. First I'm trying to get you think he at least
16  passed his --
17     A. He passed the 20 years, but he was able to get a
18  non --
19     Q. -- service-related disability pension?
20     A. Right, but he was also able to go into a unit
21  where he didn't have to perform any law enforcement
22  functions.
23     Q. Right. So he wasn't out there making arrests in
24  the supply department?

Page 119

1      A. No.
2      Q. This was another one of those jobs at that time
3  where you could be employed full-time with the Delaware
4  State Police without having to exercise arrest powers?
5      A. Right.
6      Q. Let's try another one. A Lieutenant
7  Robert Schlifer, S-c-h-l-i-f-e-r?
8      A. Yes, sir.
9      Q. Do you know anything about his career?
10     A. Yes, sir.
11     Q. Was he injured in a crash while he was in his
12  vehicle?
13     A. Yes, sir.
14     Q. Was he supposedly drinking on the job?
15     A. Yes, sir.
16     Q. Was he convicted of drinking on the job in
17  criminal court?
18     A. No, sir.
19     Q. Did he face a criminal charge?
20     A. Yes, sir.
21     Q. He beat it? He was found innocent?
22     A. No.
23     Q. What happened?
24     A. I think the judge threw the charge out. They

Page 120

1  appealed it. State won the appeal, but nothing ever
2  happened after that other than allowing him to leave the
3  division without any disciplinary action.
4      Q. So no disciplinary action against him, and he
5  had faced this charge of drinking while he was serving as
6  a patrol officer?
7      A. Right.
8      Q. There was a vehicle crash involved?
9      A. Yes. He overturned on Route 1 south of Red Lion
10  in I want to say January of 2002.
11     Q. So this was the month before you got operational
12  responsibility for New Castle County?
13     A. Yes, sir.
14     Q. Is that why you know about it?
15     A. Yes, sir. It happened in my troop area.
16     Q. It happened in your troop area. Right?
17     A. Yes.
18     Q. After you took over operational command, the
19  effects of all this continued after you were responsible?
20     A. A little bit. I wasn't privy to everything that
21  was going on. I knew that that night I got called out
22  because of a trooper who was injured in my area, and I
23  went to the hospital. He obviously had severe injuries.
24  He had some neurological injuries, injuries to his arms.

Page 121

1  We had taken blood. The blood came back that he was over
2  the limit. He was charged. The charge was thrown out.
3  The State filed an appeal, and I think the appeal ruled
4  that he could be recharged again, but he never was.
5      Q. What was his period of recuperation? Did he end
6  up with some permanent injuries?
7      A. Yes, sir.
8      Q. What kind of permanent injuries did he end up
9  with?
10     A. I think some head trauma as a result --
11  neurological injuries. He also had a severe injury to
12  his left arm because that was the side of which the
13  vehicle came to rest on.
14     Q. Was he able to perform his normal police duties
15  after those injuries?
16     A. No, sir.
17     Q. How soon did it take before it was recognized
18  that his injuries were going to be permanent?
19     A. I don't think it was that long after he had
20  gotten released from the hospital that they knew that his
21  injuries were more severe and he probably wouldn't be
22  coming back.
23     Q. By "coming back," he was a lieutenant -- was he
24  a traffic lieutenant?

31 (Pages 118 to 121)

Price, et al.                                    v.                        Chaffinch, et al.
David L. Baylor, Volume 1                  C.A. # 04-1207                        July 18, 2005

Page 122

1    A.   Traffic lieutenant, Troop 1.
2    Q.   You're saying within a few months after his
3    being released from the hospital it was recognized that
4    his injuries were going to be permanent?
5    A.   Right.
6    Q.   Was he put on light duty?
7    A.   See, he never came back to work. His status
8    would have been light duty, yes. He would have been held
9    on the light-duty list.
10   Q.   There's a thing called the light-duty list?
11   A.   Yes. Maintained by HR.
12   Q.   Are people on the light-duty list drawing their
13   regular pay for a normal work week?
14   A.   Yes, sir.
15   Q.   Even if he didn't come back on the job, he was
16   still being paid?
17   A.   Yes, sir.
18   Q.   Is it correct that he was held on that
19   light-duty list for two years?
20   A.   I believe so, sir, yes.
21   Q.   He would have retired around January of 2004?
22   A.   Somewhere around there, I think, yes.
23   Q.   Eventually he would have been ordered to retire
24   after the two years?

Page 123

1    A.   Yes, sir.
2    Q.   You have to obey that order?
3    A.   Yes, sir.
4    Q.   Otherwise, it will jeopardize your pension
5    status?
6    A.   Yes, sir.
7    Q.   The acting colonel in January of 2002 when he
8    was injured was Aaron Chaffinch?
9    A.   Yes, sir.
10   Q.   And the colonel during the following two years
11   was Aaron Chaffinch?
12   A.   Yes, sir.
13   Q.   And Tom Marcin was lieutenant colonel for a
14   short period of time?
15   A.   Yes, sir.
16   Q.   And then following that was Tom MacLeish as the
17   lieutenant colonel?
18   A.   Yes, sir.
19   Q.   Next we have got a master corporal again,
20   Michael Jordan. Did you know him?
21   A.   Yes, sir.
22   Q.   How did you know him?
23   A.   Just as a trooper.
24   Q.   Do you have any idea when he retired?

Page 124

1    A.   No, sir.
2    Q.   Do you know anything about him being injured and
3    then becoming something called a court liaison officer?
4    A.   I believe so, yes.
5    Q.   Are you aware that he served as the court
6    liaison officer?
7    A.   Yes, sir. I think that was during the mid-'90s.
8    Q.   Who would be the colonel back in the mid-'90s?
9    A.   Ellingsworth/Pepper.
10   Q.   Do you know about whether he had to have
11   reconstructive knee surgery?
12   A.   That I can't tell you, sir.
13   Q.   He did have some sort of permanent disability?
14   A.   I was aware that he was injured and that's why
15   he was the court liaison officer.
16   Q.   So you knew that?
17   A.   Yes.
18   Q.   Do you know whether he was allowed to serve as
19   court liaison officer for two years?
20   A.   I don't know.
21   Q.   Next is a Master Corporal Christine Price. Did
22   you know her?
23   A.   Yes.
24   Q.   Did you know she sustained some sort of a back

Page 125

1    injury?
2    A.   Yes, sir.
3    Q.   Do you know whether that was work-related?
4    A.   I think so, sir.
5    Q.   Are you aware that she was placed in Human
6    Resources in light duty for two years?
7    A.   Yes, sir, because I was there at the time.
8    Q.   This would have been back in the --
9    A.   Mid-'90s.
10   Q.   When you were there.
11   A.   Uh-huh. '94 or '5.
12   Q.   Then after two years did she go off on a
13   disability?
14   A.   I think eventually she did, yes, sir.
15   Q.   Do you remember how many years she was with the
16   force when she was injured?
17   A.   She had more than 10.
18   Q.   Were you aware that her injury was permanent?
19   A.   Yes, sir, I believe I was.
20   Q.   Was it a back injury?
21   A.   I believe so, sir.
22   Q.   Do you remember any of the details?
23   A.   No, sir.
24   Q.   Do you remember when it was recognized that her

32 (Pages 122 to 125)

Price, et al.                                                    v.                            Chaffinch, et al.
David L. Baylor, Volume 1                          C.A. # 04-1207                                 July 18, 2005

Page 126

1  injury was going to be permanent?
2      A.  During the course of that time -- we reported to
3  John Dillman.  She had kept him informed of her
4  situation, and basically we were told just when -- how
5  long she would be there and she would be gone.
6      Q.  You weren't part of the process?
7      A.  No.  Very few people are part of the process.
8      Q.  These decisions are being made at the highest
9  level?
10     A.  Usually the deputy superintendent,
11  superintendent, and HR director.
12     Q.  Those three people are making the decisions on
13  where to assign these people?
14     A.  Most of the time.
15     Q.  These people are making the decisions on letting
16  them stay for the two years?
17     A.  Yes, sir.
18     Q.  Was she someone who had more than 10 years of
19  service?
20     A.  I believe so, sir.
21     Q.  Captain David Citro, does that ring a bell?
22     A.  Yes, sir.
23     Q.  You worked under him when he was a sergeant?
24     A.  Yes, sir.

Page 127

1      Q.  In the public information function?
2      A.  Yes, sir.
3      Q.  Did he eventually rise to the rank of captain?
4      A.  Yes, sir.
5      Q.  Did he sustain some kind of an injury?
6      A.  I think he sustained a neck injury when he was
7  up at Troop 1, Penny Hill, back in the '80s, late '80s.
8      Q.  Did you remember anything about the nature of
9  it?  Was it an automobile crash?
10     A.  Not sure.  I think it was on duty.  But I know
11  it provided him pain and discomfort.
12     Q.  Was he a commander at Troop 1 when this
13  happened?
14     A.  No.  He was the corporal.
15     Q.  So it happened when he was a corporal?
16     A.  Yes, sir.
17     Q.  Was this like an injury that dog teamed his
18  whole career?
19     A.  Yes.  From what I know, yes.
20     Q.  He was injured when he was a corporal and
21  eventually he rose to the rank of captain?
22     A.  Uh-huh.
23     Q.  Eventually was he a troop commander or not?
24     A.  Never was a troop commander.  He went from

Page 128

1  Troop 1 to Youth Aid to public information back to Youth
2  Aid as a sergeant, headquarters as a lieutenant, and was
3  staff support and then was the captain.
4      Q.  Did the injury affect his mobility in his neck?
5      A.  I think there was a range-of-motion issue, yes.
6      Q.  He had less-than-normal range of motion in his
7  neck because of the injury?
8      A.  I can't say that.
9      Q.  Just based on your observations.
10     A.  Yes.
11     Q.  Did it appear to you?
12     A.  Yes.  He appeared to be in some discomfort, yes.
13     Q.  But, nevertheless, he went forward and finished
14  a career with the State Police?
15     A.  Yes, sir.
16     Q.  Immediately after he suffered that injury as a
17  corporal, are you aware of whether he was put on a
18  light-duty status for two years?
19     A.  I think he was put on a light-duty status
20  sometime after he was captain, because he was told he had
21  to leave.
22     Q.  So finally made it to the rank of captain,
23  right?
24     A.  Yes, sir.

Page 129

1      Q.  Did he pass the 20-year threshold?
2      A.  Yes, sir.
3      Q.  When did he leave?  You're saying --
4      A.  I think he left in the beginning of '04.  It was
5  either beginning of '03 or beginning of '04, but he was
6  forced to retire.
7      Q.  Short of being 55?
8      A.  Oh, yes.  He wasn't near 55 yet.
9      Q.  He had finished 20 years at least?
10     A.  Yes, sir.
11     Q.  Are you saying that his last duty assignment was
12  a light-duty assignment?
13     A.  No.  His last duty assignment he was in charge
14  of the computer --
15     Q.  Info tech?
16     A.  No.  The computer crime section.  He kind of got
17  that up and running and then he was told to leave.
18     Q.  He agreed to leave?  What are you saying here?
19     A.  No.  He was forced to leave.  He was not happy
20  that he left.
21     Q.  Did he leave on a disability or anything?
22     A.  I'm not sure.  I think it was, but Major Papili
23  can give you that because he had to deliver the news.
24     Q.  I'm understanding that he was told to leave.

33 (Pages 126 to 129)

Price, et al.                                    v.                          Chaffinch, et al.
David L. Baylor, Volume 1                  C.A. # 04-1207                        July 18, 2005

Page 130

1 What I'm trying to get at is: Was he just considered
2 doing his normal job or on a light-duty position before
3 that?
4   A. I'm not sure. I would have to assume that he
5 was on a light-duty position for them to tell him that he
6 had to leave.
7   Q. Yes, that would be the predicate, right?
8   A. That would be the standard practice, that they
9 usually do -- what the State Police usually does is
10 says, okay, from this point -- from two years you have to
11 leave if you can't get a clean bill of health from the
12 doctor. So I think he didn't get a clean bill of health
13 from the doctor and he was forced to retire. Because
14 there was a meeting -- this was probably one of the only
15 ones we really had where Major Papili made the request
16 for him to be the captain in charge of the computer
17 crimes section as a civilian and the colonel said no.
18   Q. What I'm understanding is that he had sustained
19 this injury way back when he was a corporal early in his
20 career?
21   A. I believe so.
22   Q. We could find out the dates. The answers you're
23 giving me today are based on your memory and not looking
24 at documents?

Page 131

1   A. Exactly.
2   Q. We understand that. But he sustained an injury
3 early in his career before you worked under him in the
4 public information office?
5   A. Yes, sir.
6   Q. That was a permanent injury that lasted
7 throughout his career?
8   A. Yes, sir.
9   Q. By what you know of how he left, you're saying
10 you're inferring that he was on light-duty status prior
11 to being ordered to retire?
12   A. Yes, sir.
13   Q. And Major Papili would have more direct
14 knowledge about this?
15   A. Yes, sir.
16   Q. This retirement I think you're saying happened
17 sometime in 2004?
18   A. I think so.
19   Q. Aaron Chaffinch would have been the colonel at
20 the time?
21   A. Yes, sir.
22   Q. And he would have been the colonel or acting
23 colonel from October 1st, 2001, through that retirement,
24 right?

