# THE NEUBERGER FIRM
### ATTORNEYS AND COUNSELLORS AT LAW

### TWO EAST SEVENTH STREET
### SUITE 302
### WILMINGTON, DELAWARE 19801-3707

### WWW.NEUBERGERLAW.COM
### EMAIL: INFO@NEUBERGERLAW.COM

THOMAS S. NEUBERGER, ESQUIRE
STEPHEN J. NEUBERGER, ESQUIRE

PHONE: (302) 655-0582
FAX: (302) 655-9329

April 20, 2006

**Via CM/ECF Filing**

The Honorable Gregory M. Sleet
United States District Court
District of Delaware
844 King Street
Wilmington, DE 19801

RE:     **Price, et al. v. Chaffinch, et al.,** C.A. No. 04-956-GMS
        **Deposition of Retired Major Joseph Forester**

Dear Judge Sleet:

As requested at the pretrial, attached is the deposition transcript of retired Major Joseph Forester. Due to their confidential nature, his medical records which were an exhibit at the deposition, are being filed separately under seal.

Respectfully submitted,

/s/ Thomas S. Neuberger

Attorney for Plaintiffs

cc:     Thomas S. Neuberger, Esq. (via CM/ECF)
        Martin D. Haverly, Esq. (via CM/ECF)
        Richard M. Donaldson (via CM/ECF)

FTU \ Letters \ Sleet.08

# Tab A



In the Matter Of:

# Price, et al.
## v.
## Chaffinch, et al.

C.A. # 04-956-GMS

-----------------------------------------------------------------------

Transcript of:

Joseph N. Forester

December 22, 2005

-----------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


CORPORAL B. KURT PRICE, et al.,      )
                                     )
          Plaintiffs,                )
                                     ) Civil Action
v.                                   ) No. 04-956-GMS
                                     )
COLONEL L. AARON CHAFFINCH, et al., )
                                     )
          Defendants.                )
------------------------------------)
SERGEANT CHRISTOPHER D. FORAKER,     )
                                     )
          Plaintiff,                 )
                                     )  Civil Action
v.                                   ) No. 04-1207-GMS
                                     )
COLONEL L. AARON CHAFFINCH, et al., )
                                     )
          Defendants.                )


          Deposition of JOSEPH N. FORESTER taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., 2 East 7th Street, Wilmington, Delaware,
beginning at 10:05 a.m., on Thursday, December 22,
2005, before Kurt A. Fetzer, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

        THOMAS S. NEUBERGER, ESQ.
        CHERYL A. SASADEUSZ, ESQ.
        THE NEUBERGER FIRM, P.A.
          2 East Seventh Street - Suite 302
          Wilmington, Delaware  19801
          For the Plaintiffs


                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477

Price, et al.                                    v.                           Chaffinch, et al.
Joseph N. Forester                      C.A. # 04-956-GMS              December 22, 2005

Page 2

```
 1   APPEARANCES:  (Cont'd)
 2       ROBERT J. FITZGERALD, ESQ.
         MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
 3        123 South Broad Street
          Philadelphia, Pennsylvania  19109
 4        For the Defendants
 5   ALSO PRESENT:
         B. KURT PRICE
 6       CHRISTOPHER D. FORAKER
         WAYNE WARREN
 7           - - - - -
 8           JOSEPH N. FORESTER,
 9       the deponent herein, having first been
10       duly sworn on oath, was examined and
11       testified as follows:
12               EXAMINATION
13   BY MR. NEUBERGER:
14   Q.   Major Forester, just so I can send you the
15   witness check and in case I actually had to subpoena
16   you for trial, what's your mailing address where I can
17   send the check to?
18   A.   12 Blue Heron, that's the color blue H-e-r-o-n,
19   Drive, Georgetown, Delaware.
20   Q.   What's the zip down there?
21   A.   19947.
22   Q.   Thank you.
23       And you were born in 1946?
24   A.   Correct.
```

Page 3

```
 1   Q.   When you were with the State Police did you
 2   ever have the opportunity to have a deposition taken?
 3   A.   Oh, yeah.
 4   Q.   Then I'm sure you also testified in criminal
 5   cases on numerous occasions?
 6   A.   Correct.
 7   Q.   Well, this is a civil case so I actually want
 8   to point out a couple of things.  Okay?
 9   A.   Okay.
10   Q.   If I ask you a question today that you don't
11   understand, just let me know and I will rephrase it.
12   Okay?
13   A.   I will do that.
14   Q.   If you have to take a break, let us know and we
15   will take a break.
16   A.   Okay.
17   Q.   I don't want you to guess, so if you don't know
18   just say you don't know.
19   A.   No problem there.
20   Q.   Are you taking any medicines or anything like
21   that that would interfere with your ability to
22   remember things today?
23   A.   No.
24   Q.   And then at trial if you're called as a witness
```

Page 4

```
 1   and you gave a different answer to a question than
 2   what you gave today, I'm allowed to under the rules to
 3   point that out to the Court and jury.
 4       You understand that?
 5   A.   Fine.
 6   Q.   All right.  Now, we're only going to mark about
 7   two or three things today, but the state
 8   confidentially has produced portions of your personnel
 9   file, as well as that of various other troopers and
10   they're being kept confidential so what I would like
11   to do is just mark this first.
12       MR. FITZGERALD:  If I may real quickly,
13   the state has produced all of his records and you
14   identified portions of it to take back, just to
15   clarify the record.
16       MR. NEUBERGER:  Yes.  That's correct.  I
17   didn't copy everything.
18       THE WITNESS:  Okay.
19       MR. NEUBERGER:  Why don't we mark this as
20   Forester, with one r, Deposition Exhibit No. 1.
21       (Forester Deposition Exhibit No. 1 was
22   marked for identification.)
23   BY MR. NEUBERGER:
24   Q.   Do these appear to be records from your
```

Page 5

```
 1   personnel file?
 2   A.   (Reviewing document)  This is my chicken
 3   scratch so I'm assuming that one is all right.
 4       Yes.  That looks pretty much like me.
 5   Q.   Right.  Just for the record, these are just
 6   maybe half of what I asked to be copied.  I mean, you
 7   know they also keep records on summary discipline or
 8   things like that --
 9   A.   Mm-hmm.
10   Q.   -- in the personnel record?
11   A.   Correct.
12   Q.   Okay.  I don't know.  You may have -- you
13   didn't have much of a record.
14   A.   I wasn't too bad.
15   Q.   I think you might have dented a car once or
16   something like that.  I don't know what it was.  I
17   didn't feel there was any need to copy any of those
18   kinds of things.
19       What I am going to ask you is to sort of
20   tell me from the academy forward to your retirement
21   for the 28-year career you had basically what your
22   assignments were.  Page 2 here might be a good little
23   cheat sheet to help you.
24   A.   That would be a big help.
```

2 (Pages 2 to 5)

Price, et al.                                    v.                          Chaffinch, et al.
Joseph N. Forester                      C.A. # 04-956-GMS              December 22, 2005

Page 6

1   Q.  Why don't we just try to march through your
2 attending the academy, your initial patrol
3 assignments, what troops they would have been in and
4 just march forward through your career and then also
5 as you advanced to different ranks, just let us know
6 about that.
7       So when did you graduate from the academy?
8   A.  Okay.  Well, it says here that I went to Troop
9 7 in March of '73.  So I know I started at the
10 academy in October of '72, so it's about six months,
11 so probably late February, early March sometime I
12 finished.
13       Then it shows where I made, was promoted
14 to trooper first class in '75, October 16th, which is
15 about three years after I went on, which is about
16 normal.
17   Q.  Where would you have been assigned for those
18 three years?
19   A.  Troop 7.
20   Q.  Okay.
21   A.  Troop 7 patrol.
22   Q.  All right.  So Troop 7 was your first
23 assignment?
24   A.  Correct.

Page 7

1   Q.  And I always get these wrong.  Troop 7, is that
2 Rehoboth?
3   A.  Dewey Beach.
4   Q.  Dewey Beach/Rehoboth?
5   A.  It was in Dewey Beach back then.
6   Q.  Really?
7   A.  Oh, yeah.  Yeah.
8   Q.  No kidding?
9   A.  Yeah.  Right in Dewey Beach.
10   Q.  So Troop 7 patrol Dewey Beach.  And up through
11 this 1975 promotion to trooper first class you're
12 still at Dewey Beach?
13   A.  Correct.
14   Q.  All right.  So go ahead.
15   A.  Okay.  The next thing it shows is we're
16 assigned to the tactical accident control team.  It
17 shows where I went there in December of '76.
18       Basically, what that was is it was a law
19 enforcement/traffic enforcement unit.  It ranged from
20 four to six members during the time I was on it and we
21 worked the entire county.  We would report to various
22 troops, Troop 5 being over in Bridgeville, Troop 4
23 being in Georgetown, Troop 7 being on the east side.
24 And we would work the high violation areas of speed

Page 8

1 and what they would call today aggressive driving but
2 we called it speed and traffic enforcement.
3   Q.  Were you operating out of a troop while you
4 were in this control position?
5   A.  No.  We actually worked right out of
6 headquarters traffic, but we never went to
7 headquarters.  I mean, we were assigned to Sussex
8 County and we just worked the various troops.  The
9 assignments came out of headquarters, but we worked
10 the county.
11   Q.  You were working the county.  Okay.  So is it
12 fair to say then in about December of '76 you're
13 coming out of Troop 7 patrol and you're really getting
14 your direction from headquarters?  Is that what you
15 just told me?
16   A.  From headquarters traffic section, right.
17   Q.  Headquarters traffic, right.  What happens next
18 for you?
19   A.  The next thing I see we're TAD, which is
20 temporary assigned duty, back to Troop 7, basically
21 for the summer months.
22   Q.  So is this in May of '77?
23   A.  This is May of '77 and it says terminating
24 September '77.  What they did, if I remember

Page 9

1 correctly, the guys that were on the tac. team, that
2 they sent from whatever troop they were went back to
3 the respective troops.  I know I went to Troop 7.
4   Q.  Would you have been back on the patrol function
5 then?
6   A.  Exactly.  I would have been working out of an
7 office shift.
8   Q.  This is still while you were a trooper first
9 class?
10   A.  Correct.
11   Q.  Okay.  Then what happens next for you?
12   A.  Next was in September of '78 I was promoted to
13 corporal.
14   Q.  Okay.  Where were you stationed when you got
15 promoted?
16   A.  I think I was in the tac. team when that
17 happened.
18   Q.  So back to the tac. team?
19   A.  Yeah.
20   Q.  So after September of '77 you went back to the
21 tac. team?
22   A.  Yeah.  They said the temporary assigned duty
23 terminated on September 12, '77, so we just reverted
24 back to the tac. unit at that time.

3 (Pages 6 to 9)

Price, et al.                                         v.                              Chaffinch, et al.
Joseph N. Forester                            C.A. # 04-956-GMS                    December 22, 2005

Page 10

1   Q.   So your promoted to corporal.  You're still in
2   the tac. unit operating in Sussex County.  And what
3   happens next?
4   A.   Okay.  It doesn't have a date, but somewhere
5   along there I got assigned to headquarters traffic
6   section.  And what that was it was the year Colonel
7   Cochran was the chairman of the CARE conference, which
8   was a nationwide thing, and it rotated and he was the
9   chairman.
10      And they sent me to traffic and, to tell
11  you the truth, it says assigned to headquarters.  I
12  thought it was a temporary assigned duty, but it might
13  have been permanently assigned.  I was up there, I was
14  in charge of all of the statistics that was gathered
15  during the CARE conference or during the CARE
16  operation.  That's Memorial Day, 4th of July and Labor
17  Day and all the weekends during the summer months,
18  which is when the Operation CARE took place.  Don't
19  ask me what it stands for.  I just know it was CARE.
20      Then my job, part of my job
21  responsibilities there was to get all these weekend
22  statistics from throughout the state and call it to
23  the national people of CARE.  And then they put out
24  stats through NHTSA, which was the National Highway

Page 11

1   Traffic Safety Administration, and then your local
2   office of Office of Highway Safety and those people
3   got that information too.
4   Q.   Then you actually were working out of
5   headquarters in Dover?
6   A.   Yes, I was.  But I'll tell you, that's why my
7   memory is serving me as being a temporary assignment
8   because I was still on the tac. team.  I was on the
9   tac. team up to, if my memory serves, up to about '80
10  or '81.  I was sort of pulling double duty is what it
11  amounted to.
12  Q.   Double duty.  Let me make a note of that.
13      So you're saying you remember continuing
14  with tac. until '81, right?
15  A.   Mm-hmm.
16  Q.   So is it fair to say that from your first
17  assignment in March of '73 through at least '81
18  you're working in Sussex County?
19  A.   Yes.
20  Q.   Okay.  So you're helping out at headquarters
21  and somewhere along the line you got promoted to
22  sergeant, so let's put that in there.
23  A.   Right.  April 2nd, '82 I was promoted to
24  sergeant and that's when I remember being assigned to

Page 12

1   traffic as my new assignment.
2   Q.   Okay.
3   A.   Yeah.  Next is -- okay.
4   Q.   Okay.  So '72 to '81 you're in Sussex County.
5      Then April of '82 you remember being
6   permanently assigned there in traffic in Dover, right?
7   A.   Correct.
8   Q.   That's at headquarters, right?
9   A.   Correct.
10  Q.   And do you then become a lieutenant in the
11  traffic section?
12  A.   No.  That promotion to sergeant is what I
13  stayed in.  And then they got something out of
14  sequence here.  They have assigned to headquarters
15  traffic section 10-81.  And, you know, those two days
16  there or dates there, that may be when I did go up
17  there, but, like I said, they have two assigned to
18  traffic.  That first one back where there's no date, I
19  think I was TAD and where they have assigned to
20  headquarters traffic section 10-81, that may be when
21  they put me up there, but for whatever reason I'm
22  recalling when I made sergeant is when they sent me to
23  traffic section.
24  Q.   Okay.  So do you get promoted to lieutenant

Page 13

1   while you're in traffic?
2   A.   Well, it's a long story on that.  As you can
3   see, I made sergeant in '82.
4   Q.   Yes.
5   A.   I was preparing to take the test for sergeant
6   and I was on the promotable band for sergeant, but I
7   ended up making it.  So I wasn't even going to test
8   for lieutenant because I just made sergeant.
9   Q.   Yes, I was noticing that.
10  A.   But the people told me, they said, "Go ahead
11  and do it."  They said, "There's not much difference
12  in testing."
13      I said okay.  So I can honestly say it's
14  the first test I went into that I really wasn't
15  sweating because --
16  Q.   You didn't care?
17  A.   -- it was all a plus if I made it.  And as luck
18  would have it, I made it.  That's why you see I was
19  only a sergeant for, what, about eight months.
20  Q.   Okay.  So January of '83 you become a
21  lieutenant?
22  A.   Correct.
23  Q.   And what's your assignment when you become a
24  lieutenant?

4 (Pages 10 to 13)

Price, et al.                                    v.                              Chaffinch, et al.
Joseph N. Forester                      C.A. # 04-956-GMS                December 22, 2005

Page 14

1    A.  I was assigned as the OIC of the public
2  information office.
3    Q.  Okay.  How long did you serve as the OIC at the
4  public information office?
5    A.  Well, that says 6-14-82.  So a little over a
6  year is what I remember.
7         And then it's showing the following year
8  in June of '83 I went down as deputy commander as a
9  lieutenant at Troop 5.
10    Q.  So aside from this interval say of '81 to the
11  middle of '83 at headquarters or whatever, now you're
12  returning to Sussex County at Troop 5 in June of '83.
13  Is that correct?
14    A.  Correct.
15    Q.  And you're at Troop 5.  And what's next for
16  you?
17    A.  Okay.  Then I spent about two years there and
18  then I got assigned to deputy troop commander -- I'm
19  sorry.  Assigned to headquarters community relations
20  director.
21         Apparently, the community relations
22  section had fallen into some disrepair at the time and
23  they asked me to go up there and see if I couldn't
24  rejuvenate it and that was my assignment in June of

Page 15

1  '85.
2    Q.  Okay.  Were you basically there for a year into
3  '86?
4    A.  Correct.
5    Q.  So were you at headquarters for that?
6    A.  Correct.
7    Q.  Okay.  And do you ever return back to Sussex
8  County?
9    A.  Yes.  Back in July of '86 I was then assigned
10  to Troop 7 as deputy troop commander.
11    Q.  Are you still a lieutenant?
12    A.  Still a lieutenant, yes.
13    Q.  Okay.  And do you get promoted to captain?
14    A.  I got promoted to captain.  It says here May of
15  '89.
16    Q.  Okay.  Where do you get assigned?
17    A.  You'll see the next block down should
18  have been first because I went to Troop 5 in February
19  of '89 and I was the troop commander, but I did not
20  get promoted to captain because you have to wait until
21  people officially retire before the slot opens up.
22         So I was there from February of '89 to May
23  of '89 and then May of '89 I officially was put on
24  captain rank at Troop 5 as troop commander.

Page 16

1    Q.  And how long do you continue serving as a
2  commander of Troop 5?
3    A.  Okay.  If you follow this thing, you're going
4  to have to drop down a couple of places.  Then I was
5  assigned to Troop 7 as troop commander in it looks
6  like February of '93.
7    Q.  As the commander of Troop 7?
8    A.  Correct.
9    Q.  In '93 is this still in Dewey Beach?
10    A.  No.  It's up at its current location now.
11    Q.  Okay.  So you commanded Troop 5.  You commanded
12  Troop 7.
13         What else happened?  What happens next?
14    A.  The next thing was I got promoted to major in
15  July of '94.
16    Q.  Do you stay at Troop 7?
17    A.  No.  I was then assigned to headquarters,
18  executive staff.
19    Q.  Okay.  So up through July of '94 you're still
20  serving in Sussex County, correct?
21    A.  Correct.
22    Q.  And then do you stay at headquarters through
23  the end of your career?
24    A.  Yes.

Page 17

1    Q.  So July of '94 you go to headquarters on the
2  executive staff.  And do you become the -- which of
3  the executive staff positions do you take?
4    A.  I was the operations officer at that time for
5  Kent and Sussex County.
6    Q.  So in '94 you become the operations officer.  I
7  noticed they had it down here two times.  I just
8  didn't understand that.
9    A.  I think what that second one is there was a
10  period of time there, and I can't say exactly how
11  long, they had a reassignment of the executive staff,
12  is what they did, and they actually made me the
13  operations officer for all three counties.  And I want
14  to say that was something less than a year.
15         THE WITNESS:  If you guys know?  I can't
16  remember.
17    A.  It was not quite a year.
18    Q.  I remember taking the deposition of retired
19  Lieutenant Colonel Tom Marcin.  There was a time I
20  think he said when he had all three counties too, so I
21  guess that happens with retirements and things.
22    A.  Right.
23    Q.  At some point in time you even had additional
24  responsibility?

5 (Pages 14 to 17)

Price, et al.                                    v.                              Chaffinch, et al.
Joseph N. Forester                      C.A. # 04-956-GMS              December 22, 2005

Page 18

1    A.   Exactly.
2    Q.   That additional responsibility included New
3  Castle County?
4    A.   Exactly.
5    Q.   But from '94 through November of 2000 you had
6  responsibilities as the operations officer for Kent
7  and Sussex Counties?
8    A.   Correct.
9    Q.   So is it fair to say that your career spanned
10  about 28 years?
11    A.   Mm-hmm.
12    Q.   Yes?
13    A.   Yes. I'm sorry. Yes.
14    Q.   And except for these short stints at
15  headquarters for traffic or public information
16  function, your career was in Kent and Sussex Counties,
17  major time in Sussex County?
18    A.   Major time in Sussex County.
19    Q.   I guess when I say Kent County, you never were
20  assigned to the troops there?
21    A.   Never.
22    Q.   But you had operational responsibilities?
23    A.   When I became major then they fell under my
24  command, correct.

Page 19

1    Q.   Thank you.
2         Now, do you remember under your command --
3  well, do you know present Captain Barbara Conley?
4    A.   Yes.
5    Q.   She's the director of traffic?
6    A.   Okay.
7    Q.   Are you aware of that?
8    A.   I knew, I knew she was up there one time or
9  another. I didn't know she was still there.
10    Q.   Right. In fact, when you retired in -- you
11  said you retired in November of 2000, right?
12    A.   Mm-hmm. Yes.
13    Q.   I think just before you retired, she became the
14  assistant director of traffic. Do you have a vague
15  memory of that?
16    A.   Well, November 1st was my official retirement
17  date, as I was gone, I think I left August 1st.
18  Again, I think that's when I left.
19    Q.   Just so I understand the sequence, do you have
20  any idea who replaced your vacancy after you retired?
21  Was it Dave Baylor?
22    A.   When I retired it was a while before they put
23  anybody in there, but I think Dave was the next one
24  that came on board.

Page 20

1    Q.   If you officially retired in November of '00, I
2  think Dave got appointed in April of the next year.
3    A.   I think Chaffinch ended up being in my position
4  for a while.
5    Q.   Okay.
6    A.   But I know there was a period of time there --
7  and that's probably when Tommy Marcin had all three
8  counties. But I think Chaffinch went from his
9  position, whatever it was there as a major, to
10  operations major, I think.
11    Q.   See if this refreshes your recollection. I
12  mean Chaffinch went from technology major to
13  operations in Kent and Sussex.
14    A.   Well, if that happened, then he --
15    Q.   Then he replaced you?
16    A.   Yes.
17    Q.   Anyway, you do remember now Captain Barbara
18  Conley, right?
19    A.   Yes.
20    Q.   And back there in the eighties, I want to go
21  back to '84 or '85, is it true that she was in the
22  chain of command under you?
23    A.   I'm looking for the time frame I was over at
24  Bridgeville.

Page 21

1         Assigned to Bridgeville from '83 and so
2  that would be, yes, she was there, I'm almost sure she
3  was there both as a lieutenant and as a captain.
4    Q.   In fact, let me just --
5    A.   I just don't recall when she came on the job.
6    Q.   Right. I mean, she was known as Barbara Miller
7  before she got married.
8    A.   Right.
9    Q.   Do you remember that?
10    A.   Correct.
11    Q.   I'm going to show you some summary discipline
12  that you were involved with just to refresh your
13  recollection of the chain of command thing back in
14  1984 and 1985.
15         MR. NEUBERGER: Let's just mark this as
16  Exhibit No. 2.
17         MR. FITZGERALD: Tom, can you tell me
18  where we're going with this?
19         MR. NEUBERGER: Sure. I'm laying a
20  foundation that she has personal knowledge of having
21  worked with him back in '84 and '85. That's all.
22         MR. FITZGERALD: Okay.
23         (Forester Deposition Exhibit No. 2 was
24  marked for identification.)

