# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORPORAL B. KURT PRICE; | : | |
| CORPORAL WAYNE WARREN; and | : | |
| SERGEANT CHRISTOPHER D. FORAKER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A.No.04-956-GMS |
| | : | |
| COLONEL L. AARON CHAFFINCH, | : | |
| individually and in his official capacity as | : | |
| Superintendent of the Delaware State Police; | : | |
| LIEUTENANT COLONEL THOMAS F. | : | |
| MACLEISH, individually and in his official | : | |
| capacity as Deputy Superintendent of the | : | |
| Delaware State Police; DAVID B. MITCHELL, | : | |
| in his official capacity as the Secretary of the | : | |
| Department of Safety and Homeland Security of | : | |
| the State of Delaware; and DIVISION OF | : | |
| STATE POLICE, DEPARTMENT OF SAFETY | : | |
| AND HOMELAND SECURITY, STATE OF | : | |
| DELAWARE, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR RENEWED MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR JUDGMENT AS A MATTER OF LAW ON THEIR PETITION CLAUSE COUNTS**

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

MARTIN D. HAVERLY, ATTORNEY AT LAW
MARTIN D. HAVERLY, ESQ. (#3295)
Two East Seventh Street, Suite 201
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Attorneys for Plaintiffs

Dated: June 19, 2006

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING ...................................................................... 1

SUMMARY OF THE ARGUMENT ...................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

    A.    Sgt. Foraker's 2002 First Amendment Retaliation Lawsuit ............................................ 2

        1.    The Initial Lawsuit ..................................................................................... 2

        2.    The Unprecedented Jury Verdict ................................................................... 2

        3.    The Settlement and Reinstatement ................................................................. 2

    B.    Plaintiffs Sound the Alarm, Plea for Help and Begin to Petition Up the Chain of Command ........................................................................................................ 2

    C.    The Subject Matter of Plaintiffs' Petitions ................................................................ 4

        1.    Poisoning of Police Officers with Lead, Copper, Arsenic, Nitroglycerine, and Other Heavy Metals .......................................................................... 4

        2.    Dangerously Low Staffing Levels ................................................................. 5

        3.    Malfunctioning HVAC System ..................................................................... 5

        4.    Malfunctioning Bullet Trap and Conveyor System .......................................... 6

        5.    Hazardous Armorers Room .......................................................................... 6

        6.    Defective Headsets ..................................................................................... 7

        7.    No Protective Training or Equipment ............................................................. 7

        8.    Need for Professional Hazmat Crews ............................................................ 7

    D.    The FTU is Shut Down in Because of Environmental Contamination ............................ 8

    E.    The State Auditor's Office Begins To Investigate ...................................................... 8

    F.    Plaintiffs Petition the State Auditor ....................................................................... 8

        1.    First Meeting ............................................................................................. 9

            a.    Plaintiffs Gave the Auditors Written Statements ................................... 9

                (1).    Cpl/3 Warren's Written Statement ............................................. 9

    (2). Cpl/3 Price's Written Statement ................................................... 9

    (3). Sgt. Foraker's Written Statement ............................................ 10

   b. Plaintiffs Gave the Auditors Oral Statements and Answered
    Questions ......................................................................... 10

   c. Plaintiffs Gave the Auditors a Concise Packet of Key Documents ...... 11

   d. Plaintiffs Gave the Auditors 11 Voluminous Binders of Information .. 11

   e. Summary ......................................................................... 11

  2. Second Meeting ....................................................................... 12

ARGUMENT ........................................................................................... 12

 I. STANDARD OF REVIEW ................................................................. 12

  A. Introduction ........................................................................... 12

  B. Judgment As a Matter of Law ..................................................... 12

 II. PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED
  PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES ........ 13

  A. Introduction ........................................................................... 13

  B. Petitions To All Branches of Government Are Protected ................................ 14

   1. Executive and Legislative Petitions ..................................... 15

   2. Judicial or Quasi-Judicial Petitions ........................................ 16

   3. There Must Be a Channel Open to Seek Redress for Grievances ........ 17

  C. The Specifics ........................................................................... 18

  D. Discussion ........................................................................... 19

   1. Petitions About Hazardous Conditions at the FTU ............................ 19

   2. Sgt. Foraker's Earlier Successful Lawsuit ............................ 22

CONCLUSION ........................................................................................ 22

<u>**TABLE OF AUTHORITIES**</u>

**Cases**                                                                                              **Page**

Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997) ................................................................ 13-14,17,19-21

BE & K Construction Co. v. NLRB, 536 U.S. 516 (2002) ................................................. 14,19

Bieregu v. Reno, 59 F.3d 1445 (3d Cir. 1995) ................................................................... 13-14

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003) .............................................................. 17,19

Brookins v. O'Bannon, 699 F.2d 648 (3d Cir. 1983) ........................................................ 15,20

Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155 (3d Cir. 1988) ............................ 16

Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972) ............................................. 14-19

Gable v. Lewis, 201 F.3d 769 (6th Cir. 2000) .................................................................... 15-16

Herr v. Pequea Township, 274 F.3d 109 (3rd Cir.2001) ..................................................... 15-16,20

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005) ...................................................... 17-19,22

Hoeber v. Local 30, United Slate, Tile & Composition Roofers, 939 F.2d 118 (3d Cir. 1991) ............... 17

Losch v. Borough of Parkesburg, Pa., 736 F.2d 903 (3d Cir. 1984) .............................................. 16,18,20

Mariana v. Fisher, 338 F.3d 189 (3d Cir. 2003) .............................................................. 15,19-20

McDonald v. Smith, 472 U.S. 479 (1985) .......................................................................... 13-14,16-18

Monteiro v. City of Elizabeth, 436 F.3d 397 (3d Cir. 2006) ................................................. 18

Powell v. Alexander, 391 F.3d 1 (1st Cir. 2004) ................................................................ 15

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000) ......................................... 13

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994) ...................................................... 13-21

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc) ................... 12-13

Thomas v. Collins, 323 U.S. 516 (1945) ........................................................................ 14

Tristrata Tech., Inc. v. ICN Pharmaceuticals, Inc., 313 F.Supp.2d 405 (D.Del. 2004) ................... 12

U.S. v. Cruikshank, 92 U.S. 542 (1875) ....................................................................... 14

U.S. v. Giampa, 758 F.2d 928 (3d Cir. 1985) ................................................................... 13

