# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE;　　　　　:
CORPORAL WAYNE WARREN; and　　:
SERGEANT CHRISTOPHER D. FORAKER,　:
　　　　　　　　　　　　　　　　　:
　　　　Plaintiffs,　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　v.　　　　　　　　　　　　　　:　　C.A.No.04-956-GMS
　　　　　　　　　　　　　　　　　:
COLONEL L. AARON CHAFFINCH,　　　:
individually and in his official capacity as　:
Superintendent of the Delaware State Police;　:
LIEUTENANT COLONEL THOMAS F.　　:
MACLEISH, individually and in his official　:
capacity as Deputy Superintendent of the　　:
Delaware State Police; DAVID B. MITCHELL,　:
in his official capacity as the Secretary of the　:
Department of Safety and Homeland Security of　:
the State of Delaware; and DIVISION OF　　:
STATE POLICE, DEPARTMENT OF SAFETY　:
AND HOMELAND SECURITY, STATE OF　　:
DELAWARE,　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　Defendants.　　　　　　　　:

**PLAINTIFFS' APPENDIX TO THEIR OPENING BRIEF IN SUPPORT OF THEIR RENEWED MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR JUDGMENT AS A MATTER OF LAW ON THEIR PETITION CLAUSE COUNTS**

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiffs

Dated: June 19, 2006

MARTIN D. HAVERLY, ATTORNEY
AT LAW
MARTIN D. HAVERLY, ESQ. (#3295)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

## TABLE OF CONTENTS

State Auditor's Office's Attendance Sheet, May 12, 2004 ................................................... A001

Table of Contents for Binders given to State Auditors and Proof of Receipt ........................ A002

Business Cards of State Auditors ........................................................................................ A004

Statement to the Auditors by Christopher D. Foraker ........................................................... A005

Statement to the Auditors by Wayne Warren ....................................................................... A011

Statement to the Auditors by Kurt Price ............................................................................... A021

Table of Contents for Concise Packet of Documents given to the State Auditors
    by Plaintiffs ................................................................................................................ A024

Complaint in Foraker v. Chaffinch, et al., C.A.No.04-1207-GMS ........................................ A052

    Exhibit A: Stipulated Order from Foraker v. Chaffinch, et al.,
        C.A.No-1207-GMS ................................................................................... A077

Answer in Foraker v. Chaffinch, et al., C.A.No.04-1207-GMS ........................................... A080

First Amended Complaint in Price, et al. v. Chaffinch, et al., C.A.No.04-956-GMS ........... A097

Answer to First Amended Complaint in Price, et al. v. Chaffinch, et al.,
    C.A.No.04-956-GMS ................................................................................................. A126

Plaintiff's Answers and Objections to Defendants' First Set of Interrogatories
    in Foraker v. Chaffinch, et al., C.A.No.04-1207-GMS ............................................... A144

Plaintiff's Answers and Objections to Defendants' First Set of Interrogatories
    in Price, et al. v. Chaffinch, et al., C.A.No.04-956-GMS .......................................... A182

    Exhibit 1: FTU Rough Timeline of Events .............................................................. A231

    Exhibit 2: Partial List of Agencies and Officers Exposed to the Hazards
        at the FTU ........................................................................................... A274

Deposition of Christopher D. Foraker, vol.1 (Dec. 13, 2005) ............................................... A294

Deposition of Christopher D. Foraker, vol.2 (Dec. 22, 2005) ............................................... A343

Deposition of B. Kurt Price (Oct. 18, 2005) ........................................................................ A370

Deposition of Wayne H. Warren, vol.1 (Oct. 17, 2005) ........................................... A423

Deposition of Wayne H. Warren, vol.2 (Oct. 18, 2005) ........................................... A487

Deposition of Ralph H. Davis, III (Sept. 6, 2005) ................................................... A492

Deposition of Greg A. Warren (Jan. 11, 2006) ....................................................... A515

Deposition of David L. Baylor, vol. 2 (July 26, 2005) ............................................. A574

Deposition of L. Aaron Chaffinch (Aug. 30, 2005) ................................................. A580

     Exhibit 1: Verdict Form from <u>Foraker v. Chaffinch, et al.</u>, C.A.No. 02-302-JJF ....... A589

Deposition of Thomas F. MacLeish ......................................................................... A593

     Exhibit 3: Memorandum of 3/4/04 from Lt. Col. Aaron MacLeish to Captain
     Albert J. Homiak regarding the Firearms Range ............................................. A601

     Exhibit 4: State of Delaware Recommendations and Design Considerations for
     Indoor Rifle Ranges ........................................................................................ A604

     Exhibit 11: Emails between Thomas MacLeish, Christopher Foraker and Gregory
     Warren, January 5, 2004 .................................................................................. A607

     Exhibit 12: Emails between Ralph Davis and Christopher Foraker,
     January 9, 2004 ................................................................................................ A609

     Exhibit 13: Email from Christopher Foraker to Gregory Warren, January 9, 2004 ... A611

     Exhibit 14: Email between Gregory Warren and Christopher Foraker,
     January 23, 2004 .............................................................................................. A613

     Exhibit 15: Email from Christopher Foraker to Paul Eckrich, February 19, 2001 ..... A614

     Exhibit 16: Firearms Training Unit Indoor Range Maintenance and Service Report,
     March 31, 2004 ................................................................................................ A615

Stipulated Order from <u>Foraker v. Chaffinch, et al.</u>, C.A.No.04-1207-GMS ......................... A618

Settlement Agreement from <u>Foraker v. Chaffinch, et al.</u>, C.A.No.04-1207-GMS ................ A620

ATTENDANCE SHEET

Date: May 12, 2004

Upon the request of the State Auditor's Office, which is conducting a duly authorized investigation of the Delaware State Police Firearms Training Unit, representatives of that Office conducted interviews of the following with their attorney present at their attorney's offices in Wilmington.

Found below is a sign in sheet for the interviews.

| Name | Organization |
|------|--------------|
| *Edward L. Watson* | OAOA |
| *George C. Eilers* | OAOA |
| *Jean J. Rothenburger* | OAOA |
| *[signature]* | State Police |
| *[signature]* | attorney |
| *[signature]* | DSP Sgt. |
| *Christopher D. Stalker* | DSP |
| *Wayne Warren* | DSP |
| *Kurt Price* | DSP |
| *James P. Warwick* | DSP |

FTU2725

A2801

A001

*5/12/04 received copies of the following 10 notebooks of original documents from Ops New Jersey #2B*

*Edward L Watson Field Audit Manager OAOA 5/12/04*

# FIREARMS TRAINING UNIT

## TABLE OF CONTENTS for the BINDERS
(SJN draft 4-15-04)

| Binder # | Contents |
|---|---|
| 1 | Feasibility Study for the FTU by Clark-Nexsen (Early 1990s) |
| 2a | Feasibility Study for the FTU by Clark-Nexsen (December 1993) - original |
| (2b) | Feasibility Study for the FTU by Clark-Nexsen (December 1993) - copy - highlighted version |
| 3 | Specifications for the DSP Training Facility/Firing Range <br> - actual specs signed off on by State and JAED Corp. |
| 4 | DSP Training Facility Field Investigation Report by Clark-Nexson (April 26, 1999) <br> - This was the report commissioned by the state in response to the high levels of lead detected after the range was first opened.  This is the report explaining how to fix the problems. <br> - This is the report that told the State that everything was wrong. |
| 5 | Miscellaneous Items <br> - OSHA Regulations <br> - Environmental Solutions Report (saying that the FTU is contaminated.  Dated February 2004) <br> - and other items |
| 6 | Chronological Series of Notes, Interviews with Architectural Firms, Scoring Ranking of the Firms, Letters, Many Reports on Contaminants |
| 7 | Chronological Correspondence Between the State, JAED and Facilities Management (1994-1998). |
| 8 | EPA - Building Air Quality Guide (1991) |
| 9 | Greg Warren Notebook |
| 10 | Chris Foraker Notebook |

FTU2726

A2802

A002

*11 Notebooks delivered by FSN*

*#2B* 

# FIREARMS TRAINING UNIT

## TABLE OF CONTENTS for the BINDERS
(SJN draft 4-15-04)

| __Binder #__ | __Contents__ |
|---|---|
| 1 | Feasibility Study for the FTU by Clark-Nexsen (Early 1990s) |
| 2a | Feasibility Study for the FTU by Clark-Nexsen (December 1993) - original |
| (2b) | Feasibility Study for the FTU by Clark-Nexsen (December 1993) - copy - highlighted version |
| 3 | Specifications for the DSP Training Facility/Firing Range<br>    - actual specs signed off on by State and JAED Corp. |
| 4 | DSP Training Facility Field Investigation Report by Clark-Nexson (April 26, 1999)<br>    - This was the report commissioned by the state in response to the high levels of lead detected after the range was first opened.  This is the report explaining how to fix the problems.<br>    - This is the report that told the State that everything was wrong. |
| 5 | Miscellaneous Items<br>    - OSHA Regulations<br>    - Environmental Solutions Report (saying that the FTU is contaminated.  Dated February 2004)<br>    - and other items |
| 6 | Chronological Series of Notes, Interviews with Architectural Firms, Scoring Ranking of the Firms, Letters, Many Reports on Contaminants |
| 7 | Chronological Correspondence Between the State, JAED and Facilities Management (1994-1998). |
| 8 | EPA - Building Air Quality Guide (1991) |
| 9 | *Greg Warren notebook* |
| 10 | *Chris Forster notebook* |

