FROM : FAX SERVICE                FAX NO. :                Mar. 23 2004 08:37AM P2



 

**Neilson Associates Incorporated**

42 Blue Stone Drive

Chadds Ford, Pennsylvania, 19317, USA

Telephone 610-793-0883
Fax 610-793-0885
E-mail: clientservices@neilsonassociates.com
URL: http://www.neilsonassociates.com

March 21, 2004

SGT. Christopher D. Firaker
NCOIC Firearms Training Unit
Delaware State Police
391 Clark Farm Road
Smyrna, , Delaware, 19977

REF:  Indoor Air Quality (IAQ) Range

Dear Mr. :

In accordance with your request , through the auspices of the Environmental Solutions Group, we did perform a comprehensive Indoor Air Quality analysis of the firing range . The basic protocol used centered around determining the extent of airborne contamination products resulting from utilization of the firing range for non-lead containing  ammunition. Our preliminary report is as follows:

### History : Building Design Criteria

The Delaware State Police Firearms Training facility was constructed in 1996 and consists of rectangular building approximately 155 wide and 200 feet long. The structure is on grade and a single story. The frontal section of the building contains office space , class rooms, change rooms, and various storage rooms and a gun cleaning and minor repair facility.

The rear section of the building contains the  firing range with the capability for 20 lanes of any combination of manual and automatic  rifle, and  handgun target practice. The rear section of the range contains a small control room and an area to load weapons. The frontal section contains deflection plates and a water curtain and conveyor belt designed for the capture of lead containing spent ammunition.

The ventilation system for the firing range consists of two roof mounted heating and air conditioning  systems with steam/ hot water heating coils, heat recovery wheels and mechanical air conditioning.  The design parameters of the system are such that the air flow is a pass-through, there is no make up or dilution and the range is under negative pressure while the

FTU2765

ventilation system is in operation. The range is divided in two equal parts consisting of ten firing lines each with three sets of laterally placed supply ducts.

## Current Operational Characteristics

While apparently not originally contemplated in the design drawings, in addition to pistol and rifle training, the range also provides training and practice for various types of shotguns and different types of ammunition loads.

The range is set up for firing positions from the target area at 3,7,10,15 and 25 yards. There are supply ducts with discharge positions such that coverage is provided for firing lane, however there is only over the shoulder sweep ventilation from the supply units at 25 and 15 yards.

According to Training staff since January of 2001, the Firearms Training Unit has replaced the use of lead ammunition with a type of non lead ammunition marketed under a trade mark designation Frangible Lead Free- ammunition and manufactured by CCI/Speer.

The composition of this ammunition according to the manufacturers MSDS information indicates that the primary elements are Tin, Copper and Zinc.

At the present time the spent bullet conveyor belt assembly has been removed, and the residual metals from the frangible ammunition are clogging the existing system. Reportedly the ventilation system for the range has always been marginal in performance. In addition there is no recovery system for floatable waste products resulting from shotgun wadding and frangible munitions residue is not currently being collected and disposed of as the system is not functioning appropriately.

Occupants and users of the range have noted accumulations of dust on various horizontal surfaces, visual impairment and nasal contamination.

## IAQ Survey Procedures

Low volume area SKC battery operated sample pumps calibrated for air flows between 1.5 and 2.0 liters were set up on the lane markers adjacent to the standing shooters position. These lane markers were then moved each time the shooters changed position.

Sample filter cassettes were .3 micron PVC pre-weighed full face filter cassettes and were place at approximately head height to conform to the breathing zone of the shooter . Because of the probability of high filter contamination several filters were only using the cassette plug. In addition one high volume (10liter) was set up in the Control Room.

Prior to the start of training exercises a series of smoke bomb tests were preformed to visually ascertain flow patterns. These test were performed at the 25 , 10 and 7 yards line positions.

FTU2766

A2842

A042

FROM : FAX SERVICE                    FAX NO. :              Mar. 23 2004 08:38AM  P4

Testing performed on February 11, 2004 was conducted on and average of eight shooters all firing 357 Sig ammunition in Sig Sauer, P229 handguns using 12 round ammunition clips.

The range was in operation from approximately 10:55 until 3:00 PM with a short break for lunch, a total of 3,600 rounds of ammunition were used during this test.

The eight shooters performed a variety of tasks consisting of the following training exercises:

1. DEA targets: turning, 4 yards, 6 magazines.

2. DEA targets: stationary, 7 yards, 3 magazines.

3. DEA targets: stationary, 10 yards 6 magazines.

4. Bulls eye targets, standing, kneeling and prone, 25 yards, and 3 magazines

5. QIT targets: head shots 4 and 7 yards, 3 magazines.

6. QIT targets: failure drill, 4 and 7 yards, 3 magazines.

7. QIT targets: moving failure drill, 15 to 4 yards/4 to 15 yards, 6 magazines.

8. QIT targets: lateral failure drills, 4 yards 6 magazines, Ex: 2 rounds left, 1 round right.
9. Position shooting drills: Easton barricades, 4 magazines, 2 lanes, 2 person teams , all positions.

## Test Results

The results of the smoke testing clearly indicated a high degree of swirling above .through the breathing zone area and back towards the control Room . A visual review of the. three lateral duct and related supply diffusers indicated uneven airflow and a large divergence from specifications as to design air flow patterns i.e. the duct line closest to the 25 yard firing line should have been less then the first duct line nearest the control room and appeared to considerable higher.  There are three large lateral duct system shown on the design/as-built drawings showing airflow patterns from the Control Room forward of 1,800 (# 1), 1,200 (#2) and 200 (#3) cubic feet per minute for each supply diffuser. Again as noted duct system #2 had significantly more air flow then duct system.#1. .

The was also an anomaly noted during the morning hours that seemed to disappear during the afternoon range operations. During the morning there were distinctive un- .explainable pressure variations between the control room, office area, and Cleaning Room. The pressure changes were noted in air flow patterns through the Control Room door and the Range and caused the Control room differential pressure to go from positive to the Range to negative.

FTU2767

This condition was spasmodic and did not re-occur during the afternoon firing training season. Several possible causes can be postulated but all require further study:
1. The heating cycle between the two roof top units is not synchronized.
2. The blower belts are loose and slipping under various load conditions.

The results of the air testing indicate and in- balanced system with complex swirling across the ceiling space and into the breathing zone of shooters.

## TABLE 1: TEST RESULTS

| Date | Sample # | Location | Tin, mg/m3 | Copper, mg/m3 | Zinc, mg/m3 | Lead, mg/m3 |
|------|----------|----------|------------|---------------|-------------|-------------|
| 2-11-04 | 32463 | Lane 2 | 0.008 | 1.330 | 0.016 | 0.394 |
| 2-11-04 | 32524 | Lane 4 | 0.005 | 0.508 | 0.007 | 0.109 |
| 2-11-04 | 32482 | Lane 6 | 0.034 | 0.147 | 0.006 | 0.054 |
| 2-11-04 | 32470 | Lane 8 | 0.055 | 0.535 | 0.008 | 0.157 |
| 2-11-04 | 32519 | Lane 10 | 0.002 | 0.009 | 0.004 | 0.013 |
| 2-11-04 | 32513 | Control Room | 0.008 | 0.011 | 0.002 | 0.003 |
| OSHA Limits for Air Contaminants | | | 15 | 1.0mg/m3 | 5.0mg/m3 | 30ug/m3 |

## Potential Building Contamination

In order to determine if the spent combustion products from the firing range had contaminated the office area , which consists of several class rooms and an administration area, a one square  foot section of rug was sampled. The process used consisted of utilizing a high volume Gast pump calibrated to 10 liters per minutes connected via a section of Tygon tubing to 37mm PVC open faced cassette. Samples were collected by slowly brushing the rug with a small brush and then re-vacuuming the entire area with the cassette head. Samples were taken from the Office area and class rooms.

