men and women who would work or train there. For example, Facilities Management wrongfully awarded the construction contract to a bidder which had not scored the highest in the application process. Instead it intentionally miscounted the points awarded to various applicants and the project was awarded to the wrong bidder which constructed a facility which has been proven to be dangerous to the health and safety of all those who use the facility.

12. A substandard facility was built as a result of improprieties, financial irregularities, breach of the public trust, fraud and/or corruption by public officials at the highest levels of state government.

13. After its construction, no Certificate of Occupancy was ever issued for the facility by any properly designated independent governmental authority. As a result, numerous problems with the facility were evident soon after its opening. For example, in November 1998, it was visually apparent that the HVAC air handling system was working improperly and was not removing lead and other bullet fragmentation from the air.

14. As a result of the problems at the FTU, range staff began to suffer from physical symptoms, such as nasal secretions and also from elevated levels of lead in their bloodstream.

15. From 1998-2003, thousands of taxpayer dollars were spent as numerous firms and state agencies attempted, and failed,

-5-

to fix the problems at the FTU.  Facilities Management sought to
hide these issues from public scrutiny, to the detriment of the
health and safety of the men and women who worked or trained
there.

16.  In an attempt to reduce lead contamination caused by a
perpetually defective HVAC system which did not remove lead
contaminants from the air, and to try to make the range safer, in
2001, the DSP transitioned to the use of non-lead based,
frangible handgun ammunition which was used at the firing range.

17.  However, the change to frangible ammunition eventually
caused numerous additional problems at the FTU, which defendant
Chaffinch and Facilities Management sought to cover-up and hide
from public scrutiny.  For example, in the summer of 2003, the
use of this new ammunition caused the bullet-trap to malfunction
and ultimately break down because it had been specifically
designed to handle lead-based ammunition and not frangible ammo
which dissolves into dust particles upon impact.

18.  Because the bullet-trap had ceased to function, range
personnel themselves, and not Facilities Management which was the
landlord for the facility, were required by hand to attempt to
clean up 'toxic goo' on a daily basis which consisted of various
dangerous heavy metals, such as zinc and copper.  The landlord
ignored such problems and instead by default range personnel were
left to deal with the issue.  They were not given hazardous

-6-

material training, protection or equipment to use while
conducting this cleanup.  Nor were professional hazardous
material teams brought in to conduct cleanup, as is done at other
firing ranges.

19.  As a result of the broken bullet-trap, malfunctioning
air handling system and numerous other problems, the FTU was a
hazardous place to work.  This was known at all times by
defendants Chaffinch, MacLeish and Facilities Management.

### B.  Plaintiffs Speak Out to Try to Fix the Problems at the Range

20.  On December 1, 2003, Sergeant Foraker was transferred
to the FTU and became the NCOIC.

21.  For the previous 20 months defendant Chaffinch had
appointed a personal friend as the NCOIC of the FTU.  During that
person's tenure conditions at the range were allowed to steadily
deteriorate.   Defendant Chaffinch knew of this deterioration and
covered it up because otherwise it would have exposed the fact
that through personal friendship he had placed an inexperienced
person in charge of the FTU.

22.  On December 1st Sgt. Foraker began to immediately
observe numerous problems and safety concerns that were impairing
the safe and proper functioning of the FTU and were endangering
the men and women who trained or worked there.

23.  Soon after, Corporals Price and Warren told Sgt.
Foraker that when they had previously expressed their health and

-7-

A103

safety concerns about working at the FTU they were told by defendant Chaffinch's friend, "you have to die from something."

24.  Beginning December 1, 2003, and continuing through the present, on behalf of himself and Corporals Price and Warren, Sgt. Foraker began to speak out and relay their joint concerns up the chain of command about the hazardous health and physical conditions at the FTU, in an attempt to have those problems fixed and thus protect the health and safety of all those who came into contact with the range.

25.  Sgt. Foraker, on behalf of himself and Corporals Price and Warren, also spoke out and contacted Facilities Management in an attempt to have the problems at the range rectified.

26.  One example of their protected speech occurred on December 19, 2003, when Sgt. Foraker e-mailed defendant MacLeish and also Major Eckrich and reported that the health and safety of Troopers were being endangered by the problems at the FTU.

27.  But defendant MacLeish ignored their health and safety concerns and, for example, did not order plaintiffs to undergo medical or occupational testing to look into their health and well-being.

28.  Similarly, on February 20, 2004, Sgt. Foraker e-mailed Major Eckrich and expressed his concerns that the conditions at the range were contaminating the staff at the FTU.  Major Eckrich then relayed these concerns to defendants MacLeish and Chaffinch.

-8-

A104

29.  But again, MacLeish and Chaffinch ignored their health and safety concerns and did not order plaintiffs to undergo medical or occupational testing to look into their health and well-being.

30.  All of plaintiffs' speech and concerns were relayed up the chain of command to defendants Chaffinch and MacLeish.

31.  However, the DSP hierarchy dismissed plaintiffs' concerns.  For example, in January 2004, defendant MacLeish told plaintiffs to "just put on a paper dust mask to protect yourself" and that it is expected that they would have health problems from working at a firing range.  Likewise, defendants MacLeish and Chaffinch did not order plaintiffs to undergo medical or occupational testing to look into their health and well-being.

32.  But plaintiffs were not the only ones concerned with or being adversely effected by the hazardous conditions at the FTU.

33.  For example, in January 2004, police academy recruits training at the FTU complained of nosebleeds, sore throats, headaches and a "penny taste" in their mouths.

34.  Despite having their concerns ignored by defendants in the DSP hierarchy, plaintiffs continued to speak out and diligently work to have the hazardous conditions at the FTU corrected.  For example, they went and spoke out to a federal authority and defendants learned of this.

### C.  The Range is Shut Down Due to Environmental Contamination

35.  On March 19, 2004 the problems at the range finally

came to a head and the FTU was shut down because of environmental contamination.  A federal official who plaintiffs had located demanded that the FTU be closed as a result of the building not being fit for occupancy.  But again neither defendants Chaffinch or MacLeish ordered plaintiffs to undergo medical or occupational testing to look into their health or well-being.

36.  In a March 20, 2004 article in the Delaware State News, a Captain, who was also the Director of Training for the DSP, described the condition of the range as follows: "This pistol range is the absolute epitome of a project from hell since its very inception."  "At the end of this week, nobody will be allowed in the building.  The building will be abandoned as of Friday.  The entire building is contaminated with lead."

37.  The closing of and problems related to the FTU attracted widespread media attention in both the downstate and upstate newspapers.

**D.  Plaintiffs Also Speak to the State Auditor's Office**

38.  Because of the catastrophic condition of the FTU and the various issues of paramount public importance which its closing raised, on Tuesday, April 20, 2004, Governor Ruth Ann Minner called upon the State Auditor to investigate the problems at the FTU.  Leaders in the Delaware General Assembly made a similar request.

39.  As part of this investigation, on May 12th and again on

-10-

July 28th, 2004 plaintiffs met with, were interviewed by and turned over voluminous documentation to three investigators of the State Auditor's office.  Plaintiffs also spoke out to the Auditors in written form by submitting to them lengthy individual written statements which addressed numerous issues of public concern.

40.  Plaintiffs spoke to the auditors about health hazards, safety concerns and other problems at the range.  Plaintiffs also spoke out about the root causes of these problems, such as improprieties in the bidding and construction process of the FTU, which resulted in an unsafe building being constructed.

41.  At all times plaintiffs spoke out on issues of public concern under the First Amendment and sought to bring to light actual or potential wrongdoing or breach of the public trust by high public officials and also sought to bring to light and fix the hazardous conditions at a state facility which were endangering the health and safety of state employees and numerous others.

42.  The media reported on plaintiffs' May 12th remarks, which incensed and antagonized defendants Chaffinch and MacLeish when they learned of this.  They then decided to retaliate against plaintiffs, order them to fitness for duty exams, fabricate reasons to fire them and to drive them from their positions as State Troopers.

-11-

A107

43. By its content, form and context, at all times plaintiffs spoke out about matters of public concern.

44. All of plaintiffs' speech was non-disruptive of any legitimate interest of their employer and was on matters of public concern to their employer, as well as the General Assembly, the Governor of Delaware, the news media, voters and the public at large. Their speech related to matters of political, social and other concern to the community.

45. Plaintiffs were acting in good faith and with honest motives at all times when they exercised their First Amendment rights to freedom of speech. At all times, plaintiffs believed their speech to be true and plaintiffs' speech is in fact true. Plaintiffs were not being disloyal by speaking out. Instead, they were trying to protect their fellow Troopers and members of the public who were being injured and otherwise placed in harms way by the dangerous conditions at the FTU.

46. The public concern in and value to the community at large of being free to hear plaintiffs' speech outweighs any asserted government interest in the effective and efficient provision of services.

47. Nothing plaintiffs said interfered with the regular operations of the DSP. Plaintiffs' speech did not interfere with the DSP's interests in: crime fighting; fostering trust and confidence among officers; protecting the safety of officers or

-12-

other members of the community.

48.  Plaintiffs' speech did not threaten the authority of defendants to run the DSP.  Nothing plaintiffs said damaged their relationship with defendants or with any of their superior officers.  Plaintiffs did not impugn the integrity of their supervisors.

49.  Plaintiffs' speech did not have a detrimental impact on any close working relationship for which personal loyalty, trust and confidence are necessary.  Plaintiffs are not the alter egos of defendants.  Organizationally, plaintiffs are four and five ranks below defendants in the chain of command.  Defendants are the Colonel and Lieutenant Colonel.  Plaintiffs are a mere sergeant and two corporals.

50.  Any disruption that was caused in the DSP was not caused by plaintiffs' speech but was instead caused by the very problems that plaintiffs' speech was in fact intended to address.

51.  In their positions as employees of DSP at the FTU, plaintiffs did not make or formulate DSP policy.  Rather, formulation of DSP policy is left up to the Superintendent and Deputy Superintendent of the DSP.

## E.  Retaliation Against Plaintiffs

52.  The individual defendants were aware of plaintiffs' protected speech, described above, and it antagonized them.

53.  Defendants then deliberately set out upon a course of

-13-

conduct designed to retaliate against plaintiffs because of their protected speech and to dismiss them from the DSP at the cost of their careers and livelihoods.  Defendants Chaffinch and MacLeish did a 180 degree about face from blissful indifference to plaintiffs' health to demanding that they undergo repeated fitness for duty exams.  Defendants believed that this course of retaliation would allow them to continue their practice of ignoring and covering up the problems at the FTU, protecting their friends at the expense of loyalty to all the men and women who they command, and thus save themselves from further public contempt and ridicule arising out of their failed leadership of the State Police.

54.  For example, immediately after Corporal Price was interviewed a second time on July 28th by State Auditor investigators, defendant MacLeish ordered him to report to him so he could be interrogated about his interview.  Plaintiff's legal counsel then promptly sent an email directly to MacLeish and demanded the right to accompany his client to that interrogation.  MacLeish ignored that demand, never replied, and then ordered Price to be interrogated without his legal counsel present upon penalty of severe punishment.  Nor would he even allow a Union representative to attend the interrogation. MacLeish then interrogated Price without counsel present.

55.  Throughout the course and as a result of plaintiffs'

-14-

A110

protected speech, defendants retaliated against plaintiffs in numerous ways, including:

> (a)  False charges of misconduct by each plaintiff were made to each investigator for the State Auditor's Office charging that it was the plaintiffs themselves and not Facilities Management and the leadership of the DSP who were responsible for all of the problems with the FTU.  These false charges were tantamount to threats or suggestions of discharge.
>
> (b)  They were forcibly and improperly sent for fitness for duty examinations which were intended to be a pretextual vehicle to dismiss them from the DSP.
>
> (c)  Their job responsibilities were materially altered and they have been placed on light duty status, forbidden from wearing their police uniforms, performing their regular duties and prohibited from using a firearm to protect the public, enforcing laws or otherwise protecting the public.

56.  False charges of misconduct and dereliction of duty have been leveled against plaintiffs by defendants Chaffinch and MacLeish.  Blame for the abysmal condition of the FTU has been placed at their feet by defendants.

57.  Additionally, less than a week after initially speaking to the Auditor's office, defendant MacLeish, acting on behalf of and with the knowledge and consent of defendant Chaffinch, ordered that plaintiffs be sent for trumped up fitness for duty examinations.

58.  Fitness for duty examinations are a well-known tool for eliminating whistleblowers in police agencies in the State of Delaware.

59.  An officer who is found not to be fit for duty cannot

-15-

act as a police officer in the State of Delaware.

60.  An officer who is found to be unfit for duty is put on temporary light duty status, where he is prohibited from using his firearm, wearing a uniform, enforcing laws and protecting the public.  Within one year, the officers then are forcibly retired with resultant severe financial loss for their families due to the deprivation of their salaries and reduced pensions.

61.  Fitness for duty examinations were conducted on plaintiffs by a DSP doctor soon after.

62.  On June 18th, plaintiff Corporals Price and Warren then were put on light duty status because they allegedly had failed their fitness for duty examinations due to hearing loss.  Price and Warren have since in writing been prohibited from using their firearms, wearing a uniform, enforcing the laws and protecting the public.  They have been explicitly ordered to run the other way if they observe a crime in progress, such as a crime of violence on another citizen who they are otherwise sworn to protect at the risk of their own lives.  They have been ordered to violate the very core of their code as police officers, to protect the public.

63.  On July 15, 2004, plaintiff Foraker passed his fitness for duty examination conducted by a DSP doctor.

64.  Instead of being happy that plaintiff Foraker had passed his fitness for duty exam and had been given a clean bill

-16-

of health by DSP doctors, the DSP promptly scheduled him for a second opinion in the hopes that he would fail the second examination.

65.    By their actions described above and otherwise, defendants have made it clear that they intend to force plaintiff Foraker out of the DSP.  On a daily basis defendants continue to take actions against him designed to drive him out or force him to retire.

**F.  The Historic Practice in the DSP Regarding Hearing Loss**

66.    It is the historic policy, practice and custom of the DSP to stay away from, ignore and otherwise remain purposefully ignorant about the hearing ability of Troopers.

67.    This historic policy, practice and custom is driven by two concerns.  First, an inability to find medical hearing standards applicable to the work that police officers do.  Second, a fear that large numbers of Troopers have suffered hearing loss already.  Thus even if standards are available, it is feared that their application would result in the forced retirement of a large portion of the active force.

68.    Additionally, the DSP has historically overlooked or accommodated any Trooper when hearing loss issues have arisen.

69.    For example, it is well-known throughout the DSP that one Major's hearing was so bad that he had to wear a hearing aid in the course of his duties.  But this officer was not sent for a

-17-

fitness for duty exam, placed on light duty, or forcibly retired from the DSP.

70. Likewise, there are and have been numerous additional officers in the DSP whose hearing abilities are similar or worse than plaintiffs, but their hearing loss has been intentionally overlooked and ignored by defendants. For example, one comparable trooper with hearing loss greater than Corporal Warren has been allowed to operate as a uniformed patrol officer with complete police powers.

71. Additionally, it is virtually unprecedented for the DSP to inquire into medical issues for its Troopers. Family physicians are allowed to sporadically certify medical fitness for duty. Otherwise, medical fitness for duty is ignored by management.

72. The totality of retaliatory adverse action taken by defendants against plaintiffs are sufficient to deter a person of ordinary firmness from exercising their First Amendment right to freedom of speech.

73. A reasonable person of ordinary firmness would be deterred from exercising their First Amendment right to freedom of speech when threatened with false charges of misconduct, repeated fitness for duty examinations, severely diminished job responsibilities and discharge.

74. There is a causal link between First Amendment

-18-

A114

protected activity on matters of public concern and the adverse
action described above. This is demonstrated by:

      (a)  The temporal proximity of events, as indicated
above.  For example, less than a week after speaking to
the Auditor's office, plaintiffs were singled out and
sent for unprecedented fitness for duty examinations.
There was no concern for such fitness for duty from
December 2003 through March 2004 when plaintiffs
repeatedly spoke out to defendants about the health
dangers of the FTU and their own health problems.
There was no such concern when in January 2004 Police
Academy recruits complained of health issues when they
had served there only weeks, instead of the years
plaintiffs were exposed.  There was no such concern
when the range publically was shut down in March 2004.
But only a few days after plaintiffs spilled the beans
to the Auditors on May 12th by turning over to them
voluminous documentation on the misdeeds involving
Facilities Management and the range and gave lengthy
written statements about conditions at the FTU, only
then were plaintiffs allegedly unfit for duty.

      (b)  Circumstantial evidence of a pattern of
antagonism following protected activity, as
demonstrated by Chaffinch going on WBOC-TV Salisbury

-19-

A115

and attacking plaintiffs on television; MacLeish's hostile remark that plaintiffs should "just put on a paper dust mask to protect yourself" and that it is expected that they would have health problems from working at a firing range; defendants incensed and antagonized reactions to media reports on plaintiffs' first interviews with the Auditors; and MacLeish's hostile interrogation and browbeating of Corporal Price and refusal to allow him to have his attorney present to defend him after Price had spoken to the Auditors.

c)  Personal knowledge and awareness of protected activity by the individual defendants.  For example, defendants knew plaintiffs had spoken out to a federal authority which finally forced defendants' hand and made them close the FTU.  Additionally defendants knew of the heavy media coverage of plaintiffs' speech.

(d)  Violation of DSP policies, procedures, practices and customs by ignoring the longstanding DSP policy of purposeful ignorance regarding hearing loss and other medical issues.  It is the policy of the DSP once a Trooper has graduated from the Police Academy to leave all medical issues relating to whether or not he or she can serve in a police capacity in the ultimate hands of the family physician of that Trooper and not

-20-

to independently inquire further if that physician
sporadically certifies that the Trooper is fit for
duty.

(e)  Disparate treatment between plaintiffs and
other similarly situated State Troopers both past and
present.  For example, there is the trooper with
hearing loss greater than Corporal Warren who was
allowed to serve on patrol with full police powers.
There is the Major who had to wear a hearing aid who
never was sent for a fitness for duty exam or had his
status questioned.  There are numerous other Troopers
with significant hearing loss comparable to plaintiffs
who the defendants refuse to examine.

(e)  The actions of the defendants once they sent
plaintiffs for fitness for duty exams which reveal that
they were not looking for disinterested objective
medical advice but instead were seeking to create a
distorted and manufactured medical record to use
against plaintiffs.  For example, once Sgt. Foraker
passed his exam, he was ordered to submit to another in
a vain hope to find something to use against him.
Medical records also were withheld from medical
examiners if they would have favored plaintiffs.

(f)  The actions in falsely blaming plaintiffs for

-21-

A117

problems at the FTU, when the record reveals that
problems were publically known to be historic and the
fault of Facilities Management and a friend of
defendant Chaffinch.

(g)  The evidence as a whole.

75.  First Amendment protected activity was a substantial or
motivating factor in the adverse action taken against plaintiffs.
The natural probative force of the evidence demonstrates
causation.

76.  The defendants cannot prove by a preponderance of the
evidence that absent a constitutional violation, plaintiffs would
have had adverse employment action taken against them anyway.

77.  As a direct and proximate result of the actions of the
defendants as detailed herein, plaintiffs have or will suffer
lost wages, earnings and benefits, diminished earning capacity
now and upon their retirement, loss of DSP pensions and benefits,
decreased employment and earnings opportunities, and other
pecuniary losses, emotional pain, suffering, disappointment,
anger, inconvenience, mental anguish, loss of enjoyment of life,
mental and physical pain, physical injury, anguish, humiliation,
embarrassment, injury to reputation, and other non-pecuniary
losses and injury.

**IV.  ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT**

78.  The individual defendants' actions violated clearly

-22-

A118

established federal constitutional rights of which any reasonable official would have known, including more than three decades of Supreme Court and Third Circuit case law prohibiting retaliation against public employees for protected speech.

79.  At all times material hereto the individual defendants participated in, authorized, and sanctioned the federal constitutional deprivations described above which illegally retaliated against plaintiffs.

80.  At all times material hereto the individual defendants and their agents were acting under color of law.  The federal constitutional deprivations described herein are fairly attributable to the State.

81.  The actions of the defendants and their agents or employees were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federal constitutional rights and because of the exercise of those rights.

82.  The defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights.

83.  Their actions were outrageous and taken with evil motive, in bad faith, out of personal animus and without any reasonable grounds to support them.

84.  Their actions were wanton and malicious or taken with

-23-

reckless indifference to federal constitutional rights.

85.  The exercise of rights under the U.S. Constitution made a difference in all actions adverse to plaintiffs.

86.  The exercise of these rights was a motivating, substantial or determinative factor in all actions adverse to plaintiffs.

87.  The individual defendants' actions were willful, reckless and oppressive.

88.  The defendants' actions were motivated by bias, bad faith, and improper motive.

89.  The defendants' actions constitute an abuse of governmental power.

90.  The defendants did not reasonably believe that the actions they took were necessary to accomplish any legitimate governmental purpose.

91.  The defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

92.  The defendants' actions are not so reasonable as to further any governmental interest asserted and do not closely fit the goal of serving those governmental interests.

### COUNT I (FREE SPEECH CLAUSE)

93.  Plaintiffs repeat and reallege paragraphs 1 - 92 set forth above.

94.  The defendants took action adverse to plaintiffs as a

-24-

A120

direct and proximate result of and in retaliation for plaintiffs'
First Amendment protected speech on matters of public concern.
There is a temporal and causal relationship between plaintiffs'
aforementioned protected speech, and adverse employment action.
First Amendment protected activity was a substantial or
motivating factor in the adverse employment action.  The
defendants cannot prove by a preponderance of the evidence that
absent a constitutional violation they would have had grounds to
adversely treat plaintiffs.

95.  Plaintiffs' constitutional right to freedom of speech
has been denied under the First Amendment of the U.S.
Constitution and 42 U.S.C. § 1983.

### COUNT II - (PETITION CLAUSE)

96.  Plaintiffs repeat and reallege paragraphs 1 - 95 set
forth above.

97.  The defendants took action adverse to plaintiffs as a
direct and proximate result of and in retaliation for their
exercise of their First Amendment right to petition the
government for redress of grievances.  There is a temporal and
causal relationship between plaintiff's aforementioned protected
petitioning and adverse employment action.  First Amendment
protected activity was a substantial or motivating factor in the
adverse employment action.  The defendants cannot prove by a
preponderance of the evidence that absent a constitutional

-25-

A121

violation they would have had grounds to adversely treat plaintiffs.

98.  Plaintiffs' constitutional right to petition the government for redress of grievances has been denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

**Wherefore**, plaintiffs pray that the Court:

A.  Enter judgment against the defendants.

B.  Enter a declaratory judgment declaring the acts of the defendants to be a violation of plaintiffs' constitutional rights.

C.  Enter a judgment against the defendants Chaffinch and MacLeish, jointly and severally, for compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation, embarrassment, and injury to reputation.

D.  Enter separate judgments against defendants Chaffinch and MacLeish for punitive damages.

E.  Issue a mandatory injunction directing defendant Mitchell to closely monitor all contact between defendants Chaffinch or MacLeish and plaintiffs and to prohibit any retaliation against or harassment of the plaintiffs by Chaffinch or

-26-

A122

       MacLeish, upon penalty of finding Mitchell in

       contempt of Court.

F.   Award back pay to compensate plaintiffs for the

       loss of overtime assignments due to their being

       placed on light duty.

G.   Issue a reparative injunction directing plaintiffs

       be taken off of light duty status and put back on

       full duty status at the FTU.

H.   Issue a mandatory injunction ending the continuing

       illegal actions of defendants Chaffinch and

       MacLeish and barring them from considering

       protected speech whenever considering taking any

       employment action concerning plaintiffs.

I.   Issue a reparative injunction directing that

       individual defendants Chaffinch and MacLeish place

       a signed document in each plaintiffs' personnel

       file apologizing for their illegal violations of

       plaintiffs' constitutional rights.

J.   Issue a reparative injunction directing that

       individual defendants Chaffinch and MacLeish issue

       public written apologies to plaintiffs and run

       their apologies in the Delaware State News, the

       News Journal and on WBOC-TV Salisbury, MD.

K.   Enjoin the defendants from retaliating against

-27-

A123

plaintiffs.

L.    Award plaintiffs attorneys' fees, costs and pre

and post judgment interest for this action.

M.    Require such other and further relief as the Court

deems just and proper under the circumstances.


**THE NEUBERGER FIRM, P.A.**


/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582

Attorneys for Plaintiffs


**Of Counsel:**

**JACOBS & CRUMPLAR, P.A.**
**THOMAS C. CRUMPLAR, ESQUIRE (#942)**
Two East Seventh Street
P.O. Box 1271
Wilmington, DE 19899
(302) 656-5445


Dated: October 14, 2005

Firearms Training Unit / Pleadings / First Amended Complaint.FINAL

-28-

A124

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

October 14, 2005, I electronically filed this **Pleading** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:


Robert J. Fitzgerald, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Bend Street
Philadelphia, PA 19109
rfitzgerald@mmwr.com

Richard M. Donaldson, Esquire
Montgomery, McCracken, Walker, & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
rdonaldson@mmwr.com


/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

-29-

A125

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| B. KURT PRICE, WAYNE WARREN;<br>AND CHRISTOPHER FORAKER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 04-0956 |
| | : | |
| L. AARON CHAFFINCH,<br>individually and in his official capacity as the<br>Superintendent of the Delaware State Police;<br>THOMAS F. MACLEISH, individually and<br>in his official capacity as the Deputy<br>Superintendent of the Delaware State Police;<br>DAVID B. MITCHELL, in his official<br>capacity as Secretary of the Department of<br>Public Safety of the State of Delaware; and<br>DIVISION OF STATE POLICE,<br>DEPARTMENT OF PUBLIC SAFETY,<br>STATE OF DELAWARE, | : | |
| Defendants. | : | |

DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES
TO PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendants L. Aaron Chaffinch, Thomas F. MacLeish, David B. Mitchell, and Division

of State Police, Department of Safety & Homeland Security, State of Delaware hereby answer

Plaintiffs' First Amended Complaint as follows: Defendants deny each and every averment of

Plaintiffs' First Amended Complaint except as expressly admitted below.

1.     It is admitted only that Plaintiffs in this civil action are seeking compensatory and

punitive damages and injunctive relief based on allegations that Defendants violated their rights

under the First Amendment of the United States Constitution. It is denied that Plaintiffs are

entitled to such relief. Moreover, Paragraph 1 states conclusions of law to which no responsive

pleading is required. To the extent paragraph 1 is deemed to contain any factual averments, they are denied. On the contrary, Defendants took immediate and appropriate action to determine and protect the health and safety of all individuals who worked or trained or trained at the Firearms Training Unit ("FTU"), including Plaintiffs.

## I.    **JURISDICTION**

2.        It is admitted that Plaintiff invokes jurisdiction of the Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the First Amendment of the United States Constitution. It is denied that Plaintiffs are entitled to relief pursuant to 42 U.S.C. § 1983 or on any other basis. The remainder of Paragraph 2 states conclusions of law to which no responsive pleading is required.

## II.    Parties

3.        It is admitted that Plaintiff Corporal B. Kurt Price is a citizen of the United States and a resident of Kent County, Delaware. It is further admitted that he is a 19-year veteran of the Delaware State Police who is assigned to the FTU as a firearms instructor. The remainder of Paragraph 3 is denied.

4.        It is admitted that Plaintiff Corporal Wayne Warren is a citizen of the United States and a resident of Sussex County, Delaware. It is further admitted that he is a 21-year veteran of the Delaware State Police who is assigned to the Firearms Training Unit ("FTU") as a firearms instructor. The remainder of Paragraph 4 is denied.

5.        It is admitted that Plaintiff Sergeant Christopher D. Foraker is a citizen of the United States and a resident of New Castle County, Delaware. It is further admitted that he is a 19-year veteran of the Delaware State Police who is currently a section chief and non-commissioned officer in charge of the FTU. The remainder of Paragraph 5 is denied.

-2-

A1651

A127

6.      It is admitted that L. Aaron Chaffinch is the Superintendent and highest-ranking officer of the Delaware State Police. It is further admitted that Plaintiffs are suing Colonel Chaffinch in his individual and official capacities. It is also admitted that Col. Chaffinch has been a named defendant in two civil rights actions in which juries returned verdicts in the Plaintiffs' favor. It is denied that Col. Chaffinch is a serial violator of troopers' constitutional rights. It is also denied that Plaintiffs are entitled to any relief against Colonel Chaffinch. On the contrary, since his appointment in October of 2001, Colonel Chaffinch has been cognizant and protective of the constitutional rights of the troopers under his command, including Plaintiffs.

7.      Admitted.

8.      It is denied that Col. Chaffinch or Lt. Col. MacLeish have violated or are continuing to violate Plaintiff's constitutional rights. The remainder of Paragraph 8 is admitted.

9.      It is denied that Plaintiff is entitled to attorneys fees and/or costs. The remainder of Paragraph 9 is admitted.

### III.    FACTS GIVING RISE TO THE ACTION

#### A.    History of the FTU

10.      It is admitted that the FTU was intended to be a state-of-the-art indoor firearms facility and that it opened in 1998, after several years of planning, design, and construction. It is also admitted that approximately 2000 law enforcement officers used the FTU annually.

11.      Denied.

12.      Denied. Plaintiffs' accusations in Paragraph 12 are outrageous and unfounded.

13.      It is admitted that New Castle County did not issue a Certificate of Occupancy for the facility. It is denied that problems associated with the facility were evident because the Certificate of Occupancy was not issued. Defendants were not in positions responsible for the

-3-

A1652

A128

FTU in 1998 and are without knowledge or information sufficient to form a belief as to whether, in November 1998, it was visually apparent that the HVAC air handling system was working improperly and was not removing lead and other bullet fragmentation from the air. Accordingly, those allegations are denied.

14.    It is admitted that some troopers working at the FTU experienced a slight elevation of blood lead levels, although those levels were within the range considered medically acceptable. It is denied that the range staff complained of physical symptoms such as nasal secretions until the Plaintiffs in this case discontinued required range maintenance in December 2003.

15.    It is admitted that, in 1999 and 2000, the state of Delaware expended funds to repair and upgrade systems at the FTU. It is denied that Facilities Management sought to hide anything from public scrutiny, to the detriment of the health and safety of the men and women who worked or trained there. The remainder of Paragraph 15 is denied.

16.    It is admitted that, in 2001, the Delaware State Police transitioned to the use of non-lead based, frangible handgun ammunition to reduce lead contaminants and to make the range safer. The remainder of Paragraph 16 is denied.

17.    Denied.

18.    Denied.

19.    Denied.

### B. Plaintiffs Speak Out to Try to Fix
### the Problems at the Range

20.    Admitted.

21.    It is denied that Colonel Chaffinch ever appointed a personal friend as the NCOIC of the FTU; to the contrary, he appointed Sgt. Richard Ashley, a competent trooper. It is also

-4-

denied that, during Ashley's tenure, conditions at the range deteriorated. On the contrary, from February 2002 until December 2003, conditions at the range remained stable, and the range functioned as a viable training facility. It is also denied that Colonel Chaffinch or anyone else covered up any alleged deterioration. Lastly, it is denied that Colonel Chaffinch took any action on the grounds that it might expose any alleged inexperience of a "personal friend." On the contrary, Colonel Chaffinch and the command of the FTU conducted themselves according to the policies, procedures, and protocols of the DSP.

    22.       Denied. On the contrary, on December 1, 2003, Plaintiff Foraker toured the FTU with Sgt. Ashley, and both observed during that tour that the FTU was a clean, functioning, and useful training facility. Plaintiff Foraker did not identify any problems or safety concerns.

    23.       Defendants are without knowledge or information sufficient to form a belief regarding what Plaintiffs Price and Warren may have told Plaintiff Foraker. Accordingly, Paragraph 23 is denied.

    24.       Denied.

    25.       Denied.

    26.       It is admitted that Plaintiff Foraker sent an e-mail to Lt. Col. MacLeish and Major Eckrich on December 19, 2003. The remainder of Paragraph 26 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 26 is deemed to contain any factual averments, they are denied.

    27.       It is denied that Lt. Col. MacLeish ignored the health and safety concerns of the Plaintiffs. It is also denied that Lt. Col. MacLeish did not order Plaintiffs to undergo medical or occupational testing. On the contrary, Lt. Col. MacLeish, immediately upon being made aware of the health and safety concerns expressed by Plaintiff Foraker, became concerned for

-5-

Plaintiffs' safety and suggested that Plaintiffs undergo physical examinations and blood work.
That suggestion was rejected by the captain responsible for the FTU.

28.    Defendants are without knowledge or information sufficient to form a belief
regarding whether Plaintiff Foraker e-mailed Major Eckrich. Accordingly, Paragraph 28 is
denied.

29.    It is denied that Lt. Col. MacLeish ignored the health and safety concerns of the
Plaintiffs. It is also denied that Lt. Col. MacLeish did not order Plaintiffs to undergo medical or
occupational testing. On the contrary, Lt. Col. MacLeish, immediately upon being made aware
of the health and safety concerns expressed by Plaintiff Foraker, became concerned for
Plaintiffs' safety and suggested that Plaintiffs undergo physical examinations. That suggestion
was rejected by the captain responsible for the FTU.

30.    Denied.

31.    It is denied that the DSP hierarchy dismissed Plaintiffs' concerns. On the
contrary, the DSP hierarchy was and is concerned with the health and safety of all the troopers,
including Plaintiffs. It is also denied that Lt. Col. MacLeish told the Plaintiffs to "just put on a
paper dust mask to protect yourself" or that it was expected that they would have health
problems from working at the FTU. On the contrary, in January 2004, Lt. Col. MacLeish,
having been told by the captain responsible for the FTU that Plaintiffs did not require physical
examinations, suggested that, as a precautionary measure, Plaintiffs wear paper masks to further
protect themselves from any potential airborne dangers. Lastly, it is denied that Defendants
MacLeish and Chaffinch did not order Plaintiffs to undergo or occupational testing. On the
contrary, immediately upon learning of Plaintiff Foraker's concerns, Lt.Col. MacLeish suggested

-6-

A1655

A131

that Plaintiffs undergo a physical examination. That suggestion was rejected as unnecessary by the captain responsible for the FTU.

32.    It is admitted that others, including Defendants, were concerned with the conditions at the FTU. It is also admitted that troopers other than Plaintiffs were exposed to those conditions. The remainder of Paragraph 32 is denied.

33.    It is admitted that after the Plaintiffs discontinued maintenance of range equipment, certain trainees experienced health problems.

34.    It is denied that Plaintiffs' concerns were ignored by Defendants. On the contrary, Defendants were and are concerned about the health and safety of all troopers, including Plaintiffs. It is also denied that Plaintiffs continued to work diligently to have the hazardous conditions at the FTU corrected. On the contrary, from December 2003 until March 2004, Plaintiffs refused to take minimal, common-sense steps to reduce problems at the FTU. It is also denied that Plaintiffs ever spoke to a federal authority. The remainder of Paragraph 34 is denied.

### C. The Range is Shut Down Due to Environmental Contamination

35.    It is admitted that the FTU was shut down in March 2004. The remainder of Paragraph 35 is denied.

36.    It is admitted that Gregory Warren, a captain of the DSP and at the same time a litigant against Col. Chaffinch and others, is quoted in a March 20, 2004 Delaware State News article as set forth in Paragraph 36 of the Complaint.

37.    It is admitted that both the Delaware State News and the News Journal newspapers published articles concerning the construction, closing, and environmental issues at the FTU.

-7-

A1656

A132

**D.  Plaintiffs Also Speak to the State Auditor's Office**

38.      It is admitted that Governor Ruth Ann Minner and leaders in the Delaware

General Assembly asked the State Auditor to investigate the FTU.  The remainder of

Paragraph 38 is denied.

39.      It is admitted that, on May 12 and again on July 28, 2004, Plaintiffs met with,

were interviewed by, and turned over documents to three investigators of the State Auditor's

office.  The remainder of Paragraph 39 states conclusions of law to which no responsive pleading

is required.  To the extent the remainder of Paragraph 39 is deemed to contain any factual

averments, they are denied.

40.      Defendants are without knowledge or information sufficient to form a belief as to

the content of Plaintiffs' speech to the auditors.

41.      Paragraph 41 states conclusions of law to which no responsive pleading is

required.  To the extent Paragraph 41 is deemed to contain any factual averments, they are

denied.

42.      It is admitted that the media reported on Plaintiffs' May 12, 2004, meeting with

the auditors.  The remainder of Paragraph 42 is denied.  It is specifically denied that Col.

Chaffinch and/or Lt. Col. MacLeish were incensed or antagonized by Plaintiffs' May 12th

remarks.  It is also denied that Col. Chaffinch or Lt. Col. MacLeish decided to retaliate against

Plaintiffs for any reason or to fabricate reasons to fire them or to drive them from their position

as State Troopers.  On the contrary, neither Col. Chaffinch nor Lt. Col. MacLeish has retaliated

against the Plaintiffs in any way or for any reason.  The decision to order fitness for duty

examinations for Plaintiffs was a direct and a common sense response to the health and safety

concerns that were raised after inspections of the FTU.

-8-

A1657

A133

43.    Paragraph 43 states conclusions of law to which no responsive pleading is required.

44.    Paragraph 44 states conclusions of law to which no responsive pleading is required.

45.    Denied. Plaintiffs were motivated by a personal desire to attack and embarrass Defendants and the DSP leadership.

46.    Paragraph 46 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 46 is deemed to contain any factual averments, they are denied.

47.    Paragraph 47 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 47 is deemed to contain any factual averments, they are denied.

48.    Paragraph 48 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 48 is deemed to contain any factual averments, they are denied.

49.    Paragraph 49 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 49 is deemed to contain any factual averments, they are denied.

50.    Paragraph 50 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 50 is deemed to contain any factual averments, they are denied.

A1658

A134

51.    Paragraph 51 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 51 is deemed to contain any factual averments, they are denied.

### E. Retaliation against Plaintiffs

52.    Denied. Rather than being antagonized, Col. Chaffinch and Lt. Col. MacLeish, upon learning of Plaintiffs' concerns, were concerned about the health and safety of all those working or training at the FTU and took immediate, proper, and effective action consistent with their obligations as members of the DSP leadership.

53.    It is admitted that Plaintiffs were ordered to undergo fitness for duty exams because of the concerns raised about working conditions at the FTU. The remainder of Paragraph 53 is denied. Col. Chaffinch and Lt. Col. MacLeish have acted consistent with their concern with the health, welfare and safety of all troopers, including Plaintiffs, and have acted consistent with the policies, procedures and protocols of the DSP.

54.    It is admitted that, on July 30 2004, Lt. Col. MacLeish, among others, received an e-mail from Stephen J. Neuberger and that Lt. Col. MacLeish did not reply to that email. The remainder of Paragraph 54 is denied. Lt. Col. MacLeish did not interrogate Plaintiff Price. On the contrary, as is fair and proper for the second highest ranking officer in the DSP, Lt. Col. MacLeish merely requested to speak to Cpl. Price and engaged in a telephone conversation pursuant to a request of the Secretary of Safety and Homeland Security and the president of the troopers' union.

55.    Paragraph 55 and all its subparts are denied.

(a)    It is denied that Defendants made false charges of misconduct or that any charges were tantamount to threats or suggestions of discharge. On the contrary, Defendants

-10-

merely noted that since December 2003, when Plaintiff Foraker became the NCOIC at the FTU, conditions at the FTU had noticeably deteriorated.

        (b)    Denied. Defendants ordered fitness for duty examinations as a result of their concern for the health, safety, and welfare of all troopers, including Plaintiffs.

        (c)    It is admitted that Plaintiffs Price and Warren have been placed on light duty status. The remainder of Sub-Paragraph (c) is denied.

56.    Denied. Defendants have correctly noted that after December 2003, when Plaintiff Foraker became the NCOIC of the FTU, conditions at the FTU deteriorated, possibly as a result of Plaintiffs' failure to conduct routine and basic maintenance.

57.    Denied. Lt. Col. MacLeish suggested that Plaintiffs undergo fitness for duty examinations long before Plaintiffs spoke to the Auditor's office. Finally, the fitness for duty examinations were a common sense response to the health concerns brought to light at the FTU.

58.    Denied. On the contrary, fitness for duty examinations are a necessary and proper means to insure the safety, welfare, and protection of the employees of the DSP and, ultimately, the citizens of the State of Delaware.

59.    Denied. On the contrary, Plaintiffs Price and Warren are still expected to perform as state police officers while on light duty status.

60.    It is admitted that a trooper on light duty status is prohibited from using his firearm or wearing a uniform. The remainder of paragraph 60 is denied.

61.    It is admitted that Dr. Aaron Green, a doctor associated with Healthworks Corporation, conducted fitness for duty examinations Plaintiffs Price and Warren in June 2004 and on Plaintiff Foraker in July 2004. The remainder of Paragraph 61 is denied.

-11-

62.    It is admitted that, on June 18, 2004, Plaintiffs Price and Warren were put on light duty status because their fitness for duty exam revealed significant hearing loss. The remainder of Paragraph 62 is denied.

63.    It is admitted that, on July 18, 2004, Dr. Green expressed his opinion that Plaintiff Foraker was fit for duty.

64.    It is admitted that Plaintiff Foraker, like all other range staff personnel, including Plaintiffs Price and Warren, was scheduled for a second hearing test. The remainder of Paragraph 64 is denied.

65.    Denied. On the contrary, Defendants have no intention, desire, or reason to force Plaintiff Foraker out of the DSP.

### F. The Historic Practice in the DSP regarding Hearing Loss

66.    Denied. On the contrary, every 5 years, troopers under the age of 35 are required to undergo physical examinations that include hearing tests. Those between the ages of 35 and 40 are required to undergo physical examinations, including hearing tests, every 2 years. Those over the age of 40 are required to undergo physical examinations, including hearing tests, every year.

67.    Denied. There are no concerns that drive a policy, practice, or custom of ignoring the hearing ability of troopers because no such policy, practice, or custom exists.

68.    Denied.

69.    It is admitted that a major wore a hearing aid and that this officer was not sent for a fitness for duty exam, placed on light duty, or forcibly retired from the DSP because of it. The remainder of Paragraph 69 is denied.

-12-

70.    Denied.

71.    Denied. On the contrary, troopers under the age of 35 are required to undergo physicals which include hearing tests every 5 years. Those between the ages of 35 and 40 are required to undergo physical examinations including hearing tests every 2 years. Those over the age of 40 are required to undergo physical examinations, including hearing tests, every year.

72.    Paragraph 72 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 72 is deemed to contain any factual averments, they are denied.

73.    Paragraph 73 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 73 is deemed to contain any factual averments, they are denied.

74.    Paragraph 74 and its subparts state conclusions of law to which no responsive pleading is required. To the extent Paragraph 74 and its subparts are deemed to contain any factual averments, they are denied.

75.    Paragraph 75 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 75 is deemed to contain any factual averments, they are denied. On the contrary, any actions taken against the Plaintiffs by Defendants were motivated by a desire to protect and maintain Plaintiffs' health and a desire to insure that the DSP provide the highest level of policing for the State of Delaware.

76.    Paragraph 76 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 76 is deemed to contain any factual averments, they are denied.

-13-

A1662

A138

77.        Paragraph 77 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 77 is deemed to contain any factual averments, they are denied.

### IV. ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT

78.        Paragraph 78 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 78 is deemed to contain any factual averments, they are denied. On the contrary, Defendants' actions were consistent with the demands of the U.S. Constitution.

79.        Paragraph 79 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 79 is deemed to contain any factual averments, they are denied. On the contrary, Defendants did not illegally retaliate against or violate the constitutional rights of Plaintiffs.

80.        Paragraph 80 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 80 is deemed to contain any factual averments, they are denied.

81.        Paragraph 81 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 81 is deemed to contain any factual averments, they are denied. On the contrary, Defendants and their agents or employees were aware of and acted consistent with the constitutional rights of Plaintiffs.

82.        Paragraph 82 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 82 is deemed to contain any factual averments, they are denied.

-14-

83.    Paragraph 83 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 83 is deemed to contain any factual averments, they are denied. On the contrary, the actions of Defendants were taken out of respect and concern for Plaintiffs' health and safety, as well as the effectiveness of the FTU as a training facility and the DSP on the whole.

84.    Paragraph 84 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 84 is deemed to contain any factual averments, they are denied. On the contrary, the actions of Defendants were respectful of and consistent with the constitutional rights of Plaintiffs.

85.    Paragraph 85 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 85 is deemed to contain any factual averments, they are denied.

86.    Paragraph 86 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 86 is deemed to contain any factual averments, they are denied. On the contrary, to the extent Plaintiffs suffered actions adverse to them, those actions were motivated by a proper concern for Plaintiffs' health and safety, as well as a concern for the effectiveness of the FTU as a training facility and the DSP as a whole.

87.    Paragraph 87 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 87 is deemed to contain any factual averments, they are denied.

88.    Paragraph 88 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 88 is deemed to contain any factual averments, they are denied.

-15-

A1664

A140

89.    Paragraph 89 states conclusions of law to which no responsive pleading is required.  To the extent Paragraph 89 is deemed to contain any factual averments, they are denied.

90.    Paragraph 90 states conclusions of law to which no responsive pleading is required.  To the extent Paragraph 90 is deemed to contain any factual averments, they are denied.

91.    Paragraph 91 states conclusions of law to which no responsive pleading is required.  To the extent Paragraph 91 is deemed to contain any factual averments, they are denied.

92.    Paragraph 92 states conclusions of law to which no responsive pleading is required.  To the extent Paragraph 92 is deemed to contain any factual averments, they are denied.

### COUNT I (FREE SPEECH CLAUSE)

93.    Defendants incorporate their responses to Paragraphs 1 through 92 as if set forth at length herein.

94.    Paragraph 94 states conclusions of law to which no responsive pleading is required.  To the extent Paragraph 94 is deemed to contain any factual averments, they are denied.

95.    Paragraph 95 states conclusions of law to which no responsive pleading is required.  To the extent Paragraph 95 is deemed to contain any factual averments, they are denied.

### COUNT II – (PETITION CLAUSE)

96.    Defendants incorporate their responses to Paragraphs 1 through 95 as if set forth

A1665

A141

at length herein.

97.    Paragraph 97 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 97 is deemed to contain any factual averments, they are denied.

98.    Paragraph 98 states conclusions of law to which no responsive pleading is required. To the extent Paragraph 98 is deemed to contain any factual averments, they are denied.

WHEREFORE, it is admitted that Plaintiffs are seeking the relief set forth in the Complaint, and it is denied that Plaintiffs are entitled to such relief on any basis.

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrines of absolute and qualified immunity.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Defendants abided by all applicable policies, procedures, rules, and laws.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they have failed to allege a basis upon which punitive damages could be recovered.

-17-

A1666

A142

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because, during all relevant times, Plaintiffs were responsible for the maintenance and safety of the firing range.


WHEREFORE, Defendants request that the Court dismiss the Complaint with prejudice and enter any further relief, including costs and attorneys' fees to Defendants and against Plaintiffs, as this Court deems appropriate.

Respectfully submitted,

Dated: November 7, 2005

Noel C. Burnham (DE Bar No. 3483)
Richard M. Donaldson (DE Bar No. 4367)
Montgomery, McCracken,
   Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
Telephone: (302) 504-7840
Facsimile: (302) 504-7820

Edward T. Ellis
(Admitted Pro Hac Vice)
Robert J. Fitzgerald
(Admitted Pro Hac Vice)
Montgomery, McCracken,
   Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA  19109
(215) 772-1500

*Counsel for Defendants*

-18-

A1667

A143

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

SERGEANT CHRISTOPHER D. FORAKER,  :
  :
       Plaintiff,  :
  :
     v.  :
  :
COLONEL L. AARON CHAFFINCH, et al.,  :    C.A.No.04-1207-GMS
  :
       Defendants.  :

**PLAINTIFF'S ANSWERS AND OBJECTIONS TO DEFENDANTS' FIRST SET OF
INTERROGATORIES**

Plaintiff, by and through his attorneys, hereby objects to Defendants' First Set of Interrogatories Directed to Plaintiff Foraker ("Discovery") in accordance with the numbered paragraphs as set forth below.  Plaintiff reserves the right to amend or supplement the responses contained herein as may be necessary or appropriate in the future.

Discovery has not concluded in this case.  Plaintiff reserves the right to supplement his responses at a later time as discovery is completed.

**GENERAL OBJECTIONS**

1.    Plaintiff objects generally to Discovery insofar as it requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product, or which are otherwise privileged or protected and not subject to discovery.

2.    Plaintiff objects generally to Discovery to the extent that it seeks information not relevant to this action or that does not appear reasonably calculated to lead to the discovery of admissible evidence.

-1-

A144

3.      Plaintiff objects generally to Discovery insofar as it requests information or documents which constitute or contain sensitive and non-public business, medical patient, medical credentials, personal, income tax or other confidential information.  Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

4.      Plaintiff objects generally to Discovery insofar as it  requests personal or confidential information.  Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

5.      Plaintiff objects generally to Discovery insofar as it does not specify a reasonable time or place of production or the manner of making the inspection in accordance with Fed.R.Civ.P. 34(b).  Plaintiff will produce the indicated documents for inspection and copying at a time and location to be agreed upon by the parties.

6.      Plaintiff objects generally to Discovery insofar as it seeks discovery of agreements with third parties (not parties to or related to this action) which may be subject to nondisclosure and either cannot be produced without agreement of a third party or cannot be produced without an appropriate stipulation and order of confidentiality.

7.      Plaintiff objects generally to Discovery insofar as it is unduly burdensome because the discovery it seeks is already in the possession, custody or control of defendants.

8.      Plaintiff's responses that follow are without prejudice to and are not a waiver of the foregoing general objections.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Plaintiff objects to Defendants' definitions and instructions insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the case law

-2-

A145

in the Third Circuit.

2.    Plaintiff objects to Defendants' definitions and instructions to the extent they imply an obligation to supplement answers to Discovery which impose upon Plaintiff an obligation beyond that required by Fed.R.Civ.Proc. Rule 26(e).

3.    Plaintiff objects to Defendant's definitions and instructions insofar as they would require counsel for Plaintiff to disclose their mental impressions, conclusions, opinions or legal theories in violation of Fed.R.Civ.Proc. Rule 26(b)(3).

4.    Plaintiff objects to Defendants' definitions and instructions regarding claims of privilege insofar as they impose burdens on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the applicable case law.

5.    Plaintiff objects to the extent that Defendants' definitions and instructions cause each interrogatory to ask multiple questions.

## OBJECTIONS TO SPECIFIC INTERROGATORIES
## (IN ADDITION TO AND SUBJECT TO ALL THE FOREGOING OBJECTIONS)

1. Identify each person who answered or aided in answering these Interrogatories and indicate which Interrogatory each such person answered or aided in answering.

**Answer:**  Plaintiff Sgt. Christopher D. Foraker - all.  Mrs. Suzanne Foraker - Answer to Interrogatory #3.


2. Identify each person who answered or aided in answering the Requests in Defendants' First Set of Requests for Production of Documents and indicate which Requests each such person answered or aided in answering.

**Answer:**  Plaintiff Sgt. Christopher D. Foraker - all.

-3-

A146

3.  Identify all injuries or damages that Plaintiff claims in this action, including without limitation (a) harm to plaintiff's reputation, as alleged in Paragraph 51, 52 and 55 of the Complaint; (b) his isolation from society, as alleged in paragraph 53 of the Complaint; (c) his exposure to public contempt or ridicule, as alleged in paragraph 54 of the Complaint; and (d) his decreased earning capacity, as alleged in paragraph 67 of the Complaint.  Specify the basis for each item of damages, provide a calculation for each amount of monetary damages, and attach to the accompanying Request for Production of Documents and Things any and all documents which support these damages.

**Answer:**  See Price et al. v. Chaffinch, et al., Answer to Interrogatory # 3 which is incorporated by reference herein.

(a)  Emotional distress.  See Answer to Interrogatory # 13 below.

(1) Expert Component.  Objection.  Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure.

(2) Non-Expert Component.   In September 1985, now Sgt. Foraker was appointed to the Delaware State Police Academy.  He was thrilled to be accepted into the profession that his two eldest brothers had chosen.  It was during his tenure in the Academy that he won the Best Shooter Award in his Academy class. Early in his career, members of the Academy, Administrative and Executive Staffs advised him to "find his niche" and go after it.  He pursued becoming a member of the S.O.R.T. (Special Operations Response Team) and achieved it.  He pursued becoming a member of the K-9 Team and achieved that as well.  Life was good.  He not only worked out daily and stayed in shape but he worked and trained his dog, Eiko everyday.  The pride he felt for the Division radiated through him.  There was no mistaking that he was a proud Delaware State Trooper.

-4-

A147

In October 1997, he realized his career goal with the Delaware State Police – to be assigned as a full-time firearms instructor.  After 12 years of being assigned to patrol duty with shift work, nights and weekends, holiday work, etc., he was finally assigned to the then named Ordnance Unit, later referred to as the Firearms Training Unit.  He was on top of the world.  He was truly enthused, exhilarated, excited and eager to be a firearms instructor to pour his tactical knowledge into every student to enable them to survive whatever they may  encounter.

After inservice or recruit training at the outside DSP Range on Denney's Road concluded, he would go to the Clark Farm Road FTU construction site to assist there.  While the new FTU was under construction, he spent many long hours working to assist with the completion of the project.  He worked on the following tasks: installation of the target system and target carriers; installation of the sump pumps and sprayer bars for the bullet trap; vacuuming underneath of the bullet trap; bolting the bullet trap ramps together; attached sheet metal covering over the water troughs and sump pumps; building work benches for the armorers room; installation of the floor pockets for the barricade stations on the range; assembly of picnic tables for the outside eating area; assemble and secure steel shelving in the ammunition and chemical storage rooms; installation of sound absorbing material inside of the chemical storage room where the air compressor is located; assembly of steel cage in rear of bullet trap; and cut down trees, branches and cleared debris behind the building for the picnic area.  He did all of this work, in addition to his regular duties as a firearms instructor.  Sgt. Foraker loved being a firearms instructor.  He loved working at the FTU.  He loved the DSP.

During the time from October 1997 through July 2001, he was very happy. He was advancing in the organizational structure of the SORT team by assuming the Alpha Team Leader position with his planning and executing of high-risk search and arrest warrants and resolving

-5-

A148

critical incidents.  He finally realized his career aspirations and was excited to be able to positively impact the entire 600+ member Division. He was working very hard, long hours but rarely put in for overtime – he was just glad to be there and to contribute. The Foraker family was very content. The relationship between Chris Foraker and his wife Suzanne was terrific – they were best friends. Sgt. Foraker was happy and content.

On August 1, 2001, Chris Foraker was promoted to Sergeant and NCOIC of the Firearms Training Unit.  In his eyes, this most certainly was the dream-job in the Division.  He was in charge of a large budget, a multi-million dollar facility, the design and implementation of both academy and in-service firearms training curriculum, the testing and evaluation of many products to include weapons, ammunition, body armor, holsters, etc.   He was elated.  He was realizing that his hard work and dedication were paying off.

Shortly thereafter, Sgt. Foraker found himself the victim of defendant Chaffinch's destructive retaliatory animus.  Chaffinch transferred and set out to destroy Sgt. Foraker because Sgt. Foraker had reported Chaffinch's close personal friend for: having dangerously high levels of lead in his bloodstream; lying in the course of his duties in violation of the DSP dishonest rule (see Rule & Regulation # 15); sexually harassing and touching a vulnerable female civilian employee at the FTU; and for his poor performance.  A federal court jury found that Chaffinch had illegally violated the First Amendment when he retaliated against Sgt. Foraker for his protected First Amendment speech.  The case was settled post-trial and Judge Farnan ordered that Sgt. Foraker be reinstated as the NCOIC of the FTU with all of his previous duties and responsibilities.

So on December 1, 2003 Sgt. Foraker was reinstated as the NCOIC of the FTU.  He was elated that his good name had been restored to him and that a jury of his peers had vindicated him. He and his family hoped that they would be able to put the past behind them, move on with their

-6-

A149

lives and get back to their normal, happy life together.  Unfortunately this was not to be.

Sgt. Foraker found the FTU to be in complete disarray when he returned – it was in a state of disaster.  Then on his own and on behalf of his subordinates, he began reporting the emergency crises that existed in the facility.  Months passed, and despite continually speaking out in an attempt to rectify the dangerous situation and protect the health and safety of those working and training at the facility, nothing was done.  (For a listing of Sgt. Foraker's protected First Amendment speech and petition clause activity, see Answer to Interrogatory # 14 below.)

Eventually the range was closed and the retaliation began.  See Answer to Interrogatory # 15 below.  And this illegal retaliation has utterly decimated Sgt. Foraker emotionally.

(i) Emotional and Physical Problems.  Sgt. Foraker has been disgusted and dismayed at the way the defendants have retaliated against him.  He is shocked at the way he has been treated.  He was embarrassed, humiliated, disheartened and demoralized.  He feels like his whole career and everything he has worked for has been flushed down the toilet.  He feels that everything he accomplished in his first lawsuit, including restoring his good name, was for naught because Chaffinch and MacLeish maliciously managed to destroy his good name anyway by their further retaliation.

As the retaliation began anew, he began to suffer from chronic diarrhea and hemorrhoids.  His lack of appetite was apparent and he began to lose weight.  He can feel his pulse very strongly in his neck.  As a result, he has had to continue daily on the blood pressure medication he was forced to begin taking during his first lawsuit.  He also now suffers from severe headaches.

He experiences a pervasive sense of sadness because of his feelings about what he has lost.  Although he hates to admit it, tearfulness and crying have become issues.  He feels a sense of tremendous shame and disgrace because of the wrongdoing he has been accused of.  He feels

-7-

A150

humiliated and demoralized.  This in turn angers him because of how much of his career and his

life he has dedicated to the FTU and the DSP.  He is disheartened and crushed because everything

he has ever worked for has been taken away from him.

(ii) Impact on his Family and Social Relationships.  Although he is

stoic at work, all the stress comes out in his home life.  Neither he nor his wife Suzanne can sleep

at night they are so upset.  He has to take sleep aids because this has consumed all of his thoughts.

He has nightmares and flashbacks.  He wakes up in the middle of the night, afraid that someone

may be in the house.  Then he has to get up and check on his children to put his mind at ease.  But

even when he awakens in the morning, he is not rested because of the very limited amount of sleep

he has gotten.  He is constantly fatigued and at a loss for energy.  He has lost interest in various

pursuits.  He no longer exercises the way he once did because of how down and fatigued he feels.

He feels physically debilitated.

It is extremely trying and tiring for Sgt. Foraker and Suzanne Foraker to hide their

distraught emotional state from their children.  The children want their father back and Suzanne

Foraker wants her husband back.  The Foraker children have had to endure under the nightmarish

retaliatory acts of defendants Chaffinch and MacLeish since they were 6 and 4, and it breaks Sgt.

Foraker's heart to see them hurting.  It hurts him and he wonders how long does he have to tell his

children that if you do the right thing, you will be rewarded.  At times, the stress becomes too much

to bear for him because it is on his mind all of the time.  Sgt. Foraker is suffering under the weight

of knowing the negative impact that defendants' retaliation has had on his family.  For example,

Sgt. Foraker becomes irritable and angry because of the retaliatory actions taken against him by

defendants, and he then uncharacteristically snaps or yells at his girls or his wife because he is so

distraught about what defendants are doing to him.  His heart aches every time he sees his two

-8-

little girls upset and crying when he is irritable and angry. It hurts him as he sees how his girls suffer over how he has been transformed as a result of defendants' actions.

All of this weighs on him a great deal. Sgt. Foraker is a tough man, a very stoic individual. But although he does not like to admit it, frequently he finds himself close to tears or despite his best efforts actually crying when with his family. He does not want to allow himself to cry in front of his children and his wife because he does not want them to think less of him. He constantly feels down and depressed.

Additionally, he has trouble trusting people because of what has occurred and he has withdrawn socially and avoids those with whom he once was close. Sometimes, he felt like he could not trust extended family. He has found himself much more guarded in whom he socializes with and has trouble opening up like he did before with close friends. He feels isolated, like he is on an island. Thus, many of the relationships he valued and cherished have been damaged and fallen away as a result of this retaliation.

His intimate and love life with his wife, which had always been very passionate, has been tremendously effected in a great many negative ways. Additionally, he no longer shares his feelings openly with his wife as he had always done in the past. He avoids telling her about what he is dealing with because he does not want to bring her down or have her suffer under the same weight that defendants have forced him to bear. The experience of trying to deal with what defendants have done to him has been one of the ultimate tests of Sgt. Foraker's marriage. If not for their strong faith in the Lord, Sgt. Foraker doubts that their marriage would have been able to survive this at all.

(iii) Distress About His Now Bleak Future Employment Prospects.

Defendants have surely destroyed Sgt. Foraker's future employment opportunities and this has

-9-

A152

upset Sgt. Foraker a great deal as he must now struggle with how he will provide for his family. This is especially troubling because Sgt. Foraker sees his major identity as a husband, father and provider for his family, but now he will not be able to provide for his dear wife and children. He has to struggle with how he won't be able to obtain employment in the firearms industry or any other related industry. Sgt. Foraker is anxious and extremely worried about his future career prospects. How does it look when someone who has dedicated their life to firearms training is blamed for being an incompetent coward who destroyed a multimillion dollar firearms training facility. His future post-DSP career has been destroyed and he is crushed because of that.

Additionally, because Suzanne Foraker is a stay-at-home, home-school mother, the prospect of Sgt. Foraker not being able to find work in the future puts an enormous amount of pressure on Sgt. Foraker. No longer will Sgt. Foraker ever be able to leave the DSP and obtain a lucrative position in the firearms industry. He will not be allowed into that small nucleus of tight-knit, well-informed specialists. As vendors have said, "Perception is reality and the perception is wrong doing."

(b) Injury to Reputation. See above. See also Answer to Interrogatory # 13 below which is incorporated by reference herein. See Price et al. v. Chaffinch, et al., Answer to Interrogatory # 3 which is incorporated by reference herein.

(c) Humiliation. See above. Additionally, Sgt. Foraker is humiliated because, as discussed above and below, he has worked his entire career to reach the pinnacle of firearms expertise in the DSP. And upon reaching that point, defendants have falsely accused him of being an incompetent coward who destroyed the very multimillion dollar firearms training facility in which he worked.

This is demoralizing and humiliating to him. Sgt. Foraker is very passionate about his

-10-

A153

career and he has worked hard to reach and achieve the position he is in now.  But everything he has accomplished, everything he has worked for has been taken from him by defendants.

He must deal with the constant, 'what did you do' questions from people who want to know how he destroyed a multimillion dollar state facility.  It is humiliating to have to deal with the stares from people he does not even know.  It is hard to deal with the stares from fellow troopers in the relatively close-knit community that is the DSP.  Even when he tries to explain that he did not destroy the facility, oftentimes he is met with disbelief, disbelief that the Colonel would lie about something that important.   The perception in the DSP and throughout the general public is that he did something wrong.  Sgt. Foraker has been forced to labor under this tremendous shame and disgrace.

(d)  Diminished earning capacity.  Objection.  Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure.

(e)  Economic losses.  Objection.  Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure.

4.  Do you contend that any admissions with regard to the issues in this lawsuit have been made by any party to the lawsuit or by any party's agent, servant or employee?  If so, identify the person who made the admission and the substance of the admission.  If the admission is contained in a document, identify the document.

**Answer:**   Objection.  Vague, overbroad and unduly burdensome.  Calls for a legal conclusion.  Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3).  In addition, discovery is just beginning and the record in this

-11-

A154

regard remains to be developed.

Without waiving the objections, yes.  The persons who made the admissions and the substance of the admissions are found in the depositions, trial testimony, sworn affidavits, Answers and answers to interrogatories in the following cases:  <u>Foraker v. Chaffinch</u>, C.A. No.02-302-JJF (D.Del.); <u>Dillman v. Chaffinch, et al.</u>, C.A. No. 02-509-KAJ (D.Del.); <u>Bullen and Giles v. Chaffinch, et al.</u>, C.A. No. 02-1315-JJF (D.Del.); <u>Conley v. Chaffinch et al.</u>, C.A. No. 04-1394-GMS (D.Del.).  They are also found in the media articles, TV broadcast, Auditor's Report, emails and other documents concerning the Firearms Training Unit and its personnel.

5.  For each statement published by Defendants, or which you believe was published on their behalf, that was false and defamatory, identify:

   (a) the contents of the statement;

   (b) when each statement was made, and

   (c) to whom each statement was made.

**Answer:**  Objection. Calls for a legal conclusion.  Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3).   In addition, discovery is just beginning and the record in this regard remains to be developed. Notwithstanding and subject to said objections:

See Price et al. v. Chaffinch, et al., Answers to Interrogatories at Exhibit 1 - FTU Rough Timeline of Events.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

-12-

A155

All of the statements made by defendants Chaffinch and MacLeish to members and representatives of the Delaware, Maryland, national and international media, before, during and after their April 6, 2004 tour of the FTU, including the following: "Chaffinch acknowledged problems, but indicated the blame lies only with one or two troopers under his command." "When I was here in the fall, everything was going as well as the previous times I'd been here.....I think people who live in glass houses shouldn't throw stones. It's a lot dirtier now. Things seemed in their proper places in the fall. I've never seen it like this.....The previous sergeant did a good job....Things changed in December when another sergeant came in. That's at least a portion of where the ball was dropped." "He praised Sgt. Ashley for his work at the range. 'Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning,' he said. 'Sgt. Ashley was willing to do that. I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel (bullet trap cleaning) was part of his purview. He felt that was putting him in harm's way.'"

These and other similarly defamatory statements were made to representatives of the Delaware State News, the News Journal, WBOC-TV, American Police Beat magazine and other media outlets that are still to be discovered in this case, and were subsequently published by those outlets or in those publications. Some of the defamatory statements were subsequently republished again as well.

Additionally, Chaffinch and MacLeish ratified and adopted the defamatory statements of Secretary Homer as their own.

Moreover, Chaffinch and MacLeish also published their false accusations to members of the DSP. For example, in the presence of members of his Executive Staff, Chaffinch falsely accused Foraker of destroying the FTU, stating "the mess at the range is all Foraker's fault."

-13-

A156

In the same way, Chaffinch and MacLeish, maliciously and in bad faith, also published their false accusations to members of the State Auditor's office.

6. As to each statement published by defendants, or which you believe was published on their behalf, that you claim was false, state why you contend it was false and why you believe defendant Chaffinch knew or recklessly disregarded the alleged fact it was false at the time it was published.

**Answer:** Objection. Unduly burdensome. Calls for a legal conclusion. The question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3). Moreover, discovery is just beginning and the record in this regard remains to be developed. Notwithstanding and subject to said objections:

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

See Price et al. v. Chaffinch, et al., Answers to Interrogatories at Exhibit 1 - FTU Rough Timeline of Events.

See Price et al. v. Chaffinch, et al., Answer to Interrogatory # 5, 6, 7, 9, 10, 11, 12, 13, 15, which are incorporated by reference herein.

Additionally, it is common knowledge in the DSP that the FTU has been plagued with many many problems since its very inception. It is well-known throughout the Division that the facility has never worked properly. From the long-standing problems of lead contamination, to dangerously high levels of lead in the bloodstream of the staff. From the perpetually malfunctioning HVAC system, to the roof that began to collapse because it could not hold its own

-14-

A157

weight.  From non bullet resistant doors, to the rain that poured down through the leaky and porous

roof.  From the lack of a baffled ceiling to protect Troopers against dangerous ricocheting bullets,

to the malfunctioning bullet trap and its toxic goo.  From the lack of a fire suppression and

sprinkler system in this building that stores large amounts of live ammunition, to the wrong air

filters on the perpetually malfunctioning HVAC system.  From the broken zamboni, to the lack of

any standard operating procedures for the facility.  The FTU has never worked as designed.

Defendant Chaffinch knew about all of these problems.  Virtually everyone in the DSP knew that

the FTU was a mess and had not worked properly.

Secondly, the numerous problems of lead contamination and the dangerous levels of lead in

the blood of the Trooper staff were significant issues in the original case of <u>Foraker v. Chaffinch</u>,

C.A. No.02-302-JJF (D.Del.).  Defendant Chaffinch knew about these problems.  He, members of

his Executive Staff and many others testified about them under oath, in depositions and in open

Court in front of Judge Farnan and the federal court jury that found Chaffinch guilty of violating the

First Amendment when he retaliated against Sgt. Foraker for speaking out about, among many other

things, health concerns arising out of lead contamination at the FTU.

Thirdly, defendants Chaffinch and MacLeish also knew from four months worth of

documents provided from December 2003 to March 2004 that his accusations were false.  Foraker

spoke out about and relayed up the chain of command the emergency range issues beginning in

early December 2003 and continued to do so through the closing of the range in March 2004 (and

even continuing thereafter).  Because of the many concerns being relayed up the chain of command,

defendants Chaffinch and MacLeish knew about the dangerous conditions at the range but

nonetheless held off on doing anything about it.

The February 3, 2004 swipe surface sample results from Environmental Solutions, an

-15-

A158

agency brought in by the FTU staff, Lt. Davis and Captain Warren, (and not by the Administration or Executive Staff),  confirmed the suspicions of the FTU members that the building was contaminated everywhere.  The April 13, 2004 Harvard Environmental Report confirmed that the entire facility was contaminated.  All of this information was relayed up the chain of command to defendants Chaffinch and MacLeish.  Yet rather than try to help the many men and women who were being exposed to and were suffering from all of these many problems, they instead falsely and maliciously blamed them for destroying a facility that everyone in the DSP knows was sick and broken from the very beginning.

Additionally, Chaffinch and MacLeish knew that Secretary Homer's own claims were false, that she was just trying to save herself and her agency from public ridicule for failing in their duty to build and maintain a safe and healthy firing range, for their abysmal failure to ever fix any of the many problems that plagued the FTU and for failing in their duty not to poison state employees.  But because Chaffinch and MacLeish were so preoccupied with destroying Sgt. Foraker that in addition to their own false and defamatory accusations, they willingly agreed with, and adopted, everything that Homer said.

The thousands of pages of documents being produced in both the present case and also the companion case demonstrate that the DSP knew before construction even began on the facility that the proposed plans were inadequate and the building would not function as it was intended.  The range has had serious and life-threatening problems, since even prior to 'day one' of its operation.

Here are several examples, taken from among the many thousands of documents produced in this case that clearly and plainly demonstrate that Sgt. Foraker was not the cause of the problems at the FTU:

- In a March 27, 1996 letter from Mr. Thomas M. Corcoran, President of RangeTech

-16-

International, Corp. to the DSP, upon review of the plans for the HVAC system for the FTU, Mr. Corcoran concluded and warned that "this system, as designed will not work." He continued, "the definition of 'will not work' is simply that the present design will not perform as it is required to under the present requirements established by OSHA & NIOSH. ... We have concluded that the designed ventilation system will inevitably fail if it is constructed as designed." Despite these dire warnings, and in conscious disregard for the health and lives of the men and women who would work and train there, the DSP and Facilities Management built and installed this plainly inadequate system anyway.

- In a November 11, 1998 memo from Sgt. Brian Fitzpatrick to Lt. William Bryson and Captain Thomas DiNetta, Sgt. Fitzpatrick reported and complained about a noticeable and extremely problematic reduction in airflow from the perpetually malfunctioning HVAC system. He raised several safety concerns and advised that the problems were "urgen[t]" and needed to be promptly rectified. He warned that "the range staff is exposed daily and there is a potential for serious health problems." His concerns went unheeded.

- In a December 1, 1998 letter from Batta Environmental to Doyle Tiller of Facilities Management, Batta warned that lead levels in the firing range were "above the OSHA limit." And that was while the FTU was still a newly built facility.

- In the words of Sgt. Parton in an undated memo to Lt. Davis, referring to his time as NCOIC of the FTU circa 1999 and 2000, "I reported continuously regarding lead contamination, personnel lead levels and the recurring problems with the ventilation ... I have a very vivid memory of my tenure at the range and the problems that were encountered on a regular basis." The FTU has been a serious problem since the day it was built.

- There are a plethora of and literally thousands of similar documents in the record.

Sgt. Foraker did not break the FTU. As is common knowledge throughout the DSP, the FTU has been sick and broken for many years and none of its many problems were caused in any way by Sgt. Foraker. Instead, Sgt. Foraker, Cpl/3 Warren and Cpl/3 Price sounded the alarm about the dangerous conditions at the FTU that were endangering not only their lives, but the lives of the hundreds and even thousands of Troopers and other law enforcement personnel who train at the FTU every year.

-17-

A160

7.  Identify any statement by defendant Chaffinch to family, friends, political mentors, members of his Executive Staff or others that he will do everything in his power to inflict injury on and destroy plaintiff, as alleged in paragraph 30 of the Complaint.

**Answer:** Objection.  Discovery is just beginning and the record in this regard remains to be developed.  Subject to and without waiving the objection:

"I got my shots in.  People who live in glass houses shouldn't throw stones.  The mess at the range is all Foraker's fault.  I got him back."  Chaffinch made this false statement to members of his Executive Staff, including retired Major David Baylor.  He made the same or similar statements to Captain Glenn Dixon and to Captain Barbara L. Conley.  Plaintiff expects that discovery in this case will reveal that Chaffinch made numerous similar false statements to other members of the DSP as well.

8.  Identify any person to whom defendant Chaffinch stated, "I got my shots in ... I got him back," as alleged in Paragraph 31 of the Complaint, and when those statements were allegedly made.

**Answer:**  Objection.  Discovery is just beginning and the record in this regard remains to be developed.  Subject to and without waiving the objection:

Retired Major David Baylor on or about April 6, 2004.  Chaffinch made the same or similar statements to Captain Glenn Dixon and to Captain Barbara L. Conley.  Plaintiff expects that discovery in this case will reveal that Chaffinch made numerous similar false statements to other members of the DSP as well.

-18-

A161

9.  Identify the true causes of the problems at the FTU alleged in paragraph 37 of the Complaint.

**Answer:**   See Answer to Interrogatory #6 above.

See Price et al. v. Chaffinch, et al., Answers to Interrogatories at Exhibit 1 - FTU Rough Timeline of Events.

See Price et al. v. Chaffinch, et al., Answer to Interrogatory # 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 which are incorporated by reference herein.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

Additionally, the true causes of the problems at the FTU include corruption, cronyism, the good ol' boy network, illegality and other wrongdoing at the highest levels of state government.

Because of a purported (and simply unbelievable) 'mathematical error' which boiled down to Facilities Management being unable to count to the number nine (9), the contract to build the FTU was awarded to JAED, Corp., a company that had never built a specialty building like a firing range before and had no experience in that regard.  JAED's raw score had placed them last on the list of vendors being considered for the project.  Nonetheless, the contract to build the range was awarded to them anyway.  Relatedly, despite the fact that all three Troopers on the five person exploratory committee voted to award the contract to Clark Nexsen (a company nationally recognized as the leader in the building and construction of indoor firing ranges) the two Facilities Management personnel on the five person committee overruled the three Troopers and instead awarded the contract to unqualified and inexperienced JAED.  JAED then proceeded to build a broken building that simply could not function in a safe and healthy manner.  The contract to build a highly specialized building was given to an unqualified contractor who then failed to build a safe

-19-

or healthy building.

Other causes include the following:

- In violation of the law, a certificate of occupancy was never obtained or issued because no final inspection took place. An inspection by the appropriate New Castle County officials would have revealed that the FTU was simply not up to code.

- No hearing abatement studies were conducted. No hearing conservation program was instituted nor were yearly audiometric examinations given.

- No SOP's were in place to protect full-time or part-time firearms instructors from heavy metal contamination in their blood streams, hearing loss or other disabling injuries.

- No SOP's or education was provided for floor scrubber machine operation or discarding of the hazardous materials.

- No SOP's provided for cleaning the bullet trap or the sprayers and any other work associated with the bullet trap.

- Facilities Management altered the ventilation system by removing HEPA filters to increase air flow in the hope of saving money by emitting hazardous contaminants to the outside only to have them sucked back into the air supply ducts and into the building where the Troopers would breathe it in.

- No continual monitoring or surface sampling protocol was in place by Facilities Management to regulate the hazardous materials in the building.

The thousands of pages of documents produced in this case also demonstrate that the cause of the environmental disaster at the FTU was not Sgt. Foraker.

10. Identify any step that Plaintiff took to try to fix the FTU, as alleged in paragraph 38 of the Complaint.

**Answer:** See Price et al. v. Chaffinch, et al., Answers to Interrogatories at Exhibit 1 - FTU Rough Timeline of Events.

See Price et al. v. Chaffinch, et al., Answer to Interrogatory # 6, 12, 13, 14 which are

-20-

A163

incorporated by reference herein.

See the voluminous documentation produced in response to the request for production of

documents, which is incorporated by reference herein.

The numerous steps Sgt. Foraker took to try to fix the FTU include the following:

- October 9, 2001, 2:29 pm e-mail from Foraker to Major Joe Swiski re: possible neurological symptoms regarding Cpl/3 Eddie Cathell.  Lesion removed from left eye lid.  "I urge the Executive Staff to consider reassigning Cpl/3 Cathell to a position within the Division that will remove him from the danger of any further risk of lead exposure.  It appears that Cpl/3 Cathell may be an at risk employee for future disability"

- October 10, 2001, 5:48 pm e-mail from Major Joe Swiski to Foraker re: possible neurological symptoms for Cpl/3 Eddie Cathell.  Major Swiski states, "I have a meeting with the Colonel tomorrow.  I will pass this on."

- October 15, 2001, 11:30 am e-mail from Foraker to Major Joe Swiski re: Fall shoot has begun.  Asks for direction re: Cpl/3 Cathell.  "In this environment, Cpl/3 Cathell's lead level will most certainly rise above the current level of 15.  As I posed in the memo to you September 7th, I need clarification from the Executive Staff as to what other precautions or procedures I should incorporate to aid Cpl/3 Cathell in the reduction of his blood lead level.

- October 24, 2001, 1:13 pm e-mail from Major Joe Papili to Major Joe Swiski re: Health concerns pertaining to Cpl/3 Eddie Cathell.  "Sounds like notice that Chris is advising of.  He is doing the right thing by documenting these reports…we need to do something to ensure that the division is not liable for some health risk due to lead level rises for Cpl/3 Cathell.  We need to address this with the rest of Staff.  If you want me to I will do it.  Please advise."

- November 6, 2001, 12:28 pm e-mail from Foraker to Major Joe Swiski re: Guardian hazardous material recovered from the bullet trap.

- December 13, 2001, 8:50 am e-mail from Foraker to Major Joe Papili re: range sound system and headsets (attempting to aid in the hearing issues at the range).

- January 24, 2002, 4:30 pm e-mail from Foraker to Joe Papili re: funds for the new headsets.

- February 4, 2002, 1:29 pm e-mail from Doyle Tiller to Foraker re: duct clean in firing range.

-21-

- February 5, 2002, 8:32 am e-mail from Major Joe Swiski to Foraker re: duct cleaning and "The colonel was advised of Ed's lead level. He did not comment."

- February 5, 2002, 9:00 am e-mail from Foraker to Major Joe Swiski re: duct cleaning in the firing range, headsets issues and status of Ed Cathell's lead level.

- February 5, 2002, 9:12 am e-mail from Foraker to Major Joe Papili re: Cpl/3 Eddie Cathell, "Am I doing the right thing?"

- February 6, 2002, 9:29 am e-mail from Major Joe Papili to Foraker re: Cpl/3 Eddie Cathell blood lead levels. "I think you have done the best you can at this point. The liability is off you. Sometimes you just have to play the hand your dealt. Things will change in due time. Be patient, smart and move on. The ball is now in their court. I'm close to getting some additional help."

- March 21, 2002, 11:42 am e-mail from Capt. Daryl Mergenthaler "It's nice to see that you will be officially recognized for the job you did at the range during the awards ceremony. Congratulations!"

- June 13, 2003, 8:28 am e-mail from Col. L. Aaron Chaffinch to all DSP users re: additional firearms training instructor for the Firearms Training Unit. Sgt. Foraker had been requesting this fifth person during his entire tenure. Sgt. Ashley was then afforded this necessity. When Foraker reassumed the command of the FTU in Dec. 2003, he again was only afforded 3 personnel.

- August 20, 2003, 5:27 pm e-mail from Jay Zolcak of Mayfran to Sgt. Ashley, DSP FTU. Price for conveyor belt to be repaired.

- August 21, 2003, letter from Sgt. Ashley to Major Eckrich ? that accompanied the RWO's for bullet recovery system modifications. "…The system that we have was designed for solid projectile recovery. Because of environmental and employee concerns, due to the lead contamination…"

- November 23, 2003, 12:51 am e-mail from Foraker to Capt. Greg Warren re: Facilitating a Smooth Transition for Foraker to be reassigned to the FTU on December 1st. Please see paragraph 5, "I would like to have….This would facilitate a smooth transition and safeguard everyone involved".

- December 3, 2003, staff meeting with Capt. Greg Warren re: current headsets, FTU staffing needs, vehicles, training, serious maintenance issue with the bullet trap only to be doubled when shotgun goes to frangible ammo.

- December 11, 2003, 11:58 am e-mail from Lt. Ralph Davis to Foraker re: FTU issues.

-22-

- December 12, 2003, meeting between Lt. Ralph Davis and Foraker re: serious safety concerns to include: 1. Headsets – one way communication, switch location, hearing protection is poor due to all electronics housed in ear housing, sound is deafening requiring secondary protection, two-way radio system (wireless UHF FM) -–constant interference from local companies and Rt. 1 travelers with standard walky-talky & CB transmissions, Kurt and Wayne expressed safety issues to Ashley and now Foraker.  Also, current condition of Snail Bullet Trap System: 1. Weekly professional maintenance program contracted out to a mechanic company is imperative to implement immediately.  Filters, sprayer jet heads and sump pumps are clogging daily with the silt-mud created from frangible ammunition.  2. Once frangible ammunition transition is completed with shotgun ammunition, this problem will increase 2-3 fold.  3.  Savage cleans system once per year.

- December 17, 2003, 5:15 pm e-mail from Foraker to Pete Gerardi (DAS) re: FTU parking lot lights.

- December 19, 2003, Bortek Industries visited the FTU Facility to replace dead batteries, squeegee blades, filter and L.D. lubed actuator for the floor scrubber/zamboni machine.

- December 19, 2003,  7:20 pm e-mail from Foraker to Lt. Col. MacLeish, Major Paul Eckrich, cc'd to Capt. Greg Warren and Lt. Ralph Davis re:  Emergency Range Issues.

- December 22, 2003,  4:51 pm e-mail from Foraker to Lt. Ralph Davis re: Mayfran Int'l to repair the clutch and chain to get the drag conveyor system back up and running.

- January 5, 2004, 3:47 pm e-mail from Foraker to Lt. Col. MacLeish, cc'd to Major Paul Eckrich, Capt. Greg Warren and Lt. Ralph Davis re: emergency range issues.

- January 8, 2004,  2:54 pm e-mail from Foraker to Ernest Durham re: MSDS sheets for Lawman RHT 357 SIG 100 GR. Frangible CF MSDS.

- January 9, 2004, 7:58 pm e-mail from Foraker to Capt. Greg Warren, cc'd to Lt. Ralph Davis re: range health issues and departmental liability.  This email discusses the air flow problems, reddish haze in the firing area, maintenance should be conducted by professionals equipped in the prevention of lead exposure in a contaminated environment, and drag conveyor problems.

- January 20, 2004, 2:21 pm e-mail from Foraker to Capt. Greg Warren and Lt. Ralph Davis re: Mayfran Corp and conveyor repairs.

- January 21, 2004,  2:39 pm e-mail from Foraker to Bill Carrow re: range instructor headsets.

-23-

A166

- January 21, 2004, 3:23 pm e-mail from Foraker to Capt. Greg Warren and Lt. Ralph Davis re: Environmental Solutions Group (air quality testing).

- January 27, 2004, 10:12 am e-mail from John Durham of (DAS) to Foraker re: weapons cleaning area. Rescheduling the exhaust system meeting.

- January 28, 2004, 5:21 pm e-mail from Doyle Tiller to Lt. Ralph Davis re: firing range hygiene recommendations, not SOP's.

- January 30, 2004, 1:55 pm e-mail from Foraker to Debra Powell re Bortek Industries repairs to floor scrubber. "This equipment is utilized to clean the hazardous materials like lead and copper off the range floor. It would not run and the batteries were beyond charging and had to be replaced."

- February 2, 2004, 7:45 am e-mail from Bill Proventure of Carey's Heating and Air Conditioning re: range ventilation.

- February 3, 2004, 12:58 pm e-mail from Foraker to Fay Veal (DSP Purchasing) re: funds for air quality testing & surface sampling of the FTU Facility.

- February 3, 2004, 3:29 pm e-mail from Cpl/ Kurt Price to Foraker re: request for a medical evaluation and testing performed by Omega medical service.

- February 4, 2004, 7:08 pm e-mail from Foraker to Capt. Greg Warren, cc'd Lt. Ralph Davis re: Safety & Range Maintenance Concerns.

- February 11, 2004 - Art Neilson of Neilson Associates indicated that "If that was one of my ranges, I would shut you down." "This is not a hygiene issue...it is a mechanical issue."

In addition to numerous written communications in which Sgt. Foraker spoke out in an attempt to fix the FTU and protect the health and safety of the Troopers, civilians and other personnel who work and train at the range, on innumerable occasions Sgt. Foraker also spoke out in person as he orally and vocally pleaded with DSP leadership and many others to fix the problems at the FTU.

11. Describe in detail the means and manner in which defendant Chaffinch ordered that

-24-

A167

neither plaintiff nor his supervisor could speak with the media, as alleged in paragraph 56 of the Complaint.

**Answer:** Objection.  Discovery is just beginning and the record in this regard remains to be developed.  Subject to and without waiving the objection:

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

See Price et al. v. Chaffinch, et al., Answers to Interrogatories at Exhibit 1 - FTU Rough Timeline of Events.

On April 6, 2004, the same day that defendant Chaffinch defamed Sgt. Foraker by falsely accusing him of destroying the multi-million dollar FTU facility, members of the media requested permission to speak to Sgt. Foraker and his Captain (Captain Gregory Warren) so that they might tell their side of the story and defend themselves from defendants' false and slanderous accusations.  But as Tom Eldred of the Delaware State News wrote the next day:

> Contacted later, Col. Chaffinch said Sgt. Ashley has retired. He would not permit the Delaware State News to interview Capt. Warren or Sgt. Foraker.
>
> "I have the authority to say yes or no," he said. "I'm not going to allow those people to be interviewed at this point in regard to this particular situation. I'm not trying to create any more of a mess than we already have."

Additionally, on numerous occasions, defendant MacLeish has refused, both orally and in writing, to allow Sgt. Foraker to respond to interview requests from the media, requests that were being made to allow Sgt. Foraker to defend himself from defendant Chaffinch and MacLeish's defamatory falsehoods.

-25-

A168

12.  Describe in detail the means and manner in which Defendants Chaffinch and MacLeish has stripped away or otherwise altered Plaintiff's rights, privileges, duties, responsibilities and authority, as alleged in paragraphs 57 and 63 of the Complaint.

**Answer:** Objection.  The question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3). Subject to and without waiving said objection:

See Price et al. v. Chaffinch, et al., Answers to Interrogatories at Exhibit 1 - FTU Rough Timeline of Events.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

Defendants Chaffinch and MacLeish have stripped away and otherwise altered Sgt. Foraker's rights, privileges, duties, responsibilities and authority in numerous ways, including the following:

(1)  On July 20, 2004, Sgt. Foraker attended a Commanders and Section Chiefs meeting to which he had been invited to attend via e-mail, pursuant to the usual practice in the DSP.  At approximately 9:00 am, just prior to the beginning of the meeting, Sgt. Foraker was approached by defendant MacLeish who sought to bully, intimidate and retaliate against Sgt. Foraker for exercising his First Amendment rights.  MacLeish stated "Sgt. Foraker, is there something that you would like to address or present in this meeting?"  Foraker responded "No, not that I am aware of."  MacLeish then stated  "This is a commanders and section chiefs meeting."  Foraker replied "I am the section chief of the FTU."  MacLeish then ordered Foraker out into the hallway.

Out in the hallway, MacLeish continued to bully, intimidate and retaliate against Sgt. Foraker, stating, "I want to be clear on this that this meeting is for lieutenants and above, sergeants

-26-

A169

are not invited to attend this meeting.  The format on these meetings has been changed some time ago."  Foraker replied, "How long ago was the format changed?"  MacLeish stated "quite some time ago."  Foraker replied, "I attended these meetings prior to my being transferred out of the FTU."  MacLeish stated that "this Colonel changed the format when he took over."  Foraker replied, "I attended a commanders and section chief meeting after Col. Chaffinch took over, prior to my transfer from the FTU.  I also received two e-mails as a section chief to respond to the meeting and to also get my photo taken."  MacLeish stated "The Colonel has changed the format and only lieutenants and above will be attending these meetings.  You fall under the Academy and you are represented by Lt. Davis here at this meeting."  Sgt. Foraker then stated, "Ok, I don't want to break any rules."  Later, Lt. Davis advised Sgt. Foraker that he documented his conversation with MacLeish immediately following his removal from the meeting.

Sgt. Foraker then left pursuant to MacLeish's retaliatory order to leave.  MacLeish then walked back into the classroom and shut the door behind him.

Attendance at these meetings was one of the important responsibilities of his position as the NCOIC of the FTU during his prior tenure in this position.  Denying Sgt. Foraker access to these meetings following his reinstatement has crippled his ability to positively impact the entire division with regard to any and all issues pertinent to firearms and the FTU.  As NCOIC of the FTU, Sgt. Foraker has a wealth of knowledge to share about firearms and related issues that he is not being allowed to impart to the commanders and section chiefs of the division.

Additionally, due to defendants' retaliation, Sgt. Foraker is caught between the proverbial rock and a hard place.  Despite being a section chief, MacLeish has ordered him not to attend these meetings of section chiefs and other commanders.  However, because he is a section chief, for the last year, Sgt. Foraker has continued to receive e-mails inviting and in some cases requiring his

-27-

attendance at these meetings.  Some of these e-mails state that they were sent pursuant to either

Chaffinch and/or MacLeish's authority.  Accordingly, Sgt. Foraker is in an unenviable position.

On the one hand, he has been ordered not to attend these meetings.  On the other hand, he has been

ordered to attend these very same meetings.

(2)  Since his return to the FTU, Sgt. Foraker has been deprived of the Trooper personnel

required to fully staff and safely operate the FTU.  He has been repeatedly forced to attempt to

justify the necessity of a fifth full-time firearms instructor which is required due to

student-to-instructor ratio safety concerns and to enable the effective and efficient administration

of the unit.  However, he has been denied the Trooper personnel required to fulfill the FTU's

mandate and responsibilities.  Conversely however, Sgt. Ashley (who didn't file a lawsuit against

defendants) was given the required Trooper personnel following Sgt. Foraker's original transfer

out of the FTU in April 2002.  However, this responsibility was stripped from the position upon

Sgt. Foraker's return.

(3)  Since his return to the FTU, Sgt. Foraker's authority has been diminished by Major

Eckrich, Captain Homiak, Lt. Hagan, subsequent commanders and others as they aggressively

monitor many of his actions.  Previously, Sgt. Foraker had a greater autonomy and authority to take

certain actions and make certain types of budgetary decisions.

(4) Relatedly, Sgt. Ashley previously was allowed to bypass Lt. Davis and Capt. Warren

when making many types of decisions, such as, for example Ashley's decision to purchase the

$33,000 conveyor system for the bullet trap.  Ashley was allowed to bypass them and go directly

to Major Eckrich on the issue.  But as just discussed, Sgt. Foraker's immediate superiors have

been aggressively tasked to monitor and micromanage many of his previously routine

responsibilities.  For example, if Sgt. Foraker needs to buy work t-shirts for his men, he is now

-28-

A171

required to seek approval from both his lieutenant and his captain for even such small expenditures of money.

13.  Describe in detail the means and manner in which the position held by Plaintiff has been a jump off point on retirement into lucrative employment in the firearms industry and the means and manner in which media publicity will make it impossible for Plaintiff to work in the firearms industry, as alleged in paragraph 68 of the Complaint.

**Answer:**  Objection.  Discovery is just beginning and the record in this regard remains to be developed.  To the extent this question may be answered by expert testimony it is premature under the Rules of Civil Procedure and the Scheduling Order of this case.  Subject to and without waiving the aforementioned objections:

DSP history demonstrates that Troopers in charge of the FTU, in addition to serving there for long periods of time and/or retiring while occupying that position also subsequently see beneficial advances to their police careers or post retirement income.  For example, Captain Cunningham retired from his position of running the FTU and was soon after hired by Smith & Wesson, a major gun company. Although he has subsequently retired from Smith & Wesson, he is currently an independent contract hired by DNREC to oversee hunter safety facilities and programs.  Lt. Bryson also retired from the FTU and is currently the Chief of the Camden, DE police department and is an engineering consultant for JAED Corp.  Lt. Lawson opened an independent, private firearms training facility in Dover, DE.

Throughout his time in the DSP, it has been one of Sgt. Foraker's career goals to become an expert in firearms and firearms related issues.  He believed that in doing so, he could better

-29-

himself and also more importantly better the Division and the many Troopers he trains and comes into contact with.  And through hard work and dedication, Sgt. Foraker climbed that mountain and reached the pinnacle in the DSP.

The NCOIC of the FTU, as well as the other officers at the FTU are the experts in the DSP in the area of firearms. They are responsible for the initial training and subsequent annual recertification of every Trooper.  As a result of these and other duties, Sgt. Foraker has a great deal of interaction with representatives of the local, national and international firearms communities.  As discussed above, due to these contacts, many Troopers who served in leadership positions at the FTU have been able to benefit from these contacts and achieve lucrative post-DSP career employment opportunities.

Sgt. Foraker believed that upon retiring from the DSP, that he would be able to parlay his expertise and experience to go into the firearms industry, the police training industry, or other private sector industries such as gun, ammunition or body-armor manufacturing.  But the defendants, through their defamatory words and retaliatory actions, have cruelly thrown him off of the peak of the mountain, and he has plummeted down to the trash heap in the ravine below.

Defendants have maliciously defamed Sgt. Foraker on a local, national and international scale.  He was defamed both to the general public and also in the close-knit, and highly specialized police and firearms communities.  In addition to the widespread and highly damaging stories in the Delaware State News, the News Journal and the widely viewed television broadcast on WBOC-TV, defendants also defamed him in an article that was published in 'American Police Beat' magazine, an international police publication.  Defendants falsely stated as fact that Sgt. Foraker's incompetence and cowardness had destroyed a multi-million dollar police firearms training facility.  Police officers, those in the firearms industry, as well as members of the general

-30-

A173

public have now been left with the false impression that Sgt. Foraker is an incompetent and cowardly NCOIC of the FTU.  Who wants to hire someone who destroyed a multi-million dollar firearms facility?  Who wants to hire an incompetent?  Who wants to hire a coward?  No one of course, especially in the industries for which Sgt. Foraker wishes to work.

Sgt. Foraker is an officer who lives and breathes his job.  He even named his two cats Smith and Wesson.  He worked his entire career to reach the pinnacle that is being the NCOIC of the FTU and being responsible for the firearms training of every Trooper and recruit in the DSP, as well as being responsible for firearms and numerous other related issues for the entire Division. And now after reaching the pinnacle of his DSP career, defendants have announced that he is an utter, abject failure at the very thing he has dedicated his professional life to.  Defendants have accused him of being incompetent and a coward.  They have accused him of destroying a multi-million dollar, highly specialized firearms training facility.  They highly publicized their accusations, on a local, regional, national and even international scale.  No one in the firearms or police industries is going to want to touch him with a ten foot pole.  Thus, as a direct and proximate result of defendants' false, slanderous and defamatory allegations, Sgt. Foraker's post-retirement career has been destroyed.

Representatives of various companies in the firearms industry also have indicated to Sgt. Foraker that they are aware of the news coverage and/or false accusations made against him by defendants.  Among these companies are Remington Arms, FiringLine, Armor Holdings, Lawman Supply and BeamHit.  And as one representative of a firearms industry company has told him, "in this business, perception is reality."

Furthermore, firearms companies routinely check out an individual's reputation when they apply for employment.  Their reputation is paramount.  These companies do extensive background

-31-

A174

checks on applicants for training positions or any type of position within the firearms industry. That is why reputation is paramount. As Sgt. Foraker has been told, "in this business, perception is reality." And the perception is that Sgt. Foraker through incompetence and cowardness has destroyed a multi-million dollar firearms training facility. Why would anyone in the firearms industry want to hire him now? He has a giant 'red flag' on his resume and in his history that can never be overcome.

Additionally, in this computerized and digital age, employers are increasingly scrutinizing their prospective employees. They will search the internet and, for example, 'Google' Sgt. Foraker's name. They will come up with defendants' defamatory accusations which have been on the internet for all to see for over one year now. See e.g., http://www.newszap.com/articles/ 2004/04/07/dm/central_delaware/dsn03.txt, for one of many such articles. Defendants' false and defamatory accusations will immediately discourage and turn off any prospective employer for the above discussed reasons.

Lastly, agents of defendants have made it their mission to widely publicize defendants' false accusations about Sgt. Foraker. For example, Deputy Attorney General Mike Tupman is the DAG assigned to the DSP. He works for the DSP leadership, and works closely with defendants Chaffinch and MacLeish. As an example, he was the losing attorney who unsuccessfully tried to defend Chaffinch's illegal retaliatory actions in Sgt. Foraker's 2002 First Amendment free speech retaliation case. On April 11, 2005, in a meeting with Sgt. Foraker, Cpl/3 Wayne Warren, and representatives of Armor Holdings and Lawman Supply (both of which are companies in the firearms industry), in the 2nd floor conference room, Tupman falsely accused Sgt. Foraker of being "a bad penny [who] just keeps showing up." Sgt. Foraker understood this to be an attack upon his professional reputation implying that he was an incompetent, cowardly and trouble-making officer.

-32-

A175

Tupman was acting at the time in his official capacity as a representative of the DSP and at the behest of defendants Chaffinch and MacLeish in a malicious effort to further destroy Sgt. Foraker's reputation in the close-knit firearms industry.

14.  Identify any instance of protected speech upon which Plaintiff bases his cause of action for free speech retaliation, as alleged in paragraph 81 of the Complaint.

**Answer:** Objection.  Calls for a legal conclusion.  Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3).  Subject to and without waiving  said objections:

Sgt. Foraker's protected First Amendment speech and petitioning activity includes the following:

(1) The filing, prosecution, successful jury verdict and settlement of Sgt. Foraker's initial lawsuit,

(2) All of plaintiff's speech in which he spoke out about the many problems at the FTU and his efforts to correct them and to protect the health and safety of his men and all of the other personnel who trained at the FTU, and

(3) All of plaintiff's speech in speaking to the State Auditor's office about the many problems at the FTU.

15.  Identify any adverse action taken by defendants against Plaintiff as a result of and in retaliation for Plaintiff's protected speech, as alleged in paragraph 81 of the Complaint.

-33-

A176

**Answer:** Objection. Calls for a legal conclusion. Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3). Subject to and without waiving said objections:

See Price et al. v. Chaffinch, et al., Answers to Interrogatories at Exhibit 1 - FTU Rough Timeline of Events.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

See Answer to Interrogatory # 5 above.

The adverse action taken by defendants against Sgt. Foraker as a result of and in retaliation for his protected First Amendment speech and petitioning activity includes the following:

(1) Defendants defamed Sgt. Foraker on a local, national and international scale by falsely blaming him for destroying the multi-million dollar Firearms Training Unit,

(2) Defendants materially and significantly altered and decreased Sgt. Foraker's job responsibilities and duties as the NCOIC of the FTU,

(3) Defendants materially violated the conditions of Judge Farnan's reinstatement Order, which ended Sgt. Foraker's first successful free speech retaliation suit against defendants and resulted in his reinstatement to the FTU,

(4) Defendants sent Sgt. Foraker for numerous retaliatory fitness for duty exams in a blatant attempt to find a pretext to retaliate against him,

(5) Defendants and their agents have bad-mouthed and spread false rumors about Sgt. Foraker in the close-knit, DSP community and in the firearms community,

(6) Defendants falsely blamed Sgt. Foraker for the destruction of the FTU in interviews

-34-

A177

with the State Auditor's office.

      (7) Defendants and their agents have actively exerted pressure on plaintiff down through the chain of command in an effort to retaliate against Sgt. Foraker and force him to quit and/or retire from the DSP.

      16.  Have you sought and/or received any mental health, psychiatric, and/or psychological treatment, and/or professional counseling for your alleged injuries?  If so, please identify the nature of the injury, disease or impairment, the name of every practitioner and institution who treated or examined you in connection with the injury, disease or impairment, and state the dates of treatment or examinations received.

      **Answer:**  Answer to sentence # 1 - yes, Sgt. Foraker has sought treatment.

      Answer to sentence # 2 - see the medical records which are being produced subject to appropriate protective order or confidentiality agreement.

      See also Answer to Interrogatory #3 above.  See also the report of Carol A. Tavani, M.D., plaintiff's forensic psychiatrist that will be produced in accord with the requirements of the scheduling order and the Federal Rules of Civil Procedure.

      17.  State whether you intend to call any persons as expert witnesses at trial.  If so, separately as to each person:

        (a) Identify the person;

        (b) State the subject matter as to which the person is expected to testify;

        (c) State the substance of the facts and opinions to which the person is expected to testify and a summary of the grounds for each opinion;

-35-

A178

(d) State the person's age, residence and business address;

(e) State the name and address of the person's present employer, or if self-employed, the name of the business and his/her occupation;

(f) Describe in detail the person's educational background, claimed field(s) of expertise, professional experience, publications, and courses attended which concerned the subject for which the person was retained in this case, and membership in professional societies; and

(g) Describe in detail the person's previous court appearances (including case citations).

**Answer:** Objection. Overbroad and premature. Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure. Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3). The information required under the Rules will be produced at the appropriate time.

By way of further response, see Plaintiffs' Rule 26 Disclosures and subsequent amendments.


As to Objections

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ.  (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582

-36-

TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiffs

Dated: July 19, 2005

Foraker / Pleadings / FINALForaker - Interrogatory Answers.

-37-

**DECLARATION OF SGT. CHRISTOPHER D. FORAKER UNDER 28 U.S.C. § 1746**

1. I am the Plaintiff in this action. I have personal knowledge of the facts contained in this Declaration and, if called as a witness, I am competent to testify to those facts.

2. I have read the Plaintiff's Answers to Defendants' Interrogatories set out above. The answers contained therein are true and correct to the best of my knowledge, information, and belief.

3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

SGT. CHRISTOPHER D. FORAKER

7-19-05
Date

-39-

A091

A181

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CORPORAL B. KURT PRICE et al.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL L. AARON CHAFFINCH, et al.,** | : | **C.A.No.04-956-GMS** |
| | : | |
| **Defendants.** | : | |

<u>**PLAINTIFFS' ANSWER AND OBJECTIONS TO DEFENDANTS' FIRST SET
INTERROGATORIES**</u>

      Plaintiffs, by their attorneys, hereby object to Defendants' First Set of Interrogatories

("Discovery") in accordance with the numbered paragraphs as set forth below.  Plaintiff reserves

the right to amend or supplement the responses contained herein as may be necessary or

appropriate in the future.

      Discovery has not concluded in this case.  Plaintiffs reserve the right to supplement their

responses at a later time as discovery is completed.

<u>**GENERAL OBJECTIONS**</u>

      1.     Plaintiffs object generally to Discovery insofar as it requests information or

documents which are subject to the attorney-client privilege, or which constitute trial preparation

materials or attorney-client work product, or which are otherwise privileged or protected and not

subject to discovery.

      2.     Plaintiffs object generally to Discovery to the extent that it seeks information not

relevant to this action or that does not appear reasonably calculated to lead to the discovery of

admissible evidence.

      3.     Plaintiffs object generally to Discovery insofar as it requests information or

-1-

A182

documents which constitute or contain sensitive and non-public business, medical patient, medical credentials, personal, income tax or other confidential information. Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

4.     Plaintiffs object generally to Discovery insofar as it  requests personal or confidential information. Plaintiffs will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

5.     Plaintiffs object generally to Discovery insofar as it does not specify a reasonable time or place of production or the manner of making the inspection in accordance with Fed.R.Civ.P. 34(b). Plaintiffs will produce the indicated documents for inspection and copying at a time and location to be agreed upon by the parties.

6.     Plaintiffs object generally to Discovery insofar as it seeks discovery of agreements with third parties (not parties to or related to this action) which may be subject to nondisclosure and either cannot be produced without agreement of a third party or cannot be produced without an appropriate stipulation and order of confidentiality.

7.     Plaintiffs object generally to Discovery insofar as it is burdensome because the discovery it seeks is already in the possession, custody or control of defendants.

8.     Plaintiffs' responses that follow are without prejudice to and are not a waiver of the foregoing general objections.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Plaintiffs object to Defendants' definitions and instructions insofar as they impose burdens on Plaintiffs beyond that required by the Federal Rules of Civil Procedure or the case law in the Third Circuit.

-2-

A183

**OBJECTIONS TO SPECIFIC INTERROGATORIES**
**(IN ADDITION TO AND SUBJECT TO ALL THE FOREGOING OBJECTIONS)**

1.   Identify each person who answered or aided in answering these Interrogatories and indicate which Interrogatory each such person answered or aided in answering.

**Answer:** Plaintiffs Cpls. B. Kurt Price, Wayne Warren and Sgt. Christopher D. Foraker - all.  Mrs. Lynn Price - Answer to Interrogatory #3.  Mrs. MaryLou Warren - Answer to Interrogatory #3.  Mrs. Suzanne Foraker - Answer to Interrogatory #3.

2.   Identify each person who answered or aided in answering the Requests in Defendants' First Set of Requests for Production of Documents and indicate which Requests each such person answered or aided in answering.

**Answer:** Plaintiffs Cpls. B. Kurt Price, Wayne Warren and Sgt. Christopher D. Foraker - all.

3.   Identify injuries or damages that Plaintiffs claim in this action.  Specify the basis for each item of damages, provide a calculation for each amount of monetary damages, and attach to the accompanying Request for Production of Documents and Things any and all documents which support these damages.

**Answer:**   See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 3, 13, both the specific answers and overarching concepts which are incorporated by reference herein.

(a) Emotional distress.

(1) Expert Component.  Objection.  Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure.

(2) Non-Expert Component.  Plaintiffs have been crushed emotionally as a

-3-

A184

result of defendants' retaliatory actions.  Plaintiff Cpls. Kurt Price, Wayne Warren and Sgt.

Foraker are longtime Troopers who have always been highly respected among their peers.  Each

chose police work as their career, with Cpl. Price doing a distinguished tour of duty with the U.S.

Marine Corps before joining the DSP.  They are tough men who have worked tough jobs over the

course of their long careers in the DSP.  From undercover drug operations, to Special

Investigations Tactical Operations, to the high risk special weapons activities of the SORT team,

these men have thrived and built their careers on doing difficult jobs and doing them a cut above.

Each are cut from the John Wayne and Clint Eastwood molds.  They do not like to talk about or

express their feelings, as they believe that to do so is a sign of weakness.

(i) Emotional and Physical Problems.

Cpl. Price has suffered greatly under the burdens caused by defendants' retaliation against

him.  He suffers from migraine headaches and extreme fatigue.  He is constantly tired and worn

out.  Conversely, he oftentimes suffers from many sleepless nights as a result of all of the worry.

When he does sleep, he suffers from nightmares.  He cannot get the retaliation and the resulting

worry off of his mind.  He now has problems trusting people because despite  nearly 20 years of

loyal service to the DSP, the Division has cruelly cast him aside.  He has feelings of uselessness

and is struggling with depression.  He feels that things are hopeless and that there is nothing to look

forward to or feel good about to keep him going.

Additionally, the stress of wondering how he was going to provide for his family simply

wore him down.  He began to suffer from chest pains in January 2005 and had to undergo stress

and other testing to deal with the problem and now is forced to take medications to deal with the

problems.  His family doctor, Dr. Gary Quiroga, who also is a cardiologist, ordered him out of

work and he went out on FMLA leave as a result as he tried to find a way to lessen the stress, but

-4-

A185

it was to no avail.  He continues to be burdened by the weight of trying to provide for his family in the face of the uncertainties created by defendants' retaliatory misconduct.

Cpl. Warren also has suffered greatly under the burdens caused by defendants' retaliation against him. He is constantly worn down and tired because of the stress of it all.  Severe fatigue has become a serious issue.  After dinner, instead of working outside the way he used to, he usually simply crashes and falls asleep because he is so worn down by the stress of trying to provide for his family and cope with defendants' retaliation.  His sleep patterns are in disarray. Often times he tosses and turns because he cannot get the stress and financial worry off of his mind. He never used to have trouble falling asleep but cannot sleep now because of the stress and worry. He is much more irritable than he used to be.  When he is under stress, his ears 'ring' much worse than they normally do.  And due to the retaliation against him and losing his livelihood, his stress levels have been extremely high.  Lastly, he is constantly down and believes that he is suffering from depression.  His entire life has been consumed by what the DSP has done to him as they have cruelly cast him aside.  It haunts him that he is being punished for telling the truth by the very Division he has dedicated his life to.

(ii) Impact on the Family and Social Relationships.

Cpl. Price has become forgetful because he is so preoccupied with worry.  For example, there have been times he took one of his beloved children to the wrong location or at the wrong time for basketball practice.  Upon realizing what he has done, he is frustrated and embarrassed that he cannot seem to get his head straight in his dealings with his family.  And this upsets him a great deal.

The family unit has been greatly affected.  Cpl. Price has a much shorter fuse with his children since the retaliation began.  He yells a lot and loses his temper and patience much more

-5-

A186

easily and is frequently agitated and yelling.  Kurt used to be a happy go lucky man with a good

sense of humor.  But he does not smile or laugh anywhere near as much as he used to.  He is easily

frustrated and frequently must fight back tears.  His wife and children's feelings are frequently hurt

as a result, which then upsets Kurt even more, knowing how much he has hurt his family.  The

family did not hold birthday parties for their two children in January and April 2005 because the

family unit just felt burned out from struggling to cope with the stress on the family caused by

defendants.  It hurts Kurt to see his wife and children working so hard to cheer him up and yet not

be able to because he cannot pull back from the feelings of hopelessness that he is experiencing.

Kurt has suffered as his son cried because he "just wants his Dad back."  Kurt's daughter has had

to undergo counseling at school because the stress in the home has begun to negatively affect her.

Cpl. Price's intimate and love life with his wife Lynn also has been negatively affected in

numerous ways.

    In an effort not to burden his family, Cpl. Price often tries to talk to and lean on his fellow

plaintiffs, Cpl. Warren and Sgt. Foraker.  But his family notices that less and less of their father

and husband's times is being devoted to them as he is simply trying to keep his head above water

with losing his job.  Kurt is not able to spend as much time as he used to with his family because of

the constant worry.

    Family vacations have been cancelled and drastically cut back because he has been barred

from working any overtime or extra duty jobs while on light duty.  Even when he is able to try to

get away, his head is simply not with his family.  His children constantly question him as to

whether the family is going to survive daddy losing his job.  He and his dear wife Lynn have had to

take out an emergency home equity line of credit to cope with the unforseen financial difficulties

that inevitably result from reduced pay and job loss.  The worry of needing to sell his home to

-6-

A187

survive weighs heavily upon Kurt and his wife and children. It tears Kurt up inside to have to see his son and daughter upset because daddy is so upset all of the time. It hurts he and his wife Lynn to have to answer questions from their children about why after almost 20 years of loyal and dedicated service the DSP is doing this to their dad.

Cpl. Price and his family also have withdrawn from their local community and their previous friendships have suffered. No longer do they socialize with friends in their local neighborhood the way they once did. It is easier to just withdraw than to have to deal with the constant questioning and explaining that inevitably arise during conversation.

Th uncertainty of what lies ahead for his family also causes Kurt a great deal of stress. The lack of a job, of a future plan weighs heavily upon him. As discussed below, he previously knew what he was going to do when he retired from the DSP. But those plans are now out the window due to defendants' retaliation against him.

Cpl. Warren has suffered from similar emotional problems and difficulties. He is much more irritable than he used to be. He is constantly aggravated. He has a shorter fuse, yells and loses his temper very quickly since defendants' retaliation began. He is always in a bad mood. And all of these things have negatively impacted upon his family, which upsets Wayne a great deal.

Much like Cpl. Price, Cpl. Warren tries not to burden his family with his stress and worries. He tries to lean on his fellow plaintiffs and others for support. But by the same token, his family notices that their husband and father is spending less time with them then before because of the weight of it all as he tries to shield them from it. But despite his best efforts to protect his family from the changes defendants have wrought upon him, he has been unsuccessful. His wife MaryLou and his daughters see how he is changing. They see the impact defendants' actions have

-7-

A188

had on his day to day demeanor and disposition.  It hurts them to see this.  His intimate and love life with his wife MaryLou also has suffered.

Wayne also suffers a great deal because of the uncertainty of what lies ahead.  His eldest daughter is about to begin college.  His youngest will soon be at that age.  Losing his job at this critical time when he is trying to pay for college is a constant source of stress for him.  The lack of a job also causes problems because his future plans are in disarray.  As discussed below, he previously knew what he was going to do when he retired from the DSP.  But those plans are now out the window due to defendants' retaliation against him.  The worry of needing to sell his home to survive also weighs heavily upon Wayne and his wife and daughters.

Wayne also feels those feelings of hopelessness because in his eyes, his career, everything that he worked for in the DSP has been wasted.

(b) Injury to Reputation.  The DSP is a small, close-knit police force with approximately 600 uniformed Troopers and 250 civilian employees.  It is a much smaller force than the state police forces of other larger states, such as Pennsylvania, New Jersey and New York.  As a result, Troopers have a much higher degree of knowledge of and interaction with each other than would be found in larger departments.  Indeed, because it is a small force, life in the DSP has a soap opera quality to it, with everyone talking about what happened to everyone else.

As longtime firearms instructors at the FTU, each were responsible for the firearms and other training of every single recruit and Trooper in the DSP.  Every single Delaware State Trooper has to train and certify annually under their careful and watchful eyes.  Similarly, due to the large number of outside agencies who either send their recruits to the State Police Academy and FTU for training, or send their officers to the FTU for firearms instruction, they also skillfully train those officers as well.  And as their performance evaluations demonstrate, Cpl. Price, Cpl.

-8-

Warren and Sgt. Foraker excel at what they do. Each takes great pride in passing on their years of specialized firearms expertise to each recruit, Trooper or other law enforcement officer who walks through the doors of the FTU.

Until defendants' retaliatory acts began, plaintiffs' reputations in the DSP and the State of Delaware law enforcement communities were sterling. But now, not only have plaintiffs' good names been besmirched as a result of defendants' maliciously blaming them for destroying the FTU, but they also have been singled out and treated in a manner in which no DSP Trooper has ever been treated.

Whereas historically the DSP has never tested for hearing problems in Troopers, suddenly, plaintiffs have been singled out and not only tested for hearing problems, but actually sent for auditory fitness for duty exams. Similarly, whereas historically the DSP has always actually accommodated Troopers who did in fact have hearing problems, suddenly, plaintiffs have been singled out and now the DSP refuses to accommodate them in any way shape or form. In the same way, whereas historically the DSP has always taken care of their own injured Troopers, be it by always giving them two years of light duty to finding internal DSP jobs where that the injured Trooper can still perform and thus keep them on the payroll, suddenly, Cpls Price and Warren have been singled out and maliciously targeted for termination, without being given two years of light duty, and without the DSP finding internal jobs that they can perform and still keep a DSP paycheck coming in.

And when something unprecedented like this happens in the DSP, the rest of the Troopers quickly catch on and begin to think there is something wrong with plaintiffs. They have been branded as 'suspect' in this close-knit police community.

Furthermore, by falsely accusing plaintiffs of destroying the multi-million dollar FTU

-9-

A190

facility, defendants have destroyed plaintiffs' professional reputations in the eyes of the close-knit law enforcement and firearms communities. Again, see Foraker v. Chaffinch, et al. Answer to Interrogatory # 13, 3 which are incorporated by reference herein.

As discussed in greater length in Foraker v. Chaffinch, et al. Answer to Interrogatory # 13, 3, troopers who served at the FTU have a track record of obtaining lucrative post-DSP employment. Plaintiffs will no longer be able to obtain any such jobs because they are damaged goods in the eyes of those in the law enforcement and firearms industries. They have been accused of destroying a multi-million dollar firearms training facility as a result of their incompetence and neglect. No one will want to hire them now.

In addition to Sgt. Foraker, Cpls. Price and Warren already had plans for their post-DSP careers. Each already have contacts that they have cultivated in the lucrative firearms training and professional security fields, fields that are ideal for them given their extensive experience, expertise and professional background. Each had planned to move into those fields following their retirement from the DSP. But those opportunities have been stolen from them.

Not only will these companies not want to hire individuals who now have a massive black mark on their professional service records from the false blame that has been laid upon them for destroying the FTU, but they also are now being drummed out of the DSP, allegedly because they are 'damaged goods.' Despite the fact that there are numerous police and law enforcement jobs in the DSP that plaintiffs are fully able to perform (including that of firearms instruction if the DSP and Facilities Management would simply fix and safely equip the building), defendants are maliciously running Cpls. Price and Warren out of the DSP. They are being thrown upon the scrap heap like damaged goods. No such company in any firearms, security or other law enforcement field will want to hire them now. The perception is that if the State Police agency you have served

-10-

with honor and dedication for nearly twenty or more years is throwing you aside and has refused to treat you the way previous Troopers have been treated, then there must be something wrong with you.  As Sgt. Foraker has been told, in the firearms industry, perception is reality and the perception is wrongdoing.

Additionally, plaintiffs' good names and reputations in the local community in which they and their families live have been publically destroyed by defendants malicious falsehoods.  For example, there is a popular restaurant in Leipsic, DE named "Sambos."  In plaintiffs' opinions, and in the opinions of many good hard working Delawareans, Sambo's is one of the hidden treasures and finest eating establishments in the State of Delaware.  It is the place to go if you want to eat crabs, and enjoy the company of your neighbors and your community in a relaxed, comforting and casual atmosphere.  The walls in Sambo's are covered with pictures of wildlife and famous NASCAR drivers.  Additionally, there is a large world map also located on the wall.  It is a Sambo's tradition that a pin is placed on the map to represent the places all over the world from which people have come to eat at Sambo's.  This world map is literally covered in pins, representing visitors from most, if not all of the seven continents and innumerable countries from around the world.  A little closer to home, numerous members of the Delaware State Police also routinely eat at Sambo's.  The Executive Staff, including defendants Chaffinch and MacLeish, routinely take visiting police officers from out of state to eat and relax at Sambo's.

Part of the decor at Sambo's includes newspapers being placed over all of the tables in the establishment to serve as tablecloths.  And when defendants first publically leveled their false accusations against Cpl. Price, Cpl. Warren and Sgt. Foraker, these false accusations were the subject of a massive front page story in the Delaware State News.  Shortly after its publication, both Cpl. Price and Sgt. Foraker separately dined at Sambo's and were horrified to find that the

-11-

A192

false and defamatory front page Delaware State News article was covering nearly every table in the restaurant. These false accusations were prominently displayed for all to see. Moreover, the very day that Cpl. Price first saw these newspaper articles covering all of the tables, defendants Chaffinch and MacLeish entered Sambo's escorting numerous visiting out of state police officers. Again, defendants' false accusations were there for all to see.

(c) Humiliation. It is humiliating and embarrassing to be blamed for destroying the FTU and to be falsely accused of incompetence and neglect of your duties. These false accusations have been the subject of widespread media attention, in the News Journal, the Delaware State News, WBOC-TV, Police Beat magazine and others, over the last year and a half. Cpls. Price, Warren and Sgt. Foraker have been publically accused of being destroying the multimillion dollar firearms training facility that was entrusted to their care. They have been falsely accused of both incompetence and neglect. Not only has this widespread media coverage circulated throughout the law enforcement and firearms communities, but it has circulated throughout the public. And these false accusations have absolutely crushed plaintiffs.

In the same way, it is humiliating and embarrassing to be singled out for special and unprecedented treatment by the DSP. Troopers and others in the law enforcement and firearms communities are talking. It weighs on Cpls. Price, Warren and Sgt. Foraker when they have to attend functions, be it with members of the public, or with members of the firearms or law enforcement communities. All of these things have made it extremely hard for Cpls. Price, Warren and Sgt. Foraker to function and survive in the close-knit DSP and law enforcement communities since defendants singled them out and maliciously destroyed their good names. It has been hard for them to hold their heads up everyday when they went to work. They have suffered under the strain of the constant stares and whispers from their comrades. They have been shunned and

-12-

ostracized within this close-knit community of police officers.

Publically, it is even worse.  As mentioned above, the Sambo's incident strikes very close to home for plaintiffs, who regularly enjoy the great food that Sambo's has to offer.  Not only were they falsely accused in the close-knit DSP community, not only were they falsely accused publically, but these false accusations had even made their way into one of their favorite places to eat and relax.  They had invaded their comfort zone.

In the same way, it is a terrible insult and embarrassing to they and their families to have to deal with these false accusations on a daily basis.  The malicious gag order defendants imposed has only made things worse.  Although they are being attacked by defendants, they are barred from publically defending themselves.  They are heartbroken that their own superiors, the men who are supposed to be principled, ethical and honest, would falsely accuse them of wrongdoing when the superiors know better.

(d) Diminished earning capacity.  Objection.  Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure.

(e) Economic losses.  Objection.  Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure.

4.  Do you contend that any admissions with regard to the issues in this lawsuit have been made by any party to the lawsuit or by any part's agent, servant or employee?  If so, identify the person who made the admission and the substance of the admission.  If the admission is contained in a document, identify the document.

**Answer:**  Objection.  Vague, overbroad and unduly burdensome.  Calls for a legal conclusion.  Moreover, the question is a thinly veiled attempt to prematurely obtain the mental

-13-

A194

impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of

Fed.R.Civ.Proc. Rule 26(b)(3). In addition, discovery is just beginning and the record in this

regard remains to be developed.

Without waiving the objections, yes. The persons who made the admissions and the

substance of the admissions are found in the depositions, trial testimony, sworn affidavits,

Answers and answers to interrogatories in the following cases: <u>Foraker v. Chaffinch</u>, C.A.

No.02-302-JJF (D.Del.); <u>Dillman v. Chaffinch, et al.</u>, C.A. No. 02-509-KAJ (D.Del.); <u>Bullen and</u>

<u>Giles v. Chaffinch, et al.</u>, C.A. No. 02-1315-JJF (D.Del.); <u>Conley v. Chaffinch et al.</u>, C.A. No.

04-1394-GMS (D.Del.). They also are found in the media articles, TV broadcasts, Auditor's

Report, e-mails and other documents concerning the FTU and its personnel.


5. Describe in detail the improprieties, financial irregularities, breach of the public trust,

fraud and/or corruption by public officials alleged in paragraph 12 of the Complaint.

**Answer:** Objection. Discovery is just beginning and the record in this regard remains to

be developed. Without waiving the objection:

See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 6, 9 which are incorporated by

reference herein.

See the voluminous documentation produced in response to the request for production of

documents, which is incorporated by reference herein.

See Exhibit 1 - FTU Rough Timeline of Events.

Additionally, the financial irregularities started with the initial bidding process to construct

the indoor shooting range. As any lay person would know, an indoor firing range is a highly

specialized building requiring expertise and experience in the design and operational needs of

-14-

A195

such an indoor shooting range.  A selection committee was formed to interview for an architectural and engineering firm (hereinafter "A/E") to design and build the building.  This committee was utilized to review the expertise and experience of the A/E firms on range construction.  The panel consisted of five members and they were to rate the A/E firms.  Three of the five members were DSP officers:  Major Michael McDonald, administrative officer; Captain Gregory Warren; and Lt. William Bryson OIC of the firearms training unit.  The other two people were from Facilities Management.  After the bidding process was complete, the panel made its recommendation from 1-10 with 1 being the best and 10 being the worst.

The contract was sent out to bid through the State of Delaware, and it was awarded to JAED, Inc. from Smyrna , DE.  Contradictorily however, JAED finished dead last in the process and had never previously designed an indoor pistol range.  The three DSP officers on the selection committee had voted Clark-Nexson of Virginia Beach, VA as the number one firm.  Clark-Nexson was the same firm that had performed the feasibility study for the DSP indoor facility. They also were a nationally recognized industry leader in the building of indoor firing ranges.  JAED had no experience or expertise of any kind in the design or construction of an indoor shooting range.  All DSP panel members were shocked at JAED winning the contract because JAED had finished dead last whereas Clark-Nexson had finished in first place.  However, it was determined by Facilities Management that the votes of their two panel members outweighed the votes of the three DSP members.  Tellingly, as was revealed in 2004, Elrita Annett the project coordinator for Facilities Management publically stated to the Delaware news media and the State Auditor's office that it did not matter what the results of the range committee vote were because JAED was going to get the bid anyway.  The result was foreordained. The process was all just a sham.

Construction was to begin in 1996.  However, during the design process a grave error was

-15-

A196

discovered by Mr. Thomas M. Corcoran of RangeTech, an A/E firm specializing in indoor range ventilation systems.  Upon review of the plans for the HVAC system for the FTU, Mr. Corcoran concluded and warned that "this system, as designed will not work."  He continued, "the definition of 'will not work' is simply that the present design will not perform as it is required to under the present requirements established by OSHA & NIOSH. ... We have concluded that the designed ventilation system will inevitably fail if it is constructed as designed."  He concluded that the air handling unit as designed would not work in keeping hazardous contaminants out of the respiratory zones of staff, Troopers and recruits.  This critical design flaw was noticed just on review of the buildings blue prints.  The building ventilation system also was never tested for laminar flow.

Randall J. Hair administrator of the office of OSHA consultation addressed a letter to Lt William Bryson discussing health and safety issues related to the range.  He stated, "once the system is in place and before range use, we do recommend that you confirm by written report from the contractor that all ventilation systems are within design specifications.  Further, we suggest that this report include actual airflow measurement data and be signed attesting to its correctness by a company official."  This was never done.  Similarly, Traci Trznadel an industrial hygienist of the office of OSHA addressed a letter to Lt. William Bryson on May 1, 1996 discussing safety and health concerns of the range users.

Actual construction began in the summer of 1996.  Construction continued for two years with numerous problems and cost overruns. Before ground was even broken, more problems arose.  The surveying firm utilized for the project incorrectly set the elevations for the entire project, resulting in a six foot deviation, that cost the State of Delaware $85,000 dollars to correct. This was just in hauling enough dirt in to begin construction.

The problems continued thereafter.  For example, during the actual construction process,

-16-

A197

the roof began to cave in.  It was discovered that the center beam in the open range area was engineered incorrectly and could not support the weight of the roof and HVAC system.  To correct this hazardous problem, a second beam had to be installed to prevent imminent collapse. However, due to this emergency addition that was not reflected in the original blue-prints or plans for the facility, the ceiling baffling system, which was designed to give ricochet protection, had to be deleted, which then put all range personnel and users at greater risk of injury due to errant rounds hitting the ceiling and then ricocheting back up the firing line to kill or seriously injure range personnel or other Troopers.

More problems include the following.  During the construction process, a substandard roof was installed to save money.  As a result of this corner cutting, the roof leaks to this day. Similarly, ballistic doors designed to protect staff and visitors were removed.  Additionally, the facility was constructed with no female restroom, despite knowing full well that it would be a co-ed facility.  Upon completion of the building, the DSP later had to convert another room into a female rest-room to make up for this significant oversight.

In the same way, no fire suppression or sprinkler system was installed, despite the fact that the facility stores large amounts of extremely flammable and dangerous chemical munitions, flash bang grenades, live ammunition and other similarly dangerous materials.  JAED sent the Fire Marshall a letter requesting the elimination of a sprinkler system.  But their letter failed to note that there was an ammunition storage room in the facility where live ammunition and other explosives were to be stored.  The Fire Marshal never performed an inspection.  Similarly, the building was built without an exhaust fan in the armorer's room where dangerous and toxic chemicals were used.  The staff would later be forced to work in this room until they nearly passed out from the dangerous fumes.  Chemicals were stored in a storage room that was unprotected, with not even a

-17-

A198

flame cabinet for protection.

To save money during construction, Delaware State Troopers were used to provide labor in the installation of the Savage wet bullet trap and other items at the FTU. Lt. Bryson, Sgt. Fitzpatrick, Sgt Engler, Cpl. Price, Sgt. Foraker and others helped perform the work in an attempt to keep costs down. This work was approved by Colonel Alan Ellingsworth of the DSP.

When it was completed in 1998, there were never any inspections performed, nor was a certificate of occupancy ever issued. Cpl. Warren contacted Jamie Kinsey of the New Castle County Land Use office on February 24, 2004 at 1020 hours and confirmed this. Similarly, there were no as built plans or final inspections conducted by NCC. The facility opened in September of 1998 with no grand opening ceremonies. There was never any baseline decibel level testing performed to determine a time weighted average of exposure to harmful high impact noise or the level of protection that would be needed to work in the environment. There was no hazardous waste training, protective equipment or standard operating procedures in place, then or later, during the operation of the building. There were never any standard operating procedures, or hazardous material abatement training given or offered. There was never any air monitoring or noise abatement testing or hearing conservation plan used.

The first air test conducted by Batta in November of 1998 two months after the range had opened revealed high levels of lead in the air during live fire. Lead levels were over the required OSHA limit of 0.05 MG/M3. Results ranged from 0.098 in the central downrange area to 0.141 MG/M3 at firing point #7 and 0.165 MG/M3 at firing point #14. By January of 1999, all staff had elevated blood lead levels.

Clark-Nexson was contracted to evaluate the building and to make recommendations to correct the problems, at a cost of $20,000. Again however, their recommendations were not

-18-

followed.

Several years later, the Division switched to frangible handgun ammunition which created a new problem with the current design of the bullet trap. The bullet trap failed to perform as designed and caused the air handler to be taxed even more. (The .357 frangible ammunition turns to dust on impact causing the Heppa filters in the exhaust vents to clog faster). This decision was made without the proper investigation. Experts should have been consulted prior to the change in ammunition. Additionally, there was never any baseline air test for copper after the ammunition switch.

In 2004 Governor Minner authorized the State Auditor to conduct an investigation into the FTU woes. Members of the FTU staff were ordered to comply with this investigation. On May 9, 2004 each unit member gave detailed statements to the investigators. The investigation revealed that the wrong A/E firm received the contract to engineer and build the new range. A math error which involved being able to count to nine (9) was quoted as the reason for the mistake. However, Elrita Annett the project coordinator for Facilities Management publically stated to the news media and the State Auditor's office that it did not matter what the results of the range committee vote was -  JAED was going to get the bid anyway. The result was foreordained. The process was all just a sham.

Then on April 6, 2004 Colonel Chaffinch, Lt. Colonel MacLeish and Cabinet Secretary Gloria Homer held a press conference at the range. All three publically blamed the range personnel for the failed systems. Shortly after the press release Governor Minner, responded to the range and commented, that poor house keeping was the problem.

In May of 2005, in an effort to hide the true causes of the problems at the FTU, Major Randall Hughes, acting on behalf of his buddies defendants Chaffinch and MacLeish, refused to

-19-

allow Dr. Randy Tubbs and his team of experts from NIOSH to come in and inspect the range.  Dr. Tubbs is an indoor range expert employed by NIOSH.  NIOSH is a Federal agency associated with OSHA.  The inspection and federal oversight was free of any financial charges to DSP or the State of Delaware.  NIOSH would also have been unbiased in their recommendations.  Nonetheless, the DSP refused to allow these federal experts to come in and assess the disaster they and defendants created at the FTU.

6.  For the period from 1998 to the present, identify and describe in detail any communication Plaintiffs have had with any person relating to the improprieties, financial irregularities, breach of the public trust, fraud and/or corruption by public officials and identify the persons with whom plaintiffs had those communication(s).

**Answer:**  Objection.  Not reasonably calculated to lead to the discovery of admissible evidence.  Unduly burdensome.  Without waiving these objections:

See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 6, 10 which are incorporated by reference herein.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

See Exhibit 1 - FTU Rough Timeline of Events.

See Answer to Interrogatory # 11 which is incorporated by reference herein.

See Plaintiffs written statements and interviews with the State Auditor's Office.

7.  For the period from 1998 to the present, identify any person who has provided Plaintiffs any documents relating to the improprieties, financial irregularities, breach of the public trust,

-20-

A201

fraud and/or corruption by public officials.

**Answer:**  The staff of the FTU, past and present.  Captain Greg Warren.


8.  Identify any person who suffered physical symptoms as a result of the problems at the FTU and describe the physical symptoms they suffered, as alleged in Paragraph 14 of the Complaint.

**Answer:**  Objection.  Overbroad, burdensome, not designed to lead to the discovery of admissible evidence.  Discovery also is just beginning and the record in this regard remains to be developed.  Without waiving the objection:

See plaintiffs' medical records which will be produced subject to appropriate protective order or confidentiality agreement.

See Exhibit 2 - Partial List of Agencies and Officers Exposed to Hazards at the FTU.

9.  Describe in detail how Defendant Chaffinch sought to cover-up and hide from public scrutiny the additional problems at the FTU caused by the change to frangible ammunition, as alleged in paragraph 17 of the Complaint.

**Answer:**  Objection.  Discovery is just beginning and the record in this regard remains to be developed.  Without waiving the objection:

See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 5, 6, 7, 11, 12, 15 which incorporated by reference herein.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

Additionally, Chaffinch sought to cover-up and hide from the public the additional

-21-

A202

problems at the FTU by blaming Sgt. Foraker, Cpls. Warren and Price and others for those very

same problems.  As discussed above, the FTU has always had problems.  Then in 2002 Chaffinch

illegal removed Sgt. Foraker and transferred in Sgt. Ashley who was Chaffinch's buddy, but who

had no experience and was in over his head.  The facility went to pot with Ashley in charge.

Ashley mishandled, was too timid and/or was unwilling to address the bullet-trap and ventilation

issues arising from the change to frangible ammo.  This caused further contamination,

contaminating the facility to an even greater degree.  Then in December 2003, Sgt. Foraker arrived

back at the FTU pursuant to Judge Farnan's reinstatement order as a result of the federal jury

verdict that Chaffinch had violated the First Amendment.  Sgt. Foraker promptly discovered the

many problems and began to speak out about them on behalf of himself and his men.  Defendant

Chaffinch then got scared, orchestrated the setup and maliciously blamed his own Troopers for

destroying the FTU in a transparent attempt to hide his own culpability for transferring in someone

who had no working knowledge of the multimillion dollar facility and who ultimately destroyed it.


10.  For the period from 2001 to the present, describe in detail any activities performed by

Plaintiffs that should have been performed by Facilities Management in its role as landlord of the

FTU.

**Answer:**  Objection.  Discovery is just beginning and the record in this regard remains to

be developed.  Without waiving the objection:

(1) The Broken Bullet Trap. The day to day operations of the indoor range were very

demanding.  The Savage bullet trap is a very complicated maintenance-intensive mechanical

machine.  The trap is a wet system, containing a mixture of water and a penetrating oil to preserve,

lubricate and protect the steel parts from rust.  This mixture cascades down the impact ramp

-22-

draining into a trough located on the front of the trap. The theory behind the wet system is that upon the bullet impacting the ramp, it will hydroplane into the deceleration chamber which is located at the rear of the trap. Theoretically, this system was designed to capture the bullet and reduce residual dust as a result of the impact. This system was designed to capture solid projectiles with minimal fragmentation. For example, the frangible handgun training ammunition shot exclusively since January 2001, is designed to pulverize into dust upon impact to the steel bullet trap. The residual material mixed with the water/oil substance and created a byproduct that would clog filters and sprayer heads and would wear down mechanical moving parts.

Additionally, the water system would also capture shotgun ammunition. The trap would become burdened with the buffer from the double 00 buck rounds, and wads and discs from the rifled slugs. With the cardboard targets placed within a few feet of the wet impact ramp, "target blowback" into the water system was a constant and continual problem. When these materials congealed, sump pumps, screens and sprayer heads became clogged causing a monumental maintenance work environment. When sprayer heads would clog or pumps would burn out, training would cease in order for repairs to be completed. When the wet system was turned off, and the byproduct of these mixed materials were permitted to dry, the substance would solidify into a "concrete-like" material. This was never more evident then when the conveyor system was cemented in place after a break in training. This resulted in the removal of the conveyor system by the manufacturer, Mayfran and replaced by a "makeshift" cleated drag belt system. This occurred in the summer of 2003 when Sgt. Ashley along with Major Eckrich circumvented the Academy Staff chain of command by-passing Captain Greg Warren and Lt. Ralph Davis and having the belt replaced by Mayfran with the "makeshift" cleated drag belt. The new belt failed within one week. The FTU Staff members were attempting to perform maintenance to the best of their abilities with

-23-

the limited resources they had.  With the lack of support from the DSP Administration and

Facilities Management to keep the range operational, the failures became overwhelming.

The failure of the trap resulted in the FTU staff and instructors being forced to attempt to

perform maintenance on the trap. They had to clean the ramp on the bullet trap with inverted

brooms when the cardboard, buffer and shotgun wads started to build up on the face of the dry

ramp. They also had to scoop, by hand, the shotgun wads out of the toxic water tank located at the

rear of the bullet trap with a strainer when the debris restricted the flow of water in the tank. The

sump pumps burned out frequently requiring replacement.

The FTU staff was never provided with any hazardous/toxic material abatement training

nor provided with protective equipment and/or gear to perform these maintenance functions to

protect them from exposure to the toxic and hazardous materials they were subjected to daily.

Facilities Management's industrial hygienist Mr. Doyle Tiller knew that the FTU had been

shooting leaded ammunition since the opening of the facility in September, 1998. Mr. Tiller knew

of the toxic byproducts generated by the ammunition fired at the facility and did nothing other than

assure the FTU staff that everything at the FTU was in fine operating fashion.  The FTU staff had to

continually check the water level of the trap due to leaks and evaporation, and add water

accordingly.  Daily bullet trap maintenance programs, standard operating procedures, or training

never existed.  DSP eventually contracted with Savage Range Systems to perform a service

program on the bullet trap which consisted of a once a year, clean up and service of the trap and

conveyor system by two factory trained specialists. The maintenance program fell far short.  Upon

transition from the jacketed handgun leaded ammunition to frangible ammunition, the trap began to

break down more frequently. The shotgun ammunition and target blowback caused a strain on the

system.  The bullet trap system was unable to sustain the added burden that the frangible

-24-

A205

ammunition imposed.

For example, during this time Cpl. Price's blood serum lead level rose six points from a 5 to an 11. Dr. Aaron Green of Bayhealth advised Cpl. Price that the oil in the water was a penetrating agent that carried all the contaminates into his blood stream. Price advised Sgt. Ashley of his blood lead level results and Dr. Green' assessment. He advised Sgt. Ashley of his health concerns and Ashley cruelly stated, "you have to die from something." Needless to say, that was very upsetting to hear.

They also had to clean the filters in the pump line at least once every two weeks by hand. They would scrub out the toxic build up on the cylinder screens with a small brush.  They had to constantly monitor the air by checking with their hands to feel air coming from the ductwork. Oftentimes in the winter they would have to climb up on the roof to press the reset button on the outside system.  Numerous calls were made to Facilities Management about these problems but nothing was ever fixed as the system failures were continually reoccurred.  A copy of the complaint log was requested by Cpl/3 Warren; however Facilities Management refused to provide it to him.

Facilities Management should have provided for cleanup and maintenance of the bullet trap and maintenance of the ventilation system. It was both dangerous and hazardous for the men to maintain this specialized equipment; the men were not given any training or hazardous materials protection to prevent risk of exposure to the various hazardous materials that were found to be in extreme excess of OSHA and NIOSH standards.

(2) General Range Cleanup.  Daily cleanup maintenance was required after every shoot. This included removing the cardboard targets; pushing spent shell casings and shotgun hulls with an inverted broom into separate piles; and scooping them up with a shovel. The brass shell casings

-25-

were stored in large barrels within the range and the shotgun hulls were discarded into the dumpster. The FTU Staff was provided with a Hepa vacuum and a Bortek wet floor scrubber to perform the cleaning of the range floor. But the staff did not receive any formal training on the operation of the vacuum or floor scrubber.  These items were delivered to the range without any standard operating procedures to follow.  No one had ever given or made available any hazardous material abatement training or protocol to follow.  The Facilities Management certified industrial hygienist should have provided the cleaning protocol and procedures as well as the proper cleaning detergents required to neutralize the dangerous heavy metals and toxins associated with the cleaning.  Furthermore, no guidelines or standard operating procedures were implemented in the proper handling and disposal of the hazardous waste water generated from the clean.

(3) Big Picture Lack of SOP's, Safety Policies and Other Expertise.  Due to the very nature of an indoor shooting range, special needs and requirements exists to ensure the personal health and safety of students and staff.  However, no one within the Delaware State Police has the training or expertise to provide proper maintenance of such a facility.  Facilities Management has engineers and an industrial hygienist who do possess the background, training, expertise and duty to ensure that proper plans are in place and adhered to.  The maintenance should have been conducted by professionals, experts who are properly trained in the handling and disposal of hazardous material cleanup and abatement.  Facilities Management should have overseen this and ensured compliance.  This was their responsibility yet they abandoned the plaintiffs and left them to suffer.

Neither Sgt. Foraker, Cpls. Price or Warren received any formal training when they were assigned to the range.  In violation of numerous right to know laws, they were not informed about the dangerous chemicals or heavy metals that they were being exposed to and at what rate of

-26-

A207

exposure to the toxins. Again there was no standard operating procedure to maintain the range, nor were there any inspections by Facilities Management or the Department of Health. Nor were these men ever issued any of the required protective equipment to perform maintenance in this environment.

The range required massive amounts of maintenance to ensure it was working properly. The staff at the FTU including Sgt. Foraker, Cpls. Price and Warren have training and certifications in areas related to firearms instruction, weapons breakdown and weapons maintenance. They do not have any training or certifications in hazardous material cleanup, abatement or disposal. Nor do their job descriptions detail anything related to hazardous material clean up, removal or maintenance at the facility. Only fully equipped and factory trained technicians should have been tasked to perform this highly specialized undertaking. All of these duties fall within the purview of Facilities Management.


11.  For the period from April 2002 to December 2003, describe in detail how and to what extent the conditions at the FTU were allowed to deteriorate and what defendant Chaffinch did to cover up the alleged deterioration, as alleged in paragraph 21 of the Complaint.

**Answer:**  Objection. Discovery is just beginning and the record in this regard remains to be developed. Without waiving the objection:

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

See Answer to Interrogatory # 9 above which is incorporated by reference herein.

See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 5, 6, 7, 8, 11 which are incorporated by reference herein.

-27-

A208

See Exhibit 1 - FTU Rough Timeline of Events.

Additionally:

(1)  Defendants Knew About the Conditions at the FTU.  In April 2002, Sgt. Ashley assumed command as the NCOIC of the FTU.  He had no training or experience in any aspect of running an indoor firing range.  Nor did he realize the dangers of operating an indoor range. Importantly, he also did not want to be confrontational with the administration.  It was well-known throughout the DSP how defendant Chaffinch illegally retaliated against Sgt. Foraker when he had previously spoken out regarding health and safety concerns at the FTU.  Sgt. Ashley, while hoping to be promoted to Lieutenant, did not want to make any waves.  He would attempt to avoid any controversy, and after raising issues with the Executive Staff, would go along with them and not argue the issues which needed to be expressed to the detriment of the health of the personnel at the FTU.  For example, air flow and HVAC issues were constant problems, but because defendants downplayed them, Ashley refused to press the matter.

On numerous occasions during the work week, Sgt. Ashley told Cpls. Price and Warren that he was going to HQ to meet with defendants and the Executive Staff to express the important needs and concerns about the range.  It was well-known that he was friends with and thus had an open door to defendant Chaffinch and Major Eckrich.  But despite the voicing of these concerns to defendants and members of the Executive Staff, nothing was ever fixed.  No help was ever given. Instead, defendants ignored all of the problems.  The entire time the range was in operation the administration maliciously covered up problems and mistakes.

The personnel and staff at the FTU also directly relayed their concerns about the hazardous conditions at the FTU up the chain of command to Sgt. Ashley.  Chaffinch had personally selected Ashley to run the FTU and Ashley had a direct line of communication that he used (meaning he

-28-

A209

bypassed his Lieutenant and his Captain) to Colonel Chaffinch and Major Eckrich.  All of Ashley's information was relayed to defendants during his numerous meetings with them.  In addition to meeting with defendants at headquarters, Sgt. Ashley has been observed lunching with Col. Chaffinch and Major Eckrich at a local restaurant, Where Pigs Fly, in Dover by division personnel.

(2) Problems With the Broken Bullet-Trap and HVAC Systems.  The conveyor on the bullet trap wore down during this time period, creating problems with the pumps and filters. The frangible ammunition, target blowback and shotgun buffer would mix with the water and form a very thick toxic goo and sludge-like material.  This material would settle in the bottom of the tank and would create monumental maintenance problems.  As the bullet trap began to fail and break down, it became harder to keep the range clean. It became visually apparent that the air handling system was not working properly. A pink colored dust also was settling everywhere in the range - on the floors, window ledges, counters, horizontal surfaces and even behind the bullet trap.  There were more dry spots on the ramp causing frangible dust to be circulated into the air.  The men had to monitor the air handler closely.  Oftentimes, the air handlers would simply turn off by themselves.  Sometimes they would turn back on again.  Other times, the FTU staff had to risk life and limb by climbing up on the roof of the facility to reset the HVAC system.  Sgt. Ashley would watch the range air pressure gauge located in the control booth periodically, which was another indicator that the air handler was not operating correctly.

They had to start replacing sump pumps more often and Sgt. Ashley decided to change the original water pump and replace them with a trash pump in an effort to overcome the sludge problem produced by the frangible ammunition.  This change caused the filters to become clogged faster due to the "churning effect" that occurred in the water trough requiring daily maintenance

-29-

with the toxic goo.

Finally, the conveyor belt seized up and was rendered inoperable. Sgt. Ashley directly contacted the administration, again bypassing his Lieutenant and Captain, and received permission from Major Eckrich to hire Mayfran to remove the conveyor belt, altering the original design and installed a cleated drag belt to scrape the debris generated by the combination of the frangible ammunition, shot gun wading and paper target material into a barrel. The drag belt was installed but it became inoperable within one week. Sgt Ashley called the company and explained the system failures all the while tinkering with the cleated drag belt system.

Conversely, Sgt. Foraker was advised in December 2003 by Mayfran that only system certified technicians should perform any adjustments or maintenance on the Mayfran conveyor system. The new drag belt system continued to be a strain on time requiring daily maintenance. The tank was filled more often and had to be monitored closely. The plaintiffs could not shut the water and conveyor systems down because without keeping the sludge wet and flowing and the belt moving 24-7, it would solidify into a concrete-type material rendering the drag belt inoperable.

The $33,000 replacement conveyor system for the bullet trap which was surreptitiously obtained by Sgt. Ashley was not the correct system to use for this particular bullet trap and the type of bullets used at the FTU. As discussed, it frequently jammed up and required special maintenance which for the safety of the FTU staff and for the sake of the equipment itself needed to be performed by specialists with safety equipment and training which the FTU staff did not possess. Nevertheless, defendants praised Sgt. Ashley to the media and maliciously blamed Sgt. Foraker and Cpls. Warren and Price for its malfunctioning.

(3) The Hazardous Armorer's Room. The new gun cleaning solution in the parts washer for

-30-

the armorer's breakdown was a pungent, orange citrus chemical that produced an overwhelming odor to those forced to use it.  Inhaling this chemical caused severe headaches while working in the confined space of the armorer's room. Cpls. Warren and Price advised Sgt. Ashley of their physical symptoms relating to breathing the chemical and requested that an exhaust vent be installed in the room to prevent the staff from becoming sick while working with the chemical. Ashley advised he would ask Facilities Management, but later said there was no funding to pay for the installation of an exhaust vent and advised the Cpls. Price and Warren, "You just have to learn to deal with it."

(4) The Defective Headsets. Since the range opened in September of 1998 the instructors headsets had not been replaced or upgraded. Headsets are used for hearing protection and for communication, but the ones being used by the FTU staff were failing.  The manufacturer was contacted and the staff was told that it would cost approximately $1,500 to replace each headset. Sgt. Ashley advised Cpls. Price and Warren that the Administration refused to pay for this vital hearing protection and that they would have to acquire cheaper hearing protection. He purchased wireless Peltor Powercom Plus headsets.

But these headsets failed to perform or provide the necessary decibel level protection. For example, during a training session, Cpl. Price told Sgt. Ashley that his ears actually hurt and that he believed that the hearing protection was not adequate and instead was actually harmful. That angered Sgt. Ashley and he accused Cpl. Price of being a whiner and a complainer stating that Cpl. Price complained about everything.

Additionally, the Peltor headsets used a frequency to transmit and receive on a frequency that was universal to a lot of wireless communications. Everyone who possessed walkie-talkies, CB radios or even local drive through fast food restaurants could hear the FTU Range

-31-

A212

communications that transpired while firearms training took place. They could also hear everyone who was talking on the same frequency. This created a safety risk. If there was an emergency and the staff had to call a cease fire, such an important order would have to wait for a break in the conversation. This is why functioning Mancom headsets were essential due to that fact the instructors required uninterrupted communication. This is a critically important safety issue.

(5) The Inoperable Floor Scrubber. The floor scrubber had been rendered inoperable since the summer of 2003. Upon Sgt. Foraker's return on December 1, 2003, he made contact with the manufacturer to discover that the maintenance contract for the machine had expired. Sgt. Foraker utilized FTU Budget funding to have a technician make the repairs to bring the machine back into working order. Additionally, prior to Cpl/3 Cathell's retirement, he was the only officer who operated the floor scrubber in an attempt to aid him in the reduction of his blood lead levels. More importantly, there were no SOP's in the safe handling and operation of the floor scrubber and disposal of its contaminants.

12. Describe in detail the problems and safety concerns at the FTU that Plaintiff Foraker observed on December 1, 2003 as alleged in paragraph 22 of the Complaint.

**Answer:** See Exhibit 1 - FTU Rough Timeline of Events.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

See Foraker v. Chaffinch, et al. Answer to Interrogatory # 10 which is incorporated by reference herein.

(1) Introduction. On December 1, 2003 Sgt. Foraker returned to the range. He observed many problems upon his return. Sgt. Foraker, Capt. Warren, Lt. Davis and Sgt. Ashley collectively

-32-

A213

had a meeting to review numerous issues referencing the FTU.  Specifically, the ventilation system (Ashley claimed it was perfect and balanced), the bullet recovery system, new drag conveyor system, adjustments to clutch and motor sprockets.  This tour revealed a coating of red dust on range floor, back wall shelf, floor scrubber, target bundles, window sills and all horizontal surfaces.  Target blow-back, shotgun wading and spacers covered with a red dust litter the lower ramps of the bullet trap.  Inspection of the rear of bullet trap revealed heavy concentration and accumulation of the same red dust covering all horizontal surfaces.  The armorers room was in complete disarray with gun parts and tools scattered on every surface with pungent cleaning fluid covering the floor.  Trash dumpster and cardboard recycler were overflowing with trash all over the field.  Sgt. Ashley's tobacco chew spit cups were everywhere in the facility.  There were tobacco chew stains on chairs, desks, phones and floor.  Additionally the parking lot lights were inoperable, there were huge pot holes in the parking lot, and the fuel tank alarm was sounding.

(2) The Broken HVAC System and Bullet Trap.  Inspection of the FTU revealed a heavy build up of pink colored dust, and other debris in the range. The bullet trap was not functioning properly.  Numerous impact ramps were dry due to clogged sprayer heads, and the drag belt system was not working.  Cpls. Price and Warren explained to Sgt. Foraker that the ventilation system and bullet trap were failing.  They explained that they often had to go on the roof to press the reset button when the ventilation system simply failed to turn on.  They explained to him that the frangible ammunition was clogging up the filters and sprayer heads and increased the amount of maintenance time needed to keep the bullet trap operating even marginally.

They explained that the ventilation system was blowing air back at the shooters and instructors (and thus it was blowing in the wrong direction) and was depositing copper colored dust all over everyone.  The system simply was not working.  Cpls. Price and Warren explained

-33-

that they would blow their noses and get excrements that were brownish in color. Sometimes instructors and students would experience nosebleeds, sore throats, irritated eyes and a penny taste in their mouths. The range was getting covered with the copper colored dust, it was even depositing behind the shooting positions and all over the stored cardboard targets at the rear-most-point on the range several yards behind the shooters and instructors.

The copper colored dust behind the trap had build up on all of the horizontal surfaces and equipment stored behind the range. Sgt. Foraker also observed that it appeared that the bullet trap had not been properly sealed following repairs. Material safety data sheets on the frangible ammunition were never provided by DSP Administration or Facilities Management. Sgt. Ashley advised Cpls. Price and Warren as well as DSP Executive Staff members, including Chaffinch and MacLeish, that the frangible ammunition was comprised of a ceramic material. But once Sgt. Foraker's research into the MSDS sheets on the frangible ammunition was completed in early 2004, it was learned that the frangible bullets instead contained numerous hazardous materials including: copper, zinc, arsenic, and tin. Upon receipt of the MSDS sheets, Sgt. Foraker immediately provided them to Lt. Col. MacLeish, Major Hughes as well as members of Facilities Management.

(3) Armorer's Room Ventilation Problems. Cpls. Price and Warren informed Sgt. Foraker that they had requested an exhaust vent in the armorer's room as a result of the nauseating new cleaning chemicals that were giving them headaches. They then advised that they thought regulations concerning ventilation had been neglected.

(4) Defective Headsets. Sgt. Foraker observed the faulty headsets and questioned why the division had purchased equipment that would compromise the safety of the unit and students. As explained above, Cpls. Price and Warren explained to him that the purchase was made in an effort

-34-

to cut operating costs at the expense of their health and safety.

(5) Other Issues.  Both Cpls. Price and Warren stated to Sgt. Foraker that the roof still leaked. The floor scrubber was not working, and had not worked since the summer of 2003. During recruit training it was not uncommon for the FTU to be in complete disarray.  Recruit training is stressful and demanding duty as it is.  Twelve to 16 hour days are the norm.  But the hazardous state of the range was making things worse.

(6) Serious Health Concerns.  Cpls. Price and Warren also told Sgt. Foraker about their health concerns. They were experiencing headaches, chronic fatigue, joint pain, nose bleeds and metallic tastes in their mouths.  Cpl. Price stated that his urine had a strong odor.  There had been a spike in their lead levels while performing the hands on hazardous maintenance on the bullet trap that Facilities Management should have hired experts to do.  They expressed their concern over the lack of training, SOP's and equipment to perform such specialized tasks.

(7) Sgt. Foraker's Reaction.  Sgt. Foraker was diligently taking notes during these meetings and while inspecting the facility. He expressed his serious concerns with the health issues and with the condition of the building. Sgt. Foraker immediately began to make the Executive Staff aware, through the proper chain of command, of the situation at the range. He notified Lt. Davis, and Captain Warren of the Academy, since the FTU fell under the training academy in the chain of command.

Captain Warren and Sgt. Foraker then followed the chain of command as the Academy fell directly under defendant MacLeish's responsibilities and they notified MacLeish of the situation.

(8) Later Steps.  Later, material safety data sheets were obtained from our ammunition manufacturers.  Cpls. Price and Warren had previously been told that the frangible ammunition was made of a ceramic material.  Contradictorily however, the MSDS sheets revealed bullet

-35-

composition that was 85% sintered copper, zinc, tin, arsenic, and nitroglycerin. All of these compounds are known to have an adverse effect on human health.

The men immediately began requesting medical screenings and swipe sampling of the entire facility to ascertain the amounts and levels of contamination. (See e.g., the Harvard Environmental Study for the results of the tests that were belatedly performed and yet which revealed high levels of lead contamination). Joe Farrell from Environmental Solutions conducted swipe sampling too. The results were off the charts for lead, zinc, tin, and copper. Again the men pled for advanced medical screening, and home testing since the contamination was so wide spread at the facility.

Lastly, there was a recruit at the DSP named Casey Fountain, from DNREC air and waste division. Recruit Fountain had an extensive background in hazardous materials, and its effects on humans. He was a wealth of knowledge on the science of the hazardous materials and applicable laws. After the men spoke with him extensively, he was interviewed by Captain Warren and Lt. Colonel Macleish. After the men had spoken to Recruit Fountain, they knew they had grave issues at hand.

13. For the period from December 1, 2003 to the present, identify and describe in detail any communication with Plaintiffs relating to the hazardous and physical conditions at the FTU, including, but not limited to, communications with the DSP chain of command and Facilities Management, as alleged in Paragraphs 24 and 25 of the Complaint.

**Answer:** See Exhibit 1 - FTU Rough Timeline of Events.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

-36-

A217

See Foraker v. Chaffinch, et al. Answer to Interrogatory # 10 which is incorporated by reference herein.

Sgt. Foraker, Cpls. Price and Warren continually voiced their concerns, both orally and in writing, over the serious detrimental health issues related to their employment at the range.  For example, Cpls. Price and Warren expressed their concerns due to the actual physical symptoms they were experiencing, the environmental disaster they could see with their own eyes all around them and because of the results of the environmental solution tests.  They felt that they had been poisoned.  During a February 25, 2004 meeting with Lt. Col. MacLeish, Captain Warren, Lt. Ralph Davis, Sgt. Foraker, Cpl/3 Warren, Cpl/3 Price, MacLeish stated that "Kurt, you have been at the range so long we don't know what we have done to you."  The Troopers were shocked that the Lt. Col. would say something like that.  Their concerns were meeting resistence from DSP administration and Facilities management.  Price and Warren continued to voice their concerns to their immediate supervisor Sgt. Foraker.  Sgt. Foraker was under extreme pressure dealing with these issues. Everyday Sgt. Foraker was in a meeting, on the phone, or sending and answering e-mails.  Sgt. Foraker was truly standing up for our health and our families.  Captain Warren and Lt. Davis also spoke up on our behalf to try and fix the problems and protect us.  Captain Warren also sent numerous e-mails, and made numerous phone calls.  But no one in the Administration would do anything to help.  They also continued to get resistence from Facilities Management.  There is a voluminous paper trail of e-mails and memos on this issue.

14. Describe in detail the communication between Plaintiffs and defendant MacLeish during which MacLeish allegedly told Plaintiffs to "just put on a paper dust mask to protect yourself," as alleged in paragraphs 31 and 74 of the Complaint.

-37-

A218

**Answer:** Objection. Discovery is just beginning and the record in this regard remains to be developed. Without waiving the objection:

See Exhibit 1 - FTU Rough Timeline of Events.

By way of further explanation, during a meeting on Friday, January 30, 2004, Captain Warren informed the FTU staff that Lt. Col. MacLeish had ordered that as of Monday, February 2, 2004, the FTU staff was required to just put on a paper dust mask to protect themselves at the range.

Sgt. Foraker subsequently discussed this with MacLeish. MacLeish stated that a paper dust mask would protect the men from the toxic cloud that was floating up the firing line. Sgt. Foraker stated that the toxic cloud was full of copper, and other metals contained within the frangible ammunition and that a paper dust mask would not protect them. MacLeish was visibly angered and frustrated with Sgt. Foraker as a result of his speech as he became red faced and grimaced at Sgt. Foraker. Sgt. Foraker added that the paper dusk mask is unsafe due to the inability to communicate with the students and fellow instructors.

15. Identify the "federal authority" referred to in paragraph 34 of the Complaint and describe in detail any communication between Plaintiffs and that person(s).

**Answer:** See Exhibit 1 - FTU Rough Timeline of Events.

The statement was made during a February 2004 meeting between Major Eckrich, Captain Greg Warren, Lt. Davis, Sgt. Foraker, Cpl/3 Warren, Cpl/3 Price, Mr. Joe Ferrell of Environmental Solutions and Mr. Art Nielson. Mr. Art Nielson is a certified federal industrial hygienist who owns and operates his own business. He also is a sworn federal industrial hygienist,

-38-

A219

authorized to inspect and close federal ranges due to environmental contamination issues. Following an inspection and analysis of the FTU, Mr. Nielson presented a badge and stated that if the FTU was a federal range, he would shut it down due to the level of air contamination throughout the range and the rest of the building which was followed up with written correspondence stating that the problem with the FTU was not a hygiene issue but a mechanical failure.  He also stated that the building was not fit for occupancy.

16.  Describe in detail the communication between Plaintiff Price and defendant MacLeish during which defendant MacLeish allegedly "interrogated" and "browbeat" Plaintiff Price, as alleged in paragraphs 54 and 74 of the Complaint.

**Answer:**  Defendant MacLeish has browbeat and interrogated Cpl/3 Price on several occasions.  For example:

The first intimidating and threatening incident occurred on Wednesday, April 28, 2004. That day, Lt. Col. MacLeish arrived at the Wilmington Police Department firing range at approximately 12:30 pm. In an attempt to get him alone, MacLeish asked if Cpl/3 Price would take a ride with him and show him the National Guard range.

While looking at the range, MacLeish asked if Cpl/3 Price did not understand MacLeish's order.  MacLeish stated that he did not want Price on the range.  MacLeish stated to Price,"I am not going to fuck you."  As a result of this conversation, Price felt threatened, intimidated and disgraced by MacLeish's comments.

The context of the second incident began on Wednesday July 28, 2004 when Price was interviewed for the second time by the State Auditor's office.  During their questioning, Price was told that he was at fault for the range disaster.  He was accused of not caring for the safety and

-39-

A220

well-being of his students.  He was accused of being derelict in his duties.  At no time was Price advised of his rights under LEOBOR or Mirandized.  As a result of what the Auditors stated during the interview, Price believed that the Auditors were echoing the accusations made by Chaffinch and MacLeish.

Then on Friday, July 30, 2004, Price was sick and stayed home from work.  Sgt. Foraker called him and advised that MacLeish was looking for him to interview him.  Price's attorney, Stephen J. Neuberger, Esq., then sent an e-mail to MacLeish, advising that if such an interview was to occur, that Price's legal counsel must be present.

Ignoring the request for counsel, on Monday, August 2, 2004, MacLeish's office paged Price and he responded to the page.  Lt. Col. MacLeish then got on the telephone and demanded to know what happened with the Auditor's investigation.  Cpl/3 Price was intimidated by MacLeish's actions but tried to explain that he felt that he was being set up to take the fall for the situation at the range.  MacLeish then threateningly advised Price that he would be investigated by IA if the Auditor's Office found his performance at the FTU lacking.

By way of further response, defendant MacLeish also has repeatedly sought to bully and intimidate Sgt. Foraker and Cpl. Warren.  See e.g., Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 12 which is incorporated by reference herein.


17.  Identify any false charges of misconduct and dereliction of duty made by Defendants against Plaintiffs, as alleged in paragraphs 55 and 56 of the Complaint.

**Answer:**  Objection.  Discovery is just beginning and the record in this regard remains to be developed.  Without waiving the objection:

See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 5, 7, 11, 13 which are

-40-


A221

incorporated by reference herein.

See Exhibit 1 - FTU Rough Timeline of Events.

Additionally, defendants Chaffinch and MacLeish have repeatedly and falsely accused Sgt. Foraker, Cpl. Price and Cpl. Warren of destroying the FTU and being responsible for the environmental disaster at that facility.


18.  For the period from December 1, 2003 to the present, identify any actions Defendants have taken "daily" against Plaintiff Foraker designed to drive him out or force him to retire, as alleged in Paragraph 65 of the Complaint.

**Answer:**  See Exhibit 1 - FTU Rough Timeline of Events.

See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 12, 15 which are incorporated by reference herein.

For example, during this time frame, Sgt. Foraker also was continually ordered to conduct research for an independent authority on range function and repair.  After diligently working and providing information regarding Bill Metcalf, FLETC, among others, Chaffinch and MacLeish ignored and refused to utilize his expertise.  Instead they hired another company that had never built a range thereby stepping on that proverbial landmine again that the Facilities Management had stepped on years early when they hired unqualified JAED to build the FTU.  They again hired a "contractor."  This was strictly 'busy work,' intended to antagonize Sgt. Foraker.  This all the while continued while Foraker was diligently trying to cope with the closure of the FTU and not allow it to impact on Divisional training and readiness as he established a new place to shoot at the National Guard Range, created curriculum for the shoot, and so on.  Sgt. Foraker also was ordered to write policies and procedures of which he had no expertise or knowledge.

-41-

19.  Identify any officer in the DSP whose hearing abilities are similar or worse than Plaintiffs, but has been allowed to operate as a full, active-duty uniformed officer with complete police powers, and describe in detail his or her hearing abilities.

**Answer:** Objection.  Discovery is just beginning and this information is in the possession, custody or control of the defendants.  Plaintiffs have sought the production of those records and named numerous specific individuals, yet defendants have maliciously refused to produce such records.  Without waiving this objection:

Major Joseph Forrester.  Lt. Charles Klim.  Also see the deposition of Rt. Major David Baylor on July 18, 2005.


20.  Identify any medical records that were withheld from medical examiners, as alleged in paragraph 74 of the Complaint.

**Answer:**  See Exhibit 1 - FTU Rough Timeline of Events.

One of the medical records that was withheld from the medical examiners was the important attachment to the highly technical questionnaire the FTU staff was ordered to fill out for the TK Group in Illinois.   The attachment explained that the men did not understand and found confusing the questions and that many of the questions required expert and highly specialized knowledge that the FTU staff did not possess.  However, because the men were ordered to fill out the questionnaire, they were required to do so or risk being brought up on IA charges for insubordination.  So, they did fill out the questionnaire, but attached the above discussed attachment to it.  But the DSP, specifically Captain Yeomans, refused to send the attachment to the TK Group and thus only sent incomplete medical information.

-42-

A223

Dr. Green subsequently expressed concern during plaintiffs' fitness for duty exams that the TK Group attachment had been wrongfully withheld and removed from plaintiffs' medical records.

Additionally, Captain Yeomans also withheld medical records from Dr. Green when the plaintiffs were ordered for those same fitness for duty exams.  For example, during Sgt. Foraker's July 2004 exam, upon discovery of the fact that the records were missing, the examination was actually halted while Dr. Green called Yeomans and demanded the missing records that were being withheld.

21.  For the period from December 1, 2003 to the present, as to each medical practitioner who examined or treated Plaintiffs, separately state the medical practitioner's name and address, describe the medical practitioner's practice specialty, state the date(s) on which the medial practitioner examined or treated you, identify the nature of the examination or treatment in detail, state the amount(s) the medical practitioner charges(d) you, and describe the medical practitioner's findings.

**Answer:**  Objection.  Overbroad, burdensome and beyond the permitted scope of the Federal Rules of Civil Procedure.  Without waiving the objection:

See the medical records which will be produced subject to appropriate protective order or confidentiality agreement.

See also Answer to Interrogatory #3 above.  See also the report of Carol A. Tavani, M.D., plaintiffs' forensic psychiatrist that will be produced in accord with the requirements of the scheduling order and the Federal Rules of Civil Procedure.

22.  Have you sought and/or received any mental health, psychiatric, and/or psychological

-43-

A224

treatment, and/or professional counseling for your alleged injuries?  If so, please identify the

nature of the injury, disease or impairment, the name of every practitioner and institution who

treated or examined you in connection with the injury, disease or impairment, and state the dates of

treatment or examinations received.

       **Answer:**  Response to sentence # 1 - yes, plaintiffs have sought treatment.

       Response to sentence # 2 - see the medical records which will be produced subject to

appropriate protective order or confidentiality agreement.

       See also Answer to Interrogatory #3 above.  See also the report of Carol A. Tavani, M.D.,

plaintiff's forensic psychiatrist that will be produced in accord with the requirements of the

scheduling order and the Federal Rules of Civil Procedure.

       23.  State whether you intend to call any persons as expert witnesses at trial.  If so,

separately as to each person:

       (a) Identify the person;

       (b) State the subject matter as to which the person is expected to testify;

       (c) State the substance of the facts and opinions to which the person is expected to

       testify and a summary of the grounds for each opinion;

       (d) State the person's age, residence and business address;

       (e) State the name and address of the person's present employer, or if self-

       employed, the name of the business and his/her occupation;

       (f) Describe in detail the person's educational background, claimed field(s) of

       expertise, professional experience, publications, and courses attended which

       concerned the subject for which the person was retained in this case, and

-44-

membership in professional societies; and

(g) Describe in detail the person's previous court appearances (including case citations).

**Answer:** Objection.  Overbroad and premature.  Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure.  Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3).  The information required under the Rules will be produced at the appropriate time.

By way of further response, see Plaintiffs' Rule 26 Disclosures and subsequent amendments.

-45-

As to Objections:

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger

**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiffs

Dated: July 19, 2005

Firearms Training Unit / Pleadings /Final  FTU - Interrogatory Answers

-46-

## DECLARATION OF CPL/3 B. KURT PRICE UNDER 28 U.S.C. § 1746

1. I am a Plaintiff in this action. I have personal knowledge of the facts contained in this Declaration and, if called as a witness, I am competent to testify to those facts.

2. I have read the Plaintiff's Answers to Defendants' Interrogatories set out above. The answers contained therein are true and correct to the best of my knowledge, information, and belief.

3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

_CPl/3 Kurt _____

CPL/3 B. KURT PRICE

_071905_____

Date

-49-

A2312

A228

**DECLARATION OF SGT. CHRISTOPHER D. FORAKER UNDER 28 U.S.C. § 1746**

1. I am the Plaintiff in this action. I have personal knowledge of the facts contained in this Declaration and, if called as a witness, I am competent to testify to those facts.

2. I have read the Plaintiff's Answers to Defendants' Interrogatories set out above. The answers contained therein are true and correct to the best of my knowledge, information, and belief.

3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

SGT. CHRISTOPHER D. FORAKER

7-19-05
Date

-39-

A2313

A229

**DECLARATION OF CPL/3 WAYNE WARREN UNDER 28 U.S.C. § 1746**

    1. I am a Plaintiff in this action. I have personal knowledge of the facts contained in this Declaration and, if called as a witness, I am competent to testify to those facts.

    2. I have read the Plaintiff's Answers to Defendants' Interrogatories set out above. The answers contained therein are true and correct to the best of my knowledge, information, and belief.

    3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

_____
**CPL/3 WAYNE WARREN**

_____
Date

-48-

A2314

A230

# Exhibit 1

**FTU Rough Timeline of Events**

Non-dated material - Ltr. From Capt. Paul Cunningham to Major Robert Gouge re: vendors that bid for to complete range work

March 27, 1996     Letter from RangeTech Int'l Corp. to Lt. William Bryson re: recommendation for construction of the DSP Firing Range.  The ventilation system "will not work" and should not be built or installed.

May 1, 1996     Letter from Traci Trznadel to Lt. Bill Bryson re: safety and health issues at the new range facility:  hearing, noise, training and education is of highest importance.

June 10, 1998     DSP Qualification shoot report.  Ret. Major Joe Forrester, who at the time was wearing double hearing aids, was full duty at the time.

November 4, 1998     DSP Qualification shoot report.  Retired Major Joe Forester, who at the time was wearing double hearing aids, was full duty at the time.

January 13, 1999     Letter from Tom Winborn, Sr. Vice President at Clark Nexsen to Elrita Annett of the Department of Adm. Svcs., Div. of Facilities Mgmt. re: corrections necessary to mechanical system, ventilation criteria, suspension of the lay-in ceiling, baffle system for impact on airflow and ballistic adequacy, etc.

May 1999     Letter from William Davis, Facilities Program Mgr. To Christopher M. Pepe, Sales Engineer of The Train Company, cc'd to Sgt. Brian Fitzpatrick of DSP re: HVAC improvements to the DSP firing range.

May 21, 1999     Fax message from Data Chem Laboratories to Elrita Annett, Facilities Mgmt. re: lead swipe samples at the indoor firing range

**2000-2001**     Facilities Management stopped installing HEPA filters on the air filtration system at range.

January, 2001     Division goes exclusively frangible handgun ammo.  Sgts. Fitzpatrick and Parton were involved in the decision making to go to frangible along with Executive Staff.

September 4, 2001  Email from Capt. Mergenthaler to Foraker re: Eddie Cathell lead levels.

September 6, 2001  Email from Major Joe Swiski, to Foraker re: examining the amount of lead being generated and subsequently disposed of.

September 7, 2001  Email from Foraker to Major Joe Swiski re: range staff blood lead levels

October 1, 2001     Email from Doyle Tiller, Facilities Management to Foraker re: hazardous waste re: (lead).

1

A232

| | |
|---|---|
| October 9, 2001 | 2:29 P.M. Email from Foraker to Major Joe Swiski re: Cathell possible neurological symptoms. |
| October 9, 2001 | 5:48 P.M. Email from Major Swiski to Foraker re: Cathell neurological symptoms. He said he is having a meeting with Col. Chaffinch on October 10, 2001.  He will pass on the info. Re: Cathell's neurological symptoms. |
| October 15, 2001 | 11:30 A.M. Email from Foraker to Major Joe Swiski re: blood lead levels of the staff members of the FTU.  Specifically, needed clarification from the executive staff as to what other precautions or procedures he should incorporate to aid Cathell in the reduction of his blood lead level. |
| October 24, 2001 | 1:13 P.M. Email from Major Joe Papili to Major Joe Swiski re: health concerns lead at the FTU.  Papili says that "He is doing the right thing by documenting these reports…we need to do something to ensure that the division is not liable for some health risk due to lead level rises for Cpl/3 Cathell.  We need to address this with the rest of Staff.  If you want me to I will do it.  Please advise". |
| November 6, 2001 | 12:28 P.M. Email from Foraker to Major Joe Swiski re: Guardian removal and disposal of the hazardous material recovered from the bullet trap during the clean up in August of 2001. |
| November 6, 2001 | 2:20 P.M. Email from Major Joe Swiski to Foraker re:  changing the acceptable lead levels from a 15 to a 20 re: Cathell's lead levels. |
| December 3, 2001 | 9:15 A.M. Email from Doyle Tiller to Foraker re: duct clean at firing range. |
| December 13, 2001 | Email from Foraker to Maj. Papili re: range sound system and headsets. |
| December 13, 2001 | 8:50 A.M. Email from Foraker to Major Joe Papili re: range sound system and Headsets. |
| December 17, 2001 | 12:26 P.M. Email from Foraker to Major Joe Papili re: DSP Firearms Instructors needed at the range. |
| January 8, 2002 | 9:55 A.M. Email from Foraker to Major Joe Papili re: FTU manpower issues, specifically, the status of reassigning John Piser to the FTU. |
| January 22, 2002 | 11:16 A.M. Email from Foraker to Major Joe Papili re: manpower issues for the FTU. |
| January 24, 2002 | 10:22 A.M. Email from Foraker to Lt. Galen Purcell re: new shotgun barrels, frangible non-toxic shotgun ammunition and in-car shotgun racks. |
| January 24, 2002 | 11:50 A.M. Email from Lt. Galen Purcell to Foraker re: shotgun barrels, non-toxic shotgun ammo. And in-car racks.  "Congrats on a great job!" |
| January 24, 2002 | 8:30 P.M. Email from Foraker to Major Joe Papili re: Piser reassignment to FTU, and headsets money. |

2

A233

| January 24, 2002 | 11:31 P.M. Email from Major Papili to Foraker re:  no news on headsets and no news about Piser being assigned to the FTU. |
|---|---|
| February 4, 2002 | 1:29 P.M. Email from Doyle Tiller, Facilities management to Foraker re: duct clean in the firing range. |
| February 4, 2002 | 3:23 P.M. Email from Foraker to Major Joe Swiski re: duct cleaning.  "The ducts will be recontaminated immediately upon the commencement of the Spring 1 shoot". |
| February 5, 2002 | 8:32 A.M. Email from Major Swiski to Foraker re: cleaning the ducts at the range.  "The Colonel was advised of Ed's lead level.  He did not comment". |
| February 5, 2002 | 9:00 A.M. Email from Foraker to Major Swiski re: duct cleaning in the firing range. |
| February 5, 2002 | 8:32 A.M. Email from Major Swiski to Foraker re: Proceed with the duct cleaning.  Swiski says that the shotgun lead particulates alone will not load the vents as quickly as before.  He also goes on to say that the Colonel had no comment regarding Cathell's blood lead levels. |
| February 5, 2002 | 9:00 A.M. Email from Foraker to Major Joe Swiski re: scheduling of hazardous materials removal.  Will wait to hear back from Swiski regarding the new headsets, skid pad.  Foraker goes on to say, "I hope the risk the department is taking with Cathell's lead level out weights the danger to him and the department". |
| February 5, 2002 | 9:12 A.M. Email from Foraker to Major Papili re: asking if he is doing the right referencing Cathell's lead levels and cleaning of the duct work at the FTU. |
| February 6, 2002 | 9:29 A.M. Email from Major Papili to Foraker re:  duct clean at the FTU.  Papili's response, "I think you have done the best you can at this point.  The liability is off you.  Sometimes you just have to play the hand your dealt.  Things will change in due time.  Be patient, smart and move on.  The ball is now in their court.  I'm close to getting you some additional help. |
| February 6, 2002 | Memorandum from Foraker to Major Papili re: augment instructor participation during the Fall 2001 in-service shoot. (Justifying the need for a 5th, full time instructor). |
| March 21, 2002 | 11:42 A.M. Email from Capt. Mergenthaler to Foraker re: an award received in recognition for his laudable performance at the range. |
| March/April 2002 | Sgt. Foraker did not turn over the range to Ashley in the wretched condition that Ashley turned it back over to him on Dec. 1, 2003.  In December 2003 - trash all over the outside, parking lot lights not functioning, floor scrubber non-functioning, broken bullet trap/conveyor, lead/copper dust all over everything inside the building. |
| June 13, 2003 | 8:28 A.M. Division-wide email went out by the authority of Col. Chaffinch re: a full-time firearms instructor opening at the FTU. |

3

A234

| | |
|---|---|
| August 20, 2003 | 5:27 P.M. Email from Jay Zokcak of Mayfran International to Sgt. Rich Ashley re: price for a conveyor belt, new clutch and the associated costs. |
| August 20, 2003 | Quotation converting the existing conveyor to a drag conveyor from Snail Systems. |
| August 21, 2003 | RWO by Sgt. Rich Ashley for alterations to bullet recovery system. |
| November, 2003 | Foraker & DSP informed Foraker is Court ordered by Judge Farnan to return as NCOIC of the FTU on December 1, 2003 |
| November 21, 2003 | 3:54 P.M. Email from Pamela Harrison to all DSP Users re: transfers of Foraker from Troop 6 to FTU, NCOIC and Ashley from FTU, to HQ Adm. Support effective December 1, 2003, authority of Col. L. Aaron Chaffinch. |
| November 23, 2003 | 12:51 A.M. Foraker sends email to Capt. Warren requesting a meeting to facilitate a smooth transition from Ashley to Foraker. |
| November 24, 2003 | 8:48 P.M. Email from Foraker to Capt. Greg Warren re: FTU Facilitating a smooth transition with Ashley leaving and Foraker returning to the FTU. |
| November 25, 2003 | 5:59 P.M. Email from Capt. Greg Warren to Foraker re: smooth transition from Ashley to Foraker at the FTU. |
| Dec. 2003 through Jan. 2004 | Ongoing discussions with Joe Farrell of Environmental Solutions to work on a fix for flow stoppages of the water trap system.  Due to the in-depth conversations surrounding the options that Joe Farrell was suggesting, Capt. Greg Warren and Foraker agreed that we should invest in a new bullet trap system. |
| December 1, 2003 | Foraker's first day assigned back to the FTU.  Foraker, Capt. Warren, Lt. Davis and Sgt. Ashley have a meeting to review numerous issues referencing the FTU. Specifically, the ventilation system (Ashley claimed it was perfect and balanced), the bullet recovery system, new drag conveyor system, adjustments to clutch and motor sprockets.

Tour revealed coating of red dust on range floor, back wall shelf, floor scrubber, target bundles, window sills and all horizontal surfaces.  Target blow-back, shotgun wadding and spacers covered with a red dust litter the lower ramps of the bullet trap.  Inspection of the rear of bullet trap revealed heavy concentration and accumulation of the same red dust covering all horizontal surfaces. Armorer's room is in complete disarray with gun parts and tools scattered on every surface with pungent cleaning fluid covering the floor.  Trash dumpster and cardboard recycler overflowing trash all over the field.  Sgt. Ashley's chewing tobacco spit cups were throughout the facility.  Tobacco chew stains were on chairs, desks, phones and the floor. |
| December 1, 2003 | Invoice from Savage Range Systems to repair bullet trap |
| December 3, 2003 | Staff meeting with Capt. Warren – current headsets are unsafe, FTU manpower issues, vehicle issues, training for Foraker and Warwick, serious maintenance |

4

A235

issues with the bullet trap only to be doubled when shotgun goes to frangible ammo.

December 5, 2003 2:30 P.M. Email from Lt. Ralph Davis to Foraker re: vehicles for Foraker and Warwick.

December 11, 2003 11:58 A.M. Emails between Lt. Davis & Foraker - Missing Glock handguns, baseline lead level checks for Foraker and Warwick, manpower issues

December 11, 2003 2:11 P.M. Email from Foraker to Lt. Davis – exhaust fan in cleaning room, baseline hearing and blood tests for Foraker and Warwick along with blood tests for Wayne Warren and Kurt Price since they had not had a blood test in several months

December 11, 2003 9:05 P.M. Memo to Foraker from himself notes/reminders.

December 12, 2003 2:48 P.M. Email from Lt. Davis to Kristy Tuxward in Human Resources referencing blood lead level test results – they would like to monitor results as an indicator of the conditions at the range

December 12, 2003 Foraker and Lt. Davis meeting referencing FTU issues: condition of headsets are inadequate and unsafe and current condition of Snail Bullet Trap System, necessity to have professional maintenance program contracted out to a mechanical company (see minutes of meeting)

December 15, 2003 Foraker's personal to-do notes for that day. Specifically, it notes looking into requesting Mechanical Services contractors in for bid proposal on weekly maintenance program for bullet trap system.

December 15, 2003 10:01 A.M. Email from Lt. Ralph Davis to Capt. Jim Paige re: missing handguns that Ashley had not accounted for.

December 15, 2003 11:38 A.M. Email from Capt. Warren to Foraker re: motor on the trap system

December 15, 2003 1:09 P.M. Email from Lt. Ralph Davis to Capt. Greg Warren re: more missing firearms that Ashley had not accounted for. These guns were in addition to the December 15th, 10:01 A.M. email.

December 15, 2003 1:31 P.M. Email from Foraker to Capt. Simpson and Siobhan Sullivan re: glock serial numbers for Glock 33 pistols.

December 15, 2003 2:21 P.M. Email from Foraker to Lt. Davis re: FTU bullet trap and exhaust hood in armoror's section. Foraker also verbally informed them about the inadequate ventilation system.

December 17, 2003 5:15 P.M. Email from Foraker to Pete Gerardi, Department of Administrative Services referencing outside parking lot lights are out. He makes numerous requests for Facilities Mgmt. to repair them. They were not fixed until after January 5, 2004.

5

December 18, 2003 Foraker discovers that the clutch pulley sprocket of the conveyor (drag or dredge system) has been damaged and the drive chain has been broken. The dredging system has been brought to a complete halt.

December 19, 2003 – Work order from Bortek Industries to bring the "Factory Cat" floor scrubber machine back into operation. Replaced dead batteries, salvage blades, filter and L.D. lubed actuator, hour meter reading 21.3. Cost of repairs approx. $1,281.52

December 19, 2003 11:39 A.M. Email from Capt. Greg Warren to Foraker re: prices for motor on trap system.

December 19, 2003 11:57 A.M. Email from Foraker to Capt. Warren and Lt. Davis re: found two missing Glocks. To the best of his knowledge, Foraker had now accounted for all missing Glock pistols.

December 19, 2003 7:20 P.M. Email from Foraker to Lt. Col. MacLeish, Maj. Eckrich with cc: to Capt. Warren and Lt. Davis re: Emergency range issues.
1. Clutch pulley sprocket of the conveyor (drag or dredge system) has been damaged and the drive chain has been broken.

2. All addressees of the email were notified that after Ashley made his "adjustments", the system was rendered inoperable.

3. Foraker met with Mark D'Allesandro, Physical Maintenance Trades Supervisor of Facilities Mgmt. referencing Mr. D'Allesandro's observation of the conditions and labor intensive work that is required on a daily basis to keep the mechanical aspect of the bullet recovery system operational. *Foraker also notified Mr. D'Allesandro that the lead contamination would continue. Mr. D'Allesandro stated that the smooth operation of the bullet trap maintenance would require a full time professional that would also need to be equipped with the proper protective gear and trained in the handling of hazardous lead and other heavy metals.*

4. Cpl. Price's lead levels elevated 6 points from a 5 to 11 after he and Sgt. Ashley completed work on the bullet trap. Cpl. Warren's blood levels also rose 3 points. Both Price and Warren expressed concern over the health risks involved in conducting maintenance on the bullet trap and bullet recovery system. *Dr. Green of Bay Health stated that the petroleum found in the water that helps to lubricate and preserve the bullet trap is a penetrating agent that is used as the vehicle to transport the lead through the skin and into the blood stream upon human contact. Foraker states that "I concur with my colleagues that this is an unnecessary health risk and that the maintenance of the bullet trap and recovery system should be left to the trained professionals who can operate in this environment safely".*

5. Foraker contacted Joseph Farrell of the Environmental Solution Group, a hazardous materials recovery company. Mr. Farrell concurs that professionals would be needed for the safe and efficient operation of the entire bullet trap system.

6

A237

December 22, 2003 4:32 P.M. Email from Foraker to Price, Wayne Warren, Warwick, Peachey re: two Glock pistols unaccounted for.

December 22, 2003 4:51 P.M. Email from Foraker to Lt. Davis - Mayfran International will be coming to the FTU to repair the clutch and chain to get the drag conveyor system back up and running.

December 24, 2003 Bortek Industries invoice to repair the "Factory Cat" floor scrubber $1,281.52

December 28, 2003 11:49 A.M. Email from Bruce Peachey to Foraker re: Glock pistols.  He thinks that Eddie Cathell kept it but he cannot prove it.

December 29, 2003  Larry Toplack of Mayfran Corporation repair arrived to repair the clutch pulley and chain and to get the dredge conveyor system back up and running.  Mr. Toplack indicated that the adjustment points had been tampered with to the point of the system being completely out of balance as well as the limit switch being removed from its anchor point causing it to be inoperable.  When the adjustment point is altered, a domino effect flows through to all the remaining adjustments to the system after they had expressed to adjustments or alterations to the system other than Mayfran trained and certified engineers and technicians.  Upon restarting the system, it was discovered that "foreign material" was in the bullet trap.  It was thought that the matter may have gotten caught between the conveyor cleat and the conveyor pan and locked up the system.  Due to the limit switch being disabled, the clutch was unable to shut the system down when the conveyor locked up causing the clutch sprocket and chain to destroy each other rendering the conveyor system inoperable.  When Mr. Toplack and I looked at the foreign material, it resembled chain links from chain Mr. Toplack found on a shelf behind the bullet trap.  At 1st thought, someone may have sabotaged the system by placing a chain into the conveyor system which prompted me to contact Facilities Management and have all locks to the facility changed as well as the alarm codes for security purposes.  After Corporals Warren and Price returned from Christmas vacation, the foreign material was identified as the zinc coil lead free training ammunition fired by the local satellite office of the FBI who periodically train at the FTU facility.

December 29, 2003 9:12 A.M. 2nd Email from Foraker to Pete Gerardi, Department of Administrative Services referencing outside parking lot lights are out.

January 5, 2004 3:47 P.M. Email from Foraker to Lt. Col. MacLeish, cc'd to Major Eckrich, Capt. Warren, Lt. Davis.  Indicating the problems with the clutch pulley and chain problems on December 29, 2003.  This email again suggests that a maintenance agreement must be entered into for an outside firm to conduct maintenance on the bullet trap.

January 6, 2004 3:10 P.M. Email from Lt. Ralph Davis to Ret. Capt. Pete Schwartzkopf in Leg. Hall re: his assigned duty pistol.  He never turned it in or paid for it when he retired.

January 7, 2004     Doyle Tiller and Mark DeVore of Facilities Mgmt. met with Paul Gerard and Alan Mindrup, Engineers of Delaware Engineering and Design Corp. re: installing vent hood in armorers room.  DeVore asked Foraker how things were going?  Foraker explained that there were ongoing ventilation problems with the range.  Foraker

7

also asked DeVore how do we dispose of the contaminants out of the floor scrubber?  DeVore said he'd have to get back to me on that.  He never did respond to this request.

January 8, 2004    The Trane representative and Mark D'Allesandro were looking at the air handler and discussing solutions to the problem (lack of proper air flow).  Both Mr. D'Allesandro and the Trane rep agreed a solution had to be reached.  They called for meeting on Tuesday the 13th of January.  Mr. D'Allesandro made the statement "I wish I could tell you everything was working properly however, I can only tell you it is working as well as it can".

January 8, 2004 2:54 Email from Foraker to Ernest Durham re: request for MSDS sheets for Lawman RHT Frangible

January 8, 2004 3:29 P.M. Email Ernest Durham to Foraker re: MSDS sheets for non toxic ammunition

January 8, 2004 5:51 P.M. Email from Foraker to Lt. Davis, cc'd Capt. Warren.  Manpower issues for instructor to student ratios.

January 8, 2004 12:12 P.M. Email from Ernest Durham to Foraker – MSDS 101 Ammunition Components (Copper-Tin)

January 9, 2004 7:43 A.M. Email from Lt. Davis to Foraker re: SOP's & issues re: firing range.

January 9, 2004 3:47 P.M. Email from Ret. Capt. Pete Schwartzkopf to Lt. Ralph Davis re: his duty Sig Sauer that he never turned in or paid for when he retired.  He goes on to say "Ashley was supposed to send me an email with the price and was going to work on the gun and tighten everything up before I sent him a check.  I never heard anymore from him and it just slipped my mind with everything goig on this year.  The gun has been in my drawer and I haven't even seen it this past year.  I actually had to go look to make sure it was still there!  Let me know by email what amount we are talking about and we will get it straightened out"

January 9, 2004 7:58 P.M. Email from Foraker to Capt. Warren, cc'd Lt. Davis – Range Health Issues, Ventilation system has significant airflow problems since my return to the range and there are serious issues pertaining to *Departmental Liability.*

January 13, 2004    Mr. D'Allesandro and the Trane representative did not show up at the range for the meeting that was supposed to take place this day.  No one called to inform Wayne Warren that no one would be coming.

January 14, 2005 4:05 P.M. Email from Lt Ralph Davis to Foraker requesting if he can contact Schwartzkopf regarding his Sig pistol.

mid-January, 2004  Lt. Col. MacLeish tells Capt. Warren to tell FTU members to put on a paper dust mask when on the range.  Capt. Warren tells Foraker to do so.  Foraker advises Capt. Warren that is a safety issue due to several reasons:  cannot hear one another when trying to conduct live fire, no SOP's, no indication of what they are being protected from, etc.

8

January 15, 2004    0855 hours.  Wayne Warren called Mark D'Allesandro to inform him of ventilation problems.  He talked with the secretary and informed her that he wanted an air quality test that day.  She advised she would pass on the message.

January 15, 2004    0920 hours.  Wayne Warren received a call from Doyle Tiller.  Mr. Tiller advised that getting the air tested was not the first step.  He would have to consult with engineers and his maintenance people.  He stated he was not aware of problems in the past.  Mr. Tiller stated he would not make a recommendation.  "I don't have the data".  The air hasn't been tested.  It was done for lead, lead testing.  Wayne Warren then asked for a copy of the test.  Mr. Tiller informed him that the tests were kept at the maintenance office.  "It is a hazardous thing".

January 15, 2004    1015 hours.  Mr. Tiller called Wayne Warren back to inform him that a technician would respond to the range after lunch.  He then asked if the floor scrubber was working.  I advised him that it was not; we could not dump the water.  He then stated that this particular building is a two-responsibility building, "It ain't perfect but it has never been perfect."  He then advised Wayne that HQ is responsible for the right to know on air quality.

January 15, 2004    1500 Hours.  Wayne Warren met with Lt. Ralph Davis, Mark DeVore, Doyle Tiller and Tom Faison concerning the air handler.  Wayne explained that the air handling system was not working properly.  Mr. DeVore first looked at the computer in the control booth and the associated pressure gauges on the wall.  He worked on the computer for approximately 30-40 minutes.  Mr. DeVore then conversed with Mr. Faison about the situation.  Mr. Faison said that we (Firearms Training Facility) had always had problems with the air handler.

We then walked down range near the target area.  We could clearly see copper frangible dust on the floor.  Mark DeVore bent over and observed the dust on the head plate platform and said it appeared to be copper.  He then looked up and stated the exit door was blocked.  At that point, I made the statement that we were really concerned with our air quality.  I explained to Mr. DeVore that only one set of exhaust ducts was working.  (You could walk the line and feel the different amounts of air from the different duct).  I then asked Mr. DeVore if it was safe to work in the environment.  He stated the air handler was working properly.

All parties walked behind the range to observe the rear storage area and the rear of the bullet trap.  We observed copper dust built up over the entire rear area.  We also observed copper dust floating on top of the water in the containment tank.  Wayne inquired about air samplings and asked if he could receive copies of the test results.

Wayne was advised by Mr. DeVore that he was not entitled to the air sampling results.  He said Wayne would have to make the request to his administration.  At that point, he turned to Lt. Ralph Davis and made the request.

Mr. DeVore inquired about the Zamboni machine.  Wayne told him we have not been using the machine because we did not know what to do with the "contaminated water".  He asked if the FTU members were supposed to dump the water out on the ground.  After hesitating, Wayne was told that the FTU members should not dump the water on the ground.  Wayne asked if the FTU

9

members could get an air monitor placed inside the range for their safety.  Mr. Tiller advised him that he didn't want to do that until he read the MSDS of the ammunition.

All parties proceeded to the office area and Wayne provided the MSDS for the frangible ammunition to Mr. Tiller.  Mr. Tiller was also provided the chemistry information for copper.

Wayne repeated his request to have the FTU air tested (He asked about air testing when they first started shooting frangible ammunition).  Mr. Tiller informed Wayne that there wasn't a baseline test performed.

January 17, 2004    Foraker sees Lt. Col. MacLeish.  MacLeish growls "just fine" when Chris asks him how he is doing.

January 19, 2004    2:35 P.M. Email from Foraker to Schwartzkopf giving him directions to make the purchase of his duty pistol.

January 20, 2004    1000 hours.  FTU members met with Captain Warren and Joe Farrell of Environmental Solutions at the FTU Facility.

Problems concerning the air handler and the copper situation were discussed.  Mr. Farrell advised he could test the air and perform swipe tests at various locations in the range for dangerous metals.

Captain Warren asked Mr. Farrell to compile a proposal and price for the testing.  Captain Warren said he would forward the information to the staff for approval.

Captain Warren observed the contamination in the rear of the range behind the bullet trap.  Joe Farrell said the contamination site didn't look good.

Captain Warren observed actual shooting in the range and observed an orange cloud rolling back toward the shooters.

Wayne Warren requested for Captain Greg Warren to have the air tested by an independent agency.  He also wanted to know why a baseline air test had not been performed for copper since the ammunition change.

January 20, 2004    2:21 P.M. Email from Foraker to Capt. Warren and Lt. Davis – Mayfran will be arriving on January 22, 2004 to repair the bullet trap drag conveyor.  A more powerful clutch pulley will be installed.

January 20, 2004    3:15 P.M.  Email from Capt. Greg Warren to Foraker thanking him for giving him the "heads up and for all your time this morning.  We will get these problems addressed one way or another.  Thanks again Greg".

January 21, 2004    Lt. Col. MacLeish made an impromptu visit to the range stating that he "Just stopped to take a look at the skid pad and thought that I would drop in."  He asked, "Are the recruits shooting?"  Foraker replied, "Yes", and proceeded to escort him to the control booth so he could see the recruits on the range.  Foraker started to explain to MacLeish the various issues from the range

10

ventilation to head set issues when he stated, "I didn't come here for that". MacLeish also spoke to Foraker regarding his comments about wearing a paper dust mask. He said, "I want you to wear them to protect you from the dust." Foraker replied, "Well, the contents of the dust are the lead, copper, zinc and hazardous contaminants". MacLeish just looked at Foraker with a perplexed look on his face and his face got red with frustration and had no further response. I also spoke to him regarding the need for new instructor headsets, he said to contact Bill Carrow to have the old headsets refurbished.

January 21, 2004    9:10 A.M. Email from Lt. Ron Hagan to Foraker re: weapons destruction.

January 21, 2004    2:39 P.M. Email from Foraker to William Carrow – New instructor headsets for safety purposes.

January 21, 2004    3:23 P.M. Email from Foraker to Capt. Warren, Lt. Davis – Proposal information regarding Environmental Solutions Group

January 21, 2004    Delaware State News article quoting Mike Protack running for governor, "One time is a mistake, twice is a pattern and three times is a pathology, and we cannot afford that" referencing to the lawsuits against the Delaware State Police.

January 21, 2004    Proposal letter from Environmental Solutions to Foraker to complete air and surface sampling at the firing range

January 22, 2004    12:10 A.M. Email from Bill Carrow to Foraker explaining that he will be out of town until January 27th, he will look into the matter when he returns.

January 22, 2004    Mayfran technician Eric Phillips arrives to make repairs to the bullet trap drag conveyor.

January 22, 2004    2:46 P.M. Email from John Dunham, Construction Project Manager of the Division of Facilities Management to Foraker notifying Foraker that he and the engineer will be at the firing range on Monday, January 26, 2004 around 9: - 9:30 A.M.

January 23, 2004    12:28 P.M. Email from Foraker to Capt. Warren, Lt. Davis cc'd Cpl. Warren, Cpl. Price, Cpl. Warwick regarding additional problems with the bullet trap and air handler. The tail axle shaft at the pivot point of the conveyor located at the far end of the range (shooting position 20), is completely warn out and unseated. Requests for the air quality testing to be made on February 10th or 11th due to the range being full with shooters to properly sample the air quality and obtain a true and accurate sample of range operations.

January 23, 2004 3:50 P.M. Email from Schwartzkopf to Foraker re: duty Sig Sauer pistol.

January 24, 2004 – Delaware State News – Range probe draws blank, Police firearms site reviewed article referencing Eddie Cathell state auditors office audit regarding the brass account, embezzled from the state via unauthorized out-of-state travel, stolen and sold magazine clips for personal gain, sold spent cartridges for personal gain, received a special severance package to entice him to retire.

11

January 24, 2004     4:07 P.M. Email from Foraker to Lt. Ron Hagan re: weapons destruction date.

January 27, 2004     10:12 A.M. Email from John Dunham, Construction Project Manager of the Division of Facilities Management to Foraker notifying Foraker that he needs to reschedule meeting to February 2, 2004 1: - 1:30 P.M.

January 28, 2004     Wayne Warren talked to Sgt. Rich Ashley about the ventilation problem.  Ashley stated that the Staff was aware of the ventilation problems at the range while Ashley was NCOIC.  Wayne advised Sgt. Ashley he wanted the air tested, he advised they wanted to look into different ammunition.  Wayne said he was exhausted at the end of the day.  He fell asleep at 2000 hours with a dry throat and was having nosebleeds.

January 28, 2004     There was a meeting with Captain Warren, Lt. Davis, Sgt. Foraker, Cpl. Price and Cpl. Warren.  The following items were discussed:

1.     There was a recent meeting that Capt. Warren had with Lt. Col. MacLeish
2.     We were told we would not be getting a fifth person at the range.
3.     We were told to try and trade Sgt. Ashley's airline ticket for the shot show to Sgt. Foraker
4.     We were told to call Clark Nexsen for the engineering study that was conducted in 1999.
5.     Starting Monday, February 2, 2004 we were told to just wear a paper dust mask per Lt. Col. MacLeish.
6.     Lt. Col. MacLeish stated that the round that we were firing was mostly "ceramic" and that there was a fine coating of copper surrounding the bullet.

January 28, 2004 Service quote from Mayfran International to complete work on the conveyor system

January 28, 2004 5:21 P.M. Email from Doyle Tiller to Lt. Davis referencing the DSP FTU Hygiene Recommendations

January 30, 2004 1:55 P.M. Email from Foraker to Debra Powell regarding Bortek Industries who repaired the "zamboni" equipment.

January 30, 2004     Current Range Status and Analysis Report – author Capt. Greg Warren

February 2, 2004 – Chronology of events that transpired on this day prepared by Cpl. Warwick regarding Environmental Solutions and other issues:  performing smoke tests, underground tank alarm, a primary heating and cooling line on the roof was leaking water, SORT began shooting (8 team members), someone named Chris(?) asked about drums outside the building, blueprints of the building were provided to Mr. Arthur Neilson an industrial hygienist with Nielson Associates) Note Wayne Warren's hand written notes regarding same.

Meeting with Art Neilson, Industrial Hygienist.  Mr. Neilson advised the air handler was not working correctly.  More air was coming from the middle ducts instead of the front and rear.  We were being exposed to unhealthy air which is a severe liability.  As an occupational exposure to it is to much.  "If that was one of my ranges, I would shut you down".  Captain Warren advised that a comment

12

was made by a Facilities Mgmt. employee, "It is expected that State employees will be exposed to hazardous materials.  Asked if the noise level had been tested, answer given,"No".  Art Neilson said that "range officers should not perform maintenance".

February 2, 2004 7:44 A.M. Email from Bill Provencher Carey's Heating and Air Conditioning to Foraker referencing range standards regarding range ventilation

February 2, 2004 7:45 A.M. Email from Bill Provencher to Foraker regarding the range ventilation system, smoke test and air flow readings on the range and travel expenses of $1,200.00.

February 2, 2004 9:20 A.M. Email from Lt. Ralph Davis to FTU members re: state police firing range hygiene recommendations.

February 3, 2004 12:58 P.M. Email from Foraker to Fay Veal in Fiscal referencing funds for air quality testing and surface sampling.

February 3, 2004 3:30 P.M. Email from Cpl. Price to Foraker requesting a medical evaluation due to the exposure to contaminants at the range.

February 3, 2004 – Chain of custody of Environmental Solutions swipe surface sample swab tests at DSP FTU

February 4, 2004 – Bill Provencher from Carey's Heating arrived to conduct a survey of the range ventilation system.

February 4, 2004 7:08 P.M. Email from Foraker to Capt. Warren re: safety and range maintenance concerns, rejustification for having a 5th full-time FTU instructor.

February 6, 2004 3:02 P.M. Email from Foraker to Lisa McNatt in DSP Human Resources Dept. requested copies of the lab reports for FTU personnel from the lead and copper level testing

February 9, 2004 12:04 A.M.  Email from Foraker to Captain Greg Warren re:  FTU Facilities Mgmt. Responsibilities Analysis Report prepared by Foraker for meeting scheduled for February 10th with Lt. Col. MacLeish.

February 9, 2004    Responsibility Status Analysis prepared by Foraker as ordered by Lt. Col. MacLeish

February 9, 2004 11:45 A.M. Email from Bill Provencher, Carey's Heating and Air Conditioning regarding the range ventilation, i.e., range standards and preliminary suggestions for correcting the ventilation problems (Bill Proventure is the U.S. Naval standard that is used when building ranges)

February 9, 2004 4:46 P.M. Email from Foraker to Capt. Greg Warren re:  range ventilation survey letter from Bill Provencher of Careys Heating and Air Conditioning.  Attached to email is copy of Provencher survey letter for repairs/modifications to the range.

13

February 10, 2004 10:21 AM Email from Lori Gooch in Procurement to Foraker regarding RWO for Environmental Solutions approved.

February 11, 2004    Analytical Report from Mid-Atlantic Environmental Laboratories referencing the samples taken from the range (copies attached to the February 3, 2004 copy of the Chain of Custody report)

February 11, 2004 12:09 P.M. Email from Kristy Tuxward to Foraker referencing Bruce Peachey's blood level lab results from the FTU.

February 11, 2004 1:59 Email from Cpl. Warwick to Foraker regarding Randy Jackson of the U.S. Navy. He said he would absolutely choose Bill Provencher from Carey's.

February 11, 2004    SORT came to shoot. Foraker previously arranged with Sgt. Parton to have all SORT members shoot on the range but only 10 arrived. So there had to be only 8-9 shooters actually shooting. This shoot was to coincide with the air testing that was being conducted by Environmental Solutions. This shoot was supposed to simulate a full in-service day.

February 12, 2004 – Chronology of events that transpired on this day prepared by Cpl. Warwick regarding Environmental Solutions and other issues: performing smoke tests, underground tank alarm, a primary heating and cooling line on the roof was leaking water, SORT began shooting (8 team members), someone named Chris asked about drums outside the building, blueprints of the building were provided to Mr. Arthur Neilson an industrial hygienist with Nielson Associates)
Note Wayne Warren's hand written notes regarding same.

Meeting with Art Neilson, Industrial Hygienist. Mr. Neilson advised the air handler was not working correctly. More air was coming from the middle ducts instead of the front and rear. We were being exposed to unhealthy air which is a severe liability. As an occupational exposure to it is to much. "If that was one of my ranges, I would shut you down". Captain Warren advised that a comment was made by a Facilities Mgmt. employee, "It is expected that State employees will be exposed to hazardous materials. Asked if the noise level had been tested, answer given,"No". Art Neilson said that "range officers should not perform maintenance". He also said that the problems with the range were not a hygiene issue...they were mechanical issues.

February 13, 2004 9:12 A.M. Email from Cpl/3 James Warwick to Foraker re: his February 2, 2004 Chronology of Events with Environmental Solutions. Please note that Cpl/ Warwick put the wrong date on his memo. It should have read February 12, 2004, not February 2, 2004.

February 16, 2004 11:51 A.M. Email from Al Parton to Foraker the names of the SORT shooters that were on the range on February 11, 2004

February 16, 2004 11:52 A.M. Email from Foraker to Schwartzkopf re: price of his duty Sig Sauer.

February 16, 2004 7:21 P.M. Email from Foraker to Capt. Greg Warren, Lt. Ralph Davis re: 2004 Shot Show Report and Results

14

February 16, 2004 8:28 P.M. Email from Foraker to Capt. Warren and Lt. Davis referencing scheduling meetings for various issues relating to the range.

February 18, 2004 – Scheduled tour to the new FBI Firearms Training Facility in Quantico, VA.

February 18, 2004 4:31 P.M. Email from Bill Alexander (DSP Academy) to all DSP personnel re: **Firearms Qualification Cancellation CLOSURE OF DSP FIREARMS FACILITY.** This decision was made due to the prevalent situations at our FTU.

February 19, 2004 10:51  Email from Foraker to Major Paul Eckrich re: scheduled meeting with:  FBI Firearms Training Facility in Quantico, VA, Joe Ferrell of Environmental Solutions Group, Carey's Ventilation and Action Target.  Foraker goes on to say he is overwhelmed with concern for the health and safety of his staff and their families.

February 19, 2004 11:35 Email from Schwartzkopf to Foraker re: duty Sig Sauer pistol.

February 19, 2004 3:02 P.M. Email from Foraker to Major Paul Eckrich, Capt. Greg Warren, Lt. Ralph Davis re: February 24, 2004 meeting with Joe Ferrell of Environmental Solutions.

February 19, 2004 3:02 P.M. Email from Foraker to Major Eckrich, Capt. Greg Warren and Lt. Ralph Davis re:  scheduling meeting with Joe Ferrell of Environmental Solutions on February 24, 2004.

February 20, 2004 12:28 P.M. Email from Foraker to Major Paul Eckrich *(see second to the last paragraph which reflects Foraker's concern over range contaminating the FTU instructors)*

February 20, 2004  Letter from Bill Provencher of Carey's Heating and Air Conditioning referencing repair and upgrade of the ventilation for the range

February 21, 2004 5:47 P.M. Email from Bill Provencher of Carey's Heating and Air Conditioning re: proposal for the FTU project with full explanations for each task.

February 21, 2004 7:21 P.M. Email from Foraker to Capt. Greg Warren, Lt. Ralph Davis re: 2004 Shot Report and Results.  Major Eckrich ultimately said that Foraker, "did not convince him enough to purchase new weapons" for the older weapons that are at the end of life expectancy.

February 23, 2004 10:25 A.M. Email from Lt. Ralph Davis to Foraker re: FTU firearms instructor announcement division-wide.

February 23, 2004 1:05 P.M. Email from Foraker to Lt. Ralph Davis re: FTU staffing.  "I will work on that tomorrow morning and send it to the Captain and cc you."

February 22, 2004 – Analytical reports from Mid-Atlantic Environmental Laboratories, Inc. regarding swab tests completed at the DSP FTU

February 24, 2004 11:30 A.M. Email from Foraker to Capt. Warren, cc'd to Lt. Davis.  Request for an open firearms instructor position at the FTU

15

February 24, 2004 4:56 P.M. Email from Foraker to Mark DeVore, Chief Engineer, Facilities Management, cc'd to Major Paul Eckrich, Capt Warren, Lt. Davis, Doyle Tiller regarding the air quality/surface sample testing results meeting scheduled for February 25, 2004. The purpose of the meeting is the presentation of the test results of the air quality and surface sampling. Joe Farrell of Environmentsl Solutions Group as well as Industrial Hygienst Arthur Neilson will present the findings of the tests. Art Neilson put his credentials on the table and stated, "If you were a federal facility, I would shut you down".

February 24, 2004 6:12 P.M. Email from Foraker to Major Joe Papili, cc'd to Major Eckrich and Lt. John Evans re: in-car gun vaults, SUV-type vehicles for FTU personnel, call-out SOP. Major Eckrich requested for Foraker to contact Major Papili to solicit his opinion and input on these matters.

February 24, 2004 Permits computer screen copy of the non existent certificate of occupancy provided by Tracy, per Wayne Warren.

February 25, 2004 – Joe Ferrell of Environmental Solutions Group and the certified industrial hygienist who conducted and supervised the testing and sampling at the range presented the results of the air quality testing and surface sampling that had been completed.

February 25, 2004 – Carey's Ventilation and Action Target make presentation that included the installation of both the ventilation system and the Total Containment Trap. After Bill Provencher and John Curtis excused after their presentation, Mark DeVore stated, "Carey's proposed changes would be a large improvement, dramatic positive change. Yes. Safer, better range dramatic and big improvement. But I am not prepared to say the range is unsafe. This being said, after Bill Provencher said the ceiling in the range is a significant danger and that the air currents in the respiratory zone are extremely turbulent". Capt. Greg Warren stated, "Test results conclude the range is over NIOSH standards for lead and copper. It is going to require a hazardous clean. It is a significant liability as an occupational hazard. It was built ass-backwards. Department of Health should be notified." MacLeish made the comment during this meeting, "Just like if you work in artillery in the military. You work at a range. You would expect to have high lead levels and hearing loss." Identified that due to the steel trap plates being welded, they have lost their steel ballistic integrity". (Attendees at the meeting were: Capt. Greg Warren, Foraker, Wayne Warren, Price, DeVore, Tiller, Executive Staff members – MacLeish, Eckrich).

February 25, 2004 1320 hours. Wayne Warren's notes re: meeting with Bill Provencher and John Curtis. Mark DeVore from Facilities Mgmt. was there. Wayne Warren asked if a decibel level test had ever been done and he said, "No". Mark Devore, State Engineer, stated that there seems to be more of a problem in the winter time. How do you get around the noise issue? DeVore stated, "It sounds to me like there has been a lot of changes in the industry in the last 5 years".

February 26, 2004 Notes prepared by Cpl. Warwick re: FLETC visit

February 26, 2004 3:45 P.M. Email from John Dunham, Construction Project manager, Division of Facilities Management re: firing range exhaust hood in gun cleaning room.

16

February 27, 2004 9:36 A.M. Email from Lt. Ralph Davis to Foraker RE:  ISHN Newsletter, Your Source for Safety, Health & Environmental Solutions.  Lt. Davis says that maybe we should subscribe to the cure for the HAZMAT headache!

February 27, 2004    RWO for Environmental Solutions to complete various surfaces tests

February 27, 2004    Purchase Order for Environmental Solutions to obtain and collect surface samples for analysis from various surfaces and locations at the FTU

February 27, 2004 3:26 P.M. Email from Foraker to Capt. Warren and Lt. Davis re: Foraker contacting Clark Nexsen to obtain copies of the cost and analysis of the needed repairs to the range and contacted Environmental Solutions to obtain a price quote on surface sampling of the remaining areas in the FTU facility and the next available date to conduct the testing.

February 27, 2004 3:54 P.M. Email and attachment– Cpl. Warwick's notes referencing the visit to FLETC

February 29, 2004    2:28 P.M. Email from Major Eckrich to Foraker re: meeting to discuss the FTU issues of concern.

February, 2004    A collective accounting of the overtime by FTU members due to inappropriate assignment of a fifth full time instructor.  Total OT hours is 523.5.

FTU Members O.T. cumulative hours 523.5.

March/April 2004    Foraker's Priority List for the FTU and Outdoor Range Considerations

March 2, 2004    Note Wayne Warren's hand written notes re:  comments made to Capt. Warren by Lt. Col. MacLeish:  "They should expect hearing loss working at the range".  Capt. Warren asked about having hearing test.  MacLeish responded, "I am not sure.  They are expected to incur some hearing loss".

March 2, 2004    Foraker's palm pilot notes re: Meeting at 9:15 with Capt. Greg Warren at FTU.  MacLeish wants an independent entity with no vested interest, no contractors, to evaluate the range issues.  Call Eckrich to verify funding for this independent opinion.  MacLeish stated regarding hearing loss, *"It is to be expected.  They work at a range"* This shows reckless indifference to his employees.

March 2, 2004 8:14 A.M. Email from Foraker to Capt. Warren and Lt. Davis re:  surface sampling being performed by Environmental Solutions at the FTU that day.

March 2, 2004 10:28 P.M. Email from Bill Carrow to Foraker referencing possible refurbishing of range instructor headsets.  The FTU's headsets were never repaired/refurbished.  Foraker was attempting for 3 months to have the headsets refurbished per Lt. Col. MacLeish's directive.

March 3, 2004 12:37 P.M. Email from Foraker to Bill Carrow to schedule a meeting when Bill can come to examine the FTU range instructors headsets.

17

March 4, 2004  Memo from Captain Albert J. Homiak, Planning Section of the D.S.P. to Lt. Col. MacLeish referencing research he conducted specific range's across the country and how they address range staffing, blood tests, range clothing, routine range maintenance, scheduled maintenance and removal of lead and other toxins. Specifically, he noted that *"in all cases, someone other than range personnel handle scheduled maintenance and removal of lead and other toxins"*.

March 4, 2004 11:25 A.M. Email from Foraker to Bill Metcalf, Manager of FLETC to solicit an independent, unbiased consultation for diagnosis of the causes of the numerous, existing problems that plague the FTU Facility and to provide a prognosis to remedy those problems.

March 4, 2004  Foraker palm pilot notes:  Meeting at Academy with Facilities Mgmt.  MacLeish referred to the range as a hazardous location.  Mark DeVore said weight was not an issue concerning AR baffles roof sag was engineering flaw.  Get SOP from FLETC.  MCI funds to pay for.  DSP cleaning SOP for Range.  We would need a Capital Request.  Baffled ceiling, building cleaning, carpet removal.  30K to clean back of bullet trap & range diffusers.  Just cleaned, didn't' test afterwards.  They said ventilation is DSP's problem.  Contractual.  Bob – answers still not good enough to get 2.2 M $ fix.  Contact Doyle Tiller with FLETC, Chaletnham, MD inf.  Next meeting March 18th.

March 4, 2004 6:40 Foraker's palm pilot notes:  Bill Metcalf from Dept. of Homeland Security.  Tom Winborne from Clark Nexsen – back wall radial diffuser, JAED engineer.  Meeting with Facilities Mgt.  Serious health & safety concerns for our personnel, hazardous site, MacLeish.  DeVore – roof sag was engineering flaw.  Get standard operating procedures for FL.

March 5, 2004 10:07 A.M. Email from Lt. Ralph Davis to Foraker.  *"Thanks again for all of your work on the range repairs"*.

March 5, 2004 11:08 A.M. Email from Foraker to John Dunham, Construction Project Manager, Division of Facilities Mgmt. – re: shelving

March 5, 2004 2:43 P.M. Email from Foraker to Cpl. Warren and Cpl. Price re: Bill Carrow coming to the FTU to examine the instructor headsets.

March 6, 2004 4:16 P.M.Email from Bill Metcalf to Foraker re: independent range consultation He states *"I'm trying to overcome what I consider to be unduly restrictive limitations being placed on my ability to provide you independent outside consultation.  Regardless, I hope to provide you assistance either independently or through my employer"*.

March 12, 2004 – Memorandum from Captain John A. Yeomans, Director of Human Resources to Lt. Col. Thomas F. MacLeish re:  Indoor Firing Range Blood Level Study Specifically, he indicated that Dr. Schwartz, a recognized expert in the field of adult blood lead levels at Johns Hopkins Bloomburg School of Public Health, that he recommended that his concerns about the cumulative effect of blood lead levels is that agencies should strive to maintain an mcg/dl reading of less than 10.  He recommended that the DSP strive to keep the blood lead levels at less then 10 and also to be vigorous in our approach to hygiene at the indoor range.

18

March 15, 2004 1:51 P.M. Email from Lt. Davis to Doyle Tiller, cc'd Capt. Warren, Foraker, MacLeish, DeVore re: attempting to schedule follow-up meeting regarding issues currently existing at the range and potential solutions.

March 15, 1004 4:08 P.M. Email from Doyle Tiller to Lt. Ralph Davis re: rescheduling the meeting to discuss the air quality problems at the FTU.

March 16, 2004        Foraker's palm pilot notes re: Clark Nexson #1, JAED #9 in bid process for FTU construction.  Building was surveyed incorrectly.  Trane' unit was heavier than anticipated.  As a result, the ceiling had to be jacked up with a support beam, ballistic baffling not installed, bullet proof doors not installed, no female restroom facilities, no sprinkler system.  FTU members helped to install the bullet trap by welding the steel panels for the bullet trap, no certificate of occupancy.  In November of 1998, instructors began blowing a dark substance from their noses realizing that there was an air handling problem.  Our guys (DSP) helped install the bullet trap – welding was performed on the steel – we have since learned that welding weakens the molecular structure and integrity of the steel panels.  Certificate of Ocupancy was not issued – we have not discovered it yet.  Shooting began in September of 1998.  Special opening with FBI National Academy Shoot.  In November of 1998 (2 mo's after opening) instructors began blowing a dark substance from their noses – realizing there was air handling problems.

March 16, 2004 8:39 A.M. Email from Foraker to Doyle Tiller, cc'd Capt. Warren, Lt. Davis re: FLETC Facility Contact information to possibly schedule a tour of their facility

March 16, 2004 1:20 P.M. Email from Capt. Warren to Lt. Col. MacLeish, Lt. Davis and Sgt. Foraker referencing various issues:  Clark Nexon report of 1999 that sums up that their assessment of the project are **pretty damning**.  FLETC quote for consultation on the range, *Environmental Solutions advised that the entire range tested positive for lead, including the carpeting, air vents, etc.* Captain Warren states that he is making the decision to move all FTU full time instructors to the academy due to the findings from Environmental Solutions.

March 16, 2004 3:22 P.M. Email from Lt. Davis to Doyle Tiller re: follow up meeting regarding the range.  Lt. Col. MacLeish decided to meet with DSP internally.  Captain Warren decides to move the FTU members to the Academy based on the contamination and unfit for occupancy condition of the range in Smyrna.

March 17, 2004 – Letter from Foraker to Bill Metcalf re: expert independent and unbiased opinions in the consideration of refurbishment and repair of failed systems of the indoor firearms training facility.  This is supposed to be seeking expert "independent and unbiased opinions" in the consideration of refurbishment and repair of failed systems of the indoor firearms training facility.

March 17, 2004        1020 hours.  Handwritten notes of Wayne Warren re: meeting at the museum to discuss:  study of lead levels, decision not to do maintenance, dust contaminants started to increase, MacLeish said that what brought us to this point was the lack of maintenance, "If you are in the artillery Division of the military, you have to expect hearing loss", he said to meet every two weeks.

19

March 17, 2004          Range meeting with Lt. Col. MacLeish at the DSP Museum.  Capt. Greg Warren, Lt. Ralph Davis, Major Eckrich, Capt. Yeomans, Gene Sharp and FTU Range Staff were present at that meeting.
Lt. Col. MacLeish SOP's for cleaning the range.  I advised Capt. Warren that should be left to experts in HAZMAT abatement.  I am not qualified to put this together.  He said MacLeish want it.  Just do it the best you can.

March 17, 2004 3:31 P.M. Email from Foraker to Bill Metcalf re: independent range consultation.

March 17, 2004 4:29 P.M. Email from Foraker to Capt. Warren and Lt. Davis, cc'd to Cpl. Warren, Cpl. Price and Cpl. Warwick notifying them of the request for written correspondence from Bill Metcalf, Mancore Remediation, _report from Environmental Solutions Group to vacate the facility immediately._

March 17, 2004 5:22 P.M. Email from Foraker to Doyle Tiller requesting necessary training and equipment to qualify the FTU in the safe and proper operation of the suits and masks, receive proper training to clean the range properly, maintain the hepa vacuum and floor scrubber properly as well.  SOP for the safe and healthy method of cleaning the range of its heavy metal contaminates.

March 18, 2004 7:56 A.M. Email from Doyle Tiller to Foraker _regarding wearing Tyvek suits at the range.  Tiller indicated that "you cannot put respirators on your staff unless you have a respirator plan and are medically cleared to wear one.  You can wear a N95 disposable mask (minimal protection) because it is not considered a respirator.  We can sit down and go over this if you like.  A lead course offered by the Central Delaware Training Academy (CDTA) 302-677-1534 would show you the basic stuff including the HEPA vac.  But the Zamboni, we should call the manufacture on the machine for operation and maintenance schedules on it"._

March 18, 2004 11:21 A.M. from Foraker to Major Eckrich, cc'd Capt. Warren and Lt. Davis regarding a price quote from Bill Metcalf to give an independent range consultation

March 18, 2004 3:00 P.M. Clark Nexsen report meeting.  Doyle Tiller had amnesia.

March 18, 2004          Foraker's notes:  Mark Sakley from Trane started installing an up to date computer for the air handler system.  We were not told why a new computer had to be installed.

March 19, 2004 3:55 P.M. Email from Cpl. Warwick to Doyle Tiller regarding the names and SS #'s of the individuals who will be visiting FLETC facility

March 19, 2004 5:36 P.M. Email from Bill Carrow to Foraker regarding scheduling the meeting to look at the instructor headsets

March 20, 2004          Delaware State News article re:  Range targeted for closing: Health concerns shut Smyrna site.

March 21, 2004          12:05 A.M. Email from Bill Carrow to Foraker re: range instructor headsets.
_"Opps – just read the paper and see the facility is closed.  Maybe you and I can meet at my office at DEMA and go over any literature you have on the headsets_

20

*and system in general"*.  (this is the guy that was recommended by Lt. Col. MacLeish to repair/refurbish the headsets used at the indoor range.  It took 3 months to respond).

March 22, 2004 9:49 A.M. Email from Foraker to Lt. Ralph Davis re: Schwartzkopf's handgun and magazines.

March 22, 2004 9:50 A.M. Email from Lt. Ralph Davis to Foraker re: Schwartzkopf's handgun and magazines.

March 22, 2004    Wayne Warren's handwritten notes re:  Wesley Morrison of Harvard Environmental.  He advised that Doyle Tiller of Facilities Mgmt. to go to conduct testing and inspect the range.  Mr. Morrison had a set of plans with him that were not accurate.  Wayne advised him that he would give him a tour of the range.  During the tour, he made the comment that the range was too large for the FTU members to clean.  He also looked in the janitors closet and stated we did not have the correct cleaning solution to mop the floors (trisodium phosphate).  Also see Wayne's typed indoor range hygiene note.

March 23, 2004    Foraker's palm pilot notes re: Stephen Coady Project Manager of Marcor Envirnmental cell (410) 251-3256, office (410) 742-6161 came to range to provide price quote to Doyle Tiller.  Mr. Coady stated that carpet is the worst thing to have in this facility and to vaccum the carpet is even worse.  He also stated that Doyle was previously employed by BATTA as an industrial hygieniest.

March 23, 2004 9:53 A.M. Email from Cpl. Warwick to Doyle Tiller requesting head counts and SS #'s of those individuals that will touring the FLETC facility.

March 23, 2004 10:28 A.M. Email from Sgt. Al Parton to Foraker re: news article in the paper

March 23, 2004 3:23 P.M. Email from Foraker to Lt. Col. MacLeish indicating that Tom Eldred from the Delaware State News called and asked Foraker for an interview regarding the hazards at the DSP FTU.  Foraker asked for permission to answer Mr. Eldred's questions.  Also, Bill Provencher did not overlook billing the DSP for his $1,200.00 air quality testing, belgrade equipment….

March 23, 2004 4:04 P.M. Email from Warwick to Doyle Tiller re: list of people going to the FLETC Facility in Cheltenham, MD.  Ironically, Ed Ide from JAED Corp is also on the list to attend.

March 24, 2004    Meeting with Chaffinch, MacLeish, Mills, Ford, Tiller, Furman, Eckrich, Homer.  Forakers palm pilot notes.

March 24, 2004 8:08 A.M. Email from Doyle Tiller to Cpl. Warwick indicating the names and SS #"s of the individuals who would be touring the FLETC facility.  Interestingly, Ed Ide, Project Engineer for JAED, the facility that completed the design work for the firearms training unit, accompanied the group.

March 24, 2004 10:57 A.M. Email from Foraker to Sgt. Al Parton re: news article

21

March 24, 2004 11:40 A.M. Email from Lt. Col. MacLeish to Foraker with specific direction relating to Foraker talking to the media indicating "I or whom I designate will be the only source of any information concerning the range"

March 24, 2004 11:41 A.M. Email from Sgt. Al Parton to Foraker re: newspaper article re: bullet trap, copper dust, ventilation system. "…The trap shut down for lack of proper maintenance, sump pumps that were too powerful and other reasons neither of us had anything to do with, all of which was recent…"

March 24, 2004 3:44 P.M. Email from Cpl/ Jim Warwick to George re: indoor range cleaning.

March 25, 2004        Delaware State News article re:  Range plan missed Mark? : Troopers question choice of design firm.

March 25, 2004        DSN – Tom Eldred – Smyrna range under fire from start

March 25, 2004        The News Journal Opinion Section re: Sick Building: Police firing range needs total repair of bad construction.

March 25, 2004 8:39 A.M. Email from Cpl. Warwick to Doyle Tiller regarding confirmation of travel to FLETC by Facilities Management personnel

March 25, 2004        Harvard Environmental Chain of Custody Report for swipe samples

March 26, 2004        Wayne Warren's handwritten notes re: Lt. Col. MacLeish wants FTU to provide him with MSDS on all of the ammunition used by the DSP.

March 26, 2004 9:16 A.M. Email from Foraker to Mark DeVore of Facilities Management indicating that Foraker hand delivered the MSDS sheets on the bean bag cartridge along with a CD and information package on Action Target bullet traps.

March 26, 2004 10:00 A.M. Foraker dropped off bean bag less-lethal MSDA sheets, Action Target info. Packet & CD to Mark DeVore of F.M. at the Thomas Collings building, Dover.

March 26, 2004 4:15 P.M. Lt. Col MacLeish stopped at Academy ordered Foraker to provide him with MSDS sheets on all ammo we shoot by Monday morning.

March 26, 2004 4:25 P.M. Email from Foraker to Major Paul Eckrich re: vehicle necessities

March 29, 2004        1st Report of Injury for Foraker completed by Lt. Ralph Davis.

March 29, 2004 8:54 A.M. Email from Foraker to Ernest Durham, Engineer with CCI Spear. ammo. provider re: MSDS sheets for non-toxic ammo.

March 29, 2004 11:03 A.M. Email from Cpl. Wayne Warren to Capt. Greg Warren and Capt. John Yeomans re: hearing analysis questionnaire.

March 29, 2004 11:54 A.M. Email from Foraker to Ernest Durham requesting MSDA for Non-Toxic Ammunition.

22

March 29, 2004 1:28 P.M. Email from Ernest Durham, Engineer with CCI Speer to Foraker re:  MSDS sheets.

March 29, 2004 2:05 P.M. Email from Foraker to MacLeish regarding ammunition MSDS info.

March 29, 2004 2:32 P.M. Email from Cpl. Warren to Foraker requesting a copy of the Harvard Environmental evaluation.

March 29, 2004 2:55 P.M. Email from Cpl. Warren to Foraker regarding Federal Cartridge MSDS sheets

March 29, 2004 3:14 P.M. Email from Foraker to MacLeish regarding sending him the MSDS sheets as well as information regarding *New Jersey State Police range that was completed by Savage Range Company and was closed down due to ventilation complications.*

March 29, 2004 3:40 P.M. Email from Wayne Warren to Sgt. Vincent Fiscella, DSTA President re: PMA Workmans Comp. Claim being denied.

March 29, 2004 3:48 P.M. Email from Cpl. Warren to Foraker requesting copies of the Harvard Environmental tests performed at the DSP FTU.

March 29, 2004          Foraker palm pilot notes.  FTU Staff meeting with Capt. Warren, Lt. Alexander re: FTU issues – staffing, 10 hr. day training schedule, all ammo. MSDS sheets for MacLeish, 4 day work week – 10 hrs days – 20 shooters/CPR, 80 shooters per week, 8 weeks for in-service shoot. Email MacLeish, No change in schedule, explain manpower effectively & safety, Zook, equipment outter wear, audio system, in-car weapons vaults, noise abatement decible testing.

March 29, 2004          MacLeish had Liz Seay call Foraker for MSDS sheets.  Foraker took what sheet he had over to him.  MacLeish requested that Foraker email him in the next 20 mins. With the information on the ammunition Foraker had not received MSDS sheets.

March 30, 2004 – Letter from Susan Engle, Territory Manager, Mid Atlantic States for Action Target to Foraker re: range maintenance packages

March 30, 2004 11:31 A.M. Email from Cpl. Kurt Price to Foraker and Sgt. Bill Alexander re:  ammo utilization on DE National Guard Range.

March 30, 2004 1:51 P.M. Email from MacLeish to Foraker responding about the MSDS sheets and the New Jersey State Police range being shut down.

March 30, 2004 4:06 P.M. Email from Foraker to MacLeish requesting permission to grant an interview to Mary Allen of The News Journal per her request

March 30, 2004 5:12 P.M. Email from MacLeish to Foraker regarding the press release interviews by Foraker, answer "No".

March 31, 2004 – Document prepared by the FTU Staff referencing Indoor Range Maintenance and Service Report submitted to MacLeish

23

A254

March 31, 2004 2:17 P.M. Email from Foraker to MacLeish referencing a copy of the Indoor Range Maintenance and Service Report

April, 2004                Compliance Environmental – Current Listing of Ammunition Used at the FTU Facility

April 2, 2004              Letter from Wayne Warren to Willard Preston, Delaware State Fire Marshal requesting copies of letters from June 20, 1995 and June 26, 1995 that originated by Ed Ide, Project Manager of JAED Corp.

April 2, 2004 9:58 A.M. and 10:23 A.M. Email from Foraker to Fay Veal, cc'd Capt. Warren, Lt. Davis, MacLeish and Eckrich re: Savage Bullet Trap incurred maintenance costs to date

April 2, 2004 10:23 A.M. Email from Foraker to Fay Veal cc'd to Lt. Col. MacLeish, Major Paul Eckrich, Capt. Greg Warren, Lt.Ralph Davis re: Savage Bullet Trap incurred maintenance costs to date.

April 2, 2004 11:35 A.M. Email from Scott Bundek, Operations Support Officer, Kent County Department of Public Safety Emergency Communications to Foraker regarding their conversation about what information was on their computer referencing "special information".  Attachment indicates the changes Foraker told Bundek to add to the system.  Prior to these changes, there were no items in the special information section.  No sprinkler system/housing of ammunitions.

April 5, 2004 2:27 P.M. Email from Fay Veal to Foraker re: Savage Bullet Trap incurred maintenance costs to date.  She says she can only go back 2 years of records.

April 5, 2004 2:29 P.M. Email from William Kramer to Cpl. Warwick re: gunfire noise research

April 5, 2004 3:16 P.M. Email from Foraker to Fay Veal re: Savage Bullet Trap incurred maintenance costs to date.

April 5, 2004 4:16 P.M. Email from Warwick to Foraker re: Gunfire Noise Research from William L. Kramer, PhD/Impulse Noise Research.

April 6, 2004              Delaware State News article re: Firing range probe sought: Legislator wants House inquiry.

April 6, 2004              Chaffinch, MacLeish, Secretary Homer & Furman gave WBOC TV, State News and the News Journal a tour of the facility falsely claiming that the reason the facility was in the state it is was due to poor house keeping by the range supervisor, Sgt. Foraker and staff.

April 6, 2004              DSN – Tom Eldred – firing range probe sought
                           Legislator wants House Inquiry

April 6, 2004              WBOC TV16 broadcast stating that the closing of the range could have very easily been prevented if proper house keeping had been done by the staff.

24

April 6, 2004 3:40 P.M. Email from Cpl. Wayne Warren to Major Paul Eckrich re: range questions. See attachment for questions.

April 7, 2004              Forakers palm pilot notes re: meeting with Carl Danberg, Eckrich, Veal re: vests

April 7, 2004              State News Article Col. Chaffich blames Foraker for condition of the range "Sgt. Foraker didn't feel cleaning was part of his purview. ..he felt cleaning put him in harms way…he was only concerned about training and teaching people how to shoot." Etc….

April 7, 2004 3:45 P.M. Email from Foraker to MacLeish, Eckrich, Chaffinch, cc'd to Capt Warren, Lt. Davis, Gene Sharp re: costs for equipping National Guard Range and FTU Staff Attached is a copy of the outdoor range equipment & considerations for the 2004 Spring Shoot at the National Guard Range.

April 8, 2004 11:00 A.M. Email from Fay Veal to Foraker re: Savage Bullet Trap incurred maintenance costs to date.  Some maintenance is dated back to 1999 through 2004.

April 8, 2004              Foraker's palm pilot notes:  Foraker received calls from Eckrich regarding MSDA info on ammo.  Foraker explained all had already been provided to MacLeish. Then Foraker received numerous calls from Gene Sharp regarding MSDS sheets and the model name of the Action Target bullet trap.  He said the request was coming from Gloria Homer.  Foraker again explained he had provided same to MacLeish and provided bean bag MSDA and Action Target CD info packet to Mark DeVore.

April 9, 2004              The News Journal Opinion Section re: range contamination.   Their opinion is to get the sick building fixed.

April 13, 2004            Delaware State News article re:  Firing range probe sought: House speaker, Terry Spence wants inquiry.

April 13, 2004 12:35 P.M. Email from Val De Rocili@compliancecan help.com to Gloria Homer and Bob Furman re: DSP Firing Range Ammunition Listing

April 13, 2004 1:07 P.M. Email from Gloria Homer to Chaffinch re: DSP Firing Range Ammunition Listing

April 13, 2004 1:09 P.M. Email from Chaffinch to Gene Sharp, Eckrich, MacLeish re: DSP Firing range ammunition Listing.

April 13, 2004 12:29 Email from Gene Sharp to Foraker re: a series of emails that are attached referencing DSP Firing Range Ammunition Listing.  Val De Rocili from Compliance Environmental to Gloria Homer, Bob Furman and Chaffinch Foraker responded to Gene Sharp via telephone to confirm that the Total Containment Trap bullet trap with the collection bucket option.

April 13, 2004 4:57 Email from Major Paul Eckrich to Secretary Homer, cc'd to MacLeish, Chaffinch, Eugene Sharp, Neal Mills (DSHS) re: Response to Sec. Homer's First Set of Questions

25

April 13, 2004          Harvard Environmental Inspections, Testing and Sample Results of the DSP FTU –hired by the state to complete this data.

April 14, 2004 10:44 Email from Capt. Greg Warren to Major Paul Eckrich, no subject.  Contents of the memo are as follows:
I talked to Chris ref. our conversation last night.
1.  Action Target – total containment with dust collection system.
2.  Chris sent the entire set of MSDS sheets on each type of ammo. over to Tom MacLeish.
3.  Chris sent mark DeVore and Tom MacLeish the specs on the bean bag round in hard copy a couple of weeks ago.

April 14, 2004 1:13 P.M. Email from Major Paul Eckrich to Capt. Greg Warren re: historical construction information, equipment needs, etc.  Goes into detail about the change in him being present to all meetings for the FTU.  He says he cannot agree to oversee the money right now, due to past business practices.  He says that Chris Foraker has the authority to operate the Range, just as all past Range NCOIC's have.  If the Colonel would like to change that, just have him send me the orders in writing and I will be more than happy to attend future cost center meetings or any other duties that will assist the Delaware State Police in fulfilling its mission.

April 14, 2004          Fax'd letter from Capt. Greg Warren re: chronology of problems, issues and concerns referencing the DSP Firearms Training Facility.

April 15, 2004 2:39 P.M. Email from Gene Sharp to Capt. Warren and Foraker, cc'd to Eckrich, MacLeish and Chaffinch re: how many rounds per year fired at the FTU.

April 15, 2004          Forakers palm pilot notes re: Tom Faison from Facilities Mgmt. requested to speak to me outside of the FTU and stated that Bell, Tiller, Davore, Homer are all blaming range issues on Foraker for not cleaning.  Wess from Harvard Environmental is in with Facilities management to lay blame on Foraker.  Homer set up meeting with WBOC.  Bell told Faison not to tell Foraker about WBOC.

April 15, 2004          The News Journal/Local news Section of website:  Firing range tests find high lead levels

April 17, 2004          State News Article Rep. Oberle states "I was really miffed when I read that the Colonel apparently wants to point fingers at some of his own people. That's extremely troubling to me. A personal attack on the individuals who managed the facility was uncalled for. I would hope the colonel would rise above that."

April 18, 2004          The News Journal article re: Delaware State Police is broken.  Article also speaks about Rep. Oberle saying that he was, "Miffed when he read that the colonel apparently wants to point fingers at some of his own people.  That's extremely troubling to me.  A personal attack on the individuals who managed that facility was uncalled for.  I would hope that the colonel would rise above that".

26

April 19, 2004 11:47 A.M. Email from Capt. Greg Warren to Foraker re: series of emails particularly Val DeRocili of ComplianceCanHelp.com stated that the bullet trap and range system must be compatible with the ammo. used.

April 19, 2004 1:59 P.M. Email from Foraker to Capt. Warren cc'd Lt. Davis, Cpl. Warren, Cpl. Price Cpl. Warwick re:  2 additional FTU instructors and FTU vehicles.

April 19, 2004 2:00 P.M. Email from Wayne Warren to Foraker re: agencies that have shot on the indoor range.

April 19, 2004 2:09 P.M. Email referencing the agencies that have shot at the DSP indoor firing range from 1998 through 2004.

April 19, 2004 3:23 P.M. Email from Foraker to Gene Sharp re: DSP Firing Range Ammunition Listing used at the range.

April 19, 2004 3:51 P.M. Email from Capt. Greg Warren to Major Paul Eckrich, Col. Chaffinch and Lt. Col. MacLeish re: numerous FTU issues.

April 21, 2004 1:20 P.M. Email from Warwick to Capt. Greg Warren re: NIOSH

April 20, 2004 1:52 P.M. Email from Foraker to Jocelyn Nubbard of Sonomax Hearing Healthcare regarding hearing protectors

April 20, 2004          Wayne Warren's handwritten notes re: article was very embarrassing due to a lot of finger pointing at the FTU members.  NIOSH contacted Jim Warwick and advised Jim that Doyle Tiller has contacted them and stated, "because of political reasons, he couldn't allow them to conduct decibel level and air quality testing".

April 20, 2004          Jim Warwick received a call from Dr. Randy Tubbs, Psycho Acoustician for NIOSH.  He advised Jim that Doyle Tiller had just called him and said that a "political block" is now preventing him from allowing NIOSH to come in and conduct testing on the air handling system.  He said Mr. Tiller told him that the state police could give NIOSH permission to come in and conduct testing, however, he could not due to politics.  Mr. Tubbs also asked me if I was still interested in having NIOSH conduct noise research at the range.  I told Mr. Tubbs that I would contact my captain and someone would get back to him.

April 20, 2004 1:52 P.M. Email from Jocelyn Hubbard rowcliffe, Sonomax Hearing Healthcare re: Sonomax Hearing Protectors

April 21, 2004          Delaware State News article re: Minner asks auditor to probe police range.  Rep. Bill Oberle states that the facility had experienced numerous problems for years because of significant design flaws.

April 21, 2004 12:20 P.M. Email from Cpl. Warwick to Capt. Warren re:  NIOSH (National Institute for Occupational Safety and Health).

April 21, 2004          Radio news WDEL broadcasts information about Gov. Minner requesting that State Auditor, Tom Wagner investigate the troubled state police firing range.

27

April 22, 2004            Foraker's palm pilot notes re: HQ conf. Room.  MacLeish, Eckrich, G. Warren, Furman.  MacLeish what is needed by Furman.  Provide a list of all agencies that shoot at the range.  Pre bid mtg. On Wed. 4-28 at the range.

April 22, 2004 12:14 P.M. Email from Foraker to Lt. Col. MacLeish re: FTU Manpower issues

April 22, 2004 8:30 A.M. meeting at the H.Q. Conference room with MacLeish, Furman, MacCluski, Eckrich, Sharp, G. Warren, Bell, Elliot, Tiller & Devore ref information Facilities Mgmt needing additional info,

April 22, 2004 12:14 P..M. Email from Foraker to MacLeish, cc'd to Capt. Warren and Lt. Davis re: FTU Manpower issues

April 22, 2004 12:34 P.M. Email from Kristy Tuxward to Foraker cc'd to Capt. Warren regarding my 1st report of injury documenting my hearing loss (PMA claim #W8904-22979)

April 23, 2004 8:38 A.M. Email from Foraker to Rob Kracyla, Don Boulerice, Tim Morris, Wayne Warren, Kurt Price and Jim Warwick re:  TAD Firearms Instructors

April 23, 2004 9:17 A.M. Email from Foraker to Capt. Warren and Lt. Davis, re: FTU vehicles, equipment and personnel.

April 23, 2004 11:33 A.M. Email from Foraker to MacLeish, cc'd Capt. Warren, Lt. Davis re:  FTU personnel issues i.e., TAD status of FTU personnel, cost of outfitting TAD instructors, vehicle issues, hearing protection.

April 23, 2004 1:25 P.M. Email from MacLeish to Foraker re: personnel issues

April 23, 2004            Foraker' palm pilot notes re: Bob Carlson called from the firemarshalls office.  He said that big hats – Troopers were in the office looking through their files.  It was Wayne Warren attempting to get the sprinkler waiver request from JAED and approval from fire marshall.  Bob Carlson told Foraker that when FTU roof collapsed, Carper waived revoking JAED's bond and the money to fix it came from the General Fund.

April 26, 2004 3:38 P.M. Email from John Yeomans to Capt. Warren re:  FTU hearing analysis questionnaire to be completed by FTU members.  But FTU members cannot complete the questionnaire because we do not know decibel level of firing within the range and other highly technical questions that we do not have the training or expertise to answer.

April 27, 2004 3:15 P.M. Email from Major Paul Eckrich to Bob Furman, Facilities Management re: DSP hours spent cleaning the DSP indoor firing range.

April 28, 2004            Email from Kurt Price to Foraker re: Lt. Col. MacLeish stating to Kurt that he is no longer allowed to be amongst live fire at the National Guard Range.

April 28, 2004            Bob Furman of Facilities Management stated we need a maintenance person full time at the range and we also need ballistic baffling.

28

A259

April 29, 2004 11:03 A.M. Email from Cpl. Wayne Warren to Capt. Greg Warren and Capt. John Yeomans re: hearing analysis questionnaire.

April 30, 2004          Someone from the Delaware State Fire Marshall's Office fax'd Cpl/ Wayne Warren documents relative to JAED Corp. and the sprinkler systems at the range during the engineering/construction phase.

April 30, 2004          Wayne Warren's handwritten notes re: Meeting at the FTU with Bob Furman of Facilities Management.  He stated that the FTU needs a maintenance person full time at the range.  He also said we need ballistic baffling.

May 3, 2004            Kurt Price and friends went to Sambo's in Leipsic, Smyrna, DE.  Newspaper article from Delaware State News dated April 7, 2004 referencing the range closing were all over every table in the popular restaurant.

May 4, 2004            Email from Wayne Warren to Major Eckrich: requesting that the division have the carpets in the homes of the FTU Staff members tested for lead, copper and zinc contamination since we have realized via the test results of the swipe surface sampling of areas previously thought to be safe now found to be highly contaminated with the toxic heavy metals.

May 4, 2004            Captain Warren came into the office and advised me that Capt. Yeomans really wanted us to fill out the questionnaire from Omega Medical.  Capt. Warren stated Capt. Yeomans advised lt. Col. MacLeish hasn't ordered us to fill it out at this point, however, if we don't comply, "He will probably blow up".

May 4, 2004            Chris and friends went to Sambo's to witness the newspapers from Delaware State News article dated April 7, 2004 on every table.

May 4, 2004 8:51 A.M. Email from Capt.Greg Warren to Capt. John Yeomans and Foraker.  The guys have advised me of two problems: 1. They do not have a baseline decibel reading test for the range, because there has never been one done, 2. They are afraid of what a doctor who has not actually examined them at all if going to say that could adversely impact their careers.

May 4, 2004 9:12 A.M. Email from Cpl. Kurt Price to Foraker re: his meeting with Lt. Col. MacLeish re: his light duty status

May 4, 2004 3:33 P.M. Email from Wayne Warren to Foraker re: results of air testing in the firearms training unit.  Very serious concerns about the Harvard Environmental report.

May 5, 2004 9:36 Email from Foraker to Capt. Greg Warren and Lt. Ralph Davis re: Wayne Warren's concerns about the Harvard Environmental report.

May 5, 2004 11:41 A.M. Email from Foraker to Cpl. Price re: Cpl. Price's meeting with Lt. Col. MacLeish referencing his light duty status.

May 5, 2004 11:56 A.M. Email from Foraker to Capt. Greg Warren and Lt. Ralph Davis re: Cpl. Price' meeting with Lt. Col. MacLeish referencing his light duty status.

29

May 5, 2004          Wayne Warren's handwritten notes re:  a discussion that was conducted at the
                     Academy with Captain Warren.  He advised FTU members that Capt. Yeomans
                     really wants us to fill out the questionnaire.  He asked Capt. Warren, "what do
                     they want?  Do they want to put in for retirement or do they want to be
                     transferred back to Patrol?"

                     Later that afternoon, Capt. Yeomans called Kurt and asked him if we were going
                     to fill out the questionnaire.  He then asked Kurt, "What do you and Wayne want?
                     Put in for retirement of transferred back to Patrol?

May 5, 2004 4:23 P.M. Email from Wesley Morrison of Harvard Environmental to Wayne Warren and
                     Doyle Tiller (DAS) re: firing range preparation for next phase of work.

May 6, 2004          State Auditors called to schedule an interview with FTU members.

May 7, 2004          Cpl. Wayne Warren met with Wesley Morrison of Harvard Environmental.  Notes
                     are referred to in an email dated May 14, 2004 11:11 A.M. from Cpl. Wayne
                     Warren to Major Paul Eckrich.

May 7, 2004 2:05 P.M. Email from Capt. Greg Warren to MacLeish, Yeomans, Foraker, Davis re:
                     meeting with Lt. Col. MacLeish.  "Gentlemen, I believe Kurt has some very
                     legitimate concerns regarding his future status, and even his current status as a
                     trooper for that matter.  If you can help clarify any of his questions I think that
                     would certainly help out?  Thank you. Greg.

May 7, 2004 2:18 P.M. Email from Capt. Greg Warren to Lt. Col. MacLeish, Foraker and Lt. Ralph
                     Davis re: his concurrence with the FTU's concerns about the hazardous
                     materials that they may be bringing into their homes.

May 10, 2004         Began Spring Shoot at the National Guard Range.

May 10, 2004 8:26 A.M. Email from Lt. Col. MacLeish to Capt. Greg Warren, Capt. John Yeomans,
                     Sgt. Foraker and Lt. Ralph Davis re: Price' meeting with MacLeish referencing
                     his light duty status.

May 11, 2004         Date of fax'd letter from Capt. Greg Warren to Mr. Thomas Wagner, State
                     Auditor.  Numerous problems, issues and concerns re: DSP firing range.

May 11, 2004         Letter from Harvard Environmental to Wayne Warren re: Front End Loading –
                     Phase II/Assets & Supplies Project management agenda.

May 11, 2004 2:20 P.M. Email from Lt. Col. MacLeish to Greg Warren, Foraker and Lt. Ralph Davis
                     re: the concerns of the FTU about the toxins they are bringing into their homes.
                     He said, *"We are looking into this and will be in touch with you and the firearms
                     training unit with an appropriate response in the near future.*

May 12, 2004         Statements and interviews with the State Auditors Office in Tom Neuberger's
                     Office.

30

May 13, 2004          Received letter dated May 13, 2004 from Lt. Col. MacLeish that Foraker is scheduled for a audiological fitness for duty exam. The scheduled medical appointment is May 24, 2004.  Attendance is mandatory.

May 13, 2004          Letter from Lt. Col. MacLeish to Wayne Warren re: audiological fitness for duty exam.

May 14, 2004          Delaware State News article re: four FTU troopers about health woes at the range.  *The article quotes again the statement that Col. Chaffinch faulted Foraker for the problems at the range.*

May 14, 2004 11:11 A.M. Email from Cpl. Wayne Warren to Major Paul Eckrich re: range supplies for clean up.  Cpl. Warren goes on to suggest that the cleaning personnel who routinely cleaned the facility prior to the closing that they be informed about their exposure.

May 16, 2004 9:46 A.M. Email from Cpl. Wayne Warren to Foraker re:  Omega questionnaire for hearing.  Especially question 3A regarding 8-hour time weighted average of the noise level and 3B is not really clear, don't understand, etc.

May 17, 2004 11:40 A.M. Email from Wayne Warren to major Paul Eckrich, Capt. Warren, Lt. Davis, Sgt. Foraker re: range issues/ storage containers

May 17, 2004 1:35 P.M. Email from Sgt. Foraker to Lt. Col. MacLeish informing that vacation will prevent me from complying with the May 24th appointment.

May 17, 2004 1:35 P.M. Email from Lt. Col. MacLeish to Sgt. Foraker stating that I will be notified of the new appointment date.

May 18, 2004          Letter from Lt. Col. MacLeish to Foraker re: rescheduled diagnostic testing exam at Omega Medical Center.

May 18 2004 1:01 P.M. Email from Capt. Greg Warren to Lt. Col. MacLeish and Capt. John Yeomans re: Cpl. Wayne Warrens concerns regarding the completion of the Omega questionnaire for hearing.

May 19, 2004 8:12 A.M. Email from Capt. John Yeomans to Cpl. Wayne Warren re: completion of the Omega questionnaire for hearing.

May 20, 2004          Received letter dated May 18, 2004 from Lt. Col. MacLeish stating my new mandatory Omega Medical appointment date will be Monday, June 7, 2004.

May 24, 2004          Email (no time) Jim Warwick attend a mandatory medical appt. at Omega Medical in Newark.

                      Spring Shoot re: all experienced instructors will be absent from the shoot.  Gross safety violation.

June 2004             American Police Beat, national publication.  FTU article "Contaminated shooting range shut down".  This publication is also circulated throughout Europe and

31

A262

some Asian countries per the Circulation Manager at American Police Beat.  Col. Chaffinch is quoted as retaliating against Foraker regarding the range.

June 3, 2004 1:53 P.M. Email from Cpl. Wayne Warren to Lt. Col. MacLeish and Capt. Yeomans re: an answer to his May 4, 2004 memo referencing the results of the air testing at the firing range.

June 3, 2004 2:51 Email from Wayne Warren to Capt. Greg Warren re:  addendum to the Harvard report.  He is requesting a copy of the addendum.

June 4, 2004 12:50 P.M. Email from Capt. Greg Warren to Cpl. Wayne Warren re: addendum to the Harvard report.  Capt. Warren indicates that he will forward Cpl. Warren's request to Major Eckrich.

June 4, 2004          Wayne Warren's handwritten notes re: meeting with Secretary Mitchell and Major Eckrich at the Smyrna range.  Secretary Mitchell advised he wanted everything documented for Workmans Comp. Claim.  He also wanted the metal exposure documented.  Secretary Mitchell advised Major Eckrich he wanted everyone taken care of who worked at the range.

June 7, 2004          0800 hours.  Wayne Warren's handwritten notes re: Visit by Governor Minner and Secretary Mitchell, Lt. Col. MacLeish and Mark Reinford to FTU in Smyrna.  Wayne gave everyone a tour of the facility and explained the problems encountered.  Gov. Minner made the comment behind the bullet trap that "someone didn't clean up after themselves".  Greg Patterson took his right index finger and wiped the top of the hose coming from the filter.  Gov. Minner then toured the classrooms.  She made the comment in classroom I, "There was poor housekeeping"  Gov. Minner asked if anyone was still occupying the building.

June 7, 2004          Hearing Loss Prevention Program Questionnaire completed with Omega.

June 7, 2004          Forakers mandatory audiological fitness for duty exam (changed – See July 7, 2004 letter from Lt. Col. MacLeish).

June 8, 2004          Letter from Lt. Col. MacLeish to Wayne Warren to schedule an audiological fitness exam with Dr. Aaron Green of Health Works in Dover, DE

June 9, 2004          Fax'd copy of the American Police Beat magazine article re: contaminated range closed (a national publication that makes it way into Europe and Asia, per the Circulation Manager)

June 10, 2005 2:31 P.M. Email from Elizabeth Seay to DSP Troop Commanders and DSP Section Chiefs Sworn re: June Commanders Meeting

June 17, 2004          Wayne Warren's audiological exam with Dr. Aaron Green at Health Works.  Please see his handwritten notes.

June 18, 2004          Letter from Lt. Col. MacLeish to Foraker rescheduling his hearing diagnostic testing to June 7, 2004.

June 18, 2004 3:44 P.M. Email from Major Eckrich to Wayne Warren, Greg Warren, Chris Foraker, Kurt Price, Jim Warwick and Ralph Davis re: results of air testing and lead contaminants in homes and results of air quality tests.  "…Based on the information we have at this time, no presence of airborn lead and proper hygience protocol, it would not be prudent to test carpets in your homes…"

June 22, 2004    Letter from Lt. Col. MacLeish to Foraker re: fitness for duty exam to ascertain his audiological fitness.  Appt. scheduled for July 8, 2004.

June 22, 2004 1001 A.M. Email  from Lt. Ralph Davis to Capt. John Yeomans re: FTU members concerns for their individual health issues and questions/concerns.  Also, their review of all documents records and/or files maintained by the division in relation to their current work status.

June 22, 2004 10:00A.M. Email from Lt. Davis to Capt. Yeomans cc'd to Maj. Hughes, Capt. Warren, Cpls Warren, Price & Warwick and Sgt. Foraker re: 1st - restricted duty status notifications – verbally, will it be followed up with written correspondence. 2nd – request for FTU staff to review our own personnel file in regards to health issues.

June 22, 2004 10:18A.M. Email from Lt. Davis to Maj. Eckrich cc'd to Maj. Hughes, Capt. Warren, Sgt. Foraker, Cpls Warren, Price & Warwick re: Secretary Mitchell's directive to document the exposure of toxic heavy metals experienced by the FTU Staff while at the range in a 1st report of injury.

June 22, 2004 3:15P.M. Email from Wayne Warren to Major Eckrich, Chris Foraker, Kurt Price, Jim Warwick, Greg Warren, Ralph Davis re:  unclear about Major Eckrich's response to the lead contaminants in their homes, not clear on the results of the air testing report; how can lead be in the supply vents and not in the air?  How did the lead get on the supply vent?  The test was not conducted when the range was in operation, how valid was the test?  No safe zone to perform proper hygiene. Personal clothing hung in the lockers with work clothes.  No written protocol was presented to him.  I was only given a verbal list of proper hygiene.

June 22, 2004    Letter from Lt. Col. MacLeish to Foraker re: audiological fitness for duty exam with Dr. Aaron Green scheduled for July 8,2004.

June 22, 2004 8:03 P.M. Email from Capt. John Yeomans to Lt. Ralph Davis re: a formal letter to Price and Wayne Warren regarding their light duty status.

June 23, 2004    Wayne Warren received a document dated January 18, 2001, Delaware State Police Firearm Training Facility Personal Hygiene Protocol created by Sgt. Al Parton.  Foraker discovered it while unpacking files from boxes and then forwarded it to Wayne Warren.  Wayne, Kurt and Foraker had never seen this document until Foraker discovered it while moving files from the Smyrna FTU to the Academy Office.

June 23, 2004 1:27 P.M. Email from Lt. Ralph Davis to Capt. Yeomans re: light duty status letter, medical documents that Dr. Green did not have nor did he possess.

33

June 23, 2004 8:13 P.M. Email from Capt. John Yeomans to Lt. Ralph Davis re:  Yeomans will draft a light duty letter for the Lt. Col. Signature.  Yeomans said he sent the medical information to Omega and Dr. Green.

June 25, 2004        Received letter in US mail from Lt. Col. MacLeish dated June 22, 2004 stating that I was required to respond to Health Works, Thursday, July 8, 2004 to be examined by Dr. Aaron Green to ascertain my audiological fitness for duty.

June 25, 2004        Foraker exam with Dr. Kozma, psychologist.

June 27, 2004 11:46 P.M. Email from Major David Baylor to Cpls. Price and Warren re: sorry about their situation.  He had just read the state news article online regarding their situation.  He is very concerned and he said he would offer his sick, A/T or vacation time if that would help them.

June 28, 2004 1:51 P.M. Email from Wayne Warren to Doyle Tiller re: Phase I clean up

June 28, 2004 4:06 P.M. Email from Major Eckrich to Lt. Ralph Davis re: 1st Report of Injury Eckrich indicates that Lt. Davis misunderstood Mitchell's request for officer's exposure to lead and other toxic metals.

June 28, 2004 4:14 P.M. Email from Major Randall Hughes to Wayne Warren re: Phase I clean up

June 28, 2004 4:48 P.M. Email from Foraker to Lt. Ralph Davis re:  1st report of injury.  Also, Cpl. Warren recalls vividly the conversation between Secretary Mitchell and Major Eckrich where Secretary Mitchell emphatically requested Major Eckrich to document the heavy metal (copper, lead & zinc) exposure that the FTU personnel have suffered at the range for workmans comp injury purposed. Foraker goes on to indicate that he has not received any guidance from anyone as to what exactly Secretary Mitchell may need.  Wayne said that he understood it to be Major Eckrich to take care of this for Secretary Mitchell.  Major Eckrich did not give any directives for Foraker to complete the report.

June 28, 2004 4:10 P.M. Email from Lt. Ralph Davis to Major Paul Eckrich re:  1st Report of Injury

June 28, 2004        Delaware State News article regarding Wayne & Kurt being targeted for firing because they spoke out about problems at the FTU range.

June 29, 2004        Received email from Captain Albert Homiak inviting all DSP Section Chiefs and DSP Troop Commanders to a Commanders Meeting and NIBRS Numbers meeting.  Meeting is to be held on July 20th.

June 30, 2004        Foraker has a verbal discussion with Major R.L. Hughes re: FTU vehicles.

June 30, 2004 3:16 P.M. Email from David Owen to Cpl/Price re: his frustration about what is being done to the members of the FTU.

July 1, 2004        DSP Injury Report Supplemental Information completed for all FTU members.

July 1, 2004        Delaware State News article, page 10 – State Auditor states Score miscount gave firing range to wrong firm.  State Auditor, Tom Wagner said, *"There's no*

34

*silver bullet in terms of one scenario that created all the problems.  I'd say you could describe it as a* **comedy of errors**".

| | |
|---|---|
| July 5, 2004 | Delaware State News article says State Auditor, Tom Wagner says audit shows bid mistakes points to mathematical error.  Retired Major Mike MacDonald calls that "unbelievable". |
| July 5, 2004 8:21 A.M. | Email from Capt. John Yeomans to Lt. Ralph Davis re: first report of injury for the FTU members. |
| July 6, 2004 11:53 A.M. | Email from Capt. Yeomans to Warwick, Price, Foraker and Cpl. Warren re: Dr. Cooper Testing/evaluation.  Requesting copies of exam reports to aid in the workmens comp. claims. |
| July 6, 2004 | Foraker has verbal conversation with Major R.L. Hughes re: FTU vehicles. |
| July 6, 2004 | Foraker's Injury Report for Jim Warwick, Kurt Price and Wayne Warren |
| July 6, 2004 – DSN – | Tom Eldred Delaware State News story - Audit shows bid mistakes.  Simple mathematical error called, "unbelievable" |
| July 7, 2004 | Email from Major R.L. Hughes to Capt. Greg Warren regarding FY05 Budget items with specific reference to the FTU. |
| July 7, 2004 | Letter from Lt. Col. MacLeish regarding the changed fitness for duty evaluation date to July 15, 2004.  This appointment is mandatory. |
| July 7, 2004 | Sound off in the Delaware State News re: comments from State Auditor Tom Wagner that there is no comedy in the FTU situation. |
| July 7, 2004 12:00 P.M. | Kurt Price called Foraker and stated that he ran into Pat Davidson, mgmt. level, with Kent Construction.  Speaking about the range, during construction phase, stated that his bidder stated to him he had a real concern whether the I-beam would hold the weight of the ventilation system on the roof. |
| July 7, 2004 1:31 P.M. | Email from Capt. Greg Warren to Major Randall Hughes re: FTU FY 2005 Budget. |
| July 7, 2004 2:29 P.M. | Email from Cpl. Wayne Warren to Jean Rothenburger (state auditors) re: agencies that have shot on the closed DSP range as well as the number of days that the range was in use in Dec., Jan and Feb. |
| July 7, 2004 2:27 P.M. | Email from Capt. John Yeomans to Wayne Warren re: medical records |
| July 7, 2004 2:37 P.M. | Email from Cpl. Wayne Warren to Capt. John Yeomans re: information for Art Neilson Associates, industrial hygienist. |
| July 7, 2004 | 1st Report of Injury for Chris Foraker completed by Captain Greg Warren. |
| July 8, 2004 | Foraker fitness for duty exam with Dr. Aaron Green at Health Works. |

July 9, 2004 11:09 A.M. Email from Capt. John Yeomans to Capt. Davis, Foraker, Warwick re: rescheduling the medical appt. with Dr. Green due to a death in his family.

July 9, 2004 1: 07 P.M. Email from Capt. Greg Warren to Major R.L. Hughes regarding the FY05 Budget.  Chris should be involved in these meetings.

July 9, 2004 2:49 P.M. Email from Chris to Capt. Greg Warren re: permanent FTU assignments specifically mentioning Don Boulerice and Tim Morris

July 9, 2004 2:58 P.M. Email from Capt. Greg Warren to Col. Chaffinch, Lt. Col. MacLeish and Sgt. Foraker re: Permanent FTU Assignments.

July 9, 2004 3:55 P.M. Email from Sgt. Foraker to Major R.L Hughes re: FTU Vehicles describing the necessity for larger SUV type vehicles for all FTU members.

July 11, 2004 11:40 A.M. Email from Foraker to Fiscella referencing FTU vehicle necessity.

July 12, 2004 11:02 A.M. Email from Capt. John Yeomans to Cpls. Wayne Warren and Price re: receipt of Dr. Cooper's medical records.  He will forward to Dr. Emmett at U of Penn.

July 14, 2004        Wayne Warren's notes re: receipt of information from the HR department concerning his health records, job descriptions and correspondence to Dr. Emmett of the University of Penn.

July 15, 2004        Email from Laurie Robbins re: reminder of Commanders Meeting on July 20.

July 15, 2004        Forakers' ***second fitness for duty exam*** with Dr. Aaron Green.  Foraker discovered that there were medical records missing from the file that HR/Yeomans should have forwarded to Dr. Greene to make his final assessment of Foraker's fitness for duty.  Dr. Greene called Yeomans and requested to have the records immediately brought to him in his office while Foraker waited in exam until the records were delivered. (See Forakers palm pilot notes)

July 15, 2004 8:28 A.M. Email from Capt. John Yeomans to Cpl. Price and Cpl. Warren re: their medical information in the files to ascertain their accuracy.

July 15, 2004 2:19 P.M. Email from Cpl. Wayne Warren to Capt. John Yeomans  re: concerns about the TK Group questionnaire.

July 16, 2004 2:20 P.M. Email from Cpl. Warren to Capt. John Yeomans re: blood test for his family

July 20, 2004        Commanders Meeting.  Approx. 9:00 A.M. just prior to the meeting is to begin, I was approached by Lt. Col. MacLeish regarding my attendance at the meeting. Out in the hallway he orders me to leave in violation of Judge Farnan's reinstatement order as a result of Chaffinch being convicted of violating the First Amendment to the U.S. Constitution for retaliating against me for reporting health issues at the FTU and other important matters.

36

July 20, 2004          Lt. Ralph Davis told me that he had a conversation with Lt. Col. MacLeish
                       referencing my non-attendance at the Commanders Meeting scheduled for same
                       day.  Lt. Davis said that he wrote down the details of the conversation.

July 20, 2004 4:40 P.M. Email from Capt. John Yeomans to Cpl. Wayne Warren re: medical file
                       review in the personnel office, Dr. Emmett will provide a copy of all test data and
                       reports, he said he has asked that decibel level testing be conducted at the
                       range, bills for family blood tests.

July 20, 2004 3:50 P.M. Email from Capt. Yeomans to Foraker re: fitness for duty test
                       Results from Dr. Aaron Green.  A second opinion will be requested.

July 21, 2004          Delaware State News article re:  State:  $720,000 to reopen firing range.
                       Quoting Secretary Gloria Homer "at this point we don't think there are any
                       adjustments needed to the HVAC" she said.

July 21, 2004 4:50 P.M. Email from Captain John Yeomans to Foraker re: 2nd medical opinion for
                       fitness for duty to be scheduled at the University of Penn.
                       Also, he indicated that a decibel level test will be conducted at the Firearms
                       Training Unit in Smyrna in the near future.

July 22, 2004          Attended the funeral of a fallen comrade.  Had a discussion with Captain Nate
                       McQueen regarding the Commanders Meeting on July 20th.  He said that "if looks
                       could kill he would be dead" regarding his request for Foraker to help with the
                       funeral cadence for Trooper Shea.

July 22, 2004 3:40 P.M. Email from Paul Cunningham to Foraker re: indoor range lead contamination

July 23, 2004 2:14 P.M. Email from Cpl. Wayne Warren to Captain Yeomans and Major Randall
                       Hughes re: TK questionnaire.  Dr. Green was very concerned about the survey,
                       the fact that no one examined me for the determination and the fact that he did
                       not receive the additional answer sheet I provided to Omega at the time the
                       questionnaire was being completed.  I hope the medical review board will ask the
                       same questions about the questionnaire.

July 26, 2004 11:30 A.M. Email from Capt. John Yeomans to Wayne Warren re: medicals
                       Capt. Yeomans called Dr. Green who apparently had some of the same
                       concerns.  I would ask him to discuss this with Dr. Emmett as well.

July 28, 2004          Foraker saw Lt. John Slank and Lt. Tom Ford at Troop 2.  They were disgusted
                       with Lt. Col. MacLeish when they learned that he asked Foraker to leave the
                       meeting.  Lt. Slank said that there needs to be a leadership change in this
                       organization.

July 28, 2004          Email (no date/time) from Foraker to Sgt. Vince Fiscella re: the state auditor
                       interviews.

July 28, 2004 9:24 P.M. Email from Paul Cunningham to Foraker re: USMC range facility in
                       Chesapeake, VA.

July 28, 2004          State Auditors mtg. Ref. Range issues.

July 29, 2004          Retired Lt. Larry Talley, current Secretary of the DSTA called Foraker and warned him to be careful…something's up with the DSP administration.

July 29, 2004          Sgt. Fiscella, Lt. Tom Brackin, Secretary Homer, Secretary Mitchell, Lt. Col. MacLeish had meeting re: range problems and FTU members damages. Secretary Mitchell says that something has to be done.  They, the FTU members, have been injured.  He asked Lt. Col. MacLeish if anyone from the FTU have been contacted to see if they needed anything. Secretary Mitchell wanted Lt. Col. MacLeish to contact Cpl. Price to see if he needed anything and how he was fairing.

July 29, 2004 7:12 A.M. Email from Capt. John Yeomans to Foraker re:  Dr. Green's report regarding Foraker's fitness for duty.  A second opinion is being sought by the DSP and an appointment will be made soon by the DSP.

July 29, 2004 9:38 A.M. Email from Vanessa Laughman to Foraker re: medical files.  Copies were at the front desk of HQ for him to pick up.

July 30, 2004 8:54 A.M. Email from Foraker to Price re: Request to contact Lt. Col. MacLeish.

July 30, 2004 1:12 P.M. Email from Warwick to Fiscella re: NIOSH

July 30, 2004 3:50 P.M. Email from Lt. Ralph Davis to Foraker re: his meeting with Major Randall Hughes.  Reduce AT time, Wayne and Kurt can be used for Patrol Procedures, etc.

August 2, 2004 8:06 A.M. Email from Foraker to Wayne Warren and Price re: His meeting with Major Hughes/patrol procedures

August 17, 2004 12:39 P.M. Email from Capt. Skip Homiak to all DSP Section Chiefs and Troop Commanders re: Commanders Meeting.

August 17, 2004 3:47 P.M. Email from Kristy Tuxward to Foraker re: first report of injury report

August 19, 2004          FTU Lawsuit filed

August 19, 2004          WDEL radio broadcasts the lawsuit.

August 20, 2004          Foraker's physical with Dr. Emmett of the U of Penn.  Dr. Emmett said that 100% of the hearing loss was attributed to indoor range.  Results of decibel testing was incredibly loud with just one shooter; Sig was at 127 db, by law noise must be reduced to 90 db.  Dr. Emmett said I would need to ask the State to get the copy of the db test.  He said you are in a different category of hearing loss than the others I have examined.  I don't have the same concern for you because your loss is not severe.  I said I have not suffered additional loss since Sept. '98.  The Division sent me back to patrol 4-2000 till 12-2003.  No additional loss since 9-1999, no concern then, why now?  I have proven I can function both in the FTU as well on patrol since the initial injury.  Lead, copper, & zinc exposure has not been a concern.  Best to keep blood levels below 10 mg/dl.  More zinc in blood indicates your body is attempting to expel lead.

38

August 21, 2004         DSTA Hall – Troopers Picnic held.  Secretary Mitchell asked to meet personally/privately with Foraker and Price in a closed door conference room.

August 25, 2004         SparkWeekly.com message posted re: "You have to die from something".

August 30, 2004         Foraker files individual retaliation lawsuit against Chaffinch and MacLeish, Civil Action No. 04-1207.

August 30, 2004 3:09 Email from Bill Alexander to Foraker re: Commanders Meeting Recap

August 30, 2004         Memo from Lt. Bill Alexander to Academy Staff re: Commanders Meeting Recap

August 31, 2004         9:4 A.M. Email from Capt. Skip Homiak to all DSP Section Chiefs and Troop Commanders re: September Commanders Meeting scheduled for September 29.

August 31, 2004 12:14 P.M. Email from Rt. Capt. Bruce DiVincenzo re: he heard the WILM radio broadcast.  He indicated that the range was a problem from the first day the bids were taken.

September 1, 2004 1450 WILM John Watson show hosts Tom Neuberger and Capt. Greg Warren re: issues with state police/firing range.

September 7, 2004 2:02 P.M. Email from Capt. John Yeomans to Capt. Skip Homiak re: scheduled mandatory fitness for duty exams for FTU personnel.

September 7, 2004 2:21 P.M. Email from Capt. Skip Homiak re: Fitness for duty exams.

September 10, 2004 7:53 A.M. Email from Wayne Warren to Capt. John Yeomans re: house testing

September 10, 2004 10:24 A.M. Email from Capt. John Yeomans to Wayne Warren re: audible testing at the range.

September 13, 2004 12:27 P.M. Email from Foraker to Capt. Skip Homiak re: range decibel level testing.  Requests for the official copy of the decibel level testing recently completed at the DSP Firearms Training Facility.

September 15, 2004 9:59 A.M. Email from Capt. Skip Homiak to Foraker re: range decibel level testing report.  Capt. Homiak stated that he talked with Capt. Yeomans and he said that upon advice from Mr. Ellis, defendants council, that any and all documents related to litigation will need to go through Mr. Neuberger.

September 16, 2004 11:04 A.M. Email from Capt. Skip Homiak to Wayne Warren re: doctors note for sick days in August.

September 17, 2004 12:04 P.M. Email from Capt. Skip Homiak to Foraker re: home testing for lead.

September 30, 2004 DSTA Financial Aid Board Meeting/Request of Funds

October 7, 2004         3:06 P.M. Email from Capt. Skip Homiak to Price and Wayne Warren re: Dr. Emmet has indicated he would like both of you to remain on light duty status

39

pending further consultation with a University of Penn ENT specialist and a review of documentation in his possession as well as some new requests he has made.  This recommendation for continued light duty status is regarding your hearing issue.

October 12, 2004    Auditors account of the closing of the DSP Firing Range.

October 13, 2004    Larry Talley, Secretary of DSTA warned Foraker to be careful who he talks to.

October 19, 2004    3:03 P.M.  News Journal Blog  - Al Mascitti – A New Rule On Stupidity posted re: scoring for the original bidding in the firing range project and inability of Facilities Management to count to 9.

October 20, 2004    Exam with Dr. Emmett of U. of Penn.

November 5, 2004    Letter from Dr. Emmett University of Penn.  To Capt. John Yeomans Re: Foraker's fitness for duty.  "I concur with Dr. Aaron Green that Christopher Foraker is able to perform the essential job requirements for both a Delaware State Trooper and for an Ordnance Officer".

November 10, 2004    Forakers' Performance Appraisal Scoring Sheet – from December 1, 2003 through September 3, 2004

November 17, 2004    Letter from Lt. Col. MacLeish re: based on Dr. Emmett's assessment "Foraker is fit for duty at this time".

November 23, 2004    Foraker conversation with Vince Fiscella re: the State is bringing someone in to assess the ventilation system.

December 6, 2004    10:22 A.M. Email from Lt. Ron Hagan to Wayne Warren, Foraker, Warwick and Price re: in home lead testing.

December 8, 2004    2:25 P.M. Email from Foraker to Lt. Hagan, Wayne Warren, Warwick and Price, cc'd Capt. Skip Homiak re: in home lead testing.

December 16, 2004    8:41 P.M. Email From Foraker to Capt. Skip Homiak re: new Sig Pistols w/flashlight adaptor rails

December 18, 2004    3:24 P.M. Email from Bank Miller to Foraker re: Range master Recertification Course in Provo, Utah.

December 22, 2004    6:34 P.M. from Foraker to Lt. Ron Hagan and Capt. Skip Homak re: new sig pistols with flashlight adaptor rails.

January 3, 2005    10:33 A.M. Email from Fay Veal, Fiscal Analyst to Foraker re: Order for shirts.

January 3, 2005    2:18 P.M. Email from Lt Ron Hagan to Jessica Julian, Dep. Attorney General Office re: home testing for FTU Personnel homes

January 6, 2005    Foraker home test scheduled.  Resume of home tester, Ronald Thaman, see notes indicating that Mr. Thaman was willing and able to test our homes almost 1

40

A271

year ago when we originally requested it.  But the DSP refused to do so at the time.  Instead, he was now ordered to test their homes, not to determine if they were tracking lead home from the FTU, but instead to determine if their homes independently produce lead.

January 7, 2005    Foraker residential water samples taken and submitted to Neilson Associates for testing.

January 7, 2005    Wayne Warren's home tested for lead and other heavy metals.
Wayne reviewed Mr. Thamans twelve page resume and was surprised to see that most of his experience was with mold and mildew, fire investigation and asbestos.  He became suspicious at the lack of experience with lead testing in firearms ranges.  It appeared to him that the testing was simply a way to mount a defense and not a concern for our safety.

January 11, 2005    9:45 P.M. Email from Foraker to Capt. Skip Homiak re: Shirt Order
"Everything needs to flow through the Academy, initially to Lt. Hagan  It allows for more accountability and should facilitate less confusion overall.  We'll talk more at the meeting on Wednesday."

January 24, 2005    2:52 P.M. Telephone call from Major R.L. Hughes to Foraker. "I am committed to making this range right.  I want to make this range state of the art.  I want it fixed right and I want you to help me do that.  You have the expertise that I don't have and I would like you to be on the range committee to get this accomplished.  I have had people not show up to these range meetings and I know that you would and you have expertise we need to get this done right".  I responded, "Yes, I will be a member of the range committee.  I will help in any way that I can to make sure that the range gets fixed right".  He said, "Good, I will email you with notes from the meetings and any other info. regarding the project.  He also said when I could be available to get together to sit down and go over what we have so far.  I said that Wednesday, January 26th is out because I am heading to New Jersey to visit the newest N.J.S.P. indoor range. …."

January 25, 2005    8:54 Email from Foraker to Major Randall Hughes re serving on the Range Committee.

January 25, 2005    5:13 P.M. Email from Foraker to Foraker re: documenting his conversation with Major Randall Hughes on January 24, 2005 regarding holsters and second, "I am committed to making this range right.  I want to make this range state-of-the-art.  I want it fixed right and I want you to help me do that.  You have the expertise that I don't have and I would like you to be on the range committee to get this accomplished.  I have had people not show up to these range meetings and I know that you would and you have the expertise we need to get this done right".  I responded, "Yes, I will be a member of the range committee.  I will help in any way that I can to make sure that the range gets fixed right."

January 28, 2005    5:48 P.M. Email from Foraker to Major Randall Hughes re: FLETC Cheltenham visit to their range.  Also, Foraker asks to sit down to go over all the material that Hughes spoke of regarding the repairs on the range project covered in the previous range committee meetings.   Major Hughes proceeded to draw a schematic of the range with the improvements to date and gave it to Foraker.

41

January 28, 2005      2:13 P.M. Email from Kendra Mooers of CCI Speer re: MSDS sheets for ammo.

January 31, 2005      Neilson Associates, Inc.  Invoice for laboratory analysis of 2 water samples from residence of Foraker.  Paid for personally.  $150.00

February 1, 2005      Mandatory In-service Training held at Troop 2.  See 2005 Mandatory In-Service Legal Update/Anti-Harassment Policy Unpdate.  Major Mark Seifert address the Attendees.  He told a story about his morning with his young son at his daycare center.  He proceeded to state, "He slipped and fell on the ice only to be helped to his feet by a fire policeman whose son attends the same day care center.  He explained that the Administrative Staff has fallen down and we need your help to get back up on our feet."

February 10, 2005 10:05 A.M. Email from Foraker to Lt. Ron Hagan re: evaluation

February 15, 2005 2:20 P.M. Telephone conversation with Capt. Skip Homiak re: FTU budget meeting.  He became angry.

February 28, 2005   12:00 – Foraker met with Major Hughes @ DEMA and turned over to him Action Target video & binder of bullet traps.

March 27, 2005       DSN – Troopers wives speak out
                     Women: Range put husbands health, careers in jeopardy.  Impacts every aspect of our lives.

April 11, 2005        approx. 11:00 A.M. – Meeting occurred in 2nd floor conf. Room – Foraker, Cpl. Warren, Paul Adamowski of Armor Holdings, Brian Byrne of Lawman Supply were all standing in the conf. Room talking about the holster problems.  Foraker saw D.A. Mike Tupman and Foraker walked over to him and said, "Hey, Mike how are you doing?"  Before Foraker could finish his greeting, Tupman said, "You're like a bad penny, you just keep showing up".  Foraker was taken back by this comment.

                     Approx. 1:30 P.M. – Lunch with Bryan Byrne and Paul Adamowski.

April 12, 2005        A.M. Bryan Byrne of Lawman Supply came to the National Guard Range to drop off some equipment and engaged in a conversation with Jim Warwick, Don Boulerice and Tim Morris.  Brian expressed to them how wrong and unprofessional it was for Tupman to say what he said in front of people from outside DSP.  He reiterated what he said on April 11, 2005.

June 22, 2005         Police Expo in Atlantic City, N.J. conversation with Greg Isabella, and Bob Portsman, Remington Arms co.  Discussions about the range.

42

A273

# Exhibit 2

**Partial List of Agencies and Officers Exposed to the Hazards at the FTU**

      Outside Agencies that have conducted firearms training at the Delaware State Police Indoor Firearms Training Facility since the opening of the facility in September-1998.  The calendar for the 2000 year was not located but would prove similar to 1999 and 2001.

**Agencies**

2004

1.  Delaware State University
2.  Capitol PD
3.  Camden PD
4.  New Castle City PD

2003

1.  FBI
2.  New Castle City PD
3.  Federal Probation
4.  Capitol PD
5.  ABCC
6.  Camden PD
7.  Delaware State University
8.  Fire Marshall's Office
9.  Secret Service
10.  Citizens Police Academy
11.  Trooper youth week
12.  Kent County Sheriff

2002

1.  Fire Marshall's Office
2.  DNREC
3.  Capitol PD
4.  Camden PD
5.  Office of Narcotic's and Dangerous Drugs
6.  Probation and Parole
7.  Attorney General's Office
8.  FBI
9.  ABCC

2001

1. IRS
2. Attorney General's Office
3. Secretary Ford's Office
4. Justice Department
5. ABCC

2000

UN

1999

1. Capitol PD
2. Dover PD
3. Newark PD
4. DNREC
5. Seaford PD
6. DLEMA
7. FBI
8. Fire Marshall's Office

1998

1. DNREC
2. Capitol PD
3. Fire Marshall's Office
4. Seaford PD
5. FBI

**Officers**: See Next Page

# 67TH DELAWARE STATE POLICE CLASS
## 02/26/98

| NAME | DOB | POLICE DEPARTMENT |
|------|-----|-------------------|
| Echevarria, Clay C. | 08/22/64 | DSP |
| Hatfield, James S. | 12/31/66 | DSP |
| Little, Jonathan M. | 12/31/70 | DSP |
| Lorditch, Michael R. | 06/29/65 | DSP |
| Meadows, Daniel K. | 08/12/70 | DSP |
| Murray, William P. | 06/09/66 | DSP |
| Partyka, Andrew M. | 12/23/68 | DSP |
| Wilkins, Kristin L. (Hired 02/20/98) | 11/23/74 | DSP |
| Yanush, David J. (Resigned 01/01/98) | 07/19/65 | DSP |

# 50TH MUNICIPAL POLICE CLASS

| | | |
|------|-----|-------------------|
| Cathell, Darin E. | 07/31/75 | Bethany Beach |
| Feeney, Kevin M. | 09/10/73 | Newark |
| Gates, Jeffrey B. | 01/23/75 | University of DE |
| Glasco, Eric J. | 01/20/75 | Rehoboth Beach |
| Hermance, Christopher P. | 10/08/70 | Dover |
| Jaksch, Harvey I. | 08/08/72 | Dover |
| Keld, Paul C. | 05/27/69 | Newark |
| Kent, Matthew M. | 11/27/70 | Capitol |
| Lucas, Ricardo J. | 12/15/63 | Capitol |
| Mc Iver, Jennifer L. | 08/25/70 | D.A.B.C.C. |
| O'Bier, Scott A. | 08/21/70 | Rehoboth Beach |
| Rapa, Michael C. | 08/21/75 | Seaford |
| Reynolds, Dallas J. | 01/20/74 | Rehoboth Beach |
| Rubin, Andrew S. | 12/23/75 | Newark |
| Schroeder, Jeremy J. | 08/28/75 | Rehoboth Beach |
| Sieck, Robert Troy | 07/18/69 | Frederica |
| Simpson, Scott A. | 07/31/67 | Newark |
| Smith, Thomas Scott* | 12/20/66 | Newark |
| Spicer, David E. | 08/20/70 | Dover |
| St. Clair, Raymond L., Sr. | 10/18/69 | Capitol |
| Windish, Gerald, Jr. | 06/09/73 | Newark |
| Wyka, Joseph W. | 07/18/73 | Capitol |

Revised: 022098

---

*NAME PLATE: Smith, T. Scott

Delaware State Police Academy

68th DSP and 51st Municipal

September 17, 1998

| NAME | DEPARTMENT |
|------|------------|
| Armstrong, Tonya L. | DSP |
| Brown, Christian M. | DSP |
| Burns, Jay E. | DSP |
| Butkus, Michael M. | DSP |
| Cathell, Derek E. | DSP |
| Cras, James R. | DSP |
| Di Silvestro, Mentino M. | DSP |
| Dimon, N. Carol | DSP |
| Fuski, Matthew P. | DSP |
| Hamm, Eric L. | DSP |
| Hennon, Todd D. | DSP |
| Kelly, Stephen J. | DSP |

| NAME | DEPARTMENT |
|---|---|
| Mark, Keith R. | DSP |
| McDerby, Sean P. | DSP |
| McNally, Floyd S. | DSP |
| Paplll, Mark A. | DSP |
| Parsons, S. Benjamin | DSP |
| Rizzo, Steven T. | DSP |
| Simpler, Gregory W. | DSP |
| Smith, Larry Jr. | DSP |
| Smith, Thomas P. | DSP |
| Smith, V. Amber | DSP |
| Snyder, Darhl L | DSP |
| Spence, Gregory M. | DSP |
| Streeter, Jason C. | DSP |
| Taylor, Scott T. | DSP |
| Tuxward, Robert D. | DSP |
| Wallace, Robert F. | DSP |
| White, William A. | DSP |
|  |  |
| Argo, Alex | Millsboro PD |
| Davis, Shawn A. | Millsboro PD |
| Grassl, Daniel | Newark PD |
| Hazzard, Matthew T. | Elsmere PD |
| Potocki, Blake V. | Newark PD |
| Ruiz, Reinaldo | Elsmere PD |
| Simpson, Charles W. | Millsboro PD |

## COPT CERTIFIED
### 69th DSP and 52nd Municipal

| NAME | DEPARTMENT |
|------|------------|
| March 18, 1999 | |
| Argo, Kenneth | DSP |
| Brower, Carey L. | DSP |
| Buckley, John T. | DSP |
| Carlisle, Teryl O. | DSP |
| Davis, Roger M. | DSP |
| Driggins, Jonathan K. | DSP |
| Fanning, Charles P. | DSP |
| Harmon, Chad E. | DSP |
| Holmes, Evan G. | DSP |
| Mahendru, Vishal | DSP |
| Martinez, Andrel | DSP |
| McDaniel, Kerry Y. | DSP |
| McGuire, Mary E. | DSP |
| Minear, Jason | DSP |
| Popp, Christopher W. | DSP |
| Slover, Scott D. | DSP |
| Torres, Tony O. | DSP |
| Whitelock, Benjamin E. | DSP |
| Whitmarsh, Jeffrey C., II | DSP |
| Wright, Adam A. | DSP |
| Zane, Helen | DSP |
| Zelinski, Cheryl L. | DSP |
| | |
| | |
| Andrews, Jonathan R., II | DNREC-Division of Parks and Recreation |
| Aniunas, Dennis J. | Newark PD |
| Armstrong, Michael S. | Rehoboth PD |
| Bryda, Gerald J. | Newark PD |
| Bush, Jason C. | Rehoboth PD |
| Calloway, Brian K. | Millsboro PD |
| Carey, David | State Fire Marshall |
| Chaffinch, Benjamin A. | Seaford PD |

70th DSP, 53rd Municipal

(Reference C)
Delaware State Police Academy

Friday, December 10, 1999

| NAME | DEPARTMENT |
|---|---|
| Aguilar, Leonard | DSP |
| Brown, Robin | DSP |
| Campbell, Michael | DSP |
| Csapo, Mark | DSP |
| Dempsey, Elizabeth | DSP |
| Diehl, Jennifer | DSP |
| Dorsey, Jaime | DSP |
| Duffy, Sean | DSP |
| Elwood, David | DSP |
| Forester, John | DSP |
| Fuscellaro, Francis | DSP |
| Gaddy, Leshaun | DSP |
| George, Natalie | DSP |
| Hueber, Craig | DSP |
| Huston, Eric | DSP |
| King, Jonathan | DSP |
| Laird, John | DSP |
| Myers, David | DSP |
| O'Leary, Sean | DSP |
| Stout, Dewey | DSP |
| Underwood, Derek | DSP |
| Walker, William | DSP |
| Wolansky, Timothy | DSP |
|  |  |
| Baird, Kelly | U.D.P.D |
| Bullock, Brian | Fire Marshall |

Reference: A

# 71st DSP / 54th Municipal Academy Class
## 7/18/00-12/14/00

| | |
|---|---|
| Alexander, Dermot | DSP |
| Alimenti, Anthony | DSP |
| Boggs, Mark | DSP |
| Brown, Scott | DSP |
| Deveney, Renee | DSP |
| Fausey, Stephen | DSP |
| Hake, David | DSP |
| Hanich, David | DSP |
| Hargis, Rickey | DSP |
| Jones, Alfonso | DSP |
| Keller, Hudson | DSP |
| Keller, Shawn | DSP |
| Mauchin, Scott | DSP |
| McLaughlin, Casey | DSP |
| Paskevicius, Thomas | DSP |
| Pietlock, Andrew | DSP |
| Rhoades, Thomas | DSP |
| Robertson, Steven | DSP |
| Salcfas, Daniel | DSP |
| Shea, Christopher | DSP |
| Thompson, William | DSP |
| Trestka, Frank | DSP |
| Wenk, Patrick | DSP |
| | |
| Grant, Brian | DNREC – Parks & Recreation |
| Hartman, Benjamin | Capitol Police Department |
| Hudson, Matt | Seaford Police Department |
| James, Torrie | Smyrna Police Department |
| Ladd, Bonnie | Rehoboth Beach Police Department |
| Lux, William | DABCTE |
| Miller, Mark | University of De Police Department |
| Miller, Marlon | Bethany Beach Police Department |
| Shyers, Keith | Camden Police Department |

# DELAWARE STATE POLICE
## TRAINING ACADEMY
### March 12, 2001-June 29, 2001
### 55TH MUNICIPAL RECRUIT CLASS

| NAME | DATE OF BIRTH | DEPARTMENT |
|------|---------------|------------|
| Bant, William R. | 11/19/79 | Bethany Beach Police Department |
| Barrett, Robert Z. | 08/01/74 | Dover Police Department |
| Benton, Shawn | 10/22/72 | University of Delaware Police Department |
| Bergman, Jason D. | 09/10/72 | Millsboro Police Department |
| Besaw, Frank | 07/12/60 | University of Delaware Police Department |
| Bowles, Keita W. | 06/29/74 | University of Delaware Police Department |
| Bradshaw, Michael | 03/05/77 | Newark Police Department |
| Buchert, Todd M. | 12/29/75 | Millsboro Police Department |
| Burcham, Susan M. | 10/05/66 | University of Delaware Police Department |
| Burton, Mark R. | 08/03/79 | Ocean View Police Department |
| Chamberlain, Matthew H. | 04/26/78 | DNREC – Parks and Recreation |
| Duncan, William | 07/10/76 | Selbyville Police Department |
| Heckman, Stephen J. | 09/09/77 | Newark Police Department |
| Hutson, Carl | 05/22/75 | Clayton Police Department |
| John, Bryan | 03/31/71 | DNREC – Parks and Recreation |
| Kaczmarczyk, Brian | 01/13/78 | Rehoboth Beach Police Department |
| Marsch, Leonard | 12/25/79 | Bethany Beach Police Department |
| Micolucci, Gregory | 04/17/76 | Newark Police Department |
| Reynolds, Joanna | 11/09/75 | Bethany Beach Police Department |
| Robbins, Randy | 03/08/79 | Dover Police Department |
| Schwagel, Jeffrey | 09/29/73 | Newark Police Department |
| Sharpe, Robert | 01/25/73 | Newark Police Department |
| Wheatley, Barry | 11/25/74 | Millsboro Police Department |
| Wilson, Matthew | 11/13/75 | Laurel Police Department |
| Young, David | 01/18/77 | Newark Police Department |
| Zolper, Casey | 03/19/78 | DNREC – Fish and Wildlife |

# DELAWARE STATE POLICE TRAINING ACADEMY

72nd DSP / 56th Municipal

## 72ND DELAWARE STATE POLICE RECRUIT CLASS

### Twenty-two Week Training Program (07/17/01 – 12/13/01)

|  | NAME | DATE OF BIRTH | DEPARTMENT |
|---|------|---------------|------------|
| 1 | Daniels, Eric D. | 03/11/77 | Delaware State Police |
| 2 | Dudzinski, John W. | 01/03/67 | Delaware State Police |
| 3 | Eschenwald, Jose A. | 06/17/69 | Delaware State Police |
| 4 | Foraker, Erik B. | 12/04/79 | Delaware State Police |
| 5 | Hudak, Andrew J. | 03/01/76 | Delaware State Police |
| 6 | Huynh, Darnell K. | 03/06/66 | Delaware State Police |
| 7 | Ivans, Melissa | 09/28/77 | Delaware State Police |
| 8 | Jiminez, Stanley G. | 10/16/67 | Delaware State Police |
| 9 | Lafferty, Thomas A., Jr. | 11/04/71 | Delaware State Police |
| 10 | Long, Richard E., Jr. | 03/19/68 | Delaware State Police |
| 11 | Morton, Jerel W. | 05/06/71 | Delaware State Police |
| 12 | Mullins, Michelle A. | 02/12/79 | Delaware State Police |
| 13 | Perry, Dawn M. | 09/28/75 | Delaware State Police |
| 14 | Pomella, Angela J. | 12/18/78 | Delaware State Police |
| 15 | Roe, Matthew J. | 01/15/79 | Delaware State Police |
| 16 | Smith, Michelle L. | 01/10/74 | Delaware State Police |
| 17 | Smith, Terrence D. | 06/04/75 | Delaware State Police |
| 18 | Stevens, Regina M. | 03/31/71 | Delaware State Police |
| 19 | Stevenson, Jason L. | 02/26/78 | Delaware State Police |
| 20 | Thompson, Kristopher R. | 03/16/79 | Delaware State Police |
| 21 | Warrington, Matthew R | 04/19/80 | Delaware State Police |
| 22 | Wilson, Mark A. | 02/03/80 | Delaware State Police |
| 23 | Workman, Scott D. | 09/25/70 | Delaware State Police |
|  | Gibbons, Gerald W. |  | Delaware State Police – Resigned (07/23/01) |
|  | Pond, Leroy L. III |  | Delaware State Police – Resigned (07/30/01) |
|  | Smith, Lidia B. | 08/11/63 | Delaware State Police- Resigned (09/04/01) |
|  | Terch, Jill L. | 10/08/78 | Delaware State Police – Resigned (09/26/01) |

## 56TH MUNICIPAL CLASS

|  | NAME | DATE OF BIRTH | DEPARTMENT |
|---|------|---------------|------------|
| 1 | Andrews, Anthony A. | 11/08/80 | Dewey Beach Police Department |
| 2 | Brown, Michael L. | 05/17/77 | Rehoboth Beach Police Department |
| 3 | Burk, Patrick | 03/30/74 | Delaware Alcohol Beverage Control and Tobacco Enforcement |
| 4 | Daniels, William B. | 06/19/80 | Seaford Police Department |
| 5 | DeSaulniers, Jeffrey J. | 02/01/78 | Capitol Police Department |
| 6 | Donohue, Kimberly A. | 03/09/80 | Capitol Police Department |
| 7 | Hussong, William K. | 02/14/76 | Rehoboth Beach Police Department |
| 8 | Lord, Timothy L. | 03/24/73 | Selbyville Police Department |
| 9 | Malinky, Peter B. | 06/24/75 | Capitol Police Department |
| 10 | Michelau, Todd E. | 01/04/71 | Capitol Police Department |
| 11 | Mills, Ashley M. | 03/15/76 | Seaford Police Department |
| 12 | O'Neal, William | 12/04/57 | Bridgeville Police Department |
|  | Little, Walter R. | 03/10/69 | Capitol Police Department – Resigned (07/18/01) |
|  | Richardson, Bobbie F. | 04/05/67 | Seaford Police Department – Resigned (10/01/01) |

Revised 10/02/2001

# DELAWARE STATE POLICE
# TRAINING ACADEMY

## 57TH MUNICIPAL RECRUIT CLASS
### March 4, 2002-June 20, 2002

| NAME | DATE OF BIRTH | DEPARTMENT |
|---|---|---|
| | | |
| 1. Beckett, Nakeita I | 9/24/78 | Capitol Police Department |
| 2. Brackin, Amber L. | 9/3/77 | DNREC Parks and Recreation |
| 3. Coleman, Adam G. | 6/26/80 | Bridgeville Police Department |
| 4. Legates Jr., Robert C. | 1/5/79 | Millsboro Police Department |
| 5. Little, Walter R. | 3/10/69 | Capitol Police Department |
| 6. Lonski, Donald M. | 1/10/71 | Capitol Police Department |
| 7. Manning, Andrew J. | 2/28/77 | DNREC Parks and Recreation |
| 8. Masten, Robert W | 1/27/76 | Milford Police Department |
| 9. Melvin, Joseph W | 12/18/77 | Milton Police Department |
| 10. Parker, Harvey B. | 11/29/79 | Bridgeville Police Department |
| 11 Street, Brian K | 9/16/75 | Smyrna Police Department |
| 12. Thomas, Phillip S | 02/25/77 | Milton Police Department |
| 13. Torres Jr., Ricardo J. | 1/19/74 | DNREC Fish and Wildlife |
| 14. Young, Dwight L. | 4/5/77 | Milford Police Department |
| | | |
| West-Ney, Tracey | 10/12/73 | Capitol Police Department Resigned 03/04/02 |
| Conaway, Carl K J | 7/28/66 | Capitol Police Department Resigned 03/11/02 |
| | | |

A285

# DELAWARE STATE POLICE
## TRAINING ACADEMY
73rd DSP   58th Municipal

## 73rd DELAWARE STATE POLICE RECRUIT CLASS
### July 29, 2002-December 20, 2002

| NAME | DEPARTMENT |
|------|-----------|
| 1.  Baker, Anthony C. | Delaware State Police |
| 2.  Ballinger, Jeffrey D. | Delaware State Police |
| 3.  Box IV, Raiford | Delaware State Police |
| 4.  Breen, John J. | Delaware State Police |
| 5.  Brietzke, Douglas M. | Delaware State Police |
| 6.  DeLoach, Antoine F. | Delaware State Police |
| 7.  Galloway, Justin | Delaware State Police |
| 8.  Giddings, Joshua A. | Delaware State Police |
| 9.  Grasmick, Donald W. | Delaware State Police |
| 10.Greaves, Christy D. | Delaware State Police |
| 11.Greene, Brian M. | Delaware State Police |
| 12.Griffith, Terry L. | Delaware State Police |
| 13.Hudson, Jeffery H. | Delaware State Police |
| 14.Jefferson, Bryan | Delaware State Police |
| 15.Justiniano, Edwin H. | Delaware State Police |
| 16.Killen, William E. | Delaware State Police |
| 17.Kunicki, Robert | Delaware State Police |
| 18.Martin, Danielle | Delaware State Police |
| 19.Oldham, Nicole L. | Delaware State Police |
| 20.Reif, Michael P. | Delaware State Police |
| 21.Saucier, Donna M. | Delaware State Police |
| 22.Stock, Patrick F. | Delaware State Police |
| 23.Strecker, Charles R. | Delaware State Police |
| 24.Surowiec, Paul J. | Delaware State Police |
| 25.Tenebruso, Anthony | Delaware State Police |
| 26.Terranova, Nicholas | Delaware State Police |
| 27.Trestka, Michael J. | Delaware State Police |

# 58TH MUNICIPAL RECRUIT CLASS

| NAME | DEPARTMENT |
|------|------------|
| 28. Azato, James | Lewes PD |
| 29. D'Elia, Gregory | Newark PD |
| 30. Dill, Michael David | Rehoboth PD |
| 31. Fox, Robert L. | Del State Fire |
| 32. Guiteras, Mark | Dover PD |
| 33. Hammond, Brandon | Ocean View PD |
| 34. Kester, Lewis | Ocean View PD |
| 35. Maurer, Craig | Newark PD |
| 36. Mitchell III, John | Elsmere PD |
| 37. Richardson, Derrick | Milton PD |
| 38. Sansone, Nicholas | Newark PD |
| 39. Schad, Brian | Del State Fire |
| 40. Shelton, Scott | Elsmere PD |
| 41. Smith, Matthew | Milford PD |
| 42. Stubbs, James Eric | Dover PD |
| 43. Torres, Ismael | Milton PD |
| 44. Turner Jr. ,Carlton | Dover PD |

## 73rd DSP Fast Trackers

| NAME | DEPARTMENT |
|------|------------|
| 45. Argo, Alexander 5th | Delaware State Police |
| 46. Horsman, Scott A. | Delaware State Police |
| 47. Porter, Jay | Delaware State Police |
| 48. Reinbold, Kerry B | Delaware State Police |
| 49. Reynolds Jr., Dallas J. | Delaware State Police |
| 50. Ritchie, Brian D. | Delaware State Police |
| 51. Tamayo, Margaret A. | Delaware State Police |
| 52. Thomson, Brian R. | Delaware State Police |
| 53. Diana, David A | Delaware State Police |
| 54. Grassi, Daniel | Delaware State Police |
| 55. Owens, Matthrew C. | Delaware State Police |

# 59th Municipal Recruit Class
### February 3, 2003-May 20, 2003

|     | NAME | DEPARTMENT |
|-----|------|------------|
| 1. | Bean, Travis E. | Seaford PD |
| 2. | Berrios, Jr., Miguel A. | Millsboro PD |
| 3. | Brittingham, Shawn M. | Georgetown PD |
| 4. | Carter, Russell C. | Ocean View PD |
| 5. | Cartwright Sr., Kenneth L. | Capitol PD |
| 6. | Chambers, Eric S. | Seaford PD |
| 7. | Cordrey, Bradley A. | Laurel PD |
| 8. | Couch, Nicholas A. | DNREC Fish & Wildlife |
| 9. | Evick, Kristen C. | Seaford PD |
| 10. | Harvey, Derrick L. | Laurel PD |
| 11. | Hitchens, Adam B. | Bridgeville PD |
| 12. | Jackson, Sherrie Y. | Lewes PD |
| 13. | Jones, Christopher M. | Newark PD |
| 14. | Koth, William O. | DNREC Parks & Rec |
| 15. | LaRue IV, Morris W. | Newark PD |
| 16. | MacDonald, Douglas S. | University of Delaware PD |
| 17. | Martin Jr., Silvio L. | Georgetown PD |
| 18. | Mikus, John P. | University of Delaware PD |
| 19. | Newcomer, Keith E. | Seaford PD |
| 20. | Reynolds, Justin W. | Capitol PD |
| 21. | Rutecki, Thomas J. | Newark PD |
| 22. | Story, Christopher, | Bridgeville PD |
| 23. | West-Ney, Tracey L. | Capitol PD |
| 24. | Williams, Marcus W. | Delaware State University PD |
| 25. | Zullo, Vincent A. | Newark PD |

## 74th DSP and 60th Municipal Recruit Class Roster
September 22, 2003-February 19, 2004

### 74th DSP

| | NAME | DEPARTMENT |
|---|---|---|
| 1. | Badner Jr., Joseph M. | Delaware State Police |
| 2. | Blair, Aaron C. | Delaware State Police |
| 3. | Blakeman, Matthew | Delaware State Police |
| 4. | Bond Jr., Rodney H. | Delaware State Police |
| 5. | Branch Jr., Michael D. | Delaware State Police |
| 6. | Carroll, Kristin L. | Delaware State Police |
| 7. | Coleman, Vonetta M. | Delaware State Police |
| 8. | Dawson, Mark A. | Delaware State Police |
| 9. | Malkin, Ronald | Delaware State Police |
| 10. | Packard, Jonathon E. | Delaware State Police |
| 11. | Palese III, Andrew K. | Delaware State Police |
| 12. | Rash, Gregory | Delaware State Police |
| 13. | Rindone, Steven R. | Delaware State Police |
| 14. | Rogers Jr., Kenneth W. | Delaware State Police |
| 15. | Struck, Jennifer L. | Delaware State Police |
| 16. | Thompson III, William O. | Delaware State Police |
| 17. | Walker, Jason | Delaware State Police |
| 18. | Weller 2nd, Jerry Lee | Delaware State Police |
| 19. | Yeich, Stephen | Delaware State Police |

### 60th Municipal

| | | |
|---|---|---|
| 20. | Barlow, Matthew P | Georgetown PD |
| 21. | Baynard, Donald K. (DK) | Del State U PD |
| 22. | Beard, Robert | Del State U PD |
| 23. | Beckage, Robert J. | Fenwick Island PD |
| 24. | Beighley, Robert | Newark PD |
| 25. | Brenner, Christine L. | U of De PD |
| 26. | Brode, Earl K | Harrington PD |
| 27. | Carrasco, Robert | Lewes PD |
| 28. | Diaz, Joel | Georgetown PD |
| 29. | Edwards, Raymond D. | Rehoboth Beach PD |
| 30. | Fountain, Casey | DNREC A/W |
| 31. | Galaska, John M. | State Fire Marshal's Office |
| 32. | Gardner III, Leon F. | Del State U PD |
| 33. | Gedney, Brian F. | Dover PD |
| 34. | Harmon, Matthew G. | Seaford PD |
| 35. | Judson, Shannon T. | Rehoboth Beach PD |
| 36. | King, Jennifer M. | Dover PD |
| 37. | Miller, Christopher R. | Seaford PD |
| 38. | Nester III, Leonard J. | Dover PD |
| 39. | Norman, Justin W. | Ocean View PD |
| 40. | Riddle, Jason | Bethany Beach PD |
| 41. | Rogers, Mark A. | Georgetown PD |
| 42. | Roswell, Robert E. | Dover PD |
| 43. | Smythe, Thomas A. | Clayton PD |
| 44. | Stevenson, Demetrius | Dover PD |

A289

| 45. | Sweet, Mark E. | Rehoboth Beach PD |
| 46. | Webb Jr., Timothy D. | Dewey Beach PD |

### Fast Trackers

| 1. | Bant, William R | Bethany Beach PD |
| 2. | Chorlton, David A | Wilmington PD |
| 3. | Conaway, Douglas G | New Castle County PD |
| 4. | Hevelow, Christian | De River and Bay |
| 5. | Simpson Jr., Charles W. | Selbyville PD |
| 6. | Sutton, Christopher | State Fire Marshal |

A290

# 61st Municipal Recruit Class

March, 2004 - June 17, 2004

| | NAME | DEPARTMENT |
|---|---|---|
| 1. | Alexander, Richard P. | Cheswold PD |
| 2. | Archer, Kyle D. | Ocean View PD |
| 3. | Bean, Troy T. | Georgetown PD |
| 4. | Davis, Gavin E. | DNREC F/W |
| 5. | Gillespie, Adam S. | Harrington PD |
| 6. | Harmon, Joseph B. | Milford PD |
| 7. | Layton, Troy A. | Selbyville PD |
| 8. | Majewski, Stephen | Fenwick Island PD |
| 9. | Marino, Kirk | Georgetown PD |
| 10. | Neeman, Wesley C. | Harrington PD |
| 11. | Spicer, Chad E. | Bridgeville PD |
| 12. | Terranova, Michael A. | DNREC F/W |
| 13. | Wilson, Joshua A. | Selbyville PD |

| | |
|---|---|
| Kline, Susan J. Cheswold PD | Resigned 04/07/2004 |
| Yossick, William Del State University PD | Resigned 03/15/2004 |

69th DSP 52nd municipal

# COPT CERTIFIED

| | |
|---|---|
| Garey, Nathan W. | DNREC-Division of Parks and Recreation |
| Gott, Jeffrey A. | Camden-Wyoming PD |
| Green, Carlo L. | Greenwood PD |
| Hoffman, Sand J. | DNREC-Division of Parks and Recreation |
| Horsman, John F. | Frederica PD |
| Horsman, Scott A. | Newark PD |
| Lebreton, Tracy A. | Newark PD |
| McCabe, Keith M. | Rehoboth PD |
| McKinery, Brian A. | DNREC-Division of Parks and Recreation |
| Moran, Michael R. | State Fire Marshall |
| Reed, Robert L. | Millsboro PD |
| Riddle, Jaime B. | Dewey Beach PD |
| Schlimer, Joseph F., Jr. | Felton PD |
| Skinner, Lance P. | Selbyville PD |
| Sterner, Jason A. | Seaford PD |
| Sutton, Christopher R. | State Fire Marshall |
| VanCampen, Michael K. | Newark PD |
| Wagner, James A. | DNREC-Division of Parks and Recreation |
| White, Paul M. | Newark PD |
| Whitman, Robert T. | Milton PD |
| Whitney, Marcus D. | Seaford PD |
| Wilson, Matthew L. | Selbyville PD |

20th 53rd municipal

(Reference C)

| | |
|---|---|
| Burnett, Jason | Selbyville |
| Conover, Joseph | Newark |
| Davis, Lawrence | Milford |
| Flood, Steve | Seaford |
| Harris, Lawrence | Dagsboro |
| Hudson, Brad | Rehoboth Beach |
| Jones, Julie | DNREC-F&W |
| Knight, Matthew | Dover |
| Lawson, Derek | Dover |
| Layfield, Brent | Selbyville |
| Letonoff, Victor | Millsboro |
| Lowe, Roy | Millsboro |
| Mitchell, Aaron | Millsboro |
| Parsons, Brian | Laurel |
| Rausch, Matthew | Capitol |
| Reinbold, Kerry | Newark |
| Rieger, Scott | Newark |
| Rockwell, Matthew | Seaford |
| Spadea, Michael | Elsmere |
| Tamayo, Margaret | Georgetown |
| Tyndall, John | Laurel |
| VonTheden | Blades |
| Wisniewski, Michael | Dover |

A293



In the Matter Of:

# Price, et al.
## v.
## Chaffinch, et al.

C.A. # 04-956-GMS

---

Transcript of:

# Christopher D. Foraker
Volume # 1
December 13, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

VOLUME 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


CORPORAL B. KURT PRICE, et al.,        )
                                       )
          Plaintiffs,                  )
                                       ) Civil Action
v.                                     ) No. 04-956-GMS
                                       )
COLONEL L. AARON CHAFFINCH, et al., )
                                       )
          Defendants.                  )
------------------------------------)
SERGEANT CHRISTOPHER D. FORAKER,       )
                                       )
          Plaintiff,                   )
                                       )  Civil Action
v.                                     ) No. 04-1207-GMS
                                       )
COLONEL L. AARON CHAFFINCH, et al., )
                                       )
          Defendants.                  )


          Deposition of CHRISTOPHER D. FORAKER
taken pursuant to notice at the law offices of
Montgomery, McCracken, Walker & Rhoads, LLP, 300
Delaware Avenue, 7th Floor, Wilmington, Delaware,
beginning at 9:35 a.m., on Tuesday, December 13, 2005,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.
APPEARANCES:
        THOMAS S. NEUBERGER, ESQ.
        THE NEUBERGER FIRM, P.A.
         2 East Seventh Street - Suite 302
         Wilmington, Delaware  19801
         For the Plaintiffs

               WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477

Price, et al.                                    v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                    December 13, 2005

Page 2

1  APPEARANCES:  (Cont'd)
2      EDWARD T. ELLIS, ESQ.
       MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
3        123 South Broad Street
         Philadelphia, Pennsylvania  19109
4        For the Defendants
5  ALSO PRESENT:
       B. KURT PRICE
6      WAYNE WARREN
7        - - - - -
8           CHRISTOPHER D. FORAKER,
9      the deponent herein, having first been
10     duly sworn on oath, was examined and
11     testified as follows:
12          EXAMINATION
13 BY MR. ELLIS:
14     Q.   Sergeant Foraker, my name is Ed Ellis.  I'm
15 sure you know that by now.
16     A.   Yes, sir.
17     Q.   The purpose of our being here today is for me
18 to take your deposition in connection with the claims
19 you've made against Aaron Chaffinch and Thomas
20 MacLeish and the Delaware State Police.
21          Have you been deposed before?
22     A.   Yes, sir, I have.
23     Q.   How many times?
24     A.   Referring to this particular case or my

Page 3

1  previous case or my career?
2      Q.   Your career.
3      A.   I've probably been deposed fifteen times maybe.
4      Q.   Fifteen times all in civil cases?
5      A.   No, sir.
6      Q.   Some would have been in criminal cases?
7      A.   Some are criminal cases.
8      Q.   How many times have you been deposed in a civil
9  case?
10     A.   I believe three times.  This would be the
11 fourth time, I believe.
12     Q.   During the course of your career with the State
13 Police have you testified in court?
14     A.   Yes, sir.
15     Q.   How many times?
16     A.   (Pause).
17     Q.   Approximately.
18     A.   Probably fifty, sixty times, at least.
19     Q.   Were they all in criminal cases?
20     A.   Yes, sir.
21     Q.   Well, the purpose of the proceeding, as you
22 know, is for me to ask you questions about your case
23 and for you to give me answers.  So if you don't
24 understand the question, I'm sure you know by now to

Page 4

1  speak up and tell me you don't understand it.
2      A.   Yes, sir.
3      Q.   If you do understand it, just please answer the
4  question.
5           The first thing I'm going to show you
6  today is a document that has previously been marked in
7  another deposition as an exhibit and it's been marked
8  as Exhibit MacLeish 5 in Thomas MacLeish's deposition.
9           Are you familiar with that document?
10     A.   Yes.  I believe this is a news article written
11 by Tom Eldred of the Delaware State News.
12     Q.   When you first saw this document, would I be
13 correct that it didn't appear in its current format
14 but it was actually in the newspaper?
15     A.   That's correct.
16     Q.   Do you believe that you are defamed by any part
17 of this newspaper article?
18     A.   Yes, I do.
19     Q.   I want you to go down and point out to me each
20 paragraph that you believe is defamatory.
21     A.   (Reviewing document)  For one, there's I guess
22 the third article down or third paragraph down, it
23 says, "Flammable materials are stored in the shooting
24 area."

Page 5

1      Q.   Right.
2      A.   That's not true.  Flammable materials were not
3  stored in the shooting area.
4      Q.   Okay.
5      A.   I think the seventh paragraph down, "Mrs. Homer
6  said Facilities Management only provides 'custodial'
7  services and is not otherwise responsible."  That's an
8  incorrect statement.
9      Q.   Okay.
10     A.   Followed by "Colonel Chaffinch acknowledged
11 problems but indicated the blame lies only with one or
12 two troopers under his command."
13     Q.   Okay.  Keep going.
14     A.   The statement "'We are not responsible for the
15 equipment or cleanup of the range,' Mrs. Homer said as
16 she began the tour."
17          Facilities management is responsible for
18 that building.  It is their building.
19     Q.   As we go through this, Sergeant Foraker, please
20 remember that the question I asked you is whether the
21 statements in here were defamatory towards you and if
22 you believe that that statement is defamatory towards
23 you, that's fine.  But I'm not asking you just to
24 identify mistakes in the article or where people made

2 (Pages 2 to 5)

Price, et al.                                          v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1              C.A. # 04-956-GMS                      December 13, 2005

Page 6

1  mistakes. I'm specifically referring to where people
2  make statements that you believe to be defamatory
3  towards you.
4      A. I don't think it is a mistake. I think it is
5  defamatory. I think she's taking the responsibility
6  off of facilities management and laying blame with me
7  and my men.
8      Q. Okay. That's fine. Keep going.
9      A. The quote that says, "'The people who have
10 complained about the facility are also the same people
11 who are in charge of the facility.'"
12         They were pointing in my opinion to me and
13 my men again there.
14     Q. Do you understand that to have been a statement
15 that Mrs. Homer made?
16     A. It says it's a quote from Mrs. Homer.
17     Q. Okay. Thanks. Keep going, please.
18     A. Also a quote from Secretary Homer: "'We're
19 looking for the test results later this week,' she
20 said. 'I haven't seen any indication yet that those"
21 and then in brackets "that used the range) have had
22 higher than standard lead levels in their blood. The
23 proof is in the blood tests, not in how well the
24 equipment works.'"

Page 7

1      Q. That's the third paragraph on page 2.
2         MR. NEUBERGER: That's the fourth
3  paragraph.
4      Q. I'm sorry. The fourth paragraph on page 2.
5      A. That's correct.
6         Another statement, "'Ventilation can only
7  do so much,' she said. 'The hygiene of the facility
8  is just as important.'"
9      Q. Okay. Please continue.
10     A. The next paragraph, it says, "Mrs. Homer and
11 Mr. Furman pointed to material scattered on the floor
12 or on shelves."
13     Q. Why do you think that statement is defamatory?
14     A. Because she's indicating that we maintained a
15 mess or we created a mess there. By the time she took
16 her tour, there had been numerous people come through
17 that facility and we had to get out of there in a
18 hurry and move out. And there were many people in and
19 out of that facility, many people, from facilities
20 management personnel to State Police personnel, and
21 there were things moved about in there.
22         And I had no responsibility with the
23 condition that she found it in that particular day.
24     Q. Were you present on April 6th when this

Page 8

1  interview of Secretary Homer took place?
2      A. No, I was not.
3      Q. Were any of your subordinates present that day?
4      A. No. They weren't invited.
5      Q. Go ahead. Please continue.
6      A. "She pointed to a propane gas tank on the floor
7  at the back of the range."
8      Q. Okay. Was there a propane gas tank in the
9  building while you were in charge there?
10     A. No, sir. It was outside.
11     Q. What type of a tank was it? How big of a tank?
12     A. It's a small propane tank for a gas grille.
13     Q. Okay. About the size you would use on a
14 barbecue grille?
15     A. Correct. It was outside and then when the move
16 took place, we moved it inside so it didn't come up
17 missing and stolen.
18     Q. What was it used for?
19     A. Cooking on a gas grille.
20     Q. It actually was used to cook on a gas grille?
21     A. Correct.
22     Q. Okay. Why were you cooking on a gas grille at
23 the --
24     A. I wasn't.

Page 9

1      Q. Who was?
2      A. I believe Sergeant Ashley was doing some
3  cooking on some grille.
4      Q. Was there a grille there during the time you
5  were in charge?
6      A. No, sir.
7      Q. So there was a tank that would be used on a
8  grille but there was no grille while you were in
9  charge?
10     A. That's correct. The tank was outside.
11     Q. Right. But there was no grille attached to it?
12     A. Not anymore.
13     Q. Okay. So whoever grille it was had removed
14 the grille and left the tank?
15     A. Correct.
16     Q. That's fine. I'm sorry. Keep going through
17 the article, please.
18     A. Again, "'These individuals who have complained
19 about non-ballistic doors have stored a propane tank
20 back there. Look at the cardboard piled up here. As
21 you can see, there's quite a lot of flammable material
22 stored in this facility. That wasn't in the original
23 plans.'"
24         "'The bullet trap wasn't cleaned

3 (Pages 6 to 9)

A297

Price, et al.                                        v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                    December 13, 2005

Page 10

1 properly,' Mrs. Homer said. 'The back, where the
2 track is, was so poorly maintained that it became
3 unworkable.'"
4    Q.   Thank you.  Please continue.
5    A.   The quote from Colonel Chaffinch:  "'I knew
6 there was ammunition in this building but I didn't
7 know it wasn't supposed to be here,' he said.  'When I
8 was here in the fall, everything was going as well as
9 the previous times I'd been here.'"
10   Q.   Please continue.
11   A.   The top of page 3, "'There was some
12 discoloration in the bullet trap but that was about
13 it,' he said.  'I think people who live in glass
14 houses shouldn't throw stones.  It's a lot dirtier
15 now.  Things seemed in their proper places in the
16 fall.  I've never seen it like this.'"
17           "Asked what 'people' he was referring to,
18 Colonel Chaffinch said he was referring to 'the people
19 that provided (the media) with the information in the
20 first place.'"
21           "'The previous sergeant in charge did a
22 good job,' he continued.  'Things changed in December
23 when another sergeant came in.  That's at least a
24 portion of where the ball was dropped.'"

Page 11

1           "The 'previous sergeant' was Sergeant
2 Richard Ashley, who was picked by the colonel in April
3 2002 to replace Sergeant Christopher D. Foraker as
4 range supervisor."
5    Q.   Just with respect to that sentence that you
6 just read, do you believe that sentence is defamatory?
7    A.   Yes.  Because he's referring to me as not doing
8 my job and Richard Ashley did.
9    Q.   Okay.  He's referring to you as dropping the
10 ball from the previous paragraph, right?
11   A.   Correct.
12   Q.   That's what you're referring to, right?
13   A.   And it makes it very clear in the second, that
14 sentence, the second sentence that I read to you of
15 what he's trying to say.
16   Q.   Is it factually accurate that Ashley was picked
17 by the colonel in April 2002 to replace you as range
18 supervisor?
19   A.   Yes.
20   Q.   Okay.  I understand.  I'm just trying to get
21 clear what you're talking about.
22           Keep going, please.
23   A.   "'If the people that are assigned here now
24 don't feel that protocol is part of their protocol,

Page 12

1 they will be assigned elsewhere.'"
2           "Contacted later, Colonel Chaffinch said
3 Sergeant Ashley has retired.  He would not permit the
4 Delaware State News to interview Captain Warren or
5 Sergeant Foraker."
6           "'I have the authority to say yes or no,'
7 he said.  'I'm not going to allow those people to be
8 interviewed at this point in regard to this particular
9 situation.  I'm not trying to create any more of a
10 mess than we already have.'"
11           "He praised Sergeant Ashley for his work
12 at the range."
13           "'Because of the frangible ammunition we
14 were using, the bullet trap required hands-on, daily
15 cleaning,' he said.  'Sergeant Ashley was willing to
16 do that.'"
17           "'I cannot say Sergeant Foraker was
18 willing to do that.  He was interested in instruction
19 and teaching people how to shoot.  He did not feel
20 (bullet trap cleaning) was part of his purview.  He
21 felt that was putting him in harm's way.'"
22           I believe that's about it.
23   Q.   Thank you.
24           Now I would like to go back to the

Page 13

1 beginning of the article and ask you some questions
2 about the paragraphs that you referred to, that you've
3 identified in your testimony today.
4           Going back to the first page, the first
5 statement that you identified as being defamatory is
6 the statement "Flammable materials are stored in the
7 shooting area."
8           The first question I have for you is:  Do
9 you have an understanding of what Mr. Eldred meant by
10 "the shooting area"?
11   A.   The range itself.
12   Q.   The area in which trainees would discharge
13 their weapon towards the target?
14   A.   Correct.
15   Q.   That's what you would refer to as the shooting
16 area?
17   A.   That's correct.
18   Q.   Do you know what he means by "flammable
19 materials"?
20   A.   He's going off what Gloria Homer and Aaron
21 Chaffinch have said.
22   Q.   I understand that.  But what do you understand
23 to be, what do you understand the phrase "flammable
24 materials" in that sentence to refer to?

4 (Pages 10 to 13)

Price, et al.                                                v.                                         Chaffinch, et al.
Christopher D. Foraker, Volume 1                    C.A. # 04-956-GMS                        December 13, 2005

Page 14

1    A.    Well, I think it's referred later on in the
2    article about that propane tank being there and the
3    cardboard targets.  The cardboard targets are up
4    against the back wall.  They're not actually in the
5    actual shooting area.
6    Q.    When you use the phrase "back wall," which part
7    of the range are you referring to?
8    A.    The wall that would be to your back when you're
9    facing down range to shoot.
10   Q.    So is that a place where you normally stored
11   targets?
12   A.    That was moved from a designated room that was
13   called the target room, that was moved from that room
14   back I believe by either Sergeant Fitzpatrick or
15   Sergeant Parton.  We started storing the cardboard
16   targets out there on the range so they were closer,
17   much closer and easier access, and we could use the
18   target storage room for interactive training.
19   Q.    Just so I make sure it's clear what you're
20   saying here, when the range first opened I take it
21   there was a room that was intended to be a target
22   room?
23   A.    Correct.
24   Q.    And that's where you stored all the targets?

Page 15

1    A.    Correct.
2    Q.    What are the targets made of?
3    A.    Cardboard.
4    Q.    At some point you said prior to when you became
5    the NCOIC somebody decided to move the targets out
6    onto the range itself so they would be easier to get
7    at?
8    A.    Correct.
9    Q.    Would you consider the targets flammable?
10   A.    Certainly they'll burn, but they're not in the
11   actual shooting area.  We don't shoot from back there.
12   Q.    I understand that.  They're in the same room as
13   the shooting goes on though, correct?
14   A.    Correct.
15   Q.    They're just behind where the shooter is
16   supposed to be?
17   A.    Correct.
18   Q.    The propane gas tank that Secretary Homer
19   refers to as being on the floor at the back of the
20   range, again is that the back of the range meaning
21   behind where the shooter stands or is that behind the
22   bullet trap back of the range?
23   A.    No.  It's behind the shooter.
24   Q.    So it's in the shooting area itself but behind

Page 16

1    where the shooter would stand?
2    A.    Correct.
3    Q.    How many feet would you estimate it would be
4    from what I think you called the starting line for the
5    shooters to the area where the targets are stored?
6    A.    It's like 30 feet.
7    Q.    On the first page of Exhibit MacLeish 5, going
8    back to the document, there's a statement that you
9    said you felt was defamatory and it's from Mrs. Homer
10   and it's, I quote, "'We are not responsible for the
11   equipment or cleanup of the range,'" unquote.
12          What is it you believe facilities
13   management was responsible for in terms of the
14   equipment and cleanup of the range?
15   A.    Well, like was established in my first trial,
16   we were just considered tenants of that building.
17   They didn't consider me a manager of that facility.
18   With regard to the health and safety of that building,
19   that is the responsibility of facilities management.
20   They have to ensure that the equipment, the
21   ventilation system, in particular, is working
22   properly.  That's their responsibility.  They are
23   responsible for maintaining and testing to ensure that
24   that's a healthy facility.

Page 17

1           I am only in charge of the firearms end of
2    things.  I'm in charge of making sure that the firing
3    line is safe, tactical training and that sort of
4    thing.  That building belongs to facilities management
5    and that was made quite clear to me in my first trial.
6    Q.    When you say that facilities management is
7    responsible for the building, does that mean that you
8    and your staff at the firearms training unit have no
9    responsibility for cleaning up target debris or bullet
10   casings?
11   A.    No.  We were responsible for collecting the
12   bullet casings and -- you're talking about debris that
13   accumulated where?
14   Q.    In the shooting area in front of the bullet
15   trap.
16   A.    Correct.
17   Q.    In other words, between where the shooter is
18   and where the bullet trap is?
19   A.    That's correct.
20   Q.    So as I understand the way the range works, the
21   trainee would point the weapon at the target and
22   behind the target is the bullet trap.  When the bullet
23   goes through the target, it creates debris.  Is that
24   correct?

5 (Pages 14 to 17)

Price, et al.                                                    v.                                        Chaffinch, et al.
Christopher D. Foraker, Volume 1                    C.A. # 04-956-GMS                        December 13, 2005

Page 18

1     A.   Correct.  That is correct.
2     Q.   So the debris gets all over the front of the
3   range, correct?
4     A.   Correct.
5     Q.   Then who is responsible for cleaning that up?
6     A.   That would be us or our students, depending on
7   what we're doing that day.
8     Q.   Who is it that you understand to be responsible
9   for maintaining the bullet trap?
10    A.   Apparently we were supposed to be responsible
11  entirely for cleaning the bullet trap.
12    Q.   You used the word "apparently."  What do you
13  mean by "apparently"?
14    A.   Well, we also have Savage Range System come in
15  and completely clean it, drain it.  They have a
16  one-year or an annual visit where they clean out the
17  debris and make sure everything is running properly.
18    Q.   Between the annual visits from Savage Range, is
19  it the FTU's responsibility, by "FTU" I mean you and
20  your subordinates, to maintain the bullet trap?
21    A.   I guess it would have to be broken down into
22  what you mean as far as maintain.  If certain things
23  break or what exactly are you asking me?
24    Q.   Well, let me just ask you a couple of questions

Page 19

1   about the bullet trap.
2          It's my understanding that the bullet trap
3   is what you call a wet system.  Is that correct?
4     A.   Correct.
5     Q.   What does it mean to be a wet system?
6     A.   There's a lower ramp underneath of the
7   deceleration chamber that is wet.  A water and oil
8   mixture sprays down on that bottom ramp.
9     Q.   What's the purpose of the water spraying down
10  onto the bottom ramp?
11    A.   My understanding is that a projectile strikes
12  the water and that ramp and it hydroplanes up into the
13  deceleration chamber, rotates around until it loses
14  its energy, drops down onto a conveyor belt.  It
15  transports it to a bucket and dumps it into the
16  bucket.
17    Q.   Let's list some of the things that can go wrong
18  with the bullet trap.
19          Number one, there have been situations,
20  have there not, when the bullet trap is dry, there's
21  no water coming out of the nozzles?
22    A.   When I came back on December 1st, when I was
23  Court ordered back by Judge Farnan from the federal
24  court, when I arrived on December 1st, 2003 there were

Page 20

1   three dry spots.
2     Q.   During your first tour as NCOIC at the firearms
3   training unit, did you ever have the situation occur
4   where the nozzles were not shooting water out the way
5   they were supposed to?
6     A.   Yes.
7     Q.   And how often would that occur?  We're talking
8   now July 2001 through April 2002, right?
9     A.   Yes.
10    Q.   How often would that occur that one or more of
11  the nozzles was not shooting water out in the manner
12  that it was designed to do?
13    A.   Fairly often, a few times a month.
14    Q.   Whose responsibility was it to fix that?
15    A.   We would try to diagnose the problem to see
16  what was wrong, from whether it's a thrown breaker for
17  that particular pump, whether the plug is bad on the
18  pump, whether the impeller is stuck on the pump, if
19  the pump is burned out, if it's the screen, the filter
20  screen that's clogged, if it's the valve that's stuck
21  or broken or it needs to be adjusted or if it is, in
22  fact, the sprayer head that's clogged.
23    Q.   When you say, "we would try to diagnose it,"
24  who is the "we"?

Page 21

1     A.   All of us in the firearms training unit.
2     Q.   So between August of 2001 and February of 2002,
3   that would include yourself, correct?
4     A.   What were the dates again?
5     Q.   Between August 2001 and April 2002, the
6   firearms training unit would include yourself, right?
7     A.   Correct.
8     Q.   Also Corporal Price?
9     A.   Correct.
10    Q.   And Corporal Warren?
11    A.   Correct.
12    Q.   And Eddie Cathell?
13    A.   Correct.
14    Q.   Was there anybody else?
15    A.   I don't believe so, no.
16    Q.   You would during that period have temporary --
17  what do you call them?  Part-time trainers come in to
18  help out during peak loads, wouldn't you?
19    A.   Adjunct instructors.
20    Q.   Is that what you would call them?  Okay.
21          Did you have the adjunct instructors work
22  on the bullet trap too?
23    A.   No.
24    Q.   So suppose that you had this problem with the

6 (Pages 18 to 21)

A300