Price, et al.                                      v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                December 13, 2005

Page 22

1  bullet trap and you diagnosed that it was a bad pump,
2  what would you do?
3      A.   We would have to unplug the pump, reach into
4  the water trough, pull the pump out, disconnect it
5  from the tubing, reconnect it to another, reconnect
6  another pump to the tubing, plug it in and put it back
7  in the water-oil mixture and see if that would repair
8  it, if that would correct the problem.
9      Q.   Is what you've just described to us the process
10 of replacing the pump?
11     A.   Yes.
12     Q.   Did you actually replace pumps yourself?
13     A.   Yes.
14     Q.   You were at the firing range when it first
15 opened in 1998, weren't you?
16     A.   Yes.
17     Q.   During the time between 1998 when it opened and
18 2001 when you became the NCOIC, did you perform the
19 task of replacing the pump that you just described?
20     A.   Between what dates?
21     Q.   Between the time the range opened in '98 and
22 the time you became the NCOIC in 2001, did you perform
23 the task of replacing the pump like you just described
24 to me?

Page 23

1      A.   Yes.
2      Q.   How about filters, did you change filters
3  during that time period?
4      A.   Yes, I did.
5      Q.   Did you clean the like shotgun waddings out of
6  the tank that's below the bullet trap?
7      A.   Yes, I did.
8      Q.   And you did all of these things yourself?
9      A.   I did them, yes.
10     Q.   Did Corporal Price do it?
11     A.   I believe so.
12     Q.   How about Corporal Warren?
13     A.   I believe he did also.
14     Q.   How about Eddie Cathell?
15     A.   Yes, sir.
16     Q.   When you became the NCOIC, did you continue to
17 perform the maintenance of the water system in the
18 bullet trap?
19     A.   Yes.
20     Q.   Now, would you agree with me that the firearms
21 training unit personnel were responsible for the
22 maintenance of the water system in the bullet trap?
23     A.   Those parts that I mentioned, yes.
24     Q.   And facilities management was not responsible

Page 24

1  for that, right?
2      A.   No.
3      Q.   Now, facilities management was clearly
4  responsible for the HVAC system, correct?
5      A.   Correct.
6      Q.   During the time that -- let me back up a
7  second.
8           I want to refer back to what Mrs. Homer
9  has said here on the first page of Exhibit No. 5.
10     A.   Can I qualify something?
11     Q.   Yes.
12     A.   But I do believe it's facilities management's
13 responsibility to let us know what environment we're
14 working in with that bullet trap.
15     Q.   What do you mean by that?
16     A.   What type of hazards we're being exposed to in
17 that water.  No one is testing the water.  No one is
18 keeping an eye on it to make sure it doesn't have any
19 pathogens growing in it.  No one is keeping up to tell
20 us what levels of contamination is behind the bullet
21 trap that we're working in.  No one is testing it to
22 see what we're being exposed to.  No one is giving us
23 respirators, Tyvek suits to protect us from hazards.
24     Q.   Do you know what information was provided by

Page 25

1  the State Police to facilities management as to what
2  the projectiles are composed of that are being shot
3  into the bullet trap?
4      A.   I didn't understand your question.
5      Q.   What does facilities management know about
6  what's going into the bullet trap in terms of bullets?
7      A.   They should know everything of what's going on
8  in that building.  It's their building.
9      Q.   Well, I guess maybe you can say they should,
10 but my question to you is:  Do you have any
11 information as to what anybody at the State Police
12 told them?
13     A.   (Pause.)
14     Q.   Do you understand the question?
15     A.   No, not yet.
16     Q.   Did you ever tell anybody at facilities
17 management whether you were the NCOIC or at any time
18 what was in the bullets that were going into the
19 bullet trap?
20     A.   I would think that they already knew from prior
21 to me taking over.
22     Q.   I understand that's what your position is.  I'm
23 simply asking whether you ever told them.
24     A.   No.  But I also think that it's incumbent upon

7 (Pages 22 to 25)

A301

Price, et al.                                    v.                         Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS              December 13, 2005

Page 26

1  them to know what's going on.
2  Q.  It may well be.  I'm just trying to establish
3  the facts and the question is whether you ever told
4  anybody at facilities what was in the bullets.
5      I take it the answer is no?
6  A.  Eventually, yes.  I provided them with an MSDS
7  sheet of the bullets.
8  Q.  And that would have been when?
9  A.  January of 2004, a month after I took over.
10  Q.  At any point prior to that, and you were the
11  NCOIC in 2001 and 2002, at any point prior to 2004 did
12  you provide an MSDS to the folks at facilities?
13  A.  No, I did not.
14  Q.  You have talked to people at facilities while
15  you were working at the range, right?
16  A.  Yes.
17  Q.  Like people like Mark D'Allesandro?
18  A.  Correct.
19  Q.  Who else did you deal with from facilities?
20  A.  Doyle Tiller.
21  Q.  Who else?
22  A.  Mark DeVore.
23  Q.  Did you deal with Tiller and DeVore prior to
24  December 2003?

Page 27

1  A.  Yes.
2  Q.  When would that have been?
3  A.  Back when I was in charge the first time.
4  Q.  What was your purpose for having interaction
5  with Doyle Tiller back in 2001-2002?
6  A.  Ventilation problems.
7  Q.  How about DeVore?
8  A.  Same thing.  He's the engineer.
9  Q.  I'm sorry if I asked you this question already.
10  But at any point prior to January 2004 did you provide
11  to anybody at facilities the MSDS's for the bullets
12  you were using at the range?
13  A.  No, I did not.
14  Q.  Is there anybody else that you dealt with from
15  facilities other than the three names we already have
16  mentioned during the period prior to December 2003?
17  A.  Tom Faison.
18  Q.  What was his job?
19  A.  I don't know what his title was, but he was
20  kind of like the everyday maintenance guy.
21  Q.  Okay.
22  A.  Give me just a minute.
23  Q.  Take your time.
24  A.  An electrician by the name of Elliott.

Page 28

1  Q.  Elliott Harding?
2  A.  Yes.
3      Mr. Bell.
4  Q.  Is that B-e-l-l?
5  A.  Correct.  I can't think of the other guy that
6  was a maintenance guy before Tom Faison.  I can't
7  believe it.  I can see him in my mind.
8  Q.  So there was another, your routine maintenance
9  guy you referred to him as?
10  A.  Correct.
11  Q.  Did Mark D'Allesandro replace Tom Faison?
12  A.  No.
13  Q.  They were working at the same time?
14  A.  Correct.  They have two different job
15  functions.
16  Q.  What's Faison's job?
17  A.  Like I said, I believe he's the everyday
18  maintenance guy.
19  Q.  What is your understanding of D'Allesandro's
20  job?
21  A.  I believe he's like a supervisor, a level above
22  him.
23  Q.  Going down again on the first page of MacLeish
24  5, there is a statement "'The people who have

Page 29

1  complained about the facility are also the same people
2  who are in charge of the facility.'"
3      At this point, and this is April 6th when
4  this discussion with the press occurred, who was
5  complaining about the facility?
6  A.  We have.  We spoke out about problems with the
7  range.  We spoke about problems and we brought them to
8  the forefront.
9  Q.  Who is the "we," Sergeant Foraker?
10  A.  Myself and my men.  And I explained this in my
11  interrogatories.
12  Q.  Is it accurate what Mrs. Homer says is that the
13  people who are complaining are the same people who are
14  in charge of the facility?
15  A.  Yes.  She's indicating myself, my men and
16  Captain Warren.
17  Q.  Go over to the next page, please.  The fourth
18  paragraph down is a paragraph that you said you
19  thought was defamatory and it has to do with I think
20  blood lead levels.
21      Would you agree with that?
22  A.  Yes, I do.
23  Q.  Do you know what Gloria Homer meant, do you
24  have any idea what she meant when she uses the

8 (Pages 26 to 29)

A302

Price, et al.                                                                    v.                                                  Chaffinch, et al.
Christopher D. Foraker, Volume 1                          C.A. # 04-956-GMS                                      December 13, 2005

Page 30

1 phrase "higher than standard lead levels"?
2    A.   I believe the standard is a 4 or a 5.
3    Q.   My question is:  Do you know what she meant?
4    A.   No matter what our levels were, she's saying
5 that they're okay, they're standard.
6    Q.   Okay.  When you were the NCOIC in 2001 and
7 2002, is it true that you tried to keep the blood lead
8 levels somewhere between 6 and 12?
9    A.   Correct.  I actually wanted to be below a 10
10 because that's what Johns Hopkins, Dr. Schwartz from
11 Johns Hopkins according to Major Swiski, he wanted us
12 to stay a 10 or below.
13    Q.   Dr. Schwartz said 10 or below would be
14 desirable, right?
15    A.   That's what you want to shoot for.  You want to
16 stay below a 10.
17    Q.   Didn't he also say to Major Swiski that none of
18 the blood lead results that the Delaware State Police
19 had shown him, other than Eddie Cathell's, presented
20 any sort of danger to the troopers?
21    A.   I don't know that he said that.
22    Q.   So you do know that he said that he wanted it
23 under 10, but you don't know anything else that he
24 said?

Page 31

1    A.   I'm telling you what Major Swiski told me.  I
2 never talked to Mr. Schwartz.
3    Q.   Okay.  Did you receive test results for blood
4 lead levels in April of 2004 for you and your men?
5    A.   Yes.
6    Q.   Were any of them higher than a 12?
7    A.   I don't believe so.
8    Q.   Were any of them higher than 10?
9    A.   I don't believe so.
10    Q.   Two paragraphs down from the paragraph I was
11 just asking you about is one that begins with the
12 phrase "'Ventilation can only do so much.  The hygiene
13 of the facility is just as important.'"
14         Why do you believe that that statement is
15 defamatory?
16    A.   Because it's indicating that the closing of
17 that range was due to our lack of upkeep, which is
18 totally a fabrication and is totally false.
19    Q.   Okay.  That's what you believe she means by
20 that?
21    A.   That's exactly what she means by that.
22    Q.   In the next paragraph down you have stated that
23 you found the following statement defamatory, and I'll
24 quote:  "Mrs. Homer and Mr. Furman pointed to material

Page 32

1 scattered on the floor or on shelves."
2         Do you know whether there was, in fact,
3 material scattered on the floor or on shelves the day
4 that Mrs. Homer and Mr. Furman went through the range?
5    A.   I believe that I went there a day or two after
6 that to pick up some weapons and, like I explained,
7 there were many people in and out of that range and
8 there were things there that I didn't leave there and
9 my men didn't leave there.
10         So there had been other people in that
11 building in and out and there were other things
12 around.  There was ammunition that wasn't even our
13 ammunition, some of which wasn't what we use on a
14 regular basis, here and there.  We didn't leave it in
15 that condition that they're using.
16    Q.   Okay.  I understand that and you have said that
17 before, but my question is:  Do you know whether the
18 statement that is made in this article that there was
19 material scattered on the floor and shelves is correct
20 or not?
21    A.   I think it's false what she's saying.  I didn't
22 do that.  We didn't do that.  We didn't leave it that
23 way.
24    Q.   The article doesn't say anything about who put

Page 33

1 the debris or material there.
2    A.   It's insinuating that it was me and my men.
3    Q.   Okay.  That's what you believe to be defamatory
4 about that statement?
5    A.   Yes.
6    Q.   Now, you said that there was ammunition there
7 that wasn't your ammunition?
8    A.   Not that we were using, no.
9    Q.   Do you know how it got there?
10    A.   I have no idea.
11    Q.   What kind of ammunition was it?
12    A.   A different caliber, I believe.  It was either
13 a different caliber or a different make.
14    Q.   Did you have an educated guess as to how the
15 ammunition got there that wasn't yours?
16    A.   I don't.
17    Q.   Was it there the last time -- well, was it
18 there when the range was in operation in February of
19 2004?
20    A.   No.  Just like I said before, there were things
21 there that weren't there when my men and I left the
22 range.
23    Q.   So you believe that at some point between the
24 time the range stopped operating and the point that

9 (Pages 30 to 33)

A303

Price, et al.                                    v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 1        C.A. # 04-956-GMS                  December 13, 2005

Page 34

1  this tour occurred in April of 2004 somebody came in
2  and put ammunition there that didn't belong to the
3  Delaware State Police?
4     A.  I don't know that it belonged to the Delaware
5  State Police.  It wasn't what we were using at the
6  time.
7     Q.  Are you saying that that ammunition that you
8  were not using at the time appeared at the firing
9  range between the time that you stopped operating
10 there and the time of this story?
11    A.  Correct.  I don't know how it appeared there.
12 I don't know how it got there.
13    Q.  That's fine.  But your deduction is it appeared
14 at some point between the last time you were using it
15 and the time that the cabinet secretary went through
16 for the tour?
17    A.  Correct.
18    Q.  Going farther down on page 2 of Exhibit
19 MacLeish 5 is the paragraph that says, "'The bullet
20 trap wasn't cleaned properly.  The back, where the
21 track is, was so poorly maintained that it became
22 unworkable.'"
23       At the point that you stopped using the
24 range -- and I gather this is sometime in February

Page 35

1  2004 -- and by "stopped using" it I mean stopped
2  shooting in the building, was the bullet trap working?
3     A.  (Pause).
4     Q.  That's a bad question.
5        Was the conveyor system or the drag chain,
6  whatever you call it that operated in the tank of the
7  bullet trap, was that functional?
8     A.  No.
9     Q.  Do you know why not?
10    A.  Because I believe the pivot shaft they called
11 it was pulled out of its socket.
12    Q.  Is the pivot shaft on the motor end of the belt
13 or on the far end?
14    A.  It's the far end.
15    Q.  And I take it that's the piece of equipment
16 that holds the end of the belt in place so that it can
17 turn around it, turn from going in one direction to
18 back going the opposite direction?
19    A.  That's my understanding.
20    Q.  You have watched it operate, right?
21    A.  I've seen the belt move.  I haven't seen that
22 end.  I have no idea what that end looks like.
23    Q.  How did you know that it wasn't working
24 properly?

Page 36

1     A.  Because the technician that came in January
2  discovered that.
3     Q.  Okay.  So had the belt stopped operating in
4  January?
5     A.  It stopped operating in December.
6     Q.  At any point from December to the time the
7  range closed was the belt operating?
8     A.  I don't believe on a regular basis, no.
9     Q.  Maybe this would be a good time to ask you some
10 questions about that.
11       I'm going to show you a document that has
12 been marked D-1.
13       MR. NEUBERGER:  Excuse me?
14       MR. ELLIS:  D, as in defendant, 1.
15       MR. NEUBERGER:  Are you saying this is in
16 the record or we're going to make it in the record?
17       MR. ELLIS:  No.  It's already in the
18 record.  It was in -- I forget -- one of the other
19 plaintiff's deposition.
20       MR. NEUBERGER:  All right.
21 BY MR. ELLIS:
22    Q.  Sergeant Foraker, I would like you to take a
23 look.  The document I have shown you is actually three
24 e-mails in a chain.  The first one is the one in the

Page 37

1  back, which is dated Friday, December 19, 2003 at 7:20
2  p.m. and it goes from you to Thomas MacLeish and Paul
3  Eckrich with copies to Greg Warren and Ralph Davis.
4        There is then Colonel McLeish's reply on
5  January 5th and then you reply to that on January 5th
6  later in the day.
7        I'm going to ask you a number of questions
8  about this exhibit, but for present purposes if you
9  could just look at the earliest of the e-mails which
10 is the one that begins on the second page and that's
11 the one that starts on Thursday, December 18, 2003.
12       Do you see that?
13    A.  Yes.
14    Q.  This states that on December 18 you discovered
15 that the clutch pulley sprocket of the conveyor drag
16 or dredge system has been damaged and the drive chain
17 has been broken.  And then you then go on to say that
18 this has brought the dredging system to a complete
19 stop.
20       When you refer to the dredging system, is
21 that the same thing as we have been talking about here
22 today calling it the belt?
23    A.  The drag belt, yes.
24    Q.  The drag belt, okay.

10 (Pages 34 to 37)

Price, et al.                                    v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS              December 13, 2005

Page 38

1    As I understand it, as of December 2003
2  the belt that was in use was a metal belt with cleats
3  on it that were designed to drag the residue of the
4  ammunition down towards the end of the tank?
5    A.  Yes.
6    Q.  Is that right?
7    A.  Yes.
8    Q.  So as of December 18 this drag system was not
9  working, right?
10   A.  Correct.
11   Q.  Now, if you go to the first page of this
12  exhibit, D-1, and this is your January 5th e-mail to
13  Lieutenant Colonel MacLeish, you also talk, you talk
14  in this one about repair work that was done on the
15  clutch pulley and chain.
16        You were present to see that work done,
17  right?
18   A.  Yes.
19   Q.  And it was done by a guy named Toplack from the
20  Mayfran Corporation?
21   A.  Yes.
22   Q.  After Mr. Toplack completed his repair, was
23  there a point when the system was working correctly?
24   A.  It was running when he left.

Page 39

1    Q.  How long did it stay running?
2    A.  Not very long.
3    Q.  A matter of I mean days, weeks?
4    A.  Days, I believe.
5        MR. ELLIS:  I'm going to ask the reporter
6  to mark this as D-17.  I think that's what we're up
7  to.
8        (Defendant's Deposition Exhibit No. 17 was
9  marked for identification.)
10       THE WITNESS:  Did you want me to read
11  this?
12  BY MR. ELLIS:
13   Q.  Yes, please.  I'm particularly interested at
14  this point in you reading the second paragraph, the
15  paragraph that has the number 2 in front of it.  This
16  is an e-mail from you to Greg Warren, copied to Ralph
17  Davis dated January 9, 2004.
18        And also paragraph 3 on the next page.
19  Sorry.
20   A.  (Reviewing document)  Okay.
21   Q.  Now, does this e-mail document, this is dated
22  January 9, document that the conveyor is, once again,
23  no longer working?
24   A.  That's correct.

Page 40

1    Q.  And the third, the paragraph numbered 3 on the
2  second page of Exhibit D-17 says the drag conveyor has
3  failed once again.  You don't indicate here what day
4  it failed.
5        Do you recall it failing on the date that
6  you sent this e-mail or was it someday prior to that?
7    A.  I don't recall at this time if this was the
8  actual day that I discovered it or not.
9    Q.  Well, according to Exhibit D-1 it would have
10  been fixed as of December 29, right?
11   A.  Correct.  When he left it was running, it was
12  working at that particular moment.
13   Q.  Now, am I correct that between Christmas and
14  New Year's that you were not doing any shooting on the
15  range, it was basically shut down?
16   A.  Correct.
17   Q.  So the first day of operation after the
18  holidays would have been Monday, January 5th, right?
19   A.  Correct.
20   Q.  Did shooting start on Monday, January 5th or
21  was it someday later in that week?
22   A.  I believe recruit training started on that
23  Monday, the 5th, and depending on where they are in
24  the curriculum that particular day, they may start

Page 41

1  shooting in the afternoon.
2    Q.  So at some point between Monday, the 5th and
3  Friday, the 9th the conveyor belt broke down again.
4  Is that a fair statement?
5    A.  That or maybe it broke down prior to us coming
6  back.  I don't know.  I'm not 100 percent sure at this
7  point in time.
8    Q.  Was it running when the range was closed, the
9  conveyor system I mean?
10   A.  Yes.  They said it had to run continuously.
11   Q.  So as of December 29th it got turned on even
12  though there was nobody in the building?
13   A.  Correct.  Both Savage and Mayfran said that
14  they had, they requested that the water system and the
15  conveyor belt continue to run 24/7.
16        MR. ELLIS:  Let me mark this as Exhibit
17  D-18.
18        (Defendant's Deposition Exhibit No. 18 was
19  marked for identification.)
20  BY MR. ELLIS:
21   Q.  Now take a look at the bottom.  This is two
22  e-mails, the first one being January 23, 2004 from you
23  to Greg Warren and Ralph Davis and then Greg Warren's
24  response of January 26 to you.

11 (Pages 38 to 41)

Price, et al.                                         v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1              C.A. # 04-956-GMS                    December 13, 2005

Page 42

1    And I really only want to ask you about
2   the earlier of the two e-mails on the 18th and ask you
3   if this documents the fact that the conveyor system
4   was not operational as of Friday, January 23rd?
5    A.   (Reviewing document)  Your question again?
6    Q.   I think the question was whether this January
7   23rd e-mail documents the fact that the belt, the
8   conveyor system, in other words, is not operational as
9   of that date?
10   A.   Correct.  That's fair to say.
11   Q.   I recognize there are other things in that
12  e-mail.  But can we take it from the e-mail that by
13  the 23rd it's not working again?
14   A.   Correct.
15   Q.   Do you remember whether it was working at any
16  point between January 9th and January 23rd?
17   A.   It was working when Mr. Toplack left.  The next
18  time I viewed it I believe it was broken again.  It
19  had ceased operation.
20   Q.   When you say that when Mr. Toplack left, that's
21  December 29th, correct?
22   A.   I believe so, thinking back.
23   Q.   That's based on Exhibit D-1?
24   A.   Yes.

Page 43

1    Q.   Now, when was the next time you looked at it,
2   if you remember?
3    A.   At this point in time I don't recall exactly
4   when I looked at it.  It was sometime that week when
5   we came back.  I don't know whether it was actually
6   Monday or Tuesday.
7    Q.   That would be the week that ended with Friday,
8   January 9th?
9    A.   Correct.
10   Q.   Are you able to tell me whether between the 9th
11  and the 23rd it was ever operational?
12   A.   I don't believe that it was.
13   Q.   Now, D-18, which I think is still in front of
14  you, has in the second paragraph of the January 23rd
15  e-mail a reference to air quality testing that's to
16  occur on February 10th or 11th.
17    Do you see that?
18   A.   Yes.
19   Q.   Am I correct that the testing that occurred on
20  the 10th or 11th was done with the SORT team?
21   A.   Correct.
22   Q.   And that the SORT team shot in the range and
23  while they were shooting the air testing went on?
24   A.   That's correct.

Page 44

1    Q.   Was there any shooting that occurred at the
2   range, in training that occurred at the range that
3   occurred between February 11th and the time it was
4   shut down?
5    A.   Not that I'm aware of.
6    Q.   Now, between the 23rd, which is the date of
7   your e-mail to Greg Warren and Ralph Davis, between
8   the 23rd and the day of the shoot of the SORT team,
9   February 11th, was there shooting going on?
10   A.   Yes.
11   Q.   Was that the completion of the training class
12  at the academy?
13   A.   Yes.
14   Q.   So from the beginning of January to sometime in
15  the beginning of February, the range was in use every
16  day?
17   A.   Monday through Friday, I believe so.
18   Q.   At the time all this is going on, and I'm
19  talking January and early February 2004, did you have
20  a belief as to what the effect was of the conveyor
21  system going down, what the effect that would have on
22  the environment in the shooting range?
23   A.   The dredge system?
24   Q.   Yes.

Page 45

1    In other words, did you believe that it
2   was bad for the bullet trap system to have the dredge
3   belt inoperable?
4    A.   In the shooting range itself would it be bad?
5    Q.   Well, was it bad for the bullet trap system to
6   have the conveyor belt inoperable?
7    A.   I don't know that I can answer it as to whether
8   it would be bad or not.
9    Q.   As to the environment in the area where the
10  shooters were, do you think the conveyor belt being
11  inoperable had any effect on that environment?
12   A.   On the shooters?
13   Q.   Yes.
14   A.   No.
15   Q.   Do you believe there was any effect on the
16  environment of the building by the bullet trap
17  conveyor system not being operable?
18   A.   No.
19   Q.   What was your understanding as to what the
20  purpose of the bullet trap conveyor system, what was
21  the purpose of it?
22   A.   It's to transport leaded projectiles and dump
23  them into a barrel.
24   Q.   What purpose does it serve if you're not

12 (Pages 42 to 45)

Price, et al.                                                   v.                                              Chaffinch, et al.
Christopher D. Foraker, Volume 1                    C.A. # 04-956-GMS                          December 13, 2005

Page 46

1  shooting leaded projectiles?
2      A.  To drag the debris, leaded projectiles from
3  shotguns and whatever else debris that you have from
4  the frangible, and dredge it out and dump it into a
5  barrel.
6      Q.  Do you have an understanding of why that's
7  necessary?
8      A.  It's a convenient way to get rid of the spent
9  rounds.
10     Q.  Do you understand that it prevents the pumps
11  from getting clogged?
12     A.  No.  I don't believe it does that, no.
13     Q.  Did you ever talk to any of the Mayfran
14  personnel that were sent to the State Police range,
15  did you ever discuss with them the purpose of the
16  conveyor system?
17     A.  There's two different systems that you're
18  talking about.  There's a conveyor system that
19  originated.  The conveyor system transports solid
20  projectiles.
21         A dredge system drags debris and to me
22  that's two different, two different systems, two
23  different animals.
24     Q.  I'm really referring to the dredge system that

Page 47

1  was in effect, in place in January 2004.
2          Did you ever talk to any of the Mayfran
3  people about what the purpose of it was?
4      A.  Not what the purpose of it was, no.  We know
5  that it was to dredge the debris and dump it into a
6  barrel.
7      Q.  Go back to D-17, please.  Look at paragraph 2,
8  please, for a minute.  I would like you to read the
9  first sentence to yourself.
10     A.  (Reviewing document)  Okay.
11     Q.  In this sentence you're reporting to Captain
12  Warren that the wet ramp was dry in some areas, right?
13     A.  Right.  There were three areas when I arrived
14  there December 1, there were three points that were
15  dry.
16     Q.  Well, this is January 9th.  Were there more
17  than three?
18     A.  It was the same.
19     Q.  It was the same three?
20     A.  Correct.
21     Q.  And did it ever happen that there were more
22  than three places that were dry?
23     A.  Not during this time frame, no.
24     Q.  This sentence refers to the filter screens and

Page 48

1  the sprayer jet heads.  It says it causes the filter
2  screens and the sprayer jet heads to do something and
3  I can't see what that is because there was a hole in
4  the paper when it was photocopied.
5          Do you believe that word might be "clog"?
6      A.  It could be.
7      Q.  The filter screens and the sprayer jet heads
8  clogged because of the frangible ammunition, right?
9      A.  Correct.
10     Q.  And what was the effect of them clogging?
11     A.  It would become dry on the other side.
12     Q.  And do you believe that that caused a problem
13  with air quality?
14     A.  We didn't shoot in the dry ramps.  We shot in
15  the wet ramps.  We would locate our shooters in front
16  of wet ramps.
17     Q.  In this e-mail you sent to Greg Warren you
18  said, "The air quality problem is surely compounded by
19  the fact that the wet ramp is dry in some areas."
20         Did you believe that to be a problem at
21  the point you sent Greg Warren this e-mail?
22     A.  There may at certain times be a round that may
23  hit there, just like it would hit the upper ramp that
24  is also dry.  It's permanently dry, the upper ramp.

Page 49

1      Q.  Right.
2      A.  But what I do go on to say and I described it
3  in my interrogatories is that when we witnessed the
4  dust cloud that was from the rounds being fired from
5  the gun, the muzzle blast itself was traveling
6  backwards in our faces.
7      Q.  That's the subject of paragraph 1 of this
8  e-mail, right?
9      A.  Correct.
10     Q.  Did the circumstances that you described in
11  this e-mail that's D-17 exist at the range throughout
12  the entire month of January when shooting was going
13  on?
14     A.  Yes.
15         MR. NEUBERGER:  Why don't we take our
16  break now?
17         MR. ELLIS:  That's fine.
18         (A brief recess was taken.)
19  BY MR. ELLIS:
20     Q.  Sergeant Foraker, did you believe in January
21  2004 that you had the authority to shut down the range
22  if the circumstances, excuse me, if the environment
23  was not safe for the people working there?
24     A.  Absolutely not.  That is five or six pay grades

13 (Pages 46 to 49)

Price, et al.                                         v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1              C.A. # 04-956-GMS                      December 13, 2005

Page 50

1  above me. That's at the secretary level, cabinet
2  secretary level or at the colonel of the State Police
3  level.
4      Q. Why do you say that?
5      A. Because it's not our building. It's a facility
6  that's owned by the State of Delaware, not by the
7  Delaware State Police. And I am trained -- I'm a
8  trainer. I'm responsible for the safe operation of
9  training.
10     Q. Well, do you believe that it was safe to train
11 in the circumstances that were present in the range in
12 January 2004?
13     A. From my standpoint from a trainer, things were
14 safe as a trainer.
15     Q. Do you believe that the people that you were
16 training were in danger of inhaling contaminants
17 during January 2004?
18     A. I had a suspicion that it could be a problem
19 and once we found out, and that was January 8th that
20 we found out what the bullet, the frangible bullet was
21 made of, which was copper dust, I contacted the
22 engineer from the manufacturer of the bullet, got that
23 information. He said that "You don't want to eat it"
24 and my response to him was "If we have a penny taste

Page 51

1  in our mouth, then aren't we eating it?" And he said,
2  "Well, don't walk into the dust cloud."
3          So from that point on we would shoot and
4  once the cloud was starting to form, we would cease
5  fire and back off the line. It caused a significant
6  interruption in our training program.
7      Q. At the point that you -- well, in January 2004
8  given the observations you made of physical conditions
9  in the facility, did you believe that your
10 subordinates in the firearms training unit were being
11 placed in harm's way?
12     A. From what?
13     Q. From the conditions you just described, the
14 clouds of dust, the smoke from the discharge of the
15 weapons, the circumstances that you described in
16 Exhibit D-17 in your e-mail to Captain Warren.
17     A. I suspected that there were contaminants. I
18 don't know how dangerous it was. I'm not a chemist.
19 I'm not an industrial hygienist. And that's the
20 responsibility of facilities management.
21         We asked for them to conduct testing. We
22 asked for them to conduct swipe samples of the
23 facility, and they refused to do that. So then myself
24 and my men, we brought in Environmental Solutions and

Page 52

1  actually it came out of the budget. Instead of coming
2  out of the budget of facilities management, it came
3  out of the budget of the firearms training unit to pay
4  for sampling to see what we were being exposed to and
5  at what rate we were being exposed to it because
6  there's limits on exposure.
7      Q. I guess my question to you is: Do you believe
8  that you and the people in the firearms training unit
9  were in harm's way as a result of the environmental
10 conditions at the range in January 2004?
11     A. I believed that the possibility existed at that
12 time.
13     Q. Do you believe that the students, the people
14 you were teaching were in harm's way as a result of
15 the environmental conditions at the range in January
16 2004?
17     A. At that particular time I believed that the
18 possibility existed. That's why I wanted facilities
19 management to test the environment.
20     Q. Now, at any point before February 11, 2004 did
21 you recommend to anyone in the State Police that the
22 range be shut down?
23         MR. NEUBERGER: I'm sorry. What was the
24 date?

Page 53

1          MR. ELLIS: February 11, 2004.
2          MR. NEUBERGER: But before you said from
3  this date to that date. I'm sorry.
4          MR. ELLIS: At any point prior to February
5  11, 2004 I think is what I said.
6          MR. NEUBERGER: Thank you.
7  BY MR. ELLIS:
8      Q. Do you understand the question?
9      A. Can you read it back to me?
10     Q. I will just say it again.
11         At any point prior to February 11, 2004
12 did you recommend to anybody above you in the State
13 Police hierarchy that the range be shut down for
14 shooting purposes?
15     A. No. I asked for it to be tested. I believe
16 that we needed to test the facility to see what was
17 going on in the facility before we could, before
18 anybody at that cabinet level secretary position would
19 make that call because they needed more information.
20         Colonel MacLeish came up on January 21st
21 and he saw the same environment that has all been
22 described here. He had the authority to shut it down,
23 but he did not.
24     Q. How do you know he had the authority?

14 (Pages 50 to 53)

Price, et al.                                        v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                   December 13, 2005

Page 54

1    A.  He's the lieutenant colonel of the State
2  Police.
3    Q.  Any other reason you think he had the
4  authority?
5    A.  He has a whole lot more authority than I do.
6  I'm a sergeant.
7    Q.  I understand that.
8    A.  But he even waited until test results came in
9  and even when the test results came in, he waited till
10  a piece of paper, a report came in from Art Nielson of
11  Nielson Associates making the statement that the
12  facility is not fit for occupation and he also
13  said that it is not a hygiene issue; it is a
14  mechanical issue that's the problem here in this
15  facility.
16    Q.  When you met with then Lieutenant Colonel
17  MacLeish -- when did you say it was?  January 21st?
18    A.  21st, I believe.
19    Q.  How long did you meet with him?
20    A.  A short period of time.
21    Q.  Less than an hour?
22    A.  Yes.
23    Q.  Less than a half hour?
24    A.  I believe it was.

Page 55

1    Q.  Less than fifteen minutes?
2    A.  I would be guessing.
3    Q.  Where did you talk to him?
4    A.  I talked to him when he entered the building at
5  the front office area.  I talked to him while we
6  walked up to the control booth.  I talked to him in
7  the control booth and then we walked back out into the
8  hallway and back into the office and then he left.
9    Q.  Was there anybody present during the
10  conversation other than you and Lieutenant Colonel
11  MacLeish?
12    A.  At one point in time when we walked into the
13  control booth I believe it was Corporal Price in the
14  control booth.
15    Q.  Anybody else?
16    A.  I don't recall at this time.
17    Q.  What was the purpose, do you have an
18  understanding of why Lieutenant Colonel MacLeish was
19  present at the range that day?
20    A.  He said he had stopped by to see the skid pad
21  and then he just dropped by and wanted to just see how
22  the recruits were doing.
23    Q.  Did you have a discussion with him about the
24  environmental conditions in the range?

Page 56

1    A.  I tried to have a conversation with him.
2    Q.  So what did you say to him?
3    A.  I started to explain to him about the
4  ventilation problem.  And he said, "I'm not here for
5  that."
6        Then I started to explain to him about the
7  bullet trap and the conditions of the bullet trap.
8  And he said, "I am not here for that.  I just came
9  here to see the recruits."
10        And then I also asked him about the
11  headsets because we needed new headsets.  And he said,
12  "Contact Bill Carroll from communications and see if
13  you can get those retrofitted.  That sounds like an
14  awful lot of money to buy new ones."
15    Q.  At the point Lieutenant Colonel MacLeish came
16  to the range on January 21st, 2004 were you aware that
17  Captain Warren was preparing a report for Lieutenant
18  Colonel MacLeish on the conditions of the range?
19    A.  I know that he was and he did prepare a report
20  for him.  I'm not exactly sure on the exact dates.
21    Q.  Go back to D-1, which should be in front of you
22  someplace.  It may be underneath that.
23        MR. NEUBERGER:  Here you go.
24    Q.  Again, go to the second page of this exhibit,

Page 57

1  the Friday, December 19 e-mail you sent to MacLeish
2  and Eckrich got a response from MacLeish on January 5.
3        Do you see that?
4    A.  Yes, I do.
5    Q.  Do you see the third sentence where he says,
6  "Captain Warren, please prepare a written report that
7  addresses the concerns that Sergeant Foraker has
8  presented and propose possible solutions"?
9    A.  Yes.
10    Q.  And you got a copy of that e-mail, right?
11    A.  Yes.
12    Q.  Actually, it was directed to you and Captain
13  Warren, right?
14    A.  Yes.
15    Q.  So you knew in January of 2004 that Colonel
16  MacLeish was expecting a report from Captain Warren on
17  conditions at the range?
18    A.  Yes.
19    Q.  Did you have any input into what Captain Warren
20  prepared?
21    A.  I believe that there was a good bit of
22  information that we had, that I had given the chain of
23  command, put up the chain of command to him through
24  these various e-mails and we talked many times over

15 (Pages 54 to 57)

Price, et al.                                    v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                December 13, 2005

Page 58

1  the phone.  So from those conversations and these
2  e-mails I believe that he probably incorporated a good
3  bit of that information in his report.
4      Q.   Take a look at Exhibit D-18.
5           Do you have that in front of you?
6      A.   Mm-hmm.
7      Q.   Referring now to the top of D-18 which is an
8  e-mail from Greg Warren to you of January 26th, 2004,
9  the second sentence says, "I want to review some items
10  with you, prior to submitting my final report to
11  MacLeish."
12          Do you see that?
13      A.   Yes.
14      Q.   Did you actually have a meeting with Captain
15  Warren on January 27th to discuss certain items?
16      A.   We had a lot of meetings.  I'm not sure exactly
17  if the 27th we did.  I'm not sure at this point in
18  time.
19      Q.   Did Greg Warren show you his report to MacLeish
20  before he submitted it to MacLeish?
21      A.   He may have.  I don't recall at this time.
22      Q.   Did you have a pretty good idea what it was
23  going to say before Captain Warren submitted it to
24  Lieutenant Colonel MacLeish?

Page 59

1      A.   I believe so.
2      Q.   Let me show you what's previously been marked
3  D-2.  That's a copy of Captain Warren's report dated
4  January 30, 2004, right?
5      A.   Right.
6      Q.   Did you write any part of this report?
7      A.   I don't believe so.
8      Q.   Did you discuss with Captain Warren the
9  contents of the report?
10      A.   Yes, I believe I did.
11      Q.   At any point prior to February 11 did you have
12  a discussion with Greg Warren about the possibility of
13  shutting down the range until the environmental
14  conditions could be fixed?
15      A.   I don't recall at this time.
16      Q.   Did you ever have such a discussion with Ralph
17  Davis?
18      A.   I don't believe so.
19      Q.   Ralph Davis was your immediate supervisor,
20  right?
21      A.   Yes.  But Captain Warren took the lead on this
22  particular project, so I was dealing directly with
23  Captain Warren.  I believe that the academy and the
24  academy class that was in that that was left for

Page 60

1  Lieutenant Davis to handle while Captain Warren worked
2  on this project.
3      Q.   When you say, "this project," you're referring
4  to the report that we have in front of you as Exhibit
5  D-2?
6      A.   I'm talking about anything to do with the
7  range.
8      Q.   When Tom MacLeish was at the range on January
9  21st, did you tell him that you thought the range
10  should be shut down until the environmental problems
11  could be fixed?
12      A.   No.  Because we didn't know exactly what the
13  environment was that we had.  We didn't know how
14  contaminated it was, whether it was dangerous or not.
15  We assumed, we had thought that it may be, but we
16  weren't sure.  And we were going to provide him with
17  as much information because facilities management
18  wasn't doing it.
19          So we brought in Environmental Solutions
20  to get the samples done to see just what we were being
21  exposed to.  That way we could provide that
22  information to the lieutenant colonel and the colonel
23  and the secretary so they could make a decision on
24  what to do.

Page 61

1      Q.   Did it ever occur to you that it might be a
2  good idea to remove your men from the contaminated
3  area, from the possibly contaminated area until you
4  could figure out whether it was, in fact,
5  contaminated?
6      A.   Well, we know that they went back to clean the
7  pumps and sprayer heads and those things, the screens
8  back behind the bullet trap, we knew that they were
9  getting contaminated that way.  And we found out from
10  Dr. Green from Health Works about how the water and
11  oil mixture, the oil acts as a penetrator into your
12  bloodstream.
13          So I tried to keep them away from that
14  because we knew that in February we would have
15  downtime because we didn't have any shooters coming in
16  after the recruit class was done.  We would have
17  downtime where we could, in turn, have either Savage
18  or another company come in and we could decide on what
19  we're going to do with this facility, with this bullet
20  trap.
21      Q.   Well, did it ever occur to you during that time
22  that it might be a good idea to remove your men and
23  the trainees from an area that might be contaminated?
24      A.   I knew that back behind the bullet trap was a

16 (Pages 58 to 61)

A310

Price, et al.                                              v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1              C.A. # 04-956-GMS                    December 13, 2005

Page 62

1  problem because of that situation. So we didn't, I
2  didn't have them go back there.
3      Q.  I'm really referring to the front of the range
4  where the trainees were and where your men were
5  supervising the trainees in the shooting process. Did
6  it ever occur to you to get people out of there
7  because it might be a dangerous condition?
8      A.  I'm not an industrial hygienist and the state
9  has one and I'm asking him, I'm asking him what do we
10  do? And he doesn't do anything.
11      Q.  All I'm asking you is whether that thought ever
12  occurred to you, whether it ever occurred, not
13  whether -- I understand that you talked to people at
14  facilities and I understand that you ultimately had
15  the place tested.
16          But my question is whether it ever
17  occurred to you as the NCOIC at the firing range to
18  remove the students and your instructors from a
19  circumstance that might be hazardous to their health?
20      A.  I'll put it to you this way: I did not have
21  the authority to shut that range down and I didn't
22  have the authority to stop without some sort of
23  evidence that the place is a problem, that it's a
24  contaminated facility where we should not be training.

Page 63

1      Q.  My question to you though was whether -- I
2  recognize that you said what you believed to be your
3  authority. And I'm simply asking you whether the
4  thought ever crossed your mind that you should remove
5  your people and the students from what might be a
6  contaminated area?
7      A.  I don't recall if it did at this time.
8      Q.  As I understand it, you never made that
9  recommendation to Captain Warren, right, that the
10  place be shut down prior to February 11th anyway?
11      A.  No. I wanted to get information to fully
12  inform people that had that authority to shut it down
13  or not.
14      Q.  I understand. When you are running
15  qualification training for active members of the State
16  Police, what is your authority over higher-ranking
17  officers while they're in the facility?
18      A.  I'm in charge of conducting the training that
19  they receive.
20      Q.  You're in charge of conditions and procedures
21  on the shooting range itself, right?
22      A.  I'm in charge of the curriculum and the
23  training that they receive.
24      Q.  When, say, there's a requalification or

Page 64

1  recertification training going on -- let me back up a
2  second so I will make the record clear.
3          Every member of the State Police has to
4  qualify twice a year on their weapons, right?
5      A.  Correct.
6      Q.  Do you call it qualification or certification?
7      A.  Qualification.
8      Q.  That means that all the lieutenants and all the
9  captains and all the majors have to come and shoot,
10  right?
11      A.  Correct.
12      Q.  When they come into the facility are they under
13  your supervision?
14      A.  They're under the supervision of all of us,
15  yes.
16      Q.  All of you meaning you and your staff at the
17  firearms training unit?
18      A.  Yes, strictly as a firearms training
19  environment.
20      Q.  That's what I mean.
21          So that if someone who is higher ranking
22  than you is doing something unsafe or what you believe
23  to be unsafe in the range, you can have them removed,
24  can't you?

Page 65

1      A.  You would have to paint that picture pretty
2  clear for me to answer that correctly. I'm not going
3  to try to exercise my authority over someone who is
4  higher ranking than me.
5          If they're doing something unsafe, then we
6  will correct them. But as far as removing them, that
7  would have to be something very extreme for me to
8  remove somebody.
9      Q.  Very serious?
10      A.  Very extreme. They would have to be a danger
11  to themselves and to others.
12      Q.  And if they were, you would remove them, right?
13      A.  I would cease fire at that particular time.
14  And since it's never happened to me before, I would
15  have to consult with other ranking officers there at
16  the time to see what we would do. That wouldn't be a
17  sole decision by me.
18      Q.  Now, when you say that you would correct the
19  higher-ranking officer, what do you mean by that?
20      A.  We would stop their action, per se.
21      Q.  So that if the --
22      A.  And counsel them and say, "Hey, this is what
23  you did. Please don't do that."
24      Q.  The firing range has been described to me as a

17 (Pages 62 to 65)

Price, et al.                                              v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1                C.A. # 04-956-GMS                    December 13, 2005

Page 66

1  very Democratic environment.  Would you agree with
2  that characterization?
3     A.   I guess it would be your interpretation of
4  Democratic.  What do you mean?
5     Q.   I mean that when officers of the State Police
6  are undergoing firearms training, regardless of their
7  rank they all submit to the authority of the person in
8  charge of the range?
9     A.   They submit to the authority of the
10 instructors, not just one in particular, but whoever
11 is calling the line, whoever is standing behind them
12 giving them direction.
13    Q.   And that would be you and the people that work
14 on your staff?
15    A.   That's correct.
16    Q.   Could you go back, please, to the MacLeish 5
17 Exhibit, which is the newspaper article that we
18 started out with this morning.
19         On the second page of Exhibit MacLeish 5,
20 I want to ask you about the paragraph about three
21 quarters of the way down that begins with the
22 phrase "'The bullet trap wasn't cleaned properly,'
23 Mrs. Homer said.  'The back, where the track is, was
24 so poorly maintained that it became unworkable.'"

Page 67

1         Is it correct that the track was
2  unworkable as of April 6, 2004?  By "the track" I
3  would assume she means the conveyor system or the drag
4  system as you call it?
5     A.   I'm not exactly sure what she means by that.
6     Q.   Well, there's only one track on the bullet
7  trap, isn't it?
8     A.   Is it a track?
9     Q.   Pardon me?
10    A.   Is it a track?
11    Q.   Doesn't it look like a tank track?  Isn't the
12 belt that we have been talking about, isn't it metal?
13    A.   Yeah.  Okay.  So you're saying it looks like a
14 tank track?
15    Q.   Yes.  Doesn't it?
16    A.   I guess you could say that, yes.
17    Q.   It was not workable at the point Mrs. Homer saw
18 it, right?
19    A.   That's correct.  It had failed again.
20    Q.   Go over to the third page of the document.
21         Now, I want to ask you down in the middle
22 of the page there's a statement attributed to Colonel
23 Chaffinch and it says, "'Because of the frangible
24 ammunition we were using, the bullet trap required

Page 68

1  hands-on, daily cleaning.  Sergeant Ashley was willing
2  to do that.'"
3         Do you believe that because of the
4  frangible ammunition the bullet trap required
5  hands-on, daily cleaning?
6     A.   By a trained professional, yes.
7     Q.   Do you agree that Sergeant Ashley was willing
8  to do hands-on daily cleaning?
9     A.   What I can say about that is the bullet trap
10 had three dry ramps, dry points when I arrived on
11 December 1st.  The conveyor system was a problem.  He
12 tweaked and tinkered with it that very day and the
13 place was an utter mess everywhere throughout the
14 facility.
15         So I would have to say that Sergeant
16 Ashley didn't do that.
17    Q.   He didn't do what?
18    A.   He didn't do what they're claiming he did here.
19 And I believe -- interviewing and interrogation 101
20 when we're trained as police officers, you have an
21 idea of how to read someone, their body language.  If
22 you're in their house and you question them if they
23 have any dope or any drugs and their eyes glance to a
24 certain area, you know that's where they're hiding

Page 69

1  their stash.
2         Also, when people say something like to
3  the fact like Lieutenant Colonel MacLeish said to
4  Corporal Price, "I'm not going to fuck you," you know
5  that that's exactly their intent is.  That's
6  interviewing and interrogation 101.  And when Major
7  Baylor said when Colonel Chaffinch came back he said
8  he felt like he had been set up, well, that's exactly
9  what he was doing to me.  He was setting me up for the
10 fall for the blame for this facility and the condition
11 that was there.  And that condition already existed
12 prior to me stepping in the door on December 1st.
13         And by him saying that he felt he was set
14 up, that's exactly what he was doing to me.  And I
15 know for a fact that he is friends with Sergeant
16 Ashley.  That was established in my first trial.  I
17 know that they are friends with Paul Eckrich, who has
18 the control of the budget, and they oftentimes have
19 lunch together.  And I'm sure that it will be clear
20 when we gather the evidence from his computer if it
21 hasn't been destroyed that it will show that that was
22 premeditated.
23    Q.   Whose computer are you talking about?
24    A.   Colonel Chaffinch 's computer.

18 (Pages 66 to 69)

A312

Price, et al.                                                v.                                            Chaffinch, et al.
Christopher D. Foraker, Volume 1                    C.A. # 04-956-GMS                      December 13, 2005

Page 70

1    Q.   What is it that you're saying was premeditated?
2    A.   I believe that they're framing me right here
3    for this, for the blame of this range being closed.
4    He's using that to blame me and destroy my reputation
5    and my men's reputations.
6    Q.   We will get to that.  But just for present
7    purposes, do you know what Sergeant Ashley did in
8    terms of maintaining the bullet trap while he was the
9    NCOIC at the range?
10    A.   Like I said, apparently he wasn't doing what
11    they're saying he was doing because there were dry
12    ramps, there were problems with the conveyor system.
13    He tweaked and tinkered with that and then come to
14    find out that's what caused the tail shaft to break.
15    Q.   Well, all of this are things that you're
16    surmising from --
17    A.   No.  I think it's pretty clear.
18    Q.   Let me ask you this:  Between the time you left
19    the range in April, it would have been April 8, 2002,
20    and when you came back on December 1, 2003, did you
21    ever go to the range?
22    A.   Yes.
23    Q.   How many times?
24    A.   The time frame that I wasn't there?

Page 71

1    Q.   Right.
2    A.   I believe it was three times.
3    Q.   Would those have been your qualification
4    shoots?
5    A.   Yes.
6    Q.   Any time other than that?
7    A.   I don't believe so.
8    Q.   Do you know what Sergeant Ashley was doing in
9    terms of bullet trap maintenance on a daily basis?
10    A.   No, I don't.  I don't know if he was doing
11    anything at all.
12    Q.   I understand.  Go to the next paragraph.
13    A.   I know that when I took over on December 1st he
14    actually made the statement while we were back there
15    and he was tinkering with it that this is a full-time
16    job just taking care of the bullet trap, which is one
17    thing that I do agree with.  It's a full-time job for
18    a professional that knows what they're doing, they're
19    trained, not only in how to operate and fix and clean
20    the equipment but also trained and equipped to protect
21    them against hazardous materials.
22    Q.   Go to the next paragraph, please.
23    A.   Where are you?
24    Q.   The one immediately below the one that we just

Page 72

1    discussed and that begins with the statement "'I
2    cannot say Sergeant Foraker was willing to do that.'"
3    During the time that is really at issue
4    here, which is December 1, 2003 until April 2004, did
5    you do maintenance of the water system on the bullet
6    trap?  I'm referring to you personally.
7    A.   We weren't able to.
8    Q.   The answer is no, you did not do it then?
9    A.   That's correct.  We weren't able to.
10    Q.   When you say, "we" you're referring to you
11    and --
12    A.   Me and my staff.
13    Q.   That would be Price, Wayne Warren and Warwick?
14    A.   Correct.
15    Q.   Is it true that you were interested in
16    instruction and teaching people how to shoot?
17    A.   That's my passion and that's our job, yes.
18    Q.   Is it true that you did not feel the bullet
19    trap cleaning was part of your purview?
20    A.   No.  That's an absolute lie.
21    Q.   Did you feel the bullet trap cleaning was part
22    of your purview?
23    A.   Yes.
24    Q.   And did you do any bullet trap cleaning between

Page 73

1    December 1st and April 6th, 2004?
2    A.   No.  I was unable to.
3    Q.   Did you feel that doing bullet trap cleaning
4    was putting you in harm's way?
5    A.   I thought the possibility existed.
6    Q.   Well, as of April here you know a lot more
7    about the facility than you knew in December 2003,
8    didn't you?
9    A.   That's correct.
10    Q.   And as of April 2004 you knew what all the
11    chemicals were that were used in the bullet trap,
12    didn't you?
13    A.   As of when?
14    Q.   April 6, 2004.
15    A.   Yes.
16    Q.   And did you believe that for you to deal with
17    those chemicals was putting yourself in harm's way?
18    A.   Without the proper training and equipment
19    provided to me and my men, yes.
20    Q.   Now, you said that you were unable to do the
21    cleaning of the bullet trap between December 1st and
22    the time the range shut down.  Why was that?  What was
23    it about the circumstances that made it impossible for
24    you to do that?

19 (Pages 70 to 73)

Price, et al.                                    v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                 December 13, 2005

Page 74

1    A.   Like Sergeant Ashley had said to me, it's a
2  full-time job and being the NCOIC of the firearms
3  training unit is a full-time job.  I requested a fifth
4  person when I was there the first time in 2001 to 2002
5  and that was granted for that unit, but I was
6  transferred away from it.  I was illegally transferred
7  out of there by Colonel Chaffinch.
8          Ashley, Sergeant Ashley, who took my
9  place, was afforded a fifth person.
10   Q.   Okay.
11   A.   Even though he had a fifth person, he still
12  wasn't able to keep up, if he says he was doing the
13  bullet trap maintenance he still wasn't able to keep
14  up with the conditions of that range.  The conditions
15  of that range when I walked in there on December 1st
16  were a mess.  It was a disaster everywhere.
17   Q.   Are you saying that you couldn't do the work on
18  the bullet trap because you didn't have time?
19   A.   That's a large part of it, yes.
20   Q.   Are there other parts of it?
21   A.   We didn't have time.  We didn't have enough
22  personnel to do that.
23   Q.   That's the same thing as saying you don't have
24  enough time, right?

Page 75

1    A.   If you surmise it that way, yes.
2    Q.   Was there any other reason other than the
3  number of people you had working there?
4    A.   The fact that Dr. Green had said what was
5  causing their blood levels, my staff's blood levels to
6  rise and spike up, with that that was also an issue
7  that I was thinking about that maybe I shouldn't have
8  them do that.  I contacted Captain Warren and told him
9  the circumstances of the bullet trap, that it's far
10  behind on maintenance now; can we look into having
11  either Savage or facilities management putting
12  somebody in this position here to take care of this
13  that's trained in dealing with any type of hazards
14  that they come across in this bullet trap and also be
15  able to take care of the mechanical aspect, a
16  technician that can be trained to take care of this
17  bullet trap because we're unable to do that?  And
18  we're also having problems with our lead levels
19  rising.
20          When I talked with him, I then also after
21  talking with him I got in touch with Mark D'Allesandro
22  from facilities management and I brought him in and we
23  talked over the bullet trap problems and all of the
24  issues to deal with that.  He agreed that's a

Page 76

1  full-time position.  He said that he would have to
2  talk to his superiors as to whether they could afford
3  to put a technician there full time; they may not be
4  able to do that.
5          So then I went beyond that and contacted
6  mechanical companies in the area to try to get them to
7  come in and give us a price quote of somebody
8  maintaining the bullet trap.  Once they found out,
9  once those mechanical companies found out that they
10  would be dealing with lead exposure, they wanted
11  nothing to do with it.
12          Then eventually I contacted Environmental
13  Solutions and talked with them about it.  Joe Farrell
14  from Environmental Solutions then came in. He looked
15  at the facility and the bullet trap and he was trying
16  to work out, come up with some idea of how to make
17  this a simpler cleaning process back there with the
18  bullet trap to keep the water clean and fresh because
19  as it stood there now it's not working.
20          And technically it never really did work
21  right.  It was constantly being modified over the
22  years.
23   Q.   You're referring to the bullet trap now?
24   A.   Yes.  That's what I was talking about just

Page 77

1  then.  The ventilation system has always been modified
2  and a constant problem.
3    Q.   Did you discuss with Rich Ashley on December 1,
4  2003 the condition of the bullet trap?
5    A.   Yes.
6    Q.   And what did he say to you about the condition
7  of the bullet trap?
8    A.   He said that "We replaced the conveyor system
9  and put a drag belt in and we have had problems with
10  it.  We have been trying to get it to work."  And then
11  he wanted to explain it to me and we walked back
12  behind it and he showed it to me.  And while he's
13  talking about it, he picks up a wrench in hand and
14  there was a plate that was over top of a sprocket and
15  chain assembly.  That was removed.  He had that off.
16  And while the system was running, the chain was just
17  slapping the edge of a bracket.
18          And he started tinkering with adjustment
19  points for that motor assembly to tighten that chain,
20  slide the sprocket further away to tighten the chain
21  and so forth.  And I'm thinking to myself I don't know
22  what you're doing; I know that you're adjusting
23  things, but I'm not a technician.  And he said, "Well,
24  I can do this because I have my chicken farm, my

20 (Pages 74 to 77)

Price, et al.                                                    v.                                              Chaffinch, et al.
Christopher D. Foraker, Volume 1                    C.A. # 04-956-GMS                          December 13, 2005

Page 78

1  poultry farm, and I have a lot of equipment that is
2  similar and I work on it and keep it running, so I
3  have been keeping this thing running."
4      Q.  Did you discuss while you were back behind the
5  bullet trap with Rich Ashley whether the pumps were
6  working as they're supposed to?
7      A.  He said it was a daily, daily issue where the
8  pumps were clogging, where they would become dry on
9  the other side at different locations.  I noted that
10  in my mind that there were three spots that were dry
11  December 1st.  Those were the same three spots that
12  were dry when we shut the range down in March.  We
13  just shot around those dry spots in the wet areas.
14          He actually said that he replaced the
15  original pumps with more super heavy-duty trash pumps
16  and he said that there's so much silt in the water
17  that it's got, it's got to push the silt through the
18  sprayers.
19      Q.  Okay.  Did you discuss the changing of the
20  filters with Mr. Ashley or with Sergeant Ashley?
21      A.  He just said maintaining this is a full-time
22  job in and of itself.
23      Q.  After you took over the range on December 1st,
24  2003, did you replace any of the pumps?

Page 79

1      A.  I had checked on one or two of them that were
2  dry and the pump itself was fine.  It was running,
3  which would mean that the -- and I think I opened up
4  the canister.  And the canister where the --
5      Q.  Where the filter is?
6      A.  -- where the filter wasn't completely
7  clogged.  I mean, it had debris in it, but it was
8  flowing through it.  I put the cap back on.  So that
9  would probably have meant that the sprayer head or the
10  valve itself was bad.
11      Q.  Did you repair the sprayer head or the valve?
12      A.  No, I didn't.  It was getting to where it was
13  too time consuming what was going on and there were so
14  many other things, so many other things at the
15  facility that was going on that was wrong or that was
16  broken or that needed attention and so forth.
17      Q.  After you returned to the range on December
18  1st, 2003, from that point until the time the range
19  was shut down did you or the staff working under you
20  replace any pumps?
21      A.  I don't believe so because, like I just said, I
22  think I checked on at least one, maybe two of the
23  three that had dry ramps out in front and they didn't
24  need a new pump that I could tell.  It was something

Page 80

1  else.  The diagnosis was not -- I didn't finish
2  finding out what exactly it was because that would be
3  labor intensive and time consuming to take the sprayer
4  heads off and try to get them unclogged.
5      Q.  Well, fixing a sprayer head that was clogged is
6  something that you had done during your first tour of
7  duty as the NCOIC at the range, right?
8      A.  I had done that prior to us shooting frangible
9  ammunition.  Since frangible ammunition, that stuff
10  like turns to concrete when it gets dry.
11      Q.  I understand that.
12      A.  I would imagine that you probably would have to
13  order new sprayer heads and have them reinstalled
14  because they're like a bar and if the silt lays in
15  there and it's probably turned to
16  concrete at some point in time where it got dry and
17  then dried out and then turned to concrete, so you're
18  not going to be able to get that out of there.
19      Q.  During your first tour of duty as the NCOIC
20  were you shooting frangible ammunition?
21      A.  Yes.
22      Q.  Did the residue from the frangible ammunition
23  clog the sprayer heads at some point or another?
24      A.  Sometimes it would, but a lot of times it would

Page 81

1  clear itself.
2      Q.  Did it clog the filters?
3      A.  Yes.
4      Q.  This is during your first tour of duty?
5      A.  Yes.
6      Q.  That would be August 2001 through April 2002?
7      A.  Yes.
8      Q.  I thought you testified earlier this morning
9  that during that period when you were the NCOIC in
10  2001 and 2002 that you and the people working under
11  you replaced pumps, cleaned the filters and unclogged
12  the sprayer heads.
13          Was I mistaken in that?  Is that what your
14  testimony was?
15      A.  No.  That was all what occurred, yes.
16      Q.  Now, when you came back beginning December 1,
17  2003 did you and the people that worked under you at
18  the range do those same things, replacing the filters,
19  replacing the pumps, cleaning the sprayer heads?
20      A.  When I came back December 1st?
21      Q.  Yes.
22      A.  No.  That had not been done.
23      Q.  Was it done during the period from December
24  2003 to when the range closed?

21 (Pages 78 to 81)

Price, et al.                                    v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS          December 13, 2005

Page 82

1   A.  No, it had not been.
2   Q.  Now, did you make a conscious decision not to
3  do that because of the environmental hazard you felt
4  that activity posed to the people that worked for you?
5   A.  Relative to their blood lead levels, yes.
6   Q.  Was there anything other than the blood lead
7  levels that caused you to do that, that caused you to
8  discontinue the maintenance of the water system behind
9  the bullet trap?
10   A.  The mere time that it took to maintain it.
11   Q.  So there are two reasons?
12   A.  It's a full-time job.
13   Q.  I understand.  One is the time and the second
14  is the blood lead levels?
15   A.  Correct.
16   Q.  Now, when was it that you made that decision to
17  stop doing that work?
18   A.  I believe that was in December.  I don't know
19  the exact date.
20   Q.  So it would be December 2003?
21   A.  Correct.
22   Q.  Was that a decision that you made individually
23  or was that a decision that you made in conjunction
24  with the people that were in your staff?

Page 83

1   A.  We talked about it as a staff.  We round tabled
2  what was going on.  We knew that we would be
3  shooting -- stop shooting in February.  We knew we
4  would have downtime at that point in time.  Then we
5  could bring a company in and decide on what we're
6  going to do, what can we do and how can we do it
7  better, how can we get somebody that can do it full
8  time to maintain it that is trained, that's a
9  technician that has an expertise in maintaining this
10  bullet trap, has an understanding of it and can
11  maintain it and can also be equipped with protective
12  gear to protect them against being contaminated or
13  being exposed to hazardous materials.
14   Q.  So your decision to discontinue doing that type
15  of work occurred somewhere the first half of December?
16   A.  Somewhere in there, yes.
17   Q.  What were the blood lead levels that caused you
18  concern in the early part of December?
19   A.  Not necessarily the blood level per se but how
20  quickly the levels jumped.  When Corporal Price and
21  Corporal Warren were working on the bullet trap,
22  particularly Corporal Price's lead levels I think
23  jumped I believe six points in a short period of time.
24   Q.  Was it still below 10?

Page 84

1   A.  I believe it went above 10.  I believe it was
2  11.
3   Q.  That would still be within the 6 to 12 range
4  that you had used as a target in 2002, right?
5   A.  Yes.  But, like I said, Dr. Schwartz had said
6  we should stay below a 10, a 10 or below.
7       Now, when we said, when it was said 6 to
8  12, that was being told to me by Major Swiski at the
9  time because then it went okay, well, now it's okay to
10  be a 15 and then when certain individuals reached that
11  point, then it was okay to go a little higher than
12  that.
13   Q.  Okay.
14   A.  And then now I believe we have gone backwards
15  now.  We're back to a 10.  We want to keep it below a
16  10 again.
17   Q.  Did you tell Captain Warren that you had made a
18  decision not to continue doing the water system
19  maintenance at the bullet trap in December 2003?
20   A.  Yes.  And I thoroughly explained to him about
21  the issues with having downtime coming in February
22  where we could bring a company in.  He asked me to
23  make some phone calls to mechanical companies in the
24  area, also talk to facilities management, which I did

Page 85

1  and D'Allesandro said they didn't have anybody; it
2  would have to be somebody who was newly hired, a new
3  position specific to that facility.  And the
4  bureaucracy involved in that, I didn't understand what
5  exactly he was telling me, but it sounded like they
6  weren't going to provide anybody to do that work.
7   Q.  Hasn't facilities always taken the position
8  that the bullet trap was not their responsibility?
9   A.  Well, pretty much.  They pretty much said the
10  ventilation system is working fine or, as D'Allesandro
11  put it, "I wish I could say it was working.  All I can
12  say is it's working as well as it can."
13   Q.  With respect to responsibility, hasn't it
14  always been the case that facilities management has
15  taken the position that they were responsible for the
16  HVAC system and that the State Police was responsible
17  for the bullet trap?
18   A.  Yes.
19   Q.  That's been true since 1998, right?
20   A.  Yes.
21   Q.  Now, did you ever tell Captain Warren in
22  writing that you were going to stop doing the
23  maintenance on the back of the bullet trap, the water
24  system on the back of the bullet trap?

22 (Pages 82 to 85)

A316

Price, et al.                                    v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                      December 13, 2005

Page 86

1    A.  I don't know that I did.
2    Q.  Could you take I think it's Exhibit 1, yes,
3  Exhibit 1 up for a minute, please?
4        Go to the third page of Exhibit 1.  And
5  this is the tail end of the e-mail that you sent to
6  MacLeish and Eckrich on December 19, 2003.  And in the
7  first full paragraph there's discussion of context you
8  had with Joseph Farrell of Environmental Solutions
9  Group.
10       Do you see that?
11   A.  Which page are you on?
12   Q.  The third page.
13   A.  The third page?
14   Q.  Yes.
15   A.  Okay.
16   Q.  Do you see that?
17   A.  Yes.
18   Q.  The end of it says, the last sentence -- it's
19  not the last sentence.
20       The next-to-last sentence says,
21  "Mr. Farrell and a team of corporate engineers are
22  attempting to devise a plan that will prevent the
23  clogging of the filters, screens and sprayer jet
24  heads."

Page 87

1        Do you see where it says that?
2    A.  Mm-hmm.  Yes.
3    Q.  Had Mr. Farrell been out to the range prior to
4  the date you sent this e-mail?
5    A.  He may have.  I don't recall at this time.
6    Q.  It says in the last sentence of that paragraph
7  "He," I think referring to Mr. Farrell, "will forward
8  a proposal to me in the near future."
9        Is that something Mr. Farrell told you he
10  was going to do?
11   A.  Yes.
12   Q.  Would it be logical to assume that in order for
13  him to do that he would have had to have been at the
14  facility looking at it before he made up such a
15  proposal?
16   A.  Yes.
17   Q.  It says here, there's reference here to a team
18  of corporate engineers.
19       Did Mr. Farrell bring a team of corporate
20  engineers to the firearms facility prior to you
21  writing this e-mail?
22   A.  No.  I'm going by what he told me, Mr. Farrell
23  told me.
24   Q.  You don't have a present recollection of him

Page 88

1  being there before you sent this e-mail, right?  You
2  just think he was?
3    A.  I know he's been to that facility many times
4  because he comes up and picks up the hazardous waste
5  that we produce.  So he would have been there many
6  times.  I don't know the exact date he was there.
7    Q.  So he was familiar, as far as you're concerned
8  he would have been familiar with that facility
9  regardless of whether he was there prior to December
10  18th?
11   A.  Right.  Right.
12   Q.  Now, what was your understanding of what he was
13  going to come back to you with in terms of a proposal?
14  What was it going to be a proposal to do?
15   A.  To maintain, to maintain the bullet trap, the
16  water system of the bullet trap.
17   Q.  Now go over to D-1 again.
18       MR. NEUBERGER:  You mean the front page?
19       MR. ELLIS:  I'm sorry.  Yes, the front
20  page.  The first page of D-1 as opposed to the last
21  page of D-1.
22  BY MR. ELLIS:
23   Q.  Now look down at the end of the third
24  paragraph.  There's a sentence here that says, "I

Page 89

1  expect to hear back from Environmental Solutions this
2  week with a proposal to combat the frangible material
3  and to maintain that area of the operation."
4        Do you see where it says that?
5    A.  Yes, I do.
6    Q.  Did you ever hear back from Environmental
7  Solutions with a proposal to deal with the frangible
8  material and maintain that area of the system?
9    A.  Mr. Farrell actually came back a couple of
10  different times and talked with me about it, but we
11  didn't get to a proposal.  That was all put on hold
12  because of the closing of the range.
13   Q.  So when you said here "I expect to hear back
14  this week," that would have been the week of January
15  5th.  That never happened, I take it?
16   A.  Right.  That's correct.
17   Q.  At no point between January 2004 and today has
18  Farrell come back to you with a proposal for
19  maintaining the water system in the bullet trap?
20   A.  No.  In fact, the priority came to be that we
21  were going to have his company do the swipe samples
22  along with Art Nielson, the industrial hygienist, to
23  come in and do that.
24   Q.  I recognize that Farrell's group did other

23 (Pages 86 to 89)

A317

Price, et al.                                                                    v.                                                        Chaffinch, et al.
Christopher D. Foraker, Volume 1                      C.A. # 04-956-GMS                                  December 13, 2005

Page 90

1  types of testing for you at the range.  I do recognize
2  that.
3          I'm just trying to figure out whether they
4  ever came back with a proposal that's referenced here
5  in this e-mail.
6      A.   No.  In fact, when Captain Warren and I spoke
7  it got to the point where the system that Mr. Farrell
8  was talking about putting together would have been
9  expensive and it would be unproven, just like they did
10  with the drag conveyor.  That's unproven.  You know,
11  all of the different tweaking and tinkering and
12  modifications that they have done to that bullet trap,
13  it would be almost doing, it would be like doing that
14  again and not knowing whether it would work or not.
15          So we were actually talking about the
16  possibility of maybe a new bullet trap and he wanted
17  me to then contact other companies and see what's out
18  there, see what's available.
19      Q.   Who is the "he"?
20      A.   Captain Warren.
21      Q.   Captain Warren.  And when did he tell you to
22  contact other companies about the possibility of a new
23  bullet trap?
24      A.   I believe January time frame, January of '04.

Page 91

1      Q.   Can you be more precise as to the beginning or
2  end of January 2004?
3      A.   I don't recall exactly at this time.
4      Q.   Can you tell me approximately when it was that
5  you told Captain Warren that you were not going to
6  have your men do the work on the water system in the
7  bullet trap?
8      A.   It may have been as early as the first week or
9  second week in December.
10      Q.   Did you ever tell anybody in the State Police,
11  other than Captain Warren, that you were going to stop
12  having your men do the work on the water system in the
13  bullet trap?
14      A.   I don't recall at this time if I did.
15      Q.   Do you remember ever telling Ralph Davis about
16  it?
17      A.   I may have.  I know that I was dealing directly
18  with Captain Warren.
19      Q.   I realize that and you said that before.
20          So you don't have a present recollection
21  of sitting in a room and talking to Ralph Davis about
22  it?
23      A.   I don't recall that I did at this time.
24      Q.   Was the discussion that you had with Captain

Page 92

1  Warren in the presence of the other members of your
2  staff?
3      A.   I believe so.  I believe that was at the range.
4  I believe it was a meeting that we had at the range
5  and of course we went through the facility and looked
6  at it and so forth.
7          MR. ELLIS:  Let me ask the court reporter
8  to mark whatever the next number is.
9          (Defendant's Deposition Exhibit No. 19 was
10  marked for identification.)
11  BY MR. ELLIS:
12      Q.   Can you take a look at what we have marked as
13  D-19, please?  Tell me when you're done looking at it.
14      A.   (Reviewing document)  Yes.
15      Q.   Is this a document you prepared?
16      A.   Yes.
17      Q.   I take it that this documents a meeting that
18  you had with your staff and Captain Warren on December
19  3, 2003?
20      A.   Yes.
21      Q.   Was this document prepared before or after the
22  meeting?
23      A.   Before.
24      Q.   Is the handwriting on the bottom of D-19 yours?

Page 93

1      A.   Yes.
2      Q.   Can you read it to me?  Because it's a little
3  bit fuzzy in the photocopying.
4      A.   It says, "SLEAF approximately 9,000 for
5  training."
6          MR. NEUBERGER:  What was the first word?
7          THE WITNESS:  SLEAF, S-L-E-A-F.
8  BY MR. ELLIS:
9      Q.   That's an acronym that has to do with some
10  source for law enforcement money, isn't it?
11      A.   Correct.
12      Q.   So are you saying here that SLEAF is going to
13  get you about $9,000 for training somebody?
14      A.   I believe that it was discussed that there was
15  $9,000 that could possibly be used for training.  I
16  was looking to send Warwick away to get his basic
17  certification.
18      Q.   Certification as a firearms instructor?
19      A.   Correct.  He was transferred into the unit, but
20  he wasn't a firearms instructor as of yet.
21      Q.   Did you have this document in front of you when
22  the meeting was going on with Captain Warren?
23      A.   Yes, I believe it was.
24      Q.   It looks like there are check marks next to

24 (Pages 90 to 93)

Price, et al.                                        v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1              C.A. # 04-956-GMS                        December 13, 2005

Page 94

1  some of the bullet points on Exhibit D-19.
2          Are those your check marks or do you even
3  recognize them as check marks?
4      A.  I guess they're check marks.
5      Q.  Were you checking off each item as you talked
6  about it with Captain Warren?
7      A.  I may have.  I don't remember at this time.
8      Q.  The second bullet point has to do with whether
9  you had sufficient personnel, correct?
10     A.  Correct.
11     Q.  Where was Corporal Peachey at this point?
12     A.  Corporal Peachey was in an extreme amount of
13 pain and he was -- he would come in periodically, but
14 he had a difficult time being on his feet.  So he was
15 taking a lot of time off, sick time off as he was
16 approaching the end of that two-year period.
17     Q.  Did that circumstance exist before you got
18 there?  In other words, was this a problem Ashley had
19 to deal with too?
20     A.  Ashley told me that he made some sort of deal
21 with the staff and Peachey where he would be able to
22 take time off because he was going to lose time or
23 lose injured or sick time.  I don't recall what he
24 said, but he made some sort of an agreement with the

Page 95

1  executive staff.
2      Q.  I guess was it your understanding that as of
3  December 1, 2003 when you took over was Peachey going
4  to be available to you every day?
5      A.  I know that he have was not available every
6  day.
7      Q.  Do you know whether he had been available to
8  Ashley before you got there?
9      A.  It sounded like to me that this deal that
10 Ashley was talking about had just been agreed upon and
11 he was now starting to take time off.
12     Q.  The pain Peachey was having had to do with
13 getting shot in the ankle, right?
14     A.  Yes.
15     Q.  And that had occurred a long time before
16 December 2003, hadn't it?
17     A.  February of '02.
18     Q.  So was it your understanding that Peachey had
19 been in that pain ever since February '02?
20     A.  I guess.  I mean, I'm sure that they considered
21 it a permanent injury I'm sure just shortly after it
22 happened.
23     Q.  Was the firearms training unit busier in
24 December 2003 than it had been during your first tour

Page 96

1  of duty in 2001 and 2002?
2      A.  Yes, in the aspect that there were a lot of
3  things going on at one time, plus there were a lot of
4  things wrong with the facility at the same time.  As I
5  explained in my interrogatories, there is, there was
6  numerous things at issue with that facility, the
7  ventilation system, the bullet trap, the armorer's
8  room and the condition it was in, the fact that both
9  the dumpster, trash dumpster and the target dumpster
10 were overflowing and had trash all over the fields.  I
11 spent a good many days picking up trash while my
12 instructors conducted the training on the range.
13     Q.  Well, did the assigned functions of the
14 firearms training unit change between the first time
15 you were in charge and the second time you were in
16 charge?
17     A.  I believe everything was the same.
18     Q.  Were you having an unusual flurry of activity
19 in December 2003 and January of 2004 because of the
20 amount of people that had to shoot?
21     A.  No.  I don't think that was the case.  I think
22 the case was that it was overwhelming with the amount
23 of things that had to be accomplished with the
24 facility.

Page 97

1      Q.  So you believe you were busier because the
2  facility --
3      A.  Was in the condition that it was in.
4      Q.  Okay.  That's fine.
5          Going down Exhibit D-19, bullet point 3
6  I'm afraid I don't understand.  Are you able to
7  explain what you're referring to in terms of "None
8  police shoots unsafe to instructors & public"?
9      A.  I actually misspelled that.  It should be
10 non-police shoots unsafe.
11     Q.  Oh, non-police shoots.  Okay.
12         I didn't realize that you had shooting
13 going on that was not by police officers of one kind
14 or another.  Is it true --
15     A.  Sergeant Ashley had told me that the colonel,
16 Colonel Chaffinch at the time, he asked for the
17 Citizens Police Academy and I believe the 911 centers
18 and some other civilians for them to come in, I
19 believe even the academy, the relatives of academy
20 personnel come in and shoot and that's what Ashley and
21 he agreed upon to do.
22         And I felt that was very unsafe because I
23 don't know who's who that is coming through the door
24 and we're putting a gun in their hands and I don't

25 (Pages 94 to 97)

A319

Price, et al.                                    v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS          December 13, 2005

Page 98

1  think that's very safe. We don't know their mental
2  state. We don't know anything about them and I felt
3  that that was very unsafe.
4      Q. Okay. Did you discontinue that practice?
5      A. The practice of putting, of actually having
6  them shoot? Yes. They could observe shooting. They
7  could have a tour of the facility and be out and about
8  and we could show them different things that we would
9  do, but that would be it. They wouldn't actually fire
10 a gun.
11     Q. Going down to the last bullet point, "Serious
12 Maintenance issue with the bullet trap." Can you
13 recall your discussion with Captain Warren on this
14 point on December 3rd, 2003?
15     A. I explained to him the current condition of the
16 bullet trap. We were doing research on frangible
17 shotgun ammunition. We were still at this point
18 shooting leaded shotgun ammunition. We were doing
19 research on the frangible ammunition, but it wasn't,
20 it wasn't quite perfected to where we would consider
21 it as accurate and may cause additional failures,
22 whereas service ammunition if we were shooting the
23 leaded ammunition people wouldn't fail as often
24 because it wasn't as accurate.

Page 99

1      Q. I understand.
2      A. But that frangible ammunition would then just
3  multiply the amount of debris that would be imposed on
4  the bullet trap.
5      Q. Right. Is there anything else that was part of
6  that discussion as to bullet point, I guess it's the
7  sixth bullet point? Is that all you talked about, was
8  the frangible ammunition for the shotguns?
9      A. We discussed the maintenance of the bullet
10 trap, what was explained to me from my men, what was
11 explained to them by Dr. Green, explaining why their
12 lead levels jumped so high in such a short period of
13 time. We discussed those things and I believe it was
14 that day that I told him that we have downtime coming
15 in February; that if we stop bullet trap maintenance
16 at that particular time there's not going to be an
17 issue on the other side where we shoot from because we
18 don't shoot into the dry ramps. So we would stop that
19 maintenance until we can figure out who could do that
20 maintenance safely without being contaminated or
21 exposed to hazards.
22     Q. So that's the meeting at which you decided to
23 stop doing the maintenance on the water system?
24     A. Yes, I do believe that is the meeting.

Page 100

1          MR. NEUBERGER: Do you want to take a
2  lunch break now when you finish this up?
3          MR. ELLIS: Yes. This is as good a time
4  as any. That's fine.
5          MR. NEUBERGER: Why don't we take an hour
6  then? Is that okay?
7          MR. ELLIS: That's fine.
8          (Recessed for lunch at 12:40 p.m.)
9          - - - - -
10         AFTERNOON SESSION
11            1:45 p.m.
12         MR. ELLIS: Why don't we mark this next
13 exhibit, whatever we're up to, 20.
14         (Defendant's Deposition Exhibit No. 20 was
15 marked for identification.)
16 BY MR. ELLIS:
17     Q. Can you take a look at Exhibit 20, please,
18 Sergeant Foraker? Tell me when you have had a chance
19 to look at it.
20     A. (Reviewing document) Okay.
21     Q. Can you tell me what this document is?
22     A. This is a document that I prepared of questions
23 that I could think of to ask in the transition meeting
24 when I was Court ordered back to the firearms training

Page 101

1  unit on December 1, 2003, questions that I could ask
2  of Sergeant Ashley.
3      Q. Did you prepare this yourself?
4      A. I did.
5      Q. Where?
6      A. At home.
7      Q. Did you give a copy to Sergeant Ashley before
8  you had the meeting with him?
9      A. No.
10     Q. Did you have any help preparing it?
11     A. No.
12     Q. I notice that there are certain parts of it
13 that appear to be filled in before the meeting. Is
14 that correct?
15     A. What are we talking about?
16     Q. Well, look, for example, at the personnel
17 section, which is the first one on the first page of
18 the exhibit, where next to Bruce Peachey, next to
19 Bruce Peachey's name the status appears to have been
20 typed in beforehand. Is that correct? Is that what
21 happened?
22     A. Yes. I put that in there.
23     Q. Did you put that in there before the meeting
24 that you had with Sergeant Ashley?

26 (Pages 98 to 101)

Price, et al.                                   v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS              December 13, 2005

Page 102

1    A.   Yes.  I believe I did.
2    Q.   Where did you get the information to put in
3  there?
4    A.   I believe I may have talked to Corporal Jim
5  Warwick and he told me what was going on with Bruce
6  Peachey and I put that in there before I came into
7  work that day.
8    Q.   Is all of the handwriting on these three pages
9  of Exhibit D-20 your handwriting?
10   A.   Yes, sir.
11   Q.   In the upper right-hand corner of the first
12  page is some characters that I can't entirely make
13  out.
14       Is that your handwriting also?
15   A.   No, that isn't.  I'm sorry.
16       MR. NEUBERGER:  That looks like SJN,
17  co-counsel.
18       MR. ELLIS:  That would be Stephen J.
19  Neuberger?
20       MR. NEUBERGER:  Yes.  I think so.  That
21  looks like his handwriting.
22  BY MR. ELLIS:
23   Q.   Do you know how his handwriting got on the
24  upper right-hand corner of Exhibit D-20, "his" meaning

Page 103

1  Stephen J. Neuberger's?
2    A.   No, I don't know how it got there.
3    Q.   Did you give Stephen J. Neuberger a copy of
4  this document?
5    A.   I may have.  I don't recall doing it at this
6  time, but I may have.
7    Q.   Did you speak with Stephen J. Neuberger during
8  the week before you returned to the range in December
9  2001?
10   A.   I don't believe so.
11   Q.   How about in the week after your return to the
12  range?
13   A.   I don't believe so.
14   Q.   When was the first time you spoke to Stephen
15  Neuberger after December 1, 2003?
16   A.   At this time I don't recall.
17   Q.   Aside from the initials in the upper right-hand
18  corner on the first page, is everything in here your
19  handwriting, is all of the handwriting yours?
20   A.   It looks to be mine.
21   Q.   Look on the bottom of the last page, the
22  words "Environmental Solutions" and some other words
23  below that.  Is that your handwriting or not?
24   A.   Yes, it is.

Page 104

1    Q.   How did you work with this form?  In other
2  words, how did you fill in what you filled out during
3  the course of your discussion with Sergeant Ashley?
4    A.   Captain Warren, Lieutenant Davis, Sergeant
5  Ashley and myself sat down for a transition meeting
6  December 1st.  I believe it was like 9:00 o'clock
7  maybe in the morning.
8    Q.   Okay.
9    A.   I handed a copy of this to each one of them and
10  retained one myself.
11   Q.   Okay.
12   A.   And basically Captain Warren ran the meeting
13  and I basically just asked if we could go through this
14  so I could understand what's going on with the
15  facility.  It was in a way of keeping me organized in
16  trying to transition where I would get as much
17  information as I could and get up to speed on what's
18  going on with the facility.
19   Q.   Did you write what you wrote on this document
20  during the course of the meeting?
21   A.   Yes, sir.
22   Q.   Was this all in the meeting where you were
23  together in an office as opposed to when you were
24  walking around the range?

Page 105

1    A.   Correct.  We were seated in the conference room
2  at the firearms training unit.
3    Q.   It appears on the top of the page you had
4  originally entered for Bruce Peachey an injured status
5  where it looks like you're saying calls off injured
6  Monday and Thursday, works Wednesday, calls off
7  injured Tuesday and Friday.  Is that what you wrote in
8  down there?
9    A.   Yes.  That's what I thought was going on with
10  him at that particular time, what they had agreed upon
11  between Corporal Peachey, Sergeant Ashley and
12  executive staff.
13   Q.   Did you find out when you got to this meeting
14  that that wasn't the case; in other words, that what
15  you had written down in advance was not actually what
16  was going on?  The reason I ask the question is
17  because you have got it crossed out.
18   A.   I don't believe that that was what he was
19  actually following.  I think it was more or less he
20  came in when he could depending on how he felt and he
21  would stay as long as he could depending on how he
22  felt.
23   Q.   There's a notation in your handwriting to the
24  right of that that says, "need doctor excuse for each

27 (Pages 102 to 105)

Price, et al.                                v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 1        C.A. # 04-956-GMS              December 13, 2005

Page 106

1  day out."
2         Can you tell me what that means?
3     A.  There was a request, I think Sergeant Ashley
4  said that there was a request for him to get a
5  doctor's note.
6     Q.  "Him" meaning Bruce Peachey?
7     A.  Bruce Peachey, yes.
8     Q.  On the left-hand side of the personnel section
9  on the first page of the exhibit is the notation
10 "family night Wednesday."
11        What's that mean?
12    A.  The recruits' families, the recruits that are
13 currently in the academy and their families will have
14 a night where we get together with them and we talk
15 about firearms safety and give them a tour of the
16 range, that sort of thing.
17    Q.  Did that occur every Wednesday night?
18    A.  No.  It usually only happens once a recruit
19 class, one time a recruit class.
20    Q.  Does the notation you made here reflect that it
21 was going to be the Wednesday night that immediately
22 followed your transition meeting?
23    A.  It may be.  I don't recall at this time.
24    Q.  Under FTU Budget there's a notation that says,

Page 107

1  "Spend dollars on OT for extra body" and then I can't
2  read the rest of it.
3         Since it's your handwriting, why don't you
4  tell me what it is you wrote there?
5     A.  It says, "Spend money on overtime for extra
6  body not to sacrifice safety."
7     Q.  What does that mean?
8     A.  That means use overtime for extra help when you
9  need it.
10    Q.  Is this something Ashley is telling you or is
11 that something that you're telling Ashley or what?
12    A.  That may have been coming from Captain Warren.
13    Q.  You're not sure?
14    A.  That or that may have been what was told to
15 Ashley and Ashley is then telling me.
16    Q.  Down in the bottom under FTU Weapon Inventory
17 there appears to have been a piece of this form that
18 was filled out before you actually went to the
19 meeting.
20        Am I correct that that's what's going on
21 here, that the sentence "Barrel not manufactured to
22 specs & tolerances to accept aftermarket sling bracket
23 product" was typed in beforehand?
24    A.  Right.

Page 108

1     Q.  And where did you get that information?
2     A.  That's information that I knew about prior to
3  going into the meeting.
4     Q.  That's my question.  My question is:  Where did
5  you get the information?
6     A.  I had done research on the shotgun barrels that
7  we transitioned all our shotguns and refitted them
8  with new shotgun barrels.
9     Q.  That had occurred the first time you were the
10 NCOIC, right?
11    A.  Correct.
12    Q.  Was this entry that you made an indication that
13 there was a problem with the shotgun sling brackets?
14    A.  I wanted to ask that question if there was a
15 problem.
16    Q.  Okay.  So it's a notation to yourself to ask
17 that question?
18    A.  That's correct.
19    Q.  Under the section for facility there's a
20 notation in the category of Overall Building
21 Conditions.
22        Do you see that to the right of that?
23    A.  Yes.
24    Q.  Can you read that to me?

Page 109

1     A.  It says, "moving exhaust hood to armor room."
2     Q.  Is that something Sergeant Ashley was telling
3  you?
4     A.  He said that he was in touch with facilities
5  management about a ventilation issue in the armorer's
6  room.
7     Q.  Did he tell you that facilities was going to
8  move the exhaust hood to the armorer's room?
9     A.  I believe that's what it says.
10    Q.  And was that Sergeant Ashley's response to the
11 complaints that the staff had about a new form of
12 solvent that was being used?
13    A.  I'm sorry.  Can you rephrase that?
14    Q.  Was that Sergeant Ashley's response to
15 complaints that he had received from his subordinates
16 about the solvent that was being used to clean the
17 weapons?
18    A.  It may have been.
19    Q.  The next line down says, "Roof leaks" and
20 you've written in "Normal."  What's that mean?
21    A.  Normal leaks.
22    Q.  In other words, the roof leaked all the time?
23    A.  Correct.
24    Q.  It leaked back when you were the NCOIC the

28 (Pages 106 to 109)

Price, et al.                                    v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS              December 13, 2005

Page 110

1  first time?
2    A.  Correct.
3    Q.  And before that even?
4    A.  Correct.
5    Q.  The next line down says HVAC - Heater & Air
6  Conditioning Chiller System and you've written in now
7  chilled.
8    A.  Actually, it's "new chiller."
9    Q.  "New chiller."  Okay.  That's why I should
10  always ask you to read it rather than guessing as to
11  what it says.
12          Is that again something that Sergeant
13  Ashley told you?
14    A.  Yes.
15    Q.  The Fuel Oil Delivery, can you read that for
16  me, please?
17    A.  "Facilities management."
18    Q.  What's that mean?
19    A.  They are on a schedule with facilities
20  management.
21    Q.  Before you turn the page, on the second page of
22  Exhibit D-20, was this form that you had prepared
23  meant to remind you to ask certain questions about the
24  systems because you were aware that some of the

Page 111

1  systems had had problems in the past?
2    A.  This was to get a good understanding of what's
3  going on with the facility, if there are needs that I
4  need to address and what order to address them, what's
5  urgent, what's not, trying to get a handle.  I know
6  there's a lot involved with the FTU.  I was there
7  before, so I understand that there's a lot involved.
8          And I wanted -- this is things that I
9  could put together and think of before my meeting and
10  I'm sure there are many things that I didn't put on
11  here that I probably asked in that meeting that may
12  have come to me either after the meeting or whenever
13  that brought themselves to light.
14          But this was what I could think of prior
15  to the meeting.
16    Q.  Because of your prior service at the firing
17  range, you knew that there were certain problems you
18  could anticipate when you came back, didn't you?
19    A.  Like the ventilation system, yes.
20    Q.  Or like roof leaks?  You knew there were roof
21  leaks because you worked there before, right?
22    A.  Right.
23    Q.  Others would be the ventilation system, right?
24    A.  Correct.

Page 112

1    Q.  Did you ask Sergeant Ashley how the ventilation
2  system was working?
3    A.  Yes, I did.
4    Q.  What did he tell you?
5    A.  He said it was balanced.
6    Q.  Now, do you know what it means to balance the
7  air-handling system?
8    A.  No, I don't.
9    Q.  Did you ask him what he meant by balanced?
10    A.  That's always been a phrase that facilities
11  management has used.  They basically come in.  They do
12  some things on the computer.  They do some things on
13  the roof to the ventilation system and they said it's
14  balanced and then leave.
15    Q.  To your observation, has the system worked
16  better when it was balanced than when it wasn't
17  balanced?
18    A.  No.  The system has never worked.
19    Q.  Did you ask Sergeant Ashley after he told you
20  the system was balanced whether it was working; in
21  other words, it was effectively removing smoke and
22  dust from the environment?
23    A.  No, I didn't ask him that.
24    Q.  Look farther down where it says, "Bullet Trap."

Page 113

1    A.  Yes.
2    Q.  What did you write just to the right of that on
3  page 3?
4    A.  "Savage in September."
5    Q.  Okay.  What's that mean to you?
6    A.  That they came in September.
7    Q.  Did Sergeant Ashley tell you that they had
8  changed the type of belt or chain or whatever you want
9  to call it that was in the bullet trap?
10    A.  Yes.
11    Q.  Did he offer any opinion as to whether that
12  made things better or worse?
13    A.  He said that the system has to run 24 hours a
14  day, the belt and the water system.  The pumps have to
15  stay on.  If you turn them off or stop the conveyor,
16  the silt turns to concrete and it will freeze up the
17  entire system.
18    Q.  Did somebody from Mayfran also tell you that at
19  some point when they were working on the system?
20    A.  Actually, Ashley told me that that's what they
21  told him at that particular time.
22    Q.  Did anybody from Mayfran ever tell you that
23  independently of what they told to Sergeant Ashley?
24    A.  I don't recall at this time if they did say

29 (Pages 110 to 113)

A323

Price, et al.                                v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 1        C.A. # 04-956-GMS           December 13, 2005

Page 114

1  that.
2      Q.  Over on the right side of page 3 is a notation
3  that says, "can reduce number of pumps."
4          Do you know what that refers to?
5      A.  Sergeant Ashley had told me that he put in
6  bigger, more powerful pumps to push the residue
7  through the sprayer heads and just to overpower the
8  clogging by more power, pushing it through, pushing
9  the water and oil through.  And he said that you can
10  even reduce the number of pumps that you're using.
11          But I found that to be incorrect because
12  when I went out there, there were three -- well, I
13  thought it was incorrect because when I went out
14  there, there were three dry spots.  And that could be
15  any number of things as to why they're dry.
16      Q.  Did you understand him to be saying that you
17  could, on the one hand, either operate with fewer
18  pumps running at the same time or, on the other hand,
19  you wouldn't have to replace the pumps as often?
20          In other words, when he says that you can
21  reduce the number of pumps, do you know whether he
22  meant that you wouldn't have to replace them as often
23  or that you could run your system with some of them
24  not operating at all?

Page 115

1      A.  You could run it with less.
2      Q.  In other words, run it with some of them not
3  operating at all?
4      A.  Right.  Because they were more powerful pumps.
5      Q.  Did you ask him specifically that and ask him
6  if that's what he meant when he said that you can
7  reduce the number of pumps?
8      A.  No.  To me, it was quite clear that's what he
9  was saying.
10      Q.  There's supposed to be something like 20 pumps
11  on this system, right, one for each lane?
12      A.  I think there's 18.
13      Q.  If a pump goes out that's in the middle, in
14  other words, it's not number 1 or number 18, it's
15  somewhere in the middle, that's going to leave you a
16  dry spot in the middle of the wet spots, right?
17      A.  It may.  It depends on what output the other
18  sprayer heads are having.
19      Q.  It's possible for a sprayer head to cover the
20  dry spot simply by being strong enough itself to push
21  water into the dry spot?
22      A.  Some.  Sometimes that's possible.
23      Q.  Down below where we just read from there's a
24  notation or there's a line for Floor Scrubber.  What

Page 116

1  did you write next to that?
2      A.  He said it works okay.
3      Q.  Did you find that to be correct?
4      A.  That is incorrect.  That floor scrubber had
5  been dormant for some time.  After talking with
6  Corporal Price he said it was down since, it hadn't
7  been used since the summertime of 2003.  And it's
8  consistent, that's consistent because when you looked
9  at the floor scrubber, it's bright yellow, sort of
10  like the color of your paper there, and on the top of
11  it and on the seat that's black, you couldn't tell
12  what color they were because it had a reddish dust on
13  top of it.
14      Q.  Down below in the Corporate Contractors &
15  Suppliers section, the bottom line there reads "Dave
16  Lawson does" something.
17          Can you read that for me?
18      A.  "Dave Lawson does FFL for $12."
19      Q.  What's FFL?
20      A.  Federal firearms license.
21      Q.  What's that got to do with anything involving
22  the range?
23      A.  We were talking about buying guns.  When
24  someone retires they can buy guns and he was, Ashley

Page 117

1  was explaining to me that 10 percent, when somebody
2  buys a gun 10 percent goes back to the federal
3  government and with Dave Lawson it's $12 to send
4  someone with their gun to get it reregistered from the
5  State Police into their name.
6      Q.  I see.  Okay.
7          Do you believe that Tom MacLeish has made
8  defamatory statements about you?
9      A.  Absolutely.
10      Q.  What is it that Tom MacLeish said about you
11  that was defamatory?
12      A.  Tom MacLeish has treated me in certain
13  situations with contempt.  I remember at a graduation
14  ceremony where I was permitted to go and speak at a
15  graduation ceremony and present the firearms award.
16  After I was done, I sat down.  The recruit class had
17  graduated.  We had broken the meeting and we were all
18  going to head back to the academy.
19          The actual graduation ceremony I think was
20  in June.  It was for municipals and it was held at a
21  Dover Elementary School and we were in the auditorium
22  and on stage.  We stepped off stage and Lieutenant
23  Colonel MacLeish walked towards or by me and I stuck
24  my hand out and said, "How are you doing, sir?"  And

30 (Pages 114 to 117)

A324

Price, et al.                                         v.                           Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS              December 13, 2005

Page 118

1  he looked at me, he grabbed my hand and he bit down
2  and he growled at me like a dog.  He was angry with
3  me.
4      Q.  When was this?
5      A.  I believe it was in June of '04.
6      Q.  My question was whether he said anything that
7  you believe is defamatory about you.
8      A.  Yes.  I mean, he agreed with everything that
9  was in that newspaper.
10     Q.  When did he do that?
11     A.  He participated in it.
12     Q.  He participated in what?
13     A.  He participated in that news article.  He
14 participated at that press release.  He participated
15 in the Channel 16 presentation on TV.
16     Q.  Well, when you say, "press release," are you
17 talking about MacLeish Exhibit 5?
18     A.  He was there during that particular press
19 release.
20     Q.  Would you agree with me that his name does not
21 appear in Exhibit MacLeish 5?  Take a look at it if
22 you want.
23     A.  It may not appear there, but I know that he was
24 there.

Page 119

1      Q.  Would you agree with me that he's not quoted
2  anywhere in that article?
3      A.  No, I don't believe he is quoted in there.
4      Q.  And you weren't there, right?
5      A.  That's correct.
6      Q.  What makes you think he was there?
7      A.  I saw him on TV there.
8      Q.  Okay.  Did he say anything on TV?
9      A.  I don't recall at this time if he said anything
10 on TV, but he was in -- I believe he did say
11 something, but I can't recall what it was at this
12 time.
13     Q.  Let me ask you this question:  How many times
14 was there news coverage of tours of the shut down
15 range to your best recollection?  How many times was
16 there a tour conducted of the range in which newspaper
17 or TV stations or radio stations were present?
18     A.  I believe that one there that you pointed out
19 to me.
20     Q.  You think that was the only one?
21     A.  There may have been more.  I don't recall at
22 this time.
23     Q.  I'm just asking for the best of your
24 recollection.

Page 120

1      As you're sitting here today, you can only
2  remember one?
3      A.  Correct, at this time.
4      Q.  Now, do you believe that Tom MacLeish said
5  anything that was printed in the press during that
6  tour?
7      A.  There may have been.  I don't recall at this
8  time.
9      Q.  What words came out of then Lieutenant Colonel
10 MacLeish's mouth that were defamatory toward you?
11     A.  He blamed me and my men for the condition of
12 the range.
13     Q.  And who did he say that to?
14     A.  I believe he said that during that media tour.
15     Q.  How do you know he said that?  Have you seen a
16 news account that quotes MacLeish?
17     A.  I believe he said something to the Channel 16
18 news.
19     Q.  Is Channel 16 WBOC?
20     A.  Correct.
21     Q.  The Salisbury, Maryland station?
22     A.  Correct.
23     Q.  What is it that you believe he said?
24     A.  I believe he blamed me and my men for the

Page 121

1  condition of that facility.
2      MR. ELLIS:  Can we go off the record for
3  just a second?
4      (Discussion off the record.)
5  BY MR. ELLIS:
6      Q.  Is there any statement that you're aware of
7  that Tom MacLeish has made aside from whatever
8  happened on April 6, 2004 at that tour that you
9  believe is defamatory towards you?
10     A.  Anywhere?
11     Q.  Yes, anywhere.
12     A.  He said it in his deposition.
13     Q.  Aside from that?
14     A.  I don't recall at this time.
15     Q.  Now let me go back to this exhibit which will
16 be No. 21.
17     (Defendant's Deposition Exhibit No. 21 was
18 marked for identification.)
19 BY MR. ELLIS:
20     Q.  Have you had a chance to look at that?
21     A.  Yes.
22     Q.  Can you tell me what D-21 is?
23     A.  Notes that I prepared for a meeting between
24 myself and Lieutenant Davis at the time.

31 (Pages 118 to 121)

A325

Price, et al.                                                    v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1              C.A. # 04-956-GMS                        December 13, 2005

Page 122

1    Q.   Is this a document you prepared before the
2    meeting that you had with Lieutenant Davis?
3    A.   Correct.
4    Q.   Now, I noticed that the subject matters on
5    Exhibit D-21 are very similar or in some cases the
6    same as the subject matters in Exhibit 19, which is a
7    document prepared prior to your meeting with Captain
8    Warren.
9         Why did you find it necessary to discuss
10   the instructor headset problem with Lieutenant Davis
11   after you had already discussed it with Captain
12   Warren?
13   A.   I believe I had a meeting with Lieutenant Davis
14   because Captain Warren wasn't there on that particular
15   day and I knew I was meeting with Lieutenant Davis.
16   These were just things that I wanted to present to him
17   to make sure that he was fully aware of what I was
18   doing, what was going on with me and the FTU at the
19   time because I knew he was busy doing other things
20   with the recruits and so forth.
21   Q.   You had discussed the headsets with Captain
22   Warren on the 3rd, right?
23   A.   Correct.
24   Q.   I guess my question is:  Why are you talking

Page 123

1    about it again with Davis on the 12th?  Was there
2    something unfinished about the discussion that you had
3    with Warren?
4    A.   No.  I believe I'm just keeping him informed of
5    what's going on.
6    Q.   On Exhibit D-21 there appears to be handwriting
7    and, again, this is the best I have in terms of a
8    photocopy.
9         Is that your handwriting?  Can you tell?
10   A.   It kind of looks -- yeah.  I believe it's mine.
11   Q.   Can you tell what it was that you were writing
12   in the middle of the page after the discussion about
13   the instructor headsets?  Is that more SLEAF money?
14   A.   Yeah.  "Possible SLEAF money," I think.
15   Q.   So was it Davis telling you that there might be
16   available funding for new headsets?
17   A.   It's possible, but I don't recall exactly at
18   this time.
19   Q.   Do you recall what Davis -- I take it at this
20   meeting you were complaining to Davis about the
21   headsets?
22   A.   I was informing him of all of this that I wrote
23   down.
24   Q.   Did you expect Davis to do something about it?

Page 124

1    A.   I don't believe so.  I believe I was just
2    keeping him up to speed on what was going on.
3    Q.   Let me ask you this question:  If you believed
4    that the headsets that the instructors used are
5    inadequate for whatever reason, whose responsibility
6    is it to fix the problem; in other words, to get
7    headsets that are adequate?
8    A.   The problem is we don't really know what
9    adequate is because there's never been a decibel level
10   testing in that range.  We know that those particular
11   headsets hurt our ears.  They're not protecting us
12   well enough.
13   Q.   There are six points that you raise with
14   Lieutenant Davis on December 12th.  It looks to me
15   like five of the six have to do with the problem of
16   interference from outside communications.
17        Am I correct on that?
18   A.   Correct.
19   Q.   One of the six deals with the volume.  Not the
20   volume but the noise levels, right?
21   A.   Right.
22   Q.   Did you believe at this point that the system
23   that your instructors were using was inadequate
24   because of the way the communication was set up; in

Page 125

1    other words, that it was on a wavelength where you
2    could get interference from outside entities?
3    A.   It was inadequate for a few reasons which I put
4    on there.
5    Q.   Whose responsibility is it to change the
6    headsets and get a proper set of headsets for the
7    instructors?
8    A.   I guess it would have to fall on me.
9    Q.   So is the problem you had that you didn't know
10   where to find the money to get it?
11   A.   Yes.  I'm looking for money at that time
12   because I was told that we really didn't have the
13   money to get it out of the FTU budget.
14   Q.   Who told you that?
15   A.   Sergeant Ashley at the time.
16   Q.   Did you on December 3rd ask Captain Warren if
17   he could find you money to get a new set of headsets?
18   A.   No, I don't believe so.
19   Q.   When you told Captain Warren about the
20   inadequacies of the headsets on December 3rd, what was
21   his response?
22   A.   I don't recall at this time.
23   Q.   When you were talking to Lieutenant Davis on
24   December 12th, I take it he's telling you you may be

32 (Pages 122 to 125)

A326

Price, et al.            v.            Chaffinch, et al.
Christopher D. Foraker, Volume 1      C.A. # 04-956-GMS      December 13, 2005

---

Page 126

1  able to get some money from SLEAF?
2     A.  The possibility existed.  He would have to look
3  into it, I guess.
4     Q.  Did he ever get back to you?
5     A.  I don't recall if he did.
6     Q.  Had he gotten back to you on it before you had
7  your discussion with Tom MacLeish about it on January
8  21st about the headsets?
9     A.  I don't believe it turned out there was SLEAF
10  money available.  I believe Lieutenant Davis did look
11  into it and the money was not available.
12     Q.  Did you look in your own budget to see if there
13  were any funds available, in other words, not relying
14  on Rich Ashley, did you go into the financial
15  information you had available to you as the head of
16  the range and see whether there was money available
17  for new instructor headsets?
18     A.  No.  There wasn't money available for us to buy
19  the headsets.  The money was committed to other
20  things.
21     Q.  What fiscal year were you on?  Do you remember?
22     A.  I believe it was '03.
23     Q.  I'm sorry.  What I meant is did the fiscal year
24  end on December 31st or some other point in the year?

Page 127

1     A.  Of July.  So it would have been '04's budget.
2     Q.  That's fine.
3        Now, the other --
4     A.  If I could clarify something?
5     Q.  Sure.
6     A.  When I spoke with Sergeant Ashley about the
7  budget, he had it broken down with what was remaining
8  was already going to be committed to certain things,
9  whether it be ammunition or what have you.  So I was
10  looking for additional funding outside of that to buy
11  these headsets.
12     Q.  So as I understand it, you were taking over in
13  the middle of the year where the budgetary money was
14  already committed, correct?
15     A.  That's correct.
16     Q.  You believe you had a problem because the
17  instructor headsets were inadequate and unsafe, right?
18     A.  Correct.
19     Q.  So you were looking around for money to get new
20  headsets?
21     A.  That's correct.
22     Q.  You don't remember asking Captain Warren for
23  the money, but you do remember asking Lieutenant Davis
24  for money?

Page 128

1     A.  I believe so, yes.
2     Q.  Now, did you ever ask Major Eckrich for money
3  for headsets?
4     A.  I don't recall if I did at this point in time.
5     Q.  You did raise the question with Lieutenant
6  Colonel MacLeish on January 21st, right?
7     A.  Correct.
8     Q.  And he said talk to Bill Carroll?
9     A.  Correct.
10     Q.  Carroll is the guy in the communications unit?
11     A.  That's correct.
12     Q.  Is he a civilian?
13     A.  Yes.
14     Q.  Going back to Exhibit D-21, the other thing
15  that you talked about with Ralph Davis that day, this
16  would be December 12th, is the current condition of
17  the bullet trap, correct?
18     A.  Correct.
19     Q.  You have got three points to talk to him about.
20  Did you talk about all of these three points?
21     A.  I talked about these with him and basically
22  told him what I was doing, is getting contractors in.
23     Q.  Is that what it says here in the bottom in your
24  handwriting?  It says, "get contractors in"?

Page 129

1     A.  Yeah.
2     Q.  So going back to your meeting with Captain
3  Warren on December 3rd, you discussed it, you
4  discussed the bullet trap issue with him on December
5  3rd, right?
6     A.  Correct.
7     Q.  And was Lieutenant Davis present on December
8  3rd?
9     A.  No, sir.
10     Q.  On December 12th you talk about it with
11  Lieutenant Davis, right?
12     A.  Correct.
13     Q.  Why are you talking about it with him when you
14  have already talked about it with his boss?
15     A.  Like I previously stated to you.
16     Q.  You just wanted to keep him involved?
17     A.  I just want to inform him of what's going on.
18     Q.  Was the involvement of contractors to do
19  maintenance on the bullet trap going to be an expense
20  that had not been budgeted for?
21     A.  Yes.  It would have to go above and beyond what
22  was budgeted for Savage Range to come in once a year.
23  Once a year was not even close to what needs to be
24  done.

33 (Pages 126 to 129)

Price, et al.                                      v.                            Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                    December 13, 2005

Page 130

1    Q.  So as in the case of the instructor headsets,
2  you needed to find more money?  Is that what this is
3  about when you're talking to Lieutenant Davis?
4    A.  Not in regards to the maintenance of the bullet
5  trap, no, I wasn't looking for more money at that
6  point in time.
7    Q.  Was it going to require more money?
8    A.  It may.  It depends on whether facilities
9  management were going to come up with someone.  At
10  that particular moment in time I was talking also with
11  Mark D'Allesandro and he was looking into whether he
12  was going to bring or whether he was going to be able
13  to get somebody placed there out of facilities
14  management.
15    Q.  Did you ever put in writing the discussion or
16  make any record in writing of the discussions you say
17  you had with Mark D'Allesandro about putting the
18  facilities management person in the range to handle
19  the bullet trap problems?
20    A.  Did I put that in writing?
21    Q.  Yes.
22    A.  I don't recall if I have or not at this time.
23        MR. ELLIS:  Let me show you Exhibit 22.
24        (Defendant's Deposition Exhibit No. 22 was

Page 131

1  marked for identification.)
2  BY MR. ELLIS:
3    Q.  Do you recognize this e-mail that's dated
4  December 11th, 2003 from Ralph Davis to you?
5    A.  Do I remember it?
6    Q.  Do you recognize it?
7    A.  (Reviewing document) I'm sorry.  What was your
8  question?
9    Q.  My question is whether you recognize this
10  e-mail.  Do you remember getting it?
11    A.  No, I don't remember it.
12        MR. ELLIS:  Let me show you Exhibit 23.
13        (Defendant's Deposition Exhibit No. 23 was
14  marked for identification.)
15  BY MR. ELLIS:
16    Q.  I would like you to focus, in particular, on
17  the second e-mail on Exhibit D-23 and that would be
18  the one dated December 11, 2003, 2:11 p.m. from you to
19  Davis.
20        My question is:  Is that an e-mail that
21  you sent to --
22    A.  This one has 2:18 p.m.
23    Q.  No.  That's the top one.  Remember, I said the
24  second one.

Page 132

1    A.  2:11.  Okay.
2    Q.  Okay.  My question is:  Does D-23 show a
3  message at 2:11 p.m. on December 11, 2003 that you
4  sent to Ralph Davis?
5    A.  Yes.
6    Q.  If you compare D-23 with D-22, doesn't D-23
7  appear to be your response to Davis's e-mail earlier
8  in the day?
9    A.  Yes.
10    Q.  In fact, you have got six paragraphs to your
11  message and Ralph Davis has six paragraphs to his,
12  right?
13    A.  Yes.
14    Q.  Now looking first at Exhibit D 22, which is
15  Davis's message to you, this deals with your efforts
16  to get a fifth person at the FTU because you were so
17  busy, right?
18    A.  Correct.
19    Q.  And you actually had a fifth person in Peachey,
20  but Peachey wasn't working very much so you didn't
21  consider him an effective fifth person, correct?
22    A.  That's correct.
23    Q.  Davis says to you in his e-mail of December
24  11th at 11:58 in the morning that Henry Speed would be

Page 133

1  available most days to help you, does he not?
2    A.  Yes, he does.
3    Q.  Did you use Henry Speed during January when the
4  recruits were in?
5    A.  No.  I attempted to do that through his
6  sergeant, Sergeant Carl Bond, and he did not make
7  Henry Speed available.
8    Q.  So you never did use Speed?
9    A.  That's correct.  He wasn't available.
10    Q.  It also says here that Rich Ashley was
11  available and willing to assist.
12        Did you use Rich Ashley during the
13  training in January of 2004?
14    A.  Rich wasn't exactly friendly with me at the
15  time and didn't seem too interested in helping.
16    Q.  Did you call Ashley and ask him to help?
17    A.  I called him about some other things and his
18  attitude towards me wasn't friendly.
19    Q.  Well, my question is:  Did you ask Ashley to
20  come up and supervise the recruits in January of 2004?
21    A.  No, I did not.  I believe that he was busy on
22  projects that he was appointed to do.  One in
23  particular I know was the vest project, trying to
24  straighten things out with that.

34 (Pages 130 to 133)

Price, et al.                                    v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 1        C.A. # 04-956-GMS              December 13, 2005

Page 134

1    Q.   He was assigned to the planning section after
2  he left the FTU, right?
3    A.   I think he was administrative support.
4    Q.   Who did he work for?
5    A.   I think the colonel.
6    Q.   You believe Ashley as a sergeant reported
7  directly to the colonel?
8    A.   Yes, I do.
9    Q.   You said in your response to Ralph Davis's
10 e-mail, and this is paragraph 6 on December 11,
11 2003 -- I'm sorry.  This is paragraph 6 of your 2:11
12 p.m. e-mail of December 11, 2003:  "I have plans that
13 I would like to run by you when you" -- it says, "to
14 run by you when you tomorrow afternoon if you have a
15 minute."  I assume there was a typo in there and that
16 there are plans that you wanted to run by Ralph Davis
17 having to do with the fifth person.  Is that correct?
18   A.   That would correlate with --
19   Q.   Your paragraph 6?
20   A.   Yes.  My paragraph 6 would correlate with
21 Lieutenant Davis's paragraph 6.
22   Q.   My question is:  What were the plans that you
23 wanted to run by Lieutenant Davis?
24   A.   I don't recall at this time.

Page 135

1        MR. ELLIS:  Now let me show you Exhibit
2  24.
3        (Defendant's Deposition Exhibit No. 24 was
4  marked for identification.)
5  BY MR. ELLIS:
6    Q.   I want to call your attention specifically to
7  the second e-mail on Exhibit D-24, the one dated
8  February 23, 2004 at 10:25 a.m. from Davis to you.
9        Do you recall getting this?
10   A.   Yes.
11   Q.   Did you ultimately get approval for the fifth
12 person?
13   A.   I put things together for the fifth person and
14 sent them to Captain Warren for approval.
15   Q.   And then what happened?
16   A.   I didn't get anyone else in the unit.
17   Q.   Well, you ended up getting three more people,
18 right, at some point?
19   A.   Who were those three?
20   Q.   Well, at some point you learned that Price and
21 Warren were going to be put on light duty, right?
22   A.   I'm not exactly sure when that occurred or what
23 was going on because there was no e-mail sent out to
24 anybody saying anything.  I didn't know anything.

Page 136

1    Q.   Well, didn't you learn at some point that the
2  hearing tests that were conducted on the people in the
3  firearms training unit had flagged problems in hearing
4  for Wayne Warren and Kurt Price?
5    A.   See, that's another area where I have no idea
6  what's going on.  You're talking about they flagged
7  them.  That's never been done before.  People have
8  worked with hearing loss at different places in the
9  State Police, so I have no idea what was going on.
10   Q.   Well, were you told at some point that you
11 couldn't use your two subordinates, Wayne Warren and
12 Kurt Price, in shooting situations?
13   A.   Yes.
14   Q.   Who told you that?
15   A.   I believe that came from Lieutenant Colonel
16 MacLeish.
17   Q.   And how did he tell you that?
18   A.   I believe he said that in a meeting.
19   Q.   And where was that meeting?
20   A.   We had a number of meetings and I'm not sure
21 exactly which one it was at this time.
22   Q.   Well, what did he say?  What exactly did he say
23 about Price and Warren?
24   A.   He said he didn't want them around the line of

Page 137

1  fire.
2    Q.   And do you remember when that meeting was?
3    A.   I don't recall at this time what date and what
4  meeting that was.
5    Q.   Did you get a Sergeant Kracyla assigned to the
6  FTU?  I may not be pronouncing that right.
7  K-r-a-c-y-l-a.  If you want to correct me on that I
8  would be happy to pronounce it right.
9    A.   Off and on.  It was sporadic.
10   Q.   Did you also get a Corporal Boulerice?
11   A.   Yes.  Again, off and on.
12   Q.   And did you also get a Timothy Morris?
13   A.   Yes.
14       MR. ELLIS:  Let me show you Exhibit 25.
15       (Defendant's Deposition Exhibit No. 25 was
16 marked for identification.)
17 BY MR. ELLIS:
18   Q.   Do you recognize this?   This Exhibit D-25 is
19 two e-mails, one dated April 22 and one dated April
20 23, and they're in a chain.  The first one is from Tom
21 MacLeish to Warren, Davis and you, and by "Warren" I
22 mean Greg Warren, Davis and yourself.
23       Do you remember receiving that e-mail?
24   A.   Yes.

35 (Pages 134 to 137)

Price, et al.                                                      v.                                          Chaffinch, et al.
Christopher D. Foraker, Volume 1                  C.A. # 04-956-GMS                        December 13, 2005

Page 138

1    Q.   This assigns three troopers as range
2   instructors on what's called a TAD basis, does it not?
3    A.   That's what it says.
4    Q.   That would be Kracyla, Boulerice and Morris,
5   right?
6    A.   Correct.
7    Q.   What's a TAD basis mean?
8    A.   Temporary assigned duty.
9    Q.   That's different from a permanent assignment,
10   right?
11    A.   It depends on who you ask, but it's supposed to
12   be, yes.
13    Q.   What's the difference between a TAD assignment
14   and a permanent assignment at least in your view?
15    A.   A TAD is only for a short period of time and
16   then they will be transferred back to their origin.
17    Q.   Was it your understanding based on your
18   discussion with Lieutenant Colonel MacLeish that Kurt
19   Price and Wayne Warren had further testing to undergo?
20    A.   I wasn't clear on anything from Lieutenant
21   Colonel MacLeish.
22    Q.   Well, Lieutenant Colonel MacLeish told you that
23   they weren't supposed to be exposed to live fire.  Is
24   that correct?

Page 139

1    A.   That's correct.
2    Q.   Did he tell you anything else in that meeting
3   with respect to Price and Warren?
4    A.   He said something to the effect that "You have
5   to expect hearing loss.  You work at a range.  It's
6   like working in the infantry."
7    Q.   You mean the artillery?
8    A.   Artillery.  Okay.
9    Q.   Did Lieutenant Colonel MacLeish tell you that
10   he was having more testing done on Wayne Warren and
11   Kurt Price?
12    A.   I don't recall him saying that, in those words,
13   no.
14    Q.   Was it your understanding that Wayne Warren and
15   Kurt Price were going to have further testing done to
16   determine whether they could stay at the firearms
17   training unit given their hearing loss?
18    A.   I didn't have any understanding of what was
19   going on and who was going to be where.
20    Q.   Did you ask anybody?
21    A.   Yes.
22    Q.   Who did you ask?
23    A.   I asked Captain Warren and Captain Warren
24   didn't know anything either.  He wasn't being kept

Page 140

1   informed of what was going on.
2    Q.   When did you have this conversation with
3   Captain Warren?
4    A.   There was a meeting that was supposed to be
5   held, and I'm trying to think when it was.  And
6   Lieutenant Colonel MacLeish canceled it, but I think
7   we still got together and had a meeting of ourselves
8   since we had already planned to have that meeting.
9   And I said to him "I don't know what's going on.  Do
10   you know?"
11         And he said no, that he's not being kept
12   in the loop either.
13    Q.   Who was at that meeting that you have just
14   described?  You said a meeting of us.
15    A.   The FTU staff and Captain Warren.
16    Q.   Was Davis there?
17    A.   I don't think he was there.
18    Q.   Was MacLeish there?
19    A.   No.  That's who canceled.
20    Q.   Aside from asking Captain Warren, did you ask
21   anybody else what the status of your two subordinates
22   was?
23    A.   I don't recall at this time if I did.
24    Q.   Do you recall any conversation with John

Page 141

1   Yeomans?
2    A.   That I had with John Yeomans?
3    Q.   Yes.  About the status of your two
4   subordinates?
5    A.   I don't recall any.
6    Q.   So you've got two of your three subordinates
7   you have been told can't be exposed to live fire and
8   the only person you asked questions about concerning
9   their status was Captain Warren?
10    A.   He's in my chain of command, yes, sir.
11    Q.   I understand.
12    A.   This is a paramilitary organization and I am
13   only a sergeant.  There are plenty of people above me
14   and Lieutenant Colonel MacLeish was running this whole
15   situation as far as I could tell, everything was being
16   run through him.  So he's the one that sent the
17   e-mails and letters and communicated only in meetings
18   to us in the beginning and then that communication
19   kind of fell away after a while.
20         MR. ELLIS:  Now let me show you 26.
21         (Defendant's Deposition Exhibit No. 26 was
22   marked for identification.)
23   BY MR. ELLIS:
24    Q.   I'm sorry.  But let's go back one to Exhibit 25

36 (Pages 138 to 141)

Price, et al.                                    v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                December 13, 2005

Page 142

1   before you get to 26, Sergeant Foraker.
2           The top e-mail on D-25 is an e-mail from
3   you to the three people who were assigned TAD, plus
4   the three existing members of the FTU.  And it says,
5   "Just an FYI, take note of the time it was sent to me,
6   I opened the e-mail this morning."
7           Why did you include that statement?
8   A.  Because there was question as to what was
9   happening and who was going where because that's the
10  first time that I had heard that Rob Kracyla was
11  coming and Rob actually found out through someone else
12  and called me.  And I said, "I have not heard anything
13  of that sort."
14          And I understood Colonel MacLeish to say
15  that Tim Morris and possibly even Don Boulerice would
16  be transferred permanently and not TAD.  And I was
17  responsible for calling them and we had conversations
18  with all of these people earlier that day.  And I
19  didn't know about this e-mail until the following day.
20  Q.  I understand.
21          Going over to 26 now, the bottom e-mail
22  which is from you to Lieutenant Colonel MacLeish on
23  Exhibit D-26 is you describing to Lieutenant Colonel
24  MacLeish problems with the TAD assignments, right?

Page 143

1   A.  Yes.
2   Q.  And the top e-mail is Lieutenant Colonel
3   MacLeish responding to you, right?
4   A.  Yes.
5   Q.  Now, he uses the phrase in the beginning of his
6   e-mail to you "until we can confirm the status of
7   Corporals Warren and Price."
8           What did you understand that to mean?
9   A.  That things were up in the air with them.
10  Q.  And what things might be up in the air with
11  Corporals Warren and Price?
12  A.  Obviously their medical status.
13  Q.  Do you agree with Lieutenant Colonel MacLeish
14  that it would be unfair to either Price and Warren or
15  to those who would replace them to make permanent
16  assignments while Price's and Warren's status was up
17  in the air?
18  A.  The way I understood him in our earlier meeting
19  was that he was transferring them in permanently.  He
20  asked me who do you want and I told him and he said
21  give them a call.  But the way the conversation --
22  that was my understanding, was that they were going to
23  be permanently assigned.
24          And I'm all for my unit growing in number,

Page 144

1   not diminishing in number.  So I was absolutely fine
2   with that to keep Warren and Price and have these guys
3   as well.  That's what I understood it to be.
4           Then I got this e-mail (indicating) and it
5   says TAD, of course, and these three guys.  I didn't
6   know anything about Rob Kracyla.
7   Q.  When you say, "this e-mail" you're talking
8   about D-25 now, right?
9   A.  Yes.
10  Q.  Then you found out you were getting Kracyla
11  too.  Is that right?
12  A.  Yes.  But it was very difficult to get them at
13  the same time and it was -- it's always been a problem
14  when you don't have someone assigned assigned to the
15  FTU because they get pulled back to their other
16  assignment, especially when you're talking about SIU
17  personnel.
18  Q.  And SIU personnel, are they primarily the drug
19  unit?
20  A.  Don Boulerice was in the drug unit and Sergeant
21  Kracyla was working with the FBI task force at the
22  time.
23  Q.  Would it be fair to say that getting the
24  adjunct instructors has been a headache for whoever is

Page 145

1   running the FTU for years?
2   A.  Yes.
3   Q.  And that was a headache for you back in 2001
4   and 2002, right?
5   A.  Yes.
6   Q.  Would it be accurate to say that in 2001 and
7   2002 you would have as many as two or three adjunct
8   instructors?
9   A.  It all depends on whether it's recruit training
10  or it's in-service training.
11  Q.  I take it that recruits require more than
12  in-service?
13  A.  Correct.
14  Q.  Is Captain Simpson the person in charge of the
15  SIU?
16  A.  Yes, he is.
17          It was also an issue in that particular
18  e-mail that you pointed out where Lieutenant Quig from
19  Troop 6 told Tim Morris that he was permanently
20  assigned to the FTU.  How he got that information, I
21  don't know.  And then he made him give up his car and
22  then I had to find him a car.  And it's just an
23  absolute nightmare at this point in time to try and
24  get things straightened out when I'm trying to conduct

37 (Pages 142 to 145)

A331

Page 146

1  a shoot and recruits and do this all at the same time.
2      Q.  Do you remember when the spring shoot started
3  in 2004?
4      A.  May, I believe.
5      Q.  Once it got started, who did you have for live
6  fire, who did you have to supervise live fire
7  exercises?
8      A.  Who did I have?
9      Q.  Yes.  Who were under your supervision to
10  supervise live fire exercises?  Obviously Warwick was
11  one.
12     A.  Corporal Warwick, corporal Morris and Corporal
13  Boulerice most of the time.  I would have every now
14  and then Sergeant Kracyla, Sergeant Parton.
15     Q.  Al Parton?
16     A.  Yes.
17         I don't know if I had supervised Corporal
18  Danny Wright during that time.  I don't believe so.  I
19  don't recall seeing him at this time.
20     Q.  Were Corporals Price and Warren able to assist
21  you in classroom instruction?
22     A.  Some, yes, they did.  But, then again, when I
23  tried to use Corporal Price, he was at a facility
24  where he was at a classroom and then stepped out of

Page 147

1  the classroom while the recruits were cleaning up
2  brass and the lieutenant colonel came up and was angry
3  that he was there at that facility.  But he had been
4  in the classroom and then up in the tower where he was
5  protected and he even had hearing protection, but he
6  was cornered by the colonel, Lieutenant Colonel
7  MacLeish at the time, and basically berated him about
8  "What didn't you understand about my command?"
9      Q.  Were you present during that encounter?
10     A.  No, I wasn't.
11     Q.  You heard about it from Kurt Price?
12     A.  Correct.
13         MR. NEUBERGER:  Could we take our break
14  now?  It's 3:00 o'clock.
15         MR. ELLIS:  Absolutely.
16         (A brief recess was taken.)
17         (Defendant's Deposition Exhibit No. 27 was
18  marked for identification.)
19  BY MR. ELLIS:
20     Q.  Could you take a look at Exhibit 27?  Just take
21  a look at that and tell me if that's a document that
22  you recognize.
23     A.  (Reviewing document)  What was your question,
24  sir?

Page 148

1      Q.  Do you recognize the document?
2      A.  I believe that I may have prepared this.
3      Q.  Do you remember when?
4      A.  It would have to be sometime between January
5  5th afterwards, because it's talking about the
6  recruits and their experience, January 5th of 2004.
7      Q.  Is this document something you could have
8  prepared after the range had stopped shooting?
9      A.  I think this was maybe justification for our
10  air quality test.
11     Q.  Is the handwriting that's on the bottom your
12  handwriting?
13     A.  It looks like it, yes.
14     Q.  Could you read it for me?
15     A.  "Greg no problem going to ramrod it through."
16     Q.  Is that Greg Warren, presumably?
17     A.  Probably, yes.
18     Q.  What does that sentence mean, "Greg no problem
19  going to ramrod it through"?
20     A.  He wants to get it approved so we can get the
21  testing done since facilities management isn't doing
22  it.
23     Q.  And did you give this document to Greg Warren?
24     A.  I may have.  I don't recall at this time.

Page 149

1      Q.  Did he tell you that he would approve the air
2  testing?  I guess let me back up a second.
3         Whose responsibility is it to get the air
4  testing done within the State Police or was this
5  something that just had never come up before?
6      A.  I would imagine this would go up the chain of
7  command to the executive staff.  It's not our
8  building, so I guess they have to work out the details
9  at that level.
10     Q.  Who arranged for -- the air was tested in the
11  building sometime in early 2004, wasn't it?
12     A.  I was given approval to have Environmental
13  Solutions come in for a certain price and they did
14  just that.  They came in to do swipe samples and did
15  air sampling.
16     Q.  You say you were given approval.  Who gave you
17  the approval?
18     A.  Inevitably it came I believe from Faye Veal.
19  Faye Veal said, "Go ahead and do it.  Here's the money
20  for it.  Here's the purchase order for it."
21     Q.  Who is Faye Veal?
22     A.  Faye Veal is a civilian.  She falls underneath
23  of Major Eckrich in reference to the budgetary
24  responsibilities.

38 (Pages 146 to 149)

Price, et al.                                   v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS              December 13, 2005

Page 150

1    Q.  So is the ultimate person who gives approval
2    for that Major Eckrich?
3    A.  It would have to be at least at his level,
4    maybe higher.  I don't know whether it has to go
5    through the cabinet secretaries because the building
6    isn't ours and there was some question as to whether
7    that could be done or not.
8         I know that we have had conversations with
9    Doyle Tiller and he's the hygienist from facilities
10   management and that's who we were trying to get to
11   come in and test our facility.  And he was telling us
12   that he wasn't going to do that at this point in time;
13   that that wasn't the first step.  And he kept putting
14   us off and putting us off and finally I want to get it
15   done.  I want to get it tested to see what we're being
16   exposed to.
17   Q.  Okay.  Let me ask you this, first of all.  Who
18   told you that it was okay to contract with
19   Environmental Solutions and get the testing done?
20   A.  Captain Warren I guess put it through the
21   executive staff and the executive staff okayed me to
22   use the funds in my budget to pay for it.
23   Q.  Where did you get the funds in your budget?  I
24   thought everything was already committed at this

Page 151

1    point.
2    A.  I don't recall at this time where, what may
3    have been deleted to get that.  I don't know.
4    Q.  So back to the question I asked you:  Who was
5    it who told you it was okay to pay for the testing?  I
6    think your answer is Greg Warren?  Is he the person
7    who communicated to you the decision that it was okay
8    to get the testing done?
9    A.  I believe so, but I'm not 100 percent sure at
10   this time.
11   Q.  You believe that somebody above him had to
12   approve it?
13   A.  I believe so.
14   Q.  And you think it would have been at least at
15   the Major Eckrich level and possibly higher?
16   A.  Correct.  And the purpose behind this is
17   because you have two different entities of government
18   and you don't want to do something wrong when you
19   should have done it another way and I'm trying to do
20   it the right way.
21   Q.  You have two parallel cabinet departments?  Is
22   that what you're saying?
23   A.  Correct.
24   Q.  I take it that at some point you had a

Page 152

1    conversation with Doyle Tiller in which you asked him
2    to come in and test the air.
3    A.  We have had a number of conversations with him
4    where we stopped in and telephone calls that we have
5    made to him.
6    Q.  Do you recall when the first conversation was
7    after your return in which you said that you wanted to
8    have the air tested because you didn't think it was
9    safe?  When I say, "after your return," I'm talking
10   about after December 1, 2003.
11   A.  We had been contacting facilities management
12   since I came back on December 1st for various things,
13   one of which each time we called it had to do with the
14   ventilation system not working.
15   Q.  Okay.
16   A.  We even so much -- Corporal Warren asked for a
17   copy of the log.  When we call in there, they're
18   supposed to write down when we call in.  They refused
19   to provide it to us.
20   Q.  And who was it that you asked to provide you a
21   copy of the log?
22   A.  I believe he asked Mark DeVore.
23   Q.  I want to focus on the communication you had
24   directly with Doyle Tiller, so this is not anything

Page 153

1    you heard somebody else tell you.
2         But did you have a conversation with Doyle
3    Tiller in which you asked him to come in and test the
4    air, the air quality inside the building and he
5    refused to do so?
6    A.  Yes.
7    Q.  Approximately when did that take place?
8    A.  That was that first week with recruits in
9    January, January 5th.
10   Q.  And did he say why?
11   A.  He was basically saying that that's not, that's
12   not -- "We're not at that step yet."
13   Q.  What did you understand him to mean by "We're
14   not at that step yet"?
15   A.  I don't really understand.  He's very good at
16   talking in circles and I just -- he talks above you,
17   well, above me anyway at times.
18   Q.  Was anybody present at that discussion you had
19   with him other than you and Mr. Tiller?
20   A.  I believe Corporal Warren was with me.
21   Q.  Did either you or Corporal Warren ask him what
22   it would take to get the testing, the air testing done
23   by the department of facilities management or the
24   division of facilities management?

39 (Pages 150 to 153)

Price, et al.                                    v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1        C.A. # 04-956-GMS              December 13, 2005

Page 154

1    A.   What I can remember him saying, at this point
2  in time what I can remember him saying is that we
3  weren't at that stage or step yet and there were other
4  things that needed to happen, other things that we
5  could try.  And I remember he brought in Mark
6  D'Allesandro and called Trane because Doyle Tiller
7  witnessed the ventilation system, he witnessed the
8  debris floating backwards.  I mean, I'm not an
9  engineer, so I don't know what's going on, but I do
10 know that the breeze is supposed to go to the bullet
11 trap and up into the filters.  It's not supposed to go
12 backwards.  And that's what was happening.
13        Doyle Tiller and Mark DeVore were able to
14 see that.  Mark DeVore spent a good bit of time, like
15 30, 40 minutes on the computer in the control booth
16 and then Mark D'Allesandro came in, along with I think
17 it's Whitehouse or Whitehead.
18   Q.   The guy from Trane?
19   A.   The technician from Trane.  They came in and
20 they looked it over.  And I think the guy from Trane
21 said that there was some leakage, air leakage around
22 the door, but it wasn't significant to cause any
23 problems.
24        And Mark D'Allesandro said that "I wish I

Page 155

1  could tell you it's working, but all I can tell you is
2  it's working as best it can."
3        But it's not working when it's going
4  backwards.
5    Q.   Is this a meeting where all of these people
6  from the state are in the building at the same time?
7  By "all of these people" I mean Tiller, DeVore and
8  D'Allesandro and then Whitehouse from Trane are all in
9  the building at the same time?
10   A.   They may have been.
11   Q.   What did you do as a result of the discussion
12 that you had with D'Allesandro, DeVore and Tiller in
13 which they said that they weren't going to test the
14 air quality in the range?
15   A.   Basically, they're telling me that the
16 ventilation system is working as best it can and that
17 we're just not going to do that testing.  So I think
18 it was necessary to have it done and I consulted with
19 Captain Warren.  He felt the same way.  My guys felt
20 the same way.
21        We wanted to know what -- when you look up
22 lead and exposure, there's time weighted averages of
23 exposure and we wanted to know what is our time
24 weighted average of exposure and what we're being

Page 156

1  exposed to.
2    Q.   Just give me a minute here.  I'm trying to find
3  the exhibit that I think was used already.
4        See if you have Exhibit D-17.
5        MR. NEUBERGER:  You said 17?
6        MR. ELLIS:  Yes, 17.
7        MR. NEUBERGER:  Here it is.
8  BY MR. ELLIS:
9    Q.   Look at paragraph number 1 that begins in the
10 beginning of the page and read that and tell me if
11 that is describing the occasion in which all these
12 people were at the range looking at the problem.
13   A.   (Reviewing document).
14   Q.   Is that the meeting you're referring to?  I'm
15 sorry.  You just spent some time describing some
16 activity at the range involving Doyle Tiller, Mark
17 DeVore and Mark D'Allesandro and also a guy named
18 Whitehouse, who was from the Trane Corporation.
19        Is the description of what they did
20 something you memorialized in paragraph 1 of Exhibit
21 D-17?
22   A.   It could be.
23   Q.   Now, I don't see any -- I see a description
24 here of what D'Allesandro and Whitehouse are doing.

Page 157

1        Were Tiller and DeVore also in the meeting
2  that you described in paragraph 1 of Exhibit D-17?
3    A.   They may have been there on that day.  I'm not
4  exactly sure.
5    Q.   Do you recall ever putting in writing in any
6  e-mail or other document the fact that Doyle Tiller
7  was refusing to do this testing, the air testing that
8  you wanted done?
9    A.   I don't recall at this time if I did.
10       MR. ELLIS:  Let me show you Exhibit 28.
11       (Defendant's Deposition Exhibit No. 28 was
12 marked for identification.)
13 BY MR. ELLIS:
14   Q.   Have you taken a look at D-28, Sergeant
15 Foraker?
16   A.   Yes.
17   Q.   First of all, you have identified who Mark
18 D'Allesandro is here.  But what's your understanding
19 of what Mark DeVore's responsibility was with respect
20 to the exhaust hood?
21   A.   Mark DeVore was in touch with outside engineers
22 that were pricing out the job to move that vent.
23   Q.   So that was done by people outside the Delaware
24 state government?

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A334

Price, et al.                                              v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 1                C.A. # 04-956-GMS                        December 13, 2005

Page 158

1   A.   It was never done.
2   Q.   Do you know why it was never done?
3   A.   Probably since the building was closed.
4   Q.   This e-mail that's dated December 15, 2003 that
5   goes from you to Ralph Davis has in the subject line
6   "FTU Bullet Trap/Exhaust Hood.  There's no discussion
7   in this e-mail about the bullet trap, is there?
8   A.   No, there's not.
9   Q.   Do you know why you put bullet trap there?
10  A.   No, I don't.
11  Q.   I'm just curious.
12        Are you the person who arranged with
13  Environmental Solutions Group to have the air quality
14  testing done?
15  A.   Yes, I believe so.
16  Q.   And did you deal directly with Mr. Farrell?
17  A.   Yes, I did.
18        MR. ELLIS:  This is 29.
19        (Defendant's Deposition Exhibit No. 29 was
20  marked for identification.)
21  BY MR. ELLIS:
22  Q.   Have you had a chance to look at Exhibit D-29?
23  A.   Yes.
24  Q.   This refers to a meeting that appears to have

Page 159

1   occurred on Wednesday, February 25th.
2        Is that a correct characterization of the
3   first sentence?
4   A.   Yes.
5   Q.   Do you know who was present at the February
6   25th, 2004 meeting?
7   A.   No, I don't recall at this time.
8   Q.   Was this a meeting that Lieutenant Colonel
9   MacLeish was at, do you remember?
10  A.   It may have been.
11  Q.   You don't remember?
12  A.   I don't recall at this time.
13  Q.   Do you remember who it was that assigned you
14  the task of contacting Clark Nexsen?
15  A.   I think these are two things that I said I
16  would do, I volunteered to do.
17  Q.   Do you remember who was running the meeting?
18  A.   It may have been Captain Warren.  It may have
19  been Lieutenant Colonel MacLeish.  I don't recall at
20  this time.
21  Q.   During the period from January 2004 through,
22  say, April 2004, did Lieutenant Colonel MacLeish give
23  you assignments to do?
24  A.   What was the beginning date?

Page 160

1   Q.   The beginning of the year, beginning of January
2   of 2004.
3        Did Lieutenant Colonel MacLeish give you
4   assignments?
5   A.   Yes.  There were numerous things that he wanted
6   us to research or find.  There were numerous things.
7   Q.   What do you remember that he asked you to do?
8   A.   At some point in time, and I don't recall dates
9   and times, but he wanted like MSDS sheets, research
10  ammunitions.
11  Q.   What do you mean by "research ammunitions"?
12  A.   Research other ammunitions that are out there
13  that we could shoot other than frangible ammunitions.
14  I believe he wanted to get SOP's from other ranges,
15  things like that.
16  Q.   Did he ask you to prepare or did he ask you to
17  get an estimate of the cost of repairing what was
18  wrong with the range?
19  A.   I know he asked me to bring in an independent
20  expert that was not a contractor that was -- that had
21  no vested interest because when I did bring in Bill
22  Prodencher, who is the expert from the U.S. Navy on
23  building range ventilations, he was considered a
24  contractor and they didn't like the fact that they

Page 161

1   thought he had a vested interest so they didn't take
2   him at his word apparently.
3        So I had to do research and find an
4   independent expert from the Federal Law Enforcement
5   Training Center.  So he was a government entity and --
6   I'm trying to think of his name.
7   Q.   Metcalf?
8   A.   Yes, William Metcalf.  And I worked out with
9   getting him, getting approval to get him in.  I
10  contacted Faye Veal again at headquarters and she then
11  talked with Major Eckrich on getting the funds to pay
12  the man when he came in, but I don't believe that they
13  ever followed up on that.
14  Q.   Well, didn't Metcalf have a problem with his
15  own management letting him do the job?
16  A.   He had to get approval through his management
17  and that he did.
18  Q.   He told you he had that approval?
19  A.   Yes, he did.
20  Q.   Going back to Exhibit D-1, which I think is
21  somewhere in front of you, if you look at the second
22  page of D-1, this is MacLeish's e-mail to you of
23  January 5, 2004.  He's asking you to get cost
24  estimates for the repairs, isn't he?

41 (Pages 158 to 161)

Price, et al.                                          v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1              C.A. # 04-956-GMS                        December 13, 2005

Page 162

1    A.   I'm not exactly clear on what he wants cost
2  estimates on, whether it's the cost to fix the
3  conveyor system, drag system or what.
4    Q.   Or the HVAC system?
5    A.   Right.
6    Q.   Did you ask him?
7    A.   I don't recall at this time whether I did or
8  not.
9    Q.   Let me maybe try to simplify this.
10        You got an estimate from a company called
11 Carey's Heating and Air Conditioning for something
12 like $2.3 million to fix the problems with the HVAC
13 and the bullet trap at the range?
14   A.   Correct.
15   Q.   And that was the company that you identified as
16 being the Navy contractor?
17   A.   That's correct.
18   Q.   And that's Bill Prodencher's company?
19   A.   That's correct.
20   Q.   Was the reason that you went and got that
21 estimate because somebody said to you go find out how
22 much it will cost to fix the problem?
23   A.   Probably so because I know I was also getting
24 Clark Nexsen's report in of what they estimated the

Page 163

1  problem was in 1999.  So I was doing that
2  simultaneously, bringing that in as I was getting the
3  information from Carey's.
4    Q.   Now, Carey's is not a government agency, right?
5  It's not the Navy itself?
6    A.   No.  It's an independent contractor.
7    Q.   So it's a contractor that does work for the
8  Navy?
9    A.   That's correct.
10   Q.   Was the question you asked Clark Nexsen in
11 terms of what was wrong with the place the same
12 question you were asking Carey's?
13   A.   I believe so.
14   Q.   Why were you asking two different engineering
15 companies the same question?
16   A.   I guess actually I'm not.  I'm asking Clark
17 Nexsen for their report that they put out in '99 to
18 compare to something new that we're going to get in.
19   Q.   So you --
20   A.   So they could make an intelligent decision
21 again with comparators.
22   Q.   I'm sorry.  Who could make an intelligent
23 decision?
24   A.   So any of the upper echelon, the cabinet

Page 164

1  secretaries and those people.
2    Q.   Was the reason you went out and got Carey's
3  estimate because Colonel MacLeish had asked you to get
4  a cost estimate for how much it would cost to fix the
5  problem?
6    A.   I believe he was talking about the conveyor
7  system.
8    Q.   Okay.  Then the question --
9    A.   I don't believe that he was talking about
10 anything more than the conveyor system at this point.
11   Q.   Under whose authority did you go to talk to
12 Carey's about getting an estimate for fixing the whole
13 range?
14   A.   We came up with Carey's Ventilation through Jim
15 Warwick attending a class up in New Hampshire for
16 SIGARMS.  He talked to their director of training and
17 their director of training and him conversed over the
18 problems that we were having at the range.
19        He subsequently told Jim Warwick give this
20 number to Chris and have him call out west and
21 eventually get a hold of Carey's.  They're apparently
22 one of the best in the business in range ventilation.
23   Q.   And was the purpose so that you could figure
24 out what it would cost to fix the problem?

Page 165

1    A.   The purpose of me calling him?
2    Q.   Yes.  Why did you call Prodencher?
3    A.   I wanted to try to talk to someone that knows
4  what they're doing because I know that facilities
5  management obviously doesn't and Trane doesn't know
6  what's going on and JAED, who built and engineered the
7  ventilation system, doesn't understand what's going on
8  and how to make a range work.
9    Q.   Did Lieutenant Colonel MacLeish also ask you to
10 do something called a responsibility analysis?
11   A.   Yes, he did.
12   Q.   How did you receive that assignment?  Was that
13 over the phone, in person, by e-mail?
14   A.   I thought that may have been in a meeting.
15   Q.   Do you remember who was at that meeting?
16   A.   I know Captain Warren was.  I'm not exactly
17 sure who else was there.
18        MR. ELLIS:  Let me mark this as No. 30.
19        (Defendant's Deposition Exhibit No. 30 was
20 marked for identification.)
21 BY MR. ELLIS:
22   Q.   Have you had a chance to look at Exhibit 30?
23   A.   Yes.
24   Q.   First of all, do you recall when it was that

42 (Pages 162 to 165)

Price, et al.                                      v.                                  Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                    December 13, 2005

Page 166

1   you received the assignment to prepare the
2   responsibility status analysis?
3       A.   Obviously sometime prior to February 9, 2004.
4       Q.   Do you recall how much before February 9, 2004
5   you received the assignment?
6       A.   No, I don't recall the exact date at this time.
7       Q.   Do you recall -- I think you said earlier that
8   you thought you got the assignment in a meeting with
9   Lieutenant Colonel MacLeish?
10      A.   I believe so.
11      Q.   Do you remember who else was at the meeting?
12      A.   I believe Captain Warren was at the meeting.  I
13  don't remember anybody else.
14      Q.   Do you remember where the meeting was?
15      A.   We have had so many meetings off and on.
16      Q.   I understand.
17      A.   It could have been at the academy.  It could
18  have been at headquarters.  I'm sure if it was a
19  meeting it was probably at headquarters.
20      Q.   Do you recall whether it was after Captain
21  Warren turned in his current range status and analysis
22  report that we have marked as Exhibit D-2?
23      A.   I actually thought that they were due like at
24  the same time.  Maybe they weren't.

Page 167

1       Q.   Warren's report appears to have been turned in
2   ten days before yours.  That's not what you remember?
3       A.   That may have happened.
4       Q.   My question was really whether you believe that
5   the lieutenant colonel's request for your report on
6   responsibility status analysis was an outgrowth of
7   Greg Warren's report on the current status of the
8   range.
9            In other words, did Warren's report lead
10  to the request that you prepare your report?
11      A.   You're asking me that he asked, that Lieutenant
12  Colonel MacLeish asked him -- I guess ask the question
13  again.  I'm not following you.
14      Q.   Warren's report is dated January 30th.
15      A.   I see that, yes, sir.
16      Q.   I think that in an earlier e-mail we saw that
17  Captain Warren may have shown you a copy of the report
18  before he turned it into Colonel or Lieutenant Colonel
19  MacLeish.
20           Do you remember that?
21      A.   You said there was an e-mail from Captain
22  Warren?
23      Q.   I thought I remember this.  Just give me a
24  minute here and I will try to find it.  I thought I

Page 168

1   remember Captain Warren showing you something.
2            Well, if you look at D-18, the top e-mail
3   on D-18 which is a January 26th, 2004 e-mail from Greg
4   Warren to you says, "I want to review some items with
5   you, prior to submitting my final report to MacLeish."
6            Do you remember him -- I think you
7   testified that you didn't remember actually seeing the
8   report but you were pretty sure that Greg Warren
9   discussed parts of the report with you before he
10  turned it into Colonel MacLeish.
11      A.   Yeah.  I believe he had some questions to ask
12  me.
13      Q.   Do you remember any of the questions?
14      A.   Not that I recall at this time.
15      Q.   Now, ten days after Warren's report comes out
16  you submit your report to Lieutenant Colonel MacLeish.
17  My question to you was:  Do you believe there was
18  something in Greg Warren's report that led the
19  lieutenant colonel to ask you to prepare the
20  responsibility status analysis?
21      A.   I don't know what the colonel thought at that
22  particular time.
23      Q.   Do you remember anything he said to you when he
24  gave you the assignment?

Page 169

1       A.   No.  But I do remember talking to Captain
2   Warren afterwards, after receiving the assignment, and
3   I told him "I don't feel comfortable writing this
4   because it's not my expertise.  I don't know what we
5   should and shouldn't do.  There's other agencies out
6   there that have outside vendors come in."
7            And he said, "Just do the best you can,
8   write it up as best you can," and this is Captain
9   Warren, "because the colonel wants it."
10      Q.   What did you understand the colonel to be
11  asking you to tell him?
12      A.   What responsibilities at the range would fall
13  on the staff at the range, I guess.  That was my
14  thought process in preparing this.
15      Q.   Well, as I read your report, which we have
16  marked now as Exhibit D-30, you divided up
17  responsibility for the maintenance of the systems at
18  the range in this report.  In other words, you told
19  Lieutenant Colonel MacLeish what you thought would be
20  the most desirable division of responsibility among
21  the various involved entities.
22           Is that an accurate way to characterize
23  the document?
24      A.   Okay.

43 (Pages 166 to 169)

A337

Price, et al.                                    v.                                Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                    December 13, 2005

Page 170

1    Q.   One of the items involved would be facilities
2  management and in each of your proposals you have a
3  proposal for what facilities management should be
4  responsible for.  Isn't that right?
5    A.   Correct.
6    Q.   And the next line down in both of these options
7  is the Trane Company's responsibility for maintaining
8  filters and that sort of thing, right?
9    A.   Correct.
10   Q.   And then you propose to retain an outside
11 contractor to maintain the conveyor belt and the
12 mechanical systems related to the operation of the
13 conveyor system, right?
14   A.   Right.
15   Q.   And you also want another local contractor to
16 handle the hazardous materials that are produced by
17 what goes on at the range.  Is that right?
18   A.   Correct.
19   Q.   And then the last thing you do is you assign
20 certain responsibilities for the cleaning of the
21 target system and the range floor to people that were
22 actually under your command?
23   A.   Correct.
24   Q.   Now, what is it about that division of

Page 171

1  responsibilities that you don't think is within your
2  area of expertise as a guy who was the head of the
3  firearms training unit?
4    A.   What isn't my responsibility?
5    Q.   What in this assignment that you got is beyond
6  what you're capable of doing as the firearms training
7  unit NCOIC?
8        In other words, what in this allocation of
9  responsibilities is outside your area of expertise?
10   A.   Anything to do with the ventilation system, the
11 issue with the bullet trap.
12   Q.   I'm sorry.
13   A.   I'm not following you.
14   Q.   Maybe you're not following me.
15       The lieutenant colonel didn't ask you to
16 do any of these things, right?  He's just asking you
17 to allocate responsibility for who will do them in the
18 future?
19   A.   I'm not following you.
20   Q.   Is it your understanding that the colonel, the
21 lieutenant colonel at the time wanted you to make a
22 recommendation as to how to divide up responsibility
23 for the various mechanical systems at the range going
24 forward?

Page 172

1    A.   Yes.
2    Q.   Now, why do you say that that wasn't within
3  your area of expertise?
4    A.   Because I hadn't done enough research and I
5  don't think that I'm qualified to say who does what at
6  a range.  I just know that we shouldn't be doing
7  certain things at the range.  That's what I put in
8  this.  This is divvying up responsibilities between
9  organizations.  I don't know who's going to do what.
10   Q.   Is there anyone under the command of the
11 lieutenant colonel at this time period who is more
12 qualified than you to make a recommendation as to who
13 will be responsible for the various mechanical
14 components of the range?
15   A.   I don't think any of us are qualified to make
16 that.  I think you need to contact people that are
17 experts in the field and you need to make the
18 corrections to the ventilation system and the systems
19 there and ensure that they work in order to know what
20 responsibilities and how those responsibilities can be
21 divvied up.
22       I felt very uncomfortable creating this
23 because I don't know what they're going to do.  I
24 don't know if they're ever going to fix that range and

Page 173

1  it sounds like they're not.
2    Q.   In the first page of your report you set forth
3  the conditions under which you believe your
4  recommendations would be valid, don't you?
5    A.   Right.
6    Q.   In other words, you say that this document is
7  prepared and based on the completion of all
8  renovations and all structural and cosmetic
9  alterations in accordance with Carey's specifications,
10 right?
11   A.   Correct.
12   Q.   So you did, in fact, go to people who you
13 thought knew what they were doing in order to prepare
14 your recommendation, didn't you?
15   A.   But I don't know what the state is going to do.
16   Q.   Well, you weren't asked to answer that
17 question, were you?  I mean, you were asked to make a
18 recommendation as to how you as the head of the FTU
19 would divide responsibility, right?
20   A.   I guess you can characterize it that way, yes.
21   Q.   And that's what you did, right?
22   A.   I did the best I could with little knowledge.
23   Q.   Now, prior to making the recommendation you had
24 talked to the representative from Carey's, right?

44 (Pages 170 to 173)

Price, et al.                                                v.                                        Chaffinch, et al.
Christopher D. Foraker, Volume 1                C.A. # 04-956-GMS                        December 13, 2005

---

Page 174

1    A.  Yes.  I talked to him numerous times.
2    Q.  And you also had the benefit of the Clark
3  Nexsen report from 1999, right?
4    A.  As soon as I got it, I handed that over up the
5  chain of command for them, for the executive staff to
6  have it.
7    Q.  Did you read it yourself?
8    A.  I glanced at it to see how it compared to the
9  Carey's report and it was very, very close, very
10  similar.
11    Q.  In other words, both organizations had looked
12  at the problem and analyzed it pretty much the same
13  way?
14    A.  Correct.  And the problem that they both
15  analyzed and the problem they come up with was the
16  ventilation problem.  The ventilation system is too
17  small.  It can't move the air out of the respiratory
18  zone.
19        And when I see the smoke test and when I
20  see the smoke from a muzzle blast traveling backwards
21  I have to tend to agree that they are absolutely
22  correct.
23    Q.  You supported Carey's proposal to fix the
24  range, right?

---

Page 175

1    A.  I support a fix of the range and nothing short
2  of that.  And I know that Carey's would fix the range.
3  Even in a meeting with Mark DeVore, Mark DeVore, an
4  engineer, he said after the presentation with Carey's
5  he said absolutely that would, that would make vast
6  improvements at the range.
7    Q.  Carey's proposal included a change in the
8  bullet trap system, didn't it?
9    A.  Correct.
10    Q.  What was the change in the bullet trap system?
11    A.  To a dry system.  With that particular system
12  you can shoot anything and it was also under...
13        It's a vacuum.  The deceleration chamber
14  is under vacuum.  So it will capture all particulates
15  that are coming off any rounds that go in there.  So
16  it would be a much cleaner way than the hazards that
17  we were experiencing with the ventilation system that
18  wouldn't draw out the contaminants and then also on
19  the bullet trap itself it would have a vacuum on it to
20  suck in particulates, airborne particulates.
21    Q.  When you say it has a vacuum, you just mean it
22  has negative pressure, right?  You don't mean it's
23  really a vacuum in the deceleration chamber, do you?
24    A.  No. It's under a negative pressure, yes, that

---

Page 176

1  draws in particulates and it has a HEPA filter on it
2  and everything.
3    Q.  Why did you provide a copy of this report
4  that's D-30 to Greg Warren and Ralph Davis before you
5  submitted it to MacLeish?
6    A.  Because they're in my chain of command.
7    Q.  Did Lieutenant Colonel MacLeish tell you to
8  send it up through the chain of command?
9    A.  No.  But I followed the chain of command and
10  that's generally the way you do things.  It's a
11  paramilitary organization and I am only a sergeant.
12    Q.  Did you actually have a meeting with Lieutenant
13  Colonel MacLeish on February 10, 2004?
14    A.  What was the date?
15    Q.  Look at D-30.
16    A.  Okay.
17    Q.  Did you actually have a meeting with Lieutenant
18  Colonel MacLeish on February 10th of 2004?
19    A.  I'm not exactly sure, the reason being is I
20  know I was flying either that day or the following day
21  out west.  So I'm not exactly sure if we had that
22  meeting.  We may have.
23    Q.  Do you remember a meeting with Mark DeVore,
24  Doyle Tiller, Major Eckrich, Lieutenant Colonel

---

Page 177

1  MacLeish, yourself and Greg Warren?
2    A.  That's quite possible, yes.
3    Q.  At which you discussed things like the cost of
4  cleaning up the range?
5    A.  (Pause).
6    Q.  Do you remember a meeting where all of those
7  things were discussed?
8    A.  Cost of cleanup?
9    Q.  Yes.
10    A.  I wouldn't have anything to do with the cost of
11  cleanup.
12    Q.  I'm not saying that you did.  But it was
13  discussed at the meeting that you were present at.  Do
14  you remember any of that?
15    A.  That may have been discussed.  That wouldn't
16  have pertained to me.
17    Q.  Do you remember a discussion between MacLeish
18  and the facilities people over who would be
19  responsible cost-wise for the cleanup?
20    A.  I don't recall that.
21    Q.  Do you remember any discussion between MacLeish
22  and the facilities people in which the facilities
23  people said that they believed that the air-handling
24  system was working correctly?

---

45 (Pages 174 to 177)

Price, et al.                                    v.                    Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS          December 13, 2005

Page 178

1    A.   That's what they have always said.
2    Q.   Do you remember anything more about that
3    meeting other than that you might have been there?
4    A.   At this point in time I don't recall.
5    Q.   Do you remember any discussion of this report
6    that you gave to the lieutenant colonel at the
7    meeting?
8    A.   No.  I don't recall discussing it with him.
9    Q.   Well, do you remember being asked by the
10   lieutenant colonel to prepare range standard operating
11   procedures for hygiene at the range?
12   A.   Again, I have no expertise in that field.  We
13   don't know what kind of system we're going to wind up
14   having.  We don't know how it's going to work.  We
15   have nothing on any blueprint of how it's going -- all
16   we have is the Clark Nexsen report from '99 and we
17   have the new report from Carey's, which they basically
18   are not going to use.
19        So you have to know what you have in a
20   facility before you can make SOP's and I didn't feel
21   comfortable with making any SOP until you have what
22   you have and now you know what to do with what you
23   have.  And I would definitely want someone who is
24   trained in that expertise like, say, hazardous

Page 179

1    material abatement, noise abatement.  Those are things
2    that have never been done.  There's never been any
3    noise abatement done and facilities management has not
4    kept up on swipe samples to see if the facility is
5    clean the way it should be.
6         We have no standard to follow.  So without
7    any standard to follow, I mean it's like the standard
8    for 75 feet per minute of airflow out of the
9    respiratory zone.  We don't have any standard.
10   Q.   I recognize that you don't have any standard.
11   But who within the State Police in your view is
12   responsible for creating the standard?
13   A.   The policymakers.
14   Q.   Who are you referring to as "the policymakers"?
15   A.   The policymakers are the executive staff.
16   Q.   And why do they have any more expertise than
17   you do concerning the range?
18   A.   Not that they have any more expertise, but they
19   should be bringing in the experts to tell us how to do
20   it.  We have offered to bring in NIOSH for free and
21   they refused NIOSH.
22   Q.   Is there any --
23   A.   NIOSH will do that for free.  They will come in
24   and test your facility, tell you how to fix it if it's

Page 180

1    broken.  They will tell you what you need as far as
2    SOP's and what guidelines to follow, how to monitor
3    each person, how to monitor the building.
4         We were bringing them in for free.  It's a
5    federal agency and they refused them.  Facilities
6    management flat-out refused them and so did the State
7    Police.
8    Q.   Is there anybody in the State Police who has
9    more familiarity with the operation of the firing
10   range building than you do?
11   A.   There's several people that have probably about
12   the same.
13   Q.   And who would that be?
14   A.   Sergeant Fitzpatrick, Sergeant Parton.
15   Q.   People that have been in your job before you?
16   A.   Kurt Price.  He's been there since it was
17   built.  Corporal Warren as well.
18        MR. ELLIS:  One more document?
19        MR. NEUBERGER:  Yes, one more.  He has ten
20   more minutes.
21        MR. ELLIS:  I think we're up to Exhibit
22   31.
23        (Defendant's Deposition Exhibit No. 31 was
24   marked for identification.)

Page 181

1    BY MR. ELLIS:
2    Q.   Take a look at this, please, Sergeant Foraker,
3    and tell me what it is.
4    A.   (Reviewing document).  Did you tell me to read
5    the entire document or something in particular?
6    Q.   Do you recognize the document, first of all?  I
7    don't know that you necessarily need to read the whole
8    thing, but you're welcome to do that if you want to.
9    A.   Yes.  This was prepared by Jim Warwick.
10   Q.   I take it that's why Warwick is sending it to
11   you on March 31, 2004 because he prepared it?
12   A.   Yes.
13   Q.   Why was Warwick preparing this report?  Do you
14   know?
15   A.   He had done some research, contacted this
16   company called Ramcor.  They are the cleaning and
17   maintenance vendor for the Federal Law Enforcement
18   Training Center in Cheltenham, Maryland.  They had
19   some experts in hazardous abatement of heavy metals
20   and so forth.
21        He contacted them, talked to them and then
22   prepared this document as far as responsibilities of
23   this, of what he saw that may -- this is my belief, is
24   that he wrote this in conjunction with what they may

46 (Pages 178 to 181)

A340

Price, et al.                                    v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 1        C.A. # 04-956-GMS              December 13, 2005

Page 182

1  do and what we don't do at the DSP firing range.
2      Q.  Was this report prepared in response to a
3  request by somebody above you in the State Police?
4      A.  I believe it may have been.
5      Q.  Do you remember who asked for it?
6      A.  It may have been Lieutenant Colonel MacLeish.
7      Q.  When you say, "It may have been," it may not
8  have been?  What makes you say it may have been but
9  you're not sure?
10     A.  It may have been him because he was asking for
11 a number of different things at one time.
12     Q.  Did you turn this report into Lieutenant
13 Colonel MacLeish?
14     A.  I believe so.
15     Q.  Were you at a meeting with him where you turned
16 it into him?
17     A.  I don't recall at this time.
18     Q.  Do you remember having any discussion with him
19 about it?
20     A.  No, I don't recall any conversation with him
21 about it.
22         MR. NEUBERGER:  We're going to break here?
23         MR. ELLIS:  Yes.
24         MR. NEUBERGER:  We're going to recess.

Page 184

1  DEFENDANT'S DEPOSITION EXHIBITS         MARKED
2  31 Document Bates stamp numbered FTU2599-
3     2602                        180
4
5  ERRATA SHEET/DEPONENT'S SIGNATURE       PAGE 185
6
7  CERTIFICATE OF REPORTER               PAGE 186

Page 183

1          (Deposition recessed at 4:20 p.m.)
2
3              I N D E X
4  DEPONENT:  CHRISTOPHER D. FORAKER        PAGE
5    Examination by Mr. Ellis          2
6            E X H I B I T S
7  DEFENDANT'S DEPOSITION EXHIBITS       MARKED
8  17 Document Bates stamp numbered FTU2351-
      2352                    39
9
   18 Document Bates stamp numbered FTU2364   41
10
   19 Document Bates stamp numbered FTU2316   92
11
   20 Document Bates stamp numbered FTU3586-
12    3588                   100
13 21 Document Bates stamp numbered FTU2320  121
14 22 Document Bates stamp numbered FTU2317  130
15 23 Document Bates stamp numbered FTU2318  131
16 24 Document Bates stamp numbered FTU2462  135
17 25 Document Bates stamp numbered FTU2640  137
18 26 Document Bates stamp numbered FTU2643  141
19 27 Document Bates stamp numbered FTU2363  147
20 28 Document Bates stamp numbered FTU2321  157
21 29 E-mail to Gregory A. Warren and Ralph H.
      Davis from Christopher D. Foraker dated
22    February 27, 2004            158
23 30 Document Bates stamp numbered FTU2429-
      2433                    165
24

Page 185

1
2
3
4
5      REPLACE THIS PAGE
6
7      WITH THE ERRATA SHEET
8
9      AFTER IT HAS BEEN
10
11     COMPLETED AND SIGNED
12
13     BY THE DEPONENT.
14
15
16
17
18
19
20
21
22
23
24

47 (Pages 182 to 185)

A341

Price, et al.                                    v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 1          C.A. # 04-956-GMS                December 13, 2005

Page 186

1   State of Delaware    )
                         )
2   New Castle County    )
3
4           CERTIFICATE OF REPORTER
5
6           I, Kurt A. Fetzer, Registered Diplomate
    Reporter and Notary Public, do hereby certify that
    there came before me on Tuesday, December 13, 2005,
7   the deponent herein, CHRISTOPHER D. FORAKER, who was
    duly sworn by me and thereafter examined by counsel
8   for the respective parties; that the questions asked
    of said deponent and the answers given were taken down
9   by me in Stenotype notes and thereafter transcribed by
    use of computer-aided transcription and computer
10  printer under my direction.
11          I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13          I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17          Kurt A. Fetzer, RDR, CRR
            Certification No. 100-RPR
18          (Expires January 31, 2008)
19
    DATED:
20
21
22
23
24

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A342



**WILCOX & FETZER LTD.**

In the Matter Of:

# Price, et al.
## v.
## Chaffinch, et al.

### C.A. # 04-956-GMS

---------------------------------------------------------------------

Transcript of:

# Christopher D. Foraker
Volume # 2
December 22, 2005

---------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 187

VOLUME 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
CORPORAL B. KURT PRICE, et al.,      )
                                     )
            Plaintiffs,              )
                                     ) Civil Action
v.                                   ) No. 04-956-GMS
                                     )
COLONEL L. AARON CHAFFINCH, et al., )
                                     )
            Defendants.              )
------------------------------------)
SERGEANT CHRISTOPHER D. FORAKER,     )
                                     )
            Plaintiff,               )
                                     )  Civil Action
v.                                   ) No. 04-1207-GMS
                                     )
COLONEL L. AARON CHAFFINCH, et al., )
                                     )
            Defendants.              )
```

        Continued deposition of CHRISTOPHER D. FORAKER
taken pursuant to notice at the law offices of
Montgomery, McCracken, Walker & Rhoads, LLP, 300
Delaware Avenue, 7th Floor, Wilmington, Delaware,
beginning at 2:00 p.m. on Thursday, December 22, 2005,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.
APPEARANCES:
        THOMAS S. NEUBERGER, ESQ.
        THE NEUBERGER FIRM, P.A.
          2 East Seventh Street - Suite 302
          Wilmington, Delaware  19801
          For the Plaintiffs

                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477

Price, et al.                                          v.                                   Chaffinch, et al.
Christopher D. Foraker, Volume 2              C.A. # 04-956-GMS                    December 22, 2005

| | |
|---|---|
| **Page 188** | **Page 190** |

**Page 188**

1  APPEARANCES:  (Cont'd)
2       EDWARD T. ELLIS, ESQ.
        MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
3        123 South Broad Street
         Philadelphia, Pennsylvania  19109
4        For the Defendants
5  ALSO PRESENT:
        B. KURT PRICE
6       WAYNE WARREN
7            - - - - -
8            CHRISTOPHER D. FORAKER,
9       the deponent herein, having first been
10      duly sworn on oath, was examined and
11      testified as follows:
12           EXAMINATION
13  BY MR. ELLIS:
14      Q.   Sergeant Foraker, good afternoon.
15      A.   Good afternoon, sir.
16      Q.   Will you tell me what you believe Thomas
17  MacLeish has done to you in retaliation for your
18  filing your prior lawsuit against Colonel Chaffinch?
19      A.   He has made the statement that he's connected
20  at the hip with Colonel Chaffinch and he adopted
21  everything that Colonel Chaffinch said against me.
22           I know for a fact that on July 20th of '04
23  there was a troop commander section chief meeting and
24  when I walked into that meeting I was the only one at

**Page 189**

1  that particular time at the threshold of that door,
2  there was nobody else around me, and Colonel Chaffinch
3  gave me an absolute hateful stare.  I looked around to
4  make sure to see if he was looking at anybody else,
5  but there was nobody else around.  I looked back at
6  him and he continued to give me a hateful stare.
7            And then I just proceeded to the back of
8  the room and when I went to the back of the room I
9  glanced back up there and there was Lieutenant Colonel
10  MacLeish and Colonel Chaffinch talking.  And they both
11  looked at me and then within a minute's time
12  Lieutenant Colonel MacLeish came back and kicked me
13  out of the meeting.
14           And I can tell you that two days after
15  that was the funeral of Chris Shea and Captain McQueen
16  was in a position where he would call the commands for
17  people to come to attention, to salute, to come to
18  parade rest, to march, that sort of thing.  And
19  colonel -- or Captain McQueen, I'm sorry, at that
20  troop commanders meeting had specifically asked that I
21  assist him in being his echo.
22           Apparently, he had seen the look that they
23  gave me and then he got the same look, I guess, from
24  both Lieutenant Colonel MacLeish and Colonel Chaffinch

**Page 190**

1  and they didn't like the idea that he was going to use
2  me and they suggested other people.  And he, in turn,
3  said, "Well, Chris has the experience.  I would really
4  like to have Chris help me."  Because we had talked
5  out in the hallway before I came into the room and
6  Captain McQueen asked me then if I would help him and
7  I said, "Certainly, I will help you."
8            But Colonel MacLeish or Lieutenant Colonel
9  MacLeish and Colonel Chaffinch obviously with their
10  body language and their facial expression didn't like
11  that.  Captain McQueen persisted that "I really need
12  him, need Chris to help me out here.  He's got the
13  experience.  He's done it before."
14           So I guess they eventually agreed because
15  on the 22nd when we buried Chris Shea I was a part of
16  that detail.  After it was over in the parking lot of
17  Lewes Fire Hall Captain McQueen pulled me off to the
18  side and he told me that he couldn't believe -- he
19  said, his words were "If looks could kill, you'd be
20  dead," referring to the look that Colonel Chaffinch
21  gave to me.  And then he actually said that the look
22  that they gave him was also a dirty look and he said
23  after the meeting was over he was talking to someone
24  and found out that Colonel MacLeish had thrown me out

**Page 191**

1  of the meeting.
2            He then proceeded to tell them, that
3  particular person he was talking to, that he's more,
4  Chris, he was referring to me, is more of a trooper
5  than either one of them and Chris needs to be a part
6  of this detail.  He told me while we were in the
7  parking lot on the 22nd, he told me that...
8            I just want to get the wording correct.
9  That "It's obvious retaliation against you and it's no
10  wonder they're winding up getting sued because of the
11  way they act."  And he reiterated to me that day, he
12  said, "I think you're a great trooper" and he said,
13  "I've known you for a long time and what they're doing
14  to you is not right.  It's obvious retaliation."
15           Then a couple of days after that on the
16  28th at 8:32 a.m. at Troop 2 I was in the criminal
17  investigation unit, the detective unit at Troop 2.  It
18  was just outside of the video room, video observation
19  room and the kitchenette that they have.  And I ran
20  into Lieutenant Slank, Lieutenant Ford, Sergeant
21  Fiscella, Sergeant Corrigan and Corporal Warwick was
22  with me and Lieutenant Slank said, "I can't believe
23  they threw you out of that meeting."  He said, "It is
24  obvious retaliation."

2 (Pages 188 to 191)

Price, et al.                                                                v.                                                          Chaffinch, et al.
Christopher D. Foraker, Volume 2                    C.A. # 04-956-GMS                              December 22, 2005

Page 192

1          He also said, "It is ridiculous.  You are
2   a section chief.  Why would they throw you out of that
3   meeting?"  He also said that "Corporal McCall is
4   always at those meetings.  To use the excuse that
5   you're a sergeant and throw you out of that meeting,
6   that's ludicrous."
7      Q.   Who is Corporal McCall?
8      A.   Corporal Charles McCall.
9      Q.   Is he in charge of some identified unit?
10     A.   He is I think in charge of community relations.
11     Q.   Where does he work out of?
12     A.   Headquarters.
13     Q.   Who does he report to?
14     A.   I'm not sure.  He's since retired.
15     Q.   I don't mean to interrupt you.  Are you done
16  answering yet?
17     A.   Sergeant Corrigan also said that he's attended
18  those meetings and he's not a section chief.
19          And there was an incident where I attended
20  in-service training at Troop 2 where there was a
21  presentation given by then Major Seifert and Major
22  Seifert came up to me and said, "Chris, since you're
23  in charge of the range, how about you giving us an
24  update?"

Page 193

1      Q.   Giving who an update?
2      A.   Just giving the people that were attending
3   in-service, give them an update on the range issues
4   and about the upcoming in-service shoot.
5      Q.   Okay.
6      A.   And I expressed to him regarding the range "I
7   haven't attended any of the meetings since a period of
8   time.  I wasn't invited to any of the meetings that
9   were supposedly the -- I don't know -- steering
10  committee, range committee.  I hadn't been appointed
11  to that."  So he said, "Oh, okay.  Nevermind then."
12          But I'm used in that capacity as the
13  section chief of firearms where I can go to section
14  chief meetings and if I need to clarify training or
15  also troop commanders that are at those meetings will
16  talk to me about incidents that happened with their
17  troopers on the street.  They will tell me something
18  that happened and thinking that we could implement
19  training that's relative to what is happening on the
20  street.  We had scenario training where we would take
21  scenarios that are presented at these meetings from
22  the troop commanders that have interviewed and read
23  the reports of their troopers and they will say, "Hey,
24  look, this is something that happened to my trooper.

Page 194

1   What do you think?  Do you think it can be addressed
2   in training," that sort of thing.
3          So when I was at those meetings I was
4   utilized in that capacity and that's why I was
5   attending those meetings if I was able to, if, in
6   fact, manpower allowed me to.
7      Q.   Am I correct that what you're saying is that
8   Colonel MacLeish retaliated against you for your
9   lawsuit against Colonel Chaffinch by excluding you
10  from the commanders meetings?
11     A.   I addressed this in my interrogatories.
12     Q.   I know.  I want you to address it in your
13  deposition.
14          I mean, is that what you're saying?
15     A.   That's in addition.  I mean, I think there's
16  many things that he's done.  He's taken away my power
17  as a commander.  I'm no longer a section chief
18  apparently.
19     Q.   Well, I know that you're not working at
20  present.  But what was your job title at the point
21  that you went on disability?
22     A.   Apparently noncommissioned officer in charge of
23  the firearms training unit.
24     Q.   And that's what you have been since December

Page 195

1   1st, 2003, correct?
2      A.   It used to be that I was a section chief, but
3   he's taken that away from me.
4      Q.   When you say that you used to be a section
5   chief, what does it mean to be a section chief other
6   than to go to the meetings that commanders went to?
7   At least you believe that.
8      A.   You're able to interact with troop commanders
9   and section chiefs from other units within the
10  division.
11     Q.   And how are you able to do that other than by
12  going to the commanders meetings?
13     A.   It's an important dialogue to have.  That's why
14  they have the meetings.
15     Q.   I understand.  All I'm asking you is:  Is there
16  any aspect of it, is there anything to being, is there
17  anything that MacLeish has done to you other than to
18  tell you not to come to the commanders meetings?
19     A.   Yes.  And, like I said, I addressed a lot of
20  that in my interrogatories.
21     Q.   I understand that.  Well, other than telling
22  you shouldn't come to the commanders meetings,
23  what else has he done that you can think of sitting
24  here right now?

3 (Pages 192 to 195)

Price, et al.                                            v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 2              C.A. # 04-956-GMS                        December 22, 2005

Page 196

1    A.   Obviously to me he has adopted the attitude
2  that Colonel Chaffinch had towards me, the vendetta
3  that Colonel Chaffinch had for me he adopted it, with
4  his attitude whenever he sees me, you know, shakes my
5  hand but growls at me when I was at a graduation
6  ceremony.  He's very agitated and he grits his teeth
7  and that sort of thing when he's around me.
8    Q.   When you say he growls at you, what do you mean
9  by that?
10    A.   I mean when I said how are you doing, sir, I
11  stuck out my hand, he begrudgingly shook my hand but
12  grit his teeth and growled at me.
13    Q.   You mean like a dog?
14    A.   That's correct.
15    Q.   Now, has he demoted you?
16    A.   Reference my authority, yes.
17    Q.   You're saying that because he told you not to
18  come to the commanders meetings?
19    A.   No.  I believe I was being absolutely
20  micromanaged.  Never before, it's unprecedented for a
21  section chief in charge of a budget to then have
22  someone else sit in on their budget meetings.  That's
23  never happened before with the firearms training unit.
24  The person in charge goes to budget meetings by

Page 197

1  himself.
2    Q.   By himself?  Who is the budget meeting with?
3    A.   Generally with Major Eckrich or whoever the
4  major is in charge of the budget.
5    Q.   Okay.  And in what way do you feel you're being
6  micromanaged?
7    A.   Well, it started with as soon as Captain Homiak
8  took over all of a sudden then I have to -- he's going
9  to go to the meeting with me.
10    Q.   Now, Captain Homiak, you said as soon as he
11  took over.  You mean as soon as he took over the
12  academy class?
13    A.   Correct.
14    Q.   So what you believe is that MacLeish told
15  Homiak to micromanage you?
16    A.   Yes.  I believe so.  I really do.  I was
17  also -- that graduation ceremony that I spoke of was
18  the last time I had an opportunity to speak at a
19  graduation ceremony.  From that point on after he
20  growled at me, I was no longer permitted to speak at a
21  graduation ceremony.
22    Q.   When did that graduation ceremony take place?
23    A.   I believe it was in June of '04.
24    Q.   And so how many graduations have there been

Page 198

1  since then?
2    A.   Several.  Usually two per year.
3    Q.   So how many is that?  Three then?
4    A.   Probably so.
5    Q.   How many graduation ceremonies have you spoken
6  at altogether in your life?
7    A.   Probably five, six maybe.
8    Q.   So why is it that you get to give a speech at
9  the graduation ceremony?
10    A.   To present the outstanding shooter award.
11    Q.   So who gave the outstanding shooter award last
12  time?
13    A.   I gave it out.  However, I wasn't allowed to
14  speak.
15    Q.   Well, did you tell somebody you wanted to
16  speak?
17    A.   I was told that that format has been changed.
18    Q.   What do you mean by "that format"?
19    A.   The format where the award ceremony, giving out
20  the best shooter award, the outstanding shooter award
21  is just going to be given out and somebody else is
22  going to read the name off; there won't be any speech
23  for that.
24    Q.   How many awards are given out at an academy

Page 199

1  graduation?
2    A.   Several.
3    Q.   More than just the best shooter award?
4    A.   Yes.
5    Q.   Do you know what the names of the other awards
6  are?
7    A.   The outstanding recruit award, the attorney
8  general's award, outstanding fitness award.  I believe
9  that there's another one like a spirit award or
10  something along that line.
11    Q.   Well, under the old format, as I think you put
12  it, was there somebody who presented each one of these
13  awards?
14    A.   Yes.
15    Q.   And at the point they presented it did they
16  make a little speech?
17    A.   Yes.
18    Q.   And I take it what somebody decided was that
19  there aren't going to be speeches with the
20  presentation of the award anymore?
21    A.   Just with the shooter's award.
22    Q.   So everybody else gets to make a speech but
23  you?
24    A.   Correct.

4 (Pages 196 to 199)

Price, et al.                                             v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 2              C.A. # 04-956-GMS                    December 22, 2005

Page 200

1  Q.  And did anybody tell you why?
2  A.  They just wanted to cut down on the time.
3  Q.  Who was it that told you this?
4  A.  Captain Homiak.
5  Q.  So what you're saying is that everybody else
6  who gets to give an award gets to give a speech but
7  you don't?
8  A.  That's correct.
9  Q.  Is there anything else Thomas MacLeish has done
10 to you by way of retaliation?
11      MR. NEUBERGER:  For the sake of the
12 record, you may have asked some of this question at
13 the first day of the deposition.  And I assume are you
14 asking in addition to what you may have said at the
15 first day?
16      MR. ELLIS:  Well, I think what I asked in
17 the first day had to do with speaking out; in other
18 words, in the lawsuit that has the three plaintiffs.
19      What I have asked him specifically today
20 was in retaliation for his, was relevant to
21 retaliation for his having sued Chaffinch in the first
22 lawsuit.
23      MR. NEUBERGER:  Okay.  So this is
24 different.  I didn't pick that up.  This is different

Page 201

1  than the speaking out?
2      MR. ELLIS:  Yes.
3      MR. NEUBERGER:  Okay.
4  BY MR. ELLIS:
5  Q.  Did you understand that, Sergeant Foraker?
6  A.  No, I did not.
7  Q.  I take it that you're giving me are things that
8  you believe Colonel Chaffinch did to retaliate against
9  you for whatever reason colonel -- I'm sorry.  Let me
10 back up.
11      You're giving me reasons Thomas MacLeish
12 retaliated against you without respect to what his
13 motive might have been?
14 A.  His motive is adopting the thought process of
15 Colonel Chaffinch who they're connected at the hip.
16 Q.  Okay.  My original question to you was:  What
17 do you believe he did because you had filed suit
18 against Colonel Chaffinch?  And you gave me the
19 discussion about the July 20, 2004 meeting where he
20 had you leave the commanders meeting and then you gave
21 me some other things and I thought that you were
22 responding with respect to things that you believe he
23 did to you because of your prior lawsuit.
24      Now, is that what you were intending to

Page 202

1  give me when you answered those questions?
2  A.  You're going to have to rephrase that.
3  Q.  You believe that Colonel MacLeish did certain
4  bad things to you, right?
5  A.  Absolutely.
6  Q.  I'm trying to separate bad things that he did
7  to you because you filed the lawsuit that you filed
8  against Aaron Chaffinch back in 2002, I'm trying to
9  separate that out from things that he did to you
10 because you allege you have made statements that
11 brought to light certain problems at the firearms
12 training unit facility in Smyrna.
13      Are you able in your mind to differentiate
14 between the two?
15 A.  I guess it would be hard to differentiate
16 between the two because it's been constant retaliation
17 since I spoke out.  It's been retaliation against me
18 and my men for speaking out and when we spoke out to
19 the auditors they condemned us, without a doubt they
20 condemned us.
21 Q.  Who is the "they"?
22 A.  Colonel Chaffinch and Lieutenant Colonel
23 MacLeish.
24 Q.  Okay.

Page 203

1  A.  He adopted everything that lieutenant --
2  correction:  He adopted everything that Colonel
3  Chaffinch said, as when you look into his deposition,
4  again, he says we're 50 percent responsible for this
5  range failure.
6  Q.  I just want then to ask you again with respect
7  to what Tom MacLeish did to you.  Number one, you told
8  me that he removed you from a commanders meeting.
9      That's one thing you believe he did to
10 retaliate against you, right?
11 A.  Yes.
12 Q.  The second thing you think he did is you think
13 he told Nate McQueen that he didn't want you to be in
14 the honor guard at Chris Shea's funeral.  Is that
15 right?
16 A.  Absolutely.
17 Q.  But, nevertheless, you were in the honor guard?
18 A.  That's correct.
19 Q.  You said there was some person who told McQueen
20 that MacLeish had thrown you out of the meeting.
21      Who is the person who you believe told
22 McQueen that MacLeish had thrown you out of the
23 meeting?
24 A.  I don't know who Captain McQueen spoke with.

5 (Pages 200 to 203)

A348

Price, et al.                                          v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 2            C.A. # 04-956-GMS                 December 22, 2005

Page 204

1    Q.   He just told you that somebody had told him
2  that.  Is that right?
3    A.   He told me that he had spoken to someone after
4  the meeting.
5    Q.   You've told me that Lieutenant Slank,
6  Lieutenant Ford and Sergeant Fiscella and Sergeant
7  Corrigan had a meeting with you in which some of those
8  guys told you that this was obvious retaliation?
9    A.   We didn't have a meeting.  It was just we were
10 standing around the kitchenette.
11   Q.   In Troop 2?
12   A.   At Troop 2, yes, sir.
13   Q.   On July 28th?
14   A.   Correct.
15   Q.   You said that Colonel MacLeish growled at you
16 at the graduation in June of 2004?
17   A.   That's correct.
18   Q.   And you said that for some reason they won't
19 let you speak at graduation when you give out the
20 shooter award and you believe that was retaliation for
21 whatever you have done?
22   A.   Absolutely.
23   Q.   Is there anything else that you can think of?
24   A.   Yes.  Like I said, they have demoted me.  I am

Page 205

1  being micromanaged.  I have a budget that I'm supposed
2  to be able to make purchases on.  Recently I had to
3  buy shirts for the men in the unit and they questioned
4  that and things like that were never questioned
5  before.  I had to justify that and he made me justify,
6  try to justify a fifth person again, Lieutenant
7  Colonel MacLeish.
8    Q.   Well, when you say you're being micromanaged,
9  in what ways are you being micromanaged other than
10 that you had to have, that you went to your budget
11 meeting with your boss basically?
12   A.   That was captain -- well, again, it continued
13 because then it was Captain Downs.
14   Q.   Did Downs replace Homiak?
15   A.   Correct.
16   Q.   Downs was your boss at the point you stopped
17 working, right?
18   A.   No.  He's been promoted to major.  Both of
19 those have been promoted to major.
20   Q.   Who was your boss at the point that you went on
21 disability?
22   A.   Well, the transition was happening between
23 Downs and Captain Shamany and then underneath them is
24 Lieutenant Hagan.

Page 206

1    Q.   So Lieutenant Hagan was your direct supervisor
2  when Downs was the head of the academy?
3    A.   That's correct.  And he too was micromanaging
4  me and --
5    Q.   What do you mean by "micromanaging"?
6    A.   Making my job absolutely impossible.
7    Q.   What did he do to make your job impossible?
8    A.   I wanted -- I needed for the unit vehicles, we
9  needed a computer.  We needed things like that in
10 order to function.  He continually wanted me to stay
11 up on my e-mails and wanted me to make sure that all
12 of the electronic documents are taken care of.  I
13 can't do that from the range location.
14   Q.   Who is the "he"?
15   A.   I'm talking about Lieutenant Hagan.
16   Q.   So is it Hagan who is micromanaging you?
17   A.   All of the above.
18   Q.   So you need vehicles and they're asking you to
19 justify why you need vehicles?
20   A.   Yes.
21   Q.   Is that what you're saying?
22   A.   Yes.
23   Q.   And you consider that micromanaging?
24   A.   No.  Because I have justified it many, many

Page 207

1  times.
2    Q.   And I take it they don't agree that you have
3  justified them?  Is that the problem?
4    A.   It's a continual thing that we need.  We have
5  ammunition and weapons, body armor, electronic
6  headsets.  We have tools.  We have weapon parts.  We
7  have all these things in our police cars or in my case
8  a Buick Century.  We have these things in vehicles
9  that are not conventional.  We need SUV-type vehicles
10 with gun vaults in them so things don't get stolen.
11       For instance, Lieutenant Hagan went to
12 Baltimore in November, November 30th I believe it was
13 of 2004.  He was at some sort of conference.  His
14 vehicle was parked in a parking garage.  He left his
15 hotel and came out to the vehicle and found his Dodge
16 Durango had been broken into.  The window was smashed
17 and he identified that there was a camera missing and
18 that's about it that he gave as far as the report.
19 That was in November of '04.
20       By June or July of '05 he calls me up on
21 the phone and says, "I'm coming to shoot today.  Do
22 you have a vest for me?"  I'm thinking he forgot his
23 vest.  And he said, "No.  Mine I believe was stolen."
24 I said, "Did you report it?"

6 (Pages 204 to 207)

Page 208

1        "Well, no."
2        "It's not in the computer?"
3        "No."
4        "It's not in NCIC?"
5        "No."
6        "Okay. Yeah, I have one for you to use."
7        So he comes up and ironically that very
8   same day in the afternoon or actually about 10:00
9   o'clock I get a phone call on my cell phone and it's
10   the ATF from Baltimore. They say, "We've recovered
11   one of your stolen vests" or "We have recovered a vest
12   of yours. We need to verify that it's been stolen.
13   We have contacted the manufacturer with the serial
14   number and they say it belongs to the State Police,
15   Delaware State Police."
16        So I said, "Okay." And I wrote down the
17   information who to contact, who to call back. And
18   right away they said it was a blue carrier with it
19   would have had State Police on it. So I immediately
20   then talked with Captain Downs and Lieutenant Hagan
21   right there at the range. I said, "Hey, I think that
22   Baltimore City has recovered your vest. The vest was
23   used by an assailant in a home invasion."
24        And I explained to him that it was

Page 209

1   Baltimore and Lieutenant Hagan turns white and he
2   said, "Oh, it must have been stolen in November and I
3   didn't know it was stolen." I said, "Okay." I said,
4   "It must have been yours because it had a blue
5   exterior carrier." Well, then he turned white again.
6   He said, "I didn't know that one was missing." I
7   said, "How many vests did you have?" He said, "Well,
8   I had two." He said, "The one I thought was stolen
9   was a white one."
10        So we have two vests out there, one of
11   them has been recovered in a felony home invasion
12   which will be the first case tried in Baltimore City
13   under the statute of wearing body armor in the
14   commission of a felony.
15    Q.  Does this have anything to do with Lieutenant
16   Hagan micromanaging you?
17    A.  Yes. Because I had to jump through hoops to
18   talk to the ATF to convince them that now we have two
19   vests missing because now he's saying oh, it must have
20   been stolen, both vests must have been stolen on
21   November 30th in Baltimore. He was then saying, at
22   one point in time he was saying, "Well, one of them I
23   think was stolen in March of '05 from the academy."
24        So we were all over the map and we're

Page 210

1   trying to figure out when it was actually missing
2   because he had no idea. So --
3    Q.  But --
4    A.  Hold on. Let me finish. I need to explain it
5   to you so you get the full truth of what's going on.
6        I mean, is that okay? You want the truth?
7        MR. NEUBERGER: Go ahead.
8    Q.  I want you to complete your explanation, but I
9   don't see how this has anything to do with him
10   micromanaging your work.
11        MR. NEUBERGER: Finish your explanation.
12    A.  Absolutely, it does because he turns around and
13   tells me that "Oh, they must have both been stolen at
14   the same time in November."
15        So I called the ATF unit in Baltimore and
16   they think I'm off my rocker, like "Okay, now you're
17   saying two of them were stolen on that day and you
18   guys didn't know that they were gone until we called
19   you?" I was like "Yeah, I see your point, but we need
20   them entered into NCIC."
21        So they had to pull the original report
22   that was issued by Baltimore City. I had to then fill
23   out a report, a little explanation as to what had
24   happened apparently so they could add that, those two

Page 211

1   items being stolen at that particular time and then
2   they then entered the white vest into NCIC as being
3   stolen. Otherwise, you wouldn't know where they came
4   from unless you called the manufacturer. On a weekend
5   that's next to impossible.
6    Q.  I understand.
7    A.  But, anyway, I did that for him and he never,
8   of course, didn't think that he did anything wrong, I
9   guess. But I'm jumping through hoops and on the
10   phone, on my cell phone, I'm trying to make all this
11   stuff happen. And he micromanaged me about what
12   reports, our monthly activity sheets coming in late
13   when I don't even have a computer at my location. I
14   have to drive 20 minutes to 25 minutes in traffic to
15   Troop 2 to try to get that accomplished when I'm
16   shorthanded with manpower.
17    Q.  Is it part of your job as the head of the
18   firearms training unit to deal with the body armor?
19   You order the body armor, don't you?
20    A.  Actually, no. The body armor gets ordered by
21   supply.
22    Q.  Do you keep an inventory of the body armor?
23    A.  We take down serial numbers on each shoot.
24   They write down the serial numbers to their handgun,

7 (Pages 208 to 211)

Price, et al.                                    v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 2          C.A. # 04-956-GMS              December 22, 2005

Page 212

1  shotgun and their body armor.
2      Q.   And is that how you could tell that Lieutenant
3  Hagan was the person assigned to the body armor that
4  was stolen in Baltimore?
5      A.   No.  Because the problem was that we had manual
6  records and they were all over the place because they
7  made us move from the range to the academy, then from
8  the academy to a trailer and then from the trailer to
9  Troop 2.  So a lot of our documents were actually
10 housed at the range but outside in a Conex and to find
11 anything in there is just impossible.
12         So actually I contacted the manufacturer
13 and they --
14     Q.   Is it part of your responsibility as the NCOIC
15 of the firearms training unit to keep track of who has
16 what vest?
17     A.   I think that's what we do because we have to
18 keep track of handgun and shotgun serial numbers.
19     Q.   And also bulletproof vest serial numbers?
20     A.   I believe that the supply section when they get
21 their recruits measured that it actually comes into
22 them and then they pass it off to the recruit and the
23 recruit then wears it and when they come down to shoot
24 we record what they're wearing, their body armor

Page 213

1  serial numbers.
2      Q.   Why do you record what they're wearing?
3      A.   I guess to keep track of it in case this
4  happens, in case something gets stolen.  That way we
5  know what the serial number is and we can get it to
6  the agency that's making out the report and get it
7  entered into NCIC.
8      Q.   In what other ways has Lieutenant Hagan
9  micromanaged you?
10     A.   Again, I believe I touched on this in my
11 interrogatory answers.
12     Q.   Can you remember anything else as you're
13 sitting here today?
14     A.   At this point in time I can't remember anything
15 else.
16     Q.   Is there any way that Captain Homiak
17 micromanaged you other than what you've described
18 about going to a budget meeting?
19     A.   Yes.  Well, that came into play when I was
20 trying to buy shirts for my men.
21     Q.   What was the way in which he micromanaged you?
22     A.   I had to report my purchases to him before and
23 he had to approve them before I went and purchased
24 anything.

Page 214

1      Q.   He's your boss, right?
2      A.   It's never been done before.
3      Q.   Well, he is your boss though, right?
4      A.   He is.  But I'm in charge of the budget and the
5  expenditures are entrusted to me to buy for the needs
6  of the unit.
7      Q.   So he wanted to see what kind of shirts you
8  were buying and how much you were going to pay for
9  them?  Is that what you're telling me?
10     A.   No.  I believe he's micromanaging me.
11     Q.   I'm just asking you for the facts.
12         Did he want to see how many shirts you
13 were buying and what you were paying for them?  Is
14 that what he asked for?
15     A.   I believe that there's more to it than that.
16     Q.   What was it?
17     A.   I believe that he's micromanaging me just to
18 make my job, just take away my authority, constantly
19 eroded my authority.
20     Q.   That may well be, but my only question to you
21 is factually whether he asked for the number of shirts
22 and how much you were paying for them?
23     A.   That was provided to him.
24     Q.   So he asked for that and you gave it to him?

Page 215

1      A.   Actually, I believe it was provided by Lori
2  Gooch in supply.
3      Q.   Well, in what other ways did he micromanage you
4  or did he micromanage you when he was your boss?
5      A.   Yes, he did.
6      Q.   But what else did he do that you can remember
7  sitting here today that you considered micromanaging?
8      A.   I just can't remember everything at this point
9  in time.
10     Q.   I understand.
11         Harry Downs was your supervisor at some
12 point, right?
13     A.   That's correct.
14     Q.   In what way did he micromanage you?
15     A.   He then took over for Captain Homiak and
16 micromanaged me and he actually sat in on my budget
17 meeting.
18     Q.   Did Homiak sit in on the budget meeting?
19     A.   He wanted to and was going to and he got called
20 away for some reason and couldn't make it to the
21 budget meeting.
22     Q.   So Homiak didn't sit in on the budget meeting?
23     A.   No.  He was intending on being there.  He just
24 couldn't at the last minute.

8 (Pages 212 to 215)

A351

Price, et al.                                                    v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 2                    C.A. # 04-956-GMS                        December 22, 2005

Page 216

1    Q.   Downs did sit in on the budget meeting?
2    A.   That's correct.
3    Q.   Other than that, what did he do to micromanage
4    you?
5    A.   At this time I can't think of anything else
6    right now.
7    Q.   Did any of these supervisors that you've had
8    since December, well, actually since the Smyrna range
9    shut down in March of 2004, did any of them come onto
10   the site while you were conducting the training
11   exercise?
12   A.   Lieutenant Colonel MacLeish did.
13   Q.   I was really referring to the immediate
14   supervisors the academy had during that time from
15   March 2004 to the present.  Did any of the academy --
16   A.   No, they did not.
17   Q.   How many times did MacLeish do that?
18   A.   A couple of times.
19   Q.   Was it both times at the New Castle range?
20   A.   No.  One was at the New Castle range.  One was
21   at the old range.
22   Q.   Well, did MacLeish come in there after March
23   2003?  I'm sorry.  March 2004?
24   A.   Come where?

Page 217

1    Q.   Into the Smyrna range after March of 2004
2    during the time you were doing --
3    A.   Just to shoot for his qualifications.
4    Q.   In the Smyrna range after March of 2004?
5    A.   I'm sorry.  I thought you were referring to the
6    National Guard range.
7    Q.   No.  I was really referring to the old range,
8    what I will call the Smyrna range, the one that is
9    closed done because of the contamination.
10   A.   Yes.  He was there April 6th when they did the
11   press release to slander us.
12   Q.   And you were not there that day, right?
13   A.   That's right.  I was not.
14   Q.   How many times since then has MacLeish come
15   onto the range during the training exercises?
16   A.   I'm sorry.  Can you repeat that?
17   Q.   How many times has MacLeish come onto the range
18   during a training exercise since March of 2004?
19   A.   Which range?
20   Q.   Any of them.  Any of them that you were in
21   charge of while you were training people.
22   A.   Two or three.
23   Q.   Did he ever come onto the range after March
24   2004 in any capacity other than as a trainee?

Page 218

1    A.   Yes.  Like I said, the April 6th, 2004 --
2    Q.   Aside from that?
3    A.   -- media campaign.
4    Q.   Aside from that?  Did he ever come onto a range
5    where you were training people after March 2004 in any
6    capacity other than as a trainee?
7    A.   I don't believe so.
8    Q.   Now let me go back to December 2003 for a
9    minute.
10        After you came back as the head of the
11   firearms training unit in December 2003 did anybody in
12   that building use the floor scrubber?  By that I mean
13   the thing that was referred to as the Zamboni.
14   A.   What dates are you talking again?
15   Q.   At any point after December 1, 2003.
16   A.   No.  It was only used once and that was the day
17   that it was repaired.
18   Q.   So that would be one day in December?
19   A.   Correct.
20   Q.   And who ran it?
21   A.   I did.
22   Q.   How long did you run it for?
23   A.   I don't know.  I bet probably a half an hour
24   maybe.

Page 219

1    Q.   Did you clean the floor in the shooting area?
2    A.   Yes, I did.
3    Q.   But it wasn't run since then?  Is that right?
4    A.   No.  It hadn't been run since June previous to
5    that 2003.
6    Q.   But since that date in December am I correct
7    that it hasn't been run?
8    A.   I don't believe so.
9    Q.   At least it wasn't run while you were there?
10   A.   Right.  Because there was nowhere or no way to
11   empty out the contaminants inside it.
12   Q.   Why not?  Is that the reason you didn't run it
13   after the one day in December that you ran it?
14   A.   It was filled at that point in time that it
15   needed to be emptied and we kept asking for facilities
16   management to give us some direction on what to do
17   with the contaminants and how to get rid of it.  And
18   at one point in time Mark DeVore, we cornered him and
19   said, "How can we get that out?"
20        And he said, he kept saying, "Well, I'll
21   have to get back to you on that.  I'll have to get
22   back to you on that."  And I believe Corporal Warren
23   even said at one point in time "What do you want us to
24   do?  Dump it on the ground?"  And he paused and

9 (Pages 216 to 219)

Price, et al.                                    v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 2          C.A. # 04-956-GMS            December 22, 2005

Page 220

1    stuttered and said, "No, don't do that."
2         Well, that's the only way we could empty
3    it because there's no place else to empty it.  There's
4    no way to get it out and they're not providing any way
5    for us to get it out and replenish the fluid in there.
6    Q.   You know who Environmental Solutions is, right?
7    A.   Yes.
8    Q.   Didn't the State Police have an agreement with
9    Environmental Solutions to remove contaminated liquid
10   from the firing range?
11   A.   They actually removed contaminated debris.  It
12   sometimes included a little bit of slush water.
13   Q.   I'm talking about drums of liquid.  Wasn't
14   there an agreement for Environmental Solutions to
15   remove drums of contaminated liquid from the firing
16   range?
17   A.   We didn't have drums of contaminated liquid.
18   We had residue from shot.
19   Q.   You dealt with Environmental Solutions, didn't
20   you?
21   A.   Yes.
22   Q.   You yourself as part of trying to find out what
23   was wrong with the range?
24   A.   Yes.

Page 221

1    Q.   Did you ever ask them if they could dispose of
2    the water that was in the floor cleaning machine?
3    A.   No, I did not.
4    Q.   Why not?
5    A.   I just did not.  I felt that facilities
6    management could provide us with a way to pump it out
7    or get rid of it, where to put it.
8    Q.   Well, the State Police was responsible for
9    disposing of what you just called the sludge that was
10   in the bottom of the bullet trap, right?
11   A.   Correct.
12   Q.   Why would you think that somebody other than
13   the State Police would be responsible for what came up
14   off the floor in the shooting area?
15   A.   The machine belongs to them.  They purchased
16   the machine and that belongs to them.  I wanted them
17   to provide us with an avenue to get the contaminated
18   water out of it.
19   Q.   Is what you're telling me that you didn't
20   believe it was your job to get rid of the contaminated
21   water?
22   A.   I didn't know how to get rid of the water.
23   Q.   Did you believe it was your job to get rid of
24   the contaminated water in the floor cleaning machine?

Page 222

1    A.   No.  Because I don't believe that I had an
2    avenue to get rid of it.  That's why I was asking
3    Doyle Tiller and Mark DeVore from facilities
4    management.
5    Q.   The answer is no, then, you didn't believe it
6    was your job to get rid of the water that was in the
7    floor cleaning machine?
8    A.   Correct.  I believe that should have been
9    coming from them as to what we're supposed to do with
10   that water.
11   Q.   In December 2003 was there what they call a
12   HEPA vac. at the range?
13   A.   Yes.
14   Q.   Did anybody operate it after December 1, 2003?
15   A.   No.
16   Q.   Why not?
17   A.   It's an extremely slow and tedious job to try
18   to vacuum that massive range.  The wand is about the
19   same width as a normal vacuum and that's why
20   facilities management bought the floor scrubber.
21   Q.   Okay.  Did copper dust accumulate in the
22   shooting area of the range in December and January,
23   December 2003 and January 2004?
24   A.   What are the dates again?

Page 223

1    Q.   December 2003-January 2004.  During that period
2    did copper dust accumulate?
3    A.   There was already copper dust everywhere in
4    that area.
5    Q.   I realize that.  Did more accumulate in
6    December and January?
7    A.   It may have.  If it was coming from anywhere,
8    it was coming from the muzzle blast of the gun and
9    floating backwards and depositing behind us.
10   Q.   Well, if a copper round hit the bullet trap, it
11   would disintegrate and cause copper dust, wouldn't it?
12   A.   In the water it would cause sludge.
13   Q.   But if it had a spot that wasn't wet like the
14   top of it, it would cause dust, wouldn't it?
15   A.   It could.
16   Q.   Were you concerned that --
17   A.   But most of the time it deflects and goes down,
18   the debris.
19   Q.   Regardless of where it came from, whether it
20   was from the muzzle blast or from the bullet trap, did
21   you have a concern that the copper dust could ignite
22   on a stray round?
23   A.   Copper dust ignite?
24   Q.   Yes.

10 (Pages 220 to 223)

A353

Price, et al.                                      v.                              Chaffinch, et al.
Christopher D. Foraker, Volume 2          C.A. # 04-956-GMS                December 22, 2005

Page 224

1    A.   No.
2    Q.   Aren't there incidents in ranges where copper
3    dust will ignite during shooting?
4    A.   Copper dust?
5    Q.   Yes.
6    A.   I don't believe so.
7    Q.   Were there any other types of chemicals in that
8    dust that had a risk of ignition?  If you know.
9    A.   It's possible, I guess.
10   Q.   Are you saying you don't know whether it was
11   possible to ignite the dust?
12   A.   We didn't know what was in the dust on the
13   floor because no one took any samples of it.  No one
14   from facilities management was maintaining and keeping
15   check on what is on the floor and at what level of
16   clean and so forth.
17   Q.   I recognize that.  But you knew what was in the
18   frangible ammunition, didn't you, because you had an
19   MSDS by the beginning of January?
20   A.   January 8th.
21   Q.   Right.  So you knew what was in the bullet,
22   right?
23   A.   Right.
24   Q.   And you knew there was gunpowder in whatever

Page 225

1    starts the bullet out of the gun, right?
2    A.   Right.
3    Q.   And you knew the other chemicals that were used
4    in the shotgun rounds, didn't you?
5    A.   Correct.
6    Q.   So based on that you could have figured out
7    what was in the dust on the floor, couldn't you?
8    A.   I'm not a chemist, but I guess it could have
9    been.
10   Q.   Was there anything there that you were
11   concerned about igniting?
12   A.   No, I wasn't concerned about it igniting.
13   Q.   When you were at the range the first time, and
14   I'm referring now to when you were in charge of the
15   range, the NCOIC in 2001 and 2002, was ammunition
16   stored in the area behind the bullet trap?
17        MR. NEUBERGER:  I'm sorry.  Just so I
18   understand, you're saying when he had his first tour
19   there?
20        MR. ELLIS:  When he was the NCOIC the
21   first time.
22   A.   I don't believe so.
23   Q.   Was it stored there after you came back on
24   December 1, 2003?

Page 226

1    A.   It was there when I came December 1st, 2003.
2    Q.   Did you leave it there?
3    A.   Yes.  My understanding was that the bomb unit
4    would be taking it and having it destroyed at some
5    point in time.
6    Q.   Did you believe it was a good idea to leave
7    ammunition in the area behind the bullet trap?
8    A.   I'm not sure.
9    Q.   Could you see any risk to the facility or to
10   personnel from having ammunition stored in the area
11   behind the bullet trap?
12   A.   I know it's very damp back there.  There's a
13   lot of evaporation.  There was a lot of condensation
14   on the walls.  The boxes were very wet.  So I believe
15   that if they were back there for any extended period
16   it would probably deaden the primers of anything that
17   might have been live back there.
18   Q.   So does that mean you think it was safe to
19   store the ammunition behind the bullet trap?
20   A.   I don't know that it's safe to store ammunition
21   anywhere in the building because we don't have a
22   sprinkler system.
23   Q.   So is what you're saying that no ammunition
24   should have been stored anywhere in that building?

Page 227

1    A.   I don't know.  I'm not an expert in that field
2    and I don't know.
3    Q.   I'm really asking for not your expert opinion
4    because I recognize that you're not an expert, but I'm
5    asking for your opinion as the NCOIC at a firearms
6    training unit.
7         Do you believe it was safe to have
8    ammunition stored in any part of that building?
9    A.   If a fire occurred, no.
10   Q.   Did it ever occur to you to move the ammunition
11   out?
12   A.   No.  Because we really didn't have another
13   place to store the ammunition.
14   Q.   Did it ever occur to you to move it out from
15   behind the bullet trap and put it in a room at the
16   other end of the building?
17   A.   No.  Because, like I said, it's damp back
18   there, it's not dry.  It's very damp.
19   Q.   Is there a lot of copper dust back there?
20   A.   Yes.
21   Q.   After December 1, 2003 when you returned as the
22   NCOIC did you or the people that worked for you at the
23   range do anything to get the dust cleaned up from the
24   floor, the walls, the equipment, that type of thing?

11 (Pages 224 to 227)

A354

Price, et al.                                v.                          Chaffinch, et al.
Christopher D. Foraker, Volume 2          C.A. # 04-956-GMS              December 22, 2005

Page 228

1    A.   At one point in time we used the shovels and
2   scooped up the target blowback and the shotgun wadding
3   and so forth that was on the ramp, the dry ramp at the
4   bottom.
5    Q.   Anything else that you did to clean up the
6   dust?
7    A.   No.
8    Q.   I have a couple of questions about the
9   psychiatric report that your attorney has provided to
10  us and this is the one from Carol Tavani.  I'm not
11  going to mark it as an exhibit.  If you need to look
12  at it, I think it will simplify the protective order
13  issues if we don't bother marking it as an exhibit,
14  but I'm just going to read you a section or two and
15  ask you if you can comment on some things.
16          There is reference on the sixth page -- if
17  you need to see this, I can show it to you.  But
18  there's reference on the sixth page to hypervigilance
19  on your part and it refers to an individual that you
20  felt represented a danger before who has now been
21  fired and he's returned, he or she has returned from
22  being out of the country.
23          Are you familiar with the issue I'm
24  talking about?

Page 229

1    A.   Yes.
2    Q.   Who is the individual that you felt represented
3   a danger?
4    A.   Corporal Cathell.
5    Q.   What type of a danger did you feel he
6   represented to you?
7    A.   I think Serpico is a real person.  I think
8   there was a person from Easton, PA SWAT team that was
9   recently killed by another SWAT team member.  And I
10  wouldn't put anything past him.  I know he's been out
11  of the country over in the Middle East and it wouldn't
12  surprise me if he wanted me dead.
13   Q.   So you thought Corporal Cathell wanted to kill
14  you?
15   A.   I wouldn't put it past him if something
16  happened to me or my family.
17   Q.   Did Corporal Cathell ever tell you he wanted to
18  kill you?
19   A.   No.  But I can tell you that his best friend is
20  Colonel Chaffinch and when Colonel Chaffinch looked at
21  me in that meeting, I've seen that look two times
22  before that and both times were on the street and
23  those people did want to kill me and they told me so.
24  And the way he looked at me, he hated my guts and he

Page 230

1   and Corporal Cathell are very close friends.
2    Q.   So you think Aaron Chaffinch wants to kill you?
3   Is that what you think?
4    A.   I'm going to tell you I don't put anything past
5   him.
6    Q.   I just want to know if you think he wants to
7   kill you.
8    A.   I don't put anything past him, sir.
9    Q.   Does that mean that you think he wants to kill
10  you?
11   A.   I wouldn't put anything past him.
12   Q.   Do you know if Corporal Cathell ever killed
13  anybody?
14   A.   He may have.  I don't know.
15   Q.   You don't know of anybody that he's killed, do
16  you?
17   A.   I don't know.
18   Q.   How about Aaron Chaffinch, do you know if he
19  ever killed anybody?
20   A.   No, sir, I don't know.
21   Q.   When is the last time you saw Eddie Cathell?
22   A.   2002.
23   Q.   How long do you expect to continue to serve as
24  a Delaware State Trooper?

Page 231

1          MR. NEUBERGER:  Excuse me.  Do you mean
2   how long does he intend, does he want to serve or does
3   he think he's going to serve?  There's a lot of ways
4   to answer the question.
5          MR. ELLIS:  I want to know his present
6   intent.  How long does he plan to serve as of today as
7   a Delaware State Trooper?
8    A.   As long as I possibly can.
9    Q.   That would be until age 55?
10   A.   Quite possibly.  I mean unless something else
11  came along, but with my reputation ruined the way it's
12  been ruined by Colonel Chaffinch and Lieutenant
13  Colonel MacLeish there's no way that I can enter into
14  any type of job after.  I know that for sure.
15   Q.   So you're how old today?
16   A.   I'm 43.
17   Q.   So your current intention would be to work
18  until age 55 as a Delaware State Trooper?
19   A.   I would have to, yes.
20   Q.   Is there a difference in your mind between a
21  commissioned officer and a noncommissioned officer?
22   A.   One is considered brass and one is not.
23   Q.   What's the distinction in your mind?
24   A.   Lieutenants and above are OIC's of a unit,

12 (Pages 228 to 231)

Price, et al.                                                    v.                                          Chaffinch, et al.
Christopher D. Foraker, Volume 2                    C.A. # 04-956-GMS                              December 22, 2005

Page 232

1  officers in charge, and sergeants and below are
2  noncommissioned.
3      Q.   Any other difference?
4      A.   Pay scale.
5      Q.   Anything else?
6      A.   No.
7      Q.   Are there criteria that you have to meet to be
8  a lieutenant or captain that you don't have to meet to
9  be a sergeant?
10     A.   It depends on when you came on the job.
11     Q.   How about in your case?
12     A.   In my case I would need a four-year degree in
13 order to be promoted to lieutenant.  I can test and be
14 banded for lieutenant, but until I receive my
15 four-year degree or equivalent thereof would I be able
16 to be promoted.
17     Q.   Is there any other qualification you don't have
18 that you can think of?
19     A.   Is there any other qualification that I don't
20 have?
21     Q.   Yes, other than the four-year degree that would
22 prevent you from becoming a lieutenant.
23     A.   I don't believe so.
24     Q.   Are you presently treating with a psychologist

Page 233

1  or psychiatrist?
2      A.   Yes.
3      Q.   When is the last time you -- first of all, who
4  is it?
5      A.   Dr. Kozma.
6      Q.   That's K-o-z-m-a?
7      A.   Yes.
8      Q.   And when is the last time you saw Dr. Kozma?
9      A.   I believe it was November.
10     Q.   Of this year?
11     A.   Correct.
12     Q.   And when did you see him prior to that?
13     A.   October.
14     Q.   Are you on a schedule to see him once a month?
15     A.   Yes.
16     Q.   Are you seeing any other mental health
17 professional other than Dr. Kozma for treatment?
18     A.   No.  Because the fitness for duty exams that I
19 was sent for by the state, those were just
20 observations, I believe.
21     Q.   I'm not referring to them.  I meant seeing
22 someone for treatment.
23          Are you seeing a psychiatrist for
24 treatment?

Page 234

1      A.   Now you have me questioning whether Dr. Kozma
2  is a psychiatrist or a psychologist and I don't know
3  the difference at this point.
4      Q.   I think Dr. Kozma is a psychologist.  And if
5  that's the case, then I'm wondering who is prescribing
6  your medication?
7      A.   That would be my family physician.
8      Q.   Okay.  Thanks.
9          The report that Dr. Tavani gave us says
10 that you're having what she calls flashbacks of
11 conversations and the report says you're having
12 flashbacks of conversations, most especially the media
13 event.
14          What media event --
15          MR. NEUBERGER:  Could I see the page
16 you're talking about?
17          MR. ELLIS:  I'm sorry.  Page 6 of the
18 report.
19          MR. NEUBERGER:  Thanks.
20          MR. ELLIS:  This is her report of
21 September 13, 2005.
22 BY MR. ELLIS:
23     Q.   What media event does that refer to?
24     A.   The April 7th, 2004 media event.

Page 235

1      Q.   You mean the event that was reported in the
2  April 7th newspaper?
3      A.   Correct.
4      Q.   What do you have --
5      A.   And on WBOC, Channel 16, and also what was put
6  in the International Police Beat magazine.
7      Q.   What's in the Police Beat magazine is Tom
8  Eldred's article, is it not?
9      A.   I don't know that it has Tom Eldred written on
10 it.
11     Q.   Do you know, is it different from Tom Eldred's
12 article that appeared in The State News?
13     A.   It's very similar.
14     Q.   What is it exactly you're having the flashback
15 of?  Is it the newspaper or is it the video from the
16 TV?
17     A.   It's being blamed for something that I did not
18 do.  It's being blamed for and targeted out of
19 retaliation, me speaking out, my men speaking out
20 about things of public concern.  We have an enormous
21 amount of public people that come through that range
22 from the cleaning lady to the 4-H Club, to the Boy
23 Scouts, to 911 center, the Citizens Police Academy.
24 We have people come through that range and when we

13 (Pages 232 to 235)

A356

Price, et al.                                                                                    v.                                                            Chaffinch, et al.
Christopher D. Foraker, Volume 2                                 C.A. # 04-956-GMS                                             December 22, 2005

Page 236

1    spoke out they immediately retaliated against us.
2        Q.   I understand that's what you're contending in
3    the case.
4            My question is simply:  When you have a
5    flashback, what do you see?
6        A.   I see the face of both MacLeish and Chaffinch.
7        Q.   And where are they when you see the face, the
8    faces?
9        A.   I know the graduation ceremony where Lieutenant
10   Colonel MacLeish growled at me, I see that face.  I
11   see the hateful face of Colonel Chaffinch when I
12   walked into that meeting.  I see him taking the tour,
13   taking Gloria Homer on the tour of the range.  I see
14   Colonel MacLeish in there talking to the news media,
15   blaming me and my guys, my men for the closure of that
16   range.
17       Q.   So you're having a flashback of something that
18   you didn't see firsthand?  Is that what you're telling
19   me?  I'm referring here to your --
20       A.   I read it in the news media and I saw it on the
21   TV myself.
22       Q.   Okay.  So are you having a flashback of the TV
23   account on WBOC?
24       A.   That also, yes.

Page 237

1        Q.   But you're having a flashback of MacLeish and
2    Chaffinch being in the range on April 6th?  Is that
3    what you're saying?
4        A.   Yes.  Because not only was their picture taken
5    but there was video of that as well on WBOC.
6        Q.   I'm just trying to figure out what you're
7    having the flashback of, that's all.
8            What you're having a flashback of is the
9    news account and people being at the range?
10           MR. NEUBERGER:  He also said some more
11   things.
12       Q.   And other things.  But in terms of the media
13   event, it's the news account on WBOC and it's also
14   things that are physically happening in the range.  Is
15   that what you're telling me?
16       A.   Also the auditor's report.
17       Q.   You're having a flashback of the auditor's
18   report?
19       A.   Absolutely.  If you were interrogated like I
20   was, yeah, you would.
21       Q.   Anything else?
22       A.   I know I addressed this in my interrogatories
23   as well.
24       Q.   As you're sitting here now, can you think of

Page 238

1    anything else that you're having a flashback of?
2        A.   Not at this time.
3            MR. NEUBERGER:  Let's take a break.  Can
4    we break?
5            MR. ELLIS:  Can I do one last question?
6            MR. NEUBERGER:  On the Tavani thing?
7            MR. ELLIS:  Yes.
8    BY MR. ELLIS:
9        Q.   One last question on the psych. report.
10   There's an incident that she describes that you
11   apparently told her about where there was a remark
12   portraying you as a, quote, bad penny, unquote, made
13   by someone representing the State Police in front of a
14   committee on which you served attended by vendors and
15   colleagues.
16           What event is that and who is the person
17   who made the bad penny remark?
18       A.   That was by Deputy Attorney General Mike Tupman
19   in a meeting over holsters attended by both a
20   Safariland representative, Armor Holdings
21   representative and Lawmen Supply.
22       Q.   Who is it that told you Tupman made the remark
23   about you being a bad penny?
24       A.   He told me that personally.

Page 239

1        Q.   Tupman told you that?
2        A.   That's correct.  He told me "You're a bad penny
3    that just keeps showing up."
4        Q.   As I understand the psychiatric report, he made
5    a comment that you were a bad penny to a bunch of
6    other people.
7        A.   It was in front of all those other people.
8        Q.   And were you there?
9        A.   He made it to me, directly to me.
10       Q.   I'm sorry.  Okay.  Now I understand.
11           So Mr. Tupman was at a meeting of a
12   committee and says to you that "You're a bad penny,
13   you keep turning up" in front of a bunch of other
14   people?
15       A.   That's correct.
16       Q.   Okay.  Now I understand.
17           Now, there's also a comment in here that
18   one of the vendors explained things to the others
19   present.  Who was that vendor and what is it that he
20   or she said?
21       A.   Brian Byrne, who is the representative from
22   Lawmen Supply who lives in this area and reads the
23   newspaper accounts, explained it to the Armor Holdings
24   representative.

                                                                                   14 (Pages 236 to 239)

Price, et al.                                    v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 2          C.A. # 04-956-GMS          December 22, 2005

Page 240

1   Q.   Okay.  Thanks.
2        MR. NEUBERGER:  Let's take a break.
3        MR. ELLIS:  Yes.
4        (A brief recess was taken.)
5   BY MR. ELLIS:
6   Q.   Sergeant Foraker, we know from some of the
7   exhibits in this case, and I'm going to put Exhibit 1
8   in front of you, D-1, that you sent an e-mail to then
9   Lieutenant Colonel MacLeish on January 5th, 2005.
10       Can you tell me what the next contact you
11  had with Lieutenant Colonel MacLeish was after that
12  e-mail?
13  A.   (Pause)
14  Q.   I haven't found any e-mails between you and
15  Colonel MacLeish or Lieutenant Colonel MacLeish then
16  the whole rest of the month of January.
17       Does that stand to your recollection?
18  A.   I don't recall at this time.
19  Q.   Can you remember any conversation you had
20  between January 5th and the end of January with Thomas
21  MacLeish?
22  A.   Yes.  He came up on January 21st and that's
23  when he told me that -- when I tried to explain to him
24  the conditions of the range and the problem with the

Page 241

1   ventilation system and so forth, he said that he
2   didn't come up there for that.  "I didn't come here
3   for that," he said.
4   Q.   That's the day that you had the conversation
5   about the radio sets with him?
6   A.   Correct.
7   Q.   And he told you to contact the guy in the
8   communications office?
9   A.   Correct.
10  Q.   Any other contact with him for the month of
11  January that you can remember?
12  A.   Not that I recall at this time.
13  Q.   Now, do you recall being at a meeting in early
14  February, about approximately February 10th, with
15  people from facilities management, Tom MacLeish, Major
16  Eckrich, Captain Warren and Bill Bryson?
17  A.   Yes.  There were a couple of meetings with
18  those same players that you just mentioned.
19  Q.   All right.  Well, Bill Bryson wouldn't have
20  been in all of these meetings because he didn't even
21  work for the State Police anymore, would he?
22  A.   No.  But he's very close personal friends with
23  Lieutenant Colonel MacLeish and Lieutenant Colonel
24  MacLeish wanted him involved since he had been

Page 242

1   previously involved in the range, so he was made a
2   part of the committee and also attended the meetings.
3   Q.   Do you recall anything that happened at that
4   meeting that occurred on approximately February 10th?
5   This is a meeting with Mark DeVore, Doyle Tiller and
6   the State Police representatives that I just
7   mentioned.
8   A.   What was your question again?
9   Q.   Do you remember anything that happened at that
10  meeting?
11  A.   Nothing specific at the time.
12  Q.   Do you remember anything that the lieutenant
13  colonel said to the facilities people at that meeting
14  about the condition of the range?
15  A.   I don't recall at this time.
16  Q.   Now, do you recall a second meeting later in
17  the month, somewhere in the neighborhood of February
18  25th in which you were present with the three
19  subordinates you had in the firearms training unit,
20  Greg Warren, a guy named Sharp, I think it's Gene
21  Sharp from the fiscal section?  You know who he is,
22  right?
23  A.   Yes.
24  Q.   Also Major Eckrich and Tiller and DeVore.  Do

Page 243

1   you recall being at that meeting?
2   A.   Yes, I do recall being at meetings with those
3   individuals.
4   Q.   Do you remember specifically a meeting
5   occurring in late February and a discussion of the
6   ventilation system at that meeting?
7   A.   I do know that the ventilation system was
8   discussed.
9   Q.   Do you remember anything that MacLeish said to
10  the facilities representatives about the ventilation
11  system at that meeting?
12  A.   No, I don't recall at this time.
13  Q.   Do you remember any discussion at that meeting
14  as to whether the building was safe?
15  A.   I don't believe it could have been determined
16  at that point in time.  I don't know if they had the
17  swipe samples back by that time.  I know we had hired
18  Environmental Solutions to come in and do swipe
19  sampling and we were awaiting their test results.  I'm
20  not exactly sure when they came in.
21  Q.   Do you --
22  A.   When I say, "we," actually it would have been
23  the lieutenant, the colonel, Secretary Ford and
24  Secretary Homer that were awaiting those results to

15 (Pages 240 to 243)

Page 244

1   determine whether the range should be shut down or
2   not.
3       Q.   I guess really my question is what you remember
4   about the particular meeting I described on February
5   25th, 2004.
6           Do you remember there being questions
7   asked of the facilities people as to whether the range
8   was safe for occupancy?
9       A.   This was late February?
10      Q.   Yes.
11      A.   I don't recall at this time.
12      Q.   Now, do you remember a meeting on March 4th at
13  which instead of just Tiller and DeVore there were
14  about five or six people from facilities, including a
15  guy name Bob Furman?
16      A.   Yes.  I was at a meeting with those players
17  involved, yes.
18      Q.   Do you remember where that meeting was?
19      A.   There were a couple of different meetings with
20  those individuals.  I know that there was one at the
21  academy and I believe there was one at Secretary
22  Ford's conference room.
23      Q.   Do you remember which of those came first?
24      A.   I don't recall at this time.

Page 245

1       Q.   With respect to the one that occurred at
2   Secretary Ford's conference room, who was present?  Do
3   you recall?
4       A.   Secretary Ford, Secretary Homer, Bob Furman, I
5   believe Doyle Tiller, Mark DeVore, I believe Captain
6   Warren was there.  There might have been a couple of
7   other people from facilities management.
8       Q.   Was Tom MacLeish there?
9       A.   Yes.  And Colonel Chaffinch was there also.
10      Q.   Were the three guys that worked under you in
11  the FTU present?
12      A.   No, they were not.
13      Q.   All right.  First I'm going to ask you about
14  the meeting that occurred involving Bob Furman on
15  March 4th.  And you said you think that occurred at
16  the academy?
17      A.   There was one that occurred at the academy with
18  Bob Furman attending.
19      Q.   What do you recall occurred in that meeting?
20      A.   I believe the discussion at one point in time
21  was about the ventilation system, that they were not
22  going to replace it; that they were going to rebalance
23  it.
24      Q.   Do you recall any discussion at that meeting

Page 246

1   about the cause of the problem?
2       A.   Which problem are you speaking of?
3       Q.   Well, the problem that made the range unfit for
4   use.
5       A.   Yes.  They were discussing the ventilation
6   system.
7       Q.   Was there any discussion of the bullet trap at
8   that meeting?
9       A.   I believe there was.
10      Q.   And do you remember what the substance was of
11  the discussion of the bullet trap?
12      A.   I believe they were thinking as to what the
13  cost may be to refurbish it.  It had been altered so
14  many times since it was put in place that it wasn't
15  close, even close to the condition that it originally
16  had been in.  There were so many alterations made that
17  I guess, I believe that facilities management was in
18  contact with Savage Range directly about the bullet
19  trap and also considering a new bullet trap.
20      Q.   Do you remember any other discussion about the
21  bullet trap in that meeting?
22      A.   Not that I recall at this time.
23      Q.   Do you recall any discussion at that meeting
24  about maintenance that had been done in the building?

Page 247

1       A.   I believe that there were some questions asked
2   about the maintenance.
3       Q.   What questions do you recall being asked about
4   the maintenance?
5       A.   Who would do the maintenance?  Whether it would
6   be an outside firm or it would be facilities
7   management.  I believe Mark D'Allesandro was in there.
8   He reiterated that the maintenance of that bullet trap
9   would take a full-time technician to maintain it and
10  they were kicking around the idea of it being a
11  facilities management person or hiring someone outside
12  like they do at FLETC.
13      Q.   Was there any discussion in that meeting as to
14  what maintenance had been done on the bullet trap over
15  the course of the last few months?  I'm sorry.  Not of
16  the bullet trap.
17          Was there any discussion at that meeting
18  about what maintenance had been done at the range
19  since December 1, 2003?
20      A.   They had asked about the floor scrubber and I
21  had told them that I was informed that the floor
22  scrubber, when I arrived on December 1, 2003 that the
23  floor scrubber had not been utilized since I believe
24  June of '03 and that as soon as I got there I

16 (Pages 244 to 247)

A359

Price, et al.                                              v.                                        Chaffinch, et al.
Christopher D. Foraker, Volume 2              C.A. # 04-956-GMS                          December 22, 2005

Page 248

1  recognized that the floor scrubber wasn't running.
2  The horizontal surface on the top of it was covered
3  with a reddish dust. So I had that repaired and the
4  day that it was repaired I ran it in the facility and
5  then the following, I believe it was the following day
6  that I asked my guys "How do we get rid of the water?"
7  And they said, "We don't. No one has told us anything
8  about how to get rid of the water." That was an issue
9  back before when I was there the first time, what to
10 do with the water, the contaminated water and still no
11 one had come up with a solution.
12         And so then I contacted Mark DeVore and
13 Doyle Tiller and they kept saying, "We'll get back to
14 you on that. We'll get back to you on that."
15    Q.   Did you repeat all of this that you're telling
16 me now in that meeting on March 4th, 2004?
17    A.   I don't believe that I was free to talk at that
18 meeting.
19    Q.   I'm really asking you, what I meant to ask you
20 is: Was there a discussion at that meeting of what
21 maintenance had been done since December 1, 2003? And
22 you have said to me that you told people that you
23 fixed the floor scrubbing machine?
24    A.   I had someone come in and fix it. It was like

Page 249

1  a 1200-and-some-dollar bill to fix it.
2     Q.   Did you also tell them then that you didn't run
3  it, that you hadn't run it since it was fixed?
4     A.   Yes. Because we didn't know what to do with
5  the fluid that was inside.
6     Q.   Did you also tell the people at that meeting
7  that you hadn't swept up or otherwise vacuumed the
8  dust that was in the shooting area since December 1,
9  2003?
10    A.   Like I said, when the floor scrubber was
11 repaired on December 19th, I did do that on December
12 19th.
13    Q.   But you hadn't otherwise done any cleanup of
14 the dust?
15    A.   That's correct.
16    Q.   Did you tell people that at that March 4th
17 meeting?
18    A.   I believe so.
19    Q.   Did you also tell them that you had stopped
20 doing maintenance on the water system of the bullet
21 trap in December 2003?
22    A.   I don't believe I used the word "stopped." I
23 believe that it hadn't been done for quite some time
24 and the reason being was the sheer fact that it was so

Page 250

1  far behind it was a monumental task and a full-time
2  job to do just that, maintain the bullet trap.
3     Q.   Do you remember what reaction Bob Furman had at
4  that meeting when you told the group at that meeting
5  these things that you just told me?
6     A.   I don't recall exactly what he said at this
7  time.
8     Q.   Do you remember anything that Lieutenant
9  Colonel MacLeish said in response to what you have
10 just described to me?
11    A.   I remember at one point in time Lieutenant
12 Colonel MacLeish asked me, he was asking -- I don't
13 know whether he was asking me a question or he was
14 telling me something and I was writing it down. And
15 he got very agitated at me and said, "Look at me when
16 I'm talking to you." He's volatile.
17    Q.   Do you remember anything other than that?
18    A.   Not at this time.
19    Q.   Did you get the impression that Colonel
20 MacLeish didn't know that you hadn't been doing
21 cleanup tasks at the range since December 2003?
22    A.   I don't know that.
23    Q.   You made a reference to the floor scrubber
24 machine during the first period when you were the

Page 251

1  NCOIC at the range in August, from August 2001 to
2  April 2002.
3         Did you use the floor scrubbing machine
4  during that period?
5     A.   When I was there for those seven months in
6  charge and actually prior to that, Corporal Cathell,
7  that was like his big thing. He wanted to do the
8  floor scrubbing thing, so he ran the floor scrubber.
9     Q.   Well, when you were Corporal Cathell's boss do
10 you know what Corporal Cathell did with the water?
11    A.   The same thing he had been doing with it under
12 Sergeant Parton and Sergeant Fitzpatrick and
13 Lieutenant Bryson.
14    Q.   What was that?
15    A.   I believe he was dumping it out on the ground.
16    Q.   Did you ever see him dump it out on the ground?
17    A.   Yes.
18    Q.   So did you think that was a good idea?
19    A.   They apparently had it tested. I don't know
20 what the test results were. Sergeant Parton was a
21 part of that. I don't know what the test results
22 were.
23    Q.   Did you think it was a proper thing to do for
24 Corporal Cathell to do, to be dumping water from the

17 (Pages 248 to 251)

A360

Price, et al.                                                    v.                                          Chaffinch, et al.
Christopher D. Foraker, Volume 2                    C.A. # 04-956-GMS                          December 22, 2005

Page 252

1  floor scrubbing machine out on the ground?
2      A.   I didn't think it was a good idea, but I don't
3  know what the level of contamination was.
4      Q.   Did you ever ask anybody?
5      A.   No, I didn't.
6      Q.   I mean, Parton is still with the State Police,
7  isn't he?
8      A.   Yes, he is.
9      Q.   Did you ever ask Parton what the contamination
10  test showed?
11      A.   No, I didn't.
12      Q.   You never asked Rich Ashley what he had them do
13  with the water when he was in charge, did you?
14      A.   If the machine hadn't been run since, well,
15  since June, it was in a condition and a state that you
16  couldn't even move it.  It was dead.
17      Q.   I understand that.
18      A.   And I know it hadn't been run for quite some
19  time.
20      Q.   But that would have left 14 months in which
21  Ashley could have had Cathell running it, couldn't it?
22      A.   I don't know when Cathell resigned or retired.
23      Q.   Did you ever have a conversation with Ashley
24  about what he did with the water from the floor

Page 253

1  scrubbing machine?
2      A.   No, I didn't.  All I know is what my guys told
3  me and they told me that it was being dumped on the
4  ground.
5      Q.   Do you remember anything else that occurred at
6  that March 4th meeting at the academy with Furman and
7  Tiller and DeVore and the representatives from the
8  State Police?
9      A.   I don't recall at this time.
10      Q.   Do you remember being at a meeting at the
11  museum conference room, the State Police Museum
12  conference room a little bit later in March, somewhere
13  around the 17th?
14      A.   Yes, I do.
15      Q.   Do you remember who was present at that
16  meeting?
17      A.   I believe that was Lieutenant Colonel MacLeish,
18  Major Eckrich, Gene Sharp, I think Captain Homiak.
19  I'm not sure if Captain Homiak and Captain Yeomans
20  were there, but I know they had prepared two reports
21  that were being introduced at that meeting.  I know
22  Lieutenant Davis was there, Captain Greg Warren was
23  there, Corporal Price, Corporal Warren and Corporal
24  Warwick were there and myself.

Page 254

1      Q.   Do you know what the purpose was for that
2  meeting?
3      A.   I don't recall at this time what the purpose of
4  that meeting was.
5      Q.   Aside from the reports that Homiak and Yeomans
6  presented, either presented or were handed out, do you
7  recall anything else that occurred at that meeting?
8      A.   That there was discussion about policies and
9  procedures that we didn't have.  There was discussion
10  about there was no final inspection of the building.
11  There was no certificate of occupancy for the
12  building.  The ventilation system had never worked and
13  that the maintenance of the facility should be done by
14  professionals that are trained to protect themselves
15  from hazardous exposure with Tyvek suits and
16  respirators; that the bullet trap was a full-time
17  maintenance job for a technician that's trained in how
18  to protect themselves against heavy metal exposures.
19      Q.   Who was saying all these things?
20      A.   It was I believe a discussion that was going
21  on.  I believe that that was what also Captain Yeomans
22  and Captain Homiak, their reports were leaning in that
23  direction.
24      Q.   Was there any disagreement among the group as

Page 255

1  to those issues?
2      A.   I believe Lieutenant Colonel MacLeish was just
3  listening.  I don't think he offered a thought either
4  way.
5      Q.   So he didn't disagree?
6      A.   I don't believe he offered up anything.
7      Q.   Was there anybody in the group that was
8  meeting -- you're all State Police employees at that
9  point, right?  There's no facility people at that
10  meeting, right?
11      A.   No, there weren't.
12      Q.   Was there anybody within that group that was
13  disagreeing with the positions that you've just
14  described concerning how the range should be handled?
15      A.   Well, we had a disagreement.  We disagreed on
16  the fact that Lieutenant Colonel MacLeish said, "It's
17  expected to have hearing loss.  You work at a range.
18  It's expected to have high levels of lead and copper
19  in your system."
20          That's what he said and I disagreed with
21  that, absolutely.
22      Q.   I was not referring to that.  I was referring
23  to the testimony you gave a couple of minutes ago
24  about who would be responsible for maintenance, the

18 (Pages 252 to 255)

Price, et al.                                    v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 2          C.A. # 04-956-GMS                 December 22, 2005

Page 256

1  fact that the HVAC system didn't work right, I mean
2  all these things that you have described, including
3  the fact that there should be someone skilled or at
4  least experienced in handling hazardous metals that
5  would do the cleanup, that somebody in a Tyvek suit
6  might be needed to do the cleanup, all of these things
7  that were proposed by one or other members of the
8  State Police that were present at that meeting.
9         Was there any disagreement in the crowd
10 about where you were going to go in the future?
11    A.  I wasn't exactly sure where Lieutenant Colonel
12 MacLeish stood because he was -- the way he treated us
13 in that meeting...
14    Q.  Let me ask the question a little different way.
15        Did he say that he disagreed with you?
16    A.  He didn't say it, but his body language --
17    Q.  Did he tell you that he thought you should be
18 wearing Tyvek suits and dipping your hands into the
19 solution underneath the bullet trap?
20        MR. NEUBERGER:  Excuse me.  You did step
21 on his answer.
22        You said something about body language?
23    A.  Well, his body language was such that he was
24 like angry at us because I stepped in and disagreed

Page 257

1  with him on whether, because we worked there, whether
2  we should be harmed in some way or we should be
3  exposed to something when we have no training on how
4  to protect ourselves against this type of exposure.
5  There's no policies and procedures in place, and we
6  talked about that.
7         And he was --
8     Q.  Did he not assign you to prepare policies and
9  procedures?
10    A.  Again, that should be done, like I explained
11 the last time I talked with you, that should be done
12 by professionals who know how to protect themselves,
13 not by somebody who's a layman.  I'm a lowly sergeant
14 and that's five or six pay grades above me.  That's by
15 industrial hygienists and people that know what
16 they're doing.
17    Q.  Were you assigned to prepare SOP's?
18    A.  I was assigned to come up with some sort of
19 SOP.  But when you don't know what your facility is
20 going to be like or look like when supposedly changes
21 are going to be made to the building, you don't
22 prepare policies and procedures until you know what
23 you have, the environment has been set forth before
24 you and then you can make policies and procedures.

Page 258

1     Q.  So the answer is you were assigned to prepare
2  policies and procedures, right?
3     A.  I was assigned to look at policies and
4  procedures at different facilities.
5     Q.  Were you assigned to come up with policies and
6  procedures for the Delaware State Police firing range?
7     A.  Yes, of which I adamantly said I shouldn't be
8  the one that does that; I am not qualified to do that.
9     Q.  Was there a discussion of hearing loss at that
10 meeting?
11    A.  Like I said, he said when the hearing loss came
12 up he said that it's expected.
13    Q.  How did hearing loss come up?
14    A.  I don't recall at this time how that came up.
15    Q.  Do you recall MacLeish asking whether there
16 were any medical conditions or medical problems that
17 had not been addressed to that date?
18    A.  I don't recall at this time.
19    Q.  So you don't recall who raised the issue of
20 hearing loss?
21    A.  A lot of meetings, a lot of different people at
22 different meetings.
23    Q.  I understand that.  You seem to have a pretty
24 good recollection of this one and I thought I would

Page 259

1  see if you would remember who raised the issue of
2  hearing loss.
3         Are you saying that you don't remember?
4     A.  I don't recall at this time.
5     Q.  Now, what exactly was it that Lieutenant
6  Colonel MacLeish said in this meeting about exposure
7  to metals or lead or something of that sort?
8     A.  We discussed this the last time we were
9  together.
10    Q.  I don't recall us discussing this meeting at
11 all, but please give me the answer, if you could.
12    A.  Yes.  He made a statement that, you know,
13 "You're going to have hearing loss if you work at a
14 range."
15    Q.  No, that wasn't my question.  It had to do with
16 exposure to lead or other metals.
17    A.  Basically the same thing.  I remember him
18 saying, "It's expected that you're going to have
19 elevated lead levels and heavy metal exposures.  You
20 work at a range."
21    Q.  Is that all that he said about it?
22    A.  (Pause.)
23    Q.  I mean, do you remember anything else?
24    A.  I disagreed with him on that.  I believe that I

19 (Pages 256 to 259)

Price, et al.                                                     v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 2                    C.A. # 04-956-GMS                       December 22, 2005

Page 260

1  don't think that facilities management or the State
2  Police was doing everything it possibly could to
3  protect us from that.  I felt that the industrial
4  hygienist, Doyle Tiller, should be monitoring our air,
5  our ventilation, also monitoring with swipe samples as
6  to what we're being exposed to, and that was not done.
7        Also, there was no decibel level testing
8  done, so we had no idea what we were exposed to as far
9  as decibel levels in that building.
10   Q.  I really want to focus on the lead and other
11  heavy metals at this point.
12        Did you do any research on your own on
13  lead exposure?
14        MR. NEUBERGER:  You're saying at this time
15  or going back over the whole three years?
16   Q.  During the first few months of 2004 when these
17  issues were arising at the range.
18   A.  We were doing a lot of different research.  We
19  were trying to compile MSDS sheets and compile a lot
20  of different things.  We looked at different things to
21  do with lead exposure and we felt that we have no idea
22  what we're doing and we shouldn't be doing any of
23  this.  This should be, as far as like SOP's should be
24  done by someone who's a trained professional so they

Page 261

1  can inform us and keep the policies and procedures.
2        I mean, that's why we contacted NIOSH and
3  they refused NIOSH.
4   Q.  Did you contact Dr. Schwartz at Johns Hopkins?
5   A.  No.  That had been done by John Yeomans, I
6  believe.
7   Q.  None of the firearms training unit people
8  contacted Dr. Schwartz?
9   A.  Not directly.  Not that I believe so.
10   Q.  Is it your belief that a person working at a
11  firing range should have no more exposure than a
12  person in the general population to elevated lead
13  levels?
14   A.  The way I see it and the way I've had
15  professionals in the industry, experts in the industry
16  tell me is that you can have zero exposure in the
17  respiratory zone if the ventilation system does what
18  it's supposed to do.  And when you look at
19  professional organizations they have professional
20  technicians that come in that are trained in hazardous
21  abatement that come in and have policies and
22  procedures set in place on wearing Tyvek suits and
23  respirators and how to clean so that they don't become
24  exposed to the contaminants.

Page 262

1        We had no training, no SOP's, nothing.
2  When you're told it's slippery out there because of
3  the shotgun buffer and that was your gauge on when to
4  run the floor scrubber, that's not a policy and
5  procedure.
6   Q.  You believed the floor scrubber should be run
7  every day, didn't you?
8   A.  I don't think it would have to be run every
9  day.  It depends on how much shooting you do.
10   Q.  Well, you would believe it should be run every
11  day that there's shooting done, wouldn't you?
12   A.  It would depend on how much shooting you're
13  doing.
14   Q.  I showed you Exhibit 31 last time.
15        MR. ELLIS:  Tom, do you have a copy there?
16        MR. NEUBERGER:  31.  I've got them all
17  here.
18        MR. ELLIS:  Why don't you show that to the
19  witness and then I will just take this one?
20        MR. NEUBERGER:  Sure.
21  BY MR. ELLIS:
22   Q.  That's something that you were involved in
23  preparing, isn't it?
24   A.  This was done by Corporal Warwick.

Page 263

1   Q.  And did you submit this to someone above you in
2  the organization?
3   A.  Yes.  I believe I sent it up the chain of
4  command.
5   Q.  Well, look at the second page.  It's actually
6  the third page of the exhibit, but it's the second
7  page of the report.
8   A.  I'm sorry.  Second page?
9   Q.  It's got 2601 on the bottom right-hand side.
10   A.  Yes.
11   Q.  Are the items that are listed under
12  responsibilities on page 2601 the things that you
13  believe need to be done in order to maintain the range
14  properly?
15   A.  I believe that Corporal Warwick contacted
16  someone who is well-versed in range cleaning.  So what
17  he put in here I believe was maybe what he discovered
18  from that person.
19   Q.  Did you believe that the suggestions in this
20  report were correct?
21   A.  I don't know.  I didn't talk to Mr. Buechner
22  personally, but I would take Jim Warwick's word for
23  this to be accurate.
24   Q.  And you submitted this up the chain of command,

20 (Pages 260 to 263)

A363

Price, et al.                                          v.                                     Chaffinch, et al.
Christopher D. Foraker, Volume 2          C.A. # 04-956-GMS                        December 22, 2005

Page 264

1  right?
2      A.   That's correct.
3      Q.   Did Colonel MacLeish -- he was Lieutenant
4  Colonel MacLeish at the time -- ever tell you that you
5  and your men couldn't have blood tests done to
6  determine whether there was lead or other contaminants
7  in your system?
8      A.   No, I don't believe so.
9      Q.   Did he ever tell you you couldn't get hearing
10  tests done?
11     A.   No.  In fact, he kept sending us for
12  unprecedented fitness for duty exams.
13     Q.   He sent you for hearing tests, right?
14     A.   He sent us for fitness for duty exams.  I think
15  there's a difference.
16     Q.   But the fitness for duty exams involved your
17  hearing, didn't they?
18     A.   Yes.  And, like I said, that's unprecedented.
19     Q.   And he increased the frequency of your blood
20  tests, didn't he?
21     A.   Increased the frequency?  I don't understand
22  what you mean.
23     Q.   Every person assigned to the range has his
24  blood tested periodically.  Isn't that correct?

Page 265

1      A.   Quarterly, about quarterly.
2      Q.   Didn't Tom MacLeish increase the frequency of
3  the testing because you were reporting high blood lead
4  levels?
5      A.   No.  I don't believe so.  I believe he sent us
6  for fitness for duty exams.
7      Q.   I'm not asking you about the fitness for duty
8  exams.  I'm asking you about the blood tests.
9           Your testimony is he did not increase the
10  frequency of the blood sampling?
11     A.   I believe we had blood drawn a number of
12  different times, but we also had our urine tested and
13  that's one thing that we thought may be an indicator
14  as to how our organs are operating.
15     Q.   My question is really whether you recall, and
16  either you do or you don't, do you recall Lieutenant
17  Colonel MacLeish increasing the frequency of the blood
18  testing when you reported high blood lead levels in
19  2004?
20     A.   I believe that they were tied to fitness for
21  duty exams and we kept going for them for our hearing.
22     Q.   I'm really not referring to the fitness for
23  duty exams at all.  This is something that happened
24  long before that.  If you don't remember it happened,

Page 266

1  that's fine.  Just tell me no.  I don't know whether
2  it happened or not.
3           My question is:  Do you recall that he did
4  that?
5      A.   We went frequently to get exams.  There was a,
6  you know, it was like they didn't get the results they
7  wanted so they wanted to send me again.
8      Q.   I'm referring to blood lead levels.
9           Where did you go to get your blood lead
10  tested?
11     A.   Health Works in Dover.
12     Q.   Do you recall that there was a point where you
13  got it tested more frequently than you had before?
14     A.   I don't recall that it was more frequent, no, I
15  don't.
16     Q.   That's fine.
17           Did Colonel MacLeish authorize you to hire
18  Environmental Solutions to do testing in the facility?
19     A.   I don't know where exactly the authorization
20  came from.  I sent it up the chain of command through
21  Captain Warren.  Captain Warren said that it had been
22  approved and gave me the go-ahead.
23     Q.   He didn't tell you who it had been approved by?
24     A.   I would, I would venture to say it came from

Page 267

1  the executive staff.  It came from the budget major,
2  which would have been Eckrich.
3      Q.   Who was Warren's boss at the time?
4      A.   I believe he answered to Lieutenant Colonel
5  MacLeish.
6      Q.   Did Lieutenant Colonel MacLeish authorize you
7  to hire Bill Prodencher to look at the facility?
8      A.   Again, we got the approval up the chain of
9  command.  I don't know who exactly approved it.  I
10  made the request.
11     Q.   You got your approval from Captain Warren?
12     A.   Yes, I believe so.
13     Q.   And his boss at the time would have been
14  Lieutenant Colonel MacLeish?
15     A.   Yes.  But I don't know if he was dealing
16  directly with Lieutenant Colonel MacLeish or Major
17  Eckrich.  I know at one point in time I had to contact
18  Major Eckrich directly to see if the funds existed to
19  bring in the expert from FLETC.
20     Q.   That would be Bill Metcalf?
21     A.   Correct.
22     Q.   And were there funds available?
23     A.   There were funds available.  However, they
24  never called him.

21 (Pages 264 to 267)

A364

Price, et al.                                          v.                               Chaffinch, et al.
Christopher D. Foraker, Volume 2              C.A. # 04-956-GMS                    December 22, 2005

Page 268

1    Q.   Who is the "they"?
2    A.   The executive staff that wanted me to contact
3  an independent agent or an independent person.
4    Q.   Why didn't you call Metcalf and hire him?
5    A.   I couldn't hire him.  I just basically sent an
6  e-mail to him, called him on the phone and he
7  eventually got approval.  I sent, I sent that up the
8  chain of command, that he had approval, and never
9  heard back from him.
10   Q.   So you heard back on hiring Prodencher but you
11 never heard back on Metcalf?
12   A.   That's correct.
13   Q.   Is there anything in terms of environmental
14 testing at the range that you wanted to do but you
15 couldn't do because Lieutenant Colonel MacLeish told
16 you not to?
17   A.   Like I explained to you the last time we met,
18 the building doesn't belong to the State Police.  We
19 occupy it.  Anything I do relative to the testing of
20 the facility I think I need to contact the chain of
21 command to let them know this is what I would like to
22 do and then the two powers that be that are five or
23 six pay grades above me can talk together and make
24 sure that it's okay.

Page 269

1          Facilities management, they have had that
2  attitude that they are the experts in certain things
3  and it needs to be left to them.
4    Q.   I understand that and you have said that
5  before.
6          What I am trying to find out, what I am
7  asking is whether you ever proposed something up the
8  chain of command that Lieutenant Colonel MacLeish told
9  you you couldn't do in terms of testing?
10   A.   No, I don't believe so.
11   Q.   Did he ever refuse any request you made
12 concerning getting your employees tested to determine
13 whether they were suffering medical problems from the
14 condition of the building?
15   A.   I know for the longest time they refused to
16 test our homes to see if we had any contamination in
17 our homes.
18   Q.   Was it eventually tested?
19   A.   No.  They had someone come in that wasn't
20 necessarily testing our homes for exposure.  He was
21 testing our homes to see what our homes could produce.
22   Q.   I'm not sure what you mean by that.
23   A.   Well, he was testing our water, just for
24 instance.  He never asked me a thing.  He just told me

Page 270

1  "This is what I'm here for.  This is what I need to
2  do.  You know, it's up to you.  Can I do my job?" I
3  said, "Yeah.  I'm not here to be adversarial in any
4  way."
5          But the things that he did were to me off
6  the wall.  I mean, he never asked me anything, like
7  what's my routine, where do you come in at or anything
8  like that.  He walked over to my front door inside my
9  house.  There's a throw rug that my wife just bought
10 from the store and he does a swipe sample of that.
11 I'm thinking what in the world is he doing?
12          Then he filled up bottles from my water
13 and to me he's trying to determine what my house
14 produces, not fingerprint whether there's lead,
15 copper, zinc, tin, whatever in my house and that came
16 from the facility because, remember, the facility had
17 no safe haven where we could go and change and shower
18 without being underneath a vent that was blowing out
19 contaminants.
20   Q.   Are you an expert in this type of chemical
21 testing?
22   A.   Absolutely not.
23   Q.   Okay.
24   A.   But I don't think I have to be to know that the

Page 271

1  air is going the wrong direction.  It's blowing ice
2  in my face.  And I just got that throw rug that nobody
3  has ever walked on.
4    Q.   I understand that.
5    A.   I don't think --
6          MR. NEUBERGER:  Counsel, are you almost
7  done?
8          MR. ELLIS:  I'm getting close to being
9  done.
10         MR. NEUBERGER:  Do you think you will be
11 done in fifteen minutes?
12         MR. ELLIS:  What time is it?
13         MR. NEUBERGER:  It's almost 20 after 4:00.
14         MR. ELLIS:  Pretty close.
15         MR. NEUBERGER:  Okay.  For the record,
16 we're over the seven hours.  We're about 15 minutes
17 over the seven hours now.  Okay?
18         MR. ELLIS:  Okay.
19         MR. NEUBERGER:  I think the flashback
20 stuff that we went through a little bit earlier
21 affected my client's medical issues.  As you know,
22 he's on meds and things like that.  And I really would
23 like to try to conclude the deposition.  If you can
24 conclude it in the next fifteen minutes, I think

22 (Pages 268 to 271)

A365

Price, et al.                                              v.                                    Chaffinch, et al.
Christopher D. Foraker, Volume 2          C.A. # 04-956-GMS                    December 22, 2005

Page 272

1  that's fine.  But I don't think we can go anything
2  more than another fifteen minutes.
3      Can you try to finish it?
4      MR. ELLIS:  Yes, I will.
5      MR. NEUBERGER:  Okay.  Let's do it.
6  BY MR. ELLIS:
7      Q.  I know from other documents and testimony in
8  the case, Sergeant Foraker, that you were interviewed
9  by the auditor's office?
10     A.  Yes, sir.
11     Q.  Am I correct that you were interviewed twice?
12     A.  Yes, sir.
13     Q.  Can you describe to me the first interview?
14     A.  I had put my thoughts down on paper and when I
15  walked in I handed them my thoughts on paper and I sat
16  down and they asked me some questions.
17     Q.  Do you remember any of the questions that you
18  were asked?
19     A.  I don't recall at this time.
20     Q.  Who was in the room with you?
21     A.  There were three employees of the auditor's
22  office and myself and Mr. Tom Neuberger.
23         MR. ELLIS:  I'm going to ask the court
24  reporter to mark this as an exhibit.

Page 273

1          I think it's 32.
2          MR. NEUBERGER:  Yes, it's 32.
3          (Defendant's Deposition Exhibit No. 32 was
4  marked for identification.)
5  BY MR. ELLIS:
6      Q.  Is this the statement that you prepared and
7  gave to the auditors on May 12th, 2004?
8      A.  It looks like it, sir.
9      Q.  To try to shortcut this, I have reviewed this
10  statement and I don't find anything in this statement
11  where you tell the auditors that beginning in December
12  2003 the firearms training unit staff did not or
13  discontinued doing any maintenance on the bullet trap,
14  did not run the floor scrubber except for the one
15  occasion, did not run the HEPA vac.
16         Is there some reason -- if you think I'm
17  wrong on that, take a look at this document as long as
18  you want, but I guarantee you there's nothing in there
19  on that.
20         My question is:  Why didn't you tell the
21  auditors any of that information?
22     A.  I believe that I did.
23     Q.  Why didn't you put it in your statement?
24     A.  I believe I verbally told them that that day.

Page 274

1      Q.  My question is:  Why didn't you put it in the
2  statement?
3      A.  I guess because I didn't believe that it had
4  any bearing.
5      Q.  Is it your belief that the maintenance work
6  that we have talked about in terms of the bullet trap,
7  cleaning the floor and that type of thing didn't have
8  anything to do with the firing range becoming unusable
9  by March 2004?
10     A.  No.  I believe the place was contaminated
11  because of the ventilation system.
12     Q.  So, in other words, what you're saying is that
13  had you done, had you run the floor sweeper daily, had
14  you run the HEPA vac. daily, had you cleaned out the
15  water system behind the bullet trap or under the
16  bullet trap, the building still would have ended up in
17  the same condition it ended up in March of 2004?
18     A.  Absolutely.  The ventilation system circulated
19  contaminants throughout that building.  It was in the
20  ductwork.  One in particular, one duct was 140,000
21  micrograms per square foot of lead contamination.
22  That's a fresh air supply duct, not an exhaust vent.
23  That's a fresh air supply.
24         And that's 35 yards away from the firing

Page 275

1  line.  Most of our shooting takes place from 10 yards
2  and in.
3      Q.  You --
4      A.  And it's 14 feet in the air.  Excuse me.
5      Q.  You don't claim to have any expertise in HVAC
6  systems, correct?
7      A.  No, sir.
8      Q.  And you don't claim to be an expert on the
9  bullet trap, right?
10     A.  No, sir.  All I know is when everything travels
11  backwards and it's supposed to go that way
12  (indicating), something is wrong.
13     Q.  It's going the wrong way?
14     A.  Correct.
15     Q.  You have stated to the psychiatrist,
16  Dr. Tavani, in the second interview you had with the
17  auditors, and this would have been approximately July
18  28, 2004, you felt attacked and the doctor uses that
19  word in her report.
20     A.  Absolutely.
21     Q.  Why do you feel that you were attacked?
22     A.  Because they were squarely taking the position
23  of Colonel Chaffinch and Lieutenant Colonel MacLeish
24  and Secretary Homer that that range was closed because

23 (Pages 272 to 275)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Price, et al.                                    v.                        Chaffinch, et al.
Christopher D. Foraker, Volume 2        C.A. # 04-956-GMS           December 22, 2005

Page 276

1  we didn't clean enough.
2      Q.   And what makes you say that?  Is it things that
3  they said to you that day?
4      A.   Yes.  Yes.
5      Q.   Do you remember who it was from the auditor's
6  group that was saying these things that you found
7  objectionable?
8      A.   I don't recall his name.
9      Q.   Can you describe him?  Was it one or -- I guess
10  I should ask you this question:  How many people were
11  involved in that interview?
12     A.   All three were there, but there was one in
13  particular that was running the interview.
14     Q.   Do you recall --
15     A.   Interrogation I should say.
16     Q.   Can you describe to me which one that was?
17     A.   I know he was the shortest one out of the
18  group.
19     Q.   Okay.  What did he say to you that led you to
20  believe that you were being attacked?
21     A.   He was basically, he sounded like a little bit
22  of what you've been saying about not cleaning and that
23  sort of thing and that isn't it really true that
24  because you didn't clean, because you didn't do the

Page 277

1  maintenance on the bullet trap that the building
2  became contaminated?
3          I said, "No, that's not true.  The
4  ventilation system circulated that throughout the
5  building."  That's why when they took swipe samples of
6  the vents they were above the firing line limit.
7  That's not the firing line.  That's above our heads in
8  the shower where it was contaminated.  That's way away
9  from the firing line.
10     Q.   But I'm just asking you what this investigator
11  said to you or asked you that made you feel like you
12  were attacked.
13     A.   He was very aggressive and it was an
14  interrogation.  It felt like I was being interrogated
15  and I know what that's like because I've done it to
16  defendants and I felt like I was a defendant, like I
17  should have had my rights read to me.
18     Q.   What is it that he said other than what you
19  have just told me about the maintenance, maintenance
20  at the range?  Is there anything else that he said, or
21  is it just that one issue?
22     A.   There were a lot of things that he said.  At
23  this particular time I don't recall.
24     Q.   Exhibit Papili 2 is a copy of the auditor's

Page 278

1  report.  Have you read that before?
2      A.   I read it before, yes.
3      Q.   Turn to page 11, please.  It's already opened
4  as I handed it to you.
5      A.   Do you need it?
6      Q.   No.  I got my own copy.  You don't have to turn
7  because when I handed it to you page 11 was opened.
8      A.   Thank you.
9      Q.   Is there anything in the top paragraph on page
10  11 that you believe is inaccurate?
11     A.   (Reviewing document)  It wasn't that we
12  stopped.  It hadn't been done for some time.  Like I
13  explained to you the last time we were together, there
14  were three ramps that were dry, three spots that were
15  dry when I arrived there on December 1 and those were
16  the same three spots that were dry when we shut the
17  range down.
18     Q.   Is there any other statement in that paragraph
19  that you disagree with?
20     A.   The potential health-related issues, we didn't
21  know at that particular time what was going on, what
22  we were being exposed to and how much, at what rate.
23  There was a lot more to it than just -- you know, we
24  just didn't know.

Page 279

1      Q.   All right.  Anything else?
2      A.   I believe that's it.
3      Q.   In paragraph two is there anything that is not
4  accurate?
5      A.   (Reviewing document)  No.  That's correct.
6      Q.   How about the third paragraph, it starts
7  with "We found no evidence," is there anything in
8  there that is not accurate?
9      A.   (Reviewing document)  I disagree with the first
10  sentence.  The first sentence says that "The DSP
11  command was not notified that range staff would not be
12  performing duties related to the maintenance and
13  custodial functions historically accomplished by range
14  staff."
15     Q.   It says no evidence in the documentation.  Are
16  you aware of any document that tells the DSP command
17  that range staff would not be performing duties
18  related to the maintenance and custodial functions
19  historically accomplished by the range staff?
20     A.   I don't know.  There may be documentation yet
21  discovered from, like I said, Captain Warren up the
22  chain of command because I notified Captain Warren.
23     Q.   You notified Captain Warren in the meeting
24  orally, right?

24 (Pages 276 to 279)

Price, et al.                                    v.                            Chaffinch, et al.
Christopher D. Foraker, Volume 2         C.A. # 04-956-GMS              December 22, 2005

Page 280

1    A.  That's correct.
2    Q.  Anything else in that paragraph that you think
3  is inaccurate?
4    A.  I find it absolutely preposterous that within
5  42 days, within 42 shooting days between December 2003
6  and February 2004 that that range needed to be shut
7  down and was destroyed because we didn't perform
8  maintenance on the bullet trap.
9    Q.  I'm really just asking you whether those
10  sentences are accurate, not the ultimate conclusion.
11    A.  No, I don't believe that.  I don't believe that
12  the way they're inferring it it's accurate, no.
13    Q.  Do you believe there were 42 days of firearms
14  training from December 2003 until February 2004?
15    A.  There may have been.
16    Q.  Okay.  Look at the last, the fourth paragraph
17  which is a description of the --
18    A.  I'm sorry.  I'm not done with the third one.
19    Q.  Okay.  I thought you were.  Go ahead.
20    A.  No.  "In addition, the DSP Lieutenant Colonel
21  stated that he spoke to the captain in charge of the
22  range and asked him whether or not the range should be
23  closed and was told by the captain that the range did
24  not need to be closed."

Page 281

1        It doesn't say when that was asked and I
2  don't believe that Captain Warren had the authority to
3  close that range.  I believe that that's at the
4  colonel, lieutenant colonel, secretary level, not,
5  certainly not at my level and not at Captain Warren's.
6  And even Colonel MacLeish wouldn't close the range
7  even knowing when the swipe samples came in.  He
8  waited for federal industrial hygienist Art Nielson to
9  say that it was not fit for occupancy.
10        MR. NEUBERGER:  Okay.  The point is you
11  disagree with this?
12        THE WITNESS:  Yes.
13        MR. NEUBERGER:  It's now 4:35.  Are you
14  willing to close the deposition?
15        MR. ELLIS:  I would like to ask him about
16  the next paragraph and then I'm done.
17        MR. NEUBERGER:  And that's it?
18        MR. ELLIS:  Yes.
19        MR. NEUBERGER:  You mean paragraph --
20        MR. ELLIS:  The fourth paragraph down.
21        MR. NEUBERGER:  Okay.  Let's finish it.
22  Go ahead.
23  BY MR. ELLIS:
24    Q.  My question to you on that paragraph is it

Page 282

1  describes an interview with you.  The question is
2  whether there's anything in there that you think is
3  not accurate.
4        MR. NEUBERGER:  That's a yes or no
5  question.
6        THE WITNESS:  Okay.  I just need to read
7  it.
8    A.  (Reviewing document).
9        MR. NEUBERGER:  So the question is:  Is
10  that an accurate statement in that paragraph, yes or
11  no?
12        THE WITNESS:  No.
13        MR. NEUBERGER:  It's not accurate.
14  BY MR. ELLIS:
15    Q.  What's inaccurate about it?
16    A.  Are we still going forward?
17        MR. NEUBERGER:  Just answer the question.
18  Just wrap it up.
19        Are there things said in there that are
20  inaccurate?
21    A.  Yes, especially where it says, "Sergeant
22  replied that there was not a safety issue.  Therefore,
23  the scheduled shoots were not canceled."
24        My responsibility is for the safety of

Page 283

1  shooting, shooting on the range.  I have no idea what
2  we're being exposed to.  That's why they make
3  industrial hygienists to test the facility, to monitor
4  the facility, which was never done.
5        MR. NEUBERGER:  Okay.  I think you said
6  that the first day and you've said that repeatedly
7  before.  Okay.  Go ahead.
8  BY MR. ELLIS:
9    Q.  My question is they have described an interview
10  in which they quote you in a reply to their question
11  in the last sentence of that paragraph.
12        Are you telling me that you did not say
13  what the auditors attribute to you in the last
14  sentence of the fourth paragraph on page 11 of Exhibit
15  Papili 2?
16    A.  Can you please rephrase that?
17    Q.  Are you saying that you did not say what the
18  auditors have quoted you as saying at the end of the
19  fourth paragraph on page 11 of Exhibit Papili 2?
20    A.  Not the way they're referring to it, no.
21    Q.  What way did you say it?
22    A.  Just how I explained it to you.  I'm
23  responsible for the safety of shooting on the range.
24    Q.  Okay.  And did you tell them that you did not

25 (Pages 280 to 283)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A368



Page 284

1  believe that the conditions on the range were a safety
2  issue and that's why you allowed the shooting to
3  continue?
4     A.  I said that shooting was safe.  I had no idea
5  the levels that we were being exposed to and if it was
6  dangerous until swipe samples came back.
7         MR. ELLIS:  Okay.
8         MR. NEUBERGER:  Okay.  I don't have any
9  questions and we're concluding the deposition.  I
10  appreciate your consideration.  Thank you.
11        MR. ELLIS:  Okay.
12        (Deposition concluded at 4:40 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

Page 286

REPLACE THIS PAGE
WITH THE ERRATA SHEET
AFTER IT HAS BEEN
COMPLETED AND SIGNED
BY THE DEPONENT.

Page 285

1            I N D E X
2  DEPONENT:  CHRISTOPHER D. FORAKER        PAGE
3     Examination by Mr. Ellis         188
4
5         E X H I B I T S
6  DEFENDANT'S DEPOSITION EXHIBIT        MARKED
7  32  Six-page document captioned "Statement
   to Auditors Prepared by Christopher D.
   Foraker May 12, 2004"        273
8
9  ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 286
10  CERTIFICATE OF REPORTER        PAGE 287
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 287

1  State of Delaware   )
                        )
2  New Castle County  )
3
4          CERTIFICATE OF REPORTER
5
6      I, Kurt A. Fetzer, Registered Diplomate
   Reporter and Notary Public, do hereby certify that
   there came before me on Thursday, December 22, 2005,
7  the deponent herein, CHRISTOPHER D. FORAKER, who was
   duly sworn by me and thereafter examined by counsel
8  for the respective parties; that the questions asked
   of said deponent and the answers given were taken down
9  by me in Stenotype notes and thereafter transcribed by
   use of computer-aided transcription and computer
10  printer under my direction.
11      I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12  examination of said witness.
13      I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17        Kurt A. Fetzer, RDR, CRR
          Certification No. 100-RPR
18        (Expires January 31, 2008)
19
   DATED:
20
21
22
23
24

26 (Pages 284 to 287)



**WILCOX & FETZER LTD.**

In the Matter Of:

# Price, et al.
## v.
## Chaffinch, et al.

C.A. # 04-956-GMS

------------------------------------------------------------------------

Transcript of:

B. Kurt Price

October 18, 2005

------------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

B. KURT PRICE, et al.        )
                             )
     Plaintiffs,             )
                             )
        v.                   )  C.A. No. 04-956-GMS
                             )
L. AARON CHAFFINCH, et al.,  )
                             )
     Defendants.             )
                             )
                             )
                             )
CHRISTOPHER FORAKER,         )
                             )
     Plaintiff,              )
                             )
        v.                   )  C.A. No. 04-1207-GMS
                             )
L. AARON CHAFFINCH, et al.,  )
                             )
     Defendants.             )

               Deposition of B. KURT PRICE taken pursuant
to notice at the law offices of Montgomery McCracken
Walker & Rhoads, LLP, 300 Delaware Avenue, Suite 750,
Wilmington, Delaware, beginning at 9:35 a.m., on Tuesday,
October 18, 2005, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

          THOMAS S. NEUBERGER, ESQUIRE
          THE NEUBERGER FIRM, P.A.
            2 East 7th Street - Suite 302
            Wilmington, Delaware 19801
            for the Plaintiffs

               WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477

Price, et al.                                    v.                              Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS                    October 18, 2005

Page 2

1  APPEARANCES (cont'd):
2      EDWARD T. ELLIS, ESQUIRE
       ROBERT J. FITZGERALD, ESQUIRE
3      MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
       123 South Broad Street
4      Avenue of the Arts
       Philadelphia, Pennsylvania 19109
5      for the Defendants
6  ALSO PRESENT:
7      CHRISTOPHER D. FORAKER
       WAYNE H. WARREN
8
                      - - - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1              B. KURT PRICE,
2          the witness herein, having first been
3          duly sworn on oath, was examined and
4          testified as follows:
5  BY MR. ELLIS:
6      Q.   Corporal Price, in reviewing your medical
7  records, which I did before taking your deposition, I
8  noticed that there is comment in there that you
9  occasionally have problems with your memory.
10     A.   Yes.
11     Q.   Can you describe the problems to me?
12     A.   Sometimes I just can't remember things -- it's
13 ironic I can remember things that happened 20 or 30 years
14 ago, but there's some issues that I cannot recall.
15     Q.   You mean you can remember things that are
16 remote in time but not things that happened recently?
17     A.   Sometimes, yes, sir.  Not all the time.
18     Q.   Are you taking any medication today?
19     A.   Yes.  Today I'm taking Enalapril, which is for
20 blood pressure.
21     Q.   Do you know how to spell that?
22     A.   E-n-a-l-p-r-i-l, I think.  And then I'm also
23 taking -- I found out about three or four weeks ago that
24 my blood pressure has spun out of control, and I'm also

Page 4

1  on a diuretic, and the only thing I know is on the
2  bottle, the prescription bottle, I think their initials
3  for the medication are ACL, and maybe a U in there.  I
4  also take Prilosec.
5      Q.   Anything else?
6      A.   Not that I have taken today, no.
7      Q.   Anything else you've taken within the last
8  week?
9      A.   I take medication that my family doctor
10 prescribed to me for nerves, and it's l-e-p and I can't
11 remember how that name -- I looked at the bottle today
12 because I knew you were going to ask me how to spell it,
13 and I must have stage fright.  I don't recall.  I
14 apologize for that.
15     Q.   When you say it's for your nerves, I'm not sure
16 what you mean by that.
17     A.   There are times that I shake and I also have
18 muscle spasms.  That's happened probably within the last
19 six months.
20     Q.   I noticed also in your medical records that you
21 were taking a drug called Ziac for a long time?
22     A.   Yes.
23     Q.   When did you first start taking that, do you
24 remember?

Page 5

1      A.   I want to say somewhere in the mid to early
2  1990s, and that was for high normal blood pressure, and I
3  am blessed in my family history with blood pressure
4  issues.
5      Q.   I'm sorry to hear that.
6          Do you currently take Ziac?
7      A.   No.  The doctor switched me off of that
8  sometime after March of 2004.
9      Q.   Enalapril is the current blood pressure
10 medicine you're taking?
11     A.   That and then the new diuretic that I started
12 taking.
13     Q.   That's the one you couldn't remember --
14     A.   It's on the prescription bottle.  There's only
15 four letters.
16     Q.   What's Prilosec for?
17     A.   I have been diagnosed with acid reflux.  That
18 started in January of this year.
19     Q.   I'm sorry if I already asked you this, but
20 what's the name of the medication you're taking for your
21 nerves?  You said you don't remember the name.
22     A.   I apologize.  I would guess at it, but it is
23 l-e-p something.
24     Q.   That's fine.  I will look at the records and

2 (Pages 2 to 5)

Price, et al.                                         v.                              Chaffinch, et al.
B. Kurt Price                                 C.A. # 04-956-GMS                        October 18, 2005

---

Page 6

1  figure that out.
2      A.   Dr. Quiroga was the one who prescribed that for
3  me.
4      Q.   I think he's the guy whose handwriting I can't
5  read.
6                MR. ELLIS:  Off the record.
7                (Discussion off the record.)
8  BY MR. ELLIS:
9      Q.   Has the condition that you have that you
10  described as nerves and muscle spasms been diagnosed by a
11  doctor?
12     A.   Yes.
13     Q.   What are they calling it?
14     A.   Stress-induced issues.  It started -- well,
15  it's started a while ago but finally came to a head in
16  January, I think, and I may be wrong on the exact date,
17  but it was sometime in the winter.
18     Q.   Has the medication that you are taking for what
19  you described as stress-induced issues been prescribed to
20  you first since July of this year?
21     A.   It may have been.  I started with the Prilosec
22  sometime after my stress test and all the other tests.
23     Q.   You had a stress test.  Was that for your
24  heart?

---

Page 7

1      A.   Yes.
2      Q.   Did you pass the stress test?
3      A.   Yes, sir.
4      Q.   Do you have some pulmonary problem?
5      A.   When I went for my physical at Omega Medical in
6  March, they said that my pulmonary function test was not
7  where it needed to be.  I don't know what the exact
8  readings were.
9      Q.   Have you been treated for that?
10     A.   Not since then, no.
11     Q.   What is your date of birth, please?
12     A.   January the 2nd, 1963.
13     Q.   Are you married?
14     A.   Yes.
15     Q.   What's your wife's name?
16     A.   Lynn, L-y-n-n.
17     Q.   What is your wife's occupation?
18     A.   She is a physical therapist.
19     Q.   Where does she work?
20     A.   She works for the Colonial School District with
21  the special-needs children.
22     Q.   What type of work does she do with
23  special-needs children?
24     A.   She is a specialist in the transportation field

---

Page 8

1  in regards to how to properly secure handicapped children
2  in buses.  She comes up with programs for that, in
3  addition to she medically treats, she does her physical
4  therapy to these special-needs kids.
5      Q.   What range of ages?
6      A.   I know she goes to a high school, an
7  intermediate school, and an elementary school.  She has
8  three schools she goes to, in addition to the
9  transportation center for the Colonial School District.
10     Q.   You have children?
11     A.   Yes, sir.
12     Q.   How many?
13     A.   Two.
14     Q.   What are their names and ages?
15     A.   Jim, or James, he is 14, and Katie is 12, my
16  daughter.  Our daughter.
17     Q.   Where is James in school?
18     A.   He goes to school at Smyrna High School.
19     Q.   Is that in the Colonial School District?
20     A.   No, sir.  That's in Kent County.
21     Q.   Would he be a freshman?
22     A.   Yes, sir.
23     Q.   How about Katie, where does she go to school?
24     A.   She goes to school at Smyrna Middle School, in

---

Page 9

1  Smyrna, Delaware, as well.
2      Q.   Are they doing well in school?
3      A.   Yes, sir.
4      Q.   When is the last day that you reported to work
5  as a Delaware state trooper?
6      A.   It was sometime in March.
7      Q.   Why did you stop reporting to work?
8      A.   I had a meeting -- I was summoned to a meeting
9  by Captain Homiak, and, again, I can't be specific as a
10  date, but I do know it was in March, that he and
11  Captain Yeomans needed to go over my University of
12  Pennsylvania report and some other paperwork.
13     Q.   So did you go to a meeting?
14     A.   Yes, sir.
15     Q.   Who was at the meeting?
16     A.   It was Captain Homiak, who was the director of
17  training at the academy, Captain Yeomans from the HR
18  department, and we also had Sergeant Vincent Fiscella
19  from the DSTA.
20     Q.   Where was the meeting?
21     A.   It was in Captain Homiak's office in the
22  academy.
23     Q.   Can you describe what happened at the meeting?
24     A.   They told me I could no longer perform as a

---

3 (Pages 6 to 9)

A373

Price, et al.                                    v.                          Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS              October 18, 2005

Page 10

1  Delaware state trooper.
2      Q.   Did they tell you why?
3      A.   They said it was because of the amount of
4  hearing loss that I had incurred at the range.
5      Q.   Were you aware that you had a hearing loss?
6      A.   I was told on March 1st -- I knew I had some,
7  but I did not know as to what degree it was until they
8  started sending us for testing.
9      Q.   Had you been tested on your own?
10     A.   Yes.
11     Q.   For hearing loss?
12     A.   Yes.
13     Q.   How long ago were you first tested for hearing
14 loss?
15     A.   It was sometime in the late '90s I went to see
16 Dr. Cooper -- actually, I'm sorry, it was not Dr. Cooper.
17 It was Dr. Joseph Giletto at the time.
18     Q.   Why did you go see Dr. Giletto?
19     A.   I had just a real faint ring in my ear and I
20 thought that it may be related to allergies or something
21 to that effect, because I do have allergies.
22     Q.   Are you taking allergy medication today?
23     A.   No, sir.  It doesn't work.
24     Q.   So you went to see Dr. Giletto you said it was?

Page 11

1      A.   Yes, sir.
2      Q.   In the late '90s?
3      A.   Yes.
4      Q.   Did he give you a hearing test?
5      A.   Yes, he did.
6      Q.   What was the result of the hearing test?
7      A.   He said that I had a very light or very slight
8  case of high-frequency hearing loss.
9      Q.   I'm going to get a copy of a document made to
10 show you, Corporal Price, but before we get to that, the
11 meeting in March of 2005 with Captain Homiak and
12 Captain Yeomans, did they present you with a copy of a
13 report from the University of Pennsylvania?
14     A.   I believe so, yes.  This was an addendum or a
15 second report that we had received.
16     Q.   Do you recall in January receiving a longer
17 report, like maybe a seven- or eight-page report?
18     A.   Something to that effect, yes, sir.
19     Q.   And then in March you got a second report that
20 confirmed the results of the first report?
21     A.   I believe so.
22     Q.   What else was said in the meeting that you were
23 at with captains Homiak and Yeomans and
24 Sergeant Fiscella?

Page 12

1      A.   Well, when they told me what the outcome was, I
2  was shocked.  I'll be honest with you.  As far as I felt
3  pretty much that my career was over and that I was out
4  the door.  I remember Captain Yeomans telling me that I
5  had options, and one option was to start using my sick
6  time that I had accrued over the years.  He said that I
7  had earned it and that I may use it.
8      Q.   At the point that you had this meeting with
9  Homiak, Yeomans, and Fiscella, had you noticed that you
10 were having difficulty in hearing people?
11     A.   In certain settings I would have difficulty,
12 but most of the time I would not.
13     Q.   What settings would cause difficulty for you?
14     A.   Background -- noisy background.
15         MR. ELLIS:  I'm going to ask you to take a
16 look at DX 11.
17         (Defendants' Deposition Exhibit No. 11 was
18 marked for identification.)
19 BY MR. ELLIS:
20     Q.   This document has a Bates number on it,
21 FTU4376, and I'll tell you, Corporal Price, this was
22 pulled out of your medical records that were produced by
23 you in the course of this case.
24         Have you had a chance to look at this

Page 13

1  material before?  This is one page out of a number of
2  pages that you have produced.
3      A.   I believe I have looked at this.  I can't be
4  100 percent sure because there's been so much
5  documentation.  I don't know if I have looked at this
6  specifically.
7      Q.   I believe that this is Dr. Giletto's report on
8  you or at least his notes of having checked out your
9  hearing in 1997.  Do you see where it begins at the top,
10 "This state trooper presents on April 17, 1997,
11 complaining of," and then there's some copying trouble
12 there on the next line, but I believe that that word is
13 "tinnitus," t-i-n-n-i-t-u-s.
14         Do you recognize the term "tinnitus"?
15     A.   Yes.
16     Q.   That's ringing in your ear?
17     A.   Yes.
18     Q.   I'd like you to go down looks like about the
19 fourth paragraph, begins on the left-hand side with the
20 words "The left ear might be the ear to sustain more
21 damage."  Do you see that?
22     A.   Yes, sir.
23     Q.   I'm going to read the next couple sentences to
24 you.  It says, "The left ear might be the ear to sustain

4 (Pages 10 to 13)

Page 14

1  more damage.  However we are talking about abnormalities
2  here that are much greater than anticipated.  He is in
3  the 20s, 30s and 40s on the right side, and is in the
4  70s, 80s and 85s on the left side.  This is too
5  abnormal."
6          Do you recall Dr. Giletto telling you that
7  you had significant abnormalities in your hearing in
8  1997?
9     A.   I don't recall where he stated it was
10 significant to me.
11    Q.   You can see that he does here.  He says it's
12 "much greater than anticipated," right?
13    A.   That's what I read, yes.
14    Q.   As a result of your examination by Dr. Giletto,
15 did you tell anybody at the State Police that you were
16 having hearing problems?
17    A.   No, I did not.
18    Q.   Did you have your hearing tested every year as
19 part of an annual physical?
20    A.   I was supposed to, yes.
21    Q.   When you say you were supposed to, does that
22 mean that it didn't always happen?
23    A.   I know that I had not received a hearing test
24 from 2001 until March of 2004.

Page 15

1     Q.   Did you understand that you were supposed to
2  tested every year because you were in the Firearms Unit?
3     A.   No, I did not.
4     Q.   Who did your annual physical?
5     A.   I'm assuming that would have been HealthWorks,
6  Dr. Green's crew down at State Street in Dover.
7     Q.   So you have the choice of either having
8  Dr. Green do it or having your private physician do it?
9     A.   Yes.
10    Q.   And you chose to have Dr. Green do it?
11    A.   Yes.
12    Q.   Do you recall the results of your hearing test
13 in 2001?
14    A.   HealthWorks I believe stated that I had normal
15 hearing.
16    Q.   Do you believe that your hearing was
17 deteriorating between 2001 and 2005?
18    A.   I don't know.  From what my research has
19 indicated, it's a slow process.
20    Q.   I'm really trying to ask you about your
21 personal observation.  Have you noticed that it's become
22 harder to hear people or that you have more trouble
23 hearing in a crowded room, for example?
24    A.   I do notice I have a harder time hearing in a

Page 16

1  crowded room.
2     Q.   Do you believe that you would be capable of
3  performing the job of a patrol trooper given the current
4  state of your hearing?
5     A.   No, I do not.
6     Q.   Do you believe that you would be capable of
7  performing the job of a range officer, the job that you
8  had at the FTU for the past --
9     A.   According to Dr. Emmett, I believe that he
10 stated that I could.
11    Q.   Dr. Emmett stated you could?
12    A.   Yes.  He said that with the hearing protection
13 we had discussed in my meeting, he said you don't need to
14 go to hearing at a range.  That's what he verbally told
15 me.  I don't know if that's written down, but that's what
16 the man told me.
17    Q.   Aside from what Dr. Emmett told you, do you
18 believe that you would be capable of doing the job of a
19 range officer?
20    A.   I don't know that I'm qualified to make that
21 statement.
22    Q.   Going back to the March 2005 meeting you had
23 with Captain Homiak and Captain Yeomans and
24 Sergeant Fiscella, you said that Yeomans told you you

Page 17

1  should start using your sick time.
2     A.   He said that that was one of my options, yes.
3     Q.   What else happened at that meeting?
4     A.   Again, my recollection of that meeting, I was
5  stunned by what I was being told.  I had a 20-year career
6  that was now, the way I looked at it, coming to a halt,
7  and I was shocked and kind of thrown for a loop on that.
8          He said that I could maybe apply for a
9  disability pension, and that was pretty much about all
10 that I can independently recall.
11    Q.   Do you recall Sergeant Fiscella saying anything
12 at the meeting?
13    A.   Sergeant Fiscella asked of Captain Yeomans if
14 Lieutenant Colonel -- I don't know if Lieutenant Colonel
15 MacLeish was named colonel yet or not.  I can't remember
16 when that happened.  But Fiscella asked if Yeomans would
17 make comment to Colonel MacLeish to send a letter
18 supporting any type of application that was made in
19 regards to a pension.  As did he asked the same from
20 Secretary Mitchell.
21    Q.   What did Yeomans say to that?
22    A.   Yeomans said that he would ask.
23    Q.   Have you applied for a pension?
24    A.   No, sir.

5 (Pages 14 to 17)

Price, et al.                                              v.                              Chaffinch, et al.
B. Kurt Price                                    C.A. # 04-956-GMS                      October 18, 2005

Page 18

1    Q.    Anything else happen at that meeting that you
2 can remember?
3    A.    Not right offhand, no, sir.
4    Q.    I take it whatever date that was in March 2005
5 was the last day that you reported for work?
6    A.    No, sir. I think I continued to go to work
7 until sometime into March. I think. I can't recall the
8 exact date.
9    Q.    I'm sorry. I thought you said that March was
10 when that meeting occurred.
11    A.    Right. It was sometime after that meeting I do
12 believe that I started to use my sick time. I think. I
13 can't be specific. I don't remember the dates without
14 looking at documentation.
15    Q.    What have you been doing on a daily basis?
16    A.    Well, I try to stay physically active because I
17 find if I'm not, I get extremely depressed and emotional.
18 I try to work out every day either on my treadmill or my
19 bike or with my weights.
20    Q.    So you walk or run on the treadmill?
21    A.    I walk, yes, sir.
22    Q.    How much time do you spend working out in a
23 day?
24    A.    I try to spend an hour.

Page 19

1    Q.    Every day?
2    A.    I try to, yes, sir.
3    Q.    What else have you been doing?
4    A.    I have the luxury of having a friend that owns
5 a farm, and I spend a lot of time out there on this farm
6 mowing grass or cutting -- working with reeds for the
7 duck blinds and so forth.
8    Q.    Where is the farm?
9    A.    The farm is located northeast of Smyrna.
10    Q.    What else have you been doing as a matter of
11 daily activity?
12    A.    Try to --
13         MR. NEUBERGER: I'm sorry. You're asking
14 if he's out there mowing the grass every day or -- I
15 think he interpreted that as anything else you have done.
16         MR. ELLIS: Yes.
17         MR. NEUBERGER: Maybe I'm --
18         MR. ELLIS: He said that he works out
19 every day and he spent a lot of time working on a farm.
20         MR. NEUBERGER: But was your question does
21 he do that every day?
22         MR. ELLIS: No. I assume you don't work
23 on the farm every day.
24         THE WITNESS: No, sir.

Page 20

1         MR. NEUBERGER: He said weights, too.
2         MR. ELLIS: I'm sorry?
3         MR. NEUBERGER: I think he tried to give
4 you what he does daily. That was weights, the treadmill,
5 that kind of stuff. And then I think he took your
6 question as what other kinds of things have you done
7 since.
8 BY MR. ELLIS:
9    Q.    That's what I meant to ask. What other types
10 of things have you done since you have not been working?
11    A.    That's pretty much it on a daily basis.
12    Q.    Do you have any hobbies?
13    A.    Yes.
14    Q.    What?
15    A.    I love archery and I love to hunt and I love to
16 fish. I love to crab. I just like being outside in
17 general. It's healthier for you.
18    Q.    Have you been hunting since March?
19    A.    Yes.
20    Q.    What have you been hunting?
21    A.    Mourning doves.
22    Q.    Where do you go to hunt dove?
23    A.    A friend of mine owns about a 40-acre field in
24 Leipsic, Delaware, and he invites us out on occasion to

Page 21

1 go hunt there.
2    Q.    What do you hunt them with?
3    A.    A shotgun.
4    Q.    Do dove have a season?
5    A.    Yes, sir.
6    Q.    What's dove season in Delaware?
7    A.    I know it's September 1st until this year it
8 went to September 30th.
9    Q.    Supposed to be the month of September this
10 year?
11    A.    Yes, sir.
12    Q.    Have you hunted anything else?
13    A.    No, sir.
14    Q.    I understand you're going deer hunting this
15 weekend?
16    A.    I'm going to start the track to Montana this
17 weekend.
18    Q.    You're going to do what?
19    A.    I'm going to start out West, yes, sir.
20         MR. NEUBERGER: Whatever he finds.
21    Q.    How long do you plan on being in Montana?
22    A.    Our actual hunt is for five days.
23    Q.    What are you going to hunt in Montana?
24    A.    We are going to hunt deer.

6 (Pages 18 to 21)

A376

Price, et al.                                              v.                                    Chaffinch, et al.
B. Kurt Price                                    C.A. # 04-956-GMS                        October 18, 2005

Page 22

1    Q.    With what type of weapon?
2    A.    A rifle.
3    Q.    How long do you expect to take to get you to
4  Montana?
5    A.    Well, I want to spend some time with my son,
6  and we want to go by Mount Rushmore and just generally
7  sightsee.
8    Q.    You're taking your son on the trip?
9    A.    Yes, sir.
10   Q.    How does he get out of school for that?
11   A.    There's a policy with the Smyrna School
12  District that if your child's in good standing and you
13  get prior permission from all of his teachers and
14  administrators, that you can take them out of school.
15   Q.    Anybody else going with you on the trip other
16  than your son?
17   A.    No, sir.  Just us.
18   Q.    How long do you expect to be gone altogether?
19   A.    I'm going to try to take about three days going
20  out, and then coming home, I'm going to have to push
21  because I want to get him back in school.  I'm going to
22  assume it's going to be two days to come back.  So I
23  would assume that would be what, ten days?
24   Q.    Have you done any other hunting other than the

Page 23

1  dove hunting and the deer hunting that you're about to
2  do?
3    A.    Not this year, no.
4    Q.    You testified a few minutes ago that you were
5  helping a friend build duck blinds.
6    A.    Yes, sir.
7    Q.    Do you expect to hunt in those duck blinds at
8  some point this fall?
9    A.    Yes, sir.
10   Q.    When would that be?  Would that be during duck
11  season?
12   A.    Yes.
13   Q.    When's duck season in Delaware?
14   A.    I know they just had, I think, a week of it,
15  and then I think this coming weekend -- no.  I can't
16  recall.  There's two weeks coming up I think the end of
17  October until the 5th of November.  There's a season.
18  And then it goes out for a while and comes back in again
19  and then goes out and then comes back in again.  I would
20  have to look at the regulations to give you the specific
21  dates.
22   Q.    But you expect whatever those dates are that
23  you will be hunting some duck this year?
24   A.    God willing.

Page 24

1    Q.    What do you hunt the ducks with?
2    A.    Shotgun.
3    Q.    Do you wear hearing protection when you're
4  hunting with rifles or shotguns?
5    A.    Yes.
6    Q.    How long have you been doing that?
7    A.    On a steady basis now for about the last, oh --
8  since about the late '90s.  I wasn't that smart prior
9  to --
10   Q.    Prior to your consultation with Dr. Giletto?
11   A.    That's correct.
12   Q.    Do you coach any sports teams?
13   A.    I am certified through the 4H as an archery
14  instructor.  And I do that occasionally.
15   Q.    Have you done that since March of this year?
16   A.    No.  Actually last winter I gave it up.
17   Q.    Why?
18   A.    Depression.
19   Q.    Why did depression make you want to give that
20  up?
21   A.    I had no desire to do it any longer.
22   Q.    Have you given up other things because of
23  depression?
24   A.    Yes.

Page 25

1    Q.    What?
2    A.    Social events.
3    Q.    Can you give me examples of social events that
4  you have given up because of depression?
5    A.    Well, I just find it hard out around crowds
6  anymore.  I don't go out to eat near as often as what we
7  used to.
8    Q.    What is it about crowds that makes you
9  uncomfortable?
10   A.    Answering questions about what has happened
11  with the State Police.  Just you can't get away from it.
12  It's like a monster.
13   Q.    What do you mean by "it's like a monster"?
14   A.    Just every facet of my life I get questioned
15  about what's going on with the State Police, and I get
16  tired of trying to answer questions, and I find it easier
17  to stay home.
18   Q.    Can you give me an example of somebody who's
19  asked you questions about the State Police?
20   A.    A lot of people that -- even people from
21  different agencies due to the very nature that we train a
22  lot of municipal officers.  I also did two years with the
23  City of Dover Police Department prior to coming to the
24  State Police, and I know a lot of people, and I have

7 (Pages 22 to 25)

A377

Price, et al.                                          v.                                  Chaffinch, et al.
B. Kurt Price                               C.A. # 04-956-GMS                        October 18, 2005

Page 26

1    lived in the area all my life basically since I was two
2    in the Kent County, Delaware, area, and I know a lot of
3    folks, and every time I go somewhere, somebody asks how
4    you doing, this, that, and the other, and it gets very,
5    very old.
6        Q.    When's the last time that you had a
7    conversation with somebody where they asked you about the
8    State Police?
9        A.    I can't give you a specific date, but it was
10   last week sometime.
11       Q.    Who was it that asked you about it?
12       A.    It may have been somebody -- oh goodness.    At
13   the bank in Smyrna, at the PNC Bank in Smyrna.
14       Q.    So you went to the bank in Smyrna?
15       A.    Yes.
16       Q.    Who was it that you talked to that asked you
17   about the State Police?
18       A.    I believe -- I don't remember her last name,
19   but it's Marcie.    I don't know her last name.
20       Q.    What's her job?
21       A.    I'm sorry?
22       Q.    What is her job?
23       A.    She works with the Smyrna School District, I
24   think.

Page 27

1        Q.    This is just somebody you encountered in the
2    bank?
3        A.    Yes.
4        Q.    What did she say to you?
5        A.    She just asked how things were going and how I
6    was doing, and, again, you just get hammered with that
7    every time you go anywhere.
8        Q.    What did you say when she asked you how things
9    were going?
10       A.    I told her that I was just awful down.
11       Q.    Was that the end of the conversation you had
12   with her?
13       A.    Yes, sir.    I'm terrible on last names.    I will
14   tell you that, too.
15       Q.    That's fine.    Not a problem.
16              So she said to you how is it going, and
17   what else did she say to you?
18       A.    I don't recall the specifics of it because it's
19   just -- I just kind of ignore anything after that, to be
20   honest with you.    As soon as they start asking me, I just
21   ignore it.    Attempt to.
22       Q.    If you meet a friend and the friend says how
23   are you doing, you interpret that as a question about the
24   State Police?

Page 28

1        A.    Yes.
2        Q.    Why don't you review for me your work history
3    with the State Police beginning with when you started at
4    the academy.
5        A.    I actually went through the Delaware State
6    Police Academy in September of 1983 with the City of
7    Dover Police Department as a municipal officer.    I
8    completed two years with the City of Dover, and I applied
9    with the Delaware State Police sometime in March or early
10   spring of 1985, and I was selected -- September 3rd,
11   1985, I was assigned to the 51st Delaware State Police
12   recruit class.
13       Q.    So did you go through another training period
14   at the academy?
15       A.    No, I did not at that time because the training
16   that we received when I initially went through the
17   academy was the exact same thing.    I had some firearms
18   familiarization training, I believe two weeks of accident
19   investigation and report writing, and then we went to
20   field training.
21       Q.    What was your first assignment?
22       A.    I was assigned to Troop 5 in Bridgeville as a
23   recruit on the FTO Program, the Field Training Officer
24   Program.

Page 29

1        Q.    Where did you go next?
2        A.    I went to Troop 3, which is located in Camden,
3    Delaware, Kent County.
4        Q.    What was your assignment there?
5        A.    Patrol.
6        Q.    How long did you stay there?
7        A.    I stayed there until August of 1989.
8        Q.    What happened then?
9        A.    I went to the Special Investigations Unit, and
10   that year, April of that year, I was also selected to be
11   on the SORT team.
12       Q.    April of '89?
13       A.    Yes, sir.
14       Q.    While you were on patrol in Troop 3 you joined
15   the SORT team?
16       A.    Yes.
17       Q.    How long did you stay with the Special
18   Investigations Unit?
19       A.    Not very long.    Quite honestly, I did not like
20   the work.
21       Q.    When you say "not very long," are you speaking
22   less than a year?
23       A.    Yes, sir.
24       Q.    Why didn't you like the work?

8 (Pages 26 to 29)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Price, et al.                                           v.                              Chaffinch, et al.
B. Kurt Price                              C.A. # 04-956-GMS                           October 18, 2005

Page 30

1    A.    I didn't like looking like a bum, quite
2    honestly.
3    Q.    This is a job where you had to go undercover?
4    A.    Yes, sir, I was undercover, that's correct.
5    And I was newly married at the time and we did not have a
6    set schedule, and that was hard for the home.
7    Q.    What's your next job?
8    A.    I went back to patrol at Troop 3. I believe
9    that was sometime in the late spring -- I'm going to
10   say -- the end of March, first part of April of 1990 I
11   went back to patrol at Troop 3.
12   Q.    How long did you stay there?
13   A.    I stayed in the patrol field at Troop 3 until
14   December 16th, 1996.
15   Q.    That's when you went to the Firearms Training
16   Unit?
17   A.    Right. At that time it was called the
18   ordinance section.
19   Q.    You remained in that for the rest of your time
20   at the State Police?
21   A.    I believe so.
22   Q.    Prior to being assigned there on a permanent
23   basis, were you what you call a guest instructor?
24   A.    Yes, sir. In January of 1991 I became

Page 31

1    certified as a firearms instructor with the division.
2    Q.    When you started at the Firearms Training Unit,
3    who was the person in charge of the unit?
4    A.    Lieutenant William Bryson.
5    Q.    Who was his successor?
6    A.    Sergeant Fitzpatrick, Brian Fitzpatrick.
7    Q.    After Fitzpatrick, does that bring us to
8    Al Parton?
9    A.    Yes.
10   Q.    When did Fitzpatrick replace Bryson, do you
11   remember?
12   A.    I want to say it was sometime in November of
13   1998.
14   Q.    Was that about the time that the new range
15   opened?
16   A.    We actually opened -- started shooting
17   September, the end of September of 1998.
18   Q.    When you started at the range, who were the
19   other instructors?
20   A.    There was, like I said -- already mentioned,
21   there was Bryson, Fitzpatrick, there was Matt Engler,
22   myself, Bill Rhoades was also -- Sergeant William Rhoades
23   was assigned to -- I believe he was assigned at ordinance
24   section, but his actual job function was the NCOIC of

Page 32

1    SORT, and he would help us out occasionally.
2    Q.    I take it when Bryson left, Fitzpatrick took
3    his place?
4    A.    Yes, sir.
5    Q.    Do you remember who moved into the unit to
6    replace Fitzpatrick when he was promoted?
7    A.    I don't believe anybody did. Again, that's a
8    long time ago and a lot of water under the bridge.
9    Q.    When did Eddie Cathell first come to the
10   Firearms Training Unit, do you remember?
11   A.    I believe it was September, and, again, this is
12   a guess. It would have been sometime in September of '98
13   I do believe. I'm not 100 percent on that.
14   Q.    Do you remember who he replaced?
15   A.    He replaced Sergeant Matt Engler.
16   Q.    When did Rhoades leave, do you remember?
17   A.    I don't know when he retired, but he pretty
18   much ran the SORT team, and we saw him occasionally. He
19   may have helped us out three or four times a year. The
20   rest of the time he was extremely busy with our Special
21   Operations team.
22   Q.    Do you know if anybody replaced him?
23   A.    I think Sergeant Parton took his spot.
24   Q.    Do you remember the names of any other

Page 33

1    corporals who have served in the Firearms Training Unit
2    while you were there?
3    A.    Corporal Peachey, Corporal Foraker until he got
4    promoted to sergeant.
5    Q.    Do you know who Corporal Foraker replaced when
6    he first came into the Firearms Training Unit?
7    A.    No, I do not.
8    Q.    Anybody else you can think of?
9    A.    I believe that's it.
10   Q.    How about James Warwick, do you know who he
11   replaced?
12   A.    Yes, sir. I think they may have brought him in
13   to replace Peachey. I apologize for that.
14   Q.    That's okay.
15        I would like for you to describe to me,
16   please, your duties as a corporal in the Firearms
17   Training Unit.
18   A.    To train recruits of all different agencies and
19   background, and to conduct and service training for the
20   division of State Police, and, of course, with that was
21   the all-encumbering safety also goes with that. That's
22   the primary concern, we're dealing with a firearm.
23   Q.    Anything else?
24   A.    We would -- I think it was Sergeant Parton gave

9 (Pages 30 to 33)

Price, et al.                                         v.                              Chaffinch, et al.
B. Kurt Price                            C.A. # 04-956-GMS                        October 18, 2005

Page 34

1  me the task of revising recruit lesson plans and also
2  performing user maintenance, what he described as user
3  maintenance on the Savage bullet trap.  What that
4  entailed, I don't know.  I was never instructed as to
5  what proper maintenance would be.  I received absolutely
6  no training at all.
7      Q.   I'll get to that in a minute.
8           Are there any other tasks that you believe
9  were part of your assignment as an instructor in the
10  Firearms Training Unit?
11     A.   We conducted armors breakdown on our issued
12  handguns and shotguns.  That was done on an annual basis.
13     Q.   Does that mean that you had to break down every
14  one of the guns that was assigned to the Delaware state
15  trooper?
16     A.   Yes, sir.
17     Q.   Did you do that in conjunction with the other
18  instructors?
19     A.   Yes.  And we also provided interactive training
20  or simmunitions training, whatever you want to call it.
21  That was scenario-based realistic training.
22     Q.   That's training that's done using --
23     A.   A marking cartridge.  Similar to paintball,
24  yes, sir.

Page 35

1      Q.   Can you think of any other duties that you had
2  as part of the Firearms Training Unit?
3      A.   I may, but right now that's all I've got.
4      Q.   That's fine.
5           Now, you used the phrase "user
6  maintenance" on the Savage bullet trap --
7      A.   Yes.
8      Q.   -- I think in your prior testimony.  And you
9  said something about Sergeant Parton being the person who
10  assigned you to do that.
11     A.   Yes.
12     Q.   When did that occur?  When did he assign you to
13  do that?
14     A.   It was shortly after -- sometime after he took
15  command of the range.  I can't -- if I gave you a date,
16  I'd be guessing, and I don't want to do that.
17     Q.   Can I back up just a second here?  When
18  Lieutenant Bryson was in charge of the Firearms Training
19  Unit, was Fitzpatrick a sergeant there?
20     A.   Yes.
21     Q.   When Bryson left, they didn't replace him with
22  a lieutenant, right?
23     A.   No, they did not.
24     Q.   So Fitzpatrick became the person in charge of

Page 36

1  the unit?
2      A.   Yes.
3      Q.   Prior to the opening of the new facility in
4  1998, were you involved in the construction of the
5  facility?
6      A.   Yes.
7      Q.   What did you do as part of the construction?
8      A.   We assembled the bullet trap.
9      Q.   When you say "assembled the bullet trap,"
10  physically what does that mean?  What did it look like
11  when it got there, and what did you do to assemble it?
12     A.   The trap arrived on a flatbed trailer, I
13  believe, and it was in pieces, so we had to bolt it
14  together.
15     Q.   How big were the pieces?
16     A.   Probably as big as this table.  So I guess that
17  would be 14, 16 feet.  I don't know.  But it was big.
18     Q.   When you say as big as the table, you're
19  talking about as long as the table which I'm guessing is
20  about 14 feet long?
21     A.   Yes, sir.
22     Q.   Is it as wide as the table, as well?
23     A.   Just about, yes, sir.
24     Q.   You and I are sitting about what, eight feet

Page 37

1  apart?
2      A.   I would assume so.
3           MR. NEUBERGER:  These are usually two
4  feet, the ceiling tiles.  They're a good way of measuring
5  things.
6      Q.   When you say the pieces had to be bolted
7  together, is that so that -- in other words, the bullet
8  trap comes in sections that were more or less round?
9      A.   Yes.
10     Q.   And they had to be bolted together so that you
11  end up with a tube that runs what, 140 feet from one end
12  to the other?
13     A.   Something like that, yes, sir.  I know it was
14  over 100 feet.
15     Q.   What tasks did you perform in the assembly of
16  the bullet trap?
17     A.   One specific task that I remember, when they
18  shipped the conveyor belt, it was all together, but it
19  was upside-down.  So we had to flip section by section of
20  that conveyor belt.  And that like to kill me.
21     Q.   Why is that?
22     A.   It was heavy.  Yes, sir.
23     Q.   When you said it was shipped in one piece, does
24  that mean that the entire length of the conveyor belt was

10 (Pages 34 to 37)

Price, et al.                                      v.                              Chaffinch, et al.
B. Kurt Price                              C.A. # 04-956-GMS                    October 18, 2005

Page 38

1  all hooked together in one piece?
2      A.    I think there was a break in one end so that we
3  could feed it through the system over -- again, I don't
4  know.  This was all, hey, do this.  The only thing -- the
5  only background that I had in construction was building
6  deer stands and duck blinds.  I had no idea how to do all
7  this stuff.  But Savage had one man that came down and
8  kind of told us what to do to put it together.
9      Q.    You got it together?
10     A.    Yes.
11     Q.    What was the conveyor belt made of when it was
12  originally installed?
13     A.    It was like a steel chain in that it had links
14  built into it, but it was -- there was a metal piece that
15  ran -- I believe this is horizontal.  It ran horizontal,
16  but it could turn and move.  It was almost built like a
17  centipede.
18     Q.    But like a tank track?
19     A.    Yes, sir.  That would be a good way to describe
20  it.
21     Q.    But it was made of metal?
22     A.    Yes.
23     Q.    Were you one of the people who fed the belt
24  into the system?

Page 39

1      A.    I believe so.
2      Q.    When Bryson left, Fitzpatrick took over,
3  correct?
4      A.    Yes.
5      Q.    Was Parton a sergeant or a corporal then?
6      A.    I'm assuming he would have been a corporal
7  then.
8      Q.    So how long after the range opened did Parton
9  give you instructions to do maintenance on the bullet
10  trap?
11     A.    I never received instructions.  I was given a
12  directive in my evaluation that that was part of my
13  duties.
14     Q.    When was that?  How long after the range
15  opened?
16     A.    I'd have to look at my evaluation to give you a
17  specific date.
18     Q.    Was it within the first year, do you recall?
19     A.    That would be a guess of mine.  I don't recall
20  when Fitzpatrick got moved out and Parton got promoted.
21     Q.    Prior to Parton giving you this instruction, do
22  you know whether anybody did maintenance on the bullet
23  trap?
24     A.    I don't recall.

Page 40

1      Q.    When you got this instruction or, as you called
2  it, directive to do maintenance, did you ask Al Parton
3  what you were supposed to do?
4      A.    Yes.
5      Q.    What did he say to you?
6      A.    He said to keep the screens that are on the
7  pumps clean.
8      Q.    Anything else?
9      A.    That was pretty much it.
10     Q.    Did you have any part in installing the pumps
11  when the system was assembled?
12     A.    I don't recall specifically installing the
13  pumps where I went and put actual -- I remember watching
14  it being done, but I don't recall actually getting a hand
15  on it.
16     Q.    Do you remember how many pumps there were in
17  the system?
18     A.    Somewhere around maybe 20, because I know there
19  was one piece that had to be modified for the thing to
20  fit in the building.
21     Q.    What do you mean --
22     A.    A piece of the bullet trap itself.
23     Q.    The bullet trap was too big?
24     A.    Yes.  And there was a piece that had to be

Page 41

1  specifically made for our range by Savage.
2      Q.    Did you as part of your duties at the range
3  begin to unclog the pumps?
4      A.    Yes.
5      Q.    Do you remember what year you first started
6  doing that?
7      A.    That would be a guess.
8      Q.    Did you do any other work on the water system
9  for the Savage bullet trap other than unclogging the
10  pumps?
11     A.    If I noticed that the trap was low in water, we
12  would stick a garden hose in it, in the trough itself,
13  and turn the water on and let it fill up again.
14     Q.    Did you do anything else?
15     A.    I think one time I operated the forklift while
16  Savage was there to hold a 55-gallon drum of oil up while
17  they put oil into the water.
18     Q.    Did you clean shotgun wadding out of the water?
19     A.    Yes.
20     Q.    What did you use to do that?
21     A.    We had a couple things.  We had a strainer at
22  one time and a small I called a guppy net, just
23  something that you would use in an aquarium setting.
24     Q.    Basically to strain the water through to keep

11 (Pages 38 to 41)

A381

Page 42

1  the shotgun wadding in the net?
2      A.   Yes.
3      Q.   Did you do anything with the filters?
4      A.   We used a garden hose to blow those out, and
5  sometimes we would use either a nylon or a bronze brush
6  to get the -- I don't know what it was, but it would
7  collect on there and get pretty hard and we would use
8  that to knock it out.
9      Q.   Just so the record's clear as to what you're
10 doing here, it's my understanding that there is a pan or
11 a tank of water that sits below the conveyor belt in the
12 bullet trap.  Is that right?
13     A.   Yes.
14     Q.   And the pump that we have been talking about is
15 something that pumps water out of the tank and into the
16 sprayer heads that are actually on the front of the
17 bullet trap.  Is that right?
18     A.   Yes.
19     Q.   And the sprayer heads release water into the
20 front of the bullet trap, right?
21     A.   That's correct.
22     Q.   And at least in theory, the water is supposed
23 to wash the residue and bullets down into the conveyor
24 system.  Do I have that right?

Page 43

1      A.   What the water is designed for on that lower
2  ramp, as it was explained to me when I first started
3  there, was to hydroplane the bullet as it impacted the
4  lower ramp so that when it went into the deceleration
5  chamber which is located on the back of the trap, that's
6  where it would spin, lose its energy and then drop onto
7  the conveyor belt.
8      Q.   When you talk about the filters, the filters
9  are somewhere between the pump and the sprayer nozzle,
10 right?
11     A.   Yes.
12     Q.   And what you would have to do is to stop the
13 pump and then unscrew the cap and pull the filter out and
14 clean it?
15     A.   Yes.
16     Q.   You were at the range when the State Police
17 changed from lead bullets to frangible ammunition,
18 weren't you?
19     A.   Yes, sir.
20     Q.   Were you involved in the decision-making
21 process at all?
22     A.   No, sir.
23     Q.   Did the maintenance that you had to do behind
24 the bullet trap on the water system change after the

Page 44

1  State Police changed from lead to frangible ammunition?
2      A.   We had to clean the filters out more and the
3  pumps.  The pumps would go down quite often.
4      Q.   More often than when you shot bullets?
5      A.   Yes.  Leaded ammo.
6      Q.   I'm sorry.  Leaded ammo.
7           Are you able to give me an estimate as to
8  how long a pump would last when you were shooting leaded
9  ammo prior to the year 2000?
10     A.   It would all be a guess.  You want me to guess
11 at it?
12     Q.   I don't want you to guess.  If you have any
13 recollection of how frequently you had to replace a pump,
14 I would appreciate that.
15     A.   I can't recall exactly, and I would hate to
16 give you an answer that would be incorrect.
17     Q.   That's fine.  I don't want you to guess.
18          Would you say that the pumps had to be
19 replaced more frequently once you started shooting
20 frangible?
21     A.   Yes.
22     Q.   And the filters needed to be cleaned more
23 often?
24     A.   Yes.

Page 45

1      Q.   When the range first opened, were there
2  ventilation problems?
3      A.   Yes.
4      Q.   What did you observe that you believe to be a
5  ventilation problem?
6      A.   I was present when they conducted the only test
7  that I ever saw, was just a simple smoke test where they
8  had a smoke-creating machine, and I think it got to a
9  point where they were doing that so often, that I think
10 either the State Police or Facilities Management
11 purchased one of these machines that was one that they
12 use in theatrical settings to create a fog.
13          And they ran smoke tests, plus when you
14 were on the line, sometimes there would be no -- you
15 could not feel any air blowing out there, and you could
16 see the smoke -- as a weapon would discharge, you could
17 see the smoke billowing up and actually moving to the
18 rear of the range.
19     Q.   When you say "sometimes," what does that mean?
20 Does it mean it didn't happen all the time?
21     A.   It happened a lot more than it did not happen.
22 To give you an exact estimate, I would -- again, that
23 would be a guess.  But being out there every day for as
24 long as I was, we had more problems with it than when it

12 (Pages 42 to 45)

Price, et al.                                                    v.                                              Chaffinch, et al.
B. Kurt Price                                         C.A. # 04-956-GMS                              October 18, 2005

Page 46

1   would work.
2       Q.   Let me go back a second to something you said a
3   few minutes ago.  You said you were there when they did a
4   test.
5       A.   Yes.
6       Q.   Was this when the range was first being opened
7   in September 1998?
8       A.   No, sir.  This was after our blood lead levels
9   started to elevate.
10      Q.   What year was that?
11      A.   That would have been somewhere between --
12  again, I can't be specific, but it would be somewhere
13  between October and December of '98, I believe, our lead
14  levels began to climb.  Plus we were -- just little
15  things.  You would blow black soot out of your nose back
16  then.
17      Q.   Were changes made to the range after
18  November 1998?
19      A.   Sometime in that area I know they brought in an
20  environmental company that conducted some air testing on
21  instructors, and through various parties, I believe it
22  was Batta, B-a-t-t-a, and they found that the levels
23  exceeded the OSHA limits, and I think they rebalanced the
24  system.  I don't know what that entailed, but --

Page 47

1       Q.   Was there a point when more ducts were put in
2   or baffles were put into the shooting area?
3       A.   I don't recall the baffling.  The only issue in
4   regards to the baffling, I remember when they had to
5   remove some of the baffling on the roof due to the roof
6   beginning to sag.
7       Q.   Do you remember when that occurred?
8       A.   I think that was done prior to again, but again
9   that is a guess.
10      Q.   Do you remember changes being made to the HVAC
11  system after it opened?
12      A.   There were so many changes made, I can't give
13  you an exact date, but I do recall people coming in and
14  working on the system.
15      Q.   When you say there were a lot of changes made,
16  who is it that's making the changes?
17      A.   I believe that would have been either Trane or
18  Facilities Management or a combination between the two.
19      Q.   So Facilities Management being a part of the
20  Delaware state government?
21      A.   I believe so.
22      Q.   And then Trane is an outside contractor that's
23  brought in to deal with the air-handling system?
24      A.   Yes.  It was their system that they put on the

Page 48

1   roof.
2       Q.   How did you learn that the State Police would
3   start shooting frangible ammunition instead of lead
4   ammunition at the range?
5       A.   I believe we had attempted to use an ammunition
6   that was called Clean Fire, but we found that our lead
7   levels were still going up even with the Clean Fire, and
8   it was presented at the time, as I can recall, and again,
9   I was not in that loop, but I do remember hearing
10  discussion that it came out that frangible was nontoxic.
11      Q.   Do you remember who told you that you were
12  going to start using frangible?
13      A.   I believe that started when Sergeant Parton was
14  there.  There may have been some discussion when
15  Fitzpatrick was there.  But again -- but I know that's
16  about in the time period that we switched.
17      Q.   I want to focus on the time period after you
18  started to use frangible ammunition.  Were there other
19  instructors at the range who did maintenance of the water
20  system in the bullet trap?
21      A.   I think we all shared some responsibility there
22  as far as who would go back and check on -- we would talk
23  just in the office setting, hey, did anybody check, no.
24  Then one guy would get up and -- again, that was my

Page 49

1   recollection of it.  It varied.
2       Q.   Can you tell me other people that you know who
3   did work on the water system behind the bullet trap?
4       A.   I know Corporal Wayne Warren did,
5   Sergeant Foraker.
6       Q.   Are we talking about Sergeant Foraker when he's
7   a corporal or a sergeant?
8       A.   Probably both.
9       Q.   Do you remember actually seeing him do the work
10  when he was a sergeant?
11      A.   I know he would be back there.  I can't recall
12  specifics, but I know we would all go back and look and
13  inspect as best that we could.  You have to understand,
14  we had absolutely no training to know what we were
15  looking at.  Basically just user-type issues as far as
16  well, that looks clogged.  You could see when the screens
17  would clog.
18      Q.   You could see that?
19      A.   Yes, sir.
20      Q.   You didn't need training to be able to tell it
21  was clogged?
22      A.   No.
23      Q.   Who else did you see doing work on the water
24  system of the bullet trap?

13 (Pages 46 to 49)

Wilcox & Fetzer, Ltd.                    Professional Court Reporters                    (302)655-0477

A383

Price, et al.                                           v.                                    Chaffinch, et al.
B. Kurt Price                              C.A. # 04-956-GMS                        October 18, 2005

Page 50

1    A.   I would hate to even guess at that.  I don't
2  know -- with all the personnel changes in and out of
3  there, it's hard to say.
4    Q.   How about Peachey?
5    A.   I cannot say.
6    Q.   How about Cathell?
7    A.   That would be a guess.  I don't want to do
8  that.
9    Q.   So the only people you remember for sure doing
10  work back there were Warren and Foraker?
11    A.   And myself.
12    Q.   And yourself, sure.
13    A.   Yes, sir.  And Sergeant Ashley in his tenure
14  would go back there, as well, and work on the bullet
15  trap.
16    Q.   Did Al Parton ever work on the bullet trap?
17    A.   I don't recall.
18    Q.   And how about Fitzpatrick?
19    A.   I don't recall.  That was a long time ago.
20    Q.   Did you in the course of the work you did on
21  the bullet trap ever do any cleaning of the belt?  I'm
22  talking about the first belt that was installed.
23    A.   Lieutenant Bryson, when we first turned the
24  belt on, he gave me a wire brush and I stood there as the

Page 51

1  belt turned to knock some of the wood chips and debris
2  off of it.
3    Q.   Did you continue to use a wire brush on it
4  during the following years that you worked at the range?
5    A.   As I can recall, the leaded ammo was no problem
6  with it.  After the frangible ammo hit it, it pretty much
7  destroyed that belt.
8    Q.   You were given the wire brush at the point you
9  were using leaded ammunition?
10    A.   Yes.  Prior to us even opening the facility.
11  Just to knock the debris off.
12    Q.   Did you continue to use the wire brush after
13  the facility opened?
14    A.   No.
15    Q.   So you didn't do it at all once you actually
16  started shooting there?
17    A.   No.
18    Q.   During the time frangible ammunition was being
19  shot, did you do anything with the belt itself?
20    A.   No, sir.  I was not qualified to do that.
21    Q.   I'm just asking whether you did it.
22    A.   Not that I can recall, no.
23    Q.   What did you observe Sergeant Ashley doing with
24  the water system behind the bullet trap?

Page 52

1    A.   He would help us change pumps as they would go
2  down.
3    Q.   Anything else?
4    A.   I remember he had a torch back there and he was
5  actually cutting holes with the torch in the bullet trap.
6    Q.   Did he ever tell you why he was cutting the
7  holes?
8    A.   Something in regards -- again, the gist of it,
9  as I can recall, was to help increase the water flow.
10    Q.   Where on the bullet trap was the hole being
11  cut?
12    A.   It was being cut just above the trough where
13  the drag belt and the chain had once been.  If you have
14  the deceleration chamber, underneath the deceleration
15  chamber there is -- that's where the belt would go down.
16  As I understood it, it would go down this way, so to
17  speak, and then come back up through the trough.  He cut
18  underneath the deceleration chamber.
19    Q.   You mean he was cutting into the bottom of the
20  deceleration chamber?
21    A.   No, sir.
22          MR. NEUBERGER:  Off the record.
23          (Discussion off the record.)
24          MR. ELLIS:  Why don't we give a number

Page 53

1  there.
2          (Defendants' Deposition Exhibit No. 12 was
3  marked for identification.)
4  BY MR. ELLIS:
5    Q.   I have put a picture in front of you,
6  Corporal Price.  Am I correct that we are looking at the
7  back of the bullet trap?
8    A.   Yes, sir.
9    Q.   I take it down at the bottom of the structure
10  that appears on the right side of the picture is the tank
11  that we have been talking about that holds the water?
12    A.   Yes, sir.  The very bottom?
13    Q.   Yes.
14    A.   Yes.
15    Q.   And the hoses that we see running out of the
16  tank and up to the top of the bullet trap are the hoses
17  that carry the water to the sprayer nozzle?
18    A.   Yes.
19    Q.   And those things that look like little cans or
20  jars that are partway up the hose from the tank to the
21  sprayer nozzle, is that where the filter is?
22    A.   Yes, sir.
23    Q.   Can you describe to me where Sergeant Ashley
24  was cutting the holes with the torch?

14 (Pages 50 to 53)

Wilcox & Fetzer, Ltd.                     Professional Court Reporters                     (302)655-0477

Price, et al.                                    v.                              Chaffinch, et al.
B. Kurt Price                         C.A. # 04-956-GMS                    October 18, 2005

Page 54

1    A.    If you see -- the easiest way for me to
2  describe it, if you see the first screen or pump,
3  whatever you want to call it that houses the pump from
4  the right, go straight down and you will see a continual
5  line of what looks to be steel.
6    Q.    Yes.
7    A.    You will note that there are some holes that
8  are located in that trough.
9    Q.    Sort of round holes that look like they were
10  cut by a torch?
11    A.    Yes, sir.
12    Q.    That's the hole that was cut by the torch?
13    A.    That's what I'm talking about, that is correct.
14    Q.    What was your understanding as to what was
15  supposed to flow through those holes?
16    A.    As I understood it, water. Water, oil,
17  solution, whatever was in the trough.
18    Q.    When did Sergeant Ashley cut those holes, do
19  you remember?
20    A.    No, sir. That would be --
21    Q.    Obviously between April 2002 and December 2003?
22    A.    Yes, sir. Sometime in that frame.
23    Q.    You don't remember any more specifically than
24  that?

Page 55

1    A.    No. I wish I could, but I can't.
2    Q.    You want to take a break for a minute?
3         MR. NEUBERGER: Yes. It's time.
4         (A recess was taken.)
5  BY MR. ELLIS:
6    Q.    During the course of the time that you worked
7  at the firing range in Smyrna, do you recall the range
8  being shut down to do environmental remediation?
9    A.    Yes.
10    Q.    How many times?
11    A.    I can recall specifically twice, and there may
12  have been more, but I do remember two times that we shut
13  down.
14    Q.    Do you remember when the first one was?
15    A.    It was either -- I want to say it was sometime
16  early in -- I think it was the turn of the century, 2000
17  area, somewhere in there.
18    Q.    Do you remember what was done?
19    A.    Back behind the bullet trap, this area that you
20  see in this picture, if I can reference that, is that all
21  right?
22    Q.    Sure. That's Exhibit 12.
23    A.    That area had to be environmentally cleaned in
24  addition to -- I do know that one for sure. There's

Page 56

1  another time that they did -- they repeated the same
2  cleanup, but they also did the front deflectors at the
3  target system itself in the lights there on the front
4  side of the bullet trap. I don't remember if they did
5  that one the first time or if that was done on the second
6  time.
7    Q.    Was there any environmental cleanup done in the
8  office area during the time you were assigned there?
9    A.    Not that I can recall.
10    Q.    I'd like you to describe for me what effect the
11  change in the ammunition had on the operation of the
12  bullet trap. Your observation.
13    A.    Just a layperson observation was that it
14  created a lot more problems with the bullet trap. The
15  initial conveyor, it seized -- that material seized that
16  conveyor -- or that belt up, from what I was told and
17  understand it. The pumps failed more often or had to be
18  unclogged. It just created an absolute -- trying to
19  think of the word. It made the maintenance of the bullet
20  trap impossible to try to stay up on.
21    Q.    My understanding is that the State Police went
22  to frangible ammunition either late in 2000 or early in
23  2001. Does that correspond with your recollection?
24    A.    I know it was sometime in that time frame. I

Page 57

1  can't tell you the exact date.
2    Q.    You've testified that the change to frangible
3  caused the pumps to fail more often.
4    A.    Yes.
5    Q.    It caused the belt to seize up?
6    A.    Right.
7    Q.    Did you ever actually see the belt seize up?
8    A.    I know it was coated with that material and
9  would not turn. So I'm assuming that would have been the
10  seize, as I understand things.
11    Q.    Did it cause the sprayer heads to clog?
12    A.    Yes.
13    Q.    You've testified that it made it, in your
14  words, impossible to maintain.
15    A.    A lot harder, yes, sir.
16    Q.    If that's the case, how was it that you were
17  able to keep the equipment running for almost three years
18  after you switched over to frangible ammunition?
19    A.    That would be a guess at my point. We just
20  tried to keep working on it as best we could with no
21  training at all. We did the best we could with it.
22         And at some point in time, I can't
23  remember under whose -- which supervisor's tenure, they
24  finally got a contract, as I understand it, with Savage

15 (Pages 54 to 57)

Price, et al.                                  v.                          Chaffinch, et al.
B. Kurt Price                        C.A. # 04-956-GMS                    October 18, 2005

Page 58

1  Arms to come once a year, usually in the August or
2  September area, to perform maintenance on the trap.  I
3  can't remember which sergeant it was because there was --
4  I think in almost as many years we had that many
5  supervisory changes at the range.  But it was somewhere
6  after we had gone to frangible ammo that we adopted a
7  contract, as I was told, with Savage Arms to come once a
8  year.
9      Q.    When the Savage Arms people came, did somebody
10  from Mayfran Corporation come, as well?
11     A.    Not all the time.  No.  In fact, I can only
12  remember those people being there the last time.  That
13  would have been when Sergeant Ashley was there.
14     Q.    Did the Savage people, the people from Savage
15  Arms, actually do work on the belt system?
16     A.    I don't know.  That would have -- you have to
17  look at the records on that.  I do not know.
18     Q.    What did you see the Savage Arms personnel do
19  when they came to the range?
20     A.    I observed them removing the debris -- can I
21  make reflection to the picture?
22     Q.    Certainly.  Exhibit 12.
23     A.    Yes, sir.  The trough where all the water was
24  housed, they would use shovels and so forth to clean the

Page 59

1  debris from there, and I remember them on the front side
2  of the bullet trap, there's a trough on the front side of
3  the lower impact ramp, if you will, where the water comes
4  out of the sprayer heads and cascades down, that impact
5  ramp there, there was a trough that was located on the
6  front of that and they would clean that trough.
7      Q.    Anything else that you saw the Savage Arms
8  employees do when they came to the range?
9      A.    No, sir.  Not that I have any independent
10  memory of.
11     Q.    Do you know whether they replaced the pumps?
12     A.    Not to my recollection.
13     Q.    How about the filters?
14     A.    No, sir.
15     Q.    Did they do anything with the nozzles, the
16  sprayer nozzles?
17     A.    I don't know.
18     Q.    What is the effect on the shooting side of the
19  range if the sprayer nozzle doesn't send any water out?
20     A.    The effect as far as the ramp itself?
21     Q.    Right.
22     A.    That would dry.  That would go dry.
23     Q.    If you're shooting dry and you're shooting lead
24  ammunition, what effect does that have on the lead

Page 60

1  bullets when it comes into the bullet trap?
2      A.    The effects if it came into -- I'm assuming it
3  would go up the impact ramp as it would have anyway,
4  would not hydroplane possibly.  I don't know.  I'm not
5  trained in that.  That's just a guess.
6      Q.    What effect does shooting dry have if you're
7  using frangible ammunition?
8      A.    I would assume the bullet would degenerate.
9      Q.    When you shoot frangible ammunition at the
10  bullet trap and it impacts, can you see it disintegrate?
11     A.    No.
12     Q.    When you shoot it at a dry bullet trap, can you
13  see clouds of dust from the ammunition striking the
14  bullet trap?
15     A.    I suppose you could.  I know at times, if that
16  were the case, we would move the shooters away from the
17  dry ramp.
18     Q.    So that they would be shooting at a wet part of
19  the trap?
20     A.    Yes, sir.  I can tell you from experience that
21  I never had to and nor did I know how to take the sprayer
22  heads off, but usually with the dry portion of the ramp,
23  it was created by the --
24     Q.    By the filter being clogged?

Page 61

1      A.    By the filter, and that could be remedied.
2      Q.    Were you able to determine that if you shot
3  frangible ammunition at a dry part of the ramp, that it
4  would cause an increase in dust?
5      A.    I would assume it would.  But that's an
6  assumption.  I could not see or watch a bullet impact.  I
7  could not see that.
8      Q.    I recognize that you can't see the bullet
9  impact, but on occasions, when you saw people shooting at
10  a dry part of the ramp, did you notice that there was
11  more dust in the air around the bullet trap than there
12  would be if the trap were wet?
13     A.    I can't make that determination.
14     Q.    Why did you move the shooter from a dry part of
15  the ramp to a wet part of the ramp when you noticed that
16  somebody was shooting at a dry area?
17     A.    We attempted to accommodate the system until we
18  could perform maintenance on it.
19     Q.    What do you mean "accommodate the system"?
20     A.    So that we wouldn't shoot into the dry area.
21  Because it's not designed to be shot dry.
22     Q.    So what's the effect if you shoot frangible
23  ammunition into a dry area?
24     A.    That would be an assumption on my part.

16 (Pages 58 to 61)

Price, et al.                                          v.                                    Chaffinch, et al.
B. Kurt Price                                  C.A. # 04-956-GMS                          October 18, 2005

---

Page 62

1    Q.   You just knew you didn't want to do it?
2    A.   Right.  It's a wet system.  It's designed to be
3   shot wet.
4    Q.   Did the maintenance that you performed on the
5   bullet trap change when Al Parton left the range and was
6   replaced by Chris Foraker as the sergeant?
7    A.   I don't believe so, no.
8    Q.   So you were essentially doing the same things
9   that you had done under Parton?
10   A.   Yes, sir.
11   Q.   When Foraker left and was replaced by
12  Rich Ashley, did the maintenance work that you did on the
13  bullet trap change?
14   A.   Can you rephrase that again?  I'm sorry.
15   Q.   It's the same question I asked you about going
16  from Parton to Foraker.  When Foraker left in April of
17  2002 and was replaced by Ashley, did the maintenance on
18  the bullet trap change?
19   A.   No, sir.
20   Q.   When Foraker returned to replace Ashley in
21  December 2003, did the maintenance on the bullet trap
22  change?
23   A.   I'm going to tell you yes, but I would like to
24  qualify my answer, if I may.

---

Page 63

1    Q.   Sure.
2    A.   I can't be specific on the date without looking
3   at the document itself.  I had been performing large
4   amounts of maintenance on the bullet trap.  I received a
5   blood test, a notice to go for blood work.  I went and I
6   did that, and the results of that test prompted me to
7   have an extreme amount of concern in regards to lead
8   being in my blood.
9    Q.   Was this before or after Foraker returned?
10   A.   This was before.
11   Q.   How long before?
12   A.   I want to say it was sometime in the summer or
13  fall of '03.  Again, that's a guess.  I don't recall
14  specific dates without having to look at the form.  And
15  it prompted a phone call from Dr. Green to me from
16  HealthWorks.
17       I essentially went where my blood lead
18  levels had been in the single digits, somewhere between
19  4 to 6, somewhere in that area, my lead level was now at
20  an 11.  And in my discussion with Dr. Green, he asked
21  what I had been doing, and I specifically told him that
22  nothing any different; I have just been working on the
23  bullet trap.  And then he asked about that, and he asked,
24  well, what does the bullet trap contain, and I explained

---

Page 64

1   to him a mixture of oil and water which is in the bottom
2   part of the trough there, the tank itself, and he said
3   that what would happen is that any petroleum product is
4   actually a penetrator of human skin and that would --
5   that would carry into my bloodstream any type of
6   contaminants.
7       That was the first time that anybody had
8   ever explained that to me or that I was made aware of
9   that.
10   Q.   What happened next?
11   A.   I voiced my concerns verbally with
12  Sergeant Ashley and Lieutenant Davis and Captain Warren
13  at the academy.
14   Q.   You talked to all three of them at the same
15  time?
16   A.   No, sir.
17   Q.   Why don't you tell me who you talked to first.
18   A.   I can't remember, but I do remember I talked to
19  all three.
20   Q.   Did you talk to them individually or in a
21  group?
22   A.   I know I talked to Captain Warren and
23  Captain Davis while they were in the administrative
24  office during at the academy.

---

Page 65

1    Q.   Where did you talk to Ashley?
2    A.   I'm going to assume it was in the office of the
3   range.
4    Q.   You're assuming, but you don't remember?
5    A.   No, sir.  I can't be specific.
6    Q.   What is it that you said to him?
7    A.   I told him that I had a concern about how my
8   blood lead levels increased 6 points just by performing
9   maintenance on the bullet trap.
10   Q.   What did he say?
11   A.   He said, "Well, you got to die from something."
12   Q.   What did you say to that?
13   A.   I said, "Well, I would prefer to die of old
14  age," and I turned around and walked away from the man.
15   Q.   That was the end of the conversation?
16   A.   Yes, sir.
17   Q.   Was your conversation with Davis and Warren
18  before your conversation with Ashley or was it after your
19  conversation with Ashley?
20   A.   As I stated earlier, I can't recall who I
21  talked to first.  I was, again, shaken because that was
22  the second highest -- I'm sorry.  That's the second time
23  that my blood lead levels have been over 10.
24   Q.   I'll get to that in a minute, but describe your

---

17 (Pages 62 to 65)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

A387

Price, et al.                                    v.                        Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS                  October 18, 2005

Page 66

1  conversation with Ashley and Davis. I'm sorry. With
2  Davis and Warren.
3      A.   I just explained to them my concerns in regards
4  to the lead level and our lack of training and any type
5  of protective equipment that we had, and they understood
6  my concerns.
7      Q.   What did Davis say at the meeting?
8      A.   He just, " well, I would be concerned, as
9  well," something to that effect.
10     Q.   Did he tell you he was going to do anything
11 about it?
12     A.   I don't recall.
13     Q.   What did Warren say?
14     A.   I don't recall what his comments were.
15     Q.   Was anybody else present at the meeting?
16     A.   It was not a meeting. They were there and I
17 was there and I wanted to mention it to them. I don't
18 recall if anybody else was in there or not.
19     Q.   Where was it in the academy?
20     A.   The administrative office.
21     Q.   As a result of getting this blood lead level
22 that you said was 11, did you stop doing work on the
23 bullet trap?
24     A.   I explained to Sergeant Ashley that I was going

Page 67

1  to back off of it, yes.
2      Q.   What did he say to that?
3      A.   He said no problem.
4      Q.   Beginning whenever this blood lead level result
5  came back, did you stop doing work on the bullet trap
6  system altogether?
7      A.   No, sir. Not totally.
8      Q.   What is it that you continued to do, and what
9  did you not do anymore?
10     A.   I would go back and help replace the pumps on
11 an occasion.
12     Q.   So you would still replace the pumps?
13     A.   Yes.
14     Q.   What is it that you stopped doing?
15     A.   I don't recall that I -- again, this would be a
16 guess on my point. I probably shouldn't even give an
17 answer because it would be a guess.
18     Q.   I don't want you to guess, but to your
19 recollection, did you stop doing anything?
20     A.   I know that I backed --
21     Q.   That's a bad question. Was there anything that
22 you stopped doing as a result of getting the blood lead
23 level back?
24     A.   I did not go back as often and clean the

Page 68

1  filters.
2      Q.   So you continued to do it, you just didn't do
3  it as much?
4      A.   Correct.
5      Q.   You have been tested for blood lead levels ever
6  since 1998. Would that be correct?
7      A.   Somewhere in there, yes, sir.
8      Q.   I'm using 1998 because that's when the range
9  opened.
10     A.   Yes.
11     Q.   Were you tested for blood lead levels when you
12 were shooting at the outdoor range?
13     A.   No.
14     Q.   What's the highest result you ever had on a
15 blood lead test?
16     A.   11.
17     Q.   Was that the one that occurred in 2003?
18     A.   No. There was another one somewhere -- in
19 either -- again, it would be a guess, but I remember one
20 coming back where it was an 11, as well, when we were
21 still shooting leaded ammo at that time.
22     Q.   So prior to going to frangible?
23     A.   Yes, sir.
24     Q.   Were you doing anything different in 2003 than

Page 69

1  you had been doing in 2002 in terms of working on the
2  bullet trap?
3      A.   No, sir.
4      Q.   Is there some activity you were engaged in in
5  2003 that you attribute the higher blood lead level to
6  that you weren't doing in 2002?
7      A.   Not that I can recall. Again, I continued to
8  try to keep that bullet trap working.
9      Q.   I understand that. Were you working more on
10 the bullet trap in 2003 than you had been in 2002?
11     A.   I don't recall. That would be -- I don't know.
12     Q.   Were you doing more hunting in 2003 than you
13 had done, say, in 2002 or 2001?
14     A.   No, sir. And if I'm not mistaken, that period
15 of time of year is no open season.
16     Q.   I would have imagined that, but not being a
17 hunter, I wasn't sure.
18     A.   Yes, sir.
19     Q.   What you're telling me is that you modified
20 your behavior after you got the score of 11 back and had
21 the conversation with Dr. Green?
22     A.   Yes.
23     Q.   Did your blood lead level go down after that?
24     A.   I believe it did. Again, I know we got tested

18 (Pages 66 to 69)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A388

Page 70

1  at Omega March 1st, but I would have to look at those
2  results to give you an answer.  I don't recall what those
3  were.
4              MR. NEUBERGER:  Did you mean March 1st --
5              THE WITNESS:  Of 2004.  Yes, sir.  I'm
6  sorry.
7      Q.   That's what I understood you to mean.
8              After Sergeant Foraker returned to the
9  range in 2003, were you involved in discussions about
10  whether the instructors at the Firearms Training Unit
11  should continue to do maintenance of the bullet trap?
12     A.   Yes.
13     Q.   Where did those discussions take place?
14     A.   I believe they were in our office.
15     Q.   Who was involved in those discussions?
16     A.   I believe it was Sergeant Foraker -- I know it
17  was Sergeant Foraker, Corporal Warren, myself, and I'm
18  going to assume that it was Corporal Warwick.
19     Q.   I guess I should ask you the question.  Why are
20  you assuming Corporal Warwick?
21     A.   I just have more memory of us three being
22  together than I do Corporal Warwick, because I worked
23  longer with Corporal Warren and Sergeant Foraker than I
24  did with Corporal Warwick.  He kind of came in at the

Page 71

1  time that I was removed.
2      Q.   About the time you were removed?
3      A.   Yes.
4      Q.   What is the time you were removed?
5      A.   I believe that was sometime in April.
6      Q.   Of 2004?
7      A.   Yes.
8      Q.   My understanding from some records I have seen
9  is that Corporal Warwick was assigned to the range in
10  either October or November of 2003.  Does that correspond
11  to your recollection?
12     A.   If that's what you're telling me, I'm going to
13  assume --
14     Q.   I don't want you to assume it, but do you
15  remember him being there while Sergeant Ashley was still
16  there?
17     A.   Yes.
18     Q.   So that had to be 2003 because Ashley left in
19  December 2003.
20     A.   Yes, sir.
21     Q.   How did the subject of maintenance of the
22  bullet trap come up in the discussions with the staff at
23  the Firearms Training Unit?
24     A.   One, we discussed -- I remember the discussion

Page 72

1  about we really don't know what we're doing back there as
2  far as any type of formal training with the
3  health-related risks of our rise in lead levels and no
4  protective gear or training, that was a huge issue with
5  us.
6      Q.   Do you remember which of the four of you first
7  raised the issue?
8      A.   I do not.
9      Q.   Do you remember, was this something that you
10  talked about together in a meeting?
11     A.   I know it was in the office.  It was not a
12  meeting, so to speak.  We just started -- struck up a
13  conversation on it and discussed our concerns.
14     Q.   Do you remember anything you said to any of the
15  other three people about your concerns?
16     A.   I was concerned about my lead level in
17  particular going to an 11, and I was afraid that, if we
18  continued, I did not know how high a lead level I was
19  going to attain.
20     Q.   Do you remember whether Corporal Warren's lead
21  levels had gone up in 2003?
22     A.   I believe his had.  I believe recalling -- I do
23  recall a conversation where he said his lead level had
24  gone up.

Page 73

1      Q.   Do you remember what it went up to?
2      A.   No, I do not.
3      Q.   Do you remember anything that any of the other
4  three people said in your discussions about whether you
5  would continue to do maintenance of the bullet trap?
6      A.   I don't recall specifics in regards to what we
7  would do with the bullet trap, the maintenance of it.
8  Our primary issue and concern was the health-related
9  risks.  That's what I remember the bulk of the
10  conversation about.
11     Q.   Do you remember there being any discussion of
12  possible reasons for rise in blood lead level other than
13  maintaining the bullet trap?
14     A.   No.
15     Q.   Was it your assumption at the time that the
16  reason your blood lead level had risen was because you
17  were doing the maintenance of the bullet trap?
18     A.   That is what the doctor who treated me in
19  regards to my elevation in lead, that is what he advised
20  me.  And I would have no reason to doubt what he said.
21     Q.   Did the group collectively of Firearms Training
22  Unit instructors decide to stop doing maintenance of the
23  bullet trap?
24     A.   I don't recall if we just said that's it, we're

19 (Pages 70 to 73)

Price, et al.                                    v.                        Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS                 October 18, 2005

Page 74

1    not going to do it anymore, or if it went up the chain of
2    command.  I don't know.
3       Q.    What do you mean it going up the chain of
4    command?
5       A.    I know Sergeant Foraker was feverishly working
6    and talking with folks in regards to issues regarding the
7    range and the bullet trap.
8       Q.    Did you participate in any of these feverish
9    discussions with Sergeant Foraker?
10      A.    No, sir, I did not.
11      Q.    So what you knew was that he was telling you
12   that he was discussing range issues with people above him
13   in the chain of command?
14      A.    He was always on the phone and always on his
15   computer.
16      Q.    And he told you that, when he was on the phone
17   or on the computer, he was having these discussions with
18   people above him in the chain of command about the firing
19   range?
20      A.    That's what he said.
21      Q.    Did you cease altogether doing maintenance on
22   the bullet trap in December of 2003?
23      A.    We collectively decided that, until we received
24   formal training -- or even better than that, I know we

Page 75

1    had discussed with a vendor, and I believe that was
2    Joe Farrell, of what options we would have in regards to
3    getting an outside vendor to tend to the bullet trap,
4    because we did not have the training, nor the equipment
5    or the background to provide any educated maintenance of
6    that bullet trap.
7       Q.    Let me break down the question, because you
8    have given me more than I really asked for.
9       A.    I'm sorry.
10      Q.    Did you collectively make a decision to stop
11   doing the maintenance on the water system on the back of
12   the trap?
13      A.    Yes.
14      Q.    Were all four of you involved, meaning by the
15   four of you I mean Foraker, Price, Warren, and Warwick,
16   were you all involved in making that decision?
17      A.    As best as I can recall, yes.
18      Q.    And the reason for making that decision is that
19   what you have just described to me about lack of training
20   and the concern about the health effects?
21      A.    Yes, sir.
22      Q.    Now, when you made that decision, I'm asking
23   you now as one of the four, what effect did you expect
24   that to have on the operation of the bullet trap?  By

Page 76

1    "that decision" I mean what effect did you expect the
2    decision to stop doing the maintenance of the water
3    system to have on the operation of the bullet trap?
4       A.    Well, only thing that I can tell you is what I
5    saw there every day prior to this decision being made,
6    that it was becoming more and more of a nightmare to try
7    to keep it running.  We were spending a lot more time,
8    myself and other instructors, trying to keep that thing
9    going.
10      Q.    But what did you personally expect would happen
11   to the operation of the system if you stopped doing the
12   maintenance?
13      A.    That would be an assumption on my part.  You
14   want me to give you that answer, an assumption?
15      Q.    I want your expectation.
16      A.    My expectation would have been --
17      Q.    You had been working with that system by then
18   for what, six, seven years?
19      A.    Sometime in there.  I would assume that it
20   would fail.
21      Q.    What would be the consequence of it failing?
22      A.    I don't know.
23      Q.    Would you expect the environmental conditions
24   in the shooting area to deteriorate?

Page 77

1       A.    I don't know that.  I have no expertise at all
2    in environmental issues.
3       Q.    I'm not asking for your expertise.  I'm asking
4    for what your expectation was.  Would you have expected
5    because the water system wasn't working for the
6    conditions in the shooting area to deteriorate?
7       A.    I don't know.  I can't give you an answer on
8    that.
9       Q.    What you're saying is that you had no
10   expectation?
11      A.    I didn't know what would happen.
12      Q.    Did you yourself communicate to anyone above
13   you in the chain of command the fact that you were not
14   going to do maintenance of the water system in the bullet
15   trap anymore?
16      A.    I do not recall.
17      Q.    Do you recall when you, meaning you, the group
18   collectively, as the Firearms Training Unit made the
19   decision to stop doing the maintenance of the bullet
20   trap, when in 2003?
21      A.    I'm sorry.  Could you ask me that again?  I'm
22   sorry.
23      Q.    That's probably a bad question.
24            Do you remember when you made the decision

20 (Pages 74 to 77)

Price, et al.                                    v.                                    Chaffinch, et al.
B. Kurt Price                            C.A. # 04-956-GMS                            October 18, 2005

Page 78

1  to stop doing maintenance on the bullet trap?
2      A.   I don't remember.  I can't give you a date.  I
3  don't know.
4      Q.   Do you remember how long after Sergeant Foraker
5  returned to the Firearms Training Unit you made that
6  decision?
7      A.   I can't recall.  To be specific, I don't
8  remember.
9      Q.   Do you remember whether it was before Christmas
10 of 2003?
11     A.   I'm sorry.  I don't remember.  I don't remember
12 the exact date or even if it was before or after the
13 holiday.  I don't know.
14     Q.   I think your colleague, Corporal Warren,
15 yesterday testified that it occurred within the first
16 week, approximately, of Mr. Foraker's return to the
17 Firearms Training Unit.
18          Do you have any reason to believe that's
19 not an accurate recollection?
20     A.   It may have been.  I don't recall, though.
21          (A recess was taken.)
22 BY MR. ELLIS:
23     Q.   I'm going to show you what I have previously
24 marked Exhibit D-1.

Page 79

1          MR. NEUBERGER:  We have it.
2  BY MR. ELLIS:
3      Q.   This is a chain of e-mails, and the first one
4  on the first page of D-1 is dated January 5th, 2004, at
5  3:47 p.m. and it goes from Foraker to MacLeish.  As you
6  know, e-mails run in reverse order so that the first of
7  the e-mails is actually the one at the bottom which
8  begins on the second page, and it's dated December 19,
9  2003, at 7:20 p.m. from Foraker to MacLeish and Eckrich.
10          Do you see that?
11     A.   Yes, sir.
12     Q.   Have you seen a copy of this e-mail before?
13     A.   I don't recall this specific e-mail.  Again, we
14 have looked through so much information that I don't
15 recall this one.
16     Q.   What I'm really asking is whether you saw it in
17 December 2003.
18     A.   No, I don't recall that.
19     Q.   Take a look at the e-mail that's on the top of
20 D-1, and that's the January 5th, 2004, e-mail to MacLeish
21 from Foraker.
22     A.   Yes, sir.
23     Q.   Did you see that at the time?  By "at the time"
24 I mean around the time it was initially prepared, which

Page 80

1  is January 2004.
2      A.   I do not recall seeing this one.
3      Q.   Did you ever meet Larry Toplack from Mayfran
4  Corporation?
5      A.   No, sir.
6      Q.   Are you familiar with the allegation that
7  someone was trying to sabotage the bullet trap system?
8      A.   Yes, I do remember when that came up.
9      Q.   How did you learn about it?
10     A.   I believe Sergeant Foraker called me --
11 Sergeant Foraker called me at home and advised me that he
12 felt that somebody may have been trying to sabotage the
13 bullet trap.
14     Q.   Did he explain why he believed that?
15     A.   He said there was some type of matter in the
16 trap that he had never seen -- or he had not seen before.
17     Q.   Did he tell you who he thought it might have
18 been?
19     A.   No, sir.
20     Q.   Did you later have an opportunity to review the
21 material that was in the bullet trap?
22     A.   Yes.
23     Q.   Were you able to identify that material?
24     A.   I had seen that material before when the FBI

Page 81

1  utilized our range.  It was their form of what is called
2  nontoxic lead-free ammo.
3      Q.   Do you know whether there was an investigation
4  performed into whether there was sabotage involving the
5  bullet trap?
6      A.   I do not know.
7      Q.   Were you ever questioned by anybody as part of
8  an investigation?
9      A.   I believe I informed Sergeant Foraker that I
10 thought it was the material that came from -- I believe
11 it was a federal ammunition that the FBI utilized.  It
12 almost looked like a corkscrew, like a spring almost.
13 That may be a bad interpretation, but that's what it
14 looked like.
15     Q.   Was there a point when the members of the
16 Firearms Training Unit decided that they were going to
17 attempt to accumulate as much information as possible
18 about conditions at the range?
19     A.   Yes.
20     Q.   When did that occur?
21     A.   It would be -- I can't guess, but it was
22 sometime in that January period, I believe.
23     Q.   How did you come to decide that that's what you
24 were going to do?

21 (Pages 78 to 81)

Page 82

1    A.    Through discussion there in the office.
2    Q.    Do you remember what motivated you to do that?
3    A.    Our health concerns, and I know that we had a
4    recruit -- I can't remember his name -- that had a
5    background and told us that we need to be very concerned
6    with the conditions at the range.
7    Q.    Were the conditions in the range in
8    January 2004, and by "the conditions in the range," I
9    mean the conditions on the firing line while the shooting
10   was going on, was it worse than it had been in December
11   2003?
12   A.    Not that I recall.
13   Q.    In December 2003 was it worse than it had been
14   the previous summer?
15   A.    I don't believe we were shooting in the summer.
16   Q.    There was no shooting at all going on?
17   A.    If it was, it was very limited.  If I can
18   remember correctly.  Again, that's a long time ago and a
19   lot of things have happened.
20   Q.    Was there shooting in the fall of 2003?
21   A.    Yes.
22   Q.    Were conditions in December worse than they had
23   been in the fall of 2003?
24   A.    It was dirty.

Page 83

1    Q.    It was dirtier?
2    A.    Yes, sir.
3    Q.    It was dirtier in December than it had been in
4    the fall?  By "the fall" I mean September, October,
5    November.
6    A.    You could see debris, some form of debris, that
7    was on the range.
8    Q.    What I'm really referring to aside from the
9    debris is the smoke, dust from the frangible ammunition
10   and the operation of the HVAC system.  Was it worse in
11   December than it was in the fall?
12   A.    I can't recall exact dates or conditions.  I
13   know we always had problems with the HVAC.
14   Q.    What I'm trying to get at is:  Did it get any
15   worse in December than it had been before that?
16   A.    I would say it would have to be some worse,
17   yes.
18   Q.    After you as a group collectively decided to
19   stop doing the maintenance of the water system behind the
20   bullet trap, did the conditions in the shooting area get
21   worse?
22   A.    I would have to say it probably did.
23   Q.    Do you have an opinion as to why it got worse?
24   A.    No, I do not.

Page 84

1    Q.    Do you have any idea at all?  You have no idea
2    why it got worse?
3    A.    That would be an assumption on my part.
4    Q.    What's your assumption?
5    A.    My assumption would be that it may have gotten
6    worse.
7    Q.    I asked you if it got worse and you said it did
8    get worse.  My question to you is:  Do you have an
9    opinion as to why?
10   A.    I would assume, and, again, that's an
11   assumption and my opinion, that the air-handling system
12   was failing.
13   Q.    Do you believe that, after you stopped doing
14   the maintenance on the bullet trap, there was more stress
15   being placed on the air-handling system?
16   A.    I don't know.  I'm not qualified to make that
17   determination.
18   Q.    Were you able to see visually whether there was
19   more dust or smoke in the shooting area of the range
20   after you had stopped doing maintenance on the bullet
21   trap?
22   A.    Whenever you discharge a firearm there was
23   always smoke.
24   Q.    I understand that.  I'm not asking for your

Page 85

1    opinion or your expertise or your qualifications.  Just
2    visually were you able to observe more dust and smoke in
3    the shooting area after you had stopped doing the work on
4    the bullet trap than there was before you stopped doing
5    work on the bullet trap?
6    A.    I would say there had to be more.
7    Q.    Do you have any opinion as to why that was so?
8    A.    No, sir.
9    Q.    Before we move on, I'd like to show you some of
10   the blood lead test results that you have turned over to
11   us in discovery.
12         MR. NEUBERGER:  We're off the record.
13         (Discussion off the record.)
14         (Defendants' Deposition Exhibit No. 13 was
15   marked for identification.)
16         MR. NEUBERGER:  We have agreed that those
17   exhibits which the court reporter has possession of that
18   are marked "Confidential Attorney's Eyes Only," and there
19   are several, will be separately sealed by the court
20   reporter and treated as documents under seal for purposes
21   of the deposition.  Thank you.
22         MR. ELLIS:  That would be Exhibit 11 and
23   Exhibit 13 today?
24         MR. NEUBERGER:  Let's go back to

22 (Pages 82 to 85)

A392

Price, et al.                                        v.                           Chaffinch, et al.
B. Kurt Price                               C.A. # 04-956-GMS                     October 18, 2005

Page 86

1  yesterday.  That's 13 and 11.  We have got 9 today, DX 9.
2  6 is so marked, also.  5 was also so marked.
3        MR. ELLIS:  As is 4.
4        MR. NEUBERGER:  As is 4.
5  BY MR. ELLIS:
6     Q.   Take a look at Exhibit D-13, please.
7     A.   Yes, sir.
8     Q.   This is a collection of serum blood lead levels
9  that we have put together out of the material that you
10 have produced as part of the lawsuit.
11          Are these documents that you have seen
12 over the years as your test results have come in?
13    A.   Yes.
14    Q.   The first one in the exhibit, I can't make out
15 what that score is.  It looks like a 7 to me.  Do you
16 have any recollection of whether that was the blood lead
17 result that you got in --
18    A.   It's actually a 4.
19    Q.   That's a 4.  In September 1998.
20    A.   Yes.
21    Q.   So that's before the indoor range opened?
22    A.   Yes.
23    Q.   Now, the next test result you got was in
24 December 1998, and there you have gone to a 9.

Page 87

1     A.   Yes.
2     Q.   But that's still considered normal by any
3  measure, right?
4     A.   From the information that we have been given, I
5  would assume it would be.
6     Q.   Have you seen any threshold number provided by
7  any occupational safety and health organization that
8  would suggest that 9 is outside normal?
9     A.   Not would be outside, no.
10    Q.   I'm sorry?
11    A.   Not outside normal, no.
12    Q.   You have seen some blood lead thresholds at 10,
13 right?
14    A.   Yes.
15    Q.   And you have seen others as high as 40?
16    A.   I have not seen 40, no.
17    Q.   Have you seen the federal Occupational Safety
18 and Health Administration limit?
19    A.   No, sir.
20    Q.   You did research on this and you didn't look at
21 the OSHA limit?
22    A.   I didn't look at that one that I can recall,
23 no.
24    Q.   Looking over at the next one, which is April of

Page 88

1  1999, you went up to 11, right?
2     A.   Yes, sir.
3     Q.   Did you have any discussion with Dr. Green
4  about what an 11 meant?  At that point I guess in 1999.
5     A.   I don't recall any specific conversation then.
6     Q.   Do you recall whether you became alarmed in
7  April of 1999 that you had a result that was above 10?
8     A.   Yes, sir.
9     Q.   Did you do anything to change your behavior?
10    A.   I can't recall.
11    Q.   Did you do anything to change the way you did
12 your job?
13    A.   I don't recall.
14    Q.   If you go to the next page, this is the fourth
15 page of the document.  It's got FTU4642 on the bottom,
16 and this is a test done in June 1999, is it not?
17    A.   Yes.
18    Q.   Here you're back inside the range two months
19 after you had been outside the range.
20    A.   Yes.
21    Q.   The next page, which is FTU4424, gives your
22 result of 8; is that correct?
23    A.   Yes.
24    Q.   Did you feel any better about having an 8 in

Page 89

1  September than you had about having an 11 in April?
2     A.   Yes.
3     Q.   Why?
4     A.   Because I was under double digits.
5     Q.   Who was it explained to you that that was
6  important?
7     A.   If I may, there had been people that we would
8  have conversations with as these blood results came back
9  over the years would say that we should try to keep it as
10 low as possible, needless to say.  So as the numbers
11 lowered, I was happy with that.  These were the folks
12 there at HealthWorks that would give us this information.
13    Q.   Could you turn to the next page, please, which
14 4625.  That appears to be another report on the same test
15 that's reflected in 4424.  On the right-hand side of that
16 report is 0 to 24.  What do you understand that to mean?
17    A.   I don't know.
18    Q.   Go to the next test, which is December 1999.
19 That's FTU4626.
20    A.   Yes, sir.
21    Q.   You showed another 8, did you not?
22    A.   Yes.
23    Q.   Had you done anything to change your behavior
24 between the time you had the 11 and the time you got the

23 (Pages 86 to 89)

A393

Price, et al.                                     v.                          Chaffinch, et al.
B. Kurt Price                              C.A. # 04-956-GMS                   October 18, 2005

Page 90

1  8 score?
2      A.   Not that I can recall.
3      Q.   You're still working as an instructor at the
4  range, right?
5      A.   Yes.
6      Q.   And they're still shooting leaded ammunition at
7  this point, right?
8      A.   I don't know.  I would assume so.  I don't know
9  if we were going to frangible then or not.
10     Q.   My understanding, and I have seen this in
11 documents, is that the Delaware State Police moved from
12 leaded to frangible ammunition in late 2000, early 2001.
13 Does that stand to your recollection?
14     A.   That may be, yes.
15     Q.   Go over to the next page, 4627 --
16     A.   Can I also clarify something, too?
17     Q.   Sure.
18     A.   About the frangible and leaded discussion?  We
19 never -- we always shot leaded shotgun ammo.  We never
20 went totally lead-free.
21     Q.   I do understand that.  I also understand that
22 there's lead in the primer in the frangible ammunition.
23     A.   I believe that they are Clean Fire primers.
24     Q.   Was that always true of the frangible

Page 91

1  ammunition?
2      A.   I believe so.
3      Q.   It's your understanding there was no lead at
4  all in the frangible ammunition?
5      A.   That's what we were led to believe, yes.  I
6  have seen no documentation to suggest otherwise.
7      Q.   The next document is page 4627 on the bottom.
8      A.   Yes, sir.
9      Q.   This is in March 2000 at 9.  You seem to be
10 having pretty consistent blood lead levels over the
11 period 1999 through 2000.  Would you agree with that?
12 They're all just below the 10?
13     A.   Yes.
14     Q.   Go to the next one, which is 4628.  This is May
15 of 2000.  There you have gone up to 10.
16     A.   Yes.
17     Q.   Were you ever told that there was an error
18 range in the test scores?
19     A.   No.
20     Q.   In other words, that, when you see 10, you
21 should really view it as plus or minus?
22     A.   No.  We were never told that.
23     Q.   Go to the next one.  This is July of 2000, page
24 4629.  Here you're back down to 8.  Did you consider it

Page 92

1  significant that you went from 10 in May to 8 in July?
2      A.   I don't believe we were shooting in July.
3      Q.   Did you notice that your blood lead levels
4  tended to rise when you were actually shooting at the
5  range?
6      A.   I would assume that they would.  I don't know
7  that to be fact.  I would have to refer to the dates.
8      Q.   Sitting here, having worked in that environment
9  for seven years or so, do you have a recollection that it
10 would get worse during the times you were shooting or did
11 you not make that correlation?
12     A.   I would like to retract that.  That would be a
13 total assumption on my end, the more I think about it.  I
14 apologize for taking that step.
15     Q.   That's okay.
16          Are there times of the year when you're
17 always shooting?
18     A.   I know the spring and the fall historically has
19 been recruits and inservice training.
20     Q.   So there would tend to be less shooting in the
21 middle of the summer?
22     A.   Yes.
23     Q.   And there would be less shooting in the dead of
24 winter?

Page 93

1      A.   Yes.  Normally.
2      Q.   I understand everything is subject to
3  variation.
4          Go to the next page, please, 4428.  This
5  one is a test taken pretty much in the dead of winter of
6  2001, February 2001, and here you have the same score
7  that you had the previous summer, right?
8          MR. NEUBERGER:  I'm sorry.  Which page are
9  we talking about here?
10         MR. ELLIS:  4428.  In order to arrange
11 them in chronological order, we had to pull them from
12 different parts of the back of the production.
13         MR. NEUBERGER:  Do you have 4428 in yours?
14         THE WITNESS:  Yes.
15         MR. NEUBERGER:  Here we are.  4428.  Thank
16 you.
17 BY MR. ELLIS:
18     Q.   Do you see that you have the same score in
19 early 2001 that you had in the summer of 2000?
20     A.   Yes.
21     Q.   Go to the next one, which is May of 2001.  So
22 that's three months later than 4428.  This is FTU4429.
23 Here you dropped one, correct?
24     A.   It says 7, yes.  At the top I have a hard time

24 (Pages 90 to 93)

A394

Price, et al.                      v.                    Chaffinch, et al.
B. Kurt Price            C.A. # 04-956-GMS            October 18, 2005

Page 94

1  seeing the date.
2    Q.  I do.  If you look at the bottom, you will see
3  that the doctor made a note that they called and left
4  message on May 17th.  Do you see that?
5    A.  Yes, sir.  Thank you.
6    Q.  Going over to the next one, which is
7  August 2001, you've got a blood lead level of 8 again,
8  right?
9    A.  Yes.
10    Q.  By then were you shooting frangible ammunition?
11    A.  I would assume so.
12    Q.  Go to the next page, which is 4431, and this is
13  October 2001.  Do you see that your score there is 7?
14    A.  Yes.
15    Q.  The next page, which will be early 2002, and
16  that's page 4432, you're back down to 7.
17    A.  Yes, sir.
18    Q.  Now go to July of 2002, which is page 4433, and
19  this shows you at a 5.
20    A.  Yes.
21    Q.  Do you have any idea why you went from a 7 down
22  to a 5 over the course of a few months?
23    A.  No, I do not.
24    Q.  I guess it's the course of six months, really.

Page 95

1        Did you do anything consciously to change
2  your behavior?
3    A.  No, sir.
4    Q.  Was the air-handling system working better at
5  the range?
6    A.  I can't make that assumption.
7    Q.  Go to the next one.  This is December 2003 --
8  wait a minute.
9        MR. NEUBERGER:  It looks like there are
10  some missing.
11        MR. ELLIS:  There may well be.
12        MR. NEUBERGER:  There are some notes there
13  as to what they were.  You see that on the exhibit you're
14  talking about now.
15  BY MR. ELLIS:
16    Q.  We have tried to pull all these together out of
17  the file.  We may not have gotten all of them, but if you
18  take a look at the right-hand part of page FTU4434, you
19  see some handwritten notations from Dr. Green, right?
20    A.  Yes.
21    Q.  They record some test results, some of which we
22  have already looked at, but at least one of which we have
23  not, and the one that we haven't looked at is the one of
24  April 15th, 2003.  Do you see that one that says an 11?

Page 96

1    A.  Yes.
2    Q.  Is that the one that you have testified about
3  today that got you concerned?
4    A.  Yes.
5    Q.  And the reason that it got you concerned was
6  because you went from 5 to an 11?
7    A.  That would be the way I see it on here, and I
8  know that's what prompted the phone call to me.
9    Q.  The two tests prior to the 5 you had 7, right?
10    A.  Yes.
11    Q.  Then you dropped down to a 5, right?
12    A.  Yes.
13    Q.  And you don't have any explanation in terms of
14  your behavior or conditions at the range that would
15  explain to you having gone from a 7 to a 5, right?
16    A.  No.
17    Q.  Do you have any explanation for why you went
18  from 5 to an 11?
19    A.  That would be conjecture and assumption on my
20  point -- on my part.  I do think, if I can recall
21  correctly I testified earlier, that we were pulling
22  maintenance on the bullet trap itself more often, now
23  that we're into frangible ammo.
24    Q.  If I'm correct that you started using frangible

Page 97

1  ammunition no later than early 2001, then all the scores
2  that are reflected on page 4434 would have been scores
3  that you had during the period that you were using
4  frangible ammunition at the range, wouldn't it?
5    A.  Yes, sir.
6    Q.  So during the time that you were using
7  frangible ammunition, you had a blood lead level of 7 in
8  2001, 7 in early 2002, 5 in mid-2002, then all of a
9  sudden you went up to an 11 in 2003.
10    A.  Yes.
11    Q.  Do you know whether you were doing different
12  things to maintain the bullet trap at any of these time
13  periods that it would cause the fluctuation?
14    A.  Not that I can recall.
15    Q.  The score that you got that's reflected on
16  page 4434 is a 10, right?
17    A.  Yes.
18    Q.  That's down from an 11.  Did you consider that
19  a significant drop?
20    A.  No.
21    Q.  You would have received this result within a
22  matter of days after Sergeant Foraker returned to the
23  range, would you not?
24    A.  I have received, as you can see, so many

25 (Pages 94 to 97)

Price, et al.                                         v.                            Chaffinch, et al.
B. Kurt Price                               C.A. # 04-956-GMS                      October 18, 2005

Page 98

1   results, I can't remember seeing the 10 or --
2      Q.   Do you recall any discussion with
3   Sergeant Foraker or other members of the Firearms
4   Training Unit in December 2003 about this particular test
5   result?
6      A.   Not this one.
7      Q.   Was there any particular one you recall
8   discussing?
9      A.   The 11. I know I discussed that.
10     Q.   Who did you discuss that with, Sergeant Ashley?
11     A.   I discussed it with him and the other people
12  that I testified to today.
13     Q.   You said that after you got the 11 you talked
14  to Sergeant Ashley and told him that you wanted to back
15  off, I think were your words, on working on the bullet
16  trap.
17     A.   Yes.
18     Q.   You did, in fact, back off?
19     A.   Yes, sir.
20     Q.   The result was to reduce the blood lead level
21  from 11 to 10?
22     A.   Result was to get it lower than that. That's
23  what the result was. But the intent was to bring it down
24  as low as I could possibly get it.

Page 99

1      Q.   In any of the times that you saw Dr. Green, did
2   he ever tell you that you were suffering from lead
3   poisoning? It's not going to be in any of these
4   documents. I'm asking about anything he said to you.
5      A.   Not lead poisoning, but there were times that
6   we had higher-than-normal lead exposures.
7      Q.   Meaning that you had 10 or higher?
8      A.   Yes.
9      Q.   Did he tell you that it was doing you any harm?
10     A.   No.
11     Q.   Look at the next one, please, which is 4633.
12  This is January 29, 2004, and you had a score of 9,
13  right?
14     A.   Yes.
15     Q.   By the time you had this sample drawn in
16  January 2004, am I correct that you had stopped doing the
17  maintenance of the bullet trap altogether?
18     A.   We may have. I don't know.
19     Q.   Look at the next and last document in this
20  package, which is 4359, and I think this is the sample
21  that was drawn at Omega Medical Center. Does that
22  correspond to your recollection?
23     A.   Yes.
24     Q.   Can you see that the blood lead level on this

Page 100

1   test was an 8?
2      A.   Yes.
3      Q.   Over in the far right, look at the second black
4   bar that runs from left to right across the page.
5      A.   Okay.
6      Q.   You see where it says "Units Therapeutic
7   Range"?
8      A.   Yes.
9      Q.   Did you have an understanding of what that
10  meant?
11     A.   No.
12     Q.   Look down below the column that says "Units
13  Therapeutic Range" where it says less than 40.
14     A.   Okay.
15     Q.   Did you have an understanding that 8 was less
16  than 40?
17     A.   Yes.
18     Q.   Did you have an understanding of what the
19  40 meant?
20     A.   No, I did not.
21     Q.   Look down below the blood lead occupational
22  exposure section of this report where it says "OSHA
23  Guideline."
24     A.   Okay.

Page 101

1      Q.   What does that say?
2      A.   "Less than 100 ug/dl."
3      Q.   I'm sorry. One up. You're under the zinc
4   protophorphyrn.
5      A.   I'm sorry. "OSHA Guideline," is that the one?
6      Q.   Yes.
7      A.   "Less than 40 ug/dl."
8      Q.   Does that suggest to you that the OSHA
9   guideline is less than 40?
10     A.   I would assume so. Nobody explained that to
11  me.
12     Q.   You scored 8, right?
13     A.   Yes.
14     Q.   You said nobody explained that to you?
15     A.   No, sir.
16     Q.   Didn't you get a letter from Omega?
17     A.   Yes.
18     Q.   Didn't they tell you that your blood lead level
19  was fine?
20     A.   That's what they said, yes.
21          MR. ELLIS: Let's break.
22          (A lunch recess was taken at 12:30 p.m.)
23          (The deposition resumed at 1:35 p.m.)
24

26 (Pages 98 to 101)

Price, et al.                                      v.                              Chaffinch, et al.
B. Kurt Price                              C.A. # 04-956-GMS                    October 18, 2005

Page 102

1    BY MR. ELLIS:
2        Q.    Have you had contact directly with
3    Thomas MacLeish about safety and health concerns about
4    the firing range?
5        A.    Not that I recall.
6        Q.    Have you been at meetings with MacLeish, either
7    when he was the lieutenant colonel or when he was the
8    colonel, at which the issues of safety and health at the
9    range were discussed?
10       A.    Yes.
11       Q.    How many times?
12       A.    I can specifically recall -- and don't quote me
13   on dates, but there is one time in the conference room at
14   the academy and another time at the State Police museum
15   in Dover which is on the headquarters complex.
16       Q.    Do you recall which one of those occurred
17   first?
18       A.    I believe it was the one at the academy.
19       Q.    Do you remember when that occurred?
20       A.    That would be a guess -- is it okay to guess?
21   I mean, give -- I mean between January and February,
22   maybe.
23       Q.    Why is it that you estimate that it occurred
24   between January and February?

Page 103

1        A.    I remember it was cold.
2        Q.    At the point you had the meeting at the
3    academy, was the range officially shut down at that
4    point?
5        A.    I don't believe so.
6        Q.    Do you recall the date the range was officially
7    shut down?
8        A.    No, sir.
9        Q.    But you believe that that meeting at the
10   academy occurred before the range had been shut down?
11       A.    That's correct.
12       Q.    Do you recall who was there?
13       A.    I believe it was Lieutenant Colonel MacLeish,
14   Major Paul Eckrich, I believe Doyle Tiller from
15   Facilities Management, Mark DeVore, and I think there was
16   another guy there, but I don't remember his name, from
17   Facilities Management.  He had a beard.
18       Q.    Would that be Bob Furman?
19       A.    It could be.  I believe that's who it was.  I
20   know Sergeant Foraker was there, Corporal Warren,
21   Corporal Warwick, myself, Lieutenant Davis, and
22   Captain Warren.
23       Q.    What caused you to be there?
24       A.    We were addressing health concerns at the

Page 104

1    range.
2        Q.    Why were the Facilities people there?
3        A.    I guess to help address the issues.
4        Q.    Who was running the meeting?
5        A.    I think it was Greg Warren and
6    Colonel MacLeish.
7        Q.    Do you recall how long the meeting lasted?
8        A.    No, I do not.
9        Q.    Do you recall anything that was said in the
10   meeting?
11       A.    After the meeting concluded, I recall the
12   comment that was made.
13       Q.    What comment was made after the meeting was
14   concluded, and by whom and to whom?
15       A.    Lieutenant Colonel MacLeish made the comment to
16   me, and I don't know if he said it as a joke, but he
17   said, "Kurt, you have been at the range so long, we don't
18   know what we have done to you," and that just really --
19   and that's why it really stuck out in my mind.  I thought
20   that that was kind of an inappropriate comment to be
21   made.
22       Q.    Was he laughing when he said it?
23       A.    No.
24       Q.    Describe to me his demeanor when he said that.

Page 105

1        A.    Pretty much me sitting here looking at you
2    saying, "Kurt, we don't know" -- "you have been at that
3    range so long, we don't know what we have done to you."
4        Q.    Did you say anything back to him?
5        A.    No.  I was dumbfounded.
6        Q.    Do you remember anything that happened before
7    that comment?
8        A.    There was a lot of discussion as to the
9    air-handling system, and that's really about all that I
10   remember about the meeting.
11       Q.    Do you remember discussion of lead levels?
12       A.    No.
13       Q.    Do you remember discussion of potential
14   modifications of the range to make it safer?
15       A.    No, sir.
16       Q.    Do you remember any discussion of modifications
17   to the HVAC system?
18       A.    No.
19       Q.    Do you remember discussion of any environmental
20   cleanup that will done in the range?
21       A.    I believe it was being discussed as far as they
22   would need to contact a vendor to do that.
23       Q.    Do you remember there being any discussion as
24   between the State Police and Facilities Management who

27 (Pages 102 to 105)

Wilcox & Fetzer, Ltd.                Professional Court Reporters              (302)655-0477

A397

Price, et al.                                    v.                          Chaffinch, et al.
B. Kurt Price                              C.A. # 04-956-GMS                October 18, 2005

Page 106

1  had responsibility for modification of the range?
2      A.   No, sir.
3      Q.   Do you remember any discussion at that meeting
4  of whether the FTU personnel had been doing maintenance
5  of the bullet trap over the past couple months?
6      A.   I don't recall that specifically.  I had
7  actually forgotten my note-taking material at the range
8  when we left for the meeting.
9      Q.   Are you saying that's why you didn't take any
10 notes?
11     A.   Yes, sir.
12     Q.   I'm just asking what you remember unaided by
13 notes, and you're saying you don't remember basically
14 anything that was said at that meeting?
15     A.   Not all that you're telling me, no.
16     Q.   Is there anything that I haven't asked you
17 about that you do remember from the meeting?  From the
18 meeting itself, not anything that was said --
19     A.   No, sir.
20     Q.   Do you recall speaking at the meeting?
21     A.   No, I do not.
22     Q.   Do you recall being asked any question at the
23 meeting?
24     A.   No, sir.

Page 107

1      Q.   Do you recall anything that any of the four of
2  you from the Firearms Training Unit said during that
3  meeting?
4      A.   No, sir.  I think all of our information was
5  being relayed by Captain Warren, if my memory serves me
6  correctly.  Again, I don't recall specifically.
7      Q.   Is that the only meeting at the academy that
8  you attended with people from Facilities Management
9  present?
10     A.   That's the one I remember.  I may have been at
11 one there.  I remember years ago they came up to the
12 range for meetings and so forth, and we had a lot of
13 meetings with Facilities Management over my tenure as a
14 firearms instructor at the indoor range.
15     Q.   Those are meetings at the range?
16     A.   Yes.
17     Q.   I'm talking about a meeting at the academy.  Is
18 that the only one you were at?
19     A.   That's the only one I can remember.
20     Q.   How many times have you met Bob Furman?
21     A.   I think that time.
22     Q.   Is that the only time?
23     A.   Yes.
24     Q.   You said that there was a second meeting that

Page 108

1  you were with Lieutenant Colonel MacLeish it would
2  have been at the time and that was one that occurred in
3  the museum.
4      A.   Yes.
5      Q.   Do you recall when that occurred?  I'm sorry.
6  I asked you that.  You said you don't recall, but it was
7  after the meeting at the academy.
8      A.   Yes.
9      Q.   Who was present at that meeting?
10     A.   Lieutenant Colonel MacLeish, Major Eckrich, I
11 believe, Mr. Gene Sharpe from fiscal, I believe
12 Captain Homiak and Captain Yeomans, Sergeant Foraker,
13 Corporal Warren, Corporal Warwick, and myself.  Did I say
14 Lieutenant Davis and Captain Warren?
15     Q.   You did not yet.
16     A.   They were there, too, I believe.
17     Q.   Do you recall what Homiak did in that meeting
18 or said?
19     A.   He stated that he had been tasked by the
20 lieutenant colonel to conduct a survey of other agencies
21 with indoor firing ranges as far as how maintenance was
22 conducted.
23     Q.   Did he report at that meeting on what he had
24 found?

Page 109

1      A.   Yes.
2      Q.   What did he say that you recall?
3      A.   The gist of it as I can remember was that there
4  was a variety of different issues.  It varied from
5  hazardous material teams coming in to clean the range
6  after the shoot, to instructors who were trained and
7  equipped to clean the range after the shoot.
8      Q.   Do you remember anything else that Homiak
9  reported on?
10     A.   No, sir, I don't recall.
11     Q.   Do you recall whether Homiak was actually at
12 that meeting or whether you simply got a report handed
13 out from Captain Homiak?
14     A.   I want to say he was there, but -- I believe he
15 was there.
16     Q.   What did Captain Yeomans say or do during that
17 meeting?
18     A.   I believe he had been tasked by Lieutenant
19 Colonel MacLeish to contact a Dr. Schwartz from Johns
20 Hopkins University Hospital in regards to blood lead
21 levels.
22     Q.   Did you get a copy of his report?
23     A.   I did, but I believe I turned that over to my
24 attorney.

28 (Pages 106 to 109)

A398

Price, et al.                                      v.                        Chaffinch, et al.
B. Kurt Price                              C.A. # 04-956-GMS                  October 18, 2005

Page 110

1    Q.    Did Captain Yeomans report on what he had
2  found?
3    A.    Yes.
4    Q.    Do you recall what he said?
5    A.    He at one time stated that Dr. Schwartz said we
6  should strive to keep our blood lead levels below 10.
7    Q.    Do you remember anything else?
8    A.    No, sir.
9    Q.    Do you recall a discussion of research that
10  Captain Yeomans had done with a Professor Miller at the
11  University of Delaware?
12    A.    No, sir.
13    Q.    Do you remember anything else Yeomans said or
14  did during the meeting?
15    A.    No, I do not.
16    Q.    Do you recall anything that Lieutenant Colonel
17  MacLeish said during that meeting?
18    A.    Yes.
19    Q.    What did he say?
20    A.    He stated that we worked in a hearing -- I'm
21  sorry. That we worked in a firing range and hearing loss
22  was expected, as was elevated toxin levels in our
23  bloodstream.
24    Q.    Did you say anything to him when he said that?

Page 111

1    A.    No, sir.
2    Q.    Did you agree with that?
3    A.    No.
4    Q.    Have you been to other firing ranges, indoor
5  firing ranges, since you have been working at the
6  Delaware State Police range?
7    A.    As far as on a tour or shooting in them?
8    Q.    Either. Or both.
9    A.    I have not shot in another agency's indoor
10  range. I do know we went to the FLETC range in
11  Cheltenham, Maryland, and we also went to the FBI range
12  in Quantico, Virginia.
13    Q.    Did you also go to the FLETC range in Glenco,
14  Georgia?
15    A.    No, sir.
16    Q.    Did you go to any other range during the time
17  that you were with the State Police Firearms Training
18  Unit other than the Cheltenham, Maryland, one and the
19  Quantico one?
20    A.    No, sir. That was the only two.
21    Q.    When you work at a firing range, you're working
22  with lead projectiles, are you not?
23    A.    Yes.
24    Q.    Even though the handgun ammunition the Delaware

Page 112

1  State Police uses is frangible, it doesn't have lead, the
2  shotgun ammunition still has lead, right?
3    A.    Yes.
4    Q.    Prior to your switching over to frangible, all
5  the ammunition had lead, right?
6    A.    Yes.
7    Q.    Would you expect, given that exposure to lead,
8  that people who work in an indoor firing range might have
9  elevated blood lead levels?
10    A.    No.
11    Q.    Why do you think you're tested for serum blood
12  lead levels if you wouldn't expect that to cause --
13  working there to cause a higher blood level of lead?
14    A.    I would assume it would be to make sure we do
15  not get a higher lead level than what is considered to be
16  normal.
17    Q.    Do you understand that, as a firing range
18  instructor, you are more exposed to lead than a person in
19  the general population?
20    A.    Yes.
21    Q.    Would you expect that, in that type of job,
22  you're likely to have elevated blood lead levels?
23    A.    Not if the building is functioning correctly
24  with the air-handling system.

Page 113

1    Q.    When you were in the outdoor range, didn't you
2  have your blood lead tested?
3    A.    No. But I will say that prior to -- or I
4  believe it's the first lead level done on the sheet that
5  you showed me, if I may?
6    Q.    You may do whatever you like with those
7  exhibits.
8    A.    It's Exhibit No. 13. We were at that time
9  currently working with the recruit class in the outdoor
10  range shooting leaded ammo, and I was a 4 percent, which
11  is considered okay even if you're a kid, according to the
12  documentation we have here.
13    Q.    You also had 5s where you were shooting indoor,
14  right?
15    A.    Yes, sir.
16    Q.    Had you ever prior to 1998 had a blood lead
17  test done?
18    A.    Not that I can recall, sir.
19    Q.    You believe that you should be able to shoot in
20  an indoor range and have no elevation of your blood lead
21  level at all?
22    A.    If the building's functioning correctly, that's
23  what I do believe.
24    Q.    What's the basis for that belief?

29 (Pages 110 to 113)

Page 114

1    A.    As an employer, I would expect everything,
2  every precaution to be done to ensure my health and to
3  make me educated in regards to what I need to do to make
4  sure that I stay healthy in that environment.
5    Q.    Have you ever talked to experts in ranges to
6  determine whether it's realistic to expect that, as an
7  instructor in an indoor firing range, you would have
8  blood lead levels the same as the population at large?
9    A.    I have not talked to --
10   Q.    Have you ever done any research on that
11 question?
12   A.    No, sir, I have not.
13   Q.    We're back to the meeting that occurred in the
14 museum conference room.  Do you recall anything else that
15 Lieutenant Colonel MacLeish said during that meeting?
16   A.    I think he commented at one time that he was
17 interested in getting us trained in hazardous material
18 abatement.
19   Q.    Do you recall anything else?
20   A.    Not directly, no.
21   Q.    Do you recall any discussion of contracting out
22 the hazardous material cleanup work?
23   A.    That may have occurred.  I don't specifically
24 recall that.

Page 115

1    Q.    Do you recall anything that Major Eckrich said
2  during that meeting?
3    A.    No, sir, I do not.
4    Q.    Do you recall anything that Captain Warren said
5  during that meeting?
6    A.    No.  I'm sorry.  I don't.
7    Q.    Do you recall anything that Lieutenant Davis
8  said during that meeting?
9    A.    No, sir.
10   Q.    Did you say anything during the meeting?
11   A.    No, sir.  Not that I can --
12   Q.    Not that you can recall?
13   A.    No, sir.
14   Q.    Do you recall anything that Sergeant Foraker
15 said during the meeting?
16   A.    No, sir, I do not.
17   Q.    How about anything that Corporal Warwick said?
18   A.    I do not recall that.
19   Q.    Corporal Warren, do you recall anything that he
20 said?
21   A.    No, I don't.
22   Q.    What did you understand the purpose of the
23 meeting to be?
24   A.    I wasn't sure because, quite honestly, the only

Page 116

1  one from the FTU that was specifically invited was
2  Sergeant Foraker, and we showed up, as well, and I think
3  it kind of set them back a little bit.
4    Q.    Set who back?
5    A.    The people that were there, because they had to
6  grab more chairs to accommodate more bodies that showed
7  up.
8    Q.    How do you know that none of the rest of you
9  were invited?
10   A.    MacLeish made the comment that "We did not know
11 that you people were coming."
12   Q.    If you weren't invited and you didn't know the
13 purpose of the meeting, why did you show up?
14   A.    I wanted to be there because it had to do with
15 the range.  I assumed that that's what it had to deal
16 with.
17   Q.    Were you given any instructions coming out of
18 that meeting?
19   A.    No, sir.  Not that I recall.
20   Q.    Do you recall anybody at that meeting asking
21 whether the FTU officers, including yourself, required
22 any more medical attention?
23   A.    I don't recall that being said.
24   Q.    Do you recall anyone telling Lieutenant Colonel

Page 117

1  MacLeish at that meeting that you and Corporal Warren
2  were having hearing trouble?
3    A.    That may have happened.  I don't recall that.
4    Q.    At the point that you went to this meeting, had
5  you already been to Omega Health?
6    A.    I don't know what the date of that meeting
7  was -- only thing I can tell you is that the Omega Health
8  visit was March 1st of 2004.  I don't recall what date
9  the meeting was at the museum, and I apologize.  I don't
10 remember that date.
11   Q.    That's okay.  It is not expected that you
12 remember every date.
13         Do you remember how the Omega Medical
14 examinations got set up?
15   A.    I know that Sergeant Foraker had had dialog
16 with, I believe it was, Mr. Joe Farrell from
17 Environmental Solutions and that he -- since we were
18 being exposed to the same type of things that his workers
19 do, I think he wanted to get us to the people that were
20 familiar with toxic exposures, more so than HealthWorks.
21   Q.    What was the matter with HealthWorks?
22   A.    I don't believe they had the background to go
23 as in-depth or have the experience that Omega Medical had
24 with exposures.

30 (Pages 114 to 117)

Price, et al.                                v.                        Chaffinch, et al.
B. Kurt Price              C.A. # 04-956-GMS              October 18, 2005

Page 118

1    Q.    Are you the person who set up the appointments
2    at Omega?
3    A.    No, sir.
4    Q.    Do you know who set up the appointments?
5    A.    No, I don't.
6    Q.    Are you the person who asked for the State
7    Police to send you to Omega?
8    A.    I think we did that collectively.
9    Q.    Do you recall at the meeting that occurred at
10   the museum with Lieutenant Colonel MacLeish and the other
11   folks that you've identified whether you knew of the
12   results of the examination you had gone for at Omega?  In
13   other words, did you have in your mind as you went into
14   that meeting the results of the examination at Omega?
15   A.    I believe we had the hearing results that day.
16   Q.    You mean the day you had the exam?
17   A.    Yes.  But I don't know what date the meeting
18   was at the museum as far as if we knew that -- if it was
19   before or after, I can't remember, the Omega visit.
20   Q.    Was there any discussion in the meeting at the
21   museum of the results of the Omega testing?
22   A.    I think there was some discussion about the
23   hearing loss.
24   Q.    At the meeting in the museum?

Page 119

1    A.    I believe so, yes.
2    Q.    What was the substance of that discussion?
3    A.    That hearing loss had incurred, but we were
4    really unsure as to what our status was.  If my memory
5    serves me correctly.
6    Q.    When you say "our," who's "our"?
7    A.    Myself and Corporal Warren.
8    Q.    Who is it that made that statement that you
9    were not sure "what our status was"?
10   A.    I can't recall specifically.  I just remember
11   that being discussed.
12   Q.    When you or somebody else said that you weren't
13   sure of the status of yourself and Corporal Warren, did
14   anybody in the room respond to that?
15   A.    No, sir, not that I remember.
16   Q.    Did you ask anybody in the meeting whether you
17   could get tested further?
18   A.    I don't recall making that statement.
19   Q.    Is there anything else that happened in the
20   meeting with Lieutenant Colonel MacLeish and the other
21   folks you identified in the conference room at the State
22   Police museum that you haven't told me about?  Can you
23   think of anything that happened that we haven't
24   discussed?

Page 120

1    A.    Not that I can remember right offhand.  I may
2    have discussed that further in my interrogatory answers.
3    I don't recall.
4    Q.    I just want to know what you can remember
5    sitting here now.
6            Did you have any discussion with
7    Lieutenant Colonel MacLeish about any health or safety
8    issues at the range before the meeting that occurred at
9    the academy with the Facilities Management people?  And
10   by "you," I mean you personally.
11   A.    I remember one day he showed up at the range
12   and came into the control room where I was calling the
13   line when we had a recruit class.
14   Q.    Was this at the Smyrna facility?
15   A.    Yes, sir, it was.  And I don't know -- I just
16   remember he popped in there and I was calling the line,
17   and when you're calling the line from that control room,
18   you can't -- you got to be 110 percent on that range
19   issue.  So I don't recall talking to him about the
20   health.
21   Q.    Did you have a discussion with him at some
22   point after the meeting that occurred in the museum?
23   A.    It was a date in April that we were at the
24   Wilmington Police Department's range when Lieutenant

Page 121

1    Colonel MacLeish responded to the range and told me to
2    get in the car with him, that he wanted me to look at the
3    National Guard range which we were going to utilize until
4    our facility got squared away.
5    Q.    Did you actually go to the National Guard
6    range?
7    A.    Yes, sir.
8    Q.    How far is the National Guard range from the
9    Wilmington Police Department range?
10   A.    Approximately 100 yards.
11   Q.    You drove from one range to the other?
12   A.    Yes, sir.
13   Q.    And did he talk to you?
14   A.    Yes.
15   Q.    What did he say to you?
16   A.    The conversation started out with if I did not
17   understand the order that he had given, and I was "What
18   order?"  What I was told that I was to instruct the
19   recruits on the class -- in the classroom at that range
20   but not go out on the firing line.  When the colonel
21   pulled up, we had just broken for lunch and I was outside
22   walking around with my headset in my hand, and I assumed
23   that he thought that I was on the line, and I was not.
24   Q.    I take it at the Wilmington Police Department

31 (Pages 118 to 121)

Price, et al.                                  v.                            Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS                     October 18, 2005

---

Page 122

1  range there is a classroom building?
2      A.   Yes, sir.
3      Q.   Part of your function as an instructor is to
4  provide classroom instruction, right?
5      A.   Yes, sir.
6      Q.   You had just completed the instruction part of
7  your day?
8      A.   They had actually completed their shooting, and
9  I had walked outside after they had completed their
10  shooting from the classroom.  They did not want me on the
11  line, on the firing line.
12     Q.   As you understood your instructions, you were
13  supposed to stay in the building so that you didn't get
14  exposed to noise?
15     A.   That's correct.
16     Q.   You were walking out of the building as the
17  recruits were finishing shooting?
18     A.   No.  They had already finished shooting, and
19  guns were in the holster, no rounds going off, and I
20  walked outside and was talking with the other instructors
21  as he pulled up.
22     Q.   It's your impression that he thought that you
23  were on the line with them?
24     A.   Yes.

---

Page 123

1      Q.   You said that when he got you in the car, that
2  he said to you something about do you not understand my
3  order?
4      A.   Yes.
5      Q.   What order was he referring to?
6      A.   I don't know.  I know Sergeant Foraker had a
7  discussion with me where he advised me that I could
8  continue my duties as far as range classroom instruction
9  was concerned, but they did not want me on the actual
10  firing line, and I was okay with that, obviously, because
11  I just wanted to stay -- I wanted to keep my hands in the
12  instruction end.
13     Q.   You just said that Sergeant Foraker told you
14  that they didn't want you on the firing line.  Who did
15  you understand the "they" to be?
16     A.   I'm assuming the staff, be it the
17  administrative staff or the staff at the academy.  It
18  didn't matter.  I was told by my sergeant that they
19  didn't want me on the line.  Regardless of who said it, I
20  wasn't going to be on the line.
21     Q.   Did anybody ever tell you that that was an
22  order that Lieutenant Colonel MacLeish had given?
23     A.   When MacLeish came, I understood it then.
24     Q.   But you did not understand it prior to that?

---

Page 124

1      A.   No.
2      Q.   What event occurred that caused you to be taken
3  off the live firing line?
4      A.   Lieutenant Colonel MacLeish at that point said
5  that he did not even want me on the premises while
6  shooting was being conducted.  He did not want me even
7  remotely around the range, that he was looking out for
8  the division, as well as my health.
9      Q.   Let me back up a second.  Your normal duties as
10  a firearms instructor include being on the line while the
11  guns are going off, right?
12     A.   It used to.
13     Q.   That's what a normal instructor does, right,
14  what an instructor does under normal circumstances?
15     A.   Yes.
16     Q.   You were told not to do that.  Is that because
17  you had gotten the hearing test result back that said you
18  had hearing loss?
19     A.   Yes.
20     Q.   I know you have had a number of reports on your
21  hearing, but which of the reports triggered you being
22  taken off the live fire line?
23     A.   I believe it was the one from March 1st.
24     Q.   That would have been the one from Omega Health?

---

Page 125

1      A.   Yes, sir.
2      Q.   When you got the results from Omega Health, did
3  you turn them over to the Human Resources Department or
4  did you get them from someone in the State Police?
5      A.   We were given a copy by people at Omega.  They
6  gave us a printout of our hearing test results, and I
7  turned that over to Christie Tuxward.
8      Q.   Did the folks at Omega explain to you what the
9  test results meant?
10     A.   They said that I had -- I now had severe
11  hearing loss, and that was pretty much the way they left
12  it.
13     Q.   After you turned the paperwork over to the
14  Human Resources Department, did you then hear back from
15  somebody above you in the chain of command as to what was
16  going to be done about your hearing loss?
17     A.   No, sir.  I believe -- no, I can't recall a
18  specific conversation about what was going to be done
19  with my hearing loss.
20     Q.   You said that Sergeant Foraker told you that
21  you weren't allowed to be on the line?
22     A.   On the gun line.
23     Q.   While the guns were going off.
24     A.   Right.  That was communicated to me by

---

32 (Pages 122 to 125)

Price, et al.                                    v.                            Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS                    October 18, 2005

Page 126

1    Sergeant Foraker, but nobody else talked to me about what
2    was going to happen, that I can recall.
3        Q.   Would Sergeant Foraker normally be the person
4    that you get your orders from?
5        A.   Yes, sir.  He's my sergeant.
6        Q.   Do you remember how long after you went to
7    Omega that Sergeant Foraker gave you that instruction?
8        A.   No, sir, I do not recall.
9        Q.   Do you remember, when you had the meeting at
10   the academy that you described to me earlier, had you
11   already been restricted from live fire?
12       A.   I don't know.
13       Q.   How about at the point that you went to the
14   meeting at the State Police museum, had you already been
15   restricted from live fire?
16       A.   Not that I can recall.
17       Q.   At the point that Sergeant Foraker told you
18   couldn't be on the line when live fire was going on, had
19   you been placed on light duty yet?
20       A.   I don't think so.  I don't think I went on
21   light duty until June 18th of 2004.
22       Q.   So this was something that occurred before you
23   were put on light duty.
24       A.   I think this was -- I almost -- it was in

Page 127

1    April, because I answered this question in the
2    interrogatory from a note that I had made and provided in
3    the interrogatory, but I want to say it was either April
4    21st or April 19th.  Somewhere in that time frame.
5    Without looking at the notes, don't put me down on the
6    date, please, because I don't remember.  It was in April.
7        Q.   No one's going to hold you to a date that's two
8    years ago.
9            Is there anything that Lieutenant Colonel
10   MacLeish said to you at the meeting at the Wilmington
11   Police Department range in April of 2004 that you haven't
12   told us?
13       A.   Yes.
14       Q.   What?
15       A.   Pardon my language.  He said that he was not
16   going to fuck me.
17       Q.   What did you think he meant by that?
18       A.   As the lieutenant colonel of the Delaware State
19   Police and as somebody that has worked for the colonel
20   since he was a corporal in an acting sergeant's position,
21   I just found that knowing that the circumstances are
22   unknown with the hearing issues and everything else, and
23   after being informed that I could no longer be on the
24   range, quite honestly, why would he make that comment?

Page 128

1        Q.   Were you apprehensive when he asked you whether
2    you understood his order?
3        A.   I knew he was upset.
4        Q.   No.  I'm not asking about him.  I'm asking
5    about you.  Were you apprehensive?
6        A.   Yes, I was.
7        Q.   The lieutenant colonel said to you that he was
8    acting in the best interest of the division, right?
9        A.   Yes.
10       Q.   And he said he was concerned about your health,
11   right?
12       A.   That's correct.
13       Q.   And he said he was not going to fuck you?
14       A.   That's correct.
15       Q.   And what was your reaction to those statements
16   that he made to you?
17       A.   I understood the first two, but "I'm not going
18   to fuck you" thing really threw me for a loop coming from
19   that man.
20       Q.   Why would it be any different coming from
21   Lieutenant Colonel MacLeish than coming from anybody else
22   that you knew in the Delaware State Police?
23       A.   Because he is a lieutenant colonel of the
24   Delaware State Police, that's why, and he's my

Page 129

1    supervisor, and my career and my life is in that man's
2    hands.
3        Q.   Wasn't he just telling you that he wasn't going
4    to do you any harm?
5        A.   Why would he make that comment?
6        Q.   Maybe because you appeared apprehensive.
7        A.   That was damned sure the wrong choice of words
8    to use.
9        Q.   Why is that?
10       A.   Just not an appropriate comment to make to
11   somebody who's got a hearing loss and is unsure about
12   their future with the Delaware State Police.  I'm sorry.
13   I just took that as a personal threat.
14       Q.   In what way is that a threat to you?
15       A.   You're not going to fuck me?  Why would you
16   make that comment?
17       Q.   Maybe because it's true.
18       A.   It might be.  I took it that it's like
19   interrogation 101.  When somebody makes that comment to
20   you, then to me I assume -- maybe that's a bad thing, but
21   at that point in time, call it paranoia or whatever, but
22   I assume that that is exactly what he intended to do to
23   me.  That is the way I took that remark.  Maybe I
24   misunderstood his meaning, but I can tell you that is

33 (Pages 126 to 129)

Price, et al.                                      v.                                    Chaffinch, et al.
B. Kurt Price                              C.A. # 04-956-GMS                        October 18, 2005

Page 130

1  absolutely the way I took that remark.
2      Q.   How long had you known Tom MacLeish?
3      A.   I started working for Colonel MacLeish in 1986,
4  I think it was March, March of 1986, when I came off FTO.
5  He was my sergeant.
6      Q.   Did you get along with him okay?
7      A.   Yes, sir.
8      Q.   Did he ever do anything underhanded to you?
9      A.   He used to yell at me sometimes.
10     Q.   That's not really underhanded, is it?
11     A.   No.  Sometimes I couldn't understand why he was
12 yelling, but that's just his management approach
13 sometimes.
14     Q.   Did you have any reason to believe that when he
15 said to you he wasn't going to fuck you, that he really
16 meant the opposite?
17     A.   As a colonel of the Delaware State Police, and
18 given the circumstances and what just happened to me,
19 that is what I felt.  Right, wrong, or indifferent, that
20 was my instinct.
21     Q.   I'm just asking why you had that instinct.
22     A.   I guess I was paranoid at that point in time in
23 my career and still am.
24     Q.   Where is the tower at the Wilmington police

Page 131

1  range?
2      A.   That is approximately -- if I can remember
3  right now.  I wasn't there long.  It is about 30 yards
4  behind the shooting line.  It's soundproof.
5      Q.   Is it inside the classroom building?
6      A.   No, I don't believe so.
7      Q.   How high is the tower?
8      A.   I don't know.  I'm going -- it's a guess.
9  Twenty feet or so.
10     Q.   How do you get up?
11     A.   Go up a flight of stairs.
12     Q.   Is it something that looks like it's on stilts?
13     A.   No, sir.  It's a concrete block building.
14     Q.   It's soundproof?
15     A.   Yes.
16          MR. ELLIS:  Why don't we take a break for
17 a minute.
18          (A recess was taken.)
19          (Defendants' Deposition Exhibit No. 14 was
20 marked for identification.)
21 BY MR. ELLIS:
22     Q.   This is a one-page document, Corporal Price.
23 It's an e-mail dated May 4th, 2004, and it appears to
24 come from you and go to Chris Foraker.

Page 132

1          Did you prepare this document?
2      A.   Yes, sir.
3      Q.   Why did you prepare this?
4      A.   I had some questions as to nobody had spoken to
5  me in regards to what my duty status what, if I was on
6  full duty, light duty.  I was concerned when I was
7  removed from the range as far as just what exactly was
8  going on with my career.
9      Q.   You've testified that, on the occasion when
10 Lieutenant Colonel MacLeish spoke to you at the
11 Wilmington Police Department range, you had been inside
12 the building.  Am I correct that, according to this
13 e-mail, you weren't inside the building but you were in
14 the tower?
15     A.   Yes, according to the e-mail.
16     Q.   Were you in the building or were you in the
17 tower?  Which was it?
18     A.   I'm assuming since I read this that it was the
19 tower, the soundproof tower.  It's made of concrete
20 block.  Sits back off the range.
21     Q.   What were you doing in the tower?
22     A.   I was watching through the plate-glass window
23 with the headset on watching the recruits shoot.
24     Q.   What's the purpose of having the headset?

Page 133

1      A.   I wanted to make sure that my hearing was not
2  going to be compromised.
3      Q.   I thought the building was soundproof.
4      A.   Yes, sir, it was.  But I just had my headset
5  on.
6      Q.   When you have the headset on, do you receive
7  radio transmissions?
8      A.   Not there, no, sir.
9      Q.   Does the tower at the Wilmington Police
10 Department range have communication systems that tell the
11 people on the firing line what to do?
12     A.   I don't know.  If they did, we weren't using
13 that.  I believe they were using a hand-held system out
14 on the line.
15     Q.   So was the tower being used for any purpose
16 other than for you to stand there and watch?
17     A.   That's all I was doing, sir, was watching the
18 recruits shoot.
19     Q.   Was there anybody in there with you?
20     A.   I don't believe so.
21     Q.   So when you first saw Colonel MacLeish, you had
22 a headset on?
23     A.   No, sir.
24     Q.   You had your headset in your hand?

34 (Pages 130 to 133)

Price, et al.                                                   Chaffinch, et al.
B. Kurt Price                          v.                       October 18, 2005
                          C.A. # 04-956-GMS

Page 134

1    A.   Yes, sir.  The recruits had finished shooting
2    and I believe they were policing up the range and were
3    getting ready to break for lunch, and I was, I believe,
4    engaged in discussion with firearms instructors.
5    Q.   Did you have any other discussion with
6    Lieutenant Colonel MacLeish concerning range issues?
7    Again, by discussion with him, I mean in which you
8    communicated with him and he communicated with you
9    directly.
10   A.   I don't recall any specifics.
11   Q.   Was there a point when you had a telephone
12   conversation with him in roughly late July of 2004?
13   A.   I don't remember -- I believe it was sometime
14   in July, sir.
15   Q.   Do you recall the event that I'm asking you
16   about?
17   A.   Actually was the first part of August.  Yes,
18   sir.  I had answered that in the interrogatory, but I
19   also have some recollection of it, but not as in-depth as
20   the interrogatory.
21   Q.   What do you recall about that event?
22   A.   I received a phone call at home from
23   Sergeant Foraker advising me that Lieutenant Colonel
24   MacLeish wanted to talk to me.  I in turn called my --

Page 135

1    one of my attorneys, Stephen Neuberger, and advised
2    him --
3    Q.   I don't want you to tell me anything you said
4    to your lawyer for the purpose of obtaining legal advice
5    or anything he said to you in the way of legal advice.
6    But we can stop with the fact that you called your
7    lawyer.
8         As a result of talking to your lawyer, did
9    you do something?
10   A.   I did not call Colonel MacLeish.
11   Q.   Did you, nevertheless, have a conversation with
12   Lieutenant Colonel MacLeish?
13   A.   Yes, sir.
14   Q.   How did that come about?
15   A.   I got paged by the executive staff secretary,
16   and I returned the page.
17   Q.   Which secretary are we speaking of here?
18   A.   Liz Seay.  Elizabeth Seay.
19   Q.   Did you actually talk to Colonel MacLeish?
20   A.   Yes.
21   Q.   How long did the conversation last?
22   A.   I'm going to guess.  It was five minutes or so.
23   Q.   What did he say to you?
24   A.   I voiced my concerns with our second auditor's

Page 136

1    interview with him, and I told him that I felt that the
2    division was trying to lay blame on the range mess on the
3    staff there.
4         I also voiced my concern about the
5    division sending our hearing test results to the TK Group
6    when they did not follow the protocol that the TK Group
7    mandated them.
8    Q.   What was his response?
9    A.   His response was that they did not prompt any
10   questions for the auditor's investigators to ask us, and
11   he said that the only way the division would take any
12   adverse action on us was if the auditors found any gross
13   negligence on our part.
14        I believe he also stated that they were
15   working on getting us to the University of Penn to see
16   Dr. Emmett.
17   Q.   Did he tell you why you would be going to the
18   University of Penn to see Dr. Emmett?
19   A.   A second opinion.
20   Q.   A second opinion on what?
21   A.   On I'm assuming our first opinion by Dr. Green.
22   Q.   On your hearing?
23   A.   I would assume so.  That and our metal
24   exposure.

Page 137

1    Q.   Is there anything else that transpired in that
2    discussion you had with Lieutenant Colonel MacLeish in
3    August of 2004?
4    A.   Not that I can recall directly.  There may be
5    something more in my interrogatory answer to that.
6    Q.   As far as what you can tell sitting here today,
7    you raised a concern with him about how you had been
8    questioned by the auditor, right?
9    A.   Yes.
10   Q.   And you raised a question as to how the
11   audiology group from Illinois was handling your audiology
12   issue?
13   A.   Yes.
14   Q.   And then he said in response to you that there
15   was nobody contemplating any action against you from
16   within the State Police at the present time for anything
17   connected with the maintenance of the range.
18   A.   He said that if the state auditors found there
19   was gross negligence on our part, that the division would
20   look into it.
21   Q.   Did you feel that you had been grossly
22   negligent?
23   A.   No.
24   Q.   Did he tell you that there was going to be any

35 (Pages 134 to 137)

Price, et al.                                    v.                          Chaffinch, et al.
B. Kurt Price                            C.A. # 04-956-GMS              October 18, 2005

Page 138

1  employment action taken against you in the absence of
2  gross negligence?
3      A.   No.
4      Q.   Did you ask him?
5      A.   No.
6      Q.   I take it he also said that he was going to get
7  a second opinion on your hearing problem.
8      A.   He was going to get a second opinion on hearing
9  and metal exposure.
10     Q.   Did you think that was a good thing, to get a
11 second opinion?
12     A.   Yes.
13     Q.   Why?
14     A.   I'd rather have two than one.  I believe that's
15 the norm in our society, as well.
16     Q.   By the time you had that conversation with
17 Lieutenant Colonel MacLeish, am I correct that you had
18 your hearing tested by Omega, right, first?
19     A.   At that time we had actually had two hearing
20 tests by Omega.
21     Q.   So you had had two hearing tests by Omega.  Had
22 you also had one from Dr. Cooper?
23     A.   Yes.
24     Q.   Had you had any others?

Page 139

1      A.   I don't believe so.
2      Q.   Were the hearing tests that you had had up at
3  that point consistent to the effect that you had a
4  substantial noise-induced hearing loss?
5      A.   Dr. Cooper advised me that my hearing loss had
6  not really changed in my left ear, but it had gotten
7  worse in my right ear.  He also advised that I was not a
8  candidate for a hearing aid.
9      Q.   Did he say why?
10     A.   He said my hearing loss did not -- he feels
11 that the amount of hearing loss that I had, a hearing aid
12 would not be beneficial; says it's not that severe yet.
13     Q.   Your hearing loss is not that severe?
14     A.   That's correct.  That's what he told me.  I got
15 to rely on his decision.
16     Q.   During the course of 2004 where you were
17 working on range issues, did you have any discussions
18 with Aaron Chaffinch?  I'm sorry.  About the range.
19     A.   No, sir.
20     Q.   Have you ever worked with Aaron Chaffinch?
21     A.   When I was at Troop 5 in Bridgeville on FTO, he
22 was in the drug unit office, and I would just see him to
23 talk to him.  But we never worked together.
24     Q.   Have you ever talked to him about the firing

Page 140

1  range?
2      A.   No.
3      Q.   Have you ever talked to David Baylor about the
4  firing range?
5      A.   I know there were times when Major Baylor was
6  still on the job that he would stop by the range.  I
7  remember one particular time when he stopped by and we
8  were talking about his classmate, Corporal Bruce Peachey,
9  but as far as discussion directly involving the range, I
10 don't know that I ever did.
11     Q.   How about Major Papili, did you ever discuss
12 health or safety concerns at the range with him?
13     A.   No, sir.
14     Q.   How about Major Eckrich?
15     A.   I don't recall.
16     Q.   Aside from the meeting.  I know you
17 testified --
18     A.   I don't know about anything with -- I know we
19 would talk about -- I know he's an avid rabbit hunter.
20 We would talk about things like that, but I don't know if
21 we talked about the range.
22     Q.   How about Major Hughes, did you ever have any
23 discussions with Major Hughes about the range?
24     A.   No, sir.  Not that I can recall directly.  My

Page 141

1  recollection from discussions with Major Hughes was he
2  telephoned me on June 18th and placed me on light duty.
3      Q.   So Major Hughes is the person who told you you
4  were on light duty because of your hearing loss?
5      A.   Yes.  That was my fitness of duty exam which
6  fitness for duty exam -- which occurred June 17th of
7  2004.
8      Q.   So at the point that you talked to Lieutenant
9  Colonel MacLeish in August 2004, you had already been
10 placed on light duty?
11     A.   Yes.
12     Q.   And he told you that he would get a second
13 opinion for you?
14     A.   Yes.
15     Q.   You were interviewed by the State Auditor's
16 Office, right?
17     A.   Yes.
18     Q.   How many times were you interviewed by the
19 State Auditor's Office?
20     A.   I don't want to sound -- in regards to the
21 range itself, correct?  Because I got interviewed by them
22 in regards to issues on Corporal Cathell, as well.
23     Q.   I'm not referring to Corporal Cathell's issues.
24     A.   I want to make sure.  I was interviewed two

36 (Pages 138 to 141)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A406

Price, et al.                                          v.                                    Chaffinch, et al.
B. Kurt Price                                  C.A. # 04-956-GMS                          October 18, 2005

| Page 142 | Page 144 |
|---|---|

**Page 142**

1  times by the State Auditor's Office.
2      Q.    Would I be correct that the first one was about
3  May 11th or May 12, 2004?
4      A.    Somewhere in there I do believe.
5      Q.    And the second one was sometime in late July?
6      A.    I think so.
7      Q.    Did you participate in assembling a lot of
8  three-ring binders, much like we have got here sitting
9  around the table, to be presented to the Auditor's
10  Office?
11     A.    I believe I did, yes.
12     Q.    What role did you play in assembling the
13  three-ring binders?
14     A.    It may have just been taking paperwork -- I
15  don't know, to be honest with you.  I can't be specific
16  with that.  I do remember we turned over a lot of
17  documentation.
18     Q.    Did you yourself gather information to be
19  incorporated into the binders?
20     A.    I don't recall that, no.
21     Q.    How did you come to be interviewed by the State
22  Auditor's Office?
23     A.    As I understood it, it was an order by
24  Governor Minner that we were to cooperate in the

**Page 143**

1  investigation of the FTU.
2      Q.    Who delivered that order to you?
3      A.    I believe it was my attorney, Mr. Neuberger.
4      Q.    Did you get any kind of direction from anybody
5  inside the State Police to make yourself available to
6  talk to the Auditor's Office?
7      A.    Not that I can recall.
8      Q.    I think you had said you had been interviewed
9  by auditors with respect to other issues?
10     A.    Yes.
11     Q.    One of them had something to do with
12  Eddie Cathell?
13     A.    Yes.
14     Q.    Any others?
15     A.    No.  Not that I can recall.  I think that was
16  it.
17     Q.    What was the issue with Eddie Cathell?
18     A.    Something about the fund at the range and how
19  monies were -- how Corporal Cathell had acquired the
20  money and what he used the monies for.
21     Q.    The Brass Fund?
22     A.    Something like that, yes.
23     Q.    Where did your first interview take place with
24  the State Auditor's Office?

**Page 144**

1      A.    With the range now?
2      Q.    Yes.
3      A.    It occurred in Mr. Neuberger's conference room.
4      Q.    Is that the one with no windows that's real
5  cold all the time?
6      A.    Yes.
7           MR. NEUBERGER:  Very comfortable.
8           MR. ELLIS:  Off the record.
9           (Discussion off the record.)
10  BY MR. ELLIS:
11     Q.    Who was present for the interview?
12     A.    There were three auditors and my attorney and
13  myself when I went through.
14     Q.    Did the auditors ask you questions?
15     A.    This was the first interview, right?
16     Q.    Yes.
17     A.    Yes, they did.  And I also provided a written
18  statement to them.
19     Q.    Do you remember what any of the questions were?
20     A.    I would have to look at -- I think it was
21  general information as far as when did I start up there
22  and what my duties were.
23     Q.    Do you remember how long the interview lasted?
24     A.    I'm going to guess that it was between 15 and

**Page 145**

1  20 minutes.
2      Q.    What did they ask you other than how long you
3  worked there?
4      A.    I can't remember all -- it was general-type
5  information.
6      Q.    Did you give them any documents?
7      A.    I gave them that prepared statement, I think.
8  I know I gave it to my attorney.  I'm assuming he would
9  have made that available to them.
10     Q.    You didn't hand it to them, though?
11     A.    No, sir.  In fact, I could not finish reading
12  the statement.
13     Q.    You what?
14     A.    I could not finish reading the statement.  I
15  got upset.
16     Q.    Why could you not finish reading the statement?
17          MR. NEUBERGER:  You seem to be losing your
18  composure.  Do you want to take a break here?
19          THE WITNESS:  No.  I'll be all right.
20     A.    Because I don't know what might happen to my
21  kids.  I don't know what I brought home to those kids.  I
22  don't know if I can send them to college.  I'm sorry.
23     Q.    Do you want to take a break?
24     A.    No.  Let's roll.  My family is all that I got.

37 (Pages 142 to 145)

A407

Price, et al.                                    v.                          Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS                     October 18, 2005

Page 146

1      (Defendants' Deposition Exhibit No. 15 was
2   marked for identification.)
3   BY MR. ELLIS:
4      Q.   Corporal Price, I'm ready to take a break if
5   you want.
6      A.   No, sir.  Let's roll, please.
7      Q.   Then take a look at Exhibit 14.
8      A.   14 or 15?
9           MR. NEUBERGER:   This is a new one.  It's
10  15.
11          THE WITNESS:  14 is my e-mail.
12     Q.   Can you tell us what Exhibit D-15 is?
13     A.   It appears to be my statement that I prepared
14  for the Auditor's Office.
15     Q.   Did you have any help preparing it?
16     A.   No, sir.
17     Q.   Did you show it to anybody before you turned it
18  over to them?
19     A.   No, I did not.
20     Q.   Did you read this statement to the auditors?
21     A.   Yes, sir.  As far as I could.
22     Q.   Do you remember how far you got?
23     A.   The part about my kids.  Then Mr. Neuberger had
24  to take over for me because like I do here, I lost my

Page 147

1   composure.  I apologize.
2      Q.   So you read all the way to the top of the third
3   page?
4      A.   Yes, sir.
5      Q.   Did you give copies of Exhibit D-15 to the
6   auditors?
7      A.   I don't know.  My attorney had it.  I don't
8   know if he gave it to them or not.
9      Q.   I'm sorry.  I asked you a couple minutes ago
10  whether you gave copies to anybody before you went into
11  that meeting.  I think you said no.
12     A.   No.  Not before I went into the meeting, no.
13     Q.   So you walked into the meeting with copies of
14  this statement in your hand?
15     A.   A copy, my copy.
16     Q.   Did anybody else have copies that you know of?
17     A.   Not that I can recall.
18     Q.   I take it from your testimony that you read
19  this document to the auditors as they're sitting in the
20  room with you.
21     A.   Yes, sir, that is correct.
22     Q.   Why did you read it to them instead of just
23  handing it to them?
24     A.   I was going under the advice of my attorney.

Page 148

1      Q.   Did they ask you any follow-up questions after
2   you read the document to them?
3      A.   I don't recall, sir.  I was shook up.
4      Q.   What shook you up was reading the part at the
5   top of page 3 that has to do with your kids?
6      A.   Yes.
7      Q.   And this has to do in part with the results of
8   your Omega Medical test.
9      A.   Part.  Also the swipe sampling and so forth.
10     Q.   Let me show you another document.
11          (Defendants' Deposition Exhibit No. 16 was
12  marked for identification.)
13  BY MR. ELLIS:
14     Q.   Take a minute to review D-16, please.
15     A.   (Complied.)
16          Yes, sir.
17     Q.   Is this a letter you received from Omega
18  Medical in March 2004?
19     A.   Yes.
20     Q.   The blood work results that are identified down
21  in the fifth bullet point states that the blood lead
22  levels of copper, zinc, lead and zinc protoporphyrin are
23  all within normal limits.  Do you see that?
24     A.   Yes.

Page 149

1      Q.   The 24-hour urine for copper and lead was high,
2   right?
3      A.   Yes.
4      Q.   And you report that to the auditors over in
5   Exhibit 15, right?
6      A.   Yes.
7      Q.   Take a look at the last page of 15.
8          Why is it you reported in Exhibit 15 that
9   your 24-hour urine test results were high but you didn't
10  report that the blood tests were all within normal
11  limits?
12     A.   Why did they conduct -- my question's there.
13  My concern was they conducted a 24-hour urinalysis.  If
14  it's in my urine, that means it's in my body and it's
15  being processed by my internal organs.  My concern is
16  what effect is that going to have on me?
17     Q.   Actually, if it's in your urine, it means it's
18  out of your body, right?
19     A.   Right, but it's got to go through my bladder,
20  I'm assuming my kidneys, my liver.
21     Q.   Did you see the explanation in the 24-hour
22  urine section of Exhibit D-16 which explains that 24-hour
23  urine for these metals is not considered reliable?
24     A.   I read that here, yes.

38 (Pages 146 to 149)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Price, et al.                                          v.                                  Chaffinch, et al.
B. Kurt Price                                C.A. # 04-956-GMS                          October 18, 2005

Page 150

1    Q.    Did you read it when you got it in March 2004?
2    A.    Yes.
3    Q.    Did you have any questions about that?
4    A.    I sure did.
5    Q.    Did you ask Omega Medical?
6    A.    I asked Captain Yeomans because it said here
7    you need a repeat follow-up six to eight weeks under
8    recommendations.
9    Q.    I see that, but my question is:  Did you have
10   any questions for Omega about their explanation about why
11   they're telling you that high lead and copper levels in
12   the urine are not significant?
13   A.    I don't recall any specific conversation with
14   anybody at Omega in regards to that.
15   Q.    I realize that you didn't call them, but did
16   you have any questions that you would have liked to have
17   asked them?
18   A.    Yes.
19   Q.    Why didn't you call them?
20   A.    My wife actually responded and asked that of
21   Captain Yeomans.
22   Q.    Captain Yeomans isn't a doctor, right?
23   A.    He was going to get an answer -- he told my
24   wife in a meeting, I think it was, July 6 that he would

Page 151

1    get back to her, and that never happened.
2    Q.    Would you take a look at the last sentence in
3    this letter that's dated March 18th, 2004?
4    A.    Yes.
5    Q.    It says, "If have any questions please do not
6    hesitate to call me," and gives a phone number, right?
7    A.    Yes.
8    Q.    That's the doctor who examined you, right?
9    A.    I would assume that's the phone number to where
10   she works, yes.
11   Q.    Did you call?
12   A.    No.
13   Q.    Did you have your wife call?
14   A.    No.
15   Q.    Do you understand that the preferred test for
16   exposure to copper, zinc, and lead is the blood test
17   rather than the urine test?
18   A.    That's what they say, yes.
19   Q.    Do you have any reason to doubt that?
20   A.    Yes.
21   Q.    Why?
22   A.    I have done some research on my own, and I have
23   found that some areas say that urinalysis and also air
24   sampling is a better way to check for metal exposure.

Page 152

1    Q.    Who is it that says that?
2    A.    I think it was the Great Smoky Mountain Labs.
3    Q.    Where is it that you did this research?
4    A.    On the Internet.
5    Q.    Is this something that you did back at the
6    time?
7    A.    It was sometime after that, yes.
8    Q.    Do you remember when you did that research?
9    A.    I couldn't nail it down for you.
10   Q.    Has what you found been produced as part --
11   A.    No.  I didn't print it out.  I just read about
12   it.
13   Q.    So there's a place called, is it, Great Smoky
14   Lab?
15   A.    Great Smoky Mountain Laboratories.  I don't
16   recall the Web site, as far as what the actual address
17   is.
18   Q.    I understand that, but that's the entity that
19   operated the Web site?
20   A.    Yes.  From what I understand, there's no real
21   set standard as far as blood, urine.  Just depends on who
22   you spoke to.
23   Q.    Have you asked any other doctor that you have
24   seen in the last two years whether the blood test is the

Page 153

1    preferred test for measuring exposure to heavy metals?
2    A.    No, I have not spoken to a doctor about that.
3    Q.    Have you seen anything to suggest that the
4    urine test would be more valuable, other than a Web site
5    operated by Great Smoky Mountain Laboratories?
6    A.    Not that I have found.
7    Q.    Why did you mention the urine test in your
8    statement to the Auditor's Office but not the blood test?
9    A.    Because it was a concern to me.
10   Q.    Has your wife done any research into the
11   question of whether the blood lead level is a reliable
12   indicator of exposure to zinc, copper, or lead?
13   A.    I don't know.
14   Q.    Do you recall whether your lawyer said anything
15   at the meeting with the auditors other than to read the
16   portion of this statement that you weren't able to read?
17   A.    I don't recall any dialog.
18   Q.    Do you know if any of your colleagues in the
19   Firearms Training Unit had been in to talk to the
20   auditors before you were?
21   A.    I don't remember how the order went that day.
22   Q.    Do you remember --
23   A.    I don't remember who was first.  I don't think
24   it was me.  I don't remember.

39 (Pages 150 to 153)

Wilcox & Fetzer, Ltd.                    Professional Court Reporters                    (302)655-0477

A409

Price, et al.                                    v.                        Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS                October 18, 2005

Page 154

1    Q.   Do you remember who was there that day?
2    A.   From the Auditor's?
3    Q.   No.  From the Firearms Training Unit.
4    A.   I recall it was Sergeant Foraker,
5  Corporal Warren, and Corporal Warwick.
6    Q.   Did you all drive up together in the car?
7    A.   I think we did.
8    Q.   Did Corporal Warwick have a statement prepared?
9    A.   I'm assuming he had.
10   Q.   Did Sergeant Foraker have a statement prepared?
11   A.   Again, that's something -- that would be an
12  assumption on my part.
13   Q.   In the case of Warwick, would that also be an
14  assumption?
15   A.   Yes, sir.
16   Q.   Did you ever see the statements of any of the
17  other individuals that were there that day?
18   A.   Not that I can recall.
19   Q.   Do you remember anything else that happened at
20  the meeting with the auditors on May 12, 2004, other than
21  what we have talked about?
22   A.   That was what I can remember.
23   Q.   Did they sound interested in what you had to
24  say?

Page 155

1    A.   Yes.
2    Q.   Did they take documents from that meeting?
3    A.   I'm assuming they did.  I know there was a
4  bunch there.
5    Q.   Was it your understanding when you left
6  Wilmington that day that your attorney was going to have
7  a news conference about what you had said to the auditor?
8    A.   No, sir.
9    Q.   Did you have in your mind any idea that
10  Mr. Neuberger was going to call in the press to discuss
11  the case?
12   A.   Not that I was aware of.
13   Q.   Are you aware that he did?
14   A.   I don't believe he held a press conference.  I
15  know our statements were released to the media.
16   Q.   Do you know who released them?
17   A.   That would be an assumption on my part, but
18  I'm -- should I assume?
19   Q.   Why don't you assume for this one.
20        MR. NEUBERGER:  Let's not assume.  I
21  object to your speculating.
22  BY MR. ELLIS:
23   Q.   You certainly didn't release them, did you?
24   A.   No.

Page 156

1    Q.   Do you believe that it was your attorney who
2  released them?
3        MR. NEUBERGER:  I'll object.  There's no
4  foundation that the media received these documents, the
5  document that you're talking about.
6        MR. ELLIS:  Let him answer the question
7  anyway.
8        MR. NEUBERGER:  I understand.
9        MR. ELLIS:  Go ahead and answer the
10  question
11  BY MR. ELLIS:
12   Q.   Do you believe that it was your attorney that
13  released the documents to the press?
14   A.   Again, that would be an assumption on my part.
15   Q.   Is that what you assume?
16   A.   I'm going to assume that.
17   Q.   Did you have any contact from the Auditor's
18  Office between May 2004 and the end of July 2004?
19   A.   I know we were interviewed again by then.
20   Q.   Was that in July?
21   A.   Yes.
22   Q.   Between the first interview and the second
23  interview, did you have any further contact?
24   A.   No.

Page 157

1    Q.   Did anybody within the State Police chain of
2  command talk to you about the auditor's investigation
3  between May and the end of July 2004?
4    A.   Not that I can recall.
5    Q.   Did anybody come to you asking for information
6  to be turned over to the Auditor's Office?
7    A.   Not that I can recall.
8    Q.   When you met with the auditors the second time,
9  did you have a prepared statement?
10   A.   No.
11   Q.   Where did that meeting take place?
12   A.   Mr. Neuberger's office.
13   Q.   Same conference room?
14   A.   Yes.
15   Q.   Who was present in the room when you were
16  interviewed?
17   A.   Mr. Neuberger and the three investigators.
18   Q.   Would you remember the names of the
19  investigators if I gave them to you?
20   A.   If you tell me their names, I'm sure that was
21  probably their names, but I don't remember -- only one I
22  know, I think, is Rothenburger, because I remember at one
23  time -- or whatever his name was, I think he was a
24  policeman with the State of Delaware for a short period

40 (Pages 154 to 157)

Page 158

1  of time.
2      Q.    Do you recall perhaps him being a range master
3  for a county police department in New Jersey?
4      A.    I think that's what he said, yes.
5      Q.    Do you remember a guy named George Eilers,
6  E-i-l-e-r-s, going there?
7      A.    He may have been.  I don't know.
8      Q.    Does the name Ed Watson ring a bell with you?
9      A.    No.
10     Q.    You were in a room with three auditors, one of
11  whom was named Rothenburger?
12     A.    Yes.
13     Q.    How long did that meeting last?
14     A.    Twenty minutes to half an hour.  Somewhere in
15  there.  Again, that's very general.
16     Q.    Do you remember which of the three was asking
17  you questions?
18     A.    The Rothenburger guy mostly.
19     Q.    Do you remember what questions he asked you?
20     A.    I don't really recall the specific questions as
21  far as I think he made statements I did not care about
22  the staff or people at the range because we let people
23  train in an unsafe environment.  And, quite honestly, I
24  felt that it was a witch-hunt at that point in time.  And

Page 159

1  the questions that I was being asked and the way I was
2  being talked to, I should have been Mirandized and also
3  advised of my police men's bill of rights.  I felt that
4  they were placing the blame on me.
5      Q.    What did they say to you that made you believe
6  that?
7      A.    That I didn't care about the students and the
8  staff that worked at the FTU, and that's the furthest
9  thing from the truth.
10     Q.    What did you understand them to be referring to
11  when they --
12     A.    I'm assuming the conditions at the range.
13     Q.    Did they tell you what conditions?
14     A.    No, they did not.
15     Q.    Did they ask you about the maintenance of the
16  bullet trap?
17     A.    They may have.  I don't recall the specific
18  questions they asked.
19     Q.    In the first meeting with the auditors, the
20  meeting that occurred in May of 2004, did they ask you
21  any questions about the bullet trap?
22     A.    I don't recall.
23     Q.    Did they ask you any questions about the bullet
24  trap in the second meeting?

Page 160

1      A.    They may have.  I don't recall.
2      Q.    Do you remember any question they asked you in
3  the second meeting?
4      A.    The flavor of the discussion was they were
5  laying the blame on the staff of the FTU.
6      Q.    The blame for what?
7      A.    I'm assuming the conditions there.
8      Q.    Again, I don't want you to assume.  Did they
9  say what they were blaming you for?
10     A.    The clouds of smoke, the material, the pinkish
11  material that was deposited on the range and throughout
12  the building.
13     Q.    I know you don't remember any of the questions,
14  but what is it that they said that led you to believe
15  that they were blaming you?
16     A.    Their attitude and demeanor.
17     Q.    Can you differentiate --
18     A.    They were -- it was more or less an
19  accusation-type mode they were in and finger-pointing at
20  me.
21     Q.    You're talking about all three of them now, not
22  any one of the three or two of the three?
23     A.    I know Rothenburger, he was saying that I had
24  the authority to close the range down.  No, I don't.  And

Page 161

1  then there was a man that sat to my left, kind of a
2  heavyset man with gray hair and glasses, and he was
3  making comments, as well.  I don't remember his name.
4      Q.    Do you remember any of the comments he made?
5      A.    No, but the flavor -- not specific, but the
6  flavor was it was our fault.
7      Q.    You remember there being a flavor in this
8  meeting that you, meaning the people in the Firearms
9  Training Unit, were responsible for conditions at the
10  range.
11     A.    Yes.  That's the way I interpreted it.
12     Q.    Just want to get on this before we move on.
13  You don't remember exactly what any of the three auditors
14  said that led you to that conclusion?
15     A.    Rothenburger making the comment that I did not
16  care about the staff, nor the students.
17     Q.    And Rothenburger also made some comment that
18  you had the authority to shut down the range?
19     A.    Yes.
20     Q.    Did anybody in the Firearms Training Unit have
21  the authority to shut down the range?
22     A.    No, sir.
23     Q.    Who has the authority to shut down the range?
24     A.    The few times that it had been shut down

41 (Pages 158 to 161)

Price, et al.                                                                                 Chaffinch, et al.
B. Kurt Price                              C.A. # 04-956-GMS                      October 18, 2005

Page 162

1  before, it comes from executive staff.
2      Q.    When had it been shut down before?
3      A.    When we had the environmental cleanups before
4  the bullet trap.
5      Q.    Those were all planned in advance, weren't
6  they?
7      A.    It got contaminated.  I don't know if it was
8  planned, but they had to shut the range down to bring in
9  the hazardous material team to clean the range up.
10     Q.    What I mean by "planned" is that there was a
11 recognized problem, a contractor was engaged to fix the
12 problem, they scheduled time and shut it down to fix the
13 problem.  Isn't that what happened?
14     A.    Yes.  I assume so.
15     Q.    Suppose you have an unsafe condition on the
16 range.  Do you as an instructor allow shooting to go on?
17     A.    What type of -- I don't understand your
18 question.  What type of unsafe condition?  Are we talking
19 about an AD where somebody gets shot?  Are we talking
20 about all the numerous leaks that occur on the range
21 floor when the weather gets bad?  What type of unsafe
22 condition?
23     Q.    What do you consider an unsafe condition on the
24 range?

Page 163

1      A.    If somebody obviously gets shot or gets sick,
2  we have to deal with that situation.
3      Q.    Suppose someone on the range passes out in the
4  middle of a shoot.  As they're falling down, the gun goes
5  off and a couple of bullets are ricocheting all over the
6  range.  Under those circumstances would you stop
7  shooting?
8      A.    Yes.
9      Q.    Who would make that decision?
10     A.    The safety officers and the range folks.  The
11 NCOIC until we got this situation -- again, a lot would
12 depend on what the situation was.  If we needed to call
13 in evidence technicians or whatever the case might be.
14 We have had instances of recruits passing out and we have
15 had one person that may have had a heart attack while
16 there.
17     Q.    Have you had occasions when bullets
18 occasionally went off sideways?
19     A.    By the grace of God, they have always gone down
20 range.
21     Q.    Safety is very important to you at the range,
22 right?
23     A.    Yes.
24     Q.    Is there anything more important than safety?

Page 164

1      A.    Not when you're dealing with a firearm.
2      Q.    When Mr. Rothenburger said to you that you had
3  the authority to shut down the range if it wasn't safe,
4  what did you say?
5      A.    That I did not have that authority.
6      Q.    What did he say to that?
7      A.    I don't recall how it went from there.
8      Q.    Did you ever discuss with Sergeant Foraker
9  whether conditions at the range posed a safety hazard?
10     A.    We had a lot of dialog about conditions at the
11 range and what we didn't know.
12     Q.    You didn't know whether it was safe or not?
13     A.    We didn't know what conditions were at the
14 range and what was unsafe and what was -- we had no
15 training in hazardous material, if that's what you're
16 making reference to.  Our training is pretty much
17 firearms-related, in how to shoot weapons and so forth.
18     Q.    Are you telling me that there's no amount of
19 smoke or dust in the shooting area of the range that
20 would cause you to shut it down?
21     A.    I'm not qualified to make that determination.
22     Q.    So then you're telling me that there's no
23 amount of dust and smoke that will --
24     A.    I'm assuming if there was a fire and you

Page 165

1  couldn't see, that we would evacuate the building and
2  call 911.
3      Q.    But short of that, there's no circumstance
4  under which you're going to shut down the range?
5      A.    I don't have that authority.
6      Q.    Did your attorney say anything in the meeting
7  with the auditors in July of 2004?
8      A.    The only thing that I can specifically recall
9  was that the comment was made by Mr. Neuberger that
10 issues were being looked into as a possibility of a
11 federal lawsuit being filed.
12     Q.    Who did Mr. Neuberger say that to?
13     A.    I'm not sure.
14     Q.    By the way, when we're talking about
15 Mr. Neuberger, we're talking about Thomas Neuberger?
16     A.    Yes, sir.  The gentleman to my left.
17     Q.    Do you remember anything else that occurred
18 during the second interview you had with the auditors?
19     A.    No, sir.
20     Q.    Did you cry during the second interview?
21     A.    No.  I was too mad.
22     Q.    Did you tell them that it sounded like they
23 were accusing you of doing something wrong?
24     A.    Yes, I did.

42 (Pages 162 to 165)

Price, et al.                                    v.                        Chaffinch, et al.
B. Kurt Price                           C.A. # 04-956-GMS                  October 18, 2005

Page 166

1    Q.    What was their response?
2    A.    I don't recall one.
3    Q.    Do you recall anything else from that meeting?
4    A.    Not directly, no.
5    Q.    Did Mr. Foraker show up that day to be
6    interviewed, as well?
7    A.    I believe so, yes.
8    Q.    How about Corporal Warren?
9    A.    I don't believe he was there for that one.
10    Q.    How about Corporal Warwick?
11    A.    I don't recall him being there.
12    Q.    Do you know why it was just you and
13    Sergeant Foraker that day?
14    A.    No, sir, I don't recall.
15    Q.    You testified a little while ago that at the
16    May interview with the auditors they seemed very
17    interested in what you had to say.
18    A.    Yes.
19    Q.    And you testified that in the July meeting with
20    the auditors they seemed accusatory?
21    A.    Yes.
22    Q.    Did they give you any idea what they had
23    learned between May and July that caused what you
24    perceived to be a change in their attitude towards you?

Page 167

1    A.    I don't recall any issue that they brought up.
2    Just their attitude and the way they spoke to me.
3    Q.    Did Aaron Chaffinch ever say anything to you
4    that would lead you to believe that he was mad at you for
5    having produced all this information about the safety and
6    health conditions at the range in Smyrna?
7    A.    No.
8    Q.    Do you believe that he had anything to do with
9    putting you on light duty?
10    A.    I can't make that assumption.
11    Q.    Are you saying you don't know?
12    A.    I don't know.
13    Q.    I know you've testified that you had
14    discussions with Thomas MacLeish on several occasions.
15    Did he ever tell you that he blamed you for conditions at
16    the range?
17    A.    I know it came out in his deposition that he
18    put 50 percent of the blame on the staff of the FTU for
19    the conditions there.
20    Q.    I'm talking about prior to the institution of
21    the lawsuit.
22    A.    There was a media story that was run in the
23    State News and on WBOC TV where he, Colonel MacLeish, and
24    Gloria Homer blamed the staff of the FTU for the

Page 168

1    conditions of the range in the media.
2    Q.    Are you referring to the tour of the firearms
3    training facility that Gloria Homer was involved in?
4    A.    Yes, sir.
5    Q.    Were you at the range that day?
6    A.    No.
7    Q.    I don't believe Lieutenant Colonel MacLeish is
8    mentioned in that story.  Do you have any reason to
9    believe he was there that day?
10    A.    I know he was quoted on the WBOC release.
11    Q.    How do you know that?
12    A.    I observed it on television.
13    Q.    Was he actually interviewed?
14    A.    Yes.  If I'm not mistaken, he was in our
15    office, judging by -- he was in the office of the range.
16    Q.    What is it that he said that was on TV?
17    A.    That the staff -- they felt that the staff was
18    partly to blame for the issues at the range.
19    Q.    Do you have a tape of that?
20    A.    I do not, no.
21    Q.    Do your lawyers have a tape of it?
22    A.    I don't know.
23          MR. NEUBERGER:  I thought it's been
24    produced.  You have had that forever.  We will give it to

Page 169

1    you.
2          MR. ELLIS:  We don't have a tape of
3    anything.
4          MR. NEUBERGER:  I have seen it.  Something
5    else lost in the thousands of pages of whatever.  There's
6    something floating around.  We're off the record.
7          (Discussion off the record.)
8    BY MR. ELLIS:
9    Q.    Do you believe that you were placed on light
10    duty because of something you did in connection with the
11    firearms training facility?
12    A.    Yes.
13    Q.    What is it you did that you think caused you to
14    be put on light duty?
15    A.    When we spoke to the auditors and turned over
16    the volumes of information and when the story got out in
17    the media.
18    Q.    Do you know how the story got out in the media?
19    A.    No, sir.  I already testified to that.
20    Q.    I'm sorry.  Which story are you talking about?
21    You testified about --
22    A.    The statements, our statements that we made to
23    the Auditor's Office.
24    Q.    Do you think that you should be on full,

43 (Pages 166 to 169)

Price, et al.                                                    v.                                    Chaffinch, et al.
B. Kurt Price                                          C.A. # 04-956-GMS                      October 18, 2005

Page 170

1 active, unrestricted duty at this point?
2     A.  I think that in a patrol capacity I would be a
3 safety issue due to my background-noise problem.  But
4 there are functions within the State Police that I could
5 do in regards to my hearing loss.
6     Q.  Like what, for instance?
7     A.  I know there was a trooper by the name of
8 Ron Tate who was having psychological issues, and he was
9 in what's called SBI, or detective licensing, the State
10 Bureau of Identification, where he was fingerprinting
11 people for background checks.  I could do that.
12        I feel that I could be an instructor at
13 the training academy.  I have a background in training.
14 I'm a certified handcuff instructor, defensive tactics
15 instructor.  I feel that there's plenty of places that
16 they could put me and accommodate me like they have done
17 in the past with other troopers.
18     Q.  Tell me what other troopers have been
19 accommodated.  I assume you want to be accommodated till
20 you're age 55?
21     A.  I would like to, yes.
22     Q.  That would be to the year what, 2018?
23     A.  I'm 42 now.  So that's what, 13 and -- yes.
24     Q.  You want to be in a position where you don't

Page 171

1 have to be exposed to criminal activity, basically, for
2 the next 13 years?
3     A.  Yes.
4     Q.  Do you know of anybody that's been put in that
5 capacity for 13 years?
6     A.  I know Detective Sergeant Steve Swain has been
7 in the evidence locker on the State Police ever since I
8 have been on the State Police.  I am now in my 21st year.
9     Q.  Why do you believe Swain was placed there,
10 because of some disability?
11     A.  I know he was involved in an auto wreck in
12 which his vocal cords were damaged and he cannot speak
13 clearly.
14     Q.  How often do you speak to, was it,
15 Sergeant Swain?
16     A.  I would see him approximately three times a
17 year for three certifications at the range.
18     Q.  Anybody else?
19     A.  Major Joe Forrester who stayed on the job till
20 he was 55, and he had hearing aids, and my doctor tells
21 me that I'm not yet a candidate for hearing aids.  I kind
22 of feel that that's a little unfair.
23     Q.  Did Forrester wear a hearing aid for 13 years?
24     A.  I don't know.

Page 172

1     Q.  Anybody else?
2     A.  Charlie Klim had hearing issues, and he stayed
3 till he was 55.
4     Q.  How do you know Klim had hearing issues?
5     A.  I used to see him walking around with a hearing
6 aid.
7     Q.  How long ago did Klim leave?
8     A.  Oh, goodness.  That would be a guess.
9     Q.  Was it before 1995?
10     A.  I don't know.
11     Q.  Anybody else?  I'm sorry.  Do you know how long
12 Klim was wearing the hearing aid?
13     A.  No, I don't.
14        I know Sergeant Henderson used to work in
15 supply who eventually went off on a disability pension.
16 As I can recall, he was never placed on light duty, and
17 he continued to work paid jobs and have full police
18 powers and authority, could wear his uniform, could work
19 overtime, and could run marathons.  He had a back
20 problem, but he would run.  And then all of a sudden he
21 goes to supply and within sometime later he retired.
22 Twenty-five-year service and he had a back-related
23 injury.  I feel that was an accommodation.  As his back
24 injury deteriorated, then they put him in supply.  But as

Page 173

1 I can recall, he was actually never placed on light duty.
2     Q.  How long was he in supply?
3     A.  I'm going to say it was probably close to three
4 years.  Again, that's a guess.  I apologize for that.
5 But it was quite sometime.
6     Q.  Can you think of anybody else?  Can you think
7 of anybody who's been accommodated for 13 years?
8     A.  Oh, 13 years?  I don't know how long
9 Captain Citro was accommodated for, but as I can recall,
10 he didn't go on light duty until he had approximately two
11 years left or he was on light duty -- I forget how all
12 that panned out, but that injury occurred back in the mid
13 to early '80s, and he didn't leave until I'm going to --
14 that would be a guess.  But it was after 2000.
15     Q.  You don't know when Citro went on light duty,
16 do you?
17     A.  No, I do not.
18     Q.  What's your source of information, just sitting
19 at these depositions?
20     A.  Yes.  I just want to be treated like everybody
21 else and past practice of the State Police.
22     Q.  It's your belief that the past practice of the
23 State Police is to carry a trooper as long as necessary
24 to get him to 55 regardless of his injury?

44 (Pages 170 to 173)

Wilcox & Fetzer, Ltd.               Professional Court Reporters               (302)655-0477

A414

Price, et al.                                                  v.                                    Chaffinch, et al.
B. Kurt Price                                         C.A. # 04-956-GMS                      October 18, 2005

Page 174

1    A.   To try to accommodate them, yes.
2    Q.   Would you want to be treated like
3  James Romanelli?
4    A.   I can stay on light duty for at least two
5  years?  Is that what you're making reference to?  Because
6  I believe that's what his status was.
7    Q.   He was told to separate after less than two
8  years, wasn't he?
9    A.   I don't know.  I was told to separate in less
10  than a year.
11    Q.   Have you had your wife's blood lead levels
12  checked?
13    A.   No.
14    Q.   Your children?
15    A.   Yes.
16    Q.   What was the result?
17    A.   I think one was a 4 and one was a 5.  I can't
18  recall which was which.
19    Q.   Both within normal limits?
20    A.   Yes.  That's what their pediatrician stated.
21    Q.   When did you have them tested?
22    A.   I can't remember the exact time.  It was pretty
23  much when all this stuff broke out.
24    Q.   When you say "all this stuff," there's been a

Page 175

1  lot of stuff.  Which part?
2    A.   I'm sorry.  The swipe sampling came back and
3  they found that the area that we changed our clothes in
4  was higher than the standards for the Navy firing range.
5    Q.   So that's back in early 2004.
6    A.   I would assume so.  It's been a while.
7    Q.   Are you referring to the test results that came
8  back from Nielson & Associates?
9    A.   No, sir.
10    Q.   Harvard Environmental?
11    A.   Yes.
12         MR. ELLIS:  Why don't we take a break for
13  a couple minutes.
14         (A recess was taken.)
15  BY MR. ELLIS:
16    Q.   How long after you got the results from the
17  Harvard study did you have your children's blood lead
18  levels checked?
19    A.   I don't remember exact dates.  It was shortly
20  thereafter.
21    Q.   Did you have their blood tested for zinc?
22    A.   I don't know what all the doctor did.  My wife
23  took them there.
24    Q.   But you're sure there was blood lead level

Page 176

1  tested?
2    A.   There was blood tests done.
3    Q.   You're sure that lead was one of them?
4    A.   I'm certain of that because I remember one -- I
5  think one was a 4 and one was a 5.  I don't recall which
6  were which.
7    Q.   I wanted to ask you about a couple pieces of
8  the complaint in this case, and I'm not going to mark it
9  as an exhibit, but I'll put a copy of it in front of you,
10  and I'd like you to turn to page 14 of the complaint.
11  There are faxed marks all over this document, but the
12  bottom middle of the page has a little number in it which
13  I think is the number in the complaint.
14    A.   The bottom middle what now?
15    Q.   Has a number 14 on it.
16    A.   Yes, sir.
17    Q.   See paragraph 54?
18    A.   Yes.
19    Q.   Could you read that to yourself for a minute?
20    A.   (Complied.)
21         Okay.
22    Q.   You have previously testified today about a
23  telephone call you had with Lieutenant Colonel MacLeish
24  in early August of 2004.

Page 177

1    A.   Yes.
2    Q.   Is paragraph 54 meant to refer to the same
3  telephone call?
4    A.   Yes.
5    Q.   Did you ask Lieutenant Colonel MacLeish to have
6  a union representative present?
7    A.   I had spoken with Sergeant Fiscella in regards
8  to speaking to MacLeish.
9    Q.   My question is:  When Colonel MacLeish called
10  you -- I'm sorry.  His secretary called you, right?
11    A.   Yes.
12    Q.   And asked you to call back the headquarters,
13  right?
14    A.   Yes.
15    Q.   And when you called back, did Lieutenant
16  Colonel MacLeish get on the phone?
17    A.   Yes.
18    Q.   And then you had the conversation that you
19  described earlier?
20    A.   That's correct.
21    Q.   Did you ask him to have a union rep on the line
22  with you?
23    A.   No, but -- not specifically, no.
24    Q.   Generally?

45 (Pages 174 to 177)

Price, et al.                                    v.                          Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS                October 18, 2005

Page 178

1    A.    Yes.
2    Q.    What generally did you say to him that you
3  believe was a request to have a union representative on
4  the phone line?
5    A.    I know that when I spoke with Mr. Neuberger,
6  that he was sending an e-mail stating that he would
7  represent me. I also explained to Mr. Neuberger that, if
8  that would not be allowed, I would at least like to have
9  a union representative there.
10   Q.    I recognize you might have said that to
11 Mr. Neuberger, to Mr. Fiscella, but did you say it to
12 Lieutenant Colonel MacLeish?
13   A.    I don't recall me making that statement.
14   Q.    You described the conversation with Lieutenant
15 Colonel MacLeish earlier. Did you consider that an
16 interrogation?
17   A.    Yes.
18   Q.    Why?
19   A.    Him speaking to me after my attorney advised
20 him not to.
21   Q.    Did he ask you any questions in that
22 conversation?
23   A.    He made a comment, and I can't recall the exact
24 comment, but he commented that he did not know anything

Page 179

1  about an auditor's investigation on that date.
2    Q.    But my question is: Did he ask you any
3  questions.
4    A.    I don't recall a specific question.
5    Q.    Do you recall whether there were any questions?
6    A.    I don't know.
7    Q.    In order to have an interrogation, don't you
8  have to have questions?
9    A.    I don't know.
10   Q.    Could you turn to page 18 --
11   A.    Did you say 18?
12   Q.    18, yes. One-eight. The top of page 18, the
13 first complete sentence on the page is part of
14 paragraph 7, and it says, "One comparable trooper with
15 hearing loss greater than Corporal Warren has been
16 allowed to operate a patrol vehicle with complete police
17 powers."
18        Do you know the name of that trooper?
19   A.    No, sir.
20   Q.    Do you know how that sentence got in the
21 complaint?
22   A.    I did not write this specific complaint.
23   Q.    Have you during the time period that's at issue
24 here, which we're talking basically 1994, have you had

Page 180

1  any contact with Dave Mitchell directly about the
2  conditions of the firing range?
3        MR. NEUBERGER: I'm sorry. Did you say
4  1994?
5        MR. ELLIS: I may have. I meant 2004.
6  Print what I meant, not what I said.
7  BY MR. ELLIS:
8    Q.    In 2004 did you have any direct contact with
9  Dave Mitchell about the health and safety issues at the
10 range?
11   A.    At a retired association's picnic, after we had
12 announced our lawsuit, Secretary Mitchell and
13 Sergeant Fiscella took me and Sergeant Foraker into the
14 conference room at the DSTA, which is our state troopers
15 association, and we discussed some concerns there.
16   Q.    Could you tell me the content of that
17 discussion?
18   A.    Secretary Mitchell basically told me to, in his
19 words, put my concerns in a drawer and shut the drawer,
20 that the department would take care of me.
21   Q.    How long did this meeting last?
22   A.    I want to say maybe half an hour.
23   Q.    There must have been something said other than
24 put my concerns in a drawer.

Page 181

1    A.    He told some war stories about when he was a
2  policeman I think with Maryland State Police, and I think
3  it was Prince George's County Police Department. Just
4  general conversation that way.
5    Q.    Do you recall anything that you said at the
6  meeting?
7    A.    I was concerned about how the division was
8  sending my medical records that were incomplete,
9  protocols not met like that, sent to the TK Group. I
10 voiced my concern as though I felt I was being pushed out
11 the door.
12   Q.    Anything else?
13   A.    There's a lot of war stories being told. That
14 was pretty much it, really.
15   Q.    Did you tell any war stories?
16   A.    I may have.
17   Q.    Do you recall Sergeant Foraker saying anything
18 in that meeting?
19   A.    Not directly, no.
20   Q.    Did Sergeant Fiscella say anything in that
21 meeting?
22   A.    Sergeant Fiscella said that he felt that the
23 department may take me out of the Firearms Training Unit
24 and place me back into a patrol setting.

46 (Pages 178 to 181)

A416

Price, et al.                                    v.                              Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS                    October 18, 2005

Page 182

1    Q.    This was a period during which you were on
2  light duty, isn't it?
3    A.    Yes, sir.
4    Q.    Did he say how he thought the department could
5  do that if you were restricted from active duty?
6    A.    He did not make any statements to that effect.
7    Q.    Did you question him about that?
8    A.    I don't recall specific questions that I asked
9  about it. I was pretty shocked that he would make that
10  comment.
11   Q.    Did you tell him you were shocked?
12   A.    Later I think I did.
13   Q.    Later that day?
14   A.    No. This was -- Sergeant Fiscella and I have
15  had a lot of conversations over a period of time. He's
16  my union president.
17   Q.    When you told him you were shocked, what did he
18  say back?
19   A.    He just said that he felt that that was an
20  option that the State Police might have with me. I think
21  he called it job restructuring.
22   Q.    Do you believe that your reputation has
23  suffered as a result of the events that are described in
24  the case?

Page 183

1    A.    Yes.
2    Q.    What is it that has caused your reputation to
3  suffer?
4    A.    Comments that were made to the media about the
5  staff at the FTU allowing the building to degenerate.
6    Q.    Anything else?
7    A.    Comments that have been made by Colonel
8  MacLeish that I testified to here today. I don't think
9  he's too sensitive to my situation, nor does he care.
10   Q.    I'm sorry. The question was what has harmed
11  your reputation. I recognize you testified about
12  comments made to the media about the FTU staff's handling
13  of the range. Are there any other things that Colonel or
14  Lieutenant Colonel MacLeish has said to harm your
15  reputation?
16   A.    Those are the ones I have direct knowledge of.
17   Q.    When you say "those," you're talking about
18  comments he's made to the media.
19   A.    Yes.
20   Q.    Specifically the comment he made, whatever it
21  is, to the television station?
22   A.    Yes.
23   Q.    Anything else?
24   A.    And Colonel Chaffinch making the comment --

Page 184

1    Q.    I'll get to Colonel Chaffinch. I just want
2  Colonel MacLeish for now.
3    A.    I'm sorry. That, and the unique thing about
4  the Firearms Training Unit is that we see every sworn
5  Delaware state trooper in the state of Delaware. In
6  addition to that, we also train the municipal people. We
7  know all the police officers. It's a small community.
8  And I just feel that it's done me damage.
9    Q.    I will get to that in a minute.
10   A.    I'm sorry.
11   Q.    I want to first identify what it is that did
12  you damage, and you testified that MacLeish made a
13  statement to WBOC --
14   A.    Yes.
15   Q.    -- that you saw on television.
16   A.    Yes.
17   Q.    Is there anything else that MacLeish said?
18   A.    Right now I cannot think of anything.
19   Q.    How about Colonel Chaffinch, is there anything
20  that he said that harmed your reputation?
21   A.    He also made a comment in the State News when
22  they did the tour.
23   Q.    That's the tour with Gloria Homer?
24   A.    Yes. That the staff was to blame for the

Page 185

1  deterioration of the building.
2    Q.    Anything else Chaffinch said that damaged your
3  reputation?
4    A.    Not that I have direct knowledge of, no.
5    Q.    You testified that you have contact with most
6  or all of the police officers in the state of Delaware.
7  Right?
8    A.    Yes, sir.
9    Q.    How do you know that it's harmed your
10  reputation in that group of people?
11   A.    Just comments that have gotten back to us.
12   Q.    Like what, for instance?
13   A.    That the staff -- I'm assuming when they say
14  staff, this is just comments that were made. I'm just
15  repeating these comments that I heard -- are blaming us
16  for the range mess.
17   Q.    Who blamed you for the range mess? What police
18  officers, excluding MacLeish or Chaffinch, whatever they
19  happened to have said?
20   A.    Oh, my goodness. A lot of folks made mention
21  of it.
22   Q.    Well, name one.
23   A.    I can't right off the top of my head.
24   Q.    Can you name anybody that's told you that they

47 (Pages 182 to 185)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Price, et al.                                                   v.                                            Chaffinch, et al.
B. Kurt Price                                        C.A. # 04-956-GMS                               October 18, 2005

Page 186

1  think less of you because of the comments that MacLeish
2  or Chaffinch made to the media?
3      A.    Not where they think less of us, no.
4      Q.    Have people told you that they think more of
5  you?
6      A.    No.
7      Q.    Have they told you that they hold you in less
8  esteem now on account of what Colonel Chaffinch or
9  Colonel MacLeish said to the media?
10     A.    Not that anybody has said to me directly.
11     Q.    Why do you think that your reputation has been
12 harmed by these statements?
13     A.    Because they put it out in the media that it
14 was our fault for that.  And everybody can form an
15 opinion when they read or hear that.
16     Q.    Has anybody told you what opinion they have
17 formed?
18     A.    Not that I can put a finger on right now.
19     Q.    Then why do you believe that they formed a
20 negative opinion of you as a result of these statements
21 that have been made to the press by Chaffinch or
22 MacLeish?
23     A.    They showed pictures of the range in the media
24 and on TV and showed -- and then stated that it was the

Page 187

1  staff's fault and that we let that occur.
2      Q.    Has anybody come up to you and said that they
3  read the article in the State News and that it must be
4  your fault?
5      A.    No.
6      Q.    Has anybody that you know come up to you and
7  said that they read the article in the State News?
8      A.    Yes.
9      Q.    Who?
10     A.    Our next-door neighbors, various friends and
11 associates.  Everybody reads the State News in Kent and
12 Sussex County just about.
13     Q.    What did your neighbors say to you about the
14 article that was in the State News?  By "the article" I
15 assume we're referring to the April 7th article that had
16 to do with the Gloria Homer/Chaffinch tour?
17     A.    Yes.
18     Q.    Is that what you're referring to?
19     A.    Yes.
20     Q.    What did your neighbors say to you about that
21 article?
22     A.    They could not believe that we were being
23 blamed.
24     Q.    So it sounds like your neighbors were sticking

Page 188

1  up for you.
2      A.    Probably.
3      Q.    What about other friends?  Can you name anybody
4  else other than your neighbors -- let me back up a
5  second.
6            When you say your neighbors, are you
7  talking about people that live immediately next to you in
8  your development?
9      A.    Yes.
10     Q.    Do you have neighbors on both sides of you?
11     A.    Yes.
12     Q.    When we talk about neighbors, are we talking
13 about both sets of neighbors?
14     A.    Pretty much so.  The one made comments to me,
15 but they have also commented to my wife.
16     Q.    What is it that they have said to your wife?
17     A.    Pretty much the same issue, that they can't
18 believe we're being blamed.
19     Q.    Has anybody said to you that they read the
20 article in the State News, that they believe the
21 allegations and that they think that you're a bad person
22 because of what was put in the paper?
23     A.    No.
24     Q.    Would you say that your friends and associates

Page 189

1  have, by and large, been supportive of you?
2      A.    Yes.
3      Q.    When you talk about bad things that have
4  happened to you at the State Police, you're talking about
5  being put on light duty, for one thing, right?
6      A.    Yes.
7      Q.    And second is the fact that you're at some
8  point going to have to leave because you can no longer do
9  the essential functions of the job, right?
10     A.    That's what I have been told.
11     Q.    Is there anything that's happened to you that's
12 been bad in terms of your employment with the State
13 Police other than those two things?
14     A.    Getting the letter saying that I must terminate
15 before even having a year of light duty.
16     Q.    And that has to do with the ultimate
17 determination of your employment which hasn't occurred
18 yet, right?
19     A.    That's correct.
20     Q.    Anything else?
21     A.    The way I have been treated by Lieutenant
22 Colonel -- or Colonel MacLeish.
23     Q.    Is there anything other than --
24     A.    Things that he said.

48 (Pages 186 to 189)

Wilcox & Fetzer, Ltd.                 Professional Court Reporters                 (302)655-0477

Price, et al.                                                                Chaffinch, et al.
B. Kurt Price                                                                October 18, 2005
                              v.
                        C.A. # 04-956-GMS

Page 190

1  Q.    The conversations you have had with him, you
2  described them all today?
3  A.    Yes, sir.
4  Q.    Anything else?
5  A.    Bad things with the division; is that correct?
6  Q.    In terms of your employment, yes.
7        MR. NEUBERGER:  Well, what's confusing is
8  you just were asking all these reputation questions.
9        MR. ELLIS:  I was done asking him about
10  that.
11       MR. NEUBERGER:  I understand.  Now he's
12  understanding you some official division versus
13  other actions what you just questioned him on.
14  BY MR. ELLIS:
15  Q.    What I'm referring to is actions that are
16  specifically part of your employment relationship.  And I
17  thought that the two things we agreed on was, No. 1,
18  being put on light duty; No. 2, being told that you're
19  going to have to separate.
20       Is there anything else in terms of your
21  employment that has happened to you that is bad that you
22  believe is a result of the reporting you did to the
23  auditors in terms of the range?
24  A.    The light duty issue, if I can just touch on

Page 191

1  one issue on that.
2  Q.    Sure.
3  A.    It's cost me a lot of money as far as working
4  pay jobs and overtime.  It has created a financial stress
5  on my family and I.
6  Q.    I do understand that, and that's kind of the
7  result of being placed on light duty.  But it's light
8  duty that causes all that, right?
9  A.    Yes.
10  Q.    You understand the light duty to have to do
11  with your hearing loss, right?
12  A.    That's what they say, yes.
13  Q.    What makes you say that you were placed on
14  light duty because of your gathering information and
15  presenting it to people in terms of safety and health
16  concerns at the range?
17  A.    There's no such standards for hearing within
18  the State Police.  They had a major that stayed on with
19  hearing aids till he was 55.  My doctor, who is a hearing
20  specialist, says that I am not a candidate for a hearing
21  aid yet, and I feel that there are places that I can
22  still function within the State Police.  And they have
23  accommodated people in the past with medical-related
24  issues.  Never in the history of the State Police or at

Page 192

1  least that I can think of has anybody been placed on
2  light duty for a hearing loss.  And to the contrary, when
3  there was hearing loss, it was you need glasses, get
4  glasses.  You need -- your hearing goes bad, get a
5  hearing aid.
6  Q.    You're saying that, but you don't want to be
7  put back on patrol, right?
8  A.    I don't want to be put in harm's way where I
9  can get myself or someone else injured because of
10  something I don't pick up.  But there's other areas that
11  I can --
12  Q.    You acknowledge there are things you don't pick
13  up, right?
14  A.    Yes.
15  Q.    Is there any other reason why you believe that
16  you were put on light duty because of your activities and
17  researching and presenting information on the range?
18  A.    Testimony by Colonel MacLeish.  During one of
19  his depositions he stated that we were pain in the asses.
20  I feel that that was another vehicle or motive for him to
21  get rid of us.
22  Q.    Anything else?
23  A.    Not that I can think of right offhand.
24  Q.    You testified a couple minutes ago that being

Page 193

1  put on light duty had caused you financial harm because
2  you couldn't work what you called pay jobs.
3  A.    Yes, sir.
4  Q.    What pay jobs did you formerly perform that you
5  could not perform because you're on light duty?
6  A.    The NASCAR race in Dover, that was two events a
7  year.  I worked that probably for the last 15 years or
8  longer.
9        I also provided some security at
10  basketball games, as well as other events where
11  celebrities would come to town at Comcast cable place
12  where they used to have celebrities.  We would go there
13  and provide security for celebrities.
14  Q.    Where are you talking about?
15  A.    In Dover.  Yes, sir.
16  Q.    Was it an arena?
17  A.    No.  It was just actually where the Comcast
18  cable company has their business.  They would bring
19  certain celebrities in.
20  Q.    Okay.
21  A.    Of course the overtime that went with recruit
22  training.
23  Q.    Any other pay jobs or overtime that you're
24  missing?

                                          49 (Pages 190 to 193)

Wilcox & Fetzer, Ltd.           Professional Court Reporters           (302)655-0477

Price, et al.                                    v.                        Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS                  October 18, 2005

Page 194

1    A.   Not that I can recall right off.
2    Q.   Do you recall how much money you made in
3  overtime in 2003?
4    A.   I'd have to look at my activity sheets.  I can
5  give you an example, though.  Just for the two races I
6  would make almost $2,000 at each race.
7    Q.   What type of work did that involve?
8    A.   Directing traffic and crowd control.
9    Q.   Are those the sorts of things that you think
10  you can do without good hearing?
11    A.   I don't think I'm qualified to make that
12  determination.
13    Q.   I recognize that you're not a doctor, but would
14  you think that crowd control and directing traffic are
15  things that require hearing?
16    A.   I would say you need some hearing for it.
17    Q.   During the course of your employment in the
18  Firearms Training Unit, have you developed contacts in
19  the firearms industry?
20    A.   Yes.
21    Q.   Have you talked to any of them about employment
22  there --
23    A.   Yes.
24    Q.   -- in the year 2018 when you would have retired

Page 195

1  from the State Police?
2    A.   Yes.
3    Q.   Who have you talked to?
4    A.   Just brief discussions with a gentleman by the
5  name of Al Clark.
6    Q.   I'm sorry.  Al?
7    A.   Al Clark.
8    Q.   Al Clark?
9    A.   Yes, sir.
10    Q.   Who's Al Clark?
11    A.   He is a retired Navy SEAL.  And he operates a
12  business called Specialized Tactical Training Services in
13  which he trains the United States Navy and also the
14  United States Marine Corps at Camp David.
15    Q.   What type of training does he do?
16    A.   He puts on tactical pistol schools, weapons
17  retention schools, long gun-type schools.
18    Q.   What's a weapons retention school?
19    A.   How to maintain your weapon if somebody is
20  trying to get it.
21    Q.   Hold onto it literally.
22    A.   It's a defensive tactic program.
23    Q.   What discussions have you had with Mr. Clark
24  about employment?

Page 196

1    A.   He said that he would be interested in me upon
2  retirement.
3    Q.   When did you have those discussions with
4  Mr. Clark?
5    A.   I believe the last time I talked to Mr. Clark
6  would have been sometime in February of 2004 at the Shot
7  Show in Las Vegas.
8    Q.   Do you have any reason to think that anything
9  that's occurred since February 2004 would make Mr. Clark
10  reluctant to hire you?
11    A.   I don't feel that -- with the amount of hearing
12  loss that I have, I don't know that it would be in my
13  best interest to be around a million rounds going off a
14  year.
15    Q.   What you're saying is that you might not be
16  able to accept that type of job for medical reasons.
17    A.   Possibly.  I don't know if there's any type of
18  physical that I have to take or not.  I don't know what
19  the standards are there.
20    Q.   Have you discussed employment with anybody else
21  in the firearms industry?
22    A.   I always keep a bug in George Harris's ear.
23  George Harris from the Sigarms Academy.  I talk to him or
24  I used to.

Page 197

1         And also another gentleman by the name of
2  Bank Miller who works at Firearms Law Enforcement
3  Training Center, but not FLETC, if that makes sense to
4  you.  It's a private entity out in Utah.
5    Q.   Sigarms is the manufacturer of the weapons that
6  the Delaware State Police use now.
7    A.   Yes, sir.
8    Q.   Have you discussed employment with Sigarms in
9  any of these conversations you have had with
10  George Harris?
11    A.   Yes.
12    Q.   Has he told you that he would be interested in
13  hiring you?
14    A.   He told me if he had a position, he would be
15  interested.
16    Q.   Is that a position that you might not be able
17  to accept because of your hearing loss?
18    A.   Yes.
19    Q.   Bank Miller is with somebody who trains law
20  enforcement officers on how to use weapons?
21    A.   I believe it's a subsidy of Action Target in
22  Provo, Utah.
23    Q.   Have you discussed employment with Bank Miller?
24    A.   I just joke with him, "Hey, keep me in mind

50 (Pages 194 to 197)

Price, et al.                                    v.                          Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS                  October 18, 2005

Page 198

1   because I would love to go to Utah."
2       Q.   Why would you love to go to Utah?
3       A.   It's a beautiful country.
4       Q.   It is that.
5            Is that the type of job that you would be
6   unable to accept because of your hearing loss?
7       A.   Like I say, I don't know -- I'm just assuming
8   that because I don't know what type of entry-level
9   physicals you have to have or what the standards are.  I
10  would have to look into it deeper.
11      Q.   Are both the Sigarms job and the Bank Miller
12  job ones that would require you to be exposed to weapons
13  discharge?
14      A.   I would assume so, yes.
15      Q.   When's the last time you had a conversation
16  with Bank Miller?
17      A.   Approximately two to three weeks ago, maybe a
18  month ago, on the telephone.
19      Q.   Did you call him or did he call you?
20      A.   I actually called Sergeant Foraker and
21  Sergeant Foraker handed him the phone.
22      Q.   What did you talk about?
23      A.   He just wished us luck with our issue.
24      Q.   You didn't talk about employment with him?

Page 199

1       A.   No, sir.  I'm not mentally prepared to talk
2   about employment right now.
3       Q.   When's the last time you talked to
4   George Harris?
5       A.   I think it was e-mail form, probably somewhere
6   in the area, and this is a guess, four to five months
7   ago.
8       Q.   Did you discuss employment in the e-mail?
9       A.   No, sir.  Just general conversation.
10      Q.   Do you think that Sergeant Ashley did a good
11  job as sergeant in charge of the range?
12      A.   I think he did the best he could.
13      Q.   What do you mean by that?
14      A.   He had a very limited background when he came
15  into the unit.  But he did the best he could.
16      Q.   Did you think he did a better job than
17  Sergeant Foraker?
18      A.   No.
19      Q.   Did you testify in the case that
20  Sergeant Foraker brought in 2003 that at that point the
21  Firearms Training Unit was running better than it ever
22  had?
23      A.   I don't recall that comment.
24            MR. NEUBERGER:  Could I ask you what day

Page 200

1   that is?
2            MR. ELLIS:  It's Volume D, as in David,
3   Monday, June 23, 2003.  Did I say page 192?  Take a look
4   at page 192.
5   BY MR. ELLIS:
6       Q.   Do you recall testifying in that case?
7       A.   Yes.
8       Q.   Do you recall who asked you the questions?
9       A.   No, I do not.  May have been Ms. Killian.  I
10  don't know.  I'm assuming it is because here's an answer
11  where I said, "No, ma'am."
12      Q.   You wouldn't say that to Mr. Tupman?
13      A.   I hope not.
14      Q.   Do you recall being asked the question:  "Do
15  you think there was a problem with Chris Foraker's manner
16  of supervision with Ed Cathell?"  Actually, before I ask
17  you any questions, just read that page.
18      A.   Thank you.  (Complied.)
19      Q.   I'm going to lean over your shoulder.
20            Do you recall the testimony that I have
21  just shown you on page 192?
22      A.   Yes.
23      Q.   Do you recall being asked if there was a
24  problem with Foraker's supervision with Ed Cathell?

Page 201

1       A.   Yes.
2       Q.   And do you recall your answer being "No, ma'am,
3   I do not"?
4       A.   Right.
5       Q.   Do you recall being asked the next question,
6   "Do you feel like you're working on a team at the range?"
7       A.   Yes.
8       Q.   Do you see the answer there?
9       A.   Yes.
10      Q.   And then do you see where he asks a question,
11  "Is it better than when Chris Foraker was a supervisor?"
12  Do you remember being asked that question?
13      A.   Yes.
14      Q.   What's your answer?
15      A.   The answer is "I would say we're better than
16  much -- pretty much the whole time I was in the unit."  I
17  don't know what that meant, if that's a typo or what.  "I
18  don't know.  Right now we're kind of doing things the way
19  we need to have them done."
20      Q.   "I would say better than much -- pretty much
21  the whole time I was in the unit."  Do you know what you
22  meant by that?
23      A.   I know that a lot of our certifications had
24  expired under various supervisors at the range.  We were

51 (Pages 198 to 201)

Price, et al.                                    v.                          Chaffinch, et al.
B. Kurt Price                          C.A. # 04-956-GMS                October 18, 2005

---

Page 202

1   getting recertified and picking up new training and
2   bringing that back to the division.
3       Q.    You're talking about during the time period
4   that you testified?
5       A.    Yes.
6       Q.    During the time that Ashley was your
7   supervisor, did you have any arguments with Ashley over
8   whether you would do work on the watering system line to
9   the bullet trap?
10      A.    Arguments?
11      Q.    Yes.
12      A.    No, sir.  I advised him, like I stated earlier
13  today.
14      Q.    In other words, you told him that you were
15  going to back off on it and he said okay?
16      A.    Yes.
17      Q.    Did you overhear any discussions that he had
18  with any other of the instructors at the FTU on that
19  subject?
20      A.    Not that I can recall.
21      Q.    You had a discussion with him and that was the
22  end, as far as you were concerned?
23      A.    As far as I knew, yes.
24          MR. ELLIS:  I have no further questions.

---

Page 204

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

---

Page 203

1          MR. NEUBERGER:  We don't have any
2   questions, but we will reserve reading and signing.
3          (Deposition concluded at 4:40 p.m.)
4          -  -  -  -  -
5
6          T E S T I M O N Y
7
8   DEPONENT:  B. KURT PRICE                    PAGE
9
10  BY MR. ELLIS................................. 3
11
12          E X H I B I T S
13
14  DEFENDANTS' DEPOSITION EXHIBIT NO.        MARKED
15
16  11 - A typewritten document................... 12
17  12 - A copy of a photograph................... 53
18  13 - A multi-page document from SmithKline
        Beecham Laboratories......................... 85
19
        14 - An e-mail dated May 4, 2004, to
20  Christopher Foraker from Kurt Price.......... 131
21  15 - A three-page document entitled,
        "Statement to Auditor's Office".............. 146
22
        16 - A letter dated March 18, 2004, to
23  Kurt Price from Vaneeta Kubal, M.D........... 148
24  ERRATA SHEET/DEPONENT'S SIGNATURE      PAGE 204

---

Page 205

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 18th day of
October, 2005, the deponent herein, B. KURT PRICE, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.
        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


        Kimberly A. Hurley
        Certification No. 126-RPR
        (Expires January 31, 2008)


        DATED:

---

52 (Pages 202 to 205)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A422



In the Matter Of:

# Price, et al.
## v.
## Chaffinch, et al.

### C.A. # 04-956-GMS

--------------------------------------------------------------------------

## Transcript of:

# Wayne H. Warren
## Volume # 1
## October 17, 2005

--------------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Case 1:04-cv-00956-GMS    Document 191-4    Filed 06/19/2006    Page 124 of 200

Price, et al.                                                              Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

```
1                          VOLUME 1


           IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF DELAWARE


CORPORAL B. KURT PRICE, et al.,        )
                                       )
            Plaintiffs,                )
                                       ) Civil Action
v.                                     ) No. 04-956-GMS
                                       )
COLONEL L. AARON CHAFFINCH, et al.,    )
                                       )
            Defendants.                )
-----------------------------------)
SERGEANT CHRISTOPHER D. FORAKER,       )
                                       )
            Plaintiff,                 )
                                       )  Civil Action
v.                                     ) No. 04-1207-GMS
                                       )
COLONEL L. AARON CHAFFINCH, et al.,    )
                                       )
            Defendants.                )
```

          Deposition of WAYNE H. WARREN taken
pursuant to notice at the law offices of Montgomery,
McCracken, Walker & Rhoads, LLP, 300 Delaware Avenue,
Suite 750, Wilmington, Delaware, beginning at 10:10
a.m., on Monday, October 17, 2005, before Kurt A.
Fetzer, Registered Diplomate Reporter and Notary
Public.

APPEARANCES:

        THOMAS S. NEUBERGER, ESQ.
        THE NEUBERGER FIRM, P.A.
          2 East Seventh Street - Suite 302
          Wilmington, Delaware  19801
          For the Plaintiffs

              WILCOX & FETZER
      1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477

Price, et al.                                                    v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                           C.A. # 04-956-GMS                        October 17, 2005

---

Page 2

1  APPEARANCES: (Cont'd)
2      EDWARD T. ELLIS, ESQ.
3      MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
         123 South Broad Street
4        Philadelphia, Pennsylvania 19109
         For the Defendants
5
   ALSO PRESENT:
6      B. KURT PRICE
       CHRISTOPHER D. FORAKER
7
8                - - - - -
9              WAYNE H. WARREN,
10     the deponent herein, having first been
11     duly sworn on oath, was examined and
12     testified as follows:
13                  EXAMINATION
14  BY MR. ELLIS:
15     Q.  Could you state your name for the record,
16  please?
17     A.  Wayne Howard Warren.
18     Q.  And you are currently a member of the Delaware
19  State Police?
20     A.  Yes, I am.
21     Q.  And what's your rank?
22     A.  Master corporal.
23     Q.  What's your date of birth?
24     A.  5-22-58.

---

Page 3

1     Q.  Are you married?
2     A.  Yes.
3     Q.  What's your wife's name?
4     A.  Mary Lou.
5     Q.  Does your wife work?
6     A.  Yes, she does.
7     Q.  What does she do?
8     A.  She's a Registered Nurse with a pain doctor in
9  the Lewes area.
10    Q.  A pain doctor?
11    A.  Yes.  Gabriel Samori.
12    Q.  Gabriel?
13    A.  Samori.
14    Q.  Can you spell it, please?
15    A.  S-a-m-o-r-i.
16    Q.  Do you have children?
17    A.  Yes, I do.
18    Q.  How many?
19    A.  Two.
20    Q.  What are their ages?
21    A.  Jackie is 18 and Jennifer is 16.
22    Q.  And is Jackie a female?
23    A.  Yes.
24    Q.  Where is Jackie in school?

---

Page 4

1     A.  Kennesaw State University in Kennesaw, Georgia.
2     Q.  How about Jennifer?
3     A.  She's in Cape Henlopen High School.
4     Q.  Do you live in Lewes, Delaware?
5     A.  Yes, I do.
6     Q.  Can you give me your address, please?
7     A.  16820 Ketch, K-e-t-c-h, Court in Lewes.
8     Q.  Are you presently actively working as a state
9  trooper?
10    A.  No, I'm not.
11    Q.  When is the last day that you were active as a
12  state trooper?
13    A.  That would have been June 17th, 2004, I
14  believe, before I was placed on light duty.
15    Q.  Okay.  I guess I probably used a bad phrase
16  then.
17            When I said actively working, I meant
18  going to, going on the job and performing some work
19  for the State Police.  You were actually going to work
20  after June 17th, 2004, were you not?
21    A.  That's correct.
22    Q.  And am I correct that you are presently not
23  working?
24    A.  That's correct.

---

Page 5

1     Q.  And when is the last day that you reported for
2  duty?
3     A.  I believe it was May 12th of this year, 2005.
4     Q.  Why did you stop reporting to work?
5     A.  I was given a letter by Captain Downs stating
6  that I was going to have to separate from the division
7  by June 10th of this year.
8     Q.  Okay.  Now, who was Captain Downs?
9     A.  He was the captain in charge of the training
10  academy.
11    Q.  So he was the director of training as of May
12  12th, 2005?
13    A.  That's correct.
14    Q.  Why did his giving you the letter telling you
15  that you would have to separate on June 10th cause you
16  to stop coming to work?
17    A.  Well, it was a traumatic experience.  I was
18  just given a letter stating that I had to separate
19  from the division by June 10th.
20    Q.  Was this unexpected?
21    A.  Absolutely it was unexpected.
22    Q.  What is your employment status since May 12th?
23  Has it been sick leave?  Has it been --
24    A.  Sick leave.

---

2 (Pages 2 to 5)

A425

Price, et al.                                                      v.                                           Chaffinch, et al.
Wayne H. Warren, Volume 1                        C.A. # 04-956-GMS                                 October 17, 2005

---

Page 6

1    Q.   So you have been taking sick leave since May
2  12th, 2005?
3    A.   That's correct.
4    Q.   Have you been sick?
5    A.   Cytologically or physically?
6    Q.   Well, let's start with physically.
7         Have you been physically ill?
8    A.   I've had diarrhea, headaches, depression.
9    Q.   And did the diarrhea start on May 12th?
10   A.   No.
11   Q.   Did the headaches start on May 12th?
12   A.   I would say I had a severe headache on the
13 evening of May 12th.
14   Q.   And how about the depression, did that start on
15 May 12th?
16   A.   I wouldn't say it started on May 12th, no.
17   Q.   Can you tell me when the diarrhea started?
18   A.   I can't tell you for sure.
19   Q.   Can you tell me if it was before May 12th or
20 after May 12th?
21   A.   I've had problems with my stomach ever since
22 this incident occurred.
23   Q.   When you say, "this incident," what are you
24 referring to?

---

Page 7

1    A.   The fact that I was being placed on light duty
2  and being retaliated against by the division.
3    Q.   I think you have testified that you were first
4  placed on light duty in June 2004.
5         Is that when the diarrhea started?
6    A.   I can't remember exactly when I've had the
7  stomach problems.
8    Q.   Now, how about the headaches, when did the --
9  let me back up a second.
10        I've looked at some of your medical
11 records and I see in your medical records that you
12 suffer from migraines occasionally?
13   A.   I've had headaches.
14   Q.   Is it your understanding that these are
15 migraine headaches?
16   A.   I don't know the difference between a migraine
17 headache and a regular headache, to be honest with
18 you.
19   Q.   Have you consulted with a doctor about the
20 headaches?
21   A.   Yes.
22   Q.   What do you take for the headaches, what
23 medicine?
24   A.   I'm currently taking Protonix for my stomach

---

Page 8

1  problems and Lexapro.  Nothing specifically for
2  headaches.
3    Q.   The Lexapro is an antidepressant, isn't it, or
4  antianxiety drug?
5    A.   That's correct.
6         MR. NEUBERGER:  Off the record.
7         (Discussion off the record.)
8  BY MR. ELLIS:
9    Q.   How frequently do you get headaches?
10   A.   I can't really say.
11   Q.   Can you say whether it's more than once a week?
12   A.   Possibly.  It depends on what week you're
13 talking about, I mean a certain time frame or...
14   Q.   Do you associate the headaches with any
15 particular activity?
16   A.   Well, when I was at the range I was getting
17 headaches frequently the last part of that assignment.
18   Q.   When you say, "the last part of that
19 assignment," can you give me a time frame?
20   A.   That would have been fall and winter of 2003 up
21 until the range closed in I think it was March of
22 2004.
23   Q.   Now, you used the term "frequently."  You said
24 you were getting headaches frequently.  What do you

---

Page 9

1  mean by "frequently"?
2    A.   At that point in time?
3    Q.   Yes.
4    A.   Probably every other day or every day.
5    Q.   Okay.  And after you were removed from the
6  range, did the headaches stop?
7    A.   They didn't stop completely, no.
8    Q.   But they became less frequent?
9    A.   That's correct.
10   Q.   For example, you're sitting here today on a
11 Monday morning.  Do you have a headache right now?
12   A.   No, I do not.
13   Q.   Did you have a headache over the weekend?
14   A.   Not that I can remember.
15   Q.   Did you have one last week?
16   A.   Not that I can remember.
17   Q.   Okay.  Going back to May 12th, 2005, at the
18 point that you went off on sick leave, did you provide
19 any doctor's note to your boss?
20   A.   After May of 2005?
21   Q.   Right.  Well, I think you testified that the
22 last day that you were on, that you reported to work
23 was May 12th, 2005, right?
24   A.   I believe that's correct.

---

3 (Pages 6 to 9)

Price, et al.                                      v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1                  C.A. # 04-956-GMS                October 17, 2005

Page 10

1    Q.   And since then you have been on sick leave?
2    A.   That's correct.
3    Q.   Did your supervisor ask you for a doctor's note
4    to explain why you were out on sick leave?
5    A.   No.
6    Q.   Did you provide one?
7    A.   No.
8    Q.   Have you been seeing a doctor for whatever
9    condition it is that puts you out on sick leave?
10   A.   Yes, I have.
11   Q.   And who's that?
12   A.   Dr. Stanislav.
13   Q.   And how long has it been, when is the last time
14   you saw Dr. Stanislav?
15   A.   Probably last week.
16   Q.   When is the last time before that?
17   A.   The records would indicate the times that I
18   have been seeing him.  I can't recall.
19   Q.   Can you give me an estimate of how many times
20   you have seen him since May 12th, 2005?
21   A.   No, I can't.
22   Q.   Would you say that it's less than ten?
23   A.   I can't give you any estimate.
24   Q.   No estimate at all?

Page 11

1    A.   No.
2    Q.   What have been your daily activities since May
3    12, 2005?
4    A.   Pretty much staying at home and just around the
5    house.
6    Q.   When your daughter went away to college, did
7    you take her down to Georgia?
8    A.   Yes, I did.
9    Q.   And was that in August of 2005?
10   A.   That's correct.
11   Q.   Did you drive?
12   A.   Yes, I did.
13   Q.   Did you drive your own car?
14   A.   Yes, I did.
15   Q.   Who went with you?
16   A.   My wife and my daughter.
17   Q.   How long did that take?
18   A.   Well, it was about a 13-hour drive down there.
19   We stayed a couple of days and we came back.
20   Q.   Did you find that experience stressful?
21   A.   That experience stressful?  Not really.  Not
22   any more stressful than daily life.
23   Q.   Have you played any sports since May 12, 2005?
24   A.   No.

Page 12

1    Q.   Did you play any sports in 2004?
2    A.   No.
3    Q.   2003?
4    A.   No.
5    Q.   I think I heard from somebody in the State
6    Police that you were a softball player.
7    A.   Softball coach.
8    Q.   Oh, you were a coach?
9    A.   Mm-hmm.
10   Q.   Were you also a softball player?
11   A.   A long time ago.
12   Q.   Okay.
13   A.   Smarter.
14   Q.   When is the last time you played?
15   A.   Probably twelve years ago, something like that,
16   twelve or thirteen years ago.
17   Q.   Do you have a regular athletic activity that
18   you've engaged in in the last ten years?
19   A.   I worked out, ran.  That's about the extent of
20   my physical activity.  Walking.
21   Q.   When you say, "worked out," what's that mean?
22   Lift weights?
23   A.   Exercise.  No, I haven't really lifted weights
24   probably in ten years, I would say.  Maybe a little

Page 13

1    longer.
2    Q.   What is your typical workout?
3    A.   Just do some exercises, running, stretching.
4    Q.   Have you been able to run since May 12, 2005?
5    A.   Not really.
6    Q.   Why not?
7    A.   I just haven't felt like it.
8    Q.   Have you worked out since May 12, 2005?
9    A.   Other than walking, no.
10   Q.   When you say that you do stretching, what type
11   of stretching?
12   A.   Just a normal stretching routine, stretch my
13   back, stretch my legs, arms.
14   Q.   Do you currently have any physical ailments?
15   A.   I have a shoulder problem.
16   Q.   What's the nature of your shoulder problem?
17   A.   The collarbone is rubbing the shoulder bone,
18   pressed into the...
19   Q.   Rotator cuff?
20   A.   Rotator cuff.  I believe that's what it is.
21   Q.   Have you been told that you have to have
22   surgery?
23   A.   Yes.
24   Q.   And do you have a torn rotator cuff?

4 (Pages 10 to 13)

A427

Price, et al.                                         v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                October 17, 2005

Page 14

1    A.   No.
2    Q.   What's the nature -- is it an impingement?
3    A.   Apparently, that's what it is.  They're going
4    to have to remove some of the collarbone, the end of
5    the collarbone that's going into the rotator cuff
6    joint, I guess.
7    Q.   So your expectation is that you would have to
8    have surgery to shave the bone?
9    A.   That's correct.
10   Q.   Does that cause you trouble sleeping at night?
11   A.   No, I would say not.
12   Q.   Have you also been diagnosed with carpal
13   tunnel?
14   A.   Yes, I have.
15   Q.   When did you receive that diagnosis?
16   A.   It was in December and I think it may have been
17   2003.  I'm not sure about the year, but it was in
18   December.  That I'm sure of.
19   Q.   What are the symptoms of the carpal tunnel?
20   A.   My hands are numb.
21   Q.   Are they numb right now?
22   A.   Sort of.
23   Q.   Are you being treated for carpal tunnel?
24   A.   No.

Page 15

1    Q.   Why aren't you being treated for it?
2    A.   I was given wrist splints and as far as I know,
3    that's about all they can do.  If it gets worse, they
4    told me that they could, they could do an operation to
5    relieve the numbness, if it got to that point.  I'm
6    not big on the operation.
7    Q.   Have you been hunting since May 12th, 2005?
8    A.   Yes.
9    Q.   Where did you go hunt?
10   A.   In the Lewes area.
11   Q.   What did you hunt for?
12   A.   Deer.
13   Q.   When?
14   Q.   When?
15   Q.   When?
16   A.   Probably a couple of weeks ago.
17   Q.   What's deer season in Delaware?
18   A.   Actually, it starts September 1st.
19   Q.   And how long does it run?
20   A.   Until January 31st.  I believe that's when it
21   is.
22   Q.   And what weapons are you allowed to use during
23   that period?
24   A.   Currently bow and arrow and muzzle loader.

Page 16

1    Q.   And --
2    A.   And shotgun on the weekends for doe.
3    Q.   What do you shoot with?
4    A.   Bow and arrow.
5    Q.   So you were hunting with a bow and arrow a
6    couple of weeks ago?
7    A.   Mm-hmm.
8    Q.   Do you plan on going hunting this fall?
9    A.   Yes, I do.
10   Q.   Where do you plan on going?
11   A.   In Delaware and West Virginia.
12   Q.   When is it that you're planning to go to West
13   Virginia?
14   A.   This weekend.
15   Q.   How about when are you planning to hunt in
16   Delaware?
17   A.   Whenever I get a chance.
18   Q.   When you go to West Virginia do you hunt with a
19   bow and arrow?
20   A.   Yes, I do.
21   Q.   Do you hunt with a gun at all anymore?
22   A.   Sometimes.
23   Q.   Back some years ago you hunted with a gun, did
24   you not?

Page 17

1    A.   Yes.
2    Q.   What type of weapon?
3    A.   12-gauge shotgun.
4    Q.   Did you ever hunt with a rifle?
5    A.   No.  I can't ever remember killing one with a
6    rifle.
7    Q.   I may have asked you this already.  But when
8    you go to West Virginia what are you going to hunt?
9    Deer?
10   A.   Deer.
11   Q.   Do you also hunt birds?
12   A.   No.
13   Q.   How about in the Lewes area, do you hunt birds?
14   A.   No.
15   Q.   So the only thing you hunt is deer?
16   A.   Pretty much deer.
17   Q.   Do you ever hunt rabbits, squirrels, anything
18   like that?
19   A.   No.
20   Q.   During the period since May 12th, 2005 have you
21   been paid by the State Police every week?
22   A.   Yes.
23   Q.   Have you had any type of outside income?
24   A.   No.

5 (Pages 14 to 17)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Price, et al.                                                          v.                                              Chaffinch, et al.
Wayne H. Warren, Volume 1                          C.A. # 04-956-GMS                                October 17, 2005

Page 18

1    Q.   Have you undertaken any jobs around the house
2  during that period since May 12th?
3    A.   Yes.
4    Q.   Like what job?
5    A.   Just worked around the house doing landscaping,
6  cleaning, normal maintenance of a house.
7    Q.   You testified a few minutes ago that you had
8  been a softball coach.  What type of softball did you
9  coach?
10   A.   Girls softball.
11   Q.   What level?
12   A.   I've been coaching since my daughter was 11 and
13  she's 18, so probably 9 years.
14   Q.   And was this a municipal league or was it a
15  high school league or what type of league?
16   A.   It's a travel team.  We travel around and play
17  different areas.
18   Q.   Does your daughter Jennifer play softball?
19   A.   No, she does not.
20   Q.   When is the last time you coached?
21   A.   This summer.
22   Q.   Just this past summer?
23   A.   That's correct.
24   Q.   2005?

Page 19

1    A.   Right.
2    Q.   Is your daughter in college on a softball
3  scholarship?
4    A.   Yes, she is.
5    Q.   Oh, she is?
6    A.   Mm-hmm.
7    Q.   Congratulations.
8    A.   Thanks.
9        MR. NEUBERGER:  He's a good coach.
10        MR. ELLIS:  He may be, but there has to be
11  some genetics there too.
12        MR. NEUBERGER:  It's the mother.
13        THE WITNESS:  Yeah, it is.
14  BY MR. ELLIS:
15   Q.   Do you expect to coach softball next summer?
16   A.   I hope to.
17   Q.   What was your first -- let me back up a second.
18        When did you start with the Delaware State
19  Police?
20   A.   January 31, 1983.
21   Q.   You went through the Police Academy, right?
22   A.   That's correct.
23   Q.   What class were you?
24   A.   I think it was the 46th.

Page 20

1    Q.   Why don't you go through with me the positions
2  you've had with the State Police from the beginning
3  when you were a recruit?
4    A.   I started as a recruit trooper in January of
5  1983.  I graduated from the academy, was the
6  Governor's outstanding recruit upon graduation, was
7  assigned to the patrol unit at Troop 7.
8        After that assignment I was transferred
9  into the special investigations unit out of Troop 9 in
10  Odessa.
11   Q.   Troop 9 you said?
12   A.   That's correct.
13        I think that was five or six years there.
14  At that time I transferred back to the patrol unit at
15  Troop 7, was transferred into the special
16  investigations tactical unit.  It was a newly formed
17  unit.
18   Q.   Is that the drug unit?
19   A.   No.  What it was was it was a unit that was
20  assigned to control the open air drug markets in
21  marked police cars.  We were a proactive unit.  We
22  would actually go into the neighborhoods.  There was
23  five officers, flood the area and do more or less just
24  take-offs of what we could see.  We were arresting

Page 21

1  people, more or less like the Wilmington jumpout squad
2  is doing up here.  We would go in and identify drug
3  dealers or people that were doing different types of
4  crime and address them immediately.
5        We worked also with the drug unit
6  providing them with backup and cover and also
7  executing warrants for them.
8    Q.   How long were you with the special
9  investigations tactical unit?
10   A.   I think that was three years.  And then we were
11  absorbed into what was called the Governor's Task
12  Force.  I think I was in that for a little over two
13  years, I believe.  The dates will all be on my
14  personnel file.
15        And from there, I was transferred back to
16  Troop 4 patrol and from Troop 4 patrol I was
17  transferred into the firearms training unit.
18   Q.   And I understand you went into the firearms
19  training unit in August 2001?
20   A.   That's correct.
21        And I was a member of the special
22  operations response team since I believe '86 or '87.
23   Q.   Until when?
24   A.   Till right now, I guess.  No one has told me

6 (Pages 18 to 21)

Wilcox & Fetzer, Ltd.                          Professional Court Reporters                          (302)655-0477

Price, et al.                                    v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1                 C.A. # 04-956-GMS                      October 17, 2005

Page 22

1  anything about that.
2      Q.   When is the last time you actually worked with
3  the SORT team?
4      A.   I'm not sure.  It would have been -- actually,
5  I think I am sure.  I think it was June 17th, 2004.  I
6  think I did a surveillance with the drug unit.
7      Q.   Prior to your going to the firearms training
8  unit in 2001, how often did you go to the range in
9  Smyrna?
10     A.   That's a hard question to answer.  The special
11 operations team has monthly training and sometimes we
12 would report to the range to shoot and on different
13 occasions I was assigned to the range temporarily.
14     Q.   Okay.  At what point did you start getting
15 temporary assignments at the range?
16     A.   I can't answer that at all.
17     Q.   Do you remember what job you were in when you
18 starting getting temporary assignments at the range?
19     A.   Actually, I think I was in the special
20 investigations unit.  So it was --
21     Q.   Now, that's the unit that you described as
22 dealing with open air drug markets?
23     A.   No. The special investigations unit was the
24 actual drug unit itself, my second assignment with the

Page 23

1  division.
2      Q.   At that point were you certified as a range
3  instructor?
4      A.   Yes.
5      Q.   When did you first get certified as a range
6  instructor?
7      A.   I don't know the exact date, but it would again
8  be in my personnel file when the FBI certified me.
9      Q.   Going back to the question I had asked you
10 about how often you went to the range, did you have to
11 qualify twice a year like everybody else?
12     A.   Actually, we were qualifying more than that
13 with the special operations team and it varied.  I
14 mean, sometimes, you know, the policy was followed and
15 sometimes it wasn't followed.  Sometimes we didn't get
16 in the qualifications.
17          But, again, you would have to obtain the
18 records from the special operations team to see
19 exactly when I was qualifying.
20     Q.   Which policy are you referring to?
21     A.   The policy of the special operations team of
22 how often we would have to shoot.  And it's been
23 changed over the years.
24     Q.   I understand that.  But you're saying that the

Page 24

1  SORT team had to qualify more frequently than rank and
2  file troopers?
3      A.   That's correct.
4      Q.   So however many times the SORT team had to
5  qualify, that number of times you would have been at
6  the range?
7      A.   Yes.
8      Q.   Did you go to the range -- well, I think you
9  testified that you were also assigned there on
10 temporary duty.
11     A.   That's correct.
12     Q.   Under what circumstances would you be assigned
13 there on temporary duty?
14     A.   As a safety officer to walk the line behind the
15 shooters.
16     Q.   Why would you be assigned there from some other
17 location?  Was it because there weren't enough safety
18 officers assigned there permanently?
19     A.   That's correct.
20     Q.   Prior to the opening of the range in Smyrna in
21 1998, where did the Delaware State Police shoot?
22     A.   We shot on a range off of Denneys Road, an
23 outdoor range.
24     Q.   Was this a Delaware State Police range?

Page 25

1      A.   That's correct.
2      Q.   Were you also assigned temporary duty at that
3  outdoor range?
4      A.   Yes.  When it was the outdoor range, yes.
5      Q.   Between the time the range opened in 1998 and
6  the time you were assigned there permanently in 2001,
7  did you serve as a temporary duty officer?
8      A.   I believe I did.
9      Q.   When you arrived at the firearms training unit
10 in August 2001, who else was assigned there?
11     A.   Sergeant Chris Foraker, Master Corporal Kurt
12 Price, Master Corporal Eddie Cathell.
13     Q.   At some point was Cathell replaced?
14     A.   Yes, he was.
15     Q.   Do you remember when that was?
16     A.   I believe it was in November.
17     Q.   Of what year?
18     A.   Of -- I can't recall.
19     Q.   Who replaced Cathell?
20     A.   Who replaced Cathell?  Well, we had Corporal
21 Bruce Peachey, Master Corporal Bruce Peachey was also
22 assigned to the range at that point.  That was it.
23     Q.   Did Peachey come before Cathell left?
24     A.   I'm not sure.

7 (Pages 22 to 25)

Price, et al.                                    v.                        Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

---

Page 26

1    Q.   Did James Warwick become a range instructor at
2  some point during this period?
3    A.   After that time he did, yes.
4    Q.   Do you know who he replaced?
5    A.   No, I do not, or if he was just brought in.  I
6  don't know if it was a replacement for Cathell when
7  Peachey retired or just how that occurred.
8    Q.   When Peachey was assigned to the range, was
9  part of the time he was assigned to the range a
10  period when he was on terminal leave?
11    A.   I think he was on light duty.  I don't think it
12  was terminal leave.
13    Q.   Do you know whether there was a time when he
14  went on terminal leave while he was still assigned to
15  the range?
16    A.   No, I do not.
17    Q.   I would like you to describe for me your duties
18  during the time you were assigned to the range.  I'm
19  talking about the period before you were put on light
20  duty.
21        In other words, beginning in 2001 up until
22  the point you were put on light duty, describe your
23  job.
24    A.   The job first and foremost was the safety of

Page 27

1  everyone who walked through that building, to instruct
2  on firearms to newly assigned troopers, as well as
3  municipal officers, to recertify veteran officers with
4  yearly qualifications, to write lesson plans and
5  investigate different types of training, weapons
6  maintenance, to include armorers breakdowns.  And I'm
7  sure I'm going to forget some of them.
8        We had to maintain the building and ensure
9  that we had the necessary supplies, targets,
10  ammunition and anything else that we needed for the
11  course of the shoot.
12    Q.   What percentage of your time was spent
13  actually -- let me back up a second.
14        When you say that one of your jobs was
15  instructing troopers and municipal officers on
16  firearms, is there a piece of that that's a classroom
17  component?
18    A.   Yes, there is.
19    Q.   Were you one of the teachers in front of the
20  classroom?
21    A.   Yes, I was.
22    Q.   What is it exactly you were teaching people in
23  the classroom?
24    A.   We covered weapon safety.  We went over any new

Page 28

1  techniques that we picked up over the past year.  What
2  we would do is instruct them prior to them
3  recertifying just on the basic weapon handling, calm
4  them down, make sure they understood what we expected
5  of them when we went onto the range.
6        So what we basically did is we would bring
7  them in.  We usually did a weapons inspection and then
8  we would explain to them what they were going to
9  expect for the day's activities, the itinerary.
10    Q.   Excuse me.  Let me interrupt you for just a
11  minute.
12        Are you referring now to the
13  requalification class that you would run?
14    A.   That's correct.
15    Q.   So you would bring people in.  You used the
16  phrase "calm them down."
17    A.   That's correct.
18    Q.   What do you mean by that?
19    A.   Well, a lot of people were very upset and
20  apprehensive about requalifying.
21    Q.   Troopers are?
22    A.   Very much so.
23    Q.   Why is that?  Do you know?
24    A.   I have no idea.  That's not my forte.

Page 29

1    Q.   So you do something called a weapons
2  inspection?
3    A.   That's correct.
4    Q.   What's that mean?
5    A.   We're looking over the weapons to make sure
6  that they're clean and serviceable just to check so
7  that that officer has an operating weapon and it's not
8  inoperational.
9    Q.   How many troopers do you have in a class?
10    A.   It varied.
11    Q.   What's the high number?
12    A.   Twenty.
13    Q.   And what would be the smallest number you would
14  have in a class?
15    A.   Four, five.
16    Q.   So when the troopers come in for the
17  recertification, do you inspect the weapon, each
18  trooper's weapon?
19    A.   Yes, we do.
20    Q.   So when you say inspect it, what does that
21  mean?
22    A.   We're looking the weapon over to make sure it's
23  properly lubricated, doesn't have any rust on it and
24  it is in operating order.

8 (Pages 26 to 29)

A431

Price, et al.                                          v.                                   Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                    October 17, 2005

Page 30

1    Q.   Are you completely disassembling it?
2    A.   They're disassembling it, a field stripping of
3  the weapon, and then we look it over.
4    Q.   Does this all happen in the classroom?
5    A.   Yes, it does.
6    Q.   What happens next in a recertification?
7    A.   Then we explain to them what they're going to
8  do and we also go over the techniques that they're
9  required to perform out on the range.  So we explain
10  to them loading processes, shooting with a flashlight,
11  different options that they have, anything new that we
12  may have picked up in the field from our training from
13  going to outside sources when we attend training
14  classes.
15    Q.   When you say new techniques, what are you
16  referring to?  Can you give me an example?
17    A.   Well, the technique of shooting with a
18  flashlight.  There's several different techniques that
19  have been developed over the years and we're trying to
20  keep up to date with the best techniques.  Also
21  reloading the weapon.  If an officer is injured, how
22  would they reload that weapon, how would they keep in
23  the fight.
24        So we evaluate the different techniques

Page 31

1  out there and that goes on on a yearly basis and then
2  we instruct to that technique.
3    Q.   Okay.  What happens next as part of the
4  process?
5    A.   Once we take them through the classroom time,
6  then we actually go out onto the range and we perform
7  the daily activities of shooting.
8    Q.   How long does the classroom session take?
9    A.   It depends.  Usually it would be an hour, hour
10  and 45 minutes.  It depends on what type of shooting
11  we were going to do prior to going out.  If we were
12  going to just do simply qualification, it would be a
13  shorter period of time.
14        If we were going to put a different type
15  of shoot that involved where the officer would have to
16  move and we had different types of training, then the
17  classroom would be a little longer.
18    Q.   Okay.  How long does the actual shooting
19  session take?
20    A.   That depends on how fast the group is out on
21  the range.  If they're moving along good, it could be
22  two-and-a-half, three hours.  If not, it could be
23  extended.
24    Q.   Does the requalification -- excuse me.

Page 32

1        Does the recertification process -- do you
2  call it recertification or requalification?
3    A.   You can call it either one.
4    Q.   Is it a whole day's exercise?
5    A.   Well, it's not a whole day unless we have
6  problems.  If we have problems, then the shooters have
7  the opportunity to stay after everyone else is gone
8  and then continue to shoot.  And usually there's some
9  training that goes into that prior to them trying to
10  qualify if they failed the qualification.
11    Q.   When you say, "have problems," you mean people
12  who don't succeed in qualifying?
13    A.   That's correct.
14    Q.   Do you score them on their accuracy to the
15  target?
16    A.   Yes, we do.
17    Q.   And is that what determines whether they pass
18  or not?
19    A.   That's correct.
20    Q.   Now, is there a difference between the
21  recertification process for existing troopers and the
22  teaching of an academy class?
23    A.   Yes.
24    Q.   What do you do when you teach an academy class?

Page 33

1  Describe that process.
2    A.   Well, we bring them in.  We acclimate them to
3  the weapon.  We go over the classroom portion.  We
4  explain the nomenclature of the weapon and we take it
5  really slow so each individual person we're pretty
6  sure will be capable of going out onto the range and
7  starting the next process.
8        So we really start them off in the
9  classroom.  We explain to them safety issues, about
10  the weapon and we also give them some information on
11  health issues and problems that they may encounter at
12  the range.
13        For example, there's a section in there
14  that we had in our booklet about lead and the dangers
15  of lead and to make sure that they washed their hands
16  when they came off the range before they did anything
17  else and not to do anything in the range because of
18  the problems with lead.  So that was pretty much
19  discussed with them.
20        We talked to them about proper hearing
21  protection, make sure that was in place.  Range rules,
22  they're read every day.  They have to understand what
23  the rules are in the range because there's usually a
24  lot of people in the range inexperienced.  We want to

9 (Pages 30 to 33)

Price, et al.                                        v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                October 17, 2005

Page 34

1  make sure that it's operating as safely as we can make
2  it operate.
3     Q.  When you say, "range rules," are you referring
4  to the part of the building where the actual shooting
5  takes place?
6     A.  No.  Actually, we're talking about the entire
7  building because when they enter that building the
8  weapon is supposed to be unloaded.  We don't want them
9  coming in with a loaded weapon.  So actually when they
10 park their vehicle in the parking lot, once they come
11 through the double doors there's range rules at that
12 point.
13    Q.  So they have to come in with an unloaded gun?
14    A.  That's correct.
15    Q.  And then where do they load it for the
16 shooting?
17    A.  Actually out on the range.
18    Q.  How long does it take for an academy class to
19 progress through the training that's given at the
20 firearms training unit?
21    A.  Well, it's supposed to be a 40-hour range
22 class.
23    Q.  Is that 40 hours consecutive or is it broken up
24 over the course of the academy course?

Page 35

1     A.  Well, 40 hours with the handgun and then we
2  have three days with the shotgun.  So it's broken up.
3     Q.  So for one solid week that class is at the
4  range being trained on handguns?
5     A.  That's correct.
6     Q.  And then they come back for three more
7  consecutive days of training on shotguns?
8     A.  That's correct.
9     Q.  And does the shotgun training follow
10 immediately after the end of the handgun training?
11    A.  There's usually some time in between.  It
12 depends on -- the class is broken down into different
13 groups.  Depending on the size of the class.
14    Q.  Of the 40 hours that the academy class trains,
15 what percentage of that is spent actually on the range
16 shooting?
17    A.  Again, that would depend on the class and/or
18 the group.  Each group could be spending different
19 amounts of time on the range shooting themselves.  One
20 group could get more time actually shooting in the
21 range than the next group.
22          So I couldn't give you an accurate amount
23 of time for one class.
24    Q.  Okay.  A typical academy class would be about

Page 36

1  25 or 30 recruits?
2     A.  Correct.
3     Q.  And are they broken up into subgroups?
4     A.  That's correct.
5     Q.  I understand.  So that you're saying that some
6  subgroups will proceed faster than others?
7     A.  That's correct.
8     Q.  On average, what percentage of the time is a
9  recruit actually shooting as opposed to being in a
10 classroom or doing other functions?
11    A.  Again, I wouldn't want to guess on that.  I
12 mean, it's a large percentage of the time that they're
13 out there actually shooting.
14    Q.  Like half or more?
15    A.  Yes.
16    Q.  When you do what you call a municipal class,
17 what's the purpose of the municipal class coming
18 through the State Police range?
19    A.  We train in firearms.
20    Q.  So that's training that the municipal police
21 academies don't have?
22    A.  That's correct.
23    Q.  Do you give them the same training that you
24 give to the academy recruits?

Page 37

1     A.  If it's strictly a municipal class?
2     Q.  Yes.
3     A.  Yes.
4     Q.  So it's basically --
5     A.  Well, they may not receive what we call
6  simmunitions training.
7     Q.  Can you describe what is simmunitions?
8     A.  It's a tactical exercise where it's life-like.
9  There are role players and the officers are put in
10 situations that are scripted and they actually go in
11 and do a mock exercise.
12    Q.  Where is that done?
13    A.  At the State Police firing range in Smyrna.
14 That's where it was done.
15    Q.  It was done actually in the shooting area?
16    A.  No, it wasn't.  Sometimes it was.  Sometimes it
17 was done in another room in the building.
18    Q.  And why do you call it simmunitions?  What's
19 that name mean?
20    A.  It's the round that was developed for training.
21 It's like a paint round.
22    Q.  So it actually is a round that's shot out of a
23 gun?  It's just not going to hurt anybody?
24    A.  Correct.

10 (Pages 34 to 37)

Price, et al.                                              v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                    October 17, 2005

Page 38

1    Q.   Kind of like playing paint ball?
2    A.   Basically.
3    Q.   Are there any other types of training that you
4    do or that you did at the firing range in Smyrna that
5    we haven't talked about?
6    A.   We instructed patrol procedures in the range,
7    in the firing area itself.
8    Q.   What do you mean by "patrol procedures"?
9    A.   We instructed the troopers how to make a
10   vehicle stop and how to approach people, how to
11   handcuff them, when to handcuff them, actually to
12   contact the public.  And we did that with scripted
13   scenarios and it was a classroom portion.
14        Again, we explained to them what we were
15   going to do, how we were going to train them and then
16   we actually went out and performed it.
17   Q.   Does that training involve discharging weapons?
18   A.   No, it does not.
19   Q.   Why is it done in the range area?
20   A.   It was done in the range area so everyone could
21   see what was going on and it could be evaluated better
22   in that environment.
23        We also did it when it was, when the
24   weather was bad outside so that we had the attention

Page 39

1    of the recruits that we were trying to train rather
2    than trying to keep warm or keep dry or whatever,
3    whatever the environment was out there.
4    Q.   I take it the doors are big enough to enable a
5    vehicle to be brought inside the building at that part
6    of the building?
7    A.   Yes.
8    Q.   And that's why you do it out there?
9    A.   Yes.
10   Q.   When you started at the range in August of
11   2001, were you instructed by anybody on personal
12   hygiene?
13   A.   Instructed?  What's your term instructed?  I'm
14   just a little unclear about it.
15   Q.   Somebody who was either your boss or a coworker
16   explaining to you rules of personal hygiene.
17   A.   Well, they just explained that what we would do
18   is if you're on the range, as I stated before, when
19   you would come off the range you would wash your
20   hands, you would change your clothes.  And it was the
21   bathroom area that had a locker room in it.  We would
22   change our clothes when we arrived at the facilities,
23   put on range clothes, make sure that you washed your
24   hands every time you come off the range.

Page 40

1        If you came off the range to go to the
2    bathroom, wash your hands before you went to the
3    bathroom.  That the clothing that was worn on the
4    range would be laundered at the facility and sent off
5    to the laundry.
6        Basically, that was it.  Once we -- we had
7    to maintain the back of the bullet trap and monitor
8    the water tank and if there was a large amount of
9    debris that we had a little fishnet or a scoop to
10   clean the debris out so that the water would flow
11   freely.
12   Q.   I'll get to the maintenance of the equipment in
13   a minute.  I'm just really talking about personal
14   hygiene.
15   A.   Personal hygiene was covered pretty much, the
16   best that I can remember at this time.
17   Q.   At the point that you started at the range, was
18   the range using lead bullets or was it using frangible
19   ammunition?
20   A.   It was using frangible ammunition at that time.
21   Q.   What did you understand the frangible
22   ammunition to be?
23   A.   For the longest time I understood it to be
24   ceramic ammunition, ceramic bullet heads.

Page 41

1    Q.   When you say, "ceramic," what do you mean?
2    A.   Ceramic.
3    Q.   Like pottery?
4    A.   Like a pottery.
5    Q.   And who told you that it was ceramic?
6    A.   I can't recall who started that.
7    Q.   Do you remember when you were told that it was
8    ceramic?
9    A.   Actually, I believe it was in January of I
10   believe it was 2003.  When we switched over to the
11   frangible ammunition, that was what was told to us at
12   that particular point in time.  And who told us, I
13   can't tell you.
14   Q.   My understanding is that the State Police went
15   from lead to frangible ammunition in late 2000 or
16   early 2001.
17        Is that your recollection?
18   A.   That could be.  I could be off on the date of
19   that.
20   Q.   Whether it was late 2000 or early 2001, it
21   would have been frangible at the point you started
22   there.  Would that be correct?
23   A.   That's correct.
24   Q.   Now, when you started there did you have an

11 (Pages 38 to 41)

Price, et al.                                                v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                        C.A. # 04-956-GMS                        October 17, 2005

Page 42

1 understanding as to what the frangible ammunition was
2 made of?
3   A.   No.  I just heard that it was ceramic and
4 that's it.
5   Q.   But you don't remember who you heard it from?
6   A.   No.
7   Q.   Did you hear it from your boss?
8   A.   Whenever we switched over is when I heard that
9 information and, yeah, I heard it from my boss before,
10 Sergeant Ashley, at one point.
11   Q.   I'm really referring to the point -- Sergeant
12 Ashley wasn't your boss at the time you became a
13 firearms instructor?
14   A.   No.  No.  I'm sorry.  I didn't understand that
15 you were putting me within a time frame.
16   Q.   I'm really talking about the time frame when
17 you started at the range, which would have been August
18 2001.
19        My question is I think you've already
20 testified that you understood that it was a ceramic
21 bullet you were shooting in August 2001?
22   A.   That's correct.
23   Q.   But you don't recall who told you it was
24 ceramic?

Page 43

1   A.   No, I do not.
2   Q.   Let me add one more thing.  Your boss at the
3 point you started at the range would have been
4 Sergeant Foraker, right?
5   A.   That's correct.
6   Q.   Do you recall ever having a discussion with him
7 as to what the bullet was made of --
8   A.   No.
9   Q.   -- prior to when he left, in other words,
10 during his first tour as officer in charge?
11   A.   No.
12   Q.   Do you recall how you first learned that the
13 State Police was switching over from lead bullets to
14 frangible ammunition?
15   A.   I can remember hearing rumors about a lead
16 problem at the range where there were rumors going
17 around that there was more lead than was supposed to
18 be in the range itself.  They were looking to correct
19 that lead problem and they started investigating other
20 types of bullet material and that's what led us to
21 switch over to frangible ammunition.
22   Q.   Okay.  And you heard that at about the time
23 that the switch or shortly before the changeover
24 occurred, whenever that was?

Page 44

1   A.   No.  Actually, once the range opened, there was
2 a little bit of information being passed around that
3 the range was not really safe because there was a
4 large amount of lead.
5   Q.   So that would go back to 1998?
6   A.   That's correct.
7   Q.   And who told you that there was a large amount
8 of lead?
9   A.   I can't recall.
10   Q.   Did you ever see any environmental studies from
11 1998 that said there was a large amount of lead?
12   A.   At what time frame?
13   Q.   1998.
14   A.   Did I see anything in 1998 about 1998?
15   Q.   Right.
16   A.   No.
17   Q.   So at the point you begin work at the range in
18 August 2001 your understanding is that there is
19 ceramic or some type of ceramic material in the bullet
20 but you don't remember who told you that?
21   A.   No, I do not.
22   Q.   Prior to your assignment to the range in August
23 2001, had you ever gone to the part of the building
24 that houses the back of the bullet trap?

Page 45

1   A.   Yes.
2   Q.   And what occasioned you to be behind the bullet
3 trap prior to your being assigned there?
4   A.   We were storing special operations training
5 equipment behind the bullet trap.
6   Q.   What was it you stored behind the bullet trap?
7   A.   Ropes, ammunition, targets, specialty items for
8 the special operations unit.  We had a locker.  That's
9 where our storage area was.
10   Q.   Was the ammunition kept in the locker?
11   A.   Some of our ammunition was.  Some of the
12 special operations team ammunition was kept in that
13 locker.
14   Q.   That's really what I am referring to.
15   A.   That's correct.
16   Q.   So what type of ammunition was kept in that
17 locker?
18   A.   Well, I can recall there were .223 rounds
19 there.
20   Q.   We're talking bullets?
21   A.   Bullets.  And I can't recall what other
22 ammunition at this point.  I know that that was our
23 storage facility in that building.
24   Q.   Is that the only reason you would have been

12 (Pages 42 to 45)

Price, et al.                                              v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                        C.A. # 04-956-GMS                          October 17, 2005

Page 46

1  behind the bullet trap prior to your assignment there?
2      A.   Yes.
3      Q.   Now, once you were assigned there, did somebody
4  take you and show you the back of the bullet trap?
5      A.   Yes.
6      Q.   Who?
7      A.   Corporal Price.
8      Q.   How long after you were assigned to the
9  firearms training unit in August 2001 was it that he
10  took you back behind the bullet trap?
11      A.   I would say probably within the first week or
12  so.
13      Q.   And was it just the two of you?
14      A.   Yes.
15      Q.   Describe what conversation you had back there
16  behind the bullet trap.
17      A.   He was just explaining the operation of the
18  trap and the problems that we would encounter and how
19  we could correct it.
20      Q.   What did he tell you about the operation of the
21  trap?
22      A.   That the water had to flow through the pumps
23  that went to the sprayer head and cascaded down over
24  the trap itself on the front side where the shooting

Page 47

1  would commence.  If we had problems, we would have to
2  go back and make sure nothing was clogging up those
3  pumps and the shotgun wadding and any other foreign
4  material other than the water or the liquid that was
5  flowing in there sometimes would have to be removed.
6      Q.   Removed from where?
7      A.   From the water tank itself.
8      Q.   Did he show you how to remove the shotgun
9  wadding?
10      A.   Yes.
11      Q.   That's what you were describing a few minutes
12  ago where you removed it with a little fishnet or
13  something?
14      A.   A fishnet or a colander I believe we had at one
15  time or a little strainer.
16      Q.   A strainer.
17          How did you get down into the water?  Did
18  you have to move any piece of the bullet trap?
19      A.   No.
20      Q.   You just sort of reached in between the bullet
21  trap and the pan?
22      A.   Well, there's a water tank there.  It's empty.
23  It's empty now, but it used to be full.
24      Q.   I understand that.

Page 48

1      A.   So it was easily accessible.  You could just
2  reach in there.
3      Q.   When you say a water tank, are you referring to
4  the pan at the bottom of the system?
5      A.   That's correct.
6      Q.   At the point that you were first assigned to
7  the firearms training unit, what did the conveyor belt
8  look like?
9      A.   It was pretty much solid and it would hold the
10  projectiles intact and take them to one end of the
11  conveyor, dumping them in a 55-gallon drum.
12      Q.   When you say it was solid, what was the belt
13  made of?
14      A.   When it was disposed of we were told that it
15  was made of steel.
16      Q.   Were you able to tell before it was disposed of
17  that it was made of steel?
18      A.   I never really paid that close attention what
19  the metal was.
20      Q.   Was it slatted?  Did it have slats in it?
21      A.   Yes.
22      Q.   Did the slats when the belt was running along
23  on the level part of the equipment, did the slats
24  close up so it almost looked solid?

Page 49

1      A.   I can't recall exactly what the configuration
2  was at that time.  All I know now is it was paddles
3  when it was changed.
4      Q.   Did it look like tank tracks?
5      A.   Probably.
6      Q.   When you say, "Probably" it's just because you
7  don't remember that well?
8      A.   That's correct.
9      Q.   I take it that the way the system was supposed
10  to work is that a bullet would drop out of the bullet
11  trap onto the conveyor which would then take the
12  bullet down to the end and drop it into a can?
13      A.   That's correct.
14      Q.   Now, when Mr. Price or Corporal Price took you
15  back behind the bullet trap, what types of problems
16  did he say came up with the system?
17      A.   Well, the pumps would sometimes be clogged and
18  if there were a lot of wads, if there were a lot of
19  wadding in the tank itself, it would restrict the flow
20  of the water and sometimes you had to pick the pump up
21  in order for it to free itself and to continue pumping
22  the water.
23      Q.   Any other types of problems that he described
24  to you?

13 (Pages 46 to 49)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A436

Price, et al.                                              v.                                      Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                       October 17, 2005

Page 50

1   A.   That's all I can recall at this time.
2   Q.   During the time that you worked at the firearms
3   training unit, did you learn of any other problems
4   that could occur with the bullet trap system other
5   than what Corporal Price described to you on the first
6   day that he took you back there?
7   A.   Well, we could see that the belt or I could see
8   that the belt was wearing over a period of time, the
9   original belt, and that the sintered copper was
10  clogging up the conveyor belt and causing problems
11  with that.
12  Q.   Anything else?
13  A.   Well, the sprayer heads would clog and I was
14  never really told how to even clean those or look at
15  them.
16      The other thing was the filters in the
17  pumps themselves would clog up and restrict the flow
18  of water and that was a big problem, especially toward
19  the end.  And there was a screen in the pump where the
20  filter was located and the screen would get caked with
21  that material and we would have to clean the filters
22  off.
23      And I'm sure there's other things that I'm
24  not going to recall everything that went wrong with

Page 51

1   that bullet trap in that period of time, but those are
2   some of the things that I can recall.
3   Q.   Is there a difference between the pumps getting
4   clogged, which is what Corporal Price told you, and
5   the filters getting clogged?
6   A.   Yes.
7   Q.   What's the difference?
8   A.   Well, the pumps themselves had problems
9   circulating the sintered copper in the water, but then
10  the filter would clog where the pump was pumping the
11  water to the filter.  That would clog and not allow
12  the water to proceed up to the sprayer head and then
13  the sprayer head would clog at some point.
14  Q.   So the filter was between the pump and the
15  sprayer head?
16  A.   That's correct.
17  Q.   I understand.
18      What did Corporal Price tell you that you
19  were supposed to do when the pump was clogged?
20  A.   Try to free it.
21  Q.   Did he show you how to free it?
22  A.   We just picked it up.  We picked it up out of
23  the water.  We picked it up to try to free it.  If the
24  material was clogging it up around the bottom of it --

Page 52

1   I mean, it was not a long process.  This process was a
2   very short process.  It was just verbally explained to
3   me and that was it.
4   Q.   I understand.  I'm just trying to see what it
5   was that was explained.
6   A.   Right.
7   Q.   When you say -- let me just back up to a little
8   more description of the system.
9       Am I correct that in this tank that's at
10  the bottom of the system there's water?
11  A.   That's correct.
12  Q.   And above the tank is the conveyor belt?
13  A.   That's correct.
14  Q.   How far above the water level was the conveyor
15  belt?
16  A.   This is just a guess.  Probably 24 inches or
17  so.
18  Q.   So the pump is somewhere between the conveyor
19  belt and the water, right?
20  A.   That's correct.
21  Q.   It's actually in the water, right?
22  A.   It's in the water.
23  Q.   And I take it that the pump would suck the
24  water out of the tank and shoot it up to the sprayers?

Page 53

1   A.   Correct.
2   Q.   When the pump got clogged, I take it you had to
3   move it around and that would unclog it?
4   A.   Sometimes, or we would have to replace it.
5   Q.   What was it getting clogged with?  The shotgun
6   wadding?
7   A.   No.  It was getting clogged with the sintered
8   copper that was acting as a clay.  It would harden.
9   When it first came into the water, it was like flour.
10  It would sit on top of the water.  After a period of
11  time, it would drop down to the bottom of the tank and
12  it would be like a sand combination, coarse.  And it
13  would form a circle around the pump preventing the
14  water from entering into that area so that the pump
15  could bring the water up to the sprayer head.
16  Q.   So you would have to take the pump out of the
17  water and knock the copper off of it?
18  A.   You did different things.  There was no certain
19  way to free up the pump.  It either was freed up or it
20  wasn't.  It had to be replaced and then all you would
21  do is replace the pump.
22  Q.   Did you ever actually replace a pump?
23  A.   Yes.
24  Q.   And what did that involve?

14 (Pages 50 to 53)

Price, et al.                                    v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

Page 54

1    A.   Well, you had to unplug the pump, take it out
2 of the water, take the clamp off that secured the hose
3 that would pump the water up to the filter and then in
4 the filter on up into the sprayer head.  So you would
5 have to remove the hose from the filter and reinstall
6 a new one.
7    Q.   How long did that take?
8    A.   It depends if we could get the clamp off right
9 away and if we had to mess with that.
10    Q.   Was this a force clamp?
11    A.   No.  It was a screw clamp.
12    Q.   A screw clamp.
13    A.   A screw with a band.
14    Q.   A band?
15    A.   And it tightened up, right.
16    Q.   Did the range keep a supply of spare pumps?
17    A.   Yes.
18    Q.   How long did it typically take, just give me an
19 average of how long it took to replace a pump?
20    A.   Ten or fifteen minutes.
21    Q.   What did you do with the pump, the bad pump
22 when it had to be replaced?
23    A.   What did we do with the bad one?
24    Q.   Yes.

Page 55

1    A.   Throw it into the dumpster.
2    Q.   Did you ever recondition them?
3    A.   No.
4    Q.   How often would you have to replace a pump?
5    Q.   What time frame?
6    Q.   The first six months of your employment at the
7 range.
8    A.   Not very often.
9    Q.   How often is "not very often"?  Once a month?
10 Once a week?
11    A.   No.  I would say they would last three or four
12 months at least.
13    Q.   A pump would last three or four months?
14    A.   (The witness nodded.)
15    Q.   Do you know how many pumps were on the system?
16    A.   No, I do not.
17    Q.   Was there a pump for every shooter station?
18    A.   I believe there were.
19    Q.   And if that was correct, there would be 20
20 altogether?
21    A.   That's correct.
22    Q.   You testified I believe that the belt, you
23 could see the belt wearing over the course of time.
24 How do you know that?  What is it that you observed

Page 56

1 that led you to believe that the belt was wearing?
2    A.   Well, it contained a lot of the sintered copper
3 and it wasn't breaking free from the belt and the belt
4 was slowing up.
5    Q.   When you say, "it wasn't breaking free," what
6 do you mean?
7    A.   As I said, the sintered copper was adhering to
8 the belt, causing it to -- it wasn't as smooth as it
9 was when I first started at the range and I could just
10 tell the difference in the way it was operating and
11 the fact that it had this stuff all over it.
12    Q.   But by "this stuff" you're talking about the
13 goop?
14    A.   The sintered copper, yeah, whatever else was in
15 it.
16    Q.   Now, did it become necessary to change the
17 pumps more frequently as your time went on at the
18 firing range?
19    A.   Yes.
20    Q.   And why was that?  It just started going more
21 frequently?
22    A.   Yes.  And the type of pump was changed from the
23 pump that was originally designed in the system and
24 then we started putting on a trash pump that was not

Page 57

1 designed by that system.  It was a larger pump.
2    Q.   And when you say, "a trash pump," you mean a
3 pump that will be sort of indiscriminate about what it
4 sucks in?
5    A.   That's what I was told.
6    Q.   Who told you that?
7    A.   Sergeant Ashley.
8    Q.   So it was Sergeant Ashley who changed the type
9 of pump that was being used?
10    A.   As far as I know.
11    Q.   He's the one who told you to start putting a
12 different pump on, right?
13    A.   That's correct.
14    Q.   Did the trash pumps have to be changed more
15 frequently than the original pump?
16    A.   I would say probably yes.
17    Q.   Why do you say that?  Just from your experience
18 as to how often you changed the pumps?
19    A.   Yeah.  It just seemed like, you know, for
20 whatever reason, you know, we just put -- I can
21 remember being in the back of the range and changing
22 one pump and then suddenly we had to change it again
23 for whatever reason, and I don't know if that was
24 because of the flow of the water in the tank that

15 (Pages 54 to 57)

Price, et al.                                    v.                    Chaffinch, et al.
Wayne H. Warren, Volume 1            C.A. # 04-956-GMS          October 17, 2005

Page 58

1   certain things got there in certain areas.
2          We never documented when we changed the
3   pumps or what pumps we were changing, so it's strictly
4   from memory and observation. There's nothing
5   scientific about it.
6   Q.   Okay. Now, you testified that the filters were
7   getting clogged. Did the filters get clogged -- were
8   clogged filters a problem from the point that you
9   started in the firearms training unit in August 2001
10  onward?
11  A.   I remember having to clean the filters then,
12  but I don't remember cleaning them as much when I
13  started as when we ended up.
14  Q.   When you say you cleaned the filter, what does
15  that involve?
16  A.   Unplug the pump, take the plastic cover off and
17  then pull out the screen.
18  Q.   Take the plastic cover off the filter?
19  A.   That's correct. And then there was a screen in
20  that cover, in the little area where the...
21  Q.   Where the water flows through?
22  A.   Right. We would have to take that out and take
23  a little brush, brush that material out of there and
24  spray it off until it was clean and then reinstall it

Page 59

1   back into the system.
2   Q.   Did you have spare filters?
3   A.   Yes, we did.
4   Q.   Now, you also testified that the sprayer heads
5   became clogged. Was that something that you noticed
6   when you first started working in August 2001 at the
7   range?
8   A.   Not as bad, no.
9   Q.   Well, did it happen at all?
10  A.   Yes.
11  Q.   What caused the sprayer heads to get clogged?
12  Do you know?
13  A.   It's just my assumption that the sintered
14  copper got pumped up into the sprayer heads and
15  clogged them. That's just my....
16  Q.   Why do you say it's your assumption? Did you
17  ever pull the sprayer head apart and examine it?
18  A.   No.
19  Q.   Did anybody at the range pull the sprayer heads
20  apart while you were there?
21  A.   Not to my knowledge.
22  Q.   How did you get them unclogged?
23  A.   We didn't get them unclogged.
24  Q.   Well, when was the first time you noticed the

Page 60

1   sprayer head clogged?
2   A.   I can't recall exactly when, when I first
3   observed something like that.
4   Q.   Well, you're saying that once it got clogged,
5   it never got unclogged at all from the whole time that
6   you worked there?
7   A.   No, I'm not saying that.
8   Q.   Well, then, somebody must have unclogged it,
9   right?
10  A.   Either that or the replacement of the pump
11  allowed more water to travel up and it freed itself.
12  Q.   But you don't know whether anybody unclogged
13  the sprayer heads by manually taking them apart and
14  fixing them?
15  A.   No. I know that we had Savage Range come in
16  once a year to do a total maintenance of the system
17  and whether that was part of their maintenance
18  agreement, I'm not sure exactly what they did.
19  Q.   You've testified that the belt was wearing and
20  you've also testified that the sintered copper was
21  clogging the belt. You didn't call it sintered copper
22  back then, right?
23  A.   No, I didn't.
24  Q.   Because you thought it was ceramic?

Page 61

1   A.   That's correct.
2   Q.   Was there wear on the belt that was apparent to
3   you that was different from the clogging caused by the
4   sintered copper?
5   A.   I'm not sure what you're asking me now.
6   Q.   I'm asking you if there's a difference between
7   the belt wearing which you testified about and the
8   fact that the belt was getting clogged.
9   A.   I'm not sure if there was a difference. I just
10  knew that the belt looked different and I'm assuming
11  that it was wearing down.
12  Q.   Was it your understanding that that belt had
13  been there since 1998?
14  A.   As far as I know, it had never been changed. I
15  never heard of anybody mentioning that it had been
16  changed.
17  Q.   So let me just review what we have talked about
18  over the last few minutes.
19          Beginning in August 2001 there were times
20  when you would have to unclog the pumps in the bullet
21  trap system, correct?
22  A.   That's right.
23  Q.   And you said I think that it seemed to become
24  more common as time went on?

16 (Pages 58 to 61)

A439

Price, et al.                                          v.                        Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                October 17, 2005

Page 62

1    A.   That's correct.
2    Q.   Did Corporal Price unclog the pumps?
3    A.   Yes, he did.
4    Q.   At the time that you started it would have been
5  Corporal Cathell working with you?
6    A.   That's correct.
7    Q.   Did he unclog the pumps?
8    A.   I can't recall.
9    Q.   How about Sergeant Foraker, did you ever see
10  him unclog a pump?
11    A.   I can't recall.
12    Q.   Did you ever see -- what was Peachey's rank
13  when he was there?  Corporal?
14    A.   Corporal Peachey also.
15    Q.   Did you ever see him unclog a pump?
16    A.   No.  I can't recall.
17    Q.   Did you ever see Corporal Price replace a pump?
18    A.   Yes.
19    Q.   Did you ever see Sergeant Foraker replace a
20  pump?
21    A.   I can't recall.
22    Q.   How about Eddie Cathell?
23    A.   I can't recall.
24    Q.   How about Corporal Peachey?

Page 63

1    A.   I can't recall.
2    Q.   Did you ever yourself unclog the belt or try to
3  unclog the belt?
4    A.   No.
5    Q.   Did you ever see anybody else try to unclog the
6  belt?
7    A.   Unclog the belt?  I don't understand what the
8  question is there, no.
9    Q.   Well, you testified that the sintered copper
10  was clogging the belt.
11    A.   Correct.
12    Q.   And my question was whether you ever tried to
13  unclog it?
14    A.   No.
15    Q.   Did you ever see anybody else try to unclog it?
16    A.   No.
17    Q.   You testified that during the time that you
18  worked there there was shotgun wadding in the tank
19  that you had to remove?
20    A.   That's correct.
21    Q.   And you removed it yourself, right, from time
22  to time?
23    A.   That's correct.
24    Q.   Did you ever see Corporal Price remove the

Page 64

1  shotgun wadding?
2    A.   Yes.
3    Q.   Did you ever see Sergeant Foraker remove the
4  shotgun wadding?
5    A.   I can't recall.
6    Q.   How about Eddie Cathell?
7    A.   I can't recall.
8    Q.   And Corporal Peachey?
9    A.   I can't recall.
10    Q.   You said that you had to clean filters from
11  time to time when you worked at the range, right?
12    A.   That's correct.
13    Q.   Did you ever see Corporal Price clean the
14  filters?
15    A.   Yes, I did.
16    Q.   Did you ever see Sergeant Foraker?
17    A.   I can't recall.
18    Q.   How about Corporal Cathell?
19    A.   I can't recall.
20    Q.   And Corporal Peachey?
21    A.   I can't recall.
22    Q.   Did you ever see Rich Ashley cleaning a filter?
23    A.   I believe so.
24    Q.   Did you ever see him unclog the pumps?

Page 65

1    A.   I've seen him working on the pumps.
2    Q.   Did you ever see him replace the pumps?
3    A.   Yes, I did.
4    Q.   Did you see him remove shotgun wadding from the
5  tank?
6    A.   I can't recall.
7    Q.   When you first started working at the range I
8  think you've testified that Corporal Price is the one
9  who showed you the back of the bullet trap and told
10  you all of the things that had to be done with it,
11  right?
12    A.   That's correct.
13    Q.   Did you ever have a discussion with Sergeant
14  Foraker about the tasks that were required at the back
15  of the bullet trap?
16    A.   At what point?
17    Q.   During the first stretch where he was your boss
18  at the range.
19    A.   No.
20    Q.   That would be I think it's roughly August 1,
21  2001 through maybe April 2002.
22    A.   No.
23    Q.   You never talked to him about any of those
24  tasks?

17 (Pages 62 to 65)

Price, et al.                                  v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                  October 17, 2005

Page 66

1   A.  About working behind the bullet trap?
2   Q.  About any of the tasks that we have just been
3   discussing for the last twenty minutes or so which
4   involves the pumps, the belt, the sprayer heads and
5   the filters.
6        Did you ever have a discussion with
7   Sergeant Foraker during the first stretch of time
8   where he was your boss?
9   A.  Not that I recall.
10       MR. ELLIS:  Why don't we take a break for
11  a couple of minutes?
12       MR. NEUBERGER:  Sure.
13       (A brief recess was taken.)
14  BY MR. ELLIS:
15  Q.  During the period between August 1, 2001 and
16  the time Sergeant Foraker left the range, which I
17  believe is April 2002, do you know why it was that you
18  and Corporal Price seemed to be the only two people
19  who worked maintenance on the back of the bullet trap?
20  A.  Why?
21  Q.  Yes.
22  A.  Because the other person was lazy.
23  Q.  Who was that?
24  A.  Corporal Cathell.

Page 67

1   Q.  Okay.  Did you ever hear Sergeant Foraker
2   instruct Cathell to do any of the work on the
3   maintenance of the bullet trap?
4   A.  No.
5   Q.  Did you ever ask him to help you do anything
6   behind the bullet trap?
7   A.  No.
8   Q.  Did you ever hear Corporal Price ask him to
9   help with the bullet trap maintenance?
10  A.  No.
11  Q.  At the point that Sergeant Foraker was
12  transferred out of the firearms training unit in April
13  2002, was Cathell still assigned there?
14  A.  Yes.
15  Q.  During this stretch between August 2001 and
16  April 2002, how often did you perform any type of
17  maintenance on the bullet trap?
18  A.  I would be afraid to even estimate during that
19  time.
20  Q.  Were you back there doing something at least
21  once a week?
22  A.  Oh, yes, at least inspecting it to make sure
23  that everything appeared to be working in proper
24  order, whatever order that was, because I had no

Page 68

1   formal training in it.
2   Q.  I understand that.  I'm just trying to get a
3   sense.
4   A.  But I was back there at least once a week,
5   that's correct.
6   Q.  Was it as often as every day there was shooting
7   going on?
8   A.  No.  I wouldn't say that, that often, no.
9   Q.  Did either you or Corporal Price have to go
10  back there every day there was shooting going on?
11  A.  Between that time frame?
12  Q.  Yes.
13  A.  I would say no.
14  Q.  So it wasn't an everyday thing?
15  A.  That's correct.
16  Q.  Now, when Sergeant Ashley came to the range did
17  the maintenance of the bullet trap change?
18  A.  For his entire stay?
19  Q.  Well, let's start with when he first came to
20  the range in April 2002, did he have a meeting with
21  the staff of the range?
22  A.  Not really.  He just informally told us, you
23  know, he was transferred there and he's going to do
24  the best job that he could.  And I can't remember a

Page 69

1   formal meeting at all.
2   Q.  Did you have any discussion with him when he
3   first got there about the need for maintenance of the
4   bullet trap?
5   A.  No.  I can't remember any.
6   Q.  Did the maintenance of the bullet trap continue
7   after April of 2002 the same as it had been before
8   2002?
9   A.  Yes.
10  Q.  I'm sorry.  Before April 2002?
11  A.  Yes.
12  Q.  When did Sergeant Ashley begin to do things on
13  the bullet trap?
14  A.  Actually when the trap started to fail more,
15  when we noticed the pumps going down more often and
16  having to go back and clean out the water tank, once
17  the system started to require more maintenance, then
18  he started getting involved in it.
19  Q.  Did he perform any tasks on the bullet trap
20  that you and Sergeant Price did not perform?
21  A.  Yes.
22  Q.  What?
23  A.  He adjusted the clutch and he actually, you
24  know, performed maintenance on the motorized area of

18 (Pages 66 to 69)

Price, et al.                                          v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                    October 17, 2005

Page 70

1   it.
2       Q.   When you say, "adjusted the clutch" --
3       A.   That's what he told us.
4       Q.   Okay.  Do you know what the clutch for that
5   system looked like?
6       A.   No.
7       Q.   So you didn't actually see him adjusting the
8   clutch?
9       A.   I saw him working on a piece of equipment that
10  I didn't know what it was.
11      Q.   What else did he do that you and Corporal Price
12  didn't do?
13      A.   He basically worked on the mechanical portion
14  of the trap itself where the sprocket area is.
15      Q.   When you say, "the mechanical portion," you're
16  talking about the mechanical portion of the belt,
17  right?
18      A.   Exactly.  In where the motor area that runs
19  that whole system, he worked on the motor area.
20      Q.   Anything else?
21      A.   Not that I can recall right now.
22      Q.   Now, during the time between August of 2001 and
23  April of 2002, was there a point when the range was
24  shut down completely for overhaul of the system?

Page 71

1       A.   Can you -- I'm sorry.  The time frame again?
2       Q.   Again, August 2001 through April 2002, the time
3   when Sergeant Foraker was your boss the first time,
4   was there ever a point when the range was shut down
5   for maintenance?
6       A.   I'm not sure if that was when our yearly
7   maintenance was being done by Savage or not, but that
8   would have been the only time that I can recall.
9       Q.   Is it your recollection that Savage came in and
10  did maintenance on the trap every year?
11      A.   They were supposed to.
12      Q.   Well, is it your recollection that they
13  actually did?
14      A.   I'm not sure if they performed it every year or
15  not.  I don't know.
16      Q.   Do you recall any year in which they came in
17  and did maintenance on the bullet trap?
18      A.   I remember them being there, but I can't give
19  you the specific year.
20      Q.   Do you remember how long it took, how many
21  days?
22      A.   This is a guess.  I'm going to say it was a
23  week because I know we were closed down for a week.
24      Q.   So when Savage came in to do maintenance on the

Page 72

1   range, the range had to be shut down for a whole week?
2       A.   That's correct.
3       Q.   Do you know what they did?
4       A.   I know they drained the water out of the water
5   tank and they were supposed to overhaul the entire
6   system.  That was my understanding.  I didn't see any
7   maintenance contract or anything like that.  It was
8   just word of mouth of what they were doing there.
9       Q.   Did you ever actually see the Savage people in
10  the building?
11      A.   Yes.
12      Q.   Were you able to observe what they did in the
13  building?
14      A.   I observed the water tank emptied by them at
15  one point.
16      Q.   Did you see them working on any other parts of
17  the equipment?
18      A.   No.
19      Q.   After Sergeant Ashley became the
20  noncommissioned officer in charge of the range, was
21  there any point at which the range was shut down for
22  maintenance?
23      A.   I believe there was.
24      Q.   When was that?

Page 73

1       A.   I can't give you any date, but I recall that we
2   had to shut the system down on at least one occasion
3   and I'm not sure why we shut it down, but there should
4   be maintenance records.
5       Q.   Do you remember what year it was?
6       A.   No.
7       Q.   Was there a point when the range had to be shut
8   down so that the belt could be changed?
9       A.   Yes.
10      Q.   Do you remember when that was?
11      A.   I believe that was the summer of 2003 and,
12  again, I believe that's when it was.
13      Q.   When you testified a couple of minutes ago that
14  there was a point when the range had to be shut down
15  for maintenance while Ashley was in charge, is that a
16  separate occasion than the one where they shut it down
17  to change the belt?
18      A.   Yes.
19      Q.   And do you recall what type of maintenance was
20  done the time they shut it down that was not to change
21  the belt?
22      A.   No, not specifically what was being done.
23      Q.   During the course of the time that Ashley was
24  in charge, did you continue to do all the maintenance

19 (Pages 70 to 73)

Price, et al.                                              v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                      C.A. # 04-956-GMS                        October 17, 2005

Page 74

1  things on the bullet trap that you described today?
2    A.  Yes.
3    Q.  So you continued to unclog the pumps, right?
4    A.  Yes.
5    Q.  You continued to unclog the filters?
6    A.  Yes.
7    Q.  You continued to change the pumps when
8  necessary?
9    A.  Yes.
10   Q.  And you changed the filters?
11   A.  Yes.
12   Q.  Did you do any maintenance on the front of the
13 bullet trap?
14   A.  Yes.
15   Q.  What did you do on the front of the bullet
16 trap?
17   A.  We oversaw the recruits or the veteran officers
18 sweep up the debris which was the brass shell casings
19 and the shotgun casings.  We also would clean the
20 front of the bullet trap, which the ramp itself would
21 have to be cleaned of target blowback where the
22 bullets would go through the cardboard.  The cardboard
23 would deposit, so that ramp would have to be swept
24 down so it didn't get up into the water, which it

Page 75

1  would get in the water but we were trying to prevent
2  that.
3         So when we observed -- and it was a visual
4  observation.  There was no standard to go by as to
5  what we needed to do or no maintenance scheduling in
6  order to do that maintenance.  It was just simply what
7  we observed and how we decided on what we had to do,
8  but we would brush that back down off the face of the
9  bullet trap and put it in a container to remove it.
10   Q.  So what you're saying is that when there was a
11 lot of target blowback, you cleaned up the front of
12 the bullet trap?
13   A.  That's correct.  I'm sure I'm probably
14 forgetting one of the other little things that we were
15 doing around there, but we tried to maintain what we
16 could.
17   Q.  Who is it that did the cleanup in the front of
18 the bullet trap other than yourself?
19   A.  The shooters and people in the range, the range
20 personnel.
21   Q.  So that would include, in terms of range
22 personnel that would include Price?
23   A.  That's correct.
24   Q.  Cathell?

Page 76

1    A.  Yes.
2    Q.  Peachey?
3    A.  Yes.
4    Q.  Sergeant Foraker?
5    A.  Yes.
6    Q.  And Sergeant Ashley?
7    A.  Yes.
8    Q.  And all of those people I just identified did
9  sweeping up of the material in the front of the bullet
10 trap?
11   A.  Everybody pitched in usually.  I can't -- like
12 I couldn't tell you that everybody was doing it all
13 the time.  It was if you were out there, and that went
14 with whatever group was there shooting, if it fell on
15 a day that we felt that the front of the trap needed
16 to be cleaned up, then those people would have
17 participated in that part of the cleanup.
18   Q.  That's not an everyday thing though?
19   A.  No.
20   Q.  During the course of the time that Sergeant
21 Foraker was in charge in 2001 and early 2002, did you
22 have health concerns about working in the range?
23   A.  Yes.
24   Q.  And what were the concerns?

Page 77

1    A.  Originally when we heard, before I was
2  transferred into the range when we heard about the
3  lead issue, I had a health concern about lead exposure
4  at that point, just apprehension about being in a
5  building where lead was being circulated.
6    Q.  Okay.  And did you ask anybody at the State
7  Police about the safety issue?
8    A.  No.  Once I was told that we switched
9  ammunition and that was going to take care of the
10 problem, then I kind of, you know, put that concern in
11 the back of my mind more or less.
12   Q.  Was that the only concern that you had about
13 working in the range in terms of a safety concern?
14   A.  At that point in time?
15   Q.  Yes.
16   A.  Yes.
17   Q.  And did you talk to somebody about what your
18 lead exposure, what your exposure would be to lead
19 when you started working in the range?
20       In other words, at the point that you got
21 assigned there, did you say to somebody "What am I
22 going to be exposed to" or words to that effect?
23   A.  No.
24   Q.  So how is it that you assured yourself, how is

20 (Pages 74 to 77)

Price, et al.                                    v.                         Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

Page 78

1  it that you put it to the back of your mind?
2     A.  When we were told that we had switched
3  ammunition prior to my assignment, then I just felt
4  that, you know, the division had done what they were
5  supposed to do to correct the problem and that we were
6  going to be working in a safer environment.
7     Q.  I guess back to my original question:  At the
8  point that you started working there, did you have a
9  health concern?  I'm talking about August 2001 now.
10    A.  I can always say that in an indoor shooting
11 range I had a concern.
12    Q.  Why is that?
13    A.  Being exposed to lead in the building.  Was it
14 under control?  No one ever -- I never had a right-to-
15 know officer explain to me anything.
16        So I guess it was just something that I
17 was always concerned about when I originally heard
18 that we had a problem.
19    Q.  What's a right-to-know officer?
20    A.  An officer that we're supposed to have to
21 explain to us any dangerous chemicals or metals that
22 we're being exposed to.
23    Q.  Did you ever ask your supervisor at the range
24 what materials or chemicals you were exposed to?

Page 79

1     A.  During what period of time?
2     Q.  At any point.
3     A.  Yes.
4     Q.  When was that?
5     A.  Once it came down to our investigation, we
6  wanted to know what the makeup of the bullets were,
7  what they were.
8     Q.  That's 2004, right?
9     A.  That's correct.
10    Q.  So in 2001 when you were first assigned there
11 you didn't ask anybody like Sergeant Foraker, for
12 example, what the bullets were made of?
13    A.  No.
14    Q.  Did you ask Sergeant Foraker whether there was
15 a danger of exposure to lead in the indoor range?
16    A.  No.
17    Q.  You testified a couple of minutes ago that
18 you're always concerned about lead exposure in an
19 indoor range.
20        Is that because of things you've heard
21 about indoor ranges in general?
22    A.  That's correct.
23    Q.  And what is it that you've heard about indoor
24 ranges in general?

Page 80

1     A.  That most of them don't work.
2     Q.  That most of them do not work?
3     A.  Do not work.  That there's lead in the air.
4     Q.  So would it be accurate to say that you've
5  heard from other sources in law enforcement that,
6  generally speaking, indoor ranges have lead problems?
7     A.  Yes.
8     Q.  And you heard that how long ago?
9     A.  That would be tough for me to say because we
10 have done thorough investigations after we found out
11 about the problem.  So I couldn't tell you if I found
12 it out before that time or since we started looking
13 into this issue.
14    Q.  But at least in your mind even as far back as
15 August 2001 you had a concern about lead being in an
16 indoor range?
17    A.  That's correct.
18    Q.  Was it your understanding in August 2001 that
19 all the ammunition being used at the Delaware State
20 Police facility was frangible or that only the handgun
21 bullets were?
22    A.  I knew only the handgun bullets were frangible
23 ammunition.
24    Q.  So that the shotgun rounds as I understand it

Page 81

1  had lead in them all along?
2     A.  That's correct.
3     Q.  Did you know that as of August of 2001?
4     A.  Yes.
5     Q.  When you started working at the range, did you
6  start having your blood tested for lead?
7     A.  Yes, I did.
8     Q.  What is the highest blood lead level that you
9  have recorded?  Do you know the answer to that?
10    A.  9.
11    Q.  And how many times was it tested?
12    A.  I have no idea.
13    Q.  During the time that you worked for Sergeant
14 Foraker the first time through, so it's August 2001
15 through April 2002, did you ever express to him a
16 concern about any safety or health issue at the range?
17    A.  Not that I can recall.
18    Q.  During the time you worked for Sergeant Ashley,
19 this would be roughly April 2002 through December
20 2003, did you express to Sergeant Ashley a concern
21 about health or safety issues at the range?
22    A.  Yes, I did.
23    Q.  How many times did you do that to your
24 recollection?

21 (Pages 78 to 81)

Price, et al.                                    v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                   October 17, 2005

Page 82

1    A.  I can remember when we switched from WD-40 to a
2  citrus cleaner in our parts washer when we were doing
3  our armorers breakdown, I was getting a lot of
4  headaches from that very strong odor and I asked him
5  why we didn't have an exhaust fan in the armorers
6  room.  And I said that the citrus cleaner was giving
7  me headaches and I couldn't work in there.
8          And on another occasion the hearing
9  protectors that we were using in the range were
10  starting to fail and we said, you know, we have to get
11  these things fixed because they're failing.
12    Q.  Okay.
13    A.  And then I believe one other time when my blood
14  serum spiked to 9 I told him that I was concerned
15  about sticking my hands in the tank and changing the
16  pumps and working on the filters.
17          And there may have been something else at
18  that point, but those are the three things that I can
19  recall.
20    Q.  All right.  When you say, "blood serum," you're
21  talking about the blood lead level, right?
22    A.  That's correct.
23    Q.  Do you recall when the citrus -- what do you
24  call it?  Oil?

Page 83

1    A.  It's a citrus cleaner.
2    Q.  Is it like a penetrant?
3    A.  Similar to that.  It's similar to what you see
4  on TV or what the people are using now to clean their
5  houses.  It's a citrus-based cleaner and it was being
6  used by our mechanics and we got it in our parts
7  washer to clean the oil off the weapons.
8    Q.  Oh, it cleans the oil off?
9    A.  That's correct.
10    Q.  Do you recall when you switched over from WD-40
11  to the citrus cleaner?
12    A.  No.  I can't recall.
13    Q.  Do you recall in December of 2003 the
14  facilities management people coming in to plan an
15  exhaust hood in the armorers room?
16    A.  I recall them coming there to survey the area.
17    Q.  When did that occur?
18    A.  I can't tell you exactly but, again, that would
19  probably be on the maintenance records.  Also when the
20  complaint was made or when the request was made should
21  be there also.
22    Q.  When you say, "maintenance records," what are
23  you referring to?
24    A.  When we're calling into facilities management

Page 84

1  for a problem with the building, it should have been
2  documented.
3    Q.  How do you know it should have been documented?
4    A.  I would assume that's how they would perform a
5  work order to send someone there to perform the work.
6    Q.  Okay.  Do you know that there's some sort of a
7  log or maintenance record kept by facilities
8  management?
9    A.  I believe so.  I called and requested that from
10  I can't recall the gentleman's name now, but he said
11  he would have to check with his boss to see if they
12  could release that information to me.  So I assume
13  that there were records being kept.
14    Q.  Did you ever get such a record?
15    A.  No, I did not.
16    Q.  And you don't remember who you asked?
17    A.  I can't recall the guy's name at this point.
18    Q.  How many times did you discuss with Sergeant
19  Ashley the citrus cleaner?
20    A.  I can't recall, but I had several conversations
21  with him.
22    Q.  Do you remember any of them?
23    A.  I can remember telling him that I couldn't stay
24  in that environment, that it was overwhelming, the

Page 85

1  smell of that citrus cleaner, and I couldn't stay in
2  there and work on weapons.
3    Q.  So did you remove yourself from that area and
4  clean the weapons somewhere else?
5    A.  I would go in and out.
6    Q.  Where did this discussion with Sergeant Ashley
7  take place?
8    A.  At the firearms training unit.
9    Q.  Do you remember what room it took place in?
10    A.  No, I do not.
11    Q.  Do you remember if anybody else was there?
12    A.  I'm pretty sure that Corporal Price heard me
13  ask about that situation.
14    Q.  And what did Ashley say in response?
15    A.  He after a couple of requests I remember him
16  telling me that they didn't have money to install the
17  exhaust vent.
18    Q.  Okay.  Anything else?
19    A.  Basically that's all he said.
20    Q.  But then at some point after that you said that
21  the facilities people came in to survey for the
22  exhaust vent?
23    A.  At some point in time.  I can't recall exactly
24  when it was.

22 (Pages 82 to 85)

A445

Price, et al.                                    v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

---

Page 86

1    Q.   Do you recall there being plans to put in the
2   exhaust system in December 2003 when the range was
3   shut down for Christmas?
4    A.   No.  I can't recall that.
5    Q.   You said that their hearing protectors were
6   failing.  What are the hearing protectors?
7    A.   The muffs that we were wearing that allowed us
8   to hear the instructors and to protect us from the
9   noise.  We also wore the foam plugs in our ears and
10  then the muffs over top.
11           The muffs and the communications were
12  starting to fail.  We couldn't communicate back and
13  forth.  Intermittently that communication was not
14  going through and that's a safety issue out on the
15  range.
16   Q.   And what time period are we talking about?
17   A.   I would say that probably started in the summer
18  of 2003, and that's just a guess.
19   Q.   Okay.  And what type of communication did you
20  have with Sergeant Ashley about that?
21   A.   We just explained to him that the
22  communications were starting to fail and it was an
23  integral part of our operation and we needed to be
24  able to communicate with one another and the fact that

---

Page 87

1   it didn't seem like they were providing that much
2   hearing protection.
3    Q.   And what did he say in response to that?
4    A.   Well, we're going to look into it and we made
5   some phone calls to see what it would cost to
6   refurbish or replace those systems.
7    Q.   When you say, "we made some phone calls," who
8   is the "we"?
9    A.   I can't recall if it was myself, Corporal Price
10  or who actually talked to the representatives to get
11  that information.
12   Q.   And whatever became of that?
13   A.   As I recall, it was going to cost $1500 to
14  either refurbish or replace those systems and Sergeant
15  Ashley said that we didn't have the money to do that;
16  that we were going to have to do something else.
17   Q.   And so did anything ever get replaced or
18  refurbished?
19   A.   He replaced that system with a wireless system
20  of Power Com Plus, I believe it was, or a Power Com
21  II.  I know it was a Power Com wireless system to
22  replace that current system.
23   Q.   When you say, "a wireless system," now the
24  system that you said was failing, that didn't have

---

Page 88

1   wires running out of the ear sets, did it?
2    A.   Yes, it did.
3    Q.   It did?
4    A.   Mm-hmm.
5    Q.   Where did they plug into?
6    A.   They plugged into a receiver and a transmitter
7   that we had on our belt.  And it was a controlled
8   system within the range itself that was on its own
9   frequency controlled by the range.
10   Q.   When you say that he replaced the system with a
11  wireless system, what do you mean by "a wireless
12  system"?
13   A.   It wasn't the system that was set up in the
14  control booth.  These were just simple radios that
15  were purchased, I believe they were purchased from
16  Lawmen's Supply, and they were on a frequency that the
17  normal public had access to.
18           So someone riding down the road with a
19  little walkie-talkie or a little communications device
20  could interrupt our firearms training just by clicking
21  the button and talking and we would receive that
22  information.  Plus we were putting out our information
23  to the general public to receive also.
24   Q.   And when did the system get replaced?

---

Page 89

1    A.   I believe that was the summer or fall of 2003.
2   Again, the purchase records would probably indicate
3   exactly when that happened.
4    Q.   How many times did you discuss the hearing
5   protection with Sergeant Ashley?
6    A.   Several times again.
7    Q.   When you say, "several," how many times?
8    A.   That would be -- I'm just guessing.  I would
9   say at least ten times.
10   Q.   Was this the subject of a meeting of the staff
11  at the range?
12   A.   What type of meeting are you talking about?
13  When Ashley left or when he was still there in the
14  situation that --
15   Q.   No.  When he was still there.
16   A.   When he was still there?  Once we started
17  trying those systems, they failed and we explained to
18  him that they were failing and the problem that we
19  were encountering with other people cutting into the
20  communications.
21   Q.   And so what did he say about that?  What was
22  his response?
23   A.   Kurt was the lead on that one and I think he
24  said, "Kurt, you whine about everything."

---

23 (Pages 86 to 89)

Price, et al.                                                                                                              v.                                                                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                                                              C.A. # 04-956-GMS                                                          October 17, 2005

| Page 90 | Page 92 |
|---|---|

Page 90

1    Q.   Anything else?
2    A.   "We don't have the money to spend on these
3    things."
4    Q.   And are we talking about now the fall of 2003?
5    A.   That's correct, somewhere in the fall of 2003.
6    Q.   So that would have been shortly before Ashley
7    left?
8    A.   That's correct.
9    Q.   Now, you testified that you talked to Sergeant
10   Ashley about your blood serum going up to 9, excuse
11   me, spiking to 9.
12        When did you do that?
13   A.   I'm not sure.  And I got to retract that
14   statement.  I'm not sure what it went to, but I knew
15   it started to rise.  And I can remember Kurt's going
16   up and we were discussing the issue.  And I believe
17   Dr. Green stated that the oil and water mixture were
18   helping the lead get into our bloodstream so we
19   shouldn't, we shouldn't be placing our hands in the
20   water tank.
21   Q.   Okay.  Were you placing your hands in the water
22   tank?
23   A.   That's how we had to free up the pumps.  And
24   also we were touching the filters to clean out the

Page 91

1    filters.
2    Q.   When did Dr. Green say that to you?
3    A.   He didn't say it to me.
4    Q.   Who did he say it to?
5    A.   He said it to Corporal Price.  And we were
6    discussing the issue that we felt that something was
7    causing our levels to go up.  And we're laypeople.  We
8    didn't understand what the problem was.  We had no
9    training in this area at all.
10   Q.   Well, you must have studied blood lead levels
11   in the last two years, have you not?
12   A.   Yes.
13   Q.   You know that a blood lead level of 9 is below
14   any threshold for blood lead poisoning, don't you?
15   A.   Are you saying that anything below 9 is not
16   dangerous?  Is that what you're saying to me?
17   Q.   I'm saying that there's no standard published
18   by any agency in the country that flags a 9 as a
19   problem.  Isn't that correct?
20   A.   That's correct.
21   Q.   You know what the OSHA limit is, right?
22   A.   Not really because it changes and I have seen
23   different levels coming out of OSHA.
24   Q.   You haven't seen one lower than 10, have you?

Page 92

1    A.   Not that I've seen, no.
2    Q.   So I take it you had a discussion with Sergeant
3    Ashley over your blood lead level going up to 9?
4    A.   I can't say that it was about it going up to 9
5    because I can't recall if that was the test which
6    showed 9, but I knew it was going up.
7    Q.   Okay.  It was going up.  Maybe it was 8.  Is 9
8    the highest it ever got to?
9    A.   9, as far as I know 9 is the highest that I
10   have seen.
11   Q.   So at some point your blood lead level rose and
12   you talked to Sergeant Ashley about that?
13   A.   That's correct.
14   Q.   Where did that discussion take place?
15   A.   At the firearms training unit.
16   Q.   What part of the building?
17   A.   I would imagine that would have taken part in
18   our office building because that's where we received
19   the results.
20   Q.   When you say you imagine, do you actually
21   remember this conversation or are you just sort of
22   guessing?
23   A.   No, I'm not guessing.  I know the conversation
24   occurred.  Where it occurred, I can't tell you exactly

Page 93

1    where it occurred, in what room.
2    Q.   Who was present other than you and Sergeant
3    Ashley?
4    A.   I can't recall.
5    Q.   What did you say to Sergeant Ashley?
6    A.   I just said, "I'm concerned about my lead level
7    increasing and I don't think we should be putting our
8    hands in the tank."
9    Q.   And what did he say?
10   A.   I'm not sure at that point what his response
11   was to me.
12   Q.   Do you remember any part of the discussion
13   other than what you've just said?
14   A.   No, not really.  I know that I alerted him to
15   that fact.
16   Q.   Did you tell him what your blood level reading
17   was that caused you concern?
18   A.   I had told him it had gone up and that's why I
19   was concerned.
20   Q.   Did you tell him what it had gone up to?
21   A.   I can't recall.
22   Q.   Was this in response to some sort of a document
23   you got that gave you a blood lead reading?
24   A.   Yes.

24 (Pages 90 to 93)

Price, et al.                                      v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                     October 17, 2005

Page 94

1    Q.   Do you remember approximately when this
2  conversation with Sergeant Ashley occurred?
3    A.   No, I cannot.
4    Q.   Did you change what you did in terms of the
5  bullet trap as a result of the increase in your blood
6  lead level?
7    A.   Yes.  Sergeant Ashley started performing most
8  of the maintenance at that point.
9    Q.   Is that because you refused to do it?
10   A.   I can't recall if I refused to do it or I said
11 that we shouldn't be doing it.  I can't recall.
12   Q.   Did Sergeant Ashley tell you to stop doing it?
13   A.   No, he did not.
14   Q.   Did you completely discontinue the maintenance
15 work at the back of the bullet trap at that point or
16 did you just reduce the amount that you did?
17   A.   I think, if I can recall, I reduced the amount
18 because I think the shotgun wadding still had to be
19 dipped out of the tank.
20   Q.   And you could do that without putting your
21 hands in the water?
22   A.   That's correct.
23   Q.   Did you have any discussions other than the
24 three you've identified with Sergeant Ashley about

Page 95

1  safety and health issues at the range during the time
2  Sergeant Ashley was in charge?
3    A.   I wouldn't say they were the only three
4  conversations.  I just can't recall anything further
5  at this point.
6          There were a lot of things that happened
7  over that period of time and I'm not going to be able
8  to remember all of them right now.
9    Q.   But you have given me what you recall at this
10 point?
11   A.   That's correct, three concerns that I can
12 remember.
13   Q.   Did you have concerns about the heating and
14 air-conditioning system at the range during the course
15 of the time that you worked there?
16   A.   Yes, I did.
17   Q.   Did you have those concerns during the period
18 Sergeant Foraker was there from August 2001 through
19 April 2002?
20   A.   Yes.
21   Q.   And what were those concerns?
22   A.   That the airflow wasn't always flowing the way
23 it should.  Sometimes I could feel something coming
24 back at me and I shouldn't have felt anything in my

Page 96

1  face.  I was pointing down range watching the shooters
2  behind them, so I really shouldn't have had anything
3  coming back at me at all.
4    Q.   Anything else?
5    A.   Water leaking on the floor.  That was a big
6  concern because of people on the range moving and I
7  was always afraid someone would slip because the roof
8  leaked.  And we constantly tried to monitor that and
9  keep that mopped up.
10   Q.   Where did the roof leak?  What part of the
11 roof?
12   A.   Actually, I don't know exactly where it leaked,
13 but I can tell you on the right side of the range at
14 the splitter there was always water in that location.
15 If you're facing down range to the right side of the
16 beam, of the splitter, we always had water there.
17   Q.   What are you referring to as the splitter?
18 Splitter, is that what you're saying?
19   A.   Splitter.  It's the big steel V that's going
20 down the range to deflect anything that would be shot
21 in, it would be going toward the bullet trap.
22   Q.   Any other concerns about the heating and
23 air-conditioning system during the time Foraker was
24 your boss the first time through?

Page 97

1    A.   I think the ventilation system was a constant
2  concern.
3    Q.   And you've just described that sometimes the
4  air would flow back at you.  Is that what your concern
5  was?
6    A.   That's correct.
7    Q.   During the time that you worked at the firearms
8  training unit were any modifications made to the
9  airflow system?
10   A.   Can you explain that a little further?
11   Q.   Any changes to the vents or the baffling or any
12 of the airflow, the ducts, did any of that occur
13 during the time that you worked there?
14   A.   None of the ductwork that I can recall was
15 changed since I started there.
16   Q.   That's what I meant.
17   A.   Correct.
18   Q.   Did you discuss what Sergeant Foraker, again
19 this is August 2001 through April 2002, your concerns
20 about the airflow?
21   A.   I can't recall a specific conversation, but I
22 know we were all concerned about the ventilation
23 system at times because we could feel the air coming
24 back at us and that was constant the entire time I was

25 (Pages 94 to 97)

A448

Price, et al.                                          v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                    October 17, 2005

Page 98

1   assigned to the range.
2       Q.   During the course of the time that you have
3   been a state trooper have you been to indoor firing
4   ranges that were operated by other law enforcement
5   agencies?
6       A.   During the time that I've been a trooper?
7       Q.   Yes.
8       A.   Yes.
9       Q.   Now, how about, say, from 1995 through the
10  present, so the last ten years, were you at indoor
11  firing ranges operated by other law enforcement
12  agencies?
13      A.   Could you just repeat that one more time?
14      Q.   Yes.
15          During the last ten years have you been to
16  indoor firing ranges operated by law enforcement
17  agencies other than the Delaware State Police?
18      A.   Yes.
19      Q.   How many?
20      A.   Probably five.
21      Q.   And do you remember which five?
22      A.   The Federal Law Enforcement Training Center at
23  Cheltenham, Maryland, the FBI range at Quantico, the
24  New Jersey State Police range I believe it's in

Page 99

1   Trenton.  There was a naval range over by Washington,
2   D.C. that we had the opportunity to see.
3           Maybe it was only four.
4       Q.   Did you go to the Federal Law Enforcment
5   Training Center range in Glynco, Georgia?
6       A.   I didn't go on a trip specifically to see that.
7   I don't think I saw that range, no.
8       Q.   Is it your understanding from your experience
9   as a trooper that most indoor firing ranges have
10  airflow problems?
11      A.   Yes.
12      Q.   That would include the FBI range that you went
13  to in Quantico, right?
14      A.   Yes.
15      Q.   What was the nature of the discussions you had
16  with Sergeant Foraker during the first time that he
17  was your supervisor about the airflow problems?
18      A.   At certain times you could feel air coming back
19  at your face.
20      Q.   Anything other than that?
21      A.   No.  Not that I can recall.
22      Q.   Were there times when the air seemed to move in
23  the correct direction?
24      A.   Yes.

Page 100

1       Q.   So it wasn't fouled up all the time; it was
2   only fouled up part of the time?
3       A.   I'm not sure about that statement because we
4   walked the line so we're moving from one location to
5   the next location, so I'm not sure if you stayed in a
6   particular location that you wouldn't feel the same
7   thing all the time.
8           So what I am saying is we were in constant
9   movement back and forth across the range when we were
10  out there, so whether or not the same thing occurred
11  at the same location all the time, I'm not sure.
12      Q.   So when you're describing what would occur
13  you're describing being at a certain position on the
14  range where the air would blow back at you?
15      A.   That's correct.
16      Q.   But you could move down, say, a half a dozen
17  shooting positions and the air would be flowing
18  towards the target the way it's supposed to?
19      A.   You could move away from that location, that's
20  correct.  I wouldn't say a half a dozen.  I wouldn't
21  give a specific number, but I would say you could move
22  away from the location.
23      Q.   Now, say you were to stay in the same location
24  from day to day or from week to week, were there

Page 101

1   circumstances in which the air would be flowing
2   differently?  In other words, it would be fine one day
3   and not another?
4       A.   I couldn't make a determination on that because
5   we were constantly moving in different positions and
6   we didn't look at that as hard at that point.
7       Q.   After Sergeant Ashley became your supervisor,
8   did you have discussions with him about airflow within
9   the range?
10      A.   Yes.
11      Q.   How many times, to your recollection?
12      A.   I would be afraid to give you a number really.
13  I mean, it was, it was a constant conversation.
14      Q.   Is the airflow problem at the range something
15  that the range training officers talked about a lot?
16      A.   Yes.
17      Q.   So it was a problem from the beginning of your
18  time there until the end?
19      A.   That's correct.
20      Q.   Were the discussions you had with Sergeant
21  Ashley any different from the discussions you had with
22  Sergeant Foraker about the conditions at the range?
23  I'm sorry.  The airflow I'm talking about now.
24      A.   Probably.  Because I can remember one winter,

26 (Pages 98 to 101)

Wilcox & Fetzer, Ltd.                    Professional Court Reporters                    (302)655-0477

A449

Price, et al.                                          v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                      October 17, 2005

Page 102

1   and I'm not sure, 2002, I can't recall exactly what
2   winter it was, but we had to go onto the roof and
3   reset the ventilation system, the whole motor because
4   it would shut down because it was going below a
5   certain temperature or that's what we were told why it
6   shut down.
7          But, anyway, it had to be reset in order
8   for it to come up and start working again. So at that
9   particular point in time I was getting a little upset
10  that we had to go on the roof and reset the system.
11     Q.  So the system only shut down during that one
12  particular winter; it didn't do it in the other
13  winters when you worked there?
14     A.  I don't think it did it as much. I'm sure it
15  did because it would shut down more so in the
16  wintertime than it would any other time, but there was
17  one particular time it seemed like we were just having
18  a lot of problems with it.
19     Q.  When you say reset the system, what is it that
20  you had to do?
21     A.  We had to press a button up on the unit itself.
22  Like the larger unit outside, we would have to open
23  the door and hit a reset button within that unit.
24     Q.  All right. You say it happened more in the

Page 103

1   winter than the summer?
2      A.  Oh, yes.
3      Q.  Did it happen at all in the summer?
4      A.  I can't ever recall anyone stating that that
5   was what the problem was in the summertime.
6      Q.  So this was strictly a cold weather problem?
7      A.  Yes.
8      Q.  Did it happen in the winter of 2001-2002 when
9   Sergeant Foraker was the head of the range?
10     A.  Well, I'm not sure if it did or not because I
11  know when it wouldn't come up that we would call
12  facilities management and usually they would send
13  someone out and correct the problem. But when it was
14  happening during that one period of time I asked the
15  technician, I said, "You know, we're wasting time
16  waiting for you to get here. Can you show me how to
17  correct this problem?"
18         And that's when he explained to me that
19  once it got below a certain temperature that the unit
20  would shut down and it would have to be reset. I
21  asked him how he got the thing started because he
22  would go up on the roof and come back down and the
23  thing would start back up again.
24     Q.  Who was that technician? Do you remember?

Page 104

1      A.  I think his name was Ron Whitehouse. I believe
2   that's his last name and that's, again, just a....
3      Q.  He's not a facilities management employee, is
4   he?
5      A.  No. He's a Trane employee. He works for
6   Trane.
7      Q.  So your procedure would be you would call
8   facilities management and facilities management would
9   send Trane out to fix whatever was wrong?
10     A.  Sometimes they would send their own maintenance
11  man to come.
12     Q.  And who was that? Do you remember?
13     A.  It varied over different periods of time of who
14  had the building.
15     Q.  My question originally a couple of minutes ago
16  was whether the complaints that you had about the HVAC
17  system were any different when Ashley was the sergeant
18  in charge from what it was when Foraker was the
19  sergeant in charge. And I think you said that it
20  seemed that the system was going off, it had to be
21  reset more that one particular winter.
22         Aside from that, was there any difference
23  in the complaint between when Foraker was in charge
24  the first time and when Ashley was in charge?

Page 105

1      A.  I really don't think so. There was a problem
2   the whole time I was assigned there.
3      Q.  When you talked to Sergeant Ashley about it,
4   did he seem to agree with you that there was a
5   problem?
6      A.  Yeah. He knew there was a problem, but he
7   didn't seem like it was any big deal.
8      Q.  Well, when Sergeant Foraker was in charge the
9   first time through, did he seem to recognize there was
10  a problem?
11     A.  Yes, he recognized there was a problem.
12     Q.  Did it seem like a big deal?
13     A.  Yes.
14     Q.  Did he ever do anything about it?
15     A.  I don't know what was done at that point in
16  time.
17     Q.  During the whole time that you were at the
18  range when there was shooting going on, were there
19  days when the ventilation system seemed to work
20  correctly, there were good days?
21     A.  Yes, I would say so.
22     Q.  And then there were really bad days?
23     A.  That's correct.
24     Q.  Do you have any idea what caused there to be a

27 (Pages 102 to 105)

Price, et al.                                          v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                      October 17, 2005

Page 106

1  good day or what caused there to be a bad day?
2     A.  No.
3            MR. ELLIS:  Off the record.
4            (Discussion off the record.)
5            (Recessed for lunch at 12:30 p.m.)
6            - - - - -
7            AFTERNOON SESSION
8            1:30 p.m.
9  BY MR. ELLIS:
10    Q.  This morning when you began your testimony,
11 Corporal Warren, you testified that you were taking
12 two drugs.  The second one was Lexapro?
13    A.  That's correct.
14    Q.  What was the first one?
15    A.  Protonix.
16    Q.  Can you spell that?
17    A.  P-r-o-t-o-n-i-x.
18    Q.  Is there any other medication that you're
19 taking on a regular basis at present?
20    A.  I was taking Allegra for allergies.
21    Q.  Anything else?
22    A.  No.
23    Q.  What do you take when you get a headache?
24    A.  Nothing.

Page 107

1     Q.  Now, when Sergeant Foraker returned to the
2  firearms training unit, I think the parties will all
3  be in agreement that it occurred on December 1, 2003.
4            The question I have for you is:  How did
5  you learn that he was coming back?
6     A.  I think -- well, there's always rumor.  The
7  State Police is full of rumor.  But I think Sergeant
8  Ashley informed us that he was going to be transferred
9  out of the FTU, that Sergeant Foraker was returning.
10    Q.  Do you recall how long before the transfer
11 Sergeant Ashley told you that?
12    A.  I would say less than a month.
13    Q.  Prior to Sergeant Foraker's return, did you
14 have a meeting with anybody from the executive staff
15 concerning Sergeant Foraker's return?
16    A.  Yes.
17    Q.  And who did you have a meeting with?
18    A.  Lieutenant Colonel MacLeish.
19    Q.  Who was present at the meeting?
20    A.  Myself, Corporal Price and I'm not sure if
21 anyone else was present.
22    Q.  Was there another officer assigned to the range
23 at that point, other than Sergeant Ashley, of course?
24    A.  Yes.  I think Corporal Peachey was still

Page 108

1  assigned to the unit.
2     Q.  Was James Warwick assigned there yet?
3     A.  I'm not sure.
4     Q.  Do you remember if Corporal Peachey was present
5  at the meeting?
6     A.  I'm not sure.
7     Q.  Do you remember if Corporal Warwick was present
8  at the meeting?
9     A.  I'm not sure about that.
10    Q.  Where did the meeting occur?
11    A.  At the FTU, firearms training unit.
12    Q.  In one of the offices?
13    A.  Yes.
14    Q.  Do you remember which office?
15    A.  I'm pretty sure it was the little conference
16 room that we had off the main office section.
17    Q.  To the best of your recollection, there were
18 only three people there, you, Corporal Price and
19 Lieutenant Colonel MacLeish?
20    A.  I think Sergeant Ashley may have been there,
21 but I'm not sure.  I can say for sure that myself and
22 Corporal Price were there.
23    Q.  What happened at that meeting?
24    A.  Lieutenant Colonel MacLeish informed us that

Page 109

1  Sergeant Foraker was coming back to the FTU.
2     Q.  You already knew that, right?
3     A.  Yes.
4     Q.  And what else did Lieutenant Colonel MacLeish
5  say?
6     A.  That he wanted -- what I can remember is that
7  he just come in and said he wanted full cooperation
8  with Sergeant Foraker.
9     Q.  Do you remember anything else?
10    A.  Not specifically, no.
11    Q.  How long did that meeting last?
12    A.  I couldn't tell you.
13    Q.  Did you take any notes of the meeting?
14    A.  No.
15    Q.  Did you say anything at the meeting?
16    A.  I probably did.
17    Q.  Do you remember what you said?
18    A.  No.
19    Q.  Do you remember if Corporal Price said anything
20 at the meeting?
21    A.  I can't recall any specifics of the meeting
22 other than what was, what was said by Lieutenant
23 Colonel MacLeish, that Sergeant Foraker was going to
24 be transferred back and he wanted 100 percent

28 (Pages 106 to 109)

A451

Price, et al.                                                    v.                                      Chaffinch, et al.
Wayne H. Warren, Volume 1                          C.A. # 04-956-GMS                          October 17, 2005

|  | Page 110 |
|---|---|

1  cooperation with him.
2  Q.  Were you in favor of Sergeant Foraker coming
3  back?
4  A.  At that point in time I'm not sure.  Sergeant
5  Foraker had been transferred out because Sergeant
6  Ashley had been transferred in and now we were having
7  another change of supervisors.
8  Q.  Okay.  You don't remember anything more than
9  what you have told me about that meeting with
10  Lieutenant Colonel MacLeish?
11  A.  No.
12  Q.  When Sergeant Foraker returned did he have some
13  sort of an introductory meeting with the staff?
14  A.  Yes.
15  Q.  And when did that take place?
16  A.  I'm pretty sure it was probably the first week
17  that he came back.
18  Q.  And who was present at that meeting?
19  A.  I think Lieutenant Davis was there and I don't
20  know if we were actually involved in the meeting or we
21  were just talking in the building, but I remember, I
22  remember Lieutenant Davis was there.  I'm not sure
23  if -- I'm really not sure who was there and what part
24  of the meeting, you know, if we were even involved in

|  | Page 111 |
|---|---|

1  the meeting or we were just part of the discussion
2  during that time.
3  Q.  What do you remember happened that day?
4  A.  I just remember Sergeant Foraker returning to
5  the FTU.  I know that or I'm pretty sure that
6  Lieutenant Davis showed up and Sergeant Ashley would
7  have been there also.  And they just -- they had their
8  meeting and we had some discussion with them at that
9  point.
10  Q.  You had some discussion with whom?
11  A.  With Sergeant Foraker.  And I'm not sure --
12  well, I'm sure we were talking to Sergeant Ashley
13  also.  I don't think we were involved in a sit-down
14  meeting, per se.  I think they were involved in a
15  sit-down meeting.
16  Q.  I'm sorry.  When you say, "we," who are you
17  referring to?
18  A.  Corporal Price and myself.
19  Q.  How about Warwick, was he there that day?
20  A.  I'm not sure.
21  Q.  It's my understanding that Warwick came in the
22  firearms training unit about a month before Sergeant
23  Foraker returned.  Does that jive with your
24  recollection?

|  | Page 112 |
|---|---|

1  A.  I remember him in there approximately the same
2  time.  I don't know if he was in there a little
3  earlier or not.
4  Q.  What's the first discussion that you had with
5  Sergeant Foraker after he returned on December 1, 2003
6  about the maintenance of the bullet trap?
7  A.  As I recall, he was asking us, asking me about
8  why it appeared to be so dirty.
9  Q.  Why what appeared to be so dirty?
10  A.  The bullet trap and the range area.  And we
11  explained to him that the maintenance was getting
12  overwhelming, plus the fact that we had health
13  concerns about cleaning the area.
14      Also, I remember discussing with him the
15  headset situation.  And I don't know if he brought
16  that up or we just brought that information to his
17  attention because of the safety issue of operating
18  with a wireless system.
19  Q.  Well, how long after he returned do you recall
20  there being a discussion about the maintenance work
21  that you had been doing behind the bullet trap?
22  A.  I would say pretty much as soon as he returned,
23  that first week or so.
24  Q.  And was this a discussion you had with Sergeant

|  | Page 113 |
|---|---|

1  Foraker yourself or was it a discussion that you had
2  as a group with Sergeant Foraker?
3  A.  Most of our discussions were conducted in the
4  FTU office where we all have desks in the same office
5  setting and we talk back and forth about different
6  things that are occurring.  Usually that's the way we
7  conducted the business.  It was an open line of
8  communication back and forth and everyone would hear
9  conversations.
10      I mean, we were working together as a
11  unit, as a team to conduct training and to operate in
12  that facility.  So there wasn't a lot of, you know,
13  closed door type of things.  It affected -- everyone
14  was affected by everything that was going on in the
15  building.
16  Q.  When you say, "everyone," you're referring to
17  the four of you that were assigned to the firearms
18  training unit?
19  A.  Yes.  Anyone who was coming into the building
20  also, any adjunct instructors or any students, anyone
21  who was exposed to that building.
22  Q.  What do you recall was the first discussion you
23  had, what is the substance of the first discussion you
24  had with Sergeant Foraker about the maintenance of the

29 (Pages 110 to 113)

A452

Price, et al.                                    v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1            C.A. # 04-956-GMS                    October 17, 2005

Page 114

1 bullet trap after he returned in December of 2003?
2    A.   I can't tell you what the first thing was, but
3 I can tell you that the ventilation system and the
4 deposits of dust was a major concern because we were
5 seeing the deposits build up more than usual.
6    Q.   Okay.  I'm really referring to the work that
7 was done behind the bullet trap in terms of keeping
8 the water flow going, keeping the conveyor belt going,
9 cleaning out the shotgun wadding, that type of thing.
10         I mean, when do you recall there being,
11 when do you recall there being a discussion with
12 Sergeant Foraker about that?
13    A.   During his return, pretty, pretty soon after
14 his return.  I can't give you the exact date or time
15 or if that was the first thing that we discussed with
16 him.
17    Q.   I'm not asking you whether that was the first
18 thing you discussed with him, but at some point or
19 another you talked to him?
20    A.   That's correct.
21    Q.   What was the substance of the discussion?
22    A.   About the amount of accumulation of dust behind
23 the bullet trap.  It was starting to appear
24 everywhere.

Page 115

1    Q.   So you talked to him about dust accumulating
2 behind the bullet trap?
3    A.   That's correct.
4    Q.   Did you also talk to him about the pumps
5 clogging?
6    A.   Yes.
7    Q.   And what was the substance of the discussion
8 about the pumps clogging?
9    A.   Everything seemed to be requiring more
10 maintenance.
11    Q.   More than what?
12    A.   More than normal.
13    Q.   And is that something that you were informing
14 Sergeant Foraker of?
15    A.   I'm not so sure that it wasn't questioned by
16 Sergeant Foraker and it was commented back by me.  I'm
17 not sure that I just talked to him and explained to
18 him or he was questioning about what he observed.  I
19 can't discern exactly how that occurred.
20    Q.   Did you discuss the need to replace the filters
21 in the system?
22    A.   I can't recall if that particular conversation
23 came up at that time.
24    Q.   Did you discuss the need to pull the wadding

Page 116

1 out of the water, the shutgun wadding out of the water
2 behind the bullet trap?
3    A.   Again, I can't remember a specific conversation
4 about that.
5    Q.   Was there any point when you discussed with
6 Sergeant Foraker whether you would continue to do
7 maintenance behind the bullet trap?
8    A.   I think that what I conveyed to him was that I
9 thought it was a health risk for us to continue doing
10 maintenance with the bullet trap because of the
11 situation that we had encountered with Sergeant
12 Ashley.
13    Q.   What situation are you referring to?
14    A.   Well, when the blood serum level started to
15 elevate with lead and Dr. Green's comment to Corporal
16 Price about the water helps, the water and oil helps
17 take the lead into your system.  So that was a concern
18 once we found that out from Dr. Green.
19    Q.   Well, when is it that you found that out from
20 Dr. Green?
21    A.   I can't give you a specific date on that.
22    Q.   You don't recall finding that out from
23 Dr. Green sometime in 2004?
24    A.   Dr. Green did not relay that information to me.

Page 117

1 Corporal Price spoke out in that office setting about
2 what Dr. Green had told him.
3    Q.   Do you not recall that having occurred in 2004
4 rather than 2003?
5    A.   I can't give you a specific time when that
6 actually happened, when I heard that conversation from
7 Corporal Price.
8    Q.   Was there a point when you participated in a
9 discussion with the other members of the FTU in which
10 you decided that you were not going to do the
11 maintenance on the pumps and the filters and the water
12 system behind the bullet trap?
13    A.   I think there probably was a conversation and
14 concern that we really didn't know what we were
15 getting into.
16    Q.   What do you mean you didn't know what you were
17 getting into?  This was something that you had done
18 for two-and-a-half years, right?
19    A.   Yes, it was.
20    Q.   When did you have that discussion,
21 approximately?  You know that Sergeant Foraker
22 returned on December 1st.
23    A.   After Sergeant Foraker returned we started
24 voicing our concerns and that's when I think we all

30 (Pages 114 to 117)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

A453

Price, et al.                                        v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                    October 17, 2005

Page 118

1   reached the decision that we had to be limited in how
2   much maintenance we were actually doing.
3      Q.   Was there a point when you stopped doing any
4   maintenance behind the bullet trap, you personally?
5      A.   There probably was, but I couldn't give you the
6   specific time, even when we quit scooping the shotgun
7   wadding out.
8      Q.   I'm going to show you a document that has
9   previously been marked as an exhibit in another
10  deposition so you will see an exhibit designation on
11  there.  It says Papili 2 on the bottom right.
12         Do you see that?
13     A.   Yes, I do.
14     Q.   This is a document that the parties have
15  exchanged in this lawsuit.  Are you familiar with that
16  document?
17     A.   It appears to be the auditor's report.
18     Q.   Have you read that before today?
19     A.   I've read so many different documents I'm not
20  sure if I read this or not.
21     Q.   Why don't you just take a look at it for a
22  minute and see if you have read it before?
23     A.   (Reviewing document) I believe I've read this.
24     Q.   Okay.  Could you turn to page 11, please?

Page 119

1      A.   Okay.
2      Q.   I want to ask you about the first paragraph.
3   I'm going to read it to you:  It says, and I quote,
4   "On December 1, 2003, a new Sergeant took over command
5   of the firing range.  In an interview he informed us
6   that shortly thereafter he met with the current staff
7   and as a result of that meeting a decision was made
8   not to perform any maintenance at the range.  The
9   staff made the decision not to continue performing
10  maintenance and custodial functions due to health
11  related issues and not being qualified to perform
12  those functions."
13         Is that statement, it's three sentences in
14  that paragraph, is that an accurate statement of what
15  happened?
16     A.   What I think you have to do is I don't
17  understand what the word "maintenance" means.
18     Q.   Okay.  Aside from that?
19     A.   Well, to perform any maintenance, normal
20  maintenance was performed right up to the last day
21  that we shot.  And that meant that we had to clean the
22  interior of the range where the students were
23  shooting.  Shell casings had to be swept up and put
24  into the barrels and the cardboard had to be taken out

Page 120

1   and removed.
2         So maintenance, all maintenance, some
3   maintenance?  This to me says perform any maintenance
4   at the range.  Well, any maintenance, does that mean
5   that sweeping up the shell casings is not maintenance?
6      Q.   I would not have interpreted that as
7   maintenance, but I don't want to get into an argument
8   with you over what the auditor's office uses as
9   definitions.
10        So just let me ask you this:  Did the
11  staff make the decision not to continue to perform
12  certain maintenance and custodial functions?
13     A.   Certain maintenance, that's correct.
14     Q.   What was it that you decided not to continue
15  doing?
16     A.   Going back and replacing pumps or putting our
17  hands into that solution, cleaning any of the filters
18  from the pumps itself.
19     Q.   Anything else?
20     A.   And I'm not sure if we would have decided that
21  we weren't going to scoop the wadding out at that
22  point in time because, as I said, certain maintenance
23  was still performed right up until the last day.
24     Q.   Well, after you had this meeting and decided

Page 121

1   what you weren't going to do, do you recall yourself
2   personally going back and scooping the shotgun wadding
3   out of the conveyor system?
4      A.   Do I remember that?  No, I do not.
5      Q.   Are you saying that you didn't do it or you
6   just don't remember?
7      A.   I'm saying I don't remember.
8      Q.   Do you recall seeing any of the other officers
9   assigned to the range pulling the shotgun wadding out
10  of the water area?
11     A.   No.
12     Q.   So the auditor says that there was a meeting.
13  Was there, in fact, a meeting?
14     A.   An informal meeting as I discussed prior to?
15     Q.   Yes.
16     A.   Yes.
17     Q.   So there was discussion among the four of you
18  as you were in the area where you had your desks in
19  the front of the range?
20     A.   That's correct.
21     Q.   And as a result of that informal discussion, as
22  you call it, a decision was made not to perform
23  certain functions behind the bullet trap?
24     A.   That's correct.

31 (Pages 118 to 121)

Price, et al.                                                                          v.                                            Chaffinch, et al.
Wayne H. Warren, Volume 1                                           C.A. # 04-956-GMS                                October 17, 2005

Page 122

1    Q.   One of the functions would be unclogging the
2  pumps?
3    A.   That's correct.
4    Q.   One of the functions would be replacing the
5  pumps, right?
6    A.   That's correct.
7    Q.   Another of the functions would be unclogging
8  the filter that is on the hose?
9    A.   That's correct.
10    Q.   Now, was there a discussion or at this informal
11  meeting that you had was there a discussion of what
12  would likely happen to the bullet trap system if you
13  stopped doing those particular maintenance functions?
14    A.   I'm not sure if that was discussed or if it was
15  discussed that someone else is responsible for
16  performing the cleaning, someone else needs to be
17  responsible for performing the cleaning.
18    Q.   Let me ask you as somebody who had worked at
19  the range at that point for roughly two-and-a-half
20  years if you stopped doing those maintenance and
21  repair functions involving the pumps and the filters
22  and the water system, what did you expect was going to
23  happen with the system if you just stopped doing it?
24    A.   If anyone stopped doing it?

Page 123

1    Q.   Right.  In other words, if it ceased to be
2  done.
3    A.   It's going to eventually clog up and stop.
4    Q.   And what would be the consequence in the front
5  of the bullet trap, in other words, the shooting area,
6  if that were to happen?
7    A.   Then it would create more of a problem.
8    Q.   And would the nature of the problem be dust and
9  smoke in the area?
10    A.   That's always going to occur.
11    Q.   I'm sorry?
12    A.   That's always going to occur.
13    Q.   And it would be worse if the water system
14  doesn't work, right?
15    A.   That's correct.  That's correct.
16    Q.   Did anybody at this informal meeting of the
17  staff at the FTU say if we stop doing that we're
18  likely to create problems?
19    A.   No.  We felt if we didn't stop doing it we were
20  going to create more of a health risk for ourselves.
21    Q.   I understand that.  But I'm asking whether any
22  of you discussed the potential consequences of not
23  doing the work on the pumps and the filters and that
24  sort of thing that we have been talking about today?

Page 124

1    A.   I don't know if we had a discussion on it, but
2  I think we all knew what the outcome would be.
3    Q.   Now, you testified a few minutes ago that there
4  was some thought that somebody else ought to be doing
5  the work or ought to be doing the maintenance work
6  that the troopers had previously done.  Am I correct
7  about that?
8    A.   That's correct.
9    Q.   And describe to me who said what in terms of
10  that discussion.
11    A.   I couldn't.  It's been a long time ago.
12  There's no way I could tell you exactly who said what
13  in that meeting.
14    Q.   Okay.  Now, going back to the exhibit that you
15  have in front of you, Papili 2, and going back to the
16  top of page 11, if you understand the term maintenance
17  as used in the third line of that sentence to be the
18  maintenance on the pumps and the filters and the water
19  system at the back of the bullet trap, is that a
20  correct statement as far as you know, that paragraph,
21  that first paragraph on page 11?
22    A.   Yes.
23    Q.   Now, was there a discussion between yourself
24  and the other members of the staff, including Sergeant

Page 125

1  Foraker, in December 2003 as to who you would get to
2  do the work that you didn't want to do in the back of
3  the bullet trap?
4    A.   I don't think we discussed who we would get,
5  who was responsible for that job.
6    Q.   I don't understand what you're saying.
7    A.   At that point in time we didn't feel that we
8  were responsible for cleaning behind the bullet trap
9  because we had no training, we had no equipment.  We
10  didn't know what we were dealing with.  No one told us
11  what was contained in that water tank, what chemicals
12  we were putting our hands in.
13    Q.   What you're saying is that you believed you had
14  been doing a job for the last two-and-a-half years
15  that you weren't responsible for doing?
16    A.   Or had no knowledge of what we were actually
17  doing, that's correct.
18    Q.   Well, okay.  But you actually did this work for
19  two-and-a-half years and you believed that you weren't
20  responsible for doing it?
21    A.   That's correct.
22    Q.   Did Corporal Price at this meeting articulate
23  the same idea?  In other words, did he say to you or
24  to anybody else in the room that he didn't believe he

32 (Pages 122 to 125)

Price, et al.                                           v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                    October 17, 2005

Page 126

1  was responsible for doing it?
2      A.  I think we all felt that way.  Whether or not
3  he said it, I can't tell you exactly what he said.
4      Q.  What did Sergeant Foraker say?  Do you
5  remember?
6      A.  He was of the same opinion, that it was outside
7  of our realm.
8      Q.  Of the group of you in that office whose idea
9  was it to stop doing this work?
10     A.  I think it was probably all of us together.
11  There were health concerns here.
12     Q.  I understand that.  I'm not questioning that at
13  all.
14          I'm just trying to figure out whose idea
15  it was.
16     A.  I couldn't sit here and tell you it was one
17  person's idea because I think we were all concerned.
18     Q.  Had you articulated that concern to Sergeant
19  Ashley when he was there?
20     A.  About putting our hands in the water?
21     Q.  Yes.
22     A.  Yes.
23     Q.  And I take it in your case you had that
24  discussion with him when you talked to him about your

Page 127

1  serum blood lead level rising and you believe that had
2  something to do with the mixture that was in the
3  water?
4      A.  That's correct.
5      Q.  Any other time you talked to Sergeant Ashley
6  other than that time?
7      A.  I'm sure there was, but I can't recall every
8  conversation that we had during that time.
9      Q.  Did you ever tell anybody in the Delaware State
10  Police that the firearms training unit personnel had
11  stopped doing the maintenance on the water system, the
12  pumps, the filters that we have talked about behind
13  the bullet trap?
14     A.  I can't recall ever saying that.
15     Q.  Are you saying it didn't happen or are you
16  saying that you may or may not have and you just don't
17  remember?
18     A.  I can't recall saying that.
19     Q.  Did you ever have any discussion with
20  Lieutenant Davis about maintenance work behind the
21  bullet trap?
22     A.  I can't recall.  I know that he came in a
23  meeting when we contacted facilities management and
24  there was some discussion in front of the bullet trap

Page 128

1  and in the rear, but I can't recall whether or not I
2  told him about the maintenance issue at that point in
3  time.
4      Q.  Do you recall when that meeting occurred?
5      A.  That was January of 2004.
6      Q.  And who was present from facilities management?
7      A.  Mark DeVore and Doyle Tiller.
8      Q.  And why were they called?  What was the subject
9  matter?
10     A.  The ventilation system was failing and I was
11  getting concerned about breathing whatever it was in
12  the air.  And once we found out that it was -- and I'm
13  not sure if I found out.  I'm pretty sure I found out
14  beforehand what the frangible ammunition was composed
15  of.  I think that occurred after, after we knew that
16  we were breathing sintered copper.
17          And I explained to him that the
18  ventilation system was failing again and that I wanted
19  the air tested, I called facilities management and
20  requested that the air be tested.
21     Q.  You're talking about DeVore now you're talking
22  to or Tiller?
23     A.  I talked to Doyle Tiller about that.  Actually,
24  I talked to the secretary.  The secretary told me he

Page 129

1  wasn't there and then I received a call back from
2  Doyle Tiller.
3      Q.  So Tiller and --
4      A.  Mark DeVore and I believe one of the
5  maintenance people also was present initially at the
6  building when those two arrived.  And I'm not sure if
7  he remained when we talked out on the range and behind
8  the bullet trap or not.
9      Q.  Do you remember who that was?
10     A.  No.
11     Q.  Was it Mark D'Allesandro?
12     A.  I'm not sure.
13     Q.  So you're saying Lieutenant Davis was present
14  for that discussion?
15     A.  Yes, he was.
16     Q.  That discussion was primarily about the HVAC?
17     A.  That's correct.
18     Q.  Did you ever discuss with Captain Greg Warren
19  the fact that the firearms training unit personnel
20  were not doing the maintenance work on the water
21  system behind the bullet trap?
22     A.  I can't recall.
23     Q.  Did you ever talk to Lieutenant Colonel
24  MacLeish about that subject?

33 (Pages 126 to 129)

Price, et al.                                              v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                          October 17, 2005

Page 130

1    A.  I can't recall.
2    Q.  How about Colonel Chaffinch?
3    A.  I can't recall.
4    Q.  Did you ever talk to Colonel Chaffinch about
5   any part of the firearms training unit or about any
6   concern you ever had at the firearms training unit?
7    A.  Talk to him directly?
8    Q.  Yes.
9    A.  I don't remember any time.
10   Q.  How about Lieutenant Colonel MacLeish or now
11  Colonel MacLeish, did you ever talk to him directly
12  about concerns you had at the firearms training unit
13  about the health concerns or safety concerns?
14   A.  During what period of time?
15   Q.  Any period of time.
16   A.  Yes.
17   Q.  When?
18   A.  Once we found out that we had a major health
19  problem and concern there, we started having meetings
20  and we explained to him during this meeting, the first
21  meeting what our concerns were.
22   Q.  When approximately did that meeting occur?
23   A.  That would have been early 2004, I believe.
24   Q.  And --

Page 131

1    A.  After the range was shut down.
2    Q.  Now, the range, the shooting stopped at the
3   range in about mid-February, right?
4    A.  February or March.
5    Q.  And the range was formally shut down around the
6   middle of March, right?
7    A.  That's correct.
8    Q.  Are you talking about some conversation that
9   occurred after the range was shut down and all of the
10  personnel were moved out or was it before that?
11   A.  It was during that time period.  I'm not sure
12  if it was before or after, but in that specific time
13  period that's when the conversations started with
14  Lieutenant Colonel MacLeish.
15   Q.  Where did that meeting take place?
16   A.  I can remember one meeting was at the State
17  Police Academy conference room on the second floor.  I
18  think that was our first meeting.
19       And I can remember another meeting, I
20  think it was on the second floor of the museum.  I
21  believe that was one of the other meetings.
22   Q.  So there were two times when you met with --
23   A.  Those are the two times that I can remember.  I
24  think there was more than that, but I can't, I can't

Page 132

1   recall exactly how many meetings there were, but those
2   two meetings I can remember.
3    Q.  Now, the one that occurred at the State Police
4   Academy, who was present other than yourself and Tom
5   MacLeish?
6    A.  I'm pretty sure Corporal Price was present,
7   members of facilities management and I think that
8   would have been Doyle Tiller, Mark DeVore and some of
9   the maintenance men that were assigned at previous
10  times to the building.  I'm not sure if the academy
11  staff was there.
12       I think Sergeant Foraker was there, but
13  there should be, should have been meeting notes.
14   Q.  Did you take notes?
15   A.  No.  But it wasn't my meeting.  There should
16  have been meeting notes if it occurred at the academy.
17   Q.  What do you mean there should have been meeting
18  notes?  You mean you would have expected somebody at
19  the meeting to take notes?
20   A.  Usually when the staff holds a meeting someone
21  is taking notes.  I may have taken notes at that
22  particular point in time.  I can't recall a hundred
23  percent.
24   Q.  If you took notes would you have turned them

Page 133

1   over to your lawyer to be turned over to us as part of
2   the lawsuit?
3    A.  Probably.
4    Q.  Well, why don't you check and make sure that
5   there aren't some notes sitting in your home or in
6   your car that we haven't seen yet?  Otherwise, I will
7   continue to just ask you to give them to
8   Mr. Neuberger, if that's the case.
9    A.  I think everything I have has been turned over
10  to Mr. Neuberger or the auditor's office.
11   Q.  Okay.  That was my question.
12       The meeting that occurred at the academy,
13  do you recall when that was?
14   A.  No.  Just during that time frame of the winter.
15   Q.  Was it held at the academy because the range by
16  that time had been shut down?
17   A.  I'm not sure what the reason why was.
18   Q.  Do you remember the substance of the
19  discussion?
20   A.  Yeah.  The State Police firing range.
21   Q.  Do you remember was there discussion of the
22  maintenance of the bullet trap at that meeting?
23   A.  Probably.
24   Q.  And when you say, "Probably," do you remember

34 (Pages 130 to 133)

Price, et al.                                          v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                    October 17, 2005

---

Page 134

1  the discussion?
2      A.  Well, the entire problem was being discussed by
3  both sides, by the State Police and facilities
4  management.  And they were trying to come up with an
5  idea of how to correct it, what happened and how to
6  correct the problem.
7      Q.  Did the subject of the maintenance of the water
8  system at the bullet trap come up in that meeting?
9      A.  I'm not sure, per se.  Probably yes, but I
10  can't recall a specific conversation with what you're
11  asking me.
12      Q.  I'm really not asking you to lay odds.  I just
13  want to know if you remember anything being discussed
14  at that meeting.  If you don't remember, that's fine.
15  I'm not trying to get you to invent anything.
16      A.  No.  I can't, I can't recall any specifics.
17      Q.  Do you know who Bob Furman is?
18      A.  Yes.
19      Q.  Was he present at that meeting?
20      A.  I think he was.
21      Q.  Do you remember him saying anything at that
22  meeting?
23      A.  Not anything specific.  I remember him talking.
24      Q.  So just so I get this clear, at that State

---

Page 135

1  Police Academy meeting you don't recall the substance
2  of any discussion about maintenance of the water
3  system of the bullet trap?
4      A.  No.
5      Q.  Now, you said there was another meeting that
6  occurred at the museum?
7      A.  That's correct.
8      Q.  Is that the State Police Museum?
9      A.  Yes.
10      Q.  And who was present at that meeting?
11      A.  Lieutenant Colonel MacLeish, Corporal Price,
12  Sergeant Foraker, Captain Yeomans, I think Major
13  Eckrich, I'm going to say Captain Warren.
14      Q.  Anybody else that you can remember?
15      A.  Did I say Lieutenant Davis?
16      Q.  No.
17      A.  I think he was present.
18      Q.  Was there anybody from facilities there?
19      A.  At that meeting I don't think there was anybody
20  from facilities management.
21      Q.  Which occurred first?  The meeting at the State
22  Police Academy or the meeting at the museum?
23      A.  The meeting at the State Police Academy, I'm
24  pretty sure.

---

Page 136

1      Q.  What do you recall about the meeting at the
2  museum?
3      A.  That's when we were talking about lead levels
4  and they presented us with a study of different lead
5  levels.  I think Lieutenant Colonel MacLeish said that
6  if -- how did he put it?  People in the military
7  assigned to the artillery are expected to incur
8  hearing loss.  It was something to that -- don't quote
9  me exactly, but it was a statement made in that
10  respect at that meeting.
11      Q.  Anything else that you remember about that
12  meeting?
13      A.  I remember them presenting some information
14  about blood lead levels, a study that Captain Yeomans
15  had performed, and I think Captain Homiak had a study
16  there also.
17      Q.  Were you given copies of the studies?
18      A.  Yes.  Yes.
19      Q.  Do you remember anything else about the meeting
20  at the museum?
21      A.  I can't recall if he also made the comment --
22  he made a comment at one of these meetings "I can't
23  believe you guys didn't clean."  And I'm not sure if
24  it was at that meeting or one of the previous

---

Page 137

1  meetings.  There were more meetings than just the two
2  that I mentioned.
3      Q.  I understand that.
4          When you say, "he," who is the "he" you're
5  referring to?
6      A.  That was Lieutenant Colonel MacLeish.  I'm
7  sorry.
8      Q.  He said he can't believe that you guys didn't
9  clean?
10      A.  That's right.
11      Q.  Clean what?
12      A.  (The witness shrugged.)
13      Q.  Do you remember what came before that?
14      A.  Well, we were talking about the range.  That
15  was the reason why we had the meeting.
16      Q.  Were you talking about the bullet trap?
17      A.  He didn't specifically say the bullet trap.
18      Q.  Were you talking about the bullet trap before
19  he made the comment that you seem to remember?
20      A.  No.  I think we were just discussing the range
21  itself.
22      Q.  The range itself?  Now, the range has a lot of
23  components, right?
24      A.  That's correct.

---

35 (Pages 134 to 137)

Price, et al.                                                                              v.                                              Chaffinch, et al.
Wayne H. Warren, Volume 1                                            C.A. # 04-956-GMS                                        October 17, 2005

Page 138

1    Q.   Were you discussing the components of the
2  range?
3        In other words, were you talking about the
4  offices or the shooting area?
5    A.   I think it was the overall condition of the
6  range.
7    Q.   The sentence you remember, which is "I can't
8  believe that you guys didn't clean," seems to come out
9  of the blue here.  What did it follow?  Do you have
10  any recollection of why he got -- where did he get the
11  idea that you didn't clean?
12    A.   Well, because as far as I know, Sergeant
13  Foraker was informing him of the condition and what
14  was going on with the range pretty much on a weekly
15  basis, maybe even a daily basis.  So he knew what was
16  happening with the facility or he should have known
17  what was happening with the facility.
18    Q.   And what do you base that statement on?  Why do
19  you think he should have known?
20    A.   The fact that Sergeant Foraker told us that he
21  was informing the staff as to the condition of the
22  range?
23    Q.   Do you know whether Sergeant Foraker ever told
24  the staff that you had stopped performing the

Page 139

1  maintenance on the water system at the back of the
2  bullet trap?
3    A.   Do I know 100 percent?
4    Q.   Do you know any percent?
5    A.   No.
6    Q.   Did Sergeant Foraker ever tell you that he
7  informed the staff -- when you say, "the staff" you
8  mean the executive staff, right?
9    A.   That's correct.
10    Q.   Did Sergeant Foraker ever tell you that he had
11  informed the staff that you weren't doing the
12  maintenance in the back of the range anymore?
13    A.   I can't recall if he said that specifically,
14  but he told them that we were reducing the amount of
15  maintenance that we were performing.
16    Q.   And you know that because that's what he said
17  to you?
18    A.   That's correct.
19    Q.   And what he said to you is "I have told the
20  executive staff that we are reducing the amount of
21  maintenance we're performing"?
22    A.   I don't know if that's his exact terminology,
23  but he informed us that he had relayed it up the chain
24  of command.

Page 140

1    Q.   And exactly what is it that he said to you he
2  had relayed up the chain of command?
3    A.   That there is maintenance problems at the range
4  and we can't continue to clean the range.
5    Q.   Go back to the exhibit that's in front of you,
6  Papili 2, and go down, please, to the third paragraph
7  on page 11.
8        The first sentence states as follows:
9  Quote, "We found no evidence in the documentation made
10  available to us where DSP command was notified that
11  range staff would not be performing duties related to
12  the maintenance and custodial functions historically
13  accomplished by range staff."
14        Do you have any information that would
15  suggest that sentence is not accurate?
16    A.   I do not.
17        MR. ELLIS:  Could you put a mark on that?
18  I'm going to call them D, just D-1, Defendant's 1.
19        (Defendant's Deposition Exhibit No. 1 was
20  marked for identification.)
21  BY MR. ELLIS:
22    Q.   What I have put in front of you is a chain of
23  e-mail messages and I don't know whether you have seen
24  these before or not, Corporal Warren.  So what I would

Page 141

1  like you to do is to begin at the back at a Friday,
2  December 19, 2003 e-mail and then you will see a
3  response and then you will see a response to the
4  response.
5        Could you just take a look at that and
6  tell me if you have seen these messages before?
7    A.   (Reviewing document)  I believe I have seen
8  this before.
9    Q.   Starting with the one at the back of the chain,
10  and that's the one dated Friday, December 19, 2003
11  from Chris Foraker to Thomas MacLeish and Paul
12  Eckrich, when did you first see that?
13    A.   Are you talking about the last page where it
14  starts out "explained to Mr. D'Allesandro"?
15    Q.   No. I'm talking about -- well, that's actually
16  the tail end of the message.  If you go to the page
17  before the one you were just reading from, you will
18  see the beginning of that e-mail where it has the
19  writer and the people that it's addressed to.
20    A.   Right.
21    Q.   Going from there to the end of the next page is
22  one message.
23        Have you seen that before?
24        MR. NEUBERGER:  Why don't you just read it

36 (Pages 138 to 141)

Wilcox & Fetzer, Ltd.                                      Professional Court Reporters                                      (302)655-0477

Price, et al.                                           v.                                Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                      October 17, 2005

Page 142

1    over quietly to yourself?
2           THE WITNESS:  That's what I am going to
3    do.
4       A.  (Reviewing document)  Bits and pieces of this
5    look familiar.
6       Q.  Let me ask you, first of all, which bits and
7    pieces look familiar?
8       A.  About the drag or dredge system has been
9    damaged.  The drive chain has been broken.  I observed
10   that.
11      Q.  Let me clarify my question to you.
12          I'm not interested in whether any of the
13   events that are described in the message are familiar
14   to you.  I know they probably are.
15          My question is:  Have you seen the actual
16   e-mail before?
17      A.  I'm not sure.
18      Q.  Take a look at the one on the top page that's
19   addressed to Lieutenant Colonel MacLeish from Chris
20   Foraker.
21          Did you ever see that message before?
22   Again, I recognize that you're going to be familiar
23   with the events.  My question is whether you saw the
24   message before.

Page 143

1       A.  I probably have, yes.
2       Q.  And when did you first see this message?
3       A.  I'm not sure.
4       Q.  Did you see it at or around the time it was
5    written?
6       A.  I'm not sure.  I looked at a volume of
7    paperwork and I can't tell you exactly when I saw each
8    piece of information.
9       Q.  You mean you looked at a volume of paperwork as
10   a part of this litigation?
11      A.  When we were conducting the investigation as to
12   what went wrong.
13      Q.  Do you see in the second paragraph that there's
14   a discussion that somebody may have attempted to
15   sabotage the system?  It's about two-thirds of the way
16   down the second paragraph on the first page of the
17   exhibit.
18      A.  Yes, I do see that.
19      Q.  Do you recall Sergeant Foraker's contention
20   that someone may have tried to sabotage the system?
21      A.  Yes, I can remember that.
22      Q.  Did you ever talk to him about that?
23      A.  Yes.
24      Q.  And do you remember why he thought that

Page 144

1    somebody had tried to sabotage the system?
2       A.  I think because there was material in the belt
3    down in the tank, in the recovery tank that looked
4    like small pieces of chain.
5       Q.  It wasn't small pieces of chain though, was it?
6       A.  No, it wasn't.
7       Q.  And how do you know it wasn't?
8       A.  Because I've observed it on different occasions
9    from bullets being fired by the federal government.
10      Q.  It's FBI ammunition.  Is that right?
11      A.  That's correct.
12      Q.  When Sergeant Foraker said to you that somebody
13   is trying to sabotage the drive chain by putting a
14   chain down in there, did you tell him that no, that
15   wasn't the case; it was just FBI ammunition?
16      A.  At that point in time I'm not sure.
17      Q.  When he described the problem to you did you
18   recognize it as FBI ammunition?
19      A.  Not until we actually had a chance to observe
20   the ammunition.
21      Q.  How long after the discussion you had about
22   sabotage was it before you actually observed whatever
23   that was that was in the tank?
24      A.  I can't give you the exact time frame.

Page 145

1       Q.  Was it before Sergeant Foraker had all of the
2    locks changed on the building?
3       A.  I don't think so.
4       Q.  How was it that you came to be looking at the
5    material that was in the water tank?
6       A.  That's what I am trying to remember.  I can't
7    recall exactly when that event transpired, but I know
8    it didn't happen immediately because we were concerned
9    that something may have fallen into the tank.  I know
10   it wasn't immediately, so I'm not sure exactly when we
11   discovered that what he was viewing was the actual FBI
12   ammunition that had been used there.
13      Q.  If you take a look at this e-mail, the first
14   sentence of the third paragraph says that the foreign
15   material was dredged out and Mr. Toplack made several
16   more adjustments and left the system up and running
17   prior to his flight back to Ohio on Tuesday, December
18   30.
19          That would suggest the sabotage allegation
20   was raised prior to December 30, 2003, right?
21      A.  As it appears here, it would.
22      Q.  Does that correspond to your recollection?
23      A.  I wish I could be of more help, but I can't
24   recall exactly when it happened, whether we were even

37 (Pages 142 to 145)

Wilcox & Fetzer, Ltd.                    Professional Court Reporters                    (302)655-0477

Price, et al.                                           v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                    October 17, 2005

Page 146

1    notified at that particular point in time as to what
2    had transpired or what had been found.
3        Q.   Did Sergeant Foraker ever say to you who he
4    thought might have tried to sabotage the system?
5        A.   No.
6        Q.   Did you believe that anybody had tried to
7    sabotage the drag belt?
8        A.   At that point in time?
9        Q.   Yes.
10       A.   I really didn't know.
11       Q.   Do you recall any superior officer of yours
12   initiating an investigation into whether sabotage had
13   occurred?
14       A.   No.
15       Q.   How is it that you -- I may have already asked
16   this -- how is it that you eventually realized that it
17   wasn't a chain, it was just the FBI's ammunition that
18   was creating the appearance of a chain?
19       A.   I think once we observed what they were talking
20   about as far as it appeared to be a chain, well,
21   unless you actually see it, you have no idea.  A chain
22   could be several different sizes, several different
23   shapes, but once it was observed then we could
24   identify it exactly what it was or what we thought it

Page 147

1    was.
2        Q.   I guess my question is:  Was the reason you
3    were looking at it because somebody wanted you to
4    investigate it to see whether it really was a chain?
5        A.   Yes.
6        Q.   Do you remember who it was that told you to do
7    that investigation?
8        A.   I don't know if it was an investigation or if
9    it was just a comment and I can't tell you now exactly
10   who found it or who got the first piece of it to
11   actually look at it in the first place.
12       Q.   I had understood it was you.  Was it not you?
13       A.   I don't recall if it was or it wasn't, but I
14   can recall the incident as it appeared to be a chain.
15       Q.   And when you saw what the material really was,
16   did you immediately recognize it as the FBI's
17   ammunition?
18       A.   Yes.
19       Q.   Now I want to just go back for a minute to the
20   meeting that occurred at the State Police Academy and
21   this is the meeting at which I think you testified
22   that yourself, Sergeant Foraker, Corporal Price, some
23   people from facilities management and MacLeish were
24   present at.

Page 148

1            Do you recall Major Eckrich being at that
2    meeting?
3        A.   He could have been.
4        Q.   Do you recall Captain Warren being at that
5    meeting?
6        A.   He could have been.
7        Q.   You don't remember one way or the other?
8        A.   No.
9        Q.   How about Ralph Davis, do you recall him being
10   there?
11       A.   (Witness shakes head).
12       Q.   Do you recall anybody at that meeting asking
13   the question of you when the last time was that the
14   bullet trap had been cleaned out?
15       A.   No, I can't remember.
16       Q.   Do you recall that questioning being asked of
17   Sergeant Foraker?
18       A.   No.
19       Q.   You're saying you don't remember whether this
20   happened or not?
21       A.   I don't know if that question was asked at that
22   particular meeting or not.
23       Q.   Do you remember any meeting at which you were
24   present with Sergeant Foraker and the rest of the FTU

Page 149

1    group in which somebody from facilities management
2    asked you when the last time was that maintenance had
3    been done on the system at the bullet trap, the water
4    system in the back of the bullet trap?
5        A.   No.
6        Q.   You're saying you don't remember if it happened
7    or not?
8        A.   No.
9        Q.   No, you don't remember?
10       A.   I don't remember.  No.  Excuse me.  No, I don't
11   remember whether or not that question was asked.
12       Q.   Now, my understanding is that the firing range,
13   the building itself wasn't in use over the Christmas
14   holiday in 2003.  Does that correspond to your
15   recollection?
16       A.   I don't believe it was.
17       Q.   By not in use I mean people weren't shooting.
18       A.   I understand what you're saying.  That's
19   correct.
20       Q.   Now, immediately after the first of the year
21   did a class come back and start shooting?
22       A.   Yes.
23       Q.   At that point I would like you to tell me what
24   did you observe in the shooting area in terms of smoke

38 (Pages 146 to 149)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A461

Price, et al.                                         v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                October 17, 2005

Page 150

1  and debris and that sort of thing at the point that
2  the shooting began in January?
3      A.   Pretty much the same thing, that there were
4  problems with the ventilation system, debris kept
5  accumulating and depositing it along the sides of the
6  building inside the range itself and behind the bullet
7  trap.
8      Q.   Was the face of the bullet trap starting to dry
9  up?  In other words, the water was not cascading down
10 as it should?
11     A.   Not as it should, no.
12     Q.   Did the situation continue to get worse through
13 January?
14     A.   I would say probably, yes.
15     Q.   At some point did you go to Sergeant Foraker
16 and ask him whether he thought it was advisable to
17 continue shooting in circumstances that were
18 deteriorating?
19     A.   I think that was part of our discussion, yes.
20     Q.   And what did he say?
21     A.   I can't recall exactly what his words were.
22     Q.   Do you remember what you said?
23     A.   No.  I just said that "This is something that
24 has to be resolved.  I mean, we're getting into a

Page 151

1  situation here that we got to deal with."
2      Q.   Were the environmental conditions at the range
3  worse in January 2004 than they had been in December
4  2003?
5      A.   I would probably say yes.
6      Q.   Were they worse in December 2003 than they had
7  been the previous summer?
8      A.   Yes.
9      Q.   So what we're dealing with is a continually
10 deteriorating situation, right?
11     A.   That's correct.
12     Q.   Now, in January 2004 do you recall either
13 yourself or any of the other officers at the range
14 saying to Sergeant Foraker "I think we should shut
15 this down" or words to that effect?
16     A.   Yes.  I think there was concern about operating
17 and we wanted, we really wanted help from facilities
18 management.
19     Q.   What do you mean help from facilities
20 management?
21     A.   We were operating in a building that we had no
22 training, no protective gear.  We had no, I mean no
23 background of what we were being exposed to.  They
24 employ an industrial hygienist.  They should have sent

Page 152

1  someone in to evaluate that building.  They should
2  have made a determination.  They have the scientific
3  knowledge to determine whether or not the building is
4  unsafe.
5          We had no knowledge other than common
6  sense.
7      Q.   In January 2004 it's my understanding from
8  reading various documents in the case that there was
9  reddish dust all over the place.  Is that something
10 that you recall?
11     A.   That's correct.
12     Q.   There was a haze in the shooting area.  Is that
13 correct?
14     A.   That's correct.
15     Q.   The air was in some cases blowing the haze back
16 towards the shooters.  Is that correct?
17     A.   That's correct.
18     Q.   People like yourself, for example, were getting
19 a penny taste in your mouth.  Is that something that
20 you experienced?
21     A.   Yes, I did.
22     Q.   And you heard reports from other people in the
23 building that experienced the same thing?
24     A.   Yes, I did.

Page 153

1      Q.   Was there any doubt in your mind that there was
2  something wrong with that building?
3      A.   None.
4      Q.   Now, did Sergeant Foraker have the authority as
5  the officer in charge, noncommissioned officer in
6  charge of the range to shut it down if he believes
7  it's unsafe?
8      A.   I'm not sure.
9      Q.   You're not sure?
10     A.   No.
11     Q.   Did you ever say to him that you thought maybe
12 we should shut it down because it's not safe?
13     A.   I just expressed a concern of health reasons
14 about what was going on there.
15     Q.   Did he ever suggest to you that it should be
16 shut down because it's not safe?
17     A.   I think we were all concerned about the health
18 and safety of everyone in that building.  But when we
19 called in facilities management, I posed that question
20 to Mark DeVore and asked him if it was safe to work in
21 the environment.  And he said the ventilation system
22 was working as designed and that was the engineer who
23 viewed that situation in January of 2004, along with
24 the industrial hygienist.  He observed the situation.

39 (Pages 150 to 153)

Price, et al.                                          v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1                C.A. # 04-956-GMS                   October 17, 2005

---

Page 154

1    If it was a serious concern, I think he
2  should have made a decision there. He's the one with
3  the qualifications. I'm not an industrial hygienist.
4  I'm a firearms instructor.
5    Q.  I do understand that and I'm not trying to make
6  you an industrial hygienist. But the facilities
7  management people were not responsible for the
8  day-to-day operation of the range, were they, in the
9  sense of putting state troopers in the range and
10 supervising their activities in the range?
11   A.  In that sense I agree with you, that's correct.
12   Q.  When DeVore, I think it was, said to you that
13 the HVAC system was working as intended, did you say
14 to him "But the bullet trap is not"?
15   A.  I just wanted to know if we were working in a
16 safe environment.
17   Q.  Well, did you ever point out to him that you
18 and the other FTU personnel had stopped doing the
19 maintenance of the water system in the back of the
20 bullet trap?
21   A.  Yes.
22   Q.  You told that to DeVore?
23   A.  Yes.
24   Q.  And when did you tell him that?

Page 155

1    A.  That would have been in January of I believe
2  2004.
3    Q.  When in January?
4    A.  I can't tell you the exact date.
5    Q.  Was it early or late January?
6    A.  I can't tell you the exact date.
7    Q.  Did he have a response to that when you told
8  him?
9    A.  He was asking questions about the situation at
10 the range and he wasn't real cooperative about
11 anything other than I asked him about the previous air
12 testing. I asked him if there was a baseline test
13 when we started using frangible ammunition.
14   Q.  I'm sorry. What do you mean "a baseline test"?
15 Of what?
16   A.  Of the air quality, what the air contained.
17   Q.  When you told him that you had stopped doing
18 the maintenance on the water system in the back of the
19 bullet trap, what was his response?
20   A.  I'm going to have to back up on that. I'm not
21 sure if I actually told him we had stopped doing any
22 maintenance on the water system at all. I'm not sure
23 that was discussed particularly. I'm not sure he even
24 asked that question.

Page 156

1    He observed the back of the range along
2  with Doyle Tiller. But whether or not that question
3  was asked, I'm not sure. They asked about the floor
4  scrubber, if the floor scrubber was being used.
5    Q.  And what did you tell him?
6    A.  No, it was not.
7    Q.  Why wasn't the floor scrubber being used? Is
8  that the thing that you guys called the Zamboni?
9    A.  That's correct.
10   Q.  Why was that not being used?
11   A.  Well, I'm not sure if it was up and running 100
12 percent. I can't recall that or not, but I know there
13 was a concern on once we got the effluent in the floor
14 scrubber what we were supposed to do with it.
15   Q.  By "the effluent" you mean the --
16   A.  The wastewater after it picks up the lead and
17 copper.
18   Q.  Well, what had you been doing with it for the
19 previous two-and-a-half years?
20   A.  I hadn't been doing anything with it because I
21 didn't operate the machine. I had no training, no
22 background in it whatsoever.
23   Q.  I understand that. Somebody operated the
24 machine?

Page 157

1    A.  Corporal Cathell usually operated that machine.
2    Q.  Do you know what he did with the water when he
3  was done?
4    A.  Do I know what he did with it?
5    Q.  Yes.
6    A.  I never saw him do it, but I think he dumped it
7  outside.
8    Q.  In the weeds?
9    A.  Right outside the range, yes, on the ground.
10   Q.  But you never saw him do it?
11   A.  I never saw him do it.
12   Q.  After Cathell left, did anybody use the
13 machine?
14   A.  I'm not sure, to be honest with you.
15   Q.  Would you agree with me that using frangible
16 ammunition and shooting it at that bullet trap when
17 it's dry exacerbates the HVAC problem?
18   A.  Would I agree with that?
19   Q.  Yes.
20   A.  Yes.
21   Q.  At any point did you have a discussion with
22 Sergeant Foraker or any of the other FTU troopers
23 wherein you suggested shutting down the range until
24 you could get a contractor in to do the work on the

---

40 (Pages 154 to 157)

Price, et al.                                          v.                               Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                    October 17, 2005

Page 158

1 bullet trap that you didn't feel competent to do or
2 capable of doing or safe doing?
3    A.   I think there was discussion about
4 discontinuing shooting, but I don't know what happened
5 with that information.
6    Q.   When you say there was discussion about
7 discontinuing shooting, among whom?
8    A.   Amongst the firearms instructors and the people
9 that were assigned to the range and I can't give you
10 everyone involved in the conversation, but Sergeant
11 Foraker was part of the conversation, yes.
12    Q.   Do you believe that Sergeant Foraker would have
13 the authority to shut down the range if he didn't
14 believe it was safe?
15       MR. NEUBERGER:  Well, that was asked and
16 answered.
17       But go ahead, you can answer.
18    A.   I believe he has the authority to shut down
19 the range?
20    Q.   Yes.
21    A.   I would think he would have to go through the
22 captain of the academy.  I think he would have to
23 consult with the captain of the academy who would
24 probably consult with the lieutenant colonel before

Page 159

1 that decision was made since he's ultimately in
2 charge.
3    Q.   Could you go back to Exhibit Papili 2, please?
4    A.   2 or 1?
5    Q.   Papili 2, which is this (indicating) one,
6 please.
7       Could you turn to page 11 which is where
8 we looked before?  I want you to read the fourth
9 paragraph down.  It's two sentences.  Just read it to
10 yourself for a minute.
11    A.   The fourth paragraph down?
12    Q.   Yes, the fourth paragraph on page 11.  It
13 begins "When we interviewed the Sergeant."
14    A.   (Reviewing document)  I'm finished.
15    Q.   Referring to the first sentence, do you agree
16 that that's an accurate description of what was going
17 on at the range in January 2004?
18    A.   Yes, I do.
19    Q.   Did you believe that it was a safety issue?
20    A.   Yes.
21    Q.   Did Sergeant Foraker ever tell you it was not a
22 safety issue?
23    A.   No.
24    Q.   Did he ever tell you it was perfectly fine to

Page 160

1 function in that environment?
2    A.   No.
3    Q.   Let me back up a second.
4       Did you ever have any discussion with
5 Captain Greg Warren concerning the health and safety
6 issues at the range?
7    A.   Yes.
8    Q.   And how many times did you talk to him about
9 health and safety conditions at the range?
10    A.   I couldn't -- I can't guess at that.
11    Q.   Do you remember when the first time was you
12 talked to him about it?
13    A.   No, I can't.
14    Q.   Was it after Chris Foraker had returned to the
15 range or was it before?
16    A.   I can't recall.
17    Q.   Do you remember when the last discussion you
18 had with him was?
19    A.   That was probably just before he left.  I mean,
20 the range was a concern and still is a concern.
21    Q.   Do you remember the substance of any of the
22 discussions you had with Captain Warren?
23    A.   The only thing I can actually remember was
24 Captain Warren asking about the composition of the

Page 161

1 bullets and making a statement that "I was told that
2 you were shooting ceramic ammunition and then I
3 received an MSDS and it stated that you were shooting
4 sintered copper."
5       That's about the only conversation that I
6 can actually say I remember him saying.
7    Q.   Was there anything more to it than that?
8    A.   I'm sure there was, but that's all I can
9 actually recall.
10    Q.   Okay.  Did you ever have any discussion with
11 Major Eckrich about the health and safety concerns at
12 the range?
13    A.   Yes.
14    Q.   How many times did you talk to him?
15    A.   Again, I couldn't even begin to guess at the
16 amount of times.
17    Q.   Was it more than once?
18    A.   Yes.
19    Q.   Do you remember when the first one was?
20    A.   No.
21    Q.   Did you ever have a discussion with Major
22 Eckrich, aside from the group meetings that you have
23 described at the academy or at the museum near
24 headquarters, about the conditions at the range?

41 (Pages 158 to 161)

Price, et al.                                          v.                                Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                    October 17, 2005

Page 162

1    A.   I'm sure I've talked to him about that
2    situation.
3    Q.   Have you talked to him one on one?
4    A.   There was a meeting at the range itself and I
5    can remember Bob Furman present and Major Eckrich was
6    present.  And we discussed the maintenance issues at
7    the range and I think he agreed or made a statement
8    that the range personnel shouldn't be in charge or
9    required to do the maintenance of the range.
10        Other than that, there were conversations,
11   but I can't recall.
12   Q.   Do you remember the substance of any other
13   discussion with Major Eckrich about health or safety
14   at the range?
15   A.   I remember discussing an issue about taking the
16   lead home to my family and contaminating my house.
17   Q.   Was that a conversation that you had with him
18   or was it an exchange of e-mails?
19   A.   Well, it was an exchange of e-mails, but I
20   think there was a conversation over that also.
21   Q.   Was that face to face or was it on the phone?
22   A.   I can't recall.
23   Q.   Do you remember the substance of the
24   conversation?

Page 163

1    A.   Just that I was concerned about contaminating
2    my home once we got the swipe samples back and we
3    started seeing how contaminated the entire building
4    was, including the places where we were changing our
5    clothes.
6    Q.   So you actually discussed this with Major
7    Eckrich?
8    A.   Yes.
9    Q.   What was the substance of it?
10   A.   I just voiced my concern.
11   Q.   What did he say?
12   A.   I'm not sure if he gave me a response or not or
13   he was going to look into it.  I can't recall.
14   Q.   Did you have any discussions with Major Papili
15   about health or safety at the range?
16   A.   I have had several discussions with Major
17   Papili, but I can't specifically remember any one time
18   where I discussed the issues of the range.  I'm sure I
19   did, but I can't remember.
20   Q.   How about Major Baylor?
21   A.   Again, I know I talked to him, but I can't
22   recall any specific conversation.
23   Q.   You have several times in the course of our
24   discussion today mentioned an investigation, you

Page 164

1    called it, into the range.
2    Q.   What are you referring to?
3    A.   When a recruit came forward and explained to me
4    and Corporal Price that we had serious health concerns
5    at the range, he inquired about what the composition
6    of the bullets were.  I couldn't give him an answer.
7    I couldn't, I couldn't tell him with 100 percent
8    certainty what the composition of the bullets were.
9    He had previous background with hazardous materials
10   and he said, "Well, I think that we need to, we need
11   to research this because some of the recruits are
12   complaining."
13        We sat down and we listened to him as to
14   what he had to say and we passed that information up
15   the chain of command.  Just talking to people in
16   facilities management, really it came after the first
17   meeting when we were trying to explain a very valid
18   concern and problem with the ventilation system.  And
19   I can remember it, that the state's engineer, Mark
20   DeVore, was trying to intimidate and he wasn't
21   concerned about what was going on.
22        And then the industrial hygienist said,
23   "Well, we never had a problem with this before."
24   Well, I had heard of previous problems at the range,

Page 165

1    so that kind of sparked my interest as to look a
2    little deeper as to what was going on with this
3    building and facility.  And I'm thinking well, all
4    these problems existed.  Why wasn't someone up on it
5    and why hasn't these problems -- why haven't the
6    problems been corrected and what are the problems in
7    this building?
8         So being an investigator, I started
9    looking around a little bit.  The first thing I did
10   was I went back and I checked the panel in the
11   building, the electrical panel.  It had a final
12   inspection sticker on it.  There were no other
13   previous inspections performed and I just thought that
14   was kind of suspicious that there wasn't a subpanel or
15   a rough-in inspection performed on that electrical
16   panel.  The electricians are usually pretty good with
17   their inspections and following the building codes.
18        So I thought well, do you know what?  We
19   really need to talk to someone about this building.
20   And we started looking into the building.  We called
21   the county to obtain any records that they may have
22   had.  Since the building was constructed in New Castle
23   County, we thought surely we would have a building
24   permit issued there.  We would have the inspections

42 (Pages 162 to 165)

A465

Price, et al.                                    v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                      October 17, 2005

Page 166

1  that were performed and we would have a certificate of
2  occupancy and when the certificate of occupancy was
3  issued.
4        We were thrown off a little bit with that
5  and then we were finally told that there was never a
6  certificate of occupancy issued for that building.
7  Actually, there was never a building permit issued to
8  construct the building. So that really provoked my
9  interest a little bit more and I thought do you know
10  what? Something is really wrong here. The State of
11  Delaware, we are a Department of Public Safety. Why
12  aren't we following the rules?
13       So from that point on we started looking
14  at every aspect of the building.
15    Q.  Well, what other aspects of the building did
16  you look at? Who is the "we," by the way?
17    A.  Members of the firearms training unit.
18    Q.  So what other aspects of the building were you
19  looking at?
20    A.  Well, we checked out to see if the fire marshal
21  had performed an inspection, and he didn't. And I
22  just found that kind of odd, since we're housing
23  ammunition and explosives, that the fire marshal
24  wouldn't do an inspection on that building.

Page 167

1        So we asked for the information from the
2  Fire Marshal's Office and we got stonewalled there a
3  little bit until their attorneys reviewed our request
4  or my request. I gave him a written request for any
5  information that they may have on the building and the
6  only thing they had was a letter requesting a
7  sprinkler exemption from the range, which they
8  granted.
9    Q.  What else did you look at?
10    A.  The letter that didn't contain the ammo storage
11  room in that request and why the room designations
12  were not on that letter.
13    Q.  Okay. What else?
14    A.  If there had been any previous problems with
15  the building. Why wasn't the air being monitored?
16    Q.  You knew that there had been previous problems
17  with the building, didn't you?
18    A.  Yes. But I didn't see anything in writing
19  where any scientific test had been conducted and no
20  one was monitoring the air in the building.
21    Q.  Anything else that you did as part of this
22  investigation?
23    A.  Yes.
24    Q.  What? Just what else?

Page 168

1    A.  Well, we started -- we got that information,
2  found out that the air had been monitored and tested
3  in November of '98 by a company by the name of Batta,
4  that the air quality was over the OSHA limit for lead,
5  requested swipe samples to be done in the building by
6  Environmental Solutions.
7        They performed the swipe sampling and
8  levels came back all over the building that were
9  higher than what they should have been to OSHA
10  standards, reported the information. They brought in
11  Harvard Environmental and they redid the same type of
12  swipe testing procedures. And, again, it got the same
13  results: The building had contaminants throughout
14  that exceeded the OSHA limits.
15    Q.  What year was this done?
16    A.  That was in 2004. And then we were just
17  researching the building. How did this all happen?
18  And we found out that the bidding process or the
19  selection of the architectural engineering firm was
20  skewed and the wrong company actually received the
21  bid. They designed the building and it wasn't going
22  to work.
23        They had an expert who looked at the
24  ventilation system plans and said that it would fail

Page 169

1  and explained to them in writing that it was going to
2  fail prior to it being constructed. And we found a
3  letter from Randall Hair, an OSHA consultant, and
4  Traci Trunzdale, an OSHA consultant also, that
5  explained what they should do about the ventilation
6  system and also that they should be concerned about
7  the decibel level of noise in that type of building
8  and recommendations made to control those things.
9    Q.  Anything else that you found?
10    A.  Well, I think it's all contained or a lot of it
11  is contained in the auditor's report there.
12    Q.  I do recognize that. I'm just seeing what you
13  remember.
14        Do you remember anything more than what
15  you just described?
16    A.  I'm sure I'm going to forget a lot of things
17  because it's a rather large investigation containing a
18  few thousand documents. We looked at the ventilation
19  system, that there were modifications made to the
20  ventilation system, that there were problems since day
21  one with the ventilation system. It was never checked
22  or passed or inspected prior to turning it over to the
23  State Police for our use. The air wasn't monitored
24  constantly.

43 (Pages 166 to 169)

Price, et al.                                                                    v.                                                Chaffinch, et al.
Wayne H. Warren, Volume 1                                   C.A. # 04-956-GMS                                    October 17, 2005

Page 170

1    Once we had a problem, the solution to the
2  problem was switching to frangible ammunition.  I
3  don't think there was any investigation as to what
4  cause the frangible ammunition would have to the
5  bullet trap that was initially installed.
6    Also, the ventilation system itself, the
7  HVAC system was modified several times and there was
8  no scientific testing conducted to prove that it was
9  operating correctly.  We took someone's word for it.
10  And we were in a poisonous building all the time in my
11  opinion.
12    Q.  Who was responsible for the decision to go to
13  frangible ammunition?
14    A.  I'm not sure.  And I know there was no baseline
15  testing performed when we switched to frangible
16  ammunition.  No one came in to test the air to see how
17  much contaminants were in the air at that point in
18  time when we switched over.  So we switched over to
19  frangible ammunition and we never received a baseline
20  air quality test to see how much dust was being
21  generated by shooting that ammunition.  That was never
22  performed.
23    And if we're shooting mostly frangible
24  ammunition and sintered copper ammunition, why were we

Page 171

1  only getting our blood serum checked for lead when we
2  were actually breathing probably more copper?  And was
3  copper controlled?  It was controlled we found out.
4  Why weren't we getting a blood serum test for copper
5  and zinc also that was contained in the ammunition?
6    And one thing led to another and one thing
7  led to another.  What was the decibel levels of the
8  range or the work environment?  No one could tell us.
9  Therefore, we couldn't figure out a time weighted
10  average of exposure.
11    How long could we actually work in that
12  environment?  No one told us that.  No one knew what
13  the decibel level protection were for the earmuffs and
14  the earplugs.  We were operating in a dangerous
15  building without any equipment or any training.  No
16  one told us that we were working in such a dangerous
17  environment.
18    And I checked with the State Police to
19  find out who was responsible, was there a right-
20  to-know officer, and I was told we didn't have a
21  right-to-know officer.  And one thing led to another.
22  I mean, it was just like why are you doing this to us?
23    And then we're trying to correct the wrong
24  and then we're being retaliated against further.

Page 172

1  We're being stymied.  We're not allowed to come to the
2  meetings to discuss problems on the range.  So one
3  thing led to another.  There's so much in the
4  investigation and that's what I am calling it, an
5  investigation, because that's what it is.  We looked
6  into documents and information.  I can't figure out
7  why they would treat someone that way.
8    Q.  At any point have you been tested for your
9  serum level of copper?
10    A.  Yes.
11    Q.  Did it ever test outside of the normal limits?
12    A.  It was considered high normal.
13    Q.  It was below the threshold of being high,
14  wasn't it?
15    A.  That's correct.
16    Q.  How about for zinc, were you ever tested for
17  zinc?
18    A.  Yes.
19    Q.  Have you ever tested outside of the normal
20  limits?
21    A.  Yes.  The first time I was tested.  And I think
22  actually it was the only time I have been tested.
23    Q.  Have you ever had a doctor tell you that the
24  zinc had caused you any health problems?

Page 173

1    A.  No.
2    Q.  How about the copper?
3    A.  No.
4    Q.  In other words, no doctor has ever told you
5  you had a health problem?
6    A.  The only thing a doctor told me about copper is
7  he said it wasn't my liver's friend and that was
8  Dr. Green of Health Works.
9    MR. NEUBERGER:  Ed, we have been going for
10  an hour and a half.  Could we take a break?
11    MR. ELLIS:  Sure.
12    MR. NEUBERGER:  Thank you.
13    (A brief recess was taken.)
14    MR. ELLIS:  Can you mark that one?
15    (Defendant's Deposition Exhibit No. 2 was
16  marked for identification.)
17  BY MR. ELLIS:
18    Q.  Could you take a look at what I have asked the
19  court reporter to mark as D-2 and tell me if that's a
20  document you're familiar with?  It's got Delaware
21  State Police Firearms Training Range Current Range
22  Status And Analysis written on the front with the name
23  of Captain Gregory A. Warren, 01/30/04.
24    A.  (Reviewing document).

44 (Pages 170 to 173)

Price, et al.                                   v.                                   Chaffinch, et al.
Wayne H. Warren, Volume 1                  C.A. # 04-956-GMS                     October 17, 2005

Page 174

1    Q.   Are you familiar with this document?
2    A.   Yes.
3    Q.   Did you write any part of it?
4    A.   No.  I don't know if I provided any information
5    for him.
6    Q.   That was my next question.
7         Did you provide any information to Captain
8    Warren for this report?
9    A.   I'm unsure, unless I would read the whole
10   report.
11   Q.   Well, take a look at it for a few minutes
12   anyway.
13   A.   (Reviewing document).
14   Q.   Let me ask you a question preliminarily.
15        Did you become aware in January 2004 that
16   Lieutenant Colonel MacLeish had asked Captain Warren
17   to prepare a report on problems at the range and what
18   could be done about them?
19   A.   No.
20   Q.   You're not aware of that?
21   A.   No.
22   Q.   You can take a look at the page of this
23   document that says Chronology, it starts with
24   Chronology of Events.  There are no page numbers on

Page 175

1    the document, but it's the sixth page I think of the
2    document.  It starts on the top Chronology of Events.
3         Another way of looking at it is the third
4    page up from the back.
5    A.   I didn't go back far enough.  Sorry.
6    Q.   The bottom paragraph on that page begins
7    "Captain Warren responded to the Range on January 20
8    to meet with the Range staff."
9         Do you see that?
10   A.   Yes.
11   Q.   Do you recall a meeting you had with Captain
12   Warren at the range concerning the multiple concerns
13   raised at the facility?
14   A.   Yes.  I remember the meeting.  I don't remember
15   a whole lot of what was said other than about
16   Environmental Solutions.
17   Q.   Do you recall whether Environmental Solutions
18   had done testing there or not?
19   A.   At that point?
20   Q.   Yes.
21   A.   I'm not sure.
22   Q.   Was that the company that Mr. Farrell worked
23   for?
24   A.   Yes.

Page 176

1    Q.   Was Mr. Farrell at that meeting?
2    A.   I'm not sure if he was at the meeting or not.
3    Q.   Do you recall anything that happened at that
4    meeting?
5    A.   No.  Because there were so many different
6    meetings and things that were happening.  If this was
7    the original meeting, we expressed our concerns to
8    Captain Warren and we requested Environmental
9    Solutions to come in and do a swipe sample.
10   Q.   Well, it would appear that Environmental
11   Solutions was actually at the building this day, would
12   it not, based on Captain Warren's memo?
13   A.   That's correct.  But I don't know if they were
14   there to meet with him after our meeting or if the
15   meeting included them with all of us present.
16   Q.   If you go over on to the next page, please,
17   beginning in the third paragraph is a series of what
18   appear to be actions that Captain Warren is telling
19   the staff are going to be taken.  I would like to go
20   through them with you.
21        "Contact Environmental Solutions to
22   initiate the air quality testing."  Is that something
23   that actually happened?
24   A.   I believe it did.

Page 177

1    Q.   Number 2, "Contact Carey's Heating and Air
2    Conditioning."
3         Did that actually happen?
4    A.   Yes.
5    Q.   Number 3 is "Pilot and R&D the 'clean fire'
6    round."
7         Did that occur?
8    A.   I can't recall that one.
9    Q.   What do you understand a "clean fire" round to
10   be?
11   A.   It was lead-free.
12   Q.   Is that the same type of ammunition that the
13   FBI uses?
14   A.   I believe it is.
15   Q.   So that's the same thing that looks like the
16   chain?
17   A.   A spring or a chain.
18   Q.   You think that is the same thing?
19   A.   I believe so.
20   Q.   "Identify alternate sites" is number 4.
21        Is that something that happened?
22   A.   Yes.
23   Q.   Number 5 is "All staff and students will
24   immediately start wearing paper air mask."

45 (Pages 174 to 177)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Price, et al.                                    v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1            C.A. # 04-956-GMS              October 17, 2005

---

Page 178

1        Did that occur?
2    A.  No.
3    Q.  Do you recall a discussion of that?
4    A.  Yes.
5    Q.  What did Captain Warren say about the paper air
6  masks?
7    A.  He said that authority, Lieutenant Colonel
8  MacLeish, that we would all have to start wearing
9  paper dust masks.
10   Q.  Did he tell you how that came up in the
11  conversation with Lieutenant Colonel MacLeish?
12   A.  He basically told us we were going to have to
13  start wearing dust masks.
14   Q.  That's all he said?
15   A.  That's all I can recall that he said.
16   Q.  Did you actually start doing it?
17   A.  No.
18   Q.  How did you learn that the range was going to
19  be shut down?
20   A.  I think we received the swipe sampling back
21  from Environmental Solutions.  We had two different
22  samplings conducted, one with Environmental Solutions
23  and one by Harvard Environmental.  And I think it was
24  the one that we received from Environmental Solutions

---

Page 179

1  in a letter from Art Nielson, who was an industrial
2  hygienist, that recommended that the range be closed
3  after he reviewed the swipe sampling.  And I'm not
4  sure if the air test was done at that point or not.
5    Q.  Did somebody in the State Police have to tell
6  you that the range was being shut down?
7    A.  Yes.
8    Q.  Who was it that told you?
9    A.  I can't recall.
10   Q.  Did you learn it from Sergeant Foraker?
11   A.  I can't recall.
12   Q.  I have another document to show you.
13       MR. ELLIS:  I am going to ask the court
14  reporter to mark that as No. 3.
15       (Defendant's Deposition Exhibit No. 3 was
16  marked for identification.)
17  BY MR. ELLIS:
18   Q.  My question is going to be whether you're
19  familiar with that document.
20       By the way, the document in terms of
21  description has on the front cover Delaware State
22  Police Firearms Training Facility Responsibility
23  Status Analysis, Sergeant Christopher D. Foraker,
24  02/09/04.

---

Page 180

1    A.  (Reviewing document)  I've probably seen this.
2    Q.  Did you participate in preparing it?
3    A.  I don't know if anything was used that I had at
4  this point.
5    Q.  Did you write any part of it?
6    A.  No.
7    Q.  When was the first time you talked to anybody
8  in the State Police above you in the chain of command
9  about your hearing problem?
10   A.  I can't recall the exact time that that
11  happened.
12   Q.  Do you recall ever raising your personal
13  hearing issue with anyone inside the State Police?
14   A.  I'm sure that I made the comment after my wife
15  told me that I should get a hearing test in the office
16  area, but I think -- I can't remember when I went to
17  human resources and asked Kristy Tuxward what I had to
18  do about the problem.
19   Q.  You recall going and talking to Kristy Tuxward
20  about your hearing problem?
21   A.  Right.
22   Q.  You have no recollection of when that was?
23   A.  (Witness shakes head).
24   Q.  You have previously described a meeting that

---

Page 181

1  occurred at the museum, at the State Police Museum?
2    A.  That's correct.
3    Q.  You don't, by any chance, recall that meeting
4  occurring on March 17th, 2004, do you?
5    A.  No.
6    Q.  Do you recall whether at that meeting Sergeant
7  Foraker told the lieutenant colonel, which would have
8  been MacLeish at the time, that you and Corporal Price
9  were having hearing trouble?
10       MR. NEUBERGER:  I'm sorry.  Did you say
11  March 14th of '04 or did you mean '05?
12       MR. ELLIS:  I meant March 17, '04.
13       MR. NEUBERGER:  And you're saying in March
14  of '04 Sergeant Foraker --
15       MR. ELLIS:  Yes, March 17, '04 is the
16  date.  If I screwed up the date, I'm sorry.
17       MR. NEUBERGER:  No.  I am confused.  I
18  got you now.  I'm with you.
19  BY MR. ELLIS:
20   Q.  Do you recall at that meeting whether Sergeant
21  Foraker raised with the lieutenant colonel the
22  question of your hearing?
23   A.  No, I do not.  I can't recall that.
24   Q.  You have no recollection one way or another?

---

46 (Pages 178 to 181)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

A469

Price, et al.                                              v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                      October 17, 2005

Page 182

1    A.   None.
2    Q.   You're not saying it didn't happen; you just
3   don't remember?
4    A.   I don't remember, that's correct.
5    Q.   Do you remember anybody else at that meeting
6   raising the question of your and Corporal Price's
7   hearing?
8    A.   No.
9    Q.   You were tested first for hearing by Omega.  Is
10  that right?
11   A.   No.
12   Q.   Which is the first doctor that tested you for
13  your hearing?
14   A.   On which occasion?
15   Q.   Well, beginning in the beginning of 2004.  In
16  other words, this whole issue of the range starts up
17  in early 2004 and I know that you had a series of
18  tests of your hearing.
19       What was the first one that you can
20  recall?
21   A.   I think that was March 1st, I believe, at Omega
22  Medical.
23   Q.   So the first one was at Omega?
24   A.   That's correct.

Page 183

1    Q.   And how did you come to go to Omega?
2    A.   We were discussing issues with Joe Farrell of
3   Environmental Solutions and we were concerned that
4   Bayhealth maybe was not as adequate in our exposure to
5   heavy metals or any other hazardous materials that we
6   may be exposed to.  And we asked him who his
7   technicians had to go see or who oversaw the program
8   at Environmental Solutions since those people were
9   being exposed to pretty much a lot of the same things
10  we were since they were removing that hazardous
11  material from the range.
12       He recommended Omega Medical and said that
13  they would do a pretty good job; that they do the work
14  on employees of Environmental Solutions.  So that's
15  how we ended up going to Omega Medical.
16   Q.   Did somebody at the firearms training unit
17  arrange for the State Police to pay for Omega?
18   A.   I believe so, yes.
19   Q.   Was that you that set that up?
20   A.   I don't recall.
21   Q.   So you were tested by Omega for blood lead
22  levels?
23   A.   Mm-hmm.
24   Q.   Yes?

Page 184

1    A.   Yes.
2    Q.   And you were also tested for I guess the blood
3   copper level?
4    A.   Yes.
5    Q.   Also zinc?
6    A.   Yes.
7    Q.   And you had your hearing tested as well?
8    A.   Yes.
9    Q.   What else was tested?  Anything else that's
10  pertinent to the conditions at the range?
11   A.   Cardiopulmonary function test, chest X-ray.
12       I'm not sure what else.  Those are the
13  things that I can remember.
14   Q.   What did the result come back in terms of your
15  hearing?
16   A.   I had high frequency.
17   Q.   High frequency hearing loss?
18   A.   Loss, mm-hmm.
19   Q.   What was the next step in getting your hearing
20  tested?
21   A.   (Pause).
22   Q.   Let me back up a second.
23       Who was the next doctor that you saw about
24  your hearing?

Page 185

1    A.   I'm not sure if it was Dr. Cooper at that
2   point.
3    Q.   Was it either Dr. Cooper or Dr. Green?
4    A.   Yes.  Or I could have been sent back to Omega
5   for another test.  And that's where it's confusing
6   because there's Bayhealth or Omega, Dr. Cooper
7   somewhere along the line, Dr. Green.  Well, he
8   actually did the fitness for duty exam.  And then I
9   was sent back to Omega to get a second test and also
10  to fill out a questionnaire by a company by the name
11  of the TK Group.
12       And I can't remember in what order I did
13  that.
14   Q.   Now, the Omega examination concluded that you
15  had high frequency hearing loss, right?
16   A.   That's correct.
17   Q.   And Dr. Cooper concluded the same thing, right?
18   A.   That's correct.
19   Q.   And Dr. Green in his fitness for duty exam
20  concluded the same thing, right?
21   A.   That's correct.
22   Q.   And did you ever get a result when you went
23  back to Omega from the examination by the TK Group?
24   A.   Yes.

47 (Pages 182 to 185)

A470

Price, et al.                                    v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                      October 17, 2005

Page 186

1    Q.   And what was that conclusion?
2    A.   That I had high frequency hearing loss, but it
3    was domestic related.
4    Q.   Domestic as opposed to work related?
5    A.   That's correct.
6    Q.   So by "domestic" it would include shooting
7    hunting rifles or hunting shotguns; it doesn't
8    necessarily have to do with something that happens in
9    your house?
10   A.   I don't really know what it meant because no
11   one ever talked to me about it.  I got it in a letter.
12   Q.   Now, you were also sent to see Dr. Emmett at
13   the University of Pennsylvania, right?
14   A.   That's correct.
15   Q.   Did anybody ever explain to you why you were
16   going to see Dr. Emmett?
17   A.   It was a second opinion from Dr. Green.  And
18   also Dr. Green after he made the statement that copper
19   is not your liver's friend he recommended that we be
20   checked out by someone else.
21   Q.   By the way, have you had your liver checked
22   out?
23   A.   No.
24   Q.   In none of these tests did you ever have your

Page 187

1    liver checked out?
2    A.   Not to my knowledge.
3    Q.   Have you ever had any kind of a test that said
4    that you had a problem with your liver?
5    A.   Not that I know of.
6    Q.   Let me show you what I will mark as No. 4.
7         (Defendant's Deposition Exhibit No. 4 was
8    marked for identification.)
9    BY MR. ELLIS:
10   Q.   Are you familiar with Exhibit D-4?  This is a
11   letter from Dr. Edward A. Emmett from the University
12   of Pennsylvania Medical Center to Captain Yeomans at
13   the State Police.
14   A.   (Reviewing document)  I'm familiar with this.
15   Q.   Who did you get a copy of this from?
16   A.   Captain Yeomans.
17   Q.   Now, did you have a discussion with Captain
18   Yeomans about it when he gave it to you or after he
19   gave it to you?
20   A.   I'm certain that I did.
21   Q.   Do you remember the substance of the
22   discussion?
23   A.   No.
24   Q.   Look at the last page of the letter.

Page 188

1         Do you see where at the top of the last
2    page Dr. Emmett says, quote, "To be certain about his
3    inability to meet the requirements for a Delaware
4    State Trooper I would recommend that he undergo
5    functional hearing testing from Ms. Sherrie Davis at
6    the Hospital of the University of Pennsylvania"?
7         Did you, in fact, undergo a functional
8    hearing test?
9    A.   Yes, I did.
10   Q.   Why did you do that?
11   A.   I was ordered to do so by the division.
12   Q.   Did you understand that if you had a certain
13   performance in the functional hearing testing that you
14   would be allowed to continue work?
15   A.   I'm sorry?
16   Q.   Excuse me.  Just wait one second, please.
17        Did you understand that Dr. Emmett in this
18   letter that's marked Exhibit D-4 had concluded that
19   you were not capable of meeting the requirements of
20   performing the job of a Delaware State Trooper?
21   A.   Yes.
22   Q.   And why did you understand, what was your
23   understanding as to why he wanted you to go through
24   the functional hearing test?

Page 189

1    A.   To see if I could hear in a controlled
2    environment.
3    Q.   It's a different kind of test than the typical
4    tone test, right?
5    A.   Yes, it is.
6    Q.   Was it your understanding that if you could
7    perform on the functional hearing test you would be
8    able to continue as a Delaware State Trooper?
9    A.   Yes.
10   Q.   You went and did the functional test, right?
11   A.   That's correct.
12   Q.   And then let me show you No. 5.
13        (Defendant's Deposition Exhibit No. 5 was
14   marked for identification.)
15   BY MR. ELLIS:
16   Q.   Exhibit D-5 is a letter dated February 24, 2005
17   from Dr. Emmett to Captain Yeomans.
18        Have you seen that before?
19   A.   Yes.
20   Q.   Where did you receive this?
21   A.   From Captain Yeomans.
22   Q.   Did you have a conversation with Captain
23   Yeomans as a result or at the point that you received
24   this?

48 (Pages 186 to 189)

Price, et al.                                    v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                    October 17, 2005

Page 190

1   A.   I recall some of the conversation.
2   Q.   Did this letter surprise you?
3   A.   Yes, it did.
4   Q.   Why?
5   A.   Because I know I have trouble with my hearing,
6   but most of my trouble is in a noisy environment so if
7   I have background noise, I'm incapacitated.  And
8   that's why I went to get my hearing checked in the
9   first place.  I mean, I knew I had a hearing problem.
10        And this test is really an outdated test.
11  It's for hearing aid candidates.  It's really not for
12  troopers and there were no standards set by the State
13  Police to even measure what this was.
14  Q.   Prior to your having your hearing tested by
15  Omega on March 1, 2004, did you believe you were
16  capable of performing the duties of a Delaware State
17  Trooper?
18  A.   In what capacity?  I don't understand what
19  you're asking.
20        Could I function as a Delaware State
21  Trooper?  Is that what you're asking me?
22  Q.   Yes.
23  A.   Yes.
24  Q.   Now, when you asked me the question in what

Page 191

1   capacity, what do you mean by that?  Are you saying
2   that you're recognizing that the job of a firing range
3   instructor is different from the job of a sergeant in
4   the human resources department?
5   A.   Yes.
6   Q.   Did you believe at the point that you -- I'm
7   sorry.  Let me back up a second.
8        You've testified previously that you were
9   active on the SORT team?
10  A.   Yes.
11  Q.   And you still are or you're still at least
12  carried on the SORT team?
13  A.   I'm carried on the SORT team.
14  Q.   And that during the spring of 2004, during the
15  spring of 2004 were you still going on SORT missions?
16  A.   Yes.
17  Q.   Before you were tested, did you believe that
18  you could be a SORT officer as part of your duties?
19        In other words, were you capable given
20  what you believed to be some hearing problems of
21  performing as a SORT officer?
22  A.   In certain capacities.
23  Q.   What do you mean by that?
24  A.   If I weren't relying on my hearing 100 percent,

Page 192

1   if that wasn't a part of the job, if I were an
2   administrative officer or I dealt with supplies or
3   equipment or training, to evaluate things, yes, I
4   think I could do that.
5   Q.   But you don't believe that you could -- let me
6   make sure you understand the question.
7        Prior to March 1, 2004 did you believe
8   that you could be on a SORT mission where you would be
9   breaking down doors or undertaking surveillance of a
10  dark building or apprehension of a dangerous suspect?
11  A.   I think I would have been limited.
12  Q.   You continued to do that type of thing up until
13  June of 2004 though, didn't you?
14  A.   No.
15  Q.   You said that you did your last SORT activity I
16  think on June 17th, 2004?
17  A.   June 17th, 2004, that evening.
18  Q.   What was the job?
19  A.   To recon or surveil a mobile home where we were
20  going to execute a search warrant the following
21  morning.  So all I would do is a physical drawing of
22  the area, assess the area, determine the amount of
23  exterior perimeter personnel that would be needed,
24  what we would have to do with the roadway.

Page 193

1        Basically, I surveyed the area in a
2   vehicle with an undercover officer.
3   Q.   When's the last time you were actively involved
4   with a SORT operation that was going to take down a
5   suspect?
6   A.   Probably during that same year.
7   Q.   Early 2004?
8   A.   Mm-hmm.
9   Q.   After March 2nd?
10  A.   I'm not sure.
11  Q.   After you had the first test result back from
12  Dr. Emmett, this is Exhibit 4, did you believe that
13  you were capable of performing the duties of a road
14  trooper?
15  A.   No.
16  Q.   Did you believe you were capable of performing
17  the activities of a firearms training unit instructor?
18  A.   According to Dr. Emmett, no.
19  Q.   Well, how about according to you?
20  A.   I didn't want to incur any more hearing loss,
21  no.
22  Q.   After you received Exhibit D-5, you then went
23  back up to see Dr. Emmett again, right?
24  A.   That's correct.

49 (Pages 190 to 193)

A472

Price, et al.                                    v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

Page 194

1  Q.  And you had a conversation with him?
2  A.  Yes, I did.
3  Q.  How long did it last?
4  A.  I have no idea.
5  Q.  Was it in his office in Philadelphia?
6  A.  Yes, it was.
7  Q.  Do you remember what you said to him?
8  A.  Yes, I do.
9  Q.  What did you say to him?
10  A.  I wanted him to explain the functional hearing
11  test to me and also explain the audiogram.  He
12  couldn't explain the functional hearing test.  I said
13  I have researched this in-depth and I learned that a
14  functional hearing test is a lot different than a
15  hearing and noise test, a HINT test, which is given to
16  police officers and firefighters in the State of
17  California as a mandatory hearing test.
18       And the reason why they give them a
19  hearing and noise test is because anyone with high
20  frequency hearing loss will not be able to hear in a
21  noisy environment.  And since police officers usually
22  deal with noisy environments and that's a safety
23  issue, I was very concerned over my safety, health and
24  welfare and any of the officers that would be relying

Page 195

1  on me.
2  Q.  At the point that you saw Dr. Emmett the second
3  time, which I gather from Exhibit 6 -- I guess I might
4  as well have marked Exhibit 6 at this point.
5       (Defendant's Deposition Exhibit No. 6 was
6  marked for identification.)
7  BY MR. ELLIS:
8  Q.  I take it that your second meeting with
9  Dr. Emmett was on March 18, 2005?
10       MR. NEUBERGER:  This says 16th in the
11  first sentence.  Do you see that?
12       MR. ELLIS:  I'm sorry.  You're
13  right.
14  BY MR. ELLIS:
15  Q.  March 16th, 2005?
16  A.  Yes.
17  Q.  That was the date of your second meeting?
18  A.  Third meeting.
19  Q.  Third meeting.  Okay.  Did you meet with
20  Dr. Emmett the second time you went up?
21  A.  No, I did not.
22  Q.  So you met with the audiologist?
23  A.  That's correct.  My mistake.
24  Q.  You were on light duty at this point, right?

Page 196

1  A.  That's correct.
2  Q.  Did you want to come off of light duty and be
3  available to be assigned generally within the force?
4  A.  Yes.
5  Q.  You did want to come off of light duty?
6  A.  Yes.
7  Q.  But you don't believe that you would have been
8  capable of performing as a road trooper, right?
9  A.  That's correct.
10  Q.  You don't believe that you would have been
11  capable of performing in the firearms training unit,
12  right?
13  A.  In the capacity as you stated as a firearms
14  trainer, no.
15  Q.  Well, that's what you're doing is firearms
16  training though, isn't it?
17  A.  That's correct.
18  Q.  So what you wanted, I take it, is to be cleared
19  for full duty but not to be put in certain
20  assignments?
21  A.  Yeah.  Actually, I wanted to be accommodated as
22  a lot of other troopers are in the Delaware State
23  Police who have injuries.
24  Q.  But you didn't want to be available for certain

Page 197

1  functions?
2  A.  I was concerned for my safety and the safety of
3  other troopers if I were put in situations that I knew
4  I could fail.
5  Q.  Did you get a copy of Exhibit 6?
6  A.  Yes.
7  Q.  Who did you get it from?
8  A.  Captain Yeomans.
9  Q.  All right.  Now, you said that you wanted to be
10  accommodated like a lot of other troopers had been
11  accommodated.
12       Can you give me the names of these other
13  troopers who have been accommodated?
14  A.  Well, ones with hearing loss would be Major
15  Joseph Forrester and Lieutenant Charles Klim.
16  Q.  Anybody else?
17  A.  Well, there are several other officers who have
18  injuries, but those are the two that I know of with
19  hearing disabilities.
20  Q.  Okay.  Do you know of any other corporals that
21  were accommodated with hearing loss?
22  A.  Corporals?
23  Q.  Yes.
24  A.  Not to my knowledge I don't.

50 (Pages 194 to 197)

A473

Price, et al.                                    v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                    October 17, 2005

Page 198

1   Q.   Who was Lieutenant Klim?  What was his job?
2   A.   He was in charge of IA at one time or he worked
3   with internal affairs at one time.
4   Q.   When did he retire?
5   A.   I have no idea.
6   Q.   Did he work past 1995?
7   A.   I have no idea.
8   Q.   Did you know the guy?
9   A.   I know him, yes.  I knew who he was and I knew
10  that he had hearing problems.
11  Q.   How did you know that he had hearing problems?
12  A.   Just through talk with the State Police.
13  Q.   Did he ever tell you that he had hearing
14  problems?
15  A.   No.
16  Q.   Was he ever given light duty for a hearing
17  problem?
18  A.   I have no idea.
19  Q.   So it's basically somebody that you have heard
20  about that you heard had hearing problems?
21  A.   That's correct.
22  Q.   How long did you want the State Police to put
23  you in a job where you wouldn't be exposing yourself
24  or other people to danger?

Page 199

1   A.   I planned on working until I was 55.
2   Q.   So you just expected the State Police to put
3   you in that kind of a job for as long as you wanted
4   to?
5   A.   I just wanted the same treatment as other
6   troopers before me.
7   Q.   Tell me another trooper who was allowed to work
8   to 55 who wasn't capable of performing the job of a
9   road trooper.
10  A.   Major Joseph Forrester.
11  Q.   Aside from that.
12  A.   That's with the hearing issue.  We have a
13  Sergeant Steve Swaine, who's been in evidence at Troop
14  4 and he's still on the job, currently on the job.
15  Q.   What's Wayne's problem?
16  A.   He has a voice problem.
17       And I think there were other people listed
18  in the interrogatories that we submitted or should
19  have been.
20  Q.   What's Wayne's rank?
21  A.   He's a sergeant.
22  Q.   Do you believe he was placed there to
23  accommodate the fact that he has a voice problem?
24  A.   I know he was.

Page 200

1   Q.   How do you know that?
2   A.   He had an accident and his voice is cracking.
3   He's very hard to understand.  One of the things that
4   we have to be able to do is communicate, the same job
5   function that I would have to be able to do using your
6   senses.
7   Q.   Why do you think he was put there as an
8   accommodation?
9   A.   Because he can't effectively communicate with
10  the public.  He has problems speaking.
11  Q.   I understand that you think he has problems
12  speaking.  But did somebody tell you that he was put
13  there as an accommodation?
14  A.   When it happened and when he came back to work
15  they said well, they're going to put him in the
16  evidence detection unit.
17  Q.   But who told you that he was put there because
18  he had trouble communicating?
19  A.   That was just the, just the talk of the
20  division.
21  Q.   Oh.
22  A.   From personal observation I know he can't speak
23  that well.
24  Q.   Okay.

Page 201

1          MR. ELLIS:  Can I take a break for a
2   minute?
3          (A brief recess was taken.)
4   BY MR. ELLIS:
5   Q.   Were you present at the range on the date when
6   there was a media tour?
7   A.   No, I was not.
8   Q.   Were you present at the range at any point when
9   Gloria Homer went through?
10  A.   No, I was not.
11  Q.   Were you present when Colonel Chaffinch went
12  through?
13  A.   Yes, I was.
14  Q.   And who was Colonel Chaffinch with the day he
15  went through?
16  A.   Lieutenant Colonel MacLeish, Secretary Mitchell
17  and Governor Minner.
18  Q.   When was that?
19  A.   I'm bad with dates.  2004.
20  Q.   Anybody other than those four people, Chaffinch
21  MacLeish, Mitchell and Minner?
22  A.   Governor Minner, Secretary Mitchell, Colonel
23  Chaffinch, Lieutenant Colonel MacLeish, I believe
24  Major Eckrich and I believe Secretary Mitchell had

51 (Pages 198 to 201)

Price, et al.                                    v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

Page 202

1  someone with him. He came there on two occasions, so
2  I'm not -- I know on one occasion he had someone with
3  him and I thought on the second occasion he had
4  someone also.
5      Q.  Were you part of the tour?
6      A.  Yes, I was.
7      Q.  What were you doing as part of the tour?
8      A.  I was explaining to them what had happened at
9  the range.
10     Q.  Did you take them all around the entire
11  building?
12     A.  Yes, I did.
13     Q.  Did you take them to the area behind the bullet
14  trap?
15     A.  Yes.
16     Q.  Did you take them in the armorers room?
17     A.  Yes, I did.
18     Q.  So every piece of the inside of the building?
19     A.  We walked around the entire building, that's
20  correct.
21     Q.  What did you tell them had happened? I mean,
22  you said that you were there giving them an
23  explanation of what had happened?
24     A.  Yes.

Page 203

1      Q.  What is it you said had happened?
2      A.  I explained to them that the ventilation system
3  had failed. Also, the bullet trap had failed, the
4  ventilation system had probably never worked properly.
5      Q.  Do you remember what reaction you got out of
6  the group?
7      A.  I think at one time when we were explaining how
8  the ventilation system was failing Governor Minner
9  made a comment about the beam, how that probably
10  caused problems with the airflow.
11     Q.  The beam?
12     A.  The beam, the beam running down the center of
13  the building.
14          Behind the bullet trap there were things
15  lying on the ground where somebody had been doing some
16  work and she just said well, someone didn't clean up
17  after themselves. And when we were in classroom
18  number 1 she made that, she said it looks like there
19  was poor housekeeping. She made that comment.
20          Those are the only two things that really
21  stick out. I mean, there were questions and answers.
22  They would ask me a question. I would explain it to
23  them the best I could as to what I observed.
24     Q.  Was there anybody else from the firearms

Page 204

1  training unit present?
2      A.  I don't believe so.
3      Q.  I'm sorry?
4      A.  I don't believe so, no.
5      Q.  Do you know who assigned you to do the tour?
6      A.  I'm not sure if Major Eckrich called and asked
7  me to be there. He asked me to be there on the Friday
8  before because I think the tour that we're talking
9  about was on a Monday. So Secretary Mitchell wanted
10  to come in on the Friday before and view it without
11  anyone and I gave him the tour.
12          And then I believe it was a Monday that he
13  brought the Governor and then the colonels accompanied
14  her.
15     Q.  So Mitchell went through by himself with you?
16     A.  On the Friday with his -- he had a gentleman
17  with him and I'm not sure exactly who that was. And
18  Major Eckrich was there also.
19     Q.  So Eckrich, Mitchell and somebody with Mitchell
20  went through it on a Friday?
21     A.  That's correct.
22     Q.  And then the whole group went through on a
23  Monday?
24     A.  That's correct. I'm pretty sure that's how it

Page 205

1  was.
2      Q.  Do you remember anything that Lieutenant
3  Colonel MacLeish said during that tour?
4      A.  The only thing that I think Lieutenant Colonel
5  MacLeish made comment about was the room that we were
6  training simmunitions in. I think he explained that
7  training to the Governor. That's the only thing that
8  sticks in my mind for whatever reason.
9      Q.  Do you remember anything that Colonel Chaffinch
10  said to you?
11     A.  I can't recall.
12     Q.  Do you remember anything else that Major
13  Eckrich said?
14     A.  I can't recall anything else.
15     Q.  Has either Lieutenant Colonel or Colonel
16  MacLeish ever said anything to you to lead you to
17  believe that he was retaliating against you for
18  anything that you did at the firearms training unit?
19     A.  The one comment, as I stated earlier, he said,
20  "I can't believe you guys didn't clean" was kind of
21  putting the blame on us for the situation. And I
22  really didn't understand where that comment came from,
23  but it was placing blame on us for the situation.
24     Q.  Okay. And, again, when did he make that

52 (Pages 202 to 205)

Price, et al.                                                v.                                          Chaffinch, et al.
Wayne H. Warren, Volume 1                          C.A. # 04-956-GMS                          October 17, 2005

Page 206

1  statement?  That was at one of the meetings at either
2  the academy or the museum?
3      A.   That's correct.  It was one of the meetings,
4  one of the range meetings that we had.
5      Q.   And was that after he had learned that you had
6  stopped doing the maintenance on the water system at
7  the back of the bullet trap?
8      A.   Yes.  And I don't know if it was particularly
9  the water system.  I don't know how he -- he just
10  said, "I can't believe you guys didn't clean."  He
11  never specifically said clean what.
12      Q.   The officers in the firearms training unit were
13  never responsible for cleaning up the office area,
14  were they?  Didn't you have a contractor come in and
15  do that?
16      A.   Yes.
17      Q.   So you were never responsible for cleaning the
18  office area?
19      A.   No.
20      Q.   Anything else that MacLeish said that would
21  lead you to believe that he was retaliating against
22  you?
23      A.   I don't know.  I think the actions speak louder
24  than the words.  He put us on light duty and sent a

Page 207

1  letter to us explaining that we were being placed on
2  light duty.
3      Q.   Are you saying that the act of sending you the
4  letter was retaliatory?
5      A.   I view it as that, that's correct.
6      Q.   Why?
7      A.   Well, he stripped us of all of our police
8  powers, the economic impact that that had on my family
9  and that was it.  It was a letter.  There was no
10  communication.  He didn't call me in his office and
11  say, "Corporal Warren, I would like to discuss with
12  you your future and your situation with the State
13  Police."
14          It was simply a letter sent to me
15  explaining I was on light duty and that I couldn't
16  wear my uniform, I couldn't work any extra duty, I
17  couldn't drive a marked police car, I couldn't carry
18  my gun.  I could still have my gun, but I couldn't use
19  it for police duties.  To turn my head from any acts
20  of crime.  Just that happened and shortly after that I
21  had to give up my assigned vehicle, which was a Dodge
22  Durango, couldn't do any type of SORT work whatsoever.
23          I'm sure there were other things listed in
24  interrogatories.  I can't recall everything that

Page 208

1  happened to me that --
2      Q.   I recognize that there are all these things
3  that happened to you, but my question is:  Did Tom
4  MacLeish, colonel or lieutenant colonel, ever say
5  anything to you that led you to believe that he was
6  doing that for retaliatory reason as opposed to for a
7  legitimate reason?
8      A.   He never communicated one way or another to me
9  in that respect.
10      Q.   How about Aaron Chaffinch, did he ever
11  communicate with you about your going on light duty?
12      A.   No.
13      Q.   Did he ever say anything that you're aware of
14  that would lead you to believe that he had done
15  anything retaliatory to you?
16      A.   I'm not sure of the question.  Could you just
17  explain the question to me again, please?
18      Q.   Let me ask it a little differently.
19          You've read a whole lot of newspaper
20  articles about the firearms training facility, haven't
21  you?
22      A.   Yes.
23      Q.   Do you think you have read everyone that's been
24  in The Delaware State News or The Wilmington News

Page 209

1  Journal since the beginning of 2004?
2      A.   Probably.
3      Q.   Did Colonel Chaffinch ever mention you by name
4  in any quote that was ever attributed to him?
5      A.   Not by name.
6      Q.   Did Thomas MacLeish ever mention you by name?
7      A.   Not to my knowledge.
8      Q.   Has he ever been quoted saying anything about
9  you or the firearms training unit?
10      A.   Not to my knowledge.
11      Q.   Going back to your comments a little while ago
12  about being accommodated, is it your belief that the
13  Delaware State Police should find a job for you no
14  matter what your injury and no matter how long it
15  would take you to reach age 55?
16      A.   Well, I think they have done that in the past.
17  They have set a precedent.
18      Q.   You won't be 55 for, what, another 12 years?
19      A.   Another eight.
20      Q.   Eight?
21      A.   I'm currently 47.
22      Q.   And who have they carried -- you have already
23  been on light duty for well over a year, right?
24      A.   That's correct.

53 (Pages 206 to 209)

A476

Price, et al.                                          v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1                  C.A. # 04-956-GMS                      October 17, 2005

Page 210

1    Q.   So who have they carried for nine years in a
2  position as somebody who couldn't function as an
3  active trooper?
4    A.   Major Joseph Forrester is one.
5    Q.   For nine years?
6    A.   I don't know how long they carried him with a
7  hearing aid, but they carried him for quite some time,
8  until he was 55 and he retired.
9    Q.   You don't know how long though?
10   A.   No.
11   Q.   Do you know anybody who has been carried for
12 nine years?
13   A.   Sergeant Steve Swaine is still working.  I
14 don't know when his accident occurred, but he's been
15 working in the evidence unit ever since the accident
16 and he came back to work.
17   Q.   But you don't know why he's in the evidence
18 unit other than what you have heard from rumors?
19   A.   Yeah.  Usually people aren't assigned to one
20 duty that long within the division.  There has to be a
21 reason.
22   Q.   Anybody else?
23   A.   You would have to refer to my interrogatories
24 to look at other comparators.  I can't think of all of

Page 211

1  them right off the top of my head.
2    Q.   As you're sitting here today, can you think of
3  anybody who's been unable to function full duty as a
4  trooper who has been carried for as long as nine
5  years?
6    A.   I can't think off the top of my head.
7    Q.   Could you envision if enough troopers had that
8  type of physical problem it being difficult to staff
9  certain functions of the State Police?
10   A.   Yes.
11   Q.   How did you come to have a meeting with the
12 investigators from the state auditor's office?
13   A.   They called and asked for an interview.
14   Q.   Who did they call?
15   A.   I talked to them on the phone.
16   Q.   So somebody from the auditor's office called
17 you directly?
18   A.   Right.
19   Q.   And who was it who called?  Do you remember?
20   A.   I think his name was Jean Roethlisberger.  I'm
21 pretty sure.  I talked to two different guys there and
22 I'm not sure what the other guy's name was, but I
23 think it was Jean who called called and said, "We want
24 to talk to you.  When can we set up a meeting?"

Page 212

1    Q.   And that's Jean, J-e-a-n, right?
2    A.   Yes.
3    Q.   But it's a male?
4    A.   That's correct.
5    Q.   Did you inform your supervisor that you had
6  received the call?
7    A.   I'm pretty sure I did.
8    Q.   In order for you to talk to somebody outside of
9  the State Police on State Police business, you had to
10 have authority from the command structure, didn't you?
11   A.   Well, we were cooperating with an
12 investigation.
13   Q.   I understand that.  But in order to do that,
14 you have to have permission, don't you?
15   A.   In that event?
16   Q.   Maybe you don't.  I'm not trying to put words
17 in your mouth.  I thought that you did.
18   A.   And I can't recall who I even talked to about
19 that.
20   Q.   Do you recall getting permission from anybody
21 to talk to the state auditor?
22   A.   No.
23   Q.   Where did you meet with him?
24   A.   At Mr. Neuberger's office.

Page 213

1    Q.   Who was present?
2    A.   My attorney, Mr. Neuberger, and there were
3  three, I believe there were three investigators and
4  Roethlisberger, Roethensberger, whatever his last name
5  is.  I don't want to butcher his name.
6    Q.   I think Roethlisberger is the quarterback for
7  the Pittsburgh Steelers.
8        I think it's Rothenburger.
9    A.   It's close.  I don't think there's anyone in
10 the office with that name.
11       I believe there were two other
12 investigators also.
13   Q.   Do you remember their names?
14   A.   No, I do not.
15   Q.   Were there any other officers from the FTU
16 present during your interview with the state auditor?
17   A.   No.
18   Q.   How long before the meeting with the state
19 auditor was the appointment made?
20   A.   I'm not sure.
21   Q.   The meeting was on May 11th, right?
22       MR. NEUBERGER:  I think it was April 20th,
23 wasn't it?
24       MR. ELLIS:  Well, let's find out.

54 (Pages 210 to 213)

Price, et al.                                                                        v.                                           Chaffinch, et al.
Wayne H. Warren, Volume 1                                    C.A. # 04-956-GMS                                      October 17, 2005

Page 214

1       THE WITNESS:  You're going to have to
2   refer to a document because I have no recollection of
3   the date.
4       MR. ELLIS:  Mark this as Exhibit 7.
5       Exhibit 7 is a document that has at the
6   top of the first page My Chronology with the Firearms
7   Training Facility Corporal/3 Wayne Warren, May 11,
8   2004.
9       (Defendant's Deposition Exhibit No. 7 was
10  marked for identification.)
11      MR. NEUBERGER:  I'm sorry.  I misspoke.
12  April 20th is when the Governor ordered the
13  investigation.  I was confused.  I thought they met on
14  the 12th.
15      MR. ELLIS:  I'm going to ask you to mark
16  Exhibit 8 also.
17      (Defendant's Deposition Exhibit No. 8 was
18  marked for identification.)
19  BY MR. ELLIS:
20   Q.  When you get a chance, Corporal Warren, take a
21  look at 7 and 8.
22   A.  All right.  (Reviewing documents).
23      Are these the same?
24      MR. NEUBERGER:  No.  No, they're not the

Page 215

1   same.  These are different documents.
2    Q.  D-7 should have My Chronology with the Firearms
3   Training Facility on the top and D-8 should have
4   Concerns about the Firearms Training Unit Facility on
5   the top.
6       Can you tell me what D-7 is?
7    A.  This was prepared for the auditor's office.
8   It's my chronology of the firearms training facility.
9    Q.  Did you prepare this before the meeting that
10  you had with the auditor's office?
11   A.  Yes.
12   Q.  How long before?
13   A.  I'm unsure.
14   Q.  Did you have help in preparing it?
15   A.  No.
16   Q.  After you had prepared it, did you show it to
17  anyone before you showed it to the auditors?
18   A.  I'm pretty sure I showed it to my attorney.
19   Q.  Did you show it to other members of the
20  firearms training unit?
21   A.  I'm not sure.
22   Q.  Did you present this to the auditor's on May
23  11th?
24   A.  Yes, if that's when we spoke with the auditors.

Page 216

1    A.  I'm going to assume because the date says May
2   11th here on the document that that's when you met
3   with him.
4       If you didn't, whatever date you met with
5   him, did you give him this?
6    A.  Yes, I did.
7    Q.  Did you read it to him?
8    A.  Yes, I did.
9    Q.  You read the entire document to him?
10   A.  I'm not sure if I read the entire document or
11  not.
12   Q.  Look now at Exhibit D-8.  D-8 is a different
13  document.
14      Did you also prepare this?
15   A.  Yes.
16   Q.  Did you have any help in preparing this?
17   A.  No.
18   Q.  Did you show this to anybody before the meeting
19  that you had with the auditor's office?
20   A.  Probably my attorney.
21   Q.  Anybody else?
22   A.  I'm not sure.
23   Q.  Did you hand a copy of Exhibit D-8 to the
24  auditors when you met with them?

Page 217

1    A.  I'm not sure.
2    Q.  Did you read it to them?
3    A.  I can't recall that.
4    Q.  Did they ask you any questions at this first
5   meeting?
6    A.  I can't recall if they questioned me or not.
7   I'm pretty sure that there were questions asked, but I
8   can't recall any substance of the questions.
9    Q.  During the course of the meeting with the
10  auditors did your lawyers say anything?
11   A.  I'm not sure.
12   Q.  You don't remember?
13   A.  No.
14   Q.  I think you testified that the other members of
15  the FTU were not present in the meeting you had with
16  the auditors, right?
17   A.  That's correct.
18   Q.  Did they meet with them separately on the same
19  date?
20   A.  Yes.
21   Q.  Did you all go to Wilmington together?
22   A.  Yes.
23   Q.  Where did you meet that morning?
24   A.  I'm not sure.

55 (Pages 214 to 217)

Price, et al.                                                  v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                       C.A. # 04-956-GMS                      October 17, 2005

Page 218

1    Q.   Did you drive up with somebody else?
2    A.   I'm pretty sure I drove up by myself to at
3    least Smyrna usually.
4    Q.   You're coming all the way from Lewes, right?
5    A.   Right.
6    Q.   Did you meet other members of the firearms
7    training unit someplace and drive into Wilmington with
8    them?
9    A.   Yes.
10   Q.   Do you remember where you met them?
11   A.   No.
12   Q.   Were you present during the meetings that they
13   had with the auditor?
14   A.   No.
15   Q.   Did you provide any documents other than D-7
16   and D-8 to the auditors on the day that you met with
17   them?
18   A.   No.  I think the binders were provided by
19   Captain Warren, I believe.
20   Q.   Okay.  My understanding was the binders were
21   provided by your lawyer.
22        Do you have any recollection of that?
23   A.   No.  That could have happened.
24   Q.   Were you present when the binders were handed

Page 219

1    over to the auditors?
2    A.   I don't believe so.
3    Q.   Do you know whether that had occurred before
4    you got there or whether it happened after you left?
5    A.   No.
6    Q.   Am I correct that your lawyer had a news
7    conference the day that you met with the auditors?
8    A.   I believe so.
9    Q.   Were you present for the news conference?
10   A.   No.
11   Q.   Where were you when the news conference
12   occurred?
13   A.   I have no idea.
14   Q.   Did you know that it was going to happen after
15   you were done talking to the auditors?
16   A.   I'm not sure.
17   Q.   I'm sorry.  I asked that question badly.
18        Did you know that there was going to be a
19   news conference before it actually happened?
20   A.   I'm not sure.
21        MR. NEUBERGER:  Just for a sake of the
22   record, if you're saying I had a press conference, I
23   don't remember having a press conference.  I could be
24   wrong.

Page 220

1        MR. ELLIS:  That's okay.
2        MR. NEUBERGER:  I have lots of press
3    conferences.
4        MR. ELLIS:  Other people remember and I
5    know you have so many that it's hard to keep track of
6    them all.
7        MR. NEUBERGER:  I might have answered
8    questions from the press in some fashion, but I don't
9    know if I had a press conference.  Maybe I did.
10   BY MR. ELLIS:
11   Q.   Did you have a second meeting with the
12   auditors?
13   A.   No, I did not.
14   Q.   Did you have an appointment to meet with the
15   auditors a second time?
16   A.   No, I did not.
17   Q.   Were you ever contacted by the auditors to meet
18   a second time?
19   A.   No, I was not.
20       MR. NEUBERGER:  Are you sure of that?
21       THE WITNESS:  I'm positive.
22       MR. NEUBERGER:  Okay.
23       He goes away to sports events at times.
24       MR. ELLIS:  Who does?

Page 221

1        MR. NEUBERGER:  He wasn't there the second
2    time.  He took his daughter, went to a baseball game
3    with his daughter or something.  That's what it is.
4    Okay.
5    BY MR. ELLIS:
6    Q.   Why do you believe that either Colonel
7    Chaffinch or Colonel MacLeish or both are retaliating
8    against you for complaining about conditions at the
9    firing range in Smyrna?
10   A.   Why do I think they did that?  I don't
11   understand what you're asking me.
12   Q.   I'm asking you why do you think that things
13   that have happened to you were done by them out of a
14   retaliatory motive?
15        In other words, what makes you think that
16   they are doing things to you because you made
17   complaints about the firearms training unit facility?
18   A.   Well, I spoke out about a facility that was
19   doomed from the very inception.  The government
20   problems with the bidding process it's already been
21   uncovered that there was a problem with the bidding.
22   Q.   Let me just stop you right here.  I understand
23   that there is a lot of information that suggests that
24   the bidding was screwed up, that the HVAC system

56 (Pages 218 to 221)

Wilcox & Fetzer, Ltd.                    Professional Court Reporters                    (302)655-0477

A479

Price, et al.               v.               Chaffinch, et al.
Wayne H. Warren, Volume 1        C.A. # 04-956-GMS        October 17, 2005

Page 222

1 wasn't designed properly, that there's all kinds of
2 issues as to the compatibility of the bullet trap with
3 the ammunition being used. I recognize all of those
4 things are there and I don't really need for you to
5 recite that.
6      What I am trying to ask you is why you
7 think that your being placed on light duty is a result
8 of your having complained about conditions at the
9 range?
10    A.  Because all of those things that happened were
11 signs of corruption.  We exposed the corruption.  We
12 were causing problems with another government agency,
13 which was facilities management.  Once we started,
14 they didn't want us to continue.  So in order to try
15 to keep us quiet and to hush this whole exposure, they
16 just started putting pressure on us and one of the
17 things or one of the ways to get rid of us is to put
18 us on light duty and then out the door.
19      And the minute they can get us out the
20 door, then we're out of the hair of the State Police.
21 We're not going to cause any more problems.  It took a
22 lot for us to come forward with all this information.
23 No one came forward before us to expose all the
24 wrongdoing with the different government agencies.  We

Page 223

1 did that.  Now we're giving their administration a
2 black eye because they can't control their employees.
3      So, therefore, they have got to come out
4 and get rid of us.  They send us for a hearing test.
5 That's an easy fix because there are no standards for
6 them to go by to determine whether or not we have a
7 hearing problem.  So they can just tell the doctors
8 that hey, are they capable of working?  Well, what
9 standards did the doctors have to follow?  No.  They
10 have high frequency hearing loss and we will get them
11 out the door.  The financial impact of that move is
12 enormous.  It was over $22,000 a year in overtime for
13 me.  Take the car.  Let's play games with them.  Let's
14 transfer them around, take them out of that building,
15 give them this to do, give them that job to do,
16 meaningless jobs.
17    Q.  Did --
18    A.  Excuse me.  I'm sorry.  I just had this other
19 thought come into my mind.
20      And I believe Colonel Chaffinch testified
21 in his deposition that he didn't want to cause
22 problems with another government agency.  He didn't
23 want that to happen.  Well, it happened.  It is what
24 it is.  We are public safety.  Let's take care of the

Page 224

1 public.
2      But because the public was informed -- and
3 I think Colonel MacLeish and both Colonel Chaffinch
4 testified that they didn't like the fact that it got
5 in the newspapers.
6    Q.  Okay.  Anything else?
7    A.  That's all I can think of at this time.
8      Sorry about interrupting there, but that
9 thought came into my mind as to what was happening.
10    Q.  Okay.  That's okay.
11      Did the information that you presented to
12 the auditor identify any official at facilities
13 management as having been corrupt?
14    A.  Well, I believe it identified, not that I
15 provided, but as a result of the investigation that
16 was conducted that Alrita Annett was going to award
17 the contract to build that building to a Delaware firm
18 regardless of who applied for it and I believe that
19 was being looked into by the Attorney General's
20 Office.  There's not been an outcome to my knowledge
21 at this time.
22    Q.  Anybody else?
23    A.  I'm not sure who would be responsible for
24 monitoring air quality of the building, but that was

Page 225

1 not being done.  And whoever would be in charge of EPA
2 compliance, I guess that person would be subject to
3 questioning also.
4    Q.  Did you accuse anybody in the State Police of
5 corruption?
6    A.  No.
7    Q.  When you say that being put on light duty had a
8 financial impact on you, is it because you missed
9 overtime?
10    A.  That's correct.
11    Q.  Anything else?
12    A.  Well, overtime is special duty jobs or anything
13 else available to troopers who want to make extra
14 money.
15    Q.  Now, when you talk about special duty jobs,
16 what are you talking about?
17    A.  In my area one of the jobs I would work would
18 be transports of mental patients.  When a hospital
19 commits a mental patient to one of the three northern
20 facilities, there has to be two off-duty officers to
21 transport the mental patient to that facility.  And I
22 was on the on-call list for those special duty jobs,
23 which was a four-hour pay job.
24    Q.  How does the mental patient transport work?

57 (Pages 222 to 225)

Price, et al.                                    v.                           Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

Page 226

1    Are you in a police vehicle?
2       A.   You're in a marked police vehicle with two
3    officers and you're transporting a mental patient from
4    the hospital, usually in Sussex County, that's to
5    either Rockford, the State Hospital or MeadowWood or
6    you could take them to there's a place in Dover also.
7       Q.   Are you wearing a uniform --
8       A.   No.
9       Q.   -- when you do that?
10      A.   No.
11      Q.   What's the purpose behind having a state
12   trooper transport the mental patient?
13      A.   It's just the policy of the state and I think
14   it was a decision reached by the Attorney General's
15   Office that the State Police would do the transport.
16      Q.   Is the issue that the patient could become
17   violent?
18      A.   That could happen, but it's more or less
19   transportation for the patient from the committing
20   hospital to one of the facilities that can receive
21   him.
22      Q.   Is there somebody from the hospital in the
23   vehicle while the transport is occurring?
24      A.   No.

Page 227

1       Q.   So it's two state troopers and one mental
2    patient?
3       A.   That's correct.
4       Q.   You're not a taxicab service, right?
5       A.   Yes, that's what we are.
6       Q.   Well, are you armed when you make this
7    transport?
8       A.   Yes.
9       Q.   What other special duty jobs were you able to
10   do before that you can't do now?
11      A.   The NASCAR races in Dover and all the special
12   operations overtime, along with the firearms training
13   overtime.
14      Q.   What did you do in terms of NASCAR races?  Is
15   this basically providing security for the races?
16      A.   Yeah.  Just physical presence, riding around
17   the campground areas is what I was assigned to do.
18      Q.   In a marked car?
19      A.   No.
20      Q.   Riding around in what then?
21      A.   In a Dodge Durango.
22      Q.   Are you in uniform?
23      A.   Yes.
24      Q.   So you're in a uniform in your government

Page 228

1    Durango?
2       A.   That's correct.
3       Q.   What type of problems come up at the NASCAR
4    races?  Drunks?
5       A.   Drunks.
6       Q.   Mostly drunks?
7       A.   Yes.
8       Q.   Do you have to arrest people?
9       A.   I never had to arrest anyone.
10      Q.   Do state troopers occasionally have to arrest
11   people at the Dover Downs Speedway?
12      A.   I think it's minimal.
13      Q.   It happens though?
14      A.   Yes.
15      Q.   Now, you said there was SORT team overtime?
16      A.   That's correct.
17      Q.   What type of work is that?
18      A.   High-risk search warrants, surveillance.
19      Q.   The regular duty of the SORT team?
20      A.   That's correct.
21      Q.   And you also mentioned FTU overtime.
22      A.   That's correct.
23      Q.   What type of work is that?
24      A.   Working with recruits, training patrol

Page 229

1    procedures.  That was overtime.  We did our normal,
2    our tour of duty at the firearms training unit as a
3    firearms instructor and then we had overtime training
4    patrol procedures, instructing the training for the
5    patrol procedures.  Sorry.
6       Q.   Is that done at the academy?
7       A.   No.  That was done at the range.
8       Q.   Now, since you were put on light duty -- which
9    is what?  June 2004?
10      A.   That's correct.
11      Q.   You were assigned to the academy, right?
12      A.   Yes.
13      Q.   What assignments were you given?
14      A.   At the firearms training unit?
15      Q.   Well, you were still part of the firearms
16   training unit when you were put on light duty, were
17   you not?
18      A.   Yes.
19      Q.   And for most of that first year you were
20   undergoing periodic testing to determine whether your
21   hearing loss would prevent you from performing the
22   duties of a trooper, weren't you?
23      A.   That's correct.
24      Q.   And then at roughly the end of the first year

58 (Pages 226 to 229)

A481

Page 230

1  you were told that you could not perform the duties of
2  a trooper, right?
3      A.   That's correct.
4      Q.   So during that year that you were on light duty
5  before you had been told that you couldn't be returned
6  to full duty, what assignments were you given?
7      A.   Just administrative duties, assisting with
8  equipment, investigating different types of equipment,
9  assisting with administrative duties for the firearms
10  training unit.  So if they needed to contact a vendor
11  or to look into something, we did that.
12     Q.   Now, during that period roughly June 2004 to
13  May 2005, the firearms training unit, the rest of the
14  firearms training unit was not in Dover, was it?
15     A.   No.
16     Q.   It was up at Troop 2?
17     A.   That's correct.
18     Q.   And so you and Corporal Price were in Dover
19  whereas the rest of the unit was up in Troop 2?
20     A.   Right.  I'm sorry.  Also when the range was
21  being cleaned, I had to respond to the range also and
22  be present while the cleaning crew was working in the
23  range.
24     Q.   Why were you present for that?  What was the

Page 231

1  purpose of that?
2      A.   Just as a liaison from the State Police to make
3  sure that --
4      Q.   Who assigned you to that job?
5      A.   I want to say Major Hughes.
6      Q.   Was there a point when somebody within the
7  management of the Delaware State Police suggested that
8  you and Corporal Price be put on a Title 3
9  surveillance?
10     A.   I'm not sure.
11     Q.   Do you remember being asked to go to a wire
12  room?
13     A.   I remember talk about that, but I mean I don't
14  know what came of it.  I mean, I just remember talk of
15  them discussing whether or not we were going to do
16  that.
17     Q.   Who was the "them"?
18     A.   I can't recall who it was.
19     Q.   Do you recall any discussion of that with
20  Sergeant Foraker?
21     A.   No.
22     Q.   Do you recall any discussion of it yourself
23  with anybody?  You seem to remember the events.  But
24  do you remember who you talked to about it?

Page 232

1      A.   No.  No.  The only thing I remember was that
2  being mentioned and I thought I've worked on wires
3  before and you have to pay close attention to
4  conversation on the phone.  There's probably going to
5  be background noise and that's something that I'm not
6  good at.  That would be kind of foolish to put me in a
7  serious situation as a Title 3, especially when it
8  involves minimization, that what if I miss something
9  and I didn't minimize properly or I violated the law
10  because of my hearing problem?
11          To me, that really didn't make sense.
12  Then I just dismissed it and it never came up again.
13  So the brief conversation, I can remember that briefly
14  but I don't remember anything past that because
15  nothing ever came of it.
16     Q.   Who did you have the conversation with?
17     A.   I can't recall.
18     Q.   Did you express to whoever that person was the
19  concern you had that you've just described here about
20  whether you could perform properly in a wire room
21  because of your hearing problem?
22     A.   I believe I did.
23     Q.   But you don't remember who you said it to?
24     A.   No.

Page 233

1      Q.   There are things that go on in a wire room that
2  don't involve sitting with the headphones on, aren't
3  there?
4      A.   That's correct.
5      Q.   And what functions would those be?
6      A.   Transcribing tapes, monitoring phone calls as
7  far as -- well, I haven't done one that's been
8  computerized.  Mine was with index cards and there was
9  a lot of manual labor involved.
10     Q.   There's a lot of paperwork, right?
11     A.   Right.  Now I understand it's pretty
12  computerized and it takes half the manpower that it
13  used to, other than the surveillance teams.
14     Q.   But there are functions in the wire room where
15  you would not need to use the headphones at all,
16  right?
17     A.   I'm not sure with today's operations with the
18  investigations.  I can't answer that because I know
19  it's entirely different than what I used to do.
20          What I used to do I would say yes because
21  we had cards to file and to analyze every day and we
22  had to give a written report.  But I understand now
23  that the computer does all the analyzation, tells the
24  amount of calls coming in, the amount of calls going

59 (Pages 230 to 233)

Price, et al.                                    v.                          Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS              October 17, 2005

Page 234

1  out, what the average time was on line. It prints out
2  the number of who the person is. They can do actual
3  searches to find out who the number is registered to.
4  It's entirely different than the way we used to do it.
5      My understanding is it's more labor
6  intensive on the surveillance than it is the wire room
7  itself.
8      Q. So if it was the type of wire you used to sit
9  on, there would be plenty for you to do that didn't
10  involve headphones, right?
11     A. There would be a fair amount of work, not
12  plenty.
13     Q. Whoever it was that you had this discussion
14  with about being used in a Title 3, did you suggest to
15  them that you would be able to do that kind of work?
16     A. No.
17     Q. Would you have wanted to work on a Title 3?
18     A. I used to love Title 3's.
19     Q. So why didn't you try to make a place for
20  yourself in the Title 3 that was being discussed?
21     A. Because of the seriousness of the investigation
22  and I think it would be kind of stupid for somebody
23  with a hearing disability to be involved in something
24  where you listen to conversation that occurs quickly.

Page 235

1  And in that situation --
2      Q. I'm really not disputing that.
3      A. I don't think that that would have been a good
4  thing for me to do for the State Police or myself.
5      Q. Why is that?
6      A. Because of my disability.
7      Q. But how about if you were put on functions that
8  were not, that were not, that did not involve
9  listening to the conversations on the wire?
10     A. In my experience we always shortcut everything
11  so sooner or later I would have been the one to listen
12  to a phone conversation and I want no parts of that.
13  That's the way we do business. It happens all the
14  time. We always operate shorthanded.
15         MR. NEUBERGER: Do you think we will
16  finish at 5:00?
17         MR. ELLIS: What time is it?
18         MR. NEUBERGER: Ten of 5:00.
19         MR. ELLIS: Off the record.
20         (Discussion off the record.)
21  BY MR. ELLIS:
22     Q. You testified that it was your intention of
23  working to age 55 with the State Police. Is that
24  correct?

Page 236

1      A. That's correct.
2      Q. At some point, assuming that you're not allowed
3  to do that, do you intend to file for a disability
4  pension?
5      A. It depends on if I'm forced out and if I can't
6  work, what are they going to tell me?
7      Q. I'm sorry. I don't understand you.
8      A. It depends on the division. Are they --
9      Q. Assuming that at some point you are told that
10  you can no longer continue as a state trooper because
11  you're unable to perform the essential functions of
12  the job, is it your intention to file for a disability
13  pension?
14         MR. NEUBERGER: For the sake of the
15  record, I think that's asking, that's asking for
16  what's going to happen in the future after he gets the
17  advice of his lawyers at whatever point in time. I
18  don't think he can answer that question honestly to
19  you.
20     A. That's actually what I was going to tell you.
21  I would have to consult with my attorney and see the
22  options and what would be available with the
23  information the state would provide me.
24     Q. What do you mean by the information that the

Page 237

1  state would provide you?
2      A. I have received the letter stating that I was
3  on light duty. I received a letter telling me that I
4  had to separate from the division on June 10th. I
5  received another letter from the state telling me I
6  was going to have to separate from the division on
7  August 10th. And then I received a letter that those
8  letters have been rescinded until further notice. And
9  that's about the extent of the communication that I
10  have with the State Police or our human resource
11  center.
12     Q. If you were to get a disability retirement,
13  what percentage of your pay would that give you?
14     A. That's determined by the Pension Board.
15     Q. Whether you get it is determined by the Pension
16  Board, isn't it?
17     A. No. The percentage is determined also. That's
18  my understanding.
19     Q. Are you not guaranteed three-quarters of your
20  pay?
21     A. I'm not guaranteed that, no, I'm not, sir.
22     Q. What is it that the state has to determine in
23  order to decide how much of your pay you're going to
24  get?

60 (Pages 234 to 237)

Price, et al.                                                    v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1                    C.A. # 04-956-GMS                        October 17, 2005

Page 238

1   A.   I'm not really sure.  I have not had anyone
2  explain it.  I don't know if anyone can explain that.
3   Q.   Okay.  It says in your interrogatory answers
4  that troopers who served at the FTU have a track
5  record of obtaining lucrative post-DSP employment.
6   A.   That's correct.
7   Q.   What troopers would you be referring to there?
8   A.   A retired Captain Paul Cunningham went to work
9  for Smith & Wesson and I think he eventually became
10  the president of Smith & Wesson.
11         Dave Lawson started an indoor range in the
12  Dover area.  And he was training, he's got contracts
13  with several municipalities in qualifying or I should
14  say recertifying municipal police officers.  I think
15  he also has the DNREC contract and maybe a couple of
16  other state agencies.
17         Let's see.  I think Lieutenant Bill Bryson
18  is currently the chief of Camden, but he was a
19  consultant, a range consultant with JAED Construction
20  also.
21   Q.   That's the company that fouled up the range,
22  isn't it?
23   A.   That's correct.
24         MR. NEUBERGER:  Off the record.

Page 239

1         (Discussion off the record.)
2  BY MR. ELLIS:
3   Q.   Bryson is a police chief now, right?
4   A.   That's correct.
5   Q.   When did Cunningham leave the police force?
6   A.   Unsure.
7   Q.   He was a captain?
8   A.   Yes.
9   Q.   What rank was Lawson?
10   A.   Lieutenant.
11   Q.   Is there any reason you can't open up your own
12  indoor range?
13   A.   Is there any reason?
14   Q.   Yes.  Why couldn't you start up your own indoor
15  range when you leave the State Police?
16   A.   I'm a little gun-shy about the indoor ranges
17  right now.
18   Q.   Well, aside from that?
19   A.   Would there be any reason why I couldn't?
20   Q.   Yes, other than the fact that you got a hearing
21  problem.
22         Is that what you meant when you said that
23  you were gun-shy of indoor ranges?
24   A.   No.  There's ventilation problems and a host of

Page 240

1  other things and then who -- because we have been
2  bashed the true story has not been told about this
3  situation.  There's been one side of the story told at
4  this point.  So with what happened to us even people
5  in the division really don't know what's going on in
6  this situation and with my reputation.
7   Q.   Well, what is your reputation?
8   A.   I really don't know at this point.  It was
9  sterling before this happened.
10   Q.   Well, what's to say it's not sterling now?
11   A.   Well, I have been placed on light duty.  I have
12  been blamed in the newspaper that we let a $3 million
13  building go down the drain.  It was on WBOC TV, a
14  local station in the area in which I live.
15         So perception is really everything and
16  only one side of the story has been told.
17   Q.   Was your name on WBOC?
18   A.   No.
19   Q.   Is there anybody else that has left the
20  firearms training unit for a lucrative post-DSP job?
21   A.   Those are all that I can think of at the
22  present time.
23   Q.   Does retired Lieutenant Lawson's indoor range
24  have ventilation problems?

Page 241

1   A.   Not to my knowledge.
2   Q.   Have you ever been there?
3   A.   Yes.
4   Q.   Would I be correct in saying that there are
5  certain jobs that you would not be able to perform
6  after you leave the State Police because of your
7  hearing problem?
8   A.   Correct.
9   Q.   Have you talked to anybody outside of the State
10  Police about a job when you leave the State Police?
11   A.   I've talked to several people just inquiring
12  about what's available.
13   Q.   Well, who have you talked to?
14   A.   I talked to a local roofing contractor about
15  being, he talked to me about being an appraiser for
16  his business.
17   Q.   Do you have any background as a roofing
18  appraiser?
19   A.   No.  None.
20   Q.   Is it easy to pick up?
21   A.   I guess it is.
22   Q.   Did this roofing contractor offer you a job?
23   A.   He just told me if I retire or whatever happens
24  to me with the State Police to look him up.

61 (Pages 238 to 241)

Price, et al.                                    v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 1                  C.A. # 04-956-GMS                        October 17, 2005

Page 242

1    Q.   Any other person you have talked to outside of
2    the State Police about potential employment?
3    A.   How long ago of a time frame are you talking
4    about now?
5    Q.   I'm talking about for about the last year and a
6    half since the problems have occurred at the range.
7    A.   No.  Not that I can recall.
8    Q.   Have you talked to Smith & Wesson about a job?
9    A.   No.
10   Q.   Does Cunningham still work for Smith & Wesson?
11   A.   No.
12   Q.   Have you talked to Cunningham about how he got
13   into the industry?
14   A.   I've talked to him, but I didn't really I guess
15   ask him how he broke into the industry.
16   Q.   What did you talk to him about?
17   A.   Firearms, training, construction of the
18   building.
19   Q.   It says in your interrogatory answers troopers
20   and others, and this refers to the situation with the
21   range and the media coverage, troopers and others in
22   the law enforcement and firearms communities are
23   talking.
24        Who is talking?  What troopers are talking

Page 243

1    about you?
2    A.   I'm not familiar what you're asking me.
3    Q.   I'm not going to mark this.
4         MR. NEUBERGER:  Do you know what number
5    that is just so I have it?
6         MR. ELLIS:  It's page 12 and it is
7    interrogatory 3 and the way you have answered it it's
8    sub(c).
9         MR. NEUBERGER:  Okay.  Why don't you just
10   show it to him?
11   BY MR. ELLIS:
12   Q.   That's the subsection there (indicating).
13   A.   (Reviewing document)  Okay.
14   Q.   What are you referring to in that sentence that
15   I just read to you?
16   A.   People in the community making comments about
17   following the firearms training unit in the media and
18   that, you know, we were getting blamed for the
19   destruction of that building.
20   Q.   Who blamed you for the destruction of the
21   building?
22   A.   It was in the media.
23   Q.   Who is it that has talked to you and said that
24   you were being blamed for that?  I mean, your

Page 244

1    neighbors?
2    A.   Different contacts in the community.
3    Q.   Give me an example.
4    A.   I can't give you a name right off the top of my
5    head, but since this has broken I mean it's a subject
6    of conversation.
7         You know, my next-door neighbor, we talked
8    about it the other day:  "How are you doing?  Are they
9    still blaming you for the building?"
10   Q.   Did you ever tell him that somebody was blaming
11   you for problems in the building?
12   A.   Did I ever tell him?
13   Q.   Yes.
14   A.   No.  He saw it in the newspaper.  And a lot of
15   people make jokes about it.  One person just said, you
16   know, "Can you hear me?  They're really putting you
17   guys down about the fall of the firearms training
18   unit."
19   Q.   He says, "Can you hear me"?
20   A.   Yes.
21   Q.   Joking about your hearing loss?
22   A.   Right.
23   Q.   Has your hearing loss been in the newspaper?
24   A.   Yes.

Page 245

1    Q.   How did your hearing loss get in the newspaper?
2    A.   Our wives spoke out in the newspaper.
3    Q.   So your wives put it in the newspaper?
4    A.   That's correct.
5    Q.   I'm sorry.  Can you slide that back?
6         MR. ELLIS:  What time is it, Tom?
7         MR. NEUBERGER:  It's about eight after.
8         MR. ELLIS:  I'll tell you what.  Let me
9    knock off.  I've got like maybe another 10, 15, 20
10   minutes ago.  Why don't we start it first thing in the
11   morning?
12        MR. NEUBERGER:  That's fine.  Just finish
13   up in the morning.  That's fine.
14        MR. ELLIS:  Off the record.
15        (Discussion off the record.)
16        (Deposition recessed at 5:10 p.m. until
17   Tuesday, October 18, 2005 at 9:30 a.m.)
18
19
20
21
22
23
24

62 (Pages 242 to 245)

Price, et al.                                    v.                              Chaffinch, et al.
Wayne H. Warren, Volume 1              C.A. # 04-956-GMS                     October 17, 2005

Page 246

1              I N D E X
2   DEPONENT: WAYNE H. WARREN              PAGE
3     Examination by Mr. Ellis        2
4            E X H I B I T S
5   DEFENDANT'S DEPOSITION EXHIBITS       MARKED
6   1 E-mail to Thomas F. MacLeish from
      Christopher Foraker dated
7     January 5, 2004             140
8   2 Multipage document captioned "Delaware
      State Police Firearms Training Range
9     Current Range Status And Analysis"
      dated 01/30/04          173
10
    3 Multipage document captioned "Delaware
11    State Police Firearms Training Facility
      Responsibility Status Analysis dated
12    01/30/04              179
13  4 Seven-page letter to Captain John A.
      Yeomans, M.D. from Edward A. Emmett,
14    M.D. dated January 21, 2005       187
15  5 Letter to Captain John A. Yeomans
      from Edward A. Emmett, M.D. dated
16    February 24, 2005          189
17  6 Letter to Captain John A. Yeomans
      from Edward A. Emmett, M.D. dated
18    March 18, 2005          195
19  7 Multipage document captioned "My Chronology
      with the Firearms Training Facility Cpl/3
20    Wayne Warren May 11, 2004"      214
21  8 Three-page document captioned "Concerns
      about the Firearms Training Unit Facility
22    Prepared By Cpl/3 Wayne Warren"     214
23  ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 247
24  CERTIFICATE OF REPORTER          PAGE 248

Page 248

1   State of Delaware   )
                        )
2   New Castle County   )
3
4          CERTIFICATE OF REPORTER
5
6        I, Kurt A. Fetzer, Registered Diplomate
    Reporter and Notary Public, do hereby certify that
7   there came before me on Monday, October 17, 2005, the
    deponent herein, WAYNE H. WARREN, who was duly sworn
8   by me and thereafter examined by counsel for the
    respective parties; that the questions asked of said
9   deponent and the answers given were taken down by me
    in Stenotype notes and thereafter transcribed by use
10  of computer-aided transcription and computer printer
    under my direction.
11       I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17       Kurt A. Fetzer, RDR, CRR
         Certification No. 100-RPR
18       (Expires January 31, 2008)
19
    DATED:
20
21
22
23
24

Page 247

1
2
3            REPLACE THIS PAGE
4            WITH THE ERRATA SHEET
5            AFTER IT HAS BEEN
6            COMPLETED AND SIGNED
7            BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A486



**WILCOX & FETZER LTD.**

In the Matter Of:

# Price, et al.
## v.
# Chaffinch, et al.

## C.A. # 04-956-GMS

-------------------------------------------------------------------------

Transcript of:

# Wayne H. Warren
## Volume # 2
## October 18, 2005

-------------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 249

VOLUME 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

B. KURT PRICE, et al.          )
                               )
     Plaintiffs,               )
                               )
     v.                        ) C.A. No. 04-956-GMS
                               )
L. AARON CHAFFINCH, et al.,    )
                               )
     Defendants.               )
                               )
                               )
                               )
CHRISTOPHER FORAKER,           )
                               )
     Plaintiff,                )
                               )
     v.                        ) C.A. No. 04-1207-GMS
                               )
L. AARON CHAFFINCH, et al.,    )
                               )
     Defendants.               )
                               )

          Continued deposition of WAYNE H. WARREN
taken pursuant to notice at the law offices of Montgomery
McCracken Walker & Rhoads, LLP, 300 Delaware Avenue,
Suite 750, Wilmington, Delaware, beginning at 9:25 a.m.,
on Tuesday, October 18, 2005, before Kimberly A. Hurley,
Registered Merit Reporter and Notary Public.

APPEARANCES:

          THOMAS S. NEUBERGER, ESQUIRE
          THE NEUBERGER FIRM, P.A.
           2 East 7th Street - Suite 302
           Wilmington, Delaware 19801
           for the Plaintiffs

          WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477

Price, et al.                                      v.                              Chaffinch, et al.
Wayne H. Warren, Volume 2                    C.A. # 04-956-GMS                    October 18, 2005

Page 250

1  APPEARANCES (cont'd):
2       EDWARD T. ELLIS, ESQUIRE
        ROBERT J. FITZGERALD, ESQUIRE
3       MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
         123 South Broad Street
4        Avenue of the Arts
         Philadelphia, Pennsylvania 19109
5        for the Defendants
6  ALSO PRESENT:
7       CHRISTOPHER D. FORAKER
        B. KURT PRICE
8
                   - - - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 251

1               WAYNE H. WARREN,
2        having been previously sworn as a witness,
3        was resumed on examination and testified
4        further as follows:
5            MR. ELLIS: I'm going to ask the court
6   reporter to mark this as No. 9.
7            (Defendants' Deposition Exhibit No. 9 was
8   marked for identification.)
9   BY MR. ELLIS:
10      Q.   We received this in the medical records that
11  you produced. Can you tell me what this is?
12      A.   That I produced?
13      Q.   Yes.
14           MR. NEUBERGER: It came from us. It was
15  in our records.
16  BY MR. ELLIS:
17      Q.   Just by way of identification for the record,
18  D-9 is a three-page document that has Bates stamps
19  FTU4676 through FTU4678, and it's got "Wayne H. Warren"
20  on the top of the front page.
21           Have you ever seen that before?
22      A.   No, I haven't.
23      Q.   Then that's fine. I don't need to ask you --
24  do you have any idea what it is?

Page 252

1       A.   Yes. It looks like a report.
2       Q.   It's clearly a report on your medical
3   condition.
4       A.   That's correct.
5       Q.   Do you know who it's from?
6       A.   Says Dr. Emmett. So I assume it's from
7   Dr. Emmett.
8       Q.   But that's just an assumption?
9       A.   That's correct.
10           MR. ELLIS: I ask you to take a look at
11  Exhibit 10.
12           (Defendants' Deposition Exhibit No. 10 was
13  marked for identification.)
14  BY MR. ELLIS:
15      Q.   This is a three-page document that's got on the
16  top of the front page "FTU Transition meeting
17  12/01/2003."
18           Have you seen that document before?
19      A.   Yes.
20      Q.   Where did you first see that document?
21      A.   In one of the depositions.
22      Q.   Is that one of the depositions in this case
23  that you were attending?
24      A.   That's correct.

Page 253

1       Q.   But you were not the deponent?
2       A.   No.
3       Q.   Had you ever seen it prior to that?
4       A.   No.
5       Q.   Was Ralph Davis the deponent on the day that
6   you first saw this document?
7       A.   Yes.
8       Q.   I don't have any more questions about that.
9            Yesterday you testified about an
10  investigation that you participated in on the background
11  and history of the firing range in Smyrna. Can you tell
12  me who else was involved in the investigation?
13      A.   Corporal Price and Sergeant Foraker.
14      Q.   Did you and Corporal Price and Sergeant Foraker
15  divide up the work that you were going to do?
16      A.   Yes. Different people did different sections
17  of it.
18      Q.   Was Corporal Warwick involved?
19      A.   Yes, I believe he was.
20      Q.   Can you describe for me your assignment, so to
21  speak, as part of the investigation?
22      A.   There wasn't any specific assignment. We were
23  just digging to find out what was wrong with the
24  building, why were we experiencing these problems, and

2 (Pages 250 to 253)

Price, et al.                                              v.                                    Chaffinch, et al.
Wayne H. Warren, Volume 2                    C.A. # 04-956-GMS                          October 18, 2005

Page 254

1    how we got to this point, how we got to the point where
2    the building was in such disarray and breakdown because
3    of the ventilation system.
4        Q.   When I asked you about assignments, I meant did
5    you divie up the parts of the investigation so that, for
6    example, one of you dealt with the Certificate of
7    Occupancy, whereas somebody else dealt with the HVAC
8    specifications, that type of thing?
9        A.   Yes.
10       Q.   Well, what was your particular role?
11       A.   What my particular role was?
12       Q.   Yes.
13       A.   I was finding out as much information about the
14   different aspects of the building as I could.  I didn't
15   have a specific assignment.  We divied up the jobs, and
16   what we thought would help in determining what happened
17   with the building.  But there was no formal job
18   assignments as to who was to do what.
19       Q.   You didn't divide the work by, for example,
20   area of the building or subject matter.  In other words,
21   did one of you look at health issues and another one look
22   at the specs for the HVAC system, another person look at
23   some other aspect?
24       A.   Different people looked at different aspects of

Page 255

1    the building, that's correct.
2        Q.   Do you remember what parts you had?
3        A.   No.
4        Q.   Do you remember what parts Sergeant Foraker
5    had?
6        A.   No.
7        Q.   How about what parts Corporal Price had?
8        A.   No.
9        Q.   How about what parts Corporal Warwick had?
10       A.   Only thing I remember about Corporal Warwick is
11   he contacted NIOSH, the National Institute of
12   Occupational Safety and Health, and he was looking into
13   hearing protection.  That's the only thing that stands
14   out in my mind at this point.
15       Q.   Does anything stand out in your mind for what
16   Price or Foraker did?
17       A.   Not really.
18       Q.   When you had your meeting with the Auditor's
19   Office on May 11th or May 12th, 2004, was
20   Corporal Warwick with you?
21       A.   I can't recall if he was there or not.
22       Q.   I think you said you drove up to Wilmington
23   with other people in the car with you after you met
24   somewhere.

Page 256

1        A.   Yes, we did.
2        Q.   Do you remember who was in the car with you?
3        A.   No, I don't.
4        Q.   Do you remember if it was one person or more
5    than one person?
6        A.   No, I can't remember.
7             MR. ELLIS:  I don't have any more
8    questions.  Thank you.
9             MR. NEUBERGER:  I don't have any
10   questions, but we will want to review and sign the
11   deposition.
12            (Deposition concluded at 9:35 a.m.)
13                  - - - - -
14
15
16
17
18
19
20
21
22
23
24

Page 257

1              T E S T I M O N Y
2
3    DEPONENT:  WAYNE H. WARREN              PAGE
4
5    BY MR. ELLIS................................ 251
6
7              E X H I B I T S
8
9    DEFENDANTS' DEPOSITION EXHIBIT NO.        MARKED
10
11   9 - A three-page document headed "Wayne
     H. Warren".................................. 251
12
     10 - A three-page document entitled, "FTU
13   Transition meeting 12/01/2003"................ 252
14
15   ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 258
16
17   CERTIFICATE OF REPORTER            PAGE 259
18
19
20
21
22
23
24

                                          3 (Pages 254 to 257)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                                    v.                          Chaffinch, et al.
Wayne H. Warren, Volume 2              C.A. # 04-956-GMS              October 18, 2005

Page 258

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Page 259

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 18th day of
October, 2005, the deponent herein, WAYNE H. WARREN, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.
        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


        Kimberly A. Hurley
        Certification No. 126-RPR
        (Expires January 31, 2008)


DATED:

4 (Pages 258 to 259)

A491



WILCOX & FETZER LTD.

In the Matter Of:

# Price, et al.
## v.
## Chaffinch, et al.

C.A. # 04-1207

------------------------------------------------------------------------

Transcript of:

Ralph H. Davis, III

September 6, 2005

------------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE,      )
CORPORAL WAYNE WARREN,        )
and SERGEANT CHRISTOPHER      )
D. FORAKER,                   )
                             )
     Plaintiffs,              )
                             )
     v.                       ) C.A. No. 04-1207
                             )
COLONEL L. AARON CHAFFINCH,)
individually and in his      )
official capacity as         )
Superintendent of the        )
Delaware State Police;        )
LIEUTENANT COLONEL THOMAS     )
F. MacLEISH, individually     )
and in his official          )
capacity as Deputy           )
Superintendent of the        )
Delaware State Police;        )
DAVID B. MITCHELL, in his     )
official capacity as the     )
Secretary of the Department)
of Safety and Homeland       )
Security of the State of     )
Delaware; and DIVISION OF  )
STATE POLICE, DEPARTMENT OF)
SAFETY AND HOMELAND          )
SECURITY, STATE OF           )
DELAWARE,                     )
                             )
     Defendants.             )

          Deposition of RALPH H. DAVIS, III, taken
pursuant to notice at the law offices of The Neuberger
Firm, P.A., 2 East 7th Street, Suite 302, Wilmington,
Delaware, beginning at 1:06 p.m., on Tuesday,
September 6, 2005, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

               WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

Price, et al.                                    v.                          Chaffinch, et al.
Ralph H. Davis, III                    C.A. # 04-1207                September 6, 2005

Page 2

1  APPEARANCES:
2       STEPHEN J. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
3        2 East 7th Street - Suite 302
         Wilmington, Delaware 19801
4        for the Plaintiffs
5       EDWARD T. ELLIS, ESQUIRE
        MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
6        123 South Broad Street
         Avenue of the Arts
7        Philadelphia, Pennsylvania 19109
         for the Defendants
8
ALSO PRESENT:
9
        SERGEANT CHRISTOPHER D. FORAKER
10      CORPORAL B. KURT PRICE
        CORPORAL WAYNE WARREN
11
12           - - - - -
13
14           RALPH H. DAVIS, III,
15      the witness herein, having first been
16      duly sworn on oath, was examined and
17      testified as follows:
18  BY MR. NEUBERGER:
19      Q.   Captain Davis, my name is Steve Neuberger.  I'm
20  a lawyer for Sergeant Chris Foraker, Master Corporal
21  Wayne Warren, and Master Corporal Kurt Price.
22           Have you ever testified in court before?
23      A.   Yes, sir.
24      Q.   Have you ever had your deposition taken before?

Page 3

1       A.   Yes, sir.
2       Q.   I'm going to ask you some questions, and the
3   court reporter here is going to type up your answers to
4   those questions.
5            Do you understand that?
6       A.   Yes, I do.
7       Q.   We have to take turns talking, because, although
8   the court reporter is very, very good, she can't get
9   everything down if we talk at the same time.
10           Do you understand that?
11      A.   Yes, I do.
12      Q.   You have to verbalize your answers instead of
13  nodding your head.  Just say yes or, instead of shaking
14  your head, just say no.
15           Do you understand that?
16      A.   Yes, I understand.
17      Q.   After we're done today you will have an
18  opportunity to review the transcript and make any
19  corrections to things like typographical errors or things
20  of that nature.  Okay?
21      A.   I understand.
22      Q.   If I ask you a question that you don't
23  understand, just ask me to rephrase it and I will be
24  happy to.

Page 4

1       A.   I will.
2       Q.   Very importantly, I don't want you to guess.  If
3   you don't know the answer, just say so and I'll move on.
4       A.   I understand.
5       Q.   Are you taking any medication or is there
6   anything else that would prevent you from testifying
7   truthfully or just remembering accurately today?
8       A.   No, I'm not taking medication.
9       Q.   If you need any breaks, if you need to go to the
10  john, need to stretch your back out or something like
11  that, just let me know.
12      A.   Thank you.
13      Q.   You have taken an oath to tell the truth, and
14  you understand the significance of that oath, don't you?
15      A.   Yes, I do.
16      Q.   Captain Davis, what is your full name?
17      A.   Ralph Hunter Davis, III.
18      Q.   What is your current rank?
19      A.   Captain.
20      Q.   Where were you born?
21      A.   I was born in Milford Hospital in Milford,
22  Delaware.
23      Q.   Where were you raised?
24      A.   In the Lewes-Milton, Delaware, area.

Page 5

1       Q.   Where did you go to grade school and high
2   school?
3       A.   I'm a graduate of Cape Henlopen High School in
4   Lewes, Delaware.
5       Q.   Did you have any education past high school?
6       A.   Beyond high school I'm a graduate of Delaware
7   Technical & Community College and of Wilmington College.
8       Q.   Do you currently live in Lewes down in Sussex
9   County?
10      A.   Yes, I do.
11      Q.   You were in the Marines for four years, weren't
12  you?
13      A.   Correct.
14      Q.   What years were they?
15      A.   1981 through 1985 active and then you go into an
16  inactive reserve status for two years beyond that.
17      Q.   Were you honorably discharged?
18      A.   Yes, sir.
19      Q.   What was your rank when you were honorably
20  discharged?
21      A.   Sergeant E5.
22      Q.   How many years have you been with the Delaware
23  State Police?
24      A.   Nineteen years.

2 (Pages 2 to 5)

Price, et al.                                    v.                              Chaffinch, et al.
Ralph H. Davis, III                       C.A. # 04-1207                      September 6, 2005

Page 6

1    Q.   Could you run me through your -- it would be
2  either your history or promotion history up through your
3  current rank of captain?
4    A.   I'll start at the beginning.  I was first
5  employed in March of 1986; attended the academy.
6            From there I was sent to Troop 7 to
7  complete my field training, officer program portion of
8  the training.
9            From there I was assigned to Troop 3 in
10  Camden, Delaware.  I was there for approximately six
11  months, when I was reassigned to Troop 7 in Lewes.
12            I remained there until January of 1990,
13  when I was assigned to the Special Investigations Unit.
14            I was there until December of 1996, when I
15  was promoted to the rank of sergeant; transferred to
16  Troop 4 in Georgetown.
17            I remained there for two years and in
18  October -- I'm sorry, January of 1998 I was transferred
19  back to the Special Investigations Unit.
20            Remained there for 10 months until October.
21  I was promoted to the rank of lieutenant, assigned to the
22  training academy in October of 1999.
23            From there -- I remained there until
24  September of 2004, when I was promoted to the rank of

Page 7

1  captain and I was transferred to my current position as
2  director of planning.
3    Q.   The position you held before you were director
4  of planning which you are now, what was that, again?
5    A.   I was assigned to the training academy.  I
6  served two roles there.  My first assignment was as a
7  special projects coordinator.
8    Q.   What was your second role?
9    A.   As assistant director of training.
10    Q.   In your current position as the director of
11  planning, do you currently report to Colonel MacLeish?
12    A.   No.  Upon my promotion and transfer to the
13  planning section, that role or that position no longer
14  reported to the colonel due to the conflict of the
15  lawsuit I had had with the then colonel, Colonel
16  Aaron Chaffinch.  So my assignment or my position now
17  reports to the administrative major, who is Major
18  Paul Eckrich.
19    Q.   Now, you were subpoenaed to come here and
20  testify today; isn't that correct?
21    A.   That's correct.
22    Q.   You understand the significance of a subpoena?
23    A.   Yes, sir, I do.
24    Q.   You understand that because of the subpoena,

Page 8

1  that you are compelled to come here and testify today,
2  correct?
3    A.   I understand.
4    Q.   You understand if you're subpoenaed and don't
5  show up, you can be held in contempt of court and
6  punished?
7    A.   I understand, yes.
8    Q.   You were originally subpoenaed to testify last
9  Monday, August 29th, I believe.  Isn't that correct?
10    A.   Yes, sir.
11    Q.   You understand that the date was changed at the
12  request of the lawyers for the defendants in this case,
13  correct?
14    A.   I understand, yes, sir.
15    Q.   On December 1st of 2003, you were serving as the
16  assistant director of training at the academy, correct?
17    A.   That's correct.
18    Q.   Who was the actual director of training at that
19  time?
20    A.   Captain Gregory Warren.
21    Q.   Do you recall if on December 1st of 2003, if you
22  went on a tour of the FTU?
23    A.   Yes.  Captain Warren and I participated in a
24  transition meeting I guess is what you would call it.  We

Page 9

1  were -- a new NCOIC of the range was coming in to the
2  range and the outgoing NCOIC, who was Sergeant
3  Richard Ashley, they were planning on having a meeting, a
4  transition meeting.  It's an informal meeting, but it's
5  so that the range can be toured, problems can be
6  discussed, any issues that the outgoing NCOIC can relate
7  to the new incoming NCOIC.
8            So Captain Warren and I attended this
9  meeting with Sergeant Foraker and Sergeant Ashley.
10    Q.   When the meeting was over, did you do a
11  walk-through of the facility generally known as the
12  Firearms Training Unit?
13    A.   Yes.  I believe Captain Warren had to leave, so
14  he did not attend the actual tour.  But Sergeant Foraker,
15  Sergeant Ashley, and I did a tour of the facility.
16    Q.   Do you recall anything about the condition of
17  the facility during that tour?
18    A.   Yes, I do.
19    Q.   Do you recall what the condition was?
20    A.   I don't want to say it was -- it wasn't filthy.
21  It wasn't in extreme filth, but it was disorganized and
22  disorderly.  I will put it that way.  Things were not --
23  didn't appear to be in their place.  There was -- the
24  range typically had a problem with a dust or a powder

3 (Pages 6 to 9)

Price, et al.                                      v.                              Chaffinch, et al.
Ralph H. Davis, III                        C.A. # 04-1207                    September 6, 2005

Page 10

1  residue that seemed to be over everything in the actual
2  range itself.
3            In the administrative areas -- I attribute
4  a lot of this to at the time there were four officers
5  there who were devoting all their attention to training.
6  So the administrative tasks sometimes had to be put
7  aside. So things were piled in piles. Things were
8  disorderly. But it's because they just did not have the
9  time to attend to many of these tasks.
10    Q. I think you mentioned some kind of a dust or a
11  dirt or a powder.
12    A. Seems every time I was at the range there was
13  always a powdery residue on everything. I don't know
14  what you would call it. I don't know how to describe it,
15  but it was just a powder, a fine powder, that seemed to
16  be on things.
17    Q. Was that fine powder on things on December 1st,
18  2003?
19    A. Yes, it was.
20    Q. Was it everywhere along the firing line?
21            MR. ELLIS: Object to the form of the
22  question.
23    A. When I went out on the line, the area where you
24  would actually shoot a gun, where there's targets and

Page 11

1  where there's people with guns, there was always -- as
2  far back as I can remember on the range, when we would
3  clean up, there would be a white powdery residue that
4  would be swept up as we cleaned, and this was on the
5  range on that -- during that tour on December the 1st, as
6  well.
7    Q. So we talked about the firing line right now,
8  correct?
9    A. Yes.
10    Q. There is this powdery residue on the firing line
11  somewhere?
12    A. Yes, sir.
13    Q. Was it everywhere?
14            MR. ELLIS: Object to the form of the
15  question.
16            MR. NEUBERGER: You can answer.
17    A. Everywhere I went it was there.
18    Q. I guess a good next question would be: Where
19  else did you go other than just the firing line?
20    A. After we left the range, the actual physical
21  range area, Sergeant Foraker, Sergeant Ashley, and I went
22  to the area behind the firing line. I'll put it that
23  way. Behind the area where the targets are. And we went
24  behind that.

Page 12

1            MR. ELLIS: You said behind the bullet
2  trap?
3            THE WITNESS: Yes. Yes, sir.
4            We went back there for Sergeant Ashley to
5  explain to Sergeant Foraker how the bullet trap worked to
6  show him the condition of it. I understand
7  Sergeant Foraker had some prior knowledge of the range,
8  having been assigned there before. However, there
9  apparently had been some type of modification to this
10  bullet trap in Sergeant Foraker's absence. And
11  Sergeant Ashley went and took us there to show us -- show
12  Sergeant Foraker specifically how the new bullet trap
13  worked.
14    Q. Was there any of that fine powdery residue
15  behind the bullet trap?
16    A. Yes, sir.
17    Q. Did you go anywhere else other than the firing
18  line and behind the bullet trap?
19    A. If I recall, we went to the gun locker area, to
20  a storage area, and I don't know the official name of it,
21  but it was an area where we did some munitions training.
22  It was a room that was used for some storage.
23            We went in the cleaning area where we would
24  clean weapons. And the early part of the meeting we

Page 13

1  spent in I'll call it the administrative area where there
2  were classrooms and office space and a conference room.
3    Q. Let's focus on the areas other than the
4  administrative area, the areas that you just mentioned to
5  me.
6    A. Sure.
7    Q. What was the condition of those areas, if you
8  recall?
9    A. The gun locker seemed to be orderly, from what I
10  recall. We went into the gun locker and looked around.
11  The guns were in their racks and everything seemed to be
12  okay.
13            We went into the storage -- there's an area
14  where we did simunitions. Then there's a little storage
15  area off that, if I recall correctly. That was
16  disorderly. Things seemed to be out of place. Things
17  were just piled in piles again.
18            Again, I have to add that I think it was a
19  function of four guys who were overworked and focused on
20  training who did not have the time -- I don't blame them
21  for that.
22            I do recall the area behind the bullet
23  trap. That area was very cluttered and very I don't want
24  to say dirty, but things were sitting around everywhere.

4 (Pages 10 to 13)

A496

Price, et al.                                           v.                                  Chaffinch, et al.
Ralph H. Davis, III                          C.A. # 04-1207                         September 6, 2005

Page 14

1    Seemed to be out of place.
2        Q.   Let me ask you:  Do you think there were enough
3    staff assigned to the firing range prior to December 1st
4    of 2003?
5             MR. ELLIS:  Object to the form of the
6    question.
7        A.   To get it from two perspectives.
8    Professionally, from what I have learned, the national
9    standards for ranges, we are -- were dramatically
10   understaffed at the range.  I mean, there are ratios that
11   other ranges follow that we were not even close to it.
12   We have a one-to-two ratio or one-to-three ratio and we
13   were sometimes at one to ten.
14       Q.   Just so we're clear, you're talking about the
15   instructor-to-student ratio?
16       A.   I apologize.  Yes, sir.  The
17   student-to-instructor ratio.  We were one to ten
18   frequently, and it was, as far as the safety goes, just a
19   nightmare.
20            But as far as being able to maintain the
21   range, we were sorely understaffed, as well, because not
22   only did we have issues, the actual shooting, these
23   gentlemen were required to do administrative tasks that
24   simply had to be put aside and they were not a priority.

Page 15

1        Q.   Captain Davis, I'd like to put a document in
2    front of you.  I'm going to mark this as Davis Deposition
3    Exhibit No. 1.  For the purpose of the record, I'd like
4    to identify this document as being the answer to
5    interrogatory No. 12 from the Price, Warren, and Foraker
6    v. Chaffinch and MacLeish case.
7             MR. ELLIS:  Whose answer?  This is your
8    answer?
9             MR. NEUBERGER:  I'm sorry.  Yes, it's
10   plaintiffs' answer.
11            MR. ELLIS:  This is an answer to an
12   interrogatory?
13            MR. NEUBERGER:  Yes.  No. 12.  It's halfway
14   down on the first side.
15            MR. ELLIS:  What are we calling this?
16            MR. NEUBERGER:  Davis Deposition Exhibit
17   No. 1.  This may be the same documents, for the purposes
18   of the record, as Baylor Deposition Exhibit No. 3, but
19   the only copy of that I could find was very poor quality
20   and was hard to read.
21            (Davis Deposition Exhibit No. 1 was marked
22   for identification.)
23   BY MR. NEUBERGER:
24       Q.   Captain Davis, do you see how halfway down on

Page 16

1    the first page of this document there's a number 12?
2        A.   Yes, sir.
3        Q.   What I'd like you to do is I'd like you to start
4    at that point and just read this document quietly to
5    yourself and then tell me when you're finished.
6        A.   Thank you.  (Complied.)
7        Q.   Captain Davis, have you reviewed this document?
8        A.   Yes, I have.  Thank you.
9        Q.   You worked with Master Corporal Wayne Warren and
10   Master Corporal Kurt Price and Sergeant Chris Foraker for
11   many years?
12       A.   Yes.
13            MR. ELLIS:  Object to the form of the
14   question.
15            THE WITNESS:  Yes, I do.
16       Q.   If they swore that the FTU was in the condition
17   described in the exhibit, would you have any reason to
18   disagree with them?
19            MR. ELLIS:  Object to the form of the
20   question.
21       A.   None whatsoever.  No reason to disbelieve what
22   they said.
23       Q.   Would you have any reason that they were not
24   being truthful or honest?

Page 17

1        A.   No reason whatsoever.
2        Q.   Are you familiar with their reputations for
3    truthfulness and honesty in the Delaware State Police?
4        A.   Yes, I am.
5        Q.   What is their reputation for truthfulness and
6    for honesty in the Delaware State Police?
7        A.   I believe that they're, all three, held in very
8    high regard by all members of the division, not only
9    junior people but senior people, as well.  They're
10   respected for their knowledge of firearms training and
11   just their integrity as a whole.
12       Q.   Captain, we're done with that exhibit.
13            Did there come a time when you learned that
14   Sergeant Foraker and master corporals Price and Warren
15   were speaking out about the conditions at the FTU?
16       A.   Yes.
17       Q.   Do you recall when you discovered that?
18       A.   I first learned about it in the middle of
19   December of 2003 it would be.
20       Q.   Did any of the men speak to you orally and relay
21   to you concerns?
22       A.   I met with Sergeant Foraker sometime in the
23   middle of December.  I believe it's the 19th, but I can't
24   be certain of that.  But sometime in the middle of

5 (Pages 14 to 17)

Price, et al.                                             v.                                    Chaffinch, et al.
Ralph H. Davis, III                          C.A. # 04-1207                          September 6, 2005

Page 18

1  December Sergeant Foraker asked for a meeting with me and
2  brought to my attention some of the issues that were
3  addressed in the earlier exhibit.
4      Q.  Now, in the months that followed December of
5  2003, did Sergeant Foraker and master corporals Price and
6  Warren contact you on any other occasions and raise
7  concerns about the conditions at the Firearms Training
8  Unit?
9      A.  Because of the chain of command, I spoke with
10  Sergeant Foraker on very, very, very many occasions
11  concerning that, but I also spoke individually with
12  corporals Warren and Price concerning the conditions, as
13  well.
14      Q.  Did the three of them send you any e-mails about
15  the conditions at the Firearms Training Unit beginning in
16  December of 2003 through, let's say, June of 2004?
17      A.  Yes, they did.
18      Q.  I'd like to put some exhibits in front of you.
19  This first exhibit was previously marked as MacLeish
20  Deposition Exhibit 11.
21          Ed, you have a copy of this?
22          MR. ELLIS:  Unfortunately, I forgot my
23  copies.  Sorry.
24          MR. NEUBERGER:  No problem at all.

Page 19

1  BY MR. NEUBERGER:
2      Q.  Captain Davis, do you have this document in
3  front of you?
4      A.  Yes, I do.
5      Q.  At the bottom right-hand corner of this document
6  it says FTU3881?
7      A.  Yes, it does.
8      Q.  Does this appear to be, I guess, three e-mails,
9  this document?
10      A.  Yes, sir.
11      Q.  I'd like you to look at the original e-mail
12  which I guess would be the third e-mail down on the first
13  page.  Do you see that?
14      A.  Yes, I do, sir.
15      Q.  Does it say it's sent from Chris Foraker on
16  December 19th, 2003?
17      A.  Yes, it does.
18      Q.  It's sent to then Lieutenant Colonel MacLeish
19  and I guess then Major Paul Eckrich?
20      A.  Yes, sir.
21      Q.  It's also copied to Captain Greg Warren and to
22  you, as well?
23      A.  That's right.
24      Q.  The subject line is "Emergency Range Issues"?

Page 20

1      A.  Yes, it is.
2      Q.  Do you recall if you ever received a copy of
3  this e-mail?
4      A.  If I could have a chance to look at it.
5      Q.  Sure.
6      A.  All right, sir.  I have had a chance to review
7  it, and I do recall the e-mail.
8      Q.  I think you mentioned a few minutes ago that --
9  actually, let me ask you:  Is the DSP, in your opinion, a
10  paramilitary organization?
11      A.  Yes, it is.
12          MR. ELLIS:  Object to the form of the
13  question.
14      Q.  Is there a chain of command within the
15  organization?
16      A.  Yes.
17          MR. ELLIS:  Object to the form of the
18  question.
19      Q.  You were at the time Sergeant Foraker's
20  lieutenant; isn't that right?
21      A.  That's correct.
22      Q.  If an e-mail was sent to you about health or
23  safety concerns at the FTU, would you have passed that up
24  the chain of command?

Page 21

1      A.  Absolutely.  Typically, if it were something I
2  could handle, I would handle it myself.  That's the --
3  I'd handle it at the lowest level possible.  However,
4  something of this magnitude absolutely would be sent
5  through the chain of command.
6      Q.  Who would you send it to?
7      A.  To Captain Gregory Warren, the director of
8  training.
9      Q.  I'd like to put another document in front of
10  you, one which was previously marked as MacLeish
11  Deposition Exhibit No. 12.
12          Captain Davis, do you have this document in
13  front of you?
14      A.  Yes, sir, I do.
15      Q.  Let's first look at the first page, the very
16  top.  Does this appear to be an e-mail sent from you to
17  Chris Foraker on January 9th of 2004?
18      A.  Yes, it does.
19      Q.  Does it appear to say, "Chris, thanks for
20  keeping us apprised.  I'll get back to you with answers
21  and will continue to address your concerns with the
22  staff.  Ralph"?
23      A.  That's exactly what it says.
24      Q.  You see the end of the second sentence where it

6 (Pages 18 to 21)

Price, et al.                                         v.                              Chaffinch, et al.
Ralph H. Davis, III                        C.A. # 04-1207                        September 6, 2005

Page 22

1  says, "will continue to address your concerns with the
2  staff"?
3      A.  Yes, sir.
4      Q.  What staff were you referring to, if you recall?
5      A.  If I could review the e-mail --
6      Q.  Sure.
7      A.  -- I'll be able to answer more...
8          All right, sir.  I have had a chance to
9  review it.
10     Q.  Do you recall ever receiving this e-mail?
11     A.  Yes, sir, I do.
12     Q.  You can put that document down.
13     A.  To answer your question about the staff, the
14 staff that I was referring to in this letter would be the
15 Delaware State Police executive staff which is the
16 colonel, lieutenant colonel, and the majors.
17     Q.  So at the time would that have been
18 Colonel Chaffinch and Lieutenant Colonel MacLeish?
19     A.  Correct.
20     Q.  And then do you recall who the majors would have
21 been at that time?
22     A.  Major Papili, Major Baylor, Major Seifert, and
23 Major Eckrich.  I guess there would have been one other.
24     Q.  Would that have been either Major Swiski or

Page 23

1  Major Hughes?
2      A.  I believe Major Swiski was gone at this time.
3  Major Hughes would have been the Sussex field operations
4  officer.
5      Q.  So you indicated that you were referring to
6  raising these issues with those members of the executive
7  staff?
8      A.  The executive staff would deal with personnel
9  issues, transfers in, transfers out, increasing the
10 staffing of a unit.
11     Q.  You can put that document down.
12         I'd like to put another document in front
13 of you, one which was previously marked as MacLeish
14 Deposition Exhibit 13.
15         Captain Davis, could you take a look at
16 this document?  And you may want to read it quietly to
17 yourself.
18     A.  Thank you.  (Complied.)
19         Okay, sir.  I reviewed the document.
20     Q.  Does this appear to be an e-mail sent from
21 Sergeant Chris Foraker to Captain Warren and copied to
22 you on January 9th, 2004, at 7:58 p.m.?
23     A.  Yes, sir, it does.
24     Q.  Do you recall if you ever read this document?

Page 24

1      A.  Honestly, this is the first time I feel that I
2  have ever read this, but obviously it was cc'd to me.  I
3  just don't recall receiving this.
4      Q.  Let's turn to the second page of the document.
5  And the very last line of the second page, does it at
6  least appear to indicate that the e-mail message was
7  opened by you on January 10, 2004, at 12 noon?
8      A.  Yes, it does indicate that.
9      Q.  You can put that document down.
10         I'd like to put another document in front
11 of you.  This one was previously marked as MacLeish
12 Deposition Exhibit No. 14.  Could you just read this
13 document quietly to yourself, Captain?
14     A.  Sure.  (Complied.)
15         All right, sir.  I have had a chance to
16 review the document.
17     Q.  Does the second e-mail on this first page appear
18 to be an e-mail which was sent from Chris Foraker to you
19 and Captain Greg Warren on January 23rd, 2004?
20     A.  Yes, it does.
21     Q.  Do you recall at this time if you remember
22 reading that document?
23     A.  I do remember reading this document.
24     Q.  I'd like to direct your attention to the second

Page 25

1  paragraph, towards the end of the paragraph where there's
2  a quote that "You have to die from something."  The third
3  line up.  Do you see that?
4      A.  Yes, I do.
5      Q.  You have read that whole paragraph?
6      A.  Yes, I have.
7      Q.  This paragraph at least appears to indicate that
8  after corporals Price and Warren raised some issues with
9  then Sergeant Ashley regarding their blood lead levels,
10 that he said to them "You have to die from something."
11         MR. ELLIS:  I was waiting for the question.
12 BY MR. NEUBERGER:
13     Q.  You were in the Marines for four years on active
14 duty, right?
15     A.  Correct.
16     Q.  And you have been with the Delaware State Police
17 for 19 years?
18     A.  That's correct.
19     Q.  Do you think "You have to die from something" is
20 an appropriate response to give to a subordinate when a
21 subordinate expresses some concerns about their health
22 and safety?
23         MR. ELLIS:  I object to the form of the
24 question.

7 (Pages 22 to 25)

Price, et al.                                    v.                              Chaffinch, et al.
Ralph H. Davis, III                      C.A. # 04-1207                      September 6, 2005

Page 26

1    A.  I think in retrospect, if I had said that, I
2    would probably wish I had not said that. I'm not immune
3    from saying stupid things or insensitive things, but had
4    I said that, I probably would have wished I could retract
5    that statement.
6        Q.  I put another document in front of you. This
7    one was previously marked as MacLeish Deposition Exhibit
8    No. 15. Could you read this quietly to yourself?
9        A.  Sure. (Complied.)
10           Okay, sir. I have reviewed the document.
11       Q.  Does this appear to be an e-mail which was sent
12   from Sergeant Chris Foraker to Major Paul Eckrich and
13   then copied to Captain Greg Warren and to yourself on
14   Thursday, February 19th, 2004?
15       A.  Yes, it does.
16       Q.  Do you recall reading this e-mail --
17       A.  Yes, sir.
18       Q.  -- at that time?
19       A.  Yes, I do, sir.
20       Q.  Put that document down.
21           I'd like to put one more document in front
22   of you. This one was previously marked as MacLeish
23   Deposition Exhibit No. 18.
24           Captain, could you please read that

Page 27

1    document quietly to yourself?
2        A.  Sure. (Complied.)
3            Okay, sir. I have reviewed the document.
4        Q.  Captain, does this appear to be an e-mail sent
5    from Corporal James P. Warwick to Captain Greg Warren and
6    then copied to Chris Foraker, Wayne Warren, Kurt Price,
7    and yourself?
8        A.  Yes, it does.
9        Q.  The date is April 21st, 2004?
10       A.  Yes, it is.
11       Q.  Having read this document, can you see that this
12   document deals with the National Institute for
13   Occupational Safety and Health?
14       A.  Yes, sir.
15       Q.  Do you recall hearing anything about what I'll
16   call NIOSH wanting to come in and do some testing on the
17   FTU in April 2004?
18       A.  Yes, I do recall that.
19       Q.  Specifically what do you recollect about that?
20       A.  My recollection is that the firearms staff,
21   Firearms Training Unit staff, felt that NIOSH would be an
22   unbiased test entity, unbiased observer, who would be
23   able to come in and, if I recall this correctly, at no
24   charge and would review our entire firearms operation and

Page 28

1    generate a report on what needed to be done. And, again,
2    they were unbiased and it was free. I don't know what
3    could be better than that.
4        Q.  Do you know if anything ever came of that?
5        A.  Just from what's in the e-mail, that there
6    was -- for some reason the State felt it was not
7    appropriate to have NIOSH do the test.
8        Q.  To the best of your knowledge, did NIOSH ever
9    come in and run tests on the facility known as the
10   Firearms Training Unit?
11       A.  To the best of my knowledge, no, they did not.
12       Q.  That didn't happen when you were the lieutenant
13   at the academy?
14       A.  Correct.
15       Q.  To the best of your knowledge, has it happened
16   since you were promoted to captain?
17       A.  To the best of my knowledge, it has not
18   happened.
19       Q.  You can put that document down.
20           Now, we just ran through a series of
21   e-mails that were either sent to you or copied to
22   you; is that correct?
23       A.  Yes, that's correct.
24       Q.  I think you testified a little bit earlier that

Page 29

1    staff of the FTU, in addition to sending e-mails, were
2    also orally raising concerns with you about the
3    conditions at the FTU. Would that be correct?
4        A.  That's accurate.
5        Q.  Did you have any reason to believe that
6    Chris Foraker, Wayne Warren, and Kurt Price were not
7    acting in good faith when they were raising their
8    concerns about the health and safety of the conditions at
9    the FTU?
10           MR. ELLIS:  Object to the form of the
11   question.
12       A.  No. I believe that they were being honest and
13   sincere whenever they raised a concern. Honest and
14   sincere for their own health, the health and safety of
15   their families, but I think overall the health and safety
16   of us who had occasion to visit at least two occasions to
17   shoot.
18       Q.  Did you think they were trying to cause trouble?
19       A.  Absolutely not, no.
20       Q.  I think you indicated that they were trying to
21   protect the health and safety of those who worked and
22   trained there, as well as their families?
23       A.  Yes, that's correct.
24       Q.  In your opinion, did you think that the concerns

8 (Pages 26 to 29)