Price, et al.                                    v.                         Chaffinch, et al.
Ralph H. Davis, III                      C.A. # 04-1207                September 6, 2005

Page 30

1  that they were raising were serious?
2        MR. ELLIS:  Object to the form of the
3  question.
4     A.  Absolutely.
5     Q.  When they raised the concerns to you, be it
6  orally or in writing, did you find that they did so in a
7  disruptive manner?
8     A.  Absolutely not.  No.  I would meet with them at
9  formal meetings or informal occasions and they would
10  bring up their concerns to me, basically pleaing for
11  help, we need to get this thing resolved, how can we get
12  it done.  They were following the appropriate chain of
13  command that should have worked to accomplish those
14  requests.
15     Q.  Did you find that you weren't able to do your
16  job because they were trying to essentially get the range
17  fixed?
18        MR. ELLIS:  Object to the form of the
19  question.
20     A.  I felt that I, not only myself, and I'll speak
21  for Captain Warren, as well, spent a huge amount of our
22  time addressing the issues they brought to us.
23     Q.  Was that because you thought they were important
24  issues which needed to be addressed?

Page 31

1     A.  Absolutely.
2     Q.  Did anything they said to you threaten your
3  authority as their lieutenant?
4     A.  No, never.
5     Q.  Do you know of anything that they said which
6  impugned your integrity?
7     A.  Absolutely not.
8     Q.  Are you aware of anything that they may have
9  said which would have threatened Captain Warren's
10  authority?
11     A.  Not at all.
12     Q.  Are you aware of anything that they may have
13  said which would have impugned Captain Warren's
14  integrity?
15     A.  Never.
16     Q.  You were the assistant director of training in
17  the end of 2003 and the beginning of 2004; isn't that
18  right?
19     A.  That's correct.
20     Q.  And director of training at the time was Captain
21  Greg Warren?
22     A.  That's correct.
23     Q.  Would that have made you his second in command?
24     A.  That's correct.

Page 32

1     Q.  Did you work closely together with
2  Captain Warren?
3     A.  Very closely, yes, sir.
4     Q.  Based on your observations, did he do his job
5  well?
6        MR. ELLIS:  Object to the form of the
7  question.
8     A.  Based on my observations, Captain Warren went
9  well above his job requirements in addressing the issues
10  about the Firearms Training Unit.
11     Q.  Based on your interactions with Captain Warren,
12  did you find him to be a truthful man?
13     A.  Very truthful.
14     Q.  Based on your interactions with Captain Warren,
15  did you find him to be a man of honor?
16     A.  Very much so.
17     Q.  Captain Davis, I'd like to put another document
18  in front of you.  This document was previously marked as
19  Chaffinch Deposition Exhibit No. 2.  Could you read this
20  document quietly to yourself, Captain?
21     A.  Yes, sir.  (Complied.)
22        Okay, sir.  I have had a chance to review
23  the document.
24     Q.  Capital Davis, have you ever seen this document

Page 33

1  before?
2     A.  Yes, sir, I have.
3     Q.  Does this appear to be a memo sent to you from
4  Sergeant Alfred W. Parton, Jr., who was the NCOIC at the
5  time of the SORT, S-O-R-T, team?
6     A.  It does appear to be that, yes, sir.
7     Q.  Do you recall approximately when you received
8  this document, because it appears to be undated?
9     A.  I do not recall a date, no, sir.
10     Q.  But it would have had to have been when you were
11  a lieutenant, because it appears to be addressed to
12  Lieutenant Ralph Davis, correct?
13     A.  That's correct.
14     Q.  Page 1 of this exhibit, does Sergeant Parton
15  appear to be expressing that there were problems at the
16  FTU even when he was in charge of the FTU?
17     A.  Yes, that's what he's stating in the memo.
18     Q.  Did he ever talk to you about that or ask you if
19  you had received this memo or anything like that?
20     A.  I don't recall speaking to him personally about
21  receiving the memo.
22     Q.  But you did receive the memo?
23     A.  Oh, I remember it, yes, sir.
24     Q.  You can put that document down.

9 (Pages 30 to 33)

Price, et al.                                  v.                              Chaffinch, et al.
Ralph H. Davis, III                    C.A. # 04-1207                   September 6, 2005

Page 34

1     I'd like to direct your attention --
2        MR. ELLIS: Before you go on, this you said
3  was Chaffinch what, 2?
4        MR. NEUBERGER: 2.
5  BY MR. NEUBERGER:
6     Q. Now, Captain, do you recall a time in July of
7  2004 when you were at a commanders' and section chiefs'
8  meeting when Sergeant Foraker was asked to go out into
9  the hallway with I guess then Lieutenant Colonel
10  MacLeish?
11     A. I do remember that meeting, yes, sir.
12     Q. Do you recall that he was asked to go out into
13  the hallway before the meeting began by Lieutenant
14  Colonel MacLeish?
15     A. Well, what I recall about that was I learned of
16  these events that you just described after the meeting.
17  I was called into the director of training's office,
18  Captain Greg Warren's office, by the lieutenant colonel,
19  and he began to explain why he removed Sergeant Foraker
20  from the meeting.
21        At that time I had no idea he had removed
22  Sergeant Foraker from the meeting. But he went on to
23  explain that this was a meeting for captains and section
24  chiefs only; he's very sensitive to the issue of Sergeant

Page 35

1  Foraker and the lawsuit and he asked him to leave because
2  he is not a section chief or a captain.
3     Q. Do you recall if he said anything else to you
4  during that meeting?
5     A. During the meeting in the director of training's
6  office?
7     Q. Yes.
8     A. No, I do not. He did not say anything else.
9     Q. To the best of your knowledge, was
10  Sergeant Foraker the section chief of the Firearms
11  Training Unit?
12     A. Absolutely. If I recall, too, Mr. Neuberger,
13  that Sergeant Foraker was told -- I spoke to
14  Sergeant Foraker about this later. Sergeant Foraker was
15  directed to be at those meetings as a section chief. But
16  in particular, I may be mistaken, but this was a special
17  occasion when section chiefs were supposed to appear to
18  have their photos taken for some publication. I'm not
19  sure if it was our annual report. But Sergeant Foraker
20  was specifically directed to be there on that date.
21     Q. How did it come about that you were at that
22  meeting? Did you receive an order or a request to be
23  there?
24     A. Well, section chiefs, troop commanders, that is

Page 36

1  the standing order to be at those meetings because it is
2  a commanders' meeting. I did not receive a special
3  invitation I'll say. But if I recall, Sergeant Foraker
4  was told to be there at that meeting. By whom, I'm not
5  sure. And by what media, I'm not sure, either. But he
6  was told to be there at that meeting.
7     Q. I'm going to skip back to January of 2004. Did
8  you ever attend a meeting at the FTU with staff of the
9  FTU and also members of Facilities Management?
10     A. Yes, I did.
11     Q. Do you recall if it happened on one occasion or
12  maybe more than one occasion?
13     A. I recall attending just one meeting on one
14  occasion.
15     Q. Do you recall that there were representatives of
16  Facilities Management at that meeting?
17     A. I recall at least two, if not a third individual
18  from Facilities Management attending the meeting.
19     Q. Did they express any type of an attitude or a
20  feeling towards the concern that the men were raising?
21        MR. ELLIS: Object to the form of the
22  question.
23     A. I would say the two individuals that I
24  specifically remember being there had two different

Page 37

1  attitudes. There was an engineer there, Mark DeVore, I
2  believe. DeVore is the last name definitely. His was a
3  defiant attitude and almost looking down upon -- step
4  back.
5        Corporal Warren seemed to be running the
6  meeting. He was the knowledgeable person of the range.
7  He was giving us a tour. He was doing most of the
8  discussion. As we toured the facility, Corporal Warren
9  would point out issues that he felt needed to be
10  addressed that, No. 1, may fix the problem and he was
11  also identifying problems as we went along. And
12  Mr. DeVore's attitude was almost you don't know what
13  you're talking about, I'm the engineer, you're a cop,
14  basically. That theme carried throughout the tour
15  whether we were in the control room, out on the range, or
16  back behind the bullet trap.
17        The other individual I remember attending
18  the meeting from Facilities Management was
19  Mr. Doyle Tiller. He was very congenial and he was
20  listening, but he didn't appear to be very knowledgeable
21  of the things that Corporal Warren and I believe
22  Corporal Warwick were there that we were discussing. We
23  talked about the composition of the frangible ammunition,
24  and on that occasion he told me that, oh, there's

10 (Pages 34 to 37)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Price, et al.                                  v.                           Chaffinch, et al.
Ralph H. Davis, III                    C.A. # 04-1207                September 6, 2005

Page 38

1  nothing -- no heavy metal in it; it's all ceramic.  He
2  didn't appear to be very knowledgeable as -- I believe
3  his title is plant hygienist or physical hygienist.  He
4  didn't appear to be very knowledgeable in that regard.
5  But he was not defiant or antagonistic at all.
6      Q.   Did you later find out that there was, in fact,
7  heavy metals in the bullets that were being fired at the
8  FTU?
9      A.   Yes, I did.  To my surprise.  My association
10  with the Firearms Unit began in earnest probably in March
11  of 2003, and even prior to that I was always under the
12  impression that this was a nontoxic, lead-free frangible
13  ammunition.  Nontoxic to me, I would think you would lead
14  everybody to believe there were no heavy metals in it,
15  because my limited knowledge of that area, heavy metals
16  are toxic.
17      Q.   Just speaking as a trooper who trained there
18  twice a year, is that something that would be of concern
19  to you?
20      A.   Absolutely.  I thought it was a positive that we
21  went away from lead, not knowing that we were going from
22  one heavy metal to another, which there's no gain there I
23  don't believe.
24      Q.   Let me just name some of the heavy metals and

Page 39

1  see if they ring a bell to you.  Arsenic, tin,
2  nitroglycerine, copper?
3      A.   Copper, zinc.
4      Q.   Are those the types of heavy metals that you
5  later found out were in the ammunition?
6      A.   Yes.
7          MR. ELLIS:  Is nitroglycerine a heavy
8  metal?
9      Q.   Is nitroglycerine a toxic material which you
10  later found out was in the ammunition being shot?
11      A.   I believe it's a toxic element, and I found out
12  that it was in the round, yes, sir.
13      Q.   For example, there's a periodic table which I
14  probably haven't looked at since chemistry class in high
15  school.  Have you looked at the periodic --
16          MR. ELLIS:  I guarantee you nitroglycerine
17  is not on the periodic table.
18          MR. NEUBERGER:  It's NI?
19  BY MR. NEUBERGER:
20      Q.   In all seriousness, are those all substances
21  which, to the best of your knowledge, are toxic?
22      A.   Absolutely.
23          MR. ELLIS:  Was the nitroglycerine in pill
24  form?

Page 40

1          THE WITNESS:  It was in bullet form.
2      Q.   Have you ever been to a place called Sambo's?
3      A.   I have not.  I have heard about the place and a
4  reputation, but I have never been there personally.
5      Q.   What have you heard about the place?
6      A.   I heard that -- it's actually a very nice place
7  to go.  It's very laid-back.  People go there to relax,
8  to have fun, sort of let their hair down, say what they
9  want to say, and eat crabs and drink beer.
10      Q.   Have you ever heard that it's a popular place to
11  go?
12      A.   Yes.
13          MR. NEUBERGER:  I'd like to take a short
14  probably one-minute break.  I want to confer with my
15  clients out in the hallway and see if I have missed
16  anything, and I don't think I will have any more
17  questions after that.
18          MR. ELLIS:  Okay.
19          (A recess was taken.)
20          MR. NEUBERGER:  Captain Davis, I have no
21  further questions for you.
22          THE WITNESS:  Thank you, sir.
23  BY MR. ELLIS:
24      Q.   Captain Davis, I have a couple questions.

Page 41

1          I think you testified that you became the
2  assistant director of training in about October 1999.  Is
3  that correct?
4      A.   No.  October of 1999 my title -- I was a
5  lieutenant, but my title was special projects
6  coordinator.
7      Q.   I missed something in your history.
8      A.   I'm sorry.
9      Q.   When did you become assistant director of
10  training?
11      A.   It would have been March of 2003.
12      Q.   Who was your predecessor?
13      A.   As the assistant director of training?
14      Q.   Right.
15      A.   Lieutenant Purcell, P-u-r-c-e-l-l.
16      Q.   I'm going to put a document in front of you that
17  I'm going to ask the court reporter to mark whatever
18  we're up to.
19          (Davis Deposition Exhibit No. 2 was marked
20  for identification.)
21  BY MR. ELLIS:
22      Q.   Have you ever seen this document before?
23      A.   Yes, sir, I have.
24      Q.   Where did you see it?

11 (Pages 38 to 41)

Price, et al.                                          v.                          Chaffinch, et al.
Ralph H. Davis, III                         C.A. # 04-1207                    September 6, 2005

---

Page 42

1    A.   I believe Sergeant Foraker provided it to me, to
2  Captain Warren, and to Sergeant Ashley at the, as it
3  indicates, December 1st, 2003, transition meeting.
4    Q.   Is this your handwriting on this document?
5    A.   Yes, sir, it is.  I believe this is the document
6  I also provided to the State Auditor's Office during
7  their review.
8    Q.   Have you provided it to anybody else?
9    A.   Not that I recall.
10   Q.   For example, immediately after the meeting that
11  occurred on December 1 of 2003, did you provide a copy to
12  your boss?
13   A.   To Captain Warren?
14   Q.   Yes.
15   A.   He was at the meeting, so he would have had his
16  own.
17   Q.   You testified that he left at some point during
18  the meeting.
19   A.   Yes.  We did a sit-down meeting in a conference
20  room initially.  Captain Warren, I forget what event --
21  he was required to leave -- he left and then we did the
22  tour, myself, Sergeant Ashley, and Sergeant Foraker.
23   Q.   Was this document produced at the beginning of
24  the meeting, at the middle of the meeting, or at the end

Page 43

1  of the meeting?
2    A.   Beginning of the meeting.  I believe
3  Sergeant Foraker wanted it -- if I recall, his intent was
4  so that we had some continuity almost as if it were an
5  agenda.  These were the issues he wanted to address in
6  the meeting, let's keep on task.
7    Q.   This is a document that you first received blank
8  from Sergeant Foraker at the beginning of the meeting on
9  December 1?
10   A.   Well, not blank.  It had the issues to the left
11  I guess you will say.
12   Q.   I'm sorry.  When I say "blank," I mean there was
13  no handwriting on it?
14   A.   Correct.
15   Q.   The typed part was there, but the handwriting
16  wasn't?
17   A.   That's accurate, yes, sir.
18   Q.   Who directed the meeting; in other words, who
19  was running the meeting?
20   A.   I believe initially it was Captain Warren.
21  We're a paramilitary organization.  The highest ranking
22  officer.
23   Q.   The captain?
24   A.   Right.

Page 44

1    Q.   Did you expect to see this type of document at
2  that meeting?
3    A.   No.  I was pleasantly surprised, actually.
4    Q.   Why were you surprised?
5    A.   Typically meetings can be a little run amuck and
6  let's sit down and kind of B.S., what's the problem,
7  let's get it done, let's get it over with.  I was
8  impressed that Sergeant Foraker obviously had been
9  thinking about the meeting prior to the meeting and took
10  the time to construct such a document.
11   Q.   Was this the first time during your tenure as
12  the assistant director of training that there had been a
13  change in command at the Firearms Training Unit?
14   A.   Yes.
15   Q.   The first comment made on the upper left-hand
16  corner, isn't really a comment, says "Wayne, Kurt" and
17  then there's a mark and it says "Jon," J-o-n.
18   A.   I think that's January.
19   Q.   January.  Do you know what that refers to?
20   A.   No idea, sir.
21   Q.   Below that it says, "Jimmy - needs baseline."
22  Would that be Jimmy Warwick?
23   A.   Corporal Warwick, yes, sir.  He had just
24  recently been assigned to the Firearms Training Unit, and

Page 45

1  I'm referring to the fact that he needs a baseline blood
2  test.
3    Q.   Would that be a blood lead level?
4    A.   Yes, sir.
5    Q.   The first line of the document that is typed has
6  Wayne Warren's name on the left side of the document.  Do
7  you see that?
8    A.   Yes, I do.
9    Q.   Can you read for me what's in your handwriting
10  just to the right of that?
11   A.   "Patrol Procedures."
12   Q.   "Patrol Procedures"?
13   A.   Can't say it -- "patrol Procedures."
14   Q.   What does that refer to?
15   A.   Corporal Warren was our -- one of our lead
16  patrol procedure instructors.
17   Q.   Does that mean that he instructed recruits at
18  the academy on patrol procedures?
19   A.   Besides his primary function as a firearms
20  instructor, he was also tasked with providing patrol
21  procedures courses for the recruits, yes, sir.
22   Q.   Bruce Peachey was another person sent to the
23  Firearms Training Unit at the time, right?
24   A.   I believe he was temporarily assigned due to an

12 (Pages 42 to 45)

Price, et al.                                    v.                        Chaffinch, et al.
Ralph H. Davis, III                        C.A. # 04-1207                September 6, 2005

Page 46

1  injury he sustained while working, yes, sir.
2    Q.  As of December 1, 2003, he would have been
3  almost ready to retire, right?
4    A.  Yes, sir.
5    Q.  Is February 9th his retirement date?  See
6  that --
7    A.  I don't believe he retired in February.  I
8  believe he lasted through the summer at least of 2004.
9    Q.  Do you know what you meant when you wrote
10  "physician's note" just to the left of February 9th?
11    A.  I think his physical status as far as was he a
12  light duty, how much could he work because of the injury
13  he sustained in his legs, I think we were requesting a
14  physician's note just to identify his status for us.
15    Q.  Who is it that's requesting a physician's note?
16    A.  I don't recall who requested that.  I don't know
17  if it was just something that was brought up.  I don't
18  know -- he wasn't in attendance, so it definitely wasn't
19  him.  I don't remember if Captain Warren said we need to
20  get a physician's note and I wrote down a reminder for
21  myself.
22    Q.  Who's responsible for getting the physician's
23  note under those circumstances when you have a person
24  who's got a physical injury?

Page 47

1    A.  The trooper.  The injury trooper.
2    Q.  I guess what I mean is who in the chain of
3  command is responsible for making sure the trooper
4  provides the note?
5    A.  I guess the trooper ultimately is responsible
6  for it, but the supervisor should see that they provide
7  the note.
8    Q.  In this case would it be Sergeant Ashley or
9  would it be you?
10    A.  It should have been Sergeant Ashley.
11    Q.  If Sergeant Ashley didn't do it, then you were
12  responsible?
13    A.  Correct.
14    Q.  Down below that where you have a line for
15  Jim Warwick, can you read to me what you wrote there?
16    A.  The abbreviation for captain, will identify,
17  abbreviated, firearms school/course.
18    Q.  Why did you write that?
19    A.  Corporal Warwick came into the unit without
20  formal firearms training and the captain obviously either
21  had agreed or we collectively agreed that the captain
22  would identify a course to which we could send
23  Corporal Warwick.
24    Q.  Is that so he could become certified?

Page 48

1    A.  Correct.
2    Q.  Further down there are some notes on FTU weapon
3  inventory.  You wrote the word "plenty" there next to
4  "Handguns."
5    A.  Yes, sir.
6    Q.  Is that correct?
7    A.  Yes, I did.
8    Q.  Why did you write that?
9    A.  We had a large surplus of handguns in the
10  Firearms Training Unit.  Basically Sergeant Ashley was
11  telling Sergeant Foraker we did not need to order any
12  more; we had plenty.
13    Q.  Here you're recording what Sergeant Ashley says
14  to Sergeant Foraker?
15    A.  Yes.
16    Q.  Is that same thing true with the "Shotguns"
17  line?
18    A.  "Mixed models," yes, sir.
19    Q.  How about the next line where it says, "Weapon
20  Destruction Status," could you read that just to make
21  sure?
22    A.  My handwriting says, "IA," referring to Internal
23  Affairs, "advised do not have to attend."
24    Q.  I don't see a "not" there.

Page 49

1    A.  I'm sorry.  "IA advised do have to attend."
2    Q.  It looks to me like it says, "do have to
3  attend."
4    A.  You're right.  "IA advised do have to
5  attend" is what it says.
6    Q.  Could you perhaps explain to us why you wrote
7  that down?
8    A.  I can't explain what I wrote, but I can explain
9  what I meant.
10    Q.  Explain what you meant.
11    A.  The typed verbiage prior to what I wrote states
12  "Weapon Destruction Status."  Apparently there was --
13  each year the Firearms Training Unit is responsible for
14  training any seized weapons.  There was some concern
15  whether Internal Affairs needed to accompany the Firearms
16  Training Unit to the destruction site or whether they did
17  not have to attend.  And here Sergeant Ashley told us
18  that they do not have to attend the actual destruction.
19    Q.  "They," meaning the FTU personnel?
20    A.  No.  The Internal Affairs section.
21    Q.  So over to the next page, please.
22    A.  (Complied.)
23    Q.  On the upper left-hand corner, as the statement
24  says, "hood to cleaning room."  What does that refer to?

13 (Pages 46 to 49)

Price, et al.                   v.                     Chaffinch, et al.
Ralph H. Davis, III              C.A. # 04-1207           September 6, 2005

---

Page 50

1    A.  There was an issue of the cleaning solution that
2  was being used to clean the weapons.  Not the trooper
3  themselves, but the Firearms Training Unit, they did a
4  more detailed cleaning.  The solution appeared to be
5  caustic, would burn their nose and eyes.  And they
6  brought up the issue of getting a hood installed, having
7  a hood installed in the cleaning room so that these fumes
8  would be vented.
9    Q.  Is this Sergeant Ashley telling you that getting
10  a hood in the cleaning room was something that was in the
11  process at that point?
12    A.  Yes.
13    Q.  The next line down where it says,
14  "Handgun-Service," can you read that for us?
15    A.  In my handwriting I have written: "frangible
16  old service ammo to SORT for outside shooting."
17    Q.  What does that mean?
18    A.  It means the service ammo -- we are currently
19  using frangible service ammo.  We did have some old
20  ammunition that was composed of lead that would be used
21  by our Special Operations Response Team for outside
22  shooting.
23    Q.  I understand.  What you're saying is you're
24  currently using frangible, the old stuff is being sent to

---

Page 51

1  SORT for outside --
2    A.  Because they were shooting outside.
3    Q.  And lead is less of a problem in the outside
4  environment?
5    A.  Correct.
6    Q.  By the way, is what I just asked you things that
7  Sergeant Ashley was telling Sergeant Foraker at the point
8  that Sergeant Foraker was taking over?
9    A.  Correct.
10    Q.  The remainder of the comments on the second page
11  of this document, are they things that Sergeant Ashley is
12  telling Sergeant Foraker at the point that he's turning
13  over the range?
14    A.  Yes, sir.
15    Q.  At the bottom left there's a comment.  It looks
16  like several names and some arrows.  Can you read the
17  names, please, that are in your handwriting?
18    A.  Rich, Ronnie, Kurt, Wayne, Amber.
19    Q.  Do you know who those people are?
20    A.  I have a pretty good feel for who they are.
21  Rich Ashley, Ronnie Rhoads, Kurt Price, Wayne Warren, and
22  Amber Smith Cammacho.
23    Q.  Why are their names written down there, and
24  what's the meaning of the arrows next to them?

---

Page 52

1    A.  They were the individuals or the troopers who
2  were certified as simunitions role players.
3    Q.  Again, this is something that Sergeant Ashley's
4  telling Sergeant Foraker?
5    A.  Correct.
6    Q.  The next section of the document is called
7  "Facility."  I don't see anything written next to
8  "Overall Building Conditions."  Why didn't you write
9  anything next to that?
10    A.  This was done prior to the tour.
11    Q.  I understand that.
12    A.  So I didn't revisit this after the tour.
13    Q.  Why not?
14    A.  I just didn't.  Not for any reason.  Just did
15  not.
16    Q.  The next line down where it says next to "Roof
17  leaks," it says -- I think this is "normal leaks"?
18    A.  Yes, sir, that's what it says.
19    Q.  Why did you write down "normal leaks"?
20    A.  Sergeant Ashley told us that.
21    Q.  Going over to the next page, the first line next
22  to the air-handling system, it says "balanced."  Is that
23  something Sergeant Ashley says?
24    A.  Yes.

---

Page 53

1    Q.  The next line down, "Lighting System,"
2  "reconfigured works well," that's something Ashley said?
3    A.  That's correct.
4    Q.  "Target System," could you read that?  I'm not
5  sure what that means in your handwriting.  I'm sorry.  I
6  don't mean to be insulting about your handwriting.
7  Sometimes it's legible and sometimes it's not.
8    A.  I understand.  "Running man working."
9    Q.  What does that mean?
10    A.  Part of the target system allowed the target to
11  move across the range as if it were a running individual.
12  And in this case Sergeant Ashley is telling us that it is
13  working.
14    Q.  That it is working?
15    A.  Correct.
16    Q.  "Sound System," these are things that
17  Sergeant Ashley told Sergeant Foraker and you recorded
18  them down?
19    A.  Correct.
20    Q.  "Works perfect & JBL remote system"?
21    A.  Yes, sir, that's what it says.
22    Q.  The next is "Bullet Trap - July/August
23  reworked."  Do you know what that means?
24    A.  I believe what he means is that in July and

---

14 (Pages 50 to 53)

Price, et al.                                    v.                          Chaffinch, et al.
Ralph H. Davis, III                      C.A. # 04-1207                September 6, 2005

Page 54

1    August of 2003 this system was repaired or reconfigured.
2        Q.   Do you know what the repair or reconfiguration
3    was?
4        A.   I have since learned since this meeting, not at
5    the meeting but during the period of time from this
6    meeting, that an addition was added to the drag system so
7    that the sludge that accumulated in the trap area would
8    be pulled out of the system.
9        Q.   Did you know that that had occurred at the time
10   that it occurred?
11       A.   I did not, no, sir.
12       Q.   The next line down is "Water/Oil Pump System."
13   I think it says "Goulds," G-o-u-l-d-s.
14       A.   That's correct.
15       Q.   I take it Goulds is the name of a pump?
16       A.   Yes, it is.
17       Q.   What's the significance of writing down "Goulds
18   pumps" here?
19       A.   Just because Sergeant Ashley told us that's the
20   type of pumps he was using.
21       Q.   The next line down says, "Conveyor Belt System -
22   runs 24/7/365 to prevent freeze-up."
23       A.   Yes, sir.
24       Q.   Do you know why it runs 24/7/365 to prevent

Page 55

1    freeze-up?
2        A.   I believe because of the composition of the
3    frangible ammunition, when it hit the ramp, would go into
4    the air, fall into the water.  If the conveyor system
5    wasn't running continually, the system would turn into
6    almost a concrete and it would freeze up the system.  The
7    system was not strong enough to start up and drag the
8    composite out.
9        Q.   How do you know that, what you just said?
10       A.   I know it from Sergeant Ashley telling us that.
11   I also learned it from talking to the firearms training
12   staff that this is what would take place.  It's common
13   sense, as well.  You drop concrete in the water, it
14   freezes up, the system can't pull it.
15       Q.   The next line says, "Cleaning Supplies."  Can
16   you read what that says?
17       A.   "Won't need patches."
18       Q.   Can you explain the meaning of that?
19       A.   My recollection is that Sergeant Ashley was able
20   to find a deal on patches, and, if I'm not mistaken, they
21   were patches that were made by prisoners.  Because of
22   this great price, he had ordered a huge number of
23   patches.
24       Q.   I'm sure I don't understand the workings of the

Page 56

1    Firearms Training Unit, but what's a patch?
2        A.   Used to clean the weapon.  You would push it
3    through the barrel of the weapon.
4        Q.   To clean the weapon, okay.
5        A.   Because of the savings by finding them at a
6    reduced cost, he had ordered a huge number and he was
7    telling us you won't need to order patches for a while.
8        Q.   That doesn't have anything to do with cleaning
9    the dust off the floor?
10       A.   No.  These typically are 2-by-2 patches, maybe
11   1-by-1, depending on the weapon.
12           MR. NEUBERGER:  You're talking about
13   inches, just for the record?
14           THE WITNESS:  I'm sorry.  Two inch by two
15   inch.  I'm sorry.
16       Q.   Down on the bottom of the third page there are
17   some things in your handwriting that I'd like you to go
18   over with us just to make sure I understand the words.
19           First, on the left, the first of the four
20   items mentioned at the bottom, could you read that?
21       A.   "Glocks two handguns missing."
22       Q.   By the way, maybe I should ask you this:  This
23   is all stuff that you wrote down before you actually went
24   on the tour, right?

Page 57

1        A.   Correct.
2        Q.   Keep going.
3        A.   The next area I wrote "Remedial training issue
4    date" with a question mark, DICAT."
5        Q.   What's a DICAT?
6        A.   It's an acronym for Division-wide Command
7    Accountability and Tracking.  It was a monthly meeting
8    where commanders and section chiefs were called together
9    and issues were addressed with those individual
10   commanders.
11       Q.   What type of remedial training are you talking
12   about here?
13       A.   If I recall, the issue was that, if an
14   individual went to our firearms range, to the range, and
15   did not qualify, there was a sequence of events in order
16   for them to be requalified and then they had to continue
17   to come back to the range quite frequently for training.
18           That created an issue -- compounded the
19   current staffing issue that we did not need.  By having
20   them come on frequently, that meant that the staff had to
21   dedicate more staffing to that issue.  They would like to
22   limit the amount of times that an individual would have
23   to come back and be retrained.
24       Q.   Now, this is something that Sergeant Ashley was

15 (Pages 54 to 57)

Page 58

1  telling you?
2      A.  I believe so, yes, sir.  All this is from
3  Sergeant Ashley.
4      Q.  In effect, that there were two Glock handguns
5  missing is also something Sergeant Ashley said?
6      A.  Yes, sir.
7      Q.  Go over farther to the right where it says
8  "exhaust fan."
9      A.  Yes, sir.
10     Q.  Is that what it says?
11     A.  It does say that, yes, sir.
12     Q.  Do you remember what the discussion about that
13  was that led you to write down "exhaust fan"?
14     A.  I believe we're referring back to the exhaust
15  fan in the cleaning room.  The hood that was referenced
16  on the second page.
17     Q.  Okay.
18     A.  He was explaining that he had discussed this
19  with Facilities Management.
20     Q.  Okay.  And the last item over on the right,
21  could you read that for us?
22     A.  It says, "5th person," and I'm guessing that it
23  also says, "maintenance/clerical."  "Clerical" I'm very
24  sure about.  The "maintenance" I'm not very clear on.

Page 59

1      Q.  Was that Sergeant Ashley suggesting that a fifth
2  person be assigned to the FTU?
3      A.  Yes, sir.
4      Q.  And the function of that fifth person was to do
5  maintenance and clerical work?
6      A.  Clerical issues, yes, sir.
7      Q.  When you were done this meeting -- I think you
8  said it occurred in the office area -- what did you do
9  with this piece of paper or at least with the original of
10  this piece of paper?
11     A.  With the actual paper itself, what did I do with
12  the paper?
13     Q.  Yes.
14     A.  I maintained a file of Firearms Training Unit
15  issues and that went in that file.
16     Q.  Did you ever talk to Sergeant Ashley about the
17  things that were discussed in this meeting after the
18  meeting was over?
19     A.  I do not recall speaking to him about this, no,
20  sir.  It seemed to be resolved issues.  There was no
21  follow-up that I see here.
22     Q.  Are there things that Sergeant Ashley told you
23  in this meeting that are untrue?
24     A.  To the best of my knowledge, no, sir.

Page 60

1      Q.  Now, it is my understanding, captain Davis, that
2  last week you received an instruction from
3  Colonel MacLeish to search for documents that might be
4  pertinent to any of the plaintiffs in this case, who are
5  all sitting across the table from you, or the Firearms
6  Training Unit.
7          Did you, in fact, get such a communication?
8      A.  Yes, I did.  Not exactly at that verbiage, but I
9  received an e-mail from the Colonel's secretary asking me
10  to provide or research documents concerning the Firearms
11  Training Unit and the range.
12     Q.  Now, did you provide a copy of that e-mail to
13  Mr. Neuberger?
14         MR. NEUBERGER:  Objection.  Attorney/client
15  privilege.  I instruct Captain Davis not to answer on
16  that basis.
17         MR. ELLIS:  I don't think the mere fact
18  that he sent it to you is privileged.
19         MR. NEUBERGER:  I think it is.  I think you
20  can ask him whether he communicated about it without the
21  specifics of what the communication was.  But it's your
22  questions, obviously.
23  BY MR. ELLIS:
24     Q.  Have you had communications with Mr. Neuberger,

Page 61

1  and I'm referring to Stephen Neuberger at least for the
2  time being, about the substance of the lawsuit that
3  brings us here today?
4      A.  No, sir.
5          MR. NEUBERGER:  I'll object on privilege
6  grounds here again.  I understand you're not asking
7  specifics, and I understand that he answered, but go
8  ahead.
9      Q.  Have you had communications -- I may have asked
10  this in a slightly different way.  Have you had
11  communications with Mr. Neuberger about the content of
12  that e-mail that you got from the Colonel's secretary?
13     A.  Yes.
14     Q.  You, I understand, were a plaintiff in a lawsuit
15  brought against Colonel Chaffinch sometime last year.  Am
16  I correct about that?
17     A.  Yes.
18     Q.  Would I be correct that that lawsuit was filed
19  in, roughly, February 2004?
20     A.  Correct.
21     Q.  When did you retain the Neuberger law firm to
22  represent you in that lawsuit?
23         MR. NEUBERGER:  Objection.  Attorney/client
24  privilege again.

16 (Pages 58 to 61)

Price, et al.                                v.                           Chaffinch, et al.
Ralph H. Davis, III                    C.A. # 04-1207                  September 6, 2005

Page 62

1       MR. ELLIS:  Date of hire, date of retaining
2   a lawyer is never privileged.
3       MR. NEUBERGER:  Under what authority is the
4   date not privileged?
5       MR. ELLIS:  It's not a communication.
6   What's privileged --
7       MR. NEUBERGER:  I think it is, the fact
8   that there is a meeting and when it would have occurred.
9       MR. ELLIS:  You're going to take the
10  position that you are this witness's attorney for purpose
11  of the Foraker, Warren, Price lawsuit?
12      MR. NEUBERGER:  I think you can certainly
13  ask him that, but I am going to take that position.
14      MR. ELLIS:  You're not going to let him
15  answer the question as to the date which your father at
16  the time for his own lawsuit --
17      MR. NEUBERGER:  The date, yes.  And I am
18  going to instruct him.
19      MR. ELLIS:  I want that clear for the
20  record because we may end up in court on some of this
21  stuff.
22  BY MR. ELLIS:
23      Q.  Your attorney has indicated that he is your
24  attorney for purposes of this current lawsuit.  By "the

Page 63

1   current lawsuit" I mean the Foraker, Price, Warren
2   lawsuit.  Did you hear that when he said that a couple
3   seconds ago?
4       A.  Yes, I did.
5       Q.  I'd like to ask you when that representation
6   began.
7       MR. NEUBERGER:  Hold on.
8       MR. ELLIS:  If you're going to instruct him
9   not to answer, that's fine.  I want to get the
10  parameters.  But I think I have to ask the question in
11  order to properly prepare the record.
12      MR. NEUBERGER:  Can you give me a second to
13  think about that?  Because I'm trying to go through my
14  knowledge of the case law.
15      MR. ELLIS:  Absolutely.
16      MR. NEUBERGER:  I'll object to that on
17  privilege grounds and instruct Captain Davis not to
18  answer specifically when the representation began.
19  BY MR. ELLIS:
20      Q.  What are the terms of Mr. Neuberger's
21  representation of you; in other words, are you paying
22  him?
23      MR. NEUBERGER:  Objection.  Attorney/client
24  privilege.  Instruct the client not to answer.

Page 64

1   BY MR. ELLIS:
2       Q.  Do you have a retainer agreement?
3       MR. NEUBERGER:  Again, same objection.
4   Attorney/client privilege.  Instruct Captain Davis not to
5   answer.
6   BY MR. ELLIS:
7       Q.  If the question is imprecise, do you have a
8   representation agreement, in other words, a letter, in
9   which Mr. Neuberger has set forth the terms of his
10  representation of you in connection with the Warren,
11  Price, Foraker lawsuit?
12      MR. NEUBERGER:  You can answer that.
13      A.  Could you repeat the question?
14      MR. ELLIS:  Can you read it back, please?
15      (The reporter read back as instructed.)
16      THE WITNESS:  No, I do not.
17  BY MR. ELLIS:
18      Q.  Were the terms of his representation of you
19  subject to an oral discussion?
20      MR. NEUBERGER:  Are you asking him what the
21  specific contents of the discussion were?
22      MR. ELLIS:  No.
23      MR. NEUBERGER:  Whether there was a
24  discussion --

Page 65

1       MR. ELLIS:  Just whether there was a
2   discussion.
3       A.  Yes.
4       Q.  When did that discussion take place?
5       MR. NEUBERGER:  Now, is this just a
6   variation on when the representation began question?
7       MR. ELLIS:  It isn't necessarily, but it
8   could be, but it really depends on the subject of the
9   communication which you said he's not going to answer.
10  Whether it reveals it or not, I can't tell you.
11      MR. NEUBERGER:  To the extent it's asking
12  when the representation began, I will object on privilege
13  grounds and instruct the client not to answer.
14      MR. ELLIS:  You're going to instruct him
15  not to answer when he had a conversation with you at
16  which you set the terms of the representation in this
17  lawsuit, meaning the Foraker, Price, Warren lawsuit.
18      MR. NEUBERGER:  I'm sorry.  Could I ask the
19  court reporter to read that again?
20      (The reporter read back as instructed.)
21      MR. NEUBERGER:  Yes.
22      MR. ELLIS:  Yes, you're instructing him not
23  to answer?
24      MR. NEUBERGER:  I'm sorry.  Correct.

17 (Pages 62 to 65)

A509

Price, et al.                                    v.                              Chaffinch, et al.
Ralph H. Davis, III                        C.A. # 04-1207                  September 6, 2005

|  | Page 66 |
|---|---|

1  BY MR. ELLIS:
2    Q.  Have you ever, and by that I mean ever,
3  discussed with Tom Neuberger or Steve Neuberger the
4  circumstances at the Firearms Training Unit?
5    A.  I do not recall an occasion where we discussed
6  that.
7      MR. NEUBERGER:  For the purposes of the
8  record, I'm letting you ask that question without waiver
9  of the privilege.
10     MR. ELLIS:  I don't think it sought
11  privileged information.
12     MR. NEUBERGER:  Right.  To the extent it
13  did, I just want that on the record, Ed.
14  BY MR. ELLIS:
15    Q.  Are you prepared, Captain Davis, to meet with me
16  outside the presence of Mr. Neuberger or his father to
17  discuss the substance of the Foraker, Price, and Warren
18  lawsuit?
19    A.  No.
20    Q.  Are you prepared to meet with me to discuss your
21  actions in terms of supervision of Foraker, Price, and
22  Warren when they were under your command at the Firearms
23  Training Unit?
24    A.  Without my representative?

|  | Page 67 |
|---|---|

1    Q.  Without your attorney present.
2    A.  No.
3    Q.  Why not?
4    A.  I think because of my history with the division,
5  my history with Colonel MacLeish.  For those reasons, I
6  feel that I need to be very careful what I say, how I say
7  it.
8    Q.  What specifically is it about your history with
9  Colonel MacLeish that makes you say what you just said?
10    A.  I just feel uncomfortable and prefer my legal
11  counsel to be there.
12    Q.  Did you ever serve under the direct command of
13  Colonel MacLeish?
14    A.  No, sir.
15    Q.  You presently, as I understood your testimony,
16  report to Major Eckrich; is that correct?
17    A.  That's correct.
18    Q.  Before the deposition today did you have lunch
19  with the three plaintiffs?
20    A.  No, sir.  Well, let me retract that.  I met them
21  as they were going out to get lunch.  I came back, I sat
22  in Mr. Neuberger's office.
23      MR. NEUBERGER:  Just for the record, I
24  think you mean Mr. Tom Neuberger.

|  | Page 68 |
|---|---|

1    THE WITNESS:  His dad's office.  They came
2  back in and sat down and finished their lunch.  But I
3  didn't go out to lunch with them.
4    Q.  You sat in Tom Neuberger's office while they ate
5  their lunch?
6    A.  A couple.  I think some of them had finished.
7    Q.  Did you discuss the case?
8    A.  No, sir.
9    Q.  What did you talk about?
10    A.  My daughter, their daughters.
11    Q.  All daughters?
12    A.  We're lucky.
13    Q.  Going back to Exhibit 2 for a minute, did you
14  turn a copy of that document over to the State Auditor?
15    A.  Yes, sir, I believe I said I did that earlier.
16  I did give them this document, a copy of it.
17    Q.  Have you given it to anybody else?
18    A.  No, sir.
19    Q.  The only place it went from your file is to the
20  State Auditor?
21    A.  To the best of my knowledge, yes, sir.
22    Q.  Where is your file today?
23    A.  At my home.
24    Q.  At your home?

|  | Page 69 |
|---|---|

1    A.  Yes, sir.
2    Q.  You have your FTU file at your home?
3    A.  I took it home because I was directed from the
4  Colonel to review my file and I took it home and took out
5  the pertinent documents.
6    Q.  When you say you took out pertinent documents,
7  what do you mean by that?
8    A.  The ones that he asked me to provide.
9    Q.  In other words, the ones that you felt were
10  responsive to the directive?
11    A.  That's it.
12    Q.  Where do you normally keep your file?
13    A.  In my desk.
14    Q.  Your desk is now at headquarters; is that right?
15    A.  That's correct.
16    Q.  Who did you turn over the Firearms Training Unit
17  to; in other words, to whom did you turn over the
18  Firearms Training Unit when you changed jobs?
19    A.  When I left, I was performing two duties, the
20  director and the assistant director duties.  So the
21  incoming director was Captain Albert Homiak and the
22  incoming assistant director was Lieutenant Ronald Hagen.
23  So I turned all of my duties over to them collectively at
24  the same time, which would have been the September of

18 (Pages 66 to 69)

A510

Price, et al.                                    v.                                    Chaffinch, et al.
Ralph H. Davis, III                    C.A. # 04-1207                    September 6, 2005

Page 70

1  2004.
2      Q.  I'm sorry, who's your replacement, again?
3      A.  I guess my actual replacement would be
4  Lieutenant Ronald Hagen.  He became the assistant
5  director of training.
6      Q.  Did you turn over files to him?
7      A.  Yes.
8      Q.  Why didn't you turn over the FTU file?
9      A.  Because the FTU issue was ongoing and I knew I
10  may need to refer to them when I move on.  So I kept
11  those files.
12     Q.  Did you give him a copy?
13     A.  No, I don't believe I did.
14         MR. ELLIS:  Could we take a break for a
15  minute?
16         MR. NEUBERGER:  Sure.
17         (A recess was taken.)
18         MR. ELLIS:  I'm done.
19         MR. NEUBERGER:  I have a couple questions,
20  then.
21  BY MR. NEUBERGER:
22     Q.  Now, Captain Davis, are you aware that
23  Sergeant Foraker filed a lawsuit against
24  Colonel Chaffinch in approximately April of 2002?

Page 71

1      A.  Yes, sir.
2      Q.  Are you aware that he filed another lawsuit
3  against Colonel Chaffinch and against Colonel MacLeish in
4  August of 2004, claiming that they both had retaliated
5  against him for suing the division in the first place?
6      A.  I'm aware of that, yes, sir.
7      Q.  Are you aware that Captain Barbara Connolly
8  filed a lawsuit against Colonel Chaffinch in the end of
9  October 2004?
10     A.  Yes, I'm aware of that.
11     Q.  Are you aware that a short time thereafter
12  Colonel MacLeish authorized the release of a portion of
13  her Internal Affairs file to the media?
14         MR. ELLIS:  I'm going to object to the form
15  of that question.
16     A.  I have heard that, yes, sir.  I have no personal
17  knowledge that that occurred, but I have heard that.
18     Q.  Are you aware that subsequently in November or
19  December of 2004, Captain Connolly amended her original
20  lawsuit and sued Colonel MacLeish, claiming that he had
21  retaliated against her for filing her initial lawsuit
22  against Colonel Chaffinch?
23     A.  I'm aware of that, yes, sir.
24     Q.  Is it a concern in the back of your mind that

Page 72

1  you could be retaliated against, be it now or in the
2  future, because you originally sued Colonel Chaffinch and
3  then Secretary Jim Ford?
4          MR. ELLIS:  Object to the form of the
5  question.
6      A.  I am concerned of that.  I have some tangible
7  things that I think that that would lead me to be concerned in
8  that my -- upon being noticed of my transfer and
9  promotion, it was done differently than how others had
10  been treated.  I did not receive a call from anyone
11  telling me congratulations, you're being promoted, you're
12  going to be transferred.  I simply received an e-mail
13  like everyone else.  And my promotion was not done in the
14  typical fashion in that the colonel or the superintendent
15  would send out an e-mail by his authority you're promoted
16  to captain.  Mine was done by the authority of the
17  secretary of the Department of Safety and Homeland
18  Security.
19         I was being treated differently from the
20  minute I was promoted.
21     Q.  Right, and so the secretary at the time when you
22  were promoted who actually had to sign off on the e-mail
23  per his authorization, would that have been Secretary
24  David Mitchell?

Page 73

1      A.  That's right.
2      Q.  The colonel at the time was Colonel Chaffinch?
3      A.  Correct.
4      Q.  It's your understanding that he did not sign the
5  e-mail at all because his name was not on the promotion,
6  authorization e-mail?
7      A.  That's correct.
8      Q.  That is unusual I think you're indicating?
9      A.  I believe it's unheard of.  I believe the only
10  people who are promoted by the secretary are probably the
11  colonel and maybe the lieutenant colonel.  Typically
12  lower-ranking officers are promoted by the colonel.
13     Q.  Do you recall the mediation in your case in
14  August, ballpark time, July or August of 2004?
15     A.  I do recall, yes.
16     Q.  You recall that the defendants in that case were
17  Colonel Chaffinch and retired Colonel Ford, he was then
18  the cabinet secretary?
19     A.  Yes, I do recall.
20     Q.  And you recall that Colonel MacLeish actually
21  attended that mediation, don't you?
22     A.  Yes, I do recall that.
23     Q.  He attended the mediation even though he wasn't
24  a defendant in a lawsuit.  Do you recall that?

19 (Pages 70 to 73)

Price, et al.                                v.                              Chaffinch, et al.
Ralph H. Davis, III                    C.A. # 04-1207                   September 6, 2005

Page 74

1     A.   Yes, I do.
2     Q.   Even though he wasn't a defendant in a lawsuit,
3  he attended the mediation in the court case in which
4  Colonel Chaffinch was a defendant?
5     A.   Yes, I recall that.
6     Q.   And, to the best of your knowledge, are
7  Colonel Chaffinch and Colonel MacLeish friends?
8     A.   I don't know that personally, but I believe they
9  are very close.
10    Q.   Is retaining a lawyer a decision which you take
11 lightly?
12    A.   I do not take it lightly.
13         MR. NEUBERGER:  I have no further questions
14 in that regard.
15 BY MR. ELLIS:
16    Q.   Has Colonel MacLeish ever told you that he was
17 going to retaliate against you for having sued
18 Colonel Chaffinch?
19    A.   Has he personally told me that?
20    Q.   Yes.
21    A.   Never.
22    Q.   Has he told anybody else that that you know of?
23    A.   I heard once a rumor immediately after my
24 promotion that Colonel MacLeish, then Lieutenant Colonel

Page 75

1  MacLeish, made the statement that -- I'm paraphrasing --
2  that he would promote me, but he would promote me and
3  send me to Troop 1A, which is at the
4  Pennsylvania-Delaware border, and I live in Lewes.  And
5  when that was brought to his attention that that might
6  not be a very good idea, he said fine, then I'll promote
7  him and send him to Troop 2, which is near Newark.  Maybe
8  that was just posturing.  Maybe it was anger.  I don't
9  know what it was.
10    Q.   When ultimately you were promoted, you didn't
11 get sent to Troop 1A?
12    A.   No.
13    Q.   You didn't get sent to Troop 2?
14    A.   Did not.
15    Q.   You got sent about what, 100 yards from where
16 your office had previously been?
17    A.   Fifty.  Yes, sir.
18    Q.   Fifty yards.  You said that you had heard the
19 rumor.  Who was it that told you that rumor?
20    A.   I prefer not to say.
21    Q.   You have to tell us.  It's part of the case.
22         MR. NEUBERGER:  Unless --
23    A.   It's retired Major Baylor, David Baylor.
24    Q.   You've testified that you did not receive a call

Page 76

1  from Colonel Chaffinch informing you of your promotion,
2  correct?
3     A.   Correct.
4     Q.   Normally, when the colonel calls, that's the
5  first official word that a trooper gets that he's going
6  to get a promotion, isn't it?
7     A.   Official word, yes, sir.
8     Q.   You, of course, knew that you were going to get
9  the promotion because you had been at the mediation,
10 right?
11    A.   Correct.
12    Q.   And that was worked out as part of the court
13 mediation, correct?
14    A.   Correct.
15    Q.   What is it about the fact that you didn't get a
16 call directly from the colonel that you had sued that
17 makes you believe that you could be the subject of
18 retaliation?
19    A.   It was not that solely by itself, because I
20 understand what you're saying.  If the court had mandated
21 this would take place or it was mediated that this would
22 take place.  But then the fact that the e-mail came out
23 and very noticeably I received calls from other troopers
24 who said this is obvious, promoted under the authority of

Page 77

1  the secretary, not under the authority of the
2  superintendent.
3     Q.   Let's just take one thing at a time, because I
4  want to get to that.
5         What was it about the fact that
6  Aaron Chaffinch didn't call you that you felt might
7  subject you or have you subjected to retaliation?
8     A.   As I said, it's not the one thing by itself.
9  It's the totality of the circumstances.
10    Q.   I understand that, but is there anything in that
11 fact, the fact that you didn't get the call, even any
12 tiny little scintilla of a thing that makes you worried?
13    A.   Sure.  That he is angered at my promotion.
14    Q.   That who, the guy you sued is angry?
15    A.   Correct.
16    Q.   The fact that Secretary Mitchell is the person
17 who sent out the e-mail or who authorized the e-mail
18 promoting you doesn't affect the validity of the
19 promotion, does it?
20    A.   Not at all.  I prefer it coming from him,
21 actually, in this circumstance.
22    Q.   Why is that?
23    A.   Because the Colonel didn't want to promote me, I
24 don't want him to be forced to do it.  I'm happy the

20 (Pages 74 to 77)

Price, et al.                                    v.                        Chaffinch, et al.
Ralph H. Davis, III                      C.A. # 04-1207                    September 6, 2005

Page 78

1  Secretary did it, actually.  It means more to me coming
2  from a person who wants to do it than a person who
3  doesn't want to do it.
4              MR. ELLIS:  I don't have any further
5  questions.
6  BY MR. NEUBERGER:
7     Q.  That raises some questions from my end.
8              Captain Davis, did Major Baylor call you up
9  and tell you that he testified in his deposition in this
10 case that Colonel MacLeish and Colonel Chaffinch think
11 you're a pain in the ass because you sued them?
12             MR. ELLIS:  What?  Object.  You're saying
13 that they testified that Captain Davis was a pain in the
14 ass?
15             MR. NEUBERGER:  No.  Did now retired
16 Major Baylor call him up and tell him that Major Baylor
17 told him that Colonel Chaffinch and Colonel MacLeish
18 think Captain Davis is a pain in the ass because he sued
19 them.
20             MR. ELLIS:  I don't believe that's their
21 testimony.
22             MR. NEUBERGER:  For the record, I read that
23 this morning.
24    A.  I have had no communication with retired

Page 79

1  Major Baylor regarding his testimony or anyone's
2  testimony or deposition.
3     Q.  Are you aware that Colonel MacLeish testified in
4  this lawsuit that he doesn't like people who file
5  lawsuits against the division?
6              MR. ELLIS:  Again, I'm going to object to
7  the form of the question.  I don't believe that's what he
8  said.
9     A.  I'm not aware that that's to what he testified.
10    Q.  Are you aware that he testified in Captain
11 Barbara Connolly's lawsuit that he doesn't like it when
12 people file lawsuits against the division?
13    A.  I was not aware of that.
14    Q.  Are you aware that Colonel Chaffinch testified
15 in this lawsuit last week that he doesn't like it when
16 people file lawsuits against the division?
17    A.  I was not aware of that.
18             MR. NEUBERGER:  I have no further
19 questions.
20             MR. ELLIS:  Nothing for me.
21             MR. NEUBERGER:  You have the right to read
22 and review this deposition for accuracy if you want.
23 Would you like to do that?
24             THE WITNESS:  Yes, I would.

Page 80

1        (Deposition concluded at 2:55 p.m.)
2              - - - - -
3
4        T E S T I M O N Y
5
6  DEPONENT:  RALPH H. DAVIS, III         PAGE
7
8  BY MR. NEUBERGER............................. 2
   BY MR. ELLIS................................. 40
9  BY MR. NEUBERGER............................ 70
   BY MR. ELLIS................................. 74
10 BY MR. NEUBERGER............................ 78
11
12       E X H I B I T S
13
14 DAVIS DEPOSITION EXHIBIT NO.          MARKED
15
16 1 - A five-page document numbered page 32
   through 36.................................... 15
17
   2 - A three-page document entitled, "FTU
18 Transition meeting 12/01/2003"................ 41
19
20 ERRATA SHEET/DEPONENT'S SIGNATURE       PAGE 81
21
22 CERTIFICATE OF REPORTER         PAGE 82
23
24

Page 81

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

21 (Pages 78 to 81)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Price, et al.                                    v.                        Chaffinch, et al.
Ralph H. Davis, III                      C.A. # 04-1207                   September 6, 2005

Page 82

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                )
NEW CASTLE COUNTY)

      I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 6th day of
September, 2005, the deponent herein, RALPH H. DAVIS,
III, who was duly sworn by me and thereafter examined by
counsel for the respective parties; that the questions
asked of said deponent and the answers given were taken
down by me in Stenotype notes and thereafter transcribed
by use of computer-aided transcription and computer
printer under my direction.
      I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
      I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


      Kimberly A. Hurley
      Certification No. 126-RPR
      (Expires January 31, 2008)


DATED:

22 (Page 82)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A514



**WILCOX & FETZER LTD.**

In the Matter Of:

# Price, et al.
## v.
## Chaffinch, et al.

C.A. # 04-956-GMS

-------------------------------------------------------------------------

Transcript of:

Gregory Allen Warren

January 11, 2006

-------------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

Page 1

                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE, et al.,    )
                                   )
               Plaintiffs,         )
                                   )      Civil Action
v.                                 )   No. 04-956-GMS
                                   )
COLONEL L. AARON CHAFFINCH,        )
et al.,                            )
                                   )
               Defendants.         )
SERGEANT CHRISTOPHER D. FORAKER,   )
                                   )
               Plaintiff,          )
                                   )      Civil Action
v.                                 )   No. 04-1207-GMS
                                   )
COLONEL L. AARON CHAFFINCH,        )
et al.,                            )
                                   )
               Defendants.         )

          Deposition of GREGORY ALLEN WARREN taken
pursuant to notice at the law offices of Montgomery,
McCracken, Walker & Rhoads, LLP, 300 Delaware Avenue,
Seventh Floor, Wilmington, Delaware, beginning at
9:40 a.m. on Wednesday, January 11, 2006, before Kathleen
White Palmer, Registered Merit Reporter and Notary
Public.
APPEARANCES:
        THOMAS S. NEUBERGER, ESQUIRE
        THE NEUBERGER FIRM, P.A.
          2 East Seventh Street - Suite 302
          Wilmington, Delaware  19801-3707
          for the Plaintiffs
     -------------------------------------------------
                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

Price, et al.                                          v.                              Chaffinch, et al.
Gregory Allen Warren                        C.A. # 04-956-GMS                    January 11, 2006

Page 2

1  APPEARANCES (Continued):
2
3        EDWARD T. ELLIS, ESQUIRE
         MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
         123 South Broad Street
4        Philadelphia, Pennsylvania  19109
         for the Defendants
5
6  ALSO PRESENT:
7        B. KURT PRICE
         CHRISTOPHER D. FORAKER
8        WAYNE WARREN
9              - - - - -
10       GREGORY ALLEN WARREN,
11       the witness herein, having first been
12       duly sworn on oath, was examined and
13       testified as follows:
14 BY MR. ELLIS:
15    Q.  Good morning.  Mr. Warren, are you currently
16 employed?
17    A.  Yes, I am.
18    Q.  Where are you employed?
19    A.  I own my own business.  I do consulting work for
20 law enforcement agencies and small businesses.  And then,
21 of course, I teach.
22    Q.  What is the nature of the consulting that you
23 do?
24    A.  Basically I do strategic planning.  I write

Page 3

1  business plans if it's a small business.  I do strategic
2  planning for police departments and law enforcement
3  agencies and those types of groups.  And then I'll work
4  on some grant work and do some other things like writing
5  policy and things of that nature.  Basically things that
6  most police officers don't like to do, you know, I do.
7     Q.  When you said you "write business plans," are
8  these business plans that have nothing to do with
9  security or police work?
10    A.  Yes.  They're general business plans.  They're
11 people who want to start a small business.  Over the last
12 25 years I've been involved in Rotary and a lot of
13 community activities and nonprofits and things like that
14 and I've had the opportunity to try to help people with
15 small business plans, yes.
16    Q.  Does your consulting business have a name other
17 than --
18    A.  Yes.  Do you need that?
19    Q.  Yes.
20    A.  Strategic Management Research Center.  And it's
21 licensed here in Delaware.
22    Q.  Is it incorporated?
23    A.  No, no.  Sole ownership.
24    Q.  Is that located in Dover?

Page 4

1     A.  Hockessin.
2     Q.  Hockessin?
3     A.  Yes.
4     Q.  Why don't you give me an address, if you could?
5     A.  11 Withers, W-i-t-h-e-r-s, Way, Hockessin,
6  Delaware, 19707.
7     Q.  Where do you presently live?
8     A.  At that same location, yes.
9     Q.  How long have you lived there?
10    A.  Since April 29.
11    Q.  Of 2005?
12    A.  That's correct.
13    Q.  What percentage of the work that you do in the
14 consulting business is for police departments?
15    A.  A small amount right now.  A small amount right
16 now.
17    Q.  What percentage would you say you do for private
18 businesses?
19    A.  Probably 60 to 65 percent.
20    Q.  Where do you teach?
21    A.  Wilmington College and DelTech are the two
22 places I have classes right now.  Currently Drexel I do
23 not have any classes going with them or the U of D.
24    Q.  How many classes do you teach at Wilmington

Page 5

1  College?
2     A.  Right now I scheduled -- I've got three running
3  right now and I have two scheduled for the second half of
4  the spring.  So I've got five this semester that I'm
5  locked in on that I've signed contracts for.
6     Q.  All at Wilmington College?
7     A.  Yes.
8     Q.  Are you a full-time faculty member at Wilmington
9  College?
10    A.  No, no.  It's adjunct faculty, yes.  That gives
11 me more flexibility, by far.
12    Q.  So you get paid by the class?
13    A.  Yes, yes.  I can pick and choose the classes
14 that I want to take, yes.
15    Q.  Are you a tenured track professor?
16    A.  I've been there almost 20 years.  I've been
17 there since 1987, but they don't consider -- adjuncts
18 don't actually get tenure.
19    Q.  That was my question.
20    A.  Right.  You're signing a contract per class.  So
21 the college doesn't have an obligation to me, but also I
22 don't have an obligation to them.  I can pick and choose
23 the classes I want to teach and they can pick and choose
24 the classes they want to offer me to teach.

2 (Pages 2 to 5)

Price, et al.                                    v.                      Chaffinch, et al.
Gregory Allen Warren                   C.A. # 04-956-GMS                January 11, 2006

Page 6

1    Q.  Are you currently teaching at DelTech?
2    A.  Just one class there right now, yes.  That's all
3    I could fit into my schedule.
4    Q.  You said that you're not teaching at Drexel now.
5    Does that mean that you have taught there in the past?
6    A.  Certainly, yes.
7    Q.  Again, as an adjunct?
8    A.  Yes.
9    Q.  Is your relationship with DelTech as an adjunct?
10   A.  Yes.
11   Q.  Again, with DelTech, are you on a tenure track?
12   A.  No.  Adjuncts do not get tenure, no.
13   Q.  You said that about Wilmington College.  I
14   wasn't sure whether that was true about all schools.
15   A.  Yes.
16   Q.  University of Delaware you have taught at?
17   A.  Yes.
18   Q.  When is the last time you taught at the
19   University of Delaware?
20   A.  Let's see.  It's been two and a half, maybe
21   three years.  The last class I taught for them was
22   fundamentals of supervision and leadership, and that's
23   been about three years ago.  Things just got so busy at
24   the State Police that I decided there's no way to try to

Page 7

1    pull that off at the same time.
2    Q.  When is the last time you taught at Drexel?
3    A.  About the same time because that's when I left
4    Troop 3 and went to the academy.  And there were so many
5    issues to deal with, I just didn't think I could be
6    driving to Wilmington two or three nights a week to be
7    teaching.  So that would be about the same time.  The
8    last time I taught for them was organizational behavior,
9    I believe.
10   Q.  Of the five classes you're currently teaching at
11   Wilmington College, why don't you tell me what the five
12   classes are?
13   A.  Multicultural issues in criminal justice.
14       I'm trying to give you time to catch up
15   here.
16   Q.  That's okay.  We have a court reporter for that.
17   A.  Research methods in criminal justice.  I have --
18   let's see.  Juvenile justice won't be coming up till next
19   block.  Computer operations and technology in criminal
20   justice isn't until next block.  I'm doing a second
21   criminal justice research class starting tomorrow morning
22   from ten to three in Dover and -- let's see.  The next
23   one after that will be executive level law enforcement
24   leadership, which is a grad level class.  I'll be

Page 8

1    teaching that in June at Wilson Graduate Center.  I do
2    that every June for them.
3    Q.  What's the course that you're going to teach at
4    DelTech?
5    A.  Constitutional law.
6    Q.  On what level do you teach that?  Undergrads?
7    A.  Yes, that's undergrad, yes.  DelTech is only for
8    an associate's degree.
9    Q.  That's the highest degree DelTech awards?
10   A.  Right.  It is a community college, so that's the
11   highest degree that they award, right.
12   Q.  What is your educational background?
13   A.  Basically I have an associate's degree in police
14   science.
15   Q.  From where?
16   A.  DelTech.  I have a bachelor's degree in criminal
17   justice.
18   Q.  Where is that from?
19   A.  From Wilmington College.  I have another
20   bachelor's degree from Wilmington College in behavioral
21   science.  And then I have my master' degrees, my MS, in
22   business management from Wilmington College,
23   personnel/business management.  And then my Ed.D., my
24   doctorate, is in vocational education from Temple

Page 9

1    University in Philadelphia.
2    Q.  You said it was in vocational --
3    A.  Vocational education, yes, from Temple.
4    Q.  What's vocational education?
5    A.  Basically it is jobs training.  It's preparing
6    people to go into a certain career field or into
7    basically preparing them for their career track.  You
8    know, there's educational leadership.  There's secondary
9    education.  There's elementary education.  There's
10   technology and education.
11       Of course, vocational education is the one
12   that's for jobs training, and that worked out for me.
13   Having a background in training, that was a perfect
14   match.
15   Q.  Did you write a dissertation to get your
16   doctorate of education?
17   A.  Yes, I did.
18   Q.  What was it in?
19   A.  Basically it was an analysis of how well the
20   Delaware State Police Academy prepared its recruits for
21   taking on the responsibilities of becoming a state
22   trooper or a law enforcement officer in this state.
23   Q.  What year did you write that?
24   A.  That would have been 1991 is when it was

3 (Pages 6 to 9)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A518

Price, et al.                                        v.                          Chaffinch, et al.
Gregory Allen Warren                        C.A. # 04-956-GMS                    January 11, 2006

Page 10

1  approved.  I started on it around '90.  So it took me
2  about a year and a half to get it done.
3      Q.  Have you had any works published?
4      A.  A couple, yes.
5      Q.  What would they be?
6      A.  Basically my dissertation was copyrighted and
7  published, and then also a couple articles that I wrote.
8  One, the last one I can remember was on community
9  policing.
10          And then I've written a textbook on police
11 training, but I self-published that so I could get it out
12 in the field and use it in my training without having to
13 worry about royalties and things of that nature.
14     Q.  What do you mean by "self-published"?
15     A.  I went ahead and set the book up with the help
16 of a publisher, but I went ahead and paid for the book to
17 be published.  Therefore, I didn't owe anybody anything
18 for it.  The book is mine.  I don't have to split any
19 proceeds with anyone.  I can use it any way that I want
20 to with my training.
21     Q.  How many copies of that have you sold?
22     A.  Probably close to 1,000.  Maybe 850 to 900, in
23 that range.  I still use it in a couple seminars I teach
24 each year.  I'll be teaching one -- let's see -- in the

Page 11

1  spring and I'm teaching one in July up in New Jersey on
2  how to run a police training academy.  And the State
3  Police Academy has used it before.  I've used it at the
4  University of Delaware.  I've used it in several
5  different classes.  And then sometimes people just up and
6  purchase it for their own classes and things.
7      Q.  What year was it published?
8      A.  Let's see.
9      Q.  Approximately.
10     A.  That would be '99, '99 into 2000.  It took a
11 couple of years to try to get the work done on it.
12     Q.  What was your date of hire at Delaware State
13 Police?
14     A.  January 31st of 1983.
15     Q.  You achieved the rank of captain before you
16 left; right?
17     A.  That's correct, yes.
18     Q.  How long were you a captain?
19     A.  I'm trying to give you the exact dates.  It
20 would be -- I was a captain for eight years.
21     Q.  You left the force somewhere around July of
22 2004; right?
23     A.  That's correct, yes.
24     Q.  So that means you would become a captain in

Page 12

1  about 1996?
2      A.  Yes.
3      Q.  What was your first assignment as a captain?
4      A.  I took over as the director of planning at
5  headquarters.
6      Q.  How long were you in that job?
7      A.  About a year.  I don't know the exact date, but
8  close to a year.
9      Q.  That's fine.  Then what after that?
10     A.  I took over as the commander of Troop 3.  The
11 commander at Troop 3 retired.  That opened up a troop for
12 me and they sent me down to Troop 3 in Camden.
13     Q.  How long were you there?
14     A.  Four and a half years.
15     Q.  Then what did you do?
16     A.  I went to the academy as director of training.
17     Q.  How long were you the director of training?
18     A.  Until I retired in July of 2004.  About a year
19 and a half to a year and three quarters, in that range.
20 I don't know the exact dates.
21     Q.  Did you become a director of training in April
22 2002?
23     A.  Yes, yes.
24     Q.  So that would be a little over two years?

Page 13

1      A.  Yes.  Actually, it was, yes.  I thought it was
2  more like a year and three-quarters, but it's actually
3  around two years.  Maybe over by just a couple months.
4      Q.  Time flies when you're having fun.
5      A.  Oh, isn't it the truth?
6      Q.  Are you familiar with the concept of
7  paramilitary organization?
8      A.  Certainly.
9      Q.  What's that mean?
10     A.  Well, it means that an organization is run in
11 more of a hierarchial fashion than the typical
12 organization would be out here on the street.  There's
13 typically more of a formal chain of command.  There's a
14 formal span of control.  Typically there's a very formal
15 table of organization.  There is typically more rules and
16 regulations to be followed than in a private sector or
17 nonprofit.  Things of that nature.
18     Q.  You said a formal chain of command.  What do you
19 mean by "a formal chain of command" as opposed to a chain
20 of command that's not formal?
21     A.  Well, if you were in a solely owned business,
22 the chain of command might be well-known by everyone.
23 It's the owner of the business and then maybe a relative
24 of theirs or a long-timer.  But it's a fairly loose-knit

4 (Pages 10 to 13)

Price, et al.                                    v.                          Chaffinch, et al.
Gregory Allen Warren                  C.A. # 04-956-GMS              January 11, 2006

Page 14

1  organization and sometimes people go to their manager and
2  maybe sometimes they go to the owner with a problem or
3  something.
4          But as you well know, a paramilitary
5  organization has a very strong rank structure, obviously;
6  hence, the term "paramilitary." It's based off of a
7  military model and there's a very distinct rank structure
8  to be followed, and the chain of command goes along with
9  that rank.
10     Q.   In a paramilitary organization, would you expect
11  discipline to be stronger --
12     A.   Yes.
13     Q.   -- than it would be in a typical business
14  organization?
15     A.   If you were asking me to answer that in
16  generalities or as an expert or whatever, I would have to
17  say yes. But that doesn't necessarily always have to
18  operate that way.
19     Q.   What would be the circumstance under which you
20  would not operate that way?
21     A.   Well, as most of us well know who have worked in
22  paramilitary organizations, there's the formal table
23  organization. There's a formal rank structure and a
24  formal chain of command. However, in many organizations,

Page 15

1  that is circumvented by the grapevine, by an informal
2  chain of command, by friendships, by the good ole boy
3  system, politics. All of those factors, when weighed and
4  put together, many times erode that formal chain of
5  command. And there's as strong of an informal chain of
6  command in some paramilitary organizations as there is a
7  formal chain of command.
8      Q.   When you were the director of training at the
9  Delaware State Police, did you teach the concept of a
10  paramilitary organization in the academy?
11     A.   Yes.
12     Q.   In what type of a class was that taught?
13     A.   Well, the indoctrination and orientation of the
14  new recruits when they first come in, as the director of
15  training, I present that to them along with the assistant
16  director of training.
17          However, part of my background has been
18  over the years with the State Police I've pretty much --
19  I don't want this to sound egotistical, but I pretty much
20  headed up most of the leadership training initiatives
21  that the organization undertook, probably for the last
22  ten years.
23          So that put me in a position of not only
24  having received formal leadership training by

Page 16

1  Northwestern University, but it gave me the ability to
2  come back and to develop training programs for our
3  division, for new sergeants, for newly promoted
4  lieutenants. I also developed the leadership training
5  for the police chief's council for all of the municipal
6  supervisors and mid-level managers and individuals who
7  would be presented.
8          So I've been able to instill that
9  paramilitary structure not only into recruits, but also
10  into the division's own, the Delaware State Police's own
11  supervisors, first-line supervisors, mid-level managers,
12  but also in the municipal police departments, also. So
13  I've been very fortunate to have been, you know, involved
14  in those.
15     Q.   What is it that you tell recruits about the
16  paramilitary nature of the organization?
17     A.   Well, basically we are trying to teach the
18  recruits to do things the way they are supposed to be
19  done and to follow the rules and the procedures and to
20  follow the chain of command and things of that nature.
21  So that's how we start from the very beginning, and we
22  start as building blocks. We try to show them the table
23  of organization, the actual rank structure.
24     Q.   Excuse me. Is the table of organization

Page 17

1  basically the same thing as an organization chart would
2  be in a private company?
3      A.   Yes. An organizational structure chart, table
4  of organization, TO. There's all kinds of terminology
5  people use. But they are pretty much interchangeable,
6  yes.
7      Q.   What does it mean in a paramilitary organization
8  to follow the chain of command?
9      A.   Well, it means to follow the formal rank
10  structure.
11     Q.   So suppose the colonel of the Delaware State
12  Police has a problem with the way a particular group of,
13  say, road troopers, like a shift, is behaving. To follow
14  the chain of command, does that mean that the colonel is
15  going to talk to the lieutenant colonel who is going to
16  talk to somebody else down the structure and eventually
17  it's going to cascade down to the people who he's got a
18  problem with?
19     A.   If you're asking if that's how it's supposed to
20  be done and if that's how we teach it, I'll answer yes.
21          If you're asking me is that how it is done,
22  then I'll have to answer no to that.
23     Q.   But at least, in theory, that's the way it's --
24     A.   In theory, yes, absolutely.

5 (Pages 14 to 17)

Price, et al.                                   v.                      Chaffinch, et al.
Gregory Allen Warren                  C.A. # 04-956-GMS              January 11, 2006

Page 18

1    Q.  So that means that the colonel could be five or
2  six layers above the person that he's given instruction
3  to, but the instruction would pass through each one of
4  the layers in a chain of command before it gets there?
5    A.  If done properly, yes.
6    Q.  You used the phrase, you said that you were
7  responsible for most of the leadership training
8  initiatives for the Delaware State Police.
9    A.  Yes.
10    Q.  What's a leadership training initiative?
11    A.  Well, for instance, I'll just give you an
12  example.
13          Secretary Ford contacted me one day and
14  asked me to solidify a relationship with the University
15  of Delaware and with Delaware State University and with
16  Delaware Technical and Community College to utilize those
17  three state-run colleges to develop better leadership
18  training programs, not only for the Division of State
19  Police, but also something that all the municipal police
20  officers in this state, if they chose, could piggyback
21  off of.
22          So there's an example.  And so I ended up
23  having to meet with representatives from all three of
24  those colleges.  We then formed a committee.  We then

Page 19

1  went through over a year's worth of meetings and focus
2  groups and developing a curriculum.  Then ultimately we
3  went and found a funding source, and then we started the
4  training program.
5          Over ten years I've done several different
6  types of leadership initiatives, but that's an example of
7  one.
8    Q.  So when you say you're setting up an initiative,
9  does that mean you're setting up a class or program?
10    A.  It's not an actual class.  It's a program
11  because the program could entail many classes and many
12  different types of courses, you know.
13    Q.  As a captain in the Delaware State Police, did
14  you do performance appraisals on people that reported to
15  you?
16    A.  Certainly.
17    Q.  Have you, in any of these various classes you've
18  taught, taught people how to do performance appraisals?
19    A.  I'll be going -- I have and I'll be going to
20  New Jersey in March to train for a company that I do some
21  work for on the side.  I'll be training police
22  supervisors on how to do effective performance appraisals
23  of their personnel, yes.  So I've done them, and I also
24  teach it.

Page 20

1    Q.  What do you think is the most important thing in
2  doing an effective performance appraisal?
3    A.  Being fair.
4    Q.  Anything else?
5    A.  Oh, there's a great many things.  I mean, we
6  start from the very beginning, but you asked me what's
7  the most important.  It's certainly being fair to
8  individuals.
9    Q.  Would you say it's important to be truthful to
10  individuals?
11    A.  Absolutely.  And in order to be fair, you would
12  have to be truthful.  So I would take that as one of the
13  under or the lynchpins or underlinks for that, yes.
14    Q.  Would you think that it's important to put in a
15  performance appraisal negative aspects of the
16  individual's performance so that they can be corrected?
17    A.  Certainly.  Without those, the individual may
18  never become aware of them.  And if they're not aware of
19  them, then you are certainly not going to be able to
20  address them.  So I would have to answer yes.
21    Q.  Were the performance appraisals something that
22  were taken seriously within the Delaware State Police?
23    A.  With some thought, I'll answer that most of the
24  time, but not always.

Page 21

1    Q.  How about within whatever organization you were
2  supervising at any given time?  You certainly took it
3  seriously; right?
4    A.  I took it very seriously.
5    Q.  How about, did you insist that the people that
6  reported to you take it seriously?
7    A.  Very, very much so.  In fact, I gave them extra
8  time -- in fact, I actually would mentor my young
9  supervisors to make sure that they were being fair, that
10  they were being thorough.  And I made sure they had the
11  time to be comprehensive in these things so that we
12  weren't just, as some entities were within the division,
13  giving it lip service.
14    Q.  How many people have to sign off on a
15  performance appraisal within the Delaware State Police,
16  at least while you were there?
17    A.  Typically three signatures go on one at a troop
18  level.
19    Q.  Who would that be?
20    A.  Well, obviously the signature of the person
21  receiving it, so there's proof that they had the
22  opportunity to read it.  But also for it to be reviewed
23  with them:  their supervisor, their direct supervisor,
24  the person who filled it out.

6 (Pages 18 to 21)

Price, et al.                                    v.                            Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                    January 11, 2006

Page 22

1      Q.  Okay.
2      A.  And then, of course, either myself or in my
3  absence a lieutenant would sign it for me.
4      Q.  Is it also required that somebody from the human
5  resources department review it?
6      A.  When they get up there, I believe there is a
7  signature required by a representative of HR.  I can't
8  swear to that.  I've never been assigned to HR, but
9  there's a slot I know on there for that.  Whether that
10  gets done or not, I don't know.
11      Q.  Were those requirements the same when you were
12  at the academy as when you were running Troop 3?
13      A.  Well, there were some changes made in there, so
14  I really, without going back and actually looking at
15  them, for instance, we used to do semiannual performance
16  appraisals for years.  We did them every six months.
17  Colonel Chaffinch, I don't think, has ever been a big fan
18  of performance appraisals nor anything that's of a formal
19  nature; therefore, he decided to do away with doing them
20  every six months and doing them once a year, doing them
21  on an annual basis.
22          So there were some changes to the
23  performance appraisal process in there and I wasn't
24  involved in on that, so I don't want to -- you know, I

Page 23

1  can't really answer your question directly.
2      Q.  I guess my question is:  While you were at the
3  academy, did a performance appraisal still have to be
4  signed by the supervisor and then the next level up?
5      A.  Oh, certainly, yes.
6      Q.  When you were the next level up on performance
7  appraisals, did you actually read them before you signed
8  them?
9      A.  The performance appraisals?
10      Q.  Yes.
11      A.  Absolutely.  You're putting your signature on
12  someone's career, basically.  So that is one of the
13  things that you really need to take seriously.  And it
14  takes an inordinate amount of time to do it, but it's
15  something that the troopers themselves deserve.
16      Q.  Why did you leave the Delaware State Police?
17      A.  I went ahead and retired.
18      Q.  Why?
19      A.  I had a lawsuit pending against the governor of
20  the State of Delaware.  I had been overlooked for a
21  promotion for major on five different occasions.  At that
22  point I could see the writing on the wall that there was
23  no way that this governor nor her superintendent -- who
24  was a hard-line Democrat, also -- that there was no way

Page 24

1  that they were ever going to promote somebody who was
2  creative or innovative or a Republican, for that matter.
3          So I saw with my lawsuit coming to a close,
4  because of an out-of-court settlement, that I wasn't
5  willing to sit there for three or four years and wait for
6  the next election.  I just decided to retire and move on
7  with teaching and things that I enjoy doing.
8      Q.  Are you a Republican?
9      A.  Yes, I am.
10      Q.  Am I correct that at least the allegation you
11  made in your lawsuit was that you had been overlooked
12  because you supported the governor's opponent in the 2000
13  election?
14      A.  Yes, that's correct.
15      Q.  Did you support the governor's opponent in the
16  2004 election?
17      A.  Yes, I did.
18      Q.  Did your support rise to be anything more than a
19  vote?
20          MR. NEUBERGER:  Wait a second.  Wait a
21  second.  Wait a second.  You can't ask him who he voted
22  for in an election.
23          MR. ELLIS:  I didn't ask him who he voted
24  for, but he already told me who he voted for.

Page 25

1          MR. NEUBERGER:  Well, I don't know that
2  that's what he said.  He said "support."  That could mean
3  I talked to my neighbor.  That could be a lot of things.
4  I think right now you're asking him how he voted in an
5  election, and unless he wants to volunteer that, I don't
6  think the rules of evidence allow you to ask that kind of
7  a question.
8          MR. ELLIS:  Well, I was not asking him --
9          MR. NEUBERGER:  Okay.
10          MR. ELLIS:  The question I asked him was
11  did he do more than vote for --
12          MR. NEUBERGER:  I think implicit in that is
13  you voted and you went and did something else.  So maybe
14  if you would rephrase your question --
15  BY MR. ELLIS:
16      Q.  Who was the governor's opponent in 2004?
17      A.  Mr. Burris.
18      Q.  No, no.  2004.  I know it wasn't Burris.
19      A.  Oh, in the very last election?
20      Q.  Yes.
21      A.  I'm not even familiar.  Who ran against the
22  governor?
23          MR. NEUBERGER:  Maybe you better go back to
24  your question.

7 (Pages 22 to 25)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Price, et al.                                    v.                          Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                    January 11, 2006

Page 26

1    A.  Because 2000 is the year we were involved.
2        Q.  I guess my question is:  Were you involved in
3    2004?
4        A.  No, no.  We just decided that the politics being
5    what they are in Delaware at this time, and as solidified
6    and entrenched as things are, we just decided to vote and
7    that was it.  So we are relaxing and enjoying life right
8    now.
9        Q.  Who is the "we," by the way?
10       A.  My wife and I.
11       Q.  When you say the politics are so entrenched,
12   what are you referring to?
13       A.  Well, in the State Police right now and in the
14   state as a whole, I think it would be safe to assume that
15   most people would say this:  that the democrats have a
16   fairly strong hold on state government and most facets of
17   state government including the State Police.
18           So that would just be a general comment on
19   my behalf as a citizen of the state.
20       Q.  Firearms training is a component of the Delaware
21   State Police Academy; right?
22       A.  That's correct.
23       Q.  How many hours of firearms training are given to
24   a recruit, a recruit that has not been through another

Page 27

1    police academy and does not come from a city police
2    department or something like that?
3        A.  Generally it's in the area of 100 hours, but it
4    really depends on what you consider "training."  There's
5    hands-on training.  There's classroom instruction.
6    Sometimes there's extra training involved for recruits
7    who aren't picking it up as quickly as they could or
8    should.
9            But it depends on the recruit somewhat and
10   it depends on the class.  Some police officers come with
11   different -- from municipal agencies with different types
12   of weapons and, therefore, the range instructors have to
13   work extra hard with them.  I think it's in the area of
14   100 hours.  I think the state requires them.  That would
15   be a question for an actual firearms trainer.  But I
16   believe the state requires 70-some hours of firearms
17   training at a minimal.
18       Q.  When you were the director of training, did the
19   firearms instructors prepare class curriculums --
20       A.  Yes.
21       Q.  -- or curricula?
22           Did you, as the director of training,
23   approve that?
24       A.  Generally speaking, yes.  I would have to

Page 28

1    approve the curriculum for each.
2        Q.  Did you do that personally or was there somebody
3    else who did that for you?
4        A.  No.  Each -- the way we set up the curriculum
5    is, in Delaware, in order to be certified as a police
6    officer, you're required to have 502 hours of basic
7    training.  A Delaware state trooper receives about 1,300
8    hours of basic training.
9            Obviously, myself, training is my forte,
10   but I'm not an expert in each and every one of those
11   modules or courses because in order to put a trooper out
12   on the street, there are actually over 100 different
13   classes that have to be taught, for instance.
14           So I'm relying on, theoretically speaking,
15   close to 100 different instructors and/or experts to put
16   their own curriculum together for the academy class.
17       Q.  I guess my question is:  What level of review do
18   you have over the curriculum?  Do you --
19       A.  I would approve it, but I would not go through
20   it and actually read the curriculum, but I would have to
21   approve it, yes.  I'd look at the number of hours.  I'd
22   make sure that the person who wrote it I'm familiar with
23   and that they appear to be qualified; that someone hasn't
24   just been slipped in there.  But I will not go through

Page 29

1    and read every page of a six-month training process.  It
2    would be impossible.
3        Q.  There is a supervisor between you and the
4    firearms training unit when you are the director of
5    training; correct?
6        A.  That's correct.
7        Q.  What role did the supervisor -- I guess the
8    supervisor is a lieutenant?
9        A.  That's correct.
10       Q.  What role does the lieutenant play in
11   supervising the firearms training unit?
12       A.  Well, really, I like to think that wherever I've
13   worked as a captain, that the two lieutenants or the one
14   lieutenant or wherever I was assigned that worked for me,
15   that we were pretty much interchangeable.  I don't stand
16   on a great deal of formality.  I would rather see the
17   process get done or the problems get addressed or
18   whatever.  So if I'm not there and a lieutenant that
19   works for me were to take the initiative to work on
20   something, I would not be offended by that or have a
21   problem.  I know there are certain captains that would,
22   but I would not have a problem with that.
23           So the formal chain of command would be
24   sergeant to lieutenant to captain.  The informal chain of

8 (Pages 26 to 29)

Price, et al.                                           v.                              Chaffinch, et al.
Gregory Allen Warren                        C.A. # 04-956-GMS                    January 11, 2006

Page 30

1  command could be sergeant to lieutenant or sergeant to
2  captain depending on who's, you know, on deck that day.
3  Somebody might be on vacation, for instance, for a week.
4  **Q.  When you were the director of training, how**
5  **often did you go to the firing range in Smyrna?**
6  A.  Not very often.
7  **Q.  How many times a year?**
8  A.  Well, I had to go up and shoot, so that would be
9  two times a year.  And probably stop in once every few
10 months.  It's located a few miles away from the academy,
11 but it's not so much the distance.  That would be easy
12 enough.
13        Most people who have worked for me know
14 that I am very hard driven and very fast passed.
15 However, I don't consider myself to be a micromanager.  I
16 expect everyone to do their job and to do it efficiently
17 and proficiently.  Unless I'm told otherwise, then I'm
18 going to give them the latitude and autonomy to try to do
19 their job as well as they can.  So I try not to have
20 people feel as if they are being baby-sat.
21 **Q.  Would it be fair to say that you, while you were**
22 **the director of training, you were to the range an**
23 **average of maybe six times a year?**
24 A.  I don't even think that much.  I would say -- I

Page 31

1  got overloaded by Secretary Ford with projects as the one
2  I even described to you, but there were many, many
3  others.  My guess is I went up to shoot a couple of times
4  and maybe stopped by once to just say hi and give the
5  guys verbal support, so --
6  **Q.  Who were the lieutenants that worked under you**
7  **when you were the director of training?**
8  A.  There was Lieutenant Ralph Davis and Lieutenant
9  Galen Purcel.  Lieutenant Purcel was transferred and then
10 Lieutenant Alexander came into the academy.
11 **Q.  Was Davis there the whole time that you were the**
12 **director of training?**
13 A.  Yes, but in two different positions.  There are
14 two lieutenants' positions there.  He actually switched
15 positions.
16 **Q.  What are the two positions?**
17 A.  Well, one position is actually classified as the
18 assistant director of training, and then the other
19 position is a staff position.  Basically it's a project
20 position.
21 **Q.  What does that mean?**
22 A.  Well, the project position is working on
23 curriculum, administering the council and police
24 trainings comprehensive exam, setting up Scantron

Page 32

1  tests -- just basically all of the ancillary and support
2  type of functions that fall under the academy.
3        And then the other lieutenant, as I said,
4  is more of an operational person and they're in the front
5  office as the assistant director of training.
6  **Q.  So I take it Davis went from being in the**
7  **project position to being the assistant director of**
8  **training?**
9  A.  That's correct.
10 **Q.  Then when he did that, he did that because**
11 **Purcel left?**
12 A.  Yes, that's correct.
13 **Q.  Then Alexander replaced Davis as the project**
14 **lieutenant?**
15 A.  Yes.
16 **Q.  Did you assign Lieutenant Purcel while he was**
17 **the assistant director of training to monitor activities**
18 **at the range?**
19 A.  Well, he had been there for years prior to me
20 getting there and he already knew that that was part of
21 his responsibilities, so I didn't have to assign that to
22 him.
23 **Q.  How do you know he knew it was part of his**
24 **responsibilities?**

Page 33

1  A.  Well, I would believe Galen, being a good
2  lieutenant, his -- well, I would, first of all, have to
3  say that I assume -- and I hate to use that term because
4  I wasn't there, but when he was assigned to the academy,
5  I'd like to think that whoever the captain was that was
6  there then would have sat down with him and said this is
7  one of your duties.  So I'd like to hope that someone
8  explained that to him.
9        And then Galen obviously being there would
10 have picked up through, you know, OJT and things of that
11 nature that that's one of his responsibilities.
12 **Q.  Did he ever report to you while he was the**
13 **assistant director of training on anything that was going**
14 **on at the firing range?**
15 A.  No, no.
16 **Q.  How about when Ralph Davis was the assistant**
17 **director of training, did you assign him to do any**
18 **particular level of monitoring of what was going on at**
19 **the range?**
20 A.  Well, I had to.
21 **Q.  Do you remember when you did that and why you**
22 **had to?**
23 A.  Well, yeah.  I can be very blunt about it if
24 you'd like.  The superintendent changed the rules.

9 (Pages 30 to 33)

Price, et al.                                           v.                                    Chaffinch, et al.
Gregory Allen Warren                          C.A. # 04-956-GMS                          January 11, 2006

Page 34

1    Q.   First of all, you said that you had to assign
2  Ralph Davis to do something.  Do you remember when that
3  occurred?
4    A.   That would have been in mid to late November, I
5  believe, of 2003 when Chris was assigned to come back to
6  the range.  I think when there was a court order saying
7  that Sergeant Foraker would be taking the range back
8  over, that's when I had to sit down with Ralph and we had
9  to start talking about how we were going to handle Chris
10  coming back and Sergeant Ashley leaving.
11    Q.   Before that, prior to November 2003, had you
12  assigned Ralph Davis to any particular level of activity
13  with respect to the range?
14    A.   No, I did not.
15    Q.   So he was doing essentially the same thing
16  Purcel had done up until November?
17    A.   That's correct, yes.
18    Q.   You said something about the colonel changed the
19  rules.
20    A.   Yes.
21    Q.   What do you mean by that?
22    A.   Well, as I said, to be very blunt, remember
23  earlier we were talking about there's a formal chain of
24  command in a paramilitary organization?  There's also an

Page 35

1  informal chain of command and I was at the academy in the
2  mid '90s as a lieutenant, so this was my second time back
3  there.
4          But, in short, the pistol range has always
5  pretty much been given a lot of latitude and a lot of
6  autonomy to work on its own.  It is a separate facility.
7  It has a very specialized mission.  It's very dangerous
8  work.  It takes very dedicated people to want to work
9  there.  And so when a person is assigned there, you'd
10  like to think that they are a veteran, well trained,
11  highly motivated, and very proficient in their work.
12          So what has happened, what I have seen
13  happening for years is that the lieutenant and the
14  captain at the academy have, on paper, been part of the
15  chain of command, but in reality have never really been
16  much of the part of the chain of command.
17          When I say that, I mean the lieutenant
18  would get the activity sheets and would check them at the
19  end of the month and would sign them.  If there was maybe
20  something dealing with scheduling of recruits, since we
21  have the recruits at the academy, if there was a problem,
22  then the sergeant at the range would come to the
23  lieutenant or captain at the academy and go, We need your
24  authorization to change a training date.  Those types of

Page 36

1  things.
2          To be perfectly honest with you, the major,
3  the administrative officer in the State Police has
4  typically been more of a director of firearms training
5  than the captain at the academy has.  For all intents and
6  purposes, the lieutenant colonel in the State Police
7  calls the shots when it's regarding personnel issues at
8  the range with obviously the colonel's input and
9  sometimes the colonel making those decisions personally,
10  as we well know.
11          And then the administrative officer, who is
12  the major in charge of all of the money, has always
13  been -- had a very, very tight or close relationship with
14  the sergeant at the range because the range is a very
15  expensive entity.  As a single building goes, it's
16  probably the second most expensive entity the State
17  Police has next to aviation.
18          So I will be very honest with you.  The
19  captain at the academy has had -- and I'm not saying
20  myself.  I'm talking about all captains as long as I've
21  been assigned there as a lieutenant and in watching a
22  couple of others and then coming back.  The captain at
23  the academy has had very, very little to do with the
24  range.

Page 37

1          However, that all changed when Chris was
2  court ordered to come back.  Then all of a sudden I found
3  the lieutenant colonel and colonel basically throwing
4  Lieutenant Davis and I into the mix immediately.  Why
5  that was, I don't know.  I don't know if that was the
6  fact that Lieutenant Davis and I weren't -- I'll put it
7  this way:  The administration wasn't enamored with
8  Lieutenant Davis or I and they figured we'll put Chris
9  and Ralph and Greg together and let them work together,
10  or if it was more of no one at headquarters wanted to
11  have anything to do with Chris.
12          But there's definitely a reason why for
13  years the State Police ran one informal structure or
14  chain of command and then all of a sudden when Sergeant
15  Foraker is assigned to come back, that informal chain of
16  command completely changes and we all of a sudden go back
17  to this very, very formal -- and we don't want to have
18  anything to do with him.
19    Q.   Well, what led you to believe that the formal
20  structure was going to be imposed?
21    A.   Well, I'll give you an example.
22          I still remember this day when I received a
23  phone call at Troop 3 as I was the commander there,
24  Lieutenant Colonel Marcin called me and said, "Greg," he

10 (Pages 34 to 37)

Price, et al.                                         v.                                    Chaffinch, et al.
Gregory Allen Warren                         C.A. # 04-956-GMS                        January 11, 2006

Page 38

1  said, "Jim Ford is moving you to the academy." And I
2  said, "Okay. I anticipated that. He told me that a few
3  months ago."
4              And he said, "Well, hang on. There's more
5  coming." And I said, "Well, what's up?" And he said,
6  "Well, there's some things at the range that are going to
7  be taken care of." And I said, "Can you fill me in?"
8  Because he was kind of dancing around it a little bit, so
9  I knew this wasn't something he wanted to talk about.
10             I said, "Can you fill me in?" And he said,
11 "Well, in short," he said, "the colonel is pulling Chris
12 Foraker out and Sergeant Ashley is going to the range."
13             I have no personal animosity against
14 Sergeant Ashley. In fact, I've worked with him before at
15 Troop 3, but I've questioned that, a captain to the
16 lieutenant colonel on the telephone questioned that as to
17 why is this occurring. Why would you take somebody who
18 I've known for years as a trainer -- I've never known
19 Chris personally, but I knew him as a trainer. I never
20 had a problem with him. I never questioned anything he'd
21 done. I knew he was on the SWAT team. In fact, I think
22 he was in somewhat of a leadership position there.
23             So I questioned:  "Why is this happening?"
24 And he said, "Greg, can't go any further. I won't

Page 39

1  comment on it. It wasn't my decision. I fought it. But
2  Aaron has decided that Chris is out, Ashley's in. You're
3  going to have to live with it."
4              At that point I knew some things were going
5  to be changing. But then I knew things would really
6  change when, in fact, when Chris was assigned to come
7  back to the pistol range, I had been at the academy for
8  over a year or maybe even a year and a half or a year and
9  a quarter, something like that before Chris ever came
10 back. I had been at the academy as the captain.
11             During that time period I had never been
12 asked once by Sergeant Ashley or by the lieutenant
13 colonel or by Major Eckrich or by the colonel themselves
14 to attend any meetings or anything at all. I wasn't
15 involved in correspondence. I wasn't invited to come
16 next-door.
17             For instance, the budget. The budget at
18 the range at that time I think was in the area of three
19 or $400,000 a year. Now, here I am as the captain on the
20 formal chain of command responsible for the range.
21 However, there's a half a million -- somewhere between a
22 quarter and a half-a-million-dollar budget going on or
23 being formulated and dispensed and I wasn't even invited
24 to the meetings.

Page 40

1              Sergeant Ashley would go right down and
2  meet with Major Eckrich and whoever else was over there
3  because I wasn't privy to the meetings. I wasn't even
4  invited. I didn't know they took place much less be
5  invited.
6              So Lieutenant Davis and I basically were
7  left out of this mix until Sergeant Foraker was assigned
8  to come back. Then all of a sudden Ralph and I were
9  basically told flat out, this is how it's going to be.
10 Sergeant Foraker reports to you, da-da, da-da.
11             So then after maybe -- I was there in the
12 mid '90s. So maybe after eight or nine years of this
13 informal chain of command taking place where a sergeant
14 was reporting directly to a major, and then if that major
15 couldn't call the shot, the lieutenant colonel and
16 colonel were in on it, and after all those years of the
17 colonel picking and choosing certain things, like
18 obviously the Ashley move was hand picked by Colonel
19 Chaffinch, then all of a sudden I find out that I'm now
20 going to be in a very formal way in the chain of command
21 at the range.
22             And I advised Ralph Davis of the same
23 thing. I said, "Ralph, stand by." I said, "The rules
24 have changed." So that's when we sat down and talked

Page 41

1  about Sergeant Foraker coming back.
2      Q.  Well, let me go back to something you said in
3  the beginning.
4      A.  Yes.
5      Q.  Did you have a conversation with either the
6  colonel or the lieutenant colonel that told you that you
7  were going to be in charge of the range or that you were
8  going to have direct responsibility for the range?
9      A.  Yes. The lieutenant colonel -- I think he came
10 over personally. I don't think I got --
11     Q.  This is MacLeish?
12     A.  Yes.
13          I don't think I got that in an e-mail. I
14 think he came over personally and told me that Sergeant
15 Foraker would be coming back. Of course, I already knew
16 that because we had all been informed on a formal phone
17 call through the Delaware Emergency Management Agency's
18 bridge line, but I think he came over and told me that
19 Sergeant Foraker would be coming back and that Sergeant
20 Ashley would be coming out.
21          And I think my question to him was: "What
22 do I do with Sergeant Ashley? Is he going to stay here
23 or is he going out into the field? Or what's happening
24 with him? Is he retiring or whatever?"

11 (Pages 38 to 41)

Price, et al.                                    v.                        Chaffinch, et al.
Gregory Allen Warren                   C.A. # 04-956-GMS              January 11, 2006

Page 42

1    And so we had an informal conversation
2  about roles. And that's when the lieutenant colonel
3  said, you know, basically, for all intents and purposes,
4  the range and Chris are yours.
5        **Q. So where did this conversation take place?**
6        A. I think it was over in my office, I believe. I
7  can't swear to that because we are talking about some
8  time ago and so much has happened, but I think it was
9  actually -- I think he came over to see me. I didn't go
10 to see him.
11       **Q. Is this before the move had taken place?**
12       A. Yes. Oh, yes, certainly, because Ralph and I
13 had set up, you know, an actual process for switching,
14 switching NCOICs, noncommissioned officer in charge.
15       **Q. So MacLeish came to you and said that he was**
16 **going to place you in charge of transitioning the range**
17 **from Ashley to Foraker?**
18       A. In a nutshell, yes, that's put pretty well.
19       **Q. Did you think that was inappropriate?**
20       A. No. It's probably the way it should have always
21 been and it's the way it's always shown to be on the
22 table of organization.
23       But the reason it struck me funny is
24 because it's not how it was done for almost a decade, and

Page 43

1  then all of a sudden, you know, Chris is coming back and
2  we are going to be put into the formal chain of command
3  again.
4        In fact, I received -- shortly after this I
5  received my first invite to a range budget development
6  meeting, and that was the first one I'd ever been invited
7  to since I had been at the academy.
8        **Q. Did you believe that this was the way it should**
9  **have been run?**
10       A. It's the way it should have been run, but wasn't
11 run, yes.
12       **Q. So was Davis present in your office when**
13 **MacLeish came over and told you that he wanted you to be**
14 **in charge of the changeover?**
15       A. I don't think so because I ended up sitting down
16 with Ralph one day for some time and talking about this.
17 And I don't think Ralph was real comfortable. I think
18 Ralph felt something's coming. There's a reason for
19 this. You know, the State Police don't just change
20 something they've been doing for years overnight for no
21 apparent reason. I mean, we've been around long enough
22 to know that.
23       So I think when you have a lieutenant and
24 captain who have a lieutenant colonel come over and

Page 44

1  obviously in a not real friendly fashion and basically
2  say here is how it's going to go, here's what I want done
3  and you better make sure this switch goes smoothly, Ralph
4  and I are smart enough to know that the rules of life are
5  starting to change and they're starting to change
6  quickly.
7        **Q. So let me back up a second.**
8        Did Lieutenant Colonel MacLeish tell you
9  that he thought that there might be problems with the
10 changeover?
11       A. No, I don't think he said I'm anticipating
12 problems. I think his -- I think his thought was more of
13 I'm not happy about this. A judge is ordering us to do
14 this. And you better make sure that this goes smooth.
15 And so, hey, I'm reading you loud and clear. And that's
16 what Ralph and I attempted to do.
17       **Q. You just used the phrase "I think his thought**
18 **was." Is that what he actually said to you?**
19       A. No. I mean, I couldn't give you verbatim what
20 he said to me two and a half years ago, I guess it would
21 be now.
22       **Q. Did he say anything to you about being concerned**
23 **that the staff at the Firearms Training Unit would accept**
24 **Foraker back?**

Page 45

1        A. No, I don't think we got into anything that
2  deep. I don't remember that. I remember him standing.
3  In fact, I don't even think he sat down. I think he was
4  standing in my office when he told me this or what have
5  you. So I don't think we got into anything like that.
6  If we did, I don't remember that. I mean, we might have,
7  but I don't remember that.
8        **Q. So your recollection is that he told you that**
9  **Foraker was going back and he wanted you to make sure**
10 **that the transition went smoothly?**
11       A. Mm-hmm.
12       **Q. So as a result of that conversation, what did**
13 **you do?**
14       A. I sat down with Lieutenant Davis and basically
15 we talked and, you know, I let him vent a little bit and
16 let him get maybe whatever frustrations he had on his
17 chest, you know, off.
18       And then after we got that done, we started
19 talking about how should we actually facilitate this
20 physical, you know, transition from one NCOIC to another.
21       **Q. What did you decide to do?**
22       A. We decided we should be there. Yes.
23       **Q. So did you then arrange a meeting at the range?**
24       A. Basically what we waited to do was I think it

12 (Pages 42 to 45)

Price, et al.                                    v.                          Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                 January 11, 2006

Page 46

1   was a couple of days, we waited until maybe a couple of
2   days or maybe even a week prior to the actual transition
3   date and I think we got up with Sergeant Foraker.
4            In fact, I'll tell you what:  I think
5   Sergeant Foraker was more proactive on this one.  He
6   called us, called me and said, you know, "Can I come meet
7   with you?  Can I talk to you about how can I come in and
8   make this transition smooth?  You know, how can we do
9   that?"
10           And we went ahead and set up a meeting
11  between Chris and I think Ralph and myself to figure out
12  how should we go about doing this.  You know, how do we
13  pull this off?
14           And I think we called Sergeant Ashley and
15  asked him what his schedule was, you know, just try to
16  make it as palatable for everyone as possible, you know,
17  the transition.  I knew it would make many people feel
18  uncomfortable from the colonel down to, you know, other
19  players in the department.  And the lieutenant colonel
20  said he would make this go smooth, so I'm going to try to
21  accommodate that.
22      Q.  So who did you expect it was going to make
23  uncomfortable?
24      A.  Starting with the superintendent.

Page 47

1       Q.  Well, the superintendent doesn't go to the range
2   but twice a year; right?
3       A.  Right.
4       Q.  So were there people at the range that you
5   thought were going to be uncomfortable?
6       A.  No.  I think it was going to make the lieutenant
7   colonel uncomfortable.  I think it was going to make
8   Major Eckrich uncomfortable.  I think it was going to
9   make the superintendent uncomfortable.
10      Q.  Why do you think it was going to make the
11  lieutenant colonel uncomfortable?
12      A.  Because I think they were -- I'll just be blunt.
13  They were pissed off that a judge would order them to put
14  Sergeant Foraker back into the pistol range.
15      Q.  It's an order that the colonel consented to;
16  right?
17      A.  Consenting to it and wanting that, as you well
18  know, are two different things.
19      Q.  I fully understand that, but it was an order
20  that the colonel had consented to?  It wouldn't have
21  happened if the colonel didn't consent?
22      A.  Well, when you have punitive damages hanging
23  over your head, I think you'll consent to a lot of things
24  you may not like.

Page 48

1       Q.  I'm not saying he liked it.
2       A.  That's what I'm saying.
3       Q.  But the fact of the matter is, he consented to
4   it?
5       A.  He had to sign off on it, I assume.  Not being
6   an attorney, I'm not sure of the process there, but I
7   assume you would have had to sign off on the judge's
8   order.
9       Q.  Why do you think it was going to be a problem
10  for Major Eckrich?
11      A.  Because I'm finding out now -- and when I say
12  "finding out now," after this transition took place, I
13  found out in a hurry that things weren't as copacetic at
14  the range as Sergeant Ashley had let all of us believe.
15  And I think Major Eckrich was in on that, too, because
16  he's in charge of all the money.  And if you want me to
17  be very blunt with you, I'll give you an example.
18           Apparently in September right before Chris
19  came back in the November order or came back 12/1,
20  apparently Sergeant Ashley, with the approval of Major
21  Eckrich, because it was ten or $11,000, I guess the range
22  had been experiencing problems with its bullet trap and
23  it's dredging or its -- I guess dredging system or
24  whatever you call it up there, but they had been

Page 49

1   experiencing problems for so long that the system had
2   basically shut down and they brought a company in from
3   the outside to modify the entire system.
4            Now, here is where I go --
5       Q.  The entire what system?
6       A.  The bullet trap has a system built underneath of
7   it that retrieves the bullets after they've decelerated,
8   and it also catches everything else, whether it's
9   fragmentation or tuft or dirt or whatever the case might
10  be.
11           And this system had basically gone into,
12  under Sergeant Ashley's tutelage, had gone into the
13  shutdown mode.  I mean, it was not operating properly to
14  the point where after Chris came in and we started having
15  experts come in and look at this system, we're finding
16  out Sergeant Ashley had changed pumps.  He had been
17  experimenting up there with things.  He had been, I
18  guess, involved with some hazardous materials that he
19  probably should never have been involved with and, in
20  fact, expected his subordinates to be involved with those
21  same hazardous materials, also, without training, without
22  safety equipment.
23           So, in short, Sergeant Ashley I know, with
24  at least the approval of Major Eckrich, because he has to

13 (Pages 46 to 49)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A528

Price, et al.                                    v.                          Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                    January 11, 2006

Page 50

1  cut the money loose, had a company come in without
2  Lieutenant Davis knowing, without myself knowing, come in
3  and make major modifications, at least $10,000 worth I've
4  been told, on the range, and we didn't even know it.  And
5  that's why I referred to -- and you may now see that's
6  why I referred to the way it was supposed to be run and
7  the way it was really run.
8         Ralph and I, from the time I got to the
9  academy when I was transferred there from Troop 3, I, as
10 the table of organization shows, should have been an
11 integral part of the operations of the pistol range, and
12 so should the lieutenant at the academy.  However, we
13 were doing nothing, as the other captains and lieutenants
14 had done, we were doing nothing more than what was
15 expected of us, and that was sign off on the monthly
16 activity sheets and once every six months and then
17 eventually once every year go ahead and complete, you
18 know, an evaluation of the officers up there and that was
19 it.
20     Q.  Who is it that told you that that's what the
21 expectations were?
22     A.  As far as what we should be doing when we got
23 there?
24     Q.  When you were the director of training, who told

Page 51

1  you that the only expectation they had for you was to
2  sign off on monthly activity sheets?
3      A.  Captain Merganthaler, who I spent -- I went up
4  to meet with him.  I asked him if I could come up and
5  meet with him one day, maybe have lunch together, walk me
6  around, talk to me, tell me how things had been going,
7  tell me what's up, you know, give me at least a one-day
8  transition, coming from a troop for four and a half years
9  to the academy.
10        Captain Merganthaler spent 20 minutes with
11 me.  He handed me one page of hand-scribbled notes, most
12 of it which I couldn't read, and left me with basically
13 all kinds of things that had not been accomplished;
14 hence, why Secretary Ford was yanking him out of the
15 academy and putting me in there.
16     Q.  Back to my question.
17        Who is it that told you that all you needed
18 to do was sign off on the activity sheets and do a
19 performance appraisal every once in a while?
20     A.  Captain Merganthaler.
21     Q.  So in 20 minutes he told you that?
22     A.  Yes.  He went boom, boom, boom, here, boom,
23 boom, boom.  And, in fact, I don't even remember sitting
24 down.  He was standing up and I was standing up and we

Page 52

1  walked down the hall a little bit and he handed me a
2  piece of paper.  So I got the 20-minute package.
3      Q.  You don't believe he was doing a very good job;
4  right?
5      A.  Well, if the 20-minute transition is indicative
6  of the quality of work that he is capable of doing, I
7  have to answer, no, I don't think he was doing a very
8  good job.
9      Q.  Lieutenant Colonel Marcin would have been your
10 boss during the time he was the lieutenant colonel;
11 right?
12     A.  Yes.
13     Q.  Then when he left, he was replaced by MacLeish?
14     A.  Yes, that's correct.
15     Q.  During the time Marcin was the lieutenant
16 colonel, did you ever ask him what your responsibility
17 was with respect to the shooting range?
18     A.  Well, in a very nice way, of course, we talked.
19 And --
20     Q.  In a very nice way, what did he tell you?
21     A.  In a really nice way, he told me basically leave
22 things alone and just stay away from Sergeant Ashley.
23 And I guess I maybe made a smart comment or two and I
24 think, in short, you'll find that that was the colonel's

Page 53

1  pick.  When the superintendent hand picks an individual,
2  I don't care what rank they are, and puts them in a
3  position and the lieutenant colonel fights him on that
4  and says that's not the right thing to do and the
5  lieutenant colonel is told to mind his own business and
6  that I'm going to do this no matter what, I think it's
7  safe to say that a captain probably ought to just leave
8  it alone and let it go.
9         And so I hate to say this, even though
10 Lieutenant Davis and I both know what the formal chain of
11 command is, we did what every other captain and
12 lieutenant up there has done, and we let Sergeant Ashley
13 run the range the way he saw fit.  Whether that was right
14 or wrong, I'll be the first to admit to you, in
15 retrospect, I think I was wrong, I should have taken more
16 responsibility.  But there were all kinds of people from
17 the colonel down to the lieutenant colonel to Major
18 Eckrich to others that we probably all should have been
19 more responsible towards the range.
20     Q.  When was it that you talked to Lieutenant
21 Colonel Marcin about the range?  How long after you
22 became the director of training?
23     A.  Well, we talked a little bit that day on the
24 phone.

14 (Pages 50 to 53)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A529

Price, et al.                                     v.                                 Chaffinch, et al.
Gregory Allen Warren                   C.A. # 04-956-GMS                    January 11, 2006

Page 54

1    Q.  That was before you were --
2    A.  When I was at Troop 3 about I was coming up
3  there.
4    Q.  Right.
5    A.  And Lieutenant Colonel Marcin and I got along
6  pretty well because I had worked for him once before
7  years ago when he was a lieutenant and I was a corporal.
8  So we had a pretty good professional relationship.  He
9  would talk to me about things that I don't think he would
10  necessarily talk to others about and I talked to him
11  about things that I wouldn't necessarily talk to others
12  about.  And so we would have talked multiple times.  We
13  used to see each other every few days and just talk about
14  things.
15        So if there was -- I don't remember like a
16  formal meeting because we used to see each other on a
17  regular basis.
18    Q.  Was there a point when he told you that he did
19  not expect you to supervise activities at the range?
20    A.  If you're telling me or asking me did he order
21  me to leave the range alone, no, he never sat me down and
22  said, Greg, I'm ordering you to stay away.
23        I worked there.  I mean, I've been in the
24  State Police at that point close to 20 years.  You don't

Page 55

1  need to order a 20-year captain to do something.  You can
2  talk about it and they understand.  If they don't
3  understand, they'll ask for clarification.
4        Let me tell you:  When the lieutenant
5  colonel tells me, Greg, I didn't think it was the right
6  move, I fought it tooth and nail, I was put in my place
7  and it is a done deal, leave it alone, hey, you don't
8  have to order me from there.  I understand and I'm
9  reading you loud and clear:  Don't mess with what Colonel
10  Chaffinch has done.  So I did exactly what the lieutenant
11  colonel had inferred.
12        Are you asking me if he ordered me?
13  Absolutely not.  If he inferred that to me, I'll say
14  absolutely yes.
15    Q.  I want to know what he said to you that led you
16  to infer that.
17    A.  He told me to leave him alone.  This is the
18  colonel's hand-picked guy.  He's coming in.  Chris is
19  out.  If there's anybody in the department that doesn't
20  like it, tough.
21        Let's face it:  If the lieutenant colonel
22  can't put a stop to something, what is a captain as the
23  director of training, what influence are they going to
24  have on, you know, on helping the situation?  So...

Page 56

1    Q.  Were you present on December 1st when the
2  meeting occurred to turn over the range?
3    A.  Yes.  I went up initially and then I left, yes.
4        MR. NEUBERGER:  If you are going to start
5  going to another document, can we just take a little
6  break?
7        MR. ELLIS:  Yes.
8        (A recess was taken at this time.)
9  BY MR. ELLIS:
10    Q.  Can you describe for me, please, what happened
11  at the meeting on December 1st at the range?
12    A.  We set up a meeting on site, as you just said,
13  at the range.  I believe there was Sergeant Ashley,
14  Sergeant Foraker, Lieutenant Davis, and myself in the
15  room.  I don't know if anybody else was in there at the
16  time.  I think it was just the four of us.
17        And what we did is Sergeant Foraker had
18  been thorough enough to prepare basically a document like
19  a checkoff sheet of things that he knew were important to
20  the operations of the range.
21        So he came with that, which was nice
22  because Ralph and I hadn't had time nor had we even
23  thought about doing that.
24        And so basically I think I started out by

Page 57

1  saying, guys, I know there are some hard feelings in this
2  room right now.  I know things haven't always gone as
3  smooth as we would like.  However, the colonel and --
4  basically I even said, "A federal judge has made a ruling
5  in this case and the colonel has been involved in this."
6  And I said, you know, "These are the orders that we've
7  got.  And so we need to be professional.  And you don't
8  have to love each other.  I don't expect any hand holding
9  and loving up here, a love fest or anything, but we are
10  professional and we need to make this transition go as
11  smooth as we can."
12        And I think I stayed for maybe an hour,
13  maybe an hour and a half, something like that.  And then
14  I left Lieutenant Davis up there for the rest of the day
15  and I told Ralph -- I do remember telling him, "Ralph, I
16  do not want you leaving here until this transition is
17  completed today."  Because I didn't -- Sergeant Ashley
18  being pulled out of there probably wasn't going to make
19  him very happy and I didn't want him being hostile to
20  Sergeant Foraker.
21        And so I just felt better knowing that
22  Ralph would be up there kind of as a referee if there
23  were to be any words or questions or anything of that
24  nature.

15 (Pages 54 to 57)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A530

Price, et al.                                          v.                          Chaffinch, et al.
Gregory Allen Warren                        C.A. # 04-956-GMS              January 11, 2006

Page 58

1    So that's how the transition went.
2       Q.  Do you remember anything that Ashley said at the
3    transition meeting?
4       A.  Well, I don't remember specifics because it's
5    been a long time ago, but I can tell you this:  I do
6    remember leaving there, and I'll tell you why, why I
7    remember it, because I'd only been there like an hour,
8    maybe an hour and a half, maybe at the outside two hours,
9    and I felt comfortable enough to leave, the reason being
10   is Sergeant Ashley basically -- as Chris was going down
11   his little list there and going through some of the items
12   that were of importance and stuff, Sergeant Ashley was
13   basically telling us:  That's done.  That's in good
14   shape.  This is running really well.  I've got that taken
15   care of.  I mean, I hadn't found anything that I felt I
16   even needed to stay for.
17      So I went ahead and I felt comfortable
18   enough that, hey, these guys have gotten along together
19   now for the last hour, two hours.  Sergeant Ashley is not
20   saying anything that's causing me any alarm like I need
21   to stay up here physically or even what I can see,
22   there's operations.
23      So, in short, when I left there that day, I
24   didn't think there were any problems at the range.  I

Page 59

1    thought everything was fine and that's what I'd always
2    been led to believe.  And, of course, it didn't take long
3    for me to figure out that things weren't, you know, as
4    happy up there at the range as I had thought they were.
5       Q.  At the meeting, did Ashley behave
6    professionally?
7       A.  Yes, yes.
8       Q.  Did Foraker behave professionally?
9       A.  Yes.  Oh, everybody did.  That's why I say, I
10   felt comfortable -- I felt comfortable with the
11   relationship at that point that Chris and Rich were both
12   going to be professional.  And I felt comfortable about
13   what I was hearing from Ashley, comfortable enough that I
14   would leave.
15      Q.  Did you know any reason other than the fact that
16   Foraker was replacing Ashley for there to be any
17   animosity between Foraker and Ashley?
18      A.  No, no.  But as you can well imagine, troopers
19   take their jobs very seriously and there are transfers
20   that take effect sometimes that don't necessarily make
21   people happy or they're not too enamored with, so...
22      Q.  Were you involved in the transfer from Ashley to
23   Foraker in April 2002?
24      A.  No.  In fact, I think I mentioned to you,

Page 60

1    Lieutenant Colonel Marcin called me, told me I was being
2    transferred and -- but then went on to tell me about, you
3    know, as I think I told you, as Colonel Chaffinch had
4    gotten involved and was, you know, obviously, you know,
5    punishing Chris for Chris having been a little hard on
6    one of his compadres or friends.
7       Q.  My question was whether you were involved in
8    transitioning from Foraker to Ashley, and I take it the
9    answer is no.
10      A.  No.  I was told, you know, to stay out of this.
11   And I did that.
12      Q.  What is the next contact you had with anybody
13   about the conditions at the range?
14      A.  I think I did talk to Ralph later.  Ralph may
15   have called me at home or hit my cell phone or something
16   just to tell me that we got through the first day and
17   there were no fisticuffs, so to speak.  Just a light
18   phone call saying:  "We're okay up there.  I didn't have
19   any problems with these two guys."
20      Then maybe a couple of couple days, maybe
21   less than a workweek, I guess, I think Sergeant Foraker
22   had called down and asked to talk to Ralph or I or both
23   of us and set up -- wanted to set up a meeting.  And when
24   we had that meeting, that's when I found out that we had

Page 61

1    some issues we were going to have to address.
2       Q.  Prior to December 1, 2003, did you know what
3    maintenance troopers assigned to the range had to do at
4    the range?
5       A.  Well, common sense I knew from having been up
6    there and shot before.  You know, we had to sweep up
7    brass and make sure the bullet -- I guess I wouldn't say
8    bullet.  The targets that the bullets hit would have to
9    be picked up occasionally and, I guess, taken out and
10   burned or out to a dumpster.  Those general kind of
11   things.
12      So, yes, I knew some of that.  Technical
13   things, I'm not a range person.  I've never been in our
14   SORT team and I've never been assigned to the range.  So,
15   no, I don't know what kind of, you know, technical things
16   that they have to do.
17      Q.  Did you know anything about what maintenance
18   they had to do on the bullet trap system?
19      A.  No.
20      Q.  Did you know anything about what they had to do
21   to control the computers inside the control room?
22      A.  I know where the control room is and I know
23   there's some technology of different types in there.  I
24   know it hasn't worked very well over the years.  There

16 (Pages 58 to 61)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Price, et al.                                    v.                           Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                January 11, 2006

Page 62

1  have been various problems with different things, but,
2  no, I don't know. I'm not a technical person when it
3  comes to the range, nor should I have been. So, no, I
4  don't.
5      Q.  So what you knew as of December 1, 2003, is that
6  they had to sweep up debris after shooting, but beyond
7  that, you didn't have any knowledge of the requirements
8  of the water system and the bullet trap or the target
9  system?
10     A.  I'd never even been back there. I didn't -- I
11  don't even know how it operates.
12     Q.  You had never been behind the bullet trap prior
13  to December 1st?
14     A.  No, not until Chris had obviously brought these
15  problems to our attention. And then I said, "Ralph, we
16  got to go up there. We got to go take a look at this
17  stuff." Because I couldn't even picture what he was
18  talking about because I had never even been in back of
19  there. Most troopers wouldn't go back there. You are
20  not even allowed to go back there. There's hazardous
21  materials. There's oils. There's dust back there. You
22  know, there's things you shouldn't be around, anyhow,
23  so...
24     Q.  When is the first time you went behind the

Page 63

1  bullet trap?
2      A.  I think maybe the second or third week of
3  January.
4      Q.  Of 2004?
5      A.  Of 2004, yes, yes.
6             I wanted to go up. And Chris had been
7  telling us -- and then I had talked to Corporal Price and
8  Corporal Warren, and they were basically corroborating
9  what Chris was telling me. And I'm going, you know, this
10  is -- this sounds bad.
11            And so I said to Ralph, I said, "We got to
12  go up and take a look at this. We are in the chain of
13  command here. We got to go up and take a peak and see
14  exactly what we are dealing with." And, of course, we
15  did.
16     Q.  On December 1st, 2003, was the meeting that you
17  were at with Foraker, Ashley, and Davis in the office
18  area?
19     A.  We met in the conference room, I think, because
20  I wanted a place where we could -- see, I didn't know how
21  this was going to go. I didn't know if we were going to
22  end up with a yelling match or accusations made, you
23  stole my job, or if it weren't for a judge, I wouldn't be
24  leaving here or whatever. I didn't know what I was going

Page 64

1  to be facing. So I think we went into the conference
2  room and shut the door, yeah.
3      Q.  At any point during that day did you go out into
4  the shooting area, the range itself?
5      A.  I'm trying to think. I know we didn't go behind
6  the bullet trap. We didn't go in any of the secure
7  areas. I don't know, to answer your question. I don't
8  remember going in the classrooms. We could have as we
9  walked and talked, but I don't know. I left pretty
10  shortly after being there after an hour or two. I'm sure
11  Lieutenant Davis did. I don't think I did. I don't
12  recollect like taking a tour.
13     Q.  Okay.
14     A.  But I could have. I mean, I don't remember.
15  Sorry.
16     Q.  You've testified that within a short period of
17  time after that December 1st meeting you had some further
18  discussion with Chris Foraker?
19     A.  Mm-hmm.
20     Q.  Do you remember when that was?
21     A.  If you're asking me do I remember a date, no.
22  If you're asking me do I remember him coming down and
23  being upset, yes. And I think it was -- I think I
24  testified a few minutes ago, it was a couple of days to a

Page 65

1  business week. I mean two, three, four days we were
2  together. I mean, he had come down and said, you know,
3  this is what I've inherited.
4      Q.  Was that something that was set up? In other
5  words, was it a meeting set up in advance?
6      A.  I think it was. I think Chris had called down
7  and talked to either me or Ralph and asked, "Hey, are you
8  guys going to be there? I got to come down and see you."
9      Q.  Now, were you present at a meeting at the range
10  on December 3rd with Foraker and the rest of the staff?
11     A.  On December 3rd?
12     Q.  Yes.
13     A.  No, I don't remember going back up there.
14  December 3rd? I don't remember going up there. I went
15  back to meet a technician or an engineer in January
16  because the day I went up to take a tour, I also got a
17  chance to meet a gentleman who was an expert and he went
18  ahead and had some not-so-pleasant things to say about
19  the range and stuff.
20            So I do remember going back up, but not
21  December 3rd and not anywhere very shortly after the
22  transition.
23     Q.  Let me show you Exhibit 19. This has previously
24  been marked at another deposition, D-19.

17 (Pages 62 to 65)

A532

Price, et al.                                    v.                              Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                January 11, 2006

Page 66

1   A.  Got you.
2   Q.  Have you ever seen this before?
3   A.  It doesn't strike a bell with me, but I may very
4   well have seen this because I remember Chris talking to
5   us about all of these issues.  I remember training for
6   Jimmy.  I remember the headsets, they weren't working
7   properly.  They said they could talk to tractor-trailers
8   out on the highway.
9        So I probably have seen this.  But if you
10  are asking me if I recollect it, if I can say, oh, yeah,
11  I can remember the day I got this, no.
12  Q.  Is what you are saying that the topics that are
13  on Exhibit D-19 look familiar, but you don't recognize
14  the document?
15  A.  Yes.  My guess is Chris probably gave this to
16  me, but my desk is covered with papers at the captain at
17  the academy.  So my guess is I've seen this before.  But
18  you are asking me do I remember getting this?  No.  But I
19  do remember Chris coming down and not being real happy
20  with what he had to deal with up there.
21  Q.  Chris has testified that there was a meeting at
22  the range on December 3rd between yourself and the member
23  of the firearms training unit staff.  Do you have any
24  recollection of that?

Page 67

1   A.  Could have been, but I remember Chris coming
2   down into the academy, and I still remember him not being
3   happy.  He said, "We have got a bunch of things that
4   we've got to deal with."  And so I always take time out
5   for guys.  And I said, "Let's run through this stuff."
6   Q.  So this was --
7   A.  So I could have been up there on December 3rd,
8   but I don't recollect that.  You asked me do I remember
9   going back up on December 3rd.  I don't.  I remember
10  going back up one time on occasion and we met in a
11  classroom and there was an engineer or a technician
12  there.  I remember that time.
13       I remember walking behind the bullet trap
14  and just basically almost falling out and just saying,
15  "Oh, my God."
16       But like I said, you are asking me about
17  something that happened a long time ago and, you know,
18  the range is only one entity that I've got to cover along
19  with recruits and projects and all of that.  So that's
20  about as clear as I can make that for you.
21  Q.  The discussion you had with Chris that you said
22  was in your office, and I think you said at some time
23  probably less than a week after December 1st?
24  A.  Yes.

Page 68

1   Q.  Was anybody there other than you and
2   Mr. Foraker?
3   A.  Lieutenant Davis may have been there, but I
4   can't swear to that because, I mean, Ralph is a busy guy,
5   too, and I don't follow him around and mandate where he's
6   at.  So Ralph may have been there and -- or it may have
7   just been Chris and I.
8   Q.  What do you remember about the discussion?
9   A.  I can still remember Chris coming -- here I am,
10  I'm sitting here on December 1st with some degree of
11  anxiety about how the day is going to go.  By that
12  evening I'm pretty relieved.  I mean, Ralph gives me a
13  holler or whatever at home and says, "Hey, you know,
14  we're okay.  Ashley says everything is great.  Chris is
15  up there working on this.  We didn't have any problems
16  today."
17       But then like I said, within a couple of
18  days, maybe three or four days, whatever, but, I mean, it
19  was maybe.  It wasn't like a month went by.  Chris was
20  talking to me saying, Greg -- or "Captain, we've got
21  issues we got to deal with."
22  Q.  What is it he told you that you had to deal
23  with?  What was the substance?
24  A.  These items right here.

Page 69

1   Q.  Okay.
2   A.  Now, there may have been more than this, but I
3   do remember several of these and him going over these
4   items with me.  I do remember this.
5   Q.  With respect to the last bullet point on
6   Exhibit D-19, what did he tell you about the bullet trap
7   that you can recall?
8   A.  Basically -- I mean, I don't remember the
9   technical jargon and stuff, but I remember him saying,
10  "It's not working properly.  You can't believe what we've
11  got up there."  And I guess he meant the dirt or the dust
12  and the thing being clogged up and stuff.
13  Q.  What did he actually say to you about the bullet
14  trap?  Don't guess at what he was referring to.
15  A.  That's what I'm saying.
16  Q.  If you don't remember, you don't remember.
17  A.  I don't remember.  That's what I'm saying.  I
18  mean, I remember him coming in and being upset about
19  multiple items, and I remember going over these because I
20  still remember when I see this walkie-talkie, one of the
21  comments was sometimes the guys get bleedover from trucks
22  out on the highway.  So I can remember those things.
23       But you're asking me, you know, what did we
24  go down -- what exactly did he say about the bullet trap?

18 (Pages 66 to 69)

A533

Price, et al.                                v.                              Chaffinch, et al.
Gregory Allen Warren              C.A. # 04-956-GMS              January 11, 2006

---

Page 70

1  I remember it wasn't good, that it wasn't functioning
2  properly, that there were problems up there.
3      Q.  What did you do?  Did you do anything as a
4  result of your conversation with Chris Foraker, whenever
5  it occurred?
6      A.  I went ahead and talked to him and said, "Let's
7  get as many facts together as we can."  I think that's
8  one of the things that took us some time.  And it was,
9  hey, I know you're upset about what you are talking about
10 here.  Let's see exactly what we've got.
11         So I think I asked him, "Where do we go
12 from here?"  I'm not a range expert and I hadn't at that
13 point seen what he had seen, nor experienced what
14 Corporal Price and Corporal Warren had been apparently
15 living through for some time.
16         So I don't think I took a great deal of
17 action.  I think I pretty much probably threw it back in
18 his lap as in, hey, get me all the information you can.
19 You know, because I've been around long enough to know
20 that, you know, that's going to be the first thing
21 facilities management is going to want to see or hear is
22 they're going to want data.  They're going to want facts.
23 They want to know how bad is it really or whatever the
24 case might be.

Page 71

1         So I don't remember jumping right on this.
2  I think it was about a week or so before I finally -- I
3  saw Colonel MacLeish one day and said, "Hey, just as a
4  heads up, I'll be coming over to see you."  And I think
5  he looked at me like, You coming over to see me?  What's
6  up?  And I think I went ahead and started right then
7  telling him.  You know, I didn't want to leave -- knowing
8  how the State Police works, I didn't want to leave
9  Eckrich and MacLeish out of the loop.  I didn't hardly
10 ever see Chaffinch, but I mean, Eckrich and MacLeish I
11 saw on a regular basis around headquarters.
12     Q.  What is it you told MacLeish?
13     A.  Basically that there were problems at the range
14 that we didn't know about and that they looked pretty
15 serious and that I was going to need to come over and
16 talk to him and Eckrich because I knew some of them were
17 going to deal with money, too.
18         And I also knew that Eckrich and Ashley,
19 you know, have been friends and been pretty tight.  And I
20 knew that Ashley was reporting directly to Eckrich for, I
21 guess, maybe a year or a year and a half, and so I knew I
22 would have to see Eckrich and MacLeish both.  I knew I
23 wouldn't be able to fix all this stuff with one person.
24 It was going to take both of them.

Page 72

1      Q.  Approximately when did you have that
2  conversation with MacLeish?
3      A.  It wasn't like within a day or two of this, but
4  it was within a week.  Because I worked -- the academy is
5  here and headquarters is here.  So you almost can't not
6  run into one another.
7         So I think I saw him -- I remember seeing
8  MacLeish.  I think he was over at the academy for
9  something and I grabbed him in the hall.  He didn't come
10 over to see me and I hadn't gone to him yet.  I think it
11 was one of those informal ones as, hey, just so you know,
12 here is a heads up.  I'll be coming over to see you.  We
13 are going to need to have a meeting on this.
14     Q.  That's all you said to him?
15     A.  I explained to him some of the issues real
16 quick, but as a person is walking, you can only say so
17 much.  But he knew right up front that we got some issues
18 to address over there.
19     Q.  Approximately when was this?
20     A.  I think it was about a week.
21     Q.  A week of what?
22     A.  Of Chris going there.
23     Q.  Okay.
24     A.  The first couple of days everything was cool.  I

Page 73

1  think Chris was trying to basically see what have I got
2  up here.  You know, what's going on here?  But very
3  quickly we found out, Ralph and I, that we had a mess to
4  deal with.
5         And, of course, that's not something you
6  are going to -- if you find out that you got safety
7  issues, hazardous material issues, you got training
8  issues, personnel issues all coming at one time, that's
9  not something you are going to keep a secret from your
10 boss very long.
11         So I remember informally -- because we
12 never had a chance to meet with Colonel MacLeish until
13 after the holidays.  He was basically indisposed of.
14     Q.  If you look at Exhibit D-19, there's no mention
15 here of hazardous materials, is there?
16     A.  No, no.  I'm telling you, Chris had come down
17 and told us, though, that there were things up there.  I
18 guess he had already interviewed, maybe, at that point
19 Corporal Price and Corporal Warren, and I think already
20 with his tour of the building and probably with
21 interviewing the guys -- I don't know this, you would
22 have to ask Chris, but my guess is after interviewing the
23 guys and touring the building, it didn't take him long to
24 figure out that there were some issues to deal with

---

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                                    v.                          Chaffinch, et al.
Gregory Allen Warren              C.A. # 04-956-GMS              January 11, 2006

Page 74

1  behind that bullet trap that most of us would never know
2  about, you know, unless you go back there.
3      Q.  What was the next discussion you had with Chris
4  Foraker about the range after your discussion with Tom
5  MacLeish in the hallway at the academy?
6      A.  We basically start communicating on a regular
7  basis, so I don't know exactly what -- you know, what you
8  want to refer to or whatever.
9          But I know after that, I think everybody's
10  antenna went up and we knew that this wasn't something
11  that Chris could fix on his own or that the guys were
12  going to be able like to make adjustments to.  It wasn't
13  one of those, hey, Chris, go ahead and do what you got to
14  do and fix it.  This was going to be a major problem and
15  a major project that was going to take some money and
16  take some decisions on the part of the superintendent and
17  the deputy superintendent.
18          So we started talking almost on a regular
19  basis.  I mean, there was rarely a day went by Chris
20  didn't tell us something.
21      Q.  What is it you understood to be his problem in
22  terms of maintenance of the bullet trap?
23      A.  If you want me to be honest with you, there -- I
24  was kind of flabbergasted.  I mean, I go to the first --

Page 75

1  I don't hear anything for the first year, year and a
2  quarter, year and a half I'm at the academy.  I'm being
3  told on a regular basis when Sergeant Ashley comes down
4  to the academy, everything is copacetic.  Yeah, life is
5  good.  I am having a good time up there.  Yeah, Kurt and
6  Wayne are happy.  Everything is grand.  I mean, you would
7  really think the range was a resort.
8          Now all of a sudden that person is out and
9  within 48 hours, let's say, give or take a few hours, but
10  within 48 hours I've got a sergeant coming to me going --
11  he's basically waving a flag going "help."
12          So I don't know how I can make it any more
13  clear for you than --
14      Q.  My question is:  What did he tell you the
15  problem was in connection with the maintenance of the
16  bullet trap?
17      A.  I don't remember exactly.  I remember us going
18  over this list of items, but I remember him saying that
19  the place was filthy.  There were things stored there
20  that probably shouldn't be stored there.  I remember them
21  talking about there wasn't enough staff.  I remember him
22  talking about the bullet trap, and apparently it had been
23  modified or -- I don't know if he used the word
24  "modified" or, you know, "rigged" or whatever, some type

Page 76

1  of jerry-rigging or whatever it was.  But, I mean, he
2  went through a whole list of things.
3          And as I said, I look at this, I don't
4  remember all of this, but I remember the walkie-talkies
5  and head-sets just as clear as yesterday.  So he went
6  through all this.
7      Q.  Did you at some point learn that the troopers
8  assigned to the Firearms Training Unit had for a number
9  of years been doing maintenance of the bullet trap?
10      A.  No.  I had always been led to believe --
11      Q.  You never learned that at all?
12      A.  I had always been led to believe -- now, that's
13  probably my fault because I'm not a technical person, but
14  I always thought that there was a contract -- this sounds
15  stupid, but I always thought there was a contract that we
16  had a professional company come in and every so often do
17  maintenance behind the bullet trap.  And I think Major
18  Swiski is where I got that information from that.  "Greg,
19  there's a contract where a company comes in and they do
20  the maintenance behind and then the guys do the
21  maintenance in front."  You know, like I was telling you,
22  sweeping, vacuuming, taking the bullet targets out and
23  things.
24      Q.  There was a company that came in and did

Page 77

1  maintenance behind, but have you ever learned that the
2  staff at the Firearms Training Unit was doing its own
3  maintenance behind the bullet trap?
4      A.  Not until after Chris brought all of this to our
5  knowledge.  We didn't know because Ashley wasn't telling
6  us.
7      Q.  Did you ever ask him?
8      A.  Ask who?
9      Q.  Ashley.
10      A.  No, because he was telling us everything is
11  going really well.  We are happy up there.  Things are
12  functioning fine.
13      Q.  When was it you learned that the staff had been
14  doing maintenance of the water system behind the bullet
15  trap?
16      A.  Basically when the lid blew off.
17      Q.  When is that?  Give me a date.
18      A.  That's what I'm telling you.  That first week is
19  when everything came to the surface.  Chris got there.  I
20  assume it took him a couple of days to do everything he
21  wanted to do and to check on everything that he needed to
22  check on.  The range is a pretty good-sized facility and
23  there are several people that work there.  Then he came
24  right to us and said, "Here are some of the issues we are

20 (Pages 74 to 77)

A535

Price, et al.                                                    v.                                        Chaffinch, et al.
Gregory Allen Warren                              C.A. # 04-956-GMS                          January 11, 2006

Page 78

1  going to be dealing with and I'm going to need your
2  help."
3       Q.  Well, looking at D-19, the issue that I'm asking
4  you about is the last bullet point, and it says:
5  "Serious Maintenance issue with the bullet trap only to
6  be doubled when shotgun goes to frangible ammo."
7       I've asked you what he told you about the
8  bullet trap and you said you didn't remember.
9       Is there some point at which you remember
10 him telling you that the guys that worked there had been
11 working, had been performing maintenance activities on
12 the bullet trap for some number of years?
13      A.  I don't remember exactly when.  I know we knew
14 that almost immediately, though, because he came down and
15 I know we talked about this and he said basically the
16 troopers had had enough; that they were tired of having
17 to put their hands in stuff.  They were tired of
18 breathing stuff in.
19      And I think -- I think the troopers
20 probably were relieved at some point in this to have a
21 boss there that was finally going to at least go to bat
22 for them instead of just telling everybody:  Life is
23 great; hey, get in here and help me clean this toxic mess
24 up.  I think they were probably relieved at some point

Page 79

1  that, hey, finally somebody is going to go to
2  headquarters and is going to say something about how bad
3  things really are up here.
4       But if you are asking me a date, I think
5  I've told you, you know, four or five times now, you are
6  asking me to remember things that are a long time ago and
7  we met and talked or he would call me or he would talk to
8  Lieutenant Davis probably on an every-day, if not an
9  every-day, maybe an every-other-day basis during the
10 entire month of December.  And when we got into January
11 and we really saw how bad things were, there were some
12 weeks where we were on the phone or e-mails almost every
13 day.
14      MR. ELLIS:  D-33.
15      (Exhibit D-33 was marked for
16 identification.)
17 BY MR. ELLIS:
18      Q.  Exhibit D-33 is an e-mail chain that appears to
19 be something you printed out.
20      The first question I'm going to have is
21 about the bottom e-mail that's dated Friday, December 19,
22 at 7:20 in the evening from Chris Foraker to you, to Tom
23 MacLeish, Paul Eckrich, Greg Warren, and Ralph Davis.
24      A.  Yes.

Page 80

1       Q.  Are you familiar with that?
2       A.  No, I'm not, but I'm looking at it.
3       Q.  Take a look at it.  That's fine.
4       A.  Do you want me to take time to actually read it,
5  the whole thing?
6       Q.  Yes.
7       MR. NEUBERGER:  You should.  Read it
8  quietly to yourself.
9       THE WITNESS:  All right.  (The witness
10 reviews the document.)
11      A.  Okay.  Got you.  Thank you.
12 BY MR. ELLIS:
13      Q.  Do recall getting this e-mail on December 19th?
14      A.  No, I don't recall getting it, but obviously I
15 got it.  I mean, I'm cc'd on here, so, you know, I
16 obviously got it.
17      Q.  Did you discuss with Foraker the substance of
18 this e-mail before he sent it?
19      A.  I very well may have.  I do not know.
20      Q.  Do you recall telling him that he should send it
21 to MacLeish and Eckrich and just copy you?
22      A.  I may very well have told him that, absolutely.
23 In fact, I probably did.
24      Q.  Now, you said that Colonel MacLeish was

Page 81

1  indisposed over Christmas.  I believe that was your word.
2       Am I correct that he was on vacation for
3  the last two weeks of the year?
4       A.  Yeah.  Because I remember going over and talking
5  to his secretary and saying I need to get in to see him,
6  we need to set a meeting up ASAP, and I was told he would
7  be off and to get back with him when we came back from
8  the holiday.
9       Q.  Was there a point when Chris Foraker informed
10 you that he and the staff had ceased doing the
11 maintenance activity on the bullet trap?
12      A.  Yes, they did tell us that.
13      Q.  When did they tell you that?
14      A.  I don't remember exactly when.  I mean, we went
15 through -- this started December 1st and then I retired
16 in July.  So I went through about six months of this.
17      So if you are asking me to try to recollect
18 when he told me that they had ceased doing the
19 maintenance work that Sergeant Ashley had ordered them to
20 do, I couldn't give you a date.  I'm sorry, but there's
21 no way I could tell you.
22      Q.  Do you recall ever passing that information up
23 the line to anybody above you in the chain of command?
24      A.  Yeah.  In fact, we had -- as soon as I could get

21 (Pages 78 to 81)

Wilcox & Fetzer, Ltd.                    Professional Court Reporters                    (302)655-0477

A536

Page 82

a hold of him and get him to sit down with us -- the lieutenant colonel was there, I think -- I know he was there because I actually conversed with him and I believe Major Eckrich was there and Lieutenant Davis was there and I was there at a minimal. There may have been another person, but I know there were at least four of us there.

**Q. Approximately when did that occur?**

A. Well, I did what the secretaries told me to. And so I went ahead and the day we all got back, I set up a meeting and that meeting date came and I was told it had been cancelled, so I was so mad. I went next-door and talked to the lieutenant colonel's secretary and said, "Why has our meeting been cancelled? This is ASAP. I've been waiting three weeks now to get this meeting."

And they told me he had an event to go watch, one of his kids was in a sporting event or something and he had to leave early, and he just basically cancelled the meeting.

So I said, "Well, we need to set up another one, like now." And so it took us another maybe a week or even maybe two weeks to get up with him.

So I started trying in December to get a meeting. And it actually took till probably maybe the

Page 83

third week of January before we could actually sit down formally and go over all of these problems.

**Q. Do you recall there being a meeting in the third week of January with the people that you've identified to discuss the range?**

A. That's what I just said.

**Q. Do you have any notes of that meeting?**

A. No. No, I don't. But I know who -- I remember -- I mean, certain things just stick out in your mind because I'll never forget it. It's the day Colonel MacLeish told everybody at the academy -- or told Ralph and I as the academy directors that everybody at the range is going to wear a paper dust mask from now on. Because Ralph was sitting to my right and the lieutenant colonel was sitting right in front of me because sometimes things in life are almost prophetic or you just almost fall out when they say something -- you know, something is so absurd.

And that was one of those things, it's like when Lieutenant Colonel Marcin told me that day, there are certain things that are so absurd that they just stick out in your mind.

And that's why I remember that day so well. And I remember Ralph being there with me. And I think

Page 84

Paul Eckrich was in there, too, to my right, and there may have been a fifth person, but I don't remember if there was a fifth person or not.

**Q. Could that meeting have occurred as late as January 30th?**

A. Oh, certainly, because remember I told you, we had one set up for January 12th and then it was cancelled. That was the one where lieutenant colonel decided to take care of some personal business instead of the range and then we had to get a new one set up. And, you know, when you're viewed as we were viewed being at the academy, I'm surprised that we were even able to pull it off by then, to be perfectly honest with you.

**Q. Let me show you what has been previously marked as Exhibit D-2.**

A. Okay.

**Q. Can you tell me what D-2 is?**

A. Yes. I've seen this. This is a report that I prepared for the lieutenant colonel, yes.

**Q. Going back to Exhibit D-33, which is the first exhibit I showed you today --**

A. Okay.

**Q. -- there is an e-mail dated Monday, January 5, 2004, from MacLeish to you and Foraker in which MacLeish**

Page 85

**says: "Captain Warren please prepare a written report that addresses the concerns Sergeant Foraker has presented and propose possible solutions."**

**Is this D-2 the report that you prepared in response to that instruction?**

A. Yes.

**Q. Now, did you prepare this report entirely on your own?**

A. Obviously with facts from other people, but I typed it personally. I didn't have my secretary do it. I actually typed this personally.

**Q. The title of the document is "Current Range Status and Analysis."**

A. Yes.

**Q. What did you mean by "Current Range Status"?**

A. Where we currently stand.

**Q. I've looked through this document and I can't find anywhere in this document in which you report that the firearms training unit staff had stopped doing maintenance of the bullet trap.**

A. Okay.

**Q. Do you believe it's contained in this document anywhere?**

A. May not be. There's probably a lot of things

Price, et al.                                                v.                                    Chaffinch, et al.
Gregory Allen Warren                          C.A. # 04-956-GMS                        January 11, 2006

Page 86

1  that aren't contained in here because the range had been
2  in operation at this point for -- well, going on a
3  decade. So, I mean, I tried to put a report together
4  that would give people a historical background and tell
5  them what we currently have.
6          But, no, to answer your question directly,
7  there's probably not only that. I mean, I got to believe
8  there's other things that aren't included in here,
9  either. I was trying to put this thing together as
10 quickly as we could and get it over to them.
11     Q.  Well, you had more than three weeks to put it
12 together; right?
13     A.  Yes, certainly, but we are waiting for data and
14 facts to come in. Plus, as you can tell, I have a
15 regular job to do, too. And he ordered me to do this, so
16 I didn't feel it was right.
17          I will tell you there are many captains in
18 the department that would have said, Here, Lieutenant
19 Such and Such, or Here, Sergeant So and So. I went ahead
20 and put it together myself.
21     Q.  Do you believe it would have been important for
22 the lieutenant colonel to know that the range staff had
23 ceased doing maintenance on the bullet trap?
24     A.  I don't have it in here, as you said. I mean, I

Page 87

1  haven't reread this. This has been a couple years ago
2  when I ended up doing this. But you say it's not in
3  there, so I believe it's not in there.
4          I will tell you this: If what you are
5  asking me is did the lieutenant colonel know what was
6  going on at the range? If he tells you that he didn't --
7     Q.  I'm not really asking you what the colonel knew.
8     A.  Okay. Because all of the verbal conversations
9  that take place, he knew the extent of how bad things
10 were up there. Did he know every little, tiny detail?
11 No. Same thing I didn't know every little, tiny detail
12 because I don't work up there.
13     Q.  Do you consider the fact that the staff at the
14 range had stopped doing the maintenance of the bullet
15 trap to have been an important fact?
16     A.  Yes, I would say that's important.
17     Q.  Is it possible that you didn't know that fact at
18 the point you prepared Exhibit D-2?
19     A.  No. I think Chris did a pretty admirable job of
20 keeping us informed. I think I mentioned earlier that
21 maybe not every day, but at least every other day he was
22 getting up with Ralph or I, one of us, letting us know
23 what was going on and how things were shaking out. And
24 to be perfectly honest with you, Major Eckrich knew

Page 88

1  almost all of this stuff, too, because he's the one who
2  has to cut the money loose.
3     Q.  Would you agree with me that there's nothing in
4  the e-mail that's at the bottom of Exhibit D-33 -- and
5  that's the December 19, 2003, e-mail -- that informs the
6  addressees that the staff at the Firearms Training Unit
7  had stopped doing maintenance of the bullet trap?
8     A.  No. When I just read this, I did not see that
9  in there, no.
10     Q.  Let me show you another exhibit that's again
11 already been marked in another deposition. This is
12 Exhibit 17.
13     A.  Okay.
14     Q.  Why don't you take a minute and read that if
15 you're not familiar with it.
16     A.  Okay. Got you. (The witness reviews the
17 document.) Okay. Thank you.
18     Q.  Do you find anything in Exhibit D-17 that
19 informs you that the Firearms Training Unit staff has
20 stopped doing maintenance on the bullet trap?
21     A.  Well, I see in here where it says "The air
22 quality problem is surely compounded by the fact that
23 the" --
24          MR. NEUBERGER: You are on the first page,

Page 89

1  paragraph 2, numbered 2 you are reading from?
2          THE WITNESS: Yes.
3          MR. NEUBERGER: Go ahead.
4     A.  "The air quality problem is surely compounded by
5  the fact that the wet ramp is dry in some areas due to
6  the frangible" -- and I think that would probably be
7  "material," but it's got a hole through it -- "when wet
8  turns to a pudding type mud that in short order causes
9  the filter screens and the sprayer jet heads to" --
10 something else missing because of the whole punch -- "and
11 causes the pumps to fail as well."
12          That's what I see in there. I do not see
13 where it says that they've stopped doing maintenance.
14 But I can see where the system is obviously experiencing
15 problems.
16          MR. NEUBERGER: Excuse me, Ed. There is a
17 second sentence to that. Could you read that to yourself
18 privately?
19          THE WITNESS: (The witness reviews the
20 document.) Okay. Got you.
21          I do see where it refers to Environmental
22 Solutions as a professional firm that is coming in to --
23 trying to work on that problem, trying to address it.
24 BY MR. ELLIS:

23 (Pages 86 to 89)

A538

Price, et al.                                      v.                          Chaffinch, et al.
Gregory Allen Warren                      C.A. # 04-956-GMS              January 11, 2006

Page 90

1  Q.  Do you recall receiving this e-mail?
2  A.  No, but there was a gazillion e-mails.  I think
3  I mentioned that to you.  We were talking almost
4  either -- Chris would stop down and see us.  He was very
5  good about driving down to see us.  Corporal Warren and
6  Corporal Price would come down and see us and tell us how
7  bad things were.
8      So if you are asking me do I remember
9  getting this one?  No, no, I don't, but I'm sure I did.
10  Q.  Do you remember the content of this one?
11  A.  No.  There were tons of documents and
12  discussions.  So, no, I do not.
13  Q.  Do you recall doing anything with this e-mail?
14  A.  No.  I mean, if you are asking me do I
15  remember -- okay.  I went and did this?  No, I don't
16  remember.
17      We were trying to do the research to try to
18  pass this up in writing because I'd already told the
19  lieutenant colonel all of this verbally.  I mean, he was
20  staying in the loop.  How do you think he knew to even
21  tell me to put a report together?  They knew what was
22  going next-door.
23      And, of course, Major Eckrich is easier to
24  get a hold of than the lieutenant colonel because he has

Page 91

1  a walk-in policy.  The lieutenant colonel you can't get
2  to without an appointment.  You can't get to his office
3  physically.  The major you can just walk over and see him
4  because lots of times he's just sitting at his desk.
5      So Major Eckrich knew all of this, that it
6  was going on.  And my guess is the minute I would leave,
7  my guess is he's running right down the hall and telling
8  the lieutenant colonel and the colonel every bad thing
9  that's going on.
10  Q.  When you say the Major Eckrich knows all these
11  things that are in Exhibit D-17, how do you know that?
12  A.  Because I told him and many times Lieutenant
13  Davis would tell me, "Hey, I went ahead and told about
14  that."  And I'd go, "Thank you.  I don't have to call him
15  now."
16  Q.  Why didn't you forward this e-mail to Eckrich?
17  A.  For whatever reason.  He's very easy to get a
18  hold of.  We can walk right over and see him.  You know?
19      And like I said, everything that goes on up
20  there -- there may be one thing you're maybe not privy
21  to, but everything that involves an expenditure of money,
22  almost everything, particularly anything of any size,
23  requires the administrative officer's approval.  So we
24  are missing one piece here in all of these e-mails is

Page 92

1  that almost anything that Chris did, Major Eckrich was
2  aware of because it involved the expenditure and, some of
3  them of large amounts of money, and they had to be
4  approved.  And Chris was good about getting approval
5  before he would spend money on things.
6      And as I think I told you, I'm not in the
7  budget loop, anyhow, so I wouldn't approve anything to be
8  done unless I had talked to the lieutenant colonel or to
9  the major.
10  Q.  Is there anything in Exhibit D-17 that requests
11  approval for an expenditure?
12  A.  Let's see.  The professionals coming in,
13  Environmental Solutions, that would require money.  Jay
14  Zolcak of Mayfran, if we are working with that firm, that
15  would cause us to have to use money.  Joseph Ferrell of
16  chemical specialists -- he's a chemical specialist with
17  Environmental Solutions, that would cause us to have to
18  get approval.
19      I mean, unless you want me to reread this
20  thing and highlight where, but, I mean, there are many
21  things on here that would require, you know, an
22  expenditure.  Somebody would have to approve, you know,
23  us bringing experts in from the outside.
24  Q.  Do you know why Foraker would not send a copy of

Page 93

1  this e-mail to the major?
2  A.  You'd have to ask Sergeant Foraker that.  I
3  mean, there was so much going on, that's what I think I
4  was alluding to before.  To remember every single detail
5  or every e-mail or every conversation is literally
6  impossible because this saga went on for months, and it
7  was almost a daily conversation with one person, if not a
8  half a dozen people.
9  Q.  Do you recall ever putting in writing to anyone
10  at the Delaware State Police the fact that the staff at
11  the Firearms Training Unit had stopped doing the
12  maintenance of the bullet trap?
13  A.  Me, personally?  I don't remember.  You asked me
14  in writing.  So in writing, no.  In meetings, yes.
15  Q.  Okay.
16  A.  But not in writing.  There's nothing I can sit
17  here and go two and a half years later or two years later
18  or whatever, hey, I remember doing that.  To answer your
19  question fairly, I do not recollect giving them something
20  that said that in writing, no.
21  Q.  In these meetings that you say you mentioned it,
22  you don't have any notes of any of these meetings?
23  A.  No.  I mean, I've been gone for a year and a
24  half now.

24 (Pages 90 to 93)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                                                v.                                            Chaffinch, et al.
Gregory Allen Warren                              C.A. # 04-956-GMS                          January 11, 2006

Page 94

1   Q. Well, have you destroyed any notes of meetings
2   that you had at one point?
3       A. I kept things for my lawsuit with the governor.
4   I have all of that, obviously. That involved me
5   personally. The rest of the stuff I left.
6   Q. You left where?
7       A. In the office, obviously, for the next person.
8   Q. Could you take a look at Exhibit D-2, please?
9       A. D-2?
10  Q. Yes.
11      A. Got you.
12  Q. I want to ask you about -- it's the third page
13  of the document. The pages are not numbered, but it's
14  the third page of the exhibit.
15      A. Full page?
16  Q. No. The third piece of paper in the exhibit.
17      A. It's a small -- like that?
18  Q. No. It's the one before that.
19      A. Okay. Full page like that.
20  Q. It should be the third piece of paper in
21  Exhibit D-2.
22      A. I got you.
23  Q. The second paragraph on that page begins "During
24  the summer of 2003." Do you see that?

Page 95

1       A. Yes.
2   Q. I'd like you to read that, and my question for
3   you is: What's your source of information for the facts
4   that are set forth in that second paragraph on the third
5   page?
6       A. All right. (The witness reviews the document.)
7           Yes. That contains information I got from
8   Sergeant Ashley and from Sergeant Foraker.
9   Q. Anybody else?
10      A. Corporal Price or Corporal Warren -- I mean,
11  another officer may very well have given me data. I
12  mean, I spent two or three weeks trying to put this thing
13  together. So there may have been other people. But I do
14  remember Sergeant Ashley on more than one occasion
15  standing in the doorway of my office kind of -- how I do
16  say this? -- making excuses or covering tracks about why
17  was everything -- why did no one know any of this except
18  for you and Paul Eckrich and whoever else up the chain of
19  command. Because they were spending large sums of money
20  trying to fix the problems with the bullet trap as early
21  as the summer of 2003.
22          And then I think he, when all of this blew
23  up in December, I think Sergeant Ashley thought, boy, I'm
24  in -- I'm in a real jam now because it was very obvious

Page 96

1   that he hadn't been telling everybody the truth. And the
2   people who did know were keeping it secret, like Major
3   Eckrich.
4   Q. What is it you think Major Eckrich knew that he
5   was keeping it a secret?
6       A. If you recall, there's one thing I saw in the
7   documents here is that as early as September of 2003,
8   Sergeant Ashley, getting an expenditure approval from
9   Major Eckrich, had a company come in from the outside and
10  apparently do some type of renovations or rehabbing of
11  the system that does the dredging. So we have to know if
12  the company came in in September.
13          I mean, you and I have been around long
14  enough to know that there is a state system that has to
15  be followed for expenditures. If the company was there
16  in September, at least by August of 2003 while Sergeant
17  Ashley was there, Major Eckrich had to know about all of
18  this. I mean, what major is going to expend ten, 20, 30,
19  $40,000 on a contractor to come in and provide work
20  without an explanation? Sergeants don't just pick the
21  phone up and go, "Hey, major, I need another 20,000."
22  "Oh, yeah, go ahead." They're going to ask why. Money
23  is tight. Money has always been tight. Why? Where am I
24  going to get the money from? Those types of things.

Page 97

1           So there's a big piece of this that you're
2   missing, and it involves the administrative officer who
3   has known about this at least since the summer of 2003
4   and decided to do nothing about it except sign off on
5   some money, I guess.
6   Q. Do you know the name of the contractor?
7       A. There were several companies, so I think I saw
8   there was Mayfran, Savage. There were a lot of
9   environmental people. To ask me which company came in,
10  no, I don't know. But I know that we have records on
11  that. So I'm sure you have access to that.
12  Q. Do you know whether the company that came in and
13  modified the conveyor system was the same company that
14  had installed it in the first place?
15      A. No, I have no idea. I mean, I don't know.
16  Q. Go back to Exhibit D-2, please, the same page I
17  was just asking you about.
18      A. All right.
19  Q. The last paragraph on the page begins with
20  "Sergeant Foraker."
21      A. Which page?
22  Q. The same page we were just on.
23      A. Okay. Fire when ready.
24  Q. The bottom paragraph on that page, it's the

25 (Pages 94 to 97)

Wilcox & Fetzer, Ltd.                    Professional Court Reporters                    (302)655-0477

A540

Price, et al.                                              v.                                    Chaffinch, et al.
Gregory Allen Warren                              C.A. # 04-956-GMS                          January 11, 2006

---

Page 98

1  third page of Exhibit D-2.
2      A.  Got.
3      Q.  You begins with the words "Sergeant Foraker."
4      A.  Yes.
5      Q.  About halfway down in that section is a sentence
6  that begins with "With these problems."  Could you read
7  that for a minute?  It actually goes into a few lines on
8  the next page.
9      A.  Correct me if I'm wrong.  I'll start with "With
10  these problems"?
11     Q.  Yes.
12     A.  "With these problems" --
13     Q.  Just read it to yourself.
14     A.  I thought you wanted it read into the record.
15     Q.  No.  We know you know how to read.
16     A.  I thought you wanted it read into the record.
17  Okay.  (The witness reviews the document.)  Okay.
18     Q.  In this sentence or two that you've just read to
19  yourself, you state that "a conclusion has been made."
20  And as I understand it, you are describing a conclusion
21  of your report.  Is that a fair statement of what you are
22  doing here?
23     A.  Well, I think it's not of the report.  It's not
24  a conclusion of the report.  It's a conclusion of all the

---

Page 99

1  facts and data that have been presented to me over, at
2  that point, the course of about a month and a half.
3      Q.  Is this your conclusion or is this a conclusion
4  that you've adopted from somebody else within the State
5  Police?
6      A.  No.  I think this is a conclusion from a
7  couple -- at that point I know we had had a couple of
8  companies come in, and I don't know who they were, but we
9  had already had a couple of environmental people come in.
10  It was a conclusion of me as a supervisor, you know, and
11  as a police officer.
12          And then, of course, I'm taking into
13  account what's being told to me by a sergeant and several
14  veteran police officers who work up there.
15          So it is -- if you are asking the question
16  what is it a conclusion of?  It's a conclusion of facts
17  and data, my visit up there, my interviews of Sergeant
18  Foraker and the other officers, what Lieutenant Davis has
19  told me, what Paul Eckrich has told me.  So, yeah, it's
20  all that put together, yes.
21     Q.  Is it your conclusion, though?
22     A.  Well, it's my report, so I assume you have to
23  say it's my conclusion, yes.
24     Q.  So this is a conclusion Greg Warren reached

---

Page 100

1  after analyzing and gathering facts and doing whatever
2  else you did to write the report?
3      A.  Yes.
4      Q.  This sentence I am just looking at says "that
5  the current 'non-toxic, frangible' ammunition, coupled
6  with the current configuration of the bullet trap system,
7  and air handling and filtration system limitations, is
8  causing a series of complicated problems."
9          I would like you to describe in your own
10  words -- in layman's terms, it is, if you can -- what it
11  is about the interaction between the frangible
12  ammunition, the current configuration of the bullet trap
13  system, and the air-handling and filtration system
14  limitations that's causing the problem.
15     A.  Well, so I don't go into some long diatribe
16  about something I'm not real familiar with because I'm
17  not a range builder, I'll put it this way:  The bullet
18  trap was designed for a certain type of ammunition which
19  does not fragment on impact.  We, because of federal
20  guidelines, or whatever the reasoning, went away from
21  that leaded ammunition and went to a type of ammunition
22  that fragments on impact, but it has no lead in it,
23  apparently.  The bullet trap is not designed for bullets
24  that fragment.

---

Page 101

1          So how it's been described to me is there's
2  liquid in a conveyor system in the back of the range, in
3  the back of the bullet trap, and when these bullets
4  impact -- I guess it's like a chamber or deceleration
5  chamber of some sort, they obviously disintegrate.  Those
6  particles then find their way down into this liquid.  And
7  what they do is they, I guess, they cause the liquid to
8  clog up some pumps and screens and make like -- I think
9  I've used the term like a sludge or a mud or something
10  like that.
11          So does that answer your question?
12     Q.  What's that have to do with the air-handling and
13  filtration system?
14     A.  Well, the problem with that is that these
15  bullets fragment, as I told you.  Plus every firearm, no
16  matter what type of ammunition they are using, produces
17  some type of smoke when the round goes off.  I mean,
18  without the pressure being released from a tiny
19  explosion, you know, in the chamber and barrel of the
20  begun, the bullet is not going to go anywhere.
21          So every time a gun is fired, there's a
22  release of smoke in the range.  And so between smoke
23  coming from all of these weapons that are firing
24  thousands of times a day coupled with dust coming up from

---

26 (Pages 98 to 101)

Price, et al.                                v.                        Chaffinch, et al.
Gregory Allen Warren                   C.A. # 04-956-GMS               January 11, 2006

---

Page 102

1  these bullets that are fragmenting, because there are a
2  couple places on the range that the pumps have clogged up
3  bad enough that the liquid that's supposed to cut down on
4  that -- it's not supposed to cut down on dust and things.
5          I guess it was originally designed to maybe
6  make these bullets not -- see, I'm not familiar with this
7  because the original design was they're leaded bullets
8  and they hit a liquid. I don't know what it was supposed
9  to do at that point. Maybe cut down on lead dust. I got
10 to believe that even if a bullet is solid lead and it
11 hits another piece of steel, there's going to be some
12 lead dust coming from that round. So there's got to be a
13 reason.
14         You would have to ask a range person why
15 the liquid needs to come down the way that it does. But
16 from what I can see is that there are certain areas of
17 the range that we had to work around that we wouldn't put
18 shooters on, but there can be dust that gets into the air
19 when these rounds hit the bullet trap.
20         So you've got two types of dust coming up
21 into the air, I guess. One is smoke and the other is
22 like dust particles.
23     Q. So just let me see if I understand right.
24         You're telling me that two sources of

---

Page 103

1  airborne particles --
2     A. That I'm aware of.
3     Q. That you're aware of.
4     A. As a nontechnical person.
5     Q. It's your report. I'm just trying to get what
6  your understanding is within the context of your report.
7     A. Yes.
8     Q. One source is the discharge of the weapons
9  itself?
10    A. That's correct.
11    Q. The other source is from dust that's created
12 when the frangible ammunition hits the backstop?
13    A. I'm sure there's even particles of cardboard and
14 things in the air from when you blow a shotgun, when you
15 fire a shotgun through a cardboard target. I bet that's
16 even in the air. But that's what I'm aware of, you know.
17    Q. Up in the paragraph above the one that we are
18 talking about, and this is the paragraph that I asked you
19 to read a couple minutes ago, about two-thirds of the way
20 down in that paragraph there's a sentence that says:
21 "This 'firing on a dry line' causes a greater amount of
22 dust than normal to be generated from the 'non-toxic,
23 frangible' ammunition."
24         Is what you are saying there when the

---

Page 104

1  frangible ammunition hits a dry piece of the bullet trap,
2  that it creates more airborne particles than would
3  otherwise be there?
4     A. I don't know that because I'm not a technical
5  person, but that's my belief, yes, that if it were wet
6  and the bullet hits it and fragments, that you probably
7  would not get as much dust in the air. But I don't know
8  that. You'd have to ask an expert that.
9     Q. Is it your belief as expressed in this report
10 that the additional dust from the frangible ammunition
11 and the smoke from the discharge of the weapons at the
12 firing line is overtaxing an air-handling system that
13 isn't very good in the first place?
14    A. Yup, I think that -- yup. It wasn't adequate to
15 start with, and then taxing it made it that much worse,
16 yes.
17    Q. Could you go, please, to the next-to-the-last
18 page in the report?
19    A. Okay.
20    Q. It starts on the top of the page with the words
21 "On 1/29/04 all Range staff."
22    A. Yes.
23    Q. Is this meant to be part of your report?
24    A. Yes. This is just -- I think I put this in here

---

Page 105

1  kind of as a chronology. Yes, that's what I called it, a
2  "Chronology of Events." Just for whoever was going to
3  end up reading this so they could see, you know, the
4  process. I guess they could see what steps we had
5  undergone so far. So yes.
6     Q. Look at the second item, the second paragraph on
7  this next-to-the-last page of Exhibit D-2. It starts
8  with "On Friday 1/30/04." Is that the meeting that you
9  described that you had with the lieutenant colonel that
10 had been postponed at least once?
11    A. That's the one that I started in mid December
12 trying to arrange and it took us about a month and a
13 half. Basically I think the lieutenant colonel was
14 stalling for time because as of early January, the
15 minute -- the day we got back from the holidays, the
16 secretaries told me: "Come back over then. We'll see
17 what we can do for you."
18         In fact, I think you saw that even on
19 January 5th the lieutenant colonel had already ordered me
20 to put together a report.
21         My personal opinion is that's why couldn't
22 we have met -- I mean, is the lieutenant colonel's time
23 so important that he can't take 15 or 20 minutes out for
24 his troopers and for a facility that is so important like

---

27 (Pages 102 to 105)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                                    v.                          Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS              January 11, 2006

Page 106

1  the range to at least meet with me?
2          I mean, I am a captain and I'm at least
3  60 feet away from his office. My building is right next
4  to his building. But instead -- instead of agreeing to
5  meet with me, the one meeting was cancelled and he gave
6  me this report which he knew would take me some time to
7  put together.
8          So basically I think he was blowing us off.
9  I think he was buying time. And I think he was just
10  making more work for me because he knew I was swamped.
11         And also I think he was, well, basically
12  turning a deaf ear to something he knew was probably
13  going to end up being a problem. But that's pretty
14  indicative of Colonel MacLeish's career is he's not big
15  on addressing issues head on. He pretty much likes to
16  let other folks take care of the not-so-pleasant things
17  and he likes to do the handshaking and the press
18  conferences and things of that nature.
19         So if you are asking me did this surprise
20  me? No. I should have expected as much from Colonel
21  MacLeish. Hey, put a report together and then when you
22  get that done, I'll meet with you.
23         But it's really inexcusable that it should
24  take a captain a month and a half to meet with his boss

Page 107

1  over something as important as people's health.
2      **Q. You said that you believed that lieutenant**
3  **colonel was buying time.**
4      A. Yes.
5      **Q. What do you think he was buying time for?**
6      A. I think he knew this was going to be real
7  uncomfortable. I think he knew this wasn't going to make
8  a lot of people happy. I think he knew, because we all
9  have known in the State Police ever since it opened, the
10  range has got some severe problems. And I think he knew,
11  oh, here it comes. It's all coming to a head.
12         And I think he probably figured, hey, if I
13  can stretch this thing out or if I can put a little bit
14  of a muzzle on this or if I can have Greg Warren maybe
15  patch some of this up, whatever -- I have worked for
16  Lieutenant Colonel MacLeish four times in my career. Let
17  me express this to you: This is -- the way he handled
18  this is of no surprise to me.
19      **Q. So you just think he didn't want to deal with**
20  **it?**
21      A. Yeah. He doesn't like dealing with things that
22  are uncomfortable. He likes dealing with the good
23  things, the fun things, the happy things. So I think he
24  was turning a deaf ear to it.

Page 108

1          That and the fact that I don't think he
2  likes Sergeant Foraker, and I know he doesn't like me
3  because he came over and told me in August right after he
4  took over as lieutenant colonel that I needed to back off
5  and I needed to lay down and that I had to quit being so
6  boisterous about things within the division that weren't
7  going the way they should have been and about policy
8  that's being violated and rules and regulations that are
9  being violated and things of that nature.
10         So, yeah, you're absolutely right. I think
11  he was buying time and I think he was in a very nice way,
12  a very subtle way that he can cover by his authority
13  basically saying, hey, go away, do this and then you get
14  up with me later. So I think it was somewhat busy work.
15         In fact, I told him I didn't feel
16  comfortable doing this. In fact, he had to order me to
17  do this report. And I don't know if he's told you that
18  or not, but I told him initially I'm not qualified to do
19  this. Why don't you cut an emergency expenditure and
20  have an engineer fly in here in the next 24, 48 hours,
21  have them write this report. And he said, "Absolutely
22  not."
23      **Q. Did you --**
24      A. That should give you some inclination as to the

Page 109

1  direction he was heading.
2      **Q. When did you have that conversation with him?**
3      A. Well, I think he ordered us -- I think there's
4  documentation. He actually said on January 5th -- I
5  think it's in an e-mail someplace.
6      **Q. It's in Exhibit D-33.**
7      A. Yes. Let me take a look here.
8      **Q. He says: "Captain Warren please prepare a**
9  **written report."**
10      A. Yes. You got it.
11      **Q. Now, I haven't seen any communication from you**
12  **to him suggesting that an engineer be brought in. I take**
13  **it that was not in writing?**
14      A. No. That was personally.
15      **Q. When did you have that conversation?**
16      A. The same time he told me, "Well, Greg, I need
17  you to put this report together because we are going to
18  be receiving -- this is going to get ugly." And he's
19  been around a long time like I have. Much longer than I
20  have. He knew that the public or that the troopers or
21  that the union or that even the media at some point was
22  going to find out about this.
23         And so he even told me, he said, "I want a
24  report ready to go so that when the media calls start

28 (Pages 106 to 109)

A543

Price, et al.                                        v.                          Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                        January 11, 2006

---

Page 110

1  coming, I have something to refer to."
2      Q.  When did you have that conversation with him?
3      A.  It had to be -- I started on this thing almost
4  immediately, so it had to be within a day or two of him
5  telling me to do it.  Because I remember going home that
6  night and really stewing over should I basically refuse
7  to do this.  Should I violate a direct order and tell
8  him, no, I'm not going to do this?  I almost thought
9  about telling him I wanted it in writing.  I ended up
10 having to do that one other time, and so I thought about
11 doing that in this one and then I thought, no.  I mean,
12 all that would do would make the situation worse if the
13 lieutenant colonel and captain who are supposed to be
14 helping the situation or be part of the solution start
15 feuding.
16     Q.  Look at Exhibit D-33, please.  The only response
17 I've been able to find from you to MacLeish about the
18 report is the one that's at the top e-mail here, and this
19 is a document that we received in discovery.  And I take
20 it from the way the document is configured that you
21 printed this out from your state police computer.
22     A.  Mm-hmm.
23     Q.  Is that correct?
24     A.  Yes.

---

Page 111

1      Q.  It doesn't have a date on it.  Did you actually
2  send this message?
3      A.  Yeah.  I mean, you've got it right here in front
4  of you.  I don't know if it got sent or not.  I assume.
5  Why would I type it up if I haven't sent it?
6      Q.  I don't know.  I don't see a date on it.
7      A.  Some come through without the date and some come
8  through with the actual date, but I don't know why this
9  would not have the date on it.
10     Q.  It comes out without a date if you print it out
11 before you send it.  And there's no --
12     A.  What I did -- I don't know this, but I may have
13 hit "Print" so that I have a copy for my folder and then
14 I may have hit "Send."  I don't know.
15     Q.  You believe you sent it?
16     A.  Oh, absolutely.  Why would I not send it?  Why
17 would I type that and then not send it?  So absolutely.
18     Q.  There's a lot of reasons why people would do
19 something.  I'm just trying to figure out what you did.
20         Do you remember when you sent it?
21     A.  No.  I mean, I have no idea because the date's
22 not on there and I sure don't remember typing in a
23 two-sentence, you know, message to someone that's a
24 couple of years old, no.

---

Page 112

1      Q.  It says in the beginning:  "I spoke to Chris at
2  length over the weekend."  The e-mail you got from
3  MacLeish is Monday, January 5th.  Does that suggest to
4  you that you sent it either Monday, January 5th, or the
5  following Monday, January 12th?
6      A.  I don't know.  I mean, you're asking me to
7  conjecture and I just can't do that.
8      Q.  Did you send this message before or after you
9  had the conversation with Lieutenant Colonel MacLeish in
10 which you asked him if you could bring in an outside
11 engineer or something like that?
12     A.  I think I just told you.  There's no date on it,
13 so I don't know the exact day of when it got sent.
14 Typically I -- when I type something in, I typically will
15 keep a copy and hit "Send" and then I'm off to the next
16 project.  But I don't know that.  I can't tell you if I
17 sent it that minute, if I sent it an hour later, or if I
18 held it for a day or something and then sent it.  I don't
19 know.
20     Q.  I'm not asking you for a date.  I'm asking you
21 if it was before or after the conversation with MacLeish
22 in which you say that you told him he should bring in an
23 engineering company to look at the range.
24     A.  Mm-hmm.

---

Page 113

1      Q.  Do you remember whether it was before or after
2  this e-mail?
3      A.  No, I do not.  No.  That's a long time ago.
4  Sorry.
5      Q.  When you had your meeting with Eckrich,
6  MacLeish, and Davis, and that's the meeting that you've
7  documented here as January 30th, was that before or after
8  you released the report?  Your report is dated that day,
9  also.
10     A.  The report would have gone over to Lieutenant
11 Colonel MacLeish prior to our meeting.
12     Q.  That was my question.
13     A.  Right.  Yes.
14     Q.  Do you actually recall that happening?
15     A.  I remember the meeting very, very well.  I do
16 not remember like when I shipped this over, if I hand
17 delivered it to a secretary.  No, I don't remember
18 sending it out.  I could have had my secretary run it
19 over.  I can't remember that.
20     Q.  You don't recall perhaps that you didn't have it
21 completed by the meeting and had to finish it a couple
22 days later?
23     A.  No, I don't recall that.
24     Q.  Okay.

---

29 (Pages 110 to 113)

Price, et al.                                              v.                                 Chaffinch, et al.
Gregory Allen Warren                        C.A. # 04-956-GMS                      January 11, 2006

Page 114

1    A.  I'm not saying that didn't happen because I may
2  have been waiting on a final piece or something, but I
3  believe he had this before we met.
4    Q.  Describe to me what happened in that meeting.
5    A.  Well, in short, we went in, sat down, and we --
6  in short, I think Ralph let me do most of the talking and
7  we just basically started in on quickly here's what we've
8  come to.  You know, Ralph and I have tried to do what you
9  asked us to.  Chris is communicating with us telling us
10  here's what we've got.
11        By then I had already talked to Wayne and
12  Kurt and I had talked to Ashley multiple times because he
13  was kind of coming over to the academy and kind of
14  hanging around and talking to everybody.
15        So basically we just walked through why we
16  were there, how bad it was, and that we, as a division,
17  were going to have to own up to the fact that there's a
18  major problem there.
19    Q.  You've said that you had a conversation with
20  MacLeish shortly after you got his instruction to prepare
21  the report; right?
22    A.  Yes.
23    Q.  Did you have any discussion with MacLeish about
24  the range between whatever day that was and your meeting

Page 115

1  on January 30th?
2    A.  Yes, because my building is so close to his that
3  even if you don't mean to, you can't inadvertently not
4  run into one another within a week or two.  So, yes, I
5  had been trying whenever I saw him to give him an update
6  on, hey, this is what's up now.
7        Of course, he would always brush it aside
8  and he had been busy and he would be gone or whatever.
9  So then I'd get frustrated and I'll go and get Eckrich
10  where he is at his office and I'd pin him down
11  and tell him what was up.
12    Q.  What do you remember telling MacLeish between
13  the time that he gave you the assignment to do the report
14  and the date you actually handed in the report?
15    A.  Well, he does outrank us, so I tried to tell him
16  we are doing what you told us to.  I mean, Chris is doing
17  research.  I'm trying to put the report together.  So we
18  are working on this thing.
19        And basically I tried to keep inferring to
20  them and just, you know, just coming right out and
21  saying, "It is bad up there."  Because I was still trying
22  to get this meeting with them.  You know, one meeting had
23  already been cancelled on the 12th of January for what I
24  considered to be a pretty poor reason.

Page 116

1        And now I've been given this report to do,
2  which he and I both know you can't do a report on
3  something as important and as serious in a building
4  that's got a ten-year or eight-year history or whatever
5  in two days or three days.  He knew that it was going to
6  take me quite awhile to get this thing done.
7        So I felt as if I was being basically blown
8  off and basically, you know, being told in a nice way, go
9  away.
10    Q.  I understand that.  But what did you tell him?
11    A.  What I just told you, how bad things were up
12  there.
13    Q.  Did you give him specifics?
14    A.  Oh, absolutely he knew what was going on up
15  there.
16    Q.  I'm asking what you told him.
17    A.  That's what I'm telling you, how serious things
18  are.
19    Q.  What did you tell him?
20    A.  One of the things is we are short on manpower.
21    Q.  Okay.
22    A.  I'm telling him we are trying to get the
23  recruits trained.  Even in the midst of all this, we are
24  just trying to get these poor folks done and get them

Page 117

1  trained.  And then that Chris is working with
2  professionals trying to get them to come in and see where
3  we really stand in all of this.
4        So I remember telling him, you know, as
5  much as I could in the minute that you're walking down
6  the hall with him.  You can't get a lot in, but you can
7  at least get the point in that things are bad, we need
8  your help, we need to meet now.
9    Q.  At the meeting on January 30th, do you recall
10  discussing the FTU personnel's trip to Las Vegas?
11    A.  I think we did.  I think we did talk about some
12  issue -- not only did we talk about a trip, I think we
13  also talked about how many people we need up there and
14  things like that, yes.  I don't remember the details, but
15  I know we tried to -- Ralph and I thought to ourselves,
16  well, it's taken us a month and a half to get a meeting.
17  If we are going to get one, we better go ahead and cover
18  everything we can.
19        So I do recollect talking about personnel
20  issues.  And there was some issue about a training
21  program that was out -- I didn't remember where, but you
22  said Las Vegas.
23    Q.  It was a gun show; right?
24    A.  Yes, I think so.

30 (Pages 114 to 117)

Price, et al.                              v.                    Chaffinch, et al.
Gregory Allen Warren              C.A. # 04-956-GMS              January 11, 2006

Page 118

1    Q.  Do you remember talking about problems with the
2  air handling?
3    A.  Yes, because that's why we -- that was a major
4  reason.  You know, some of these ancillary things we
5  threw in because you don't get -- as you can see, if it
6  takes you a month and a half to get your boss, you
7  probably need to cover everything you can while you've
8  got him because it might take you another month and a
9  half.  I mean, it could be the middle of March when I got
10  him the next time.
11          So, in short, the reason we called this
12  meeting was for the big things, which is the range
13  air-handling system and the fact that the guys are
14  getting a penny taste in their mouth, people are having
15  nosebleeds, things like that.
16          Then some of the ancillary things, like
17  Captain Schwarzkopf having left with his gun and we can't
18  find things in inventory and personnel issues, those were
19  some of the extra things and other things we talked about
20  while we were in the meeting, yes.
21    Q.  Do you recall there being a question asked of
22  you as to whether the range should be closed?
23    A.  No, no.  I think we talked about:  Where do we
24  stand with the range?  Can we finish the shoot?  Can we

Page 119

1  get the municipal and state recruits through the academy
2  process?
3          And I told lieutenant colonel, I said, "I'm
4  not an expert.  I'm not an engineer."  I said, "But these
5  guys are working their tail off trying to get these
6  recruits done so that we can, if we have to, we can close
7  this place down."
8    Q.  At any point in January 2004 did the lieutenant
9  colonel ask you whether the range was safe?
10    MR. NEUBERGER:  Up to January --
11    MR. ELLIS:  Any time in January.
12    A.  I'm trying to think because I went up for some
13  visits, talked to him personally a couple of times, told
14  Eckrich.  No, I don't recollect him saying:  Greg, is the
15  range safe?
16  BY MR. ELLIS:
17    Q.  Did he ever ask you whether the range should be
18  shut down?
19    A.  Yeah, because I think I told him we need to shut
20  it down.
21    Q.  When did he ask you?
22    A.  At that same meeting, I believe.
23    Q.  You told him you thought it should be shut down?
24    A.  I knew we were going to have to close it down.

Page 120

1  I mean, because then we already had some of the folks
2  that are experts come in and go -- in fact, one gentleman
3  I talked to there said:  "If this were my range or if it
4  was under my authority, I would have closed it already."
5  So I knew what was coming.
6    Q.  That's one of the consultants that was brought
7  in?
8    A.  Yes.
9    Q.  That didn't happen until after this meeting;
10  right?
11    A.  No.  One of the consultants I think I actually
12  saw in January, like January -- like the third week of
13  January or something.  In fact, he was there, I think,
14  when I went up.
15    Q.  Which consultant are you referring to?
16    A.  I don't know his name, but he was -- I think it
17  was the time I went up and he was sitting in the
18  classroom and he was an older, heavyset gentleman.  And I
19  think he said, you know, "I've done inspections.  I've
20  looked at ranges all over," and I think his comment was:
21  If I had authority over this or if I were OSHA or
22  something like that, I'd go ahead and close this place
23  down.
24    Q.  You don't know who that was?

Page 121

1    A.  No, no, because I'm not -- I was up there for a
2  meeting with the guys and to meet this gentleman, but, I
3  mean, I have no idea who he was.  There are so many
4  people that Chris was able to get in there and contact
5  and have them come in and consult, but I don't know each
6  of these individuals, no.
7          And so to answer your question, in short,
8  the lieutenant colonel knew that it needed to be closed.
9  I think that's why he would even ask that question if he
10  did, you know.
11    Q.  My question is simply whether you were asked
12  that question, and you say that you were asked that
13  question or were not?
14    A.  I don't recollect him saying is it safe or
15  should we close it down.  I do remember when he said,
16  well, if they're going to go ahead and try to finish the
17  shoot, then I want everybody to wear a paper dust mask,
18  and that was when I almost fell out.
19    Q.  Okay.
20          (Discussion off the record.)
21          (A luncheon recess was taken at this time.)
22  BY MR. ELLIS:
23    Q.  Could you take a look, please, at Exhibit D-2
24  again?  That's the report that's right in front of you.

31 (Pages 118 to 121)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A546

Price, et al.                                    v.                        Chaffinch, et al.
Gregory Allen Warren              C.A. # 04-956-GMS              January 11, 2006

Page 122

1    A.  Got you.
2    Q.  Again, going to the next-to-the-last page of the
3    report, which is the chronology that we discussed
4    previously --
5    A.  Okay.
6    Q.  -- the third paragraph up from the bottom refers
7    to contact you had on Friday afternoon.
8    A.  Yes.
9    Q.  Would that have been Friday, January 30th?
10   A.  I don't know that.  I'm not sure.
11   Q.  Well, take a look at the report as that page
12   proceeds to describe the chronology.
13   A.  But I don't know that.  I can't say that was the
14   30th.  I mean, it would make sense because we finished
15   this up and it says "on Friday afternoon."  I didn't put
16   the date in.  So you would assume it's that Friday.  But
17   I don't know that.  I remember the incident, though,
18   because it was kind of unusual having a recruit with that
19   background, but I don't remember the exact date.
20   Q.  Now, do you see the bottom paragraph there where
21   it says "Captain Warren immediately called Megan Parker"?
22   A.  Yes.
23   Q.  Is that something that you did after Lieutenant
24   Davis had had the discussion with Recruit Fountain?

Page 123

1    A.  No.  That was after I talked to Lieutenant
2    Colonel MacLeish.  But, yes, that conversation I had with
3    Lieutenant Colonel MacLeish was after Lieutenant Davis
4    had had contact with Recruit Fountain.  So Recruit
5    Fountain to the range staff, then Recruit Fountain and
6    the range staff to Lieutenant Davis, then Lieutenant
7    Davis advised me, and then I went ahead and called the
8    lieutenant colonel.  And then, of course, he advised me
9    to call DNREC and public health.
10   Q.  So look over at the last page of the report.
11   A.  Okay.
12   Q.  It talks about you calling Facilities
13   Management; correct?
14   A.  Yes.
15   Q.  So that would have been a meeting set up for
16   first thing Monday morning?
17   A.  It says that the meeting has been set up for
18   Tuesday, 2/10/2004.
19   Q.  I'm sorry.  I'm looking at the first paragraph
20   on that page, not the third.
21   A.  Oh, okay.  Up at the top.
22   Yes, that's what I would have been wanting
23   is obviously an immediate meeting on Monday morning so we
24   could sit down with them and obviously, you know, get

Page 124

1    some help.
2    Q.  Well, would that have been Monday morning,
3    February 2nd?
4    A.  I don't know because I don't have the dates on
5    this, but that's what I would assume.  It would be the
6    next one and that would make sense, yes.
7    Q.  Now, the second paragraph on the last page to
8    the exhibit says that you received no contact either over
9    the weekend or on Monday morning.
10   A.  I contacted Elrita.  I contacted her and I know
11   her.  That's why I used her first name in here.  I
12   contacted her and told her what our problem was.  And she
13   says, "Well," she says, "that's going to take a lot more
14   than me."  She said, "Let me contact our" -- I'm trying
15   to think of the formal name of them -- it's a person who
16   is a environmental expert.  But she said, "Let me contact
17   them and then I'll call you back over the weekend."  So I
18   gave her all my numbers and things.  And then, of course,
19   she never called me over the weekend.
20   And then Monday came and I thought she
21   didn't call me over the weekend, maybe she is going to
22   call me this morning.  I still remember this.  She didn't
23   call me that morning, so I called her office and that's
24   when they told me that she doesn't even come in on

Page 125

1    Monday.  She's off on Monday.  So that's when I knew I
2    had been hoodwinked, that she was just blowing me off and
3    had no intentions of calling me back or setting up a
4    meeting for a Monday.  She doesn't even work on Mondays.
5    So...
6    Q.  Does the fact that you are reporting here on
7    something that occurred on Monday suggest that you didn't
8    complete this report until at least sometime later in the
9    day on Monday?
10   A.  It could have been.  Absolutely.  I told you
11   that before.  I'm not sure when we wrapped this up
12   exactly and when I sent it out.  No, you are right.
13   Q.  Now, do you recall on Monday, February 2nd,
14   being in a meeting with Lieutenant Colonel MacLeish and
15   Major Eckrich concerning the range?
16   A.  I don't recollect being in a meeting, but I may
17   very well have been because I think I was really frosted
18   over the fact that Facilities Management didn't get back
19   with me.  And then, of course, the lieutenant colonel had
20   ordered me to contact DNREC.  And when I called DNREC,
21   they said it's not an issue for us; contact public
22   health.  And, of course, I contacted public health and
23   then they said, "We can't handle it.  You got to go to
24   admin. services."

32 (Pages 122 to 125)

A547

Price, et al.                                    v.                          Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                    January 11, 2006

---

Page 126

1   So I may very well have gone over and met
2  with them or called for an emergency meeting or something
3  to talk about, I guess, what had transpired in that last
4  couple of days, yes. But I don't know. I mean, you may
5  have a date for me that you can refresh my memory or
6  whatever.
7      Q. Well, that's what I'm asking you, February 2nd,
8  2004.
9      A. I don't remember. I don't remember. It's been
10  too long ago.
11     Q. Go back to the previous page. That's the
12  next-to-the-last page of Exhibit D-2.
13     A. Okay.
14     Q. I see where you've enumerated things that you
15  have said to the staff following your meeting with the
16  lieutenant colonel; right?
17     A. Yes.
18     Q. There are five items?
19     A. Yes.
20     Q. The last of those items is the paper air mask
21  item that you've discussed with me this morning. Do you
22  see that?
23     A. Yes.
24     Q. What did you say in response to the lieutenant

Page 127

1  colonel's suggestion that people wear the paper air
2  masks?
3      A. Well, I hate to be rude here, but I kind of
4  chuckled a little bit and I said, "You got to be kidding
5  me." And he didn't smile. So that's when I knew, you
6  oh, I guess I shouldn't have just chuckled at that. And
7  that's when he went ahead and said, "Well, we have these
8  things in stock, don't we?" And he looked at Major
9  Eckrich because I remember Major Eckrich looking at -- I
10  think even Major Eckrich was like flabbergasted. And
11  Ralph, I looked over at Ralph and Ralph was just sitting
12  there almost like speechless. Like, a paper dust mask?
13  I mean, has he been listening to anything that's been
14  transpiring over the last month and a half?
15         So that's about all I can elaborate for you
16  about that.
17     Q. My question is: Did you say anything to him
18  other than chuckling?
19     A. I chuckled and I said, "You got to be kidding."
20  I said, "You want everybody to wear a paper dust mask?"
21  And I said, "That's going to obviously impede shooting up
22  there."
23         And I said, "On top of that, I mean, it's
24  not going to do anything. You and I both know what a

Page 128

1  paper dust mask is for." And here I've been discussing,
2  you know, types of heavy metals and things like that that
3  I don't think a paper dust mask was designed to, you
4  know, to filter out.
5      Q. What was his response when you said that would
6  impair shooting?
7      A. He said, "No, absolutely not." He said, "That's
8  what I want done." And he looked again, like I said,
9  over to Major Eckrich and said, "Don't we carry those in
10  stock? Maybe somebody back in the crime lab uses them or
11  something."
12         But -- I can't remember what Paul's
13  response was, but he said, "They will be gotten
14  immediately. I mean, if we don't have them in stock,
15  purchase them now." So I carried that message back.
16     Q. Did the shooters at the range ever actually use
17  the paper dust masks?
18     A. Not that I'm aware of. That would be something
19  you'd have to ask because I wasn't physically up there.
20  But to the best of my knowledge, that fell through
21  because my personal opinion is after Ralph and I left the
22  room, Paul Eckrich probably told him -- I don't know what
23  I would have done, but I wouldn't have done that because
24  that ended up being rescinded.

Page 129

1         And, in fact, when I called Lieutenant
2  Colonel MacLeish back later to say, "Listen, Colonel, the
3  guys say that won't work. You can't talk through the
4  masks. They won't be able to give commands. It's going
5  to be a safety issue amongst everything else while
6  shooting is going on."
7         Well, it was funny. He told us to have
8  this mask. He didn't think it was funny. Then he
9  ordered us a second time. And the major, "I want these
10  masks up there now. And if you have to, order them."
11        But when I went back to him the following
12  day or two days later and we talked about this, it was
13  like, well, listen, that was taken out of context. I
14  don't really mean I want everybody to wear a paper dust
15  mask. I just meant to show my concern for everyone up
16  there and that we should try to do something.
17        So then he was trying to make it look like
18  I was concerned about everyone and maybe I overreacted,
19  but I didn't mean what I said. Well, when, in fact, it
20  was very obvious he did mean what he said to the point I
21  put it in the report that it should be done.
22     Q. At any point did you tell MacLeish that you
23  thought the range should be shut down because it was
24  unsafe?

33 (Pages 126 to 129)

Price, et al.                                    v.                          Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                    January 11, 2006

Page 130

1    A.  No.  I told him it would have to be shut down.
2    Okay?  But not at that very second because the guys were
3    working like crazy to try to get the recruit class done.
4    They didn't want to see the recruits not graduate because
5    we couldn't finish the shoot.  Because we might be able
6    to find them another place to shoot, but, one, the
7    classes are fairly large, but in the downtime it would
8    take us to find another range, to set up a schedule, to
9    move them to that location, it would have backed up the
10   entire recruit graduation and everything else.
11       And we also -- we train municipals on top
12   of just troopers.  It would have been a political
13   nightmare.  It just would have been horrendous trying to
14   tell everybody the recruits aren't graduating, it's going
15   to be put off for a couple more weeks because we had to
16   move to another range.
17       So I think everybody was trying to work to
18   get the recruits done and then realized the range will
19   have to be shut down immediately as soon as they are
20   done.
21   **Q.  Did you tell the lieutenant colonel that the**
22   **range should not be shut down because you were trying to**
23   **get the recruit class through?**
24   A.  No.  That came out of just a general

Page 131

1    conversation.  That's what we all came to when we were
2    sitting in the room together.
3    **Q.  I'm asking what you said, not what the general**
4    **conversation was.**
5        **Did you ever tell the lieutenant colonel**
6    **that the range should be shut down because it was unsafe?**
7    A.  Not shut down that second, but I told him, yes,
8    we are going to have to shut it down.
9    **Q.  You told him you would have to shut it down**
10   **eventually?**
11   A.  Oh, absolutely.  I don't mean eventually like a
12   month or two later.  I meant eventually as in the minute
13   we finish shooting this group of recruits and we get them
14   certified so they can graduate, we need to close this
15   thing down and just lock it up and then have the experts
16   come in and work on this for us.
17   **Q.  Look at Exhibit 17 for a minute.  After you**
18   **received this e-mail from Chris Foraker, why didn't you**
19   **go to the colonel and tell him you thought the range**
20   **should be shut down?**
21   A.  Because we were trying to get that last group of
22   recruits in.  And that seemed to be -- the range officers
23   were working hard.  I think they had the recruits' best
24   interests in mind.  MacLeish didn't want it shut down,

Page 132

1    obviously, because he knew that that would go public and
2    everybody would know about it and it would be a real pain
3    in his tail.  And so I think everybody just said let's
4    finish up this group of recruits and then we'll shut it
5    down if we have to.
6    **Q.  Did MacLeish tell you he didn't want it shut**
7    **down?**
8    A.  No, I don't recollect him saying, no, don't shut
9    it down or shut it down, either one.
10   **Q.  Go back to Exhibit D-2, again, please.  The**
11   **next-to-the-last page, which is this chronology we've**
12   **been looking at, could you go up to the fourth paragraph**
13   **from the bottom of the page?  It starts with the words**
14   **"Captain Warren."**
15   A.  Yes.
16   **Q.  Do you see that?  It says:  "Captain Warren**
17   **contacted by Lieutenant Colonel MacLeish" --**
18   A.  Yes.
19   **Q.  It says here that you were "advised to present a**
20   **report ASAP that could be used to prepare a news**
21   **release" -- I guess this isn't quite grammatical, but**
22   **"from on the problems, issues and concerns at the Range."**
23   **Do you see that?  Was that contact that occurred on**
24   **Friday, January 30th?**

Page 133

1    A.  That -- I don't recollect if it was on Friday,
2    the 30th, or, you know, within a couple days afterwards.
3    That I don't recollect.  Or even a couple days
4    beforehand.  Because as I said, we just didn't meet on
5    the 30th.  There were verbal conversations going on on
6    the phone, in the hallway, and things like that where he
7    was made aware of what was going on.
8        So in actuality, he could have told me that
9    a couple days before January 30th, but it had to be
10   within that range for me to place it right there.
11   **Q.  Did you ever prepare such a report?**
12   A.  No, no.  He wanted me to go ahead and do this.
13   And then before I ever got a chance to actually put the
14   report together, I was told, "Hold off on that.  This
15   thing is going to Facilities Management."  Before I ever
16   got to the point where I actually put another report
17   together, I remember being told we are going to basically
18   take this thing out of the hands of the State Police and
19   we are going to get Facilities Management involved in
20   this and -- now, I don't know what conversations took
21   place with cabinet secretaries and things, but I think
22   from what I'm gathering now after the fact, probably
23   Secretary Homer said basically I'll take this thing over
24   since it deals with the building and I'll make it all

34 (Pages 130 to 133)

Price, et al.                                    v.                              Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                      January 11, 2006

Page 134

1 better, as in schmoozing it over.
2     Q.  So the report that would be used to prepare a
3 news release was a different document than the Current
4 Range Status and Analysis report that's here in
5 Exhibit D-2?
6     A.  Yes.  It would have been, but there was never --
7 I never ended up doing one, yes.  But I think it was
8 intended to be something, you know, short and sweet and
9 looking good and smelling good and all that, something
10 that would be benign to the State Police and we could
11 give out to the media.
12     Q.  What was the instruction that Colonel MacLeish
13 gave you?
14     A.  I remember him saying that this thing is going
15 to come out.  I mean, he felt at that point that the
16 problems up there were bad enough and there was enough
17 hub-bub between the recruits, probably, even going home
18 and telling their police chiefs what they're being
19 subjected to, what they are having to go through up
20 there.
21         So my guess is he knew the writing was on
22 the wall that at some point, in a small state like
23 Delaware, the truth was going to come out and that he
24 wanted something, I think, short and sweet.  I mean, I

Page 135

1 described what I was looking for there, something --
2     Q.  What I'm asking is:  What did he actually say to
3 you that he wanted?  A report that would be used for the
4 press?
5     A.  Right.
6     Q.  That's it?
7     A.  Got you.  Yes.  That's what I'm saying.  But I
8 don't remember.
9     Q.  These are the words he used to you,
10 approximately?
11     A.  No, I can't give you a quote after a couple of
12 years, no.
13     Q.  But that's the best of your recollection what he
14 asked?
15     A.  Yes.  What you see there is the best of my
16 recollection, yes.
17     Q.  Now, did you attend the meeting on February 10,
18 2004, with a group of people from the State Police and a
19 group of people from Facilities Management?
20     A.  Yes, I did.
21     Q.  Do you remember where that meeting was?
22     A.  I believe it was in the academy conference room.
23     Q.  So that would be your building?
24     A.  Yes.

Page 136

1     Q.  Who was present at the meeting?
2     A.  A bunch of people.  Do you want me to name as
3 many as I can?
4     Q.  I would like that, yes.
5     A.  I know the lieutenant colonel was there.  I know
6 Major Eckrich was there.  I was there.  I believe Chris
7 was there.  I believe Kurt Price was there.  Wayne
8 Warren.  I don't remember if Jimmy Warwick was there or
9 not.  I don't remember if he was there.
10         And then from -- and I think Ralph may have
11 been there, but I can't swear to that, either.  He and
12 Jimmy are the only two I can't remember on our end.
13         Then Facilities Management brought a ton of
14 people, also.  They brought the director of Facilities
15 Management.  I don't remember his name.  They brought the
16 engineer.  His name was Devore.  I remember him because
17 we had conversations.  They brought a gentleman named
18 Tiller who I think is an environmental hygienist.  And
19 maybe another person or two.
20         It was a full house.  The conference room
21 was about this size and it was packed.  And I think even
22 retired lieutenant -- now that I think about it, I think
23 even retired Lieutenant Bill Bryson, who is a police
24 chief, he showed up.  And I was surprised.  I remember

Page 137

1 saying something to him about, you know, "What are you
2 doing here?"  And he says, "Well, I was invited by Tom
3 MacLeish to come to the meeting."
4         So it was a full house.  There may have
5 been more people there, but that's all I can remember.
6     Q.  I don't want to get two different meetings mixed
7 up.  And I don't want -- you are the person that was
8 there, so I'm not trying to put words into your mouth,
9 but my understanding that the meeting with the characters
10 that you just identified occurred on approximately
11 March 4th.
12     A.  Oh.
13     Q.  And that there was a prior meeting where only
14 Devore and Tiller for Facilities Management were there.
15     A.  That might have been.
16     Q.  Bryson was there?
17     A.  I was picturing the big meeting that we had with
18 all the players came in there and we had a long,
19 drawn-out meeting and all kinds of things.  But, you
20 know -- but the meeting you are talking about, now that
21 I'm starting to think about it, I think that was in our
22 conference room, too.  I think we had it right there at
23 the academy conference room.
24         And I think you are right, that was later

35 (Pages 134 to 137)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Price, et al.                                    v.                              Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                  January 11, 2006

Page 138

1   on because we had all the players in there.  We had all
2   kinds of people.  In fact, the one you are talking about,
3   now that I recollect, I think an engineer actually came
4   to and made a presentation and then they asked him to
5   leave.  And I think that's why all those other people
6   came, because there was an engineer coming to actually
7   make a presentation about the gravity of the situation.
8           So, yes, I think you are right.  I think
9   there was an earlier meeting with just a handful of us.
10      Q.  So I don't get this confused, you've described
11  the meeting an engineer came to.
12      A.  Yes.
13      Q.  Is it your recollection that that meeting
14  occurred on March 4th in the museum conference room?
15      A.  With your help, yes, that's what I was -- no,
16  that wasn't the museum conference room.  That was the
17  academy conference room.
18      Q.  Okay.  I'm sorry.
19          Now, is the engineer you are referring to a
20  guy named Bill Proventure?
21      A.  I believe so, yes.  I believe so.  I wouldn't
22  swear to that without looking it up in like a log and
23  seeing it, but I think you're right.  I think he was a
24  gentleman who had long experience with the range and had

Page 139

1   come back and visited it again for us and basically was
2   able to lay out a plan as to what should be done to
3   correct these problems in the long term.
4       Q.  Maybe I should ask this question a little
5   differently.
6           Between the date January 30th where you had
7   your meeting with MacLeish and Eckrich and Davis and the
8   end of March, how many different meetings were you at
9   concerning the range?
10      A.  Well, as you can tell, I'm going back a couple
11  of years now and I'm trying to go through these.
12          We had a meeting -- you mentioned the
13  museum earlier.  I don't know if that was a Freudian
14  slip, but we did have a meeting at the museum conference
15  room.  We had the meeting you just described.  Then we
16  had the big meeting I described.  Then we had meetings,
17  informal meetings at the range where I would go up and
18  meet a person.  Once Tom MacLeish stopped in there
19  unannounced.
20          I mean, there were so many things going on
21  during that two-month period, oh, if you are asking me to
22  like write you a chronology of all the meetings that I
23  attended or that someone on the staff did, I couldn't do
24  it for you.  There were a lot of things going on, a lot

Page 140

1   of meetings.
2       Q.  Do you recall meetings, any meeting where State
3   Police and facilities personnel were present in which the
4   State Police representatives and the facilities
5   representatives got into an argument over whether the
6   facility was performing as intended?
7       A.  I was in at least three meetings with members of
8   Facilities Management.  They obviously -- who would want
9   to take credit for running an operation like the pistol
10  range?
11          So I think what happened from the very
12  beginning, as you could tell, Elrita never even called me
13  back.  I think we ended up into a finger-pointing and a
14  match about who's responsible for what and why have we
15  gotten to where we're at today and those types of things.
16      Q.  What was the --
17      A.  The meeting that I was at where things got
18  heated was out to public safety between Secretary Homer
19  and Secretary Ford.  That meeting got pretty heated, too.
20      Q.  Do you remember when that occurred?
21      A.  That was even later.  They kept escalating up
22  the chain of command because the finger-pointing kept
23  going and, you know, everybody was trying to blame, you
24  know, Sergeant Foraker and the guys up there for this.

Page 141

1   And it just got out of hand.  It snowballed very rapidly.
2       Q.  Who was present in the meeting that occurred in
3   Secretary Ford's office?
4       A.  Some of those folks, I don't even know their
5   names.  But I know Secretary Homer was there because she
6   kind of ran the meeting.  I guess she called it.  And
7   then Secretary Ford was there.  Colonel Chaffinch was
8   there and Colonel MacLeish was there.  I know those four
9   for sure.
10          The gentleman who I told you who was the
11  director of Facilities Management, and I think his name
12  is Furman.
13      Q.  Bob Furman?
14      A.  I had to think about that, but I think his name
15  is Furman.  He was there.  Devore was there.  I was
16  there.  I think Sergeant Foraker was there, also, and
17  there may have been a couple of other people.  There were
18  some people there who I didn't even recognize, so I just
19  didn't worry about it.
20          But again, that conference room is about
21  this size and there wasn't an empty chair in there.  It
22  was full.  And Secretary Homer made -- you know, made it
23  clear that this was her meeting and she was going to run
24  it.

36 (Pages 138 to 141)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A551

Price, et al.                                    v.                      Chaffinch, et al.
Gregory Allen Warren              C.A. # 04-956-GMS                 January 11, 2006

---

Page 142

1    Q.   Is the conference room that you are describing
2  in the department of public safety the one that's
3  adjacent to the secretary's office?
4    A.   Yes.
5    Q.   Probably seats about 12 people at the table,
6  roughly?
7    A.   Yeah, but we had it packed.  There were more
8  than 12 people in there.  But, yes, that is the one.
9  You're right.
10   Q.   Describe what you remember from that meeting.
11   A.   Well, basically Secretary Homer dressed
12 everybody down.  Basically put them in their place.
13 Basically said that the range was running fine and that
14 this would be taken care of at her level with Colonel
15 Chaffinch and Secretary Ford.
16        I think it was a nice way of putting all
17 the players in one room, and from somebody of the rank of
18 me and Devore, let's say, he's probably the same rank as
19 me, he's an engineer there, he and I probably have the
20 same amount of authority, I think it was a way for her to
21 basically say you guys are getting out of hand with this
22 thing by telling everybody the truth and stuff.  And I
23 think we need to put a lid on it now.  And I'm telling
24 you as a cabinet secretary, with your cabinet secretary

Page 143

1  sitting here and your colonel sitting here, that we'll
2  take care of this.  You know, we'll tell you what we want
3  you to do.
4         And I walked out of there no questions in
5  my mind about, you know, there's a lot of heated people
6  in this state right now about this issue.
7    Q.   What is it she said as opposed to what you think
8  she meant?
9    A.   Well, she basically dressed us down by telling
10 us that this was not a big deal, that everybody knew the
11 range had had some problems.  And I think her term was it
12 needed some tweaking.  And when I heard that, I'm like,
13 you know what?  I see a cover-up written all over this
14 thing.
15        You know when a cabinet secretary who has
16 probably been informed of all this information now --
17 this thing started in December and now we are probably
18 running close to March, maybe the end of February, maybe
19 mid February, something like that, and this thing has
20 been brewing, then it's very obvious that she wanted a
21 lid on this because it's going to not look so good on her
22 organization.
23   Q.   So she said that it needed some tweaking?
24   A.   "A tweaking" is a word I remember her using.

Page 144

1    Q.   She said everybody knows there were some
2  problems with the building?
3    A.   Right, but that they weren't anything that
4  couldn't be -- that adjustments could be made and that
5  they would decide -- and she made it very clear, we'll
6  decide, meaning the upper echelon of the State Police and
7  her, we'll decide what's going to go on.
8         I think it was all -- I think she was
9  chewing out a couple of her people in a nice way telling
10 them you have messed up and you've put me in this
11 position.  And I think she was telling us, you guys need
12 to back off.  That's how I took the meeting when I left.
13   Q.   I'm not really asking you how you took it.  I'm
14 asking what she said.  She said that "we will fix it."
15 Is that what she said?
16   A.   Yes.
17   Q.   Now, did she use the word "we"?
18   A.   Well, I can't -- I don't recollect what
19 terminology she used.  Semantics, I mean, I'm getting --
20 I'm telling you how I'm taking it as a supervisor.  The
21 semantics, I can't remember everything she said.  I could
22 remember the word "tweaking," though, because that really
23 caught me when she said that.
24   Q.   Did she say that Facilities Management was

Page 145

1  responsible for the building?
2    A.   That is one thing I got from the meeting was
3  that we are somewhat responsible for this in that the
4  building, we own it.  She actually said that term.  "We
5  own the building."
6    Q.   Okay.
7    A.   But that's when her responsibility, you could
8  tell, was going to stop and she was going to lay it back
9  on the State Police because then it was inferred that you
10 guys have messed this building up somehow, but we'll
11 decide how it's going to get fixed.
12   Q.   Did she at that meeting, did Secretary Homer
13 state that she believed that the State Police had not
14 properly maintained the building?
15   A.   No, I don't think she came right out and said
16 that.  I don't think she would say that with the
17 secretary -- with our secretary sitting there and knowing
18 Chris is in the room and I'm in the room.  She's very
19 abrasive, sometimes even, you know, truculent and crass.
20 But I don't -- I think even she wouldn't come out and
21 basically say, hey, it's your fault and point a finger at
22 you.  She's got enough sense not to do that.
23   Q.   She did not lay fault at the meeting?
24   A.   No.  She did that in her press conference.  She

37 (Pages 142 to 145)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A552

Price, et al.          v.          Chaffinch, et al.
Gregory Allen Warren     C.A. # 04-956-GMS     January 11, 2006

Page 146

1 didn't have to do that in the meeting with the door
2 closed.
3    **Q. What else did she say in the meeting that you**
4 **remember?**
5    A. She called on who would speak. She basically
6 ran the meeting. She decided when our meeting was over
7 with. I can't recollect everything she said.
8    **Q. I'm not asking for everything. Do you remember**
9 **anything she said other than what you have already told**
10 **us?**
11    A. No. She asked Colonel Chaffinch if he had any
12 comments. I remember that. And he sat there quiet as a
13 mouse and just said basically, you know, we'll cooperate
14 with whatever you tell us to do. And that was about
15 that. So I didn't hear much from him.
16       Secretary Ford made some -- just the
17 basically benign comments that you -- you know, well,
18 we'll work together on this, all that stuff.
19       So I don't think -- I don't recollect
20 anything profound after that. I think that meeting was
21 called -- because nothing really came out of it. We went
22 out and met, and basically we just got yelled at. I
23 mean, we got put in our place, basically.
24    **Q. How long did the meeting last?**

Page 147

1    A. Not real long. Half an hour, 40 minutes, maybe.
2    **Q. What did she say is what you call yelling at you**
3 **other than what you've described?**
4    A. I don't mean yelling, verbally yelling. I'm
5 telling you that when you work in a paramilitary
6 organization, and even in an environment like
7 administrative services, it's very rank structured
8 because it's part of government. She was making it known
9 "I'm in charge."
10       I mean, she started the meeting out.
11 Everybody was just talking. When she came in, she sat
12 down. Everybody sat down. She ran the meeting. And
13 like I said, you could even see her looking at specific
14 people.
15       And I could tell Devore probably wondered
16 whether or not he was going to have a job, you know, in a
17 very short period of time. You could just see it. I've
18 been around 20 years. I've been in enough meetings to
19 know when we are in there constructively working on a
20 solution and when we are getting our tail chewed. And we
21 were getting our tail chewed in this one.
22       There was nothing really constructive that
23 came out of this. It was one of those, hey, be quiet,
24 back off, and we'll tell you how to call the ball on this

Page 148

1 thing.
2    **Q. But those aren't words that she used? That was**
3 **just what you took away from it?**
4    A. Well, some of the words she used -- I told you,
5 she minimized the range problems just simply by saying
6 "There have been some range problems in the past I've
7 been made aware of now." I mean, she was always covering
8 herself. "I've been made aware of now." And that some
9 of the things up there obviously need tweaking or are
10 going to need tweaking or something like that.
11       And then she started into, you know, we'll
12 make those decisions out here. It's our building. We
13 own it. I do remember her using the term "we own it"
14 because that was a pretty abrasive thing to say,
15 particularly with my secretary in there, my cabinet
16 secretary in there. She basically was putting him in his
17 spot, too.
18       But for me to sit here and write you
19 quotes, I'm sorry, I can't do that for you.
20    **Q. You teach organizational behavior?**
21    A. Yes.
22    **Q. Have you ever heard the phrase "taking ownership**
23 **of a problem"?**
24    A. Oh, certainly.

Page 149

1    **Q. That's a good thing, isn't it?**
2    A. I like to think that it is if a person takes
3 ownership of it. The key is: Are they going to really
4 take ownership of it? Are they going to look for
5 solutions and generate viable alternatives? Or is it
6 going to become a blaming game or a scapegoat game? And
7 that's the key. It depends on the type of leader you end
8 up with.
9    **Q. Is there anything else you remember about this**
10 **meeting that occurred in Ford's conference room?**
11    A. No. I remember I spoke up and said something,
12 and I'm sure that went over like a rock in a pond. And I
13 don't remember what I said exactly, but I think I
14 basically defended, and I think I basically countered
15 something she said.
16       She said something that really struck me to
17 the core, and I can't remember exactly what it was, but
18 it was something like you guys are responsible for all of
19 this. And I countered her with something. And you could
20 see that she didn't even have a little like for me. If
21 looks could kill, I would have been fried right in my
22 chair. So I didn't say anything else after that.
23       But there was something she said that
24 really cut to the State Police part of this. And it

38 (Pages 146 to 149)

Wilcox & Fetzer, Ltd.       Professional Court Reporters       (302)655-0477

Price, et al.                                    v.                        Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS              January 11, 2006

Page 150

1  wasn't like look at -- it wasn't like it was directed to
2  our colonel.  It was directed towards you people, you
3  know, that work there don't know what you're doing.
4      Q.  I thought you said she didn't try to blame
5  anybody.
6      A.  Well, no, I didn't say that.  I mean, she didn't
7  come out and say, okay, Greg, you are responsible for
8  this.  You messed this up.  You messed -- no, she didn't
9  do that.  Even she has enough sense not to do that in a
10 meeting.
11         But as I told you, we were in there
12 probably half an hour, 45 minutes, and she did most of
13 the talking.  Some other people spoke as I just said, but
14 she did most of the talking.
15     Q.  So she said something, you don't remember what
16 it was, but you responded to it?
17     A.  There was something where she -- I still
18 remember because I was sitting here and she was down here
19 to my right, so I still remember sitting there biting my
20 tongue while all this is going on.  And then I just took
21 the initiative just to say something back.  I don't
22 remember.  But it was something that I really took issue
23 with and I think she was getting into the blaming.
24         But you're asking me to go back a couple of

Page 151

1  years.  And I sat through -- my goodness.  In that six
2  months I must have sat through 25 or 30 meetings on this
3  issue or ancillary issues that go with it.  So I can't
4  give you quotes.  I'd love to, but I can't.
5      Q.  "This issue" meaning the range?
6      A.  On the range.  And the other ancillary things
7  that come with it from personnel issues to safety issues
8  and, you know, all kinds of things.  Yes.
9      Q.  Do you have a recollection of when the meeting
10 in Ford's office occurred?
11     A.  It would have been -- since things were
12 escalating, it would have had to have been late February.
13 It would have had to have been early March.  I mean, it
14 had to be somewhere in there.  It wasn't a January
15 meeting.  I do know that.  We were much farther past
16 that, but I don't remember the exact date, no.
17     Q.  Do you recall whether it was before or after the
18 tour that Gloria Homer and Aaron Chaffinch gave to the
19 media at the range?
20     A.  No.  This was before the tour, before the tour.
21     Q.  Do you have any recollection of any meeting
22 prior to the meeting in Ford's office at which there was
23 a discussion between Facilities Management people and
24 State Police people about the role of maintenance and

Page 152

1  hygiene in the problems that the range was encountering?
2      A.  Yes.  I remember the two meetings we just talked
3  about, the small one and then that big one I was telling
4  you about with Chief Bryson and folks like that.  And I
5  think that was one of the issues involved is who's
6  responsible for what.
7      Q.  Do you remember, did the Facilities Management
8  people state to the group at the meeting, in either of
9  these meetings, their belief that a lack of maintenance
10 was a contributing factor in the condition of the range?
11     A.  No.  I think they were -- I remember one thing
12 they said.  I think, if I remember correctly, they were
13 defending their position that this is what we've done for
14 you.  You know, we come in and we change air filters
15 every so often and stuff.
16         And then I do recollect -- I do recollect
17 there were discussions about a machine that was up there
18 that was supposed to help clean the floors or something
19 like that and they kept going on and on about why aren't
20 you using it.  And our guys kept saying it's broke.
21 That's why we are not using it.  They would come right
22 back to it.  They would come back to this Zamboni, I
23 think they would call it.  Like an ice hockey machine.
24 Well, it's broke.  We are telling you that.  Why don't

Page 153

1  you -- we just told you, it's broke.
2          So the first meeting, if I remember
3  correctly, it was a small one after you and I discussed
4  this just a couple of minutes ago, and I think they were
5  defending their position, but they still at that point --
6  I still remember that meeting being fairly professional.
7  I don't remember like people getting heated at that one.
8      Q.  My question really wasn't whether it got heated,
9  but whether there was an exchange of positions and you
10 recall any discussion at any of these meetings --
11     A.  Yes.  I think they were defending their
12 maintenance of the building and I think they were
13 inferring that our maintenance was substandard, yes.
14     Q.  Okay.
15     A.  That's how I took it.
16     Q.  When you say your maintenance was substandard,
17 what does that mean?
18     A.  Well, as I said, they kept referring to this
19 machine, that we weren't using it.
20     Q.  Now, there's at least two machines there that
21 were supposed to be used in the cleaning of the building.
22 One was the floor-scrubbing machine, which I believe some
23 people referred to as the Zamboni, and the other one was
24 something called a HepaVac.

39 (Pages 150 to 153)

Price, et al.                                    v.                              Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                 January 11, 2006

Page 154

1    A.  Okay.
2    Q.  Do you know what a HepaVac is?
3    A.  I think it's -- obviously a vacuum cleaner, but
4    it has a special filtration system on it, a HEPA filter.
5    Q.  Do you know what a HEPA filter is?
6    A.  Yes.
7    Q.  Do you know what HEPA stands for?
8    A.  High efficiency -- I'm not sure about it, but I
9    know it's to take the smallest particles.  But not being
10   an environmental hygienist, I don't want to get into it,
11   but it takes finer particles that a regular filter cannot
12   extract.  It extracts the most finest particles, I guess,
13   that you can get out of the air.
14   Q.  Do you know how the Zamboni and the HepaVac came
15   to be in the building?
16   A.  No.  That --
17   Q.  Did you ever see them?
18   A.  No.  I assume that that was, you know, something
19   that had been in there for some time.  Probably before I
20   ever went back to the academy.  I don't know that, but, I
21   mean, I assume so.
22   Q.  When you were a sergeant, am I correct that you
23   were part of a committee that was set up to study the
24   range?

Page 155

1    A.  In fact, we not only studied the range, we
2    studied building an entire academy complex up there.
3    Q.  Was it a committee you were on?
4    A.  Yes.
5    Q.  Who else was on the committee?
6    A.  It would have been -- at that time I think he
7    was Sergeant Bryson or had just become Lieutenant Bryson.
8    And we had Major McDonald.  There were three of us on
9    there.
10   Q.  Was anybody else on there other than the three
11   of you?
12   A.  There was a gentleman who had headed the project
13   up, he retired and the three of us kind of took his
14   place.
15   Q.  What was the purpose of that committee?
16   A.  Basically to decide the need that we have for a
17   new range, the need we have for a new academy, where
18   could property be had if it's available.  If we are going
19   to do this, what should the building look like?  Just
20   basically it was almost like a feasibility study.  We
21   were like the front end of just doing research and kind
22   of identifying the need for this facility.  And if we
23   were going to build it, what type of backstop would we
24   have?  Would it have classrooms?  All of those kind of

Page 156

1    things.
2    Q.  Did you eventually end up on the committee that
3    selected the design engineer?
4    A.  Yes.
5    Q.  Was Bryson also on that?
6    A.  Yes.
7    Q.  McDonald, too?
8    A.  Yes.
9    Q.  Was there a point at which your involvement in
10   that committee ended?
11   A.  Yes.
12   Q.  What caused it to end?
13   A.  Well, basically we were disbanded.  We were an
14   ad hoc committee to start with, and so once the decision
15   had been made as to who was going to be awarded the
16   design, then basically Mike McDonald and I kind of fell
17   off of it.  As a formal committee, the committee was
18   disbanded.  I believe he was a lieutenant at that time.
19   Lieutenant Bryson was going to be the point person, but,
20   of course, Mike McDonald would still be involved.  We
21   wouldn't be a formal committee.  Major McDonald would be
22   involved with him because Major McDonald ran the money.
23   Q.  He was the administrator?
24   A.  Yes.

Page 157

1    Q.  Bryson was the officer in charge of the FTU at
2    the time?
3    A.  Yes.  That's why I assume he was picked to head
4    this thing up, yes.
5    Q.  Did you have any further involvement with that
6    project?  By the "project," I mean the construction of
7    the range.
8    A.  I had some input into the academy facets.  I
9    remember having some say over -- and some comments about
10   if we are going to build a range up there, I think our
11   colonel thought why don't we try to move the entire
12   academy up there, and I think he wanted my input on that
13   piece.
14        So as we had been working for a little
15   while with a company called Clark Nexson, most of my
16   input on this project involved the training academy idea
17   and I went on the visitations and things like that with
18   Sergeant Bryson to other pistol ranges and what not.
19        However, the then-secretary of the
20   Department of Public Safety hated my ideas.  And
21   basically when she looked at our first preliminary set of
22   drawings, she called it "Trooper World."  She said -- she
23   opened it up and she started making fun of it.  She said
24   something about the Taj Mahal and Trooper World and all

40 (Pages 154 to 157)

Price, et al.                                    v.                        Chaffinch, et al.
Gregory Allen Warren              C.A. # 04-956-GMS              January 11, 2006

Page 158

1   of that.
2           Then I was basically told through the chain
3   of command, back off the academy.  It isn't going to
4   happen.  We'll be lucky if we can get a range built up
5   there.
6           So at that point then I just told Bill
7   Bryson, "What can I do to help you?"  And he said, "Well,
8   when I visit someplace, come with me.  Or if I get some
9   brochures in, look at them."
10          So I stayed in contact with Bill Bryson
11  while we started to go through this process.  But once it
12  had been awarded by Administrative Services, then there
13  was no need for people like myself or Mike.  Mike was
14  needed for money.  I wasn't needed at all since the
15  academy wasn't going to be built up there.  Bill was
16  going to be the point person.
17          So I fell out of the picture.  And shortly
18  thereafter I was transferred, anyhow, to become a shift
19  commander, so it didn't make any difference.
20      **Q.  You didn't have anything to do with the**
21  **selection of the bullet trap?**
22      A.  No, no.  I don't have any expertise in that
23  field and I didn't get to go on any of the visitations.
24  I went to visitations to see ranges, but I didn't go -- I

Page 159

1   think a couple visitations were just to see bullet traps.
2   Some people flew some places and went and checked.  I
3   never went on any flights.  The only thing I went to were
4   things that were within driving distance.  I went down to
5   the Navy pistol range, the SEALs, in Norfolk.  I went to
6   the NRA's range in Washington, D.C.  So I did some short
7   trips and was involved in that piece, but I was never
8   sent out to do any of the bullet trap work.
9       **Q.  What is it you were looking at these ranges**
10  **when you went to look at them?**
11      A.  Size, design, feasibility.  How many people can
12  you get in there?  Were you happy with the company that
13  built it?  Any safety issues?  Those types of things.
14  What you would expect when you go to look at a facility
15  asking all kinds of questions.
16      **Q.  But you didn't have any questions about the**
17  **bullet traps?**
18      A.  No, because that's not my bailiwick.  I mean,
19  I'm not -- I'm not a range officer.
20      **Q.  When you say the "design," what do you mean?**
21  **Are you an expert in range design?**
22      A.  No.  That's what I'm saying.  We were going to
23  look at ideas about did we think this would fit on our
24  piece of property  because we had now found out where we

Page 160

1   were going to have to build it.  Do we like that?  Does
2   that fit in?  You know, is that going to work?  If we
3   expand some day and do build an academy, will that meet
4   our need?
5           So, no, I'm not an expert in any way,
6   shape, or form.  I think they just wanted someone there
7   with maybe another objective opinion about what they --
8   you know, what they saw.
9       **Q.  So was that basically, when that committee, that**
10  **ad hoc committee ended, was that the end of your**
11  **involvement in the range?**
12      A.  Yes.
13      **Q.  Until you became the head of the academy in**
14  **2002?**
15      A.  Right, yes.
16      **Q.  Otherwise, you would go there twice a year to**
17  **shoot?**
18      A.  Well, I would find out more than that.  I would
19  go there twice a year to shoot, but I also was a shift
20  sergeant, so all of my officers had to go up there and
21  shoot.  And then I went to the academy as a lieutenant in
22  the mid '90s for a couple of years, and so obviously all
23  my recruits would go up there for training.
24          But as far as being in the chain of command

Page 161

1   and having like a formal capacity, you're right, that
2   would be it.
3       **Q.  I'm talking about being in the building once it**
4   **opened in 1998.**
5       A.  Yes, I would just go up there to shoot.
6       **Q.  That's all I was trying to get at.**
7       A.  I'm sorry.  I thought you meant my particular
8   role in it.
9       **Q.  Leaving aside the first meeting that you talked**
10  **about, which I think is the one that occurred on**
11  **February 10th, 2004, were you at any other meetings with**
12  **people from Facilities Management in which the**
13  **maintenance of the bullet trap system was discussed?**
14      A.  I attended one meeting I know of for sure on
15  site.  We actually met up there because I remember Mark
16  Devore was there and I remember Doyle Tiller was there.
17  And I still remember walking out into the range itself.
18  So I know I attended at least one meeting up there with
19  members of Facilities Management.
20      **Q.  Who else was there other than you and Tiller and**
21  **Devore?**
22      A.  I think Wayne Warren was there and Chris Foraker
23  was there.  I don't know if Ralph went with us, if Ralph
24  Davis went with us.  Then the two gentlemen I just

41 (Pages 158 to 161)

Price, et al.                                            v.                                    Chaffinch, et al.
Gregory Allen Warren                        C.A. # 04-956-GMS                        January 11, 2006

Page 162

1   mentioned from Facilities Management and myself. It
2   wasn't a large meeting.
3       Q.   Do you remember when it occurred?
4       A.   No. Like I told you, there were so many
5   meetings and --
6       Q.   Was it before or after you turned in this report
7   that's Exhibit D-2?
8       A.   I can't even answer that for you. I don't know.
9   It's been too long ago.
10      Q.   Was there any discussion with these gentlemen at
11  the range about the maintenance of the bullet trap?
12      A.   Yes. Almost -- rather than beat a dead horse
13  here, it was kind of like the same discussion we had at
14  that sit-down meeting, same kind of thing. Well, you
15  know, we are responsible for this, you are responsible
16  for that.
17           And then when we would question them about,
18  well, if that's what you're saying you're responsible
19  for, how come you haven't been doing it, and then they
20  would get all defensive. And really, it didn't get
21  anywhere.
22           I mean, they came -- I remember meeting
23  with them and walking around and actually walking out
24  there and they left and it didn't accomplish anything.

Page 163

1   It went in one ear and out the other ear.
2       Q.   Was there ever a point when they said to you
3   that the range, sort of the housekeeping at the range was
4   not, in their view, adequate?
5       A.   I think they still inferred that, yes. I think
6   that was one of their defenses to get us off of asking
7   them why isn't it working right. I think their idea is
8   always don't worry about why it's not working right. You
9   just do your part. And our guys were telling them -- I
10  still remember our guys were trying to tell them, our
11  part isn't working and you haven't given us the equipment
12  to utilize. You haven't trained us. We don't know what
13  we are dealing with and they didn't want to hear any of
14  that. It was, hey, we got the building. You guys have
15  been told what to do, now go do it, and our guys were
16  getting unhappy. I mean, they were, like, hey, why isn't
17  somebody helping us here?
18      Q.   So when you referred to your guys, "our guys" is
19  your phrase --
20      A.   Members of the division, yes.
21      Q.   You are talking about Foraker, Price, Warren,
22  and Warwick?
23      A.   Or any other trooper that would be assigned up
24  there, yes, because a lot of part-timers worked up there.

Page 164

1       Q.   You said that your guys were telling the
2   facilities people that they didn't have the equipment.
3       A.   Mm-hmm.
4       Q.   What equipment didn't they have?
5       A.   Things like gloves. Things like breathing
6   apparatus. Things like training. We don't even know
7   what we are really dealing with and stuff.
8            Like I said, it was going nowhere. They
9   had made up their mind -- I think the only reason they
10  came up to visit is just basically because our guys kept
11  pestering them and said you need to come up here because
12  this thing is not working.
13           The first thing they said is we'll have a
14  company come in and -- I think they call it adjusting the
15  air flow. The air flow has been adjusted for years. It
16  works for about 24 or 48 hours and then it reverts right
17  back to what it was doing before. So they were giving --
18  in my opinion, they were giving the range guys lip
19  service.
20      Q.   So did your guys specifically complain to the
21  facilities people that they didn't have gloves?
22      A.   We were standing right there. I remember all
23  these issues coming up. In fact, I still remember
24  Corporal Warren getting a little heated. He wasn't real

Page 165

1   happy. In fact, I think Wayne actually got so
2   frustrated, I think he may have walked off for a couple
3   of minutes during the meeting because I'm trying to watch
4   everybody to see how this was going because I wasn't
5   getting a good feel for it.
6       Q.   If they didn't have gloves, why didn't you just
7   have them go buy gloves?
8       A.   I'm not an environmental -- I'm standing here
9   with a guy who is an environmental hygienist and another
10  guy who is an engineer. I'm a captain in the State
11  Police. So I've got these guys here. This is what
12  they're supposed to be experts in -- I mean supposed to
13  be experts in. So that's what -- why we had them come up
14  there.
15      Q.   Was there any particular reason why you didn't
16  just have them go buy gloves if they said they needed
17  gloves?
18      A.   On top of that, Major Eckrich would have to tell
19  them to do that. I don't have the authority as the
20  captain in charge of the academy to spend -- and I mean
21  this literally -- to spend a penny on the pistol range.
22  There's absolutely no authority at all to spend any
23  money. It has to go to the major. He's the
24  administrative officer. It was set up that way years

42 (Pages 162 to 165)

Wilcox & Fetzer, Ltd.                Professional Court Reporters                (302)655-0477

Price, et al.                                 v.                                Chaffinch, et al.
Gregory Allen Warren                 C.A. # 04-956-GMS                 January 11, 2006

Page 166

1  ago, and that's the way it's always been done.
2      Q.  Doesn't Chris Foraker have authority to spend
3  money at the range?
4      A.  I'm sure there are things in his bailiwick,
5  whether it's preapproved, like here's how much you have
6  for ammunition, here's how much you have to buy targets,
7  yes.  But even those expenditures would have been
8  preapproved in budget meetings, I assume, early on.
9      Q.  Did anybody ever tell you what the history was
10  of the floor-scrubbing machine?
11      A.  No.  To this day, I don't know much about that
12  because, I mean, I wasn't involved in on that.
13      Q.  Did you ever ask anybody?
14      A.  No.  I did ask about why hasn't it not been
15  used.  And I think one of the things was it breaks
16  constantly.  It's broke most of the time.
17      Q.  Who told you that?
18      A.  I think some of the range guys.  Either that or
19  Sergeant Ashley.  I can't remember exactly who told me
20  that, but I do remember, you know, it came up in
21  discussions with Administrative Services is the reason we
22  are not using it is it's broke most of the time.
23      Q.  How about the HepaVac, do you know whether the
24  HepaVac was used?

Page 167

1      A.  No, I don't know.
2      Q.  Did you ever ask anybody whether they had used
3  the HepaVac?
4      A.  No.  I don't recollect asking anybody if they
5  had used it.  I may very well have, but I don't recollect
6  like a specific instance where I asked, no.
7      Q.  Do you understand what the HepaVac was supposed
8  to do?
9      A.  Well, I don't know, but I would assume it's used
10  to vacuum the range facility.  I mean, that's what a
11  vacuum cleaner would be for.  Unless I'm wrong, correct
12  me if I'm wrong, I would assume that's what it was
13  utilized for.
14      Q.  Did you ever ask anybody if they used it to
15  vacuum the range?
16      A.  I don't recollect asking anybody if they used
17  it, no.
18      Q.  Did anybody ever inform you as to whether it was
19  used or not used?
20      A.  I think it came up in these same discussions
21  with Administrative Services, but I don't recollect what
22  the -- what it actually entailed.
23      Q.  Do you remember what Administrative Services
24  people told you?

Page 168

1      A.  No.  Like I said, they kept saying, hey, the
2  building is fine.  They basically kept inferring that
3  it's a constant maintenance thing here.  You guys have to
4  do all this stuff.  You know, granted this may not be
5  working right, but if you guys do what you're supposed
6  to, life would still be grand.
7          I mean, that's how I was getting this.  But
8  I didn't have specific discussions with an engineer over
9  a vacuum cleaner, if that's what you're asking me.
10      Q.  Did the facilities representatives tell you that
11  the building was working fine, or did they tell you that
12  there were problems with the building, but that there
13  were maintenance issues on your side, as well?
14      A.  No.  They -- they knew that there were problems
15  with the building because there are certain things -- you
16  know, they can refute what they can refute.  But they
17  can't refute the fact that the building's roof almost
18  collapsed.  They can't refute that when it rains, the
19  building leaks.  They can't refute that there are all
20  kinds of other -- I won't even go into it.  It's an
21  elongated list with problems with the building.
22          And even they know the National Guard has
23  come in to test it.  They've paid to have people come in.
24  There was a special study done which was very damning of

Page 169

1  the facility.  They've paid thousands of dollars, I
2  think, in order to have this air flow adjusted.  From
3  what I understand, it cost several thousand dollars to
4  have that done and they paid for most of that.
5          So they know the history.  I mean, Mark
6  Devore is an engineer with Facilities Management.  I
7  believe on his end he's the one that has to approve on
8  major expenditures just like on our end Major Eckrich has
9  to.  So they know all of that.  They know the history of
10  the building.  They are not new kids on the block, so to
11  speak.
12      Q.  Would you agree with me that the facilities
13  people that you dealt with acknowledged that there was a
14  history of trouble in the building?
15      A.  Oh, yes.  Absolutely.
16      Q.  Do you recall any meeting, either with or
17  without Facilities Management representatives there,
18  where there was a discussion of the health effects of the
19  range on the people that worked there, meaning the FTU
20  staff?
21      A.  Yes.  And I remember one specific phone call
22  with Doyle Tiller.
23      Q.  I'm not really referring to a phone call now.
24      A.  Just meeting.

43 (Pages 166 to 169)

Price, et al.                                    v.                              Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                        January 11, 2006

|  | Page 170 |
|---|---|

1    **Q.   In any of these meetings --**
2    A.   Yes.  They were informed I know at least a
3  couple of times --
4    **Q.   I'm sorry.  Who was informed?**
5    A.   You just said the Facilities Management
6  representatives.  They were informed at least a couple --
7  on a couple different occasions that the whole reason we
8  were bringing this to their attention is the building is
9  almost in a shut-down stage.  We've got recruits with
10  nosebleeds.  We have staff that have a penny taste in
11  their mouth.  We have people having nasal excrements that
12  are red.
13       So are -- if you are asking me did I ever
14  tell them that personally?  Yes, I did.  But everyone
15  else was telling them, too.  So they were getting that
16  from all sides.
17    **Q.   What role did you have in getting the FTU staff**
18  **tested for exposure to whatever they were exposed to?**
19    A.   None.
20    **Q.   Okay.**
21    A.   That would fall under HR and Major Eckrich.
22  Major Eckrich would have to expend the money.  Captain
23  Yeomans would have to line those types of things up.  I
24  have nothing to do with HR.

|  | Page 171 |
|---|---|

1    **Q.   Do you recall any discussion at any of these**
2  **meetings about hearing loss?**
3    A.   Yes.
4    **Q.   Which of those meetings are you referring to?**
5    A.   The one I distinctly remember, I was in the
6  museum conference room and I was at one end of the table
7  and Lieutenant Colonel MacLeish was at the other end and
8  that's when he -- we were discussing these issues,
9  meaning health, in general, whether it was lead levels,
10  whether it was some of the things in this, quote,
11  frangible ammunition.  And the topic of hearing came up.
12  And that was when Lieutenant Colonel MacLeish made the
13  comment, well, you know, if you're in the artillery in
14  the Army, you have to expect some hearing loss.
15    **Q.   Do you recall the lieutenant colonel asking the**
16  **members of the FTU staff whether they thought they needed**
17  **any additional medical testing prior to what they had had**
18  **up till that point?**
19    A.   No.  I think -- I think -- I think most of that
20  was handled between Lieutenant Colonel MacLeish and
21  Captain Yeomans.  That is one of the few things that I
22  really didn't play much of a role in, much of an integral
23  role.
24    **Q.   Do you recall a meeting at the museum conference**

|  | Page 172 |
|---|---|

1  **room on March 17, 2004?  This would have been a meeting**
2  **with --**
3    A.   I think that may be the one we just talked
4  about.  That would be my guess because I think that's the
5  only meeting we actually had over there involving the
6  range.
7    **Q.   Do you recall anything about that meeting other**
8  **than what you've just told me?**
9    A.   Just that at one point Captain Yeomans, who was
10  seated to my right, I remember, at this meeting, he spoke
11  up and tried to say something in defense of the troopers,
12  which I thought was noble of him because he said it
13  directly to the lieutenant colonel.
14       The lieutenant colonel basically shot him
15  down, put him in his place, and John didn't say another
16  thing for the rest of the meeting.  He left there with
17  his tail between his legs and that was the end of that.
18    **Q.   First of all, who was attacking the troopers?**
19    A.   Basically in a nutshell the lieutenant colonel
20  was inferring to them, hey, guys, things happen in life.
21  You know, there are things that -- I guess you would say
22  risks that come with being a trooper.  You know, you're
23  not, I guess, you would say drafted to be at the range.
24  In a very nice way, I think this was his way of saying,

|  | Page 173 |
|---|---|

1  hey, I'm here.  See, I'm here.  I'm the lieutenant
2  colonel.  I care about you.  But also at the same time, I
3  left there knowing he was in a very nice way telling
4  everybody knock it off, I'm tired of hearing about all of
5  this.  That's how I got it leaving there.
6    **Q.   Well, all right.  So what he said, what he**
7  **actually said as opposed to what you got when you left**
8  **there was that you're not drafted to be on the range,**
9  **that there are certain occupational hazards with the**
10  **range?**
11    A.   I don't think he used the word "drafted."  I
12  think he said it's a voluntary position or something like
13  that.  He was very nicely saying, hey, we don't make you
14  work there.  You know?  One of those kinds of things.
15    **Q.   What is it that Yeomans said after MacLeish said**
16  **whatever he said?**
17    A.   I can't recollect, but I still remember I was
18  impressed that John would try to say something to counter
19  what the colonel said because the colonel was jumping on
20  the guys; in a very nice way, basically putting them in
21  their place.
22       As soon as Tom MacLeish -- in fact, I
23  remember he cut John off, said something directly to him
24  and you could see John just kind of basically slide down

44 (Pages 170 to 173)

A559

Price, et al.                                                    v.                                       Chaffinch, et al.
Gregory Allen Warren                              C.A. # 04-956-GMS                          January 11, 2006

Page 174

1  in his chair and push back from the table. John never
2  said another word the rest of the meeting. It was easy.
3  You know, but I don't remember exactly what topic it was.
4  We were talking about obviously, again, several topics.
5      Q.  Do you recall Yeomans presenting a report at
6  that meeting?
7      A.  May have, but I don't recall. Too long ago.
8      Q.  Do you recall anything else that happened at
9  that meeting?
10     A.  No. I mean, several people spoke. I don't
11  recall all the details, no.
12     Q.  Do you recall any discussion of SOPs at that
13  meeting?
14     A.  We may very well have. I don't recall, though.
15  I mean, I still remember a couple of those distinct
16  things because they kind of hit me in the face. But, I
17  mean, you are asking me to recollect from a couple years
18  ago what was said in a meeting, one of 25 meetings and I
19  can't do it. I don't recollect.
20     Q.  Does the academy have SOPs?
21     A.  Certainly.
22     Q.  Did the range have SOPs?
23     A.  Sure. Absolutely.
24     Q.  Who writes the SOPs for the range while you were

Page 175

1  the academy head?
2      A.  Well, the policies don't get written like on a
3  regular basis. We're what they call nationally
4  accredited. That means typically you're visited every
5  five years, and at that point everybody scrambles to make
6  their policies, get them up-to-date, make them look good,
7  and try to survive the visitation by CALEA, which is the
8  national accreditation group.
9      Q.  Why don't you tell the reporter what CALEA
10  stands for?
11         MR. NEUBERGER:  How do you spell it?
12         THE WITNESS:  C-A-L-E-A, all capitals.
13  C-A-L-E-A.
14  BY MR. ELLIS:
15     Q.  Council --
16     A.  I'm trying to think the formal term. I can't at
17  this point.
18     Q.  Don't worry about it.
19     A.  Sorry about that. I don't deal with them
20  anymore, thank goodness.
21     Q.  Okay.
22     A.  Thank goodness.
23     Q.  I take it that during the time that you were the
24  director of training, there was no CALEA review of the

Page 176

1  Delaware State Police?
2      A.  No, no, not while I was there because it's every
3  five years.
4      Q.  Did you ever, during the time you were director
5  of training, review the SOPs for the firearms training
6  unit?
7      A.  No.
8      Q.  Do you recall the lieutenant colonel asking that
9  SOPs be developed for maintenance at the range?
10     A.  Yes.
11     Q.  When did that occur?
12     A.  Later on as we -- I think as he got the word
13  from Facilities Management that you guys are responsible
14  for this, I think he then thought, well, I better do
15  something here. I can't look too inept. I already look
16  inept enough.
17         So I think he thought, well, I better do
18  something. So I think that's when he basically sent down
19  to the guys -- that went by me. I didn't have to work on
20  that. It went to the guys about write up a policy, and I
21  think Chris had to do that. I think all the guys had a
22  say in it, but I think that was one of the things that
23  Chris had to write up, was a policy on how to clean the
24  range or what would be done to keep the range clean. But

Page 177

1  I can't swear to that. You'd have to ask Sergeant
2  Foraker.
3         MR. ELLIS:  I ask the court reporter to
4  mark this as 34.
5         (Exhibit D-34 was marked for
6  identification.)
7  BY MR. ELLIS:
8      Q.  That's an e-mail dated February 4, 2004, from
9  Foraker to you.
10     A.  Yes.
11     Q.  Could you take a look at that?
12     A.  Do you want me to read the whole thing or just a
13  specific area?
14     Q.  I want to ask you a question as to what
15  discussion you had with Chris Foraker that generated
16  ultimately this e-mail. So you can take a look at as
17  little or as much as you think is necessary for you to
18  answer that question.
19     A.  Go ahead and ask your question and you can let
20  me know whether or not you need me to read it. Just
21  trying to save you some time here. Or if you want me to
22  sit here and read it for the next few minutes, I can do
23  that, too. Whatever suits you.
24     Q.  Do you see the first sentence?

45 (Pages 174 to 177)

Price, et al.                                    v.                        Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                  January 11, 2006

Page 178

1    A.  Yes.
2    Q.  It references a discussion you had earlier on
3  February 4 with Chris Foraker; right?
4    A.  Mm-hmm.  It says:  "Just to recap what I have
5  done today regarding range issues," yes.
6    Q.  Do you remember that discussion you had with him
7  on February 4th, 2004?
8    A.  I think one -- yes.  I think one of the things
9  that the lieutenant colonel had wanted was us to check
10  into changing ammunitions.  That was one of the things
11  that had come out of our discussions.  And so like number
12  one there, I believe that's where that came from is this,
13  quote, clean fire ammunitions.
14    Q.  What was the purpose of changing ammunition?
15    A.  Obviously to try to cut down on some of these
16  hazardous materials being released inside the range.
17    Q.  Look at paragraph 2.
18    A.  Okay.
19    Q.  This references a test that's supposed to occur
20  on February 11th, does it not?
21    A.  Yes.
22    Q.  The test was supposed to determine whether the
23  ventilation system was working correctly, wasn't it?
24    A.  Yes.  I believe that's what that means.

Page 179

1    Q.  Isn't this the test where the guy set off the
2  smoke bombs to see which way the wind blows?
3    A.  I don't know because we had several different
4  guys on several different occasions come up there, so I
5  don't know that, you know, for a fact.
6    Q.  Did that also arise out of something the
7  lieutenant colonel wanted?
8    A.  The --
9    Q.  The testing.  Did the lieutenant colonel
10  authorize the testing to see whether the facility was
11  working properly?
12    A.  Yes.  He wanted -- I guess we convinced him we
13  needed experts in here, and I think he said, yes, make
14  arrangements to go ahead and get somebody in here to test
15  the range to find out, you know, what we've got.
16    Q.  Paragraph 3.
17    A.  Okay.
18    Q.  It deals with repairs to the bullet trap.
19    A.  Mm-hmm.
20    Q.  Is that also something that arose out of a
21  discussion you had with the lieutenant colonel?
22    A.  That I don't recollect.  I don't remember that.
23  I know he wanted somebody to come in and test the air
24  handler.  But I don't recollect if he wanted somebody to

Page 180

1  come in and test the actual bullet trap or work on that
2  system from that meeting.  I don't know.
3    Q.  Do you recall ever having a discussion with Tom
4  MacLeish about the bullet trap?
5    A.  Yes.  I mean, throughout all of this -- there
6  are no -- there are no surprises here because I think you
7  have to look at this range holistically.  You can't look
8  at the air-handling system without looking at the bullet
9  trap.  You can't look at the bullet trap without looking
10  at -- I think you've got to see the synergistic effect
11  that shooting has on this facility.
12    I remember in this we made sure and, in
13  fact, I still remember telling Lieutenant Davis we are
14  going to communicate through this.  We need to talk with
15  one another.  We need to keep Paul in the loop.  We
16  needed to keep the lieutenant colonel in the loop.
17    So I remember over a period of time, as you
18  can see the different things we've tried to do here is
19  trying to keep everyone on the same page.  Here's what's
20  going on here.  Here's what we are doing here.  You know,
21  we tried to keep everybody informed.  And a lot of it was
22  done verbally because we don't work in the New York State
23  Police where the academy is 200 miles, you know, from
24  maybe headquarters or whatever the case might be.  I

Page 181

1  mean, we are 60 feet apart.
2    So I know you are relying heavily on your
3  e-mails and I can appreciate that, but this is probably
4  30 percent of the correspondence.  Seventy percent took
5  place in hallways, over the telephone, cell phones, and
6  other things that, unfortunately, you know, you don't
7  have.
8    MR. ELLIS:  What was the question?
9    (The reporter read from the record as
10  requested.)
11  BY MR. ELLIS:
12    Q.  What did you tell him in any discussion that you
13  had with him about the bullet trap?
14    A.  It's broke.
15    Q.  That's it?
16    A.  It's broke and it's broke bad.
17    Q.  Okay.
18    A.  And Sergeant Ashley is probably to blame for
19  that as much as anybody for tinkering with it.  And I
20  laid a little bit of it on Paul Eckrich, too.  I said,
21  you know, he approved the expenditures to have people
22  come in here and be working on this thing and modifying
23  it.  And, you know, later on they said, well, we had to
24  try to do something.  We knew it was shut down, so we

46 (Pages 178 to 181)

Price, et al.                                      v.                              Chaffinch, et al.
Gregory Allen Warren                      C.A. # 04-956-GMS                    January 11, 2006

Page 182

1  just -- and I said, "Where is it proven that this
2  company, that this will work?"  "Well, they told us it
3  might not work.  It was just an experiment."  I said,
4  "You spent thousands of dollars."
5      Q.  Who told who that what wouldn't work?
6      A.  This is Sergeant Ashley and Paul Eckrich and
7  myself.  When everything blew up here, then Sergeant
8  Ashley, I think, felt like, uh-oh, a lot of this is
9  getting stuck all over me because I was in charge of that
10 place for the last year and a half.  So he did a lot of
11 talking, a lot of lobbying, a lot of politicing around
12 headquarters trying to cover himself and trying to say,
13 hey, I was doing the best I could up there.  You know,
14 but it was barely, you know, surviving as it was up
15 there.  You know?
16     Q.  What did he actually say to you?
17     A.  Oh, he came in my office on regular basis and
18 then he would leave my office and go next-door to
19 Lieutenant Davis and then he would walk out --
20     Q.  What did Ashley say to you?
21     A.  He would come in and try to defend his position.
22     Q.  What did he say?
23     A.  I'll try to give you an example.
24         When I started getting on him about this

Page 183

1  frangible ammunition, I said, "It's apparently shut the
2  whole system down, Rich."  I said, "On top of that, the
3  guys are breathing this stuff in."  And I said, "We even
4  have recruits up there who are complaining about it."
5         And I still remember him telling me, "Don't
6  listen to anything those guys tell you.  That stuff is
7  just ceramic."  He said, "When those bullets
8  disintegrate, it's just dust.  Don't worry about it.
9  It's no big deal.  I know what I'm talking about."
10        So this was early on when all this started
11 to come up.  Maybe naively so at that point, you know,
12 I'm thinking, hey, he's a sergeant, he knows a lot about
13 guns, he's been up there for a year and a half.  You
14 know, I hope he knows what he's talking about.
15        Well, it wasn't long we figured out that he
16 doesn't know what he's talking about, that he hadn't even
17 checked the MSDS sheets to see what was in this
18 ammunition, but yet he's going all over headquarters
19 talking to everybody basically telling them nontruths.
20     Q.  Who did he talk to other than you?
21     A.  Well, I know, for instance, right next-door
22 Ralph and I know my DIs because he would make rounds.  He
23 has been out in the garage area talking to the mechanics.
24     Q.  What's a DI?

Page 184

1      A.  A drill instructor.
2         So he would talk to some of my staff and
3  then he would talk to Ralph and myself.  I mean, he
4  didn't really have a job.  They pretty much wrote him off
5  and -- you know, when they pulled him out of there.  And
6  I think that was their way of getting him out of the
7  picture in a hurry.
8         So he just basically -- it was a nice job.
9  He had all day to walk around headquarters.  And he had a
10 couple little projects to work on, but besides that, he
11 was allowed basically to walk around all day.  And he did
12 that for months until he went ahead and said I've had
13 enough of this, I'm out of here.
14     Q.  Did you actually hear what he said to your drill
15 instructors?
16     A.  No.  I wasn't in the room.  I did -- I did catch
17 him in there a couple of times and they looked at me and
18 basically said, "Yeah, Rich is over here venting" or that
19 type of thing.  I said, "Don't worry about it.  Just blow
20 it off.  Just move on."  It was no big deal.
21     Q.  Did you hear what he said to Davis?
22     A.  No, no.  He would go from me next-door to Ralph.
23 But our door is normally shut because we are on the phone
24 a lot of times.

Page 185

1      Q.  Now, let me show you another exhibit.
2         MR. ELLIS:  This is 35.
3         (Exhibit D-35 was marked for
4  identification.)
5  BY MR. ELLIS:
6      Q.  Do you recognize Exhibit D-35?
7      A.  Yup.
8      Q.  Tell me what it is, please.
9      A.  Well, it's basically a response to Tom Wagner.
10     Q.  A response?
11     A.  Mm-hmm.
12     Q.  A response to what?
13     A.  Well, basically it's entailing what has gone on
14 to Tom Wagner, who is the state auditor.  We know that.
15 As to what's going on at the pistol range.
16     Q.  This isn't dated.  Did you prepare it?
17     A.  That I don't know.  I didn't date it, did I?
18 No.  Sorry.  I do not know.  Like I said, there was so
19 much going on, I can't give you an exact date.
20     Q.  When you say it's a response, is it
21 responding --
22         MR. NEUBERGER:  Wait a minute.  Can we take
23 our break now?  He can read it over.  Maybe that will
24 help him date it.  From references to things, it might

47 (Pages 182 to 185)

Price, et al.                                    v.                    Chaffinch, et al.
Gregory Allen Warren            C.A. # 04-956-GMS            January 11, 2006

Page 186

1  give him some idea.  We've been here -- let's take a
2  break.
3          MR. ELLIS:  That's fine.
4          MR. NEUBERGER:  Then you can just look at
5  it during the break.
6          THE WITNESS:  Okay.  Great.  Thanks.
7          (A recess was taken at this time.)
8   A.  I had a chance to take a look at this.
9  BY MR. ELLIS:
10     Q.  You testified a few minutes ago that it was a
11  response to the Delaware state auditor.
12     A.  Mm-hmm.
13     Q.  Was there something the Delaware state auditor
14  did to get a response?  Did the Delaware state auditor
15  communicate with you in such a way that you thought it
16  required a response?
17     A.  No, no.  That was just semantics.  But I had
18  been in conference, let's say, with a great many people
19  over this whole issue when I saw that -- what I thought
20  was going to happen is we were going to end up with one
21  huge cover-up.
22          So I had been in conversation with multiple
23  people throughout the state.  And when I say a response
24  to, I guess I should have said a complaint to, but it was

Page 187

1  a response to what people had told me to do.  They said,
2  "Well, you need to tell someone."  And I said, "Well, I
3  understand that."  And I said, "Well, who better with a
4  question like this than to go to the state auditor?"  So
5  that's what you have in front of you there.
6     Q.  When did you prepare this?
7     A.  I don't know, though.  I mean, I didn't date it
8  and it had to be in the spring, though, of 2004, but I
9  mean, I don't know the exact date.  It probably would
10  have been -- if you are asking me to take a guess, I can
11  take a guess for you.  But if you are asking for a date,
12  I can't give it to you.
13     Q.  Well, let me ask it this way:  You were
14  interviewed by the state auditors' people approximately
15  May 12, 2004.
16     A.  Mm-hmm.
17     Q.  Was this document prepared before or after that?
18     A.  You know, I don't -- I don't want to tell you
19  because there were a million things going on at that
20  time.  You know, if I tell you that it was before,
21  because I'm leaning that way, then it may not have been.
22  I don't want to tell you a mistruth.
23          I don't know the date I gave this to him.
24  I don't know if I gave this to him in response to what

Page 188

1  people had told me that you really need to let somebody
2  know about this or if I wrote this up because I was
3  really disappointed -- I do remember this -- when I was
4  interviewed by the state auditor's office, I was really
5  disappointed in the flavor of the interviewers, the
6  direction that they were heading with this.  I could just
7  tell by their questions it was more like not why the
8  range is a problem, but, you know, they were like -- it
9  was almost like an interrogation.
10          So I don't know if I wrote this to Tom.  I
11  know Tom personally and I don't know if I wrote this to
12  him kind of as, hey, here's the real skinny on what
13  happened up there or if I wrote it to him as a complaint
14  prior to their office even getting involved in on this.
15  I don't know.
16     Q.  How is it that you know Mr. Wagner personally?
17     A.  He lives in Dover and works in Dover and I know
18  him from Rotary and meetings and all that kind of stuff.
19     Q.  Do you know him from Republican political
20  activities?
21     A.  Yes, I've seen him at a great many of those,
22  certainly.
23     Q.  He's a Republican; right?
24     A.  Yes.

Page 189

1     Q.  Who is it that suggested you go to the state
2  auditor with your problems having to do with the range?
3     A.  Everybody.
4     Q.  "Everybody" is a lot of people.  Can you be more
5  specific?
6     A.  Everybody.  I mean, over the course of the
7  spring I talked to retired policemen, state troopers,
8  legislators, people on Dover city -- in Dover city
9  government, friends of the family, neighbors, you name
10  it.
11          I mean, when this came out in the paper in
12  March, I mean, everybody knew about it.  It was a big
13  deal.  And so, of course, people would talk to you about
14  it.  And then you'd say -- well, I would tell them, "You
15  can't imagine the frustration I'm feeling right now."
16  And they go, "Well, you need to tell somebody about
17  what's really going on up there."
18          When I say "everybody," I can't tell you
19  exactly like these 17 people told me to do this, but I
20  mean a lot of people said, "You need to go to the state
21  auditor's office with it."
22     Q.  Can you name any of them?  You said former --
23     A.  I got retired state policemen that I talked to
24  that are on the board of directors with the museum with

48 (Pages 186 to 189)

Price, et al.                                    v.                                    Chaffinch, et al.
Gregory Allen Warren                       C.A. # 04-956-GMS                       January 11, 2006

|  | Page 190 |
|---|---|

1  me.  We were talking once before a board meeting.  A
2  couple of my own relatives.  For instance, even my own
3  mother.  I mean, I was discussing this whole thing with
4  her.  She said, "Boy, it must really be a mess."  I said,
5  "Oh, you can't imagine, Mom."  She said, "Well, you know,
6  you need to discuss this with somebody who can look into
7  it."  And she said, "Who would that be?"  And I gave her
8  a list of, you know, these are the people who could take
9  responsibility for this, the attorney general, state
10  auditor.  She said, "Let Tom Wagner know what's up."
11        So again, you are asking for something a
12  couple of years ago.  A lot of people are telling me to
13  do this.
14        **Q.  Like, for instance, what former troopers?**
15        A.  I remember being at a board meeting, a museum
16  board meeting which we hold monthly and I remember being
17  outside, because we all get there early, and talking.
18  And a couple of guys were saying, "Well, you ought to go
19  to Tom Wagner with it and let him know what's up and
20  he'll do an investigation and the truth will come out."
21        **Q.  What guys?**
22        A.  Again, you are asking me for a couple of years
23  ago.  I talked to, over the course of six months on this
24  subject, literally hundreds and hundreds and hundreds of

|  | Page 191 |
|---|---|

1  people on literally hundreds of occasions.  I'd love to
2  answer it, but I can't.
3        **Q.  I'm not asking for all the names.  I'm asking**
4  **for any of them.**
5        A.  I can't.  You asked me for --
6        **Q.  You can't remember the name of anyone who**
7  **suggested that you go to the state auditor?**
8        A.  No.  But I remember building up to this and
9  people kept telling me and kept telling me and I thought,
10  no, I don't want to do that.  And more people would tell
11  me you ought to do that.
12        And finally after a couple weeks I thought,
13  You know what?  It deserves to come out, so I went ahead
14  and did it.
15        **Q.  But you can't remember the name of anybody who**
16  **suggested that --**
17        A.  If you are asking me for a specific person, no.
18        **Q.  Okay.**
19        A.  No.
20        **Q.  On the third page of this document, what's that**
21  **above your signature?**
22        A.  Excuse me?
23        **Q.  What's that above where it says "Gregory A.**
24  **Warren"?**

|  | Page 192 |
|---|---|

1        A.  That is my signature.
2        **Q.  I'm sorry.**
3              MR. NEUBERGER:  He has an elaborate W.
4        A.  You said above my signature.  That's the
5  paragraph.
6        **Q.  So where it says "Gregory A. Warren," that's**
7  **your printing out of your name?**
8        A.  Yes.
9        **Q.  And above that is your signature?**
10        A.  Yes, that's my signature.  I wasn't following
11  you.  What's that above your signature.  That is my
12  signature.
13        **Q.  I thought it was a secret Rotary handshake.**
14        A.  No.  But after you sign documents for 25 years,
15  it gets a little sloppy after a while.  Sorry.  With
16  identity theft, I thought it was better to have a
17  signature like that.
18        **Q.  At the point that you wrote this letter, you're**
19  **suing the governor; right?**
20        A.  Yes.
21        **Q.  And you're suing Colonel Chaffinch; right?**
22        A.  Yes.
23        **Q.  And you suggest to the auditor that the**
24  **Secretary Homer be fired?**

|  | Page 193 |
|---|---|

1        A.  Mm-hmm.
2        **Q.  And Colonel Chaffinch be fired?**
3        A.  Yes, absolutely.
4        **Q.  And Lieutenant Colonel MacLeish be fired?**
5        A.  Yes.
6        **Q.  You're taking a shot at the governor, too?**
7        A.  Yes, because there's no doubt in my mind that
8  Secretary Homer -- Secretary Homer and the governor are
9  very close, or were at that time.  They are not too close
10  anymore.  But at that point in time they were very close.
11  And I have little doubt that when this came out in the
12  newspapers, Homer was over in their office.
13        So, in short, do I think the governor is
14  somewhat responsible for this?  Yes.  But I think Homer
15  and Chaffinch and MacLeish are more than capable of
16  orchestrating a cover-up, obviously, to keep things
17  quiet.  Things don't look good when you have bad things
18  come out in the press on your shop.
19        **Q.  The last two words of the letter are "this**
20  **administration."**
21        A.  Yes.
22        **Q.  Does that refer to Governor Minner's**
23  **administration?**
24        A.  No.  That would be the State Police

49 (Pages 190 to 193)

Wilcox & Fetzer, Ltd.                Professional Court Reporters                (302)655-0477

Price, et al.                                         v.                                    Chaffinch, et al.
Gregory Allen Warren                        C.A. # 04-956-GMS                      January 11, 2006

Page 194

1  administration. I already talked about the governor up
2  at the top. It says "Governor Minner appointed these
3  individuals," this administration meaning Homer,
4  Chaffinch, MacLeish, those folks.
5      Q. So your testimony is that "this administration"
6  at the end of that letter doesn't refer to the governor?
7      A. No. It's the State Police administration.
8      Q. When did you learn that Ralph Davis was going to
9  sue the State Police?
10     A. At least a month or a couple of months before I
11 retired. I don't remember the exact date. I mean, that
12 was right in the middle of some of this other stuff that
13 was going on, so --
14     Q. I think he filed suit about February 12th, 2004.
15     A. Might well have been even in the winter. We had
16 so many irons in the fire, I don't remember. But I know
17 before he filed because he came and talked to me about it
18 and, you know, it's very upsetting to go through that.
19 So he wanted to talk about it.
20     Q. How long before he filed suit did he come and
21 talk to you about it?
22     A. Oh, some time. Early on. I'm talking about a
23 few weeks before he filed easily. He came and sat down
24 and we talked some.

Page 195

1      Q. Before or after Christmas?
2      A. I don't know.
3      Q. What did he say to you?
4      A. He wanted to know what the process was like, how
5  stressful is it, you know, cost involved. Do you think
6  it's smart to do this? How bad will I get hammered by
7  the colonel? Just the questions you would expect a
8  friend to -- or somebody that you work with, works with
9  you every day, the things you would expect them to ask.
10     Q. So Ralph Davis is a friend of yours?
11     A. Well, not a personal friend, but I consider him
12 a professional friend, yes.
13     Q. Did you recommend a lawyer to him?
14     A. Yes. I told him flat out who I thought -- for
15 his situation, I told him flat out who I thought would be
16 the most appropriate person to handle that case, yes.
17     Q. Where did you get Mr. Neuberger's name? When
18 you decided to file your suit?
19     A. Well, it was more than one person, but I think
20 it may have been a representative from the union, and I
21 think maybe a legislator had pointed me in Tom's
22 direction. But I had already read about Tom and his
23 reputation, so I thought he would be the right person for
24 the job.

Page 196

1          MR. NEUBERGER: Off the record.
2          (Discussion off the record.)
3  BY MR. ELLIS:
4      Q. You said that you had worked with Tom MacLeish
5  on some number of occasions prior to when he became the
6  lieutenant colonel?
7      A. Yes.
8      Q. Why don't you tell me when they were and where
9  they were.
10     A. The first time I worked for him he was the
11 sergeant in charge of the fatal accident team at Troop 3
12 and I was a fatal accident reconstructionist.
13         The next time would have been -- make sure
14 I have this right -- as a troop commander, he was at
15 Troop 3 and I was a shift sergeant.
16         Then when I was a troop commander, he was
17 my major after Major Forester retired.
18         And then I think I told you four times.
19 This would be the fourth time. I'm the captain in charge
20 of the academy and he's the lieutenant colonel. So it
21 would be four times.
22     Q. Describe your relationship with him.
23     A. When I first met him, it was good. After an
24 unfortunate incident and I got to see his true colors, my

Page 197

1  opinion of him changed dramatically, and that was the
2  first time I worked for him.
3      Q. What was that incident?
4      A. Rather than go into something long dissertation,
5  I had been sent out on a fatal accident. I could not
6  determine why the car had flipped over. I ran it by my
7  immediate supervisor, the next in line, which was a
8  corporal, senior corporal. And he said, "Yeah, Greg,
9  this is going to be a tough one."
10         So I'm sitting in the office and we are
11 talking about it and Tom MacLeish comes in and slams the
12 door shut and says, "I cannot believe that you guys can't
13 figure something so simple out." He says, "A road
14 trooper could have figured out why this accident
15 occurred." And we are both sitting there -- I mean, I
16 went to the University of North Florida for my
17 reconstruction. I know all that stuff.
18         And I'm sitting there and thinking, What in
19 the world? I mean, so he's ranting and raving now. We
20 are sitting and he's standing and he's basically yelling
21 in the office -- he's got the door shut -- about how
22 incompetent we are.
23         So obviously he got up and had a bad
24 morning. But nevertheless, he says, "Come out and get in

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Price, et al.                                                          v.                                            Chaffinch, et al.
Gregory Allen Warren                                    C.A. # 04-956-GMS                                January 11, 2006

Page 198

1   my car and I'll show you," because we were just at a
2   loss.
3           So we went up to where the tow yard is and
4   there's the car sitting in there. And he says, "Look at
5   this car." He says, "Of course you can see how this
6   accident occurred and why the car rolled over. The tires
7   are all chewed up. Obviously they had a blowout and it
8   ate up a tire and the rim dug into the road and it
9   obviously flipped over."
10          So I'm standing there and now I'm thinking,
11  you know, you're about one step away from a complete
12  moron. And Sergeant Foskey, who is very good friends
13  with Sergeant MacLeish, started to try to talk and Tom
14  wouldn't let him get a word in edge wise.
15          So we just let him continue ranting and
16  raving. And then finally when he stopped to take a
17  breath, I said, "Sarge," I said, "I got photographs I
18  took last night. The tires on the car are fine. It's
19  not the tires." And he goes, "Well, of course it is.
20  Look at this. Anybody can see that. A recruit can see
21  that." I said, "Sarge" -- you got to remember. This is
22  in the late '80s. They didn't have rollbacks. They
23  didn't have -- they had a couple. They had the old-time
24  regular tow truck that we probably all grew up with.

Page 199

1           So when the tow track driver came out, he
2   flipped the car back up onto its wheels. When he slammed
3   it down -- I was standing there. I'm out there at the
4   scene with the firemen. When he slammed it down,
5   obviously the tires can't take that kind of stress and
6   the tires went flat.
7           But he didn't bring any dollies with him,
8   so the tow truck driver just hooked up to the back of it,
9   picked the back up and just took off to the tow yard.
10  Well, you have two tires, two front tires on the ground
11  on the road and they're flat and they drove miles like
12  that. Well, of course those tires got ripped to
13  smithereens.
14          And that's an example of where here's a guy
15  who is a supervisor, been in the State Police probably
16  ten years at that point. He's trained in accident
17  reconstruction, too, and he comes in and, I mean,
18  literally he just about lost it. Even with one of his
19  best friends he lost it.
20          And there's an example where -- and I saw
21  this many times throughout his career where he's very
22  quick to draw a judgment on other people, but he's not so
23  quick to draw a judgment on himself. And he can be very
24  hypocritical at times.

Page 200

1           I think he -- internally I think he lacks
2   confidence in himself, but externally he does a great job
3   of the big handshake. How are you doing? Hey, buddy,
4   give me a hug. But when it comes down to meat and
5   potatoes, there's -- I'll be very honest with you, most
6   people see him as a hollow shirt. I hate to say that,
7   but it's a shame you have to say that about the
8   superintendent of the State Police, but most people see
9   him as a hollow shirt.
10          That's one example. If you want others,
11  I'll give them to you, but I'd bore you to tears with the
12  details.
13      Q.  You saw him as a hollow shirt?
14      A.  I didn't when I first started working for him
15  because he appeared to be very nice, but then when he
16  started taking two-and-a-half-hour lunch breaks and he
17  would be gone and we'd never see him and he would leave
18  and we would never hear from him and he was reading the
19  paper on duty and -- it didn't take me long.
20          About the first month or two I thought this
21  guy is really nice, and then after about two months and
22  that little yelling escapade that took place, I figured
23  out in a hurry what I was really dealing with.
24          And then when his wife told me he would end

Page 201

1   up being superintendent of the State Police some day, I
2   just really got turned off by both of them.
3      Q.  Is it accurate to say you didn't like him?
4      A.  Yes.
5      Q.  During the period from December 1st through the
6   time you left the State Police, did you have any
7   conversations with Aaron Chaffinch about anything?
8          MR. NEUBERGER:  I'm sorry. What were the
9   dates, Ed?
10         MR. ELLIS:  December 1st, 2003, to when he
11  left the State Police.
12     A.  No. There was no way he would talk to me or I
13  would talk to him because my suit was pending at that
14  point. So, in fact, I had been told by counsel not to
15  talk to him.
16  BY MR. ELLIS:
17     Q.  You don't have to tell him what counsel told
18  you.
19     A.  You understand, I did not have any conversations
20  with him during those dates.
21     Q.  Could you go back to Exhibit 34? I think I left
22  a few questions on 34 to be asked.
23     A.  Okay.
24     Q.  Paragraph 4, do you know what caused Chris

51 (Pages 198 to 201)

Price, et al.                                    v.                         Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS              January 11, 2006

Page 202

1  Foraker to call Mayfran Corporation about changing the
2  bullet trap back to the way it originally had been?
3      A.   Just that it wasn't working, obviously. But, I
4  mean, no, I don't recollect any particular conversation
5  on why he called them. I just know that it was broke.
6  And so obviously we had to try to do something to figure
7  out what we were going to do in the future.
8      Q.   Do you know whether that arose out of a meeting
9  that you had with the lieutenant colonel earlier that
10 week?
11     A.   No, I don't recollect.
12     Q.   The next paragraph says something about the
13 lieutenant colonel wanting Foraker to provide a checklist
14 on what maintenance responsibilities should be assigned
15 between facilities and the firearms training unit.
16     A.   Yes.
17     Q.   Do you know what caused Chris Foraker to write
18 that paragraph? It's the one that I think should have a
19 five in front of it, but there's a little punch hole in
20 the document that you have in front of you.
21     A.   Yes. I think that was one of the things that he
22 had been tasked with, is trying to write policy on
23 cleanup and maintenance of the firearm facility. And I
24 think MacLeish's order to Chris probably was precipitated

Page 203

1  because Mark Devore was getting on MacLeish and MacLeish
2  didn't like that, so he dumped it down on to Chris.
3      Q.   What do you mean "Devore was getting on
4  MacLeish"?
5      A.   Well, remember we were talking about these
6  conversations involving administrative services was
7  trying to say that, yeah, we know the range doesn't work
8  right, but the reason it's not working right right now is
9  it's all your fault.
10          And so I think Devore was saying to
11 MacLeish, you guys need to do a better job cleaning. If
12 you do a better job cleaning, all of these problems will
13 go away. They weren't happening under Ashley's watch.
14          So I think MacLeish thought, well, you
15 know, I have to do something here, so what I'll do is I'm
16 going to make these guys write up, you know, a cleanup
17 policy. So I think that's how it shook out.
18     Q.   You mean a maintenance policy?
19     A.   A cleanup, maintenance of the range, yeah.
20     Q.   You don't mean cleanup as an environmental
21 cleanup? You mean just cleaning up the range on a
22 day-to-day basis?
23     A.   Yes.
24     Q.   Is there anybody in the State Police that would

Page 204

1  be better qualified than the head of the Firearms
2  Training Unit to describe to MacLeish what an appropriate
3  division of responsibility would be?
4      A.   You're asking me, personally?
5      Q.   I'm asking you as the former head of the
6  academy.
7      A.   I'm going to tell you the same response I gave
8  to MacLeish doing my report, is I don't think any of us
9  should have been doing any of these reports. One, we are
10 not qualified experts.
11          And second of all, why couldn't we be
12 biased one way or the other as everyone else in this
13 situation has been?
14          I just didn't think it was good business
15 practice to be having the guys like myself or Eckrich or
16 Foraker or anybody -- I think we needed experts. I think
17 this should not fall on the shoulders of a sergeant. It
18 puts him in a terrible position to be trying to write up
19 policy on something he, himself, has never received
20 training on.
21          So I don't think this is good business
22 practice for the lieutenant colonel to order us. And
23 same thing with me. He's asking me to do research on a
24 topic -- he knows that I am not a pistol range expert,

Page 205

1  but yet he asked me to formulate a report on what the
2  problems are and then what are some, you know, possible
3  solutions or direction.
4      Q.   When you say you could be biased, what do you
5  mean by that?
6      A.   I just mean any type of bias. I mean, if you
7  like being -- if you like the range, you could be biased
8  for it. If you disliked the range, you could be biased
9  against it. If you -- any type of bias. It's just not
10 good practice.
11     Q.   At this point in time, and this is February
12 2004, the State Police is in a situation where they have
13 to deal with another agency of the state government as to
14 how the range is going to be run; right? Is that a fair
15 statement?
16     A.   I would think so, yes.
17     Q.   Would you agree with me that there was a certain
18 adversarial relationship between facilities in the State
19 Police as of February 2004?
20     A.   Yes.
21     Q.   So even if the State Police hire experts to help
22 them decide what position they want to take, they still
23 need somebody to deal with the experts; right?
24     A.   Yes. Somebody would have to interface with

52 (Pages 202 to 205)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A567

Price, et al.                                    v.                              Chaffinch, et al.
Gregory Allen Warren              C.A. # 04-956-GMS                      January 11, 2006

|  | Page 206 |
|---|---|

1    them, yes.
2        Q.  Now, MacLeish authorized the hiring of
3    Environmental Solutions, didn't he?  Either MacLeish or
4    Eckrich did?
5        A.  Mm-hmm.
6        Q.  Is that right?
7        A.  Yes.  They would have to approve the
8    expenditure, yes.
9        Q.  They authorized bringing the people in to deal
10    with the belt, the belt that the people from Mayfran
11    Corporation?
12        A.  Certainly.  It's broke.
13        Q.  Authorized getting the air tested; right?
14        A.  Right.
15        Q.  Authorized bringing in Proventure in from
16    Carey's Air Conditioning Company; right?
17        A.  Yes.
18        Q.  There had to be somebody within the State Police
19    that was going to deal with all these outside experts;
20    right?
21        A.  Sure.  You'll have to have a point person,
22    absolutely.
23        Q.  Is there any person in the State Police better
24    to be the point person than the guy who is actually in

|  | Page 207 |
|---|---|

1    charge of the facility?
2        A.  The point person I see as a contact person.
3    That's different than writing policy and procedures on
4    cleanup.  So which question do you want me to answer?
5    Because I don't think he's the appropriate person.  I
6    don't think it's fair to him and he hasn't received the
7    training.  He doesn't have a degree in environmental
8    cleanup or hazardous materials.  To have him write a
9    policy on how to clean up things that he's not a chemist
10    on is one thing.  I'll have to say no.
11            If you are saying is he the right person to
12    have as a contact person?  I would have to say absolutely
13    he is, yes.
14        Q.  If it's going to require a degree in
15    environmental engineering to write a policy, the policy
16    is never going to get written within the State Police, is
17    it?
18        A.  No, and it shouldn't be.  It should be done by
19    who you just stated.  My guess is that somebody should
20    have come in from OSHA or NIOSH or even a university or
21    someone who is a private sector company who specializes
22    in this field to write the policy on how to clean up
23    these chemicals.
24        Q.  So it's your belief that the policies for the

|  | Page 208 |
|---|---|

1    state troopers should be written by somebody outside the
2    State Police?
3        A.  When it comes to -- let me ask you this:  If you
4    were a pilot on a helicopter -- correction.  If you were
5    flying on a helicopter, would you want the pilot to write
6    the policies on maintenance or would you want a jet
7    engine mechanic to write those policies?  That's my
8    point.  It's such a technical field that you need an
9    expert to address it.
10            You know, there are some things, if you
11    want a general policy on something, like arrest
12    procedures, we are trained in that.  That's what we do
13    for a living.  If you are asking a guy to go into
14    hazardous materials and talk about the properties or how
15    long those things stay in your fatty tissues or can you
16    ingest those things or breathe them in or whatever the
17    case may be, I think that's way over our head and it's
18    not fair to expect a sergeant in the State Police to do
19    this task.
20            Nor do I think it was right for me to have
21    to do my report.  And, in fact, I told you, I told
22    Colonel MacLeish that, that it was not for us to do.
23        Q.  So your belief is that as to maintenance
24    policies for the range, they should have been written by

|  | Page 209 |
|---|---|

1    somebody outside the State Police?
2        A.  Absolutely.  If they want to interview our
3    personnel or if they want to come on site and review it
4    and look at it or whatever, great.  That would be super.
5    That's what you would want.  But they shouldn't be
6    written by people inside.
7        Q.  This paragraph we've just been talking about in
8    terms of the assignment of responsibility between
9    facilities and the Firearms Training Unit, Foraker, did
10    in fact, prepare such a document, didn't he, even though
11    he says in this paragraph he's not going to?
12        A.  I don't know if he did or not.  It's been too
13    long ago.
14        Q.  Take a look at 34.
15        A.  He may very well have.
16        Q.  I'm sorry.  Exhibit 30.
17        A.  Okay.  (The witness reviews the document.)
18    Okay.  Yes.  Okay.
19        Q.  Do you remember receiving a copy of this?
20        A.  I'm sure I did.  I mean, in fact, I'm looking at
21    it.  He's got it sent to me.  You ask me if I recollect
22    it, no.  Obviously Chris worked on it and it looks like
23    he put one together.
24        Q.  Do you remember ever reading it?

53 (Pages 206 to 209)

Price, et al.                                    v.                          Chaffinch, et al.
Gregory Allen Warren                    C.A. # 04-956-GMS                January 11, 2006

Page 210

1   A.  No.  I just told you I don't remember receiving
2   this or what have you, but I obviously got it.  But it's
3   probably because of all the other things that were going
4   on at this time.  So I apologize for that, but I don't
5   remember this.
6      Q.  Tell me if you think there's anything in this
7   exhibit, D-30, that is outside the area of expertise for
8   the head of the Firearms Training Unit.
9      A.  You're asking me for my opinion on whether or
10  not Chris has the expertise to draw this document up?  Is
11  that what you're saying?
12     Q.  No.  I'm asking you whether there was any
13  substantive area in here -- in other words, as I
14  understand this, he's making recommendations as to who
15  ought to be conducting maintenance activities within the
16  range.
17     A.  Right.  And as you can see, I guess, I think you
18  answered your own question, in my opinion I don't feel comfortable
19  doing what Colonel MacLeish asked him to do, so he did
20  the best he could, I guess, with his conscience.  Because
21  what Colonel MacLeish asked him to do was develop a
22  policy, I think you said, on cleanup of the range, which
23  means to me a policy would be who's going to clean what
24  up, how often is it going to get cleaned.  This is Chris'

Page 211

1   best job at saying:  I need help.  In fact, I think it
2   says here, outside contractor, he talks in the back here
3   about dust collection units and total containment bullet
4   traps.  Again, I see outside contractor.  And so, you
5   know --
6      Q.  Let's understand the question here.
7      A.  Okay.
8      Q.  You used the term "policy."  The document,
9   Exhibit D-34 that we started with, says "a checklist
10  outlining my thoughts on what maintenance
11  responsibilities should be assigned between facilities
12  management and FTU personnel."
13     A.  Okay.
14     Q.  Now, would you agree with me that what he's
15  given us here in Exhibit D-30 is Chris Foraker's
16  recommendation as to how to distribute the necessary
17  maintenance work between facilities management, the FTU
18  staff, and outside contractors?
19     A.  Okay.  You've explained it much better.
20        I agree with you.  Yes, absolutely.  I
21  think Chris did that.  Absolutely.  He's denoted here who
22  he thinks should take care of each of several different
23  parts of the maintenance program, yes.
24     Q.  Is there anything in this document, any

Page 212

1   substantive area in this document where he's made a
2   recommendation that you believe is outside what he's
3   professionally capable of doing?
4      A.  Anyplace where I see outside contractor, for
5   instance, would lead me to believe that Chris is openly
6   and honestly saying this is outside my purview, I can't
7   really address this.
8        So I think he did the very best that he
9   could and tried to follow the orders that were given to
10  him by the lieutenant colonel.
11     Q.  Just take a look and read page -- it's the
12  fourth page where it says "Outside Contractor."  I think
13  you'll see that all he's really doing there is suggesting
14  that an outside contractor be retained to do the work
15  rather than having it done by somebody, either within the
16  FTU or facilities.
17     A.  Mm-hmm.
18     Q.  Would you agree with that having taken a look at
19  that?
20        MR. NEUBERGER:  You're talking about page
21  2433 here.
22        MR. ELLIS:  32.
23        MR. NEUBERGER:  I thought you said the last
24  page.

Page 213

1        MR. ELLIS:  I thought I said the third
2   page, but it's actually the same type of information is
3   on 2432 as is on 2433.
4        MR. NEUBERGER:  Right.  Could you restate
5   your question, then, or have her read it back?  Whatever
6   you want to do.
7        MR. ELLIS:  Just give me a second.
8        MR. NEUBERGER:  Okay.
9   BY MR. ELLIS:
10     Q.  Is it true that what Chris Foraker has done here
11  is to allocate responsibility as between the FTU staff,
12  the staff of the facilities management organization, and
13  outside contractors?
14     A.  Yes.
15     Q.  Now, when he uses an outside contractor, what
16  he's saying, I think, and tell me if you agree with this,
17  is that this is an area that is outside the expertise of
18  either FTU or facilities and ought to be done by somebody
19  from the outside?
20     A.  Yes, I'd agree with that, certainly.
21     Q.  In either case, either Option (A), which is on
22  the page that has 2432 at the bottom, or Option (B),
23  which has 2433 on the bottom, he suggests that the FTU be
24  responsible for using the floor scrubber, doesn't he?

54 (Pages 210 to 213)

Price, et al.                                          v.                           Chaffinch, et al.
Gregory Allen Warren                       C.A. # 04-956-GMS                    January 11, 2006

|  | Page 214 |
|---|---|

1    A.  I haven't read it.  Do you want me to take the
2  time to read it?
3           MR. NEUBERGER:  It's right here.
4       Q.  It's just the last sentence.
5       A.  Hang on for one second.  (The witness reviews
6  the document.)  Yes.  Yes, he does.
7       Q.  Did you have conversations with Tom Wagner, the
8  state auditor, directly about the Firearms Training Unit?
9  In other words, you with Mr. Wagner?
10      A.  No.  We never got to that point where we talked
11 personally.
12      Q.  Did you become aware at some point that the
13 governor had asked the auditor to conduct an
14 investigation?
15      A.  Yes.
16      Q.  Were you interviewed as part of that
17 investigation?
18      A.  Yes.
19      Q.  How many times were you interviewed?
20      A.  Just once.
21      Q.  Did you come to the interview with a prepared
22 statement?
23      A.  Yes.
24      Q.  Was Exhibit 35 the prepared statement?

|  | Page 215 |
|---|---|

1       A.  This may have been it, but I also prepared a
2  statement for a couple of legislators, so -- but this may
3  have been it.  Like I said before, I don't remember if I
4  wrote this after because I was mad about how the
5  direction I saw the investigators going, so I can't
6  remember if I gave the investigators a copy of some
7  points that I had put together for legislators who wanted
8  to appropriate the funds to fix the range or if I gave
9  them this one.  So it could have been either one.
10      Q.  Do you see anything, any reference in Exhibit 35
11 to the unsatisfactory way in which the investigation
12 seems to be going?
13      A.  I didn't --
14      Q.  You didn't see them?
15      A.  I didn't read through the whole document, but I
16 don't think I had a problem with that.  So this may -- I
17 may very well have given this -- if I did this before, I
18 probably gave this to those guys when they came to do the
19 interviews, but I can't swear to that because I don't
20 remember exactly because, like I said, I drew up a couple
21 different documents and there are a million things going
22 on right then.
23      Q.  Where were you interviewed?
24      A.  In Mr. Neuberger's conference room.

|  | Page 216 |
|---|---|

1       Q.  How many people were in the room when you were
2  interviewed?
3       A.  I think there were five, five of us.  I think
4  there was Neuberger and myself and then I think three
5  investigators came.
6       Q.  Do you remember the names of any of the
7  investigators?
8       A.  No.  I don't know any of them, so --
9       Q.  Did they ask you questions?
10      A.  Certainly.
11      Q.  Did you give answers?
12      A.  Certainly.
13      Q.  How long did the interview take?
14      A.  A couple of hours.  I don't remember exactly.
15      Q.  Was there something that you found
16 unsatisfactory about the way they were asking you
17 questions or the substance of the questions?
18      A.  Yes.  Having been an investigator in the past, I
19 wouldn't have approached the investigation from the way
20 they did as far as a bedside manner or -- I guess some of
21 the boilerplate they go through and things like that.
22 But I didn't like, once we got into it, bedside manner
23 aside, I didn't like the direction that they were
24 heading.  It was more like instead of asking for factual

|  | Page 217 |
|---|---|

1  information about what happened, it was more like you
2  guys, you guys, you guys.  It was almost like they were
3  sent in there with a predetermined idea as to who was at
4  fault or whatever the case might be.
5           I'm just giving you my opinion, but I could
6  tell that it was a hostile interview in my opinion.
7  Instead of being -- instead of looking for facts, I think
8  they were fishing and using a spear gun while they were
9  fishing.
10      Q.  What was it that they said to you that led you
11 to the conclusion that they were looking for a
12 predetermined result?
13      A.  Well, I think it was more like -- I think I felt
14 as if it was those range guys, those range guys, or why
15 didn't you and Lieutenant Davis or why -- but it was
16 never any responsibility -- they never asked me a
17 question about Major Eckrich or Lieutenant Colonel
18 MacLeish or Colonel Chaffinch.  It was all from me down
19 and it was very pointed and very hostile towards these
20 guys, these guys, these guys.  And so, of course, you
21 know, I mean, I'm a human being and I take offense to
22 that and I thought it was very offensive how they handled
23 it.
24      Q.  Do you think the auditors' investigators were

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Page 218

1  covering up the problem?
2     A.  I'll be very honest with you, and after having
3  read their report, they covered up a great deal when it
4  comes to Lieutenant Colonel MacLeish.  I think they did
5  him a great justice in there and they did the range guys
6  a great injustice.
7     Q.  Why is that?
8     A.  Well, because they basically, in so many words
9  when I read it, there was one piece in there where they
10  make it sound like Colonel MacLeish couldn't possibly
11  have any responsibility in this because it was Captain
12  Warren, and below is where all the balls were dropped.
13       And I think they used the idea that -- and
14  I think Colonel MacLeish is probably going to stick by
15  these words as I didn't know, I didn't know, I didn't
16  know, no one told me.  Well, that's a very, very weak
17  leadership process if that's what you have to stand on.
18     Q.  I guess my original question is:  Do you believe
19  that the state auditor covered up wrongdoing --
20     A.  Yes.
21     Q.  -- in his report?
22     A.  Yes.  I'm sure that they are very aware, because
23  this thing was extremely political and if somebody like
24  myself as a sergeant back then when this range was being

Page 219

1  built, if I was told where some of the funds went and who
2  was involved and why certain decisions were made, I
3  certainly know because many of us told them -- many of us
4  told them I know the auditors' investigators have have
5  a better idea than what they included in their report as
6  to why that range was messed up.  Maybe they just felt as
7  if, hey, we can't prove all that we know, so we'll just
8  stick in here what we can prove and then what we can hang
9  on the little guy.  And so I think that's the direction
10  it went.
11     Q.  Back when the range was built, who was the
12  superintendent?  Ellingsworth?
13     A.  Ellingsworth, yes.  It was Colonel Graviet's
14  idea, but he ended up retiring and Ellingsworth would
15  have been the superintendent then, yes.
16     Q.  So what is it you believe that the auditors'
17  report covered up?
18       I'm not trying to hide the ball from you
19  here.  Let me show you the report.  It's been previously
20  marked in another deposition as Papili 2.
21     A.  I read it when it came out a long time ago.  I
22  haven't seen it since then.  But I can tell you from what
23  I read of it, what do I think they're covering up?  One,
24  I think they do an admirable job for Tom MacLeish, and

Page 220

1  basically towards the back, I think it is, but I don't
2  recollect, it's been a long time since I read it, but
3  there's a piece in there that I took personal offense to
4  because it looked to me like they were defending Tom
5  MacLeish by saying, well, the lieutenant colonel didn't
6  know.
7       And so then that leads you to believe if
8  you're saying all these problems were occurring but the
9  lieutenant colonel didn't know, then what you're
10  inferring is somebody wasn't telling him.
11       Well, let me tell you:  The lieutenant
12  colonel knew within days of Chris Foraker getting up to
13  the range that there was trouble up there and that a lot
14  of things had been hidden for a long time.  And he knew
15  they were coming.  I think that's why it took -- why
16  would it take me a month and a half to get a meeting with
17  my boss over something this important?  I have never
18  worked for anybody where it took me a month and a half --
19  and you can subtract ten days for Christmas, but still,
20  it's a month, basically, trying to get a meeting with a
21  person.
22       And so, in short, I think they protected
23  Tom MacLeish.  That's on the operational side.
24       When it comes to the big picture, there

Page 221

1  were a lot of hands involved in the construction of that
2  pistol range and there were a lot of, I think, personally
3  from what I understand and what I've been told, a lot of
4  underhanded dealings that occurred with the construction
5  of the range.
6     Q.  What possible reason could the auditor have had
7  for covering up the problems with the range?
8     A.  Politics.
9     Q.  He's a Republican; right?
10     A.  Mm-hmm.
11     Q.  The current governor is a Democrat?
12     A.  Mm-hmm.
13     Q.  2004 was an election year; right?
14     A.  Yes.
15     Q.  He issues a report less than a month before the
16  election.
17     A.  Absolutely.
18     Q.  You're thinking this Republican was trying to
19  cover up a Democrat's problem?
20     A.  This is not an R&D issue here.  I said politics.
21  I didn't say Republican and Democrat.
22     Q.  Okay.
23     A.  Tom has a duty to the state.
24     Q.  Tom who?

56 (Pages 218 to 221)

A571

Price, et al.                                    v.                              Chaffinch, et al.
Gregory Allen Warren                      C.A. # 04-956-GMS                      January 11, 2006

Page 222

1    A.   Tom Wagner.
2    Q.   Okay.
3    A.   He has a duty to the state to do -- I guess to
4    come out with things that he can prove.  And I guess --
5    and it's probably a good thing for him.  It's not good to
6    put forth things that you can't prove or things that
7    people won't tell the truth on or documents that were
8    burned up or whatever the case might be.
9         But, in short, when that range started to
10   be built, I will tell you that range had as many enemies
11   as it did proponents.  It had as many opponents as it did
12   proponents.  And a lot of people chiseled away at the
13   idea of the range.  A lot of people chiseled away at the
14   idea of funding for the range.  A lot of people -- I'm
15   going to use the term half-assed the entire construction
16   of that range from the beginning to the end.
17   Q.   So what is it you believe that motivated Tom
18   Wagner to cover up some of these problems?
19   A.   Because would you -- if you can't absolutely
20   nail a person to the wall, then why would you want to
21   start leaning towards the truth?  Why would you want to
22   bring some of these nasty little secrets out?  Why would
23   you want to expose this skeleton in the closet?  Why
24   wouldn't it be easier, rather than rattling the skeletons

Page 223

1    in the closet of ten or 12 major players in this state,
2    wouldn't it just be easier to just write the report up
3    and say, you know what?  Those troopers there should have
4    done a better job running that vacuum cleaner.
5    Q.   So your belief is that Wagner covered up for a
6    bunch of people that are mostly democrats?
7    A.   Well, I don't think his investigators hurt
8    themselves a whole lot.  And you know, you got to
9    remember his investigators are state employees.
10   Q.   I'm not sure what you mean by "hurt themselves."
11   A.   I don't think they went to the greatest lengths
12   to track some of these things down.  I think they did --
13   I think they checked on some things and then, for
14   instance, if it got burned up in a fire, well, it got
15   burned up in the fire.  Well, you know, we can't go ask
16   that person that kind of question.  My goodness.  You
17   know?
18        So I think it was much easier to blame the
19   little guy in this, than I said, it's easier to say
20   you didn't use your vacuum cleaner than go to the very
21   root of the problem and say, You know what?  You guys
22   shouldn't have tampered with that funding or, You know
23   what?  Your project was doomed from the beginning because
24   of the political process and the good ole boy system in

Page 224

1    this state where there's no way they're going to bring in
2    a qualified expert from the outside when we can give it
3    to a local person around here who's a strong Democrat and
4    a strong democratic supporter.
5         So I can go into detail for you, but I
6    think you get the picture that there's more to this
7    scenario than meets the eye.
8    Q.   You said something about the auditors'
9    investigators being state employees?
10   A.   Mm-hmm.
11   Q.   What does that have to do with it?
12   A.   Well, there's just that:  state employees.  And
13   you are investigating other state employees and other
14   state politicians and heavy hitters in your state.  Would
15   you like to ever get promoted?  I mean, I've worked in
16   state government for 20 years and I can certainly tell
17   you that if you step on the wrong toes, pretty much you
18   may not get terminated because you are a merit employee,
19   but you can pretty much forget getting promoted or
20   getting an assignment that you'd like to have.  And --
21   Q.   Did you hold back in your investigations because
22   of that?
23   A.   Investigations?
24        MR. NEUBERGER:  He's saying when you were a

Page 225

1    commander, did you hold back on investigating politically
2    important people because they were politically important?
3    A.   That's why I retired as a captain.  That should
4    answer that for you.  No, I did not.  I had my troopers
5    arrest Kent County Levy Court commissioners for drunk
6    driving.
7         Do I need to go on with some of the things
8    that we've done?  I won't use names, but I can tell you
9    in four and a half years as a troop commander, I arrested
10   one of governor -- or had my troopers arrest the daughter
11   of one of Governor Minner's closest advisors for drunk
12   driving.
13        So I won't go into all the details, but
14   that's why I retired a captain.
15        (Discussion off the record.)
16        MR. ELLIS:  I'm done.
17        MR. NEUBERGER:  He's done and I don't have
18   any questions.
19        So thank you, Captain Warren, for coming
20   today.
21        MR. ELLIS:  Thank you.
22        (The deposition was then concluded at
23   3:40 p.m.)
24        - - - - -

57 (Pages 222 to 225)

Price, et al.                           v.                        Chaffinch, et al.
Gregory Allen Warren          C.A. # 04-956-GMS              January 11, 2006

---

Page 226

1        INDEX TO TESTIMONY
2
3
    GREGORY ALLEN WARREN                    PAGE
4
5   Examination by Mr. Ellis          2
6
                - - - - -
7
8        INDEX TO EXHIBITS
9
    EXHIBIT D:                          PAGE
10
11  33  A two-page copy of an e-mail string, the
        first to Thomas F. MacLeish Re:  Emergency
12      Range Issues                  79
13  34  A two-page copy of an e-mail string, the
        first dated Wednesday, February 4, 2004,
14      from Christopher D. Foraker to Gregory A.
        Warren                        177
15
    35  A three-page copy of a letter to Mr. Thomas
16      Wagner from Gregory A. Warren    185
17
                - - - - -
18
19
20
21
22
23
24

---

Page 228

1   State of Delaware )
2                    )
3   New Castle County )
4
5        CERTIFICATE OF REPORTER
6
7        I, Kathleen White Palmer, Registered Merit
    Reporter and Notary Public, do hereby certify that there
8   came before me on the 11th day of January, 2006, the
    deponent herein, GREGORY ALLEN WARREN, who was duly sworn
9   by me and thereafter examined by counsel for the
    respective parties; that the questions asked of said
10  deponent and the answers given were taken down by me in
    Stenotype notes and thereafter transcribed into
11  typewriting under my direction.
12       I further certify that the foregoing is a
    true and correct transcript of the testimony given at
13  said examination of said witness.
14       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17
18
19            Kathleen White Palmer, RPR, RMR
              Certification No. 149-RPR
20            (Expires January 31, 2008)
21
    DATED:  January 15, 2006
22
23
24

---

Page 227

1
2
3
4
5
6
7
8       REPLACE THIS PAGE
9
10      WITH THE ERRATA SHEET
11
12      AFTER IT HAS BEEN
13
14      COMPLETED AND SIGNED
15
16      BY THE DEPONENT.
17
18
19
20
21
22
23
24

---

58 (Pages 226 to 228)



**WILCOX & FETZER LTD.**

In the Matter Of:

# Price, et al.
## v.
## Chaffinch, et al.

### C.A. # 04-956-GMS

---

Transcript of:

# David L. Baylor
Volume # 2
July 26, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 177

VOLUME 2


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


CORPORAL B. KURT PRICE, et al.,    )
                                   )
            Plaintiffs,            )
                                   ) Civil Action
v.                                 ) No. 04-956-GMS
                                   )
COLONEL L. AARON CHAFFINCH, et al., )
                                   )
            Defendants.            )
------------------------------------)
SERGEANT CHRISTOPHER D. FORAKER,   )
                                   )
            Plaintiff,             )
                                   )  Civil Action
v.                                 ) No. 04-1207-GMS
                                   )
COLONEL L. AARON CHAFFINCH, et al., )
                                   )
            Defendants.            )

        Continued deposition of DAVID L. BAYLOR
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Wilmington,
Delaware, beginning at 9:30 a.m., on Tuesday, July 26,
2005, before Kurt A. Fetzer, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

        THOMAS S. NEUBERGER, ESQ.
        MARTIN D. HAVERLY, ESQ.
        THE NEUBERGER FIRM, P.A.
          2 East Seventh Street - Suite 302
          Wilmington, Delaware  19801
          For the Plaintiffs

                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477

Price, et al.                                                    v.                                                Chaffinch, et al.
David L. Baylor, Volume 2                         C.A. # 04-956-GMS                                         July 26, 2005

Page 178

1  APPEARANCES: (Cont'd)
2        ROBERT J. FITZGERALD, ESQ.
          MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
3        123 South Broad Street
          Philadelphia, Pennsylvania 19109
4        For the Defendants
5  ALSO PRESENT:
          B. KURT PRICE
6        CHRISTOPHER D. FORAKER
7                    - - - - -
8              DAVID L. BAYLOR,
9  having been previously sworn as a witness,
10 was resumed on examination and testified
11 further as follows:
12              EXAMINATION
13 BY MR. NEUBERGER:
14    Q.  Just to begin, we're here for the continuation
15 of the deposition of retired Major David Baylor that
16 was continued the other day.
17        Major Baylor, what I would like to do is
18 show you a report that was issued by the auditor of
19 accounts office in October of 2004 about an
20 investigation that was done of the firearms training
21 unit of the Delaware State Police at the request of
22 Governor Minner, the office of the comptroller and I
23 believe even the various legislators and then I am
24 going to ask you to read it over.  We will find

Page 179

1  various items in there and maybe I will ask you some
2  questions about it.  Okay?
3     A.  Yes, sir.
4     Q.  This was Papili Deposition Exhibit No. 2.  And
5  as you can see, this is dated October 12, 2004 and
6  it's a 14-page document.
7        Do you see that?
8     A.  Mm-hmm.  Yes, sir.
9     Q.  Now, on the very first page of this document,
10 the second item, do you see where it says, "Issue:
11 What caused the facility to be environmentally unsafe
12 and to be closed in March 2004"?
13    A.  Yes, sir.
14    Q.  Now, in March 2004, for example, you were still
15 serving on the executive staff of the Delaware State
16 Police?
17    A.  Yes, sir.
18        MR. FITZGERALD:  Excuse me, Tom.  Do you
19 have a copy for me?
20        MR. NEUBERGER:  I'm sorry.  I gave it out
21 the other day.
22        MR. FITZGERALD:  That's all right.
23        MR. NEUBERGER:  Why don't you sort of
24 share?  Okay.

Page 180

1  BY MR. NEUBERGER:
2     Q.  I think you had gone on terminal leave in
3  September 2004?
4     A.  Yes, sir.
5     Q.  Now, we're at the bottom of page 1 on the first
6  bullet point.  It says, "Initially, the HVAC system
7  did not function as designed, due in part to
8  incomplete installation requirements and interior
9  design complications."
10        Do you see that?
11    A.  Yes, sir.
12    Q.  Now, you were with the Delaware State Police
13 for all of the years you told us about the other day?
14    A.  Yes, sir.
15    Q.  We know when you retired, right?
16    A.  Yes, sir.
17    Q.  When you were on the executive staff -- let's
18 just say from I think that was February of 2002
19 through September 1st of 2004.  Let's focus on that
20 period.  Okay?
21    A.  Okay.
22    Q.  Were you aware that there were issues with the
23 HVAC system at the firearms training unit?
24    A.  Yes, sir.

Page 181

1     Q.  Did you become aware of that in part because of
2  things you learned while serving on the executive
3  staff?
4     A.  Yes, sir.
5     Q.  Did you become aware of that in part because of
6  other things you learned just serving with the
7  Delaware State Police?
8     A.  Yes, sir.
9     Q.  And, in fact, when you were in command of New
10 Castle County did you have contact with the firearms
11 training unit in your command capacity?
12    A.  They didn't report to me, but I had contact
13 with them.  The site there near Smyrna was in Troop
14 9's area when I was a trooper commander.  I would stop
15 in there periodically and talk to the guys whenever I
16 was in the area and I was down there for training so,
17 yes, I was in and out of the site.
18    Q.  Okay.  And when the site was closed they
19 started using the facility I think of the Delaware
20 National Guard, right?
21    A.  Yes, sir.
22    Q.  And was that in New Castle County also?
23    A.  Yes, sir.  The Ommelanden range.
24    Q.  Would you stop by that training unit also?

2 (Pages 178 to 181)

Price, et al.                                          v.                                     Chaffinch, et al.
David L. Baylor, Volume 2                    C.A. # 04-956-GMS                        July 26, 2005

Page 206

1        Do you see that?
2   A.  Yes, sir.
3   Q.  And maintenance of the bullet trap system and
4   how it was being done was an issue that the executive
5   staff was aware of during your tenure on the executive
6   staff?
7   A.  Yes, sir.
8   Q.  I think we're done with that.
9        Then you told us Sergeant Foraker comes
10  back to the range in December of 2003, right?
11  A.  Yes, sir.
12  Q.  I think you've indicated that there came a time
13  when the range was closed?
14  A.  Yes, sir.
15  Q.  That was in 2004?
16  A.  Yes, sir.
17  Q.  And you've indicated that there were issues
18  between facilities management and the Delaware State
19  Police about the range?
20  A.  Yes.
21  Q.  Was the range based on your discussions with
22  the executive staff up until September of 2004, was
23  the range a hazardous place to work for the troopers
24  assigned to it?

Page 207

1   A.  I later learned and believe that it was and
2   that it is.
3   Q.  Why do you say it was and it is?
4   A.  Because you have issues where the people that
5   were working there had some health-related issues.  It
6   was common knowledge.  You later learned that the
7   building wasn't built by people who are experts in
8   building those type of buildings when you're talking
9   about a highly complex facility.
10       So with all of that, I felt and I still
11  feel today that it was a hazardous situation for them
12  and for anybody who trained in that facility at all,
13  including myself.
14  Q.  And is it your recollection that some of the
15  problems that were reported prior to the facility
16  being closed in early 2004 related to complaints that
17  were coming from new recruits from the academy who
18  were being trained there?
19  A.  Yes, sir.
20  Q.  Do you recall the complaints about the penny
21  taste in their mouth and things like that?
22  A.  And nosebleeds, yes.
23  Q.  Now --
24  A.  I later learned about that.  It wasn't

Page 208

1   something that was shared with everybody up front.
2   Q.  So you're saying you later learned on the
3   executive staff about that?
4   A.  Mm-hmm.
5   Q.  Now, a week or so ago we took the testimony of
6   in 2004 was Lieutenant Colonel Tom McLeish and he's
7   presently the colonel of the State Police.  You know
8   that, right?
9   A.  Yes, sir.
10  Q.  We took his testimony and inquired into the
11  range being closed down.  And you know it's still
12  closed today?
13  A.  Yes, sir.
14  Q.  Present Colonel McLeish testified that 50
15  percent of the blame and culpability for the problems
16  at the firearms training unit rests on the shoulders
17  of my clients, Sergeant Foraker, Corporal Warren and
18  Corporal Price.
19  A.  Okay.
20  Q.  Based on your knowledge, do you agree with that
21  statement, that 50 percent of the blame and
22  culpability for the problems at the range rest on
23  these men?
24  A.  Based on my knowledge, I would have to disagree

Page 209

1   with that.
2   Q.  And why?  Why would you disagree with that
3   assessment of the blame resting on the shoulders of my
4   men for closing down the range?
5   A.  Well, if everything that I've heard and learned
6   and then everything that I've read today was true, it
7   all goes back to the original concept and building of
8   the facility.  And if the building wasn't built
9   properly to do the sophisticated training that we do
10  and if our people weren't trained to maintain it so it
11  can be a safe facility for all to use and if there
12  were certain hazardous material, things that had to be
13  done and those procedures weren't put in place and if
14  a maintenance policy wasn't put together and outlined
15  on the correct operation and maintenance and finally
16  if a bullet trap system was changed that was not the
17  one originally designed, then I don't know how you can
18  blame troopers for that.
19       It would be the equivalent of blaming
20  troopers for operating a Ford vehicle in which the gas
21  tank exploded when they were hit from the rear because
22  they were stopping a car on the side of the road and
23  somebody decided to run into them or for some unknown
24  reason ran into them.  You can't blame the troopers

9 (Pages 206 to 209)

Page 378

1    feel you're able to indicate that there was even an
2    earlier practice that let people stay for even more
3    than two years in some situations?
4        A.   I believe that.
5        Q.   That's your honest testimony then?
6        A.   Yes.
7        Q.   And if you're asked to identify what troopers
8    the policy has been applied to, you don't have the
9    records to make that decision, do you?
10       A.   I don't have the records, no.
11       Q.   You can just do it from your memory?
12       A.   Yes, sir.
13       Q.   As best you can?
14       A.   As I'll try.
15       Q.   Sure.  And whether my clients, my two clients,
16   Kurt Price and Wayne Warren, have been singled out and
17   are being forced out earlier than has been done for
18   other people, that's something that the judge or the
19   jury in our case will have to decide based on all of
20   the records.  Is that a fair statement?
21       A.   Yes, sir.
22       Q.   You haven't seen all of the records, have you?
23       A.   No, sir.
24       Q.   And maybe lastly, last week I had asked you

Page 379

1    about these fifteen or so non-patrol duty assignments.
2            Do you remember that?
3        A.   Yes, sir.
4        Q.   You talked about video lottery, desk jobs,
5    things like that?
6        A.   Yes, sir.
7        Q.   You talked about the desk person at the various
8    troops, for example, right?
9        A.   Yes, sir.
10       Q.   Now, if a person is on light duty, they could,
11   for example, be put at a desk job at a troop.  Wasn't
12   that your testimony last week?
13       A.   They are.
14       Q.   Right.  They are.  And we identified a number
15   of people that all those jobs added up to and I tried
16   to ask you some questions about the kinds of things
17   that people could do put in those jobs, right?
18       A.   Yes, sir.
19       Q.   Are you saying that consistent with the past if
20   my clients were on light duty and they haven't
21   finished two years on light duty, there exists within
22   the Delaware State Police desk jobs at troops or video
23   lottery or some of those other units that they could
24   be placed in?

Page 380

1        A.   Yes.
2        Q.   You're telling us there are places within the
3    Delaware State Police that with their skills, I think
4    this was your words, skills, knowledge and ability
5    that they could still fit even though they might not
6    be able to work at the range?
7        A.   Yes, sir.
8        Q.   And there are places within the Delaware State
9    Police based on their skills, knowledge and ability
10   that they could be placed even though they might not
11   be able to go out on patrol?
12       A.   Yes, sir.
13           MR. NEUBERGER:  Robert, you might have
14   some more questions, but basically I think that ends
15   us on what we call the firearms training unit case.
16           There is still a case with Sergeant
17   Foraker where I will probably have about an hour's
18   worth of questions relating to remarks and things.  We
19   will just have to schedule that at a convenient time
20   for you in the future because of your job duties.  I
21   really understand what a burden this has been on you
22   and we will just put it off for a decent time, but it
23   won't be at all like this has been because I think a
24   lot of it we virtually covered with the other thing,

Page 381

1    but there are a handful of remarks and things that we
2    would have to wrap up.
3            MR. FITZGERALD:  I agree.  The defendants
4    agree.
5            We will schedule it at a time convenient
6    for the deponent and the parties involved and just do
7    it that way.
8            MR. NEUBERGER:  Do you have any more
9    questions?
10           MR. FITZGERALD:  I have no more questions.
11           MR. NEUBERGER:  That's it.  We really
12   appreciate your assistance here.
13           (Deposition concluded at 3:00 p.m.)
14
15
16
17
18
19
20
21
22
23
24

52 (Pages 378 to 381)

Price, et al.                                          v.                              Chaffinch, et al.
David L. Baylor, Volume 2                    C.A. # 04-956-GMS                      July 26, 2005

```
                                              Page 382
 1                    I N D E X
 2   DEPONENT:  DAVID L. BAYLOR              PAGE
 3     Examination by Mr. Neuberger      178
       Examination by Mr. Fitzgerald     257
 4     Examination by Mr. Neuberger      365
 5             E X H I B I T S
 6   BAYLOR DEPOSITION EXHIBITS          MARKED
 7   3 Excerpt of answers to interrogatories    210
 8   4 Two-pages of e-mails dated 7/12/00       219
 9   5 Two-page memorandum to Lt. Ralph Davis
       from Sgt. Alfred W. Parton, Jr.   224
10
     6 Sign-in sheet for range          230
11
     7 Eight-page document captioned "Disability
12     Leave/Modified Duty Assignment During
       Rehabilitation From Injury Or Illness"   269
13
     CERTIFICATE OF REPORTER            PAGE 383
14
15
16
17
18
19
20
21
22
23
24
```

```
                                              Page 383
 1   State of Delaware    )
                          )
 2   New Castle County    )
 3
              CERTIFICATE OF REPORTER
 4
          I, Kurt A. Fetzer, Registered Diplomate
 5   Reporter and Notary Public, do hereby certify that
     there came before me on Tuesday, July 26, 2005, the
 6   deponent herein, DAVID L. BAYLOR, who was duly sworn
     by me and thereafter examined by counsel for the
 7   respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
 8   in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
 9   under my direction.
10       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
11   examination of said witness.
12       I further certify that reading and signing of
     the deposition were waived by the deponent and
13   counsel.
14       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
15   interested in the event of this suit.
16
17
18       Kurt A. Fetzer, RDR, CRR
19       Certification No. 100-RPR
20       (Expires January 31, 2008)
21
22   DATED:
23
24
```

53 (Pages 382 to 383)

A579



## In the Matter Of:

# Price, et al.
# v.
# Chaffinch, et al.

### C.A. # 04-956-GMS

-------------------------------------------------------------------------

## Transcript of:

## L. Aaron Chaffinch

## August 30, 2005

-------------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

         IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE, et al.,      )
                                     )   Civil Action No.
            Plaintiffs,              )   04-956-GMS
                                     )
v.                                   )
                                     )
COLONEL L. AARON CHAFFINCH, et al.,) 
                                     )
            Defendants.              )
-----------------------------------  )
SERGEANT CHRISTOPHER D. FORAKER,     )
                                     )   Civil Action No.
            Plaintiff,               )   04-1207-GMS
                                     )
v.                                   )
                                     )
COLONEL L. AARON CHAFFINCH, et al.,) 
                                     )
            Defendants.              )
            Deposition of L. AARON CHAFFINCH pursuant
to notice at the law offices of The Neuberger Firm,
P.A., 2 East 7th Street, Wilmington, Delaware,
beginning at 9:35 a.m. on Tuesday, August 30, 2005,
before Renee A. Meyers, Registered Professional
Reporter and Notary Public.

APPEARANCES:

            MARTIN D. HAVERLY, ESQ.
            STEPHEN J. NEUBERGER, ESQ.
            THE NEUBERGER FIRM, P.A.
              2 East 7th Street - Suite 302
              Wilmington, Delaware  19801
              for the Plaintiffs,


               WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477

Price, et al.                                    v.                           Chaffinch, et al.
L. Aaron Chaffinch                       C.A. # 04-956-GMS                    August 30, 2005

Page 2

1  APPEARANCES (Continued):
2        EDWARD T. ELLIS, ESQ.
         MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
3        123 South Broad Street
         Philadelphia, Pennsylvania 19109
4        for the Defendants.
5  ALSO PRESENT:
6    WAYNE J. WARREN
7          L. AARON CHAFFINCH,
8    the witness herein, having first been
9    duly sworn on oath, was examined and
10   testified as follows:
11 BY MR. NEUBERGER:
12   Q.  Colonel, my name is Steve Neuberger and I am a
13 lawyer for Sergeant Chris Foraker and for Master
14 Corporals Wayne Warren and Kurt Price; do you
15 understand that?
16   A.  Yes, sir.
17   Q.  You have testified in court before, haven't
18 you?
19   A.  Yes, sir.
20   Q.  And you have had your deposition taken before,
21 haven't you?
22   A.  Yes, sir.
23   Q.  I am going to ask you some questions and the
24 court reporter here is going to type up your answers

Page 3

1  to those questions; do you understand that?
2    A.  Yes, sir.
3    Q.  And we have to take turns talking.  If we each
4  talk at the same time, the court reporter, although
5  she is very good, can't get everything down; do you
6  understand that?
7    A.  Yes, sir.
8    Q.  And you have to verbalize your answers.  For
9  example, instead of nodding your head, say yes, or
10 instead of shaking your head, say no.
11   A.  Yes, sir.
12   Q.  And after we are done here today, you will have
13 an opportunity to review the transcript of your
14 answers and correct any typographical errors that may
15 occur; do you understand that?
16   A.  Yes, sir.
17   Q.  If I ask you a question and you don't
18 understand that question, just ask me to rephrase it
19 and I would be happy to rephrase it; okay?
20   A.  Yes, sir.
21   Q.  It's very important, I do not want you to
22 guess; do you understand that?
23   A.  Yes, sir.
24   Q.  Are you taking any medications today that would

Page 4

1  prevent you from testifying truthfully or remembering
2  accurately?
3    A.  No, sir.
4    Q.  If you need any breaks, if you need to go to
5  the john, if you need to stretch out your back, if you
6  need to do some yoga, just let me know and I will be
7  happy to take a five-, ten-minute break?
8    A.  Yes, sir.
9    Q.  You have taken an oath to tell the truth?
10   A.  Yes, sir.
11   Q.  And you understand the significance of that
12 oath?
13   A.  Yes, sir.
14   Q.  And you understand that today I am going to be
15 asking you some questions arising out of the events
16 related to two different lawsuits; do you understand
17 that?
18   A.  Yes, sir.
19   Q.  There is the lawsuit of Foraker v. Chaffinch
20 and MacLeish; do you understand that?
21   A.  Yes.
22   Q.  And then there is a lawsuit Price, Warren, and
23 Foraker v. Chaffinch and MacLeish; do you understand
24 that?

Page 5

1    A.  Yes, sir.
2    Q.  What's your full name?
3    A.  Leonard Aaron Chaffinch.
4    Q.  And where were you born?
5    A.  Milford, Delaware.
6    Q.  And where were you raised?
7    A.  Bridgeville, Delaware.
8    Q.  What's your education?
9    A.  Bachelor's degree from the University of
10 Delaware.
11   Q.  Where did you go to high school at?
12   A.  Woodbridge High School.
13   Q.  And what was your first year with the Delaware
14 State Police?
15   A.  1978, I started.
16   Q.  And you recently retired; correct?
17   A.  May the 5th, 2005, was my last day.
18   Q.  Now, when were you promoted to colonel?
19   A.  February the 8th, 2002.
20   Q.  When were you promoted to lieutenant colonel?
21   A.  May 30th, 2001.
22   Q.  Do you recall when you were promoted to major?
23   A.  October 15th, 1999.
24   Q.  Were you ever troop commander down at Troop 5?

2 (Pages 2 to 5)

Price, et al.                                                                          v.                                                    Chaffinch, et al.
L. Aaron Chaffinch                                                   C.A. # 04-956-GMS                                            August 30, 2005

Page 58

1  FTU?
2      A.  I am not sure if I can answer that because I
3  wasn't there every time that recruits were there and
4  what the situation was at the time that recruits were
5  there, so I can't answer that one way or the other.
6      Q.  Is it your position that Sergeant Foraker and
7  Master Corporals Price and Warren did not care about
8  the safety of their students?
9      A.  No, sir.
10     Q.  Is it your position that Sergeant Foraker and
11 Master Corporals Price and Warren did not care about
12 the safety of those who they trained at the FTU?
13     A.  No, sir, it is not.
14     Q.  Is it your position that Sergeant Foraker and
15 Master Corporals Price and Warren were incompetent?
16     A.  No, sir, it is not.
17     Q.  Is it your position that their incompetence
18 destroyed the FTU?
19     A.  That's not applicable because of the answer to
20 the previous question.
21     Q.  So no?
22     A.  There wasn't incompetence, so it has to be
23 non-applicable.
24     Q.  In your opinion, specifically, who was

Page 59

1  responsible for the problems at the FTU?
2          MR. ELLIS:  Objection.  He's already
3  answered that.
4          THE WITNESS:  I don't know.  Like I
5  explained earlier, you know, it's a whole bunch of
6  different things that occurred since the building was
7  initially built and started being used as a range.
8  BY MR. NEUBERGER:
9      Q.  If you had to assign a percentage of the blame
10 and culpability for the problems at the FTU to the
11 personnel who worked there, meaning Sergeant Foraker
12 and Master Corporals Price and Warren, what would that
13 percentage be?
14         MR. ELLIS:  Object to the form of that
15 question.
16         THE WITNESS:  I have no idea.
17 BY MR. NEUBERGER:
18     Q.  Well, I believe a few minutes ago, you
19 identified some -- you said that Sergeant Foraker and
20 Master Corporals Price and Warren hadn't performed
21 maintenance at the FTU; do you recall saying that?
22     A.  I said that maintenance had been being done and
23 then it wasn't being done.  I don't know why it wasn't
24 being done and who was supposed to be doing it.

Page 60

1      Q.  So, do you know if the decision to stop doing
2  maintenance was justified?
3      A.  No, I do not.
4      Q.  Do you know if the personnel and staff at the
5  FTU had any training in hazardous material cleanup and
6  abatement?
7      A.  My understanding is that they did not have.
8      Q.  Do you know if the staff at the FTU were ever
9  given Tyvex suits to wear while performing cleanup and
10 abatement at the FTU?
11     A.  I am not sure.
12     Q.  Do you know if they were ever given moon suits
13 to wear while performing cleanup and abatement at the
14 FTU?
15     A.  No, I do not.
16     Q.  Do you know if they were ever given respirators
17 to wear?
18     A.  No, sir, I do not.
19     Q.  Do you know if they were ever given little
20 booties to put on their feet?
21     A.  No, sir, I do not.
22     Q.  Now, are you aware of any problems within the
23 armorer's room at the FTU?
24     A.  I think it's too -- I think it was known to be

Page 61

1  too small.
2      Q.  Do you think that problem was caused by
3  Sergeant Foraker or Corporals Price and Warren?
4      A.  The fact that it was too small?
5      Q.  Yes.
6      A.  They didn't have anything to do with the size
7  of the room.
8      Q.  Now, you mentioned some problems with the
9  ventilation in the HVAC system; do you recall saying
10 that?
11     A.  Yes, sir, I do.
12     Q.  Do you think those problems were caused by
13 Sergeant Foraker or Master Corporals Price and Warren?
14     A.  No, sir, I do not.
15     Q.  You also mentioned some problems with the
16 bullet trap; do you recall mentioning that?
17     A.  Yes, sir.
18     Q.  Do you think the problems with the bullet trap
19 were caused by Sergeant Foraker or Master Corporals
20 Price and Warren?
21     A.  I don't believe so, no, sir.
22     Q.  Now, are you aware of any issues with high
23 decibel levels at the FTU?
24     A.  I don't believe so.

16 (Pages 58 to 61)

Price, et al. v. Chaffinch, et al.
L. Aaron Chaffinch    C.A. # 04-956-GMS    August 30, 2005

Page 62

1    Q.  Are you aware of any problems with inadequate
2    hearing protection or ear protection with the
3    equipment used at the FTU?
4    A.  No, I am not.
5    Q.  Now, I think you had mentioned that you were
6    aware of some -- of maintenance not -- of general
7    maintenance not being performed at the FTU; isn't that
8    right?
9    A.  Yes, sir.
10    Q.  I think you indicated that you weren't sure why
11    that was not being done; would that be accurate?
12    A.  I'd say so, that's accurate, yes.
13    Q.  Are you aware of any conditions at the FTU that
14    were caused by Sergeant Foraker or by Master Corporals
15    Price and Warren?
16    A.  The fact that the shooting system wasn't
17    working and was needing maintenance, I don't know --
18    it seems to me that somebody would have taken the
19    responsibility to either do that or see that it got
20    done.  So I -- you know, I can't say one way or the
21    other because I don't know whose responsibility that
22    would have been.  I only know that it was being done
23    and then it wasn't being done.
24    Q.  Now, you mentioned, I think, the shooting

Page 63

1    system.
2    A.  Mm-hmm.
3    Q.  What, specifically, are you referring to?
4    A.  The targets and the system that -- so that
5    everything works properly so that you can actually
6    have people come in there and qualify or re-qualify.
7    Q.  So, are you saying that, like, the
8    re-qualification process or the actual mechanics --
9    A.  The mechanics so that you can go through the
10    re-qualification with whoever you have coming there
11    that day or, you know, whatever day we are speaking
12    about.
13        You know, they have -- they have a pretty
14    busy schedule with keeping everybody up-to-date with
15    regards to their re-qualifications and so on, and, so,
16    when something goes awry, that gets behind.  And, you
17    know, it would seem to me that you would do everything
18    you could -- it would be imperative to keep things
19    rolling so you can stay on your schedule so you don't
20    get behind.  But why that occurred, I am not sure.
21        I know the frangible ammunition had some
22    degree of the fault of that, but I don't know what
23    other, you know, other things came into play so that
24    now, you know, it wouldn't work properly.

Page 64

1    Q.  So, you are saying that they were falling
2    behind in the recertification process with everything
3    that goes into that process?
4    A.  Well, once the system doesn't work, you are --
5    it goes without saying you are going to fall behind.
6    Q.  And by "the system," you mean, like, the
7    systems at the FTU, the bullet trap, the HVAC, and
8    things like that?
9    A.  Well, yeah, the HVAC, but the fact that all
10    these other things are going awry, there is smoke and
11    whatever there is in the air and all that, it's a
12    health situation, you know.
13        Apparently, initially, it wasn't a health
14    situation because my understanding is that lieutenant
15    colonel asked about, Should we shut it down?, and was
16    told no.
17    Q.  Okay.
18    A.  But I am not sure.  All I know is that the
19    final decision was made in March by the lieutenant
20    colonel to shut it down.
21    Q.  I got you.
22        MR. NEUBERGER:  Ed, this is probably a
23    good place for a break.
24        (Recess taken.)

Page 65

1    BY MR. NEUBERGER:
2    Q.  Now, Colonel, in April of 2004, you have
3    participated in several media tours of the FTU; isn't
4    that right?
5    A.  Two.
6    Q.  Two media tours.  One was in the beginning of
7    April and one was in the end of April of 2004?
8    A.  I am not sure.  I would think they were about a
9    week and a half apart, but I am not 100 percent sure
10    on that.  They were all scheduled by the secretary of
11    administrative services, but not by me.
12    Q.  But you were at each of those tours; correct?
13    A.  Yes, I was.
14    Q.  Do you recall if they were both in April?
15    A.  I am not 100 percent sure.  I only know that
16    they were like less than two weeks apart, I believe.
17    Q.  Well, I'd like to focus on the first of those
18    tours.
19    A.  Yes, sir.
20    Q.  And try to jog your memory about some of those
21    details; okay?
22    A.  Yes, sir.
23    Q.  Do you recall who was there at the first tour?
24    A.  Paul Eckridge, Secretary Homer, Bob Furman,

17 (Pages 62 to 65)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

A584

Price, et al.                                    v.                          Chaffinch, et al.
L. Aaron Chaffinch                      C.A. # 04-956-GMS                  August 30, 2005

Page 150

1    Q.  Have you ever said that you think those three
2  officers are, quote, a dick head, close quote?
3    A.  No, I have not.
4    Q.  Have you ever said that you hate those
5  officers?
6    A.  No, I have not.
7    Q.  Have you ever said that, in reference to those
8  three officers, that I am done with this mother
9  fucker?
10    A.  No, I have not.
11    Q.  So, you have never said anything like that to
12  anyone, period; is that your testimony?
13    A.  That's right.
14    Q.  So, if someone said that you had said something
15  to that effect, would they be lying?
16    A.  That's correct.
17    Q.  Now, Colonel, do you know what the National
18  Institute of Occupational Safety & Health is?
19    A.  Not for sure.
20    Q.  How about the acronym NIOSH, does that ring any
21  bell for you?
22    A.  I was going to ask you if that was the same
23  one.
24    Q.  Have you ever heard of that group?

Page 151

1    A.  Yes.  I have heard of it, yes.
2    Q.  Are you aware that they are a subset or sub
3  department of the Center for Disease Control?
4    A.  Not really.  I didn't know that.
5    Q.  Are you aware that in April of 2004, they came
6  to the State Police and to facilities management and
7  offered to analyze the FTU free of charge and
8  determine what all of its problems were?
9    A.  I don't remember knowing anything about that.
10    Q.  Do you recall that in April of 2004, or
11  thereabout, that they came to the DSP and facilities
12  management and offered to provide free medical
13  analysis and consultation and treatment for all of the
14  officers serving at the FTU?
15    A.  That wasn't shared with me.
16    Q.  If a national agency came in to make that kind
17  of an offer to the DSP, who do you think they would
18  contact?  Who would be the contact person?
19    A.  I have no idea.  They didn't contact the
20  colonel.
21    Q.  So if someone wasn't going to contact the
22  colonel, do you know who they would -- is there like a
23  set person who --
24    A.  I would guess maybe they would contact the

Page 152

1  Cabinet Secretary.  I don't know.  I am only guessing.
2  I don't know.  I shouldn't guess.
3    Q.  You shouldn't guess.
4        So, is it your testimony that you never
5  heard anything about that during that time period?
6    A.  That's my testimony.
7    Q.  Did anyone from facilities management ever talk
8  to you about that during that time period?
9    A.  No, sir.
10    Q.  Did you later hear that they had came back -- I
11  guess you retired -- was it April or May of 2005?
12    A.  May the 5th.
13    Q.  Did you ever hear that, in early 2005, Master
14  Corporal Wayne Warren requested a health hazard
15  evaluation from NIOSH of the facility of the FTU?
16    A.  I was on administrative leave.
17    Q.  Did you ever hear about that?
18    A.  No, I did not.
19    Q.  In light of everything that you have learned
20  since December of 2003, do you think that the FTU is a
21  safe place to work?
22        MR. ELLIS:  Object to the form of that
23  question.  Do you have a time frame on that?
24        MR. NEUBERGER:  I gave him a time frame.

Page 153

1        MR. ELLIS:  What?
2        MR. NEUBERGER:  I gave him a time frame.
3        MR. ELLIS:  You said based on the things
4  he's learned since December of 2003.  You didn't say
5  when you were asking the question as -- you didn't
6  specify a time frame as to when it was safe.
7        MR. NEUBERGER:  I will rephrase the
8  question.
9  BY MR. NEUBERGER:
10    Q.  The time frame I am going to give you is from
11  December of 2003 forward.
12        Do you recall that, based on everything
13  you have learned during that time frame and since this
14  time frame began, that the FTU was a safe place to
15  work?
16    A.  Well, when you say "FTU," the Firearms Training
17  Unit is -- you must be talking specifically about the
18  building.
19    Q.  I am.
20    A.  If you are talking about the building, then the
21  answer is no, it's not a safe place to work.
22    Q.  The building is on -- it's on Clark Road or
23  something like that?
24    A.  Yes.

39 (Pages 150 to 153)

Price, et al.                                                                                                                    v.                                                                                    Chaffinch, et al.
L. Aaron Chaffinch                                                            C.A. # 04-956-GMS                                                        August 30, 2005

Page 154

1    Q.  It's north of Smyrna?
2    A.  That's correct.  Clark Farm Road, I think it
3  is.
4    Q.  Thank you.
5        Are you aware that NIOSH has evaluated
6  firing ranges for safety issues in the past for other
7  police departments throughout the country?
8    A.  No, I am not.
9        MR. ELLIS:  Object to the form of that
10 question.
11 BY MR. NEUBERGER:
12   Q.  Colonel, I'd like to put another document in
13 front of you.  I believe this was MacLeish Deposition
14 Exhibit No. 18.
15       Ed, do you have that?
16       MR. ELLIS:  If it's a MacLeish exhibit, I
17 have it.
18 BY MR. NEUBERGER:
19   Q.  Now, Colonel, does this appear to be an e-mail
20 from -- I guess it would be Master Corporal Warwick?
21   A.  I am not sure.
22   Q.  From Corporal Warwick to Captain Greg Warren?
23   A.  It does.
24   Q.  And is the date April 21st, 2004?

Page 155

1    A.  Yes, it is.
2    Q.  And it's subject is NIOSH?
3    A.  Yes, it is.
4    Q.  Now, I'd like to direct your attention to the
5  third paragraph of this e-mail, and I am going to read
6  that to you; okay?
7    A.  Sure.
8    Q.  Does that say that, "On Tuesday, April 20th,
9  2004, I received a call from Dr. Randy Tubbs who told
10 me that Mr. Doyle Tiller had just called him and said
11 that a, quote, political block, close quote, is now
12 preventing him from allowing NIOSH to come in and
13 conduct testing on the air handling system.  He said
14 Mr. Tiller told him that the State Police could give
15 NIOSH permission to come in and conduct testing,
16 however, he could not due to politics."
17       Now, did you ever hear anything, while you
18 were serving there as the colonel of the State Police,
19 about politics were preventing NIOSH from coming in to
20 fix the -- or to evaluate the FTU?
21   A.  No, I did not.
22   Q.  Do politics play a role in decisions that are
23 made in the Delaware State Police?
24   A.  I wouldn't say on the day-to-day decisions.  On

Page 156

1  the big decisions.  The cabinet secretary the State
2  Police falls under is certainly a political appointee,
3  so you can't throw political or politics out, but, you
4  know, politics don't dictate whether or not you shoot
5  or don't shoot or all different kinds of things
6  involved in law enforcement.
7    Q.  You mentioned politics are involved in the big
8  decisions.
9        What would qualify as a big decision?
10   A.  Who the colonel is going to be.
11   Q.  Things of that magnitude?
12   A.  Yes.
13   Q.  So, the position of colonel, the position of
14 lieutenant colonel, maybe?
15   A.  Yes.
16   Q.  But you are saying the day-to-day operations,
17 politics don't play a role?
18   A.  Not -- not to the degree that they do what we
19 have already discussed.
20   Q.  So you are saying that they do play somewhat of
21 a role?
22   A.  Politics plays a role in everything.  I have
23 had this conversation with many people.  Politics
24 plays a role in day-to-day activities of your family.

Page 157

1  I mean, it has nothing to do with the State Police.
2  So, to a degree, politics is involved in everything.
3    Q.  So, are you saying that politics do play a role
4  in the day-to-day operations of the Delaware State
5  Police?
6    A.  Yes.
7    Q.  Do politics play a role in the day-to-day
8  operations of the Delaware State Police when it comes
9  to the health and safety of the troopers under your
10 command?
11   A.  No.
12   Q.  Did personal loyalty to you, as colonel, play a
13 role in the decisions you made while you were colonel
14 of the State Police?
15       MR. ELLIS:  Object to the form of that
16 question.
17       THE WITNESS:  You will have to explain
18 what you mean by "personal loyalty."  Are you
19 signalling out anyone or -- I mean, I don't know what
20 you are telling me or asking me.
21 BY MR. NEUBERGER:
22   Q.  I will rephrase it.
23   A.  Thank you.
24   Q.  When you had to make decisions while you were

40 (Pages 154 to 157)

A586

Price, et al.                                              v.                                    Chaffinch, et al.
L. Aaron Chaffinch                              C.A. # 04-956-GMS                      August 30, 2005

Page 158

1  colonel of the Delaware State Police, is one of the
2  factors that you considered whether the person you are
3  making the decision about had been personally loyal to
4  you as an individual?
5      A.   Well, you see, when you are a superintendent of
6  the State Police, you make decisions about all kinds
7  of things.
8      Q.   Okay.
9      A.   Everything is not personnel issues.  There is
10  all kinds of things that you make decisions about
11  daily.
12          If you are talking about putting someone
13  in a high position or something like that, any person
14  certainly would properly lean towards somebody who has
15  been loyal to them as opposed to somebody who has been
16  disloyal.  That's just common sense.
17      Q.   So, is that a factor that you would consider
18  when making personnel decisions, if we can narrow that
19  focus?
20          MR. ELLIS:  Object to the form of the
21  question.
22          THE WITNESS:  That would be one part of
23  the decision.
24  BY MR. NEUBERGER:

Page 159

1      Q.   Right.  That would be --
2      A.   Depending on what you are filling -- if you are
3  filling a position, depending on the -- the
4  qualifications of the different ones that are -- that
5  you are looking at and the experience and -- there is
6  all kinds of different things that come into play.
7  But if everything -- everything else being equal,
8  sure, personal loyalty may -- may kind of tip the
9  scale, if you will.
10      Q.   Got you.  Okay.
11          Now, did there come a time when you sent
12  Chris Foraker, Wayne Warren, and Kurt Price for
13  fitness for duty exams?
14      A.   Not me.
15      Q.   Are you saying you did not make that decision?
16      A.   That's right.  The lieutenant colonel made
17  those decisions.
18      Q.   Would that be --
19      A.   Tom MacLeish.  Yeah.  He is the colonel now.
20      Q.   Did he talk to you about that decision?
21      A.   He just told me that they are going to be sent.
22  But now we need probably to know what the time frame
23  is because there is like five months when I wasn't
24  even working.  From October 27th of '04, until March

Page 160

1  25th of '05, I wasn't working, so I wasn't kept
2  up-to-date.
3      Q.   We will focus on the time period from April of
4  2004 through September of 2004.
5      A.   Okay.  Yes, sir.
6      Q.   Are you aware that, during that time frame, my
7  clients were sent for fitness for duty exams?
8      A.   I am aware that they were sent, but as far as
9  the time frame, I am not real, you know, I am not real
10  -- I have no idea exactly when it was.
11      Q.   But at some point during -- you are aware that
12  they were sent?
13      A.   I am aware that they were sent.  I couldn't
14  even tell you if it was during that time frame that
15  you just enumerated.
16      Q.   Do you know why they were sent for fitness for
17  duty exams?
18      A.   Not exactly.  I don't know all the, you know,
19  the details.
20      Q.   I think you indicated --
21      A.   I know that decision was made.
22      Q.   And you indicated that then Lieutenant Colonel
23  MacLeish made that decision?
24      A.   That's right.  See, the lieutenant colonel's

Page 161

1  position, the range -- the training, personnel,
2  discipline all comes under the deputy superintendent,
3  so --
4      Q.   Did he have to run that decision by you?
5      A.   No.
6      Q.   Did he run that decision by you?
7      A.   He just let me know about it.
8      Q.   Did you have the authority to say, No, don't do
9  that?
10      A.   Sure.
11      Q.   Did you tell him, No, don't do that?
12      A.   No, I did not.  And I didn't know all the
13  particulars that he knew.  I wasn't -- I wouldn't do
14  that without knowing what's going on.
15      Q.   Okay.
16      A.   I have no reason to believe that he wasn't
17  making the right decision.  If I had had a reason to
18  believe he wasn't making the right decision, maybe I
19  would have looked into it farther, but I have no
20  reason to believe that.  He was working with human
21  resources and whoever else was involved in it.
22      Q.   And are you indicating that you don't know why
23  he made that decision?
24      A.   Right.  I don't know all the particulars.

41 (Pages 158 to 161)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

A587

Price, et al.                                              v.                                    Chaffinch, et al.
L. Aaron Chaffinch                              C.A. # 04-956-GMS                              August 30, 2005

Page 198

1          MR. ELLIS:  I don't have any questions.
2          (The deposition was concluded at 2:40
3    p.m.)
4                    - - - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 200

4          REPLACE THIS PAGE
5          WITH THE ERRATA SHEET
6          AFTER IT HAS BEEN
7          COMPLETED AND SIGNED
8          BY THE DEPONENT.

Page 199

1              INDEX TO TESTIMONY
2
L. AARON CHAFFINCH                    PAGE
3
Examination by Mr. Neuberger            2
4
              - - - - -
5
6          INDEX TO EXHIBITS
7
                    PAGE
8
Chaffinch Exhibit No. 1 entitled "Verdict Form" was
9   marked for identification....................... 21
10  Chaffinch Exhibit No. 2 which is a memorandum to Lt.
    Ralph Davis from Sgt. Alfred W. Parton, Jr. was marked
11  for identification.............................. 102
12  Chaffinch Exhibit No. 3 bates stamped FTU2849 through
    FTU2940 was marked for identification............ 128
13
    ERRATA SHEET......................................200
14
    CERTIFICATE OF REPORTER...........................201
15
16
17
18
19
20
21
22
23
24

Page 201

L. Aaron Chaffinch

State of Delaware )
                 )
New Castle County )
          CERTIFICATE OF REPORTER
     I, Renee A. Meyers, Registered Professional
Reporter and Notary Public, do hereby certify that
there came before me on the 30th day of August, 2005,
the deponent herein, L. AARON CHAFFINCH, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed into
typewriting under my direction.
     I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
     I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

                    Renee A. Meyers
                    Certification No. 106-RPR
                    (Expires January 31, 2005)

DATED:  September 2, 2005

51 (Pages 198 to 201)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A588

*Filed in open court on 6/24/03 @*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SERGEANT CHRISTOPHER D. FORAKER,

       Plaintiff,

       v.

COLONEL L. AARON CHAFFINCH,
individually and in his official
capacity as Superintendent of the
Delaware State Police, DIVISION
OF STATE POLICE, DEPARTMENT OF
PUBLIC SAFETY, STATE OF DELAWARE,

       Defendants.

    :
    :
    :
    :
    :    C.A. No. 02-302-JJF
    :
    :
    :
    :
    :
    :
    :
    :



DEPOSITION
EXHIBIT
Chaffinch
8-30-05

## **VERDICT FORM**

DO YOU UNANIMOUSLY FIND THE FOLLOWING BY A PREPONDERANCE OF THE EVIDENCE?

### A.  **First Amendment Claim**

1.  Do you find that the content of plaintiff's speech that was protected by the First Amendment was a substantial or motivating factor in defendant Chaffinch's decision to transfer plaintiff?

      Answer:     Yes ✓ or No _____

*[If you answer "No" to this question, please skip the rest of the questions, have all jurors sign at the bottom, and notify the Court Officer.]*



RECEIVED
JUN 2 6 2003
By_____

A476

A589

2.   Do you find that defendant Chaffinch would have made the same decision to transfer plaintiff even if plaintiff had not engaged in protected speech?

      Answer:      Chaffinch would have made the same decision _____

                         Chaffinch would not have made the same decision _✓____

*[If you answer "Chaffinch would have made the same decision" to this question, please skip the rest of the questions, have all jurors sign at the bottom, and notify the Court Officer.]*

3.   Do you find that plaintiff's transfer was an adverse employment action that would deter a person of ordinary firmness from engaging in the protected activity?

      Answer:     Yes __✓__ or No _____

*[If you answer "No" to this question, please skip the rest of the questions, have all jurors sign at the bottom, and notify the Court Officer.]*

**B.   Compensatory Damages**

4.   If you find that defendant Chaffinch violated plaintiff's First Amendment right of free speech, was the decision by Chaffinch to transfer plaintiff the proximate cause of any damage to Plaintiff?

      Answer:     Yes __✓__ or No _____

*[If you answer "No" to this question, please skip the rest of the questions, have all jurors sign at the bottom, and notify the Court Officer.]*

A477

A590

5.   If you find that the actions of defendant Chaffinch were the proximate cause of any damages to plaintiff for the exercise of protected First Amendment speech, do you find that those actions caused him any more than nominal ($1) in damages?

Answer:        Yes ✓ or No _____

6.   If you find that the actions of defendant Chaffinch were the proximate cause of any damage to plaintiff and caused more than nominal damages, what is the total amount of damages:

$ 40,120.00 _____.

## C.   Punitive Damages

7.   Do you find that defendant Chaffinch acted with malice or with callous and reckless indifference or oppressively to the First Amendment rights of plaintiff, and that his conduct was so shocking and offensive that you wish to exercise your discretion to award punitive damages?

Answer:        Yes ✓ or No _____

*[If you answer "No" to this question, please skip the next question, have all jurors sign at the bottom, and notify the Court Officer.]*

8.   If you wish to exercise your discretion to award punitive damages, the amount of punitive damages you believe is appropriate to punish and deter the illegal conduct is

$ 60,000.00 _____.

_____
Jury Foreperson

_____
Juror 2

_____
Juror 3

_____
Juror 4

_____
Juror 5

_____
Juror 6

_____
Juror 7

_____
Juror 8

June 24, 2003



## WILCOX & FETZER LTD.

In the Matter Of:

# Price, et al.
## v.
## Chaffinch, et al.

C.A. # 04-1207

-------------------------------------------------------------------------

Transcript of:

Thomas F. MacLeish

July 19, 2007

-------------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

Page 1

                IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE,      )
CORPORAL WAYNE WARREN,        )
and SERGEANT CHRISTOPHER      )
D. FORAKER,                   )
                             )
     Plaintiffs,              )
                             )
        v.                   )  C.A. No. 04-1207
                             )
COLONEL L. AARON CHAFFINCH,  )
individually and in his      )
official capacity as         )
Superintendent of the        )
Delaware State Police;       )
LIEUTENANT COLONEL THOMAS     )
F. MacLEISH, individually     )
and in his official           )
capacity as Deputy            )
Superintendent of the         )
Delaware State Police;        )
DAVID B. MITCHELL, in his     )
official capacity as the      )
Secretary of the Department)
of Safety and Homeland        )
Security of the State of      )
Delaware; and DIVISION OF     )
STATE POLICE, DEPARTMENT OF)
SAFETY AND HOMELAND           )
SECURITY, STATE OF            )
DELAWARE,                     )
                             )
     Defendants.             )

           Deposition of COLONEL THOMAS F. MacLEISH
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 9:30 a.m., on Tuesday,
July 19, 2005, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.
                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477

Price, et al.                                       v.                              Chaffinch, et al.
Thomas F. MacLeish                          C.A. # 04-1207                              July 19, 2007

Page 2

```
 1   APPEARANCES:
 2      STEPHEN J. NEUBERGER, ESQUIRE
        MARTIN HAVERLY, ESQUIRE
 3      THE NEUBERGER FIRM, P.A.
          2 East 7th Street - Suite 302
 4        Wilmington, Delaware 19801
          for the Plaintiffs
 5
        EDWARD T. ELLIS, ESQUIRE
 6      MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
          123 South Broad Street
 7        Avenue of the Arts
          Philadelphia, Pennsylvania 19109
 8        for the Defendants
 9   ALSO PRESENT:
10      SERGEANT CHRISTOPHER D. FORAKER
        CORPORAL B. KURT PRICE
11      ALISON LASSETER
12                - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1          COLONEL THOMAS F. MacLEISH,
 2       the witness herein, having first been
 3       duly sworn on oath, was examined and
 4       testified as follows:
 5   BY MR. NEUBERGER:
 6     Q.  Colonel, my name is Steve Neuberger, and I'm an
 7   attorney representing Master Corporal Price and Master
 8   Corporal Wayne Warren.  Are you aware of that?
 9     A.  Yes.
10     Q.  Have you ever testified in court before?
11     A.  Yes, I have.
12     Q.  Have you ever had your deposition taken before?
13     A.  Yes, I have.
14     Q.  I'm going to ask you some questions, and the
15   court reporter here is going to type up your answers to
16   those questions.  Okay?
17     A.  Yes.
18     Q.  We have to take turns talking because if we talk
19   at the same time, although the court reporter is very,
20   very good, she can't get everything down.  So we have to
21   take turns.
22     A.  I understand.
23     Q.  You have to verbalize your answers.  For
24   example, instead of nodding your head, just say yes.
```

Page 4

```
 1   Instead of shaking your head, just say no.
 2          Do you understand that?
 3     A.  Yes, I do.
 4     Q.  After we're done here today, you will have an
 5   opportunity to review the transcript of the deposition to
 6   correct any typographical errors that may be made.  Do
 7   you understand that?
 8     A.  Yes, I do.
 9     Q.  If I ask you a question and you don't understand
10   the question, just ask me to rephrase that question.  I
11   will be more than happy to do that.  Do you understand?
12     A.  Yes.
13     Q.  Do you understand that I don't want you to guess
14   at any answers?
15     A.  Yes.
16     Q.  Are you taking any medications or is there
17   anything else that would prevent you from testifying
18   truthfully or remembering accurately today?
19     A.  No, I'm not.
20     Q.  If you need any breaks, if you need to go to the
21   john, need to stretch your back out, need to take five
22   minutes, let me know and I'll be happy to take a
23   five-minute break.
24     A.  Yes.
```

Page 5

```
 1     Q.  You have taken an oath to tell the truth today?
 2     A.  Yes, I have.
 3     Q.  Do you understand the significance of that oath?
 4     A.  Yes, I do.
 5     Q.  You understand that I'm going to be asking you
 6   questions today concerning events arising out of two
 7   separate lawsuits?
 8     A.  Yes.
 9     Q.  Foraker v. Chaffinch, MacLeish, and the DSP?
10     A.  Yes.
11     Q.  And then Price, Warren, and Foraker versus
12   Chaffinch, MacLeish, and the DSP?
13     A.  Yes.
14     Q.  Your current position is Colonel of the Delaware
15   State Police; isn't that right?
16     A.  Yes, it is.
17     Q.  Is that the highest-ranking position in the
18   Delaware State Police?
19     A.  Yes, it is.
20     Q.  When were you promoted to colonel?
21     A.  May 6 of 2005.
22     Q.  What was your position prior to that?
23     A.  I was lieutenant colonel.
24     Q.  What are the job responsibilities of the
```

2 (Pages 2 to 5)

Price, et al.                                    v.                              Chaffinch, et al.
Thomas F. MacLeish                      C.A. # 04-1207                        July 19, 2007

Page 62

1 beginning, and my assumption was that they had been
2 trained in how to properly clean the facility, yes.
3     Q.  You said you're assuming that they had been
4 trained.
5     A.  Correct.
6     Q.  What if they had not actually been trained?
7     A.  Well, they had received training in firearms and
8 things in the past, and at that point in time, as I said,
9 the facility had been open -- I don't recall specifically
10 receiving training on how to sweep a floor.  When I was
11 14 I learned to be a janitor.  But there were brooms
12 there, there was a man there.  As I said, these people
13 had been at the range for quite sometime.  But am I
14 knowledgeable that they had specific training?  No, I am
15 not.
16     Q.  Are you saying it's like a common-sense thing
17 that everybody knows how to clean up a firing range?
18     A.  That prior to 2004 people apparently did know
19 how to clean the range.
20     Q.  Do you know if there were standard operating
21 procedures at the time for how to operate and clean the
22 firing range?
23     A.  I found out subsequent to that no, there is not.
24     Q.  Are there standard operating procedures for just

Page 63

1 about everything in the Delaware State Police?
2     A.  Yes, but we don't have standard operating
3 procedures for cleaning a troop.
4     Q.  You served as a troop commander at some point?
5     A.  Yes, I have.
6     Q.  Let's say a patrol car had a problem with its
7 engine.  Was the trooper who was driving the patrol car
8 authorized to fix it?
9     A.  No, he was not.
10     Q.  What did he have to do?
11     A.  He'd write it up and report it to a mechanic who
12 would fix it.
13     Q.  Would you agree that the FTU is a multi-million
14 dollar firearms facility?
15     A.  Yes.
16     Q.  Would you agree that it is a specialized
17 facility?
18     A.  Yes.
19     Q.  Do you agree that a lot of highly technical
20 equipment is located in that facility and is essential
21 for training?
22         MR. ELLIS:  I object to the form of the
23 question.
24     A.  Yes.

Page 64

1     Q.  Is it your position that the men had a
2 responsibility to clean and fix this highly technical
3 equipment?
4     A.  The air-handling system was handled by
5 Administrative Services who had people trained to do so.
6 So they would report it -- any type of malfunction or
7 problem that they had to them.
8         The bullet trap system was a system much
9 like the engine on a car.  I'm not saying it's exactly
10 similar, but there are certain things that you're
11 responsible for taking care of in a general sense.  You
12 check the oil, you make sure that it's running properly,
13 if you have problems, you report them.
14         That's the general sense that I have of the
15 range.
16     Q.  Do you know if the men were given respirators to
17 use while cleaning the range?
18     A.  They were not.
19     Q.  Do you know whether they were given Tyvec suits
20 to wear when cleaning the range?
21     A.  They were not.
22     Q.  Do you know if they were given moon suits to
23 wear when cleaning the range?
24     A.  They were not.

Page 65

1     Q.  Were they given little booties to wear over
2 their shoes while they were cleaning the range?
3     A.  They were not.  Was I aware they needed any of
4 those things?  No, I was not.
5         MR. NEUBERGER:  I'd like to put another
6 document in front of you.  Mark this as MacLeish
7 Deposition Exhibit 3.
8         (MacLeish Deposition Exhibit No. 3 was
9 marked for identification.)
10         (A recess was taken.)
11 BY MR. NEUBERGER:
12     Q.  Colonel, I just put a document in front of you;
13 isn't that right?
14     A.  Yes, you did.
15     Q.  At the top of this document does it say in the
16 darkened section, "Delaware State Police Planning
17 Section"?
18     A.  Yes, it does.
19     Q.  Underneath that does it say "MEMORANDUM"?
20     A.  Yes, it does.
21     Q.  Does this appear to be a memo to Lieutenant
22 Colonel MacLeish?  That would be right?
23     A.  Yes, it is.
24     Q.  Does it say it's from Captain Albert J. Homiak?

17 (Pages 62 to 65)

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Price, et al.                                    v.                          Chaffinch, et al.
Thomas F. MacLeish                        C.A. # 04-1207                  July 19, 2007

Page 154

1          After December the 1st, the cleanliness and
2    the upkeep, it was obvious that it wasn't there
3    subsequent to the fact, that I was last at the range in
4    September. It was in one of these pieces of paper for
5    our fall shoot. It seemed to be clean and kept up. When
6    I stepped in there -- when I stopped in to see the
7    facility in January, mid-January, you could see that
8    there was less -- it was not as clean as it was
9    previously.
10        Q. So things went downhill when Sergeant Foraker
11   came in?
12        A. There was a noticeable difference in the way the
13   facility was being maintained.
14        Q. Was it a positive difference or a negative
15   difference?
16        A. In the cleanliness, it was a negative
17   difference.
18        Q. Did there come a time when you heard that the
19   Governor ordered an investigation of the FTU by the State
20   Auditor's Office?
21        A. Yes.
22        Q. How did you learn about that?
23        A. I believe it was through the cabinet secretary
24   at that time.

Page 155

1        Q. Would that have been secretary Jim Ford?
2        A. Yes.
3        Q. Or Jim Ford, Jr.?
4        A. Yes.
5            MR. NEUBERGER: How about we take a short
6    five-minute break?
7            (A recess was taken.)
8    BY MR. NEUBERGER:
9        Q. Colonel, from September of 2003 through
10   December 1st of 2003, how many times did you go to the
11   FTU?
12        A. Twice that I can recall.
13        Q. When did you go to the FTU during that time
14   frame?
15        A. I can be general. Once was during the fall
16   shoot.
17        Q. Which would have been?
18        A. Which would have been sometime in
19   September/October time frame. And then the second time
20   would have been just before Sergeant Foraker returned to
21   duty there.
22        Q. Sergeant Foraker returned to duty on
23   December 1st of 2003, correct?
24        A. Yes.

Page 156

1        Q. Are you saying you would have visited the FTU
2    sometime in November of 2003?
3        A. Late November. I made a point of going up
4    there. When we were told Sergeant Foraker was coming
5    back, I made a point of scheduling an appointment with
6    the firearms training staff to talk to them.
7        Q. Would that have been all of the staff there at
8    the time or was it only Sergeant Ashley?
9        A. I believe everyone was there. Sergeant Foraker
10   wasn't there. It was Sergeant Ashley, Corporal Price,
11   Corporal Warren, Corporal Warwick. Corporal Peachey was
12   assigned and he came in at the time we said we were going
13   to start. I think I said we were going to start at 8:30,
14   and I got there early. I think it was -- there was like
15   a half-hour difference in the time we started and the
16   time I said we were going to start. It was either 8:30
17   and I got there early. But he came in in the middle of
18   it. So I was there then. We talked in the conference
19   room.
20        Q. Do you have personal knowledge of the conditions
21   of the FTU on December 1st, 2003?
22        A. No, I do not.
23        Q. Before we took the break I started to ask you
24   some questions about the State Auditor investigation. Do

Page 157

1    you recall that?
2        A. Would you refresh my memory.
3        Q. No problem. At some point did you find out that
4    the Governor had ordered the State Auditor's Office to
5    investigate the FTU?
6        A. Yes.
7        Q. You found that out from Secretary Ford, correct?
8        A. That's what I recall. Typically that's the way
9    I would have found that type of information out, yes.
10        Q. Was there any media coverage of the decision to
11   have the State Auditor's Office investigate the FTU?
12        A. Do I recall specifically sitting here right now
13   that media covered that? I can't say that, but I would
14   assume, yeah, there was coverage. As you said earlier,
15   there was a lot of coverage during that period of time.
16        Q. You would agree with that statement, that there
17   was a lot of coverage during that period of time?
18        A. Yes.
19            MR. ELLIS: A lot of coverage of what? Of
20   the auditor investigation or the range?
21            MR. NEUBERGER: Of the range.
22            THE WITNESS: Of the range, yes. There had
23   been from mid-March through April/May time frame, yes.
24

40 (Pages 154 to 157)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Price, et al.                                      v.                              Chaffinch, et al.
Thomas F. MacLeish                        C.A. # 04-1207                          July 19, 2007

Page 158

1  BY MR. NEUBERGER:
2      Q.  Did there come a time when you learned that
3  Sergeant Foraker and corporals Price and Warren had
4  spoken to the Auditor's Office?
5      A.  My understanding was they gave statements to the
6  State Auditor's Office.  They did not necessarily speak
7  to them.  Statements were given through this office.
8      Q.  Did you ever talk to Colonel Chaffinch about
9  that?
10     A.  Yes.
11     Q.  What did you say to Colonel Chaffinch about
12 that?
13     A.  I found it odd that when the Auditor's Office
14 met with them, that they would meet at an attorney's
15 office to give their statements and then they wouldn't
16 speak.  It would just be written statements handed over
17 by an attorney.  That was the crux of what we discussed.
18     Q.  What did Colonel Chaffinch say to you about them
19 giving those statements to the State Auditor's Office, if
20 anything?
21     A.  I can't recall him saying anything specifically.
22     Q.  How about generally?
23     A.  Generally, it was the same thing.  I just
24 described what I said, the oddity of them giving

Page 159

1  statements at their attorney's office.  I guess that was
2  telling us at that point in time that there was -- that
3  there was going to be a lawsuit in the future and we were
4  heading down that road again.
5      Q.  Do you recall how soon after the men spoke to
6  the State Auditor's Office that you learned about it?
7      A.  I don't recall at this point.
8          MR. NEUBERGER:  I'd like to put another
9  exhibit in front of you.  We will call this MacLeish
10 Deposition Exhibit 17.
11         (MacLeish Deposition Exhibit No. 17 was
12 marked for identification.)
13 BY MR. NEUBERGER:
14     Q.  Colonel, do you have that document in front of
15 you?
16     A.  Yes, I do.
17     Q.  On page 1 does this appear to be a copy of the
18 front page of the Delaware State News for Friday,
19 May 14th, 2004?
20     A.  Yes, it does.
21     Q.  Does the top headline say in big bold letters,
22 "Shots traded over range"?
23     A.  Yes.
24     Q.  Underneath that does it say, "Troopers differ on

Page 160

1  blame for health woes at Smyrna site"?
2      A.  Yes.
3      Q.  Do you think you ever saw this article?
4      A.  Yes, I did.
5      Q.  When bad things about the Delaware State Police
6  are in the papers, are they usually brought to your
7  attention when you were either lieutenant colonel or when
8  you are colonel?
9      A.  Yes, they are.
10     Q.  For example, I think there was a story in The
11 News Journal about a month ago dealing with the trooper
12 holding up a noose that was on the front page of the
13 paper.  Was that brought to your attention?
14     A.  Yes, it was.
15     Q.  On the first page of this exhibit, there's a
16 front-page story of the State News, and that was brought
17 to your attention, also, wasn't it?
18     A.  Actually, I think I read this at home.
19     Q.  Do you think you read the entire article?
20     A.  Yes.
21     Q.  Could we turn to the very last page of this
22 exhibit?  Are you there?
23     A.  I'm there.
24     Q.  At the bottom right-hand corner of the page does

Page 161

1  it say "FTU2897"?
2      A.  Yes, it does.
3      Q.  Does this appear to be an article with the
4  title, "Troopers discuss firing range"?
5      A.  Yes.
6      Q.  Was it written by Mary Allen?
7      A.  Yes.
8      Q.  Is it dated May 13th, 2004?
9      A.  Yes.
10     Q.  Do you think you saw that article?
11     A.  May I look at it quickly?
12     Q.  Absolutely.
13     A.  Yes, I probably read it.
14     Q.  You can put that document down.
15         Did you ever talk to Colonel Chaffinch
16 about these two articles?
17         MR. ELLIS:  About specifically these two
18 articles or the information that's in them?
19         MR. NEUBERGER:  Specifically these two
20 articles.
21     A.  I'm sure we did, but I don't recall the
22 specifics of whatever -- of what we discussed.  It didn't
23 involve anything that would have resulted in any action
24 we were going to take divisionally.

41 (Pages 158 to 161)

Price, et al.                                    v.                          Chaffinch, et al.
Thomas F. MacLeish                    C.A. # 04-1207                        July 19, 2007

Page 238

1  from you last?
2       MR. ELLIS:  I thought we just gave you a
3  box of documents yesterday.
4       MR. NEUBERGER:  I haven't even actually
5  seen that yet.  I think there's a box in my office
6  somewhere.  But I'm specifically referring to the
7  personnel file issue.  I think Robert and I are still
8  working that out.
9       MR. ELLIS:  Okay.  I don't know that this
10  witness is going to know any of those documents anyway.
11  For purposes of today, I'll accept that and we will
12  decide --
13       MR. HAVERLY:  I think they're also
14  documents dealing with the Foraker case solely.  There's
15  been requests served.  You may or may not have reviewed
16  it yet or anything like that.
17       MR. ELLIS:  When did it get to us?
18       MR. HAVERLY:  Sometime this week is when it
19  should get to you.
20       MR. ELLIS:  You just sent us some stuff.
21       MR. HAVERLY:  Yes.
22       MR. ELLIS:  I may not have seen it yet.  We
23  responded to two sets of requests for production of
24  documents I believe yesterday.  I hope it was yesterday.

Page 239

1  And we produced several thousand pages' worth of
2  documents.  If there's a new request for production, then
3  I'm not aware of it.
4       MR. HAVERLY:  I'm just saying that there
5  is.
6       MR. NEUBERGER:  I apologize for not being
7  up on the documents.  I'm sure we have them if you guys
8  sent them over.
9       MR. ELLIS:  Thank you.
10       MR. NEUBERGER:  Do you have any questions?
11       MR. ELLIS:  I'm not going to ask him
12  questions when you're not done.  That wouldn't be fair.
13       MR. NEUBERGER:  In that case we're going to
14  recess the deposition.  It's 4:10.
15       (Deposition concluded at 4:10 p.m.)
16       (Deposition to be continued.)
17                    - - - - -
18
19
20
21
22
23
24

Page 240

1          T E S T I M O N Y
2
3  DEPONENT:  COLONEL THOMAS F. MacLEISH        PAGE
4
5  BY MR. NEUBERGER.............................. 3
6
7          E X H I B I T S
8
9  MacLEISH DEPOSITION EXHIBIT NO.              MARKED
10
11  1 - Copies of newspaper articles Bates
     stamped CF69 through CF76.................... 21
12
    2 - A multipage document entitled,
13  "COMPLAINT".................................. 23
14  3 - A three-page memorandum dated March 4,
     2004......................................... 65
15
    4 - A three-page document entitled,
16  "Recommendations and Design
     Considerations For Indoor Rifle Ranges........ 74
17
    5 - A four-page e-mail dated April 7, 2004.... 83
18
    6 - A three-page document Bates stamped
19  FTU2756 through FTU2758...................... 105
20  7 - A memorandum dated 11/8/98.............. 108
21  8 - A letter to Mr. Doyle Tiller from
     Kenneth M. Belmont, dated December 1, 1998... 111
22
    9 - A two-page memorandum dated 12/3/98...... 113
23
    10 - A memorandum dated April 29, 1999....... 115
24

Page 241

1          E X H I B I T S (cont'd)
2  MacLEISH DEPOSITION EXHIBIT NO.              MARKED
3  11 - Two-page e-mails Bates stamped
     FTU3881 through FTU3882...................... 117
4
    12 - Two-page e-mails Bates stamped
5  FTU2348 through FTU2349...................... 121
6  13 - A two-page e-mail dated January 9,
     2004......................................... 123
7
8  14 - E-mails Bates stamped FTU3886........... 131
9
    15 - An e-mail dated February 19, 2004....... 137
10  16 - A three-page document entitled,
     "Firearms Training Unit Indoor Range
     Maintenance and Service Report, dated
11  March 31, 2004.............................. 140
    17 - A six-page newspaper article Bates
12  stamped FTU2901 through FTU2897.............. 159
13
    18 - An e-mail dated 4/21/04................. 179
14
    19 - An e-mail dated March 5, 2005........... 205
15
    20 - Multiple pages of e-mails Bates
16  stamped CF20 through CF63.................... 223
17
18  ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 242
19
20  CERTIFICATE OF REPORTER             PAGE 243
21
22
23
24

61 (Pages 238 to 241)

Page 242

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Page 243

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 19th day of
July, 2005, the deponent herein, COLONEL THOMAS F.
MacLEISH, who was duly sworn by me and thereafter
examined by counsel for the respective parties; that the
questions asked of said deponent and the answers given
were taken down by me in Stenotype notes and thereafter
transcribed by use of computer-aided transcription and
computer printer under my direction.
        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


        Kimberly A. Hurley
        Certification No. 126-RPR
        (Expires January 31, 2008)


DATED:



**DELAWARE STATE POLICE PLANNING SECTION**

# MEMORANDUM

**TO:**     Lieutenant Colonel MacLeish

**FROM:**     Captain Albert J. Homiak

**DATE:**   March 4, 2004

**Re:**     Firearms Range

DEPOSITION
EXHIBIT 3
MAC LeisH
RGH 7/19/05
PENGAD 800-631-6989

Sir,

I sent a message out on the Planning List Serve (this includes both the FBINAA and SPPO) requesting response from agencies with indoor ranges. I received several responses, and from those who responded I either contacted by phone or e-mail. I spoke to approximately 15 representatives from various agencies, including federal, state, and local departments. As with any issue, some agencies are more proactive, progressive, and professional in how they deal with issues and personnel at their firing range. I found most agencies have gone to, or are in the process of having a lead-free range due to problems they experienced first-hand, or because of problems they heard about and were trying to avoid. The topics I spoke to them about included:

- What was their staffing level and rotation schedule for personnel assigned to their range?
- What are the duties and responsibilities of range personnel?
- Are they required to conduct maintenance and clean-up responsibilities?
- Do your range personnel get tested for toxins in the blood, and if so at what frequency?
- Do you have parameters for toxins in the blood for range personnel?
- What policies do you have in place to protect range personnel?

Range staffing at the various agencies was similar to ours. No agency I spoke to routinely rotated their range personnel. Much like our system, officers were assigned based on individual officer expertise and requests to be assigned to the firearms unit. Range officers were required to be trained on the system they worked within. This involved "train the trainer" or a representative from the company who installed the systems within the physical plant. No agency had mandatory rotation due to potential toxins associated with being a firearms instructor. Some agencies use a TAD or substitute firearms instructors to supplement the permanent staff. Some agencies that still use lead-based ammo in their range rotate different assignments within the range. These internal assignments include operating the control center, doing administrative duties, firearm repairs, and being on the range during qualifications. This is done in order to

minimize constant exposure to live firing, hence lessening exposure to noise, lead, and other toxins. Nobody has a written policy regarding this; it's based more on common sense or a blood test result.

**Blood tests** on range personnel for lead and other toxins varied. Some agencies test their personnel every 3 months, some twice a year, and others only one time a year. The administrators I spoke with acknowledged they rely on what the testing labs and doctors advise them about lead levels in employees blood. Most were familiar with what might be considered in the high range, but they said they relied on outside medical experts for definitive answers. For those who had range personnel with high lead levels, they said it usually coincided with a scheduled shoot and that the affected person would be relegated to administrative duties and kept away from the hands-on portion of the firing range. They would have more frequent blood tests conducted on an individual basis in those instances.

**Range clothing** is supplied at each facility. Most agencies encourage their officers to leave their range-issued clothing and other gear at the facility or it is part of their SOP that requires them to do so. There were some agencies I spoke with that did not monitor whether range clothes remained at the firing range and they had no policy in place regarding that. Some ranges have built showers at the facility for range officers to utilize prior to going home. Additionally, some agencies utilize special floor mats that are placed at the exit doors from the range. The mats are intended for people to wipe their shoes when exiting the firing range, since it is everyone's goal to make their range lead-free.

**Routine range maintenance**, except in very few cases, was conducted by range personnel. This may involve minor things such as changing lights to putting salt on icy sidewalks. Some of the more proactive agencies clean their ranges daily with range officers, but they require their officers to use a vacuum with a HEPA filter. Dallas PD conducts routine and scheduled maintenance that their personnel are capable of doing, however they wear protective gear and respirators. Some agencies require protective slippers be worn when conducting even the most minor repairs. They are discarded when finished.

Someone other than range personnel handle **scheduled maintenance and removal of lead and other toxins in all** cases. Some agencies have an outside vendor, another government agency, or a service plan with their range building firm to remove the lead/toxic buildup. They also use the same process to conduct maintenance involving contact with lead or other toxins. Missouri State Police utilizes an outside vendor that requires its workers to wear ventilators when removing lead. The same agency had a problem with clogged air filters that required the replacement of filters every day.

I spoke with numerous agencies, however only one agency (York Regional Police in Ontario) had the same system as ours (Savage Snail System with a wet ramp). The person I spoke with sounded well versed in the subject and he was adamant that you couldn't use frangible ammunition (which is what we use) with the Snail System because

FTU2763

A209

A602

it would clog the bullet traps and render then inoperable. He supplied me the name of the lead-free ammo they use if you are interested.

I've asked for some of the agencies to send me their Firing Range SOP and can provide that if you wish. The above information was gleaned from phone conversations, e-mails, or a combination of both.

I've attached two documents I located on the Internet. One is a National Park Service firing range waste management information sheet and a firing range waste management checklist. The second document from the Division of Occupational Safety pertains to indoor ranges and offers standards and suggestions on a variety of topics that I was asked to research. I have highlighted certain areas I thought were pertinent.

Lastly, I also called the National Rifle Association (NRA) and spoke with John Joines. Mr. Joines heads the NRA's Technical Team Advisors. This group provides **unbiased** technical assistance to police and private firing ranges. To summarize, they would have a person go to the range and completely evaluate the facility. This includes ventilation, bullet traps, and other issues. The evaluation should only take one day and a report would be generated within a month. The cost is $150 for the evaluation, .37 cents per mile, up to $45 per day for meal money, and a hotel room if needed (unlikely). Mr. Joines indicated the person who would be assigned is Jack Giordano from New Jersey, who he claimed is the best person of his 90 person advisory team. I have more information if you're interested in this option. Since there is a sense of urgency to get some resolution on the matter, a decision should be made on this option as soon as possible since it would take 1-2 weeks for him to come to Delaware, and then one month for the report.

Please let me know if this report is lacking anything you wanted information on and I will certainly provide additional information.

FTU2764

A210

A603



DEPOSITION
EXHIBIT 4
Mac Leish
KAH 7/19/05
PENGAD 800-631-6989

STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

## RECOMMENDATIONS AND DESIGN CONSIDERATIONS
### FOR INDOOR RIFLE RANGES
(taken from various OSHA and NIOSH publications)

To reduce and/or eliminate the health hazards associated with indoor firing ranges the following design considerations and work practices are recommended:

1. An optimum air supply would be 75 fpm at the firing line. The minimum air supply must be 50 fpm at the firing line.

2. Filtered and conditioned air must be introduced behind the firing line to guarantee an evenly distributed flow of air through the shooting position.

3. Supplied air inlets should be placed approximately 15 feet behind the shooter's position.

4. The entire range facility should be maintained at a slightly negative pressure with respect to adjacent areas to prevent the escape of contaminants. This criteria suggests that exhaust air should exceed supplied air by 10%.

5. For maximum efficiency exhaust ducts should be located behind and at the apex of the bullet trap. An alternative location is to place the exhaust ducts on the side walls slightly in front of the apex of the bullet trap.

6. A minimum down range conveying velocity of 35 fpm must be maintained.

7. When the 75 fpm rate is used a minimum of 25% of the air should be exhausted 15-20 feet down range of shooting position and remaining 75% at the bullet trap.

8. When the 50 fpm rate is used, 100% of the air should be exhausted down range at the bullet trap.

9. Each range should have its own ventilation system to prevent the circulation of contaminated air to other areas of the building.

10. The supply and exhaust system must be electrically interlocked, thereby eliminating an error in turning one system on and not the other. The system should operate on one fan speed only and not on variable speed fans.

FTU3721

A211

A604

11.    Each range should be equipped with a floor drain and trap to facilitate cleaning by wet methods. The drain location should be approximately 20 feet down range of the firing line. The floor should slope 2-3 inches toward the drain.

12.    To minimize the effect of peak sound pressure levels on individuals in the indoor range, all reflecting walls should be covered with high efficiency sound absorbing material such as fiberglass insulation covered with perforated aluminum or steel sheets with openings equivalent to 10-15% of the area to permit easy access to the acoustical material for periodic replacement. The floors directly behind the shooting booths should be covered with acoustical flooring (carpet that has good absorption characteristics).

13.    Range officer quarters should be acoustically treated to reduce noise levels.

14.    The bullet trap should never be anchored or attached to any structural support for the building. The energy of the bullet striking the trap can be transmitted as noise and vibration throughout the building.

15.    The walls and surroundings could be painted in soft, contrasting pastel colors to reduce the dungeon-like effect.

16.    The range should be equipped with range officers quarters, areas for cleaning of weapons and storing materials, and with toilet and washing facilities.

17.    All air being exhausted from the range should be filtered using a High Efficiency Particulate Filter (HEPA) or equivalent.

## RECOMMENDED WORK PRACTICES

1.    The ventilation system should be in operation at all times while the range is in use and during clean-up.

2.    Sweeping the range should be accomplished by vacuum cleaning or wet methods. Use of a hand broom, even with dust suppression compounds, should be prohibited.

3.    At all times while cleaning, repairing, or reclaiming lead in the bullet trap, a NIOSH approved respirator for the removal of lead dust and fumes must be worn.

4.    Proper ear protection should be provided for and worn by all individuals inside the firing area. The ear protectors should be selected on the basis of offering maximum protection.

FTU3722

A212

A605

5.    Ear plugs worn must be properly fitted.

6.    In case of extremely loud weapons, both plugs and muffs should be worn simultaneously.

7.    A hearing conservation program should be instituted and yearly audiometric examinations given.

8.    A rotation system should be instituted for the range officer position. It is suggested that one month of duty be followed by three months of alternate activity. This change is suggested not only to alleviate any possible lead absorption and prevent its accumulation, since this should be minimal following the engineering changes, but to prevent undue psychological stresses associated with the position.

9.    Eating, drinking, and smoking in the range should be prohibited.

10.    A specific schedule must be established to perform maintenance and repair work to keep the range facilities operational and free of hazardous conditions.

FTU3723

A213

A606

DEPOSITION
EXHIBIT    II
MacLeish
K4H 7/19/05

**Warren Gregory A (DSP)**

To:          MacLeish Thomas F (DSP)
Subject:     RE: Emergency Range Issues

I spoke to Chris at length over the weekend regarding several issues at the range that need to be addressed. He is currently waiting on written estimates and as soon as I receive those I will compile a report on the range in general including the bullet trap issue and get it to you ASAP. Thank you, Greg

-----Original Message-----
**From:**     MacLeish Thomas F (DSP)
**Sent:**     Monday, January 05, 2004 7:06 AM
**To:**       Foraker Christopher D (DSP); Warren Gregory A (DSP)
**Cc:**       Davis Ralph H (DSP); Eckrich Paul (DSP)
**Subject:**  RE: Emergency Range Issues

Sgt. Foraker,
    I read your email this morning. Have you received any cost estimates? Captain Warren please prepare a written report that addresses the concerns Sgt. Foraker has presented and propose possible solutions.

-----Original Message-----
**From:**     Foraker Christopher D (DSP)
**Sent:**     Friday, December 19, 2003 7:20 PM
**To:**       MacLeish Thomas F (DSP); Eckrich Paul (DSP)
**Cc:**       Warren Gregory A (DSP); Davis Ralph H (DSP)
**Subject:** Emergency Range Issues

Gentlemen,

On Thursday, December 18, 2003, I discovered that the clutch pulley sprocket of the conveyor (drag or dredge system) has been damaged and the drive chain has been broken. This has brought the dredging system to a complete stop. I immediately contacted Mr. Charles Nester of Savage Range Systems who originally built the system. Mr. Nester referred me to Mr. George Murnyak of Mayfran International, from Mayfield Village Ohio who removed the old conveyor system and replaced it with the new drag / dredge conveyor system. Mr. Murnyak explained that the only thing under warranty is the clutch of which he could ship one to us. I asked who would be putting the new clutch assembly on and getting the chain and conveyor system up and running again. He said he would get back to me on that. I did not hear back from Mr. Murnyak today even after leaving phone messages for him to return my calls. I will again call on Monday, December 22nd to attempt to make contact with Mr. Murnyak.

On December 1, 2003, when I resumed command of the Firearms Training Unit, Capt. Warren, Lt. Davis, Sgt. Ashley and myself conducted a transition meeting at the range in which Sgt. Ashley explained in detail the conditions of various facets of the range. When I inquired of the condition of the bullet recovery system, Lt. Davis, Sgt. Ashley and myself responded to the rear of the range to observe the current operations of the system. Sgt. Ashley explained the condition of the new drag conveyor system that replaced the original bullet conveyor system and commented that it was functioning well, as it was designed. As Sgt. Ashley explained the proper functioning of the system, he took wrench in hand and started making several adjustments to the clutch and motor sprockets to adjust and tighten the slack of the chain. The chain is now broken and the clutch sprocket is destroyed. The mechanical operation of this very expensive equipment should not be left for amateurs in the mechanical field to tweak but for professionals who have the training and experience to make proper scientific and calculated adjustments and measurements when necessary. My expertise as well as the entire FTU staff lies in firearms, officer safety and force training. We do not posses the training, skills and knowledge or the time necessary to properly maintain the system at it's optimal performance.

I have met with Mark D'Allesandro, Physical Maintenance Trades Supervisor of Facilities Management. Mr. D'Allesandro has observed the conditions and the labor intensive work that is required on a daily basis to keep the mechanical aspect of the bullet recovery system operational. I also explained to Mr. D'Allesandro that once the industry has perfected the performance of the frangible slug ammunition, the Division will complete the transition over to lead free, non-toxic slug and buck shot shotgun ammunition. This frangible shot volume will triple the amount of sludge that currently is clogging pumps, screens, filters and sprayer jet heads. He has also noted that regardless of completing the transition to frangible ammunition, lead contamination will always be present and a health danger due to the lead lined deceleration chamber. Mr. D'Allesandro stated that the smooth operation of

1

FTU3881

A226

A607

bullet trap maintenance would require a full time professional that would also need to be equipped with the proper protective gear and trained in the handling of hazardous lead and other heavy metals.

Cpl/3 B. Kurt Price expressed to me his concerns elevating 6 points on his blood lead level after he and Sgt. Ashley completed work on the bullet trap. Cpl/3 Price's lead level rose from a 5 to 11 and only dropped one point to a 10, 8 months later. Cpl/3 Price expressed such a concern that he would consider a transfer from the FTU if his level does not descend into the single digits. Cpl/3 Wayne Warren's lead levels have elevated 3 points. Both Cpl/3 Warren and Cpl/3 Price have expressed concerns over the health risks involved in conducting maintenance on the bullet trap and bullet recovery system. Bay Health Physician, Dr. Green has expressed to Cpl/3 Price that the petroleum found in the water that helps to lubricate and preserve the bullet trap is a penetrating agent that is used as the vehicle to transport the lead through the skin and into the blood stream upon human contact. I concur with my colleagues that this is an unnecessary health risk and that the maintenance of the bullet trap and recovery system should be left to the trained professionals who can operate in this environment safely.

With the permission of Capt. Warren and Lt. Davis, I have contacted Joseph Farrell of the Environmental Solution Group, the hazardous materials recovery company that disposes of the hazardous materials produced by the bullet trap. After explaining to Mr. Farrell all of the same operational components and health risk factors as was explained to Mr. D'Allesandro, along with the increased volume of frangible shotgun ammunition, Mr. Farrell concurred that professionals would be needed for the safe and efficient operation of the entire bullet trap system. Mr. Farrell and a team of corporate engineers are attempting to devise a plan that will prevent the clogging of the filters, screens and sprayer jet heads along with recycling fresh filtered water back into the system to prevent clogging and the destruction of pumps. He will forward a proposal to me in the near future.

Our firearms curriculum and yearly schedule do not afford us down time and we will be resuming firearms training on January 5, 2004. This is the make-up for the fall in-service shoot and the beginning of recruit firearms training.

I thank you in advance for your immediate attention in this matter and look forward to your direction as soon as possible.

Sgt. Christopher D. Foraker #606
NCOIC, Firearms Training Unit
391 Clark Farm Rd.
Smyrna, DE 19977
Office    302-659-6020
Fax      302-659-6019
Pager    302-247-5606

2

FTU3882

A227

A608

Foraker Christopher D (DSP)

DEPOSITION
EXHIBIT 12
MacLeish
KAH 7/19/05

From:        Davis Ralph H (DSP)
             Friday, January 09, 2004 7:43 AM
To:          Foraker Christopher D (DSP)
Subject:     RE: Standard Operating Procedures & issues

Chris,

Thanks for keeping us apprised. I'll get back to you with answers and will continue to address your concerns with the staff.

Ralph

-----Original Message-----
From:        Foraker Christopher D (DSP)
Sent:        Thursday, January 08, 2004 5:51 PM
To:          Davis Ralph H (DSP)
Cc:          Warren Gregory A (DSP)
Subject:     FW: Standard Operating Procedures & issues
Importance:  High

L.T.

As we had spoke about earlier, I do believe that we do need to change the firearms policy regarding remedial training for marginal shooters. As it reads now, we would have to provide those who fall into this criteria, range and instructional time quarterly. There is no breathing room in our schedule now as it stands. Making it even more difficult is the fact that the FTU is only functioning at 4 personnel with the absence of Cpl. Peachey. When we do have down time, we will need it for vacation time or lose it. We would utilize that down time to make range repairs or attend necessary training to keep up our certifications and standards. Please let me know if I should inform Lt. Smentkowski of this change.

I would also like to point out that the firearms industry standard for instructor to student ratio is 1 instructor for every 4 students of in-service personnel and 1 instructor to every 2 recruit students (MAXIMUM NUMBER OF STUDENTS ON EACH COUNT). You can find the industry standards as stated above in the FBI, Secret Service, State of Colorado Law Enforcement Standards and posted by such private organizations as Front Sight Firearms Training Institute and the Bulls Eye Tactical Firearms Training Center along with many others across the country. This should be our standard as well. The FTU was bolstered to 5 personnel in 1997 when there was Lt. Bryson, Sgt Fitzpatrick, Sgt. Engler, Cpl. Price and myself assigned to the unit. In 1998 when Sgt. Engler transferred out, he was replaced with Cpl. Cathell. When Lt. Bryson retired, Cpl. Parton replaced him retaining the 5 personnel standard. When Sgt. Fitzpatrick was transferred, Sgt. Parton was promoted and took his place, however, no one replaced Sgt. Fitzpatrick. When Sgt. Rhoades retired, he was replaced as NCOIC of SORT by Sgt. Parton, who I replaced as NCOIC of the FTU. Sgt. Parton was replaced by Cpl. Warren in the FTU. I continually requested a 5th person through my 7 month tenure to adhere to the industry standard instructor to student ratio and to allow me the necessary time to efficiently manage the facility, the FTU personnel as well as the safe operation of firearms training at the facility. A reminder that when we have an instructor in the booth, he is merely issuing commands and totally relies on the line instructors for the safety of individual students. This is never more prevalent than when the booth instructor issues commands during a low light qualifier which leaves the booth disconnected and blind, totally relying on the firearms instructors on the line to communicate by radio the situation out on the range. When I was transferred from the range, Sgt. Ashley was afforded a fifth person, Cpl. Piser who elected to resign from the Division and go with the FBI. Sgt. Ashley was later again afforded a 5th person in the assignment of Cpl. Peachey.

I am aware that there have been additional personnel who have sent letters of transfers along with a and résumé to their supervisors to apply for the opening that will arise when Cpl. Peachey officially retires from the Division. I would much like to be a part of the selection process of the next person to be assigned to the FTU. I not only know the job task and responsibilities required as well as the abilities needed to achieve positive results In the FTU, I also know as well as anyone the Divisional personnel who poses those necessary skills and abilities to meet and exceed Divisional goals and objectives.

An FYI on the foreign material found to have bound up the drag conveyor system was identified by Corporals Warren and Price as the "Non-toxic lead free" (NOT FRANGIBLE) ammunition fired by the FBI. I have since informed the FBI that they are now mandated to fire non-toxic lead free frangible ammunition at the FTU. They have agreed and will

1

FTU2348

A228

A609

comply for 2004.

Thank you for your attention and concern in these matters.

Respectfully,

Sgt. Christopher D. Foraker #606
NCOIC, Firearms Training Unit
391 Clark Farm Rd.
Smyrna, DE 19977
Office    302-659-6020
Fax      302-659-6019
Pager   302-247-5606

-----Original Message-----
**From:**    Smentkowski Paul E (DSP)
**Sent:**    Thursday, January 08, 2004 11:55 AM
**To:**      DSP_Troop Commanders; DSP_Section Chiefs Sworn; DSP_Section Chiefs Civilian
**Subject:** FW: Standard Operating Procedures
**Importance:** High

Reminder...... updated SOPs should be e-mailed to me no later than Friday 01-09-04. Thanks for those I have already received. Paul

Captain Paul E. Smentkowski
Delaware State Police
Inspections/Accreditation
3001 Brandywine Parkway, Wilmington, DE 19809
302-477-8510 or 11, Fax 302-477-8504

-----Original Message-----
**From:**    Smentkowski Paul E (DSP)
**Sent:**    Tuesday, December 09, 2003 9:36 AM
**To:**      Warren Gregory A (DSP); Evans Jeffrey R (DSP); Anderson Brian C (DSP); Carrow William D (DSP); Harris William T (DSP); Willey
            Julie F (DSP); Shamany Elizabeth E (DSP); Downes Harry W (DSP); Sullivan Siobhan G (DSP); Sharp Eugene M (DSP); Evans
            John R (DSP); McDonald Michael J (DSP); Paige James (DSP); Yeomans John A (DSP); Homiak Albert J (DSP); Aviola Joseph P
            (DSP); Gooch Lori S (DSP); Conley Barbara L (DSP); Thistlewood Fred M (DSP); Reed Debra M (DSP); Pulling Richard C (DSP);
            DSP_Troop Commanders; Simpson Charles J SIU (DSP)
**Cc:**      Chaffinch Aaron L (DSP); MacLeish Thomas F (DSP); Papili Joseph A (DSP); Seifert Mark W (DSP); Baylor David L (DSP); Eckrich
            Paul (DSP); Hughes Randall L (DSP)
**Subject:** Standard Operating Procedures
**Importance:** High

Hello everyone,
    It is time again to review and update our SOPs. Please take the time to carefully review your troop/unit SOP and make any revisions necessary to keep the information current. Many of the SOPs have not been updated for several years. This is not good since DSP is up for reaccreditation in August 2004. Some SOPs may not need any changes other than the date.

**Please e-mail me your updated SOP no later than Friday, January 9, 2004, but the earlier the better.** If you do not have your SOP saved on your computer, let me know and I will e-mail the latest version to you. Please call with any questions or concerns.

Thanks-Paul

Captain Paul E. Smentkowski
Delaware State Police
Inspections/Accreditation
3001 Brandywine Parkway, Wilmington, DE 19809
302-477-8510 or 11, Fax 302-477-8504

2

FTU2349

A229

A610

Foraker Christopher D (DSP)

DEPOSITION
EXHIBIT 13
MacLeish
KAH 7/19/05

| From: | Foraker Christopher D (DSP) |
|---|---|
| | Friday, January 09, 2004 7:58 PM |
| To: | Warren Gregory A (DSP) |
| Cc: | Davis Ralph H (DSP) |
| Subject: | Range Health issues and Departmental liability |

Captain Warren,

We are experiencing significant air flow problems at the range. I have personally witnessed the problem since I have returned to the FTU on December 1, 2003. Corporals Warren and Price have expressed that this problem has been in existence for many months and has only been "band aided" over time when complaints have been made. Shooters can be standing on the 7 yard line firing and you can be standing at the back of the range, nearly 30 yards behind the shooters, and smell the gunpowder as the air flow brings the smoke back behind the shooters and instructors. Corporal Warwick expressed that at one point the smoke was so dense that he was barely able to see a shooter on the firing line. The staff here has relayed to me that a firm was brought in by Facilities Management in the Spring or Summer of 2003 to attempt to correct the problem. They were unsure of the name, however, believed that it began with the name of Chesapeake. The representative of that company stated that the current air handler system was not designed to move the volume of air in a reasonable time frame and was not designed to pull the air and heavy metal particulates upwards defying gravity. I do remember that the State hired the engineering firm of Clark Nixon to come in to evaluate the range air flow and propose a fix for the problems we were experiencing. From my understanding of what Clark Nixon proposed, the State did not heed their advice.

At this point we are firing lead free, non-toxic, frangible handgun projectiles comprised of a copper dust compound. The bullet is designed to pulverize upon impact to steel. At present, we are experiencing a few different problems which I will identify as follows:

1. A reddish haze in the air that is suspended throughout the range when the bullet strikes the bullet trap. The airborne particles are inhaled by the instructors and students. When anyone blows their nose, a large amount of the reddish debris is discharged. Students and instructors also complain of a copper penny taste in their mouth after shooting and described a significant eye mucus present when awaking the following morning after a day on the range. On Thursday, January 8, 2004, I made contact with Ernest Durham, engineer for CCI / Speer, the manufacturer of the frangible bullet, to inquire as to the properties that comprise the bullet. Durham stated that the bullet is comprised of 90% copper which is indicated by the reddish haze. Durham stated that to inhale the copper is not as dangerous as to eat it. I stated that if we taste it, we must be eating it. Durham stated that you don't want to walk into the reddish cloud and you definitely do not want to eat it. I made contact with Facility Management, Physical Plant Maintenance Trades Supervisor, Mark D'Allesandro yesterday and advised him of our ongoing problem. He and Facility Management maintenance worker Tom Faison responded to the range and witnessed the visual problem with the reddish haze during weapons fire on the range. Note, that only eleven shooters were on the firing line during the observation, usually there are significantly more in upwards of twenty shooters on line during in-service training. However, with only eleven shooters, the effect was significant. Both D'Allesandro and Faison expressed that this problem needs to be corrected immediately. D'Allesandro contacted Seiberlich Trane and met with Trane technician Ron Whitehouse today to review the computer readings as well as find out if there is a damper or filter problem or some other reason for this problem. Whitehouse stated that he found a couple of supply doors leaking air which he remedied by bracing them, however, we did not experience any change on the range. Whitehouse and his supervisor from Trane will meet up with D'Allesandro at the range on Tuesday, January 13, 2004 at 0800 hrs. to conduct testing on the range in an attempt to determine where the problem lies. I have been personally involved in the range project since I was transferred into the FTU in October of 1997 and have conversed with a number of outside personnel hired or solicited by the State to advise on measures of correcting the air quality and flow problem of this facility. ALL of the persons that have passed through over the years have expressed that significant changes as was outlined by Clark Nixon would need to be completed in order to correct this issue. The range staff is under the impression that without the rapid exhaust and removal of the copper frangible particulates from our breathing air, this problem constitutes a potentially unsafe and unhealthy working environment detrimental to our good health and inconsistent with departmental goals and objectives.

2. The air quality problem is surely compounded by the fact that the wet ramp is dry in some areas due to the frangible material when wet turns to a pudding type mud that in short order causes the filter screens and the sprayer jet heads to clog and causes the pumps to fail as well. Due to the fact that cleaning out the filters / screens and the sprayer jet heads as well changing out the failed pumps greatly increases the blood lead level, this maintenance should be executed by professionals who are well versed and properly equipped in the prevention of lead exposure in a contaminated environment. This is being addressed by the professional disposal company of toxic materials, Environmental Solutions. I

1

FTU2351

A230

A611

have heard from Joseph Ferrell, Chemical Specialist with Environmental Solutions who stated that they are developing the plans to correct the problem. I believe this will be a large scale plan that will handle the drastic increase in the sludge when we eventually complete the transition to total lead free, non-toxic, frangible shotgun ammunition. I have provided the MSDS information on the frangible ammunition to Joe Ferrell and expect to hear back from him in the very near future ·rding a service maintenance contract and cost.

3. The drag conveyor has failed once again, however, due to the limit switch being back in place, the chain and clutch survived the shutdown. I immediately telephoned Jay Zolcak of Mayfran Corporation of Ohio and informed him of the problem. Zolcak asked me to back off the limit switch slightly to allow the clutch to pop back in and attempt to free the chain from the problem. I did attempt this with negative results. Zolcak advised that they will confer with their design engineers and attempt to have someone flown out by Tuesday, January 13, 2004 to attempt to correct the problem. Zolcak will call the range on Monday, January 12, 2004 to advise of the plan of action.

Thank you for your immediate attention in this matter and look forward to any further direction you may suggest in our efforts to achieve a safe and healthy work environment at the Firearms Training Facility.

Sgt. Christopher D. Foraker #606
NCOIC, Firearms Training Unit
391 Clark Farm Rd.
Smyrna, DE 19977
Office    302-659-6020
Fax      302-659-6019
Pager    302-247-5606

| Tracking: | Recipient | Read |
|-----------|-----------|------|
| | Warren Gregory A (DSP) | Read: 01/12/2004 12:43 PM |
| | Davis Ralph H (DSP) | Read: 01/10/2004 12:00 PM |

2

FTU2352

A231

A612

**Warren Gregory A (DSP)**

DEPOSITION
EXHIBIT *14*
*Macleish*
*KAH 7/19/05*

PENGAD 800-531-6989

To:                    Foraker Christopher D (DSP)
ubject:              RE: Bullet Trap Update / Air Handler

10-4, I'll call you first thing Tuesday morning ref. coming up and meeting with you. I want to review some items with you, prior to submitting my final report to Macleish. Thanks, Greg

-----Original Message-----
From:        Foraker Christopher D (DSP)
Sent:        Friday, January 23, 2004 12:28 PM
To:          Warren Gregory A (DSP); Davis Ralph H (DSP)
Cc:          Warren Wayne H (DSP); Price Kurt K (DSP); Warwick James P (DSP)
Subject:     Bullet Trap Update / Air Handler

Gentlemen,

Eric Phillips and myself uncovered a major problem with the drag conveyor. The tail axle shaft at the pivot point of the conveyor located at the far end of the range (shooting position 20) is completely warn out and unseated. Mr. Phillips stated that this may have occurred when the motor control center was continually readjusted (tweaked & tinkered) to the point of being out of balance. He further explained that if the frame housing the motor is out of balance it would likely torque the tail shaft from it's position causing the current damage and failure. I spoke with Jay Zolcak from Mayfran who stated that this would not be covered under warranty. Mr. Zolcak explained that when they came to the range in September and replaced the conveyor with the drag conveyor, Sgt. Ashley did not want a new tail axle shaft installed due to time restraints to get the range back up and running. This is a major repair undertaking that will encompass two to three full days of work while the range is shutdown to shooters. I advised Mr. Zolcak that the range would be down for this repair February 16th through 18th. He advised that he would be able to accommodate us with two Mayfran mechanical technicians on those dates as long as DSP provides Mayfran with a purchase order for the cost. I asked for Mr. Zolcak to provide me with a faxed quote for the cost of the repairs immediately so I can present same to you. I am standing by for the fax quote on the cost of the repairs to forward to you.

Regarding the air quality testing, is there anyway that we can expedite the approval to have the testing completed on February 10th or 11th. I will have a full range of shooters on each of those days to properly sample the air quality and obtain a true and accurate sample of range operations. I was also advised by both Cpl. Price and Cpl. Warren when they had approached Sgt. Ashley regarding maintaining the pumps and the water system as well the spike in the lead levels in their blood causing health problems, Sgt. Ashley responded with "You have to die from something". This statement offended them and they as well as Jim Warwick and myself are extremely concerned over our health and the health of those who we train.

Thank you in advance for your immediate attention in these extremely serious concerns.

Respectfully,

Sgt. Christopher D. Foraker #606
NCOIC, Firearms Training Unit
391 Clark Farm Rd.
Smyrna, DE 19977
Office   302-659-6020
Fax      302-659-6019
Pager   302-247-5606

1

FTU3886

A232

A613

**Warren Gregory A (DSP)**

DEPOSITION
EXHIBIT
MacLeish 15
KAH 7/19/05

| | |
|---|---|
| ᴘm: | Foraker Christopher D (DSP) |
| ᴠnt: | Thursday, February 19, 2004 10:51 AM |
| ᴛo: | Eckrich Paul (DSP) |
| Cc: | Warren Gregory A (DSP); Davis Ralph H (DSP) |
| Subject: | FW: Scheduled meetings |

Major,

The FTU Staff scheduled a tour of the new FBI Firearms Training Facility in Quantico, VA. Yesturday **February 18, 2004**. It proved very interesting with all of the problems that they have encountered being very similar to the problems at the FTU. They have spent 33Mil to date and are very disapointed in the end product. As a result of the visit to the FBI facility, we have received very good inteligence on products, corporations and knowlegable people in the field.

I have been in contact with **Joe Ferrell of Environmental Solutions Group, Inc** who will make a presentation on the results of the air quality testing and surface sampling that had been completed last week on the range. He will be accompanied by the **Certified Industrial Hygienist** who conducted and supervised the testing and sampling. The two gentlemen will be available to make that presentation on **Tuesday, February 24, 2004** to yourself and Lt. Col. MacLeish and to field any and all questions that you may have.

I have been in contact with Bill Provincher, President of **Carey's Ventilation**, John Curtis, President of **Action Target** and Susan Engle, Territory Manager of Action Target. The three of them will be flying out to make a product presentation to yourself, Lt. Col. MacLeish and Facilities Management personnel. The presentation will include instillation of both the ventilation system and the Total Containment Trap. The meeting will be for **Wednesday, February 25, 2004.** They have also planned to provide us with a **tour of three facilities that they have completed in the Washington D.C. area on ᵀʰursday, February 26, 2004.**

ᴵ appologize for missing todays budget meeting. In attempting to compile all the necessary research and data on various ammunitions, range ventilation systems, ballsitic ceilings, bullet retrival systems along with the normal daily duties and responsibilities as the NCOIC of the FTU, I wrote down the wrong meeting time for today.

**I am overwhelmed with concern for the health and safety of my staff and their wives and children. We have read material where other Agencies have even went to the extent of having the blood levels tested of the wives of range staff to determine to what extent they had been exposed to the contaminants. I have spent much less time on the range when compared to my staff and yet my copper and lead levels are the same as the others. My lead level shot up from a 3 to 9 and my copper is at 971 in just 2 months. This indicates to me that after utilizing good personal hygiene, that our entire building is contaminated with the lead and copper and that the ventilation is circulating the contamination throughout the entire facility. We have been changing our clothes and some of us even shower prior to leaving the facility; however, if we do not have a safe haven to escape and shed the contamination, then we are taking the contamination home to contaminate homes and expose the hazards to our wives and children. Medicals**

I look forward to our meeting on Monday, February 23rd, 2004 @ 1500 hrs. and discussing these issues of concern.

Thank you for your understanding in this matter and the concern for the health and safety for the FTU Staff.

Respectfully,

Sgt. Christopher D. Foraker #606
NCOIC, Firearms Training Unit
391 Clark Farm Rd.
Smyrna, DE 19977
Office    302-659-6020
}        302-659-6019
Pager    302-247-5606

1

FTU3894


DEPOSITION
EXHIBIT 16
MAC Leigh
KJH 7/9/05

# Firearms Training Unit
# Indoor Range Maintenance and Service Report
March 31, 2004
Prepared by FTU Staff

The information contained in this report is a result of both research and interviews conducted with experts in the field of hazardous abatement. George Buechner is one expert who was consulted on the cleaning and maintenance of an indoor range. Mr. Buechner is the Project Manager for Ramcor Group Services Inc. He is currently supervising the cleaning and maintenance of the Federal Law Enforcement Training Center in Cheltenham, Maryland.

Writes, Mr. Buechner, "Cleaning and maintenance procedures will vary depending on the type of ammo being fired, green (non-lead) or lead. Test results (air monitoring, swipe testing, etc.) will also dictate the level of cleaning required and the type of PPE (Personal Protection Equipment) required to carry out the necessary cleaning and maintenance. Procedures and PPE requirements will also vary according to the laws and statutes governing your area. The required and necessary means should be adhered to stringently to ensure the safety and health of all involved and the legality of such an operation.

Mr. Buechner states, 'It is my opinion that any range, whether green or lead, should be attended to by professionals certified and trained in the safe cleaning, handling and disposal of any hazardous materials present, thereby minimizing the risk to all parties. In the case of lead the risk of ingestion, inhalation, skin contact and/or transportation and contamination of other areas are serious and should dictate procedures that take all the steps needed to decrease these hazards. Environmental concerns should also be seriously considered in the development of procedures, lest risks of ground, water or any other type of contamination be present.'

'In the case of green (non-lead) ammunition the chief risk is combustion of residue if not properly cleaned and disposed of. Such residue can collect on the floors of ranges, in cracks, etc. and be ignited by sparks. This risk of fire gives rise to the very serious concern that impulsive reactions to such an event could lead to further hazards. For instance, if a class were firing on a range and a fire were suddenly to break out there is a risk of those present accidentally shooting themselves or someone else in the confusion of a knee-jerk reaction to such an occurrence,' Mr. Buechner writes.

In conclusion, Mr. Buechner states, 'This is just some general information and common practices governed by laws and environmental and safety regulations. Much of this is based on my own experience and that of my company but each situation has its own unique requirements.'"

FTU2593

After investigating the cleaning and maintenance procedures used for indoor ranges, it is evident that full-time, highly trained and equipped personnel should be utilized. Properly staffing this position (s) would allow range staff to focus on the day-to-day training and safety issues of divisional personnel.

The following responsibilities associated with proper range maintenance assume that both the air handling system and bullet trap system are functioning properly and in unison. Although comprehensive, this list is not all inclusive of responsibilities associated with servicing an indoor range.

> **Responsibilities include assuming <u>Savage Bullet Trap System</u>:**

1.  Daily vacuuming of the range floor and bottom of the bullet trap using a Hepa Vac
2.  Make daily adjustments and repairs to conveyor system as needed
3.  Make daily adjustments to fluid flow to ensure ramps remain wet (this prevents pumps from overheating)
4.  Monitor oil and water fluid consistency along with volume levels
5.  Monitor fluids and tanks for hazardous allergens, mold, mildew and other hazardous properties inconsistent with a healthy work environment
6.  Remove and clean out screens and filters and replace as needed
7.  Sift out shotgun plastic wadding and spacers from water tanks
8.  Clean out sprayer jet heads as needed
9.  Target carrier adjustments and repairs
10. Weekly vacuuming of the range ceilings and walls
11. Weekly floor cleaning utilizing the a floor scrubber
12. Coordinate with lead recycle vender to remove canisters from the site
13. Coordinate with hazardous abatement vendor to remove contaminated bullet trap filters
14. Coordinate with hazardous abatement vendor to remove contaminated water from floor scrubber
15. Remove and replace Tac Mats as needed
16. Replace lighting as needed
17. Yearly removal of sludge build up in the water tanks *(this process would increase with the use of frangible)*

FTU2594

A235

A616

> **Responsibilities include assuming <u>Action Target Bullet Trap System</u>:**

1. Daily vacuuming of the range floor and bottom of the bullet trap using a Hepa Vac
2. Removal and replacement of bullet trap containment canisters as needed
3. Removal and replacement of deceleration vacuum filters
4. Coordinate with lead recycle vender to remove canisters from the site
5. Coordinate with hazardous abatement vendor to remove contaminated bullet trap filters
6. Coordinate with hazardous abatement vendor to remove contaminated water from floor scrubber
7. Target carrier adjustments and repairs
8. Weekly vacuuming of the range ceilings and walls
9. Weekly floor cleaning utilizing the a floor scrubber
10. Remove and replace Tac Mats as needed
11. Replace lighting as needed

Additionally, some other considerations would include the following:

❖ Inventory of hazmat materials
❖ Maintenance of MSDS records
❖ Liaison with DAS in reference to various/applicable testing
❖ Liaison with vendors in reference to scheduled and unscheduled maintenance
❖ Oversight and maintenance of stored combustibles
❖ Ensure compliance of all local, state and federal laws governing environmental issues
❖ Familiarization and dissemination of Right to Know Laws

This report was designed to provide some insight into the proper cleaning and maintenance procedures used for indoor ranges. Professionals who are trained in the safe cleaning, handling and disposing of hazardous materials would minimize risks to parties utilizing our indoor range. Standard Operating Procedures cannot be established until a decision is made concerning both the bullet trap system and the type of ammunition that will be used.

FTU2595

A236

A617

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CHRISTOPHER D. FORAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 02-302-JJF |
| | ) | |
| COLONEL L. AARON CHAFFINCH, | ) | |
| individually and in his official capacity as | ) | |
| Superintendent of the Delaware State Police, | ) | |
| DIVISION OF STATE POLICE, | ) | |
| DEPARTMENT OF PUBLIC SAFETY, | ) | |
| STATE OF DELAWARE, | ) | |
| | ) | |
| Defendants. | ) | |

## STIPULATED ORDER

The parties to this case, acting through their authorized counsel, hereby stipulate and agree as follows, subject to approval of the Court:

1.    Sergeant Christopher D. Foraker is ordered reinstated to his prior position as the Non-Commissioned Officer-in-Charge of the Firearms Training Unit of the Delaware State Police with all of the rights, privileges, duties, responsibilities and supervisory authority previously held by him when he earlier occupied that position on February 20, 2002.

2.    Plaintiff withdraws his post-trial motion for reinstatement.

3.    The Court shall retain jurisdiction over this matter to enforce its order of reinstatement should that become necessary.

4.    The judgment entered by the Court in this case on July 2, 2003 is vacated.

5.    Plaintiff withdraws his two Rule 50 motions filed before the submission of the case

to the jury.


Dated: November *17,* 2003                          Dated: November *19,* 2003

Thomas S. Neuberger, Esquire                        W. Michael Tupman, Esquire
Bar # 243                                           Bar # 3040
Two East Seventh Street, Suite 302                  Deputy Attorney General
Wilmington, DE 19801                                Department of Justice
(302) 655-0582                                      102 West Water Street, 3rd Floor
Counsel for Plaintiff                               Dover, DE 19904
                                                    (302) 739-7641
                                                    Counsel for Defendants


Dated: November *19,* 2003

Martin D. Haverly, Esquire
Bar # 3295
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Counsel for Plaintiff


IT IS SO ORDERED, this _____ day of _____, 2003


_____
Joseph J. Farnan, Jr.
United States District Judge

I:\TUPMAN\Files\foraker.stip.ord.wpd


-2-


A005

A619

## SETTLEMENT AGREEMENT

*WHEREAS*, the parties to this Agreement are involved in litigation in the federal courts, Foraker v. Chaffinch et al., Civ.A. No. 02-302-JJF (D. Del.) (judgment entered July 2, 2003), appeal filed, July 31, 2003, Docket No. 03-3324 (3rd Cir.); and

*WHEREAS*, the parties wish to bring this litigation to an amicable conclusion and resolve all outstanding issues in the case; and

*WHEREAS*, for the mutually exchanged promises in this Agreement and other good and valuable consideration, the parties hereby agree as follows:

1.    Within ten (10) calendar days of the date of the last signatory to this Agreement, the Delaware State Police will reinstate Sergeant Christopher D. Foraker to his prior position as the Non-Commissioned Officer-in-Charge of the Firearms Training Unit with all of the rights, privileges, duties, and responsibilities and supervisory authority previously held by him when he earlier occupied that position on February 20, 2002.

2.    The defendants agree that there shall be no retaliation against plaintiff in violation of his civil rights once he assumes the duties of that position.

3.    Within a ten (10) calendar days of the date of reinstatement, the parties will file a Stipulated Order with the United States District Court for the District of Delaware, the form of which is attached to this Agreement and incorporated by reference and made an integral part of this Agreement.

4.    Within a reasonable time after the District Court approves the Stipulated Order, counsel for the defendants/appellants will file a notice of dismissal of the appeal to the United States Court of Appeals for the Third Circuit.

Page 1 of 3

5.    Within fifteen (15) calendar days of the date of the last signatory to this Agreement, the State of Delaware will tender a check in the amount of $50,460.00 (which includes $400.00 in post-judgment interest) payable to Christopher D. Foraker and to issue an appropriate Internal Revenue Service Form 1099 to Foraker.  Foraker will execute a general release in favor of the defendants in the form attached hereto.

6.    Within fifteen (15) calendar days of the date of the last signatory to this Agreement, the State of Delaware will tender a check in the amount of $50,460 (which includes $400.00 in post-judgment interest) payable to Thomas S. Neuberger, Esquire and to issue an appropriate Internal Revenue Service Form 1099 to Thomas S. Neuberger, P.A.

7.    Within fifteen (15) calendar days of the date of the last signatory to this Agreement, the State of Delaware will tender a check in the amount of $100,675.00 for attorney's fees payable to Thomas S. Neuberger, Esquire and to issue an appropriate Internal Revenue Service Form 1099 to Thomas S. Neuberger, P.A.

8.    Within fifteen (15) calendar days of the date of the last signatory to this Agreement, the State of Delaware will tender a check in the amount of $41,458.00 for attorney's fees payable to Martin D. Haverly, Esquire and to issue an appropriate Internal Revenue Service Form 1099 to Martin D. Haverly.

9.    Within a reasonable amount of time after receipt of the checks for attorney's fees, plaintiff's counsel will withdraw their applications pending with the District Court for attorney's fees, costs, and pre-judgment interest.

10.    The parties agree not to issue a press release or take any affirmative steps to notify the media or the public about this Agreement.  The parties may respond to unsolicited inquiries from

Page 2 of 3

the media.  The defendants recognize that this Agreement is a public record as defined by the

Freedom of Information Act, 29 <u>Delaware Code</u> Chapter 100, and that it may be subject to inspection

and copying upon request by a citizen.


**IN WITNESS WHEREOF, the parties hereto have signed this AGREEMENT:**

Dated: November _19_, 2003

Thomas S. Neuberger, Esquire
Bar # 243
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
Counsel for Plaintiff


Dated: November _19_, 2003

Martin D. Haverly, Esquire
Bar # 3295
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Counsel for Plaintiff


Dated: November _19_, 2003

W. Michael Tupman, Esquire
Bar # 3040
Deputy Attorney General
Department of Justice
102 West Water Street, 3rd Floor
Dover, DE 19904
(302) 739-7641
Counsel for Defendants


Dated: November _19_, 2003

Joseph C. Schoell, Esquire
Counselor to the Governor
Office of the Governor
Carvel State Building, 12th Floor
Wilmington, DE 19801
(302) 577-8158


I:\TUPMAN\Files\foraker.settlement.wpd


Page 3 of 3

## **CERTIFICATE OF SERVICE**

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

June 19, 2006, I electronically filed this **Appendix** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

FTU / Appendix/ FTU - Petition Clause - Appendix