# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

B. KURT PRICE, et al.            :
                                        :
             Plaintiff,          :
                                        :       C.A. No. 04-1207-GMS
           v.                      :       (Consolidated with C.A. No. 04-1207-GMS)
                                         :
L. AARON CHAFFINCH, et al.,      :
                                         :
             Defendants.      :

# OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION
# FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE,
# <u>TO AMEND THE JUDGMENT OR FOR A NEW TRIAL</u>

Date: June 19, 2006

Noel C. Burnham (DE Bar No. 3483)
Richard M. Donaldson (DE Bar No. 4367)
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
(302) 504-7840

Edward T. Ellis (Admitted Pro Hac Vice)
Robert J. Fitzgerald (Admitted Pro Hac Vice)
Carmon M. Harvey (Admitted Pro Hac Vice)
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109
(215) 772-1500

*Counsel for Defendants L. Aaron Chaffinch,
Thomas F. MacLeish, David B. Mitchell, and the
Division of State Police, Department of Safety and
Homeland Security, State of Delaware*

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS................. 1

II.   SUMMARY OF THE ARGUMENT ............................................................. 3

III.  CONCISE STATEMENT OF FACTS ............................................................ 4

    A.   The Parties ............................................................................................ 4

    B.   The DSP Firing Range ......................................................................... 5

    C.   Range Maintenance ............................................................................. 6

    D.   The FTU Staff Stopped Maintenance On The Bullet Trap................... 7

    E.   The April 6, 2004, Media Tour of the Firing Range............................. 8

    F.   The State Auditor's Investigation ........................................................ 8

    G.   Evidence of Damage to Chris Foraker's Reputation ........................... 9

    H.   Disputed Damages Testimony ............................................................ 10

IV.   ARGUMENT .......................................................................................... 10

    A.   Standard of Review............................................................................. 10

        1.   Renewed Motion for Judgment as a Matter of Law under Rule
            50(b)................................................................................. 10

        2.   Motion to Alter or Amend Judgment Under Rule 59(e)......... 11

        3.   Motion for New Trial Under Rule 59(a).................................. 12

    B.   The Court Should Grant Defendants' Motion for Judgment as a Matter of
        Law with Respect to the Jury's Findings of First Amendment Retaliation
        in the Price Action and of Defamation (Count III) in the Foraker Action........... 13

        1.   The Court Should Enter Judgment in Favor of Defendants in the
            Price Action Because Garcetti v. Ceballos Holds That Public
            Employees Who Make Statements Pursuant to Their Official
            Duties are not Protected by the First Amendment ................................... 13

            a.   Garcetti is a change in the law that deprives the Price
                plaintiffs of a cause of action on the facts they proved............... 13

            b.   The Court should grant judgment as a matter of law
                pursuant to Rule 50(b) on the claims now barred by
                Garcetti; in the alternative, the Court should amend its
                judgment entered on June 15, 2006, to reflect that Garcetti
                is now controlling law on the claims in the Price Action ........... 17

# TABLE OF CONTENTS
(continued)

Page

2.   Defendants Renew Their Motion for Judgment as a Matter of Law on Plaintiffs' Petition Clause Claims in the Price Action Because Plaintiffs Have Not Stated a Claim Under the First Amendment Petition Clause ........................................................................ 18

    a.   Defendants are entitled to judgment as a matter of law because plaintiffs' speech about the conditions at the firing range was not a "petition" under the First Amendment .............. 18

    b.   Even if plaintiffs' speech about the indoor firing range was a "petition," it is not constitutionally protected activity for the reasons set forth in Garcetti ................................... 20

3.   Defendants Renew Their Motion for Judgment as a Matter of Law on Foraker's Claim of Defamation Against Defendant Chaffinch Because (1) Foraker Has Failed to Demonstrate Actual Malice, (2) Each of The Statements at Issue is True, And (3) Foraker Has Failed to Demonstrate Reputational Harm ............................................... 21

    a.   Plaintiff Foraker has failed to show that defendant Chaffinch spoke with "actual malice." ........................................ 21

    b.   The statements at issue are substantially true .............................. 23

    c.   Plaintiff has failed to establish that any of the statements at issue damaged his reputation ....................................... 26

C.   The Court Should Grant Defendants' Motion for a New Trial on All Parts of the Verdict for which the Court Does Not Enter Judgment for Defendants as a Matter of Law ............................................................ 28

   1.   The Court Erred in Allowing Ernest "Bud" Fini to Testify as s Expert Under Fed. R. Evid. 702 .................................................... 28

    a.   Legal Standard .............................................................. 28

    b.   Fini is not qualified to testify about hiring practices in the firearms industry .......................................................... 29

    c.   Fini's testimony was not reliable ................................................ 30

   2.   The Court Erred in its Jury Instructions by Refusing to Give an Instruction that Defendant Chaffinch had a First Amendment Right to Speak about the Range ........................................................ 32

   3.   Defendants Are Entitled to a New Trial as to Plaintiff Foraker's First Amendment Retaliation Claims in C.A. No. 04-1207-GMS Because the Verdict is Ambiguous Once Defendants are Granted Judgment as a Matter of Law as to the Claims Encompassed by Garcetti ........................................................................... 33

# TABLE OF CONTENTS
### (continued)

Page

4.  Defendants are Entitled to a New, Reconfigured Trial with Price's and Warren's Cases Tried Separately from Foraker's Cases ................... 34

5.  The Court Should Grant a New Trial Because the Evidence does not Support the Jury's Award of Punitive Damages; in the Alternative, the Court Should Remit the Punitive Damages Award Because it is Disproportionate to the Evidence of the Net Worth of the Defendants ......................................................................... 36

D.  Whether In His Current Lawsuit Foraker Must Establish That His 2002 Lawsuit Addressed A Matter of "Public Concern." ............................................ 38

V.  CONCLUSION ............................................................................................................ 40

## TABLE OF AUTHORITIES

**Page**

## CASES

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, No. CIV. A. 97-450-JJF,
2002 U.S. Dist. LEXIS 439 (D. Del. Jan. 10, 2002) .................................................. 36

*Adams v. Murakami*, 813 P.2d 1348 (Cal. 1991) ........................................................ 37

*Anderson v. Davila*, 125 F.3d 148 (3d Cir. 1997) ...................................................... 39

*Arab Termite Pest Control of Florida, Inc. v. Jenkins*, 409 So.2d 1039 (Fla. 1982) ................... 37

*Baldassare v. New Jersey*, 250 F.3d 188 (3d Cir. 2001) ............................................... 17

*BMW of North America v. Gore*, 517 U.S. 559 (1996) .................................................. 36

*Bowman v. City of Middletown*, 91 F. Supp. 2d 644 (S.D.N.Y. 2000) .................................... 19

*Bradshaw v. Township of Middletown*, 296 F. Supp. 2d 526 (D.N.J. 2003) .............................. 19

*Cooper v. Cape May County Bd. of Social Servs.*, 175 F. Supp. 2d 732 (D.N.J. 2001) .............. 19

*Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267 (3d Cir. 2001) ........................ 11, 12

*Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828 (Md. 2004) ........................ 37

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ................................ 28

*Doe v. Cahill*, 884 A.2d 451 (Del. 2005) .............................................................. 21

*Dunn v. HOVIC*, 1 F.3d 1371 (3d Cir. 1993) ........................................................... 37

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) .............................................. 29, 30

*Feldman v. Phila. Hous. Auth.*, 43 F.3d 823 (3d Cir. 1994) ........................................... 17

*Gannett Co. v. Kanaga*, 750 A.2d 1174 (Del. 2000) .................................................... 32

*Garcetti v. Ceballos*, No. 04-473, 2006 U.S. LEXIS 4341 (S.Ct. May 30, 2006) ............... passim

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ............................................................ 22

*Garrison v. Mollers N. Am., Inc.*, 820 F. Supp. 814 (D. Del. 1993) ................................ 12, 36

*Gill v. Del. Park*, 294 F. Supp. 2d 638 (D. Del. 2003) .............................................. 21

# TABLE OF AUTHORITIES
(continued)

**Page**

*Grigley v. City of Atlanta*, 136 F.3d 752 (11th Cir. 1998) ............................................................... 20

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989) ......................................... 21

*Hartnett v. Brown & Bigelow*, 394 F.2d 438 (10th Cir. 1968) ................................................. 34

*Hazelwood v. Ill. Cent. Gulf. R.R.*, 450 N.E.2d 1199 (Ill. App. Ct. 1983) ................................. 37

*Henry v. Hess Oil V.I. Corp.*, 163 F.R.D. 237 (D.V.I. 1995) ....................................................... 12

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ......................................................... 28

*LifeScan, Inc. v. Home Diagnostics, Inc.*, 103 F. Supp. 2d 345 (D. Del. 2000) ......................... 12

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) ............................................... 11

*Magee v. Gen. Motors Corp.*, 213 F.2d 899 (3d Cir. 1954) ......................................................... 12

*Max's Seafood Café v. Quinteros*, 176 F.3d 669 (3d Cir. 1999) ............................................... 11

*McCormick v. City of Wildwood*, 439 F. Supp. 769 (D.N.J. 1977) ............................................. 34

*McDaniels v. Flick*, 59 F.3d 446 (3d Cir. 1995) ........................................................................ 11

*McDonald v. Smith*, 472 U.S. 479 (1985) ................................................................................... 20

*Mitchell v. Wilmington Trust Co.*, 449 A.2d 1055 (Del. Ch. 1982) ........................................... 38

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243 (1940) ....................................................... 12

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) .......................................................... 21, 22

*North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194 (3d Cir. 1995) ........................ 11

*Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000) ............................................................... 30

*Orkin Exterminating Co. v. Jeter*, 832 So. 2d 25 (Ala. 2001) ................................................... 37

*Pickering v. Board of Education*, 391 U.S. 563 (1968) ............................................................. 16

*Prentice v. Zane's Admin.*, 49 U.S. 470 (1850) ........................................................................ 34

*Ramunno v. Cawley*, 705 A.2d 1029 (Del. 1998) ....................................................................... 26

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ............................................ 11

## TABLE OF AUTHORITIES
(continued)

**Page**

*Riley v. Moyed*, 529 A.2d 248, 250 (Del. 1987) .................................................... 21, 23

*San Filippo v. Bongiovanni*, 30 F.3d 424, 442 (3d Cir. 1994)................................... 18, 19, 20, 39

*Schreffler v. Bd. of Educ. of Delmar Sch. Dist.*, 506 F. Supp. 1300 (D. Del. 1981).................... 37

*Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061 (3d Cir. 1996) ................................ 36

*Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198 (3d Cir. 1986) ...................... 36, 38

*St. Amant v. Thompson*, 390 U.S. 727 (1968) ............................................................... 22

*Strauss v. Biggs*, 525 A.2d 992 (Del. 1987)................................................................. 36

*Suarez Corp. v. McGraw*, 202 F.3d 676 (4th Cir. 2000) ................................................. 32, 33

*Williamson v. Consol. Rail Corp.*, 926 F.2d 1344 (3d Cir. 1991) ................................................. 36

*Woodson v. Scott Paper Co.*, 109 F.3d 913 (3d Cir. 1997) ............................................. 12, 33, 34

*X-Men Secs., Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999) ......................................... 32, 33

*Zhadan v. Downtown L.A. Motors*, 66 Cal. App. 3d 481 (Cal. Ct. App. 1976)........................... 37

## STATUTES

42 U.S.C. § 1983.................................................................................................. 1

## MISCELLANEOUS

Restatement (Second) of Torts § 908........................................................................... 36

*Black's Law Dictionary* (8th ed. 2004) ....................................................................... 18

I.    **STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS**

These consolidated cases arise under 42 U.S.C. § 1983 and the laws of the State of Delaware.  Defendants are L. Aaron Chaffinch, the retired Superintendent of the Delaware State Police ("DSP"), Thomas F. MacLeish, currently the Superintendent, and David B. Mitchell, Secretary of Safety and Homeland Security for the State of Delaware.  The plaintiffs are B. Kurt Price, Wayne Warren, and Christopher Foraker, three of the four state troopers assigned to the Firearms Training Unit of the DSP at the point the DSP closed its indoor firing range in March 2004.

The three plaintiffs alleged in Civil Action No. 04-956-GMS (the "Price Action"), filed on August 19, 2004, that defendants Chaffinch and MacLeish retaliated against them in violation of the First Amendment's Free Speech Clause after they exercised their rights to report workplace problems through the DSP chain of command and to the State Auditor of Accounts (Count I).  (D.I. #1.)  On October 14, 2005, plaintiffs filed an Amended Complaint, adding a claim that defendants' conduct violated the First Amendment's Petition Clause (Count II).  (App. at A-165 – A-193; D.I. #45.)

Plaintiff Foraker filed Civil Action No. 04-1207-GMS (the "Foraker Action") on August 30, 2004, alleging that Chaffinch and MacLeish retaliated against him in violation of the First Amendment's Free Speech Clause (Count I) and Petition Clause (Count II) because he had sued defendant Chaffinch in 2002 over a lateral job transfer.  (App. at A-194 – A-218; D.I. #1.)  Plaintiff Foraker further alleged that defendants Chaffinch and MacLeish made statements about him that were defamatory under Delaware law (Count III) and invaded his privacy (Count IV).  (*See id.*)

On January 25, 2006, the parties filed summary judgment motions in both cases as to all counts except that Foraker did not move for summary judgment on his defamation and invasion of privacy claims. (D.I. ##80-86 (Price Action); D.I. ##60-66 (Foraker Action).) On April 10 and 13, 2006, the Court denied plaintiffs' motions for summary judgment. (D.I. #135 (Price Action); D.I. #112 (Foraker Action).) On May 12, 2006, the Court denied defendants' motions for summary judgment in the Price Action, and denied it in the Foraker Action except for Foraker's claim for invasion of privacy. (D.I. #167 (Price Action); D.I. #118 (Foraker Action).) The Court also found that plaintiff Foraker is a limited purpose public figure who must prove "actual malice" to establish a claim for defamation. (*See id.*)

By Order dated April 18, 2006, the Court granted plaintiffs' motion to consolidate the Price and Foraker Actions for trial. (D.I. #138 (Price Action); D.I. #117 (Foraker Action).)

Trial commenced on May 15, 2006, and lasted for twelve days. At the conclusion of plaintiffs' case and again at the conclusion of all of the evidence, defendants moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. On May 30, 2006, the day the Court charged the jury, the United States Supreme Court decided *Garcetti v. Ceballos*, No. 04-473, 2006 U.S. LEXIS 4341 (S.Ct. May 30, 2006), which circumscribes the scope of First Amendment protection afforded public employees who speak on matters of public concern pursuant to their duties as public employees. *Garcetti* clearly bars the Price Action as a matter of law. The jury returned a verdict in favor of the plaintiffs except for its finding in favor of defendant MacLeish as to Foraker's defamation claim. (*See* App. at A-1 – A-15 (Verdict Forms); D. I. ##182-84 (Price Action).)

-2-

On May 31, 2006, defendants made an oral motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) and, alternatively, a motion to alter or amend the judgment under Rule 59(e). The Court entered judgment on the verdict on June 15, 2006. (D.I. # 186.)

Defendants submit this motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) on the entire Price Action and the defamation claim in the Foraker Action. If the Court determines that it cannot act under Rule 50(b) because *Garcetti* was not raised expressly in the defendants' Rule 50(a) motions, the defendants ask the Court to amend the judgment pursuant to Fed. R. Civ. P. 59(e) by vacating the judgment entered on June 15 and entering judgment in defendants' favor and against all plaintiffs in the Price Action. *Garcetti* requires this result. Alternatively, defendants move for a new trial under Fed. R. Civ. P. 59(a) on issues as to which the Court does not grant judgment as a matter of law.

## II.     **SUMMARY OF THE ARGUMENT**

1.     Defendants are entitled to judgment under either Rule 50(b) or Rule 59(e) in the Price Action because, under *Garcetti*, plaintiffs have no First Amendment protection against their superior officers' reaction to statements the plaintiffs made during the course of their duties.

2.     Defendants are entitled to judgment as a matter of law with respect to plaintiffs' First Amendment Petition Clause claims in the Price Action because plaintiffs' speech about the conditions at the firing range was not a "petition" under the First Amendment. If plaintiffs' speech about the firing range was a "petition," defendants are entitled to judgment as a matter of law because the "petition" is not constitutionally protected under *Garcetti*.

3.     Defendants are entitled to judgment as a matter of law with respect to Foraker's claim of defamation against Chaffinch in the Foraker Action because (a) Foraker has failed to

demonstrate actual malice, (b) each of the statements at issue is true, and (c) Foraker has failed to demonstrate reputational harm.

4.  Defendants are entitled to a new trial because:

(a)  the Court erred in admitting the testimony of Ernest "Bud" Fini as an expert on hiring practices in the U.S. firearms industry;

(b)  the Court erred in refusing to give a jury instruction that defendant Chaffinch had a First Amendment right to speak out about the firing range;

(c)  once the Court applies *Garcetti* to grant defendants' motion for judgment as a matter of law with respect to Foraker's claims in the Price Action, the verdict in Foraker's favor is ambiguous;

(d)  the consolidated trial of the claims of Price and Warren and the claims of Foraker resulted in prejudice to defendants and an unjust disposition of both cases;

(e)  the evidence does not support the jury's award of punitive damages; in the alternative, the punitive damages award should be remitted because it is disproportionate to the evidence presented at trial of the net worth of defendants.

## III.  CONCISE STATEMENT OF FACTS

### A.  The Parties

Christopher Foraker became a sergeant and the non-commissioned officer-in-charge (NCOIC) of the Firearms Training Unit ("FTU") on August 1, 2001.  He had worked in the FTU as a corporal since 1997.  On April 8, 2002, Col. Chaffinch transferred Foraker from the FTU and replaced him with Sgt. Richard Ashley.  Foraker challenged the lateral reassignment in *Foraker v. Chaffinch*, No. 02-302-JJF (D. Del.), contending that Chaffinch retaliated against him for excessively criticizing a subordinate range officer who happened to be a friend of Chaffinch.

In June 2003, a jury found that Col. Chaffinch had violated Foraker's free-speech rights by transferring him and awarded Foraker compensatory and punitive damages. After the verdict, the parties settled the case, agreeing that Chaffinch would return Foraker to the FTU as NCOIC. (App. at A-55 – A-56.) Foraker replaced Ashley on December 1, 2003, and remained in the FTU until October 2005, when he went on medical leave.

Kurt Price was first assigned to the FTU in 1996; he worked there continuously until April 2006. Price has suffered severe noise-induced hearing loss. For that reason, the DSP assigned him to light duty in June 2004 (App. at A-226 – A-227 (Pls.' Ex. 4)); he went on medical leave in March 2005 for stress. On April 7, 2006, Price's sick leave and other accumulated time were exhausted, and he retired from the DSP. (App. at A-230 – A-231.)

Wayne Warren was first assigned to the FTU in 2001. Like Price, he has suffered noise-induced hearing loss. He has been on light duty since June 2004 (App. at A-236 –A-237 (Pls.' Ex. 5)), and on medical leave for stress since May 2005. Warren remains on sick leave.

### B.    The DSP Firing Range

The Firearms Training Unit conducts weapons and use-of-force training for state troopers and other law enforcement officers within the State of Delaware. It is also responsible for all recordkeeping and field activities associated with DSP weapons and body armor. The FTU reports to the Assistant Director of Training at the DSP Training Academy, who in turn reports to the Director of Training, who is responsible for all training and certification within the DSP.

The State Department of Administrative Services ("DAS"), Division of Facilities Management, in cooperation with the DSP, built an indoor firing range in Smyrna that opened in September 1998. The firing range hosted training shoots for a myriad of federal, state and local law enforcement agencies in Delaware during its years of operation. The range closed in March

2004 due to environmental contamination.  (App. at A-238 – A-239.)  It remains closed pending
modifications to its mechanical systems.

The firing range was the subject of complaints by DSP personnel during the entire time it
was operational.  The biggest complaints were about the heating, ventilating and air conditioning
("HVAC") system.  Notwithstanding the complaints, the HVAC operated for more than five
years with only periodic stoppages for cleaning.  (App. at A-248.)

      **C.**     **Range Maintenance**

When the firing range opened in the fall of 1998, troopers assigned to the FTU received
instruction in the maintenance of the bullet trap in the indoor range.  Maintenance included
removing shotgun wadding and paper target "blow back" from the water tank below the bullet
trap, unclogging the pumps that circulated water from the tank through the bullet trap, and
replacing filters on the water system.  (App. at A-76 – A-77 (5/16/06 Trial Tr., Testimony of W.
Warren, at 424:19 – 427:18); A-124 (5/19/06 Trial Tr., Testimony of B. Price, at 1002:4 –
1004:4); A-268 – A-269 (Trial Tr., Testimony of R. Ashley (dep. tr. at 8:24 – 13:12); A-256 –
A257 (Trial Tr., Testimony of A. Parton (dep. tr. at 9:11 – 13:20)); *see also* Testimony of C.
Foraker.)  This routine maintenance prevented the water system from becoming clogged.

