1

1

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                          -  -  -

5    B. KURT PRICE, WAYNE WARREN,    :     Civil Action
     and CHRISTOPHER D. FORAKER,     :
6                                    :
               Plaintiffs,           :
7                                    :
          v.                         :
8                                    :
     L. AARON CHAFFINCH,            :
9    THOMAS F. MACLEISH,            :
     DAVID B. MITCHELL, and         :
10   DIVISION OF STATE POLICE,      :
                                    :
11             Defendants.          :     No. 04-956-GMS

12                          -  -  -

13   CHRISTOPHER D. FORAKER,        :     Civil Action
                                    :
14             Plaintiff,           :
                                    :
15        v.                        :
                                    :
16   L. AARON CHAFFINCH,            :
     THOMAS F. MACLEISH,            :
17   DAVID B. MITCHELL, and         :
     DIVISION OF STATE POLICE,      :
18                                  :
               Defendants.          :     No. 04-1207-GMS
19
                            -  -  -
20
                         Wilmington, Delaware
21                    Monday, May 15, 2006
                           10:00 a.m.
22                    FIRST DAY OF TRIAL

23                          -  -  -

24   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury

25

A - 16

2

1    APPEARANCES:

2        THOMAS S. NEUBERGER, ESQ., and
         STEPHEN J. NEUBERGER, ESQ.
3        The Neuberger Law Firm
            -and-
4        MARTIN D. HAVERLY, ESQ.
         Law Offices of Martin D. Haverly

5
            Counsel for Plaintiffs
6
         R. MONTGOMERY DONALDSON, ESQ.
7        Montgomery, McCracken, Walker & Rhoads, LLP
            -and-
8        EDWARD T. ELLIS, ESQ., and
         CARMON M. HARVEY, ESQ.
9        Montgomery, McCracken, Walker & Rhoads
         (Philadelphia, PA)
10
            Counsel for Defendants
11
            - - -
12            INDEX

13    Preliminaries ----------------- Page 3

14    Court's Preliminary Instructions
      to Jury ------------------------ Page 21

15
      Mr. Neuberger, Opening --------- Page 31
16
      Mr. Ellis, Opening ------------- Page 67

17    WAYNE H. WARREN

18        Direct examination ------------- Page 97

19        Discussion re Exhibits --------- Page 161

20

21        - - -
22
23
24
25

---

3

1        (At this point the jury was selected, sworn
2    and/or affirmed.)

3        THE COURT: Thank you. Ms. Walker will lead you
4    back right through that door in a moment here. We will take
5    about ten minutes.

6        (Jury leaves courtroom at 11:15 a.m.)

7        THE COURT: I understand why Secretary Mitchell
8    is not here. Do the parties desire the Court to say
9    anything about that?

10        MR. ELLIS: Your Honor, he is obviously here --

11        THE COURT: For attorneys' fees.

12        MR. ELLIS: I would appreciate if you would say
13    to the Court that shouldn't be held against him. He is not
14    involved in the case at all.

15        MR. T. NEUBERGER: He is here in an official
16    capacity for injunctive relief only. Nothing on the
17    liability, Your Honor.

18        THE COURT: So is there any particular statement
19    you would like to make that you can agree on, counsel? I
20    can say words to that effect. Or would you like to get your
21    heads together so I don't say anything controversial?

22        MR. ELLIS: We will talk.

23        THE COURT: And just let me know, because they
24    would like to move.

25        Let's take ten.

A - 17

---

4

1        (Recess taken.)

2        THE COURT: Counsel, have you agreed on what you
3    want me to say?

4        MR. T. NEUBERGER: Yes, Your Honor.

5        THE COURT: Ms. Walker, I think counsel has
6    something before the jury comes in.

7        Let me take a quick look.

8        Counsel has agreed on this statement I have just
9    read.

10        MR. T. NEUBERGER: Yes, Your Honor.

11        THE COURT: Would you prefer I do this at the
12    end of the preliminary instructions or at the beginning?

13        MR. ELLIS: I think at the beginning, Your
14    Honor.

15        THE COURT: All right.

16        MR. ELLIS: Your Honor, there were a number of
17    exhibits that were not ultimately disposed of at the
18    pretrial conference, including Plaintiffs' Exhibits 1, 2 and
19    3, which is the verdict form, the settlement agreement, and
20    the third document dealt with the prior lawsuit.

21        As far as I know, the Court has not ruled them
22    in or out. We are at the opening. I didn't want Mr.
23    Neuberger to be referring to documents that were out.

24        THE COURT: This should have been raised at 8:30
25    this morning. This is one of the reasons I have the 8:30

---

5

1    conference if necessary. That is why Ms. Walker came out to
2    ask whether you needed to see me.

3        Let's talk about it. Just for future purposes,
4    now I am wasting my jury's time right now as far as I am
5    concerned.

6        Go ahead.

7        MR. ELLIS: Your Honor --

8        THE COURT: Refresh my recollection, counsel.

9        MR. ELLIS: Your Honor, at the pretrial
10    conference we discussed Exhibits 1, 2 and 3 from the
11    plaintiffs' list.

12        THE COURT: I don't remember what Exhibits 1, 2
13    and 3 are. I don't have instant recall.

14        MR. T. NEUBERGER: Your Honor, Exhibits 1 and
15    3 is the jury verdict sheet from the first case. The order
16    of Judge Farnan is No. 2. And No. 3 is the settlement
17    agreement.

18        The ruling at the pretrial conference, if I
19    recall, Your Honor, was that I would excise from the
20    punitive damages jury question-answer certain language and
21    that we would excise the amounts of the jury verdicts. I
22    have proceeded accordingly, and the excised document is in
23    the book.

24        No. 2 is the stipulated order. And there was
25    nothing to be excised from the stipulated order. And No. 3

---

6

1  was the settlement agreement. I excised the amounts of the
2  settlement.
3         So the Court ruled on these exhibits at the
4  pretrial. The record would show that they are in in this
5  fashion.
6         THE COURT: Counsel.
7         MR. ELLIS: I didn't believe the Court had ruled
8  on them, Your Honor. I thought the Court had suggested that
9  we talk about what could be excised out of the verdict form
10 and reserved ruling on Exhibits 2 and 3.
11        THE COURT: Well, do you still have difficulty
12 with the exhibits in the form just announced by Mr.
13 Neuberger?
14        MR. ELLIS: I do, Your Honor, and it is for the
15 same reasons that I expressed at the pretrial conference.
16        THE COURT: You want me to remember that?
17 Counsel, you realize how many rulings I have made since we
18 last met?
19        MR. ELLIS: Your Honor, Exhibit No. 1 is the
20 verdict form. The verdict form is couched in part in very
21 inflammatory language.
22        THE COURT: May I see it?
23        Ms. Walker, my exhibits are in my office. I
24 think they are in a chair.
25        MR. J. NEUBERGER: Your Honor, I have a copy

7

1  here.
2         THE COURT: That would be great. Appreciate it.
3  We are talking about No. 1?
4         MR. T. NEUBERGER: Yes, Your Honor.
5         THE COURT: I have it, counsel. You say it's
6  couched in inflammatory language? Are you saying Judge
7  Farnan --
8         MR. ELLIS: I am saying, Your Honor, if the
9  punitive damages language gets given to the jury is
10 inflammatory.
11        MR. T. NEUBERGER: No. 7 I excised as the Court
12 directed. The Court can look at it, Your Honor. I sent it
13 to him a long time ago.
14        MR. ELLIS: I have it, Your Honor.
15        THE COURT: That language has been redacted?
16        MR. ELLIS: The language out of No. 7 has been
17 redacted, yes, Your Honor. The amounts have been redacted.
18        THE COURT: So what is the problem you have
19 then? You said something about inflammatory language.
20        MR. ELLIS: My problem is that I think it's
21 prejudicial, unfairly prejudicial to defendant Chaffinch to
22 have the form from the prior lawsuit admitted into evidence
23 in this lawsuit. It is going through what a prior jury did
24 on a prior occasion. It carries implications for Colonel
25 Chaffinch for the current case and anything else he does.

8

1         THE COURT: My recollection is consistent with
2  yours, it is a little inconsistent with Mr. Neuberger's. I
3  thought counsel were going to discuss this.
4         MR. ELLIS: Your Honor, I received a redacted
5  version of this form, which all it took out was a couple
6  words from No. 7 and the dollar amounts. But I had a
7  problem beyond the mere dollar amounts, Your Honor. I had a
8  problem with the whole concept of the document coming in.
9         THE COURT: The purpose of the document, Mr.
10 Neuberger, is?
11        MR. T. NEUBERGER: It shows his motive to
12 retaliate, Your Honor. This is the verdict against him
13 which we say is the linchpin for retaliating against my
14 client.
15        THE COURT: Is there a less prejudicial, at
16 least from the defendants' point of view, way that this
17 fact, the fact of this verdict, can be adduced to this jury?
18 Given counsel's complaint, can you think of another way that
19 may be less prejudicial from their point of view?
20        MR. T. NEUBERGER: No, Your Honor.
21        THE COURT: Counsel.
22        MR. ELLIS: Your Honor, we have agreed there is
23 a verdict. There is no dispute as to that. I will
24 stipulate to that. I will have my own witness testify to
25 that. There is no question there was a verdict. That is

9

1  not what I am fighting against. I am fighting against the
2  prejudicial overflow the document would have.
3         THE COURT: That's a little vague. Prejudicial
4  as to what? What does that mean?
5         MR. ELLIS: This is an actual jury form. This
6  represents what another jury did. To me it is an
7  encouragement for this jury to do the same thing the other
8  jury did.
9         THE COURT: We can discuss this. I don't have
10 right now a fixed view. But it is evidence of an official
11 act of that jury.
12        MR. ELLIS: Absolutely, Your Honor. No argument
13 with you there at all. You are absolutely right.
14        THE COURT: You think the piece of paper is
15 somehow unduly, unfairly prejudicial, that it would be more
16 prejudicial than the simple act of announcing to this jury,
17 perhaps by the Court, or by one of you or both of you, that
18 this happened, that a previous jury, which I believe this
19 panel already knows, because I believe it was part of the
20 description of the case, that a previous verdict had been
21 rendered, that part of this case is about the alleged
22 retaliation for that.
23        MR. ELLIS: Yes. I think this is the same
24 discussion we had at the pretrial conference. I agreed with
25 the Court that one way to handle it is to simply tell the

10

1  jury what happened without having the document in front of
2  them.
3          THE COURT: Mr. Neuberger, your difficulty with
4  that.
5          MR. T. NEUBERGER: Your Honor, at the pretrial,
6  you made various rulings. For example, I am prepared to go
7  through a litany of these, you remember the thing about
8  section chief, three paragraphs of the answer, where they
9  say he is a section chief, I offered those paragraphs of the
10 complaint. Your Court said they are in. They are
11 admissions. Okay. He is still fighting me on those three
12 exhibits. We followed up with what you directed at the
13 pretrial. They are rearguing things that were done at the
14 pretrial.
15         We have got various paragraphs of the complaint
16 that he still doesn't agree are in. We have Major
17 Forester's medical records. The Court is going to tell us
18 whether they come in or not.
19         THE COURT: They did produce them?
20         MR. T. NEUBERGER: The ones we had, then the
21 doctor who was supposed to mail it to you, we don't know
22 whether or not -- the doctor's lawyers said they were
23 sending it to the Court, and we don't know whether they ever
24 came in. They were for your eyes only.
25         THE COURT: I don't think they did. We can

11

1  check that.
2          MR. T. NEUBERGER: The Court's ruling was, get
3  rid of all the medical records except Forester, I will think
4  about that, and we are going to do it through oral
5  testimony.
6          Now, John Dillman, the Personnel Director, is
7  having back surgery and we are going to have to do his
8  testimony by deposition. They designated the pages of
9  Forester's medical records that they had Dillman talk about.
10 So I don't know where I am at on that one.
11         THE COURT: You have a general concern. Let's
12 see if we can address this.
13         MR. T. NEUBERGER: On the verdict form, this is
14 what the jury did. There is no better way of establishing
15 irrevocably that there was a finding of the jury. I have
16 deleted anything that could be said to be prejudicial. This
17 is a document crafted by the Court. It is a judicial
18 record. This is not unduly prejudicial.
19         THE COURT: I don't see it as such. It has been
20 redacted. May I have a copy of the redacted --
21         MR. T. NEUBERGER: That is what we gave you, in
22 my white book. So if you look at No. 6, for example, it
23 just has X's where the dollars were. The same thing with 8.
24 And 7, we took all the language out about whatever the
25 elements were of the punitive damages findings. So it says,

12

1  yes, we find punitive damages.
2          THE COURT: Counsel, I am having difficulty
3  with, you have used, I will characterize it as hyperbole,
4  "inflammatory language." Usually, we don't find
5  inflammatory language in verdict forms, and I don't see any
6  in this form. Would you point me to it?
7          MR. ELLIS: Your Honor, the inflammatory
8  language deals with the punitive damage question.
9          THE COURT: Point me to the language. Don't
10 tell me what it deals with.
11         MR. ELLIS: It is taken out, Your Honor.
12         THE COURT: What is the concern?
13         MR. ELLIS: My position is the very fact of the
14 verdict form -- the verdict form --
15         THE COURT: Your objection is overruled.
16         MR. ELLIS: Okay.
17         THE COURT: What is next?
18         MR. ELLIS: Exhibit No. 2, Your Honor, this is
19 the stipulated order.
20         THE COURT: What about it?
21         MR. ELLIS: I don't think the stipulated order
22 is relevant to the case. Sergeant Foraker got put back in
23 the range. The fact that there is a settlement agreement in
24 a stipulated order should not be relevant. It probably
25 violates Rule 608 as well.

