IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

\- - -

B. KURT PRICE, WAYNE WARREN, and CHRISTOPHER D. FORAKER, : Civil Action

Plaintiffs,

v.

L. AARON CHAFFINCH, THOMAS F. MACLEISH, DAVID B. MITCHELL, and DIVISION OF STATE POLICE,

Defendants. : No. 04-956-GMS

\- - -

CHRISTOPHER D. FORAKER, : Civil Action

Plaintiff,

v.

L. AARON CHAFFINCH, THOMAS F. MACLEISH, DAVID B. MITCHELL, and DIVISION OF STATE POLICE,

Defendants. : No. 04-1207-GMS

\- - -

Wilmington, Delaware
Tuesday, May 16, 2006
9:00 a.m.
SECOND DAY OF TRIAL

\- - -

BEFORE: HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury

APPEARANCES:

THOMAS S. NEUBERGER, ESQ., and
STEPHEN J. NEUBERGER, ESQ.
The Neuberger Law Firm
-and-
MARTIN D. HAVERLY, ESQ.
Law Offices of Martin D. Haverly

Counsel for Plaintiffs

R. MONTGOMERY DONALDSON, ESQ.
Montgomery, McCracken, Walker & Rhoads, LLP
-and-
EDWARD T. ELLIS, ESQ., and
CARMON M. HARVEY, ESQ.
Montgomery, McCracken, Walker & Rhoads
(Philadelphia, PA)

Counsel for Defendants

- - -

INDEX

Preliminaries ---------------- Page 190

WAYNE H. WARREN (Continued)

Direct examination ----------- Page 193
Cross-examination ------------ Page 411

- - -

THE COURT: Good morning. Please be seated.

(Counsel respond "Good morning.")

THE COURT: I understand that we didn't deal with everything last night.

MR. T. NEUBERGER: Real quickly, I want to make the record clear. I want to move Exhibits 1 through 156, with the exception of 3, with the exception of 107, with the exception of 120 and 113-9.

THE COURT: You would be better to say -- they are already in. So what is not in?

MR. T. NEUBERGER: Yes. What is not in is 3, 107, 120 and 139 and a few are still in play, we just don't have rulings on them yet.

THE COURT: You are waiting for rulings on 3...

MR. T. NEUBERGER: 107, we said we would only use it if we need it for some sort of rebuttal.

THE COURT: You were going to get back to me with some case law.

Mr. Ellis, you are looking a little incredulous.

MR. ELLIS: I am following you.

THE COURT: I am reading your facial expression.

MR. T. NEUBERGER: 120, that was the paragraph of the complaint about the two lawsuits. We are getting some case law on that. 139 was the John Dillman e-mail that I will be submitting the Court the transcript.

THE COURT: Are we in agreement on that?

MR. ELLIS: Yes, Your Honor.

MR. T. NEUBERGER: Then I would like permission at a break to be able to check the jury books to make sure that 122 was pulled. We had pulled 122 yesterday, Your Honor.

THE COURT: Any problem with that, Mr. Ellis?

MR. ELLIS: No problem with that, Your Honor.

MR. T. NEUBERGER: We do have Exhibit 156, which was the one that was added yesterday and was admitted. That was the right-to-know policy. I could give that to the clerk for the jurors, then the copies for the Court. And I have given them to Mr. Ellis.

THE COURT: Okay.

MR. ELLIS: That is fine, Your Honor.

MR. T. NEUBERGER: The jury is waiting. I want to advise the Court that we just received their exhibit book yesterday and there are major problems with their exhibit book. Just as an example, No. 8 was ruled out --

THE COURT: We will spend a little time this afternoon.

MR. T. NEUBERGER: Yes. I am just highlighting there are problems with their book.

THE COURT: That is fine.

Are we ready, ladies and gentlemen?

MR. ELLIS: Your Honor, just as an aside here on this issue about Exhibit 120, I think it is -- I did do some research last night. State Farm v. Campbell is the case I thought it was. It is at 538 U.S. 408. There is no Third Circuit opinion. This is a 2003 decision. There is no Third Circuit opinion that really implements it in any situation like this. I think it's clear from that opinion that you can't -- unless the conduct is identical, and involves the same parties, you can't bring conduct from other cases into the case that is before this jury and ask for punitive damages on that basis.

Just to continue, Your Honor. There are two prior jury verdicts involving Colonel Chaffinch. One of them is the prior Foraker decision, which is here, there is nothing we can do about that, much as I would like to. The second one is a case called Bullen versus Chaffinch. I tried that case a couple years ago in front of Judge Farnan next-door. It's really not a similar case. And furthermore, Judge Farnan took the punitive damages away from the jury and granted judgment on the Rule 50 motion.

So that is the only other jury verdict at this point. It is a completely different kind of case. I don't think it is at all appropriate to pile that onto this one in this case.

THE COURT: Let me take a look.

Q. So this is approximately a year later?
A. That's correct.
Q. Wayne, you mentioned standard operating procedures, I believe, at some point. I want to ask you, what is a standard operating procedure?
A. It's a written procedure how you would perform some activity. If you were going to fill out a traffic citation, there is a standard operating procedure that tells you how you fill the citation out. We have standard operating procedures for just about everything that we do.
Q. Where are those standard operating procedures found?
A. They are found in our divisional manual and the administrative manual. The rules and regulations of the Delaware State Police.
Q. Is that a two-volume book of some kind?
A. Yes, it is.
Q. Were there any standard operating procedures regarding maintenance or the other things you had to do at the FTU?
A. No, there were not.
Q. Wayne, based on what you were able to observe during Sergeant Ashley's tenure, did conditions get better while he served there?
A. No, they did not.
Q. Did conditions get worse while he served there?
A. Yes, they did.

Q. Did there come a time when Sergeant Ashley transferred out?
A. Yes, there was.
Q. Now, was he replaced by an officer?
A. Yes, he was.
Q. The officer who replaced him, did he respond differently to your health and safety concerns?
A. Yes, he did.
Q. Who was that officer?
A. Sergeant Foraker.
Q. Wayne, what day was Sergeant Foraker transferred back in?
A. It would have been December 1st, 2003.
Q. Do you recall why he was transferred back in?
A. He was court-ordered transferred back to the training -- or the Firearms Training Unit by Judge Farnan.
Q. Was that as a result of something that had happened in a court case?
A. Yes, it was.
Q. Do you recall what caused that Court order? Or do you even know?
A. Yes, I know.
Q. What caused that Court order?
A. The jury found in favor of Sergeant Foraker that he was illegally transferred from the Firearms Training Unit, and Judge Farnan returned him there.

Q. What was the condition of the FTU on December 1st of 2003?
A. Disastrous.
Q. Was it similar to what you have just been describing to the jury?
A. Yes, it was.
Q. At some point after Sergeant Foraker was transferred back in, did you raise health and safety concerns to him?
A. Yes, I did.
Q. Were they the same kind of concerns which you have just been telling the jury about?
A. Yes, they were.
Q. Did you tell Sergeant Foraker about any health symptoms?
A. Yes, I did.
Q. Do you know -- were you present when any recruits talked about the same?
A. Yes, I was.
Q. What were some of those health symptoms you described to Sergeant Foraker?
A. Nose bleeds. A penny taste in their mouth. Headaches. They were fatigued. They were having trouble breathing.
Q. What was Sergeant Foraker's reaction to hearing these things?

MR. ELLIS: Your Honor, could we have a time frame for this? We are getting into a period that matters now.

THE COURT: That would be helpful, Mr. Neuberger.

BY MR. S. NEUBERGER:
Q. Wayne, do you recall when you raised these issues to Sergeant Foraker?
A. That would have been in December of 2003.
Q. Do you recall, was it the end of December or the beginning of December?
A. It was the beginning of December.
Q. Was it right around the time when he was transferred back in?
A. Yes, it was.
Q. So I think, I believe my question was, what was Sergeant Foraker's reaction to your sharing these concerns with him?
A. He was very concerned. He was taking notes as to what I was telling him.
Q. Now, during that very beginning part of December, did you participate in a decision to stop doing certain kinds of maintenance at the FTU?
A. Yes, I did.

Q. What maintenance was decided that -- strike that.

What maintenance was no longer going to be performed?

A. We were not going to be placing our hands into the water tank at the rear of the bullet trap. We were going to limit the amount of exposure that we were having to these toxic metals.

Q. Why was that decision made?

A. We knew that our levels, our lead level was starting to increase, and we were concerned that it started jumping up, that it was rising.

Corporal Price had gone to one of the State Police doctors, Dr. Green, who had advised him --

MR. ELLIS: Objection, Your Honor. This is going to be hearsay.

