305

1  A.   That's correct.
2  Q.   And then there is a number of other bullet points on
3  that page. Am I correct?
4  A.   Yes, there are.
5  Q.   Let's take a look at one more page forward, 2743 in
6  the bottom right-hand corner. Let's take a look at the
7  fourth bullet point down. Does that indicate that the
8  sensor support beam was not engineered properly. When the
9  air handler was placed on the roof, the support beam started
10 to sag and had to be reinforced. If the plans were
11 reviewed, would this have happened?
12      Does it indicate that?
13 A.   Yes, it does.
14 Q.   Is that the thing you mentioned earlier about the roof
15 caving in?
16 A.   That's correct.
17 Q.   Let's turn one more page, 2744 in the bottom
18 right-hand corner.
19 A.   I have it.
20 Q.   Does the very first bullet point address the industry
21 standards for range ventilation on the firing line?
22 A.   Yes, it does.
23 Q.   Now, Wayne, I understand we haven't gone through all
24 of these. But were these all things that you were concerned
25 about?

306

1  A.   Yes, they were.
2  Q.   Is that why you put them in this statement?
3  A.   That's correct.
4  Q.   Did you talk to the auditor about these things or did
5  you just give him a statement?
6  A.   I actually read the statement to him.
7  Q.   Did you also give the auditor documents?
8  A.   And then give him the documents, that's correct.
9  Q.   Take a look at PX-21. Wayne, have you ever seen this
10 document before?
11 A.   Yes.
12 Q.   What is this document?
13 A.   It's a sign-in sheet for the auditor's investigation.
14 Q.   Is your signature on this page somewhere?
15 A.   Yes, it is.
16 Q.   You can put that document down.
17      Were you trying to be obstructive by talking to
18 the auditors?
19 A.   Absolutely not.
20 Q.   Were you trying to be obstructive by answering their
21 questions?
22 A.   No.
23 Q.   Were you trying to cover things up?
24 A.   No.
25 Q.   Were you trying to be helpful?

307

1  A.   Yes.
2  Q.   Now, Wayne, why did you speak to the auditors?
3  A.   There was an auditors' investigation. I was required
4  to speak to them.
5  Q.   Were you concerned about anything?
6  A.   Yes.
7  Q.   What were you concerned about?
8  A.   Being blamed for the downfall of the operation.
9  Q.   Do you recall seeing any news media coverage
10 discussing your meetings with the auditors?
11 A.   Yes.
12 Q.   Do you recall what newspapers that coverage was in?
13 A.   I believe it was in both the News Journal and the
14 State News.
15 Q.   Could you take a look at PX-28. Have you found that?
16 A.   Yes, I have.
17 Q.   What is this exhibit?
18 A.   It's a copy of the Delaware State News.
19 Q.   What does the headline say?
20 A.   Shots Traded Over Range.
21 Q.   What does the subheadline say?
22 A.   Troopers Differ on Blame for Health Woes at Smyrna
23 Site.
24 Q.   Could you take a look at PX-29?
25 A.   I am there.

308

1  Q.   What is this document?
2  A.   This is an Internet search of the News Journal.
3  Q.   What is the headline here?
4  A.   Troopers Discuss Firing Range.
5  Q.   Have you ever seen these articles before?
6  A.   Yes, I have.
7  Q.   Do you recall approximately when?
8  A.   When they were printed.
9  Q.   Now, Wayne, let's change gears a little bit.
10      Do you feel that you have been retaliated
11 against for reporting problems at the FTU?
12 A.   Absolutely.
13 Q.   Why do you feel that way?
14 A.   Well, once we started sounding the alarm, it was
15 apparent that that was not the right thing to do. We
16 weren't being received well by the administration. This was
17 causing a problem, us speaking out about the problems with
18 this building.
19      It was embarrassing for the State Police and the
20 State of Delaware to have constructed this building and
21 allow it to operate in the manner it was being operating in.
22 Q.   Were any actions taken against you after you began
23 speaking out?
24 A.   I was sent for fitness-for-duty-exams.
25 Q.   Had they sent you for a fitness-for-duty exam before

369

1  A.   Yes.
2  Q.   Was she sometimes also able to get you some of your
3  prescriptions but get them for free?
4  A.   Yes.
5  Q.   You can put that exhibit away.
6       Now, I believe you testified that you were treating
7  with a psychologist. Was that your testimony earlier?
8  A.   Yes, it was.
9  Q.   How did that come about?
10 A.   I was examined by Dr. Tavani, a psychiatrist, who
11 recommended treatment with a psychologist.
12 Q.   So did you follow her advice?
13 A.   Yes, I did.
14 Q.   What is the name of your treating psychologist?
15 A.   It's Dr. Kozma.
16 Q.   How long have you been seeing him?
17 A.   I believe it was September of 2005.
18 Q.   Did anything happen during the fall, around September
19 of 2005 that caused you to have to start seeing a
20 psychologist?
21 A.   Yes.
22 Q.   What happened?
23 A.   I just started really not being able to tolerate what
24 was going on with this situation.
25 Q.   Did you feel like you were under stress at all?

370

1  A.   A lot of stress.
2  Q.   Was that all or was there more to it than that?
3  A.   There was a lot more to it than that.
4  Q.   Now, did you used to handle stress well?
5  A.   I thought I did.
6  Q.   Could you open up that plaintiffs' exhibit book to
7  PX-16?
8       MR. ELLIS:  Your Honor, I object. This was the
9  subject of lengthy testimony yesterday.
10      MR. S. NEUBERGER:  I am going to point out his
11 handling stress marks before, Your Honor. That is the
12 extent of it.
13      THE COURT:  I will permit it.
14      Please be as brief as you can, Mr. Neuberger.
15      MR. S. NEUBERGER:  Okay, Your Honor. Thank you.
16 BY MR. S. NEUBERGER:
17 Q.   Wayne, have you found PX-16?
18 A.   Yes, I have.
19 Q.   Do you see under Work Habits a category for Handling
20 Stress?
21 A.   Yes, I do.
22 Q.   Now, was your rating in that regard Consistently and
23 substantially exceeds expectations?
24 A.   Yes, it was.
25 Q.   Thank you. You can put that document away.

371

1       Now, during the fall of 2005, did the State
2  Police send you to one of their doctors?
3  A.   Yes, they did.
4  Q.   What was the name of the doctor that they sent you to?
5  A.   Dr. Caren DeBernardo.
6  Q.   Now, do you know where she is located at?
7  A.   In Towson, Maryland.
8  Q.   Did she give you a psychological fitness-for-duty
9  evaluation?
10 A.   Yes, she did.
11 Q.   Now, Wayne, could you please open up the plaintiffs'
12 exhibit book to PX-48, please.
13 A.   I have it.
14 Q.   Does this appear to be a letter sent to you from
15 Colonel MacLeish dated November 21st of 2005?
16 A.   Yes, it is.
17 Q.   I want to read the first paragraph to you. Does it
18 say, Following your fitness-for-duty evaluation Dr. Caren
19 DeBernardo from the Forensic Law Enforcement Services has
20 concluded you meet the diagnostic criteria for adjustment
21 disorder with mixed anxiety and depressive mood and has
22 deemed you not fit for duty. Therefore, as of November 3rd,
23 2005, you have been placed on sick leave.
24      Does it indicate that?
25 A.   That's correct.

372

1  Q.   Now, does it appear to put you on retroactive sick
2  leave, that paragraph I just read to you?
3  A.   No, it does not.
4  Q.   For example, the letter, it is dated November 21st,
5  2005. Right?
6  A.   That's correct.
7  Q.   Then does the paragraph say that as of November 3rd
8  you are being put on sick leave?
9  A.   Yes, it does.
10 Q.   Were you on light duty up until this point?
11 A.   Yes.
12 Q.   So did this take you off of light duty?
13 A.   Yes.
14 Q.   So since November 21st of 2005, how have you stayed on
15 the payroll?
16 A.   Using sick leave, accumulated time leave, and vacation
17 time leave.
18 Q.   So were you given two years of light duty?
19 A.   No, I was not.
20 Q.   Now, I want to direct your attention to -- actually,
21 we can put that document away.
22      Were you present at State Police headquarters on
23 April 11th of 2005?
24 A.   I am not sure.
25 Q.   Let me see if I can jog your memory a little bit. Do

373

1  you recall at some point having a meeting with Sergeant
2  Foraker, a gentleman by the name of Mr. Tupman, and
3  individuals from the firearms industry?
4  A.  I recall that meeting.
5  Q.  Are you saying you can't remember the exact date of
6  that meeting?
7  A.  That's correct.
8  Q.  Did it happen after December of 2003?
9       MR. ELLIS:  Your Honor, I am going to have an
10 objection to the description of this incident, because I
11 think at best it is hearsay and probably also irrelevant.
12      (The following took place at sidebar.)
13      THE COURT:  Okay.
14      MR. ELLIS:  It is my understanding, at least
15 from the initial description of the event, that they are
16 trying to elicit testimony from this witness that Mr.
17 Tupman, who is an attorney from the state AG's office, made
18 a statement to Sergeant Foraker something to the effect that
19 you are a bad penny or something like that or you are
20 showing up again, you are a bad penny.
21      That is my understanding of what the description
22 is they are about to elicit.
23      It's not a statement by either of my clients.
24 It is not a statement by either an agent of either of my
25 clients towards Sergeant Foraker.  I don't think it is

374

1  relevant.  I think to the extent that there is any probative
2  value coming out of it, it's hearsay.
3       THE COURT:  It is not hearsay.
4       Why is it relevant?
5       MR. S. NEUBERGER:  Your Honor, it is being
6  offered on the issue of injury to reputation.  This was that
7  meeting with Sergeant Foraker, Corporal Warren, members of
8  the local firearms industry, a company called Lawman's
9  Supply and several other companies.  I believe there were
10 also several other troopers there.  I am not sure if Colonel
11 MacLeish was there.
12      But in the course of that, Sergeant Foraker
13 walked in I believe with Corporal Warren, went around and
14 greeted everybody.  Mr. Tupman said to him a statement to
15 the effect of -- and the exact phrasing is a little in
16 dispute -- but, You are a bad penny who keeps showing up.
17      Now, where that goes is, Corporal Warren
18 witnessed that statement.  After the meeting -- so that in
19 and of itself is being offered on the issue of -- I think
20 Mr. Tupman is their agent, he is their attorney, for
21 example, he represented Colonel Chaffinch in the first case.
22 But going beyond that, after the meeting ended, Sergeant
23 Foraker and Corporal Warren had lunch with several of these
24 firearms industry representatives.  During the course of
25 that lunch, several of them commented that they had indeed

