446

```
 1                IN THE UNITED STATES DISTRICT COURT
                 IN AND FOR THE DISTRICT OF DELAWARE
 2                        -  -  -

 3   B. KURT PRICE, WAYNE WARREN,   :    Civil Action
     and CHRISTOPHER D. FORAKER,    :
 4                                  :
 5             Plaintiffs,          :
                                    :
 6         v.                       :
                                    :
 7   L. AARON CHAFFINCH,            :
     THOMAS F. MACLEISH,            :
     DAVID B. MITCHELL, and         :
 8   DIVISION OF STATE POLICE,      :
                                    :
 9             Defendants.          :    No. 04-956-GMS

10                        -  -  -

11   CHRISTOPHER D. FORAKER,        :    Civil Action
                                    :
12             Plaintiff,           :
                                    :
13         v.                       :
                                    :
14   L. AARON CHAFFINCH,            :
     THOMAS F. MACLEISH,            :
15   DAVID B. MITCHELL, and         :
     DIVISION OF STATE POLICE,      :
16                                  :
               Defendants.          :    No. 04-1207-GMS
17
                          -  -  -
18
                    Wilmington, Delaware
19              Wednesday, May 17, 2006
                         9:00 a.m.
20              THIRD DAY OF TRIAL

21                        -  -  -

22   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury

23

24

25
```

A - 82

447

```
1   APPEARANCES:

2        THOMAS S. NEUBERGER, ESQ., and
         STEPHEN J. NEUBERGER, ESQ.
3        The Neuberger Law Firm
              -and-
4        MARTIN D. HAVERLY, ESQ.
         Law Offices of Martin D. Haverly
5
              Counsel for Plaintiffs
6
7        R. MONTGOMERY DONALDSON, ESQ.
         Montgomery, McCracken, Walker & Rhoads, LLP
              -and-
8        EDWARD T. ELLIS, ESQ., and
         CARMON M. HARVEY, ESQ.
9        Montgomery, McCracken, Walker & Rhoads
         (Philadelphia, PA)
10
              Counsel for Defendants
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

448

```
1                    INDEX

2        Preliminaries ------------------ Page 449

3   WAYNE H. WARREN (Continued)

4        Cross-examination ----------- Page 451
         Redirect examination ---------- Page 497
5
    DAVID BAYLOR
6
         Direct examination ------------ Page 507
7        Cross-examination ------------- Page 634
         Redirect examination ---------- Page 658
8
    JENNIFER WARREN
9
         Direct examination ------------ Page 667
10       Cross-examination ------------- Page 677

11  MARY LOU WARREN

12       Direct examination ------------ Page 680
         Cross-examination ------------- Page 689
13       Redirect examination ---------- Page 692

14  B. KURT PRICE

15       Direct examination ------------ Page 694

16  PX-157   Group of Documents, First page
17       titled "Employer's Report of
         Occupational Injury or Disease - Page 664
18
         Discussion Re Deposition ------- Page 708
19
                   - - -
20

21

22

23

24
25
```

449

```
1        THE COURT:  Good morning.  Please be seated.

2        Mr. Ellis, I understand you have a question.

3        MR. ELLIS:  Yes, Your Honor.  Yesterday, Mr.

4   Neuberger elicited testimony from this witness to the effect

5   that his financial situation at the point that he leaves the

6   State Police is causing him great distress and he is

7   concerned about losing his house and things like that.

8        I think because of that, that entitles me to ask

9   him about his pension, his workers' comp payment and all the

10  things that the state provides him so he shouldn't be in

11  distress about that.

12       THE COURT:  You say he has a substitute means of

13  income and therefore he shouldn't be in distress?

14       MR. ELLIS:  Yes.  I think the Court can instruct

15  the jury that it is not to be offset against lost wages.

16  But I think that because they brought it up, I am entitled

17  to elicit testimony that he has got other means of income so

18  that the emotional distress angle that has been placed in

19  front of the jury shouldn't be there.

20       THE COURT:  Mr. Neuberger.

21       MR. S. NEUBERGER:  Your Honor, I believe these

22  areas are covered by the collateral source rule.  Not only

23  is that information not supposed to come in for offset

24  purposes, it is also not supposed to come in because it is

25  not supposed to enter the jury's mind at all.  There are
```

450

```
1   cases relating to pension payments.  I believe I cited them

2   in my Court submission.  Workers' compensation payments, the

3   Court already issued a ruling directly on those.

4        Whether my client is upset about losing his job

5   is what came out yesterday and there is resulting financial

6   distress from losing his job.  But I believe the purpose of

7   the collateral source rule, regardless of all of that, is to

8   keep out payments from collateral sources, workers'

9   compensation, pension payments, be it disability pension

10  payments or also regular pension payments.  There is case

11  law on that, Your Honor, because that is something he would

12  be getting anyway.

