```
SHEET 1                                              Thursday, May 18, 2006

                                                            723

 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4   B. KURT PRICE, WAYNE WARREN,    :   Civil Action
     and CHRISTOPHER D. FORAKER,     :
 5                                   :
              Plaintiffs,            :
 6                                   :
         v.                          :
 7                                   :
     L. AARON CHAFFINCH,             :
 8   THOMAS F. MACLEISH,             :
     DAVID B. MITCHELL, and          :
 9   DIVISION OF STATE POLICE,       :
                                     :
10            Defendants.            :   No. 04-956-GMS

11                          - - -

12   CHRISTOPHER D. FORAKER,         :   Civil Action
                                     :
13            Plaintiff,             :
                                     :
14       v.                          :
                                     :
15   L. AARON CHAFFINCH,             :
     THOMAS F. MACLEISH,             :
16   DAVID B. MITCHELL, and          :
     DIVISION OF STATE POLICE,       :
17                                   :   No. 04-1207-GMS
              Defendants.
18                          - - -

19                    Wilmington, Delaware
                      Thursday, May 18, 2006
20                         9:15 a.m.
                      FOURTH DAY OF TRIAL
21
                            - - -
22
     BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury
23

24                          - - -

25
```

United States District Court - Honorable Gregory M. Sleet

A - 91

Thursday, May 18, 2006

SHEET 2

**724**

```
1   APPEARANCES:
2       THOMAS S. NEUBERGER, ESQ., and
        STEPHEN J. NEUBERGER, ESQ.
3       The Neuberger Law Firm
            -and-
4       MARTIN D. HAVERLY, ESQ.
        Law Offices of Martin D. Haverly
5
                Counsel for Plaintiffs
6
        R. MONTGOMERY DONALDSON, ESQ.
7       Montgomery, McCracken, Walker & Rhoads, LLP
            -and-
8       EDWARD T. ELLIS, ESQ., and
        CARMON M. HARVEY, ESQ.
9       Montgomery, McCracken, Walker & Rhoads
        (Philadelphia, PA)
10
                Counsel for Defendants
11                      - - -
12
13
14
15              INDEX
16  DR. CAROL TAVANI
17  DIRECT EXAMINATION BY MR. WAVERLY     728
18  CROSS-EXAMINATION BY MR. ELLIS        812
19  ERNEST FINI
20  VOIR DIRE EXAMINATION BY MR. ELLIS    851
    VOIR DIRE EXAMINATION BY MR. WAVERLY  862
21  DIRECT EXAMINATION BY MR. WAVERLY     870
    CROSS-EXAMINATION BY MR. ELLIS        898
22  REDIRECT EXAMINATION BY MR. WAVERLY   912
23  MASTER CPL. KURT PRICE
24  DIRECT EXAMINATION BY MR. S. NEUBERGER 914
25
```

**725**

1
2
3       (Proceedings reconvene in court at 9:00 a.m.)
4           THE COURT: Good morning. Please be seated.
5           MR. T. NEUBERGER: Your Honor, I have
6   Exhibit 157 that was introduced yesterday for the jurors and
7   then two for the Court.
8           THE COURT: Thank you.
9           MR. T. NEUBERGER: Thank you.
10          THE COURT: He'll give that to Ms. Walker and
11  I'll take it.
12          MR. T. NEUBERGER: And then, Your Honor, I wrote
13  up a two-page bench memo on that Dillman I think we were
14  talking about yesterday.
15          THE COURT: I'll look at your memo.
16          MR. T. NEUBERGER: I would appreciate it, Your
17  Honor. I would appreciate it.
18          Your Honor, today was scheduled to be expert
19  day except for the economist so we agreed to interrupt the
20  testimony of Kurt Price and put our medical expert and the
21  other two experts on first.
22          THE COURT: That's fine.
23          MR. T. NEUBERGER: Yesterday when we were
24  talking about the collateral source issue, the Court
25  indicated that could be taken care of in an instruction.

**726**

1           THE COURT: Yes.
2           MR. T. NEUBERGER: Am I correct in assuming that
3   the Court might have a model instruction that it will --
4           THE COURT: We can come up with one. I'm
5   content to review anything the parties would like to submit
6   for my consideration.
7           MR. T. NEUBERGER: I know the Court oftentimes
8   has forms.
9           THE COURT: I don't want to talk about that
10  right now.
11          MR. T. NEUBERGER: No, I just wanted to know if
12  we should prepare one or you have one in your possession?
13          THE COURT: No, I would like you to come up with
14  something. I'll look and see what we have.
15          MR. T. NEUBERGER: Then we will do it that way,
16  Your Honor. Thank you.
17          THE COURT: Are we ready?
18          MR. T. NEUBERGER: Yes, Your Honor.
19          THE COURT: Mr. Kenney, would you bring in the
20  jury.
21          I think there is a way to deal with the Dillman
22  designation that doesn't run afoul of the hearsay rule.
23  That is, it stays away from the exhibit which is hearsay.
24  And Mr. Ellis is correct about that. Because of the matter
25  in which the questioning proceeded, if you look closely,

**727**

1   I've underlined for your consideration paragraphs at pages
2   144 and 145 that I think did not offend the hearsay rule.
3           MR. T. NEUBERGER: Fine, Your Honor. We'll work
4   on that.
5           THE COURT: You can take a look at that. I'll
6   pass this down.
7           MR. T. NEUBERGER: Thank you, Your Honor.
8           THE COURT: You can take a look and see what you
9   think.
10          (Jury returned at 9:20 a.m.)
11          THE COURT: Good morning, ladies and gentlemen.
12  Please be seated. You have a new escort. You're a little
13  surprised. He is not nearly as cute.
14          We're going to have a little change of pace.
15  We're going to interrupt the testimony of Cpl. Price for
16  the moment to accommodate the schedules of some of the
17  witnesses that we'll take a little bit out of turn. So,
18  Mr. Neuberger.
19          MR. T. NEUBERGER: Mr. Haverly.
20          THE COURT: Mr. Haverly is going to take care of
21  the introductions. And who are you going to call?
22          MR. WAVERLY: Your Honor, I call Carol Tavani to
23  the stand.
24          THE COURT: All right.
25                      - - -

United States District Court - Honorable Gregory M. Sleet

SHEET 33                                                                Thursday, May 18, 2006

848
Tavani - cross

1  A.   If you look at the DSM-IV, it says, under the C
2  criteria, it says three or more of the following, and then
3  it lists all the criteria, which means nobody is saying you
4  have to have all of those. You know, it's not an all or
5  nothing thing. He certainly has the foreshortened future
6  which is one of the C criteria. He has the restricted range
7  of affect. He has the feeling of estrangement from others.
8  That is three right there. So he buys the C criteria. He
9  doesn't have to have all of these.
10 Q.   He certainly doesn't have the ones I read you; right?
11 A.   I'm sorry. Let me get back to it again. I lost my
12 place.
13      I don't know that he doesn't make efforts to
14 avoid thoughts or feelings or conversation. I think he --
15 in fact, he does try not to think about them. But because
16 he has the intrusive recollections, they come flooding back
17 anyway. He can't really help it.
18      Efforts to avoid activities, situations or
19 people who arouse recollections of it. Well, I don't think
20 he is trying to run into any of these people particularly.
21      You know, I can't speak to whether he is
22 actively avoiding it or not but it don't think he would like
23 it.
24      So I don't know that he doesn't have aspects of
25 that. But I'm saying just because he didn't, that doesn't

849

1  mean he doesn't have post-traumatic because he has three
2  other C criteria.
3  Q.   One last question.
4  A.   Yes.
5  Q.   Who is paying you to be here today?
6  A.   The plaintiffs' attorney.
7  Q.   Okay.
8       MR. ELLIS: Thank you.
9  A.   Obviously.
10      THE COURT: Mr. Waverly, any redirect?
11      MR. WAVERLY: No redirect.
12      THE COURT: No redirect? Okay.
13      Doctor, thank you.
14      MR. T. NEUBERGER: Your Honor, we do have our
15 next witness but now would be a good time.
16      THE COURT: I think it would be a good time to
17 break. We'll break until 2:00 o'clock.
18      (Lunch break taken.)
19      THE COURT: Please be seated.
20      Good afternoon. Please be seated.
21      Ms. Walker, bring the jury back in, please.
22      MR. T. NEUBERGER: Your Honor, do you remember I
23 subpoenaed the medical record of Major Forrester and they
24 were going to submit them to the Court in camera. You
25 don't, by any chance, have an envelope that is lying around?

850

1       THE COURT: That is a thing that has been
2  ignored.
3       MR. T. NEUBERGER: I know we're calling the
4  office and reminding them. But you're not aware of it
5  coming in?
6       THE COURT: I've heard no response at all.
7       MR. ELLIS: Your Honor, before you get the jury,
8  I think this next witness is the guy that we had the issue
9  or on his expert credentials and you said before he
10 testified before the jury, you would put him on for voir
11 dire.
12      THE COURT: That's fine. Is this the witness?
13      MR. WAVERLY: This is the witness, Your Honor.
14      THE COURT: Which witness is this?
15      MR. WAVERLY: Mr. Fini. Ernest Fini. He goes
16 by the name of Bud.
17      THE COURT: Let the jury know we're going to be
18 delayed a few minutes.
19      THE DEPUTY CLERK: Okay.
20      THE COURT: See, I don't have the order of
21 witnesses in front of me.
22      MR. ELLIS: That's why I raised it, Your Honor,
23 because I didn't want to see the jury come in and have to go
24 back out again.
25      MR. T. NEUBERGER: She'll swear you in.

851
Fini - voir dire

1       ---
2       PLAINTIFFS' TESTIMONY
3       ... ERNEST FINI, having been placed
4       under oath at 2:05 p.m. as a witness, was
5       examined and testified as follows ....
6       ---
7       THE COURT: Well, I think you wanted to conduct
8  the voir dire, didn't you?
9       MR. WAVERLY: Yes.
10      THE COURT: Are you challenging the
11 qualifications? Are you challenging?
12      MR. ELLIS: I'm challenging, Your Honor. I
13 wasn't quite sure of the procedure, whether it should start
14 with them or me.
15      THE COURT: Well, no, I think to better focus.
16      MR. ELLIS: Fine, Your Honor.
17      VOIR DIRE EXAMINATION
18 BY MR. ELLIS:
19 Q.   Good afternoon, Mr. Fini.
20 A.   Good afternoon sir.
21 Q.   I'd like to ask you a few questions about your
22 background.
23 A.   Certainly.
24 Q.   What is your current employment?
25 A.   My current employment is Vice President and General

United States District Court - Honorable Gregory M. Sleet

SHEET 34

Thursday, May 18, 2006

Fini - voir dire
852

1 Manager of Rizzini USA, an Italian shotgun company located
2 in West Chester, Pennsylvania.
3 Q.   I'm sorry. Could you spell name of that company?
4 And could you please move a little closer to the mike
5 because I'm having a little trouble hearing you.
6 A.   Rizzini, R-I-Z-Z-I-N-I, USA. West Chester,
7 Pennsylvania.
8 Q.   And how long have you bone employed there?
9 A.   We moved the company here in December of 2004.
10 Q.   Does that mean you've been employed there since
11 December of 2004?
12 A.   Exactly.
13 Q.   And what is your -- what are your duties?
14 A.   Vice President and General Manager.
15 Q.   How many employees does Rizzini have?
16 A.   Three total.
17 Q.   What do they do?
18 A.   We are the distribution branch for the import of
19 firearms from our owner company in Italy.
20 Q.   Are the people that work for you salespeople?
21 A.   Not directly. We have sales rep groups across the
22 United States who work for us. In the office there is only
23 a warehouse person and an office clerical person.
24 Q.   So at this point at least, you do not supervise
25 sales?

