```
                                                              948

 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4   B. KURT PRICE, WAYNE WARREN,    :    Civil Action
     and CHRISTOPHER D. FORAKER,     :
 5                                   :
                  Plaintiffs,        :
 6                                   :
           v.                        :
 7                                   :
     L. AARON CHAFFINCH,             :
 8   THOMAS F. MACLEISH,             :
     DAVID B. MITCHELL, and          :
 9   DIVISION OF STATE POLICE,       :
                                     :
10                Defendants.        :    No. 04-956-GMS

11                          - - -

12   CHRISTOPHER D. FORAKER,         :    Civil Action
                                     :
13                Plaintiff,         :
                                     :
14         v.                        :
                                     :
15   L. AARON CHAFFINCH,             :
     THOMAS F. MACLEISH,             :
16   DAVID B. MITCHELL, and          :
     DIVISION OF STATE POLICE,       :
17                                   :
                  Defendants.        :    No. 04-1207-GMS
18
19                          - - -

20
                        Wilmington, Delaware
21                      Friday, May 19, 2006
                            9:00 a.m.
22                       FIFTH DAY OF TRIAL

23                          - - -

24   BEFORE: HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury

25
```

## Page 949

APPEARANCES:

THOMAS S. NEUBERGER, ESQ., and
STEPHEN J. NEUBERGER, ESQ.
The Neuberger Law Firm
-and-
MARTIN D. HAVERLY, ESQ.
Law Offices of Martin D. Haverly

    Counsel for Plaintiffs

R. MONTGOMERY DONALDSON, ESQ.
Montgomery, McCracken, Walker & Rhoads, LLP
-and-
EDWARD T. ELLIS, ESQ., and
CARMON M. HARVEY, ESQ.
Montgomery, McCracken, Walker & Rhoads
(Philadelphia, PA)

    Counsel for Defendants

- - -

## Page 950

INDEX

B. KURT PRICE (CONTINUED)
    Direct examination ------------- Page 951
    Cross-examination -------------- Page 1001

GLENN DIXON
    Direct examination ------------- Page 1001
    Cross-examination -------------- Page 1074
    Redirect examination ----------- Page 1076

GREGORY A. WARREN
    Direct examination ------------- Page 1077

THOMAS C. BORZILLERI
    Direct examination ------------- Page 1098
    Cross-examination -------------- Page 1117
    Redirect examination ----------- Page 1127

JOSE CASTRO
    Direct examination ------------- Page 1128
    Cross-examination -------------- Page 1153

GREGORY A. WARREN
    Direct Continued --------------- Page 1158

- - -

## Page 951

THE COURT: Good morning. Please be seated.

Do we have any issues?

Please, bring out the jury.

(Jury enters courtroom at 9:05 a.m.)

THE COURT: Mr. Neuberger.

MR. S. NEUBERGER: Thank you, Your Honor.

... B. KURT PRICE, having been previously sworn as a witness, was examined and testified further as follows ...

DIRECT EXAMINATION CONTINUED

BY MR. S. NEUBERGER:

Q. Now, Kurt, while Sergeant Ashley was the Section Chief of the FTU, did he ever talk to you about how he wanted to be promoted to the rank of Lieutenant?

A. Yes, sir. I know that during --

MR. ELLIS: Objection, Your Honor. Hearsay.

THE COURT: I apologize. I didn't hear the question.

MR. S. NEUBERGER: The question was while Sergeant Ashley was the Section Chief did he ever speak to Corporal Price about the fact that he wanted to be promoted to Lieutenant.

THE COURT: Did he ever speak to him about it?

MR. S. NEUBERGER: Yes. I am not asking what was said, the content of the conversation.

## Page 952

MR. ELLIS: The witness has just begun to describe the conversation.

THE COURT: He can answer the question yes or no.

BY MR. S. NEUBERGER:

Q. Kurt, could you answer the question yes or no?

A. Yes, he did.

Q. Now, I believe you testified that you had been at the range since, was it '96?

A. Yes, sir. December 16, 1996.

Q. Were three of your prior supervisors prior to Sergeant Aaron Chaffinch Sergeant Foraker, Sergeant Parton and Sergeant Fitzpatrick? Is that correct?

A. That's correct.

Q. Had they served at the range in a full-time capacity before becoming Section Chief?

A. Yes, each of those individuals that you mentioned were full time at the range.

Q. Had Sergeant Ashley served at the range full time before becoming a Section Chief?

A. No, he had not. At best he was up there as an adjunct instructor.

Q. Was Sergeant Ashley a personal friend of Colonel Chaffinch?

MR. ELLIS: Objection, Your Honor.

**957**

1  Q.   And so when a trooper is on the firing line, they are
2  firing into the bullet trap this way?
3  A.   Yes, sir, that's correct.
4  Q.   Do any bullets ever hit this part?
5  A.   Yes. It is my estimation that there is at least 40 to
6  maybe even 50 percent of the rounds that impact the upper
7  ramp.
8  Q.   That is even on the wet ramp?
9  A.   Even on the wet ramp system, that's correct.
10 Q.   During your time at the FTU, has there ever been water
11 on the top part of the ramp?
12 A.   No, sir. Like I just stated earlier, that is not the
13 design of the Savage wet system.
14 Q.   Thank you.
15       Now, when Sergeant Foraker was reinstated, did
16 you talk to him about any concerns you had about the
17 conditions at the FTU?
18 A.   Yes, sir. We talked about the condition of the bullet
19 trap itself. I voiced my concern, in particular, about that
20 one lead test and about what the State Police doctor, Aaron
21 Green, had advised me in regards to putting our hands into
22 that toxic goo located in the water tank and how the oil
23 penetrated my skin, thus carrying any, not only lead, but
24 any contaminants into my bloodstream.
25       That was a huge concern for me.

**958**

1  Q.   Did you raise any other health concerns to him?
2  A.   Yes, sir. About the failing ventilation system.
3  There were times -- and the only way that I can describe it,
4  as children, you tend to put things in my mouth. I used to
5  put pennies and stuff in my mouth, just like every other kid
6  did. I was getting that taste in my mouth.
7        There were times -- I live exactly seven miles
8  from my house to that range. And there were times that
9  after we would conduct training that day, it was all I could
10 do to drive home and not fall asleep behind the wheel.
11       I would get to my house and literally just lay
12 down in a chair or even on the floor and sleep for hours,
13 miss my dinner, miss my time with my family.
14       And my joints ache. At one time I even went so
15 far as to get tested for Lyme.
16 Q.   During Sergeant Foraker's first week back at the FTU,
17 was a decision made to cut back on certain types of
18 maintenance behind the bullet trap?
19 A.   Yes. I know we had a meeting with an individual by
20 the name of Joe Farrell at some point from Environmental
21 Solutions. And what we had done, we had not stopped per se.
22 I don't want that term used. What we had elected to do was
23 to get an expert who is highly trained and specialized in
24 the field of hazardous material handling abatement and
25 cleanup.

**959**

1        We had no experience at all to be doing the
2  things that we were doing. And we had decided to suspend
3  those tasks that we were doing behind the trap until we
4  could get an educated decision and try to bring an outside
5  vendor in to take over that maintenance who was highly
6  trained, equipped, and prepared to deal with the toxic waste
7  site that was literally behind and in the trap.
8  Q.   Did you continue to do other kinds of maintenance
9  around the FTU?
10 A.   Yes. At the end of the shoot, we would clean up the
11 spent casings. We would clean up the blow-back. We would
12 clean up the shotgun holes and so forth off the range. We
13 would empty the trash. We would take out the contaminated
14 cleaning patches from the cleaning room, throw them in the
15 trash.
16       We still conducted that type of maintenance.
17 Q.   Were there any issues with staffing levels at the FTU
18 in the December 2003 time period?
19 A.   Yes. For the most part, it was only Sergeant Foraker,
20 Corporal Warren, Corporal Warwick and myself that were
21 conducting I believe at that time recruit training. As I
22 stated earlier, that is a very stressful job. You have
23 people that have never held a gun in their hand.
24       Again, there is no do-over when you make a
25 mistake with a firearm. Once you pull that trigger, it is

