1186

```
08:54:37   1              IN THE UNITED STATES DISTRICT COURT

           2              IN AND FOR THE DISTRICT OF DELAWARE

           3                           - - -

           4   B. KURT PRICE, WAYNE WARREN,    :    Civil Action
               and CHRISTOPHER D. FORAKER,     :
           5                                   :
                         Plaintiffs,           :
           6                                   :
                    v.                         :
           7                                   :
               L. AARON CHAFFINCH,             :
           8   THOMAS F. MACLEISH,             :
               DAVID B. MITCHELL, and          :
           9   DIVISION OF STATE POLICE,       :
                                               :
          10             Defendants.           :    No. 04-956-GMS

          11                           - - -

          12   CHRISTOPHER D. FORAKER,         :    Civil Action
                                               :
          13             Plaintiff,            :
                                               :
          14        v.                         :
                                               :
          15   L. AARON CHAFFINCH,             :
               THOMAS F. MACLEISH,             :
          16   DAVID B. MITCHELL, and          :
               DIVISION OF STATE POLICE,       :
          17                                   :
                         Defendants.           :    No. 04-1207-GMS
          18
                                       - - -
          19
                              Wilmington, Delaware
          20                  Monday, May 22, 2006
                                    9:00 a.m.
          21                    SIXTH DAY OF TRIAL

          22                           - - -

          23   BEFORE: HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury

          24

          25
```

1187

```
 1  APPEARANCES:
 2     THOMAS S. NEUBERGER, ESQ., and
        STEPHEN J. NEUBERGER, ESQ.
 3      The Neuberger Law Firm
          -and-
 4      MARTIN D. HAVERLY, ESQ.
        Law Offices of Martin D. Haverly
 5
              Counsel for Plaintiffs
 6
        R. MONTGOMERY DONALDSON, ESQ.
 7      Montgomery, McCracken, Walker & Rhoads, LLP
          -and-
 8      EDWARD T. ELLIS, ESQ., and
        CARMON M. HARVEY, ESQ.
 9      Montgomery, McCracken, Walker & Rhoads
        (Philadelphia, PA)
10
              Counsel for Defendants
11
                      - - -
```

1188

```
 1                        INDEX
 2    Preliminaries Re Destruction
      Of Evidence ---------------------- Page 1189
 3
      GREGORY WARREN (Continued)
 4
         Direct examination   -------------- Page 1198
 5       Cross-examination    -------------- Page 1235
         Redirect examination ------------- Page 1282
 6
      LYNN B. PRICE
 7
         Direct examination   -------------- Page 1287
 8       Cross-examination    -------------- Page 1294

 9    NATHAN McQUEEN, JR.

10       Direct examination   -------------- Page 1298
         Cross-examination    -------------- Page 1310
11       Redirect examination ------------- Page 1320

12    SUZANNE B. FORAKER

13       Direct examination   -------------- Page 1321
         Cross-examination    -------------- Page 1330
14
      JOHN DILLMAN (Deposition)
15
         Plaintiffs' Designations -------- Page 1336
16       Defendants' Designations -------- Page 1357

17    MARK W. SEIFERT

18       Direct examination   -------------- Page 1375
         Cross-examination    -------------- Page 1377
19
      CHRISTOPHER D. FORAKER
20
         Direct examination   ------------- Page 1378
21
         Discussion           ---------------------- Page 1445
22
23                    - - -
```

1189

1  THE COURT: Good morning. Do we have anything
2  to chat about.
3  MR. S. NEUBERGER: Yes, we do, Your Honor. Your
4  Honor, on the destruction of evidence issue, back in April,
5  the Court had issued the order appointing an expert to
6  determine whether anything could be recovered from the hard
7  drive.
8  Mr. Cruse reported back. He gave us that long
9  report and there was no summary. In order to aid the Court
10 in its determination and try to move this issue along before
11 the end of the trial, I contacted Captain Bunting, who was
12 the person the Court originally appointed as the expert and
13 was the name offered by the defendants. I talked to Captain
14 Bunting over the weekend, and I asked him if he would take a
15 look at Mr. Cruse's report.
16 Captain Bunting has prepared an affidavit, a
17 declaration, which I will file later today. I have a copy
18 of the declaration for the Court and for counsel.
19 THE COURT: All right. You may share that with
20 the Court and counsel.
21 MR. S. NEUBERGER: Your Honor, I believe Captain
22 Bunting's conclusions are that it appears that it was
23 erased. Now, Captain Bunting has agreed to make --
24 THE COURT: It appears what was erased?
25 MR. S. NEUBERGER: That the hard drive was

1190

1  erased after Colonel Chaffinch used the computer. He has
2  found a lot of information on it subsequently, but all that
3  appears to be from subsequent DSP users I believe he
4  indicated at Troop 4.
5  THE COURT: Was there any question but that it
6  had been erased? I think that was agreed on?
7  MR. S. NEUBERGER: Your Honor, the Court's order
8  had specifically stated that it needs more information to
9  determine whether the hard drive could be unerased or
10 recovered.
11 THE COURT: Right. That was the issue.
12 MR. S. NEUBERGER: I believe he indicated that
13 there is nothing to be found from Colonel Chaffinch on the
14 hard drive. In other words, nothing could be recovered from
15 the erasure.
16 THE COURT: Mr. Cruse? Who made that
17 conclusion?
18 MR. S. NEUBERGER: Captain Bunting analyzing Mr.
19 Cruse's report. The Court had indicated, I believe, in its
20 order that Mr. Cruse could only contact the Court directly.
21 So out of an abundance of caution, I didn't want to contact
22 Mr. Cruse. Captain Bunting has agreed to make himself
23 available tomorrow at any point during the day for Your
24 Honor to question him in chambers about the report and
25 things like that in order to aid the Court in its

1191

1  determination.
2      So I wanted to bring that to the Court's
3  attention.
4      THE COURT: What is the sum and substance of
5  this unsworn declaration? What is it that Captain Bunting
6  finds?
7      MR. S. NEUBERGER: He finds that, he goes
8  through all the circumstantial evidence to determine that,
9  yes, all the telltale signs of a hard drive being erased are
10 there.
11     THE COURT: We agree, there -- I don't think the
12 defendants contest that, that there was an erasure, or
13 whatever the technical term is.
14     MR. S. NEUBERGER: And I believe nothing can be
15 recovered from the time that Colonel Chaffinch used the hard
16 drive. That is the gist of that, Your Honor. So then I
17 believe that now takes us to the next step of the Court's
18 order. We have now determined that nothing can be
19 recovered. Where do we go from here? I believe that's
20 where we are at. So Captain Bunting is available to speak
21 to the Court at any point tomorrow.
22     THE COURT: Well, I am not sure that I want to
23 meet with Captain Bunting, number one, I am not sure that
24 there is a need. I will look at the declaration probably
25 over the evening, and we will see what if anything is to

1192

1  occur afterwards.
2      Mr. Ellis, what were you going to say?
3      MR. ELLIS: I didn't hear your question, Your
4  Honor.
5      THE COURT: What is it you would like to add to
6  this?
7      MR. ELLIS: I don't know that I can add
8  anything, Your Honor. You are right. We realize the thing
9  was wiped. That is their standard procedure.
10     THE COURT: You haven't had a chance to read
11 this, either.
12     MR. ELLIS: I haven't had a chance to look at
13 it, Your Honor. But if that is all Bunting is going to say,
14 it is not a disputed fact, and I don't think it is necessary
15 to bring it in.
16     THE COURT: What I had hoped we would be in a
17 position to understand is the essence of the findings by Mr.
18 Cruse, which were rather inscrutable to me, based upon the
19 writing that was submitted. I, quite frankly, didn't find
20 the summary. I know that the last three pages contain some
21 information which seems to suggest, at least it was
22 suggested to the Court's suggestion that there were
23 so-called keywords that were identified that I assumed that
24 the Neubergers would argue could be associated with language
25 used by the former Colonel in the past.

1193

1  But I don't know where that would take us,
2  either.
3      MR. ELLIS: Your Honor, one of the sort of
4  difficulties here was your original order said Cruse could
5  report to you and nobody else. So we didn't feel it was
6  appropriate to contact him to explain the inscrutable --
7      THE COURT: I think both counsel acted
8  appropriately.
9      MR. ELLIS: If what Bunting is saying is that
10 Cruse's report says it's been wiped, that is not a disputed
11 fact. The question is, why was it wiped and whether the
12 jury should be directed to draw an inference from that.
13     THE COURT: Right.
14     MR. ELLIS: At this point, Your Honor, if you go
15 back in the briefing during the original briefing over the
16 motion for spoliation structure or whatever it was when we
17 started out, the question is, why was it wiped, and also
18 whether it destroyed anything that was not otherwise
19 recoverable.
20     If you recall, the evidence we presented was
21 that anything that went through Chaffinch's BlackBerry, for
22 example, you heard testimony on Friday from Glenn Dixon who
23 said he got a BlackBerry message, that is something that is
24 all in the regular e-mail system and would go through one of
25 the servers that was recovered.

1194

1  There are other things that -- my recollection
2  is that the only thing that would not go through the regular
3  police servers is this text messaging thing. The text
4  messaging, Your Honor, the user goes from the PC and hooks
5  up to a website. For whatever reason it doesn't get saved
6  on the server and it also doesn't get saved by the website.
7      There is no evidence at this point that
8  Chaffinch ever used that. And if we end up in some type of
9  hearing, he will testify that he never used the text
10 messaging system, except that he would have his secretary go
11 on using her computer and send text messages occasionally
12 using her computer but using his name to indicate that it
13 came under the authority of the Colonel.
14     And that's the proffer I will make. If
15 appropriate, I think we should have a side hearing outside
16 the presence of the jury to deal with that question. And
17 then if it turns out that you conclude that it should go to
18 the jury, we should put it to the jury.
19     I am a little uncomfortable at this point
20 because the jury is getting piecemeal little bits and pieces
21 about computer use without any real connection.
22     THE COURT: I am not sure how much of this
23 jury's time I am going to allow to be taken up by this
24 issue.
25     Let's hear from the Neubergers.

