1343

1  "Question: Now, when you left the State Police
2  it was -- let's put it this way: Since you were a civilian,
3  did that enable you to exercise independent judgment in
4  giving advice to the Colonel and to the Lieutenant Colonel
5  concerning personnel functions?
6      "Answer: I believe so.
7      "Question: Since you did not wear a uniform.
8  Right?
9      "Answer: Correct.
10     "Question: You weren't under the command
11 structure of the Delaware State Police. Is that right?
12     "Answer: Well, I was under the command
13 structure. I think there are certain formalities I guess
14 that civilians may feel entitled to that a uniformed officer
15 may feel a little more prohibited from exercising. Some of
16 that may simply come from being a civilian, but a lot of it
17 probably comes from serving in a function that is
18 specialized for which you have been selected because you
19 have got expertise that normally wouldn't be available from
20 a uniformed officer.
21     "Question: Well, a uniformed officer can be
22 trained in personnel functions. Right?
23     "Answer: Well, in my opinion, certainly a
24 uniformed officer can be trained in personnel functions.
25 But a uniformed officer is not going to spend an entire

1344

1  career in personnel functions or have an interest in
2  personnel functions to the extent that I believe I did, and
3  I think a lot of people that are in that profession have a
4  choice and have spent an entire career in that.
5      "A uniformed officer most likely is going to
6  probably have a good academic background in human resources,
7  which may help the Colonel select them to be in that
8  assignment. They may have worked in a human resources
9  office for a couple of years, so he's got some background in
10 it, but they're going to be assigned there probably for a
11 couple of years at most and aren't going to spend 30 years
12 in it or 20 years in it, that sort of thing.
13     "Question: I understand what you're saying.
14 You're saying that a civilian who has worked many years in
15 the function has more experience and possibly even more
16 knowledge in that function than someone who is just coming
17 in for a two or a three or a four-year rotation?
18     "Answer: Correct. And I think that because of
19 that background, and I may have been a little bit different
20 because I did function as a cabinet secretary, and I had
21 been with other departments, so I had, for whatever sense
22 you want to say, I had the ability to speak up. But I had
23 no hesitation, if I thought what a superintendent was
24 telling me was wrong, I mean, I was never inhibited by
25 telling him, I think you're wrong. Here's why I think

1345

1  you're wrong, but also, I mean respectfully, and also with
2  the understanding that he had the authority to make the last
3  call.
4      "I suspect that a uniformed officer would have
5  that degree of ability to a lesser extent. And I'm not
6  suggesting that an officer if he saw that the Colonel was
7  saying something illegal or saying something wrong wouldn't
8  hesitate to bring it to his attention, but I just feel that
9  I may have had a little greater ability to do that without
10 worrying about my career, my next performance evaluation, my
11 next promotion, my next assignment, all of those things that
12 a uniformed officer may be more inclined to think about.
13     "Question: Right. You're telling us that
14 uniformed officers have a certain career path that they're
15 hoping to travel. Right?
16     "Answer: Correct.
17     "Question: And it's the Colonel who ultimately
18 makes decisions about promotions or assignments. Is that
19 correct?
20     "Answer: Correct.
21     "Question: For example, the federal government
22 as a condition on granting police moneys has required the
23 Delaware State Police to have certain rules and regulations
24 relating to job security and discipline of civilian
25 employees. Isn't that correct?

1346

1      "Answer: Yes.
2      "Question: You remember that.
3      "And uniformed officers are subject to
4  discipline within a different structure than the civilians.
5  Is that correct?
6      "Answer: Uniformed officers probably had
7  greater levels of protection in terms of staying on the job,
8  but certainly you were subject to a lot greater levels of
9  flexibility when it came to job functions, job assignments,
10 job promotions, that sort of thing, were much more greatly
11 influenced by the Superintendent.
12     "I mean, I came into the Delaware State Police
13 at the position of Director of Human Resources. I wasn't
14 going to be promoted to some higher-level position. That's
15 what I was there for and felt it was part of my
16 responsibility to provide that expertise to the
17 Superintendent.
18     "Question: And you've been replaced by a
19 Captain. Are you aware of that fact?
20     "Answer: I am aware of that.
21     "Question: There is no civilian director of
22 the personnel function anymore. You are aware of that fact?
23     "Answer: That's correct.
24     "Question: And if a Colonel or Lieutenant
25 Colonel or even a Major over that Captain in the chain of

1347

1  command orders him to do something under the Delaware State
2  Police command structure, he has to obey. Is that true?
3       "Answer: That's true. I wouldn't take that to
4  the extent of suggesting that the current officer in there
5  or any other officer, I think --
6       "Question: No. I'm talking about generically.
7       "Answer: -- wouldn't speak up if he thought the
8  Colonel was saying something incorrect or suggesting a
9  policy that was not a defensible position. But I just don't
10 think that an officer would have either the ability to speak
11 up with the ability that a civilian would have or for that
12 fact the expertise based on a career as opposed to a
13 temporary assignment.
14       "Question: Okay. Now, you were subpoenaed to
15 appear today. Is that correct?
16       "Answer: Yes.
17       "Question: I think you said this morning, and
18 the deposition notes will show it, I think you indicated
19 this morning that hearing tests were not expected to be part
20 of your annual physicals for the troopers at the Delaware
21 State Police.
22       "Was that a true statement this morning?
23       "Answer: Yes. We developed a protocol for our
24 physicians. The hearing was not part of that protocol.
25 Now, we were aware that some of the physicians were indeed

1348

1  testing hearing.
2       "Question: Right.
3       "Answer: Again, it wasn't part of what we were
4  asking for.
5       "Question: Right.
6       "Answer: This may have been a little bit
7  misleading in that I said we stayed away from the issue
8  completely.
9       "What's more correct, or to elaborate on that
10 more is, as I indicated earlier, we had done a number of
11 studies that couldn't lead us to a conclusion. So that's
12 probably more correct than saying we stayed away from the
13 issue completely. We stayed away from the issue completely
14 only because our studies suggested that we couldn't define
15 it.
16       "Question: Right. You're telling us that
17 consistent with that, you were not requiring your physicians
18 as part of your protocol to even be testing hearing?
19       "Answer: That's correct.
20       "Question: Right.
21       "Answer: Because, indeed, if they did report
22 something, we wouldn't have known what to do with it.
23       "Question: I think you even indicated a little
24 earlier this afternoon that officers that are around
25 controlled explosions, the discharge of weapons and all

1349

1  sorts of other things they encounter during their duties
2  that lead the division to be concerned that if you were
3  testing everyone for hearing that you might end up with too
4  many disabled officers. Is that a fair statement?
5       "Answer: A combination of recognizing that
6  through normal factors, including aging, people are losing
7  hearing, coupled with the fact that if we set the standard
8  too low then, yeah, we could lose a whole bunch of people.
9  We set it wherever we set it, we didn't think we could
10 defend it.
11      "Question: Lastly, I think to wrap it up, I
12 want to show you again those letters that were Baylor
13 Exhibits 1 and 2. Okay?
14      "Answer: Okay.
15      "Question: Now, you were asked, you remember
16 being asked some questions about these letters. Right?
17      "Answer: Yes, I do.
18      "Question: And you had indicated that the six
19 restrictions found in these letters were used on previous
20 occasions by the department under your tutelage?
21      "Answer: That's correct.
22      "Question: Okay. Now, Captain Citro did not
23 receive a letter similar to these, did he?
24      "Answer: Not to my knowledge. I certainly
25 never provided one to him.

1350

1       "Question: Right. And Major Forester did not
2  receive a letter similar to these, to your knowledge, did
3  he?
4       "Answer: He did not.
5       "Question: And, in fact, in both of these
6  letters, and it's really an introductory paragraph, it says
7  you're being put on light duty. Do you see that? It's sort
8  of at the end of the paragraph.
9       "Answer: I do.
10      "Question: So these officers were being told
11 they were being put on light duty. Right?
12      "Answer: Yes.
13      "Question: And I think it's a fair statement
14 of your testimony that this letter is not uniformly used for
15 every trooper who's put on light duty.
16      "Answer: That is correct.
17      "Question: This letter is not typically used
18 for every trooper who is put on light duty. Is that a fair
19 statement?
20      "Answer: Say that again, please.
21      "Question: I think you told us that sometimes
22 the contents of this letter would be used for some troopers
23 who were being put on light duty?
24      "Answer: Correct.
25      "Question: And there's other occasions when

**1351**

1  this letter is not used for troopers being put on light
2  duty?
3        "Answer: I would say it's probably more often
4  not used than it is used.
5        "Question: So it's your testimony that this
6  letter is more often not used than used. Is that correct?
7        "Answer: Correct. Correct.
8        "Question: The fourth paragraph, this is the
9  one about suspending the police powers. Do you see that?
10       "Answer: Yes.
11       "Question: I think you told us that this
12 provision in a letter that was used relieves a trooper of
13 his oath, his sworn oath to protect the public. Was that
14 your testimony?
15       "Answer: Yes. But I think takes the officer
16 out of that position where he or she has to choose between
17 acting on what they have throughout their entire career
18 believed is their responsibility. It's something that may
19 cause them further harm or may not have the result that it
20 could have had in terms of the safety of the civilian or the
21 person who's in harm's way, if you will, were they able to
22 fully do what they're required to do.
23       "Question: Under your tutelage in the
24 personnel function, do you ever remember sending a
25 light-duty letter to a trooper who had hearing issues and

