IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE;       :
CORPORAL WAYNE WARREN; and    :
SERGEANT CHRISTOPHER D. FORAKER, :
                              :
     Plaintiffs,          :
                              :
     v.                :     C.A.No.04-956-GMS
                              :
COLONEL L. AARON CHAFFINCH,    :
individually and in his official :
capacity as the Superintendent, :
Delaware State Police; LIEUTENANT :
COLONEL THOMAS F. MACLEISH,    :
individually and in his official :     Jury Trial Demanded
capacity as the Deputy          :
Superintendent, Delaware State   :
Police; DAVID B. MITCHELL, in his :
official capacity as Secretary of :
the Department of Safety and     :
Homeland Security, State of      :
Delaware; and DIVISION OF STATE  :
POLICE, DEPARTMENT OF SAFETY AND :
HOMELAND SECURITY, STATE OF     :
DELAWARE,                 :
                              :
     Defendants.          :

FIRST AMENDED COMPLAINT[1]

    1.  This is a civil action for compensatory and punitive

damages and injunctive relief for retaliatory violations of the

---

    [1] Pursuant to Fed.R.Civ.P. 15(a), having obtained the
"written consent of the adverse party" as contained in the
contemporaneously filed Stipulation, plaintiffs hereby amend
their Complaint. A claim for First Amendment Petition Clause
retaliation has been added at Count II and ¶¶ 96-98. There are
no other changes.

free speech clause of the First Amendment of the United States Constitution.  Plaintiffs exercised their First Amendment rights by: (1) reporting to defendants that the health and safety of Delaware State Troopers and others were being endangered by hazardous conditions at the Delaware State Police's Firearms Training Unit ("FTU"); and (2) speaking to the Delaware State Auditor's Office about health hazards, safety concerns and other problems at the FTU, as well as the root causes of those dangerous conditions.  Defendants retaliated against plaintiffs for their protected activities, materially changed the conditions of their employment and have made concerted retaliatory efforts to create pretextual reasons to terminate their employment.

## I.    JURISDICTION

2.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the Fourteenth Amendment to the United States Constitution.  The cause of action arises under 42 U.S.C. § 1983.  The claims arose in this judicial district.

## II.    THE PARTIES

3.  Plaintiff Corporal B. Kurt Price is a citizen of the United States and a resident of Kent County, Delaware.  He is a 19 year veteran of the Delaware State Police ("DSP") assigned to the FTU as a firearms instructor.  At all times material hereto, his job performance has been outstanding.

-2-

4.   Plaintiff Corporal Wayne Warren is a citizen of the
United States and a resident of Sussex County, Delaware.  He is a
21 year veteran of the DSP assigned to the FTU as a firearms
instructor.  At all times material hereto, his job performance
has been outstanding.

5.   Plaintiff Sergeant Christopher D. Foraker is a citizen
of the United States and a resident of New Castle County,
Delaware.  He is a 19 year veteran of the DSP and is currently a
section chief and the non-commissioned officer in charge
("NCOIC") of the FTU.  At all times material hereto, his job
performance has been outstanding.

6.   Defendant Colonel L. Aaron Chaffinch is currently the
Superintendent of the DSP and its highest ranking officer.  He is
sued individually and in his official capacity.  Since his
appointment in October of 2001 he has been a serial violator of
the constitutional rights of the Troopers under his command.  For
example, two federal juries have returned verdicts against him in
favor of three separate troopers because of his civil rights
abuses.

7.   Defendant Lieutenant Colonel Thomas F. MacLeish is
currently the Deputy Superintendent of the DSP and its second-
highest ranking officer.  He is sued individually and in his
official capacity.

8.   Defendant David B. Mitchell is currently Secretary of

-3-

the Department of Safety and Homeland Security of the State of
Delaware and he is the superior to Chaffinch and MacLeish in the
chain of command.  He is sued in his official capacity to obtain
injunctive relief which will prohibit Chaffinch and MacLeish from
continuing to violate the constitutional rights of plaintiffs.

9.  Defendant Division of State Police, Department of Safety
and Homeland Security, State of Delaware ("State Police" or
"DSP") is an agency of the State of Delaware, which is only
joined in this action for purposes of collecting attorneys' fees
and costs.

