

October 12, 2004

The Honorable Ruth Ann Minner
Governor
State of Delaware
Tatnall Building, 2nd Floor
William Penn Street
Dover, DE 19901

Dear Governor Minner:

On April 21, 2004, the AOA was requested by the Office of the Governor and the Office of the Controller General to review the issues surrounding the closing of the DSP Firing Range in March 2004.

The three issues that we were requested to review and our conclusions are as listed:

**ISSUE: WHY WAS AN A/E FIRM WITH NO EXPERIENCE IN DESIGNING AN INDOOR FIRING RANGE SELECTED FOR THE PROJECT?**

- A mathematical error caused the wrong firm to be ranked number one.

- The DAS Project Manager did not want to do business with an out of state A/E firm.

**ISSUE: WHAT CAUSED THE FACILITY TO BE ENVIRONMENTALLY UNSAFE AND TO BE CLOSED IN MARCH 2004?**

We are unable to determine that any one factor resulted in the eventual closing of the range, but offer that the following were contributing causes:

- Initially, the HVAC system did not function as designed, due in part to incomplete installation requirements and interior design complications.

- Inadequate maintenance protocols i.e. the lack of written policies and procedures for routine maintenance of mechanical systems.

A - 240

The Honorable Ruth Ann Minner
Page 2
October 12, 2004

- From December 2003 through March 2004 no maintenance of mechanical systems or cleaning of firing range performed.

**ISSUE: WERE ALL FUNDS APPROPRIATED FOR THE PROJECT EXPENDED FOR THEIR INTENDED PURPOSE?**

- A fire destroyed the majority of financial records therefore a detailed review could not be performed.

- A review of the State of Delaware Financial Management System's (DFMS) and DAS's Operations Management System's (OMS) data did not indicate that any appropriated funds were expended for other projects.

Shortly after the request, the Office of the Controller General provided the AOA with various documentation received from an anonymous source. In addition, the Office of the Budget provided the funding history of the DSP Firing Range.

On April 27, 2004, representatives from the AOA met with the Secretary, Department of Administrative Services (Department), and members of her administrative staff. During that meeting we were informed that:

1. All of the documentation pertinent to the DSP Firing Range had been housed in a building that was destroyed in a fire in 2000. The Department was only able to salvage a minimal amount of the documentation and that the documentation would be turned over to the AOA.
2. The Department would provide the AOA with all available computerized financial information from the Operational Management System (OMS) utilized by the Department for the recording of financial transactions.
3. The Department is responsible for the custodial, and normal building maintenance, to include the air handling system.
4. The Department is not responsible for the bullet trap system or for cleaning of the firing range area.
5. The Department purchased a HEPPA vacuum cleaner and floor cleaner for the DSP to utilize for the cleaning of the firing range.

We were also informed that an audit in 1999 of the Department's bid selection process revealed that there were errors in the mathematical scoring of some of the bid selection committees. The Department was not sure if it included the firing range selection process.

On April 26, 2004, AOA staff toured the DSP Firing Range.

On May 12, 2004 and July 28, 2004, AOA staff met with the current DSP Firing Range Training Unit at their attorney's office in Wilmington, DE. to discuss the various issues at the firing range.

The Honorable Ruth Ann Minner
Page 3
October 12, 2004

The concept of the Delaware State Police (DSP) building and maintaining its own firing range began in August 1992 when "letters of interest" were solicited from interested architecture and engineering (A/E) firms and ended in September 1998 with the completion of the facility. The firing range provided services until March 2004 when the DSP closed the facility due to environmental/health issues.

## SCOPE/METHODOLOGY

We obtained and reviewed all available financial records from both the Department and the DSP. Obtained and reviewed numerous types of documents from an attorney representing the current DSP Firearms Training Unit. Reviewed budgetary information provided by the Office of the Budget, and other information provided by the Office of the Controller General. Obtained and reviewed information provided by JAED Corporation and Clark Nexsen.

