Price, et al.                         v.                    Chaffinch, et al.
Alfred W. Parton, Jr.            C. A. # 04-956-GMS              May 11, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE, et al.,       )
                                      )
            Plaintiffs,               )
                                      )  Civil Action
v.                                    )  No. 04-956-GMS
                                      )
COLONEL L. AARON CHAFFINCH, et al.,   )
                                      )
            Defendants.               )
--------------------------------------)
SERGEANT CHRISTOPHER D. FORAKER,      )
                                      )
            Plaintiff,                )
                                      )  Civil Action
v.                                    )  No. 04-1207-GMS
                                      )
COLONEL L. AARON CHAFFINCH, et al.,   )
                                      )
            Defendants.               )

        Videotape deposition of ALFRED W. PARTON, JR.
taken pursuant to notice at the law offices of
Montgomery, McCracken, Walker & Rhoads, LLP, 300
Delaware Avenue, Suite 750, Wilmington, Delaware,
beginning at 2:14 p.m. on Thursday, May 11, 2006,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.

APPEARANCES:

        STEPHEN J. NEUBERGER, ESQ.
        CHERYL A. SASADEUSZ, ESQ.
        THE NEUBERGER FIRM, P.A.
          2 East Seventh Street - Suite 302
          Wilmington, Delaware  19801
          For the Plaintiffs
                  WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
              (302) 655-0477

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

A - 254

Price, et al.
Alfred W. Parton, Jr.

v.

C. A. # 04-956-GMS

Chaffinch, et al.
May 11, 2006

**Page 2**

1 APPEARANCES: (Cont'd)
2    EDWARD T. ELLIS, ESQ.
     CARMON M. HARVEY, ESQ.
3    MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
     123 South Broad Street
4    Philadelphia, Pennsylvania 19109
     For the Defendants
5
  ALSO PRESENT:
6    B. KURT PRICE
     CHRISTOPHER D. FORAKER
7    WAYNE WARREN
     LINDSAY DuPHILY, VIDEOTAPE OPERATOR ·
8    DISCOVERY VIDEO SERVICES
9         - - - - -
10       THE VIDEOTAPE OPERATOR:  This is the
11 videotape deposition of Alfred W. Parton, Jr.  This
12 deposition is taken by the defendant in the matter of
13 Corporal B. Kurt Price, et al., Plaintiffs, versus
14 Colonel L. Aaron Chaffinch, et al., Defendants, Civil
15 Action No. 04-956, and Sergeant Christopher D.
16 Foraker, Plaintiff, versus Colonel L. Aaron Chaffinch,
17 et al., Defendants, in Civil Action No. 04-1207.
18       This deposition is being held in the
19 offices of Montgomery, McCracken, Wilmington,
20 Delaware.  We're going on the record at approximately
21 2:14 p.m. on May 11, 2006.
22       The court reporter is Kurt Fetzer from the
23 firm of Wilcox & Fetzer, Wilmington, Delaware.
24       My name is Lindsay DuPhily.  I'm the

**Page 3**

1 videotape specialist of Discovery Video Services in
2 association with Wilcox & Fetzer.
3       Counsel will now introduce themselves and
4 then the court reporter will swear in the witness.
5       MR. NEUBERGER:  This is Steve Neuberger
6 for plaintiffs.
7       MR. ELLIS:  Ed Ellis for the defendants.
8         - - - - -
9       ALFRED W. PARTON, JR.,
10 the deponent herein, having first been
11 duly sworn on oath, was examined and
12 testified as follows:
13           EXAMINATION
14 BY MR. ELLIS:
15   Q.   Could you state your name for the record?
16   A.   Alfred W. Parton, Jr.
17   Q.   Are you presently employed by the Delaware
18 State Police?
19   A.   Yes, I am.
20   Q.   And what is your rank?
21   A.   Sergeant.
22   Q.   And what is your current assignment?
23   A.   Currently assigned as the NCOIC of the Special
24 Operations Response Team.

**Page 4**

1   Q.   Now, you used a term NCOIC.  Can you tell us
2 what that is?  I know that's an abbreviation.
3   A.   Yes.  Noncommissioned officer in charge.
4   Q.   And what does that mean to be the
5 noncommissioned officer in charge?
6   A.   I'm the sergeant in charge of our tactical unit
7 and responsible for all tactical operations,
8 administrative function, et cetera.
9   Q.   How long have you held the position of NCOIC of
10 the SORT Team?
11   A.   Approximately five years.
12   Q.   And how many troopers are on the SORT Team
13 altogether?
14   A.   32, including myself.
15   Q.   And can you describe what the function of the
16 SORT Team is?
17   A.   Yes.  The SORT Team is a tactical team, more
18 commonly known as a SWAT team.  We just use the
19 acronym SORT.  We are responsible for conducting all
20 high-risk operations within Delaware State Police,
21 hostage incidents, barricade incidents, high-risk
22 search warrants, vehicle stops, things of that nature,
23 something outside the normal scope of the patrol
24 function.

**Page 5**

1   Q.   And how many years have you been on the SORT
2 Team altogether?
3   A.   Approximately fifteen.
4   Q.   Did you graduate from the Delaware State Police
5 training academy?
6   A.   Yes, I did.
7   Q.   And what year was that?
8   A.   1988.
9   Q.   And what were you doing prior to 1988?
10   A.   I was a welder.
11   Q.   And how about prior to that?
12   A.   The U.S. Army.
13   Q.   Now, was there a point during your history with
14 the Delaware State Police that you were the
15 noncommissioned officer in charge of the firearms
16 training unit?
17   A.   Yes.
18   Q.   Can you tell me when that was?
19   A.   I believe it was October 1999 through
20 approximately the 1st of August 2001.
21   Q.   Prior to October 1999 were you assigned to the
22 firearms training unit?
23   A.   Yes, for a period of time, I believe from the
24 first of January of '99, so approximately ten months.

2 (Pages 2 to 5)

Price, et al.  
Alfred W. Parton, Jr.

v.

C. A. # 04-956-GMS

Chaffinch, et al.  
May 11, 2006

Page 6

1    Q. And prior to becoming in charge of the firearms
2    training unit, you worked there as an instructor?
3    **A. Yes.**
4    Q. And who was your superior officer at that
5    point, who was your boss?
6    **A. Sergeant Brian Fitzpatrick.**
7    Q. Now, you said that your time at the FTU was
8    from October 1999 until August 2001.
9         Was there also a time period more recent
10   when you were acting officer, acting noncommissioned
11   officer in charge of the firearms training unit?
12   **A. Yes. October 2005 till last Monday actually,**
13   **the 8th of May.**
14   Q. Of 2006?
15   **A. Of 2006, yes, sir.**
16   Q. Now, referring to the time, the first time
17   period which would be the 1999 to 2001 time period,
18   who were the instructors on your staff?
19   **A. That would have been Chris Foraker, Eddie**
20   **Cathell and Kurt Price.**
21   Q. Did you also have people who assisted you in
22   firearms instruction when the range was very busy?
23   **A. Yes. We used adjunct instructors from time to**
24   **time.**

Page 7

1    Q. Tell us what an adjunct instructor is.
2    **A. They were just a certified firearms instructor**
3    **that we had a list of current certified firearm**
4    **instructors that we used to augment in-service**
5    **training or recruit training, additional firearm**
6    **instructors when we were short staffed.**
7    Q. And are they also officers in the Delaware
8    State Police?
9    **A. Yes.**
10   Q. How do you go about getting adjunct instructors
11   to come and assist you during training?
12   **A. I would make a request first to the instructor**
13   **to check availability and from there would put it out**
14   **to, you know, their supervisors. I ultimately went to**
15   **the academy at one point, went through my chain of**
16   **command with an actual teletype or request that would**
17   **come out from the director of training, which was**
18   **actually the lieutenant colonel at the time.**
19   Q. Was this an inconvenience for you to have to
20   raise help in that fashion?
21   **A. Yes, it was.**
22   Q. And did you do it the entire time that you were
23   assigned to the firearms training unit?
24   **A. Intermittently, yes, we have to request**

Page 8

1    **instructors pretty much all the time.**
2    Q. Now, during the time that you worked at the
3    firearms training unit, and again I'm referring to '99
4    through 2001, did you pretty much every day at
5    the indoor range that's in Smyrna, Delaware?
6    **A. Yes, unless I was on vacation or otherwise on**
7    **military or something like that.**
8    Q. Did you experience problems with the building?
9    **A. Yes.**
10   Q. Why don't you describe to us what the problems
11   were that you experienced with the building?
12   **A. The biggest issue was ventilation. The**
13   **ventilation never worked properly at the range I don't**
14   **think from the day that it opened. During the time**
15   **that I was there, it never worked properly. And as a**
16   **result, we were monitoring lead levels, which lead**
17   **levels were elevated at times. And so those -- that**
18   **was one of the big concerns there.**
19   Q. Would you say it was common knowledge within
20   the State Police that there were problems with the
21   building?
22   **A. Yes.**
23   Q. Now, during the time that you were the NCOIC at
24   the firearms training unit, did you have the authority

Page 9

1    to shut the range down for safety reasons?
2    **A. On a short-term basis, yes. If I had something**
3    **that was a safety hazard at the time -- and when I say**
4    **short term, no more than that time period that that**
5    **violation occurred. Anything beyond that would have**
6    **taken the executive staff or the training staff to**
7    **authorize.**
8    Q. Now, are you familiar with the bullet trap
9    system at the firearms training unit?
10   **A. Yes.**
11   Q. During the time that you were the
12   noncommissioned officer in charge, did you do
13   maintenance on the bullet trap?
14   **A. Yes. We did some.**
15   Q. How did you know what maintenance had to be
16   done on the bullet trap?
17   **A. It was mainly problematic maintenance. When I**
18   **say "problematic maintenance," when we had a problem**
19   **with a filter or sump pump or something of that**
20   **nature, I had to take care of it. Also, filling water**
21   **levels in the trough, in the back side of the bullet**
22   **trap, maybe occasionally scooping out, you know,**
23   **shotgun wads and that kind of thing.**
24   Q. Did you unclog pumps that were in the water

3 (Pages 6 to 9)

Price, et al.                                     v.                    Chaffinch, et al.
Alfred W. Parton, Jr.              C. A. # 04-956-GMS                   May 11, 2006

Page 10

1  system?
2    A.  We replaced a couple of pumps.
3    Q.  Did you also sometimes unclog them when they
4  had paper or cardboard around them?
5    A.  We would do the intermediate filters, we
6  would -- actually I tried to clean those at one point
7  or I tried to have them cleaned.  You couldn't do that
8  so we replaced them.
9    Q.  What is involved in replacing one of those
10  filters?
11    A.  It's an intermediate filter that is on the back
12  side of the bullet trap.  The water that circulates
13  through the system -- there's a small it's plastic
14  container that holds a stainless steel filter.  You
15  have to unscrew the plastic, take the filter out,
16  discard it and put a new one in, then put the plastic
17  back on and it has an O-ring that seals for water
18  leakage.
19    Q.  And is that something that you would do when
20  you were in charge there?
21    A.  I actually delegated that.  So I did, I did a
22  couple of things prior to, you know, before I was
23  promoted, but I did delegate that responsibility.
24    Q.  During the time that you were in charge, who

Page 11

1  did the maintenance on the water system of the bullet
2  trap?
3    A.  I believe primarily Corporal Price.
4    Q.  Did you have a machine that was used to scrub
5  the floor when you were in charge of the firing range?
6    A.  Yes.  It was a Zamboni-type machine.
7    Q.  And what was the function of the Zamboni?  How
8  did it work?
9    A.  It had a water-detergent solution that was -- I
10  mean, it's very much like the one that they use at the
11  ice rink, you know, put water on the floor and
12  squeegeed it back up.  And it had brushes that -- you
13  know, I don't recall exactly how the function worked,
14  but the bottom line is it put detergent-water on the
15  floor, sucked it back up into the system and squeegeed
16  the floor.
17    Q.  Who was assigned to run that machine when you
18  were in charge of the firing range?
19    A.  Corporal Cathell pretty much ran it most of the
20  time.  I won't say that others didn't because that's
21  very possible when he wasn't around.
22    Q.  Did you have at the range when you were in
23  charge there something called a HEPA vac?
24    A.  Yes.

