*FTO Pleadings*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE et al.,      :

       Plaintiff,      :

      :

   v.      :

      :

COLONEL L. AARON CHAFFINCH, et al.,    :    C.A.No.04-956-GMS

      Defendants.     :

      :

## PLAINTIFFS' ANSWER AND OBJECTIONS TO DEFENDANTS' FIRST SET INTERROGATORIES

Plaintiffs, by their attorneys, hereby object to Defendants' First Set of Interrogatories ("Discovery") in accordance with the numbered paragraphs as set forth below. Plaintiff reserves the right to amend or supplement the responses contained herein as may be necessary or appropriate in the future.

Discovery has not concluded in this case. Plaintiffs reserve the right to supplement their responses at a later time as discovery is completed.

## GENERAL OBJECTIONS

1.     Plaintiffs object generally to Discovery insofar as it requests information or documents which are subject to the attorney-client privilege, or which constitute trial preparation materials or attorney-client work product, or which are otherwise privileged or protected and not subject to discovery.

2.     Plaintiffs object generally to Discovery to the extent that it seeks information not relevant to this action or that does not appear reasonably calculated to lead to the discovery of admissible evidence.

3.     Plaintiffs object generally to Discovery insofar as it requests information or

-1-

documents which constitute or contain sensitive and non-public business, medical patient, medical credentials, personal, income tax or other confidential information. Plaintiff will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

4.    Plaintiffs object generally to Discovery insofar as it requests personal or confidential information. Plaintiffs will only produce such information, if not subject to any other objections, pursuant to an appropriate stipulation and order of confidentiality.

5.    Plaintiffs object generally to Discovery insofar as it does not specify a reasonable time or place of production or the manner of making the inspection in accordance with Fed.R.Civ.P. 34(b). Plaintiffs will produce the indicated documents for inspection and copying at a time and location to be agreed upon by the parties.

6.    Plaintiffs object generally to Discovery insofar as it seeks discovery of agreements with third parties (not parties to or related to this action) which may be subject to nondisclosure and either cannot be produced without agreement of a third party or cannot be produced without an appropriate stipulation and order of confidentiality.

7.    Plaintiffs object generally to Discovery insofar as it is burdensome because the discovery it seeks is already in the possession, custody or control of defendants.

8.    Plaintiffs' responses that follow are without prejudice to and are not a waiver of the foregoing general objections.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.    Plaintiffs object to Defendants' definitions and instructions insofar as they impose burdens on Plaintiffs beyond that required by the Federal Rules of Civil Procedure or the case law in the Third Circuit.

-2-

**A - 303**

## OBJECTIONS TO SPECIFIC INTERROGATORIES
## (IN ADDITION TO AND SUBJECT TO ALL THE FOREGOING OBJECTIONS)

1. Identify each person who answered or aided in answering these Interrogatories and indicate which Interrogatory each such person answered or aided in answering.

**Answer:** Plaintiffs Cpls. B. Kurt Price, Wayne Warren and Sgt. Christopher D. Foraker - all. Mrs. Lynn Price - Answer to Interrogatory #3. Mrs. MaryLou Warren - Answer to Interrogatory #3. Mrs. Suzanne Foraker - Answer to Interrogatory #3.

2. Identify each person who answered or aided in answering the Requests in Defendants' First Set of Requests for Production of Documents and indicate which Requests each such person answered or aided in answering.

**Answer:** Plaintiffs Cpls. B. Kurt Price, Wayne Warren and Sgt. Christopher D. Foraker - all.

3. Identify injuries or damages that Plaintiffs claim in this action. Specify the basis for each item of damages, provide a calculation for each amount of monetary damages, and attach to the accompanying Request for Production of Documents and Things any and all documents which support these damages.

**Answer:** See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 3, 13, both the specific answers and overarching concepts which are incorporated by reference herein.

    (a) Emotional distress.

        (1) Expert Component. Objection. Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure.

        (2) Non-Expert Component. Plaintiffs have been crushed emotionally as a

-3-

**A - 304**

result of defendants' retaliatory actions. Plaintiff Cpls. Kurt Price, Wayne Warren and Sgt. Foraker are longtime Troopers who have always been highly respected among their peers. Each chose police work as their career, with Cpl. Price doing a distinguished tour of duty with the U.S. Marine Corps before joining the DSP. They are tough men who have worked tough jobs over the course of their long careers in the DSP. From undercover drug operations, to Special Investigations Tactical Operations, to the high risk special weapons activities of the SORT team, these men have thrived and built their careers on doing difficult jobs and doing them a cut above. Each are cut from the John Wayne and Clint Eastwood molds. They do not like to talk about or express their feelings, as they believe that to do so is a sign of weakness.

(i) Emotional and Physical Problems.

