were stored in large barrels within the range and the shotgun hulls were discarded into the dumpster. The FTU Staff was provided with a Hepa vacuum and a Bortek wet floor scrubber to perform the cleaning of the range floor. But the staff did not receive any formal training on the operation of the vacuum or floor scrubber. These items were delivered to the range without any standard operating procedures to follow. No one had ever given or made available any hazardous material abatement training or protocol to follow. The Facilities Management certified industrial hygienist should have provided the cleaning protocol and procedures as well as the proper cleaning detergents required to neutralize the dangerous heavy metals and toxins associated with the cleaning. Furthermore, no guidelines or standard operating procedures were implemented in the proper handling and disposal of the hazardous waste water generated from the clean.

(3) Big Picture Lack of SOP's, Safety Policies and Other Expertise. Due to the very nature of an indoor shooting range, special needs and requirements exists to ensure the personal health and safety of students and staff. However, no one within the Delaware State Police has the training or expertise to provide proper maintenance of such a facility. Facilities Management has engineers and an industrial hygienist who do possess the background, training, expertise and duty to ensure that proper plans are in place and adhered to. The maintenance should have been conducted by professionals, experts who are properly trained in the handling and disposal of hazardous material cleanup and abatement. Facilities Management should have overseen this and ensured compliance. This was their responsibility yet they abandoned the plaintiffs and left them to suffer.

Neither Sgt. Foraker, Cpls. Price or Warren received any formal training when they were assigned to the range. In violation of numerous right to know laws, they were not informed about the dangerous chemicals or heavy metals that they were being exposed to and at what rate of

-26-

A - 327

exposure to the toxins. Again there was no standard operating procedure to maintain the range, nor were there any inspections by Facilities Management or the Department of Health. Nor were these men ever issued any of the required protective equipment to perform maintenance in this environment.

The range required massive amounts of maintenance to ensure it was working properly. The staff at the FTU including Sgt. Foraker, Cpls. Price and Warren have training and certifications in areas related to firearms instruction, weapons breakdown and weapons maintenance. They do not have any training or certifications in hazardous material cleanup, abatement or disposal. Nor do their job descriptions detail anything related to hazardous material clean up, removal or maintenance at the facility. Only fully equipped and factory trained technicians should have been tasked to perform this highly specialized undertaking. All of these duties fall within the purview of Facilities Management.

11. For the period from April 2002 to December 2003, describe in detail how and to what extent the conditions at the FTU were allowed to deteriorate and what defendant Chaffinch did to cover up the alleged deterioration, as alleged in paragraph 21 of the Complaint.

Answer: Objection. Discovery is just beginning and the record in this regard remains to be developed. Without waiving the objection:

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

See Answer to Interrogatory # 9 above which is incorporated by reference herein.

See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 5, 6, 7, 8, 11 which are incorporated by reference herein.

-27-

See Exhibit 1 - FTU Rough Timeline of Events.

Additionally:

(1) Defendants Knew About the Conditions at the FTU. In April 2002, Sgt. Ashley assumed command as the NCOIC of the FTU. He had no training or experience in any aspect of running an indoor firing range. Nor did he realize the dangers of operating an indoor range. Importantly, he also did not want to be confrontational with the administration. It was well-known throughout the DSP how defendant Chaffinch illegally retaliated against Sgt. Foraker when he had previously spoken out regarding health and safety concerns at the FTU. Sgt. Ashley, while hoping to be promoted to Lieutenant, did not want to make any waves. He would attempt to avoid any controversy, and after raising issues with the Executive Staff, would go along with them and not argue the issues which needed to be expressed to the detriment of the health of the personnel at the FTU. For example, air flow and HVAC issues were constant problems, but because defendants downplayed them, Ashley refused to press the matter.

On numerous occasions during the work week, Sgt. Ashley told Cpls. Price and Warren that he was going to HQ to meet with defendants and the Executive Staff to express the important needs and concerns about the range. It was well-known that he was friends with and thus had an open door to defendant Chaffinch and Major Eckrich. But despite the voicing of these concerns to defendants and members of the Executive Staff, nothing was ever fixed. No help was ever given. Instead, defendants ignored all of the problems. The entire time the range was in operation the administration maliciously covered up problems and mistakes.

