# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| B. KURT PRICE, WAYNE WARREN, and CHRISTOPHER D. FORAKER, | : | Civil Action |
| Plaintiffs, | : | |
| v. | : | |
| L. AARON CHAFFINCH, THOMAS F. MACLEISH, DAVID B. MITCHELL, and DIVISION OF STATE POLICE, | : | |
| Defendants. | : | No. 04-956-GMS |

- - -

| | | |
|---|---|---|
| CHRISTOPHER D. FORAKER, | : | Civil Action |
| Plaintiff, | : | |
| v. | : | |
| L. AARON CHAFFINCH, THOMAS F. MACLEISH, DAVID B. MITCHELL, and DIVISION OF STATE POLICE, | : | |
| Defendants. | : | No. 04-1207-GMS |

- - -

Wilmington, Delaware
Wednesday, May 24, 2006
9:00 a.m.
EIGHTH DAY OF TRIAL

- - -

BEFORE: HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury

```
                                    1694
1   APPEARANCES:
2       THOMAS S. NEUBERGER, ESQ., and
        STEPHEN J. NEUBERGER, ESQ.
3       The Neuberger Law Firm
            -and-
4       MARTIN D. HAVERLY, ESQ.
        Law Offices of Martin D. Haverly
5
                Counsel for Plaintiffs
6
        R. MONTGOMERY DONALDSON, ESQ.
7       Montgomery, McCracken, Walker & Rhoads, LLP
            -and-
8       EDWARD T. ELLIS, ESQ., and
        CARMON M. HARVEY, ESQ.
9       Montgomery, McCracken, Walker & Rhoads
        (Philadelphia, PA)
10
                Counsel for Defendants
11
                        - - -
12
                        INDEX
13  JOSEPH A. SWISKI
14      Direct examination ------------- Page 1695
        Cross-examination  ------------- Page 1714
15      Redirect examination ---------- Page 1723
16  THOMAS F. MacLEISH
17      Direct examination ------------- Page 1726
        Cross-examination  ------------- Page 1798
18      Redirect examination ---------- Page 1817
19      STIPULATION READ --------------- Page 1821
20  THOMAS F. MacLEISH (Recalled)
21      Direct examination ------------- Page 1840
        Cross-examination  ------------- Page 1919
22
23                      - - -
24
25
```

```
                                    1695
1   THE COURT:  Good morning.
2       (Counsel respond "Good morning.")
3       (Jury enters courtroom at 9:03 a.m.)
4       THE COURT:  Good morning, ladies and gentlemen.
5   Please be seated.
6       Mr. Neuberger.
7       MR. T. NEUBERGER:  Your Honor, as my next
8   witness I would like to call retired Major Joseph Swiski to
9   the stand.
10      ... JOSEPH A. SWISKI, having been duly sworn as
11      a witness, was examine examined and testified as
12      follows ...
13              DIRECT EXAMINATION
14  BY MR. T. NEUBERGER:
15  Q.  Good morning.  Are you retired Major Joseph Swiski of
16  the Delaware State Police?
17  A.  Yes.
18  Q.  Who is your present employer?
19  A.  The State of Delaware.
20  Q.  Do you work for the Secretary of Homeland Security,
21  Mr. David Mitchell?
22  A.  Yes.
23  Q.  Are you on his staff?
24  A.  Yes.
25  Q.  Is Mr. Mitchell the boss of defendant Thomas MacLeish
```

```
                                    1696
1   here?
2   A.  Yes.
3   Q.  When did you retire from the Delaware State Police?
4   A.  April 2003.
5   Q.  Okay.  When were you promoted to the position of Major
6   in the Delaware State Police?
7   A.  I believe it was April of 2000.
8   Q.  So you served for three years from April of 2000 to
9   April of 2003 as a Major?
10  A.  Yes.
11  Q.  Okay.  What was your job assignment as a Major?
12  A.  I was the Administrative Major.
13  Q.  You dealt with the budget, things like that?
14  A.  Yes.
15  Q.  You dealt with issues relating to, budget issues
16  relating to the Firearms Training Unit, do you remember
17  that?
18  A.  Yes.
19  Q.  When did you join the Delaware State Police?
20  A.  September 4th, 1979.
21  Q.  So you served 21 years?
22  A.  Twenty-four.
23  Q.  And did you have assignments upstate, downstate?  How
24  did your career go?
25  A.  Upon graduating from the Academy, I was assigned to
```

```
                                    1697
1   Troop 6 in patrol.  I remained there for a few years.
2   Q.  Troop 6.  Where was that?
3   A.  Prices Corner.  Wilmington.  Then I became a Detective
4   at Troop 2, which is in New Castle.  Stayed at Troop 2 as a
5   Detective, a Sergeant and as a Lieutenant.  Then I
6   transferred to Dover to Internal Affairs -- I am sorry, I
7   skipped a brief stint in the Drug Unit.  I was in the Drug
8   Unit for about 18 months.
9   Q.  Was that upstate or downstate?
10  A.  All over.
11  Q.  Downstate, too?
12  A.  Based out of Odessa.  But I worked at the beach.  I
13  worked in Wilmington.  And I worked all over the state.
14  Q.  Then you were in Internal Affairs?
15  A.  Right.  After being in Internal Affairs for about two
16  years, I went to Troop 6 Prices Corner as a Deputy Troop
17  Commander.  Then I was promoted to Captain and assigned to
18  Troop 2 as the Commander.  Then I was promoted to Major and
19  reported to headquarters.
20  Q.  Okay.  So that's April of 2000 when you were promoted
21  to Major.  Right?
22  A.  Right.
23  Q.  And you are assigned to the headquarters building in
24  Dover?
25  A.  Yes.
```

1722

1 Police?
2 A.   When I took over as the Administrative Major, there
3 were currently six cost centers. The cost centers were
4 developed so you could group functions within the State
5 Police and give that money to that group, so you don't have
6 to deal with all the individual departments and everything.
7 Everybody is grouped together, so you give that money. When
8 I took over, there were six cost centers, so I dealt with
9 six representatives of each cost center.
10 Q.   Was the Firearms Training Unit a cost center?
11 A.   Yes, they were their own cost center.
12 Q.   When you dealt with the cost center heads, there would
13 be six of them, I take it, were you exercising supervisory
14 authority over them?
15 A.   Just as far as the budget goes.
16 Q.   Was it your anticipation that the cost center heads
17 would keep their chain of command informed as to their
18 activities and their budgets?
19 A.   Yes.
20 Q.   One last question. Did you attend Commanders' and
21 Section Chiefs' meetings during the time that you were with
22 the State Police?
23 A.   Yes.
24 Q.   Was it typical for the person who was in charge of the
25 Firearms Training Unit to attend the Commanders' and

1723

1 Sections Chiefs' meeting?
2 A.   If there was a specific point on the agenda, yes, they
3 would attend. But as a normal course of business, I don't
4 remember them being regularly in attendance.
5 Q.   During the time that you attended those meetings, does
6 that cover a period when Al Parton was the head of the
7 Firearms Training Unit?
8 A.   Yes.
9 Q.   How about Brian Fitzpatrick?
10 A.   Yes.
11 Q.   And how about Chris Foraker?
12 A.   Yes.
13 Q.   And Rich Ashley?
14 A.   Yes.
15 Q.   One final question. If Mr. Neuberger had called you
16 to talk about your testimony today, would you have talked to
17 him?
18 A.   Yes.
19        MR. ELLIS: Thank you.
20        THE COURT: Mr. Neuberger.
21           REDIRECT EXAMINATION
22 BY MR. T. NEUBERGER:
23 Q.   Chris Foraker became the Section Chief of the Firearms
24 Training Unit in August of 2001. Do you remember that,
25 Colonel Pepper promoted him to replace Al Parton? Do you

1724

1 remember that?
2 A.   Yes.
3 Q.   And then in April of 2002 you know that he was
4 transferred out by Colonel Chaffinch. Right?
5 A.   Yes.
6 Q.   Are you telling me that in that period of time between
7 August of 2001 and April of 2002 Chris Foraker did not
8 attend?
9        THE COURT: He is not telling you anything, Mr.
10 Neuberger. He is telling this jury.
11 BY MR. T. NEUBERGER:
12 Q.   I am sorry. Is it your testimony that during that
13 period of time Sergeant Foraker did not attend Commanders'
14 and Section Chiefs' meetings?
15 A.   No, I didn't say that.
16 Q.   That is what I am trying to get at. You don't
17 remember one way or the other whether he attended at all
18 during that time?
19        THE COURT: That is not what he said. Don't
20 mischaracterize his testimony.
21 BY MR. T. NEUBERGER:
22 Q.   Why don't you explain what you remember.
23 A.   If there was something on the agenda to be discussed
24 that involved the Firearms Unit or any other special unit,
25 that person would be there to discuss it. Sometimes a

1725

1 Section Chief would be invited to sit in just to observe
2 what's going on. I can't specifically say Sergeant Foraker
3 was never there. I don't know. I can imagine over that
4 period of time he may have been there. But I am not
5 absolutely sure.
6 Q.   My question is do you have a specific recollection of
7 any of those Commanders' meetings from August of 2001 to
8 April of 2002 today? Do you have a specific recollection of
9 any of those meetings?
10 A.   No, sir.
11 Q.   And is it fair to say, for any meetings that occurred
12 in that period of time, you have no memory one way or the
13 other as to whether he attended?
14 A.   No, sir.
15 Q.   Now, as the Administrative Budget Major, you dealt
16 with him for the range during that period of time. Right?
17 A.   Yes, regularly.
18 Q.   Is it true that he was the Section Chief of the
19 Firearms Training Unit?
20 A.   Yes, sir.
21        MR. T. NEUBERGER: Thank you. I have no other
22 questions.
23        THE COURT: Anything further?
24        MR. ELLIS: No, Your Honor.
25        THE COURT: Thank you, Major.

