able to confirm them by reference to the Abramson & Freeman time sheets.

III. Unreasonable Fees Sought

The balance of the **fee petition, [\*14]** while sufficiently specific, must also be reasonable. The defendants challenge several avowedly immoderate items. They note that Officer Carter-Herman originally sued seventeen (17) defendants, but eight (8) of them were dismissed before trial. Of the nine remaining defendants, Officer Carter-Herman did not prevail against five -- Commissioner Richard Neal, Captain Jeanette Dooley, Lieutenant Michael Ryan, Sergeant John Brooks and Sergeant Kathleen Smith -- on any claims. Moreover, of the four defendants against whom Officer Carter-Herman did prevail, she did not prevail on all counts. The City of Philadelphia was charged with quid pro quo sexual harassment under Title VII and the PHRA, a hostile work environment under Title VII and the PHRA, retaliation under Title VII and the PHRA, and a § 1983 violation. The City was found liable on four of these seven counts. Captain Samuel Lynch and Sergeant James Martin were charged with retaliation under the PHRA, a § 1983 violation based on the First Amendment, a § 1983 violation based on equal protection, and intentional infliction of emotional distress. Each was found liable on three of these four counts. Finally, Sergeant Michael Otto **[\*15]** was charged with retaliation under the PHRA, a § 1983 violation based on the First Amendment, a § 1983 violation based on equal protection, intentional infliction of emotional distress, assault, and battery. He was only found liable on one of the six claims. The defendants urge that all of these shortcomings necessitate a reduction in the lodestar to "account for the [plaintiff's] limited success." *Hensley v. Eckerhart, 461 U.S. 424, 437, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983).*

The defendants also argue that plaintiff may not recover attorneys' fees for time expended on pendent state law claims. This contention is clearly incorrect with regard to time spent on the PHRA claim, as that Act specifically allows a prevailing plaintiff in an employment discrimination action to recover her attorneys' fees and costs. See 43 *Pa. Stat. Ann. tit. 43, § 962(c.2).* However, fees incurred in connection with other pendent **state law** claims, as a general principle, may not be reclaimed under *42 U.S.C. § 1988* or Title VII. See *North Carolina Dept. of Transp. v. Crest Street Community Council, Inc., 479 U.S. 6, 12, 93 L. Ed. 2d 188, 107 S. Ct. 336 (1986); Baughman v. Wilson Freight* **[\*16]** *Forwarding Co., 583 F.2d 1208, 1215-16 (3d Cir. 1978).* In this case, Officer Carter-Herman attempted to prove claims of intentional infliction of emotional distress and assault and battery to the jury. Moreover, plaintiff had a breach of contract claim against the City of Philadelphia in the

case from September 29, 1995 until July 26, 1996. We will consider the propriety of awarding fees in connection with these **state law** claims.

In evaluating a challenge to the reasonableness of a **fee petition**, a district court "can reduce the hours claimed by the number of hours 'spent litigating claims on which the party did not succeed and that were 'distinct in all respects from' claims on which the party did succeed.'" *Washington, 89 F.3d at 1044* (citations omitted). In the present action, defendants contend that the mentioned state law claims, the claims against the thirteen (13) defendants against whom Officer Carter-Herman did not prevail, and the unsuccessful claims against the remaining defendants were sufficiently "distinct" from the successful claims so as to warrant a reduction in hours. In considering this argument, we are mindful that "in cases in which the plaintiff's successful **[\*17]** and unsuccessful claims involve a common core of facts or related legal theories, or where much of counsel's time is dedicated to the litigation as a whole, it is often impossible to divide counsel's time on a precise claim-by-claim basis." *Northeast Women's Center v. McMonagle, 889 F.2d 466, 476 (3d Cir. 1989).*

The facts and legal theories in the present case frequently overlapped. For example, the same facts supporting a state law claim for assault or intentional infliction of emotional distress supported a Title VII retaliation claim or a § 1983 claim, an alleged equal protection violation based on sex discrimination could have been interpreted as quid pro quo sexual harassment, and so forth. Because the causes of action and facts were so intertwined in this complex case, we are hesitant to eliminate many of the hours which the defendants claim are unreasonable. There are a few exceptions, however.

The plaintiff may not recover for time spent on the withdrawn breach of contract claim. "Where the plaintiff has failed to prevail on a claim that is distinct in all respects from [her] successful claims, the hours spent on the unsuccessful claim should be excluded in considering **[\*18]** the amount of a reasonable fee." *Hensley v. Eckerhart, 461 U.S. 424, 440, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983).* The breach of contract claim falls squarely under Hensley's prohibition. Unfortunately, plaintiff did not pinpoint the hours attributable to the breach of contract claim, rendering an hour-by-hour deduction impossible. This is not fatal, however, because the challenge to the breach of contract claim may be framed as a specificity challenge. As plaintiff does not "provide[] enough information as to what hours were devoted to [the breach of contract claim] and by whom for [this] court to determine if the claimed fees are reasonable," the court must make a reduction in its discretion. n3 *Rode, 892 F.2d at 1191.* The breach of contract claim was dismissed by order of the court on July 26, 1996, and was the least

crucial of Officer Carter-Herman's claims. Without drawing too fine of a line, we believe that a 2% reduction in the lodestar calculation accounts for the lack of specificity in the time sheets with regard to this count and plaintiff's failure to prevail. See *Hensley, 461 U.S. at 436-37, 76 L. Ed. 2d 40, 103 S. Ct. 1933.*

n3 In implementing this reduction for lack of specificity we do not reduce the lodestar sua sponte. See *Bell, 884 F.2d at 719.* When defendants pinpointed certain entries on the time sheet as insufficiently specific, they concurrently presented a broader challenge to the overall specificity of the time sheets. Specifically, they stated that, based on the evidence presented, they were unsure if "the work involved non-compensable state-law claims or compensable federal law claims[]" Defendants' Answer In Opposition to Plaintiff's Motion for Attorney's Fees and Costs, p. 6.

[*19]

The next issues concern the eight dismissed defendants and plaintiff's partial success against the defendants who went to trial. Unquestionably, building a case against the dismissed defendants was a worthwhile and necessary predicate to prevailing against any party at trial. However, the fact remains that the plaintiff did not prevail against them. As for the defendants at trial, the result, while in plaintiff's favor, was not overwhelming. In short, a reduction in the lodestar is "crucial" and necessary to reflect the "limited success" which the plaintiff enjoyed in this case. *Hensley, 461 U.S. at 440.* In our equitable discretion, we will reduce counsel fees by 20% to indicate these shortcomings.

IV. Duplicate Billing

The next question is that of duplication. The defendants object to several entries on plaintiff's **fee petition** as needlessly duplicative and therefore unreasonable. See Defendant's Answer in Opposition to Plaintiff's Motion for Attorney's Fees and Costs, Exh. B. A reduction for duplication is warranted "only if the attorneys are unreasonably doing the same work." *Rode, 892 F.2d at 1187* (emphasis added). The "duplication" cited by the defendants [*20] in this action appears to be nothing more than careful lawyering. Periodic consultation among the various attorneys working on a case is not unreasonable. It is not unreasonable for those same attorneys to speak to their client in tandem. Defendants' contentions to the contrary are without merit.

V. Areas Where Plaintiff Did Not Prevail, Including PBI Hearing

The defendants next seek to exclude from the **fee petition** hours expended on activities for which Officer Carter-Herman did not prevail. For the most part, the arguments presented rehash those offered under the "unreasonable hour" rubric and do not warrant further discussion. See supra Part III.

Defendants do identify three discrete issues of some importance. First, attorney Michael Tolcott bills, without explanation, a phone call to Barbara Rachuba-Feeney which lasted .3 hours. Sergeant Rachuba-Feeney certainly did not prevail in this litigation. Michael Tolcott's hours will be reduced by .3. Second, attorneys Tolcott and K. Tia Burke claim to have expended 20.5 hours on research and drafting for a motion to compel the testimony of Sharron Smith, Officer Carter-Herman's psychotherapist. The motion outlined the [*21] prior split among the various circuits as to the propriety of a psychotherapist-patient privilege under federal law. We will not compensate plaintiff for this time not only because she did not prevail on the motion, but because the motion failed to evaluate or even cite the Supreme Court's decision in *Jaffee v. Redmond, 135 L. Ed. 2d 337, 116 S. Ct. 1923 (1996).* In that opinion, issued some three months prior to the plaintiff's motion to compel, the Court resolved the Circuit Court split in favor of a psychotherapist-patient privilege. Defendants should not, and will not, be obliged to reimburse plaintiff for this oversight.

Finally, defendants ask the court to exclude those hours which Officer Carter-Herman and her attorneys spent preparing for and attending certain administrative hearings. Plaintiff objects, averring that the representation of a party at such proceedings is fully compensable under the fee-shifting statutes which authorize her petition. Plaintiff states her case too broadly. The Supreme Court has addressed the availability of attorneys' fees for related administrative proceedings on several occasions. In *New York Gaslight Club, Inc. v. Carey, 447 U.S. 54,* [*22] *64 L. Ed. 2d 723, 100 S. Ct. 2024 (1980),* the Court addressed whether attorneys' fees should be granted for federal and state administrative hearings held in conformance with Title VII. The Court stressed the statute's regimented structure. That is, before a plaintiff may sue in federal court under Title VII, she must file a complaint with the Equal Employment Opportunity Commission ("EEOC") and receive a "right to sue letter" from that agency. *Id. at 65.* Before she may file a complaint with the EEOC, she must follow all equal employment procedures afforded by state law. *Id. at 64-65.* Relying on the fact that "initial resort to state and local remedies is mandated" by Title VII, the Court held that a successful Title VII plaintiff should recoup attorneys'

fees related to mandatory administrative proceedings. *Id. at 65, 71.*

Conversely, attorneys' fees for administrative proceedings held in conjunction with § 1983 are generally not available under *42 U.S.C. § 1988.* When the Supreme Court reached that conclusion in *Webb v. Board of Educ. of Dyer County, 471 U.S. 234, 85 L. Ed. 2d 233, 105 S. Ct. 1923 (1985),* it emphasized a major distinction between § 1983 and Title [*23] VII: while a Title VII plaintiff is legally compelled to pursue administrative remedies before she may institute a federal court action, a § 1983 plaintiff may proceed directly to federal court. *Id. at 241.* However, subsequent to Webb, the Court has emphasized an important, sometimes overlooked qualification of that decision: § 1988 may authorize attorneys' fees for the "'discrete portion of the work product from the administrative proceedings' that 'was both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached ....'" *North Carolina Dept. of Transp. v. Crest Street Community Council, 479 U.S. 6, 15, 93 L. Ed. 2d 188, 107 S. Ct. 336 (1986),* citing *Webb, 471 U.S. at 243.* Any such award, however, is merely permissive and lies well within the district court's discretion. *Webb, 471 U.S. at 244.*

In this case, the plaintiff fairly prevailed under both Title VII and § 1983. As such, she is entitled to attorneys' fees for time related to administrative proceedings mandated by Title VII, and could collect fees for time spent pursuing her § 1983 claim in adjunct hearings.

