IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORPORAL B. KURT PRICE; | : | |
| CORPORAL WAYNE WARREN; and | : | |
| SERGEANT CHRISTOPHER D. FORAKER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A.No.04-956-GMS |
| | : | |
| COLONEL L. AARON CHAFFINCH, individually | : | |
| and in his official capacity as Superintendent of the | : | |
| Delaware State Police; LIEUTENANT COLONEL | : | |
| THOMAS F. MACLEISH, individually and in his | : | |
| official capacity as Deputy Superintendent of the | : | |
| Delaware State Police; DAVID B. MITCHELL, in | : | |
| his official capacity as the Secretary of the | : | |
| Department of Safety and Homeland Security of the | : | |
| State of Delaware; and DIVISION OF STATE | : | |
| POLICE, DEPARTMENT OF SAFETY AND | : | |
| HOMELAND SECURITY, STATE OF | : | |
| DELAWARE, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR
JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE, TO AMEND THE
JUDGMENT OR FOR A NEW TRIAL**

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**MARTIN D. HAVERLY, ATTORNEY AT
LAW**
**MARTIN D. HAVERLY, ESQ. (#3295)**
Two East Seventh Street, Suite 201
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Attorneys for Plaintiffs

Dated: July 7, 2006

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING ................................................................ 1

SUMMARY OF THE ARGUMENT ............................................................................... 1

STATEMENT OF FACTS ........................................................................................ 2

    A.    Plaintiffs' Job Duties as Firearms Instructors ................................ 2

    B.    Plaintiffs Speak Out and Petition Up the Chain of Command ........................ 2

        1.    Why Plaintiffs Spoke and Petitioned Up the Chain of Command ..................... 3

    C.    Plaintiffs Speak Out to and Petition the State Auditor ......................... 3

        1.    First Meeting ................................................................ 4

            a.    Plaintiffs Gave the Auditor Written Statements ................................ 4

                (1).    Cpl/3 Warren's Written Statement ............................................ 4

                (2).    Cpl/3 Price's Written Statement ............................................. 4

                (3).    Sgt. Foraker's Written Statement ............................................ 5

            b.    Plaintiffs Gave the Auditor Oral Statements and Answered Questions .............. 5

            c.    Plaintiffs Gave the Auditor a Concise Packet of Key Documents ......... 5

            d.    Plaintiffs Gave the Auditor Eleven Voluminous Binders of Information ............ 6

            e.    Why Plaintiffs Spoke to the Auditor ......................................... 6

    D.    The Defamatory Statements ......................................................... 6

    E.    Firearms Industry Expert Bud Fini ................................................. 7

        1.    Qualifications ............................................................... 7

        2.    Methodology ................................................................. 9

ARGUMENT ................................................................................... 10

    I.    STANDARD OF REVIEW .......................................................... 10

        A.    Judgment as a Matter of Law ................................................ 10

*i*

      B.     New Trial ............................................................................................... 11

      C.     Alter or Amend the Judgment ............................................................. 12

II.     GARCETTI DOES NOT AFFECT PLAINTIFFS' FIRST AMENDMENT FREE
      SPEECH CLAIMS ..................................................................................... 12

      A.     Introduction .......................................................................................... 12

      B.     The State of Third Circuit Law Prior to Garcetti ............................. 13

      C.     The Facts of Garcetti .......................................................................... 13

      D.     The Garcetti Court Explicitly Warned Against the Overbroad or Expansive
            Interpretation of the Scope of an Employee's Job Duties As the Defense Now
            Urges ..................................................................................................... 15

      E.     The Garcetti Court Also Explained That It Was Not Overruling Longstanding
            Prior Supreme Court Precedent ......................................................... 16

           1.     Speech Made Internally is Still Protected ............................. 16

           2.     Speech About the Workplace or One's Job is Still Protected .............. 18

      F.     Garcetti Does Not Impact Upon Plaintiffs' Free Speech Case .......................... 20

           1.     Speech Up the Chain of Command ....................................... 21

           2.     Speech to the State Auditor ................................................... 21

III.    GARCETTI ALSO DOES NOT AFFECT PLAINTIFFS' FIRST AMENDMENT
      PETITION CLAUSE CLAIMS ....................................................................... 25

      A.     Plaintiffs Engaged in Protected Petitioning Activity ......................... 25

      B.     Garcetti Has No Impact Upon Third Circuit Petition Clause Jurisprudence ..... 25

           1.     Garcetti Was a Free Speech Case ....................................... 25

           2.     The Portion of the Free Speech Analysis Affected by Garcetti Has
                No Analogue in Third Circuit Petition Clause Jurisprudence .............. 25

IV.    THERE IS ABUNDANT RECORD EVIDENCE THAT CHAFFINCH DEFAMED
      SGT. FORAKER ....................................................................................... 27

      A.     Standard of Review .............................................................................. 27

      B.     The Basics ............................................................................................. 27

C.     The First Flawed Defense Claim ....................................................... 28

    1.     Chaffinch Blamed Sgt. Foraker For The Disastrous Conditions at the Range ............................................................................. 28

    2.     But Chaffinch Also Testified That These Statements Were False ....... 28

D.     The Second Flawed Defense Claim .................................................... 29

E.     The Third Flawed Defense Claim ...................................................... 30

V.     THERE IS ABUNDANT RECORD EVIDENCE TO SUPPORT SGT. FORAKER'S DAMAGES AWARD BESIDES EXPERT FINI'S TESTIMONY .............................. 30

A.     Standard of Review ......................................................................... 30

B.     The Basis for the Economic Damages ............................................... 31

C.     Fini Is a Proper Expert ................................................................... 32

    1.     Qualifications .................................................................... 32

    2.     Reliability ......................................................................... 33

VII.     THE COURT PROPERLY REFUSED TO GIVE A JURY INSTRUCTION ADDRESSING DECISIONMAKER CHAFFINCH'S FIRST AMENDMENT RIGHTS ..................................................................................................... 35

VIII.     THE PUNITIVE DAMAGES AWARD IS FULLY JUSTIFIED BY THE FACTS AND THE LAW ..................................................................................... 35

A.     Standard of Review ......................................................................... 35

B.     Discussion .................................................................................... 36

    1.     Degree of Reprehensibility .................................................... 36

    2.     Ratio to Compensatory Damages ........................................... 38

IX.     THE COURT PROPERLY CONSOLIDATED THE CASES ...................................... 39

CONCLUSION ....................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

Allah v. Al-Hafeez, 226 F.3d 247 (3d Cir. 2000) ................................................................. 36

Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997) ............................................................. 27

Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997)(en banc) ........................................ 13,17,19

Baldassare v. State of N.J., 250 F.3d 188 (3d Cir. 2001) .................................................... 13,17

Bedford v. SEPTA, 867 F.Supp. 288 (E.D.Pa. 1994) ............................................................ 13

BMW of North America v. Gore, 517 U.S. 559 (1996) ........................................................... 36-38

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003) ............................................................. 20,26

Chuy v. Phila. Eagles Football Club, 595 F.2d 1265 (3d Cir.1979)(en banc ) ................................ 30

City of San Diego v. Roe, 543 U.S. 77 (2004)(per curiam) .................................................... 19

Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424 (2001) ..................................... 37-38

Connick v. Myers, 461 U.S. 138 (1983) ...................................................................... 17,19,26

Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) ................................................. 33

Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387 (M.D.Pa. 2003) ........................................... 13

Doe v. Cahill, 884 A.2d 451 (Del. 2005) .................................................................... 27,30

Eclock v. Kmart Corporation, 233 F.3d 734 (3d Cir. 2000) ................................................... 32-33,35

EEOC v. Univ. of Pa., 850 F.2d 969 (3d Cir. 1988) .......................................................... 25

Ely v. Reading Co., 424 F.2d 758 (3d Cir. 1970) ............................................................ 24

Evans v. Port Auth. of N.Y. and N.J., 273 F.3d 346 (3d Cir. 2001) ........................................... 30,35-36

Feldman v. Phila. Hous. Auth., 43 F.3d 823 (3d Cir. 1994) .................................................. 13

Garcetti v. Ceballos, –U.S.–, 126 S.Ct. 1951 (2006) ....................................................... *passim*

Garrison v. Louisiana, 379 U.S. 64 (1964) ................................................................. 28-29

General Electric v. Joiner, 522 U.S. 136 (1997) ............................................................ 32

Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410 (1979) ............................................. 17,19

Goodman v. Pa. Turnpike Comm'n, 293 F.3d 655 (3d Cir. 2002) ............................................................ 11

Gutierrez v. Gonzalez, 125 Fed.Appx. 406 (3d Cir. 2005) ...................................................................... 12

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005) ..................................................................... 12,26-27

Howard v. Bd. of Educ. of City of East Orange, 90 Fed.Appx. 571 (3d Cir. 2003) ................................. 13

Johnson v. Campbell, 332 F.3d 199 (3d Cir. 2003) ................................................................................ 11

Kernezy v. Peters, 79 F.3d 33 (7th Cir. 1996) ....................................................................................... 39

Kodrea v. City of Kokomo, Ind., 2006 WL 1750071 (S.D.Ind. June 22, 2006) ....................................... 15

Kumho Tire Company v. Carmichael, 526 U.S. 137 (1999) ............................................................... 32-34

Loughman v. Consol-Pennsylvania Coal Co., 6 F.3d 88, (3d Cir.1993) .................................................. 31

Mathie v. Fries, 121 F.3d 808 (2d Cir. 1997) ......................................................................................... 39

McNaboe v. NVF Co., 2000 WL 354366 (D.Del. March 20, 2000) ......................................................... 12

Mitchell v. Street, 2005 WL 1993774 (E.D.Pa. Aug. 16, 2005) ............................................................. 13

Monsanto v. Quinn, 674 F.2d 990 (3d Cir. 1982) ................................................................................... 17

Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977) ................................................ 19

New York Times v. Sullivan, 376 U.S. 254 (1964) ............................................................................. 28-29

North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194 (3d Cir. 1995) ...................................... 12

Pacific Ins. Co. v. American National Fire Ins. Co., 148 F.3d 396 (4th Cir. 1998) ................................. 24

Pickering v. Bd. of Educ., 391 U.S. 563 (1968) .............................................................................. 18-19,26

Price v. Chaffinch, 2006 WL 1313178 (D.Del. May 12, 2006) .................................................. 12-13,27,30

Rankin v. McPherson, 483 U.S. 378 (1987) ....................................................................................... 13,17

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000) ............................................. 11,27,29

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) ............................................................................. 19

Roebuck v. Drexel Univ., 852 F.2d 715 (3d Cir. 1988) .......................................................................... 12

Ruscavage v. Zuratt, 831 F.Supp. 417 (E.D.Pa.1993) ........................................................................... 12

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994) .................................................................... 13,26

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996)(en banc) ............... 10-12,29

Spence v. Funk, 396 A.2d 967 (Del. 1978) ............................................................. 30

Springer v. Henry, 2002 WL 389136 (D.Del. March 11, 2002) ........................................ 13,26

Springer v. Henry, 2004 WL 2127172 (D.Del. Sept. 16, 2004) ........................................ 40

St. Amant v. Thompson, 390 U.S. 727 (1968) .......................................................... 28-29

State Farm Mut. Ins. Co. v. Campbell, 538 U.S. 408 (2003) ........................................... 36-38

Suarez Corp. v. McGraw, 202 F.3d 676 (4th Cir. 2000) ................................................ 35

Tormenia v. First Investors Realty Co., Inc., 251 F.3d 128 (3d Cir. 2000) .............................. 35

U.S. v. Downing, 753 F.2d 1224 (3d Cir. 1985) ....................................................... 33

U.S. v. Giampa, 758 F.2d 928 (3d Cir. 1985) ......................................................... 11

U.S. v. Rockwell, 781 F.2d 985 (3d Cir. 1986) ....................................................... 11

Waldorf v. Shuta, 142 F.3d 601 (3d Cir. 1998) ....................................................... 32-33

Walters v. Mintec/International, 758 F.2d 73 (3d Cir. 1985) ........................................... 35-36

We, Inc., v. City of Phila., 174 F.3d 322 (3d Cir. 1999) .............................................. 26

Willow Inn, Inc. v. Public Service Mutual Ins. Co., 399 F.3d 224 (3d Cir. 2005) ........................ 36-37

X-Men Sec., Inc. v. Pataki, 196 F.3d 56 (2d Cir. 1999) ............................................... 35

## Constitutions, Statutes and Rules

U.S. Const., Amend. I ........................................................................ *passim*

10 Del.C. § 4002 ............................................................................ 38

Fed.R.Civ.P. 42 ............................................................................. 39

Fed.R.Civ.P. 50 ............................................................................. 10-11

Fed.R.Civ.P. 50(a) .......................................................................... 11

Fed.R.Civ.P. 59(e) .......................................................................... 12

Fed.R.Evid. 702 ............................................................................. 32-33,35

Fed.R.Evid. 801(d)(1) ......................................................................................................... 28

Fed.R.Evid. 801(d)(2) ......................................................................................................... 28

## NATURE AND STAGE OF THE PROCEEDING

Following a 12 day trial and approximately six hours of deliberations, on May 31, 2006, a seven person jury found that defendant Chaffinch and his successor defendant MacLeish acted "recklessly, maliciously, or intentionally" in retaliating against plaintiffs for exercising their protected First Amendment rights. The jury also found that Chaffinch defamed Foraker in stating to the media that Foraker was to blame for problems at the firing range, where problems stemming from poor design and construction surfaced almost immediately upon its opening in 1998 and continued through the present. The jury awarded compensatory damages of $862,395 to Price, $543,276 to Warren and $74,676 to Foraker. Each of those amounts includes $2,200 for emotional distress, injury to reputation and humiliation. Chaffinch was ordered to pay punitive damages of $15,682 to Foraker, $113,625 to Warren and $181,103 to Price - each of which is a 21% ratio of punitive to compensatory damages. MacLeish was ordered to pay punitive damages of $6,720 to Foraker, $48,697 to Warren and $77,615 to Price - each of which is a 9% ratio.

This is plaintiffs' Answering Brief and Appendix in opposition to defendants' motion for judgment as a matter of law or in the alternative, to amend the judgment or for a new trial.[1]

## SUMMARY OF THE ARGUMENT

1. The carefully crafted and narrow Garcetti decision does not work any substantial change in public employee jurisprudence on the facts of the present case. It has no effect on the free speech or petition clause issues herein. 2. The jury acted rationally in awarding compensatory damages, as easily can be determined. 3. The Court's rulings on the admission of expert testimony were correct. 4. Under the Supreme Court's carefully crafted substantive due process test for evaluating punitive damages awards, the verdict should be upheld. 5. Under

---

[1] Pursuant to the Court's direction in its June 13th e-mail, the appendix does not contain the trial transcript because the transcript has already been filed with the Court. References to the trial transcript will be designated with the name of the witness testifying, followed by the page number of the transcript. E.g. (Foraker 1381).

1

Delaware law the defamation rulings are correct.  6.  All other rulings of the Court were correct.

<u>STATEMENT OF FACTS</u>

**A.  Plaintiffs' Job Duties as Firearms Instructors.**  Plaintiffs each testified extensively about their job duties as firearms instructors at the FTU.  Firearms training is a very dangerous and stressful job.  (W. Warren 241, Foraker 1442).  As firearms instructors, plaintiffs were responsible for: teaching firearms use to recruits and other law enforcement officers; teaching firearms care; breaking down and servicing weapons; teaching law enforcement and survival tactics, including specialized tactical training such as interactive and low light training; teaching how to survive deadly encounters; all the while also being responsible for the bi-annual firearms recertification training required for all 650 State Troopers.  (W. Warren 105-07, 194, 212; Price 704-07, 937-38; Foraker 1383, 1389-91).  In addition to the thousands of law enforcement officers who train at the FTU, plaintiffs also train various citizens groups which use the facility, including the Boy and the Girl Scouts.  (W. Warren 108; <u>Price</u> Inter. at Exhibit 2; B131-50).[2]

**B.  Plaintiffs Speak Out and Petition Up the Chain of Command.**  On December 1, 2003, when Sgt. Foraker reassumed command as NCOIC of the FTU, he observed and learned from Cpls/3 Price and Warren about the many health and safety problems at the FTU.  Each of the three plaintiffs (as well as Sgt. Foraker both individually and on behalf of Cpls/3 Price and Warren), then immediately began to speak out and petition, both orally and in writing, up the chain of command about the many problems plaguing the FTU.  These problems included the following: (1)  sickening and poisoning of police officers and others through exposure to lead, copper, zinc, arsenic, nitroglycerine and other heavy metals; (2) dangerously low staffing levels;

---

[2]  To the extent defendants may claim that plaintiffs' job responsibilities included shutting down the multi-million dollar FTU for environmental reasons, plaintiffs explained that they only had the limited authority to shut the range down for safety violations on the firing line, such as accidental discharges or Troopers passing out or fainting while holding firearms.  (W. Warren 282; Price 1033). Shutting down for any other reason was a decision that would have to be made by someone of a rank much higher than our corporal and sergeant plaintiffs.  (Foraker 1421; W. Warren 281; Price 964).

(3) a malfunctioning HVAC system that would blow airborne hazards towards shooters rather than away from them; (4) a malfunctioning bullet trap and conveyor system; (5) a hazardous armorers room; (6) defective headsets; (7) the need for professional hazmat crews; and (8) the lack of protective training or equipment.[3]  As Cpl/3 Price explained in paraphrasing a line from the film "Forrest Gump," with all of its problems the range "was like a box of chocolates.  You never knew what you were going to walk into."  (Price 1026-27).

### 1.  Why Plaintiffs Spoke and Petitioned Up the Chain of Command.

Plaintiffs spoke out and "sounded the alarm" (Foraker 1405) because of the health and safety problems at  the FTU.  (W. Warren 255, 220-22).  "It was obviously dangerous ... [and] it was a Hazmat site."  (Foraker 1485).  Plaintiffs spoke out because they were concerned, not only for their own health and that of their families, but also for the health and safety of everyone who had to work, train or operate in the FTU, such as recruits, law enforcement officers and even the civilian citizens.  (W. Warren 221-22).  They were "trying to protect" those who worked and trained there.  (Foraker 1484-85).

### C.  Plaintiffs Speak Out to and Petition the State Auditor.  Happy that there was finally a government body looking into their concerns about the broken FTU and hopeful that the State Auditor would be able to help them fix the broken building, plaintiffs soon arranged a time for a meeting and interview with the Auditors.  As Sgt. Foraker testified, "[w]e were hopeful that the state auditor would help us fix our range."  (Foraker 1430).

As discussed below and revealed in detail at trial, plaintiffs spoke to and petitioned the Auditor about the health and safety hazards plaguing the broken FTU and also about the root causes of the problems there - from government incompetence and corruption in the bidding and construction process, to the subsequent coverup that had succeeded for approximately seven

---

[3]  (W. Warren 198-222, 231-32, 235-36, 240-47, 252-58, 260-65, 502, 150-60; Price 940, 942, 944-47, 955-62, 988; Foraker 1394-97, 1403, 1405, 1407-22; Davis 1569-73, 1581; G. Warren 1202-06, 1212-15, 1224-25; Baylor 558-59; PX 40-44; B236-43).

years in ensuring that none of this information would ever see the light of day.

      **1.  First Meeting.**  On May 12, 2004, plaintiffs met with several investigators from the State Auditor's Office.  (Price Compl. & Ans. ¶ 39 - D.I. 45 & 51; Foraker 1429;  W. Warren 298, 306, 464; Price 970, 1030-31; Rothenberger 2418; PX21; B209).  At this meeting, plaintiffs did the following.

      **a.  Plaintiffs Gave the Auditor Written Statements.**  Plaintiffs gave the Auditor lengthy and detailed written statements that are in the record.  (PX22-24; B210-28). As review of these statements makes clear, plaintiffs addressed the many, many health and safety problems plaguing the FTU and as well as the governmental improprieties and wrongdoing that led to the construction of such a broken and hazardous building.[4]

      **(1).  Cpl/3 Warren's Written Statement.**  Cpl/3 Warren prepared a written statement and detailed chronology, and also continued and prepared a list of concerns about the facility. (PX23; B216-25).  He systematically discussed and questioned the contracting, building and design process that resulted in the broken FTU.  (Id. at B221).  He also prepared a detailed time line, addressing the health, safety and maintenance issues that plagued the facility.  (Id. at 218-20).  After addressing these matters, he closed his statement and explained -

> In summary I want to say that I am very disappointed in the lack of concern for the health and safety of everyone who trains in this facility[,] by the State Police and Facilities Management.  It is apparent that politics and egos were more important than constructing a safe state of the art facility.  I feel that from the initial stages of the project[,] people in administrative positions made uninformed decisions.  After the construction started[,] cost cuts continued at the expense of health and safety.  Facilities Management failed to oversee the entire project.  The State Police should have never accepted the building until it was tested and inspected by an independent evaluator to insure that the building was safe to use.

(Id. at B221).

      **(2).  Cpl/3 Price's Written Statement.**  Cpl/3 Price was the

---

[4]  (W. Warren 300-06; Price 970; Foraker 1429-30; PX22-24; B210-18).

most senior member of the FTU staff and he also prepared a written statement. (PX24; B226-28). In compelling terms, he described to the Auditor problems with the construction and building process at the FTU. (Id. at B226-27). He also described many of the health and safety problems that the range had faced since it opened in 1998. (Id. at B227). He explained how he believed his exposure to hazardous conditions at work was poisoning his family at home. (Id. at B228). He expressed his dismay that the Division had failed to protect him from an unsafe and hazardous working environment. (Id.).

> **(3). Sgt. Foraker's Written Statement.** In his statement, Sgt. Foraker explained in detail the sequence of events related to the health and safety issues that he faced. (PX 22; B210-15). In his words, there was a "contamination crisis" at the facility. (Id. at B215). He described how he and his men were not being given proper protective equipment and how their health was being endangered by the hazardous conditions. (Id. at B214).

> I have become incensed with the lack of leadership of the Department of Safety and Homeland Security, and the Department of Facilities Management, particularly with <u>individuals who prefer to put their personal agendas above the health, safety and betterment of Division personnel and the state taxpayers</u>.

(Id. at B210) (emphasis added). He explained that "[m]y plea is not solely for myself. It is for every Delaware State Trooper as well as all other law enforcement officers that have participated and will participate in the shooting activities at the range." (Id. at B215). As Sgt. Foraker testified at trial, he and his men hoped the Auditor would help them fix this broken facility. (Foraker 1430).

> **b. Plaintiffs Gave the Auditor Oral Statements and Answered Questions.** Plaintiffs also spoke to and gave the Auditor lengthy oral statements, answered many questions and explained the FTU's many problems as described above, including hazardous working conditions. (W. Warren 299-305, 503; Foraker 1430; Rothenberger 2421-23).

> **c. Plaintiffs Gave the Auditor a Concise Packet of Key Documents.** Plaintiffs then gave the investigators a concise packet of documents, addressing many key facets

of the long history of problems that had plagued the facility, including instances of dramatic

government incompetence and wrongdoing.[5]   For example, one document explained that even

before construction began, in 1996 the DSP knew that the HVAC system "will not work" and

"will inevitably fail" as designed.  (See Bryson 2185-86; PX165; B262-64).

### d.  Plaintiffs Gave the Auditor Eleven Voluminous Binders of

**Information.**  They also delivered eleven large volumes and binders of documentation,

addressing: the long history of problems at the FTU, beginning in the early 1990s; irregularities

in the bidding process; numerous reports regarding the state and condition of the contaminated

facility over a seven year period; correspondence from Facilities Management; innumerable e-

mails and other reports related to the broken facility.[6]

### e.  Why Plaintiffs Spoke to the Auditor.  In Sgt. Foraker's words,

"[w]e were hopeful that the state auditor would help us fix our range."  (Foraker 1430).  Price

added -

> [I]n my heart, I knew it was the right thing to do.  We wanted them to come in, and we
> wanted, especially with these auditor investigators, we wanted to show them what was
> wrong with the range.  All we were asking for is that the state fix the problem so that we
> can work in a safe, healthy environment.  That's all we were asking for.

(Price 971).  Plaintiffs wanted to protect the health and safety of all who worked at the range.

> My plea is not solely for myself.  It is for every Delaware State Trooper as well as all
> other law enforcement officers that have participated and will participate in shooting
> activities at the range.

(PX22; B215).  Plaintiffs also were concerned because they were falsely "[b]eing blamed for the

downfall of the operation" at the FTU and they wanted to defend themselves.  (W. Warren 307;

PX22; B215).

### D.  The Defamatory Statements.  Review of the earlier April 7, 2004 Delaware State

---

[5]  (W. Warren 306; Price 970; Foraker 1430).

[6]  (Foraker 1430, 1541-43; W. Warren 306, 502-03;  Price 970; Rothenberger 2423, 2431-32).

News article (PX25; B229-232)[7] and the American Police Beat Magazine story (PX26; B233-35)

reveal the following defamatory statements made by Chaffinch:

1.   When discussing the FTU with reporters, he acknowledged there were problems but
     indicated the blame lies with one or two troopers under his command, meaning Sgt.
     Foraker  (emphasis added).

2.   "The previous sergeant in charge did a good job," implying that Sgt. Foraker did not do a
     good job.

3.   "Things changed in December when another sergeant [Foraker] came in.  That's at least
     a portion of where the ball was dropped,"  (brackets and emphasis added), indicating that
     Sgt. Foraker did not do a good job.

4.   "I think people who live in glass houses shouldn't throw stones.  It's a lot dirtier now.
     Things seemed in their proper place in the fall.  I've never seen it like this," implying
     that there were no problems under Sgt. Ashley and all of the problems must be
     attributable to Sgt. Foraker.

5.   "When I was here in the fall, everything was going as well as the previous times I'd been
     here," suggesting that there were no problems under Sgt. Ashley and all of the problems
     must be attributable to Sgt. Foraker.

6.   He also claimed that when he was there in the fall, "There was some discoloration of the
     bullet trap but that was about it,"  implying that Sgt. Ashley did his job and Sgt. Foraker
     did not.

7.   "We will work collectively with Administrative Services to make corrections and
     establish a standard operating procedure protocol . . .  If the people that are assigned here
     now don't feel that protocol is part of their protocol, they will be assigned elsewhere,"
     falsely implying that Sgt. Foraker is unwilling to follow protocols. (emphasis added).

8.   He continued to praise Sgt. Ashley while implying that Sgt. Foraker was not doing his
     job by stating, " . . . the bullet trap required hands-on, daily cleaning . . . Sgt. Ashley was
     willing to do that.  I cannot say that Sgt. Foraker was willing to do that.  He was
     interested in instruction and teaching people how to shoot.  He did not feel (bullet trap
     cleaning) was part of his purview.  He felt that was putting him in harm's way."

(PX25-26; B229-35).

    **E.  Firearms Industry Expert Bud Fini.**

        **1.  Qualifications.**  A review of Bud Fini's trial testimony (Fini 851-913) and

Curriculum Vitae, (PX90; B245-49), reveals that he is more than qualified to testify about the

---

    [7]  PX25 has been copied and altered from its original form at trial to accommodate the appendix
format.  There are no alternations to the substance of the article.

hiring practices and employee compensation packages within the tight knit firearms company community.

He has worked in the firearms industry for almost 30 years, and for 27 years he worked in management. (Fini 863). He began in 1976 as a salesman for Remington Arms. Placed on the fast track, within three years he was promoted to management. In addition to being made Assistant Manager of National Accounts, he was placed on the Interview Committee. (Fini 864-865). All of the potential sales candidates for field positions and other positions within the company would come to headquarters to be interviewed. As a member of the committee, he interviewed those people, reviewed their resumes and reported to management his thoughts on their qualifications for the position they were seeking. (Fini 865, 878).

He became Regional Manager in 1981, Worldwide Manager of Firearms in 1984, and Director of Marketing Communications in 1991. (PX90; Fini 865-866; B246-47). He left Remington in 1996 and subsequently worked as a consultant for Savage, SigArms and Rizzini USA, among others. At all of these firearms companies, he was involved in hiring. (Fini 866-67).

As this Court noted during the pretrial conference, Fini has worked for nearly every major company within the firearms industry. (Pretrial Conf. 30-31; PX90; B245-48). As a manager for 27 years within the firearms industry, he was responsible for hiring and approving transfers of employees. (Fini 868, 878-81, 899-900) . Many times he prepared the actual job descriptions themselves. (Fini 878). He has reviewed over 500 resumes for firearms industry positions (Fini 878-879), conducted at least 80 one-on-one interviews (Fini 868, 881) and conducted informal background checks. (Fini 879). Altogether, he was involved in personally hiring approximately 30 employees and directly involved in transferring approximately 50-60 people. (Fini 879). Altogether, he hired approximately 17 employees for the positions in the law enforcement section of the industry for which he believes plaintiff Foraker would be qualified. (Fini 899-900).

Compared to other industries in the United States, the firearms industry is a very small, tight knit community. (Fini 877, 887). Apparently, very little is published as to compensation packages and hiring practices within this community. Indeed, the sales force survey relied upon by defendants' economist did not include a break down for salespeople in the firearms industry. (Sullivan 2311).[8]

     **2. Methodology.** Fini explained the hiring process in the tight knit firearms industry: prepare a job description, advertise the job and/or managers identify someone they know in the industry who should be considered for the job, review initial resumes, first round of interviews, follow-up calls made to substantiate information garnered at the first interview, a second round of interviews with the best candidates, and then extend a job offer. (Fini 868-869, 877, 887).[9]

     The bad publicity at the FTU would certainly be brought to light during this process and the fact that Foraker had an issue in his background would severely damage his chances of obtaining employment in the firearms industry. (Fini 861-862, 882, 884, 892-894). In a similar situation, a prior sexual harassment complaint in the background of a potential candidate came to light and caused the candidate to lose the job. (Fini 861-862). Defendants' argument that Fini could not identify anyone else in Foraker's particular situation is spurious and merely highlights the malicious and reckless nature of defendants' actions against Foraker. Certainly if an

---

    [8] Contrary to defendants unsubstantiated assertions, most Human Relations departments in the firearms industry simply handle the mechanical aspects of the hiring process (i.e. insuring that the candidate's resume was accurate and drug testing). (Fini 880). Management's role was to insure that the individual had the skills and expertise necessary to handle the job and to make sure that the candidate was a good fit for the company. (Fini 880-881). Because Remington Arms was part of Dupont, its Human Relations department had a broader role which included a consensus effort between the managers and Human Relations. Even so, at Remington it was a consensus effort for which Fini had significant input similar to his input elsewhere. (Fini 880-81).

    [9] Fini keeps himself abreast of what is reasonable compensation within the industry by networking with other managers within this tight knit community. He attends national conventions. It is common to pick up the phone and ask other managers within this small community. (Fini 877, 887).

employee is defamed in the press for "dropping the ball" within the context of his <u>firearms</u>

training unit job, then there would be a negative affect upon managers such as Fini when the

person defamed applies to work in the firearms industry. Fini further noted that the issue would

not go away after a few years, given the tight knit community which is the firearms industry and

the fact that the internet will always allow access to the negative news articles about Foraker.

(Fini 912-913).

Fini explained that especially for employees in the law enforcement section of the

firearms industry, the area for which Foraker is most qualified, managers look for clean cut

individuals who have a background like plaintiff Foraker in law enforcement, especially as an

armorer, who had excellent communication skills. (Fini 881-882, 892-895). Foraker would

understand the products and how to use them, and he could talk the same language as the

armorers who typically purchase firearms on behalf of law enforcement agencies, and he had an

excellent resume. (Fini 894-895).

In the year 2002, in connection with Foraker's first lawsuit, Fini reviewed Foraker's

resume and met with him. At that time, he determined that he would still make a fine candidate

in the law enforcement section of the firearms community. (Fini 892-895). Later, after the

negative media publicity which gave rise to the present case, Fini opined that Foraker now was

severely damaged and could not get a job in the industry. (Fini 884).

<u>**ARGUMENT**</u>

**I.     STANDARD OF REVIEW**

   **A. Judgment as a Matter of Law.** In the en banc <u>Sheridan</u> decision, our Circuit clearly

stated that under Rule 50 "we must look at the evidence in the light most favorable to ... the

verdict winner, and draw all reasonable inferences in [his] favor." <u>Sheridan v. E.I. DuPont de</u>

<u>Nemours and Co.</u>, 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc). "Under Rule 50, a court [only]

should render judgment as a matter of law when 'a party has been fully heard on an issue and

-10-

there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 149 (2000) (quoting Fed.R.Civ.P. 50(a)). Rule 50 motions "should be granted sparingly," and only "where the record is critically deficient of the minimum quantum of evidence in support of the verdict." <u>Johnson v. Campbell</u>, 332 F.3d 199, 204 (3d Cir. 2003) (internal punctuation omitted). Thus, the "[k]ey to surviving a Rule 50 motion is a legally sufficient evidentiary basis for the verdict." <u>Goodman v. Pa. Turnpike Comm'n</u>, 293 F.3d 655, 665 (3d Cir. 2002). There must be "evidence upon which the jury could properly find a verdict." <u>Id.</u>

"[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." <u>Reeves</u>, 530 U.S. at 150. "In doing so ... the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Id.</u> Importantly for our present case, also "it must disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Id.</u> at 151. "[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." <u>Id.</u> (internal punctuation omitted).

Great deference is given to the jury's role because "[o]ne of the oldest established rules of Anglo-American jurisprudence is that the jury is the arbiter of credibility of witnesses." <u>U.S. v. Giampa</u>, 758 F.2d 928, 935 (3d Cir. 1985); <u>see e.g.</u> <u>Sheridan</u>, 100 F.3d at 1072. Likewise, "[i]t is well settled that where there is a conflict or contradiction of evidence, the question should be submitted to the jury." <u>U.S. v. Rockwell</u>, 781 F.2d 985, 990 (3d Cir. 1986). "It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts." <u>Id.</u>

**B. New Trial.** The judicial conscience is shocked and a new trial should be granted

only when a feather or scintilla of evidence in the scales results in a verdict, despite the "great weight" of the evidence against it. <u>Sheridan</u>, 100 F.3d at 1076.[10]  The "great weight" of the evidence test is a "stringent standard" to ensure that the role of the jury as the fact finder is not usurped.  <u>Id.</u>  "[T]his stringent standard is necessary to ensure that a district court does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury.  Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts."  <u>Id.</u> (internal punctuation omitted).

    **C. Alter or Amend the Judgment.**  "Rule 59(e) permits motions to amend or alter a judgment and may be granted to submit new, previously undiscovered evidence or to correct a clear error of law or prevent manifest injustice." <u>Gutierrez v. Gonzalez</u>, 125 Fed.Appx. 406, 417 (3d Cir. 2005).  The moving party "must rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct a clear error of law or prevent manifest injustice." <u>North River Ins. Co. v. CIGNA Reinsurance Co.</u>, 52 F.3d 1194, 1218 (3d Cir. 1995); <u>McNaboe v. NVF Co.</u>, 2000 WL 354366, *20 (D.Del. March 20, 2000).  "Motions under Rule 59(e) should be granted sparingly because of the interests in finality and conservation of scarce judicial resources."  <u>Ruscavage v. Zuratt</u>, 831 F.Supp. 417, 418 (E.D.Pa.1993); <u>see also</u> <u>McNaboe v. NVF Co.</u>, <u>supra</u>.

**II.    <u>GARCETTI</u> DOES NOT AFFECT PLAINTIFFS' FIRST AMENDMENT FREE SPEECH CLAIMS.**

    **A. Introduction.**  The three step free speech retaliation paradigm is well known.  <u>See</u> <u>Price v. Chaffinch</u>, 2006 WL 1313178, *2-3 (D.Del. May 12, 2006); <u>Hill v. City of Scranton</u>, 411 F.3d 118, 125 (3d Cir. 2005).  The only step now challenged by defendants is the first - the

---

    [10]  The motion should be granted "only where a miscarriage of justice would result if the verdict were to stand." <u>Sheridan</u>, 100 F.3d at 1076; <u>see</u> <u>Roebuck v. Drexel Univ.</u>, 852 F.2d 715, 736 (3d Cir. 1988) (new trial only when "the verdict is contrary to the great weight of the evidence, thus making a new trial necessary to prevent a miscarriage of justice").

protected activity test.  Following extensive summary judgment briefing on the subject (D.I. 84, 98, 103), the Court previously ruled against defendants on this step, holding as a matter of law that plaintiffs had engaged in protected First Amendment free speech.  Price,  2006 WL 1313178, *3.[11]  Accordingly, the issue presently before the Court is a narrow one - the impact on this proceeding of Garcetti v. Ceballos, – U.S. –, 126 S.Ct. 1951 (2006).

**B.  The State of Third Circuit Law Prior to Garcetti.**  Prior to Garcetti, in the Third Circuit speech by an employee that was required by his ordinary job duties was protected by the First Amendment.  See Feldman v. Phila. Hous. Auth., 43 F.3d 823, 829-31 (3d Cir. 1994) (internal auditor); Baldassare v. State of N.J., 250 F.3d 188, 196-97 (3d Cir. 2001) (investigator).

**C.  The Facts of Garcetti.**  Garcetti involved the written "work product" of a supervising prosecuting attorney,  Garcetti, 126 S.Ct. at 1960, which was alleged to be protected speech.  In his federal lawsuit this prosecutor agreed that he had "prepared [this] memorandum 'pursuant to his duties as a prosecutor.'"  Id.  The Supreme Court was most careful to note the limited scope of its holding by pointing out factually in the four paragraphs found at p. 1960 that there was no reasoned dispute that this written memo was part of "his daily professional activities." (emphasis added).  Indeed, the Court then went on at p. 1961 and emphasized that its ruling was not intended "to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate."  But on the facts of the case

---

[11]  The Court's conclusion that plaintiffs had engaged in protected speech necessarily included the required lesser included legal findings that plaintiffs had spoken out on matters of public concern - including the hazardous conditions at the FTU - and that plaintiffs' interests as citizens in speaking out about such paramount matters outweighed the government's interests as an employer.  See Azzaro v. County of Allegheny, 110 F.3d 968, 976 (3d Cir. 1997) (en banc); Rankin v. McPherson, 483 U.S. 378, 384-85, 388 (1987); Springer v. Henry, 2002 WL 389136, *3-5 (D.Del. March 11, 2002).  Importantly, even in the absence of the Court's prior ruling, because defendants never conceded that they took the adverse action against plaintiffs because of their speech, under Third Circuit precedent they waived any disruption defense.  See San Filippo v. Bongiovanni, 30 F.3d 424, 434 n.11 (3d Cir. 1994); Howard v. Bd. of Educ. of City of East Orange, 90 Fed.Appx. 571, 575 n.6 (3d Cir. 2003); Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387, 399 (M.D.Pa. 2003); Mitchell v. Street, 2005 WL 1993774, *2 n.5 (E.D.Pa. Aug. 16, 2005); Bedford v. SEPTA, 867 F.Supp. 288, 295 n.8 (E.D.Pa. 1994).

the "controlling factor [] is that his expressions were made pursuant to his duties as a calendar

deputy." Id. at 1959-60.

> That consideration - the fact that Ceballos spoke as a prosecutor fulfilling a
> responsibility to advise his supervisor about how best to proceed with a pending case -
> distinguishes Ceballos' case from those in which the First Amendment provides
> protection against discipline.

Id. at 1960.  In other words, prior precedent was left undisturbed and the holding was a narrow

one, for indeed the first sentence of the Opinion declares the continuing vitality of public

employee free speech jurisprudence.  Id. at 1955 ("It is well settled that "a State cannot condition

public employment on a basis that infringes the employee's constitutionally protected interest in

freedom of expression.").

 As discussed at length at section **A.** of the Facts above, plaintiffs were expert firearms

instructors at the Training Unit.  As they testified extensively at trial, their ordinary job duties

were: to teach recruits how to shoot; to teach bi-annual firearms recertification to every State

Trooper as well as to other law enforcement officers; and to teach tactics and the use of force to

law enforcement officers.  That is what they were employed to do, not to speak out about

hazardous material exposure, be it up the chain of command or to the State Auditor.  Their

claims are in no way comparable to those in Garcetti where the plaintiff did not dispute that his

written memorandum was generated in the ordinary course of his supervisory duties and that it

concerned fundamental daily routine core job responsibilities.  There is no reasoned contention

in our present case that it was the routine job duty of any plaintiff to report governmental

mismanagement, corruption, or health or safety hazards.  They were not environmental or other

ombudsmen.

 As each plaintiff explained, job safety as part of their job duties only extended to

ensuring that recruits and police officers used their firearms in a safe manner that would not kill

or endanger the other officers on the firing line or in the field.  As discussed in section **A.** of the

Facts, if a recruit pointed his firearm at another officer on the firing line, that would be a safety

violation which they were required to remedy because it was within the scope of their job duties. But hazardous working conditions arising from a broken building, a broken HVAC system and exposure to lead, copper, zinc, arsenic, nitroglycerin and other heavy metals obviously was beyond the scope of their duties. They were not environmental engineers or industrial hygienists, but only firearms instructors. Plaintiffs only spoke out about these matters because they are honorable, dedicated and conscientious men who care about the health and safety of others, not because their job duties required it. Indeed, the record reveals that even the Director of Facilities Management testified that air quality, environmental safety and the functioning of the broken HVAC system was his Department's responsibility, and thus not the ordinary or routine job responsibilities of plaintiffs. (Furman 2343, 2348-50).

   **D.  The <u>Garcetti</u> Court Explicitly Warned Against the Overbroad or Expansive Interpretation of the Scope of an Employee's Job Duties As the Defense Now Urges.** The Court cautioned that it would <u>not</u> allow government employers to gut the free speech protections of their employees by way of overly broad job descriptions that bear little or no relation to what the employee ordinarily actually does. The Court explained that it would not elevate form over substance and instead it would look at what an employee <u>actually does</u> before analyzing what speech is required by their ordinary duties and which speech is not.

> We reject ... the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. ... <u>The proper inquiry is a practical one</u>. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

<u>Garcetti</u>, 126 S.Ct. at 1961-62 (emphasis added). Subsequent lower court decisions applying <u>Garcetti</u> also have recognized this limitation and requirement of its holding. See <u>Kodrea v. City of Kokomo, Ind.</u>, 2006 WL 1750071, *7-8 (S.D.Ind. June 22, 2006) (noting <u>Garcetti</u>'s rejection of the suggestion that a public employer can restrict an employee's rights via overly broad job descriptions and finding that the speech at issue was not part of that plaintiff's "ordinary job

responsibilities" or "core function."). Thus, the Supreme Court has explained that a "practical" approach must be taken in determining what speech is actually required by an employee's ordinary job duties and what is not. Garcetti, 126 S.Ct. at 1961. As explained above, a practical approach to plaintiffs' job duties herein reveals that they were required to teach people how to shoot various types of firearms - not report on hazardous environmental conditions at the disastrous FTU, be it up the chain of command or to the State Auditor. Unlike Mr. Ceballos, whose job was to investigate false affidavits, their job was not to investigate environmental hazards or mismanagement. That was the job of Facilities Management. (Furman 2343, 2348-50).

**E. The Garcetti Court Also Explained That It Was Not Overruling Longstanding Prior Supreme Court Precedent.** The Supreme Court also noted that (1) speech made internally in the workplace (rather than externally to the media or others) was still protected, as is (2) speech addressing a public employee's job or workplace. Garcetti, 126 S.Ct. at 1959. All of plaintiffs' speech falls into both of these still protected categories.

**1. Speech Made Internally is Still Protected.** The Garcetti Court explained that it was not overruling the long line of Supreme Court cases holding that internal speech receives First Amendment protection.

> That Ceballos expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work. See, e.g. Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 414 (1979). ... [I]t would not serve the goal of treating public employees like any member of the general public, ... to hold that all speech within the office is automatically exposed to restriction.

Garcetti, 126 S.Ct. at 1959. Thus, the fact that Ceballos' speech was raised internally to his supervisors rather than externally to the media was not dispositive. Similarly, the fact that plaintiffs' speech was raised internally to their supervisors up the chain of command, and also then later to the State Auditor, and not to the media, does not trump plaintiffs' claims.

The Supreme Court's reasoning in this regard is not surprising given its numerous

-16-

previous opinions explaining that internal speech  receives protection.  For example, in the

groundbreaking Givhan case cited by the Garcetti Court, a public school teacher followed her

internal chain of command and went to her principal and spoke out against racially

discriminatory employment practices and policies in the school in which they both worked.

Givhan, 439 U.S. at 412-13.  For the Court, Justice Rehnquist explained that -

> Neither the [First] Amendment itself nor our decisions indicate that this freedom [of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.  We decline to adopt such a view of the First Amendment.

Id. at 415-16.  Much the same, the present Price plaintiffs also raised their protected concerns

about hazardous health practices at the FTU internally up the chain of command in the DSP.[12]

The Third Circuit also has had repeated occasion to address the issue of internal speech

and has followed the well established Supreme Court precedent outlined above.[13]  Thus, it is

---

[12] Similarly, in Connick v. Myers, 461 U.S. 138, 149 (1983), a district attorney circulated an internal questionnaire addressing, inter alia, whether public employees were being pressured to work on political campaigns.  Recognizing the Givhan holding about internal speech, id. at 148 n. 8, the Court found that this area of speech touched on a matter of public concern, even though it was raised internally.  Id  In the same way, in Rankin v. McPherson, 483 U.S. 378 (1987), an employee in a county constable's office was fired for expressing privately to another employee in the workplace her displeasure with President Reagan's policies and her hope that his would be assassin would have better luck next time.  Here, the Supreme Court again recognized the holding in Givhan and found the employee's speech to be protected.  Id. at 386 n.11.

[13] Freedom of speech is not "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."  Monsanto v. Quinn, 674 F.2d 990, 994 (3d Cir. 1982).

> Internal dissemination of information and ideas can be as important to effective self-governance as public speeches.  Thus, if the content and circumstances of an internal communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech, even though it occurred in a private context.

Baldassare, 250 F.3d at 197 (internal punctuation omitted) (overruled on other grounds by Garcetti, supra) (quoting Azzaro, , 110 F.3d at 978).  Similarly, in Azzaro, 110 F.3d 968, the Third Circuit held that a female county employee's internal reports of sexual harassment by a high ranking county official were protected, id. at 981, even though they were raised up her internal chain of command to her supervisor, id. at 971, and eventually to the county human resources department.  Id. at 971-72.

clear that plaintiffs' internal speech remains protected even after Garcetti.

        **2. Speech About the Workplace or One's Job is Still Protected.**  The Garcetti

Court also explained that it was not overruling the long line of Supreme Court precedent holding

that speech about the workplace or the speaker's job also is protected.

> The memo [at issue] concerned the subject matter of Ceballos' employment, but this,
> too, is nondispositive.  The First Amendment protects some expressions related to the
> speaker's job.  See, e.g.[Pickering v. Bd. of Educ., 391 U.S. 563, 573 (1968)]; Givhan,
> [439 U.S.] at 414.  As the Court noted in Pickering: "Teachers are, as a class, the
> members of the community most likely to have informed and definite opinions as to how
> funds allotted to the operation of the schools should be spent.  Accordingly, it is essential
> that they be able to speak out freely on such questions without fear of retaliatory
> dismissal."  391 U.S. at 572.  The same is true of many other categories of public
> employees.

Garcetti, 126 S.Ct. at 1959 (emphasis added).  Thus, the fact that Ceballos' speech also

addressed aspects of his employment was not dispositive.  Similarly, that plaintiffs' speech

addressed the very hazardous conditions in which they were forced to work for many years is not

dispositive of their claims.  No one was in a better position to know what ailed the broken FTU

than plaintiffs - the very firearms instructors who have labored, worked and inhaled the

numerous toxins contaminating that facility for many years.

        As was recognized by the Supreme Court, the key case in this regard is Pickering, which

held that the question of school funding was a matter of legitimate public concern in a

democratic society and that "free and open debate [on such matters] is vital to informed decision-

making...."  Pickering, 391 U.S. at 571-72.  Continuing, as quoted above in Garcetti, the

Pickering Court held that teachers are in the best position to know what ails the schools they

work in and it is "essential that they be able to speak out freely on such questions without fear of

retaliat[ion]."  Id. at 572.  Much like the teacher in Pickering, plaintiffs knew the hazards

plaguing the FTU better than anyone.  It is essential that they be able to speak freely about them

without the fear of retaliation because vital overarching public policy reasons require that fiascos

such as the FTU see the light of day to better inform the public about the operation of its

government.

In <u>City of San Diego v. Roe</u>, 543 U.S. 77, 125 S.Ct. 521 (2004) (per curiam), the

Supreme Court again addressed why it is imperative that public employees be able to speak out

about workplace matters without fear of retaliation.  The Court explained that -

> Underlying the decision in <u>Pickering</u> is the recognition that public employees are often
> the members of the community who are likely to have informed opinions as to the
> operations of their public employers, operations which are of substantial concern to the
> public.  Were they not able to speak on these matters, the community would be deprived
> of informed opinions on important public issues.

<u>City of San Diego</u>, 125 S.Ct. at 525 (citing <u>Pickering</u>, 391 U.S. at 572).

> The [Supreme] Court has recognized the right of employees to speak on matters of public
> concern, typically matters concerning government policies that are of interest to the
> public at large, a subject on which public employees are uniquely qualified to comment.

<u>Id.</u> at 523-54 (citing <u>Pickering</u>, <u>supra</u>; <u>Connick</u>, <u>supra</u>).  As trial in this case revealed, plaintiffs

were uniquely situated to offer informed opinions about the exposure and poisoning of thousands

of law enforcement personnel at their broken facility but the defense would deny them a remedy

for the retaliation they endured.[14]

The Third Circuit also has repeatedly discussed  the issue of speech addressing matters

in the workplace and its holdings have been consistent with this same precedent.  Much like the

Supreme Court's <u>Givhan</u> decision, in <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1202 (3d Cir. 1988),

the Court held that speech by a police department employee addressing race discrimination in the

workplace was protected.  Similarly, in <u>Azzaro</u>, 110 F.3d at 981, the Third Circuit *en banc* held

---

[14] On several other occasions the Supreme Court has found speech to be protected even though it
addressed matters found in the employee's own workplace.  For example, as discussed above, in <u>Givhan</u>,
439 U.S. 410, a public school teacher spoke to the principal about racially discriminatory policies and
practices at the school in which she worked.  <u>Id.</u> at 412-13.  Despite the fact that this speech addressed
matters in the workplace, it was nonetheless held to be protected by the First Amendment.  <u>Id.</u> at 414-16.
Similarly, in <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 282 (1977), a public
school teacher went to a local radio station and informed it of a new teacher dress code that was being
instituted by the principal.  Neither the parties nor the Supreme Court challenged the lower court's
conclusion that such speech was protected, despite the fact that it addressed matters in the workplace,
rather than matters outside of it.  <u>Id.</u> at 283-84.

that speech by a county employee about sexual harassment in the workplace also was protected.

In a case very similar to our own, the Third Circuit has even addressed speech by public employees about health and safety hazards in the workplace. In Brennan v. Norton, 350 F.3d 399, 415 (3d Cir. 2003), the Court addressed speech by a firefighter about asbestos exposure in the fire station where he worked. The plaintiff fireman spoke up the chain of command to the Deputy Chief in his firehouse and later to the department of health about the asbestos exposure. Id. at 408. Despite the fact that this speech addressed unsafe working conditions - the same conditions in which the plaintiff and other firemen worked every day - the Court found it to be protected. Id. at 415. Brennan is dispositive here. Just as the fireman's job in Brennan was to put out fires, so also plaintiff's jobs as firearms instructors were to teach police officers how to use and shoot firearms. And just as the fireman in Brennan exposed hazardous working conditions arising from asbestos at the firehouse in which he worked, so also plaintiffs exposed hazardous working conditions arising from lead, zinc, copper, arsenic and nitroglycerin at the facility where they worked. All this activity is protected speech under Brennan.

**F. Garcetti Does Not Impact Upon Plaintiffs' Free Speech Case.** As the precedent outlined above makes clear, the recent Garcetti decision does not impact upon plaintiffs' free speech case. As discussed, plaintiffs jobs as firearms instructors required that they teach firearms training and tactics to recruits and police officers. That is what they were "employed to do." Garcetti, 126 S.Ct. at 1960. That is what their ordinary "official duties" required. Id.

Unlike the prosecutor in Garcetti who admitted his job routinely required him to review search warrants and affidavits and advocate a position based upon his review - the very speech that caused his transfer; unlike the internal auditor in Feldman whose job it was to expose fraud and corruption within the Philadelphia Housing Authority - the very speech that caused his firing; unlike the investigator in the prosecutor's office in Baldassare whose job it was to investigate wrongdoing in the prosecutor's office - the very speech that caused his termination;

plaintiffs' job routinely required them to teach firearms and tactics to recruits and Troopers - which was <u>not</u> the speech that caused the retaliation against them.

**1. Speech Up the Chain of Command.** Plaintiffs' jobs also did not require them to raise health and safety concerns about working conditions up the chain of command.[15] But despite the fact that their jobs did not require them to speak out in this manner, they did so anyway - and the First Amendment protects them.[16] Accordingly, the Court's earlier ruling at summary judgment should stand and it is unaffected by <u>Garcetti</u>. Plaintiffs engaged in protected speech when they raised their health and safety concerns up the chain of command.

**2. Speech to the State Auditor.** Similarly, plaintiffs routine job duties did not require them to speak to the Auditor as they did by preparing lengthy written statements reporting on health hazards and exposing corruption, giving similar oral statements, preparing a compendium of documents revealing governmental mismanagement, and delivering numerous boxes of documents discovered in their own internal investigation.

The defense contends that all this was done pursuant to job duties because plaintiffs supposedly admitted they were ordered to speak to the Auditor. (DOB at 9, 14-16). But these out of context quotes are too thin a reed to support the erroneous defense contention that <u>Garcetti</u>

---

[15] Plaintiffs could have kept silent and refused to rock the boat like Sgt. Ashley chose to do. Notably, one piece of telling evidence regarding whether plaintiffs' job duties required them to blow the whistle about health hazards was whether Sgt. Ashley did so - which he did not.

[16] That plaintiffs' supervisors praised them in their performance evaluations for speaking out about the hazardous conditions at the FTU does not make their speech part of their official duties. Instead, the very sections of their evaluations cited by the defendants demonstrates that they were being praised for actions which "exceeded [the] expectations" of their job duties. (PX7 at p.9; PX15 at p. 8; PX 20 at p.8; B173,193,205). Similarly, the claim that Sgt. Foraker was in "sole charge" (DOB at 14) of conditions at the range is equally false. Sgt. Foraker's job duties are enumerated in the Facts at section **A.** above. Morever, even in the biased words of one of the defense witnesses with the most to hide, the Director of Facilities Management himself admitted that environmental safety, air quality and the functioning of the malfunctioning HVAC system were his responsibility, not plaintiff's. (Furman 2343, 2348-50). As Cpl/3 Warren explained, the unsafe levels of lead in the air were off the charts - 700 times the OSHA standards (W. Warren 263, 209-11) and very often the contaminated air was blowing in the wrong direction, into the respiratory zone instead of away from it. (W. Warren 205-07).

plainly applies to this case and, since the Auditor speech was pursuant to ordinary routine duties, it should be unprotected.

First, complying with the governor's general order to all state employees to cooperate with an investigation being undertaken by another state agency cannot fairly be viewed as being part of plaintiff's ordinary job duties to teach firearms and tactical training. Allowing the governor's broad order to cooperate to become part of their routine job duties will eviscerate First Amendment protections for numerous public employees in a way contrary to <u>Garcetti</u>'s admonitions as to the limited scope of the ruling.[17]

In an effort to compile a record on this new issue, for which discovery was never taken or trial testimony elicited, plaintiffs reviewed the record and note that Sgt. Foraker contemporaneously described the Governor's alleged general order as an "authorization" given by the Governor to speak to the Auditor. (PX22 at B210). Such an authorization was needed given the multiple gag orders imposed on plaintiffs, both by regular DSP rules and regulation (which forbid discussing internal DSP matters with anyone outside of the Division), as well as the gag orders imposed by Chaffinch and MacLeish. (<u>See, e.g.</u> PX25; B229-232 - forbidding comment).

Second, even if plaintiffs were ordered to speak to the Auditor, it is clear they went above and beyond what they were ordered to do. Their conduct in this regard was extraordinary and unprecedented. They affirmatively gave the Auditor oral and written statements, a concise

---

[17] For example, many public employers have broad rules on the books generally requiring employees to report: waste; mismanagement; misconduct; unsafe working conditions; violations of state or federal law. Although there may be formal rules in this regard, it cannot fairly be said that such general rules become part of an employee's job duties since they have no bearing or relation to what the employees at issue actually do on a routine daily basis. Interpreting such broad rules to be part of an employee's ordinary job duties would undermine the "practical" approach to the issue required by <u>Garcetti</u> and unduly expand the circumscribed definition of job duties given by the Supreme Court to ensure that free speech protections are not eviscerated. Such an overbroad interpretation cannot be countenanced and would run directly afoul of the Court's admonitions that government employers cannot defeat free speech claims by simply giving employees excessively broad job descriptions.

packet of key documents, as well as eleven more binders of documents that they had compiled over many months of investigating.[18]  They blew the whistle on years of mismanagement and relayed their own investigatory conclusions to the Auditor about the current and historic problems at the FTU.  Such speech, above and beyond any general order certainly is protected conduct.

Finally, this entire line of argument is simply sandbagging by the defense, to the great prejudice of the plaintiffs.  It would have the Court find as a constitutional fact that the speech to the Auditor is not protected based upon an incomplete and partial record on an issue which was not fairly tried or presented to the Court in any manner whatsoever.  It would have the Court decide an issue for which no notice was ever given prior to trial or even during discovery, so the proper record was never discovered or introduced.  As was discussed above, the issue of protected speech activity (of which this determination is a lesser included part) was decided by the Court at summary judgment, so again, no evidence was introduced on this issue at trial because it had been removed from the case.  But now the defense would use this fact as a weapon against plaintiffs.  This violates fundamental rules of fairness and Due Process.

The pending Garcetti case was well known to any practitioner once certiorari was granted.  Nevertheless, the defense raised no Garcetti issues during discovery, or in the pretrial Order.  One can examine the defense's trial brief or even search the issues of fact and law presented in the defense sections of the governing pretrial order and one will find no issues claiming that statements to the Auditor were made pursuant to any ordinary job duty.

Since the present argument was not a defense to the case for which fair notice was given and it had been removed from the case at summary judgment, there was no need at trial to prove that the Auditor statements were given while wearing a citizen's hat and not that of an employee.

_____

[18]  Given that the State's own records on the FTU had been destroyed mysteriously in a fire, plaintiffs efforts in this regard were all the more important. (Rothenberger 2432).

But if notice had been given, plaintiffs would have proven that it was their attorneys, who also spoke out to the press on their behalf after the first Auditor meeting, who arranged the actual meeting with the Auditor on their clients' behalf so their clients could blow the whistle on DSP wrongdoing. After all, it was defendant Chaffinch who earlier had attacked plaintiffs in his Delaware State News front page story and gagged them from replying. (PX25; B229-32). The subsequent speech to the Auditor was the means of: responding to that gag order; responding to the defamatory attack on plaintiffs; and of informing the public of governmental mismanagement and corruption through the Auditor and the media. But despite the inadequate record, any fair reading of the entire trial testimony of plaintiffs, the chronology of events, the news story, the written auditor documents, and the general outline of the cross examination of Auditor investigator Rothenberger, establishes this fact.

This after the fact defense attempt to distort the truth, on an inadequate record about how the Auditor statements were given, should be rejected as a matter of law since there was no fair notice of the issue given by the party required to raise it. See Ely v. Reading Co., 424 F.2d 758, 763 (3d Cir. 1970)(the pretrial order is binding on the parties when it is relied upon to a party's detriment); Pacific Ins. Co. v. American National Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998) (a Rule 59(e) motion "may not be used . . . to raise arguments which could have been raised prior to the issuance of the judgment . . . [or] to argue a case under a novel legal theory that the party had the ability to address in the first instance."). Defendants could have raised the Garcetti issue pre-trial. Had they done so, the issue would have been addressed fully at trial. But now the defense should not be allowed to benefit from its tactical decision and illicit sandbagging.

Accordingly, the Court's earlier ruling at summary judgment should stand and it is unaffected by Garcetti - plaintiffs engaged in protected speech when they raised their health and

safety concerns to the State Auditor.[19]

### III.   GARCETTI ALSO DOES NOT AFFECT PLAINTIFFS' FIRST AMENDMENT PETITION CLAUSE CLAIMS.

**A. Plaintiffs Engaged in Protected Petitioning Activity.**  Plaintiffs rely upon and adopt their extensive analysis of this issue contained in their recent opening brief.  (D.I. 190).  The defense position that a formal mechanism must be invoked to receive petition clause protections is simply wrong under binding Supreme Court and Third Circuit precedent.  Unfortunately for defendants, the district court cases they cite from the District of New Jersey and the Southern District of New York cannot overrule Third Circuit and Supreme Court precedent to the contrary.  See EEOC v. Univ. of Pa., 850 F.2d 969, 980 (3d Cir. 1988).

**B. Garcetti Has No Impact Upon Third Circuit Petition Clause Jurisprudence.**  In the same way, the defense position that Garcetti impacts upon Third Circuit petition clause precedent does not withstand scrutiny.  (DOB at 20).

**1. Garcetti Was a Free Speech Case.**  First, as review of the Opinion makes clear, Garcetti was a free speech case and nowhere does it discuss, reference or otherwise make mention of the separate petition clause.[20]

**2. The Portion of the Free Speech Analysis Affected by Garcetti Has No Analogue in Third Circuit Petition Clause Jurisprudence.**  Second, the portion of the free speech analysis affected by Garcetti has no analogue or parallel in Third Circuit petition clause law.

_____

[19]  Although apparently not in dispute, it also is clear that Sgt. Foraker's earlier lawsuit, alleging that defendant Chaffinch had violated his First Amendment rights, also is unaffected by Garcetti and thus is still protected by the free speech clause.  The defense has never claimed that filing that lawsuit was required by his job duties.  Accordingly, the Court's earlier ruling at summary judgment should stand and it is unaffected by Garcetti - plaintiff Sgt. Foraker engaged in protected speech when he filed and successfully prosecuted his earlier First Amendment retaliation lawsuit against Chaffinch.

[20]  The long independent pedigree of the petition clause  is discussed in plaintiffs' recent petition clause opening brief.  (D.I. 190 at 13-19).

Defendants confusingly claim that <u>Garcetti</u> adds an additional third step to free speech protected activity analysis. In other words, in addition to (1) the 'public concern' determination and (2) the <u>Pickering</u> disruption balancing, there purportedly is now a third step, (3) a <u>Garcetti</u> speech as a citizen nuance, that comes before the public concern one. (DOB at 20 n.3).

But <u>Garcetti</u> itself explicitly rejects this. The Supreme Court stated that the protected activity determination still contains only "two inquiries" and the <u>Garcetti</u> nuance is simply a part of the public concern analysis. <u>Garcetti</u>, 126 S.Ct. at 1958.

> The first requires determining whether the employee spoke as a citizen on a matter of public concern.

<u>Id.</u>[21] The second step still remains the <u>Pickering</u> balancing test. <u>Id.</u>; <u>see</u> <u>Springer</u>, 2002 WL 389136, *3 (noting this step is commonly known as the "<u>Pickering</u> balancing test."). Thus, as the Supreme Court has made clear, the speech as a citizen nuance is simply part of the public concern free speech analysis.

Consequently, as discussed in the earlier brief (D.I. 190 at 18-19) and as exhaustively explained by the Third Circuit in <u>San Filippo v. Bongiovanni</u>, 30 F.3d 424, 434-43 (3d Cir. 1994), <u>Garcetti</u> does not apply to the petition clause because there is no public concern analysis or disruption balancing under Third Circuit petition clause law. Instead, matters of purely private concern are protected, as long as the petition is not a sham. <u>See, e.g. id.</u> at 440, 443; <u>Hill v. City of Scranton</u>, 411 F.3d 118, 126 (3d Cir. 2005); <u>Brennan</u>, 350 F.3d at 417; <u>We, Inc., v. City of Phila.</u>, 174 F.3d 322, 330 n.2 (3d Cir. 1999).[22] Thus, because there is no public concern step - which is where the speech as a citizen requirement comes into play - <u>Garcetti</u> is never triggered.

---

[21] That this is part of the same step should come as no surprise. The Supreme Court has repeatedly discussed the citizen speech requirement as being part of the public concern analysis since the 1960s. <u>See, e.g.</u> <u>Pickering</u>, 391 U.S. at 568; <u>Connick</u>, 461 U.S. at 142. <u>Garcetti</u> simply explained what 'speech as a citizen' means.

[22] As the Third Circuit noted in <u>San Filippo</u>, our Circuit is the only one to follow this approach. <u>San Filippo</u>, 30 F.3d at 439-40.

For the aforementioned reasons, the recent <u>Garcetti</u> decision does not impact on

plaintiffs' petition clause count - which independently sustains the verdict.[23]

## IV.    THERE IS ABUNDANT RECORD EVIDENCE THAT CHAFFINCH DEFAMED SGT. FORAKER.

**A. Standard of Review.**  As discussed in the standard of review in Argument I above,

all facts relevant to this Rule 50 defense motion must be viewed in the light most favorable to

plaintiff as the verdict winner, and all evidence favorable to the moving defendants that the jury

is not required to believe must be disregarded.  <u>Reeves</u>, 530 U.S. at 150-51.  Importantly, all

evidence from biased defense witnesses or portions of such evidence can be entirely disregarded

by the jury, as is their privilege.  <u>Id.</u> at 151.

**B. The Basics.**  As the Delaware Supreme Court recently explained, for public figure

plaintiffs, like Sgt. Foraker -

> Under Delaware law, a public figure defamation plaintiff in a libel case must plead and
> ultimately prove that:  1) the defendant made a defamatory statement;  2) concerning the
> plaintiff;  3) the statement was published;  and 4) a third party would understand the
> character of the communication as defamatory.  In addition, the public figure defamation
> plaintiff must plead and prove that 5) the statement is false and 6) that the defendant
> made the statement with actual malice.  Finally, "[p]roof of damages proximately caused
> by a publication deemed libelous need not be shown in order for a defamed plaintiff to
> recover nominal or compensatory damages."

<u>Doe v. Cahill</u>, 884 A.2d 451, 463 (Del. 2005) (internal footnotes omitted).  The Court ruled at

summary judgment that plaintiff Foraker had established each of these elements.  <u>Price</u>, 2006

WL 1313178, *4-6.  Given that the same evidence was introduced at trial, the Court's prior

---

[23]  Defendants also mistakenly claim that the public concern requirement applies to petitions if a
plaintiff petitions the federal government and is then retaliated against by a state or local government.
(DOB at 39).  In <u>Hill</u>, 411 F.3d at 121, several police officers sued the city in federal court.  Following
the conclusion of their lawsuit, they again sued the city in federal court, asserting that they had been
retaliated against for their initial lawsuit.  <u>Id.</u>  In holding that their earlier lawsuit was protected by the
petition clause, <u>id.</u> at 126, the Court applied traditional Third Circuit petition clause law and simply
looked at whether the petition was a sham.  <u>Id.</u>  Because it was not, it was protected by the petition
clause.  <u>Id.</u>  The Court did <u>not</u> apply the public concern analysis since it is does not apply to petition
clause claims.  <u>Id.</u>; <u>accord</u> <u>Anderson v. Davila</u>, 125 F.3d 148, 162-163 (3d Cir. 1997) (police officer who
filed a federal lawsuit against the Virgin Islands police department protected by the petition clause from
retaliation for filing that lawsuit and he was not required to meet the public concern requirement).

ruling should stand.

**C. The First Flawed Defense Claim.**  Defendants have moved on three grounds.  First, they wrongly assert that there was no evidence of actual malice. (DOB at 21-23).  Actual malice requires either knowledge or reckless disregard of the falsity of a statement.  New York Times v. Sullivan, 376 U.S. 254, 279-80 (1964).  Reckless disregard requires publishing with a "high degree of awareness of ... probable falsity" Garrison v. Louisiana, 379 U.S. 64, 74 (1964), or publication while "entertain[ing] serious doubts" about the truth of the matter.  St. Amant v. Thompson, 390 U.S. 727, 731-32 (1968).  Here the jury made an unassailable factual finding of actual malice - that "Chaffinch knew the statement Plaintiff Foraker was false or recklessly disregarded whether it was false."  (D.I. 186 - Foraker Verdict Inter. # 5).  This finding was proven by "clear and convincing evidence."  (Id.).

**1. Chaffinch Blamed Sgt. Foraker For The Disastrous Conditions at the Range.**  There was a sufficient record before the jury.  For example, Review of PX25-26 reveals that Chaffinch blamed Sgt. Foraker for the conditions at the FTU.  In Chaffinch's words, "the ball was dropped" on Sgt. Foraker's watch.  (PX25; B229-32).  He implied that Sgt. Foraker did not do a good job, but that his predecessor did.  (Id.).  He indicated that the blame for the disastrous conditions at the FTU lies with one or two Troopers under his command and pointed the finger of blame at Sgt. Foraker.  (Id.).  A fair reading of Chaffinch's statements in the articles is that Sgt. Foraker destroyed the FTU and caused the hazardous conditions there.

**2. But Chaffinch Also Testified That These Statements Were False.**  At trial, Chaffinch continued to place blame for the conditions at the FTU on Sgt. Foraker.  However, then he was impeached with his own deposition admissions that flatly contradicted his trial testimony and his defamatory statements.  These admissions, Fed.R.Evid. 801(d) (1) & (2), demonstrate his knowledge of the falsity of his defamatory statements.

Question: In your opinion, did Sergeant Foraker ... cause the FTU to be shut down?

-28-

Answer: No sir.

(Chaffinch 1634). So even though he earlier claimed Sgt. Foraker dropped the ball and caused the FTU to be shut down, conversely he admitted that Sgt. Foraker did <u>not</u> cause the FTU to be shut down. Continuing,

Question: Do you think the problems with bullet trap were caused by Sergeant Foraker...?

Answer: I don't believe so. No, sir.

(Chaffinch 1636).[24] Even though he earlier blamed Sgt. Foraker for the problems with the bullet-trap, conversely he admitted that Sgt. Foraker did not cause any of those problems.

Thus, Chaffinch's own admissions reveal that he knew that his earlier defamatory statements to the media were false, thus meeting the high "knowledge" standard. <u>N.Y. Times</u>, 376 U.S. at 279-80. Moreover, in light of his own unadulterated admissions and the professed knowledge to which he attested under oath, Chaffinch certainly meets the lesser standard of reckless disregard of the truth or publishing with a high degree of awareness of probable falsity. <u>Id.</u>; <u>Garrison</u>, 379 U.S. at 74; <u>St. Amant</u>, 390 U.S. at 731.

**D. The Second Flawed Defense Claim.** Defendants also claim that all of Chaffinch's statements were substantially true. (DOB at 23-26). But here the jury made a contrary factual finding that Chaffinch "published an untrue statement" about Sgt. Foraker. (D.I. 186 - Foraker Verdict Inter. #4). As discussed above, the record demonstrates that Chaffinch's claims that Sgt. Foraker dropped the ball and was responsible for the disastrous conditions at the FTU are false. His claims also are contradicted by the testimony of numerous other witnesses.[25]

---

[24] Chaffinch's dishonesty about this material fact also is affirmative evidence of guilt. <u>Reeves</u>, 530 U.S. at 147; <u>Sheridan</u>, 100 F.3d at 1069.

[25] Plaintiffs note (1) their own testimony, (2) that of their now retired Captain Dr. Gregory Warren, and (3) that of their direct supervisor Capt. Ralph Davis, all of whom testified that Sgt. Foraker did not drop the ball and destroy the FTU but instead went above and beyond in reporting unsafe working conditions, such as sending health and safety concerns up the chain of command and conducting an investigation into the longstanding problems, and striving to the utmost degree to have those conditions

**E. The Third Flawed Defense Claim.** Lastly, defendants also assert that Sgt. Foraker's

defamation claim fails because he did not offer any evidence of injury to reputation. (DOB at 26-

28). This claim is incorrect as a mater of law.

There are four categories of defamation *per se* that are actionable without proof of

special damages, including statements which "malign one in a trade, business or profession."

Spence v. Funk, 396 A.2d 967, 970 (Del. 1978). The Delaware Supreme Court recently refused

an invitation to change this "settled" common law rule of presumed damages. Doe, 884 A.2d at

463 n.55. Accordingly, because Chaffinch attacked Sgt. Foraker's job performance as the

Section Chief by falsely blaming him for destroying the FTU, such statements are defamatory

*per se* and injury to reputation is presumed. Therefore, Sgt. Foraker was not required to offer

any evidence of injury to his reputation.[26]

## V.    THERE IS ABUNDANT RECORD EVIDENCE TO SUPPORT SGT. FORAKER'S DAMAGES AWARD BESIDES EXPERT FINI'S TESTIMONY.

**A. Standard of Review.** The court has an "obligation to uphold the jury's award if

there exists a reasonable basis to do so" and "may not vacate or reduce the award merely because

it would have granted a lesser amount of damages." Evans v. Port Auth. of N.Y. and N.J., 273

F.3d 346, 351-52 (3d Cir. 2001). "[I]t is well accepted that a court will not inquire into the

calculation methods employed by the jury during its deliberations." Chuy v. Phila. Eagles

Football Club, 595 F.2d 1265, 1279 n. 19 (3d Cir.1979) (en banc ). Instead, a court "must

assume" that the jury acted rationally, "'followed the court's instructions and arrived at a verdict

---

fixed and remedied to protect the health and safety of all. (W.Warren 199-201,244-45,286-87; Price
940,942-43,955-57,960-62,1009; Foraker 1393-95,1398,1402-03,1405-21,1423-27,1429-30; G.Warren
1202-06,1211-14,1226; Davis 1569-73; see also Baylor 560,565-67; PX7 at p.9; B173).

    [26] To the extent defendants are asserting that Chaffinch's statements are not defamatory, that is
not the case. As the Court succinctly explained at summary judgment when solely discussing the issue of
air quality, "assigning ... unwarranted blame to Foraker for the FTU's air quality is defamatory." Price,
2006 WL 1313178, *4. In the same way, blaming Sgt. Foraker for dropping the ball and destroying a
multi-million dollar firearms facility also is defamatory. See Spence, 396 A.2d at 969. The jury also
affirmed this in one of its factual findings. (D.I. 186 - Foraker Verdict Inter. #6).

based on those instructions.'" <u>Loughman v. Consol-Pennsylvania Coal Co.</u>, 6 F.3d 88, 102, 105 (3d Cir.1993).

     **B.  The Basis for the Economic Damages.**  The defense position that expert Fini's testimony was the sole basis for the award of economic damages to Sgt. Foraker is without merit. (DOB at 28).  Given that Sgt. Foraker's economic damages were more than $2 million (Borzilleri 1103), it is certainly possible and reasonable to assume that in light of the jury award of only $72,476, that sum was not intended to compensate him at all for his future economic losses in the firearms industry.

     Instead, it is reasonably likely that, based on Sgt. Foraker, Dr. Tavani and Dr. DeBernardo's testimony, the jury awarded Sgt. Foraker the amount of money necessary to compensate him for the vacation/sick/injured time he has had to use or will have to use until he overcomes the major depression from which he currently suffers.  Indeed, the Court explicitly instructed the jury that they could award Sgt. Foraker "lost earnings <u>or other benefits</u>" which  he has suffered in the past or will suffer in the future.  (Jury Instructions 2499-2500) (emphasis added).  It appears that is what the careful jury did and, as explained below, this is a sufficient evidentiary basis to uphold the economic damages award.

     Dr. Tavani testified that Sgt. Foraker had a good prognosis and that it would take him approximately six months to get better once the stressor of workplace retaliation ceased.  (Tavani 770-71, 826-859).  Upon getting better, it is very possible that the jury presumed he would finish out his career with the DSP, thereby dramatically reducing his economic losses, as the defense claimed he should do anyway. (Ellis Closing 2610).  Perhaps the jury also believed the repeated defense claim that Sgt. Foraker's reputation would be restored in ten years when he retired (Ellis Closing 2611) or that because of the vindication brought about by the verdict, Sgt. Foraker would have no problem finding a job in the firearms industry ten years from now.  Thus, it is certainly possible that the jury did not award Sgt. Foraker any money at all for his future wage loss.

Instead, it is certainly possible that the jury award to Sgt. Foraker was the cash equivalent of what they believed was necessary to reimburse him for all or a portion of the vacation, sick and accumulated leave time he has had to or will have to use until he recovers. Sgt. Foraker testified he had been burning his benefit time since October/November 2005 and that is the only reason he has been able to remain on the payroll after being declared unfit for duty for psychological reasons. (Foraker 1475, 1535; PX46; B244). Alternatively, Foraker also testified he had six months of benefit time remaining. (Foraker 1475). So it is reasonable that the jury award was to compensate him for the time he has to burn until he gets better.

   **C.   Fini Is a Proper Expert.**  Alternatively, a trial court's decision to admit or exclude expert testimony is reviewed under an abuse of discretion standard.  Kumho Tire Company v. Carmichael, 526 U.S. 137, 152 (1999); General Electric v. Joiner, 522 U.S. 136, 138-39 (1997).

   **1.   Qualifications.**  The Third Circuit interprets "the specialized knowledge requirement liberally, and [has] stated that this policy of liberal admissibility of expert testimony 'extends to the substantive as well as the formal qualifications of experts.'" Eclock v. Kmart Corporation, 233 F.3d 734, 741 (3d Cir. 2000) quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998); Fed.R.Evid. 702.

   As evidenced in section **E**. of the Facts, and noted by this Court, (Fini 869), Fini has the qualifications to testify as to the hiring practices and employee compensation packages within the tight knit firearms community, and therefore he can testify as to whether or not Foraker would have obtained a job in the law enforcement sector of the firearms industry absent Defendants' vendetta. He had technical and specialized knowledge obtained through his 27 years as a manager in the small, tight knit firearms industry which would assist the trier of fact to understand its hiring and compensation practices.[27]

---

[27] Defendants' argument that Foraker's lack of a bachelor's degree and five years of direct selling experience makes him ineligible for hiring by the firearms industry is like comparing apples to oranges.  It cites one employer on one website who is advertising for a general salesperson to sell to the

Indeed, he certainly has better qualifications concerning the firearms industry than other experts previously admitted within the Third Circuit.  See Waldorf v. Shuta, 142 F.3d 601, 626-27 (3d Cir. 1998)(sociologist qualified to be a vocational expert);  Eclock v. Kmart Corporation, 233 F.3d 734 (3d Cir. 2000)(psychologist testifying about vocational rehabilitation).

As noted by the Court, the analogy to a judge who has hired law clerks for a number of years is a good one.  Such a judge would certainly be qualified to provide an opinion as to the qualifications and compensation packages for such law clerks.  (Pretrial Conf. 34-35; B161-62).

**2. Reliability.**  As pointed out by this Court, the standard under Fed.R.Evid. 702 is not limited to the five-factor analysis in Daubert (Fini 869) and does not require that every expert witness' opinion be based upon science or be reproducible. (Pretrial Conf. 35-36; B162-63).  Indeed, according to the Supreme Court, the test of reliability under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993)  is "flexible."

> [A] trial court *may* consider one or more of the more specific factors that Daubert mentioned when doing so will help determine that testimony's reliability.... Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case.  Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.

Kumho Tire Company v. Carmichael, 526 U.S. 137, 141-142 (1999) (emphasis in original).  This makes sense because  "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" Id. at 148 (internal citations omitted).

The gatekeeping inquiry must be tied to the facts of the particular case.  Id. at 150; Daubert, 509 U.S. at 591; U.S. v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985).

---

general public.  But it ignores the law enforcement subgroup of salespeople where Fini indicated Foraker was most qualified and for which clean cut former police department armorers like Foraker would typically be hired because they know how to speak the law enforcement language.  Indeed, Fini testified that he was not concerned about Foraker's educational credentials for the entry level positions (within the law enforcement subgroup) which he testified about, (Fini 896), and was only somewhat concerned about his educational background for the next highest position within law enforcement sales.  (Fini 896-897).

-33-

> The factors identified in <u>Daubert</u> may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony ... The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in <u>Daubert</u>, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence.  Too much depends upon the particular circumstances of the particular case at issue.

<u>Kumho Tire</u>, 526 U.S. at 150.  Defendants erroneously attempt to latch on to one or two <u>Daubert</u> factors as if an expert must meet all of the <u>Daubert</u> factors in order to be reliable, which the aforementioned law indicates is not the case.

In Foraker's case, he had a desire to work in the firearms industry.  The firearms industry is a small, close-knit industry where very little information is printed for public consumption and where the managers at different companies know each other well enough to call each other up and inquire about employees' salaries and backgrounds.[28]  In such an industry, the <u>Daubert</u> factors do not fit perfectly like they do for an automobile accident case.  Providing an opinion as to the likelihood of an individual being hired within a small, tight knit industry and the compensation such a person would receive, while helpful to a jury,  is not like determining the speed at which one object struck another object.  The immutable laws of physics do not apply.

Contrary to Defendants' assertions, Fini provided his methodology or reasoning which brought him to his opinions.  Neither during *voir dire* nor during cross examination did Defendants' counsel specifically ask Fini what particular generalized criteria he used and whether he could reproduce his work.  The reason is simple: some things an expert testifies about, by the very nature of the subject, cannot be reproduced in a laboratory or on a calculator.

---

[28]  So the defense essentially claims that scholarly research is necessary in an area where none exists. Meanwhile, it argues that because Foraker violated no law the "dropped the ball" statements made by defendant Chaffinch would not injure Foraker.  But Fini explained that these statements injured Foraker because the typical industry background search would reveal them and a person with "excess baggage" would not be looked upon as highly by a prospective manager. Fini pointed out that the fact that a firearms industry background check identified a person with a prior sexual harassment complaint filed against him leading to him not being hired. Thus, Fini certainly had "good grounds" for his reliable opinions.

Such is the case here.[29]  Accordingly, the Court properly found Fini qualified as an expert under Rule 702.

## VII.  THE COURT PROPERLY REFUSED TO GIVE A JURY INSTRUCTION ADDRESSING DECISIONMAKER CHAFFINCH'S FIRST AMENDMENT RIGHTS.

The defense asserts that the Court committed error in refusing to instruct the jury that decisionmaker Chaffinch had a First Amendment right to defame Sgt. Foraker.  (DOB at 33).  This is a rehash of a deceptive defense argument from outside the employment context which was sprung on the eve of jury deliberations and it was rejected by the Court which noted that X-Men Sec., Inc. v. Pataki, 196 F.3d 56 (2d Cir. 1999), and Suarez Corp. v. McGraw, 202 F.3d 676 (4th Cir. 2000), are clearly distinguishable.  (J. Sleet 2460).  In the interests of brevity and judicial economy, plaintiffs rely upon their well-reasoned, comprehensive analysis of this issue which was previously submitted (D.I. 176) and which the Court adopted as its own ruling.  (J. Sleet 2460-61).

## VIII.  THE PUNITIVE DAMAGES AWARD IS FULLY JUSTIFIED BY THE FACTS AND THE LAW.

**A.  Standard of Review.**  "[T]he dispositive legal question is whether, given the evidence presented, the jury's award was so irrational as to 'shock the judicial conscience.'"  Tormenia v. First Investors Realty Co., Inc., 251 F.3d 128, 138 (3d Cir. 2000).  The court has an "obligation to uphold the jury's award if there exists a reasonable basis to do so" and "may not vacate or reduce the award merely because it would have granted a lesser amount of damages."  Evans, 273 F.3d at 351-52 (internal punctuation omitted); accord Walters v. Mintec/Int'l, 758

---

[29]  Defendants' reliance on Eclock is misplaced.  In Eclock, the Third Circuit reversed a trial court who allowed expert testimony.  But in Eclock the trial court failed to conduct a requested Daubert hearing, 233 F.3d at 744, the expert was a psychologist testifying about vocational rehabilitation whose expert qualifications were thin, id., and his testimony was unreliable and inconsistent on its face due to the identification of disability percentages which were impossible under the theory the expert espoused.  Id. at 749-750.  Fini's testimony does not suffer from these flaws.  He was subject to a *voir dire* examination, has better qualifications than Eclock's expert, and was not inconsistent in his testimony.

F.2d 73, 80 (3d Cir. 1985).[30]

**B. Discussion.** "The purpose of punitive damages is to punish the defendant for his willful or malicious conduct <u>and</u> to deter others from similar behavior." <u>Allah v. Al-Hafeez</u>, 226 F.3d 247, 252 (3d Cir. 2000) (emphasis added); <u>see</u> <u>State Farm Mut. Ins. Co. v. Campbell</u>, 538 U.S. 408, 416 (2003) ("deterrence and retribution"). Thus, a punitive award has two focuses. First, it is focused individually - to punish the defendant for his wrongdoing, but its second focus is outward towards society - to deter others from similar misbehavior.

Curiously, defendants come to this federal court citing a great deal of dated and inapplicable state law while making a due process argument, all while ignoring numerous recent and well-known U.S. Supreme Court decisions squarely addressing the issue. "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." <u>State Farm</u>, 538 U.S. at 416. As the Supreme Court has made very clear, due process requires that three primary factors should be considered in assessing the correctness of punitive damages: (1) the degree of reprehensibility of the defendants' conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the sum awarded to plaintiffs and those sums awarded in similar cases. <u>Id.</u> at 418; <u>BMW of North America v. Gore</u>, 517 U.S. 559, 575 (1996); <u>Willow Inn, Inc. v. Public Service Mutual Ins. Co.</u>, 399 F.3d 224, 230 (3d Cir. 2005).

**1. Degree of Reprehensibility.** The "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility," a factor which the

---

[30] If remittitur is decided to be appropriate, the award should not be reduced to the level the court itself would have awarded. <u>See</u> <u>Evans</u>, 273 F.3d at 352 (the court "may not ... reduce the award merely because it would have granted a lesser amount of damages"). Instead, "remittitur should be set at the '<u>maximum recovery</u>' that does not shock the judicial conscience." <u>Id.</u> at 355 (internal punctuation omitted) (emphasis added).

defense brief makes clear is not challenged. <u>State Farm</u>, 538 U.S. at 419.[31]  The Supreme Court

has instructed that several sub-factors should be taken into account here, including whether:

> the tortious conduct evinced an indifference to or a reckless disregard of the health or
> safety of others; the target of the conduct had financial vulnerability; the conduct
> involved repeated actions or was an isolated incident; and the harm was the result of
> intentional malice, trickery, or deceit, or mere accident.

<u>Id.</u>  It is clear that all of these factors weigh in favor of our modest punitive damages awards.

First, defendants clearly demonstrated a reckless disregard and indifference not only for

plaintiffs' health and safety, but also for the health and safety of the innumerable recruits, law

enforcement officers and civilians who work and train at the range.  Plaintiffs tried to protect all

of these individuals by speaking out, and defendants tried to cover up and destroy them for it.

Second, plaintiffs certainly were financially vulnerable. Defendants ran Cpl/3 Price out of the

Division and cast him on the trash-heap on the eve of trial.  The same will be done soon for Cpl/3

Warren as well.  None of the plaintiffs can afford to lose their jobs.  Third, the defense actions

also were certainly not isolated momentary incidents.  Instead, the trial testimony revealed a

calculated effort over more than two years to create and employ a pretext to get rid of plaintiffs

and otherwise force them into silence and punish them for their speech.  In the same way, it is

clear that Chaffinch is a recidivist who simply refuses to abide by the Constitution.[32]  Lastly, no

doubt the brazen, intentional and malicious manner in which defendants went about seeking to

destroy plaintiffs also was a factor.[33]

---

[31]  The importance of this factor is not surprising given that the "imposition of punitive damages
is an expression of [the jury's] moral condemnation" of the actions of the defendants.  <u>Cooper Indus., Inc.
v. Leatherman Tool Group, Inc.</u>, 532 U.S. 424, 432 (2001).

[32]  Three separate juries have now found him guilty of personally trampling on the constitutional
rights of six Troopers.  As the Supreme Court has explained, "a recidivist may be punished more severely
than a first offender" and "repeated conduct is more reprehensible than an individual instance of
malfeasance" and may be considered in awarding punitive damages.  <u>BMW</u>, 517 U.S. at 577; <u>see</u> <u>Willow
Inn</u>, 399 F.3d at 232 (noting that "specific instances of similar conduct by the defendant in relation to
other parties" not involved in the case may be considered).

[33]  From Chaffinch's open bragging that "I'm going to get that son of a bitch," to MacLeish's
callous statements that he thought plaintiffs were a real "pain in the ass" for raising health issues, to

**2. The Ratio to Compensatory Damages.** Here, the case law also favors plaintiffs. The punitive damages award in this case was actually much <u>less then</u> the compensatory award, a situation unlike every other addressed by the Supreme Court. <u>See</u> <u>State Farm</u>, <u>supra</u>, <u>BMW</u>, <u>supra</u>; <u>Cooper</u>, <u>supra</u>. Thus, there are no issues of the punitive award being grossly disproportionate to the compensatory award. This is not a case involving a 500 to 1 punitives to compensatory ratio as in <u>BMW</u>, nor does it involve a 145 to 1 ratio as in <u>State Farm</u>. Instead, the punitive awards here are mere fractions of the compensatory awards. Instead, the punitive award against Chaffinch was 21% and against MacLeish a mere 9% of each compensatory award. Such a scenario does not violate due process.[34]

The defense claim is a red herring that the punitive award is disproportionate to their net worth and that the award independently must be overturned on this ground. First, although the net worth of a defendant is a consideration, it is neither the determinative one nor the only one. <u>State Farm</u>, 538 U.S. at 427-28. Second, the cornerstone of this argument is a claim that the Court already rejected - the joint property issue. (<u>See</u> J. Sleet 2465). Third, given that both Chaffinch and MacLeish's net worth, including the value of several expensive personal and vacation homes, as well as large yearly salaries and pensions, are already in the record, it is clear that the punitives award does <u>not</u> exceed their ability to pay. (MacLeish 1740-43; Chaffinch 1612-13, 1615-17; PX141; B250-61). Lastly, the latest defense efforts to plead poverty and inability to pay are deceptive given that there is a State statute, 10 Del.C. § 4002, that will

---

Chaffinch's cruel and repeated mocking of plaintiffs' injuries, all these facts were appropriate considerations for the jury. (MacLeish 1760; Price 963; Baylor 556; Dixon 1057-58, 1065, 1068-69).

[34] Defendants also misleadingly seek to artificially inflate the numbers and confuse the issue by aggregating the total amounts of punitive damages awarded to each plaintiff against each defendant, rather than by properly analyzing the issue by looking at the amount awarded to each individual plaintiff against each individual defendant for each separate constitutional violation. For example, by looking at the amount awarded to Sgt. Foraker against MacLeish, separately from the amount awarded to Cpl/3 Warren against MacLeish, and again separately from the amount awarded to Cpl/3 Price against MacLeish, a correct picture is painted of the amount awarded for each separate constitutional violation.

indemnify them and which has already been used to indemnify Chaffinch in the past when

punitive damages were awarded against him in Sgt. Foraker's first case.  "It would be entirely

inappropriate for a defendant to raise the issue of his limited financial resources if there existed

an indemnity agreement placing the burden of paying the award on someone else's shoulders."

Mathie v. Fries, 121 F.3d 808, 816 (2d Cir. 1997); See Kernezy v. Peters, 79 F.3d 33, 37 (7th Cir.

1996) ("The defendant should not be allowed to plead poverty if his employer or an insurance

company is going to pick up the tab.").

Ωδ      The punitive damages award delivered by the cautious jury is clearly not excessive in

light of defendants' egregious misconduct under the predominant reprehensibility factor.  No

doubt the jury also intended to invoke the deterrence function of punitives by sending a clear

message to other corrupt government officials that they are not above the law and they should not

disregard the constitutional rights of their employees or they will similarly be held accountable in

any whistleblowing case.  The punitive damages award should be upheld.

## IX.    THE COURT PROPERLY CONSOLIDATED THE CASES.

Defendants now apparently also challenge the Court's earlier consolidation ruling.

(DOB at 34).  Here, following briefing (D.I. 90, 94, 101), the Court ruled that pursuant to

Fed.R.Civ.P. 42, it would consolidate these cases for trial because of "common questions of law

and fact."  (D.I. 138).[35]

Defendants also claim that, despite the numerous common issues of law and fact, the

Court erred in not severing plaintiff Price and Warren's claims from those of plaintiff Foraker

(DOB at 34).  Unfortunately for defendants, and consistent with their repeated disregard of the

---

[35]  As they did in earlier briefing on this issue, defendants continue to misrepresent the record, falsely claiming that there was no evidence of motive to retaliate against plaintiffs Price and Warren and that Price and Warren did not engage in any protected speech.  As discussed in the earlier briefing (D.I. 101 at 5-7), and as revealed in trial testimony, both defense claims are wrong.   For example, one of the motives to retaliate was plainly revealed throughout the two week trial as defendants were angered by plaintiffs speech because it was making life in state government difficult for them and exposing secrets that both the DSP and the State preferred stayed hidden.

requirements of the Court's Rule 16 Scheduling Order (Pretrial Conf. 19-24; B153-58),

defendants never made a motion in this regard pursuant to the January 13th and later January 25th

2006 deadlines set by the Court for consolidation or summary judgment motions.  (D.I. 15 at ¶ 7;

see D.I. 77).  Accordingly, defendants waived the right to do so.

     Alternatively, the defense motion on both of these issues should be interpreted as

untimely motions for reconsideration.  See Springer v. Henry, 2004 WL 2127172, *6 (D.Del.

Sept. 16, 2004) (treating post-trial challenges to summary judgment rulings as untimely motions

for reconsideration).   Because it is clear that the Court did not make an error of apprehension,

did not misunderstand defendants' earlier position or otherwise make an improper decision, the

Court's earlier rulings should stand.  Id.

## CONCLUSION

     For the above stated reasons, the jury verdict and awards should be upheld.  Plaintiffs

words are apt. "We were hopeful that the state auditor would help us fix our range."  (Foraker

1430).  Price added -

> [I]n my heart, I knew it was the right thing to do.  We wanted them to come in, and we
> wanted, especially with these auditor investigators, we wanted to show them what was
> wrong with the range.  All we were asking for is that the state fix the problem so that we
> can work in a safe, healthy environment.  That's all we were asking for.

(Price 971).  Plaintiffs also wanted to protect the health and safety of all others.  (W. Warren

255, 220-22; Foraker 1484-85).

> My plea is not solely for myself.  It is for every Delaware State Trooper as well as all
> other law enforcement officers that have participated and will participate in shooting
> activities at the range.

(PX22 at B215).

-40-

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**MARTIN D. HAVERLY, ESQ. (#3295)**
**MARTIN D. HAVERLY, ATTORNEY AT LAW**
Two East Seventh Street, Suite 201
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Dated: July 7, 2006                Attorneys for Plaintiffs

# Unreported Opinions



Slip Copy                                                                                                      Page 1
Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. Indiana,Indianapolis
Division.
Matthew G. KODREA, Plaintiff,
v.
CITY OF KOKOMO, INDIANA, and Matthew
McKillip, individually and as Mayor of the City of
Kokomo, Dan Smith, in his individual capacity, and
Jack Dodd, in his individual capacity, Defendants.
**No. 1:04-CV-1843-LJM-WTL.**

June 22, 2006.

Lawren K. Mills, McMains Morse P.C., Mary Jane
LaPointe, McMains LaPointe, Indianapolis, IN, for
Plaintiff.
Andrew P. Wirick, Hume Smith Geddes Green &
Simmons, Indianapolis, IN, for Defendants.

***ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT***
LARRY J. McKINNEY, Chief Judge.
***1** This cause is before the Court on Defendants', City
of Kokomo, Indiana (the "City"), Matthew McKillip
(the "Mayor"), Dan Smith ("Smith"), and Jack Dodd
("Dodd") (all four defendants collectively,
"Defendants"), Motion for Summary Judgment. In his
Amended Complaint, Plaintiff, Matthew G. Kodrea
("Kodrea") raises claims under 42 U.S.C. § 1983 and
Indiana Code § 36-1-8-8, a state "whistleblower"
statute. More specifically, Kodrea contends that
Defendants unlawfully terminated him in retaliation for
his reports of two situations of alleged abuse within
City government. As a result, Kodrea claims that
Defendants violated his rights guaranteed by the First
Amendment and the state statute. The parties have fully
briefed the matter and it is now ripe for ruling.

For the reasons stated herein, Defendants' motion is
**GRANTED in part and DENIED in part.**

I. *PRELIMINARY EVIDENTIARY
CONSIDERATIONS*

Defendants requested in their reply brief that the Court
strike several items that Kodrea submitted with his
designated materials in opposition to the motion for
summary judgment. Defendants also filed a Motion to
Strike Affidavits that were submitted with Kodrea's
sur-reply. The list of items that Defendants seek to
strike are as follows: (1) letters from Alan Warner
("Warner") and Joe Hawkins ("Hawkins"), as well as
their affidavits submitted with the sur-reply; (2)
affidavits of Patsy Liali ("Liali") and David McKinney
("McKinney"); (3) the affidavit of James Trobaugh
("Trobaugh"), former Mayor of Kokomo; (4) Findings
of Fact, Conclusions of Law, and Order entered by the
Howard Circuit Court in the case styled *Kern v. City of
Kokomo,* Cause No. 34C01-0507-PL-0632 *("Kern*
Order"); and (5) deposition exhibits labeled 12(B),
12(C), and 12(F) FN1 and the affidavit of Jesse A. Dixon
("Dixon"). The Court addresses each of these five
groups of items in turn.

> FN1. Apparently the exhibits were numbered
> at the various depositions that have been taken
> in this case on an ongoing basis rather than
> separately numbered for the particular
> deposition in which they were identified.
> Rather than re-label these exhibits when he
> filed his designated materials, Kodrea simply
> used the original designated numbers. For
> clarity, the Court will refer to those exhibits as
> they were designated at the depositions and
> cite to them as "Dep. Ex. ___ " in this Order.

First, with respect to the Warner and Hawkins letters,
Defendants argue that the letters contain inadmissible
hearsay and that they not self-authenticating and contain
no foundation for their consideration. Defendants also
seek to strike the affidavits, which are duplicative of the
information in the letters. As an initial matter, the Court
notes that evidence offered during a summary judgment

proceeding need only be admissible in content, not in form. *See Juarez v. Menard, Inc., 366 F.3d 479, 484 n. 4 (7th Cir.2004).* Kodrea identified the letters as ones he had received from Warner and Hawkins and attached them to his own affidavit. Kodrea Aff., ¶ 13. Warner and Hawkins' affidavits simply restate the same information contained in the letters and were offered in response to Defendants' authentication and foundation concerns, *i.e.,* the form of the letters. To the extent the letters and affidavits contain hearsay, the Court will disregard such information; however, the Court declines to strike these materials in their entirety at this stage of the proceedings on merely technical grounds.

**\*2** Next, the Court considers the affidavits of Liali and McKinney. Defendants first contend that the affidavits should be struck because they improperly contradict Kodrea's testimony. Defendants do not explain the basis for this objection, and they fail to make any citation to that portion or portions of Kodrea's testimony that they believe is contradictory. The Court declines to scour the record and make Defendants' argument for them. Defendants next raise a hearsay objection to paragraphs 4 through 7 of Liali's affidavit and paragraphs 6 through 8 of McKinney's affidavit. Portions of those paragraphs relate to things that Kodrea indicated were said or done by Smith. To the extent that these statements are offered to prove what Smith may have said, they are hearsay and will be disregarded. However, the Court declines to strike the affidavits in their entirety.

Third, Defendants seek to strike Trobaugh's affidavit on the basis that it is irrelevant under Federal Rule of Evidence ("FRE") 402. "Relevant evidence" is that evidence which has a tendency to make the existence of any fact of consequence to the determination of the action more or less probable. FRE 401. Kodrea argues in his surreply that the affidavit is relevant to demonstrate that Defendants should reasonably have known that employees could not be retaliated against for exercising their First Amendment right to speak out on matters of public concern. Thus, the affidavit is relevant to the issue of qualified immunity. The Court concludes that Trobaugh's affidavit has some relevance to that issue and therefore denies Defendants' request to strike Trobaugh's affidavit.

Fourth, Defendants seek to strike the *Kern* Order on the basis that it is irrelevant. Kodrea claims that the *Kern* Order is relevant to showing a municipal pattern and practice of violating First Amendment rights of City employees. The Court does have some concerns about the relevancy of the *Kern* Order. Though the parties do not discuss it in detail, Kern (unlike Kodrea) presumably was a merit-based employee and decisions regarding his employment fell under a merit-based system. Further, it appears that Kern vocalized his particular concerns directly to the public via the media. Based on these distinctions, the probative value of the *Kern* Order is slight, and when considering the potential prejudice under FRE 403 the *Kern* Order might well be excluded. The Court is hesitant, however, to strike the *Kern* Order prematurely at this stage of the proceedings. In any event, the Court concludes that the *Kern* Order is not necessary for disposition of Defendants' Motion for Summary Judgment and need not even be considered.

Finally, Defendants seek to strike deposition exhibits 12(B), 12(C), and 12(F) and the Dixon affidavit. Kodrea identified the deposition exhibits in his own affidavit and attached the Dixon affidavit to his surreply. Kodrea Aff., ¶ 6; Surreply. The deposition exhibits contain various e-mails, letters, cards, a list of achievements and community activities, and newspaper articles about Kodrea's community involvement and work on behalf of the Parks Department. Deposition exhibit 12(F) in particular appears to be a letter that Dixon wrote and the information contained therein is duplicative of that in the Dixon affidavit. Defendants's arguments regarding the deposition exhibits are broad and do not specifically discuss each particular document of the numerous documents submitted, but they seek to strike the deposition exhibits on the basis of inadmissible hearsay and improper character evidence under FRE 404. Defendants' Motion to Strike seeks to exclude the Dixon affidavit pursuant to Local Rule 56.1(d).

**\*3** With respect to the deposition exhibits, the Court finds that the newspaper articles, to the extent that they are being offered for the truth of the matters asserted therein, are inadmissible hearsay and cannot be relied upon for summary judgment proceedings. *See Chi.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3
Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

*Firefighters Local 2 v. City of Chicago,* 249 F.3d 649, 654 (7th Cir.2001); *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997). To the extent that the newspaper articles discuss Kodrea's community involvement, they are also irrelevant and will be struck. Likewise, the items that relate to Kodrea's character and go beyond his capacity for truthfulness are improper character evidence under FRE 404 and are inadmissible. The Court will further disregard as irrelevant the unsigned note about child labor laws, Kodrea's list of community activities that are unrelated to his job, and various recommendation letters from the fire chief, Delphi supervisor, Howard County Sheriff, and a City councilman, all which appear to pre-date the beginning of Kodrea's employment with the Parks Department. However, any remaining items that relate to Kodrea's work performance or suggest the level of involvement by each individual defendant in the employment actions against Kodrea will be considered for the limited purposes of refuting Defendants' evidence to the contrary. Finally, with respect to deposition exhibit 12(F) and the Dixon affidavit, the Court declines to strike those matters for the same reasons discussed above for the Warner and Hawkins items.

## II. *BACKGROUND*

Kodrea was hired as the recreational programmer for the City's Parks Department on July 28, 2003. Kodrea Dep. at 47. Although he had some sports-related experience from participation in athletics during high school and college, Kodrea did not have any particular work experience as a recreational programmer. Kodrea Dep. at 10, 28-29. Kodrea's immediate supervisor was Smith, Superintendent of the Parks Department. Kodrea Dep. at 47. Smith was supervised by the Mayor. Kodrea Dep. at 47. Dodd was Director of Human Resources. Dodd Dep. at 12-13.

As a new employee, Kodrea was supposed to receive a 30-day, a 60-day, and a 90-day evaluation. Smith Dep. at 67. Kodrea claims that he did not actually receive a 30-day evaluation, but he contends that Smith verbally informed him that he was doing fine. Kodrea Dep. at 108. Kodrea's subsequent 60-day and 90-day evaluations were favorable for the most part, as was his "end of the year" evaluation in January 2004. Kodrea Dep. at 107; Dep. Ex. 12(D).

Kodrea's job responsibilities included supervising and coordinating recreational programs and supervising the seasonal staff for concession stands. Kodrea Dep. at 29, 71-72. Kodrea was also encouraged to work as the district commissioner for the American Softball Association ("ASA"). Kodrea Dep. at 84-86. However, nothing in Kodrea's job description required him to monitor or report misconduct. Dep. Ex. 13; Kodrea Dep. at 29. In addition, Kodrea was not responsible for signing and approving or otherwise completing employee time sheets. Metz Dep. at 16-18; Reed Dep. at 32, 35, 41; Kodrea Dep. at 144; Kodrea Aff., ¶ 5. Further, with respect to the ASA, Kodrea was not responsible for determining the amount of the ASA fees. Reed Dep. at 17; Kodrea Dep. at 87. Beyond keeping track of the teams and collecting the registration fees for teams, Kodrea was not responsible for handling ASA money. Kodrea Dep. at 88-91; Metz Dep. at 12-13; Reed Dep. at 17, 25.

**\*4** Sometime in the fall of 2003, Kodrea noticed a discrepancy with the time for one of the seasonal employees, Jim Campbell ("Campbell"). Kodrea Dep. at 77-78, 130-31. Kodrea also noted that Campbell had not completed the closing procedures for one of the concession stands. Kodrea Dep. at 130. Kodrea reported the problem to Smith. Kodrea Dep. at 135, 138. Smith told Kodrea to take care of the problem, so Kodrea ordered that Campbell's checks be stopped and finished closing the concession stands himself. Kodrea Dep. at 130, 135.

In May of 2004, Kodrea again noted a discrepancy with Campbell's time and claims that he once again notified Smith to voice his concerns that Campbell was being paid for hours that he had not worked. Kodrea Dep. at 140-42. Kodrea also told Smith that Campbell was working for another company and not working his actual hours. Kodrea Dep. at 142. Smith allegedly told Kodrea that Campbell kept Smith from being audited and that Campbell's time was not an issue and not to worry about it. Kodrea Dep. at 140, 142-43. More specifically, Kodrea claims that Smith stated, "That's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

never been a problem, it's not a problem now, and it's never going to be a problem." Kodrea Dep. at 143.

Shortly thereafter, in June of 2004, Kodrea was contacted by Wayne Meyer ("Meyer"), the State ASA Commissioner. Kodrea Dep. at 89-90. Meyer asked Kodrea where the "refund check" for overpayment of ASA fees for that year should be sent because the prior recreational programmer was no longer employed at the City. Kodrea Dep. at 90. When Kodrea questioned Smith about the ASA refund, Smith told Kodrea not to worry about it and that he would take care of it. Kodrea Dep. at 94. Kodrea claims that Smith was very abrupt and direct with his response. Kodrea Dep. at 96.

Kodrea claims that shortly after he brought the ASA refund issue to Smith's attention he received a problem employee performance appraisal. Kodrea Dep. at 96; Dep. Ex. 12(E). Kodrea claims that he had never received any indication of a problem with his work nor any counseling on performance issues prior to receiving the appraisal, a point disputed by Defendants. Kodrea Dep. at 70, 118; McKillip Dep. at 43, 54-55; Dodd Dep. at 43; Smith Dep. at 51, 63-64, 74-75, 78-79. Kodrea claims that Smith called him into Smith's office and informed him that no one had seen the appraisal yet and that Kodrea's next evaluation in thirty days was already prepared with the same information and that Kodrea would be terminated at that point. Kodrea Dep. at 120-21; Dep. Ex. 26. Kodrea also claims that Smith gave him an ultimatum to either resign by noon the following workday and no one would see the appraisal or Kodrea would be terminated with the appraisal on his record and Smith would make sure that he did not get another City job. Kodrea Dep. at 120; Dep. Ex. 26.

Rather than resign, Kodrea alleges that he reported the meeting to Dodd and expressed his belief that he was being retaliated against for reporting Campbell and the ASA refund issue. Kodrea Dep. at 146-49; Kodrea's Answers to Interrogatories at 3. Kodrea claims that Dodd stated he would investigate. Kodrea Dep. at 146-49; Kodrea's Answers to Interrogatories at 3. Kodrea also submitted a written response to the appraisal and alleged that he was being retaliated against for bringing Campbell's work hours and the ASA refund to Smith's attention. Kodrea Dep. at 100,

126; Dep. Ex. 12(E). Thereafter, Smith removed the concession staff from Kodrea's supervision and removed all ASA contacts from Kodrea's responsibility. Kodrea Dep. at 221; Kodrea's Answers to Interrogatories at 12.

**\*5** A week after receiving the problem employee performance appraisal, Dodd informed Kodrea that he was being placed on probation for thirty days. Kodrea Dep. at 146; Dodd Dep. at 98. Kodrea was required to undergo counseling sessions with Smith, which were attended by Dodd. Kodrea Dep. at 147, 153; Dodd Dep. at 41, 53. Kodrea continued to raise concerns about what he considered Campbell's time abuse and the misuse of public funds and complained that he felt he was being retaliated against for reporting these instances. In fact, he submitted a written report to Dodd about the two instances of alleged misconduct. Kodrea Dep. at 172. Kodrea also sought a transfer to another department, but his request was denied. Kodrea Dep. at 206; Dodd Dep. at 88.

Kodrea claims that he completed the probationary period satisfactorily. Kodrea Dep. at 154, 156. In fact, both Smith and Kodrea signed a list entitled "Goals and Objectives" which indicated completion of the probationary period. Dep. Ex. 33. In contrast, the Defendants claim that the probation period was extended for an additional thirty days, though there is nothing in writing to indicate that this is the case. Dodd Dep. at 71; Smith Dep. at 65. Rather, Defendants claim that Kodrea was verbally advised of the extension of the probationary period. Dodd Dep. at 71, 90; Smith Dep. at 65, 87, 89, 148-49. On September 9, 2004, prior to the completion of this disputed second probationary period, Kodrea was terminated based on Smith's recommendation. Kodrea Dep. at 157; Dodd Dep. at 13; Smith Dep. at 49. Kodrea sought reinstatement via the City's grievance process, but he was unsuccessful. McKillip Dep. at 59.

### III. *SUMMARY JUDGMENT STANDARD*

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). See also United Ass'n of Black Landscapers v. City of Milwaukee, 916 F.2d 1261, 1267-68 (7th Cir.1990), cert. denied, 499 U.S. 923 (1991).* Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir.2003), reh 'g denied.* Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).* The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 997 (7th Cir.1996), cert. denied, 520 U.S. 1116 (1997).* It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996).* When the moving party has met the standard of Rule 56, summary judgment is mandatory. *Celotex, 477 U.S. at 322-23; Shields Enters., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir.1992).*

**\*6** In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm, 94 F.3d 254, 257 (7th Cir.1996), cert. denied, 519 U.S. 1109 (1997).* The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson, 477 U.S. at 248; JPM Inc. v. John Deere Indus. Equip. Co., 94 F.3d 270, 273 (7th Cir.1996).* Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer, 969 F.2d 278, 281 (7th Cir.1992).* "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co., 94 F.3d 1121, 1124 (7th Cir.1996), cert. denied, 519 U.S. 1115 (1997).*

IV. *DISCUSSION*

A. RETALIATION CLAIM UNDER § 1983

Kodrea claims that he was terminated in retaliation for questioning Campbell's work hours and questioning how the ASA refund was handled. His claim rests on an alleged violation of his First Amendment right to free speech.[FN2]

> **FN2.** The Court notes that Kodrea has sued the Mayor in both his official and individual capacities. An official capacity suit against government employees is treated in all respects as one suit against the municipality. *See Leahy v. Bd. of Tr's of Cmty. Coll. Dist. No. 508, 912 F.2d 917, 922 (7th Cir.1990).* In addition, courts have emphasized that civil rights claims against individual defendants in their official capacities are redundant of the claims brought against a governmental entity; therefore, there exists no additional claims against the Mayor in his official capacity. *See Kentucky v. Graham, 473 U.S. 159, 167 n. 14 (1985); Rascon v. Hardiman, 803 F.2d 269, 274 (7th Cir.1986).* Kodrea concedes this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

point in his response to the motion for summary judgment. Resp. in Opp. to Summ. J. at 39. Accordingly, the Court **DISMISSES** the claims against the Mayor in his official capacity.

Generally speaking, public employment cannot be conditioned on a basis that infringes on an employee's constitutionally protected interest in freedom of expression. *See Connick v. Myers,* 461 U.S. 138, 142 (1983). While the government enjoys greater latitude in regulating the speech of its employees than that of the general public, a citizen does not surrender all First Amendment protection by accepting a job with a governmental entity. *See Carreon v. Ill. Dep't of Human Servs.,* 395 F.3d 796, 790-91 (7th Cir.2005) (citing *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205,* 391 U.S. 563, 568 (1968)). The Court must apply a three-part analysis in evaluating Kodrea's First Amendment retaliation claim under 42 U.S.C. § 1983: 1) Was his speech constitutionally protected? 2) If so, were Defendants' actions motivated by Kodrea's constitutionally protected speech? 3) If Kodrea can show that his constitutionally protected speech was a substantial or motivating factor in his termination, can Defendants show that they would have taken the same action in the absence of Kodrea's exercise of his rights under the First Amendment? *See Kuchenreuther v. City of Milwaukee,* 221 F.3d 967, 973 (7th Cir.2000). If Kodrea can establish the first two prongs, the burden shifts to Defendants to prove that Kodrea would have been terminated regardless of his protected speech. *See Garrett v. Barnes,* 961 F.2d 629, 632 (7th Cir.1992). If Defendants carry that burden, Kodrea bears the burden of persuasion to show that Defendants' proffered reasons were pretextual and that discrimination was the real reason Defendants fired him. *See King v. Preferred Tech. Group,* 166 F.3d 887, 893 (7th Cir.1999). In the summary judgment context, this means that Kodrea must show that a rational factfinder could infer that Defendants' stated reasons for firing him were lies. *See Alexander v. Wis. Dep't of Health & Family Servs.,* 263 F.3d 673, 683 (7th Cir.2001).

### 1. *Constitutionally Protected Speech*

**\*7** Whether Kodrea's speech is protected under the First Amendment is normally a question of law for the Court to determine. *See Kokkinis v. Ivkovich,* 185 F.3d 840, 843 (7th Cir.1999). In addressing this question, the Court must determine whether Kodrea spoke as a citizen on a matter of public concern. *See Connick,* 461 U.S. at 147. However, to the extent that there are factual issues that must be addressed by a jury first, the Court will be unable to make a conclusive determination.

The main thrust of Defendants' argument is that Kodrea's speech was not done in his capacity as a citizen but in the context of his employment. The Supreme Court just recently addressed the issue of whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties in *Garcetti, et al. v. Ceballos,* 547 U.S. ----, 2006 WL 1458026 (May 30, 2006). The plaintiff in *Garcetti,* Ceballos, was a deputy district attorney employed as a calendar deputy with supervisory responsibilities. *See Garcetti,* 2006 WL 1458026, *3. Pursuant to his duties, he investigated a complaint from a defense attorney regarding inaccuracies in an affidavit used to obtain a search warrant. *See id.* Following his investigation, Ceballos prepared a memo outlining his concerns with the affidavit and recommending that the case be dismissed. *See id.* Ceballos' memo prompted a meeting with his supervisors and members of the sheriff's department that allegedly became very heated. *See id.* at *4. In spite of Ceballos' concerns, the district attorney's office decided to proceed with prosecution. *See id.* Thereafter, during a hearing on a motion challenging the warrant, Ceballos was called by the defense to testify about his observations, but the trial court upheld the warrant. *See id.* Ceballos claimed that he was subsequently subjected to retaliation, including a transfer and denial of a promotion. *See id.*

The Supreme Court found that the controlling factor in answering the question of whether Ceballos' speech was protected was that his expressions were made pursuant to his official duties. *See id.* at *8. Indeed, part of Ceballos' responsibilities were to investigate concerns and advise his supervisors regarding pending cases, a fact that was not disputed by the parties. *See id.* Under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

these circumstances, the Supreme Court concluded that Ceballos was not acting as a citizen but as a government employee, doing what he was employed to do, and so his speech did not qualify for First Amendment protection. *See id.*[FN3]

> **FN3.** Prior to this ruling, the Seventh Circuit had found no constitutional protection for speech made under similar circumstances. *See, e.g., Schad v. Jones,* 415 F.3d 671 (7th Cir.2005); *Gonzalez v. City of Chicago,* 239 F.3d 939 (7th Cir.2001).

In reaching this decision, the Supreme Court made several observations applicable to this case. First, because the parties did not dispute that Ceballos' memo was done pursuant to his duties, the Supreme Court observed that it did not have occasion to articulate a framework for defining the scope of an employee's duties in cases where there is room for serious debate. *See id.* at * 10. It did reject, however, the suggestion that an employer can restrict an employee's rights simply by creating broad job descriptions. *See id.* In addition, the Court was not persuaded that Ceballos' speech was unprotected merely because he had expressed his views in the office and they concerned the subject matter of his employment, explicitly noting that in some cases employees may still receive First Amendment protection for expressions made at work or related to the employee's job. *See id* . at *7.

**\*8** *Garcetti* reveals that an important factor in addressing whether or not Kodrea's speech was protected is his job responsibilities. Unlike the situation in *Garcetti,* however, there is a factual dispute in this case concerning whether Kodrea's complaints about Campbell's hours and the ASA refund were made pursuant to his ordinary duties. As Kodrea notes, nothing in his job description required him to monitor or report misconduct. Dep. Ex. 13; Kodrea Dep. at 29. Further, Kodrea was not responsible for signing and approving or otherwise completing Campbell's time sheets; that responsibility was handled by Smith and the Parks Department secretaries. Metz Dep. at 16-18; Reed Dep. at 32, 35, 41; Kodrea Dep. at 144; Kodrea Aff., ¶ 5. Indeed, it is not clear how much oversight

Kodrea even had over Campbell's hours because Smith apparently authorized Campbell to work from home, authorization that should have come from Campbell's supervisor and which Kodrea knew nothing about. Smith Dep. at 15; Dodd Dep. at 28; Kodrea Aff., ¶ 5. Finally, Kodrea claim that Smith explicitly told him not to worry about Campbell's hours and that it was not a problem, which suggests that it was Smith's responsibility to oversee Campbell's hours rather than Kodrea's. Kodrea Dep. at 140, 142-43.

With respect to the ASA and refunds, the evidence and testimony favorable to Kodrea demonstrates that he did not determine the amount of the initial ASA fees; that amount had been the same for years. Reed Dep. at 17; Kodrea Dep. at 87. Further, beyond keeping track of the teams and collecting the registration fees for teams, Kodrea was not responsible for handling money. Kodrea Dep. at 91. Specifically, he was not responsible for depositing the collected fees in the bank or with the controller or with handling any paperwork related to these activities. Metz Dep. at 12-13; Reed Dep. at 17, 25; Kodrea Dep. at 88-89. Finally, there is no evidence that Kodrea had any oversight of the refunds. To the contrary, he claims that Smith said he would take care of this issue, which suggests that the refund process was not part of Kodrea's job at all. Kodrea Dep. at 94.

Simply put, there are factual issues about whether Kodrea's ordinary job responsibilities included overseeing Campbell's hours of work and the ASA refunds. Neither activity appears to have been Kodrea's core function as a recreational program director. The Court is unable to conclude that Kodrea's complaints were made simply as an employee rather than a concerned citizen. Accordingly, the Court must resolve any doubt in favor of Kodrea for purposes of summary judgment and conclude at this stage of the proceedings that Kodrea may have acted as a concerned citizen. Therefore, from the record before the Court, Defendants are not entitled to summary judgment on the question of whether Kodrea acted as a concerned citizen and *Garcetti* does not preclude Kodrea from presenting his claims to a jury for consideration.

**\*9** Having concluded that there is a factual dispute about whether Kodrea acted as a citizen that precludes

Slip Copy                                                                                                                                Page 8
Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

entry of summary judgment, the Court must next address whether Kodrea's speech was a matter of public concern. To answer this question, the Court must look at " 'the precise content, form, and context of the speech that admittedly may be of some interest to the public.' " *Kokkinis,* 185 F.3d at 844 (quoting *Clif v. Bd. of Sch. Comm'rs of City of Indianapolis,* 42 F.3d 403, 410 (7th Cir.1994)). Relevant questions include whether the point of the speech was to raise issues of public concern or to further a purely private interest. *See id.* (internal citations omitted). The content of the speech is the most important factor in the inquiry. *See Kuchenreuther,* 221 F.3d at 974. Unlike the question of whether not Kodrea acted as a citizen, the Court finds that it is able to make the legal determination of whether Kodrea's speech was on a matter of public concern.

First, the content of the speech in question supports a conclusion that the speech is a matter of public concern. Kodrea's speech concerned a situation where an employee was allegedly not working the hours for which he was being paid and a situation of potential misappropriation of funds. Numerous cases from the Seventh Circuit have discussed complaints regarding potential breaches of public trust in situations of time abuse and misuse of funds and concluded that the speech is on a matter of public concern. *See, e .g., Gazarkiewicz v. Town of Kingsford Heights,* 359 F.3d 933, 941 (7th Cir.2004); *Marshall v. Porter County Plan Comm'n,* 32 F.3d 1215, 1219-20 (7th Cir.1994); *Breuer v. Hart,* 909 F.2d 1035, 1038 (7th Cir.1990); *Ohse v. Hughes,* 816 F.2d 1144, 1150-51 (7th Cir.1987), *vacated and remanded,* 485 U.S. 802, *reinstated in relevant part,* 863 F.2d 22 (1988). Indeed, "[s]peech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests." *Gazarkiewicz,* 359 F.3d at 941 (quoting *Conaway v. Smith,* 853 F.2d 789, 797 (10th Cir.1988)). The Court concludes that the content of Kodrea's speech is comfortably on the socially valuable side of the constitutional line.

The Court next considers the form of Kodrea's speech. Kodrea initially conveyed his concerns internally to Smith, his supervisor. Defendants contend that Kodrea's

speech was not a matter of public concern because he did not seek a form of communication to air his concerns publically. However, First Amendment protection of speech is not limited to only those instances where the speech is broadcast to the world. *See Givhan v. W. Line Consol. Sch. Dist.,* 439 U.S. 410, 415-16 (1979). The fact that Kodrea may have spoken privately with Smith does not make his speech less a matter of public concern. *See Delgado v. Jones,* 282 F.3d 511, 518 (7th Cir.2002) (citing *Givhan,* 439 U.S. at 415-16). Indeed, as the Seventh Circuit has recognized, "an employee who attempts to follow internal mechanisms to resolve important issues should not be automatically treated less favorably than the individual who immediately turns to the press or public forum." *Spiegla v. Hull,* 371 F.3d 928, 937-38 (7th Cir.2004). To accept Defendants' argument would be to disregard these principles and place a burden on plaintiffs to become public champions of potential wrongdoing in order to be afforded First Amendment protection, a result not required by the law. Moreover, the Court notes that Kodrea has presented evidence suggesting that he did not simply report his concerns to his supervisors but also consulted other City employees for advice on the matters. Kodrea Dep. at 126, 129, 139; Liali Aff., ¶¶ 4-5; McKinney Aff., ¶¶ 4-8. Under the circumstances, the Court is unable to find that the form of Kodrea's speech renders it unworthy of constitutional protection.

**\*10** Finally, the Court considers the context of Kodrea's speech. At this stage, the Court considers Kodrea's motive for speaking as a "relevant, though not dispositive, factor." *Spiegla,* 371 F.3d at 938 (citing *Sullivan v. Ramirez,* 360 F.3d 692, 700 (7th Cir.2004). "Motive matters to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected if the expression addresses only the personal effect upon the employee." *Gustafson v. Jones,* 290 F.3d 895, 908 (7th Cir.2002) (internal quotations and citations omitted). In considering the context of speech, "it is necessary to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light?" *Kokkinis,* 185 F.3d at 844 (internal quotations omitted). The fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove it from the scope of public

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 9
Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

concern. *Cliff,* 42 F.3d at 410. To find otherwise would permit motive to supplant content in terms of overall importance. *Id.*

Here, the Court disagrees with Defendants' contention that the evidence shows that Kodrea's only motivation for speaking was to protect his job. Kodrea claims that he began expressing concerns related to Campbell's work hours in the fall of 2003 and expressed concerns again in May 2004, both before he received the problem employee performance appraisal form dated June 25, 2004. Kodrea Dep. at 130-31, 135, 138, 140-43; Dep. Ex. 12(E). Kodrea also spoke with Smith about the ASA refunds prior to receiving the problem employee performance appraisal form. Kodrea Dep. at 89-90, 93-96; Kodrea's Answers to Interrogatories at 3; Dep. Ex. 12(E). Kodrea claims that the first time he heard about any problems with his performance was the problem employee performance appraisal. Kodrea Dep. at 118. After receiving the appraisal, Kodrea began to question it as retaliation for raising his concerns with Smith. Kodrea Dep. at 100. While Kodrea's motivation from that point on in part may have been a desire to protect his job, the Court cannot conclude from the timing of Kodrea's speech that Kodrea's sole motivation in voicing his concerns was for personal reasons. Therefore, the Court finds that the context of Kodrea's speech supports a conclusion that Kodrea's speech was on a matter of public concern.

Considering the content, form, and context of Kodrea's speech, with the overriding consideration given to the speech's content as required by precedent, the Court concludes that Kodrea's speech was on a matter of public concern. As a final matter then, the Court must consider the *Connick-Pickering* balance test.[FN4] Even if speech relates to a matter of public concern, it is not constitutionally protected unless the speaker's First Amendment interests outweigh the public employer's interests in providing services efficiently. The parties have not presented any meaningful argument with regard to the *Connick-Pickering* balance test; however, there is nothing in the record to suggest that Kodrea's speech was sufficiently disruptive that the government's interest in promoting efficiency outweighed Kodrea's First Amendment rights. Indeed, it appears that Kodrea voiced his concerns to his immediate supervisors in a

non-disruptive manner through the appropriate chain of command. Accordingly, and assuming without deciding that Kodrea spoke as a citizen, the Court must conclude at this stage that Kodrea's speech is protected. Defendants are therefore not entitled to summary judgment on this issue.

> FN4. Factors to be considered when balancing an employee's and employer's relative interests include: "(1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public." *Kokkinis,* 185 F.3d at 845 (citation omitted).

### 2. *Substantial or Motivating Factor/Pretext*

**\*11** The Court must next address whether retaliation was the substantial or motivating factor in Defendants' decision to terminate Kodrea. *See Carreon,* 395 F.3d at 791. In order to prove retaliation, it is not enough to show that a defendant "welcomed" the end of the protected activity "or even that such activity played some minor role in the [adverse employment] decision ." *Rakovich v. Wade,* 850 F.2d 1180, 1189 (7th Cir.1988) (citations omitted). *See also O'Connor v. Chi. Transit Auth.,* 985 F.2d 1362, 1369 (7th Cir.1993). A plaintiff must demonstrate a causal link between the protected speech and the adverse employment action. *See Healy v. City of Chicago,* --- F.3d ----, 2006 WL 1652434, \*6 (7th Cir. June 16, 2006). However, a plaintiff also does not have the onerous burden of showing that retaliatory motive was the sole reason for the defendant's actions. *Rakovich, 850 F .2d at 1190.* Instead, a plaintiff's burden is to show that *"had it not been for the violation,* the injury of which he complains

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

would not have occurred." *Id.* (citations omitted) (emphasis in original). Additionally, a plaintiff may show improper motivation based on the timing of the adverse employment action, *i.e.,* by showing that the action "took place on the heels of protected activity." *Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1458 (7th Cir.1994).*

Defendants claim that Kodrea was terminated for a legitimate reason, *i.e.,* poor performance. However, Kodrea has presented sufficient evidence to place that rationale in dispute. Prior to the problem employee peformance appraisal, Kodrea received numerous compliments on the work that he was doing. Dep. Ex. 12(B). Further, his previous performance evaluation had been, for the most part, favorable. Dep. Exs. 12(D), 15. Indeed, Kodrea claims that the first time that Defendants made any mention of poor performance was when he received the problem employee performance appraisal, and Smith verified that Kodrea had not received any written communication expressing poor performance prior to that time. Kodrea Dep. at 70, 118; Smith Dep. at 109. Kodrea claims that the appraisal surfaced right after he spoke with Smith about the ASA refunds. Kodrea Dep. at 89-90, 93-96; Kodrea's Answers to Interrogatories at 3; Dep. Ex. 12(E). Kodrea also claims that when he received the appraisal he was given the ultimatum to resign or be fired, but chose to file a response and questioned the action as retaliation. Kodrea Dep. at 100; 120-21, 126.

Further, following the problem employee performance appraisal, Kodrea was placed on probation for thirty days. Kodrea Dep. at 145-46. Defendants contend that the probation period was extended an additional thirty days; however, like the lack of written communication on alleged poor performance, there is a lack of anything in writing to document such an extension. Indeed, Kodrea claims that he was informed that he had completed probation and believed that he had completed probation satisfactorily. Kodrea Dep. at 154, 156; Dep. Ex. 33.

**\*12** Here, the timing of Defendants' employment actions is suspect. The first time that Kodrea received a written communication regarding alleged poor performance was shortly after he expressed concerns

about the ASA refunds. Moreover, once Kodrea persisted in voicing his concerns and claimed retaliation, he was ultimately terminated. Finally, Kodrea testified that he was awarded unemployment benefits, which if true suggests that the Indiana Department of Workforce Development found no just cause for the termination. Kodrea Dep. at 171. Under the circumstances, the Court concludes that a jury could reasonably find that Kodrea's speech was a substantial or motivating factor for the poor performance appraisal and, ultimately, termination and that Defendants' stated reasons for their actions are mere pretext.

### 3. *Qualified Immunity and Individual Liability*

Defendants contend that even if Kodrea's speech is protected, they are entitled to qualified immunity. Defendants Smith and the Mayor further claim that they cannot be individually liable for any violation that may have occurred because they did not personally participate in Kodrea's termination. The Court addresses each argument in turn.

Government officials enjoy qualified immunity and are shielded from civil liability, "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton, 483 U.S. 635, 638 (1987).* To determine whether an official is entitled to qualified immunity requires a two part inquiry, as follows: (1) whether the facts alleged, taken in the light most favorable to the party asserting the injury, demonstrate that the official's conduct violated a constitutional right; and (2) whether the right was "clearly established" such that it would have been clear to a reasonable official "that his conduct was unlawful in the situation he confronted." *Saucier v. Katz, 533 U.S. 194, 201-02 (2001).*

The Court has already concluded that the facts as alleged and in the light most favorable to Kodrea reveal that Kodrea's First Amendment right may have been violated. Therefore, if Kodrea's right was "clearly established," then Defendants do not have qualified immunity.

The Court concludes that the right was clearly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 11
Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

established. As the Court has already noted, numerous cases demonstrate that complaints by public employees regarding time abuse or the misuse of funds are matters of public concern. Further, *Connick* has been the law for over twenty years. In addition, former Mayor Trobaugh was certainly aware of an employee's First Amendment rights to speak out on such matters Troubaugh Aff., ¶¶ 8-9. Dodd was likewise aware that an employee could not be retaliated against for voicing his concerns. Dodd Dep. at 65. Finally, Defendants were apparently aware that Kodrea's complaints touched on a matter of public concern as they purport to have investigated the allegations. Under the circumstances, any reasonable individual in Defendants' positions would have recognized that Kodrea could not be terminated for expressing concerns about Campbell's work hours or the ASA refunds. Defendants are therefore not entitled to qualified immunity.

**\*13** The Court must next consider the question of individual liability for the Mayor and Smith. To establish liability under § 1983, it is necessary to show some causal connection between the action complained of and the official sued. See *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). However, direct participation by a defendant is not necessary. *See Conner v. Reinhard,* 847 F.2d 384, 396 (7th Cir.1988). Instead, any official who "causes" a citizen to be deprived of her constitutional rights can be held liable. *Id.* at 396-97. "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of [his] constitutional rights." *Id.* at 397.

Here, the Court concludes that a jury could reasonably find that both the Mayor and Smith participated in the adverse employment actions against Kodrea. With respect to the Mayor, Dodd testified that the Mayor is ultimately responsible for decisions on employment issues. Dodd Dep. at 12, 15. The Mayor likewise testified that in most cases he is part of the termination process. McKillip Dep. at 54. Further, the Mayor was kept apprised of the employment issue with Kodrea and tacitly approved of Dodd's decision to terminate Kodrea when Dodd notified the Mayor of that decision. Dodd Dep. at 42-43. It also appears that the Mayor was the

individual responsible for recommending the use of the problem employee performance appraisal form (the first instance, according to Kodrea, of anyone noting a problem with his performance), and the Mayor approved all employment policies that were drafted by Human Resources. McKillip Dep. at 43; Kodrea Dep. at 118; Dodd Dep. at 19. Finally, the Mayor was involved in Kodrea's grievance process, ultimately denying the grievance and upholding the decision to terminate. McKillip Dep. at 59. Based on these circumstances, the Court finds that a jury reasonably could conclude that the Mayor helped to set in motion the events that led to the alleged retaliation.

Likewise, the Court finds that a jury reasonably could conclude that Smith is individually liable. Smith recommended Kodrea's termination, a recommendation upon which the jury could reasonably infer that Dodd relied. Smith Dep. at 49. Smith also completed the problem employee performance appraisal, and he apparently worked with Dodd on drafting that form. Smith Dep. at 73; Dep. Exs. 12(E), 24. Further, Smith was involved in discussions with the Mayor and Dodd about Kodrea's employment, and he was in charge of the counseling sessions with Kodrea that followed the problem employee performance appraisal. Dodd Dep. at 41, 53-54; Kodrea Dep. at 153. Finally, Kodrea claims that one of the volunteers for softball told him that Smith was going to fire him, and Kodrea claims that when Smith provided him with a copy of the problem employee performance appraisal Smith gave Kodrea the ultimatum to resign or be fired. Kodrea Dep. at 120-21, 244. Taking the circumstances in the light most favorable to Kodrea, the Court finds that Smith, like the Mayor, could be found to have participated in the adverse employment actions. Accordingly, the Court denies summary judgment on the question of individual liability for both the Mayor and Smith.

### 4. *Municipal Liability*

**\*14** As a final matter, the Court must address the question of municipal liability. A government entity is only liable under § 1983 when execution of a government policy or custom "by its lawmakers or by

those whose edicts or acts may fairly be said to represent official policy" inflicts the injury of which a plaintiff complains. *See Monell v. N.Y. City Dep 't of Soc. Servs., 436 U .S. 658, 694 (1978)*. Unconstitutional policies or customs can take three forms: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that, although unauthorized, is so permanent and well-settled that it constitutes a "custom or usage" with the force of law; or (3) an allegation that a person with final policymaking authority caused the injury. *See Rasche v. Vill. of Beecher, 336 F.3d 588, 597 (7th Cir.2003)*. Defendants contend that summary judgment is appropriate because there is no evidence of any policy or custom. The Court, however, disagrees and finds that summary judgment is inappropriate.

A single constitutional violation by a person with final policymaking authority may trigger liability under § 1983. *See Kujawski v. Bd. of Comm'rs, 183 F.3d 734, 737 (7th Cir.1999)*. Here, the Mayor had the ultimate responsibility for decisions related to employment issues, and he testified that in most cases he is part of the termination process. Dodd Dep. at 12, 15; McKillip Dep. at 54. In fact, the evidence favorable to Kodrea reveals that the Mayor participated in and approved of the decision to terminate Kodrea. Dodd Dep. at 43; McKillip Dep. at 43, 59.

Defendants nonetheless contend that there can be no municipal liability because Dodd fired Kodrea. Even if the Mayor played no part in Kodrea's termination, and in spite of the evidence to the contrary suggesting the Mayor's involvement, Defendants cannot escape municipal liability by claiming that Dodd made the termination decision on his own. Final policymaking authority may be delegated or ratified by an official having policymaking authority. *See Kujawski, 183 F.3d at 737; Waters v. City of Chicago, 416 F.Supp.2d 628, 630 (N.D.Ill.2006)*. In this case, there is evidence that when Dodd made the decision to terminate Kodrea the Mayor approved of the decision. Dodd Dep. at 12-13, 42-43; Smith Dep. at 49; McKillip Dep. at 59. As Dodd acknowledged, the Mayor had the ultimate responsibility for decisions related to employment issues, including approval of employment policies (Dodd Dep. at 12, 15, 19), and his approval of Dodd's

decision means that municipal liability can be imposed.

Moreover, municipal liability could be imposed even if the Mayor and Dodd deny any motive for retaliation against Kodrea. A jury could reasonably infer that the decision to terminate Kodrea was based on Smith's recommendation, and a jury could certainly conclude that Smith had a reason for retaliating against Kodrea. As the Northern District of Illinois recently noted, "a tainted input" may be sufficient to establish liability. *Waters, 416 F.Supp.2d at 630-31. See also Dev, 28 F.3d at 1459*.

**\*15** For all of these reasons, the Court concludes that Defendants are not entitled to summary judgment on the question of municipal liability.

### B. STATE WHISTLEBLOWER CLAIM

While Defendants offer several rationales for why they are entitled to summary judgment on Kodrea's state whistleblower claim, the Court finds one dispositive: whether Kodrea has a private right of action under Indiana Code § 36-1-8-8. This statute provides in relevant part that a public employer may not terminate an employee for reporting in writing a violation of law or misuse of public resources. An employer who violates this statute commits a Class A infraction. *See Ind.Code § 36-1-8-8(d)*. Whether or not Defendants may have violated the state statute, the Court concludes that the state statute does not provide Kodrea with a private right of action.

The parties have not directed the Court to any Indiana appellate decisions addressing this particular statute, and the Court's own research found none. Therefore, the Court must look to the language of the statute itself to determine whether the General Assembly intended to provide for a private right of action. The Court concludes that the plain language of the statute clearly limits Kodrea's remedy to appealing any disciplinary action pursuant to the procedures set forth by personnel policy or collective bargaining agreement, a remedy which Kodrea apparently employed via the grievance process in which the termination decision was upheld. *See Ind.Code § 36-1-8-8(c)*. Thus, on its face, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 13
Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

statute does not grant Kodrea a private right of action.

This conclusion is strengthened by a comparison of this statute with Indiana Code § 22-5-3-3, a "companion" statute passed in the same piece of legislation. *See* 1987 Ind. Acts, Pub.L. No. 32, §§ 3-4 at 938-40.[FN5] Indiana Code § 22-5-3-3 provides protection for employees of private employers under public contract and is virtually identical to § 36-1-8-8 in all material respects except for the remedy in subsection (c). Specifically, § 22-5-3-3(c) provides that an employee of a private employer under public contract may "process an appeal of [any] disciplinary action as a civil action." This difference in language reveals that the General Assembly can and does provide for a civil remedy when it chooses to do so.[FN6] Further, unlike § 36-1-8-8, § 22-5-3-3 has been addressed by Indiana's appellate courts. The Indiana Court of Appeals agreed that where an employee of a private employer under public contract brings a whistleblower claim, the cause of action arises under § 22-5-3-3 rather than common law. *See Coutee v. Lafayette Neighborhood Hous. Servs., Inc.,* 792 N.E.2d 907, 911-12 (Ind.Ct.App.2003), *reh 'g and trans. denied.* Based on *Coutee,* this Court concludes that in order for Kodrea to have a cause of action, it must arise under Indiana Code § 36-1-8-8 itself. Again, however, the statute explicitly limits Kodrea's remedy and does not provide for a private right of action.

> **FN5.** The two statutes were also later amended at the same time. *See* 1990 Ind. Acts, Pub.L. No. 9, §§ 14, 16 at 482-85.

> **FN6.** In fact, the General Assembly recently provided for such a remedy in legislation protecting employees who report that false claims for payment have been made to the State. *See* 2005 Ind. Acts, Pub.L. No. 222, § 23 at 3591 (codified as Indiana Code § 5-11-5.5-8(c)).

**\*16** Finally, the Court notes that its conclusion that Kodrea does not have a private right of action is consistent with Indiana's employment-at-will doctrine, which provides that where there is no definite term of

employment that the employment is at-will and is presumptively terminable at any time, with or without cause. *See Coutee,* 792 N.E.2d at 911. One exception to this doctrine is the public policy exception, which is applicable when an employee is discharged for exercising a statutory or constitutional right or for refusing to commit an illegal act for which he would be personally liable. *See, e.g., McGarrity v. Berlin Metals, Inc.,* 774 N.E.2d 71, 76 (Ind.Ct.App.2002); *Pepsi-Cola Gen. Bottlers, Inc. v. Woods,* 440 N.E.2d 696, 697 (Ind.Ct.App.1982). However, the Indiana Supreme Court has been reluctant to broaden the exceptions to the employment-at-will doctrine in the absence of clear statutory expression, and so the public policy exception has been construed narrowly by Indiana courts. *See, e.g., Dale v. J.G. Bowers, Inc.,* 709 N.E.2d 366, 368 (Ind.Ct.App.1999); *Wicor v. Anchor Indus., Inc.,* 669 N.E.2d 172, 177 n. 5 (Ind.1996). Thus, where the General Assembly has explicitly provided a remedy for a violation in a statute itself, courts have found the public policy exception inapplicable. *See Groce v. Eli Lilly & Co.,* 193 F.2d 496, 502-04 (7th Cir.1999) (discussing Indiana state law claim of retaliatory discharge for reporting violations of the Indiana Occupational Safety and Health Act); *Coutee,* 792 N.E.2d at 911. In this case, the statute in question provides a specific remedy, *i.e.,* the right to appeal a disciplinary action pursuant to internal personnel policies, and so under Indiana law the public policy exception would not assist Kodrea. He is therefore limited to the remedy provided in the statute.[FN7] Given the plain language of the statute and its explicit limitation on a remedy, a comparison of the statute to similar statutory provisions, and the employment-at-will doctrine, Kodrea's argument that a private right of action may be implied is unavailing. Accordingly, the Court concludes that Indiana Code § 36-1-8-8 does not provide Kodrea with a private of right of action. Kodrea's state law claim must therefore be dismissed.

> **FN7.** The Court notes that Judge Lozano of the Northern District of Indiana, relying on an analysis of the employment-at-will doctrine, recently reached a similar conclusion when he dismissed a plaintiff's state law claim brought pursuant to Indiana Code § 36-1-8-8. *See*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 14
Slip Copy, 2006 WL 1750071 (S.D.Ind.)
**(Cite as: Slip Copy)**

*Jennings v. Warren County Comm'rs,* No.
4:04-cv-094, 2006 WL 694742, *7-8
(N.D.Ind. March 14, 2006).

### V. *CONCLUSION*

For the foregoing reasons, Defendants', City of
Kokomo, Matthew McKillip, Dan Smith, and Jack
Dodd, Motion for Summary Judgment is **GRANTED
in part and DENIED in part.** Plaintiff's, Matthew G.
Kodrea, state law claim is dismissed with prejudice.

The Court also dismisses the claims against Defendant
Matthew McKillip in his official capacity as Mayor.
Any individual claims against Defendant Matthew
McKillip remain pending.[FN8]

> [FN8.] For the reasons stated herein, the Court
> also **DENIES** Defendants' Motion to Strike
> (Doc # 77).

IT IS SO ORDERED this 22nd day of June, 2006.

S.D.Ind.,2006.
Kodrea v. City of Kokomo, Ind.
Slip Copy, 2006 WL 1750071 (S.D.Ind.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1436231 (Trial Motion, Memorandum and
Affidavit) Plaintiff's Surreply (Apr. 25, 2006) Original
Image of this Document (PDF)
• 2006 WL 1436230 (Trial Motion, Memorandum and
Affidavit) Defendants' Reply in Support of Motion for
Summary Judgment (Apr. 17, 2006) Original Image of
this Document (PDF)
• 2006 WL 1113716 (Trial Motion, Memorandum and
Affidavit) Plaintiff's Response in Opposition to
Summary Judgment (Mar. 17, 2006) Original Image of
this Document (PDF)
• 2006 WL 735193 (Trial Motion, Memorandum and
Affidavit) Defendants' Memorandum of Law In Support
of Motion For Summary Judgment (Feb. 17, 2006)
• 2004 WL 2889448 (Trial Pleading) Complaint and
Demand for Jury Trial (Nov. 9, 2004)
• 1:04cv01843 (Docket) (Nov. 9, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 354366 (D.Del.), 8 Wage & Hour Cas.2d (BNA) 415
**(Cite as: Not Reported in F.Supp.2d)**


**Briefs and Other Related Documents**

United States District Court, D. Delaware.
John F. McNABOE, plaintiff,
v.
NVF COMPANY, Evans Tempcon, and Brenda
Nestor Castellano, defendants.
**No. 97-558-SLR.**

March 20, 2000.

Thomas S. Neuberger, Esquire, Wilmington, Delaware. Counsel for plaintiff. Of Counsel: William H. Ewing, Esquire, and Deborah Weinstein, Esquire, of Connolly Epstein Chicco Foxman Oxholm & Ewing, Philadelphia, Pennsylvania.

James E. Liguori, Esquire, and Gregory A. Morris, Esquire, of Liguori, Morris & Redding, Dover, Delaware. Counsel for defendants. Of Counsel: Milton M. Ferrell, Jr., Esquire, and Thomas G. Schultz, Esquire, of Ferrell Schultz Carter & Fertel, Miami, Florida.

MEMORANDUM OPINION
ROBINSON, District J.

## I. INTRODUCTION

**\*1** On October 19, 1997, plaintiff commenced this action against defendants NVF Company ("NVF"), Brenda Nestor Castellano, and Evans Tempcon ("Evans"). (D.I.1) As set forth in his second amended complaint, plaintiff asserted claims for (1) breach of his employment contracts with NVF and Evans; (2) violation by NVF and Evans of the Delaware Wage Payment and Collection Act ("WPCA"), Del.Code Ann. tit. 19, §§ 1101-15; (3) breach of the covenant of good faith and fair dealing by NVF and Evans; (4) tortious interference with contractual relations by Castellano; (5) violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§

1001-1461, by NVF; and (6) violation of the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. §§ 621-33a by NVF and Castellano. (D.I.31) On August 14, 1998, defendants filed an answer denying plaintiff's allegations and asserting several counterclaims. (D.I.81) Specifically, defendants asserted claims for breach of fiduciary duty and violations of the obligations of good faith and fair dealing. (D.I. 81 at 16-18)

The court held a jury trial commencing on February 1, 1999 and concluding on February 12, 1999.[FN1] After plaintiff had rested, defendants moved for judgment as a matter of law ("JMOL") under Fed.R.Civ.P. 50(a) as to all counts of the.(D.I.81)[FN2](D.I. 249 at 3-31) The court granted defendants' motion with respect to plaintiff's claims against defendant Castellano and plaintiff's claims against NVF for benefits under the Deferred Retirement Income Security Plan ("DRISP"). (D.I. 264 at 162-63) At the close of evidence on February 12, 1999, defendants renewed their motion for JMOL, which motion was denied. (D.I. 263 at 12-13)

> FN1. The court notes at the outset of its discussion that this trial was nothing short of an ordeal. Plaintiff, for his part, kept his theories of liability and evidentiary bases therefor moving targets to the end. Defendants' histrionics only served to muddy, rather than clarify, the myriad evidentiary disputes presented throughout the course of the proceedings. The court, having become accustomed to more orderly, courteous litigation, was ill prepared to effectively manage this raucous affair. One can only hope that the experience is not one any of the participants would ever wish to repeat.

> FN2. During trial, plaintiff voluntarily withdrew his claim under ERISA. (D.I. 266 at 200)

By verdict rendered on February 16, 1999, a jury found

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that defendants NVF and Evans had breached their respective contracts of employment with plaintiff, [FN3] had violated the covenant of good faith and fair dealing, and had failed without reasonable grounds to pay plaintiff wages owed to him. (D.I.256) The jury also found that defendant NVF had not violated the ADEA when it terminated plaintiff's employment. (D.I.256) In addition, the jury found in favor of plaintiff with respect to all of defendants' counterclaims. (D.I.256) The jury awarded plaintiff damages amounting to $458,800. (D.I.256) The court entered judgment on the verdict on February 17, 1999. (D.I.256)

> FN3. At trial, plaintiff did not assert that his employment with defendant Evans was anything other than at-will.

Currently pending before the court are various motions filed by the parties post trial. Defendants have filed a renewed motion for JMOL pursuant to Fed.R.Civ.P. 50(b) on the breach of contract claim against defendant NVF, breach of the covenant of good faith and fair dealing claim against NVF, and the claims for violation of the WPCA against NVF and Evans. (D.I.270) Alternatively, defendants request a partial new trial under Fed.R.Civ.P. 50(c) and 59 with respect to each claim on which the renewed motion for JMOL is denied or reversed on appeal.[FN4] (D.I.270) Defendants also have filed a motion to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e). (D.I.272) For his part, plaintiff has filed a motion to revise, alter, or amend the judgment under Fed.R.Civ.P. 54(b) and 59. (D.I.279) Both parties have filed motions for attorneys' fees and expenses but have agreed to defer briefing on these motions until after disposition of their motions under Fed.R.Civ.P. 50, 54, and 59. (D.I.269, 278)

> FN4. Defendants also request oral argument on this motion. (D.I. 270 at 2) Said request is denied.

## II. DEFENDANTS' RENEWED MOTION FOR JMOL

### A. Standard of Review

*2 By its motion for entry of JMOL or, alternatively, for a new trial, defendants seek relief from an adverse jury verdict. To prevail on a renewed motion for JMOL following a jury trial, the moving party must show that the evidence and the justifiable inferences therefrom do not afford any rational basis for the verdict. See Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 200 (3d Cir.1996). In assessing the sufficiency of the evidence, the court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in favor of the nonmovant. See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 269-70 (3d Cir.1995). The appropriate inquiry is whether " 'the record is 'critically deficient of the minimum quantity of evidence from which the jury might reasonably afford relief.' " Simone v. Golden Nugget Hotel & Casino, 844 F.2d 1031, 1034 (3d Cir.1988) (quoting Dawson v. Chrysler Corp., 630 F.2d 950, 959 (3d Cir.1980)).
In making such a determination, "the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." While a "scintilla of evidence is not enough to sustain a verdict of liability," the question is "whether there is evidence upon which the jury could properly find a verdict for that party."

Jaguar Cars, Inc., 46 F.3d at 269-70 (internal citations omitted) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.1993)).

### B. Discussion [FN5]

> FN5. As a threshold matter, plaintiff argues that defendants waived most of their arguments in support of their motion for JMOL by failing to raise them at trial. (D.I. 285 at 9-10) Having reviewed the trial transcript and the record, the court concludes that defendants either sufficiently identified during trial the grounds on which they intended to proceed for JMOL or are excused from not having done so because the issue was

not raised by plaintiff until after judgment was enforced.

1. Plaintiff's breach of contract claim against NVF

Defendants argue that they are entitled to JMOL with respect to plaintiff's breach of contract claim. During closing arguments, plaintiff summarized his contract claim as follows:

[Plaintiff] made an agreement with Victor Posner on February 7th, 1996....

That agreement was to take this written contract, which [plaintiff] had in April 1994, and put it into effect for three years, from the Court order confirming NVF's reorganization plan, which was issued on April 25th, 1996. That was [plaintiff's] testimony, and that is what all the supporting documentation shows.

(D.I. 263 at 43) Plaintiff contended that the three-year oral contract for employment was reflected in a "collection of writings" and thus met the requirements of the Delaware Statute of Frauds, Del.Code Ann. tit. 6, § 2714(a) (1993). (D.I. 263 at 52) The jury found that plaintiff "had an enforceable contract of employment with defendant NVF Company on September 26, 1997" that was breached by defendant NVF and awarded plaintiff damages in the amount of $458,800.[FN6] (D.I. 256 at 2-3) Defendants contend that based upon the evidence adduced at trial the contract described by plaintiff cannot exist as a matter of law. The issue before the court, therefore, is whether the evidence and testimony affords a rational basis for the jury's finding that the collection of writings asserted by plaintiff is in compliance with the Delaware Statute of Frauds.

FN6. The jury's notations on the verdict sheet indicate that it arrived at this amount by first summing the amount plaintiff would have been paid through April 25, 1999 had his employment with NVF not been terminated ($602,300), the cost of his insurance benefits through April 25, 1999 ($6,300), and his relocation expenses ($6,000) and then reducing that total by his post-termination earnings during the period through April 25, 1999 ($160,419). (D.I.256) In addition, the

award included $4,615 in damages based upon defendant Evans' failure to pay plaintiff wages owed. (D.I.256)

**\*3** Delaware's Statute of Frauds mandates that [n]o action shall be brought to charge any person upon ... any agreement that is not to be performed within the space of one year from the making thereof ... unless the contract is reduced to writing, or some memorandum, or notes thereof, are signed by the party to be charged therewith, or some other person thereunto by the party lawfully authorized in writing ....

Del. C. Ann. tit. 6, § 2714(a). The requirements of this statute apply to employment contracts that "cannot possibly be performed within one year." *Kirschling v. Lake Forest Sch. Dist.,* 687 F.Supp. 927, 930 (D.Del.1988). Plaintiff conceded at trial that the three-year, oral employment contract he alleged fell within the Statute of Frauds. He maintained, however, that five written documents he proffered, when considered collectively and in light of the testimony, constituted a writing sufficient to satisfy the Statute of Frauds. These five documents include: (1) a version of the 1994 employment agreement bearing the signatures of plaintiff and William J. Campbell, NVF's Executive Vice President;[FN7] (2) a memorandum dated January 17, 1996 from plaintiff to Donald Glazer, Executive Vice President of First Security and Investment Corporation ("First Security"), to which was attached a version of the 1994 employment agreement; (3) a credit approval letter dated February 5, 1996 from Leonard B. Wolf, Senior Vice President, Congress Financial Corporation ("Congress Financial"), to NVF that conditioned issuance of credit on plaintiff having "a signed [three-year] employment contract"; (4) a memorandum dated February 21, 1996 from Glazer to plaintiff regarding the "Employment Agreement"; and (5) the First Amended Disclosure Statement to Accompany the First Amended Joint Plan of Reorganization of NVF Company and the Official Committee of Unsecured Creditors Under Chapter 11 of the Bankruptcy Code ("First Amended Disclosure Statement") dated February 29, 1996.

FN7. Three versions of the 1994 agreement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 4
Not Reported in F.Supp.2d, 2000 WL 354366 (D.Del.), 8 Wage & Hour Cas.2d (BNA) 415
(Cite as: Not Reported in F.Supp.2d)

were offered into evidence at trial. The version plaintiff now asserts as part of the "collection of writings" has a handwritten notation on page 2 indicating that the dates in ¶ 2(b) of the contract are incorrect. (D.I. 275 at A109-19) The other two versions of the 1994 agreement bear not only the signatures and the notation "dates are wrong" but also a variety of other alterations and additional handwritten notations affecting the terms of the agreement. (D.I. 275 at A120-30, A141-51) According to plaintiff, he added the handwritten notations, including the "dates are wrong" notation, after Campbell signed the agreement in the spring of 1994. (D.I. 235 at 201-02; D.I. 258 at 97-98; D.I. 264 at 8)

In Delaware, in order for a collection of writings to constitute a memorandum under the Statute of Frauds, two requirements must be met: (1) one of the writings must be signed by the party to be charged; and (2) "the writings in the circumstances [must] clearly indicate that they relate to the same transaction." *See Lindsey v. M.A. Zeccola & Sons, Inc., 26 F.3d 1236, 1239-40 (3d Cir.1994).* In the case at bar, the only document proffered by plaintiff that is signed by the party to be charged is the February 21, 1996 memorandum from Glazer to plaintiff.[FN8] The other documents are either signed by plaintiff, are unsigned, or are signed by third parties. With the exception of plaintiff's January 17, 1996 memorandum to Glazer, none of the documents either implicitly or explicitly incorporate by reference any of the other documents cited by plaintiff. Thus, the documents can be read together only if "they clearly relate to the same transaction and the party to be charged has acquiesced in the contents of the unsigned writing." Restatement (Second) of Contracts § 132 cmt. c (1981).

FN8. At trial, the court denied defendants' motion for a directed verdict on the ground Glazer was not an authorized agent of the party to be charged at the time he signed the February 21 memorandum, finding that Glazer was more than an "incorporator." (D.I. 264 at 165; D.I. 263 at 7) Defendants' motion for

JMOL does not raise any new issues that would cause the court to reconsider its prior decision.

a. The 1994 agreement

**\*4** Although the "collection of writings" proffered by plaintiff consists of documents concerning plaintiff's employment with NVF, the documents themselves do not relate to the same transaction. With the exception of the 1994 agreement, the documents proffered by plaintiff speak to plaintiff's continued employment with NVF following the anticipated confirmation of the 1996 plan of reorganization. The 1994 agreement between plaintiff and NVF, on the other hand, was drafted as part of an aborted 1994 plan of reorganization.[FN9] As such, it cannot be said to "relate to the same transaction" unless there exists some direct or indirect connection between it and the other documents in the collection.

FN9. It is undisputed that a copy of the 1994 agreement never was filed with the Bankruptcy Court. (D.I. 297 at 28-29)

The January 17, 1996 memorandum's reference to the 1994 agreement does not supply this connection. On its face, the January 17, 1996 memorandum indicates that "a copy of [plaintiff's 1994 e]mployment [a]greement" was attached. Plaintiff, however, testified at trial that he did not remember which version of the 1994 agreement he attached to the memorandum. (*See, e.g.,* D.I. 258 at 114) Moreover, the memorandum was merely an inquiry into whether the terms of the agreement were still acceptable to the parties:

If everything is still in order, please let me know. If there is a problem, please let me know immediately and set up an appointment with Victor Posner to discuss this matter.

(D.I. 275 at A134) The memorandum precipitated the February 7, 1996 meeting between Victor Posner, Glazer, and plaintiff during which plaintiff contends an oral agreement was reached. The documents proffered by plaintiff that post date the February 7, 1996 meeting make no reference whatsoever to any version of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2000 WL 354366 (D.Del.), 8 Wage & Hour Cas.2d (BNA) 415
**(Cite as: Not Reported in F.Supp.2d)**

1994 agreement. In fact, the First Amended Disclosure Statement states that plaintiff's employment agreement with NVF was oral in nature, not written. (D.I. 275 at A102)

Even plaintiff's testimony as to the outcome of the February 7, 1996 meeting with respect to the adoption of the terms of the 1994 agreement is inconsistent at best. At trial, plaintiff testified as follows:

Q. [W]hen you met with Mr. Posner and Mr. Glazer, were there any discussion [s] of the terms of the contract?

A. Yes. It was supposed to be for three years.

Q. Anything else?

A. My salary of $380,400. And also the agreement with-regarding continuing the $75,000 bonus, if the company would attain profits on the operation line of a million dollars.

Q. Was there any reference to any of your previous arrangements that you had made with Mr. Posner or NVF?

A. Yes. I brought out the original agreement regarding the '94 agreement that never went through, and they stated that they would send me a contract that they would write to review.

Q. And what was going to be in the contract?

A. Hopefully, everything that was in the '94 contract.

Q. When you say hopefully, what do you mean by that?

A. I never got it so I couldn't say. All I got was a commitment letter.

*5 Q. Did you have an understanding on that subject?

A. Yes, we did.

Q. What was that.

A. The understanding is it would be the same as the '94 agreement.

(D.I. 297 at 82-83) Plaintiff testified during redirect examination as to the outcome of the meeting as follows:Q. After First Security signed an agreement to buy NVF, what steps if any did you take to follow up on your expectations [that the 1994 agreement would become effective when First Security brought NVF out of Chapter 11]?

A. I sent a letter to Don Glazer with a copy of the employment agreement to make sure that it was still in effect.

Q. And what happened after you sent that memo.

A. The only thing after that memo came was Don Glazer's letter to me regarding a subsequent contract, so that I could turn around and give it to Congress Financial, who was asking for it at the same time.

Q. Did you have a meeting in between?

A. Yes, I did....

Q. And what occurred at that meeting?

A. We discussed the employment agreement. We discussed First Security purchasing out the NVF Company out of Chapter 11. And we discussed my future plans with the company going forward.

Q. And what if anything was agreed at that meeting?

A. I believe the agreement, the [1994] employment agreement [FN10] ... was in effect at that point in time.

FN10. The court notes that the version of the 1994 agreement plaintiff indicated was adopted by Posner at the February 7, 1996 meeting was neither the version of the agreement he attached to his original complaint (DX 123C; D.I. 275 at A141-51) nor the version he attached to his second amended complaint (PX 114; D.I. A120-30). During cross examination, plaintiff stated that the version of the 1994 agreement he was asserting at trial as being incorporated into the oral agreement was the one attached to his original complaint. (D.I. 258 at 90, 106, 113; D.I. 243 at 150)

Q. What do you mean by "that time"?

A. As soon as the company came out of Chapter 11, that this agreement would be in effect.

Q. And would there be any changes to it?

A. Yes, sir. The terms of the agreement were changed because it was only supposed-it was changed to three years instead of five years.

Q. And did Mr. Glazer's memo here ... cause any change in that understanding?

A. No, sir.

Q. Did you wonder why the plan of reorganization just

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 6
Not Reported in F.Supp.2d, 2000 WL 354366 (D.Del.), 8 Wage & Hour Cas.2d (BNA) 415
**(Cite as: Not Reported in F.Supp.2d)**

said oral agreement?

A. Yes, sir.

Q. Did you ask Mr. Mojdehi about that?

A. Yes, sir. And he told me that First Security said that they would be drafting it later.

(D.I. 264 at 117-19) Moreover, plaintiff testified on direct examination and then again on recross that he considered the February 21, 1996 memorandum his "contract":Q. Do you recognize [the February 21, 1996 memorandum]?

A. Yes, I do.

Q. What is that?

A. It's an employment agreement. It's basic from First Security Investment Corporation to John McNaboe.

(D.I. 297 at 79)Q. Well, you never got the contract, did you?

A. I thought the letter in effect from Mr. Glazer was contract enough.

Q. Well-

A. Wait. You didn't let me finish. The bank accepted it and I accepted it and I thought it was valid.

Q. Well, we went through that for a couple hours Friday. And you said that you didn't get the contract, you were waiting for a contract and you didn't get it and that's why you're suing, didn't you.

A. That's correct, sir.

Q. So the fact of the matter is you didn't get the contract and you didn't quit, isn't it?

**\*6** A. No, I believe the letter from Mr. Glazer was contract enough and bound the company.

(D.I. 239 at 107)

Viewing the evidence and the inferences to be drawn therefrom in a light most favorable to plaintiff, the court concludes that plaintiff has not presented sufficient evidence indicating that "the party to be charged has acquiesced in the contents of the unsigned writing[, i.e., the 1994 agreement]." Restatement (Second) of Contracts § 132 cmt. c. The record, therefore, is insufficient to support inclusion of the 1994 agreement in the collection of writings that is to be considered as complying with the Statute of Frauds. [FN11] *See* Lindsey, 26 F.3d at 1240-41.

FN11. To the extent that the jury reduced plaintiff's damages award by the amount of his post-termination earnings, the jury's verdict is inconsistent with a finding that the "enforceable contract" between plaintiff and NVF contained the terms of any version of the 1994 agreement. A consistent interpretation of the jury's verdict in this regard requires only a finding that there existed some type of enforceable employment agreement between plaintiff and NVF, said agreement having a term of three years and providing for a certain level of compensation.

b. Subject matter and terms of employment

The remaining documents proffered by plaintiff, even when considered collectively in light of the testimony elicited at trial, do not satisfy the Statute of Frauds. In order to comply with the Statute of Frauds, a collection of writings must

(a) reasonably identif[y] the subject matter of the contract,

(b) ... sufficient[ly] ... indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party, and

(c) state[ ] with reasonable certainty the essential terms of the unperformed promises in the contract.

Restatement (Second) of Contracts § 131; *accord* Lindsey, 26 F.3d at 1239; Kirschling, 687 F.Supp. at 931. This is in addition to the requirement that at least one of the documents be signed by the party to be charged. *See* Abramson v. Delrose, Inc., 132 F.Supp. 440, 442 (D.Del.1955).

In the case at bar, the documents proffered by plaintiff do not singly or in combination sufficiently identify the subject matter and the terms of employment with the precision needed to satisfy the statute. In fact, the remaining documents are inconsistent with respect to the terms and nature of plaintiff's alleged employment contract. The February 5, 1996 letter from Congress Financial refers to a "signed employment contract" while the First Amended Disclosure Statement speaks of an oral employment contract. Moreover, the First Amended Disclosure Statement speaks of an annual

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2000 WL 354366 (D.Del.), 8 Wage & Hour Cas.2d (BNA) 415
**(Cite as: Not Reported in F.Supp.2d)**

salary of $380,000 while the February 21, 1996 memorandum indicates that plaintiff will "receive [his] current annual salary ($380,400) ." [FN12]

> [FN12.] Testimony at trial indicated that at the time this memorandum was written plaintiff's annual salary was $300,000, not $380,400. (D .I. 297 at 85)

Although the February 21, 1996 memorandum sets forth some specific terms of employment, that memorandum refers on its face to a "subsequent agreement." As such, it merely suggests the possibility of contracting in the future. Plaintiff's postures vis-a-vis the February 21, 1996 memorandum's reference to "subsequent agreement" does not provide for a different interpretation of the phrase:

Q. [The February 21, 1996 memorandum] isn't the same agreement which is described here as was described in your April 1994 contract, is it?

A. No. But it states on the second line, on the bottom line: "As previously discussed, this letter and the subsequent agreement are confidential, however, you are authorized to disclose this letter and the agreement to any lender to NVF that requires the same ."

**\*7** So the subsequent agreement could be the same agreement in '94 or it could be an agreement that is better than '94.

Q. What about an agreement worse than '94, Mr. McNaboe?

A. It could be, also. But that doesn't mean I would agree to it.

Q. It doesn't say a word in this letter about there being any prior written contract between you and NVF, does it, sir?

A. I would disagree with that statement.

Q. Where, please?

A. Let me finish. "As previously discussed, this letter and [the] subsequent agreement are confidential."

That subsequent agreement could be the agreement from '94 that he seen [sic] originally, that I mailed to him. I would have no idea. The only one that could answer that would be Mr. Glazer.

Q. So an April 1994 agreement would be what Mr. Glazer meant here, when he said a subsequent agreement?

A. I can't answer you what Mr. Glazer meant when he wrote that. All I know is that the company had given me a three-year contract. That was the agreement at that point in time, on the meeting that was held on February 7, 1996 at Mr. Posner's home.

Q. And they say the first sentence-I am sorry, the third sentence: "Upon such confirmation"-meaning ... the reorganized plan; is that correct?

A. That's correct.

Q. -"we would like to enter into an employment agreement with you."

Isn't it clear from that they have not yet entered into an employment agreement with you?

A. Read the first three lines: "As a follow up to our meeting held February 7, 1996 wherein you met with myself and Victor Posner in Miami Beach, it is our desire to retain your services as the President, chief operating officer and Director of the reorganized NVF Company."

Q. And it is their desire, in order to do that, to enter into a contract with you, in the future?

A. It says right there, upon such confirmation, we would like to enter into an employment agreement with you for an initial term of three years, yes, sir.

Q. It doesn't say you had an employment agreement in April of 1994, the term of which is being changed, does it?

A. My agreement with Victor Posner on February 7th, I had an agreement for a contract....

(D.I. 258 at 116-20)Q. It's your testimony that that is really an error, that what they were discussing was the prior agreement of April 13th, 1994. Is ... my understanding correct?

A. My understanding, as I testified to more than once is that the agreement from 1994 was sent to Mr. Glazer, was brought up with Mr. Posner, at this meeting on February 7th. That was my testimony.

Q. And then it was the April 1994 agreement that they

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2000 WL 354366 (D.Del.), 8 Wage & Hour Cas.2d (BNA) 415
**(Cite as: Not Reported in F.Supp.2d)**

are referring to when they say, and the subsequent agreement?

A. Well, I couldn't tell you. I haven't seen the subsequent agreement yet. But my belief was it was going to follow the plan of 1994.

(D.I. 243 at 148)Q. No, I am saying in his letter, [Glazer] is talking about entering into another employment agreement with you, perhaps?

**\*8** A. That's because the date of the February 7 meeting, we discussed the employment contract of '94, we discussed the terms of it. And, yes, they were going to write a new agreement.

Q. And you hoped that the new agreement would have terms in it that you liked [,] right?

A. Well, everybody would like that.

Q. But you didn't know what the terms were going to be until such time, if ever, a new agreement was written up and signed[,] right?

A. Until I seen it, I would assume that it still belonged to the 1994 contract.

(D.I. 243 at 152-53) Under the circumstances at bar, such a one-sided expression of conditional willingness to agree cannot be twisted into an enforceable contract in the absence of other writings to the contrary. [FN13] *See Raisler Sprinkler Co. v. Automatic Sprinkler Co., 171 A. 214, 222 (Del.Super.Ct.1934).* Such a conclusion is not undermined by plaintiff's belief that an employment contract had been formed via the February 21, 1996 memorandum and his reliance on that belief when he continued his employment with NVF.[FN14] (D.I. 239 at 107; D.I. 264 at 119-20)

> **FN13.** Congress Financial's acceptance of the February 21, 1996 memorandum as satisfying its requirement that plaintiff have "a signed [three-year] employment contract" before it would issue a secured line of credit is not evidence to the "contrary."

> **FN14.** From April 25, 1996 to September 26, 1997, plaintiff served as Chief Executive Officer, President, and Chief Operating Officer of NVF, receiving a salary of $380,000 per year and a bonus of $75,000 for

the year 1996. (D.I. 297 at 142-43; D.I. at 66)

Moreover, the collection of writings proffered by plaintiff does not state "with reasonable certainty the essential terms" of plaintiff's employment as required under Delaware law to overcome the presumption of an agreement for employment at-will. "In Delaware all the provisions of an employment contract must be clearly expressed in writing to create an employment agreement that is not one for employment at-will." *Lindsey,* 26 F.3d at 1242. The only terms set forth in the proffered collection of writings are the duration of employment, salary, and position to be filled. Nothing is said with regards to the performance bonus, DRISP participation, relocation expenses, and insurance benefits to which plaintiff claims he is entitled. Moreover, as noted above, neither the nature of the proposed agreement nor the salary term is consistent among the proffered documents. *See Lindsey,* 26 F.3d at 1242 (finding that "ambiguity in the written description of the parties' agreement on a term is fatal to the [plaintiff's] case because of Delaware's 'heavy presumption' in favor of employment at-will").

The evidence presented at trial does not constitute clear and convincing proof of all of the terms of the contract plaintiff is attempting to enforce. *See id.* at 1243. Even when the evidence is viewed in the light most favorable to plaintiff and all reasonable inferences are drawn in favor of plaintiff, the writings proffered by plaintiff when considered collectively do not recite with the necessary clarity the subject matter and terms of employment required to overcome the presumption of employment at-will and satisfy the Statute of Frauds. Although the court is most reluctant to enter judgment contrary to the jury's verdict, it concludes that there is insufficient evidence of record upon which a reasonable jury properly could have found that as of September 26, 1997, there was an enforceable three-year contract of employment between plaintiff and defendant NVF. Therefore, a verdict contrary to that rendered by the jury is compelled.[FN15]

> **FN15.** Plaintiff's WPCA claim against defendant NVF was premised upon NVF's failure to pay him the wages and benefits

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 9
Not Reported in F.Supp.2d, 2000 WL 354366 (D.Del.), 8 Wage & Hour Cas.2d (BNA) 415
**(Cite as: Not Reported in F.Supp.2d)**

owed him under the alleged three-year employment contract for the period of time remaining on the contract following his termination. At no time did plaintiff assert that defendant NVF owed him wages earned for work already performed at the time of his termination. Therefore, having found that the evidence adduced at trial is insufficient to support the jury's verdict as to the existence of an enforceable fixed-term contract between plaintiff and NVF, defendant NVF is entitled to JMOL with respect to plaintiff's WPCA claim against it.

2. Plaintiff's breach of the covenant of good faith and fair dealing claim against NVF

**\*9** The jury found that defendant NVF breached the covenant of good faith and fair dealing. Defendants argue that the jury's verdict with respect to the breach of covenant claim derived from the existence of a three-year contract; the claim, therefore, cannot stand if the court grants JMOL with respect to the breach of contract claim. Defendants' argument, however, is against the weight of Delaware case law and inconsistent with the jury instructions given at bar. [FN16]

FN16. The court instructed the jury that the covenant of good faith and fair dealing applied whether plaintiff was determined to be an at-will employee or an employee who had an employment contract with a definite term. (D.I. 263 at 149) The standard set forth in the instruction was the same regardless of the nature of the employment arrangement. (D.I. 263 at 149)

It is settled law in Delaware that, despite the heavy presumption of at-will employment, all employment contracts as well as at-will employment are subject to the covenant of good faith and fair dealing. *See Merrill v. Crothall-American, Inc., 606 A.2d 96, 101 (Del.1992); E.I. duPont de Nemours & Co. v. Pressman, 679 A .2d 436, 440 (Del.1996).* "[T]o constitute a breach of the implied covenant of good faith, the conduct of the employer must constitute

'an aspect of fraud, deceit or misrepresentation." ' ... An employer acts in bad faith when it induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract.

*Merrill, 606 A.2d at 101.* There are four narrowly defined categories where bad faith can apply:(1) the termination violated public policy; (2) the employer misrepresented an important fact and the employees relied "thereon either to accept a new position or remain in a present one"; (3) the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; or (4) the employer falsified or manipulated a record to create fictitious grounds to terminate the employee.

*Layfield v. Beebe Med. Ctr., Inc., C.A. No. 95C-12-007, 1997 WL 716900, at \*3-4 (Del.Super. July 18, 1997)* (quoting *Pressman, 679 A.2d at 442-44).* There is no indication in the relevant case law that the standard varies depending on the nature of the employment at issue, i.e., whether there is a written contract for a fixed term or employment is at-will.

Defendants do not assert that the evidence adduced at trial was insufficient to support the jury's finding that NVF breached the covenant in the context of a fixed-term employment contract. Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in favor of plaintiff, the court finds that there is sufficient evidence of record upon which a reasonable jury properly could have found that plaintiff proved by clear and convincing evidence that defendant NVF's conduct constituted the type of fraud and deceit "that falls within the protective cocoon" of the covenant of good faith and fair dealing. *Broksky v. Hercules, Inc., 966 F.Supp. 1337, 1352 (D.Del.1997).* Accordingly, defendants' motion for JMOL with respect to plaintiff's claim against defendant NVF for breach of the covenant of good faith and fair dealing is denied.

3. Plaintiff's claim for liquidated damages under the WPCA

**\*10** Defendants assert that a grant of JMOL is warranted with respect to plaintiff's claim that he is entitled to liquidated damages under Delaware's WPCA for defendant Evans' breach of that statute. The WPCA provides that

[i]f an employer, without any reasonable grounds for dispute, fails to pay an employee wages, as required under this chapter, the employer shall, in addition, be liable to the employee for liquidated damages in the amount of 10 percent of the unpaid wages for each day, except Sunday and legal holidays, upon which such failure continues after the day upon which payment is required or in an amount equal to the unpaid wages, whichever is smaller ....

Del.Code Ann. tit. 19, § 1103(b). Specifically, defendants assert that the clear weight of the evidence adduced at trial shows that there existed "reasonable grounds for dispute" whether defendant Evans owed plaintiff any wages. In support of their contention, defendants cite to the testimony of David Weychert, Chief Financial Officer of Evans (D.I. 266 at 87, 89); Glazer (D.I. 248 at 45-47); and Campbell (D.I. 264 at 29-30). All of these witnesses testified that it was their understanding that the compensation paid plaintiff by defendant Evans was to be deducted from the salary paid him by NVF. This testimony was countered by plaintiff's testimony that he was not directed to reduce his compensation from NVF to offset his compensation from Evans. (D.I. 297 at 155; D.I. 264 at 131)

After hearing and weighing the evidence adduced at trial, the jury returned a verdict in which it found that defendant Evans "failed to pay wages due to plaintiff without having any reasonable grounds for dispute." (D.I. 256 at 4) As the trier of fact, the jury was in the unique position to evaluate the credibility of the witnesses. It was not required to believe the testimony of any one witness, even if that testimony was uncontroverted. Only where "the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict" should a court "determine the proceeding ... by judgment notwithstanding the verdict." *Brady v. Southern Ry. Co.,* 320 U.S. 476, 479-80 (1943). Viewing the evidence in the light most favorable to

plaintiff and recognizing the prohibition on passing on the credibility of witnesses, the court finds a rational basis for the verdict. Accordingly, the grant of JMOL is inappropriate and defendants' motion with respect to this claim is denied.

## II. DEFENDANTS' MOTION IN THE ALTERNATIVE FOR A PARTIAL NEW TRIAL [FN17]

FN17. Federal Rule of Civil Procedure 50 provides in part that

[i]f the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial.

Fed.R.Civ.P. 50(c)(1). The court, therefore, will address all the grounds raised in defendants' motion for new trial irrespective of its grant of JMOL as to plaintiff's claim of breach of contract against NVF.

### A. Standard of Review

The standard for granting a motion for a new trial is less demanding than that for granting a motion for judgment as a matter of law. *See Lightning Lube Inc. v. Witco Corp.,* 802 F.Supp. 1180, 1185 (D.N.J.1992). A new trial may be granted "to all or any of the parties and on all or part of the issues ... in an action where there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a). In considering a new trial motion, the court must " 'view all the evidence and inferences reasonably drawn therefrom in the light most favorable to the party with the verdict.' " *Marino v. Ballestas,* 749 F.2d 162, 167 (3d Cir.1984) (quoting *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1273 (3d Cir.1979)).

**\*11** A trial court has broad discretion in ruling on a

Not Reported in F.Supp.2d                                                      Page 11
Not Reported in F.Supp.2d, 2000 WL 354366 (D.Del.), 8 Wage & Hour Cas.2d (BNA) 415
**(Cite as: Not Reported in F.Supp.2d)**

motion for a new trial on the grounds of improperly admitted or excluded evidence, the court's ruling on points for charge, misconduct of counsel, or newly discovered evidence. *See Link v. Mercedes-Benz of N. Am., Inc.,* 788 F.2d 918, 921-22 (3d Cir.1986). The court may consider the credibility of witnesses and weigh the evidence. *See Lightning Lube,* 802 F.Supp. at 1185. In evaluating a motion for a new trial on the basis of trial error, the court's inquiry is twofold: (1) whether an error was in fact committed, and (2) whether that error was so prejudicial that denial of a new trial would be "inconsistent with substantial justice." *Farra v. Stanley-Bostitch, Inc.,* 838 F.Supp. 1021, 1026 (E.D.Pa.1993) (quoting Fed.R.Civ.P. 61). To uphold the verdict, the court need only determine that the record contains the " 'minimum quantum of evidence from which a jury might reasonably afford relief." ' *Dawson,* 630 F.2d at 959 (quoting *Denney v. Siegel,* 407 F.2d 443, 439 (3d Cir.1969)).

The trial court's discretion, however, is more limited in granting a new trial on the ground that the jury's verdict is against the weight of the evidence. The Third Circuit has cautioned that the trial court should grant a new trial on this basis "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir.1991). This more stringent standard is necessary to ensure that the trial court does not substitute its ' 'judgment of the facts and the credibility of the witnesses for that of the jury." ' *Fineman v. Armstrong World Indus.,* 980 F.2d 171, 211 (3d Cir.1992) (quoting *Lind v. Schenley Indus.,* 278 F.2d 79, 90 (3d Cir.1960) (en banc)). The trial court is not allowed to " 'substitute its own judgment for that of the jury simply because the court might have come to a different conclusion." ' *Lightning Lube,* 802 F.Supp. at 1186 (quoting *Fineman v. Armstrong World Indus.,* 774 F.Supp. 266, 269 (D.N.J.1991)).

B. Discussion

1. Evidentiary rulings

Defendants contend that the court erroneously admitted evidence concerning the alleged oral agreement reached between plaintiff and First Security. Specifically, defendants allege it was error for the court to admit plaintiff's testimony concerning the February 7, 1996 meeting, the February 21, 1996 memorandum from Glazer, and the February 5, 1996 letter from Congress Financial. To grant a new trial on improperly admitted evidence, the admission must have constituted prejudicial error. Rule 61 of the Federal Rules of Civil Procedure provides:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

**\*12** Fed.R.Civ.P. 61. Under this rule, "harmless errors" are technical errors or defects that do not affect the rights of the parties. *See Kotteakos v. United States,* 328 U.S. 750, 760 (1946). In making a determination of "harmless error," a court must consider the record before it and the circumstances of the particular case. *See id. at 762.* If the alleged error affected the substantial rights of a party, a new trial shall be ordered; otherwise, the error is harmless and must be disregarded. *See Harkins v. Ford Motor Co.,* 437 F.2d 276, 278 n. 5 (3d Cir.1970); *see also McQueeney v. Wilimington Trust Co.,* 779 F.2d 916, 924 (3d Cir.1985) (holding that a trial court's "errors are harmless only if it is highly probable that the errors did not affect the outcome of the case.").

a. Plaintiff's testimony as to statements made by Posner and Glazer

The first issue before the court concerns plaintiff's testimony about his February 7, 1996 conversation with Posner and Glazer regarding his continued employment with NVF following Bankruptcy Court confirmation of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the reorganization plan. Defendants contend that this testimony was erroneously admitted as it constitutes hearsay.[FN18] At trial, the court allowed the admission of the testimony at issue on the ground that the statements made by Posner and Glazer were verbal acts and thus not hearsay.[FN19] (*See, e.g.,* D.I. 297 at 76)

> FN18. Specifically, defendants argue that the statements were neither (1) admissions under Fed.R.Evid. 801(d)(2)(D) as neither Posner nor Glazer were agents of NVF at the time the alleged statements were made nor (2) verbal acts and thus not hearsay under Fed.R.Evid. 801(c). (D.I. 271 at 28-29)

> FN19. The court recognized on numerous occasions that at the time the statements at issue were made, Posner was not authorized to direct or act on behalf of NVF but was authorized to do so with respect to First Security, of which he was the sole shareholder. As of February 7, 1996, Glazer was Executive Vice President of First Security and, thus, an authorized agent of that entity.

Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The Advisory Committee Notes exclude from this definition an offered statement whose significance lies solely in the fact that it was made [as] no issue is raised as to the truth of anything asserted .... The effect is to exclude from hearsay the entire category of "verbal acts" and "verbal parts of an act," in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights.

Fed.R.Evid. 801(c), advisory committee notes.

In the case at bar, plaintiff was attempting to prove the existence of an oral agreement. The words the offerors, Posner and Glazer, uttered in making the offer are admissible as nonhearsay as they are utterances to which the law attaches duties and liabilities. *See* 4 Jack

B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 801(c)(01) (1999); 6 *Wigmore Evidence* § 1770 (Chadbourn rev.1976); M. Graham, *Federal Practice and Procedure: Evidence* § 6705 (Interim ed.1992). Evidence of the oral agreement was being offered to prove that the statements were made, not to prove the truth of the matter stated. There is no requirement that the parties to the contract be the same as the parties to the litigation in which the evidence is introduced.[FN20] Thus, it is irrelevant to the analysis that neither Posner nor Glazer are parties to the present action. Accordingly, the court concludes that admission of the testimony did not violate the rule against hearsay. The court, therefore, will deny defendants' motion for new trial on this ground.

> FN20. The court notes in this regard, however, that prior to the February 7 meeting, First Security had executed a stock purchase agreement pursuant to which it would purchase the stock of NVF and that NVF and the Creditors' Committee jointly had filed with the Bankruptcy Court a proposed Disclosure Statement and Plan of Reorganization to carry that agreement into effect. (D.I. 286 at B150-51, B160-161) Following confirmation of the plan of reorganization, in June 1996, First Security merged into NVF, at which time any contractual duties entered into by First Security attached to NVF, the surviving corporation. *See* Del.Code Ann. tit. 8, § 259(a); *Gould v. American Hawaiian Steamship Co.,* 331 F.Supp. 981, 998 (D.Del.1971).

b. Admission of the February 21, 1996 memorandum

**\*13** Defendants also object to the admission of the February 21, 1996 memorandum on the grounds that (1) at the time he authored the document, Glazer was an officer of First Security, a non-party to this action; (2) the document was written on behalf of First Security; and (3) the document consists merely of preliminary negotiations rather than a final employment agreement. (D.I. 271 at 29) As an initial matter, the court notes that defendants did not raise an objection to the admission

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of this document pretrial despite its being asserted by plaintiff in his opposition to defendants' motion for summary judgment. In fact, defendants agreed to the document's admission in the Pretrial Statement.

Like the testimony concerning Posner's and Glazer's statements at the February 7, 1996 meeting, the February 21, 1996 memorandum constitutes a verbal act. As such, it is not hearsay. Its admission, therefore, was consistent with the Federal Rules of Evidence. Accordingly, defendants' motion for new trial on this ground is denied.

### c. Admission of the February 5, 1996 letter from Congress Financial

The final evidentiary issue before the court concerns the admission of the February 5, 1996 letter from Congress Financial to plaintiff. On the eve of trial, the court excluded admission of the February 5, 1996 letter because of its untimely production by plaintiff. (Tele-conference, January 25, 1999) The court reversed its decision regarding the admissibility of the document on the fifth day of trial. (D.I. 243 at 61-62) Despite instruction by the court, the witness, Leonard B. Wolf, was unable, given the document-intense banking industry, to testify without reference to the existence of documents and, in particular, the document at issue. (D.I. 243 at 51-56) The decision to admit the document was made in order to facilitate trial proceedings by allowing for testimony in a non-disjointed fashion.

Defendants' assertion of prejudice with respect to the introduction of the February 5, 1996 letter is meritless. Defendants knew of the witness, and that he possessed relevant knowledge, well before trial. In fact, Wolf was listed on both plaintiff's and defendants' pretrial witness list. Defendants were well aware of Wolf's employer, Congress Financial, which was identified during discovery, and its involvement in the reorganization of NVF. Defendants had ample opportunity to pursue discovery against Congress Financial. Moreover, and most importantly, defendants had the letter in their possession since November 1998, three months prior to trial, and were on notice that Wolf would be testifying as to the contents of the February 5, 1996 letter. In

addition, the court permitted defendants to speak with the witness concerning any of the documents in his file prior to their cross examination. (D.I. 243 at 61-62) Under the circumstances, the court concludes that if admission of the February 5, 1996 letter were an error, that error was not so prejudicial that denial of a new trial would be "inconsistent with substantial justice." Accordingly, defendants' motion for new trial on this basis is denied.

### 2. Jury instructions

**\*14** Defendants move for a new trial in part because the court allegedly provided jury instructions that were legally incorrect, misleading, or inadequate. The court must review the alleged errors in the jury instructions to "determine whether, if taken as a whole, [the instructions] properly apprised the jury of the issues and the applicable law. '[T]he charge, taken as a whole and viewed in light of the evidence, [must] fairly and adequately submit[ ] the issues in the case to the jury." ' *Tigg Corp. v. Dow Corning Corp.,* 962 F.2d 1119, 1126-27 (3d Cir.1992) (internal citations omitted) (quoting *Link,* 788 F.2d at 920; *see also Gutzan v. Altair Airlines, Inc.,* 766 F.2d 135, 138 (3d Cir.1985). The court must examine the jury instructions as a whole, "consider[ing] the totality of the instructions and not a particular sentence or paragraph in isolation." *United States v. Coyle,* 63 F.3d 1239, 1245 (3d Cir.1995); *see also Limbach Co. v. Sheet Metal Workers Int'l Ass'n,* 949 F.2d 1241, 1259 n. 15 (3d Cir.1991). Furthermore, "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51.

### a. Pertaining to plaintiff's claims for violation of the WPCA

The first error that defendants allege in their motion for a new trial is that the jury instruction pertaining to plaintiff's claims under the WPCA was improper. The court instructed the jury on the Delaware WPCA as

follows:
Under Delaware law, if an employer fails to pay an employee wages due to the employee when the employee is discharged and the employer does not have reasonable grounds for disputing that it owes the wages to the employee, the employer may be liable to the employee for liquidated damages in addition to the unpaid wages.
Plaintiff alleges that both NVF Company and Evans Tempcon violated this law by failing, without reasonable grounds, to pay him wages to which he was entitled.

(D.I. 263 at 150-51)

As a threshold matter, the court notes that defendants offered no specific objection to this instruction during the prayer conference. (D.I. 264 at 205-06) Rather, they offered only a general objection "to the [c]ourt's refusal to give the instructions [they] requested ." (D.I. 263 at 13) In so doing, defendants failed to delineate "the matter objected to and the grounds of the objection" as required by Fed.R.Civ.P. 51. Fed.R.Civ.P. 51; *see also* 9A Charles A. Wright et al., *Federal Practice and Procedure* § 2553 (2d ed.1995). Accordingly, in the absence of a showing of plain error,[FN21] defendants have waived their right to object to this instruction. *See United States v. Zehrbach,* 47 F.3d 1252, 1260 n .6 (3d Cir.1995) (en banc).

FN21. The Third Circuit has defined "plain error" as "those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings." ' *United States v. Santos,* 932 F.2d 244, 250 (3d Cir.1991) (quoting *United States v. Atkinson,* 297 U.S. 157, 160 (1936)).

Defendants contend that the court's instruction regarding the WPCA does not "indicat[e] to the jury that [plaintiff's] WPCA claim did not have to relate to the recovery of wages owed to him for work he performed up to the date of his termination." (D.I. 271 at 31-32) Moreover, defendants argue that the instruction gives the jury no guidance regarding how to judge whether defendants' refusal to pay plaintiff was "reasonable."

*15 The court based the instruction on § 1103 of title 19 of the Delaware Code, which provides in relevant part:
(a) Whenever an employee quits, resigns, is discharged, suspended or laid off, the wages earned by the employee shall become due and payable by the employer on the next regularly scheduled payday(s) either through the usual pay channels or by mail, if requested by the employee, as if the employment had not been suspended or terminated.
(b) If an employer, without any reasonable grounds for dispute, fails to pay an employee wages, as required under this chapter, the employer shall, in addition, be liable to the employee for liquidated damages in the amount of 10 percent of the unpaid wages for each day, except Sunday and legal holidays, upon which such failure continues after the day upon which payment is required or in an amount equal to the unpaid wages, whichever is smaller ....

Del.Code Ann. tit. 19, § 1103. The court's instruction is essentially a simplified restatement of this provision. Further guidance from the court as to what constitutes "reasonable grounds for dispute" was unnecessary as such a determination is well within a jury's capabilities.

After reviewing the jury instruction, the court finds that, even if defendants had objected, the instruction on the WPCA apprises the jury of the issues and the applicable law. Accordingly, the court will deny defendants' motion for new trial on this ground.

b. Pertaining to the "collection of writings" doctrine

The next error that defendants allege in their motion for a new trial is that the jury instruction on the Delaware Statute of Frauds misstated the burden of proof. The court instructed the jury that "[a] collection of several writings, only one of which is signed, may satisfy the statute of frauds only if the writings, taken together, clearly relate to the same transaction." (D.I. 263 at 144) Defendants contend that this instruction does not represent Delaware law because it does not require proof of the connection of the various writing by clear

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and convincing evidence where the connection is not evident on the face of the writings.

Defendants cite *Lindsey* in support of their assertion. The Third Circuit in *Lindsey,* however, did not recognize the application of such a heightened standard of proof, instead citing § 132 of the Restatement (Second) of Contracts, which provides only that "[t]he memorandum may consist of several writings if one of the writings is signed and the writings in the circumstances clearly indicate that they relate to the same transaction." [FN22] In the absence of any indication that the Delaware courts apply a clear and convincing evidence standard to proof of the collection of the writings, the court finds that its decision to omit such wording in its instruction on the Delaware Statute of Frauds was correct. Defendants' motion for a new trial on this ground is denied.

> FN22. The *Lindsey* court made no mention of cmt. a of the Restatement (Second) of Contracts § 132, which states in part that "[e]xplicit incorporation by reference is unnecessary, but if the connection depends on evidence outside the writings, the evidence of connection must be clear and convincing." In contrast, the Third Circuit noted that Delaware's heavy presumption of at-will employment requires a plaintiff to present by clear and convincing evidence all the essential terms of the employment contract she is seeking to enforce. See *Lindsey,* 26 F.3d at 1243.

c. Pertaining to definiteness as to terms of a contract

*16 Defendants next move for a new trial on the basis that the jury instruction on contract definiteness was inconsistent with Delaware law. As a threshold matter, the court notes that defendants offered no specific objection to this instruction during the prayer conference. (D.I. 264 at 191) Defendants, therefore, are barred from raising this objection after trial in the absence of a showing of plain error. See *Zehrbach,* 47 F.3d at 1260 n. 6.

In instructing the jury on contract definiteness, the court stated that
[f]or an agreement to be enforced, it must be sufficiently definite and explicit in its material terms so that the parties' intentions may be ascertained to a reasonable degree of certainty....
An agreement is not necessarily unenforceable if there are open terms, so long as you find that the parties, having agreed on certain important terms, agree to bind themselves to negotiate together in good faith to work out the terms remaining open.

(D.I. 263 at 143) Despite defendants' arguments to the contrary, such an instruction does not misstate Delaware law. [FN23] It is an established principle of Delaware jurisprudence that an agreement must be reasonably definite and certain in its material terms to be enforceable. See *Hindes v. Wilmington Poetry Society,* 138 A.2d 501, 503 (Del. Ch.1958); *Most Worshipful Prince Hall Grand Lodge of Free & Accepted Masons of Delaware, Inc. v. Hiram Grand Lodge Masonic Temple, Inc.,* 80 A.2d 294, 295 (Del. Ch.1951). It is, however, "equally true that a [Delaware] court will not upset an agreement where the indefinite provision is not an essential term." *Hindes,* 138 A.2d at 503.

> FN23. Defendants' assertion that the instruction "interjected an issue into the trial that is not supported by any evidence and which was not reserved as an issue for trial by any party" is without merit. (D.I. 271 at 32-33)

Moreover, to the extent that the instruction might have "left the jury with the impression that it could find in [plaintiff's] favor simply by concluding that the parties agreed on one or two terms with numerous other terms being left open to further negotiations," that impression would have been cured by the court's instruction concerning employment at-will. The court specifically instructed the jury in that regard that
[i]n Delaware all the provisions of an employment contract must be clearly expressed in writing to create an employment agreement that is not one for employment at will. Therefore, you must determine

Not Reported in F.Supp.2d                                                         Page 16
Not Reported in F.Supp.2d, 2000 WL 354366 (D.Del.), 8 Wage & Hour Cas.2d (BNA) 415
**(Cite as: Not Reported in F.Supp.2d)**

whether plaintiff has proved by clear and convincing evidence that a legally binding contract for a term of three years of employment was formed between plaintiff and Victor Posner, which contract binds defendant NVF Company.

(D.I. 263 at 145) Examining the jury instructions as a whole, the court finds that the instruction pertaining to definiteness does not warrant a new trial. Accordingly, the court will deny defendants' motion for new trial on this ground.

### d. Pertaining to plaintiff's claims for breach of the covenant of good faith and fair dealing

Defendants next argue that the court's instruction concerning breach of the covenant of good faith and fair dealing misstates Delaware law. The court gave the following instruction pertaining to the breach of the covenant:
**\*17** To prove that NVF did not act in good faith or with fair dealing, plaintiff must show by a preponderance of the evidence that NVF harbored ill will toward plaintiff and committed an act of deceit, fraud, or misrepresentation by one of the following actions:
1. Promising him secure future employment when, in fact, NVF had no such intention and later caused him to be discharged from his employment with NVF; or
2. Deliberately discrediting plaintiff by fabricating reasons for his termination which were not true; or
3. Creating an untrue record of poor job performance after discharging plaintiff.

(D.I. 263 at 149-50) Defendants contend that this instruction is improper because it fails to require a finding that NVF acted with an "intent to injure" plaintiff in order for a breach to be established. Defendants further argue that the court's instruction, to the extent that it allows a breach to be found if NVF created an untrue record of poor job performance after discharging plaintiff, is contrary to Delaware law.

As a threshold matter, the court notes that defendants did not raise these grounds of objection before the jury began deliberations. (D.I. 264 at 199-205) Accordingly, defendants have waived their right to object to the

court's instruction. Notwithstanding defendants' failure to "stat[e] distinctly the matter objected to and the grounds of the objection," this court may still grant a new trial on this basis if " 'the error was so fundamental and highly prejudicial as to constitute plain error." ' *Zehrbach* 47 F.3d at 1260 n. 6 (quoting *Bennis v. Gable,* 823 F.2d 723, 727 (3d Cir.1987)). The Third Circuit has admonished, however, that plain error is to be found "sparingly and only where the error was sure to have had unfair prejudicial impact on the jury's deliberations." *Id.* at 1263 n. 9. Alternatively, review is merited if the error is such that the failure to consider it would result in a " 'miscarriage of justice." ' *Beardshall v. Minuteman Press Int'l Inc.,* 664 F.2d 23, 27 (3d Cir.1981) (quoting *United States v. 564.54 Acres of Land,* 576 F.2d 983, 987 (3d Cir.1978), *rev'd on other grounds,* 441 U.S. 506 (1979)).

Delaware law concerning breach of the covenant of good faith and fair dealing has been summarized previously. *See* discussion *supra* at Part II.B.2. Reviewing the instruction in light of this case law, the court concludes that it gave the correct instruction with one exception: Delaware law does not explicitly indicate that the covenant is breached if the employer "[c]reat[es] an untrue record of poor job performance after discharging plaintiff." (Emphasis added) To the extent that the instruction indicated such was Delaware law, it is in error.

Review of the record reveals, however, that it is unlikely such error had a prejudicial impact on the jury's deliberations. The evidence adduced at trial and the corresponding argument concerning breach of the covenant of good faith and fair dealing focused on (1) defendant NVF's termination of plaintiff for the allegedly pretextual reasons set forth in the September 25, 1997 letter to plaintiff, i.e., plaintiff's failure to move to Florida and his receipt of unauthorized compensation; and (2) defendants' alleged duplicity in agreeing to a written employment contract without any intent to execute such. Plaintiff presented substantial evidence at trial supporting these assertions. In contrast, there was neither evidence nor argument proffered at trial indicating that defendants attempted to distort plaintiff's performance record following his termination. Under these circumstances it is unlikely that the court's

incorporation within the instruction of an incorrect theory of liability affected the jury's verdict. *See Hopp v. City of Pittsburgh,* 194 F.3d 434, 441-42 (3d Cir.1999); *see also* 11 Charles A. Wright et al., *Federal Practice and Procedure* § 2886 (2d ed.1995). Accordingly, it cannot be said that the instruction merits the grant of a new trial on the basis of manifest injustice. The court, therefore, shall deny defendants' motion for new trial on this ground.

### e. Pertaining to the after-acquired evidence defense

**\*18** In their final argument, defendants assert that they are entitled to a new trial because the court refused to instruct the jury as to the "after-acquired evidence defense" [FN24] as it pertained to plaintiff's breach of contract and the covenant of good faith and fair dealing claims against defendant NVF. Defendants have not provided, nor has an independent search revealed, any case wherein the Delaware Supreme Court has ruled directly on the applicability of the after-acquired evidence defense to breach of contract cases, generally, or in the employment context specifically. Although the lower Delaware court decisions cited by defendants in support of their assertion, *Eastern Elec. & Heating, Inc. v. Pike Creek Prof'l Ctr.,* 1987 WL 9610 (Del.Super.Ct. Apr. 7, 1987), and *Davenport Group MG, L.P. v. Strategic Inv. Partners, Inc.,* 685 A .2d 715 (Del. Ch.1996), involve application of the after-acquired evidence defense to breach of contract actions, they do not do so in the employment context. Neither case, therefore, can be said to support defendants' assertion that the doctrine acts as a complete bar to recovery in an action involving breach of an employment contract. In the absence of specific guidance from the Delaware Supreme Court to the contrary, this court's decision to omit the defendants' "after-acquired evidence" instruction was correct. Accordingly, defendants' motion for new trial on this ground is denied.

FN24. A number of courts have held that if an employer can demonstrate by way of "after-acquired evidence" that it would have fired an employee had it known of his or her prior misconduct, then the employee's claim

for breach of contract is barred, i.e, excuses the employer's breach. *See, e.g., O'Day v. McDonnell Douglas Helicopter Co.,* 959 P.2d 792, 799 (Ariz.1998).

### 3. Special verdict form

Defendants contend that they are entitled to a new trial because the special verdict form was confusing and contrary to law. Federal Rule of Civil Procedure 49(a) provides:

Special Verdicts. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

A trial court has wide discretion in determining whether to submit a case to a jury by special verdict questions and in determining the form of such questions. *See* 9A Charles A. Wright et al., *Federal Practice and Procedure* § 2505 (2d ed.1995).

**\*19** In their motion for a new trial, defendants contend generally that the special verdict questions are improper because they track the "erroneous" jury instructions. Specifically, defendants attack special verdict questions 6, 9, 12, 13, and 14.[FN25] Under Fed.R.Civ.P. 49(a) any objection to the form and language of special verdict questions not raised before the jury retires are deemed waived. *See Neely v. Club Med Management Servs.,*

*Inc.,* 63 F.3d 166, 200 (3d Cir.1995). Review of the record reveals that defendants voiced no objections to the questions they now deem improper.[FN26] Accordingly, they have waived their right to object. *See id.;* Fed.R.Civ.P. 49(a) and 51. Consequently, defendants' objection can be considered post-trial only if review is necessary to avoid a gross miscarriage of justice or if the error was plain or fundamental. *See Neely,* 63 F.3d at 200 n. 39; *Zehrbach,* 47 F.3d at 1260 n. 6.

FN25. These questions read as follows:
6. Do you find that plaintiff John J. McNaboe had an enforceable contract of employment with defendant NVF Company on September 26, 1997?
9. Do you find that defendant NVF Company failed to pay plaintiff wages due under his contract without having any reasonable grounds for dispute?
12. Do you find that defendant Evans Tempcon failed to pay plaintiff the entire amount of wages it owed to him?
13. What amount of damages do you award plaintiff for defendant Evans Tempcon's failure to pay the entire amount of wages it owed?
14. Do you find that Evans Tempcon failed to pay wages due to plaintiff without having any reasonable grounds for dispute?
(D.I. 256 at 2-4)

FN26. At trial, the defendants requested that a general verdict form be employed or, alternatively, that their proposed special verdict form be submitted to the jury. (D.I. 264 at 209-10; D.I. 263 at 12) They voiced no objection to the verdict form adopted, however.

In addition to arguing that the special verdict questions are deficient for the same reason as are the corresponding jury instructions, defendants argue that questions 6, 9, 12, 13, and 14 are ambiguous on their face, providing no guidance to the jury as to the proper scope of inquiry. The special verdict questions,

however, were not designed to be read in a vacuum. Rather, they were designed to be read in conjunction with the jury instructions. The court is not required to repeat on the verdict form the substantive law when the jury instructions adequately cover the subject. *See Greenleaf v. Garlock, Inc.,* 174 F.3d 352, 363 n. 8 (3d Cir.1999). Having reviewed the record, the court finds nothing with respect to the special verdict questions constituted error in this case that would amount to plain error or require the granting of a new trial in order to avoid manifest injustice. Accordingly, defendants' motion for new trial on this ground is denied.

4. Verdict against the weight of the evidence

A new trial may be granted where the verdict is contrary to the great weight of the evidence, that is, where a miscarriage of justice would result if the verdict were to stand. The court already has granted defendants' motion for JMOL as to plaintiff's breach of contract claim against defendant NVF by setting aside the jury's verdict that there existed as of September 26, 1997 an enforceable employment contract for a definite term between plaintiff and NVF. From the previous discussion of the evidence and testimony presented at trial as to this issue, the court concludes that the jury verdict in this regard is against the great weight of the evidence such that it would be a miscarriage of justice to let it stand. Accordingly, in the event the court's grant of JMOL in favor of defendants on this issue (i.e., the existence of an enforceable employment contract for a definite term between plaintiff and NVF) is reversed, the court conditionally grants defendants' motion for a new trial on plaintiff's breach of contract and WPCA claims against defendant NVF pursuant to Fed.R.Civ.P. 50(c)(1) and 59.[FN27]

FN27. Although defendants assert that they are "entitled to a judgment on each of plaintiff's claims for relief," they do not specifically set forth the grounds for such relief with respect to plaintiff's claim against NVF for breach of the covenant of good faith and fair dealing. (D.I. 271 at 38-40) To the extent that defendants contend the verdict as it

relates to this claim is against the weight of the evidence, the court finds upon review of the evidence and testimony as discussed herein, *see* discussion *supra* II.B.2, that the jury's verdict in this regard does not "cr[y] out to be overturned or shock[ the] conscience." *Williamson,* 926 F.2d at 1353. The jury made its finding on the basis of its judgment as to the credibility of the witnesses and the weight it felt the evidence deserved, and the court is not in a position to say that the verdict is so inconsistent with the evidence as to constitute a manifest injustice.

**\*20** With respect to the remaining claims for which defendants seek a new trial, under the standard set forth above, the jury's verdict in this matter cannot be set aside. The jury heard conflicting testimony as to whether defendant Evans paid plaintiff all of the wages he was owed at the time of his termination. Given the dearth of objective evidence, the jury had to weigh the credibility of the witnesses in making the difficult decision whether there existed "reasonable grounds" for dispute with regard to the wages owed plaintiff, if any, by defendant Evans. By concluding that defendant Evans did not pay plaintiff the entire amount of wages he was owed, and did so without reasonable grounds for dispute, the jury was presumably indicating that it did not believe that defendant Evans was justified in withholding payment.

Upon consideration of evidence presented and as discussed herein, the court concludes that the verdict as it relates to claims against defendant Evans is not against the clear weight of the evidence. Nor is the verdict in this regard a manifest miscarriage of justice or a shock to the conscience. The jury made its findings on the basis of its judgment as to the credibility and weight it felt the evidence deserved. The court, having reviewed the record before it, cannot say that the jury verdict is so inconsistent with the evidence as to constitute a manifest injustice. It would be improper for the court to substitute its judgment of the facts and credibility of the witnesses for that of the jury. Accordingly, defendants' motion for new trial on the claims against defendant Evans on the ground that the jury's verdict is against the weight of the evidence is

denied.

### III. DEFENDANTS' MOTION TO ALTER OR AMEND THE JUDGMENT

#### A. Standard of Review

Under Fed.R.Civ.P. 59(e), on a party's motion, the court may amend its findings and/or its judgment in a particular matter. A party bringing a motion pursuant to Fed.R.Civ.P. 59(e) must rely on one of three grounds: (1) an intervening change in controlling law; (2) new evidence not available previously; or (3) a need to correct a clear error of law or prevent manifest injustice. *See North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir.1995). Such a motion may not be used "to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to entry of judgment." 11 Charles A. Wright et al ., *Federal Practice and Procedure* § 2810 (2d ed.1995). The grant of a Rule 59(e) motion rests within the sound discretion of the trial court. *See Kiewit Eastern Co. v. L & R Constr. Co.,* 44 F.3d 1194, 1204 (3d Cir.1995); *see also Ruscavage v. Zuratt,* 831 F.Supp. 417, 418 (E.D.Pa.1993) ("Motions under Rule 59(e) should be granted sparingly because of the interests in finality and conservation of scarce judicial resources.").

#### B. Discussion

Defendants' motion is grounded on the third base, i.e., the need to correct a clear error of law or prevent manifest injustice. Initially, defendants ask this court to modify the entry of judgment in order to specify that defendant Castellano prevailed on all of plaintiff's claims against her and that defendant NVF prevailed on plaintiff's claims against it under the ADEA and ERISA. Such modification is not required nor is it necessary in order to prevent manifest injustice. As it stands, the judgment, which incorporates the jury's verdict, accurately reflects the result of the trial. The court, therefore, declines defendants' request to alter the judgment in this regard.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 20
Not Reported in F.Supp.2d, 2000 WL 354366 (D.Del.), 8 Wage & Hour Cas.2d (BNA) 415
**(Cite as: Not Reported in F.Supp.2d)**

**\*21** Defendants further ask the court to reduce or remit the amount of the judgment awarded plaintiff for his claim of breach of contract against NVF. [FN28] As the court will grant defendants' motion for JMOL as to this claim, the motion to alter or amend the judgment in this regard has become moot. Likewise, defendants' concern that the judgment is ambiguous, to the extent that it could be read as entitling plaintiff to recover from NVF the sum awarded for breach of the covenant of good faith and fair dealing in addition to the sum awarded for breach of contract, is moot. The court, therefore, need not address these issues further.

FN28. Specifically, defendants request that the award against NVF be reduced to accurately reflect the amount of plaintiff's mitigation of damages and the jury's award against defendant Evans ($4,615). (D .I. 273 at 7-10)

### IV. PLAINTIFF'S MOTION TO ALTER OR AMEND THE JUDGMENT

#### A. Standard of Review

The standard of review for this motion has been addressed adequately above, in connection with defendants' motion to alter or amend the judgment.

#### B. Discussion

In his motion, plaintiff requests that the court revise or amend the judgment (1) to eliminate the reduction in the award for defendant NVF's breach of his employment contract attributed to his post-termination earnings; (2) to award liquidated damages of 100% pursuant to the WPCA; and (3) to award prejudgment interest. In light of the court's grant of defendants' motion for JMOL with respect to plaintiff's claim against defendant NVF for breach of contract, plaintiff's request for elimination of the reduction in that award is moot. Similarly, to the extent that plaintiff's request for liquidated damages under the WPCA is based upon the existence of an enforceable fixed-term employment contract between plaintiff and NVF entitling plaintiff to

the payment of wages and benefits for the unexpired term of the contract, that claim is moot as well. Plaintiff does not argue that the damages award from defendant NVF for breach of the covenant of good faith and fair dealing entitles him to liquidated damages under the WPCA.

Plaintiff is entitled, however, to liquidated damages under the WPCA against defendant Evans. After weighing the evidence and the credibility of the witnesses, the jury determined that defendant Evans had failed to pay plaintiff the entire amount of wages it owed him without having "reasonable grounds for dispute." As noted above, the court is not in a position to overturn the jury's verdict in this regard. Since plaintiff was a discharged employee whose earned wages were not paid on "the next regularly scheduled payday," he is entitled under the WPCA to liquidated damages in the amount of the lessor of 10% of the amount of unpaid wages for each day that the obligation continued unmet or double damages. *See* Del.Code Ann. tit. 19, § 1103(b). Under the circumstances at bar and in light of the jury's verdict, plaintiff is entitled to an award of liquidated damages against defendant Evans in the amount of $4,615. Accordingly, the court shall enter judgment in favor of plaintiff and against defendant Evans in the amount of $9,230.

Plaintiff further seeks an award of prejudgment interest. In Delaware, when the amount of damages is calculable, prejudgment interest is awarded as a matter of right and not of judicial discretion. *See Moskowitz v. Mayor & Council of Wilmington,* 391 A.2d 209, 210 (Del.1978); *see also Citadel Holding Corp. v. Roven,* 603 A.2d 818, 826 (Del.1992). Such "interest accumulates from the date payment was due the plaintiff, because full compensation requires an allowance for the detention of the compensation awarded and interest is used as a basis for measuring that allowance." *Moskowitz,* 391 A.2d at 210. Accordingly, plaintiff is entitled to prejudgment interest from the date of his termination, September 26, 1997, to February 17, 1999, the date judgment was entered. Defendants do not challenge plaintiff's request for application of prejudgment interest at the legal rate set forth in § 2301 of title 6 of the Delaware Code, which provides that "the legal rate of interest shall be 5% over

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 21
Not Reported in F.Supp.2d, 2000 WL 354366 (D.Del.), 8 Wage & Hour Cas.2d (BNA) 415
**(Cite as: Not Reported in F.Supp.2d)**

the Federal Reserve discount rate including any surcharge as of the time from which interest is due." Del.Code Ann. tit. 6, § 2301(a). Plaintiff asserts, and defendants do not dispute, that the Federal Discount Rate on September 26, 1997 was 5%. The court, therefore, shall award plaintiff prejudgment interest calculated at 10% per annum from September 26, 1997 to February 17, 1999 (509 days). This amounts to $644 on the award from defendant Evans and $64,023 on the award from defendant NVF.

## V. CONCLUSION

**\*22** For the reasons stated: (1) defendants' renewed motion for judgment as a matter of law (D.I.270) on plaintiff's claim (a) for breach of contract claim against NVF is granted, (b) for breach of the covenant of good faith and fair dealing against NVF is denied, (c) for violations of the WPCA by NVF is granted, and (d) for liquidated damages under the WPCA is granted with respect to NVF and denied as to Evans; (2) defendants' alternative motion for a partial new trial (D.I.270) is denied in part and granted in part; (3) defendants' motion to alter or amend the judgment (D.I.272) is denied; and (4) plaintiff's motion to revise, alter, or amend the judgment (D.I.279) is denied in part and granted in part. Both defendants' (D.I.269) and plaintiff's (D.I.278) motions for attorneys' fees and expenses are denied without prejudice to renew. An order shall issue.

D.Del.,2000.
McNaboe v. NVF Co.
Not Reported in F.Supp.2d, 2000 WL 354366 (D.Del.), 8 Wage & Hour Cas.2d (BNA) 415

Briefs and Other Related Documents (Back to top)

• 1:97CV00558 (Docket) (Oct. 09, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



415 F.Supp.2d 490                                                                                   Page 1
415 F.Supp.2d 490
**(Cite as: 415 F.Supp.2d 490)**

**C**
Briefs and Other Related Documents

United States District Court,E.D. Pennsylvania.
Robert J. MITCHELL, Plaintiff,
v.
Mayor John F. STREET and The City of
Philadelphia, Defendants.
**No. Civ.A. 04-3213.**

Aug. 16, 2005.

**Background:** Terminated Deputy Police
Commissioner for City of Philadelphia, sued mayor and
city under First and Fourteenth Amendments and §
1983 alleging retaliation for exercise of his rights to
free speech and to petition government for redress of
grievances, as well as violations of Pennsylvania
Constitution. Defendants moved for summary
judgment.

**Holdings:** The District Court, Robert F. Kelly, Senior
District Judge, held that:

5(1) Deputy Police Commissioner's appearance on
radio program to discuss gun permit issue and District
Attorney's findings involved a matter of "public
concern";

7(2) material issues of fact existed as to whether
protected activity was a substantial factor motivating
the termination decision;

8(3) court would decline to exercise supplemental
jurisdiction over state constitutional claims, in light of
unclear state of law as to whether cause of action for
damages against government officials existed under
Pennsylvania Constitution; and

10(4) mayor was not entitled to qualified immunity.

Motion denied.

West Headnotes

**[1] Constitutional Law 92 ⚷⚯⚯90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and
Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public Employment.
Most Cited Cases

**Constitutional Law 92 ⚷⚯⚯91**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k91 k. Right of Assembly and Petition. Most
Cited Cases
Three-step analysis applies to public employee's claims
of termination in retaliation for exercising his First
Amendment rights to petition government for redress of
grievances and to engage in free speech: first, employee
must show that he engaged in a protected activity,
second, employee must show that the protected activity
was a substantial factor motivating the dismissal
decision, and finally, employer may defeat employee's
claim by demonstrating that the same action would have
taken place even in the absence of the protected
conduct. U.S.C.A. Const.Amend. 1.

**[2] Constitutional Law 92 ⚷⚯⚯90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and
Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public Employment.
Most Cited Cases
Public employer may dismiss employee for speech

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

415 F.Supp.2d 490
415 F.Supp.2d 490
**(Cite as: 415 F.Supp.2d 490)**

Page 2

addressing a matter of public concern if state's interest, as an employer, in promoting the efficiency of its operations outweighs the employee's interest, as a citizen, in commenting upon matters of public concern; however, this balancing test comes into play only if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so. U.S.C.A. Const.Amend. 1.

**[3] Constitutional Law 92 ⚖82(11)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k82 Constitutional Guaranties in General
            92k82(6) Particular Rights, Limitations, and Applications
                92k82(11) k. Public Employees; Military Personnel. Most Cited Cases
In claim for retaliatory discharge from government employment, employee must establish that conduct which triggered the discharge was protected under the First Amendment. U.S.C.A. Const.Amend. 1.

**[4] Constitutional Law 92 ⚖45**

92 Constitutional Law
    92II Construction, Operation, and Enforcement of Constitutional Provisions
        92k44 Determination of Constitutional Questions
            92k45 k. Judicial Authority and Duty in General. Most Cited Cases
Determining whether public employee's speech involved a matter of public concern is a question of law for the court. U.S.C.A. Const.Amend. 1.

**[5] Constitutional Law 92 ⚖90.1(7.2)**

92 Constitutional Law
    92V Personal, Civil and Political Rights
        92k90 Freedom of Speech and of the Press
            92k90.1 Particular Expressions and Limitations
                92k90.1(7) Labor Matters
                    92k90.1(7.2) k. Public Employment.
Most Cited Cases

**Municipal Corporations 268 ⚖181**

268 Municipal Corporations
    268V Officers, Agents, and Employees
        268V(B) Municipal Departments and Officers Thereof
            268k179 Police
                268k181 k. Commissioners, Board, or Other Governing Body. Most Cited Cases
Philadelphia Deputy Police Commissioner's appearance on radio program to discuss issue of whether he had obtained illegal gun permit and District Attorney's findings after investigation that he had engaged in no wrongdoing whatsoever involved a matter of "public concern," for purposes of his First Amendment retaliation claim; issue involved possible illegal activity and corruption on part of high ranking government official. U.S.C.A. Const.Amend. 1.

**[6] Federal Civil Procedure 170A ⚖2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most Cited Cases
To survive summary judgment on retaliation claim after employer has articulated legitimate, nonretaliatory reasons for adverse employment action, employee must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

**[7] Federal Civil Procedure 170A ⚖2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

415 F.Supp.2d 490
415 F.Supp.2d 490
**(Cite as: 415 F.Supp.2d 490)**

Page 3

170Ak2497.1 k. In General. Most Cited
Cases
Genuine issues of material fact, as to whether
Philadelphia Deputy Police Commissioner's protected
activities were a substantial factor motivating the
decision to terminate him, precluded summary
judgment for city and mayor on his First Amendment
retaliation claims. U.S.C.A. Const.Amend. 1.

**[8]** Federal Courts 170B ⬡14.1

170B Federal Courts
  170BI Jurisdiction and Powers in General
    170BI(A) In General
      170Bk14 Jurisdiction of Entire Controversy;
Pendent Jurisdiction
        170Bk14.1 k. In General. Most Cited
Cases
District court would decline to exercise supplemental
jurisdiction over terminated Philadelphia Deputy Police
Commissioner's state constitutional claims against city
and mayor, as question of whether right of action for
money damages against government officials existed
under Pennsylvania Constitution was unclear. 28
U.S.C.A. § 1367(c)(1); Pa.Const. Art. 1, §§ 1, 11.

**[9]** Officers and Public Employees 283 ⬡114

283 Officers and Public Employees
  283III Rights, Powers, Duties, and Liabilities
    283k114 k. Liabilities for Official Acts. Most
Cited Cases
Qualified immunity is available to government officials
performing discretionary functions.

**[10]** Civil Rights 78 ⬡1376(10)

78 Civil Rights
  78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith and
Probable Cause
      78k1376 Government Agencies and Officers
        78k1376(10) k. Employment Practices.
Most Cited Cases
Mayor of Philadelphia was not entitled to qualified
immunity from liability to former Deputy Police
Commissioner on his § 1983 claim relating to his

termination in alleged retaliation for filing equity
complaint seeking to enjoin his removal pending results
of District Attorney's investigation into whether he had
obtained illegal gun permit and for appearing on radio
program and discussing results of that investigation;
former Deputy Commissioner had alleged violation of
his First Amendment rights to petition government for
redress of grievances and to engage in free speech,
which were clearly established. U.S.C.A.
Const.Amend. 1; 42 U.S.C.A. § 1983.

**\*492** James E. Beasley, William T. Hill, The Beasley
Firm, Philadelphia, PA, for Plaintiff.
Shelley R. Smith, City of Philadelphia Law Department,
Philadelphia, PA, for Defendants.

*MEMORANDUM*
ROBERT F. KELLY, Senior District Judge.

**I. *INTRODUCTION***

Presently pending before this Court is the Defendants',
Mayor John F. Street ("Mayor Street") and the City of
Philadelphia, Motion for Summary Judgment. On July
7, 2004, Mitchell filed his Complaint with this Court.
Mitchell's Complaint contains three counts.
Specifically, the counts are: Violation of the First &
Fourteenth Amendment and 42 U.S.C. § 1983 (Count
I); Violation of Article I, Section I, of the Pennsylvania
Constitution (Count II); and Violation of Article I,
Section XI, of the Pennsylvania Constitution (Count
III). Defendants have moved for summary judgment
on all three counts. For the following reasons,
Defendants' Motion is denied. However, as will be
explained in *infra* Part IV.B, Counts II and III of the
Complaint will be dismissed without prejudice.

**II. *BACKGROUND***

Plaintiff, Robert J. Mitchell ("Mitchell") is the former
Deputy Police Commissioner for the City of
Philadelphia. Mitchell held that title from 1996 until
2004. In early 2004, a rumor began to circulate that
**\*493** Mitchell had obtained an illegal gun permit. In
late February, 2004, the media picked up the story and

415 F.Supp.2d 490
415 F.Supp.2d 490
**(Cite as: 415 F.Supp.2d 490)**

Page 4

reported that Mitchell allegedly possessed an illegal gun permit. Initially, Police Commissioner Sylvester Johnson ("Johnson") announced his support for Mitchell at a press conference on February 26, 2004. That same day, Mayor Street called a meeting to discuss the gun permit issue. Present at this meeting were Mayor Street, Johnson, Mitchell, Mayor Street's Chief of Staff Joyce Wilkerson ("Wilkerson"), Communications Director Barbara Grant ("Grant") and Police Counsel Karen Simmons, Esquire ("Simmons"). At the meeting, Mitchell denied any wrongdoing with respect to the gun permit. The parties dispute the actual outcome of this meeting as it related to Mitchell's continued employment, however, what is certain is that on February 27, 2004, at a press conference, Mayor Street stated that Mitchell would be taking a leave of absence from his position as Deputy Police Commissioner. An investigation then commenced into the gun permit issue.

On March 11, 2004, Mitchell filed a complaint in Equity with the Court of Common Pleas of Philadelphia County. The complaint sought to enjoin Mayor Street and the City of Philadelphia from removing him from his post as Deputy Police Commissioner pending the results of the investigation regarding the gun permit.[FN1]

> [FN1.] That complaint was dismissed as moot by the Court of Common Pleas on June 11, 2004. (*See* Defs.' Mot. Summ. J. Ex. E).

On May 26, 2004, Philadelphia District Attorney Lynne Abraham announced the results of her investigation into the gun permit issue. The District Attorney concluded that Mitchell had engaged in no wrongdoing whatsoever.

On May 27, 2004, Mitchell appeared on the Michael Smerconish ("Smerconish") radio program.[FN2] During this appearance, Smerconish and Mitchell discussed the District Attorney's public announcement regarding the gun permit issue and her findings that Mitchell engaged in no wrongdoing. On June 1, 2004, Mitchell received a letter from Johnson terminating his employment. Mitchell subsequently filed his Complaint with this Court approximately one month later.

> [FN2.] Mitchell previously appeared on the Smerconish show on March 4, 2004 after the announcement by Street that Mitchell was suspended from his position as Deputy Police Commissioner.

### III. *STANDARD*

"Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.' " *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 267 (3d Cir.1991) (citations omitted). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact.[FN3] *494Big Apple BMW, Inc. v. BMW of N. Am. Inc.*, 974 F.2d 1358, 1362 (3d Cir.1992). Once the moving party has produced evidence in support of summary judgment, the non-movant must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates there is a genuine issue of fact for trial. *Id.* at 1362-63. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> [FN3.] "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.' " *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F.Supp. 554, 561 n. 14 (E.D.Pa.1998) (citations omitted), *aff'd*, 172 F.3d 40 (3d Cir.1998).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

415 F.Supp.2d 490
415 F.Supp.2d 490
**(Cite as: 415 F.Supp.2d 490)**

Page 5

## IV. *DISCUSSION*

Defendants have moved for summary judgment on all three counts. Under Count I, Defendants assert that no genuine issue of material fact exists regarding Plaintiff's claim for retaliation under both his First Amendment right to free speech and his right to petition. Second, under Counts II and III, Defendants assert that there is no cause of action for damages under the Pennsylvania Constitution. Finally, Mayor Street asserts he is shielded from liability based upon the doctrine of qualified immunity. These arguments will be considered in turn.[FN4]

> **FN4.** The Defendants do not contest that the Plaintiff has met the threshold for there to be municipal liability under *Monell v. Dep't of Social Servs. of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, I will not engage in a discussion of this issue.

### A. COUNT I

[1][2] Count I actually contains two separate causes of action. First, Mitchell asserts that the Defendants retaliated against him and terminated his employment based upon the filing of his equity complaint with the Court of Common Pleas of Philadelphia County. Mitchell asserts that this violated his right to petition the government for a redress of grievances. Additionally, Mitchell asserts that he was fired in retaliation for exercising his free speech rights by appearing on the Smerconish radio program. The parties are in agreement as to the elements that make up both of these claims. Both claims require the following three-step analysis:

[f]irst, plaintiff must show that he engaged in a protected activity. Second, plaintiff must show that the protected activity was a substantial factor motivating the dismissal decision. Finally, defendant may defeat plaintiff's claim by demonstrating that the same action would have taken place even in the absence of the protected conduct.

*San Filippo v. Bongiovanni,* 30 F.3d 424, 430 (3d

Cir.1994) (citations omitted).[FN5] I will consider these elements as they relate to Plaintiff's right to petition and free speech causes of action.

> **FN5.** As set out in *San Filippo,* "a public employer may dismiss an employee for speech addressing a matter of public concern if the state's interest, as an employer, in promoting the efficiency of its operations outweighs the employee's interest, as a citizen, in commenting upon matters of public concern." 30 F.3d at 434 n. 11 (citation omitted). However, "[t]his balancing test comes into play only if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so." *Id.; see also, Dennison v. Pa. Dep't of Corr.,* 268 F.Supp.2d 387, 399 (M.D.Pa.2003). The Defendants deny that they fired Mitchell because of his allegedly protected speech so as to deem the balancing test inapplicable. Furthermore, neither party asserts that the balancing test should be utilized in this case.

### 1. Protected Activity

The first step requires this Court to consider whether Mitchell engaged in a protected activity under his right to petition and free speech claims. As to his **\*495** right to petition, Defendants concede that the filing of Mitchell's equity complaint with the Court of Common Pleas of Philadelphia County was a protected activity. However, Defendants vigorously contest that Mitchell engaged in any protected activity under his free speech claim.

[3][4] The United States Court of Appeals for the Third Circuit ("Third Circuit") has noted that in a claim for retaliatory discharge from government employment, the plaintiff "must establish that the conduct which triggered the discharge was protected under the first amendment." *San Filippo,* 30 F.3d at 434. Specifically:

[w]here the alleged retaliation is based on expressive conduct constituting speech, a court must first

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

415 F.Supp.2d 490                                                                          Page 6
415 F.Supp.2d 490
**(Cite as: 415 F.Supp.2d 490)**

determine whether or not the speech can be fairly characterized as addressing a "matter of public concern," for a governmental employee who makes public comments about problems not of "public concern" has no first amendment immunity against employer discipline.

*Id.* "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community." *Baldassare v. N.J.,* 250 F.3d 188, 195 (3d Cir.2001)(internal quotation marks and citation omitted). Thus, a court must focus on the "content, form, and context of the activity in question." *Id.* (citing *Connick v. Myers,* 461 U.S. 138, 147-48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Watters v. City of Phila.,* 55 F.3d 886, 892 (3d Cir.1995)). Furthermore, "[t]he content of the speech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Id.* (internal quotation marks and citations omitted). Determining whether the public employee's speech involved a matter of public concern is a question of law for the court. *Id.* (citing *Waters v. Churchill,* 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Green v. Phila. Hous. Auth.,* 105 F.3d 882, 885 (3d Cir.1997)).

[5] The parties dispute whether Mitchell's appearance on the Smerconish radio program to discuss the gun permit issue and the District Attorney's findings constituted a matter of public concern. Defendants assert that this case is similar to *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, and that I should therefore find as a matter of law that Mitchell's speech did not involve a matter of "public concern." However, for the following reasons, I find that *Connick* is distinguishable from the instant case.

In *Connick,* the plaintiff, Shiela Myers ("Myers"), was employed as an Assistant District Attorney in New Orleans for five and one half years. 461 U.S. at 140, 103 S.Ct. 1684. Myers was informed that she would be transferred to prosecute cases in a different section of the criminal court. *Id.* Myers opposed this transfer and she then "prepared a questionnaire soliciting the views of her fellow staff members concerning office

transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id. at 141, 103 S.Ct. 1684.* She then distributed the questionnaire to her co-workers the next day. *Id.* Later that day, Myers was terminated by Harry Connick ("Connick") the District Attorney for Orleans Parish for refusing the transfer. Myers brought suit under 42 U.S.C. § 1983, asserting that she was wrongfully terminated because she had exercised her constitutionally protected right to free speech by distributing the questionnaire. *Id.*

**\*496** The United States Supreme Court ("Supreme Court") noted that practically all of Myers questions did "not fall under the rubric of matters of 'public concern.' " *Id. at 145, 103 S.Ct. 1684.* The Supreme Court noted that the questionnaire did not seek to inform the public that the District Attorney's office was discharging its governmental responsibilities in the investigation or prosecution of criminal cases in an improper manner nor did the questionnaire seek to bring to light actual or potential wrongdoing on the part of Connick or others. *Id.* The Supreme Court continued by noting that the questions posed by Myers reflected her dissatisfaction with her transfer and her "attempt to turn that displeasure into a cause celebre." *Id.*

Unlike the majority of the questions posed in *Connick,* however, I find that the issues discussed on the Smerconish radio program did involve matters of public concern. Unlike *Connick,* the gun permit issue involved possible illegal activity and corruption on the part of a high ranking government official, namely Mitchell. As previously noted, the courts have stated that matters of public concern can include attempts to bring to light actual or potential wrongdoing on the part of government officials. *See Baldassare,* 250 F.3d at 195 (citations omitted). Thus, it follows that the discussion on the Smerconish radio program regarding the District Attorney's investigation and findings regarding the possible wrongdoing and/or illegality of how Mitchell received the gun permit involved matters of "public concern." The instant case goes beyond the intra-office dissatisfaction in *Connick* since there is the additional element of potential wrongdoing/illegality that brought the gun permit issue to the forefront of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

415 F.Supp.2d 490                                                                                Page 7
415 F.Supp.2d 490
**(Cite as: 415 F.Supp.2d 490)**

public sphere in the first place. Therefore, as Mitchell's appearance on the Smerconish radio program involved a matter of "public concern," Mitchell engaged in a protected activity under the law.

### 2. Substantial Factor Motivating the Dismissal

The next step in the analysis is to determine whether Mitchell's protected activities were a substantial factor which motivated the decision to terminate Mitchell's employment. The Defendants assert that Mitchell cannot satisfy this element. The Plaintiff asserts that he can survive summary judgment with respect to this element by discrediting the Defendants' reasons for his termination. For the following reasons, I agree with Plaintiff's position.

[6] To survive summary judgment, "a plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) (citations omitted). In this case, Mitchell attempts to discredit the Defendants reason for his termination.[FN6]

> FN6. While *Fuentes* was a Title VII case, courts have noted that "[p]retext analysis used in Title VII cases is also useful in deciding First Amendment retaliation claims." *Cavicchia v. Phila. Hous. Auth.,* No. 03-0116, 2003 WL 22595210, at *9 n. 2 (E.D.Pa. Nov.7, 2003), *aff'd,* 137 Fed.Appx. 495 (3d Cir.2005)(non-precedential)(citing *Azzaro v. County of Allegheny,* 110 F.3d 968, 981 (3d Cir.1997)(en banc); *Feldman v. Phila. Hous. Auth.,* 43 F.3d 823, 831 (3d Cir.1994); *Zappan v. Pa. Bd. of Prob. & Parole,* No. 00-1409, 2002 WL 32174230, at *11 (E.D.Pa. Nov.25, 2002); *Rodriguez v. Torres,* 60 F.Supp.2d 334, 340 n. 2 (D.N.J.1999)*Fogarty v. Boles,* 938 F.Supp. 292, 299 n. 4 (E.D.Pa.1996), *aff'd,* 121 F.3d 886 (3d

Cir.1997)).

**\*497** [7] The Defendants assert that the decision to fire Mitchell was made at the February 26, 2004 meeting. Thus, it is the Defendants' position that Mitchell could not be retaliated against for his protected activities because the decision to fire him occurred before any of the protected activities occurred. However, I find that there are factual inconsistencies in the record that would allow a reasonable fact finder to find Defendants' proffered reason unworthy of credence. *See Fuentes,* 32 F.3d at 765 (citations and footnote omitted). For example, the Defendants assert that the decision to fire Mitchell was made at the February 26, 2004 meeting. This meeting was called to discuss the gun permit issue. No party suggests that budgetary concerns were discussed at this meeting as it related to Mitchell's further employment as Deputy Police Commissioner. Yet, Johnson's press conference on June 1, 2004 detailing Mitchell's termination and the corresponding news coverage explains that Mitchell was fired for budgetary reasons. (*See* Pl.'s Resp. Defs.' Mot. Summ. J., Ex. O). This and other inconsistencies in the record discredit Defendants' proffered theory of Mitchell's termination enough so as to create material issues of fact as to this element.[FN7]

> FN7. Additionally, with respect to the free speech retaliation claim, the Third Circuit has noted that the temporal proximity between the employee's protected activity and the adverse employment action "is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997)(internal quotation marks and citations omitted). In this case, Mitchell appeared on the Smerconish radio program and was terminated less than one week later. It is worth noting, however, that Mitchell's termination was also soon after the District Attorney made her findings with respect to the gun permit issue.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

415 F.Supp.2d 490
415 F.Supp.2d 490
**(Cite as: 415 F.Supp.2d 490)**

Page 8

### 3. Same Action Would have been Taken Absent the Protected Activity

Defendants do not address this third element of Plaintiff's right to petition and free speech claims. Therefore, I find it unnecessary to address it in the context of deciding Defendants' Summary Judgment Motion. As there are material issues of fact remaining as to all three elements of Plaintiff's right to petition and free speech retaliation claims, I find summary judgment is inappropriate as it relates to Count I of Mitchell's Complaint.

### B. COUNTS II AND III

[8] Counts II and III seek money damages under the Pennsylvania Constitution, Article I, Section I and Article I, Section XI respectfully. The Defendants assert that summary judgment should be granted in their favor because Plaintiff cannot maintain a cause of action under the Pennsylvania Constitution for money damages. For the following reasons, based upon the discretion given to me as stated under 28 U.S.C. § 1367(c)(1), I will decline to exercise supplemental jurisdiction over these two counts and dismiss them without prejudice.

Section 1367(c)(1) states that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if the claim raises a novel or complex issue of state law." As one court in this District has recently noted, "[t]he question of whether there exists a 'right of action for money damages against government officials of the Pennsylvania Constitution' is unclear." *Gremo v. Karlin*, 363 F.Supp.2d 771, 794 (E.D.Pa.2005)(quoting *Robbins v. Cumberland County Children & Youth Serv.*, 802 A.2d 1239, 1251 (Pa.Cmwlth.Ct.2002)); compare *\*498Erdman v. Mitchell*, 207 Pa. 79, 90-91, 56 A. 327, 331 (1903)(holding that there is a right of action for injunctive relief under the first article of the Pennsylvania Constitution); *Harley v. Schuylkill County*, 476 F.Supp. 191, 195-96 (E.D.Pa.1979)(extending *Erdman* to apply to claims for damages); *Jones v. City of Phila.*, 2004 WL 3104795, 68 Pa. D. & C.4th 47, 68-75 (Pa.Com.Pl.2004) (writing

in support of its determination that Article I of the Pennsylvania Constitution is self-executing and permits private parties to seek civil remedies for constitutional violations); with *Millar v. Windsor Township*, No. 04-2529, 2005 WL 1513120, at \*3-4 (M.D.Pa. June 24, 2005)(stating that there is a dearth of case law on the issue and declining to exercise jurisdiction over the state constitutional claims because deference to the state appellate courts is appropriate); *Tillman v. Alonso*, No. 04-4391, 2005 WL 1311588, at \*5-6 (E.D.Pa. May 31, 2005)(explaining the uncertainty of the state of the law on the issue of bringing a state constitutional claim under Article I and declining to exercise jurisdiction over state constitutional claims because of this uncertainty); *Mulgrew v. Fumo*, No. 03-5039, 2004 WL 1699368, at \*2-4 (E.D.Pa. July 29, 2004)(explaining that the issue of whether a direct right of action under Article I of the Pennsylvania Constitution is unclear and declining to exercise supplemental jurisdiction over these state constitutional claims).

In light of the unclear state of the law on Mitchell's state constitutional claims, I find that the most appropriate course of action in this particular case is to decline supplemental jurisdiction over Counts II and III of the Complaint pursuant to 28 U.S.C. 1368(c)(1).[FN8] Therefore, Counts II and III will be dismissed without prejudice.

> FN8. This decision is particularly prudent in light of the fact that it appears that the issue of "whether a cause of action for money damages arises under the state constitution is an issue currently pending before the Commonwealth Court of Pennsylvania." *Millar*, 2005 WL 1513120, at \*3 n. 5 (citing *City of Phila. v. Jones*, No. 795-CD-2004 (Pa. Commw. Ct. filed Apr. 19 2004)). "Argument was heard by the [Commonwealth] court *en banc* on June 8, 2005." *Id.*

### C. QUALIFIED IMMUNITY

[9] Finally, Defendant Mayor Street asserts that he is entitled to qualified immunity. "Qualified immunity is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

415 F.Supp.2d 490                                                                                              Page 9
415 F.Supp.2d 490
**(Cite as: 415 F.Supp.2d 490)**

available to government officials performing discretionary functions." *Lodato v. Ortiz,* 314 F.Supp.2d 379, 385-86 (D.N.J.2004)(citing *Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).    "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727 (citing *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)).

A court required to rule upon the qualified immunity issue must consider ... this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [government official's] conduct violated a constitutional right?  This must be the initial inquiry....  If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  On the other hand, if a violation could be made out on a favorable view of the parties's submissions, the next, sequential step is to **\*499** ask whether the right was clearly established.

*Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)(internal citation omitted).

[10] Regarding the first part of the qualified immunity test, as set out in *supra* Part IV.A., I have found that Mitchell has alleged a violation of his constitutional rights to be free from retaliation for filing his equity complaint and for speaking out on a matter of public concern.    Therefore, the first part of overcoming Mayor Street's qualified immunity has been satisfied by Mitchell.

Next, I note that the Defendants do not attempt to make any type of argument as to the second part of the qualified immunity test.  Specifically, the Defendants sole argument with respect to qualified immunity is that, "[b]ecause the plaintiff cannot establish that his constitutional rights were violated, Defendant Mayor Street is entitled to qualified immunity, and, therefore, judgment in his favor." (Mem. Law. Supp. Defs.' Mot.

Summ. J., at 11).  Thus, Mayor Street does not attempt to contest that both of these rights were clearly established at the time he acted.  However, it is clear that both of these rights were established at the time Mayor Street acted. *See Watters,* 55 F.3d at 891 (stating that "it is essential that public employees be able to speak out freely on questions of public concern without fear of retaliatory dismissal....  Judicial vigilance is required to ensure that public employers do not use their authority to silence discourse on matters of public concern simply because they disagree with the content of the employee's speech.") (citations omitted); *San Filippo,* 30 F.3d at 441-443 ("The mere act of filing a non-sham petition is not a constitutionally permissible ground for discharge of a public employee."); *Bennis v. Gable,* 823 F.2d 723, 733 (3d Cir.1987)(stating that the law was clearly established that a public employee could not be retaliated against for exercising his rights under the First Amendment).  Thus, I find Defendant Mayor Street shall not be entitled to qualified immunity.

## V. *CONCLUSION*

In conclusion, I find that summary judgment is improper as to Count I of the Complaint.  I find that material issues of fact remain in Mitchell's claims for retaliation under the First Amendment's free speech and right to petition clauses.  Additionally, I conclude that because Counts II and III raise novel and complex issues of state law, I will decline supplemental jurisdiction over these state constitutional claims and dismiss them without prejudice.  Finally, I have concluded that Defendant Mayor Street is not entitled to qualified immunity.

An appropriate Order follows.

### *ORDER*

**AND NOW,** this 16th day of August, 2005, upon consideration of the Defendants' Motion for Summary Judgment (Doc. No. 11), and the Response and Replies thereto, it is hereby **ORDERED** that:
1. the Motion is **DENIED**; and

415 F.Supp.2d 490                                                                                  Page 10
415 F.Supp.2d 490
**(Cite as: 415 F.Supp.2d 490)**


2.  Counts II and III of the Complaint are **DISMISSED WITHOUT PREJUDICE**.


E.D.Pa.,2005.
Mitchell v. Street
415 F.Supp.2d 490

Briefs and Other Related Documents (Back to top)

• 2005 WL 2150103 (Trial Motion, Memorandum and
Affidavit) Motion (Jul. 12, 2005)
• 2:04cv03213 (Docket) (Jul. 07, 2004)
• 2:04cv01110 (Docket) (Mar. 15, 2004)
• 2004 WL 2695311 (Trial Pleading) Complaint (2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                    Page 1
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

[Briefs and Other Related Documents](#)
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
B. Kurt PRICE, Wayne Warren, and Christopher D.
Foraker, Plaintiffs,
v.
L. Aaron CHAFFINCH, Thomas F. Macleish, David
B. Mitchell, and Division of State Police, Defendants.
Christopher D. FORAKER, Plaintiff,
v.
L. Aaron CHAFFINCH, Thomas F. Macleish, David
B. Mitchell, and Division of State Police, Defendants.
**No. 04-956 (GMS), 04-1207(GMS).**

May 12, 2006.

[Martin D. Haverly, Esq.](#), [Thomas S. Neuberger](#),
[Stephen J. Neuberger](#), The Neuberger Firm, P.A.,
Wilmington, DE, for Plaintiffs.
[Richard Montgomery Donaldson](#), [Noel C. Burnham](#),
Montgomery, McCracken, Walker & Rhoads,
Wilmington, DE, for Defendants.

*MEMORANDUM*
[SLEET](#), J.

### I. INTRODUCTION

**\*1** The above-captioned actions were consolidated on
April 18, 2006. In Civil Action No. 04-956 ("the Price
case"), three state troopers assigned to the Delaware
State Police's ("DSP") Firearms Training Unit facility
("FTU") allege that their First Amendment rights were
violated by two superiors who retaliated against them
for speaking out against hazardous health conditions at
the FTU. Thus, the Price complaint states one count of
Free Speech retaliation and one count of Petition Claus
retaliation, both pursuant to [42 U.S.C.A. § 1983 (2003)](#).
In Civil Action No. 04-1207 ("the Foraker case"),
Sergeant Christopher Foraker individually alleges that
his First Amendment rights were violated by the same

two superiors after they retaliated against him for filing
(and winning) a First Amendment retaliation lawsuit in
2002. Thus, like the Price complaint, the Foraker
complaint also states one count of Free Speech
retaliation pursuant to [§ 1983](#), and one count of Petition
Clause retaliation pursuant to [§ 1983](#). Additionally, the
Foraker complaint states two state law causes of action:
defamation and false light invasion of privacy.
Presently before the court are the defendants' motions
for summary judgment on all counts in both cases. For
the following reasons, the court concludes that summary
judgment is inappropriate for all counts except
Foraker's false light claim.

### II. STANDARD OF REVIEW

Evaluating a motion for summary judgment requires the
court to "review the record as a whole, 'draw[ing] all
reasonable inferences in favor of the non-moving
party[,]' [while refraining from] weighing the evidence
or making credibility determinations. *[Reeves v.
Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150,
120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)](#)* (citation
omitted). If [the court is able to] determine that 'there
is no genuine issue as to any material fact' and that the
movant is entitled to judgment as a matter of law,"
summary judgment must be granted. *[Hill v. City of
Scranton](#)*, [411 F.3d 118, 124-25 (3d Cir.2005)](#) (quoting
[Fed.R.Civ.P. 56(c)](#)).

### III. BACKGROUND

The FTU, a multi-million dollar indoor firing range for
the DSP, became operational in September of 1998. A
few months later, due to concerns about the ventilation
system, an environmental-assessment firm hired to
conduct a study of the air quality in the facility
concluded that the amount of lead in the air
significantly exceeded the maximum acceptable level
recommended by the Occupational Safety and Health
Administration. (D.I. 85 at A222.) [FN1] By at least as
early as June 14 of the following year, the FTU's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

air-quality problems became the subject of public scrutiny after *The News Journal*-a local Delaware newspaper-publicized the results of the study in an article entitled, "Shooting range under fire for lead: State police are exposed to levels of metal in air twice federal standard." (Id. at A2639-A2640, 189 A.2d 773.)

> FN1. "D.I. 85," which refers to Docket Item 85 in the Price case, was also filed as Docket Item 65 in the Foraker case.

Foraker became the non-commissioned officer in charge ("NCOIC") of the FTU on August 1, 2001. At that time, he supervised several firearms instructors, including Corporal B. Kurt Price and Corporal Wayne Warren. Foraker also supervised Corporal Eddie Cathell, who was a personal friend Colonel L. Aaron Chaffinch. Foraker and Cathell had a rather rocky professional relationship, and on several occasions Foraker spoke out against Cathell. On February 22, 2002, Foraker was involuntarily transferred from the FTU to another position within the DSP. In response, Foraker filed a § 1983 action against Chaffinch for unlawful First Amendment retaliation. After a five-day trial, a jury found that Chaffinch had in fact retaliated against Foraker. The parties later agreed on settlement terms, pursuant to which Foraker was reinstated as the NCOIC of the FTU on December 1, 2003. After his reinstatement, Foraker learned that the FTU had the same air-quality issues that it had prior to his involuntary transfer in 2002. Not surprisingly, the air quality weighed on the minds of Foraker, Price, and Warren. Foraker soon began to voice their concerns to their commanding officers, including Lieutenant Colonel Thomas MacLeish. Eventually, the trio's concerns worked their way up the chain of command to Chaffinch.

**\*2** In March of 2004, the FTU's air quality remained poor and, as a result, the facility was formally closed. Due to the public attention the FTU's closing generated, Chaffinch gave two media tours of the facility in April 2004. Before the first tour, however, Chaffinch revealed his intent to blame Foraker for the FTU's closing to Captain Glenn Dixon:

[Chaffinch] talked about the meeting that he was going

to at the range, and at that time he mentioned Sergeant Foraker and that he was going to put it on Foraker during the meeting. He had outlined that he had the newspaper people going [sic] to be present at the meeting and that he is going to put it on Foraker and lay a lot of the blame on Foraker for the range.

(Dixon Dep. at 8:7-13.) Consistent with this statement, Chaffinch was quoted during the tour as saying:The previous sergeant in charge did a good job. Things changed in December [2003] when another sergeant came in. That's at least a portion of where the ball was dropped.

...

Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning. [The previous sergeant] was willing to do that.... I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel that cleaning was part of his purview. He felt that was putting him in harm's way.

(D.I. 85 at A850.) Foraker was unable to respond to these allegations, which were printed in both the *Delaware State News* and *American Police Beat Magazine*, because Chaffinch placed a gag order on his troopers. Nevertheless, Foraker, Price, and Warren all gave statements in cooperation with an investigation by the State Auditor's Office. Shortly thereafter, Price and Warren were placed on light duty-ostensibly because they had disabilities rendering them unfit for regular duty-and Foraker was banned from attending Section Chief meetings he had attended in the past.

## IV. DISCUSSION

### A. First Amendment Retaliation (Counts I and II)

There is "a well-established three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment." Hill, 411 F.3d at 125. The employee must show at step one that the activity in question is protected by the First Amendment. Hill, 411 F.3d at 125. At step two, the employee must show "that the protected activity 'was a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 3
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

substantial factor in the alleged retaliatory action[s]." '
*Hill,* 411 F.3d at 125 (citations omitted). Step two also
requires the court to inquire whether the alleged
retaliatory actions were serious enough to be actionable.
*Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685
(4th Cir.2000) ("[N]ot every reaction made in response
to an individual's exercise of his First Amendment right
to free speech is actionable retaliation.") (cited by
*McKee v. Hart,* 436 F.3d 165, 170 (3d Cir.2006).
However, this is an extremely low hurdle to overcome:
**\*3** First Amendment retaliation claims are always
individually actionable, even when relatively minor.
Even "an act of retaliation as trivial as failing to hold a
birthday party for a public employee," if "intended to
punish her for exercising her free speech rights," may
be actionable if under the circumstances it would be
sufficient to "deter a person of ordinary firmness" from
exercising his or her First Amendment rights. *Suppan v.
Dadonna,* 203 F.3d 228, 234-35 (3d Cir.2000) (citing
*Rutan v. Republican Party,* 497 U.S. 62, 76 n. 8, 110
S.Ct. 2729, 111 L.Ed.2d 52 (1990)). A First
Amendment retaliation claim will lie for any individual
act which meets this "deterrence threshold," and that
threshold is very low: as we said in *Suppan,* a cause of
action is supplied by all but truly de minimis violations.
*Id.*

*O'Connor v. City of Newark,* 440 F.3d 125, 127-28 (3d
Cir.2006). Finally, at step three, "the employer may
defeat the employee's claim by demonstrating that the
same adverse action[s] would have taken place in the
absence of the protected conduct." [FN2] *Id. See also
Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

> FN2. The plaintiffs contend that the
> defendants waived this affirmative
> defense-familiarly known as the *Mount
> Healthy* defense-by failing to raise it in their
> pleadings. The defendants point out that the
> plaintiffs raised it in the complaints by
> alleging that "[t]he defendants cannot prove
> by a preponderance of the evidence that absent
> a constitutional violation they would have had
> grounds to adversely treat plaintiffs" (D.I. 45
> ¶ 94 (the Price case); D.I. 1 ¶ 84 (the Foraker

case)), and the defendants denied the
allegation in their answers. (D.I. 51 ¶ 94 (the
Price case); D.I. 7 ¶ 84 (the Foraker case).)
The court concludes that such denials were
sufficient to put the plaintiffs on notice that
the *Mount Healthy* defense would be at issue.

Here, all three plaintiffs clearly engaged in protected
First Amendment activity by speaking out about the
air-quality issues at the FTU,[FN3] and in Foraker's case,
by filing suit in 2002. Chaffinch had an obvious motive
to retaliate in response to the plaintiffs' activities, and a
jury could reasonably infer that MacLeish (who was
allegedly "joined at the hip" with Chaffinch) would be
similarly motivated to retaliate. Furthermore, the
allegedly retaliatory actions-publicly blaming the
plaintiffs for the FTU's poor air quality,[FN4] placing Price
and Warren on light duty, banning Foraker from
meetings, etc.-are more than *de minimis.* And, with
regard to the *Mount Healthy* defense, the plaintiffs
point to several similarly-situated troopers who were
not subject to the same allegedly retaliatory actions.
Thus, the plaintiffs have demonstrated a genuine issue
of material fact at each step of the analysis, thereby
rendering summary judgment inappropriate as to
Counts I and II.

> FN3. The defendants argue that Price and
> Warren's Petition Clause claim (Count II) fails
> because their cooperation with the Auditor's
> investigation does not qualify, as a matter of
> law, as an attempt to petition the government
> under the First Amendment. Due to the
> number of disputed facts in this case,
> including facts regarding the nature of the
> plaintiffs' cooperation with the Auditor, the
> court believes the most prudent course of
> action at this stage is to deny summary
> judgment as to Count II and revisit the issue
> after trial.

> FN4. Although Chaffinch's comments to the
> media were explicitly directed at Foraker,
> there is evidence in the record suggesting that
> at least one trooper understood Chaffinch to
> be speaking about Price and Warren as well.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

### B. Qualified Immunity

The defendants argue that, even if summary judgment in their favor is inappropriate, they are nevertheless entitled to qualified immunity with regard to Counts I and II. "Qualified immunity insulates government officials performing discretionary functions from suit insofar as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *McKee,* 436 F.3d at 169 (internal quotations omitted). "To determine whether an official has lost his or her qualified immunity, [the court] must first decide whether a constitutional right would have been violated on the facts alleged." *Id.* (internal quotations omitted). "If the answer to that question is 'yes,' [the court] must then consider whether the right was clearly established." *Id.* (internal quotations omitted). "If [the court] also answer[s] 'yes' to the second question, [the court] must conclude that the official does not have qualified immunity." *Id.*

**\*4** Because disputed issues of material fact exist regarding the constitutional violations alleged in Counts I and II, the answer to the first question depends upon the resolution of those factual disputes. Assuming *arguendo* that the answer to the first question turns out to be "yes," the court must inquire whether those rights, if violated, were clearly established. In *McKee,* the Third Circuit succinctly summarized the proper approach to such a query:

" 'Clearly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McLaughlin v. Watson,* 271 F.3d 566, 571 (3d Cir.2001). Put another way, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Id.* at 572. The Supreme Court has recently reiterated this point, stating that "it is important to emphasize that this [clearly established] inquiry 'must be undertaken *in light of the specific context of the case,* not as a broad general proposition." ' *Brosseau v. Haugen,* 543 U.S. 194, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (per curiam) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d

272 (2001) ] ) (emphasis added).

436 F.3d at 171. Although this inquiry "must be undertaken in light of the specific context of the case," *Brosseau,* 543 U.S. at 198, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). "Accordingly ... the salient question ... is whether the state of the law [at the time of the acts in question] gave [the defendants] fair warning that their alleged treatment of [the plaintiffs] was unconstitutional." *Id.*

In this case, the defendants admit that First Amendment retaliation is unlawful in general, but they argue that at the time of the alleged retaliation the state of the law did not give them fair warning that their treatment of Foraker was actionable. The court disagrees. In *Brennan v. Norton,* 350 F.3d 399 (3d Cir.2003)-a case decided before the retaliation in this case-the Third Circuit further defined the line between actionable and non-actionable retaliation. There, the court stated that, if there is a "nexus between [the] protected conduct and [the] alleged retaliation," an act as simple as affixing a sticker bearing the phrase "Department Asshole" on the plaintiff-firefighter's helmet "could rise to the level of a First Amendment violation." *Id.* at 419. The few retaliatory actions mentioned above are obviously more severe than the harassing sticker in *Brennan.* Therefore, the court holds that if the disputed issues of fact are resolved against the defendants, they will not be protected by qualified immunity.

### C. Defamation (Count III)

"Under Delaware law, the tort of defamation has five elements: (1) the statement must be of a defamatory character; (2) publication to a third party; (3) the communication must refer to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury." *Gill v. Del. Park, LLC,* 294 F.Supp.2d 638, 646 (D.Del. Dec.2, 2003). Viewing the facts in the light most favorable to Foraker, Chaffinch's statements to the media easily satisfy the five elements of defamation: (1) assigning

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(allegedly) unwarranted blame to Foraker for the FTU's air quality is defamatory; (2) making a statement to a newspaper is publication to a third party; (3) mentioning Foraker by name obviously refers to him; (4) any person reading Chaffinch's statement would understand it to be defamatory; and (5) maligning a person in his profession is injurious *per se, Johnson v. Campbell,* No. 00-510-JJF, 2001 U.S. Dist. LEXIS 25596, at *14-*15 (D.Del. Mar. 30, 2001). Likewise, MacLeish's statements-the air-quality problems had began only recently, and procedure had not been followed at the FTU-also satisfy all five elements. To be sure, MacLeish's statements present a closer case because he neither referred to Foraker by name, nor explicitly blamed the FTU's problems on him. Nevertheless, a reasonable jury could infer from the context of the controversy that MacLeish's statements were in fact defamatory of Foraker.

**\*5** The defendants argue that they cannot be held liable for defamation because they were merely stating their opinions. In *Milkovich v. Lorain Journal Co.,* the Supreme Court explained:
If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Here, the defendants' opinions "imply a knowledge of facts" leading to the conclusion that Foraker's performance as the NCOIC was inadequate. Accordingly, the defendants may not escape liability by hiding behind the "opinion" shield. The defendants also contend that they cannot be held liable for defamation because their statements were substantially true. However, as the defendants must understand, the question of who was at fault for the FTU's poor air quality is fraught with so many disputed facts that the court cannot determine the truth or falsity of the

defendants' statements at this stage.

The only remaining issue is whether Foraker is a public figure. "Where the plaintiff is a public figure, there is an additional constitutional requirement that the defendant have acted with actual malice. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Actual malice exists where the declarant acts with 'knowledge that it was false or with reckless disregard of whether it was false or not.' " *Id. Gill,* 294 F.Supp.2d at 646. The determination of whether a plaintiff is a public figure is a legal issue for the court to resolve. *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 938 (3d Cir.1990). "*Gertz [v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)* ] identified three classes of public figures: those who achieve such stature or notoriety that they are considered public figures in all contexts; those who become public figures involuntarily, but these are 'exceedingly rare'; and those who are deemed public figures only within the context of a particular public dispute." *U.S. Healthcare,* 898 F.2d at 938. The latter class-limited purpose public figures-comprise "individuals who voluntarily 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." ' *Id.* (quoting *Gertz,* 418 U.S. at 345). "Generally, two factors inform this determination. The first factor indicative of a [plaintiff's] status is his relative access to the media." *U.S. Healthcare,* 898 F.2d at 938. "The second factor is the manner in which the risk of defamation came upon [the plaintiff]." *Id.*

**\*6** Here, Foraker's access to the media was limited to the point of being non-existent by Chaffinch's imposition of a gag order. Certainly, that cuts against Foraker's public-figure status. On the other hand, the air quality at the FTU was a public controversy as early as 1999. And yet, Foraker, who was aware of the ongoing controversy, actively sought to be reinstated as the NCOIC of the FTU. Thus, Foraker knew or should have known that he was injecting himself into a situation in which, as the head of a controversial facility, there was a substantial risk of public scrutiny and defamation. The question the court must answer, then, is whether Chaffinch's gag order outweighs Foraker's voluntary assumption of risk. In *Sculimbrene v. Reno,* 158

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.Supp.2d 8 (D.D.C. Feb.16, 2001), the D.C. district court was confronted with a similar situation. In that case, the plaintiff was a former FBI Special Agent who became involved in the "Filegate" scandal as a result of his employment at the White House Liaison Office. After media commentator Lanny Davis made disparaging comments about the plaintiff on CNN and CNBC, the plaintiff sought permission to respond publicly. However, that request was denied by his superiors. Id. at 11-14; id. at 23. The plaintiff then sued Davis under a defamation-like federal statute. In spite of the FBI's refusal to allow the plaintiff to respond publicly, the court concluded that the plaintiff was a limited purpose public figure both because of the high public interest in "Filegate," and because of the plaintiff's significant role in determining the outcome of the controversy. Id. at 23-24. Likewise here, although Foraker was subject to a gag order, as the NCOIC of the FTU he was a significant player in a controversy with high (local) public interest. Moreover, unlike the plaintiff in Sculimbrene, Foraker sought the NCOIC position with advance knowledge of the attendant controversy. Therefore, as with the FBI agent in Sculimbrene, Foraker is a limited purpose public figure in this context, and therefore, he must prove his defamation case using the heightened "actual malice" standard. The court further holds that the record contains sufficient evidence for a reasonable jury to conclude that the defendants' statements were made with actual malice. Thus, summary judgment will be denied as to Count III.

### D. False Light Invasion of Privacy (Count IV)

The common law right of privacy was first recognized by the Delaware Supreme Court in Barberi v. News-Journal Co., 56 Del. 67, 189 A.2d 773 (1963). "The general purpose of protecting the right of privacy relates to one's private life, not when that life has become a matter of legitimate public interest." Martin v. Widener Univ. Sch. of Law, No. 91C-03-255, 1992 Del.Super. LEXIS 267, at *54 (Del.Super. Ct. June 4, 1992). Thus, "[o]ne who seeks the public eye cannot complain of publicity if the publication does not violate ordinary notions of decency." Barberi, 56 Del. at 70, 189 A.2d 773.

*7 With those principles in mind, the defendants argue that "a public figure cannot sustain an action for false light invasion of privacy because someone has publicized his public activities." (D.I. 62 at 32.) The court agrees. Although the act of publicly shedding false light on a person's job performance can be deeply offensive and hurtful, there is simply no invasion of privacy when the person being criticized is a public figure and the performance being criticized is the very activity that gave rise to the person's public-figure status in the first place. See Godbehere v. Phoenix Newspapers, 162 Ariz. 335, 783 P.2d 781, 789 (Ariz.1989) (holding that "a plaintiff cannot sue for false light invasion of privacy if he or she is a public official and the publication relates to performance of his or her public life or duties"). Therefore, the court concludes that allegedly unwarranted criticism of Foraker's performance as the NCOIC at the controversial FTU does not give rise to a cause of action for false light invasion of privacy.

### V. CONCLUSION

For the reasons stated, the court will deny summary judgment as to Counts I, II, and III. The court will grant summary judgment as to Count IV.

### ORDER

IT IS HEREBY ORDERED THAT:
1. The defendants' motion for summary judgment in the Price case (D.I.80) be DENIED; and
2. The defendants' motion for summary judgment in the Foraker case (D.I.60) be DENIED as to Counts I, II, and III, and GRANTED as to Count IV.


D.Del.,2006.
Price v. Chaffinch
Slip Copy, 2006 WL 1313178 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1204468 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 7
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

in Limine to Limit the Cross Examination of Captain Glenn Dixon (Mar. 21, 2006) Original Image of this Document (PDF)

• 2006 WL 1204472 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Mar. 21, 2006) Original Image of this Document (PDF)

• 2006 WL 1204467 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion to Strike Select Portions of Defendants' (1) Reply Brief in Support of their Motion for Summary Judgment and (2) Accompanying Appendix for Failure to Comply with Local Rule 7.1.3 and the Federal Rules of Civil Procedure (Mar. 20, 2006) Original Image of this Document (PDF)

• 2006 WL 1204466 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion to Strike Select Portions of Defendants' Reply Brief and Appendix (Mar. 10, 2006) Original Image of this Document (PDF)

• 2006 WL 809118 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Preclude Expert Testimony of Brian P. Sullivan (Feb. 28, 2006) Original Image of this Document (PDF)

• 2006 WL 809127 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Feb. 28, 2006) Original Image of this Document (PDF)

• 2006 WL 809128 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Preclude Expert Testimony of Brian P. Sullivan (Feb. 28, 2006) Original Image of this Document (PDF)

• 2006 WL 809116 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion to Strike Select Portions of Defendants' (1) Reply Brief in Support of their Motion for Summary Judgment and (2) Accompanying Appendix for Failure to Comply with Local Rule 7.1.3 and the Federal Rules of Civil Procedure (Feb. 24, 2006) Original Image of this Document (PDF)

• 2006 WL 809114 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Support of their Motion for Summary Judgment on Counts I and II (Feb. 17, 2006) Original Image of this Document (PDF)

• 2006 WL 809115 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants' Motion for Summary Judgment (Feb. 17, 2006)

Original Image of this Document (PDF)

• 2006 WL 809126 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants' Motion for Summary Judgment (Feb. 17, 2006) Original Image of this Document (PDF)

• 2006 WL 809112 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion to Consolidate the Trial of these Two Cases Pursuant to Fed.R.Civ.P. 42(a) (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 809113 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Brief in Support of their Motion for Sanctions and other Relief Due to Defendants' Intentional Destruction of Relevant Evidence (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 809124 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion to Consolidate the Trial of these Two Cases Pursuant to Fed.R.Civ.P. 42(a) (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 809125 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Support of their Motion for Sanctions and other Relief Due to Defendants' Intentional Destruction of Relevant Evidence (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 809108 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Sanctions and other Relief (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809109 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiffs' Motion to Consolidate the Trial of These Two Cases Pursuant to Rule 42(a), Fed. R.Civ. P. (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809110 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment on Counts I and II (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809111 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Summary Judgment (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809120 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment on Counts I and II (Feb.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 8
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

8, 2006) Original Image of this Document (PDF)

• 2006 WL 809121 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Sanctions and other Relief (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809122 (Trial Motion, Memorandum and Affidavit) Defendants Response to Plaintiffs' Motion to Consolidate the Trial of these Two Cases Pursuant to Rule 42(a), Fed.R.Civ.P. (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809123 (Trial Motion, Memorandum and Affidavit) Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809117 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Jan. 23, 2006) Original Image of this Document (PDF)

• 2005 WL 3666813 (Trial Pleading) Defendants' Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint (Nov. 9, 2005) Original Image of this Document (PDF)

• 2005 WL 3666811 (Trial Pleading) First Amended Complaint%n1%n (Oct. 14, 2005) Original Image of this Document (PDF)

• 2005 WL 3666812 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of the Motion of the Defendants to Bar Certain Communications of Counsel Or, in the Alternative, to Disqualify Counsel (Oct. 14, 2005) Original Image of this Document (PDF)

• 2005 WL 3666815 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of the Motion of the Difendants to Bar Certain Communications of Counsel Or, in the Alternative, to Disqualify Counsel (Oct. 14, 2005) Original Image of this Document (PDF)

• 1:04cv01207 (Docket) (Aug. 30, 2004)

• 1:04cv00956 (Docket) (Aug. 19, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

David T. SPRINGER, M.D., Plaintiff,

v.

Renata J. HENRY, individually and in her official capacity, and Gregg C. Sylvester, M.D. in his official capacity, Defendants.

No. 00-885(GMS).

March 11, 2002.

MEMORANDUM AND ORDER

**SLEET**, District J.

**\*1** On October 6, 2000, Dr. David Springer filed this complaint against Renata J. Henry and Dr. Gregg Sylvester. Springer was a physician who had been under contract to provide medical services at the Delaware Psychiatric Center ("DPC"). Springer alleges that Henry and Sylvester refused to renew his contract in retaliation for remarks he made concerning the operation of the DPC facility. Springer contends that his termination therefore violated the First Amendment.

Presently before the court are two motions-Springer's Motion for Partial Summary Judgment and the defendants' Motion for Summary Judgment. Springer's motion asserts that his speech was protected under the First Amendment. He further contends that if the court determines that his speech was protected-a question of law-a jury must decide whether his speech caused his termination. Finally, Springer contends that defendant Henry is not entitled to qualified immunity because his First Amendment right was clearly established prior to his termination.

The defendants' motion argues that Springer's speech was not protected because it addressed his personal concerns. Alternatively, the defendants argue that Springer's speech was disruptive. Additionally, the defendants contend that Springer would have been terminated regardless of his speech due to his failure to bid for renewal of his contract. Moreover, the defendants argue that Springer has failed to prove that he has suffered damages as a result of their alleged actions. Finally, the defendants argue that Henry is entitled to qualified immunity because it was not certain that Springer's contract would be renewed, and therefore, his rights were not clearly established.

Upon review of the briefs and the law, the court agrees with Springer that his speech was protected under the First Amendment. Moreover, the undisputed facts establish that his speech was not disruptive. Furthermore, the court agrees with the plaintiff that his right to engage in speech was clearly established at the time he was terminated. Therefore, Ms. Henry is not entitled to qualified immunity. Thus, the court will grant the plaintiff's motion for partial summary judgment on the issues of protected speech and qualified immunity. The court must, therefore, deny the defendants' motions on these issues.

Additionally, the court finds that questions of fact remain as to whether Springer's speech was the motivation behind his termination, whether the circumstances required his termination such that his speech was immaterial, and whether he suffered damages. In light of these genuine issues of material fact, summary judgment is inappropriate on these issues. Thus, the court will deny the defendants' motion in its entirety. The court will now explain the reasons for its decision.

II. FACTS

Dr. David Springer began working for the DPC in 1991.[FN1] The hospital was supervised by the Delaware Department of Health and Social Services ("DDHSS"). More specifically, it was supervised by the DDHSS's Division of Alcoholism, Drug Abuse, and Mental Health ("DADAMH"). Renata Henry was the director of the DADAMH.[FN2] Dr. Gregg Sylvester was the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Secretary of the DDHSS. From August 1992 to June 2000, Springer was the director of the DPC. In that capacity, he was responsible for training psychiatric residents. He was also a member of the credentials committee responsible for hiring new doctors.

> FN1. In 1991, DPC was known as Delaware State Hospital. Nevertheless, Delaware State Hospital and DPC are the same entity.

> FN2. Although she served as director of DADAMH, Ms. Henry is not a physician.

**\*2** The DPC confronted numerous, serious problems. Several patients had committed suicide. Others had escaped. In December 1999, the federal Healthcare Financing Agency threatened to end DPC's federal funding. Moreover, the Delaware News Journal ran several highly critical articles about the DPC.

On November 23, 1999, Springer wrote a memorandum addressed to the Governor, the DPC Governing Board, and Ms. Henry. Springer's memo addressed at least twenty-three separate topics. However, the memo generally described attempted suicides, security failures (including patient escapes), under-staffing, violations of Medicare regulations (including an alleged failure to properly notify Medicare officials of the correct number of staff on hand), and lack of quality medical care. Springer also mentioned the need to continue the medical residency program. On March 21, 2000, Springer filed a report with the DPC Governing Board which addressed concerns similar to those outlined in his memo. In his report, however, he also alleged fraud and threatened to take his concerns to regulatory agencies.

Like the other doctors at the DPC, Springer was an independent contractor under contract with the DPC. From 1991 to 2000, Springer's contracts specified that the contract term was for one year and could be terminated without cause upon fifteen days notice. The contract terms do not guarantee renewal. Nevertheless, Springer's contract-as well as those of the other DPC physicians-was renewed each year.

In 1996, the Delaware General Assembly amended the Delaware Procurement Act, 29 Del. C. ch. 69, to provide that all contracts for professional services exceeding $50,000 per year must be subject to public bidding. In early 2000, Secretary Sylvester instructed his division directors to comply with the new provisions and require public bidding on professional service contracts. The DPC physicians earned more than $50,000 per year.

After Springer wrote his memo to the Governor, the situation at the DPC workplace became progressively worse. On May 12, 2000, Henry notified Springer that his contract would not be renewed. Springer was told that he would have to submit a bid to maintain his employment. Defendants maintain that all fifteen DPC psychiatrists were required to submit bids. Conversely, Springer maintains that he was the only physician who was made to reapply. Moreover, Springer contends that he was not informed of the bidding procedures until the day before the bids were due.

Springer asserts that the non-renewal of his contract was based on his comments to the Governor. However, DPC offered three other reasons. First, they believed that Springer was insubordinate because he failed to return documents relating to the credentials certification of a physician applicant. Springer asserts that he missed the deadline for returning the materials because he wished to consult his attorney. Second, DPC alleged that Springer improperly kept patient records at home. Springer submits that he never kept originals or copies of patient documents in his home office. Finally, DPC told Springer that he had improperly considered his personal feelings in deciding whether a certain physician applicant should be credentialed. Springer contends that he did not act inappropriately in the decision-making process.

### III. STANDARD OF REVIEW

**\*3** Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc.,* 13 F.3d 674, 679 (3d Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).* When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.1999)*. The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence-not mere allegations-for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace,* 101 F.3d 947, 951 (3d Cir.1996)*(citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F .2d 1224, 1230 (3d Cir.1993)* (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson,* 477 U.S. at 249-50*.

## IV. DISCUSSION

### A. Springer's Rights under the First Amendment

In order to establish that his First Amendment rights were violated, Springer must demonstrate that his speech was protected. *See Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.1997)*. He must then establish that his protected speech was a motivating factor behind the alleged retaliation. *See id.* Finally, the burden will then shift to the defendants to demonstrate that the same action would have been taken if the speech had not occurred. *See id.*

### 1. Springer's Speech was Protected

The Third Circuit has outlined a two-part test to determine whether a public employee's speech is protected. First, the speech must pertain to a matter of

public concern. *See Azzaro v. County of Allegheny,* 110 F.3d 968, 976 (3d Cir.1997)*. Second, the court must balance the government's interest in effective administration against the employee's free speech rights. *See id.* This is commonly referred to as the *Pickering* balancing test. *See Pickering v. Board of Ed. of Tp. High School,* 391 U.S. 563, 568 (1968)* ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

#### a. Matters of Public Concern

**\*4** Whether speech addresses a matter of public concern is an issue for the court to decide. *See Waters v. Churchill,* 511 U.S. 661, 668 (1994)*. To ascertain whether speech addresses a matter of public concern, the court must consider whether the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996)* (citations omitted). In making this determination, the court can consider the "content, form, and context of a given statement." *Connick v. Myers,* 461 U.S. 138, 147-48 (1983)*.

The content of Springer's speech clearly addressed a matter of public concern. Speech may be characterized as a matter of political or social concern if the speech reveals "actual or potential wrongdoing." *See Holder v. City of Allentown,* 987 F.2d 188, 195 (3d Cir.1993)*. The cases cited by the plaintiff clearly establish that health care issues are matters of public concern when addressed by medical professionals. *See Schneiner v. New York City Health and Hospitals,* 157 F.Supp.2d 487, 495-96 (S.D.N.Y.2001) (finding speech protected where physician wrote to Mayor Giuliani's office regarding problems at municipal hospital); *Kattar v. Three Rivers Area Hospital Auth.,* 52 F.Supp.2d 789, 799 (W.D.Mich.1999)* ("In several cases, courts have held that statements by health care providers regarding patient care involved matters of public concern.") (collecting cases).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

In the present case, similar to *Schneiner* and *Kattar,* Springer was a health care provider who commented on the state of health care at the DPC facility. All of his statements concerned deficiencies at the facility. Moreover, many of problems Springer addressed involved danger to the lives of patients or the surrounding community (i.e. suicides and escapes). Thus, he raised concerns of a grave nature that would be relevant to the medical community, the community surrounding the DPC facility, the families of DPC patients, and the Delaware taxpayers who financed the operation. The court therefore concludes that the content of Springer's speech addressed issues that would be relevant to many groups of Delaware residents.

The defendants assert that Springer's statements were motivated by his own personal interests and thus did not address a matter of public concern. This allegation is based on the fact that Springer's comments also addressed the medical residency program. The defendants argue that since Springer was in charge of the residency program, only he would benefit from such comments. The court rejects this argument. First, a medical residency program could be beneficial to the DPC even in Springer's absence. Second, and more important, the medical residency program was but one of many points Springer addressed. The record clearly demonstrates that the vast majority of Springer's comments addressed the safety and medical concerns at the DPC. Thus, the court finds that the content of Springer's speech addressed a matter of public concern.

**\*5** The context of Springer's speech also indicates that he was addressing a matter of public concern. First, his comments were addressed to the Governor, the DPC Governing Board, and Ms. Henry. If Springer merely wanted to raise his personal issues, addressing his comments to Henry alone would have sufficed. The fact that his statements were addressed to public officials, however, indicates that was attempting reach an audience that could provide redress for the serious issues he raised. Furthermore, the federal government had already begun to investigate problems at the DPC long before Springer's statements. Additionally, several News Journal articles had also addressed the issues Springer raised. *See Watters v. City of Philadelphia, 55*

*F.3d 886, 895 (3d Cir.1995)* (noting that news coverage can be relevant to determining whether speech addresses a matter of public concern.) The involvement of the federal government and the press strongly indicates that the public was interested in the operations of the DPC. Thus, the court finds that the content and context of Springer's speech addressed a matter of public concern.

### b. Balancing the Government's and Springer's Interests

The only argument the defendants assert on this point is that Springer's comments were disruptive to the DPC's operation. The defendants assert that Springer's comments were intended to be disruptive. The court has reviewed the defendants' recitations of the facts and neither recitation includes facts that would permit the court to reasonably conclude that Springer's comments had any disruptive effect. Indeed, as far as the court can tell, the only fact that the defendants assert in support of this argument is that after agreeing to return the documents regarding the physician applicant, Springer delayed in producing the documents while he consulted his attorney. First, the defendants have failed to adduce facts demonstrating that the delay was disruptive. More important, even if this delay in returning the documents was disruptive, the defendants have failed to show how this disruption was in any way related to Springer's *speech.* Therefore, the court rejects the defendants' argument and concludes that they have not sufficiently demonstrated a government interest sufficient to outweigh Springer's First Amendment rights.

### 3. The Remaining Prongs of the Test

The court finds that summary judgment is inappropriate as to whether Springer's termination was motivated by his speech or, similarly, whether he would have been terminated in the absence of the speech. First, the record reveals that any number of factors could have motivated the defendants' decision to terminate Springer's contract. Indeed, the defendants have provided at least three reasons that are unrelated to Springer's comments-his insubordination, keeping

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

documents at home, and improperly considering his personal feelings during the physician applicant process. However, issues of fact surround whether plaintiff was truly insubordinate, whether he kept documents at home, or whether he had a "vendetta" against the physician applicant. Springer denies all of these allegations. Thus, the parties do not agree on the facts concerning these issues. The court cannot decide these issues on the record before it because they all involve credibility determinations. The motivation behind the defendants' decision is, therefore, a question of fact that is more properly addressed to the fact-finder than to the court. Moreover, it is unclear whether the plaintiff would have been terminated if he had not spoken. The defendants' assert that all fifteen psychiatrists were required to bid for their contracts. Conversely, Springer contends that he was the only physician made to bid. Additionally, Springer asserts that he was not notified of the bidding process in a timely fashion. Since the parties disagree on this highly relevant fact, the jury, rather than the court, should decide this matter. The court will, therefore, deny summary judgment on these two prongs.

### 4. Damages

**\*6** The court similarly finds that summary judgment on the issue of damages is inappropriate. Based on Singer's tax returns for the years 1997 to 2000, the defendants assert that he suffered no economic loss. Conversely, Springer alleges that his 2001 tax return (not mentioned by defendants) proves a significant economic loss. Moreover, Springer states that he can provide expert testimony to prove that he has, indeed, suffered damages. In light of these conflicting factual interpretations, the court finds that there is a genuine issue of material fact on the damages issue. Therefore, the court will also deny defendants' motion on this point.

### B. The Qualified Immunity Issue

Henry is not entitled to qualified immunity. Although state officials may be sued in federal court, their liability may be limited by the doctrine of qualified

immunity, which permits officials to avoid liability for actions performed in the course of their official duties. The Supreme Court recently affirmed the two part test for qualified immunity. First, the court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, are sufficient to show that the defendant violated a constitutional right. *See Saucier v. Katz,* 121 S.Ct. 2151, 2155-56 (2001). Second, if a constitutional violation can be demonstrated on the facts alleged, the court must next consider whether the right was clearly established at the time of the alleged violation. *See id.* at 2156. In *Saucier,* the court further clarified that the right must be established in a "particularized" sense, meaning that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See id.* Additionally, the court noted that although the court must decide whether the facts alleged-not proved-by the plaintiff amount to a constitutional violation, even where there may be a material issue of fact, if the law did not put the officer on notice that his conduct was unlawful, summary judgment may be permissible. *See id.* at 2156-57.

The parties here contest only whether Springer's rights were clearly established at the time he was terminated. A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ." *See id.* at 2156. More specifically, a right is clearly established where case law speaks "with obvious clarity to the specific conduct in question." *United States v. Lanier,* 520 U.S. 259, 271 (1997).

Relevant Supreme Court precedent establishes that "independent government contractors cannot be terminated for exercising their First Amendment rights." *Board of Comm. Wabaunsee v. Umbehr,* 518 U.S. 668, 686 (1996). *See also O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 721 (1996) (noting same). Thus, the Supreme Court has recognized on at least two occasions that an independent contractor-such as Dr. Springer-- has a constitutional right to free speech. Therefore, it cannot be more clear that this right was clearly established.

**\*7** The defendants assert that this court should be

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

persuaded by *Hauge v. Brandywine School District, 131 F.Supp.2d 573 (D.Del 2001).* In that case, the court held that the right to be free from retaliation was not clearly established because due to the "fact-intensive nature of the *Pickering* balancing test," the officials were not on notice that their conduct violated the First Amendment. *Id.* at 584. The court will not follow *Hauge* for two reasons. First, the court is persuaded by the plaintiff's contention that *Hauge,* although it may have been correctly decided on the record before that court, is unique. Although the *Hauge* court granted qualified immunity based on the fact-intensive balancing required by the *Pickering* test, neither the plaintiff nor the defendants have presented any authority to permit this court to conclude that the *Pickering* balancing test must always lead to a denial of qualified immunity.[FN3] If the court were to accept the defendants' position, qualified immunity could never be denied in First Amendment retaliation cases. This is an extreme result, one the *Hauge* court probably did not intend and one that this court will not sanction.

> FN3. Indeed, the *Hauge* court itself cites no authority for this novel proposition.

Second, this case is factually distinguishable from *Hauge.* Hague involved a school district administrator who brought allegations of fraud against the school district. *See id.* at 577-578. This case involves a physician who spoke on the various problems confronting hospital administration. Under facts very similar to those in this case, courts have found that the right to speak was clearly established. *See Schneiner,* 152 F.Supp.2d at 493 ("There is no doubt that the plaintiff [physician's] rights under both the First Amendment and the Fourteenth Amendment [to comment on health care at the hospital] were clearly established at the time the plaintiff was disciplined."). Thus, considering the facts before this court, this court also finds that Springer's right was clearly established at the time he spoke.[FN4]

> FN4. The court finds that the defendants' reliance on *Saucier v. Katz,* 121 S.Ct. 2151 (2001) for the proposition that there must be

exact congruence between the precedential facts and the facts of the present case is misplaced. First, *Saucier* involves a completely different context-excessive force under the Fourth Amendment. More important, *Saucier* does not require that the facts of each case be identical. The court therefore rejects the defendants' argument on this issue.

Finally, the defendants contend that the plaintiff's right was not clearly established because under the new bidding process, his contract was not certain to be renewed. As Springer notes, however, independent contractors are entitled to First Amendment protection where there is a *preexisting* contractual relationship. *See Umbehr,* 518 U.S. at 685 (noting that holding establishing right to First Amendment speech was limited to independent contractors with "preexisting commercial relationship" with government). Springer had been under contract with the DPC since 1991. Thus, it is clear that he had a pre-existing commercial relationship. The court therefore rejects the defendants' argument on this issue.

For these reasons, the court finds that Ms. Henry is not entitled to qualified immunity.

## V. CONCLUSION

For all of the foregoing reasons, the court concludes that Springer's speech was protected. Nevertheless, a jury must decide whether his protected speech motivated his termination, whether he would have been terminated in the absence of the speech, and whether he suffered damages. Finally, Henry is not entitled to qualified immunity. Thus, the court will deny the defendants' motion for summary judgment and grant Springer's motion for partial summary judgment.

*8 NOW, THEREFORE, IT IS HEREBY ORDERED that:
1. The Defendants' Motion for Summary Judgment (D.I.35) is DENIED;
2. The Plaintiff's Motion for Partial Summary Judgment (D.I.38) is GRANTED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


D.Del.,2002.
Springer v. Henry
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00885 (Docket) (Oct. 06, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court,D. Delaware.

David T. SPRINGER, M.D., Plaintiff,

v.

Renata J. HENRY, individually and, in her official capacity as Director of the Division of Alcoholism, Drug Abuse and Mental Health of the Department of Health and Social Services of the State of Delaware and Gregg C. Sylvester, M.D., in his official capacity as Secretary of the Department of Health and Social Services of the State of Delaware, Defendants.

**No. C.A. 00-885 GMS.**

Sept. 16, 2004.

Thomas S. Neuberger and Stephen J. Neuberger of The Neuberger Firm, P.A., Wilmington, Delaware for the plaintiff.

Phebe S. Young and Marc P. Niedzielski of the Department of Justice, Civil Division, Wilmington, Delaware for the defendant.

*MEMORANDUM OPINION*

SLEET, J.

### I. INTRODUCTION

**\*1** Presently before the court are the parties motions for post-trial relief. Following a four-day jury trial, in which the jury concluded that the defendant, Renata Henry ("Henry"), the director of Delaware's Division of Alcoholism, Drug Abuse and Mental Health, retaliated against the plaintiff, Dr. David T. Springer ("Springer"), for expressions of protected speech, in violation of the First Amendment to the United States Constitution. The plaintiff was awarded damages accordingly. The defendant now challenge the verdict and moves for a new trial. The plaintiff seeks reinstatement and attorneys' fees, interest, and costs.

For the reasons stated below, the court will grant in part the defendants' motion challenging the damages award. The verdict will otherwise stand. The judgment for a new trial will be denied. Likewise, the plaintiff's motion for reinstatement will be denied. The court will grant the plaintiff's motion for fees, interest, and costs based on the adjusted award.

### II. BACKGROUND

#### A. Procedural History

The plaintiff Springer filed a complaint on October 6, 2000, seeking compensatory and punitive damages, as well as injunctive relief for "retaliatory violations of the free speech and petition clauses of the First Amendment of the U.S. Constitution." (D.I.1). Springer named Renata Henry, individually and in her official capacity as Director of the Division of Alcoholism, Drug Abuse and Mental Health ("DADAMH") of the Delaware Department of Health and Social Services ("DDHSS"), Dr. Gregg Sylvester, in his official capacity as Secretary of the DDHSS, and the DDHSS as defendants. (D.I.1). In his complaint, Springer requested, among other relief, compensatory damages, punitive damages, attorneys' fees and costs, and reinstatement. (D.I.1). On June 19, 2001, the parties stipulated to dismiss the DDHSS and "all claims for monetary damages against the two individual defendants in their official capacities, if any such claims were implicit in the Complaint." [FN1] (D.I.24).

> FN1. Effectively, this dismissed Dr. Sylvester from the action. Since he is no longer Secretary, he has no authority to reinstate Dr. Springer to his former position. As such, the remaining injunctive claim for reinstatement against Sylvester is moot. Thus, in spite of the parties use of both the singular and plural tenses when referring to the defendant(s), it seems clear that only one defendant remains in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

this action-Renata J. Henry.

The defendant Henry moved for summary judgment on November 9, 2001, arguing that Springer's speech was not protected; that, in the alternative, it was disruptive; that his termination was inevitable given his failure to submit a bid; that, regardless, Springer has not suffered any damages; and, finally, that Henry was entitled to qualified immunity.[FN2] (D.I.47). Springer cross-moved for partial summary judgment on November 19, 2001, arguing that his speech was protected under the First Amendment, and that Henry was not entitled to qualified immunity. On March 11, 2002, the court denied Henry's motion for summary judgment and granted Springer's cross-motion for partial summary judgment. (D.I.47). The court concluded that Springer's speech was protected and that Henry was not entitled to qualified immunity. (D.I.47). Specifically, the court identified the memorandum dated November 23, 1999, and a report filed with the Governing Body on March 21, 2000, as protected speech. (D.I.47, pp. 3-4). The issues that remained to be decided by a jury at trial were whether Henry terminated Springer because of his exercise of protected speech, and, whether as a result of his termination, Springer suffered any damages. On March 18, 2002, Henry and Sylvester appealed the Order. However, their appeal was dismissed on November 29, 2002.

FN2. Dr. Sylvester was part of the Motion for Summary Judgment, however, given the above stipulated dismissal, his involvement is irrelevant to the recitation of facts.

*2 The case proceeded to trial on March 29, 2004, and took place over the course of four days. The jury returned a verdict in favor of Springer. He was awarded $998,895 in damages, but was not reinstated to his position at the DPC. (D.I.98). The parties submitted post-trial motions, which the court presently considers.

B. Factual Background

1. Springer's Contract

Springer began working for the DPC as a part-time independent contractor physician in 1991.[FN3] (B0339).[FN4] He worked under annual contracts that were automatically renewed for nine years until June of 2000. (B0343). From 1991 to 2000, Springer's contracts specified that the contract term was for one year and could be terminated without cause upon fifteen days notice. The contract terms did not guarantee renewal. Nevertheless, until 2000, Springer's contract was renewed each year.

FN3. In 1991, DPC was known as Delaware State Hospital. Nevertheless, Delaware State Hospital and DPC are the same entity.

FN4. B followed by a number refer to the pages in the plaintiff's four volume post-trial motions appendix.

In 1991 Springer's billing rate was eighty dollars per hour. At some point it raised to ninety and at the time of his termination, his rate was ninety-three dollars per hour. (B0371). His contracts stated that he would work 30 hours per week for 50 weeks, for a total of 1500 hours per year. (B0341). At ninety three dollars per hour, Springer's annual pay from the DPC was $139,500. (B0340). When he began, his duties included being the Assistant Residency Training Director. In 1993 he was promoted to the position of Residency Training Director. (B0348). In addition, Springer served as a member of the Credentials Committee [FN5] from 1993 to 2000. (B0386). He was also the Chairman of the Medical Staff Executive Committee ("Executive Committee") from 1999 to 2000. (B0387).

FN5. The Credentials Committee is a committee composed of physicians who conduct peer review of physician performance and the qualifications of physicians who apply for jobs or contracts. (B0386).

2. Events Leading up to Springer's Termination

In 1996, the Delaware General Assembly amended the Delaware Procurement Act, 29 Del. C. ch. 69, to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

provide that all contracts for professional services exceeding $50,000 per year must be subject to public bidding. (B0830). The provision went unenforced at the DPC until early 2000, when Dr. Sylvester, Secretary of the DDHSS, instructed his division directors to comply with the Act and require public bidding on professional service contracts.

DADAMH, a subdivision of DDHSS, oversaw the administration of the Delaware Psychiatric Center (hereinafter the "DPC" or "hospital"). The defendant Renata Henry was hired as the Director of DADAMH in 1999.[FN6] (B0740). Her boss, Dr. Sylvester, began his term as the Secretary of DDHSS in October of 1997 and served in that capacity until January of 2001.[FN7] (B0222-0225).

> FN6. Although she served as director of DADAMH, Ms. Henry is not a physician.

> FN7. He started as Acting Cabinet Secretary of the DDHSS in October 1997, and was sworn in as the official Secretary in January 1998, under Governor Carper. (B0222-225)

On October 21, 1999, the DPC psychiatric residents drafted a memo to then Governor Carper, Dr. Sylvester, Dr. Springer, and other hospital staff, articulating their concerns regarding the egregious conditions of the DPC. (B1154-1157; PX1 [FN8]). They also sent the memo to the News Journal and the Department of Public Safety. (B1157). In the memo, the residents cited problems such as under-staffing, overcrowding, low morale, poor security, inadequate treatment, and overall unsafe conditions for the staff as well as the patients. *Id.* The residents expressed a concern that the residency program was suffering as a result. *Id.* The memo received media attention and was the subject of a series of editorials. (B1158).

> FN8. PX = Plaintiff Exhibit

**\*3** On November 23, 1999, a number of the DPC Medical Staff Executive Committee officers echoed the residents' attempt to expose the conditions. They drafted a memo entitled "Critical Issues in the Care of the Mentally Ill in Delaware." (B1158; PX7). Springer was the President of the Committee at the time the letter was drafted. The memo was addressed to the Governor, the DPC Governing Board, and Henry. (B1158). The memo generally reiterated many of the same concerns expressed by the residents, in particular, the decline of the residency program. The executive Committee invited the DPC Governing Body to schedule a series of emergency meetings with it to discuss hiring teaching psychiatrists to save the residency program. (B1158-59). In a prior ruling, the court already determined that this memo constituted speech protected under the First Amendment. (D .I. 47).

On December 2, 1999, a number of Executive Committee Officers, including Springer, drafted another memo addressed "To Whom It May Concern." (B1160). The memo expressed the Executive Committee's frustration with the lack of initiative on the administration's part to remedy the issues previously raised. (B1160). The signatories proposed a list of actions that "may begin us on the road to protecting and preserving patient care and safety." (B1160). On December 16, 1999, Springer individually addressed the DPC Governing Body Members in a memo entitled "Proposed Agenda for December 22, 1999 Governing Body Meeting." (B1162). In this memo, on behalf of the medical staff, Springer outlined a proposed plan of action. (B1162-63).

At some point following the initial memo by the residents, the Delaware News Journal ran several highly critical articles about the DPC. In December 1999, the federal Healthcare Financing Administration (FHA) threatened to withdraw 6.5 to 7 million dollars in federal funding to the DPC. (B0234-37; B0297). Given the growing notoriety of the conditions at the hospital and the threat from the FHA to withdraw funding, Henry felt pressured to effect immediate improvements. (B0747-48; B0268). In response to the pressure, she requested temporary credentialing for a particular physician applicant. At trial, she testified that the DPC needed the physician applicant in order to meet the federal requirements concerning the ratio of psychiatrists to patients. (B0747). At first, Springer objected to credentialing the physician applicant. Henry

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

was frustrated with Springer because she felt he was obstructing the credentialing process. (B0274; B0301).

On January 7, 2000, Springer was approached by Mr. Giarow Shimono ("Shimono"), the hospital director at the time, about credentialing the physician applicant on an emergency basis. (B0431). Springer told Shimono about his concerns regarding the physician applicant. Springer testified that Shimono wanted to put the physician applicant on duty anyway. Springer had no authority himself to issue emergency credentials. (B0432-33). Springer informed Shimono that he had documents to support his concerns about the physician applicant. (B0434; B0438). He kept the documents at his home office. (B0435). The documents, drafted in 1997, included an email to "Dr. Smoyer or the credentials committee," a memo addressed to the credentials committee, and "one was just a memo to [Springer's] own file." (B0435). Henry asked Springer to produce the documents. (B0435). In response, Springer wrote a letter to Henry dated January 7, 2000, advising her to consult with an attorney about whether Springer was permitted to disseminate the "peer review material." (B0436-37). As it turned out, the Attorney General's office concluded that Henry was allowed to view the materials. (B0438). Springer accordingly produced them. (B0438).

**\*4** On January 26, 2000, Springer drafted a report in preparation for a meeting with the Governing Body scheduled for January 29, 2000. (B1164-74). He did not, however, present the report until March 21, 2000. (B1152; B1164-74). In the report, Springer alleged that the tension between the administrators and the medical staff was causing physicians to practice below their "minimal ethical standards." He threatened to notify regulatory agencies of the conditions in order for them "to intervene and demand improvements." (B1164). As well, he accused the administration of granting temporary privileges to a psychiatrist in violation of medical staff bylaws. (B1165). He said the administration's action was prompted by an unannounced site visit from Medicare. (B1165). The court determined by way of summary judgment that this memo constituted speech protected under the First Amendment. (D.I.47).

The Credentialing Committee met twice with regard to this particular applicant, on April 27 and May 2, 2000. *Id.* At the first meeting on April 27, three members of the Credentialing Committee voted to grant partial privileges to the physician applicant, two members, including Springer, voted not to grant privileges. (B0408-10). On May 2, 2000, the Executive Committee met to consider the recommendation of the Credentialing Committee. (B0405-06). The Executive Committee elected to grant the physician applicant partial privileges. (B0413). Springer testified that Henry refused to sign the physician applicant's credentialing unless he was given full unrestricted privileges. (B0413).

On May 12, 2000, Henry sent Springer a letter informing him that his contract with DADAMH would not be renewed. (B1175). The letter indicated that DADAMH would be publishing requests for proposals and invited Springer to respond. (B1175). Springer testified that he did not receive the letter until May 15, 2000. (B0424). The deadline to submit a proposal was May 17, 2000. (B1176). The request for proposals had been public since April 10, 2000, and the deadline to ask questions about the bid was April 19, 2000, by 4:30 p.m. (B0429; B0774). Springer was only on notice of the request as of his receipt of Henry's letter on May 15. (B0424). Springer asked Melody Lasana, DADAMH's Contract Manager, for an extension of the deadline. (B1176). His request was denied. (B1176).

### 3. Post-Termination

Springer asserts that the non-renewal of his contract was based on his comments to the Governor. Henry testified that the reason Springer was not automatically renewed was because "not only were we under the gun at the hospital, but we also had just had a series of rulings in reference to how the department was doing contracts and indicating that we were out of compliance as we continued to renew, renew, renew, renew year after year after year without putting things out to bid. And this was department-wide as well as in the division that I stepped in to run." BO816. She stated that she was unable to ask all of the independent contractor physicians to rebid in a single year. She testified that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 5
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

she chose Springer because to her knowledge there were no other physicians that had been there as long as he had without ever having been asked to rebid. (B0817).

**\*5** Springer alleges that he suffered losses as a result of his termination and has been unable to find employment comparable to the work he did as Residency Training Director. Accordingly, he filed the present action against the defendant on October 6, 2000. (D.I.1).

At the conclusion of the trial, the jury returned the following verdict. When asked if Springer proved by a preponderance of the evidence whether his protected activity was a substantial or motivating factor in the decision not to renew his contract, the jury answered, "Yes." (B1585). In particular, the jury found that plaintiff's exhibits two through five were the instances of protected activity that motivated the decision not to renew his contract. (B1586). Exhibits two and five were Springer's memorandum dated November 23, 1999, and the report he prepared in preparation for the meeting with the Governing Body on March 21, 2000. Exhibits one, three, and four were, respectively, a memo from the DPC resident physicians dated October 21, 1999, a memo drafted by the Executive Committee, of which Springer was a signatory, dated December 2, 1999, and a memo from Springer to the Governing Body dated December 16, 1999.

When asked if Henry proved by a preponderance of the evidence that "regardless of [Springer's] exercise of his First Amendment rights, that she would not or could not have renewed his contract in July 2000," the jury answered, "No." *Id.* When asked if Springer suffered any actual injury from not being offered a new contract, the jury answered, "Yes." (B1587). The jury found Springer suffered damages in the amount of $285,464 up to present, and $588,431 into the future. *Id.* The jury also found that Springer suffered $100,000 in non-economic damages. *Id.* Finally, when asked if the defendant acted recklessly, intentionally or maliciously with regard to Springer, the jury answered, "Yes." (B1589; D.I. 92). Accordingly, the jury awarded Springer $25,000 in punitive damages. The court entered the Judgment on April 5, 2004, "for damages plaintiff suffered which were proximately caused by not

being offered a new contract ... in the amount of [$285,464]; [$588,431] for future damages; and finding in favor of plaintiff for non-economic damages in the amount of [$100,000]; and on the additional verdict form awarding plaintiff punitive damages in the amount of [$25,000]." The parties filed post-trial motions which the court now considers.

### III. STANDARD OF REVIEW

A. Renewed Motion for Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50, a court may render judgment as a matter of law (JMOL) after the moving party is fully heard on an issue at trial, if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir.1993) (citation omitted). If the court denies a motion for JMOL during trial, the motion may be renewed within ten days of entry of judgment in the case. Fed. R. Civ. P. 50(b). To prevail on a renewed motion for JMOL following a jury trial, a party " 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings.' " *Pannu v. Iolab Corp.,* 155 F.3d 1344, 1348 (Fed.Cir.1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed.Cir.1984)). " 'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp.,* 732 F.2d, at 893. In assessing the sufficiency of the evidence, the court must draw all reasonable inferences from the evidence in the light most favorable to the non-moving party. *Id.; Richardson-Vicks Inc. v. UpJohn Co.,* 122 F.3d 1476, 1479 (Fed.Cir.1997). The appropriate inquiry is whether a reasonable jury, given the facts before it, could have arrived at the conclusion it did. *Dawn Equip. Co. v. Kentucky Farms, Inc.,* 140 F.3d 1009, 1014 (Fed.Cir.1998). The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 6
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

elements of the evidence." *Perkin-Elmer Corp., 732 F.2d at 893*.

## B. Motion for a New Trial

**\*6** The court may grant a new trial pursuant to Federal Rule of Civil Procedure 59 "for any of the reasons for which new trials have heretofore been granted in actions of law in the courts of the United States." Fed. R. Civ. P. 59(a). A court should grant a new trial in a jury case, however, only if "the verdict was against the weight of the evidence ... [and] a miscarriage of justice would result if the verdict were to stand." *Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir.1991)*. In making this determination, the trial judge should consider the overall setting of the trial, the character of the evidence, and the complexity or simplicity of the legal principles which the jury had to apply to the facts. *Lind v. Schenley Industries, Inc., 278 F.2d 79, 89 (3d Cir.)*, *cert. denied*, 364 U.S. 835 (1960).

## IV. DISCUSSION

## A. HENRY'S MOTIONS

The defendant argues that she is entitled to judgment as a matter of law under Rule 50 on the issue of qualified immunity, on damages, and on the plaintiff's substantive claim of retaliation. In the alternative, the defendant argues that she should be granted a new trial under Rule 59 because she was denied a fair trial. She bases this claim on the following alleged errors: (1) that the court failed to make essential rulings of law on the protected nature of Dr. Springer's communications and on the existence of qualified immunity, and to charge the jury in accordance therewith; (2) that the court excluded critical evidence; and (3) that the plaintiff's counsel's made racially inflammatory comments during his rebuttal.

### 1. Henry's Motion for Judgment as a Matter of Law

#### a. Whether Henry is entitled to qualified immunity

As noted in the plaintiff's opposition brief, the court already ruled that Henry was not entitled to qualified immunity as a matter of law. (D.I. 47, Memorandum and Order ("the court finds that Ms. Henry is not entitled to qualified immunity")). As such, the court construes defendant's motion as an untimely motion for reconsideration of its previous summary judgment ruling.

As a general rule, motions for reconsideration should be granted only "sparingly." *Karr v. Castle, 768 F.Supp. 1087, 1090 (D.Del.1991)*. In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Shering Corp. v. Amgen, Inc., 25 F.Supp.2d 293, 295 (D.Del.1998); Brambles USA, Inc. v. Blocker, 735 F.Supp. 1239, 1240 (D.Del.1990)* (citing *Above the Belt, Inc. v. Mel Bonhannan Roofing, Inc., 99 F.R.D. 99 (E.D.Va.1983)*); *see also Karr, 768 F.Supp. at 1090* (citing same). Moreover, even if the court has committed one of these errors, there is no need to grant a motion for reconsideration if it would not alter the court's initial decision. *See Pirelli Cable Corp. v. Ciena Corp., 988 F.Supp. 424, 455 (D.Del.1998)*. Finally, motions for reconsideration "should not be used to rehash arguments already briefed." *TI Group Automotive Systems, (North America), Inc. v. VDO North America L.L.C., 2002 U.S. Dist. LEXIS 1018, 2002 WL 87472 (D.Del.2002)* (citation omitted); *see also Quaker Alloy Casting v. Gulfco Industries, Inc., 123 F.R.D. 282, 288 (N.D.Ill.1988)* ("This Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."). The defendant is merely rehashing exhausted arguments. No additional evidence was introduced at trial to change the court's understanding of the issue. Henry is not entitled to qualified immunity for the reasons stated in the court's Memorandum and Order dated March 11, 2002.[FN9]

FN9. The court stated:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Henry is not entitled to qualified immunity. Although state officials may be sued in federal court, their liability may be limited by the doctrine of qualified immunity, which permits officials to avoid liability for actions performed in the course of their official duties. The Supreme Court recently affirmed the two part test for qualified immunity. First, the court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, are sufficient to show that the defendant violated a constitutional right. *See Saucier v. Katz,* 121 S.Ct. 2151, 2155-56 (2001). Second, if a constitutional violation can be demonstrated on the facts alleged, the court must next consider whether the right was clearly established at the time of the alleged violation. *See id.* at 2156. In *Saucier,* the court further clarified that the right must be established in a "particularized" sense, meaning that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See id.* Additionally, the court noted that although the court must decide whether the facts alleged-not proved-by the plaintiff amount to a constitutional violation, even where there may be a material issue of fact, if the law did not put the officer on notice that his conduct was unlawful, summary judgment may be permissible. *See id.* at 2156-57.

The parties here contest only whether Springer's rights were clearly established at the time he was terminated. A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ." *See id.* at 2156. More specifically, a right is clearly established where case law speaks "with obvious clarity to the specific conduct in question." *United States v. Lanier,* 520 U.S. 259, 271 (1997).

Relevant Supreme Court precedent establishes that "independent government contractors cannot be terminated for exercising their First Amendment rights." *Board of Comm.*

*Wabaunsee v. Umbehr,* 518 U.S. 668, 686 (1996). *See also O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 721 (1996) (noting same). Thus, the Supreme Court has recognized on at least two occasions that an independent contractor-such as Dr. Springer-has a constitutional right to free speech. Therefore, it cannot be more clear that this right was clearly established.

The defendant assert that this court should be persuaded by *Hauge v. Brandywine School District,* 131 F.Supp.2d 573 (D.Del 2001). In that case, the court held that the right to be free from retaliation was not clearly established because due to the "fact-intensive nature of the *Pickering* balancing test," the officials were not on notice that their conduct violated the First Amendment. *Id.* at 584. The court will not follow *Hauge* for two reasons. First, the court is persuaded by the plaintiff's contention that *Hauge,* although it may have been correctly decided on the record before that court, is unique. Although the *Hauge* court granted qualified immunity based on the fact-intensive balancing required by the *Pickering* test, neither the plaintiff nor the defendant have presented any authority to permit this court to conclude that the *Pickering* balancing test must always lead to a denial of qualified immunity. If the court were to accept the defendant' position, qualified immunity could never be denied in First Amendment retaliation cases. This is an extreme result, one the *Hauge* court probably did not intend and one that this court will not sanction.

Second, this case is factually distinguishable from *Hauge.* Hauge involved a school district administrator who brought allegations of fraud against the school district. *See id.* at 577-578. This case involves a physician who spoke on the various problems confronting hospital administration. Under facts very similar to those in this case, courts have found that the right to speak was clearly established. *See Schneiner,* 152 F.Supp.2d at 493 ("There is no doubt that the plaintiff [physician's] rights

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

under both the First Amendment and the Fourteenth Amendment [to comment on health care at the hospital] were clearly established at the time the plaintiff was disciplined."). Thus, considering the facts before this court, this court also finds that Springer's right was clearly established at the time he spoke.

Finally, the defendant contend that the plaintiff's right was not clearly established because under the new bidding process, his contract was not certain to be renewed. As Springer notes, however, independent contractors are entitled to First Amendment protection where there is a *pre-existing* contractual relationship. *See Umbehr,* 518 U.S. at 685 (noting that holding establishing right to First Amendment speech was limited to independent contractors with "preexisting commercial relationship" with government). Springer had been under contract with the DPC since 1991. Thus, it is clear that he had a pre-existing commercial relationship. The court therefore rejects the defendant' argument on this issue.

For these reasons, the court finds that Ms. Henry is not entitled to qualified immunity. D.I. 47, pp. 11-13.

**\*7** Therefore, the court concludes that there is no reason to disturb the verdict on the basis that Henry was entitled to qualified immunity.

### b. Whether Springer suffered any damages

Henry argues that Springer is not entitled to any damages, be they economic damages for past economic loss to date of trial and/or projected future losses, general damages for harm to reputation, and/or punitive damages.

### I. Economic damages

The jury awarded Springer economic damages to compensate Springer for past and future economic losses. Defendant argues that Springer is not entitled to

economic damages for two reasons. First, she asserts that it was incorrect to assume that Springer's contract would have been renewed until his projected retirement date. Second, Henry argues that Dr. Andrisani's testimony alone was insufficient to support the award. (D.I.126, pp. 19-20). She contends that the "sole evidence in support of plaintiff's claim for economic damages was the opinion testimony of John Andrisani, Ph.D." (D.I.126, p. 19).

Whether Springer's contract would have been renewed but for his memos was a question of fact properly before the jury. The court cannot conclude that the evidence was insufficient to support a finding that the DPC would have continued its practice of automatically renewing Springer's contract had he not drafted and disseminated the controversial memos.

Likewise, the court cannot conclude that Dr. Andrisani's testimony was insufficient to support the jury's award of economic damages. The only evidence the defendant presented to contradict Dr. Andrisani's testimony was their own expert, Dr. Link. The issue came down to a battle of experts. It is within the province of the jury to determine which expert is more credible. *See Lansdale v. Philadelphia Electric Co.,* 692 F.2d 307, 313 (3d Cir.1982) ("The battle of the experts was waged in the trial court before the jury. The jury resolved the factual dispute. What Lansdale lost, fairly and squarely, at the hands of a jury cannot be retrieved by converting a factual controversy into an issue of law. *Id.* " ). Upon review of the experts' testimony, the court concludes there was sufficient evidence to believe Dr. Andrisani's calculation of loss.[FN10]

> FN10. Henry raises no challenge to the qualifications of Springer's expert or the methodology that he employed in calculating the plaintiff's damages. Moreover, the court could discern no colorable issue in this regard.

### ii. General damages

The jury awarded Springer non-economic damages in the amount of $100,000 for harm to his reputation. Henry contends that there is no evidence in the record

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

to support a finding of harm to Springer's reputation.

The court agrees with the defendant that a reasonable jury could not have concluded based on the evidence in the record that Springer has suffered any loss to his reputation. Springer cites to the fact that Henry discussed her frustrations regarding Springer's conduct with Dr. Sylvester, a preeminent physician in the community, as the cause of the damage to his reputation. However, at trial, Dr. Sylvester testified that he had no reason to doubt that Springer is "committed to quality healthcare for patients" and that he is a "skilled clinician." (B0237). Even drawing all reasonable inferences from the evidence in a light most favorable to the plaintiff, a reasonable jury could not have arrived at the conclusion that Springer's reputation suffered.

### iii. Punitive damages

**\*8** The jury awarded Springer $25,000 in punitive damages. Henry contends that the record is insufficient to support a punitive award. Although the court may not have reached the same decision had this been a bench trial, it is not in a position to "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp., 732 F.2d at 893*. Therefore, the punitive award will stand.

Punitive damages are appropriate when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade, 461 U.S. 30, 56 (1983)*. The record contains evidence to support a finding that Henry acted with, if not evil intent, then reckless indifference to Springer's federally protected rights. The trial record contains evidence that Henry was upset about Springer's memos. She felt that they preached "blatant mistruths." (B0746). Despite the pressure she was under to enforce the bidding process, Springer was the only independent contractor psychiatrist asked to submit a proposal that year. The timing of the non-renewal of his contract could be viewed as suspect given that it occurred in relatively close proximity to the drafting of his controversial memoranda. As well, Henry notified

Springer only five days, at best, before the proposal deadline despite the fact that the position had been advertised for over a month. Springer testified he received her letter only two days before the proposal deadline. As such, the court will not upset the punitive award. A reasonable jury could have concluded that Henry was motivated by evil intent or reckless indifference.

In conclusion, the court reduces the damages award by $100,000. There is insufficient evidence in the record for a reasonable jury to conclude that Springer's reputation has been damaged. The remaining damages, economic and punitive, are preserved.

### c. Whether, as a matter of law, the evidence is sufficient to support a finding of retaliation

In order to establish that his contract was not renewed in retaliation for exercising his First Amendment rights, Springer first had to demonstrate that his speech was protected. *See Green v. Philadelphia Housing Authority, 105 F.3d 882, 885 (3d Cir.1997)*. Next, he had to establish that his protected speech was a substantial or motivating factor behind the alleged retaliation. *See id*. Finally, if Springer established these two elements, the burden would then shift to the defendant to demonstrate that the same action would have been taken if the speech had not occurred. *Id.; see also Carter v. Del. State Univ.,* 2002 U.S. Dist. LEXIS 4721, at \*5 (D.Del. Mar. 21, 2002).

Here, the court decided as a matter of law that Springer's memorandum dated November 23, 1999, and the report he prepared in preparation for the meeting with the Governing Body on March 21, 2000, constituted protected speech. (D.I.47). The jury determined that those materials, as well as the memo from the Executive Committee dated December 2, 1999, and the memo from Springer to the Governing Body outlining a proposed agenda for a future meeting dated December 16, 1999, constituted instances of protected activity that were a substantial or motivating factor in the decision to not renew Springer's contract. (B1585; D.I. 90). The jury also found that Henry failed to prove that regardless of Springer's protected speech,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

she would not or could not have renewed Springer's contract.

**\*9** Henry argues that "[p]laintiff's entire case regarding the substantive claim of First Amendment retaliation is based on the temporal relationship between his protected writings ... and Renata Henry's May 12, 2000 courtesy letter." (D.I.126, p. 22). She contends that the temporal relationship is not close enough according to the Supreme Court. *Id.* (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001)).

The court rejects this argument because, viewing the record as a whole, there was evidence other than the proximity in time of Springer's speech and Henry's non-renewal letter to suggest that the protected writings were the substantial and/or motivating factor in Henry's decision not to renew Springer's contract. The record indicates that Henry felt that Springer's conduct was insubordinate and disruptive. She felt he was obstructive to the credentialing process. This evidence viewed in conjunction with the temporal element, is substantial enough for a reasonable jury to conclude that Springer's protected speech was a motivating factor in Henry's decision not to renew his contract. As well, a reasonable jury could have concluded that Henry failed to prove that she would not or could not have renewed Springer's contract regardless of his exercise of protected speech.

### 2. Henry's Motion for a New Trial or, in the Alternative, Motion to Amend the Judgment or Other Relief

As stated above, a new trial may be granted where "the verdict is contrary to the great weight of the evidence." *Roebuck v. Drexel Univ.*, 852 F.2d 715, 735 (3d Cir.1988). For the reasons that follow, the court concludes that Henry is not entitled to a new trial.

a. Whether the court failed to make required findings on the protected nature of Springer's communications and on the existence of qualified immunity, and thus failed to properly charge the jury on these issues; and, whether the court erred in refusing to permit Henry to

testify about her belief as to the falsity of Springer's statements and in excluding other critical evidence

### (I) The protected nature of Springer's communications

With regard to plaintiff's exhibits two and five, at the pre-trial stage of the case, the court determined as a matter of law that these memoranda constituted protected speech. The court will not revisit this issue. As discussed above in relation to the Henry's motion for renewed judgment as a matter of law on whether she is entitled to qualified immunity, no additional evidence was presented at trial that would alter the court's prior ruling. In addition to those two exhibits, the defendant objects to the characterization of plaintiff's exhibits numbers one, three, and four as protected speech as reflected in the jury verdict form. Henry also argues that the court's failure to instruct the jury on which portions of the documents were protected is cause for a new trial.

Exhibits one, three, and four were, respectively, a memo from the DPC resident physicians dated October 21, 1999, a memo drafted by the Executive Committee, of which Springer was a signatory, dated December 2, 1999, and a memo from Springer to the Governing Body dated December 16, 1999. Even if the court were to determine that these exhibits did not constitute protected speech, the error is harmless.

**\*10** The Third Circuit has outlined a two-part test to determine whether a public employee's speech is protected. First, the speech must pertain to a matter of public concern. *See Azzaro v. County of Allegheny*, 110 F.3d 968, 976 (3d Cir.1997). Second, the court must balance the government's interest in effective administration against the employee's free speech rights. *See id.* This is commonly referred to as the *Pickering* balancing test. *See Pickering v. Board of Ed. of Tp. High School*, 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 11
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Whether speech addresses a matter of public concern is an issue for the court to decide. *See Waters v. Churchill,* 511 U.S. 661, 668 (1994). To ascertain whether speech addresses a matter of public concern, the court must consider whether the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996) (citations omitted). In making this determination, the court can consider the "content, form, and context of a given statement." *Connick v. Myers,* 461 U.S. 138, 147-48 (1983).

It is a fair statement that the jury verdict form suggested to the jury that all of plaintiff's exhibits one through five were instances of protected activity under the First Amendment. *See* Jury Verdict Form, ¶ 1 (asking "Do you find that plaintiff has proven by a preponderance of the evidence that his protected activity under the First Amendment *reflected in Plaintiff's Exhibits 1, 2, 3, 4, and 5* was a substantial or motivating factor in the decision to not renew or offer [plaintiff] a new contract?" (emphasis added). The jury concluded that the memo drafted by the residents dated October 21, 1999, was not an instance of protected activity that was a substantial or motivating factor in the decision to not renew Springer's contract, therefore, its appearance in the jury verdict form is immaterial to the present motion. (B1586, D.I.90). To the contrary, the jury concluded that exhibits two through five were protected speech that was a substantial and motivating factor.

Exhibits two and five are discussed above. Exhibits three and four involve the following. On December 2, 1999, a number of Executive Committee Officers, including Springer, drafted a memo addressed "To Whom It May Concern." (B1160). The memo expressed the Executive Committee's frustration with the lack of initiative on the administration's part to remedy the issues previously raised. (B1160). The signatories proposed a list of actions that "may begin us on the road to protecting and preserving patient care and safety." (B1160). On December 16, 1999, Springer individually addressed the DPC Governing Body Members in a memo entitled "Proposed Agenda for December 22, 1999 Governing Body Meeting." (B1162). In this memo, on behalf of the medical staff,

Springer outlined a proposed plan of action. (B1162-63).

**\*11** The content of Springer's speech in plaintiff's exhibits three and four clearly addressed a matter of public concern. Speech may be characterized as a matter of political or social concern if the speech reveals "actual or potential wrongdoing." *See Holder v. City of Allentown,* 987 F.2d 188, 195 (3d Cir.1993). Health care issues are matters of public concern when addressed by medical professionals. *See Schneiner v. New York City Health and Hospitals,* 157 F.Supp.2d 487, 495-96 (S.D.N.Y.2001) (finding speech protected where physician wrote to Mayor Giuliani's office regarding problems at municipal hospital); *Kattar v. Three Rivers Area Hospital Auth.,* 52 F.Supp.2d 789, 799 (W.D.Mich.1999) ("In several cases, courts have held that statements by health care providers regarding patient care involved matters of public concern.") (collecting cases).

Springer was a health care provider who commented on the state of health care at the DPC facility. All of his statements concerned perceived deficiencies at the facility. Moreover, many of problems Springer, along with other members of the Executive Board, addressed involved danger to the lives of patients or the surrounding community (i.e. suicides and escapes). Thus, he raised concerns of a grave nature that would be relevant to the medical community, the community surrounding the DPC facility, the families of DPC patients, and the Delaware taxpayers who financed the operation. The court therefore concludes that the content of plaintiff's exhibits three and four addressed issues that would be of concern to many groups of Delaware residents.

Henry has asserted in prior communications with the court that Springer's comments were disruptive to the DPC's operation and that Springer intended them to be disruptive. Indeed, plaintiff's exhibits three and four contain proposed solutions to the existing problems at the DPC. Therefore, the court is hard-pressed to believe that Springer intended to aggravate the conditions at the hospital. It is apparent that he was motivated by a desire to improve conditions at the DPC and was frustrated that, in his view, he was encountering resistance. Upon

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

review of the record, there is no evidence that would permit the court to reasonably conclude that Springer's comments had any disruptive effect.

Consistent with the court's prior rulings, exhibits three and four were appropriately presented to the jury as instances of protected activity. Therefore, the court will not grant the defendant a new trial on this ground.

### (ii) Qualified immunity

Again, in their motion for a new trial, Henry challenges the courts determination that she was not entitled to qualified immunity. Henry contends that given her allegations that Springer's memos contained falsehoods, the court should reconsider whether she reasonably failed to recognize the protected nature of Springer's speech. Alternatively, Henry argues, the court should have permitted her to testify about her belief that the memos contained untruths and instructed the jury on this point.

**\*12** In fact, the court did permit Henry to testify that she felt that some of Springer's statements were lies. However, the court did not permit the defense to present evidence as to the substance of the particular statements. Such testimony was irrelevant to the issues on trial. Regardless, although Henry testified that she felt that parts of the memos were not true, she also stated that "there are some parts ... I was not upset about because it was clear that they were known." B0745. As such, the jury was free to conclude that the memos were at least in part accurate, undisputed accounts of the conditions at the DPC. Furthermore, given Henry's testimony, even if the court were to reconsider its prior ruling on qualified immunity with the defendant's present arguments in mind, the outcome would not change. Certainly, Henry should have understood that by taking the actions which have been previously discussed, in light of Springer's memos, she was violating his clearly established right to free speech.

Henry also argues that certain rulings by the court impeded her ability to present evidence on whether Springer's speech obstructed DPC policy

implementation and whether she could have reasonably believed under the circumstances that Springer was not exercising a clearly established right. Again, these issues were briefed and decided at the pre-trial stage of the proceedings. They will not be revisited at this time.

Henry also seeks to overturn the court's exclusion of proposed defense exhibits four, three, and six. Whereas, exhibit four was a compilation of sixteen letters terminating employment relationships with people unrelated to Springer or this case, the court concluded they were irrelevant. Whereas, proposed exhibits three and six were deemed to be settlement proposals, demand letters, and/or products of compromise negotiations, the court excluded them pursuant to Federal Rule of Evidence 408. (D.I.81).

The court has already addressed these arguments and affirms its evidentiary rulings related to these issues. Accordingly, Henry's motion for a new trial on the basis of her challenge to the court's evidentiary rulings as discussed above is denied.

### b. Whether Springer's counsel's remarks during closing argument were racially inflammatory and require a new trial

Preliminarily, it should be noted that Henry is an African-American female and Springer is a white male. This fact would have been evident to all those who viewed the parties during the trial proceedings, including the jury. It should also be noted that race was never raised as an issue in this case by either party.

During closing arguments, plaintiff's counsel made a number of remarks that defendant' allege were racially inflammatory. For example, plaintiff's counsel repeatedly analogized the defendant' defense to an octopus emitting "black ink." Furthermore, plaintiff's counsel referred to his client as a forty-five year old white male. In his brief, plaintiff's counsel submits that the "black ink" analogy is a common theme. He cites to several cases in which it has been used.

**\*13** The court agrees with the defendant that plaintiff's counsel's choice of analogies and language was notable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 13
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

given the respective races of the parties. However, the court cannot conclude that counsel's remarks affected the jury's impartiality and, thereby, provoked a verdict in Springer's favor. The court is satisfied that the octopus and black ink analogy is common enough and did not likely confuse the issues for the jury. The court also concludes that counsel's remark that his client is a forty-five-year-old white male was innocuous when considered in the context in which it was uttered. Counsel was discussing the experts' testimony regarding the probability that Springer would maintain sixty-hour work weeks in the future. (B0980). Counsel may have been making a statistical reference, *i.e.,* the statistical probability that a forty-five year old white male would continue to work a sixty-hour week until the age of retirement. Although, given the context of the remark and the manner of its delivery, it is not unreasonable for the defendant to question whether counsel was attempting to appeal to some perceived or hoped for bigotry on the jury, and although the court agrees that counsel's choice of language was unfortunate, in light of the overall setting of the trial and the character of the evidence the court cannot conclude that the verdict was against the weight of the evidence. It would not be a miscarriage of justice to let the verdict stand. *Williamson,* 926 F.2d at 1352.

## B. SPRINGER'S MOTIONS

### 1. Springer's Motion for Reinstatement to the Position of Residency Training Director at the Delaware Psychiatric Center

Springer moves for an injunction ordering his reinstatement to the position of Residency Training Director at the DPC. Reinstatement is not a feasible remedy in a case in which the desired position is no longer available at the time of judgment. *Max v. Sinclair Int'l,* 766 F.2d 788, 796 (3d Cir.1985), *cert. denied,* 474 U.S. 1057 (1986). For the following reasons, the court denies Springer's motion.

Springer was hired by the DPC as an independent contractor physician. None of his contracts delegated to him the position of Residency Training Director. While employed at the DPC, one of his duties involved serving as the Residency Training Director. Although Springer served in that capacity from 1993 up until his termination, the record is completely devoid of evidence that he would have continued in that capacity had his contract been renewed. In fact, the evidence infers the opposite conclusion. The evidence calls into doubt the continuing vitality of the residency training program altogether. The evidence also indicates that since the former Medical Director left, the residency program has been completely revamped. (B0760-763). Thus, it is quite probable that Springer's participation in the program would have been entirely redefined if he were even to have remained involved. Plaintiff's counsel acknowledged as much in a sidebar conference. When questioned by the court as to why he was proceeding with what appeared to be an irrelevant line of questioning, he responded:

*14 MR. T. NEUBERGER: I am seeking reinstatement. I know I am going to have this problem. I thought [the present Residency Training Director] was Dr. Rosenbaum. He is an innocent third party. I am trying to build up a record as far as who is in the position. And we would have to address it posttrial briefing, whether or not you would bump him. Now I have been totally surprised and told there is somebody else in the position as well as they have had a reorganization. I am floundering around a little bit, in all honesty, trying to figure out how that affects the injunctive issues in my case.... Just for the sake of the record, I think what has happened here is that it's too late in the day for me to be challenging the bona fides of a reorganization. And I will just probably leave the record as is in my case, and may just in the end fail on reinstatement and it's just an issue of what money damages are. We will just have to see.

(B0763-764).

In essence, Springer is asking the court to draft a provision into his hypothetical future contracts that never before existed. As such, the court denies Springer's motion for reinstatement.

### 2. Springer's Motion for Attorneys' Fees, Interest, and Costs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Springer asks for attorneys fees in the amount of $224,972.50 plus $27,748 for time expended on post-trial motions. He asks for costs and expenses in the amount of $6,988.59. He also seeks an award of attorneys' fees for the services of a contract attorney in the amount of $25,000. Finally, he seeks an award of post-judgment interest on those amounts from the date of the jury verdict on April 1, 2004, and an award of pre-judgment interest on the liquidated and unliquidated damages award between July 1, 2000 and April 1, 2004.

### a. Attorneys' fees

Springer moves for attorneys' fees, interest, and costs pursuant to 42 U.S.C § 1988 and Rule 54. (D.I.103). Section 1988 permits the court, in its discretion, to award reasonable attorneys fees. Although the statute gives a district court discretion to award attorneys' fees, the Third Circuit has stated that a court *should* award attorneys fees to a prevailing party absent special circumstances. *Truesdell v. Philadelphia Hous. Auth.,* 290 F.3d 159, 163 (3d Cir.2002). Henry challenges the request for attorneys' fees on two grounds. First, she argues that Springer was not a prevailing party. Second, Henry contends that the amount sought is excessive.

Springer may recover fees under this section if (1) he is the "prevailing party," and (2) the attorneys' fees are reasonable. *Farrar v. Hobby,* 506 U.S. 103 (1992). A party is a prevailing party if he or she succeeds "on any significant issue in litigation which achieves some of the benefit [the party] sought in bringing the suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983). Reasonable fees are measured by the "lodestar" calculation which multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Hensley,* 461 U.S. at 433. A court may adjust the lodestar figure when appropriate under the circumstances. *Blum v. Stenson,* 465 U.S. 886, 897 (1984).

### (I) Springer is the prevailing party

*15 Specifically, the Henry argues that Springer is not

a prevailing party because the Court of Appeals declined to affirm this court's March 11, 2002, decision that she was not entitled to qualified immunity. Henry mis-characterizes the procedural event. Rather, the Third Circuit dismissed the *defendant's* interlocutory appeal. Henry also argues that to the extent the court grants the defendant relief pursuant to her post-trial motions, Springer would not be the prevailing party. The court has granted partial relief to the defendant by determining that as a matter of law Springer is not entitled to non-economic damages for his alleged reputation injuries. However, Springer still succeeded on significant issues in his case and has achieved much of the benefit he sought in bringing the suit. *Hensley,* 461 U.S. at 433. Therefore, he is the prevailing party.

### (ii) The requested attorneys' fees are reasonable

Springer must also establish that the attorneys fees are reasonable. Here, his counsel submits that under the lodestar calculation he should be awarded attorneys' fees in the amount of $224,972.50. In addition, he seeks $27,748 for time spent on post-trial motions. The defendant generally objects to the requested amount on the grounds that the fees sought are excessive. She also raises a general objection to "a third party payment of attorneys fees in the amount of $100,000" but fails to expand upon that objection. Finally, Henry questions the plaintiff's calculation of the fees of the contract attorney, John M. LaRosa.

Although Springer bears the burden of proving that the requested fees are reasonable, the defendant must "present specific evidence challenging the reasonableness of the requested rates or the time expended." *Central Delaware Branch of NAACP v. Dover,* 123 F.R.D. 85, 88 (D.Del.1988) (citing *Blum,* 461 U.S. at 892). "[They] cannot rely upon conclusory denials of the applicant's prima facie proofs." *Id.*

Henry declined to object to the lodestar calculation other than to state that it is excessive. She contends that it was unreasonable for Springer's counsel to charge rates comparable to those of the Philadelphia market given that the case was not litigated in Philadelphia and that his counsel is not admitted to practice in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Pennsylvania. However, Springer's counsel has submitted his own declarations as well as the declarations of other attorneys attesting to the reasonableness of the rates.

The court concludes that the plaintiff has satisfied the prima facie burden of proving the requested attorneys fees are reasonable. The defendant has declined to present any evidence that would contradict such a determination. With regard to the alleged miscalculation of the attorneys fees related to the work done by attorney John M. LaRosa, the court recognizes that there is an inconsistency between the invoices and the figure stated in the plaintiff's opening brief in support of his motion for attorneys' fees. (D.I. 113, p. 14; D.I. 113, Exhibit F). The plaintiff explains that the figure proposed in the opening brief is Mr. LaRosa's current rate. Springer argues that under *Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir.2001), the reasonable fee is the rate at the time of the petition rather that the rate at the time the services were performed. The defendant declined to address this issue in light of *Lanni*, nor has she presented any opposing case law. The plaintiff's motion for attorneys fees will be granted as requested.

**\*16** It should also be noted that the court accepts plaintiff's counsel's supplemental fee request. It was filed on June 16, 2004. (D.I.125). Henry has not submitted any objection to the request. The court infers that Henry's silence on the matter indicates her acquiescence with the figure.

b. Costs

Springer asks for costs and expenses in the amount of $6,988.59. Springer provided a detailed account of costs. Again, the defendant raises merely a conclusory objection. She states, "plaintiff is seeking expenses not recoverable under statutory costs." Henry failed to state her objections with any specificity. Nor did she did present any evidence to contradict the requested amount. The court will grant the plaintiff's motion for costs.

c. Prejudgment Interest

Springer seeks prejudgment interest on liquidated and unliquidated compensatory damages. It is within the court's discretion to award prejudgment interest. *Savarese v. Agriss*, 883 F.2d 1194, 1207 (3d Cir.1989).

Henry argues that Springer is not entitled to prejudgment interest because his "damages are unliquidated and could not be calculated prior to the jury's decision." As the plaintiff points out, only the non-economic damages in the amount of $100,000 are unliquidated. In view of the court's decision to grant in part the defendant's motion for renewed JMOL, the plaintiff will not be awarded non-economic damages. Therefore, the defendant's argument regarding the unliquidated nature of the damages is moot.

Henry further argues that "[i]t would be unjust to assign prejudgment interest ... where plaintiff's expert witness Paul Andrisani's testimony to the jury included interest into the numbers presented." (D.I.121, p. 8). As the plaintiff points out in his reply brief, Dr. Andrisani did, in fact, provide a damages calculation that *excluded* interest and those figures were argued to the jury. (B0676-677; B0914).Thus, the court will grant the plaintiff's motion for prejudgment interest.

The plaintiff asks for a prejudgment interest rate "equal to the weekly average one year constant maturity treasury yield, as published by the Board of Governors of the Federal Reserve system." *See* 28 U.S.C. § 1961; (D.I.113, p. 26). Springer claims he is entitled to an award of prejudgment interest from the date of the expiration of his contract on July 1, 2000, through the entry of judgment on April 1, 2004, compounded semi-annually. Henry has raised no objection to the measure of prejudgment interest. Therefore, the court will grant the plaintiff's request. Prejudgment interest shall be calculated accordingly.

V. CONCLUSION

For the reasons stated above, Henry's motion for judgment as a matter of law shall be granted in part. The court concludes as a matter of law that Springer is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 16
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

not entitled to $100,000 in non-economic damages. The remaining damages award shall stand. All other defense post-trial motions will be denied. Likewise, Springer's motion for reinstatement will be denied. The court will grant Springer's motion for attorneys fees, interest and costs.

*ORDER*

**\*17** For the reasons stated in the corresponding Opinion, IT IS HEREBY ORDERED that:

1. Henry's motion for judgment as a matter of law and/or judgment notwithstanding the verdict is GRANTED IN PART, Springer is not entitled to $100,000 in non-economic damages.

2. Henry's motion for a new trial is DENIED.

3. Springer's motion for reinstatement (D.I.102) is DENIED.

4. Springer's motion for attorneys' fees, interest and costs is GRANTED:

a. Attorneys' fees will be awarded in the amount of $224,972.50. Supplemental attorneys fees will also be awarded in the amount of $27,804.

b. Attorneys fees will be awarded for the services of contract attorney John LaRosa in the amount of $25,000.

c. Costs will be awarded in the amount of $6,988.59.

d. Prejudgment interest shall be awarded on the liquidated damages at the rate equal to the weekly average one year constant maturity treasury yield, as published by the Board of Governors of the Federal Reserve system between July 1, 2000, through April 1, 2004, compounded semi-annually.

e. Springer shall not be awarded prejudgment interest on the unliquidated damages, to wit, the $100,000 non-economic damages.

f. Post-judgment interest shall be awarded on all amounts with the exception of the $100,000 non-economic damages.

D.Del.,2004.
Springer v. Henry
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 1065681 (Verdict and Settlement Summary) (Apr. 01, 2004)
• 1:00CV00885 (Docket) (Oct. 06, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

July 7, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF which

will send notification of such filing to the following:

Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

FTU / Briefs /Post-trial Merits AB.FINAL

-42-