Page 132

1   A. Yes, sir.
2   Q. Tom MacLeish would have been the lieutenant
3 colonel through most of that time, right?
4   A. It was either 2003/2004. We were all on staff.
5 The colonel was definitely the colonel. So it was
6 right -- may have been right there in that point where
7 Marcin was on his way out and MacLeish was on his way in.
8   Q. But John Yeomans would have been the
9 uniformed --
10   A. He was HR director, yes.
11   Q. Was MacLeish present at this meeting Papili had
12 where he rejected him being the civilian head --
13   A. Yes. I believe we were all there, all the
14 majors.
15   Q. Let's go on to another one. A master corporal
16 again, Everett Jackson. Does that ring a bell?
17   A. Yes, sir.
18   Q. Did he work under you at Troop 9?
19   A. Yes, sir.
20   Q. Did he sustain some kind of an injury?
21   A. Yes, sir.
22   Q. What kind of an injury was it?
23   A. A back injury.
24   Q. Was it a permanent injury?

Page 133

1   A. Yes, sir.
2   Q. Did it interfere with his performing the normal
3 expected duties of a patrol officer?
4   A. Yes, sir.
5   Q. Was he unable to perform the duties of a patrol
6 officer?
7   A. Yes, sir.
8   Q. Did he hurt himself on the job?
9   A. I believe so, sir.
10   Q. Was he allowed to serve two years on light duty?
11   A. Yes, sir.
12   Q. When did he retire?
13   A. I want to say August of 2001.
14   Q. So the two years of light duty would have taken
15 place for the two years prior to August of 2001?
16   A. Right.
17   Q. At least in August of 2001 that's when
18 Aaron Chaffinch would have been the lieutenant colonel?
19   A. Yes, sir.
20   Q. Do you remember the month when Aaron Chaffinch
21 became the lieutenant colonel?
22   A. I want to say May of 2001.
23   Q. So Jerry Pepper was the colonel?
24   A. Right.

34 (Pages 130 to 133)

Price, et al.                                                                    v.                                      Chaffinch, et al.
David L. Baylor, Volume 1                          C.A. # 04-1207                                            July 18, 2005

Page 134

1　Q.　At that time, right?
2　A.　Right.
3　Q.　What light-duty assignment was he given?
4　A.　He handled the desk duties, all day work.
5　Q.　At Troop 9?
6　A.　Yes, sir.
7　Q.　Was there like a specific incident, a crash or
8　something, where he got injured?
9　A.　You know, I'm not sure.
10　Q.　How long did it take to recognize that he wasn't
11　going to be coming back from his back injury?
12　A.　I don't know.  When I got there as a troop
13　commander, he had had -- he had been dealing with this.
14　You could tell just from a layman's point of view the
15　way he was carrying himself that he was severely injured,
16　and I didn't personally think he was coming back.
17　Q.　When did you come in there as Troop 9 commander?
18　A.　I believe it was in 2000, February 2000.
19　Q.　Let's try another one.  A master corporal again.
20　William Merritt.  Do you know anything about him?
21　A.　Yes, sir.
22　Q.　Do you know when he retired?
23　A.　2001.
24　Q.　By the way, was he somebody who had more than

Page 135

1　10 years of service?
2　A.　Yes.  We went through the academy together,
3　also.
4　Q.　Going back to Everett Jackson, did he have more
5　than 10 years of service?
6　A.　Yes, sir.  He was on before me.  He came on in
7　1978.
8　Q.　We're saying William Merritt retired did you say
9　in 2001?
10　A.　I think it was 2001.
11　Q.　Are you aware that he was on light duty for two
12　years?
13　A.　Yes, sir.
14　Q.　Was he facing some sort of criminal charge?
15　A.　He was under criminal investigation.
16　Q.　He was under a criminal investigation, right?
17　A.　Uh-huh.
18　Q.　Was he put on light duty?
19　A.　Yes, sir.
20　Q.　Was he kept on light duty for two years?
21　A.　Yes, sir.
22　Q.　Then was he allowed to retire?
23　A.　Yes, sir.
24　Q.　Because he had his normal severance pension?

Page 136

1　A.　They got him -- it had to be 2000 because they
2　got him to 2002 where he retired maybe with accumulated
3　time.  I think it was put to the fashion he needed to
4　retire or face disciplinary action.
5　Q.　He was allowed to retire you're saying in 2002
6　you believe?
7　A.　I believe.
8　Q.　He was facing this investigation that started
9　sometime in 2000?
10　A.　Uh-huh.  January 1st, 2000.  I'll never forget
11　it.  I got called that night, too.  He worked for me in
12　the truck team.
13　Q.　You were the director of traffic at the time?
14　A.　Uh-huh.
15　Q.　You got called at night and told that he was
16　facing some charges, he was facing an investigation?
17　A.　There was an investigation going on, yes, sir.
18　Q.　He was put on light duty and required to stay at
19　home?
20　A.　Yes, sir.
21　Q.　He didn't come in and work?
22　A.　Not at all.
23　Q.　He was kept on that light-duty list?
24　A.　Yes, sir.

Page 137

1　Q.　And he was paid a normal work week for two
2　years?
3　A.　Yes, sir.
4　Q.　Did the investigation ever get completed?
5　A.　Yes, sir.
6　Q.　Was he given the option of then retiring or
7　facing disciplinary charges?
8　A.　Yes, sir.
9　Q.　He chose to retire?
10　A.　Yes, sir.
11　Q.　Did he have more than 10 years?
12　A.　Yes, sir.
13　Q.　When he was allowed to retire in 2002, this was
14　after Aaron Chaffinch became the superintendent in
15　February of 2002?
16　A.　Yes, sir.
17　Q.　Was he a New Castle County officer?
18　A.　Yes, sir.
19　Q.　This is something you had to deal with when you
20　assumed operational command for New Castle County?
21　A.　No.  Because I dealt with it as director of
22　traffic.  Merritt had worked for Chaffinch's director
23　when Chaffinch was director of traffic because I replaced
24　Chaffinch as director of traffic.

35 (Pages 134 to 137)

Price, et al.                                           v.                                        Chaffinch, et al.
David L. Baylor, Volume 1                      C.A. # 04-1207                                July 18, 2005

Page 138

1   Q.  He had worked for Aaron Chaffinch.
2        The next one is a Sergeant, looks like,
3  Jahn Hitchens?
4   A.  Yes, sir.
5   Q.  Does that ring a bell?
6   A.  Yes, sir.
7   Q.  Was he injured in some fashion?
8   A.  Yes, sir.
9   Q.  Did his injury prevent him from wearing a gun
10  belt?
11   A.  For a while.
12   Q.  Is he still working?
13   A.  Yes.
14   Q.  For the State Police?
15   A.  Yes, sir.
16   Q.  Do you know where he was working before he got
17  injured?
18   A.  Fatal team.
19   Q.  Do you know when he was injured, approximately?
20   A.  He was hit by a bus.
21   Q.  In the 2000s or the 1990s?
22   A.  School bus.  It was 2000.
23   Q.  Hit by a school bus?
24   A.  Uh-huh.

Page 139

1   Q.  Was he serving as a patrol sergeant at the time?
2   A.  For some reason I want to say he was out of
3  Odessa and he got hit by the bus and then he got put in
4  the truck team -- I mean, in the fatal team.
5   Q.  Being put on the fatal team, was that some sort
6  of light-duty assignment?
7   A.  He was in a light-duty position because he
8  couldn't wear the gun belt.
9   Q.  Did he eventually get better?
10   A.  I think he returned to full duty, yes.
11   Q.  He returned to full duty, and he's been able to
12  wear his gun belt?
13   A.  Yes, sir.
14   Q.  Do you have any idea when he returned to full
15  duty?
16   A.  No.
17   Q.  He did not suffer a permanent disabling injury?
18   A.  No, sir.
19   Q.  Do you know how long he was on light duty?
20   A.  No, sir.  I think a while.
21   Q.  By that do you mean more than six months?
22   A.  Yes.
23   Q.  Let's try another one.  A Master Corporal
24  Scott Warner.

Page 140

1   A.  Yes, sir.
2   Q.  Do you know anything about him?
3   A.  Scott worked for me at Troop 9 in Odessa.  I'm
4  not sure if it was on-duty or off-duty, but he was in a
5  light-duty capacity for several years.  It seemed with
6  Scott that, as soon as he got near the two-year time
7  frame, he came back to full duty, then to go back on
8  light duty a short time later.  That's the way it seemed.
9   Q.  He had some kind of a back injury you're telling
10  me.
11   A.  Uh-huh.
12   Q.  This is when you were the commander at Troop 9?
13   A.  Uh-huh.
14   Q.  That would have been what year?
15   A.  2000 to 2002.
16   Q.  Eventually you leave that position, right?
17   A.  Right.
18   Q.  Was he still on light duty when you left the
19  position?
20   A.  He came off light duty, was off for a little
21  bit, he was in our tag team, which is a radar team, and
22  then as soon as that position got eliminated, he went
23  back onto light duty.
24   Q.  As far as you know, is he still serving on light

Page 141

1  duty?
2   A.  The last time I checked he was, but that's been
3  a while since I left.
4   Q.  When you left --
5   A.  He was on light duty.
6   Q.  He was still on light duty?
7   A.  Yes, sir.  Waiting for possible back surgery.
8   Q.  It's your understanding that he has been on
9  light duty for more than two years, if you aggregate them
10  altogether?
11   A.  Absolutely.
12   Q.  We could check the records, but if we added them
13  together, it's your understanding he's served on light
14  duty for more than three years?
15   A.  Yeah, because when I was in HR, he helped
16  Dave Citro and Doug Salter on the museum that was being
17  built at the time.  So he was on light duty then.
18   Q.  He was on light duty way back in HR in the
19  mid-to-late '90s?
20   A.  Yes, sir.
21   Q.  He was on light duty when you were the troop
22  commander at Troop 9?
23   A.  Yes, sir.
24   Q.  And he was on light duty when you retired?

36 (Pages 138 to 141)

Price, et al.                                           v.                              Chaffinch, et al.
David L. Baylor, Volume 1                    C.A. # 04-1207                                July 18, 2005

Page 142

1    A.  Yes, sir.
2    Q.  When you retired Aaron Chaffinch was the
3  colonel?
4    A.  Yes.
5    Q.  And Tom MacLeish was the lieutenant colonel?
6    A.  Yes, sir.
7    Q.  Do you recall what his assignment was when you
8  retired?
9    A.  He was pulling desk duty at Troop 9.
10    Q.  How about a Corporal Anthony D'Alessandro?
11    A.  Don't know anything about it.
12    Q.  How about a Lieutenant Susan Brady?
13    A.  She was before my time.
14    Q.  How about a Lieutenant Randy Mosley?
15    A.  I know that Randy had some medical issues.  I
16  think they surrounded his heart.  And he wound up
17  retiring.
18    Q.  Do you remember when he retired, what year?
19    A.  I want to say it was '94ish.
20    Q.  Are you aware of whether he was on light duty?
21    A.  No, sir, I'm not sure what his status was when I
22  left.  I think he was.
23    Q.  Do you know who Lieutenant Paul Sczbulek was?
24    A.  Yes.

Page 143

1    Q.  Did he get on any light-duty status?
2    A.  Yes, sir.
3    Q.  He was charged with various bank robberies?
4    A.  Yes, sir.
5    Q.  It's my understanding he was convicted of some
6  things?
7    A.  Yes, sir.
8    Q.  He was sentenced to a federal penitentiary?
9    A.  Yes, sir.
10    Q.  While all that investigating was going on, was
11  he put on the light-duty list?
12    A.  Oh, yeah.  Mr. Dillman did that.  I remember
13  that one.
14    Q.  Was that in the '90s?
15    A.  I was still in PIO.  So that was probably early
16  '90s.  Yeah, early '90s.
17    Q.  So in the past have people who have been under
18  investigation for crimes been put on the light-duty list?
19    A.  Yes, sir.
20    Q.  We probably touched on two or three instances of
21  that here.  Is that right?
22    A.  Yes, sir.
23    Q.  When you retired, was that practice still being
24  followed, if people were facing investigation for serious

Page 144

1  crimes, that they would be put on the light-duty list and
2  receive their pay?
3    A.  Yes, sir.  I guess you could -- when you talk
4  about Schlifer, you could put him in that category.
5    Q.  When they put you on the light-duty list, you
6  lose your arrest powers, ability to carry a gun?
7    A.  No.  I never understood it to be that.  The only
8  thing is that being on light duty, they didn't want you
9  to go out and function as a trooper for fear of
10  getting -- making the injury more severe, but you never
11  lost your authority as a trooper or your power of arrest.
12  That's not the way it should be.
13    Q.  Let's mark something here.  I want to show you
14  light duty letters that were given to my two clients.
15  I'm going to ask you to read them both over quietly and
16  then I'm going to ask you some follow-up questions on
17  that.
18        We're going to mark Corporal Kurt Price's
19  June 25th, 2003, letter as Baylor Deposition Exhibit 1,
20  and then we're going to do Corporal Wayne Warren's
21  June 25th, 2003, letter as Baylor Deposition Exhibit
22  No. 2.
23        Go off the record.
24        (Baylor Deposition Exhibit Nos. 1 and 2

Page 145

1  were marked for identification.)
2  BY MR. NEUBERGER:
3    Q.  Have you looked them over?
4    A.  Yes, sir.
5    Q.  Both these letters are letters from Lieutenant
6  Colonel Tom MacLeish to Kurt Price and Wayne Warren; is
7  that right?
8    A.  Yes, sir.
9    Q.  These were issued on June 25th, 2003, right?
10    A.  Yes, sir.
11    Q.  This is when you were still serving on the
12  executive staff, right?
13    A.  Yes, sir.
14    Q.  If we look at the first paragraph of both these
15  letters, they're notified that they're being put on
16  light-duty status.  Do you see that?
17    A.  Yes, sir.
18    Q.  Then there are various restrictions that were
19  put on them.  Do you see that, 1 through 6?
20    A.  Yes, sir.
21    Q.  Are you telling me that those restrictions are
22  unusual?
23    A.  I'm telling you that the restrictions of
24  reporting to work in a civilian attire, that's normal,

37 (Pages 142 to 145)

Price, et al.                                                     v.                              Chaffinch, et al.
David L. Baylor, Volume 1                         C.A. # 04-1207                          July 18, 2005

Page 150

1  Delaware State Police vehicle, may only use an unmarked
2  divisional vehicle for administrative purposes. I
3  remember how that came about. I was there when the
4  discussion took place.
5      Q. How did that happen?
6      A. Basically, they didn't want certain people who
7  were on light duty to be in a marked car. Personally
8  because I didn't think they didn't want to see these
9  people were members of the division at the time. What
10  they did was come out with a policy if you're on light
11  duty, everybody has to be in an unmarked car which caused
12  us to go around and scramble and look for a whole bunch
13  of unmarked cars which created more of a fiasco than what
14  it was worth.
15     Q. Have you ever seen a letter that contains all of
16  these six restrictions?
17     A. Right now I can't say either way.
18     Q. You've told me you've seen letters that talk
19  about the marked car, for example?
20     A. Uh-huh.
21     Q. Right now you're telling me you don't have a
22  present recollection of seeing a letter either way, one
23  way or the other, that contains these six restrictions?
24     A. I don't think so. But I'm not sure.