Page 22

1  BY MR. NEUBERGER:
2     Q.  Do you see, is this your handwriting on these
3  three pages?  Lieutenant Joseph N. Forester?
4     A.  Correct.
5     Q.  Right?
6     A.  Yes.
7     Q.  These are just some summary discipline records
8  from Captain Conley when she was at Troop 5 in
9  Bridgeville.  Do you see that in the upper right-hand
10  corner?
11     A.  Yes.
12     Q.  So just trying to refresh your recollection,
13  was she in your chain of command back here in '84 and
14  '85?
15     A.  Yes.
16     Q.  Okay.  That's all I needed to know there.
17  We're done with that.
18          And throughout your career, for example,
19  you said you were the commander of Troop 5 beginning
20  in February of 1989.
21          Do you remember that?
22     A.  Correct.
23     Q.  And I believe she would testify that she was a
24  traffic lieutenant at Troop 5 in -- I'm sorry.  Wait a

Page 23

1  minute.  '89.  Let's go back.
2          She would testify that she was a trooper
3  at Troop 5 from '82 to '93.  Does that sound --
4     A.  '82 to?
5     Q.  '93.
6     A.  Yeah.  That sounds right.  It's within the time
7  frame that I would recall her.
8     Q.  Right.  When you were the commander of Troop 5,
9  she would have been a trooper working under your
10  command.  Is that right?
11     A.  Correct.  In fact, if she got there in '82, she
12  would have been there when I was a lieutenant.
13     Q.  Yes.  Okay.
14     A.  That's what I couldn't recall for sure.
15     Q.  Okay.  And then when you were operations
16  commander for Kent and Sussex Counties from '94 to
17  2000, let's just focus on that, okay, I think she
18  would testify that in '99 and 2000 she was a traffic
19  lieutenant at Troop 5.
20          Do you recall her being a traffic
21  lieutenant under your command when you were operations
22  commander?
23     A.  You know, I recall her being a traffic
24  lieutenant, but my recall is at Troop 3, but she may

Page 24

1  have gone down to Troop 5 that latter part there.
2     Q.  Right.  I think she would testify that in '97
3  to '99 at Troop 3 in Camden she was a traffic
4  lieutenant.
5     A.  Correct.
6     Q.  You have a memory like that?
7     A.  Yes.
8     Q.  Then she would testify that '99 to 2000 before
9  she went to headquarters she was a traffic lieutenant
10  in Troop 5 Bridgeville.
11          Do you remember both of those?
12     A.  That's very possible, yes.  2000 was a hectic
13  year for me.  I was in charge of putting the plan
14  together for the state for the 2000 collapse of
15  everything, so I don't remember where everybody went
16  that year.
17     Q.  Okay.  Did you find her to be a truthful
18  officer?
19     A.  I found Barbara to be truthful to me, yes.  I
20  can't say that I ever caught her in a lie.  I think, I
21  think we had a good working relationship.
22     Q.  Well, what I wanted to ask you was having
23  worked under your command, she would testify that
24  there was a nickname for you.

Page 25

1     A.  Which one?
2     Q.  Okay.  Is it correct that in the division you
3  had the nickname Miracle Ear?
4     A.  Miracle Year?
5     Q.  No.  Ear, e-a-r, Miracle Ear.
6     A.  If that happened, I'm not aware of that one.
7     Q.  So you have never heard that nickname?
8     A.  That's not one I heard.
9     Q.  So that's not one of the ones you heard?
10     A.  No.
11     Q.  Okay.  Do you have any reason to doubt the
12  truthfulness of that kind of a statement from Captain
13  Conley who worked under you, now Captain Conley who
14  worked under you?
15     A.  I wouldn't doubt it was said, no.
16     Q.  That obviously reflects there might be some
17  things about hearing in your background and we're
18  going to talk about that.
19     A.  Correct.
20     Q.  The reason you were called to testify as a
21  witness today is I happen to represent Corporals Kurt
22  Price and Wayne Warren in a case against the Delaware
23  State Police.  I want you to know that.
24          Do you understand that?

7 (Pages 22 to 25)

Price, et al.                                v.                            Chaffinch, et al.
Joseph N. Forester              C.A. # 04-956-GMS              December 22, 2005

Page 26

1    A.   No problem.
2    Q.   And some of the issues in that case relate to
3  their being relieved of their duties as a police
4  officer because of hearing issues they have and
5  whether or not that's consistent with historic
6  practices of the Delaware State Police, so that's how
7  you have gotten involved.
8         Do you understand that?
9    A.   No problem.  Yes, I understand.
10   Q.   Was there some point in time when you actually
11  started wearing hearing aids while you were a uniform
12  trooper of the Delaware State Police?
13   A.   Yes.
14   Q.   And we're going to look at your records a
15  little bit later to try to get all of the details.
16  But before we look at the records, do you remember
17  approximately when you would have started wearing
18  hearing aids?
19   A.   It was after I was on executive staff, so I'm
20  going to say it was sometime '96-97-ish.
21   Q.   Okay.
22   A.   In fact, I can tell you when it was.  It was
23  1997 because I was 51 years old.
24   Q.   Okay.  That's when you would have been a major

Page 27

1  who was the operations commander of Kent and Sussex
2  County, correct?
3    A.   Correct.
4    Q.   Were you wearing, did you start wearing two
5  hearing aids?
6    A.   I started with two.
7    Q.   So does that mean in both ears?
8    A.   Correct.
9    Q.   And is it true that before you started wearing
10  the hearing aids that you recognized that you had
11  hearing difficulties even before you put on the
12  hearing aids?
13   A.   Well, let me be pointblank.  What my problem
14  was is I had two things that I noticed when I was up
15  at executive staff and I really didn't notice a
16  problem until then.  It was, one -- and this isn't a
17  sexist statement, but I had a hard time understanding
18  ladies on the telephone for whatever.  It was just the
19  pitch of their voice that created a hearing problem
20  for me to understand what they said and many times I
21  would have to ask them to repeat.
22         And then the other one was being in a room
23  with a lot of background noise.
24   Q.   Okay.

Page 28

1    A.   Those were the two areas of my deficiencies.
2    Q.   Okay.  So is it fair to say that it was those
3  kinds of symptoms that led to your having to get
4  hearing aids?
5    A.   Well, yes.
6    Q.   Right.  And had you had those kinds of problems
7  for several years before you started wearing hearing
8  aids?
9    A.   Well, no, not several years.  I noticed it and
10  then I believe the first medical time that I realized
11  that it was just more than me was it was picked up in
12  one of my physicals and when that happened then that's
13  when I went and had something done with it.
14   Q.   Just so I'm clear, right now I'm only asking
15  you for your best memory and we are going to look at
16  the records.  So I will take whatever answers you're
17  giving me as your best attempt to remember things that
18  happened a long time ago.
19         Is that fair?
20   A.   That's fair.
21   Q.   Okay.  But you're saying you had some hearing
22  problems of the nature you've described and eventually
23  it led to your having to wear hearing aids?
24   A.   Correct.

Page 29

1    Q.   You're saying in communicating with at least
2  people with female voices over the telephone you were
3  having problems understanding everything that was
4  said?
5    A.   I would have a hard time hearing.  I would have
6  to ask them to repeat, correct.
7    Q.   And you're saying that in closed spaces with
8  lots of background noise, once again you were having
9  difficulty hearing everything?
10   A.   That's correct.
11   Q.   Okay.  Do you remember when your family first
12  started to notice you were having hearing problems?
13   A.   No.
14   Q.   There may be a reference in the medical things.
15  We will look at that.
16         Right off the top of your head you don't
17  remember?
18   A.   No.
19   Q.   Do you remember when you first started to
20  notice that you were having hearing problems?
21   A.   Well, like I said, the first I noticed was
22  when I was on the executive staff because I think the
23  first thing I noticed was the phone conversations.
24  And then you would be in meetings in a room more at

Page 30

1    that level than I was previous in my previous
2    assignments and I would notice it.
3          So I'm going to say I made executive staff
4    in '94, so sometime between July of '94 and sometime
5    in '97, if my memory serves me, when I went and had my
6    audiology test taken, given, so sometime within a
7    two-and-a-half, three years time frame it occurred.
8    Q.  So you had an audiology test, right?
9    A.  Mm-hmm.
10          MR. NEUBERGER:  Let's mark this as Exhibit
11    3.
12          These are some marked-out confidential
13    medical records, not of you but just of an unknown,
14    unnamed person that appear to be audiology tests. I'm
15    going to see if that jogs your memory about the kind
16    of test that you said you had here.
17          Let's make this Exhibit 3.
18          (Forester Deposition Exhibit No. 3 was
19    marked for identification.)
20          MR. FITZGERALD:  Tom, what is he supposed
21    to be looking at this for?
22    BY MR. NEUBERGER:
23    Q.  You said you had an audiology test, right?
24    A.  Mm-hmm.  Yes.

Page 31

1    Q.  Does this appear to be the kind of test results
2    you got when you had an audiology test?
3    A.  I'm going to tell you the truth, sir, I don't
4    know.  I'm assuming, everything being equal, that this
5    is probably what they do.  I can't recall what papers
6    were even shown to me.
7          I can recall some of the conversation that
8    I had because I still go and, in fact, I'm due for my
9    next hearing test on January 6th.  Basically, I
10    remember the verbal part of it more so than I do the
11    paper part of it.
12    Q.  Do you remember them putting you in a room and
13    putting a headset on your ears?
14    A.  Right.  And he talks to you like this
15    (demonstrating).
16    Q.  And the guy talks to you and asks you to repeat
17    back what he said?
18    A.  Exactly.  He says a series of words and he has
19    his mouth covered or she had her mouth covered and
20    they ask you to repeat back what they say.
21    Q.  Okay.  Just on that portion when you had this
22    audiology test, do you remember the facility that did
23    the audiology test for you?
24    A.  Well, it was Dr. Smith.  I remember his name.

Page 32

1    And it was up in Dover and I want to say not State
2    Street.  I think it's Governors Avenue.  It's right
3    near the hospital.
4    Q.  Right.  The Kent General?
5    A.  ENT or something.  Does that sound right?  I
6    still go to him and I can't tell you.  They have an
7    office down there and they have an office in Milford.
8    Q.  In Milford.  At Dr. Smith's in Dover, he was
9    the person who you have been seeing throughout for the
10    audiology test?
11    A.  Correct.  He also has an assistant that works
12    with him.  I forget her name.  One or the other have
13    done my test.  They're the two.
14    Q.  Any records as far as the level of hearing loss
15    you have now as well as in the past would be in
16    Dr. Smith's office?
17    A.  Correct.
18    Q.  Right?
19    A.  Correct.
20    Q.  Okay.  Any charts or results of your audiology
21    test would be in Dr. Smith's office, right?
22    A.  Correct.
23    Q.  If we just turn to the second page of this
24    exhibit, this is an X'd out report after an audiology

Page 33

1    test, I'll assert that for you, of a test that
2    somebody had in December of 2004.
3          Do you see where it has like impressions?
4    It has test results, test results, recommendations.
5    Do you see that there?
6    A.  Mm-hmm.  Yes.
7    Q.  After you had your audiology test, do you
8    remember today whether or not any reports were written
9    about your test results?
10    A.  I'm sure they were, but I can't say that I
11    received any.
12    Q.  Right now you just don't remember what any of
13    your reports said?
14    A.  I know from going to my people that I don't get
15    one of these to take home with me.  I mean, I'm sure
16    if I asked I could, but I just never asked.
17    Q.  Does your audiologist send your test results to
18    your family doctor?
19    A.  No.
20    Q.  No?
21    A.  No.
22    Q.  Okay.
23    A.  That's a separate entity that I go to.
24    Q.  No.  I understand that.  You have never

Page 34
1  asked --
2    A.  Because this guy, I actually have been going to
3  this one longer than I have been going to my current
4  family doctor.  So if he does, I'm not -- he hasn't
5  done it through my direction and I'm not aware that he
6  has.
7    Q.  So this Dr. Smith, who you don't remember his
8  full name --
9    A.  Eric is his first name.
10   Q.  Eric.  All right.  And you said his offices are
11 near Kent General, that whole medical area around
12 there?
13   A.  He has offices there and Milford.
14   Q.  Do you go to the Milford office?
15   A.  That's the one I usually go to because it's
16 closer.  And they used to have one in Lewes, but that
17 has since closed.  I went there when they had those
18 offices because it was closer.
19   Q.  All right.  So they had one in Lewes before,
20 but they closed that?
21   A.  Correct.
22   Q.  Aside from putting the earphones on you and
23 reading you the words and everything, did they ever
24 wire you up, put electrodes and everything like that

Page 35
1  on your brain and do all sorts of beeps and things
2  like that?
3    A.  No. The only thing I had is him actually
4  verbally talking to me behind the paper and then the
5  headset had pitches and you just pressed a button to
6  let them know when you heard the noise.
7    Q.  Do you recall whether he concluded -- I might
8  have forgot to ask you this.
9        Are you saying it was like sometime before
10 '97 that you had your first audiology test, if you
11 remember?
12   A.  You know, I think -- I'm almost positive that
13 we also had tests with our state physicals with the
14 state.
15   Q.  We're going to look at that.
16   A.  But I never went -- well, let me back up.  I
17 can't say never.
18       I had one prior to going on the job back
19 in 1972.  But other than that, I don't recall ever
20 going to any physical I had on my own and having to
21 get it done, other than at the state physicals that I
22 had and it just became a part of it.  I don't think it
23 was done annually, but it was done periodically.
24   Q.  Are you saying that when you had your state

Page 36
1  periodic physicals you used the state's doctor?
2    A.  Correct.
3    Q.  And did the state's doctor run audiology tests
4  also?  Is that what you're saying?
5    A.  I can remember -- let me see here.
6        They're on State Street is where we went.
7  He gave me some kind of test because, because I can
8  remember at some point in time and then I had previous
9  discussions on it where he said that "You were having
10 some higher decibel levels," if that's the correct
11 terminology, is where my, is where I was lacking.
12   Q.  Right.  Did he explain, did you learn from
13 whoever was doing your audiology test that because of
14 some hearing loss you would have problems hearing
15 things in crowded rooms or crowded areas?
16   A.  I'm sure the conversation went something like
17 that.  I don't remember what the exact conversation
18 was.
19   Q.  Right.  But you learned from your testing that
20 you had hearing loss in the area of hearing higher
21 decibel levels?
22   A.  My recollection is the higher decibel levels is
23 where my problems were or are.
24   Q.  Right.  I was trying to determine when your

Page 37
1  first audiology test might have been.  We're going to
2  look at these records.  You might have had tests
3  outside of the State Police.  Okay?
4    A.  Can I speak here for a second?
5    Q.  Well, you're not allowed to ask him advice
6  during a deposition.
7    A.  I'm not allowed to ask him?
8    Q.  No. No.
9    A.  Well, let me just put it this way.  We're
10 across the table here.  I have had conversations with
11 the gentleman to my right and we met over some, we
12 reviewed some things.  And in that review within the
13 last couple, three weeks it came across the
14 examinations that I had with the state people.
15       With that knowledge, I know that I had
16 testing.  But without having been told this is what
17 went on, you know, I can remember having tests, but I
18 can't remember the tests themselves.  It's just I
19 don't remember.  It's every year you went for a
20 physical and just whatever they had you do.
21   Q.  What you're telling me now is that before
22 today's deposition the attorney for the State of
23 Delaware asked to meet with you?
24   A.  Well, we had a telephone conversation.

Price, et al.                                    v.                            Chaffinch, et al.
Joseph N. Forester                    C.A. # 04-956-GMS            December 22, 2005

Page 38

1    Q.  Okay.  So you had a telephone conversation with
2    the attorney for the State of Delaware?
3    A.  Correct.
4    Q.  At that time did you have your medical records
5    from the State Police in front of you?
6    A.  No.
7    Q.  At that time did he have the medical records
8    from the State Police in front of you?
9    A.  He had something that --
10   Q.  In front of him?
11   A.  Right.
12   Q.  In front of him?
13   A.  Right.
14   Q.  Did he tell you what he thought was in the
15   records?
16   A.  What he reviewed with me was my physicals
17   starting ninety something and went each year.  And
18   then we hit a year where it said that it was abnormal
19   and then they went to the next year where they came
20   back normal.
21       One of the questions was was that with
22   your hearing aids in or out and I said I don't
23   remember.  I don't know if they did the test with them
24   in or out.  I don't know.

Page 39

1    Q.  Okay.  Right now I'm asking you aside from
2    annual physicals that the State Police did for you, do
3    you remember when you had your first audiology test by
4    someone who wasn't provided by the State Police?
5    A.  Yes.  That would have been this Dr. Smith and
6    I'm going to say it was 1997, to the best of my
7    recollection.
8    Q.  Do you recall whether aside from the one test
9    that you were given whether they gave you a test
10   called the auditory brainstem response test?
11   A.  If that involves the headset with the high
12   pitch, that's the only other kind that I can recall
13   having.
14   Q.  Right.  So the only test you remember is that
15   one you have described for us, right?
16   A.  Right.
17   Q.  That's good.  I'm trying to get back to when
18   you first recall that you were having hearing
19   problems.  You have already told me about when you
20   began with the hearing aids.  You have told me about
21   in '97 going to Dr. Smith and having some testing.
22       And I'm trying, without looking at the
23   medical records, trying to jog your memory as to what
24   time earlier than '97 that you first recognized that

Page 40

1    you were having some hearing problems.
2    A.  Okay.  The only thing I can say is that I do
3    not recall having any difficulty in any of my
4    assignments from trooper through the rank of captain,
5    which would be through 1994 --
6    Q.  '94.
7    A.  -- that I had any problems.  I don't recall it
8    creating any problems for me at all.
9        It was during that time frame after I made
10   executive staff and, again, I guess because I was on
11   the phone more often I was having problems with all
12   the time hearing and having to ask to repeat when I
13   would be talking to some female voices and also in
14   large rooms with background noise at meetings.
15       So sometime between July of '94 and
16   whenever it was in '97 that I went and had the test.
17   Q.  I mean, I think you're telling me that
18   you don't recall any problems being created on the job
19   prior to your being a captain because of hearing
20   issues?
21   A.  Prior to being major.  I don't recall through
22   my rank of captain.
23   Q.  I'm not asking, in my question I'm not asking
24   you whether you felt there were any problems being

Page 41

1    created.  I'm asking you when did you first start
2    recognizing that you had hearing loss issues?
3    A.  And I'm saying sometime between July of '94 and
4    when I went for that test in '97.
5    Q.  Okay.  So you're saying between '94 and '97 you
6    were recognizing that you had hearing issues and that
7    led you to get the audiology test by Dr. Smith?
8    A.  Correct.  Okay.
9    Q.  Then I'm trying to jog your memory about
10   whether or not even before '94 you were recognizing
11   that you had hearing issues.
12   A.  I can't sit here and say that I do.
13   Q.  That's fine.  We're going to look at some
14   records that may jog your memory.  Okay?
15   A.  Okay.
16   Q.  I'm trying to say that do you remember if
17   before '94 your family was recognizing that you had
18   hearing issues before '94?
19   A.  Not that I'm aware of.  All I can tell you is
20   in '97 once I got the hearing aids they were saying
21   that they noticed that we didn't have to play the
22   television as loud and stuff like that, but that was
23   about the only issue, the television.  No, prior to
24   that, no.

11 (Pages 38 to 41)

Price, et al.                                v.                              Chaffinch, et al.
Joseph N. Forester                  C.A. # 04-956-GMS                  December 22, 2005

Page 42

1    Q.   Now, between '94 and '97 and your having the
2  first test with Dr. Smith, is it your testimony that
3  you were still able to do your job, whatever your job
4  was?
5    A.   Yes.
6    Q.   Right?
7    A.   (The witness nodded.)
8    Q.   And you were a uniform officer, right?
9    A.   Correct.
10   Q.   You were operations major at Kent County,
11  correct, Kent and Sussex County, correct?
12   A.   Correct.
13   Q.   In '94 you were also a commander at Troop 5,
14  right, early part of '94?
15   A.   Correct.
16   Q.   And as a uniform officer --
17   A.   Let me back up.
18   Q.   Go ahead.
19   A.   I was troop commander at Troop 7 in '94.
20   Q.   I'm sorry.  I misread.  Right.  Exactly.
21       You were a troop commander in the first
22  half of '94, right?
23   A.   At Troop 7, correct.
24   Q.   Right.  As a major and as a captain you were a

Page 43

1  uniform officer of the Delaware State Police, right?
2    A.   Correct.
3    Q.   You had full law enforcement powers, correct?
4    A.   Correct.
5    Q.   You were expected to be able to perform any and
6  all law enforcement functions that a police officer
7  has to perform, right?
8    A.   Correct.
9    Q.   You were expected to be able to perform
10  arrests, right?
11   A.   Correct.
12   Q.   And you were expected to be able to respond to
13  crisis situations?
14   A.   Correct.
15   Q.   You're expected to be able to keep the peace,
16  right?
17   A.   Correct.
18   Q.   You're expected to be able to come to the aid
19  of people in life-threatening and other situations.
20  Is that correct?
21   A.   That is correct.
22   Q.   By the way, did you ever have any involvement
23  with the SORT team during your career, meaning a
24  commander or anything like that?

Page 44

1    A.   I was never on the SORT team, but as I guess
2  probably starting at the rank of lieutenant and
3  certainly as a troop commander and certainly as a
4  major you have dealings with them because you go to
5  situations where they're called in and as a troop
6  commander and certainly as a major you're going to
7  have a big impact on what action is the final
8  resolution to the situation.
9    Q.   Right.  I think you're telling me that as a
10  troop commander there are situations you responded to
11  that the SORT team was involved with?
12   A.   Absolutely.
13   Q.   And I think you're telling me that as the
14  operations commander for Kent and Sussex County there
15  were situations you responded to that involved the
16  SORT team?
17   A.   Absolutely.
18   Q.   And so I think you're telling me that you were
19  on the scene at crisis situations that involved the
20  SORT team?
21   A.   Absolutely.
22   Q.   And is it fair to say that in those crisis
23  situations that involved the SORT team that you were
24  in the decision-making loop on the scene at those

Page 45

1  times?
2    A.   Yes.
3    Q.   Right now I think SORT is commanded by a
4  sergeant.  Let's just assume that.
5    A.   Okay.
6    Q.   If you're the operations major for the county
7  and SORT is commanded by a sergeant and you're on the
8  scene, are you the senior-ranking officer there?
9    A.   If you're the major it's a good chance that you
10  are because there's only two people that outrank you
11  and they don't usually come to SORT operations.
12   Q.   So then you would be involved in
13  decision-making on the scene?
14   A.   Correct.
15   Q.   Just jumping back to some of the hearing
16  symptoms you were having, this thing about talking on
17  the telephone and female invoices, did that carry over
18  to other forms of communication, like radio
19  communication or things like that?
20   A.   You know, I can't say that I can ever recall
21  having a problem with the radio in the police car.  I
22  just didn't.  Maybe I had it up louder than maybe most
23  people.  I don't know.
24       But I don't recall that ever being a

12 (Pages 42 to 45)

Price, et al.                                    v.                         Chaffinch, et al.
Joseph N. Forester                    C.A. # 04-956-GMS              December 22, 2005

Page 46

1   problem.
2      Q.  But going back to 2000 when you retired, did
3   you have a State Police-issued cell phone?
4      A.  Absolutely.
5      Q.  And when did you start using a State
6   Police-issued cell phone in your career?  Would you
7   have used it as a captain?
8      A.  I'm sure I had one as a captain.  I'm assuming,
9   making that assumption.  I would say when they came
10  out and when they got issued to the respective ranks,
11  if I was in the rank that was supposed to get one I
12  got it.
13     Q.  You definitely remember having a State
14  Police-issued cell phone when you were a major?
15     A.  Absolutely.
16     Q.  Let's just think back to Troop 7, which isn't
17  all that far back.  Let's just simply say '94.
18          You remember using cell phones back in
19  '94, don't you?
20     A.  Correct.
21     Q.  In going back to these crisis situations where
22  the SORT team might be there or whatever and you were
23  in a decision-making role, during those kinds of
24  things communications also happened with people off

Page 47

1   the scene.  Isn't that true?
2      A.  Correct.
3      Q.  So, for example, you could be communicating
4   over a cell phone with some other people involved in
5   the situation during a crisis.  Is that true?
6      A.  If it's during a crisis it's going to be
7   somebody involved with it, yes.
8      Q.  There could be a thing where you're
9   communicating over the cell phone with an FBI or a
10  Treasury response team?
11     A.  Could be.  Could be.
12     Q.  And after you started wearing the hearing aids,
13  did you feel you were still able to do your job as a
14  policeman?
15     A.  Yes.
16     Q.  Now, did you ever discuss -- before we do that,
17  so when you did see Dr. Smith, if you can remember,
18  did he tell you you had hearing loss at the higher
19  levels?
20     A.  That's my recollection, is that my problems
21  were at the high -- I'm sure I heard it from him
22  because I don't know who else I would have heard it
23  from -- at the high decibel levels is what I recall.
24     Q.  And he told you this loss is permanent and it

Page 48

1   never comes back?
2      A.  Oh, yeah.
3      Q.  Now, did you ever discuss your hearing loss
4   with somebody in human resources at the Delaware State
5   Police?
6      A.  I don't recall speaking to anybody in human
7   resources.  The only person I can recall speaking to
8   at the time was my superintendent, which was Colonel
9   Ellingsworth.
10     Q.  Colonel Ellingsworth.  We will come back to
11  him.
12          You're saying you don't recall speaking to
13  John Dillman about your hearing issues in personnel,
14  right?
15     A.  I don't recall.  Did I?  It's possible, but I
16  don't recall.
17     Q.  Did he know you had hearing issues?
18     A.  He gets all these reports back, so I'm sure he
19  did.  I would assume he did.  I know that's a bad
20  thing to do, but I would assume he did.  It was no
21  secret.
22     Q.  Okay.  Well, that's where I get back to this
23  Miracle Ear quote.  By "It was no secret," are you
24  saying that once you started wearing hearing aids

Page 49

1   anybody that was working with you in the State Police
2   knew you had hearing problems?
3      A.  They knew I wore hearing aids.
4      Q.  Before you started wearing hearing aids, did
5   people dealing with you know that you were turning up
6   volumes louder and things like that to accommodate
7   yourself?
8      A.  I never heard anybody say anything.  I can
9   honestly sit here and tell you I never heard anybody
10  say to me "Man, you're playing this louder than what
11  other people are."  I never had that happen on the
12  job.
13     Q.  Once you started wearing the hearing aids
14  you're saying that everybody knew?
15     A.  Everybody knew that I was wearing them?
16     Q.  Right.
17     A.  Correct.
18     Q.  And John Dillman would have been one of those
19  people who knew you were wearing hearing aids?
20     A.  Again, there was no secret and I wasn't hiding
21  anything.
22     Q.  Right.  So what was the policy of the division
23  as far as you understood it at the time you were
24  experiencing hearing loss issues?