U.S. v. Rockwell, 781 F.2d 985 (3d Cir. 1986) ...................................................................... 13

United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217 (1967) ...................................... 14

We, Inc., v. City of Phila., 174 F.3d 322 (3d Cir. 1999) ........................................................... 19

Williamson v. Consolidated Rail Corp., 926 F.2d 1344 (3d Cir. 1991) .................................................... 13

**Constitutions, Statutes and Rules**

U.S. Constitution Amendment I ........................................................................................ passim

Fed.R.Civ.P. 50 ...................................................................................................... 12

*iv*

## NATURE AND STAGE OF THE PROCEEDING

Following a 12 day trial, on May 31, 2006 a jury returned a verdict against defendants in this First Amendment retaliation action. The careful jury found as a matter of fact that plaintiffs' speech about health hazards at the State Police Firearms Training Unit (and Sgt. Foraker's earlier lawsuit) were substantial or motivating factors in the retaliatory adverse actions taken against them, and that defendants would not have taken those same adverse actions in the absence of plaintiffs' protected activity.

At summary judgment, the Court ruled as a matter of law that plaintiffs had engaged in First Amendment protected speech activity. However, due the number of disputed facts, the Court deferred its decision of whether plaintiffs also had engaged in protected petition clause activity until post-trial briefing. (D.I. 167 at 6 n.3). In its June 5, 2006 Order, the Court followed up on its earlier ruling and directed the parties to address the petition clause issue.

Given that it is plaintiffs' burden to prove that they engaged in protected petitioning of government for redress of grievances, plaintiffs have made the present motion. This is plaintiffs' opening brief in support of their renewed motion for summary judgment, or in the alternative for judgment as a matter of law, requesting that the Court now rule, as a matter of law, that plaintiffs engaged in First Amendment protected petitioning of government.

## SUMMARY OF THE ARGUMENT

Plaintiffs engaged in First Amendment protected petitioning of government for redress of grievances when: (1) they gave written statements, spoke to, and gave voluminous documentation to the State Auditors Office about the hazards at the FTU and the causes of those hazards; (2) they raised the same health and safety concerns up the chain of command in the Division of State Police; and (3) when Sgt. Foraker filed and successfully prosecuted his earlier lawsuit against defendant Chaffinch.

1

**STATEMENT OF FACTS**

**A. Sgt. Foraker's 2002 First Amendment Retaliation Lawsuit.**

      **1. The Initial Lawsuit.** In April 2002, Sgt. Foraker filed a First Amendment

retaliation lawsuit against defendant Chaffinch and the DSP.  See Foraker v. Chaffinch, et al.,

C.A.No. 02-302-JJF (D.Del.). (Foraker 2 Compl. & Ans. ¶ 10; A55,82).

      **2. The Unprecedented Jury Verdict.** The case went to trial in June of 2003

where the federal court jury -

> found that defendant Chaffinch had violated plaintiff's First Amendment free speech
> rights by illegally transferring him from the FTU in retaliation for engaging in protected
> speech activity.

(Foraker 2 Compl. & Ans. ¶ 11; A55,82).  The careful jury awarded $40,120 in compensatory

damages.  (Chaffinch Ex. 1 at ¶ 6 - Special Verdict Form; A591).  The discerning jury continued

and found that Chaffinch had acted with "malice or with callous and reckless indifference or

oppressively" and that his "conduct was so shocking and offensive" that it warranted an award of

$60,000 in punitive damages "to punish and deter [his] illegal conduct."  (Id. at ¶¶ 7-8; Foraker 2

Compl. & Ans. ¶ 11; A591,55,82).

      **3. The Settlement and Reinstatement.** The case subsequently settled in

November 2003 pursuant to a settlement agreement and a Stipulated Order. (Foraker 2 Compl. &

Ans. ¶¶ 12-17; A56-57,82).  The Order stated that Sgt. Foraker

> is ordered reinstated to his prior position as the Non-Commissioned Officer-in-Charge of
> the Firearms Training Unit of the Delaware State Police with all of the rights, privileges,
> duties, responsibilities and supervisory authority previously held by him when he earlier
> occupied that position on February 20, 2002.

(Stipulated Order at ¶ 1; A78,618).  The Court specifically retained jurisdiction to enforce its

reinstatement Order.  (Id. at ¶ 3; A78,618).

**B. Plaintiffs Sound the Alarm, Plea for Help and Begin to Petition Up the Chain of**

**Command.** On December 1, 2003, when Sgt. Foraker assumed command as NCOIC of the FTU,

he observed and learned from Cpls/3 Price and Warren about the many health and safety

-2-

problems at the FTU.   Sgt. Foraker individually and on behalf of Cpls/3 Price and Warren (<u>Price</u>

Inter. #9 p.22; A203), immediately began to speak out and petition, both orally and in writing,

about the many problems at the FTU discussed below.[1]

> In addition to numerous written communications in which Sgt. Foraker spoke out in an
> attempt to fix the FTU and protect the health and safety of [all who work and train there]
> on innumerable occasions Sgt. Foraker also spoke out in person as he orally and vocally
> <u>pleaded with DSP leadership and many others to fix the problems at the FTU</u>.

(<u>Foraker</u> Inter. #10 p. 24; A167) (emphasis added).   The record is full of e-mails in which Sgt.

Foraker raised these serious issues up through the chain of command, some directly to defendant

MacLeish and in others to Capt. Davis and Capt. Warren. (<u>See, e.g.</u> MacLeish ex. 11-15; <u>Price</u>

Inter. #13 and ex. 1; A607-614,217-218,231-273).   In his Captain's words, "there was rarely a

day went by Chris didn't tell us something" about the problems at the range.  (G. Warren 74;

A535).  "Chris did a pretty admirable job of keeping us informed."  (G. Warren 87; A538).

In their supervisor's words,  plaintiffs were "basically pleaing for help" and "waiving a

flag going 'help'" as they spoke out about the hazards at the FTU discussed below. (Davis 30,17-

18, 28-29; G. Warren 75; A501,497-498,500,535).

> [T]hey were being honest and sincere whenever they raised a concern.  Honest and
> sincere for their own health, the health and safety of their families, but I think overall the
> health and safety of us who had occasion to visit [the FTU on] at least two occasions [a
> year] to shoot.