FTU2727



**EDWARD L. WATSON, CFE**
STATE AUDITOR

STATE OF DELAWARE
OFFICE OF AUDITOR OF ACCOUNTS
TOWNSEND BUILDING, SUITE 1
401 FEDERAL STREET
DOVER, DE 19901

2763
(302) 739-3724 Extension 117
(302) 739-4241 Extension 117
FAX (302) 739-3961
Email: ewatson@state.de.us

**George C. Eilers, CGFM**
State Auditor III



State of Delaware
Office of Auditor of Accounts
Townsend Building, Suite 1
401 Federal Street
Dover, DE  19901

Phone: (302) 739-4241 x141
Fax: (302) 739-2723
E-mail: george.eilers@state.de.us

**Jean J. Rothenburger**
Investigative Administrator



State of Delaware
Office of Auditor of Accounts
Townsend Building, Suite 1
401 Federal Street
Dover, DE  19901

Phone: (302) 739-4241 x 106
Fax: (302) 739-3961
E-mail: jean.rothenburger@state.de.us

FTU2728

A2804

A004

**Statement to Auditors**
**Prepared by Christopher D. Foraker**
**May 12, 2004**

My attorneys, Tom and Stephen Neuberger, who I have retained to represent me, have advised me that Governor Minner has given authorization for me to speak freely during this interview with the State Auditors Office referencing issues specific to the Delaware State Police Firearms Training Unit in Smyrna, DE. Therefore, I have made a prepared statement that hopefully will aid this office in their investigation.

My career with the Delaware State Police began in 1985, a career of hopes, aspirations and intentions to complete my work with honor and integrity to the best of my ability.

Early in my career, the Division encouraged us to find our niche and pursue those career goals. I began serving the Division in patrol for 13 years, during which time I pursued various specialties to include: becoming a team member and ultimately a team leader with our Special Operations Response Team (SORT), working in K9 for 5 years and ultimately, after personally paying for my initial firearms instructor certification, my professional career path of becoming a certified firearms instructor was realized. My assignment as a full-time firearms instructor in 1997 was the beginning of fulfilling my career goals with the Division.

I have honored this oath for 19 years through many life and death situations, forever compelled to uphold not only the law but to *ethically* perform my duty. However, since 2002, I have become incensed with the lack of leadership and accountability within this great organization as well as the leadership of the Department of Safety and Homeland Security, and the Department of Facilities Management, particularly with individuals who prefer to put their personal agendas above the health, safety and betterment of Division personnel and the state taxpayers. It is because of the current leadership of the Delaware State Police, as well as others, that I sit before you today to answer questions about some things of which I am familiar and of those things that I know little or nothing about.

My tenure as the Non-Commissioned Officer In Charge (NCOIC) has been in two, separate, brief periods of time. The first of which was an eight month assignment from August, 2001 until my illegal transfer in April, 2002 and then my federal, court-ordered reinstatement to the same position December 1, 2003 to the present. Colonel Chaffinch was convicted in federal court for violating my constitutional rights by transferring me illegally from the FTU and then assigning me to patrol duties knowing full well of my medically documented 43% hearing deficit in my left ear. The Delaware State Police has standards for new

FTU2729

A2805

A005

applicants. Hearing deficits of that magnitude would disqualify applicants during the hiring phase of employment.

In 2001 and 2002, I spoke out on matters of public concern and was discriminated against by Colonel Chaffinch. At that time, I followed proper protocol in seeking a solution to the numerous issues within the State Police Firearms Training Unit only to hit a brick wall. In 2003 and 2004, I reported matters of public concern through proper protocol and find myself being discriminated against **_once again!_**

I have compiled **some** of the events that have transpired at the FTU since my return on December 1, 2003 through May 11, 2004:

On my return to the range on **December 1, 2003**, I requested a meeting with Sgt. Rich Ashley, Lt. Ralph Davis and Capt. Greg Warren to review all issues concerning the FTU. These issues included: the bullet recovery system, new drag conveyor system, the ventilation system, the floor scrubber machine, as well as many other items that I outlined for inquiry in the meeting. Almost every response by Sgt. Ashley was that everything was fine and in working order. To quote Sgt. Ashley he said: "ventilation system is balanced", "floor scrubber works ok", "conveyor belt system has been fixed by Mayfran", "the roof leaks as normal", etc. At no point in time did he mention any major issues that required my attention; however, when I requested an inspection of the new drag chain conveyor system, Sgt. Ashley said that it was functioning well as it was designed, then took wrench in hand, and began making adjustments which ultimately rendered the entire conveyor system inoperable in the days that followed.

**Two days into my tenure,** I had a staff meeting with Capt. Warren to review numerous items informing my immediate superiors that: 1. our current headsets are unsafe, 2. the FTU manpower was insufficient and posed a student to instructor ratio safety concern, 3. Vehicle issues, 4. Training and recertification training, **5. Serious maintenance issues regarding the bullet trap.** I also arranged for baseline blood and hearing tests for myself and Cpl. Warwick. Cpl. Warwick, who had been assigned to the FTU on November 20, 2003 was not provided with a baseline blood lead level or hearing tests during Sgt. Ashley's tenure.

**In mid-December, 2003,** it was discovered that the entire dredging system had been brought to a complete halt due to the drag or dredge system being damaged and the drive chain broken as a result of Sgt. Ashley "tinkering" with the system rendering it inoperable. The inoperable floor scrubber machines' dead batteries were replaced and the machine was restored to operational condition. I was advised by Cpl. Kurt Price that the last time he remembered the floor scrubber being used was sometime in the summer of 2003.

FTU2730

During this time, supervisors in Facilities Mgmt. after observing the bullet trap, indicated that *bullet trap maintenance* would require a full time professional that would also need to be equipped with the proper protective gear and trained in the handling of hazardous lead and other heavy metals.  Shortly before this time frame, Cpls. Warren and Price advised me that they expressed concern to Sgt. Ashley regarding the jump in their blood lead levels after their hands-on-work behind the bullet trap.  *They indicated to me that their superior officer, Sgt. Ashley told them "you have to die from something".*  Dr. Green of Bay Health stated that the petroleum found in the water that helps to lubricate and preserve the bullet trap is a penetrating agent that is used as the vehicle to transport the lead through the skin and into the blood stream upon human contact.

**In late December, 2003**, the vendor responsible for repair of the dredge conveyor system arrived at the FTU to complete their repairs.  They confirmed that Sgt. Ashley's tampering with the system caused the adjustment point to become altered and thereby causing a domino effect that flowed through to all the remaining adjustments on the system.  They said that only Mayfran trained and certified engineers and technicians should make repairs or adjustments to the system.  It was also discovered by this Mayfran specialist that the limit switch was intentionally disabled bypassing a safety feature to shut down the system during a malfunction.  This caused the clutch, not being able to shut itself down, to destroy the drive chain and clutch sprocket rendering the conveyor system inoperable.

**On January 9, 2004, I reported _with urgency_ the deteriorating ventilation system at the FTU.  I indicated to my superior officers that the ventilation system had significant airflow problems.**

Due to the lack of action by the leadership in the Delaware State Police, the members of the firearms training unit and our immediate supervisors, Lt. Ralph Davis and Captain Greg Warren, identified the _**immediate need**_ to contact an environmental company to conduct testing by obtaining air and surface samples in the building. Environmental Solutions was hired to conduct the swipe tests.

Mid-Atlantic Environmental Laboratories, provided their analytical report of the swipe tests conducted by Environmental Solutions and the results indicated lead, copper and zinc contamination were **everywhere**  throughout the facility.  **No safe haven existed anywhere in the building.**  We learned that regardless of the precautions of personal hygiene and building maintenance, that we were being poisioned at a rate that far exceeded the standards set forth by the US Navy.  After Lt. Col. MacLeish was informed that the FTU Staff and members of the current recruit class were experiencing respiratory problems, bloody noses and a copper taste in their mouths, he advised the members of the FTU to "just put on a paper dust mask to protect yourself".  Lt. Col. MacLeish expressed to the Academy Staff and to members of the FTU that we work at a firing range.  It is expected for FTU staff members to have elevated lead levels and subsequent

hearing loss. The professional, unbiased test results indicated that we were far beyond the so called protection of a paper dust mask.

Captain Albert J. Homiak, in the Planning Section of the Delaware State Police, was commissioned to conduct his own research referencing the range. His research included the topics of range staffing, blood tests, range clothing, routine range maintenance, scheduled maintenance and removal of lead and other toxins. Specifically, he noted that "in all cases, someone other than range personnel handle scheduled maintenance and removal of lead and other toxins". Captain John W. Yeomans, Director of Human Resources also conducted a study. He indicated that Dr. Schwartz, a recognized expert in the field of adult blood lead levels at Johns Hopkins Bloomburg School of Public Health, recommended that the DSP strive to keep the blood lead levels at less then 10 and also to be vigorous in our approach to hygiene at the indoor range. We were being diligent in our hygiene but our blood levels continued to rise due to a non functioning air handling system and no safe haven.