FTU2768

A2844

A044

FROM : FAX SERVICE          FAX NO. :          Mar. 23 2004 08:40AM P6

TABLE 2

| Date | Sample # | Location | Total Particulate | Copper, ug/m3 | Zinc, ug/m3 | Lead, ug/m3 |
|------|----------|----------|-------------------|---------------|-------------|-------------|
| 3-2-04 | 32483 | Office Area by FAX machine | 0.727 | 33.2 | 1.30 | 9.82 |
| 3-2-04 | 32509 | Rear desk, Office area. | 0.535 | 28.5 | <1.25 | 9.08 |
| 3-2-04 | 32485 | Conference Rm. | 0.613 | 58.2 | 1.65 | 13.4 |
| 3-2-04 | 32465 | Class Rm. #1, Speakers Pod. | 0.640 | 42.5 | 1.35 | 11.2 |
| 3-2-04 | 32480 | Class Rm. #2, Adjacent Blackboard | 0.549 | 18.6 | <1.25 | 7.52 |

FTU2769

## Results of Wipe Samples

| Date | Sample # | Location | Copper, | Zinc, | Lead, ug/m3 |
|------|----------|----------|---------|-------|-------------|
| 2-03-04 | 1 | Target trap above pump#7 | 12.9 | 1.97 | 14.85 |
| 2-03-04 | 2 | Target trap floor front of chiller piping | 9.59 | 2.50 | 57.9 |
| 2-03-04 | 3 | Target trap above Pump#2 | 62.40 | 1.73 | 7.99 |
| 2-03-04 | 4 | Control Rm. Diffuser | 6.0 | 1.68 | 4.23 |
| 2-03-04 | 5 | Firing Range, man #9 back of Target holder. | 31.2 | 1.88 | 32.2 |
| 2-03-04 | 6 | Firing Range lane #3, lower half backstop | 22.75 | 2.38 | 16.35 |
| 2-03-04 | 7 | Gun Cleaning Rm., Fume hood | 2.69 | 7.59 | 5.05 |

FTU2770

A2846

A046

FROM : FAX SERVICE                FAX NO. :                Mar. 23 2004 08:41AM  P8

| | | | | | |
|---|---|---|---|---|---|
| 2-03-04 | 8 | Firing Range floor between lanes 17-18 . | 13.45 | 1.47 | 5.24 |
| 2-03-04 | 9 | Firing Range floor left side next to wall by Exit | 59.9 | 1.56 | 13.4 |
| 2-03-04 | 10 | Center beam right side,10 yard line | 11.6 | 1.68 | 23.6 |
| 3-04-04 | 1 | Class Rm.#1 | 0.016 | 0.119 | 0.014 |
| 3-04-04 | 2 | Class Rm.#2 | 0.010 | 0.122 | 0.010 |
| 3-04-04 | 3 | Front Lobby | 0.005 | 0.125 | 0.009 |
| 3-04-04 | 4 | Hallway | 0.020 | 0.130 | 0.028 |
| 3-04-04 | 5 | Front office . | 0.025 | 0.145 | 0.043 |
| 3-04-04 | 6 | Conf. Rm. | 0.010 | 0.127 | 0.020 |
| 3-04-04 | 7 | Break Rm. | 0.636 | 0.146 | 0.210 |
| 3-04-04 | 8 | Cleaning Rm. | 0.072 | 0.178 | 0.378 |
| 3-04-04 | 9 | Repair Rm. | 0.088 | 0.215 | 0.160 |
| 3-04-04 | 10 | Chem. Rm. | 0.067 | 0.214 | 0.021 |
| 3-04-04 | 11 | Ammo Locker air diffuser | 0.059 | 0.172 | 0.181 |
| 3-04-04 | 12 | Target Rm. | 0.022 | 0.121 | 0.054 |

FTU2771

A2847

A047

| 3-04-04 | 13 | Behind target trap floor | 11.5 | 1,545 | 37.8 |
| 3-04-04 | 14 | Men's RR | 0.257 | 0.311 | 0.098 |

## Recommendations and Conclusions

Based upon our preliminary assessment we offer the following recommendations and conclusions.

1. The existing collection system is non-functional for expended ammunition and needs to be completely re-engineered. This would include replacement of the existing water pumps, skimmer baskets and a capture filtration system .

2. The existing ventilation system is not balanced and it is not known if the HVAC will perform to the original design specifications. An engineering study should be perfo9rmed to ascertain compliance with the original range ventilation specifications.

3. Given that the original design did not contemplate firearms other then rifles and pistols, the ventilation capture system must be re-designed in order to handle the use of shotguns and other firearms.

4. Analysis of samples collected from the HVAC duct work within the administrative office area and class rooms and settled dust samples within the Mechanical space for spent rounds recovery clearly show that a hazardous material abatement cleanup program should be performed by a competent abatement firm.

5. Results of settled dust on the carpeted areas within the Administration office area and class rooms clearly indicate that there is hazardous material contamination of the entire facility.

6. Results of the air testing show elevated levels of copper along the south wall of the building.

7. Results from vacuum sampling of the rug in various areas of the office area clearly show significant contamination.

8. The applicable occupational safety and health standards that would apply to this site are listed within 29CFR1910.1000, Subpart Z and would relate only to those individuals who are on-site everyday. In summary those individuals who are at this site on a routine basis are experiencing airborne concentrations of lead and copper above the allowable 8 hour time weighted average as define by the US Occupational Health and Safety Administration.

FTU2772

A2848

A048

In summary, based upon the lack of a functioning spent munitions recovery system, inadequate air flow patterns within the firing range, hazardous material contamination of the range, office area and class rooms, elevated occupational exposures to lead and copper, and elevated blood lead levels for the training staff, this facility does not meet minimum standards for occupational federal health and safety standards for occupancy.

Should you have any questions please do not hesitate to give me a call.

Sincerely,

Arthur Neilson

FTU2773

A2849

A049



Delaware State Police
Special Operations Response Team



**MEMORANDUM**
**Date:**

**To:**     **Lt. Ralph Davis**

           **Deputy Director of Training**

           **Delaware State Police**

**From:**   **Sgt. Alfred W. Parton Jr.**

           **NCOIC, Special Operations Response Team**

           **Delaware State Police**

           **Phone: 302-834-2630 x322 / FAX: 302-834-2648**

**Subj:**    **DSP Range**

Please find the attached copy of an e-mail dated 06/29/2000 regarding lead contamination at the DSP range. I am forwarding this in response to information I received during a conversation with Cpl/3 Warren concerning a meeting during February 2004. I was informed that a statement was made by someone affiliated with Facilities Management that there were no reported problems at the range from some point in 1999 through 2001 or 2002. Since I was not present I am not quoting exact dates, but I take exception to the implication that the range staff during that period reported nothing. As the NCOIC of the range, I reported continuously regarding lead contamination, personnel lead levels and the recurring problems with the ventilation. The attached e-mail refers to meetings with members of Facilities Management and DSP staff on two occasions during December 1999 and June 15, 2000 specific to contamination and possible cause and solution. I caution these members to use care making these statements in the future. I would appreciate a reminder to them with this e-mail that I am not as naïve or incompetent as they may believe. I have a very vivid memory of my tenure at the range and the problems that were encountered on a regular basis. Thank you for attention to this matter.

FTU2774

A2850

A050

```
To:       William H. Waggaman@Superintendent@DSP
From:     Alfred W. Parton@FTU@dsp
Cc:       Galen M. Purcell@Training@DSP,Joseph A.
          Swiski@Administration@DSP,WILLIAM DAVIS@TECHSVCS@FACMGT
Subject:  Lead contamination / personnel lead levels
Attachment: BEYOND.RTF
Date:     6/29/00 11:12 AM
```

LTC Waggaman,

As you know, we are constantly monitoring the lead problems here at the range to include personnel lead levels. As per our normal procedure, we are being tested at the conclusion of the Spring II in-service. Although the amount of live fire shooting was minimal, I felt it important for us to continue with this process on a consistent basis.

Cpl/3 Eddie Cathell is the first to have his completed, other members will be complete this week. On today's date, I received notification that Eddie's level has elevated from a 20 mcg/dl to 30 mcg/dl, a rise of 10 points since the last test on 051000. This level has raised concern by the medical staff at Health Works in respect to safe levels of personal contamination. Dr. Green has advised, he will be sending a letter to outlining his concerns for Eddie's health. During this in-service, Eddie was the primary instructor for the live fire portion of training. He was exposed to approximately 450 students firing a total of 30 rounds of leaded ammunition per person. This is really an insignificant amount considering we are usually exposed to 600 shooters at 230 rounds per person. During these periods the highest increase has been 6 or 7 points.

I talked with Eddie this morning regarding any additional shooting, or weapon handling outside of work. He assures me that he does not conduct an extraordinary amount of shooting. He does practice on occasion at the range and does shoot some competition as well.

On 061500, a meeting was conducted with Facilities Management regarding the ventilation and contamination problems, as well as, the proposed ceiling installation to improve air flow. We are still experiencing lead dust contamination behind the bullet trap with the source being the ceiling where the center I-beams were installed. This a large contamination that has been cleaned up twice since I have been here. Initially, Facilities considered the trap as the contamination source , however, with the newest contamination, it is very apparent where the contamination came from. It was decided last December that the ceiling would be dropped to stop the air turbulence and increase efficiency of the system. It should also be noted that this modification would also stop the contamination in the rear sealing the escape route. I was advised in December that the cost would be approximately $100,000.00 and money was not available. During the June 15th meeting we again discussed this modification and again money was the issue. We have now reached a point where an instructor has reached a critical level of contamination and the problem needs to be resolved.