In 2000, as a result of concerns about the elevated blood lead levels of some of the FTU
troopers, the DSP switched from lead to non-leaded "frangible ammunition" in the firing range.
Frangible ammunition splatters into bullet fragments and dust when it hits.  (App. at A-269 – A-
270 (Trial Tr., Testimony of R. Ashley (dep. tr. at 13:23 – 14:14)); *see also* App. at A-249.)
Frangible ammunition particles are washed by the water system into the water tank that
recirculates water back into the water system.  At the DSP range, these particles and water
formed a hard substance that clogged the pumps, filters, and spray nozzles and caused the
conveyor system to freeze up.  (App. at A-268 (Trial Tr., Testimony of R. Ashley (dep. tr. at 9:3-

19)); A-124 (5/19/06 Trial Tr., Testimony of B. Price, at 1003:3-17).)  In September 2003, NCOIC Ashley hired a conveyor company to replace the metal conveyor belt with a drag belt system designed to scoop the clay-like substance and carry it to the end of the belt where it could be pushed into drums for disposal.  (*See* App. at A-269 (Testimony of R. Ashley (dep. tr. at 11:11 – 12:9)).)  The drag belt system had difficulties, too, and broke down.  By the time it broke down, Foraker had replaced Ashley.  (App. at A-281.)

### D. The FTU Staff Stopped Maintenance On The Bullet Trap

Foraker and his three subordinates decided within a week of Foraker's return to the range to "suspend" the activities necessary to keep the water system of the bullet trap operational.  (*See* App. at A-80 (5/16/06 Trial Tr., Testimony of W. Warren, at 437:10-17); A-126 (5/19/06 Trial Tr., Testimony of B. Price, at 1010:6-14); A-159 (5/22/06 Trial Tr., Testimony of C. Foraker, at 1396:7-20); *see also* App. at A-240 – A-253; Testimony of J. Rothenburger.)  At the point they stopped performing the maintenance activities, Foraker and the FTU staff understood that their failure to perform those functions would cause the bullet trap system to fail.  (*See* App. at A-80 (5/16/06 Trial Tr., Testimony of W. Warren, at 438:23 – 439:13); A-126 (5/19/06 Trial Tr., Testimony of B. Price, at 1010:16 – 1011:6)); *see also* Trial Testimony of Chris Foraker.)

Foraker encountered mechanical difficulties with the bullet trap shortly after he "suspended" maintenance, and on December 19, 2003, he began to report these difficulties up the DSP chain of command.  Lt. Col. MacLeish responded by asking Foraker for cost estimates for the repair of the conveyer-belt system.  (App. at A-280 – A-281.)  He also asked Capt. Greg Warren, who, as Director of Training, was responsible for the range, to prepare a written report addressing Foraker's concerns and proposing possible solutions.  (*Id.*)  Foraker and individuals above him in the chain of command continued this dialogue regarding the deteriorating conditions at the range through March 2004.  (*Id.*; *see also* App. at A-283 – A-284.)

### E.      The April 6, 2004, Media Tour of the Firing Range

Beginning on March 20, 2004, articles began to appear in the Delaware State News about conditions at the firing range, with other news articles following.  (*See, e.g.,* App. at A-287 – A-291.)  On April 6, 2004, DAS Secretary Gloria Homer conducted a media tour through the range, which was not operational at the time; defendant Chaffinch attended the tour.  During the event, Secretary Homer made a number of comments to the effect that the facility had been poorly maintained by DSP personnel.  (App. at A-292 – A-297.)  Chaffinch was quoted as follows in the April 7 edition of the State News:

> "When I was here in the fall, everything was going as well as the previous times I'd been here."

> "There was some discoloration in the bullet trap but that was about it," he said.  "I think people who live in glass houses shouldn't throw stones.  It's a lot dirtier now.  Things seemed in their proper places in the fall.  I've never seen it like this."

> "The previous sergeant in charge did a good job," he continued.  "Things changed in December when another sergeant came in.  That's at least a portion of where the ball was dropped."

> "[T]he bullet trap required hands-on, daily cleaning," he said.  "Sgt. Ashley was willing to do that."

> "I cannot say Sgt. Foraker was willing to do that.  He was interested in instruction and teaching people how to shoot.  He did not feel (bullet trap cleaning) was part of his purview.  He felt that was putting him in harm's way."

(*Id.*)

### F.      The State Auditor's Investigation

On April 21, 2004, the Governor requested the State Auditor to review "the issues surrounding the closing of the DSP Firing Range in March 2004."  (App. at A-240.)  As part of the investigation, the investigators from the State Auditor's office interviewed the four DSP range officers and Capt. Greg Warren at the office of their common attorney in Wilmington, and

re-interviewed Foraker and Price on July 28, 2004.  As state troopers, plaintiffs had a duty to

cooperate with the investigation and to describe their experiences at the firing range to the

investigators.  (*See* App. at A-63 (5/16/06 Trial Tr., Testimony of W. Warren, at 307:2-4);  A-84

– A-85 (5/17/06 Trial Tr., Testimony of D. Baylor, at 554:23 – 555:9); A-116 (5/19/06 Tr.,

Testimony of B. Price, at 970:23 – 971:3); A-131 – A-132 (5/22/06 Trial Tr., Testimony of G.

Warren, at 1202:23 – 1206:14); A-320 (Pls.' Answers to Interrogatories).)

The State Auditor issued his report on October 12, 2004.  He made the following

conclusions pertinent to this case:

> On December 1, 2003, a new Sergeant took over command of the
> firing range.  In an interview he informed us that shortly thereafter
> he met with the current staff and as a result of that meeting a
> decision was made not to perform any maintenance at the range.
> The staff made the decision not to continue performing
> maintenance and custodial functions due to health related issues
> and not being qualified to perform those functions.
>
> * * *
>
> We can only surmise that with the failing of the conveyor system,
> no maintenance performed on the bullet recovery system, and no
> custodian maintenance being performed to clean the firing range,
> that these situations contributed to an unhealthy and unclean
> environment leading to the ultimate closing of the firing range.

(App. at A-250.)  The closing of the range resulted in part from Foraker's decision to stop

performing maintenance on the bullet trap.

### G.     Evidence of Damage to Chris Foraker's Reputation

In support of his claim that Chaffinch defamed him during the April 6, 2004 media tour,

Foraker introduced evidence of reputational harm in the form of out-of-court questions by

Foraker's acquaintances regarding the reason why the range was closed.  (*See* App. at A-143

(5/22/06 Trial Tr., Testimony of S. Foraker, at 1328:7 – 1329:2); *see also* Testimony of Chris

Foraker.)  Foraker also introduced the out-of-court statement of Deputy Attorney General

Michael Tupman at a meeting with firearms salesmen that Foraker was "like a bad penny [who]

just keep[s] turning up."  (*See* App. at A-67 (5/16/06 Trial Tr., Testimony of W. Warren, at

381:11 – 382:16); A-64 – A-67 (5/16/06 Trial Tr., sidebar discussion, at 372:25 – 381:8); *see*

*also* Testimony of Chris Foraker.)  Foraker offered no other evidence in support of his claim that

his reputation has been harmed by allegedly defamatory statements.  Indeed, one of plaintiffs'

own witnesses, Capt. Ralph Davis, stated that Foraker's reputation had not been harmed as a

result of the statements at issue.  (*See* Testimony of Ralph Davis.)  The testimony of Maj. Joe

Papili and Sgt. Al Parton was consistent with Davis's.  (*See* App. at A-259 (Testimony of A.

Parton (dep. tr. at 19:10 – 20:5)).)

H.    <strong><u>Disputed Damages Testimony</u></strong>

Over the defendants' objections, plaintiffs introduced opinion testimony under Rule 702,

Fed. R. Evid., from Ernest "Bud" Fini on hiring practices in the U.S. firearms industry.  (*See*

App. at A-98 – A-105 (5/18/06 Trial Tr., Testimony of E. Fini, at 871:4 – 897:12); App. at A-

298 – A-301 (Fini Report).)  Since Foraker has suffered no hearing loss and can work as a

trooper until age 55, this was the only testimony from which the jury could have concluded that

Foraker suffered any wage loss as a result of the events in the case.


IV.    <strong><u>ARGUMENT</u></strong>

    A.    <strong><u>Standard of Review</u></strong>

        1.    <strong>Renewed Motion for Judgment as a Matter of Law under Rule 50(b)</strong>

Judgment as a matter of law may be granted under the Federal Rules of Civil Procedure

when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party

on that issue." Fed. R. Civ. P. 50(a). In *McDaniels v. Flick*, 59 F.3d 446 (3d Cir. 1995), the

Third Circuit stated that:

> Such a motion should be granted only if, viewing the evidence in
> the light most favorable to the nonmovant and giving it the
> advantage of every fair and reasonable inference, there is
> insufficient evidence from which a jury reasonably could find
> liability. In determining whether the evidence is sufficient to
> sustain liability, the court may not weigh the evidence, determine
> the credibility of witnesses, or substitute its version of the facts for
> the jury's version.

*Id.* at 453 (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)); *see*

*also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-50 (2000).

A post-trial motion for judgment as a matter of law under Rule 50(b) must be preceded

by a Rule 50(a) motion "sufficiently specific to afford the party against whom the motion is

directed with an opportunity to cure possible defects in proof which otherwise might make its

case legally insufficient." *Lightning Lube, Inc.*, 4 F.3d at 1173.

### 2.      Motion to Alter or Amend Judgment Under Rule 59(e)

Defendants move in the alternative to amend the judgment pursuant to Fed. R. Civ. P.