13

1          THE COURT: Probably, or does it?
2          MR. ELLIS: I am not sure what it is offered
3  for. If it is offered to show that Colonel Chaffinch lost
4  the first case or agreed to settle the first case on certain
5  terms, then it is.
6          THE COURT: Mr. Neuberger.
7          MR. T. NEUBERGER: Your Honor, Paragraph 1 of
8  the order is the benchmark of reinstatement that we measure
9  adverse action from. He is reinstated to all the rights,
10 privileges, duties, responsibilities and supervisory
11 authority previously held from him. This is the measure
12 from which we measure adverse action. Witnesses will
13 testify that his rights, duties and responsibilities were
14 taken away from him. And as you know, from the summary
15 judgment opinion the other day, adverse actions, which a
16 person of ordinary firmness -- is a firm issue in this case.
17 This is what adverse action is measured from.
18         That is what we said before, at the pretrial,
19 that he is rearguing.
20         THE COURT: Counsel.
21         MR. ELLIS: Your Honor, my understanding of what
22 this order was to be entered for was to enable the Court to
23 have in effect a contempt-of-court proceeding.
24         THE COURT: I remember that argument being made.
25         MR. T. NEUBERGER: That is for posttrial

14

1 briefing. This is independent in the liability case. This
2 is adverse action.
3     THE COURT: You need to respond to that.
4     MR. ELLIS: I think that again the document
5 itself is prejudicial. We all understand that the parties
6 agreed to settle the case and bring it back.
7     THE COURT: That is not the purpose, as I
8 understand it, that Mr. Neuberger is offering the document
9 for.
10     MR. T. NEUBERGER: That's right.
11     THE COURT: It is to show the adverse action.
12     MR. ELLIS: This document doesn't show adverse
13 action, Your Honor.
14     THE COURT: From that which it is being measured
15 against. I think what Mr. Neuberger -- and he can correct
16 me if he thinks I am wrong about this, if I misstate his
17 position -- is saying is that the Court ordered Sergeant
18 Foraker reinstated to his position, with all rights and
19 privileges, and that there was adverse action taken in spite
20 of the Court's order.
21     MR. T. NEUBERGER: Yes, Your Honor. That is it
22 exactly.
23     MR. ELLIS: Your Honor, as I said at the
24 pretrial, what we are here for in this case is to determine
25 whether there was any adverse action taken. It's just

15

1 duplicative to say that there was a stipulated order
2 involved. It doesn't -- in other words, it is irrelevant to
3 whether this actually occurred.
4     THE COURT: I don't think it is irrelevant. You
5 may not like the fact that the jury will have an exhibit
6 that reflects an official act in this case, an agreed-upon
7 action by the parties, both parties.
8     The objection is overruled.
9     MR. ELLIS: The third document is the settlement
10 agreement.
11     MR. T. NEUBERGER: So once again, Your Honor,
12 there is a provision in the settlement agreement that there
13 shall be no retaliation against Sergeant Foraker because of
14 the prior case. That of course dovetails back into what was
15 the terms of the stipulated order.
16     So this, again, is being offered to show that
17 they have taken actions in violation not only of the order
18 but in violation of the agreement they entered into putting
19 him back into the range. And they go to punitives, also.
20     MR. ELLIS: Your Honor, the lawsuit is about
21 whether they violated the First Amendment, not about whether
22 they violated a prior settlement agreement or a stipulated
23 order. All it does is throw more documents at the jury.
24 The question is not whether they violated the settlement
25 agreement or the stipulated order.

16

1     THE COURT: Does it have any relevance to the
2 issue of punitive damages?
3     MR. ELLIS: I don't think it does, Your Honor.
4 I think the question is whether they violated the First
5 Amendment, not whether they violated the settlement
6 agreement. The fact that there is a settlement agreement in
7 place doesn't make the First Amendment violation any more
8 egregious.
9     MR. T. NEUBERGER: It is another piece of
10 evidence of causation, an adverse action. It goes to
11 punitive damages, also. It shows he is maliciously ignoring
12 a Court order. He is ignoring a written agreement. So it
13 comes in for various purposes, Your Honor.
14     THE COURT: You don't plan to refer to this
15 document in your opening?
16     MR. T. NEUBERGER: No, Your Honor, not this
17 document.
18     THE COURT: I will defer ruling on that.
19     MR. T. NEUBERGER: And then there is these other
20 documents.
21     THE COURT: Are they pertinent to your opening?
22     MR. T. NEUBERGER: No. I am not mentioning them
23 in the opening. But we are going to be rearguing all the
24 rulings.
25     THE COURT: We are not going to reargue. To the

17

1 extent that we must, we will visit, not revisit, but visit
2 rulings that the Court, in your view, needs to make.
3     MR. ELLIS: Thank you, Your Honor.
4     THE COURT: Let's get the jury in.
5     MR. T. NEUBERGER: Your Honor, the preliminary
6 instructions, it looks like they contain the false light,
7 invasion of privacy that is out of the case now. I don't
8 know if you will give this to the jury. You probably want
9 to take out on Page 6.
10     THE COURT: We will give it to them after we
11 redact that. I will just deliver these. Actually, I will
12 have them strike, unless there is objection. Would you
13 prefer that they be given a clean copy? What I mean by
14 clean is another version with the false light out.
15     MR. ELLIS: I would prefer that, Your Honor.
16     THE COURT: Okay.
17     MR. T. NEUBERGER: Then, Your Honor, at the
18 top -- in with false light there was a paragraph at the top
19 of Page 7 that deals with workers' compensation claims that
20 the defense was insisting on putting into the instruction.
21 I believe the Court, because of the Court's collateral
22 source ruling the other day, that whole paragraph should
23 come out.
24     MR. ELLIS: That has nothing to do with
25 collateral source, Your Honor.

18

```
1      MR. T. NEUBERGER:  It looked like it to me, Your
2   Honor.
3           THE COURT:  The Court will not deliver the
4   entirety of the paragraphs that occur under the heading
5   False Light, Invasion of Privacy that occur at Page 6, and
6   will excise as well the, in light of its previous ruling,
7   the language at the top of Page 7 having to do with workers'
8   compensation.
9           MR. T. NEUBERGER:  Thank you, Your Honor.
10          THE COURT:  Consequently -- do we have the disk?
11      MS. WALKER:  Yes.
12      THE COURT:  I will not hand out this morning
13   these instructions.  But we will provide them once we have
14   made those changes.
15          MR. T. NEUBERGER:  Thank you, Your Honor.
16      THE COURT:  Anything else?
17      MR. ELLIS:  Not from me, Your Honor.
18      THE COURT:  Let's bring out the jury.
19          There is one other thing.  There was some
20   scurrying around while I was absent from chambers about the
21   desire to use PowerPoint in the opening.  Is there still
22   that desire?
23          MR. ELLIS:  We were told no, Your Honor, so we
24   are not going to do it.
25          THE COURT:  That is fine.
```

19

```
1           MR. T. NEUBERGER:  Your Honor, I am confused.  I
2   am going to show a few blowups.  Nobody told us about
3   PowerPoint.
4       THE COURT:  Is this the same discussion?
5       MR. T. NEUBERGER:  I am not privy to that
6   discussion.
7           MR. ELLIS:  Your Honor, I understand that Mr.
8   Neuberger is going to use blowups.  And I am going to use
9   blowups, too.  I don't think we have a problem.
10          MR. T. NEUBERGER:  That is not PowerPoint.  I
11   don't know what PowerPoint is.
12      THE COURT:  There is not a problem.
13      MR. ELLIS:  Your Honor, we might have a problem.
14   Mr. Neuberger, when he said blowups --
15      THE COURT:  Ms. Walker, will you hold the jury,
16   please.
17          What I am prepared to do to avoid any further
18   head-butting on this is permit both parties to use your
19   technology in your presentations, your PowerPoints, your
20   blowups, that kind of thing.  Have you each had a chance to
21   review each other's?
22          MR. T. NEUBERGER:  Yes.  He has had mine for a
23   long time.
24      MR. ELLIS:  Your Honor, I didn't send them to
25   Mr. Neuberger because we were told we couldn't use them on
```

20

```
1   the screen.  So I can show them to him now.
2           MR. T. NEUBERGER:  I was sent over the weekend a
3   timeline I was told he wanted to use.  Then he said he made
4   a hand something over there.  I don't have a problem with
5   whatever demonstratives he wants, I don't have to see.
6       THE COURT:  Great.
7       Ms. Walker, please bring in the jury.
8       (Jury enters courtroom at 11:50 a.m.)
9       THE COURT:  Please be seated, ladies and
10   gentlemen.  Ladies and gentlemen, you have just
11   experienced -- we were longer than ten minutes, weren't
12   we? -- what sometimes happens.  The best laid plans, as they
13   say, sometimes go awry.  It was necessary for counsel and
14   the Court to have some discussion about some matters that I
15   needed to rule upon in order that we present the evidence in
16   the fairest light possible to both sides.  So from time to
17   time that might happen.
18          So let me bring to your attention that from time
19   to time, as you saw me do when we questioned you, we will go
20   over here to sidebar, when there is a need, in the view of
21   the Court, to have a discussion out of your presence.  It is
22   not my desire to hide things, or the parties' desire to hide
23   things from you.  It is simply so that I am sure that we are
24   all complying with the rules and that they are being applied
25   fairly and evenly to both sides.  In that instance, you will
```

21

```
1   hear me turn on this white noise machine, and you probably
2   can't hear what I am saying now, hopefully not, and in that
3   way, again, it is not to hide things from you, it is to make
4   sure that the rules of the game are being applied in an
5   even-handed fashion.
6           Before I actually get into my formal preliminary
7   instructions, you heard the name David Mitchell.  You don't
8   see a third defendant over there.  The reason is, David
9   Mitchell is the Secretary for Safety and Homeland Security
10   for the State of Delaware.  He is named in this lawsuit in
11   his official capacity only because the lawsuit involves the
12   department of which he is the head.  His actions are not at
13   issue in this case.  He will not be a witness.  Therefore,
14   you should not draw any inference from the fact that he is
15   not here, because he simply doesn't need to be here.
16          So, members of the jury, now that you have been
17   sworn, I am going to give you some preliminary instructions
18   to guide you in your participation in the trial.
19          You will actually get these, as quickly as we
20   can, a copy for each of you.  We are not giving those to you
21   right now because that was part of the discussion we just
22   had to have.  There are some things I need to excise or take
23   out.
24          Before I begin with those instructions, allow me
25   to give you an overview of who the parties are and just to
```

22

1  remind you what each contends.
2       The parties in this case, as you know, are the
3  plaintiffs, Corporal B. Kurt Price, Wayne Warren, Corporal,
4  and Sergeant Christopher D. Foraker. The defendants are L.
5  Aaron Chaffinch, the retired Superintendent of the Delaware
6  State Police, Thomas F. MacLeish, currently the
7  Superintendent, and, as you know, David B. Mitchell.
8       In this case the plaintiffs' claim they
9  exercised their constitutional rights to free speech and
10  petition when they raised concerns about the environmental
11  conditions at the State Police indoor firing range. You
12  have heard me refer to it as the FTU. They further assert
13  that, in retaliation for their raising concerns, the
14  defendants took adverse action against them.
15       Now, the defendants deny that they did anything
16  to the plaintiffs because of anything the plaintiffs said
17  about the conditions at the range. In responding to things
18  they learned about the range from the plaintiffs and others,
19  the defendants contend that they acted solely with the
20  welfare of the plaintiffs, other law enforcement personnel
21  and the public in mind.
22       Sergeant Christopher Foraker also contends that,
23  in retaliation for filing a lawsuit against defendant
24  Chaffinch in 2002, the defendants took adverse action
25  against him, including defaming him and invading his

23

1  privacy. The defendants deny Foraker's claims. They
2  contend that they did nothing to Foraker because of his
3  previous lawsuit.
4       So let me begin by explaining your general
5  duties and the rules that will govern your discharge of
6  those duties in this case.
7       It will be your duty to find from the evidence
8  what the facts are. You and you alone will be the judges of
9  the facts. You will then have to apply those facts to the
10  law as I will give it to you both during these preliminary
11  instructions and at the close of the evidence. You must
12  follow that law whether you agree with it or not.
13       In addition to instructing you about the law, at
14  the close of the evidence, I will provide you with
15  instructions as to what the claims of the parties mean, what
16  they are. Of course, you are bound by your oath as jurors
17  to follow these and all the instructions that I give you,
18  even if you personally disagree with them. All the
19  instructions are important, and you should consider them
20  together as a whole.
21       Perform these duties fairly, ladies and
22  gentlemen. Do not let any bias, sympathy or prejudice that
23  you may feel toward one side or the other influence your
24  decision in any way. Also, do not let anything that I may
25  say or do during the course of the trial influence you.

24

1  Nothing, ladies and gentlemen, that I may say or do is
2  intended to indicate, or should be taken by you as
3  indicating, what your verdict should be.
4       The evidence from which you will find the facts
5  will consist of the testimony of witnesses. Now, the
6  testimony of witnesses consists of the answers of the
7  witnesses to questions posed by the attorneys or the Court.
8       You will not be permitted to ask questions in
9  this proceeding.
10       Evidence will also consist of documents and
11  other things received into the record as exhibits, and any
12  facts that the lawyers agree to or stipulate to or that I
13  may instruct you to find.
14       Now, certain things are not evidence and must
15  not be considered by you. I will list them for you now.
16  They are essentially four categories.
17       First, statements, arguments, and questions by
18  lawyers are not evidence.
19       Objections to questions are not evidence.
20  Lawyers have an obligation to their clients to make
21  objections when they believe evidence being offered is
22  improper under the rules of evidence. You should not be
23  influenced by the objection or by the Court's ruling on it.
24  If the objection is sustained, ignore the question. If it
25  is overruled, treat the answer just like any other. If you

25

1  are instructed that some item of evidence is received for a
2  limited purpose only, you must follow that instruction.
3       Testimony that the Court has excluded or told
4  you to disregard is the third category, it is not evidence
5  and must not be considered.
6       Finally, anything you may have seen or heard
7  outside of this courtroom is not evidence and must be
8  disregarded by you. You are to decide the case solely on
9  the evidence presented here in this courtroom.
10       There are two kinds of evidence, essentially
11  direct and circumstantial are the two kinds. Direct
12  evidence is direct proof of a fact, such as the testimony of
13  an eyewitness. Circumstantial evidence is proof of facts
14  from which you may infer or conclude that other facts exist.
15  As a general rule, the law makes no distinction between
16  these two types of evidence, but simply requires that you
17  find facts from all the evidence in the case, whether direct
18  or circumstantial, or a combination of the two.
19       You are the sole judges of each witness'
20  credibility. You should consider each witness' means of
21  knowledge, strength of memory, opportunity to observe, how
22  reasonable or unreasonable the testimony is, whether it is
23  consistent or inconsistent, whether it has been
24  contradicted, the witness' biases, prejudices, or interests,
25  the witness' manner or demeanor on the witness stand, and

26

1  the circumstances that, according to the evidence, could
2  affect the credibility of the testimony.
3          If you find the testimony to be contradictory,
4  you must try to reconcile it, if reasonably possible, so as
5  to make one harmonious story of it all. But if you can't do
6  this, then it is your duty and privilege to believe the
7  testimony that in your judgment is most believable and
8  disregard any testimony that in your judgment is not
9  believable.
10         This instruction applies to the testimony of all
11 witnesses, including expert witnesses.
12         I will give you detailed instructions on the law
13 at the end of the case, and those instructions will control
14 your deliberations and decision. But in order to help you
15 follow the evidence, I will now give you a brief summary of
16 the elements which the plaintiffs must prove to make their
17 case.
18         As to the First Amendment retaliation claim, to
19 prevail on a claim of retaliation, any plaintiff must prove
20 by a preponderance of the evidence that either individual
21 defendant intentionally violated his protected First
22 Amendment rights and that this violation was a substantial
23 or motivating cause of adverse action taken against him.
24         He must prove that he was the victim of adverse
25 action that would deter a person of ordinary firmness from