MR. S. NEUBERGER: It is effect on the listener for why the maintenance was stopped.

THE COURT: I will overrule the objection.

THE WITNESS: He went to the State Police doctor, Dr. Green, with a concern that his lead levels were raising to a concerning rate for him. The doctor had asked about any different types of activity that we have been increasing, what were we doing differently than we had been doing before, because the pumps were starting to fail more, we had to do more maintenance in the water tank itself, and

requiring us to place our hands in the tank and to work on the pumps.

In this water tank, there was a slight amount of oil, some type of lubricating agent. And the doctor explained to us that the lubricating -- excuse me, explained to Corporal Price that the lubricating agent was actually aiding the lead to get into our skin. It was acting as a penetrating agent to our skin, also. So it was helping the lead get into our system, and that we should limit the exposure to it.

BY MR. S. NEUBERGER:

Q. Now, is that one of the reasons why that decision was made to stop doing that type of maintenance?

A. Yes, it was.

Q. Wayne, I want to show you another picture. What does this picture show?

A. That is behind the bullet trap, in the rear of the water tank.

Q. Now, is this the water tank right here?

A. Yes, it is.

Q. Can you tell what color that water is from the photo?

A. It's a blackish color.

Q. What are all those things floating in it?

A. That's shotgun wadding.

Q. Did you have to stick your hand in there?

A. We had to use a strainer or fishnet to scoop out the water.

Q. And this thing right here, what's that?

A. That's the actual water pump itself, submerged in the water.

Q. Is there just one water pump on the entire bullet trap, the back area?

A. No, there are not. There are several water pumps.

Q. Would you have to stick your hands -- actually, did you ever have to change those pumps?

A. Yes, we did.

Q. Would that require putting your hands into this water material?

A. Yes, it did.

Q. Was that what you were just describing to the jury with Dr. Green?

A. That is correct.

Q. Now, did you continue to do maintenance on the front side of the bullet trap?

A. Yes, we did.

Q. What kind of maintenance did you continue to perform?

A. We continued to take -- sweep up the brass and any other particles that would have been on the floor. We would do the bullet ramp that contained the cardboard blow-back. The normal everyday maintenance that had to be performed in

the front of the bullet trap we continued to do, or I should say, we supervised the students in doing that maintenance along with them.

Q. The decision to stop doing the maintenance behind the bullet trap with the water, was that intended to be permanent?

A. No, it was not.

Q. Did you ever inform your chain of command that the decision had been made to stop doing the maintenance behind the bullet trap with the pumps and the water?

A. There was a discussion with Sergeant Foraker about what we needed to do, and Sergeant Foraker --

MR. ELLIS: Objection, Your Honor. I think it is hearsay again. He is about to say what Sergeant Foraker said.

MR. S. NEUBERGER: All I wanted to know was did he inform his chain of command. I have no problem cutting him off here.

THE COURT: That is fine. You can't tell the jury what somebody else said.

THE WITNESS: I understand, Your Honor. I am sorry.

BY MR. S. NEUBERGER:

Q. I will ask Sergeant Foraker that question a little bit later.

241

Did you ever hear back down the chain of command that you should continue to do this maintenance with the water and the bullet trap in the back?
A. No, I did not.
Q. Wayne, do you recall looking at your evaluations yesterday?
A. Yes, I do.
Q. All right. Strike that.
Is firearms training stressful even under the best of conditions?
A. Absolutely.
Q. What is it like under the worst of conditions?
A. It's very stressful, and the stress just continues.
Q. When you are training students how to shoot, can that be dangerous?
A. It's very dangerous.
Q. Is it a full-time job?
A. Absolutely.
Q. Do many of the recruits who come in, do they know how to use guns?
A. No, they do not.
Q. Approximately how many recruits would you train at any one time along the firing line?
A. It varied. Usually recruits, we would probably have probably ten at a time. It just depended on the amount in

242

the class, how many actual recruits were in the class.
Q. Were staffing levels a problem around the beginning of December of 2003?
A. Yes.
Q. Was understaffing a general problem that had been experienced at the FTU?
A. Yes, it was.
Q. Are you familiar with industry-wide student-to-instructor safety ratios in the firearms world?
A. Yes, I am.
Q. What are those ratios?
A. If you are instructing new recruits, there should be one instructor for every two to three students. If you are instructing seasoned officers, it could go up to five, one instructor per five people.
Q. What was the ratio at the FTU for teaching recruits?
A. I would say probably one to four, usually.
Q. Were there times when it got up to an even larger number?
A. Yes. It changed all the time. It was depending upon how many instructors that we had. And a lot of times we were calling on municipal officers to come in and assist with the operation, if they had court, or if the state troopers that we had planned to attend that day to assist with the safety operations, if they got pulled off, then we

243

didn't have enough people there.
Q. Is not having enough instructors to teach students, is that dangerous?
A. Yes, it is.
Q. Have you ever heard of something called low-light firearms training?
A. Yes, I have.
Q. What is that?
A. Actually, it's when we turn the lights down low to simulate a nighttime situation. So we are restricting the view and the sight of the officers in the training environment.
Q. Is staffing even more of a concern then?
A. It's very critical at this point.
Q. Did you ever raise concerns about understaffing to any officers in your chain of command above you in December of 2003 or January of 2004, just to narrow the time frame?
A. Excuse me about the time frame?
Q. December of 2003 or January of 2004, thereabouts?
A. Yes.
Q. Who did you raise those concerns to?
A. Sergeant Foraker.
Q. Was more staff ever assigned to the FTU to help you guys?
A. No.

244

Q. Do you remember how many overtime hours you and your fellow firearms instructors worked in January of 2004, as well as the previous month, December of 2003?
A. If I recall, in that time frame, we were, I think it was around 500 hours of overtime.
Q. Now, after you met with Sergeant Foraker in the beginning of December of '03, did you guys reach a decision in that meeting as to how you were going to address the issues at the FTU?
A. We explained our concerns to Sergeant Foraker, who advised us that he would pass it up the chain of command. We were going to continue, but we wanted the air tested, to see what our environment was, what we were working in. We also wanted swipe-sampling done of the area to see what type of environment, how bad was the environment we were working in.
Q. Was a decision made to start sending e-mails up the chain of command?
A. Yes.
Q. Who was designated to send those e-mails on your behalf?
A. That would have been Sergeant Foraker, my supervisor.
Q. Was a decision made to try to have meetings with officers higher in the chain of command above Sergeant Foraker?

245

A. Yes.
Q. And eventually, did you participate in some of those meetings once they actually occurred?
A. Yes.
Q. Now, do you recall when those meetings with officers higher in the chain of command actually began to happen?
A. That would have been in the winter of 2004.
Q. Winter of 2004 or winter of 2003?
A. Actually, the first meeting would have been in December of 2003 with Sergeant Foraker. And from that point, I can't give you the exact time frame of the meetings after that. The first meetings actually occurred in December of 2003.
Q. Did you ever have any meetings with Lieutenant Ralph Davis or Captain Greg Warren?
A. Yes.
Q. Were they in your chain of command above Sergeant Foraker at the Police Academy?
A. Yes.
Q. Had they just recently come into your chain of command?
A. Yes.
Q. Based on what you were able to observe during those meetings, were Lieutenant Davis and Captain Warren, did they express concern about the problems?

246

A. Very much so.
Q. Do you recall how long it took to get a meeting with someone above Captain Warren in the chain of command?
A. No, I do not.
Q. Just so we are clear, is Captain Greg Warren a relative of yours at all?
A. No relation.
Q. At some point were you able to have a meeting with Lieutenant Colonel MacLeish?
A. Yes.
Q. Do you recall how long after December of 2003 that may have been?
A. I know it was at least January, maybe February and it could have been even March.
Q. Did you have any meetings with any other branches of state government?
A. Yes.
Q. What branch of state government did you have meetings with?
A. The first one was in January of 2004. It was Division of Facilities Management.
Q. Do they own the building known as the FTU?
A. Yes, they do.
Q. Does the State Police have some kind of an agreement which allows you to use that building that you are aware of?

247

A. Yes.
Q. Now, the concerns that you gave to Sergeant Foraker and asked him to raise up the chain of command, were they about the conditions at the FTU?
A. Yes, they were.
Q. Did Lieutenant Colonel MacLeish ever stop by the range in December of 2003 or January of 2004 to check on recruit training?
A. Yes, he did.
Q. Did you ever try to raise your health concerns directly to him?
A. I did not.
Q. Do you know who may have?
A. Sergeant Foraker.
Q. Eventually, were you able to get a meeting with Colonel MacLeish?
A. Yes.
Q. Did he ever say to you, Just put on a paper dust mask and you will be okay?