375

1  heard that comment.  I am not sure how big the conference
2  room was.  But it goes to the issue of bad things being said
3  about Sergeant Foraker.
4       THE COURT:  Bad things, that can mean any number
5  of things.  What is the context of the reference?  It is so
6  vague.  He just says you are a bad penny.  Tupman is a
7  Deputy AG.  Right?
8       MR. T. NEUBERGER:  Yes.
9       THE COURT:  That is your conclusion, Mr.
10 Neuberger, that he is their agent.  He is their lawyer.  I
11 am not sure that makes him their agent.  He is their lawyer.
12      MR. T. NEUBERGER:  He can say things that bind
13 them.
14      THE COURT:  I am not sure I agree with that
15 necessarily.  I don't necessarily disagree.  But I am not
16 sure, you say it so confidently, I am not so sure you are
17 right about that.  I don't think that is the issue here.
18 That is not the basis at least at the present upon which I
19 am going to let this in if I am going to.  Go ahead.
20      MR. S. NEUBERGER:  It goes to Sergeant Foraker's
21 reputation being injured.  Bad things are being said about
22 him.  Sergeant Foraker will testify later he took this as an
23 attack on his professional reputation.
24      THE COURT:  Are you saying this is a publication
25 of a defamatory comment in the presence of third parties?

376

1       MR. T. NEUBERGER:  In addition to what he is
2  saying.  Bad penny, it is something that --
3       THE COURT:  I know bad penny is pejorative.
4       MR. T. NEUBERGER:  That is our point.  It is
5  pejorative.
6       THE COURT:  Of what, is what I am --
7       MR. T. NEUBERGER:  If Chris Foraker is a bad
8  penny, it is saying Chris Foraker is not a sterling cop.
9       THE COURT:  Go ahead.
10      MR. S. NEUBERGER:  That actually sums it up.
11      MR. ELLIS:  Your Honor, as you said, there is
12 nothing -- it's too vague a statement.  It's clearly not
13 authorized by either of my clients.  He is not an agent of
14 my clients unless he is representing them in a lawsuit.
15      THE COURT:  Why isn't he an agent?
16      MR. ELLIS:  Well, Your Honor --
17      THE COURT:  His title at the time, I am not
18 sure, but I know he was and still is a Deputy Attorney
19 General.
20      MR. ELLIS:  That's right.
21      THE COURT:  Is he assigned --
22      MR. T. NEUBERGER:  There are two.  He is the
23 senior representative of DSP.  He heads the section.
24      THE COURT:  The way the structure is in the
25 State Department of Justice, you know, I used to be a Deputy

### 377

1  Attorney General, the fact of the matter is they have
2  lawyers assigned. So he could conceivably find himself in
3  the position of being an agent.
4       MR. ELLIS: I realize conceivably, but not in
5  this situation.
6       THE COURT: Why not?
7       MR. ELLIS: In order to establish an
8  attorney-client agency relationship, he has to be given some
9  authority to talk on the subject matter.
10      THE COURT: Wasn't he given authority to speak
11 on the subject matter of the meeting? Why was he there?
12      MR. ELLIS: Your Honor, I don't know why he was
13 there. There is no description of what the meeting was
14 about.
15      THE COURT: Let's hear. What was the meeting
16 about?
17      MR. S. NEUBERGER: I suspect it had something to
18 do with firearms, or the two representatives wouldn't be
19 there. I expect it was some kind of a contract --
20      THE COURT: I don't need to know what you
21 suspect. What can you prove?
22      MR. S. NEUBERGER: A gentleman from the company
23 called Lawman Supply and another, that escapes my mind, they
24 were there for a meeting with Sergeant Foraker, Corporal
25 Warren, Mr. Tupman, I believe there may have been several

### 378

1  other troopers.
2       THE COURT: What was the purpose of the meeting?
3       MR. S. NEUBERGER: I can ask him.
4       MR. T. NEUBERGER: It had to do with the range.
5       MR. S. NEUBERGER: Yes. Otherwise, the firearms
6  people wouldn't have been there.
7       THE COURT: You don't know the answer to the
8  question you are about to ask?
9       MR. S. NEUBERGER: I believe the Court is asking
10 the second question, which I had not anticipated.
11      THE COURT: I am trying to understand whether
12 these responses are admissible over the objection that has
13 been lodged.
14      MR. S. NEUBERGER: My clients routinely deal
15 with individuals in the firearms industry as part of the
16 purchase of ammunition, supplies, things like bulletproof
17 vests for all the troopers. One of their job
18 responsibilities entails buying this kind of equipment. It
19 is something that will come out during Sergeant Foraker's
20 testimony in a little more detail. That is just one of the
21 things that is the FTU's bailiwick. I believe that is what
22 it related to, was purchase of some kind of supplies for the
23 State Police, be it just for the FTU or the division as a
24 whole, all 650 of them.
25      THE COURT: Your proffer with regard to this

### 379

1  line of inquiry is that Mr. Tupman, when greeting your
2  client, Corporal Warren, said --
3       MR. S. NEUBERGER: While greeting Sergeant
4  Foraker while Corporal Warren was standing there, he looked
5  at Sergeant Foraker and said, You are a bad penny that just
6  won't go away.
7       THE COURT: To Foraker.
8       MR. S. NEUBERGER: To Foraker.
9       MR. ELLIS: Your Honor, even if he is an agent,
10 generally speaking, an attorney, generally speaking, for the
11 State Police, that doesn't give him authority, that doesn't
12 mean he is authorized by the Colonel to make personal or
13 offhand statements --
14      THE COURT: Is the statement really being
15 offered for the truth? Is that your objection, that it's a
16 hearsay statement?
17      MR. ELLIS: It is being offered as a statement
18 by my client, a pejorative statement by my client because if
19 it is not by my client, it is not relevant. And if it is
20 about -- if it is the idea that this guy has got damage to
21 his reputation, I mean, Tupman is the guy who tried the
22 first Foraker case. Tupman has got his own, you know,
23 reasons to think whatever he thinks. And whatever he says
24 to Foraker is his business, not the Colonel's.
25      It appears to be another attempt to prove

### 380

1  defamation damages without bringing any witnesses in, just
2  letting people rely on things that have been said to them.
3  I have already objected to that and you have overruled my
4  objection. This is another thing along the same lines. I
5  think you are getting into fairly serious water here.
6       THE COURT: I am always in serious water. You
7  are not going to frighten me with that kind of comment.
8  That is what life tenure gives you.
9       MR. ELLIS: I didn't mean it in that way. You
10 are allowing them to put on proof without bringing in any
11 witnesses.
12      THE COURT: I am concerned about that. I am
13 concerned about establishing your burden through -- I think
14 Mr. Ellis is right. I may JMOL you if you don't have some
15 more evidence than you have thus far on the issue of
16 reputational damage.
17      MR. S. NEUBERGER: We intend to, Your Honor.
18      THE COURT: I don't know why you are wasting
19 time with this line of inquiry with this witness at this
20 time.
21      MR. S. NEUBERGER: It would be on one of the
22 issues, again, of damages.
23      THE COURT: I will let you do it. I will let
24 you ask whether, in the presence of these other gentlemen,
25 Tupman made -- he heard Tupman make the comment to Foraker,

381

1  what is it?
2      MR. S. NEUBERGER: You are a bad penny that just
3  won't go away, is a bad penny who just keeps --
4      THE COURT: I don't know if it damages you at
5  all. If there is a sufficiency issue at the end of
6  plaintiffs' presentation, I will deal with it.
7      I do not think it prejudices you at all in the
8  jury's mind.
9      (End of sidebar conference.)
10 BY MR. S. NEUBERGER:
11 Q.  Wayne, do you remember the specific firearms industry
12 representatives who were at that meeting?
13 A.  Yes, I do.
14 Q.  Who were they?
15 A.  There was a representative from Safari Land, I can't
16 think of the gentleman's name. And there was a
17 representative from Lawman's Supply. The gentleman's name
18 was Brian Byrne (phonetic).
19 Q.  Was one of the State Police's lawyers also at that
20 meeting?
21 A.  Yes, he was.
22 Q.  Did that State Police lawyer say anything to Sergeant
23 Foraker in front of those firearms industry representatives
24 that you heard?
25 A.  Yes, he did.

382

1  Q.  What did he say?
2  A.  Chris, you are like a bad penny. You just keep
3  turning up.
4  Q.  Did you have lunch later that same day with those
5  firearms industry representatives?
6  A.  Yes, I did.
7  Q.  Who else had lunch with you?
8  A.  Sergeant Foraker.
9  Q.  Where did you have lunch?
10 A.  Where Pigs Fly, in Dover.
11 Q.  Is that the name of a restaurant down there?
12 A.  Yes, it is.
13 Q.  Did the comment by the DSP lawyer, did that come up in
14 conversation?
15 A.  Immediately, when we went into the restaurant and
16 talked to those gentlemen.
17 Q.  Just what did they say?
18     MR. ELLIS: Objection, Your Honor.
19     MR. S. NEUBERGER: I will strike the question,
20 Your Honor.
21 BY MR. S. NEUBERGER:
22 Q.  Now, Wayne, to loop back and touch on some of these
23 hearing issues which have been talked about a lot, you have
24 already testified, I believe, about the May 13, this
25 audiological fitness-for-duty exam. Do you recall

383

1  testifying about that?
2  A.  That's correct.
3  Q.  Is that the first time that the State Police began
4  sending you for hearing tests after you began speaking out
5  in December of 2003?
6  A.  That would have been the second test.
7  Q.  When was the first test?
8  A.  The first test was performed on March 1st, 2004.
9  Q.  Just so we are clear, while you were raising concerns
10 up the chain of command about the conditions at the FTU, did
11 you ever ask for medical tests?
12 A.  Yes, I did.
13 Q.  What medical tests were you asking for?
14 A.  I really wanted to know what the effects of copper,
15 lead, zinc, tin, arsenic, and nitroglycerin had on my
16 respiratory zone.
17 Q.  Did you ask for any specific parts of your body to be
18 tested?
19 A.  I was concerned for my lungs.
20 Q.  Now, did you ever ask for blood testing?
21 A.  Yes.
22 Q.  Did you ever ask for urine testing?
23 A.  Yes.
24 Q.  Now, did you ever ask for hearing testing?
25 A.  No.