13       The purpose underlying the collateral source

14  rule is to keep all of that out of the jury's mind so that

15  they don't get confused when they are later deliberating.  I

16  believe the Supreme Court wrote on that back in the sixties,

17  and I believe there has been subsequent case law on that

18  which I cited in my Court submission.

19       THE COURT:  Mr. Ellis, how long do you

20  anticipate being on with this witness?

21       MR. ELLIS:  I would estimate roughly as long as

22  I have already, which is about 45 minutes, give or take a

23  little bit.

24       THE COURT:  I am going to think about it.  So

25  you will defer any questioning in that area.
```

---

551

1          THE COURT:  You may proceed, Mr. Neuberger.
2          MR. T. NEUBERGER:  Thank you.
3   BY MR. T. NEUBERGER:
4   Q.    Is it possible that you had a meeting with Captain
5   Conley and Captain Dixon later that day of the tour?
6   A.    Yes, it is.
7   Q.    But you don't have any of recollection right now one
8   way or the other what might have been said at the meeting.
9   Is that correct?
10  A.    No, I don't.
11  Q.    Now, when you were, just to jump back to the
12  retraction that you were suggesting to the Colonel, when you
13  talked to him, did you indicate to him that you did not
14  believe that he as the Colonel should be giving a public
15  statement where you are throwing your subordinates under the
16  bus?
17  A.    Yes, sir.
18  Q.    Did you believe by making that kind of a statement
19  that was not demonstrating the proper kind of leadership
20  needed from the Colonel over the issue?
21  A.    Yes.
22  Q.    Now, my three clients in this case are going to
23  testify, one already has, that they made a decision to stop
24  performing certain maintenance and custodial functions at
25  the firearms training range because of health-related

552

1   issues, and that they weren't qualified to perform those
2   kinds of functions.
3          Now, are you familiar with my clients'
4   reputation for truth and honesty?
5   A.    Yes, sir.
6   Q.    Do they have -- let's talk about Chris Foraker.  What
7   is his reputation for truth and honesty?
8   A.    A professional, he has a reputation for truth and
9   honesty.
10  Q.    Now, how about Wayne Warren, what is his reputation
11  for truth and honesty?
12  A.    Same.
13  Q.    He has a good reputation?
14  A.    Yes, sir.
15  Q.    And Kurt Price, does he have a good reputation?
16  A.    Yes, sir.
17  Q.    In your words, do you believe them to be excellent
18  troopers?
19  A.    I believe them all to be good troopers, yes.
20  Q.    Now, I want to focus on, first, in March of 2004, the
21  range was shut down from further use.  Do you remember that
22  event?
23  A.    Yes, sir.
24  Q.    And you are still there through the following August
25  31st.  Right?

553

1   A.    Yes, sir.
2   Q.    Okay.  After the range was shut down, do you remember
3   Colonel MacLeish at some time making a remark that they all
4   should just be putting on a paper dust mask like painters do
5   when they come to the house?
6   A.    Yes, sir.
7   Q.    And when you heard that remark from him, did he appear
8   to be frustrated with all the complaining that my clients
9   were making about the range?
10  A.    Yes, sir.
11  Q.    Going back to that newspaper article there, in the
12  headquarters building, is it true that every day copies of
13  the News Journal papers and the Delaware State News are made
14  available on both floors of the building?
15  A.    Yes, sir.
16  Q.    And -- well, when the range was closed and afterwards,
17  in March of 2004, did newspaper articles about the State
18  Police start to appear?
19  A.    Yes, sir.
20  Q.    Were Colonel Chaffinch and Lieutenant Colonel MacLeish
21  aware of the various newspaper stories appearing about the
22  range?
23  A.    Yes, sir.
24  Q.    And then on May 12th, my clients were interviewed by
25  the State Auditor's Office.  You knew the State Auditor was

554

1   conducting an investigation of the range.  Right?
2   A.    Yes.  There were all kinds of inquiries going on about
3   that range at that point in time.
4   Q.    And after my clients gave statements to the State
5   Auditor on May 12th, there was a newspaper that ran shortly
6   thereafter, explaining the contents of things they said.
7   You are aware of that.  Right?
8   A.    Yes, sir.
9   Q.    And is it true that Colonel MacLeish and Lieutenant
10  Colonel -- Lieutenant Colonel MacLeish and Colonel Chaffinch
11  were aware of those newspaper stories that were appearing?
12  A.    I believe so, sir.