Fini - voir dire
853

1 A.   I do field rep salesmen who are not direct employees.
2 They are commissioned compensated sales reps.
3 Q.   Independent contractors?
4 A.   Yes, sir.
5 Q.   Are they distributors such that they represent other
6 lines also?
7 A.   They represent other lines. They are not
8 distributors.
9 Q.   So they may represent you and they may represent
10 other gun companies?
11 A.   Generally other noncompeting companies.
12 Q.   Okay. Your last employment prior to that, where was
13 that?
14 A.   Perazzi USA, California. Azusa, California.
15 Q.   And what was your job there?
16 A.   I'm sorry. Previously previous to that, I was
17 independent contractor at Heckler Koch.
18 Q.   What does it mean to be an independent contractor?
19 A.   I basically am contracted to companies in the
20 firearms business to perform various functions, anywhere
21 from a Vice President, General Manager to managing their
22 communications, perhaps managing a new product, placing
23 media.
24 Q.   At Heckler & Koch, I see in your resume that it says
25 you were a consultant?

Fini - voir dire
854

1 A.   Yes.
2 Q.   What functions did you serve for Heckler & Koch?
3 A.   For Heckler & Koch, it was strictly communications,
4 preparing advertising, placing media.
5 Q.   Did you supervise any salespeople?
6 A.   Salespeople, no.
7 Q.   Your prior position, according to your resume is
8 savage arms; is that correct?
9 A.   Prior to H&K?
10 Q.   Yes.
11 A.   No, it was Perazzi USA in California.
12 Q.   And what did you do for Perazzi?
13 A.   I am a Sales Manager.
14 Q.   How manly salesmen did you supervise?
15 A.   Just myself.
16 Q.   Before that, were you at Savage Arms?
17 A.   Yes, sir.
18 Q.   And I see that you were Vice President of Sales and
19 Marketing?
20 A.   Yes, sir.
21 Q.   How many reports did you have?
22 A.   I believe I had four direct reports.
23 Q.   And what were their jobs?
24 A.   Secretarial, Customer Service, Communications.
25 Q.   And no sales representatives?

Fini - voir dire
855

1 A.   We again had independent sales reps that worked and
2 reported to me regarding their sales activities.
3 Q.   You did not -- did you have supervisory
4 responsibility in the sense that you were supervising an
5 employee who was an employee of Savage Arms that you were
6 supervising directly?
7 A.   For sales.
8 Q.   Yes.
9 A.   Yes, one employee.
10 Q.   And were you directly responsible for hiring that
11 employee?
12 A.   No, he was there prior to my coming there.
13 Q.   It would appear from your resume that you have the
14 same title, job title for OF Mossberg from 1998 to 1999?
15 A.   That is correct.
16 Q.   And what was the nature of your responsibility?
17 A.   Basically product management.
18 Q.   Did you supervise salesmen?
19 A.   Not in that position.
20 Q.   Your resume says you were at SigArms between 1996 and
21 1998. Could you describe your job there?
22 A.   Vice president, sales and marketing. Very similar --
23 well, we haven't talked about that. My job was to manage
24 all the marketing and sales aspects for the product line,
25 develop new products, and work with the sales reps. We

United States District Court - Honorable Gregory M. Sleet

A - 94

SHEET 35                                                                 Thursday, May 18, 2006

**856 — Fini - voir dire**

1  again had independent sales reps, although we did have some
2  company direct personnel on our payroll strictly for law
3  enforcement.
4  Q.  Did you supervise the reps that were on your payroll?
5  A.  The independent reps.
6  Q.  I'd like to make a distinction between independent
7  reps and reps that were on your payroll. Is that a fair
8  distinction?
9  A.  Yes, sir.
10 Q.  You said that you had sales representatives that were
11 on the SigArms payroll; right?
12 A.  Yes, sir.
13 Q.  Did you supervise them?
14 A.  No, only worked with them.
15 Q.  Did you hire any of them?
16 A.  We were involved in the hiring of two of them, yes.
17 Q.  In what way were you involved in the hiring?
18 A.  Reading the resumes, interviewing the candidates,
19 providing my knowledge of the industry, how these
20 individuals who had interacted and worked with the company.
21 Q.  Who is the person that actually hired, by job title?
22 I don't need the name?
23 A.  It was a group consensus that the Vice President of
24 Production along with the Presidents of the company, myself
25 and the Manager of Law Enforcement Sales all participated.

**857 — Fini - voir dire**

1  Q.  Your resume indicates that 1996 you were the
2  President of Intermark Sporting Goods Marketing. Is that a
3  company of your own creation?
4  A.  Yes, sir.
5  Q.  Did you have employees?
6  A.  Yes, sir.
7  Q.  How many employees?
8  A.  Just one.
9  Q.  And what did that person do?
10 A.  Managed all the office activities while I was working
11 at the concerns that we had previously mentioned.
12 Q.  So I take it after you left Remington, you started
13 your own business and sort of hired yourself out as a
14 consultant?
15 A.  Yes, sir.
16 Q.  Okay. You were at Remington for 20 years, it would
17 appear; is that right?
18 A.  Almost 20 years, yes.
19 Q.  Why did you leave Remington?
20 A.  The company was downsized and I was not invited to go
21 to their move in North Carolina.
22 Q.  You were laid off?
23 A.  Essentially.
24 Q.  During the period '91 to '96 when you were the
25 Director of Marketing and Communications, did you supervise

**858 — Fini - voir dire**

1  representatives?
2  A.  No, sir.
3  Q.  How about when you were the marketing manager for
4  firearms from '86 to 91? Did you supervise sales
5  representatives?
6  A.  Directly, no.
7  Q.  How about when you were Regional Sales Manager for
8  the Midwest Region from 1981 to 1994? Did you supervise
9  sales reps?
10 A.  Yes, sir.
11 Q.  How many?
12 A.  Four to five, depending at the time you would like to
13 choose.
14 Q.  And were you responsible for hiring sales
15 representatives during that time period?
16 A.  I was involved in the hiring of reps to my territory,
17 yes.
18 Q.  So that would be the four or five reps that worked
19 for you?
20 A.  Not all of them. We rotated people and when that was
21 occurring I was involved with the process.
22 Q.  Now, you prepared a report in, for use in this case;
23 right?
24 A.  Yes, sir.
25 Q.  And in your report, I think one of the conclusions

**859 — Fini - voir dire**

1  you reached was that Chris Foraker was a prime candidate for
2  a position as a sales representative in the firearms
3  industry, is that a fair characterization?
4  A.  I believe I characterized that he was a candidate to
5  get into law enforcement sales rather than the broad subject
6  you just mentioned.
7  Q.  What was it that made you believe he was a prime
8  candidate for that type of job?
9  A.  I guess I would start with my initial history at
10 Remington, as I started as a field rep calling on law
11 enforcement organizations, working with law enforcement
12 people over that period of time, working with them at H&K,
13 working with them at Mossberg, working with them at SigArms,
14 also at Savage. I believe I have a fairly good
15 understanding of the arena that they have to participate to
16 be successful in law enforcement sales.
17 Q.  Do you have your report up there with you?
18 A.  Yes, sir.
19 Q.  Could you go to the third page of the report?
20     THE COURT: Is this as to his qualifications,
21 Mr. Ellis?
22     MR. ELLIS: No, Your Honor. I'm into the second
23 part of the Daubert analysis. I didn't realize I was
24 limited to qualifications.
25     THE COURT: No, I didn't realize there was a

United States District Court - Honorable Gregory M. Sleet

SHEET 36

Thursday, May 18, 2006

Fini - voir dire  860

1 second aspect that you wanted to query into with this area.
2 That's fine. That's fine.
3     MR. ELLIS: Okay.
4 BY MR. ELLIS:
5 Q.  Mr. Fini, do you see where you have the conclusion at
6 the bottom of page three?
7 A.  Yes, sir.
8 Q.  Could you read that first sentence of that, to
9 yourself?
10 A.  "Based on Chris Foraker's resume and my personal
11 interaction with him, I assess him to be a prime candidate
12 for a position with a firearms' manufacturer or
13 industry-related company."
14 Q.  It doesn't limit it to law enforcement, does it?
15 A.  No, not in that particular sentence.
16 Q.  Look at the last sentence in that paragraph. It
17 begins, "I would expect?"
18 A.  Yes, sir.
19 Q.  That says, "I would expect that Chris Foraker would
20 be hired in the firearms industry for either entry level
21 sales or a training position absent the negative publicity."
22 That doesn't limit it to law enforcement, does it?
23 A.  No, that particular sentence does not do that.
24 Q.  Is there some place where you do?
25 A.  Well, the first page and-a-half basically deals

Fini - voir dire  861

1 with two companies that deal in the subject of those
2 conversations or that written portion has to deal with law
3 enforcement sales. I think I just generally accepted that
4 we were speaking of that area of the business. If you
5 read any of the other paragraphs, they all deal with law
6 enforcement.
7 Q.  Okay. Now, in arriving at the conclusions that you
8 have reached at here, did you take into account other case
9 studies of individuals with "baggage" like you have set
10 forth here with respect to Mr. Foraker?
11 A.  Personally, I know of no other cases that directly
12 deal with such an issue.
13 Q.  Have you read any periodicals or magazines in the
14 industry that deal with that type of question?
15 A.  Specifically?
16 Q.  The question of someone who had baggage, as you
17 put it, trying to get into a position in law enforcement
18 sales?
19 A.  No, I assumed you were just limiting it to the
20 situation here. If you include other situations, I have
21 been exposed to.
22 Q.  Okay. What type of situations?
23 A.  Sexual harassment.
24 Q.  Is there anything else?
25 A.  That is what comes to mind immediately.