**960**

1  done. So it is almost -- I know what the standards are.
2  But there were some people that required one-on-one
3  instruction, thus leaving areas uncovered.
4  Q.   Did you personally ever try to bring in some temporary
5  staff or somebody on what I think is called temporary
6  assigned duty to help out around the FTU?
7  A.   Yes. But that was impossible. The staffing -- not
8  impossible. Let me retract that. It was very hard to get
9  people to come into the FTU. The staffing at the Delaware
10 State Police is, we are very low on manpower right now.
11 When troop commanders knew that they were giving up a body
12 for a week or two weeks at a time, they would balk at that.
13 I was only a Corporal. I am not a Sergeant, Lieutenant,
14 Captain, Major, Lieutenant Colonel or Colonel. I could only
15 make the request. It was out of my realm to get the
16 individual there. I even went so far as to call some
17 municipal officers that were -- that I knew personally who
18 were firearms instructors to try to get these individuals in
19 to give us a hand.
20 Q.   After Chris came back, did you all collectively start
21 to raise certain concerns up the chain of command?
22 A.   Yes, we did.
23 Q.   As part of doing that, did you have any meetings with
24 any officers in the chain of command?
25 A.   Yes. I know initially, of course, we spoke with

961

1 Sergeant Foraker as a unit. Then we also went through our
2 chain of command involving Lieutenant Ralph Davis, who is
3 now Captain Davis. We also involved Captain Greg Warren.
4 He was the director of training at the State Police Academy.
5 Then we even had some meetings with Colonel MacLeish --
6 Lieutenant Colonel MacLeish at the time, facilities
7 Management individuals, and so forth.
8 Q.    During your meetings with then Colonel MacLeish, did
9 he ever say to you, Kurt, you have been at the range so long
10 we don't know what to do with you?
11 A.    Yes. That was a meeting, and I don't know the date,
12 but that was a meeting that was held in the conference room
13 at the State Police Academy.
14 Q.    During a meeting with Colonel MacLeish, did he ever
15 say something to the effect of, did he ever say to you
16 something to the effect of troopers who work at the firing
17 range should expect to have high lead levels and hearing
18 loss?
19 A.    Yes, he did. That comment was made at the State
20 Police Museum meeting.
21 Q.    I think you also mentioned you had a meeting of some
22 kind with Facilities Management?
23 A.    Yes. I know that one time we talked to Facilities
24 Management, it was at a meeting in the conference room of
25 the Academy.

962

1 Q.    Did Facilities Management respond to any concerns you
2 raised during that meeting?
3 A.    No, they did not. In fact, they were quite arrogant
4 and they tended to talk down to the staff of the FTU as well
5 as to Captain Warren and the other folks that were there
6 with the State Police.
7 Q.    Now, to focus the time frame a little about, from
8 December 1st, 2003 forward, did you start to investigate the
9 problems and the causes of the problems at the FTU?
10 A.    Yes. That's what we did for a living before we went
11 to the range as instructors. We all investigated, either in
12 patrol functions, criminal investigations, also special
13 investigations. That was our specialty.
14 Q.    Now, just to loop back to those meetings that you had
15 with then Lieutenant Colonel MacLeish, during those
16 meetings, were you able to visibly observe Colonel
17 MacLeish's demeanor?
18 A.    Yes.
19 Q.    Could you describe it to the jury, please?
20 A.    I have known Colonel MacLeish my entire career. I
21 worked for him when he was a Corporal, in a Sergeant's
22 position waiting to be promoted to Sergeant. He was my
23 shift commander. He was my traffic LOORNT at Troop 3. He
24 was also my Troop Commander at Troop 3. I knew Colonel
25 MacLeish quite well. And he was pissed off. Make no

963

1 mistake, he wasn't mad, he wasn't upset. He was pissed.
2 Q.    Did there ever been come a time when you heard Colonel
3 MacLeish say what he thought of you for raising your
4 concerns during the meeting?
5 A.    Yes.
6 Q.    What did he say?
7 A.    He said we were pains in the ass for raising our
8 concerns for our health and that of the people who we have
9 sworn to train and protect.
10 Q.    Did Colonel MacLeish ever say to you, and I quote, and
11 I apologize for the profanity, "Kurt, I am not going to fuck
12 you"?
13 A.    Yes, he did. He made that comment to me.
14 Q.    How did you interpret that statement?
15 A.    I --
16        MR. ELLIS: Objection, Your Honor, as to how he
17 interpreted it.
18        MR. S. NEUBERGER: Your Honor, I can rephrase
19 the question.
20 BY MR. S. NEUBERGER:
21 Q.    Did you take that statement as a threat?
22        MR. ELLIS: Objection, Your Honor.
23        THE COURT: It's leading, isn't it, Mr.
24 Neuberger?
25        MR. S. NEUBERGER: That's why I asked him how he

964

1 took the statement initially, how did you interpret the
2 statement.
3        THE COURT: I think we should let the statement
4 speak for itself is the correct response. He testified to
5 the statement. You will make an argument, your dad will
6 make an argument at closing. The other side will make an
7 argument. We will leave it for the jury to decide.
8        MR. S. NEUBERGER: Okay, Your Honor.
9 BY MR. S. NEUBERGER:
10 Q.    Kurt, did there finally come a time when the FTU was
11 shut down?
12 A.    Yes, that was sometime March of 2004.
13 Q.    Did you make that decision?
14 A.    No. No way.
15 Q.    Did you have the authority to shut down the FTU?
16 A.    Absolutely not.
17 Q.    Could you explain to the jury why not?
18 A.    When you shut down the building, and I mean shut it
19 down and everybody goes home, that requires a much larger
20 decision from a much higher-ranking individual than a
21 Corporal.
22 Q.    Did there ever come a time when you learned about a
23 media tour at the FTU?
24 A.    Yes, I do.
25 Q.    Do you recall approximately what month and year that

```
                                                                   965
 1  was?
 2  A.    That would have been April 2004.
 3  Q.    Did you ever see anything in the news media resulting
 4  from that tour?
 5  A.    Yes, I did.
 6  Q.    Do you recall what meeting outlets you saw coverage
 7  in?
 8  A.    I know I saw it in the Journal. I also saw it in the
 9  Delaware State News. It was a headline in the State News.
10  There was the Colonel and Secretary Gloria Homer at the
11  range, Colonel Chaffinch, that is.
12  Q.    Have you ever heard of a place called Sambo's?
13  A.    Yes, sir, I have.
14  Q.    What is Sambo's?
15  A.    Sambo's is -- it is actually designated a tavern. It
16  is located in Leipsic, Delaware. I have been going there
17  now -- I don't want anybody to this I went in there
18  under-age drinking -- but when I turned 20, that is how old
19  you had to be to go to Sambo's. Sambo's, all my life when I
20  was growing up, was a legendary place. And I found out why
21  so. That's my home away from home.
22  Q.    Kurt, I want to show you a picture which is in the
23  book marked as I believe PX-140.
24  A.    Yes, sir.
25  Q.    What is that picture?
```

```
                                                                   966
 1  A.    That is Sambo's Tavern. In fact, that is Sonny
 2  Sambo's -- his real name is Sonny Burroughs. That is
 3  Sonny's pickup truck on the right side.
 4  Q.    Do you go to Sambo's very often?
 5  A.    Yes, sir, I do. Every opportunity I get. At times I
 6  go there for lunch, it makes my wife mad because I don't
 7  take her.
 8  Q.    What kind of food is Sambo's known for?
 9  A.    Sambo's is known for its crabs. Their shrimp is out
10  of this world. Their crabcakes, that is their real and true
11  specialty. There is no filler in them. Nothing but meat.
12  Q.    What did they use for tablecloths at Sambo's?
13  A.    They use newspapers, just bulk newspapers. They buy
14  them in bulk, because of course when you open crab, you
15  crack crabs, and other shellfish, it is quite messy. That
16  way they can just roll it up and fill it out.
17  Q.    Kurt, I would like to show you another photo, and I
18  would like you to describe for the jury what it is. What
19  does that picture show?
20  A.    That is the -- when you come in Sambo's, there is the
21  bar area, then that is a little portion of the bar area
22  where they also seat people.
23  Q.    How about this picture?
24  A.    That is the State News laying all over the tables of
25  Sambo's.
```

```
                                                                   967
 1  Q.    Now, did there ever come a time when you learned that
 2  the story in the State News which you just told the jury
 3  about had found its way to Sambo's?
 4  A.    Yes. I have a dear friend of mine, his name is
 5  Saul --
 6         MR. ELLIS: Your Honor, I think this is hearsay
 7  coming.
 8         MR. S. NEUBERGER: I don't think it is hearsay,
 9  Your Honor.
10         THE COURT: The objection is overruled. Let's
11  hear what he has to say.
12         THE WITNESS: Can you ask me again? I am sorry.
13  BY MR. S. NEUBERGER:
14  Q.    Sure. Did there ever come a time when you learned
15  that the State News article which you just mentioned made
16  its way to Sambo's?
17  A.    Yes. Again, every other Monday night -- I have a
18  life-long friend that has a one-man band. He plays at
19  Sambo's every other Monday. He was there on this one Monday
20  evening, it was after the initial story came out about --
21  not the initial story, I am sorry. The story that you are
22  making reference to.
23         Anyway, we had planned on going to Sambo's to
24  see Saul, some dear friends and others. And we walked into
25  Sambo's. When we sat down at our table, it was literally
```

```
                                                                   968
 1  covered with that article.
 2  Q.    Just so we are clear, could you take a look at PX-, I
 3  believe it's 25 in the first volume of the white book?
 4  A.    Yes, sir, I am there.
 5  Q.    Is this the article that was on the table?
 6  A.    Sure was.
 7  Q.    Do you remember how many tables it was on?
 8  A.    It was on every table that I had a visual on.
 9  Q.    All right. Did you run into any police officers at
10  Sambo's there that night?
11  A.    Yes. My friends and I were sitting there, listening
12  to Saul, drinking some beer, having a big time. I looked
13  up, and here came both defendants, Colonel Chaffinch,
14  Lieutenant Colonel MacLeish, and they had an entourage of I
15  am going to say between 15 to 25 people, somewhere in there,
16  out-of-state troopers that were actually sitting in on oral
17  board examinations for people seeking promotions within the
18  Department of State Police.
19  Q.    All right, Kurt. Are there any maps that hang on the
20  wall in Sambo's?
21  A.    Yes. Sambo's is covered with world -- the map of the
22  entire earth, the world, all over the place.
23  Q.    And what is done with those maps in Sambo's?
24  A.    Well, when people come to visit this restaurant, and
25  it's their first time there and they have come from a
```