1195

1 MR. T. NEUBERGER: Your Honor, I want to
2 withdraw the assertion I was making the other day as a
3 layperson trying to interpret the first report. It is not
4 in this declaration of Captain Bunting now because it was
5 put together hurriedly. But he has advised that those last
6 three pages of the other report, where it gives raw data on
7 the number of times a word appears, such as audiogram, he
8 says that is in subsequent users. That is not found in the
9 portions of the hard drive that were completely wiped.
10 So the inference that I was trying to make that
11 this would be further evidence of communications cannot be
12 made from that report.
13 THE COURT: So it becomes a nonissue.
14 MR. T. NEUBERGER: The last three pages become a
15 nonissue, yes.
16 Now, the record we have built so far -- there
17 are transcripts now. We do have a transcript of Major
18 Baylor's testimony and we do have a transcript of the end of
19 Captain Dixon's testimony about use of the text messaging
20 system. And Major Baylor testified that Colonel Chaffinch
21 would use the text messaging system, mentioned one specific
22 text message.
23 THE COURT: And Captain Dixon also.
24 MR. T. NEUBERGER: Captain Dixon, while he
25 showed us a BlackBerry, Captain Dixon also said that he used

1196

1 text messages.
2 THE COURT: I am not sure, is that different --
3 is the BlackBerry the text messaging system, are we talking
4 about the same thing?
5 MR. T. NEUBERGER: No, the BlackBerry is not the
6 text message. I believe this expert would also explain
7 that. He would say that, if you send a BlackBerry e-mail to
8 a Delaware State Police recipient at their e-mail address,
9 that is backed up. If you send it to a private address,
10 like AOL or something like that, that would not appear on
11 any backups because it doesn't go through State Police
12 servers.
13 But my point is that a text message of a hundred
14 characters or so very simply could be, send Foraker for
15 audiogram. And there is no backup of those messages.
16 Lieutenant Moses said that in his affidavit that was before
17 the Court when the Court ruled originally.
18 Our position is, we have established that the
19 Colonel uses text messages, and that there is no way to
20 retrieve the text messages he ever sent because the computer
21 was wiped clean. And then under the case law, the jury
22 could draw an inference from that.
23 THE COURT: If the Court is willing to advise
24 them...
25 MR. T. NEUBERGER: I understand. We are at the

1197

1 next step.
2 THE COURT: I am not sure -- I agree that we are
3 at the next step. I think Mr. Ellis would agree with that.
4 We are at the next step. The Court agrees. We will see
5 where the next step takes us.
6 MR. T. NEUBERGER: With Lieutenant Colonel
7 Seifert today, I was going to take it down the next road. I
8 think the Court is saying you don't want the jury to be
9 hearing any of this.
10 THE COURT: No, I don't.
11 MR. T. NEUBERGER: I was going to ask him if the
12 text messaging system, whether --
13 THE COURT: Quite frankly, Mr. Neuberger, I
14 don't know what this nets the plaintiff in the final
15 analysis. I am not sure the plaintiff has a good idea of
16 what they net, the plaintiffs have a good idea of what they
17 net, other than an inference.
18 MR. T. NEUBERGER: No, I understand. All we are
19 seeking is an inference.
20 THE COURT: There has to be at least some reason
21 to grant that request, that is, that there was spoliation
22 and that this information wasn't otherwise available. I am
23 not going to have the argument now. I have already eaten up
24 15 minutes of my jury's time.
25 MR. T. NEUBERGER: I was going to go into this

1198

1 with Major Seifert. I will not.
2 THE COURT: No, you won't.
3 MR. T. NEUBERGER: I was also going to lay the
4 same foundation with Captain Warren. I will not. He gave
5 an affidavit to the Court. And we are talking about a jury
6 instruction, when we categorize our evidence, violations of
7 the rules, et cetera, et cetera, another category of
8 evidence would be on causation. That is where we are trying
9 to take that. There is no need to make any more record on
10 that.
11 THE COURT: Let's get the jury in, please.
12 (Jury enters courtroom at 9:15 a.m.)
13 THE COURT: Good morning, ladies and gentlemen.
14 Please be seated. Hope you had a restful weekend. We have
15 a hard-working week ahead of us.
16 We are ready to resume with Dr. Warren.
17 ... GREGORY WARREN, having been previously sworn
18 as a witness, was examined and testified further as
19 follows ...
20 DIRECT EXAMINATION CONTINUED
21 BY MR. T. NEUBERGER:
22 Q. Captain Warren, good morning.
23 A. Good morning, how are you?
24 Q. Fine.
25 Were you at the promotion ceremony when

1199

1  defendant Tom MacLeish was promoted to the rank of
2  Lieutenant Colonel?
3  A.  Yes, I was.
4  Q.  At that promotion ceremony, did Lieutenant Colonel
5  MacLeish make any statements about his relationship with
6  Colonel Chaffinch?
7  A.  There were several guys around me who were talking,
8  but I did get a chance to hear quite a bit of it. One of
9  the statements I will never forget is, he stated that
10 Colonel Chaffinch and he were joined at the hip.
11 Q.  So you heard him say that that day?
12 A.  That's correct.
13 Q.  This was at some sort of ceremony in an auditorium or
14 something?
15 A.  He was at the podium speaking, yes.
16 Q.  Where was that located?
17 A.  I believe it was, it was offsite. I believe it was at
18 the Sheraton.
19 Q.  In Dover?
20 A.  In Dover, yes.
21 Q.  Now, to go on, I think when we had broke last week, we
22 were, it was the first week of December 2003, just so we are
23 situated, you had explained some things about a transitional
24 meeting. Let's jump ahead about a month or so, after
25 Sergeant Foraker was reporting various problems with the

1200

1  range to you that we will talk about in a little bit.
2        Did Sergeant Ashley ever come along and indicate
3  anything to you while all this was going on about the kinds
4  of bullets that they were using at the range?
5  A.  Sergeant Ashley made every effort, I think, to
6  intentionally come over to the Academy as much as he could.
7  I would see him walking in the building two or three times a
8  day. He would put his head in Ralph's door, Lieutenant
9  Davis' door. He would put his head in my door and things
10 like that.
11       I don't know if that was an effort to stay on
12 top of what was going on at the range and hear what's
13 happening or if it was an effort for him to be able to lobby
14 on his own behalf. However, I do distinctly remember one
15 occasion, one of the times I was busy and didn't pay that
16 great attention. But one day he was standing in my doorway,
17 and I was at my desk. And I kind of hit him right between
18 the eyes about the MSD sheets --
19 Q.  Let's stop there. That is a technical word. What is
20 an MSD sheet?
21 A.  Well, I don't know the technical term for them. I
22 think it's a material safety -- it deals with all the
23 hazardous materials. So I think they call them MSDS sheets
24 or MDS sheets or something of that nature.
25 Q.  So was this indicating the composition of the bullets

1201

1  that they were using at the range?
2  A.  Yes. From what I understand, any time there is a
3  hazardous material, there is supposed to be an MDS or MSDS
4  sheet or whatever the technical term is for it, that
5  describes the materials that are contained in that, so that
6  people who are exposed to it are aware of what they are
7  dealing with.
8  Q.  Did he indicate any understanding of what he believed
9  the composition of the materials were?
10 A.  That is what happened. I hit him right between the
11 eyes with it, so to speak, and said, hey, is what I hear up
12 there true, that these guys are breathing in all these heavy
13 metals from these bullets that are disintegrating? And he
14 said no --
15       MR. ELLIS: Your Honor --
16 BY MR. NEUBERGER:
17 Q.  You can't say what he said.
18       Did he say what the actual composition of the
19 bullets were?
20       MR. ELLIS: Still hearsay, Your Honor.
21       THE COURT: Sustained. You can establish that
22 through other means than this witness.
23 BY MR. NEUBERGER:
24 Q.  You saw reports on the composition of the bullets?
25 A.  That's correct.

1202

1  Q.  And --
2        THE COURT: Are you talking about Sergeant
3  Ashley?
4        MR. T. NEUBERGER: No. I am talking about
5  Captain Warren had the MSD sheets in front of him indicating
6  what the composition of the bullets were from a scientific
7  study.
8  BY MR. NEUBERGER:
9  Q.  My question is, did Sergeant Ashley have that
10 knowledge previously?
11       THE COURT: That would be sustained, as to what
12 knowledge Sergeant Ashley had.
13       MR. T. NEUBERGER: Then I will go on.
14 BY MR. T. NEUBERGER:
15 Q.  In your dealings with Sergeant Ashley, either prior to
16 December of 2003 or after, did he ever indicate in any
17 fashion, through a report or anything that he was aware of,
18 what the composition of the bullets was?
19       MR. ELLIS: Objection, Your Honor.
20       THE COURT: Sustained.
21       MR. T. NEUBERGER: Let's move on.
22 BY MR. T. NEUBERGER:
23 Q.  The first week or so, it is December 1st, 2003, did
24 Chris Foraker ever bring anything to your attention about
25 the bullet trap?

## 1203

1  A.   Within a few days, Chris started making contact with
2  Ralph and I both personally and on the phone, yes.
3  Q.   And what was he indicating?
4  A.   Well, that there were problems. Not just the bullet
5  trap, but a lot of different things at the range, the bullet
6  trap being one of them.
7  Q.   This is happening within the first few days, you are
8  saying?
9  A.   Probably not the first two days, but by the end of the
10 first week, if not the very beginning of the second week. I
11 can't remember the exact time. It was not long after -- we
12 had a sense of security a couple days and thought things
13 were going to go rather well. Then all of a sudden the
14 bottom fell out when Chris and the guys starting really
15 taking the range apart and started looking at it.
16 Q.   What kind of problems did he start indicating to you?
17 A.   There was a range of them, from the headsets didn't
18 work properly and that some of the troopers could actually
19 hear truck drivers talking out on the highway. Somehow the
20 frequencies were running over each other.
21      Some of the headsets didn't work, period.
22      There was an enormous amount of I guess smoke
23 and dust and a combination of those kinds of things in the
24 range. But most of us already knew that.
25      I guess the general cleanliness of the range

## 1204

1  left quite a bit to be desired, particularly from what I
2  understand. I eventually went back there, but not
3  initially. Behind the bullet trap itself was very dirty and
4  unkept and things of that nature.
5       There were more than that. I think there were
6  some issues regarding there wasn't enough personnel. We
7  weren't actually putting enough officers on the line I think
8  to meet, there is some type of an accreditation standard or
9  national safety standard. I am unfamiliar with it. But
10 apparently there is a safety standard and we were short on
11 the number of officers that should be up there on the line
12 when we are training.
13      As I said, there was quite a list. I may have
14 missed a couple of items on there. That is an idea of the
15 things we were dealing with.
16 Q.   One of them was the bullet trap?
17 A.   Absolutely.
18 Q.   Then I think you said eventually you yourself went
19 over there and went behind the firing line and looked at the
20 bullet trap yourself?
21 A.   Yes, sir.
22 Q.   Are most troopers allowed to go back there?
23 A.   No, they are not.
24 Q.   Why not?
25 A.   Well, for safety reasons, and then, of course, I guess

## 1205

1  there are mechanical items back there. It's a secure area.
2  You have to have a key to get back there anyhow. Of course,
3  as we find out, there is some hazardous materials back
4  there, too.
5  Q.   When you looked back there, what do you basically
6  remember?
7  A.   You come in the end, and you look down. It's a very
8  elongated room, so to speak. It is only a few feet wide but
9  very, very long. It's the first time I had ever been back
10 there. As soon as I walked in there, I just turned around,
11 looked at the guys, you could see it. The whole thing looks
12 like a bowling alley, so to speak. It is very long and
13 narrow. It was just red. It looked like Mars, almost. It
14 was just a red powder, almost like somebody hadn't dusted
15 their house in three or four years. But it was all red. It
16 had this red tint to it.
17 Q.   In this initial period of time when Sergeant Foraker
18 is identifying the problems, did you give him any directions
19 as to any investigations he should conduct?
20 A.   Well, I wanted him to try to find out everything he
21 could. I knew this was going to be a problem, obviously.
22 Even though I am not a range or a technical person and I
23 have never worked at the range and I am not a firearms
24 expert, I have enough sense to find out it shouldn't be like
25 this.