**1352**

1  suspending his oath of office?
2        "Answer: No.
3        "Question: Right. So, for example, if your
4  oath of office had been suspended here and you witnessed a
5  crime of violence being perpetrated on a woman, say a rapist
6  or something, you're supposed to call an officer to help
7  stop -- you're supposed to call an officer to stop the
8  crime. Isn't that what this says?
9        "Answer: This says you would act in the same
10 capacity that a civilian would act.
11       "Question: Yes.
12       "Answer: I suspect that leaves some judgment
13 to the officer. And part of what this was intended to do
14 was to help relieve the division from lawsuits. If the
15 outcome of whatever happened wasn't a good one and somebody
16 filed a lawsuit against the division, this gave us a little
17 bit of an ability to say this person wasn't acting as an
18 officer; this person was doing something that they felt a
19 good citizen ought to do.
20       "Question: I'm looking at the language of 4.
21 In the second line it says, You are to remove yourself from
22 the situation.
23       "Do you see that?
24       "Answer: Yes.
25       "Question: But it does say they are they are

**1353**

1  supposed to leave, doesn't it? Isn't that the message
2  that's being conveyed?
3        "Answer: I don't want to suggest that it
4  causes them to ignore the situation or to leave the
5  situation. It suggests that they attempt to keep themselves
6  out of harm's way and to act like a civilian would act.
7        "Question: Right. So in my example --
8        "Answer: Call 911. If you can safely
9  intervene, intervene, I guess, that sort of thing.
10       "Question: Right. So my example of a woman is
11 being raped by a violent rapist and the only people around
12 are her and the trooper and the rapist, this can be read as
13 saying that the trooper is to remove himself from the
14 situation and call 911 while the woman is left at the mercy
15 of the rapist. Isn't that what it says?
16       "Answer: It could be interpreted that way.
17 I'm not sure it has to be interpreted that way. But the
18 most important thing it says, I think, is that clearly if
19 you are a sworn uniformed officer, you do have an obligation
20 to respond as an officer in that situation. Because you're
21 on restricted duty, that obligation is removed.
22       "Question: Now, because of the consequences
23 that could flow from this letter, you wouldn't issue such
24 letters lightly, would you?
25       "Answer: No.

**1354**

1        "Question: I think you're trying to tell me
2  that the essence of a Delaware State Policeman, Delaware
3  State Trooper, is this function of risking their life to
4  save civilians?
5        "Answer: Yes.
6        "Question: And when you take away that
7  function, you're affecting the self-esteem and the identity
8  of a state trooper. Is that right?
9        "Answer: That's correct. And I believe that
10 through all my years of working with these men and women, I
11 understand the significance of that, and, therefore, it's
12 not something that you do without a great deal of thought,
13 without a great deal of justification.
14       "Question: I just have one last question.
15 That whole concept of the identity that we talk just talked
16 about, is the motto that the state troopers use the words
17 preserve and protect?"
18       MR. T. NEUBERGER: Then it says the witness
19 nodded.
20       "Question: Yes?
21       "Answer: Yes.
22       "Question: So that sums up the identity they
23 have?
24       "Answer: Yes. That's very significant. It's
25 more than just a slogan. It's part of their personality and

**Page 1355**

1 part of what they are and who they are.
2     "Question: Okay. And is it protect and serve?
3 Did it have it wrong?
4     "Answer: I heard it protect and serve. I'm
5 not quite sure what you said.
6     "Question: Okay. It's protect and serve?
7     "Answer: That's what I heard."
8     MR. T. NEUBERGER: That concludes our direct,
9 Your Honor.
10     THE COURT: Ladies and gentlemen, we will resume
11 at 2.
12     (Jury leaves courtroom at 1:01 p.m.)
13     THE COURT: Mr. Neuberger, this next witness,
14 what would you like to do?
15     MR. T. NEUBERGER: I want to ask him if he
16 served with Colonel Chaffinch in the State Police. How many
17 years did he work on the executive staff with him. Then say
18 based on his years of serving the State Police, does he have
19 a reputation one way or the other as to truthfulness. Then
20 ask him what it is and he had testified under oath before:
21 It pains me to say this, but he has a reputation for not
22 being very truthful.
23     So that was the foundation I would lay of his
24 interactions.
25     THE COURT: Is the former Colonel's character at

**Page 1356**

1 issue in this case? What I mean by that is, is it an
2 element of a charge of claim or defense? Or are you simply
3 seeking to attack the credibility of the former Colonel?
4     MR. T. NEUBERGER: We researched this over the
5 weekend.
6     THE COURT: Mr. Neuberger, I don't want to know
7 about your research. I want you to answer my question. Is
8 the former Colonel's character in issue? By in issue, the
9 rules of evidence contemplate the following: that it is an
10 element of a charge, claim or defense. Is it in issue?
11     MR. T. NEUBERGER: No.
12     THE COURT: Then you can't do what you seek to
13 do. No, you can't. You can wait until the Colonel gets on
14 the stand, and then you can attack him.
15     MR. T. NEUBERGER: Yes. I was trying to defer
16 this witness. Mr. Ellis was the one who objected. I want
17 to save him until after the Colonel testifies.
18     THE COURT: That is the only time you can use
19 him.
20     THE COURT: We are in recess.
21     (Luncheon recess taken.)
22     THE COURT: Bring in the jury, Ms. Walker.
23     MR. ELLIS: Your Honor, we have
24 counterdesignations to read. I thought Mr. Neuberger was
25 going to read the whole thing.

**Page 1357**

1     MR. T. NEUBERGER: It was 1:00. It can be done
2 either way. They can read the counterdesignations like it's
3 their cross. Whatever you would like.
4     MR. ELLIS: I will do that.
5     (Jury enters courtroom 2:05 p.m.)
6     THE COURT: Good afternoon, ladies and
7 gentlemen. We are going to have what we call
8 counterdesignations, designations that the defense would
9 like to have presented to you, the same witness, John
10 Dillman.
11     MS. HARVEY: We are going to start on Page 3,
12 Line 9:
13     "Question: Mr. Dillman, did you ever work for
14 the Delaware State Police?
15     "Answer: I did.
16     "Question: In what capacity?
17     "Answer: Originally, I was the Director of
18 Personnel, the same position, but the title was changed to
19 Director of Human Resources.
20     "Question: You said originally you were
21 Director of Personnel. When did you start being Director of
22 Personnel?
23     "Answer: I was hired by the Delaware State
24 Police in 1979. I stayed for approximately one year. At
25 that point I was appointed by Governor DuPont to a position.

**Page 1358**

1 I then became, a year after that, 1981, I was appointed to
2 Governor DuPont's cabinet. Stayed there until February, I
3 believe, of 1985, at which time the Governor left office,
4 and I returned to the State Police and stayed there until I
5 retired in 2002.
6     "Question: When was the name of the title
7 changed from Director of Personnel to Director of Human
8 Resources?
9     "Answer: I don't know exactly. Probably
10 sometime in the late nineties. Again, the position didn't
11 change. The duties didn't change. It was strictly the name
12 was updated with what was more used in that industry.
13     "Question: Did that change result in any
14 difference in the organizational structure of the Delaware
15 State Police?
16     "Answer: No, it did not."
17     MS. HARVEY: Go to Page 8, Line 4:
18     "Question: Were there ever times where you
19 sent letters to physicians or you or the Colonel at any
20 given time sent a letter to a physician asking them to
21 identify certain essential job functions that the trooper
22 may or may not be able to do and to make a determination as
23 to the nature and extent of any injury or medical problem?
24     "Answer: Yes.
25     "Question: But that would be something outside

## Page 1359

1. the realm of the annual physical?
2. "Answer: That's correct.
3. "Question: What role did you as the HR
4. director have in sending -- well, let's talk about those
5. instances. I understand you are telling me that the annual
6. physical would come up annually or, depending on the age of
7. the trooper, however often it was required. Is that
8. correct?
9. "Answer: That is correct.
10. "Question: And the HR department didn't take
11. an active role in sending troopers to those annual
12. physicals? That was something that came up by the calendar?
13. "Answer: Well, I think our office, I am not
14. sure whether we tracked them or reminded officers physicals
15. were due. I think we were involved in the scheduling. The
16. officer had the option to either go to the division's
17. doctors, which I think we had two or three groups that did
18. that, or they could go to their personal physician and have
19. our paperwork completed.
20. "So we tracked that. We maintained the records.
21. We actually did the negotiations, if you will, and developed
22. the contracts with these medical groups. But that was
23. pretty much the extent of it.
24. "Question: In those situations where a letter
25. was sent to the physician asking to make a specific

## Page 1360

1. determination as to the trooper's ability to perform
2. essential job functions, which you said was different from
3. an annual physical, what role did you as the HR director
4. have in determining whether or not to send that letter out?
5. "Answer: I would be the individual, probably
6. in consultation with other people within my office that were
7. most involved on a daily basis with looking at the records
8. to determine if there was a question as to the officer's
9. ability to perform job functions. Often it involved
10. workers' comp, compensation issues. Often it involved
11. pension issues. Often it involved the ability to determine
12. a light-duty assignment for an officer who was unable to
13. perform full duties.
14. "So I would be reviewing those records and then
15. making a recommendation to the Lieutenant Colonel or the
16. Colonel, who would sign the letters. There may have been
17. some cases where I signed the letters. But most of the
18. letters went out under the Colonel's signature or Lieutenant
19. Colonel's signature.
20. "Question: In determining whether or not to
21. send those letters out, what role did the Superintendent
22. play?
23. "Answer: The Superintendent would basically
24. go, I guess, through the same thought process that I would
25. based on the records I was showing him, the information that

## Page 1361

1. I was providing to him."
2. MS. HARVEY: Page 20, Line 5.
3. "Question: Was there ever a time where you
4. sent one of these letters to a doctor and the doctor wrote
5. back and said, trooper X has a disability that prevents him
6. from performing one, two, three essential job functions, and
7. this disability is permanent?
8. "Answer: Yes.
9. "Question: And who can you think of who that
10. was?
11. "Answer: Well, that was a fairly normal
12. occurrence. I guess the difference is that most of those
13. decisions were fairly clear-cut. We had officers who were
14. involved in major accidents that had disabilities that
15. clearly would preclude them from continuing to function as a
16. Delaware State Trooper. Those officers either recovered in
17. such a lengthy time or they never recovered to the point
18. that they were able to perform. And they applied for and
19. received workers' compensation benefits, disability, pension
20. benefits. So I mean that was the kind of routine thing
21. where there was no question in the doctor's minds, there was
22. no question in our minds or anybody's minds as to the
23. officer's ability to function. That was the majority of
24. cases and that was the normal situation. But there indeed
25. were cases that were not that clear-cut."