III.  **FACTS GIVING RISE TO THE ACTION**

A.  **History of the FTU**

10.  The FTU was built and eventually opened in September of
1998 at a cost of approximately $3.3 million dollars.  At the
time, it was touted as a state of the art firearms facility.
Until its closure, it was used annually by approximately 2,000
police officers from the DSP and other local agencies, as well as
by agents from the FBI, DEA and other federal agencies.

11.  However, due to intentional wrongdoing by those
responsible for its construction in the Department of
Administrative Services of the State of Delaware and its Division
of Facilities Management ("Facilities Management"), the FTU was
knowingly and purposefully improperly and dangerously constructed
without proper consideration for the health and welfare of the

-4-

men and women who would work or train there.  For example,
Facilities Management wrongfully awarded the construction
contract to a bidder which had not scored the highest in the
application process.  Instead it intentionally miscounted the
points awarded to various applicants and the project was awarded
to the wrong bidder which constructed a facility which has been
proven to be dangerous to the health and safety of all those who
use the facility.

12.  A substandard facility was built as a result of
improprieties, financial irregularities, breach of the public
trust, fraud and/or corruption by public officials at the highest
levels of state government.

13.  After its construction, no Certificate of Occupancy was
ever issued for the facility by any properly designated
independent governmental authority.  As a result, numerous
problems with the facility were evident soon after its opening.
For example, in November 1998, it was visually apparent that the
HVAC air handling system was working improperly and was not
removing lead and other bullet fragmentation from the air.

14.  As a result of the problems at the FTU, range staff
began to suffer from physical symptoms, such as nasal secretions
and also from elevated levels of lead in their bloodstream.

15.  From 1998-2003, thousands of taxpayer dollars were
spent as numerous firms and state agencies attempted, and failed,

-5-

to fix the problems at the FTU.  Facilities Management sought to hide these issues from public scrutiny, to the detriment of the health and safety of the men and women who worked or trained there.

16.   In an attempt to reduce lead contamination caused by a perpetually defective HVAC system which did not remove lead contaminants from the air, and to try to make the range safer, in 2001, the DSP transitioned to the use of non-lead based, frangible handgun ammunition which was used at the firing range.

17.   However, the change to frangible ammunition eventually caused numerous additional problems at the FTU, which defendant Chaffinch and Facilities Management sought to cover-up and hide from public scrutiny.  For example, in the summer of 2003, the use of this new ammunition caused the bullet-trap to malfunction and ultimately break down because it had been specifically designed to handle lead-based ammunition and not frangible ammo which dissolves into dust particles upon impact.

18.   Because the bullet-trap had ceased to function, range personnel themselves, and not Facilities Management which was the landlord for the facility, were required by hand to attempt to clean up 'toxic goo' on a daily basis which consisted of various dangerous heavy metals, such as zinc and copper.  The landlord ignored such problems and instead by default range personnel were left to deal with the issue.  They were not given hazardous

-6-

material training, protection or equipment to use while conducting this cleanup. Nor were professional hazardous material teams brought in to conduct cleanup, as is done at other firing ranges.

19. As a result of the broken bullet-trap, malfunctioning air handling system and numerous other problems, the FTU was a hazardous place to work. This was known at all times by defendants Chaffinch, MacLeish and Facilities Management.

### B. Plaintiffs Speak Out to Try to Fix the Problems at the Range

20. On December 1, 2003, Sergeant Foraker was transferred to the FTU and became the NCOIC.

21. For the previous 20 months defendant Chaffinch had appointed a personal friend as the NCOIC of the FTU. During that person's tenure conditions at the range were allowed to steadily deteriorate. Defendant Chaffinch knew of this deterioration and covered it up because otherwise it would have exposed the fact that through personal friendship he had placed an inexperienced person in charge of the FTU.

22. On December 1st Sgt. Foraker began to immediately observe numerous problems and safety concerns that were impairing the safe and proper functioning of the FTU and were endangering the men and women who trained or worked there.

23. Soon after, Corporals Price and Warren told Sgt. Foraker that when they had previously expressed their health and

-7-

safety concerns about working at the FTU they were told by
defendant Chaffinch's friend, "you have to die from something."

24. Beginning December 1, 2003, and continuing through the
present, on behalf of himself and Corporals Price and Warren,
Sgt. Foraker began to speak out and relay their joint concerns up
the chain of command about the hazardous health and physical
conditions at the FTU, in an attempt to have those problems fixed
and thus protect the health and safety of all those who came into
contact with the range.

25. Sgt. Foraker, on behalf of himself and Corporals Price
and Warren, also spoke out and contacted Facilities Management in
an attempt to have the problems at the range rectified.