In addition, we interviewed the following:

1. Current and former Department of Administrative Services' personnel.
2. Current and former Delaware State Police personnel.
3. Representatives of JAED.
4. Representatives of Clark Nexsen.

Our review period included the initial August 1992 advertisement requesting "letters of interest" from Architectural firms for the design and construction management of the proposed firing range through the closing of the range in March 2004.

An integral part of a review is determining the cause of the problem and its effect on cost and operational efficiencies. During our review of the issues we were unable to determine that any one event led to the closure of the firing range. Moreover, it is our opinion that numerous decisions, which included changes to the original design specifications to inadequate maintenance protocols, were contributing factors. However, it is also our opinion that the decisions made were not with ill intent, but perhaps uninformed or lacked the professional expertise to draw reasonable conclusions for the decision making process.

Throughout our review we noted that all parties involved were operating under the premise that the project was under funded and that concessions to the original plans would have to be made in order to complete the project. This is first evidenced when the August 1995 bid proposals were rejected for being over budget and the subsequent re-bidding of the project in May 1996. Additionally, we found that decisions were made to eliminate certain aspects of the original design such as the bullet deflectors and the fire suppression system due to budgetary constraints. Also, an alternate bullet trap system was purchased due to the yearly maintenance cost associated with the originally recommended bullet trap.

The Honorable Ruth Ann Minner
Page 4
October 12, 2004

The information contained within this report is a compilation of the results of our review of available documentation and interviews with current and former interested parties.

**REVIEW RESULTS**

**1.    ISSUE:  WHY WAS AN A/E FIRM WITH NO EXPERIENCE IN DESIGNING AN INDOOR FIRING RANGE SELECTED FOR THE PROJECT?**

**SELECTION/AWARD PROCESS**

In August 1992, the Delaware State Police (DSP) advertised requesting letters of interest from architectural and engineering (A/E) firms interested in the design and preparation of a master plan, specifications, bid documents and construction administration for a "fully baffled outdoor police firearms training facility". The advertisement required five (5) copies of the letters to be submitted to the Office of the Superintendent of the Delaware State Police, att: Capt. Cunningham by September 4, 1992.

On October 14, 1992, interviews were conducted of the A/E firms that had responded to the advertisement. From documents obtained from the Department it was ascertained that nine (9) firms were interviewed. Our examination of original scoring sheets filed by Karen Sweeney, P.E., DAS, revealed that the Clark Nexsen firm was ranked first and JAED was ranked seventh.

The DSP awarded Clark Nexsen a contract for a feasibility study on March 22, 1993. In December 1993, Clark Nexsen issued the completed feasibility study to the DSP. Originally, the study was to encompass a complete training facility for police officers to include an academy, firing range, skid pad, and dormitories. The study was scaled down to just the firing range due to budgetary concerns.

According to two former DSP officers involved in the process, it was their understanding that the DSP would award Clark Nexsen the contract. However, shortly before awarding the contract the DSP was informed that DAS would be involved in the project and the contract would be bid out.

In May 1994 DAS's Division of Facilities Management placed an advertisement requesting letters of interest from architectural firms for the development of plans, specifications, and construction administration of a new indoor firing range for the Department of Public Safety. In response to the request five firms, Clark Nexsen, Diamond Group, STV Group, Architects Studios and the JAED Corp., submitted letters of interest. An interview panel consisting of two DAS and three DSP employees was formed to interview the firms.

Interviews were conducted on August 15, 1994. Each member of the panel scored the firms using DAS provided scoring sheets. DAS's Project Manager collected the scoring sheets, ranked the firms based on mathematical and ordinal scoring, and announced that JAED Corp. ranked number one.