Page 12

1    Q.  And what's a HEPA vac?
2    A.  It's just a, it's a vacuum cleaner, heavy-duty
3  industrial vacuum cleaner that has HEPA filters in it
4  to help filter out, you know, contaminants such as,
5  you know, the dust that we would pick up off the
6  floor.
7    Q.  Did you use the HEPA vac?
8    A.  Yes.  We utilized it.
9    Q.  What did you use it for?
10    A.  Vacuuming the range floor at the end of the
11  day.  Also, vacuuming off the ramp, vacuuming up
12  cardboard, things of that nature.
13    Q.  Who was assigned to do that work?
14    A.  A lot of times we utilized just the students
15  that shot at the range that day.  A couple of people
16  would, you know, at the end of the day take the HEPA
17  vac, they would vacuum the floor and that was pretty
18  much it.
19        Now, I'm sure there was times that we
20  ourselves, you know, used that to pick up the
21  cardboard on the ramp and things like that.  We had
22  recruits come up.  They have utilized it before, so it
23  was probably a conglomerate of people.
24    Q.  Now, I asked you a few minutes ago about the

Page 13

1  maintenance work that you did on the water system for
2  the bullet trap.
3        Why was it necessary to do that?
4    A.  Referring to the filters?
5    Q.  Cleaning the filters, cleaning the shotgun
6  wadding out of the water.
7    A.  It would clog the system.
8    Q.  What happens if you clog the system?
9    A.  The water stops running.
10    Q.  And what does that lead to out in front of the
11  bullet trap?
12    A.  Well, when you have the water not running it
13  leads to a dry ramp then.
14    Q.  And are you supposed to shoot on a dry ramp?
15    A.  It can, the ramp can be shot dry.  I know that,
16  you know, the manufacturer doesn't suggest I don't
17  think long-term usage of it.  But with leaded
18  projectiles you can certainly, you know, it will
19  still, you know, utilize it, but I believe it's a wet
20  ramp and it was utilized as a wet system primarily.
21    Q.  During the time that you were, you started --
22  let me put it this way.  At the point you started at
23  the range, the range was using leaded projectiles.  Is
24  that correct?

4 (Pages 10 to 13)

Price, et al.                                v.                         Chaffinch, et al.
Alfred W. Parton, Jr.              C. A. # 04-956-GMS                      May 11, 2006

Page 14

1    A.  Leaded projectiles with non-leaded primers.
2    Q.  Was there a point during the time that you were
3  in charge of the range that you changed from leaded
4  projectiles to what's called frangible ammunition?
5    A.  Yes, I did.
6    Q.  And were you involved in making the decision to
7  do that?
8    A.  Yes.
9    Q.  Can you tell us why you did that?
10    A.  We were all obviously concerned with lead
11  levels.  Lead levels were the big tangible at that
12  point that, you know, you could really put your finger
13  on.  You know, we get tested for lead on a periodic
14  basis before and after a shoot.
15          When I refer to a shoot, an in-service
16  training event.  And lead levels would rise and fall
17  during those periods.
18          Some lead levels were higher than others.
19  Corporal Cathell's was very high at one point and in
20  an attempt to reduce the lead levels I elected to try
21  the frangible ammunition which had no lead in it.
22    Q.  Did the frangible ammunition have the effect
23  that you desired?
24          In other words, did it cause the blood

Page 15

1  lead levels to drop?
2    A.  They stabilized, they were pretty stable, I
3  mean throughout.  I mean, we still had Corporal
4  Cathell that, you know, he was higher than everybody
5  else, but lead levels were pretty stable.
6    Q.  Did you at the time that you started using the
7  frangible ammunition know what was in the frangible
8  ammunition?
9    A.  I had a pretty good idea.
10    Q.  How did you know?
11    A.  We actually had SIGARMS came in -- I'm sorry.
12  Not SIGARMS.  Blount.  Speer ammunition is what we
13  were utilizing.
14          They actually came in and gave us a short
15  presentation one day on ammunition and I believe we
16  covered frangible that day.
17    Q.  Now, a couple of minutes ago I asked you some
18  questions about shooting on the dry ramp.  Were you
19  supposed to shoot lead -- I'm sorry.
20          Were you supposed to shoot the frangible
21  ammunition on a dry ramp?
22    A.  I don't know that it ever said anyplace that
23  you couldn't do it.  Do you know what I mean?  It was
24  a wet ramp system so I preferred to use it wet.

Page 16

1    Q.  Did you ever have occasion to observe what
2  happens when the frangible ammunition impacts with
3  steel?
4    A.  Yeah.  It breaks into small particles,
5  basically dust.  It turns into just minute dust
6  particles.
7    Q.  Now, when you were in charge of the range was
8  there a point when you arranged for a maintenance
9  contract?
10    A.  Yes.
11    Q.  And do you remember when that was
12  approximately?
13    A.  It was probably the summer of 2000 because I
14  took over in October '99.  I know it was in the
15  summertime because we were actually finished our, we
16  finished our fall in-service and spring in-service and
17  so I'm going to say it was probably in the summer of
18  2000.
19    Q.  What was the arrangement that you reached and
20  who did you reach it with?
21    A.  It was actually the manufacturer of the bullet
22  trap, Savage Range.  They offered a cleanup package,
23  if you will, a maintenance package where they would
24  come in and actually clean the trap, do an inspection

Page 17

1  of the trap, clean, change the filters, clean out the
2  nozzles, change the water, check the oil viscosity
3  levels, that kind of thing.
4    Q.  Why is it that you entered into that
5  arrangement with Savage?
6    A.  Well, one thing we noticed with the frangible
7  ammunition was that there was a lot of residual
8  frangible materials back in the back side in the
9  trough.  Where the water would recirculate, there's a
10  large tube that comes down to the trough.  It was
11  depositing all of the frangible residue in those
12  positions and they basically would start to form large
13  cones underneath those openings.
14          And if we didn't do something with it, it
15  was just going to continue to build up.  And they
16  offered a method to come in and clean that out.
17    Q.  And on the part of the State Police whose
18  responsibility was it to deal with that problem?
19    A.  It would have been mine to make sure that I did
20  something about it I mean or suggest it.  I had to go
21  to fiscal to get money to do that.
22    Q.  Now, during the time that you were the person
23  in charge of the firearms training unit, did you
24  attend commanders and section chiefs meetings?

5 (Pages 14 to 17)

Price, et al.                              v.                        Chaffinch, et al.
Alfred W. Parton, Jr.              C. A. # 04-956-GMS                    May 11, 2006

Page 18

1    A.  No.
2    Q.  Did you consider yourself a section chief?
3    A.  Yes.
4    Q.  Did you ever get announcements about the
5    section chiefs meetings?
6    A.  Yeah.  There's an e-mail that comes out.
7        Again, I'm assuming you're referring to
8    DICAT?
9    Q.  I believe we are, yes.
10   A.  Which was, well, it's DSPSTAT now.  Yeah.
11   There's a blanket e-mail that comes out to all section
12   chiefs, which I was on the section chief list, and
13   announcing when it was.
14   Q.  Did you consider that an order to go to the
15   meeting?
16   A.  No, I didn't because I didn't, I didn't
17   particularly feel they needed me there, so...
18   Q.  In any event, you never went?
19   A.  No.
20   Q.  One last series of questions I have for you has
21   to do with an exhibit that I'm going to slide over and
22   put in front of you and it has a sticker on the front
23   that says Plaintiff's Exhibit 25.
24   A.  Yes.

Page 19

1    Q.  That's an on-line version of a news article
2    that appeared in The Delaware State News in 2004.
3    Take a moment to review that and make sure you
4    understand what article that is.
5    A.  Yes.  I'm familiar with the article.
6    Q.  Now, did you see that article when it appeared
7    in the newspaper on April 7th, 2004?
8    A.  I don't know if I read it on-line or in the
9    newspapers.  I mean, I did read the article, yes.
10   Q.  You notice that in that article there are
11   comments made or at least there's a report of comments
12   made by Colonel Chaffinch about Chris Foraker.  Have
13   you seen that?
14   A.  Yes.
15   Q.  Did any of the comments that Colonel Chaffinch
16   made about Chris Foraker affect your opinion or your
17   view of Chris Foraker?
18   A.  No.
19   Q.  How long have you known Chris Foraker?
20   A.  Oh, for years.  I mean, we were on the SORT
21   Team together, so at least fifteen years.
22   Q.  Do you consider yourself a friend of Chris
23   Foraker?
24   A.  Yes.

Page 20

1    Q.  And the comments the colonel made had no effect
2    on your relationship with Chris Foraker?
3    A.  No.
4    Q.  Or your opinion of him?
5    A.  No.
6        MR. ELLIS:  Nothing further.  Thank you.
7        MR. NEUBERGER:  All right.  Let's take a
8    break.
9        THE VIDEOTAPE OPERATOR:  Going off the
10   record at approximately 2:31 p.m.
11       (A brief recess was taken.)
12       THE VIDEOTAPE OPERATOR:  We're back on the
13   record at approximately 2:37 p.m.
14   BY MR. NEUBERGER:
15   Q.  Now, Sergeant, Parton, you're currently a
16   sergeant in the State Police, right?
17   A.  Yes.
18   Q.  And you would like to retire from the State
19   Police.  Is that correct?
20   A.  Yes, sir.
21   Q.  The State Police is a paramilitary
22   organization, isn't it?
23   A.  Yes, it is.
24   Q.  And there's a chain of command, right?

Page 21

1    A.  Yes, there is.
2    Q.  And you have to follow orders from superior
3    officers, right?
4    A.  Yes.
5    Q.  That's just the nature of it being a
6    paramilitary organization, right?
7    A.  That's correct.
8    Q.  All right.  And now defendant MacLeish is
9    currently the colonel at the top of the chain of
10   command in the Delaware State Police, correct?
11   A.  Yes.
12   Q.  And until he retired approximately a year ago,
13   defendant Chaffinch was the colonel of the State
14   Police, right?
15   A.  Yes.
16   Q.  All right.  Now, to the best of your knowledge,
17   is lead exposure something that's good for the human
18   body?
19   A.  No, it's not.
20   Q.  To the best of your knowledge, did anyone at
21   the FTU ever receive training on how to clean the
22   lead-lined bullet trap?
23   A.  Not to my knowledge, no.
24   Q.  To the best of your knowledge, did anyone at

6 (Pages 18 to 21)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                                      v.                    Chaffinch, et al.
Alfred W. Parton, Jr.              C. A. # 04-956-GMS                      May 11, 2006

Page 22

1  the FTU ever receive training in how to clean up lead,
2  copper, zinc, tin, arsenic or nitroglycerin bullet
3  residue from the bullet trap?
4  **A. No, sir.**
5  Q.  Did you ever receive any training about how to
6  clean up the toxic dust caused by the impact of the
7  frangible ammunition against the lead-lined bullet
8  trap?
9  **A. No, sir.**
10  Q.  Did you ever receive any formal training in how
11  to maintain the firing range?
12  **A. No, sir.**
13  Q.  Did you ever receive any training in hazardous
14  material handling?
15  **A. No, sir.**
16  Q.  How about hazardous material disposal?
17  **A. No.**
18  Q.  How about hazardous material abatement?
19  **A. No.**
20  Q.  Okay.  Were you ever given any protective
21  equipment to wear at the FTU like a Tyvek suit?
22  **A. No.**
23  Q.  How about one of those big, bulky moon suits?
24  **A. No.**

Page 23

1  Q.  How about a respirator?
2  **A. No.**
3  Q.  How about those little booties for your feet?
4  **A. No.**
5  Q.  Okay.  None of that.
6        Now, I would like to put an exhibit in
7  front of you.  This is Plaintiff's Exhibit 113.
8        Now, do you have that document in front of
9  you, Sergeant?
10  **A. Yes, sir, I do.**
11  Q.  Have you ever seen this document before?
12  **A. Yes.**
13  Q.  What is this document?
14  **A. This was a memorandum I sent to Lieutenant**
15  **Ralph Davis regarding, expressing my concerns about**
16  **some comments that had been made regarding whether or**
17  **not complaints had ever been made at the range during**
18  **a certain period of time.**
19  Q.  Do you recall when you sent this memo, ballpark
20  time period?
21  **A. No, I don't.**
22  Q.  And can you take a quick look at this memo just
23  to familiarize yourself with it?
24  **A. Yes, sir. (Reviewing document).**

Page 24

1        **Okay, sir.**
2  Q.  Okay.  Could you take a look at the eighth line
3  down and the sentence that says "As the NCOIC"?
4        Do you see that sentence?
5  **A. Yes, sir.**
6  Q.  I'm going to read that to you.  Okay?  Does
7  that say, "As the NCOIC of the range, I reported
8  continuously regarding lead contamination, personnel
9  lead levels and the recurring problems with the
10  ventilation"?
11        It says that, right?
12  **A. Yes.**
13  Q.  That's perfectly consistent with your testimony
14  earlier, right?
15  **A. Yes.**
16  Q.  And I think you testified earlier that the
17  range always had problems during your tenure, right?
18  **A. Yes, sir.**
19  Q.  And it had problems before your tenure, right?
20  **A. Yes, sir.**
21  Q.  And it had problems after your tenure, right?
22  **A. Yes, sir.**
23  Q.  The place has always been a problematic
24  facility.  Isn't that correct?