Cpl. Price has suffered greatly under the burdens caused by defendants' retaliation against him. He suffers from migraine headaches and extreme fatigue. He is constantly tired and worn out. Conversely, he oftentimes suffers from many sleepless nights as a result of all of the worry. When he does sleep, he suffers from nightmares. He cannot get the retaliation and the resulting worry off of his mind. He now has problems trusting people because despite nearly 20 years of loyal service to the DSP, the Division has cruelly cast him aside. He has feelings of uselessness and is struggling with depression. He feels that things are hopeless and that there is nothing to look forward to or feel good about to keep him going.

Additionally, the stress of wondering how he was going to provide for his family simply wore him down. He began to suffer from chest pains in January 2005 and had to undergo stress and other testing to deal with the problem and now is forced to take medications to deal with the problems. His family doctor, Dr. Gary Quiroga, who also is a cardiologist, ordered him out of work and he went out on FMLA leave as a result as he tried to find a way to lessen the stress, but

-4-

it was to no avail. He continues to be burdened by the weight of trying to provide for his family in the face of the uncertainties created by defendants' retaliatory misconduct.

Cpl. Warren also has suffered greatly under the burdens caused by defendants' retaliation against him. He is constantly worn down and tired because of the stress of it all. Severe fatigue has become a serious issue. After dinner, instead of working outside the way he used to, he usually simply crashes and falls asleep because he is so worn down by the stress of trying to provide for his family and cope with defendants' retaliation. His sleep patterns are in disarray. Often times he tosses and turns because he cannot get the stress and financial worry off of his mind. He never used to have trouble falling asleep but cannot sleep now because of the stress and worry. He is much more irritable than he used to be. When he is under stress, his ears 'ring' much worse than they normally do. And due to the retaliation against him and losing his livelihood, his stress levels have been extremely high. Lastly, he is constantly down and believes that he is suffering from depression. His entire life has been consumed by what the DSP has done to him as they have cruelly cast him aside. It haunts him that he is being punished for telling the truth by the very Division he has dedicated his life to.

(ii) Impact on the Family and Social Relationships.

Cpl. Price has become forgetful because he is so preoccupied with worry. For example, there have been times he took one of his beloved children to the wrong location or at the wrong time for basketball practice. Upon realizing what he has done, he is frustrated and embarrassed that he cannot seem to get his head straight in his dealings with his family. And this upsets him a great deal.

The family unit has been greatly affected. Cpl. Price has a much shorter fuse with his children since the retaliation began. He yells a lot and loses his temper and patience much more

-5-

**A - 306**

easily and is frequently agitated and yelling. Kurt used to be a happy go lucky man with a good sense of humor. But he does not smile or laugh anywhere near as much as he used to. He is easily frustrated and frequently must fight back tears. His wife and children's feelings are frequently hurt as a result, which then upsets Kurt even more, knowing how much he has hurt his family. The family did not hold birthday parties for their two children in January and April 2005 because the family unit just felt burned out from struggling to cope with the stress on the family caused by defendants. It hurts Kurt to see his wife and children working so hard to cheer him up and yet not be able to because he cannot pull back from the feelings of hopelessness that he is experiencing. Kurt has suffered as his son cried because he "just wants his Dad back." Kurt's daughter has had to undergo counseling at school because the stress in the home has begun to negatively affect her. Cpl. Price's intimate and love life with his wife Lynn also has been negatively affected in numerous ways.

In an effort not to burden his family, Cpl. Price often tries to talk to and lean on his fellow plaintiffs, Cpl. Warren and Sgt. Foraker. But his family notices that less and less of their father and husband's times is being devoted to them as he is simply trying to keep his head above water with losing his job. Kurt is not able to spend as much time as he used to with his family because of the constant worry.

Family vacations have been cancelled and drastically cut back because he has been barred from working any overtime or extra duty jobs while on light duty. Even when he is able to try to get away, his head is simply not with his family. His children constantly question him as to whether the family is going to survive daddy losing his job. He and his dear wife Lynn have had to take out an emergency home equity line of credit to cope with the unforseen financial difficulties that inevitably result from reduced pay and job loss. The worry of needing to sell his home to

-6-

**A - 307**

survive weighs heavily upon Kurt and his wife and children. It tears Kurt up inside to have to see his son and daughter upset because daddy is so upset all of the time. It hurts he and his wife Lynn to have to answer questions from their children about why after almost 20 years of loyal and dedicated service the DSP is doing this to their dad.

Cpl. Price and his family also have withdrawn from their local community and their previous friendships have suffered. No longer do they socialize with friends in their local neighborhood the way they once did. It is easier to just withdraw than to have to deal with the constant questioning and explaining that inevitably arise during conversation.

Th uncertainty of what lies ahead for his family also causes Kurt a great deal of stress. The lack of a job, of a future plan weighs heavily upon him. As discussed below, he previously knew what he was going to do when he retired from the DSP. But those plans are now out the window due to defendants' retaliation against him.