The personnel and staff at the FTU also directly relayed their concerns about the hazardous conditions at the FTU up the chain of command to Sgt. Ashley. Chaffinch had personally selected Ashley to run the FTU and Ashley had a direct line of communication that he used (meaning he

-28-

A - 329

bypassed his Lieutenant and his Captain) to Colonel Chaffinch and Major Eckrich. All of Ashley's information was relayed to defendants during his numerous meetings with them. In addition to meeting with defendants at headquarters, Sgt. Ashley has been observed lunching with Col. Chaffinch and Major Eckrich at a local restaurant, Where Pigs Fly, in Dover by division personnel.

(2) Problems With the Broken Bullet-Trap and HVAC Systems. The conveyor on the bullet trap wore down during this time period, creating problems with the pumps and filters. The frangible ammunition, target blowback and shotgun buffer would mix with the water and form a very thick toxic goo and sludge-like material. This material would settle in the bottom of the tank and would create monumental maintenance problems. As the bullet trap began to fail and break down, it became harder to keep the range clean. It became visually apparent that the air handling system was not working properly. A pink colored dust also was settling everywhere in the range - on the floors, window ledges, counters, horizontal surfaces and even behind the bullet trap. There were more dry spots on the ramp causing frangible dust to be circulated into the air. The men had to monitor the air handler closely. Oftentimes, the air handlers would simply turn off by themselves. Sometimes they would turn back on again. Other times, the FTU staff had to risk life and limb by climbing up on the roof of the facility to reset the HVAC system. Sgt. Ashley would watch the range air pressure gauge located in the control booth periodically, which was another indicator that the air handler was not operating correctly.

They had to start replacing sump pumps more often and Sgt. Ashley decided to change the original water pump and replace them with a trash pump in an effort to overcome the sludge problem produced by the frangible ammunition. This change caused the filters to become clogged faster due to the "churning effect" that occurred in the water trough requiring daily maintenance

-29-

with the toxic goo.

Finally, the conveyor belt seized up and was rendered inoperable. Sgt. Ashley directly contacted the administration, again bypassing his Lieutenant and Captain, and received permission from Major Eckrich to hire Mayfran to remove the conveyor belt, altering the original design and installed a cleated drag belt to scrape the debris generated by the combination of the frangible ammunition, shot gun wading and paper target material into a barrel. The drag belt was installed but it became inoperable within one week. Sgt Ashley called the company and explained the system failures all the while tinkering with the cleated drag belt system.

Conversely, Sgt. Foraker was advised in December 2003 by Mayfran that only system certified technicians should perform any adjustments or maintenance on the Mayfran conveyor system. The new drag belt system continued to be a strain on time requiring daily maintenance. The tank was filled more often and had to be monitored closely. The plaintiffs could not shut the water and conveyor systems down because without keeping the sludge wet and flowing and the belt moving 24-7, it would solidify into a concrete-type material rendering the drag belt inoperable.

The $33,000 replacement conveyor system for the bullet trap which was surreptitiously obtained by Sgt. Ashley was not the correct system to use for this particular bullet trap and the type of bullets used at the FTU. As discussed, it frequently jammed up and required special maintenance which for the safety of the FTU staff and for the sake of the equipment itself needed to be performed by specialists with safety equipment and training which the FTU staff did not possess. Nevertheless, defendants praised Sgt. Ashley to the media and maliciously blamed Sgt. Foraker and Cpls. Warren and Price for its malfunctioning.

(3) The Hazardous Armorer's Room. The new gun cleaning solution in the parts washer for

-30-

the armorer's breakdown was a pungent, orange citrus chemical that produced an overwhelming odor to those forced to use it. Inhaling this chemical caused severe headaches while working in the confined space of the armorer's room. Cpls. Warren and Price advised Sgt. Ashley of their physical symptoms relating to breathing the chemical and requested that an exhaust vent be installed in the room to prevent the staff from becoming sick while working with the chemical. Ashley advised he would ask Facilities Management, but later said there was no funding to pay for the installation of an exhaust vent and advised the Cpls. Price and Warren, "You just have to learn to deal with it."