1726

1  THE WITNESS: Thank you.
2  (Witness excused.)
3  MR. T. NEUBERGER: Your Honor, at this time I
4  would like to call the defendant Colonel Thomas MacLeish to
5  the stand.
6  THE COURT: Colonel MacLeish.
7  ... THOMAS F. MACLEISH, having been duly sworn
8  as a witness, was examined and testified as
9  follows ...
10  DIRECT EXAMINATION
11  BY MR. T. NEUBERGER:
12  Q.  Since May of 2006, have you been the Colonel of the
13  Delaware State Police?
14  A.  I am sorry, Mr. Neuberger. Would you repeat the
15  question? I was moving a document in front of me.
16  Q.  Since May of 2005, have you been the Colonel of the
17  State Police?
18  A.  Yes, I have.
19  Q.  And is it true that before that you were the
20  Lieutenant Colonel of the Delaware State Police?
21  A.  Yes, sir.
22  Q.  And the defendant here, Aaron Chaffinch, promoted you
23  to Lieutenant Colonel. Is that correct?
24  A.  Yes, he did.
25  Q.  And you thought it was a great honor when he promoted

1727

1  you and selected you. Is that correct?
2  A.  Yes, I did.
3  Q.  Aaron Chaffinch is your friend. Is that correct?
4  A.  Yes, he is.
5  Q.  And yesterday he characterized you as a buddy of his.
6  Would you agree with that?
7  A.  Yes.
8  Q.  And you call him by his first name Aaron on occasion.
9  Isn't that correct?
10  A.  On occasion. Most of the time it's Colonel.
11  Q.  You feel very strongly about him and your friendship?
12  A.  I feel he is a good friend.
13  Q.  Now, is it true you stated in front of Commanders of
14  the Delaware State Police that you and Colonel Chaffinch are
15  joined at the hip?
16  A.  Yes.
17  Q.  And you were here for the opening statements in this
18  case. Right?
19  A.  Yes, I was.
20  Q.  Did you hear your lawyer in the opening statement
21  indicate that all the decisions made in this case affecting
22  my men were made by you?
23  A.  All the decisions in this case affecting my men were
24  made by me, yes.
25  Q.  All the decisions in this case affecting Sergeant

1728

1  Chris Foraker, Corporal Kurt Price, and Corporal Wayne
2  Warren, it's your testimony, were made by you?
3  A.  Yes, they were.
4  Q.  And so you agree that you are responsible for making
5  those decisions with regard to my men?
6  A.  Yes, for my men, I am responsible for making those
7  decisions.
8  Q.  Now, you know that in April of 2002 Sergeant Foraker
9  here filed a First Amendment free speech retaliation case
10  against Colonel Chaffinch?
11  A.  Yes, I am aware of that.
12  Q.  And you are aware that the case went to trial in June
13  of 2003?
14  A.  Yes, I am aware of that.
15  Q.  You testified at the trial. Isn't that correct?
16  A.  Yes, I did.
17  Q.  And you are familiar with the fact that in that
18  lawsuit Sergeant Foraker claimed that the Colonel had
19  retaliated against him for speaking out on several matters?
20  A.  Yes, I am.
21  Q.  And you recall that one of the claims he had made was
22  that he was retaliated against because he had disciplined
23  one of the Colonel's close friends for lying during the
24  course of his duties?
25  A.  Yes.

1729

1  Q.  And then you know that in June of 2003 a Federal Court
2  jury found for Sergeant Foraker and against Colonel
3  Chaffinch?
4  A.  Yes.
5  Q.  Now, you were called as a witness in that trial. Is
6  that correct?
7  A.  Yes, I was.
8  Q.  And you told the jury that day that, quote, Chris is a
9  good police officer, close quote?
10  A.  Yes, I did.
11  Q.  You told the jury that day that Chris is the kind of
12  person you would want to have under your command?
13  A.  Yes, I did.
14  Q.  You told the jury that day that he was a good trooper?
15  A.  Yes, I did.
16  Q.  And you told the jury that day that you had had a
17  conversation with Chris Foraker where you told him he had
18  done a good job in all of his assignments?
19  A.  Yes. That was the content of what I said.
20  Q.  And you know that Judge Farnan of this Court ordered
21  Chris Foraker to be reinstated back to his position at the
22  range?
23  A.  Yes, sir.
24  Q.  You know that there is a written judicial order
25  setting forth the terms of that reinstatement?

1730

1  A.  Yes, sir.
2  Q.  Let's look at Plaintiffs' Exhibit 2 in the white book
3  in front of you. Can you find that? It's Volume 1.
4  A.  Yes, sir.
5  Q.  Have you found that?
6  A.  Yes, sir. On the Plaintiffs' Exhibit 2 in the white
7  binder.
8  Q.  Up in the top in the right-hand corner you see where
9  it was filed by the Clerk of the District Court on November
10 20th, 2003. Do you see that?
11 A.  Yes, sir.
12 Q.  Let me read to you Paragraph 1 here.
13          Sergeant Christopher D. Foraker is ordered
14 reinstated to his prior position as the noncommissioned
15 officer in charge of the Firearms Training Unit of the
16 Delaware State Police with all the rights, privileges,
17 duties, responsibilities, and supervisory authority
18 previously held by him when he earlier occupied that
19 position on February 20th of the year 2002.
20          Is that what it says?
21 A.  Yes, sir, it does.
22 Q.  On the second page you see the Judge's signature
23 there, do you, bottom of the second page?
24 A.  Yes, sir, I do.
25 Q.  Do you see the attorney for the Delaware State Police,

1731

1  Michael Tupman's signature there?
2  A.  Yes, sir, I do.
3  Q.  Mr. Tupman is one of the two lawyers who defended
4  Colonel Chaffinch in that first case. Is that correct?
5  A.  Yes, sir.
6  Q.  He is one of the Deputy Attorney Generals who works
7  for the State Police?
8  A.  Yes, sir, he is assigned to the State Police by the
9  Attorney General's Office.
10 Q.  You were personally aware of this order and all
11 obligations under it. Is that correct?
12 A.  Yes, sir, I was.
13 Q.  And you understand that judicial orders of federal
14 judges should be obeyed?
15 A.  Yes, sir, I do.
16 Q.  You understand that a person should make every
17 possible effort to obey and comply with a judicial order of
18 a federal judge?
19 A.  Absolutely.
20 Q.  And you agree that a person who knowingly disobeys a
21 federal judge's order should be punished?
22 A.  Yes, I do.
23 Q.  Now, is it true that on July 20th of the year 2004 you
24 removed Sergeant Foraker from a meeting of Commanders and
25 Section Chiefs?

1732

1  A.  Yes, I did.
2  Q.  Is it true it's your position he is not a Section
3  Chief entitled to attend that meeting?
4  A.  Yes, that's correct.
5  Q.  Is it true you contend he was mistakenly invited to
6  the meeting?
7  A.  Yes.
8  Q.  And you took him out in the hall and ordered him not
9  to attend the meeting. Is that correct?
10 A.  I approached him in the room, asked him if he had
11 something to present at the meeting, had he been asked to
12 attend on behalf of his Commander, Captain Warren or
13 Lieutenant Davis. We were having a quiet conversation. And
14 he indicated no, and he had been invited. And I asked him
15 to step in the hall so we may talk.
16 Q.  So you took him out in the hall?
17 A.  Yes, I did.
18 Q.  And you told him that he wasn't invited to the
19 meeting?
20 A.  I told him in essence, yes, that he was not to attend
21 the meeting. The meeting is for Lieutenants and Captains.
22 Q.  And you told him he wasn't a Section Chief. Is that
23 right?
24 A.  I considered Sergeant Foraker the Sergeant and NCOIC
25 of the Firearms Training Unit. Some people designate that

1733

1  as a Section Chief. In a past sense and perhaps even in a
2  current sense, he is, based upon the e-mail that was sent to
3  him. I don't dispute the fact that the Planning Section
4  sent out a notice to him, and it was sent to him and he
5  appeared. I didn't have any dispute with that. But at that
6  meeting, in our normal course of business, he wasn't to
7  attend unless he had something to present. If he had
8  something to present, he would have been able to stay.
9  Q.  Is it true you are indicating that Sergeant Foraker
10 does not qualify as a Section Chief for that meeting?
11 A.  For that meeting, he was a Section Chief, yes, he was.
12 He had been invited as such.
13          MR. T. NEUBERGER:  May I approach the witness,
14 Your Honor?
15          THE COURT:  Yes, you may.
16 BY MR. T. NEUBERGER:
17 Q.  Colonel MacLeish, do you remember coming to our
18 offices to give a deposition in this case?
19 A.  Yes, I do.
20 Q.  And on July 19th of the year 2005, did you come to my
21 offices?
22 A.  Yes, sir.
23 Q.  And was Mr. Edward Ellis one of your lawyers there
24 present?
25 A.  Yes, he was.