The plaintiff first filed her unlawful employment [*24] discrimination claim with a state agency, the Pennsylvania Human Relations Commission ("PHRC"). *Pa. Stat. Ann. tit. 43, § 959.* After exploring state procedures, the plaintiff filed a charge with the EEOC as directed by *42 U.S.C. § 2000e-5(b).* In taking these actions, Officer Carter-Herman followed the letter of Title VII to a tee, and her attorneys will be compensated for time related to the PHRC and EEOC hearings. *Carey, 447 U.S. at 65.*

The plaintiff also seeks to recover fees for hours expended preparing for and attending hearings before the Police Department's Ethics and Accountability Division ("EAD") and the Police Board of Inquiry ("PBI"). The EAD hearing was conducted because it was believed that Officer Carter-Herman had knowledge of corruption in Philadelphia's 39th Police District. The PBI hearing, which focused on an altercation between the plaintiff and Sergeant Otto, resulted in a finding that plaintiff was guilty of insubordination. Neither of these hearings was mandated by Title VII. Nor were they "useful and of a type ordinarily necessary to advance [] civil rights litigation" and therefore compensable under § 1988. *Crest Street, 479 U.S. at 15,* citing [*25] *Webb, 471 U.S. at*

*243.* Accordingly, Officer Carter-Herman may not recover those attorneys' fees which derived from the PBI and EAD hearings. The court will strike 2.0 hours expended by Joyce Mozenter in preparation for the PBI hearing, 4.0 hours for Robert Mozenter's appearance at that hearing, and 3.3 hours spent by Joyce Mozenter in connection with the EAD hearing.

### VI. Observation of Trial by Certain Attorneys

The defendants next argue that the plaintiff cannot recover counsel fees for the trial attendance of two Abramson & Freedman associates. In her reply, plaintiff deducts these hours from the lodestar calculation, mooting this point.

### VII. Preparation of **Fee Petition** and Reply

The defendants also contest any award of fees for the preparation of plaintiff's **fee petition** and reply brief. As a general matter, such fees are recoverable. *Student Public Interest Research Group of New Jersey v. AT&T Bell Lab., 842 F.2d 1436, 1455 (3d Cir. 1988)* ("SPIRG"). However, "time spent on the **fee petition** is to be analyzed separately from the time spent on the main part of the litigation." *Cerva v. E.B.R. Enterprises, Inc., 740 F. Supp. 1099, 1108 (E.D. Pa. 1990).* The [*26] hours claimed for preparing a **fee petition** should be reduced if the petition is only partly successful. *SPIRG, 842 F.2d at 1455.* In fact, a district court abuses its discretion when it fails to make an appropriate reduction. *Cerva, 740 F. Supp. at 1108* (citation omitted).

The **fee petition** prepared by plaintiff in this action was generally successful. However, there were some areas in which plaintiff did not prevail, and the petition did not require particularly intricate legal craftsmanship. Exercising our discretion, we will reduce the lodestar award for the preparation of the **fee petition** by 25%.

### VIII. Fees For Time Spent With Certain Witnesses

Defendants also wish to exclude from the lodestar calculation any time which plaintiffs spent interviewing or deposing witnesses not identified, witnesses who were not called to testify, or non-witnesses. This contention is without merit. Locating witnesses and potential witnesses, interviewing these individuals, and reaching a determination as to their role in the case (or lack thereof) are essential practices of the successful attorney. Plaintiff's counsel cannot be penalized for carefully building their case.

### IX. Mathematical [*27] Miscalculations

Finally, defendants point out certain multiplication mistakes in plaintiff's **fee petition** which produced an erroneous lodestar. Plaintiff has conceded and corrected these errors in her reply brief.

1997 U.S. Dist. LEXIS 1130, *

X. Conclusion

A. The following hours are excluded from lodestar consideration:

| ATTORNEY | HOURS |
|----------|-------|
| Robert Mozenter | 8.5 |
| Joyce Mozenter | 13.05 |
| Michael Tolcott | 2.1 |
| K. Tia Burke | 19.7 |

B. Utilizing the hours which remain, the lodestar in this case is computed as follows:

| ATTORNEY | HOURS | | RATE | TOTAL |
|----------|-------|---|------|-------|
| Gilbert Abramson | 372.35 | x | $ 275 | $ 102,396.25 |
| Michael Tolcott | 254.05 | x | $ 165 | 41,918.25 |
| Stanley Cheiken | 210.625 | x | $ 150 | 31,593.75 |
| K. Tia Burke | 724.04 | x | $ 150 | 108,606.00 |
| Joyce Mozenter | 122.35 | x | $ 225 | 27,528.75 |
| Robert Mozenter | 12.10 | x | $ 225 | 2,722.50 |
| | LODESTAR = | | | $ 314,765.50 |

C. The lodestar will be reduced as follows to reflect the limited nature of plaintiff Joy Carter-Herman's success in this case:

| BASIS | REDUCTION (%) |
|-------|---------------|
| Withdrawn breach of contract claim | 2% |
| Limited success against defendants | 20% |
| TOTAL REDUCTION = | 22% |

D. The adjusted fee award is $ 245,517.09 (.78 **[*28]** x $ 314,765.50).

E. Plaintiff seeks $ 9,852 for preparation of her **fee petition** and reply brief. The court will reduce this request by 25% and award a $ 7,389 fee for this endeavor.

F. Plaintiff will be awarded costs in the amount of $ 39,891.42.

ORDER

AND NOW, this 31st day of January, 1997, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion of plaintiff Joy Carter-Herman for attorneys' fees and costs is GRANTED. Defendants shall pay to plaintiff attorneys' fees in the amount of $ 252,906.09 and costs in the amount of $ 39,891.42.

BY THE COURT:

Harvey Bartle, III

J.

FOCUS - 2 of 10 DOCUMENTS

**CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW,
INC., Plaintiff, v. CITY OF CHICAGO, et al., Defendants**

**No. 76 C 1982**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION**

*1985 U.S. Dist. LEXIS 14562*

**October 24, 1985**

**OPINIONBY: [*1]**

GETZENDANNER

**OPINION:** SUSAN GETZENDANNER, District Judge

MEMORANDUM OPINION AND ORDER

This civil rights action is before the court on the petition of plaintiff Chicago Lawyers' Committee for Civil Rights Under Law, Inc. ("Chicago Lawyers' Committee" or "CLC") for attorney's fees pursuant to *42 U.S.C. § 1988.* Plaintiff requests $202,773.00 in fees for work performed from 1976 through 1981 in connection with the prosecution of its lawsuit against the City of Chicago ("City") for allegedly unconstitutional surveillance of its members. The suit was consolidated for discovery with two class actions seeking injunctive relief against the same pattern of unconstitutional activity. Alliance to End Repression ("Alliance") v. City of Chicago, No. 74 C 3268; American Civil Liberties Union ("ACLU") v. City of Chicago, 75 C 3295. The two class actions were resolved by an agreed consent decree in February 1981. In April 1981, the CLC reached a separate consent decree with the City. In order to understand the nature of the fee petition, which is sharply contested by the City, it is necessary to review the context of all three lawsuits.

On November 13, 1974, the Alliance case [*2] was filed as a class action, with 32 named plaintiffs, on behalf of various individuals and organizations engaged in political, religious, education, or social activities. Plaintiffs claimed that the City of Chicago police department and several of its employees had unlawfully conducted surveillance of, and compiled dossiers on, the lawful political and associational activities of plaintiffs; had gathered information about plaintiffs by unlawful means, including warrantless wiretaps and break-ins; and had disrupted and harassed plaintiffs' lawful activities. This activity was claimed to violate plaintiffs' rights under the first, fourth, fifth, sixth, eighth, ninth, and fourteenth amendments to the Constitution. On May 16, 1975, Judge Lynch, in denying the City's motion to dismiss, held that the plaintiffs had presented a justiciable controversy and would be entitled to relief if they could prove the allegations contained in their complaint.

The ACLU suit was filed on October 3, 1975, as a parallel class action on behalf of all individuals, not-for-profit corporations, and unincorporated associations who were subjected to interference, harassment, and surveillance for purely lawful [*3] conduct. Initial ACLU defendants included the City of Chicago, most of the same city officials sued in Alliance, and several federal officials including the Attorney General and the Secretary of Defense. These parties were later added as named defendants in the Alliance case in 1977; other federal agencies were added in both cases in 1979 and 1980. The City of Chicago was added as a defendant in Alliance in November 1979.

On March 25 and May 24, 1976, the Alliance and ACLU cases, respectively, were certified as class actions. The orders granting certification included as class members "all organizations located or operating in the City of Chicago who engage or have engaged in lawful political, religious, education or social activities and who, as a result of these activities, have been, are now, or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, surveillance, or dossier collection, maintenance, and dissemination by defendants or their agents." It should be noted that by this time, both cases had achieved wide notoriety in the Chicago area due to press conferences conducted by the Alliance attorneys in March of [*4] 1975, which in turn sparked an extensive media expose and a grand jury in-

vestigation into the activities of the Police Department's Investigative Division.

The present suit was filed on May 28, 1976. Plaintiff Chicago Lawyers' Committee is an organization of lawyers dedicated to providing quality legal services to the poor and minorities of Chicago in connection with complex litigation and business law problems. Sometime in 1975, the plaintiff discovered that the Chicago Police Department was maintaining intelligence files on the CLC and that private discussions between a CLC attorney and members of the Alliance to End Repression were overheard by a police informant and written up in files that the police maintained on Alliance. On July 3, 1975, CLC lawyers Henry A. Preston and Lowell Sachnoff requested Superintendent James Rochford to make the information available for review and to cease further intelligence-gathering activities with respect to the Committee. On July 22, 1975, this request was denied, and the CLC filed suit ten months later for declaratory and injunctive relief. No damages were sought. This action was never maintained as a class action, nor were the federal defendants [*5] involved in the Alliance and ACLU cases ever added. However, the present case was consolidated for pretrial discovery purposes with the two class actions on December 8, 1976, and settlement negotiations proceeded on a consolidated basis as well.

The ACLU and Alliance complaints are both broad in scope, with allegations addressed to a wide range of surveillance activities, including interference in attorney/client relationships. Alliance plaintiff Dennis Cunningham, an attorney, alleged that defendant unknown police agents had violated the attorney/client relationship and the sixth amendment right to counsel by advising the parents of his client William Willet that Cunningham was a "known subversive" and should not represent their son. (Alliance Complaint, PP 83, 142). The ACLU plaintiffs alleged that defendants stole documents from the legal office of the Chicago 7 defense team (PP10-5(b), 10-14); offered attorney Ronald Clark cash for information on one of his clients (P10-6); unlawfully interfered with respect to plaintiff Kermit Coleman's legal representation of clients (P10-7); infiltrated the participation of the ACLU in litigation involving civil liberties [*6] (P10-9); and disseminated information about the ACLU's activities, including legal representation (P10-9). The complaint also contains more general allegations that the "right to counsel" was violated by defendants (P12(e)), and that plaintiffs were disrupted and subjected to surveillance "in the course of lawyer-client relationships and in the course of lawful activity related to legal proceedings of all kinds" (P13-4).

The Lawyers' Committee complaint is more centrally concerned with the implications of defendants' surveillance for the problems of lawyer representation.