Page 151

1      Q. I think you're telling me that you find this
2  letter to be unusual?
3      A. Yes.
4      Q. Are you telling me that this letter is out of
5  the norm based on your experience?
6      A. I'm not familiar with seeing a letter written
7  like this before.
8      Q. You served in HR for all the years you told us
9  about?
10     A. Uh-huh.
11     Q. You're telling us you're unfamiliar with seeing
12  a letter like this based on that experience?
13     A. Yes, sir. Some people got letters. Some people
14  didn't.
15     Q. Some people had been put on light duty without
16  even getting letters?
17     A. Yes, sir.
18     Q. And some people are put on light duty who do get
19  letters?
20     A. Right.
21     Q. You told us a little earlier today in the
22  morning that, as the operations officer for New Castle
23  County, you had dealings with the human relations office?
24     A. Human Resource, yes.

Page 152

1      Q. You tell me you dealt with men or women under
2  your command having Human Resources issues?
3      A. Yes, sir.
4      Q. You told us this morning that you as a member of
5  the executive staff participated in discussions that deal
6  with Human Resources issues with troopers?
7      A. Yes, sir.
8      Q. If we look at your experience as the operations
9  officer for New Castle County and your experience as a
10  member of the executive staff, is it true you find this
11  letter to be unusual?
12     A. Yes, sir.
13     Q. There is an end to my list here. Let's go on to
14  the next one.
15     A. I hope so.
16     Q. I appreciate your patience. It's a very
17  important matter.
18     A. I understand.
19     Q. A few more names. A Corporal Bo Sarley?
20     A. Yes, sir.
21     Q. Did you know him?
22     A. Yes, sir.
23     Q. Did he serve under your command?
24     A. No, sir. He was senior to me.

Page 153

1      Q. What did you know about him?
2      A. That he had a severe back injury.
3      Q. Was he put on light-duty status?
4      A. I think so, yes.
5      Q. Did he receive two years of light-duty status?
6      A. I believe so, sir.
7      Q. Do you remember when he retired?
8      A. No, sir.
9      Q. Would it be in the '90s?
10     A. I think it would be '90s, mid-'90s.
11     Q. Did you know anything about what light-duty job
12  he was assigned to?
13     A. No, sir. I think he was allowed to stay a
14  detective.
15     Q. Do you know if he was in a crash or something
16  that caused this severe injury?
17     A. I'm not sure.
18     Q. Do you know how long it took to recognize the
19  fact that his injury was going to be permanent?
20     A. No, I don't.
21     Q. Next would be a Master Corporal Thomas Robbins.
22         MR. FITZGERALD: I want to put on the
23  record now an objection. It's going to be a relevance
24  objection. Obviously, you can ask the questions. I'm

39 (Pages 150 to 153)

Price, et al.                                         v.                              Chaffinch, et al.
David L. Baylor, Volume 1                    C.A. # 04-1207                          July 18, 2005

Page 154

1  not going to prevent you from asking them. You're moving
2  into people who were injured or retired long before any
3  relevant time frame in this case, before 1992. We have
4  raised this issue in some discovery conversations we have
5  had. So you can ask these questions, but I'll object on
6  relevance.
7  BY MR. NEUBERGER:
8      Q.  Thomas Robbins, do you know anything about him?
9      A.  I knew that he was injured in a helicopter
10 crash.
11     Q.  Do you know around when that happened?
12     A.  Early '80s, mid-'80s. Mid-'80s, I think.
13     Q.  Do you know whether he was put on light duty or
14 not?
15     A.  Yes.
16     Q.  Was the light duty in sort of a 911 call center?
17     A.  I think so. I'm not sure.
18     Q.  Do you know whether he was allowed to serve for
19 two years on light duty?
20     A.  Not sure.
21     Q.  Next name is a Corporal Michael Linz, L-i-n-z?
22     A.  Don't know him.
23     Q.  Next is a Laura Mayhew King. Does that ring a
24 bell?

Page 155

1      A.  Yes, sir.
2      Q.  Do you know anything about her?
3      A.  Mid-to-late '80s time frame, line-of-duty
4  injury, I believe back, was able to stay on and then
5  pensioned off with a disability.
6      Q.  Are you saying that she was put on light duty
7  for two years?
8      A.  I think so.
9      Q.  Are you saying she was then ordered to retire?
10     A.  Yes, sir.
11     Q.  Had she more than 20 years?
12     A.  No, sir.
13     Q.  She had more than 10?
14     A.  I don't even think she had that.
15     Q.  So you think she had less than 10 years of
16 service?
17     A.  Yes, sir.
18     Q.  A Trooper Randy Armistead?
19     A.  Yes, sir.
20     Q.  Did you know anything about him?
21     A.  Yes, sir. I was there at the crash.
22     Q.  His vehicle collided with another?
23     A.  Head-on crash on 95. 1986 I believe it was.
24     Q.  Did he have permanent head injuries?

Page 156

1      A.  Yes, sir. He had permanent head trauma.
2      Q.  Was he able to resume his normal-role duties?
3      A.  No, sir. He was injured and was pensioned off
4  after two years.
5      Q.  How many years did he have on the force?
6      A.  I think Randy only had like three or four at the
7  time of the crash.
8      Q.  Are you saying he was put on light-duty status
9  for two years first?
10     A.  Because he went to rehab, Bryn Mawr Rehab. So,
11 yeah, I think it was two years.
12     Q.  Was he put on the light-duty status such that he
13 didn't even have to come in and try to do a job?
14     A.  No. He couldn't.
15     Q.  His brain injuries were so severe?
16     A.  He went right from Christiana Hospital right to
17 Bryn Mawr Rehab Center.
18     Q.  Throughout his two years of light-duty status he
19 wasn't given an actual job at a troop?
20     A.  No, sir.
21     Q.  Then after those two years they invoked whatever
22 they could to retire him and then get a pension?
23     A.  Yes, sir.
24     Q.  How about a Mark Givens?

Page 157

1      A.  Don't know him.
2      Q.  Two more names. Four more names. A
3  Herb Murray?
4      A.  Herb Murray, that one doesn't --
5      Q.  A Rick Van Brunt?
6      A.  That name sounds familiar, but I don't know the
7  specifics.
8      Q.  And a Lieutenant Jeff David?
9      A.  Pooh Bear.
10     Q.  Did we cover him already?
11     A.  No. He was a classmate of mine, too.
12     Q.  I hear there's all sorts of names people get in
13 the academy. Is that true?
14     A.  That's true.
15         MR. FITZGERALD: Can you spell that last
16 name, please.
17     A.  D-a-v-i-d.
18     Q.  So he was a classmate at the academy?
19     A.  Yes, sir.
20     Q.  Did he suffer a stroke several years ago?
21     A.  Yes, sir.
22     Q.  Was he put on light duty?
23     A.  Yes, sir. He was good friends of
24 Colonel Pepper.

40 (Pages 154 to 157)

Price, et al.                                    v.                        Chaffinch, et al.
David L. Baylor, Volume 2              C.A. # 04-956-GMS                    July 26, 2005

Page 262

1  BY MR. FITZGERALD:
2    Q.  Do you recognize this document?
3    A.  It looks like a document from our
4  administrative manual.
5    Q.  And could you read the title into the record,
6  please?
7    A.  Disability Leave/Modified Duty Assignment
8  During Rehabilitation From Injury Or Illness.
9    Q.  With respect to this policy, what training did
10  John Dillman give you on this policy?
11    A.  He didn't give anybody any training, to my
12  knowledge.  Just the policy was written and it was put
13  in there and it was incumbent upon you to familiarize
14  yourself with it and read it.
15    Q.  Did you do that?
16    A.  I read, as part of my practice for preparing
17  for promotions I would read policies, yes.
18    Q.  And when you were working in the human
19  resources department or the personnel department from
20  '94 through I think April of '98 and a trooper came in
21  who had been injured or suffering from an illness,
22  would you look up this policy and figure out how to
23  apply it to him or her?
24    A.  No.  I went right to Mr. Dillman.

Page 263

1    Q.  You testified earlier that you would deal with
2  troopers who were retiring when you worked in the
3  personnel office.  Describe what you would do.
4    A.  Basically when they came in I was made aware
5  that they were retiring and referred them to
6  Ms. Theresa Pleasanton.
7    Q.  Did you do anything other than refer them to
8  Theresa Pleasanton?
9    A.  Every now and then we had an exit interview for
10  them and I would have them complete that and that's
11  it.
12    Q.  You testified that you dealt with people who
13  suffered something more than a short-term injury that
14  took longer to recuperate.
15        Do you remember that?
16    A.  Yes, sir.
17    Q.  What did you do?
18    A.  As a troop commander I kept in contact with
19  some of my individuals to make sure if they needed
20  anything.  For example, I had Everett Jackson, I had
21  Blaine Quickel, Q-u-i-c-k-e-l.  I asked them how
22  they're doing and if they're keeping in touch with HR.
23    Q.  When you were in HR what did you do?
24    A.  What did I do?

Page 264

1    Q.  When you dealt with people who suffered an
2  injury that took longer to recuperate, how did you
3  deal with them?
4    A.  They were referred to Mr. Dillman.
5    Q.  While you worked in personnel did you ever
6  review medical forms?
7    A.  Not really, no, I don't think so.  Every now
8  and then I would get a form for weight, a person who
9  failed the weight program, a person who failed the
10  P.T. test.  And they would be notified that they
11  failed and they had X number of days to come into
12  compliance.
13    Q.  What about results from the annual physicals?
14    A.  That would be sent primarily to Lisa McNatt and
15  to Mr. Dillman and they would collaborate between each
16  other on that.
17    Q.  Did you ever participate in those
18  collaborations?
19    A.  No, not really.
20    Q.  What were they looking for those results for?
21    A.  I guess they were -- I don't know.  You would
22  have to ask them.
23    Q.  How do you know they got together to
24  collaborate about the medical forms?

Page 265

1    A.  Because I knew the process was she would get
2  them and if there was an issue she would go to
3  Mr. Dillman.
4    Q.  You testified earlier that some troopers with
5  regard to the annual physical slipped through the
6  cracks.
7        Did any trooper not, to your knowledge did
8  any trooper not comply after being told to get a
9  physical?
10    A.  To my knowledge, no.  But I don't know.
11    Q.  You said some slipped through the cracks.  What
12  did you mean by that?
13    A.  That there would be some troopers that probably
14  were able to go without having a physical done that
15  year when they should have had it done.
16    Q.  And what would happen?
17    A.  If it was later learned, they would be sent to
18  get the physical done.
19    Q.  Did anybody not go get the physical once they
20  were told to go get the physical?
21    A.  That part I don't know because that was after
22  that -- after it became known, it was strictly handled
23  by Mr. Dillman or Ms. McNatt.
24    Q.  You don't know of anybody who didn't get a

23 (Pages 262 to 265)

Price, et al.                                                    v.                    Chaffinch, et al.
David L. Baylor, Volume 2                            C.A. # 04-956-GMS                      July 26, 2005

Page 266

1   physical after they were told to?
2   A.  No, I don't.
3   Q.  When you were assigned to the HR department,
4   did you become completely familiar with the policy
5   regarding disability leave?
6   A.  Disability leave or light duty?
7   Q.  Disability leave.
8   A.  What do you mean by "disability leave"?
9   Q.  Is there a policy of the Delaware State Police
10  concerning people who are on disability leave?
11  A.  You just showed me this.  I guess there is.
12  Q.  And did you become familiar with it when you
13  were working in the HR department?
14  A.  I knew that there was a sick leave and there's
15  written policies and there's application.  Okay?
16  Q.  Right.  I'm asking if you became familiar with
17  the written policy concerning disability leave while
18  you worked in the HR department.
19  A.  Yes.  I became familiar with it, yes.
20      An expert on it?  No.
21  Q.  And if I asked you if you became familiar with
22  the policy concerning light-duty status, what was the
23  written policy in 1994?
24  A.  I don't know.  You would have to pull the

Page 267

1   policy and let me read it and then I can say.
2   Q.  Well, referring again to your complete
3   familiarity with the written policy on disability
4   status --
5   A.  I don't think I said that.  I never said
6   complete.  I said I was familiar.
7   Q.  That was my question.
8   A.  There were a lot of policies over the years and
9   I studied a lot of policies over the years.  So I
10  never said complete familiarity because if I said
11  complete, I would have said I was an expert.  No.  I
12  said I became familiar with a whole wide variety of
13  policies over the years.
14  Q.  Okay.  And over the years you don't remember
15  what the written policy was?
16  A.  If you show me with a reference date, then I
17  will say yes, I can recall that or no, I don't recall
18  that.
19      If you can produce that, I can do that for
20  you.
21  Q.  Well, I understand you could do it if you had
22  the written policy in front of you.  I'm asking you
23  now can you recall what the policy was in 1994?
24  A.  I'm telling you without it in front of me, no.