13 (Pages 46 to 49)

Page 50

1    A.   Well, that's why I went to the superintendent
2   and I can just about quote what I said to him.  I
3   said, "Alan, if this creates a problem, I'll retire
4   today."
5         And he said, "Joe, it does not create a
6   problem."  And I said, "Very good."
7    Q.   "If this creates a problem, I'll retire today"
8   and he told you "No, it does not create a problem"?
9    A.   Correct.
10   Q.   Do you recall if he said something like "When
11  you have a problem with seeing, you get glasses; when
12  you have a problem with hearing, you get hearing
13  aids"?
14   A.   You know, I can't say that I heard him say that
15  exactly, but that sounds like him and I know I have
16  used the same terminology.  I have some friends that
17  are pretty vain male individuals and I tell them
18  "You're stupid.  If you're having a hearing problem,
19  take care of it.  If your eyes start to go, you get
20  glasses to improve them."  I said, "You know, it's the
21  same thing."
22   Q.   Sergeant Foraker has told me at some State
23  Police DSTA probably function within the last couple
24  of years you told him a little bit about this

Page 51

1   conversation with Colonel Ellingsworth.
2    A.   Probably.  I don't doubt it.  Like I said, it
3   was no secret.
4    Q.   I understand that.  You found Sergeant Foraker
5   to be a truthful officer with your experience with
6   him?
7    A.   I have had nothing but good things to say about
8   him, anything, whether on the job or off the job.
9    Q.   Right.  You're familiar with his reputation as
10  an officer, aren't you?
11   A.   Yes, I am.
12   Q.   And he has a reputation of the highest order.
13  Isn't that true?
14   A.   In my mind he does.
15   Q.   You know that the Delaware State Police, for
16  example, has rules and regulations on truthfulness and
17  honesty?
18   A.   Correct.
19   Q.   It's a very serious matter with the police,
20  right?
21   A.   It is to me.
22   Q.   And is it true that he has the highest
23  reputation for his truthfulness and honesty?
24   A.   In my eyes he does.

Page 52

1    Q.   Right.  Chris remembers from the conversation
2   where you're saying, "When I had a problem I spoke to
3   Colonel Ellingsworth" -- and we're in agreement on
4   that, right?
5    A.   Correct.
6    Q.   And Chris remembers in the conversation that
7   you did mention this phraseology I have tried to use,
8   that Ellingsworth said, "When you have a problem with
9   seeing, you get glasses.  When you have a problem with
10  hearing, you get hearing aids."
11        So I'm just trying to ask you does that
12  jog your memory that he might have said that?
13   A.   You know, I don't know how long ago Chris and I
14  had this conversation.  I'm not going to sit here and
15  say I can absolutely remember him saying that, but I
16  can say this.  That sounds like Alan and that's why if
17  he said that's what I said, then that was said.
18   Q.   Okay.  Thanks.
19        And so Colonel Ellingsworth, he didn't
20  make an issue of your hearing loss?
21   A.   No.
22   Q.   He did not revoke your powers as a police
23  officer?
24   A.   No, he didn't.

Page 53

1    Q.   He did not suspend you because you had hearing
2   issues?
3    A.   No.  In fact, as I said earlier, I told him I
4   would retire today.  He said, "Absolutely not.  It's
5   not necessary."
6    Q.   He didn't send you for a fitness for duty exam?
7    A.   No.  Because I think that came about from my
8   physical, if I recall correctly, because that's why I
9   say I can't sit here and say that the state physical
10  puts you in that box and all that, but I'm almost sure
11  what happened was I was told by the state people that
12  I had this situation and I reported back to Alan and
13  said I'm going to my own doctor and get it taken care
14  of.
15   Q.   Right.  But you know that there are times when
16  an officer's fitness for duty comes into question?
17   A.   Oh, yeah.
18   Q.   The Delaware State Police during your time
19  there had means of determining whether an officer
20  still should be carrying a gun and exercising police
21  powers, correct?
22   A.   Correct.
23   Q.   For example, an officer could be having a lot
24  of emotional stress at home or death in the family or

Page 54

1  things like that, emotional issues, correct?
2    A.  Correct.
3    Q.  And the Delaware State Police has always had
4  the authority that if they thought there were
5  questions in a trooper's fitness to send him for
6  examinations by qualified people, right?
7    A.  They would do it, absolutely.
8    Q.  If an officer has physical problems, the
9  Delaware State Police also has the authority to send
10 them for what's called fitness for duty exams,
11 correct?
12   A.  Absolutely.
13   Q.  So my question to you was:  After whatever
14 report came back from your physical and after your
15 conversation with Colonel Ellingsworth, Colonel
16 Ellingsworth did not direct you to have a fitness for
17 duty exam?
18   A.  No.
19   Q.  And who was the lieutenant colonel under
20 Ellingsworth at that time?
21   A.  That would have been Jerry Pepper.
22   Q.  So what year would this conversation have been
23 in when you went to him and told him about that?
24   A.  Again, I'm going to use the year 1997 as my

Page 55

1  sort of landmark.  For whatever reason, I can recall
2  that I was 51 when I started wearing hearing aids.
3        So I'm going to say it was '97 because I
4  was born in '46.
5    Q.  Okay.  So you think it was '97?
6    A.  Yeah.
7    Q.  So thinking back, because I just don't want to
8  make any mistakes who the colonel was and who the
9  lieutenant colonel was, so you're saying Alan
10 Ellingsworth was definitely the colonel that you
11 talked to?
12   A.  He was the colonel I talked to.  And that's why
13 I say because I'm sure there was a time frame there
14 from when I got my physical until when I got or had to
15 go to my own doctor to actually get the hearing aids.
16 So sometime after my physical, which again knowing
17 what I would do, I went to him the first opportunity I
18 had to meet with him and I told him, if not the same
19 day.
20   Q.  Right.  But it's Alan Ellingsworth?
21   A.  Alan Ellingsworth.
22   Q.  And your recollection is that the second in
23 command was Jerry Pepper?
24   A.  Yeah.  He was second in command the whole time

Page 56

1  Al was colonel.
2    Q.  Is that right?
3    A.  Yes.
4    Q.  That goes a little further back than I'm
5  familiar with.  Okay?
6    A.  Okay.  Because I replaced him.
7    Q.  All right.  So did Lieutenant Colonel Pepper
8  also know that you had hearing issues?
9    A.  Oh, yeah.  The entire, like I said, the entire
10 staff knew.  As far as I'm concerned, anybody that
11 worked under my command -- well, I can't say the
12 troopers on the street.  It was no secret.  It was
13 there.  I wear them.  They're in there and everybody
14 had the opportunity to know.
15   Q.  Right.  But I'm just talking about who is above
16 you in the chain.  And there's only two people?
17   A.  Everybody at my rank and above knew.
18   Q.  Right.  So Jerry Pepper was over you?
19   A.  Absolutely.
20   Q.  And you're telling me he knew you had the
21 hearing issues?
22   A.  Absolutely.
23   Q.  He didn't send you for a fitness for duty exam
24 either?

Page 57

1    A.  No.
2    Q.  Then John Dillman at that time was the civilian
3  director of personnel for the State Police, right?
4    A.  Correct.
5    Q.  And he had a deputy who was a uniform officer
6  under him, correct?
7    A.  Yes.
8    Q.  But John Dillman was the highest-ranking
9  person?
10   A.  Right.
11   Q.  And John Dillman knew that you were wearing
12 hearing aids?
13   A.  I'm assuming he did.  I mean, like I said, I
14 know they get these reports to put in their files.
15   Q.  It was that, plus you interacted with him?
16   A.  Again, through word of mouth, exactly.
17   Q.  You were in the headquarters building on the
18 second floor, I guess, right?
19   A.  Correct.
20   Q.  He was in the headquarters building on the
21 first floor, correct?
22   A.  Correct.
23   Q.  You see people in the halls every day?
24   A.  And we passed in passing almost every day, if

Page 58

1  not sitting down and talking about something.
2     Q.  Right.  And John Dillman never asked you to
3  have a fitness for duty exam either?
4     A.  No.
5     Q.  Right.  Now, during this time when you were
6  concerned for your hearing, did you ever learn of any
7  written policies the State Police had as far as
8  hearing loss, written policies?
9     A.  I'm not aware of any one way or the other.  You
10  know, again, I'm looking, I'm thinking back to
11  policies.  Policies could be dealing with anything
12  that -- if I had a hearing problem that couldn't be
13  corrected, just like glasses couldn't correct a sight
14  problem, you know, I wouldn't have been able to stay
15  on board.
16     Q.  You don't have any hearing devices in your ears
17  today, do you?
18     A.  Yes, I do.
19     Q.  Oh, you do?
20     A.  Both of them.
21     Q.  Really?
22     A.  Yes.
23     Q.  Okay.  My father-in-law used to have hearing
24  aids and I haven't dealt with anybody for he's been

Page 59

1  dead about ten years, so I don't know what the
2  technology is like anymore.
3     A.  They're flush, but they're in the ear.
4     Q.  They're there, okay.
5          Are you saying that today you in a crowded
6  room with the aid of the hearing aids you can totally
7  compensate for the hearing loss?
8     A.  I can -- I don't know that you ever totally
9  correct it, but what I do is it's not as difficult.  I
10  still -- and I guess this is probably one of the ways
11  you correct things and compensate for things, is I
12  make sure I'm looking at people as I'm speaking to
13  them and as they speak back to me.  I pay closer
14  attention.  Maybe that's the word I want to use, the
15  terminology I want to use.
16     Q.  Right.  So you're saying even with the hearing
17  aids even today it doesn't totally compensate for the
18  hearing loss?
19     A.  I don't think there's anything that would
20  totally compensate for it, but it certainly is a lot
21  better.  If I take them out, I can notice a
22  difference.  Then when I put them back in, the clarity
23  and everything is there.
24     Q.  It does improve it?

Page 60

1     A.  Absolutely.
2     Q.  But going back to '97 and through your
3  retirement with the State Police, no one in authority
4  over you sent you for independent testing to determine
5  if Dr. Smith made a mistake, right?
6     A.  No.
7     Q.  No one sent you for independent testing to
8  determine whether whoever was giving the annual
9  physicals for the Delaware State Police made a
10  mistake?
11     A.  No.
12     Q.  No one, for example, they didn't send you up to
13  the University of Pennsylvania or Johns Hopkins to
14  have you get an independent, get another opinion on
15  the level or severity of your hearing loss?
16     A.  No.
17     Q.  They just took your word and your doctor's
18  word?
19     A.  I guess, yes.
20     Q.  Right?
21     A.  Yes.
22     Q.  They didn't ask for a second opinion?
23     A.  No, they didn't.
24     Q.  And since they didn't ask for a second opinion,

Page 61

1  they never asked for a third opinion, right?
2     A.  You got to come to two before you hit three.
3  No.
4     Q.  So they relied on the situation as you
5  presented it to them.  Is that correct?
6     A.  Correct.
7     Q.  And if you had not gone to the colonel and
8  talked to him about it, you don't have any basis to
9  believe that they would have ever raised the question,
10  do you?
11     A.  Well, I think they would have because, again,
12  in the conversation I had with the state's attorney in
13  the last couple, three weeks there was one time in the
14  series of testings that it came up that my hearing was
15  abnormal and I want to say that was in the '96-97 time
16  frame because I know, again, when that became known to
17  me.  And knowing the way that I operated, as soon as I
18  was made aware of that I had a problem I went back to
19  Alan and I would almost be willing to bet that I met
20  him that day, unless my physical was at the end of the
21  day or something, but the very first opportunity that
22  I had to meet with him I let him know about it.
23     Q.  Well, let's look then at some of those medical
24  records.  Okay?  You still have in front of you what I

Price, et al.                                  v.                          Chaffinch, et al.
Joseph N. Forester                    C.A. # 04-956-GMS              December 22, 2005

Page 62

1   marked as Forester Exhibit No. 1, I believe, your
2   file. Okay?
3       A.   Okay.
4       Q.   Let's flip about five pages from the back. Do
5   you see those little numbers on the bottom right-hand
6   corner, D14 something.
7       A.   15004?
8       Q.   Yes. Let's go to 14996.
9       A.   Okay.
10      Q.   Can you find that?
11      A.   Got it.
12      Q.   So what we're going to do here is we have 14996
13  and the next page would be a 14997, 998.
14          On page 14998 do you see your handwriting?
15      A.   Correct.
16      Q.   So this is a three-page questionnaire. Is that
17  right?
18      A.   Correct.
19      Q.   If we look on page 14996 at the top left-hand
20  corner, it says Medical History Questionnaire?
21      A.   Correct.
22      Q.   And it's for Occupational Health Services in
23  Milford, Delaware. Is that correct?
24      A.   Correct.

Page 63

1       Q.   And on the third page it says June of 1992.
2   That's when you signed it?
3       A.   The third page? June 1st, correct.
4       Q.   That is your signature, correct?
5       A.   Correct.
6       Q.   Is this a questionnaire you filled out for
7   whoever was performing the annual physicals for the
8   Delaware State Police in 1992?
9       A.   Occupational Health Services? I would say yes.
10      Q.   Is this a questionnaire you submitted to the
11  Delaware State, well, to somebody and it got in the
12  State Police records, right?
13      A.   Mm-hmm. Correct.
14      Q.   And in 1992 when you gave this, you filled this
15  in, if I'm correct you were a captain. Do you want to
16  look back at your assignments in the beginning there?
17      A.   That sounds right.
18      Q.   See if it sounds right.
19      A.   '92? Yes. Correct.
20      Q.   So you were a captain and this is approximately
21  eight years before you retired, correct?
22      A.   Correct.
23      Q.   So now we're on this first page here and we
24  have got you giving yes's and no's, those kinds of

Page 64

1   things that you give when you fill out a medical
2   questionnaire, right?
3       A.   Right.
4       Q.   And, in fact, it indicates, up under No. 1 it
5   indicates who your family doctor was, right?
6       A.   Dr. Sharman at the time, correct.
7       Q.   So there's a Dr. Sharman, S-h-a-r-m-a-n. Is
8   that right?
9       A.   Correct.
10      Q.   And he was in Georgetown at the time?
11      A.   I think he was in Millsboro is where his office
12  was located, but it may have been Georgetown.
13      Q.   Anyway, there's a Dr. Sharman. What was his
14  first name?
15      A.   I don't recall.
16      Q.   If you recall.
17      A.   I don't recall.
18      Q.   He was your family doctor for a while?
19      A.   Correct.
20      Q.   So he was at this time your family doctor,
21  correct?
22      A.   Correct.
23      Q.   Is he still around?
24      A.   I don't know. We changed doctors since then,

Page 65

1   but I don't know.
2       Q.   So when did you change to somebody else?
3       A.   Well, I'm trying to backtrack now. Dr. Aviado
4   is my current one and we had one right before him, but
5   he since has retired and he was also an Oriental
6   doctor. I'm trying to think of what his name was.
7          If you had my wife in here, she could tell
8   you. She has a better recall.
9       Q.   I know. They take charge of that stuff.
10      A.   Dr. Sharman was at least two, three doctors
11  back.
12      Q.   This Dr. Aviado, that is the current doctor?
13      A.   That is the current one.
14      Q.   How do you spell his name?
15      A.   A-v-i-a-d-o, I believe.
16      Q.   A-v-i-a-d-o. Do you remember his first name?
17      A.   No.
18      Q.   Where is he located?
19      A.   Milford.
20      Q.   Milford. And then before that you're saying
21  there's the retired doctor?
22      A.   Right.
23      Q.   Was he with a practice this retired doctor,
24  this other doctor?

17 (Pages 62 to 65)

Wilcox & Fetzer, Ltd.           Professional Court Reporters            (302)655-0477

Price, et al.                                    v.                           Chaffinch, et al.
Joseph N. Forester                        C.A. # 04-956-GMS                  December 22, 2005

Page 66

1    A.   Yeah.  Dr. Aviado was with him.
2    Q.   So they're in the same office?
3    A.   Yeah.  And they were in Georgetown at the time,
4    but Dr. Aviado has since moved up to Milford.
5    Q.   And then before them there was Dr. Sharman or
6    are you saying there's still somebody else in there?
7    A.   No.  I think Dr. Sharman was the one before him
8    if I had to guess.
9    Q.   So we're on the front page here of D14996.  We
10   just looked at the family doctor name.
11        Now, if we go down, see where it says V,
12   Ears at the bottom?
13   A.   Gotcha.
14   Q.   And do you see there's a question asked if you
15   have difficulty hearing or hearing loss?  Do you see
16   that?
17   A.   Yes.
18   Q.   And is it true that in 1992 you answered yes to
19   that question?
20   A.   I sure did.
21   Q.   Okay.  So, once again, we're just trying to
22   refresh your memory here.  Okay?  You understand that,
23   right?
24   A.   Sure.  Yeah.

Page 67

1    Q.   You didn't see these records before today,
2    right?
3    A.   Absolutely not.
4    Q.   The lawyer for the State of Delaware didn't
5    show you these records before today, right?
6    A.   No, he didn't.
7    Q.   He had records in front of him when he had a
8    phone conversation with you, but you couldn't see
9    those records, right?
10   A.   I couldn't see what he had in front of him.
11   Q.   Right.  And when you had this discussion with
12   the lawyer on the phone some time ago, did he point
13   out to you that in 1992 you said yes to the question
14   asking if you had difficulty with hearing?
15   A.   Could you repeat that again?
16   Q.   Yes.
17        I'm saying when you had the phone
18   conversation -- was it with Mr. Fitzgerald here?
19   A.   Right.
20   Q.   When you had that phone conversation, did he
21   point out to you that in 1992 you said yes that
22   you had difficulty hearing or hearing loss?
23   A.   I don't recall him saying that.
24   Q.   But you see it here now?

Page 68

1    A.   It's here.
2    Q.   And would you agree with me in 1992 you did
3    have difficulty hearing and you had hearing loss?
4    A.   I certainly put it down there.
5    Q.   And then there's a question number 6.  Do you
6    see that?
7    A.   Question 6?  Okay.
8    Q.   It says, "Your hearing tested?"
9    A.   Okay.
10   Q.   And did you answer yes, that your hearing has
11   been tested?
12   A.   I certainly did.  I have no recollection of
13   that one.
14   Q.   I understand.  But that is your handwriting,
15   right?
16   A.   Yes, it is.
17   Q.   Then on the line where you said yes, your
18   hearing was tested is it true that you wrote in you
19   guess 1980?
20   A.   Correct.
21   Q.   The question was when was your hearing tested?
22   Do you see that?
23   A.   Correct.
24   Q.   And you answered "Guess - 1980."  Is that

Page 69

1    right?
2    A.   Yes.
3    Q.   If we go back to 1980 in your career, I think
4    that's way back, is it true that in 1980 you were a
5    corporal?
6    A.   Corporal.
7    Q.   Right?
8    A.   Correct.
9    Q.   And you would have been a corporal assigned to
10   the tactical accident control team.  Is that correct?
11   Maybe not.
12        Why don't you tell me where you were in
13   '80?
14   A.   It says -- probably somewhere between the tac.
15   team and the assignment at headquarters was what?
16   '82?  No.  '81.  Well, it says 46-81 over here on the
17   order number.  So I'm going to say -- we're using the
18   year 1980, correct?
19   Q.   Yes.
20   A.   So I'm going to say I was corporal.
21   Q.   Right.  That sounds about right?
22   A.   Right.
23   Q.   We're still in this number 6 here.
24        Do you see where there's three lines

Price, et al.                                   v.                          Chaffinch, et al.
Joseph N. Forester                        C.A. # 04-956-GMS              December 22, 2005

Page 70

1  handwritten after that?
2    A.  Exactly.
3    Q.  If you go down to the middle of the second
4  line, do you see where you wrote in a number 6 in the
5  middle of that second line there?
6    A.  Mm-hmm.
7    Q.  That number 6 there is referring to this
8  question we have just been talking about about the
9  hearing test.
10        Do you see that?
11   A.  Right.
12   Q.  And why don't you read for us what your
13  handwriting says there in that addition to number 6
14  that starts "By the division"?
15   A.  "Number 6 by the division and 1980 is an
16  approximate time guess."
17   Q.  So you're indicating there that your hearing
18  was tested around 1980 by the division and that's an
19  approximate guess, right?
20   A.  That's correct.
21   Q.  And you had started with the State Police I
22  think you told me earlier the academy class you
23  started was October of 1972, right?
24   A.  Correct.