(Davis 29; A500).  "[T]hey were trying to protect the health and safety of those who worked and

trained there, as well as their families."  (Davis 29; A500).[2]

---

[1]  (Davis 17-18; <u>Price</u> Inter. #13; <u>Foraker</u> Inter. #6 p.15, #10; MacLeish ex. 11-16; W. Warren
112-18,160-62, 175; Price 74; Foraker 57-58, 84-85, 91-92, 122, 279-80; G. Warren 60-61,63-70, 73-80,
87, 90, 114; A497-98,217-18,158,607-17,452-54,464-65,468,390,309-10,316,318,326,367-68,531-35,
538-39,545).

[2]  Cpls Price and Warren had previously spoken out and raised health and safety concerns during
Sgt. Ashley's tenure, but their concerns fell on deaf ears as Sgt. Ashley "did not want to make any
waves."  (<u>Price</u> Inter. #11 p. 28; A209).  He told them that "you got to die from something." (Price 65;
MacLeish ex. 14; <u>Price</u> Inter. #10 p.25; A387,613,206).  At his deposition, Captain Warren commended
Sgt. Foraker for being willing to try to protect his men and blow the whistle, even if it meant angering
those at headquarters.  (G. Warren 78-79; A536).

**C. The Subject Matter of Plaintiffs' Petitions.** Plaintiffs petitioned the chain of command, asking and sometimes begging that the following problems at the FTU be fixed.

**1. Poisoning of Police Officers with Lead, Copper, Arsenic, Nitroglycerine, and Other Heavy Metals.** Plaintiffs petitioned the chain of command about the serious issues of lead exposure and sky-rocketing blood lead levels. DSP doctors had told the FTU staff that much of the work they were doing at the FTU to keep the mechanical systems from falling apart involved using chemicals that acted as "a penetrating agent" and which were transporting lead directly through their skin and into their bloodstream. (MacLeish ex. 11 p.2; Price Inter. #10 p.26; Price 63-66,72-73; Foraker 99; A608,207,387-89,320). The blood lead levels of Cpls Price and Warren had spiked and the numbers were not coming down back down. (MacLeish ex. 11 p.2; Price Inter. #10 p.25; A608,206). As plaintiffs spoke out and explained, doing the specialized mechanical range upkeep for which they were not trained "is an unnecessary health risk ... [which] should be left to the trained professionals who can operate in this environment safely." (MacLeish ex. 11 p.2; A608). In addition to their own safety, plaintiffs also were "extremely concerned over our health and the health of those who we train." (MacLeish ex. 14; A613).

As Sgt. Foraker pleaded in one e-mail, "I am overwhelmed with concern for the health and safety of my staff and their wives and children." (MacLeish ex. 15; A614). He explained that as NCOIC of the unit, "I have spent much less time on the range when compared to my staff and yet my copper and lead levels are the same as the others. My lead level shot up from a 3 to a 9 and my copper is at 971 in just two months." (MacLeish ex. 15; A614). He explained that the "entire building is contaminated with the lead and copper and that the ventilation is circulating the contamination throughout the entire facility." (Id.). Despite the best efforts to decontaminate themselves at the end of the day, "we do not have a safe haven to escape and shed the contamination, then we are taking the contamination home to contaminate homes and expose the

-4-

hazards to our wives and children." (Id.).

      **2. Dangerously Low Staffing Levels.** The FTU was "dramatically understaffed" (Davis 14; A497), and plaintiffs continually petitioned and spoke out about these problems and how more personnel were needed in order to safely operate the range. (See MacLeish ex. 12; Foraker 74; A609-10,314). Industry instructor to student safety ratios require 1 instructor for every 2 or 3 students. (Davis 14; A497). At the FTU, the ratio was 1 instructor for every 10 students. (Id.). Because of these dangerously low levels of staffing, "as far as safety goes, [it was] just a nightmare." (Id.).

      **3. Malfunctioning HVAC System.** Plaintiffs also petitioned and spoke out about the hazards caused by the perpetually malfunctioning HVAC system. The State of Delaware's own standards require that the air supply be blowing 75 cfm down range at the firing line, (MacLeish ex. 4; A604), but the ventilation system failed to meet the state's own standards. (See Foraker 154-55,174; A334,339). It has never worked as required, cannot remove toxins from the air and in fact blows air and toxins 180 degrees in the wrong direction into the respiratory zones of the shooters. So plaintiffs sounded the alarm about these problems and petitioned to get them fixed. (Price Inter. #12 p.33-34; A214-15). For example, "[w]e are experiencing significant air flow problems at the range," problems which have "only been 'band aided' over time when complaints have been made." (MacLeish ex. 13 p.1; A611). The smoke on the firing line was sometimes so dense that an instructor could barely see the student in his charge. (Id.).

      Plaintiffs also pleaded for help and explained that there was a "reddish haze" suspended in the air which was being "inhaled by the instructors and students. When anyone blows their nose, a large amount of reddish debris is discharged. Students and instructors also complain of a copper penny taste in their mouth" as well as other serious health problems such as nosebleeds, headaches and chronic fatigue. (MacLeish ex. 13 p.1; Price Inter. #12 p.35; A611,216). After

contacting experts, plaintiffs explained that they were told "you don't want to walk into the reddish cloud and you definitely do not want" to breathe it in. (MacLeish ex. 13 p.1; Foraker 50-51; A611,308). Continuing, plaintiffs explained that "this problem constitutes a potentially unsafe and unhealthy working environment detrimental to our good health and inconsistent with departmental goals and objectives." (MacLeish ex. 13 p.1; A611).

>     **4. Malfunctioning Bullet Trap and Conveyor System.** Plaintiffs also raised

serious concerns about how the bullet trap was not working properly. There was a "major problem" with its conveyer belt system which had been broken and destroyed due to the DSP not using professionals to maintain the system. (MacLeish ex. 14; W. Warren 69-70; A613,533-34). As plaintiffs explained, the

> mechanical operation of this very expensive equipment should not be left for amateurs in the mechanical field to tweak but for professionals who have the training and experience to make proper scientific and calculated adjustments and measurements when necessary. My expertise as well as the entire FTU staff lies in firearms, officer safety and force training. We do not possess the training, skills and knowledge or the time necessary to properly maintain the system at its optimal performance.