Art Nielson, a federal industrial hygienist indicated that his professional opinion and years of indoor range experience was that the elevated blood lead levels were a direct result of **mechanical system failures** and not a hygiene issue. Additionally, he said that the contamination levels within the entire building exceeded acceptable levels for occupancy.

**In March, 2004**, it was learned that in 1999, Clark Nexsen, the number one ranked vendor during the initial bidding phase to build the range was not awarded the contract in 1997. Clark Nexsen was subsequently contracted by the state to conduct a $35K study to research the ventilation failures that plagued the range. Their findings regarding the air handling system were damning.

During this same time frame, I was contacted by media representatives from The Delaware State News paper as well as The News Journal. Following protocol, I asked for permission to speak with these reporters. Lt. Col. MacLeish fervently ordered me not to speak to them.

**On April 2, 2004**, it was learned that neither HQ Communications, the Kent County 911 Center or the Smyrna/Clayton fire companies were aware that the FTU facility housed large quantities of firearms ammunition as well as explosive and chemical munitions without any fire suppression sprinkler system in the facility. Early on in the project planning phase, Ed Ide, Project Manager of the JAED Corp. requested that the Delaware State Fire Marshal's not include a sprinkler system in the facility. The schematic Mr. Ide provided to the Fire Marshal in his request omitted the identifiers of our ammunition and chemical munitions rooms set forth in all original blueprints.

FTU2732

**On April 26, 2004,** Captain Yeomans, Director of Personnel, wanted all FTU members to complete a hearing analysis questionnaire for an off-sight medical physician. To date, we have not completed this report due to specific questions that would require information pertaining to the physical building of which we know nothing about i.e, hearing abatement tests, decibel rates, etc. We cannot accurately answer all of the questions on that medical questionnaire. For instance, we do not know what the decibel rate exposures were and are because a noise abatement study was never conducted. We also do not have the appropriate hearing protection that would be recommended had a noise abatement study been performed.

I am also aware that the following issues were recommended to the Delaware State Police prior to and during the initial bidding process by Clark Nexsen, as well as other professional firms:

   1.   Noise abatement study
   2.   SOP's for handling disposing of hazardous materials
   3.   Rigorous monitoring of heavy metal contaminant exposure
   4.   Continual air-flow testing conducted in the respiratory zone
   5.   Proper ballistic ceiling (to avoid a ricochet)

The FTU members have collectively worked during the months of December, January and February 523.5 hours of overtime. I have repeatedly requested a fifth full time firearms instructor to ensure that we follow proper student / instructor ratios so as to avert a potentially dangerous training situation, particilarly when you have live fire. But I was repeatedly asked to justify my requests when this same necessity was afforded to Sgt. Ashley during his tenure. This again just points to discrimination.

The members of the FTU have not received any training: no SOP's (Standard Operating Procedures) in the proper abatement of hazardous heavy metal contaminants, no floor scrubber SOP's or been given the proper equipment or SOP's to protect ourselves against exposure to health risk contaminants and hearing damage.

In closing, I performed my duties with the best intentions of all parties involved. I have attempted, through proper avenues, to remedy the problems that plague the firearms training unit. By not remaining silent and keeping my superiors informed of the catastrophic circumstances at the range, I have been rewarded by having my reputation, once again, slandered by Col. Chaffinch and Secretary Homer in media venues.

FTU2733

I am here to declare the blame for the Delaware State Police Firearms Training Units' contamination crisis does not lie here with me or any other member within the FTU or Academy Staff. ***That blame lies behind the pointing fingers of the accusers themselves.   The political posturing and restriction of my first amendment rights of free speech are not the answer.***

My plea is not solely for myself.  It is for every Delaware State Trooper as well as all other law enforcement officers that have participated and will participate in shooting activities at the range.

I fully appreciate the opportunity afforded me to speak out about these issues which are most certainly matters of public concern.

FTU2734

A2810

A010

### My Chronology with the Firearms Training Facility
### Cpl/3 Wayne Warren
### May 11, 2004

**Prepared at the request of the State Auditor's Office**

I transferred to the Firearms Training Unit August of 2001. I had received various Firearms Certifications prior to my assignment as a Firearms Instructor.
I was not given a written standard operating procedure for the range assignment, nor was I informed about the potential heath hazards of the assignment.

### Maintenance Issues

I received on the job training about the procedures used at the range by Cpl/3 Eddie Cathell and Cpl/3 Kurt Price. I was given a short explanation of proper hygiene while working at the range that consisted of the following:

- Change clothes and shoes when arriving at the range in the locker room
- When clothes become soiled launder at the range and place in laundry for dry cleaning
- Wash hands every time you exit the range area
- Do not wear shoes worn on the range anywhere else

I was then advised on the maintenance and cleaning procedures performed by the students. Those instruction were the following

- The range is cleaned by inverting brooms and pushing the spent brass into a pile
- Use a shovel to pick up the brass and place it into small buckets for transport to a larger drum
- Once a week have the students sweep down the bullet ramp with the broom bristles down
- Have the students place the shredded cardboard in a trash can and transport it to the dumpster

Cpl/3 Cathell advised that he would run the Zambonee machine approximately two days a week or when he thought the floor needed to be cleaned.

I was then taken to the back of the bullet trap and given a brief explanation on the operation of the bullet recovery system.

FTU2735

A2811

A011

Cpl/3 Price explained to me that we were supposed to keep up the maintenance on the water tank, conveyor belt, pumps and filter screens. He showed me how we had to scoop shotgun shell wading out of the water tank with a small fish net. He informed me that the tank contained water and a small amount of oil. Again, I was not provided with a written plan regarding the maintenance procedures employed at the firing range.

One morning during my first month of the assignment I walked into the range and observed a puddle of water, I immediately informed one of the other instructors who advised that the roof constantly leaks. I got a mop and mopped up the water.
On another occasion during the first couple of months of my assignment I noticed that the bullet trap was leaking a greenish black liquid onto the floor of the range, I asked about the leaking. I was told that it would leak on occasion; I mopped the floor with the mop that was stored on the range.

As the weather changed, I noticed additional problems at the range. The air handler did not operate as effectively as in the summer. The air handler seemed to struggle; I could feel different amounts of air coming from the different air ducts. I reported this to the other instructors; I was informed that this was normal. The other instructors advised that the air handler has never worked properly, that is why we switched to the non-toxic frangible ammunition.
As the winter weather became colder the air handler struggled more than ever. I could observe smoke from the gunfire coming back toward the shooters. I again commented about the failing system and I was told that the Division knows about it however, there is no money to fix it. I was advised that the State new about the problem soon after the building had opened.

The air handler continued to fail inadvertently. I called facilities Management to report the problem. Facilities Management called in Trane; I was advised by the Trane technician (Ron Whitehouse) that the freeze stat was not working properly due to the cold temperature, he explained to me that when the temperature drops down below freezing for an extended period of time the unit will not operate.
During the spring of 2003 we changed cleaning solution from WD-40 to an Orange citrus cleaner in the parts washer for our armor's breakdown of the service pistol Sig P229. The parts washer is located in the armor's room without an exhaust fan.

I started to get headaches from the concentrated odor of the cleaner. I requested an exhaust fan through Sgt. Ashley, I was told that the State had no money to install the fan.

### Fall of 2002

During this time the pumps and filters started to fail. We were told that we would have to clean the filters more often and change out the failing water pumps. Cpl/3 Price and I complained about performing the additional maintenance work behind the bullet trap. We were concerned with the extra exposure to the liquid in the tank. Sgt. Ashley advised us "that we had to die from something". Sgt. Ashley performed most of the maintenance work after we complained.

### Summer of 2003

The Savage Company along with Mayfran came to the facility to inspect the conveyor and perform maintenance. The technicians noticed that the conveyor belt was starting to clog with the deposits from the frangible ammunition causing the belt to stop. The decision was made to change the belt from a conveyor to a drag belt. The new belt was installed and there were holes cut into the tank to allow for a better water flow. Within two days it had also failed, rendering the range inoperable. The drag belt was repaired but it had to be adjusted by Sgt. Ashley.

The maintenance on just the bullet trap was getting out of control, we had to constantly scoop the shotgun wadding from the tank in order to allow the water to flow. The filters had to be cleaned weekly.

### Fall of 2003

We could not keep up with the necessary maintenance. The ventilation system was really failing; there were times when it would simply shutdown. Calls to Facilities Management would bring maintenance men who did not have the answers for the failing system. I was told, "the system is working as well as it can".

### Health Issues
### September 10, 2001

I got the results back from my baseline lead level test from Bayhealth; the lead level was <3 MCG/DL. We were only shooting leaded shotgun ammunition and some .9mm handgun ammunition.