I have removed Eddie from any activities that will expose him to contamination here at work. I have done this in the past when his level reached 24 and was able to decrease the amount to 17. The remainder of the staff has remained relatively stable and I will forward the results upon receiving them. The range will be inactive as far as in-service and shooting events until September when the Fall shoot and recruit training begins. We will have intermittent training events until then, however, I will insure Eddie does not become involved to a point he will be exposed. He will remain in the control room as the safety officer during any live fire events. Eddie is a valuable member of the unit and would be difficult to replace. I believe the modifications must be completed as soon as possible, prior to the September training. The sheer cost of the lead clean up at the rear of the range more than justifies the cost of the modification. Especially since we now know where the contamination source stems from.

Thank you in advance for your attention to the matter,

Sgt. Alfred W. Parton Jr.
NCOIC, Firearms Training Unit
Delaware State Police
302-659-6021
302-659-6019 (FAX)

FTU2775

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SERGEANT CHRISTOPHER D. FORAKER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. |
| v. | : | |
| | : | |
| COLONEL L. AARON CHAFFINCH, | : | |
| individually and in his official | : | |
| capacity as Superintendent of the | : | |
| Delaware State Police; LIEUTENANT | : | |
| COLONEL THOMAS F. MACLEISH, | : | |
| individually and in his official | : | |
| capacity as Deputy Superintendent | : | |
| of the Delaware State Police; | : | |
| DAVID B. MITCHELL, in his official | : | JURY TRIAL DEMANDED |
| capacity as the Secretary of the | : | |
| Department of Safety and Homeland | : | |
| Security of the State of Delaware; | : | |
| and DIVISION OF STATE POLICE, | : | |
| DEPARTMENT OF SAFETY AND HOMELAND | : | |
| SECURITY, STATE OF DELAWARE, | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

1.    This is a civil action for compensatory and punitive

damages and for injunctive relief for retaliatory violations of

the Free Speech and Petition Clauses of the First Amendment of

the United States Constitution.   In June of 2003 Plaintiff

obtained a jury verdict, and an award of $100,120 in compensatory

and punitive damages, against defendant Chaffinch for multiple

violations of his free speech rights.   On December 1, 2003, under

a Stipulated Order of this Court plaintiff was reinstated to his

-1-

previous position.  The appeal in that case also was resolved by
a written Settlement Agreement.  But upon his reinstatement
defendants then set out to drive plaintiff from his employment
and within three months orchestrated a local and international
media campaign riddled with malicious falsehoods which have
totally destroyed plaintiff's professional reputation.  Plaintiff
also asserts supplemental state law claims for defamation and
false light invasion of privacy.

## I.  <u>JURISDICTION</u>

2.  The jurisdiction of this Court is invoked pursuant to 28
U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and
2202, and the First and Fourteenth Amendments to the U.S.
Constitution.  More specifically, paragraph 3 of this Court's
November 20, 2003 Stipulated Order in the case of <u>Foraker v.</u>
<u>Chaffinch, et al.</u>, C.A. No. 02-302-JJF (D. Del.), states that
"the Court shall retain jurisdiction over this matter to enforce
its order of reinstatement should that become necessary," which
precondition now has arisen.  (See Exhibit A, ¶ 3).  The cause of
action arises under 42 U.S.C. § 1983. The claims arose in this
judicial district.  This Court has jurisdiction over the state
law claims pursuant to 28 U.S.C. § 1367 which provides for
supplemental jurisdiction.

## II.  <u>THE PARTIES</u>

3.  Plaintiff Sergeant Christopher D. Foraker is a citizen

-2-

A009

A053

of the United States and a resident of New Castle County,
Delaware.  He is a 19 year veteran of the Delaware State Police
("DSP") and is currently a section chief and the non-commissioned
officer in charge ("NCOIC") of the Firearms Training Unit
("FTU").  He is less than one year short of the right to retire
with full pension benefits and the option to consider other
career opportunities.  At all times material hereto, his job
performance has been outstanding.  He is an excellent police
officer.

    4.  Defendant Colonel L. Aaron Chaffinch is currently the
Superintendent of the DSP and its highest-ranking officer.  He is
sued both individually and in his official capacity.  He has
committed repeated civil rights violations against Troopers under
his command.

    5.  Defendant Lieutenant Colonel Thomas F. MacLeish is
currently the Deputy Superintendent of the DSP and its second-
highest ranking officer.  He is sued both individually and in his
official capacity.

    6.  Defendant David B. Mitchell is currently Secretary of
the Department of Safety and Homeland Security of the State of
Delaware and he is the superior to Chaffinch and MacLeish in the
chain of command.  He is sued in his official capacity to obtain
injunctive relief which will prohibit Chaffinch and MacLeish from
continuing to violate plaintiff's constitutional rights.

-3-

7.  Defendant Division of State Police, Department of Public
Safety, State of Delaware is an agency of the State of Delaware,
which is only joined in this action for purposes of collecting
attorneys' fees and costs.

### III.  FACTS GIVING RISE TO THE ACTION

#### A.  Plaintiff's Protected Speech and Petition.

8.  From August 1, 2001 through February 22, 2002, plaintiff
previously served as the non-commissioned officer in charge of
the DSP's Firearms Training Unit in Smyrna, Delaware.

9.  In April of 2002, defendant Chaffinch illegally
retaliated against plaintiff for exercising his free speech
rights and transferred him out of the FTU.

10.  Plaintiff then exercised his First Amendment rights to
freedom of speech and to petition the government for redress of
grievances and filed a federal lawsuit against defendant
Chaffinch.  That case was docketed as Foraker v. Chaffinch, et
al., C.A. No. 02-302-JJF (D.Del.).

11.  In June 2003 a jury found that defendant Chaffinch had
violated plaintiff's First Amendment free speech rights by
illegally transferring him from the FTU in retaliation for
engaging in protected speech activity.  The jury awarded
plaintiff $40,120 in compensatory damages and also $60,000 in
punitive damages to punish defendant Chaffinch for his malicious
and oppressive conduct.

-4-

A011

12.   The case subsequently settled pursuant to a Settlement Agreement dated November 19, 2003, and a Stipulated Order of this Court dated November 20, 2003 (Exhibit A attached which is incorporated herein by reference).  As part of the Settlement Agreement, plaintiff was placed back into the position of NCOIC of the FTU.

13.   It was agreed that "there shall be no retaliation against plaintiff in violation of his civil rights once he assumes the duties of (the NCOIC) position."

14.   It was agreed that "the Delaware State Police will reinstate Sergeant Christopher D. Foraker to his prior position as the Non-Commissioned Officer-in-Charge of the Firearms Training Unit with all of the rights, privileges, duties, and responsibilities and supervisory authority previously held by him when he earlier occupied that position on February 20, 2002."

15.   Paragraph 1 of this Court's November 20, 2003, Stipulated Order also states that "Sergeant Christopher D. Foraker is ordered reinstated to his prior position as the Non-Commissioned Officer-in-Charge of the Firearms Training Unit of the Delaware State Police with all of the rights, privileges, duties, responsibilities and supervisory authority previously held by him when he earlier occupied that position on February 20, 2002."  (Exhibit A, ¶ 1).

16.   Paragraph 3 of this Court's November 20, 2003

-5-

A012

A056

Stipulated Order states that "the Court shall retain jurisdiction over this matter to enforce its order of reinstatement should that become necessary." (Exhibit A, ¶ 3).

17. Pursuant to the Settlement Agreement, on December 1, 2003, plaintiff returned to his previous position as NCOIC at the FTU.

18. Defendants Chaffinch and MacLeish were aware that plaintiff had engaged in protected speech and had petitioned the government for redress of grievances by filing and ultimately winning his initial lawsuit against defendant Chaffinch. Additionally, plaintiff's lawsuit, the trial, jury verdict and subsequent settlement received extensive media coverage throughout the State of Delaware, including numerous stories in the Delaware State News and the News Journal.

19. At all times plaintiff spoke out on issues of public concern and petitioned the government for redress of grievances under the First Amendment and sought to bring to light actual or potential wrongdoing or breach of the public trust by high public officials and also sought to bring to light defendant Chaffinch's illegal actions which violated the U.S. Constitution.

20. By its content, form and context, at all times plaintiff spoke out about matters of public concern.

21. All of plaintiff's speech and petitioning was non-disruptive of any legitimate interest of his employer and was on

matters of public concern to the DSP, as well as the General Assembly, the Governor of Delaware, the news media, voters and the public at large. His speech and petitioning related to matters of political, social and other concern to the community.

22. Plaintiff was acting in good faith and with honest motive at all times when he exercised his First Amendment rights to freedom of speech and to petition the government. At all times, plaintiff believed that his speech was true and, as the jury found, his speech was in fact true.