59(e) by vacating the judgment entered on June 15, 2006, and entering judgment in favor of the

defendants on all parts of the Price Action. The Court may grant a motion to alter or amend a

judgment on one of three grounds: (1) "an intervening change in controlling law;" (2) "the

availability of new evidence;" or (3) "the need to correct clear error [of law] or prevent manifest

injustice." *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995);

*see also Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). The Price Action

fits the first and third grounds. The decision whether to grant a motion to amend a judgment is

left to "the sound discretion of the district court." *See Cureton v. Nat'l Collegiate Athletic Ass'n*,

252 F.3d 267, 272 (3d Cir. 2001).

### 3.    Motion for New Trial Under Rule 59(a)

The defendants here also ask for a new trial.  In an action where there has been a trial by jury, a "new trial may be granted to all or any of the parties and to all or part of the issues."  Fed. R. Civ. P. 59(a).  New trials may be granted "for any of the reasons for which new trials have been granted in actions at law in the Courts of the United States."  *Id.*

A district court may grant a motion for a new trial if it determines (1) the verdict is against the weight of the evidence, (2) the damages are excessive, or (3) substantial errors were made in the admission or rejection of evidence or the giving or refusal of instructions. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S. Ct. 189, 194 (1940); *see also Woodson v. Scott Paper Co.*, 109 F.3d 913, 936 (3d Cir. 1997) (granting new trial "because of errors in the jury instructions"); *Garrison v. Mollers N. Am., Inc.*, 820 F. Supp. 814, 820 (D. Del. 1993) (stating that new trial is available where "jury's verdict is against the weight of the evidence and the jury's damage award is excessive") (citations omitted).

The standard for a new trial is "substantially less demanding than that for judgment as a matter of law."  *Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1185 (D.N.J.), *aff'd*, 4 F.3d 1153 (3d Cir. 1993).  For example, a court analyzing a motion for a new trial need not view the evidence in the light most favorable to the verdict winner.  *See Magee v. Gen. Motors Corp.*, 213 F.2d 899, 900 (3d Cir. 1954); *see also Henry v. Hess Oil V.I. Corp.*, 163 F.R.D. 237, 243 (D.V.I. 1995).

"The decision to grant or deny a new trial is committed to the sound discretion of the district court."  *LifeScan, Inc. v. Home Diagnostics, Inc.*, 103 F. Supp. 2d 345, 351 (D. Del. 2000) (citations omitted).

-12-

**B.     The Court Should Grant Defendants' Motion for Judgment as a Matter of Law with Respect to the Jury's Findings of First Amendment Retaliation in the Price Action and of Defamation (Count III) in the Foraker Action.**

        **1.     The Court Should Enter Judgment in Favor of Defendants in the Price Action Because *Garcetti v. Ceballos* Holds That Public Employees Who Make Statements Pursuant to Their Official Duties are not Protected by the First Amendment.**

               a.     *Garcetti* is a change in the law that deprives the Price plaintiffs of a cause of action on the facts they proved.

Defendants are entitled to judgment as a matter of law in the Price Action because the speech that forms the basis of plaintiffs' retaliation allegations was made pursuant to their official duties as Delaware State Police troopers, and under *Garcetti v. Ceballos*, No. 04-473, 2006 U.S. LEXIS 4341 (S.Ct. May 30, 2006), the First Amendment does not protect public employees who make statements pursuant to their official duties. *Id.* at *21.

The plaintiff in *Garcetti* was a deputy district attorney whose job responsibility during the relevant period included the review of affidavits used by prosecutors to obtain search warrants. *See id.* at *20-21. He reviewed a search warrant, found what he felt were "serious misrepresentations" in it, and recommended dismissal of the prosecution. *See id.* at *8. In the aftermath of the criminal defendant's unsuccessful attempt to have the case dismissed based on the deputy D.A.'s testimony in opposition to the warrant, the deputy D.A. claimed that his superiors subjected him to a "series of retaliatory employment actions," including a reassignment, a transfer, and denial of a promotion. *See id.* at *9-10.

The Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline." *See id.* at *21.

In the Price Action, plaintiffs Price, Warren, and Foraker asserted repeatedly that they reported their concerns about the firing range "pursuant to their official duties," the category of

employee speech that *Garcetti* now says is unprotected.  The following is a summary of testimony introduced by the Price plaintiffs on this point.

- Foraker was in sole charge of the range, and its condition was his responsibility; thus, any reports up the chain of command on conditions there were within his official job duties.  (*See* App. at A-395 – A-396 (Pls.' Ex. 7).)

- Foraker's performance appraisal for 2003-2004 included high praise from his superior officers for his reporting on conditions at the range.  Lt. Ralph Davis, Sgt. Foraker's immediate supervisor in the chain of command, commented:

    > Upon returning to the DSP FTU, Sgt. Foraker immediately identified safety issues that placed the health of FTU staff in serious jeopardy.  Sgt. Foraker immediately brought this to the attention of the DSP Academy staff and continued to provide the Academy staff, as well as the DSP Executive Staff, with information concerning the conditions at the range.

    (*See id.*)

- Price and Warren assisted Foraker at the range; thus, reporting problems up the chain of command was one of their official duties.  (*See* App. at A-47, A-48, A-50, A-51, A-53  (5/16/06 Trial Tr., Testimony of W. Warren, at 243:15-22, 244:6-22, 247:2-5, 255:13-17, 258:8-16, 260:16-21, 265:22-24); A-85 (5/17/06 Trial Tr., Testimony of D. Baylor, at 555:10-24); A-113 – A-114 (5/19/06 Trial Tr., Testimony of B. Price, at 960:20 – 961:7).)

- Both Price and Warren received positive performance appraisals from Foraker for their role in identifying and reporting problems.  Under the heading "Areas or incidents where performance was distinguished, exceeded expectations, or resulted in commendation," Foraker wrote in Price's performance appraisal:

    > Cpl/3 Price aided his supervisors in identifying safety issues at the facility that placed the health and safety of his coworkers, our families, our students and their families at risk.  Cpl/3 Price has reached out to experts in the field of ventilation, firing range design along with heavy metal exposure and contamination and established a rapport with these professionals to search out the root cause and contributing factors surrounding the dangers we face in exposure to heavy metal contamination.  Cpl/3 Price contacted and established communication with the experts in those fields to obtain a greater understanding in an effort to help protect and inform all assigned instructors, all of those who train at the facility, the cleaning personnel and all of our family members as well as the Division of State Police.

(App. at 381 (Pls.' Ex. 15).)  Under the same heading in Warren's performance appraisal, Foraker wrote:

> Cpl/3 Warren aided his supervisors in identifying safety issues at the facility that placed the health and safety of his coworkers, our families, our students and their families at risk. Cpl/3 Warren has conducted much research in the areas contributing to the cause surrounding the dangers of heavy metal exposure and contamination along with contacting and establishing a rapport with experts in that field of understanding in an effort to help protect and inform all instructors assigned to the facility, all of those who train at the facility, the civilian cleaning personnel and all of our family members as well as the Division of State Police.

(App. at A-369 (Pls.' Ex. 20).)

- Both Price and Warren testified that they had a professional duty to meet with the Auditor's investigators to discuss problems at the range:

  Price's Testimony:

  Q.  Were you trying to – why did you speak to the auditors?

  A.  *It was my duty to speak to the auditors*.  The order came down from the executive office of the State of Delaware, meaning the Governor's office.  *I am bound by that order*.

  (*See* App. at A-116 (emphasis added) (5/19/06 Tr., Testimony of B. Kurt Price, at 970:23 – 971:3).)

  Warren's Testimony:

  Q.  Now, Wayne, why did you speak to the auditors?

  A.  There was an auditors' investigation.  *I was required to speak to them.*

  (*See* App. at A-63 (emphasis added) (5/16/06 Tr., Testimony of Wayne Warren, at 307:2-4).)

- Price, Warren, and Foraker elicited testimony at trial from Col. MacLeish, Ret. Maj. David Baylor, Ret. Capt. Greg Warren, and Capt. Ralph Davis that their reports on problems at the range both up the chain of command and to the investigators for the Auditor's Office were within their official duties:

  Ret. Maj. Baylor's Testimony:

-15-

Q. Now, you remember that it was the Governor herself who ordered the auditors to investigate the conditions at the range?

A. Yes, sir.

Q. And the State Police, was it under a duty to cooperate in that investigation?

A. Yes, sir.

Q. And when the – if the Auditor's office contacted my clients and wanted to interview them, they had a duty to obey that request. Isn't that correct?

A. Whenever the Governor directs us to do something, it needs to be done.

(*See* App. at A-84 – A-85 (5/17/06 Trial Tr., Testimony of D. Baylor, at 554:23 – 555:9); *see also* App. at A-131 – A-132 (5/22/06 Trial Tr., Testimony of G. Warren, at 1202:23 – 1206:14).)

This is not a case in which "there is room for serious debate" about the scope of plaintiffs' employment duties. *Garcetti*, 2006 U.S. LEXIS 4341, at *26. The record is replete with evidence that plaintiffs made statements up the chain of command or to the investigators for the Auditor of Accounts pursuant to their official duties as Delaware State Police troopers. There is no evidence to the contrary. Unlike in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731 (1968), the plaintiffs made none of their statements in a public forum.[1] Under *Garcetti*, Price, Warren, and Foraker were not speaking as citizens when they made these statements. *See Garcetti*, 2006 U.S. LEXIS 4341, at *21. Accordingly, they have no cause of action for actions taken against them by the defendants.

---

[1]    All reports that Foraker, Price, and Warren made concerning the conditions of the range were either up the chain of command or to the investigators for the Auditor of Accounts. (*See* App. at A-47 (5/16/06 Trial Tr., Testimony of W. Warren, at 244:6-22); A-87 – A-88 (5/17/06 Trial Tr., Testimony of David Baylor, at 566:16 – 567:2); A-113 – A-114 (5/19/06 Trial Tr., Testimony of B. Price, at 960:20 – 961:7); A-131 – A-132 (5/22/06 Trial Tr., Testimony of G. Warren, at 1202:23 – 1206:14); A-164 (5/22/06 Trial Tr., Testimony of C. Foraker, at 1416:10-14); *see also* A-391, A-393 (Pls.' Ex. 7).)

> **b.**     The Court should grant judgment as a matter of law pursuant to Rule 50(b) on the claims now barred by *Garcetti*; in the alternative, the Court should amend its judgment entered on June 15, 2006, to reflect that *Garcetti* is now controlling law on the claims in the Price Action.

The Court can ordinarily grant a Rule 50(b) motion only where the moving party has previously made a motion pursuant to Rule 50(a), and then only on the grounds presented in the Rule 50(a) motion.  Defendants submit that, although the *Garcetti* issue was not the subject of a pre-verdict motion for judgment as a matter of law, the Court can grant a Rule 50(b) motion because of the extraordinary circumstances of this case.

Before the Supreme Court's decision in *Garcetti*, Third Circuit law under the First Amendment, protected the statements of public employees made in the course of their duties.  It "declined to distinguish between a public employee's expression 'as an employee' and a public employee's expression 'as a citizen.'"  *Baldassare v. New Jersey*, 250 F.3d 188, 197 (3d Cir. 2001) (quoting *Azzaro v. County of Allegheny*, 110 F.3d 968, 979 (3d Cir. 1997)); *see also Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 830-31 (3d Cir. 1994) (finding that speech of government employee was constitutionally protected although the employee's conduct was "required" by his employer).  Thus, a statement an employee made in the course of his or her duties was entitled to the same protection as a statement the employee made as a citizen unconnected to his or her job.  *Garcetti* overturned settled Third Circuit law.