27

1  engaging in protected activity under the First Amendment.
2  Put another way, the retaliatory actions must be sufficient
3  to cause reasonably hardy persons to refrain from exercising
4  their rights under the First Amendment.
5          If, on the other hand, he cannot prove this,
6  then you must return a verdict for the defendants.
7          As to defamation, defamation is a communication
8  that tends to injure a person's reputation in the ordinary
9  sense of that word; that is, some statement or action that
10 diminishes the esteem, respect, goodwill, or confidence in
11 which the person is held and tends to cause bad feelings or
12 opinions about that person.
13         A communication is defamatory if it tends to
14 lower the person in the estimation of the community or if it
15 deters third parties from associating or dealing with the
16 person defamed. For a defamation to occur, the defamatory
17 information must be communicated to someone other than the
18 person to whom it refers. In the law, this is known as
19 publication.
20         In this case, Sergeant Foraker must prove that
21 the defendants' statements were false. Plaintiff must also
22 prove that the defendants made the allegedly defamatory
23 statements with knowledge that the statements were false or
24 with reckless disregard for whether they were false.
25         Now, as I told you during the voir dire, this is

28

1  a civil case. Here each plaintiff has the burden of proving
2  his case by what is called a preponderance of the evidence.
3  That means he has to prove evidence which considered in
4  light of all of the facts leads you to believe that what is
5  actually claimed is more likely true than not.
6          To put it differently, if you were to put the
7  plaintiffs' and the defendants' evidence on opposite sides
8  of the scale, if he fails to meet this burden, the verdict
9  must be for the defendants. Each plaintiff must prove his
10 damages by a preponderance of the evidence.
11         Those of you who have sat on criminal cases will
12 have heard the term proof beyond a reasonable doubt. That
13 requirement does not apply to a civil case. Therefore, you
14 should put it out of your mind.
15         Now, just a few words about your conduct as
16 jurors.
17         First, I instruct you that during the trial you
18 are not to discuss the case with anyone or permit anyone to
19 discuss the case with you. Until you retire to the jury
20 room at the end of the case to deliberate on your verdict,
21 you simply are not to discuss the case. If any lawyer,
22 party, or witness does not speak to you when you pass in the
23 hall, ride the elevator, or the like, remember it is because
24 they are not supposed to talk with you nor you with them.
25 In this ways any unwarranted and unnecessary suspicion about

29

1  your fairness can be avoided. If anyone should try to talk
2  to you about the case, please bring it to the Court's
3  attention promptly.
4          Second, do not read or listen to anything
5  touching on this case in any way.
6          Third, do not try to do any research or make any
7  investigation about the case on your own.
8          Finally, do not form any opinion until all the
9  evidence is in. Keep an open mind until you start your
10 deliberations at the end of the case.
11         Now, during the trial, as you already know, I
12 will permit you to take notes. A word of caution is in
13 order. There is always a tendency to attach undue
14 importance, perhaps, to matters that are written down.
15 Testimony which is considered unimportant at the time
16 presented and thus not written down takes on a greater
17 importance later in the trial in light of all the evidence
18 presented. Therefore, you are instructed that your notes
19 are only a tool to aid your individual memory, and you
20 should not compare your notes with other jurors in
21 determining the content of any testimony or in evaluating
22 the importance of any evidence. Your notes are not
23 evidence, and are by no means a complete outline of the
24 proceedings or a list of the highlights of the trial.
25         Above all, your memory should be your greatest

30

1  asset when it comes time to deliberate and render a verdict

2  or decision in this case.

3      So if you do take notes, simply leave them in

4  the jury room at the end of the day, and that room will be

5  locked. Remember, they are for your own personal use.

6      I will give you detailed instructions on the law

7  at the end of the case, and those instructions, as I have

8  said to you before, will control your deliberations and

9  decision.

10      Let me just tell you real briefly how this trial

11  will take place.

12      It is like most, if not all jury trials. It

13  will come in roughly seven stages. We have completed the

14  first two phases, your selection as jurors and these

15  preliminary instructions.

16      Then will come opening statements, which are

17  intended to explain -- these are opening statements of the

18  lawyers -- explain to you what each side intends to prove

19  and are offered to help you follow the evidence. The

20  lawyers are not required to make opening statements at this

21  time or they may defer their openings until it's their turn

22  to present evidence.

23      We will then have the presentation, actual

24  presentation of evidence, which will include live witnesses,

25  and may also include previously recorded testimony as well

31

1  as documents and things.

2      I will then give you my final instructions. And

3  then we will hear your closing arguments of counsel, which

4  will again be offered to help you make your determination.

5      Finally, we will then have your deliberations,

6  where you will evaluate the evidence and discuss it among

7  yourselves and determine the outcome of the case.

8      Please keep in mind that the evidence is often

9  introduced in somewhat piecemeal fashion. So as the

10  evidence comes in, you are going to need to keep an open

11  mind.

12      I think I have already said enough about the

13  schedule. You know what the schedule is going to be.

14      We will now hear from counsel.

15      Mr. Neuberger.

16      MR. T. NEUBERGER: Thank you, Your Honor.

17      Ladies and gentlemen of the jury, as you know, I

18  am Tom Neuberger. I represent Wayne Warren there, Sergeant

19  Christopher Foraker there, Corporal Kurt Price. I will be

20  assisted by Steve Neuberger and Martin Haverly, who are

21  trying this case with me.

22      This case is about payback and revenge by the

23  most power officials in the State of Delaware.

24      A federal court jury like yourself found that

25  the Colonel of the Delaware State Police had violated

32

1  Sergeant Foraker's First Amendment freedom of speech when

2  Colonel Chaffinch retaliated against him because he had

3  disciplined a friend of the Colonel's. Then a federal judge

4  ordered Chris back to his old job.

5      After that happened, his nightmare continued,

6  because the Colonel was angry and began a vendetta against

7  him.

8      In the Colonel's own words, which you will hear

9  from witnesses, "I am going to get that son of a bitch."

10  And you will learn how he did that.

11      My three trooper clients also exercised their

12  free speech rights by reporting on health and safety

13  problems which were being faced by over 630 troopers and

14  many municipal police officers who were being endangered by

15  hazardous conditions at the Delaware State Police firing

16  range in Smyrna, Delaware, and, also, when an investigation

17  had begun speaking to the Delaware State Auditor's Office

18  about health concerns, health hazards, and other problems at

19  the range, as well as mismanagement and other root causes of

20  those problems at that broken-down facility.

21      You will learn that the defendants then did

22  everything they could to break these whistle-blowers and

23  drive them into retirement, causing them grave injury, the

24  loss of their good names, their economic futures, and

25  injuries to their physical and mental health.

33

1      Now, the evidence will show the distinguished

2  work records of these three men. For example, this is

3  Sergeant Chris Foraker in uniform (indicating). Chris

4  joined the State Police in 1985, the evidence will show, and

5  served out the State Police in patrol as a K-9 handler and

6  as a team leader on the SWAT team. They call it SORT.

7  You can use the familiar term SWAT team. He would lead the

8  team assault against criminals or terrorists holding people

9  hostage.

10      In 1997 he transferred into the firing range.

11  As a firearms instructor, the evidence will show that he,

12  Wayne and Kurt did three things. They were experts on the

13  force and power of all types of weapons. They trained

14  troopers how to survive deadly encounters and gun battles on

15  the streets. And number three, they trained troopers on how

16  to use force to rescue the helpless in life-threatening

17  situations. For example, how to save school children who

18  are taken hostage, like what happened out in Colombine, out

19  west somewhere.

20      While serving at the range, you will learn that

21  Chris' leadership qualities were recognized by the Delaware

22  State Police, and he was chosen and sent to the Northwestern

23  School of Police Staff and Command for a 12-week leadership

24  school, with special emphasis on being a manager and a

25  supervisor.

34

1      You will learn that in August, 2001, he was

2  promoted to the rank of Sergeant and became the Section

3  Chief of the entire unit at the range.

4      But less than seven months later, you will

5  learn, in February of 2002 he ran afoul of the "good old

6  boy" network in the State Police.  He was demoted and

7  transferred out of the range and given a dead-end assignment

8  at the Police Academy because he had disciplined a close

9  friend of Colonel Chaffinch for wrongdoing, such as sexually

10  harassing a civilian woman employee.

11      The evidence will show what kind of a trooper

12  Chris Foraker was.  You will hear evidence from defendant

13  MacLeish and many others, defendant MacLeish will admit that

14  Chris is a good trooper.  Numerous other Captains and Majors

15  will testify about the kinds of things they observed as the

16  measure of the man who you will learn is Chris Foraker.

17      Once again, you will learn from defendant

18  MacLeish that the Foraker name carries a good reputation in

19  the State Police, that he is the kind of person that anyone

20  would want to command.

21      You will hear from retired Major Joseph

22  Forester, who will say, I have nothing but good things to

23  say about Sergeant Foraker, whether on or off the job.  He

24  has a reputation of the highest order.

25      You will hear from the present Lieutenant

35

1  Colonel, the second in command of the State Police, who will

2  testify that Sergeant Foraker is a man of very high

3  integrity, truthfulness, and character.  Three qualities

4  which you will learn are unquestioned by his commanders.

5      Now, next, here is a picture of Master Corporal

6  Kurt Price in his State Police uniform.  Kurt is an

7  ex-Marine, who also served for many years on the SWAT team

8  as the sniper or the man who came through the door on the

9  entry teams in a hostage rescue situation.  He has been a

10  trooper since 1985, until April 7th, just a few days ago,

11  last month, when defendant MacLeish forced him into

12  retirement many years prematurely.

13      The evidence will show that he has excelled

14  during his State Police career and has worked a wide variety

15  of assignments.  In addition to patrol, he has worked

16  undercover fighting drug dealers in the K-9 unit, and since

17  1996 has served at the range, he has got the most tenure at

18  the range, as a firearms instructor doing those things I

19  explained to you.

20      His evaluation spanned several leadership

21  changes, different bosses at the range.  They will show

22  that, and you will be able to see these, that he is

23  dedicated to the survival of his students, and he has

24  devoted his entire career to the protection, advancement and

25  survival of others, and that he always gets the highest

36

1  rankings and ratings in the care of equipment at the range,

2  which you will see is an issue in this case.

3      Then we have Master Corporal Wayne Warren.  This

4  is him in uniform (indicating).  Wayne has served on the

5  SWAT team for 18 years.  Wayne was the second in command of

6  the SWAT team.  There are three teams, Alpha and two other

7  lettered teams.  Wayne was the number-two man in the SWAT

8  team.  He would master mind the rescue in a hostage

9  situation.

10      Wayne has been a trooper since 1983.  He is the

11  oldest of the three.  The evidence will show that he has

12  worked a wide variety of assignments, such as high-risk drug

13  assignments, and since 2001 was serving there at the range

14  in addition to his other duties.

15      You will see his evaluations, saying that he is

16  an outstanding firearms instructor, that his decision-making

17  is unquestionable, that he is blessed with the ability to be

18  a true and respected leader, that he leads by example, and

19  is an asset to the range.  And then, once again, his care of

20  equipment is impeccable.

21      Now, the evidence will show that there was an

22  unprecedented jury verdict for Chris Foraker in June of 2003

23  in the courtroom on the other side of this wall.  Chris went

24  to trial there, and a federal jury found that Colonel

25  Chaffinch had violated his First Amendment rights at that

37

1  time in retaliation for speaking out under the First

2  Amendment.

3      You will see the written questions answered by

4  the jury.  You will see the signatures by the jurors as to

5  the findings they made in that case.  You will learn that

6  that careful jury awarded Chris money and compensatory

7  damages in that case and that that discerning jury continued

8  and found that Colonel Chaffinch's action also merited the

9  award of what the law calls punitive damages.

10      You will learn from defendant MacLeish that this

11  jury verdict that the Colonel had violated Chris' First

12  Amendment rights was unprecedented in the history of the

13  entire State Police.  No trooper had ever successfully sued

14  a Colonel of the State Police before.

15      You will learn that the verdict received a fair

16  amount of media coverage throughout the state and cast the

17  division in a negative light.

18      You will learn that the case was subsequently

19  settled, and then on December 1st of 2003, Judge Farnan

20  ordered Chris reinstated to the previous position he held at

21  the range, with all of the rights, privileges, duties,

22  responsibilities and supervisory authority that he

23  previously held before Colonel Chaffinch had retaliated

24  against him and moved him out of there.

25      The settlement of the case, you will learn,

A - 25

---

**38**

1  received a fair amount of media attention.

2  The evidence will show that, as a consequence,

3  both defendants began an open vendetta against Sergeant

4  Foraker. You will learn that the Colonel and defendant

5  MacLeish, his close personal friend, in MacLeish's words,

6  are joined at the hip, and participated in this vendetta

7  against Chris Foraker.

8  You will learn from Captain Glenn Dixon, who I

9  will force to testify before you by a Court subpoena, that

10  Colonel Chaffinch openly bragged throughout the Delaware

11  State Police --

12  THE COURT: Mr. Neuberger, unfortunately, I

13  think our juror does need a break. She has indicated as

14  much.

15  MR. T. NEUBERGER: Why don't we take a break.

16  THE COURT: I apologize for that.

17  (Jury leaves courtroom at 12:17 p.m.)

18  THE COURT: Hopefully, she will be all right in

19  a few minutes. I apologize for that.

20  (Recess taken.)

21  THE COURT: Please be seated. We are going to

22  bring in the jury and try again.

23  Counsel, if the juror's condition becomes

24  problematic, the Court might entertain a motion. We will

25  see how she makes out. She is still coughing.

---

**39**

1  (Jury enters courtroom at 12:23 p.m.)

2  THE COURT: Okay. Please be seated. We will

3  pick up where we left off.

4  MR. T. NEUBERGER: Thank you, Your Honor, and

5  ladies and gentlemen of the jury. We were at a breaking

6  point anyway.

7  What I was saying was, I was talking about, you

8  were going to hear evidence of a vendetta. I explained what

9  Captain Dixon was going to testify. You will learn that

10  Captain Dixon, just a few ranks below the Colonel, was a

11  close confidant of Colonel Chaffinch. Colonel Chaffinch had

12  promoted him to Captain. Until a few days ago, Captain

13  Dixon commanded Colonel Chaffinch's home troop, which is

14  called Troop 5 down the Bridgeville, Delaware, near where

15  Colonel Chaffinch lives.

16  You will learn from Captain Dixon that Colonel

17  Chaffinch said that, If people -- and pardon my language --

18  f-u-c-k with Chaffinch, I am going to f-u-c-k back.

19  You will learn that he regularly stated, Colonel

20  Chaffinch, that Sergeant Foraker was a real "pain in the

21  ass," and that he was a f-u-c-k-i-n-g asshole.

22  You will also learn from Chaffinch's friend,

23  Colonel MacLeish, who Colonel Chaffinch promoted to second

24  in command, that the Colonel was irritated, not happy, with

25  Sergeant Foraker filing that lawsuit. You will learn that

---

**40**

1  childishly, Colonel MacLeish himself grits his teeth and

2  growls like a dog when he is in Sergeant Foraker's presence.

3  And you will learn from him that he feels that Sergeant

4  Foraker is a pain in the a-s-s.

5  Captain Dixon will explain that Colonel

6  Chaffinch has been angry at Sergeant Foraker for a very long

7  time, since the lawsuit began, the first one, that he would

8  regularly mock Sergeant Foraker and joke about the injuries

9  that he had to explain to the jury in that first trial. He

10  was angry the entire life of that lawsuit. And his anger

11  increased after that unprecedented jury verdict was returned

12  and Judge Farnan ordered him back to the range.