MR. ELLIS: Your Honor, the witness is hesitating. I believe it's because this calls for hearsay.

THE COURT: It's overruled. Let me see counsel.

(The following took place at sidebar.)

THE COURT: Mr. Ellis, you know better than to make a comment like that in front of the jury. That is for

248

the jury to determine, whether the witness has hesitated or not.

MR. ELLIS: I am sorry, Your Honor.

THE COURT: What is your objection?

MR. ELLIS: Well, we know from the context of this case that he didn't -- the Colonel didn't say it to this witness. He is not going to know the answer.

THE COURT: Did he say it in the presence of this witness?

MR. ELLIS: No.

THE COURT: Mr. Neuberger.

MR. S. NEUBERGER: I want to find out if he ever received an order saying that, just put on a paper dust mask. I was not going to ask who gave him that order.

THE COURT: Written order.

MR. S. NEUBERGER: Oral. In the State Police I think most things are done orally.

THE COURT: So you want to ask him did he ever receive an order to put on a paper dust mask.

MR. S. NEUBERGER: Yes.

MR. ELLIS: That is a completely different question.

THE COURT: That is a different question.

MR. S. NEUBERGER: I will rephrase the question.

THE COURT: Please be careful. This gentleman

249

is trying his best to testify without testifying to hearsay, and he is trying to do his best. If you lead him into areas that is going to necessarily lead him into hearsay -- he has a lot of information. It is not admissible in a court of law, and he is trying his best. So you got to help him.

(End of sidebar conference.)

BY MR. S. NEUBERGER:

Q. Wayne, did you ever receive an order saying just put on a paper dust mask and you will be okay?

A. Yes.

Q. During a meeting with Colonel MacLeish, did you ever hear him say, Kurt, you have been at the range so long, we don't know what we have done to you?

A. Yes.

Q. Did you ever hear Colonel MacLeish say troopers who work at the firing range should expect to have high lead levels in their blood?

A. Yes.

Q. Did you ever hear Colonel MacLeish say during a meeting troopers who work at the firing range should expect to have hearing loss?

A. Yes.

Q. What was your reaction to those statements?

MR. ELLIS: Your Honor, I object. It is irrelevant.

250

THE COURT: Sustained.

BY MR. S. NEUBERGER:

Q. Did you ever receive a response from Facilities Management during your meetings with them?

MR. ELLIS: Objection, Your Honor. I think it would be hearsay.

MR. S. NEUBERGER: I want to know if he ever heard anything from Facilities Management.

THE COURT: Can you frame a question that would not elicit a hearsay response?

BY MR. S. NEUBERGER:

Q. Did Facilities Management ever respond in any way whatsoever in your meetings with them?

A. Yes.

Q. As a result of those meetings, was the HVAC system fixed?

A. No.

Q. Were the air flow problems fixed?

A. No.

Q. Did anyone ever state to you, quote, I wish I could tell you that the HVAC systems were --

MR. ELLIS: Objection, Your Honor. Hearsay.

MR. S. NEUBERGER: It goes to the effect on the listener --

THE COURT: That is sustained. You are offering

251

it for the truth of the matter.

MR. S. NEUBERGER: Okay.

BY MR. S. NEUBERGER:

Q. Did you ever receive conflicting signals from Facilities Management as to the conditions of the FTU?

MR. ELLIS: Your Honor, object. Calls for hearsay.

MR. S. NEUBERGER: Again, Your Honor, I believe this goes to the effect on the listener, why they ultimately went to the State Auditor.

THE COURT: Mr. Maurer, would you read the question back.

(Question read.)

THE COURT: Number one, it is leading. I will let you rephrase. Let's see where we go. Did you ever receive conflicting signals?

MR. S. NEUBERGER: I understand, Your Honor.

BY MR. S. NEUBERGER:

Q. Did you ever receive any response from Facilities Management about the conditions at the FTU?

A. Yes, I did.

Q. Were you ever told that the conditions were fine?

MR. ELLIS: Objection, Your Honor.

MR. S. NEUBERGER: That is definitely not for the truth of the matter asserted, Your Honor.

252

THE COURT: I will let him answer that.

BY MR. S. NEUBERGER:

Q. Were you ever told that the conditions at the FTU, that things were fine?

A. No.

Q. Were you ever told that things were not fine?

MR. ELLIS: Objection, Your Honor.

THE COURT: Last one. Repeat the question.

BY MR. S. NEUBERGER:

Q. Did you ever receive a response from Facilities Management indicating that things at the FTU were not okay?

A. Yes.

Q. In light of the -- after you received responses from Facilities Management -- strike that.

Did you ever decide to investigate the problems at the FTU?

A. Yes, I did.

Q. What was the time frame of that?

A. That would have been in December of 2003 forward.

Q. Why did you decide to investigate the problems?

A. I had a meeting in January of 2004 with an engineer from Facilities Management and an industrial hygienist. I had called to ask them to come to the range to discuss the air flow problems and the dust backup that I was seeing on the range floor.

253

I also knew that the ventilation system was not operating correctly, and we had a couple of repair people there trying to correct the problem and they couldn't correct it. It was getting to the point where I thought I had to sound the alarm and get this problem corrected. I just thought that our health was really being put at risk here.

So I made the phone call to Facilities Management. I met with the engineer, Mark DeVore, and the industrial hygienist, by the name of Doyle Tiller. I explained to them that the air handler was not working properly. They examined the computer system in the booth for 30 to 40 minutes. We then went out on the range and we started looking at the floor of the range. I explained to him that the copper was all over the place and that we had recently learned that copper was dangerous, also. It was a heavy metal that was toxic. And I was concerned about breathing this dust.

He asked me then if I had been using the floor scrubber. I told him that the floor scrubber was in and out of operation and I didn't use the floor scrubber anyway. And the reason I didn't use the floor scrubber, because I didn't know where we were going to put the effluent after it was contaminated.

So we walked to the back of the range. We

254

observed the dust in behind the bullet trap and the problems that were occurring there with the belt actually seizing up. We asked about all the dust at that point. And I went back to the air being tested, and Mr. Tiller advised me that that is not where it would start.

MR. ELLIS: Objection, Your Honor.

THE COURT: Sustained. This is getting into an area, Mr. Neuberger.

BY MR. S. NEUBERGER:

Q. After you went behind the bullet trap with people from Facilities Management, where did you go after that?

A. Went back to the office area of the range.

Q. Are there multiple offices in the range or is there like one central office?

A. There is one large office where we all have our desks.

Q. Are there any other rooms in the office area?

A. There is a conference room there, also.

Q. So you went back to one of those rooms?

A. We went back to our main office building, or office area, excuse me.

Q. Did you continue to talk to those gentlemen from Facilities Management about the range?

A. Yes.

Q. Now, what month was this?

A. That was January of 2004.

255

Q. In December of '03 or January of '04, did any State Police recruit ever raise concerns about the conditions at the FTU?

A. Yes.

Q. Do you recall what that recruit's name was?

A. Yes, it was Casey Fountain.

Q. Was he able -- what did he tell you?

MR. ELLIS: Objection, Your Honor.

THE COURT: Sustained.

BY MR. S. NEUBERGER:

Q. Did he ever help you guys investigate the problems?

A. Yes, he did.

Q. Ultimately, did you pass the results of your investigation up the chain of command?

A. Yes, we did.

Q. Why did you do that?

A. Health concerns.

Q. Now, ultimately, did you ever go into the FTU archives?

A. Yes, I did.

Q. Did you find paperwork and other things in there?

A. Yes, we did.

Q. What kind of paperwork did you find in there, just briefly?

A. Bidding procedures, construction plans, letters, all

256

types of information for the construction process at the range.

Q. Did you find any information relating to the range after it was constructed?

A. Yes.

Q. How much paper was there in those archives?

A. Very large amount of paper.

Q. What was your reaction from reviewing all that paper?

MR. ELLIS: Objection, Your Honor. What his reaction is is irrelevant.

THE COURT: Do you want to know his reaction or what he did?

MR. S. NEUBERGER: His reaction, was he concerned.

THE COURT: Why don't you ask him that question.

BY MR. S. NEUBERGER:

Q. What did you do after you reviewed all that paperwork?

A. I started forwarding the information.

Q. Did you ever investigate whether a certificate of occupancy had ever been issued for the FTU after it was built?

A. Yes, I did.

Q. What was the conclusion of that investigation?

A. The building was never issued a certificate of occupancy by New Castle County.

Q. Was there a sprinkler system in the building?
A. No, there was not.
Q. Were any explosives stored in the building?
A. Yes.
Q. What kind of explosives were stored in the building?
A. Well, there were hundreds of thousands of rounds of ammunition. There were flash bangs, smoke grenades, different types of powders.
THE COURT: Flash bangs would be what, Corporal?
THE WITNESS: That is a grenade that goes off and causes a loud noise and it's a bright flash. It's a distraction device that we use to stun people upon building entries.
BY MR. S. NEUBERGER:
Q. Now, when on the range floor, was there a beam going down the center of the ceiling?
A. Yes, there was.
Q. Did you ever find the original plans for the FTU, or the blueprints?
A. I found several sets of blueprints.
Q. Was that original beam in those blueprints?
A. No.
Q. Did you ever learn why that original beam had been installed?
A. Yes, I did.