384

1  Q.  Why didn't you ask for hearing testing?
2  A.  I wasn't concerned over the hearing. I already knew I
3  had a problem with that. I was concerned for my well-being
4  with breathing the dust.
5  Q.  So did there come a time when you went to a place
6  called Omega Medical?
7  A.  Yes. That would have been the March 1st visit.
8  Q.  Is that somewhere near Christiana Hospital?
9  A.  Yes, it is.
10 Q.  Did you ask Omega Medical to give you hearing tests
11 that day?
12 A.  No, I did not.
13 Q.  Are you 100-percent sure?
14 A.  I am positive.
15 Q.  Did they perform hearing tests on you anyway?
16 A.  Yes, they did.
17 Q.  Do you know why?
18 A.  Not a hundred percent.
19 Q.  What is your suspicion?
20     MR. ELLIS: Objection.
21     THE COURT: Sustained.
22 BY MR. S. NEUBERGER:
23 Q.  Have you ever seen your medical records from Omega
24 Medical?
25 A.  Yes, I have.

385
1  Q.    Is there an officer from the State Police's name
2  written across the top of them?
3  A.    Yes, there is.
4  Q.    Is that officer also the Director of Human Resources,
5  John Yeomans?
6  A.    Yes, it is.
7  Q.    Did you write your -- I am sorry, did you write
8  Captain Yeomans' name across the top of your medical
9  records?
10 A.    No, I did not.
11 Q.    Do you know who Captain Yeomans reported to when he
12 was the Director of Personnel?
13 A.    Yes, I do.
14 Q.    Who did he report to?
15 A.    Lieutenant Colonel MacLeish.
16 Q.    Now, is Captain Yeomans still the Director of
17 Personnel?
18 A.    No, he is not.
19 Q.    Do you mean how many uniformed troopers serve in the
20 department of -- in the HR department in the State Police?
21 A.    I would have to say three or four. I am not a
22 hundred-percent sure on that answer.
23 Q.    What is Captain Yeomans' current assignment?
24 A.    He was just transferred to Troop 7 in Lewes.
25 Q.    Do you know how many troopers are now under his

386
1  command there?
2  A.    I would say there is over 40 at Troop 7.
3  Q.    Just so we are clear, Troop 7, is that your home troop
4  in Lewes?
5  A.    Yes, it is.
6  Q.    Now, as a result of the testing that was given to you
7  at Omega Medical on March 1st, did there come a time when
8  the test results came back?
9  A.    Yes.
10 Q.    What did the test results show?
11 A.    The blood lead level was stated to be within normal
12 ranges. The copper level was stated to be in normal ranges.
13 And my zinc level was over the normal range.
14 Q.    Had your lead and copper levels gone up since the last
15 time you had them tested?
16 A.    Yes, they had.
17 Q.    Do you recall by how much?
18 A.    I want to say either two or three, depending on which
19 test you would be using.
20 Q.    Is that two or three times?
21 A.    Two or three points over the last point that I had.
22 Q.    Did the State Police order any followup on your
23 above-normal zinc tests?
24 A.    No, they did not.
25 Q.    Did the State Police order any followup on your lead

387
1  tests, which I think you just indicated were higher than
2  they had previously been?
3  A.    That's correct.
4  Q.    Did the State Police order any followup on your copper
5  tests?
6  A.    No, they did not.
7  Q.    Did you also get a urine test that day?
8  A.    Yes, I did.
9  Q.    What were the results of that?
10 A.    It was high, but they stated in the test that urine
11 did not correlate well with blood, that blood was the
12 preferred method of determining the content.
13 Q.    Did the State Police order followup on any test
14 results at all?
15 A.    No, they did not.
16 Q.    Did you also get a hearing test from Omega Medical?
17 A.    On May 1st, I did.
18 Q.    And was there followup --
19       MR. ELLIS: I think the witness means March 1st.
20 It might be confusing later on.
21 BY MR. S. NEUBERGER:
22 Q.    What date were these tests done at Omega Medical?
23 A.    The March 1st date I received an audiometric test
24 there, also.
25 Q.    At some point did the hearing test results come back?

388
1  A.    Yes. I had them that day.
2  Q.    Was followup ordered on those tests?
3  A.    Yes. Followup was ordered on the 13th for the 24th.
4  Q.    Was any followup requested on the zinc test?
5  A.    No, it was not.
6  Q.    At some point were you asked to complete a survey from
7  a company called the TK Group?
8  A.    Yes, I was.
9  Q.    Were you able to complete the survey?
10 A.    No, I was not.
11 Q.    Why not?
12 A.    I didn't have the necessary information to answer the
13 first three questions on the survey.
14 Q.    Were you trying to be obstructive by not answering
15 that?
16 A.    No. There was a postage stamp on there that said all
17 the questions had to be answered for a determination to be
18 made.
19 Q.    Would you give the jury an example of the type of
20 question that you were unable to answer?
21 A.    Well, I may mix these up in order. The first question
22 was the decibel level of exposure in my work environment.
23 By that it means what level of noise existed in the
24 environment in which I was working.
25       Then there was a question about the level of

389

1  protection of the hearing protectors that I was wearing,
2  which I had no knowledge of because they were given to me
3  old and used, and I had no idea what protection I even had.
4       The third question was the time-weighted average
5  of exposure in that environment, which I had no idea what
6  that meant.
7  Q.  Did you fill out the survey, to the best of your
8  ability?
9  A.  I did not fill out the survey.
10 Q.  Did there come a time when the survey was filled out?
11 A.  I was ordered back up on the 24th of May in order to
12 comply with the survey.
13 Q.  Okay. How did you go about completing the three
14 questions which you didn't know how to answer?
15 A.  I typed out a statement concerning those three
16 questions. And I asked the doctor who was interviewing me
17 about the survey to attach those -- to attach those three
18 things -- I think there were more than three -- to the
19 survey when it was sent off, because I couldn't give them
20 the answers to the first three questions.
21 Q.  Were you trying to make sure that the record was
22 complete by doing that?
23 A.  Yes.
24 Q.  Did there come a time when you were sent for more
25 hearing tests with other doctors?

390

1  A.  Yes.
2  Q.  During those examinations did you have a chance to
3  review your medical records?
4  A.  Yes.
5  Q.  Did you find that your medical records were complete?
6  A.  They were not complete.
7  Q.  Could you give the jury an example of the information
8  that was not in your medical records?
9  A.  On the visit to Dr. Green, which was June 17th, 2004,
10 the attachment that I had typed out and asked to be put with
11 the survey was not there in my medical records. It wasn't
12 included in the medical records.
13 Q.  That was the attachment to the TK Group survey?
14 A.  That's correct.
15 Q.  All right. Now, Wayne, before you started speaking
16 out and raising concerns up the chain of command in December
17 of 2003, what was your most recent hearing test prior to
18 that?
19 A.  December 4th, it's either December 3rd or December
20 4th, 2003.
21 Q.  So was that a couple days after Sergeant Foraker was
22 transferred back in?
23 A.  Yes.
24 Q.  What happened as a result of that hearing test?
25 A.  I had hearing loss and nothing happened.

391

1  Q.  Did the state send you for any fitness-for-duty
2  hearing exams as a result of that test?
3  A.  No, they did not.
4  Q.  So later -- time passed in December, did you start
5  raising health concerns up the chain of command?
6  A.  Yes, we did.
7  Q.  Did you do that just in December or did you do that
8  for the months that followed?
9  A.  For the month months that followed.
10 Q.  After you began doing that, were you sent for another
11 fitness-for-duty exam?
12 A.  Yes, I was.
13 Q.  Have you had the opportunity to compare the hearing
14 test results from your December 4th, 2003 hearing exam with
15 the March 1st, 2004 one?
16 A.  Yes, I have.
17 Q.  Was your hearing better or worse in March of 2004?
18 A.  It was actually better.
19 Q.  It was better in March of 2004?
20 A.  Yes, it was.
21 Q.  And it was worse in December 3rd or 4th of 2003?
22 A.  That's correct.
23 Q.  Was there any followup from your December of 2003
24 visit?
25 A.  No.

392

1  Q.  Now, let's change the time period up a little bit.
2  Let's focus on March and May of 2004. Around that time
3  frame, Captain Yeomans, did he ever state to you, You have
4  two choices, retire now or go back out on patrol?
5  A.  Yes, he did.
6  Q.  How did you interpret that?
7  A.  As a threat.
8  Q.  Why?
9  A.  I am a 20-plus-year veteran of the State Police who
10 has worked very hard to get to where I was as a Firearms
11 Training Unit instructor. To be put back on patrol would
12 definitely be a slap in the face. I have worked so hard to
13 get to where I was, just to be put back down the ladder, for
14 what reason?
15 Q.  Are you familiar with the term career development?
16 A.  Yes, I am.
17 Q.  Could you explain that term to the jury in the context
18 of the Delaware State Police?
19 A.  There are two paths within the Delaware State Police.
20 You can choose to climb the ladder in the supervisory ranks,
21 up into the administration, or you can become specialized.
22 By becoming specialized, that's saying that you want to stay
23 in a certain area. So you can be an expert in that area,
24 such as a homicide investigator, such as a helicopter pilot,
25 a firearms instructor.