13  Q.    And is it correct that both Lieutenant Colonel
14  MacLeish and Colonel Chaffinch became angry about the
15  newspaper reporting on statements my office had made on
16  behalf of my clients?
17  A.    There was a level of frustration, yes.
18  Q.    Just give me a moment, please.
19        (Pause.)
20  Q.    So you are saying you observed a level of frustration
21  from the Lieutenant Colonel and the Colonel.  Is that right?
22  A.    Yes, sir.
23  Q.    Now, you remember that it was the Governor herself who
24  ordered the auditors to investigate the conditions at the
25  range?

555

1  A.  Yes, sir.
2  Q.  And the State Police, was it under a duty to cooperate
3  in that investigation?
4  A.  Yes, sir.
5  Q.  And when the -- if the Auditor's office contacted my
6  clients and wanted to interview them, they had a duty to
7  obey that request.  Isn't that correct?
8  A.  Whenever the Governor directs us to do something, it
9  needs to be done.
10  Q.  Now, my clients are testifying that they sent,
11  reported certain problems up the chain of command concerning
12  conditions at the range.  By doing so, they weren't being
13  disloyal to the State Police, were they?
14  A.  No, sir.
15  Q.  If there were problems at the range, did they have a
16  duty to report those things up the chain of command?
17  A.  I believe, so.
18  Q.  By reporting things up the chain of command, they
19  weren't interfering with the ability of the State Police to
20  fight crime, were they, to operate?
21  A.  Not directly, no.
22  Q.  They weren't jeopardizing the safety of troopers, were
23  they?
24  A.  No, sir.
25  Q.  Now, we are going back to the news story appearing

556

1  after May 12th.  There was a news story that appeared, you
2  told us.  Right?
3  A.  Yes, sir.
4  Q.  And is it true that Colonel Chaffinch was not happy
5  with the news stories that ran after May 12th concerning my
6  clients' statements to the auditors?
7  A.  Yes, sir, that's true.
8  Q.  And is it true, based on your observations, that
9  Lieutenant Colonel MacLeish was not happy about the news
10  stories that were running about my clients' statements to
11  the auditors?
12  A.  That's true.
13  Q.  And sometime after May 12, is it true that Colonel
14  MacLeish referred to Sergeant Foraker as a pain in the ass?
15  A.  Yes, sir.
16  Q.  In fact, he has referred to my clients Kurt Price and
17  Wayne Warren also as being a pain in the ass?
18  A.  Yes, sir.
19  Q.  Is it true that besides not being happy, the
20  Lieutenant Colonel was frustrated with the three of them?
21  A.  Sir, I think we were all frustrated at that point in
22  time.
23  Q.  Do you all feel they were a pain in the butt?
24  A.  At times I felt they were a pain in the butt.  And I
25  am sure like anybody else, they felt we were, too.

557

1  Q.  Is it true you observed Colonel Chaffinch to be
2  frustrated with them?
3  A.  Yes.
4  Q.  Is it true you observed Colonel Chaffinch to be upset
5  with all three of them?
6  A.  Frustrated, yes, and upset at times.
7  Q.  Upset at times, okay.  Is it true that Lieutenant
8  Colonel MacLeish was frustrated and upset at times?
9  A.  Frustrated.
10  Q.  Upset, too?
11  A.  His was more frustration.  The Colonel's was
12  definitely upset.
13  Q.  Could I try to refresh your recollection?
14  A.  Sure.
15  Q.  This is going to be on Page 254.  So this is the
16  second volume.  On the front page it says Volume 1, Volume
17  2.  Can you see Volume 2 there?
18  A.  Okay.
19  Q.  This was the second --
20  A.  Page number again, sir.
21  Q.  We were talking about 254.  This is the second page,
22  second day of your deposition.
23  A.  Okay.
24  Q.  Now, I want you to read to yourself Lines 11, 12 and
25  13 quietly.

558

1  (Pause.)
2  Okay.
3  Q.  Now, does that refresh your recollection?
4  A.  Yes.
5  Q.  Did Lieutenant Colonel MacLeish, did you observe him
6  to be upset with my men?
7  A.  Yes.
8  Q.  Thank you.
9  Now, let's focus on the time you were on the
10  executive staff from February of 2001 through August 31st of
11  2004.  Was the range a hazardous place to work for troopers
12  assigned to it?
13  A.  The dates, you said?
14  Q.  I am saying, when you went on the executive staff,
15  February of 2002 through the time you retired?
16  A.  Yes, sir.
17  Q.  Was the range a hazardous place for troopers to work?
18  A.  Yes.
19  MR. ELLIS:  Your Honor, I object to the use of
20  the term hazardous.  The witness doesn't have the expertise
21  to testify to that.
22  THE COURT:  Overruled.
23  BY MR. T. NEUBERGER:
24  Q.  You can answer the question.  Was the range a
25  hazardous place for troopers to work?