Fini - voir dire  862

1 Q.  You are saying somebody who is accused of sexual
2 harassment is not a prime candidate for a position with a
3 gun company; right?
4 A.  I'm saying people who have extraordinary
5 circumstances or issues like this in their resume or in
6 their background follow-up would probably be at a
7 disadvantage vs. someone who doesn't.
8 Q.  Can you give me an example other than someone who is
9 accused of sexual harassment?
10 A.  An example of someone who has an issue?
11 Q.  Yes, other than someone who has a sexual harassment
12 history.
13 A.  Not right off the top of my head.
14 Q.  You have no Human Resources training; is that
15 correct?
16 A.  Correct.
17 Q.  And you have never held a position in a Human
18 Resources Department in any of the companies that you worked
19 at?
20 A.  No, sir.
21     MR. ELLIS: I have nothing further of the
22 witness in voir dire, Your Honor.
23     THE COURT: Is there anything?
24     MR. WAVERLY: I have questions, Your Honor.
25     THE COURT: All right.

Fini - voir dire  863

1     VOIR DIRE EXAMINATION
2 BY MR. WAVERLY:
3 Q.  Mr. Fini, what is your profession?
4 A.  I basically consider myself a firearms industry
5 management professional.
6 Q.  Okay. Earlier, during the examination by opposing
7 counsel, you were talking about Intermark. What is
8 Intermark?
9 A.  Intermark is my personal company that I established
10 upon leaving Remington to provide any level of services to
11 companies in the firearms, ammunition-related business.
12 Anything from basic product management to Vice President
13 level or higher management services, either as an employee
14 or as a consultant.
15 Q.  And how many years have you worked in the firearms
16 industry?
17 A.  I went to work for Remington, which was the formal
18 part of the start, in 1976. So I guess we're a little bit
19 shy of 30 years.
20 Q.  How many years have you acted as a Manager in the
21 firearms industry?
22 A.  Twenty-seven years.
23 Q.  I'm sorry. What?
24 A.  Twenty-seven years.
25 Q.  Could you look at -- just to your right there are two

United States District Court - Honorable Gregory M. Sleet

Thursday, May 18, 2006

SHEET 37

864
Fini - voir dire

1  white binders. Look at book number two.
2  A.  (Witness complies.) Okay.
3  Q.  Look at Plaintiffs' Exhibit No. 90. There should be
4  tabs on the side.
5  A.  Okay.
6  Q.  Is that your resume?
7  A.  Yes, sir.
8  Q.  Now, initially, you began work in the firearms
9  industry with DuPont Remington Arms; correct?
10 A.  Yes, sir.
11 Q.  DuPont owned Remington Arms throughout the years you
12 worked at Remington; right?
13 A.  For most of the years, yes.
14 Q.  And were you involved in the hiring process when you
15 worked at Remington Arms?
16 A.  Yes, I was.
17 Q.  How were you involved in the hiring process?
18 A.  When I took the job as Assistant Manager of National
19 Accounts, I was included on the interview committee. That
20 was the start of my involvement.
21 Q.  Now, what year would that have been?
22 A.  That would have been approximately '78-79. I believe
23 '79.
24 Q.  1979?
25 A.  '79 or '80, yes.

865
Fini - voir dire

1  Q.  Okay. And on that committee, were you involved with
2  hiring?
3  A.  Yes, sir.
4  Q.  How were you involved with hiring when you worked on
5  that committee?
6  A.  All potential sales candidates for field positions
7  and other positions within the company would come through
8  headquarters. And I was on that committee that interviewed
9  those people, reviewed these resumes and reported to
10 management my thoughts on their qualifications for that
11 position.
12 Q.  When you became a Regional Manager with Remington
13 Arms, were you involved in the hiring process?
14 A.  Yes, I was.
15 Q.  How were you involved in the hiring process?
16 A.  Well, of course, I would be responsible for anyone
17 that would have come into my territory. I would interview
18 them and follow-up their resumes, do follow-ups in the
19 industry with people I know or maybe someone else that I had
20 worked for in the industry that I was familiar with and
21 report back to management.
22 Q.  Were you involved at that time in the transfer
23 process within the company?
24 A.  Yes. In a big company like Remington, transfers were
25 continually going on. DuPont wanted to integrate some of

866
Fini - voir dire

1  their managers and get consumer products experience for some
2  of their people. So we were rotating people fairly often.
3  So that was a constant subject at regional meetings and
4  other meetings we would have about personnel. So, yes, I
5  was involved constantly in the transfer process.
6  Q.  And when did you become a Regional Manager?
7  A.  1984.
8  Q.  Okay. Is that 1984 or 1981?
9  A.  I'm sorry. 1981.
10 Q.  And then did you get promoted in 1984?
11 A.  Yes, sir.
12 Q.  What were you promoted to? What position?
13 A.  I was promoted to Worldwide Manager of Firearms and
14 that was a headquarter position moving.
15 Q.  In that position, were you involved in hiring people?
16 A.  Yes, I was. Again, very similar to back at the
17 beginning, all candidates that were coming through for the
18 field sales positions, product positions which would report
19 to me or other positions within the company pretty much went
20 through myself and usually my Senior Product Manager who was
21 on the committee at the same time.
22 Q.  Were you involved in a hiring after you left
23 Remington Arms?
24 A.  Yes, sir.
25 Q.  And you left Remington Arms in 1996?

867
Fini - voir dire

1  A.  1996, yes, sir.
2  Q.  Were you involved in hiring people when you were at
3  Savage, for example?
4  A.  Yes, I was.
5  Q.  At SigArms?
6  A.  Yes, I was.
7  Q.  At Rizzini?
8  A.  Yes, I was.
9  Q.  Were you responsible for approving transfers at those
10 companies as well?
11 A.  Very much on a reduced basis, but some.
12 Q.  Those companies have fewer sales?
13 A.  Fewer sales, smaller operations.
14 Q.  Altogether, how many people have you been involved in
15 hiring over the years?
16 A.  I would say approximately 50 people.
17 Q.  And altogether, how many positions have you reviewed
18 for transfer requests over the years?
19 A.  Oh, maybe 80 positions something like that. 60-80
20 positions.
21 Q.  And with regards to the hiring, you would review
22 resumes, wouldn't you?
23 A.  Resumes.
24 Q.  That would be true at all the different companies?
25 A.  Exactly.

United States District Court - Honorable Gregory M. Sleet

SHEET 38

**868 — Fini - voir dire**

1  Q.  Same thing with regards to transfers?
2  A.  Absolutely.
3  Q.  Okay. How many resumes have you looked at over the
4  years dealing with the firearms industry?
5  A.  In excess of 500.
6  Q.  Okay. How many interviews have you conducted?
7  A.  Personal one-on-one interviews, probably somewhere
8  around 80 interviews.
9  Q.  Eighty interviews, did you say?
10 A.  Yes.
11 Q.  Okay. And maybe you can describe the process within
12 the firearms industry as to how people get hired. Can you
13 explain that just briefly?
14 A.  Generally, there is a need for a Product Manager,
15 Sales Manager, Trainee -- Trainee in Marketing, Trainee in
16 Training. Whatever position the person who the direct
17 report would be would prepare a job, a job description.
18 Candidates were brought in through HR, if it was a bigger
19 company as we had at Remington, or generally in a lot of
20 cases, the Marketing Group knew people who were available
21 and we contacted them for, to see if they had an interest in
22 moving into Remington or whatever company we were dealing
23 with at the time and assuming this kind of position. An
24 interview would be set up and they would go through the
25 first round.

**869**

1  From there, follow-up calls would be made to
2  substantiate some of the information that was garnered at
3  the interviews, the first interview. And usually from that,
4  the best candidates were selected for probably a follow-up
5  interview section in more depth and particulars were worked
6  out by Management or by HR, if it was one of the larger
7  companies, and either an offer would be made or the person
8  would be declined.
9  Q.  Okay. I think you indicated previously that --
10    THE COURT:  I'm going to cut this off right now.
11 Okay? You can sit down. I'm going to get my jury back out.
12    I'm satisfied, Mr. Ellis, that this witness,
13 given his experience, is in possession of sufficient
14 specialized knowledge to enable him to satisfy the
15 requirements of 702, Daubert, Kumho Tire and other cases
16 which have set forth the standard which you should know is
17 not limited to the five-factor analysis in Daubert. So in
18 the exercise of the gatekeeping function, this court is
19 going to recognize Mr. Fini -- I think it's Mr. Fini; right?
20    THE WITNESS:  Yes, sir.
21    THE COURT:  (Continuing):  -- as an expert and
22 permit the plaintiffs to adduce his testimony for this jury.
23 Okay?
24    MR. ELLIS:  I understand.
25    THE COURT:  The objection is overruled.

**870**

1    MR. WAVERLY:  Thank you, Your Honor.
2    THE COURT:  Ms. Walker, would you bring in the
3  jury?
4    MR. T. NEUBERGER:  Your Honor, could I ask, for
5  the purposes of --
6    THE COURT:  If anything, you will be, as you
7  have demonstrated, you have a fair amount of grist for your
8  cross-examination mill.
9    MR. T. NEUBERGER:  Your Honor, could I ask, for
10 purposes of our timekeeping, this 25 minutes for the voir
11 dire, is it just split for what we use or should it all go.
12    THE COURT:  I'm going to assign half of it to
13 one side and half of it to the other.
14    MR. T. NEUBERGER:  That's fine, Your Honor.
15    THE COURT:  So that's how your record keeping
16 should keep it. Okay? All right. That's 12 and-a-half a
17 side.
18    (Jury returned at 2:30 p.m.)
19    THE COURT:  Did she have to shake any of you
20 awake?
21    Have a seat. We'll now hear from the
22 plaintiffs' next witness.
23    MR. WAVERLY:  Plaintiffs call Mr. Ernest Fini to
24 the stand.
25    THE COURT:  Mr. Fini is on the stand. He has

**871 — Fini - direct**

1  been sworn.
2        DIRECT EXAMINATION
3  BY MR. WAVERLY:
4  Q.  Mr. Fini, could you please state your name and
5  business address for the record?
6  A.  Earnest Fini. I live at 3232 Griggs Drive, Boothwyn,
7  Pennsylvania 19061.
8  Q.  Mr. Fini, what is your profession?
9  A.  I am an industry marketing professional.
10 Q.  In what industry?
11 A.  In firearms.
12 Q.  What do you do as a firearms industry management
13 professional?
14    THE COURT:  He said marketing professional,
15 Mr. Waverly.
16    MR. WAVERLY:  Marketing professional. I
17 apologize.
18 A.  Basically, I provide services to the companies in
19 firearms or related business that can be from very small
20 things like providing an advertising campaign or a single ad
21 or managing a product through its introductory phase or
22 managing a product line or serving in the capacity as vice
23 president or higher of the company.
24 BY MR. WAVERLY:
25 Q.  Do you practice independently or with any company?