969

1 different country or state, what they do, they fill out a
2 little tab that has a string attached to it and they take
3 that tab with a staple -- not a staple, but a pen, and they
4 put it into the map to show where they came from. They put
5 their name, their home address, and the date that they were
6 at Sambo's.
7 Q. For example, are these at least a couple of the maps?
8 A. Yes. That's a couple. Also, I would like to point
9 out, too, as you can see by that wall, it is a huge NASCAR
10 following as well.
11 Q. Are there more maps than just this?
12 A. Yes, there are. In fact, if you go to the other side
13 of that doorway, there is also a map there as well.
14 Q. Like there?
15 A. Yes.
16 Q. I think you mentioned the tags where people write
17 their names on them?
18 A. Yes, sir, there are.
19 Q. Is that one such tag, for example?
20 A. Yes, it is. That is what I was making reference to.
21 As you can see, there is some discoloration to the tags.
22 Some of them hang up there for quite some time as well.
23 Q. To change gears again a little bit, did there come a
24 time when you spoke to the State Auditor's Office?
25 A. Yes.

970

1 Q. Do you recall approximately when that was?
2 A. The first time was sometime in May of 2004.
3 Q. Kurt, could you open up the plaintiffs' exhibit book
4 to PX-24. It is in the first volume.
5 A. Yes, sir.
6 Q. What is this document?
7 A. This is my prepared statement that I gave to one of
8 the state auditors, investigators that responded to Mr.
9 Neuberger's office.
10 Q. Did you read this to him or did you give it to him?
11 A. I gave it to him, I began reading it but I couldn't
12 read it.
13 Q. How come?
14 A. I got upset.
15 Q. All right. Did you turn -- did you give the auditors
16 anything else other than your statement?
17 A. Yes, sir, I did. We gave them a little packet of
18 specific areas that we had done our research on and had
19 found to be discrepancies with. We also turned over a
20 volume of -- we gave them at least, I want to say, 11 or 12
21 binders, plumb-full of three-ring binders worth of
22 information that we had uncovered from the archive area.
23 Q. Were you trying to -- why did you speak to the
24 auditors?
25 A. It was my duty to speak to the auditors. The order

971

1 came down from the executive office of the State of
2 Delaware, meaning the Governor's office. I am bound by that
3 order.
4 Plus, in my heart, I knew it was the right thing
5 to do. We wanted them to come in, and we wanted, especially
6 with these auditor investigators, we wanted to show what was
7 wrong with that range. All we were asking for is that the
8 state fix the problem so that we can work in a safe, healthy
9 environment. That's all we were asking for.
10 Q. All right. You can close that binder.
11 Now, Kurt, did you ever serve with a Major Joe
12 Forester?
13 A. Yes. I know when I was assigned to Troop 3 in Camden,
14 Delaware, again, which is Kent County, he was my Operations
15 Major.
16 Q. Did he have anything in his ears?
17 A. He had hearing aids in both ears. It was quite
18 obvious.
19 Q. Did you ever train Major Joe Forester at the FTU?
20 A. Yes, I did. He would come up there when he was
21 assigned to the staff. We always had to put on a special
22 staff shoot to try to get them caught up, bring them up to
23 speed on their certifications. And there were times that he
24 would come up to get recertified.
25 Q. Are there any incidents involving Major Forester that

972

1 stand out in your mind?
2 A. Yes. Myself or Corporal Warren would call the line
3 quite often. And when you are sitting in the control room,
4 you speak into a microphone similar to the one here in front
5 of me. But it wasn't this fancy. But there was a PA system
6 out on the range.
7 So the students would hear what you had to say
8 through the PA system. I am telling you, without hearing
9 protection, there were times that that PA system, I mean it
10 was so loud that it would actually hurt your ears.
11 I would notice Major Forester, when you are
12 talking into this loudspeaker system, he would actually
13 offset one of his headsets, meaning he would not leave both
14 headsets on his ears. He would cock one set off so he could
15 hear what was being said through a loudspeaker. And it
16 would ring your bell if you were out there without your
17 headset. It was loud.
18 Q. Did you ever serve with a Lieutenant Kenny Thompson?
19 A. Yes. I know, I remember, it was Sergeant Thompson at
20 the time, when he was in Auto Theft and I was in Special
21 Investigations. Then I also remember one time when
22 Lieutenant Thompson came to inspect my divisionally assigned
23 equipment and vehicle at the FTU.
24 Q. All right. Did Lieutenant Thompson have anything in
25 his ears?

973
1 A. Yes, sir. Lieutenant Thompson had hearing aids in
2 both of his ears.
3 Q. Have you ever served with a Sergeant Steve Swain?
4 A. Yes. I would see Sergeant Swain when he would come to
5 the range for his in-service training or interactive
6 training.
7 Q. Do you have any memories about Sergeant Swain when he
8 was at the range doing his training?
9 A. Yes. I had known through my dialogue with Sergeant
10 Swain and also in particular when we would do, like I
11 explained yesterday, the interactive role-playing type
12 training, you have to go into that situation as you are
13 walking into a real environment. Any time that things got a
14 little excited, Sergeant Swain's voice would begin to crack
15 and you literally could not understand what he was saying.
16 Q. During that interactive training, do you need to
17 understand --
18 A. Absolutely, because one of the things that we teach,
19 the first and foremost thing that you have to do as a police
20 officer is identify your commands. I will just give you a
21 brief example of that. When you walk into a room, (in a
22 loud voice) "Police, don't move." Well, just with that
23 statement, I have identified myself and I have given a
24 command.
25     That way, if something transpires beyond that,

974
1 you know that's where you need to direct your attention to.
2 Q. Are you aware of Sergeant Swain's duty station as of
3 April 7, 2006, when he left the division?
4 A. As far as I know, Sergeant Swain's duty station had
5 remained unchanged. He is at Troop 4 in the evidence locker
6 there, where he had been since well before the time I came
7 on the job.
8 Q. Do you know a master Corporal Bruce Peachey?
9 A. Yes.
10 Q. Could you explain to the jury how you know him?
11 A. Of course. Working with Master Corporal Peachey,
12 Bruce is a very dear and close friend of mine.
13 Q. Did there come a time when Master Corporal Peachey was
14 shot?
15 A. Yes.
16 Q. Did you go see him in the hospital?
17 A. I attempted to, but I was ordered not to go into the
18 room with him.
19 Q. Do you recall approximately what month and year that
20 was?
21 A. That would have been February of 2002.
22 Q. Is Master Corporal Peachey still with the division?
23 A. No, he is not.
24 Q. Do you recall when he separated from the division?
25 A. Corporal Peachey separated in February 2004.