## 1206

1       Of course, talking to all of the officers up
2  there, they started explaining to me that, you know, pumps
3  had been interchanged and there were problems with the
4  bullet trap system and there were some things that were
5  breaking and things of that nature. I knew this was going
6  to cost money. That I knew right up front. And I knew this
7  was going to be a problem because it shouldn't be like this.
8       So I asked Chris, hey, start gathering your
9  facts. Get everything together that you can because we are
10 going to need all of this information if we are going to try
11 and fix all of this.
12 Q.   Did he and the men start gathering those facts you
13 asked them to get?
14 A.   Yes, he did.
15 Q.   We are talking about the end of the first week or
16 sometime in the second week, were you able to get to
17 Lieutenant Colonel MacLeish that first week or so?
18 A.   No. I was able to see him haphazardly or off the
19 cuff, but I wasn't able to meet with him, no.
20 Q.   What were you able to do off the cuff with him?
21 A.   I hit him and Major Eckrich both with the problems.
22 The way our buildings are is the Academy is immediately
23 adjacent to the headquarters building. So you can't help
24 but every few days run into one another, even in the
25 hallways of the headquarters building or the Academy itself.

1207

1 So I took the opportunity every chance I got,
2 whenever I saw Major Eckrich or Lieutenant Colonel MacLeish,
3 to tell them, hey, just a head's up, we need to meet, we are
4 going to need to sit down and talk. We have some major
5 problems up there.
6 Q. How did Lieutenant Colonel MacLeish react that first
7 time you gave him the head's up?
8 A. Well, he and I don't see eye to eye on a lot of things
9 anyhow. So I kind of got the brush-off -- well, keep us
10 advised. Let us know, let Paul know, that type of thing.
11 It wasn't a warm and fuzzy feeling like, Well, Greg, let's
12 get together at 8:00 tomorrow morning and sit down and give
13 me an idea of what we are talking about.
14 It was basically some lip service. And he would
15 keep on going down the hall in a hurry and I would go on and
16 complete my business.
17 Q. Were you able to get out anything to him about the
18 kinds of problems?
19 A. Yes. Just basically that the bullet trap wasn't
20 functioning properly, that we needed some more help up
21 there. I don't think I was able to get into a lot of the
22 things, like the headsets particularly, except that they
23 weren't working properly and that there were problems with
24 them and things like that. There was no way to get into
25 great detail, because I couldn't get the time with him to do

1208

1 it.
2 Q. Did you tell him anything about the expenses that
3 might be involved?
4 A. Oh, yeah. I told him it's going to be expensive and
5 that it's going to cost money. We all know that.
6 Q. Did you ever get to grab him in your building or in
7 the parking lot?
8 A. There was a function going on. I can't remember if it
9 was a commanders' meeting or just a regular meeting that he
10 had to come over for or what it was. But I do remember
11 getting him in the hall directly out in front of my office.
12 I called him there, tried to do the same thing. Hey, you
13 know, Colonel, just to give you a head's up, things are not
14 good, we are going to have a lot to deal with here. Chris
15 is finding more and more. That type of thing. Trying to
16 drive that point home as to we need to sit down and talk
17 here ASAP.
18 Q. Were you able to have a meeting ASAP with him?
19 A. That didn't work.
20 Q. Why don't you explain to the jury how long it took for
21 you to have a meeting about the problems at the range.
22 A. Well, the Colonel's office has a series of
23 gatekeepers. They have secretaries that sit out front. So
24 you physically can't see where the Colonel's offices are.
25 So you have to go to the secretaries, which sit behind a

1209

1 gate, so to speak, a wooden gate, and are in back of glass
2 now. In old days, it was a gate. But now there is glass
3 and a door there.
4 You have to explain to them what you want. Then
5 they will talk to the Colonel, Lieutenant Colonel or one of
6 the Majors. And then they will get back to you and advise
7 you whether or not they want to see you.
8 So I went over and told them, I need to have a
9 meeting, I think I was including Ralph, too. I said
10 Lieutenant Davis and I need to have a meeting ASAP with the
11 Lieutenant Colonel regarding all these problems up at the
12 range.
13 Q. And were you able to get a meeting scheduled?
14 A. I was told that between now and Christmas it's going
15 to be very busy, there is too much going on, it's not going
16 to work. Then he is going to be off for Christmas, to get
17 back with us as soon as we get back and we will set a
18 meeting up then.
19 So I said, well, at least passed on to him for
20 me how serious this is and he can squeeze me in, I don't
21 care if it is for ten minutes, I will take it.
22 Q. Was he able to squeeze you in at any point in time
23 during the month of December up to New Year's?
24 A. No, not at all. I never met with him prior to that
25 except haphazardly in the hallways.

1210

1 Q. Were you able to ever schedule a meeting with his
2 secretary for any time in January?
3 A. Finally, when we came back from the holiday, the first
4 thing I did when I hit the ground at the Academy was I went
5 over and we lined up an initial meeting. It was right at
6 the very beginning of January. I think it was the 8th or
7 9th, in that area. We were going to have a meeting, Ralph
8 and I, with the Lieutenant Colonel. I think I asked the
9 secretaries if they could have Paul Eckrich there also
10 because I knew we were going to be talking about money and
11 we would need him there, too.
12 Q. A meeting was set for the 8th or 9th?
13 A. Yes. I can't remember the exact one, it was close,
14 8th, 9th, 10th, right in that range after we got back.
15 Q. Did that meeting occur?
16 A. No, it didn't.
17 Q. Why not?
18 A. When I went over a few minutes early -- I told Ralph
19 to come over a little later, I went over to be ready to go.
20 When I got over there, I wondered what was up because as I
21 walked across the parking lot his truck was gone. So I
22 thought, this isn't good, maybe he had to run to the store
23 or something.
24 So I went on upstairs, and I said, I am here for
25 my meeting with the Lieutenant Colonel. One of the

**1211**

1 secretaries, I won't forget, she looked at me, she rolled
2 her eyes back in her head and said, he had to go for the
3 rest of the day on something personal. And I said, you mean
4 he just -- we are going to come back in a couple hours or
5 this has been postponed? Do you want me to be by my phone
6 or whatever? And she said, no, he's gone. And I said, we
7 are not going to run the meeting today? And she said, no,
8 we are going to have to reschedule it.
9     So that was the end of that.
10 Q.  This was the 8th or 9th of January. Did the meeting
11 get rescheduled?
12 A.  Yes, we did reschedule it.
13 Q.  When was it rescheduled?
14 A.  The soonest we could get it was January 30th.
15 Q.  It took another 22 days for you to meet with him?
16 A.  Yes, sir.
17 Q.  So on the second-to-last day of January, you were
18 finally able to meet with him about the problems at the
19 range?
20 A.  That's correct.
21 Q.  Now, while you were spending this six or seven weeks
22 to finally meet with the Lieutenant Colonel, was Sergeant
23 Foraker giving you reports back?
24 A.  Yes.
25 Q.  You had talked about the assignment you gave him and

**1212**

1 the men about investigating facts. Right?
2 A.  That's correct.
3 Q.  How frequently would you hear back from the men?
4 A.  I would hear from Chris the most. That is expected,
5 since he is the Sergeant up there. He was pretty good about
6 driving down to see either myself or Ralph. And he was
7 pretty good about sending e-mails or calling us on the
8 phone.
9     Not as much, but maybe once or twice a week,
10 Corporal Warren, Corporal Price, would both come down. They
11 would stop in, peek their head in. Tell us what's up, how
12 things were going. I would try to talk to them some, say
13 how are you making out, have you found out anything about
14 that?
15     I would converse with Corporal Warren and
16 Corporal Price maybe once to twice a week, and Chris
17 sometimes maybe twice a day. Then maybe one day I wouldn't
18 hear from him at all because they would be very busy up
19 there. So it might be the next day when I would hear
20 something.
21 Q.  And was it your understanding the problems were just
22 minor or of a different nature?
23 A.  Well, we knew the problems were serious. The guys
24 told me that immediately. But it seemed like the more
25 research they did, it seemed like the problems were worse

**1213**

1 than we ever anticipated they were and they probably had
2 been going on for some time.
3 Q.  Okay. When was the earliest that you realized that
4 the problems were significant?
5 A.  I think right up front, either by the end of the first
6 week -- not within the first couple of days. I think
7 probably Chris and the guys were busy up there probably
8 doing inventories or walking around, talking to one another.
9 Chris was probably getting his feet wet. The guys were
10 probably filling him in on changes and things, whatever the
11 case might be.
12     MR. ELLIS: Your Honor, objection.
13     THE COURT: Sustained. The jury will ignore
14 what the others were probably doing.
15     THE WITNESS: I am sorry.
16 BY MR. T. NEUBERGER:
17 Q.  You were explaining when you realized the problems
18 were major. Let's just keep on that. Okay?
19     When Sergeant Foraker was reporting back to you,
20 did he ever report about repairs that had been made to the
21 bullet trap?
22 A.  Yes.
23 Q.  What did you learn from him?
24 A.  Well, it was pretty surprising because I found out
25 that there was a fairly major expenditure towards the end,

**1214**

1 it was either August or September, of the summer, just prior
2 to Chris coming in, there was a fairly major expenditure and
3 a company was brought in to, I don't know if the word is
4 revamp, renovate, modify, whatever the case might be, the
5 bullet trap system because it had basically shut down to the
6 point where it wasn't operational at all. So I guess they
7 had to try to do something to fix it.
8 Q.  Okay. Did Sergeant Foraker indicate to you that there
9 were health concerns from the men about putting their hand
10 in the liquid back there in the bullet trap?
11 A.  Yes.
12 Q.  What did you learn from him?
13 A.  Well, I was amazed, but they were being asked to
14 actually physically, without training or without equipment,
15 actually put their hands and arms into the, I guess it's a
16 trough, where this conveyor belt is. And there is oil in
17 there, and these hazardous materials are in the oil. But
18 they were asked to physically do this work, I guess this
19 cleanup either daily or maybe, you know, every other day or
20 whatever it took, I guess. They were being asked to do that
21 by their former supervisor.
22 Q.  Okay. Did there come a time when Sergeant Foraker
23 informed you that they were stopping doing maintenance on
24 the bullet trap in the back there by putting their hands in
25 the liquid?