## Page 1362

1. MS. HARVEY: Page 97, Line 2:
2. "Question: Okay. I want to show you something
3. that has been marked as Baylor 1 and Baylor 2. I give those
4. to you to use. Mr. Dillman, look at that real quickly.
5. "Answer: Okay.
6. "Question: Have you ever seen a letter like
7. this before?
8. "Answer: I have not seen these letters. I
9. have seen letters that contain the restrictions. The first
10. paragraph that talks about Dr. Green is pretty particular to
11. this case. But it then goes on to apply restrictions, and I
12. am familiar with and have seen those restrictions in other
13. matters.
14. "Question: How were you familiar with these
15. restrictions? What other matters did you participate in
16. that made you familiar with them?
17. "Answer: I think I probably was the author of
18. them somewhere along the way. Again, I am not sure I can
19. recall any specific names. But there were a number of
20. instances where individuals were determined not to be able
21. to perform full-duty assignments, and these restrictions
22. were placed for the safety of the individual as well as to
23. avoid any potential lawsuits from civilians that could have
24. come down as a result of actions to the contrary.
25. "Question: Do you remember how you went about

1363

1 creating these restrictions?
2 "Answer: Not really. I mean, I could probably
3 recreate the process. But it would be recreating as to how
4 I would go about doing something like this as opposed to any
5 specific knowledge of doing it.
6 "Question: Well, do you recall whether or not
7 you consulted with the Superintendent at that time?
8 "Answer: Well, the letter that would have
9 contained this language would have been signed most probably
10 by either the Deputy Superintendent or the Superintendent,
11 so clearly, upon taking it to him for signature, there would
12 have been some discussion.
13 "Question: But do you remember when you first
14 drafted restrictions for those troopers being placed on
15 light duty whether you had conversations with the then
16 Superintendent, whoever it may have been, to brainstorm
17 about what restrictions would be appropriate?
18 "Answer: Not that I remember. I mean, I
19 suspect that happened. But I don't remember it happening.
20 "Question: Do you recall any other source that
21 you may have used, whether it's a person or literature or
22 anything else, that you would have appealed to when you
23 drafted these restrictions?
24 "Answer: I don't remember -- again, I can
25 assume that it was all of the above. I was very active in a

1364

1 group of officials who did the same thing that I did with
2 other states, so I was in conversation with other state
3 police departments throughout the country. I normally and
4 regularly attended seminars that dealt with employment law
5 issues and policies and that sort of thing. Plus, I had
6 regular contact with uniformed officers who were either
7 doing these things or earlier in their career had done these
8 things. So it was just kind of an accumulation of all of
9 those things that I would normally utilize to draft
10 policies.
11 "Question: When you were HR director, was it
12 your policy or was it your practice to provide a letter like
13 this to troopers who were going on light-duty status?
14 "Answer: It was not unusual to do this. We
15 did not do this in every case. It was not a routine form
16 letter, if you will, that if a person was injured on the job
17 or was on prolonged illness or something like that, that
18 automatically would trigger one of these letters. Rather,
19 it was individual circumstances that dictated the letter
20 going out, and I guess to maybe a lesser extent what would
21 be included in the letter, although this was fairly generic
22 language that was used.
23 "Question: I ask you to look at Paragraph No.
24 4 of this letter. As the person who drafted these
25 restrictions, can you explain to me what that restriction is

1365

1 and what its purpose is?
2 "Answer: Well, the intent was to do two
3 things. One, to prevent further injury to the officer, and
4 also to prevent a situation where an officer attempted to
5 intervene in a situation and because of his or her inability
6 to be able to fully function cause a situation to not be
7 resolved or to be worse than it would have been had he or
8 she been able to fully respond.
9 "Question: Do you consider Paragraph 4 to be a
10 direction to violate the trooper's oath to protect the
11 public?
12 "Answer: I am sorry. Say that again?
13 "Question: Do you consider Paragraph 4 to be a
14 direction to violate the trooper's oath to protect the
15 public?
16 "Answer: I see it as relieving the officer of
17 that responsibility because he or she is in a limited
18 capacity."
19       MS. HARVEY: Page 176, Line 12:
20 "Question: I just want to ask you a few
21 questions about the documents that Mr. Neuberger asked you
22 questions about, so I would ask you to turn to Page D14995.
23 "Answer: Okay.
24 "Question: These are notes from Major
25 Forester's 1992 physical exam. And you will recall, there

1366

1 were questions about the audiometric screen that was marked
2 abnormal and the synopsis that said mild diffuse hearing
3 loss bilateral, otherwise WNL, within normal limits. I
4 think you testified that this was something that you would
5 have expected to be brought to your attention?
6 "Answer: Yes, I did.
7 "Question: Can you look down at the bottom and
8 tell me whether or not the doctor determined that Major
9 Forester was medically qualified for the job?
10 "Answer: The doctor did indicate that the
11 Major was medically qualified for the job, which may have
12 been why nobody brought it to my attention. It was simply
13 that that was the issue.
14 "Question: What do you mean that was the
15 issue?
16 "Answer: The issue was whether the individual
17 is qualified for the job or not qualified for the job. The
18 doctor concluded that he was qualified for the job, so they
19 may have felt it didn't need to go any further.
20 "Question: Turning forward a little bit to
21 14992, this is Major Forester's 1994 exam. And I think Mr.
22 Neuberger pointed out to you on that first page under the
23 HEENT section, Major Forester had no lost or decreased
24 hearing. Correct?
25 "Answer: That is correct.

1367

1  "Question: If you turn the page over, can you
2  tell me whether or not the doctor who performed the physical
3  exam deemed him medically qualified for the job?
4      "Answer: He did deem him medically qualified
5  for the job.
6      "Question: Do you recall whether or not he
7  knew about those conclusions, that conclusion in 1994?
8      "Answer: I don't recall seeing anything that
9  related to Major Forester's hearing or ever seeing anything
10 until I observed him wearing a hearing aid.
11     "Question: Do you recall seeing anything
12 relating to his medical qualifications for the job?
13     "Answer: No, no.
14     "Question: So, for instance, you don't recall
15 seeing these particular forms that are part of this
16 collection of documents?
17     "Answer: I do not remember seeing these
18 particular forms.
19     "Question: Going to Page 14987, which are
20 notes of Major Forester's 1997 physical exam, I think it was
21 pointed out to you that his audiometric screening was marked
22 abnormal. Is that right?
23     "Answer: Yes, it is.
24     "Question: And under the synopsis it indicates
25 that Major Forester was being referred by Dr. Green to an

1368

1  ENT for -- that word is unclear to me -- for hearing
2  evaluation?
3      "Answer: Yes. I see where it says that.
4      "Question: Were you made aware that he was
5  being sent to an ENT?
6      "Answer: Not that I remember.
7      "Question: Is this something you would have
8  wanted to know about?
9      "Answer: Yes.
10     "Question: Why?
11     "Answer: Because, as I testified earlier, we
12 were trying to come up with some answer to this issue and
13 had not been able to do so. I am not sure how that time
14 frame relates to 1997, but just the fact that we had these
15 results, I would have wanted to look into it further to see
16 just what it meant, how significant it is. Was Major
17 Forester at any level of risk as a result of it? Had
18 anything changed that might lead us to a more definitive
19 policy?
20     "Question: But this was not brought to your
21 attention. Is that correct?
22     "Answer: Not that I remember, no.
23     "Question: Did you tell Lisa McNabb not to
24 bring you any information relating to a trooper's hearing?
25     "Answer: No.

1369

1      "Question: Did you tell anyone else in the
2  office to ignore a doctor's evaluation concerning a
3  trooper's hearing?
4      "Answer: No.
5      "Question: Flip the page one more to 14985.
6      "Answer: Okay.
7      "Question: Again, these are the notes from the
8  physical exam of Major Forester from 1998. I think it was
9  pointed out to you that there was no indication from Dr.
10 Green that he was medically qualified one way or the other.
11 Is that correct?
12     "Answer: That's correct. The form is blank.
13     "Question: But the audiometric screen is
14 marked normal?
15     "Answer: That's correct.
16     "Question: But the synopsis says needs repeat
17 testing ASAP. Do you see that there?
18     "Answer: I do.
19     "Question: Do you have any idea what that's
20 referring to that he needs repeat testing for?
21     "Answer: No. It appears to relate to the PSA.
22 But I couldn't tell you what that means or anything other
23 than what I am seeing here on this form. I am not making
24 much sense of it.
25     "Question: Do you see any indication on this