26. One example of their protected speech occurred on
December 19, 2003, when Sgt. Foraker e-mailed defendant MacLeish
and also Major Eckrich and reported that the health and safety of
Troopers were being endangered by the problems at the FTU.

27. But defendant MacLeish ignored their health and safety
concerns and, for example, did not order plaintiffs to undergo
medical or occupational testing to look into their health and
well-being.

28. Similarly, on February 20, 2004, Sgt. Foraker e-mailed
Major Eckrich and expressed his concerns that the conditions at
the range were contaminating the staff at the FTU. Major Eckrich
then relayed these concerns to defendants MacLeish and Chaffinch.

-8-

29.  But again, MacLeish and Chaffinch ignored their health and safety concerns and did not order plaintiffs to undergo medical or occupational testing to look into their health and well-being.

30.  All of plaintiffs' speech and concerns were relayed up the chain of command to defendants Chaffinch and MacLeish.

31.  However, the DSP hierarchy dismissed plaintiffs' concerns.  For example, in January 2004, defendant MacLeish told plaintiffs to "just put on a paper dust mask to protect yourself" and that it is expected that they would have health problems from working at a firing range.  Likewise, defendants MacLeish and Chaffinch did not order plaintiffs to undergo medical or occupational testing to look into their health and well-being.

32.  But plaintiffs were not the only ones concerned with or being adversely effected by the hazardous conditions at the FTU.

33.  For example, in January 2004, police academy recruits training at the FTU complained of nosebleeds, sore throats, headaches and a "penny taste" in their mouths.

34.  Despite having their concerns ignored by defendants in the DSP hierarchy, plaintiffs continued to speak out and diligently work to have the hazardous conditions at the FTU corrected.  For example, they went and spoke out to a federal authority and defendants learned of this.

### C.  The Range is Shut Down Due to Environmental Contamination

35.  On March 19, 2004 the problems at the range finally

-9-

came to a head and the FTU was shut down because of environmental contamination.  A federal official who plaintiffs had located demanded that the FTU be closed as a result of the building not being fit for occupancy.  But again neither defendants Chaffinch or MacLeish ordered plaintiffs to undergo medical or occupational testing to look into their health or well-being.

36.  In a March 20, 2004 article in the Delaware State News, a Captain, who was also the Director of Training for the DSP, described the condition of the range as follows: "This pistol range is the absolute epitome of a project from hell since its very inception."  "At the end of this week, nobody will be allowed in the building.  The building will be abandoned as of Friday.  The entire building is contaminated with lead."

37.  The closing of and problems related to the FTU attracted widespread media attention in both the downstate and upstate newspapers.

D.  **Plaintiffs Also Speak to the State Auditor's Office**

38.  Because of the catastrophic condition of the FTU and the various issues of paramount public importance which its closing raised, on Tuesday, April 20, 2004, Governor Ruth Ann Minner called upon the State Auditor to investigate the problems at the FTU.  Leaders in the Delaware General Assembly made a similar request.

39.  As part of this investigation, on May 12th and again on

-10-

July 28th, 2004 plaintiffs met with, were interviewed by and turned over voluminous documentation to three investigators of the State Auditor's office.  Plaintiffs also spoke out to the Auditors in written form by submitting to them lengthy individual written statements which addressed numerous issues of public concern.

40.  Plaintiffs spoke to the auditors about health hazards, safety concerns and other problems at the range.  Plaintiffs also spoke out about the root causes of these problems, such as improprieties in the bidding and construction process of the FTU, which resulted in an unsafe building being constructed.

41.  At all times plaintiffs spoke out on issues of public concern under the First Amendment and sought to bring to light actual or potential wrongdoing or breach of the public trust by high public officials and also sought to bring to light and fix the hazardous conditions at a state facility which were endangering the health and safety of state employees and numerous others.

42.  The media reported on plaintiffs' May 12th remarks, which incensed and antagonized defendants Chaffinch and MacLeish when they learned of this.  They then decided to retaliate against plaintiffs, order them to fitness for duty exams, fabricate reasons to fire them and to drive them from their positions as State Troopers.

-11-

A - 175

43.  By its content, form and context, at all times plaintiffs spoke out about matters of public concern.

44.  All of plaintiffs' speech was non-disruptive of any legitimate interest of their employer and was on matters of public concern to their employer, as well as the General Assembly, the Governor of Delaware, the news media, voters and the public at large.  Their speech related to matters of political, social and other concern to the community.