**A - 243**

The Honorable Ruth Ann Minner
Page 5
October 12, 2004

Based on our interviews of panel members we learned that the DSP members raised questions as to how JAED Corp. could have been ranked number 1. It was their opinion that Clark Nexsen had experience in designing firing ranges whereas JAED Corp. had no experience. The DAS Project Manager informed them that the mathematical and ordinal scoring placed JAED number 1. In addition, the DAS Project Manager stated that it was the practice of the Department to give preference to Delaware firms when awarding contracts. In our interview with the Project Manager she stated that she preferred local firms because they were readily accessible during the various phases of the project opposed to out of state firms. We were further informed that as a result of the DSP panel member's objections, a stipulation of the contract would be that JAED Corp. would be required to use Clark Nexsen as a consultant on the project.

The former Chief Engineer for DAS, was interviewed regarding the process used to select firms for projects. He stated that ultimately the firm awarded the contract was the result of the selection panel's recommendation. When asked about the practice of giving in-state firms preference, he stated that the scoring sheet was set up to do so. In closing he stated that he was under the assumption that all panel members were in agreement with the choice of JAED.

## REVIEW OF SCORING SHEETS

The AOA obtained from DAS the original selection panel's scoring sheets along with the DAS Project Manager's matrixes calculating the mathematical and ordinal scoring of the A/E firms.

The score sheets indicated that two panel members scored JAED Corporation first and three panel members scored Clark Nexsen first. The DAS project manager explained that the firm receiving the lower total score would be ranked first. Overall JAED Corporation received a total score of "8" based on their receiving two first place votes and three second place votes and Clark Nexsen received a total score of "9" based on their receiving three first place votes and two third place votes.

Our review showed that there was a scoring error on the Clark Nexsen score sheet completed by the DAS project manager. This error resulted in Clark Nexsen being ranked third when it should have been ranked second. If the correct score was used Clark Nexsen would have received a total score of "8" and JAED Corporation would have received a total score of "9". This would have resulted in Clark Nexsen being ranked first by the selection panel. DAS did not have a procedure for the score sheets to be reviewed to confirm that the calculation was mathematically correct and errors did not occur.

The DAS project manager was asked how she ranked JAED first even though they had no experience in designing/building firing ranges. Her reply was that JAED was a local firm and could be reached easily if needed. She did admit to saying that a stipulation would be to hire Clark Nexsen as a consultant. In a subsequent interview the DAS project manager was questioned about the bid selection process. She replied that she chose JAED because a local firm would be easier to deal with. She was then asked to explain the scoring process used. She stated that the firm receiving the lower total score would be ranked first.

The Honorable Ruth Ann Minner
Page 6
October 12, 2004

When then told of her error in the addition where-by she ranked Clark Nexsen 3rd instead of 2nd she replied it would have made no difference because the project was going to go to a Delaware firm no matter how the total came out. This was due to the philosophy in DAS that the projects would go to Delaware firms to allow the project coordinator better control and accessibility to the firm's management.

## CONCLUSION

We conclude that a scoring error occurred and that as a result JAED Corp. was incorrectly ranked number one. However, based on our interviews we further conclude that a Delaware firm would have been chosen regardless of the rankings.

## 2.     ISSUE:  WHAT CAUSED THE FACILITY TO BE ENVIRONMENTALLY UN SAFE AND TO BE CLOSED IN MARCH 2004?

### HVAC

The issue, as presented to the AOA, was that the DSP stated that JAED's HVAC system was improperly designed and therefore never worked properly. Accordingly, this resulted in numerous health issues and additional costs to the State.

During our review we conducted interviews with former and current DAS and State Police personnel, and representatives of JAED Corp. and Clark Nexsen. We reviewed test reports from environmental testing firms such as Batta Engineering and Chesapeake Testing and Balancing. In addition we reviewed Clark Nexsen's review of JAED's HVAC design.