Page 25

1  **A. Yes, sir.**
2  Q.  Okay.  And in the course of this memo to
3  Lieutenant Davis you're saying that certain people in
4  the DSP or in facilities management they should be
5  careful in saying that there were never any problems
6  at the range or that people at the range never
7  reported that there were any problems, right?
8  **A. Yes.**
9  Q.  And you wrote this memo to Lieutenant Davis
10  because there were lots of problems when you were
11  there, right?
12  **A. Yeah.  There were several problems with me.**
13  Q.  Do you recall if there was an attachment to
14  this memo?
15  **A. Yes.**
16  Q.  And do you think that may have been an e-mail?
17  **A. Yes, to Lieutenant Colonel Waggaman.**
18  Q.  All right.  I would like to put another
19  document in front of you.  This is Plaintiff's Exhibit
20  114.
21        Take a quick look at that and let me know
22  if you think that's the attachment.
23  **A. Yes, it is.**
24  Q.  All right.  Now, could you take a quick look at

7 (Pages 22 to 25)

Price, et al.                                  v.                      Chaffinch, et al.
Alfred W. Parton, Jr.              C. A. # 04-956-GMS                    May 11, 2006

Page 26

1  this document and just quickly familiarize yourself
2  with it?
3    A.  (Reviewing document)  I'm familiar with it,
4  sir.
5    Q.  Now, this is an e-mail from you to I guess that
6  would have been Lieutenant Colonel Bill Waggaman on
7  the executive staff at the time?
8    A.  Yes, sir.
9    Q.  It's dated June 29, 2000?
10   A.  Yes, sir.
11   Q.  Could you take a look at the fourth paragraph,
12  please?
13   A.  Yes.
14   Q.  And does that appear to say that on June 15th,
15  2000 "a meeting was conducted with Facilities
16  Management regarding the ventilation and contamination
17  problems, as well as the proposed ceiling installation
18  to improve airflow"?
19       Does the next sentence say, "We are still
20  experiencing lead dust contamination behind the bullet
21  trap with the source being the ceiling where the
22  center I-beams were installed"?
23   A.  Yes, sir.
24   Q.  Now, in that sentence you appear to be

Page 27

1  indicating that there's some kind of a large lead dust
2  contamination behind the bullet trap?
3    A.  Yes, sir.  All behind, on the floor behind the
4  bullet trap it was covered with what appeared to be
5  lead dust.
6    Q.  And now this appears to be indicating that
7  somehow the lead, somehow the dust was getting from
8  the front to behind the bullet trap through an area
9  along the ceiling that hadn't been properly sealed.
10  Is that accurate?
11   A.  Yes, sir.  And I actually didn't find that out
12  until the second time we had it cleaned because we had
13  no idea where it was coming from, but ultimately where
14  the I-beam came through the center of the facility it
15  was wide open there where it just, the airflow just
16  blew everything right back through there.
17   Q.  So is that the I-beam that had to be installed
18  when they were initially building the range because
19  the roof started to collapse?
20   A.  Yes, it is.
21   Q.  And the roof started to collapse because, well,
22  because the roof couldn't support the weight or
23  because the building couldn't support the weight of
24  the roof, right?

Page 28

1    A.  That was my understanding, yes.
2    Q.  All right.  And I think you said that that was
3  the second time it had been cleaned up?
4    A.  Yes.  It was cleaned two times back there.
5  Once when it was really contaminated we were leaving
6  footprints on the floor and they came in, cleaned it
7  up and probably a week or two later walked back there
8  and we were starting to get -- and that's how I could
9  see that it was coming from the I-beam.  There was a
10  little 45-degree angle of dust starting to be, you
11  know, deposited on the floor and when you looked back
12  up you could see that there was daylight in between
13  the range and the bullet trap.
14   Q.  You can now put those exhibits to the side.
15       Now, did you ever call facilities
16  management and raise issues with them about the
17  contamination behind the bullet trap?
18   A.  I don't recall if I called them directly or ran
19  it through my chain of command through the academy.  I
20  don't specifically recall how it was reported.
21   Q.  I would like to put another document in front
22  of you.  This is Plaintiff's Exhibit 117.
23       Sorry about that.
24   A.  That's okay.

Page 29

1    Q.  I'm going to represent to you that these are
2  some facilities management work orders turned over by
3  the State of Delaware to us in the course of this
4  court case.
5       Now, I think you testified about this on
6  your direct, but I can't find my notes on that right
7  now.
8       What years were you at the FTU?
9    A.  October -- well, I actually started in January
10  of '99 as a range staff member, supervisor from
11  October '99 to I believe it was August 1st, 2001.
12   Q.  Okay.  So could you take a look at the second
13  page of this exhibit?
14       And on the second page of this exhibit
15  does it appear to pick up with some work order
16  requests in 1999?
17   A.  Yes.
18   Q.  And if you just take a look at some of the ones
19  that are underlined on that page, for example, on
20  12-29, well, it's 12-29-98 that it says that there's
21  smoke in the building and at least the document
22  appears to say that it was reported by Corporal
23  Foraker, right?
24   A.  Yes.

8 (Pages 26 to 29)

Price, et al.                                v.                        Chaffinch, et al.
Alfred W. Parton, Jr.            C. A. # 04-956-GMS              May 11, 2006

Page 30

1    Q.   Then if you go down a little farther to
2   February 22nd, 1999, it appears to say that the air
3   handler wasn't working, right?
4    A.   Yes.
5    Q.   Now let's turn to the next page.
6         Are there any at least from this page of
7   the document -- and at the bottom right-hand corner of
8   the page does it say D20477?
9    A.   Yes, it does.
10   Q.   Now, on the date for October 25th, 1999 does
11  there appear to be an entry for something that this
12  appears to say that you reported?
13   A.   Yes.
14   Q.   And that seems to say ventilation system not
15  working properly, right?
16   A.   Yes, sir.
17   Q.   Could you take a look at the next page?
18   A.   Yes.
19   Q.   Are you there?
20        Now, does that appear to say that there's
21  problems with the air compressor and all sorts of
22  other things, right?
23   A.   Yes, sir.
24   Q.   It would be fair to say that you were reporting

Page 31

1   various problems to facilities management at the time,
2   right?
3    A.   Yes, sir.
4    Q.   And this was a long time ago.  You can't
5   remember everything you reported, right?
6    A.   No.  It was, it was an ongoing -- and that was,
7   and I'll tell you, I mean that was the basis for that
8   e-mail.  I was upset because people were in my opinion
9   saying that I had not reported anything when it was
10  being reported all the time.
11   Q.   Gotcha.  Okay.  You can put that document down.
12        Now, at the time when you were the NCOIC
13  of the FTU back in nineteen -- I'm sorry.
14   A.   '99.
15   Q.   1999 forward?
16   A.   To 2001, yes.
17   Q.   At that time did you have responsibility for
18  patrol procedures for the Delaware State Police?
19   A.   No, not in the, no, not in the initial portion
20  of that, no.
21   Q.   Are you aware that later the patrol procedures
22  was a job responsibility which was given to the staff
23  at the FTU?
24   A.   Yes.  And I believe that was after I left is

Page 32

1   when that was implemented.
2    Q.   Right.  So after you left.  Okay.
3         And I think you testified on direct about
4   the Zamboni machine, right?
5    A.   Yes, sir.
6    Q.   And that's it goes along the floor with water
7   and it is supposed to clean the floor?
8    A.   Yes, sir.
9    Q.   Now, do you know what it's cleaning off of the
10  floor?
11   A.   Well, the detergent solution that was being
12  used was for lead abatement or -- well, I won't say
13  for abatement.  It was for cleaning lead or at least
14  to help clean lead particles.  I mean, I think that
15  was what the basis for the machine was for.
16   Q.   All right.  Now, what did you do with the
17  contaminated water?
18   A.   Well, I set up a 55-gallon drum on the back
19  side of the range which, you know, I wanted to have
20  the water dumped into that.  Hopefully, it would
21  evaporate and any contaminants stay inside or put it
22  back in the trough.
23        I have heard, and I can't say that it's
24  true, but Corporal Cathell --

Page 33

1         MR. ELLIS:  Well, I object to what he's
2   heard that he can't say is true.
3    Q.   I just want to know what you did.
4    A.   What I tried to do was set up for the water
5   either to go back in the trough or in a 55-gallon
6   drum.
7    Q.   Now, in the trough, in the trough behind the
8   bullet trap or the trough in the Zamboni?
9    A.   The bullet trap.
10   Q.   The bullet trap?
11   A.   Yes.
12   Q.   Did you ever order Corporal Price to dump that
13  stuff outside?
14   A.   I don't recall ever doing that.  I don't know.
15   Q.   If he testified that maybe you did --
16   A.   If he testified that maybe I did, then I can't
17  dispute his word because I don't have any direct
18  knowledge of it.
19   Q.   Okay.  I think you also testified on direct
20  about the changeover from lead-based ammunition to
21  frangible ammo, right?
22   A.   Yes.
23   Q.   Now, at the time lead contamination was a big
24  concern, I think you testified to that, right?