Cpl. Warren has suffered from similar emotional problems and difficulties. He is much more irritable than he used to be. He is constantly aggravated. He has a shorter fuse, yells and loses his temper very quickly since defendants' retaliation began. He is always in a bad mood. And all of these things have negatively impacted upon his family, which upsets Wayne a great deal.

Much like Cpl. Price, Cpl. Warren tries not to burden his family with his stress and worries. He tries to lean on his fellow plaintiffs and others for support. But by the same token, his family notices that their husband and father is spending less time with them then before because of the weight of it all as he tries to shield them from it. But despite his best efforts to protect his family from the changes defendants have wrought upon him, he has been unsuccessful. His wife MaryLou and his daughters see how he is changing. They see the impact defendants' actions have

-7-

had on his day to day demeanor and disposition. It hurts them to see this. His intimate and love life with his wife MaryLou also has suffered.

Wayne also suffers a great deal because of the uncertainty of what lies ahead. His eldest daughter is about to begin college. His youngest will soon be at that age. Losing his job at this critical time when he is trying to pay for college is a constant source of stress for him. The lack of a job also causes problems because his future plans are in disarray. As discussed below, he previously knew what he was going to do when he retired from the DSP. But those plans are now out the window due to defendants' retaliation against him. The worry of needing to sell his home to survive also weighs heavily upon Wayne and his wife and daughters.

Wayne also feels those feelings of hopelessness because in his eyes, his career, everything that he worked for in the DSP has been wasted.

(b) Injury to Reputation. The DSP is a small, close-knit police force with approximately 600 uniformed Troopers and 250 civilian employees. It is a much smaller force than the state police forces of other larger states, such as Pennsylvania, New Jersey and New York. As a result, Troopers have a much higher degree of knowledge of and interaction with each other than would be found in larger departments. Indeed, because it is a small force, life in the DSP has a soap opera quality to it, with everyone talking about what happened to everyone else.

As longtime firearms instructors at the FTU, each were responsible for the firearms and other training of every single recruit and Trooper in the DSP. Every single Delaware State Trooper has to train and certify annually under their careful and watchful eyes. Similarly, due to the large number of outside agencies who either send their recruits to the State Police Academy and FTU for training, or send their officers to the FTU for firearms instruction, they also skillfully train those officers as well. And as their performance evaluations demonstrate, Cpl. Price, Cpl.

-8-

Warren and Sgt. Foraker excel at what they do. Each takes great pride in passing on their years of specialized firearms expertise to each recruit, Trooper or other law enforcement officer who walks through the doors of the FTU.

Until defendants' retaliatory acts began, plaintiffs' reputations in the DSP and the State of Delaware law enforcement communities were sterling. But now, not only have plaintiffs' good names been besmirched as a result of defendants' maliciously blaming them for destroying the FTU, but they also have been singled out and treated in a manner in which no DSP Trooper has ever been treated.

Whereas historically the DSP has never tested for hearing problems in Troopers, suddenly, plaintiffs have been singled out and not only tested for hearing problems, but actually sent for auditory fitness for duty exams. Similarly, whereas historically the DSP has always actually accommodated Troopers who did in fact have hearing problems, suddenly, plaintiffs have been singled out and now the DSP refuses to accommodate them in any way shape or form. In the same way, whereas historically the DSP has always taken care of their own injured Troopers, be it by always giving them two years of light duty to finding internal DSP jobs where that the injured Trooper can still perform and thus keep them on the payroll, suddenly, Cpls Price and Warren have been singled out and maliciously targeted for termination, without being given two years of light duty, and without the DSP finding internal jobs that they can perform and still keep a DSP paycheck coming in.

And when something unprecedented like this happens in the DSP, the rest of the Troopers quickly catch on and begin to think there is something wrong with plaintiffs. They have been branded as 'suspect' in this close-knit police community.

Furthermore, by falsely accusing plaintiffs of destroying the multi-million dollar FTU

-9-

**A - 310**

facility, defendants have destroyed plaintiffs' professional reputations in the eyes of the close-knit law enforcement and firearms communities. Again, see Foraker v. Chaffinch, et al. Answer to Interrogatory # 13, 3 which are incorporated by reference herein.

As discussed in greater length in Foraker v. Chaffinch, et al. Answer to Interrogatory # 13, 3, troopers who served at the FTU have a track record of obtaining lucrative post-DSP employment. Plaintiffs will no longer be able to obtain any such jobs because they are damaged goods in the eyes of those in the law enforcement and firearms industries. They have been accused of destroying a multi-million dollar firearms training facility as a result of their incompetence and neglect. No one will want to hire them now.