(4) The Defective Headsets. Since the range opened in September of 1998 the instructors headsets had not been replaced or upgraded. Headsets are used for hearing protection and for communication, but the ones being used by the FTU staff were failing. The manufacturer was contacted and the staff was told that it would cost approximately $1,500 to replace each headset. Sgt. Ashley advised Cpls. Price and Warren that the Administration refused to pay for this vital hearing protection and that they would have to acquire cheaper hearing protection. He purchased wireless Peltor Powercom Plus headsets.

But these headsets failed to perform or provide the necessary decibel level protection. For example, during a training session, Cpl. Price told Sgt. Ashley that his ears actually hurt and that he believed that the hearing protection was not adequate and instead was actually harmful. That angered Sgt. Ashley and he accused Cpl. Price of being a whiner and a complainer stating that Cpl. Price complained about everything.

Additionally, the Peltor headsets used a frequency to transmit and receive on a frequency that was universal to a lot of wireless communications. Everyone who possessed walkie-talkies, CB radios or even local drive through fast food restaurants could hear the FTU Range

-31-

A - 332

communications that transpired while firearms training took place. They could also hear everyone who was talking on the same frequency. This created a safety risk. If there was an emergency and the staff had to call a cease fire, such an important order would have to wait for a break in the conversation. This is why functioning Mancom headsets were essential due to that fact the instructors required uninterrupted communication. This is a critically important safety issue.

(5) The Inoperable Floor Scrubber. The floor scrubber had been rendered inoperable since the summer of 2003. Upon Sgt. Foraker's return on December 1, 2003, he made contact with the manufacturer to discover that the maintenance contract for the machine had expired. Sgt. Foraker utilized FTU Budget funding to have a technician make the repairs to bring the machine back into working order. Additionally, prior to Cpl/3 Cathell's retirement, he was the only officer who operated the floor scrubber in an attempt to aid him in the reduction of his blood lead levels. More importantly, there were no SOP's in the safe handling and operation of the floor scrubber and disposal of its contaminants.

12. Describe in detail the problems and safety concerns at the FTU that Plaintiff Foraker observed on December 1, 2003 as alleged in paragraph 22 of the Complaint.

Answer:  See Exhibit 1 - FTU Rough Timeline of Events.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

See Foraker v. Chaffinch, et al. Answer to Interrogatory # 10 which is incorporated by reference herein.

(1) Introduction. On December 1, 2003 Sgt. Foraker returned to the range. He observed many problems upon his return. Sgt. Foraker, Capt. Warren, Lt. Davis and Sgt. Ashley collectively

-32-

had a meeting to review numerous issues referencing the FTU. Specifically, the ventilation system (Ashley claimed it was perfect and balanced), the bullet recovery system, new drag conveyor system, adjustments to clutch and motor sprockets. This tour revealed a coating of red dust on range floor, back wall shelf, floor scrubber, target bundles, window sills and all horizontal surfaces. Target blow-back, shotgun wading and spacers covered with a red dust litter the lower ramps of the bullet trap. Inspection of the rear of bullet trap revealed heavy concentration and accumulation of the same red dust covering all horizontal surfaces. The armorers room was in complete disarray with gun parts and tools scattered on every surface with pungent cleaning fluid covering the floor. Trash dumpster and cardboard recycler were overflowing with trash all over the field. Sgt. Ashley's tobacco chew spit cups were everywhere in the facility. There were tobacco chew stains on chairs, desks, phones and floor. Additionally the parking lot lights were inoperable, there were huge pot holes in the parking lot, and the fuel tank alarm was sounding.