1814

```
1   phone call?
2   A.   I don't recall them specifically. I think we
3   exchanged niceties at the beginning.
4   Q.   Did you talk to him about the second opinion that you
5   were going to send the Corporal?
6   A.   No, I did not.
7   Q.   You were asked some questions by Mr. Neuberger about
8   the Commanders' and Section Chiefs' meeting at which you
9   asked Chris Foraker to leave. Just so it's clear on the
10  record -- I don't want you to go back and describe what you
11  did again, I think you already did that -- but why is it
12  that you did not believe Chris Foraker belonged in that
13  meeting?
14  A.   That meeting was for Lieutenants and Captains, Troop
15  Commanders and Section Chiefs that were of officer rank. We
16  had established that in the past, and that's what I was
17  operating under. He was not a -- he was not to be at that
18  meeting because it was to be for officers.
19  Q.   What goes on in those meetings?
20  A.   We discuss divisional needs, operations, problems that
21  may arise, problems that are being faced at troops in order
22  to keep information flow going.
23  Q.   Was any other Sergeant at that meeting?
24  A.   There was one other Sergeant at that meeting.
25  Q.   Who was that?
```

1815

```
1   A.   That was Sergeant Alex Peterson. He worked in
2   Planning.
3   Q.   Why was he there?
4   A.   He is there because Planning does the workup for that
5   meeting. They do all the preparation of the slides and the
6   PowerPoints that are going to be presented.
7   Q.   Is he at every Section Chiefs' and Commanders'
8   meeting?
9   A.   Not at every one. Typically, if the Captain or the
10  Lieutenant can be there, he is not. But if there is a
11  problem or whatever, he is there.
12  Q.   Now, you have testified Chris Foraker came back to the
13  range in December 2003. Are these meetings held monthly?
14  A.   Yes, they are.
15  Q.   Between December 2003 and July 2004, had Chris Foraker
16  ever come to one of these meetings?
17  A.   He had not.
18  Q.   Do you recall during the first tour, as we call it,
19  that Chris Foraker was at the firing range back in 2001 and
20  2002, did he come to those meetings then?
21  A.   Not that I can recall.
22  Q.   You have been asked questions about Randall Hughes.
23  He is one of your Majors at present. Right?
24  A.   Yes, he is.
25  Q.   And I think you testified that he is on light duty.
```

1816

```
1   A.   Yes, he is.
2   Q.   What is the nature of his injury?
3   A.   He has a shoulder injury.
4   Q.   Who put him on light duty?
5   A.   I did.
6   Q.   Did you give him instructions?
7   A.   Yes, I did.
8   Q.   When you put him on light duty?
9   A.   Yes.
10  Q.   What were the instructions you gave him?
11  A.   That he was not to wear his uniform. That he was to
12  obviously not drive a marked police unit. And that he was
13  not to respond to complaints, do that type of police work.
14  He is not to be involved in patrol officer duties,
15  restricting him from anything that could put him in harm's
16  way.
17  Q.   Now, when he reports to the office at State Police
18  headquarters, what type of clothing does he wear?
19  A.   While on this duty, typically, he is in a coat and
20  tie.
21  Q.   Are there circumstances under which you have
22  authorized him to wear a uniform?
23  A.   Yes, there are.
24  Q.   What are those circumstances?
25  A.   When we ever a memorial-type event, the memorial
```

1817

```
1   service would be one where the entire executive staff is in
2   uniform for. For graduation, I would authorize that,
3   knowing that under those circumstances, he would be just
4   attending that function in that uniform, Governor's Prayer
5   Breakfast, Sussex County Prayer Breakfast, where typically
6   we attend those functions in full uniform.
7   Q.   Now, aside from those ceremonial functions, has he
8   been authorized to wear his uniform?
9   A.   No, he is not.
10  Q.   When he comes to work on an ordinary, regular,
11  workday, is he permitted to wear his uniform?
12  A.   No, he is not.
13  Q.   Now, how about on a day when you have a ceremony in
14  the morning, and then he works the rest of the day in his
15  office. What does he wear under those circumstances?
16  A.   He would continue to wear the uniform.
17  Q.   That's permissible?
18  A.   Yes, it is.
19  Q.   You authorized that?
20  A.   Yes.
21         MR. ELLIS: Nothing further at this time, Your
22  Honor.
23         THE COURT: Anything further, Mr. Neuberger?
24         MR. T. NEUBERGER: Just two things, Your Honor.
25                     REDIRECT EXAMINATION
```

1842

fortunate enough to be promoted. And I took a shift at Troop 3 in Woodside. I was there through 1986.

Then I went down, I was in charge of the Fatal Accident Reconstruction team for Kent County at Troop 3. And from there I was promoted to Lieutenant and moved up to headquarters, and I was the Deputy Director of Traffic there for a few years.

And I came -- while there is when I went to the National Academy. And in August of 1989 I became Traffic Lieutenant at Troop 3 in Woodside.

I left there after 14 months and 20 days, and went to headquarters, and at headquarters I was the acting -- I was the Director of Traffic as a Lieutenant in that position.

In 1991 I was promoted to Captain, and remained as the Traffic director until March of '92. March of '92 I went to Troop 3 as a Troop Commander. I stayed there through the end of 1993, and then began a seven-month portion at Troop 5 as a Troop Commander at Troop 5 from January of '94 through July of '94.

In July, August of '94 I went to Planning. I spent a year in Planning, and from there went to Community Services. I spent about two years in Community Services. In 1998 I moved to take charge of the Video Lottery Enforcement Unit. I did that assignment until I was brought

1843

up to executive staff by Colonel Pepper in May, is when he asked me, in June is when I took the assignment. That was June of 2001.

I was the Operations officer for Kent and Sussex County from June of 2001 until July of 2003, when Colonel Chaffinch asked me to be his Lieutenant Colonel. And I accepted that. And I obtained the rank in November of 2003. And I served in that capacity until I was fortunate enough to be selected by the Governor and appointed by her to be Superintendent of the State Police last May.

Q. Now, during the time that you have developed in the State Police and risen to the rank of Colonel, have you engaged in community activities in Dover?
A. Quite a few.
Q. Give us an idea of what that is.
A. I am active with my church. My boys are altar servers. I have been on the parish council for Holy Cross Parish.

I have been involved with the Cub Scout and Boy Scout troops in Pack and Troop 154 that are sponsored by the Knights of Columbus.

I am currently -- I was a Scoutmaster. I ran the troop for five years as a Scoutmaster. I am the committee chair of the troop at this time. We have about 50, 60 boys -- about 40 boys now. When I left there were

1844

about 50. But about 40 boys are active with the scout troop there.

Q. Are you also a football referee?
A. Yes, I am. I officiate high school football, and Pop Warner and everything below the high school level. That's my "get out of jail" card. I like doing that.
Q. Now, I want to focus for a while on your duties as the Lieutenant Colonel, the Deputy Superintendent.

What were your responsibilities at that point?
A. All the Majors reported to me, operationally. I had oversight in those areas. Direct units that reported to me was the Training Academy, Internal Affairs, and Human Resources. And you deal with the day-to-day operational issues that were brought to my attention by the executive officers that had basically two field force commanders for Kent and Sussex County and New Castle County.
Q. Did you also have the Training Academy report to you?
A. Yes, I did.
Q. I want to focus for a minute on the Training Academy. In order to do this, I would like you to open up the black book, Volume 2 of the black book, to Exhibit 75.

MR. ELLIS: Your Honor, this is a challenge for eyesight, so I have tried to enlarge that extra big on the screen for us.
BY MR. ELLIS:

1845

Q. Exhibit 75. It is the 11th page of the document. Now, can you tell us what this document is, Colonel MacLeish?
A. That is the TO for the division.
Q. When you say TO --
A. Table of organization.
Q. Not a wide receiver for Dallas?
A. No.
Q. Is that similar to an organization chart in the private sector?
A. Yes, it is.
Q. I want to focus on the part that's up on the screen. Does that have the units that report directly to the Deputy Superintendent on it?
A. Yes, it does.
Q. In addition to that, you said all the Majors do?
A. Yes, sir.
Q. Could you tell us when that organization chart was in effect?
A. In August of 2003.
Q. Now, you are responsible in that job for supervising the Training Academy. Right?
A. Yes, I am.
Q. Why don't you tell us what the Training Academy is responsible for in the State Police?

```
                                                                   1941

  1                 IN THE UNITED STATES DISTRICT COURT

  2                IN AND FOR THE DISTRICT OF DELAWARE

  3                              - - -

  4   B. KURT PRICE, WAYNE WARREN,     :     Civil Action
      and CHRISTOPHER D. FORAKER,      :
  5                                    :
                 Plaintiffs,           :
  6                                    :
           v.                          :
  7                                    :
      L. AARON CHAFFINCH,              :
  8   THOMAS F. MACLEISH,              :
      DAVID B. MITCHELL, and           :
  9   DIVISION OF STATE POLICE,        :
                                       :
 10              Defendants.           :     No. 04-956-GMS

 11                              - - -

 12   CHRISTOPHER D. FORAKER,          :     Civil Action
                                       :
 13              Plaintiff,            :
                                       :
 14        v.                          :
                                       :
 15   L. AARON CHAFFINCH,              :
      THOMAS F. MACLEISH,              :
 16   DAVID B. MITCHELL, and           :
      DIVISION OF STATE POLICE,        :
 17                                    :
                 Defendants.           :     No. 04-1207-GMS
 18
                                 - - -
 19
                          Wilmington, Delaware
 20                       Thursday, May 25, 2006
                               9:00 a.m.
 21                        NINTH DAY OF TRIAL

 22                              - - -

 23   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury

 24

 25
```