The complaint refers to the defendants' use of secret informers and electronic surveillance to report on private meetings during which CLC members "were engaged in private and privileged discussions relating to pending and potential litigation." (P7). It is alleged that these activities "were undertaken for the improper purpose of interfering with the attorney/client relationship and with the intent of obtaining confidential and privileged information relating to pending and potential lawsuits" (P8). In addition to alleging injuries to their rights of free speech, association, and privacy as were alleged in the [*7] Alliance and ACLU complaints, the CLC also alleged that defendants had interfered in its right to provide effective legal counsel and its obligation to preserve the confidentiality of the attorney/client relationship.

The City maintains that Judge Lynch's May 1975 ruling was the most significant event in the entire course of this litigation, since the defendants had already publicly admitted to infiltrating local community and political groups for intelligence gathering purposes. According to the City, "all that remained [after that ruling] was a final prove-up of admitted facts." In fact, pretrial discovery was complex and sharply contested, and these defendants continued to deny the illegality of their actions in the litigation even while limiting their intelligence activities in response to the publicity and the grand jury report.

On September 25, 1980, the City defendants and all three sets of plaintiffs agreed to an order generally prohibiting intelligence gathering where there is no reasonable suspicion of criminal activity and setting procedural limits for the police's surveillance activities. The agreed order contained language, apparently due in part to the CLC's [*8] efforts, which expressly referred to "the right to associate for the purpose of seeking and giving legal advice as well as advancing litigation." However, due to a change in the City's corporation counsel, the proposed order was rejected on December 10, 1980.

In early 1981, the ACLU negotiated a new settlement order with the City defendants on substantially the same terms as the earlier order. The above language was not affected. This new order was agreed to by the Alliance plaintiffs but the CLC lawyers decided they could no longer recommend that their client join in the consolidated settlement because it did not adequately protect the attorney/client relationship. Because the Alliance-ACLU order specifically protected the right to associate for litigation purposes, and barred the gathering of "first amendment information" in violation of attorney/client confidentiality, the parties began briefing whether the CLC's suit was moot. The mootness issue was never resolved, as the CLC and the City entered into an agreed order in April of 1981.

A comparison of the ACLU-Alliance and CLC agreed orders reflects both the substantial overlap between the three suits and the more [*9] narrow focus of the relief sought by the CLC. The ACLU-Alliance order applies generally to "investigative activity . . . directed toward First Amendment conduct." (P1.1). "First amendment conduct" is defined as including "the right to associate for the purpose of seeking and giving legal advice as well as advancing litigation." (§ 1.5.7). The order also states that "No first amendment information shall be gathered which violates the confidentiality of attorney-client communications." (§ 3.1). The order prohibits investigation, prosecution, harassment, or interference with a person "solely because of the person's First Amendment conduct" and requires that any criminal, dignitary protection, public gathering, or regulatory investigation that is directed towards First Amendment conduct follow various procedural protections. In particular, the order requires criminal investigations and infiltration of plaintiff groups which are directed at first amendment conduct to proceed only upon reasonable suspicion of past, ongoing, or imminent criminal activity. The order provides continuing jurisdiction in the court to redress future violations through contempt proceedings.

The CLC Agreed [*10] Order prohibits surveillance, information gathering, and maintenance of files as to meetings between attorneys and others or among attorneys concerning the giving and/or seeking of legal advice, where there is "a reasonable expectation of privacy and that the attorney/client privilege will attach." This prohibition shall not apply, however, if the attorney or attorneys by such meetings are participating in actual criminal activity. The prohibition also does not apply if a police officer attends an attorney/client conference and is known to the participants as a police officer. Like the ACLU-Alliance order, the order contains a provision allowing any person affected by the conduct complained of to apply to the court for sanctions. Because the CLC was not a class action, however, the only conduct "complained of" was that affecting the CLC. In consequence, the only persons who can avail themselves of this continuing jurisdiction are attorneys and other individuals employed by, or working under the auspices of, the CLC.

Based on their success in negotiating the April 1981 Agreed Order, the CLC's attorneys now seek a total of $202,773.00 in fees for 1,813 hours of attorney time and [*11] 772.50 hours of paralegal time spent on the case, including time spent on the petitions for fees. The CLC also asks for a multiplier. The authority for such fees stems from *42 U.S.C. § 1988*, which allows "a reasonable attorney's fee" to the "prevailing party" in a § 1983 action such as this one. As of this date, there is no longer any dispute as to whether plaintiffs are prevailing parties within the meaning of the Act. Under *Maher v. Gagne,*

*448 U.S. 122, 129 (1980),* a settlement which garners plaintiffs a substantial portion of the benefits sought does not weaken a plaintiff's claim to fees under the Act. See *Busche v. Burkee, 649 F.2d 509, 521 (7th Cir.),* cert. denied, *454 U.S. 897 (1981); Nadeau v. Helgemoe, 581 F.2d 275, 278 (1st Cir. 1978).* It is also clear that the Fees Act is retroactive to any case pending on the date of enactment. *Wharton v. Knefel, 562 F.2d 550, 556 (8th Cir. 1977); Rosado v. Santiago, 562 F.2d 114, 118 (1st Cir. 1977).*

The consent judgment entered into between the CLC and the City provides substantially all of the injunctive relief requested in the complaint and sets forth judicially enforceable standards to regulate future City [*12] activity toward the CLC. Thus, the plaintiff prevailed with respect to the major purpose for which the suit was brought. See *Dietrich v. Miller, 494 F.Supp. 42, 43-44 (N.D. Ill. 1980).* Accordingly, plaintiff should recover a compensatory attorney's fee "unless special circumstances would render such an award unjust." S. Rep. No. 94-1011, 94th Cong., 2d Sess. 4 (1976) (quoting *Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402 (1968),* reprinted in U.S. Code Cong. & Admin. News [1976] 5908, 5912. See also *Dawson v. Patrick, 600 F.2d 70, 79 (7th Cir. 1979)* (prevailing plaintiff in suits covered by § 1988 should receive fees "almost as a matter of course.").

The City's major objection to the CLC's **fee petition** stems from the action's duplicativeness. According to the City, the CLC's lawsuit was without practical significance from the onset because of the certified classes in the Alliance and ACLU cases and the relief obtained superfluous since the ACLU-Alliance Judgment Order already enjoined the police from gathering first amendment information in violation of attorney/client confidentiality. This duplication, it is argued, constitutes a "special [*13] circumstance" which renders an award "unjust." Alternatively, the City attacks the reasonableness of the hours expended by suggesting that CLC's de facto position as "third chair" in the class litigation led to overlitigation of its own claims. The City then objects to specific items: time billed for **press conferences**; time connected with changing from one team of lawyers to another; time spent in connection with the federal defendants, who were not involved in the CLC suit; and time spent on class discovery. The City also objects to the request for a multiplier.

Regarding the first of these arguments, the City cites *Nadeau v. Helgemoe, 581 F.2d 275 (1st Cir. 1978),* a case in which defendants challenged a fee award due to the existence of identical lawsuits. In particular, the defendants argued that the plaintiffs were not "prevailing" parties on the ground that their own suit had not been a catalyst in obtaining the results reached through a con-

sent decree. The court noted in passing that "no award is required if the court determines that plaintiff's suit was completely superfluous in achieving the improvements undertaken by defendants on plaintiff's behalf," *581 F.2d at 281,* **[*14]** a passage on which defendants place key emphasis. But the court rejected the argument that the difficulties of determining the particular impact of the plaintiffs' suit due to other lawsuits could justify a complete denial of fees:

> [T]he mere existence of other similar suits by other plaintiffs should not automatically be considered a basis for diminishing a plaintiff's award. Such a doctrine would, contrary to the object of the Attorney's Fees Awards Act, be a powerful disincentive to legitimate actions, for the fact that there was more than one suit against officials of an institution would not merely bar the later attorneys from compensation but would jeopardize the fees of counsel in the original suit.

*Id. at 281.* To this comment, the court added in a footnote that "the procedural mechanisms available for class actions, consolidated suits and the like make it doubtful that our holding here will result in defendants having exaggerated attorney's fees exacted from them." Id. at n.4.

The present case presents a difficult situation, since the CLC was indisputably a putative class member within the language of the ACLU complaint and arguably a class **[*15]** member within the language of the certification order. The CLC contends that it is not an "organization . . . engaged in . . . political, religious, educational or social activities" but instead a service organization of lawyers dedicated to providing quality legal representation for the poor and minorities of Chicago. The court seriously doubts, however, that the class certification order was meant to be as narrowly construed as the CLC maintains. There is thus substantial merit to the City's claim of being subjected to exaggerated fees.

The court nonetheless does not view the CLC's relation to the ACLU-Alliance class as a "special circumstance" which would render a fee award unjust. The CLC's interests, though substantially protected by the class attorneys, were different in emphasis from those of the class as a whole, and the action was allowed to proceed as a separate but consolidated action, apparently without complaint from the City on the grounds it now raises. The relief obtained is not only more specific but greater within the narrow area of attorney/client rela-

tions. While the ACLU-Alliance order prohibits the City from gathering first amendment information in violation **[*16]** of attorney/client confidentiality, and only allowed such investigations based upon reasonable suspicion of crime, the CLC order flatly prohibits the City from investigating attorney meetings whenever there is a reasonable expectation of attorney/client privilege. The only exception is where the lawyers are engaged in actual criminal activity. The City might not have agreed to these terms as part of a classwide relief, and the CLC's suit was obviously not superfluous in achieving the April 1981 order. In sum, the CLC's decision to proceed with a separate action was not so lacking in foundation that it would be "unjust" to award fees for the relief obtained.

Once a plaintiff has succeeded on any significant issue in litigation and is therefore a prevailing party, it remains for the district court to determine what fee is reasonable. This process usually involves multiplying the number of attorney hours spent times each attorney's reasonable billing rate to reach a "lodestar" figure. Then, the court may adjust the lodestar to reflect important factors unique to the lawsuit. In *Hensley v. Eckerhart, 461 U.S. 424 (1983),* the Supreme Court set forth the following factors for particular **[*17]** guidance:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id. at 430 n.3,* citing *Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-719 (5th Cir. 1974).* Generally, where the results obtained are excellent, the attorney should recover a "fully compensatory" fee, *461 U.S. at 435,* including time spent on the fee question itself. *Bond v. Stanton, 630 F.2d 1231, 1235 (7th Cir. 1980).* At the same time, however, the Seventh Circuit has admonished that district courts "can, and should, disallow particular expenses that are unreasonable whether because excessive in amount or because they should **[*18]** not

have been incurred at all." *Henry v. Webermeier, 738 F.2d 188, 192 (7th Cir. 1984)*.

In the present case, the plaintiff has submitted materials to establish an initial lodestar figure of $150,139.25. This figure can be usefully broken down as follows:

$97,081.25 for 1,520 Attorney Hours on the principal case at actual billing rates of $40 to $220;

$28,022.50 for 765 Paralegal Hours on the principal case at actual billing rates of $25 to $43;

$25,035.50 for 304.25 Attorney and 12.5 Paralegal Hours spent litigating entitlement to fees after May of 1981.