Page 268

1   Q.  Can you remember what the policy was in 1998?
2   A.  Without it in front of me, no.
3   Q.  Can you remember what the policy was when you
4   were a major?
5   A.  Without it in front of me, no, sir.
6   Q.  Can you remember what the written policy of the
7   DSP concerning how to treat troopers on light-duty
8   status, to use your terminology, or disability leave,
9   can you remember what the written policy was at any
10  time you were a trooper?
11  A.  If you show it to me, I will take a look at it
12  and then I can testify to that one way or the other.
13  Q.  So that's a no, you don't remember what the
14  policy was?
15  A.  No.  I can't say one way or the other until I
16  see it.
17  Q.  Okay.  So do you know whether or not the
18  written policy changed at any time you worked for the
19  Delaware State Police?
20  A.  No, I can't say, I can't testify to that
21  because there were things that changed over the years
22  and each time that there was a change sometimes there
23  were dates put next to it.  So if you produce those
24  policies and let me take a look at it, I can tell you

Page 269

1   if that was an authentic Delaware State Police policy
2   to my recollection or if it was something that I have
3   never seen before.
4   Q.  Let me ask the question again.
5       You worked in human resources in 1994
6   through 1998?
7   A.  Yes, sir.
8   Q.  During the four-year period do you recall the
9   written policy of the Delaware State Police concerning
10  disability leave to have changed?
11  A.  I don't know.
12  Q.  All right.  Let's take a look at this document.
13  A.  Okay.
14      MR. FITZGERALD:  I guess we will call it
15  Baylor 7.  Let's mark it Baylor 7.
16      (Baylor Deposition Exhibit No. 7 was
17  marked for identification.)
18  BY MR. FITZGERALD:
19  Q.  I'll let you look at this and the question will
20  be whether this is the policy concerning disability
21  leave when you retired.
22  A.  (Reviewing document)  This looks like the
23  policy.
24  Q.  Does this look like the policy in 1998?

24 (Pages 266 to 269)

Price, et al.                                                    Chaffinch, et al.
David L. Baylor, Volume 2              C.A. # 04-956-GMS              July 26, 2005

Page 270

1    A.  I'm not sure.
2    Q.  You don't know if this was the policy in 1994?
3    A.  I'm not sure, no, sir.
4    Q.  Is it your opinion that this policy should be
5    followed, should be enforced?  Excuse me.
6         MR. NEUBERGER:  Objection.
7    A.  Is it my opinion that this policy should be --
8    what provision of the policy?
9    Q.  Is there any provision in the policy you think
10   shouldn't be enforced?
11   A.  I think that if you take into context of what
12   issues we're dealing with, that the State Police are
13   dealing with, I think that the policy needs to be
14   tightened.
15   Q.  Why don't you provide me some idea what that
16   context is?
17   A.  The context is it should be spelled out what
18   specifically levels of sick leave or light duty -- I'm
19   sorry -- injury and what would qualify as a provision
20   of someone immediately being placed in a position
21   where they have to file for a disability pension or
22   can be carried for two years.  This allows a whole lot
23   of range for the superintendent and it can lead to the
24   inconsistent application of the policy.  That's just

Page 271

1    my opinion.
2    Q.  You think that this policy allows too much
3    discretion for the superintendent?  Is that what you
4    just said?
5    A.  I'm saying that with practice with this policy
6    there's a lot of vagueness.
7    Q.  Where is the vagueness in this policy?
8    A.  Okay.  On page III-6-35 on F it says, "In the
9    event that a period of 1 calendar year has not
10   occurred from the date of absence due to a compensable
11   illness or injury to the expiration of all available
12   leave, the Superintendent may authorize an unpaid
13   leave of absence to provide a minimal of a 1 year
14   rehabilitation period prior to separation from the
15   Division."
16        I think you have to define what's
17   rehabilitation.
18   Q.  You think that the policy should define what's
19   rehabilitation?
20   A.  I think so.  I mean, you're asking me and I'm
21   giving you my answer.
22   Q.  Right.  Is there any other vagueness in the
23   policy that you think should be tightened up?
24   A.  Sir, in the shortness of five minutes to read a

Page 272

1    very long policy to give you an answer on how I would
2    change a policy when it takes usually decisionmakers a
3    lot longer, I think it's very unfair for me to go
4    through here right now and say where I think this
5    policy is fair and unfair.
6    Q.  I didn't ask you whether it was fair or unfair.
7         You had testified that you thought it was
8    vague and it needs to be tightened up, and I'm asking
9    you where you think it's vague and needs to be
10   tightened up.
11   A.  If you will give me more time, I will do that.
12   Q.  When you said it was vague, what were you
13   thinking of?
14   A.  I was thinking about the whole policy in and of
15   itself.  I think you would have to go through it, from
16   my recollection.
17   Q.  Do you think that the policy provides the
18   superintendent too much discretion?
19   A.  I think some superintendents, yes.
20   Q.  Well, do you think that the policy identifies
21   any particular superintendent to get more or less
22   discretion?
23   A.  No, it does not.
24   Q.  I will ask again do you think the policy

Page 273

1    provides the superintendent too much discretion?
2    A.  Possibly, yes.
3    Q.  Can you identify where you think it does that?
4    A.  No.
5    Q.  What do you base that opinion on then?
6    A.  Experience.
7    Q.  Experience with the policy?
8    A.  No.  Experience with the issues that are the
9    reason why we're here.
10   Q.  Do you think that the policy is consistent with
11   your previous observation that it is the custom of the
12   DSP to take care of people who have been injured on
13   the job?
14   A.  Do I think that the policy -- the practice
15   policy or the written policy?
16   Q.  No.  The written policy.  When I say policy,
17   I'm talking about the written policy.  I will use the
18   terminology I think that we had used before.
19        When I say policy, I'm talking about the
20   written policy.  When I say practice or custom, we
21   will talk about practice or custom.
22   A.  I didn't hear that.  I'm sorry.
23   Q.  No.  That was the terminology we had used on
24   day one.

25 (Pages 270 to 273)

Price, et al.                                                                              Chaffinch, et al.
David L. Baylor, Volume 2              C.A. # 04-956-GMS                         July 26, 2005

Page 274

1    A.  Okay.  I'm sorry.
2    Q.  So I will appeal to that division again.
3        Is the written policy consistent with your
4    observation that it's the custom of the DSP to take
5    care of people who have been injured on the job?
6    A.  Yes.  It's the custom of the DSP to take care
7    of people who have been injured on the job, yes.
8    Q.  Right.  And do you think that this policy is
9    consistent with that?
10   A.  I think so.
11   Q.  Okay.  Do you think that the policy is
12   consistent with the custom of the DSP that you
13   testified to earlier to avoid ending a trooper's
14   career?
15   A.  Can you repeat that one?
16   Q.  Sure.
17       You testified earlier that it was the
18   custom of the Delaware State Police to do what they
19   could to avoid ending a trooper's career.  Do you
20   remember that testimony?
21   A.  Yes.  Yes, sir.
22   Q.  Do you think this policy concerning disability
23   leave and modified duty status during rehabilitation
24   from injury or illness is consistent with the custom

Page 275

1    of the Delaware State Police to avoid ending a
2    trooper's career?
3    A.  I'm not sure.
4    Q.  Do you think if the policy is followed as
5    written it would do what was necessary to avoid ending
6    a trooper's career unnecessarily?
7    A.  Just based on my scanning this, if it's
8    practiced I think so, yes.
9    Q.  I'm not sure what you mean.  Can you clarify
10   that answer?  What do you mean by "if it's practiced"?
11       I'm talking about if this policy is
12   followed as written, would that be consistent with the
13   custom of doing what it takes to not prematurely end a
14   trooper's career?
15   A.  If the two-year provision that seems to be
16   outlined here -- like I said, I haven't had much time
17   to read it thoroughly and I'm not a speed reader.  But
18   the two-year practice or custom of not prematurely
19   ending a trooper's career has been the practice since
20   I have known and been affiliated with the Delaware
21   State Police.
22   Q.  I understand.  How is that practice consistent
23   or inconsistent with this written policy?
24   A.  Sir, like I said, I'm going to need much more

Page 276

1    time to read this and I can't do it today.
2    Q.  Well, based on your experience in human
3    resources and your experience as a troop commander and
4    your experience as a major, how is the practice
5    consistent or inconsistent with the written policy?
6    A.  Sir, you're asking me to talk about the policy
7    and I told you I'm going to need more time.  Now, I
8    can give you testimony on practice.  All right?  But
9    you're going to have to give me way more time --
10   Q.  Based on your experience, are you at all
11   familiar with the policy, the written policy?
12   A.  I'm familiar with it.  I know it exists, yes.
13   Q.  Do you know what it outlines?
14   A.  I know what -- here's the practice.
15   Q.  No.  I'm not --
16   A.  Here's the practice as the policy was explained
17   to me.  Okay?  Does that help you?
18   Q.  No, it doesn't help.
19   A.  Well, then, I can't answer your question.
20   Q.  Are you knowledgeable of the
21   provisions of the written policy and what they
22   require?
23   A.  I'm knowledgeable of the practice of the
24   Delaware State Police and I'm knowledgeable that a

Page 277

1    policy exists.
2    Q.  Are you knowledgeable of the provisions of the
3    written policy and how they apply?
4    A.  I'm knowledgeable of the practices of the
5    Delaware State Police and I'm knowledgeable of the
6    policy that exists.  I mean, you're asking me, sir, to
7    be very up front with you, you're asking me to talk
8    about policies and policy changes and you haven't
9    produced any documents over that span of four years
10   which show policy changes.
11       And now you're asking me since I've been
12   separated from the division for almost a year is this
13   the practice, the policy of the Delaware State Police
14   when I left?  And I can't tell you because I haven't
15   received the administrative manual and I don't have
16   the manual that was in front of me on the day I left.
17   Q.  Did you have a copy of the manual when you were
18   major?
19   A.  Yes, I did.
20   Q.  How often did you look up the policy on
21   disability leave?
22   A.  I didn't look it up that often because I looked
23   up everything else, a lot of other things.
24   Q.  Do you recall ever looking up the policy on

26 (Pages 274 to 277)

Case 1:04-cv-00956-GMS    Document 117-3    Filed 03/17/2006    Page 20 of 33

Price, et al.
David L. Baylor, Volume 2
v.
C.A. # 04-956-GMS
Chaffinch, et al.
July 26, 2005

Page 278

1  disability leave when you were a major?
2  **A. Periodically. But I also went down to HR**
3  **because that was an HR function. That was their**
4  **function. That was not my function.**
5  Q. Are you just guessing that you looked it up
6  periodically or do you remember specifically times
7  looking up the disability leave while you were a
8  major?
9  **A. No. I looked it up.**
10  Q. Why?
11  **A. Why? Because I had troopers that could fall**
12  **into that. I remember looking it up one time**
13  **specifically with one of my troopers. So, yes, I did**
14  **look it up.**
15  **And I looked it up as a captain. I looked**
16  **it up when I was confronted with telling Everett**
17  **Jackson that he had to leave in two weeks. I was**
18  **confronted with telling Blaine Quickel, who almost**
19  **died in a car accident, that he's going to have to go**
20  **off before he comes back.**
21  **Yes, I did look it up. I did familiarize**
22  **myself with it at that time. But did I make it part**
23  **of my database in my head? No. Because I had other**
24  **things to worry about.**

Page 279

1  Q. Why did you look up the policy when you were
2  dealing with these troopers?
3  **A. Because I was faced with a hand delivered**
4  **letter telling me that in two weeks I had to tell a**
5  **trooper that he no longer could come into my troop as**
6  **a Delaware state trooper, that he had to retire, and I**
7  **thought it was very unfair.**
8  Q. When you looked up the policy did you find that
9  his treatment was consistent or inconsistent with the
10  policy?
11  **A. I couldn't find it. I couldn't find it. I was**
12  **told by attorneys that this is how it has to be done**
13  **and that's the way it was done. Whether I agreed with**
14  **the policy or not, that's what I was told. It was**
15  **wrong then and it would be wrong now to do that.**
16  Q. Which trooper are you talking about?
17  **A. Everett Jackson and Blaine Quickel.**
18  Q. What rank were you when you went to Everett
19  Jackson and told him --
20  **A. I was his captain. I was his troop commander.**
21  Q. When you looked up the policy when you were a
22  major, why did you look up the policy?
23  **A. Back then I had -- what's his name? -- Ron**
24  **Tate, who was one of my troopers who was on light**

Page 280

1  **duty, and I looked up the policy.**
2  Q. Why did you look up the policy?
3  **A. Because there was a whole controversy about Ron**
4  **Tate's status within the division.**
5  Q. But there was a practice in place, was there
6  not?
7  **A. There was a practice. And Ron Tate, if you**
8  **know anything about Ron Tate, was somebody that would**
9  **throw up all kind of issues, policy, practices and**
10  **all. So I looked it up.**
11  **And then I was told by Mr. Dillman that**
12  **that is something that they would deal with and to**
13  **leave it alone.**
14  Q. Okay. When you worked in the HR department why
15  did you look up the policy?
16  **A. I looked up the policy because I was studying**
17  **for promotion.**
18  Q. But you never looked it up to apply it or with
19  respect to any trooper?
20  **A. No.**
21  Q. Can you identify any trooper to whom this
22  policy was not applied?
23  **A. There you go again. I mean, you're asking me**
24  **to talk about this policy with any trooper. I can't**