Page 71

1    Q.  So 1980 would have been eight years after you
2  had started with the State Police, correct?
3    A.  Correct.
4    Q.  And so you're indicating here your memory was
5  that the State Police had tested your hearing in 1980,
6  right?
7    A.  That's what I have here, absolutely.
8    Q.  Then if we go back to that question 2 about
9  difficulty hearing or hearing loss -- do you see that?
10   A.  Question 2, "Difficulty hearing or hearing
11  loss," right.
12   Q.  Then I think you wrote something down there at
13  the bottom of the page on number 2 also.  Do you see
14  where it says number 2?
15   A.  Right.
16   Q.  Why don't you read for us what you wrote there?
17   A.  "Wife and children tell me I don't hear as good
18  now as I used to."
19   Q.  So in June of 1992 when you filled out this
20  questionnaire -- do you see that?
21   A.  Okay.
22   Q.  Right?  That's the date you filled it out?
23   A.  Correct.
24   Q.  You wrote there on this page that your wife and

Page 72

1  children were telling you at that time that you don't
2  hear as good now as you used to, right?
3    A.  That's correct.
4    Q.  So is it a fair statement that you were trying
5  to say there that your wife and children were telling
6  you that in 1992 you weren't hearing as well as you
7  used to hear?
8    A.  That's what they were saying.
9    Q.  That was a true statement when you wrote it?
10   A.  I'm sure it was.  I wouldn't have wrote it if
11  it wasn't.
12   Q.  Of course.  Let's just see if there's anything
13  else there.
14        Let's go to another one here.  Just two
15  pages forward at the bottom it has page number D14994.
16        Can you find that?
17   A.  Got it.
18   Q.  Before we start here, just on the earlier one
19  that we just went over about the hearing loss, after
20  you submitted this questionnaire the Delaware State
21  Police didn't send you for a fitness for duty exam,
22  did they?
23   A.  No.
24   Q.  After you submitted this questionnaire that's

Page 73

1  found in your personnel file, human resources didn't
2  have you in to measure the degree of hearing loss you
3  had, did it?
4    A.  I don't recall them, no.
5    Q.  Human resources never measured you for the
6  degree of hearing loss you had?
7    A.  Not that I recall, no.
8    Q.  You don't recall anybody from human resources
9  sending you to Johns Hopkins or University of
10  Pennsylvania or any other major medical center to test
11  your hearing?
12   A.  Never.
13   Q.  Never?
14   A.  Right.
15   Q.  Even though you said in this questionnaire you
16  had difficulty hearing or hearing loss, nobody in your
17  chain of command at this time in 1992 above you
18  ordered you for a fitness for duty exam?
19   A.  No.
20   Q.  You never had a fitness for duty exam during
21  your career, did you?
22   A.  Not that I'm aware of.  Just my annual
23  physicals.
24   Q.  Right.  So now we're two pages ahead on page

19 (Pages 70 to 73)

Price, et al.                                              v.                                    Chaffinch, et al.
Joseph N. Forester                              C.A. # 04-956-GMS                        December 22, 2005

Page 74

1   D14994.
2      A.   Okay.
3      Q.   And in the upper right-hand column on that page
4   do you see where this is dated June 1, 1992?
5      A.   Correct.
6      Q.   And is this a questionnaire, one of those
7   things they give you at the doctor's office that you
8   filled out at that time?
9      A.   It looks like something like that where it's
10  just a general history.
11     Q.   That's what I am saying.  If you look at the
12  top of the second page, there's the signature of you,
13  I think.
14     A.   Sorry.  That's on 4995?
15     Q.   Yes.
16     A.   Yes.
17     Q.   Right?
18     A.   Mm-hmm.
19     Q.   That's your signature, right?
20     A.   That's my signature.
21     Q.   You put that signature on May 26, 1992,
22  correct?
23     A.   That is correct.
24     Q.   And there it says, "I certify that I have

Page 75

1   answered the above questions truthfully and to the
2   best of my ability."
3           Do you see that?
4      A.   That's correct.
5      Q.   So that indicates that you filled out this
6   questionnaire on that page and before, the earlier
7   page, right?
8      A.   Correct.
9      Q.   If we're on that second page here --
10     A.   Back on 94?
11     Q.   95.  It says physical exam.  Okay?
12     A.   Okay.
13     Q.   So then at the bottom you see a doctor's, it
14  says Bruce Jacobs, Doctor of Osteopathy I think they
15  call him.
16     A.   Okay.
17     Q.   Who was he?
18     A.   You got me.  I don't know.
19     Q.   Was this an annual physical the State Police
20  had you go to?
21     A.   I'm assuming, yes.
22     Q.   That wasn't your family doctor?
23     A.   No, he's not my family doctor.
24     Q.   Right.  Is it true that for the periodic

Page 76

1   physicals the State Police would have uniform officers
2   undergo that you had the choice of using either your
3   family doctor or going to a doctor provided by the
4   state?
5      A.   I think that was true, yes.
6      Q.   And you're telling me that Bruce Jacobs was
7   never your family doctor, right?
8      A.   I don't recall.  He was never my family doctor.
9      Q.   Does it appear that this was a periodic
10  physical that you used the State Police's doctors to
11  perform?
12     A.   My best answer to this is that this appears to
13  me to be a physical paper that I filled out for my
14  State Police physical, annual physical exam.
15     Q.   Right.  So we're on the second page here, page
16  14995.
17     A.   Correct.
18     Q.   A few lines down do you see where it says
19  audiometric screen?
20     A.   Yes.
21     Q.   Do you see where the doctor checked abnormal?
22     A.   Correct.
23     Q.   And then method says audiogram, right?
24     A.   Yeah.  Yes.  That looks like that's what that

Page 77

1   says there.
2      Q.   Then we go down and do you see where it says
3   Synopsis at the bottom?
4      A.   Yes.
5      Q.   Let me read it to you:  Quote, "Mild diffuse
6   hearing loss bilaterally, otherwise WNL."
7           Do you see that?
8      A.   That's what I see.
9      Q.   Do you remember the doctor telling you at that
10  time that you had mild diffuse hearing loss
11  bilaterally?
12     A.   I'm sure if he said that to me I remember it.
13     Q.   Today you don't remember?
14     A.   I just don't remember today, right.
15     Q.   I'm just asking if you remember.
16          Here it says you had an audiogram.  Do you
17  see that?
18     A.   That I see.
19     Q.   You don't remember having an audiogram then, do
20  you?
21     A.   I don't remember.
22     Q.   You were telling us earlier that you remember
23  having with Dr. Smith an audiogram in 1997?
24     A.   Correct.

20 (Pages 74 to 77)

Page 78

1    Q.   This record from your personnel file indicates
2  that in 1992 you had an audiogram, correct?
3    A.   It certainly does.
4    Q.   You don't dispute that in 1992 you had an
5  audiogram, do you?
6    A.   I mean, this is my writing.  Absolutely not.
7  It is my writing.
8    Q.   Is that your writing or the doctor's writing
9  where it says that?
10    A.   Well, that down here is the doctor's, but I'm
11  saying that signature on this form is mine.
12    Q.   Right.  But here where it says abnormal and
13  audiogram, that's not your handwriting?
14    A.   No.  That's the doctor's or somebody else's.
15    Q.   Right.  So this record indicates that you did
16  have an audiogram, right?
17    A.   Correct.
18    Q.   And you don't dispute that fact?
19    A.   I don't dispute it.
20    Q.   And after this document was prepared in
21  June of 1992 is it correct that no commanding officer
22  over you in the Delaware State Police sent you for a
23  fitness for duty exam?
24    A.   Sir, to the best of my recollection, I was

Page 79

1  never sent for a fitness for duty exam.
2    Q.   No one at the State Police in the civilian
3  personnel office or uniform office ordered you to go
4  to Johns Hopkins University, the University of
5  Pennsylvania or any other place to determine the level
6  of your hearing loss?
7    A.   Never.
8    Q.   No one above you in the chain of command at the
9  Delaware State Police revoked your police powers?
10    A.   Never.
11    Q.   No one over you in the chain of command of the
12  State Police tried to determine whether any hearing
13  loss you were suffering would interfere with your
14  duties as a police officer?
15    A.   I was never informed, never told that.
16    Q.   Right.  Right.  Let's go to --
17    MR. FITZGERALD:  Tom, can we take a couple
18  minute break?  It's been about an hour and a half.
19    MR. NEUBERGER:  I'm sorry.  Sure.  Let's
20  take a break.
21    (A brief recess was taken.)
22  BY MR. NEUBERGER:
23    Q.   Corporal Warren just reminded me of something.
24  Do you remember that he was the second in charge of

Page 80

1  the SORT team?
2    A.   I know he was on the SORT team.
3    THE WITNESS:  And I think you were right
4  under -- help me out.  The one that was down Troop 7
5  also.
6    MR. WARREN:  Bill Rhoads.
7    THE WITNESS:  Bill Rhoads.  Thank you.
8  BY MR. NEUBERGER:
9    Q.   Right.  Okay.  Do you remember -- this was an
10  incident you were commanding -- an incident in
11  Georgetown in the winter, Captain Lewis being there,
12  you being the ranking officer on the scene and Wayne
13  Warren being there?
14    Does that jog your memory?
15    A.   Which one in Georgetown?  Just fill me in a
16  little bit.
17    Q.   Well, maybe these things happen so often.  I
18  mean, Corporal Warren would testify that there was a
19  critical incident in Georgetown that you were the
20  senior officer involved and Captain Lewis and it was
21  being commanded out of one of the squad cars and you
22  and Corporal Warren and Captain Lewis were there.
23    Does that jog any memory?
24    A.   If it's the one where the guy came walking out

Page 81

1  of the woods on us at the end of the thing?
2    Q.   No.  It's a different one.
3    A.   I would need more information.
4    Let me put it to you this way.  Wayne was
5  at many of them.
6    Q.   And you would be there?
7    A.   And I would be there, yes.
8    Q.   When you went for your annual -- well, twice a
9  year you have to get certified for your firearms
10  training.  Do you remember that?
11    A.   I think it's at least twice a year, yes.
12    Q.   Right.  At least twice a year you would have to
13  go get certified and after you started wearing the
14  hearing aids you had to get certified too, right?
15    A.   Correct.
16    Q.   And would you take the hearing aids out when
17  you were doing the shooting?
18    A.   I don't think I did because we had to put the
19  headsets on us anyway and, no, I pretty much left them
20  in.  I don't recall having to take them out, no.
21    Q.   I'm just trying to find out.
22    A.   No.  I don't think I did.
23    Q.   You don't think so?
24    A.   Uh-uh.

Price, et al.                                    v.                                    Chaffinch, et al.
Joseph N. Forester                    C.A. # 04-956-GMS                    December 22, 2005

Page 82

1    Q.   Let's go back to your medical records.
2    A.   If I can, let me just clarify.  The only thing
3  I can say about my hearing aids that I would take them
4  out on something, if your hearing aids are in and it's
5  really hot and humid, moisture can actually short them
6  out and I would take them out then.
7    Q.   Oh, wow.
8    A.   So if we were outdoors and it was hot, then I
9  would but, otherwise, I would keep them in.
10   Q.   Okay.  So you're saying that the kinds of
11 hearing aids you were wearing before you retired that
12 you're talking about right now -- right?
13   A.   They're the same ones.
14   Q.   In situations of high heat and humidity, you
15 would have to take them out on occasion?
16   A.   Yes.
17   Q.   Okay.  Now just trying to move forward on these
18 medical records here that you're refreshing your
19 memory on, let's just jump ahead to another one.
20 Let's go to 14992, if we could.
21        We're going ahead two years to on this
22 page the upper right-hand column does it say September
23 27, 1994?
24   A.   Correct.

Page 83

1    Q.   And is this, again, a periodic annual physical
2  form you had to fill out for the State Police?
3    A.   It says Delaware State Police Medical History
4  Form.
5    Q.   Right.  And this page 14992, is it true you
6  filled out that page?
7    A.   The top heading, absolutely.
8    Q.   Right.  On the back page you will see your
9  signature at the top of page 14993.
10   A.   Yes.
11   Q.   And you signed this on September 27, 1994?
12   A.   That's correct.
13   Q.   And, once again, were you answering that these
14 questions were certified to be truthful to the best of
15 your ability?
16   A.   Correct.
17   Q.   If we go back to page 14992, there's a question
18 on hearing.  See if you can find that.
19   A.   Gotcha.
20   Q.   Is there a question about asking you whether
21 you have loss or decreased hearing?  Do you see that?
22   A.   Correct.
23   Q.   And did you put a check in that box?
24   A.   There's a check mark there.

Page 84

1    Q.   By that were you indicating that yes, you do
2  have a loss or decreased hearing?
3    A.   That's what that reads to me.
4    Q.   Yes.  And so does that refresh your memory that
5  in September of 1994 that you were suffering from loss
6  or decreased hearing?
7    A.   Obviously that's what it says there and that is
8  the date on the form.
9    Q.   Right.  And, once again, just to make the
10 record clear, no one from the human resources office
11 of the Delaware State Police ordered you to go for a
12 fitness for duty exam after this result?
13   A.   No, they did not.
14   Q.   And no commanding uniform officer above you at
15 this time ordered you to go for a fitness for duty
16 exam, did they?
17   A.   No, they did not.
18   Q.   No one revoked your police powers while they
19 decided whether you were fit for duty, did they?
20   A.   No, they did not.
21   Q.   Let's go forward three years -- I'm sorry.
22 Wait a minute.  I got another one here.  One year.
23        Let's go to the page 14990.
24   A.   Okay.

Page 85

1    Q.   Let's see what's on there.  14990, is this a
2  form that you filled out in August of 1995?
3    A.   Correct.
4    Q.   Is this, once again, another one of those
5  annual physical forms that you had to complete?
6    A.   That's correct.
7    Q.   If we go to the back page, is that your
8  signature again?
9    A.   Correct.
10   Q.   And you signed this on August 29, 1995?
11   A.   That is correct.
12   Q.   Let's go down to audiometric screen.  Do you
13 see that question here (indicating), audiometric
14 screen?
15   A.   Okay.  Gotcha.
16   Q.   And there's a question about audiometric screen
17 that the doctor fills out, right?
18   A.   Correct.
19   Q.   Now, this doctor, his name is a Charlie Allen.
20 Do you see that at the bottom of the page?
21   A.   That's what that appears to be, Charlie Allen,
22 yes.
23   Q.   Was that your family doctor or their doctor?
24   A.   I think that's the state doctor.  I never had a

22 (Pages 82 to 85)

Price, et al.                                           v.                                    Chaffinch, et al.
Joseph N. Forester                            C.A. # 04-956-GMS                      December 22, 2005

Page 86

1    family doctor that --
2      Q.   Right.  Once again, you had the option when you
3    were taking these annual physicals to use a doctor
4    provided by the state, right?
5      A.   Correct.
6      Q.   In fact, they also did lab work when you did
7    these annual physicals, didn't they?
8      A.   Yes.
9      Q.   And for the lab work you had the option of
10   going to your own lab or using their lab.  Is that
11   correct?
12     A.   I'm sure it is, yes.
13     Q.   Well, under audiometric screen do you see where
14   the doctor wrote in a comment after the word "Method"?
15     A.   Correct.
16     Q.   And is it true he wrote in "minimal high
17   frequency - see below"?
18     A.   Yes.
19     Q.   And then in the bottom right-hand corner of the
20   document do you see where he gives some numbers for a
21   right and a left ear?
22     A.   Is that right in this thing here (indicating)?
23     Q.   Here you go (indicating).
24     A.   All the way down.  Okay.  I'm with you.  Yes.

Page 87

1      Q.   You don't know how to interpret those numbers,
2    do you?
3      A.   Not a clue.
4      Q.   Okay.  Now let's jump ahead another year.
5    Let's go one page ahead to page 14986.  Okay?
6      A.   86?
7      Q.   It's in the middle of the page.  It's hard to
8    find the number on this one.
9      A.   Okay.  Gotcha.
10     Q.   Okay.  Page 86 and 87, is that the annual
11   physical you underwent in October of 1997?
12     A.   October 30, '97, correct.
13     Q.   And is that your handwriting on the first page?
14     A.   Up there under History, correct.
15     Q.   Is that your signature on the second page?
16     A.   That is correct.
17     Q.   On the first page under hearing did you check
18   off loss or decreased hearing you were experiencing?
19     A.   There's a check mark there.
20     Q.   And then in the right-hand corner on this first
21   page there's a stamp from the personnel office of the
22   Delaware State Police.
23         Do you see that?
24     A.   Correct.

Page 88

1    went into their office.  Isn't that correct?
2      Q.   That's a stamp they would put on things that
3      A.   That they received, correct.
4      Q.   Now if we go to the second page, we have got
5    your signature at the top of the page, right?
6      A.   Yes.
7      Q.   That's October 30, 1997, right?
8      A.   That is correct.
9      Q.   Do you see where it says audiometric screening
10   again?
11     A.   Wait.  Yep.
12     Q.   And it was checked off as abnormal that time,
13   right?
14     A.   Correct.
15     Q.   And the doctor at the bottom of the page, his
16   name is a Dr. Green.  Isn't that right?
17     A.   Correct.
18     Q.   And under Synopsis Dr. Green wrote something
19   in.
20         Do you see that?
21     A.   I see it.
22     Q.   Let's try to read his handwriting.  Okay?
23     A.   Okay.
24     Q.   Does it appear that it says left ear?

Page 89

1      A.   I get that as left ear.
2      Q.   Then something hearing loss, right?
3      A.   Yes.  It almost looks like conductor, but I
4    don't know what that word says.  Hearing loss, yes.
5      Q.   Do you remember him telling you you had hearing
6    loss in your left ear at this time in 1997?
7      A.   Again, like I said, to me that's where I recall
8    my first incident of it, but you've obviously shown me
9    where I had it previously.  So I'm going to say this
10   is the conversation that I must be recalling.
11     Q.   Dr. Green, he was a physician provided by the
12   State Police for physicals, correct?
13     A.   Correct.
14     Q.   Does he work at something called Health Works?
15   Does that ring a bell?
16     A.   I don't know the name of it, but it's on State
17   Street, it's on State Street and 13.
18     Q.   Right.  Well, at the bottom of the page there
19   are three questions for Dr. Green to check.
20         Do you see them?
21     A.   Yes.
22     Q.   Do you see where it's got a yes or no to a
23   question "Medically qualified for job"?
24     A.   Yes.

23 (Pages 86 to 89)

Price, et al.                                    v.                              Chaffinch, et al.
Joseph N. Forester                      C.A. # 04-956-GMS              December 22, 2005

Page 90

1    Q.   And do you see he didn't answer that one way or
2   the other, did he?
3    A.   There's no check marks on any of the three
4   yes's or three no's, right.
5    Q.   After this result was obtained no one from the
6   human resources function at the Delaware State Police
7   directed you to get a second opinion on your hearing
8   problems, did they?
9    A.   No.
10   Q.   Nobody revoked your police powers?
11   A.   No.
12   Q.   Nobody sent you for a fitness for duty exam?
13   A.   No.
14   Q.   Okay.  Let's just move forward another year
15  to -- well, no.  I think this is the last one.  It's
16  found on page 14982.
17   A.   Okay.
18   Q.   Wait a minute.  I did miss one.  There is
19  another year.  I'm sorry.
20   A.   There's a '98.
21   Q.   Yes.  Let's go to '98.  It's 14984.
22   A.   Correct.
23   Q.   This is a physical you took in November of
24  1998.  Is that correct?

Page 91

1    A.   Correct.
2    Q.   You signed it on the second page, correct?
3    A.   Yes, I did.
4    Q.   On the first page you again indicated that you
5   had loss or decreased hearing.
6        Do you see that?
7    A.   Correct.
8    Q.   And on the second page, this is page 14985,
9   this is this Dr. Green again down at the bottom.  Do
10  you see that, his signature?
11   A.   Yes, I do.
12   Q.   Do you see this is a year later from the
13  earlier thing with Dr. Green, right?
14   A.   Correct.
15   Q.   Do you see where the question asked if you are
16  medically qualified for the job?
17   A.   Right.
18   Q.   It says yes or no, right?
19   A.   Correct.
20   Q.   And Dr. Green didn't answer that question, did
21  he?
22   A.   There's no check marks.
23   Q.   Then they do start putting a stamp on these
24  forms.  Do you see where it says on the right side

Page 92

1   there that the location attended was Health Works?
2    A.   Correct.
3    Q.   You're saying that where you went for the
4   physical was someplace on State Street in Dover?
5    A.   State Street and 13.
6    Q.   And 13.  Were you aware that there were other
7   places people could go for the physical?
8    A.   There were other places, but that was the most
9   convenient for me out of headquarters.
10   Q.   And I'm just trying to see if it jogs your
11  memory.  Do you remember if it was called Health
12  Works?
13   A.   No.
14   Q.   Okay.
15   A.   I don't remember.
16   Q.   So we're still on Dr. Green here and we're
17  agreed that he did not certify one way or the other
18  whether you were medically qualified for the job,
19  right?
20   A.   There's no check marks.
21   Q.   And then if we look up near the audiogram line
22  on the right, do you see some numbers?
23   A.   Audiogram on the right?  It says ear, it looks
24  like R and then I have numbers, four columns of

Page 93

1   numbers, 1200, 1,000, 2,000 and it looks like 4,000.
2    Q.   Right.  So there's an R and then there's even
3   an L in a circle too, right?
4    A.   Yes.  L.
5    Q.   Then it says you're wearing bilateral hearing
6   aids.
7        Do you see that?
8    A.   Correct.
9    Q.   Once again, after this nobody sent you for a
10  fitness for duty exam, right?
11   A.   No.
12   Q.   Nobody tried to get a second opinion from
13  Dr. Green, did they?
14   A.   Not that I'm aware of, not asked for me to go
15  for a second opinion.
16   Q.   And your police powers weren't revoked?
17   A.   No.
18   Q.   Now we have got the last one.  This is number
19  14982 and a 3.  This is dated March of the year 2000.
20       Do you see that?
21   A.   Correct.
22   Q.   And is this your annual physical for that time?
23   A.   It looks to be.
24   Q.   And did you sign this?

Page 94

1    A.   Yes, I did.
2    Q.   On the front page, is it stamped it was
3  received by the human resources section?
4    A.   Correct.
5    Q.   And on the front page there on page 14982 did
6  you indicate that you have loss or decreased hearing?
7    A.   Yes, I do.  And then right next to it I have
8  "aids."
9    Q.   You wrote in the word a-i-d-s, right?  Right?
10   A.   Correct.
11   Q.   And then on the second page Dr. Green found you
12  medically qualified for the job.
13        Do you see that?
14   A.   Down the bottom left, yes, I do.
15   Q.   He wrote in you were fit for duty.
16        Do you see that?
17   A.   I see that.
18   Q.   He never wrote that in on those two prior ones,
19  did he?
20   A.   No.  There was nothing written there.
21   Q.   And nobody from the State Police went and got a
22  second, ordered you to undergo a new exam to get a
23  second opinion on whether you were fit for duty, did
24  they?

Page 95

1    A.   No.
2    Q.   Under audiometric screen there are some right
3  and left numbers given also.
4        Do you see that?
5    A.   Yes.
6    Q.   And this time it says you were tested at Health
7  Works North.  Does that help you any as to where you
8  went for your test?
9    A.   No.  To me I went to the same place, but maybe
10  I did go someplace else.  I don't know.
11   Q.   That's fine.
12        You believe you were going to the same
13  place all the time?
14   A.   Yes.  I don't recall -- once I made staff my
15  recollection is I went to that same place all those
16  years.
17   Q.   I think we're done with that then.  We're done
18  and you don't have any dispute with what's found in
19  your medical records, do you?
20   A.   No.
21   Q.   Okay.  Once again --
22   A.   They all have my signature on it.
23   Q.   Once again, these are being kept confidential
24  by everybody.