(MacLeish ex. 11 p.1; A607). This complicated system was breaking down in numerous respects. (Price Inter. #10 p.22-24, #11 p.29-30, #12 p.33-34; MacLeish ex. 13 p.1-2; Foraker 35-38; G. Warren 49,100-101; A203-05,210-11,214-15,611-12,304-05,528,541). When the machine would break down, the bullet residue would harden and turn to concrete, which caused even more problems for the already beleaguered system. (Foraker 80, 113; A315,323).

>     Relatedly, many companies simply refused to come in and even try to repair the bullet-trap because of the dangers of lead exposure arising from it. (Foraker 76; A314). Other professionals indicated to Sgt. Foraker that maintaining the bullet-trap was a full time job that should be done by highly trained professionals, not by amateurs. (Foraker 76,74,78,82; A314-16).

>     **5. Hazardous Armorers Room.** Similarly, plaintiffs raised concerns about being sickened by the toxic fumes in the armorer's room when cleaning weapons. (Price Inter.

#11 p.31-32, #12 p.34; W. Warren 82-85; A212-13,215,445).

      **6. Defective Headsets.** Plaintiffs also raised concerns about unsafe headsets that they were being forced to use at the range, which were causing safety problems on the range itself. (Foraker Inter. #10 p.22-23; Price Inter. #11 p.32-33, #12 p.34-36; W. Warren 82, 86-89; Foraker 127; A165-66,213-17,445-46,327). They pleaded to get these problems resolved but to no avail.

      **7. No Protective Training or Equipment.** In Chaffinch's own words, the FTU was "not a safe place to work." (Chaffinch 153; A585). It "was a hazardous situation for [plaintiffs] and for anybody who trained in that facility at all." (Baylor 207; A577). Yet despite these admitted hazards, plaintiffs were never given training in hazardous material cleanup, disposal or abatement. They were never given protective equipment to wear such as Tyvex suits, moon suits, respirators or even little booties for their feet (Chaffinch 60-62; MacLeish 64-65; Price Inter. #10 p.24-27; W. Warren 151-52; Foraker 24; G. Warren 164-65; A583-84,596,205-08,462,301,557), all of which violates the State of Delaware's own standards that require, for example, the use of a respirator when cleaning firing range lead. (MacLeish ex. 4; A604-06).

      **8. Need for Professional Hazmat Crews.** Plaintiffs also petitioned the chain of command about the need to have professional hazmat crews come in and clean and decontaminate the range in order to protect all who worked and trained there.

      As plaintiffs repeatedly explained to defendants, even the State was telling them that "lead contamination will always be present and a health danger" at the range. (MacLeish ex. 11 p.1; A607). Plaintiffs told MacLeish that to properly operate the bullet trap "would require a full time professional that would also need to be equipped with the proper protective gear and trained in the handling of hazardous lead and other heavy metals." (Id. at p.1-2; A607-08). Plaintiffs explained that they had called in experts, who "concurred that professionals would be needed for the safe and efficient operation of the entire bullet trap system." (Id. at p.2; A608). In one report

that plaintiffs submitted to defendants, they explained that one expert had stated that "any range, whether green or lead, should be attended to by professionals certified and trained in the safe cleaning, handling and disposal of any hazardous materials present, thereby minimizing the risk to all parties." (MacLeish ex. 16 p.1, 3; A615,617). MacLeish's own internal memos attest to this. (MacLeish ex. 3 p.2; A602).

**D.  The FTU is Shut Down in Because of Environmental Contamination.**  On March 19, 2004, the FTU was shut down because of the very same environmental contamination problems that plaintiffs had been trying to get fixed.  (Price Compl.& Ans. ¶ 35; A105-06,132).

**E.  The State Auditor's Office Begins to Investigate.**  Following immediately on the heels of plaintiffs' internal efforts and the widespread media and legislative attention they attracted, Governor Minner and members of the General Assembly asked the State Auditor's Office to investigate the problems at the FTU. (Price Compl. & Ans. ¶ 38; Price Inter. #5 p.19; MacLeish 154, 157; Price 142-43,153-55; G. Warren 214; A106,133,200,597,407,409-10,570).

**F.  Plaintiffs Petition the State Auditor.**  Happy that there was finally a government body looking into their concerns about the broken FTU and hopeful that the State Auditor would be able to help them fix the broken building, plaintiffs soon arranged a time for a meeting and interview with the Auditors.  As Sgt. Foraker testified at trial, "we wanted their help in fixing the broken FTU."[3]

As discussed below and revealed in detail at trial, plaintiffs spoke to and petitioned the Auditors about the health and safety hazards plaguing the broken FTU (many of which are outlined above) and also about the root causes of the problems at the FTU - from government incompetence and corruption in the bidding and construction process, to the subsequent coverup that had succeeded for approximately seven years in ensuring that none of this information would

---

[3]  This quote is counsel's memory of this testimony.  When the trial transcript arrives, pursuant to the Court's Order (D.I. 185), counsel will supplement the record in support of this brief with the relevant trial testimony.

ever see the light of day.

      **1. First Meeting.** On May 12, 2004, plaintiffs met with several investigators from the State Auditor's Office. (Price Inter. #5 p.19; Price Compl. & Ans. ¶ 39; W. Warren 211-225; Price 141-44; Foraker 272; A200,106-07,133,477-80,406-07,366). At this meeting, plaintiffs did the following.

      **a. Plaintiffs Gave the Auditors Written Statements.** Plaintiffs gave the Auditors lengthy and detailed written statements that are in the record. (A5-23). These statements addressed the many, many health and safety problems plaguing the FTU and as well as the governmental improprieties and wrongdoing that led to the building of such a hazardous facility.[4]

      **(1). Cpl/3 Warren's Written Statement.** Cpl/3 Warren prepared a written statement and detailed chronology (A11), and also continued and prepared a list of concerns about the facility. (A18). Cpl/3 Warren systematically discussed and questioned the contracting, building and design process that resulted in the broken FTU. (A18-20). He also prepared a detailed time line, addressing the health, safety and maintenance issues that plagued the facility. (A11-16). After addressing these matters, he closed his statement and explained -

> In summary I want to say that I am very disappointed in the lack of concern for the health and safety of everyone who trains in this facility[,] by the State Police and Facilities Management. It is apparent that politics and egos were more important than constructing a safe state of the art facility. I feel that from the initial stages of the project[,] people in administrative positions made uninformed decisions. After the construction started[,] cost cuts continued at the expense of health and safety. Facilities Management failed to oversee the entire project. The State Police should have never accepted the building until it was tested and inspected by an independent evaluator to insure that the building was safe to use.