FTU2737

The majority of the .357 handgun ammunition was lead free, some people referred to it as ceramic ammunition. I was told that Lead level test would be monitored quarterly.

I noticed that after I worked all day in the range I was exhausted. My eyes were tired and I struggled to stay awake in the early evening.

I was not aware of the symptoms of being exposed to high decibel levels of noise for an extended period of time, along with the symptoms of breathing heavy metals.

### October 18, 2001

I received my second lead level test results; my Lead level was 5 MCG/DL. I was somewhat concerned on increasing 2 points, however I was advised that it was acceptable.

### In the fall of 2002

We started training the recruit class. We were required to do additional training with one recruit, extending the period of time required to be in the range. The additional training time brought on additional health problems. I started to get headaches and feel fatigued all day long.

### Spring of 2003

The headsets that we used to communicate with each other on the range started to fail. We were told that it would cost $1,500 each to replace the Peltor headset with Telex push to talk. Sgt. Ashley stated that we did not have the money to replace the headsets. Sgt. Ashley purchased a wireless headset (Peltor Pro Com Plus) that allowed the public to listen or talk when we were calling the range commands.

This could have been very dangerous if we were interrupted by outside conversation. We started using them and discovered immediately that they were not providing the proper level of protection. The sound coming through the headsets was deafening. We voiced our dissatisfaction and we were told that we did not have the money to buy anything better.

### Fall of 2003

I started noticing hearing loss. I was having trouble hearing my wife and daughters during normal conversation with background noise. I also developed a constant ringing in my ears.

FTU2738

A2814

A014

### Winter of 2003

I requested a hearing test from Bayhealth. The test indicated high frequency loss in both ears, along with mild speech hearing loss.

### 12-4-2003

I received my lead level test that indicated my blood level had risen to 9 MCG/DL. This started to concern me.

After experiencing numbness and tingling in both hands since the late summer, I was seen and examined by a neurologist, Dr. Ionita, who diagnosed me with bilateral carpal tunnel syndrome.

### January 29,2004

**Received baseline test for copper. My blood level for copper was 934 ug/l. The reference range was 590 to 1180. This was the first time I was tested for copper. We had been shooting copper the entire time I was assigned to the range.**

### Winter of 2004

We started training the recruit class. One recruit had previous training in hazardous materials. He expressed a concern with the amount of dust coming back at the shooters and instructors. He asked if we knew what the dust contained, if we had an MSDS on the ammunition? We advised him that we did not but we would find out. He assisted us in researching important health information.

We evaluated the information and decided we had to contact Facilities Management. I contacted Facilities Management, I requested to talk to Mark D'Allesandro and was advised by the secretary that he was not available.

I then explained to her that I was concerned about the air quality in the range and that I wanted it tested. I received a phone call after approximately 30 minutes from Mr. Doyle Tiller of Facilities Management. Mr. Tiller advised me that testing the air was not the first step. He advised that he would have to consult with his Engineers and his maintenance people. He stated he was not aware of any problems in the past.

FTU2739

At this point I new I was not going to get the necessary help from Facilities Management. There was documented evidence about ventilation problems in the past (see air balancing reports and various e-mails).

We started to investigate the problem from the planning and construction phase up to the last lead test. It was very apparent that cost cutting was a major factor in the construction and maintenance of the firing range. I am very concerned about the lack of permits and inspections. There should have been every precaution taken to ensure that the building was safe. There also should have been constant air quality monitoring as well as periodic physical inspections throughout the building. I do not think that our health and safety was a concern of Facilities Management or the State Police.

In summary I want to say that I am very disappointed in the lack of concern for the health and safety of everyone who trains in this facility by the State Police and Facilities Management. It is apparent that politics and egos were more important then constructing a safe state of the art facility. I feel that from the initial stages of the project people in administrative positions made uninformed decisions. After the construction started cost cuts continued at the expense of health and safety. Facilities Management failed to oversee the entire project. The State Police should have never accepted the building until it was tested and inspected by an independent evaluator to insure that the building was safe to use.

When the first sign of trouble surfaced the building should have been closed. The state contracted a field investigation and recommendations were made. A professional's advice was not taken and we continued to operate. The State Police and Facilities Management failed to act. Instead, they were looking for a short cut or quick fix (their solution was to change ammunition not repair the ventilation system). This was done at the health expense of everyone who used the range. After the ammunition change, the air test was no longer a concern. How could anyone assume that everything was working properly?

Because of this neglect I have suffered permanent hearing loss. I have high levels of lead, copper and zinc in my body. I have probably contaminated my home, exposing my family to these toxic metals. I have expressed this concern to the State Police and all I have gotten is excuses and troubling statements. Lt. Col Macleish told me "I work at a firing range I have to expect hearing loss". I was not informed through the Right to Know that I was expected to incur hearing loss or be exposed to dangerous heavy metals.

FTU2740

Captain Yeomons told me that my blood serum level was within acceptable ranges; he failed to discuss the time weighted average daily exposure limit set by OSHA.

**I am very upset and concerned for my long-term health.**

**Concerns about the Firearms Training Unit Facility
Prepared By Cpl/3 Wayne Warren**

I have several concerns about the construction, maintenance and health
issues concerning the firing range.

➢ The selection process for Architectural/Engineering firm to design and
build the range was questioned. Why would Facilities Management
choose a firm that was not the number one pick of the selection group.

➢ The Architectural/Engineering firm selected did not have any
previous experience in building indoor firing ranges.

➢ An experienced contractor who had experience in the construction of
firing ranges questioned the initial design of the ventilation system.
The reviewing contractor clearly stated that the system would not
work.

➢ How did the designing firm fail to get New Castle County's approval
to construct the facility? There is no record of any approved plans to
construct the building with New Castle County.

➢ Is it possible that some of the problems could have been identified if a
County Engineer reviewed the plans? During the planning stages Jaed
Corporation wrote a letter to the State Fire Marshal's Office
requesting an exemption for a required sprinkler system. The letter
contained a drawing that simply indicated rooms; there were no room
designations. Jaed failed to identify an explosives and ammo storage
room when requesting the exemption.

➢ There were several cost cutting decisions that were made with no
concern for safety in the actual firing range, eliminating bullet
resistant doors, eliminating bullet deflector baffling for the ceiling and
noise reducing material for the ceiling.

➢ The cleaning room did not include the proper exhaust for cleaning
weapons with chemicals.

➢ The armor's room did not have an exhaust vent.

FTU2742

A2818

A018

The construction phase also had problems.

- ➢ Prisoners from the nearby Department of Corrections installed the tectum used for noise reduction. The tectum was installed with out being sealed around important areas, namely the beam over the control booth.
- ➢ In an effort to cut cost, members of the FTU staff assisted in the installation of the Savage bullet trap, unqualified personnel did welding on the trap. The bullet trap was not sealed properly. If qualified professionals installed it would it have been sealed?
- ➢ The FTU staff also installed the conveyor belt on the bullet trap. Were they qualified to perform this type of work?
- ➢ The center support beam was not engineered properly. When the air handler was placed on the roof the support beam started to sag and had to be reinforced (if the plans were reviewed would this have happened).
- ➢ The ventilation ductwork was not built to the design specifications and was modified. Did the modification have an effect on the original design?
- ➢ The bullet deflectors were installed to protect the supply air ductwork and had to be removed because of the added weight. Why were the design Engineers concerned about the supply air ducts and not the students and staff that would be using the range, a ricochet could have possibly killed someone. When a contractor observed the exposed concrete tees he made the comment that he guessed no one had been injured yet because we were still open.
- ➢ Was the explosive and ammo storage room built to the proper specifications? Should the room have included a sprinkler system?
- ➢ Should the control booth be on the same supplied air duct as the firing range?
- ➢ After the building was constructed there did never New Castle County perform any final inspection. We received a document from the County stating that a final inspection was required.
- ➢ Since final inspection was not performed there was never a certificate of occupancy issued. How can Facilities Management turn the building over to the State Police without a certificate of occupancy?
- ➢ We checked with the Fire Marshal's office for the required inspection. The Fire Marshal does not have an inspection certificate for the building. Is Facilities Management exempt form the required inspections? How can we be sure we are occupying a safe building?

FTU2743

➢ The building was never tested to see if it met industry standards for safety. The ventilation system was never tested to see if it met the industry standard for airflow (the recommended NIOSH standard is 75 feet per minute at the firing line).

➢ There was never any decibel level testing to determine the amount of protection needed and the time weighted exposure limit calculated. The time weighted exposure limit to noise is set by NIOSH and it has to be followed.

➢ The decision on the proper hearing protection was merely a guess, it was never researched properly.

➢ Who is responsible to insure that employees are not being exposed to harmful noise?

➢ No one is taking responsibility for the hearing loss that has been suffered.

➢ There was never an exhaust vent in the armor's room; the vent would help with the inhalation of chemicals along with the dangerous heavy metals

➢ If the Department of Health and the Department of Natural Resources had inspected the building maybe some of these problems could have been avoided.