23. Plaintiff was not being disloyal by speaking out and petitioning the government. Instead, he sought to bring to light blatant violations of the U.S. Constitution by the highest ranking police officer in the State of Delaware.

24. The public concern in and value to the community at large of being free to hear plaintiff's speech and petition outweighs any asserted government interest in the effective and efficient provision of services.

25. Nothing plaintiff said interfered with the regular operations of the DSP. Plaintiff's speech did not interfere with the DSP's interests in: crime fighting; fostering trust and confidence among officers; protecting the safety of officers or other members of the community.

26. Plaintiff's speech did not threaten the authority of defendants to run the DSP. Nothing plaintiff said damaged his

-7-

A014

A058

relationship with defendants or with any of his superior
officers.  Plaintiff did not impugn the integrity of his
supervisors.

27.  Plaintiff's speech did not have a detrimental impact on
any close working relationship for which personal loyalty, trust
and confidence are necessary.  Plaintiff is not the alter ego of
defendants.  Organizationally, plaintiff is five ranks below
defendant Chaffinch and four ranks below defendant MacLeish in
the chain of command.  Defendants are the Colonel and Lieutenant
Colonel.  Plaintiff is a mere sergeant.

28.  Any disruption that was caused in the DSP was not
caused by plaintiff's speech but was instead caused by the very
problems that plaintiffs' speech was in fact intended to address
- defendant Chaffinch's illegal conduct.

29.  In his position as a sergeant in the DSP, plaintiff did
not make or formulate DSP policy.  Rather, formulation of DSP
policy is left up to the Superintendent and Deputy Superintendent
of the DSP.

**B.  Defendant Chaffinch's Resulting Animus Towards Plaintiff.**

30.  As a direct and proximate result of plaintiff's
successful lawsuit against him, defendant Chaffinch carries a
personal vendetta against plaintiff.  Defendant Chaffinch has
told family, friends, political mentors, members of his Executive
Staff and others that he will do everything in his power to

-8-

inflict injury on and destroy plaintiff.

31. For example, Chaffinch orchestrated several media
events where he made false and defamatory statements about
plaintiff's job performance. Immediately after one such event,
he advised his executive staff "I got my shots in. People who
live in glass houses shouldn't throw stones. The mess at the
range is all Foraker's fault. I got him back."

**C. The Long Term Historic Preexisting Problems at the FTU.**

32. The FTU is a multimillion dollar facility that was
built under the supervision and direction of the Department of
Administrative Services of the State of Delaware and its Division
of Facilities Management ("Facilities Management") which is
currently headed by Cabinet Secretary Gloria W. Homer.
Facilities Management is responsible for maintenance of the FTU
and is the landlord for the DSP.

33. Since its construction in 1998, the FTU has been
plagued by problems that have affected, endangered and impaired
the health and safety of those who work and train there. The
root cause of these problems are a faulty design and improper
construction of the facility. Due to improprieties, financial
irregularities, breach of the public trust, fraud and/or
corruption by public officials, Facilities Management also
improperly awarded the contract to build the FTU to an
unqualified bidder. As a result, a substandard facility was

-9-

A016

A060

built.

34.   When defendant Chaffinch illegally transferred plaintiff out of the FTU in April 2002, he simultaneously improperly transferred a personal friend into plaintiff's former position as NCOIC.  This friend was inexperienced and unqualified to run a firearms facility, especially a historically troubled facility like the FTU.

35.   The conditions at the FTU worsened and steadily deteriorated while defendant Chaffinch's friend was in charge of the FTU.

36.   Defendant Chaffinch was aware of these worsening conditions but purposefully chose to cover them up in order to save face.

37.   The true causes of the problems at the FTU were known at all times by defendants Chaffinch and MacLeish.

38.   Immediately upon his return to the FTU on December 1, 2003, plaintiff became aware of the problems and worsening conditions at the FTU and he immediately began to take steps to try to fix the facility.

39.   Unfortunately, the deterioration of the FTU was too far gone and on March 19, 2004, the FTU was shut down due to environmental contamination.

40.   The local media reported extensively on the forced closure of this government facility.

-10-

A017

A061

**D.   Defendants' Defamatory Retaliation Against Plaintiff.**

41.   Shortly thereafter, defendants Chaffinch and MacLeish,
with Secretary Homer, gave guided tours of the FTU to members of
the local media, including reporters from the Delaware State
News, the News Journal and WBOC-TV Salisbury, Maryland.   During
these tours, defendants Chaffinch and MacLeish falsely,
recklessly and maliciously blamed plaintiff for the problems that
had contaminated, shut down and effectively destroyed the FTU.
They accused plaintiff of mismanagement, dereliction of duty and
destroying this multimillion dollar facility.

**E.   Publication and Circulation of Defendants'
False Accusations.**

42.   Defendants' false, reckless and malicious accusations
resulted in numerous newspaper articles being published in the
Delaware State News and the News Journal, the newspapers of
general circulation in the State of Delaware.   In these articles,
defendants' false, reckless and malicious accusations were
published to an audience of hundreds of thousands of readers.

43.   Similarly, WBOC-TV in Salisbury, Maryland ran numerous
television news stories about the cause of the closure of the
FTU.   WBOC has a viewing audience and distribution market
totaling hundreds of thousands of people, in areas such as Kent
County, Sussex County, Eastern Maryland, Dover and Smyrna,
Delaware.   In these news stories, defendants' false, reckless and
malicious accusations again were published to an audience of

-11-

A018

A062

hundreds of thousands of viewers.

44.   In addition to local and regional circulation and distribution, defendants' false, reckless and malicious accusations also were published nationally and internationally. **AMERICAN POLICE BEAT** is an international police and public safety industry trade magazine with a circulation throughout the United States and Canada.   Defendants' false, reckless and malicious accusations also were published in one of its magazines with a circulation of thousands of persons, including persons in the firearms manufacturing, law enforcement and public safety communities.

45.   As discussed above, defendants false accusations were contained in and were the subject of numerous newspaper articles in the Delaware press.   One such article was published on the front page of the Delaware State News.   This particular article has been widely circulated in the local community in which plaintiff lives.

46.   For example, there is a popular, well-known seafood restaurant in Smyrna, Delaware called Sambo's.   As part of its decor, Sambo's purchases copies of newspapers and places them on the tables in the restaurant.

47.   The aforementioned edition of the Delaware State News with the front page story was purchased in bulk by Sambo's on the day defendants' defamatory accusations towards plaintiff were

-12-

published.  Copies of this article were placed on every table in
Sambo's.  Innumerable patrons of Sambo's read this article while
it sat on their tables.

### F.  Defendants' Accusations are Absolutely False and Injurious.

48.  Defendants' accusations are absolutely false.
Plaintiff is and has always been an excellent supervisor at the
FTU.  As discussed above, the problems at the FTU have been
longstanding and were only exacerbated by defendant Chaffinch's
inexperienced friend.  Plaintiff is not guilty of mismanagement,
dereliction of duty or of destroying the FTU in any way shape or
form.  For example, the statement Chaffinch made to his Executive
Staff that "the mess at the range is all Foraker's fault" is
absolutely false.

49.  Defendants knew or recklessly disregarded the knowledge
that their outrageous accusations were false and would cause
plaintiff severe emotional distress and also severely injure
plaintiff's reputation.

50.  Plaintiff was hurt, wounded, distressed, shocked,
anguished, stunned, appalled, floored, taken aback, offended,
traumatized, scandalized and otherwise outraged by these false
accusations against him

51.  The accusations that plaintiff was guilty of
mismanagement, dereliction of duty and destroying a multimillion
dollar firearms facility have injured and tend to injure

-13-

plaintiff's reputation in the popular sense; diminish the esteem, respect, goodwill or confidence in which plaintiff was previously held as well as excite adverse, derogatory or unpleasant feelings or opinions against him.

52.    In the same way, these false accusations have harmed plaintiff's reputation and lowered him in the estimation of the community or deterred third persons from associating or dealing with him.

53.    Plaintiff has been isolated from society as a result of defendants' false accusations.  Plaintiff may never know the extent of his lost opportunities to relate and associate with others because he could be avoided without knowing the reason and without having a chance to rebut the false accusations against him.

54.    These false accusations have exposed plaintiff to public contempt or ridicule in the minds of right thinking persons or among a considerable and respectable class of people.

55.    Any third party would understand accusations of mismanagement, dereliction of duty and destroying a multimillion dollar facility to be injurious to the reputation of the accused.

### G.  Defendant Chaffinch Maliciously Muzzled Plaintiff So He Could Not Respond to the False Accusations Being Made Against Him.