Since the defendants could not have made a Rule 50(a) motion on *Garcetti* grounds during the trial, the Court should allow the defendants to raise the issue in a post-trial motion for judgment as a matter of law because *Garcetti* clearly bars the Price Action.

In the alternative, the Court should exercise its discretion under Rule 59(e) to amend the judgment to account for *Garcetti*.  The Supreme Court's holding in *Garcetti* is a change in the

controlling law and, as such, is a basis for invoking Rule 59(e).[2]  It would also be a miscarriage

of justice for the plaintiffs to prevail when the Supreme Court decided during the trial that these

types of claims are not actionable under the First Amendment.

In either case, the Court should enter judgment in favor of defendants and against the

plaintiffs on all parts of the Price Action.

> **2.    Defendants Renew Their Motion for Judgment as a Matter of Law on Plaintiffs' Petition Clause Claims in the Price Action Because Plaintiffs Have Not Stated a Claim Under the First Amendment Petition Clause.**
>
>> a.    Defendants are entitled to judgment as a matter of law because plaintiffs' speech about the conditions at the firing range was not a "petition" under the First Amendment.

The plaintiffs sought in the Price Action to add an additional constitutional gloss to their

speech about the range by labeling it as a "petition."  Characterizing a particular form of speech

as a petition, however, does not by itself bestow the constitutional protection of the First

Amendment's Petition Clause.  *San Filippo v. Bongiovanni*, 30 F.3d 424, 442 (3d Cir. 1994).

The Third Circuit, noting that the Petition Clause is not meant to be "a graceful but redundant

appendage of the clauses guaranteeing freedom of speech and press," has narrowly defined a

"petition" in the constitutional sense as an invocation of a "formal mechanism" that has been

adopted by a government "for redress of those grievances for which government is allegedly

accountable."  *Id.* at 439, 442; *see* Black's Law Dictionary (8th ed. 2004) (defining "petition" as

a "formal written request presented to a court or other official body").  Consistent with this

heightened appreciation for the formalities attending this particularized form of speech, courts

have recognized constitutionally protected "petitions" in lawsuits, administrative claims, and

---

[2] The Court could also vacate the judgment and order a new trial under Rule 59(a), then treat the instant motion as a motion for summary judgment based on the trial record, and enter judgment in favor of defendants under Rule 56.

employee-grievance procedures. *Id.* at 439 & n.18 ("[W]hat San Filippo characterizes as

'petitions' are not letters to the government-employer, but lawsuits and grievances directed at the

government-employer or its officials. Submissions of this sort purport to invoke formal

mechanisms for the redress of grievances."); *Bradshaw v. Township of Middletown*, 296 F. Supp.

2d 526, 546 (D.N.J. 2003), *aff'd* 2005 U.S. App. LEXIS 18622 (3d Cir. Aug. 29, 2005); *cf.*

*Bowman v. City of Middletown*, 91 F. Supp. 2d 644, 664 (S.D.N.Y. 2000) (stating that "the

administrative remedies for which an inmate enjoys a First Amendment right of petition are

limited to those set forth under state administrative law, such as sending a complaint to a state

bureau of prisons, as opposed to informal or intra-prison complaints") (citations omitted).

     The plaintiffs' statements about the range directed up the chain of command or to the

Auditor were not constitutionally cognizable petitions. Plaintiffs did not initiate formal

proceedings within the Delaware State Police or the Office of the Auditor of Accounts.

Foraker's internal statements to the DSP chain of command were informal criticisms that are not

"petitions" in the constitutional sense. *Cooper v. Cape May County Bd. of Social Servs.*, 175

F. Supp. 2d 732, 746 (D.N.J. 2001) (holding that "speech in many informal settings, including

letters, phone calls, and meetings with officials" does not "implicate the Right to Petition under

the First Amendment because [it] is not in the nature of a formal grievance procedure that the

Petition Clause is designed to protect."). Similarly, the plaintiffs' statements to the Auditor were

not formal claims or grievances; they were factual statements made to investigators.

     Because plaintiffs' statements were not protected under the Petition Clause, defendants

are entitled to judgment as a matter of law on Count II of the Price Action.

      b.        Even if plaintiffs' speech about the indoor firing range was a "petition," it is not constitutionally protected activity for the reasons set forth in *Garcetti*.

In *Garcetti*, the Supreme Court held that an employee is not entitled to First Amendment protection for speech made pursuant to his or her official duties.  Because the "right to petition is cut from the same cloth as the other guarantees of [the First] Amendment," *McDonald v. Smith*, 472 U.S. 479, 482 (1985), there is no principled reason why the government should not also be able to freely act against an employee whose speech might be characterized as a "petition."[3]  *Id.* at 485 ("These First Amendment rights are inseparable, and there is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions.") (citations omitted); *Grigley v. City of Atlanta*, 136 F.3d 752, 755 (11th Cir. 1998).  This is especially appropriate where, as in this case, the content, context, and scope of plaintiffs' Petition Clause claim are identical to their free speech claim.

The evidence is unambiguous that plaintiffs' speech about the range, even if understood as a "petition," was made pursuant to their official duties as officers responsible for the maintenance and conditions at that facility.  Thus, to safeguard the ability of the State as an employer to "control[] speech made by an employee in his or her professional capacity" and to prevent "permanent judicial intervention in the conduct of governmental operations," the Court should hold this so-called "petition" beyond the protective reach of the First Amendment and enter judgment as a matter of law in defendants' favor.

---

[3]      Defendants acknowledge that the Third Circuit has held that petitions are different from other, less formal types of protected free speech.  *San Filippo*, 30 F.3d at 441-42.  Specifically, a plaintiff asserting a violation of his or her petition rights need not prove that the petition in question, when made to the same government from which relief of the grievance might come, was a matter of public concern.  *Id.*  The Supreme Court's analysis in *Garcetti* of what constitutes First Amendment "protected activity," however, takes place at a level prior to any consideration of "public concern."  Thus, the differences between petition and speech recognized by the Third Circuit do nothing to immunize plaintiffs' Petition Clause claim from the new restrictions set forth in *Garcetti*.

   **3.**  **Defendants Renew Their Motion for Judgment as a Matter of Law on Foraker's Claim of Defamation Against Defendant Chaffinch Because (1) Foraker Has Failed to Demonstrate Actual Malice, (2) Each of The Statements at Issue is True, And (3) Foraker Has Failed to Demonstrate Reputational Harm.**

To establish a defamation claim under Delaware law, a plaintiff must "ultimately prove that: (1) the defendant made a defamatory statement; (2) concerning the plaintiff; (3) the statement was published; and (4) a third party would understand the character of the communication as defamatory." *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005). In addition, Plaintiff Foraker, who is a limited purpose public figure, must meet the exceedingly high burden of proving that the allegedly defamatory statements are false and that defendants made the statements with "actual malice." *Id.* Foraker cannot satisfy these legal requirements. The allegedly defamatory statements are set forth in the statement of facts at Section III.E.

    a.  <u>Plaintiff Foraker has failed to show that defendant Chaffinch spoke with "actual malice."</u>

As a limited purpose public figure, plaintiff Foraker must prove with clear and convincing evidence that defendant Chaffinch acted with actual malice. *Riley v. Moyed*, 529 A.2d 248, 250 (Del. 1987); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 270-71 (1964). Foraker has not met this burden.

"Actual malice" is a term of art in constitutional law that does not mean bad motive or ill will. *Harte-Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 666 (1989) ("the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term"). To prove actual malice, a plaintiff must establish that the defendant published a factually false statement of fact with actual knowledge that it was false or with "reckless disregard" of whether it was false. *New York Times*, 376 U.S. at 270-71; *Gill v. Del. Park*, 294 F. Supp. 2d 638, 646 (D. Del. 2003).

"Reckless disregard" is also a term of art.  *See New York Times*, 376 U.S. at 288 (finding of negligence "is constitutionally insufficient to show the recklessness that is required for a finding of actual malice").  Reckless disregard requires a showing that the defendant "in fact entertained serious doubts" as to the truth of the publication, *St. Amant v. Thompson*, 390 U.S. 727, 731-732 (1968), or that the challenged statements were published with a "high degree of awareness of their probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).  The Court's inquiry is *only* whether the author believed his statement was true when he made it.

Foraker's trial evidence was not even close to meeting this burden.  He has not shown that any of the statements made by defendant Chaffinch were objectively false, let alone that Chaffinch believed them to be false when he made them.  He has presented no evidence that Chaffinch did not in fact believe Foraker failed to perform all the duties of his job and "did something wrong."

Plaintiff's evidence of actual malice was (1) the argument that Chaffinch was aware of problems with the FTU before Foraker returned in December 2003, and (2) Chaffinch's statements to other state troopers before and after the April 6, 2004 press conference that he would "get" Foraker or "put it to" him.  (D.I. #79 at 37.)  These facts do not prove "actual malice" as a matter of law.

First, because actual malice requires a "high degree of awareness" of the probable falsity of the statement, Chaffinch's general awareness of problems at the range before December 2003 is largely immaterial.  Chaffinch reported to the *State News* that the range had been in operating condition during the previous fall (a fact that is not disputed), and noted that it was no longer in operating condition in April 2004.  Chaffinch's view was supported by the testimony of Richard Ashley, David Baylor, and William Bryson.  Even two of the plaintiffs, Price and Warren,

testified that the range was in better condition before Foraker's return than it was in December 2003.

Chaffinch told the *State News* that the previous sergeant did a "good job," obviously referring to the maintenance of the range, and that "things changed" when Foraker returned. Given the trial record, no reasonable jury could have found that Chaffinch said these things knowing that they were false or that there was a "high degree of awareness" that they were false. In fact, they appear to have been true, since Foraker admitted that he stopped doing maintenance, and it is obvious that the range went from *usable* before December 1 to *unusable* by February 1.

Given the state of the record, it is also impossible for a reasonable jury to have concluded that Chaffinch's comments about Ashley being willing to do bullet trap maintenance and Foraker feeling that it put him in harm's way were made with requisite awareness of falsity. Again, Foraker did not even prove that these statements were false.