13  Captain Dixon will add that it was regularly

14  discussed among commanders at the State Police that Colonel

15  Chaffinch was going after Sergeant Foraker.

16  The lawsuit aside, the evidence will also show

17  that my three clients spoke out within channels first about

18  dangerous health issues, and also then went to the State

19  Auditor about many problems with the range where they were

20  working. You will learn that the firearms range was a

21  dangerous place to work. The evidence will show that this

22  multi-million-dollar building was snake-bitten from the very

23  beginning. And the overriding problem with the range, you

24  will hear about the quality of the air-handling for the

25  entire complex, facility.

---

**41**

1  You will learn that the HVAC, that is heating,

2  ventilation and air conditioning, the HVAC unit for this

3  large facility, this large indoor facility, as originally

4  built, was two and a half times too small to handle the

5  smoke.

6  When you shoot weapons at a firing range, you

7  will see the pictures, but just imagine, 20 spots, 50 yards

8  down the road, he knows where the target is at. As you are

9  discharging weapons indoors, a lot of smoke is generated,

10  contaminants from lead bullets, particulates from bullets

11  made of other materials. And the system is supposed to take

12  them out. You will learn the system doesn't work right.

13  Instead, the smoke comes back on the men.

14  You will also learn that the bidding process,

15  when they put it together in 1998, was flawed because the

16  person the state chose to construct the range was ranked

17  last among qualifications to build the range. There was a

18  disinterested process to rank the applicants, and the most

19  qualified applicant didn't get the job, but the job went to

20  the least qualified. It happened to be a Delaware builder.

21  Other problems you will learn about, what the

22  evidence will show is, for example, toxic goo behind where

23  the targets are, there is elaborate machinery that catches

24  the bullet slugs, puts them all in an assembly line -- along

25  a belt, carries them away, gets real dirty back there. You

---

42

1  will learn all about this.
2          My men would have to clean up toxic goo back
3  there. And you will learn that the doctors were telling
4  them back there that because of the contaminants found in
5  lead bullets, shotgun shells, frangible bullets made of
6  zinc, copper, nitroglycerin, other dangerous lead-heavy
7  metals, their blood levels in these heavy metal substances
8  were going up, and the doctors told them they shouldn't be
9  putting their hands in the toxic goo.
10         You will learn my men were never given training
11 in how to deal with these kinds of hazardous substances.
12 Weren't given hazardous materials training, and weren't
13 given protective equipment to wear when they are engaging in
14 this kind of difficult cleanup.
15         You will also learn that before Chris was
16 ordered back to the range by the Federal Court on December
17 1st, 2003, Wayne and Kurt had been complaining about these
18 health issues to Sergeant Richard Ashley, who was a friend
19 of Colonel Chaffinch, who had been put in the job when Chris
20 was pulled out of the range earlier in 2002. But Ashley
21 refused to complain to his friend Colonel Chaffinch about
22 these health issues, and they were being ignored.
23         So then Chris rejoins the range on December 1st,
24 2003. And the evidence will show that Wayne and Kurt now
25 have a commander who would speak up and do all in his power

43

1  to protect the troopers under his command, as well as those
2  other people who were being exposed to the hazards out at
3  the range. You will learn that Chris learned about these
4  problems the first few days back, and then you will hear
5  from the command in the organizational structure of the
6  range, that is who they point up to, Captain Greg Warren,
7  you will learn from Captain Greg Warren that immediately --
8  there was rarely a day that went by when Chris wasn't
9  reporting up the chain of command something about the
10 problems at the range.
11         You will learn that Chris was doing an admirable
12 job of keeping the higher levels informed of the problems he
13 had encountered. And Captain Warren, who is retired now,
14 will explain that within the first ten days after Chris took
15 over, he learned about this multitude of problems that
16 Ashley hadn't been reporting on. And then for six weeks, he
17 tried and tried to explain these problems to the defendant,
18 Lieutenant Colonel MacLeish at the time.
19         You will learn from the evidence that Lieutenant
20 Colonel MacLeish kept avoiding him, so that he could figure
21 out how to keep a lid on the problem which had been hidden
22 from the public for many years. But the evidence will show
23 that the chickens were now coming home to roost.
24         You will learn that because he wouldn't meet
25 with him, Captain Warren would catch MacLeish on the run.

44

1  Captain Warren -- you will see, the State Police
2  headquarters is in Dover, right before Dover Downs, on the
3  main road going through Dover, across from Delaware State
4  College there. And there is a two-story red brick building.
5  That is the headquarters building. On one side there is a
6  two-story building, which is a museum, on the other side is
7  their Police Academy, one or two-story brick Police Academy
8  building where they train new troopers. There is a big
9  parking lot.
10         So you will learn, Greg Warren is in that
11 building right next to the headquarters building, about 50
12 feet from Lieutenant Colonel MacLeish then, and that he
13 would catch him on the run in the parking lot or wherever
14 and give him the list of the basic problems that they were
15 having to deal with.
16         You will learn from Captain Warren that he
17 reported to the Lieutenant Colonel that on doctor's orders
18 the men were stopping putting their hands in the toxic goo,
19 when they went out and found experts to try to deal with
20 these problems and how to deal with the range safely. You
21 will hear the evidence my clients began investigating the
22 problems and finding experts. And you will also learn from
23 their immediate supervisor in the chain between Captain
24 Warren and Sergeant Foraker, Lieutenant Ralph Davis, who is
25 the next person up, you will learn from Ralph Davis that the

45

1  men at this time in December were basically pleading for
2  help, waving a flag, saying help, as they spoke about the
3  hazards they were concerned about at the range.
4          Now Lieutenant Davis is promoted to Captain
5  Davis. Captain Davis will testify that they were being
6  honest and sincere for their own health, the health and
7  safety of their families, but overall also about the health
8  and safety of those of us who have to visit the range on at
9  least two occasions for doing our recertification, our
10 training, to keep our license to carry our weapons. And
11 they were trying to protect the health and welfare of
12 everybody who was being exposed at the range and who was
13 being trained there.
14         You will learn that they were speaking out about
15 the HVAC, the malfunctioning HVAC unit.
16         In fact, you will see a lot of pictures in this
17 case. You will see one very telling picture from the roof
18 where the exhaust, you know, these big tin tubes come out of
19 the building on the roof, and the exhaust is coming out of
20 supposedly the dirty air and the contaminants. And you will
21 see the exhaust comes out like this (indicating), and intake
22 is right underneath the exhaust.
23         So this is how the building was built. They
24 take the contaminants out when it's functioning properly and
25 then pump them right back into the building.

A - 27

46

1    You will learn that the HVAC system down on the
2    range floor blew the air not away from the men but blew the
3    air into their faces. They were speaking up about that.
4         They were speaking up about the kinds of bullets
5    that they were using. They went from lead bullets, which is
6    obviously a contaminant, to what they called frangible
7    bullets. But they learned during their investigation that
8    these frangible bullets still had contaminants in them,
9    zinc, copper, nitroglycerin, other heavy metals that the men
10   will explain they were fearful what effect this was having
11   on their blood levels.
12        You will learn that the bullet trap itself was
13   not the one that was originally designed for the building.
14   They put a different one in as a cost-cutting device. It's
15   a highly sophisticated piece of equipment. It was breaking
16   down and having problems. And you will learn that many
17   companies simply wouldn't come in to fix it because of the
18   dangers involved in exposure to the toxic metals where the
19   bullets will collect.
20        And we are talking about not having the
21   equipment to clean it up. You will learn they were talking
22   about the low staffing levels. Ranges around the country
23   have an instructor-to-student ratio of one-to-three. The
24   Delaware State Police would never put enough men there to
25   meet that ratio. Instead, they had like an

47

1    instructor-to-student ratio of one-to-ten. Obviously, their
2    time was consumed with that, and not other secondary duties.
3         You will learn, there is a room, you will
4    probably see a picture of it, where they would have to clean
5    the equipment. After you discharge weapons, they have to be
6    cleaned and oiled and everything else like that. And the
7    fumes come out of there. That is called the armorer's room.
8    You will learn that the toxic fumes, the HVAC system
9    wouldn't take the toxic fumes out of the small cramped rooms
10   where they had to clean the equipment.
11        So, December, they are complaining about all
12   this up the chain of command. You will learn about these
13   kinds of complaints over the next several months. Then you
14   will learn that on March 19th, publicly, the range was shut
15   down because of environmental contamination. And then you
16   will learn that the payback and revenge began with a
17   vengeance because, with the public shutdown and the exposure
18   of this dinosaur facility that the state had constructed,
19   you will learn that an attack began on my three clients,
20   blaming them for the problems at the range and the shutdown
21   at the range.
22        You will learn that -- we don't need that.
23        You will learn that on April 6th, Colonel
24   Chaffinch decided to give the media a tour of the range.
25   This is the month after it was shut down on March 19th. You

48

1    will see the front page news stories about that media tour,
2    for example. You will have this, this newspaper article in
3    your evidence book. Here is Colonel Chaffinch walking
4    around with the secretary of Facilities Management, who was
5    the landlord for the range. You will see the full-page
6    inner story on the range. You will be able to read about
7    the things Colonel Chaffinch and eventually Lieutenant
8    Colonel MacLeish were saying about why the range was closed
9    down. And you will learn that the statements that were
10   being made were blaming the conditions on the range, these
11   historic conditions that lead to the closedown, on my three
12   clients.
13        You will hear evidence that before the tour,
14   that is before he went out there on April 6, before leaving
15   the building, Colonel Chaffinch went down and spoke to
16   Captain Barbara Conley, in charge of the Traffic Division,
17   and Captain Glenn Dixon, started speaking, pointed his
18   finger over at the Academy building -- and these people work
19   under the Academy -- saying that he was going out and he was
20   going to put it on, put it on f-u-c-k-i-n-g Foraker. He was
21   going to stick it to Foraker. He was going to put it on
22   Foraker and lay a lot of the blame on him for the range.
23        That he stated, If you f-u-c-k with me, I
24   f-u-c-k back.
25        And he also stated, I am going to stick it up

49

1    their (indicating) ass and show them what I am all about.
2         And that he was also gunning, gunning for them.
3         So he went over and gave the tour. You will
4    also learn from other evidence that now Colonel MacLeish
5    says that 50 percent of the problems at the range were the
6    fault of my men.
7         And he gave this tour, and he blamed them for
8    destroying the facility. You will have the article. You
9    will be able to look at it. That article in the Delaware
10   State News also was published in a national police magazine
11   called the Police Beat Magazine, which has a national
12   circulation throughout police agencies throughout the state,
13   throughout the United States. And you will see in that
14   magazine, also, these charges that my men destroyed the
15   range were promulgated. You will be able to look at the
16   article carefully. But there are things in there, like
17   Colonel Chaffinch saying the previous Sergeant, meaning
18   Ashley, did a good job. Things changed in December when
19   another Sergeant came back. That's at least a portion of
20   where the ball was dropped. It used to be clean, you will
21   see, I have never seen it like this before.
22        You will see statements in there that Chris
23   Foraker didn't want to put himself in harm's way by putting
24   his hands in the toxic goo, and you will be able to
25   interpret what that kind of a statement was intended.

50

1    So these stories run, there was even a TV story
2    on WBOC, Channel 16, downstate, that covers the Eastern
3    Shore, the men were attacked.  Then the news media wanted a
4    response from the men -- what about these accusations that
5    have been made against you?  And you will learn that Colonel
6    Chaffinch had then placed a gag order on the men and they
7    were forbidden to respond to the charges that were being
8    made against them.  In other words, their hands were tied
9    behind their back and they weren't allowed to defend
10   themselves because of the charges.
11        Then you will learn that after the tour, Colonel
12   Chaffinch came back to headquarters and talked to several
13   witnesses, who will testify.  You will hear a lot of
14   testimony from a Major David Baylor on many issues in this
15   case.  He was the Operations Commander for New Castle
16   County.  He commanded 250 troopers in New Castle County up
17   until the time of his retirement just about a year ago.  You
18   will learn that Colonel Chaffinch had called him into his
19   office when he came back from giving the media tour, and
20   Major Baylor will tell you his memory of the conversation.
21   Colonel Chaffinch told him words to the effect of, I got
22   them back or I got my shots in or I got my digs in.  And the
23   meaning was very clear to Major Baylor.  He was talking
24   about he got his digs back in at the men.
25        He will recount how Colonel Chaffinch made the

51

1    statement about people who live in glass houses shouldn't
2    throw stones.  And Baylor asked him, who are you talking
3    about?  And he pointed to the Academy building.  And Baylor
4    will explain that he understood that Colonel Chaffinch was
5    referring to the whole group of individuals at the range in
6    general.
7         Then you will learn that after speaking with
8    Major Baylor, that same afternoon, Colonel Chaffinch
9    returned to the Traffic Division on the first floor and
10   again spoke to Captain Conley.  You will learn from her
11   testimony that he was visibly excited and was bragging about
12   the tour.  He thought he had done a good thing here and that
13   he had put it on them and taken it to them.
14        Then you will learn that Captain Conley, Captain
15   Dixon and Major Baylor then had a discussion about what had
16   happened and what they had learned, and they expressed their
17   shock and surprise at all of this, and that they couldn't
18   believe that Colonel Chaffinch was out publicly attacking
19   the men and blaming them for all these problems at the
20   range.  And you will learn that the situation was so grave
21   that Major Baylor took Colonel Chaffinch aside and urged him
22   to call the media and to retract his attacks on the men.  He
23   told him that it shouldn't appear that he was coming at the
24   troopers.
25        You will hear evidence of Colonel Chaffinch's

52

1    malice, the fact he didn't want to hear it.  He didn't want
2    to hear anything about any retractions.  And that he said,
3    It's my time to get them back.
4         So on April 6th the range has been shut down and
5    the men have been gagged.  They can't respond.
6         And the Governor, you will learn that the
7    Governor ordered the State Auditor's Office to investigate
8    what's going on with this facility of the State of Delaware.
9    And the auditors, the State Auditor's Office, Tom Wagner,
10   comes in and does a study.  Legislators were up in arms.
11   The General Assembly was up in arms.  An investigation
12   began.
13        You will learn that my clients met on May 12th,
14   2004 with several investigators from the State Auditor's
15   Office, and, No. 1, gave them written statements that you
16   will see, explaining the problems at the range; No. 2, gave
17   them oral statements and answered questions to aid and
18   assist in their investigation; No. 3, gave them a concise
19   packet of documents, key documents about the history of the
20   coverup at the range; and then, No. 4, gave them three
21   banker boxes of materials, documents relating to the range.
22   Eleven notebooks.  All the records as far as how the range
23   was built, the bidding, and all sorts of other problems,
24   historically, through the whole tenure of the range, were
25   kept there.  So they gathered those together and turned them

53

1    over to the investigators and explained the irregularities.
2         And then on July 28th, there was followup
3    meetings with the auditors, where my clients spoke out
4    again.  The evidence will show that the defendants got angry
5    at this speaking out and answering questions to the
6    auditors.  You will learn that my clients had to do this
7    because this was the only way for them to tell somebody
8    their side of the story.  Otherwise, the Colonel's attacks
9    on them would remain unrebutted.
10        But you will learn that Colonel MacLeish was
11   dismayed by the fact that they tried to defend their
12   reputations with the auditors.  You will learn that he felt
13   they were being a pain in the ass for doing this.  You will
14   learn that MacLeish and his body language would demonstrate
15   how angry he was at the men.
16        Then we do have this little timeline here.  You
17   will learn on May 12th, they spoke to the auditors.  On May
18   13th, they were ordered to undergo fit-for-duty exams.  You
19   can take away an officer's police powers on a medical exam
20   if they are found unfit for duty.
21        So the evidence will show that from December
22   through the first quarter of 2004, they are taking
23   everything through channels.  Then on May 12th, they speak
24   to the auditors.  And when they were speaking through
25   channels, there was this attack on their reputations.  Then

54

1  on May 12th they speak to the auditors, and attempts are
2  made to take away their police powers. For example, they
3  are not allowed to wear their uniforms anymore. That is why
4  they don't have their uniforms on today. You will hear
5  about that.
6          And the kinds of things they were being accused
7  of was, you know, destroying the range. We have talked
8  about that. They are sent for these fitness-for-duty exams
9  in an attempt to shut them up. And you will hear all sorts
10  of confusing evidence in the case. You will hear evidence
11  from the defendants that they were sent for fitness-for-duty
12  exams because my men wanted to know what their blood lead
13  levels were. How high was it going up? What were the
14  dangers?
15          You will learn they were also sent for hearing
16  tests. And the defense will try to convince you that my
17  clients were sent, when they went for physicals, they also
18  had audiograms. They put in you a room, they put the
19  headset on and make all sorts of noises and you are supposed
20  to be able to hear different levels and everything. As part
21  of their physicals, they also had audiograms. And the
22  defendants will try to convince you that that was because my
23  clients wanted their hearing tested. My clients will
24  explain they didn't want their hearing tested, but they did
25  it as a way of trying to find a way to retire them.