Q. Why was that original beam installed?
A. The original beam was not engineered properly to hold the weight of the roof and the air conditioning system, that large unit that you saw up on the roof.
Q. Did you later learn that another beam had to be installed to help fix that problem?
A. Yes.
Q. Now, did you ever learn something about a concept called time-weighted averages?
A. Yes.
Q. What did you learn about that concept?
A. A time-weighted average is the amount of time that you can be exposed to certain toxic metals or fumes.
Q. And when you learned about that, did you pass that up the chain of command?
A. Yes, I did.
Q. Did you ever visit any other firearms training facilities on the East Coast to see how they dealt with problems or how they dealt with -- actually, I will strike that question.
Did you ever visit any firearms training facilities on the East Coast?
A. Yes, I did.
Q. What facilities did you visit?
A. The Federal Law Enforcement Training Center in -- not

in Glencoe, in Cheltenham, Maryland. The Federal Bureau of Investigation range in Quantico. There was a naval range in Washington, D.C., and the New Jersey State Police indoor range in Trenton, New Jersey.
Q. Were you able to observe their staff doing maintenance behind the bullet trap?
A. No.
Q. Did you know why you weren't able to observe that?
A. Yes.
MR. ELLIS: Objection, Your Honor.
THE COURT: Overruled.
BY MR. S. NEUBERGER:
Q. Were you just not allowed to watch them do that?
A. No.
Q. Did you ever learn why they didn't do it?
A. Yes.
Q. Why didn't they do it?
A. They weren't allowed to do it.
Q. Was it just the maintenance that they weren't allowed to do?
A. They weren't allowed to go behind the bullet trap.
Q. Did you ever learn why?
A. They told us --
MR. ELLIS: Objection, Your Honor.
THE COURT: Sustained.

MR. S. NEUBERGER: Okay.
BY MR. S. NEUBERGER:
Q. Did you ever bring any experts into the FTU in December 2003 forward?
A. Yes.
Q. Did you bring in -- do you know who Bill Provencher is?
A. Yes, I do.
Q. Who is he?
A. He is a ventilation expert.
Q. Do you know if he does any work for the government?
A. Yes.
Q. Did he charge the state police for inspecting the range while you were there?
A. No.
Q. Did you learn a lot from him when it came to range ventilation?
A. Yes, I did.
Q. Did you pass what you learned from him up the chain of command?
A. Yes, I did.
Q. Did you ever fill out something called a health hazard evaluation form?
A. Yes, I did.
Q. Who did you fill that form out with?

A. The National Institute of Occupational Safety and Health.

Q. Is that NIOSH?

A. That's correct.

Q. Do you recall when you filled that out?

A. I believe that would have been in 2005.

Q. Now, why did you fill that out?

A. It was a request to have the National Institute of Occupational Safety and Health come in and assist with the evaluation of our State Police firing range.

Q. Now, did you ever learn that NIOSH comes into firing ranges and offers free medical care to the officers who train there?

A. Yes.

Q. Did you ever learn that NIOSH offers to come in and completely analyze a firearms training facility?

A. Yes, that's what they do.

Q. Do you know if NIOSH has any experience working on firing ranges?

A. Yes.

Q. Do you know, can you give the jury an example of a firing range that they have worked on?

A. In Fort Collins, Colorado, NIOSH went in and did a comprehensive investigation on noise at the range.

Q. Did you ever learn that NIOSH generally offers to come

in and help repair all the problems at that firing range?

A. Yes.

Q. Did NIOSH ever come into the FTU?

A. No, they did not.

Q. Have you ever heard a company called Harvard Environmental?

A. Yes, I have.

Q. How did you first hear about them?

A. They just showed up at the range one day and said they were there to do an evaluation.

Q. Ultimately, do you know if Harvard issued some kind of a report?

A. Yes.

Q. Did the report address the levels of lead or other heavy metals in the range?

A. Yes, it did.

Q. Do you recall what it said about lead?

A. There were several areas in the range that were well over the OSHA limits for lead.

Q. Did you watch them conduct the swipe-sampling?

A. Yes, I did.

Q. Did you ever learn how high over the safe levels of lead the results were?

MR. ELLIS: Objection, Your Honor.

THE COURT: You have been letting this go on for

this long, Mr. Ellis. I am going to overrule the objection. Go ahead and answer the question.

BY MR. S. NEUBERGER:

Q. Did you ever learn how high above the safe levels of lead the lead in the FTU was?

A. I can recall one reading that was over 700 times the limit allowable.

Q. Are there clean air vents and exhaust vents on the range floor?

A. Yes, there are.

Q. Do you recall where that swipe-sampling was taken from, the 700-level one?

A. I believe that was in the, that would have been in the clean air vents, that was producing clean air into the range.

Q. Is that the vent which is supposed to be pulling fresh air from outside?

A. That's correct.

Q. Do you know a gentleman by the name of Joseph Farrell?

A. Yes, I do.

Q. Who is he?

A. He was employed by, I believe it was Environmental Solutions at the time.

Q. Is that a company that you contacted?

A. Yes, it was.

Q. Did he ever come in and inspect behind the bullet trap?

A. Yes.

Q. Did he declare something about the area --

MR. ELLIS: Could we have a time period, Your Honor?

MR. S. NEUBERGER: Yes.

BY MR. S. NEUBERGER:

Q. When did Mr. Farrell come in and inspect behind the bullet trap?

A. That would have been in either late 2003 or early 2004.

Q. Did he declare the area behind the bullet trap to be something?

A. Yes.

Q. What did he declare it to be?

A. A hazardous waste site.

Q. Do you recall that picture yesterday of the gentlemen in the Tyvek suits?

A. Yes, I do.

Q. What area of the FTU were they standing in front of?

A. They were standing in front of the area behind the bullet trap.

Q. Do you know a gentleman by the name of Art Nielsen?

A. Yes, I know who he is.

Q. Who is he?
A. He is an industrial hygienist who is federally certified.
Q. Did you ever learn that he had the authority to shut down federal firearms training facilities?
A. Yes.
MR. ELLIS: Objection, Your Honor.
THE COURT: Overruled. It's asked and answered.
BY MR. S. NEUBERGER:
Q. Did he ever flash a badge in front of you?
A. Yes. I saw his credentials.
Q. Did he declare the FTU to be something?
MR. ELLIS: Objection, Your Honor.
THE COURT: Sustained.
BY MR. S. NEUBERGER:
Q. Do you know if he ever inspected the range?
A. Yes.
Q. Do you know what the results of his inspection were?
MR. ELLIS: Objection, Your Honor.
THE COURT: Sustained.
BY MR. S. NEUBERGER:
Q. All the information you got from all these experts, did you pass that up the chain of command?
A. Yes.
Q. Now, Wayne, during the first half of 2004, was the FTU

in the Delaware media?
A. Yes.
Q. Now, were there little stories like towards the back pages of the newspapers?
MR. ELLIS: Objection, Your Honor.
THE COURT: Basis?
MR. ELLIS: Best evidence rule.
MR. S. NEUBERGER: Your Honor, at the pretrial conference I tried to introduce these articles. I believe the Court ruled I could do this through testimony but the articles couldn't come in.
THE COURT: I think that's correct. That's my recollection as well. That was my ruling.
MR. ELLIS: That is not my recollection.
MR. S. NEUBERGER: I would be more than happy to put all the articles into evidence.
MR. ELLIS: Your Honor, the Court --
(The following took place at sidebar.)
THE COURT: I don't remember exactly what the ruling was.
MR. ELLIS: Your Honor, the Court ruled these out because these individuals here, Foraker, Warren and Price, had nothing to do with these articles. They were put in by another guy named Greg Warren.
THE COURT: Do you have someone else to put