**393**

1 Those areas are areas of expertise that you need
2 training. And once you receive that, that's what you kind
3 of want to work in. It would be foolish to move somebody
4 out of that line of work when they spent that time preparing
5 themselves for their career, to go in that path.
6 Q. Do they put troopers who are fresh out of the Academy
7 into these specialized units?
8 A. No, they do not.
9 Q. How much seniority did you have when you were
10 transferred into the FTU?
11 A. I had 19 years of experience.
12 Q. Wayne, what is your own self-assessment of your
13 hearing abilities?
14 A. I do have hearing problems, disability. But it's very
15 minor. It's not enough that I could not perform as a
16 Delaware State Trooper. All I was asking for them to do was
17 accommodate me in a different position.
18 Q. Now, have you worked around loud noises during your
19 career as a Delaware State Trooper?
20 A. Yes, I have.
21 Q. What are the causes of some of those loud noises?
22 A. Sirens, alarms, we respond to a lot of alarms, when
23 you are going into that environment with the alarm ringing,
24 sirens from accident scenes, as well as you responding to
25 emergency situations. Large crowds. All types of loud

**394**

1 noises.
2 Q. How about gunfire?
3 A. Gunfire.
4 Q. Wayne, do you think you are handicapped because of
5 your hearing?
6 A. No.
7 Q. Do you think you are disabled because of your hearing?
8 A. No.
9 Q. Do you think you are able to perform as a police
10 officer?
11 A. Yes.
12 Q. Why do you think that?
13 A. Well, there is a lot of things that I can do as a
14 police officer. I am not totally disabled from doing some
15 of the jobs within the division.
16 Q. Should you still be the first person kicking through
17 the door on the SORT team?
18 A. No.
19 Q. Would it be fair to say that you might be a step
20 slower today at 48 than maybe you were at the age of 27?
21 A. Yes, I would say that's fair to say.
22 Q. So could that be a reason, too, why you shouldn't be
23 the first person through the door?
24 A. I would say so.
25 Q. Are there any jobs in the State Police that you think

**395**

1 you are able to do?
2 A. Yes.
3 Q. Now, the Firearms Training Unit, is it still shut down
4 today?
5 A. Yes, it is.
6 Q. They never actually fixed the FTU and built it the way
7 it was supposed to be built?
8 A. No, they have not.
9 Q. If they gave you the proper hearing protection that
10 actually protected your ears, do you think you could serve
11 there?
12 A. Yes, I do.
13 Q. Are there drill instructors at the Police Academy?
14 A. Yes, they are.
15 Q. Do you know how many of those there are?
16 A. I believe there are three right now.
17 Q. Could you be a drill instructor?
18 A. Yes, I could.
19 Q. Are there evidence closets at all the troops?
20 A. Yes, there are.
21 Q. Did you testify earlier that, for example, Sergeant
22 Swain is serving as an evidence technician in the evidence
23 closet?
24 A. That is correct.
25 Q. Do you know how many troops there are?

**396**

1 A. I believe there are nine.
2 Q. Could you serve in the State Bureau of Identification?
3 A. Yes, I could.
4 Q. What do they do in the SBI?
5 A. Fingerprint people that need to be background-checked.
6 Q. Are you familiar with troopers who they have put in
7 there previously?
8 A. Yes, I am.
9 Q. Are you familiar with any limitations those troopers
10 may have had?
11 A. Yes, I am.
12 Q. What kind of limitations did those troopers have?
13 A. One, I believe, had psychological problems.
14 Q. Now, are there positions known as auto theft
15 detectives?
16 A. Yes, there are.
17 Q. Do you know how many of those there are?
18 A. I think they just changed that around. I would say
19 there were probably four. Maybe more. I am not a
20 hundred-percent sure on that answer.
21 Q. Where did Lieutenant Kenny Thompson serve?
22 A. He served in the Auto Theft Unit.
23 Q. Are there also examiners in that same unit?
24 A. Yes, there are.
25 Q. Do you know how many there are?


**397**

1  A.  I would be afraid to guess.
2  Q.  Okay. Do you know of a department known as Support
3  Services in the Delaware State Police?
4  A.  Yes.
5  Q.  Is there a Support Services Planning position?
6  A.  Yes, there is.
7  Q.  Do you think you could do that?
8  A.  Yes, I do.
9  Q.  Wayne, do you think that there are a lot of jobs in
10 the Delaware State Police that you could do?
11 A.  Yes, I do.
12 Q.  Have you mentioned all of them?
13 A.  No.
14 Q.  Now, Wayne, I think you told us about your first
15 fitness-for-duty exam. When was the second one?
16 A.  The first one was June 17th. I believe the second one
17 was in October at the University of Pennsylvania.
18 Q.  Do you know what the name of the doctor was who gave
19 you that test?
20 A.  Dr. Emmett.
21 Q.  Do you know what conclusion he reached?
22 A.  He reached the same conclusion that Dr. Green did,
23 that I was unfit for duty.
24 Q.  Did you also take a third fitness-for-duty test?
25 A.  Yes, I did.

**398**

1  Q.  Was that one also before Dr. Emmett?
2  A.  Yes.
3  Q.  Do you recall what conclusion he reached the third
4  time?
5  A.  I believe that was the time that he ruled that I was
6  fit for duty.
7  Q.  Was there a test after that as well?
8  A.  I don't think there was a test. I think there was an
9  interview.
10 Q.  Have you been sent for a lot of hearing tests by the
11 State Police since you started speaking out?
12 A.  Yes.
13 Q.  Do they all tend to run together a little bit?
14 A.  Yes.
15 Q.  Ultimately, did someone declare you unfit for duty
16 because of your hearing again?
17 A.  Yes.
18 Q.  Do you know the name of that Doctor?
19 A.  That was Dr. Emmett, also.
20 Q.  What was the State Police's reaction to this
21 back-and-forth of your status as being fit for duty, unfit
22 for duty?
23      MR. ELLIS: Your Honor, I object to the question
24 for a reaction. If somebody said something, that is
25 different.

**399**

1       THE COURT: Sustained.
2  BY MR. S. NEUBERGER:
3  Q.  Did someone from the State Police say anything to you
4  after you were found to be fit for duty then unfit for duty?
5  A.  They said something to me when I was supposedly fit
6  for duty. I was brought into the Academy, and I had a
7  meeting with Captain Yeomans.
8  Q.  What did Captain Yeomans say to you?
9  A.  Captain Yeomans said that I have been determined to be
10 fit for duty and that I was going to be transferred out of
11 the FTU to protect me and that I would have the option of
12 going back on patrol, back in the Governor's Task Force,
13 placed in Intelligence, or be transferred to the Drug Unit
14 either undercover or as a uniform.
15 Q.  Is patrol the front lines of the Delaware State
16 Police?
17 A.  Yes, it is.
18 Q.  How old are the troopers who usually serve on the
19 front lines at patrol?
20 A.  Usually in their twenties and thirties.
21 Q.  Do you think you could be a danger to yourself and
22 others if they put you on the front lines of patrol?
23 A.  I think that would be a place that I could present a
24 problem, a safety issue to myself and fellow troopers.
25 Q.  Now, I think you also mentioned the Governor's Task

**400**

1  Force. Now, is that the group that takes on drug dealers?
2  A.  That's correct.
3  Q.  Is that considered the front lines?
4  A.  When I was assigned there I considered it the front
5  lines.
6  Q.  What was the third group, the third assignment that
7  you mentioned?
8  A.  The Special Investigations Unit, which is the Drug
9  Unit.
10 Q.  Is that considered the front lines?
11 A.  Again, I considered it front lines when I was in that
12 unit.
13 Q.  Then I think you mentioned Intelligence. What does
14 the Intelligence Unit do?
15 A.  They gather information, they work on wiretaps and
16 other technical investigations.
17 Q.  Now, with wiretaps, do you have to be able to hear
18 very well to listen to wiretaps?
19 A.  Yes, you do.
20 Q.  Did they offer to put you into the Career Development
21 Office?
22 A.  No, they did not.
23 Q.  Did they offer to make you the right-to-know officer
24 for the division?
25 A.  No, they did not.

405
1  up until Monday.
2         I have some question as to whether I am going to
3  do that, even if I can talk to him, whether I am going to be
4  able to react to anything he says, because he is a guy I
5  should have been able to talk to for the last six months.
6         So what my suggestion has been to Mr. Neuberger
7  is, to avoid this problem, don't call him until I have time
8  to talk to him and resolve any issues. But Mr. Neuberger
9  says he is going to call him tomorrow morning, which is
10 obviously pinching me with Captain Davis.
11        THE COURT: Let's get a response from Mr.
12 Neuberger.
13        MR. T. NEUBERGER: Your Honor, we got your
14 ruling yesterday morning on the disqualification issue. We
15 sent it to Captain Davis yesterday evening. It is my
16 understanding that he was going to immediately try to secure
17 legal counsel. And he was supposed to have a meeting with
18 someone this morning. It is my understanding it was ordered
19 by his Major to meet alone with Mr. Ellis yesterday
20 afternoon or this evening, in contravention of what you had
21 indicated in Footnote 4, that he had the right to counsel.
22 As his declaration says, he wants the right to counsel
23 because he feels he will be brought up on Internal Affairs
24 charges.
25        It is my understanding he was meeting with

406
1  someone today, who will be sending an e-mail to Mr. Ellis
2  this afternoon asserting his right to counsel and then
3  offering to schedule a meeting with him in the very near
4  future once that lawyer finds out something about the
5  representation.
6         So I would imagine in the next few days, when
7  they coordinate their schedules, they will be able to meet
8  and Mr. Ellis will have whatever information he needs for
9  the presentation of his case, which will begin next week
10 sometime.
11        In the meantime, I have always intended to call
12 Captain Davis for those things that we learned at his
13 deposition that will be -- that were in the briefing, as far
14 as the condition of the range on December 1st, the meetings,
15 the reaction of the people, the dust, all those kinds of
16 things that are out in the record, and which he was
17 questioned on at the deposition.
18        THE COURT: You can sit down, Mr. Ellis.
19        MR. T. NEUBERGER: I am concerned with boring
20 the jury by putting two more of the plaintiffs on. So I
21 think my initial intention of breaking it up a little bit --
22 we would like to call Ralph Davis, then we wanted to call
23 Major Baylor, so that we can get into some of the issues of
24 the comparators, the kinds of things, all the things Major
25 Baylor testified about in his three-day deposition. I don't