A - 85

559

1  A.   Yes, sir.
2  Q.   Were you aware of issues with the HVAC unit at the
3  range?
4  A.   Yes, sir.
5  Q.   Did you, while working on the staff, did you learn
6  about HVAC issues?
7  A.   On a limited basis, yes, sir.
8  Q.   Even before did you know about HVAC issues?
9  A.   Yes, sir.
10  Q.   For example, when you were at Troop 9 in Odessa,
11  Smyrna and the range was near you and Troop 9.  Right?
12  A.   The range operated within my troop area, yes.
13  Q.   Right.  So would you periodically stop in and talk to
14  the people there when you were in the area?
15  A.   Yes, sir.
16  Q.   And when you would make these periodic visits, did you
17  ever observe the ventilation not to be opening, not to be
18  working?
19  A.   On occasions, I noticed that all the doors in the
20  facility were sometimes open.  So, yes, I asked about it.
21  On some occasions they told me the ventilation system wasn't
22  working properly.
23  Q.   You would go to the range twice a year to do your
24  recertifications.  Right?
25  A.   Normally, yes.

560

1  Q.   It's like a day of training?
2  A.   There is a fall shoot and a spring shoot.
3  Q.   You are there all day?
4  A.   Yes.
5  Q.   Based on your observations using it from '98 forward,
6  is it correct that the HVAC unit and the bullet trap unit
7  had problems?
8  A.   Yes, sir.
9  Q.   And when you would leave the range after one of those
10  shoots, would you be given directions about what you should
11  do to decontaminate yourself?
12  A.   Yes, sir.
13  Q.   What kind of directions did you receive to
14  decontaminate yourself?
15  A.   We were directed to use the air gun to blow off our
16  pants, blow off our shirts.  We were also directed to, on
17  occasion, once you got home, make sure you shook out your
18  clothes and immediately put them in the washer.
19  Q.   What kind of contaminants were you trying to blow off
20  with the air gun?
21  A.   To my knowledge, mostly lead, lead residue.
22  Q.   Now, after you joined the executive staff in February
23  of 2002, did you start learning about lead levels being
24  monitored for troopers working at the range?
25  A.   I had heard about it indirectly before joining the

561

1  executive staff.  Then once on executive staff, yes, it was
2  a matter of discussion.
3  Q.   Right.  Did you understand that quarterly the lead
4  levels of the troopers at the range were being monitored?
5  A.   I didn't know the time frame that they were being
6  monitored.  I knew they were being monitored.
7  Q.   Okay.  Were you witness to any of the discussions that
8  were being had when Trooper Eddie Cathell's lead levels were
9  shooting up into the twenties and the thirties?
10  A.   Yes, sir.
11  Q.   Major Swiski, I think, was the administrative Major at
12  the time they were trying to lower Trooper Cathell's blood
13  lead levels?
14  A.   Yes.  Major Swiski was the administrative Major and
15  Lieutenant Colonel Marcin was the Deputy Superintendent at
16  the time.
17  Q.   When his lead levels were shooting up, the executive
18  staff was concerned about that?
19  A.   There was some concern because, at some point in time,
20  I recall him being directed not to work at the range until
21  the lead levels were lower.
22  Q.   And was it the feeling of -- well, did you understand
23  that lead levels -- lead in the bloodstream was not a thing
24  to be desired?
25  A.   Yeah, absolutely.

562

1  Q.   Okay.  Now, when you were on the executive staff, you
2  also -- there came a time when Sergeant Ashley was the
3  section chief of the range.  Is that correct?
4  A.   Yes, sir.
5  Q.   Okay.  And when you were on the executive staff, did
6  you learn whether he was doing maintenance on the system
7  himself?
8  A.   Yes, sir.
9  Q.   And was he doing his own maintenance?
10  A.   To my knowledge, yes, sir.  As a matter of fact, yes,
11  he told me he was.
12  Q.   He was not an expert in doing maintenance on bullet
13  traps, was he?
14  A.   To my knowledge --
15  Q.   To your knowledge?
16  A.   To my knowledge, no.
17  Q.   Were there discussions on the executive staff about
18  the appropriate levels of maintenance Sergeant Ashley doing
19  on the range?
20  A.   Very limited discussion about it.  It came to light
21  after the reinstatement of Sergeant Foraker back to the
22  range.
23  Q.   But what I am saying is, before Sergeant Foraker came
24  on, were there discussions of the executive staff about the
25  levels of maintenance that Sergeant Ashley doing?

A - 86

563

1    A.    Your question confuses me chronologically.