Thursday, May 18, 2006

SHEET 39

**872 Fini - direct**

1  A.  I am practicing independently, myself.
2  Q.  How many years have you worked in the firearms
3  industry?
4  A.  Approximately, 30 years. Not quite.
5  Q.  Now, could you pick up a book two? There is a white
6  book to your right, book number two, Plaintiffs' Exhibit 90.
7  That's 9-0. There are tabs on the side.
8  A.  Okay.
9  Q.  Is Plaintiffs' Exhibit 90 your resume?
10 A.  Yes, sir.
11 Q.  Have you earned any academic degrees?
12 A.  Yes, I have a Bachelor of Science from Sacred Heart
13 University in Bridgeport, Connecticut and 30 credits towards
14 an MBA in marketing.
15 Q.  What was your major with the Bachelor of Science
16 degree?
17 A.  I majored in Marketing and minored in Advertising.
18 Q.  Do you hold any professional licenses?
19 A.  Yes, I have a federal firearms license as well as a
20 federal import license.
21 Q.  Now, I don't want you to read your entire resume but
22 could you please describe briefly your relevant work
23 history?
24 A.  I basically started in the industry in 1976, taking a
25 sales position with the Remington Arms Company, a wholly

**873 Fini - direct**

1  owned subsidiary of the DuPont corporation, having two
2  territories, one in New England, one in Michigan.
3       I moved on to Assistant Manager of National
4  Accounts, which was a headquarter position, which started
5  giving me some experience in the overall business, as well
6  as sitting on the committee for interviewing potential sales
7  candidates for the company.
8       From there, I was promoted to Regional Sales
9  Manager of the Midwest region.
10 Q.  What year was that? I'm sorry. What year was that?
11 A.  That year was in 1981 through 1984. As Regional
12 Sales Manager, I was responsible for the overall sales in
13 seven Midwestern states, having four or five representatives
14 working directly for me at that time. Again, sales
15 responsibility was totally mine as well as the hiring and
16 transfer of employees under my command at that time.
17      From there, in 1984 I was promoted to Worldwide
18 Manager of Firearms. That was a home office move from
19 Kansas City back to Wilmington, Delaware actually, where I
20 managed the entire firm's business, a $200 million business
21 for the Remington Arms Company. Again, involved in the
22 hiring and transfer of people not only within my command but
23 also throughout the company and anyone who came through that
24 area for interviews or for just purposes of saying a
25 candidate was qualified for any positions within the

**874 Fini - direct**

1  company.
2       And my last stop at Remington was Director of
3  Marketing and Communications from 1991 through 1996;
4  responsible for all communications throughout the company.
5       Again, I have a number of people under my
6  command in Advertising, Public Relations, Promotion, and
7  Consumer Services. Basically, Customer Service.
8  Q.  Let me back up, okay? The position you held before
9  the position in Communications.
10 A.  Yes. Marketing Manager of Firearms.
11 Q.  Right. In that position, were you supervising anyone
12 in the law enforcement sector of the company?
13 A.  Yes. Under that banner, you'll have, we also had
14 Marketing Research and the Law Enforcement Manager reported
15 directly to me.
16 Q.  So you were involved with -- strike that.
17      Were you involved in the hiring process when you
18 worked at DuPont Remington?
19 A.  Yes, I was.
20 Q.  When did that begin, your involvement in the hiring
21 process?
22 A.  The actual involvement began in 1979 when I first
23 went in as the Assistant Manager of National Accounts. I
24 was asked to sit on the interview committee and give my take
25 on potential candidates basically for the sales positions

**875 Fini - direct**

1  that were opening in the field at that time. Every
2  candidate hired in the field came through Headquarters where
3  the Director of Sales were located as well as the Interview
4  Committee, which I was part of.
5  Q.  Were you involved in the hiring process at any time
6  thereafter at Remington?
7  A.  Yes. When I became Regional Sales Manager, I also
8  was responsible for hiring my people along with the
9  committee, but basically most of the responsibility fell on
10 me to either hire people or transfer them within the
11 territory.
12 Q.  Would that include hiring salespeople?
13 A.  They were all salespeople.
14 Q.  Were you involved in the hiring process in any other
15 way at Remington Arms?
16 A.  Yes. As Director of Marketing and Communications, I
17 also had the greatest responsibility in terms of number of
18 employees under my direct command for the hiring of those
19 people as well as continuing again anyone that came through
20 for other positions within the company. I was continually
21 sitting on those committees.
22 Q.  And at your job at Remington Arms in Communications,
23 were you also hiring people?
24 A.  Absolutely.
25 Q.  You were involved in the hiring process there then?

United States District Court - Honorable Gregory M. Sleet

Thursday, May 18, 2006

SHEET 40

Fini - direct    876

1  A.    Exactly the same then, yes. Not only for my people
2  but for others as well, for all other positions going
3  through the Marketing and Sales Department.
4  Q.    And when you were at Remington Arms, were you ever in
5  the chain of command above the people that would train
6  people how to use firearms?
7  A.    We really did not have a training section, per se.
8  That was not our situation there. Our training consisted of
9  selling.
10 Q.    Were you responsible for any hiring after you left
11 Remington Arms?
12 A.    Yes. At my position at SigArms and Savage and
13 currently at Rizzini USA, I was involved in the hiring
14 process.
15 Q.    Were you involved for approving -- were you
16 responsible for approving transfers when you worked for
17 DuPont Remington Arms?
18 A.    Yes, I was.
19 Q.    Were you responsible for approving transfers when you
20 worked for Savage?
21 A.    Yes, I was.
22 Q.    And when you were working for SigArms?
23 A.    Yes, I was.
24 Q.    And when you were working for Rizzini?
25 A.    Yes.

Fini - direct    877

1  Q.    How do you keep yourself abreast of what is a
2  reasonable amount to pay in compensation for salespeople
3  concerning hiring those salespeople?
4  A.    This industry, firearms ammunition and related
5  products, in comparison to other industries in the United
6  States, is a very small industry, very tight knit group.
7  People talk all the time. We have national conventions like
8  our Shot Show, which is our huge selling show that travels
9  around the country; the NRA Show, which is currently going
10 on this week in Wisconsin. There are a number of meetings
11 like that. There are organizations that we used to manage
12 and make sure that we all participate the same way in
13 producing products that use certain types of ammunition so
14 there are no problems in that regard.
15       So there are many opportunities in addition to
16 just picking up a phone and calling people at other
17 companies, which is a very common practice. After being in
18 the industry as long as I have, I obviously have a number of
19 contacts throughout the industry -- people I talk with on a
20 very regular basis. And we're all trying to do the same
21 thing, trying to find the best employee for the best job at
22 the right price. So I consider myself fairly well versed in
23 what is going on in these communities all the time.
24 Q.    When you worked at Remington, how did the hiring
25 process work?

Fini - direct    878

1  A.    Remington is slightly different in the fact we were
2  owned by DuPont and there were certain guidelines that had
3  to be followed, in addition to we had a really large Human
4  Resource Department that pretty much began the process once
5  Marketing or Sales identified the fact that they needed an
6  individual for a particular purpose. HR would gather some
7  of the candidates, would find ways to advertise, but in
8  addition to that, many of the candidates were brought in by
9  Marketing, Sales personnel such as myself who knew of people
10 who were available either from other companies or who were
11 wishing to come into the industry.
12 Q.    What was your role then?
13 A.    At what time?
14 Q.    At Remington.
15 A.    In the early days? I sat on the Interview Committee.
16 I basically interviewed the candidates and give my personal
17 assessment of how they would fit in field sales, because I
18 had just basically come out of field sales and was familiar
19 with what companies were looking for that we were selling
20 to, either the companies or law enforcement agencies or
21 civilian agencies.
22 Q.    Have you ever prepared job descriptions?
23 A.    Many times.
24 Q.    Have you ever reviewed resumes?
25 A.    Many times.

Fini - direct    879

1  Q.    How many resumes have you reviewed over the years?
2  A.    In excess of 500.
3  Q.    Have you ever interviewed applicants?
4  A.    Many times.
5  Q.    Have you ever conducted informal background checks on
6  applicants.
7  A.    Many times.
8  Q.    Altogether, how many people have you been involved in
9  hiring over the years?
10 A.    I would say approximately 50 people, direct hires.
11 Q.    How many positions have you reviewed for transfer
12 requests over the years?
13 A.    I'm sorry. I'd like to say that I hired about 30
14 people, personally. I probably looked at transfers and
15 directly involved transfers, that maybe occurred 50-60 times
16 in that time period. Not 50 hirees.
17 Q.    Well, when you were at Remington you were involved in
18 the transfer process; correct?
19 A.    Yes, I was.
20 Q.    How were you involved in the transfer process at
21 Remington?
22 A.    The transfer process really was no different than a
23 hiree. A need was identified for a particular individual
24 that possessed certain abilities in sales, product
25 management, law enforcement skills, whatever the situation

United States District Court - Honorable Gregory M. Sleet

SHEET 41                                        Thursday, May 18, 2006

**Page 880 — Fini - direct**

1  demanded. And basically you reviewed the resume of that
2  individual, you called them in for a round of interviews.
3  It's very similar to what you did in the original hiring
4  process.
5  Q.    What was your role in the transfer process at Savage?
6  A.    Essentially, the same thing.
7  Q.    Now, do you interact with any HR Department personnel
8  during the hiring or transfer process?
9  A.    Yes, I did. At Remington, it was more involvement
10 because they again usually would bring up the job criteria
11 to you in terms of what the salary levels would be and the
12 level of the position. It was a lot more complicated
13 because of being such a large company.
14       At the other companies, basically Management set
15 the parameters and HR was pretty much concerned with
16 initially insuring that the candidate's resume was accurate
17 for the most part; that they met any other qualifications;
18 recent times, of course, drug testing and things like that.
19 Those were more mechanical with regard to the hiring
20 process.
21 Q.    How would you describe your role or Management's
22 role?
23 A.    Our role was to insure that the individual had the
24 skills necessary and the experience necessary to do whatever
25 position they were considering that individual for, to see

**Page 881 — Fini - direct**

1  that it was a good fit for the company in terms of
2  personality. Basically, a hiring process of an individual.
3  Q.    Who would make the final decision concerning hiring
4  an applicant? Would it be the HR Department or would it be
5  the Management people?
6  A.    Again, at Remington/DuPont it was always a consensus
7  effort. There was no one individual even if you were hiring
8  someone just for your department because the theory there
9  was that you weren't hiring an individual just for one job.
10 He had a future with the company and more than one person
11 needed to assess that ability, so it was generally a
12 consensus.
13       As we moved on to some of the smaller companies,
14 it was a smaller group; sometimes just myself and,
15 sometimes, the President would make the final decision if it
16 was a person from my group. Sometimes, the President and
17 someone else would make the decision if it was for another
18 group.
19 Q.    How many interviews have you conducted over the
20 years?
21 A.    Somewhere in the range of 80.
22 Q.    What do people in the firearms industry look for in
23 an applicant?
24 A.    Well, we're looking for cleancut individuals that
25 have a particular skill, if we're interviewing for that

**Page 882 — Fini - direct**

1  skill, if we're hiring for that position.
2         As in the case of law enforcement, we would love
3  for people who have a background, if possible, like Sgt.
4  Foraker has a background. We would assess his level of
5  skill and where he could possibly aspire to in the company.
6  We look at his communication skills for considering for
7  training. A number of items like that.
8  Q.    In this case, what were you asked to do?
9  A.    I was asked to assess Sgt. Foraker by Attorney
10 Neuberger. His ability to, once leaving the Delaware State
11 Police, to see if he had the ability to transfer his skills
12 to a firearms position, look at the compensation that went
13 along with that, and whether he was a hirable candidate or
14 not.
15 Q.    Would that include a hirable candidate before as
16 compared to after what has happened to Sgt. Foraker as a
17 result of when he went back to the Firearms Training Unit?
18 A.    Yes. This meeting was prior to that, so it was
19 before.
20 Q.    Well, I think my question is were you hired to
21 identify an opinion of what he might have been able to make
22 and then whether or not he is now hirable at those
23 positions?
24 A.    Yes, sir.
25 Q.    What information did you review in this case?