975
1 Q. Kurt, did there come a time when then Lieutenant
2 Colonel MacLeish sent you for a fitness-for-duty hearing
3 exam?
4 A. Yes. The first fitness-for-duty exam was June 17th,
5 2004.
6 Q. Would you open up Volume 2 of the white book. Turn to
7 PX-142, please.
8 A. Yes, sir.
9 Q. Is this a letter that you received from Lieutenant
10 Colonel MacLeish?
11 A. Yes, sir. I don't know the exact date that I received
12 the letter, but the letter was written May 13th, it says
13 2004.
14 Q. All right. You can put that away. Now, Kurt,
15 ultimately how many fitness-for-duty hearing exams were you
16 set for?
17 A. I had one fitness-for-duty exam at Health Works. It
18 would have been a total of three.
19 Q. What was the result of those fitness-for-duty hearing
20 exams?
21 A. They stated that I was not fit for duty.
22 Q. Did Colonel MacLeish offer to accommodate you?
23 A. No, he did not.
24 Q. Did Colonel Chaffinch?
25 A. No, he did not.

976
1 Q. Let's look at PX-4 in Volume No. 1. Have you found
2 that?
3 A. Yes, sir, I have.
4 Q. Do you recognize this document?
5 A. Yes, I do.
6 Q. What is this document?
7 A. This was what they called a light-duty letter.
8 Q. It is dated June 25th, 2004?
9 A. Yes. I believe there is a typo on top of it. It was
10 2004 that I received the letter.
11 Q. Okay. Do you see how there is numbering 1 through 6
12 on the first page?
13 A. Yes, I do.
14 Q. Nos. 1 and 2, do they indicate that -- do they
15 generally indicate that you are not to wear a State Police
16 uniform?
17 A. Yes, sir. Especially No. 2. That makes direct
18 reflection of that.
19 Q. Do you see No. 4?
20 A. Yes, sir.
21 Q. Does that indicate that if you see a crime in
22 progress --
23     THE COURT: How about what does that indicate.
24 BY MR. S. NEUBERGER:
25 Q. What does that indicate?

```
                                                   977
 1  A.   That indicates that I observed -- if I observe a crime
 2  in process, that I am to back out of the situation, notify a
 3  911 center or fully uniformed police officer, that I am not
 4  to act whatsoever.
 5  Q.   Had you ever seen a light-duty letter like this
 6  before?
 7  A.   No.
 8  Q.   Did you ask for this letter?
 9  A.   I did not, no.
10  Q.   Could you explain the circumstances to the jury
11  surrounding which you received this letter?
12  A.   Well, I know that I had concerns because we had a
13  NASCAR event, and I had been asked to work this NASCAR
14  event, which I had done for probably 18 years. Also,
15  Captain Hawkins, the Troop Commander of Troop 3, had asked
16  if I would go and serve at the State Fair as security, which
17  I had done for years in advance to that.
18           So I really did not know what my duty status
19  was. And if I may, I know in April, when Lieutenant Colonel
20  MacLeish threw me off the range and made that comment that
21  he wasn't going to fuck me, that was well before this. So I
22  was confused as to what was going on. Nobody was telling me
23  anything.
24  Q.   Did you understand this letter to be an order?
25  A.   Yes.

                                                   978
 1  Q.   You can close that.
 2           So in June of 2004 were you placed on light
 3  duty?
 4  A.   Yes, I was.
 5  Q.   How long were you on light duty for? Strike that.
 6           Were you on light duty for two years?
 7  A.   No, I was not. March of 2005, I was placed on an FMLA
 8  status, I think it's Federal Medical Leave Act. I don't
 9  know what it means. But I was placed on that because I was
10  having -- I had issues, I had chest pain, I was also, quite
11  honestly, that's when I started drinking and carrying on. I
12  had chest pain, and I was falling into a severe state of
13  depression.
14  Q.   All right. Now, did you have -- in March of 2005 -- I
15  think when you said you went on the FMLA?
16  A.   Yes.
17  Q.   Were you being paid?
18  A.   Yes. But I was having to burn my sick time at that
19  point.
20  Q.   Okay. You had to burn your sick time?
21  A.   Yes.
22  Q.   Now, Kurt, did there come a time when you finally had
23  to separate from the division?
24  A.   Yes. I was forced out April, Friday, April the 7th,
25  2006.

                                                   979
 1  Q.   And how did you make it that long staying on the
 2  payroll?
 3  A.   Well, I never abused my sick leave. In fact, there
 4  were times our staffing was so -- was in such a critical
 5  state that even when my children were sick I would gather
 6  them up and take them to the range with me. I couldn't stay
 7  home with them because if I did we would be really in a
 8  world of hurt at the range for manpower.
 9           So I had over a thousand hours of sick time that
10  I had banked. I also had over 400 hours of accumulated
11  leave time, that's unpaid overtime. And I also had a large
12  amount of vacation time in the bank.
13  Q.   So that took you from March of 2005 until April of
14  2006?
15  A.   Yes, sir, it did.
16  Q.   Now, on your last day, what was the process you had to
17  go through? Was there a process you had to go through?
18  A.   Yes. It was actually harder to get out of the State
19  Police than get in it. I had to bring my marriage
20  certificate. I also had to bring my birth certificate, my
21  wife's birth certificate, the kids' birth certificates,
22  everybody's Social Security card, my gear and so forth, my
23  ID, and turn that in.
24  Q.   How did you feel having to turn all that stuff in?
25  A.   It was one of the hardest things I have had to do. I

                                                   980
 1  just gave away my life.
 2  Q.   Now, did anyone from the executive staff come down to
 3  where you were turning all this equipment in at and shake
 4  your hand?
 5  A.   No.
 6  Q.   Did anyone thank you for walking the thin blue line
 7  for more than 20 years?
 8  A.   No, they did not. I did not even get an exit
 9  interview.
10  Q.   Now, Kurt, have you been able to find a job since
11  then?
12  A.   Yes. In fact, a good friend of mine, a fellow by the
13  name of Howell Wallace, H-o-w-e-l-l W-a-l-l-a-c-e, he owns a
14  farm that is called Valor Arabians, it is Arabian Horse
15  farm. He knew I was hurting. And he offered me a position
16  on his farm.
17  Q.   How much are you making?
18  A.   I am making 12 bucks an hour.
19  Q.   What kind of work are you doing on the farm?
20  A.   Mostly, I mow the grass, mow pastures, and do
21  maintenance-type work. I have laid about 133 cubic yards of
22  mulch, planted trees and flowers, and things to that effect.
23  Q.   Do you enjoy spending that time outside now?
24  A.   I get paid to be outside. It is a thing of beauty. I
25  love it. It is very peaceful there, too. I also manage --
```

981

1  he has a wildlife program. That is initially how it
2  started. I manage his wildlife on his farm.
3  Q.  Do you think your reputation and good name have been
4  injured at all by what happened in the State Police?
5      MR. ELLIS: Objection, Your Honor.
6      THE COURT: Sustained.
7  BY MR. S. NEUBERGER:
8  Q.  Kurt, has anything happened affecting your reputation?
9      MR. ELLIS: Objection, Your Honor.
10     THE COURT: We went over this yesterday with
11 regard to these individuals' competence to testify. You
12 have witnesses who can talk about this. These are not the
13 witnesses.
14     Sustained.
15 BY MR. S. NEUBERGER:
16 Q.  Kurt, from approximately December 1st, 2003 to the
17 present, have any Delaware State Troopers come up to you and
18 said, What did you do wrong?
19     THE COURT: I am going to permit that.
20     MR. ELLIS: Please note my objection.
21     THE COURT: I have noted it before and overruled
22 it.
23     THE WITNESS: Yes, there have been.
24 BY MR. S. NEUBERGER:
25 Q.  Do you know any officers outside of the State Police

982

1  in the state law enforcement community?
2  A.  Yes. Of course, with training so many municipal
3  officers -- I think I testified the other day that I had
4  been, I had served with the City of Dover Police for two
5  years. So I still have a very strong tie.
6      I don't fall into this thing of the color of the
7  uniform. We are all police officers. And Sergeant Jim
8  Hosfelt of the Dover City Police Department came up to me
9  and he was kind of laughing about it. He said, I see you
10 guys didn't clean the range. And that just made me feel
11 terrible.
12 Q.  Have any people in the community in which you live
13 come up to you and said something to the effect of what did
14 you do wrong or something similar?
15 A.  Yes. I know our neighbors have done that. Again, I
16 have lived and I have worked in my community all my life,
17 since I was 2. I know a lot of people. A lot of folks have
18 come up -- in fact, one of my hunting buddies, Trey Holland,
19 he came up to me and said, Man, you guys didn't clean, made
20 the place blow up.
21     That just struck me wrong.
22 Q.  Have you been humiliated at all by what happened?
23 A.  Of course, I was. In the media, we were blamed for
24 not doing our job. I think that my job performance spoke
25 for itself.