**1215**

1  A.   Yes. In fact, I remember Chris told me that. I also
2  remember Corporal Price one day, he wasn't very happy. And
3  he had come down to see me personally, I guess when he was
4  picking his laundry up or maybe running an errand at
5  headquarters. And I distinctly remember Kurt Price. He was
6  really livid about this. He said, I shouldn't be subjected
7  to this.
8       MR. ELLIS: Objection, Your Honor.
9  BY MR. T. NEUBERGER:
10 Q.   Was Kurt Price upset about doing that?
11 A.   Very much so, yes.
12 Q.   Did you relay the information to Lieutenant Colonel
13 MacLeish that they had stopped doing the maintenance on the
14 bullet trap by the time you were able to meet with him?
15 A.   Yes. Both he and Major Eckrich. And I made sure,
16 since I was having problems getting up with the Lieutenant
17 Colonel, that I -- Major Eckrich is in a different part of
18 the building. And he does not have a gatekeeper. He has a
19 secretary. She sits outside his door. So you can just
20 physically walk right in, so to speak. So on multiple
21 occasions I thought, well, if I can't get the Lieutenant
22 Colonel, I know the Major has his ear and he will send us on
23 up the line.
24      So I went on multiple occasions during December
25 and January to tell Paul Eckrich, hey, you need to sit down

**1216**

1  with the Lieutenant Colonel. This is worse than you guys
2  think. Whatever information you are receiving or whatever
3  you think that is going on up there, we need to sit down and
4  talk about this.
5       So Paul lead me to believe that that was being
6  taken care of, that he would let the Lieutenant Colonel know
7  and the Colonel when he saw it.
8  Q.   Major Eckrich was on what was called the executive
9  staff of the Colonel and the Lieutenant Colonel. Right?
10 A.   He would not have to go through what I go through. He
11 wouldn't have to set up a meeting. He has the authority to
12 go down the hall, go right through, bypass the secretaries
13 and walk on in the back, yes.
14 Q.   Are you saying in December you relayed to Major
15 Eckrich also the fact they weren't doing maintenance on the
16 back of the bullet trap by putting their hands in the liquid
17 substances?
18 A.   Yes. I took that opportunity to let him know I wasn't
19 too happy about some of the things that had been occurring
20 up there, obviously, for months and/or years and how come,
21 if we are going to be on the table of organization, how come
22 we weren't brought into the loop on all these things. Of
23 course, he didn't have an answer for that.
24 Q.   So eventually, you get to have this meeting on January
25 30th with Lieutenant Colonel MacLeish?

**1217**

1  A.   That's correct.
2  Q.   And does Lieutenant Ralph Davis attend, also?
3  A.   Yes, he does.
4  Q.   Did Colonel MacLeish make some sort of remarks about a
5  paper mask at the meeting?
6  A.   That's correct.
7  Q.   What do you recall him saying?
8  A.   Well, when we were describing the problems with the
9  dust and the fumes and those types of things, he looked
10 straight across to me and he said, from here on out,
11 starting tomorrow, I want everyone at that range to wear a
12 paper dust mask. And I sat there kind of with my mouth
13 hanging open, I may have even said, You are kidding.
14 Q.   Was Major Eckrich there, too?
15 A.   Yes. He was seated to my right, yes.
16 Q.   How many people were at the meeting?
17 A.   I know the four of us. I don't think there was a
18 fifth person. I know Ralph was across to the right. The
19 Colonel was right across from me, Colonel MacLeish,
20 Lieutenant Colonel MacLeish, then Major Eckrich was at the
21 end of the table. I don't know if there was another person
22 brought in to sit in on this or not. I can't remember if
23 there was a fifth. But I know the four of us were in there.
24 Q.   Just to go back a little bit, when you were telling
25 Major Eckrich earlier about things, were you letting him

**1218**

1  know that professional groups like Environmental Solutions,
2  Mayfram, chemical specialists, things like that, were being
3  looked into?
4  A.   He already knew that because I had given Chris the
5  authority to bypass Ralph or any time he needed to get a
6  question answered, you know, Paul Eckrich is the money guy
7  and you are going to need his authority to expend any funds.
8  So step up the process here, you know, don't hold this
9  process up on account of Ralph and I maybe not being in
10 today because of meetings or something. If we are not in,
11 just bypass us and go right to Major Eckrich. If he says
12 anything, tell him I told you so.
13 Q.   So you gave him authority to do that?
14 A.   Absolutely.
15 Q.   At this meeting, were the problems at the range
16 discussed?
17 A.   Yes.
18 Q.   We are on January 30th?
19 A.   Yes, that's correct.
20 Q.   The problems at the range were you said discussed. Is
21 that right?
22 A.   That's correct.
23 Q.   And the fact that the men weren't doing the
24 maintenance in the back of the bullet trap, was that
25 discussed?

1219

1  A.   We went through everything. Since it had taken us a
2  month and a half to get a meeting, I thought, well, it may
3  be a month or two before I get this opportunity again, so
4  Ralph and I kind of -- I think Ralph was pretty dormant
5  during the meeting. He let me kind of run with the ball.
6  But I took the opportunity to kind of hit him with both
7  barrels, with everything.
8  Q.   If you took -- is it possible you took notes of these
9  meetings?
10 A.   I was so busy talking, I think I had some notes with
11 me because I wanted to make sure that the things Chris and
12 the guys had told me about, I didn't miss anything. When
13 the Colonel started talking, then I took some notes. But
14 the beginning of the meeting, I was kind of expounding upon,
15 hey, here's what we have inherited, here's what we have got
16 from Sergeant Ashley and the operations in this place for
17 the last year or two.
18 Q.   When you retired, where would those notes have been
19 left?
20 A.   At the Academy. I left everything in there in files,
21 tons of files.
22 Q.   You don't have them now?
23 A.   No, sir. I don't have any need for them. I wouldn't
24 want them.
25 Q.   Based on your observations of your contacts with

1220

1  Lieutenant Colonel MacLeish in the parking lot or in the
2  hallways and the period of time it took to meet him, did you
3  draw any conclusions as to whether he wanted to meet with
4  you?
5        MR. ELLIS: Objection, Your Honor.
6        THE COURT: Sustained.
7  BY MR. T. NEUBERGER:
8  Q.   Did Lieutenant Colonel MacLeish at any time prior to
9  January 30th indicate that he wanted to meet with you
10 quickly?
11 A.   I would have even appreciated a phone call. I would
12 have done a lot of this over the phone.
13       MR. ELLIS: Objection, Your Honor. It is not an
14 answer to the question.
15       THE COURT: Let me see counsel.
16       (The following took place at sidebar.)
17       THE COURT: What are you trying to accomplish?
18       MR. T. NEUBERGER: His conclusion, he said at
19 the deposition, was he felt that the Lieutenant Colonel was
20 trying to avoid him to have a meeting.
21       THE COURT: You can establish that, I think.
22       MR. T. NEUBERGER: That's what I thought I was
23 doing.
24       MR. ELLIS: He can't ask his conclusion. He can
25 ask what the Lieutenant Colonel said to him.

1221

1        THE COURT: I agree with that. I was getting
2  ready to say, without leading him into an improper answer.
3  I think your question, the way it is framed, because you
4  continue to lead him, rather than letting him testify, why
5  don't you just ask him the question suggested by Mr. Ellis.
6        MR. T. NEUBERGER: Which?
7        MR. ELLIS: Did he tell you that he didn't want
8  to meet with you.
9        THE COURT: If you would stop leading.
10       I want to make one other point about leading
11 questions. You know that the jury has been instructed and
12 it is a fundamental principle that questions are not
13 evidence.
14       MR. T. NEUBERGER: Right.
15       THE COURT: There is a lot of questions in this
16 record, and it's not clear to me that there is an
17 evidentiary basis for some of the things that you want to
18 get accomplished here. Again, I caution you about the
19 leading questions.
20       (End of sidebar conference.)
21       THE COURT: You may rephrase.
22 BY MR. T. NEUBERGER:
23 Q.   Let's go on. The range opened -- did the range open,
24 what year, do you remember?
25 A.   1998, I believe. '97 or '98. I think it was '98.

1222

1  The same your our museum opened, yes.
2  Q.   You were on one of the committees that was involved in
3  selecting the builders for the range?
4  A.   That's correct, yes.
5  Q.   Was there a process the state went through, bids,
6  evaluations of bids, things like that, that would be
7  involved in building a multi-million-dollar facility?
8  A.   Yes, sir.
9  Q.   The committee you were on, how many people were on
10 that committee?
11 A.   There were five total. Three from the State Police
12 and two from the State of Delaware from the Department of
13 Administrative Services.
14 Q.   Was it the function of your committee to evaluate the
15 builders and the architects?
16 A.   Yes. That's correct.
17 Q.   And --
18       MR. ELLIS: Your Honor, I object to this line of
19 questioning on the ground of relevance, if I understand
20 where it is going.
21       THE COURT: Denied.
22 BY MR. T. NEUBERGER:
23 Q.   Were the builders and the architects ranked with a
24 score?
25 A.   Certainly.