1370

1  form that he needs repeat testing because of his hearing?
2      "Answer: No, no. To the contrary, it
3  indicates he's wearing bilateral hearing aids and the
4  audiometric screening is normal, I would assume because he
5  wears the hearing aids. So, no.
6      "Question: And going over one page again to
7  Page 14983, these are notes from the physical exam of Major
8  Forester in the year 2000 signed by Aaron Green. Am I right
9  in saying his audiometric screen was normal?
10     "Answer: Yes.
11     "Question: And that Dr. Green in his synopsis
12 specifically wrote fit for duty?
13     "Answer: Yes.
14     "Question: And when given the option, marked
15 medically qualified for the job?
16     "Answer: Yes."
17     MS. HARVEY: Page 183, Line 7.
18     "Question: I want to go back to Dillman 1,
19 which is your e-mail.
20     "Answer: Okay.
21     "Question: In that statement in the middle,
22 more or less in the middle of the first paragraph, it says,
23 More importantly, he stayed away from the issue completely.
24 You expected -- you testified that you expected people in
25 your office to bring you abnormal tests, like hearing tests.

```
                                                    1371
 1   In fact, you expected them to bring you Major Forester's
 2   abnormal hearing tests?
 3            "Answer:  Yes.
 4            "Question:  That's not staying away from the
 5   issue completely, is it?
 6            "Answer:  No.  When I wrote we stayed away from
 7   the issue completely, I suspect what was in the back of my
 8   mind was two things.  One, this whole issue that I had dealt
 9   with, and was unable to define, so I didn't have an answer,
10   if somebody brought me a particular situation and said, here
11   is the officer's hearing ability.  I am still where I was
12   before saying, what's that mean.  Secondly, the situation of
13   what we had was a Major that was interacting with the
14   Colonel, Lieutenant Colonel, every single day, and was one
15   of the five highest-level officials in the division with a
16   little bit different set of duties normally than most other
17   officers had.
18            So it was kind of an all-complicated thing and
19   the result of it was nobody raised the issue with Major
20   Forester.
21            "Question:  Well, let me see if I can clarify
22   that sentence this way.  When you say we stayed away from
23   the issue completely, is the issue Major Forester's hearing
24   situation or is it hearing with respect to the DSP as a
25   whole?
```

```
                                                    1372
 1            "Answer:  I am not sure exactly what I meant by
 2   that.  But it's both, I think, I suspect both were in my
 3   mind when I wrote that sentence.
 4            "Question:  The next sentence says, This
 5   included not having our physicians report back to management
 6   if they observed hearing problems, assuming those problems
 7   were not real significant.  Did you have or expect
 8   physicians to report back to DSP management if those
 9   problems were real significant?
10            "Answer:  Yes.
11            "Question:  Now, you testified a lot that what
12   real significant means was unclear?
13            "Answer:  Right.
14            "Question:  But if a doctor came to you and
15   said, I have examined trooper so-and-so and he has got real
16   significant hearing problems, you would ask him what he
17   meant by real significant.  Right?
18            "Answer:  Yes.
19            "Question:  And you would talk to him about it
20   and maybe get a second opinion?
21            "Answer:  Maybe.
22            "Question:  And what if during the course of an
23   evaluation you talked to the doctor, you described for the
24   doctor what that particular trooper's duties are, you
25   described for the doctor what the essential job functions
```

```
                                                    1373
 1   are for all troopers, and if the doctor said, well, I have
 2   done audiometric tests and I have done this, that and the
 3   other thing, and I conclude or my professional medical
 4   opinion is that they can't communicate effectively, or
 5   discern various stimuli of danger, in fact, their hearing is
 6   so bad that it is my opinion they can't do that essential
 7   job function, understanding that you didn't have the only
 8   criteria for hearing was that job function -- is that right?
 9            "Answer:  Yes.
10            "Question:  So what would you do if a doctor
11   gave you his medical opinion that they didn't meet the
12   hearing standard?
13            "Answer:  If that was the case, if a doctor was
14   coming to me and saying that this person cannot hear
15   effectively enough to be able to keep themselves out of
16   harm's way, cannot hear clear enough, and I would give them
17   those examples that I have talked about over and over, and
18   if they were able to come back and say, no, that person
19   could not hear hostile statements or discriminate those
20   hostile statements from non-hostile statements, no, that
21   person couldn't hear the radio if they were driving 90 miles
22   an hour or something, then I would immediately take that
23   information to the Superintendent and say, okay, we have a
24   situation.  And let's assume for a second that that was a
25   patrol officer.  I would have expected that the outcome of
```

```
                                                    1374
 1   that decision was the person would have been relieved of
 2   patrol duties and at that point we would have had further
 3   testing done.  We would have moved them to an assignment
 4   they didn't -- that they didn't have to worry about getting
 5   in harm's way, done something to figure out where we go from
 6   here.
 7            "Question:  Would it be fair to say you would
 8   have begun to apply the policies that were in the manual?
 9            "Answer:  Yes.
10            "Question:  And even up to that point, you
11   would have been applying the policies or determining where
12   the policies didn't apply?
13            "Answer:  Yeah.  Let me correct that because
14   the policy talks about being on leave, whether it be
15   workers' comp, whether it be sick leave.  I am not sure we
16   would have gotten to that point yet.  I mean, the first
17   thing we would have talked about is let's get this person in
18   a safe position until we get more medical evidence and
19   figure out where we go from here.  It was just kind of
20   simply to take him out of harm's way until we could get some
21   answers.
22            "Question:  Would one of the options in terms
23   of steps to take them out of harm's way be putting them on
24   light-duty status?
25            "Answer:  Yes.
```

### Page 1379

1  A.  Yes, I am.
2  Q.  Where were you born?
3  A.  I was born in Wilmington, Delaware.
4  Q.  Where were you raised?
5  A.  Newark, Delaware.
6  Q.  So did you go to Newark High?
7  A.  I went to Christiana High.
8  Q.  Did you play any sports at Christiana?
9  A.  I was a wrestler there.
10 Q.  What year did you graduate from Christiana?
11 A.  1981.
12 Q.  What happened after high school?
13 A.  After high school, I was working at Delaware Trust
14 Company, Sears, Happy Harry's. But my goal was to be a
15 Delaware State Trooper.
16 Q.  And did you take any college courses at any point?
17 A.  Yes. I took courses at Wilmington College and
18 Del Tech.
19 Q.  How many credits did you eventually earn?
20 A.  I am between an Associate's and a Bachelor's.
21 Q.  Did anything interfere with your getting your
22 Bachelor's degree?
23 A.  Yes. In 1986, we learned that my father had lung
24 cancer. And I was working in Camden, the Troop 3 barracks.
25 With the situation with my father being ill, I requested a

### Page 1380

1  transfer up to Troop 9 in Odessa, which was near my parents'
2  home. So then I was able to move back home in December of
3  '86. And my father passed away on May 2nd, 1987.
4       And I was basically my mother's caretaker for,
5  well, until 1993, when I was married and moved into my own
6  home.
7  Q.  Where do you live with your wife now?
8  A.  We live in Townsend.
9  Q.  Is that Kent County or New Castle County?
10 A.  We are just in New Castle County. We are a mile from
11 the Maryland line, about a mile from the Kent County line.
12 It says Townsend, but we are so close to Clayton, it should
13 be Clayton.
14 Q.  I think you have two daughters. Right?
15 A.  Yes.
16 Q.  What do you like to do in your spare time?
17 A.  I like to spend time with my girls. When I say my
18 girls, I say my wife and my two daughters. We like to do
19 things together. We like to go fishing. Like my wife said
20 earlier, we do like to bike-ride and feed the horses and
21 those types of things. We like to spend time together.
22 Q.  Do you have any relatives who are in the Delaware
23 State Police?
24 A.  Yes, I do.
25 Q.  How many?

### Page 1381

1  A.  I have two in the Delaware State Police and one in the
2  Capitol Police Department.
3  Q.  And how long -- which relatives are in the Delaware
4  State Police?
5  A.  My older brother Mark, he is about ten years older
6  than me. And he is in the Auto Theft Unit, a special unit
7  with the State Police. He came on about four or five years
8  before I did. And then I have a nephew, which is Mark's son
9  Eric, and he has been on for a couple years, I believe since
10 2000.
11 Q.  I think you mentioned you have another relative in a
12 department somewhere?
13 A.  Yes. My oldest brother, he is 12 years older than me,
14 he retired after 23 years with New Castle County Police
15 Department. And he has been with the Capitol Police
16 Department about 11 or 12 years.
17 Q.  Is police work a family tradition?
18 A.  Yes, it is, for this generation.
19 Q.  Now, Chris, when did you file your first lawsuit
20 against Colonel Chaffinch?
21 A.  I believe it was April of 2002.
22 Q.  Who were your attorneys in that case?
23 A.  Tom Neuberger and Martin Haverly.
24 Q.  When did the trial take place?
25 A.  June of 2003.

### Page 1382

1  Q.  Do you recall how long the trial lasted?
2  A.  I believe it was four or five days.
3  Q.  Was it a Bench trial or was it a jury trial?
4  A.  It was a jury trial, just like this one.
5  Q.  At some point did the jury reach a verdict?
6  A.  Yes, they did.
7  Q.  What kind of case was it?
8  A.  A First Amendment free speech retaliation case, just
9  like this one.
10 Q.  Just briefly, what was the retaliation claim?
11 A.  I spoke out about problems with an employee that
12 worked for me, and that particular individual was very good
13 friends with Colonel Chaffinch at the time.
14 Q.  When did the case eventually end?
15 A.  It ended November of 2003.
16 Q.  Now, as a result of the ending of the court case, were
17 you reinstated to the FTU?
18 A.  Yes. I was Court-ordered by Judge Farnan back into my
19 position as the NCOIC and Section Chief of the Firearms
20 Training Unit.
21 Q.  What were your feelings about that case finally coming
22 to an end?
23 A.  A big relief.
24 Q.  All right. Now, what year did you join the DSP?
25 A.  September 3rd, 1985.