45.  Plaintiffs were acting in good faith and with honest motives at all times when they exercised their First Amendment rights to freedom of speech.  At all times, plaintiffs believed their speech to be true and plaintiffs' speech is in fact true. Plaintiffs were not being disloyal by speaking out.  Instead, they were trying to protect their fellow Troopers and members of the public who were being injured and otherwise placed in harms way by the dangerous conditions at the FTU.

46.  The public concern in and value to the community at large of being free to hear plaintiffs' speech outweighs any asserted government interest in the effective and efficient provision of services.

47.  Nothing plaintiffs said interfered with the regular operations of the DSP.  Plaintiffs' speech did not interfere with the DSP's interests in: crime fighting; fostering trust and confidence among officers; protecting the safety of officers or

-12-

other members of the community.

48.  Plaintiffs' speech did not threaten the authority of defendants to run the DSP.   Nothing plaintiffs said damaged their relationship with defendants or with any of their superior officers.   Plaintiffs did not impugn the integrity of their supervisors.

49.  Plaintiffs' speech did not have a detrimental impact on any close working relationship for which personal loyalty, trust and confidence are necessary.   Plaintiffs are not the alter egos of defendants.   Organizationally, plaintiffs are four and five ranks below defendants in the chain of command.   Defendants are the Colonel and Lieutenant Colonel.   Plaintiffs are a mere sergeant and two corporals.

50.  Any disruption that was caused in the DSP was not caused by plaintiffs' speech but was instead caused by the very problems that plaintiffs' speech was in fact intended to address.

51.  In their positions as employees of DSP at the FTU, plaintiffs did not make or formulate DSP policy.   Rather, formulation of DSP policy is left up to the Superintendent and Deputy Superintendent of the DSP.

### E.   Retaliation Against Plaintiffs

52.  The individual defendants were aware of plaintiffs' protected speech, described above, and it antagonized them.

53.  Defendants then deliberately set out upon a course of

-13-

A - 177

conduct designed to retaliate against plaintiffs because of their protected speech and to dismiss them from the DSP at the cost of their careers and livelihoods.  Defendants Chaffinch and MacLeish did a 180 degree about face from blissful indifference to plaintiffs' health to demanding that they undergo repeated fitness for duty exams.  Defendants believed that this course of retaliation would allow them to continue their practice of ignoring and covering up the problems at the FTU, protecting their friends at the expense of loyalty to all the men and women who they command, and thus save themselves from further public contempt and ridicule arising out of their failed leadership of the State Police.

54.  For example, immediately after Corporal Price was interviewed a second time on July 28th by State Auditor investigators, defendant MacLeish ordered him to report to him so he could be interrogated about his interview.  Plaintiff's legal counsel then promptly sent an email directly to MacLeish and demanded the right to accompany his client to that interrogation. MacLeish ignored that demand, never replied, and then ordered Price to be interrogated without his legal counsel present upon penalty of severe punishment.  Nor would he even allow a Union representative to attend the interrogation. MacLeish then interrogated Price without counsel present.

55.  Throughout the course and as a result of plaintiffs'

-14-

protected speech, defendants retaliated against plaintiffs in numerous ways, including:

(a)  False charges of misconduct by each plaintiff were made to each investigator for the State Auditor's Office charging that it was the plaintiffs themselves and not Facilities Management and the leadership of the DSP who were responsible for all of the problems with the FTU.  These false charges were tantamount to threats or suggestions of discharge.

(b)  They were forcibly and improperly sent for fitness for duty examinations which were intended to be a pretextual vehicle to dismiss them from the DSP.

(c)  Their job responsibilities were materially altered and they have been placed on light duty status, forbidden from wearing their police uniforms, performing their regular duties and prohibited from using a firearm to protect the public, enforcing laws or otherwise protecting the public.

56.  False charges of misconduct and dereliction of duty have been leveled against plaintiffs by defendants Chaffinch and MacLeish.  Blame for the abysmal condition of the FTU has been placed at their feet by defendants.

57.  Additionally, less than a week after initially speaking to the Auditor's office, defendant MacLeish, acting on behalf of and with the knowledge and consent of defendant Chaffinch, ordered that plaintiffs be sent for trumped up fitness for duty examinations.

58.  Fitness for duty examinations are a well-known tool for eliminating whistleblowers in police agencies in the State of Delaware.