State Police personnel and Facilities Management representatives stated that the response to complaints regarding the HVAC system and the facilities air quality were reactive rather than proactive. Procedures for the monitoring of air quality were not implemented to identify hazardous condition as they develop rather than after the condition developed. As a result, range personnel initiated numerous requests for maintenance of the HVAC system and tests of air quality.

Below we present a chronological sequence of events (not all inclusive) relating to problems identified and corrective actions taken as it relates to the HVAC system:

- March 1996, Range Tech, a prospective bidder, reviews the HVAC design and informs JAED that the system will not work.

- April 1996, the State of Delaware, Division of Industrial Affairs, sends a letter to the State Police stating "based on reviewing the full sized plans, it appears to have an adequate ventilation design for its intended purpose." Also, the letter states that "preventive maintenance" is a high priority.

The Honorable Ruth Ann Minner
Page 7
October 12, 2004

- June 1996, JAED Corp. employs Clark Nexsen to review the HVAC plans.

- In their June 7, 1996 report, Clark Nexsen addresses the following concerns with the system design:

  o The system designed allows for 75cfm airflow at the "breathing zone" not 75cfm of airflow across the entire vertical cross section (floor to ceiling), a requirement used by Clark Nexsen for indoor range design.

  o Three shooting lines have minimum airflow.

  o The HVAC system is approximately 2 1/2 times smaller than required to meet the 75cfm vertical cross section airflow.

**NOTE:** In an interview on June 6, 2004, JAED Corp. representatives informed the AOA that when they received Clark Nexsen's June 7, 1996 report, they meet with State Police personnel and discussed the report. The State Police decided, due to budgetary constraints, to stay with JAED Corp.'s design.

In a phone conversation on July 13, 2004, the former State Police representative stated that when he was informed about the Clark Nexsen report he went to Division of Facilities Management (Facilities) and discussed both Range Tech's and Clark Nexsen's concerns with the current HVAC design. In addition, he stated that he requested Facilities obtain a letter from JAED Corp. indicating that the system would work as designed and if not, JAED Corp. would be responsible for repairs. In closing he stated he never received any letter from JAED Corp. to that effect and denies ever stating to JAED to stay with the original design.

It should also be noted that the following information was included in a letter dated May 18, 2004, from Savage Range Systems, Inc. stating that several years ago their Installation and Training Supervisor " noticed that there was tremendous build up of dust. He had advised the Delaware State Police that the ventilation was not designed properly for a wet system. The intake was behind the trap instead of in front of it. The air was drawing at such a high level that it was forcing the air above the trap and not allowing the trap to do its job by collecting most of the airborne lead in the water."

- September 1998 the range opens.

- November 1998 the State Police notify JAED Corp. that the HVAC is not working properly.

- March 1999 Clark Nexsen is contracted to evaluate HVAC ($20,000).

The Honorable Ruth Ann Minner
Page 8
October 12, 2004

- April 1999 Clark Nexsen issues report identifying changes made to their original feasibility study and recommending corrective action.

- May 1999 the following actions are taken in response to Clark Nexsen's report:

  o HEPA filters replaced to ensure adequate exhaust.

  o Automatic controls installed to monitor HEPA filters.

  o Chesapeake Testing and Balancing tests, adjusts, and balances airflow.

  o Delaware Mechanical furnishes and installs sweeps on supply duct-work (omitted by them in original installation of HVAC system) at no cost to State.

- June 1999 baffles removed from air ducts to improve airflow ($2,600).

- July 1999 Chesapeake Testing and Balancing tests, adjusts and balances airflow ($3,500).

- September 1999 change and disposal of lead filters ($27,000).

- October 1999 improvements made to energy management system ($14,500).

- February 2000 lead filters changed and disposed (7,510).

- May 2000 Batta Engineering conducts area and personal lead sampling and reported, "Based on these samples, it appears that the previous concerns have been addressed by the remedial actions that have been taken to improve the airflow through this area."

- August 2000 change and disposal of lead filters ($7,510).

- February 2002 air duct and registers cleaned (13,756).