9 (Pages 30 to 33)

Wilcox & Fetzer, Ltd.         Professional Court Reporters         (302)655-0477

Page 34

1    A.  Yes.
2    Q.  And it would be fair to say that's one of the
3  primary reasons why there was this switchover, the
4  changeover?
5    A.  Yes.
6    Q.  So did you know what those bullets were made
7  of, the frangible ammo?
8    A.  I had an idea.
9    Q.  I guess what was your idea based on?
10    A.  Just from what, you know, I remember of talking
11  with SIG and I knew there was copper and some other
12  alloys.  I didn't have, I don't have -- I can't tell
13  you exactly what is in that round.
14    Q.  Right.  Did you tell the staff under you at the
15  time what the contents of those bullets were?
16    A.  I don't know that I ever actually did, no.
17    Q.  Now, did you ever talk to Savage Range System
18  about what the impact would be of a frangible bullet
19  going into the bullet trap versus a lead-based
20  projectile?
21    A.  I don't know that I ever specifically talked to
22  them about it, no.
23    Q.  Now, were there any written maintenance
24  policies or standard operating procedures at the FTU

Page 35

1  when you were the NCOIC as to how to clean the
2  facility?
3    A.  No.
4    Q.  I think you also testified on your direct about
5  bullet trap maintenance and cleaning filters,
6  replacing pumps, scooping out shotgun wads and things
7  of that nature?
8    A.  Yes.
9    Q.  Do you recall that testimony?
10    A.  Yes.
11    Q.  Did a State Police doctor ever tell you that
12  the oil in the trap water if you touched it with your
13  hands that that would transfer lead directly into your
14  bloodstream?
15    A.  No.
16    Q.  If a DSP doctor had told you that, do you think
17  that would have maybe been a problem?
18        MR. ELLIS:  Objection.
19    Q.  You can answer.
20    A.  Yes.
21    Q.  Do you think if a doctor, if a State Police
22  doctor had told you that you would have had to take
23  some kind of remedial action to make sure that you
24  weren't coming into contact with that contaminated

Page 36

1  water?
2        MR. ELLIS:  Objection.
3    A.  Yes.
4    Q.  Yes?
5    A.  Yes.  I'm sorry.
6    Q.  I think you also testified on direct that you
7  had the authority to shut down the range on a
8  short-term basis for a safety violation.
9        Do you recall testifying to that?
10    A.  Yes, sir.
11    Q.  Now, a safety violation, would that be
12  something like there's a recruit on the firing line
13  who he's pointing at the bullet trap and he turns
14  around 180 degrees to his right and he's pointing the
15  gun at some trooper on the firing line?
16    A.  We'll stop training, yes.
17    Q.  Is that the kind of thing that you were talking
18  about when you said for a safety violation?
19    A.  I'm sure that's one of many.
20    Q.  Can you give me another example just so I get
21  an idea?
22    A.  I mean, there's all kinds of unsafe acts that
23  could occur on a range.  I mean, we're dealing with
24  firearms.

Page 37

1    Q.  Sure.
2    A.  I mean anything that I deem that's unsafe or
3  one of my instructors were to deem unsafe, we can
4  absolutely call a halt in the training.
5    Q.  Right.  Like I have heard of I think one of my
6  clients will testify about a trooper once passing out
7  or fainting while holding a firearm.
8        That could create an unsafe environment,
9  right?
10    A.  Yes, sir.
11    Q.  Okay.  Now, I think you also testified that
12  anything beyond a short-term shutdown for safety
13  violation, that would have to go up to the executive
14  staff somewhere?
15    A.  Yes.
16    Q.  And that's above your pay grade, right?
17    A.  Yes, sir.
18    Q.  You're a sergeant, right?
19    A.  That's correct.
20    Q.  Executive staff are majors, the lieutenant
21  colonel and the colonel, right?
22    A.  Yes.
23    Q.  Are you aware that at the FTU is also, that the
24  facility known as the FTU is owned by facilities

10 (Pages 34 to 37)

Price, et al.                          v.                    Chaffinch, et al.
Alfred W. Parton, Jr.          C. A. # 04-956-GMS              May 11, 2006

Page 38

1  management of the State of Delaware?
2  A. Yes.
3  Q.  And the State Police are essentially like a
4  tenant, right?
5  A. That's correct.
6  Q.  So it's not the State Police's building, right?
7  A. No.
8  Q.  Okay.  Now, I think you also testified that you
9  were a section chief while you were at the FTU, right?
10  A. Yes.
11      MR. NEUBERGER:  No further questions.
12  BY MR. ELLIS:
13  Q.  Sergeant Parton, were there circumstances when
14  you were in charge of the range when you stopped the
15  shooting in the range because the HVAC system was not
16  properly clearing the smoke and dust?
17  A.  There may have been times when we were shooting
18  that we had to stop training long enough to either
19  call facilities or to start something back up or
20  things of that nature, but I mean they would have been
21  for a period of, you know, very short periods of time.
22      I mean, I don't recall ever stopping or
23  canceling training for anything like that.
24  Q.  If you had a circumstance where you believed

Page 39

1  that the environmental conditions in the building were
2  posing an immediate threat to the students or to the
3  instructors, did you believe you had the authority to
4  shut it down?
5  A.  Yes.
6      MR. ELLIS:  No further questions.
7  BY MR. NEUBERGER:
8  Q.  Would you have had to run that decision by the
9  executive staff to shut the range down for that long
10  of a period of time?
11      MR. ELLIS:  Well, objection to the
12  question because there's no, there's no antecedent to
13  how long, what long period of time you mean.
14      MR. NEUBERGER:  Okay.  I'll withdraw the
15  question.
16  BY MR. NEUBERGER:
17  Q.  If you had to shut down the FTU for a long
18  period of time while you were the NCOIC, is that a
19  decision you would have had to run by the executive
20  staff in the chain of command?
21      MR. ELLIS:  Objection.  You never defined
22  what you mean by how long.
23  A.  Yes, it would have had to have gone up the
24  chain of command.

Page 40

1      MR. NEUBERGER:  No further questions.
2      THE VIDEOTAPE OPERATOR:  This deposition
3  is ending at approximately 2:55 p.m.
4      (Deposition concluded at 2:55 p.m.)
5
6          I N D E X
7  DEPONENT:  ALFRED W. PARTON, JR.        PAGE
8    Examination by Mr. Ellis         3
     Examination by Mr. Neuberger      20
9    Examination by Mr. Ellis        38
     Examination by Mr. Neuberger     39
10
11  (There were no exhibits marked for identification.)
12  ERRATA SHEET/DEPONENT'S SIGNATURE     PAGE 41
13  CERTIFICATE OF REPORTER              PAGE 42
14
15
16
17
18
19
20
21
22
23
24

Page 41

1
2
3      REPLACE THIS PAGE
4      WITH THE ERRATA SHEET
5      AFTER IT HAS BEEN
6      COMPLETED AND SIGNED
7      BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

11 (Pages 38 to 41)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Price, et al.                              v.                    Chaffinch, et al.
Alfred W. Parton, Jr.              C. A. # 04-956-GMS                 May 11, 2006

Page 42

```
 1   State of Delaware   )
                         )
 2   New Castle County   )
 3
 4           CERTIFICATE OF REPORTER
 5
             I, Kurt A. Fetzer, Registered Diplomate
 6   Reporter and Notary Public, do hereby certify that
     there came before me on Thursday, May 11, 2006, the
 7   deponent herein, ALFRED W. PARTON, JR., who was duly
     sworn by me and thereafter examined by counsel for the
 8   respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
 9   in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.
11           I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13           I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17           Kurt A. Fetzer, RDR, CRR
             Certification No. 100-RPR
18           (Expires January 31, 2008)
19
     DATED:
20
21
22
23
24
```

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A - 265

Price, et al.                          v.                  Chaffinch, et al.
Richard A. Ashley             C. A. # 04-956-GMS              May 11, 2006

Page 1

                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE

        CORPORAL B. KURT PRICE, et al.,        )
                                               )
                      Plaintiffs,              )
                                               )  Civil Action
        v.                                     )  No. 04-956-GMS
                                               )
        COLONEL L. AARON CHAFFINCH, et al.,    )
                                               )
                      Defendants.              )
        ------------------------------------)
        SERGEANT CHRISTOPHER D. FORAKER,       )
                                               )
                      Plaintiff,               )
                                               )   Civil Action
        v.                                     )  No. 04-1207-GMS
                                               )
        COLONEL L. AARON CHAFFINCH, et al.,    )
                                               )
                      Defendants.              )

             Videotape deposition of RICHARD A. ASHLEY
        taken pursuant to notice at the law offices of
        Montgomery, McCracken, Walker & Rhoads, LLP, 300
        Delaware Avenue, Suite 750, Wilmington, Delaware,
        beginning at 3:15 p.m. on Thursday, May 11, 2006,
        before Kurt A. Fetzer, Registered Diplomate Reporter
        and Notary Public.

        APPEARANCES:

                STEPHEN J. NEUBERGER, ESQ.
                CHERYL A. SASADEUSZ, ESQ.
                THE NEUBERGER FIRM, P.A.
                  2 East Seventh Street - Suite 302
                  Wilmington, Delaware  19801
                  For the Plaintiffs
                        WILCOX & FETZER
            1330 King Street -  Wilmington, Delaware 19801
                      (302) 655-0477

| Price, et al. | v. | Chaffinch, et al. |
|---|---|---|
| Richard A. Ashley | C. A. # 04-956-GMS | May 11, 2006 |

Page 2

1  APPEARANCES: (Cont'd)
2      EDWARD T. ELLIS, ESQ.
        CARMON M. HARVEY, ESQ.
3      MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
        123 South Broad Street
4      Philadelphia, Pennsylvania 19109
        For the Defendants
5
   ALSO PRESENT:
6      B. KURT PRICE
        CHRISTOPHER D. FORAKER
7      WAYNE WARREN
        LINDSAY DuPHILY, VIDEOTAPE OPERATOR -
8      DISCOVERY VIDEO SERVICES
9          - - - - -
10          THE VIDEOTAPE OPERATOR:  This is the
11  videotape deposition of Mr. Richard A. Ashley taken by
12  the defendant in the matter of Corporal B. Kurt Price,
13  et al., Plaintiffs, versus Colonel L. Aaron Chaffinch,
14  et al., Defendants, Civil Action No. 04-956 and
15  Sergeant Christopher D. Foraker, Plaintiff, versus
16  Colonel L. Aaron Chaffinch, et al., Defendants, Civil
17  Action No. 04-1207.
18          This deposition is being held in the
19  offices of Montgomery, McCracken, Walker & Rhoads,
20  Wilmington, Delaware, on May 11, 2006.  We're going on
21  the record at approximately 3:15 p.m.
22          The court reporter is Kurt Fetzer from the
23  firm of Wilcox & Fetzer, Wilmington, Delaware.
24          My name is Lindsay DuPhily and I'm the

Page 3

1  videotape specialist of Discovery Video Services, in
2  association with Wilcox & Fetzer.
3          Counsel will now introduce themselves and
4  then the court reporter will swear in the witness.
5      MR. NEUBERGER:  Steve Neuberger, The
6  Neuberger Firm, for plaintiffs.
7      MR. ELLIS:  Ed Ellis for defendants.
8          - - - - -
9          RICHARD A. ASHLEY,
10  the deponent herein, having first been
11  duly sworn on oath, was examined and
12  testified as follows:
13          EXAMINATION
14  BY MR. ELLIS:
15  Q.  Could you state your name for the record,
16  please?
17  A.  Richard A. Ashley.
18  Q.  And, Mr. Ashley, what's your current
19  occupation?
20  A.  Self-employed.
21  Q.  What kind of business do you run?
22  A.  Farm.
23  Q.  Where is the farm?
24  A.  Kent County.

Page 4

1  Q.  Am I correct that you had a career as a
2  Delaware State Trooper?
3  A.  Yes, sir.
4  Q.  When did you begin with the State Police?
5  A.  September of 1983.
6  Q.  And when did you leave the State Police?
7  A.  Officially retired I believe in December of
8  '04.
9  Q.  And that gives you about 21 years of service?
10  A.  There about, yes, sir.
11  Q.  During the time that you were with the Delaware
12  State Police, was there a point when you were the
13  noncommissioned officer in charge of the firearms
14  training unit?
15  A.  Yes, sir.
16  Q.  Can you give us the approximate dates when you
17  were the NCOIC of the firearms training unit?
18  A.  I believe it was sometime in April of '02 to
19  December of '03.
20  Q.  Who did you replace when you went to the
21  firearms training unit in April of 2002?
22  A.  Sergeant Chris Foraker.
23  Q.  When you left the firearms training unit in
24  December of 2003, who replaced you?

Page 5

1  A.  Sergeant Chris Foraker.
2  Q.  Now, during the period when you were at the
3  firearms training unit, did you work primarily at the
4  indoor range in Smyrna?
5  A.  Yes, sir.
6  Q.  Tell us who the staff was that worked under you
7  at the firearms training unit.
8  A.  Corporal Wayne Warren, Corporal Kurt Price, for
9  a while Corporal Ed Cathell, Corporal Bruce Peachey
10  and at the very end after we lost a couple of people
11  Corporal Jimmy Warwick was assigned to the unit.
12  Q.  Did Warwick replace Cathell?
13  A.  I believe that's what you could say.  We were
14  down a couple of people while we were training and
15  they gave us somebody just prior to me leaving.
16  Q.  Was Bruce Peachey assigned to the firearms
17  training unit on a permanent basis?
18  A.  No.  He was TAD.  We used to call it injured
19  reserve.  He was injured and he was on IR.
20  Q.  So he was not permanently assigned there?
21  A.  No.  He should have been, but he wasn't.
22  Q.  During the time when you were the head of the
23  firearms training unit, who was your boss?
24  A.  I had two lieutenants that I worked under.