In addition to Sgt. Foraker, Cpls. Price and Warren already had plans for their post-DSP careers. Each already have contacts that they have cultivated in the lucrative firearms training and professional security fields, fields that are ideal for them given their extensive experience, expertise and professional background. Each had planned to move into those fields following their retirement from the DSP. But those opportunities have been stolen from them.

Not only will these companies not want to hire individuals who now have a massive black mark on their professional service records from the false blame that has been laid upon them for destroying the FTU, but they also are now being drummed out of the DSP, allegedly because they are 'damaged goods.' Despite the fact that there are numerous police and law enforcement jobs in the DSP that plaintiffs are fully able to perform (including that of firearms instruction if the DSP and Facilities Management would simply fix and safely equip the building), defendants are maliciously running Cpls. Price and Warren out of the DSP. They are being thrown upon the scrap heap like damaged goods. No such company in any firearms, security or other law enforcement field will want to hire them now. The perception is that if the State Police agency you have served

-10-

A - 311

with honor and dedication for nearly twenty or more years is throwing you aside and has refused to treat you the way previous Troopers have been treated, then there must be something wrong with you. As Sgt. Foraker has been told, in the firearms industry, perception is reality and the perception is wrongdoing.

Additionally, plaintiffs' good names and reputations in the local community in which they and their families live have been publically destroyed by defendants malicious falsehoods. For example, there is a popular restaurant in Leipsic, DE named "Sambos." In plaintiffs' opinions, and in the opinions of many good hard working Delawareans, Sambo's is one of the hidden treasures and finest eating establishments in the State of Delaware. It is the place to go if you want to eat crabs, and enjoy the company of your neighbors and your community in a relaxed, comforting and casual atmosphere. The walls in Sambo's are covered with pictures of wildlife and famous NASCAR drivers. Additionally, there is a large world map also located on the wall. It is a Sambo's tradition that a pin is placed on the map to represent the places all over the world from which people have come to eat at Sambo's. This world map is literally covered in pins, representing visitors from most, if not all of the seven continents and innumerable countries from around the world. A little closer to home, numerous members of the Delaware State Police also routinely eat at Sambo's. The Executive Staff, including defendants Chaffinch and MacLeish, routinely take visiting police officers from out of state to eat and relax at Sambo's.

Part of the decor at Sambo's includes newspapers being placed over all of the tables in the establishment to serve as tablecloths. And when defendants first publically leveled their false accusations against Cpl. Price, Cpl. Warren and Sgt. Foraker, these false accusations were the subject of a massive front page story in the Delaware State News. Shortly after its publication, both Cpl. Price and Sgt. Foraker separately dined at Sambo's and were horrified to find that the

-11-

A - 312

false and defamatory front page Delaware State News article was covering nearly every table in the restaurant. These false accusations were prominently displayed for all to see. Moreover, the very day that Cpl. Price first saw these newspaper articles covering all of the tables, defendants Chaffinch and MacLeish entered Sambo's escorting numerous visiting out of state police officers. Again, defendants' false accusations were there for all to see.

(c) Humiliation. It is humiliating and embarrassing to be blamed for destroying the FTU and to be falsely accused of incompetence and neglect of your duties. These false accusations have been the subject of widespread media attention, in the News Journal, the Delaware State News, WBOC-TV, Police Beat magazine and others, over the last year and a half. Cpls. Price, Warren and Sgt. Foraker have been publically accused of being destroying the multimillion dollar firearms training facility that was entrusted to their care. They have been falsely accused of both incompetence and neglect. Not only has this widespread media coverage circulated throughout the law enforcement and firearms communities, but it has circulated throughout the public. And these false accusations have absolutely crushed plaintiffs.

In the same way, it is humiliating and embarrassing to be singled out for special and unprecedented treatment by the DSP. Troopers and others in the law enforcement and firearms communities are talking. It weighs on Cpls. Price, Warren and Sgt. Foraker when they have to attend functions, be it with members of the public, or with members of the firearms or law enforcement communities. All of these things have made it extremely hard for Cpls. Price, Warren and Sgt. Foraker to function and survive in the close-knit DSP and law enforcement communities since defendants singled them out and maliciously destroyed their good names. It has been hard for them to hold their heads up everyday when they went to work. They have suffered under the strain of the constant stares and whispers from their comrades. They have been shunned and

-12-

ostracized within this close-knit community of police officers.

Publically, it is even worse. As mentioned above, the Sambo's incident strikes very close to home for plaintiffs, who regularly enjoy the great food that Sambo's has to offer. Not only were they falsely accused in the close-knit DSP community, not only were they falsely accused publically, but these false accusations had even made their way into one of their favorite places to eat and relax. They had invaded their comfort zone.

In the same way, it is a terrible insult and embarrassing to they and their families to have to deal with these false accusations on a daily basis. The malicious gag order defendants imposed has only made things worse. Although they are being attacked by defendants, they are barred from publically defending themselves. They are heartbroken that their own superiors, the men who are supposed to be principled, ethical and honest, would falsely accuse them of wrongdoing when the superiors know better.