(2) The Broken HVAC System and Bullet Trap. Inspection of the FTU revealed a heavy build up of pink colored dust, and other debris in the range. The bullet trap was not functioning properly. Numerous impact ramps were dry due to clogged sprayer heads, and the drag belt system was not working. Cpls. Price and Warren explained to Sgt. Foraker that the ventilation system and bullet trap were failing. They explained that they often had to go on the roof to press the reset button when the ventilation system simply failed to turn on. They explained to him that the frangible ammunition was clogging up the filters and sprayer heads and increased the amount of maintenance time needed to keep the bullet trap operating even marginally.

They explained that the ventilation system was blowing air back at the shooters and instructors (and thus it was blowing in the wrong direction) and was depositing copper colored dust all over everyone. The system simply was not working. Cpls. Price and Warren explained

-33-

**A - 334**

that they would blow their noses and get excrements that were brownish in color. Sometimes instructors and students would experience nosebleeds, sore throats, irritated eyes and a penny taste in their mouths. The range was getting covered with the copper colored dust, it was even depositing behind the shooting positions and all over the stored cardboard targets at the rear-most-point on the range several yards behind the shooters and instructors.

The copper colored dust behind the trap had build up on all of the horizontal surfaces and equipment stored behind the range. Sgt. Foraker also observed that it appeared that the bullet trap had not been properly sealed following repairs. Material safety data sheets on the frangible ammunition were never provided by DSP Administration or Facilities Management. Sgt. Ashley advised Cpls. Price and Warren as well as DSP Executive Staff members, including Chaffinch and MacLeish, that the frangible ammunition was comprised of a ceramic material. But once Sgt. Foraker's research into the MSDS sheets on the frangible ammunition was completed in early 2004, it was learned that the frangible bullets instead contained numerous hazardous materials including: copper, zinc, arsenic, and tin. Upon receipt of the MSDS sheets, Sgt. Foraker immediately provided them to Lt. Col. MacLeish, Major Hughes as well as members of Facilities Management.

(3) Armorer's Room Ventilation Problems. Cpls. Price and Warren informed Sgt. Foraker that they had requested an exhaust vent in the armorer's room as a result of the nauseating new cleaning chemicals that were giving them headaches. They then advised that they thought regulations concerning ventilation had been neglected.

(4) Defective Headsets. Sgt. Foraker observed the faulty headsets and questioned why the division had purchased equipment that would compromise the safety of the unit and students. As explained above, Cpls. Price and Warren explained to him that the purchase was made in an effort

-34-

A - 335

to cut operating costs at the expense of their health and safety.

(5) Other Issues. Both Cpls. Price and Warren stated to Sgt. Foraker that the roof still leaked. The floor scrubber was not working, and had not worked since the summer of 2003. During recruit training it was not uncommon for the FTU to be in complete disarray. Recruit training is stressful and demanding duty as it is. Twelve to 16 hour days are the norm. But the hazardous state of the range was making things worse.

(6) Serious Health Concerns. Cpls. Price and Warren also told Sgt. Foraker about their health concerns. They were experiencing headaches, chronic fatigue, joint pain, nose bleeds and metallic tastes in their mouths. Cpl. Price stated that his urine had a strong odor. There had been a spike in their lead levels while performing the hands on hazardous maintenance on the bullet trap that Facilities Management should have hired experts to do. They expressed their concern over the lack of training, SOP's and equipment to perform such specialized tasks.

(7) Sgt. Foraker's Reaction. Sgt. Foraker was diligently taking notes during these meetings and while inspecting the facility. He expressed his serious concerns with the health issues and with the condition of the building. Sgt. Foraker immediately began to make the Executive Staff aware, through the proper chain of command, of the situation at the range. He notified Lt. Davis, and Captain Warren of the Academy, since the FTU fell under the training academy in the chain of command.

Captain Warren and Sgt. Foraker then followed the chain of command as the Academy fell directly under defendant MacLeish's responsibilities and they notified MacLeish of the situation.