**1942**

```
 1  APPEARANCES:
 2      THOMAS S. NEUBERGER, ESQ., and
        STEPHEN J. NEUBERGER, ESQ.
 3      The Neuberger Law Firm
            -and-
 4      MARTIN D. HAVERLY, ESQ.
        Law Offices of Martin D. Haverly
 5
            Counsel for Plaintiffs
 6
        R. MONTGOMERY DONALDSON, ESQ.
 7      Montgomery, McCracken, Walker & Rhoads, LLP
            -and-
 8      EDWARD T. ELLIS, ESQ., and
        CARMON M. HARVEY, ESQ.
 9      Montgomery, McCracken, Walker & Rhoads
        (Philadelphia, PA)
10
            Counsel for Defendants
11
                    - - -
12
                    INDEX
13
    THOMAS F. McLEISH (Continued)
14
        Redirect examination ------------ Page 1944
15
    DEIRDRE O'CONNELL
16
        Direct examination  -------------- Page 1950
17      Cross-examination   -------------- Page 1962
        Redirect examination ------------- Page 1973
18
    AARON GREEN
19
        Direct examination  -------------- Page 1976
20      Cross-examination   -------------- Page 2001
        Redirect examination ------------- Page 2011
21
    JOHN YEOMANS
22
        Direct examination  -------------- Page 2012
23      Cross--examination  -------------- Page 2086
        Redirect examination ------------- Page 2124
24
25
```

**1943**

```
 1              INDEX CONTINUED
 2  THOMAS F. MARCIN
 3
        Direct examination  ---------------- Page 2126
 4      Cross-examination   ---------------- Page 2128
 5  STEVE D. SWAIN
 6
        Direct examination  ---------------- Page 2130
        Cross-examination   ---------------- Page 2134
 7      Redirect examination --------------- Page 2137
 8  ALBERT HOMIAK
 9
        Direct examination  ---------------- Page 2139
        Cross-examination   ---------------- Page 2157
10      Redirect examination --------------- Page 2159
11  RONALD HAGAN
12
        Direct examination  ---------------- Page 2160
        Cross-examination   ---------------- Page 2170
13
    WILLIAM E. BRYSON
14
        Direct examination  ---------------- Page 2171
15      Cross-examination   ---------------- Page 2184
        Redirect examination --------------- Page 2187
16
    DX-91    Letter to Corporal Price from
17           Captain Yeomans ------------------ Page 2058
18  DX-76    List of Troopers who had been
             On Light Duty -------------------- Page 2082
19
    PX-164   Document from Corporal Merritt's
20           Personnel File ------------------- Page 2126
21  PX-165   Letter from RangeTech ------------ Page 2186
22
                    - - -
23
24
25
```

**1944**

1  THE COURT: Good morning.
2  MR. T. NEUBERGER: Your Honor, good morning. If
3  I could, did I revise the special verdict sheet that we had
4  proposed? I have it on a disc and also two or three short
5  sentences on collateral sources for the damages instruction.
6  THE COURT: Mr. Ellis, have you found yours?
7  MR. ELLIS: I found it, Your Honor. But I
8  haven't had a chance to revise it.
9  THE COURT: I think at some point we probably
10 need to get on the phone with Bunting. Perhaps during one
11 of the breaks or while we are in session -- I will check. I
12 will take care of that.
13       Let's bring in the jury.
14       (Jury enters courtroom at 9:08 a.m.)
15 THE COURT: Good morning, members of the jury.
16 Please be seated.
17       I think where we left off was Mr. Ellis was
18 about to redirect the Colonel.
19       ... THOMAS F. MacLEISH, having been previously
20   sworn as a witness, was examined and testified further
21   as follows ...
22              REDIRECT EXAMINATION
23 BY MR. ELLIS:
24 Q. Colonel MacLeish, when you were being questioned
25 yesterday by Mr. Neuberger, he asked you whether you had

**1945**

1  treated Kurt Price in a manner similar to how you treated
2  Sergeant Steve Swain. And I would like you to explain to
3  the jury what you believe the differences are between Steve
4  Swain and Kurt Price and why you have treated each of them
5  in the way that you have.
6  A. Steve Swain is not on light duty. He is not -- he is
7  a full-duty trooper. There has been nothing that has
8  crossed my desk or have any doctors stated that he is
9  limited in his function or in the scope of his duties. If
10 Sergeant Swain needs to be put on the road, I can put him on
11 the road. If I need to send him anywhere within the state,
12 I can do that with him.
13       In the case of Corporal Price, I have a doctor
14 saying that he is not fit for duty and no accommodation can
15 be made. That binds me to not be able to keep him on the
16 force.
17 Q. You were also asked about a David Citro, Captain David
18 Citro. Could you explain what you believe to be the
19 differences between Citro's situation and Kurt Price's?
20 A. Captain Citro, as you have heard testimony, he
21 suffered some type of injury in the eighties, mid-eighties.
22 I don't know the specific details. But I know that he was
23 on regular duty. He was a full-duty trooper up until the
24 very end of his career, when he could no longer take the
25 physical fitness test, and the application of the two-year

2150

1 list that would not be expected to be there. I am not quite
2 sure if that is what your question is or not.
3 Q. In your experience, does the noncommissioned officer
4 in charge of the Firearms Training Unit attend the Section
5 Chiefs' and Commanders' meeting?
6 A. No, they would not be expected to unless they were
7 asked specifically to come. I know our current meetings
8 they are not expected to be there.
9 Q. Why is that?
10 A. Well, again, it is the upper management usually
11 dealing with personnel issues, discussing many topics that
12 the executive staff wants to pass onto the administrators of
13 the various troops and sections.
14 Q. Under what circumstances would the noncommissioned
15 officer in charge of the Firearms Training Unit be expected
16 to attend the meeting?
17 A. I would think if they were personally asked to discuss
18 an issue on a given Commander's meeting date. But other
19 than that, there would be no expectation that they would be
20 there.
21 Q. When you were Director of Training, who attended the
22 Section Chiefs' and Commanders' meetings on behalf of the
23 Academy?
24 A. I did.
25 Q. And do you recall seeing Sergeant Foraker at the

2151

1 Section Chiefs' and Commanders' meetings?
2 A. No.
3 Q. Let's talk about something else. In the Training
4 Academy, did any of these units that we looked at on the
5 chart have separate budgets?
6 A. Yes.
7 Q. Which ones?
8 A. The K-9 training unit. The Firearms Training Unit.
9 And actually, the Academy itself. I say the Academy itself,
10 meaning separate from their budget, in that the Academy also
11 has a budget that involves food for recruits, other issues
12 that need to be spent on at the Academy itself. There was
13 actually three different budgets within the Academy.
14 Q. You mentioned what the Academy was purchasing. What
15 types of things are the Firearms Training Unit and K-9 Unit
16 purchasing?
17 A. The Firearms Training Unit, obviously, talking about
18 targets, ammunition, weapons, of course. The K-9 training
19 unit, you are talking about dog food for canine handlers
20 statewide, harnesses, anything associated with the needs of
21 a canine or a canine handler.
22 Q. Is there an annual budget process?
23 A. Within the State Police?
24 Q. Yes.
25 A. Yes.

2152

1 Q. Can you describe how the budget process worked within
2 the Academy while you were there?
3 A. Yes, I will. Each section is asked to submit a budget
4 request for the next year, the next fiscal year, which
5 begins July 1st.
6         If you back up, around May of each year, at the
7 time Major Eckrich, the fiscal officer in charge of our
8 budget, would ask each section to come in and basically
9 evaluate where you stood at the time on the previous year's
10 fiscal budget. Once that meeting commences, there is a
11 submittal period, where you will submit your budget request
12 and you would obviously line-item things that you are asking
13 for, the reason, the approximate cost, et cetera, and submit
14 that to the, it would be ultimately submitted to the fiscal
15 officer.
16 Q. And who prepares these proposed budgets for each of
17 the units?
18 A. At the Academy, the NCOIC of the units. The K-9
19 budget, obviously, the NCOIC of the K-9 Unit. Firearms, it
20 would be Sergeant Foraker. For the Training Academy,
21 separate from those other two, it would be myself or
22 Lieutenant Alexander.
23 Q. And did you participate in the budget process at all
24 for the K-9 Unit or the Firearms Training Unit?
25 A. Yes.