The plaintiff also requests recomputation of the pre-1981 fees at 1983 rates to put the lodestar figure at $202,773.00. This figure is to compensate for inflation and rising overhead during the years that plaintiff's counsel had to wait before receiving any compensation. See *Bonner v. Coughlin, 657 F.2d 931, 937 (7th Cir. 1981)*. Finally, plaintiff's counsel requests a 2.5 multiplier for undertaking this representation with no expectation of compensation, and for the socially important results they obtained.

With the above data in mind, the court makes several observations. First, the quality of the plaintiff's [*19] representation was high, and the 1983 average rates requested are not out of line with the market rate for work of this kind and caliber. Second, the legal issues in this case were novel as of 1976, the year the lawsuit was filed, and this may go some extent toward explaining the voluminous hours spent on the case. The difficulty of the legal issues, however, was ameliorated by the pathbreaking work of the Alliance and ACLU attorneys whose efforts first exposed the City's practice of singling out politically unpopular groups for surveillance and harassment. Indeed, this court recently rejected an award of high fees for Alliance attorney Richard Gutman in a related case, on the ground that the issues were no longer novel to him after his participation in the Alliance class action. S.A.C.C. v. City of Chicago, Slip Op. No. 80 C 4714 (February 14, 1985). Given the fact that the discovery files amassed in the class litigation were made available to plaintiff's counsel, most of the complex features of this case were greatly simplified.

Third, the court finds that the total number of hours spent on this litigation to be blatantly unreasonable in light of the consolidated [*20] class actions. The court is aware that the consolidation order and the City's attempt to negotiate a consolidated settlement may have exacerbated some time spent in connection with this case; for example, the CLC's attorneys undoubtedly had to attend statuses which may have affected the CLC's interests only tangentially The fact remains, however, that the consolidation order was meant to expedite discovery, not to put the CLC in the position of acting as a third chair in the class litigation. Much of the work for which the CLC attorneys seek remuneration involves efforts either duplicative of work performed by the Alliance and ACLU attorneys, and some hours reflect work which is not meaningfully related to the plaintiff's own claims. For example, the time sheets indicate over thirty hours spent by Robert Bynum and Laura Kaster for work done on the ACLU's amicus brief in the Alliance appeal, and at least ten hours for time expressly spent in considering claims against federal defendants who were unconnected to the plaintiff's case, in addition to an untold number of hours in joint press conferences, negotiations, and the like.

It is well established that fee-shifting statutes [*21] such as § 1988 do not justify compensation for an attorney's duplicative efforts, and that district courts may exclude hours from the lodestar figure by either identifying specific instances of duplication or using a percentage approach. *Henry v. Webermeier, 738 F.2d 188, 192 (7th Cir. 1984)* (district courts should disallow unreasonable expenses); *Copeland v. Marshall, 641 F.2d 880, 903 (D.C. Cir. 1980)* (affirming district court decision to reduce lodestar fee for waste of effort without performing item-by-item accounting); *Northcross v. Board of Education, 611 F.2d 624, 636 (6th Cir.), cert. denied, 447 U.S. 911 (1980)* (in complex cases involving many lawyers, district court may fairly deduct a small percentage of total hours to eliminate duplication of services rather than pick out which hours were duplicative). While these cases all address the issue of duplicative efforts within one suit, their logic may be extended to the case of consolidated lawsuits where plaintiffs' attorneys fail to allocate tasks efficiently. The underlying rationale of these cases is that fee-shifting should be consonant with the statutory purpose of ensuring legal representation for [*22] civil rights plaintiffs, and is not intended to produce a windfall for plaintiffs or for attorneys who choose to overlitigate their claims.

Hensley also teaches that a district court may look to awards in other cases to determine what is a reasonable fee. In Robert E. v. Lane, 81 C 1057, a complex class action challenging the adequacy of mental health care facilities at Stateville Correctional Center, plaintiffs' counsel spent only about 1,000 hours in litigating a case which settled on the eve of trial: the award was under $100,000, reflecting trial preparation efforts which were never required of plaintiff's counsel in this case. In *Johnson by Johnson v. Breije, 701 F.2d 1201, 1211 (7th Cir. 1983)*, a class action challenging the constitutionality of

1985 U.S. Dist. LEXIS 14562, *

commitment procedures for Illinois criminal defendants found unfit to stand trial, the ultimate fee award for a case resolved on cross-motions for summary judgment resulted in a lodestar of only $40,813,75. Finally, it is this court's experience that the time spent by plaintiff's counsel on the fee petition alone approximates two-thirds of what most civil rights attorneys spend in litigating successfully an employment discrimination [*23] action which goes to trial.

On the other side, the court takes note of the fact that the class attorneys in the Alliance and ACLU cases settled their fee claims for almost $2,000,000, over half of which went to the ACLU's lawyers, and $672,985.15 of which went to Mr. Gutman, the lead attorney for Alliance. These figures attest both to the complexity of the case at the time it was litigated and the fierceness with which the City opposed the class plaintiffs. These figures also make clear to the court that the CLC's award should be toward the upper end of what many civil rights plaintiffs get. The class action figures themselves, however, are not accurate reflections of what the CLC's lawyers should reasonably receive for prosecuting their individual claims against the City: not only were the class attorneys vindicating a broader group of interests but they were also instrumental in setting up complex discovery procedures which, to judge from the docket sheet, the CLC was able to utilize with less resistance from the City than had been expended in the early stages of the consolidated litigation.

Based on the above concerns, the court concludes that a substantial reduction [*24] from the $202,773.00 lodestar figure must be made to account for unreasonable expenditures of time and that no multiplier is in order. The Supreme Court has emphasized that the quality of attorneys' services is generally reflected in their hourly rates. *Blum v. Stenson, 104 S.Ct. 1541, 1549 (1984).* Consequently, a positive multiplier "should be given

only in cases that are significant and where the quality of the attorney's work is considerably above average." *In re Illinois Congressional Reapportionment Cases, 704 F.2d 380, 384 (7th Cir. 1983).* These cases, by the Supreme Court's estimate, will be "rare" or "exceptional." *Blum, 104 S.Ct. at 1550 n.18.* In the present case, plaintiff's counsel -- a large corporate firm -- has recomputed its initial petition by using regular 1983 billing rates to add over $50,000 to the initial lodestar figure: a 33% increase. Under these circumstances, giving a positive multiplier would result in a "windfall" to the plaintiff's attorneys beyond what the act authorizes.

With regard to the reasonableness of the hours, the court reduces the lodestar figure by 35% to reach $131,802.45. This reduction reflects the following excesses: over 300 [*25] hours spent litigating fee entitlement; some waste of effort due to attorney turnover; around $2,818.75 for a senior partner's participation in a press conference which is billed at $300/hour and which does not appear to have had significance for the case; and, most importantly, the large number of hours spent participating in the Alliance and ACLU cases beyond the extent necessary for protecting the CLC's interests. The court considers the reduction a somewhat arbitrary, but fair and necessary, method for approximating a reasonable fee. The court is also mindful of the delay the plaintiff has faced in receiving this award, and has adjusted its reduction accordingly: a $100,000 plus award for a single plaintiff case which seeks only declaratory and injunctive relief and never goes to trial is extraordinarily high when judged by the prevailing market rates for this type of work and by awards in similar cases, and therefore reflects a fully compensatory fee.

Accordingly, the plaintiff is awarded $131,802.45 in attorney's fees and costs under § 1988.

It is so ordered.

FOCUS - 7 of 10 DOCUMENTS

**RICHARD CRAIG, Plaintiff, v. CHIEF OF POLICE DONALD CHRIST, Individually and in his Official Capacity, LT. STEPHEN C. ROBERTSON, SGT. STEVEN VOGT; RANDALL S. COOK; JASON HANSMAN; PAUL TUTSIE; EDWARD P. BRICKLEY; GREGORY GEHRING; JAMES GRAY; RONALD GRAY; JOHN MANN; ROBERT COOK; DARYL PATTON; FRANK HITTEL; JOSEPH FINCH; and Other Unnamed JOHN DOE POLICE OFFICERS, Individually and as Police Officers for the City of Indianapolis; and THE CITY OF INDIANAPOLIS, Defendants.**

Cause No. IP 96-1570-C H/G

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION

*1999 U.S. Dist. LEXIS 17548*

**September 10, 1999, Decided**

**DISPOSITION:** [*1] Judgment entered awarding $ 168,990.20 in attorneys' fees and $ 13,845.95 in costs.

**COUNSEL:** For CRAIG, RICHARD, plaintiff: MICHAEL K SUTHERLIN, SUTHERLIN & BETZ, JOSEPH C LEWIS JR, ATTORNEY AT LAW, INDIANAPOLIS, IN.

For GORDON, JEFF, GEHLE, BRIAN, HOFFMAN, COURTNEY, plaintiffs: NATHANIEL LEE, LEE BURNS & COSSELL, INDIANAPOLIS, IN.

For GORDON, JEFF, plaintiff: JAMES E BOURNE, WYATT TARRANT COMBS & ORBISON, NEW ALBANY, IN.

For CHRIST, DONALD, INDIANAPOLIS, THE CITY OF, defendants: MARY ANN OLDHAM, HARRISON & MOBERLY, INDIANAPOLIS, IN.

For CHRIST, DONALD, ROBERTSON, LT. STEPHEN C., VOGT, SGT. STEVEN, COOK, RANDALL S. !, HANSMAN, JASON, TUTSIE, PAUL, BRICKLEY, EDWARD P. !, GEHRING, GREGORY, GRAY, JAMES, GRAY, RONALD, MANN, JOHN, COOK, ROBERT, PATTON, DARYL, HITTEL, FRANK, FINCH, JOSEPH, DOE, JOHN, INDIANAPOLIS, THE CITY OF, defendants: CAREN L POLLACK, HUFFER & WEATHERS PC, THOMAS E WHEELER II, BOSE MCKINNEY & EVANS, INDIANAPOLIS, IN.

For ROBERTSON, LT. STEPHEN C., VOGT, SGT. STEVEN, COOK, RANDALL S. !, HANSMAN, JASON, TUTSIE, PAUL, BRICKLEY, EDWARD P. !, GEHRING, GREGORY, GRAY, JAMES, GRAY, RONALD, MANN, JOHN, COOK, ROBERT, PATTON, DARYL, HITTEL, FRANK, DAGGY, JON, [*2] RANDALL, STEPHEN, FINCH, JOSEPH, DOE, JOHN, defendants: JOHN F KAUTZMAN, RUCKELSHAUS ROLAND HASBROOK & O'CONNOR, INDIANAPOLIS, IN.

For INDIANAPOLIS, THE CITY OF, defendant: THOMAS SATROM, OFFICE OF CORPORATION COUNSEL, INDIANAPOLIS, IN.