Page 281

1  **do that.**
2  Q. Is it your opinion that this policy is not
3  actually being applied to the plaintiffs in this case?
4  **A. Without reviewing the entire policy, I can't --**
5  Q. I'll let you review the entire policy if you
6  need that to answer the question.
7  **A. I can't do it today. I need time to digest it.**
8  **I can't do that.**
9  Q. Then maybe we will, if I need to, we can come
10  back and do that.
11  **A. Then I need to know what's being done with**
12  **these troopers because I think a lot of that has been**
13  **done with these troopers was after I left and a lot**
14  **was done when I was a major, that, like I testified to,**
15  **I wasn't privy to. So if you disclose everything**
16  **that's been done with them and then I can look at the**
17  **policy, I can share that with you.**
18  Q. As you sit here right now though, you don't
19  think you know enough about the policy to decide
20  whether or not it's being applied to the plaintiffs?
21  **A. No. I know enough about the practice.**
22  Q. But you don't know enough about the policy. Is
23  that your testimony?
24  **A. I know enough about the practice. If you give**

27 (Pages 278 to 281)

Price, et al.                                           v.                                    Chaffinch, et al.
David L. Baylor, Volume 2                    C.A. # 04-956-GMS                              July 26, 2005

Page 302

1   maybe more?
2   A.  (Pause).
3   Q.  You mentioned Joe Forrester early.  You don't
4   know if Joe Forrester was deemed permanently disabled?
5   A.  No.
6   Q.  You don't know if he was deemed permanently
7   unfit for duty, do you?
8   A.  No.
9   Q.  Can you think of anybody who falls into those
10  two categories prior to the implementation of the two-
11  year rule?
12  A.  Not right off the top of my head.  That's over
13  a 23-year period.  I'm sure something will come to
14  mind and if I do I will let you know.
15  Q.  After the implementation of the two-year rule,
16  can you think of anybody who -- what would happen to
17  somebody who was deemed permanently disabled and
18  permanently unfit for duty?
19  A.  They would be given the two years.  For
20  example, Bruce Peachey, Bruce was, like I testified
21  before, he's my classmate.  He worked for me at Troop
22  9 and the night I became major, less than 24 hours
23  after that he became involved in that incident where
24  he got shot.

Page 303

1        And shortly thereafter he knew the extent
2   of his injury because he revealed it to myself.  He
3   revealed it to the colonel.  He revealed it pretty
4   much to everybody, that he was not going to be able to
5   come back to full duty; that it was much more severe
6   than what he initially thought.
7   Q.  When did he tell you that?
8   A.  He got shot in February.  I would say probably
9   about May or June is when I first was aware of it.  I
10  think it was sometime the end of that summer or fall
11  that I went to the colonel and asked that he be moved
12  to the range.
13  Q.  How do you know that he told the colonel that?
14  A.  Because the colonel mentioned it to me when I
15  discussed it.
16  Q.  Do you know whether or not a doctor deemed him
17  permanently disabled?
18  A.  When he referenced the comment to me, he
19  referenced it by his doctor.  His doctor wasn't
20  optimistic about him coming back.
21  Q.  Do you know whether the doctor deemed him
22  permanently disabled?
23  A.  No, I can't say that.
24  Q.  Do you know whether the doctor deemed him

Page 304

1   permanently unfit for duty?
2   A.  No.
3   Q.  And so can you think of anybody who falls into
4   that category after the implementation of the two-year
5   rule and tell me what happened to them?
6   A.  No.  If you're asking me about a doctor
7   permanently, no, because I don't have access to those
8   records.  That's only HR would have access.
9   Q.  You're saying that, your testimony is that
10  after the implementation of the two-year rule if
11  somebody was deemed permanently disabled and
12  permanently unfit for duty, they would get two years
13  and then they would have to apply for their pension
14  and retire?
15  A.  Yes, sir.
16  Q.  Or seek a disability pension?
17  A.  Yeah.  Because I remember one case where
18  Captain Citro was forced to do that.
19  Q.  What's the justification for keeping somebody
20  on the payroll for two years who has been deemed
21  permanently unfit for duty?
22  A.  The justification for me?
23  Q.  Right.
24  A.  Is that if someone -- I'm a decision-maker and

Page 305

1   I came up through the ranks proudly.  And if somebody
2   stands next to me and puts their life on the line in
3   any capacity that's envisioned and gets hurt while
4   performing their job, that's good enough for me.
5   Q.  And if the person fell down the stairs and
6   twisted their back and was deemed permanently unfit
7   for duty, you would still keep them on the payroll for
8   two years?
9   A.  If he was doing it in the line of duty,
10  absolutely.
11  Q.  Now, the two-year policy was implemented around
12  the time of the Everett Jackson situation?
13  A.  It seems like 2001.  I mean, just everything
14  was 9-11, after 9-11, that was right before.
15  Q.  Right.  Did the practice change at all from
16  2001 until the date of your retirement?
17  A.  Not that I know of.  I know there kept being
18  discussion and debate about this whole thing after
19  that, but I mean I think a lot of that was occurring
20  between the attorneys and Captain Yeomans because
21  every now and then it would be periodically mentioned
22  at the staff level but nothing in detail.
23  Q.  What was the nature of the debate?
24  A.  I guess, you know, where people fit into that,

33 (Pages 302 to 305)

Price, et al.                                    v.                          Chaffinch, et al.
David L. Baylor, Volume 2              C.A. # 04-956-GMS                      July 26, 2005

Page 306

1  those categories.
2     Q.  What was the debate?  Was it a factual debate
3  whether or not somebody actually fit in there or was
4  it a debate about what the categories meant?
5     A.  I don't know.  I think it was more about what
6  the categories meant and if somebody would fit in
7  there.
8     Q.  Were you involved in the debate at all?
9     A.  (Witness shakes head).
10    Q.  Did you have any input on the nature of the
11 policy?
12    A.  No.  Like I said, every now and then I
13 interjected, you know, my opinion about forcing people
14 to leave, forcing people to just go and separate
15 themselves from the division if we had functions in
16 the division that they could perform as a pensioned
17 trooper.
18    Q.  I need clarification on that.
19        Is a pensioned trooper somebody who has
20 left the Delaware State Police and is no longer a
21 trooper?
22    A.  They're retired, yes, retirement on disability.
23    Q.  So in your view what should have happened is
24 these people should have been retired and then given a

Page 307

1  job as a civilian?
2     A.  Yeah.  For example -- and I hate to keep using
3  this guy's name.  I'll use two guys.  Bruce Peachey
4  and I remember specifically Joe Papili arguing for
5  Dave Citro.  In Bruce Peachey's situation he had a
6  particular knowledge, a skill level with being a
7  firearms instructor.  I had been away to the FBI
8  National Academy and I had known that the FBI had
9  transitioned a lot of their instructors away from
10 active duty to retired troopers or retired or
11 pensioned-off FBI agents.  I'm sorry.  And I thought
12 that that would be perfect.  That way we get another
13 trooper out on the road or in another law enforcement
14 position and we're still using that specially trained
15 officer that's connected with the division.
16    Q.  What's the difference between the practice
17 after the implementation of the two-year rule and
18 before the implementation of the two-year rule?
19    A.  I think the difference is that after the
20 implementation they seemed to stick hard-and-fast to
21 the two-year rule.  Prior to the implementation they
22 didn't.
23    Q.  Okay.  Did Bruce Peachey get two years?
24    A.  Yes, sir.

Page 308

1     Q.  How do you know that?
2     A.  Because, like I said, that incident occurred on
3  February the 8th or 9th of 2002 and February of 2004
4  he was pensioned off.
5     Q.  When did he apply for his pension?
6     A.  That I can't tell you.  I think it was right
7  around January of 2004.
8     Q.  Do you know that or are you guessing?
9     A.  I'm pretty comfortable with that.
10    Q.  Was he told to retire?
11    A.  I think he was told that in two years he had to
12 retire.
13    Q.  By whom?
14    A.  I would believe John Yeomans was the person who
15 delivered that message.
16    Q.  Were you there?
17    A.  No.  You just asked me.
18    Q.  Yes, I know.  What's the basis for saying that
19 you think he was told to retire by John Yeomans?
20    A.  Because I knew that the colonel and I had
21 discussed it, you know, Peachey is probably going to
22 have to retire, and that John Yeomans, being the
23 director of HR, is the one who took care of that
24 notification.

Page 309

1     Q.  Do you know whether a physician ever deemed
2  Bruce Peachey permanently unfit for duty?
3     A.  I don't know that, sir.
4     Q.  Did James Romanelli get two years?
5     A.  I believe so, but I'm not sure.
6     Q.  What do you base your belief on?
7     A.  Just trying to remember back when that
8  happened.  I know it happened in July of one year.
9  I'm just not sure which year.  Because we were at the
10 state fair when that happened, when that whole thing
11 went down.
12    Q.  But you don't know what year it was?
13    A.  No, sir.  I believe I was a captain though.
14    Q.  Do you know when he applied for his pension?
15    A.  No, sir.
16    Q.  Do you know whether he was told to retire?
17    A.  No, I don't know, sir.
18    Q.  Do you know whether his injuries made him
19 permanently unfit for duty?
20    A.  Based on the information that was going around,
21 yes, that he couldn't walk.
22    Q.  That's the information that was going around.
23 Where did you get the information?
24    A.  Based on -- I mean, it was common knowledge

34 (Pages 306 to 309)

Price, et al.                                                                    v.                                            Chaffinch, et al.
David L. Baylor, Volume 2                                            C.A. # 04-956-GMS                                    July 26, 2005

Page 310

1  that he had a serious motorcycle accident, that the
2  injury was very severe and that his ability to walk
3  was, you know, it was seriously impeded.
4      Q.  Do you know whether a physician ever deemed him
5  permanently unfit for duty?
6      A.  That I don't know, sir.
7      Q.  Did Sean Nowery get two years?
8      A.  I don't know, sir. I think he left beforehand
9  at his own choosing.
10     Q.  What do you mean "beforehand"?
11     A.  Before the two years.
12     Q.  When was he hurt?
13     A.  I can't tell you that. I don't know.
14     Q.  Do you know when he applied for his pension?
15     A.  No. But his troop commander at the time I
16 believe was Captain Hawkins, who was a classmate of
17 mine, and we had talked about this because Sean, there
18 was an incident where a suspect came at him and
19 because of his injury I don't think he could react or
20 something. And he chose to put in for his pension
21 early because Captain Hawkins even suggested to him
22 "Sean, I would like for you to stay the two years."
23     Q.  So was he told to retire?
24     A.  No.

Page 311

1      Q.  Did his injuries make him permanently unfit for
2  duty?
3      A.  I don't know.
4      Q.  Do you know whether a physician ever deemed him
5  permanently unfit for duty?
6      A.  Sir, I don't know.
7      Q.  Did Jerome Loveless get two years?
8      A.  Sir, I don't know.
9      Q.  Was he told to retire?
10     A.  Sir, I'm not sure.
11     Q.  Did his injuries make him permanently unfit for
12 duty?
13     A.  Sir, I'm not sure.
14     Q.  Do you know whether a physician ever deemed him
15 permanently unfit for duty?
16     A.  Sir, I'm not sure.
17     Q.  Charles Klim, what was the nature of Charles
18 Klim's injury?
19     A.  I didn't even know Charles Klim had an injury.
20     Q.  What about Joseph Condron?
21     A.  That's a trooper -- a lot of those troopers you
22 mentioned are from downstate and I was from upstate,
23 so I'm not familiar with them.
24     Q.  So you don't know whether he got two years?

Page 312

1      A.  No, sir.
2      Q.  Do you know what the nature of his injury was?
3      A.  No, sir.
4      Q.  Do you know whether he was permanently unfit
5  for duty?
6      A.  No, sir.
7      Q.  James Mosley, did he get two years?
8      A.  I'm trying to think. There's two Mosley
9  brothers, Randy and Jim. One had a heart attack, but
10 I'm not sure which one.
11     Q.  So you don't know if it was James?
12     A.  Yeah. I'm not sure.
13     Q.  Did the one who had the heart attack get two
14 years?
15     A.  I think he had got assigned to personnel and
16 then he chose to retire on his own.
17     Q.  Before two years?
18     A.  I don't know.
19     Q.  Was he told to retire?
20     A.  I don't know.
21     Q.  Do you know whether or not his injuries made
22 him permanently unfit for duty?
23     A.  I'm not sure.
24     Q.  Do you know whether a doctor ever deemed him

Page 313

1  permanently unfit for duty?
2      A.  I don't know.
3      Q.  What about David Henderson, did he get two
4  years?
5      A.  From what I know of Dave, yes.
6      Q.  What do you know that makes you say that he got
7  two years?
8      A.  I think the injury had occurred because -- I
9  don't know for a fact. For all these cases I'll put
10 up front that I've never reviewed anybody's medical
11 record.
12     Q.  Okay.
13     A.  But I think he got moved to supply as a
14 sergeant and was allowed to retire there and I think
15 he got injured before. He had a back injury.
16     Q.  Did he get two years on light duty?
17     A.  I think at least that, yeah.
18     Q.  Do you know when he was hurt?
19     A.  No, sir.
20     Q.  Do you know when he applied for his pension?
21     A.  No, sir.
22     Q.  Was he told to retire?
23     A.  I'm not sure.
24     Q.  Did his injuries make him permanently unfit for

35 (Pages 310 to 313)

Price, et al.                           v.                    Chaffinch, et al.
David L. Baylor, Volume 2        C.A. # 04-956-GMS                July 26, 2005

Page 314

1   duty?
2      A.  I'm not sure.
3      Q.  Did a doctor ever deem him permanently unfit
4   for duty?
5      A.  I'm not sure.
6      Q.  Robert Schleifer, did he get two years?
7      A.  I want to say I think he came very -- I think
8   he did.  I can't say for sure, but I remember the
9   night of the accident.  I was troop commander in
10  Odessa and I got called out to the hospital.  I know
11  we had taken blood in that case and so I think he did
12  get two years or close to two years.
13     Q.  When was he hurt?
14     A.  I want to say he was hurt in the fall of 2001.
15     Q.  When did he apply for his pension?
16     A.  That I can't tell you right off the top of my
17  head.
18     Q.  Was he told to retire?
19     A.  Oh, he was told a lot of things.  I think he
20  made that choice before the prosecution of his case.
21     Q.  Did his injuries make him permanently unfit for
22  duty?
23     A.  Yes.  I know that for a fact.
24     Q.  How do you know that for a fact?