Page 96

1    A.   Thank you.
2    Q.   We're almost done.
3        I think you told me earlier that it's the
4  hearing doctor in Dover who is your treating physician
5  for the hearing issues and not your family doctors,
6  right?
7    A.   No.  I think it's an ENT, if I'm not mistaken.
8    Q.   Right.  The ENT person is the person treating?
9    A.   Right.  And I just go to him for my hearing.
10   Q.   Where do you buy your hearing aids?
11   A.   They go to California for repair, I assume.
12  He's the one who made the mold and then he sent away
13  for them.
14   Q.   The doctor in Dover did, the ENT doctor did?
15   A.   Yes, Dr. Green.
16   Q.   So he has those records.  Okay.
17        MR. FITZGERALD:  Dr. Green or Dr. Smith?
18        THE WITNESS:  I'm sorry.
19  BY MR. NEUBERGER:
20   Q.   Smith?
21   A.   It is Smith.
22   Q.   Smith, right.
23        Is it fair to say that any hearing issues
24  you had did not prevent you from rising in the ranks

Page 97

1  at the Delaware State Police?
2    A.   No.
3    Q.   Right.  I mean, there's reference to hearing
4  tests as far back as 1980.  You remember that?
5    A.   Correct.
6    Q.   And then there's the first audiometric test we
7  talked about in --
8    A.   I think it was '92.
9    Q.   -- 1992?
10   A.   Right.
11   Q.   And there's the hearing losses in 1992 that you
12  mentioned earlier.  In 1980 you were a corporal.
13  Whatever hearing issues you were experiencing at that
14  time did not prevent you from rising to be a sergeant,
15  did they?
16   A.   No, they didn't.
17   Q.   Whatever hearing issues you were experiencing
18  over your career did not prevent you from rising to a
19  lieutenant and performing those duties.  Is that
20  right?
21   A.   No, they didn't.
22   Q.   Whatever hearing issues you had did not prevent
23  you from being promoted to a captain, right?
24   A.   No, they didn't.

25 (Pages 94 to 97)

Price, et al.                                    v.                              Chaffinch, et al.
Joseph N. Forester                        C.A. # 04-956-GMS                  December 22, 2005

Page 98

1    Q.   Whatever hearing issues you had did not prevent
2    you from capably performing your duties as a captain,
3    as a lieutenant and as a sergeant.  Is that right?
4    A.   No, they didn't, not in my mind.
5    Q.   I'm sure you felt you did a good job, right?
6    A.   Right.
7    Q.   In fact, you got promoted to be major.
8    A.   I gave them 100 percent.
9    Q.   Right.  Whatever hearing issues you had didn't
10   prevent you from doing your job well as a major.  Is
11   that right?
12   A.   In my opinion.
13   Q.   And then I think -- I didn't copy it it was so
14   short.  There's your disciplinary record at the State
15   Police.  I think you might have had an automobile
16   accident or something like that.  You might have had
17   one or two things.
18   A.   I can tell you that incident like it happened
19   yesterday.  You always remember your first one.
20   Q.   Is that right?  But my point is whatever your
21   disciplinary record was it was just a summary
22   discipline record.  Is that right?
23   A.   Yes.
24   Q.   Whatever your discipline record was, it didn't

Page 99

1    prevent you from being promoted to the next rank, did
2    it?
3    A.   Never.
4    Q.   There was nothing in your disciplinary record
5    that prevented you from being promoted to any of these
6    ranks, right?
7    A.   Never.
8    Q.   Is that just because summary discipline is not
9    something that's held as a black mark against you with
10   the State Police?
11   A.   Well, if I may, I'll expand on that a little
12   bit.
13   Q.   Yes.
14   A.   The way I always dealt with summary
15   punishment -- and I don't recall either one of these
16   three gentlemen ever having to come before me.  Wayne
17   was really the only one that worked under me in a
18   troop capacity.  And I don't recall, maybe he would,
19   but I don't recall him having any.
20       But I always tried to tell the people
21   "Look, this is minor stuff here.  You did something
22   wrong.  We're here to correct it, learn from it and
23   let's move on."  I said, "I don't think of you as any
24   less of a person today than I did yesterday or that

Page 100

1    I'm going to do tomorrow.  We all have a job to do.  I
2    expect you to do your job."
3        The other thing is I always gave them the
4    opportunity to say something and listen to them; let's
5    hear what you have to say.  You know, I might not
6    agree with what you're going to tell me, but I always
7    gave them the opportunity to talk to me and we move
8    on.
9        That's the way I tried to do business.
10   Q.   All right.
11       MR. NEUBERGER:  Robert, can we just step
12   outside in the hall for a second?  I think we're done.
13   I just want to check with my clients.
14       MR. FITZGERALD:  Sure.
15       (A brief recess was taken.)
16       MR. NEUBERGER:  I don't have any other
17   questions.
18       Mr. Fitzgerald has the opportunity to ask
19   questions.
20   BY MR. FITZGERALD:
21   Q.   Major Forester, you testified earlier that you
22   said that if you -- this was in respect to a
23   conversation that you had with Colonel Ellingsworth.
24       You indicated that you told him that if

Page 101

1    you had a hearing problem that could not be corrected
2    you couldn't stay in.
3        Do you remember that?
4    A.   That I would retire, correct.
5    Q.   Why did you take that position?
6    A.   Well, several things.  You know, if it was
7    going to create a problem for him, I had enough
8    respect for the man that I was not going to let it be
9    a problem, number one.
10       But, number two, the other thing is it was
11   more important to me that if it was a situation where
12   it was going to affect the way I could do the job and
13   do it right, I'm out of here.
14   Q.   Okay.  In your own mind when you talk about
15   what could and could not be corrected, what did you
16   mean by "corrected"?
17   A.   Well, where I felt that I could, you know,
18   perform my job, where I could hear things and
19   distinguish things and make sure that I wasn't going
20   to miss anything in the performance of my duties.
21   Q.   I want to go back a little bit to Exhibit 1,
22   some of the pages in there.  I don't know if you still
23   have a copy of that or not.
24       MR. NEUBERGER:  Here you go.

26 (Pages 98 to 101)

Price, et al.                                       v.                            Chaffinch, et al.
Joseph N. Forester                          C.A. # 04-956-GMS                    December 22, 2005

Page 102

BY MR. FITZGERALD:
1
2    Q.   And there were questions about your physical in
3    1992 which are on pages D14994 and 995.  It's about
4    halfway through.
5    A.   14995?
6    Q.   94 and 95.
7    A.   Gotcha.
8    Q.   And there were questions about the markings
9    from the doctor about an abnormal audiometric screen
10   and a synopsis of mild diffuse hearing loss bilateral,
11   otherwise within normal limits, WNL.
12        Do you remember those questions?
13   A.   I see that down there again.  These all have my
14   signatures on them, all have my writing on them.
15        Do I remember these, per se?  You know, I
16   can say with that signature on it and that date that
17   that's what was said and done on that day.
18   Q.   Let's talk about that a little bit.
19        You will see a fifth of the way down on
20   page 95 the title Physical Exam.
21   A.   Correct.
22   Q.   Is there anything underneath that that you
23   wrote?
24   A.   No.  That's not my writing, no.

Page 103

1    Q.   And what's the date of that exam in the bottom
2    right-hand corner?
3    A.   6-1-92.
4    Q.   Now, above Physical Exam there is your
5    signature, correct?
6    A.   Yes.  That's my signature, yes.  And the
7    numbers are mine, that 5/26/92 are mine.
8    Q.   And everything above your signature going back
9    onto page 94, is that something you filled out?
10   A.   The writing part of it I know is mine and I'm
11   assuming I'm also the one who did the checks because I
12   happened to look through the childhood diseases and
13   those other things and those are the things I had, so
14   I'm saying yeah, that's mine.
15   Q.   Looking at the dates, isn't it true that you
16   filled this out before the doctor filled his part out?
17   A.   I don't know.  We have got 6-1-92 is in the
18   upper right-hand corner of D14994, but on I guess it
19   would be page D14995, which would be the second page,
20   the date is 5/26/92 where I signed it.  I hadn't
21   noticed that earlier.
22   Q.   Do you recall whether or not you got this form
23   before you went to the doctor's office and filled it
24   out?

Page 104

1    A.   I would say that's probably exactly what
2    happened.  We must have got them out of personnel.
3    Maybe they gave them to you ahead of time to fill out.
4    I don't know.
5    Q.   Well, anyway, you find out in '92 from
6    Dr. Bruce Jacobs that -- did he share these results
7    with you?  Do you recall?
8    A.   I'm sure he did.  I'm sure he did because we
9    always sat down and talked after you went through it.
10   Q.   On page 94, going back to the front in the
11   section of the medical history with the heading HEENT,
12   you did not check the section loss or decreased
13   hearing.  Is that correct?
14   A.   Where are we here?  You're going to have to
15   help me.
16   Q.   HEENT, the loss or decreased hearing section,
17   you did not check.  Is that correct?
18   A.   It's not checked, no.
19   Q.   Then you went and had a physical in 1994 and
20   this is on page 92, right?
21   A.   Okay.  Mm-hmm.
22   Q.   And on the first page of 92 you did check loss
23   or decreased hearing.
24   A.   Correct.

Page 105

1    Q.   Was that as a result of the physical exam you
2    had in 1992 where the doctor said you had mild diffuse
3    hearing loss bilaterally?
4    A.   I don't know.  I don't know if it was that or
5    just my own recollection of the time or maybe from
6    what was made available to me earlier, that maybe my
7    family had been saying something to me, but I
8    certainly have it checked.  I can't give you a
9    definitive reason why, but there must have been
10   something there that told me that my hearing is not
11   what it used to be.
12   Q.   But you testified earlier that prior to going
13   onto the executive staff sometime in '94 that you
14   didn't experience any hearing problems?
15   A.   I don't know if that was the exact wording.  I
16   think what I would like to clarify and make sure is
17   that I don't recall until I was on the executive staff
18   that I had a hearing situation where I needed to have
19   it corrected.
20   Q.   Okay.  Well, again, sitting here now looking
21   back, do you recall prior to '94 having hearing
22   problems, notwithstanding the testimony, the document
23   in '92?
24   A.   Right.  I guess the best way for me to describe

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Price, et al.                                    v.                            Chaffinch, et al.
Joseph N. Forester                    C.A. # 04-956-GMS                    December 22, 2005

Page 106

1   me being aware that I needed to have hearing
2   correction was when I was on the executive staff I
3   was, number one, on the phone more often and, number
4   two, in meetings more often.  And those were the two
5   areas where I noticed I was having to tell female
6   callers could you repeat that or could you speak up,
7   please, and in rooms with background noise I really,
8   really had to zero in on the speakers to make sure I
9   didn't miss anything.
10      Q.   Did any doctor in an annual physical exam or
11   your family doctor or Dr. Smith, your ENT, ever tell
12   you that in their opinion you were unfit for duty?
13      A.   Never.
14      Q.   Do you know whether or not Dr. Green at any
15   time ever told anyone at human resources or at the
16   Delaware State Police that in his opinion you were
17   unfit for duty?
18      A.   I'm not aware of him doing it because I have a
19   feeling that if he did do it I would have been sent to
20   one of those tests that was mentioned earlier.
21      Q.   Do you know what rank and assignment Aaron
22   Chaffinch had in 1997?
23      A.   In 1997?  I think he was still a captain.  It
24   was sometime -- I don't think he made major then.  I

Page 107

1   think he was still a captain.  I'm going to say
2   captain, to the best of my recollection.
3      Q.   Was he ever on the executive staff when you
4   were on the executive staff?
5      A.   Yes, he was.
6      Q.   Can you recall the overlap?
7      A.   I'm going to say he made that sometime, he made
8   major after Colonel Ellingsworth retired.  And Colonel
9   Ellingsworth I'm going to say retired in -- I don't
10   know -- I thought '98, maybe even '99.  I'm not 100
11   percent sure.
12          Then that's when Chaffinch made -- you
13   know, I want to say it was in '99 because it was right
14   during that election time because there was actually a
15   question of when if he was going to be appointed
16   because they wanted to know if this governor should do
17   it or should the next governor do it.
18          I'm going to say '99 if I had to get the
19   okay on that.
20      Q.   Do you know what rank and assignment Tom
21   MacLeish was in 1997?
22      A.   Captain is my best guess.
23      Q.   Was he on the executive staff at the time?
24      A.   No.

Page 108

1      Q.   At any time when you were on the executive
2   staff?
3      A.   No. He didn't make the executive staff until
4   after I retired.
5      Q.   Do you have any idea what rank and assignment
6   current Captain John Yeomans was in 1997?
7      A.   He was up at headquarters and John worked in
8   personnel while I was up there and he also worked in
9   internal affairs.  And I think he came out of Troop 3,
10   but don't hold me to the book on that.  I think he
11   worked at Troop 3, IA and personnel, if my memory
12   serves.
13      Q.   Have you ever worked with Chris Foraker?
14      A.   I never worked with Chris, per se.  We were in
15   each other's chain of command.  I just worked with him
16   when he was up at the range either in charge of it or
17   as one of the workers up there.
18      Q.   Do you have an opinion as to his reputation for
19   competency as a trooper?
20      A.   Well, I have my opinion of him.
21      Q.   What is that?
22      A.   And that is that he's extremely competent.
23      Q.   Is that your opinion today?
24      A.   Well, I'm five-and-a-half years removed, but I

Page 109

1   don't have any reason to change it.
2      Q.   Do you have any opinion as to his ability to
3   run and manage a firing range?
4      A.   I can only speak for when I was there and I
5   never saw anything that I wouldn't say he was doing
6   absolutely right.
7      Q.   Has anything happened since you formed that
8   opinion that would make you change that opinion?
9      A.   Nothing has happened since I retired that makes
10   me change that opinion.
11      Q.   That would make you question that opinion?
12      A.   No.
13      Q.   Since your retirement have you followed some of
14   the goings-on with the Delaware State Police in the
15   Delaware media?
16      A.   I've read articles in the paper.
17      Q.   Do you make it, is it a practice of yours to
18   read all of those articles or do you sometimes try to
19   avoid them?
20      A.   No.  I read them.  They're not always pleasant
21   reading, but I read them.  I mean, I gave them 28 plus
22   years of my life, so I still read about them, the good
23   and bad.
24      Q.   Let me try to take you back.  I don't have a

28 (Pages 106 to 109)

Price, et al.                                      v.                              Chaffinch, et al.
Joseph N. Forester                        C.A. # 04-956-GMS                      December 22, 2005

Page 110

1  copy of it in front of me.  But there was in April of
2  2004 a front-page article in The Delaware State
3  News --
4      A.  Okay.  Let me stop you right there because I
5  don't get The State News.
6      Q.  So you would not have read that?
7      A.  Not that one, no.  I get The Evening Journal or
8  The News Journal, whatever it's called.
9          MR. FITZGERALD:  That's all I have.
10         MR. NEUBERGER:  The News Journal would be
11  happy to hear that, and The State News sad.
12         Major Forester, I don't have any other
13  questions.  I really do appreciate your time here.
14         THE WITNESS:  Thank you very much.
15         (Deposition concluded at 12:20 p.m.)
16
17
18
19
20
21
22
23
24

Page 112

1
2
3          REPLACE THIS PAGE
4          WITH THE ERRATA SHEET
5          AFTER IT HAS BEEN
6          COMPLETED AND SIGNED
7          BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 111

1              I N D E X
2  DEPONENT: JOSEPH N. FORESTER          PAGE
3    Examination by Mr. Neuberger        2
     Examination by Mr. Fitzgerald      100
4
            E X H I B I T S
5
   FORESTER DEPOSITION EXHIBITS          MARKED
6
   1 Documents from Joseph Forester's
7     personnel file                   4
8  2 Joseph Forester's summary disciplinary
     action forms                      21
9
   3 Hearing test results, two pages    30
10
   ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 112
11
   CERTIFICATE OF REPORTER             PAGE 113
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 113

1  State of Delaware  )
                      )
2  New Castle County  )
3
4        CERTIFICATE OF REPORTER
5
6      I, Kurt A. Fetzer, Registered Diplomate
   Reporter and Notary Public, do hereby certify that
   there came before me on Thursday, December 22, 2005,
7  the deponent herein, JOSEPH N. FORESTER, who was duly
   sworn by me and thereafter examined by counsel for the
8  respective parties; that the questions asked of said
   deponent and the answers given were taken down by me
9  in Stenotype notes and thereafter transcribed by use
   of computer-aided transcription and computer printer
10 under my direction.
11     I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12 examination of said witness.
13     I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16
17        Kurt A. Fetzer, RDR, CRR
          Certification No. 100-RPR
18        (Expires January 31, 2008)
19
   DATED:
20
21
22
23
24

29 (Pages 110 to 113)

Price, et al.
Joseph N. Forester

v.
C.A. # 04-956-GMS

Chaffinch, et al.
December 22, 2005

**A**

**Aaron** 1:7,12 106:21
**ability** 3:21 75:2 83:15
  109:2
**able** 42:3 43:5,9,12,15
  43:18 47:13 58:14
**abnormal** 38:18 61:15
  76:21 78:12 88:12
  102:9
**absolutely** 44:12,17,21
  46:4,15 52:15 53:4
  54:7,12 56:19,22 60:1
  67:3 71:7 78:6 83:7
  109:6
**academy** 5:20 6:2,7,10
  70:22
**accident** 7:16 69:10
  98:16
**accommodate** 49:6
**action** 1:5,10 44:7
  111:8
**addition** 70:13
**additional** 17:23 18:2
**address** 2:16
**Administration** 11:1
**advanced** 6:5
**advice** 37:5
**affairs** 108:9
**affect** 101:12
**aggressive** 8:1
**ago** 28:18 52:13 67:12
**agree** 68:2 100:6
**agreed** 92:17
**agreement** 52:3
**ahead** 7:14 13:10 42:18
  73:24 82:19,21 87:4,5
  104:3
**aid** 43:18 59:6
**aids** 26:11,18 27:5,10
  27:12 28:4,8,23 38:22
  39:20 41:20 47:12
  48:24 49:3,4,13,19
  50:13 52:10 55:2,15
  57:12 58:24 59:6,17
  81:14,16 82:3,4,11
  93:6 94:8 96:10
**al** 1:4,7,12 56:1
**Alan** 50:3 52:16 53:12
  55:9,20,21 61:19
**Allen** 85:19,21
**allowed** 4:2 37:5,7
**amounted** 11:11
**annual** 39:2 60:8 63:7
  73:22 75:19 76:14
  81:8 83:1 85:5 86:3,7
  87:10 93:22 106:10
**annually** 35:23

**answer** 4:1 68:10 76:12
  90:1 91:20
**answered** 66:18 68:24
  75:1
**answering** 83:13
**answers** 28:16 113:8
**anybody** 19:23 48:6
  49:1,8,9 56:10 58:24
  73:8
**anymore** 59:2
**anyway** 20:17 64:13
  81:19 104:5
**Apparently** 14:21
**appear** 4:24 30:14 31:1
  76:9 88:24
**APPEARANCES** 1:18
  2:1
**appears** 76:12 85:21
**appointed** 20:2 107:15
**appreciate** 110:13
**approximate** 70:16,19
**approximately** 26:17
  63:20
**April** 11:23 12:5 20:2
  110:1
**area** 34:11 36:20
**areas** 7:24 28:1 36:15
  106:5
**arrests** 43:10
**article** 110:2
**articles** 109:16,18
**aside** 14:10 34:22 39:1
  39:8
**asked** 5:6 14:23 33:16
  33:16 34:1 37:23
  58:2 61:1 66:14
  91:15 93:14 113:8
**asking** 28:14 39:1
  40:23,23 41:1 67:14
  77:15 83:20
**asks** 31:16
**assert** 33:1
**assigned** 6:17 7:16 8:7
  8:20 9:22 10:5,11,12
  10:13 11:24 12:6,14
  12:17,19 14:1,18,19
  15:9,16 16:5,17 18:20
  21:1 69:9
**assignment** 6:23 11:7
  11:17 12:1 13:23
  14:24 69:15 106:21
  107:20 108:5
**assignments** 5:22 6:3
  8:9 30:2 40:4 63:16
**assistant** 19:14 32:11
**assume** 45:4 48:19,20
  96:11

**assuming** 5:3 31:4 46:8
  57:13 75:21 103:11
**assumption** 46:9
**attempt** 28:17
**attended** 92:1
**attending** 6:2
**attention** 59:14
**attorney** 37:22 38:2
  61:12 113:13
**audiogram** 76:23 77:16
  77:19,23 78:2,5,13,16
  92:21,23
**audiologist** 33:17
**audiology** 30:6,8,14,23
  31:2,22,23 32:10,20
  32:24 33:7 35:10
  36:3,13 37:1 39:3
  41:7
**audiometric** 76:19
  85:12,13,16 86:13
  88:9 95:2 97:6 102:9
**auditory** 39:10
**August** 19:17 85:2,10
**authority** 54:4,9 60:3
**automobile** 98:15
**available** 105:6
**Avenue** 32:2
**Aviado** 65:3,12 66:1,4
**avoid** 109:19
**aware** 19:7 25:6 34:5
  41:19 58:9 61:18
  73:22 92:6 93:14
  106:1,18
**a-i-d-s** 94:9
**A-v-i-a-d-o** 65:15,16
**a.m** 1:16

**B**

**B** 1:4 2:5 111:4
**back** 4:14 7:5 8:20 9:2
  9:4,18,20,24 12:18
  15:7,9 20:20,21 21:13
  21:21 22:13 23:1
  31:17,20 35:16,18
  38:20 39:17 42:17
  45:15 46:2,16,17,18
  46:21 48:1,10,18,22
  53:12 54:14 55:7
  56:4 58:10 59:13,22
  60:2 61:18 62:4
  63:16 65:11 69:3,4
  71:8 75:10 82:1 83:8
  83:17 85:7 97:4
  101:21 103:8 104:10
  105:21 109:24
**background** 25:17
  27:23 29:8 40:14

106:7
**backtrack** 65:3
**bad** 5:14 48:19 109:23
**band** 13:6
**Barbara** 19:3 20:17
  21:6 24:19
**basically** 5:21 7:18
  8:20 15:2 31:9
**basis** 61:8
**Baylor** 19:21
**Beach** 7:3,5,9,10,12
  16:9
**Beach/Rehoboth** 7:4
**beeps** 35:1
**began** 39:20
**beginning** 1:16 22:19
  63:16
**believe** 22:23 28:10
  61:9 62:1 65:15
  95:12
**bell** 89:15
**best** 28:15,17 39:6 75:2
  76:12 78:24 83:14
  105:24 107:2,22
**bet** 61:19
**better** 59:21 65:8
**big** 5:24 44:7
**bilateral** 93:5 102:10
**bilaterally** 77:6,11
  105:3
**Bill** 80:6,7
**bit** 26:15 50:24 80:16
  99:12 101:21 102:18
**black** 99:9
**block** 15:17
**blue** 2:18,18
**board** 19:24 58:15
**book** 108:10
**born** 2:23 55:4
**bottom** 62:5 66:12
  71:13 72:15 75:13
  77:3 85:20 86:19
  88:15 89:18 91:9
  94:14 103:1
**box** 53:10 83:23
**brain** 35:1
**brainstem** 39:10
**break** 3:14,15 79:18,20
**Bridgeville** 7:22 20:24
  21:1 22:9 24:10
**brief** 79:21 100:15
**Broad** 2:3
**Bruce** 75:14 76:6 104:6
**building** 57:17,20
**business** 100:9
**button** 35:5
**buy** 96:10

**C**

**California** 96:11
**call** 8:1 10:22 75:15
**called** 3:24 8:2 25:20
  39:10 44:5 54:10
  89:14 92:11 110:8
**callers** 106:6
**Camden** 24:3
**capably** 98:2
**capacity** 99:18
**captain** 15:13,14,20,24
  19:3 20:17 21:3 22:8
  25:12,13 40:4,19,22
  42:24 46:7,8 63:15,20
  80:11,20,22 97:23
  98:2 106:23 107:1,2
  107:22 108:6
**car** 5:15 45:21
**care** 10:7,15,15,18,19
  10:23 13:16 50:19
  53:13
**career** 5:21 6:4 16:23
  18:9,16 22:18 43:23
  46:6 69:3 73:21
  97:18
**carry** 45:17
**carrying** 53:20
**cars** 80:21
**case** 2:15 3:7 25:22
  26:2
**cases** 3:5
**Castle** 18:3 113:2
**caught** 24:20
**cell** 46:3,6,14,18 47:4,9
**center** 73:10
**certainly** 44:3,3,6
  59:20 68:4,12 78:3
  105:8
**CERTIFICATE**
  111:11 113:4
**Certification** 113:17
**certified** 81:9,13,14
  83:14
**certify** 74:24 92:17
  113:6,11,13
**Chaffinch** 1:7,12 20:3
  20:8,12 106:22
  107:12
**chain** 20:22 21:13
  22:13 56:16 73:17
  79:8,11 108:15
**chairman** 10:7,9
**chance** 45:9
**change** 65:2 109:1,8,10
**changed** 64:24
**charge** 10:14 24:13
  65:9 79:24 108:16