(A16).

      **(2). Cpl/3 Price's Written Statement.** Cpl/3 Price was the

---

[4] (Auditors Statements; W. Warren 215-17; Price 144-47; Foraker 272; A5-23,478,407-08,366).

most senior member of the FTU staff and he also prepared a written statement. (A21). In

compelling terms, he described to the Auditors problems with the construction and building

process at the FTU. (A21-22). He also described many of the health and safety problems that

the range had faced since it opened in 1998. (A22). He explained how he believed his exposure

to hazardous conditions at work was poisoning his family at home. (A23). He expressed his

dismay that the Division had failed in its duty to protect him from an unsafe and hazardous

working environment. (A23).

   **(3). Sgt. Foraker's Written Statement.** In his statement, Sgt.

Foraker explained in detail the sequence of events related to the health and safety issues that he

was dealing with as section chief and NCOIC of the FTU. (A6-9). In his words, there was a

"contamination crisis" at the facility. (A10). He described how he and his men were not being

given proper protective equipment and how their health was being endangered by the hazardous

conditions. (A9).

> I have become incensed with the lack of leadership of the Department of Safety and
> Homeland Security, and the Department of Facilities Management, particularly with
> individuals who prefer to put their personal agendas above the health, safety and
> betterment of Division personnel and the state taxpayers.

(A5) (emphasis added). He explained that "[m]y plea is not solely for myself. It is for every

Delaware State Trooper as well as all other law enforcement officers that have participated and

will participate in the shooting activities at the range." (A10). As Sgt. Foraker testified at trial,

he and his men wanted the Auditor's help in fixing this broken facility.

   **b. Plaintiffs Gave the Auditors Oral Statements and Answered**

**Questions.** Plaintiffs also spoke and gave the Auditors lengthy oral statements, answered many

questions and explained the FTU's many problems as described above.[5] For example, Cpl/3

Warren testified at trial that he discussed the hazardous conditions with the Auditors, including

---

 [5]  (See Price Inter. #5; Price 144-47; Foraker 272-73; A195-201,407-08,366).

the adverse health affects being suffered by recruits and other Troopers. He also testified about how he explained to the Auditors that, among other things: JAED, the company that build the FTU had no experience in building such a highly specialized facility; that the ventilation system was not working; and about issues related to the roof of the FTU collapsing during the construction process.

### c. Plaintiffs Gave the Auditors a Concise Packet of Key Documents.

Plaintiffs then gave the investigators a concise packet of documents, addressing many key facets of the long history of problems that had plagued the facility.[6]

Some of these document exposed dramatic government wrongdoing and incompetence. For example, one document explained that even before construction began, in 1996 the DSP knew that the HVAC system "will not work" (A32) and "will inevitably fail" as designed. (A33). Another addressed hazardous lead levels above OSHA standards all the way back in 1998. (A35). Yet another addressed how the State of Delaware had hired an unqualified Architectural and Engineering firm to build the FTU, one with no experience in building such a highly specialized facility. (A37).

### d. Plaintiffs Gave the Auditors 11 Voluminous Binders of Information.

They also delivered 11 large volumes and binders of documentation, addressing: the long history of problems at the FTU, beginning in the early 1990s; irregularities in the bidding process; numerous reports regarding the state and condition of the contaminated facility over a 7 year period; correspondence from Facilities Management; innumerable e-mails and other reports related to the broken facility.[7]

### e. Summary.

As all three plaintiffs testified at trial, by speaking to and petitioning the Auditors, plaintiffs were trying to aid the Auditors in getting to the root causes of

---

[6] (Concise Packet of Documents; Price 155; A24,410).

[7] (See Auditor Binder List; W. Warren 218-19; Price 142, 155; A2-3,479,407,410).

the disastrous comedy of errors that had plagued the FTU for as long as it has been in existence.
They wanted to expose what had occurred to the bright light of public scrutiny and enlist the
Auditor's help in fixing the broken and extremely hazardous facility.

     **2. Second Meeting.**  Plaintiffs met with the Auditor a second time on July 28,
2004.  At this meeting, they continued to speak out, answer questions and address the many
problems at the FTU.  (<u>Price</u> Inter. #16 p.39; <u>Price</u> Compl. & Ans. ¶ 39; Price 141-42, 157-61;
Foraker 272; A220,105-06,133,406-07,410-11,366).

## <u>ARGUMENT</u>

I.     **STANDARD OF REVIEW.**

     **A. Introduction.**  The procedural posture of the petition clause issue is a bit unusual.
As explained in the Nature and Stage of the Proceedings above, plaintiffs raised the present issue
at summary judgment and the Court deferred its ruling until post-trial, inviting plaintiff to raise
the issue again once the jury had resolved various factual disputes.  Although plaintiffs' motion
is titled as a renewed summary judgment motion, in light of the Court's statement in the
summary judgment opinion that these numerous factual disputes would need to be resolved at
trial before the issue could properly be addressed (D.I. 167 at 6 n.3), in light of the jury verdict,
plaintiffs believe the judgment as a matter of law standard of review is the most appropriate one
for any factual issues that must be decided.

     **B. Judgment As a Matter of Law.**  In the en banc <u>Sheridan</u> decision, our Circuit
clearly stated that under Rule 50 "[w]e must look at the evidence in the light most favorable to . .
. the verdict winner, and draw all reasonable inferences in [his] favor." <u>Sheridan v. E.I. DuPont</u>
<u>de Nemours and Co.</u>, 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc); <u>see</u> <u>Tristrata Tech., Inc. v.</u>
<u>ICN Pharmaceuticals, Inc.</u>, 313 F.Supp.2d 405, 408 (D.Del. 2004) (the court must give the
"verdict winner[ ] the benefit of all logical inferences that could be drawn from the evidence
presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the

light most favorable to him.").  "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record."  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000).