FTU2744

Master Corporal B. Kurt Price
Delaware State Police Firearms Instructor
Date 051204
Statement to Auditor's Office


      This is my prepared statement for the State of Delaware Auditor's investigation concerning the status of the State Police Range. I began my career as a State Trooper on September 3, 1985. Becoming a Trooper was fulfilling a life long dream, and a great accomplishment in my life. During my employment as a Trooper, I was assigned numerous duties. The core of my career was assigned to Patrol at Troop 3 located in Kent County. While working Patrol, I was also a member of the Special Operation Response Team(SORT). During my service on the team, I realized my Career Development goal to become a Firearms Instructor for the Division. I consider the position one of the most specialized fields in the realm of Police Skills. The Firearms Instructor teaches trainees and current officers in both marksmanship and survival skills needed to survive deadly encounters. This is done through classroom, range, and practical applications to include interactive training to assess student capabilities. In January of 1991, I began my quest in earnest to achieve my dream by obtaining my certifications. These certifications are mandated by the Council on Police Training(COPT) and enhance your Instructors' skills. Upon successful completion, I became an adjunct Instructor assisting on range and classroom presentations.

      The more I worked in this capacity the more I fell in love with instructing, it became my passion. I knew this was my career path, my speciality. I began submitting transfer request in 1993 to become a full time Instructor. Historically, the only way to become full time was due to an Instructor retiring from the Division that made the opportunity few and far between. I continued to assist on the range whenever possible so I could continue and grow as an Instructor. I would use my own time and money to attend Instructor level schools to enhance my skills and teaching abilities. In 1995, I resigned from the SORT team due to family commitments, and working a rotating shift. Yearly, I continued to upgrade my resume and request for transfer into the Firearms Training Unit(FTU). My dream came true November 23, 1996 when my transfer came through. Effective Monday, December 16, 1996, I was assigned full time to the FTU. This was an exciting time due to the fact the indoor range was becoming a reality and I would be part of it.

      We were conducting training on our outdoor range located on Denny's road in Dover. During training down time, we assisted with construction of the new indoor facility. These duties included installing the Savage arms bullet trap and deflectors. I was very apprehensive about this work due to lack of training and experience. We used welding gear, fork lifts, and grinders. According to Lt. Bryson, we provided the labor in an attempt to keep costs down. Sixteen hour days were the norm and overtime was not an issue. Liability was another concern. Since we installed the trap and deflectors, would we be liable for injury? The trap had problems and overflowed until it was altered by Boyds welding. Boyds had to cut channels in the trough to allow the water and oil to flow properly. Firearms training staff also installed the Mancom target

FTU2745

system again in attempt to offset costs. In 2003, all the target carriers had to be replaced because they were installed backwards and received extensive damage. This mistake cost the State of Delaware $20,000 dollars. We also installed a drop ceiling in the control room. This was done to help sound proof the room. A work crew from the Department of Corrections installed the sound proofing material on the walls of the range. This material is called tectum. No other sound proofing was utilized and since the roof sagged the deflectors were deleted. This leaves the greatest surface amount with no sound proofing at all. No decibel testing was conducted to ensure that students and staff were provided proper hearing protection. Noise abatement was addressed in the feasibility study, but not followed. Prior to the building opening, Lt. Bryson ordered us to vacuum the roof and under the trap. I cannot recall any type of final inspection being conducted by any Government agencies or vendors. We never turned the Air handling systems on and conduct any testing to ensure the air flow was 75 CFM per NIOSH standards. The Division was more concerned with appearance than function. The main center beam began to sag due the tremendous amount of weight on the roof created by the air handling system. Kent construction company jacked the roof upward and added a support beam. After this was completed the range was opened is September of 1998, and the FBI National academy was the first to shoot on the new facility. We began training in-service personnel that fall , and by November 1998 it was apparent something was wrong. Instructor blood lead levels rose at an alarming rate. While shooting was taking place you could observe the smoke roll back towards the students and instructors and go all the way to the back of the range. We constantly blew black debris from our noses. The State purchased a hepa-vacuum for sweeping the range; however, we never received any training or given any special protective gear or respirator. We never received any training on hazardous material abatement or disposal. This was done with the floor scrubber too. Just like the hepa- vacuum it was delivered and that was it. No formal training was given to the staff.

Smoke testing was done to ascertain air flow inside the range. Smoke tests were done so much that Facilities management purchased one to be kept at the range. That was the only air test conducted.  In January of 2004 Mr. Bill Provencher tested the air flow, and the air blows back towards the Students and Instructors. This was the first air test using a scientific instrument that I witnessed. I cannot be precise as to how many times the air handling system has been balanced and tweaked to improve air flow. It's never worked. Many experts in the field have stated it will not ever work. According to recent environmental tests conducted by environmental solutions, and Harvard enviromental Inc. The entire building is contaminated with heavy metals. Supply air ducts have been blowing contaminated air in the classrooms, office, break room, and bathrooms. The firearms staff change our clothing in the lockeroom to make sure we don't take lead, copper, zinc, arsenic, and other contaminates home to our families. Based upon an evaluation I received from October 01, 2002 to September 30, 2003 I provided 258 days of instruction to Federal, State and Local Police Departments. We fired approximately 400,000 rounds of ammunition. This amount exceeds time weighted averages for decibels and exposure to heavy toxic metals. I also provided daily maintenance on the bullet trap. These duties included cleaning filters and replacing pumps. During this period my lead level increased by 6 points. According to Dr. Green of health works this spike was caused by the oil water mixture. The oil penetrates the skin carrying toxins into the blood stream.

FTU2746

We have no safe haven. No amount of hygiene we perform protects us or our families. I have a 13 year old son and an 11 year old daughter. I have been contaminating my family and that is deplorable. Jim, my son, was 7 and Katie, my daughter, was 5 when I began working in the range. Lead has a devastating effect in young children, and it may be fatal. I have no idea what maybe happening to their young bodies and minds. I pray that they are healthy and unscathed by this negligence. On March 1, 2004, the instructors responded to Omega Medical to receive a physical examine. I learned from that examination that I have lost 60% of my hearing in my left ear and 35% in my right. My 24 hour urine sample revealed my lead and copper exposure to be high. Due to the results of my hearing test, I received a second opinion from an ENT Doctor. This Doctor advised me that I'm at the brink of needing a hearing aid. The most disturbing prognosis is that I will eventually be deaf, and there is nothing that I can do. During a meeting with the LT. Colonel, he stated that I work in a range and it's to be expected. He further used the analogy of being assigned to the artillery, and again making reference to hearing loss being expected. My expectation is my Division doing everything in their power to protect me and my family. The Division has failed in my expectation!

Since the closure of the DSP range, we have been using Wilmington P.D.'s outdoor shooting range for firing activities/training. I was recently removed from Wilmington Police Department's range by the LT. Colonel of DSP. According to him, I am not to be on the premises during firing of any type. If this is the case, what about qualifying to meet COPT standards? If I can't qualify, then my certifications will expire and I will no longer be a Trooper. I'm on light duty? No one has answered my questions. My future is uncertain now both as a State Trooper and my retirement. I looked forward to Instructing Law Enforcement and Military students after my career as a Trooper. That cannot happen now. What is to become of me and my family? I need answers, help, and support. I have not received any yet.

FTU2747

# Firearms Training Unit
## Auditor Packet of Documents
### Table of Contents

| Document # | Explanation of Document |
|:---:|:---|
| 1 | DSP memorandum - approximately 1992. Shows the rankings and raw scores of the original Architect/Engineering firm selection. JAED Corp. is ranked dead last overall and does not even receive an interview recommendation. |
| 2 | 1996 Letter to DSP from RangeTech President Thomas M. Corcoran, stating that the ventilation system "as designed will not work," and "will inevitably fail" if constructed. |
| 3 | 1999 Letter from Batta Environmental Associates reporting that lead levels in the firing range are above the OSHA limits. |
| 4 | 1999 Letter from Clark-Nexsen to Facilities Management. This letter directly contradicts JAED's contentions that Clark-Nexson approved the FTU design. Instead, it states that Clark-Nexsen "had no involvement in the design." |
| 5 | March 2004 DSP Memo from Capt. Homiak to Lt. Col. MacLeish. This document contradicts Secretary Homer and the DSP's claim that range personnel should be responsible for removing lead and other toxins from the range. It indicates that it is the practice at **all** other firing ranges to have "[s]omeone other than range personnel handle scheduled maintenance and removal of lead and other toxins in all cases." |
| 6 | March 2004 letter from Neilson Associates, noting that the FTU "does not meet minimum standards for occupational federal health and safety standards for occupancy. |
| 7 | 2004 Memo from Sgt. Parton, former NCOIC of the FTU, refuting Facilities Management's claim that there have never been any problems at the range |



Delaware State Police

Staff Support


To - Major Robert Gouge

From - Capt. Paul Cunningham

Subject - Range Project, Progress Report


Misc. - (File - Proposed Range Site Report)
        A letter was received and placed in the file. The letter is from Alonzo Coker representing the Lenape Indian Tribe of Delaware. Wants to be notified when the old range site is abandoned.