56.    In order to further injure plaintiff's reputation, defendant Chaffinch maliciously ordered that neither plaintiff

-14-

A021

A065

nor his supervisor could speak with the media to rebut the
outrageously false allegations which were being publically
leveled against plaintiff.

### H.  Continued Retaliatory Reduction of Plaintiff's Rights, Privileges, Duties, and Responsibilities.

57.  Defendants Chaffinch and MacLeish also have stripped
away plaintiff's rights, privileges, duties, responsibilities,
and supervisory authority which were protected by paragraph 1 of
this Court's November 20, 2003 Order.  (Exhibit A).

58.  For example, on June 29, 2004 and July 15, 2004,
plaintiff received several e-mails, inviting him to attend a
scheduled July 20th Commanders and Section Chiefs meeting.  As
the NCOIC of the FTU, plaintiff is the commander and section
chief of the FTU.  Plaintiff had previously attended these
meetings during his first stint as the NCOIC of the FTU.

59.  Upon arriving at the meeting, defendant MacLeish
publically humiliated plaintiff and indicated that plaintiff was
not welcome at the meeting and ordered him to leave the meeting
and never return.

60.  The number of individuals who plaintiff supervises also
has decreased since he returned to the FTU as the NCOIC.

### IV.   CAUSAL CONNECTION

61.  The totality of retaliatory adverse action taken by
defendants against plaintiff are sufficient to deter a person of
ordinary firmness from exercising their First Amendments right to

-15-

freedom of speech and to petition the government for redress of grievances.

62. A reasonable person of ordinary firmness would be deterred from exercising his First Amendments right to freedom of speech and to petition the government for redress of grievances if he was falsely accused of mismanagement, dereliction of duty, destroying a multimillion dollar government facility and if he was publically defamed on a local, regional, national and international scale.

63. There is a causal link between First Amendment protected activity on matters of public concern and the adverse actions of materially altering plaintiff's job responsibilities and launching a campaign of false accusations of dereliction of duty and other misconduct by plaintiff. This is demonstrated by:

(a)     the temporal proximity of events, since within three months of his reinstatement defendants orchestrated a local, national and international media attack on plaintiff's professionalism and reputation;

(b)     circumstantial evidence of a pattern of antagonism following protected activity, for example, when defendant Chaffinch stated "I got him back" and "I got my shots in" to his executive staff after a media event;

( c)     personal knowledge and awareness of protected

-16-

activity by the individual defendants, since defendant Chaffinch attended the trial against him and defendant MacLeish was a trial witness;

(d)    violation of paragraph 1 of this Court's Order of November 20, 2003 in that the rights, privileges, duties, responsibilities and supervisory authority previously held by plaintiff have been materially altered;

(e)    the fact that the accusations against plaintiff are a cover-up or a pretext since the problems with the FTU were preexisting and were not caused in any way by plaintiff who only had been reinstated to the facility three months before it was closed down;

(f)    the fact that defendant Chaffinch had abundant motive to take revenge on plaintiff who had publically humiliated him by obtaining an unprecedented and well publicized federal court jury verdict against him;

(g)    the fact that plaintiff was publically singled out by the individual defendants as being responsible for the safety and health problems at the FTU; and

(h)    the evidence viewed as a whole.

64.    First Amendment protected activity was a substantial or motivating factor in the adverse action taken against plaintiff. The natural probative force of the evidence demonstrates

-17-

A024

A068

causation.

67. The defendants cannot prove by a preponderance of the
evidence that absent a constitutional violation, plaintiff would
have had adverse employment action taken against him anyway.

66. Any non-retaliatory reasons cited by the defendants to
defeat causality are a pretext.

67. As a direct and proximate result of the actions of the
defendants as detailed herein, plaintiff has suffered and is
suffering diminished earning capacity now and upon his
retirement, decreased employment and earnings opportunities, and
other pecuniary losses, emotional pain, suffering,
disappointment, anger, inconvenience, mental anguish, loss of
enjoyment of life, mental and physical pain, anguish,
humiliation, embarrassment, injury to reputation, and other non-
pecuniary losses and injury.

68. For example, plaintiff intended to obtain a job in the
firearms industry after he retires from the DSP.  The position
held by plaintiff also has been a jump off point on retirement
into lucrative employment with the firearms industry.  One former
Trooper who headed the FTU on retirement was hired by Smith and
Wesson Company as a Vice-President.  The negative media
publicity, which includes statements in an international trade
magazine, will make it impossible for plaintiff to work in the
firearms industry.  Moreover, any police officers he would

-18-

A025

A069

interact with as part of any firearms industry employment will be aware of the FTU range problems and wrongly believe that plaintiff was responsible.

### V.  ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT

69.  The actions of the defendants and their agents or employees were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federal constitutional rights and because of the exercise of those rights.  The defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights.  Their actions were outrageous and taken with evil motive, in bad faith, out of personal animus and without any reasonable grounds to support them.  Their actions were wanton and malicious or taken with reckless indifference  to federal constitutional rights and as to the truth.

70.  The exercise of rights under the U.S. Constitution made a difference in all actions adverse to plaintiff.  The exercise of these rights was a motivating or determinative factor in all actions adverse to plaintiff.

71.  The individual defendants' actions violated clearly established federal constitutional rights of which any reasonable official would have known, including more than three decades of Supreme Court and Third Circuit case law prohibiting retaliation

-19-

A026

A070

against public employees for protected speech.

72. At all times material hereto the individual defendants participated in, authorized, and sanctioned the federal constitutional deprivations described above which illegally retaliated against plaintiff.

73. At all times material hereto the individual defendants and their agents were acting under color of law. The federal constitutional deprivations described herein are fairly attributable to the State.

74. The defendants' actions were motivated by bias, bad faith, and improper motive.

75. The defendants' actions constitute an abuse of governmental power.

76. The defendants did not reasonably believe that the actions they took were necessary to accomplish any legitimate governmental purpose.

77. The defendants' actions are not so reasonable as to further any governmental interest asserted and do not closely fit the goal of serving those governmental interests.

78. The defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

79. Defendant Chaffinch's vendetta and animus against plaintiff indicates that he cannot effectively and fairly make employment decisions and statements concerning plaintiff's

-20-

A027

A071

employment performance without oversight by a monitor.

### COUNT I - (Free Speech Retaliation)

80.  Plaintiff repeats and realleges paragraphs 1 - 79 set out above and incorporates them by reference.

81.  The defendants took action adverse to plaintiff as a direct and proximate result of and in retaliation for his First Amendment protected speech on matters of public concern.  There is a temporal and causal relationship between plaintiff's aforementioned protected speech, and adverse employment action. First Amendment protected activity was a substantial or motivating factor in the adverse employment action.  The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had grounds to adversely treat plaintiff.

82.  Plaintiff's constitutional right to freedom of speech has been denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

### COUNT II - (Petition Clause Retaliation)

83.  Plaintiff repeats and realleges paragraphs 1 - 82 set out above and incorporates them by reference.

84.  The defendants took action adverse to plaintiff as a direct and proximate result of and in retaliation for his exercise of his First Amendment right to petition the government for redress of grievances.  There is a temporal and causal

-21-

A028

A072

relationship between plaintiff's aforementioned protected petitioning and adverse employment action. First Amendment protected activity was a substantial or motivating factor in the adverse employment action. The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had grounds to adversely treat plaintiff.

### COUNT III - (Defamation)

85. Plaintiff repeats and realleges paragraphs 1 - 84 set out above and incorporates them by reference.

86. Plaintiff's right to live his life free of defamatory falsehood has been denied in violation of the common law of the State of Delaware.

### COUNT IV - (False Light Invasion of Privacy)

87. Plaintiff repeats and realleges paragraphs 1 - 86 set out above and incorporates them by reference.

88. Defendants sought out media sources and publicized the shutdown of the FTU in a manner which places plaintiff before the public in a false light.

89. Similar publicity about a reasonable person would be highly offensive to that reasonable person under similar circumstances.

90. Defendants knew the manner in which they conveyed the information about plaintiff was false, or they recklessly

-22-

A029

A073

disregarded whether it was false.

91.   Defendants' actions would outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.

92.   The context, conduct and circumstances discussed at length above do not justify the public statements made about plaintiff.

93.   The motives of defendants were malicious.

94.   Plaintiff's reputation and ability to find employment have suffered as a direct and proximate result of defendants' actions.

95.   Plaintiff's right to live his life free from having his privacy cast in a false light has been denied in violation of the common law of Delaware.

**Wherefore**, plaintiff prays that the Court:

      A.   Enter judgment against the defendants.

      B.   Enter a declaratory judgment declaring the acts of the defendants to be a violation of plaintiff's constitutional and common law rights.

      C.   Enter a judgment against defendants Chaffinch and MacLeish, both jointly and severally, for compensatory damages, including lost wages, back pay, benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation,

-23-

A030

A074

embarrassment, and injury to reputation.