The second part of Foraker's evidence, and undoubtedly what persuaded the jury, was the testimony of Ret. Maj. Baylor, and Captain Glenn Dixon that Chaffinch disliked Foraker and intended to avenge himself against him. While such evidence might show malice in layman's terms, it is not "actual malice" in First Amendment terms. The constitutional focus is on knowledge of the falsity of the statement the speaker actually made, not on the evil intent of the speaker in the abstract. Even if Foraker proved that Chaffinch went to the range on April 6, 2004, with the intention of doing him harm, he has not proved "actual malice" because he has not proved that Chaffinch knew that what he said was untrue when he said it. All of these elements must be proved by clear and convincing evidence, which Foraker has not done.

b.    The statements at issue are substantially true.

A limited purpose public figure like Foraker must demonstrate that the statements at issue are false. *Riley*, 529 A.2d at 250. In this case, Chaffinch's statements, to the extent they are

factual, are true.  When asked about the condition of the firing range during his visit on April 6,

2004, Chaffinch commented, "When I was here in the fall, everything was going as well as the

previous times I'd been here."  The truth of this statement is established by the testimony of Ret.

Maj. Baylor, Ret. Lt. Bryson, and plaintiffs Price and Warren.  (*See* App. at A-81 (5/16/06 Trial

Tr., Testimony of W. Warren, at 442:2-12); A-89 (5/17/06 Trial Tr., Testimony of D. Baylor, at

636:23 – 637:8); A-125 – A126 (5/19/06 Trial Tr., Testimony of B. Price, at 1008:23 – 1009:4,

1010:6-14); *see also* Testimony of William Bryson.)

When asked to explain his assessment of the condition of the range in April 2004

compared to Fall 2003, Chaffinch commented, "There was some discoloration in the bullet trap,

but that was about it.  I think people in glass houses shouldn't throw stones.  It's a lot dirtier

now.  Things seemed in their proper places in the fall.  I've never seen it like this."  Again, to the

extent they are statements of fact, these statements are true.  Conditions at the firing range

deteriorated from the Fall of 2003 to the Spring of 2004. (*See* App. at A-81 (5/16/06 Trial Tr.,

Testimony of W. Warren, at 442:2-12); A-89 (5/17/06 Trial Tr., Testimony of D. Baylor, at

636:23 – 637:8); A-125 – A-126 (5/19/06 Trial Tr., Testimony of B. Price, at 1008:23 – 1009:4,

1010:6-14); *see also* Testimony of William Bryson.)

When asked how the condition of the range deteriorated to a point where shutting it down

was necessary, Col. Chaffinch responded, "The previous sergeant in charge did a good job.

Things changed in December when another sergeant came in.  That's at least a portion of where

the ball was dropped."  The performance evaluations of the previous sergeant, Richard Ashley,

demonstrate that Sgt. Ashley's supervisors believed that he did a "good job" at the firing range.

(*See* App. at A-141 – A-142 (5/22/06 Trial Tr., Testimony of G. Warren, at 1243:22 – 1247:16);

A-351 – A-361 (Defs.' Ex. 56).)  Moreover, it is undisputed in this case that when Foraker

resumed control of the range on December 1, 2003, things changed.  Prior to that time, the FTU

staff working at the range had routinely performed certain maintenance on the bullet trap,

including replacing pumps and filters on the trap's water system and cleaning out the water tank.

(*See supra* Part III.C.)  Shortly after Foraker returned to the range on December 1, 2003, the

members of the FTU agreed to "suspend" maintenance behind the bullet trap.  (*See* App. at A-80

(5/16/06 Trial Tr., Testimony of W. Warren, at 437:10-17); A-126 (5/19/06 Trial Tr., Testimony

of B. Price, at 1010:6-14); A-159 (5/22/06 Trial Tr., Testimony of C. Foraker, at 1396:7-20); *see*

*also* A-240 – A-253; Testimony of Jean Rothenburger.)  As a result, the amount of smoke and

dust in the range increased, and the environmental conditions deteriorated.  (*See* App. at A-81

(5/16/06 Trial Tr., Testimony of W. Warren, at 442:2-12); A-126 (5/19/06 Trial Tr., Testimony

of B. Price, at 1010:6-14); *see also* Testimony of William Bryson.)  In sum, Foraker and his men

changed well-settled maintenance practices, exacerbating the problems that led to the shut-down

of the range.  Col. Chaffinch did not defame Foraker when he noted these changes; he merely

described what happened.

Col. Chaffinch also stated that "[t]he bullet trap required hands-on, daily cleaning.  Sgt.

Ashley was willing to do that."  There is no dispute that the bullet trap required daily

maintenance in order to stay operational; there was abundant testimony regarding this fact at

trial. (*See* App. at A-77 (5/16/06 Trial Tr., Testimony of W. Warren, at 426:18 – 427:18, 430:13-

20); A-124 (5/19/06 Trial Tr., Testimony of B. Price, at 1002:4 – 1004:4); A-268 – A-270

(Testimony of R. Ashley (dep. tr. at 8-14)).)  Additionally, the record contains overwhelming

evidence that Ashley performed that maintenance, even while allowing others to "back off."

(App. at A-124 (5/19/06 Trial Tr., Testimony of B. Price, at 1004:8-13); A-269 (Testimony of R.

Ashley (dep. tr. at 13)).)  Foraker introduced no evidence that these statements are false.

Col. Chaffinch was also truthful when he stated, "I cannot say Sgt. Foraker was willing to do [hands-on, daily cleaning of the bullet trap]. He was interested in instruction and teaching people how to shoot. He did not feel [bullet trap cleaning] was part of his purview. He felt that was putting him in harm's way." First, Foraker and his staff were, in fact, not willing to continue maintaining the bullet trap in the way it had been done before he returned in December 2003. Second, Foraker's testimony at trial leaves no doubt that Col. Chaffinch was right when he noted that Foraker was interested in instruction (i.e., teaching police recruits and others how to shoot) and that he considered training, not cleaning, his primary responsibility. (*See* App. at A-157 (5/22/06 Trial Tr., Testimony of C. Foraker, at 1389:21 – 1390:4).) Finally, plaintiff Foraker, as well as Price and Warren, have themselves explained that they stopped doing the maintenance because of health concerns and to avoid "harm's way." (*See* App. at A-45 – A-46 (5/16/06 Trial Tr., Testimony of W. Warren, at 236:22 – 238:14); A-113 (5/19/06 Trial Tr., Testimony of B. Price, at 957:15-25, 958:16 – 959:7); A-159 (5/22/06 Trial Tr., Testimony of C. Foraker, at 1397:4-19); *see also* A-138 (5/22/06 Trial Tr., Testimony of G. Warren, at 1234:6-9); A-250.)

      c.      <u>Plaintiff has failed to establish that any of the statements at issue damaged his reputation.</u>

Foraker's defamation claim fails as a matter of law because he has failed to offer any third-party testimony regarding harm to his reputation. A "statement is not defamatory unless it 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998).

Foraker offered no evidence at trial that Chaffinch's statements about his lack of desire to clean the bullet trap lowered him in the estimation of any individual, much less the entire community. Foraker also offered no testimony that anyone was deterred from associating with

Foraker as a result of Chaffinch's statements.  To the contrary, plaintiffs' own witness, Capt. Ralph Davis, testified unequivocally that he did not believe that Foraker's reputation had been tarnished by the statements in question.  (*See* Testimony of Ralph Davis.)  Maj. Joe Papili and Sgt. Al Parton offered the same positive opinions of Foraker's reputation.  (*See* App. at A-259 (Testimony of A. Parton (dep. tr. at 19:15 – 20:5)); *see also* Testimony of Joseph Papili.)

Foraker's evidence of reputational harm was:  (1) testimony as to whether various neighbors and acquaintances had asked him whether he did something wrong at the firing range (*see* App. at A-143 (5/22/06 Trial Tr., Testimony of S. Foraker, at 1328:7 – 1329:2); *see also* Testimony of Chris Foraker); and (2) the out-of-court statement of Michael Tupman, the state's attorney assigned to the DSP, who described Foraker as "like a bad penny [who] just keep[s] turning up."  (App. at A-67 (5/16/06 Trial Tr., Testimony of W. Warren, at 381:11 – 382:16); A-64 – A-67 (Trial Tr., sidebar discussion, at 372:25 – 381:8); *see also* Testimony of Chris Foraker.)  This evidence is not sufficient to support the jury's verdict.

First, testimony about questions asked of Foraker is insufficient to establish that his reputation was injured or that anyone was deterred from associating with him.  Second, the comments of Mr. Tupman, the attorney who defended the DSP in the first Foraker lawsuit, were not published by any defendant in this case and have no bearing on Foraker's reputation in the general community or the issue of whether third persons were deterred from associating with him as a result of the allegedly defamatory statements.  It was error for the Court to have allowed this testimony because it was not a statement of the defendants' agent (Rule 801(d)(2)) and it was not otherwise connected to the issues in this case.

Foraker has failed as a matter of law to establish his claim of defamation, and the Court

should enter judgment in defendant Chaffinch's favor and against Foraker on Count III of the

Foraker Action.

> **C.     The Court Should Grant Defendants' Motion for a New Trial on All
> Parts of the Verdict for which the Court Does Not Enter Judgment for
> Defendants as a Matter of Law.**

> **1.     The Court Erred in Allowing Ernest "Bud" Fini to Testify as s Expert
> Under Fed. R. Evid. 702.**

Plaintiffs introduced opinion testimony under Rule 702, Fed. R. Evid., from Ernest "Bud"

Fini on "hiring practices . . . in the U.S. firearms industry."  (*See* App. at A-98 – A-105 (5/18/06

Trial Tr., Testimony of E. Fini, at 871:4 – 897:12.); App. at A-298 – A-301 (Fini Report).)  Fini

is a marketing and sales executive with no training in recruiting or human resources and only

very limited experience in hiring.  Fini's testimony was the only evidence on which the jury

could have based a finding of wage loss in Foraker's case.  Because Fini's testimony should not

have been admitted, the Court should grant defendant Chaffinch a new trial on Foraker's claims.

> a.     Legal Standard

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme

Court held that in determining whether a proferred expert satisfies the requirements of Rule 702,

a trial court functions as a gatekeeper, making a "preliminary assessment of whether the

reasoning or methodology underlying the testimony is scientifically valid and of whether that

reasoning or methodology properly can be applied to the facts at issue."  *Id.* at 592-93.

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the Supreme Court

held that the *Daubert* analysis "applies to all expert testimony," including non-scientific

testimony "based on 'technical' and 'other specialized' knowledge."