55

1          But you will learn from the evidence that it
2  doesn't make any difference who asked to have their hearing
3  tested, because the Delaware State Police never forces a
4  trooper into retirement who has hearing problems.
5          You will hear from Major Joseph Forester, who I
6  will call, who retired in the year 2000. You will learn
7  that from the time he was a Corporal in 1980 through his
8  long career, retiring at age 55, he had hearing problems.
9  You will learn that when he was a Captain and a Major, he
10  had two hearing aids, in each ear. He will very honestly
11  tell us that whenever it was humid in Delaware, and that
12  does happen on occasion here in Delaware, the hearing aids
13  would never work. You will hear from men who were there in
14  crisis situations that Major Forester could never respond
15  because of his hearing problems. He had problems hearing
16  over the phone, and he had problems hearing in crowded
17  situations. But you will learn that he had a full career.
18          You will learn about Lieutenant Kenneth
19  Thompson, who wore hearing aids. And he retired in 1998,
20  after a full career. You will learn even earlier about
21  Sergeant, Big John Pallum, in the eighties, who had
22  significant hearing problems.
23          You will learn that Major Forester, for example,
24  said to the Colonel at that time, you are not wearing
25  hearing aids. Any problem with that? No. You will learn

56

1  from the former director of the Personnel Office of the
2  State Police that the State Police did not want to get into
3  hearing problems, with issues with its men because during
4  their careers, there is loud sirens, there is gunfire, there
5  is chases, there is all sorts of things that damage
6  troopers' hearing, and we don't want to get into that
7  because we probably would disqualify half the force.
8          You will learn if you ever have hearing problems
9  in the State Police, it has never interfered with anyone
10  having a successful career. But when my clients were sent
11  for the hearing test after May 13th, you will learn out of
12  alleged concern for their health and the safety of the
13  public, they were they were forced into retirement.
14          You will also learn that other state troopers
15  who have other kinds of major physical problems are always
16  accommodated and allowed to finish their careers.
17          You will learn about Sergeant Henderson, who had
18  major back issues. What they did was, they put him in
19  Supply, where he would handle supply issues for his whole
20  career.
21          You will learn about Sergeant Steve Swain, who,
22  for about two decades, because he was injured on the job, a
23  crash or something, damaged his vocal cords and everything
24  and has a documented record of vocal dysfunctions, he is
25  very, very hard to understand, obviously, can't be

57

1  understood in a crowd, and how they found a place for him,
2  the Evidence Detection Unit, where he wouldn't have to be
3  making arrests or dealing with people.
4          You will learn about Captain Dave Citro, who
5  retired, and from the 1980s, when he was a Sergeant, he had
6  had major cervical problems, limiting his motion in his neck
7  and everything, and they still let him have a full career.
8          You will learn about the history, the history of
9  all of that, and you will learn that the Delaware State
10  Police, historically, they have been loyal to each other.
11  Troopers, they put their lives on the line every day. They
12  can go out and not come back because of a gun battle.
13  Because of this, it has always been the custom, the practice
14  and the policy of the State Police that if you are injured
15  on the job, such as hearing loss because you have lost
16  hearing because you work at the range where they are
17  shooting and the everything, we find a job for you.
18          In fact, we got a document here, a list. Major
19  Baylor will -- these are the kinds of jobs that the State
20  Police can put officers in who are injured and who can be
21  permanently put in there so they don't have to be out on the
22  street making arrests.
23          For example, number one, desk officer, you will
24  learn that every one of the eight State Police troops has a
25  desk officer for a 12-hour shift. You go into the troop.

---

62

1  consults a year at Christiana Care. If you are in the
2  hospital, you have got cancer, you are going into depression
3  and they have got you on 15 other medicines and they want to
4  know how to get you out of depression, Carol Tavani is the
5  person they bring in 1,500 times a year to try to treat
6  emotional conditions.
7         She will testify that Chris Foraker is suffering
8  from major depression. It's severe. It's chronic. It's in
9  its second episode now. It started during the first
10  lawsuit, it hasn't gone away, it is continuing. He is
11  suffering from what they call post-traumatic stress
12  disorder. She will take us through the kinds of symptoms
13  that he is exhibiting that are up on the board there.
14        Then you will also learn that defendants have
15  sent Chris to Dr. DeBernardo, who is their psychiatrist, or
16  psychologist. And Dr. DeBernardo agrees virtually with all
17  of the kinds of symptoms that Dr. Tavani is explaining that
18  Chris is experiencing.
19        So their own doctor is agreeing on the serious
20  medical condition that has arisen because of the retaliation
21  against Chris.
22        Then Dr. Tavani will testify about Wayne,
23  Wayne's symptoms. Wayne is suffering also from major
24  depression. But he is only in the moderate to severe
25  category. Not severe. Dr. DeBernardo, if we can have the

---

63

1  next one, you will see once again, and you will see these
2  blowups again, agrees with those kinds of symptoms.
3         Then lastly for Kurt, who is in major
4  depression, just like Chris, you will learn of the various
5  symptoms that he is exhibiting from loss of sleep, the
6  nightmares, the flashbacks, the hyper-vigilance, the chest
7  pains, et cetera, et cetera. Then Dr. DeBernardo, the same
8  thing, she will corroborate all that.
9         It is almost 1 o'clock. I think I can finish in
10  five minutes.
11        THE COURT: All right.
12        MR. T. NEUBERGER: You will hear evidence on the
13  injury to reputation. You will learn what the circulation
14  of the News Journal stories were. You will learn what the
15  circulation of the Delaware State News is, 30,000. You will
16  learn how many people watch WBOC TV on the Eastern
17  Shore. You will learn about the circulation of the story in
18  Police Beat Magazine.
19        You will also learn from another expert, a Bud
20  Fini, a man who has spent his entire life in the firearms
21  industry, that Chris Foraker was considered a hot commodity,
22  that Chris had a career after retirement in the firearms
23  industry. And that's what happens to a lot of firearms
24  instructors. A great part of the market for firearms
25  worldwide is the police departments. If we are not talking

---

64

1  about the military, we are talking about police departments,
2  if we are not talking about hunters. Chris would have had a
3  good career in the firearms industry, but now because of the
4  circulation worldwide in the American Police Beat Magazine
5  of the falsehoods contained in the attack by Colonel
6  Chaffinch, that Chris is damaged goods and will never find
7  that kind of job in the firearms industry.
8         You will also learn about the humiliation my men
9  have been through by being stripped of their uniforms,
10  stripped of their identities, stripped of their reason for
11  being and their whole careers.
12        Then lastly, there will be evidence on punitive
13  damages, like there was in the first lawsuit. You will be
14  asked to decide whether Colonel Chaffinch's actions were
15  reckless, or intentional, or malicious and with spiteful
16  intent. And if so, you will have the right as a jury to
17  decide is there an amount of money that is necessary to
18  teach him a lesson so that this will not -- teach him and
19  Colonel MacLeish, who is joined at the hip, a lesson so that
20  this kind behavior will not happen again.
21        You will consider evidence like that, of retired
22  Major Baylor, who begged Colonel Chaffinch to retract the
23  attack on the men. And you will than able to look at the
24  evidence about Colonel Chaffinch blowing them off.
25        And we will submit that that kind of evidence,

---

65

1  and the other evidence about payback and getting that SOB,
2  are the kinds of things that will merit a sizable punitive
3  damages award against the defendants.
4         So that's it.
5         At the end of the case, I get to pull it all
6  together for you, put a little more life in it or whatever.
7  Right now we are just trying to give you the outline. At
8  that time we will ask you to assess appropriate damages, to
9  make my clients whole, to restore their good names, to give
10  them that economic security that they would have had had
11  they been able to continue their careers to age 55.
12        I know I have been long, but we recognize this
13  is an 11-day trial. I represent three separate men. Each
14  is now getting their day in court. This is a very important
15  moment in their lives. And I appreciate you bearing with me
16  through what might have been a long narrative here. But I
17  think it does give you the basics of what you are going to
18  be hearing in this case.
19        And I thank you on behalf of all of us for your
20  attention.
21        THE COURT: Thank you, Mr. Neuberger. We will
22  take our hour for lunch.
23        (Jury leaves courtroom at 1:05 p.m.)
24        (Recess taken.)
25        THE COURT: Sorry to call you back, Mr.

A - 31

66

1 Neuberger. Sorry to hold defense counsel.

2 　　　Juror No. 4 is ill, has asked to be excused.

3 She has told Ms. Walker that she is feverish. I can tell

4 you, I have been standing in the back, she has been hacking

5 the whole time. She looks flush.

6 　　　So I wanted to not excuse her until I had the

7 opportunity to discuss this with counsel.

8 　　　My inclination would be to dismiss her for

9 cause. Is there an objection?

10 　　　MR. ELLIS: No, Your Honor.

11 　　　MR. T. NEUBERGER: No, Your Honor.

12 　　　MR. ELLIS: The one in the front row?

13 　　　THE COURT: Juror No. 4. We have been trying to

14 give Mr. -- Mr. Neuberger kindly gave her a lozenge and Ms.

15 Walker has given her water. She tried. She is trying. She

16 is to be commended for trying. I don't think she is going

17 to get through. Okay. I will just dismiss her.

18 　　　MR. T. NEUBERGER: Thank you, Your Honor.

19 　　　MR. ELLIS: Your Honor, since we were waiting

20 here for a half-hour, could we have a little extra time?

21 　　　THE COURT: Take an extra 15 minutes.

22 　　　(Luncheon recess taken.)

23 　　　THE COURT: Please be seated. Ready for the

24 jury?

25 　　　MR. ELLIS: Your Honor, we found this technology

67

1 works a lot better if one of the light banks over our heads

2 is out. Would it be possible to do that?

3 　　　THE COURT: Yes. Ms. Walker will take care of

4 that.

5 　　　(Jury enters courtroom at 2:17 p.m.)

6 　　　THE COURT: Ladies and gentlemen, you will

7 notice, if you have not already, one of your members has

8 been excused because she became ill.

9 　　　Ms. Walker, could you cut out --

10 　　　MR. ELLIS: One of the ones in front will do it.

11 　　　Good afternoon. My name is Ed Ellis. It is my

12 privilege today to represent Colonel MacLeish and Colonel

13 Chaffinch and to talk to you in what is called an opening

14 statement. You just heard Mr. Neuberger's.

15 　　　We ask you to bear in mind as we go through this

16 process the instruction that the Judge gave you when you

17 first got empaneled. That was to withhold judgment, to

18 remember that there is two sides to the story. Now you are

19 going to hear the other side.

20 　　　Now, the first thing that I like to do when I

21 talk to a jury in this opening statement is to give you an

22 idea of why I think we are here. I have arranged some

23 slides that will summarize both the argument and certain

24 bits of evidence that you are going to hear over the course

25 of the next two weeks.

68

1 　　　If you could get that up there.

2 　　　Why are we in court today? Well, we are in

3 court today because Colonel Thomas F. MacLeish will not put

4 a trooper on the street who could endanger himself or

5 others. Now --

6 　　　THE COURT: Counsel, if you turn your mike down

7 a little bit, I think we will be okay.

8 　　　MR. ELLIS: Sometimes technology doesn't work,

9 Judge.

10 　　　Now, if I could back up for a minute.

11 　　　Colonel MacLeish will not, cannot, should not

12 put a trooper on the street who could endanger himself or

13 others.

14 　　　Now, you are going to hear testimony in this

15 case that four different doctors have seen Kurt Price and

16 Wayne Warren. That is two of the three individuals here.

17 Wayne is the one sitting closest to you and Kurt is the

18 gentleman in the middle in the back. Four different doctors

19 have seen them. All have found that they suffered hearing

20 loss. Now, it is obviously not the end of the story because

21 a lot of people have hearing loss. The question is, how

22 much hearing loss.

23 　　　The State Police, specifically Colonel MacLeish,

24 asked two of the four doctors, the last two, to determine,

25 based upon criteria that the State Police have had in their

69

1 employment manual for ten or 12 years, whether Price and

2 Warren were fit for duty as state troopers. Both doctors

3 found that the hearing loss that Price and Warren had

4 suffered rendered them unfit for duty as Delaware State

5 Troopers.

6 　　　Now, what the doctors said. There are two

7 doctors. First is Dr. Aaron Green. You will hear him

8 testify. Dr. Green said, The significant safety-sensitive

9 role involved in the job duties of a state trooper and

10 essential dependence on optimal hearing ability would

11 preclude Corporal Price and Corporal Warren from

12 consideration.

13 　　　He said hearing aids would not be a viable

14 accommodation due to the amplification of background noise

15 and resultant distortion.

16 　　　As you will learn, after Dr. Green saw Corporal

17 Price and Corporal Warren, the State Police asked for a

18 second opinion, because when it comes to termination of the

19 career of somebody who has 20 years in the State Police,

20 that is considered a very serious matter. So Colonel

21 MacLeish and the Human Resources Office at the State Police

22 asked for a second opinion and sent Corporal Price and

23 Corporal Warren up to the University of Pennsylvania to see

24 Dr. Edward Emmett, who is a professor of occupational

25 medicine at the University of Pennsylvania Medical School.