these articles in?
MR. ELLIS: The point, Your Honor, is it is not relevant to any whistle-blowing that these three plaintiffs are involved in. That is why the Court put it out in the pretrial order. Basically, what they are trying to do here is to go against the order that you issued at the pretrial.
THE COURT: Okay.
MR. S. NEUBERGER: Your Honor, I believe Mr. Ellis is mistaken on what you ruled at the pretrial.
THE COURT: Do we have a transcript?
MR. T. NEUBERGER: There is a transcript.
THE COURT: I would like to -- not right now.
MR. S. NEUBERGER: Could I offer, make a proffer for why I am offering this?
THE COURT: Sure.
MR. S. NEUBERGER: It goes to the motive of the defendants to retaliate. What I want to establish through the testimony of this witness is that he saw various articles in the news media. These articles addressed many of the same subjects that he and the other men were speaking out about through the chain of command. And there is overlap there. That helps establish the defendants' motive. It is only one piece of evidence. But I think it is an important piece, the defendants' motive to silence them.
I believe the defendants will testify under

examination that they were unhappy with all of the media coverage. And at the same time, my clients are speaking out about these same things that the defendants are unhappy about that are getting out into the media.
I think because of the subject matter overlap -- I am not going to talk about the hearsay statements. But I am going to ask him some of the general topics, like were there articles about health conditions at the range, were there articles reporting on the range being shut down.
THE COURT: Was he interviewed?
MR. S. NEUBERGER: By the auditor?
THE COURT: No. Was he interviewed by a news reporter?
MR. S. NEUBERGER: No, Your Honor. He was gagged. I haven't gotten to that part yet.
THE COURT: He was gagged, yes.
MR. S. NEUBERGER: Were there articles about the health concerns? Were there articles about recruits getting sick? Then ultimately I will end up, were these some of the same areas that you were speaking out about?
MR. ELLIS: Your Honor, what this witness has said is he did some research and passed it up the chain of command, as far up the chain of command as Foraker. It doesn't get any higher than that. Warren, who is a couple steps above that in the chain of command, gave some

information to the media in March of 2004. It's substantially later than anything this witness is talking about.

That is what got into the newspaper. It was Warren. Warren was quoted in the newspaper. None of these three guys were quoted. That is what we went over in the pretrial. That is why you ruled it out.

MR. S. NEUBERGER: I would disagree with that. I think there was media from the time that the recruits began getting sick at the FTU, either late December or early January of 2004 forward, a gentleman by the name of Tom Elder I believe has written a large number of stories about the conditions at FTU.

MR. ELLIS: The first article appeared on roughly March 19th.

THE COURT: I am going to let the jury take their break right now while we talk about this.

(End of sidebar conference.)

THE COURT: Members of the jury, I am going to let you take your break a little early. Go ahead and take your break.

(Jury leaves courtroom at 10:40 a.m.)

(The following took place at sidebar.)

MR. S. NEUBERGER: Now, Your Honor -- I am sorry.

THE COURT: Where does it start, Mr. Neuberger?

MR. T. NEUBERGER: Where does it start?

This is where the category of articles start.

THE COURT: You believe I ruled in your favor. Do you want to take a look and see if that happened (handing transcript to Mr. Ellis)?

MR. ELLIS: Yes, Your Honor.

Well, Your Honor, you said, I have no difficulty with the jury being given context. But you got to do it in a manner that is not unfairly prejudicial.

My point was that the articles about Greg Warren were unfairly prejudicial towards my people in this case because they didn't have anything to do with the plaintiffs. That is what went on before.

You said, the Court says, I am assuming that he would agree -- meaning me -- that there is a need for context here. And I am going to sustain the objection given that I think you have other means to accomplish your goal.

THE COURT: Okay.

MR. S. NEUBERGER: I believe the other means to accomplish the goals was through testimony. One of the defenses in this case is that Colonel MacLeish has, I think, one of them is that the Colonel has had no motive to retaliate against my men, that they were equally concerned about the health and safety issues. Given the fact this

stuff was all over the media -- was being published and talked about in the media in the same time frame, it doesn't make the State Police happy.

We have the Colonels -- I have them in a lot of depositions saying they don't like it when the DSP is in the media. The Department of Facilities Management is in the media, they are getting bad publicity. The State of Delaware is in the media getting bad publicity.

Bad publicity causes pressure. It goes to the motive to retaliate. Our guys were blowing the whistle about these same things. Because of the adverse media publicity during the same time frame, it goes to the context of everything that was going on, as the Court discussed at the pretrial conference.

I think it tends to prove, under Rule 401, the relevance rule, it tends to prove that there is a bit of a motive to retaliate against the men.

That is the gist of it, Your Honor.

THE COURT: Because of the publication of this unfavorable media.

MR. S. NEUBERGER: I believe it was more than just like one article. I believe there were a great deal from both the Delaware State News downstate and from the News Journal as well upstate.

THE COURT: How about the motive issue?

MR. ELLIS: Your Honor, it all has to do with the motive to retaliate against Greg Warren. Not three guys. Warren went to the media and got quoted in the media. These three guys had nothing to do with it. That was the basis for my objection originally.

MR. S. NEUBERGER: I am not raising the issues of what Greg Warren said. I believe that was one of the reasons the Court ruled I couldn't use the actual articles, because there was a great deal of discussion about Captain Greg Warren and some issues relevant to this lawsuit, a lot of issues not relevant to this lawsuit, extraneous material.

THE COURT: Did you understand the import of his objection, that Warren's comments that appeared in the paper really have nothing to do with these three plaintiffs?

MR. S. NEUBERGER: I am not offering Captain Warren's comments that appeared in the paper.

THE COURT: What are you offering?

MR. S. NEUBERGER: The fact that the FTU, that the conditions at the FTU were all over the media in the beginning of 2004, the media was reporting on these conditions. I am not offering, for example, Captain Warren's quote that the FTU was, quote, the absolute epitome of a project from hell since its very inception, end quote -- Captain Warren can testify about that in a couple of days when he is in here -- because that would be hearsay.

MR. ELLIS: If that is the case, it is really misleading, because the evidence would make it seem like these three people were responsible for what's in the paper. That is really misleading, because it's not the case.

THE COURT: That is a concern, the concern outlined by Mr. Ellis.

MR. S. NEUBERGER: I will be happy to have Corporal Warren testify that there is overlap in the subject matter, but it wasn't him speaking to the media and giving them this information. Does that address the concern?

THE COURT: I don't know.

MR. ELLIS: It just makes it irrelevant at that point, Your Honor. If there is a motive to retaliate, it's against Greg Warren. Not these three guys.

MR. T. NEUBERGER: Would it be okay?

THE COURT: Yes.

MR. T. NEUBERGER: I think we are missing something that we are saying on motivation. For example, in March, the range is shut down, legislators demand an investigation.

THE COURT: March of?

MR. T. NEUBERGER: 2004. Legislators demand an investigation. The Governor demands an investigation. This is a backdrop of pressure and concern about the range, which, even if that pressure is not talking about our

clients, it is talking about the fact that the state has a broken-down facility. And we are saying that the motive to retaliate is because all this is going public. So any news story of any nature about the range contributes -- about the range that is in the public domain now is contributing to a motive to retaliate.

It doesn't have to be about our guys. It doesn't have to be about Greg Warren. Simply the fact that the last news articles were in 1998, we referenced them earlier and everything, and now news articles are starting to surface again. That is the direction we are trying to go with this witness.

Simply the range is now being covered again. It doesn't make any difference.

THE COURT: They don't like it and therefore --

MR. T. NEUBERGER: Therefore, they won't like it, both defendants will say when I call them, you know, that they were displeased that there was now publicity about the range, that it was in the media again. It's as relevant as the fact that the auditor --

THE COURT: Albeit these particular plaintiffs were not the source --

MR. T. NEUBERGER: No.

THE COURT: Did you want to say something on this? I sort of felt you wanting to.

MS. HARVEY: I think if there was an overall motive to retaliate, like Mr. Ellis said, there would have been retaliation against Greg Warren in the context of this. That is what this is about, Greg Warren's comments.

THE COURT: What about Mr. Neuberger's point, that this is a general motive, bad publicity, the bad press, general motive to retaliate against anyone who may have been involved with this, with that bad press?

MS. HARVEY: I think they are alleging that the plaintiffs have been retaliated against for their comments and their exercise of their First Amendment rights. Not for something else.

MR. ELLIS: Your Honor, it becomes a 403 problem, really. I think Mr. Neuberger has made a case for marginal relevance. But, you know, you have to balance that against the unfair prejudice, because it makes it look like these three people are the source of that information.

THE COURT: That is a concern. Mr. Neuberger, I do accept your relevance point, but I think the analysis is a 403 analysis, where I am concerned about not only the prejudice, but I am concerned about jury confusion here as to the relevance, what does that mean with regard to these plaintiffs.

So I think, dialing back to the pretrial conference, I think that is probably why I made the comments

that I made and said that perhaps it may be appropriate to give some context.