407
1  remember whether Colonel Chaffinch was present at the
2  deposition or not. But they know what he is going to say,
3  it's in the deposition.
4         I want to call Major Baylor tomorrow. If
5  Colonel Chaffinch has a personal knowledge or something like
6  that, he certainly is entitled to leave. He can order
7  overnight copy of the transcript if he wants to know what
8  Major Baylor said. Everything I am talking to Major Baylor
9  about has been in his deposition.
10        I want to present my case in a certain order so
11 this jury isn't bored. So I want to get into some of the
12 testimony we talked about in the opening. Then we will
13 swing it back to Kurt Price.
14        The way I think it will go now is we would do
15 those two people in the morning, swing it back to Kurt Price
16 or finish up with the wife and daughter of Wayne Warren, do
17 Kurt Price, then his wife, then the next day it is going to
18 be experts. That's Thursday, basically experts all day,
19 although we might be able to squeeze in Major Forester or
20 somebody like that or even Greg Warren, Captain Warren.
21        Friday, the one remaining expert will be in the
22 afternoon, I think the economist, we will be doing Chris
23 Foraker and his wife.
24        So that's sort of how I am breaking it up.
25        THE COURT: Okay. Let me get a further reaction

408
1  from Mr. Ellis.
2         MR. ELLIS: Your Honor, yesterday before your
3  order came out I was told they were going to call Plaintiff
4  No. 1 and family, Plaintiff No. 2 and family, Plaintiff No.
5  3 and family. After your order came out, now it is
6  changing.
7         I don't mean to be unduly paranoid, but I
8  suspect maybe it changed because now Mr. Neuberger has an
9  opportunity to put Captain Davis on before I get a chance to
10 talk to him. I don't think that is fair. I think that I
11 should have the ability to do that before he puts him on.
12        THE COURT: I agree with you on that. I am not
13 as concerned about the Captain Davis issue as I am about the
14 Colonel Chaffinch issue, in terms of your concerns about him
15 not being able to be here while former Major Baylor and
16 others testify. Mr. Neuberger points out that you will have
17 the opportunity if you avail yourself of the opportunity to
18 order the same-day transcription of the evidence.
19        MR. ELLIS: I understand that, Your Honor. I am
20 concerned about the perception that the jury would have when
21 the witness is on the stand saying lots of bad things --
22        THE COURT: The Court can certainly explain at
23 the beginning of the day, the proceedings, why the Colonel
24 is not present at counsel table.
25        MR. ELLIS: He would be present up until, say,

### Page 409

1    11:30.
2    THE COURT: At a time of counsel's choosing,
3    assuming the Court agrees, I will explain to them that the
4    Colonel is going to be excused from the proceedings to
5    attend a funeral. Everybody understands a family event of
6    that nature, and I am sure would not hold that against him.
7    MR. ELLIS: Your Honor, I don't think that cures
8    it. I understand the Court's position.
9    THE COURT: You don't think it cures it. Why?
10   MR. ELLIS: I think the jury will sit there
11   looking at the witness. The witness will be saying things
12   about Colonel Chaffinch, and he is not there. They look
13   over, and there is an empty chair.
14   THE COURT: He is not going to be reacting while
15   the witness is saying, allegedly, bad things about him. He
16   is not going to be able to react until he gets his turn on
17   the witness stand, and he will get his turn on the witness
18   stand, assuming you elect to call him on the witness stand,
19   and he will have had the benefit of reading not only the
20   deposition testimony but the trial transcript, I am assuming
21   you are going to order it, for -- this matter is going to go
22   forward in as expeditious a manner as possible. I am not
23   going to give up a whole afternoon, given the glacial pace
24   at which we are proceeding thus far.
25   MR. ELLIS: I wasn't really suggesting that the

### Page 410

1    Court do that. I was suggesting that the Court direct Mr.
2    Neuberger to call other witnesses.
3    THE COURT: I am not going to direct Mr.
4    Neuberger on how the plaintiff should present its case, his
5    case or their case. I don't think that is fair, either. I
6    think what I have to do is try to make a reasonable
7    compromise that will do justice to both sides. I think the
8    decision I alluded to does just that.
9    But with regard to Captain Davis --
10   MR. T. NEUBERGER: I want to be very clear here.
11   The only reason I am trying to do this now is because I
12   thought the Court thought everything was going very
13   glacially and that we needed to spice it up. We needed to
14   cover some other areas.
15   THE COURT: We have allotted more time than I
16   thought would be necessary to try this case. Now I am
17   beginning to wonder if we have allotted enough time.
18   MR. T. NEUBERGER: I don't think that will be a
19   problem, because we are simply not going to cover the same
20   area with each plaintiff. We are not going to do 190 pages
21   of questions.
22   THE COURT: With regard to -- I want Mr. Ellis
23   to have an opportunity to speak with Captain Davis.
24   MR. T. NEUBERGER: We will vacate it for
25   tomorrow. I know that they have got to get their schedules

### Page 411

1    together. And I am saying, worst comes to worst, we will
2    call Captain Davis into next week.
3    THE COURT: That is fine. I want him to have a
4    chance.
5    Colonel Chaffinch, I will explain to the jury
6    the necessity of your departing.
7    DEFENDANT CHAFFINCH: Thank you, Your Honor.
8    THE COURT: I don't think you need to worry
9    about that.
10   Let's call the jury.
11   (Jury enters courtroom at 3:43 p.m.)
12   THE COURT: Members of the jury, please be
13   seated. We will now have the cross-examination, begin the
14   cross-examination, at least, of Corporal Warren by Mr.
15   Ellis.
16   Mr. Ellis.
17   MR. ELLIS: Thank you, Your Honor.
18   CROSS-EXAMINATION
19   BY MR. ELLIS:
20   Q.   Good afternoon, Corporal Warren.
21   A.   Good afternoon.
22   Q.   It is your 25th wedding anniversary today?
23   A.   Yes, it is.
24   Q.   Congratulations.
25   A.   Thank you.

### Page 412

1    Q.   Corporal Warren, you testified at some length about
2    what you considered attacks being made on you by Colonel
3    Chaffinch and Colonel MacLeish. Do you recall that?
4    A.   Yes, I do.
5    Q.   I would like to play for you now a video clip from
6    WBOC, which is the only WBOC clip that is in evidence in
7    this case. So what I would like you to do is to pay
8    attention to the monitor and --
9    MR. ELLIS: Your Honor, if we could, like we did
10   yesterday, maybe dim one of the lights and it will display
11   this better.
12   MR. T. NEUBERGER: Your Honor, I think the rule
13   of completeness would require that the whole clip be shown.
14   He is just going to show part of a small clip.
15   MR. ELLIS: Your Honor, this is about a -- the
16   whole clip is about a minute and 20 seconds. There is a
17   section at the beginning --
18   THE COURT: The whole clip?
19   MR. ELLIS: The whole clip is about a minute 20
20   seconds.
21   THE COURT: Do you have a problem showing the
22   whole clip?
23   MR. ELLIS: Yes, Your Honor, because the
24   allegations in the complaint regard things said about my two
25   clients. There are other things being said and other people

413

1  on the clip that aren't my clients and have no business
2  being in the courtroom.
3      MR. T. NEUBERGER: I think the rule of
4  completeness would --
5      THE COURT: Let me see counsel briefly at
6  sidebar.
7      (The following took place at sidebar.)
8      THE COURT: What is it about the rule of
9  completeness that you are suggesting would be violated?
10     MR. T. NEUBERGER: I think you have to have the
11 context. It is a news story. It is a news story. First of
12 all, I had no idea he was going to play this. If I had
13 known this I would have listened to it. I looked at it
14 before today, so I could --
15     THE COURT: It helps that counsel talk to one
16 another.
17     MR. ELLIS: Your Honor, it is their exhibit.
18     MR. T. NEUBERGER: And we are not showing it.
19     MR. ELLIS: It is admitted in evidence. I
20 should be able play it.
21     THE COURT: Up to what point do you want to play
22 it?
23     MR. ELLIS: Your Honor, there is a voice that
24 comes on that shows the front of the range, there is a quote
25 of MacLeish that is probably ten or 15 seconds. There is

414

1  then a reporter talking who then puts Gloria Homer on for
2  probably 15 seconds, 20 seconds, something like that. And
3  then it cuts back to MacLeish and Chaffinch in the last two
4  segments. That is another maybe 20 seconds. And I don't
5  think -- the allegation is of defamation, things my two
6  clients said about these people. It is not about anything
7  Gloria Homer or the news reporter said. To me, they are
8  charged with their own words, not her words or the news
9  reporter's words.
10     MR. T. NEUBERGER: Rule 106 says that the
11 recorded statement, those parts which in fairness ought to
12 be considered contemporaneously with it, if he doesn't show
13 it. We will look at it, we will look at it overnight and
14 everything else like that. And in our case we are going to
15 be wanting to see it. He is telling you now he objects to
16 it. So we might as well give it to you tonight to look at.
17     THE COURT: Are you going to be objecting to the
18 plaintiff using it in rebuttal, or in their case-in-chief?
19     MR. ELLIS: Rule 106 deals with a statement of
20 my client, or a single individual. It doesn't deal with an
21 amalgam of statements that are collected together in a news
22 report. These are four or five statements together. I
23 agree that my client's statement has to be read together.
24 But not a whole bunch of different statements.
25     MR. T. NEUBERGER: The rule is not limited to

415

1  statements of his clients. The rule talks about recordings
2  and all kinds of statements.
3      MR. ELLIS: I believe, Your Honor, the rule
4  deals with a statement by one individual, not a newsreel,
5  not a collection of statements. A statement is a statement
6  by one individual.
7      THE COURT: I think what Mr. Neuberger is asking
8  essentially, are you going to object to his playing the
9  balance of the statement?
10     MR. ELLIS: Yes, because it is the statement of
11 somebody else who hasn't been sued for defamation. Their
12 claim is that my client said something defamatory, not that
13 Gloria Homer did. I don't think her statement comes in
14 under any circumstances.
15     MR. T. NEUBERGER: The answer to that, Exhibit
16 25 is the Delaware State News article. Half of the Delaware
17 State News article is about Gloria Homer's stuff that
18 Chaffinch adopts. We are saying if Chaffinch is standing in
19 this news clip -- I am starting to remember now. While
20 Gloria Homer is making all these attacks on his men or
21 whatever, he is adopting her statements. So it should be
22 shown to the jury, just like Exhibit 25, which they have
23 admitted comes into the jury because it is the context. You
24 can't take anything from anything Chaffinch says or doesn't
25 say unless we have the context of the overall story.