2    Q.    It's probably a bad question then. Let me try to

3    rephrase it, please.

4          Let me do it this way. Was periodic maintenance

5    of the bullet trap in the annual budget for the Delaware

6    State Police when you were on the executive staff?

7    A.    Yes, to my knowledge, it was, I believe it was.

8    Q.    You believe it was?

9    A.    Yes.

10   Q.    Let me see if there is something that might refresh

11   your recollection on that. Look at 197. This is Volume 2

12   of the three-day deposition of yours.

13         THE COURT:  Did you give a page?

14         MR. T. NEUBERGER: 197 I believe I said, Your

15   Honor.

16   BY MR. T. NEUBERGER:

17   Q.    Could you look at 197, then we are looking here at

18   Lines 11 through 16.

19   A.    Right.

20   Q.    Does that refresh your recollection of whether or not

21   money for maintaining the bullet trap was in the State

22   Police budget when you were on the executive staff?

23   A.    If I can clear up my answer --

24   Q.    Go right ahead.

25   A.    I believe that there was money there initially, and

564

1    that Sergeant Ashley took over the duties as a cost-saving

2    measure because that's what was boasted about, that he saved

3    us a lot of money doing this maintenance himself.

4    Q.    Okay. I think I understand. I think you are saying

5    there was money in the budget for maintenance of the bullet

6    trap. Right?

7    A.    That's the way I understood it earlier, when he took

8    over these functions on his own initiative, thereby saving

9    us this money.

10   Q.    Okay. Thank you.

11   A.    That's why I wasn't clear on your question.

12   Q.    Sure. I understand.

13         Did the Delaware State Police have any written

14   policies or procedures regarding the maintenance and

15   operation of the range?

16   A.    I believe there were operational procedures. I am not

17   familiar with any maintenance procedures. I never looked at

18   that.

19   Q.    By operational, you mean there is a range and we have

20   people go out there periodically to be tested and certified.

21   Things like that?

22   A.    There is a standard operating procedure.

23   Q.    Right. But as far as maintenance, it's your

24   understanding that there were no written policies or

25   procedures for the range?

565

1    A.    I can't testify that I am familiar with any either

2    way.

3    Q.    Okay. Not to your knowledge, is what you are saying?

4    A.    No.

5    Q.    Now, defendant Colonel MacLeish here has testified

6    that 50 percent of the problems at the range rest on the

7    shoulders of my three clients, Sergeant Foraker, and Master

8    Corporal Wayne Warren and Kurt Price. Do you agree with

9    that contention?

10   A.    No, sir.

11   Q.    What are some of the reasons why you disagree with

12   that contention?

13   A.    Well, I later learned through reading documents and

14   through probably what I have heard and been exposed to over

15   my time as a trooper that the facility was not built

16   correctly, built to the specifications, and wasn't being

17   operated, i.e., that the bullet trap system wasn't

18   functioning the way it should.

19         So therefore, I can't blame the troopers for

20   that, if it wasn't built right, if the bullet trap system

21   isn't operating right, if the ventilation system isn't

22   operating right, then I can't blame my people for that.

23   Q.    Did you also understand that the originally intended

24   bullet trap for the building was not the one they actually

25   put into the building?

566

1    A.    I had heard that, yes, sir.

2    Q.    Did you also understand that the project was

3    underfunded and there had to be cutbacks?

4    A.    Yes, sir.

5    Q.    And I think you said this, that from the beginning,

6    maintenance procedures weren't drawn up?

7    A.    From the onset, the range had opened up with a myriad

8    of problems, and then it just continued on down the road.

9    Q.    Okay. Do you blame my clients for any of the

10   conditions at the range?

11         MR. ELLIS:  Your Honor, I object unless there is

12   a foundation that this witness knows all of the facts.

13         MR. T. NEUBERGER: I will withdraw the question,

14   Your Honor. We will move on.

15   BY MR. T. NEUBERGER:

16   Q.    Now, my three clients have testified or will testify

17   in this case that as of December 1st, 2003, that's when

18   Chris Foraker was ordered back, that they were experiencing

19   symptoms such as headaches, chronic fatigue, joint pain,

20   nose bleeds, metallic taste in their mouth, strong odor in