**Page 883 — Fini - direct**

1  A.    I reviewed the court documents, of course; his
2  resume; and the news and media accounts that were provided
3  to me.
4  Q.    And what was the gist of the news and media accounts?
5  What were they about?
6  A.    Excuse me. What were they?
7  Q.    What were they about?
8  A.    They were about the training facility and the
9  problems with it that were alleged to have been caused by
10 Sgt. Foraker.
11 Q.    Did you meet with Sgt. Foraker?
12 A.    Yes, I did.
13 Q.    Are you able to provide any insight as to whether or
14 not Sgt. Foraker could have obtained a job in the firearms
15 industry if he had not been retaliated against?
16 A.    Yes, I think he stood an excellent chance to be a
17 candidate for hiring within the industry.
18 Q.    Well, you think you are able to provide that insight;
19 is that accurate?
20 A.    Yes, I do.
21       MR. WAVERLY: Your Honor, at this time I
22 would ask Mr. Fini be identified as an expert for the
23 purposes that he already provided concerning opinions that
24 he may have.
25       THE COURT: That's fine.

United States District Court - Honorable Gregory M. Sleet

Thursday, May 18, 2006

SHEET 42

**884 Fini - direct**

1    MR. WAVERLY: Thank you, Your Honor.
2    BY MR. WAVERLY:
3    Q.   Now, have you ever testified as an expert before?
4    A.   No, I haven't.
5    Q.   Will all your opinions be to a reasonable degree of
6    certainty?
7    A.   Yes, they will.
8    Q.   I want you to keep that in mind throughout your
9    entire testimony; okay?
10   A.   Yes, sir.
11   Q.   Thank you. What is your opinion regarding Sgt.
12   Foraker's ability to obtain a salesman job in the firearms
13   industry?
14   A.   I think he has been severely damaged as a result of
15   the media and attention surrounding his position. There are
16   no absolute certainties but I believe he has been severely
17   damaged.
18   Q.   Okay. Well, prior to him being damaged, what would
19   the compensation be for salesman working in the firearms
20   industry?
21   A.   He would be considered -- I think the average
22   salesman salary today would be approximately $55,000. That
23   is a starting salary. Now, that is --
24   Q.   Would there be any commissions?
25   A.   There could be commissions. There would be benefits

**885 Fini - direct**

1    such as 401, medical plans, sometimes company cars. The
2    larger the company, the better the benefits. The smaller
3    the company, the less benefits, less commission, less dollar
4    sales. They're all related.
5    Q.   What would the value of the commissions be,
6    typically?
7    A.   Of the bonus compensation or just pure commissions?
8    Q.   The bonus.
9    A.   For the bonus? The bonus could approximate
10   10-to-15-to-20 percent of his salary. Because they are
11   generally salaried positions, they are not commissioned
12   sales positions because of the nature of the law enforcement
13   business.
14   Q.   I'm sorry. Did you say 10-to-20 percent?
15   A.   Uh-huh. It could be as high as that.
16   Q.   What about the next level up in sales? What would
17   that position be?
18   A.   Manager's position could take you $65,000, maybe a
19   little higher.
20   Q.   Would it get up to $75,000?
21   A.   It could, in larger companies.
22   Q.   What about a bonus or?
23   A.   Again, that usually goes along with it. You'd
24   probably lose the company car because you wouldn't travel as
25   much. There is always a bonus. The person who is in charge

**886 Fini - direct**

1    of the sales force would generally receive -- generally
2    receive a bonus. Now, what I'm saying generally applies.
3    They're not absolutes because the industry has its ups and
4    downs, as do other industries, and there is no guarantees.
5    But generally in those positions, they are accompanied by
6    some type of bonus.
7    Q.   What would you say would be a reasonable value for
8    the bonus?
9    A.   Again, 10-to-20 percent.
10   Q.   Do you believe that Sgt. Foraker could have
11   ultimately become a Sales Manager but for how he was
12   severely damaged?
13   A.   I believe it's possible. He would have to spend a
14   fair amount of time. Sgt. Foraker would come in in an entry
15   level position. It would take time.
16   Q.   How long?
17   A.   Five years, maybe ten years, given the right
18   circumstances, turnover in the departments, expanding new
19   businesses for the departments. There are lots of
20   circumstances that can control the ascent of an individual
21   in a corporation. Those are just some of them. But it is
22   possible at his age, if he could stay five-to-ten years,
23   that he could at least receive one promotional level within
24   that company.
25   Q.   Let's go up to the next level. Is there a higher

**887 Fini - direct**

1    level for people in the sales industry in firearms?
2    A.   There is a senior -- senior level Director of Sales.
3    However you want to term his position.
4    Q.   Now, is that a position Sgt. Foraker would be able to
5    obtain, do you think?
6    A.   Probably not, given his experience and his level of
7    education.
8    Q.   How do you keep abreast of the salary figures for
9    salespeople and trainers within the firearms industry?
10   A.   Again, as I said before, it's a small industry.
11   There is constant interaction between marketing people at
12   different companies; certainly, the majors and some of the
13   minors at various functions that I described; and phone
14   conversations continuing, not only about what is going on in
15   the marketplace but about available personnel and people who
16   have been hired somewhere else and what they're receiving
17   and who is available in the industry for another position.
18       This is a constant. I'd like to say a manager's
19   job is, in addition to managing the business, is managing
20   the people. And that's a big part of managing people,
21   understanding and knowing what is available for your people
22   in terms of compensation and potential job positions.
23   Q.   Do you believe Sgt. Foraker could have obtained an
24   entry level training personnel range position within the
25   firearms community but for what has happened, how he has

United States District Court - Honorable Gregory M. Sleet

A - 102

Thursday, May 18, 2006

SHEET 43

888
Fini - direct

1  been treated by the defendants?
2  A.  Oh, most definitely. Most definitely.
3  Q.  And how much would those positions be?
4  A.  They're a little bit less. $40-$45 thousand to $55
5  thousand range.
6  Q.  What about the next level up in the training area of
7  the industry?
8  A.  I feel a lot more confident about discussing Sgt.
9  Foraker's ability in this area because he is a trainer and
10 he has an excellent record in training. And I have seen
11 instances of this before. I think the probability if he
12 could stay with the company five-to-ten years that he would
13 become the Manager of Training or certainly a one-level
14 advancement from the entry level would be highly probable.
15 Q.  And how much would that position pay?
16 A.  It would probably pay another $5,000 to $10,000 over
17 the entry level position. Probably somewhere in the $50,000
18 to $60,000 range.
19 Q.  Now, earlier, you said that you met with Sgt.
20 Foraker. When did you meet with him?
21 A.  I believe it was in 2002.
22 Q.  Why did you meet with him?
23 A.  Attorney Neuberger had called me in to consult
24 regarding Chris's possible advancement to the industry once
25 he retired from the Delaware State Police in terms of the

889
Fini - direct

1  compensation that would be available in the industry at that
2  time and positions that were available.
3  Q.  Was that relative to the first lawsuit?
4  A.  Yes, it was. Yes, it was.
5  Q.  Did you formulate an opinion as to whether or not
6  Sgt. Foraker was effectively unable to find a job in the
7  firearms industry because Col. Chaffinch violated his rights
8  on that occasion?
9  A.  Yes, I did.
10     MR. ELLIS: Objection, Your Honor.
11     THE COURT: Sustained.
12     MR. WAVERLY: Let me rephrase the question.
13 BY MR. WAVERLY:
14 Q.  Did you formulate an opinion as to whether or not
15 Sgt. Foraker was effectively unable to find a job in the
16 firearms industry relating to what happened in that case?
17     MR. ELLIS: Objection, Your Honor.
18     THE COURT: Sustained.
19     MR. WAVERLY: May we go to sidebar, Your Honor?
20     THE COURT: Yes.
21     (Conference held at sidebar out of presence of
22 jury.)
23     THE COURT: Articulate the basis of your
24 objection.
25     MR. ELLIS: It's relevance, Your Honor. It's

890
Fini - direct

1  relevance.
2     THE COURT: I thought --
3     MR. WAVERLY: Your Honor, Mr. Fini will say at
4  that time, he did not believe that Sgt. Foraker had been
5  injured. That's the reason why I'm asking. It goes to his
6  credibility. He ended up leaving, recognizing he had not
7  been injured previously. Now under this new set of facts,
8  he will say, he has already said he is severely damaged, so
9  that's the reason I'm asking.
10    THE COURT: You want to show what he was worth
11 before?
12    MR. S. NEUBERGER: It's like a baseline.
13    MR. ELLIS: That is not what the question is.
14    THE COURT: I don't think that's the question.
15 Do you object to him establishing a baseline?
16    MR. ELLIS: Well, establishing a baseline, no,
17 but asking him whether he was damaged by the incident in
18 2002.
19    THE COURT: That wasn't the question. If you
20 want to establish a baseline, sure, I understand that, to
21 show before.
22    MR. ELLIS: If he wants to -- I'm not going to
23 try to tell Mr. Haverly how to run his case. If he wants to
24 ask if he had, in order to get the job in that time period,
25 2002, that's fine, or 2003.