983

1  Q.  All right. Did you used to go out socially prior to
2  the events at issue?
3  A.  Yes.
4  Q.  Could you explain your social interactions to the jury
5  now?
6  A.  Now, I don't want to go out. I don't even want to go
7  to my children's sporting events at school. Wherever you
8  go, the only way that I can explain it, to understand the
9  effect of this thing, it's like you have a monkey on your
10 back. It's like you have an addiction. Everywhere you go,
11 everybody you see, in school events, when you go out -- I
12 live in Smyrna. That is a very small community. Dover is
13 really small. I grew up in both places. My children have
14 grown up in both places. We know a lot of people. I can't
15 even go to the mall and not get this brought up to you,
16 thrown in your face.
17     I just find it easier to stay home. In fact, I
18 don't even hunt as much as I used to.
19 Q.  Kurt, are you comfortable talking about your feelings?
20 A.  No. I can't stand it. While I am here and we are on
21 this subject, I want to apologize to the Court as well as to
22 the jury for getting upset. But this is what I am reduced
23 to now. I am not the man I was.
24 Q.  Have you had any physical problems since December of
25 2003?

984

1  A.  Yes. Like I stated -- and again, through our
2  research, I have found I was suffering from exposure to
3  toxins. I have had chest pains. I had to go through a
4  battery of tests. I thought I was having a heart attack. I
5  denied that I was having that, until I called my family
6  doctor. And by the grace of God he is a cardiologist, and
7  he said, get in here.
8  Q.  Has your weight fluctuated at all?
9  A.  Yes. I used to, quite honestly, I was a pudgy thing
10 there for a while. I was about, somewhere between 220 and
11 225. Now I am down to about 187, 190 pounds.
12 Q.  Now, while all this was happening -- did you used to
13 hold birthday parties for your children?
14 A.  Yes. Every one of their birthdays.
15 Q.  Did that change at all?
16 A.  Yes. I just couldn't take it.
17 Q.  Has there been any impact on your relationship with
18 your wife Lynn?
19 A.  Yes.
20 Q.  Has your love life suffered?
21 A.  Yes.
22 Q.  And there has been some testimony about this one
23 topic, so I will just touch on this briefly. I think you
24 mentioned that there came a time that you began to drink?
25 A.  Yes.

985

1  Q.    Were you able to get that under control?
2  A.    Yes. By the strength of my wife, I was.
3  Q.    Now, Kurt, are you the -- do you like taking
4  medications?
5  A.    No.
6  Q.    Are you taking any medications presently?
7  A.    Yes, I am.
8  Q.    Which medications are they?
9  A.    I am taking 30 milligrams of Lexipro, that Dr. Tavani
10 said, it is an antidepressant, also anti-anxiety. I took
11 Zyac for my blood pressure. But when all this went off, my
12 blood pressure went out of control and they changed my
13 medication to enalapril and a diuretic called HCIZ, which is
14 a diuretic. I also, the doctor prescribed me Ambien to go
15 to sleep on, a sleep aid.
16 Q.    Could you open up the white book, Volume 2, to PX-138,
17 please.
18 A.    Yes, sir.
19 Q.    Take a look at these first three pages and tell me if
20 you ever seen them before.
21 A.    138. Correct?
22 Q.    Yes, sir.
23 A.    Yes, I have.
24 Q.    What are these three pages?
25 A.    These three pages are my out-of-pocket medical

986

1  expenses that I started to incur as a result of what's
2  happened to me.
3  Q.    If you flip past the first three pages, are the pages
4  that follow some receipts and prescriptions and things like
5  that?
6  A.    Yes.
7  Q.    You can close that book, Kurt.
8         Now, Kurt, has this court case been any source
9  of relief for you?
10 A.    Absolutely. This is the only avenue that we could
11 take to get our day, to tell our story. And it has been a
12 huge release for me. It has been literally a godsend that I
13 can exercise my right of free speech and not be retaliated
14 against any longer.
15 Q.    To change gears again, did there come a time when you
16 started treating with a medical professional after December
17 1st of 2003?
18 A.    Yes. Several.
19 Q.    Could you explain who you are treating with and the
20 circumstances surrounding it?
21 A.    Yes. I started to see Dr. Kozma, who is a
22 psychologist. He is a therapist. I also started to go to
23 Dr. Jose Capuro (phonetic), who is a psychiatrist. I go see
24 Dr. Capuro to get my medicine and also to have counseling
25 with him. Then I also seek counseling with Dr. Kozma.

987

1  Q.    Okay. How often are you able to get in to see Dr.
2  Kozma?
3  A.    I believe about once a month. I know for myself, he
4  put me on a cancellation list where if somebody cancels he
5  will work me into his schedule.
6  Q.    Do you like going to see psychologists or
7  psychiatrists?
8  A.    No. It is embarrassing.
9  Q.    Could you open up the white book again to PX-47. I
10 believe it's in the first volume.
11 A.    Yes, sir.
12 Q.    Is this a letter that you received from Colonel
13 MacLeish?
14 A.    Yes, it is.
15 Q.    All right. Were you seeing the psychologist or
16 psychiatrist in this general time frame, November 21st,
17 2005?
18 A.    Yes.
19 Q.    You can close that.
20        Kurt, during Sergeant Foraker's first tenure at
21 the FTU, did you ever observe him to do any maintenance with
22 you?
23 A.    Yes, I did.
24 Q.    Did you observe him to do any kind of maintenance
25 behind the bullet trap, just to focus the area of the

988

1  question?
2  A.    That is what I was making reference to. Yes, I
3  remember one day in specific, he and I were back there
4  changing pumps.
5  Q.    Now, just flipping back to the spring of 2004, just to
6  focus the time period again, did there come a time when you
7  began to ask for medical tests?
8  A.    Yes. I know I voiced my concern in particular after
9  we talked to Mr. Joseph Farrell and recruit Casey Fountain
10 about what these toxins may do to our lungs. And initially,
11 we were only tested for lead. My concern was, once Sergeant
12 Foraker had obtained the MSDS of the frangible ammunition,
13 now we found out we were being subjected to high levels of
14 copper, zinc, tin, arsenic, and nitroglycerin. My huge
15 question, and I still have this question today, not only do
16 I have a lead issue to worry about, now I got all these
17 other issues to worry about. And what cumulative effect
18 will all these chemicals have on me? That is what my
19 concern was. And I sent Sergeant Foraker an e-mail stating
20 that I wanted to be examined for blood, pulmonary issues and
21 so forth.
22        That was where my concern was.
23 Q.    All right. You mentioned MSDS sheets. Could you
24 explain to the jury what that is?
25 A.    That is a material safety data sheet. What that does,

**Page 989**

1 that tells you what compounds are in whatever that you are
2 dealing with, and any type of medical precautions, and
3 emergency precautions you need to take care of in case you
4 are exposed to it.
5 Q. Getting back to these tests, did you ever ask for
6 hearing tests?
7 A. No, I never asked for a hearing test, ever.
8 Q. Why not?
9 A. I had -- may I make reference to a little bit of my
10 history with that?
11 Q. Sure.
12 A. In 2001, I went to this, I had a physical with the
13 State Police, and they found that I had high-frequency
14 hearing loss. That was documented on one of my hearing
15 tests. I did say 2000. Right?
16 Q. I think you said 2000?
17 A. I meant 2000. 2001, when I went back to Health Works,
18 they said I had normal hearing. So I had normal hearing. I
19 didn't get a hearing test until 2002 or 2003. So I didn't
20 think it a big deal.
21 Q. Did there come a time in the spring of 2004 when you
22 went to a place called Omega Medical?
23 A. Yes, there was.
24 Q. Did you ask them to perform any tests on you?
25 A. No. I had already identified the testing that we were

**Page 990**

1 interested in, the lead, copper, blood tests, and I think
2 Mr. Farrell said they would do a pulmonary function test as
3 well as a chest x-ray.
4 Q. Did you ever talk to a lady by the name of --
5 A. Deirdre O'Connell.
6 Q. Thank you, yes. Did you ever talk to her?
7 A. Yes. She said she was the chief executive officer of
8 Omega Medical.
9 Q. Did you ever ask her for hearing tests?
10 A. No. I did not ask that woman or anybody else for a
11 hearing test.
12 Q. Are you a hundred-percent sure?
13 A. As I am sitting here.
14 Q. Did Omega end up performing hearing tests on you
15 anyway?
16 A. Yes.
17 Q. Do you know why?
18 A. Then, no. Now, yes.
19 Q. Okay. Could you explain that answer to the jury?
20         MR. ELLIS: Your Honor, could we have some
21 foundation for this?
22         THE COURT: Please do, Mr. Neuberger.
23 BY MR. S. NEUBERGER:
24 Q. Have you ever seen your medical records from Omega
25 Medical?