1223

1 Q. Did the organization that got the best score get the
2 contract to build the range?
3 A. No, they did not.
4 Q. And the organization that did get the contract, where
5 did it rank in the scoring?
6 A. It was last.
7 Q. Then there came a time when that organization built
8 the range. Right?
9 A. That's correct.
10 Q. And when the range opened in '98, you were still a
11 trooper then?
12 A. That's correct, yes.
13 Q. You had to go use the range for your semiannual
14 certifications. Right?
15 A. Yes.
16 Q. And were there problems with the air flow system in
17 the range at the beginning?
18 A. Well, I knew that before I even got up there to shoot,
19 because Lieutenant Bryson, who was in charge of it, and
20 myself had been friends since I joined the department in
21 '83.
22 Q. Was he on the committee, too?
23 A. That's correct, yes.
24 Q. Lieutenant Bryson. What was your rank when you were
25 on the committee?

1224

1 A. I was the Corporal, and then ended the committee as a
2 Sergeant.
3 Q. And Lieutenant Bryson was a Lieutenant then?
4 A. Yes, that's correct.
5 Q. And was he like -- was he the person in charge of the
6 range?
7 A. He was in charge of the current firearms range and the
8 Firearms Training Unit, yes.
9 Q. There was an outdoor range?
10 A. Yes.
11 Q. And he was in charge of that?
12 A. That's correct.
13 Q. And then when the indoor facility opened up, he was in
14 charge of it. Right?
15 A. Right. He just moved right over into the new
16 building, that's correct.
17 Q. And I am just asking, when you started using the
18 range, did you observe that there were HVAC problems?
19 A. Yes. Everybody was talking about it. I am not an
20 HVAC person. I knew, I mean, I could smell what I could
21 smell and see the smoke and dust in there. But I didn't put
22 two and two together except from hearing some of the people
23 complaining about it.
24    So we all knew early on there were problems.
25 Q. Did you know whether or not the bullet trap system

1225

1 that was put in was the one that was originally intended?
2 A. No. The only thing I knew about the bullet trap is
3 that I think our own personnel had to put it together. I
4 think Bill Bryson told me --
5 Q. You can't tell us what Bill Bryson said.
6 A. -- that our own guys put the item in.
7    MR. ELLIS: Your Honor, he is now --
8 BY MR. T. NEUBERGER:
9 Q. That is okay.
10    You told the jury that in December Sergeant
11 Foraker comes to you and indicates that there are going to
12 be costly repairs?
13 A. That's correct.
14 Q. And was this unusual in the range's history, based on
15 your knowledge?
16 A. From what Lieutenant Bryson and everybody else had
17 been telling me --
18    MR. ELLIS: Objection.
19 BY MR. T. NEUBERGER:
20 Q. From your knowledge as a Captain who used the range,
21 your knowledge and someone who was on the committee, and
22 from what you found out when you took over in April of 2002?
23    MR. ELLIS: Objection.
24 BY MR. T. NEUBERGER:
25 Q. And looked at records? I am asking based on your

1226

1 knowledge.
2    THE COURT: Why don't you ask him a series of
3 questions and we will get to it.
4 BY MR. T. NEUBERGER:
5 Q. Based on the kind of records you saw about the range,
6 when you looked into it starting in December of 2003, had
7 the range had -- were moneys spent to repair the range at
8 various times since its opening?
9 A. That's correct. But I suspected that would happen
10 anyway.
11    MR. ELLIS: Objection as to what he suspected.
12 BY MR. T. NEUBERGER:
13 Q. You have answered my question. Thanks.
14    This month and a half it took to meet with
15 Lieutenant Colonel MacLeish, had you indicated to him in the
16 hallways that health issues were involved?
17 A. That's correct.
18 Q. And when health issues of troopers under the command
19 of the Delaware State Police are involved, do professional
20 standards require that one move -- what do professional
21 standards require as far as how quickly you should try to
22 get to the bottom of this?
23 A. Well, I think any leader's responsibility is you need
24 to act upon that immediately and find out why it has
25 occurred or what is occurring, then take corrective action.

1231

1 A. Just sitting there and basically looking at him and
2 made the statement. I don't remember anything on him,
3 because now I am looking at Wayne.
4 Q. When that remark was made, I think you said Captain
5 John Yeomans was also present in the room?
6 A. That's correct, yes.
7 Q. He was the Director of Personnel. Right?
8 A. Yes.
9 Q. Did Captain Yeomans say something in defense of Wayne
10 Warren at that time?
11 A. I don't remember the words. But John immediately
12 spoke up before I could even say anything with what I
13 believe to be, he tried to basically tell the Colonel --
14          MR. ELLIS: Objection, Your Honor.
15          THE COURT: Sustained.
16 BY MR. T. NEUBERGER:
17 Q. Did he speak up on Wayne Warren's behalf?
18 A. Yes, he tried.
19 Q. Did he direct his remarks to the Colonel, Lieutenant
20 Colonel?
21 A. Yes, he did.
22 Q. And how did the Lieutenant Colonel react to the
23 Director of Personnel raising issues about Wayne Warren?
24 A. Basically cut him off and finished talking, and John,
25 I think, knew at that point there was nothing else to say.

1232

1          MR. ELLIS: Objection, Your Honor.
2          MR. T. NEUBERGER: He cut him off.
3          THE WITNESS: And John didn't say anything else
4 after that.
5          MR. T. NEUBERGER: Can I have a moment, Your
6 Honor?
7          THE COURT: Yes.
8          MR. T. NEUBERGER: There is something else.
9 BY MR. T. NEUBERGER:
10 Q. Did you have a lawsuit against Governor Minner and the
11 Delaware State Police because you had been passed over for
12 promotions to Major on several occasions?
13 A. That's correct.
14 Q. Was I your lawyer?
15 A. That's correct.
16 Q. And was that lawsuit settled?
17 A. Yes, it was.
18          MR. ELLIS: Objection.
19 BY MR. T. NEUBERGER:
20 Q. It's over?
21 A. Yes, it is.
22          MR. ELLIS: Your Honor, I object to that.
23          THE COURT: I am going to sustain that
24 objection.
25          Ladies and gentlemen, I direct that you

1233

1 disregard the response of the witness as to the disposition
2 of the lawsuit. It has no relevance to your deliberations.
3 BY MR. T. NEUBERGER:
4 Q. Lieutenant Colonel MacLeish is sitting here, Colonel
5 MacLeish now. Do you have professional disagreements with
6 him?
7 A. Certainly.
8 Q. During your career, you worked with him on how many
9 occasions?
10 A. I have worked directly with him at least four times.
11 Q. And what would that have been?
12 A. The first time I worked for him, he was in charge of
13 the Fatal Accident Team.
14 Q. Okay.
15 A. I worked for him, obviously, at the Academy. He was
16 my Major in charge of Kent and Sussex Counties when I was a
17 Troop Commander. And then when I was a shift Sergeant, he
18 was my Troop Commander for a while.
19 Q. Okay. And do you have disagreements with him about
20 how police officers should maintain confidence in law
21 enforcement?
22 A. Yes, absolutely.
23 Q. Do you disagree with the standards he maintains?
24          MR. ELLIS: Objection, Your Honor.
25          THE COURT: Sustained.

1234

1 BY MR. T. NEUBERGER:
2 Q. Do you have a view one way or the other, do you agree
3 with the standards that he follows?
4          MR. ELLIS: Objection, Your Honor.
5          THE COURT: Sustained.
6          BY MR. T. NEUBERGER: If I could just have a
7 moment now, Your Honor?
8          THE COURT: Certainly.
9          (Pause.)
10          MR. T. NEUBERGER: I have no further questions.
11          THE COURT: All right. Thank you, Mr.
12 Neuberger.
13          Mr. Ellis, you may examine.
14          MR. ELLIS: Your Honor, before I do that, may we
15 have a sidebar?
16          (The following took place at sidebar.)
17          MR. ELLIS: Your Honor, I request that you
18 instruct the jury to ignore Mr. Neuberger's questions at the
19 end. He is trying to get the jury to believe that Colonel
20 MacLeish is somehow running a substandard operation by
21 asking questions of this guy. He knows they will be
22 objected to.
23          THE COURT: The jury has already been advised
24 that questions are not evidence. I am not going to further
25 focus the jury on Mr. Neuberger's improper attempts to focus

**1235**

1  him as you suggest. I think we should move on. Go ahead
2  and conduct your cross-examination.
3  (End of sidebar conference.)
4  MR. ELLIS: Your Honor, I would like to use that
5  flip chart for just a minute.
6  CROSS-EXAMINATION
7  BY MR. ELLIS:
8  Q. Captain Warren, what I would like to start out with
9  here is to give the jury an idea of what your organization
10 looks like when you were the head of the Academy. Okay?
11     Your title was something called Director of
12 Training. Right?
13 A. That's correct.
14 Q. And then, as I understand it, you had two Lieutenants
15 reporting to you. Right?
16 A. Yes.
17 Q. Can you see what I am doing here?
18 A. Yes, I have got it now. Thank you. That's better.
19 Q. So if you were doing an organization chart, you would
20 have one box on either wing for the two Lieutenants. Right?
21 A. That's correct.
22 Q. And one of them was called Special Projects?
23 A. Yes.
24 Q. And that's a position that Ralph Davis held at one
25 point. Right?

**1236**

1  A. Yes.
2  Q. Then the other position is also Lieutenant. That is
3  called the Assistant Director of Training?
4  A. Yes.
5  Q. At the time that Chris Foraker came back to the range
6  in December 2003, was Ralph Davis in this position here as
7  the Assistant Director of Training?
8  A. Yes. He had moved down to that office, yes.
9  Q. Now, as I understand it, when you were the Director of
10 Training, the Special Projects Lieutenant didn't really
11 supervise anybody. He just dealt with special projects?
12 A. That's correct.
13 Q. So then under the Assistant Director of Training, you
14 would have three groups under that. Right?
15 A. There were different pieces that fall under that,
16 that's correct, yes.
17 Q. And one of them was what you call the drill
18 instructors. Right? The group that actually teaches the
19 people at the Academy?
20 A. Yes.
21 Q. And how many of them were there?
22 A. There were three.
23 Q. Does that include the Sergeant?
24 A. There is three full time, then a multitude of
25 part-timers. And there is a Sergeant, yes.