1383

1 Q. And what is your current ranking?
2 A. I am a Sergeant.
3 Q. Now, why did you initially become a trooper? Was it
4 because of your brothers?
5 A. I became a trooper because I wanted to help people.
6 My father raised us to be helpful people, to help people, to
7 care for people, to defend the defenseless. That's the type
8 of man he was. He raised us that way. And that was
9 definitely part of our family, even though my third brother
10 isn't a police officer. He has been a nurse at A.I. du Pont
11 taking care of children for the past 21 years.
12 Q. Now, did you enjoy your job as a trooper?
13 A. I love my job.
14 Q. What is the best part of it?
15 A. Interacting with all the troopers. Of course, we
16 train municipal officers as well. But that interaction,
17 that camaraderie that we have, we call it bleeding blue.
18 Q. Now, how long had you planned on remaining a Delaware
19 State Trooper?
20 A. Well, I had dreams and aspirations of going into the
21 firearms industry. However, since the retaliation, I am not
22 going to get hired anywhere, especially in that industry.
23 So my plans at this point are to stay with the division
24 until I am 55.
25 Q. Before becoming a full-duty trooper, did you attend

1384

1 the Police Academy?
2 A. Yes, I did.
3 Q. Did you graduate?
4 A. Yes, I did.
5 Q. At graduation did you receive any awards?
6 A. Yes. I was the top shooter in the class. Top Shooter
7 award.
8 Q. And did you have any career path plans at that point?
9 A. When you are in the Academy, they, the instructors,
10 they encourage you to find a career path. If you like
11 accident investigation, if you like criminal investigation,
12 if you like being a DI and a trainer, me, in particular --
13 the Firearms OIC at the time was Lieutenant Cunningham. And
14 Lieutenant Cunningham was pretty much my mentor. And he
15 said, you know, find your niche. And my niche was firearms.
16 He knew that I enjoyed it, and he said pursue it, and I did.
17 Q. Have you ever received an award called the
18 Superintendent's Citation?
19 A. Yes, I have.
20 Q. What is that?
21 A. A Superintendent's Citation is an award that is given
22 out by the Superintendent. I believe that it goes up the
23 chain of command. If you do something in the line of duty
24 that is out of the norm or, I don't know, save a life, those
25 types of things, that gets written up and sent up the chain

1385

1 of command through your troop and then to the executive
2 staff, and then the executive staff would make a decision on
3 whether you qualify for a Superintendent Citation.
4 Q. Now, what did you win yours for?
5 A. I won a Superintendent Citation in 1986, and I came
6 upon an accident where a woman was trapped in a car and the
7 car was on fire, and I pulled her from the car.
8 Q. Have you been awarded more than one such citation?
9 A. Yes. There was a second incident in 1997, in Odessa,
10 when I was working out of Troop 9, where a woman was, had a
11 knife, and she was going to slit her own throat. And I was
12 able to diffuse that situation, take the knife from her.
13 Q. What kinds of positions and job assignments had you
14 held during your career as a State Trooper?
15 A. Initially, a patrol officer, and I enjoyed that, and I
16 was kind of trying to find where I wanted to go at that
17 particular time in my career. And I decided to stay on
18 patrol and get into K-9. I had a K-9 for about five years.
19 I really enjoyed that. I had a great dog.
20    During that same time frame, about three years
21 on the job, I had tested for the SWAT team, which is what we
22 call SORT, the Special Operations Response Team. I was
23 successful on getting onto that team, and I spent about 15
24 years on that team, working my way up the chain of command,
25 the inner chain of command with that particular unit. And

1386

1 then, also, being a firearms instructor, and then eventually
2 Section Chief of the Firearms Training Unit.
3 Q. Have you ever served as a Shift Commander?
4 A. Yes. I served at Troop 6 as a Shift Commander from
5 April 30th of 2002 till my reinstatement to the range on
6 December 1st, 2003.
7 Q. Now, at any point did the State Police send you to any
8 command schools?
9 A. Yes. In 2001, I believe it was March of 2001, I was
10 sent to a 12-week course in New Jersey, and it's called the
11 Northwestern School for Police Staff and Command, a training
12 course that teaches you leadership skills and administrative
13 skills, that type of thing.
14 Q. Now, at that time where were you serving at?
15 A. I was serving at the Firearms Training Unit.
16 Q. Now, you also mentioned that you served as a Shift
17 Commander at Troop 6?
18 A. Yes, sir.
19 Q. How many troopers were you responsible for as a Shift
20 Commander?
21 A. Between -- as low as 12 but as high as 15.
22    MR. S. NEUBERGER: Your Honor, may we approach?
23 I think there is an exhibit which we have some disagreements
24 on.
25    (The following took place at sidebar.)

1387

1  THE COURT: Counsel, I want to remind you, I
2  would like to have these discussions either at the beginning
3  of the day or the end of the day. We keep having these
4  during the jury's time. I am not quite sure why. Go ahead.
5  MR. S. NEUBERGER: We are going to offer an
6  exhibit, PX-155, which is an award, actually, it is a plaque
7  which Sergeant Foraker -- which the Corporals under his
8  command at Troop 6 gave to him as a going-away present,
9  thanking him for his leadership and integrity. It is being
10 offered to establish his baseline professional reputation
11 just prior to his being reinstated to the FTU.
12 MR. ELLIS: I didn't think it was relevant, Your
13 Honor. This is not an official citation. It is not
14 something that goes into his personnel file. It is a piece
15 of wood with a metal piece on it --
16 THE COURT: You don't have another mechanism for
17 establishing his baseline reputation?
18 MR. S. NEUBERGER: I thought this was a quick
19 and easy way to do it, Your Honor.
20 THE COURT: Speaking about reputation, did I
21 understand, I was a little distracted, that there was some
22 questioning -- in fact, I wasn't distracted, the Lieutenant
23 Colonel was called to testify to the reputation on
24 truthfulness. Was his reputation for truthfulness attacked?
25 MR. ELLIS: Your Honor, I didn't do it because I

1388

1  think it's going to be attacked to justify that type of
2  response.
3  THE COURT: That was your tactical decision, in
4  spite of Rule 608, to let that lie.
5  MR. ELLIS: Yes, Your Honor. I want to get the
6  Lieutenant Colonel in and out of here and get done.
7  THE COURT: All right.
8  MR. S. NEUBERGER: Your Honor, I can withdraw
9  the exhibit.
10 THE COURT: Yes.
11 (End of sidebar conference.)
12 BY MR. S. NEUBERGER:
13 Q.  Chris, what positions did you hold on the SORT team?
14 A.  The Special Operations Response Team, I began as an
15 entry team member, and worked my way up to the assistant
16 team leader and then team leader of the Alpha Team, which is
17 an entry team.
18 Q.  How many years did you serve on the SORT team?
19 A.  Nearly 15 years.
20 Q.  Did there come a time when you left the SORT team?
21 A.  Yes, I did.
22 Q.  Why was that?
23 A.  All the emotions and problems and physical issues that
24 I had to deal with on the first retaliation, being
25 transferred out, being demoted, basically. All the physical

1389

1  symptoms that I was experiencing with lack of sleep and
2  working 12-hour shifts, which really turned out to be
3  14-hour days for me. I felt I was losing my edge.
4  And I know what it takes, because you are
5  leading other people into very dangerous situations. And I
6  decided that for their safety I should step down from that
7  position.
8  Q.  Now, Chris, what year were you originally transferred
9  into the FTU?
10 A.  October of 1997.
11 Q.  And were you promoted during that tenure there?
12 A.  Yes. I was promoted August 1st, 2001.
13 Q.  And what date were you transferred out the first time?
14 A.  April 8th of 2003.
15 Q.  And then when were you transferred back in?
16 A.  December 1st, 2003 -- I am sorry. Let me back up.
17 I was transferred out on --
18 Q.  I can rephrase the question. What date were you
19 transferred in after the conclusion of your first lawsuit?
20 A.  December 1st, 2003.
21 Q.  Now, could you give the jury an example of the kind of
22 work you would do at the FTU as Section Chief?
23 A.  We would, as far as Section Chief is concerned, be
24 responsible for all the curriculum that would be taught to
25 recruit troopers, recruit municipal, that come through the

1390

1  Academy. You are also responsible for all the in-service
2  training of firearms. Teaching tactics. Basically,
3  teaching your personnel for in service and through the
4  Academy how to survive deadly encounters.
5  Q.  Did you ever teach a course called First Responders'
6  Training?
7  A.  Yes, I did.
8  Q.  What is that?
9  A.  First Responders' Training is -- there is a lot of
10 elements to it. One in particular is, most everyone is
11 familiar with the Columbine incident. What most people
12 aren't aware of is that there was a police officer there
13 that was a school resource officer there at Columbine when
14 that all took place. Unfortunately, because of his lack of
15 training, he actually went outside and stayed outside until
16 he could get back up. We don't teach our troopers not to go
17 in. We teach them how to have urban stalking skills that
18 they can, by themselves, they can go in, tactically by
19 himself move to the objective and take the objective out.
20 If there is a person that is in there that is
21 executing kids, we can't sit outside. The first one there,
22 and you know that kids are being executed, who is to step in
23 the gap between them, the helpless, and these killers? We
24 have to train people how to go in and take out the active
25 shooter.

1391

1  Q. All right. Now, on a day-to-day basis at the FTU,
2  what is the most important thing that you teach to recruits
3  and to troopers?
4  A. First and foremost, safety.
5  Q. Now, do troopers have to come through the FTU to
6  qualify on weapons?
7  A. Yes, they do.
8  Q. What weapons do they have to qualify on?
9  A. They qualify on the 12-gaue shotgun, and they also
10 qualify on the SIG Sauer PT229 pistol. Some are in special
11 units where they actually carry a second handgun, which is a
12 Glock 33.
13 Q. As Section Chief at the FTU, is that training
14 ultimately your responsibility?
15 A. Yes, it is.
16 Q. While you were the Section Chief, were those
17 requirements waived for any injured troopers?
18 A. Yes. One in particular. Corporal Tom McKeon. He is
19 a pilot in our Aviation Unit. He had neck and back
20 injuries. He had surgery. And eventually, he wanted to
21 come off light duty. And he came to the range to qualify.
22 However, he couldn't qualify with the shotgun.
23    So the executive staff actually waived that for
24 him and put him back full duty to fly the helicopter again.
25 Q. Just to change gears a little, why are you wearing a

1392

1  suit instead of a uniform?
2  A. Because I am -- I have been declared not fit for duty
3  because of my mental status.
4  Q. Is this a picture of you in your uniform?
5  A. Yes, sir, it is.
6  Q. Are you happy that you cannot wear your uniform?
7  A. No, I am not. I have worn that proudly for 21 years.
8  That is a part of who I am.
9  Q. Now, to focus the time frame during your first tenure
10 at the FTU as Section Chief, August, I think you said, of
11 2001, until April of 2002, what was the chain of command in
12 practice at the FTU?
13 A. In practice, I would go directly to the executive
14 staff, specifically, Major Swiski. He was the financial
15 Major. And we would communicate quite a bit as to the needs
16 of the FTU. And that was pretty much the rank structure as
17 far as evaluations and monthly time sheets, they would go
18 through the Academy staff.
19 Q. Now, in your first lawsuit, were there any issues
20 addressing generally blood lead levels of troopers under
21 your command?
22 A. Yes. That was a very significant part of that first
23 lawsuit.
24 Q. Who did you raise those concerns to during that time
25 frame?