59.  An officer who is found not to be fit for duty cannot

-15-

act as a police officer in the State of Delaware.

60.  An officer who is found to be unfit for duty is put on temporary light duty status, where he is prohibited from using his firearm, wearing a uniform, enforcing laws and protecting the public.  Within one year, the officers then are forcibly retired with resultant severe financial loss for their families due to the deprivation of their salaries and reduced pensions.

61.  Fitness for duty examinations were conducted on plaintiffs by a DSP doctor soon after.

62.  On June 18th, plaintiff Corporals Price and Warren then were put on light duty status because they allegedly had failed their fitness for duty examinations due to hearing loss.  Price and Warren have since in writing been prohibited from using their firearms, wearing a uniform, enforcing the laws and protecting the public.  They have been explicitly ordered to run the other way if they observe a crime in progress, such as a crime of violence on another citizen who they are otherwise sworn to protect at the risk of their own lives.  They have been ordered to violate the very core of their code as police officers, to protect the public.

63.  On July 15, 2004, plaintiff Foraker passed his fitness for duty examination conducted by a DSP doctor.

64.  Instead of being happy that plaintiff Foraker had passed his fitness for duty exam and had been given a clean bill

-16-

of health by DSP doctors, the DSP promptly scheduled him for a second opinion in the hopes that he would fail the second examination.

65.  By their actions described above and otherwise, defendants have made it clear that they intend to force plaintiff Foraker out of the DSP.  On a daily basis defendants continue to take actions against him designed to drive him out or force him to retire.

**F.  The Historic Practice in the DSP Regarding Hearing Loss**

66.  It is the historic policy, practice and custom of the DSP to stay away from, ignore and otherwise remain purposefully ignorant about the hearing ability of Troopers.

67.  This historic policy, practice and custom is driven by two concerns.  First, an inability to find medical hearing standards applicable to the work that police officers do. Second, a fear that large numbers of Troopers have suffered hearing loss already.  Thus even if standards are available, it is feared that their application would result in the forced retirement of a large portion of the active force.

68.  Additionally, the DSP has historically overlooked or accommodated any Trooper when hearing loss issues have arisen.

69.  For example, it is well-known throughout the DSP that one Major's hearing was so bad that he had to wear a hearing aid in the course of his duties.  But this officer was not sent for a

-17-

**A - 181**

fitness for duty exam, placed on light duty, or forcibly retired from the DSP.

70.    Likewise, there are and have been numerous additional officers in the DSP whose hearing abilities are similar or worse than plaintiffs, but their hearing loss has been intentionally overlooked and ignored by defendants.  For example, one comparable trooper with hearing loss greater than Corporal Warren has been allowed to operate as a uniformed patrol officer with complete police powers.

71.    Additionally, it is virtually unprecedented for the DSP to inquire into medical issues for its Troopers.  Family physicians are allowed to sporadically certify medical fitness for duty.  Otherwise, medical fitness for duty is ignored by management.

72.    The totality of retaliatory adverse action taken by defendants against plaintiffs are sufficient to deter a person of ordinary firmness from exercising their First Amendment right to freedom of speech.

73.    A reasonable person of ordinary firmness would be deterred from exercising their First Amendment right to freedom of speech when threatened with false charges of misconduct, repeated fitness for duty examinations, severely diminished job responsibilities and discharge.

74.    There is a causal link between First Amendment

-18-

protected activity on matters of public concern and the adverse action described above. This is demonstrated by:

(a)  The temporal proximity of events, as indicated above.  For example, less than a week after speaking to the Auditor's office, plaintiffs were singled out and sent for unprecedented fitness for duty examinations. There was no concern for such fitness for duty from December 2003 through March 2004 when plaintiffs repeatedly spoke out to defendants about the health dangers of the FTU and their own health problems. There was no such concern when in January 2004 Police Academy recruits complained of health issues when they had served there only weeks, instead of the years plaintiffs were exposed.  There was no such concern when the range publically was shut down in March 2004. But only a few days after plaintiffs spilled the beans to the Auditors on May 12th by turning over to them voluminous documentation on the misdeeds involving Facilities Management and the range and gave lengthy written statements about conditions at the FTU, only then were plaintiffs allegedly unfit for duty.