- December 2003 State Police contact Facilities regarding odors from cleaning fluids in repair room and concerns with air handling system.

- January 2004 Facilities and Range staff meet with Delaware Engineering and Design Company to discuss problem with odors.

- January 2004 Facilities and Range staff meet to discuss air-handling system. Facilities observe shooting session, believe that airflow is sufficient.

The Honorable Ruth Ann Minner
Page 9
October 12, 2004

- February 2004 State Police present proposal to Facilities from Carey HVAC and Action Target for $2,500,000 to replace air handling system, bullet trap, and installing a ballistic ceiling.

- March 2004 Facilities informs State Police that they cannot support $2,500,000 expenditure.

- March 2004 State Police inform Facilities that they are closing the range due to health concerns.

The AOA's review of the above information reveals that from May 2000 until December 2003 there were no recorded problems relative to the HVAC system. We can only surmise that the system was working properly; problems were not reported; or documentation was not made available to us to identify any problems.

## BULLET RECOVERY SYSTEM

The Clark Nexsen feasibility study recommended using a "composite rubber material" system noting that " the use of rubber instead of steel alleviates the noise problem of the bullet striking the steel, stops the bullet intact without splattering into multiple pieces, reduces the maintenance required to clean the facility, and allows a weapon to be shot at point blank range from any angle without ricochet or back splatter."

The DSP decided to purchase a Savage Range Systems Inc. (Savage) Snail Trap System in lieu of the Clark Nexsen recommended system based on the Savage system would be less expensive to maintain than the "composite rubber material" system. In order to cut additional costs the DSP and Savage agreed that DSP personnel, under the direction of a Savage Technician, would assist in the installation. DSP personnel performed manual labor as well as welding tasks during the system's installation.

Savage, through July 2002, performed periodic system maintenance. It is our understanding that from that time until December 2003 the firing range Sergeant performed the maintenance required, keeping the system operational.

## FRANGIBLE AMMUNITION

The Savage system is designed and built for lead rounds. In 2000, the DSP started using frangible ammunition. The decision was made anticipating eliminating lead contaminates and therefore creating a safer working environment. However, frangible ammunition was relatively new to the industry and the long term effects as related to health issues, if any, were not yet documented.

A - 248

The Honorable Ruth Ann Minner
Page 10
October 12, 2004

Generally speaking, the use of frangible ammunition presented new conditions with its relation to the Savage System. The round, when striking the metal back plate, would disintegrate into powder, which in turn would be carried in the water that filtered through the system. Eventually, residue began building up in the system, clogging the sprayer head filters and impeding the operation of the conveyer belt system.

Various range personnel performed maintenance on the bullet trap and conveyor belt except for the period October 1999 through September 2001when the State Police contracted out the maintenance of the bullet trap and conveyor system.

We found that in August 2003, the existing conveyor belt was replaced with a drag belt system intended to prevent sludge from building up and impeding the intended operation of the system.

## MAINTENANCE

When the range opened in October 1998 lead ammunition was used for training. The use of lead ammunition produced hazardous dust particles and affected air quality. It was imperative that the range be kept clean to reduce the hazards. State Police personnel at the range were provided with equipment, HEPA vacuum and Zamboni machine, for the cleaning of the floor and walls; however, DSP personnel were not trained nor qualified to perform these functions. Consequently, hazardous material cleaning was not always properly performed. In addition there were no records kept to document that routine maintenance functions were actually performed and how often.

We have identified the following to be major flaws in the construction, operation and maintenance of the State Police Firing Range.

- The original architects design was modified due to budget restrictions.

- Management personnel within the Division of State Police and Division of Facilities Management did not ensure the following were included in the annual operation budget:

  o  Periodic maintenance of the HVAC system;
  o  Periodic air quality testing;
  o  Periodic maintenance of the bullet trap;
  o  Periodic cleaning of the firing range (area of shooting) by personnel qualified in the removal of hazardous material.