2 (Pages 2 to 5)

A - 267

Price, et al.                              v.                         Chaffinch, et al.
Richard A. Ashley                    C. A. # 04-956-GMS                   May 11, 2006

Page 6

1  First was Lieutenant Gaylen Purcell.
2      The second lieutenant was Ralph Davis and
3  then the captain, the director of training was Captain
4  Greg Warren.
5    Q.  Was Captain Warren the head of the training
6  academy?
7    A.  He was director of training, yes.
8    Q.  Was he the head of the academy the entire time
9  that you were in charge of the firearms training unit?
10   A.  Yes.
11   Q.  When you first went to the range in 2002, when
12  you first took over that assignment, had you worked at
13  the range before?
14   A.  On a TAD assignment, yes.
15   Q.  Tell us what you mean by as a TAD assignment.
16   A.  Temporarily assigned.  When we were doing
17  in-service, some recruit training, they needed extra
18  help up at the range.
19      Corporal Price and myself went to our
20  firearms instructor training at the same time.  I
21  would go up there a couple of weeks at a time maybe,
22  help on the range, help instruct.
23   Q.  Were you what they called an adjunct
24  instructor?

Page 7

1    A.  I never heard it called that.  I always heard
2  it called TAD.
3    Q.  Okay.  How did you come to get assigned to TAD?
4  How did you know it was going to be your turn to go up
5  there?
6    A.  What? TAD?
7    Q.  Yes.
8    A.  The folks that were in charge of the range
9  would call and make arrangements with my staff at the
10  troop, whatever troop I was working at the time to
11  get us up there to work a couple weeks at a time just
12  to help out.
13   Q.  When you first took over from Chris Foraker --
14  he was the one that was leaving, right?
15   A.  Yes, sir.
16   Q.  Did he show you around and show you how to do
17  the job of the NCOIC at the firing range?
18   A.  No, sir.
19      MR. NEUBERGER:  Objection.  Relevance.
20   Q.  Did you ask him to do that?
21   A.  Yes, sir.
22   Q.  And what was his response?
23   A.  Obviously he was upset about his transfer and
24  he didn't really want to show me around.  He actually

Page 8

1  told me that he didn't have time.
2    Q.  How did you learn how to do the job?
3    A.  When I got assigned there, of course I knew
4  Corporal Price and Corporal Warren for quite some
5  time.  They explained to me -- Corporal Price had been
6  to the range since its inception, the indoor range.
7      They told me that they would help me get
8  through anything that we needed to know.  The division
9  was actually going to send another individual up there
10  TAD assignment, Brian Fitzpatrick, who is a sergeant,
11  used to be in charge of the range I believe maybe
12  prior to Corporal or Sergeant Foraker, if my memory
13  serves.
14   Q.  So you discussed with Corporal Price --
15   A.  We discussed it and it was decided that we
16  would rather not have Sergeant Fitzpatrick come in
17  there at the time and that Corporal Warren and
18  Corporal Price would show me the ropes.
19   Q.  Did the range have a bullet trap?
20   A.  Yes.
21   Q.  And did Corporal Price and Corporal Warren show
22  you the bullet trap?
23   A.  Yes.
24   Q.  During the time that you worked there did you

Page 9

1  have to do maintenance work on the bullet trap?
2    A.  Yes.
3    Q.  Why don't you describe to us, please, what you
4  did to do maintenance work on the bullet trap?
5    A.  Prior to replacing the dragline?
6    Q.  Yes.  Starting at the point you began in 2002.
7    A.  In the beginning?
8    Q.  Yes.
9    A.  In the beginning when we first got there
10  Corporal Price would show me the belt that carried the
11  debris out of the trap itself wasn't working.
12  Actually, he would go back there and beat it with the
13  hammer to get it to break free.  It was solid with
14  this material that was, the debris that was coming
15  from the ammunition that was being utilized at the
16  range at the time by the State Police.
17   Q.  That's what they call frangible ammunition?
18   A.  It's one of the types of frangible ammunition,
19  yes.
20   Q.  Okay.  Please continue.
21   A.  This stuff was actually it was just, it was
22  detrimental to the range.  It destroyed the belts.  It
23  wouldn't work.
24      Once we put a new dragline in, then it was

3 (Pages 6 to 9)

Price, et al.                                    v.                          Chaffinch, et al.
Richard A. Ashley                    C. A. # 04-956-GMS                       May 11, 2006

Page 10

1  stirring up the debris and causing the filters to
2  plug. And that's a cascade system. It has to be wet
3  in order to function properly. So that we were -- it
4  was a constant issue of changing or cleaning filters.
5      Q. Did you have to clean up shotgun wadding out of
6  the water system?
7      A. Yes. When I first got there Wayne and Kurt
8  were picking the stuff up with fishnets, but a lot of
9  them were tore up and had holes in them and all. I
10 had actually sent my wife to some dollar store and I
11 think they're called colanders, the medal strainers
12 like you use for pasta or something so we could scoop
13 them out with those instead of the fishnets because
14 they don't work as well.
15     Q. Did you have to clean cardboard from the
16 targets out of the system?
17     A. Out of the front of the system, yes, on the
18 ramp and off the trough.
19     Q. Did you have to clean and replace sometimes the
20 pumps that pumped the water into the system?
21     A. Yeah. Sometimes the pumps would burn out. The
22 original purposes they were using were called Little
23 Giants. They were purchased, if memory serves, from
24 Roy's Electric. They were a really expensive pump and

Page 11

1  they weren't -- the ammunition that we were using, the
2  debris and such were going in there. They were
3  telling me these pumps weren't designed for that; we
4  needed a heavier trash pump, something that could eat
5  the debris. The impellers would take care of the
6  debris.
7          We actually worked a deal with a
8  distributor for Gould's pumps, Gould's pumps, and we
9  got a heavy trash pump and we were utilizing those in
10 the system for the heads or the cascade system.
11     Q. Did you sometimes adjust the belt yourself,
12 the --
13     A. Yes. The new one, yes. I actually helped them
14 install the new belt with the Mayfran employee.
15     Q. Mayfran, who is Mayfran?
16     A. Mayfran is one that actually manufactures the
17 stuff that Savage put into the range. It's called a
18 Savage Range, but it's actually a range manufactured
19 by Mayfran. Mayfran was the one that manufactured the
20 belts, so we went straight to the source to get the
21 new belt put in.
22     Q. And when the new belt came in you helped
23 install it?
24     A. We went back there and, if my memory serves, I

Page 12

1  know Wayne and Kurt had went back there as well. I
2  don't know if they were back there every day, but they
3  were back there as well because we would go back there
4  and talk to the guys.
5          The one guy, I believe his name might have
6  been Eddie. I'm not certain of that. That I had
7  helped him take the old belt out and actually helped
8  him install the new. He showed me what adjustments to
9  make on the belt.
10     Q. Did you ever make adjustments on the clutch or
11 the clutch motor?
12     A. Not on the clutch because you had to have a
13 spanner wrench and we didn't have a spanner. We had
14 the, we had the clutch changed a couple of times. And
15 they sent, when I say, "they" I can't remember if it
16 was Savage or Mayfran sent a man back down to readjust
17 the clutch.
18     Q. How did you know how to adjust the belt?
19     A. The gentleman when we installed the belt showed
20 me how. It works on the same principle as a dragline
21 on my combine, a feeder chain.
22     Q. While you were employed at the range did you
23 have a floor scrubber machine?
24     A. Zamboni?

Page 13

1      Q. Yes. The people called it a Zamboni?
2      A. Yes.
3      Q. And did you have somebody operate that?
4      A. Once we got it running, yes. When I first got
5  there, it wasn't, it wasn't operable. If memory
6  serves, I think -- I didn't know who took it apart,
7  but Corporal Price had told me that Corporal Cathell
8  had taken it apart. Some bearings were out and some
9  parts were missing.
10     Q. Once you got it fixed --
11     A. Put it back together and Corporal Price ran the
12 Zamboni.
13     Q. Did Corporal Price do any of the maintenance
14 work that you described on the back of the bullet
15 trap?
16     A. Everybody would go back on occasion and help.
17 Most of the, most of it I did. Both Wayne and Kurt
18 would come back and help. If we were in a middle of a
19 shoot and a lane started going dry, we would crawl
20 into the booth, whoever was in the booth operating the
21 shoot, the control booth and went out back and find
22 the trap and change the filter.
23     Q. Why did you do all of this work to keep the
24 filters clear and the water flowing?

4 (Pages 10 to 13)

A - 269

Page 14

1 A. It's a cascade system. In order to -- the
2 ammunition the State Police were using at the time was
3 the way I could describe it is like throwing a dust
4 ball against a wall or a dry clot of dirt against a
5 brick wall. When it hits, it's a dust ball, a little
6 ball of dust.
7 Well, every time that round would hit the
8 ramp, if it was a dry ramp you got a little dust ball.
9 Well, hundreds and hundreds of dust balls the HVAC
10 system, the air system, it's not going to be able to
11 remove everything. In order for that thing to be
12 working properly, all the ramps have to be wet when
13 you are firing into those ramps. The trap is to catch
14 the debris.
15 Q. So that's why you try to keep the water
16 flowing?
17 A. Exactly. That ammunition, like I said, it was
18 the downfall of that, I believe, the second downfall
19 of it.
20 Q. During the time you worked with Kurt Price, did
21 he ever complain to you about doing maintenance on the
22 bullet trap?
23 A. Yes.
24 Q. And what did he say?

Page 15

1 A. He didn't think that we should be doing the
2 maintenance, that we should be firearms instructors.
3 Q. Did he ever tell you that he didn't want to do
4 the maintenance because it was a health concern to
5 him?
6 A. Kurt -- I can't say he did or didn't because I
7 don't remember the exacts, but Kurt would bring up
8 issues. I know Wayne also brought up issues where we
9 actually purchased gloves before we would do anything
10 on it because Wayne had actually purchased the gloves.
11 I can't remember the name of the company. He
12 purchased it off of our credit card.
13 Q. What kind of gloves are these?
14 A. They were industrial, big, heavy gloves that
15 come up to your elbows.
16 Q. And what were you using the gloves for?
17 A. That was to be working in the trap and the
18 liquids themselves.
19 Q. Now, while you were in the firearms training
20 unit, did you attend commanders and section chiefs
21 meetings?
22 A. I attended meetings with the director of
23 training and the academy staff.
24 When you say section chiefs or commanders

Page 16

1 meetings, you mean like a DICAT meeting?
2 Q. Yes.
3 A. I never went to DICAT. I have only been to one
4 of those in my career.
5 Q. Now, you said that you did go to meetings with
6 the academy staff?
7 A. Yes. We all would attend. When I say, "we
8 all," Wayne, Kurt, myself, we would attend meetings at
9 the academy or they would come to our place and have
10 meetings in our conference.
11 Q. How often did you interact with Greg Warren as
12 part of doing your job when he was the captain and you
13 were the sergeant at the range?
14 A. Quite often. I went to the academy not every
15 day but I would say a couple times a week. When mail
16 was delivered there, you had to go there to get it.
17 Our clothing was delivered there. Most of the time
18 Corporal Warren got that on his way home. We were
19 certainly always in there.
20 Q. Did you meet with Captain Warren when you were
21 there?
22 A. At the academy?
23 Q. Yes.
24 A. Yes.