      (d) Diminished earning capacity. Objection. Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure.

      (e) Economic losses. Objection. Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure.


4. Do you contend that any admissions with regard to the issues in this lawsuit have been made by any party to the lawsuit or by any part's agent, servant or employee? If so, identify the person who made the admission and the substance of the admission. If the admission is contained in a document, identify the document.

**Answer:** Objection. Vague, overbroad and unduly burdensome. Calls for a legal conclusion. Moreover, the question is a thinly veiled attempt to prematurely obtain the mental

impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3). In addition, discovery is just beginning and the record in this regard remains to be developed.

Without waiving the objections, yes. The persons who made the admissions and the substance of the admissions are found in the depositions, trial testimony, sworn affidavits, Answers and answers to interrogatories in the following cases: Foraker v. Chaffinch, C.A. No.02-302-JJF (D.Del.); Dillman v. Chaffinch, et al., C.A. No. 02-509-KAJ (D.Del.); Bullen and Giles v. Chaffinch, et al., C.A. No. 02-1315-JJF (D.Del.); Conley v. Chaffinch et al., C.A. No. 04-1394-GMS (D.Del.). They also are found in the media articles, TV broadcasts, Auditor's Report, e-mails and other documents concerning the FTU and its personnel.


5. Describe in detail the improprieties, financial irregularities, breach of the public trust, fraud and/or corruption by public officials alleged in paragraph 12 of the Complaint.

**Answer:** Objection. Discovery is just beginning and the record in this regard remains to be developed. Without waiving the objection:

See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 6, 9 which are incorporated by reference herein.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

See Exhibit 1 - FTU Rough Timeline of Events.

Additionally, the financial irregularities started with the initial bidding process to construct the indoor shooting range. As any lay person would know, an indoor firing range is a highly specialized building requiring expertise and experience in the design and operational needs of

-14-

such an indoor shooting range. A selection committee was formed to interview for an architectural and engineering firm (hereinafter "A/E") to design and build the building. This committee was utilized to review the expertise and experience of the A/E firms on range construction. The panel consisted of five members and they were to rate the A/E firms. Three of the five members were DSP officers: Major Michael McDonald, administrative officer; Captain Gregory Warren; and Lt. William Bryson OIC of the firearms training unit. The other two people were from Facilities Management. After the bidding process was complete, the panel made its recommendation from 1-10 with 1 being the best and 10 being the worst.

The contract was sent out to bid through the State of Delaware, and it was awarded to JAED, Inc. from Smyrna , DE. Contradictorily however, JAED finished dead last in the process and had never previously designed an indoor pistol range. The three DSP officers on the selection committee had voted Clark-Nexson of Virginia Beach, VA as the number one firm. Clark-Nexson was the same firm that had performed the feasibility study for the DSP indoor facility. They also were a nationally recognized industry leader in the building of indoor firing ranges. JAED had no experience or expertise of any kind in the design or construction of an indoor shooting range. All DSP panel members were shocked at JAED winning the contract because JAED had finished dead last whereas Clark-Nexson had finished in first place. However, it was determined by Facilities Management that the votes of their two panel members outweighed the votes of the three DSP members. Tellingly, as was revealed in 2004, Elrita Annett the project coordinator for Facilities Management publically stated to the Delaware news media and the State Auditor's office that it did not matter what the results of the range committee vote were because JAED was going to get the bid anyway. The result was foreordained. The process was all just a sham.

Construction was to begin in 1996. However, during the design process a grave error was

-15-

discovered by Mr. Thomas M. Corcoran of RangeTech, an A/E firm specializing in indoor range ventilation systems.  Upon review of the plans for the HVAC system for the FTU, Mr. Corcoran concluded and warned that "this system, as designed will not work."  He continued, "the definition of 'will not work' is simply that the present design will not perform as it is required to under the present requirements established by OSHA & NIOSH. ... We have concluded that the designed ventilation system will inevitably fail if it is constructed as designed."  He concluded that the air handling unit as designed would not work in keeping hazardous contaminants out of the respiratory zones of staff, Troopers and recruits.  This critical design flaw was noticed just on review of the buildings blue prints.  The building ventilation system also was never tested for laminar flow.

Randall J. Hair administrator of the office of OSHA consultation addressed a letter to Lt William Bryson discussing health and safety issues related to the range.  He stated, "once the system is in place and before range use, we do recommend that you confirm by written report from the contractor that all ventilation systems are within design specifications.  Further, we suggest that this report include actual airflow measurement data and be signed attesting to its correctness by a company official."  This was never done.  Similarly, Traci Trznadel an industrial hygienist of the office of OSHA addressed a letter to Lt. William Bryson on May 1, 1996 discussing safety and health concerns of the range users.