(8) Later Steps. Later, material safety data sheets were obtained from our ammunition manufacturers. Cpls. Price and Warren had previously been told that the frangible ammunition was made of a ceramic material. Contradictorily however, the MSDS sheets revealed bullet

-35-

composition that was 85% sintered copper, zinc, tin, arsenic, and nitroglycerin. All of these compounds are known to have an adverse effect on human health.

The men immediately began requesting medical screenings and swipe sampling of the entire facility to ascertain the amounts and levels of contamination. (See e.g., the Harvard Environmental Study for the results of the tests that were belatedly performed and yet which revealed high levels of lead contamination). Joe Farrell from Environmental Solutions conducted swipe sampling too. The results were off the charts for lead, zinc, tin, and copper. Again the men pled for advanced medical screening, and home testing since the contamination was so wide spread at the facility.

Lastly, there was a recruit at the DSP named Casey Fountain, from DNREC air and waste division. Recruit Fountain had an extensive background in hazardous materials, and its effects on humans. He was a wealth of knowledge on the science of the hazardous materials and applicable laws. After the men spoke with him extensively, he was interviewed by Captain Warren and Lt. Colonel Macleish. After the men had spoken to Recruit Fountain, they knew they had grave issues at hand.

13. For the period from December 1, 2003 to the present, identify and describe in detail any communication with Plaintiffs relating to the hazardous and physical conditions at the FTU, including, but not limited to, communications with the DSP chain of command and Facilities Management, as alleged in Paragraphs 24 and 25 of the Complaint.

Answer: See Exhibit 1 - FTU Rough Timeline of Events.

See the voluminous documentation produced in response to the request for production of documents, which is incorporated by reference herein.

-36-

**A - 337**

See Foraker v. Chaffinch, et al. Answer to Interrogatory # 10 which is incorporated by reference herein.

Sgt. Foraker, Cpls. Price and Warren continually voiced their concerns, both orally and in writing, over the serious detrimental health issues related to their employment at the range. For example, Cpls. Price and Warren expressed their concerns due to the actual physical symptoms they were experiencing, the environmental disaster they could see with their own eyes all around them and because of the results of the environmental solution tests. They felt that they had been poisoned. During a February 25, 2004 meeting with Lt. Col. MacLeish, Captain Warren, Lt. Ralph Davis, Sgt. Foraker, Cpl/3 Warren, Cpl/3 Price, MacLeish stated that "Kurt, you have been at the range so long we don't know what we have done to you." The Troopers were shocked that the Lt. Col. would say something like that. Their concerns were meeting resistence from DSP administration and Facilities management. Price and Warren continued to voice their concerns to their immediate supervisor Sgt. Foraker. Sgt. Foraker was under extreme pressure dealing with these issues. Everyday Sgt. Foraker was in a meeting, on the phone, or sending and answering e-mails. Sgt. Foraker was truly standing up for our health and our families. Captain Warren and Lt. Davis also spoke up on our behalf to try and fix the problems and protect us. Captain Warren also sent numerous e-mails, and made numerous phone calls. But no one in the Administration would do anything to help. They also continued to get resistence from Facilities Management. There is a voluminous paper trail of e-mails and memos on this issue.

14. Describe in detail the communication between Plaintiffs and defendant MacLeish during which MacLeish allegedly told Plaintiffs to "just put on a paper dust mask to protect yourself," as alleged in paragraphs 31 and 74 of the Complaint.

-37-

Answer: Objection. Discovery is just beginning and the record in this regard remains to be developed. Without waiving the objection:

See Exhibit 1 - FTU Rough Timeline of Events.

By way of further explanation, during a meeting on Friday, January 30, 2004, Captain Warren informed the FTU staff that Lt. Col. MacLeish had ordered that as of Monday, February 2, 2004, the FTU staff was required to just put on a paper dust mask to protect themselves at the range.

Sgt. Foraker subsequently discussed this with MacLeish. MacLeish stated that a paper dust mask would protect the men from the toxic cloud that was floating up the firing line. Sgt. Foraker stated that the toxic cloud was full of copper, and other metals contained within the frangible ammunition and that a paper dust mask would not protect them. MacLeish was visibly angered and frustrated with Sgt. Foraker as a result of his speech as he became red faced and grimaced at Sgt. Foraker. Sgt. Foraker added that the paper dusk mask is unsafe due to the inability to communicate with the students and fellow instructors.