2153

1 Q. In what way?
2 A. In May, when the end-of-year review of the fiscal year
3 came up, I accompanied Sergeant Foraker when his scheduled
4 time was, I went with Corporal Anderson when his scheduled
5 time was. And the third budget, myself, Lieutenant
6 Alexander attended. And that was with Major Eckrich.
7 Q. As Director of Training, why did you want to sit in on
8 these budget meetings with Major Eckrich and the
9 noncommissioned officers?
10 A. Just the mere fact that I was the director of the
11 Training Academy responsible for those that were under me.
12 I would certainly want to know what they are requesting,
13 what their anticipated expenses were, where they stood on
14 their current budget year to date, knowing where deficits
15 may be. I think any Commander would be required to know
16 that.
17 Q. Do you know if the prior Director of Training sat in
18 on the budget meetings?
19 A. I don't know. But I have been told by Sergeant
20 Foraker that he did not.
21 Q. Did Sergeant Foraker ever talk to you about you
22 sitting in on the budget meetings with him?
23 A. He mentioned that he thought it was odd that I would
24 sit with him. And I think my response was, I thought it
25 would be odd if I didn't sit in with him. And it was in the

2154

1 context at the time that he thought that I was treating him
2 differently than other members of the Training Academy. And
3 I reinforced in his mind that I was not. That I just wanted
4 to be informed about the things that were going on at the
5 Academy. And just as I intended with Lieutenant Alexander
6 and just as I attended with Corporal Anderson, I would
7 attend the meetings with him.
8 Q. In any of your interactions with Sergeant Foraker,
9 were you following instructions given to you by anyone above
10 you in the chain of command?
11 A. No.
12 Q. Did anyone above you in the chain of command tell you
13 to micromanage Sergeant Foraker?
14 A. No.
15 Q. Were you told to harass him?
16 A. No, ma'am.
17 Q. Were you told to make him want to retire?
18 A. No.
19 Q. How did you treat Sergeant Foraker in comparison to
20 the noncommissioned officer in charge of the K-9 Unit?
21 A. I thought I treated everybody the same. I thought I
22 treated everybody fairly. I am just the opposite of a
23 micromanager. I empower my folks, give them the tools, and
24 pretty much let them do the job unless there is issues that
25 come up.

2155

1 So I think, in retrospect, if you bring somebody
2 in here that would work for me, I think they would testify
3 to just the opposite of that.
4 Q. Let's talk about the Academy graduation ceremonies.
5 As the Director of Training, what was your role if any in
6 the ceremony?
7 A. Kind of being the MC on the stage. Of course, I am
8 responsible for the overall production of the Academy. But,
9 you know, there was a lot of folks that had a part in it,
10 putting it together. Facilitate, you know, the successful
11 conclusion of it.
12 Q. How often is a graduation ceremony held?
13 A. We typically have two Academy classes a year. So
14 every six months.
15 Q. And the ceremony immediately preceding the one where
16 you were director, what time of day was the ceremony held?
17 A. The preceding one, and many before it, it was
18 typically held at night, rather late at night. I think it
19 didn't begin until about 7:00 p.m. And I remember when I
20 was not at the Training Academy, thinking that, really, it's
21 not a very timely thing, because a lot of the folks that
22 come to it are elderly people that travel from out of state
23 to see a loved one graduate. And I thought it was important
24 that we bump it back in order to enable them to be able to
25 have a safe trip home, get off in time, maybe get off at

2156

1 dinner time so they can have dinner with the recruit who
2 just graduated.
3 Q. Was the length of the ceremony ever viewed as a
4 problem?
5 A. Yes. That's the other problem. It always seemed --
6 well, I know sometimes I even looked at my watch, it was
7 like a three or three-and-a-half-hour event at times,
8 therefore, the need to start earlier in the day, and try to
9 shorten the ceremony. That was our goal for the Academy
10 class that graduated when I was there.
11 Q. What did you do to shorten the ceremony?
12 A. We tried to streamline it. We made -- actually, when
13 we sent out invitations for anybody, VIPs that were
14 attending, we put a time limit on the amount of time that
15 they were going to talk. We do have some folks that tend to
16 ramble on. We have some politicians sometimes that do come
17 to it. They tend to use it as a platform to speak.
18 Sometimes you have to cut it off.
19 Anyway, we put a time limit on the letter of
20 invitation about how long they would be expected to talk at
21 the most.
22 We internally, actually, talked about ways to
23 speed it up by calling the names faster, looking at the
24 overall program and seeing what we could and could not cut
25 out in order to make it a shorter ceremony.

2157

1 Q. How much time did the changes cut off the length of
2 the ceremony?
3 A. About an hour. I remember at the conclusion of it,
4 and the days after that, quite a few people came up to me
5 and said they appreciated the, not just the start time but
6 also the fact that it was not as long.
7 Q. Were the changes to the ceremony just a one-time deal?
8 A. No. They continue on.
9 Q. Do you recall if Sergeant Foraker objected to the
10 changes in the format of the ceremony when they were first
11 made?
12 A. I don't recall that, no.
13 Q. Did anyone above you in the chain of command tell you
14 to prevent Sergeant Foraker from speaking at the graduation
15 ceremony?
16 A. No.
17 Q. Did anyone above you in the chain of command give you
18 any direction as to how the ceremony was to be conducted?
19 A. No.
20    MS. HARVEY: I have no further questions.
21    THE COURT: Mr. Neuberger.
22    CROSS-EXAMINATION
23 BY MR. T. NEUBERGER:
24 Q. Major Homiak, after you supervised Chris Foraker at
25 the Police Academy, you were given a coveted command at

SHEET 1                                                              Friday, May 26, 2006

                                                                2188

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                            - - -

 4      B. KURT PRICE, WAYNE WARREN,    :   Civil Action
        and CHRISTOPHER D. FORAKER,     :
 5                                      :
                    Plaintiffs,         :
 6                                      :
             v.                         :
 7                                      :
        L. AARON CHAFFINCH,             :
 8      THOMAS F. MACLEISH,             :
        DAVID B. MITCHELL, and          :
 9      DIVISION OF STATE POLICE,       :
                                        :
10                  Defendants.         :   No. 04-956-GMS

11                            - - -

12      CHRISTOPHER D. FORAKER,         :   Civil Action
                                        :
13                  Plaintiff,          :
                                        :
14           v.                         :
                                        :
15      L. AARON CHAFFINCH,             :
        THOMAS F. MACLEISH,             :
16      DAVID B. MITCHELL, and          :
        DIVISION OF STATE POLICE,       :
17                                      :   No. 04-1207-GMS
                    Defendants.         :
18                            - - -

19                     Wilmington, Delaware
                       Friday, May 26, 2006
20                          9:00 a.m.
                       TENTH DAY OF TRIAL
21
                              - - -
22
        BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury
23