**JUDGES:** DAVID F. HAMILTON, JUDGE, United States District Court, Southern District of Indiana.

**OPINIONBY:** DAVID F. HAMILTON

**OPINION:**

ENTRY ON PLAINTIFF'S PETITION FOR AWARD OF ATTORNEYS' FEES AND COSTS

The parties to this civil rights action have settled plaintiff Richard Craig's claims against all defendants. The City of Indianapolis agreed to pay Craig $ 30,000 in return for a release of all claims against all defendants. The parties also agreed that if they were unable to reach agreement on attorneys' fees and costs under *42 U.S.C. § 1988,* "the matter will be submitted to the Court and the Court will make a decision about the reasonable costs and fees in

accordance with the guidelines applicable to an award of fees and costs to a prevailing party under *42 U.S.C. Section 1988*." Pl. Pet., Ex. 2. The parties were unable to agree on fees and costs. They have submitted their positions through briefs, affidavits, **[*3]** and other documents. No party has asked for an evidentiary hearing, and the matter is ripe for decision.

Plaintiff Craig and his attorneys have petitioned for a total of $ 12,453.15 in costs and $ 251,899.70 in fees. The requested fee amount is based on 336.1 hours by Michael K. Sutherlin at $ 300 per hour; 374.6 hours by Kristopher Kazmierczak at $ 150 per hour; 324.67 hours by Joe Lewis at $ 250 per hour; 58.64 hours by Sutherlin's law clerks at $ 55 per hour; and 51 hours by Lewis' assistant, Donna Borgerding, at $ 50 per hour, plus a supplemental fee request of $ 7937.00 for additional work on the fee petition itself. The City has raised numerous objections, including challenges to the hourly rates sought and to specific hours charged to the case. After reviewing the parties' submissions, the court agrees with some of the City's objections and disagrees with others. As explained below, the court awards a total of $ 13,845.95 in costs and $ 168,990.20 in fees. This Entry reflects the court's findings of fact and conclusions of law pursuant to *Fed. R. Civ. P. 52(a) and 54(d)(2)(C)*.

*Factual Background*

The disputes over the fee petition are the latest chapter in a highly **[*4]** publicized debacle involving Indianapolis police officers. On August 27, 1996, a group of Indianapolis police officers attended a baseball game at Victory Field in downtown Indianapolis. The officers used the Mayor's Suite at Victory Field. Police Chief Donald Christ hosted the party to reward the officers for good work. The parties continue to dispute the precise amount of beer that individual officers and the group as a whole consumed during the party. Before and after the baseball game, some of the officers also visited two local bars on South Meridian Street. Later that evening, a group of officers began walking north on Meridian Street. There is evidence, albeit disputed, that some of the officers in the group were making loud and vulgar remarks, many with offensive sexual and/or racial content. The officers were not in uniform at the time.

As the officers walked north on Meridian Street, a confrontation occurred. According to plaintiff Richard Craig, the officers were attacking a friend of his, Jeffrey Gordon. Craig says he went to Gordon's aid and a fight ensued. The outnumbered Craig and Gordon contend the officers beat them up. Several officers contend they suffered injuries **[*5]** in the brawl.

The officers managed to subdue both Craig and Gordon, and then arrested them. Uniformed officers were called to the scene and investigated the fracas. The event, which occurred in a busy part of downtown Indianapolis, was witnessed by scores, perhaps hundreds, of onlookers.

The event received extensive publicity under shorthand titles like "Downtown Police Brawl." The Indianapolis Police Department conducted an internal investigation that resulted in disciplinary action for a number of officers. The Marion County Prosecutor convened a grand jury. Police Chief Donald Christ resigned. On October 18, 1996, the grand jury indicted four police officers who are also defendants in this action: Paul Tutsie for battery, perjury, criminal mischief, and disorderly conduct; Jason Hansman for pointing a firearm, disorderly conduct, and battery; Edward Brickley for disorderly conduct, battery, and public intoxication; and Gregory Gehring for disorderly conduct and battery. The grand jury investigated plaintiff Craig and heard his testimony, but did not indict him. All criminal charges against Craig arising from the incident were eventually dismissed.

On November 4, 1996, plaintiff **[*6]** Craig filed this action in federal court. The detailed complaint asserted nine different causes of action against 17 individuals and the City of Indianapolis. This civil case remained relatively dormant while the indicted officers defended themselves on the criminal charges. After scores of witnesses testified during a trial lasting several weeks, the jury in the criminal case deadlocked on all charges. The state and the defendants then worked out agreed resolutions to the criminal charges.

This civil case then proceeded toward a trial scheduled for January 1999. Several developments along the way should be noted. Defendants Edward Brickley and Randall Cook asserted counterclaims against plaintiff Craig for assault and battery. Craig agreed to dismiss individual capacity claims against former Chief Christ and officers Jon Daggy and Stephen Randall after being satisfied that these defendants had not actually been at the scene of the melee. Craig also dropped his "policy and custom" claim against the City after the City agreed to indemnify the officers for compensatory damages, costs, and fees, and after the City conceded that the officers acted under color of state law and within **[*7]** the scope of their employment. The City remained a defendant on the state law claims. Also, Jeffrey Gordon and two other persons filed a lawsuit in state court on August 21, 1998, asserting similar federal and state claims arising from the brawl. The defendants removed that action to federal court on August 26, 1998, where it was consolidated with this case for pretrial proceedings and trial.

1999 U.S. Dist. LEXIS 17548, *

In early November 1998 as the trial approached, some defendants made an offer of judgment to Craig under *Fed. R. Civ. P. 68.* Craig did not accept the offer, which was less favorable to him than the settlement ultimately reached. The fees and costs at issue now therefore include those incurred after Craig rejected the November 1998 offer. Cf. *Marek v. Chesny, 473 U.S. 1, 87 L. Ed. 2d 1, 105 S. Ct. 3012 (1985)* (in cases subject to fee-shifting statutes, post-offer costs affected by Rule 68 offer include attorneys' fees). After further settlement negotiations, Craig reached a tentative settlement agreement with the defendants. In its final form, the settlement provided a payment of $ 30,000 to Craig in exchange for a release of his claims. The settlement left the issue of attorneys' [*8] fees and costs for further negotiation or court decision. The settlement also did not resolve the counterclaims against Craig.

*Discussion*

The governing statute here is *42 U.S.C. § 1988,* which provides that the court may award a reasonable attorney's fee and costs to a prevailing party in a civil rights case like this one. The City has carefully avoided saying that plaintiff Craig is a "prevailing party" for purposes of § 1988, see Pl. Pet. Ex. 2, but the City has objected that the hours plaintiff's lawyers spent on the portion of the fee petition arguing the issue were unnecessary. Def. Resp. at 10 ("Plaintiff is entitled to fees pursuant to *42 U.S.C. Section 1988* because defendants agreed to pay them as part of the settlement in this case."). The court therefore treats plaintiff Craig as a prevailing party for purposes of the fee petition.

In determining fees for a prevailing party under *42 U.S.C. § 1988,* the starting point is the "lodestar" amount, which is the product of the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate for the lawyer. *Hensley v. Eckerhart, 461 U.S. 424, 433, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983).* [*9] The plaintiff's request for a total fee of $ 251,899.70 treats that amount as the lodestar amount. The City challenges plaintiff's lodestar amount on several grounds, arguing that: (1) plaintiff has failed to provide sufficient documentation of the time billed; (2) plaintiff's lawyers seek compensation at excessive hourly rates; and (3) numerous hours charged by the attorneys were unreasonable, duplicative, excessive, or otherwise improper for a fee award. The court considers these issues in turn.

I. *Documentation of the Fee Request*

A party submitting a fee petition is responsible for submitting evidence showing the attorney time spent on the litigation and a reasonable rate for each attorney. See *Hensley, 461 U.S. at 433, 437 & n.12.* Plaintiff's attor-

neys have submitted detailed records of their time with diary entries describing how they spent their time on this case each day, often with more than one entry per day.

The City asserts that these records are not "contemporaneous" but are instead summaries. It is not clear what the City seeks. Perhaps the City wants to require attorneys to submit their original scribbled notes, dictation tapes, or [*10] computer records of the original keystrokes for the time entries. That approach bears no resemblance to attorneys' actual billing practices with paying clients. The billing summaries of records made at or near the time recorded are, in general, appropriate for purposes of a fee petition under § 1988. Cf. *Dutchak v. Central States, Southeast and Southwest Areas Pension Fund, 932 F.2d 591, 597 (7th Cir. 1991)* (affirming fee award based on reconstructed records, with discount applied for likely inflation of time). Moreover, the Supreme Court has instructed attorneys to use "billing judgment" in submitting fee petitions, see *Hensley, 461 U.S. at 434,* so some editing of the original, raw records is expected.

There are, however, some significant problems with some of the records. In his reply memorandum, attorney Joseph Lewis concedes that his records *repeat and double-count* several pages of his time for a period of about three months. See Co-Counsel's Reply Mem. at 7, discussing pages 8-19 of Lewis' time records.

This is a stunning mistake, admitted only after the City spotted the problem, and attributed vaguely to an "interim period between [*11] co-counsel's permanent and temporary secretaries." The mistake was not only Lewis' mistake. The other attorneys who filed the fee petition also should have caught it. In fact, anyone who was awake when reviewing the document should have recognized the problem. This was the most egregious of several problems that have unnecessarily complicated and prolonged the court's task of sorting out the disputed issues.

The numerous errors in the records are addressed more specifically below. In general, however, the types of records plaintiff has submitted are sufficient to support the hours claimed. Whether all the hours claimed are compensable is another matter.

II. *Hourly Rates*

Plaintiff seeks a fee award based on hourly rates of $ 300 for Michael Sutherland, $ 150 for Kristopher Kazmierczak, and $ 250 for Joseph Lewis. The City contends these rates are excessive and not supported by plaintiff's evidence.

1999 U.S. Dist. LEXIS 17548, *

For purposes of calculating the lodestar amount, the law presumes that the market rate for a prevailing party's legal services is the rate the party's attorney actually charges and receives for his or her services. *Gusman v. Unisys Corp., 986 F.2d 1146, 1149-50 (7th Cir. 1993);* [*12] *Barrow v. Falck, 977 F.2d 1100, 1105 (7th Cir. 1992);* accord, *People Who Care v. Rockford Bd. of Educ., 90 F.3d 1307, 1310 (7th Cir. 1996)* ("The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate."). The Supreme Court and Seventh Circuit have made it clear that a fee award under § 1988 cannot include a multiplier based on the contingent nature of the fee. *City of Burlington v. Dague, 505 U.S. 557, 567, 120 L. Ed. 2d 449, 112 S. Ct. 2638 (1992);* accord, *Barrow v. Falck, 11 F.3d 729, 731-32 (7th Cir. 1993); Barrow v. Falck, 977 F.2d at 1105.* Plaintiff's requested hourly rates do not include any multiplier.