Page 315

1      A.  Because I was told that he had neurological
2   damage.  I was there that night.  I was actually
3   surprised that he survived.
4      Q.  So you knew the night of his injury that he was
5   permanently unfit for duty?
6      A.  No, I didn't say that.  I said that that night
7   of the accident, I was surprised he survived.  I was
8   later told of his neurological damage, but I know he
9   sustained a lot of trauma and a lot of injury that
10  night.
11     Q.  Did his injuries make him permanently unfit for
12  duty?
13     A.  From what I was told, yes.
14     Q.  Told by whom?
15     A.  The colonel.
16     Q.  Who was?
17     A.  Chaffinch.
18     Q.  At the time?
19     A.  Yes.
20     Q.  Do you know whether a physician ever deemed him
21  permanently unfit for duty?
22     A.  I didn't talk to a physician, no.
23     Q.  What did Colonel Chaffinch tell you?
24     A.  That there was severe neurological damage, that

Page 316

1   he would not be able to come back.
2      Q.  Did Michael Jordan get two years?
3      A.  I don't know.
4      Q.  Do you know when he was hurt?
5      A.  No, sir.
6      Q.  Do you know when he applied for his pension?
7      A.  No, sir.
8      Q.  Do you know whether he was told to retire?
9      A.  No, sir.
10     Q.  Do you know whether his injuries made him
11  permanently unfit for duty?
12     A.  No, sir.
13     Q.  Do you know whether a doctor deemed him
14  permanently unfit for duty?
15     A.  No, sir.
16     Q.  Christine Price, did she get two years?
17     A.  I believe she did.
18     Q.  When was she hurt?
19     A.  It had to be sometime around the '94-95 range
20  because she was in HR when I was in HR.  She got
21  reassigned up there.
22     Q.  From where?
23     A.  I think I want to say Troop 4, but I know it
24  was one of the troops in Sussex County.

Page 317

1      Q.  When did she apply for her pension?
2      A.  When she was up at HR, I believe.
3      Q.  Well, when?
4      A.  In the '94-95 range, '95 I would like to say.
5      Q.  Well, if she got hurt in '94 or '95 and applied
6   for a pension in '94-95 she didn't get two years, did
7   she?
8      A.  I don't know when she got hurt.  I'm just
9   saying she got assigned up there, which led me to
10  believe that they moved her from the troop up there
11  and then sometime after that she was told that she had
12  to apply for a pension.  She was told by Mr. Dillman.
13  I remember that.
14     Q.  Was she there when you got there?
15     A.  No. She came after.
16     Q.  Okay.
17     A.  See, when I was there, when I got there, Ray
18  Peden, Ogden, a trooper by the last name of Ogden,
19  Mike Ogden, I think -- no. It was his brother.  And
20  there were a couple of others that were all sent up
21  there on light duty.
22     Q.  So Christine Price came in --
23     A.  As a light-duty trooper.
24     Q.  -- as a light-duty trooper while you were there

36 (Pages 314 to 317)

Price, et al.                                                Chaffinch, et al.
David L. Baylor, Volume 2          C.A. # 04-956-GMS          July 26, 2005

Page 318

1  and left while you were still there?
2  A.  Yes, sir.
3  Q.  Did Dave Citro get two years?
4  A.  Well, that depends on who you talk to.
5  Q.  Well, I'm talking -- go ahead.
6  A.  You're talking to me, right.
7  Q.  That's all right.  Go ahead and answer the
8  question.
9        Did Dave Citro get two years?  What are
10  the various answers?
11  A.  To my knowledge about Dave's injuries was that
12  he had a neck and back injury that occurred while he
13  was at Penny Hill when he was a corporal.  He retired
14  as a captain.  You can't make captain in two years.
15        So over that period, -- now, I don't know
16  the extent of his injury and all, but I knew that when
17  I was on the executive staff he was told by Major
18  Papili that he had to put in his pension papers.
19  Q.  When I asked did he get two years I mean was he
20  on light duty for two years?
21  A.  No.
22  Q.  So when I asked did he get two years and you
23  said it depends on who you ask, what's the argument
24  for he did get two years?

Page 319

1  A.  Well, it depends on what you ask.  If his
2  injury occurred back here but if you never get put on
3  light duty because you may have a non-patrol
4  assignment or a non-detective assignment, then that
5  can happen.  And then you get where it's longer than
6  two years because if you're a trooper and had that
7  same injury, you would be put on the two years.  So
8  that's why.
9  Q.  But he wasn't --
10  A.  He wasn't officially told --
11  Q.  He wasn't officially on light-duty status?
12  A.  Right.
13  Q.  Can you make corporal to captain with doing
14  non-law enforcement assignments throughout your whole
15  career?
16  A.  Yes, sir.  You can make corporal and major
17  without doing it.
18  Q.  Did Dave Citro do that?
19  A.  No.  He came close.
20  Q.  What law enforcement assignments did he have?
21  A.  Well, he came close to major.  Now --
22  Q.  I know.  But did he go from corporal to captain
23  doing simply only non-law enforcement assignments?
24  A.  No.  No.

Page 320

1  Q.  And do you have any idea when he was put on
2  light-duty status?
3  A.  No.
4  Q.  For how long?
5  A.  No, sir.
6  Q.  So when I asked you did he get two years what
7  is your answer?
8  A.  That I don't know.
9  Q.  Was he told to retire?
10  A.  Yes, sir.
11  Q.  By whom?
12  A.  Major Papili.
13  Q.  When?
14  A.  2003 I want to say.
15  Q.  Why?
16  A.  Because of an injury.  That was brought up in
17  executive staff.  That's when Major Papili said to the
18  colonel that he would like to see Dave as director of
19  HTCU, which is high-tech crimes unit, because of his
20  skills.
21        And the colonel said we don't have a
22  position there for him as a civilian and that's when
23  the request was made.  And he's been -- the colonel
24  specifically said two years.

Page 321

1  Q.  The colonel specifically said two years?
2  A.  Yes.
3  Q.  How long had he been on light-duty status?
4  A.  Apparently two years because he said the time
5  was up.
6  Q.  Do you know whether or not he was on for two
7  years?
8  A.  I just am only relaying the conversation that I
9  had.
10  Q.  Do you know whether or not his injuries made
11  him permanently unfit for duty?
12  A.  I would only assume so because they made him
13  retire.
14  Q.  Right.  Do you know whether a physician ever
15  deemed him permanently unfit for duty?
16  A.  I don't know that.
17  Q.  Everett Jackson, did he get two years on
18  light-duty status?
19  A.  Yes, sir.
20  Q.  When was he hurt?
21  A.  I couldn't tell you, but I know that from
22  personal conversations with Rose Killian, who was the
23  attorney for the State Police at the time, where I got
24  notice of the letter that he was on, he had been on

37 (Pages 318 to 321)

Price, et al.                                              v.                        Chaffinch, et al.
David L. Baylor, Volume 2                    C.A. # 04-956-GMS                         July 26, 2005

Page 322

1  light duty for a period of two years and that this
2  letter was informing him he had to retire.
3     Q.  I'm sorry.  That was a letter from Rose Killian
4  to Everett Jackson?
5     A.  Actually, it was a letter probably generated by
6  John Dillman at the direction of Rose Killian to
7  Everett Jackson.  Rose Killian was the one who spoke
8  to me.
9     Q.  In the letter it said you have been on light
10  duty for two years?
11     A.  Yeah.  Your light-duty period has come to a
12  point where if you cannot successfully return to full
13  duty as a Delaware State Trooper you must put in for
14  your pension disability.
15     Q.  This was a different policy than had been in
16  the past or different practice --
17     A.  Practice, yes.
18     Q.  -- that had been in the past.  Thank you.
19        And it was different how?
20     A.  That they came in with the actual firm fixed
21  date and that was it.  It was hard-and-fast.
22     Q.  Was he permanently unfit for duty?
23     A.  Yes, by observation.  Not a doctor.
24     Q.  Ronald Merritt, was he on light-duty status for

Page 323

1  two years?
2     A.  Yes.
3     Q.  How do you know that?
4     A.  Ron worked for me in the truck team, truck
5  enforcement unit.  And Ron had gotted himself in a
6  little personal problem on New Year's Eve when I was
7  the director of traffic.  And shortly thereafter he
8  was I want to say it was started out administrative and
9  then it went to light duty.
10        It went to light duty because of his high
11  blood pressure and psychological issues and he was
12  allowed to get to his retirement, 20-year retirement
13  and then retire.
14     Q.  Was he on light duty for two years?
15     A.  I think so, yes, sir.
16     Q.  When was he hurt?
17     A.  Well, he wasn't really hurt.
18     Q.  When did his light-duty status begin?
19     A.  Well, for that you're going to have to bring in
20  Lieutenant Colonel Waggaman and Colonel Pepper and
21  Major Papili, all of those decisionmakers up there who
22  were making the decision.  What happened with Merritt
23  was because of the criminal allegation or accusation
24  that he was facing with the County Police, they didn't

Page 324

1  know what to do.
2        The A.G.'s office had taken a significant
3  amount of time to investigate it.  They didn't want to
4  return him to full duty.  So what had happened was he
5  said the stress of the investigation and high blood
6  pressure put him in a medical situation then.
7     Q.  Do you know when that was?
8     A.  No.  You would have to review -- they wouldn't
9  share that with me after that.
10     Q.  Okay.  Do you know when he applied for his
11  pension?
12     A.  I know that he got his pension shortly after we
13  had our 20-year mark which would be sometime late
14  2002, I think mid to late 2002.
15     Q.  And when was the New Year's Eve problem that
16  you cited?
17     A.  Two years before that.
18     Q.  He got -- say that again.  He got his pension
19  when?
20     A.  Sometime during 2002, I believe it was.
21     Q.  But you don't know when he applied for it?
22     A.  No, sir.
23     Q.  You don't know whether he was put on light-duty
24  status on January 1st, 2000?

Page 325

1     A.  No, sir.
2     Q.  Because you don't know when he was put on
3  light-duty status?
4     A.  I know he was told not to report to work.  Then
5  we went and took his guns.
6     Q.  Susan Brady, do you know anything about Susan
7  Brady's condition?
8     A.  Only that, the only thing I know about Sue is
9  that she retired after a tumultuous ending there with
10  Colonel Pepper, who was a captain at the time, I
11  think, and Colonel Graviet was the colonel.  And she
12  got disability pension and left as a sergeant but was
13  elevated to the rank of lieutenant and pensioned off
14  with that pension.
15     Q.  When did she leave?  Do you know?
16     A.  No.
17     Q.  Randy Mosley, can you testify to his
18  situation --
19     A.  I know there were two Mosleys.
20     Q.  -- other than the possibility of the heart
21  attack issue?
22     A.  I think that was it with him.
23     Q.  So your testimony before applies to Randy
24  Mosley?

38 (Pages 322 to 325)

Price, et al.                                    v.                        Chaffinch, et al.
David L. Baylor, Volume 2              C.A. # 04-956-GMS                   July 26, 2005

Page 326

1   A.  Yeah.  I didn't know anything about Jim.
2   Q.  You didn't know anything about Jim Mosley?
3   A.  Right.
4   Q.  Paul Sczbulek, was he on light duty for two
5   years?
6   A.  Paul was one of those other infamous
7   individuals because his status wasn't known even to
8   most troopers.  And the reason that came about that
9   nobody even knew he was pensioned off was he got
10  involved in an incident up at Hares Corner at
11  Dempsey's Diner where he got into an altercation with
12  an individual.  A sergeant by the name of Norman
13  rolled up on it, found out that it was Sczbulek, told
14  him to go home.
15          Sczbulek apparently was armed with a
16  weapon and later that morning Norman was informed that
17  Sczbulek had been pensioned off, unbeknownst to most
18  people.  I know before that there was a search warrant
19  executed on Paul Sczbulek's house for which Paul
20  Sczbulek came home and when he came home detectives
21  from the State Police and FBI agents were in his
22  house.  He, as any of us would, got upset.  When they
23  got to Troop 2 John Dillman came in and somehow he was
24  put into the Rockford Center under selected individual

Page 327

1   guards because of what I was told was a dependency
2   problem with cough medicine.
3           That problem appeared to have gone at
4   least two years when he was quietly pensioned off.
5   Q.  Why do you say appeared to have gone at least
6   two years?  When was he put on light-duty status?
7   A.  Well, this happened, this happened sometime
8   around I want to say '92, I think.  I'm not sure.
9   Q.  "This" meaning what?
10  A.  The search warrant and all that.
11  Q.  Okay.
12  A.  And I'm not sure when he --
13  Q.  When did he apply for his pension?
14  A.  We didn't even know he was pensioned off.
15  Q.  Okay.  So why do you think he got pensioned?
16  A.  Well, just because of the time, maybe the time
17  frames of all of the -- he was placed down to traffic
18  section and I think that's when the whole issue with
19  the cough medicine and the light-duty status, but you
20  will have to ask other people on that.
21  Q.  Can you identify any trooper who had been
22  diagnosed with a disability that could not be
23  rehabilitated or was allowed to remain on light duty
24  for up to two years?