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Price, et al.
Joseph N. Forester

v.
C.A. # 04-956-GMS

Chaffinch, et al.
December 22, 2005

Page 115

**Charlie** 85:19,21
**charts** 32:20
**cheat** 5:23
**check** 2:15,17 83:23,24
  87:17,19 89:19 90:3
  91:22 92:20 100:13
  104:12,17,22
**checked** 76:21 88:12
  104:18 105:8
**checks** 103:11
**CHERYL** 1:19
**chicken** 5:2
**childhood** 103:12
**children** 71:17 72:1,5
**choice** 76:2
**Chris** 52:1,6,13 108:13
  108:14
**CHRISTOPHER** 1:9
  2:6
**circle** 93:3
**civil** 1:5,10 3:7
**civilian** 57:2 79:2
**clarify** 4:15 82:2
  105:16
**clarity** 59:22
**class** 6:14 7:11 9:9
  70:22
**clear** 28:14 84:10
**clients** 100:13
**closed** 29:7 34:17,20
**closer** 34:16,18 59:13
**clue** 87:3
**Cochran** 10:7
**collapse** 24:14
**colonel** 1:7,12 10:6
  17:19 48:10 51:1
  52:3,19 54:15,15,19
  55:8,9,10,12 56:1,7
  61:7 100:23 107:8,8
**color** 2:18
**column** 74:3 82:22
**columns** 92:24
**come** 43:18 45:11
  48:10 61:2 99:16
**comes** 48:1 53:16
**coming** 8:13
**command** 18:24 19:2
  20:22 21:13 22:13
  23:10,21 24:23 55:23
  55:24 56:11 73:17
  79:8,11 108:15
**commanded** 16:11,11
  45:3,7 80:21
**commander** 14:8,18
  15:10,19,24 16:2,5,7
  22:19 23:8,16,22 27:1
  42:13,19,21 43:24

44:3,6,10,14
**commanding** 78:21
  80:10 84:14
**comment** 86:14
**communicating** 29:1
  47:3,9
**communication** 45:18
  45:19
**communications** 46:24
**community** 14:19,21
**compensate** 59:7,11,17
  59:20
**competency** 108:19
**competent** 108:22
**complete** 85:5
**COMPLETED** 112:6
**computer** 113:9
**computer-aided** 113:9
**concerned** 56:10 58:6
**concluded** 35:7 110:15
**conductor** 89:3
**conference** 10:7,15
**confidential** 4:10 30:12
  95:23
**confidentially** 4:8
**Conley** 19:3 20:18 22:8
  25:13,13
**consistent** 26:5
**continue** 16:1
**continuing** 11:13
**control** 7:16 8:4 69:10
**Cont'd** 2:1
**convenient** 92:9
**conversation** 31:7
  36:16,17 37:24 38:1
  51:1 52:1,6,14 54:15
  54:22 61:12 67:8,18
  67:20 89:10 100:23
**conversations** 29:23
  37:10
**copied** 5:6
**copy** 4:17 5:17 98:13
  101:23 110:1
**corner** 22:10 62:6,20
  86:19 87:20 103:2,18
**corporal** 1:4 9:13 10:1
  69:5,6,9,20 79:23
  80:18,22 97:12
**Corporals** 25:21
**correct** 2:24 3:6 4:16
  5:11 6:24 7:13 9:10
  12:7,9 13:22 14:13,14
  15:4,6 16:8,20,21
  18:8,24 21:10 22:4,22
  23:11 24:5 25:2,19
  27:2,3,8 28:24 29:6
  29:10 32:11,17,19,22

34:21 36:2,10 38:3
  41:8 42:9,11,11,12,15
  42:23 43:2,3,4,8,11
  43:14,17,20,21 45:14
  46:20 47:2 49:17
  50:9 51:18 52:5
  53:21,22 54:1,2,11
  57:4,6,19,21,22 58:13
  59:9,11 61:5,6 62:15
  62:18,21,23,24 63:3,4
  63:5,13,15,19,21,22
  64:6,9,19,21,22 68:20
  68:23 69:8,10,18
  70:20,24 71:2,3,23
  72:3 74:5,22,23 75:4
  75:8 76:17,22 77:24
  78:2,17,21 81:15
  82:24 83:12,16,22
  85:3,6,9,11,18 86:5
  86:11,15 87:12,14,16
  87:24 88:2,3,8,14,17
  89:12,13 90:22,24
  91:1,2,7,14,19 92:2
  93:8,21 94:4,10 97:5
  99:22 101:4 102:21
  103:5 104:13,17,24
  113:11
**corrected** 58:13 101:1
  101:15,16 105:19
**correction** 106:2
**correctly** 9:1 53:8
**counsel** 113:7,13
**counties** 17:13,20 18:7
  18:16 20:8 23:16
**county** 7:21 8:8,10,11
  10:2 11:18 12:4
  14:12 15:8 16:20
  17:5 18:3,17,18,19
  27:2 42:10,11 44:14
  45:6 113:2
**couple** 3:8 16:4 37:13
  50:23 61:13 79:17
**course** 72:12
**Court** 1:1 4:3
**covered** 31:19,19
**create** 50:5,8 101:7
**created** 27:19 40:18
  41:1
**creates** 50:3,7
**creating** 40:8
**criminal** 3:4
**crisis** 43:13 44:19,22
  46:21 47:5,6
**critical** 80:19
**crowded** 36:15,15 59:5
**CRR** 113:17
**current** 16:10 34:3

65:4,12,13 108:6

_____

**D**

**D** 1:9 2:6 111:1
**date** 10:4 12:18 19:17
  71:22 84:8 102:16
  103:1,20
**dated** 74:4 93:19
  113:19
**dates** 12:16 103:15
**Dave** 19:21,23 20:2
**day** 10:16,17 55:19
  57:23,24 61:20,21
  102:17
**days** 12:15
**dead** 59:11
**dealing** 49:5 58:11
**dealings** 44:4
**dealt** 58:24 99:14
**death** 53:24
**December** 1:16 7:17
  8:12 33:2 113:6
**decibel** 36:10,21,22
  47:23
**decided** 84:19
**decision-making** 44:24
  45:13 46:23
**decreased** 83:21 84:2,6
  87:18 91:5 94:6
  104:12,16,23
**Defendants** 1:8,13 2:4
**deficiencies** 113:1
**definitely** 46:13 55:10
**definitive** 105:9
**degree** 73:2,6
**Delaware** 1:2,15,21,23
  2:19 25:22 26:6,12
  37:23 38:2 43:1 48:4
  51:15 53:18 54:3,9
  60:9 62:23 63:8,11
  67:4 72:20 78:22
  79:9 83:3 84:11
  87:22 90:6 97:1
  106:16 109:14,15
  110:2 113:1
**demonstrating** 31:15
**dented** 5:15
**deponent** 2:9 111:2
  112:7 113:7,8
**deposition** 1:14 3:2
  4:20,21 17:18 21:23
  30:18 37:6,22 110:15
  111:5
**deputy** 14:8,18 15:10
  57:5
**describe** 105:24
**described** 28:22 39:15

**details** 26:15
**determine** 36:24 60:4,8
  79:5,12
**determining** 53:19
**devices** 58:16
**Dewey** 7:3,4,5,9,10,12
  16:9
**difference** 13:11 59:22
**different** 4:1 6:5 81:2
**difficult** 59:9
**difficulties** 27:11
**difficulty** 29:9 40:3
  66:15 67:14,22 68:3
  71:9,10 73:16
**diffuse** 77:5,10 102:10
  105:2
**Dillman** 48:13 49:18
  57:2,8,11 58:2
**Diplomate** 1:16 113:5
**direct** 54:16
**directed** 90:7
**direction** 8:14 34:5
  113:10
**director** 14:20 19:5,14
  57:3
**disciplinary** 98:14,21
  99:4 111:8
**discipline** 5:7 21:11
  22:7 98:22,24 99:8
**discuss** 47:16 48:3
**discussion** 67:11
**discussions** 36:9
**diseases** 103:12
**dispute** 78:4,18,19
  95:18
**disrepair** 14:22
**distinguish** 101:19
**DISTRICT** 1:1,2
**division** 25:2 49:22
  70:14,15,18
**doctor** 33:18 34:4 36:1
  36:3 53:13 55:15
  64:5,18,20 65:6,12,21
  65:23,24 66:10 75:14
  75:22,23 76:3,3,7,8
  76:21 77:9 85:17,19
  85:23,23,24 86:1,3,14
  88:15 96:4,14,14
  102:9 103:16 105:2
  106:10,11
**doctors** 64:24 65:10
  76:10 96:5
**doctor's** 60:17 74:7
  75:13 78:8,10,14
  103:23
**document** 5:2 78:20
  86:20 105:22

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Price, et al.
Joseph N. Forester

v.
C.A. # 04-956-GMS

Chaffinch, et al.
December 22, 2005

Page 116

**Documents** 111:6
**doing** 36:13 81:17
  98:10 106:18 109:5
**double** 11:10,12
**doubt** 25:11,15 51:2
**Dover** 11:5 12:6 32:1,8
  92:4 96:4,14
**Dr** 31:24 32:8,16,21
  34:7 39:5,21 41:7
  42:2 47:17 60:5 64:6
  64:7,13 65:3,10,12
  66:1,4,5,7 77:23
  88:16,18 89:11,19
  91:9,13,20 92:16
  93:13 94:11 96:15,17
  96:17 104:6 106:11
  106:14
**Drive** 2:19
**driving** 8:1
**drop** 16:4
**DSTA** 50:23
**due** 31:8
**duly** 2:10 113:7
**duties** 26:3 79:14 97:19
  98:2 101:20
**duty** 8:20 9:22 10:12
  11:10,12 53:6,16
  54:10,17 56:23 58:3
  72:21 73:18,20 78:23
  79:1 84:12,15,19
  90:12 93:10 94:15,23
  106:12,17
**D14** 62:6
**D14994** 72:15 74:1
  102:3 103:18
**D14995** 103:19
**D14996** 66:9

**E**

**E** 111:1,4
**ear** 25:3,5,5 48:23 59:3
  86:21 88:24 89:1,6
  92:23
**earlier** 39:24 53:3
  70:22 72:18 75:6
  77:22 91:13 96:3
  97:12 100:21 103:21
  105:6,12 106:20
**early** 6:11 42:14
**earphones** 34:22
**ears** 27:7 31:13 58:16
  66:12
**east** 1:15,20 7:23
**eight** 13:19 63:21 71:1
**eighties** 20:20
**either** 56:24 58:3 76:2
  99:15 108:16 113:13

**election** 107:14
**electrodes** 34:24
**Ellingsworth** 48:9,10
  51:1 52:3,8,19 54:15
  54:16,20 55:10,20,21
  100:23 107:8,9
**else's** 78:14
**emotional** 53:24 54:1
**ended** 13:7 20:3
**enforcement** 7:19 8:2
  43:3,6
**enforcement/traffic**
  7:19
**ENT** 32:5 96:7,8,14
  106:11
**entire** 7:21 56:9,9
**entity** 33:23
**equal** 31:4
**Eric** 34:9,10
**ERRATA** 111:10 112:4
**ESQ** 1:19,19 2:2
**et** 1:4,7,12
**Evening** 110:7
**event** 113:14
**eventually** 28:22
**everybody** 24:15 49:14
  49:15 56:13,17 95:24
**exact** 36:17 105:15
**exactly** 9:6 17:10 18:1
  18:4 31:18 42:20
  50:15 57:16 70:2
  104:1
**exam** 53:6 54:17 56:23
  58:3 72:21 73:18,20
  75:11 76:14 78:23
  79:1 84:12,16 90:12
  93:10 94:22 102:20
  103:1,4 105:1 106:10
**examination** 2:12
  111:3,3 113:12
**examinations** 37:14
  54:6
**examined** 2:10 113:7
**example** 22:18 47:3
  51:16 53:23 60:12
**exams** 54:10
**executive** 16:18 17:2,3
  17:11 26:19 27:15
  29:22 30:3 40:10
  105:13,17 106:2
  107:3,4,23 108:1,3
**exercising** 53:20
**exhibit** 4:20,21 21:16
  21:23 30:10,17,18
  32:24 62:1 101:21
**EXHIBITS** 111:5
**expand** 99:11

**expect** 100:2
**expected** 43:5,9,12,15
  43:18
**experience** 51:5 105:14
**experiencing** 49:24
  87:18 97:13,17
**Expires** 113:18
**explain** 36:12
**extremely** 108:22
**eyes** 50:19 51:24
**e-a-r** 25:5

**F**

**facility** 31:22
**fact** 19:10 21:4 23:11
  26:22 31:8 53:3 64:4
  78:18 86:6 98:7
**fair** 8:12 11:16 18:9
  28:2,19,20 44:22 72:4
  96:23
**fallen** 14:22
**familiar** 51:9 56:5
**family** 29:11 33:18
  34:4 41:17 53:24
  64:5,18,20 66:10
  75:22,23 76:3,7,8
  85:23 86:1 96:5
  105:7 106:11
**far** 32:14 46:17 49:23
  56:10 58:7 97:4
**father-in-law** 58:23
**FBI** 47:9
**February** 6:11 15:18
  15:22 16:6 22:20
**feel** 5:17 47:13
**feeling** 106:19
**fell** 18:23
**felt** 40:24 98:5 101:17
**female** 29:2 40:13
  45:17 106:5
**Fetzer** 1:16,23 113:5,17
**fifth** 102:19
**file** 4:9 5:1 62:2 73:1
  78:1 111:7
**files** 57:14
**fill** 64:1 80:15 83:2
  104:3
**filled** 63:6,14 71:19,22
  74:8 75:5 76:13 83:6
  85:2 103:9,16,16,23
**fills** 85:17
**final** 44:7
**find** 24:17 62:10 72:16
  81:21 83:18 87:8
  104:5
**fine** 4:5 41:13 95:11
**finished** 6:12

**firearms** 81:9
**firing** 109:3
**Firm** 1:15,20
**first** 2:9 4:11 6:14,22
  7:11 9:8 11:16 12:18
  13:14 15:18 28:10
  29:11,19,21,23 34:9
  35:10 37:1 39:3,18,24
  41:1 42:2,21 55:17
  57:21 61:21 63:23
  64:14 65:16 87:13,17
  87:20 89:8 91:4 97:6
  98:19 104:22
**fit** 84:19 94:15,23
**fitness** 53:6,16 54:5,10
  54:16 56:23 58:3
  72:21 73:18,20 78:23
  79:1 84:12,15 90:12
  93:10
**Fitzgerald** 2:2 4:12
  21:17,22 30:20 67:18
  79:17 96:17 100:14
  100:18,20 102:1
  110:9 111:3
**five** 62:4
**five-and-a-half** 108:24
**flip** 62:4
**floor** 57:18,21
**flush** 59:3
**focus** 23:17
**follow** 16:3
**followed** 109:13
**following** 14:7
**follows** 2:11
**Foraker** 1:9 2:6 50:22
  51:4 108:13
**foregoing** 113:11
**Forester** 1:14 2:8,14
  4:20,21 21:23 22:3
  30:18 62:1 100:21
  110:12 111:2,5 113:7
**Forester's** 111:6,8
**forget** 32:12
**forgot** 35:8
**form** 78:11 83:2,4 84:8
  85:2 103:22
**formed** 109:7
**forms** 45:18 85:5 91:24
  111:8
**forward** 5:20 6:4 72:15
  82:17 84:21 90:14
**found** 24:19 51:4 73:1
  90:16 94:11 95:18
**foundation** 21:20
**four** 7:20 92:24
**frame** 20:23 23:7 30:7
  40:9 55:13 61:16

**frequency** 86:17
**friends** 50:16
**front** 38:5,8,10,12
  61:24 66:9 67:7,10
  94:2,5 104:10 110:1
**front-page** 110:2
**full** 34:8 43:3
**function** 9:4 18:16
  50:23 90:6
**functions** 43:6
**further** 56:4 113:11,13

**G**

**gathered** 10:14
**general** 32:4 34:11
  74:10
**gentleman** 37:11
**gentlemen** 99:16
**Georgetown** 2:19 7:23
  64:10,12 66:3 80:11
  80:15,19
**getting** 8:13
**give** 64:1 74:7 105:8
**given** 30:6 39:9 95:3
  113:8,11
**gives** 86:20
**giving** 28:17 60:8 63:24
**glasses** 50:11,20 52:9
  58:13
**go** 7:4 12:16 13:10
  14:23 17:1 20:20
  23:1 31:8 32:6 33:23
  34:14,15 42:18 44:4
  50:19 55:15 62:8
  66:11 69:3 70:3 71:8
  72:14 75:20 77:2
  79:3,16 81:13 82:1,20
  83:17 84:11,15,21,23
  85:7,12 86:23 87:5
  88:4 90:21 92:7
  93:14 95:10 96:9,11
  101:21,24
**goes** 56:4
**going** 4:6 5:19 13:7
  16:3 21:11,18 25:18
  26:14,20 28:15 30:3
  30:15 31:3 33:14
  34:2,3 35:15,18,20
  37:1 39:6,21 41:13
  44:6 46:2,21 47:6
  52:14 53:13 54:24
  55:3 60:2 62:12
  69:17,20 76:3 82:21
  86:10 89:9 95:12
  100:1,6 101:7,8,12,19
  103:8 104:10,14
  105:12 107:1,7,9,15

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Price, et al.      v.      Chaffinch, et al.
Joseph N. Forester    C.A. # 04-956-GMS    December 22, 2005

Page 117

107:18
**goings-on** 109:14
**good** 5:22 24:21 39:17
  45:9 50:6 51:7 71:17
  72:2 98:5 109:22
**Gotcha** 66:13 83:19
  85:15 87:9 102:7
**gotten** 26:7
**governor** 107:16,17
**Governors** 32:2
**graduate** 6:7
**Green** 88:16,18 89:11
  89:19 91:9,13,20
  92:16 93:13 94:11
  96:15,17 106:14
**guess** 3:17 17:21 18:19
  40:10 44:1 57:18
  59:10 60:19 66:8
  68:19,24 70:16,19
  103:18 105:24 107:22
**gun** 53:20
**guy** 31:16 34:2 80:24
**guys** 9:1 17:15

**H**

**H** 111:4
**half** 5:6 42:22 79:18
**halfway** 102:4
**hall** 100:12
**halls** 57:23
**handwriting** 22:2
  62:14 68:14 70:13
  78:13 87:13 88:22
**handwritten** 70:1
**happen** 25:21 49:11
  80:17
**happened** 9:17 16:13
  20:14 25:6 28:12,18
  46:24 53:11 98:18
  103:12 104:2 109:7,9
**happens** 8:17 9:11 10:3
  16:13 17:21
**happy** 110:11
**hard** 27:17 29:5 87:7
**head** 29:16
**heading** 83:7 104:11
**headquarters** 8:6,7,9
  8:14,16,17 10:5,11
  11:5,20 12:8,14,20
  14:11,19 15:5 16:17
  16:22 17:1 18:15
  24:9 57:17,20 69:15
  92:9 108:7
**headset** 31:13 35:5
  39:11
**headsets** 81:19
**Health** 62:22 63:9

89:14 92:1,11 95:6
**hear** 71:17 72:2,7 100:5
  101:18 110:11
**heard** 25:7,8,9 35:6
  47:21,22 49:8,9 50:14
**hearing** 25:17 26:4,11
  26:18 27:5,10,11,12
  27:19 28:4,7,21,23
  29:5,9,12,20 31:9
  32:14 36:14,14,20,20
  38:22 39:18,20 40:1
  40:12,19 41:2,6,11,18
  41:20 45:15 47:12,18
  48:3,13,17,24 49:2,3
  49:4,13,19,24 50:12
  50:12,18 52:10,10,20
  53:1 55:2,15 56:8,21
  57:12 58:6,8,12,16,23
  59:6,7,16,18 60:15
  61:14 66:15,15 67:14
  67:22,22 68:3,3,8,10
  68:18,21 70:9,17 71:5
  71:9,9,10,10 72:6,19
  73:2,6,11,16,16 77:6
  77:10 79:6,12 81:14
  81:16 82:3,4,11 83:18
  83:21 84:2,6 87:17,18
  89:2,4,5 90:7 91:5
  93:5 94:6 96:4,5,9,10
  96:23 97:3,11,13,17
  97:22 98:1,9 101:1
  102:10 104:13,16,23
  105:3,10,14,18,21
  106:1 111:9
**heat** 82:14
**hectic** 24:12
**HEENT** 104:11,16
**held** 99:9
**help** 5:23,24 80:4 95:7
  104:15
**helping** 11:20
**Heron** 2:18
**hiding** 49:20
**high** 7:24 39:11 47:21
  47:23 82:14 86:16
**higher** 36:10,20,22
  47:18
**highest** 51:12,22
**highest-ranking** 57:8
**Highway** 10:24 11:2
**historic** 26:5
**history** 62:20 74:10
  83:3 87:14 104:11
**hit** 38:18 61:2
**hold** 108:10
**home** 33:15 53:24
**honestly** 13:13 49:9

**honesty** 51:17,23
**Hopkins** 60:13 73:9
  79:4
**hospital** 32:3
**hot** 82:5,8
**hour** 79:18
**human** 48:4,6 73:1,5,8
  84:10 90:6 94:3
  106:15
**humid** 82:5
**humidity** 82:14
**H-e-r-o-n** 2:18

**I**

**IA** 108:11
**idea** 19:20 108:5
**identification** 4:22
  21:24 30:19
**identified** 4:14
**impact** 44:7
**important** 101:11
**impressions** 33:3
**improve** 50:20 59:24
**incident** 80:10,10,19
  89:8 98:18
**included** 18:2
**independent** 60:4,7,14
**indicate** 94:6
**indicated** 91:4 100:24
**indicates** 64:4,5 75:5
  78:1,15
**indicating** 70:17 71:4
  84:1 85:13 86:22,23
**individuals** 50:17
**information** 11:3 14:2
  14:4 18:15 81:3
**informed** 79:15
**initial** 6:2
**interacted** 57:15
**interested** 113:14
**interfere** 3:21 79:13
**internal** 108:9
**interpret** 87:1
**interval** 14:10
**invoices** 45:17
**involved** 21:12 26:7
  44:11,15,19,23 45:12
  47:4,7 80:20
**involvement** 43:22
**involves** 39:11
**issue** 41:23 52:20
**issued** 46:10
**issues** 26:2,4 40:20
  41:2,6,11,18 48:13,17
  49:24 53:2 54:1 56:8
  56:21 96:5,23 97:13
  97:17,22 98:1,9

**J**

**J** 2:2
**Jacobs** 75:14 76:6
  104:6
**January** 13:20 31:9
  113:18
**Jerry** 54:21 55:23
  56:18
**job** 10:20,20 21:5 35:18
  40:18 42:3,3 47:13
  49:12 51:8,8 89:23
  91:16 92:18 94:12
  98:5,10 100:1,2
  101:12,18
**Joe** 50:5
**jog** 39:23 41:9,14 52:12
  80:14,23
**jogs** 30:15 92:10
**John** 48:13 49:18 57:2
  57:8,11 58:2 108:6,7
**Johns** 60:13 73:9 79:4
**Joseph** 1:14 2:8 22:3
  111:2,6,8 113:7
**Journal** 110:7,8,10
**July** 10:16 15:9 16:15
  16:19 17:1 30:4
  40:15 41:3
**jump** 82:19 87:4
**jumping** 45:15
**June** 14:8,12,24 63:1,3
  71:19 74:4 78:21
**jury** 4:3