Great deference is given to the jury's role because "[o]ne of the oldest established rules of Anglo-American jurisprudence is that the jury is the arbiter of credibility of witnesses."  <u>U.S. v. Giampa</u>, 758 F.2d 928, 935 (3d Cir. 1985).  <u>See e.g.</u> <u>Sheridan</u>, 100 F.3d at 1072 ("Evaluation of witness credibility is the exclusive function of the jury, and where the only evidence of intent is oral testimony, a jury could always choose to discredit it.").  Likewise, "[i]t is well settled that where there is a conflict or contradiction of evidence, the question should be submitted to the jury."  <u>U.S. v. Rockwell</u>, 781 F.2d 985, 990 (3d Cir. 1986).  "It is the jury, not the court which is the fact-finding body.  It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts."  <u>Id.</u>[8]

## II.    PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES.

**A.  Introduction.**  The First Amendment protects the "right to petition the Government for a redress of grievances."  U.S. Const., Amend. I.  "The right to petition the government for grievances is a fundamental component of a just and orderly society."  <u>Anderson v. Davila</u>, 125 F.3d 148, 164 (3d Cir. 1997).  "[W]hen one files a 'petition' one is addressing government and asking government to fix what ... government has broken or has failed in its duty to repair," <u>San Filippo v. Bongiovanni</u>, 30 F.3d 424, 442 (3d Cir. 1994), such as plaintiffs' petitions to fix the broken and hazardous FTU in our present case.

"The historical roots of the Petition Clause long antedate the Constitution."  <u>McDonald v. Smith</u>, 472 U.S. 479, 482 (1985); <u>see also</u> <u>Bieregu v. Reno</u>, 59 F.3d 1445, 1453 (3d Cir. 1995)

---

[8]  "Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations such as [in patent litigation.]"  <u>Williamson v. Consolidated Rail Corp.</u>, 926 F.2d 1344, 1352 (3d Cir. 1991).

(observing that the independent pedigree of the Petition Clause goes back to colonial times). It is even "more ancient than -- the freedoms of speech and press." BiEregu, 59 F.3d at 1453. The Petition Clause "was not intended to be a dead letter - or a graceful but redundant appendage" to the rest of the First Amendment clauses. San Filippo, 30 F.3d at 442. Instead, it ranks "among the most precious of the liberties safeguarded by the Bill of Rights" and is "intimately connected, both in origin and purpose with the other First Amendment rights of free speech and free press." United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967). "All these, though not identical, are inseparable." Id. (quoting Thomas v. Collins, 323 U.S. 516, 530 (1945)). The "right to petition is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular form of expression." McDonald, 472 U.S. at 482. As stated above, "when one files a 'petition' one is addressing government and asking government to fix what ... [it] has broken or has failed in its duty to repair." San Filippo, 30 F.3d at 442.

"[T]he values in the right of petition as an important aspect of self-government are beyond question." McDonald, 472 U.S. at 483. The right to petition "is implicit in the very idea of government, republican in form." Id. at 482 (quoting U.S. v. Cruikshank, 92 U.S. 542, 552 (1875)) (internal punctuation omitted). The "fundamental importance of the right to petition [is] as a check against the government's abuse of power." Anderson, 125 F.3d at 162. The government simply may not retaliate against those who petition it as such a result "is hardly consistent with the fundamental principles of orderly protest, which our Constitution sought to preserve by protecting our right to petition the government for redress." Id. at 163.

**B. Petitions To All Branches of Government Are Protected.** As the Supreme Court has repeatedly recognized, "the right to petition extends to *all departments of the Government.*" Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972) (emphasis added); accord BE & K Construction Co. v. NLRB, 536 U.S. 516, 525 (2002) ("the right to petition

extends to all departments of the Government."); <u>Powell v. Alexander</u>, 391 F.3d 1, 16 (1st Cir.

2004); <u>Gable v. Lewis</u>, 201 F.3d 769, 771 (6th Cir. 2000).  It extends to "administrative agencies

(which are both creatures of the legislature, and arms of the executive) and to courts, the third

branch of Government." <u>Cal. Motor Transport</u>, 404 U.S. at 510; <u>see also id.</u> at 513 (noting that a

party "ha[s] the right of access to the agencies and courts").[9]

       As the Third Circuit also recently observed, the right to petition extends to "any branch

of government, including the executive, legislative, judicial, and administrative agencies."

<u>Mariana v. Fisher</u>, 338 F.3d 189, 199 (3d Cir. 2003); <u>see</u> <u>Brookins v. O'Bannon</u>, 699 F.2d 648,

652 (3d Cir. 1983).[10]  Thus, plaintiffs' petitions to the State Auditors Office and to the leadership

of the Division of State Police about the hazardous conditions at the FTU are clearly protected.

As is their right, plaintiffs were petitioning branches of the Executive and administrative

agencies to fix a broken facility that was poisoning those who worked and trained there, activities

which both the Supreme Court and the Third Circuit have recognized as protected conduct.

       **1. Executive and Legislative Petitions.**  As the Third Circuit has recognized,

the right of citizens to petition the Executive and Legislative branches dates back to William

Blackstone and continues and finds its origins in the Magna Carta.  <u>See</u> <u>San Filippo</u>, 30 F.3d at

443 and n.22, 23.  As Blackstone wrote long ago, "there still remains a ... right, appertaining to

every individual, namely, the right of petitioning the king, or either house of parliament, for the

redress of grievances." <u>Id.</u> at 443 n. 23 (quoting 1 William Blackstone, Commentaries * 143).

Recognizing this, the Third Circuit has explained that "*[t]here is no persuasive reason for the*

*right of petition to mean less today than it was intended to mean in England three centuries*

---

    [9]  As the Sixth Circuit observed in <u>Gable</u>, 201 F.3d at 771, the Supreme Court has rejected the
efforts of academics to narrowly confine petition clause protection.

    [10]  As the Third Circuit also has recognized, because of the Fourteenth Amendment, the First
Amendment right to petition applies equally to the states.  <u>Herr v. Pequea Township</u>, 274 F.3d 109, 115
(3rd Cir.2001) (<u>abrogated on other grounds</u> by <u>United Artists Theatre Circuit, Inc. v. Twp. Of
Warrington</u>, 316 F.3d 392, 400 (3rd Cir.2003)).

*ago*." Id. at 443 (emphasis added).[11]

In McDonald v. Smith, the petitions at issue were petitions directed to the President of the United States.  Subsequent petitions also were addressed to members of Congress, as well as other officials in both the Executive and Legislative branches, such as the Director of the FBI. See 472 U.S. at 481.  Similarly, the petitions at issue in Cal. Motor Transport, were addressed to state and federal agencies.  See 404 U.S. at 511.  See also Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 158 (3d Cir. 1988) (letter petitions to the President, Governor, legislative committees, the State Secretary of Health and others).