    Site - We currently have the 14.26 acres on NCR 485. I have requested any additional land contiguous to that parcel that may become available from DELDOT. Pending wetland mitigation and final highway alignment.

        Contact Rod Hill DelDot Real Estate 739-4323 or Jim Keller 739-4827.

        Zoning certificate on file.

        Topographical and wetlands map on file.

    Driveway - Have requested bids from three local contractors - (1). Ralph Cahall and Son Paving Inc., Clayton, DE. 653-4220, (2). Green Paving and Excavating, Inc. Townsend, De. 378-2965, and (3). Hudson's Dump Truck Service and Backhoe Work, Dover, DE. 678-2599.

        Vendors 1 and 2 have responded with their bids as of December 1, 1992. Vendor 3 has not and was contacted this date to get the bid in by the end of this week.

    Permit from DelDot on file.

    Need to contact Chuck Legates at Del Dot at 739-6670 prior to construction beginning.

    As of 12-7-92 all three bids have been returned with Cahall the lower bidder. RWO initiated.

    Architect/Engineering firm selection -

FTU2749

Short list completed and on file.

Interviews completed and file ranking on file.

Final selection pending action by Staff. Draft of selection letters on file (A/E selection)

Batson property disposal – the property has been turned over to the U.S. Marshal's office for disposal. Contact is Deputy Maggie Gemmell 573-6022. The property is presently listed with Broadcreek Realty in Seaford.

NRA range development assistance –

Contact was made with Robert Pemberton, Sr. at the Range Technical Team Operations Center (203-928-6934). Our project was assigned a range case number (DE-0183-92) and a team advisor was assigned - Mr. William Crewe, 961 Atlantic Circle, Seaford, DE.

* further information in range binder.

Portable offices - contacted Williams Mobile Offices, Baltimore, MD. Barbara Hayward - 800-782-1500.

Vacuums – information obtained from Nilfisk of America, Malvern, Pa. Russell A. Seery (215-444-3317 Ext 175.

Steel - a request has been made for surplus steel from the Defense Re-utilization Marketing Organization (U.S. government) via Delaware Divison of Purchasing Yvonne Gregg is the contact person at Delaware City - 577-3070

FTU2750

Sept. 15, 1992 contacted Greta about short listing the A/E letters. She will do and complete by Friday.

Checked the Steel at the old range at Troop 4. It is still there and appears to be 1/2 in. Contacted Ira White DelDot Real Estate section 739-2776 about the steel in the old Troop 4 garage. He will call back next week.

Contacted Ray Simpson at Troop 1. The old range is still in the basement and they are doing renovations now. Call Capt. Taylor tomorrow.

Lt. Oday contacted at Troop 5. About 150 sq. ft. of steel remain there. Capt. Kane contacted and stated that the entire range is still at Troop 2.

Ceiling steel is still in the HQ range in supply.

Contacted Eastern Shore Steel ref AR400 steel. They have a steel that ranges from 360 to 500 BHN with the tested rating of 400 BHN. It comes in 4'by8' sheets. Bulk price is $169.80 a sheet. 75 sheets would cost $12735.00. They will let me know about a small sheet for testing.

Sept. 16. 1992 contacted Yvonne Gregg Div. of Purchasing about the steel in Norfolk. Told her about the run around from Jim Lucas. She will make some phone calls and get back with me. Her Div. has a tractor trailer but generally does not go to Norfolk. We might be able to make some arrangements.

Bonnie from Eastern Shore Shore called and said that they do not have a piece of steel in stock that is 20 by 20. To cut a piece would cost $72.50. I will check back with her if needed.

———Sept. 18, 1992 The short list score sheets were turned in to me in the A.M. By totalling the raw scores, a rank order was obtained as follows:

1. Clark, Nexsen, Owen, Barbieri, Gibson      249.00 points

2. Tetra Tech Richardson      235.00 points

3. Tevebaugh Associates      226.75 points

4. Architects Studio, Inc.      195.25 points

5. Moeckel Carbonell Associates, Inc.      192.75 points

6. Pepper Architects      181.5 points

7. R. Calvin Clendaniel Associates      181.25 points

8. Nicholas Staikos AIA Architects      170.25 points

FTU2751

9. JAED Corporation                                      161.00 points

My recommendation at this point is that the top (5) firms be invited to interview for the contract.

(see shortlis.doc)

Recevied a call from Yvonne Gregg from Division of Purchasing at Delaware City. She has contacted Henry Stewart of the D.R.M.O in Norfolk,Va. (804-444-1318) He can get us the steel from Camp Allen. The steel comes in 5 and 8 ft widths. and various thicknesses. I need to call him and get the particulars on the steel and send a request to Yvonne Gregg at De. City on Monday. Discussed picking up the steel and she suggested that I call Mr. Suppi DELDOT at Bear as they have a standard 40 ft flat bed trailer that we may be able to use. Asked her about storage at Del. City. and she will look into it and let me know.

Called Henry Stewart at DRMO Norfolk. He says that he can fill our needs for steel no matter how large. (got a ticket in MD.) Steel is 1/4 up to 3/4 inches thick and comes in sheets of 8ft wide by 20, 30, or 40 ft. long. and 5 ft wide by 20, or 30 ft long. need to give dimensions. Do on Monday and fax to Yvonne Gregg at Del. City. 577-3070 and ask for fax.

Talked to Maj. Gouge OK'ED getting the steel and will pay shipping if we can store it at Del. City. No luck on a vehicle. Entrance ok and short list ok. He will sit on interview board if available . Check with Pam about his schedule  before Scheduling the interviews.

September 22, 1992 Faxed request for steel to Yvonne Gregg at Del. City. Tried to call her to check on storage. Need to call back 9-23 at 0800 hrs.

Received a call from Vince Hartman from Ft. Benning, GA. He was inquiring about Regupol shooting blocks. I told him about the hanging lamella's and the shooting blocks. I gave him the number for Kleibomer, Jurgen Jeschke, and Caswell. Strongly recommend that he contact Jeschke or Kleibomer as they have the experience. Hartman's phone number is (706-545-1416 or 5606).

Called Peter Breuer to let him know that I had a call from Hartman ( I also gave Hartman Peter's number in Lancaster)

Hartman stated that they were shooting Tungsten .223 cal. bullets.

Requested a meeting with Lt. Col. Ellingsworth to discuss the range and the Germany trip (0815 hrs.)

Talked to Lt.Col. Ellingsworth. Stressed the importance of the Germany trip. Told him that I project a cost of

FTU2752

Architect Selection Short List

Date – Sept. 18, 1992

Subject – Short List Scoring Results.

The submittals from (9) firms were reviewed and short listed by the following people –

1. Karin A. Sweeney, PE – Building Support Systems Engineer, Technical Services Section, Division of Facilities Management, Dover, DE. 19903.

2. Milton B. Horton – Building Maintenance and Construction Section, Division of State Police, Dover, DE. 19903

3. Greta Iplenski – Purchasing Officer, Division of State Police, Dover, DE. 19903.

The results of the short listing by individual scorer follows –

| Firm | Scorer | Score |
|------|--------|-------|
| 1. C,N,O,B,G | Sweeney | 73.0 |
| 2. Tetra Tech Richardson | Sweeney | 71.0 |
| 3. Nicholas Staikos | Sweeney | 70.0 |
| 4. The Architects Studio | Sweeney | 68.0 |
| 5. Tevebaugh Associates | Sweeney | 64.0 |
| 6. Pepper Architects | Sweeney | 63.0 |
| 7. JAED Corporation | Sweeney | 57.0 |
| 8. R. Calvin Clendaniel | Sweeney | 53.0 |
| 8. Hoeckel Carbonell | Sweeney | 53.0 |

Note – all scores above are rounded to closet whole number.

| | | |
|------|--------|-------|
| 1. C,N,O,B,G | Iplenski | 88.0 |
| 2. Teta Tech Richardson | Iplenski | 77.0 |

FTU2753

A2829

3. Tevebaugh Associates    Iplenski         74.5

4. Hoeckel Carbonell       Iplenski         52.5

5. R. Calvin Clendaniel    Iplenski         49.0

6. The Architects Studio   Iplenski         36.5

7. JAED Corporation        Iplenski         36.5

8. Pepper Architects       Ilenski          33.5

9. Nicholas Staikos Arch   Iplenski         32.5


1. The Architects Studio   Horton           90.5

2. C,N,O,B,G               Horton           88.5

2. Tevebaugh Associates    Horton           88.5

4. Hoeckel Carbonell       Horton           87.5

5. Tetra Tech Richardson   Horton           87.0

6. Pepper Architects       Horton           85.0

7. R. Calvin Clendaniel    Horton           79.0

8. Nicholas Staikos        Horton           78.5

9. JAED Corporation        Horton           67.5

**Rank order by total raw score - (all scores roundd)**

1. Clark, Nexsen, Owen, Barbieri, Gibson    250 points

2. Tetra Tech Richardson                     235 points

3. Tevebaugh Associates                      228 points

4. Architects Studio, Inc.                   196 points

5. Hoeckel Carbonell                         194 points

6. Pepper Architects                         182 points

6. Nicholas Staikos, AIA                     182 points

8. R. Calvin Clendaniel                      181 points

9. JAED Corporation                          162 points

FTU2754

The recommendation of Mr. Terence Martin, PE Facilities Management Division of Administrative Services is that we take the top (4) firms for interviews. My recommendation is that we include number 5. Moeckel Carbonell due to closeness of the scoring between them and number 4. Architects Studio.