D.  Enter a judgment against the defendants Chaffinch
    and MacLeish, both jointly and severally,  for
    punitive damages.

E.  Award plaintiff costs, interest and attorneys'
    fees for this suit, and pre and post judgment
    interest.

F.  Issue a mandatory injunction directing defendant
    Mitchell to act as a monitor of defendants
    Chaffinch and MacLeish to prohibit any retaliation
    or harassment of plaintiff by overseeing and
    approving any action or statements made by
    defendants Chaffinch and MacLeish concerning
    plaintiff upon penalty of finding Mitchell in
    contempt of Court.  Such injunction is to run for
    so long as defendants Chaffinch and MacLeish
    remain State employees.

G.  Issue a permanent injunction requiring the
    defendants to:
    (1)  Notify everyone who learned of defendants'
    treatment of plaintiff that their conduct was
    illegal, and
    (2)  Expunge plaintiff's personnel file of any
    derogatory information relating to this matter.

-24-

A031

A075

(3)  Place a signed document in plaintiff's personnel file apologizing for their illegal violations of plaintiff's constitutional rights.

H.  Enjoin the defendants from retaliating against plaintiff now or in the future.

J.  Issue a reparative injunction directing that individual defendants Chaffinch and MacLeish issue public written apologies to plaintiff and run their apologies in the Delaware State News, the News Journal and WBOC-TV.

K.  Require such other and further relief as the Court deems just and proper under the circumstances.

THE NEUBERGER FIRM, P. A.

THOMAS S. NEUBERGER, ESQUIRE (#243)
STEPHEN J. NEUBERGER, ESQUIRE (#4440)
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582

MARTIN D. HAVERLY, ATTORNEY AT LAW

MARTIN D. HAVERLY, ESQUIRE (#3295)
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 654-2255

Dated: August 30, 2004    Attorneys for Plaintiff

-25-

A032

A076

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2003 NOV 20   AM 10: 38

| | | |
|---|---|---|
| CHRISTOPHER D. FORAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 02-302-JJF |
| | ) | |
| COLONEL L. AARON CHAFFINCH, | ) | |
| individually and in his official capacity as | ) | |
| Superintendent of the Delaware State Police, | ) | |
| DIVISION OF STATE POLICE, | ) | |
| DEPARTMENT OF PUBLIC SAFETY, | ) | |
| STATE OF DELAWARE, | ) | |
| | ) | |
| Defendants. | ) | |

## STIPULATED ORDER

The parties to this case, acting through their authorized counsel, hereby stipulate and agree as follows, subject to approval of the Court:

1.    Sergeant Christopher D. Foraker is ordered reinstated to his prior position as the Non-Commissioned Officer-in-Charge of the Firearms Training Unit of the Delaware State Police with all of the rights, privileges, duties, responsibilities and supervisory authority previously held by him when he earlier occupied that position on February 20, 2002.

2.    Plaintiff withdraws his post-trial motion for reinstatement.

3.    The Court shall retain jurisdiction over this matter to enforce its order of reinstatement should that become necessary.

A034

A078

4.    The judgment entered by the Court in this case on July 2, 2003 is vacated.

5.    Plaintiff withdraws his two Rule 50 motions filed before the submission of the case

to the jury.

Dated: November _17_, 2003

_Thomas S. Neuberger_

Thomas S. Neuberger, Esquire
Bar # 243
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
Counsel for Plaintiff

Dated: November _19_, 2003

_W. Michael Tupman_

W. Michael Tupman, Esquire
Bar # 3040
Deputy Attorney General
Department of Justice
102 West Water Street, 3rd Floor
Dover, DE 19904
(302) 739-7641
Counsel for Defendants

Dated: November _19_, 2003

_Martin D. Haverly_

Martin D. Haverly, Esquire
Bar # 3295
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Counsel for Plaintiff

IT IS SO ORDERED, this _20_ day of _November_, 2003

_Joseph J. Farnan, Jr._

Joseph J. Farnan, Jr.
United States District Judge

I:\TUPMAN\Files\foraker.stip.ord.wpd

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CHRISTOPHER FORAKER,                                          :
                                                             :
                    Plaintiff,                               :
                                                             :
        v.                                                   :
                                                             :         Civil Action No. 04-1207
L. AARON CHAFFINCH,                                          :
individually and in his official capacity as the             :
Superintendent of the Delaware State Police;                 :
THOMAS F. MACLEISH, individually and                         :
in his official capacity as the Deputy                       :
Superintendent of the Delaware State Police;                 :
DAVID B. MITCHELL, in his official                           :
capacity as Secretary of the Department of                   :
Public Safety of the State of Delaware; and                  :
DIVISION OF STATE POLICE,                                    :
DEPARTMENT OF PUBLIC SAFETY,                                 :
STATE OF DELAWARE,                                           :

                    Defendants.

## ANSWER AND
## AFFIRMATIVE DEFENSES TO COMPLAINT

        Defendants L. Aaron Chaffinch, Thomas F. MacLeish, David B. Mitchell, and Division

of State Police, Department of Safety & Homeland Security, State of Delaware hereby answer the

Complaint of Plaintiff as follows:  Defendants deny each and every averment of the Complaint

except as expressly admitted below.

        1.      It is admitted only that Plaintiff in this civil action is seeking compensatory and

punitive damages and injunctive relief based on alleged violations of the Free Speech and

Petition Clauses of the First Amendment of the United States Constitution.  It is also admitted

RECEIVED
NOV 1 2 2004

A036

A080

that, in June 2003, Plaintiff obtained a jury verdict and award of $100,120 in compensatory and punitive damages against Defendant Chaffinch. It is further admitted that Plaintiff was reinstated to his previous position on December 1, 2003 under a Stipulated Order of this Court and that the appeal in that case was resolved by a written Settlement Agreement. It is denied that Plaintiff is entitled to any of the relief requested. The remainder of Paragraph 1 is denied

## I.    JURISDICTION

2.    It is admitted that Plaintiff invokes jurisdiction of the Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the First Amendment of the United States Constitution. It is also admitted that paragraph 3 of the Court's November 20, 2003 Stipulated Order states that "the Court shall retain jurisdiction over this matter to enforce its order of reinstatement should that become necessary." The remainder of Paragraph 3 states conclusions of law to which no responsive pleading is required.

## II.    Parties

3.    It is admitted that Plaintiff Sergeant Christopher D. Foraker is a citizen of the United States and a resident of New Castle County, Delaware. It is also admitted that he is a 19-year veteran of the Delaware State Police who is currently a section chief and non-commissioned officer in charge of the Firearms Training Unit ("FTU"). It is further admitted that Plaintiff is less than one year short of the right to retire with full pension benefits. The remainder of Paragraph 5 is denied.

4.    It is admitted that Colonel L. Aaron Chaffinch is the Superintendent and highest-ranking officer of the Delaware State Police. It is further admitted that Plaintiff is suing Colonel

2

Chaffinch in his individual and official capacities. The remainder of Paragraph 4 is denied. It is also denied that Plaintiff is entitled to any relief against Colonel Chaffinch.

     5.     Admitted.

     6.     It is denied that Col. Chaffinch or Lt. Col. MacLeish have violated or are continuing to violate Plaintiff's constitutional rights. The remainder of Paragraph 6 is admitted.

     7.     It is denied that Plaintiff is entitled to attorneys fees and/or costs. The remainder of Paragraph 7 is admitted.

### III.    FACTS GIVING RISE TO THE ACTION

#### A.    Plaintiff's Protected Speech and Petition

     8.     Admitted.

     9.     Denied.

     10.     It is admitted that Plaintiff filed a federal lawsuit, docketed as <u>Foraker v. Chaffinch, et al.</u>, C.A. No. 02-302-JJF (D. Del. filed Apr. 24, 2002). The remainder of Paragraph 10 states conclusions of law to which no responsive pleading is required.

     11.     Admitted.

     12.     Admitted.

     13.     Admitted.

     14.     Admitted.

     15.     Admitted.

     16.     Admitted.

     17.     Admitted.

A038

A082

18.     It is admitted that Col. Chaffinch and Lt. Col. Thomas MacLeish knew that Plaintiff had filed a lawsuit against Col. Chaffinch. It is also admitted that both the Delaware State News and the News Journal newspapers published articles concerning the lawsuit, trial, verdict, and settlement. The remainder of Paragraph 18 is denied.

19.     Paragraph 19 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 19 is deemed to contain any factual averments, they are denied.

20.     Paragraph 20 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 20 is deemed to contain any factual averments, they are denied.

21.     Paragraph 21 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 21 is deemed to contain any factual averments, they are denied.