The objective of *Daubert* and *Kumho* is "to insure that evidence presented by expert witnesses is relevant, reliable, and helpful to the jury's evaluation of such evidence." *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000). "*Daubert's* gatekeeping requirement … make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 746.

        b.    <u>Fini is not qualified to testify about hiring practices in the firearms industry.</u>

Rule 702 requires the proponent of an expert to demonstrate that the proffered witness is qualified to give the expert opinions he intends to express. Specialized knowledge beyond that of a layman is necessary to satisfy Rule 702. *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (citing *Waldorf v. Shuta*, 142 F.2d 601, 627 (3d Cir. 1998)).

Fini did not possess technical or specialized knowledge sufficient to satisfy Rule 702. Fini worked in sales and marketing jobs for Remington Arms Company for twenty years until he was laid off in 1996. (*See* App. at A-95 (5/18/06 Trial Tr., Testimony of E. Fini, at 857:16-23).) During that time, he was not a recruiter or a human resources manager, and had no background or training in recruiting or human resources. (App. at A-106 (5/18/06 Trial Tr. at 902:7-12).) He was not responsible for hiring anyone other than some of the handful of employees who reported to him. (App. at A-95 (5/18/06 Trial Tr. at 858:14-21).) When he left Remington, Fini opened a one-man marketing and communications firm. (*Id.* (5/18/06 Trial Tr. at 858:14-21).) In the ten years since he left Remington, Fini has worked for six different gun manufacturing companies, holding marketing positions, usually supervising no one and hiring no one. (App. at A-93 – A-95 (5/18/06 Trial Tr. at 851:24 – 857:11).) In his 30 years of employment in the firearms

industry, Fini was actively involved in the hiring of no more than 17 individuals associated with firearms sales. (*See* App. at A-105 – A-106 (5/18/06 Trial Tr. at 899:19 – 900:5).)

Fini's limited experience in hiring a few individuals who were to report to him does not make him an expert on general hiring practices or preferences in the firearms industry. *Elcock*, 233 F.3d at 743.

c.    <u>Fini's testimony was not reliable.</u>

An expert's testimony must be based on an identifiable methodology, supported by an adequate factual basis, and objective. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000). In *Elcock*, the Third Circuit rejected an expert's testimony for failure to explain how the expert excluded other variables in reaching an opinion on the plaintiff's employability because it would not allow for reproduction of his results. The Court opined that "[i]f such testing did not generate consistent results, [the expert's] method would be exposed as unreliable because it is subjective and unreproducible." *Elcock*, 233 F.3d at 747-48; *Oddi*, 234 F.3d at 158.

Fini's opinion is subjective and unreliable. Fini's testimony is essentially that:

> (1)    he has met Chris Foraker and thinks he would be a "prime candidate for a position with a firearms manufacturer or industry related company" (App. at A-96 (5/18/06 Trial Tr. at 860:8-13);
>
> (2)    he has read news accounts that quoted then-Colonel Aaron Chaffinch to the effect that Foraker did not maintain the firing range as he should have (App. at A-106 – A-107 (5/18/06 Trial Tr. at 902:13 – 904:9); and
>
> (3)    he thinks that gun companies seeking sales representatives and trainers would learn about the news articles and refuse to hire Foraker because they have "severely damaged" him. (App. at A-102 (5/18/06 Trial Tr. at 884:11-17.)

In the first part of his opinion, Fini considers Foraker a "prime candidate" for sales and training jobs (App. at A-96 (5/18/06 Trial Tr. at 860:8-23)). Fini does not articulate his criteria

-30-

for a "prime candidate," and he does not say why Foraker fits the criteria. Fini's former employer, Remington, states in a website posting for a firearms sales position that it prefers a candidate with a Bachelor's Degree and five or more years of direct selling experience. (App. at A-108 – A-109 (5/18/06 Trial Tr. at 911:24 – 912:10).) Foraker, who does not have a bachelor's degree and has no sales experience, is not a "prime candidate" measured against these criteria. (App. at A-109 (5/18/06 Trial Tr. at 912:6-12).)

As to his second point, Fini never explained why the recent account of Foraker's refusal to do building and equipment maintenance should or would affect the willingness of a gun company to hire him. Fini admitted that he knows of "no other cases" that deal with similar issues. (App. at A-96 (5/18/06 Trial Tr. at 861:7-12).) The most "comparable" situation Fini could offer was an applicant that had been accused of "sexual harassment," which is a violation of federal and state law. (*Id.* (5/18/06 Trial Tr. at 861:22 – 862:13).) Foraker has violated no law and his "suspension" of maintenance at the firing range is hardly comparable. Because he cites no comparable situations in support of his conclusion, Fini's work is not repeatable or verifiable.

Fini contends that the news accounts in the *State News*, *The News Journal* and *American Police Beat* have harmed Foraker's opportunities. In his opinion, every law enforcement agency reads *Police Beat*, and an employment background check would reveal to a potential non-Delaware employer the existence of the firing range controversy.[4] His opinion is that the "excess baggage" of the news articles will cause "those charged with hiring" to eliminate Foraker from consideration. (*See* App. at A-301 (Fini Report at 4).) No part of this chain of assumptions is

---

[4]       It is irrelevant to Fini's opinion regarding the firearms industry that police officers read *Police Beat*, since the people who would be looking to hire Foraker would not be police officers.

supported by empirical evidence, scholarly research, generally accepted human resources

analysis or even Fini's own experience.  Indeed, Fini admitted that he had never read any

periodicals or magazines in the industry with case studies addressing hiring circumstances

similar to that of Foraker.  (App. at A-96 (5/18/06 Trial Tr. at 861:13-21).)

Aside from the lack of empirical support for his conclusion, Fini cites no human

resources principle or practice, and scarcely recognizes the obvious fact that in a few years the

effects of the alleged slander will dissipate.  *See Gannett Co. v. Kanaga,* 750 A.2d 1174, 1189

(Del. 2000).  He also neglects the likely effects of years of favorable performance appraisals

Foraker has received from his superior officers.  (App. at A-108 – A-109 (5/18/06 Trial Tr. at

910:22 – 911:13).)  Because all these things are lacking, Fini's highly subjective conclusion is

untestable and wholly incapable of analysis or reproduction.

For the foregoing reasons, defendants request that this Court order a new trial as to Chris

Foraker's claims, and that the unreliable testimony of Ernest "Bud" Fini be barred from the new

trial.

> **2.      The Court Erred in its Jury Instructions by Refusing to Give an
> Instruction that Defendant Chaffinch had a First Amendment Right
> to Speak about the Range.**

Chaffinch's comments to the press are the basis for Foraker's First Amendment

retaliation claims.  The Court denied Chaffinch's request for an instruction that:

> Colonel Chaffinch also has a right to speak out on matters of public
> concern.  He is not liable to the plaintiffs under the First
> Amendment for any non-threatening statement he made about them
> while discussing a matter of public concern.  *Suarez Corp. v.
> McGraw*, 202 F.3d 676, 685 (4th Cir. 2000); *X-Men Secs., Inc. v.
> Pataki*, 196 F.3d 56 (2d Cir. 1999).

It was error for the Court to refuse that instruction because:

> in the absence of a threat, coercion, or intimidation intimating
> that punishment, sanction, or adverse regulatory action will

> imminently follow, such speech does not adversely affect a
> citizen's First Amendment rights, even if defamatory.

*Suarez Corp.*, 202 F.3d at 687 (citation omitted).  *Accord X-Men Securities, Inc.*, 196 F.3d at 56.

As the Fourth Circuit stated in *Suarez Corporation*,

> The requirement that public official's speech include a threat,
> coercion, or intimidation, to adversely affect a citizen's First
> Amendment rights recognizes that a balance must be struck
> between the citizen's right to exercise his First Amendment rights
> and the public official's personal First Amendment rights, as well
> as his duty to the public to speak out about matters of public
> concern.

202 F.3d at 688, n.13 (citation omitted).

The evidence in this case is devoid of anything that suggests threat, coercion, or

intimidation in Chaffinch's public statements.  Rather, Chaffinch simply explained to the media

that the range was in the condition it was in because Foraker would not do what his predecessor

did.  As described above, his explanation was entirely true.  More importantly, Chaffinch spoke

pursuant to his duties as the Superintendent of the Delaware State Police.  The law does not

require that Chaffinch give up his First Amendment right to speak freely and fully on matters of

public concern.

It is highly probable that the Court's error in failing to instruct the jury on Chaffinch's

duties and rights affected the outcome of this case.  *See Woodson*, 109 F.3d at 931.  Accordingly,

a new trial must be granted as to Foraker's claim of First Amendment retaliation.

> **3.    Defendants Are Entitled to a New Trial as to Plaintiff Foraker's First
> Amendment Retaliation Claims in C.A. No. 04-1207-GMS Because the
> Verdict is Ambiguous Once Defendants are Granted Judgment as a
> Matter of Law as to the Claims Encompassed by *Garcetti*.**

Once the Court applies *Garcetti* to grant defendants' motion for judgment as a matter of

law with respect to Foraker's claims in the Price Action or amends the judgment pursuant to

-33-

Rule 59(e), (*see supra* Parts IV.B.1 and IV.B.2), defendants are entitled to a new trial with respect to the Foraker Action because the verdict in Foraker's favor is ambiguous. The Verdict Form prepared before *Garcetti* combines defendants' liability for all of Foraker's constitutional claims into a single question. (*see* App. at A-1 – A-2 (Questions 1, 2, and 3)). The resulting verdict is ambiguous and defendants are entitled to a new trial as to the claims raised in the Foraker Action. *See Prentice v. Zane's Admin.*, 49 U.S. 470, 484 (1850) ("A verdict, . . . finding matter uncertainly and ambiguously, is insufficient, and no judgment will be given thereon."); *see also Hartnett v. Brown & Bigelow*, 394 F.2d 438, 441 n.2 (10th Cir. 1968) (citing *Prentice*); *McCormick v. City of Wildwood*, 439 F. Supp. 769, 773 (D.N.J. 1977) (citing *Prentice*).

> **4. Defendants are Entitled to a New, Reconfigured Trial with Price's and Warren's Cases Tried Separately from Foraker's Cases.**

If judgment as a matter of law is not granted with respect to any of the issues raised herein, defendants request two new trials: one for the claims raised by plaintiff Foraker in both the Foraker and Price Actions and another for the claims raised by plaintiffs Price and Warren. The Court appropriately consolidated these actions for discovery. When the plaintiffs moved to consolidate the cases for trial, the defendants proposed splitting the Price/Warren claims from Foraker's claims for reasons of unfair prejudice. The consolidation of the cases for trial resulted in prejudice to defendants and an unjust disposition of both cases, and the Court should remedy this problem by ordering new trials.