A - 32

70

1 He said, The testing confirms that Mr. Price has reduced
2 word recognition in the presence of background noise, and in
3 my opinion confirms that he does not meet the essential job
4 requirements as a Delaware State Trooper.
5 Same doctor on Wayne Warren: On review, the
6 level of hearing displayed by Corporal Warren in the
7 presence of relatively low background sound, taken together
8 with his history and other results, was not felt to reach
9 the communication requirements for a state trooper's routine
10 duties, where an officer's life and that of members of the
11 public may depend on the ability to hear, localize and
12 understand a variety of speech and environmental sounds.
13 You will see these documents, you will hear the
14 testimony.
15 Now, Corporal Price and Corporal Warren agree
16 that they have hearing loss. They agree that they cannot
17 perform all the duties of the Delaware State Trooper.
18 Corporal Price, when he is asked, do you believe that you
19 are capable of performing the job of a patrol trooper given
20 the current state of your hearing, he is going to say, No, I
21 do not. He has already said it.
22 Corporal Warren, I know I have trouble with my
23 hearing, but most of my trouble is in a noisy environment,
24 so if I have background noise, I'm incapacitated. I was
25 concerned for my safety and the safety of other troopers if

71

1 I were put in situations that I knew I could fail.
2 Now, in his opening Mr. Neuberger talked about a
3 Major Forester and maybe a couple other people who he said
4 had hearing problems and were allowed to continue. There
5 are no prior troopers that have medical reports of this
6 nature that I have just shown you that indicate that they
7 are incapable of performing the job of a Delaware State
8 trooper and that they could present a danger to themselves
9 or otherwise if they are put on the street.
10 You will not hear testimony of that sort.
11 Now, what you will hear is that all state
12 troopers at some point or another are exposed to situations
13 where hearing is critical to the exercise of their police
14 powers. You saw Mr. Neuberger put a big old list of jobs up
15 there, about 20 jobs. What he didn't tell you is that you
16 are going to hear testimony that with respect to every
17 single one of those jobs, if the man is in a uniform, if the
18 man carries a gun, he is subject to deployment in a
19 situation that could be dangerous, it could be dangerous to
20 himself, it can be dangerous to other troopers, it can be
21 dangerous to members of the public. Every one of those
22 jobs.
23 You will hear the witnesses testify that people
24 in those jobs are required to meet the same requirements as
25 a road trooper, the same requirements as the Colonel,

72

1 because they can be called into action at any time, because
2 they are wearing a uniform and they are carrying a gun.
3 Now, Colonel MacLeish will not put Corporal
4 Price and Corporal Warren in positions where they might be a
5 danger to themselves, other troopers or members of the
6 public. That is why we are here.
7 This case arises out of things that occurred at
8 the firing range.
9 This is the outside of the building. You will
10 probably see this picture again at some point during the
11 testimony. It is an exhibit. Both sides agree that that is
12 what it is. So you have an idea of what goes on inside the
13 building, I thought I would throw up a picture of that.
14 What you are looking at here is on the left,
15 that sort of abutment coming out of the side of the picture
16 is actually the control booth, where troopers such as
17 Sergeant Foraker or Corporal Price or Corporal Warren would
18 sit or stand and call commands to people on the line.
19 If you look at the far right of the picture,
20 that is the area where the bullets go when they are shot out
21 of a gun.
22 This is the right side of the range. Before you
23 were looking at the left side. Now you are going to look at
24 the right side. Essentially, what happens is, you can see a
25 yard line, which is a stripe running across the screen. The

73

1 troopers shoot at given distances. And you will hear a lot
2 of testimony about this. There is a 25-yard line, a
3 ten-yard line, a seven-yard line. That is where they stand.
4 They shoot their bullets at the bullet trap which is at the
5 far end. You can't really see the bullet trap real good
6 because the bullet trap is kind of underneath the ceiling,
7 and we will have some better pictures of that later.
8 Now, maintaining the bullet trap. Before I do
9 this, I would like to describe to you the bullet trap. But
10 I can't do it using this technology because we simply don't
11 have a really good picture of the bullet trap. So what I
12 did is drew a little sketch on this pad over here.
13 You would think with all the technology we have
14 today we could do better than this. Actually, this is the
15 best I can do. This is Ed's diagram of the bullet trap.
16 The bullet trap used at the Delaware State
17 Police range is what is called a wet system, which means
18 that it uses water to clean it and also to promote the
19 disposition of the shells -- the bullets, fragments of
20 ammunition that go through the system.
21 The black circle I have drawn here is what's
22 called the deceleration chamber. The target system is here
23 in red, in the middle of the picture. And essentially, what
24 happens is the bullet is shot from the firing line, goes
25 through the target and hits this wet ramp, which I have

74

1  drawn in blue.  The wet ramp is wet because there is water
2  running down it.  It is a steel plate with water running
3  down the ramp.
4  A leaded bullet -- remember, I said leaded,
5  because I am going to change that in a minute -- the leaded
6  bullet goes through the target, hits the wet ramp, ricochets
7  up into the deceleration chamber, rattles around a few
8  times, loses its speed and drops out under this conveyor
9  system.  The conveyor system, if you could imagine, it comes
10 this way, pulling the leaded bullet out of the bullet trap
11 and dumps it in the barrel for disposal.
12 Now, this bullet trap here, you are looking at
13 kind of a cross-section.  This thing is about 120, 140 feet
14 long, that way.  So what you are really looking at is an
15 enormous tube, almost like a cigar holder, that has a hole
16 in one end for the bullets to go in and a hole in the bottom
17 for them to drop out under the conveyor system.
18 Now, the fact that it is a wet system is very
19 important for this case, because, as you can see, there is
20 water in a tank underneath the bullet trap.  There are
21 pumps.  The pumps suck up the water, run them through a
22 filter.  And you will hear some of the witnesses refer to
23 this thing as an intermediate filter.  It goes through the
24 filter, into the bullet trap, cascades down here.  By
25 cascading down here, it helps the bullet deflect into the

75

1  bullet trap, but it also cleans away bullet fragments, lead
2  fragments, whatever else is here.
3  Also, you will hear testimony when the bullets
4  go through the target, you will get target blow-back.
5  Pieces of the cardboard target get blown into the system.
6  Shotgun wadding gets blown into the system.  So the system
7  has to be kept clean.  The system has to be kept clean.  One
8  problem is that the water sometimes gets full of shotgun
9  wadding, cardboard, paper, that kind of stuff, and it clogs
10 up.  What happens when it clogs up?  There is no water flow.
11 When there is no water flowing, you don't have the cascade
12 effect.  You have what is called a dry line.
13 When a bullet hits a dry line, it doesn't splat
14 or skip, it fragments.
15 Now, it fragmented when it was lead bullets.
16 But you are going to hear testimony, and Mr. Neuberger has
17 already given you a hint of this, that there was a
18 significant change to the way the State Police ran the range
19 in about the year 2000 that changed how all this worked.
20 When the range opened, they were shooting leaded
21 bullets.  You heard Mr. Neuberger tell you that there was
22 blood lead level problems.  With lead projectiles, in a
23 closed environment, as Mr. Neuberger told you, the HVAC
24 system didn't work too great in this range, and I don't
25 think there will be anybody you will see in the case who

76

1  said it did, but the HVAC didn't ventilate properly, so
2  people got high blood lead levels.
3  The State Police studied the problem in the year
4  2000 and they decided, okay, we can fix that.  We will go to
5  what they call frangible ammunition.  Frangible ammunition
6  is not a lead bullet.  It's a bullet that is made of a
7  ceramic type material that is about 85-percent copper and
8  the rest of it is tin and zinc, and probably some other
9  things in very small quantities.
10 Here is the significant difference.  When a
11 leaded bullet hits here, it ricochets into the bullet trap
12 and comes back down onto the conveyor system and goes out
13 into the tank.  The problem is that the frangible
14 ammunition, when it hits the wall, goes splat.  It doesn't
15 ricochet.  It fragments, and creates dust.  What they found
16 was that when the water picked up this junk, dust, the stuff
17 from the fragmented ammunition, it collected in the water
18 system and began to clog the pumps, clog the filters, clog
19 these nozzles up here that allowed the water to flow.
20 Once the nozzle is clogged up, the range goes
21 dry.  And like I said before, you get a situation where you
22 are shooting a dry ramp.
23 When the frangible ammunition hits a dry ramp,
24 you will hear one of the witnesses on videotape who couldn't
25 be here, but you will hear his testimony, he will say it is

77

1  like taking a dirt cloth and throwing it against a brick
2  wall.  When you do that, you get fragmentation, you get
3  dust, you get crud, so to speak, all over the place.
4  So what happened was, after the change to
5  frangible ammunition, there was a much greater possibility
6  of a dry line, dust all over the place, system wasn't
7  working quite right.
8  Now, in order to keep this whole system working,
9  in order to keep the water flowing, in order to keep the
10 system under control, in a building that had bad HVAC,
11 beginning in 1998, when the building opened, the troopers
12 assigned to the Firearms Training Unit performed maintenance
13 on the bullet trap.  Now, what does that mean?  That means
14 that when they look in the tank of water behind the bullet
15 trap and they see shotgun wadding, they got to scoop it out.
16 When they see that the filters are clogged, they have to
17 clean the filters.  Sometimes they replace the filters.
18 When the pumps get clogged, they clean or replace the pumps.
19 They actually at one point went to a bigger size pump
20 because they thought it worked better.
21 But this is work that was important to keeping
22 the range running and keeping the water flowing.  And
23 troopers did that, beginning in 1998 and continuously until
24 December 1, 2003, which gets to the next part of the story,
25 the things that they had to do.

A - 34

78

1    Shotgun wadding, target blow-back are blown into
2  the bullet trap and must be scooped out. Pumps get clogged.
3  Troopers replace the pumps. Filters get clogged. These are
4  all the things I mentioned when I had the drawing up. The
5  floor of the shooting area, I didn't mention this, the floor
6  of the shooting area, between where the shooter stands and
7  the target area, gets covered in dust and the troopers had
8  to use a machine to scrub the floor.
9    The range must be cleaned with a special vacuum
10  cleaner called a HEPA vac, and all these things were
11  provided at the range, and all these things the troopers did
12  for a little over five years, five and a half years.
13    In December 2003, Kurt Price, Wayne Warren and
14  Chris Foraker decided to stop doing the maintenance that
15  they and their fellow troopers had done since 1998. They
16  just stopped doing it. The result, as they expected, the
17  system failed. You will hear them testify that they
18  expected it to fail. Pumps and filters became clogged. The
19  water dried up on the shooting side of the bullet trap.
20  Dust and ammunition fragments filled the air. The HVAC
21  system could not remove the smoke, dust and ammunition
22  fragments. By February, the range was unusable.
23    Now, Mr. Neuberger will tell you that the auditor of
24  accounts for the State of Delaware was asked by the Governor
25  to investigate why the range was shut down. Among other

79

1  things, there were two or three questions -- and you will
2  see the auditor's report eventually. But one particular
3  question he was asked was why the did the range shut down in
4  March or February 2004.
5    This is what he said. The auditor said on
6  December 1, 2003, a new Sergeant took over command of the
7  firing range.
8    That would be Sergeant Foraker.
9    In an interview he informed us that shortly
10  thereafter he met with the current staff and as a result of
11  that meeting a decision was made not to perform any
12  maintenance at the range.
13    We found no evidence in the documentation made
14  available to us where DSP command was notified that range
15  staff would not be performing duties related to the
16  maintenance and custodial functions historically
17  accomplished by the range staff.
18    You will see in this case no evidence in the
19  documentation that anybody at the range itself told the DSP
20  command staff that they weren't doing it anymore.
21    The auditor of accounts concluded: We can only
22  surmise that with the failing of the conveyor system, no
23  maintenance performed on the bullet recovery system, and no
24  custodial maintenance being performed to clean the firing
25  range, that these situations contributed to an unhealthy and

80

1  unclean environment, leading to the ultimate closing of the
2  firing range.
3    Now, I want to go through some events. These
4  are events primarily that occurred after the closing of the
5  firing range.
6    In February, the three plaintiffs in this case,
7  Price, Warren and Foraker, in addition to another officer
8  who is not involved in the lawsuit, so they are all
9  together, four of them, asked for physical examinations,
10  including hearing tests, and blood tests, at Omega Medical
11  in Stanton, Delaware.
12    The testing was done on March 1. The results,
13  these four gentlemen were all normal and healthy. They had
14  no elevated levels of heavy metals or lead or anything else.
15  One problem is they had signs of hearing loss.
16    Immediately after they learned that they had
17  signs of hearing loss, they filed workers' compensation
18  claims against the state for hearing loss. Price and Warren
19  filed them on March 12. You will learn Foraker filed his
20  about a month, maybe six weeks later.
21    On March 17 there was a meeting. You will hear
22  about this meeting because it was a fairly important meeting
23  in the case. Corporal Price and Corporal Warren told
24  Lieutenant Colonel MacLeish -- you should know that Mr.
25  MacLeish was a Lieutenant Colonel then. He is the Colonel

81

1  today -- that they have hearing loss. MacLeish says, get
2  them tested again because maybe it went away. Maybe it's a
3  temporary condition. Maybe it's caused by being exposed to
4  gunfire and now you are not exposed to gunfire.
5    At the same time this is going on, there is an
6  audiometric test analysis being done by a company in
7  Illinois on the March 1 scoring result, the March 1 hearing
8  test results. That was completed on April 7th. The company
9  in Illinois asked Price, Warren, Foraker, and the fourth
10  guy, James Warwick, to complete an audiometry questionnaire
11  to help them analyze the data. At first they refused to
12  complete it. They finally did complete it. And on May 13,
13  Lieutenant Colonel MacLeish sent Price and Warren for a
14  repeat of the hearing test at Omega.
15    The repeat test confirmed hearing loss. Again,
16  it doesn't say whether they are fit for duty or not. All it
17  does is confirm there is hearing loss.
18    June 3, Lieutenant Colonel MacLeish sent Price
19  and Warren for fit-for-duty examinations by Aaron Green. He
20  is the doctor I said you were going to hear from.
21    On June 18th Dr. Green found Price and Warren
22  not fit for duty. And that was the quote that I showed you
23  a few minutes ago.
24    June 23rd, Price and Warren asked for a
25  light-duty letter. One of the things you are going to hear

82

1    by way of testimony is that when an officer has a medical
2    condition that is as yet undetermined, in other words, it's
3    not certain whether they are going to have to leave the
4    force or whether there will just be a condition of temporary
5    placement or something like that, they put them on what's
6    called rehabilitation status. The rehabilitation status is
7    kind of called light duty. People call it light duty. If
8    you have got employment of your own and you work someplace,
9    you may have heard of people being putting on light duty for
10   a while.
11           Normally, the state police don't give a
12   light-duty letter. They simply put the person on light duty
13   and no further questions are asked.
14           Well, in this particular case, you are going to
15   hear that Corporal Price and Corporal Warren asked for a
16   light-duty letter. This is the letter Mr. Neuberger said
17   took away their police powers. Basically, what the letter
18   says is, don't get yourself into a situation where you might
19   have to get physical with somebody because you are in a
20   condition where you might not be able to do that.
21           And that's the letter that they got. It's the
22   same letter that the State Police have sent out in
23   light-duty cases for probably ten, 12 years prior to the
24   events in this case. Same letter.
25           On June 25th, at their request, there goes the