I am going to sustain the objection with regard to that line of questioning with regard to this witness based on the arguments proffered, understanding as I do Mr. Neuberger's relevance argument. I am going to rule that the 403 concerns --

MR. T. NEUBERGER: I understand. I think what you are saying -- and we will address it when I do Colonel Chaffinch and the defendants, I will just address the point through them because then it will be much more specific.

THE COURT: I think that is the way to do it.

MR. T. NEUBERGER: We avoid the confusion. That is good.

THE COURT: Okay. Let's take our break.

(Recess taken.)

THE COURT: All right. Please bring in the jury.

MR. ELLIS: Your Honor, I have an objection already.

THE COURT: To what?

MR. ELLIS: Your Honor, it is apparent to me that Mr. Neuberger is going to have this witness identify those two boxes as being full of material that he and actually the lawyers gave to the auditors in May 2004.

Now, again, this is something we discussed at the pretrial. I object to the introduction -- I assume he is just going to show it to him and not actually move it into evidence because none of it is scheduled as exhibits. But since my clients had no idea, to this day they probably don't have any idea, of what was turned over, the contents of what they turned over, the volume of what they turned over is irrelevant.

THE COURT: Didn't we discuss this in the pretrial?

MR. ELLIS: Yes, and you ruled some stuff out.

THE COURT: I think I did. I am not going to revisit that.

MR. S. NEUBERGER: It is not being offered for that. I want my client to be able to point out the binders. One of the defense's positions in this case is that my clients were trying to cover up the problems and not being cooperative in speaking to the auditors. In other words, because they were responsible for destroying the FTU, they were trying to hide everything about the conditions.

The sheer volume of material -- and I am not going to go through it. I am going to have him, are these the boxes, just turn the boxes, so that the jury sees them. My clients were trying to hide problems with the auditors. They wouldn't have given them this sheer volume of



information.

MR. ELLIS: Your Honor, I can speak for myself. That is not my position in the case.

THE COURT: How would you address it?

MR. S. NEUBERGER: I believe Mr. Ellis has consistently said during this case my clients were uncooperative with the auditors and things of that nature, specifically towards their meetings with the auditors.

THE COURT: Have you said that?

MR. T. NEUBERGER: Your Honor, it is one of the contested issues of fact. You may remember, there were two we pointed out in the pretrial, that they were deliberately trying to cover up what they were doing at the range.

THE COURT: You may sit in the well, if you would like.

MR. ELLIS: Your Honor, I certainly contend that they discontinued the maintenance that we heard so much about and didn't tell them about it. That I contend. That is correct. That has nothing to do with these documents. There will be testimony from one of the auditors that these guys were, although they provided them information, were not particularly responsive to questions, and in particular that Mr. Neuberger interrupted the interview with certain of these witnesses. But again, you know, this volume and what's in there was not known to the people who are alleged



to have retaliated and they couldn't possibly be relevant.

MR. S. NEUBERGER: Your Honor, it is one of the contested issues of fact whether my clients were trying to hide things from the auditor. This tends to prove --

THE COURT: No, it is not. Not according to Mr. Ellis.

You can't use them. Let's move on.

MR. S. NEUBERGER: Could I remove them from the table?

THE COURT: Please remove them.

(Jury enters courtroom at 11:11 a.m.)

THE COURT: Please take your seats, ladies and gentlemen. We will continue with Mr. Neuberger's examination of Corporal Warren.

BY MR. S. NEUBERGER:

Q. Now, Wayne, during the meetings that you had with Colonel MacLeish in the beginning part of 2004, did MacLeish appear -- were you able to gauge his emotions during those meetings?

A. Yes, I was.

Q. Were these the same meetings where you were raising issues about the range?

A. Yes.

Q. Have you received training in studying people?

A. Yes, I have.



Q. Do you think you are good at reading people?

A. I think I have experience reading people, yes.

Q. What was Colonel MacLeish's visible reaction to your raising these issues in these meetings?

A. Agitated.

Q. Did he make any statements about you during those meetings?

A. Yes.

Q. What statements did he make?

A. About the hearing loss, I can't recall the exact quote, but it was about, we worked at a range and so we should expect hearing loss.

Q. Did he ever blame you for the problems at the FTU during one of these meetings?

A. He made the statement, I can't believe you didn't clean.

Q. Did you do cleaning at the FTU?

A. Yes, I did.

Q. So did there come a time when the FTU was finally shut down?

A. Yes.

Q. Was that in 2004?

A. March of 2004, correct.

Q. Who gave the order to shut down the FTU?

A. It came from the executive staff, either Colonel

MacLeish -- I believe it was Colonel MacLeish. I know it came from the executive staff.

Q. Is the executive staff -- what does the executive staff consist of?

A. Majors and above.

Q. So would that include the Lieutenant Colonel and the Colonel?

A. That's correct.

Q. All right. Now, did you have the authority to shut down the FTU?

A. No.

Q. Do you know if Sergeant Foraker had the authority to shut down the FTU?

MR. ELLIS: Objection, Your Honor. Personal knowledge.

MR. S. NEUBERGER: I will lay the foundation, Your Honor.

BY MR. S. NEUBERGER:

Q. Now, have you served with a large number of section chiefs at the FTU?

A. Yes.

Q. I believe you named all those earlier, didn't you?

A. Yes.

Q. To the best of your knowledge, did any of those section chiefs have the authority to shut down the FTU?

MR. ELLIS: Objection, Your Honor.

THE COURT: Sustained.

BY MR. S. NEUBERGER:

Q. Now, Wayne, I believe you indicated that you did not have the authority to shut down the FTU, you personally.

A. That's correct.

Q. If there was a -- if an unsafe action happened on the firing range, did you have the authority to do something in that instance?

A. Yes.

Q. What did you have the authority to do?

A. Suspend the training indefinitely. We would shut the shooting down and take care of the problem, whatever was occurring at the time, caused the dangerous incident.

Q. Could you give the jury an example of a kind of dangerous incident which would trigger that kind of a reaction?

A. An accidental discharge. Actually, someone did pass out one time on the range with a weapon in their hand, and we suspended the activity at that point.

Q. Was that a short-term thing or a long-term thing?

A. Short term.

Q. Now, did you ever learn about a press conference that was held at the FTU in 2004?

A. Yes.

Q. When did you learn about that?

A. After it occurred.

Q. Do you recall how you learned about it?

A. I saw it in the media.

Q. Did you read that media?

A. Yes, I did.

Q. What media did you read about it in?

A. The Delaware State News.

Q. Was there some kind of a news story in the Delaware State News?

A. It was a front-page story.

Q. Front-page story. And are you aware of any statements that were made in that article that are attributed to Colonel Chaffinch?

A. Yes.

Q. Did he mention any -- is there any mention of any officers at the FTU by name?

MR. ELLIS: Excuse me, Your Honor. Best evidence rule. The document is admitted. The document speaks for itself.

MR. S. NEUBERGER: I will be happy to use the document, Your Honor.

THE COURT: I wish you would.

BY MR. S. NEUBERGER:

Q. Wayne, could you turn to PX-25 in the plaintiffs'

exhibit book?

A. Exhibit Book No. 1?

Q. Yes, sir. Have you found PX-25?

A. Yes, I have.

Q. Is this the article that you were just referencing?

A. Yes, it was.

Q. Now, the Delaware State News, have you ever tried to buy that in New Castle County?

A. No, I have not.

Q. Is it widely available in Sussex County where you live?

A. Yes, it is.

Q. Now, have you ever read this article before, the one with the picture of Colonel Chaffinch?

A. Yes, I have.

Q. Could you review this article and see if he mentions any Delaware State Troopers by name? I will just direct your attention, just to speed things up a little bit, could you turn to the second page? Are you there?

A. Yes.

Q. Could you take a look at the bottom of the first column, and read from that point on until the end of the article?

A. Are you talking about the last paragraph?

MR. S. NEUBERGER: Your Honor, may I approach

285

the witness?

THE COURT: Yes, you may.

THE WITNESS: And you want me to read this. Correct?

THE COURT: To himself or out loud?

BY MR. S. NEUBERGER:

Q. To yourself, please.

(Pause.)

Q. Have you finished reading that, Wayne?

A. Not the entire article, no.

I am through.

Q. Now, in the statements attributed to Colonel Chaffinch, does he place the blame for the conditions at the range on any Delaware State Troopers?

MR. ELLIS: Objection, Your Honor. The document speaks for itself. He is asking for a characterization.

THE COURT: Sustained.

BY MR. S. NEUBERGER:

Q. What Delaware State Troopers are mentioned by name in this article?

A. Sergeant Ashley. Sergeant Foraker. Sergeant Ashley and Sergeant Foraker.

Q. Okay. Did you read this article at the time?

A. Yes, I did.

Q. Did you interpret this article as blaming anyone else?

286

MR. ELLIS: Objection, Your Honor.