416

1      THE COURT: Gloria Homer is a reporter.
2      MR. T. NEUBERGER: Gloria Homer was the cabinet
3  secretary in charge of Facilities Services. She was the
4  landlord who was attacking our people.
5      MR. S. NEUBERGER: The media tour on April 6 was
6  given by Gloria Homer and Colonel Chaffinch in tandem. On
7  the front page of that news article, it is both of them on
8  that picture, and the article itself quotes each of them.
9      THE COURT: And you want to use this tape for
10 what purpose?
11     MR. ELLIS: I want to demonstrate what my
12 clients actually said.
13     THE COURT: And you want to resist their use of
14 the tape to show what Gloria Homer --
15     MR. ELLIS: Right. Because she is not a party.
16     THE COURT: You say, okay, she is not a party.
17 But these statements are being taken out of context.
18     MR. T. NEUBERGER: They are in effect adopting
19 what she is saying by not rebutting her.
20     THE COURT: Here is what we will do. I will let
21 him play just the segment he wants to play right now so we
22 can move along. I will take the tape before it becomes an
23 issue and I will look at it myself to see if I am going to
24 credit your objection or let you use it.
25     MR. ELLIS: Okay.

417

1  MR. T. NEUBERGER: Do you have it? You will be
2  able to give it to the Court tonight?
3  MS. HARVEY: Not tonight. I can probably save
4  it.
5  THE COURT: Or tomorrow.
6  MR. T. NEUBERGER: Is it in a form --
7  MR. ELLIS: I think we have it uploaded. We
8  took everything the plaintiffs gave us and uploaded it for
9  the system.
10  MR. T. NEUBERGER: You can burn a disk and give
11  it to the Court in the morning.
12  MS. HARVEY: I am not sure my drive can do it
13  right now.
14  THE COURT: Or I can look right now.
15  MR. ELLIS: It takes a minute 20 seconds.
16  (End of sidebar conference.)
17  BY MR. ELLIS:
18  Q. Corporal Warren, what we are going to do now is play
19  two parts of this clip. The first one has Lieutenant
20  Colonel MacLeish in it. The second one has Colonel
21  Chaffinch and Lieutenant Colonel MacLeish in it. And what I
22  would like you to do is to pay attention, it will be on the
23  monitor that I think is to your right.
24  (Tape begun.)
25  THE COURT: Can you please run that back and

418

1  start it again? The jury couldn't hear. Let's make sure it
2  is on the monitors it needs to be on.
3  MR. T. NEUBERGER: We have it now, I think, Your
4  Honor. Okay. Thank you.
5  MR. ELLIS: We just have to start it over again.
6  (Tape resumed.)
7  BY MR. ELLIS:
8  Q. We are going to forward that, Corporal Warren, to the
9  next time anyone from the State Police speaks.
10  (Remainder of tape played.)
11  BY MR. ELLIS:
12  Q. Were you able to hear that, Corporal Warren?
13  A. Yes. It was grainy, the first one. The second one
14  was a little better.
15  Q. Would you agree with me that at no point during the
16  interviews your name was mentioned?
17  A. That's correct.
18  Q. And how about Corporal Price, was his name mentioned?
19  A. No, it was not.
20  Q. And Sergeant Foraker's wasn't mentioned, either.
21  Right?
22  A. No, it was not.
23  Q. And there is nobody blaming you for anything in that
24  clip, is there?
25  A. No, there is not.

419

1  Q. No one injuring your reputation. Right?
2  A. No.
3  Q. Now, you testified at some length about Plaintiffs'
4  Exhibit 25, I believe it is. Do you still have that in
5  front of you?
6  A. Both exhibit books.
7  Q. Could you pull out Exhibit 25 in your attorneys' book.
8  That is the Delaware State News article dated April 7, 2004.
9  Now, you previously looked at this document when
10  Mr. Neuberger was asking you questions. I would just like
11  to ask you a few followup questions.
12  Am I correct that your name does not appear?
13  A. That is correct.
14  Q. And Corporal Price's name does not appear, either.
15  Right?
16  A. That is correct.
17  Q. And the comments, the primary comments in the article
18  come from someone named Gloria Homer, do they not?
19  A. There is comments from other parties there, also.
20  Q. But the most comments come from Gloria Homer, don't
21  they?
22  A. Well, I haven't really had a chance to count the
23  different comments.
24  Q. Would you agree that Gloria Homer is not a party to
25  this lawsuit?

420

1  A. I would agree to that.
2  Q. Now, I would like to go back to sort of the beginning
3  of all this, a couple years before this newspaper article
4  comes out, and ask you some questions about your activities
5  at the Firearms Training Unit. I think you testified that
6  you began work there in August of 2001. Is that correct?
7  A. That's correct.
8  Q. And prior to that you had come in as what is called an
9  adjunct instructor?
10  A. That is correct.
11  Q. And am I correct that an adjunct instructor is someone
12  who is sent there on what the State Police call TAD?
13  A. Not necessarily.
14  Q. It could be someone sent just for a couple days?
15  A. That's correct.
16  Q. And am I correct that in the State Police, there are
17  certain people that are full-time assigned to the Firearms
18  Training Unit? Right?
19  A. That is correct.
20  Q. For example, when Sergeant Foraker was in charge
21  there, you were permanently assigned. Right?
22  A. That's correct.
23  Q. And Kurt Price was permanently assigned?
24  A. Yes, he was.
25  Q. And at some points Eddie Cathell was permanently

### Page 421

1   assigned?
2   A.   Yes, he was.
3   Q.   At the end there was a guy named James Warwick who was
4   assigned?
5   A.   That's correct.
6   Q.   And these people are full time assigned to the range.
7   Right?
8   A.   Right.
9   Q.   Now, you had mentioned a ratio that is necessary for
10  shooting. I think you said it was two-to-one or
11  three-to-one or five-to-one, depending on who was shooting.
12  Is that correct?
13  A.   That's correct.
14  Q.   That means for safety reasons you don't want to have a
15  lot of people -- you don't want to have too many students
16  per instructor?
17  A.   That's correct.
18  Q.   Now, the reason you don't want to have too many
19  students per instructor is because in certain circumstances
20  the students really don't know what they are doing yet and
21  that's why they are there being instructed. Right?
22  A.   That's correct.
23  Q.   So you pull in people from outside the Firearms
24  Training Unit to assist in the firearms training. Correct?
25  A.   That's correct.

### Page 422

1   Q.   And sometimes you bring in two, three, four adjunct
2   instructors for a particular shoot. Right?
3   A.   That is correct.
4   Q.   And they are not there full time, they are just
5   brought in occasionally?
6   A.   That's correct.
7   Q.   And am I correct that that has been a practice as far
8   as you have been associated with the Firearms Training Unit?
9   A.   That is correct.
10  Q.   So that even though you only have four full-time
11  people there, you could have six, seven or eight people
12  assigned there for a particular shoot?
13  A.   Yes.
14  Q.   And that, of course, would reduce the ratio that you
15  are talking about, would it not?
16  A.   Yes.
17  Q.   Now, when you started working at the building in 2001,
18  am I correct that you had a discussion with Corporal Price
19  about the operation of the bullet trap?
20  A.   Yes.
21  Q.   And that would have been very close to the time you
22  first began working there. Correct?
23  A.   That is correct.
24  Q.   Corporal Price had worked there for several years
25  before you got there. Correct?

### Page 423

1   A.   Yes.
2   Q.   Now, you testified on direct examination that you
3   believe that the bullet trap was lined with lead. Do you
4   recall that testimony?
5   A.   Yes.
6   Q.   Have you ever crawled up inside the bullet trap to
7   determine that it was lined with lead?
8   A.   No, I have not.
9   Q.   So that if Sergeant -- excuse me, Lieutenant Bryson,
10  for example, who is the person in charge -- you know who
11  Lieutenant Bryson is. Right?
12  A.   Yes, I do.
13  Q.   He was the person in charge of the Firearms Training
14  Unit when the building was constructed, was he not?
15  A.   That is correct.
16  Q.   And he is the person who physically supervised the
17  insulation of the bullet trap. Right?
18  A.   That's correct.
19  Q.   So if he comes in and says it is not lined with lead,
20  it is lined with steel, he would have been in a position to
21  observe that, would he not?
22  A.   When it was constructed or after it had been shot?
23  Q.   When it's constructed.
24  A.   It would have been lined with steel.
25  Q.   Now, one of the things Corporal Price explained to you

### Page 424

1   was how, what problems you got into with the bullet trap, in
2   other words, what caused the bullet trap not to operate
3   correctly. Is that correct?
4   A.   That is correct.
5   Q.   He also showed you how to make corrections for
6   problems that came up with the bullet trap during its
7   operation. Right?
8   A.   That's correct.
9   Q.   Now, what I would like to do is to show a picture or
10  two of exactly what the things are that you had to do with
11  the bullet trap. One of the things you had to do was to
12  remove shotgun wadding. Right?
13  A.   That's correct.
14  Q.   Now, what I would like to do is to show a picture --
15       MR. ELLIS: Your Honor, I am going to go through
16  a series of these pictures, so it might be good to dim the
17  lights. It will enhance the experience.
18  BY MR. ELLIS:
19  Q.   This should come up on your screen, Corporal Warren.
20  If it doesn't, please say so.
21       Now, what we have here is the back of the bullet
22  trap. Right?
23  A.   Yes.
24  Q.   And the substance on the bottom there is what's
25  called -- is water. Right?