21   their urine, things like that. Did they have a

22   responsibility to report such conditions and symptoms up the

23   chain of command?

24   A.    Yes, sir.

25   Q.    Was it reasonable for them to be expressing concerns

A - 87

567

1  about their health up the chain of command?

2  A.    Yes, sir.

3  Q.    And as a member of the executive staff, did the

4  executive staff and Colonel Chaffinch and Lieutenant Colonel

5  MacLeish learn that the men at the range were raising health

6  concerns about themselves?

7  A.    Yes, sir.

8  Q.    Now let's change topics.

9          Patrol function.  Is patrol an important

10  function for the Delaware State Police?

11  A.    Yes, sir.

12  Q.    Do all troopers do patrol?

13  A.    Yes, sir.

14  Q.    At some point in time in their career they do patrol?

15  A.    Yes.

16  Q.    When you retired, were there about 630, 640 uniformed

17  troopers?

18  A.    623.

19  Q.    Okay.  Were all 623 out there riding around in a

20  patrol car?

21  A.    No, sir.

22  Q.    There were other jobs they were doing in the state

23  police?

24  A.    Yes, sir.

25  Q.    Now, to speed this along, I am going to put up on the

568

1  board here a list of job assignments you identified for us

2  at your three-day deposition.  Okay?

3  A.    Okay.

4  Q.    At your deposition, did I ask you to identify

5  assignments that Corporals and people below the rank of

6  Sergeant do in the State Police besides the patrol function?

7  A.    Yes, sir.

8  Q.    And are desk officer, fatal accident investigator,

9  homicide investigator, financial crimes investigator,

10  forecasting, fraud investigator, lottery unit investigator,

11  computer crimes unit investigator, drill instructor at the

12  Academy, support services and planning, recruiting,

13  personnel, career development officer, crime scene evidence

14  detection investigator, youth aid officer, school resource

15  officer, auto theft detective, auto theft examiner, Vice

16  Squad detective, Drug Unit investigator, and community

17  services officer, positions that you identified as

18  assignments that corporals and people below the rank of

19  Sergeant do at the Delaware State Police?

20  A.    Yes, sir.

21  Q.    When you go into a troop, let's say Troop 9 in

22  December, is there somebody there called a desk officer?

23  A.    Yes, sir.

24  Q.    You go in, is there like a waiting room there and

25  probably bulletproof glass or something and somebody sitting

569

1  on the other side of the bulletproof glass.  Is that how it

2  was in Odessa?

3  A.    Not in Odessa.

4  Q.    How about Troop 6?

5  A.    Troop 6.  Yes.  Odessa wouldn't work.  Southern living

6  only.

7  Q.    Does each troop have -- there are eight troops.

8  Right?

9  A.    There are eight troops.

10  Q.    Each troop, do they have two desk officers working on

11  a 12-hour shift?

12  A.    No.  Two desk officers in a 24-hour shift.  One desk

13  officer per shift.

14  Q.    There is two shifts?

15  A.    Yes, sir.

16  Q.    So each troop has two desk officers.  Right?

17  A.    Yes, sir.

18  Q.    Desk officers are not out there doing patrol, are

19  they?

20  A.    No, sir.

21  Q.    Desk officers handle phone calls, monitor the

22  facility, and provide basic public services?

23  A.    Yes, sir.

24  Q.    Desk officers are not out there making arrests, are

25  they?

570

1  A.    Not at the time they were on the desk, no, sir.

2  Q.    They monitor the troop?

3  A.    Yes, sir.

4  Q.    Is it the function of the desk officer to be out there

5  enforcing the criminal laws?

6  A.    Not on the desk, no.

7  Q.    Now, fatal accident unit, okay, let's call it fatal

8  accident investigator, each of the three counties, do each

9  of the three counties have a fatal accident unit?

10  A.    Yes, sir.

11  Q.    Are from three to four troopers in those fatal

12  accident units?

13  A.    Yes, sir.

14  Q.    And these people reconstruct crash scenes and try to

15  figure out how the crash occurred?

16  A.    Yes, sir.

17  Q.    And members of the fatal accident unit, are they out

18  there making arrests?

19  A.    At the conclusion of an investigation, if it

20  determines that an individual should be arrested, then they

21  can prepare warrants and make an arrest.  But 90 percent of

22  their duties are investigative and administrative.

23  Q.    Okay.  Is there a homicide unit that investigates

24  murders statewide?

25  A.    Yes, sir.

A - 88

635

1 the day that he had the news encounter up at the Smyrna
2 firing range.