891
Fini - direct

1     THE COURT: If you aren't trying to establish
2  what he would have made, then what are you trying to
3  establish?
4     MR. WAVERLY: No, I'm not, Your Honor. I'm
5  trying to --
6     THE COURT: What are you trying to do?
7     MR. WAVERLY: I'm trying to identify that
8  Mr. Fini, when he met with him the first time, still thought
9  that he will be able to get a job at the firearms industry.
10    MR. T. NEUBERGER: Could I interject, Your
11 Honor?
12    THE COURT: Sure.
13    MR. T. NEUBERGER: I think what Mr. Haverly is
14 trying to say is that Sgt. Foraker's reputation was not
15 injured as a result of the first suit so he still could have
16 gotten hired.
17    MR. ELLIS: Why is that relevant to the case?
18    MR. T. NEUBERGER: The baseline, Your Honor, for
19 which to measure.
20    MR. ELLIS: It has nothing to do with the
21 baseline.
22    THE COURT: I'm not following.
23    MR. ELLIS: The baseline is could he have gotten
24 the job before this incident? Could he have gotten it
25 after? That is the baseline to the present.

United States District Court - Honorable Gregory M. Sleet

A - 103

Thursday, May 18, 2006

SHEET 44

**Fini - direct** — 892

1  MR. WAVERLY: So I could ask could he have
2  gotten a job in the firearms industry at that time?
3  THE COURT: I think there is no objection to
4  that question.
5  MR. ELLIS: That's okay.
6  MR. WAVERLY: Let me do that.
7  THE COURT: All right.
8  (Conference at sidebar ends. Proceedings
9  continue in open court.)
10  BY MR. WAVERLY:
11  Q.  Mr. Fini, in your opinion, could Sgt. Foraker have
12  gotten a job in the firearms industry in the year 2002?
13  A.  Yes.
14  Q.  At this time, in your opinion, do you believe that he
15  can get a job in the firearms industry?
16  A.  No, I do not.
17  Q.  Back in 2002, what type of job could he have gotten
18  in the firearms industry?
19  A.  I think both sales and particularly training would be
20  two areas that he would be well qualified for.
21  Q.  In what area?
22  A.  I'm sorry. In law enforcement for sure. Yes, law
23  enforcement. General sales, probably not, but in law
24  enforcement sales and specifically training for the
25  companies that deal in law enforcement products, he would be

**Fini - direct** — 893

1  an ideal candidate.
2  Q.  Is law enforcement sales a separate component of the
3  total firearms industry?
4  A.  Most of the larger companies split-off law
5  enforcement sales from regular commercial sales, dealing
6  with hunting or target shooting. The law enforcement
7  segments of the market are just so different in the way they
8  talk about products, the way the products are used,
9  obviously, what they do for the department. It's just such
10  a different world, jargon that they use is onto themselves,
11  and an individual coming out of law enforcement training
12  such as Chris Foraker just has a one-up on anyone trying to
13  get into law enforcement training or sales because of their
14  understanding and, most importantly, their ability to build
15  relationships with their peers who they will now be selling
16  in the same industry.
17  Q.  Well, in the law enforcement sector of the industry,
18  who usually purchases the guns?
19  A.  It can be the armorer. It can go up to different
20  levels, but the armorer certainly plays a big role in what
21  the Department will use and how they will use it, because
22  he has to set up the training necessary and the repairs and
23  the parts and all the other things to keep that going. The
24  armorer and the trainer.
25  Q.  Okay. Well, would the armorer or trainer

**Fini - direct** — 894

1  particularly be a police officer or a law enforcement
2  officer?
3  A.  In the department?
4  Q.  Yes.
5  A.  Yes, absolutely.
6  Q.  Is it your opinion that it would be easier for
7  someone who was already a police officer or in law
8  enforcement to sell to the armorer as opposed to some other
9  salesperson who doesn't have specialized knowledge?
10  A.  Yes. As I said, I think given the fact they speak
11  the same language, which is a different language from the
12  commercial market, that they shared the same experiences,
13  are just able to talk on a much more even level than someone
14  who has come out of commercial sales. That's why I say
15  that.
16  Q.  How did Sgt. Foraker's resume compare to other
17  resumes you saw in the law enforcement sector?
18  A.  With particular regard to training, I thought it was
19  an excellent resume. It qualified him in one of the higher
20  upper percentages of resumes for training.
21  Q.  What about for sales?
22  A.  To a lesser extent for sales, but again he has all
23  the properties given that he doesn't have a lot of sales
24  experience that that can be taught. The key is he has the
25  understanding of the products, the knowledge of the

**Fini - direct** — 895

1  products, how to use them, when to use them, and again that
2  puts him on an even keel with those that he is discussing
3  sales with.
4  Q.  How would you value his credentials as a potential
5  salesperson in the law enforcement industry?
6  A.  I still value him very highly.
7  Q.  How highly?
8  A.  Probably on a percentage -- are we talking
9  percentages?
10  Q.  I guess so.
11  A.  You know --
12  MR. ELLIS: Your Honor, I object. This is
13  vague.
14  THE COURT: It is irrelevant. Sustained.
15  Do you want to go to side bar? We can go to
16  side bar. Sustained.
17  Do you want to rephrase? You can rephrase the
18  question. If you want to go to sidebar, we can go to
19  sidebar. Sustained.
20  BY MR. WAVERLY:
21  Q.  Compared to the other resumes you viewed over the
22  years concerning positions in the law enforcement section of
23  the firearms industry, what percentage would you classify
24  Sgt. Foraker's credentials to be in?
25  MR. ELLIS: Objection, Your Honor. Again, it's

United States District Court - Honorable Gregory M. Sleet

Thursday, May 18, 2006

SHEET 45

**896**
Fini - direct

1 vague.
2     THE COURT: Let's go to sidebar.
3     MR. WAVERLY: Your Honor, I can move on.
4     THE COURT: Do you want to move on?
5 BY MR. WAVERLY:
6 Q.   Now, would the fact that Sgt. Foraker doesn't have a
7 bachelor degree concern anyone?
8 A.   For the entry level positions we're discussing here
9 today, no.
10 Q.  What about for the mid-level positions we discussed?
11 A.  The higher you aspire to, the more it becomes a
12 relevant issue. Certainly if you had a degree with a lot of
13 other experience, you could apply for positions that start a
14 little higher or maybe a lot higher. The degree is
15 important.
16     For an entry level or the ability for Chris
17 Foraker to come into a company, that is not essential that
18 he have a bachelor's degree.
19 Q.  What about five-to-ten years later after he has been
20 working in the company at the entry level position? Would
21 the lack of a college degree concern you in his getting to
22 that mid level?
23 A.  It would be an issue if he was competing against
24 someone of equal value who had the degree. If they were all
25 of Chris's level, it would be more based on experience and

**897**
Fini - direct

1 who they felt was best to handle the group.
2 Q.   Do you believe that Sgt. Foraker would have survived
3 the beginning of the interview process?
4 A.   Yes, I believe he would have.
5 Q.   What about after that?
6     MR. ELLIS: Your Honor.
7 BY MR. WAVERLY:
8 Q.   Let me give a time frame.
9     MR. ELLIS: Objection, Your Honor. For what
10 position?
11    THE COURT: Sustained.
12    MR. WAVERLY: No further questions, Your Honor.
13    THE COURT: Let's take our afternoon break.
14    (Brief afternoon recess taken.)
15    THE COURT: Please be seated.
16 Mrs. Walker.
17    (Jury returned.)
18    THE COURT: Unless you want to stand in the well
19 of the court, you can be seated, if you would like. I
20 understand why the parties are standing but it's entirely up
21 to you.
22    MR. ELLIS: It's kind of like church, Your
23 Honor.
24    THE COURT: I'll tell you.
25    (Jury returned.)

**898**
Fini - cross

1     THE COURT: Ladies and gentlemen, please take
2 your seats and we'll start the cross-examination.
3 Mr. Ellis.
4     MR. ELLIS: Thank you, Your Honor.
5         CROSS-EXAMINATION
6 BY MR. ELLIS:
7 Q.   Mr. Fini, just to review your background briefly, am
8 I correct that your longest tenure with any company in the
9 firearms industry would be with Remington?
10 A.  Yes, sir.
11 Q.  And you were with Remington from approximately 1976
12 to 1996?
13 A.  Yes, sir.
14 Q.  In 1996, you left Remington?
15 A.  Yes, sir.
16 Q.  Is that because you were laid off?
17 A.  The company moved to North Carolina I was not invited
18 to go.
19 Q.  So you were laid off?
20 A.  Essentially they claimed they eliminated the
21 position.
22 Q.  Now, over the course of the next 10 years, am I
23 counting correctly that you've been with six different
24 companies?
25 A.  Yes, sir.

**899**
Fini - cross

1 Q.   Now, over the total of 30 years that you've been with
2 a firearms companies, I think you testified that you hired a
3 total of about 30 people. Did I characterize that
4 correctly?
5 A.   Yes, sir.
6 Q.   Now, you've testified about two types of jobs here.
7 One was law enforcement sales representatives and the other
8 I think was law enforcement trainers. Do I have those two
9 right?
10 A.  Yes, sir.
11 Q.  Now, of the 30 people that you hired in the course of
12 your time in the law enforcement industry -- excuse me -- in
13 the firearms industry, how many of those 30 were law
14 enforcement sales reps?
15 A.  Direct hires or just involved with their hiring.
16 Q.  Well, of the 30 whatever you call that. Was that 30
17 direct hires?
18 A.  Pretty much, yes.
19 Q.  How many of those 30 were law enforcement sales
20 reps?
21 A.  Maybe half.
22 Q.  So that would be about 15?
23 A.  Yes, sir.
24 Q.  Now, how many of them were law enforcement
25 trainers?

United States District Court - Honorable Gregory M. Sleet

Thursday, May 18, 2006

SHEET 46

**900**
Fini - cross

1  A. Two.
2  Q. So of the two positions that you are here to talk
3  about, you directly hired 17 people in those 30 years;
4  right?
5  A. Yes, sir.
6  Q. Now, I understand from your resume and the questions
7  up answered for Mr. Haverly that you supervised sales
8  representatives from about 1981 through 1984; correct?
9  A. Yes, sir.
10 Q. And that was one of your jobs at Remington;
11 correct?
12 A. Yes, sir.
13 Q. Have you supervised any sales representatives since
14 1984?
15 A. Yes, sir.
16 Q. How many?
17 A. It's a large number.
18 Q. Well, maybe the would be us yes, sir if I went
19 backwards. Your current position is with which company?
20 A. Rizzini USA.
21 Q. Do you have any sales reps employed by Rizzini that
22 you supervise now?
23 A. Direct? Are you saying direct employees, no.
24 Q. Okay. How about the company before that? Was that
25 Heckler & Koch?