**Page 991**

1 A. Yes, I have.
2 Q. Is there a name of a certain police Captain written in
3 the top right-hand corner of some of those records?
4 A. Yes, Captain John A. Yeomans, who used to be the
5 director of the Human Resources. It was all over my medical
6 records.
7 Q. Do you recall what the results of those tests from
8 Omega showed?
9 A. I can't be specific without looking at the test
10 results. But they said I had moderate to severe hearing
11 loss.
12 Q. Did they show anything about your lead levels?
13 A. That test?
14 Q. Yes.
15 A. The hearing test?
16 Q. The other test that Omega performed on you.
17 A. I believe they said I had a lead level of either an 8
18 or a 9. I can't remember the exact. It was one or the
19 other.
20 Q. I think you also mentioned some kind of a pulmonary
21 test. Was it pulmonary or pulmonary function?
22 A. It was a pulmonary function test about -- it is where
23 you breathe into a machine. They said that I had an
24 obstruction. And also, if I may, one test that I forgot to
25 mention, Omega is unique in that they did a 24-hour urine

**Page 992**

1 analysis on us. My test results from that really concerned
2 me, because I tested high for lead and copper in my urine.
3         I knew that -- I don't like to talk about it.
4 But we are here and I am going to talk about it.
5         My urine had a terrible odor to it.
6 Q. Did the State Police ever follow up on your 24-hour
7 urine test?
8 A. No, they did not.
9 Q. Did the State Police ever follow up on your pulmonary
10 function test?
11 A. No, they did not.
12 Q. Did the State Police ever follow up on your lead test?
13 A. No, they did not.
14 Q. Was there any test that the State Police did follow up
15 on?
16 A. They sent us back for another audiological test to
17 fill that survey out from the TK Group.
18 Q. Are you familiar with the Federal Law Enforcement
19 Training Center?
20 A. Yes, sir. The one in Cheltenham, Maryland, I am.
21 Q. Did you ever investigate the levels that they set for
22 lead for their staff members?
23 A. Yes. They want everybody as low as possible, below
24 10.
25 Q. And did you ever investigate what the general level is

993
1 for the population at large for lead?
2 A. Normal population lead level is a 3.
3 Q. What was yours from the Omega test?
4 A. I believe it was either an 8 or a 9. It had actually
5 come down from as high as 11.
6 Q. Okay. Did there come a time when you filled out
7 something, a survey from a group called the TK Group?
8 A. Yes.
9 Q. Were you able to fill out the entire survey?
10 A. No, I was not. They asked for a lot of highly
11 technical and specialized data that I could not give the
12 answer to.
13     Also, one thing that I found unique about that
14 whole form was I believe out of all the questions they
15 asked, only three pertained to our work environment. The
16 rest was on what they describe as our domestic activities.
17 Q. Such as?
18 A. Such as if we operate any type of power equipment, any
19 type of saws or drills, if we -- I think there was a
20 question on there if we hunt or those type of things.
21 Q. Did there come a time when you completed the TK Group
22 survey?
23 A. I did the best I could. I then attached an attachment
24 to that particular form, advising them that I could not
25 complete the form as directed because I did not know the

994
1 answer to the three questions. One being the decibel level
2 of our work environment. That would be essential to know
3 what level of hearing protection we needed. I did not know
4 the decibel level of the hearing protection that was
5 provided. That had never been provided to us. Nor did we
6 have a hearing conservation plan in play.
7 Q. Okay. Now, also, to change gears again but to stay in
8 the same general time period, approximately March to May and
9 June of 2004. Did anyone in the DSP ever threaten you?
10 A. I had some -- numerous conversations with Captain
11 Yeomans of the Human Resource Department. Captain Yeomans
12 and I went through the Academy together. We had been
13 social, our families had been social. So I considered
14 Captain Yeomans or John a dear friend.
15     And one day after all this was sort of coming to
16 a head, Captain Yeomans looked me in the eye and told me
17 that the best thing he could ever do for me is 30 to 40
18 percent above. And that just flabbergasted me. I was
19 devastated after that. I took that as a threat.
20     He also made further comments by saying I could
21 retire or go back to patrol.
22 Q. Why did you interpret that as a threat?
23 A. Well, here, I have got a delicate situation. They are
24 telling me I can't function as a police officer but they are
25 going to put me back on patrol. Again, this was all types

995
1 of confusing and conflicting things that were going on that
2 led me to have the stresses. And I felt that that was a
3 direct threat, especially when he said 30 to 40 percent
4 above. I could not believe that.
5 Q. Are you familiar with the concept in the State Police
6 known as career development?
7 A. Yes, I am.
8 Q. Would you explain your understanding of that concept
9 to the jury, please?
10 A. Yes. You could ascend in the rank if you so chose to
11 do that, Sergeant, Lieutenant, on up through the rank
12 structure. And you become an administrator at that point.
13 Well, I always considered myself a grunt. I considered
14 myself an operator. What I wanted to do was I wanted to
15 specialize. And there has only been one thing in my life
16 that I have ever been able to do well, and that is shoot and
17 instruct.
18     And I wanted to take that and impart those
19 skills to my students. I felt I had a lot to offer.
20 Q. Now, Kurt, do you think you have any hearing problems?
21 A. In certain situations, yes.
22 Q. Do you think you are handicapped?
23 A. Absolutely not.
24 Q. Do you think you are disabled?
25 A. No.