**1237**

1  Q. So it's a Sergeant in charge of that group and then
2  there is, I think you said there is three instructors?
3  A. There is a Sergeant, that's including the Sergeant,
4  two Corporals, and then we bring part-timers in from the
5  field as needed.
6  Q. We have had some testimony here that part-time
7  instructors or adjunct instructors were occasionally brought
8  into the firing range to help out there. Is that
9  essentially the same process where you bring adjuncts in to
10 help the drill instructors?
11 A. Same theory, yes.
12 Q. You also had something called the K-9 unit. Right?
13 A. Yes.
14 Q. And that has a Corporal in charge of it?
15 A. Yes.
16 Q. Is there anybody in that unit other than a Corporal
17 and the dogs?
18 A. One more Corporal.
19 Q. Then there is a Firearms Training Unit. Right?
20 A. Yes.
21 Q. And that has a Sergeant in charge?
22 A. It could be whatever the Colonel says. There has been
23 a Lieutenant there once and Sergeant since, I believe, yes.
24 Q. Since 1998 there has been nothing else in charge
25 there. Right?

**1238**

1  A. There was a Lieutenant in charge there, then when he
2  retired there has been Sergeants since.
3  Q. The Lieutenant you are talking about is Lieutenant
4  Bryson?
5  A. Yes.
6  Q. You will have three Corporals in here (indicating).
7  Right?
8  A. Primarily, yes. That has varied here and there. I
9  know there has been fewer than that and there has probably
10 been more than that at times. Primarily, you are close.
11 Q. Of the total number of people under your supervision,
12 on this table of organization, what is the total number? I
13 count 11.
14 A. Yes, 11.
15 Q. And of the 11, four of them at least are going to be
16 in the Firearms Training Unit. Right?
17 A. That's correct.
18 Q. So that was a fairly significant piece of the
19 organization?
20 A. Yes, it is.
21 Q. Let me put this way.
22     Now, when you were at the State Police, there
23 was something called a performance appraisal system, wasn't
24 there?
25 A. That's correct, yes.

1239

1  Q.  And as part of the performance appraisal system, you
2  did something called goals and objectives. Is that right?
3  A.  That's correct, yes.
4  Q.  And would it also be correct to say that the reason
5  you do goals and objectives is to tell the individual
6  trooper what you expect of them so you can later measure his
7  or her performance against that expectation?
8  A.  That's correct.
9  Q.  Now, would it be accurate to say that one of the goals
10 and objectives of the noncommissioned officer in charge of
11 the Firearms Training Unit was to provide a safe training
12 environment?
13 A.  Certainly.
14 Q.  I want to ask you some questions about that. I am
15 going to put a -- the screen we have here has a capability
16 of putting exhibits up on the screen, Captain Warren. There
17 is also a screen right in front of you that will show it as
18 well.
19          I am also going to put up, in case you want to
20 look at an entire document before you answer questions, I am
21 going to put a copy of the binder up here.
22          The first exhibit I am going to ask you to look
23 at is Exhibit 56.
24          MR. ELLIS: Your Honor, I am experiencing
25 technical difficulties here. Excuse me just one minute.

1240

1          THE COURT: All right.
2  BY MR. ELLIS:
3  Q.  This is a performance appraisal for Richard Ashley, is
4  it not?
5  A.  Yes, it is.
6  Q.  And he is the guy who was in charge of the Firearms
7  Training Unit before Sergeant Foraker returned in December
8  of 2003. Is that correct?
9  A.  That's correct.
10 Q.  I am going to show you Page 17 of that document, and
11 ask you if that is a copy of the goals and objectives part
12 of Sergeant Ashley's performance appraisal?
13 A.  Well, I don't know that, because I didn't do it, and
14 it's just the next page in a document. But if you say so, I
15 will assume you have got the right document up there.
16 Q.  Take a look at the entire document in the book, so you
17 can assure yourself that is really what it is. It is
18 Exhibit 56 in the black binder I have put in front of you.
19 I would ask you to take a particular look at the eighth page
20 of the document, which I will put on the screen for you. Do
21 you have Page 8 there?
22 A.  Yes. Because the other one I couldn't find. But I
23 have 8, yes.
24 Q.  If you take look a look at Page 8, do you see at the
25 bottom where it says Officer's Signature?

1241

1  A.  Yes.
2  Q.  Does that look like Sergeant Ashley's signature?
3  A.  I don't know what Sergeant Ashley's signature looks
4  like, sir.
5  Q.  The next line down says Immediate Supervisor's
6  Signature. Is that the place where Ralph Davis should have
7  been signing?
8  A.  Yes, that's correct.
9  Q.  Does it look like Ralph Davis' signature?
10 A.  I can't remember. Ralph has signed it. I assume
11 that's his signature. But I can't remember what someone's
12 signature looks like after all these years. I assume that's
13 his, yes.
14 Q.  I am going to have the bottom part enlarged where it
15 says Reviewed By.
16 A.  Yes.
17 Q.  That's your signature, isn't it?
18 A.  That is definitely my signature, yes.
19 Q.  And you signed this document on November 7th, 2003?
20 A.  That's correct, yes.
21 Q.  Now, the document I had asked you to look at before is
22 a couple pages behind. I will put that up on the screen.
23 Do you recognize this as the goals and objectives that are
24 given to Sergeant Ashley at the point he gets his
25 performance appraisal? In other words, you give him his

1242

1  goals and objectives for the next year, don't you?
2  A.  I don't have the page you are talking about. It is
3  not in here.
4          MR. ELLIS: Your Honor, may I approach the
5  witness?
6          THE COURT: Yes, you may.
7          THE WITNESS: I thought maybe they were stuck
8  together. But I don't see it.
9          THE COURT: It is not in my copy, either.
10         THE WITNESS: It is not in there. It is not in
11 the valuations. An attachment. Okay.
12 BY MR. ELLIS:
13 Q.  Now do you have the goals and objections portion?
14 A.  Yes.
15         MR. ELLIS: Are you following that, Your Honor?
16         THE COURT: Does the jury have this book?
17         MR. ELLIS: No, Your Honor. I am using the
18 screen.
19         THE COURT: For their benefit it will be the
20 last pages of the exhibit.
21         MR. ELLIS: That's correct, Your Honor, yes.
22 BY MR. ELLIS:
23 Q.  Now, Captain Warren, is this the goals and objectives
24 that would go with the performance appraisal of the
25 noncommissioned officer in charge of the firing range?

1243

1  A.  Yes.
2  Q.  I am going to ask you to go to the next page after the
3  one we are at.
4      One of the goals and objectives in the upper
5  left-hand is to maintain a safe training environment in
6  addition to an environment conducive to training and
7  learning. Is that correct?
8  A.  Yes.
9  Q.  On the right side of that grid is the action steps
10 that you expect the individual here to take in order to
11 accomplish that goal. Right?
12 A.  That's correct, yes.
13 Q.  I am going to have those enlarged, in Section 3, so we
14 can all see them a little bit better. Am I correct here
15 that one of the goals and objectives being set for Richard
16 Ashley in the fall of 2003 is on a daily basis clean and
17 maintain the Firearms Training Facility?
18 A.  Yes.
19 Q.  And it also says that he is to continually inspect the
20 facility and identify deficiencies, does it not?
21 A.  Yes, it does.
22 Q.  Now, what I would like to do is take a look at what
23 ratings Sergeant Ashley received from Lieutenant Davis and
24 you for his performance for the year that ended in the fall
25 of 2003. So I ask you to go back to the beginning of that

1244

1  exhibit, and ask you if this is the first page of a typical
2  Delaware State Police performance appraisal?
3  A.  Yes, it is.
4  Q.  And you can see that under Work Habits Sergeant Ashley
5  gets pretty good ratings, doesn't he?
6  A.  Yes, he does.
7  Q.  The next page deals with management and supervisory
8  skills. He gets very good ratings on that, too. Doesn't
9  he?
10 A.  Yes.
11 Q.  Now, you believe that Sergeant Ashley was working with
12 an understaffed Firearms Training Unit, do you not?
13 A.  I am not following. You said I believe. I don't
14 believe I ever said that Sergeant Ashley was working with
15 an --
16 Q.  You recognize that you signed this performance
17 appraisal. Right?
18 A.  Yes.
19 Q.  Take a look at the fifth page of the document. I will
20 put it up on the screen.
21     Now, the way this performance appraisal system
22 works, on the left side of the screen you have objectives,
23 and the objective here is to ensure divisional compliance
24 with COPT requirements for firearms training. Right?
25 A.  Yes.

1245

1  Q.  On the right you give them a rating, to the extreme
2  right, under the category Explanation, you explain the
3  rating. Right?
4  A.  Yes.
5  Q.  Now, in this case you have given Ashley an E. What
6  does E mean?
7  A.  E would be he far exceeded the expected results.
8  Q.  There is an explanation for why he did. Right?
9  A.  Yes.
10 Q.  Why don't we have that explanation enlarged, so the
11 jury can see it.
12     Does it say, Captain Warren, beginning about
13 halfway down, During this rating period the FTU has been
14 understaffed, requiring a great deal of flexibility and
15 adaptability?
16     Does it say that?
17 A.  It does now. I see that, yes.
18 Q.  With all of the hurdles, both internal and external,
19 the FTU under Sergeant Ashley's guidance completed all
20 necessary training.
21     That's what it says?
22 A.  Yes.
23 Q.  You also recognized that Sergeant Ashley was working
24 through mechanical difficulties with the range, didn't you?
25 A.  I didn't know any of this. In fact, that's what I am

1246

1  telling you. In this document, you said I knew this. I
2  haven't seen this in two and a half years.
3  Q.  You haven't --
4      THE COURT: Let him finish the answer, Mr.
5  Ellis.
6      THE WITNESS: For instance, you made the
7  statement that I knew Sergeant Ashley was working
8  understaffed. I haven't seen this document in two and a
9  half years. That is why I told you I didn't know that or I
10 didn't state that. You made the statement that he was
11 working through a great deal of mechanical difficulties. We
12 didn't know any of that because he wasn't telling anybody of
13 that. It was a secret, the best kept secret in the State
14 Police.
15 BY MR. ELLIS:
16 Q.  You signed this document when?
17 A.  11/7/03.
18 Q.  Is it safe to say that you reviewed this document?
19 A.  I review the documents to make sure that they are
20 completed properly. I do not micromanage the Lieutenants,
21 however. I do not do that.
22 Q.  Do you believe that it is important in performance
23 appraisals to be fair and truthful?
24 A.  Yes, I do.
25 Q.  Let's take a look at a different part of the page that

1247

1  you were just looking at. This in particular, which down in
2  the lower right-hand corner -- before I get to that,
3  Objective No. 3 is to ensure the range is conducive for a
4  professional and safe work environment. Do you see that?
5  A.   Yes.
6  Q.   Let's see the comments on this performance appraisal.
7  On the right, the explanation for the rating, it says here
8  that Sergeant Ashley was able to work through numerous
9  mechanical problems which could have potentially caused
10 great delays in firearms training. Because of his
11 mechanical skills, Sergeant Ashley is able to maintain and
12 repair mechanical problems, allowing for continual training.
13          That is a performance appraisal you approved.
14 Yes?
15 A.   I signed it, yes, that it was completed on time and
16 that it was done, yes.
17 Q.   Would it be fair to say that as of the date you signed
18 this performance appraisal, you knew that Sergeant Ashley
19 was working on mechanical problems at the range?
20 A.   No, it is not. I do not micromanage and I cannot read
21 verbatim every single word and every line of every
22 performance appraisal or every report that comes across my
23 desk. That is why I had questioned you. I never
24 remembered -- apparently you said I stated something that I
25 never stated. I am sorry, I can't agree with that.