1393

1  A. Directly to Major Swiski, the executive staff.
2  Q. After you were transferred back into the FTU on
3  December 1st of 2003, was the chain of command the same as
4  it was before?
5  A. No. It had been changed to where it was strict
6  adherence to everything I had to do had to go straight to
7  the Lieutenant at the Academy.
8  Q. Let's stay focused on December 1st of '03.
9     What happened that day?
10 A. That was the day I was reinstated. And I met with
11 Captain Greg Warren, Lieutenant Ralph Davis, and Sergeant
12 Rich Ashley.
13 Q. Where did you meet with them at?
14 A. In the conference room at the Firearms Training Unit.
15 Q. All right. How would you describe your attitude that
16 day when you are returned to the FTU?
17 A. I was excited to be there. I was finally getting my
18 opportunity. I was only there seven months the first time,
19 as far as in charge. Now I could try to rescue my
20 reputation. I am back in the job that I dreamed of having,
21 that I worked so hard my entire career for. And hopefully,
22 I can take it up a notch and sink my teeth back into that
23 particular job.
24 Q. Would you use the term bulletproof to describe your
25 own attitude that day?

1394

1  A. Absolutely not.
2  Q. Now, after you had your meeting with Captain Warren,
3  Lieutenant Davis and Sergeant Ashley, what happened?
4  A. Towards the end of the meeting, I believe Captain
5  Warren excused himself and he had some other duties to take
6  care of at the Academy. And myself, Sergeant Ashley and
7  Lieutenant Davis went on a tour of the facility.
8  Q. What was the condition of the FTU that you observed
9  during that tour?
10 A. It was filthy. It was an absolute disaster.
11 Q. Now, after that tour ended, at some point during your
12 first week back did you meet with the men under your command
13 there?
14 A. Yes, I did.
15 Q. What was the general topic of your discussions with
16 your men?
17 A. My men were very concerned about their health, and
18 they were concerned about, also, the condition that the
19 facility was in, all the problems that we were having.
20 Q. Let's focus on the health concerns that you mentioned.
21 Could you describe to the jury some of the health concerns
22 which were brought to your attention?
23    MR. ELLIS: Your Honor, this is hearsay.
24    MR. S. NEUBERGER: Effect on listener, Your
25 Honor.

1395

1 THE COURT: Overruled.
2 THE WITNESS: Well, they were explaining to me
3 that they were having headaches, that they were having joint
4 pain, that they were very fatigued at the end of the day.
5 When they would blow their noses, they would have a dark
6 discharge from their noses.
7 They just felt that something was not right with
8 the conditions there at the range.
9 BY MR. S. NEUBERGER:
10 Q. Just so we are clear, are those examples of the kinds
11 of concerns that were raised to you?
12 A. Yes.
13 Q. What was your reaction to hearing those concerns as
14 the Commander?
15 A. I was extremely concerned for their health and
16 well-being.
17 Q. Now --
18 A. If I may.
19 Q. Please.
20 A. They also brought the fact that they had seen Dr.
21 Green. Dr. Green is at Health Works in Dover. That's where
22 they were sent, and we all were sent to get our blood drawn.
23 And apparently Dr. Green pointed out to them that when their
24 lead levels had spiked, and --
25 THE COURT: I think we are now a little bit far

1396

1 afield. You can stand up, Mr. Ellis, and object.
2 MR. ELLIS: Your Honor, I tried.
3 THE COURT: It's question by question, Mr.
4 Ellis.
5 Move the witness on, Mr. Neuberger.
6 BY MR. S. NEUBERGER:
7 Q. After you met with the men that day, were any
8 decisions made about maintenance in the facility?
9 A. Yes. Because of the concerns that were raised by the
10 DSP doctor, we decided to suspend the maintenance behind the
11 bullet trap.
12 Q. Okay. Did you suspend any other maintenance?
13 A. Yes. It was also brought to my attention that the
14 floor scrubber was inoperable, which it was, and that that
15 floor scrubber needed to be repaired, but then again, what
16 do we do with the effluent in it once it cleans the floor
17 and draws up the water, what do we do with it, because we
18 have no way of getting it out and into something because a
19 valve is down towards the bottom of the unit.
20 So it's a gravity-fed system.
21 Q. Did you decide to continue doing any kinds of
22 maintenance?
23 A. Yes. We continued to do maintenance on the front side
24 of the bullet trap where we would collect all the brass
25 casings, all the shotgun shells and wadding and so forth,

1397

1 paper blow-back, that was on the front ramp, the dry ramp.
2 And we would also do repairs, it seemed like daily, to the
3 target system.
4 Q. Now, when you were talking about the decision behind
5 the bullet trap, you used the word suspend. Was that
6 intended to be a permanent decision, to suspend the
7 maintenance back there?
8 A. No, it was not.
9 Q. What kind of decision was it intended to be?
10 A. We decided that because of the danger of putting our
11 hands in that toxic water, we suspended that. At the same
12 time, I made contact with Captain Warren. We had a meeting
13 regarding it. And I as trying to contact companies,
14 mechanical companies in the area to have them come in and,
15 for one, clean up the contamination, and for two, to
16 basically have a service contract of a professional that is
17 equipped in hazardous abatement, equipped to protect
18 themselves from hazardous conditions, and the mechanical
19 background to take care of that bullet trap in the rear.
20 Q. Ultimately, were you able to get one of those
21 professionals to come in and take care of the area behind
22 the bullet trap?
23 A. No, because as soon as they found out there was lead
24 involved, they wanted no parts of it.
25 Q. Now, the decision to stop doing maintenance behind the

1398

1 bullet trap, you mentioned Captain Warren. I want to ask
2 you specifically. Did you tell Captain Warren that you were
3 suspending the maintenance behind the bullet trap?
4 A. Yes, I did.
5 Q. Did anyone in the chain of command above you respond
6 down and say, no, don't do that?
7 A. No.
8 Q. When you took over the FTU on December 1st of '03,
9 were there any dry ramps on the front side of the bullet
10 trap?
11 A. Yes. There were I believe three spots where the water
12 was not flowing.
13 Q. Now, did you shoot into those dry lanes or dry ramps?
14 A. No. We would relocate the shooters to a wet ramp.
15 Q. Now, even when you are shooting on a wet ramp, what
16 kind of a surface do the bullets impact on?
17 A. It's all steel that it impacts on. Now, if I could
18 explain.
19 Q. Yes, please.
20 A. There is actually four ramps. There is a bottom ramp,
21 which is dry. Then there is a ramp that sits just above it.
22 That is the wet ramp. The water flows down into a trough
23 that is between those two ramps. And then up top, there is
24 a ramp -- there is two ramps like this, to make sure that it
25 deflects any round into that deceleration chamber.

```
                                                    1399
 1            So there is four ramps, and only one of them is
 2   wet.
 3            Like Corporal Price had testified, there is at
 4   least 40 percent of the rounds actually hit the dry top
 5   ramp.
 6   Q.   That's even on the so-called wet ramp lanes?
 7   A.   Yes.
 8   Q.   What kind of bullet trap is installed at the FTU?
 9   A.   It is a Savage range bullet trap with a wet system.
10   Q.   Have you ever visited other firing ranges where the
11   Savage bullet trap is used?
12   A.   Yes, I have.
13   Q.   Where was that?
14   A.   That was at the FBI Academy in Quantico, Virginia.
15   Q.   The FBI Academy, do they have like a stationary range
16   or do they have a tactical range like you guys have?
17   A.   What we have is a tactical range. A lot of what you
18   see is you shoot from booths. We don't have that type of
19   setup. We have a setup where it is wide open. The target
20   stays put at the back, up against the bullet trap.
21            You would then maneuver, we teach people to move
22   and shoot, to move to cover. And it's just like being
23   outside, is what we tried to mimic inside.
24            However, at the FBI Academy, you actually shoot
25   from a booth, so the target moves to and from and across in
```

```
                                                    1400
 1   front of you. And you engage the target. So your
 2   trajectory is always the same trajectory. You are going
 3   through the target at the same angle. So it's going to hit
 4   the bullet trap at the angle that they want to by design.
 5   However, there is no target blow-back with that type of
 6   situation.
 7   Q.   Why is that?
 8   A.   Well, with the target, the target is never up against
 9   the bullet trap. It's always within a certain distance.
10   Q.   So is that different than how it is at the FTU?
11   A.   Much different.
12   Q.   What kinds of weapons and ammo does the FBI fire at
13   their range?
14   A.   The only ammo that they fire at that range is solid
15   projectiles that don't pulverize like the frangible. These
16   rounds go through the target and into the bullet trap. And
17   it remains pretty much a solid object, that once it loses
18   its energy drops down on a conveyor, and then the conveyor
19   belt transports it to a bucket and you dump it into a
20   bucket. They don't allow anything else other than handgun
21   ammo.
22   Q.   Do they use shotguns there then?
23   A.   No. As a matter of fact, they knew right away that
24   this was specifically for pistol caliber rounds.
25            MR. ELLIS: Objection.
```

```
                                                    1401
 1            THE COURT: Sustained.
 2   BY MR. S. NEUBERGER:
 3   Q.   Now, the did you use shotguns at the FTU?
 4   A.   Yes, we did.
 5   Q.   Were you ever able to observe the effect of shooting
 6   shotgun ammo into the Savage wet bullet trap?
 7   A.   Yes. With shotgun ammunition, there is a buffer which
 8   is a material -- it escapes me what it's made of. But it's
 9   like a paper type of material that goes into the bullet
10   trap. And if it gets into the wet system, it will wind up
11   causing problems with the sprayer heads and with the pumps
12   and the screens clogging them up.
13   Q.   Now, you used frangible ammo at the FTU for your
14   handguns. Right?
15   A.   That's correct.
16   Q.   Have you been to any ranges that are actually designed
17   to use frangible ammo with the bullet trap?
18   A.   Yes, I have.
19   Q.   Where was that at?
20   A.   SIGARMS Academy, which is up in Exeter, New Hampshire.
21   Q.   Just so the jury is clear, what is SIGARMS?
22   A.   SIGARMS is the manufacturer of the pistol that we
23   have.
24   Q.   What kind of range was that? Was that a tactical
25   range or was that a stationary range?
```

```
                                                    1402
 1   A.   That was a tactical range, just like ours.
 2   Q.   Did you ever visit the range?
 3   A.   Yes. I have also been trained on that range.
 4   Q.   What happens when the frangible ammo is actually fired
 5   into the bullet trap?
 6   A.   Well, that is a dry bullet trap. It is not a wet
 7   system like we have. It is a tactical range where we move
 8   throughout the area. We are not shooting from a booth. The
 9   target is up against the bullet trap. But because it's dry,
10   they don't have to worry about target blow-back. And it
11   works just fine with striking the steel. It pulverizes on
12   impact. However, the ventilation system works correctly
13   where it takes out, immediately takes out of the respiratory
14   zone the muzzle blast and any airborne particles from the
15   impact of the round pulverizing.
16   Q.   Did there ever come a time when you investigated the
17   kind of bullet trap, the Savage bullet trap, which is
18   installed at the FTU?
19   A.   Yes.
20   Q.   Did you learn anything as a result of your
21   investigation?
22   A.   Yes. What I have learned, that that particular bullet
23   trap is not conducive and not made for anything other than
24   handgun rounds. Solid projectiles, it's not made for target
25   blow-back and it's not made for shotgun buffer.
```