(b)  Circumstantial evidence of a pattern of antagonism following protected activity, as demonstrated by Chaffinch going on WBOC-TV Salisbury

-19-

and attacking plaintiffs on television; MacLeish's hostile remark that plaintiffs should "just put on a paper dust mask to protect yourself" and that it is expected that they would have health problems from working at a firing range; defendants incensed and antagonized reactions to media reports on plaintiffs' first interviews with the Auditors; and MacLeish's hostile interrogation and browbeating of Corporal Price and refusal to allow him to have his attorney present to defend him after Price had spoken to the Auditors.

c)   Personal knowledge and awareness of protected activity by the individual defendants.   For example, defendants knew plaintiffs had spoken out to a federal authority which finally forced defendants' hand and made them close the FTU.   Additionally defendants knew of the heavy media coverage of plaintiffs' speech.

(d)   Violation of DSP policies, procedures, practices and customs by ignoring the longstanding DSP policy of purposeful ignorance regarding hearing loss and other medical issues.   It is the policy of the DSP once a Trooper has graduated from the Police Academy to leave all medical issues relating to whether or not he or she can serve in a police capacity in the ultimate hands of the family physician of that Trooper and not

-20-

to independently inquire further if that physician sporadically certifies that the Trooper is fit for duty.

(e)  Disparate treatment between plaintiffs and other similarly situated State Troopers both past and present.  For example, there is the trooper with hearing loss greater than Corporal Warren who was allowed to serve on patrol with full police powers. There is the Major who had to wear a hearing aid who never was sent for a fitness for duty exam or had his status questioned.  There are numerous other Troopers with significant hearing loss comparable to plaintiffs who the defendants refuse to examine.

(e)  The actions of the defendants once they sent plaintiffs for fitness for duty exams which reveal that they were not looking for disinterested objective medical advice but instead were seeking to create a distorted and manufactured medical record to use against plaintiffs.  For example, once Sgt. Foraker passed his exam, he was ordered to submit to another in a vain hope to find something to use against him. Medical records also were withheld from medical examiners if they would have favored plaintiffs.

(f)  The actions in falsely blaming plaintiffs for

-21-

A - 185

problems at the FTU, when the record reveals that

problems were publically known to be historic and the

fault of Facilities Management and a friend of

defendant Chaffinch.

(g)  The evidence as a whole.

75.  First Amendment protected activity was a substantial or

motivating factor in the adverse action taken against plaintiffs.

The natural probative force of the evidence demonstrates

causation.

76.  The defendants cannot prove by a preponderance of the

evidence that absent a constitutional violation, plaintiffs would

have had adverse employment action taken against them anyway.

77.  As a direct and proximate result of the actions of the

defendants as detailed herein, plaintiffs have or will suffer

lost wages, earnings and benefits, diminished earning capacity

now and upon their retirement, loss of DSP pensions and benefits,

decreased employment and earnings opportunities, and other

pecuniary losses, emotional pain, suffering, disappointment,

anger, inconvenience, mental anguish, loss of enjoyment of life,

mental and physical pain, physical injury, anguish, humiliation,

embarrassment, injury to reputation, and other non-pecuniary

losses and injury.

IV.  <u>**ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT**</u>

78.  The individual defendants' actions violated clearly

-22-

established federal constitutional rights of which any reasonable official would have known, including more than three decades of Supreme Court and Third Circuit case law prohibiting retaliation against public employees for protected speech.

79.  At all times material hereto the individual defendants participated in, authorized, and sanctioned the federal constitutional deprivations described above which illegally retaliated against plaintiffs.

80.  At all times material hereto the individual defendants and their agents were acting under color of law.  The federal constitutional deprivations described herein are fairly attributable to the State.

81.  The actions of the defendants and their agents or employees were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federal constitutional rights and because of the exercise of those rights.

82.  The defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights.

83.  Their actions were outrageous and taken with evil motive, in bad faith, out of personal animus and without any reasonable grounds to support them.

84.  Their actions were wanton and malicious or taken with

-23-

A - 187

reckless indifference to federal constitutional rights.

85.  The exercise of rights under the U.S. Constitution made a difference in all actions adverse to plaintiffs.

86.  The exercise of these rights was a motivating, substantial or determinative factor in all actions adverse to plaintiffs.

87.  The individual defendants' actions were willful, reckless and oppressive.

88.  The defendants' actions were motivated by bias, bad faith, and improper motive.

89.  The defendants' actions constitute an abuse of governmental power.

90.  The defendants did not reasonably believe that the actions they took were necessary to accomplish any legitimate governmental purpose.