State Police management never developed written policies and procedures for the maintenance and operation of the firing range. Our interviews with present and former State Police representatives indicated that range personnel were not provided with polices and procedures for the maintenance and operation of the range.

The Honorable Ruth Ann Minner
Page 11
October 12, 2004

On December 1, 2003, a new Sergeant took over command of the firing range. In an interview he informed us that shortly thereafter he met with the current staff and as a result of that meeting a decision was made not to perform any maintenance at the range. The staff made the decision not to continue performing maintenance and custodial functions due to health related issues and not being qualified to perform those functions.

On December 19, 2003, the Sergeant in charge sent an e-mail to his superiors noting that the conveyor system was not functional and expressing his and his staff's concern with health related issues pertaining to their performing maintenance on the bullet trap and recovery system. The Sergeant also indicated he had contacted the conveyor system supplier and an environmental group to resolve the current problems.

We found no evidence in the documentation made available to us where DSP command was notified that range staff would not be performing duties related to the maintenance and custodial functions historically accomplished by range staff. The DSP provided us with information that identified 42 days of firearms training from December 2003 until February 2004. In addition, the DSP Lieutenant Colonel stated that he spoke to the Captain in charge of the range and asked him whether or not the range should be closed and was told by the Captain that the range did not need to be closed.

When we interviewed the Sergeant we asked him if the conditions of the range, the bullet trap and recovery system not functioning properly, clouds of smoke lingering in the shooting area indicating that the ventilation system was not functioning, would that not have been reasonable cause to close the range. The Sergeant replied that there was not a safety issue therefore the scheduled shoots were not cancelled.

**NOTE:  It is our understanding that the Range Sergeant has the authority to close the firing range should he deem it unsafe or unhealthy.**

We can only surmise that with the failing of the conveyor system, no maintenance performed on the bullet recovery system, and no custodial maintenance being performed to clean the firing range, that these situations contributed to an unhealthy and unclean environment leading to the ultimate closing of the firing range.

**3.   ISSUE:  WERE ALL FUNDS APPROPRIATED FOR THE PROJECT EXPENDED FOR THEIR INTENDED PURPOSE?**

The funding for the State Police Indoor Firing Range was provided over a period of years with the first funds appropriated in Fiscal Year 1994. Funding for this project continued through Fiscal Year 1999. This funding consisted of State Bond Bill appropriations totaling $2,700,000, Minor Capital Improvement funds of $309,329, U.S. Attorney Generals Funds of $334,000, SLEAF funds of $200,000, a Criminal Justice Council grant for $41,492, and other State Police funds of $233 for a total funding of $3,585,054. Total expenditures for this project were $3,582,082.

A - 250

The Honorable Ruth Ann Minner
Page 12
October 12, 2004

We examined these expenditures against the microfilm records of Delaware Financial Management System (DFMS) maintained by the Division of Accounting, and available data from DAS's Operating Management System (OMS). All expenditures were verified and totaled to the amounts expended with the exception of the funds expended from Minor Capital Improvements ($309,329). This appropriation contained expenditures for projects other than the firing range; as a result, firing range expenditures could not be identified.

An examination of the source documents (purchase orders, payment vouchers) was not conducted since many of these records were destroyed in a fire resulting in the total loss of the building and contents where these records were maintained. Our review of the DFMS records did not identify expenditures that were not appropriate

## CERTIFICATE OF OCCUPANCY

During the course of our review we were informed that the State of Delaware did not obtain the appropriate Certificate of Occupancy (CO) from New Castle County. We contacted the New Castle County Department of Land Use and as a result of their review of the permit for the Delaware State Police Firing Range they concluded that a CO was not issued due to the following conditions identified by their inspector in July 1998:

1. The required State boiler inspection had not been completed.
2. The record plan inspection had not been performed.

In addition, during our discussions we mentioned the structural repair to the building due to the roof top mechanical systems and were informed that the repair would also require a permit and an inspection.