Page 17

1 Q. What sorts of things did you discuss with
2 Captain Warren?
3 A. How we were making out on the firearms,
4 students, recruits, hard heads that were coming
5 through that weren't -- that were troopers that we had
6 to deal with, maintenance issues on the range, stuff
7 that was breaking, things that needed to be replaced.
8 We were discussing, when I say, "we,"
9 Corporal Warren and Corporal Price and myself were
10 discussing hosting an IALEFI conference, an
11 International Association of Law Enforcement Firearms
12 Instructors conference at the range.
13 Q. Is this something you discussed with Captain
14 Warren?
15 A. Yes. He was all for it because he actually got
16 our professional organizations, when I say,
17 "professional," that's one of, getting our dues paid
18 up to bring us up to standard.
19 Q. You spoke a few minutes ago about replacing the
20 belt that was in the bullet trap?
21 A. Yes, sir.
22 Q. And was that something that you discussed with
23 Captain Warren?
24 A. Yes. Because we were at wit's end. The belt

5 (Pages 14 to 17)

Price, et al.
Richard A. Ashley

v.

C. A. # 04-956-GMS

Chaffinch, et al.
May 11, 2006

Page 18

1  that was there prior, you know, when I arrived didn't
2  work. It had froze up from the debris from this
3  ammunition. We couldn't shoot. This thing was
4  weighing tons. We tried changing clutches. We had
5  the companies come in and do that. It wouldn't
6  function.
7         So we talked to Mayfran and Savage, when I
8  say Savage Range Systems, to try to find something
9  that would meet our needs.
10  Q.  And did you communicate your problems with the
11  belt to Captain Warren?
12  A.  Yes, I did.
13  Q.  And did you discuss it with him at length?
14  A.  Yeah. We didn't have the money to fix it. We
15  were trying to see what we could, for lack of a better
16  term, we could rob Peter to pay Paul.
17  Q.  Did you ultimately find a way to pay for the
18  new belt in the bullet trap?
19  A.  Yes.
20  Q.  How was that done?
21  A.  It was utilized minor capital improvement
22  moneys from facilities management.
23  Q.  So that was money that came out of the
24  facilities management budget and not the State Police

Page 19

1  budget?
2  A.  The State Police didn't have any of the moneys
3  for it.
4  Q.  Now, in August of -- I'm sorry.
5         Was Major Eckrich also involved in the
6  discussions about getting a new belt put on the bullet
7  trap?
8  A.  Absolutely. He was the finance manager.
9  Q.  Why was Major Eckrich involved?
10  A.  He was the finance manager. He was the man in
11  charge of the pursestrings.
12  Q.  Now, during the time that you supervised Kurt
13  Price, did you ever in discussing the bullet trap
14  water system and discussing what was in the bullet
15  trap water system make the statement to him "You have
16  to die from something"?
17  A.  I never said anything about you have to die
18  from something, no.
19  Q.  Now, while you were in charge of the firing
20  range, were there HVAC problems, in other words,
21  ventilating system problems at the range?
22  A.  Yes, sir. Absolutely.
23  Q.  Can you describe the problem, please?
24  A.  The system wouldn't work. Sometimes we would

Page 20

1  go to start the system and you couldn't get it to come
2  up, so you had no airflow. Sometimes it would quit in
3  the middle of the shoot and you had no airflow.
4  Sometimes you would have half of the range had airflow
5  and the other half wouldn't. It was a machine. There
6  was always something broke on it.
7  Q.  Did you complain about it?
8  A.  Yes. Actually, when the system -- in the
9  wintertime it was actually designed for a hemisphere
10  further south than what we located. It had a freeze
11  stat to start the system. They actually showed
12  Corporal Warren how to go up on the roof to start this
13  system. There was a reset you had to push.
14         Sometimes it would throw belts. There was
15  actually -- there're motors up there and they're belt
16  driven and sometimes it would throw a belt and you
17  would have no air on one side of the range and the
18  other side would.
19         We complained about different things.
20  They actually, facilities went through and actually
21  hired a company to come in and rebalance the whole air
22  system to try to make what we had work as best we
23  could. As Corporal Warren was told by one of the
24  folks that came to rebalance that system, the system

Page 21

1  itself was a very good system, but it was just put
2  together wrong. And they were trying to make it the
3  right way to make it function as near correct as they
4  could.
5  Q.  Did they ever get it working to your
6  satisfaction?
7  A.  It would work, but you would still have
8  malfunctions in it. And when it malfunctioned, we
9  would stop shooting. I used to catch a lot of, I used
10  to catch the devil from one particular major, Major
11  Papili, because a lot of times when we would go to
12  shoot I would, we would cancel the shoot.
13         It put Wayne Warren in a bad position
14  because a lot of times it was when the SORT Team was
15  supposed to shoot and Wayne was part of the SORT Team
16  and Major Papili didn't like us making the SORT Team
17  go somewhere else to shoot.
18  Q.  Why is it that you would close the range on
19  those occasions?
20  A.  The air system wasn't working.
21  Q.  And why did that cause you to close the range?
22  A.  If you got no air circulation and you shoot in
23  there, you're not removing the dust and the debris
24  from the air. Everybody is breathing it in. That's a

6 (Pages 18 to 21)

Price, et al.
Richard A. Ashley

v.
C. A. # 04-956-GMS

Chaffinch, et al.
May 11, 2006

Page 22

1  health issue.
2  Q.  You consider that a health issue?
3  A.  Absolutely. We wouldn't shoot. We had other
4  agencies come to shoot, DNREC, others and if the
5  system didn't work, we sent them on their way. We
6  hate to do that because it caused problems for people,
7  but there was no sense in letting them being out
8  there. We wouldn't go out there and work in it, so we
9  didn't want them to work in it.
10  Q.  Now, I want to ask you a few questions about
11  the point when you left the range in December 2003.
12  A.  Okay.
13  Q.  I think you testified earlier that Chris
14  Foraker replaced you, right?
15  A.  Yes.
16  Q.  Now, did you meet with him to brief him on what
17  was going on at the range at the point that he
18  returned?
19  A.  We had a meeting the day he returned, myself,
20  Chris, Lieutenant Davis and Captain Warren. We met in
21  our conference room right there at the firearms unit.
22  Q.  Describe what happened in the meeting.
23  A.  Well, the meeting was there so we could pass on
24  the range to Chris, go through everything from the

Page 23

1  coffee fund, which Corporal Warren was holding at the
2  time, through our ammunition inventory, our weapons
3  inventory, through the range, et cetera.
4      I had a little sheet that I was going to
5  go in order on. I just wrote a handwritten sheet to
6  go in order so I'd know where I was going to go
7  down the line. And Chris had a checklist-type
8  checklist, rather nice with all of the information on
9  it. The first thing that come to my mind obviously
10  was that his attorneys gave it to him. So we wanted
11  to make sure we wanted to do everything the right way,
12  which we were ordered to do anyway.
13  Q.  Did Chris Foraker go through the checklist?
14  A.  Yes, we did.
15  Q.  Did he give you a copy of the checklist?
16  A.  Nope.
17  Q.  Did you ask him for a copy of the checklist?
18  A.  I asked for a copy between the three folks that
19  had a copy, Chris, Lieutenant Davis and Captain
20  Warren.
21  Q.  And did any of them give you a copy?
22  A.  Nope.
23  Q.  Did you actually walk through parts of the
24  range other than the conference room where the meeting

Page 24

1  started?
2  A.  We went through every bit of the range.
3  Q.  Who was with you when you went through the
4  range?
5  A.  Chris and Lieutenant Davis.
6  Q.  And did Captain Warren leave before you went
7  through the range?
8  A.  If my serves, he had some kind of a meeting.
9  He had to leave after we met in the conference room.
10  Q.  Did you go through the offices of the range?
11  A.  The offices?
12  Q.  Yes, that day. Did you walk through the
13  offices?
14  A.  Well, the conference room, you had to walk
15  through the office to get out of the conference room.
16  Q.  Okay. Did you walk through the armorer's room?
17  A.  Yes, we did.
18  Q.  Did you walk through the floor, the area, the
19  shooting area?
20  A.  Yes, we did.
21  Q.  And behind the bullet trap?
22  A.  Yes, we did.
23  Q.  And was Chris Foraker with you the whole time?
24  A.  Yes, he was.

Page 25

1  Q.  And Ralph Davis as well?
2  A.  Yes, they were.
3  Q.  And was the floor scrubber, the thing you
4  called the Zamboni, working that day?
5  A.  I can't say it was working that day. It was
6  working when we used it last. I didn't start it up
7  that day.
8  Q.  And how long before that day was the last time
9  you had seen it running?
10  A.  Every other Friday we used the thing.
11  Q.  You did maintenance every other Friday?
12  A.  We set up, actually set a schedule for every
13  other Friday it would be down for maintenance days
14  because we had a company come in and change all our
15  filters every other Friday.
16  Q.  On December 1, 2003, the day you turned over
17  the range to Chris Foraker, was the bullet trap
18  operational?
19  A.  Yes.
20  Q.  Were the lanes wet?
21  A.  Yes.
22  Q.  Was it running that day?
23  A.  Yes. Everything was up and running.
24  Q.  Mr. Ashley, I'm going to show you a videotape

7 (Pages 22 to 25)

Price, et al.                              v.                    Chaffinch, et al.
Richard A. Ashley              C. A. # 04-956-GMS                   May 11, 2006

Page 26

1  that I put an exhibit sticker marked Defendant's
2  Exhibit 88 and I'm going to slide that across the
3  table.
4          Can you tell us what that is?
5  A.  Yes, sir.
6  Q.  What is it?
7  A.  It's a videotape of a retirement party that was
8  hosted for me on June 25th of 2004.
9          MR. ELLIS:  Thank you very much.  I don't
10 have any further questions.
11         MR. NEUBERGER:  All right.  Let's take a
12 break.
13         THE VIDEOTAPE OPERATOR:  We're going off
14 the record at approximately 3:38 p.m.
15         (A brief recess was taken.)
16         (Defendant's Deposition Exhibit No. 88 was
17 marked for identification.)
18         THE VIDEOTAPE OPERATOR:  We're back on the
19 record at approximately 3:47 p.m.
20 BY MR. NEUBERGER:
21 Q.  Now, Sergeant Ashley, you're currently retired
22 from the State Police.  Isn't that right?
23 A.  Yes, sir.
24 Q.  And you're currently receiving your State

Page 27

1  Police pension, right?
2  A.  Correct.
3  Q.  Now, you're friends with Colonel Chaffinch,
4  aren't you?
5  A.  No more so than with Kurt Price and Wayne
6  Warren.  I mean not friends friends.  Just
7  professionally.  I mean, when we worked together,
8  yeah, we're friends.  We're not hanging out friends.
9  Q.  Now, after you were transferred out of the FTU,
10 did you go to the restaurant in Dover called When Pigs
11 Fly and have lunch with Colonel Chaffinch and Major
12 Eckrich?
13 A.  When I retired, yes.
14 Q.  When you retired?
15 A.  Yeah.  That was my retirement lunch.
16 Q.  It was not when you were transferred out?
17 A.  No.
18 Q.  Now, when you were transferred into the FTU as
19 NCOIC, you weren't a certified armorer, were you?
20 A.  Nope.
21 Q.  Okay.  And you didn't have a transfer request
22 to transfer into the FTU when you were originally
23 transferred in in April of 2002, did you?
24 A.  No.

Page 28

1  Q.  And you had not been intimately involved with
2  the operations of the firearms training unit like the
3  people who were assigned there on a permanent basis.
4  Isn't that correct?
5  A.  Yes.
6  Q.  Okay.  Now, Sergeant Ashley, to the best of
7  your knowledge, is it bad for young children to be
8  exposed to lead?
9  A.  Yes.
10 Q.  Is it bad for humans in general to be exposed
11 to lead?
12 A.  Certain amounts, yes.
13 Q.  Now, to the best of your knowledge, did anyone
14 at the FTU ever receive training on how to clean out
15 the lead-lined bullet trap?
16 A.  I couldn't tell you.  I don't know.
17 Q.  Okay.  To the best of your knowledge, did
18 anyone at the FTU ever receive training in how to
19 clean up lead, copper, zinc, tin, arsenic or other
20 types of bullet residue from the bullet trap?
21 A.  Not that I'm aware of.  I don't know.
22 Q.  Did you ever receive any training about how to
23 clean up the toxic dust caused by the impact of the
24 frangible bullets against the lead-lined bullet trap?