Actual construction began in the summer of 1996.  Construction continued for two years with numerous problems and cost overruns. Before ground was even broken, more problems arose.  The surveying firm utilized for the project incorrectly set the elevations for the entire project, resulting in a six foot deviation, that cost the State of Delaware $85,000 dollars to correct. This was just in hauling enough dirt in to begin construction.

The problems continued thereafter.  For example, during the actual construction process,

-16-

the roof began to cave in. It was discovered that the center beam in the open range area was engineered incorrectly and could not support the weight of the roof and HVAC system. To correct this hazardous problem, a second beam had to be installed to prevent imminent collapse. However, due to this emergency addition that was not reflected in the original blue-prints or plans for the facility, the ceiling baffling system, which was designed to give ricochet protection, had to be deleted, which then put all range personnel and users at greater risk of injury due to errant rounds hitting the ceiling and then ricocheting back up the firing line to kill or seriously injure range personnel or other Troopers.

More problems include the following. During the construction process, a substandard roof was installed to save money. As a result of this corner cutting, the roof leaks to this day. Similarly, ballistic doors designed to protect staff and visitors were removed. Additionally, the facility was constructed with no female restroom, despite knowing full well that it would be a co-ed facility. Upon completion of the building, the DSP later had to convert another room into a female rest-room to make up for this significant oversight.

In the same way, no fire suppression or sprinkler system was installed, despite the fact that the facility stores large amounts of extremely flammable and dangerous chemical munitions, flash bang grenades, live ammunition and other similarly dangerous materials. JAED sent the Fire Marshall a letter requesting the elimination of a sprinkler system. But their letter failed to note that there was an ammunition storage room in the facility where live ammunition and other explosives were to be stored. The Fire Marshal never performed an inspection. Similarly, the building was built without an exhaust fan in the armorer's room where dangerous and toxic chemicals were used. The staff would later be forced to work in this room until they nearly passed out from the dangerous fumes. Chemicals were stored in a storage room that was unprotected, with not even a

-17-

A - 318

flame cabinet for protection.

To save money during construction, Delaware State Troopers were used to provide labor in the installation of the Savage wet bullet trap and other items at the FTU. Lt. Bryson, Sgt. Fitzpatrick, Sgt Engler, Cpl. Price, Sgt. Foraker and others helped perform the work in an attempt to keep costs down. This work was approved by Colonel Alan Ellingsworth of the DSP.

When it was completed in 1998, there were never any inspections performed, nor was a certificate of occupancy ever issued. Cpl. Warren contacted Jamie Kinsey of the New Castle County Land Use office on February 24, 2004 at 1020 hours and confirmed this. Similarly, there were no as built plans or final inspections conducted by NCC. The facility opened in September of 1998 with no grand opening ceremonies. There was never any baseline decibel level testing performed to determine a time weighted average of exposure to harmful high impact noise or the level of protection that would be needed to work in the environment. There was no hazardous waste training, protective equipment or standard operating procedures in place, then or later, during the operation of the building. There were never any standard operating procedures, or hazardous material abatement training given or offered. There was never any air monitoring or noise abatement testing or hearing conservation plan used.

The first air test conducted by Batta in November of 1998 two months after the range had opened revealed high levels of lead in the air during live fire. Lead levels were over the required OSHA limit of 0.05 MG/M3. Results ranged from 0.098 in the central downrange area to 0.141 MG/M3 at firing point #7 and 0.165 MG/M3 at firing point #14. By January of 1999, all staff had elevated blood lead levels.

Clark-Nexson was contracted to evaluate the building and to make recommendations to correct the problems, at a cost of $20,000. Again however, their recommendations were not

-18-

followed.

Several years later, the Division switched to frangible handgun ammunition which created a new problem with the current design of the bullet trap. The bullet trap failed to perform as designed and caused the air handler to be taxed even more. (The .357 frangible ammunition turns to dust on impact causing the Heppa filters in the exhaust vents to clog faster). This decision was made without the proper investigation. Experts should have been consulted prior to the change in ammunition. Additionally, there was never any baseline air test for copper after the ammunition switch.

In 2004 Governor Minner authorized the State Auditor to conduct an investigation into the FTU woes. Members of the FTU staff were ordered to comply with this investigation. On May 9, 2004 each unit member gave detailed statements to the investigators. The investigation revealed that the wrong A/E firm received the contract to engineer and build the new range. A math error which involved being able to count to nine (9) was quoted as the reason for the mistake. However, Elrita Annett the project coordinator for Facilities Management publically stated to the news media and the State Auditor's office that it did not matter what the results of the range committee vote was - JAED was going to get the bid anyway. The result was foreordained. The process was all just a sham.