15. Identify the "federal authority" referred to in paragraph 34 of the Complaint and describe in detail any communication between Plaintiffs and that person(s).

Answer: See Exhibit 1 - FTU Rough Timeline of Events.

The statement was made during a February 2004 meeting between Major Eckrich, Captain Greg Warren, Lt. Davis, Sgt. Foraker, Cpl/3 Warren, Cpl/3 Price, Mr. Joe Ferrell of Environmental Solutions and Mr. Art Nielson. Mr. Art Nielson is a certified federal industrial hygienist who owns and operates his own business. He also is a sworn federal industrial hygienist,

-38-

authorized to inspect and close federal ranges due to environmental contamination issues.

Following an inspection and analysis of the FTU, Mr. Nielson presented a badge and stated that if

the FTU was a federal range, he would shut it down due to the level of air contamination

throughout the range and the rest of the building which was followed up with written

correspondence stating that the problem with the FTU was not a hygiene issue but a mechanical

failure.  He also stated that the building was not fit for occupancy.


16.  Describe in detail the communication between Plaintiff Price and defendant MacLeish

during which defendant MacLeish allegedly "interrogated" and "browbeat" Plaintiff Price, as

alleged in paragraphs 54 and 74 of the Complaint.

Answer:  Defendant MacLeish has browbeat and interrogated Cpl/3 Price on several

occasions.  For example:

The first intimidating and threatening incident occurred on Wednesday, April 28, 2004.

That day, Lt. Col. MacLeish arrived at the Wilmington Police Department firing range at

approximately 12:30 pm. In an attempt to get him alone, MacLeish asked if Cpl/3 Price would take

a ride with him and show him the National Guard range.

While looking at the range, MacLeish asked if Cpl/3 Price did not understand MacLeish's

order.  MacLeish stated that he did not want Price on the range.  MacLeish stated to Price,"I am

not going to fuck you."  As a result of this conversation, Price felt threatened, intimidated and

disgraced by MacLeish's comments.

The context of the second incident began on Wednesday July 28, 2004 when Price was

interviewed for the second time by the State Auditor's office.  During their questioning, Price was

told that he was at fault for the range disaster.  He was accused of not caring for the safety and

-39-

well-being of his students.  He was accused of being derelict in his duties.  At no time was Price

advised of his rights under LEOBOR or Mirandized.  As a result of what the Auditors stated

during the interview, Price believed that the Auditors were echoing the accusations made by

Chaffinch and MacLeish.

Then on Friday, July 30, 2004, Price was sick and stayed home from work.  Sgt. Foraker

called him and advised that MacLeish was looking for him to interview him.  Price's attorney,

Stephen J. Neuberger, Esq., then sent an e-mail to MacLeish, advising that if such an interview

was to occur, that Price's legal counsel must be present.

Ignoring the request for counsel, on Monday, August 2, 2004, MacLeish's office paged

Price and he responded to the page.  Lt. Col. MacLeish then got on the telephone and demanded to

know what happened with the Auditor's investigation.  Cpl/3 Price was intimidated by

MacLeish's actions but tried to explain that he felt that he was being set up to take the fall for the

situation at the range.  MacLeish then threateningly advised Price that he would be investigated by

IA if the Auditor's Office found his performance at the FTU lacking.

By way of further response, defendant MacLeish also has repeatedly sought to bully and

intimidate Sgt. Foraker and Cpl. Warren.  See e.g., Foraker v. Chaffinch, et al. Answer to

Interrogatory #'s 12 which is incorporated by reference herein.


17.  Identify any false charges of misconduct and dereliction of duty made by Defendants

against Plaintiffs, as alleged in paragraphs 55 and 56 of the Complaint.