24                            - - -

25
```

SHEET 2

2189

APPEARANCES:

    THOMAS S. NEUBERGER, ESQ., and
    STEPHEN J. NEUBERGER, ESQ.
    The Neuberger Law Firm
        -and-
    MARTIN D. HAVERLY, ESQ.
    Law Offices of Martin D. Haverly

            Counsel for Plaintiffs

    R. MONTGOMERY DONALDSON, ESQ.
    Montgomery, McCracken, Walker & Rhoads, LLP
        -and-
    EDWARD T. ELLIS, ESQ., and
    CARMON M. HARVEY, ESQ.
    Montgomery, McCracken, Walker & Rhoads
    (Philadelphia, PA)

            Counsel for Defendants

            - - -

(Proceedings reconvene in court at 9:00 a.m.)

THE COURT: Good morning, counsel. Please be seated.

Let's chat for a moment. We're waiting for Mr. Ellis?

MR. T. NEUBERGER: He just stepped out, Your Honor.

THE COURT: Okay.

MR. T. NEUBERGER: Could I hand to the Court Exhibits 164 and 165 that were admitted yesterday?

THE COURT: Great.

MR. T. NEUBERGER: And, Your Honor, Mr. Ellis and I were working out, he has some expert coming up from

2190

Baltimore and there could be traffic difficulties. If so, he may just play the two video depositions he took.

THE COURT: Why don't we wait for Mr. Ellis to get here.

MR. T. NEUBERGER: Okay.

(Pause.)

THE COURT: All right.

MR. ELLIS: I'm sorry, Your Honor. I had a temporary emergency there.

THE COURT: No problem. Okay. As to the -- please sit -- the discussion that the Court entertained with counsel yesterday on issues, the Court is far from convinced that the record would support the delivery of an instruction enabling the jury to join an adverse inference as to the issue of the wiping of the hard drive. Counsel have both cited the correct standards in their papers but I am not convinced by counsel for plaintiffs' assertions that the record will support, would support anything more than mere speculation on this Court's part as to what was or was not, may or may not have been. And I don't agree with you, Mr. Neuberger, young Neuberger that the Third Circuit would permit the Court to entertain hypothetical renderings such as the plaintiffs have submitted in their brief in an effort to divine what evidence may or may not have existed. Courts of law don't operate that way and this one is not going to

2191

speculate in that regard.

Some prima facie level, it's clear the cases require some prima facie sense of showing. Cases I had to decide in this regard in the past are factually quite dissimilar to the facts that have been presented in this case. You have virtually no evidence, there is very substantial dearth of evidence in the Court's view that would enable the Court to conclude there was much use made on a relative basis of this particular defendant, that is, Defendant Chaffinch by computers, the computer in question that was wiped, admittedly wiped, intentionally wiped, inappropriately wiped at a time when the evidence should have been preserved. No doubt about it.

There is no question in this Court's mind, particularly; and I want to say it again, and I know Mr. Ellis, on behalf of your client, you took umbrage during the pretrial conference at the Court's statement and its written ruling regarding the fact we had a law enforcement agency that should have known better, careless at the very least, probably reckless with regard to the preservation of evidence in a matter that was occurring in a federal court. It's disappointing, to say the least. I'll leave it there.

Having said that, the record, I am convinced, does not support. And when I say "the record," I'm talking about what we've heard from this witness stand. No e-mails,

2192

no testimony about any e-mails generated by Chaffinch. The only message that we seen, any message we've seen is the Blackberry message.

So for me to take the serious step of using this Court's offices and the imprimatur that a judge sway the influence that a judge potentially can have on a jury in a circumstance like this that in a case in my judgment as close as this case would be inappropriate under these circumstances morally. It seems to me that plaintiffs had at least one other source and opportunity to seek the preservation of the evidence, the discovery of the evidence, the possible evidence we're talking about and that is the recipients of these phantom e-mails.

It is routine in organizations like this for opponents who are suing organizations like the Delaware State Police to issue discovery requests. And those organizations, I used to work in at least two, the Department of Justice and a company known as Hercules where routinely we were involved in litigation and e-mails would come across from the General Counsel or from the Attorney General of the United States, directing her attorneys or the General Counsel directing his counsel in-house to take certain steps to search records and preserve e-mails. Those requests emanate from a party suing the entities that are named. That wasn't done as far as I can tell in this case

SHEET 18

2253

1 that correct?
2     "Answer: Leaded projectiles with nonleaded
3 primers.
4     "Question: Was there a point during the time
5 that you were in charge of the range that you changed from
6 leaded projectiles to what's called frangible ammunition?
7     "Answer: Yes, I did.
8     "Question: And were you involved in making the
9 decision to do that?
10    "Answer: Yes.
11    "Question: Can you tell us why you did that?
12    "Answer: We were all obviously concerned with
13 lead levels. Lead levels were the big tangible at that
14 point that, you know, you could really put your finger on.
15 You know, we get tested for lead on a periodic basis before
16 and after a shoot.
17    "When I refer to a shoot, an in-service training
18 event. And lead levels would rise and fall during those
19 periods.
20    "Some lead levels were higher than others. Cpl.
21 Cathell's was very high at one point and in an attempt to
22 reduce the lead levels, I elected to try the frangible
23 ammunition which had no lead in it.
24    "Question: Did the frangible ammunition have
25 the effect that you desired?

2254

1     "In other words, did it cause the blood lead
2 levels to drop?
3     "Answer: They stabilized. They were pretty
4 stable, I mean, throughout. I mean, we still had Cpl.
5 Cathell, that, you know, he was higher than everybody else,
6 but lead levels were pretty stable.
7     "Question: Did you, at the time that you
8 started using the frangible ammunition, know what was in the
9 frangible ammunition?
10    "Answer: I had a pretty good idea.
11    "Question: How did you know?
12    "Answer: We actually had SigArms came in -- I'm
13 sorry. Not SigArms, Blount. Speer ammunition is what we
14 were utilizing. They actually came in and gave us a short
15 presentation one day on ammunition and I believe we covered
16 frangible that day.
17    "Question: Now, a couple of minutes ago I asked
18 you some questions about shooting on the dry ramp. Were you
19 Supposed to shoot leaded -- I'm sorry. Were you supposed to
20 shoot the frangible ammunition on a dry ramp?
21    "Answer: I don't know that it ever said
22 anyplace that you couldn't do it. Do you know what I mean?
23 It was a wet ramp system so I preferred to use it wet.
24    "Question: Did you ever have occasion to
25 observe what happens when the frangible ammunition impacts

2255

1 with steel?
2     "Answer: Yeah. It breaks into small particles,
3 basically dust. It turns into just minute dust particles.
4     "Question: Now, when you were in charge of the
5 range, was there a point when you arranged for a maintenance
6 contract?
7     "Answer: Yes.
8     "Question: And do you remember when that was,
9 approximately?
10    "Answer: It was probably the summer of 2000
11 because I took over in October '99. I know it was in the
12 summertime because we were actually finished our, we
13 finished our fall in-service and spring in-service and so
14 I'm going to say it was probably in the summer of 2000.
15    "Question: What was the arrangement that you
16 reached and who do you reach it with?
17    "Answer: It was actually the manufacturer of
18 the bullet trap, Savage Range. They offered a cleanup
19 package, if you will, a maintenance package where they would
20 come in and actually clean the trap, do an inspection of the
21 trap, clean, change the filters, clean out the nozzles,
22 change the water, check the oil viscosity levels, that kind
23 of thing.
24    "Question: Why is it that you entered into that
25 arrangement with Savage?

2256

1     "Answer: Well, one thing we noticed with the
2 frangible ammunition was that there was a lot of residual
3 frangible materials back in the back side in the trough.
4 Where the water would recirculate, there's a large tube
5 that comes down to the trough. It was depositing all the
6 frangible residue in those positions and they basically
7 would start to form large cones underneath those openings.
8     "And if we didn't do something with it, it was
9 just going to continue to build up. And they offered a
10 method to come in and clean that out.
11    "Question: And on the part of the State Police,
12 whose responsibility was it to deal with that problem?
13    "Answer: It would have been mine to make sure
14 that I did something about it, I mean, or suggest it. I had
15 to go to Fiscal to get money to do that.
16    "Question: Now, during the time that you were
17 the person in charge of the Firearms Training Unit, did you
18 attend commanders and section chiefs meetings?
19    "Answer: No.
20    "Question: Did you consider yourself a section
21 chief?
22    "Answer: Yes.
23    "Question: Did you ever get announcements about
24 the section chiefs meetings?
25    "Answer: Yeah. There's an e-mail that comes

SHEET 19

**2257**

1  out. Again, I'm assuming you are referring to DICAT.
2  "Question: I believe we are, yes.
3  "Answer: Which was, well, it's DSP Stat now.
4  Yeah. There's a blanket e-mail that comes out to all
5  section chiefs which I was on the section chief list, and
6  announcing when it was.
7  "Question: Did you consider that an order to go
8  to the meeting?
9  "Answer: No, I didn't, because I didn't, I
10  didn't particularly feel they needed me there, so...
11  "Question: In any event, you never went?
12  "Answer: No.
13  "Question: One last series of questions I have
14  for you has to do with an exhibit that I'm going to slide
15  over and put in front of you, and it has a sticker on the
16  front that says Plaintiff's Exhibit 25.
17  "Answer: Yes.
18  "Question: That's an on-line version of a news
19  article that appeared in the Delaware State News in 2004.
20  Take a moment to review that and make sure you understand
21  what article that is.
22  "Answer: Yes. I'm familiar with the article.
23  "Question: Now, did you see that article when
24  it appeared in the newspaper on April 7th, 2004?
25  "Answer: I don't know if I read it on-line or

**2258**

1  in the newspapers. I mean, I did read the article, yes.