A wide range of evidence may be relevant in determining a market rate for an attorney's services. Evidence concerning the attorney's experience, expertise, and prior fee awards may all be relevant. The best evidence of a market rate, however, is an actual exchange of money between a willing buyer and a willing seller. Thus, the best evidence of an attorney's market rate for these purposes is evidence showing the rate the attorney actually [*13] charges and receives for his or her services on a non-contingent basis. *E.g., Gusman, 986 F.2d at 1149-51; Barrow, 977 F.2d at 1105.* The Seventh Circuit has warned district courts that "Markets know market values better than judges do," and that "it is not the function of judges in fee litigation to determine the equivalent of the medieval just price." *In re Continental Illinois Securities Litigation, 962 F.2d 566, 568, 570 (7th Cir. 1992);* see also *Barrow v. Falck, 977 F.2d at 1105.* Courts should not try to identify "a 'just' or 'fair' price for legal services" but "the *market* price for legal services." *Pressley v. Haeger, 977 F.2d 295, 299 (7th Cir. 1992).*

A. *Michael Sutherlin*

Mr. Sutherlin has practiced law since 1974 and has concentrated his practice primarily on civil rights and constitutional litigation. His affidavit in this case identifies numerous cases in which he has served successfully as lead counsel to vindicate the civil rights of victims of official wrongdoing. He contributes frequently to continuing legal education programs on civil rights and constitutional issues. [*14]

Most relevant is the evidence that Sutherlin charges and is paid $ 300 per hour for non-contingent work. Sutherlin testified in his affidavit that in 1995, he began charging $ 250 to $ 300 per hour in such matters. Sutherlin testified

that in the past two years, he has been paid more than $ 100,000 at the $ 300 hourly rate.

The City has not challenged the market-based method for determining Sutherlin's rate. The City correctly points out, however, that the bills Sutherlin has submitted using the $ 300 rate also reflect unexplained downward adjustments of the bills. See Sutherlin Aff., Ex. A at 10-13. Where the nominal billing rate is discounted for actual bills and payments, the effective market rate is lower. The court will calculate the lodestar amount at the rate of $ 275 per hour for Sutherlin. n1

> n1 This court previously awarded fees to Sutherlin based on a rate of $ 275 per hour in *Fletcher v. Calvert,* IP 95-1011-C. The court's entry in that case addressed the market rate issue in more detail. As shown in Sutherlin's affidavit, he has been awarded rates of $ 275 and $ 250 per hour in other recent cases in this district. Rates awarded in similar cases are relevant evidence of an attorney's market rate. *Tolentino v. Friedman, 46 F.3d 645, 652 (7th Cir. 1995).*

[*15]

B. *Kristopher Kazmierczak*

Mr. Kazmierczak graduated from law school in 1996 and was admitted to practice on November 4, 1996, the same day this action was filed. (He worked as a law clerk with Sutherlin prior to that date, and the petition seeks compensation for his hours as a law clerk at a rate of $ 55 per hour.) During the course of this litigation, Kazmierczak has also acted as counsel in a number of other civil rights cases, as reflected in his affidavit. Kazmierczak testified in his affidavit that he bills and receives payment for his services at the rate of $ 150 per hour, and he has documented that testimony with invoices and checks.

The City's entire response on this point is as follows:

Mr. Kazmierczak was admitted to the bar in November of 1996 (Kazmierczak Affidavit, paragraph 2) and immediately began work on this case. Whatever experience he may have had in the interim, there is no authority for the proposition that the market rate for a brand new admittee to the bar is $ 150 per hour.

Def. Resp. at 4.

The Seventh Circuit's warnings to district judges apply directly here. Even if a judge might view the rate as a little on the high side [*16] based on the judge's own

experience and views, "Markets know market values better than judges do." *In re Continental Illinois Securities Litigation, 962 F.2d at 570.* Although the City itself might not be willing to pay Kazmierczak or other new lawyers $ 150 per hour to represent it, the evidence here shows that other clients have been willing to pay and have paid Kazmierczak at that rate. See also *Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 718-19 (5th Cir. 1974)* ("If a young attorney demonstrates the skill and ability, he should not be penalized for only recently being admitted to the bar.").

To the extent the City is arguing that Kazmierczak's market rate has increased during the course of this lawsuit, it should be noted that he has submitted records of invoices and payments using the $ 150 rate as early as June 1997. Counsel in cases like this are entitled to compensation for the delay in payment of fees earned. One way to calculate that compensation is to set a rate of interest and work out the appropriate interest for each segment of work. A simpler way, which is often reasonably accurate, is to pay the attorney his or her current [*17] hourly rate for work done throughout the case. *E.g., Missouri v. Jenkins, 491 U.S. 274, 283-84, 105 L. Ed. 2d 229, 109 S. Ct. 2463 (1989); Smith v. Village of Maywood, 17 F.3d 219, 221 (7th Cir. 1994).* In light of the evidence that Kazmierczak has been able to bill and collect $ 150 per hour for non-contingent work during most of the relevant period here, the court will apply that rate to all of his time in this case after his admission to the bar.

*C. Joseph Lewis*

Mr. Lewis graduated from law school in 1976 and was admitted to the Indiana bar in 1977. He has practiced law in Indiana since then and describes his practice as focused primarily on criminal litigation, contract litigation, commercial litigation, and cases involving constitutional issues. Lewis Aff. P 3.

Lewis seeks payment at $ 250 per hour. He has testified in his affidavit that he has "personally been paid $ 250 an hour for representing clients in various capacities," and he has supported that assertion with affidavits from three clients saying that they have paid Lewis at rates up to $ 250 per hour "on occasions," or "depending upon the complexity of the issues."

The [*18] City points out that Lewis does not claim that he has any experience or expertise in civil rights litigation of this type or that anyone has paid him $ 250 per hour to litigate cases like this one. The City also argues that $ 250 per hour would be appropriate only for lead counsel, which Lewis was not. Lewis has not responded

directly to that challenge, but he asserts that he has sufficient experience and skill to justify the $ 250 rate. See Co-Counsel Reply Mem. at 14-15.

Fees under § 1988 should be awarded at market rates for "comparable work." See, e.g., *People Who Care, 90 F.3d at 1310.* An attorney whose market rate is $ 300 per hour for defending civil antitrust cases is not necessarily entitled to the same rate if and when she ventures to represent a plaintiff in an employment discrimination case or an excessive force case. See *Cooper v. Casey, 97 F.3d 914, 920 (7th Cir. 1996).* After an attorney has submitted evidence about his or her standard billing rate, however, pressing for elaborate detail and perfect knowledge about an attorney's market rate carries its own costs. As the Seventh Circuit said in *People Who Care:* "Compiling years [*19] of invoices and billing statements is not inexpensive and a rule forcing attorneys to do so would add little to the integrity of the fee-collecting process." *90 F.3d at 1312.*

In light of these principles, the court will apply a rate of $ 200 per hour for Lewis' time. The ambiguity in his and his clients' affidavits - showing that he charges and receives $ 250 per hour for some unspecified work, but not for all the work for those clients - undermines his claim to $ 250 as his market rate for this case. In the absence of more specific data, and as a means of avoiding further expensive litigation over the fee award, the court is discounting Lewis' rate from his premium or highest rate of $ 250 down to $ 200 for purposes of this case. n2

> n2 The City's other challenges to Lewis' rate are addressed more directly with respect to the hours claimed.

*D. Donna Borgerding, Ron Hofer, and Sutherlin's Law Clerks*

The fee petition also includes requests for 51 hours by Donna Borgerding at a rate [*20] of $ 50 per hour and $ 1,392.80 for the services of a private investigator, Ron Hofer, at a rate of $ 40 per hour. The City argues that these rates are not supported and that no information is provided about Borgerding's credentials or position. The City does not dispute the rate of $ 55 per hour for the time billed by Sutherlin's law clerks.

Borgerding's time records reflect tasks of a type suitable for a paralegal, if not a junior attorney, and cannot fairly be described as clerical or secretarial. She interviewed witnesses and reviewed the voluminous grand jury re-

1999 U.S. Dist. LEXIS 17548, *

cords in this case. The requested rate of $ 50 per hour is modest for a paralegal in the Indianapolis market. The court will allow the requested rate without insisting on further proof for the modest amount in dispute. See generally *People Who Care, 90 F.3d at 1315* (remanding fee award based on, among other things, unjustifiably reduced paralegal rates: "The only inquiry for requested paralegal fees should be whether the work was sufficiently complex to justify the efforts of a paralegal, as opposed to an employee at the next rung lower on the payscale ladder.").

Lewis hired Hofer to interview [*21] witnesses in the fall of 1996, shortly after the brawl. Records submitted with Lewis' reply memorandum show that Lewis (or perhaps Craig or his family) actually paid Hofer at least some of the amounts billed. The requested rate is modest, as is the total amount in dispute - less than $ 1400. By using an investigator Lewis saved money as compared to doing the interviews himself. He also avoided the potential problems that can arise when a trial lawyer wants to impeach a witness based on the lawyer's own prior interview of the witness. The court will use the invoiced rate of $ 40 per hour for Hofer's time, but the court will treat the expense for Hofer's time as a cost rather than as part of the attorneys' fee award.

III. *Compensable Hours*

Plaintiff's original fee petition seeks compensation for 336.1 hours for Sutherlin, 374.6 hours for Kazmierczak, 324.67 hours for Lewis, 58.64 hours for law clerks employed by Sutherlin (including Kazmierczak before his bar admission), and 51.0 hours for Borgerding. n3 Plaintiff's supplemental fee petition seeks compensation for an additional 17.4 hours for Sutherlin, 16.5 hours for Kazmierczak, and 4.4 hours for law clerks.

> n3 The total of 58.64 hours for law clerks does not mean that they billed their time in intervals of 36 seconds each. Instead, in the exercise of appropriate billing judgment, Sutherlin discounted the law clerks' recorded hours by 20 percent for purposes of the fee petition.

[*22]

The City argues that many of these hours are not properly compensable. The City contends that some of the time is for activities not compensable at all under § 1988, and that other hours reflect unnecessary duplication by multiple attorneys or excessive time in relationship to the task performed. Before addressing the specific challenges, some discussion of the guiding principles may be useful.

In *Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 269, 44 L. Ed. 2d 141, 95 S. Ct. 1612 (1975),* the Supreme Court held that in the absence of explicit statutory authority to award fees to a prevailing party, courts could not award fees to "private attorneys general" as an exercise of their general equitable power. Congress amended § 1988 in 1976 in quick response to the Supreme Court's decision in *Alyeska Pipeline.* Congress explained that § 1983 and other civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.

In many cases arising under our civil rights [*23] laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer. If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court.

\* \* \*

There are very few provisions in our Federal laws which are self-executing. Enforcement of the laws depends on governmental action and, in some cases, on private action through the courts. If the cost of private enforcement actions becomes too great, there will be no private enforcement. If our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce, we must maintain the traditionally effective remedy of fee shifting in these cases.

Sen. Rep. No. 94-1011, at 2, 6 (1976), reprinted in 1976 U.S.C.C.A.N. 5908, 5910, 5913.

The premise of § 1988 is that, without the prospect of a fee award for a successful plaintiff, important and meritorious cases will not be brought. In many cases, the private market for attorneys' services based on hourly fees or a share of a [*24] damage recovery simply does not offer lawyers a sufficient incentive for them to take on such cases except on a charitable basis.