Page 328

1   A.  No, I can't because I don't have access to
2   medical records, no diagnoses.
3   Q.  Do you know why plaintiffs are being separated
4   from the Delaware State Police?
5   A.  From what I understand, it's based on a medical
6   condition, their own medical condition.
7   Q.  Do you know anything about their medical
8   condition that has led to where we are now?
9   A.  The only thing that I assume to know is based
10  on the lead levels and the hearing issues because of
11  the range.
12  Q.  Did you know when you were a major did you ever
13  know what plaintiffs' lead levels were?
14  A.  Not their specific lead levels.  I heard of the
15  issue of lead levels, but I didn't know.
16  Q.  What was the issue that you heard of?
17  A.  That there's apparently an acceptable range and
18  that anything above that is unacceptable and puts them
19  in a health issue and that they weren't being
20  monitored and some had exceeded and some hadn't and
21  then they were closely monitored about that.  That's
22  all I know.
23  Q.  Do you have any idea what that range was?
24  A.  No.

Page 329

1   Q.  And you don't know what plaintiffs' actual
2   levels were?
3   A.  No, sir.
4   Q.  They were being monitored?
5   A.  Some.  Some were, absolutely.  Because Major
6   Swiski was in charge of some of that and I know
7   particularly the name that kept coming to surface
8   frequently was Eddie Cathell.
9   Q.  Well, talking about plaintiffs in this case,
10  Chris Foraker, Kurt Price and Wayne Warren and talking
11  about the time frame from December '03 until the time
12  you left, did you ever know or learn at that point
13  what an acceptable level was?
14  A.  No, sir.
15  Q.  Did you ever learn what plaintiffs' actual
16  levels were?
17  A.  No, sir.
18  Q.  Were they being monitored during that time
19  frame?
20  A.  I would assume so, but I don't know.
21  Q.  Well, I asked you if you knew why the
22  plaintiffs were being separated and you said issues of
23  blood lead level and hearing issues?
24  A.  Yes.

39 (Pages 326 to 329)

Price, et al.                                                        v.                                        Chaffinch, et al.
David L. Baylor, Volume 2                            C.A. # 04-956-GMS                                July 26, 2005

Page 330

1  Q.  Do you know what the hearing issues are?
2  A.  That there was I guess a drop in the hearing of
3  at least Corporal Price was the name that I heard more
4  closely associated with that issue and that that
5  hearing had deteriorated and that's why he was no
6  longer here, no longer going to be allowed to be a
7  trooper.
8  Q.  Can you compare the nature of -- well, do you
9  know that Kurt Price and Wayne Warren have asked to
10  renew their, have asked to apply for a disability
11  pension and that Chris Foraker has not?
12        MR. NEUBERGER:  Objection.  They haven't
13  asked to apply for a disability pension.  There's no
14  foundation for that.
15  A.  No, I don't.
16  Q.  Did you know that Kurt Price and Wayne Warren
17  have been deemed unfit for duty but Chris Foraker has
18  not?
19  A.  No.  I knew that Wayne Warren and Kurt Price
20  were not allowed to be at the range or teach and my
21  last experience up there I don't think even Chris was
22  really out at the range.  He was out at the classroom
23  part and didn't go near the range.
24  Q.  When you say you knew that Wayne Warren and

Page 331

1  Kurt Price were not allowed to be at the range, what
2  time frame are you talking about?
3  A.  The spring of 2004.
4  Q.  Are you aware of the results of their fitness
5  for duty exam?
6  A.  No, sir.
7  Q.  Are you aware of the nature of their fitness
8  for duty exams?
9  A.  Not specifically, other than what you hear,
10  that I mean the terminology is they're being forced to
11  go.
12  Q.  Do you know whether their fitness for duty
13  exams addressed lead levels?
14  A.  I don't know.
15  Q.  Do you know whether it addressed hearing?
16  A.  I don't know.
17  Q.  Do you know whether their fitness for duty
18  exams addressed any other physical limitations?
19  A.  No.
20  Q.  Do you know Dr. Aaron Green?
21  A.  I never met him before in my life.
22  Q.  Have you seen his report on the fitness for
23  duty exams?
24  A.  No.

Page 332

1  Q.  Do you know Dr. Edward Emmett?
2  A.  No.
3  Q.  Have you seen his reports for the fitness for
4  duty exams?
5  A.  No, sir.
6  Q.  Did you know that when Plaintiff Warren was
7  initially told he was fit for duty, he went to see
8  Dr. Emmett to convince him to change his mind?
9  A.  No, sir.
10  Q.  You testified earlier that plaintiffs'
11  treatment in this case has been unusual.  In fact, you
12  claim it was highly unusual.
13        In what ways is it highly unusual?
14  A.  Well, it's highly unusual that the individuals
15  were being moved from the range and not put anywhere
16  else, being told that they didn't have any law
17  enforcement duties.  Those were unusual to me.
18  Q.  Let's take the first one, moved from the range
19  and not put anywhere else.
20        Are you aware that they had claimed that
21  the range had caused them to suffer certain physical
22  ailments or disabilities?
23  A.  Yes, sir.
24  Q.  It's unusual to remove them from that

Page 333

1  environment?
2  A.  No, it's not unusual to do that.  But it would
3  be -- it would have been more usual to say okay, Kurt
4  or Wayne, right now we have some concerns about your
5  health and we think it may be closely associated with
6  you working at the range; what we're going to do is
7  move you from the range and put you here in the
8  detective unit, put you here in an operational
9  function until we get this matter clarified.
10        That's what I classify as unusual.
11  Q.  That didn't happen?
12  A.  No.  They were kind of in limbo from what I
13  understand.  And the reason why I say this is because
14  when Lieutenant Colonel McLeish called me and said
15  that he needed some bodies and he said these are going
16  to be particularly for the range and I said, "Well,
17  what are you going to do with those two guys?  Because
18  I could use them."  And he said, "I haven't figured
19  that out yet."
20        And that was unusual for me because
21  usually to plot B you have a decision for A and we
22  didn't have a decision for A and I never got one when
23  I left.
24  Q.  Pending a decision, you don't have a problem

40 (Pages 330 to 333)

Price, et al.                                                                v.                                      Chaffinch, et al.
David L. Baylor, Volume 2                         C.A. # 04-956-GMS                              July 26, 2005

Page 334

1   with them being removed from the range though?
2       A.   I don't have a problem with them being removed
3   from the range as long as that range, which was the
4   indoor range, and now they were out -- an outdoor
5   range I assume would not cause the same conditions
6   that were caused in an indoor range.
7       Q.   But that's just your assumption?
8       A.   That's just my assumption.
9       Q.   You have no idea what an outdoor range does to
10  one's hearing, for instance?
11      A.   No.
12      Q.   This discussion you had with Lieutenant Colonel
13  McLeish about staffing, when was this?
14      A.   This began in I think March and April time
15  frame and continued all the way through until I left.
16      Q.   Do you know when Kurt Price and Wayne Warren
17  were deemed unfit for duty?
18      A.   No, sir.  As a matter of fact, I think still
19  prior to me leaving they were in a duty status.  It
20  may not have been full duty, but they were in a duty
21  status.
22      Q.   What does that mean?
23      A.   That they worked pending medical evaluations.
24  But when you say they're unfit for duty that means, to

Page 335

1   me what it means is that they're unfit for full duty;
2   they couldn't be a trooper.
3       Q.   But somebody could be temporarily unfit for
4   duty.  Isn't that what light-duty status is?
5       A.   Yes.  But you didn't say light duty.
6       Q.   No, I didn't.  I said unfit for duty.
7       A.   Right.
8       Q.   Right.
9       A.   And they weren't unfit for duty.
10      Q.   When?
11      A.   Because unfit for duty means that they can no
12  longer perform the functions of a Delaware State
13  Trooper.
14          Now, light duty, I think they were more --
15  but I don't know what status they were in because
16  nobody knows what status they were in because nobody
17  was telling anybody what status they were in other
18  than they couldn't go near the range.
19      Q.   Well, when plaintiffs got the letters about
20  their light-duty status they knew they were on light
21  duty, didn't they?
22      A.   But I didn't get that letter.
23      Q.   But when you said nobody knew, plaintiffs knew,
24  right?

Page 336

1       A.   When I say nobody, I mean I didn't talk to
2   these guys about their status, but I'm talking about
3   the decisionmakers, the so-called brain trust.  When
4   we're sitting around the table trying to figure out
5   what we're going to do with people, how we're going to
6   operate the division, nobody knew the status or maybe
7   only a couple of people knew the full status.  I
8   surely didn't know the status, but I could have used
9   the individuals.
10      Q.   And after let's say in August of '04 did you
11  ask about the status of Kurt Price and Wayne Warren?
12      A.   Yeah.  I asked specifically -- I would run into
13  troopers every now and then and I would say, "What's
14  going on with the guys?  How are they doing?"
15          They would say, "They're still in limbo."
16  As time went on they said, "Well, Kurt is being forced
17  to retire."
18      Q.   When did you hear that Kurt was being forced to
19  retire?
20      A.   I think it was sometime toward the latter part
21  of 2004, beginning of 2005.
22      Q.   Before or after you left?
23      A.   Oh, this is after.  I left in August.
24      Q.   Did you ever ask Lieutenant Colonel McLeish in

Page 337

1   August of '04 before you left what's the status of
2   Kurt Price and Wayne Warren?
3       A.   In August?  No.  I didn't care.  No disrespect
4   to those guys, but I was leaving in 30 days.
5       Q.   But you asked about their status after you
6   left?
7       A.   No, I didn't ask McLeish.
8       Q.   No.  But you asked other people?
9       A.   Right.  I just asked how they were doing.
10      Q.   Right.
11      A.   I mean, just because I retired doesn't mean I
12  don't care.
13      Q.   But you didn't care enough to ask Colonel
14  McLeish, Lieutenant Colonel McLeish what their status
15  was?
16      A.   No, I didn't care enough to ask about their
17  status about assignment because I was leaving.
18      Q.   On the fitness for duty letter, I will just
19  show this to you again.  I'll just show you Baylor
20  Exhibit 1.  It's the same as 2 but the names have
21  changed.
22          MR. NEUBERGER:  For the sake of the
23  record, this is the one you corrected us on the date.
24  It's June 25th, 2004, correct?

41 (Pages 334 to 337)

Price, et al.                                                    Chaffinch, et al.
David L. Baylor, Volume 2            C.A. # 04-956-GMS            July 26, 2005

Page 338

1    MR. FITZGERALD: Yes.
2    BY MR. FITZGERALD:
3    Q.  You testified to this earlier on.  I'll ask you
4    again.
5        Have you ever seen a letter like this
6    before?
7    A.  I don't recall, sir.
8    Q.  When you say you don't recall, is it because of
9    the specifics of this letter or because you've never
10   seen a written description of light-duty status?
11   A.  No.  The specifics.  I mean, I think there have
12   been letters sent over a period of time that somebody
13   is in a light-duty situation, but never one this
14   specific.
15   Q.  You didn't know that plaintiffs were being put
16   on light-duty status?
17   A.  No, sir.
18   Q.  You didn't know before June 25th, 2004?
19   A.  I wasn't sure of their status, no.
20   Q.  You didn't know that they were on light-duty
21   status up until the time you left?
22   A.  No.
23   Q.  Do you know who drafted this letter?
24   A.  I want to say that probably Lisa McNatt and

Page 339

1    John Yeomans.
2    Q.  Why do you say that?
3    A.  Well, Iem is Lisa Elizabeth McNatt.  TFM is
4    Thomas F. McLeish.  But knowing John Yeomans, he
5    probably had something to do with forwarding it to the
6    lieutenant colonel.
7    Q.  I would like you to go through the restrictions
8    that are numbered 1 through 6 and explain to me why
9    they are appropriate or inappropriate.
10   A.  Okay.  No. 1, "Your work status will be Light
11   Duty, Non-Uniform consisting of administrative desk
12   duties."  I think in the past the verbiage has been
13   administrative duties, not necessarily desk duties
14   because some people have worked in non-desk functions.
15       No. 2, "You will report to work in
16   civilian business attire.  You are not to wear a
17   Delaware State Police uniform for work purposes or
18   otherwise."  That's pretty much consistent with the
19   past.
20       No. 3, "You may keep your assigned
21   divisional weapon; however, it should not be used for
22   any police-related duties."  That one baffles me to no
23   end.  So what other duties are they going to use it
24   for?