**K**

**keep** 5:7 43:15 82:9
**Kent** 17:5 18:6,16,19
  20:13 23:16 27:1
  32:4 34:11 42:10,11
  44:14
**kept** 4:10 95:23
**kidding** 7:8
**kind** 25:12 30:15 31:1
  36:7 39:12
**kinds** 5:18 28:3,6 46:23
  63:24 82:10
**King** 1:23
**knew** 19:8,8 49:2,3,14
  49:15,19 56:10,17,20
  57:11
**know** 3:11,14,17,18 5:7
  5:12,16 6:5,9 9:3
  10:19 12:15 17:15
  19:3,9 20:6 22:16
  23:23 25:23 31:4
  33:14 35:6,12 37:15
  37:17 38:23,24 45:20
  45:23 47:22 48:17,19

49:5 50:14,15,20
51:15 52:13,13 53:15
56:8,14 57:14 58:10
58:14 59:1,8 61:16,22
64:24 65:1,9 75:18
80:2 87:1 89:4,16
95:10 100:5 101:6,17
101:22 102:15 103:10
103:17 104:4 105:4,4
105:15 106:14,21
107:10,13,16,20
**knowing** 55:16 61:17
**knowledge** 21:20 37:15
**known** 21:6 61:16
**Kurt** 1:4,16 2:5 25:21
  113:5,17

**L**

**L** 1:7,12 93:3,4
**lab** 86:6,9,10,10
**Labor** 10:16
**lacking** 36:11
**ladies** 27:18
**landmark** 55:1
**large** 40:14
**late** 6:11
**law** 1:15 7:18 43:3,6
**lawyer** 67:4,12
**laying** 21:19
**learn** 36:12 58:6 99:22
**learned** 36:19
**led** 28:3,23 41:7
**left** 19:17,18 81:19
  86:21 88:24 89:1,6
  94:14 95:3
**left-hand** 62:19
**let's** 11:22 21:15 23:1
  23:17 30:10,17 45:4
  46:16,17 61:23 62:4,8
  72:12,14 79:16,19
  82:1,19,20 84:21,23
  85:1,12 87:4,5 88:22
  90:14,21 99:23 100:4
  102:18
**level** 30:1 32:14 60:15
  79:5
**levels** 36:10,21,22
  47:19,23
**Lewes** 34:16,19
**Lewis** 80:11,20,22
**lie** 24:20
**lieutenant** 12:10,24
  13:8,21,24 14:9 15:11
  15:12 17:19 21:3
  22:3,24 23:12,19,21
  23:24 24:4,9 44:2
  54:19 55:9 56:7

Price, et al.
Joseph N. Forester

v.
C.A. # 04-956-GMS

Chaffinch, et al.
December 22, 2005

Page 118

97:19 98:3
**life** 109:22
**life-threatening** 43:19
**limits** 102:11
**line** 11:21 68:17 70:4,5
 92:21
**lines** 69:24 76:18
**listen** 100:4
**little** 5:22 14:5 26:15
 50:24 56:4 62:5
 80:16 99:11 101:21
 102:18
**LLP** 2:2
**local** 11:1
**located** 64:12 65:18
**location** 16:10 92:1
**long** 13:2 14:3 16:1
 17:11 28:18 52:13
**longer** 34:3
**look** 26:14,16 28:15
 29:15 35:15 37:2
 41:13 61:23 62:19
 63:16 74:11 92:21
 99:21 103:12
**looked** 66:10
**looking** 20:23 30:21
 39:22 58:10 59:12
 103:15 105:20
**looks** 5:4 16:5 74:9
 76:24 89:3 92:23
 93:1,23
**loop** 44:24
**loss** 32:14 36:14,20
 41:2 47:18,24 48:3
 49:24 52:20 58:8
 59:7,18 60:15 66:15
 67:22 68:3 71:9,11
 72:19 73:2,6,16 77:6
 77:10 79:6,13 83:21
 84:2,5 87:18 89:2,4,6
 91:5 94:6 102:10
 104:12,16,22 105:3
**losses** 97:11
**lot** 27:23 53:23 59:20
**lots** 29:8
**loud** 41:22
**louder** 45:22 49:6,10
**luck** 13:17

**M**

**MacLeish** 107:21
**mailing** 2:16
**major** 2:14 16:14 18:17
 18:18,23 20:9,10,12
 26:24 40:21 42:10,24
 44:4,6 45:6,9 46:14
 73:10 98:7,10 100:21

106:24 107:8 110:12
**making** 13:7 46:9
**male** 50:17
**man** 49:10 101:8
**manage** 109:3
**march** 6:1,4,9,11 11:17
 93:19
**Marcin** 17:19 20:7
**mark** 4:6,11,19 21:15
 30:10 83:24 87:19
 99:9
**marked** 4:22 21:24
 30:19 62:1 111:5
**marked-out** 30:12
**markings** 102:8
**marks** 90:3 91:22
 92:20
**married** 21:7
**matter** 51:19
**McCRACKEN** 2:2
**mean** 5:6 8:7 20:12
 21:6 27:7 33:15
 40:17 57:13 78:6
 80:18 97:3 101:16
 109:21
**meaning** 43:23
**means** 53:19
**measure** 73:2
**measured** 73:5
**media** 109:15
**medical** 28:10 29:14
 30:13 34:11 38:4,7
 39:23 61:23 62:20
 64:1 73:10 82:1,18
 83:3 95:19 104:11
**medically** 89:23 91:16
 92:18 94:12
**medicines** 3:20
**meet** 37:23 55:18 61:22
**meetings** 29:24 40:14
 106:4
**members** 7:20
**Memorial** 10:16
**memory** 11:7,9 19:15
 24:6 28:15 30:5,15
 39:23 41:9,14 52:12
 66:22 71:4 80:14,23
 82:19 84:4 92:11
 108:11
**mention** 52:7
**mentioned** 97:12
 106:20
**met** 61:19
**method** 76:23 86:14
**middle** 14:11 70:3,5
 87:7
**mild** 77:5,10 102:10

105:2
**Milford** 32:7,8 34:13
 34:14 62:23 65:19,20
 66:4
**Miller** 21:6
**Millsboro** 64:11
**mind** 51:14 98:4
 101:14
**mine** 78:11 103:7,7,10
 103:14
**minimal** 86:16
**minor** 99:21
**minute** 23:1 79:18
 84:22 90:18
**Miracle** 25:3,4,5 48:23
**misread** 42:20
**mistake** 60:5,10
**mistaken** 96:7
**mistakes** 55:8
**Mm-hmm** 5:9 11:15
 18:11 19:12 30:9,24
 33:6 63:13 70:6
 74:18 104:21
**moisture** 82:5
**mold** 96:12
**MONTGOMERY** 2:2
**months** 6:10 8:21 10:17
 13:19
**mouth** 31:19,19 57:16
**move** 82:17 90:14
 99:23 100:7
**moved** 66:4

**N**

**N** 1:14 2:8 22:3 111:1,2
 113:7
**name** 31:24 32:12 34:8
 34:9 64:14 65:6,14,16
 66:10 85:19 88:16
 89:16
**national** 10:23,24
**nationwide** 10:8
**nature** 28:22
**near** 32:3 34:11 92:21
**necessary** 53:5
**need** 5:17 81:3
**needed** 22:16 105:18
 106:1
**Neuberger** 1:15,19,20
 2:13 4:16,19,23 21:15
 21:19 22:1 30:10,22
 79:19,22 80:8 96:19
 100:11,16 101:24
 110:10 111:3
**never** 8:6 18:19,21 25:7
 33:16,24 35:16,17
 44:1 48:1 49:8,9,11

58:2 61:1 73:5,12,13
 73:20 76:7,8 79:1,7
 79:10,15,15 85:24
 94:18 99:3,7 106:13
 108:14 109:5
**new** 12:1 18:2 94:22
 113:2
**News** 110:3,5,8,10,11
**NHTSA** 10:24
**nickname** 24:24 25:3,7
**ninety** 38:17
**nodded** 42:7
**noise** 27:23 29:8 35:6
 40:14 106:7
**normal** 6:16 38:20
 102:11
**North** 95:7
**Notary** 1:17 113:6
**note** 11:12
**notes** 113:9
**notice** 1:15 27:15 29:12
 29:20 30:2 59:21
**noticed** 17:7 27:14 28:9
 29:21,23 41:21
 103:21 106:5
**noticing** 13:9
**notwithstanding**
 105:22
**November** 18:5 19:11
 19:16 20:1 90:23
**no's** 63:24 90:4
**number** 68:5 69:17,23
 70:4,7,13,15 71:13,14
 72:15 87:8 93:18
 101:9,10 106:3,3
**numbers** 62:5 86:20
 87:1 92:22,24 93:1
 95:3 103:7
**numerous** 3:5

**O**

**oath** 2:10
**obtained** 90:5
**obviously** 25:16 84:7
 89:8
**occasion** 82:15
**occasions** 3:5
**Occupational** 62:22
 63:9
**occurred** 30:7
**October** 6:10,14 70:23
 87:11,12 88:7
**office** 9:7 11:2,2 14:2,4
 32:7,7,16,21 34:14
 64:11 66:2 74:7 79:3
 79:3 84:10 87:21
 88:2 103:23

**officer** 17:4,6,13 18:6
 24:18 26:4 42:8,16
 43:1,6 45:8 51:5,10
 52:23 53:19,23 54:8
 57:5 78:21 79:14
 80:12,20 84:14
**officers** 76:1
**officer's** 53:16
**offices** 1:15 34:10,13,18
**official** 19:16
**officially** 15:21,23 20:1
**Oh** 3:3 7:7 48:2 53:17
 56:9 58:19 82:7
**OIC** 14:1,3
**okay** 3:8,9,12,16 4:18
 5:12 6:8,20 7:15 8:11
 9:11,14 10:4 11:20
 12:2,3,4,24 13:13,20
 14:3,17 15:2,7,13,16
 15:17 16:3,11,19 19:6
 20:5 21:22 22:16
 23:13,15,17 24:17
 25:2,11 26:21,24
 27:24 28:2,21 29:11
 31:21 32:20 33:22
 37:3 38:1 39:1 40:2
 41:5,8,14,15 45:5
 48:22 52:18 55:5
 56:5,6 58:23 59:4
 61:24 62:2,3,9 66:21
 66:22 68:7,9 71:21
 74:2 75:11,12,16 80:9
 82:10,17 84:24 85:15
 86:24 87:4,5,9,10
 88:22,23 90:14,17
 92:14 95:21 96:16
 101:14 104:21 105:20
 107:19 110:4
**old** 26:23
**once** 5:15 29:8 41:20
 48:24 49:13 66:21
 83:13 84:9 85:4 86:2
 93:9 95:14,21,23
**ones** 25:9 82:13 94:18
**opens** 15:21
**operated** 61:17
**operating** 8:3 10:2
**operation** 10:16,18
**operational** 18:22
**operations** 17:4,6,13
 18:6 20:10,13 23:15
 23:21 27:1 42:10
 44:14 45:6,11
**opinion** 60:14,22,24
 61:1 90:7 93:12,15
 94:23 98:12 106:12
 106:16 108:18,20,23

109:2,8,8,10,11
**opportunity** 3:2 55:17 56:14 61:21 100:4,7 100:18
**option** 86:2,9
**order** 51:12 69:17
**ordered** 73:18 79:3 84:11,15 94:22
**Oriental** 65:5
**Osteopathy** 75:14
**other's** 108:15
**outdoors** 82:8
**outrank** 45:10
**outside** 37:3 100:12
**overlap** 107:6

**P**

**page** 5:22 32:23 62:13 62:14,19 63:1,3,23 66:9 71:13,24 72:15 73:24 74:3,12 75:6,7 75:9 76:15,15 82:22 83:5,6,8,9,17 84:23 85:7,20 87:5,5,7,10 87:13,15,17,21 88:4,5 88:15 89:18 90:16 91:2,4,8,8 94:2,5,5,11 102:20 103:9,19,19 104:10,20,22 111:2 111:10,11 112:3
**pages** 22:3 62:4 72:15 73:24 101:22 102:3 111:9
**paper** 31:11 35:4 76:13 109:16
**papers** 31:5
**part** 10:20 24:1 31:10 31:11 35:22 42:14 103:10,16
**parties** 113:8
**party** 113:13
**passed** 57:24
**passing** 57:24
**patrol** 6:2,21 7:10 8:13 9:4
**pay** 59:13
**peace** 43:15
**Pennsylvania** 2:3 60:13 73:10 79:5
**people** 10:23 11:2 13:10 15:21 29:2 33:14 37:14 43:19 45:10,23 46:24 47:4 49:5,11,19 53:11 54:6 56:16 57:23 59:12 92:7 99:20
**Pepper** 54:21 55:23
56:7,18
**percent** 98:8 107:11
**perform** 43:5,7,9 76:11 101:18
**performance** 101:20
**performing** 63:7 97:19 98:2
**period** 17:10 20:6
**periodic** 36:1 75:24 76:9 83:1
**periodically** 35:23
**permanent** 47:24
**permanently** 10:13 12:6
**person** 30:14 32:9 48:7 57:9 96:8,8 99:24
**personal** 21:20
**personnel** 4:8 5:1,10 48:13 57:3 73:1 78:1 79:3 87:21 104:2 108:8,11 111:7
**Philadelphia** 2:3
**phone** 29:23 40:11 46:3 46:6,14 47:4,9 67:8 67:12,17,20 106:3
**phones** 46:18
**phraseology** 52:7
**physical** 35:20 37:20 53:8,9 54:8,14 55:14 55:16 61:20 75:11,19 76:10,13,14,14 83:1 85:5 87:11 90:23 92:4,7 93:22 102:2,20 103:4 104:19 105:1 106:10
**physicals** 28:12 35:13 35:21 36:1 38:16 39:2 60:9 63:7 73:23 76:1 86:3,7 89:12
**physician** 89:11 96:4
**picked** 28:11
**pitch** 27:19 39:12
**pitches** 35:5
**place** 10:18 79:5 95:9 95:13,15
**places** 16:4 92:7,8
**Plaintiff** 1:10
**Plaintiffs** 1:5,21
**plan** 24:13
**play** 41:21
**playing** 49:10
**pleasant** 109:20
**please** 106:7
**plus** 13:17 57:15 109:21
**point** 3:8 4:3 17:23 26:10 36:8 67:12,21
98:20
**pointblank** 27:13
**police** 3:1 25:23 26:3,6 26:12 37:3 38:5,8 39:2,4 43:1,6 45:21 48:5 49:1 50:23 51:15,19 52:22 53:18 53:20 54:3,9 57:3 58:7 60:3,9 63:8,12 70:21 71:2,5 72:21 75:19 76:1,14 78:22 79:2,9,9,12,14 83:2,3 84:11,18 87:22 89:12 90:6,10 93:16 94:21 97:1 98:15 99:10 106:16 109:14
**policeman** 47:14
**Police's** 76:10
**Police-issued** 46:3,6,14
**policies** 58:7,8,11,11
**policy** 49:22
**portion** 31:21
**portions** 4:8,14
**position** 8:4 20:3,9 101:5
**positions** 17:3
**positive** 35:12
**possible** 24:12 48:15
**powers** 43:3 52:22 53:21 79:9 84:18 90:10 93:16
**practice** 65:23 109:17
**practices** 26:6
**prepared** 78:20
**preparing** 13:5
**present** 2:5 19:3
**presented** 61:5
**pressed** 35:5
**pretty** 5:4 50:17 81:19
**prevent** 96:24 97:14,18 97:22 98:1,10 99:1
**prevented** 99:5
**previous** 30:1,1 36:8
**previously** 89:9
**Price** 1:4 2:5 25:22
**printer** 113:9
**prior** 35:18 40:19,21 41:23 94:18 105:12 105:21
**probably** 6:11 20:7 31:5 44:2 50:23 51:2 59:10 69:14 104:1
**problem** 3:19 26:1,9 27:13,16,19 45:21 46:1 50:3,6,7,8,11,12 50:18 52:2,8,9 58:12 58:14 61:18 101:1,7,9
**problems** 28:6,22 29:3 29:12,20 36:14,23 39:19 40:1,7,8,11,18 40:24 47:20 49:2 54:8 90:8 105:14,22
**produced** 4:8,13
**promotable** 13:6
**promoted** 6:13 9:12,15 10:1 11:21,23 12:24 15:13,14,20 16:14 97:23 98:7 99:1,5
**promotion** 7:11 12:12
**provided** 39:4 76:3 86:4 89:11
**public** 1:17 14:1,4 18:15 113:6
**pulling** 11:10
**punishment** 99:15
**pursuant** 1:15
**put** 10:23 11:22 12:21 15:23 19:22 27:11 34:24 37:9 57:14 59:22 68:4 74:21 81:4,18 83:23 88:1
**puts** 53:10
**putting** 24:13 31:12,13 34:22 91:23
**P.A** 1:15,20
**p.m** 110:15

**Q**

**qualified** 54:6 89:23 91:16 92:18 94:12
**question** 3:10 4:1 40:23 53:16 54:13 61:9 66:14,19 67:13 68:5,7 68:21 70:8 71:8,10 83:17,20 85:13,16 89:23 91:15,20 107:15 109:11
**questionnaire** 62:16,20 63:6,10 64:2 71:20 72:20,24 73:15 74:6 75:6
**questions** 38:21 54:5 75:1 83:14 89:19 100:17,19 102:2,8,12 110:13 113:8
**quickly** 4:12
**quite** 17:17
**quote** 48:23 50:2 77:5

**R**

**r** 4:20 92:24 93:2
**radio** 45:18,21
**raised** 61:9
**range** 108:16 109:3
**ranged** 7:19
**rank** 15:24 40:4,22 44:2 46:11 56:17 99:1 106:21 107:20 108:5
**ranking** 80:12
**ranks** 6:5 46:10 96:24 99:6
**RDR** 113:17
**read** 70:12 71:16 77:5 88:22 109:16,18,20 109:21,22 110:6
**reading** 34:23 109:21
**reads** 84:3
**real** 4:12
**realized** 28:10
**really** 7:6 8:13 13:14 27:15 58:21 82:5 99:17 106:7,8 110:13
**reason** 12:21 25:11,20 55:1 105:9 109:1
**reassignment** 17:11
**recall** 21:5 23:7,14,20 23:23,24 31:5,7 35:7 35:19 39:8,12,18 40:3 40:7,18,21 45:20,24 47:23 48:6,7,12,15,16 50:10 53:8 55:1 64:15,16,17 65:8 67:23 73:4,7,8 76:8 81:20 89:7 95:14 99:15,18,19 103:22 104:7 105:17,21 107:6
**recalling** 12:22 89:10
**received** 33:11 88:3 94:3
**recess** 79:21 100:15
**recognized** 27:10 39:24
**recognizing** 41:2,6,10 41:17
**recollection** 20:11 21:13 22:12 36:22 39:7 47:20 55:22 68:12 78:24 95:15 105:5 107:2
**recommendations** 33:4
**record** 4:15 5:5,10,13 78:1,15 84:10 98:14 98:21,22,24 99:4
**records** 4:13,24 5:7 22:7 26:14,16 28:16 30:13 32:14 37:2 38:4,7,15 39:23 41:14 61:24 63:12 67:1,5,7 67:9 82:1,18 95:19 96:16

Price, et al.
Joseph N. Forester

v.
C.A. # 04-956-GMS

Chaffinch, et al.
December 22, 2005

Page 120

| | | | |
|---|---|---|---|
| reference 29:14 97:3 | respect 100:22 101:8 | 73:24 74:17,19 75:7 | scratch 5:3 | serious 51:19 |

reference 29:14 97:3
referring 70:7
reflects 25:16
refresh 21:12 22:12 66:22 84:4
refreshes 20:11
refreshing 82:18
Registered 1:16 113:5
regulations 51:16
Rehoboth 7:2
rejuvenate 14:24
relate 26:2
relations 14:19,21
relationship 24:21
relative 113:13
relied 61:4
relieved 26:3
remember 3:22 8:24 11:13,24 12:5 14:6 17:16,18 19:2 20:17 21:9 22:21 24:11,15 26:16 28:17 29:11,17 29:19 31:10,12,22,24 33:8,12 34:7 35:11 36:5,8,17 37:17,18,19 38:23 39:3,14 41:16 46:13,18 47:17 52:15 65:16 77:9,12,13,14 77:15,19,21,22 79:24 80:9 81:10 89:5 92:11,15 97:4 98:19 101:3 102:12,15
remembers 52:1,6
reminded 79:23
removed 108:24
repair 96:11
repeat 27:21 29:6 31:16,20 40:12 67:15 106:24
rephrase 3:11
REPLACE 112:3
replaced 19:20 20:15 56:6
report 7:21 32:24 54:14
reported 53:12
Reporter 1:17 111:11 113:4,6
reports 33:8,13 48:18 57:14
represent 25:21
reputation 51:9,12,23 108:18
resolution 44:8
resources 48:4,7 73:1,5 73:8 84:10 90:6 94:3 106:15

respect 100:22 101:8
respective 9:3 46:10 113:8
respond 43:12
responded 44:10,15
response 39:10 47:10
responsibilities 10:21 18:6,22
responsibility 17:24 18:2
result 84:12 90:5 105:1
results 31:1 32:20 33:4 33:4,9,17 104:6 111:9
retire 15:21 50:3,7 53:4 101:4
retired 17:18 19:10,11 19:13,20,22 20:1 46:2 63:21 65:5,21,23 82:11 107:8,9 108:4 109:9
retirement 5:20 19:16 60:3 109:13
retirements 17:21
return 15:7
returning 14:12
reverted 9:23
review 37:12
reviewed 37:12 38:16
Reviewing 5:2
revoke 52:22
revoked 79:9 84:18 90:10 93:16
Rhoads 2:2 80:6,7
right 4:6 5:3,5 6:22 7:9 7:14 8:5,16,17 11:14 11:23 12:6,8 17:22 19:10,11 20:18 21:6,8 22:5 23:6,8,10 24:2 28:6,14 29:16 30:8,23 31:14 32:2,4,5,18,21 33:12 34:10,19 36:12 36:19,24 37:11 38:11 38:13 39:1,14,15,16 40:17 42:6,8,14,20,22 42:24 43:1,7,10,16 44:9 45:3 48:14 49:16,22 51:9,20 52:1 52:4 53:15 54:6 55:20 56:2,7,15,18 57:3,10,18 58:2,5 59:16 60:5,20 61:1 62:17 63:12,17,18 64:2,3,5,8 65:4,22 66:23 67:2,5,9,11,19 68:15 69:1,7,21,21,22 70:11,19,23 71:6,11 71:15,22 72:2 73:14

73:24 74:17,19 75:7 75:24 76:7,15,23 77:14 78:12,15,16,20 79:16,16 80:3,9 81:12 81:14 82:12,12 83:5,8 84:9 85:17 86:2,4,21 86:22 88:5,7,13,16 89:2,18 90:4 91:13,17 91:18,24 92:19,22,23 93:2,3,10 94:7,9,9 95:2 96:6,8,9,22 97:3 97:10,20,23 98:3,5,6 98:9,11,20,22 99:6 100:10 101:13 104:20 105:24 107:13 109:6 110:4
right-hand 22:9 62:5 74:3 82:22 86:19 87:20 103:2,18
ring 89:15
rising 96:24 97:14,18
Robert 2:2 100:11
role 46:23
room 27:22 29:24 31:12 59:6
rooms 36:15 40:14 106:7
rotated 10:8
rules 4:2 51:16
run 36:3 109:3