The First Amendment right to petition clearly includes the right to petition state and other administrative and Executive agencies, such as the State Auditor's Office and the Division of State Police.  In Herr, 274 F.3d at 115, the Third Circuit explained that the right to petition "applies [ ] to petitioning state agencies" and other branches of state government.  Continuing, in Losch v. Borough of Parkesburg, Pa., 736 F.2d 903 (3d Cir. 1984), a plaintiff taped a note to the front door of the police station, telling a particular police officer to stop harassing he and his family.  Id. at 906.  The Third Circuit found that it was "clearly established" that he had the right to "petition the government in the manner that he did" and to be free of retaliation for doing so. Id. at 910.  This and the other precedent discussed above "clearly establishes that the submission of complaints and criticisms to nonlegislative and nonjudicial public agencies like a police department constitutes petitioning activity protected by the petition clause."  Gable, 201 F.3d at 771.  Thus, by petitioning the State Auditor and the leadership of the Division of State Police to fix the many problems at the broken FTU, plaintiffs were clearly engaging in protected petition clause activity.

**2. Judicial or Quasi-Judicial Petitions.**  Thus, the well-known "right of access

---

[11] As James Madison wrote more than 200 years ago, the "people 'may communicate their will *through direct petitions to the legislature and government officials*."  McDonald, 472 U.S. at 482 (quoting 1 Annals of Cong. 738 (1789)) (emphasis added).

to the courts is indeed but one aspect of the right to petition." <u>Cal. Motor Transport</u>, 404 U.S. at 510; <u>accord</u> <u>San Filippo</u>, 30 F.3d at 436; <u>see</u> <u>McDonald</u>, 472 U.S. at 484.  Of course it "is undisputed that filing lawsuits and grievances ... implicate[s] the Petition Clause of the First Amendment." <u>Brennan v. Norton</u>, 350 F.3d 399, 417 (3d Cir. 2003).  Just last summer, the Third Circuit held that

> In this circuit, any lawsuit brought by an employee against a public employer qualifies as a protected "petition" under the First Amendment so long as it is not "sham litigation."

<u>Hill v. City of Scranton</u>, 411 F.3d 118, 126 (3d Cir. 2005); <u>see</u> <u>Anderson</u>, 125 F.3d at 161 (both the threat to file and the actual filing of an employment discrimination lawsuit against the Virgin Islands Police Department constitutes protected petitioning).  Thus, it should come as no surprise that the "filing of a lawsuit carries significant constitutional protections." <u>Hoeber v. Local 30, United Slate, Tile & Composition Roofers</u>, 939 F.2d 118, 126 (3d Cir. 1991).  Accordingly, it is clear that Sgt. Foraker's earlier lawsuit, from its filing in April 2002, through the jury verdict in June 2003 until its settlement in November 2003, is protected by the Petition Clause.

**3.  There Must Be a Channel Open to Seek Redress for Grievances.**  The petition clause "imposes on the [government] an obligation to have at least some channel open for those who seek redress for perceived grievances." <u>San Filippo</u>, 30 F.3d at 442.

Importantly, it is beyond dispute that the requirements of the petition clause apply with even greater force when the "government - federal or state - formally adopts a mechanism for redress of grievances for which the government is allegedly accountable." <u>Id.</u>  Examples of such mechanisms would be, *inter alia*, the filing of a charge of discrimination with the EEOC as in <u>Anderson</u>, 125 F.3d at 161, or invoking an internal grievance procedure as in <u>San Filippo</u>, 30 F.3d at 434-35.  As the Third Circuit has observed, <u>id.</u>, it would

> undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious "petition" invoking that mechanism may be disciplined for such invocation by the very government that in compliance with the petition clause has given the particular mechanism its constitutional imprimatur.

-17-

But of course, this is by no means the only type of petitions that receive First Amendment protection.  As discussed above, the Courts have recognized numerous actions as constituting protected petitioning of government for redress of grievances, even when they occur outside the context of a formally adopted mechanism.  Examples of such petitions would be, *inter alia*, the letters to the President, members of Congress and the Director of the FBI in McDonald, 472 U.S. at 481, the petitions to state and federal transportation agencies in Cal. Motor Transport, 404 U.S. at 511, and the taping of an in artful note to the door of the police station in Losch, 736 F.2d at 906.[12]

As discussed above, from the days of ancient England and William Blackstone, every individual had the right to directly petition the king or either house of Parliament for redress of grievances.  San Filippo, 30 F.3d at 443 n.23.  There were none of the modern trappings of formal mechanisms, like a grievance procedure or the EEOC.  Nonetheless, each individual still had the right to petition.  And as the Third Circuit wrote more than 300 years later in 1994, "[t]here is no persuasive reason for the right of petition to mean less today than it was intended to mean in England three centuries ago." Id. at 443.

**C.  The Specifics.**  The protected status of petition is a matter of law.  Hill, 411 F.3d at 127.  Like free speech claims, petition clause claims also are analyzed using the same well-known three-pronged protected activity analysis.  Id. at 125.

Importantly, prong one of the protected activity analysis under the petition clause is different from that under the free speech clause in one important respect.  In the petition arena, there is no public concern versus disruption balancing or analysis.  Instead, even matters of purely private concern are protected, as long as the petition itself is not a sham.  Id.; San Filippo,

---

[12]  In Monteiro v. City of Elizabeth, 436 F.3d 397 (3d Cir. 2006), the Third Circuit recently noted that a city councilman was "exercising his constitutional right to petition the government on behalf of himself and his constituents" when he spoke out against the proposed budget at a city council meeting. Id. at 400.

30 F.3d at 440, 443; We, Inc., v. City of Phila., 174 F.3d 322, 330 n.2 (3d Cir. 1999); Brennan, 350 F.3d at 417; see also San Filippo, 30 F.3d at 434-43 (the Third Circuit's extensive analysis of the issue).[13]   As the Circuit stated in Brennan, a plaintiff need only show that the petition "was not frivolous in order to make out a prima facie claim for retaliation under the Petition Clause." Brennan, 350 F.3d at 417; see Hill, 411 F.3d at 126 (any lawsuit is a protected petition, so long as it is not "sham litigation").