FTU2755



# RANGETECH INTERNATIONAL CORPORATION
## 227 BLUFF AVENUE · LAGRANGE, ILLINOIS 60525, USA · (708) 354-3150

## Recommendation for construction of the Delaware State Police Firing range

March 27, 1996

Submitted to:   Lt. William E. Bryson
Headquarters, Ordnance Section
Delaware State Police
P.O. Box 430
Dover, DE  19903

## Operational Intent

We have evaluated the ventilation system design for the proposed State Police Facility. We have evaluated the design of the fan, heating & cooling equipment, duct, filter, air flow and control systems and have concluded that this system, as designed will not work.

The definition of "will not work" is simply that the present design will not perform as it is required to under the present requirements established by OSHA & NIOSH.

These performance standards are those based on an earlier criteria established by NIOSH. The performance intent for firing range ventilation systems shall meet all the requirements outlined as recommendations and design considerations in HEW publication no. (NIOSH) 76-130 dated December 1975 entitled "Lead Exposure Design Considerations for Indoor Firing Ranges". This design standard prefers an air flow velocity of 75 feet per minute average on the empty range. This design has consistently provided for the compliance within the established federal standards for airborne inorganic lead concentration limits. When properly executed, lead concentrations are consistently maintained below the action level of 30 micrograms per cubic meter (30 u g /m3) in an area where the limit shall not exceed 50 micrograms of lead per cubic meter (50 u g /m3) of air over a time weighted average of eight hours as measured at the respiration zone of the shooters and the range officer when firing from the firing booths per OSHA 29 CFR. 1910.1025 and 1926.62.

The ideal air flow is designated as laminar, or even flow. This is construed as an air supply that has only slight velocity variation, when measured from ceiling to floor. This velocity variation cannot exceed 15%. In order to achieve this desired air flow certain air distribution systems must be constructed. The primary goal is to provide the proper cubic foot value of air to the range through the supply trunk duct. The duct is then to be distributed through a continuous graduated plenum to a singular continuous diffuser system. The diffuser system may vary in type per each application. Either way, each configuration should provide for an even flow of air across the entire width and height of the range.

The exhaust duct system should be constructed in a fashion that evenly extracts the supply air from the range. Our experience in this matter has been to create an extraction opening the width of the range and capable of sustaining an inlet, or capture, velocity of 2000 feet per minute.

FTU2756

A2832

A032

The exhaust fan and filter system should be designed to allow for 350 to 500 fpm velocities across the filter media. The exhaust fan should be sized so as to allow for operational static pressure at 5 inches wg at the desired volume of air flow. The filter media should be that of at least 95% @ .03 micron. This will help achieve the federal exhaust emission levels established under EPA 40 CFR 50.12 (1.5 Micrograms of lead per cubic meter quarterly).

The control system should be configured in way that allows for modulation of the supply or exhaust air. The purpose for modulation is for maintaining both air flow and pressure within the range area. The exhaust has a Delta pressure span of over 3 inches wg, we must vary the volume through the exhaust fan unit. A variable frequency drive or inlet vane damper is the recommended instrument. By modulating the inlet volume to the exhaust fan we will be able to restrict volume into the fan as the filter bank offers little static pressure resistance (clean filter condition). This will also allow for a less restricted inlet volume as the static pressure increases over the filters (dirty filter condition).

# Findings

We have concluded that the designed ventilation system will inevitably fail if it is constructed as designed. our findings are based on the following:

Since the design standard is a consistent air flow velocity of 75 feet per minute average on the empty range, the supply duct(s) would have to discharge their total volumes in one place prior to the primary firing line. The system , as designed, fails to do this. Presently, the design indicates three supply trunks at varying distances on the range, two of these after the primary firing line. This design requires that the volumes of all supply trunks be introduced to the range, prior to achieving desired velocity. This presents a myriad of flaws.

The first flaw being that the designed system's first supply trunk will provide a volume of air which will create a velocity relative to the cross sectional area of the range at that point. This will provide only 1/3 of the desired flow velocity. The remainder of the air volumes needed will occur at the second supply trunk, designed to total 2/3rds of the desired, and at the third supply trunk. This addition will total the 100% of design.

The flaws in this design are varying velocities at each supply point. These variances equate to pressure differences and ultimately turbulence. Turbulence has been the number one cause of failure and will be the cause of failure to this system as well.

As mentioned earlier, the supply air volume must be the result of the desired velocity multiplied by the entire cross section of the range. This is required to maintain a consistent on range pressure. The present design indicates an attempt to direct the main supply volume to an area of rated volume / velocity. It indicates that the upper areas of the range will not be included within the airflow. these two bodies of atmosphere (moving & static ) will present their own pressure. The design fails to address how it will prevent the equalization of these two pressures  (the moving body being at a lesser pressure).

The fact of the matter is that the pressure will equalize, the velocity will become undesirable and the turbulent air flow will fail any attempt to comply with the OSHA & NIOSH standards.

Our experience in these matters have made us a leader in the firing range ventilation industry. We have successfully completed every firing range we have ever built. We have guaranteed the performance of all our ranges. We are willing to provide a performance guarantee to the Delaware State Police.

We can only make this offer provided we are allowed to design, engineer and implement our system. We will be able to provide the State Police with an engineered design. If our design is executed per our exact specifications, by our personnel and under our supervision, we will be able to guarantee operation and performance as previously described.

FTU2757

A2833

A033

If you have any questions please call (708) 354-3150   Fax (708) 354-3163

Sincerely

Thomas M. Corcoran
President
TC/nmb

FTU2758

A2834

A034

③



Dedicated to a Cleaner
Environment Since 1982

# BATTA ENVIRONMENTAL ASSOCIATES, INC.

Industrial Hygiene • Geo Environmental • Analytical Laboratory

Delaware Industrial Park • 6 Garfield Way • Newark, DE 19713-3540
(302) 737-3376 • Fax (302) 737-5764

Mr. Doyle Tiller
Facilities Program Administrator
State of Delaware
Department of Administrative Services
Division of Facilities Management
Margaret O'Neil Building - P.O. Box 1401

December 1, 1998

RE:   Lead Results - IAQ - Smyrna Firing Range - State Police Firing Range
      BEA # 32709CJ

Dear Mr. Tiller ;

On November 23, 1998, Batta Environmental Associates Inc. (BATTA) was retained to perform indoor air quality monitoring, for lead, carbon monoxide, and nitric oxide. The call was in proactive response to concerns that the HVAC system was not functioning in a completely adequate manner, as to evacuate the fumes associated to the firing range activities.

BATTA set up sampling pumps with 37mm MCE filters to be analyzed using Atomic Absorption Spectrometry. Samples were set up in the range area in the vicinity of the firing points, in the control room, and in the hallway outside of the control room. The locations were selected to help determine exposure potential in the range area, as well as to occupants outside of the firing area.

NIOSH Recognizes 0.100 mg / m³ of air borne lead as its maximum acceptable level, as OSHA recognizes 0.05 mg/m3. During the assessment, levels in the control room, and stairwell outside of the control room were found to be below the limit of detection. There is no concern with the exposure in these area(s). Levels in the firing range area, taken at the firing points during small arms firing were analyzed as being above the OSHA limit of 0.05 mg/m³. Results ranged from 0.098 mg/m³, in the central downrange area, to 0.141 mg/m³ at firing point #7 and 0.165 mg/m³, at firing point #14.

During this monitoring, Nitric Oxide and Carbon Monoxide levels were not elevated to a rate of concern. (See preliminary report dated 11/30/98)

BATTA recommends having the HVAC system adjusted to evacuate the airborne contamination in a more efficient manner, and have follow up monitoring performed in order to provide documentation of the response and corrective action.

If I may be of further assistance, please call at your convenience.

Respectfully,

Kenneth M. Belmont
IAQ ~ Project Manager

CC:   File - BEA # 32709CJ
      T.K. Zeisloft

CERTIFICATIONS AND AFFILIATIONS

A CERTIFIED MBE COMPANY

American
Industrial
Hygiene
Association

E.P.A. LAB. ID# DE004

NVLAP

BRANCH OFFICE, GEORGETOWN, DE

FTU2759



④

Architecture & Engineering

April 26, 1999

State of Delaware
Department of Administrative Services
Division of Facilities Management
O'Neill Building
410 Federal Street, Suite 2
Dover, Delaware 19901

Attn:   Ms. Elrita Annett

Ref:    State Police Training Facility
        Smyrna, Delaware
        Clark Nexsen Comm. No. 1308.2

Dear Ms. Annett:

Attached are four copies of the revised report including the cover page, Table of contents and Section 1 paragraphs A, B C & D. We have included recommendations on how to improve the airflow pattern using only the existing system per the comments at the review meeting.