22.     Defendants are without knowledge or information sufficient to form a belief as to the intent, belief, or motivation behind Plaintiff's speech. The remainder of Paragraph 22 states conclusions of law to which no responsive pleading is required. To the extent the remainder of Paragraph 22 is deemed to contain any factual averments, they are denied.

23.     Paragraph 23 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 23 is deemed to contain any factual averments, they are denied.

4

A039

A083

24.     Paragraph 24 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 24 is deemed to contain any factual averments, they are denied.

25.     Paragraph 25 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 25 is deemed to contain any factual averments, they are denied.

26.     Paragraph 26 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 26 is deemed to contain any factual averments, they are denied.

27.     It is admitted that Plaintiff ranks below Col. Chaffinch and Lt. Col. MacLeish in the chain of command, that Defendants are a colonel and lieutenant colonel in the DSP, and that Plaintiff is a sergeant. The remainder of Paragraph 27 states conclusions of law to which no responsive pleading is required. To the extent the remainder of Paragraph 27 is deemed to contain any factual averments, they are denied.

28.     Paragraph 28 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 28 is deemed to contain any factual averments, they are denied.

29.     Paragraph 29 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 29 is deemed to contain any factual averments, they are denied.

5

A040

A084

**B. Defendant Chaffinch's Resulting Animus Towards Plaintiff**

30.      Denied. Rather than having a personal vendetta against Plaintiff or seeking his destruction, Col. Chaffinch relies on Plaintiff to perform the duties of a Delaware state trooper and run the firearms training functions of the DSP.

31.      Denied. Col. Chaffinch merely noted that, since December 2003, when Plaintiff became the NCOIC at the FTU, conditions at the facility had noticeably deteriorated.

**C. The Long Term Historic Preexisting Problems at the FTU**

32.      It is denied that Facilities Management is responsible for all maintenance issues at the FTU. The remainder of Paragraph 32 is admitted.

33.      Denied.

34.      It is denied that Colonel Chaffinch ever appointed a personal friend as the NCOIC of the FTU. On the contrary, Colonel Chaffinch appointed Sgt. Richard Ashley, a competent trooper.

35.      Denied. From February 2002 to December 2003, the range functioned as a viable, useful, and clean training facility.

36.      Denied.

37.      Denied.

38.      Denied. On the contrary, on December 1, 2003, Plaintiff toured the FTU with Sgt. Ashley and both observed during that tour that the FTU was a clean, functioning, and useful training facility. Plaintiff did not identify any problems or safety concerns.

6

A041

A085

39.    It is admitted that the FTU was closed in March 2004. The remainder of Paragraph 39 is denied.

40.    It is admitted that both the Delaware State News and the News Journal newspapers published articles and the television media aired reports concerning the closing of the FTU.

### D. Defendants' Defamatory Retaliation Against Plaintiff

41.    It is admitted that Col. Chaffinch and Lt. Col. MacLeish were present during tours of the FTU with members of the local media. The remainder of Paragraph 41 is denied. Col. Chaffinch merely noted that, since December 2003, when Plaintiff became the NCOIC at the FTU, conditions at the facility had noticeably deteriorated.

### E. Publication and Circulation of Defendants' False Accusations

42.    Denied. Defendants did not make any false, reckless or malicious accusations against Plaintiff. On the contrary, Col. Chaffinch merely noted that, since December 2003, when Plaintiff became the NCOIC at the FTU, conditions at the facility had noticeably deteriorated.

43.    Defendants are without knowledge or information sufficient to form a belief as to whether WBOC-TV in Salisbury, Maryland ran numerous television news stories about the cause of the closure of the FTU. Defendants are also without knowledge or information sufficient to form a belief as to the number or location of the viewing audience and distribution market for WBOC-TV. Accordingly, these allegations are denied. The remainder of Paragraph 43 is also denied.

7

44.    Defendants are without knowledge or information sufficient to form a belief as to whether American Police Beat is an international police and public safety industry trade magazine with a circulation throughout the United States and Canada. Accordingly, these allegations are denied. The remainder of Paragraph 44 is also denied.

45.    Denied.

46.    It is admitted that Sambo's is a popular, well known seafood restaurant in Leipsic, Delaware that places newspaper on its dining tables. It is denied that this represents an example of publication of false accusations against Plaintiff.

47.    Denied.

**F. Defendants' Accusations are Absolutely False and Injurious**

48.    Is it denied that Col. Chaffinch made a statement to his Executive Staff that "the mess at the range is all Foraker's fault" and, therefore, that the statement is capable of truth or falsity. The remainder of Paragraph 48 is denied.

49.    It is denied that Defendants made any outrageous or false accusations, and, therefore, it is denied that Defendants had any knowledge or intent regarding the effect of any accusations.

50.    Denied.

51.    Denied.

52.    Denied.

53.    Denied.

54.    Denied.

8

A043

A087

55.    Denied.

## G.  Defendant Chaffinch Maliciously Muzzled Plaintiff So He Could Not Respond To The False Accusations Being Made Against Him.

56.    It is admitted that Lt. Col. MacLeish refused to allow Plaintiff to go outside the established protocols for communications with the media.  The remainder of Paragraph 56 is denied.

## H.  Continued Retaliatory reduction of Plaintiff's Rights, Privileges, Duties, and Responsibilities

57.    Denied.  Plaintiff remains the NCOIC of the FTU and is responsible for firearms trainings at the DSP.

58.    It is admitted that Plaintiff received e-mails, generally addressed to section chief and commanders, notifying him of a July 20, 2004, meeting.  It is also admitted that Plaintiff is the section chief and commander of the FTU, a subsection within the DSP Academy.  Defendants are without knowledge or information sufficient to form a belief as to whether Plaintiff attended meetings during his first stint as the NCOIC of the FTU.

59.    It is admitted that Lt. Col. MacLeish, after ascertaining that Plaintiff had no specific reason to attend the meeting, instructed Plaintiff to leave.  The remainder of Paragraph 59 is denied.

60.    Denied.

9

A044

A088

## IV.  CAUSAL CONNECTION

61.     Paragraph 61 states conclusions of law to which no responsive pleading is required.  To the extent Paragraph 61 is deemed to contain any factual averments, they are denied.

62.     Paragraph 62 states conclusions of law to which no responsive pleading is required.  To the extent Paragraph 62 is deemed to contain any factual averments, they are denied.

63.     Paragraph 63 states conclusions of law to which no responsive pleading is required.  To the extent Paragraph 63 is deemed to contain any factual averments, they are denied.

64.     Paragraph 64 states conclusions of law to which no responsive pleading is required.  To the extent Paragraph 64 is deemed to contain any factual averments, they are denied.  On the contrary, to the extent any action has been taken concerning Plaintiff, those actions were motivated by a proper concern for Plaintiff's health and safety, as well as a concern for the effectiveness of the FTU as a training facility and the DSP as a whole.

65.     Paragraph 65 states conclusions of law to which no responsive pleading is required.  To the extent Paragraph 65 is deemed to contain any factual averments, they are denied.

66.     Paragraph 66 states conclusions of law to which no responsive pleading is required.  To the extent Paragraph 66 is deemed to contain any factual averments, they are denied.

10

A045

A089

67.      Paragraph 67 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 67 is deemed to contain any factual averments, they are denied.

68.      It is admitted that one former trooper who headed the FTU was hired by Smith and Wesson Company as a Vice-President after he retired from the Delaware State Police. The remainder of Paragraph 68 is denied.

### V. ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT

69.      Paragraph 69 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 69 is deemed to contain any factual averments, they are denied. On the contrary, any actions taken by Defendants were motivated by a desire to protect and maintain Plaintiff's health and a desire to insure that the DSP provide the highest level of policing for the State of Delaware.

70.      Paragraph 70 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 70 is deemed to contain any factual averments, they are denied. On the contrary, any actions taken by Defendants were motivated by a desire to protect and maintain Plaintiffs' health and a desire to insure that the DSP provide the highest level of policing for the State of Delaware.

71.      Paragraph 71 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 71 is deemed to contain any factual averments, they are denied.

11

A046

A090

72.    Paragraph 72 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 72 is deemed to contain any factual averments, they are denied.

73.    Paragraph 73 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 73 is deemed to contain any factual averments, they are denied.

74.    Paragraph 74 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 74 is deemed to contain any factual averments, they are denied. On the contrary, any actions taken by Defendants were motivated by a desire to protect and maintain Plaintiffs' health and a desire to insure that the DSP provide the highest level of policing for the State of Delaware.

75.    Paragraph 75 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 75 is deemed to contain any factual averments, they are denied.

76.    Paragraph 76 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 76 is deemed to contain any factual averments, they are denied. On the contrary, Defendants' actions were direct, necessary, and common sense responses to the health and safety concerns associated with the FTU.