The defendants recognize that consolidation of the cases and the Court's refusal to consider severance may have promoted judicial economy. The problem is the prejudice that resulted from a consolidated trial. Foraker's individual case started with his successful prosecution of an action against Chaffinch for transferring him out of the FTU in 2002. The events surrounding Foraker's prior suit provided an impressive amount of evidence from which

Foraker could argue that Chaffinch was motivated to retaliate against Foraker. None of these facts had anything to do with Price and Warren, and would have been inadmissible as to them had their case been tried separately.

Unlike Foraker, Price and Warren are first-time litigants. There was virtually no evidence introduced at trial that either Chaffinch or his successor MacLeish had a motive to retaliate against Price or Warren. Indeed, their attorney acknowledged as much when he argued in his closing that Price and Warren were "collateral damage" in Chaffinch's "vendetta" against Foraker. Neither Price nor Warren made internal complaints about the conditions at the range that reached the level of the executive staff of the DSP. (*See* App. at A-47 (5/16/06 Trial Tr., Testimony of W. Warren, at 243:15-22, 244:6-22); A-113 – A-114 (5/19/06 Trial Tr., Testimony of B. Price, at 960:20 – 961:7).) Foraker is the sole author of the internal complaints from December 2003 until May 2004, when all three plaintiffs were interviewed by the State Auditor. (*See id.*)

Price and Warren benefited in the consolidated trial from the motivation evidence in Foraker's case; the jury was left with the inference that because defendants had a motive to do something bad to Foraker, they must have had a motive vis-à-vis Price and Warren. This is unfairly prejudicial because Price and Warren were not parties to Foraker's first lawsuit, and evidence of Foraker's first lawsuit would not have been admissible as to Price and Warren absent consolidation.

>**5.** **The Court Should Grant a New Trial Because the Evidence does not Support the Jury's Award of Punitive Damages; in the Alternative, the Court Should Remit the Punitive Damages Award Because it is Disproportionate to the Evidence of the Net Worth of the Defendants.**

The jury's punitive damages award against Col. Chaffinch in the amount of $310,410 and against Col. MacLeish in the amount of $133,032 is excessive as a matter of law. The Court should order a new trial on punitive damages or, in the alternative, a remittitur.

"[A] trial court may grant a new trial when in its sound discretion, it concludes that the jury's damage award is excessive," that is, if it "shock[s] the judicial conscience."[5] *Garrison*, 820 F. Supp. at 822 (quoting *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 771-772 (3d Cir. 1987)); *see also Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991). As an alternative to granting a new trial, a court may grant a remittitur, "if it deems the award to be clearly excessive." *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, No. CIV. A. 97-450-JJF, 2002 U.S. Dist. LEXIS 439, at *6 (D. Del. Jan. 10, 2002) (citing *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986)), *vacated in part on other grounds*, 369 F.3d 732 (3d Cir. 2004).

Delaware law allows an award of punitive damages only "to punish the wrongdoer and to deter him and others from similar conduct." *Strauss v. Biggs*, 525 A.2d 992, 1000 (Del. 1987) (citing *Jardel Co. v. Hughes*, 523 A.2d 518, 529 (Del. 1987)); *see also 2660 Woodley Rd.*, 2002 U.S. Dist. LEXIS 439, at *19-20 (citing *BMW of North America v. Gore*, 517 U.S. 559, 568 (1996)). To achieve these purposes, a jury may consider, among other relevant facts, a defendant's net worth. *Strauss*, 525 A.2d at 1000 (quoting Restatement (Second) of Torts § 908 cmt. e; citing *Bryan v. Thos. Best & Sons, Inc.*, 453 A.2d 107, 108 (Del. Super. Ct. 1982)).

---

[5] A new trial is appropriate in these circumstances even where the evidence is legally sufficient to support the verdict under Rule 50(b). *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1076 (3d Cir. 1996).

An award of punitive damages "in excess of the amount reasonably necessary to deter …

defendants or similarly situated persons from committing similar" acts does not serve the

purposes outlined above.  *Schreffler v. Bd. of Educ. of Delmar Sch. Dist.*, 506 F. Supp. 1300,

1311-12 (D. Del. 1981); *see also Adams v. Murakami*, 813 P.2d 1348, 1350 (Cal. 1991) ("[T]he

function of punitive damages is not served by an award which, in light of the defendant's wealth

… exceeds the level necessary to properly punish and deter.") (citation omitted); *Hazelwood v.*

*Ill. Cent. Gulf. R.R.*, 450 N.E.2d 1199, 1206-07 (Ill. App. Ct. 1983).  Thus, there must be a

reasonable relationship between the size of the punitive award and the defendant's ability to pay

that award as measured by his or her net worth.  *See Arab Termite Pest Control of Florida, Inc.*

*v. Jenkins*, 409 So.2d 1039, 1043 (Fla. 1982); *Darcars Motors of Silver Spring, Inc. v. Borzym*,

841 A.2d 828, 843 (Md. 2004).  After all, the "purpose is to deter, not destroy."  *Adams*, 813

P.2d at 1352 (citation omitted); *Arab Termite*, 409 So.2d at 1043; *Darcars Motors*, 841 A.2d at

843 (noting that punitive damages should not "bankrupt or impoverish a defendant").

In assessing punitive damages awards, the Third Circuit describes as "typical" a small

fraction of the defendant's worth, not awards that are more than triple the net worth.  *See Dunn v.*

*HOVIC*, 1 F.3d 1371, 1383 (3d Cir. 1993) (noting that jury's award fell within the "typical ratio"

between punitive damages and defendant's net worth of "around one percent") (citations

omitted); *see also Orkin Exterminating Co. v. Jeter*, 832 So. 2d 25, 42-43 (Ala. 2001) (finding

award of punitive damages of ten percent of defendant's net worth excessive); *Zhadan v.*

*Downtown L.A. Motors*, 66 Cal. App. 3d 481, 500 (Cal. Ct. App. 1976) (rejecting punitive

damage award when it exceeded more than one-third of a defendant's net worth).

The jury in this case awarded punitive damages in amounts that exceed defendants'

respective net worth regardless of how it is computed.  The evidence of record shows that Col.

Chaffinch's personal net worth is about $45,000.00.  Even if joint property is considered, it is less than the punitive award of $310,410.  Col. MacLeish's personal net worth is $15,000.00. The jury's award of more than $130,000 goes far beyond what the evidence suggests MacLeish could reasonably pay, even if joint property were to be considered.  It is also apparent from an analysis of the verdict form that the jury awarded as punitives a percentage of its compensatory award (30 percent), and further split the punitive award 70/30 between Chaffinch and MacLeish. Thus, the jury appears to have observed the Court's instruction that punitives must bear a relationship to compensatory damages, but failed to bear in mind that punitive damages are meant to punish but not destroy.

It is entirely possible that the Court's refusal to instruct the jury that "in calculating punitive damages, you may not consider the value of any properties or accounts jointly owned by the defendant and his spouse or dependents" affected the verdict as to punitive damages. Defendants requested this instruction because, under both Delaware and Florida law, the jointly held assets of both Col. Chaffinch and Col. MacLeish are exempt from attachment.  If the objective is some punishment short of destruction or bankruptcy, it serves no purpose to allow the jury to take assets into account that the plaintiffs cannot reach.  *Mitchell v. Wilmington Trust Co.*, 449 A.2d 1055, 1058 (Del. Ch. 1982).

The "decision of the jury is clearly unsupported and/or excessive," *Spence*, 806 F.2d at 1201 (citations omitted), and defendants respectfully request that this Court grant a new trial or remit a portion of the jury's award of punitive damages.

**D.    Whether In His Current Lawsuit Foraker Must Establish That His 2002 Lawsuit Addressed A Matter of "Public Concern."**

The Court has directed the parties to address whether plaintiff Foraker's Petition Clause claim arising from his previous lawsuit is subject to the "public concern" requirement in light of

the fact that "his 2002 lawsuit was a petition to the *Federal* Government and the retaliation was carried out by officers of the *State* Government." *Price v. Chaffinch*, Nos. 04-956, 04-1207, Order (dated June 5, 2006) (citing *San Filippo v. Bongiovanni*, 30 F.3d 424, 442 (3d Cir. 1994)). It is the defendants' position that Foraker is obligated to establish that his 2002 lawsuit, unlike most petitions in the Third Circuit, addressed a matter of public concern, but that Foraker's 2002 lawsuit meets that requirement.

In *San Filippo*, 30 F.3d at 440, Judge Pollack, over the dissent of Judge Becker, found an "independent reason" to give greater protection to the particular types of "petition" contemplated by the First Amendment than that afforded less formal forms of free speech. That independent reason is the governmental obligation to have a channel open for redress of grievances caused by that government. *Id.* at 442. If, however, a plaintiff invokes a grievance mechanism that was established by a *different* government, this independent reason for additional protections does not exist, and that plaintiff's claim should be analyzed like those in other circuits, i.e., he must show a public concern. *Cf. Anderson v. Davila*, 125 F.3d 148, 162-63 (3d Cir. 1997).

The issue underlying Foraker's 2002 lawsuit, a free-speech retaliation claim, addressed a matter of public concern. Thus, Foraker can show that his 2002 lawsuit satisfies the public concern requirement as that test has been broadly understood by the Third Circuit.

V.     **CONCLUSION**

In light of *Garcetti v. Ceballos*, and for the reasons set forth above, defendants request

that the Court:  (1) enter judgment for defendants with respect to the Price Action and the

defamation claims against defendant Chaffinch in the Foraker Action; and (2) grant a new trial

regarding the First Amendment claim in the Foraker Action, and regarding all claims not decided

as a matter of law.

                                        Respectfully submitted,


Date:  June 19, 2006                    _____*/s/ Noel C. Burnham*_____
                                        Noel C. Burnham (DE Bar No. 3483)
                                        Richard M. Donaldson (DE Bar No. 4367)
                                        Montgomery, McCracken, Walker & Rhoads, LLP
                                        300 Delaware Avenue, Suite 750
                                        Wilmington, DE 19801
                                        Telephone:  (302) 504-7840
                                        Facsimile:  (302) 504-7820

                                        Edward T. Ellis
                                        Carmon M. Harvey
                                        Montgomery, McCracken,
                                          Walker & Rhoads, LLP
                                        123 South Broad Street
                                        Philadelphia, PA  19109
                                        (215) 772-1500

                                        *Counsel for Defendants*