83

1    light-duty letter.
2            Now, as I have said, they went back for a second
3    opinion. This occurred on July 21 -- on July 21, Colonel
4    MacLeish sent the letter to the guy at the University of
5    Pennsylvania to arrange for the test. You will hear that on
6    October 6 Dr. Emmett saw Price and Warren at the
7    Occupational Environmental Clinic at the University of
8    Pennsylvania.
9            In January of 2005 -- we are now coming around
10   the calendar to almost a year after these events begin, and
11   Dr. Emmett issues reports on Price and Warren concurring
12   with Dr. Green but requesting further testing. And on
13   February 14, Price and Warren had further testing. This is
14   what is called a functional hearing test. The difference
15   between a tone hearing test and a functional hearing test is
16   that a functional hearing test tries to determine whether
17   the individual can hear against background noise, which is
18   where we all really live in the everyday world. It is not a
19   pure tone. It is a real-world kind of test.
20           So that's what the doctor at the University of
21   Pennsylvania wanted to do.
22           On February 28 Dr. Emmett confirmed that Price
23   does not meet the essential requirements as a Delaware State
24   Trooper. That is the letter that I quoted earlier. The
25   same day, he found Wayne Warren fit for duty. And he sent a

84

1    letter to that effect to the Delaware State Police. And you
2    will hear testimony that the Delaware State Police called
3    Corporal Warren in and said, congratulations, let's talk
4    about your next assignment. But Wayne Warren disputed Dr.
5    Emmett's opinion and asked for another meeting. He went
6    back up to the University of Pennsylvania and saw Dr. Emmett
7    on March 16, had a conversation with him, out of which Dr.
8    Emmett revised his opinion and found him not fit for duty.
9            On March 22nd, the State Police Human Resources
10   Department asked for some clarification because it seemed a
11   little bit strange.
12           May 10 Dr. Emmett delivered his final opinion on
13   Wayne Warren, finding him not fit for duty. And there is an
14   explanation for it. As jurors, you will get to see all this
15   because it is going to be admitted into evidence.
16           On May 11th, the Delaware State Police Human
17   Resources Department formally notified Corporal Price and
18   Corporal Warren that they had been found not fit for duty
19   and directed them to separate from the Delaware State
20   Police.
21           The Delaware State Police have a policy that
22   deals with disability, as you might imagine. And if an
23   officer is found to be permanently disabled, and all the
24   doctors that looked at these guys said that their hearing
25   condition is permanent, then the policy says that you move

85

1    to the separation and disability retirement provisions of
2    the manual, which essentially means that they have to
3    separate from the service.
4            Now, this decision was later suspended. The
5    reason it was suspended, Mr. Neuberger alluded to the fact
6    that there was legal back-and-forth over this. And there
7    was legal back-and-forth over this. And ultimately, the
8    State Police decided that because of the confusing state of
9    prior records and the difficulty of ascertaining what had
10   been done in certain cases over the past ten or 15 years,
11   they would allow them to stay on light duty for two years.
12   And that would carry them up until June -- remember, the
13   first light-duty letter is June 25th, 2004. That would
14   carry them to June of 2006.
15           Now, in the meantime, this is the policy. I
16   sort of ran ahead of myself there. If the injury is
17   temporary, the trooper can have as much as two years to
18   recover. If the injury is permanent, then the trooper must
19   leave the force and apply for disability retirement.
20           Now, Corporal Price and Corporal Warren worked
21   light duty in rehabilitation status for a time. Then they
22   began to use sick leave. Price ran out of sick leave and
23   retired on April 7, 2006. Warren remains on paid sick leave
24   today and has been, they both have been receiving pay since
25   they were put on light duty in 2004.

86

1    Now, they will what tell you what they would
2  like out of this case is to be able to work until they are
3  55, wear a uniform, carry a gun but not be exposed to any
4  criminals or criminal activity.  We are in court today
5  because this Colonel will not bend the policy to put them on
6  active police duties when they might endanger themselves or
7  others.  And I said this Colonel because it is entirely
8  possible that some Colonel in the eighties or some Colonel
9  in the nineties did it a different way.  That doesn't mean
10  Colonel MacLeish is bound by that.  And, as I have said
11  before, he won't do it.
12    Now, Colonel MacLeish made every decision in
13  this case.  And you will hear from the plaintiffs that they
14  never talked to Aaron Chaffinch about this.  They had no
15  contact with Aaron Chaffinch about this.
16    That Colonel MacLeish -- in fact, Aaron
17  Chaffinch was retired by the time that they received the
18  letters that told them they had to separate from the
19  service.  Chaffinch retired on May 5th of 2005.
20    So Colonel MacLeish made every decision in the
21  case.
22    What Price and Warren said to the auditors about
23  the firing range was not a factor.  I hope to be able to
24  persuade you of that.
25    Now, you have heard me talk about Price and

87

1  Warren.  You haven't heard me talk about Foraker.  I am
2  concentrating on Kurt Price and Wayne Warren because they
3  really present sort of a very defining issue in the case.
4    But every time that they were sent for medical
5  examinations for their hearing, Chris Foraker was sent, too,
6  as was James Warwick, who is the fourth guy who worked in
7  the firing range at the time.
8    Now, the reason they were sent is because they
9  all had hearing loss and the state police wanted to make
10  sure that they got it right so they went through the whole
11  process with two opinions, first opinion and a second
12  opinion on that.
13    So Foraker was involved in this all along.  But
14  I focused on Price and Warren because they bring the hearing
15  issue before the jury.
16    Chris Foraker's situation is a little different.
17  As Mr. Neuberger told you, he had a successful prior lawsuit
18  against Aaron Chaffinch.  And he returned to the firing
19  range in terms that I would describe as bulletproof.  Who is
20  going to mess with a guy who just won a verdict against the
21  Superintendent?
22    Now, you will learn that Aaron Chaffinch had no
23  dealings with Foraker after he returned to the range.  He
24  made no decisions.  And in fact Colonel MacLeish, who was a
25  Lieutenant Colonel at the time, told Colonel Chaffinch you

88

1  keep out of this, that when things start occurring at the
2  range, it is my responsibility, and the reason it is
3  MacLeish's responsibility is because MacLeish, the way the
4  structure works at the State Police, is in charge of the
5  Police Academy.  And you heard Mr. Neuberger talk about the
6  Police Academy.  Well, the Police Academy reported to the
7  Lieutenant Colonel, who then reported to the Colonel.
8    So this was all within Tom MacLeish's chain of
9  command.  He dealt with every issue, every document you will
10  see has his name on it.
11    Also, he used a bit of common sense and he says,
12  look, Corporal Foraker and the Colonel obviously had an
13  affair in court, and I am going to try to separate the two
14  of them so we can get things done.
15    Now, what did Foraker do during the course of
16  2003 and 2004 in dealing with the range?  Well, the first
17  thing he did is he told Colonel MacLeish there were problems
18  with the bullet trap.  And you will see the e-mail that does
19  that.
20    MacLeish told Foraker to fix the bullet trap.
21  He then directed the Captain in charge of the Academy to
22  prepare a report with recommendations for solutions to the
23  problems Foraker had identified.
24    You will see all the documents that do that.
25    Foraker reported problems with the air in the

89

1  facility.  MacLeish responded by authorizing testing of the
2  air, testing of the vents and other surfaces, and physical
3  examinations for the troopers who worked there.
4    Foraker complained that the HVAC system was
5  inadequate.  MacLeish authorized hiring a consultant to
6  examine the system, then put pressure on the Facilities
7  Management Department to fix the problem.
8    You will hear testimony from somebody from the
9  Facilities Mange ment Department who was in those meetings
10  with Colonel MacLeish and felt that he was receiving ample
11  pressure to try to fix the problem.
12    Foraker complained of hearing loss.  He filed a
13  workers' compensation claim.  In response to that, MacLeish
14  sent the troopers for hearing testing, fitness-for-duty
15  testing, and a second opinion.
16    Foraker complained that he needed more staff,
17  even though his staff was the same staff that he had in 2002
18  when he had the job before.  MacLeish authorized new staff.
19    Until he went on sick leave in late 2005, Chris
20  Foraker was in the same position he held in 2002.  Same
21  title, he had the same pay, he had the same staff, and he
22  had the same rank.
23    Now, he had different bosses.  You will hear him
24  testify and complain that things were done to him by these
25  bosses.  But you will also learn that when people change,

A - 37

90

1  commands change, sometimes people decide they are going to
2  do things a little differently, that doesn't mean someone is
3  retaliating against you every time your boss decides to
4  change a practice.
5          Chris Foraker is a healthy 43-year-old, he is
6  able to work as a Delaware State Trooper until age 55.
7          Now, you are going to hear testimony about this
8  defamation claim. This is the article that Mr. Neuberger
9  has shown you. I am sure you are going to get ample chance
10  to read it as we go through the case.
11          You are also going to hear at some point or
12  another, I think you actually did hear it in the opening
13  statement, but you are going to hear that truth is an
14  absolute defense. Regardless of whether it was politic for
15  Colonel Chaffinch to say it, the things that he said at the
16  range on April 6, 2004 were absolutely correct. What was
17  correct is that the prior Sergeant in charge of the range,
18  cleaned the range, he performed the maintenance on the
19  range, you will hear him testify by videotape of what he did
20  and how long he did it and how long it took him to do it.
21  And on December 1, 2003, when Chris Foraker came back, he
22  stopped doing it. When he stopped doing it, the lanes went
23  dry, the atmospheric conditions in the range deteriorated.
24  And you will see pictures. We have pictures of the dry
25  ramps, pictures that were taken shortly after the close of

91

1  the range. So you will see what the cause was and the
2  problem.
3          Now, does that mean that Chris Foraker caused
4  the range to be shut down all by himself? No. No. And the
5  Colonel is not going to say that. Neither of my clients are
6  going to say that.
7          What they are going to say, though, is you got a
8  bad building. You got old equipment. You got an HVAC
9  system that doesn't seem to ever work quite right. And all
10  of those present problems. But you also can't overlook the
11  maintenance of the system, the cleanliness of the building,
12  as it is being administered day-to-day by the people in it,
13  and that that is a contributing factor. What Colonel
14  Chaffinch said is almost exactly the conclusion reached by
15  the auditor of accounts when the auditor issued the report
16  on October 12th, 2004.
17          So that leaves me one last thing to address.
18  That is the question of damages. Mr. Neuberger spent some
19  time talking about damages. You remember, he showed you
20  that comparison of what the different psychologists and
21  psychiatrists said are the problems that the plaintiffs are
22  suffering from today.
23          There is a significant difference between
24  post-traumatic stress disorder and what's called an
25  adjustment disorder. There is a significant difference

92

1  between major depression and an adjustment disorder.
2          You will hear testimony from people who have
3  examined him -- excuse me, examined these gentlemen, both
4  because the State Police needed to have them examined but
5  also for purposes of this trial, that the problem that these
6  gentlemen have is not post-traumatic stress disorder or
7  major depression, they have got what is called an adjustment
8  disorder. An adjustment disorder is caused by a significant
9  change, a significant negative thing, adverse thing, that
10  happens in their life. Losing a job is something that
11  causes it. Losing a loved one. It can be getting a
12  divorce. There is a lot of things that can cause an
13  adjustment disorder.
14          One of the things that can cause an adjustment
15  disorder is going through a trial like this. And you are
16  going to hear testimony that these gentlemen here, who are
17  sitting at the plaintiffs' table, suffered from an
18  adjustment disorder, which will go away, and not from the
19  much more serious conditions.
20          A lot of the symptoms are the same. But it is
21  the degree to which the symptoms affect the function of
22  their daily life. These folks, at least two of the three of
23  them are losing their job in a job they have had for many,
24  many years. It is very unfortunate, but that is the case.
25  But at some point during the course of their careers, or it

93

1  could have been out in recreational hunting, whatever caused
2  it, they have got hearing loss. And you remember the doctor
3  said that the hearing loss is sufficient to impair their
4  ability to function as troopers. That justifies an
5  adjustment disorder, not post-traumatic stress disorder.
6          Now, I only get to talk to you twice during this
7  case. This is one of them. I get to come back in another I
8  guess two weeks or so, that is what our estimate is, and
9  what I am going to do is bring out some of these slides
10  again and I am going to show you that what I set out to
11  prove, this is what I am setting out to prove, this is
12  evidence I think you are going to hear, I am going to show
13  you how you did hear it, and I am going to come back and ask
14  you to return a verdict for the defendants in this case.
15          Thank you very much.
16          THE COURT: Thank you very much, Mr. Ellis.
17          Do the parties desire an order of sequestration?
18          MR. T. NEUBERGER: Yes, Your Honor.
19          THE COURT: So ordered.
20          MR. S. NEUBERGER: Your Honor, plaintiffs call
21  Master Corporal Wayne Warren.
22          MR. T. NEUBERGER: Your Honor, we would like to
23  distribute the exhibit books now.
24          THE COURT: Let's see counsel at sidebar for a
25  moment.

94

1          (The following took place at sidebar.)

2          THE COURT: I am going to rule Exhibit 3 out of

3   order. I think you have other ways to produce that. I

4   think that is more prejudicial to the defendant within the

5   meaning of Rule 408, the relevant federal evidentiary rule,

6   more hurtful to the defendants than helpful to you. I think

7   you have other means.

8          MR. S. NEUBERGER: Can we elicit through

9   testimony the fact of the non-retaliation provision of that

10  agreement?

11         THE COURT: Is there any objection to that? I

12  think it was the agreement itself that you were objecting

13  to. Is that correct, Mr. Ellis?

14         MR. ELLIS: Yes. I think their obligation is

15  under the First Amendment, not the agreement. That is what

16  we are here about. Not the obligation imposed by the

17  agreement. We are here for the First Amendment.

18         MR. S. NEUBERGER: By violation of a contractual

19  provision, that is evidence of causation. Violation of

20  procedures, violation of an agreement, things like that.

21         THE COURT: Causation of?

22         MR. S. NEUBERGER: Causation in the First

23  Amendment can detect -- violation of an independent

24  agreement or procedure or rule, or in this case a contract,

25  which is what the settlement agreement is, is independent

95

1   evidence of causation in the First Amendment, free speech

2   case, in the context of the First Amendment case, which is

3   why we are here today.

4          THE COURT: And the Supreme Court and/or the

5   Third Circuit have so held?

6          MR. S. NEUBERGER: Yes.

7          MR. T. NEUBERGER: It's either Arlington Heights

8   or Mount Healthy, where they talk about violating some rules

9   or procedures are some evidence of connection between the

10  protected conduct and the adverse action. So we are setting

11  this as a benchmark.

12         MR. ELLIS: Your Honor, Mount Healthy does not

13  deal with violation of a contract, the terms of which are

14  congruent with the First Amendment. There are plenty of

15  cases that say that you can infer discrimination in

16  violation of the standard procedure. There is loads of

17  cases that are there.

18         There is no case I have ever heard of that said

19  that violation of a contractual arrangement is an equivalent

20  to the same thing, and particularly when the contractual

21  arrangement doesn't require anything other than compliance

22  with the law.