MR. S. NEUBERGER: It goes to a third party's understanding of the statements, Your Honor.

MR. ELLIS: He is not a third party.

MR. S. NEUBERGER: Sergeant Foraker has a defamation complaint. One of the elements of the defamation is the statements that make it defamatory.

MR. ELLIS: He is not a third party.

THE COURT: Overruled.

BY MR. S. NEUBERGER:

Q. Did you interpret the part of the article that you just read, did you interpret this to be making any accusations?

A. Yes.

Q. What kind of accusations did you interpret this article to be making?

A. That under Sergeant Ashley everything was okay. However, when Sergeant Foraker returned he let the range deteriorate.

Q. Now, were you serving under Sergeant Foraker when he returned?

A. Yes, I was.

Q. Did Sergeant Foraker let the range deteriorate?

A. No, he did not.

Q. Would you disagree with the statements that are

287

attributed to Colonel Chaffinch in this article?

A. Yes, I would.

Q. Based on your reading of this article, did you interpret this article to be placing blame on anyone else other than Sergeant Foraker?

A. Yes.

Q. Who?

A. Myself and Corporal Price.

Q. Why do you say that?

MR. ELLIS: Your Honor, I object and move to strike that. That is clearly not third party.

MR. S. NEUBERGER: Your Honor, this goes to some of the injury to reputation issues that are involved in the First Amendment case. It's part of the adverse action, I believe, is the publication and accusations which I am trying to establish the parameters of.

Would this be a better sidebar thing?

(The following took place at sidebar.)

THE COURT: Restate your objection.

MR. ELLIS: Your Honor, the interpretation he put on it is irrelevant. The document speaks for itself. The document is what it is. He is not a third party if he is trying to talk about the interpretation of it as to him. You allowed it as to Foraker.

MR. S. NEUBERGER: I am also trying to establish

288

it as to Corporal Price. When Corporal Price is up there I will establish it as to Corporal Warren and vice versa.

One of the issues in this case, Your Honor, the adverse action we are contesting, are the public accusations of blame on all three men for destroying -- essentially destroying the FTU. Corporal Warren will testify later that numerous -- on the injury to reputation and damages thing --

THE COURT: Corporal Warren will testify if you ever finish with this witness. But go ahead.

MR. S. NEUBERGER: It is the same witness.

THE COURT: I mean Captain Warren, go ahead.

MR. S. NEUBERGER: Corporal Warren will testify later that numerous troopers came up to him and said, I can't believe you were being blamed in this article. I can't believe they are blaming you for doing this. That goes to the issue of his reputation being injured.

I believe Corporal Warren will testify as will Corporal Price that they also interpreted this article as blaming them in addition to Sergeant Foraker for the conditions at the range.

MR. ELLIS: Your Honor, you can't take the three plaintiffs and have them just sort of point fingers in a circle about what the interpretation of this document is. I don't think that's right.

THE COURT: Go ahead, Mr. Neuberger.

MR. T. NEUBERGER: Your Honor, there is a paragraph here where the Colonel is quoted as saying what people he is referring to in the article. He is saying it is the people that are providing the information in the first place about all of this. That is my clients. That is just not Chris Foraker.

MR. ELLIS: Which is Warren. Warren is the person the information pertains to. That pertains to the discussion we had right before the break.

THE COURT: Greg Warren.

MR. ELLIS: Right.

MR. T. NEUBERGER: It is a quote from the Colonel.

MR. HAVERLY: It says people.

MR. T. NEUBERGER: What people is the Colonel referring to when he is going through all these problems, he says it is the people, quote, that provided, then there is an ellipsis, the media, then it continues, with this information in the first place.

He is referring to more than one person in the quote. We are asking our client if he interpreted that as referring to him.

MR. ELLIS: Your Honor, they hadn't provided any information. Warren is the one who provided the information, I believe through Mr. Neuberger. If you want

people, that's the people.

But getting back to the more fundamental issue, I don't think that these three guys can stand around and interpret the document in each other's favor and say that is third --

THE COURT: I agree with you.

(End of sidebar conference.)

BY MR. S. NEUBERGER:

Q. Now, Wayne --

MR. S. NEUBERGER: Your Honor...

THE COURT: Sorry.

MR. S. NEUBERGER: No problem.

BY MR. S. NEUBERGER:

Q. Wayne, in that same time frame of this article being published, did you ever see Colonel Chaffinch or Colonel MacLeish on television?

A. Yes.

Q. Do you recall what they were saying?

MR. ELLIS: Objection, Your Honor. Again, best evidence. This is a document that is in the record. It can be played on the screen.

MR. S. NEUBERGER: In their admissions, Your Honor -- as well as, we were able to procure one videotape. There were other --

THE COURT: They are not admissions in your

view?

MR. ELLIS: They are double hearsay, then, Your Honor. It is a double jump, double hearsay jump. If he heard him say it himself, that is one thing. But if he watched something on a TV or on a tape, that is an out-of-court statement and he is reporting on that.

THE COURT: May I see counsel again at sidebar.

(The following took place at sidebar.)

THE COURT: So you want to have him testify about his viewing of a videotape of a news conference.

MR. S. NEUBERGER: Of a newscast.

THE COURT: A newscast.

MR. S. NEUBERGER: Yes, Your Honor.

THE COURT: The reason for that is?

MR. S. NEUBERGER: Whether there were statements made during that newscast by one of the individual defendants blaming the staff at the FTU for destroying the range, not performing maintenance, things like that.

MR. ELLIS: Your Honor, the tape is here. It is admitted in evidence. If he says it, he said it. But a characterization by the witness is not admissible.

THE COURT: That is the difficulty I am having. Why do you need to adduce that through this witness?

MR. S. NEUBERGER: Because he saw it, Your Honor. He is going to say I interpreted that as blaming me.

We are still on that issue. I interpreted the accusations of saying that the staff didn't do maintenance and therefore the range was shut down, I interpreted that --

THE COURT: The import of that interpretation is what, his interpretation that he is being blamed is what again?

MR. S. NEUBERGER: It is adverse action.

MR. HAVERLY: It also goes to his damages, Your Honor.

MR. S. NEUBERGER: Yes, Your Honor.

MR. ELLIS: That is all well and good, Your Honor. You still have to properly introduce the evidence. The evidence is the tape. The evidence is what he actually said, not the man's interpretation of it. If he is going to be allowed to interpret it, they still have to show the jury the real tape.

THE COURT: Doesn't the tape speak for itself?

MR. S. NEUBERGER: We weren't able to get all the newscasts, Your Honor. We were able to get one. It wasn't the one that I wanted to get, the one which I got phone calls from people about, like did you see that, we were able to get one tape. That is not the one --

THE COURT: It seems a little unfair. You are going to ask him to talk to the jury about a matter that he viewed. How are they to cross-examine him on that? They

have never seen the tape.

I am going to sustain the objection.

MR. T. NEUBERGER: Your Honor, if you ever tried to subpoena --

THE COURT: That is not my problem.

MR. T. NEUBERGER: I understand. There is no best evidence. The TV networks fight subpoenas of what is published on the air or their notes, I think.

Our point is that he witnessed the newscast where admissions were, statements were made by the defendants, and we wants to offer that evidence as it's the best evidence we could get of it. They deposed him.

They know these newscasts have been in the case all along. For them to say -- this is not a surprise to them. The fact that things were on TV has always been an issue in this case. This is the best evidence that we can offer as to what these people said about my man on TV.

MR. S. NEUBERGER: Your Honor, it also goes to the issue of publication. It is also a defamation case.

THE COURT: I do understand that.

MR. ELLIS: Your Honor, we asked the plaintiffs in this case for all the evidence they had of the news publications. They gave us the videotape. It is about a 30-second videotape. They didn't give us anything else. We didn't see any subpoenas issued to the WBOC or any other

television facility. Mr. Neuberger's statement about the best evidence is not supported by anything that has happened in the case.

MR. T. NEUBERGER: I have subpoenaed TV people in the past. I don't have to do it again and again.

THE COURT: I beg to differ.

MR. T. NEUBERGER: Maybe I am wrong. I did not subpoena newscasts.

THE COURT: The concern I have is Mr. Ellis' ability to test the characterization.

MR. ELLIS: Right.

THE COURT: It's a bald assertion that remains incapable of being tested because he has never had the opportunity to view the tape himself, nor will the jury get the opportunity to view the tape. I am not going to let you do it.

(End of sidebar conference.)

BY MR. S. NEUBERGER:

Q. Now, Wayne, we were just looking at PX-25. I want you to turn in the exhibit book to PX-26. Have you found that exhibit?