425

1  A.   It's a combination of water and some type of
2  lubricant, some type of oil. That's correct.
3  Q.   And those yellow and brown things floating around in
4  there are actually the shotgun waddings we have been talking
5  about. Right?
6  A.   That's correct.
7  Q.   Now, I am going to show you Exhibit 83, Defendants'
8  Exhibit 83. You talked about removing the shotgun wadding
9  and you said there was some sort of strainer or sieve that
10 you used. Right?
11 A.   That's correct.
12 Q.   Is that the strainer or sieve that you used to get the
13 shotgun wadding out of the bullet trap?
14 A.   Yes, it is.
15 Q.   And did you find that sometimes the shotgun wadding
16 would clog up the pumps?
17 A.   Not the pumps, no.
18 Q.   Did the paper blow-back clog the pumps?
19 A.   Yes.
20 Q.   And you had to remove that using the strainer?
21 A.   No. We couldn't get the paper blow-black because it
22 would settle at the bottom of the tank.
23 Q.   So you had to go in with your hands and do that?
24 A.   That's correct.
25 Q.   And you had gloves for that, did you not?

426

1  A.   No, we did not.
2  Q.   You didn't? Sergeant Ashley didn't get you gloves to
3  be working in the bullet trap?
4  A.   No, he did not.
5  Q.   Now, you also had to change a filter. Am I correct
6  about that?
7  A.   That is correct.
8  Q.   Before I get off this picture, on the upper left-hand
9  corner of the picture, is that a pump?
10 A.   Are you referring to the round circle with writing on
11 it?
12 Q.   Yes, I am.
13 A.   Yes, that is the top of the pump, that's correct.
14 Q.   That's the pump that you had to make sure was clear?
15 A.   That is correct.
16 Q.   Now, you also changed filters. Right?
17 A.   Yes, we did.
18 Q.   I ask you to look at Exhibit 80, please. Is that the
19 housing for the filter?
20 A.   Yes, it is.
21 Q.   And am I correct that what you would have to do is
22 unscrew that plastic cap off and then pull the filter out?
23 A.   Yes.
24 Q.   And then you would pop the filter in and put it back
25 in?

427

1  A.   Either that or we would clean the filter.
2  Q.   How long did that take?
3  A.   Depend on how clogged the filter was.
4  Q.   Suppose you simply are trying to replace the filter?
5  A.   I am sorry, I didn't understand your question.
6  Q.   How long does it take you if all you are doing is
7  taking the cap off and replacing the filter?
8  A.   If you are replacing the filter, it doesn't take very
9  long at all. If you are trying to clean the filter, it
10 could take up to five minutes.
11 Q.   Okay. Now, am I correct that the reason you do all
12 this, the reason that you clean the shotgun wadding out, the
13 reason you clean the filters, the reason you work on the
14 pump, is to make sure the water keeps flowing?
15 A.   That's correct.
16 Q.   And if the water doesn't flow, you end up with what's
17 called a dry ramp. Correct?
18 A.   That's correct.
19 Q.   Now, I am going to ask you to take a look at
20 Defendants' Exhibit 81. Is that a picture of the front of
21 the bullet trap?
22 A.   Yes, it is.
23 Q.   Now, by the front, when you were being questioned by
24 Mr. Neuberger, you were asked to imagine that the firing
25 line was where the jury is and the bullet trap is where the

428

1  screen is. Right?
2  A.   That's correct.
3  Q.   And that's basically what we have got here right now.
4  Right? You have got the jury where the shooter would be,
5  and that's what they are shooting in into?
6  A.   Yes.
7  Q.   Now, would you agree with me that what we are looking
8  at here is a wet bullet trap?
9  A.   Yes.
10 Q.   I want to ask you a question or two about what happens
11 when it gets dry. Take a look at the next exhibit, which is
12 No. 85. Do you see dry places in the bullet trap?
13 A.   Yes.
14 Q.   And they would be the ones that are sort of a sandy
15 lighter brown color?
16 A.   That's correct.
17 Q.   And would I be correct in stating that the effect of
18 not cleaning the filters and the pumps and that sort of
19 thing is to create a dry ramp like we are looking at here?
20 A.   Not necessarily. The pump could have not operated, or
21 it could have been turned off. And that would have created
22 the dry ramp, also.
23       I guess I am really having trouble with this
24 picture. Can you explain, is it the north side of the ramp
25 or the south side of the ramp?

429

1  Q.  I believe that is the south side of the ramp. Do you
2  recognize it as north or south?
3  A.  No, I really don't, because it's a picture of the
4  middle of the ramp to me. I know we have more problems on
5  one side than the other. That is why I was asking you if it
6  was the north or the south side of the ramp.
7  Q.  Well, I really only am asking the question so we can
8  demonstrate to the jury what happens if the water system
9  doesn't operate properly. Would you agree with me that this
10 is what happens when the water system doesn't operate
11 properly?
12 A.  Yes, I would.
13 Q.  And one thing that could go wrong would be that the
14 pump isn't working correctly. Is that right?
15 A.  That's correct.
16 Q.  Or it could be clogged?
17 A.  That's correct.
18 Q.  The other problem is the filter could be clogged?
19 A.  That's correct.
20 Q.  Now, I will show you one last picture. This, I
21 believe, is the north end of the bullet trap. Would that
22 correspond to your recollection?
23 A.  Yes, it would.
24 Q.  And that is how many open lanes with no water?
25 A.  I would say probably two.

430

1  Q.  Possibly three?
2  A.  Possibly three.
3  Q.  Possibly four?
4  A.  No, I don't think it would be four. I would have to
5  see it from a different angle to determine whether it would
6  be four or not.
7  Q.  I understand. Now, over the time that you worked at
8  the range, am I correct that it seemed to you --
9        MR. ELLIS: We can turn the lights back up now,
10 excuse me, Your Honor.
11       THE COURT: All right.
12 BY MR. ELLIS:
13 Q.  Would I be correct in saying that your experience was
14 that you had to do more and more maintenance as time went
15 on?
16 A.  Yes.
17 Q.  So that in 2001, when you first started working there,
18 you had relatively little maintenance, whereas in 2003, the
19 end of 2003, you had a lot more?
20 A.  Yes.
21 Q.  Now, you did the work yourself dealing with the water
22 in the bullet trap. Right?
23 A.  Yes.
24 Q.  And you know that Corporal Price did that, too.
25 A.  Yes.

431

1  Q.  Am I correct that you can't recall seeing Chris
2  Foraker unclogging a pump?
3  A.  That's correct.
4  Q.  Or replacing a filter?
5  A.  That's correct.
6  Q.  You just remember yourself and Corporal Price doing
7  it?
8  A.  Yes.
9  Q.  Now, am I also correct that during the first time
10 Sergeant Foraker was in charge of the range -- and I am
11 referring now to the period between August 1st, 2001 and
12 April 2002 -- that you did not talk to Sergeant Foraker
13 about any part of the cleaning of the bullet trap?
14 A.  I'm not sure.
15 Q.  Corporal Warren, we obviously have met before?
16 A.  Yes.
17 Q.  We have met at a great number of depositions. Right?
18 A.  That's correct.
19 Q.  And one of them was yours, was it not?
20 A.  That's correct.
21 Q.  I am going to put in front of you --
22       MR. ELLIS: Your Honor, may I approach?
23       THE COURT: Yes.
24 BY MR. ELLIS:
25 Q.  I am going to put in front of you a copy of a

432

1  deposition transcript that should be yours. You have seen
2  that before. Right?
3  A.  Yes.
4  Q.  Could you please turn to Page 65.
5  A.  Okay.
6  Q.  This was a deposition taken October 17th, 2005, was it
7  not?
8  A.  Yes.
9  Q.  And on Page 65 at Line 7, I asked you the question:
10       When you first started working at the range, I
11 think you have testified that Corporal Price is the one who
12 showed you the back of the bullet trap and told you all of
13 the things that had to be done with it. Right?
14       And your answer was: That's correct.
15       Was it not?
16 A.  Yes.
17 Q.  The next question I asked you was: Did you ever have
18 a discussion with Sergeant Foraker about the tasks that were
19 required at the back of the bullet trap?
20       Your answer was a question.
21       You said to me: At what point?
22       Right?
23 A.  That's correct.
24 Q.  And then my next question was: During your first
25 stretch when he was your boss at the range.

433

1  And your answer was: No.
2  A.  That's correct.
3  Q.  And I followed up, and I said: That would be, I think
4  it's roughly August 1, 2001 through maybe April 2002.
5  And your answer was: No.
6  Was it not?
7  A.  That's correct.
8  Q.  Now, you testified at some length on direct
9  examination to Mr. Neuberger about a thing called a
10 right-to-know law. Do you recall that testimony?
11 A.  Yes, I do.
12 Q.  Do you still have Plaintiffs' Exhibit 156 up somewhere
13 around your witness stand up there? I am told by Mr.
14 Neuberger that you might find it in the sleeve of Book 2.
15 Corporal Warren, I will take that transcript
16 back and maybe relieve you of some of the clutter up there.
17 Do you have Exhibit 156 in front of you?
18 A.  Yes, I do.
19 Q.  Now, you testified when you were being questioned
20 yesterday that the State Police -- that this dealt with the
21 right to know. Right?
22 A.  That's correct.
23 Q.  And you said that the State Police are required under
24 this policy -- and this is a State Police policy. Right?
25 A.  Yes, it is.

434

1  Q.  And you say that the State Police are required to have
2  a right-to-know officer?
3  A.  That's correct.
4  Q.  Can you show me anywhere in this policy that it
5  mentions a right-to-know officer?
6  A.  I believe that was one of our past practices that we
7  followed.
8  Q.  You were asked in that part of your questioning about
9  deviation between policy and practice. This is the policy,
10 Exhibit P-156, is it not?
11 A.  That's correct.
12 Q.  And you would agree with me that nowhere in Exhibit
13 P-156 is there anything that says anything about a
14 right-to-know officer?
15 A.  It says we have a right to training. I don't know who
16 would perform that.
17 Q.  As I said, it doesn't say anything about a
18 right-to-know officer, does it?
19 A.  No.
20 Q.  Now, it does say something about material safety data
21 sheets, does it not? I will just refer you to the second
22 page, Paragraph 5, which is at the top of the second page.
23 Do you see where it discusses a material safety data sheet?
24 A.  Yes, I do.
25 Q.  The first sentence of that paragraph states, Chemical

435

1  manufacturers and distributors are to provide a material
2  safety data sheet to the Delaware State Police for any
3  hazardous chemicals purchased.
4  Then the next sentence says, The MSDS will
5  contain the chemical hazard and safe handling information
6  and will be maintained by the troop commander or section
7  chief.
8  Now, when you were at the Firearms Training
9  Unit, you didn't have a Troop Commander, did you?
10 A.  In policy or practice?
11 Q.  I am just asking you about the words that are in this
12 policy.
13 A.  Yes, it would have been the Captain of the Academy.
14 Q.  Well, didn't you testify on direct examination that
15 you considered Chris Foraker a Section Chief?
16 A.  Yes.
17 Q.  The word section chief appears in the sentence I have
18 just read to you, doesn't it?
19 A.  Yes, it does.
20 Q.  This says that the MSDS will be maintained by the
21 section chief, doesn't it?
22 A.  Or the troop commander.
23 Q.  And you are not in a troop when you are in the
24 Firearms Training Unit, are you?
25 A.  No.