3 A.   Yes, sir.
4 Q.   Do you remember that day?
5 A.   Yes, sir.
6 Q.   Now, did you know he was going up there before he
7 went?
8 A.   Not a hundred-percent sure, no.
9 Q.   When he got back, you had a conversation with him.
10 Right?
11 A.   That's correct.
12 Q.   Did he tell you that Gloria Homer had actually set up
13 that press conference?
14 A.   I am not sure.  I think he could have, yes.  He could
15 have.
16 Q.   Now, he came back and said to you, described to you
17 the condition of the range, didn't he?
18 A.   Yes.
19 Q.   And what did he say the condition of the range was?
20 Q.   You want the actual words or paraphrase?
21 Q.   Perhaps a paraphrase would be appropriate.
22 A.   It was not becoming of a Delaware State Police
23 facility.
24 Q.   Did he compare it to the last time he had been there?
25 A.   Yes.

636

1 Q.   He said that he had been there in the fall.  Right?
2 A.   That's correct.
3 Q.   And when he was there in the fall -- were you there in
4 the fall with him?
5 A.   No.
6 Q.   You were there in the fall though, to shoot.  Right?
7 A.   Yes, I believe I was there sometime that fall.
8 Q.   That's because every six months or so, all Delaware
9 State Troopers have to go through the range to qualify.
10 Right?
11 A.   That's correct.
12 Q.   Now, Colonel Chaffinch that day said that he had been
13 there in the fall and the range looked fine?
14 A.   That's right.
15 Q.   And he compared that to the condition it was in on
16 April 6th?
17 A.   Yes, sir.
18 Q.   And he felt it was not in the type of condition that
19 it had been in the fall?
20 A.   That's true.
21 Q.   And that it did a disservice to the State Police?
22 A.   Yes, sir.
23 Q.   Now, you yourself have been there, I think you just
24 testified, in the fall to do your shooting?
25 A.   Yes, sir.

637

1 Q.   Am I correct that you did not see an accumulation of
2 dust in the area?
3 A.   No.  I didn't go around with a white glove, but it
4 looked like it was, you know, in good, normal condition.
5 It's usually clean and maintained.
6 Q.   It looked like it was clean and maintained in the fall
7 of 2003.  Right?
8 A.   Yes.
9 Q.   You talked to him about what he had said to the press.
10 Right?
11 A.   Yes.
12 Q.   I am talking about again on April 6, 2004.
13 A.   Yes, sir.
14 Q.   One of the things that you said he told you was that
15 he had said that people in glass houses shouldn't throw
16 dishonest?
17 A.   That's correct.
18 Q.   Now, did you ask him who he meant?
19 A.   Yes, sir.
20 Q.   And am I correct that when you asked him who he meant,
21 he made a gesture over his shoulder towards the Academy?
22 A.   He pointed his finger towards the Academy.
23 Q.   Okay.  Now, in this conversation, he didn't mention
24 Chris Foraker's name.  Right?
25 A.   No, not when he pointed his finger and all.

638

1 Q.   He didn't mention anybody's name.  Right?
2 A.   Not at that time, no.
3 Q.   Now, the Academy is the building next to the State
4 Police headquarters on Route 13 in Dover.  Right?
5 A.   Yes, sir.
6 Q.   Who was the head of the Academy at that time?
7 A.   Captain Greg Warren.
8 Q.   And Captain Greg Warren's assistant director of
9 training was Ralph Davis?
10 A.   That's correct.
11 Q.   And Chris Foraker didn't have an office located
12 physically at the Academy, did he?
13 A.   No, sir.
14 Q.   And Corporal Price and Corporal Warren weren't located
15 at the Academy, were they?
16 A.   Not physically, no.
17 Q.   But, of course, Greg Warren was.  Right?
18 A.   Yes, sir.
19 Q.   And Ralph Davis, did he have an office at the Academy?
20 A.   Yes.  He was the Lieutenant there.
21 Q.   Now, we are talking about something that occurred on
22 April 6th, 2004.  Do you recall about two weeks or so before
23 that Greg Warren had been in the newspaper criticizing the
24 condition of the range and blaming Facilities Management for
25 the conditions of the firing range?

A - 89

703

1  A.   Yes, I have.

2  Q.   Now, you mentioned the SORT team. What positions did

3  you hold on the SORT team?

4  A.   I held several different positions. I was assigned to

5  an entry team. They trained me on the submachine gun. I

6  also served as, the politically correct term is called a

7  scout observer, but it is really a sniper. I served as a

8  sniper with the team for quite some time.

9  Q.   So how long did you ultimately serve on the SORT team?

10  A.   I served on the SORT team for six years.

11  Q.   Now, when was it that you were -- did there come a

12  time when you were transferred out of the FTU?

13  A.   No. I was never really transferred out. I just kind

14  of went away.