**901**
Fini - cross

1  A. Yes.
2  Q. Did you supervise any direct sales reps there?
3  A. No.
4  Q. How about with Perazzi?
5  A. No.
6  Q. How about with Savage Arms?
7  A. We only had one direct employee involved in that
8  situation.
9  Q. So you supervised one sales employee at Savage Arms?
10 A. Yes the rest were rep groups.
11 Q. Now, when you say rep group, are you talking about
12 independent contractors that sell for more than one gun
13 core, right?
14 A. Commission salesmen who work for us, yes.
15 Q. But they also work for other gun companies?
16 A. Nonrelated gun companies, if that were the case.
17 Q. And you consider them independent contractors?
18 A. Yes toy.
19 Q. Now, you have a company called Mossberg on your
20 resume?
21 A. Yes.
22 Q. Did you supervise any sales representatives at
23 Mossberg?
24 A. Directly, no.
25 Q. How about at SigArms?

**902**
Fini - cross

1  A. Directly, no.
2  Q. So from 1996 through the present, you supervised only
3  one sales employee, salesman?
4  A. Salesman.
5  Q. Sales representative?
6  A. Person.
7  Q. Right. Now, you do not have any background as a
8  recruiter, right?
9  A. No, sir.
10 Q. And you don't have any background in the Human
11 Resources field?
12 A. No, sir.
13 Q. I'd like to ask you, you testified a few minutes ago
14 that you received information for Mr. Neuberger and you said
15 that you received some news accounts. Can you tell us what
16 news accounts Mr. Neuberger gave you?
17 A. There were articles that appeared mostly in the
18 journal, Delaware journal and one magazine, Police Beat.
19 Q. So he showed you the Police Beat Magazine. Do you
20 have the articles that he showed you with you in the
21 courtroom today?
22 A. No, I do not.
23 Q. Do you know how many they were?
24 A. About that many.
25 Q. Well, this many articles that I'm holding my fingers

**903**
Fini - cross

1  about three or four inches apart, didn't all deal with Chris
2  Foraker, did they?
3  A. No, they dealt with the training site as well.
4  Q. And in fact, there is probably only one or two of
5  those articles that dealt with Chris Foraker; right?
6  A. No, I would disagree with that. I think his name was
7  mentioned in a lot more than two or three.
8  Q. And you don't have them with you today?
9  A. No, I do not.
10 Q. Were any of the articles from the State News?
11 A. I believe so.
12 Q. Do you remember what the article in the State News
13 said?
14 A. Many of the articles were similar. I could give you
15 condensations. If you are asking for quotes I probably
16 could not quote any article, any sentence directly in that
17 respect. When you read that many, it's very difficult to
18 single out which one came from which news source.
19 Q. Did you read things to the affect that Chris Foraker
20 had decided not to do cleaning at the firing range in
21 Smyrna?
22 A. Yes.
23 Q. And that he considered it inappropriate use of his
24 resources because it was unhealthy?
25 A. I do recall the "unhealthy" part, not the words

United States District Court - Honorable Gregory M. Sleet

A - 106

SHEET 47

**904**
Fini - cross

1 leading up to that.
2 Q. Okay. Is that, the content of the articles that you
3 believe damaged his ability to get a position with the
4 firearms company?
5 A. I think you have to take the article in total context
6 when you are dealing with an issue that goes as high as the
7 governor, the head of the police unit and various town and
8 state representatives. I think it's a little broader than
9 just saying we didn't clean something.
10 Q. Did Mr. Neuberger give you a copy of the report by
11 the State Auditor of Accounts?
12 A. No, sir.
13 Q. Did he give you a copy of any news articles that
14 described the report by the State Auditor of Accounts?
15 A. Not to my recollection.
16 Q. Mr. Fini, I take it that what you are saying is that
17 based on your experience with hiring people in these two
18 positions that you described to us, that someone in a gun
19 company is likely to pick up one or more of these particles
20 articles that you have said that you saw and that those
21 articles would convince people from gun companies not to
22 hire Chris Foraker?
23 A. I think what I'm saying is that following an
24 interview process, submission of a resume for a potential
25 job assignment, the follow-up that would qualify that person

**905**
Fini - cross

1 would probably in all likelihood reveal some instances of
2 these events that occurred. And I think it would give pause
3 to a manager, if he had alternative selections available to
4 him, why he would choose that individual over another.
5 Q. Do you agree with me that over the course of time the
6 affect of any of those articles is going to dissipate?
7 A. No, I do not.
8 Q. So you think that forever, for the rest of his life,
9 Mr. Foraker, will be carrying this around?
10 A. I think for the foreseeable immediate future, it's an
11 issue. I don't care to speculate but I think it is an issue
12 for the immediate future.
13 Q. Well, how about 12 years from now?
14 A. I can't speak to that.
15 Q. You don't have a prediction? Would you agree with me
16 that it's less likely to be a problem in 12 years?
17 A. It could be.
18 Q. Chris Foraker is 43 years old now. You know that;
19 right?
20 A. Yes, sir.
21 Q. Do you know what he makes presently?
22 A. No, I don't.
23 Q. If I told you it was about $80,000 a year, would that
24 sound right to you, for a sergeant in the Delaware State
25 Police?

**906**
Fini - cross

1 A. For a trooper, yes.
2 Q. Now, there would be no economic incentive for him to
3 leave an $80,000 a year job to go to one of these $55,000 a
4 year jobs that your --
5    MR. WAVERLY: Objection, relevance. That is not
6 what he is being called for.
7    THE COURT: Well, let me see counsel.
8    (Conference held at sidebar out of presence of
9 jury.)
10    THE COURT: Mr. Ellis, don't you think that
11 question is a little unfair? Where are you trying to take
12 this jury?
13    MR. ELLIS: The jury, Your Honor?
14    THE COURT: Here is my concern. He is leading.
15 As I understand the facts, he is going to be leading. We're
16 talking about Foraker.
17    MR. ELLIS: We don't know that. He is different
18 from the other two.
19    MR. S. NEUBERGER: Yes.
20    THE COURT: All right.
21    MR. S. NEUBERGER: Your Honor, I would disagree
22 with that. Sgt. Foraker is burning his sick time the same
23 way Kurt Price was. When his sick time ran out, he had to
24 get out. He is burning his sick time.
25    THE COURT: My concern was the question might be

**907**
Fini - cross

1 a little misleading.
2    MR. ELLIS: Here is my point, Your Honor. This
3 guy is physically healthy. He can work until age 55. That
4 is 12 years from now. There is no financial incentive for
5 him to go to a gun company now because he would have to take
6 a big pay cut. But on the other hand, if he works until he
7 is 55, he then gets a much bigger pension, then he goes to
8 the gun company. In 12 years, this is all going to be
9 dissipated.
10    THE COURT: Well, he is not going, and their
11 point is he will not be able to work until he is 55.
12    MR. ELLIS: Sure, he would.
13    MR. T. NEUBERGER: Not as a Delaware State
14 Trooper.
15    MR. ELLIS: Why not?
16    MR. S. NEUBERGER: He is psychologically unfit
17 for duty.
18    MR. ELLIS: Your Honor, everybody, including the
19 woman that testified this morning, says that the prognosis
20 is good for his recovery. There is absolutely no reason why
21 Foraker can't work until 55.
22    THE COURT: As a Delaware State Trooper.
23    MR. ELLIS: He is not like the other two. They
24 have hearing problems, but he does not.
25    MR. T. NEUBERGER: Your Honor, he is unfit for

United States District Court - Honorable Gregory M. Sleet

**Page 908 — Fini - cross**

1  duty now, and once he exhausts his sick leave he will be
2  forced to retire like Kurt Price does. This case will not
3  be over in the next one year. We will have verdicts, one
4  way or another, do six months of post-trial briefing, then
5  there will be an appeal. He will be forced out just like
6  Kurt Price was because he will not have recovered because
7  Dr. Tavani says the litigation has to have come to a
8  conclusion before he can.
9      THE COURT: Let me ask you this, Mr. Neuberger.
10     MR. T. NEUBERGER: Yes, Your Honor.
11     THE COURT: None of us are physicians here and I
12 don't even know that Dr. Tavani can predict this or any of
13 the doctors mentioned. Isn't there a possibility that he
14 might recover? Anything is possible, I understand that, but
15 isn't there a medical possibility he may recover before the
16 end of the litigation?
17     MR. T. NEUBERGER: No, I think we specifically
18 had her address that. There were one or two statements she
19 made. Remember I got up and I objected when he said when we
20 get the jury verdict, and then I objected. And then he
21 rephrased the question. And then what came in was she said
22 he had a reasonably good prognosis. He has a good prognosis
23 for recovery after the litigation is over. He is not going
24 to start that healing process until after they give up;
25 okay? Where we get a judgment. And his sick leave, we

**Page 909 — Fini - cross**

1  could ask. His sick leave will probably be gone in six
2  months or something like that.
3      THE COURT: See, I didn't understand. I'll
4  stand to be corrected if I'm wrong. I didn't understand
5  that to be her testimony. I thought --
6      MR. ELLIS: I didn't either.
7      THE COURT: Go ahead.
8      MR. T. NEUBERGER: It wasn't highlighted. We
9  worked very carefully on putting that in. I believe that
10 that is the state of the record. She was asked that kind of
11 question, okay? That is why I raised that objection, okay?
12 She is not saying he is going to get better in six months
13 from today.
14     THE COURT: Do you want to pose the question in
15 the form of a hypothetical if he were able to stay?
16     MR. ELLIS: I could do that sure.
17     THE COURT: Let's do it that way.
18     MR. T. NEUBERGER: Thank you, Your Honor.
19     THE COURT: Okay.
20     (Conference at sidebar ends. Proceedings
21 continue in open court.)
22     MR. ELLIS: I just want to get the last
23 question, Your Honor. I forgot what it was.
24     THE COURT: Could you read back the last
25 question.