996
1 Q. Do you think that there are jobs in the State Police
2 which you might be able to do?
3 A. Absolutely.
4 Q. Are there drill instructors at the Police Academy?
5 A. Yes. I would love to be a TAC officer.
6 Q. Were any of your tack officers back in the Academy
7 former Marines?
8 A. Yes. Sergeant Paul Nickerson, who was one of my drill
9 instructors, he was a former Marine.
10 Q. Have there been Marines at the Academy in recent
11 years?
12 A. Yes. As a matter of fact, the assistant director of
13 training, Lieutenant Ralph Davis, was a former Marine --
14 former Marine.
15 Q. All right. Do you think you could serve in the State
16 Bureau of Investigation?
17 A. Yes.
18 Q. I am sorry. State Bureau of Identification?
19 A. Yes. There is an SBI section at the State Police.
20 Q. Do you think that is a job that you could do?
21 A. Yes. All they do is fingerprint applicants, good guys
22 that want a job. I could do that. I am not going to hurt
23 anybody and nobody is going to hurt me. I could
24 fingerprint. I could do background investigations. I would
25 be in an office setting, where not a whole lot could happen

```
                                                997
 1  to me. As a matter of fact, they have had people in there
 2  before that have had psychological problems, that have
 3  suffered strokes. That was a place that they would
 4  accommodate those people.
 5  Q.   Just briefly, are there other jobs in the State Police
 6  that you think you could do?
 7  A.   Yes, there are.
 8  Q.   Did there come a time when you had a second meeting
 9  with the state auditors?
10  A.   Yes.
11  Q.   Can you explain the circumstances surrounding that
12  meeting to the jury?
13  A.   Dr. Tavani said it -- and I want to apologize for a
14  comment that she used. She said a crucifixion. That is
15  what I told her, and I apologize. I don't want to offend
16  anybody's beliefs. It was absolutely a witch hunt. Those
17  people blamed me and made comments --
18            MR. ELLIS: Your Honor, I object to what they
19  are blaming. If it is something they said, it is one thing.
20            THE COURT: Sustained.
21  BY MR. S. NEUBERGER:
22  Q.   After your second meeting with the auditors, did you
23  receive a telephone call from Colonel MacLeish?
24  A.   Yes.
25  Q.   What was your reaction to that call?
```

```
                                                998
 1  A.   I did not want to talk to him without my attorney
 2  present.
 3  Q.   Why is that?
 4  A.   Because I was being blamed for the range.
 5  Q.   All right. Are you familiar with a state law known as
 6  a Law Enforcement Officer's Bill of Rights?
 7  A.   Yes: That provides us protection that if we don't
 8  want to talk to an individual, especially given the
 9  circumstances, that I can have my attorney present, just
10  like anybody else, before any questioning, if I wished one.
11  Q.   Now, did Colonel MacLeish make any statements to you
12  during that meeting -- during the telephone call?
13  A.   Yes, he did.
14  Q.   And what did he say to you?
15  A.   Well, I explained to him my concerns about uncompleted
16  information being sent to the doctors, about being blamed by
17  the auditor for the debacle at the range. And he commented
18  to me that they did not sic the auditors on us, and that
19  they would not take any action against us unless there was
20  gross negligence or dereliction of duty that came up as a
21  result of the State Auditor's investigation.
22  Q.   Now, by action, what did you mean by that?
23  A.   I took it as turning us over to Internal Affairs and
24  bringing us up on formal charges of dereliction of duty.
25  Q.   Was that why you wanted to have your attorney present?
```

```
                                                999
 1  A.   Absolutely. I have 20 years of service as a police
 2  officer with the Division of State Police. I had to run
 3  from them and seek protection through people I don't even
 4  know. I had to go seek out an attorney to make sure that me
 5  and my family were protected. I was afraid of these people.
 6  I was scared. I knew what was happening.
 7  Q.   Did your attorney participate during that meeting?
 8  A.   Yes, he did.
 9  Q.   He did?
10  A.   He was there, I mean.
11  Q.   Your attorney was present during the --
12  A.   Oh, oh, oh. I am sorry.
13  Q.   Not the auditors' meeting.
14  A.   Not the phone conversation, no, he was not. He was at
15  the second. I need to clarify that.
16            THE COURT: He should have asked a better
17  question. He can re-ask the question.
18  BY MR. S. NEUBERGER:
19  Q.   Kurt, focusing on your telephone conversation with
20  Colonel MacLeish, was your attorney present during that
21  meeting?
22  A.   No, he was not. I apologize for the confusion. I am
23  sorry.
24  Q.   Kurt, have you ever heard the following seven words
25  used in the context of the Delaware State Police: honor,
```

```
                                                1000
 1  integrity, loyalty, courage, discipline, attitude and
 2  service?
 3  A.   Yes, sir, I have.
 4  Q.   What are they?
 5  A.   Those are what we call core values of the Delaware
 6  State Police, those seven words. That is what you live and
 7  die by, both on and off duty.
 8  Q.   Let's wrap this up.
 9       Are you asking for special treatment from the
10  State Police in this case?
11            MR. ELLIS: Objection, Your Honor.
12            THE COURT: Sustained.
13  BY MR. S. NEUBERGER:
14  Q.   Are you asking to be treated the same as the troopers
15  before you in this case?
16            MR. ELLIS: Objection.
17            THE COURT: Let me see counsel briefly.
18            (The following took place at sidebar.)
19            THE COURT: Do you want to expand on your
20  objection.
21            MR. ELLIS: He is asking for a legal position,
22  not evidence. That is for the lawyers.
23            MR. S. NEUBERGER: Your Honor, I think that is
24  what this case is all about.
25            THE COURT: It is not. That's something that is
```

**1001**

1 ultimately the jury's determination based on facts, not his
2 opinion.
3     MR. ELLIS: Right.
4     MR. S. NEUBERGER: In that case I am done and I
5 will rest.
6     (End of sidebar conference.)
7     MR. S. NEUBERGER: Your Honor, I have no further
8 questions.
9     THE COURT: Okay. Mr. Ellis, you may examine.
10 Ladies and gentlemen, if you would like to stand and
11 stretch, you are free to do that.
12     CROSS-EXAMINATION
13 BY MR. ELLIS:
14 Q. Good morning, Corporal Price.
15 A. Good morning.
16 Q. I think you have testified that you were at the range
17 when it was built. Is that right?
18 A. Yes.
19 Q. And you actually helped in the construction when you
20 were working for Bill Bryson. Right?
21 A. Yes.
22 Q. Between 1998 and 2003, is it true that the state did
23 environmental cleanups a couple times of the range?
24 A. Yes, I believe two or three.
25 Q. And these were planned shutdowns where somebody came

**1002**

1 in and did environmental remediation. Correct?
2 A. It wasn't planned. It happened and they needed to do
3 that to make it a nonhazardous site.
4 Q. Now, when the new range first opened in 1998, am I
5 correct that you did maintenance of the bullet trap system
6 that we have had so much testimony about?
7 A. Yes.
8 Q. And that maintenance included things like scooping the
9 shotgun wadding out of the water. Is that right?
10 A. I don't recall doing that back then. I know I did it
11 later.
12 Q. You also had to unclog the filters every once in a
13 while?
14 A. No. It wasn't that bad back then.
15 Q. So it got worse over time?
16 A. Yes.
17 Q. But you did at least a little of it in 1998, didn't
18 you?
19 A. Not 1998, because we didn't open until the later end
20 of September, and we hadn't even got a shoot through and we
21 started having problems. Then I believe the shoots were
22 canceled until we had some people that came in and tried to
23 square the place away.
24 Q. When is it that you started doing maintenance on the
25 water system in the bullet trap?

**1003**

1 A. My direct -- in fact, it is reflected in one of my
2 evaluations by Sergeant Parton, when he was there. He
3 assigned me the task of doing user maintenance of the bullet
4 trap.
5 Q. And that's going to be about 1999 then?
6 A. I don't know if it was '99 or 2000.
7 Q. Would it be your observation, having worked at that
8 facility for so long, that when the State Police changed
9 from leaded to frangible ammunition it made the situation
10 with the bullet trap worse?
11 A. Yes. As time went on it did.
12 Q. Did the frangible ammunition cause the pumps to fail
13 more often?
14 A. Initially, it started to seize the conveyor system up
15 before it started to work on the pump.
16 Q. But it did work on the pumps, didn't it?
17 A. Yes, it did.
18 Q. And on the filters that lead from the pumps to the
19 bullet trap itself?
20 A. Yes.
21 Q. Now, notwithstanding the problems -- let me ask you
22 this: Is it your recollection that the State Police changed
23 to frangible ammunition sometime in the latter part of 2000?
24 A. Yes. It was either the last part of 2000-first part
25 of 2001.

**1004**

1 Q. Over the next three years, you continued to do
2 maintenance on the water system in the bullet trap, didn't
3 you?
4 A. Yes.
5 Q. And in December 2003, you made a decision to stop?
6 A. No. I made a decision to not do it that often
7 following my examination of my blood lead level.
8 Q. Well, your examination of your blood lead level
9 occurred in the spring of 2003?
10 A. Right. And if you recall from my deposition
11 testimony, I advised Sergeant Ashley that I would back off
12 and not do so much. But I would continue to do it if I
13 needed to.
14 Q. I am not really referring to that discussion. I am
15 referring to the discussion you had with Chris Foraker,
16 Wayne Warren and James Warwick in December of 2003. Am I
17 correct that you collectively made a decision to stop doing
18 the maintenance on the water system on the back of the trap?
19 A. Yes, until we could find qualified people to do it.
20 Q. Am I also correct that all four of you were involved
21 in that decision, that would be Chris Foraker, Wayne Warren
22 and James Warwick?
23 A. That is correct.
24 Q. Now, you knew that the trap was not designed to be
25 shot dry. Right?