1248

1  Q.   Now, you were what's called a second level review of
2  this performance appraisal. Correct?
3  A.   I would be the first person reviewing it.
4  Q.   Let me back up just a second. This performance
5  appraisal is prepared by Ralph Davis. Right?
6  A.   Yes. That's correct.
7  Q.   And then he gives it to you for your review. Right?
8  A.   I am the first person reviewing it, not the second
9  person reviewing it.
10 Q.   I understand this. When you review these performance
11 appraisals, are you telling me that you didn't actually read
12 them?
13 A.   No. I go through them to make sure they have been
14 filled out correctly. I may glance over them to make sure
15 they are done in a timely fashion. I make sure the
16 supervisors get them in on time. However, I make it pretty
17 well-known to people who work for me that I do not intend on
18 micromanaging you.
19 Q.   Is it correct that when you put your signature on a
20 performance appraisal, as the next reviewer, you are putting
21 your signature on someone's career?
22 A.   I don't fill the performance appraisal out. I am
23 simply signing it as the Section Chief and we are going to
24 ship it on up to HR.
25 Q.   Do you take these things very seriously?

1249

1  A.   I think I do, yes.
2  Q.   Does it take an inordinate amount of time to review
3  these performance appraisals?
4  A.   Many times in the past, yes. When you are working at
5  a recruit facility and you are working with a number of new
6  recruits, when you are working in a special unit like a
7  Training Academy, by the time they got there, you should
8  have a certain level of confidence in them and that they are
9  veteran officers. Was I remiss in that I had too much
10 confidence in people like Sergeant Ashley? I would have to
11 say, yes, I am guilty of that.
12 Q.   I am going to give you a copy of a deposition that you
13 gave in this case. Okay?
14 A.   Yes.
15 Q.   Could you open it to Page 23, please.
16 A.   Page 23?
17 Q.   Yes. You recall you and me sitting across a table and
18 spending the better part of the day discussing these issues.
19 Right?
20 A.   That's correct.
21 Q.   That was in your deposition?
22 A.   Yes.
23 Q.   On Page 23, Line 2, did I ask the question: I guess
24 my question is, while you were at the Academy did a
25 performance appraisal still have to be signed by the

1250

1  Supervisor and then the next level up?
2          Did you give me the answer: Oh, certainly, yes?
3  A.   That's correct.
4  Q.   Then I asked you: When you were the next level up on
5  performance appraisals, did you actually read them before
6  you signed them?
7          Your answer was -- the question, really, The
8  performance appraisals?
9          And I said, Yes.
10         You then answered: Absolutely. You are putting
11 your signature on someone's career, basically. So that's
12 one of the things that you really need to take seriously.
13 And it takes an inordinate amount of time to do it but it is
14 something that the troopers themselves deserve.
15         Was that your answer that day?
16 A.   That's correct. When I fill out an evaluation I put
17 an incredible amount of time in it, absolutely.
18 Q.   Are you now telling us that you did not review
19 Sergeant Ashley's performance appraisal?
20 A.   I think you are confused. When I said this, I am
21 talking about evaluations that I do on Lieutenant Davis or
22 when I was at Troop 3 on my two Lieutenants there. You are
23 mixing up what I said for my evaluations. What I do for my
24 Lieutenants, I put an incredible amount of time in
25 performance appraisals because they are very important to

**1327**

1 2002, when he was told he was originally being transferred
2 out of that position. He had never taken any medications on
3 a daily basis prior to that.
4 Q.    Now, just to change up the time frame a little bit, I
5 would like to focus you on the events and Chris' reaction to
6 the events that began occurring after he was reinstated. So
7 December 1st of 2003 to the present day. Okay?
8 A.    Sure.
9 Q.    Could you describe to the jury what Chris' emotional
10 state has been like during that time frame?
11 A.    Pretty much back to square one again. I feel like all
12 the progress that I felt he was starting to make has been
13 ruined, we are just back to square one again. The
14 depression, the anxiety. The anger. The demoralization.
15 We are just back to square one again. I really feel like
16 it's worse than it was before.
17 Q.    Now, could you describe for the jury what Chris'
18 interactions with Lauren and Emily have been like since that
19 time?
20 A.    It's been heartbreaking for them. They want their
21 daddy back. They don't know how to do that. They just walk
22 around, they circumvent him so many times because they just
23 want him back.
24 Q.    Have you been able to observe Chris' reaction to
25 Lauren and Emily in this instance?

**1328**

1 A.    Yes. He is devastated about that. His children are
2 the most important thing to him. He knows he has broken
3 their heart. But he can't -- he doesn't have control over
4 it. He is just trying to get along the best he can.
5 Q.    Has he had problems with depression?
6 A.    Yes.
7 Q.    Could you describe some of those problems to the jury,
8 please?
9 A.    He is just basically -- it's almost like we are
10 isolated. We are very close as a family, typically, prior
11 to all this happening. But he just isolates himself from
12 everybody and everything and there is no interest in doing
13 anything.
14        If we were to organize, or if somebody invites
15 us to come to their home, it's really difficult to get him
16 to want to join us or to stay for any extended period of
17 time.
18        I think that he feels as though his career in
19 particular has been thrown on the trash heap, really.
20 That's been really devastating for him, just to feel as
21 though he is so specialized. And it's a tight-knit
22 community. Firearms instruction is very -- it is a
23 tight-knit community where people know all over the country
24 who is who and who does what type of training. So I think
25 he has a lot of interaction with them and people say to him,

**1329**

1 what did you do? What happened?
2        So he has to re-explain the truth.
3 Q.    Now, Suzanne, I think you mentioned before that Chris
4 used to like taking you and the girls bike-riding, feeding
5 horses and things like that?
6 A.    Yes.
7 Q.    Does he enjoy doing those sorts of things now?
8 A.    No.
9 Q.    Just to touch on this next topic, very briefly, has
10 there been any impact on your love life with your husband,
11 Chris?
12 A.    Yes.
13 Q.    What kind of an impact has it been?
14 A.    He is not interested at all. There is a total lack of
15 interest.
16 Q.    Have you ever been with Chris out in public somewhere
17 when someone would approach him and ask him questions about
18 the firing range?
19 A.    Yes.
20 Q.    What is Chris' reaction in those instances?
21 A.    He said I did my job and I told the truth.
22 Q.    Now, during the first case, did Chris ever start
23 treating with any kind of a medical professional?
24 A.    During the first case?
25 Q.    Yes.

**1330**

1 A.    Yes.
2 Q.    And who was that?
3 A.    Dr. Kozma. He is the psychiatrist.
4 Q.    Did there come a time when Chris stopped seeing Dr.
5 Kozma?
6 A.    Yes.
7 Q.    When was that?
8 A.    I am not exactly sure when he stopped. It was after
9 the transfer back into the unit, I believe.
10 Q.    Since that time has Chris resumed seeing Dr. Kozma?
11 A.    Yes.
12 Q.    And just to wrap this up again, Suzanne, is Chris the
13 same person today than that he was before all this happened?
14 A.    No.
15        MR. S. NEUBERGER: No further questions, Your
16 Honor.
17        THE COURT: Mr. Ellis.
18        CROSS-EXAMINATION
19 BY MR. ELLIS:
20 Q.    Ms. Foraker, as I understand what you are telling us,
21 your husband experienced difficulties in the prior lawsuit
22 in the sense that he -- there was some mental aspect to it.
23 Is that fair to say?
24 A.    Yes.
25 Q.    And then, when the last lawsuit was over and he got

**Page 1331**

1 reinstated, he seemed to you to get much, much better?
2 A.  I wouldn't say much, much better.  Not much better.
3 He was improving.  It was a process that he was getting
4 better.
5 Q.  Well, you said he was thrilled to be back.  Right?
6 A.  Yes.
7 Q.  And relieved to be back.  Did you say that?
8 A.  Yes.
9 Q.  Was he off medication at that point?
10 A.  The only medication that he took prior to that was the
11 Toporol the first time.  Then during this lawsuit he was put
12 on the antidepressants and the sleep aids.
13 Q.  Was he on antidepressants during the first litigation?
14 A.  No.
15 Q.  At what point did you observe deterioration in his
16 situation, in his mental condition?
17 A.  In what time frame?  Which period?
18 Q.  That is my question.  What time period.  You were
19 asked questions about after December 1, 2003.  When did you
20 first start to observe problems?
21 A.  It got significantly worse, I mean, from the very
22 beginning, fro mm the moment he went back into the unit, he
23 could see it was a disaster.  The range was in a
24 catastrophic situation.  There was a problem in every aspect
25 of the range.  The very day he went back.