1403

1  Also, in the research that I did, our range was
2  not even designed for that bullet trap. And that's evident
3  by the hole that they had to cut in those side walls and
4  build a shed to accommodate the conveyor system. It was
5  designed for a different type of bullet trap.
6       And the ventilation system is actually supposed
7  to draw the particulates into the water, so that the exhaust
8  has to be behind the bullet trap to suck the debris into the
9  water system and out this way. But it's actually in front.
10      So when the bullet strikes a dry wet ramp, if it
11 pulverizes, it is actually pulling it this way out of the
12 bullet trap rather than pulling it in.
13 Q.  Chris, you mentioned the ventilation at the range
14 around the bullet trap. I want to show you a couple of
15 pictures.
16      MR. S. NEUBERGER: Your Honor, could I ask that
17 the lights be turned off on this area, please?
18      THE COURT: Sure.
19 BY MR. S. NEUBERGER:
20 Q.  Chris, what does this picture show?
21 A.  That is out in front of the bullet trap above it.
22 That is the exhaust that I was just explaining that is in
23 front of the bullet trap rather than behind it, the way it's
24 supposed to be.
25 Q.  Now, what is this thing right here?

1404

1 A.  Those are the vents, the smoke and debris are supposed
2 to be pulled up into that area.
3       Now, they have put plates over top of them.
4 That's not the way it was originally designed. But there
5 has always been a continual working on the system to try and
6 make it work.
7       MR. S. NEUBERGER: And just for the record, Your
8 Honor, this is part of PX-140.
9 BY MR. S. NEUBERGER:
10 Q.  Are these the plates that you are talking about,
11 Chris?
12 A.  Yes. That's not serving as a deflector. It's just
13 serving to cover the vent to prevent it from, I guess, too
14 much air flow. I am not sure.
15 Q.  And is this another vent here?
16 A.  Yes.
17 Q.  And is this one partially covered as well?
18 A.  Yes, it is.
19 Q.  Can you see this one here?
20 A.  Yes.
21 Q.  And does that appear to be partially covered?
22 A.  Yes.
23 Q.  Just to cut through that, how many of the vents have
24 some kind of covering on them right in front of the bullet
25 trap in the FTU?

1405

1 A.  All of them.
2 Q.  Now, Chris, while you were at the FTU, your second
3 time around, starting December 1st of 2003, were there any
4 issues with staffing levels?
5 A.  Yes. We were always running shorthanded.
6 Q.  Did you ever raise those concerns up the chain of
7 command?
8 A.  Absolutely. We sounded the alarm for both the
9 conditions of the range and for staffing, all the different
10 problems with the range. We sounded the alarm both in
11 writing, e-mails, as well as meetings with our superiors, to
12 push it up the chain of command, to hopefully get the
13 situation rectified.
14 Q.  Did you ever try to bring in temporary instructors? I
15 think the term is TAD, temporary assigned duty or something
16 like that?
17 A.  What we would do, on a daily basis, is have to call
18 around and see if we could get adjunct instructors to come
19 in and help out with the training. And that would be a
20 significant problem in itself, because you are relying on
21 calling somebody that has a cell phone, a pager, a home
22 number, a troop number. And then once you get a hold of
23 them or get a call back from them, then they say, okay, now
24 you have to contact my supervisor and see if it's okay. So
25 then you go through that same thing with that particular

1406

1 supervisor. And by the time it's all done and said, you
2 don't get anywhere.
3 Q.  Now, by you don't get anywhere, what do you mean?
4 A.  Well, you are not going -- it just takes so much time
5 that I could spend the whole day on the phone when I need to
6 be out on the range, because we are shorthanded. And I need
7 to make sure that the range is safe with enough instructors.
8 So I would have to be on the range as well.
9 Q.  So were you ever able to get temporary instructors
10 assigned to the FTU?
11 A.  No.
12 Q.  Now, during your second tenure, were you ever able to
13 get additional full-time instructors assigned to the FTU?
14 A.  No.
15 Q.  Just to focus the time period, I am focusing from
16 December of '03 through, say, April of 2004?
17 A.  No.
18 Q.  Now, you mentioned, I think you mentioned e-mails a
19 few minutes ago. I want to put some exhibits in front of
20 you and take a look at these. I want you to take a look at
21 PX-40, which I believe is in the first white exhibit book.
22 Chris, just let me know once you have found them?
23 A.  I am there.
24 Q.  Do you see about one-third of the way down on the
25 first page, there is an original e-mail message?

1407

1  A.  Yes.
2  Q.  And does that appear to be a message that you sent to
3  Colonel MacLeish on Friday, December 29th, 2003?
4  A.  I know. I must be on the wrong one.
5  Q.  I am sorry. PX-40?
6      MR. S. NEUBERGER: Your Honor, may I approach
7  the witness?
8      THE COURT: Yes.
9      THE WITNESS: December 19?
10 BY MR. S. NEUBERGER:
11 Q.  Yes. All right. Now, is the subject line on this
12 e-mail Emergency Range Issues?
13 A.  Yes, it is.
14 Q.  Have you ever seen this document before?
15 A.  Yes. I prepared it.
16 Q.  I would like you to take a look at your original
17 e-mail message, the second full paragraph. Okay?
18 A.  Yes.
19 Q.  And take a look at the sixth line from the bottom of
20 that paragraph, the very end of the line. I want to read
21 this to you. Okay? Does this say, The mechanical operation
22 of this very expensive equipment should not be left for
23 amateurs in the mechanical field to tweak but for
24 professionals who have the training and experience to make
25 proper scientific and calculated adjustments and

1408

1  measurements when necessary. My expertise as well as the
2  entire FTU staff lies in firearms, officer safety and force
3  training. We do not possess the training, skills, and
4  knowledge or the time necessary to properly maintain the
5  system at its optimal performance,
6      Does that indicate that?
7  A.  Yes, it does.
8  Q.  Okay. Could you turn one page to the second page of
9  this exhibit, and we will go to the first full paragraph,
10 where it starts with, Master Corporal B. Kurt Price, do you
11 see that?
12 A.  Yes, I do.
13 Q.  Does that indicate that Master Corporal B. Kurt Price
14 expressed to me his concerns, elevating six points on his
15 blood lead level after he and Sergeant Ashley completed work
16 on the bullet trap. Master Corporal Price's lead levels
17 rose from a 5 to an 11 and only dropped one point to a 10
18 eight months later.
19     Does it say that?
20 A.  Yes, sir, it does.
21 Q.  Let's skip to the third-to-last line in that
22 paragraph, the very end of the line, where it says, I
23 concur, have you found that?
24 A.  Yes.
25 Q.  Does that indicate that, I concur with my colleagues

1409

1  that this is an unnecessary health risk and that the
2  maintenance of the bullet trap and recovery system should be
3  left to trained professionals who can operate in this
4  environment safely?
5      Does it indicate that?
6  A.  Yes, sir, it does.
7  Q.  So this is an e-mail that you sent to Colonel
8  MacLeish. Right?
9  A.  That's correct.
10 Q.  Let's move on to PX-41.
11 A.  I have it.
12 Q.  Do you see the original message --
13     THE COURT: Let's take our afternoon break.
14     (Jury leaves courtroom at 3:15 p.m.)
15     (Recess taken.)
16     THE COURT: All right. Bring in the jury,
17 please.
18     (Jury enters courtroom at 3:35 p.m.)
19     THE COURT: Mr. Neuberger.
20     MR. S. NEUBERGER: Thank you, Your Honor.
21 BY MR. S. NEUBERGER:
22 Q.  Now, Chris, let's focus on PX-41 in the white exhibit
23 book. Does the original message right below the message
24 from Captain Davis, does the original message appear to be
25 an e-mail that you sent to then Lieutenant Davis and cc'd

1410

1  Captain Warren on January 8th, 2004?
2  A.  Yes, that's correct.
3  Q.  So I would like you to take a look at the first, the
4  first full paragraph. And let's take a look at the third
5  line. Okay?
6  A.  Yes.
7  Q.  Now, does that indicate that there is no breathing
8  room in our schedule now as it stands. Making it even more
9  difficult is the fact that the FTU is only functioning at
10 four personnel with the absence of Corporal Peachey?
11     Now, Chris, does it say that?
12 A.  Yes, it does.
13 Q.  Do you recall where Corporal Peachey was at this time?
14 A.  Corporal Peachey, because of his injuries, was in a
15 lot of pain. And he was actually taking time off before he
16 had to go in February of '04.
17 Q.  Now, let's skip down to the second paragraph, the
18 first line. Does that indicate that, I would also like to
19 point out that the firearms industry standard for
20 instructor-to-student ratio is one instructor for every four
21 students of in-service personnel and one instructor to every
22 two recruit students, maximum number of students on each
23 count.
24     Does it indicate that?
25 A.  Yes, sir.