91.  The defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

92.  The defendants' actions are not so reasonable as to further any governmental interest asserted and do not closely fit the goal of serving those governmental interests.

### COUNT I (FREE SPEECH CLAUSE)

93.  Plaintiffs repeat and reallege paragraphs 1 - 92 set forth above.

94.  The defendants took action adverse to plaintiffs as a

-24-

direct and proximate result of and in retaliation for plaintiffs' First Amendment protected speech on matters of public concern. There is a temporal and causal relationship between plaintiffs' aforementioned protected speech, and adverse employment action. First Amendment protected activity was a substantial or motivating factor in the adverse employment action. The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had grounds to adversely treat plaintiffs.

95.  Plaintiffs' constitutional right to freedom of speech has been denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

### COUNT II - (PETITION CLAUSE)

96.  Plaintiffs repeat and reallege paragraphs 1 - 95 set forth above.

97.  The defendants took action adverse to plaintiffs as a direct and proximate result of and in retaliation for their exercise of their First Amendment right to petition the government for redress of grievances. There is a temporal and causal relationship between plaintiff's aforementioned protected petitioning and adverse employment action. First Amendment protected activity was a substantial or motivating factor in the adverse employment action. The defendants cannot prove by a preponderance of the evidence that absent a constitutional

-25-

violation they would have had grounds to adversely treat plaintiffs.

98.  Plaintiffs' constitutional right to petition the government for redress of grievances has been denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

**Wherefore**, plaintiffs pray that the Court:

A.  Enter judgment against the defendants.

B.  Enter a declaratory judgment declaring the acts of the defendants to be a violation of plaintiffs' constitutional rights.

C.  Enter a judgment against the defendants Chaffinch and MacLeish, jointly and severally, for compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation, embarrassment, and injury to reputation.

D.  Enter separate judgments against defendants Chaffinch and MacLeish for punitive damages.

E.  Issue a mandatory injunction directing defendant Mitchell to closely monitor all contact between defendants Chaffinch or MacLeish and plaintiffs and to prohibit any retaliation against or harassment of the plaintiffs by Chaffinch or

-26-

**A - 190**

MacLeish, upon penalty of finding Mitchell in contempt of Court.

F.   Award back pay to compensate plaintiffs for the loss of overtime assignments due to their being placed on light duty.

G.   Issue a reparative injunction directing plaintiffs be taken off of light duty status and put back on full duty status at the FTU.

H.   Issue a mandatory injunction ending the continuing illegal actions of defendants Chaffinch and MacLeish and barring them from considering protected speech whenever considering taking any employment action concerning plaintiffs.

I.   Issue a reparative injunction directing that individual defendants Chaffinch and MacLeish place a signed document in each plaintiffs' personnel file apologizing for their illegal violations of plaintiffs' constitutional rights.

J.   Issue a reparative injunction directing that individual defendants Chaffinch and MacLeish issue public written apologies to plaintiffs and run their apologies in the Delaware State News, the News Journal and on WBOC-TV Salisbury, MD.

K.   Enjoin the defendants from retaliating against

-27-

plaintiffs.

L.   Award plaintiffs attorneys' fees, costs and pre

and post judgment interest for this action.

M.   Require such other and further relief as the Court

deems just and proper under the circumstances.

**THE NEUBERGER FIRM, P.A.**


/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582

Attorneys for Plaintiffs

**Of Counsel:**

**JACOBS & CRUMPLAR, P.A.**
**THOMAS C. CRUMPLAR, ESQUIRE (#942)**
Two East Seventh Street
P.O. Box 1271
Wilmington, DE 19899
(302) 656-5445


Dated: October 14, 2005

Firearms Training Unit / Pleadings / First Amended Complaint.FINAL

-28-

**A - 192**

<u>**CERTIFICATE OF SERVICE**</u>

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

October 14, 2005, I electronically filed this **Pleading** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:


        Robert J. Fitzgerald, Esquire
        Montgomery, McCracken, Walker & Rhoads, LLP
        123 South Bend Street
        Philadelphia, PA 19109
        rfitzgerald@mmwr.com

        Richard M. Donaldson, Esquire
        Montgomery, McCracken, Walker, & Rhoads, LLP
        300 Delaware Avenue, Suite 750
        Wilmington, DE 19801
        rdonaldson@mmwr.com


        /s/ Stephen J. Neuberger
        **STEPHEN J. NEUBERGER, ESQ.**