Mr. George Haggerty, Assistant Land Use Manager, New Castle County Department of Land Use provided the information discussed above to us in writing. The letter was provided to the Secretary, Department of Administrative Services, to ensure that the necessary corrective actions are taken in order to obtain a CO from New Castle County.

The Office of Auditor of Accounts would strongly suggest that the following be considered by the Department of Administrative Services and the Delaware State Police:

1. An independent HVAC contractor be hired to evaluate the current HVAC system at the range.

2. The Department of Administrative Services initiate a contract for building maintenance to include but not limited to the bullet trap, periodic range cleaning, removal of all hazardous wastes generated by the range.

A - 251

The Honorable Ruth Ann Minner
Page 13
October 12, 2004

3.  The Delaware State Police formulate written policies and procedures for the daily operations of the range. To include the daily cleaning, preventive maintenance procedures, delineation of duties for officers assigned to the range, policing of spent brass cartridges, emergency procedures, inventory and control of weapons stored at the range, the establishment of annual "occupational health" medical exam (i.e. blood lead monitoring and hearing exams for those assigned to the range). In addition to keeping all certifications current for all range personnel.

4.  All Delaware State Police Officers assigned to the range be given instruction on the proper procedures for handling of hazardous waste.

On September 30, 2004, Mr. R. Ronald Draper, Chief Administrative Auditor, and Mr. Edward L. Watson, Field Audit Manager, met with Mr. Robert Carmine, Director, Special Investigations, Office of Attorney General to discuss the results of our review. As a result of our meeting, it was agreed that the Office of Attorney General would further review the issues.

On September 9, 2004, the Honorable R. Thomas Wagner, Jr., Auditor of Accounts, Mr. R. Ronald Draper, Chief Administrative Auditor, and Mr. Edward L. Watson, Field Audit Manager, met with the Honorable David B. Mitchell, J.D., Secretary, Department of Homeland Security and Safety, Colonel Aaron L. Chaffinch, Superintendent, Delaware State Police, and Lieutenant Colonel Thomas F. MacLeish, Deputy Superintendent, Delaware State Police, to discuss the findings contained within the report.

On September 17, 2004, a meeting was held with the following individuals to review and discuss the findings within the report:

> The Honorable R. Thomas Wagner, Jr., Auditor of Accounts
> R. Ronald Draper, Chief Administrative Auditor
> Edward L. Watson, Field Audit Manager
> The Honorable Roger Roy, Co-Chair, Bond Bill Committee
> The Honorable Jennifer W. Davis, Budget Director
> The Honorable David B. Mitchell, Secretary, Department of Homeland Security and Safety
> The Honorable Gloria W. Homer, Secretary, Department of Administrative Services

The Honorable Ruth Ann Minner
Page 14
October 12, 2004


Sincerely,

OFFICE OF AUDITOR OF ACCOUNTS



R. Thomas Wagner, Jr., CFE, CGFM
Auditor of Accounts

RTW:ELW:CLF
cc:  The Honorable Robert L. Venables, Chairman, Bond Bill Committee
     The Honorable Roger Roy, Co-Chair, Bond Bill Committee
     Members of the Bond Bill Committee
     The Honorable Russell T. Larson, Controller General, Office of Controller General
     The Honorable Jennifer W. Davis, Budget Director, Office of the Budget
     The Honorable David B. Mitchell, J.D., Secretary, Department of Homeland Security and
        Safety
     The Honorable Gloria Wernicki Homer, Secretary, Department of Administrative Services
     Colonel Aaron L. Chaffinch, Superintendent, Delaware State Police
     Lieutenant Colonel Thomas F. MacLeish, Deputy Superintendent, Delaware State Police
     Mr. James A. Hutchison, III, P.E., President, JAED Corporation

Case Number 2004-024