Page 29

1  A.  Just what Corporal Price and Corporal Warren
2  showed me.
3  Q.  And do you know if they had ever received any
4  training?
5  A.  I don't know.
6  Q.  Okay.  Did you ever receive any formal training
7  in how to maintain the systems in the range?
8  A.  Formal training from?
9  Q.  Mayfran, Savage, anyone.
10 A.  Just Mayfran on how to make the adjustments on
11 the belt.
12 Q.  Just on how to make the adjustments on the
13 belt?
14 A.  Yes.
15 Q.  And beyond that, did you receive any formal
16 training?
17 A.  On maintenance?  No.
18 Q.  Okay.  Did you ever receive any training in
19 hazardous material handling?
20 A.  No.
21 Q.  How about HAZMAT disposal?
22 A.  No.
23 Q.  How about HAZMAT abatement?
24 A.  No.

8 (Pages 26 to 29)

Price, et al.                                    v.                        Chaffinch, et al.
Richard A. Ashley                  C. A. # 04-956-GMS                        May 11, 2006

Page 30

1   Q.  Were you ever given any protective equipment to
2   wear at the FTU like a Tyvek suit?
3   A.  No.
4   Q.  How about one of those big, bulky moon suits?
5   A.  No.
6   Q.  How about a respirator?
7   A.  No.
8   Q.  Were you ever given like little booties to put
9   on your feet?
10  A.  No.
11  Q.  Okay.  Now, I think you testified on your
12  direct about the many problems with the bullet trap,
13  right?
14  A.  Yes.
15  Q.  You also testified about the many problems with
16  the HVAC system.  Isn't that right?
17  A.  Correct.
18  Q.  Were there times when the HVAC system would
19  blow air 180 degrees in the wrong direction?
20  A.  I don't remember it going backwards, no.
21  Q.  Okay.  Now, I think you indicated on direct
22  that you weren't sure if Kurt Price ever raised any
23  health concerns to you regarding the maintenance of
24  the bullet trap.

Page 31

1      Do you recall that testimony?
2   A.  Yes.
3   Q.  So if Kurt Price testifies that he did raise
4   health concerns to you about the maintenance of the
5   bullet trap, you don't have any knowledge that would
6   dispute that.  You just don't remember one way or the
7   other.
8      Is that fair to say?
9   A.  I remember Kurt complaining about maintenance
10  and other things, but I don't recall it being health
11  in general.
12  Q.  Now, while you were the NCOIC do you recall
13  anyone ever coming to you and questioning the effect
14  on their lungs of breathing in smoke and other toxins?
15  A.  We were always concerned about that.  I don't
16  remember anybody in particular coming to us, but while
17  I was there we were always worried about, we were
18  always worried about the air quality itself.
19  Q.  Okay.  Now, did anyone ever raise any concerns
20  to you about the composition of the frangible
21  ammunition?
22  A.  We didn't know what it was comprised of until
23  after I left.  That's when -- because I was still
24  going back and forth to the range at times.  I don't

Page 32

1   remember if it was Corporal Warren or Corporal Price
2   that had come up with the the actual composition, what
3   was made in the ammunition, some kind of data safety
4   sheet.
5   Q.  So would that have been after you were
6   transferred out on December 1, 2003?
7   A.  Yes.  I think they had been shooting that
8   ammunition I believe from 2001 sometime.
9   Q.  Do you recall ever telling Kurt Price or Wayne
10  Warren that the frangible ammunition was ceramic or
11  made of ceramic materials?
12  A.  That's what they had told me, it was ceramic
13  material.  I had no idea what it was.
14  Q.  So they told you that?
15  A.  It was like a ceramic because it turned into
16  mud when it hit water, so...
17  Q.  Did you ever hear that a State Police doctor
18  had told Kurt Price that copper is not your liver's
19  friend?
20  A.  No.  I don't know why I would have said that
21  because I didn't know copper was in it until after, it
22  was after I was gone that we found out it was copper
23  in the rounds.
24  Q.  Did you ever -- while you were there serving as

Page 33

1   the NCOIC, did Wayne Warren ever tell you that same
2   thing?
3   A.  No.  Because we didn't know there was copper in
4   the round.
5   Q.  Did Kurt Price ever tell you while you were the
6   NCOIC that the State Police doctors had told him
7   performing the maintenance on the bullet trap, on the
8   back side of the bullet trap was causing health
9   hazards and causing his lead levels to spike?
10  A.  No.  I don't know what State Police doctors you
11  are speaking of.
12  Q.  How about Dr. Green?
13  A.  Don't know him.
14  Q.  So are you denying that he ever said that or
15  you just don't remember one way or the other?
16  A.  I don't know of any doctors that told anybody
17  that cleaning that trap was hazardous.  I had heard
18  this later down the pike but not while I was there.
19  Q.  Right.  I'm only asking about when you were
20  there.
21  A.  Yeah, that's what I'm telling you.  No.
22  Q.  I think you testified on direct that you denied
23  ever saying to Kurt Price that "Hey, you have to die
24  from something" after he raised health concerns to

9 (Pages 30 to 33)

Price, et al.                          v.                          Chaffinch, et al.
Richard A. Ashley              C. A. # 04-956-GMS                          May 11, 2006

Page 34

1   you?
2      A.  I never said that.
3      Q.  Okay.  But I thought you said you can't
4   remember if Kurt ever raised health concerns to you?
5      A.  I can't remember if he did, but I never told
6   anybody you got to die from something.
7      Q.  Did you ever call Kurt a whiner and a
8   complainer and just tell him "Hey, just shut up and
9   stop your bellyaching"?
10     A.  No.  Because if I said that, I would have told
11  him while we were doing the shotguns.  So, no, I never
12  said that to him.
13     Q.  Did you ever tell either him or Wayne Warren
14  that "Hey, you just have to learn to deal with it"?
15     A.  There was a lot of stuff up there that we
16  talked about that we had to just learn to deal with,
17  mostly with money issues.
18     Q.  Did you ever say that about health and safety
19  issues?
20     A.  Except the belt when we didn't have it, the
21  money to fix it, and the air machine not to fix it
22  right way.
23     Q.  So as to like the belt and the HVAC system, are
24  you saying that you may have said, "Hey, we just have

Page 35

1   to learn to deal with it" or something to that effect?
2      A.  We didn't have to learn to deal with it.  We
3   had to deal with it because there wasn't any money.
4      Q.  Would you agree that saying to a subordinate
5   officer after they expressed health and safety
6   concerns "Hey, you have to die from something" is, I
7   mean it's an inappropriate response?
8      A.  Absolutely, it would be.
9      Q.  Now, Sergeant Ashley, I want to put a document
10  in front of you and this has been previously marked as
11  Plaintiff's Exhibit 115.
12     A.  Thank you.
13     Q.  No problem.
14          Could you just take a quick look at this
15  and familiarize yourself with the document?
16     A.  I'm familiar with it.
17     Q.  All right.  Is this a memo or a letter that you
18  sent to Major Eckrich about repairs necessary to the
19  bullet trap?
20     A.  Yes.
21     Q.  Now, there doesn't appear to be a cc line on
22  this, does there?
23     A.  This was a letter that was created to go to our
24  secretary of public safety so we wouldn't have to go

Page 36

1   through a bid process.  If you look at the last one,
2   it says Mayfran makes this, is the only one, that
3   manufactures the belt.
4           We were trying to sole source it so we
5   wouldn't have to pay Savage extra money to do what
6   Mayfran could have done for less money.
7      Q.  That's helpful, but let's get back to my
8   question.
9      A.  I'm just telling you.
10     Q.  Is there a cc line?
11     A.  No, there isn't.  That's what this was for.
12     Q.  Okay.  But it's not addressed to the cabinet
13  secretary.  Up top it says Major, right?
14     A.  It says Major.  No name on the major.  Just
15  Major.
16     Q.  Well, for example, the current cabinet
17  secretary is David Mitchell, right?
18     A.  He is now.  This wasn't then.
19     Q.  Then that would have been Secretary Jim Ford,
20  right?
21     A.  That's correct.
22     Q.  And his last rank when he was a trooper wasn't
23  major, was it?
24     A.  No.  I think he was a colonel.

Page 37

1      Q.  Yes.  He was colonel of the State Police back
2   in say the 1970's, right?
3      A.  This would go to the major and the major would
4   put it together and then it would go to the secretary.
5      Q.  Right.  So this is addressed to the major?
6      A.  Yes, to a major.
7      Q.  And in the very first sentence it says, "In its
8   current state, the Bullet Recovery System is
9   inoperable," correct?
10     A.  That's correct.
11     Q.  Do you recall when you sent this?
12     A.  Not exactly.  It had to be prior to June
13  because that's when we got the new belt in.
14     Q.  June of what year?
15     A.  '03, I believe.
16     Q.  Okay.  All right.  You can put that document
17  away.
18          Thank you.
19          Now, I think you testified on direct that
20  you helped install the new drag belt with the help of
21  a Mayfran employee or something to that effect.
22          Do you recall testifying to that?
23     A.  Yep.  Yes, sir.
24     Q.  And I think you indicated that the Mayfran

10 (Pages 34 to 37)

Price, et al.
Richard A. Ashley

v.

C. A. # 04-956-GMS

Chaffinch, et al.
May 11, 2006

Page 38

1  employee showed you how to adjust the belt and balance
2  it and things like that?
3     A.  How to make adjustments when it's looser
4  because it's actually a big chain.
5     Q.  Do you recall who that employee was?
6     A.  I can see the guy, a small guy, like a slightly
7  grayish hair.  I want to say his name is Eddie, but
8  I'm not sure.
9     Q.  Now, did you ever receive any formal training
10  other than whatever this Mayfran employee told you
11  during the site visit?
12    A.  Nope.  No, sir.
13    Q.  Did you think you were qualified to tinker with
14  the belt and make those kinds of adjustments?
15    A.  He showed me.  He's the one who put it in.  He
16  showed me what to do, so I would say yes.
17    Q.  Okay.  Now, I think you also mentioned the
18  Zamboni.  Do you recall talking, testifying about that
19  on direct?
20    A.  Yes.
21    Q.  Now, how many hours do you think it took --
22  strike that.
23        I think you testified on direct that it
24  was every other Friday you --

Page 39

1     A.  We had maintenance days every other Friday.
2     Q.  Every other Friday you guys did all kinds of
3  FTU maintenance?
4     A.  Not all kinds, but we did maintenance, yes,
5  light bulbs, change filters.  They had filters on the
6  top to change, air filters.
7     Q.  So you're telling me that you changed the light
8  bulbs every other Friday?
9     A.  If there was a bulb burned out we did.
10    Q.  Sure.  And you would get out a ladder, climb
11  up, change the light bulb, right?
12    A.  Ladders and then we had a high-lift that went
13  down the center.
14    Q.  And did you use the floor scrubber or Zamboni
15  on those other other Fridays?
16    A.  Not every other Friday but, yes, it was used.
17    Q.  How long did it take to use the floor
18  scrubber/Zamboni to clean the range?
19    A.  When Kurt was using it, he buzzed around there
20  in just a matter of minutes.  I never timed him
21  because I was doing other things.
22    Q.  So he could clean the range floor in just a
23  matter of minutes?
24    A.  The thing was pretty quick when he was running