Then on April 6, 2004 Colonel Chaffinch, Lt. Colonel MacLeish and Cabinet Secretary Gloria Homer held a press conference at the range. All three publically blamed the range personnel for the failed systems. Shortly after the press release Governor Minner, responded to the range and commented, that poor house keeping was the problem.

In May of 2005, in an effort to hide the true causes of the problems at the FTU, Major Randall Hughes, acting on behalf of his buddies defendants Chaffinch and MacLeish, refused to

-19-

allow Dr. Randy Tubbs and his team of experts from NIOSH to come in and inspect the range.  Dr.

Tubbs is an indoor range expert employed by NIOSH.  NIOSH is a Federal agency associated with

OSHA. The inspection and federal oversight was free of any financial charges to DSP or the State

of Delaware.  NIOSH would also have been unbiased in their recommendations.  Nonetheless, the

DSP refused to allow these federal experts to come in and assess the disaster they and defendants

created at the FTU.

   6.  For the period from 1998 to the present, identify and describe in detail any

communication Plaintiffs have had with any person relating to the improprieties, financial

irregularities, breach of the public trust, fraud and/or corruption by public officials and identify the

persons with whom plaintiffs had those communication(s).

   **Answer:** Objection.  Not reasonably calculated to lead to the discovery of admissible

evidence.  Unduly burdensome.  Without waiving these objections:

   See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 6, 10 which are incorporated

by reference herein.

   See the voluminous documentation produced in response to the request for production of

documents, which is incorporated by reference herein.

   See Exhibit 1 - FTU Rough Timeline of Events.

   See Answer to Interrogatory # 11 which is incorporated by reference herein.

   See Plaintiffs written statements and interviews with the State Auditor's Office.

   7.  For the period from 1998 to the present, identify any person who has provided Plaintiffs

any documents relating to the improprieties, financial irregularities, breach of the public trust,

fraud and/or corruption by public officials.

    **Answer:**  The staff of the FTU, past and present.  Captain Greg Warren.


    8.  Identify any person who suffered physical symptoms as a result of the problems at the FTU and describe the physical symptoms they suffered, as alleged in Paragraph 14 of the Complaint.

    **Answer:**  Objection.  Overbroad, burdensome, not designed to lead to the discovery of admissible evidence.  Discovery also is just beginning and the record in this regard remains to be developed.  Without waiving the objection:

    See plaintiffs' medical records which will be produced subject to appropriate protective order or confidentiality agreement.

    See Exhibit 2 - Partial List of Agencies and Officers Exposed to Hazards at the FTU.

    9.  Describe in detail how Defendant Chaffinch sought to cover-up and hide from public scrutiny the additional problems at the FTU caused by the change to frangible ammunition, as alleged in paragraph 17 of the Complaint.

    **Answer:**  Objection.  Discovery is just beginning and the record in this regard remains to be developed.  Without waiving the objection:

    See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 5, 6, 7, 11, 12, 15 which are incorporated by reference herein.

    See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

    Additionally, Chaffinch sought to cover-up and hide from the public the additional

-21-

A - 322

problems at the FTU by blaming Sgt. Foraker, Cpls. Warren and Price and others for those very same problems. As discussed above, the FTU has always had problems. Then in 2002 Chaffinch illegal removed Sgt. Foraker and transferred in Sgt. Ashley who was Chaffinch's buddy, but who had no experience and was in over his head. The facility went to pot with Ashley in charge. Ashley mishandled, was too timid and/or was unwilling to address the bullet-trap and ventilation issues arising from the change to frangible ammo. This caused further contamination, contaminating the facility to an even greater degree. Then in December 2003, Sgt. Foraker arrived back at the FTU pursuant to Judge Farnan's reinstatement order as a result of the federal jury verdict that Chaffinch had violated the First Amendment. Sgt. Foraker promptly discovered the many problems and began to speak out about them on behalf of himself and his men. Defendant Chaffinch then got scared, orchestrated the setup and maliciously blamed his own Troopers for destroying the FTU in a transparent attempt to hide his own culpability for transferring in someone who had no working knowledge of the multimillion dollar facility and who ultimately destroyed it.

      10. For the period from 2001 to the present, describe in detail any activities performed by Plaintiffs that should have been performed by Facilities Management in its role as landlord of the FTU.

      **Answer:** Objection. Discovery is just beginning and the record in this regard remains to be developed. Without waiving the objection:

      (1) The Broken Bullet Trap. The day to day operations of the indoor range were very demanding. The Savage bullet trap is a very complicated maintenance-intensive mechanical machine. The trap is a wet system, containing a mixture of water and a penetrating oil to preserve, lubricate and protect the steel parts from rust. This mixture cascades down the impact ramp

-22-

draining into a trough located on the front of the trap. The theory behind the wet system is that upon the bullet impacting the ramp, it will hydroplane into the deceleration chamber which is located at the rear of the trap. Theoretically, this system was designed to capture the bullet and reduce residual dust as a result of the impact. This system was designed to capture solid projectiles with minimal fragmentation. For example, the frangible handgun training ammunition shot exclusively since January 2001, is designed to pulverize into dust upon impact to the steel bullet trap. The residual material mixed with the water/oil substance and created a byproduct that would clog filters and sprayer heads and would wear down mechanical moving parts.