Answer:  Objection.  Discovery is just beginning and the record in this regard remains to

be developed.  Without waiving the objection:

See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 5, 7, 11, 13 which are

-40-

A - 341

incorporated by reference herein.

See Exhibit 1 - FTU Rough Timeline of Events.

Additionally, defendants Chaffinch and MacLeish have repeatedly and falsely accused Sgt. Foraker, Cpl. Price and Cpl. Warren of destroying the FTU and being responsible for the environmental disaster at that facility.

18. For the period from December 1, 2003 to the present, identify any actions Defendants have taken "daily" against Plaintiff Foraker designed to drive him out or force him to retire, as alleged in Paragraph 65 of the Complaint.

Answer: See Exhibit 1 - FTU Rough Timeline of Events.

See Foraker v. Chaffinch, et al. Answer to Interrogatory #'s 12, 15 which are incorporated by reference herein.

For example, during this time frame, Sgt. Foraker also was continually ordered to conduct research for an independent authority on range function and repair. After diligently working and providing information regarding Bill Metcalf, FLETC, among others, Chaffinch and MacLeish ignored and refused to utilize his expertise. Instead they hired another company that had never built a range thereby stepping on that proverbial landmine again that the Facilities Management had stepped on years early when they hired unqualified JAED to build the FTU. They again hired a "contractor." This was strictly 'busy work,' intended to antagonize Sgt. Foraker. This all the while continued while Foraker was diligently trying to cope with the closure of the FTU and not allow it to impact on Divisional training and readiness as he established a new place to shoot at the National Guard Range, created curriculum for the shoot, and so on. Sgt. Foraker also was ordered to write policies and procedures of which he had no expertise or knowledge.

-41-

19. Identify any officer in the DSP whose hearing abilities are similar or worse than Plaintiffs, but has been allowed to operate as a full, active-duty uniformed officer with complete police powers, and describe in detail his or her hearing abilities.

**Answer:** Objection. Discovery is just beginning and this information is in the possession, custody or control of the defendants. Plaintiffs have sought the production of those records and named numerous specific individuals, yet defendants have maliciously refused to produce such records. Without waiving this objection:

Major Joseph Forrester. Lt. Charles Klim. Also see the deposition of Rt. Major David Baylor on July 18, 2005.

20. Identify any medical records that were withheld from medical examiners, as alleged in paragraph 74 of the Complaint.

**Answer:** See Exhibit 1 - FTU Rough Timeline of Events.

One of the medical records that was withheld from the medical examiners was the important attachment to the highly technical questionnaire the FTU staff was ordered to fill out for the TK Group in Illinois. The attachment explained that the men did not understand and found confusing the questions and that many of the questions required expert and highly specialized knowledge that the FTU staff did not possess. However, because the men were ordered to fill out the questionnaire, they were required to do so or risk being brought up on IA charges for insubordination. So, they did fill out the questionnaire, but attached the above discussed attachment to it. But the DSP, specifically Captain Yeomans, refused to send the attachment to the TK Group and thus only sent incomplete medical information.

-42-

A - 343

Dr. Green subsequently expressed concern during plaintiffs' fitness for duty exams that the TK Group attachment had been wrongfully withheld and removed from plaintiffs' medical records.

Additionally, Captain Yeomans also withheld medical records from Dr. Green when the plaintiffs were ordered for those same fitness for duty exams. For example, during Sgt. Foraker's July 2004 exam, upon discovery of the fact that the records were missing, the examination was actually halted while Dr. Green called Yeomans and demanded the missing records that were being withheld.

21. For the period from December 1, 2003 to the present, as to each medical practitioner who examined or treated Plaintiffs, <u>separately</u> state the medical practitioner's name and address, describe the medical practitioner's practice specialty, state the date(s) on which the medial practitioner examined or treated you, identify the nature of the examination or treatment in detail, state the amount(s) the medical practitioner charges(d) you, and describe the medical practitioner's findings.

**Answer:** Objection. Overbroad, burdensome and beyond the permitted scope of the Federal Rules of Civil Procedure. Without waiving the objection:

See the medical records which will be produced subject to appropriate protective order or confidentiality agreement.