2  "Question: You notice that in the article,
3  there are comments made or at least there's a report of
4  comments made by Col. Chaffinch about Chris Foraker. Have
5  you seen that?
6  "Answer: Yes.
7  "Question: Did any of the comments that Col.
8  Chaffinch made about Chris Foraker affect your opinion or
9  your view of Chris Foraker?
10  "Answer: No.
11  "Question: How long have you known Chris
12  Foraker?
13  "Answer: Oh, for years. I mean, we were on the
14  SORT team together, so at least 15 years.
15  "Question: Do you consider yourself a friend of
16  Chris Foraker?
17  "Answer: Yes.
18  "Question: And the comments the colonel made
19  had no effect on your relationship with Chris Foraker?
20  "Answer: No.
21  "Question: Or your opinion of him?
22  "Answer: No.
23  "Mr. Ellis: Nothing further. Thank you.
24  "Mr. S. Neuberger: All right. Let's take a
25  break."

**2259**

1  (Videotape deposition ends.)
2  MR. ELLIS: Your Honor, we have a video
3  deposition of Richard Ashley that we would like to play at
4  this point as well.
5  MR. ELLIS: Your Honor, just so --
6  THE COURT: Hold on.
7  MR. ELLIS: There are maybe one or two
8  objections that the plaintiffs are waiving, so we're just
9  going to play this right through. The Court won't need to
10  rule on the objections and we'll play it through.
11  THE COURT: Fine.
12  (Videotape deposition of Richard A. Ashley
13  played and reported as follows.)
14  "The videographer: This is the videotape
15  deposition of Mr. Richard A. Ashley taken by the defendant
16  in the matter of Colonel B. Kurt Price, et al, plaintiffs
17  vs. Colonel L. Aaron Chaffinch, et al, defendants, Civil
18  Action 04-956; and Sgt. Christopher D. Foraker, plaintiff,
19  vs. Colonel L. Aaron Chaffinch, et al, defendants, Civil
20  Action No. 04-1207.
21  "This deposition is being held in the offices of
22  Montgomery McCracken Walker & Rhoads, Wilmington, Delaware
23  on May 11, 2006. We are going on the record at
24  approximately 3:15 p.m.
25  "The court reporter is Kurt Fetzer from the firm

**2260**

1  of Wilcox & Fetzer, Wilmington, Delaware.
2  "My name is Lindsay DuPhily and I'm a videotape
3  specialist of Discovery Video Services in association with
4  Wilcox & Fetzer.
5  "Counsel will now introduce themselves and then
6  the court reporter will swear in the witness.
7  Mr. S. Neuberger: Steve Neuberger of The
8  Neuberger Firm for plaintiffs.
9  Mr. Ellis: Ed Ellis for defendants.
10  (Witness placed under oath.)
11  Direct Examination
12  By Mr. Ellis:
13  "Question: Could you state your name for the
14  record, please?
15  "Answer: Richard A. Ashley.
16  "Question: And, Mr. Ashley, what is your
17  current occupation?
18  "Answer: Self-employed.
19  "Question: And what kind of business do you
20  run?
21  "Answer: Farm.
22  "Question: Where is the farm?
23  "Answer: Kent County.
24  "Question: Am I correct that you had a career
25  as a Delaware State Trooper?

**2269**

1  talk to the guys.
2      "The one guy, I believe his name might have been
3  Eddie. I'm not certain of that. That I had helped him take
4  the old belt out and actually help him install the new. He
5  showed me what adjustments to make on the belt.
6      "Question: Did you ever make adjustments on the
7  clutch or the clutch motor?
8      "Answer: Not on the clutch because you had a
9  spanner wrench and we didn't have a spanner. We had the, we
10 had the clutch changed a couple of times. And they sent --
11 when I say 'they,' I can't remember if it was Savage or
12 Mayfran sent a man back down to readjust the clutch.
13     "Question: How did you know how to adjust the
14 belt?
15     "Answer: The gentleman, when we installed the
16 belt, showed me how. It works on the same principle as a
17 dragline on my combine, a feeder chain.
18     "Question: While you were employed at the
19 range, did you have a floor scrubber machine?
20     "Answer: Zamboni?
21     "Question: Yes. The people called it a
22 Zamboni?
23     "Answer: Yes.
24     "Question: And did you have somebody operate
25 that?

**2270**

1      "Answer: Once we got it running, yes. When I
2  first got there, it wasn't, it wasn't operable. If memory
3  serves, I think -- I didn't know who took it apart, but Cpl.
4  Price had told me that Cpl. Cathell had taken it apart.
5  Some bearings were out and some parts were missing.
6      "Question: Once you got it fixed --
7      "Answer: Put it back together and Cpl. Price
8  ran the Zamboni.
9      "Question: Did Cpl. Price do any of the
10 maintenance work that you described on the back of the
11 bullet trap?
12     "Answer: Everybody would go back on occasion
13 and help. Most of the -- most of it I did. Both Wayne and
14 Kurt would come back and help. If we were in the middle of
15 a shoot and a lane started going dry, we would crawl into
16 the booth, whoever was in the booth operating the shoot, the
17 control booth and went out back and find the trap and change
18 the filter.
19     "Question: Why did you do all of this work to
20 keep the filters clear and the water flowing?
21     "Answer: It's a cascade system. In order to --
22 the ammunition the State Police were using at the time was,
23 the way I could describe, it is like throwing a dust ball
24 against a wall or a dry clot of dirt against the brick wall.
25 When it hits, it's a dust ball, a little ball of dust.

**2271**

1      "Well, every time that round would hit the ramp,
2  if it was a dry ramp, you got a little dust ball. Well,
3  hundreds and hundreds of dust balls, the HVAC system, the
4  air system, it's not going to be able to remove everything.
5  In order for that thing to be working properly, all the
6  ramps have to be wet when you are firing into those ramps.
7  The trap is to catch the debris.
8      "Question: So that's why you try to keep the
9  water flowing?
10     "Answer: Exactly. That ammunition, like I
11 said, it was the downfall of that, I believe, the second
12 downfall of it.
13     "Question: During the time you worked with Kurt
14 Price, did he ever complain to you about doing maintenance
15 on the bullet trap?
16     "Answer: Yes.
17     "Question: And what did he say?
18     "Answer: He didn't think that we should be
19 doing the maintenance, that we should be firearms
20 instructors.
21     "Question: Did he ever tell you that he didn't
22 want to do the maintenance because it was a health concern
23 to him?
24     "Answer: Kurt -- I can't say he did or didn't
25 because I don't remember the exacts, but Kurt would bring up

**2272**

1  issues. I know Wayne also brought up issues when we
2  actually purchased gloves before we would do anything on it
3  because Wayne had actually purchased the gloves. I can't
4  remember the name of the company. He purchased it off of
5  our credit card.
6      "Question: What kind of gloves are these?
7      "Answer: They were industrial, big, heavy
8  gloves that come up to your elbows.
9      "Question: And what were you using the gloves
10 for?
11     "Answer: That was to be working in the trap and
12 the liquids themselves.
13     "Question: Now, while you were in the Firearms
14 Training Unit, did you attend commanders and section chiefs
15 meetings?
16     "Answer: I attended meetings with the Director
17 of Training and the academy staff.
18     "When you say section chiefs or commanders
19 meetings, you mean like an DICAT meeting?
20     "Question: Yes.
21     "Answer: I never went to DICAT. I have only
22 been to one of those in my career.
23     "Question: Now, you said that you did go to
24 meetings with the academy staff?
25     "Answer: Yes. We all would attend. When I say

SHEET 36

**Papili - direct** 2325

1  at the state fair or any other capacity we've been asked to
2  perform at, and unfortunately Cpt. Citro wasn't capable of
3  doing that because of the physical limitations placed upon
4  him. It's an officer's safety issue not only to protect
5  yourself but also to protect your fellow officers or any
6  other officers who may need assistance or support of the
7  situation that they may come upon.
8  Q.   All right. Let's move on to another topic. Do any
9  of the units you identified within your command have
10 separate operational budgets? Yes, you can put that away.
11 A.   Yes.
12 Q.   And which units are those?
13 A.   There are four units under my command. It would be
14 the crime lab. Well, it was the high technology crime unit,
15 but it's the intelligence section has an operating budget,
16 our SORT commander runs an operating budget for the Special
17 Operations Sections. And Aviation Section has a separate
18 operation budget.
19 Q.   All right. Who proposes the annual budgets for these
20 units?
21 A.   Well, they're allotted funding by our internal
22 process, which would be our physical control section, our
23 administrative officer. Once the general budget is
24 prepared, the State Police gets X amount of dollars
25 internally, the amount of money for those operating centers.

**Papili - direct** 2326

1  The cost centers are allocated by our administrative officer
2  in the fiscal control center.
3  Q.   And who brings the information to the officer in
4  charge of the fiscal section?
5  A.   They have internal cost center hearings each year
6  around May where you present your proposals for the
7  operating budget which will start in July and would be the
8  commanding officers of each of those sections.
9       So for the Aviation Section, it would be Cpt.
10 Evans. For the Crime Lab, it would have been Julie Willey
11 who ran the Crime Lab. For the Special Operations Unit, it
12 would have been Sgt. Parton who is commanding officer of our
13 SWAT team or the SORT team. And for the Intelligence, it
14 would have been Lt. Bob Moses who runs the cost center for
15 that section.
16 Q.   As a major, do you participate in the budget process
17 with the new units under your command?
18 A.   I have oversight over what is submitted. What they
19 do is when they prepare the budgets they send them to me. I
20 look at them, review them for relevant and pertinent
21 information and then they present that at the budget
22 hearings, the internal budget hearings. And sometimes if my
23 schedule permits, I do sit in. I have sat in on some but
24 not all of the internal cost center hearings.
25 Q.   And how long have you participated in budget process

**Papili - direct** 2327

1  in this matter?
2  A.   Since I've been in the current position that I hold.
3  Q.   And who is the present administrative major?
4  A.   Mjr. Paul Eckrich.
5  Q.   And when did he become administrative major?
6  A.   When Mjr. Swiski retired. I don't know exact dates.
7  A couple years ago. Three or four years ago maybe.
8  Q.   And why do you participate in the budget process?
9  A.   Well, to me it's important to know what is going on
10 within, obviously, as I have eventual oversight in those