Under § 1988, attorneys are entitled to compensation for all time reasonably expended on the litigation, without trying to parse whether they succeeded on every task or every contested motion. "That the lawyers spent some time in blind alleys is irrelevant; this is inevitable, and the hourly rate reflects the fact that not all time is equally

productive. It would be possible, but silly, to bill $ 150 for productive time and nothing for other time; the standard hourly rate reflects the standard productivity of time." *Kurowski v. Krajewski, 848 F.2d 767, 776 (7th Cir. 1988)* (obviously discussing rates from the mid-1980s). As Judge Easterbrook has explained when sitting by designation as a district judge: "Counsel may track down leads that do not pan out, however; this is an essential function of lawyers. Blind alleys are an ordinary part of litigation, as are standby witnesses. The retrospective view is the wrong one. These hours are ordinary inputs into winning cases and are fully compensable." *Bohen v. City of East Chicago, 666 F. Supp. 154, 158 (N.D. Ind. 1987).* **[*25]**

At the same time, the prevailing plaintiff's attorneys must use "billing judgment," meaning they should edit their bills and should remove charges for time they would not reasonably or fairly expect a private client to pay. See *Hensley, 461 U.S. at 434.*

To show the need for close scrutiny of the challenged time entries, the City refers to the time entries concerning the appearance of James Bourne. See Def. Resp. at 6 n.1. Mr. Bourne was hired by the homeowner's insurance carrier for Jeffrey Gordon, Craig's friend who was a plaintiff in the consolidated case. The insurer hired Bourne to defend only the counterclaims asserted by two defendants against Gordon.

This issue presents a microcosm of some of the problems here. The City points out that Sutherlin has three separate time entries for "reviewing J. Bourne appearances" on October 28, October 30, and November 6, 1998. Sutherlin's repetitive entries include the Bourne appearance in lists of activities or documents reviewed for relatively short times of 0.3, 0.4, and 1.0 hours. Lewis billed 0.2 hours on November 1, 1998, for "Reviewed appearance of J. Bourne," and another 0.2 hours for "Reviewed appearance **[*26]** by J. Bourne of Wyatt, Tarrant and Combs." Moreover, those two entries are each repeated one time in the duplicative pages of Lewis' records. Kazmierczak reviewed Bourne's appearance as part of an entry of 0.3 hours for October 29, 1998. Although it is impossible to say exactly how much time Sutherlin and Kazmierczak were billing for reviewing that one document, the City correctly points out that in the **fee petition,** "three attorneys recorded eight separate time entries for reviewing a three-line appearance by counsel retained to defend counterclaims asserted against someone other than their client." At the hourly rates sought by the attorneys, the entries amount to roughly $ 300 for the "task" of reviewing Bourne's appearance.

The court turns to the specific but more important challenges.

A. **Media and Press Inquiries**

Sutherlin and Lewis both request fees for time spent on press releases, **press conferences,** and other **media** communications, such as interviews with the Associated Press and the New York Times. The court disallows that time under § 1988. See *Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 176 (4th Cir. 1994)* (affirming denial of **[*27]** fees for time spent on public relations efforts; the "legitimate goals of litigation are almost always attained in the courtroom, not in the **media**"); *Greater Los Angeles Council on Deafness v. Community Television of Southern California, 813 F.2d 217, 221 (9th Cir. 1987)* (affirming denial of fees for time spent on publicity and lobbying). But see *Davis v. City and County of San Francisco, 976 F.2d 1536, 1545 (9th Cir. 1992)* (allowing time spent on **press conferences,** lobbying, and other public relations work that is "directly and intimately related" to successful representation of the client), *vacated in part on other grounds and remanded, 984 F.2d 345 (9th Cir. 1993); Jenkins v. Missouri, 862 F.2d 677, 678-79 (8th Cir. 1988)* (allowing time spent by counsel on tax levy election, as alternative to court-ordered tax increase, to finance mandated desegregation relief), *aff'd on other grounds, 491 U.S. 274, 105 L. Ed. 2d 229, 109 S. Ct. 2463 (1989).*

Plaintiff argues that his attorneys used the **media** as an effective discovery tool for locating witnesses, and that the **media** attention to the case required **[*28]** them to spend time on **media** relations to avoid harm to their case. See Pl. Reply at 3; Sutherlin Supp. Aff. PP 17-20. Plaintiff has not, however, identified a single witness who turned up in response to general press reports concerning this lawsuit. Defendants are not responsible for paying for a plaintiff's public relations campaign, regardless of its purpose. The court disallows 3.5 hours for Sutherlin and 5.5 hours for Lewis.

B. *Defending Counterclaims*

Defendants Cook and Brickley filed counterclaims under state law against Craig. The City argues that time spent defending the counterclaims is not compensable under § 1988. Plaintiff responds that the counterclaims were an integral part of the entire case. The parties have not provided any directly applicable authority on this issue. Section 1988 does not appear to authorize fee awards for the defense of state law counterclaims, at least when those counterclaims remain pending and plaintiff cannot be said to have been a prevailing party with respect to them. Applying the general principles set forth in *Merriweather*

*v. Family Dollar Stores of Indiana, Inc., 103 F.3d 576, 583-84 (7th Cir. 1996),* and [*29] *Lenard v. Argento, 808 F.2d 1242, 1246-47 (7th Cir. 1987),* among many other cases, the court will disallow time attributable *only* to the counterclaims. Because of the very close relationship between Craig's claims and the counterclaims, this amounts to only a modest amount of time. On this basis the court disallows 0.6 hours for Kazmierczak, 3.5 hours for Sutherlin, and 2.2 hours for Lewis.

## C. Dismissal of Defendants Daggy and Randall

The City next challenges the attorneys' time spent resolving Craig's claims against defendants Daggy and Randall, which Craig dismissed voluntarily in April 1997. The City argues that plaintiff never had a good faith basis for suing Daggy and Randall, so that counsel are not entitled to fees for time spent satisfying themselves that Daggy and Randall were not present for the Meridian Street brawl. Plaintiff contends the time was reasonably spent in pursuing the claims initially and then in dismissing them.

The City, Daggy, and Randall did not seek sanctions pursuant to Rule 11 based on plaintiff's decision to name Daggy and Randall in the complaint. In addition, plaintiff named them in his complaint while ongoing [*30] criminal proceedings complicated access to all the factual details. In light of the difficulty in sorting out individual officers' roles, especially in the early stages of the case, the court does not believe it was unreasonable for Craig to have named Daggy and Randall at the outset or to dismiss the claims against them a few months later. See *City of Riverside v. Rivera, 477 U.S. 561, 570, 91 L. Ed. 2d 466, 106 S. Ct. 2686 (1986)* (plurality opinion) (affirming fee award that included time spent on unsuccessful claims against some police officers where plaintiffs' rights were violated by a large number of officers unidentified at the time; district court found it was reasonable for plaintiffs to name 31 individual defendants at outset of case); *id. at 584-85 & n.2* (Powell, J., concurring in judgment); see also *Bohen v. City of East Chicago, 666 F. Supp. at 158* ("Blind alleys are an ordinary part of litigation. . . . The retrospective view is the wrong one."). The time spent resolving those claims will be allowed as part of the fees payable by the City.

## D. Seeking Mayor Goldsmith's Deposition

During the summer of 1998, [*31] plaintiff made a significant effort to take a deposition of Indianapolis Mayor Stephen Goldsmith. The City resisted the effort. The court ultimately granted the motion to quash the deposition notice and subpoena, but without prejudice to reconsideration if other avenues of discovery (such as deposi-

tions of former Chief Christ and other senior police officials) proved to be inadequate. The issue did not come up again.

The City argues first that no time for this unsuccessful effort should be compensable. The court disagrees. Craig's attorneys had reasonable grounds for pursuing the mayor's deposition. The separate complaints by defendants Robertson and Vogt (in a separate lawsuit) alleged they were victims of a political damage control effort during Mayor Goldsmith's 1996 campaign for governor. Although the court ultimately concluded that such post-brawl events would not be part of the trial in this case, reasonable judges could disagree on that question. The effort to take the mayor's deposition was in essence another reasonable blind alley. See, *e.g., People Who Care, 90 F.3d at 1314* (reversing district court's exclusion of attorneys' time on unsuccessful attempt [*32] to pursue interlocutory appeal; "court's focus should not be limited to the success/failure of each of the attorney's actions," but on "whether those actions were reasonable"); *Kurowski v. Krajewski, 848 F.2d at 776* ("blind alleys" are part of successful litigation); *Bohen, 666 F. Supp. at 158* (same).

The City also contends that Craig's attorneys spent an excessive amount of time on the issue, more than 24 hours among Sutherlin, Kazmierczak, and Lewis, and another 20.6 hours by Sutherlin's law clerks. The City filed a detailed, well-researched memorandum in support of its motion to quash. The City has not set forth how much time and money it spent to prevent the mayor's deposition, but the investment appears to have been considerable (unless the legal research had been done earlier for some other purpose). Plaintiff was entitled to make a similarly detailed response in the effort to take the mayor's deposition. The court will allow the time spent on this matter, but not the 0.5 hours identified as a duplicative entry for Kazmierczak. n4

> n4 The court addresses below, however, the City's broader challenge to Lewis' time after Sutherlin and Kazmierczak entered the case.

[*33]

## E. Prevailing Party Issue

The City next challenges 6.5 hours spent on the original fee petition directed to the issue of whether Craig is a prevailing party for purposes of § 1988. The City argues that the time was unnecessary because the City had agreed to treat Craig as a prevailing party. The City's

position at the time of settlement, however, was worded very carefully:

Please be advised that the defendants have not agreed, and do not agree, that Richard Craig is a "prevailing party." We have specifically denied liability and will continue to do so. We have agreed that, in the event that the parties cannot come to an agreement on attorneys' fees, the matter will be submitted to the Court and the Court will make a decision about the reasonable costs and fees in accordance with the guidelines applicable to an award of fees and costs to a prevailing party under *42 U.S.C. Section 1988*. Please file an amended notice with the Court which does not contain any reference to the parties agreeing that Mr. Craig is a "prevailing party."

Pl. Pet., Ex. 2. In light of this careful locution, plaintiff could reasonably anticipate that the City might **[*34]** try to challenge the fee petition on the prevailing party issue. Although the City chose not to do so, plaintiff could not know that ahead of time. The challenged time will be allowed.

F. *Research on Policy/Custom Claim and Other Legal Research*

The City challenges 7.5 hours for Sutherlin researching the law on policy and custom claims against local governments and joinder issues. The City also seeks a broader general reduction of time because plaintiff eventually dismissed the policy/custom claim against the City. The City also argues in essence that, if Sutherlin had to do "basic research" on the law, he should not be entitled to $ 300 (or $ 275) per hour, and if he is entitled to that high a rate, he could not reasonably charge for the research. Both arguments are misguided.

First, plaintiff's voluntary dismissal of the policy/custom claim does not negate the claim for time spent on it. The policy/custom claim was not even a blind alley. Plaintiff obtained two vital concessions before dismissing the federal claim against the City. First, the City assured plaintiff that it would indemnify the individual defendants for any compensatory damages, attorneys' fees, and **[*35]** costs that might be awarded. Second, the City and other defendants admitted that the individual defendants were acting under color of state law and within the scope of their employment at all relevant times.