Page 340

1    No. 4, "If you observe a crime in
2    progress, or foresee that a situation may occur which
3    has the potential of placing you in a confrontational
4    or dangerous position, you are to remove yourself from
5    the situation and act in the same capacity as a
6    civilian by notifying a full-duty officer or the
7    communications center."  I think there was some
8    verbiage close to that, but I don't think it was as
9    detailed as that in the past.
10   Q.  Do you have a problem with what -- you
11   obviously can't identify the change in verbiage.  But
12   is there a problem with No. 4 in theory?
13   A.  Not in theory, no.  But the only thing that it
14   implies is that you're not a trooper and that's just
15   verbiage.  No.  The theory is fine.
16   Q.  But you testified earlier that this was telling
17   them that they couldn't, that they should not uphold
18   their oath?
19   A.  Right.
20   Q.  Isn't that a problem in theory?
21   A.  It is a problem in theory, yeah.  I mean, you
22   should uphold your oath.
23   Q.  You think No. 4 is telling them not to do that?
24   A.  Absolutely I think it's telling them not to do

Page 341

1    that.
2    Q.  No. 5.
3    A.  No. 5, "You are not to operate a marked
4    Delaware State Police vehicle, and may only utilize
5    unmarked divisional vehicles for administrative
6    purposes or for the convenience of the Division.  You
7    are not to stop any vehicles for any reason until your
8    physician returns you to full duty."  Yeah.  We went
9    round and round with that when I was on staff because
10   at the time we were trying to find enough
11   unconventional police vehicles to give them, but
12   that's practice.
13   Q.  Talk to me about that.  When you were on staff,
14   you mean executive staff?
15   A.  Yes.
16   Q.  And what situation came up that you were
17   debating whether or not this should be a restriction
18   on those with light-duty status?
19   A.  It wasn't it should have been a restriction.
20   It was trying to find the resources to give these
21   people who were deemed light duty.
22   Q.  Was there a particular instance where somebody,
23   where you had reached this threshold of a number of
24   light-duty troopers that you needed to find more cars?

42 (Pages 338 to 341)

Price, et al.                                                                    Chaffinch, et al.
David L. Baylor, Volume 2              C.A. # 04-956-GMS                          July 26, 2005

Page 346

1  building of the range and the work condition
2  environment that they're in and if that, in fact,
3  caused their illness or injury, then I have some
4  personal issues with that.
5     Q.  What would your personal issues be?
6     A.  That if by virtue of State Police leadership
7  and management and if at the time I fit in that
8  situation I put troopers in situations that caused
9  them injury or illness to themselves, then I think
10 it's incumbent upon the organization and myself as a
11 leader to try to do the best thing for them and that
12 does not necessarily always mean that you have to
13 leave at two years.  That is such a unique situation
14 that I think we have to look for a reasonable solution
15 to their situation.
16    Q.  And let's be clear.  You don't know what
17 plaintiffs' physical limitations are?
18    A.  I don't.
19    Q.  You don't know why they have been deemed unfit
20 for duty?
21    A.  No, I don't.
22    Q.  You don't know whether they have been deemed
23 permanently unfit for duty?
24    A.  No, I don't.

Page 347

1     Q.  You don't know why they have been deemed
2  permanently unfit for duty?
3     A.  No, I don't.
4     Q.  It's your view that a trooper who is hurt in
5  the line of duty even if he's completely unable to
6  perform the job and never will be able to perform the
7  job and medically certified should be carried for up
8  to two years?
9     A.  Absolutely.
10    Q.  And your personal view is they should be
11 carried for longer than that?
12    A.  No.  My personal view is that we should look
13 for other areas in the organization if they can fit to
14 migrate them into that position.  If not, then they
15 have to --
16    Q.  If they did that as a trooper, you would keep
17 them on as a trooper until they reached age 55 or they
18 filed for a service pension?
19    A.  You kind of lost me on that.
20    Q.  If a trooper is deemed permanently unfit for
21 duty, you would put them in a non-law enforcement
22 position we will call it until they reached age 55?
23    A.  If they're deemed unfit for duty and they got
24 injured because of their law enforcement duty and that

Page 348

1  there was a duty that I can migrate them to within the
2  organization where they can fully function and I'm not
3  just carrying them to just carry them, yes, I would
4  look for that solution.
5     Q.  And keep them there until they file for a
6  service pension or until they have to retire because
7  of age?
8     A.  Yeah.  I would probably would retire them off
9  as a trooper.
10    Q.  You testified that plaintiffs, this case with
11 Kurt Price and Wayne Warren and Chris Foraker could
12 have been handled a lot differently.  Do you remember
13 that testimony?
14    A.  (The witness nodded.)
15    Q.  What do you mean by that?
16    A.  Well, I think that in terms of -- from the
17 documents that were presented to me here today, it's
18 clear that there were some issues surrounding that
19 range back in that period of time.  If those issues
20 were appropriately addressed, then they may not be in
21 the position that they are now. I don't know. That's
22 the only conclusion I can draw as a layman.
23       Therefore, what I am saying is that maybe
24 instead of it getting into the verbal jousting that it

Page 349

1  got into the media and all, it should have been
2  handled more of let's see what we can do to identify
3  the problems, what caused the problems, correct the
4  problems and work with these individuals.
5     Q.  Is it your testimony that's not what Lieutenant
6  Colonel McLeish did?
7     A.  No, that's not my testimony.  My testimony is
8  that I think instead of sometimes seeking the
9  solutions, we were quick to identify maybe the blame
10 and I don't think always that we sought the solutions
11 to that, whether it was Colonel McLeish, Colonel
12 Chaffinch or whoever.  I don't know.  You're going to
13 have to figure that out.
14       I can only tell you I read the newspaper
15 articles.  I saw what was going on.  We didn't have a
16 range to shoot at.  We had problems with the range
17 that go back to when it was first built and now we got
18 troopers, not only these troopers but maybe other
19 troopers that have had some level of contamination
20 because of the facility.  I think that we, "we" being
21 all of us, and I take some responsibility for this
22 too, maybe should have looked at other ways to try to
23 resolve this issue other than it getting to where it
24 got to.

44 (Pages 346 to 349)

Price, et al.                                                                                      v.                                               Chaffinch, et al.
David L. Baylor, Volume 2                                             C.A. # 04-956-GMS                                             July 26, 2005

Page 370

1  longer existed.
2      And I think Mr. Dillman got rid of them
3  after three or four years employment, which to me was
4  a little odd because if someone, for example, and this
5  question came up, if someone's spouse, significant
6  other or a reference during the course of the
7  background came in and said that "I can't believe you
8  hired Trooper Jones, I told you that he was a
9  pedophile" -- Trooper Jones is fictional, okay -- then
10  the background would indicate who you talked to and
11  if, in fact, that you talked to this person.
12      Q.   So those kinds of files weren't necessarily
13  always kept you're saying?
14      A.   They were destroyed.
15      Q.   For a trooper who has been there for twenty
16  years or so, what happens to his or her file when they
17  go out?
18      A.   (Witness shakes head).
19      Q.   You just don't know?
20      A.   Don't know.
21      Q.   You also talked about in that long list of
22  people that you were questioned about today -- and you
23  also remember I questioned you last week about twenty
24  or more people, right?

Page 371

1      A.   Yes, sir.
2      Q.   There was that Officer "Sczbueck"?
3      A.   Sczbulek.
4      Q.   Sczbulek.  There was the officer who got in
5  trouble with the criminal investigation?
6      A.   Merritt.
7      Q.   Right.  Well, there was the one it had
8  something to do with a rape charge against a minor.
9      A.   That was Merritt.
10      Q.   All right.  There could be files in internal
11  affairs about those people also, right?
12      A.   Yes, sir.
13      Q.   And those files in internal affairs, could they
14  reflect, possibly reflect that the person was put on
15  light-duty status?
16      A.   Yes, sir.
17      Q.   So that would be another place to look?
18      A.   Yes, sir.  That wouldn't always be the case.
19  It would be in certain cases.  Sczbulek and Merritt
20  were probably two cases where that may reflect that,
21  but historically it would not be in IA.
22      Q.   Right.  I understand.  They are the only two
23  that have surfaced here.
24      A.   Okay.

Page 372

1      Q.   The others that we've talked about last week or
2  today we would hope to find their records in HR is
3  what you're telling us?
4      A.   Yes, sir.
5      Q.   But if they had been retired or pensioned off
6  for five or ten or so years, are you saying that we
7  might not even find their medical records in HR?
8      A.   I'm not sure.
9      Q.   You're saying that you think for current people
10  we might find their records in HR?
11      A.   Yes, sir.
12      Q.   And you're saying you don't know for sure where
13  the records of these older people would be?
14      A.   No.  But it would stand to reason to me if
15  someone was given a disability pension, then their
16  records may follow them to the pension office.
17      Q.   Okay.  Okay.  Then to go all the way back, I'm
18  sure you remember you were questioned somewhat on
19  Baylor Deposition Exhibit No. 7, the written policy
20  from the State Police manual?
21      A.   Yes, sir.
22      Q.   And you also discussed, and I think this was
23  your words, there's policy and then there's the
24  application of the policy.

Page 373

1          Do you remember that?
2      A.   Yes, sir.
3      Q.   Is it fair to say that in answering questions
4  today about the policy or the custom or the practice
5  of the State Police many times you were focusing on
6  how the policy is applied in day-to-day practice?
7      A.   Yes.
8      Q.   Yes.  And, for example, I believe in this case
9  that the defendants want to contend that the written
10  policy, Exhibit No. 7 for your deposition, requires
11  them to force any trooper to retire who has a
12  disability that they're not going to come back from?
13      A.   Yes.
14      Q.   And that there are no limitations on that?
15  That is, there is no two-year limitation or even a
16  one-year limitation.  I believe that's the position
17  they're arguing in this case.
18      A.   Okay.
19      Q.   When I questioned you last week about twenty or
20  more people --
21          MR. FITZGERALD:  I'll just object to that.
22  That's not a question, but I will object anyway.
23      Q.   When I questioned you last week about twenty or
24  more people and you were questioned about a dozen

50 (Pages 370 to 373)

Price, et al.                                                    Chaffinch, et al.
David L. Baylor, Volume 2          v.    C.A. # 04-956-GMS              July 26, 2005

Page 374

1  today, you tried to give us your best recollection of
2  how those troopers were treated, in fact, on a day-
3  to-day basis?
4  **A.  Yes, sir.**
5  Q.  And you tried to make distinctions about before
6  the latter part of 2001 when people could be known to
7  be disabled and were allowed to stay for even more
8  than two years, right?
9  **A.  Yes, sir.**
10  Q.  And then you tried to make the distinction
11  after a certain time in 2001 that when people were
12  known to be disabled and they weren't going to recover
13  that the State Police would try to stand with them and
14  keep them in employment for a full two years?
15  **A.  Yes, sir.**
16      MR. FITZGERALD:  Objection to the form.
17  Q.  You tried to make those distinctions today,
18  right?
19  **A.  Yes, sir.**
20  Q.  You have tried to the best of your recollection
21  to point to what individuals did receive a benefit of
22  a full two years even though it was known that they
23  weren't coming back?
24  **A.  Yes, sir.**

Page 375

1  Q.  Right.  And we don't have to get into the
2  details.  You have given us your memory, right?
3  **A.  Yes, sir.**
4  Q.  And you told us where we can look for records,
5  right?
6  **A.  I believe so, yes, sir.**
7  Q.  Right.  But as a person who's worked as a
8  high-level manager in there you tried to give us the
9  best of your recollection today?
10  **A.  To the best, right.**
11  Q.  Sure.  We could bring Mr. Peachey in and we
12  could ask him questions, couldn't we?
13  **A.  Yes, sir.**
14  Q.  Sure.  We could bring Sergeant Romanelli in and
15  we can ask him questions?
16  **A.  Yes, sir.**
17  Q.  We could bring Captain Citro in and ask him
18  questions, right?
19  **A.  Yes, sir.**
20  Q.  When you were asked all of those questions
21  about Exhibit No. 7 here, I think you told us that you
22  don't have a photographic memory?
23  **A.  Yes, sir.  I don't.**
24  Q.  You were asked questions about possibly earlier

Page 376

1  versions of Exhibit 7 today, right?
2  **A.  Yes, sir.**
3  Q.  And you wouldn't have a photographic memory of
4  those policies either, would you?
5  **A.  No, sir.**
6  Q.  Colonel Chaffinch some people have testified in
7  this case that he has a photographic memory.
8      MR. FITZGERALD:  I object to form.
9  Q.  Are you aware of that?
10  **A.  He has a much more detailed memory than I do.**
11  Q.  But these written policies are in a book
12  somewhere?
13  **A.  Yes, sir.**
14  Q.  So if you need to refer to them can you find
15  them in the book?
16  **A.  Yes, if I had the book and what would help me**
17  **would be the years that the policies were revised.**
18  Q.  Right.  But I think you gave an example of at
19  least one trooper today when you had to tell him
20  something and you felt that he was the kind of person
21  that asked a lot of questions, right?
22  **A.  Mm-hmm.**
23  Q.  Yes?
24  **A.  Yes, sir.  And I actually had a mistake on**

Page 377

1  that.  I think his question was, and I remembered this
2  during lunch, was as a major did you ever refer to
3  this policy or a policy similar to this?  And I said
4  yes.  It wasn't Tate.  It was actually Peachey when
5  Peachey first came to me.
6  Q.  Peachey, okay.  But the point is that you can
7  pull that book off the shelf and if you had to explain
8  the policy to somebody would try to find it there?
9  **A.  Find it and explain it.**
10  Q.  I think that when you were being asked
11  questions about Exhibit 7 I think you did mention that
12  there was discretion that the superintendent had in
13  applying the written policy?
14  **A.  The way I've testified I think last week and I**
15  **still feel the same way is that the superintendent had**
16  **the discretion up to two years.**
17  Q.  Right.  Okay.
18      Do you feel that based on your long career
19  with the Delaware State Police and the positions you
20  have held that you're able to indicate that such a
21  practice of relating to the two years actually existed
22  at the Delaware State Police?
23  **A.  Yes, sir.**
24  Q.  Sure.  Based on that long experience, do you

51 (Pages 374 to 377)