_____

S

S 1:19 111:4
sad 110:11
Safety 11:1,2
SASADEUSZ 1:19
sat 104:9
saw 109:5
saying 11:13 28:21 29:1,7 35:9,24 36:4 41:3,5,20 48:12,24 49:14 52:2,15 55:9 59:5,16 65:20 66:6 67:17,23 72:8 74:11 78:11 82:10 92:3 103:14 105:7
says 6:8 8:23 10:11 14:5 15:14 31:18 62:20 63:1 66:11 68:8 69:14,16 70:13 71:14 74:24 75:11,14 76:18,23 77:1,2,16 78:9,12 83:3 84:7 88:9,24 89:4 91:18,24 92:23 93:5 95:6
scene 44:19,24 45:8,13 47:1 80:12

scratch 5:3
screen 76:19 85:12,14 85:16 86:13 95:2 102:9
screening 88:9
se 102:15 108:14
second 17:9 32:23 37:4 55:22,24 57:18 60:22 60:24 70:3,5 74:12 75:9 76:15 79:24 87:15 88:4 90:7 91:2 91:8 93:12,15 94:11 94:22,23 100:12 103:19
secret 48:21,23 49:20 51:3 56:12
section 8:16 10:6 12:11 12:15,20,23 14:22 94:3 104:11,12,16
see 8:19 13:3,18 14:23 15:17 20:11 22:2,9 30:15 33:3,5 36:5 47:17 57:23 62:5,14 63:18 66:11,14,15 67:1,8,10,24 68:6,22 69:24 70:4,10 71:9,13 71:20 72:12 74:4 75:3,13 76:18,21 77:2 77:7,8,17,18 83:8,18 83:21 85:1,13,20 86:13,17,20 87:23 88:9,20,21 89:20,22 90:1 91:6,10,12,15,24 92:10,22 93:7,20 94:13,16,17 95:4 102:13,19
seeing 32:9 50:11 52:9
send 2:14,17 33:17 53:6 54:5,9 56:23 60:12 72:21
sending 73:9
senior 80:20
senior-ranking 45:8
sent 9:2 10:10 12:22 60:4,7 78:22 79:1 90:12 93:9 96:12 106:19
separate 33:23
September 8:24 9:12 9:20,23 82:22 83:11 84:5
sequence 12:14 19:19
sergeant 1:9 11:22,24 12:12,22 13:3,5,6,8 13:19 45:4,7 50:22 51:4 97:14 98:3
series 31:18 61:14

serious 51:19
serve 14:3
serves 11:9 30:5 108:12
Services 62:22 63:9
serving 11:7 16:1,20
Seventh 1:20
severity 60:15
sexist 27:17
share 104:6
Sharman 64:6,7,13 65:10 66:5,7
sheet 5:23 112:4
SHEET/DEPONEN... 111:10
shift 9:7
shooting 81:17
short 18:14 82:5 98:14
show 21:11 67:5
showing 14:7
shown 31:6 89:8
shows 6:13 7:15,17
side 7:23 91:24
sight 58:13
sign 93:24
signature 63:4 74:12 74:19,20,21 78:11 83:9 85:8 87:15 88:5 91:10 95:22 102:16 103:5,6,8 111:10
signatures 102:14
signed 63:2 83:11 85:10 91:2 103:20 112:6
simply 46:17
sir 31:3 78:24
sit 41:12 49:9 52:14 53:9
sitting 58:1 105:20
situation 44:8 47:5 53:12 61:4 101:11 105:18
situations 43:13,19 44:5,10,15,19,23 46:21 82:14
six 6:10 7:20
slot 15:21
Smith 31:24 34:7 39:5 39:21 41:7 42:2 47:17 60:5 77:23 96:17,20,21,22 106:11
Smith's 32:8,16,21
somebody 33:2 47:7 48:4 63:11 65:2 66:6 78:14
someplace 92:4 95:10
soon 61:17

Price, et al.
Joseph N. Forester

v.
C.A. # 04-956-GMS

Chaffinch, et al.
December 22, 2005

Page 121

**sorry** 14:19 18:13 22:24 42:20 74:14 79:19 84:21 90:19 96:18
**sort** 5:19 11:10 43:23 44:1,11,16,20,23 45:3 45:7,11 46:22 55:1 80:1,2
**sorts** 35:1
**sound** 23:3 32:5
**sounds** 23:6 50:15 52:16 63:17,18 69:21
**South** 2:3
**spaces** 29:7
**spanned** 18:9
**speak** 37:4 59:13 106:6 109:4
**speakers** 106:8
**speaking** 48:6,7,12 59:12
**speed** 7:24 8:2
**spell** 65:14
**spent** 14:17
**spoke** 52:2
**squad** 80:21
**staff** 16:18 17:2,3,11 26:19 27:15 29:22 30:3 40:10 56:10 95:14 105:13,17 106:2 107:3,4,23 108:2,3
**stamp** 87:21 88:1 91:23
**stamped** 94:2
**stands** 10:19
**start** 27:4 41:1 46:5 50:19 72:18 91:23
**started** 6:9 26:11,17 27:6,9 28:7 29:12,19 47:12 48:24 49:4,13 55:2 70:21,23 71:2 81:13
**starting** 38:17 44:2
**starts** 70:14
**state** 3:1 4:7,13 10:22 24:14 25:23 26:6,12 32:1 35:13,14,21,24 36:6 37:3,14,22 38:2 38:5,8 39:2,4 43:1 46:3,5,13 48:4 49:1 50:22 51:15 53:9,11 53:18 54:3,9 57:3 58:7 60:3,9 63:8,11 63:12 67:4 70:21 71:2,5 72:20 75:19 76:1,4,10,14 78:22 79:2,9,12 83:2,3 84:11 85:24 86:4

87:22 89:12,16,17 90:6 92:4,5 94:21 97:1 98:14 99:10 106:16 109:14 110:2 110:5,11 113:1
**statement** 25:12 27:17 72:4,9
**STATES** 1:1
**state's** 36:1,3 61:12
**stationed** 9:14
**statistics** 10:14,22
**stats** 10:24
**stay** 16:16,22 58:14 101:2
**stayed** 12:13
**Stenotype** 113:9
**step** 100:11
**stints** 18:14
**stop** 110:4
**story** 13:2
**street** 1:15,20,23 2:3 32:2 36:6 56:12 89:17,17 92:4,5
**stress** 53:24
**stuff** 41:22 65:9 99:21
**stupid** 50:18
**submitted** 63:10 72:20 72:24
**subpoena** 2:15
**suffering** 79:13 84:5
**suit** 113:14
**Suite** 1:20
**summary** 5:7 21:11 22:7 98:21 99:8,14 111:8
**summer** 8:21 10:17
**superintendent** 48:8 50:1
**supposed** 30:20 46:11
**sure** 3:4 21:2,19 23:14 33:10,15 36:16 46:8 47:21 48:18 53:10 55:13 59:12 66:20,24 72:10 77:12 79:19 86:12 98:5 100:14 101:19 104:8,8 105:16 106:8 107:11
**suspend** 53:1
**Sussex** 8:7 10:2 11:18 12:4 14:12 15:7 16:20 17:5 18:7,16,17 18:18 20:13 23:16 27:1 42:11 44:14
**sweating** 13:15
**sworn** 2:10 113:7
**symptoms** 28:3 45:16
**synopsis** 77:3 88:18

102:10
**S-h-a-r-m-a-n** 64:7

**T**

**T** 111:4
**table** 37:10
**tac** 9:1,16,18,21,24 10:2 11:8,9,14 69:14
**tactical** 7:16 69:10
**TAD** 8:19 12:19
**take** 3:14,15 4:14 13:5 17:3 28:16 33:15 50:19 59:21 65:9 79:17,20 81:16,20 82:3,6,15 101:5 109:24
**taken** 1:14 3:2 30:6 53:13 79:21 100:15 113:8
**talk** 25:18 100:7 101:14 102:18
**talked** 55:11,12 61:8 97:7 104:9
**talking** 35:4 40:13 45:16 56:15 58:1 70:8 82:12
**talks** 31:14,16
**team** 7:16 9:1,16,18,21 11:8,9 43:23 44:1,11 44:16,20,23 46:22 47:10 69:10,15 80:1,2
**technology** 20:12 59:2
**telephone** 27:18 29:2 37:24 38:1 45:17
**television** 41:22,23
**tell** 5:20 10:10 11:6 21:17 26:22 31:3 32:6 38:14 41:19 47:18 49:9 50:17 65:7 69:12 71:17 98:18 99:20 100:6 106:5,11
**telling** 37:21 40:17 44:9 44:13,18 56:20 72:1,5 76:6 77:9,22 89:5
**temporary** 8:20 9:22 10:12 11:7
**ten** 59:1
**terminated** 9:23
**terminating** 8:23
**terminology** 36:11 50:16 59:15
**test** 13:5,7,14 30:6,8,16 30:23 31:1,2,9,22,23 32:10,13,21 33:1,1,4 33:4,7,9,17 35:10 36:7,13 37:1 38:23

39:3,8,9,10,14 40:16 41:4,7 42:2 70:9 73:10 95:8 97:6 111:9
**tested** 68:8,11,18,21 70:18 71:5 95:6
**testified** 2:11 3:4 100:21 105:12
**testify** 22:23 23:2,18 24:2,8,23 25:20 80:18
**testimony** 42:2 105:22 113:11
**testing** 13:12 36:19 37:16 39:21 60:4,7
**testings** 61:14
**tests** 30:14 35:13 36:3 37:2,17,18 97:4 106:20
**Thank** 2:22 19:1 80:7 96:1 110:14
**Thanks** 52:18
**thing** 7:15 8:19 10:8 16:3,14 21:13 29:23 35:3 40:2 45:16 47:8 48:20 50:21 81:1 82:2 86:22 91:13 100:3 101:10
**things** 3:8,22 4:7 5:8,18 17:21 25:17 27:14 28:17 29:14 35:1 36:15 37:12 45:19 46:24 49:6 51:7 54:1 59:11,11 64:1 74:7 80:17 88:1 98:17 101:6,18,19 103:13 103:13
**think** 5:15 9:16 12:19 17:9,20 19:13,17,18 19:23 20:2,3,8,10 23:17 24:2,20,21 29:22 32:2 35:12,22 40:17 44:9,13,18 45:3 46:16 53:7 55:5 59:19 61:11 64:11 65:6 66:7 69:3 70:22 71:12 74:13 75:14 76:5 80:3 81:11,18,22 81:23 85:24 90:15 95:17 96:3,7 97:8 98:13,15 99:23 100:12 105:16 106:23 106:24 107:1 108:9 108:10
**thinking** 55:7 58:10
**third** 61:1 63:1,3
**THOMAS** 1:19
**thought** 10:12 38:14

54:4 107:10
**three** 4:7 6:15,18 17:13 17:20 20:7 22:3 30:7 37:13 61:2,13 65:10 69:24 84:21 89:19 90:3,4 99:16
**three-page** 62:16
**Thursday** 1:16 113:6
**time** 7:20 9:24 14:22 17:4,10,19,23 18:17 18:18 19:8 20:6,23 23:6 26:10 27:17 28:10,18 29:5 30:7 36:8 38:4,7 39:24 40:9,12 48:8 49:23 53:18 54:20 55:13,24 57:2 58:5 61:13,15 64:6,10,20 66:3 67:12 70:16 72:1 73:17 74:8 77:10 84:15 88:12 89:6 93:22 95:6,13 97:14 104:3 105:5 106:15 107:14 107:23 108:1 110:13
**times** 17:7 27:20 45:1 53:15
**title** 102:20
**today** 3:10,22 4:2,7 8:1 25:21 33:8 50:4,7 53:4 58:17 59:5,17 67:1,5 77:13,14 99:24 108:23
**today's** 37:22
**told** 8:15 13:10 37:16 39:19,20 47:24 50:8 50:22,24 53:3,11 54:23 55:18 70:22 79:15 96:3 100:24 105:10 106:15
**Tom** 17:19 21:17 30:20 79:17 107:20
**Tommy** 20:7
**tomorrow** 100:1
**top** 29:16 62:19 74:12 83:7,9 88:5
**totally** 59:6,8,17,20
**traffic** 8:2,6,16,17 10:5 10:10 11:1 12:1,6,11 12:15,18,20,23 13:1 18:15 19:5,14 22:24 23:18,20,23 24:3,9
**training** 81:10
**transcribed** 113:7
**transcript** 113:11
**transcription** 113:9
**Treasury** 47:10
**treating** 96:4,8

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Case 1:04-cv-00956-GMS    Document 140    Filed 04/20/2006    Page 41 of 42

Price, et al.                                v.                              Chaffinch, et al.
Joseph N. Forester                    C.A. # 04-956-GMS              December 22, 2005

Page 122

| | | | |
|---|---|---|---|
| **trial** 2:16 3:24 | 26:8,9 27:20 33:24 | 81:4 99:16 | 11:18 23:9 24:21 | **1st** 19:16,17 63:3 |

**trial** 2:16 3:24
**tried** 52:7 79:12 93:12 99:20 100:9
**troop** 6:8,19,21,22 7:1 7:10,22,22,23 8:3,13 8:20 9:2,3 14:9,12,15 14:18 15:10,10,18,19 15:24,24 16:2,5,5,7 16:11,12,16 22:8,19 22:24 23:3,8,19,24 24:1,3,10 42:13,19,19 42:21,23 44:3,5,10 46:16 80:4 99:18 108:9,11
**trooper** 6:14 7:11 9:8 23:2,9 26:12 40:4 108:19
**troopers** 4:9 56:12
**trooper's** 54:5
**troops** 6:3 7:22 8:8 9:3 18:20
**true** 20:21 27:9 47:1,5 51:13,22 66:18 68:18 69:4 72:9 75:24 76:5 83:5 86:16 103:15 113:11
**truth** 10:11 31:3
**truthful** 24:17,19 51:5 83:14
**truthfully** 75:1
**truthfulness** 25:12 51:16,23
**try** 6:1 26:15 88:22 109:18,24
**trying** 22:12 36:24 39:17,22,23 41:9,16 52:11 65:3,6 66:21 72:4 81:21 82:17 92:10
**turn** 32:23
**turning** 49:5
**twice** 81:8,11,12
**two** 4:7 12:15,17 14:17 17:7 27:4,6,14 28:1 32:13 45:10 56:16 61:2 65:10 72:14 73:24 82:21 94:18 98:17 101:10 106:4,4 111:9
**two-and-a-half** 30:7

**U**
**Uh-uh** 81:24
**undergo** 76:2 94:22
**underneath** 102:22
**understand** 3:11 4:4 17:8 19:19 25:24

26:8,9 27:20 33:24 51:4 66:22 68:14
**understanding** 27:17 29:3
**understood** 49:23
**underwent** 87:11
**unfit** 106:12,17
**uniform** 26:11 42:8,16 43:1 57:5 76:1 79:3 84:14
**unit** 7:19 9:24 10:2
**UNITED** 1:1
**University** 60:13 73:9 79:4,4
**unknown** 30:13
**unnamed** 30:14
**upper** 22:9 74:3 82:22 103:18
**use** 52:7 54:24 59:14,15 86:3 113:9
**usually** 34:15 45:11

**V**
**v** 1:6,11 66:11
**vacancy** 19:20
**vague** 19:14
**vain** 50:17
**various** 4:9 7:21 8:8
**verbal** 31:10
**verbally** 35:4
**violation** 7:24
**voice** 27:19
**voices** 29:2 40:13
**volumes** 49:6

**W**
**wait** 15:20 22:24 84:22 88:11 90:18
**WALKER** 2:2
**walking** 80:24
**want** 3:7,17 17:13 20:20 25:23 32:1 55:7 59:14,15 61:15 63:15 100:13 101:21 107:13
**wanted** 24:22 107:16
**Warren** 2:6 25:22 79:23 80:6,13,18,22
**wasn't** 5:14 13:7,14 39:4 49:20 72:11 75:22 101:19
**way** 37:9 43:22 58:9 61:17 69:4 81:4 86:24 90:1 92:17 99:14 100:9 101:12 102:19 105:24
**Wayne** 2:6 25:22 80:12

81:4 99:16
**ways** 59:10
**wear** 28:23 56:13
**wearing** 26:11,17 27:4 27:4,9 28:7 47:12 48:24 49:4,13,15,19 55:2 57:11 81:13 82:11 93:5
**weekend** 10:21
**weekends** 10:17
**weeks** 37:13 61:13
**went** 6:8,15 7:17 8:6 9:2,3,20 13:14 14:8 15:18 20:8,12 24:9,15 28:13 30:5 34:17 35:16 36:6,16 37:11 37:17,19 38:17,19 40:16 41:4 50:1 54:23 55:17 61:18 72:19 81:8 88:2 92:3 94:21 95:8,9,15 103:23 104:9,19
**weren't** 72:6 93:16
**we're** 4:6 7:15 8:19 21:18 22:17 25:17 26:14 35:15 37:1,9 41:13 52:3 62:12 63:23 66:9,21 69:17 69:23 73:24 75:9 76:15 82:21 92:16,16 95:17,17 96:2 99:22 100:12
**wife** 65:7 71:17,24 72:5
**WILCOX** 1:23
**willing** 61:19
**Wilmington** 1:15,21,23
**winter** 80:11
**wire** 34:24
**witness** 2:15 3:24 4:18 17:15 25:21 42:7 80:3,7 96:18 110:14 113:12
**WNL** 77:6 102:11
**woods** 81:1
**word** 57:16 59:14 60:17,18 86:14 89:4 94:9
**wording** 105:15
**words** 31:18 34:23
**wore** 49:3
**work** 7:24 86:6,9 89:14
**worked** 7:21 8:5,8,9 21:21 24:23 25:13,14 56:11 99:17 108:7,8 108:11,13,14,15
**workers** 108:17
**working** 8:11 9:6 11:4

11:18 23:9 24:21 49:1
**works** 32:11 89:14 92:1 92:12 95:7
**wouldn't** 25:15 58:14 72:10 109:5
**wow** 82:7
**writing** 78:6,7,8,8 102:14,24 103:10
**written** 33:8 58:7,8 94:20
**wrong** 7:1 99:22
**wrote** 68:18 70:4 71:12 71:16,24 72:9,10 86:14,16 88:18 94:9 94:15,18 102:23

**X**
**X** 111:1,4
**X'd** 32:24

**Y**
**yeah** 3:3 7:7,7,9 9:19 9:22 12:3 23:6 48:2 53:17 55:6,24 56:9 66:1,3,24 76:24 103:14
**year** 10:6 14:6,7 15:2 17:14,17 20:2 24:13 24:16 25:4 37:19 38:17,18,19 54:22,24 69:18 81:9,11,12 84:22 87:4 90:14,19 91:12 93:19
**years** 6:15,18 14:17 18:10 26:23 28:7,9 30:7 50:24 59:1 63:21 71:1 82:21 84:21 95:16 108:24 109:22
**Yeomans** 108:6
**Yep** 88:11
**yesterday** 98:19 99:24
**yes's** 63:24 90:4

**Z**
**zero** 106:8
**zip** 2:20

**0**
**00** 20:1
**04-1207-GMS** 1:11
**04-956-GMS** 1:6

**1**
**1** 4:20,21 62:1 64:4 74:4 101:21 111:6

**1st** 19:16,17 63:3
**1,000** 93:1
**10-81** 12:15,20
**10:05** 1:16
**100** 98:8 107:10 111:3
**100-RPR** 113:17
**112** 111:10
**113** 111:11
**12** 2:18 9:23
**12:20** 110:15
**1200** 93:1
**123** 2:3
**13** 89:17 92:5,6
**1330** 1:23
**14982** 90:16 93:19 94:5
**14984** 90:21
**14985** 91:8
**14986** 87:5
**14990** 84:23 85:1
**14992** 82:20 83:5,17
**14993** 83:9
**14995** 76:16 102:5
**14996** 62:8,12,19
**14997** 62:13
**14998** 62:14
**15004** 62:7
**16th** 6:14
**19109** 2:3
**1946** 2:23
**1972** 35:19 70:23
**1975** 7:11
**1980** 68:19,24 69:3,4 69:18 70:15,18 71:1,5 97:4,12
**19801** 1:21,23
**1984** 21:14
**1985** 21:14
**1989** 22:20
**1992** 63:1,8,14 66:18 67:13,21 68:2 71:19 72:6 73:17 74:4,21 78:2,4,21 97:9,11 102:3 105:2
**1994** 40:5 82:23 83:11 84:5 104:19
**19947** 2:21
**1995** 85:2,10
**1997** 26:23 39:6 54:24 77:23 87:11 88:7 89:6 106:22,23 107:21 108:6
**1998** 90:24

**2**
**2** 1:15,20 5:22 21:16,23 71:8,10,13,14 111:3,8
**2nd** 11:23

Price, et al.                                              v.                                    Chaffinch, et al.
Joseph N. Forester                              C.A. # 04-956-GMS                      December 22, 2005

Page 123

**2,000** 93:1
**2000** 18:5 19:11 23:17
 23:18 24:8,12,14 46:2
 93:19
**2004** 33:2 110:2
**2005** 1:16 113:6
**2008** 113:18
**21** 111:8
**22** 1:16 113:6
**26** 74:21
**27** 82:23 83:11
**28** 18:10 109:21
**28-year** 5:21
**29** 85:10

─────── **3** ───────
**3** 23:24 24:3 30:11,17
 30:18 93:19 108:9,11
 111:9
**30** 87:12 88:7 111:9
**302** 1:20,24
**31** 113:18

─────── **4** ───────
**4** 7:22 111:7
**4th** 10:16
**4,000** 93:1
**46** 55:4
**46-81** 69:16
**4995** 74:14

─────── **5** ───────
**5** 7:22 14:9,12,15 15:18
 15:24 16:2,11 22:8,19
 22:24 23:3,8,19 24:1
 24:10 42:13
**5/26/92** 103:7,20
**51** 26:23 55:2

─────── **6** ───────
**6** 68:5,7 69:23 70:4,7
 70:13,15
**6th** 31:9
**6-1-92** 103:3,17
**6-14-82** 14:5
**655-0477** 1:24

─────── **7** ───────
**7** 6:9,19,21,22 7:1,10
 7:23 8:13,20 9:3
 15:10 16:5,7,12,16
 42:19,23 46:16 80:4
**7th** 1:15
**72** 6:10 12:4
**73** 6:9 11:17
**75** 6:14
**76** 7:17 8:12

**77** 8:22,23,24 9:20,23
**78** 9:12

─────── **8** ───────
**80** 11:9 69:13
**81** 11:10,14,17 12:4
 14:10 69:16
**82** 11:23 12:5 13:3 23:3
 23:4,11 69:16
**83** 13:20 14:8,11,12
 21:1
**84** 20:21 21:21 22:13
**85** 15:1 20:21 21:21
 22:14
**86** 15:3,9 87:6,10
**87** 87:10
**89** 15:15,19,22,23,23
 23:1

─────── **9** ───────
**92** 63:19 97:8 104:5,20
 104:22 105:23
**93** 16:6,9 23:3,5
**94** 16:15,19 17:1,6 18:5
 23:16 30:4,4 40:6,15
 41:3,5,10,17,18 42:1
 42:13,14,19,22 46:17
 46:19 75:10 102:6
 103:9 104:10 105:13
 105:21
**95** 75:11 102:6,20
**96-97** 61:15
**96-97-ish** 26:20
**97** 24:2 30:5 35:10
 39:21,24 40:16 41:4,5
 41:20 42:1 55:3,5
 60:2 87:12
**98** 90:20,21 107:10
**99** 23:18 24:3,8 107:10
 107:13,18
**995** 102:3
**998** 62:13

Wilcox & Fetzer, Ltd.                    Professional Court Reporters                    (302)655-0477