Defendants have never contended that plaintiffs' petitions were not made in good faith or were frivolous nor could they in light of the record in this regard.   Simply put, the making of a "petition is not a constitutionally permissible ground for" adverse action against anyone.   San Filippo, 30 F.3d at 443.   The government simply may not retaliate against those who petition it as such a result "is hardly consistent with the fundamental principles of orderly protest, which our Constitution sought to preserve by protecting our right to petition the government for redress." Anderson, 125 F.3d at 163.

**D.  Discussion.**

    **1.  Petitions About Hazardous Conditions at the FTU.**   In our present case, as discussed in Argument **II.B.** and **II.B.1.** above, it is clear that plaintiffs' petitions to the State Auditor and up the chain of command to the leadership of the Division are protected by the petition clause.   The Supreme Court has repeatedly held that petitions to "all departments of government" are protected, Cal. Motor Transport, 404 U.S. at 510; BE & K Construction, 536 U.S. at 525, and also has specifically found that petitions to administrative agencies and arms of the Executive also are protected.  Cal. Motor Transport, 404 U.S. at 510, 513.  The Third Circuit, as recently as 2003, also has held that the right to petition extends to all departments of government, including to administrative agencies and branches of the Executive. Mariana, 338

---

[13] Thus, in response to the Court's query (D.I. 185), the public concern analysis is inapplicable, not only to Sgt. Foraker's lawsuit petition, but also is inapplicable to plaintiffs' petitions to the State Auditor's Office and the chain of command about the hazardous conditions at the FTU.

F.3d at 199; see Brookins, 699 F.2d at 652.  It is well established that the right to petition "applies [ ] to petitioning state agencies," Herr, 274 F.3d at 115, including police officers and police departments.  Losch, 736 F.2d at 906, 910.  The State Auditor and the Division of State Police are both clearly state agencies, and each were the recipient of protected petitioning by plaintiffs about the desperate need to fix the hazardous conditions at the FTU as well as the historic causes of those conditions - including government impropriety and incompetence.  Thus, plaintiffs' petitioning of both the State Auditor and the Division of State Police are clearly protected by the First Amendment petition clause.

Plaintiffs did not go out and stand on a park bench and raise their health and safety concerns directly to the citizenry.  If they had, only the free speech clause would provide them with First Amendment protection from retaliation.  Instead, plaintiffs raised their concerns directly to the government, the very government that had caused the problems, and the very government that had the power to fix the problems.  This distinction is key.  As the Third Circuit has explained,

> [W]hen one files a "petition" one is not appealing over government's head to the general citizenry:  when one files a "petition" one is addressing government and asking government to fix what ... government has broken or has failed in its duty to repair.

San Filippo, 30 F.3d at 442; accord Anderson, 125 F.3d at 162-63.  This is exactly what plaintiffs were doing.

As the extensive deposition and trial record in this case revealed (and as defendants have repeatedly admitted), the FTU is broken.  It has been broken since before the foundation was even laid on day one as the State of Delaware picked an unqualified builder to build the building and ignored expert studies warning that the proposed building would inevitably fail as designed. And things only got worse from there.  It has never worked as promised.  Instead, it has endangered the lives of thousands of officers who have worked and trained there since the facility opened in 1998.  And the problems with the HVAC system, blood lead levels, the bullet

trap, the heavy metal composition of the ammunition and all of the other problems have only continued and worsened over time. If there was ever a broken facility crying out for desperately needed help and repairs, it was the FTU.

<u>And it is plaintiffs who cried out for help</u>. It is plaintiffs who petitioned the very government that violated its duty to build a safe facility in the first place. It is plaintiffs who petitioned the government to fix what it had broken and failed in its duty to repair. Under Third Circuit case law, case law that finds its origins not only in Supreme Court precedent but traces its history all the way back to the Magna Carta, the petition clause clearly protects plaintiffs' petitions. <u>See</u> <u>San Filippo</u>, 30 F.3d at 442 n.22; <u>Anderson</u>, 125 F.3d at 162-63. As the Third Circuit explained in the police department context in <u>Anderson</u>,

> Anderson [a police officer] was petitioning the government to "fix" a problem within the Virgin Islands Police Department. Instead of engaging in such repair, the Government compounded Anderson's grievances by initiating its [retaliatory] surveillance operation. Were we to ignore the Government's retaliation, we would render Mr. Anderson's First Amendment petition right effectively useless. Officials could simply engage in harassment any time an individual [petitions the government]. This result is hardly consistent with the fundamental principles of orderly protest, which our Constitution sought to preserve by protecting our right [to] petition the government for redress.

<u>Anderson</u>, 125 F.3d at 162-63.

In the same way, plaintiffs were desperately petitioning the government to fix the hazardous conditions at the FTU that were endangering the health and safety of all those who worked and trained there. In their supervisor's words, plaintiffs were "basically pleaing for help" and "waving a flag going 'help'" as they spoke out about the hazards at the FTU and the dire need to fix them. (Davis 30,17-18, 28-29; G. Warren 75; A501,497-98,500,535). To ignore such good faith pleas for help in fixing and restoring a hazardous facility and the efforts plaintiffs made to expose the causes of those hazards would be inconsistent with the very protections that the petition clause was designed to provide.

For the aforementioned reasons, plaintiffs' petitions to the government about the hazardous conditions at the FTU are protected by the petition clause.

-21-

**2. Sgt. Foraker's Earlier Successful Lawsuit.** As discussed in Argument **II.B.2.** above, it is clear that Sgt. Foraker's earlier successful lawsuit which found that Col. Chaffinch had maliciously violated his First Amendment rights also is protected. See, e.g. Hill, 411 F.3d at 126. Thus, Sgt. Foraker's lawsuit itself also is entitled to First Amendment petition clause protection.

**CONCLUSION**

For the reasons discussed above, by petitioning the State Auditor's Office and the Divisional chain of command, plaintiffs clearly engaged in First Amendment protected petition clause activity. Similarly, Sgt. Foraker's earlier lawsuit also is entitled to petition clause protection.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**MARTIN D. HAVERLY, ESQ. (#3295)**
**MARTIN D. HAVERLY, ATTORNEY AT LAW**
Two East Seventh Street, Suite 201
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Dated: June 19, 2006          Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

June 19, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF which

will send notification of such filing to the following:

Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

FTU / Briefs / Renewed SJ - Petition Clause.OB.FINAL

-23-