Please note the report is not a forensic report and is not presented to be critical of the original design/construction process. The report was written, per the Letter of Intent and additional comments from the review meeting, to present various options to provide a safer operating environment for the range staff which complies to the requirements of NIOSH and OSHA.

During the review meeting with your staff several questions were raised about why the cost of these repairs exceeded the budget cost, which Clark Nexsen had prepared for the State Police in 1993. The implication was that Clark Nexsen had not done an adequate job of estimating the cost for this facility during the preparation of the Feasibility Study. In order to respond to this question you need to recall some of the history of this project. Clark Nexsen was originally hired by the State Police to prepare a Feasibility Study of the Police Training Facility. This facility was to include all Delaware State Police training facilities including a Dormitory, Academic Building & Cafeteria, Vehicle Maintenance Shop, Gymnasium Complex, Water Training Tank and an Indoor Range. Most of our efforts were directed to preparing the program for these facilities and documenting the requirements in terms of square footage. A secondary portion of the report provided a concept design of the Indoor Range. A minor part of this scope was to provide a square foot budget estimate for the Indoor Range. All of these documents were prepared, submitted, reviewed, and approved in December 1993.

6160 Kempsville Circle, Suite 200A, Norfolk, Virginia 23502  757/455-5800  Fax 757/455-5638  http://www.clarknexsen.com
A Professional Corporation                Offices in Norfolk, Charlotte, Alexandria and Roanoke

FTU2760

A2836

A036



*Architecture & Engineering*

State of Delaware
Department of Administrative Services
Division of Facilities Management
Attn: Ms. Elrita Annett
Page 2

After the study was approved the State advertised for A/E services to continue the design of the Indoor Range. Clark Nexsen responded to this RFP, was selected for interview, but was not successful in obtaining the design project. After the project was awarded to another A/E firm they asked us to be a consultant to them to assist them in the design of the facility. We agreed and negotiated our effort with them. However the only effort they requested was for us to provide them with some information on bullet traps and in 1996 they asked us to review the mechanical drawings. This review was requested after the project design had been completed and unsuccessfully bid and at least one of the bidders challenged the adequacy of the mechanical design. Our review comments of that mechanical design were very much same as the recommendations contained in the attached report. During the design of this project Clark Nexsen had no involvement in the design. Neither the State nor the design A/E firm consulted with us during the design. We were not aware of any changes, which were made to our concept design nor why they were made.

Examples of these changes were:

Dividing the airflow required into smaller portions instead of providing the required velocity every where,
Providing heat and the utilization of a heat recovery system,
Using roof top equipment vs putting the equipment on grade
The bullet trap material was changed
The range was not divided into two separate rooms.

Many of these changes increased the cost of the project. We were never given any opportunity to comment on the cost impact of these changes. As we were not involved in the process we should not be held accountable for the current cost of this facility. Many of these problems would not of occurred if you had hired an A/E firm who had previous experience designing this type of specialized facility. It was the responsibility of the A/E firm that you hired to design this facility to design within your budget or to inform you as soon as they were aware that there was inadequate funding for this project. Clark Nexsen was not asked nor contracted to be a part of the cost estimating for the construction document phase of the design.

We are available to review the final report changes with your staff. If we can be of further service helping to implement any of the recommendations or to clarify them, please advise us.

Sincerely,


J. Wayne Abernathy, PE.
Associate

J:\JOBS\1308\Proposal\990414 Letter fro revised report.jwa.doc

FTU2761



# MEMORANDUM

**TO:**        **Lieutenant Colonel MacLeish**

**FROM:**        **Captain Albert J. Homiak**

**DATE:**        **March 4, 2004**

**Re:**        **Firearms Range**

Sir,

   I sent a message out on the Planning List Serve (this includes both the FBINAA and SPPO) requesting response from agencies with indoor ranges. I received several responses, and from those who responded I either contacted by phone or e-mail. I spoke to approximately 15 representatives from various agencies, including federal, state, and local departments. As with any issue, some agencies are more proactive, progressive, and professional in how they deal with issues and personnel at their firing range. I found most agencies have gone to, or are in the process of having a lead-free range due to problems they experienced first-hand, or because of problems they heard about and were trying to avoid. The topics I spoke to them about included:

- What was their staffing level and rotation schedule for personnel assigned to their range?
- What are the duties and responsibilities of range personnel?
- Are they required to conduct maintenance and clean-up responsibilities?
- Do your range personnel get tested for toxins in the blood, and if so at what frequency?
- Do you have parameters for toxins in the blood for range personnel?
- What policies do you have in place to protect range personnel?

**Range staffing** at the various agencies was similar to ours. No agency I spoke to routinely rotated their range personnel. Much like our system, officers were assigned based on individual officer expertise and requests to be assigned to the firearms unit. Range officers were required to be trained on the system they worked within. This involved "train the trainer" or a representative from the company who installed the systems within the physical plant. No agency had mandatory rotation due to potential toxins associated with being a firearms instructor. Some agencies use a TAD or substitute firearms instructors to supplement the permanent staff. Some agencies that still use lead-based ammo in their range rotate different assignments within the range. These internal assignments include operating the control center, doing administrative duties, firearm repairs, and being on the range during qualifications. This is done in order to

minimize constant exposure to live firing, hence lessening exposure to noise, lead, and other toxins. Nobody has a written policy regarding this; it's based more on common sense or a blood test result.

**Blood tests** on range personnel for lead and other toxins varied. Some agencies test their personnel every 3 months, some twice a year, and others only one time a year. The administrators I spoke with acknowledged they rely on what the testing labs and doctors advise them about lead levels in employees blood. Most were familiar with what might be considered in the high range, but they said they relied on outside medical experts for definitive answers. For those who had range personnel with high lead levels, they said it usually coincided with a scheduled shoot and that the affected person would be relegated to administrative duties and kept away from the hands-on portion of the firing range. They would have more frequent blood tests conducted on an individual basis in those instances.

**Range clothing** is supplied at each facility. Most agencies encourage their officers to leave their range-issued clothing and other gear at the facility or it is part of their SOP that requires them to do so. There were some agencies I spoke with that did not monitor whether range clothes remained at the firing range and they had no policy in place regarding that. Some ranges have built showers at the facility for range officers to utilize prior to going home. Additionally, some agencies utilize special floor mats that are placed at the exit doors from the range. The mats are intended for people to wipe their shoes when exiting the firing range, since it is everyone's goal to make their range lead-free.

**Routine range maintenance**, except in very few cases, was conducted by range personnel. This may involve minor things such as changing lights to putting salt on icy sidewalks. Some of the more proactive agencies clean their ranges daily with range officers, but they require their officers to use a vacuum with a HEPA filter. Dallas PD conducts routine and scheduled maintenance that their personnel are capable of doing, however they wear protective gear and respirators. Some agencies require protective slippers be worn when conducting even the most minor repairs. They are discarded when finished.

Someone other than range personnel handle **scheduled maintenance and removal of lead and other toxins in all** cases. Some agencies have an outside vendor, another government agency, or a service plan with their range building firm to remove the lead/toxic buildup. They also use the same process to conduct maintenance involving contact with lead or other toxins. Missouri State Police utilizes an outside vendor that requires its workers to wear ventilators when removing lead. The same agency had a problem with clogged air filters that required the replacement of filters every day.

I spoke with numerous agencies, however only one agency (York Regional Police in Ontario) had the same system as ours (Savage Snail System with a wet ramp). The person I spoke with sounded well versed in the subject and he was adamant that you couldn't use frangible ammunition (which is what we use) with the Snail System because

FTU2763

it would clog the bullet traps and render then inoperable. He supplied me the name of the lead-free ammo they use if you are interested.

I've asked for some of the agencies to send me their Firing Range SOP and can provide that if you wish. The above information was gleaned from phone conversations, e-mails, or a combination of both.

I've attached two documents I located on the Internet. One is a National Park Service firing range waste management information sheet and a firing range waste management checklist. The second document from the Division of Occupational Safety pertains to indoor ranges and offers standards and suggestions on a variety of topics that I was asked to research. I have highlighted certain areas I thought were pertinent.

Lastly, I also called the National Rifle Association (NRA) and spoke with John Joines. Mr. Joines heads the NRA's Technical Team Advisors. This group provides **unbiased** technical assistance to police and private firing ranges. To summarize, they would have a person go to the range and completely evaluate the facility. This includes ventilation, bullet traps, and other issues. The evaluation should only take one day and a report would be generated within a month. The cost is $150 for the evaluation, .37 cents per mile, up to $45 per day for meal money, and a hotel room if needed (unlikely). Mr. Joines indicated the person who would be assigned is Jack Giordano from New Jersey, who he claimed is the best person of his 90 person advisory team. I have more information if you're interested in this option. Since there is a sense of urgency to get some resolution on the matter, a decision should be made on this option as soon as possible since it would take 1-2 weeks for him to come to Delaware, and then one month for the report.

Please let me know if this report is lacking anything you wanted information on and I will certainly provide additional information.

FTU2764

A2840

A040