77.    Paragraph 77 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 77 is deemed to contain any factual averments, they are

12

denied. On the contrary, Defendants' actions were direct, necessary, and common sense responses to the health and safety concerns associated with the FTU.

78.    Paragraph 78 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 78 is deemed to contain any factual averments, they are denied. On the contrary, Defendants acted, among other reasons, to protect Plaintiffs' health and safety.

79.    Denied. Col. Chaffinch has made decisions, statements, and actions motivated by an appropriate concern for Plaintiff's well-being and regard for the performance of the DSP as a whole.

<strong>COUNT I – (Free Speech Retaliation)</strong>

80.    Defendants incorporate their responses to Paragraphs 1 through 79 as if set forth at length herein.

81.    Paragraph 81 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 81 is deemed to contain any factual averments, they are denied.

82.    Paragraph 82 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 82 is deemed to contain any factual averments, they are denied.

<strong>COUNT II – (Petition Clause Retaliation)</strong>

83.    Defendants incorporate their responses to Paragraphs 1 through 82 as if set forth at length herein.

13

A048

A092

84.     Paragraph 84 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 84 is deemed to contain any factual averments, they are denied.

### COUNT III – (Defamation)

85.     Defendants incorporate their responses to Paragraphs 1 through 84 as if set forth at length herein.

86.     Paragraph 86 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 86 is deemed to contain any factual averments, they are denied.

### COUNT IV – (False Light Invasion of Privacy)

87.     Defendants incorporate their responses to Paragraphs 1 through 86 as if set forth at length herein.

88.     Paragraph 88 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 88 is deemed to contain any factual averments, they are denied.

89.     Paragraph 89 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 89 is deemed to contain any factual averments, they are denied.

90.     Paragraph 90 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 90 is deemed to contain any factual averments, they are denied.

91.     Paragraph 91 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 91 is deemed to contain any factual averments, they are denied.

14

92.    Paragraph 92 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 92 is deemed to contain any factual averments, they are denied.

93.    Paragraph 93 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 93 is deemed to contain any factual averments, they are denied.

94.    Paragraph 94 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 94 is deemed to contain any factual averments, they are denied.

95.    Paragraph 95 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 95 is deemed to contain any factual averments, they are denied.

WHEREFORE, it is admitted that Plaintiff is seeking the relief set forth in the Complaint, and it is denied that Plaintiff is entitled to such relief on any basis.


## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of absolute and qualified immunity.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants abided by all applicable polices, procedures, rules, and laws.


15

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because they have failed to allege a basis upon which punitive damages could be recovered.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because, during all relevant times, Plaintiff was responsible for the maintenance and safety of the firing range.

WHEREFORE, Defendants request that the Court dismiss the Complaint with prejudice and enter any further relief, including costs and attorneys' fees to Defendants and against Plaintiff, as this Court deems appropriate.

Respectfully submitted,

Date: November 12, 2004

Richard M. Donaldson (DE I.D. No. 4367)
Montgomery, McCracken,
    Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
(302) 504-7880

*Counsel for Defendants*

16

A051

A095

## CERTIFICATE OF SERVICE

I, Richard M. Donaldson, hereby certify that on the 12th day of November 2004, I caused

two copies of the foregoing Answer and Affirmative Defenses to Plaintiff's Complaint, via hand

delivery, upon the following individual at the address indicated:

> Thomas Stephen Neuberger, Esq.
> Stephen J. Neuberger, Esq.
> The Neuberger Firm, P.A.
> Two East Seventh Street, Suite 302
> Wilmington, DE 19801
>
> Martin D. Haverly, Esq.
> Martin D. Haverly, Attorney At Law
> Two East Seventh Street, Suite 302
> Wilmington, DE 19801
>
> *Counsel for Plaintiff*

Richard M. Donaldson

17

A052

A096

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE;                    :
CORPORAL WAYNE WARREN; and                 :
SERGEANT CHRISTOPHER D. FORAKER,           :
                                           :
        Plaintiffs,                        :
                                           :
    v.                                     :    C.A.No.04-956-GMS
                                           :
COLONEL L. AARON CHAFFINCH,                :
individually and in his official           :
capacity as the Superintendent,            :
Delaware State Police; LIEUTENANT          :
COLONEL THOMAS F. MACLEISH,                :
individually and in his official           :    Jury Trial Demanded
capacity as the Deputy                     :
Superintendent, Delaware State             :
Police; DAVID B. MITCHELL, in his          :
official capacity as Secretary of          :
the Department of Safety and               :
Homeland Security, State of                :
Delaware; and DIVISION OF STATE            :
POLICE, DEPARTMENT OF SAFETY AND           :
HOMELAND SECURITY, STATE OF                :
DELAWARE,                                  :
                                           :
        Defendants.                        :


### FIRST AMENDED COMPLAINT[1]

1.  This is a civil action for compensatory and punitive

damages and injunctive relief for retaliatory violations of the

_____

    [1]  Pursuant to Fed.R.Civ.P. 15(a), having obtained the
"written consent of the adverse party" as contained in the
contemporaneously filed Stipulation, plaintiffs hereby amend
their Complaint.  A claim for First Amendment Petition Clause
retaliation has been added at Count II and ¶¶ 96-98.  There are
no other changes.

-1-

free speech clause of the First Amendment of the United States
Constitution.  Plaintiffs exercised their First Amendment rights
by: (1) reporting to defendants that the health and safety of
Delaware State Troopers and others were being endangered by
hazardous conditions at the Delaware State Police's Firearms
Training Unit ("FTU"); and (2) speaking to the Delaware State
Auditor's Office about health hazards, safety concerns and other
problems at the FTU, as well as the root causes of those
dangerous conditions.  Defendants retaliated against plaintiffs
for their protected activities, materially changed the conditions
of their employment and have made concerted retaliatory efforts
to create pretextual reasons to terminate their employment.

## I.  **JURISDICTION**

2.  The jurisdiction of this Court is invoked pursuant to 28
U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and
2202, and the Fourteenth Amendment to the United States
Constitution.  The cause of action arises under 42 U.S.C. § 1983.
The claims arose in this judicial district.

## II.  **THE PARTIES**

3.  Plaintiff Corporal B. Kurt Price is a citizen of the
United States and a resident of Kent County, Delaware.  He is a
19 year veteran of the Delaware State Police ("DSP") assigned to
the FTU as a firearms instructor.  At all times material hereto,
his job performance has been outstanding.

-2-

4.    Plaintiff Corporal Wayne Warren is a citizen of the United States and a resident of Sussex County, Delaware.  He is a 21 year veteran of the DSP assigned to the FTU as a firearms instructor.  At all times material hereto, his job performance has been outstanding.

5.    Plaintiff Sergeant Christopher D. Foraker is a citizen of the United States and a resident of New Castle County, Delaware.  He is a 19 year veteran of the DSP and is currently a section chief and the non-commissioned officer in charge ("NCOIC") of the FTU.  At all times material hereto, his job performance has been outstanding.

6.    Defendant Colonel L. Aaron Chaffinch is currently the Superintendent of the DSP and its highest ranking officer.  He is sued individually and in his official capacity.  Since his appointment in October of 2001 he has been a serial violator of the constitutional rights of the Troopers under his command.  For example, two federal juries have returned verdicts against him in favor of three separate troopers because of his civil rights abuses.

7.    Defendant Lieutenant Colonel Thomas F. MacLeish is currently the Deputy Superintendent of the DSP and its second-highest ranking officer.  He is sued individually and in his official capacity.

8.    Defendant David B. Mitchell is currently Secretary of

-3-

A099

the Department of Safety and Homeland Security of the State of
Delaware and he is the superior to Chaffinch and MacLeish in the
chain of command.  He is sued in his official capacity to obtain
injunctive relief which will prohibit Chaffinch and MacLeish from
continuing to violate the constitutional rights of plaintiffs.

     9.  Defendant Division of State Police, Department of Safety
and Homeland Security, State of Delaware ("State Police" or
"DSP") is an agency of the State of Delaware, which is only
joined in this action for purposes of collecting attorneys' fees
and costs.

### III.  **FACTS GIVING RISE TO THE ACTION**

#### A.  **History of the FTU**

     10.  The FTU was built and eventually opened in September of
1998 at a cost of approximately $3.3 million dollars.  At the
time, it was touted as a state of the art firearms facility.
Until its closure, it was used annually by approximately 2,000
police officers from the DSP and other local agencies, as well as
by agents from the FBI, DEA and other federal agencies.

     11.  However, due to intentional wrongdoing by those
responsible for its construction in the Department of
Administrative Services of the State of Delaware and its Division
of Facilities Management ("Facilities Management"), the FTU was
knowingly and purposefully improperly and dangerously constructed
without proper consideration for the health and welfare of the

-4-

A100