23         THE COURT: Do you have language in either of

24  the cases or any of the cases that you want to cite to me?

25         MR. T. NEUBERGER: We are not going to do

96

1   Sergeant Foraker now anyway. If we could, we could just

2   defer this to find that kind of authority. He will be our

3   third witness. He is not for a couple days.

4          Then we will do his -- we will take this Exhibit

5   3 out of the books before we distribute them. And then,

6   with what is going to be covered here today, we are not

7   really getting into exhibits deep in the book. I tried to

8   telegraph earlier in the day that, Forester or some other

9   exhibits, we could always take them out at a later time. It

10  doesn't have to delay giving out the books.

11         THE COURT: All right.

12         MR. ELLIS: I am okay with that, Your Honor.

13  There are going to be a handful of exhibits in there that

14  aren't in evidence at this point. I think you ought to tell

15  the jury not to look at any evidence that is not being the

16  subject of questioning.

17         MR. T. NEUBERGER: That would work.

18         MR. S. NEUBERGER: With us removing these

19  exhibits, this may be a good time for a break, to take

20  Exhibit 3 out.

21         THE COURT: The jury just broke. The jury has

22  been broken for a while.

23         MR. S. NEUBERGER: No problem.

24         THE COURT: Okay, that's great.

25         (End of sidebar conference.)

97

1          MR. T. NEUBERGER: Your Honor, may I distribute?

2          THE COURT: Yes, you may.

3          ... WAYNE H. WARREN, having been duly

4   sworn as a witness, was examined and testified as

5   follows ...

6          THE COURT: Ladies and gentlemen, you are about

7   to receive books of exhibits that the plaintiff intends to

8   establish for your use. Some of the exhibits are still in

9   controversy. So I am going to ask that you only view the

10  exhibits that are under examination at the time. Those have

11  been approved by the Court. When you are on your way home

12  or at some other point, we will be talking about some of

13  those others that are in controversy. Okay?

14         Ladies and gentlemen, you will hear me refer to

15  the Neubergers from time to time as young Neuberger and old

16  Neuberger. I am just being facetious. But just to keep

17  them straight, this is the younger Neuberger who will now

18  conduct this examination.

19         MR. S. NEUBERGER: Thank you, Your Honor.

20              DIRECT EXAMINATION

21  BY MR. S. NEUBERGER:

22  Q.   Wayne, could you please state your full name for the

23  jury?

24  A.   Wayne H. Warren.

25  Q.   How old are you?

98

1   A.   I am 48.

2   Q.   Are you originally from Delaware?

3   A.   Yes, I am.

4   Q.   Where were you born?

5   A.   In Lewes, Delaware.

6   Q.   Where were you raised?

7   A.   In Lewes, Delaware.

8   Q.   Where did you go to high school at?

9   A.   At Cape Henlopen High School.

10  Q.   Did you play any sports at Cape?

11  A.   Yes, I did.

12  Q.   What sports did you play?

13  A.   Cross country, winter track and track.

14  Q.   Did there come a time when you graduated from high

15  school?

16  A.   Yes.

17  Q.   What happened after you graduated?

18  A.   After I graduated I went on to Del Tech to pursue an

19  Associate's degree in criminal justice, and eventually, I

20  got my Bachelor's degree from Delaware State College in

21  Dover.

22  Q.   Where do you presently live?

23  A.   In Lewes.

24  Q.   And is that in Sussex County?

25  A.   Yes, it is.

99

1   Q.   Are you married?

2   A.   Yes, I am.

3   Q.   How long have you been married?

4   A.   It will be 25 years tomorrow.

5   Q.   What is your wife's name?

6   A.   Mary Lou.

7   Q.   What does she do?

8   A.   She is a registered nurse.

9   Q.   Do you have any children?

10  A.   Yes, I do.

11  Q.   What are your children's names?

12  A.   Jackie and Jennifer.

13  Q.   What does Jackie do?

14  A.   Jackie is a freshman at Kennesaw State in Kennesaw,

15  Georgia.

16  Q.   How about Jennifer?

17  A.   She is a junior at Cape Henlopen High School in Lewes.

18  Q.   Is anyone else living in your house at home?

19  A.   I have a dog named Dutchess.

20  Q.   So you are married, you have two daughters, and you

21  have a dog named Dutchess. If you have any spare time, are

22  there any kinds of things that you like to do?

23  A.   Yes. I enjoy coaching my daughters in sports,

24  particularly my oldest daughter in softball. I like to be

25  outdoors, so I enjoy hunting and fishing and just about all

100

1   outdoor activities.

2   Q.   Have Jackie's softball teams done well?

3   A.   Yes, they have.

4   Q.   Now, Wayne, I would like to ask you a couple of

5   questions about your history and abilities as a Delaware

6   State Trooper.

7        How many years have you been a trooper?

8   A.   Twenty-three years.

9   Q.   Do you have any interpersonal skills that you think

10  might especially qualify you to serve as a trooper?

11  A.   Yes.

12  Q.   Could you explain some of those to the jury?

13  A.   Well, I feel -- I enjoy working with people. I like

14  to help people. I like to teach people. I think I am a

15  people person. I enjoy being around people.

16  Q.   What is your current rank and assignment?

17  A.   My current rank, I am a Master Corporal. I have no

18  current assignment.

19  Q.   Why don't you have a current assignment?

20  A.   My police powers have been suspended. I have been

21  placed on light duty. I can't wear a uniform. I can't

22  drive a marked police car. I can't do anything for the

23  State Police.

24  Q.   Now, we will look back to that a little later.

25        Wayne, why did you initially become a Delaware

101

1   State Trooper?

2   A.   Well, there is a history in my family of troopers.

3   But I wanted to help people and be out working in the area

4   of Delaware.

5   Q.   Now, what is that history in your family of being a

6   trooper?

7   A.   Well, my uncle was a trooper, and his uncle was a

8   trooper. So we are like three generations deep in the State

9   Police.

10  Q.   So did you enjoy being a trooper?

11  A.   Very much so.

12  Q.   What is the best part of your job, or what was the

13  best part of your job?

14  A.   Going to work. Working with the people in the force

15  and the citizens of the State of Delaware.

16  Q.   Before the events which lead to this court case

17  happened, how long had you planned on remaining a Delaware

18  State Trooper?

19  A.   Until I was 55 years old.

20  Q.   Wayne, just to get this up front, could you explain

21  the rank structure in the Delaware State Police from level

22  of recruit all the way up to Colonel?

23  A.   I believe I can. It starts out as a recruit trooper.

24  You are assigned to the Academy. You do your training. You

25  are then transferred out into the field. You are on

102

1   temporary probation until you become trooper.  You start at
2   trooper.  You go to trooper first class.  Then you go to
3   Corporal.
4           There is three ranks in the Corporal ranks.  We
5   have a career development program that allows you to move up
6   in the rank of Corporal.  There is a senior -- there is
7   Corporal, Senior Corporal and Master Corporal.
8           Then you start in the supervisory ranks, which
9   is the rank of Sergeant.  Then you go to Lieutenant,
10  Captain, Major, Lieutenant Colonel, and Colonel.
11  Q.   All right.  Wayne, what kinds of positions have you
12  held during your career in the Delaware State Police?
13  A.   I started out as a recruit trooper.  I was transferred
14  to patrol in Troop 7 in Lewes.  I then was transferred into
15  the Special Investigations Unit out of Troop 9 in Odessa.
16  That was a Special Investigations Unit investigating drug
17  crimes.
18          From there I went to Troop 7 and patrol again.
19  From Troop 7, I was transferred into what was called the
20  Special Investigations Tactical Unit.  That unit was a newly
21  formed unit, and we were put together to address the
22  problems of open-air drug markets in Kent and Sussex County.
23          From there, I transferred into the Governor's
24  Task Force, which was another team type concept, but we were
25  put together with -- we teamed with probation officers to

103

1   enforce probation violations.  And again, we worked the
2   open-air drug markets as a team.
3           From there I had a brief transfer back to the
4   patrol unit at Troop 4.  And then subsequently, I
5   transferred to the range, or the Firearms Training Unit in
6   Smyrna.
7   Q.   Now, what year were you transferred into the Firearms
8   Training Unit in Smyrna?
9   A.   That would have been August of 2001.
10          I really forgot one of the assignments I was
11  really proud to be a part of.  That was the Special
12  Operations Response Team.  I was assigned to that team in
13  '86.
14  Q.   Now, during the course of your career, have you
15  received training in things like investigation,
16  interrogation and observation of suspects?
17  A.   Yes, along with on-the-job experience.
18  Q.   Have you been able to apply that training during the
19  course of your career?
20  A.   Yes, I have.
21  Q.   Okay.  Now, you mentioned the SORT team.  I think you
22  said Special Operations Response Team?
23  A.   That's correct.
24  Q.   Is that the State Police's version of the SWAT team?
25  A.   Yes, it is.

104

1   Q.   What kinds of things does the SORT team do?
2   A.   High-risk situations, hostage situations, warrant
3   service, service where we believe we have someone with
4   weapons, guns, we would be the team that would be called to
5   make entry in that high-risk situation.  The hostage
6   situation, someone is holding someone hostage with a weapon,
7   barricaded suspects, any type of high-risk operation that
8   requires special, really, training.
9   Q.   So if someone's child has been kidnapped by a
10  gun-toting maniac, are you guys the ones that go in and
11  rescue the child?
12  A.   That's correct.
13  Q.   It sounds like dangerous work.
14  A.   It is.
15  Q.   How long did you do it for?
16  A.   I think it was 19 years.
17  Q.   So why did you do that kind of work for 19 years?
18  A.   As I stated before, I enjoyed helping people.  I think
19  I have a gift to be just a little bit more adventurous, I
20  should say, and I care for people.
21  Q.   What kind of positions did you hold on the SORT team?
22  A.   Well, I started out on an entry team.  I worked my way
23  up to an assistant leader of the entry team, team leader of
24  the entry team, then up to second in charge of the overall
25  operation.

105

1   Q.   So the entry team, are they the people who go through
2   the doors or crashing through the windows?
3   A.   That's correct.
4   Q.   You said you worked your way up to second in command?
5   A.   That's correct.
6   Q.   Would that be the assistant noncommissioned officer in
7   charge of the SORT team?
8   A.   That's correct.
9   Q.   Now, on the issue of your being a firearms instructor,
10  how many years were you at the FTU total?
11  A.   Actually at the FTU, probably three.
12  Q.   So was that 2001, you said?
13  A.   I was transferred there in August of 2001, that's
14  correct.
15  Q.   So what does a firearms instructor do?
16  A.   Foremost, what a firearms instructor does is make sure
17  that everything is safe for the people that you are working
18  with.  Safety is of the utmost concern.
19          We teach people how to shoot.  We teach people
20  tactics.  We teach them how to survive in a serious
21  situation.  If they are injured, what would they do?  How
22  would they keep in the fight?  How to overcome any problems
23  they may encounter with a weapon, if their weapon goes down,
24  what are we going to do.  How do we protect ourselves if
25  someone is trying to take our weapon?

106

1      There is a lot of training there.  It is really
2   instilling confidence in the troopers that we train to make
3   sure when they go out on the street to work that they have
4   confidence in themselves and their equipment.
5   Q.    So would it be fair to say that you do more things
6   than just teach people how to shoot guns?
7   A.    That is correct.
8   Q.    I think you mentioned teaching tactics.  Right?
9   A.    That's correct.
10  Q.    If an armed gunman came in that door, can you explain
11  to the jury how you would teach a trooper to approach that
12  gunman and disarm him?
13  A.    The first thing I would do is identify the threat.  I
14  would be going for my weapon at the time.  And I would be
15  seeking cover.  Those things have to be taught.  And if they
16  are taught well enough, then through the training, the
17  trooper should respond to that situation.
18      That's the confidence part that we teach, so
19  that they are able to handle any situation that they
20  encounter.
21  Q.    Even under the best of conditions, is firearms
22  training stressful?
23  A.    Absolutely.
24  Q.    Is it also time-consuming under even the best of
25  conditions?

107

1   A.    Yes, it is.
2   Q.    Now, in your years as a firearms instructor, did you
3   interact with a lot of troopers in the Delaware State
4   Police?
5   A.    I interacted with all of them.
6   Q.    Approximately how many troopers are there in the
7   division at any given time?
8   A.    I think there is a little over 640.
9   Q.    And how did you interact with all of them?
10  A.    All of the uniformed troopers, or all of the division,
11  has to be recertified twice a year.  They have to come in
12  and shoot twice a year to make sure they are keeping their
13  proficiency up to where it should be so that they can carry
14  their weapons.
15  Q.    So during the course of that -- I think you said
16  recertification?
17  A.    That's correct.
18  Q.    -- do you talk with those troopers?
19  A.    Yes, we do.
20  Q.    Do you interact with those troopers?
21  A.    Absolutely.
22  Q.    Are you able to gauge the physical abilities and
23  physical limitations of the troopers who you are training?
24  A.    Yes, we are.
25  Q.    In addition to regular state troopers, do you also

108

1   teach police recruits?
2   A.    That is correct.
3   Q.    And would they be recruits from the Delaware State
4   Police Academy?
5   A.    Yes.
6   Q.    Do you teach anybody else at the FTU?
7   A.    Yes.  There is federal agencies that come through the
8   building to use it to train municipal officers.  We have had
9   the Citizens Police Academy.  We have other groups coming
10  through, different citizen groups.  We have had the Boy
11  Scouts.  We have had the Girl Scouts.  A variety of
12  different groups coming through the building.
13  Q.    How many police officers or other law enforcement
14  officers do you think that you have taught and interacted
15  with over the last -- over your career as a firearms
16  instructor?
17  A.    Probably thousands.
18  Q.    Do you know a lot of police officers?
19  A.    Yes, I do.
20  Q.    Based on your 23 years as a trooper, is the law
21  enforcement community in the State of Delaware, is it
22  relatively close-knit when compared to state police agencies
23  in other larger states, like Pennsylvania?
24  A.    Yes, it is.
25  Q.    Does life in the Delaware State Police, does that

109

1   sometimes have a bit of a soap opera quality to it?
2   A.    Yes, it does.
3   Q.    Are troopers fairly big gossips?
4   A.    Yes, they are.
5   Q.    Wayne, I would like to direct your attention to one of
6   the binders, which is to your right, the first binder, No.
7   1.  Specifically, I would like to direct your attention to
8   Plaintiffs' Exhibit 16.  Could you open that up and tell me
9   once you found it?
10  A.    The Delaware State Police performance appraisal
11  scoring sheet?
12  Q.    That is the one.  Is that your name at the very top on
13  the first page?
14  A.    Yes, it is.
15  Q.    Is the date of this evaluation from October of 2000
16  through March 31st of 2001?
17  A.    Yes, it is.
18  Q.    Does this indicate that you were serving at the Troop
19  4 Governor's Task Force?
20  A.    That's correct.
21  Q.    Now, under Work Habits, is there a -- what is your
22  ranking for your care of equipment?
23  A.    Consistently exceeds expectations.
24  Q.    How about for handling stress?
25  A.    Constantly and substantially exceeds expectations.

**A - 42**