A. Yes, I have.

Q. What does this exhibits appear to be?

A. A copy of American Police Beat.

Q. What is American Police Beat?

A. A magazine circulated nationally and internationally for law enforcement officers.

Q. Could you turn two pages in. Are you there?

A. 67.

Q. CF-68, I am sorry. Now, what is this?

A. It's an article in Police Beat Magazine.

Q. Have you ever read this article before?

A. Yes, I have.

Q. What does this appear to -- what is the subject matter of this article?

A. About the closed State Police firing range, the Delaware State Police firing range.

Q. Could you take a look at the third column.

A. Okay.

Q. Do you see the last full paragraph that begins at the bottom of the third column?

A. Yes.

Q. Is Sergeant Foraker's name mentioned in there?

A. Yes, it is.

Q. Okay. You can put that exhibit away.

Have you ever seen Delaware State Troopers reading the Delaware State News?

A. Yes.

Q. Have you ever seen Delaware State Troopers reading the News Journal?

A. Yes.

Q. Have you ever seen Delaware State Troopers reading American Police Beat Magazine?

A. Yes.

Q. Does the State Police have a rule and regulation dealing with officers speaking to the media?

A. Yes.

Q. Is there a shorthand term used by Delaware State Troopers to refer to that rule?

A. Yes.

Q. What is that term?

A. It's a gag order.

Q. Is that one of the rules that the State Police enforce?

A. Yes.

Q. Wayne, have you ever heard of a place called Sambo's?

A. Yes, I have.

Q. What is Sambo's?

A. It's a little restaurant in Leipsic, Delaware.

Q. Is that east of Smyrna?

A. Yes, it is.

Q. What kind of food do they serve at Sambo's?

A. Seafood. Good food.

Q. Could you describe the atmosphere of Sambo's?

A. Relaxed atmosphere. Just easygoing, nice environment

297

on Leipsic Road.

Q. What do they use for tablecloths in Sambo's?

A. Newspapers.

Q. How often do you go there?

A. As often as I could go there. I enjoy it.

Q. Who do you like to go there with?

A. Usually the people that I was working with on the range, which would have been Sergeant Foraker, Corporal Price and Corporal Warwick.

Q. Have you ever walked through the door with Kurt Price?

A. Yes, I have.

Q. Is that an experience?

A. In itself.

Q. Why is that an experience in itself?

A. Actually, it's like walking through Cheers with Norm. Everybody knows him when he walks through the door.

Q. Did there come a time when you learned that, I believe it was PX- --

MR. ELLIS: Your Honor, I am going to object to this unless there is personal knowledge.

MR. S. NEUBERGER: He went there, Your Honor. He saw it.

MR. ELLIS: That is different then.

THE COURT: The objection is withdrawn?

MR. ELLIS: Yes, Your Honor.

298

BY MR. S. NEUBERGER:

Q. PX-25, did there come a time when you walked into Sambo's and saw PX-25 there?

A. Yes.

Q. Where in Sambo's did you see PX-25?

A. On the tables.

Q. Was it on one table?

A. I would say it was spread out all over the tables in the restaurant.

Q. Was there one copy of this or were there multiple copies on different tables?

A. There were multiple copies.

Q. Who did you have lunch with there that day?

A. For sure, I know it was Corporal Price. Who else, I can't recall at this point.

Q. Do you recall how many people were there having lunch, to the best of your recollection?

A. Probably a couple dozen.

Q. Did there come a time when you spoke to the State Auditor's Office?

A. Yes.

Q. When was that?

A. That would have been May of 2004.

Q. Where did you meet with the state auditors at?

A. At my attorney's office in Wilmington.

299

Q. So did you have to drive up from Lewes, Delaware?

A. Yes, I did.

Q. Who did you drive up with?

A. I am sure I drove up with Corporal Price.

Q. Do you recall anyone else who was there to meet with the state auditors?

A. Yes.

Q. Who else was there?

A. Sergeant Foraker and Captain Warren. I am pretty sure it was Corporal Warwick.

Q. And who is Corporal Warwick?

A. He is another officer assigned to the Firearms Unit.

Q. Was he assigned there in or about December of 2003?

A. Yes, he was.

Q. Did he participate in the meetings you had with Sergeant Foraker in the beginning of December?

A. Yes, he did.

Q. Was he part of the investigative team?

A. Yes, he was.

Q. Now, did you talk to the state auditors?

A. Yes, I did.

Q. Did you -- what did you discuss?

A. The Firearms Training Unit.

Q. Did you discuss the conditions of the Firearms Training Unit?

300

A. Yes.

Q. Did you discuss any of the documents that you found in the FTU archives?

MR. ELLIS: Your Honor, at this point I would like to object to leading questions. This is an important area. He shouldn't be allowed to lead.

THE COURT: Sustained.

BY MR. S. NEUBERGER:

Q. What did you discuss with the auditors?

A. Information that we have obtained through our investigation as to what was going on with this building, why it was being really such a hazardous condition.

Q. Now, Wayne, could you turn to PX-23 in the plaintiffs' exhibit book.

A. I have that.

Q. All right. What is this document?

A. It's a chronology that I prepared for the Auditor's Office.

Q. Now, how many pages are there in the chronology?

A. Seven.

Q. Is there a document right after the chronology as well, which is also part of PX-23?

A. Yes.

Q. All right. Let's turn back to the very first page of PX-23. Is there a heading in the top half of the page in

the middle which says Maintenance Issues?
A. Yes.
Q. Could you take a quick look at that page and the next page. Do those pages address some of the maintenance issues which you have already talked to the jury about today?
A. Okay.
Q. Do those pages address some of the maintenance issues which you have discussed already today?
A. Yes, they do.
Q. Were these some of the things which you were trying to bring to the attention of the State Auditor?
A. Yes, they were.
Q. If you would turn one more page, at the very bottom right-hand corner, it says FTU2737?
A. I have it.
Q. Now, you see at the very, very top, the first line, it says, I started to get headaches from the concentrated odor of the cleaner?
A. Yes, I do.
Q. Was that the weapons cleaner you have already talked about today?
A. That's correct.
Q. Would you take a look at the next paragraph? Would you take a look at the fourth line from the bottom of that next paragraph, where the sentence begins, We were

concerned, do you see that?
A. I have it.
Q. Does that indicate, We were concerned with the extra exposure to the liquid in the tank. Sergeant Ashley advised us that we had to die from something?
A. I see that.
Q. Could you take a look at the next section, which says Summer of 2003?
A. I have that.
Q. Would you take a look at the third-to-last line from the bottom?
Does that indicate that the maintenance on just the bullet trap was getting out of control? And then does it go on and talk about shotgun wadding?
A. Yes, it does.
Q. Take a look at the next paragraph down, where it talks about fall of 2003. Does that, the very beginning of that paragraph indicate, We could not keep up with the necessary maintenance?
A. That's correct.
Q. Does it continue and say that the ventilation system was really failing. There were times when it would simply shut down?
A. Yes, it does.
Q. Then the next two sentences, does it talk about calls

to Facilities Management?
A. Yes, it does.
Q. Let's turn a couple more pages to the page that in the bottom right-hand corner it says FTU2740.
A. I have it.
Q. Now, let's skip down to the last sentence in that first paragraph. Does that indicate that, I do not think that our health and safety was a concern at Facilities Management or to the State Police?
A. Yes, it does.
Q. Was that a concern that you had at that time?
A. Still do.
Q. Did you talk to the auditors about it during your meeting?
A. Yes, I did.
Q. Does the next paragraph indicate, In summary, I want to say that I am very disappointed in the lack of concern for the health and safety of everyone who trains in this facility by the State Police and Facilities Management?
A. Yes, it does.
Q. Does it continue and state that, It is apparent that politics and egos were more important than constructing a safe state-of-the-art facility?
Does it say that?
A. Yes, it does.

Q. Was that a concern which you raised to the auditors?
A. Yes, it was.
Q. Let's turn a couple more pages to where it says at the very bottom right-hand corner FTU2742. Do you see that there are some bullet points on that page?
A. Yes, I do.
Q. Does the second bullet point state that, The architectural engineering firm selected did not have any previous experience in building indoor firing ranges?
Does it say that?
A. Yes, it does.
Q. Had you investigated that issue as part of your investigation which you told us about earlier?
A. Yes, I did.
Q. Was that the conclusion that you reached?
A. Yes.
Q. Let's take a look at the very next bullet point. Does that indicate that an experienced contractor who had experience in the construction of firing ranges questioned the initial design of the ventilation system. The reviewing contractor clearly stated that the system would not work?
Is that what that indicates?
A. That's correct.
Q. Is that something you had concluded based upon your investigation?