436

1  Q.  So you don't have a troop commander, do you?
2  A.  We have a troop commander. It is the Captain of the
3  Academy.
4  Q.  That's the guy that you don't really report to,
5  according to your testimony yesterday?
6  A.  In what part are we talking about? December 2003,
7  after December 2003 or before 2003?
8  Q.  Let me avoid that by simply asking you whether you
9  considered Chris Foraker your Section Chief.
10 A.  Yes, I did.
11 Q.  Did you ever ask Chris Foraker whether he had
12 maintained the material safety data sheet for the frangible
13 ammunition that you were shown a picture of?
14 A.  During what period of time?
15 Q.  How about the first time that he was the person in
16 charge of the Firearms Training Unit?
17 A.  No, I did not.
18 Q.  How about the second time?
19 A.  The second time, yes.
20 Q.  The second time he had directed you to get copies of
21 the material safety data sheet. Right?
22 A.  That is correct.
23 Q.  Now, it also says in Paragraph 8 that all employees
24 will receive training on the purpose of the Hazardous
25 Chemical Information Act, the right-to-know law, from the

### Page 437

1  respective troop commanders or section chiefs.
2      Would you agree with me that that places
3  responsibility on the section chief to provide training on
4  the purpose of the hazardous chemical information?
5  A.  Yes.
6  Q.  Would you also agree with me that you received no such
7  training from Chris Foraker at any time when he was the head
8  of the Firearms Training Unit?
9  A.  That's correct.
10 Q.  Now, in December 2003, the Firearms -- I am done with
11 that. You can be done with it, too, thank you.
12     In December 2003, the Firearms Training Unit met
13 as a group and decided not to clean the filters or the pumps
14 or replace the filters or the pumps any longer. Is that
15 correct?
16 A.  We decided not to do the maintenance behind the bullet
17 trap in the water tank area, that's correct.
18 Q.  So just so everybody is clear on what that means, that
19 means that you are no longer going to unclog the pumps.
20 Right?
21 A.  That's correct.
22 Q.  And you are no longer going to change the pumps,
23 because that was another job you did. Right?
24 A.  That's correct.
25 Q.  So sometimes the pump gives out, you have to pull it

### Page 438

1  out, replace it and stick it back in. Right?
2  A.  That's correct.
3  Q.  You are not going to do that anymore. Right?
4  A.  No.
5  Q.  And you are also not going to change the filters that
6  are in that plastic cap that I showed you a picture of a
7  couple minutes ago. Right?
8  A.  That's correct.
9  Q.  Now, am I correct that you personally, as someone who
10 had worked in that facility for two and a half years at that
11 point, expected that the system would clog up and stop?
12 A.  I guess I am not really clear what you are asking me
13 now.
14 Q.  When you stopped doing the maintenance that we just
15 talked about, the maintenance on the water system, am I
16 correct that you expected that the system would clog up and
17 stop?
18 A.  Actually, I thought we were going to get some people
19 in to help us get that rectified.
20 Q.  Let's go back and look at your deposition again. I
21 will ask you to please turn to Page 123.
22 A.  Okay.
23 Q.  Actually, the bottom of Page 122. And I asked you,
24 beginning on Line 18, the question:
25     Let me ask you, as someone who had worked at the

### Page 439

1  range at that point for roughly two and a half years, if you
2  stopped doing those maintenance and repair functions
3  involving the pumps and the filters and the water system,
4  what did you expect was going to happen with the system if
5  you just stopped doing it?
6      And your answer was: If anyone stopped doing
7  it --
8      And I said: Right. In other words, if it
9  ceased to be done.
10     What was your answer? Read Line 3 of Page 123
11 to the jury.
12 A.  Okay. Line 3: It's going to eventually clog up and
13 stop.
14 Q.  Now, leaving aside the deposition, what would be the
15 consequence in the shooting area if it clogs up and stops?
16 A.  Then that particular ramp would go dry.
17 Q.  And am I correct that that would create more of a
18 problem with dust and smoke?
19 A.  If that particular ramp were to be shot, it would
20 create more of a problem.
21 Q.  And the more dry areas, the worse it's going to be in
22 the shooting area. Correct?
23 A.  That's correct.
24 Q.  Now, am I correct that you, personally, Wayne Warren,
25 did not tell anybody above you in the chain of command that

### Page 440

1  you had stopped doing the maintenance on the bullet trap?
2  A.  That's incorrect.
3  Q.  I am sorry. You told Chris Foraker. Right?
4  A.  That's correct.
5  Q.  Because Chris was at the meeting?
6  A.  Yes.
7  Q.  And you told no one above Chris Foraker in the chain
8  of command?
9  A.  No, I did not.
10 Q.  So your only knowledge of what happened above Chris
11 Foraker in the chain of command is what Chris Foraker told
12 you?
13 A.  That's correct.
14 Q.  Now, you also, when you were interviewed by the
15 auditors, on May 12th, 2004, you didn't tell the auditors
16 that you had stopped doing the maintenance on the bullet
17 trap, did you?
18 A.  I don't recall.
19 Q.  Why don't you take a look at Exhibit P-23, which is
20 your statement, it's actually a combination of statements to
21 the auditor.
22 A.  I am there.
23 Q.  Corporal Warren, I have looked very carefully at every
24 page of that exhibit, and I cannot find anywhere in that a
25 reference to the fact that you stopped doing maintenance on

441
1  the bullet trap in December 2003. Am I wrong on that?
2  A.    I would have to read the exhibit again in order to
3  answer your question.
4  Q.    Okay. Please take a look at it and try to answer my
5  question.
6  A.    Okay.
7         (Pause.)
8         Do you want me to read the concerns, also?
9  Q.    How about the first part, the statement. Have you
10 found any mention in there of the fact that you stopped
11 doing maintenance on the bullet trap?
12 A.    No.
13 Q.    Do you suppose that it might have been a matter of
14 interest to the auditors that you stopped doing the
15 maintenance on the water system of the bullet trap knowing
16 that that would result in a dry line?
17 A.    Yes, I think that would be of interest.
18 Q.    I am going to ask you, since we are probably going to
19 break shortly, to take a look at the second part of your
20 statement overnight. And I will ask you in the morning if
21 you have done that and we will give that information to the
22 jury tomorrow. I want to ask you a few more questions
23 before we break for the day.
24 A.    Are we done with this book right now?
25 Q.    Yes, I would say I am done with that book right now.

442
1  A.    Thank you.
2  Q.    Is it correct, Corporal Warren, that conditions got
3  worse in December 2003 than they had been before that? By
4  conditions, I mean the environmental conditions inside the
5  shooting area of the range.
6  A.    Yes.
7  Q.    And is it also correct that they were worse in January
8  than they were in December?
9  A.    Yes.
10 Q.    And they were worse during this time period than they
11 had been the preceding summer. Correct?
12 A.    Yes.
13 Q.    Now, the shooting, the actual training and shooting
14 activity in the range stopped around the early part of
15 February 2004. Is that correct?
16 A.    I believe so.
17 Q.    And do you recall there being one final shoot
18 involving the SORT team on February 11th, 2004? That would
19 be the one at which the testing of the air occurred, they
20 were using the SORT team to test the air flow.
21 A.    I can recall that test being done. But I was not
22 there when it was being conducted.
23 Q.    That is fine. Then that is not a fair question to ask
24 you.
25       But it would be your recollection that the

443
1  shooting stopped in early February 2004?
2  A.    That's correct.
3  Q.    But would it also be true that there was a lot of
4  intense shooting going on in January 2004?
5  A.    Yes.
6  Q.    And the reason for that is because you had an Academy
7  class going through. Right?
8  A.    That is correct.
9  Q.    And there were probably 20, 21, 22 days of shooting in
10 January 2004?
11 A.    I can't dispute that, no. I agree with it.
12 Q.    Now, you showed the jury through your attorney a bunch
13 of pictures taken of these guys in the Tyvek suits and the
14 remediation effort that took place at some point thereafter.
15 They came through, the folks in the Tyvek suits were there,
16 I think it was roughly June of 2004?
17 A.    Whatever date was on the picture, yes.
18 Q.    It was well after the shooting had ended. Right?
19 A.    That's correct.
20 Q.    In other words, they weren't there in the summer of
21 2003 before conditions had begun to deteriorate. Right?
22 A.    No, they were not.
23 Q.    They were not there in December 2003 when you first
24 stopped doing the maintenance on the water system in the
25 bullet trap, were they?

444
1  A.    No, they were not.
2  Q.    And they weren't there in January when all that
3  shooting was going on. Right?
4  A.    No, they were not.
5  Q.    They were there many, many months later?
6  A.    That's correct.
7  Q.    Now --
8         MR. ELLIS: Your Honor, this is an appropriate
9  time to break.
10        THE COURT: All right. We will break for the
11 day.
12        Members of the jury, please remember my earlier
13 instructions to you, particularly regarding the need and
14 following your duty, as you must, to avoid news coverage of
15 this matter, as there has been. To be safe, if you listen
16 to an all-news station, turn it off, be careful in watching
17 the news in the evening. Certainly, be very judicious in
18 reading the newspaper. Okay.
19        Keep an open mind. And do not discuss the case
20 with anyone.
21        Drive safely. We will see you back here
22 tomorrow promptly at 9.
23        (Jury leaves courtroom at 4:30 p.m.)
24        THE COURT: Good evening.
25        MR. ELLIS: Have a good night, Your Honor. Hope