15  Q.   So I think you said you were transferred in there in

16  1996?

17  A.   Yes, sir.

18  Q.   Are you aware of any other trooper currently on the

19  DSP payroll who was at the FTU for a longer period of time

20  than you were?

21  A.   No, sir.

22  Q.   So while you were still with the division, were you

23  the so-called senior man?

24  A.   Yes, sir. I was there nine and a half years, would be

25  an approximation.

704

1  Q.   Now, what is the most important thing that a firearms

2  instructor teaches their students?

3  A.   Safety.

4  Q.   Now, do you do more than teach students how to shoot?

5  A.   Yes. We teach, for lack of a better term, we teach

6  students how to survive. There is a lot more to firearms

7  training than just teaching someone how to shoot. You have

8  a whole mindset that you have to try to instill, or

9  cultivate, if you will, within these people. Especially as

10  the roots get younger with, my generation, we were outside

11  playing more, we shot a lot more, we were doing a lot of

12  things. But what we have found and what is becoming an

13  ever-so challenging aspect of the firearms training is

14  teaching a newer generation that has not gone outside, that

15  has not fired weapons. Most of the time the only guns they

16  ever fired, there was a cord attached to them and they were

17  shooting ducks or playing some type of a Nintendo type game.

18  Q.   Do you teach tactics or reactive tactics or proactive

19  tactics, things of that nature at the FTU?

20  A.   Yes, we do. What we try to, again, instill is that

21  when the officer -- and you have to envision, and the only

22  way I can do that, if I could, I would like to make a

23  correlation or a comparison, the military has the luxury, if

24  they say this is a target, okay, they assault the target

25  with every force they have available, then go in and

705

1  evaluate the situation. We go in, and we are a reactive

2  force. We are not a proactive force.

3       So I walk in any or any officer walks in -- and I am

4  referring to a Delaware State Trooper -- their weapon is

5  secured in a Level 3 type holster. That means you cannot

6  get the weapon out until you manually defeat several

7  mechanics of the holster itself.

8       So by the time I see an event that I think I

9  might not need or the officer may need their weapon, we are

10  reactive. What we try to instill and train into the

11  recruits and our in-service people is not to think, because

12  I don't want to sound ignorant, but by the time you think

13  you may be taking rounds. It needs to be an unsolicited

14  reaction almost.

15  Q.   Is that an easy thing to teach to the average recruit

16  who is coming into the Academy?

17  A.   No, sir, it is not. And it requires a lot of time.

18  It requires a tremendous amount of patience, and it requires

19  a lot of repetition on your part as well as that of the

20  student that you are working with.

21  Q.   Now, once a recruit graduates from the Academy, do

22  they become a State Trooper?

23  A.   Yes, they do, after they go through their field

24  training program and they successfully complete that, then

25  they are a full-fledged State Trooper.

706

1  Q.   Do some State Troopers, like full-fledged, sworn-in

2  State troopers, do any of them sometimes struggle with those

3  same kinds of things, the reaction and thinking and things

4  like that?

5  A.   Yes, they do. There is a lot of people -- not a lot,

6  but there is people that come to the range and you identify

7  with these people as soon as you pull their cars up. I

8  don't want to sound callous. But the truth is, we would

9  look at one another in the Firearms Instructor's office and

10  we would say, oh, it's going to be a long day, or, oh, it's

11  going to be a good day. You could identify with these

12  people as soon as you saw them get out of your car, either

13  you knew you were going to have a good day or it was

14  one-on-one instruction.

15  Q.   Why would it be one-on-one instruction?

16  A.   It would be one-on-one instruction for safety reasons

17  only. Quite honestly, you wanted to keep that individual

18  within hand's reach. We have had weapons pointed at us. We

19  have had weapons pointed at other students. It's a very

20  stressful, very dangerous job. But very rewarding, too, may

21  I add.

22  Q.   With the weapons being pointed and problem students

23  and things like that, is that a reason, is that one of the

24  reasons why you said safety is so important?

25  A.   Absolutely. Because there is no do-over with a