**Page 910 — Fini - cross**

1      (The court reporter read back the requested
2  information.)
3  BY MR. ELLIS:
4  Q.  Let me rephrase that, Mr. Fini.
5      Let's say, hypothetically speaking, that Sgt.
6  Foraker were able to continue to work at the State Police as
7  a sergeant for the next 12 years. Would you agree with me
8  that there would be no economic incentive for him to take a
9  pay cut and go to a firearms company at that point?
10 A.  Strictly on the dollars, but again that is
11 speculation as to his motives why he would want to do
12 something.
13 Q.  I absolutely understand that. My next question is if
14 he were to go to the gun company at the point of mandatory
15 retirement at 2018, would you agree with me that the affect
16 of any of these articles that appeared in 2003 and 2004
17 would be largely dissipated? In other words, people
18 wouldn't remember.
19 A.  But the records are there. People who are
20 responsible for doing follow-up work on resumes and a
21 candidate selection are obviously going to know about it.
22 Q.  Well, let me ask you this. When somebody goes from a
23 law enforcement position to a firearms company, don't the
24 Human Resources people go to the State Police or the
25 municipal police, Philadelphia police, whatever it is and

**Page 911 — Fini - cross**

1  ask for a copy of the personnel file?
2  A.  Possibly. In many instances, it probably is a better
3  answer, yes.
4  Q.  They would ask someone like Sgt. Foraker to sign a
5  release and they would take the release in and ask to see
6  the official police personnel file; right?
7  A.  Yes, sir.
8  Q.  And if, in the official police personnel file, there
9  was no reprimand and no sanction and no discipline given to
10 Sgt. Foraker for anything that occurred at the range, that
11 would be something that would enable, help him get a job,
12 wouldn't it?
13 A.  It would be a positive.
14 Q.  Okay.
15     MR. ELLIS: I don't have any further questions.
16 Thank you.
17     THE COURT: Is there any redirect?
18     MR. ELLIS: I'm sorry, Your Honor. Can I do one
19 more? I'm sorry.
20     THE COURT: Yes.
21     MR. ELLIS: May I approach the witness?
22     THE COURT: You may.
23 BY MR. ELLIS:
24 Q.  Mr. Fini, I was on the Internet last night and I
25 found something from your old company. I just put the

United States District Court - Honorable Gregory M. Sleet

Thursday, May 18, 2006

SHEET 49

**912**
Fini - redirect

1  two-paged document in front of you. Can you tell me what
2  that is?
3  A.  It's a posting for a job position at Remington.
4  Q.  Is that a firearms sales position?
5  A.  Yes. It's for general hunting and shooting sales.
6  Q.  Does it have a preference for someone with a
7  bachelor's degree?
8  A.  Yes, it does.
9  Q.  And five years experience?
10 A.  Yes, it does.
11 Q.  Sgt. Foraker doesn't have a bachelor's degree, right?
12 A.  No, sir.
13 Q.  Okay.
14     MR. ELLIS: Thank you.
15     THE COURT: Redirect.
16         REDIRECT EXAMINATION
17 BY MR. WAVERLY:
18 Q.  Mr. Fini, with regards to these articles, can you get
19 on the computer and punch up on the Internet these articles?
20 A.  Yes, sir.
21 Q.  And is the Internet to be going to be here for at
22 least 12 years?
23 A.  I would expect it to be here.
24 Q.  Okay.
25     THE COURT: Not if Former Vice President Gore

**913**
Fini - redirect

1  hasn't anything to do with it. Sorry about that.
2      MR. WAVERLY: Pardon me, Your Honor. It's late.
3  BY MR. WAVERLY:
4  Q.  Mr. Fini, you mentioned that there was an article in
5  Police Beat Magazine. What is Police Beat Magazine?
6  A.  Well, every industry, to my knowledge, major
7  industry, ones that have been around for awhile, car
8  industry, firearms industry, shoe industry, have
9  publications that are specifically devoted to that industry.
10 And Police Beat is one. And it deals with the law
11 enforcement side of the industry.
12     When I was in communications, that was an
13 absolute necessity to advertise in Police Beat Magazine to
14 expose products because they cover current products, past
15 products. They cover police procedure. They cover
16 everything in the police industry. It's a real trade rag,
17 as we call it in our jargon. I don't think you could go to
18 a law enforcement section of a company or an agency and not
19 find a copy of Police Beat around somewhere.
20     MR. WAVERLY: Thank you. No further questions.
21     THE COURT: Thank you, Mr. Fini.
22     THE WITNESS: Thank you, Your Honor.
23     MR. WAVERLY: Your Honor, plaintiffs recall
24 Master Cpl. Kurt Price.
25     THE COURT: All right.

**914**
Price - direct

1      THE DEPUTY CLERK: Cpl. Price, please be
2  reminded you are still under oath.
3      THE WITNESS: Yes, ma'am.
4          - - -
5       PLAINTIFFS' TESTIMONY
6  ... MASTER CPL. KURT PRICE, having been previously
7  placed under oath, retook the witness stand at 3:49 p.m.
8  as a witness, was examined and testified as follows ...
9          - - -
10        DIRECT EXAMINATION
11 BY MR. S. NEUBERGER:
12 Q.  Kurt, do you recall Mr. Ellis asking Dr. Tavani about
13 a hunting trip?
14 A.  Yes, sir. I do.
15 Q.  Could you explain the circumstances of that hunting
16 trip to the jury, please?
17 A.  Yes. Some time around March of 2004, I booked a
18 five-day hunt for deer in broadest Montana, which is in the
19 southeastern portion of the state for my son and I -- a
20 father-and-son trip. I wanted to get an opportunity to
21 reconnect our bond that we originally had and there was no
22 better place to do it than for us to totally leave the area
23 and just go out into true God's Country.
24 Q.  Now, Kurt, you said March of 2004. Wasn't that when
25 the range closed?

**915**
Price - direct

1  A.  Yes, it was.
2  Q.  So you think that the hunting trip was in 2004?
3  A.  No, that's when I booked it. I'm sorry. The hunt
4  was actually October of 2005.
5  Q.  Okay. And why did you take your son on the hunt?
6  A.  Well, obviously I love my son dearly. And he shares
7  a passion that I share for the outdoors. I don't want the
8  Court or the jury to get any type of a misunderstanding.
9  The actual hunt part is -- and when I say "hunt," the actual
10 harvesting of the game is not, we don't even consider that.
11 What we consider is the time that we spend together in the
12 field, being out in land that God created and seeing the
13 wild.
14 Q.  Now, during the last two years, since things began
15 happening in December of 2003, has your son -- I'm sorry.
16 What is your son's name?
17 A.  My son's name is Jim. He is 15.
18 Q.  Has Jim had any problems over the last two years?
19 A.  Yes, he has.
20 Q.  Could you explain those problems to the jury?
21     MR. ELLIS: Your Honor, I'm going to object
22 unless there is some relationship to the case.
23     THE COURT: Well, I would imagine that you are
24 going to try to develop it.
25     MR. S. NEUBERGER: Absolutely, Your Honor.

United States District Court - Honorable Gregory M. Sleet

Thursday, May 18, 2006

SHEET 54

**Page 932** — Price - direct

1  contributing factors concerning the exposure we face
2  concerning heavy metal contamination? Does it indicate
3  that?
4  A.  Yes, sir, it does.
5  Q.  Let's skip down to the last paragraph of the third
6  line, the first full sentence, okay?
7  A.  Yes, sir.
8  Q.  Now, does that indicate that Master Cpl. Price's
9  initiative and work ethic will be greatly missed and
10  obviously absent in all areas where his positive impact and
11  influence was evident and witnessed by many? Does it
12  indicate that?
13  A.  That's what it says, yes.
14  Q.  Now, let's turn to the very next page, which is the
15  promotable page; okay?
16  A.  Yes, sir.
17  Q.  Now, did there come a time when your immediate
18  supervisor signed this evaluation, to the best of your
19  recollection?
20  A.  Yes.
21  Q.  Okay. And this page just doesn't reflect that
22  signature; right?
23  A.  No, it does not.
24  Q.  Okay. Did there come a time that you are aware when
25  someone reviewed this?

**Page 933** — Price - direct

1  A.  Yes.
2  Q.  Do you know who reviewed it?
3  A.  I believe that would have been Lt. Ralph Davis at the
4  time.
5  Q.  Do you know if he signed it?
6  A.  I would assume that he had.
7  Q.  Okay. Let's turn one more page, rater's comments
8  under Work Habits and skip down to the very last paragraph
9  on that page. Have you found that?
10  A.  Yes, sir.
11  Q.  Does that indicate that whenever formal or informal
12  inspections of divisional weapons equipment and vehicles
13  assigned to Master Cpl. Price has occurred, all were found
14  to be in good working order and maintained in the
15  appropriate fashion and condition above divisional
16  standards? Does it indicate that?
17  A.  Yes, sir. That's what it says.
18  Q.  Let's turn to the next page. First paragraph. Have
19  you found that?
20  A.  Yes, sir.
21  Q.  Does that indicate that as the lead instructor of the
22  DSP and municipal recruit firearms training program, Master
23  Cpl. Price showed an experience, interest and initiative to
24  forge ahead on creating a new set of range safety rules to
25  govern the safe conduct of student personnel, thereby

**Page 934** — Price - direct

1  providing a safe and conducive work environment to conduct
2  firearms training? Does it say that?
3  A.  Yes, it does.
4  Q.  Okay. Let's go on to the next paragraph. Firearms
5  training is considered by many in the field of law
6  enforcement to be one of the most stressful assignments
7  within an agency. Safety is of paramount concern and a
8  structurally strict yet agreeable learning environment.
9  Master Cpl. Price is able to communicate exceptionally well
10  with students ranging from recruit troopers who never
11  handled a firearm to the seasoned law enforcement
12  professional. Does it indicate that?
13  A.  Yes, that's what it said.
14  Q.  Okay. And the next paragraph is kind of long so
15  we'll just read the first sentence; okay?
16       Does that indicate that Master Cpl. Price
17  possesses vast knowledge in the field of firearms and
18  firearms training? Does that indicate that?
19  A.  Yes.
20  Q.  Okay. Let's skip down to -- let's skip to the next
21  page, top paragraph. Does that indicate Master Cpl. Price
22  has a committed work ethic dedicated to the survival of his
23  students. He embraces the thought that the finished
24  product, the students' survival of a deadly encounter is a
25  direct reflection of his performance as a teacher and an

**Page 935** — Price - direct

1  instructor. Master Cpl. Price prides himself in providing
2  his students with tactical training as a blueprint to
3  survive the dangers that they may encounter in real world
4  situations. Master Cpl. Price excels when imparting his
5  firearms' knowledge and related experience to recruit
6  troopers? Does that indicate that, too?
7  A.  Yes, sir, it does.
8  Q.  Let's go on to the next paragraph. I think this one
9  talks about equipment a little bit. Master Cpl. Price has
10  been responsible for the proper care and maintenance of his
11  assigned equipment. He has also provided the specialized
12  care and attention only a certified armorer would apply to
13  his assigned weapons. Master Cpl. Price provides the proper
14  standard for his students and peers to emulate in the care
15  of equipment. Does it indicate that?
16  A.  Yes.
17  Q.  Okay. Now let's just skip to the last paragraph.
18  Does that indicate as is evident in previous comments in
19  this performance appraisal, Master Cpl. Price has devoted
20  his career to the protection, advancement and survival of
21  others. He is able to maintain a very safe range by
22  controlling the movement of his students with proper
23  dialogue and voice inflection conducive for learning. His
24  calm demeanor under high stress has been a standard guide
25  for future instructors. Many troopers look to Master Cpl.

United States District Court - Honorable Gregory M. Sleet