1005

1  A.  Well, as I testified earlier, 40 to 50 percent of the
2  rounds hit the dry steel on the upper ramp anyway.
3  Q.  Would you agree with the statement that the bullet
4  trap was not designed to be shot dry?
5  A.  Yes, I would agree to that.
6  Q.  Now, Captain Warren is somebody whose name you have
7  mentioned in your testimony. He was the director of
8  training at the time that all this occurred. Right?
9  A.  Yes.
10 Q.  So that he is the head of the Academy, and the
11 Firearms Training Unit reported into the Academy. Right?
12 A.  Not initially, no.
13 Q.  Well, as this developed, didn't Captain Warren spend
14 some time with you trying to determine what the problems
15 were at the range?
16 A.  Yes, when they started to enforce the TO, that's our
17 table of organization, that is when Sergeant Warren was
18 brought into the loop. It would have been 2004, about the
19 first part of December.
20 Q.  Of 2003, you mean?
21 A.  I am sorry. 2003.
22 Q.  You are aware that Captain Warren prepared a report
23 for Lieutenant Colonel MacLeish about conditions at the
24 range?
25 A.  Yes, I believe he did.

1006

1  Q.  Have you seen that report?
2  A.  I may have. I don't know. I have seen so many
3  reports. I am sure you are going to refresh my memory on
4  that.
5  Q.  I will try to refresh your memory. Is there a black
6  binder up at the table with you?
7  A.  No.
8      MR. ELLIS: Your Honor, just one moment.
9      (Pause.)
10 BY MR. ELLIS:
11 Q.  Corporal Price, what I am going to do here, this is a
12 somewhat lengthy report, so I am going to give you a copy of
13 it so you have had the whole thing to look at the same time.
14 Then I will put it up on the screen so we don't have to flip
15 back page by page and make a lot of noise.
16     Why don't you take a look at Exhibit 26 there?
17     MR. S. NEUBERGER: Objection, Your Honor. This
18 is not created by Corporal Price. The better witness to ask
19 about this exhibit is going to be Captain Warren, who I
20 believe is the next witness.
21     MR. ELLIS: He testified that he wasn't sure. I
22 am showing the document to see if he was.
23     THE COURT: That is fine, then.
24 BY MR. ELLIS:
25 Q.  Is this a document that you have seen before?

1007

1  A.  Yes.
2  Q.  I have now got it on the screen.
3      Did you read this report?
4  A.  Yes.
5  Q.  Were you aware that Captain Warren was investigating
6  and attempting to gather information for the report?
7  A.  I know Sergeant Foraker put together some material to
8  give to Captain Warren and Captain Warren, I think, was
9  tasked by the Lieutenant Colonel to put this thing together.
10 Q.  I am going to ask you to take a look at the fifth page
11 of the document that is in front of you. I will put it up
12 on the screen for the jury.
13     If you want to just look at the screen, it might
14 be easier for you.
15 A.  Okay.
16 Q.  Now, in particular, I want you to look at the first
17 seven lines of the second paragraph. I will try to get that
18 enlarged so those of us with bifocals and trifocals and that
19 sort of thing can all see it.
20 A.  Thank you.
21 Q.  Now, take a minute to review the portion of the
22 document that I have had highlighted.
23     (Pause.)
24 Q.  Let me know when you are ready.
25 A.  Okay. I have read it.

1008

1  Q.  Captain Warren is saying in this report that the
2  bullet stop catch system is now operating dry, is he not?
3  A.  Yes, that is what he said.
4  Q.  And he says at the bottom of what I have highlighted,
5  With the backstop operating dry the amount of dust being
6  generated upon each bullet hitting this backstop area and
7  disintegrating has been compounded dramatically.
8      Is Captain Warren correct, based on your
9  observations, of what went on at the range in
10 December-January of that year?
11 A.  Well, as was testified to earlier, we would move
12 shooters to a wet ramp, not a dry ramp.
13 Q.  Eventually, of course, you will run out of wet ramps,
14 won't you?
15 A.  As I can recall, we did not run out of the wet ramps.
16 Q.  Is Captain Warren wrong then in his report?
17 A.  I don't think he is wrong. I think that what he may
18 have been referring to, he may be saying that is what would
19 happen as time went on, that could possibly happen, yes.
20 Q.  Well, you see in the first sentence where he says, It
21 is now operating dry?
22 A.  Yes. Some areas were.
23 Q.  Now, would it be your observation, as someone who
24 worked there in this time frame, that the conditions in the
25 range were worse in December than they had been in the fall?

```
                                        1009                                              1011
 1  A.   I would say that you are correct.              1  A.   As best that we could, yes, without any training or
 2  Q.   Is it also true that conditions got worse after you   2  education to that fact.
 3  stopped doing the maintenance?                      3  Q.   And it was your assumption if you stopped doing it it
 4  A.   Yes.                                           4  would fail. Right?
 5  Q.   There was more dust and smoke in the shooting area.   5  A.   Yes. But I was also following my doctor's orders,
 6  Right?                                              6  too.
 7  A.   No. That was always there, I do believe.       7  Q.   Now, as the conditions deteriorated -- let me back up
 8  Q.   I am going to ask you to take a look --        8  a second. In January 2004, there was active training going
 9           MR. ELLIS: Your Honor, is it okay if I     9  on. Right?
10  approach?                                          10  A.   Yes.
11           THE COURT: You may approach.              11  Q.   You were shooting every day?
12  BY MR. ELLIS:                                      12  A.   Yes.
13  Q.   Corporal Price, this is a copy of your deposition  13  Q.   At at a recruit class?
14  transcript, is it not?                             14  A.   I don't know if it was every day. But I know there
15  A.   Yes, sir, it is.                              15  were days we were shooting with recruits. If I am not
16  Q.   And the deposition was taken in my office here in  16  mistaken, at that point in time in their training program we
17  Wilmington?                                        17  may have been just shooting shotgun. I can't recall
18  A.   Yes.                                          18  specifically. It's been a long time ago and a lot of things
19  Q.   I would ask you to call your attention to Page 84 of  19  have happened.
20  the deposition, the very bottom of Page 84.        20  Q.   I understand that. In any event, there was a lot of
21  A.   Okay.                                         21  shooting going on in January?
22  Q.   Could you first take a look, please, at the question I  22  A.   I know that with handgun training we shoot an
23  asked you on Line 18 on Page 84. I asked you: Were you  23  astronomical amount of rounds, more so than the shotgun.
24  able to see visually whether there was more dust or smoke in  24  But there was training going on, if that will answer your
25  the shooting area of the range after you had stopped doing  25  question, sir.

                                        1010                                              1012
 1  maintenance on the bullet trap?                     1  Q.   Now, towards the end of January, you became -- you had
 2  A.   Yes.                                           2  a blood test done, didn't you?
 3  Q.   Your answer was: Whenever you discharge a firearm  3  A.   I may have. I am sure you will reflect that here in a
 4  there is always smoke.                              4  minute.
 5  A.   Yes, that's what I just said.                  5  Q.   I will try. I am going to put a blood test result up
 6  Q.   Then what I said to you: I understand that. I am not  6  on the screen here and ask if you can tell me whether you
 7  asking for your opinion or your expertise or qualifications.  7  have seen it before. It will be Exhibit 52, Page 68. Now,
 8  Just visually, were you able to observe more dust and smoke  8  this is a test you had done at Kent hospital, Kent General
 9  in the shooting area after you had stopped doing the work on  9  Hospital, isn't it?
10  the bullet trap than there was before you stopped doing work 10  A.   Not at Kent General Hospital. It was there at Health
11  on the bullet trap?                                 11  Works.
12           Your answer is: I would say there had to be 12  Q.   At Dr. Green's office?
13  more?                                              13  A.   Yes, sir.
14  A.   Yes. I would say there had to be more.        14  Q.   So you are familiar with the sort of range that the
15  Q.   Okay. Thank you.                              15  blood test results come out in, it is in something called
16           Now, after having worked in that building from 16  micrograms per decaliter?
17  1998 through 2003, am I correct that you assumed that if you 17  A.   Yeah, I would say that's what it is. I don't know all
18  stopped doing the maintenance on the bullet trap that the 18  that scientific stuff.
19  bullet trap would fail?                            19  Q.   And your test score in this particular occasion was a
20  A.   Again, that would have been an assumption on my part. 20  9, which is in the normal range. Right?
21  Again, I had no training or expertise on -- and we didn't 21  A.   Yes. It had come down. I believe that was a result
22  even know how to do the maintenance on the bullet trap. It 22  of me backing off on doing maintenance on the bullet trap.
23  was all catch as catch can.                        23  Q.   Did any of these doctors that you talked to ever tell
24  Q.   I understand that you didn't know how to do it. But 24  you that there was an error range within any given blood
25  you had been doing it for five years. Right?       25  test?
```