**Page 1332**

1       But I think that when things really started to
2 progressively get worse was when the newspaper articles came
3 out that April of 2004 I believe it was, the lies that were
4 told about him and that he was responsible for everything
5 that happened at the range.  They knew it wasn't the truth.
6 And it was very disturbing to him because he had attempted
7 to try, through the proper channels, to send e-mails and to
8 try to coordinate meetings.  So it was at that point, I
9 think, when he really started to go downhill again because
10 he thought that this is happening all over again.
11 Q.  Well, let's go back to the original question.  Are you
12 saying that after December 1, 2003 there was a period when
13 he was not deteriorating, and then it started in April?
14 A.  No.  I think that was improving from the previous
15 lawsuit.  He was improving.  I am not saying that he did
16 this dramatic deterioration.  I think when the articles, the
17 news articles came out and then it went nationwide and then
18 it went internationally, he felt, how am I ever going
19 recover my reputation from this?
20 Q.  Between December 1 and April, was there a point when
21 you began to see some deterioration?
22 A.  I think that he -- the feelings of frustration, the
23 feelings of knowing that I am back in the situation again,
24 because immediately, he did not get any support from the
25 executive staff.  No one would listen to him in attempting

**Page 1333**

1 to try and tell them what was going on.  They were ignoring
2 everything that was going up the chain of command.  So he
3 was frustrated.  He was agitated.  He just felt like, I
4 think -- I don't know what's going to happen but I have to
5 tell the truth in what's going on here.  This is what I am
6 supposed to do as a supervisor.
7 Q.  At what point did you begin to see some sort of
8 deterioration?
9 A.  If I had to pinpoint it, I would say probably when the
10 news articles came out.
11 Q.  So that from December 1, 2003 until April you saw no
12 deterioration?
13 A.  No, I don't agree with that.
14 Q.  I am just trying to get you to try to pinpoint it for
15 me.
16 A.  I can't give you a pinpoint date.  I think that the
17 emotions were the same from when he realized that they were
18 not assisting him, the emotions were the same.  But it
19 significantly got worse when the news articles came out.
20 Q.  Just so we are clear on this, you never spoke to
21 anybody on the executive staff about this case.  Right?
22 A.  That's correct.
23 Q.  So you don't know from your own personal knowledge any
24 of these things that you are saying about whether the staff
25 supported him or not.  Right?

**Page 1334**

1 A.  No.  But I believe my husband.
2 Q.  All you know is what your husband tells you.  Right?
3 A.  And I believe him.  He is a truthful man.
4     MR. ELLIS:  Thank you.  Nothing further.
5     THE COURT:  Any redirect?
6     MR. S. NEUBERGER:  No, Your Honor.
7     THE COURT:  Thank you, ma'am.  You are excused.
8     (Witness excused.)
9     MR. T. NEUBERGER:  Your Honor, at this time, a
10 witness John Dillman has had back surgery, and we would like
11 to read in some portions of his deposition.
12     THE COURT:  I think we have agreed on
13 designations and counterdesignations?
14     MR. ELLIS:  Yes, Your Honor.  We have some live
15 witnesses out here.  It wouldn't take very long.  They are
16 state employees.  I would like to get them out of here
17 before the break if we can.
18     THE COURT:  How long is this reading going to
19 take?
20     MR. T. NEUBERGER:  Just till the break.
21     THE COURT:  Let me see counsel.
22     (The following took place at sidebar.)
23     THE COURT:  Who is out there?
24     MR. ELLIS:  Ultimately, I don't care, Your
25 Honor.  But we have a witness Joe Swiski here, who is a

1335
1  state employee.
2       THE COURT: Can we get this witness on and off?
3       MR. T. NEUBERGER: Let's make a proffer. Major
4  Swiski was a member of the executive staff.
5       THE COURT: Is there an objection?
6       MR. ELLIS: No. I am providing him.
7       THE COURT: Why do I need a proffer?
8       MR. T. NEUBERGER: I am going to ask him the
9  defendant's reputation for truth and honesty. And as a
10 member of the executive staff he has testified under oath
11 that he has a reputation for not being a truthful person.
12 Since we are up here, I am asking if he has an objection of
13 that.
14      MR. ELLIS: I was anticipating this might be the
15 case. The deposition transcript that Mr. Neuberger refers
16 to, he asks him the question, and then he -- it is -- it
17 wasn't Mr. Neuberger asking the questions. It was Gary
18 Aber. He asks the question. He asks the question what that
19 is derived upon. And what it is derived upon is one prior
20 bad act, not true dishonesty. One prior bad act. I don't
21 think that is admissible.
22      THE COURT: Read the deposition designations,
23 then we will deal with this.
24      (End of sidebar conference.)
25      THE COURT: Ladies and gentlemen, we are about

1336
1  to have some testimony adduced before you in the form of a
2  reading. And that's because the witness is unavailable. So
3  Mr. Neuberger older will examine Mr. Neuberger younger, who
4  will play the part of John Dillman.
5  BY MR. T. NEUBERGER:
6  Q.   We are going to start at Page 110:
7       "Question: Mr. Dillman, there are just a few
8  things about your background that I want to clear up. Okay?
9       "You didn't identify the position that you held
10 in Governor DuPont's cabinet after you left the State Police
11 after your first stint. What was your position?
12      "Answer: I was the Director, State Personnel
13 Director.
14      "Question: And approximately how many
15 thousands of state employees at that time?
16      "Answer: Including education, we had at that
17 time about 30,000 employees.
18      "Question: Okay. And then you returned to the
19 Delaware State Police for a long career. Right?
20      "Answer: That's correct.
21      "Question: I think you said you retired from
22 the State Police?
23      "Answer: I did.
24      "Question: Did you say you retired?
25      "Answer: Yes.

1337
1       "Question: Were you asked to retire?
2       "Answer: I was forced to retire.
3       "Question: Okay. So you were forced to
4  retire?
5       "Answer: That's correct."
6       MR. T. NEUBERGER: 112, Line 3:
7       "Question: Okay. Now during your long career
8  with the Delaware State Police, is it fair to say that
9  thousands of state troopers worked under your auspices when
10 you were involved with the personnel function over those 25
11 or so years, rotated through?
12      "Answer: During that period of time, I'm not
13 sure there were thousands, but there was over a thousand
14 troopers who came through the division. I had a number of
15 troopers, certainly less than a hundred, who worked directly
16 under my supervision.
17      "Question: I'm not talking about who worked
18 under you. When you left there were about 580 troopers.
19 Right?
20      "Answer: Right.
21      "Question: That's in 2002?
22      "Answer: Right.
23      "Question: If we go all the way back to the
24 late 1970s when you were there, there were at least 300 or
25 so troopers. Correct?

1338
1       "Answer: Correct.
2       "Question: Over those years troopers retire
3  and new troopers get hired. Right?
4       "Answer: Yes.
5       "Question: I'm just trying to say, is it fair
6  to say that over a thousand troopers rotated through the
7  system during your career?
8       "Answer: I suspect it's safe to say, yes.
9       "Question: Right. Is it also safe to say that
10 you don't have a specific memory of each of them today, do
11 you?
12      "Answer: That seems to be fairly clear with
13 respect to my testimony. But that is true. I certainly
14 remember some better than others, but I don't remember them
15 all.
16      "Question: You don't remember individual
17 personnel situations each of them may have confronted over
18 their career, do you?
19      "Answer: That's correct, I do not.
20      "Question: And now come this April of 2006,
21 you'll be four years removed from when you were forcibly
22 retired from the State Police. Is that correct?
23      "Answer: Yes. That's correct.
24      "Question: And the fact that you're four years
25 removed from when you retired from the State Police, is it

```
                                                  1339
 1   fair to say that that also affects your ability to remember
 2   the details of the personnel situations faced by individual
 3   troopers?
 4           "Answer: Yes."
 5           MR. T. NEUBERGER: Let's go to Page 131. Let's
 6   start at Line 9:
 7           "Question: I think it was your testimony this
 8   morning that your recollection was you definitely remembered
 9   that Major Forester had the assistance of a hearing aid?
10           "Answer: Yes, I remember that.
11           "Question: Do you remember today whether it
12   was one or two?
13           "Answer: I remember one.
14           "Question: I think he's testified it was two.
15           "Answer: It could have been.
16           "Question: But here this document says he was
17   wearing hearing aids.
18           "Do you see that?
19           "Answer: I do.
20           "Question: This document does not indicate
21   whether he was medically qualified for the job or not.
22           "Do you see that?
23           "Answer: I do see that.
24           "Question: Now, once again, would your staff
25   in the course of their duties normally bring that to your
```

```
                                                  1340
 1   attention in November of 1998 when this was received?
 2           "Answer: Well, again, I would have expected it
 3   to, except that under this situation he's already wearing
 4   the hearing aids, and other people, my staff included, had
 5   probably seen him wearing the hearing aids, so they may be
 6   less likely to bring it to my attention. But I think it's
 7   something I would have expected to be brought to my
 8   attention and it was not.
 9           "Question: So I guess my initial point was
10   simply that some of these documents bear a stamp of received
11   by the Personnel Department of the Delaware State Police.
12   Do you see that right at that time the very top there, No.
13   14982, Personnel received, Year 2000? Do you see that?
14           "See your stamp down there on that page there?
15   You just passed it.
16           "Answer: I'm sorry. Yes.
17           "Question: Right,
18           "Answer: Yes.
19           "Question: Do you see that?
20           "Answer: Yes.
21           "Question: If we go two more pages you will
22   see it's stamped Personnel, November 11, 1997?
23           "Answer: I do.
24           "Question: That stamp indicates that these
25   documents came in through the Personnel Department. Is that
```

```
                                                  1341
 1   correct?
 2           "Answer: They do.
 3           "Question: So my question was for this
 4   thousand or more of troopers who have gone through the State
 5   Police while you were working there, there are certainly
 6   things in their personnel files which might assist you in
 7   testifying today. Is that correct?
 8           "Answer:
 9           "Why don't you just give that back to me. We
10   are done with that.
11           "Now, just to go back, just to your career
12   slightly, while you were at the State Police you were a
13   civilian employee of the State Police. Right?
14           "Answer: That's correct.
15           "Question: And about the time you were
16   forcibly retired, there were more than a hundred civilian
17   employees in the State Police. Is that correct?
18           "Answer: Yes.
19           "Question: Fair statement?
20           "Answer: Yes.
21           "Question: When you were there you were the
22   highest ranking person responsible for the personnel
23   function. Is that true?
24           "Answer: Yes.
25           "Question: You explained this morning that at
```

```
                                                  1342
 1   least when your career ended you reported to the Lieutenant
 2   Colonel?
 3           "Answer: That's correct.
 4           "Question: At an earlier time way back in your
 5   career you may have reported to a Major. Is that correct?
 6           "Answer: That's correct.
 7           "Question: But for the most part during the
 8   later stages of your career you were reporting to a
 9   Lieutenant Colonel?
10           "Answer: Yes.
11           "Question: And I think you explained this
12   morning that you often would deal directly with the Colonel
13   or the Lieutenant Colonel, depending on who was available.
14   Is that correct?
15           "Answer: That's correct.
16           "Question: And you indicated that there were
17   civilians working under you in Personnel. Right?
18           "Answer: Yes.
19           "Question: And you indicated that there were
20   also uniformed troopers working under you in Personnel?
21           "Answer: Yes.
22           "Question: And you've indicated that there
23   were Captains, Lieutenants, Sergeants and maybe even
24   Corporals over the years working under you. Right?
25           "Answer: That's correct.
```