1411

1  Q.  Who are the in-service personnel that this would be
2  referring to?
3  A.  I am sorry. In-service personnel?
4  Q.  Yes. Would that be troopers who come in for their
5  recertifications? Does that point to another group of
6  people?
7  A.  I see what you are asking now. In-service personnel
8  would be those that have to be recertified that are already
9  police officers and they are veterans.
10 Q.  Let's move on to PX-42. Have you found that?
11 A.  Yes, sir.
12 Q.  Is this an e-mail that you sent to, looks like Captain
13 Greg Warren on January 9th of 2004?
14 A.  Yes, it is.
15 Q.  Just so we are clear, does the subject line say Range
16 Health Issues and Departmental Liability?
17 A.  Yes, sir, it does.
18 Q.  Now, I want to focus your attention on the first
19 paragraph, the first line, the first sentence?
20 A.  Okay.
21 Q.  Does this indicate, We are experiencing significant
22 air flow problems at the range. I have personally witnessed
23 the problems since I have returned to the FTU on December
24 1st, 2003. Corporals Warren and Price have expressed that
25 this problem has been in existence for many months and has

1412

1  only been band-aided over time when complaints have been
2  made.
3       Does it indicate that?
4  A.  Yes, sir, it does.
5  Q.  Let's skip down two more lines, to the sentence that
6  begins, Corporal Warwick. Do you see that?
7  A.  Yes, sir.
8  Q.  Does that indicate that Corporal Warwick expressed
9  that at one point the smoke was so dense that he was barely
10 able to see a shooter on the firing line?
11      Does it indicate that?
12 A.  Yes, sir, it does.
13 Q.  Let's skip down two more paragraphs, to the paragraph
14 that begins with the No. 1. Do you see that? It's a little
15 cut off it looks like from a hole punch.
16 A.  Yes, I have it.
17 Q.  Does that indicate that reddish haze in the air that
18 is suspended throughout the range when the bullet strikes
19 the bullet trap, the airborne -- then I can't read the next
20 word -- are inhaled by the instructors and students. When
21 anyone blows their nose, a large amount of the reddish
22 debris is discharged. Students and instructors also
23 complain of a copper penny taste in their mouth after
24 shooting and describe a significant mucus present when
25 awakening the following morning after a day on the range.

1413

1       Does it say that?
2  A.  Yes, sir, it does.
3  Q.  I think -- well, let's just move on. Let's move down
4  to the end of this paragraph, the fourth line up.
5       Let me read this to you. It's the sentence that
6  starts, The range staff. Do you see that?
7  A.  Yes, I see that.
8  Q.  Does that indicate the range staff is under the
9  impression that without the rapid exhaust and removal of the
10 copper frangible particulates from our breathing air, this
11 problem constitutes a potentially unsafe and unhealthy
12 working environment detrimental to our good health and
13 inconsistent with departmental goals and objectives?
14      Does that indicate that?
15 A.  Yes, sir, it does.
16 Q.  All right. There is a Paragraph No. 2 below it.
17 Actually, let's flip over to the next page, to the very last
18 paragraph in this e-mail. The sentence that begins, Thank
19 you?
20 A.  Yes, sir.
21 Q.  Does that indicate, Thank you for your immediate
22 attention in this matter and look forward to any further
23 direction you may suggest in our efforts to achieve a safe
24 and healthy work environment at the Firearms Training
25 Facility?

1414

1       Does it indicate that?
2  A.  Yes, sir, it does.
3  Q.  Okay. Let's move on to PX-43.
4  A.  I have it.
5  Q.  The original message here, is this an e-mail, or does
6  this appear to be an e-mail that you sent to Captain Greg
7  Warren and Lieutenant Davis on January 23rd of 2004?
8  A.  Yes, sir.
9  Q.  Let's skip down to the last -- to the second-to-last
10 paragraph, the one that begins, Regarding the air quality
11 testing. Do you see that?
12 A.  Yes, I do.
13 Q.  Let's go to the third line down, the middle of the
14 line where it begins, I was also advised?
15 A.  Yes, I have it.
16 Q.  Does that indicate, I was also advised by both
17 Corporal Price and Corporal Warren when they had approached
18 Sergeant Ashley regarding maintaining the pumps and the
19 water system as well as the spike in the lead levels in
20 their blood causing health problems, Sergeant Ashley
21 responded with, You have to die from something. This
22 statement offended them. And they as well as Jim Warwick
23 and myself are extremely concerned over our health and the
24 health of those we train.
25      Does that contain that?

1415

1  A.   Yes, sir, it does.
2  Q.   Let's skip to the last e-mail, PX-44. Does this
3  appear to be an e-mail you sent to Paul Eckrich on February
4  19th of 2004?
5  A.   Yes, sir.
6  Q.   Who is Paul Eckrich?
7  A.   He is on the executive staff. He is Major Paul
8  Eckrich.
9  Q.   Now, let's skip down to the fifth paragraph, the one
10 which appears to be in a darker font than the others. Do
11 you see that?
12 A.   Yes, sir, I do.
13 Q.   Let's take a look at that then. Let's start with the
14 first sentence. Does that indicate, I am overwhelmed with
15 concern for the health and safety of my staff and their
16 wives and children.
17      Then let's skip to the third sentence, which is
18 on the end of the third line. The one that starts with, I
19 have spent, do you see that?
20 A.   Yes, sir, I do.
21 Q.   Does that indicate, I have spent much less time on the
22 range when compared to my staff. And yet my copper and lead
23 levels are the same as the others. My lead level shot up
24 from a 3 to a 9 and my copper is at 9.71 in just two months.
25      Let's skip forward one more sentence.

1416

1       THE COURT: Sergeant, let me interrupt for a
2  second. You can read, can't you?
3       THE WITNESS: Yes, I can.
4       THE COURT: Why don't you go ahead and read.
5  And if you have other questions about this
6  e-mail that you want this witness to adduce evidence on, ask
7  him a proper question.
8       MR. S. NEUBERGER: Okay, Your Honor.
9  BY MR. S. NEUBERGER:
10 Q.   Chris, were these last five e-mails that we just went
11 through, were these the only e-mails that you sent up the
12 chain of command?
13 A.   No. I have sent many up the chain of command.
14 Q.   Now, you can close that.
15      THE COURT: I wasn't telling you not to question
16 him about the e-mails. I was asking him to testify rather
17 than you testify. That's all.
18      MR. S. NEUBERGER: Yes, Your Honor. I think the
19 e-mails speak for themselves and I spent enough time on it.
20      THE COURT: Just an observation.
21 BY MR. S. NEUBERGER:
22 Q.   Chris, you mentioned that in addition to e-mails you
23 had meetings. I want to focus some questions on the
24 meetings.
25      Who did you have meetings with?

1417

1  A.   I have had meetings with Lieutenant Davis, Captain
2  Warren, numerous meetings with Facilities Management.
3  Q.   Did you eventually have any meetings with anyone in
4  the chain of command above Captain Warren?
5  A.   I don't believe we had one until after January 30th.
6  Q.   So after January 30th, did you have any meetings with
7  anyone in the chain of command above Captain Warren?
8  A.   Yes, we did.
9  Q.   Who did you have those meetings with?
10 A.   Lieutenant Colonel MacLeish, Major Eckrich, Gene
11 Sharp, who is a civilian at headquarters that -- I am not
12 exactly sure what his job is. He has something to do with
13 the budget. Captain Yeomans.
14 Q.   Let's focus on the time period prior to January 30th
15 of 2004. After you were reinstated to the FTU, did you
16 ever -- did Colonel MacLeish ever stop by the range?
17 A.   Yes, sir. On January 21st of 2004.
18 Q.   Did you talk to him about anything?
19 A.   I tried to.
20 Q.   What did you try to talk to him about?
21 A.   I tried to explain to him --
22      MR. ELLIS: Objection, Your Honor, as to what he
23 tried to talk to him about.
24      THE COURT: Sustained.
25 BY MR. S. NEUBERGER:

1418

1  Q.   What did you talk about?
2  A.   I tried to express to him all the concerns that I had
3  with passing up the chain of command with the ventilation --
4       MR. ELLIS: Objection, Your Honor.
5       THE COURT: That is overruled. You can describe
6  what happened.
7  BY MR. S. NEUBERGER:
8  Q.   Go ahead, Chris.
9  A.   I explained to him about what was going on at the
10 facility, tried to explain this by saying, bringing to his
11 attention the ventilation problem, the bullet trap problem.
12 And he blew me off and said, I am not here for that.
13 Q.   Okay. Let's focus on the period after January 30th of
14 2004. Eventually, were you able to get a meeting with
15 Colonel MacLeish?
16 A.   Yes, down the road, yes.
17 Q.   And did he talk at all during any of those meetings?
18 A.   Yes, he did.
19 Q.   Did he say anything which sticks out in your mind
20 today?
21 A.   He was very angry and agitated.
22      MR. ELLIS: Your Honor, there is a long period
23 of time. Can we have some specification as to when this
24 occurred?
25      THE COURT: Could you give a time.