Page 40

1  around there.
2     Q.  Okay.  Now, what did you do with the water from
3  the Zamboni?
4     A.  He would take it outside and let it loose in
5  the parking lot.
6     Q.  Do you know why he did that?
7     A.  Why he did it?
8     Q.  Yes.
9     A.  That's what they have always done.
10    Q.  You're saying at the FTU to the best of your
11  knowledge they have always taken that toxic water and
12  just dumped it outside?
13    A.  That's what they have always done.
14    Q.  Right.  Did you ever order him to do that?
15    A.  No.
16    Q.  Okay.  But that's just what they have always
17  done?
18    A.  Yes.
19    Q.  Are you familiar with any Environmental
20  Protection Agency regulations as to HAZMAT material
21  and disposal of it outside?
22    A.  I'm sure there's a problem with it, but that's
23  what they have always done since day one.
24    Q.  Okay.  Did you ever ask facilities management

Page 41

1  to install an exhaust fan, an exhaust vent or an
2  exhaust fan in the armorer's room?
3     A.  Several times, even I sent them e-mails clean
4  up to the time that I was retiring.  I believe the
5  last one I probably sent was probably March.
6     Q.  Did they ever do it?
7     A.  To my knowledge, I don't think so.
8     Q.  Right.  Just while you were there did they do
9  it?
10    A.  Oh, no.  They didn't do it after I left either.
11  I don't know if it's been done since or not.
12    Q.  Did Kurt or Wayne ever come to you and say,
13  "Hey, we're getting lightheaded, we're being sickened
14  because we're in the armorer's room and this toxic,
15  pungent ordor from the cleaning fluid is making us
16  sick"?
17    A.  Actually, we switched cleaning fluids because
18  they never had a hood or exhaust in there and Corporal
19  Warren brought to my attention that the cleaning fluid
20  that Sergeant Foraker and Sergeant Parton before him
21  were using was carcinogenic.  So we actually switched
22  to a, at Wayne's behest and Wayne picked it out, was
23  to a natural cleaner that was citrus, natural so that
24  it wouldn't, it wasn't a carcinogenic.  It was a

11 (Pages 38 to 41)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A - 276

Price, et al.                        v.                        Chaffinch, et al.
Richard A. Ashley              C. A. # 04-956-GMS                    May 11, 2006

Page 42

1  strong odor, but it smelled like strong oranges.
2    Q.  So did they ever complain to you and say, "Hey,
3  we're just becoming lightheaded, we're starting to
4  feel faint because we're breathing stuff in"?
5    A.  Nobody liked the odor.  We all worked in it.  I
6  don't remember them saying "I'm dizzy, I'm going to
7  fall out."  I don't remember anybody saying that.
8    Q.  Okay.  Did you ever cut holes in the, did you
9  ever cut holes with a welding torch in the water tank
10  of the bullet trap?
11    A.  Yes, we did, with a cutting torch, yes.
12    Q.  Why did you do that?
13    A.  When they installed the trap with the dragline
14  it was dragging all the water to one end of the trap
15  and the other end would be dry.  I talked to Jay, I
16  believe his name is Zolcak, from Mayfran.  And he
17  suggested we put more holes in the reservoir or trough
18  so the water could escape to the bottom to get to the
19  other end to the pump so the pumps wouldn't be run dry
20  on the far end.
21    Q.  Okay.  So just one day you brought in a cutting
22  torch and did that?
23    A.  No.  They had a cutting torch there.
24    Q.  Okay.  And you just cut the holes in?

Page 43

1    A.  Yes, we did.  Actually, I think myself and
2  Corporal Price were back there doing that.
3    Q.  Okay.  Now, I think you testified at the
4  beginning of my questioning that you were not a
5  certified armorer when you were transferred in, right?
6    A.  I wasn't a certified armorer, no, sir.  I don't
7  think all the others were either.  Their
8  certifications had expired, most of them.
9    Q.  Okay.  Do you know that for a fact or is that
10  just your speculation?
11    A.  If I remember correctly, most everybody's
12  certifications on a lot of things had expired.  That
13  was one of the things that we went through when I came
14  in, that Kurt and Wayne and myself sat down and we
15  even canceled a shoot during the summer because the
16  certifications expired on some munitions.
17        One of the deals we made was to get
18  everybody's certifications up and running.  So we had
19  everybody recertified, including Sergeant Foraker,
20  because we hosted a class for armorer certification at
21  the firearms training unit.
22    Q.  Was this after you got transferred out the
23  first time?
24    A.  That's correct.

Page 44

1    Q.  Now, as a result of your not being a certified
2  armorer, when you were teaching recruits how to
3  disassemble a weapon did you have to sit down
4  beforehand with Kurt or with Wayne and did they have
5  to show you how to do it?
6    A.  Not to disassemble.  They had to show me how to
7  put one back together.
8    Q.  So you could take it apart?
9    A.  It was 57 pieces, if I remember, sir, if my
10  memory serves me correctly.
11    Q.  So that's a complicated task, correct?
12    A.  Absolutely, it was.
13    Q.  Would that be the kind of thing that you would
14  learn how to do in an armorer's course?
15    A.  Yes.
16    Q.  Now, isn't it true that you never called the
17  firing line from the control room?
18    A.  Never.  I always went out on the line.
19    Q.  Isn't it true that calling the entire line from
20  the control room is a very, very stressful job?
21    A.  I don't know.  I wasn't in there.  I couldn't
22  tell you if it was stressful.  I know we let the guys
23  take turns inside.  I always walked the line.  I
24  consider that -- that was stressful enough because you

Page 45

1  never knew who was going to shoot where, but I never
2  worked inside the booth so I don't know.  I always let
3  those guys take turns.
4    Q.  So if Kurt or Wayne testified that it's a
5  highly stressful job to work in the control booth and
6  be responsible for the safety of everyone on the
7  firing line, would you have a reason to disagree with
8  them?
9    A.  Nope.
10    Q.  Now, Sergeant Ashley, you're currently retired
11  and you're a farmer, right?
12    A.  That's correct.
13    Q.  Do you raise chickens or something?
14    A.  Yes, I do.
15    Q.  Now, when you walk through your chicken
16  houses -- well, strike that.
17        Are you aware of the fact that -- well,
18  are you familiar with Perdue, the company that makes a
19  lot of kind of, that makes various kinds of chicken?
20    A.  Yes.
21    Q.  Are you aware of their standards for inside
22  their chicken houses about putting on a mask so you're
23  not overcome by the odor?
24    A.  I grew for Perdue one time.  I never wore a

12 (Pages 42 to 45)

Price, et al.                                    v.                              Chaffinch, et al.
Richard A. Ashley              C. A. # 04-956-GMS                              May 11, 2006

Page 46

1  mask.
2  Q.  Are you aware of their standards at least?
3  A.  Their field men don't even always wear a mask.
4  Q.  Are you aware if that's a recommended safety
5  practice?
6  A.  I'm sure it's recommended because of dust.
7  Q.  Do you do it?
8  A.  No.
9  Q.  Okay.  I think you also testified about closing
10 down the range if there was no air circulation?
11 A.  We have, yes.
12 Q.  Now, how would you know that?  Would that be
13 when like when the system, when the HVAC system and
14 all the problems it had, would that be just when it
15 would just shut off?
16 A.  Either it wouldn't start or half the range
17 would have air, the other half wouldn't.  You could
18 see it the air, when it moves because, for one,
19 you could hear it.  When you walk down the front line
20 around the seven yard line you could feel the air
21 where it was moving and where it wasn't moving.
22 Q.  Okay.
23 A.  Like I said, it caused a lot of problems for
24 Corporal Warren because of the SORT Team and Major

Page 47

1  Papili and then I would cancel their shoot.
2  Q.  All right.  Now, how long would it be shut down
3  for?
4  A.  Until it got, until they got it running, until
5  facilities came and got the thing up and running.
6  Q.  Typically how long would that be?
7  A.  Sometimes it might be an hour.  Sometimes it
8  might be three, four days.
9      It's according to what they needed, what
10 part was broken, what they could get fixed.  It's a
11 machine.
12 Q.  Do you think that you had the authority to shut
13 down the range for months at a time?
14 A.  I would have shut it down for months at a time
15 if we couldn't get it fixed, yes.  I would have went
16 through, obviously through my chain of command, but we
17 would've always made that phone call, but it could
18 have been closed, yes.
19 Q.  Right.  But do you think you independently
20 without consulting with your chain of command had the
21 authority to shut down the FTU for months at a time
22 while you were in charge of it?
23 A.  I wouldn't shut it down for months at a time
24 without going through the proper chain of command.

Page 48

1  That was their decision.
2  Q.  Right.  That's just proper procedures, right?
3  A.  That's correct.
4  Q.  DSP is a paramilitary organization, right?
5  A.  That's correct.
6  Q.  You're a sergeant, right?
7  A.  That's correct.
8  Q.  And there's a whole bunch of ranks above you,
9  right?
10 A.  Yes, sir.
11 Q.  And do you think a decision like that might be
12 a little bit above your pay grade?
13 A.  For months at a time?  Yes, sir.
14 Q.  For example, the FTU, it's actually owned by
15 the division of facilities management of the State of
16 Delaware.  Isn't that your understanding?
17 A.  Yeah.  The State Police maintains one part and
18 they maintain the other part.
19 Q.  But the actual building itself is owned by the
20 state, by facilities management and not by the State
21 Police?
22 A.  I believe so, yes.
23 Q.  And the State Police, for lack of a better
24 term, is a tenant, correct?

Page 49

1  A.  I don't know if they pay rent, but they use it,
2  yes.
3  Q.  Right.  And the State Police is in a different
4  division of the State of Delaware than facilities
5  management, right?
6  A.  A separate entity, yes.
7  Q.  I mean, the State Police, they're in the
8  department of safety and Homeland Security, right?
9  A.  That's correct.
10 Q.  And the FTU is functioning in a building owned
11 by a different division in the State of Delaware,
12 correct?
13 A.  As is most of the troops in the state.
14 Q.  Right.  So a decision like that, that might
15 have to go up pretty -- strike that.
16      A decision like that might have to go up
17 the chain of command to the cabinet secretary, for
18 example, might have to talk and consult on something
19 like that?
20      MR. ELLIS:  I'm sorry.  Decision like
21 what?
22 Q.  Shutting down the range for months at a time?
23 A.  I have no idea.  I have never done that.
24 Q.  Right.  That's above your pay grade?

13 (Pages 46 to 49)

A - 278

Price, et al.                          v.                    Chaffinch, et al.
Richard A. Ashley          C. A. # 04-956-GMS              May 11, 2006

Page 50

1   **A. That's correct.**
2   Q.   Okay.  Are you happy that decisions like that
3   are above your pay grade?
4   **A. You mean were above my pay grade?  I don't**
5   **know.  Yeah.  I guess so.**
6   Q.   Okay.
7          MR. NEUBERGER:  No further questions.
8          MR. ELLIS:  No questions here.
9          THE VIDEOTAPE OPERATOR:  The deposition is
10  ending at approximately 4:10 p.m.
11         (Deposition concluded at 4:10 p.m.)
12
13            I N D E X
14  DEPONENT:  RICHARD A. ASHLEY        PAGE
15      Examination by Mr. Ellis       3
        Examination by Mr. Neuberger   26
16
    (There were no exhibits marked for identification.)
17
    ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 51
18
    CERTIFICATE OF REPORTER              PAGE 52
19
20
21
22
23
24

Page 52

1   State of Delaware   )
                        )
2   New Castle County   )
3
4           CERTIFICATE OF REPORTER
5
        I, Kurt A. Fetzer, Registered Diplomate
6   Reporter and Notary Public, do hereby certify that
    there came before me on May 11, 2006, the deponent
7   herein, RICHARD A. ASHLEY, who was duly sworn by me
    and thereafter examined by counsel for the respective
8   parties; that the questions asked of said deponent and
    the answers given were taken down by me in Stenotype
9   notes and thereafter transcribed by use of
    computer-aided transcription and computer printer
10  under my direction.
11      I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13      I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17          Kurt A. Fetzer, RDR, CRR
            Certification No. 100-RPR
18          (Expires January 31, 2008)
19
    DATED:
20
21
22
23
24

Page 51

1
2
3         REPLACE THIS PAGE
4         WITH THE ERRATA SHEET
5         AFTER IT HAS BEEN
6         COMPLETED AND SIGNED
7         BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

14 (Pages 50 to 52)