Additionally, the water system would also capture shotgun ammunition. The trap would become burdened with the buffer from the double 00 buck rounds, and wads and discs from the rifled slugs. With the cardboard targets placed within a few feet of the wet impact ramp, "target blowback" into the water system was a constant and continual problem. When these materials congealed, sump pumps, screens and sprayer heads became clogged causing a monumental maintenance work environment. When sprayer heads would clog or pumps would burn out, training would cease in order for repairs to be completed. When the wet system was turned off, and the byproduct of these mixed materials were permitted to dry, the substance would solidify into a "concrete-like" material. This was never more evident then when the conveyor system was cemented in place after a break in training. This resulted in the removal of the conveyor system by the manufacturer, Mayfran and replaced by a "makeshift" cleated drag belt system. This occurred in the summer of 2003 when Sgt. Ashley along with Major Eckrich circumvented the Academy Staff chain of command by-passing Captain Greg Warren and Lt. Ralph Davis and having the belt replaced by Mayfran with the "makeshift" cleated drag belt. The new belt failed within one week. The FTU Staff members were attempting to perform maintenance to the best of their abilities with

the limited resources they had.  With the lack of support from the DSP Administration and Facilities Management to keep the range operational, the failures became overwhelming.

The failure of the trap resulted in the FTU staff and instructors being forced to attempt to perform maintenance on the trap. They had to clean the ramp on the bullet trap with inverted brooms when the cardboard, buffer and shotgun wads started to build up on the face of the dry ramp. They also had to scoop, by hand, the shotgun wads out of the toxic water tank located at the rear of the bullet trap with a strainer when the debris restricted the flow of water in the tank. The sump pumps burned out frequently requiring replacement.

The FTU staff was never provided with any hazardous/toxic material abatement training nor provided with protective equipment and/or gear to perform these maintenance functions to protect them from exposure to the toxic and hazardous materials they were subjected to daily. Facilities Management's industrial hygienist Mr. Doyle Tiller knew that the FTU had been shooting leaded ammunition since the opening of the facility in September, 1998. Mr. Tiller knew of the toxic byproducts generated by the ammunition fired at the facility and did nothing other than assure the FTU staff that everything at the FTU was in fine operating fashion.  The FTU staff had to continually check the water level of the trap due to leaks and evaporation, and add water accordingly.  Daily bullet trap maintenance programs, standard operating procedures, or training never existed.  DSP eventually contracted with Savage Range Systems to perform a service program on the bullet trap which consisted of a once a year, clean up and service of the trap and conveyor system by two factory trained specialists. The maintenance program fell far short.  Upon transition from the jacketed handgun leaded ammunition to frangible ammunition, the trap began to break down more frequently. The shotgun ammunition and target blowback caused a strain on the system.  The bullet trap system was unable to sustain the added burden that the frangible

-24-

ammunition imposed.

For example, during this time Cpl. Price's blood serum lead level rose six points from a 5 to an 11. Dr. Aaron Green of Bayhealth advised Cpl. Price that the oil in the water was a penetrating agent that carried all the contaminates into his blood stream. Price advised Sgt. Ashley of his blood lead level results and Dr. Green' assessment. He advised Sgt. Ashley of his health concerns and Ashley cruelly stated, "you have to die from something." Needless to say, that was very upsetting to hear.

They also had to clean the filters in the pump line at least once every two weeks by hand. They would scrub out the toxic build up on the cylinder screens with a small brush. They had to constantly monitor the air by checking with their hands to feel air coming from the ductwork. Oftentimes in the winter they would have to climb up on the roof to press the reset button on the outside system. Numerous calls were made to Facilities Management about these problems but nothing was ever fixed as the system failures were continually reoccurred. A copy of the complaint log was requested by Cpl/3 Warren; however Facilities Management refused to provide it to him.

Facilities Management should have provided for cleanup and maintenance of the bullet trap and maintenance of the ventilation system. It was both dangerous and hazardous for the men to maintain this specialized equipment; the men were not given any training or hazardous materials protection to prevent risk of exposure to the various hazardous materials that were found to be in extreme excess of OSHA and NIOSH standards.

(2) General Range Cleanup. Daily cleanup maintenance was required after every shoot. This included removing the cardboard targets; pushing spent shell casings and shotgun hulls with an inverted broom into separate piles; and scooping them up with a shovel. The brass shell casings

-25-

A - 326