See also Answer to Interrogatory #3 above. See also the report of Carol A. Tavani, M.D., plaintiffs' forensic psychiatrist that will be produced in accord with the requirements of the scheduling order and the Federal Rules of Civil Procedure.

22. Have you sought and/or received any mental health, psychiatric, and/or psychological

-43-

**A - 344**

treatment, and/or professional counseling for your alleged injuries? If so, please identify the nature of the injury, disease or impairment, the name of every practitioner and institution who treated or examined you in connection with the injury, disease or impairment, and state the dates of treatment or examinations received.

  **Answer:** Response to sentence # 1 - yes, plaintiffs have sought treatment.

  Response to sentence # 2 - see the medical records which will be produced subject to appropriate protective order or confidentiality agreement.

  See also Answer to Interrogatory #3 above. See also the report of Carol A. Tavani, M.D., plaintiff's forensic psychiatrist that will be produced in accord with the requirements of the scheduling order and the Federal Rules of Civil Procedure.


  23. State whether you intend to call any persons as expert witnesses at trial. If so, separately as to each person:

    (a) Identify the person;

    (b) State the subject matter as to which the person is expected to testify;

    (c) State the substance of the facts and opinions to which the person is expected to testify and a summary of the grounds for each opinion;

    (d) State the person's age, residence and business address;

    (e) State the name and address of the person's present employer, or if self-employed, the name of the business and his/her occupation;

    (f) Describe in detail the person's educational background, claimed field(s) of expertise, professional experience, publications, and courses attended which concerned the subject for which the person was retained in this case, and

-44-

membership in professional societies; and

(g) Describe in detail the person's previous court appearances (including case citations).

**Answer:** Objection. Overbroad and premature. Expert discovery is governed by the scheduling order and the Federal Rules of Civil Procedure. Moreover, the question is a thinly veiled attempt to prematurely obtain the mental impressions, conclusions, opinions and/or legal theories of Plaintiff's counsel in violation of Fed.R.Civ.Proc. Rule 26(b)(3). The information required under the Rules will be produced at the appropriate time.

By way of further response, see Plaintiffs' Rule 26 Disclosures and subsequent amendments.

-45-

A - 346

As to Objections:

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiffs

Dated: July 19, 2005

Firearms Training Unit / Pleadings /Final  FTU - Interrogatory Answers

-46-

A - 347

## DECLARATION OF CPL/3 B. KURT PRICE UNDER 28 U.S.C. § 1746

1. I am a Plaintiff in this action. I have personal knowledge of the facts contained in this Declaration and, if called as a witness, I am competent to testify to those facts.

2. I have read the Plaintiff's Answers to Defendants' Interrogatories set out above. The answers contained therein are true and correct to the best of my knowledge, information, and belief.

3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.


_CPL/3 Kurt Price_
CPL/3 B. KURT PRICE


_071905_
Date


-49-


A - 348

## DECLARATION OF SGT. CHRISTOPHER D. FORAKER UNDER 28 U.S.C. § 1746

1. I am the Plaintiff in this action. I have personal knowledge of the facts contained in this Declaration and, if called as a witness, I am competent to testify to those facts.

2. I have read the Plaintiff's Answers to Defendants' Interrogatories set out above. The answers contained therein are true and correct to the best of my knowledge, information, and belief.

3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

_____
SGT. CHRISTOPHER D. FORAKER

7-19-25
_____
Date

-39-

**A - 349**

## DECLARATION OF CPL/3 WAYNE WARREN UNDER 28 U.S.C. § 1746

1. I am a Plaintiff in this action. I have personal knowledge of the facts contained in this Declaration and, if called as a witness, I am competent to testify to those facts.

2. I have read the Plaintiff's Answers to Defendants' Interrogatories set out above. The answers contained therein are true and correct to the best of my knowledge, information, and belief.

3. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.


_____
CPL/3 WAYNE WARREN

_____8-2-05_____
Date


-48-


**A - 350**