11 particular units. But more importantly, during the course
12 of the year, the special operations cost center, for
13 example, encompasses all those special units I just talked
14 about. Our bomb unit, our scuba team, our SWAT team, our
15 TCU and in the course of presenting a budget, in the
16 beginning of the year, there is things that come up during
17 the course of the year that you don't, you don't anticipate
18 or are not expected. So what happens is I have a section
19 where regulators break out the scuba team, although
20 initially there weren't any appropriations submitted in the
21 initial budget request, maybe they just needed some other
22 information or other material during the course of the year.
23 I, knowing how much money I have, I can go into the budget
24 commander, which would be Sgt. Parton, and say, okay, we
25 need this. It's an officer safety issue. Well, they're

**Papili - direct** 2328

1  differing or whatever the case is, go in hand, move money
2  from one appropriation into this other area so we can
3  purchase that equipment.
4       So for me, the way I view it, it's knowledge of
5  what is going on within my units and also be able to make
6  decisions if certain things like that occurred during the
7  course of the year.
8  Q.   All right. Let's discuss the section chiefs and
9  commanders meetings. What are these meetings?
10 A.   Well, over the course of years they had different
11 names. We used to call them DICAT meetings, DSP Stat
12 meetings. They're meetings that are held regularly under
13 the direction of the superintendent, deputy superintendent
14 with the command staff of the agency.
15 Q.   Again, how many units are under your command?
16 A.   Well, there were six full-time units and eight
17 part-time units but now it's, with the reconsolidation, the
18 reconfiguration, it's four full-time units and still the
19 eight part-time units.
20 Q.   And are any of these units headed up by a
21 noncommissioned officer?
22 A.   Yes.
23 Q.   And which ones?
24 A.   Of the full-time units?
25 Q.   Any of them?

SHEET 43

**Eckrich - direct** 2353

1 THE COURT: Mr. Ellis, we need to hold. One of
2 our jurors needs a short time out.
3 MR. ELLIS: I'm sorry.
4 THE JUROR: Yes. Thank you.
5 (Juror left courtroom.)
6 THE COURT: He was anticipating the 1:00 o'clock
7 break.
8 MR. ELLIS: Still four minutes, Your Honor.
9 THE COURT: You're tough. You're tough.
10 (Juror returns to the courtroom.)
11 THE COURT: You may proceed, Mr. Ellis.
12 MR. ELLIS: Thank you, Your Honor.
13 BY MR. ELLIS:
14 Q. Mjr. Eckrich, you have a black book in front of you.
15 Could you turn to Exhibit 75 in that book?
16 A. (Witness complies.)
17 Q. Now, turn to the last page of Exhibit 75.
18 A. (Witness complies.)
19 Q. Is that an organization chart or table of
20 organization for the State Police for August 2003?
21 A. Yes, sir.
22 Q. And that's during the time period when you have been
23 the Administrative Officer at that time?
24 A. I was Administrative Officer at that time, yes, sir.
25 Q. Within the organization chart, can you give us some

**Eckrich - direct** 2354

1 examples of where there are cost centers?
2 A. Purchasing and Supply, Property and Supplies is a
3 cost center. Transportation is a cost center. ISS,
4 Information Support Services is a cost center.
5 Q. You are leading left to right within the organization
6 chart?
7 A. Yes.
8 Q. Okay.
9 A. Aviation is a cost center. Crime Lab. Hi Tech Crime
10 Unit. Special Operations. Human Resources is a cost
11 center. The Academy is one. K-9 is one. Ordnance is one.
12 Q. Ordinance is the same as the Firearms Training Unit?
13 A. Yes, sir.
14 Q. Now, what is the nature of your relationship as the
15 budget major to the head of the cost centers that you can
16 see on the organization chart?
17 A. We meet once or twice a year. We meet in May,
18 generally in May. And we will talk about, for example, we
19 just met the last couple of weeks and the purpose of that
20 meeting is to find out if their allocation of money for FY
21 '06 was sufficient, did they have enough money to get
22 through the current year, the current fiscal year and what
23 are your needs for '07 and also projecting needs for '08.
24 I'm talking about the fiscal year which runs from June, I'm
25 sorry, July 1st to June 30th. So right now we are in fiscal

**Eckrich - direct** 2355

1 FY '07.
2 Q. Now --
3 A. I'm sorry. '06.
4 Q. When you have these meetings with the head of the
5 cost centers, are they reporting to you in a supervisory
6 sense? In other words, chain of command sense?
7 A. No, sir.
8 Q. What is the purpose of all this?
9 A. The purpose is for them to tell me what their needs
10 are. Dollar needs are.
11 Q. Now, when you deal with an individual cost center,
12 say, for example, the SORT team, I think you said Special
13 Operations has its own cost center?
14 A. Yes.
15 Q. That would be Al Parton is the head of that?
16 A. Yes, sir.
17 Q. When you deal with Al Parton, are you supervising him
18 in the sense of supervising his daily activities or his
19 professional development, that type of thing?
20 A. No, sir.
21 Q. When you deal with Al Parton, do you expect or is it
22 your expectation that he will keep his chain of command
23 informed as to what he is doing, budget-wise?
24 A. Yes, sir.
25 Q. Now, in 2003, late 2003, Chris Foraker replaced

**Eckrich - direct** 2356

1 Richard Ashley as the head of the Firearms Training Unit
2 which you have identified as a cost center?
3 A. Yes, sir.
4 Q. Did you assume a budget relationship with Chris
5 Foraker like you had had previously with Richard Ashley?
6 A. Yes.
7 Q. And again, what was the nature of that relationship?
8 A. The nature of the relationship would be that Sgt.
9 Foraker would keep me abreast of problems, if there were
10 any. The idea is when the money is allocated in July, or
11 middle of July or so, that I really don't hear from him
12 unless there is a problem.
13 About halfway through the year, we will meet to
14 see if there is a problem. And when I say 'problem,' maybe
15 we allocated too much money or not enough. So that would be
16 a problem.
17 And then we meet again in May to talk about, to
18 finish off this year, talk about the upcoming year and then
19 actually talk about the next year also.
20 Q. Now, when you started the budget process in 2004, did
21 you make a change as to who you met with in the budget
22 meetings?
23 A. No, I wouldn't say I made a change. I tried to
24 include more people, being their supervisors.
25 Q. In the case of Sgt. Foraker at the Firearms Training

SHEET 44

## Page 2357 - Eckrich - direct

1 Unit, who would his supervisor have been?
2 A.  Cpt. Warren.
3 Q.  And then how about after Cpt. Warren left?
4 A.  I believe it was Homiak, Cpt. Homiak.
5 Q.  And then after Homiak left?
6 A.  Downs.
7 Q.  Now, what is the purpose of including the captain of
8 the academy in the budget meeting with the Firearms Training
9 Unit?
10 A.  The captain of the academy is responsibility for not
11 only the academy but the Firearms Training Unit as well as
12 K-9.
13 Q.  Now, you've identified other organizations, other
14 cost centers within the organization chart. For example,
15 you identified the Information Support Services as one.
16 When you meet with the cost center person, do you include
17 the major or the captain that is in charge of that piece of
18 the organization?
19 A.  Yes.
20 Q.  And how about?
21 A.  Sometimes they attend and sometimes they don't but
22 they are included.
23 Q.  How about the person that runs the Aviation? When
24 you talk to Aviation about the budget, do you incorporate
25 somebody in that chain of command?

## Page 2358 - Eckrich - direct

1 A.  Yes, sir.
2 Q.  And who would that be, for example?
3 A.  Mjr. Papili.
4 Q.  And how about when you talk to Al Parton and the SORT
5 team? Who do you include in that?
6 A.  Again, Mjr. Papili.
7 Q.  Now, when a member of the chain of command, in other
8 words, a captain or, as you mentioned, Mjr. Papili does not
9 show up for the meeting, what is it, what is your
10 expectation concerning how the cost center is going to deal
11 with the chain of command?
12 A.  That he will keep his chain of command informed.
13 Q.  Now, I want to change the subject briefly.
14     During the fall of 2003 and the beginning of
15 2004, were you involved in activities involving -- excuse
16 me. Were you involved in the State Police response to
17 problems within the firing range that is up in Smyrna?
18 A.  Yes, sir.
19 Q.  And what was your involvement?
20 A.  Mostly, from the financial end. I attended some of
21 the meetings with the idea that there may be a financial
22 impact and the lieutenant colonel and colonel wanted to keep
23 me, you know, clued in.
24 Q.  Now, you know who Greg Warren is; right?
25 A.  Yes, sir.

## Page 2359 - Eckrich - cross

1 Q.  Was he the Head of the Academy at the time?
2 A.  Yes, sir.
3 Q.  Was there any point during December 2003 or the first
4 few months of 2004 where Greg Warren came to you and told
5 you that the Firearms Training Unit officers had stopped
6 doing maintenance on the bullet trap system at the range?
7 A.  No, sir.
8     MR. ELLIS: Nothing further, Your Honor.
9     THE COURT: Mr. Neuberger, you may
10 cross-examine.
11         CROSS-EXAMINATION
12 BY MR. T. NEUBERGER:
13 Q.  Very quickly, Mjr. Eckrich. This is the holiday
14 weekend and I want to let everybody go.
15     THE COURT: No, I get to let everybody go. You
16 don't let to let anybody go.
17 BY MR. T. NEUBERGER:
18 Q.  You were promoted to colonel in 2003; is that right?
19 A.  Yes, sir.
20 Q.  And right now, you work on the executive staff of
21 Col. MacLeish; right?
22 A.  Yes, sir.
23 Q.  He is your boss?
24 A.  Yes, sir.
25 Q.  Right? Let's look at one document, one question in

## Page 2360 - Eckrich - cross

1 that white book in front of you. There are two white books.
2 There is one that volume two. You want to look at
3 Exhibit 115 and see if you can find that. There you go.
4 That's it. The white book. You have volume two there.
5 A.  What was the number again?
6 Q.  115. Did you find that?
7 A.  Yes, sir.
8 Q.  This is a document from you -- well, from Richard
9 Ashley to you; right?
10 A.  I don't recall the document. I don't see my name on
11 it. It may have been to me. It does say major on there.
12 Q.  It is addressed to major; right?
13 A.  Yes.
14 Q.  It talks about alterations in the bullet recovery
15 system; right?
16 A.  Yes.
17 Q.  You spoke with -- you remember there were -- in the
18 summer of 2003, there was $10,000-$15,000 spent on fixing
19 the bullet recovery system?
20 A.  I think it was a little more than that, but yes, sir.
21 Q.  Right. So Richard Ashley, if the major in this thing
22 is you, he didn't send this through the chain of command,
23 did he?
24 A.  No, sir.
25 Q.  All right. It's not copied to his lieutenant, is it?