The practical importance of those concessions should not be underestimated. The promise of indemnification meant that plaintiff did not need to worry about whether he could collect a judgment on his federal claims. See *Jones v. City of Chicago, 856 F.2d 985, 995 (7th Cir. 1988);* David F. Hamilton, *The Importance and Overuse*

*of Policy and Custom Claims: A View from One Trench, 48 DePaul L. Rev. 723, 730-34 (1999)* (discussing indemnification of individual defendants as affecting need for policy/custom claims against local governments under § 1983). The concession on the color of state law and scope of employment issues resolved potentially confusing issues for a jury. Under the circumstances of this case - off-duty officers in civilian clothing - plaintiff could not simply assume that he would prevail on these questions. Without the concession, plaintiff might have needed to spend even more time on discovery and legal research.

The objection **[*36]** to "basic research" by an expert in the field is superficially appealing but not persuasive in a legal world where Rule 11 has vitality and legal doctrines in civil rights cases are constantly evolving. As the Seventh Circuit pointed out in *In re Continental Illinois Securities Litigation*: "No matter how experienced a lawyer is, he has to conduct (or have conducted for him) research to deal with changes in the law, to address new issues, and to refresh his recollection." *962 F.2d at 570.* The court continued: "a lawyer who tries to respond to a motion or brief without conducting fresh research is courting sanctions or a malpractice suit." *Id.;* see also, *e.g., Norgaard v. Depuy Orthopaedics, Inc., 121 F.3d 1074, 1075-76 (7th Cir. 1997)* (where controlling Seventh Circuit precedent gave the defense a winning argument, plaintiff's counsel was negligent in failing to research law of other circuits; such research would have shown that Supreme Court had granted *certiorari* to resolve circuit split and would have alerted plaintiff's counsel to the later Supreme Court decision that would likely have led the Seventh Circuit to overrule its precedent). **[*37]**

Defendants have no valid complaint here. Plaintiffs and plaintiffs' attorneys in civil rights cases are more often attacked for failing to undertake sufficient legal research than for spending too much time on the task. This was not a routine excessive force or unlawful arrest case. These lawyers did a thorough job handling a host of legal issues (which are reflected in the case management plan, the defendants' many affirmative defenses, and the motions practice). The time spent on legal research was spent reasonably in this case. Accordingly, the time for research on the policy/custom claim will be allowed.

The City also challenges 13.0 hours for Lewis from August 28 to October 28, 1996, researching issues of qualified immunity and related threshold issues. Lewis spent this time before Sutherlin and Kazmierczak spent significant time on the case. The court will allow this reasonable amount of time on preliminary research at the rate of $ 200 per hour.

## G. *Defense of Criminal Case*

The City challenges at least 30 hours that Lewis spent on the criminal charges against and investigation of plaintiff Craig. Plaintiff has not offered any authority for including this [*38] time in a fee award. In a case like this one, where the plaintiff claims that as a result of the alleged violations of his constitutional rights, he was investigated and prosecuted without justification, his attorneys' fees incurred in the criminal proceedings may be a proper part of his claim for compensatory damages for the violations, but not part of a fee award in the civil case itself under § 1988. See *Borunda v. Richmond, 885 F.2d 1384, 1389-90 (9th Cir. 1988)* (treating attorneys' fees in criminal case as element of damages in civil case alleging arrest without probable cause, rather than as part of a fee award); *Whitley v. Seibel, 676 F.2d 245, 252 (7th Cir. 1982)* (treating attorneys' fees in criminal proceedings as element of damages in civil rights case for prosecution and imprisonment without probable cause); accord, *Greer v. Holt, 718 F.2d 206, 207-08 (6th Cir. 1983)* (§ 1988 does not provide for fee award for attorney's work in criminal case underlying § 1983 suit alleging assault by police officer).

Thus, because fees for defense of an unjustified prosecution would essentially be part of the plaintiff's *damages*, [*39] not part of a fee award in this case, the court disallows Lewis' time on the criminal case. How much time to disallow? The City was not specific in its challenge, so it essentially deferred to the court's efforts to answer the question. Lewis billed a total of 12.9 hours on August 27, 1996, the day of the brawl and Craig's arrest. Those time entries - researching assault and battery, and defenses to resisting arrest, fleeing, and assault and battery; and appearing in court to obtain Craig's release - are all directed toward the criminal charges and will be disallowed. After that first day, Lewis and his client understandably began to focus on the possibility of civil claims against the officers and the City, and Lewis' time after the first day included some efforts relevant to both proceedings. The court will exclude only those entries that appear to be devoted exclusively to the criminal case, including conferences with the prosecutor's office and related grand jury matters. The specific entries excluded are 3.1 hours on Sept. 12, 1996; 6.4 hours on Sept. 18, 1996; 1.1 hours for Sept. 25, 1996; 2.5 hours for Sept. 29, 1996; 1.6 hours for Sept. 30, 1996; 0.4 hours for Oct. 10, 1996; [*40] and 0.2 hours for Oct. 15, 1996, for a total exclusion on this basis of 28.2 hours for Lewis.

## H. *Time After Tentative Settlement*

The City next argues that plaintiff's attorneys spent unreasonable amounts of time after Craig and the defendants reached a tentative settlement. That agreement was reached in a telephone call on November 16, 1998. Sutherlin sent a confirming letter the next day, and on November 25, 1998, counsel for the City responded to further correspondence by explaining the City's position on the "prevailing party" issue. On November 24, 1998, however, counsel for individual defendants made an effort to derail or at least to modify the settlement. See Sutherlin Supp. Aff. PP 3-4; Sutherlin Aff. Ex. B at 24 (entry for Nov. 24, 1998). Not until December 21, 1998, were settlement documents prepared for and signed by Craig. Even then, issues remained concerning the status of counterclaims against Craig.

In view of the dissension among the defendants concerning the agreement, Craig's attorneys reasonably treated the settlement as tentative and took steps to stay apprised of continuing developments in the consolidated *Gordon* case. Craig's attorneys had [*41] to balance on a tightrope, avoiding on one side a continued, full-speed effort to prepare for trial, and on the other side being blindsided by a late collapse of the settlement. n5 The court will not disallow or discount the time after the tentative settlement. (The court has already disallowed some of the time, however, because it related only to the counterclaims against Craig.)

> n5 The court would not have been receptive to a late, unilateral motion to continue the long-scheduled consolidated trial based on an assertion that counsel had relaxed because they thought the case had been settled.

## I. *Time for Billing Arrangements and Coordination of Attorneys*

The City next challenges time for the first two meetings between Sutherlin and Lewis concerning the case, as well as telephone conferences between Sutherlin and Lewis on January 13, 1997, and March 19, 1997. The court will allow the time for the initial meetings. Such initial consultations are reasonable where primary responsibility is handed off [*42] from an attorney who has a long-standing relationship with the client to an expert in the particular field. The court will disallow 1.5 hours for Sutherlin and 1.9 hours for Lewis on the telephone calls.

## J. *Review of Appearances and Other Routine Documents*

The City points out next that plaintiff's attorneys repeatedly billed 0.2 or 0.3 hours for reviewing attorney's appearances and other routine documents, such as unopposed motions for extensions of time and orders granting the same. Each entry is small, but they certainly added up. One problem for the court is that neither side has bothered to add up these disputed entries.

The court has also noted that plaintiff's petition seeks a total of $ 300 for reviewing the petition of James Bourne. As another example of this problem, the City points to the entries concerning Caren Pollack's appearances. Lewis billed 0.8 hours on January 12, 1998, for reviewing Pollack's appearance. Lewis had previously billed 0.2 hours on each of three other occasions reviewing Pollack's earlier appearances. Sutherlin and Kazmierczak also billed 0.2 hours each for reviewing Pollack's appearance on January 12, 1998. In another example, Lewis [*43] billed 0.2 hours on three different dates for reviewing James Stephenson's motion to withdraw his appearance.

Plaintiff's lawyers defend this billing practice, saying that they must read and evaluate all documents, that they may need to review other documents to verify who represents whom, and that an appearance may trigger other communications, such as contact with their client.

The plaintiff's defense of this practice has some merit in theory. In view of the numerous and duplicative entries in this case, however, any inclination the court might have had to indulge this practice has been stretched too far. In the absence of more specific calculations, the court estimates that 20 hours should be disallowed for Sutherlin and 20 hours for Kazmierczak on this basis. See *Tomazzoli v. Sheedy, 804 F.2d 93, 98 (7th Cir. 1986)* ("it is generally unrealistic to expect a trial court to evaluate and rule on every entry in an application;" affirming lump-sum reduction to hours claimed where district court explained basis for doing so); *Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc., 776 F.2d 646, 656-57 (7th Cir. 1985)* (same for 15% reduction in antitrust [*44] case where district court found that many entries were "vague, inconsistent, and lacking adequate identification"); see also *In re Continental Illinois Securities Litigation, 962 F.2d at 570* (recognizing that in deciding fee petitions where large sums are not in dispute, "laser precision" may not be worthwhile); cf. *Spellan v. Board of Educ. for Dist. 111, 59 F.3d 642, 647 (7th Cir.1995)* (district court may not simply "eyeball" fee request and "cut it down by an arbitrary percentage because it seemed excessive to the court"), quoting *Tomazzoli v. Sheedy, 804 F.2d at 94.* The court addresses Lewis' time in a broader context in the next section below.

## K. *Lewis Role After Initial Stage of Case*

The City raises a broader challenge to the time charged by Lewis. Plaintiff Craig originally went to Lewis for advice concerning the criminal charges and possible civil claims. Lewis' records show that he quickly undertook an investigation of both the relevant facts and the applicable law from August 28, 1996, to late October 1996, when he and Craig decided to have Sutherlin and his colleagues enter the case.

The City estimates [*45] that Lewis billed roughly 234 hours to the case after this case was actually filed on November 4, 1996, and that 157 of those hours are for nothing but reviewing documents. Def. Mem. at 14. The vast majority of the remaining time is billed to strategy conferences with Sutherlin and telephone calls with Craig's mother.

The time records make it clear that Sutherlin and Kazmierczak were pulling the laboring oars in the case after they entered the case. Lewis essentially stepped into the background and acted as a liaison between Sutherlin and Craig and his family.

Using the City's uncontested estimate of 234 hours after November 4, 1996, and applying the rate of $ 200 per hour, that amounts to a claim for about $ 46,800 for Lewis' liaison activities. That simply is not a reasonable expenditure of time, and it is not fair to charge defendants for it. Lewis points out that defendants employed several law firms and devoted what seemed, at least to plaintiff and his counsel, to be unlimited resources to the defense of this case. The time and manpower spent by the defendants are relevant to the overall fee determination here. They do not show, however, that Lewis made a contribution [*46] to the case sufficient to support such a large award of fees for his time. One looks in vain through Lewis' time records for any indication that he took a deposition, argued a motion, or researched or drafted a brief, or even a letter. He rarely had any direct contact with opposing counsel.

The court appreciates that Lewis continued to contribute to the case in his communications between plaintiff Craig and his family and lead attorney Sutherlin. Frankly, the court might be more sympathetic to arguments about the need for Lewis' efforts if his billing records submitted with the fee petition were not so wildly inaccurate, duplicative, and inflated. The court has already mentioned some examples, such as the complete duplication of several months worth of time, and the extraordinary amount of time billed for reviewing appearances, motions to withdraw appearances, motions for