**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CORPORAL B. KURT PRICE;** | : | |
| **CORPORAL WAYNE WARREN; and** | : | |
| **SERGEANT CHRISTOPHER D. FORAKER,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **C.A.No.04-956-GMS** |
| | : | |
| **COLONEL L. AARON CHAFFINCH, individually** | : | |
| **and in his official capacity as Superintendent of the** | : | |
| **Delaware State Police; LIEUTENANT COLONEL** | : | |
| **THOMAS F. MACLEISH, individually and in his** | : | |
| **official capacity as Deputy Superintendent of the** | : | |
| **Delaware State Police; DAVID B. MITCHELL, in his** | : | |
| **official capacity as the Secretary of the Department of** | : | |
| **Safety and Homeland Security of the State of** | : | |
| **Delaware; and DIVISION OF STATE POLICE,** | : | |
| **DEPARTMENT OF SAFETY AND HOMELAND** | : | |
| **SECURITY, STATE OF DELAWARE,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR ATTORNEYS FEES,
INTEREST AND COSTS OF THE NEUBERGER FIRM PURSUANT TO 42 U.S.C. § 1988 AND
FED.R.CIV.P. 54**

**I.      EACH PLAINTIFF IS A PREVAILING PARTY.**

The Court has entered judgment against the defendants.  (D.I. 186).  Their post-trial motion is

pending.  The affirmation of the judgment by the Court is the only necessary predicate to a fee and costs

award at this time.  If the Court upholds the jury verdict, the changed legal relationship between the parties

which the judgment evidences will be affirmed.

The only condition precedent to determining the lodestar is a determination under 42 U.S.C. § 1988

whether plaintiffs are a prevailing party, which in light of the jury verdict and judgment in this case is self

evident.  "To qualify as a prevailing party, a civil rights plaintiff ... must obtain an enforceable judgment

against the defendant from whom fees are sought." Farrar v. Hobby, 506 U.S. 103, 111 (1992). That enforceable judgment has already been obtained. (D.I. 186). Accordingly, plaintiffs are prevailing parties.

The primary purposes of this lawsuit are found in the Wherefore Clause of the Complaint. (D.I. 1). Among other things, plaintiffs sought a declaration that their statutory and Constitutional rights had been violated (which is found in the jury interrogatory) and also compensatory damages. (D.I. 1). Here the Supreme Court has adopted what it has termed a "generous formulation," and it has held that parties may be considered "prevailing parties" for attorneys' fees purposes if they succeed on any significant issue in litigation that advances all or some of the benefits they seek to achieve. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). This includes "some relief on the merits of [the] claim[,]" Hewitt v. Helms, 482 U.S. 755, 760 (1987), which "*affects the behavior of the defendant toward the plaintiff[,]*" Rhodes v. Stewart, 488 U. S. 1, 4 (1988) (emphasis in original), and which "changes the legal relationship between [the parties]." Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792 (1989). All that has been accomplished herein. The "actual relief" obtained in this lawsuit thus was "substantial" and "materially alter[ed] the legal relationship between the parties" by financially "modifying the defendant's behavior in a way that directly benefit[ed] the plaintiff[s]" and the community. Farrar, 506 U.S. at 111-12.

No doubt sensing that they will lose their post trial motions, defendants argue that the Court should stay its hand and hold the fee and costs motion in abeyance until after they take an appeal. They argue that only after they have lost that appeal should the Court take up this stale file again and rule on fees and costs. Then another costly round of appeals will begin. But the authority for this convoluted manner of proceeding is rather thin and as a general rule does not support this position. (DAB at 5).

The Third Circuit and Supreme Court cases cited by the defense are not to the contrary. In Sweitlowich v. County of Bucks, 620 F.2d 33, 34 (3d Cir. 1980) (DAB at 5), the Third Circuit held that a plaintiff who successfully appealed and overturned a defense verdict and judgment was not yet a prevailing party for fees purposes. Similarly, in Hanrahan v. Hampton, 446 U.S. 754, 758-59 (1980), the Supreme Court held that a plaintiff who prevails on an appeal which entitles him to a new trial is not yet a prevailing

2

party.  Unlike the plaintiffs in those cases, present plaintiffs have obtained both a jury verdict and the Court has entered judgment against defendants.  This is more than sufficient to achieve prevailing party status. Farrar, 506 U.S. at 111; see Barber v. T.D. Williamson, Inc., 254 F.3d 1223, 1234 (10th Cir. 2001) ("[u]sually the litigant in whose favor judgment is rendered is the prevailing party for purposes of Rule 54(d)(1)") (quoting Wright & Miller, Federal Practice & Procedure, § 2667).

"Disfavoring piecemeal appeals is a long-standing policy of the federal courts."  Sussex Drug Products v. Kanasco, Ltd., 920 F.2d 1150, 1153 (3d Cir. 1990).  Piecemeal proceedings or multiple appeals will serve neither the interests of judicial economy nor the "just" and "speedy" conclusion this litigation.  Fed.R.Civ.P. 1.  Given that all issues in this case are simultaneously ripe for adjudication, there is no need for two appellate panels to address our present suit in light of the thousands of cases which currently clutter the Third Circuit's docket.

Fed.R.App.P. 4(a)(4)(A)(iii) also reflects the nationwide policy against such piecemeal appeals involving attorney's fees.  The current version of that rule provides that there is no jurisdiction whatsoever for any appeal in a case in which a fee application is pending below, provided that the trial court under Fed.R.Civ.P. 58 extends the time for appeal, if it has ruled on other post trial motions but still has a fee application pending.  Obviously, the appellate rules frown on piecemeal attorney's fees appeals unless highly unusual circumstances warrant it.  Ours is not such a case, and the defendants have offered no reason either in the record or logic to convince the Court otherwise.  Rather, resolving these issues now will further the policy against piecemeal appeals by "ensur[ing] efficient administration of scarce judicial resources."  Lusardi v. Xerox Corp., 747 F.2d 174, 177 (3d Cir. 1984).  In the same way, in light of the "unequal economic resources" of the parties in this case, resolution of the attorneys fees issue will "protect[ ] the judicial process and its participants from the delay which can prove advantageous to a well-financed litigant, and fatal to the less well-endowed."  Id.

## II.    THE HOURLY RATE OF STEPHEN J. NEUBERGER IS REASONABLE AND SUPPORTED BY UNREBUTTED RECORD EVIDENCE.

**A.  The Basics.**  "A district court may not set attorneys' fees based upon a generalized sense of what is customary or proper, but rather *must* rely upon the record."  Smith v. Phila. Housing Auth., 107 F.3d 223, 225 (3d Cir. 1997) (emphasis in original) (internal bracketing omitted); accord Evans v. Port Auth. of N.Y. and N.J., 273 F.3d 346, 361 (3d Cir. 2001) (same).  A record is required because such a determination is a question of fact.  See Smith, 107 F.3d at 225 (noting that an "attorney's marketplace billing rate is a factual question"); Bell v. United Princeton Properties, Inc., 884 F.2d 713, 715 n.1 (3d Cir. 1989) (when factual accuracy of a representation is at issue, an affidavit is required).

**B.  Plaintiffs Have Met Their Prima Facie Burden.**  "The party seeking fees bears the burden of producing sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered in order to make out a prima facie case."  Lanni v. N.J., 259 F.3d 146, 149 (3d Cir. 2001).  As set forth in great detail in plaintiffs' Opening Memorandum of Law and its numerous attachments, plaintiffs have proven a prima facie case of the reasonableness of counsels' hourly rates.  Attorneys Thomas S. Neuberger and William Ewing each have submitted declarations attesting to the reasonableness of Stephen J. Neuberger's market rate.  Accordingly, plaintiffs have demonstrated their prima facie case.

**C.  The Defense Has Defaulted and Failed to Carry Its Burden.**  "If the prima facie case has been made, the opposing party bears the burden of producing *record evidence* that will contest this rate."  Id. (emphasis added).   In other words, "[o]nce the plaintiff has made the prima facie showing with respect to the appropriate hourly rate, that rate may be contested, but only with appropriate *record evidence*.  In the absence of such evidence, the plaintiff *must* be awarded attorneys' fees at [his] requested rate."  Evans, 273 F.3d at 361 (internal punctuation omitted) (emphasis added).[1]

---

[1]  See also Washington v. Phila. County Court of Common Pleas, 89 F.3d 1031, 1036 (3d Cir. 1996) ("district court is not free to disregard attorney's affidavit when the other party 'filed no affidavit and offered no testimony contesting the accuracy of the attorney's statement with respect to charges by

In the face of this burden, the defense offers only rhetoric instead of the required record evidence. (See DAB at 6). They completely defaulted and have waived the issue by failing to meet their required evidentiary burden. Lanni, 259 F.3d at 149; Evans, 273 F.3d at 361. No declarations, affidavits or other sworn testimony were submitted. The defense has offered *no record evidence whatsoever* to contest the reasonableness of plaintiff's hourly rates. Accordingly, because the defense has failed to meet its burden and "plaintiff has made the prima facie showing with respect to the appropriate hourly rate ... plaintiff must be awarded attorneys' fees at [his] requested rate." Evans, 273 F.3d at 361 (internal punctuation omitted).

Additionally, even if the defense had carried its burden, (which it has not), the State is wasting judicial resources by being inconsistent on the market rate issue. In March 2006, as part of the settlement following the state's unsuccessful appeal that was disposed of in Springer v. Henry, 435 F.3d 268 (3d Cir. 2006), the State of Delaware agreed and consented to Stephen Neuberger's hourly rate of $250. (T. Neuberger Decl. ¶ 32). Inconsistently however, the State now refuses to agree to the reasonableness of the exact same rates for the exact same counsel.

## III.    THE NUMBER OF HOURS EXPENDED ARE REASONABLE.

**A. Introduction.** "[A] court may not reduce counsel fees *sua sponte* as excessive, redundant, or otherwise unnecessary in the absence of a sufficiently specific objection to the amount of fees requested." U.S. v. Eleven Vehicles, Their Equipment and Accessories, 200 F.3d 203, 211 (3d Cir. 2000) (internal punctuation omitted). With the exception of the limited areas discussed below, the defense has raised no objection in our case, conceding that all other time was reasonably spent. In calculating the lodestar, "the district court may not award less in fees than requested unless the opposing party makes specific objections to the fee request." Id. As the Third Circuit has stated,

> when an opposing party has been afforded the opportunity to raise a material fact issue as to the accuracy of representations as to hours spent, or the necessity for their expenditure, and declines to do so, no reason occurs to us for permitting the trial court to disregard uncontested affidavits filed

comparable practitioners.'") (quoting Black Grievance Committee v. PECO, 802 F.2d 648, 652-53 (3d Cir. 1986)).

by a fee applicant.

Id. at 212; see also McDonald v. McCarthy, 966 F.2d 112, 119 (3d Cir. 1992) ("We hold that where a party fails to challenge the accuracy of representations set forth in a fee petition, the current submissions provide the necessary record basis for the district court's fee determination ... [the Court may not] disregard the uncontested affidavits filed by the plaintiff.") (internal punctuation omitted). "A district court may not 'decrease a fee award based on factors not raised at all by an adverse party.'" Eleven Vehicles, 200 F.3d at 212 (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)). "The rationale for this prohibition is ... twofold. First, *sua sponte* reduction deprives the applicant of the right 'to offer evidence in support of the reasonableness of the request.'" Eleven Vehicles, 200 F.3d at 212 (quoting Bell, 884 F.2d at 719). "Second, 'because statutory fee litigation is adversarial litigation, there is no need to allow the district court to reduce a fee award on its own initiative.'" Id.

Accordingly, because defendants have only objected to several limited areas and because, as explained below, those objections are without merit, the Court need only multiply the total number of hours by the market rate. As stated in plaintiff's Opening Memorandum on this issue (D.I. 188 at 11), the total number of hours after the exercise of billing judgment was 2340.5 and the total amount of fees that should be awarded to The Neuberger Firm is $643,476.

**B. The Time Spent on Summary Judgment Briefing Was Reasonable and Necessary to the Successful Litigation of This Case and So is Compensable.**

**1. The Law.** "The purpose of [42 U.S.C.] § 1988 is to ensure effective access to the judicial process for persons with civil rights grievances." Hensley, 461 U.S. at 429 (internal punctuation omitted). "[A] prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Id. (internal punctuation omitted).

Putting to the side the district court cases cited by the defense (DAB at 6), under governing Third Circuit authority the "mere failure of certain motions ... is insufficient to warrant a fee reduction," and the critical issue is whether the hours spent were reasonable for the case. Blum v. Witco Chemical Corp., 829

F.2d 367, 378 (3d Cir. 1987) (citing Hensley, 461 U.S. at 435). It is immaterial that the Court ultimately found there to be a genuine issue of material fact preventing summary judgment against defendants. As discussed below, the Third Circuit, other Circuits and the Supreme Court all favor "treating a case as an inclusive whole, rather than as atomized line-items." Commissioner, INS v. Jean, 496 U.S. 154, 161-62 (1990).[2]

In the Third Circuit, the "mere failure of certain motions ... is insufficient to warrant a fee reduction." Blum, 829 F.2d at 378 (and noting that "the Supreme Court has rejected the notion that the fee award should be reduced 'simply because the plaintiff failed to prevail on every contention raised on the law suit'"). The Third Circuit has gone so far as to hold that the time spent on an unsuccessful summary judgment motion and brief is compensable even if it was never filed or considered on the merits, if it was later "relied" on in the course of the litigation. Planned Parenthood of Central N.J. v. Attorney General of the State of N.J., 297 F.3d 253, 271 (3d Cir. 2002). In Planned Parenthood, the Court found that since "the summary judgment brief was eventually submitted in lieu of a pre-trial brief, and a post-trial brief, the work was certainly 'necessary' and 'useful,'" and that a fee award was appropriate. Id.

The Third Circuit approach is in accord with existing U.S. Supreme Court precedent on the topic. In Commissioner, INS v. Jean, 496 U.S. 154, 161-62 (1990), the Supreme Court noted that "fee-shifting statutes ... favor[] treating a case as an inclusive whole, rather than as atomized line-items." "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." Hensley, 461 U.S. at 435. "Normally, this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." Id. "[T]he fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." Id.

---

[2] The District of Delaware has held the same. See Ballen v. Martin Chevrolet-Buick of Del., 1998 WL 1013874, at *2 (D.Del. Sept. 17, 1998) ("Section 1988 rewards a plaintiff who ultimately prevails - - who wins the war - - without deducting for lost battles along the way").

In the same way, other courts also have held that time spent on failed motions is recoverable under attorneys' fees statutes. The defense claim that the summary judgment time was "frivolous" (DAB at 6) is remarkably similar to a claim the Seventh Circuit rejected in Uniroyal Goodrich Tire Co. v. Mutual Trading Corp., 63 F.3d 516 (7th Cir. 1995). There, the defendants argued that fees should be denied for time spent on allegedly "failed and useless activities." Id. at 526. The Seventh Circuit rejected this approach, stating that

> Common sense ... informs us that such a rule is inappropriate. There is a significant difference between frivolous claims and colorable but unsuccessful claims. Were we to deem unreasonable the reimbursement of fees incurred for the latter, we would be discouraging the type of representation attorneys are duty-bound to provide. So long as statutes allow prevailing parties to recover attorneys' fees "reasonable" in amount, we are not prepared to link our definition of "reasonable" to whether the fees are incurred in pursuit of a successful task.

Id.; see also Aston v. Secretary of Health and Human Services, 808 F.2d 9, 11-12 (2d Cir. 1986) (finding that time spent "unnecessarily moving for summary judgment" was recoverable); Wales v. Jack M. Berry, Inc., 192 F.Supp.2d 1313, 1321 (M.D.Fla. 2001) (citing Hensley, 461 U.S. at 440, and noting that "time is not excluded simply because a motion is denied or a task proves unsuccessful").

The cornerstone of the defense argument is Judge Robinson's opinion in Fini v. Remington Arms Co., 1999 WL 825604 (D.Del. Sept. 24, 1999), which is cited for the proposition that motions that have been denied are not compensable. (DAB at 6-8). But this District Court opinion is contrary to the authority discussed above. Second, and more importantly, three years later, the Third Circuit overruled it when it issued its opinion in Planned Parenthood, 297 F.3d 253, with a holding contrary to that of the Fini case. In Planned Parenthood, the Third Circuit found that because an unsuccessful summary judgment brief was "relied" on during a later part of the case, it was "necessary," "useful" and thus the time spent on it was fully compensable. Id. at 271. This Circuit precedent is decisive for our current issue.

**2. The Time Spent at Summary Judgment Was Both Useful and Necessary To Other Parts of the Litigation.** Unfortunately for defendants, the work done by plaintiffs at summary judgment was "relied" upon during several later stages of the case and thus was both "necessary" and "useful" to the

successful completion of this litigation.  Accordingly, it is fully compensable under <u>Planned Parenthood</u>. <u>Id.</u>

First, the very same factual and legal record compiled by plaintiffs in support of their motions for summary judgment, was necessary to oppose and ultimately defeat the defense's own motions for summary judgment on these same issues.

Plaintiffs moved for summary judgment on their Free Speech and Petition Clause retaliation counts in three areas.  (1) That they had engaged in protected speech and petition clause activity.[3]  (2) that no reasonable jury could conclude that their protected activity was not a substantial or motivating factor in the retaliation against them.[4]  (3) That defendants had waived their same decision anyway affirmative defense by failing to raise it in their Answer.[5]  (See <u>Price</u> at D.I. 84; <u>Foraker</u> at D.I. 64).

Defendants also moved for summary judgment on the following grounds on plaintiffs' Free Speech and Petition Clause counts: (1) That plaintiffs had not engaged in protected petition clause activity;[6] (2)

---

[3]  Such a purely legal question, <u>Hill v. City of Scranton</u>, 411 F.3d 118, 127 (3d Cir. 2005), is entirely appropriate for summary judgment and the Court has granted summary judgment on this issue in the past.  See <u>Springer v. Henry</u>, 2002 WL 389136 (D.Del. March 11, 2002).

[4]  Given that this factor does not require that "but for" causation be proven, <u>Suppan v. Dadonna</u>, 203 F.3d 228, 236 (3d Cir. 2000); <u>see Hill</u>, 411 F.3d at 126 n.11 ("'Substantial factor' does not mean 'dominant' or 'primary' factor."), but instead only requires a plaintiff to prove that their protected activity "played a role" in the adverse action, <u>Miller v. Cigna, Corp.</u>, 47 F.3d 586, 597 n.9 (3d Cir. 1995) (en banc); <u>see Suppan</u>, 203 F.3d at 236, moving on this issue is certainly not frivolous as the defense claims.  It was not unreasonable for plaintiffs to move on this issue, even though defendants denied that plaintiffs' protected activity was the 'but for' cause of the retaliation against them, because 'but for' causation was not required and there was an extraordinary amount of causation evidence - eleven separate categories. (See <u>Price</u> at D.I. 84; <u>Foraker</u> at D.I. 64).

[5]  Given that this is an "affirmative defense," <u>Nicholas v. Pa. State Univ.</u>, 227 F.3d 133, 144 (3d Cir. 2000), that Fed.R.Civ.P. 8(c) explicitly requires that a party plead all such affirmative defenses in their answer, and that although raising several affirmative defenses in their answer, the defendants did not raise this one, it was not frivolous of plaintiffs to move on this ground as well.

[6]  To the extent the defense may claim that the time plaintiffs spent briefing the free speech protected activity issue is not compensable because defendants did not move on it (and this is the sole area where the briefing does not overlap for present purposes), such a position is in error.  Even though the Court initially denied plaintiffs' summary judgment motion (D.I. 135), in its later written opinion (D.I. 167), the Court  nonetheless responded to plaintiffs' motion on this issue and held as a matter of law that

9

that there was no causal evidence with which to establish that plaintiffs' protected activity was a

substantial or motivating factor; (3) that defendants would have made the same decision anyway; (4) that

no adverse action was taken against plaintiffs; (5) that defendants were entitled to qualified immunity; and

(6) that Chaffinch had a First Amendment right to defame Sgt. Foraker.[7]  (See Price at D.I. 81; Foraker at

D.I. 62).  It is clear that these areas overlap with the areas moved on by plaintiffs.  Accordingly, because

the same facts and law were necessary to defeat the defense's own summary  judgment motions, plaintiffs'

motions were useful and necessary, and thus are fully compensable.

Second, the summary judgment time was useful and necessary to sift through the voluminous

discovery record so that it could be reviewed and organized for use at trial.  In addition to more than

24,000 pages of documentary discovery, sixteen witness and party depositions also had to be reviewed and

organized for use in briefing.  Similarly, the voluminous medical records of the numerous comparators also

were organized and used at summary judgment.  This briefing was subsequently used again at trial: (1) as a

roadmap for the issues presented to the jury in opening and closing arguments; (2) as a road map and guide

in the preparation of the testimony of nearly every one of plaintiffs' trial witnesses (with the exception of

the spouses and experts); (3) as a guide to the medical records that were key to understanding the

comparators which were presented at trial; and (4) in preparation of numerous demonstrative exhibits used

during the trial.  Accordingly, this work was relied upon at a later stage and is thus compensable.

Third, as the defense neglects to mention, much of plaintiffs' summary judgment briefing was

directly incorporated into plaintiffs' trial briefs, schedule (i) (1) of the pretrial order, in both cases.

Fourth, much of both the factual and legal analysis also was incorporated into schedule (b) of the

pretrial order, contested issues of fact and law.

Fifth, that same law was useful and key to the jury prayers on the various aspects of First

---

they had "clearly engaged" in protected First Amendment free speech.  Price v. Chaffinch, 2006 WL
1313178, *3 (D.Del. May 12, 2006).  Thus, it is clear that plaintiffs prevailed on this issue.

[7]  The defense also moved on plaintiffs' state law claims.

Amendment retaliation (such as adverse action, substantial or motivating factor, and same decision anyway), punitive damages and other First Amendment issues.[8]

Sixth, much of the work product from summary judgment briefing has been recycled and used again in the post-trial briefing. For example, plaintiffs' moved at summary judgment on the issue of their having engaged in protected petition clause activity. As a result of the Court' invitation in its summary judgment ruling, plaintiffs renewed that motion post-trial and defendants moved on that ground as well.

Seventh, all this time was devoted generally to the litigation as a whole. It was not on any claim for which there was limited or no success in the case. Instead, it was devoted to the retaliation legal theories on which plaintiffs prevailed at trial. This work and time was completely related to successful claims in the case. It is not separable from the claims on which plaintiffs were successful and is fully compensable. See Ballen, 1998 WL 1013874, *2 ("Section 1988 rewards a plaintiff who ultimately prevails - - who wins the war - - without deducting for lost battles along the way").

**C. The Time Related to Media Activity Has Already Been Removed in the Exercise of Billing Discretion.** The defense also claims that plaintiffs should not be compensated for time related to contacts with the news media. (DAB at 10-11). Plaintiffs do not contest the claim that media efforts are not compensable under 42 U.S.C. § 1988. That is why The Neuberger Firm already excised all time related to media efforts during the exercise of billing discretion prior to submission of their attorneys fees motion.

As plaintiffs' original motion and supporting pleadings make clear, the total time invested in this case by The Firm was 2549.5 hours. (T. Neuberger Decl. ¶¶ 27, 38). However, billing discretion was then exercised and 8% of the total hours - which is 209 hours - removed, leaving the lodestar total of 2340.5 hours. (T. Neuberger Decl. ¶¶ 27, 38). The hours challenged by defendants related to media relations have already been removed in the exercise of billing discretion. Those hours were not included in plaintiffs

---

[8] Such as the defense request for a jury instruction on Chaffinch's First Amendment right to defame Sgt. Foraker, a request rejected by the Court, and a request they have renewed post-trial. The basis for plaintiffs' written submissions on the issue was the legal research done at summary judgment.

lodestar totals submitted to the Court. Thus, it is clear that the defense is objecting to time that has already been removed and which plaintiffs are not seeking reimbursement for. Accordingly, the defense objections on this ground are improper.[9]

   **D. State Law Claims.** The defense also claims that plaintiffs cannot recover for time spent on matters exclusively related to their state law claims. (DAB at 11-12). Again, plaintiffs do not dispute this.

### 1. The Defamation Claim is a Lesser Included Part of the First Amendment Retaliation Claims.

However, under the facts of our case, all facts related to Sgt. Foraker's state law defamation claim are encompassed within the larger First Amendment retaliation claim - for which fees are recoverable under §1988. In other words, under the facts of our case, the defamation claim is a lesser included part within the larger First Amendment retaliation counts. Thus, all facts and time related to prosecution of the defamation claim are still actionable under the First Amendment retaliation claim.[10]

   Thus, even without the state law defamation count, plaintiff still would have presented the same evidence because it pertains to his retaliation claims - that defendant Chaffinch went on a local, national and international media campaign and defamed Sgt. Foraker by blaming him for the disaster at the FTU in retaliation for his earlier lawsuit and for speaking out about the FTU. Indeed, defense counsel himself has already admitted that the defamation claim is a lesser included part of the larger retaliation counts. As he said at trial, the claims and damages overlap and cover the same conduct. For example, in Mr. Ellis' words, "I mean the defamation claim and the First Amendment claim are both saying Foraker is damaged goods ... It's duplicative ... the damages for the defamation is going to be folded into the larger claim." (Ellis 2397-98).[11] Thus, it is clear that plaintiffs lodestar should not be reduced.

---

   [9] As plaintiffs' opening brief (D.I. 188) makes clear, Tab B to Exhibit 1 to the opening brief consists of a "chronological listing describing all time spent on these two cases" before the exercise of billing discretion. (D.I. 188 at ¶¶ 25,26).

   [10] The same holds true for the invasion of privacy claim.

   [11] Thus, it is clear that the defense request to reduce all time expended by 1/8 (DAB at 11-12) is arbitrary, misguided and clearly mistaken.

**2. Mr. Haverly Handled All Briefing Related to the State Law Claims.** Although The Neuberger Firm took primary responsibility for all summary judgment briefing, Mr. Haverly wrote the portions of the summary judgment briefing related to the state law defamation and invasion of privacy claims. Accordingly, none of The Neuberger Firm's time relates to these two state law claims. Mr. Haverly will explain in his own fees and costs Reply the specifics of how he removed all improper time from his lodestar.[12]

**E. Prejudgment Interest.** Upon review of the Third Circuit authority cited by the defense, plaintiffs withdraw their request for prejudgment interest on the non-pecuniary damages awarded to plaintiffs. Although plaintiffs did not intend to request it, to the extent that their motion is somehow read to be requesting prejudgment interest on the future economic damages awards to plaintiffs Cpl/3 Price and Cpl/3 Warren, such a request is withdrawn.

However, an award of prejudgment interest to Sgt. Foraker on his economic damages award is appropriate. The Court instructed the jury that it could award Sgt. Foraker "lost earnings or other benefits" which he has suffered in the past or will suffer in the future. (Jury Instructions 2499-2500) (emphasis added). As plaintiffs have discussed in other post-trial briefing (D.I. 216 at 31-32), it is probable that the jury very well may have intended its economic damages award to Sgt. Foraker to compensate him for having had to already use his hard earned vacation, sick and accumulated time in order to stay on the payroll from October/November 2005 until the date of trial.[13] This is certainly one likely interpretation of the jury's verdict. Accordingly, prejudgment interest on these amounts should be awarded

---

[12] In his Reply, Mr. Haverly also will address the issue of why his participation and attendance at trial and several of the depositions was not excessive and instead was both necessary and required. However, counsel notes that even on the days when Mr. Haverly was not actively examining witnesses, Mr. Haverly was actively participating in other important ways at the counsel table during trial and the depositions.

[13] Plaintiffs submit that a November 1, 2005 date would be the appropriate date from which to compute Sgt. Foraker's prejudgment interest.

to Sgt. Foraker from November 1, 2005 until the May 31, 2006 jury verdict.[14]

 **F. Post-Judgment Interest.**  Defendants do not challenge that plaintiffs are entitled to post-judgment interest running from the May 31, 2006 jury verdict into the future, nor could they.  See 28 U.S.C. § 1961.

<div align="center"><u>CONCLUSION</u></div>

 For the reasons discussed above and in plaintiffs' opening memorandum, it is respectfully requested that up to May 31, 2006, the Court: (a) make an award of attorneys fees and law clerk and paralegal services to The Neuberger Firm in the amount of $ 643,476.00, (b) make an award of expenses and costs for this case in the amount of $38,729.01, ( c)  award post-judgment interest on those amounts from the date of the jury verdict on May 31, 2006 and (d) award prejudgment interest on the liquidated damages award to Sgt. Foraker, between November 1, 2005, through May 31, 2006, compounded semi-annually.

      Respectfully Submitted,

      **THE NEUBERGER FIRM, P.A.**

      /s/ Stephen J. Neuberger
      **THOMAS S. NEUBERGER, ESQ. (#243)**
      **STEPHEN J. NEUBERGER, ESQ. (#4440)**
      Two East Seventh Street, Suite 302
      Wilmington, DE 19801
      (302) 655-0582
      TSN@NeubergerLaw.com
      SJN@NeubergerLaw.com

Dated: July 14, 2006     Attorneys for Plaintiffs

---

 [14]  The Court has discretion when it comes to awarding prejudgment interest.  Savarese v. Agriss, 883 F.2d 1194, 1207 (3d Cir. 1989).  Exercising that discretion, the Court is not bound by the post-judgment interest requirement contained in 28 U.S.C. § 1961(b) regarding compounding the interest annually as the defense suggests.  (DAB at 14).  Instead, the Court may exercise its discretion in requiring that the award be compounded "semi-annually" as it did in the Springer post-trial opinion.  Springer v. Henry, 2004 WL 2127172, *17 (D.Del. Sept. 16, 2004); cf. Kraemer v. Franklin and Marshall College, 941 F.Supp. 479, 487 (E.D.Pa. 1996) (rejecting a defense request to compound prejudgment interest annually and instead compounding it quarterly).

# Unreported Opinions



Not Reported in F.Supp.                                                                  Page 1
Not Reported in F.Supp., 1998 WL 1013874 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

H
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
John BALLEN, Plaintiff,
v.
MARTIN CHEVROLET-BUICK OF DELAWARE,
a Limited Partnership, Defendant.
**No. CIV. A. 94-484 MMS.**

Sept. 17, 1998.

Michael R. Ippoliti, Esq., Wilmington, Delaware; Of
Counsel: Alan Epstein, Esq., of Jablon, Epstein, Wolf
& Drucker, Philadelphia, Pennsylvania; attorneys for
plaintiff.
David S. Lank, Esq., of Theisen, Lank, Mulford &
Goldberg, Wilmington, Delaware; attorney for
defendant.

MEMORANDUM OPINION

SCHWARTZ, Senior District J.

I. Introduction

**\*1** John Ballen ("Ballen"), a resident of the State of
Delaware, sued Martin Chevrolet-Buick of Delaware,
L.P. ("Martin Chevrolet"), a Pennsylvania limited
partnership, on September 26, 1994, alleging racial
discrimination and retaliation in violation of Title VII
of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et
seq.* and the Civil Rights Act of 1866, 42 U.S.C. §
1981. On March 27, 1997, judgment was entered
against Martin Chevrolet in the amount of
$239,048.00: $44,048 in back pay, $35,000 in general
compensatory damages for emotional distress and
humiliation, and $160,000 in punitive damages. Before
the Court is Ballen's motion for attorneys' fees.

II. Attorneys' Fees

Ballen seeks $119,459.50 in fees and $4,666.08 in
costs based on 542.95 hours of legal work.FN1

> **FN1.** Martin Chevrolet does not object to the
> $4,666.08 in costs.

Ballen, as the prevailing party, is entitled to an award
of reasonable attorneys' fees. *See* 42 U.S.C. §
2000e-5(k).FN2 In determining "reasonable" attorneys'
fees in a given case, the Supreme Court has instructed,
"[t]he most useful starting point ... is the number of
hours reasonably expended on the litigation multiplied
by a reasonable hourly rate." FN3 *See Blum v. Stenson,*
465 U.S. 886, 888 (1984) (citing *Hensley v. Echerhart,*
461 U.S. 424, 433 (1983)).FN4 From that amount,
district courts, in their discretion, may deduct the value
of hours inadequately documented or "not reasonably
expended." *Hensley,* 461 U.S. at 433. The Supreme
Court exhorted prevailing counsel to exercise "billing
judgment" and not to request hours that may be
considered "excessive, redundant, or otherwise
unnecessary." *Id.* at 433-34.

> **FN2.** 42 U.S.C. § 2000e-k(5) states in
> pertinent part:
> In any action or proceeding under this
> subchapter the court, in its discretion, may
> allow the prevailing party, other than the
> Commission or the United States, a
> reasonable attorney's fee (including expert
> fees) as part of the costs ....

> **FN3.** The product of these two components is
> commonly referred to as the "lodestar". *See
> City of Burlington v. Dague,* 505 U.S. 557,
> 559 (1992).

> **FN4.** Both *Blum* and *Hensley* were decided
> under 42 U.S.C. § 1988, the civil rights

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1998 WL 1013874 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

fee-shifting statute; however, the Supreme Court stated the standards set forth therein were applicable "in all cases in which Congress has authorized an award of fees to a 'prevailing party.' " *Hensley,* 461 U.S. at 433 n. 7. Therefore, the standard articulated above applies in the present case.

Martin Chevrolet does not object to the billing rates advanced for any of plaintiff's attorneys, except for those of lead plaintiff's counsel, Alan Epstein ("Epstein"), Esq. Specifically, Martin Chevrolet contends that Epstein should be paid only $250 per hour, as opposed to the $275 per hour which Ballen requests. Further, Martin Chevrolet disputes various portions of time expended on the matter; most significantly, 105 hours spent by Epstein and 32 hours spent by his associate Scott Burr ("Burr"), Esq., in preparation for and during the first trial, which ended in a hung jury. Lastly, Martin Chevrolet objects to 68.5 hours expended by local counsel, Michael Ippoliti ("Ippoliti"), Esq., because they are excessive given his position as local counsel, and the 28.5 hours expended by Ballen's former counsel, Michael P. Maguire ('Maguire"), Esq., because those hours involve time spent when the case was in administrative posture or are not sufficiently detailed.

### A. Hourly Rate

The Third Circuit Court of Appeals has held that "a reasonable hourly rate is calculated according to the prevailing market rates in the community." *Washington v. Philadelphia County Court of Common Pleas,* 89 F.3d 1031, 1035 (3d Cir.1996). "The prevailing party bears the burden of establishing by way of satisfactory evidence, 'in addition to [the] attorney's own affidavits,' ... that the requested hourly rates meet this standard." *Id.* (citation omitted).

**\*2** *Washington* is particularly relevant to the present case because it concerned a prior fee application made by Epstein, plaintiff's lead counsel in the present case. In *Washington,* the Third Circuit Court of Appeals

vacated a district court's award that reduced Epstein's hourly rate to $175 from a requested $250 and $275 per hour. Based largely on affidavits submitted by other attorneys in the civil rights field, the appellate court found that the plaintiff had satisfied his burden of establishing "the community billing rate," and that plaintiff's counsel's fees were within that rate. *Id.* at 1036. Quoting from yet another Third Circuit Court of Appeals opinion concerning a fee application by Epstein, the court opined that the district court should not adjust the requested rate downward when "the plaintiff has met his *prima facie* burden under the 'community market rate' lodestar test, and the opposing party has not produced contradictory evidence ...." *Id.* (quoting *Griffiths v. Cigna Corp.,* 77 F.3d 462 (3d Cir. November 30, 1995) (unpublished)).

The Third Circuit Court of Appeals has "recognized that billing rates are usually reflective of market rates." *Keenan v. City of Philadelphia,* 983 F.2d 459, 475 (3d Cir.1992) (citing *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp.,* 487 F.2d 161, 167 (3d Cir.1973)). In the case at bar, Epstein has presented affidavits-apparently the same affidavits submitted in the *Griffiths* case-to the effect that $250 per hour was a reasonable rate in his field; however, Epstein is now requesting attorney's fees reflecting a $275 per hour billing rate. In support of this increased billing rate, Epstein has submitted his own affidavit, a Community Legal Services Survey, and two supplemental affidavits from Alice Ballard, Esq. and Lorrie McKinley, Esq. Martin Chevrolet is willing to stipulate to $250 per hour, but objects to the $275 rate.[FN5]

> [FN5.] In calculating its billing, Epstein's firm appropriately used the lower rate of $250 for 2.70 hours of work done before the increase in his fees from $250 to $275 per hour went into effect. D.I. 89, at Exh. 2.

The Court finds that Epstein has clearly made out his *prima facie* case that $275 per hour is the appropriate hourly rate on which to base attorneys' fees for his work on this case. Martin Chevrolet has submitted no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                  Page 3
Not Reported in F.Supp., 1998 WL 1013874 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

affidavits which refute the $275 hourly rate. While, as noted in *Washington,* an attorney's own affidavit is insufficient to prove the prevailing market rate, the survey and supplemental affidavits, along with the passage of time since the previous cases were adjudicated, support Epstein's contention that his current market rate of $275 per hour is the prevailing market rate.

B. Number of Hours Spent

Each of the time components to which Martin Chevrolet objects as unreasonable will be individually considered below.

1. Hours Spent on Trial Which Ended in a Hung Jury

Martin Chevrolet objects to 105 hours spent by Epstein, and 32 hours spent by his associate Burr, preparing for and attending a trial which ended in a hung jury. An argument similar to this one was rejected in *Buffington v. Baltimore County,* 913 F.2d 113, 128 n. 12 (4th Cir.1990), *cert. denied,* 499 U.S. 906 (1991). In the context of a request for attorney's fees under 42 U.S.C. § 1988, the Fourth Circuit Court of Appeals upheld an award of attorney's fees that included time spent on a trial which ended in a mistrial. In *Buffington,* the court stated: "Section 1988 rewards a plaintiff who ultimately prevails-who wins the war-without deducting for lost battles along the way." *Id.* The Court agrees with that rationale, and believes this holding applies equally to a motion for attorney's fees brought under the Title VII counterpart to § 1988. Therefore, the Court will not deduct either the 105 hours spent by Epstein or the 32 hours spent by Burr on the first trial which ended in a hung jury; the Court does not find it unreasonable for Epstein to have been aided by an associate during trial.

2. Local Counsel Billable Hours

**\*3** Martin Chevrolet requests that the Court reduce the amount of compensable time for local counsel, Ippoliti, from 63.8 hours to 5 hours. The 63.8 hours break down into 46 hours for reviewing correspondence and pleadings and 17.8 hours for trial attendance. Martin Chevrolet finds this billing duplicative, stating "the local firm was simply base tending by signing off on pleadings." D.I. 93, at ¶ 16.

The Court disagrees with Martin Chevrolet's characterization of the role of local counsel. As noted by plaintiff, the local rules of this Court require, among other things, that local counsel attend court proceedings and sign all papers filed with the Court. Del. L.R. 83.5(d). Further, signing of pleadings by local counsel means counsel has made certain representations to the court. *See* Fed.R.Civ.P. 11(b). The Court therefore deems time spent by local counsel reviewing correspondence and pleadings, as well as time in Court, eminently reasonable in light of local counsel's responsibilities.

There is also rejected Martin Chevrolet's assertion that the Court must discount time Ippoliti spent at the trials because this Court excused him pursuant to local rules. The mere fact that this Court did not require local counsel's presence has no bearing on whether it was reasonable for Ippoliti to remain at trial to render assistance to plaintiff's lead counsel. Martin Chevrolet's request for reduction of compensable time for local counsel will therefore be denied.

3. Time Billed for Ballen's First Counsel

Ballen has also claimed attorneys' fees for time spent on the case by his first counsel, Maguire. Martin Chevrolet's objection is two-fold. First, Martin Chevrolet objects to 28.55 hours spent on the case "while it was in an administrative posture with the Delaware Department of Labor." D.I. 93, at ¶ 20. Second, Martin Chevrolet objects to these hours because they are not sufficiently particularized. D.I. 93, at ¶ 22.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1998 WL 1013874 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

The Court first notes that while Maguire apparently spent 28.55 hours on the case before the federal court complaint was drafted and filed, the record does not indicate that these hours were spent solely on tasks related to the administrative process. In fact, Maguire filed the federal complaint on September 26, 1994 while Ballen's first contact with Epstein was not until March 20, 1995, D.I. 89, at Exh. 2. Indeed, much of the 28.55 hours were apparently spent investigating the case-2.5 hours for the initial meeting with the client, 12.75 hours for interviews with witnesses and 4.6 hours for communications with Martin Chevrolet's defense counsel. Maguire allocated only 8.7 hours to dealing with the Delaware Department of Labor and the EEOC. D.I. 89, at Exh. 2. In the Court's opinion, the hours other than the 8.7 hours spent dealing with administrative agencies were hours reasonably spent by an attorney investigating his case and conferring with his opponent before crafting a complaint.

Moreover, Martin Chevrolet's position that work spent "in administrative posture" is not recoverable under the attorneys' fee statute is contrary to Supreme Court case law, and is therefore meritless. In *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 63 (1980), the Court held, in the context of Title VII, that attorneys' fees were available for work done at the state administrative level. While the rationale of the case was based in part on the language permitting a prevailing party to recover attorneys' fees in "an action or proceeding under this Title," *see id.* at 62, the Court does not believe the holding is intended to be limited to administrative work that culminates in an administrative hearing. As the Supreme Court noted, Title VII requires initial resort to state and federal administrative agencies before proceeding to court. *See id.* at 61-65 (outlining in detail the complex interplay among state and local agencies, the EEOC and the judicial system in the Title VII scheme). Contact with these administrative agencies may take many forms-from the informal conference to a more formal hearing. Indeed, the Supreme Court has upheld the award of attorneys' fees even for time spent submitting comments in administrative, non-mandatory, non-adversarial rulemaking proceedings where counsel might further or protect their client's position. *See*

*Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 561 (1986). In any event, a rule denying attorneys' fees to Title VII plaintiffs for work performed at the administrative level "would force the complainant to bear the costs of mandatory state and local proceedings and thereby would inhibit the enforcement of meritorious discrimination claims." *Id.* at 63.[FN6] Accordingly, the Court will not deny attorneys' fees based on work performed at the administrative level.

> FN6. The Court recognizes the holding of *Carey* has been limited by subsequent Supreme Court cases. *See, e.g., North Carolina Department of Transportation v. Crest Street Community Council,* 579 U.S. 6 (1986); *Webb v. Dyer County Bd. of Education,* 471 U.S. 234 (1985). However, the Court believes the narrowest holding of *Carey* that attorneys' fees are available for work in the state administrative setting as required by Title VII survives. *See Crest Street,* 479 U.S. at 15 ("A court hearing on one of the civil rights claims covered by [42 U.S.C.] § 1988 may still award attorneys' fees for time spent on administrative proceedings to enforce the civil rights claim prior to the litigation. *See Carey, supra* (so holding under identical language of Title VII).").

**\*4** Martin Chevrolet also argues that Maguire's portion of the billing petition should be rejected because it is inadequately detailed and insufficiently specific. The Court disagrees. The Third Circuit Court of Appeals has stated that "specificity should only be required to the extent necessary for the district court 'to determine if the hours claimed are unreasonable for the work performed.' " *Washington,* 89 F.3d at 1037 (quoting *Rode,* 892 F.2d at 1190 (citing *Pawlak v. Greeenwalt,* 713 F.2d 972, 978 (3d Cir.1983))). Maguire's billing statement includes entries for an initial interview with client, an interview with the Delaware Department of Labor, witness interviews, communications with the DDOL, the EEOC and defense counsel, preparation of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 5
Not Reported in F.Supp., 1998 WL 1013874 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

the complaint and review of the answer, which total
34.25 hours. These entries are sufficiently detailed and
specific for this court to determine that these hours
were reasonably spent commencing a Title VII lawsuit.

In conclusion, the Court fines the hourly rates as well
as the hours spent were reasonable. Plaintiff's fee
petition will be granted.

An appropriate order will issue.

D.Del.,1998.
Ballen v. Martin Chevrolet-Buick of Delaware
Not Reported in F.Supp., 1998 WL 1013874 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:94cv00484 (Docket) (Sep. 26, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

Ernest O. FINI, Jr., Plaintiff,

v.

REMINGTON ARMS COMPANY, INC.,
Defendant.

**No. Civ.A. 97-12-SLR.**

Sept. 24, 1999.

Thomas Stephen Neuberger, of Wilmington, Delaware, and William J. Rodgers, John P. Lohrer, and Christopher P. Edelson, of Collier, Shannon, Rill & Scott, PLLC, Washington, D.C., for plaintiff.
Kathleen Furey McDonough, and Jennifer Gimler Brady, of Potter Anderson & Corroon, LLP, Wilmington, Delaware, and Allan L. Shackelford, and Alexander L. Maultsby, of Smith Helms Mulliss & Moore, L.L.P., Greensboro, North Carolina, for defendant.

MEMORANDUM OPINION

ROBINSON, J.

I. INTRODUCTION

*1 Pending before the court are various motions filed by the parties post trial. The jury returned a verdict in favor of plaintiff Ernest O. Fini, Jr., finding that defendant Remington Arms Company, Inc. willfully discriminated against plaintiff because of his age and awarding plaintiff $135,503 for lost earnings, $323,132 for future lost earnings, and $263,733 for lost pension benefits. The jury also found that plaintiff proved the elements of his claims for promissory estoppel and breach of the covenant of good faith and fair dealing. Plaintiff was awarded $722,368 in connection with the former and $577,895 in

connection with the latter. Defendant has filed motions to alter or amend the judgment and for judgment as a matter of law on the breach of the covenant of good faith and fair dealing claim and the promissory estoppel claim. (D.I.108, 109, 110) For his part, plaintiff has filed motions for attorneys' fees and costs, as well as motions relating to the amount of monetary damages to be paid by defendant. (D.I.111, 112, 119, 124)

Each of these motions shall be addressed *seriatim*.

II. DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S PROMISSORY ESTOPPEL CLAIM

A. Standard of Review

In order to prevail on a motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50, the moving party must prove that there is insufficient evidence upon which a reasonable jury could properly base its verdict, viewing the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in favor of the non-movant. *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 269-70 (3d Cir.1995).*
In making such a determination, "the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." While a "scintilla of evidence is not enough to sustain a verdict of liability," the question is "whether there is enough evidence upon which the jury could properly find a verdict for that party."

*Id.* (citing *Lightning Lube, Inc. v. Witco Co., 4 F.3d 1153, 1166 (3d Cir.1993)*).

B. Discussion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The elements of a promissory estoppel claim require evidence that: (1) a promise was made; (2) the promisor reasonably expected to induce action or forbearance on the part of the promisee; (3) the promisee in fact relied on the promise and took action to his detriment; and (4) the only way to avoid injustice is to enforce the promise and make it binding. *See Hunter v. Diocese of Wilmington,* C.A. No. 961-Kent, 1987 WL 15555, at *6 (Del. Ch. Aug. 4, 1987) (citing *Chrysler Corp. v. Quimby,* 144 A.2d 123 (Del.1958)). As to the first element, in the absence of “evidence of falsity or fraud,” “[m]ere expressions of opinion, expectation or assumption are insufficient.... [Rather, p]romissory form is required....” *Reeder v. Sanford Sch., Inc.,* 397 A.2d 139, 141 (Del.Super.1979); *accord Peterson v. Beebe Med. Ctr., Inc.,* C.A. No. 91C-07-147, 1992 WL 354087, at *4 (Del.Super.Nov. 13, 1992). As to the third element, plaintiff must prove that his reliance was “reasonable.” *Keating v. Board of Educ.,* C.A. No. 12589, 1993 WL 460527, at *4 (Del. Ch. Nov. 3, 1993). A plaintiff must prove all four elements of promissory estoppel “by clear and convincing evidence.” *Id.; accord* Reeder, 397 A.2d at 141.

***2** The sole evidence of record cited by plaintiff is his trial testimony as follows:

Q. In September of 1995, were you ever on a trip with Tommy Millner?

A. Yes, sir.

Q. And was there one or more of those trips in September of '95?

A. In terms of leaving the state of Delaware or getting away from the corporation any significant distance, there was one trip.

Q. And where was that to?

A. It was to outside of New Haven, Connecticut.

Q. And during that trip, did you have any discussion with Tommy Millner about your position in the Remington Arms Company?

A. Yes, sir.

Q. And would you please describe or tell the jury, not describe to them, tell the jury where that occurred and what was said?

A. Art Wheaton, the vice president, Tommy Millner, and myself had traveled to upstate Connecticut to meet with a writer who was going to do a book on the history of the Remington Arms Company. And I had driven to Connecticut and then met with them there and traveled to the writer's with them and back to [the] New Haven Airport.

While we were in the airport, a number of subjects were discussed just casually, and mentioned to Mr. Millner now that it was known that we were moving, how my people were faring, myself included, with regard to the move. And Tommy again was most complimentary and said that everything was fine, all the recommendations I had made had gone forward, and that all my people, myself included, were being, would be asked and receive a letter to go to North Carolina.

Q. When you referred to your people, you were referring to whom?

A. My entire organization of the direct reports to me. Not the nonexempt or the hourly wage, they knew they would not be invited, it was not a good business practice. But all the exempts in my group were to be making the trip. Myself, according to Mr. Millner, myself included.

(D.I. 123 at 39-40) (emphasis added). Plaintiff further testified that he relied to his detriment on this conversation, as follows:Q. Now, between that period of time between the conversation you had with Tommy Millner, the president of Remington, [at] the New Haven Airport and the conversation you had with Mr. Haskins on October 6, 1995, you did not turn down any job offers with any other company, did you?

A. No.

Q. And, in fact, during that period of time, you weren't aware of any open jobs with any other company, were you, that you had-

A. Yes, I was.

Q. And what job was that?

A. Browning.

Q. And is that the job that you talked with Mr. Moser about or the job that you talked with someone else about?

A. The job that Mr. Forson took.

Q. But during that period of time, you did not, in fact, receive and refuse any sort of job offer from the-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 3
Not Reported in F.Supp.2d, 1999 WL 825604 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

A. No, sir.

(D.I. 123 at 116) This testimony on cross-examination follows from his direct examination:Q. Mr. Fini, do you know a Mr. William Forson?
A. Yes, sir.
Q. Do you know where Mr. Forson works?
**\*3** A. He currently works for Browning FN.
Q. Say that again?
A. Browning FN. It is a division of Kiot, which owns the Browning USA Firearms Company. They have a law enforcement division which is in South Carolina.
Q. Did you ever have any conversations with Mr. Forson about your potential employment at Browning?
A. Yes, sir.
Q. Would you tell the jury about those conversations?
A. Mr. Forson was leaving the Remington Arms Company and had secured a position at Browning, Browning USA at that time, in Utah, and he was moving there. And I asked of him if there were any positions available at that time, this was around October, early October.
Q. Of what year?
A. Of 1995. And Bill informed me that there were no positions currently available, that he had filled the last one.

(D.I. 123 at 75-6)

According to his trial testimony, Mr. Millner does not recall either the trip or the conversation he allegedly had with plaintiff on or about September 25, 1995. (D.I. 118 at 26) The evidence of record demonstrates that the decision to eliminate plaintiff's position was made by Robert Haskin, a decision that was communicated to plaintiff on or about October 6, 1995. (D.I. 114 at 19; D.I. 118 at 24-5, 153-54, 162; D.I. 123 at 47, 56, 74, 115)

The court concludes that, even when the evidence is viewed in the light most favorable to plaintiff and all reasonable inferences are drawn in favor of plaintiff, there is insufficient evidence of record upon which a reasonable jury properly could have found that plaintiff proved by clear and convincing evidence the elements

of promissory estoppel. First, there is no allegation that the alleged promisor, Mr. Millner, acted with falsity or fraud; therefore, promissory form was required. Accepting plaintiff's testimony for what it is, at best plaintiff has proved that, in a casual setting, Mr. Millner believed or expected that all of plaintiff's people, including plaintiff, would be invited to North Carolina. Even if plaintiff's recollection and characterization of the conversation were accepted as true, there is absolutely no evidence that Mr. Millner "reasonably expected to induce action or forbearance" on plaintiff's part by this statement. Again, even if the court were to assume such motivation on Mr. Millner's part, there is no evidence of any job openings plaintiff could have pursued during the eleven (11) days between the September 25 conversation and the October 6 termination. The mere possibility that there could have been job openings for plaintiff to pursue cannot rise to the level of reasonable, detrimental reliance contemplated under Delaware case law.[FN1] Finally, given plaintiff's inconsistent postures vis-a-vis his willingness to relocate to maintain employment, the court finds the aura of injustice under the facts of record less than compelling.

    FN1. *See, e.g., Keating,* 1993 WL 460527, at
    \*5-6, where the promisor made multiple,
    specific representations regarding continued
    employment and the promisor purchased a
    car in reliance on the promise of future
    employment.

**III. DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM**

A. Standard of Review

**\*4** The standard of review for this motion has been adequately addressed above, in connection with plaintiff's promissory estoppel claim.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 4
Not Reported in F.Supp.2d, 1999 WL 825604 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

### B. Discussion

In Delaware, there is a "heavy presumption that a contract for employment, unless otherwise expressly stated, is at-will in nature, with duration indefinite." *E.I. DuPont de Nemours & Co. v. Pressman,* 679 A.2d 436, 440 (Del.1996). Even with the at-will presumption, "every employment contract, including an at-will contract, contains an implied covenant of good faith and fair dealing" which may be applied in four
narrowly defined categories, where: (1) the termination violated public policy; (2) the employer misrepresented an important fact and the employees relied "thereon either to accept a new position or remain in a present one"; (3) the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; or (4) the employer falsified or manipulated a record to create fictitious grounds to terminate the employee.

*Layfield v. Beebe Med. Ctr., Inc.,* C.A. No. 95C-12-007, 1997 WL 716900, at *3-4 (Del.Super. July 18, 1997) (quoting *Pressman,* 679 A.2d at 442-44). The Delaware Supreme Court has explained in this regard that "[d]islike, hatred or ill will, alone, cannot be the basis for a cause of action for termination of an at-will employment." *Pressman,* 679 A.2d at 444. Rather, in order to claim a breach of the covenant, the employer's conduct "must constitute 'an aspect of fraud, deceit or misrepresentation." ' *Layfield,* 1997 WL 716900, at *4 (quoting *Pressman,* 679 A.2d at 440).

In the case at bar, plaintiff grounded his breach of the covenant claim on the same evidence relied upon to support his promissory estoppel claim, that is, "that Mr. Millner misrepresented to [plaintiff] that he [ (plaintiff) ] would be invited to move to North Carolina." (D.I. 134 at 10) Plaintiff cites to *Broksky v. Hercules, Inc.,* 966 F.Supp. 1337 (D.Del.1997), for the proposition that the covenant of good faith and fair dealing applies "when 'the employer misrepresent[s] some important fact, most often the employer's present intentions, and the employee relies thereon either to accept a new position or remain in a present one." ' *Id.*

at 1351 (quoting *Pressman, 679 A.2d at 442).* The court in *Brodsky* goes on to explain, however, that this exception is applicable only when "the employer ... make[s] a misrepresentation which is targeted to ensnare a specific employee and alter in some way his status as an at-will employee." *Id.*

As explained in the preceding discussion, there is no evidence of record that Mr. Millner intentionally used deceptive words to specifically ensnare plaintiff to continue his employment to his detriment. Indeed, there is no direct evidence linking Mr. Millner's conversation with Mr. Haskin's decision at all. Even if the court accepts plaintiff's recollection and characterization of Mr. Millner's alleged conversation, there is no evidence of record to support the requirement that, as a result of the conversation, plaintiff's status as an at-will employee was altered. *See id.* at 1351-52 and the cases discussed therein. In sum, the evidence of record, viewed in the light most favorable to plaintiff, does not constitute the type of fraud and deceit "that falls within the protective cocoon" of the covenant of good faith and fair dealing. *Id.* at 1352.

### IV. DEFENDANT'S MOTION TO ALTER OR AMEND JUDGMENT

#### A. Standard of Review

**\*5** Federal Rule of Civil Procedure 59 provides that a motion to alter or amend a judgment may be granted "(1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in courts of the United States...." Fed.R.Civ.P. 59(a)(1). Traditionally, there have been three bases for granting a motion under Fed.R.Civ.P. 59: "(1) an intervening change in controlling law; (2) new evidence; or (3) a need to correct a clear error of law or prevent manifest injustice." *Mobil Oil Corp. v. Amoco Chems, Corp.,* 915 F.Supp. 1333, 1377 (D.Del.1994). Defendant's motion apparently is grounded on the third base, as it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 1999 WL 825604 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

claims that the damages awarded by the jury are excessive as a matter of law and not supported by the evidence adduced at trial. (D.I.108)

### B. Discussion

As explained by defendant, while it does not fault the methodology adopted by plaintiff's damages expert and by the jury, it contends that the jury's award was based on clearly erroneous assumptions about plaintiff's ability to mitigate damages. Specifically, defendant argues that the jury erred when it apparently accepted the evidence proffered by plaintiff (by way of an economist) that "plaintiff's 1997 income is the most that plaintiff will ever earn in mitigation for each year until age 65." (D.I. 126 at 4)

In support of its argument, defendant refers to the record evidence that plaintiff was offered two jobs in March 1995, months before his termination. Both jobs possibly involved relocation (to Utah or California); one of the jobs (with Browning) involved a salary of $100,000 plus a 10-20% bonus range. (D.I. 123 at 81-90) In May 1996, plaintiff began consulting for SIG Arms Company. He accepted employment with SIG Arms Company in July 1997, earning an annual salary of $78,000, plus a bonus and participation in a pension plan. His 1997 tax return shows income of $57,000. In February 1998, some seven (7) months after accepting the SIG Arms position, plaintiff voluntarily left that job and became a self-employed consultant, working out of a home office. At the time of trial (August 1998), plaintiff had earned up to $53,000. (D.I. 123 at 67-73)

According to defendant, plaintiff's decision to quit his job with SIG Arms "has resulted in an annual loss of earnings in the amount of $21,000 [$78,000- $57,000]. The jury verdict makes Remington responsible for this $21,000 amount for each year until the plaintiff reaches age 65." (D.I. 126 at 3-4) The jury also awarded plaintiff lost pension benefits, reflecting plaintiff's posture at trial that he would never again be an employee and participate in a pension plan. Defendant contends that this result is clearly erroneous

and unjust for several reasons. First, defendant argues that plaintiff failed to mitigate his damages by leaving the SIG Arms position and starting his own consulting company, which self-employment has been forecast to generate a lower income with no benefits.

**\*6** It is undisputed that a plaintiff has a duty to mitigate damages, which duty includes accepting and retaining "substantially equivalent" employment. *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231 (1982). Defendant concedes that generally "a plaintiff is not legally obligated to relocate in order to mitigate damages." (D.I. 126 at 11) Defendant argues that in this case, where plaintiff expressed his willingness at trial to relocate to North Carolina with Remington and to Utah with Browning, he should be required to relocate as a part of mitigation. *See generally Ford v. Nicks,* 866 F.2d 865, 874 (6th Cir.1989).

Plaintiff argues in response that it was defendant's burden to prove in the first instance that the SIG Arms position constituted equivalent employment that would afford "virtually identical promotional opportunities, compensation, job responsibilities, and status" as had the Remington position. *Booker v. Taylor Milk Co.,* 64 F.3d 860, 866 (3d Cir.1995). Plaintiff contends that defendant "made no attempt to prove such equivalency, as it did not exist." (D.I. 136 at 8) Plaintiff further argues that there was sufficient evidence presented for the jury to conclude that plaintiff was reasonably diligent in mitigating damages. Indeed, defendant's expert had no quarrel with plaintiff's decision to start his own business, just with plaintiff's expert's valuation of the business and its prospects. (D.I. 114 at 190-92)

The court finds that there was sufficient evidence of record, including evidence of plaintiff's job searches and efforts to build and grow a consulting business (D.I. 123 at 64-73), for a reasonable jury to conclude that plaintiff mitigated his damages. The fact that plaintiff's testimony at trial was not always consistent and conflicted with defendant's evidence is not dispositive. Having heard and seen all the evidence, nevertheless the jury found for plaintiff and the court is reluctant to disturb that finding.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6
Not Reported in F.Supp.2d, 1999 WL 825604 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Defendant also argues that the jury's damages award should be overturned as unduly speculative. More specifically, defendant asserts that plaintiff's expert's front pay damages figure-and the jury's award-is based on one central assumption: for the next eleven years, [plaintiff] will have no better employment opportunity than to work as a consultant earning $57,000 per year, or the equivalent based on an annual 4% growth rate.

(D.I. 126 at 15; D.I. 115 at 15-17, 20-21)

It is true that plaintiff's expert used as his base figure plaintiff's 1997 tax return showing income to plaintiff of $57,000. As explained by the expert,
there [are] obviously two possibilities for the future. His business can fail. Only about 38% of new small businesses are in existence five years after they start up. His business can prosper. He can do far better than that. It is very difficult to know.

(D.I. 115 at 20) Defendant points out that plaintiff's income at the time of trial (August 1998) was already $52,000 or $53,000 and that plaintiff fully expected to build his business "into something ." (D.I. 123 at 71, 73)

**\*7** Remittitur is appropriate when the jury verdict is " 'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff whole, i.e., to remedy the effect of the employer's discrimination." *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1100 (3d Cir.1995) (quoting *Spence v. Board of Educ., 806 F.2d 1198, 1201 (3d Cir.1986)).* The jury apparently accepted the evidence of record proffered by plaintiff and his expert; therefore, the verdict was supported by evidence. Given the inherent difficulties associated with forecasting future earnings, the court will leave the risk of uncertainty to be borne by defendant and declines to grant a remittitur.

In sum, although the court may not agree with the jury's damages award and recognizes the inconsistencies in plaintiff's presentation to the jury, the record evidences neither a clear error of law nor a manifest injustice. Therefore, the court declines to alter

or amend the judgment by reducing the award of damages.[FN2]

> [FN2.] Defendant has requested leave to pursue supplemental discovery, posttrial, on the ground that plaintiff's current employment status (apparently an employee of O.F. Mossberg & Sons) may well reflect on his pretrial efforts to mitigate. Although the prospect of plaintiff's abusing the system raises concerns, those concerns (based on conjecture at this point) are overshadowed by the need for closure, especially where, as here, plaintiff was subjected to discovery just prior to trial.

## V. PLAINTIFF'S MOTION FOR AN AWARD OF SPECIFIC MONEY DAMAGES

Plaintiff moves the court to double the amount of damages awarded for lost earnings and pension benefits between the date of discharge and the date of trial, due to the jury's finding of willfulness. *See Starceski,* 54 F.3d at 1099; *McDowell v. Avtex Fibers, Inc.,* 740 F.2d 214, 218 (3d Cir.1984), *vacated and remanded on other grounds,* 105 S.Ct. 1159 (1985). Defendant objects to the doubling of the lost pension benefits award, based on its reading of *Blum v. Witco Chem. Corp.,* 829 F.2d 367 (3d Cir.1987). The court agrees with defendant's reading of the law. Clearly, "under the ADEA liquidated damages are measured by doubling the back pay award." *McDowell,* 740 F.2d at 218 (emphasis added). Just as clearly the Third Circuit in *Blum* held that "lost pension benefits are recoverable as front pay...." 829 F.2d at 373. The concern expressed in *McDowell,* that "deducting pension benefits received by McDowell from his back pay award could potentially reduce the amount in liquidated damages to which he otherwise could be entitled [under the ADEA] ...," is absolutely consistent with the holding that pension benefits are distinguishable from back pay. Plaintiff's request for doubling the lost pension benefits award, therefore, is denied as legally insupportable.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 7
Not Reported in F.Supp.2d, 1999 WL 825604 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Based on the court's posttrial rulings, plaintiff is entitled to pre-judgment and post-judgment interest.[FN3]

> [FN3.] Although defendant's argument for commencing accrual of postjudgment interest from the date of this opinion has some appeal, there is no precedent for doing so.

### VI. PLAINTIFF'S MOTIONS FOR ATTORNEY FEES AND COSTS

As a prevailing party at trial, plaintiff is entitled to the recovery of reasonable attorney fees and costs under the Age Discrimination in Employment Act ("ADEA"). *See Hensley v. Eckerhart,* 103 S.Ct. 1933, 1941 (1983). Generally, the award of fees is based on the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *See Pennsylvania Envtl. Defense Found. v. Canon-McMillan Sch. Dist.,* 152 F.3d 228, 231 (3d Cir.1998) (hereinafter *"P.E.D.F."*). The Third Circuit in *P.E.D.F.* instructs the trial court to use as a "starting point" the attorneys' usual billing rate, and then consider "prevailing market rates" in the relevant community. *Id .* The trial court is directed as well to review the time charged and determine whether the hours set out were reasonably expended for the particular purposes described. *See id.* Hours that are "excessive, redundant, or otherwise unnecessary" may be deemed noncompensable. *Id.* at 232.

**\*8** Plaintiff has withdrawn his request for $23,754.63 in compensation for "fees to others" ($7,916.99), "State law claims"($4,710 and $1,880), "written discovery time" ($5,671.25), and "secretarial overtime" ($3,576.39). (D.I. 132 at 3-4) Plaintiff contends that the $348,324.65 in fees not contested by defendant are not subject to reduction. *See Rode v. Dellarciprete,* 892 F.2d 1177, 1188 (3d Cir.1990). The court shall address the remaining contested fees.

### A. Attorney Time at Trial

Defendant has challenged the attorney time at trial of Mr. Edelson. Plaintiff responds that his staffing for trial was the same as or less than defendant's staffing for trial, making the staffing *per se* reasonable vis-a-vis defendant. The court agrees. *See Finch v. Hercules, Inc.,* 941 F.Supp. 1395, 1425-26 (D.Del.1996).

### B. Duplication of Services

Defendant argues that there should be a $7,306.25 reduction for time spent at depositions by multiple counsel representing plaintiff. Plaintiff argues that the counsel involved routinely work together, with one posing questions and one handling paper. The court is not inclined to reduce the award under these circumstances.

### C. Settlement Efforts

Defendant contends that plaintiff's conduct during the mediation efforts "created an insurmountable barrier to meaningful settlement discussions," causing defendant to incur substantial legal fees during the process. (D.I. 130 at 8) The court does not doubt (given the tenor of the proceedings at bar) that the parties clung with tenacity to their respective positions pretrial. The court is not inclined to reduce plaintiff's award based on conduct to which the court was not privy and which probably reflects the conduct seen with most unsuccessful mediations.

### D. Failed Summary Judgment

Defendant argues that plaintiff's motion for summary judgment on his ADEA claim was "extraordinary, was unprecedented to [defendant's] knowledge, was hopelessly flawed because of readily apparent factual disputes, and was summarily dismissed by the Court." (D.I. 130 at 9) Plaintiff counters that the research underlying his motion "was an integral part of proving" his claims. (D.I. 132 at 8)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 8
Not Reported in F.Supp.2d, 1999 WL 825604 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Generally, the court cannot preclude parties from filing motions. Motions for summary judgment are not routinely granted in this district, particularly motions filed by plaintiffs. Moreover, if any one aspect of case management is out of control, it is the tendency of parties to file motions on issues that admittedly involve genuine issues of material fact. The purpose of such filings is not necessarily to gain relief, but to "educate" the court or to obtain the court's views pretrial of the evidence and the legal issues in dispute.

In the court's view, it was not reasonable to believe that plaintiff's motion would be granted, given Third Circuit precedent and this court's track record The court, therefore, declines to reward plaintiff for this wasted exercise and will reduce the award by $35,253.75. (D.I. 130 at 9)

### E. General Research

**\*9** Defendant argues that it should not have to compensate plaintiff for research conducted on issues that were never presented to the court. (D.I. 130 at 10) The court agrees [FN4] and shall reduce the award by an additional $5,000 to account for the fact that not only was the research not related to the ultimate ADEA claim presented, but excessive in light of the well-defined concepts at issue (disparate treatment analysis and mixed motives case law).

> [FN4.] Plaintiff did not directly respond to this argument. (D.I.132)

### F. Number of Attorneys

Defendant submits that the number of attorneys involved in prosecuting plaintiff's case (approximately ten) unavoidably led to duplication of time. In the absence of clearly apparent abuses in this regard, the court is not inclined to assume such a fact and will not reduce the award on that basis.

### G. Travel Expenses

Defendant argues that it should not be responsible for costs incurred by plaintiff due to his choice of out-of-State counsel, citing *Coalition to Save Our Children v. State Board of Educ.,* 901 F.Supp. 824, 834 (D.Del.1995). Although the original submission by plaintiff did not clearly itemize or explain the travel expenses claimed (see D.I. 121, Ex. B at All, A21, A30 A49-50, A60, and A82), the travel expense summary subsequently submitted (D.I. 133 at C6-C8), for a total claim of $5,742.35, is subject to review. Consistent with the court's prior position, the court will disallow $2,416.89 for the hotel expenses incurred by plaintiff's out-of-State counsel during trial. [FN5]

> [FN5.] The court is not sure whether these expenses include meals, etc ., or just the hotel room charges.

### H. Associate Fees

Defendant argues that the associate billing rates attested to by plaintiff's counsel are excessive. In the absence of contrary evidence, the court is not inclined to reject out of hand the averments of record.

### I. Bad Faith

Plaintiff urges the court to make a "bad faith award" based on defendant's conduct as a party. (D.I. 120 at 10-11) The conduct referenced by plaintiff had its genesis in administrative proceedings and, ultimately, played an insubstantial role in the proceedings at bar. The court declines to make a "bad faith award" under these circumstances.

### J. Delay Enhancement

Plaintiff seeks an award of a "delay enhancement," "to compensate counsel for the delay in payment for the time gap between the time services were rendered and the fee award...." *Finch,* 941 F.Supp. at 1427. As

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 9
Not Reported in F.Supp.2d, 1999 WL 825604 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

explained by the court in *Finch,*

[s]uch an enhancement serves to place counsel, who have accepted [a plaintiff's] case on a contingency basis, on par with attorneys who are paid before and during the course of representation.

*Id.* Consistent with precedent, the court finds such an enhancement appropriate and further finds that plaintiff has provided support for the requested multiplier.

### K. Supplemental Request

Plaintiff's supplemental request for fees and costs associated with posttrial proceedings, in the amount of some $60,000,[FN6] is excessive. First, plaintiff did not prevail on his State law claims, which the court concluded were not compensable under the ADEA in any event. Second, plaintiff's demand for a doubling of the lost pension benefits awarded is contrary to Third Circuit law. Finally, a not insubstantial portion of plaintiff's original demand for fees and costs was found to be without merit. Therefore, only $45,000.00 shall be awarded to Collier, Shannon, Rill & Scott, PLLC as compensation for post-trial proceedings.[FN7]

> FN6. This amount is claimed by Collier, Shannon, Rill & Scott, PLLC.

> FN7. Admittedly, it is difficult to divine from the billing records how much time was dedicated to the issues identified above.

### VII. CONCLUSION

**\*10** For the reasons stated: (1) defendant's motion for judgment as a matter of law on plaintiff's promissory estoppel claim (D.I.110) is granted; (2) defendant's motion for judgment as a matter of law on plaintiff's covenant of good faith and fair dealing claim (D.I.109) is granted; (3) defendant's motion to alter or amend the judgment (D .I. 108) is denied; (4) plaintiff's motions relating to lost pension damages, pre- and

postjudgment interest, and for specific monetary damages (D.I.112, 124) are granted in part and denied in part; and (5) plaintiff's motions for attorneys' fees and costs (D.I.111, 119) are granted in part and denied in part. An order shall issue.

D.Del.,1999.
Fini v. Remington Arms Co., Inc.
Not Reported in F.Supp.2d, 1999 WL 825604 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:97cv00012 (Docket) (Jan. 08, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
B. Kurt PRICE, Wayne Warren, and Christopher D.
Foraker, Plaintiffs,
v.
L. Aaron CHAFFINCH, Thomas F. Macleish, David
B. Mitchell, and Division of State Police,
Defendants.
Christopher D. FORAKER, Plaintiff,
v.
L. Aaron CHAFFINCH, Thomas F. Macleish, David
B. Mitchell, and Division of State Police,
Defendants.
**No. 04-956 (GMS), 04-1207(GMS).**

May 12, 2006.

Martin D. Haverly, Esq., Thomas S. Neuberger,
Stephen J. Neuberger, The Neuberger Firm, P.A.,
Wilmington, DE, for Plaintiffs.
Richard Montgomery Donaldson, Noel C. Burnham,
Montgomery, McCracken, Walker & Rhoads,
Wilmington, DE, for Defendants.

*MEMORANDUM*
SLEET, J.

## I. INTRODUCTION

**\*1** The above-captioned actions were consolidated on
April 18, 2006. In Civil Action No. 04-956 ("the Price
case"), three state troopers assigned to the Delaware
State Police's ("DSP") Firearms Training Unit facility
("FTU") allege that their First Amendment rights were
violated by two superiors who retaliated against them
for speaking out against hazardous health conditions
at the FTU. Thus, the Price complaint states one count
of Free Speech retaliation and one count of Petition
Clause retaliation, both pursuant to 42 U.S.C.A. §

1983 (2003). In Civil Action No. 04-1207 ("the
Foraker case"), Sergeant Christopher Foraker
individually alleges that his First Amendment rights
were violated by the same two superiors after they
retaliated against him for filing (and winning) a First
Amendment retaliation lawsuit in 2002. Thus, like the
Price complaint, the Foraker complaint also states one
count of Free Speech retaliation pursuant to § 1983,
and one count of Petition Clause retaliation pursuant
to § 1983. Additionally, the Foraker complaint states
two state law causes of action: defamation and false
light invasion of privacy. Presently before the court are
the defendants' motions for summary judgment on all
counts in both cases. For the following reasons, the
court concludes that summary judgment is
inappropriate for all counts except Foraker's false light
claim.

## II. STANDARD OF REVIEW

Evaluating a motion for summary judgment requires
the court to "review the record as a whole, 'draw[ing]
all reasonable inferences in favor of the non-moving
party[,]' [while refraining from] weighing the evidence
or making credibility determinations. *Reeves v.
Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150,
120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citation
omitted). If [the court is able to] determine that 'there
is no genuine issue as to any material fact' and that the
movant is entitled to judgment as a matter of law,"
summary judgment must be granted. *Hill v. City of
Scranton,* 411 F.3d 118, 124-25 (3d Cir.2005) (quoting
Fed.R.Civ.P. 56(c)).

## III. BACKGROUND

The FTU, a multi-million dollar indoor firing range
for the DSP, became operational in September of 1998.
A few months later, due to concerns about the
ventilation system, an environmental-assessment firm
hired to conduct a study of the air quality in the facility

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 2
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

concluded that the amount of lead in the air significantly exceeded the maximum acceptable level recommended by the Occupational Safety and Health Administration. (D.I. 85 at A222.) <u>FN1</u> By at least as early as June 14 of the following year, the FTU's air-quality problems became the subject of public scrutiny after *The News Journal*-a local Delaware newspaper-publicized the results of the study in an article entitled, "Shooting range under fire for lead: State police are exposed to levels of metal in air twice federal standard." (<u>Id. at A2639-A2640, 189 A.2d 773</u>.)

> FN1. "D.I. 85," which refers to Docket Item 85 in the Price case, was also filed as Docket Item 65 in the Foraker case.

Foraker became the non-commissioned officer in charge ("NCOIC") of the FTU on August 1, 2001. At that time, he supervised several firearms instructors, including Corporal B. Kurt Price and Corporal Wayne Warren. Foraker also supervised Corporal Eddie Cathell, who was a personal friend Colonel L. Aaron Chaffinch. Foraker and Cathell had a rather rocky professional relationship, and on several occasions Foraker spoke out against Cathell. On February 22, 2002, Foraker was involuntarily transferred from the FTU to another position within the DSP. In response, Foraker filed a <u>§ 1983</u> action against Chaffinch for unlawful First Amendment retaliation. After a five-day trial, a jury found that Chaffinch had in fact retaliated against Foraker. The parties later agreed on settlement terms, pursuant to which Foraker was reinstated as the NCOIC of the FTU on December 1, 2003. After his reinstatement, Foraker learned that the FTU had the same air-quality issues that it had prior to his involuntary transfer in 2002. Not surprisingly, the air quality weighed on the minds of Foraker, Price, and Warren. Foraker soon began to voice their concerns to their commanding officers, including Lieutenant Colonel Thomas MacLeish. Eventually, the trio's concerns worked their way up the chain of command to Chaffinch.

**\*2** In March of 2004, the FTU's air quality remained poor and, as a result, the facility was formally closed. Due to the public attention the FTU's closing generated, Chaffinch gave two media tours of the facility in April 2004. Before the first tour, however, Chaffinch revealed his intent to blame Foraker for the FTU's closing to Captain Glenn Dixon:

[Chaffinch] talked about the meeting that he was going to at the range, and at that time he mentioned Sergeant Foraker and that he was going to put it on Foraker during the meeting. He had outlined that he had the newspaper people going [sic] to be present at the meeting and that he is going to put it on Foraker and lay a lot of the blame on Foraker for the range.

(Dixon Dep. at 8:7-13.) Consistent with this statement, Chaffinch was quoted during the tour as saying:The previous sergeant in charge did a good job. Things changed in December [2003] when another sergeant came in. That's at least a portion of where the ball was dropped.

...

Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning. [The previous sergeant] was willing to do that.... I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel that cleaning was part of his purview. He felt that was putting him in harm's way.

(D.I. 85 at A850.) Foraker was unable to respond to these allegations, which were printed in both the *Delaware State News* and *American Police Beat Magazine,* because Chaffinch placed a gag order on his troopers. Nevertheless, Foraker, Price, and Warren all gave statements in cooperation with an investigation by the State Auditor's Office. Shortly thereafter, Price and Warren were placed on light duty-ostensibly because they had disabilities rendering them unfit for regular duty-and Foraker was banned from attending Section Chief meetings he had attended in the past.

IV. DISCUSSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

A. First Amendment Retaliation (Counts I and II)

There is "a well-established three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment." *Hill,* 411 F.3d at 125. The employee must show at step one that the activity in question is protected by the First Amendment. *Hill,* 411 F.3d at 125. At step two, the employee must show "that the protected activity 'was a substantial factor in the alleged retaliatory action[s].' " *Hill,* 411 F.3d at 125 (citations omitted). Step two also requires the court to inquire whether the alleged retaliatory actions were serious enough to be actionable. *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000) ("[N]ot every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation.") (cited by *McKee v. Hart,* 436 F.3d 165, 170 (3d Cir.2006)). However, this is an extremely low hurdle to overcome:

**\*3** First Amendment retaliation claims are always individually actionable, even when relatively minor. Even "an act of retaliation as trivial as failing to hold a birthday party for a public employee," if "intended to punish her for exercising her free speech rights," may be actionable if under the circumstances it would be sufficient to "deter a person of ordinary firmness" from exercising his or her First Amendment rights. *Suppan v. Dadonna,* 203 F.3d 228, 234-35 (3d Cir.2000) (citing *Rutan v. Republican Party,* 497 U.S. 62, 76 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). A First Amendment retaliation claim will lie for any individual act which meets this "deterrence threshold," and that threshold is very low: as we said in *Suppan,* a cause of action is supplied by all but truly de minimis violations. *Id.*

*O'Connor v. City of Newark,* 440 F.3d 125, 127-28 (3d Cir.2006). Finally, at step three, "the employer may defeat the employee's claim by demonstrating that the same adverse action[s] would have taken place in the absence of the protected conduct." [FN2] *Id. See also Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

FN2. The plaintiffs contend that the defendants waived this affirmative defense-familiarly known as the *Mount Healthy* defense-by failing to raise it in their pleadings. The defendants point out that the plaintiffs raised it in the complaints by alleging that "[t]he defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had grounds to adversely treat plaintiffs" (D.I. 45 ¶ 94 (the Price case); D.I. 1 ¶ 84 (the Foraker case)), and the defendants denied the allegation in their answers. (D.I. 51 ¶ 94 (the Price case); D.I. 7 ¶ 84 (the Foraker case).) The court concludes that such denials were sufficient to put the plaintiffs on notice that the *Mount Healthy* defense would be at issue.

Here, all three plaintiffs clearly engaged in protected First Amendment activity by speaking out about the air-quality issues at the FTU,[FN3] and in Foraker's case, by filing suit in 2002. Chaffinch had an obvious motive to retaliate in response to the plaintiffs' activities, and a jury could reasonably infer that MacLeish (who was allegedly "joined at the hip" with Chaffinch) would be similarly motivated to retaliate. Furthermore, the allegedly retaliatory actions-publicly blaming the plaintiffs for the FTU's poor air quality,[FN4] placing Price and Warren on light duty, banning Foraker from meetings, etc.-are more than *de minimis.* And, with regard to the *Mount Healthy* defense, the plaintiffs point to several similarly-situated troopers who were not subject to the same allegedly retaliatory actions. Thus, the plaintiffs have demonstrated a genuine issue of material fact at each step of the analysis, thereby rendering summary judgment inappropriate as to Counts I and II.

FN3. The defendants argue that Price and Warren's Petition Clause claim (Count II) fails because their cooperation with the Auditor's investigation does not qualify, as a matter of law, as an attempt to petition the

Slip Copy                                                                                          Page 4
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

government under the First Amendment. Due to the number of disputed facts in this case, including facts regarding the nature of the plaintiffs' cooperation with the Auditor, the court believes the most prudent course of action at this stage is to deny summary judgment as to Count II and revisit the issue after trial.

FN4. Although Chaffinch's comments to the media were explicitly directed at Foraker, there is evidence in the record suggesting that at least one trooper understood Chaffinch to be speaking about Price and Warren as well.

### B. Qualified Immunity

The defendants argue that, even if summary judgment in their favor is inappropriate, they are nevertheless entitled to qualified immunity with regard to Counts I and II. "Qualified immunity insulates government officials performing discretionary functions from suit insofar as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *McKee,* 436 F.3d at 169 (internal quotations omitted). "To determine whether an official has lost his or her qualified immunity, [the court] must first decide whether a constitutional right would have been violated on the facts alleged." *Id.* (internal quotations omitted). "If the answer to that question is 'yes,' [the court] must then consider whether the right was clearly established." *Id.* (internal quotations omitted). "If [the court] also answer[s] 'yes' to the second question, [the court] must conclude that the official does not have qualified immunity." *Id.*

**\*4** Because disputed issues of material fact exist regarding the constitutional violations alleged in Counts I and II, the answer to the first question depends upon the resolution of those factual disputes. Assuming *arguendo* that the answer to the first question turns out to be "yes," the court must inquire whether those rights, if violated, were clearly established. In *McKee,* the Third Circuit succinctly summarized the proper approach to such a query:

" 'Clearly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McLaughlin v. Watson,* 271 F.3d 566, 571 (3d Cir.2001). Put another way, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Id.* at 572. The Supreme Court has recently reiterated this point, stating that "it is important to emphasize that this [clearly established] inquiry 'must be undertaken *in light of the specific context of the case,* not as a broad general proposition." ' *Brosseau v. Haugen,* 543 U.S. 194, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (per curiam) (quoting *Saucier[ v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ] ) (emphasis added).

436 F.3d at 171. Although this inquiry "must be undertaken in light of the specific context of the case," *Brosseau,* 543 U.S. at 198, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). "Accordingly ... the salient question ... is whether the state of the law [at the time of the acts in question] gave [the defendants] fair warning that their alleged treatment of [the plaintiffs] was unconstitutional." *Id.*

In this case, the defendants admit that First Amendment retaliation is unlawful in general, but they argue that at the time of the alleged retaliation the state of the law did not give them fair warning that their treatment of Foraker was actionable. The court disagrees. In *Brennan v. Norton,* 350 F.3d 399 (3d Cir.2003)-a case decided before the retaliation in this case-the Third Circuit further defined the line between actionable and non-actionable retaliation. There, the court stated that, if there is a "nexus between [the] protected conduct and [the] alleged retaliation," an act as simple as affixing a sticker bearing the phrase "Department Asshole" on the plaintiff-firefighter's helmet "could rise to the level of a First Amendment violation." *Id.* at 419. The few retaliatory actions

Slip Copy                                                                                          Page 5
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

mentioned above are obviously more severe than the harassing sticker in *Brennan.* Therefore, the court holds that if the disputed issues of fact are resolved against the defendants, they will not be protected by qualified immunity.

### C. Defamation (Count III)

"Under Delaware law, the tort of defamation has five elements: (1) the statement must be of a defamatory character; (2) publication to a third party; (3) the communication must refer to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury." *Gill v. Del. Park, LLC,* 294 F.Supp.2d 638, 646 (D.Del. Dec.2, 2003). Viewing the facts in the light most favorable to Foraker, Chaffinch's statements to the media easily satisfy the five elements of defamation: (1) assigning (allegedly) unwarranted blame to Foraker for the FTU's air quality is defamatory; (2) making a statement to a newspaper is publication to a third party; (3) mentioning Foraker by name obviously refers to him; (4) any person reading Chaffinch's statement would understand it to be defamatory; and (5) maligning a person in his profession is injurious *per se, Johnson v. Campbell,* No. 00-510-JJF, 2001 U.S. Dist. LEXIS 25596, at *14-*15 (D.Del. Mar. 30, 2001). Likewise, MacLeish's statements-the air-quality problems had began only recently, and procedure had not been followed at the FTU-also satisfy all five elements. To be sure, MacLeish's statements present a closer case because he neither referred to Foraker by name, nor explicitly blamed the FTU's problems on him. Nevertheless, a reasonable jury could infer from the context of the controversy that MacLeish's statements were in fact defamatory of Foraker.

**\*5** The defendants argue that they cannot be held liable for defamation because they were merely stating their opinions. In *Milkovich v. Lorain Journal Co.,* the Supreme Court explained:

If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the

speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Here, the defendants' opinions "imply a knowledge of facts" leading to the conclusion that Foraker's performance as the NCOIC was inadequate. Accordingly, the defendants may not escape liability by hiding behind the "opinion" shield. The defendants also contend that they cannot be held liable for defamation because their statements were substantially true. However, as the defendants must understand, the question of who was at fault for the FTU's poor air quality is fraught with so many disputed facts that the court cannot determine the truth or falsity of the defendants' statements at this stage.

The only remaining issue is whether Foraker is a public figure. "Where the plaintiff is a public figure, there is an additional constitutional requirement that the defendant have acted with actual malice. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Actual malice exists where the declarant acts with 'knowledge that it was false or with reckless disregard of whether it was false or not.' " *Id. Gill,* 294 F.Supp.2d at 646. The determination of whether a plaintiff is a public figure is a legal issue for the court to resolve. *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 938 (3d Cir.1990). "*Gertz [v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ] identified three classes of public figures: those who achieve such stature or notoriety that they are considered public figures in all contexts; those who become public figures involuntarily, but these are 'exceedingly rare'; and those who are deemed public figures only within the context of a particular public dispute." *U.S. Healthcare,* 898 F.2d at 938. The latter class-limited    purpose    public    figures-comprise

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"individuals who voluntarily 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.' " *Id.* (quoting *Gertz,* 418 U.S. at 345). "Generally, two factors inform this determination. The first factor indicative of a [plaintiff's] status is his relative access to the media." *U.S. Healthcare,* 898 F.2d at 938. "The second factor is the manner in which the risk of defamation came upon [the plaintiff]." *Id.*

**\*6** Here, Foraker's access to the media was limited to the point of being non-existent by Chaffinch's imposition of a gag order. Certainly, that cuts against Foraker's public-figure status. On the other hand, the air quality at the FTU was a public controversy as early as 1999. And yet, Foraker, who was aware of the ongoing controversy, actively sought to be reinstated as the NCOIC of the FTU. Thus, Foraker knew or should have known that he was injecting himself into a situation in which, as the head of a controversial facility, there was a substantial risk of public scrutiny and defamation. The question the court must answer, then, is whether Chaffinch's gag order outweighs Foraker's voluntary assumption of risk. In *Sculimbrene v. Reno,* 158 F.Supp.2d 8 (D.D.C. Feb.16, 2001), the D.C. district court was confronted with a similar situation. In that case, the plaintiff was a former FBI Special Agent who became involved in the "Filegate" scandal as a result of his employment at the White House Liaison Office. After media commentator Lanny Davis made disparaging comments about the plaintiff on CNN and CNBC, the plaintiff sought permission to respond publicly. However, that request was denied by his superiors. *Id.* at 11-14; *id.* at 23. The plaintiff then sued Davis under a defamation-like federal statute. In spite of the FBI's refusal to allow the plaintiff to respond publicly, the court concluded that the plaintiff was a limited purpose public figure both because of the high public interest in "Filegate," and because of the plaintiff's significant role in determining the outcome of the controversy. *Id.* at 23-24. Likewise here, although Foraker was subject to a gag order, as the NCOIC of the FTU he was a significant player in a controversy with high (local) public interest. Moreover, unlike the plaintiff in *Sculimbrene,* Foraker

sought the NCOIC position with advance knowledge of the attendant controversy. Therefore, as with the FBI agent in *Sculimbrene,* Foraker is a limited purpose public figure in this context, and therefore, he must prove his defamation case using the heightened "actual malice" standard. The court further holds that the record contains sufficient evidence for a reasonable jury to conclude that the defendants' statements were made with actual malice. Thus, summary judgment will be denied as to Count III.

### D. False Light Invasion of Privacy (Count IV)

The common law right of privacy was first recognized by the Delaware Supreme Court in *Barberi v. News-Journal Co.,* 56 Del. 67, 189 A.2d 773 (1963). "The general purpose of protecting the right of privacy relates to one's private life, not when that life has become a matter of legitimate public interest." *Martin v. Widener Univ. Sch. of Law,* No. 91C-03-255, 1992 Del.Super. LEXIS 267, at \*54 (Del.Super. Ct. June 4, 1992). Thus, "[o]ne who seeks the public eye cannot complain of publicity if the publication does not violate ordinary notions of decency." *Barberi,* 56 Del. at 70, 189 A.2d 773.

**\*7** With those principles in mind, the defendants argue that "a public figure cannot sustain an action for false light invasion of privacy because someone has publicized his public activities." (D.I. 62 at 32.) The court agrees. Although the act of publicly shedding false light on a person's job performance can be deeply offensive and hurtful, there is simply no invasion of *privacy* when the person being criticized is a public figure and the performance being criticized is the very activity that gave rise to the person's public-figure status in the first place. *See Godbehere v. Phoenix Newspapers,* 162 Ariz. 335, 783 P.2d 781, 789 (Ariz.1989) (holding that "a plaintiff cannot sue for false light invasion of privacy if he or she is a public official and the publication relates to performance of his or her public life or duties"). Therefore, the court concludes that allegedly unwarranted criticism of Foraker's performance as the NCOIC at the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 7
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

controversial FTU does not give rise to a cause of
action for false light invasion of privacy.


V. CONCLUSION

For the reasons stated, the court will deny summary
judgment as to Counts I, II, and III. The court will
grant summary judgment as to Count IV.


*ORDER*

IT IS HEREBY ORDERED THAT:
1. The defendants' motion for summary judgment in
the Price case (D.I.80) be DENIED; and
2. The defendants' motion for summary judgment in
the Foraker case (D.I.60) be DENIED as to Counts I,
II, and III, and GRANTED as to Count IV.


D.Del.,2006.
Price v. Chaffinch
Slip Copy, 2006 WL 1313178 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1204468 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Reply in Support of their Motion
in Limine to Limit the Cross Examination of Captain
Glenn Dixon (Mar. 21, 2006) Original Image of this
Document (PDF)
• 2006 WL 1204472 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Reply in Support of their Motion
in Limine to Limit the Cross Examination of Captain
Glenn Dixon (Mar. 21, 2006) Original Image of this
Document (PDF)
• 2006 WL 1204467 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Reply in Support of their Motion
to Strike Select Portions of Defendants' (1) Reply Brief
in Support of their Motion for Summary Judgment and
(2) Accompanying Appendix for Failure to Comply
with Local Rule 7.1.3 and the Federal Rules of C ivil
Procedure (Mar. 20, 2006) Original Image of this
Document (PDF)
• 2006 WL 1204466 (Trial Motion, Memorandum and

Affidavit) Answering Brief in Opposition to Plaintiffs'
Motion to Strike Select Portions of Defendants' Reply
Brief and Appendix (Mar. 10, 2006) Original Image of
this Document (PDF)
• 2006 WL 809118 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Motion in Limine to Preclude
Expert Testimony of Brian P. Sullivan (Feb. 28, 2006)
Original Image of this Document (PDF)
• 2006 WL 809127 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Motion in Limine to Limit the
Cross Examination of Captain Glenn Dixon (Feb. 28,
2006) Original Image of this Document (PDF)
• 2006 WL 809128 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Motion in Limine to Preclude
Expert Testimony of Brian P. Sullivan (Feb. 28, 2006)
Original Image of this Document (PDF)
• 2006 WL 809116 (Trial Motion, Memorandum and
Affidavit) Plaintiff's Motion to Strike Select Portions
of Defendants' (1) Reply Brief in Support of their
Motion for Summary Judgment and (2) Accompanying
Appendix for Failure to Comply with Local Rule 7.1.3
and the Federal Rules of Civil Procedure (Feb. 24,
2006) Original Image of this Document (PDF)
• 2006 WL 809114 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Reply Brief in Support of their
Motion for Summary Judgment on Counts I and II
(Feb. 17, 2006) Original Image of this Document
(PDF)
• 2006 WL 809115 (Trial Motion, Memorandum and
Affidavit) Reply Brief in Support of Defendants'
Motion for Summary Judgment (Feb. 17, 2006)
Original Image of this Document (PDF)
• 2006 WL 809126 (Trial Motion, Memorandum and
Affidavit) Reply Brief in Support of Defendants'
Motion for Summary Judgment (Feb. 17, 2006)
Original Image of this Document (PDF)
• 2006 WL 809112 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Reply in Support of their Motion
to Consolidate the Trial of these Two Cases Pursuant
to Fed.R.Civ.P. 42(a) (Feb. 15, 2006) Original Image
of this Document (PDF)
• 2006 WL 809113 (Trial Motion, Memorandum and
Affidavit) Plaintiff's Reply Brief in Support of their
Motion for Sanctions and other Relief Due to
Defendants' Intentional Destruction of Relevant
Evidence (Feb. 15, 2006) Original Image of this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 8
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

Document (PDF)

• 2006 WL 809124 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion to Consolidate the Trial of these Two Cases Pursuant to Fed.R.Civ.P. 42(a) (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 809125 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Support of their Motion for Sanctions and other Relief Due to Defendants' Intentional Destruction of Relevant Evidence (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 809108 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Sanctions and other Relief (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809109 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiffs' Motion to Consolidate the Trial of These Two Cases Pursuant to Rule 42(a), Fed. R.Civ. P. (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809110 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment on Counts I and II (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809111 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Summary Judgment (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809120 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment on Counts I and II (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809121 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Sanctions and other Relief (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809122 (Trial Motion, Memorandum and Affidavit) Defendants Response to Plaintiffs' Motion to Consolidate the Trial of these Two Cases Pursuant to Rule 42(a), Fed.R.Civ.P. (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809123 (Trial Motion, Memorandum and Affidavit) Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809117 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Jan. 23, 2006) Original Image of this Document (PDF)

• 2005 WL 3666813 (Trial Pleading) Defendants' Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint (Nov. 9, 2005) Original Image of this Document (PDF)

• 2005 WL 3666811 (Trial Pleading) First Amended Complaint%n1%n (Oct. 14, 2005) Original Image of this Document (PDF)

• 2005 WL 3666812 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of the Motion of the Defendants to Bar Certain Communications of Counsel Or, in the Alternative, to Disqualify Counsel (Oct. 14, 2005) Original Image of this Document (PDF)

• 2005 WL 3666815 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of the Motion of the Difendants to Bar Certain Communications of Counsel Or, in the Alternative, to Disqualify Counsel (Oct. 14, 2005) Original Image of this Document (PDF)

• 1:04cv01207 (Docket) (Aug. 30, 2004)

• 1:04cv00956 (Docket) (Aug. 19, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H** Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

David T. SPRINGER, M.D., Plaintiff,

v.

Renata J. HENRY, individually and in her official capacity, and Gregg C. Sylvester, M.D. in his official capacity, Defendants.

**No. 00-885(GMS).**

March 11, 2002.

MEMORANDUM AND ORDER

SLEET, District J.

**\*1** On October 6, 2000, Dr. David Springer filed this complaint against Renata J. Henry and Dr. Gregg Sylvester. Springer was a physician who had been under contract to provide medical services at the Delaware Psychiatric Center ("DPC"). Springer alleges that Henry and Sylvester refused to renew his contract in retaliation for remarks he made concerning the operation of the DPC facility. Springer contends that his termination therefore violated the First Amendment.

Presently before the court are two motions-Springer's Motion for Partial Summary Judgment and the defendants' Motion for Summary Judgment. Springer's motion asserts that his speech was protected under the First Amendment. He further contends that if the court determines that his speech was protected-a question of law-a jury must decide whether his speech caused his termination. Finally, Springer contends that defendant Henry is not entitled to qualified immunity because his First Amendment right was clearly established prior to his termination.

The defendants' motion argues that Springer's speech was not protected because it addressed his personal concerns. Alternatively, the defendants argue that Springer's speech was disruptive. Additionally, the defendants contend that Springer would have been terminated regardless of his speech due to his failure to bid for renewal of his contract. Moreover, the defendants argue that Springer has failed to prove that he has suffered damages as a result of their alleged actions. Finally, the defendants argue that Henry is entitled to qualified immunity because it was not certain that Springer's contract would be renewed, and therefore, his rights were not clearly established.

Upon review of the briefs and the law, the court agrees with Springer that his speech was protected under the First Amendment. Moreover, the undisputed facts establish that his speech was not disruptive. Furthermore, the court agrees with the plaintiff that his right to engage in speech was clearly established at the time he was terminated. Therefore, Ms. Henry is not entitled to qualified immunity. Thus, the court will grant the plaintiff's motion for partial summary judgment on the issues of protected speech and qualified immunity. The court must, therefore, deny the defendants' motions on these issues.

Additionally, the court finds that questions of fact remain as to whether Springer's speech was the motivation behind his termination, whether the circumstances required his termination such that his speech was immaterial, and whether he suffered damages. In light of these genuine issues of material fact, summary judgment is inappropriate on these issues. Thus, the court will deny the defendants' motion in its entirety. The court will now explain the reasons for its decision.

II. FACTS

Dr. David Springer began working for the DPC in 1991.[FN1] The hospital was supervised by the Delaware Department of Health and Social Services ("DDHSS"). More specifically, it was supervised by the DDHSS's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 2
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Division of Alcoholism, Drug Abuse, and Mental Health ("DADAMH"). Renata Henry was the director of the DADAMH.[FN2] Dr. Gregg Sylvester was the Secretary of the DDHSS. From August 1992 to June 2000, Springer was the director of the DPC. In that capacity, he was responsible for training psychiatric residents. He was also a member of the credentials committee responsible for hiring new doctors.

> FN1. In 1991, DPC was known as Delaware State Hospital. Nevertheless, Delaware State Hospital and DPC are the same entity.

> FN2. Although she served as director of DADAMH, Ms. Henry is not a physician.

**\*2** The DPC confronted numerous, serious problems. Several patients had committed suicide. Others had escaped. In December 1999, the federal Healthcare Financing Agency threatened to end DPC's federal funding. Moreover, the Delaware News Journal ran several highly critical articles about the DPC.

On November 23, 1999, Springer wrote a memorandum addressed to the Governor, the DPC Governing Board, and Ms. Henry. Springer's memo addressed at least twenty-three separate topics. However, the memo generally described attempted suicides, security failures (including patient escapes), under-staffing, violations of Medicare regulations (including an alleged failure to properly notify Medicare officials of the correct number of staff on hand), and lack of quality medical care. Springer also mentioned the need to continue the medical residency program. On March 21, 2000, Springer filed a report with the DPC Governing Board which addressed concerns similar to those outlined in his memo. In his report, however, he also alleged fraud and threatened to take his concerns to regulatory agencies.

Like the other doctors at the DPC, Springer was an independent contractor under contract with the DPC. From 1991 to 2000, Springer's contracts specified that the contract term was for one year and could be terminated without cause upon fifteen days notice. The contract terms do not guarantee renewal. Nevertheless, Springer's contract-as well as those of the other DPC physicians-was renewed each year.

In 1996, the Delaware General Assembly amended the Delaware Procurement Act, 29 Del. C. ch. 69, to provide that all contracts for professional services exceeding $50,000 per year must be subject to public bidding. In early 2000, Secretary Sylvester instructed his division directors to comply with the new provisions and require public bidding on professional service contracts. The DPC physicians earned more than $50,000 per year.

After Springer wrote his memo to the Governor, the situation at the DPC workplace became progressively worse. On May 12, 2000, Henry notified Springer that his contract would not be renewed. Springer was told that he would have to submit a bid to maintain his employment. Defendants maintain that all fifteen DPC psychiatrists were required to submit bids. Conversely, Springer maintains that he was the only physician who was made to reapply. Moreover, Springer contends that he was not informed of the bidding procedures until the day before the bids were due.

Springer asserts that the non-renewal of his contract was based on his comments to the Governor. However, DPC offered three other reasons. First, they believed that Springer was insubordinate because he failed to return documents relating to the credentials certification of a physician applicant. Springer asserts that he missed the deadline for returning the materials because he wished to consult his attorney. Second, DPC alleged that Springer improperly kept patient records at home. Springer submits that he never kept originals or copies of patient documents in his home office. Finally, DPC told Springer that he had improperly considered his personal feelings in deciding whether a certain physician applicant should be credentialed. Springer contends that he did not act inappropriately in the decision-making process.

### III. STANDARD OF REVIEW

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*3** Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc.,* 13 F.3d 674, 679 (3d Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.1999). The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence-not mere allegations-for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace,* 101 F.3d 947, 951 (3d Cir.1996) (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F .2d 1224, 1230 (3d Cir.1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson,* 477 U.S. at 249-50.

### IV. DISCUSSION

### A. Springer's Rights under the First Amendment

In order to establish that his First Amendment rights were violated, Springer must demonstrate that his speech was protected. *See Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.1997). He must then establish that his protected speech was a motivating factor behind the alleged retaliation. *See id.* Finally, the burden will then shift to the defendants to demonstrate that the same action would have been

taken if the speech had not occurred. *See id.*

### 1. Springer's Speech was Protected

The Third Circuit has outlined a two-part test to determine whether a public employee's speech is protected. First, the speech must pertain to a matter of public concern. *See Azzaro v. County of Allegheny,* 110 F.3d 968, 976 (3d Cir.1997). Second, the court must balance the government's interest in effective administration against the employee's free speech rights. *See id.* This is commonly referred to as the *Pickering* balancing test. *See Pickering v. Board of Ed. of Tp. High School,* 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

### a. Matters of Public Concern

**\*4** Whether speech addresses a matter of public concern is an issue for the court to decide. *See Waters v. Churchill,* 511 U.S. 661, 668 (1994). To ascertain whether speech addresses a matter of public concern, the court must consider whether the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996) (citations omitted). In making this determination, the court can consider the "content, form, and context of a given statement." *Connick v. Myers,* 461 U.S. 138, 147-48 (1983).

The content of Springer's speech clearly addressed a matter of public concern. Speech may be characterized as a matter of political or social concern if the speech reveals "actual or potential wrongdoing." *See Holder v. City of Allentown,* 987 F.2d 188, 195 (3d Cir.1993). The cases cited by the plaintiff clearly establish that health care issues are matters of public concern when

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

addressed by medical professionals. *See Schneiner v. New York City Health and Hospitals,* 157 F.Supp.2d 487, 495-96 (S.D.N.Y.2001) (finding speech protected where physician wrote to Mayor Giuliani's office regarding problems at municipal hospital); *Kattar v. Three Rivers Area Hospital Auth.,* 52 F.Supp.2d 789, 799 (W.D.Mich.1999) ("In several cases, courts have held that statements by health care providers regarding patient care involved matters of public concern.") (collecting cases).

In the present case, similar to *Schneiner* and *Kattar,* Springer was a health care provider who commented on the state of health care at the DPC facility. All of his statements concerned deficiencies at the facility. Moreover, many of problems Springer addressed involved danger to the lives of patients or the surrounding community (i.e. suicides and escapes). Thus, he raised concerns of a grave nature that would be relevant to the medical community, the community surrounding the DPC facility, the families of DPC patients, and the Delaware taxpayers who financed the operation. The court therefore concludes that the content of Springer's speech addressed issues that would be relevant to many groups of Delaware residents.

The defendants assert that Springer's statements were motivated by his own personal interests and thus did not address a matter of public concern. This allegation is based on the fact that Springer's comments also addressed the medical residency program. The defendants argue that since Springer was in charge of the residency program, only he would benefit from such comments. The court rejects this argument. First, a medical residency program could be beneficial to the DPC even in Springer's absence. Second, and more important, the medical residency program was but one of many points Springer addressed. The record clearly demonstrates that the vast majority of Springer's comments addressed the safety and medical concerns at the DPC. Thus, the court finds that the content of Springer's speech addressed a matter of public concern.

**\*5** The context of Springer's speech also indicates that

he was addressing a matter of public concern. First, his comments were addressed to the Governor, the DPC Governing Board, and Ms. Henry. If Springer merely wanted to raise his personal issues, addressing his comments to Henry alone would have sufficed. The fact that his statements were addressed to public officials, however, indicates that was attempting reach an audience that could provide redress for the serious issues he raised. Furthermore, the federal government had already begun to investigate problems at the DPC long before Springer's statements. Additionally, several News Journal articles had also addressed the issues Springer raised. *See Watters v. City of Philadelphia, 55 F.3d 886, 895 (3d Cir.1995)* (noting that news coverage can be relevant to determining whether speech addresses a matter of public concern.) The involvement of the federal government and the press strongly indicates that the public was interested in the operations of the DPC. Thus, the court finds that the content and context of Springer's speech addressed a matter of public concern.

#### b. Balancing the Government's and Springer's Interests

The only argument the defendants assert on this point is that Springer's comments were disruptive to the DPC's operation. The defendants assert that Springer's comments were intended to be disruptive. The court has reviewed the defendants' recitations of the facts and neither recitation includes facts that would permit the court to reasonably conclude that Springer's comments had any disruptive effect. Indeed, as far as the court can tell, the only fact that the defendants assert in support of this argument is that after agreeing to return the documents regarding the physician applicant, Springer delayed in producing the documents while he consulted his attorney. First, the defendants have failed to adduce facts demonstrating that the delay was disruptive. More important, even if this delay in returning the documents was disruptive, the defendants have failed to show how this disruption was in any way related to Springer's *speech.* Therefore, the court rejects the defendants' argument and concludes that they have not sufficiently demonstrated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

a government interest sufficient to outweigh Springer's First Amendment rights.

### 3. The Remaining Prongs of the Test

The court finds that summary judgment is inappropriate as to whether Springer's termination was motivated by his speech or, similarly, whether he would have been terminated in the absence of the speech. First, the record reveals that any number of factors could have motivated the defendants' decision to terminate Springer's contract. Indeed, the defendants have provided at least three reasons that are unrelated to Springer's comments-his insubordination, keeping documents at home, and improperly considering his personal feelings during the physician applicant process. However, issues of fact surround whether plaintiff was truly insubordinate, whether he kept documents at home, or whether he had a "vendetta" against the physician applicant. Springer denies all of these allegations. Thus, the parties do not agree on the facts concerning these issues. The court cannot decide these issues on the record before it because they all involve credibility determinations. The motivation behind the defendants' decision is, therefore, a question of fact that is more properly addressed to the fact-finder than to the court. Moreover, it is unclear whether the plaintiff would have been terminated if he had not spoken. The defendants' assert that all fifteen psychiatrists were required to bid for their contracts. Conversely, Springer contends that he was the only physician made to bid. Additionally, Springer asserts that he was not notified of the bidding process in a timely fashion. Since the parties disagree on this highly relevant fact, the jury, rather than the court, should decide this matter. The court will, therefore, deny summary judgment on these two prongs.

### 4. Damages

**\*6** The court similarly finds that summary judgment on the issue of damages is inappropriate. Based on

Singer's tax returns for the years 1997 to 2000, the defendants assert that he suffered no economic loss. Conversely, Springer alleges that his 2001 tax return (not mentioned by defendants) proves a significant economic loss. Moreover, Springer states that he can provide expert testimony to prove that he has, indeed, suffered damages. In light of these conflicting factual interpretations, the court finds that there is a genuine issue of material fact on the damages issue. Therefore, the court will also deny defendants' motion on this point.

### B. The Qualified Immunity Issue

Henry is not entitled to qualified immunity. Although state officials may be sued in federal court, their liability may be limited by the doctrine of qualified immunity, which permits officials to avoid liability for actions performed in the course of their official duties. The Supreme Court recently affirmed the two part test for qualified immunity. First, the court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, are sufficient to show that the defendant violated a constitutional right. *See Saucier v. Katz,* 121 S.Ct. 2151, 2155-56 (2001). Second, if a constitutional violation can be demonstrated on the facts alleged, the court must next consider whether the right was clearly established at the time of the alleged violation. *See id.* at 2156. In *Saucier,* the court further clarified that the right must be established in a "particularized" sense, meaning that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See id.* Additionally, the court noted that although the court must decide whether the facts alleged-not proved-by the plaintiff amount to a constitutional violation, even where there may be a material issue of fact, if the law did not put the officer on notice that his conduct was unlawful, summary judgment may be permissible. *See id.* at 2156-57.

The parties here contest only whether Springer's rights were clearly established at the time he was terminated. A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the situation he confronted ." *See id.* at 2156. More specifically, a right is clearly established where case law speaks "with obvious clarity to the specific conduct in question." *United States v. Lanier, 520 U.S. 259, 271 (1997).*

Relevant Supreme Court precedent establishes that "independent government contractors cannot be terminated for exercising their First Amendment rights." *Board of Comm. Wabaunsee v. Umbehr, 518 U.S. 668, 686 (1996). See also O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712, 721 (1996)* (noting same). Thus, the Supreme Court has recognized on at least two occasions that an independent contractor-such as Dr. Springer-- has a constitutional right to free speech. Therefore, it cannot be more clear that this right was clearly established.

**\*7** The defendants assert that this court should be persuaded by *Hauge v. Brandywine School District, 131 F.Supp.2d 573 (D.Del 2001).* In that case, the court held that the right to be free from retaliation was not clearly established because due to the "fact-intensive nature of the *Pickering* balancing test," the officials were not on notice that their conduct violated the First Amendment. *Id.* at 584. The court will not follow *Hauge* for two reasons. First, the court is persuaded by the plaintiff's contention that *Hauge,* although it may have been correctly decided on the record before that court, is unique. Although the *Hauge* court granted qualified immunity based on the fact-intensive balancing required by the *Pickering* test, neither the plaintiff nor the defendants have presented any authority to permit this court to conclude that the *Pickering* balancing test must always lead to a denial of qualified immunity.[FN3] If the court were to accept the defendants' position, qualified immunity could never be denied in First Amendment retaliation cases. This is an extreme result, one the *Hauge* court probably did not intend and one that this court will not sanction.

FN3. Indeed, the *Hauge* court itself cites no authority for this novel proposition.

Second, this case is factually distinguishable from *Hauge.* Hague involved a school district administrator who brought allegations of fraud against the school district. *See id.* at 577-578. This case involves a physician who spoke on the various problems confronting hospital administration. Under facts very similar to those in this case, courts have found that the right to speak was clearly established. *See Schneiner,* 152 F.Supp.2d at 493 ("There is no doubt that the plaintiff [physician's] rights under both the First Amendment and the Fourteenth Amendment [to comment on health care at the hospital] were clearly established at the time the plaintiff was disciplined."). Thus, considering the facts before this court, this court also finds that Springer's right was clearly established at the time he spoke.[FN4]

FN4. The court finds that the defendants' reliance on *Saucier v. Katz, 121 S.Ct. 2151 (2001)* for the proposition that there must be exact congruence between the precedential facts and the facts of the present case is misplaced. First, *Saucier* involves a completely different context-excessive force under the Fourth Amendment. More important, *Saucier* does not require that the facts of each case be identical. The court therefore rejects the defendants' argument on this issue.

Finally, the defendants contend that the plaintiff's right was not clearly established because under the new bidding process, his contract was not certain to be renewed. As Springer notes, however, independent contractors are entitled to First Amendment protection where there is a *preexisting* contractual relationship. *See Umbehr, 518 U.S. at 685* (noting that holding establishing right to First Amendment speech was limited to independent contractors with "preexisting commercial relationship" with government). Springer had been under contract with the DPC since 1991. Thus, it is clear that he had a pre-existing commercial relationship. The court therefore rejects the defendants' argument on this issue.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

For these reasons, the court finds that Ms. Henry is not
entitled to qualified immunity.


## V. CONCLUSION

For all of the foregoing reasons, the court concludes
that Springer's speech was protected. Nevertheless, a
jury must decide whether his protected speech
motivated his termination, whether he would have
been terminated in the absence of the speech, and
whether he suffered damages. Finally, Henry is not
entitled to qualified immunity. Thus, the court will
deny the defendants' motion for summary judgment
and grant Springer's motion for partial summary
judgment.

**\*8** NOW, THEREFORE, IT IS HEREBY ORDERED
that:
1. The Defendants' Motion for Summary Judgment
(D.I.35) is DENIED;
2. The Plaintiff's Motion for Partial Summary
Judgment (D.I.38) is GRANTED.


D.Del.,2002.
Springer v. Henry
Not Reported in F.Supp.2d, 2002 WL 389136 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00885 (Docket) (Oct. 06, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                      Page 1
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

David T. SPRINGER, M.D., Plaintiff,

v.

Renata J. HENRY, individually and, in her official capacity as Director of the Division of Alcoholism, Drug Abuse and Mental Health of the Department of Health and Social Services of the State of Delaware and Gregg C. Sylvester, M.D., in his official capacity as Secretary of the Department of Health and Social Services of the State of Delaware, Defendants.

**No. C.A. 00-885 GMS.**

Sept. 16, 2004.

Thomas S. Neuberger and Stephen J. Neuberger of The Neuberger Firm, P.A., Wilmington, Delaware for the plaintiff.

Phebe S. Young and Marc P. Niedzielski of the Department of Justice, Civil Division, Wilmington, Delaware for the defendant.

*MEMORANDUM OPINION*

SLEET, J.

## I. INTRODUCTION

**\*1** Presently before the court are the parties motions for post-trial relief. Following a four-day jury trial, in which the jury concluded that the defendant, Renata Henry ("Henry"), the director of Delaware's Division of Alcoholism, Drug Abuse and Mental Health, retaliated against the plaintiff, Dr. David T. Springer ("Springer"), for expressions of protected speech, in violation of the First Amendment to the United States Constitution. The plaintiff was awarded damages accordingly. The defendant now challenge the verdict and moves for a new trial. The plaintiff seeks

reinstatement and attorneys' fees, interest, and costs. For the reasons stated below, the court will grant in part the defendants' motion challenging the damages award. The verdict will otherwise stand. The judgment for a new trial will be denied. Likewise, the plaintiff's motion for reinstatement will be denied. The court will grant the plaintiff's motion for fees, interest, and costs based on the adjusted award.

## II. BACKGROUND

### A. Procedural History

The plaintiff Springer filed a complaint on October 6, 2000, seeking compensatory and punitive damages, as well as injunctive relief for "retaliatory violations of the free speech and petition clauses of the First Amendment of the U.S. Constitution." (D.I.1). Springer named Renata Henry, individually and in her official capacity as Director of the Division of Alcoholism, Drug Abuse and Mental Health ("DADAMH") of the Delaware Department of Health and Social Services ("DDHSS"), Dr. Gregg Sylvester, in his official capacity as Secretary of the DDHSS, and the DDHSS as defendants. (D.I.1). In his complaint, Springer requested, among other relief, compensatory damages, punitive damages, attorneys' fees and costs, and reinstatement. (D.I.1). On June 19, 2001, the parties stipulated to dismiss the DDHSS and "all claims for monetary damages against the two individual defendants in their official capacities, if any such claims were implicit in the Complaint." FN1 (D.I.24).

> FN1. Effectively, this dismissed Dr. Sylvester from the action. Since he is no longer Secretary, he has no authority to reinstate Dr. Springer to his former position. As such, the remaining injunctive claim for reinstatement against Sylvester is moot. Thus, in spite of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 2
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the parties use of both the singular and plural tenses when referring to the defendant(s), it seems clear that only one defendant remains in this action-Renata J. Henry.

The defendant Henry moved for summary judgment on November 9, 2001, arguing that Springer's speech was not protected; that, in the alternative, it was disruptive; that his termination was inevitable given his failure to submit a bid; that, regardless, Springer has not suffered any damages; and, finally, that Henry was entitled to qualified immunity.[FN2] (D.I.47). Springer cross-moved for partial summary judgment on November 19, 2001, arguing that his speech was protected under the First Amendment, and that Henry was not entitled to qualified immunity. On March 11, 2002, the court denied Henry's motion for summary judgment and granted Springer's cross-motion for partial summary judgment. (D.I.47). The court concluded that Springer's speech was protected and that Henry was not entitled to qualified immunity. (D.I.47). Specifically, the court identified the memorandum dated November 23, 1999, and a report filed with the Governing Body on March 21, 2000, as protected speech. (D.I.47, pp. 3-4). The issues that remained to be decided by a jury at trial were whether Henry terminated Springer because of his exercise of protected speech, and, whether as a result of his termination, Springer suffered any damages. On March 18, 2002, Henry and Sylvester appealed the Order. However, their appeal was dismissed on November 29, 2002.

> FN2. Dr. Sylvester was part of the Motion for Summary Judgment, however, given the above stipulated dismissal, his involvement is irrelevant to the recitation of facts.

**\*2** The case proceeded to trial on March 29, 2004, and took place over the course of four days. The jury returned a verdict in favor of Springer. He was awarded $998,895 in damages, but was not reinstated to his position at the DPC. (D.I.98). The parties submitted post-trial motions, which the court presently

considers.

### B. Factual Background

### 1. Springer's Contract

Springer began working for the DPC as a part-time independent contractor physician in 1991.[FN3] (B0339).[FN4] He worked under annual contracts that were automatically renewed for nine years until June of 2000. (B0343). From 1991 to 2000, Springer's contracts specified that the contract term was for one year and could be terminated without cause upon fifteen days notice. The contract terms did not guarantee renewal. Nevertheless, until 2000, Springer's contract was renewed each year.

> FN3. In 1991, DPC was known as Delaware State Hospital. Nevertheless, Delaware State Hospital and DPC are the same entity.

> FN4. B followed by a number refer to the pages in the plaintiff's four volume post-trial motions appendix.

In 1991 Springer's billing rate was eighty dollars per hour. At some point it raised to ninety and at the time of his termination, his rate was ninety-three dollars per hour. (B0371). His contracts stated that he would work 30 hours per week for 50 weeks, for a total of 1500 hours per year. (B0341). At ninety three dollars per hour, Springer's annual pay from the DPC was $139,500. (B0340). When he began, his duties included being the Assistant Residency Training Director. In 1993 he was promoted to the position of Residency Training Director. (B0348). In addition, Springer served as a member of the Credentials Committee [FN5] from 1993 to 2000. (B0386). He was also the Chairman of the Medical Staff Executive Committee ("Executive Committee") from 1999 to 2000. (B0387).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

FN5. The Credentials Committee is a committee composed of physicians who conduct peer review of physician performance and the qualifications of physicians who apply for jobs or contracts. (B0386).

2. Events Leading up to Springer's Termination

In 1996, the Delaware General Assembly amended the Delaware Procurement Act, 29 Del. C. ch. 69, to provide that all contracts for professional services exceeding $50,000 per year must be subject to public bidding. (B0830). The provision went unenforced at the DPC until early 2000, when Dr. Sylvester, Secretary of the DDHSS, instructed his division directors to comply with the Act and require public bidding on professional service contracts.

DADAMH, a subdivision of DDHSS, oversaw the administration of the Delaware Psychiatric Center (hereinafter the "DPC" or "hospital"). The defendant Renata Henry was hired as the Director of DADAMH in 1999.FN6 (B0740). Her boss, Dr. Sylvester, began his term as the Secretary of DDHSS in October of 1997 and served in that capacity until January of 2001.FN7 (B0222-0225).

FN6. Although she served as director of DADAMH, Ms. Henry is not a physician.

FN7. He started as Acting Cabinet Secretary of the DDHSS in October 1997, and was sworn in as the official Secretary in January 1998, under Governor Carper. (B0222-225)

On October 21, 1999, the DPC psychiatric residents drafted a memo to then Governor Carper, Dr. Sylvester, Dr. Springer, and other hospital staff, articulating their concerns regarding the egregious conditions of the DPC. (B1154-1157; PX1 FN8). They also sent the memo to the News Journal and the Department of Public Safety. (B1157). In the memo, the residents cited problems such as under-staffing, overcrowding, low morale, poor security, inadequate treatment, and overall unsafe conditions for the staff as

well as the patients. *Id.* The residents expressed a concern that the residency program was suffering as a result. *Id.* The memo received media attention and was the subject of a series of editorials. (B1158).

FN8. PX = Plaintiff Exhibit

**\*3** On November 23, 1999, a number of the DPC Medical Staff Executive Committee officers echoed the residents' attempt to expose the conditions. They drafted a memo entitled "Critical Issues in the Care of the Mentally Ill in Delaware." (B1158; PX7). Springer was the President of the Committee at the time the letter was drafted. The memo was addressed to the Governor, the DPC Governing Board, and Henry. (B1158). The memo generally reiterated many of the same concerns expressed by the residents, in particular, the decline of the residency program. The executive Committee invited the DPC Governing Body to schedule a series of emergency meetings with it to discuss hiring teaching psychiatrists to save the residency program. (B1158-59). In a prior ruling, the court already determined that this memo constituted speech protected under the First Amendment. (D .I. 47).

On December 2, 1999, a number of Executive Committee Officers, including Springer, drafted another memo addressed "To Whom It May Concern." (B1160). The memo expressed the Executive Committee's frustration with the lack of initiative on the administration's part to remedy the issues previously raised. (B1160). The signatories proposed a list of actions that "may begin us on the road to protecting and preserving patient care and safety." (B1160). On December 16, 1999, Springer individually addressed the DPC Governing Body Members in a memo entitled "Proposed Agenda for December 22, 1999 Governing Body Meeting." (B1162). In this memo, on behalf of the medical staff, Springer outlined a proposed plan of action. (B1162-63).

At some point following the initial memo by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

residents, the Delaware News Journal ran several highly critical articles about the DPC. In December 1999, the federal Healthcare Financing Administration (FHA) threatened to withdraw 6.5 to 7 million dollars in federal funding to the DPC. (B0234-37; B0297). Given the growing notoriety of the conditions at the hospital and the threat from the FHA to withdraw funding, Henry felt pressured to effect immediate improvements. (B0747-48; B0268). In response to the pressure, she requested temporary credentialing for a particular physician applicant. At trial, she testified that the DPC needed the physician applicant in order to meet the federal requirements concerning the ratio of psychiatrists to patients. (B0747). At first, Springer objected to credentialing the physician applicant. Henry was frustrated with Springer because she felt he was obstructing the credentialing process. (B0274; B0301).

On January 7, 2000, Springer was approached by Mr. Giarow Shimono ("Shimono"), the hospital director at the time, about credentialing the physician applicant on an emergency basis. (B0431). Springer told Shimono about his concerns regarding the physician applicant. Springer testified that Shimono wanted to put the physician applicant on duty anyway. Springer had no authority himself to issue emergency credentials. (B0432-33). Springer informed Shimono that he had documents to support his concerns about the physician applicant. (B0434; B0438). He kept the documents at his home office. (B0435). The documents, drafted in 1997, included an email to "Dr. Smoyer or the credentials committee," a memo addressed to the credentials committee, and "one was just a memo to [Springer's] own file." (B0435). Henry asked Springer to produce the documents. (B0435). In response, Springer wrote a letter to Henry dated January 7, 2000, advising her to consult with an attorney about whether Springer was permitted to disseminate the "peer review material." (B0436-37). As it turned out, the Attorney General's office concluded that Henry was allowed to view the materials. (B0438). Springer accordingly produced them. (B0438).

*4 On January 26, 2000, Springer drafted a report in preparation for a meeting with the Governing Body scheduled for January 29, 2000. (B1164-74). He did not, however, present the report until March 21, 2000. (B1152; B1164-74). In the report, Springer alleged that the tension between the administrators and the medical staff was causing physicians to practice below their "minimal ethical standards." He threatened to notify regulatory agencies of the conditions in order for them "to intervene and demand improvements." (B1164). As well, he accused the administration of granting temporary privileges to a psychiatrist in violation of medical staff bylaws. (B1165). He said the administration's action was prompted by an unannounced site visit from Medicare. (B1165). The court determined by way of summary judgment that this memo constituted speech protected under the First Amendment. (D.I.47).

The Credentialing Committee met twice with regard to this particular applicant, on April 27 and May 2, 2000. *Id.* At the first meeting on April 27, three members of the Credentialing Committee voted to grant partial privileges to the physician applicant, two members, including Springer, voted not to grant privileges. (B0408-10). On May 2, 2000, the Executive Committee met to consider the recommendation of the Credentialing Committee. (B0405-06). The Executive Committee elected to grant the physician applicant partial privileges. (B0413). Springer testified that Henry refused to sign the physician applicant's credentialing unless he was given full unrestricted privileges. (B0413).

On May 12, 2000, Henry sent Springer a letter informing him that his contract with DADAMH would not be renewed. (B1175). The letter indicated that DADAMH would be publishing requests for proposals and invited Springer to respond. (B1175). Springer testified that he did not receive the letter until May 15, 2000. (B0424). The deadline to submit a proposal was May 17, 2000. (B1176). The request for proposals had been public since April 10, 2000, and the deadline to ask questions about the bid was April 19, 2000, by 4:30 p.m. (B0429; B0774). Springer was only on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

notice of the request as of his receipt of Henry's letter on May 15. (B0424). Springer asked Melody Lasana, DADAMH's Contract Manager, for an extension of the deadline. (B1176). His request was denied. (B1176).

### 3. Post-Termination

Springer asserts that the non-renewal of his contract was based on his comments to the Governor. Henry testified that the reason Springer was not automatically renewed was because "not only were we under the gun at the hospital, but we also had just had a series of rulings in reference to how the department was doing contracts and indicating that we were out of compliance as we continued to renew, renew, renew, renew year after year without putting things out to bid. And this was department-wide as well as in the division that I stepped in to run." BO816. She stated that she was unable to ask all of the independent contractor physicians to rebid in a single year. She testified that she chose Springer because to her knowledge there were no other physicians that had been there as long as he had without ever having been asked to rebid. (B0817).

**\*5** Springer alleges that he suffered losses as a result of his termination and has been unable to find employment comparable to the work he did as Residency Training Director. Accordingly, he filed the present action against the defendant on October 6, 2000. (D.I.1).

At the conclusion of the trial, the jury returned the following verdict. When asked if Springer proved by a preponderance of the evidence whether his protected activity was a substantial or motivating factor in the decision not to renew his contract, the jury answered, "Yes." (B1585). In particular, the jury found that plaintiff's exhibits two through five were the instances of protected activity that motivated the decision not to renew his contract. (B1586). Exhibits two and five were Springer's memorandum dated November 23, 1999, and the report he prepared in preparation for the meeting with the Governing Body on March 21, 2000.

Exhibits one, three, and four were, respectively, a memo from the DPC resident physicians dated October 21, 1999, a memo drafted by the Executive Committee, of which Springer was a signatory, dated December 2, 1999, and a memo from Springer to the Governing Body dated December 16, 1999.

When asked if Henry proved by a preponderance of the evidence that "regardless of [Springer's] exercise of his First Amendment rights, that she would not or could not have renewed his contract in July 2000," the jury answered, "No." *Id.* When asked if Springer suffered any actual injury from not being offered a new contract, the jury answered, "Yes." (B1587). The jury found Springer suffered damages in the amount of $285,464 up to present, and $588,431 into the future. *Id.* The jury also found that Springer suffered $100,000 in non-economic damages. *Id.* Finally, when asked if the defendant acted recklessly, intentionally or maliciously with regard to Springer, the jury answered, "Yes." (B1589; D.I. 92). Accordingly, the jury awarded Springer $25,000 in punitive damages. The court entered the Judgment on April 5, 2004, "for damages plaintiff suffered which were proximately caused by not being offered a new contract ... in the amount of [$285,464]; [$588,431] for future damages; and finding in favor of plaintiff for non-economic damages in the amount of [$100,000]; and on the additional verdict form awarding plaintiff punitive damages in the amount of [$25,000]." The parties filed post-trial motions which the court now considers.

### III. STANDARD OF REVIEW

#### A. Renewed Motion for Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50, a court may render judgment as a matter of law (JMOL) after the moving party is fully heard on an issue at trial, if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir.1993) (citation omitted). If the court denies a

motion for JMOL during trial, the motion may be renewed within ten days of entry of judgment in the case. Fed. R. Civ. P. 50(b). To prevail on a renewed motion for JMOL following a jury trial, a party " 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings.' " *Pannu v. Iolab Corp.,* 155 F.3d 1344, 1348 (Fed.Cir.1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed.Cir.1984)). " 'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp.,* 732 F.2d. at 893. In assessing the sufficiency of the evidence, the court must draw all reasonable inferences from the evidence in the light most favorable to the non-moving party. *Id.; Richardson-Vicks Inc. v. UpJohn Co.,* 122 F.3d 1476, 1479 (Fed.Cir.1997). The appropriate inquiry is whether a reasonable jury, given the facts before it, could have arrived at the conclusion it did. *Dawn Equip. Co. v. Kentucky Farms, Inc.,* 140 F.3d 1009, 1014 (Fed.Cir.1998). The court may not determine the credibility of the witnesses nor "substitute his choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp.,* 732 F.2d at 893.

### B. Motion for a New Trial

**\*6** The court may grant a new trial pursuant to Federal Rule of Civil Procedure 59 "for any of the reasons for which new trials have heretofore been granted in actions of law in the courts of the United States." Fed. R. Civ. P. 59(a). A court should grant a new trial in a jury case, however, only if "the verdict was against the weight of the evidence ... [and] a miscarriage of justice would result if the verdict were to stand." *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1352 (3d Cir.1991). In making this determination, the trial judge should consider the overall setting of the trial, the character of the evidence, and the complexity or simplicity of the legal principles which the jury had to

apply to the facts. *Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 89 (3d Cir.), *cert. denied,* 364 U.S. 835 (1960).

### IV. DISCUSSION

### A. HENRY'S MOTIONS

The defendant argues that she is entitled to judgment as a matter of law under Rule 50 on the issue of qualified immunity, on damages, and on the plaintiff's substantive claim of retaliation. In the alternative, the defendant argues that she should be granted a new trial under Rule 59 because she was denied a fair trial. She bases this claim on the following alleged errors: (1) that the court failed to make essential rulings of law on the protected nature of Dr. Springer's communications and on the existence of qualified immunity, and to charge the jury in accordance therewith; (2) that the court excluded critical evidence; and (3) that the plaintiff's counsel's made racially inflammatory comments during his rebuttal.

#### 1. Henry's Motion for Judgment as a Matter of Law

##### a. Whether Henry is entitled to qualified immunity

As noted in the plaintiff's opposition brief, the court already ruled that Henry was not entitled to qualified immunity as a matter of law. (D.I. 47, Memorandum and Order ("the court finds that Ms. Henry is not entitled to qualified immunity")). As such, the court construes defendant's motion as an untimely motion for reconsideration of its previous summary judgment ruling.

As a general rule, motions for reconsideration should be granted only "sparingly." *Karr v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Shering Corp. v. Amgen, Inc.,* 25 F.Supp.2d 293, 295 (D.Del.1998); *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990) (citing *Above the Belt, Inc. v. Mel Bonhannan Roofing, Inc.,* 99 F.R.D. 99 (E.D.Va.1983)); *see also Karr,* 768 F.Supp. at 1090 (citing same). Moreover, even if the court has committed one of these errors, there is no need to grant a motion for reconsideration if it would not alter the court's initial decision. *See Pirelli Cable Corp. v. Ciena Corp.,* 988 F.Supp. 424, 455 (D.Del.1998). Finally, motions for reconsideration "should not be used to rehash arguments already briefed." *TI Group Automotive Systems, (North America), Inc. v. VDO North America L.L.C.,* 2002 U.S. Dist. LEXIS 1018, 2002 WL 87472 (D.Del.2002) (citation omitted); *see also Quaker Alloy Casting v. Gulfco Industries, Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988) ("This Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."). The defendant is merely rehashing exhausted arguments. No additional evidence was introduced at trial to change the court's understanding of the issue. Henry is not entitled to qualified immunity for the reasons stated in the court's Memorandum and Order dated March 11, 2002.[FN9]

> [FN9.] The court stated:
> Henry is not entitled to qualified immunity. Although state officials may be sued in federal court, their liability may be limited by the doctrine of qualified immunity, which permits officials to avoid liability for actions performed in the course of their official duties. The Supreme Court recently affirmed the two part test for qualified immunity. First, the court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, are sufficient to show that the defendant violated a constitutional right. *See Saucier v. Katz,* 121 S.Ct. 2151, 2155-56 (2001). Second, if a constitutional violation can be demonstrated on the facts alleged, the court must next consider whether the right

was clearly established at the time of the alleged violation. *See id.* at 2156. In *Saucier,* the court further clarified that the right must be established in a "particularized" sense, meaning that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See id.* Additionally, the court noted that although the court must decide whether the facts alleged-not proved-by the plaintiff amount to a constitutional violation, even where there may be a material issue of fact, if the law did not put the officer on notice that his conduct was unlawful, summary judgment may be permissible. *See id.* at 2156-57.

The parties here contest only whether Springer's rights were clearly established at the time he was terminated. A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ." *See id.* at 2156. More specifically, a right is clearly established where case law speaks "with obvious clarity to the specific conduct in question." *United States v. Lanier,* 520 U.S. 259, 271 (1997).

Relevant Supreme Court precedent establishes that "independent government contractors cannot be terminated for exercising their First Amendment rights." *Board of Comm. Wabaunsee v. Umbehr,* 518 U.S. 668, 686 (1996). *See also O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 721 (1996) (noting same). Thus, the Supreme Court has recognized on at least two occasions that an independent contractor-such as Dr. Springer-has a constitutional right to free speech. Therefore, it cannot be more clear that this right was clearly established.

The defendant assert that this court should be persuaded by *Hauge v. Brandywine School District,* 131 F.Supp.2d 573 (D.Del 2001). In that case, the court held that the right to be free from retaliation was not clearly

established because due to the "fact-intensive nature of the *Pickering* balancing test," the officials were not on notice that their conduct violated the First Amendment. *Id.* at 584. The court will not follow *Hauge* for two reasons. First, the court is persuaded by the plaintiff's contention that *Hauge,* although it may have been correctly decided on the record before that court, is unique. Although the *Hauge* court granted qualified immunity based on the fact-intensive balancing required by the *Pickering* test, neither the plaintiff nor the defendant have presented any authority to permit this court to conclude that the *Pickering* balancing test must always lead to a denial of qualified immunity. If the court were to accept the defendant' position, qualified immunity could never be denied in First Amendment retaliation cases. This is an extreme result, one the *Hauge* court probably did not intend and one that this court will not sanction.

Second, this case is factually distinguishable from *Hauge.* Hauge involved a school district administrator who brought allegations of fraud against the school district. *See id.* at 577-578. This case involves a physician who spoke on the various problems confronting hospital administration. Under facts very similar to those in this case, courts have found that the right to speak was clearly established. *See Schneiner,* 152 F.Supp.2d at 493 ("There is no doubt that the plaintiff [physician's] rights under both the First Amendment and the Fourteenth Amendment [to comment on health care at the hospital] were clearly established at the time the plaintiff was disciplined."). Thus, considering the facts before this court, this court also finds that Springer's right was clearly established at the time he spoke.

Finally, the defendant contend that the plaintiff's right was not clearly established because under the new bidding process, his contract was not certain to be renewed. As Springer notes, however, independent contractors are entitled to First Amendment protection where there is a *pre-existing* contractual relationship. *See* Umbehr, 518 U.S. at 685 (noting that holding establishing right to First Amendment speech was limited to independent contractors with "preexisting commercial relationship" with government). Springer had been under contract with the DPC since 1991. Thus, it is clear that he had a pre-existing commercial relationship. The court therefore rejects the defendant' argument on this issue.

For these reasons, the court finds that Ms. Henry is not entitled to qualified immunity. D.I. 47, pp. 11-13.

**\*7** Therefore, the court concludes that there is no reason to disturb the verdict on the basis that Henry was entitled to qualified immunity.

### b. Whether Springer suffered any damages

Henry argues that Springer is not entitled to any damages, be they economic damages for past economic loss to date of trial and/or projected future losses, general damages for harm to reputation, and/or punitive damages.

### I. Economic damages

The jury awarded Springer economic damages to compensate Springer for past and future economic losses. Defendant argues that Springer is not entitled to economic damages for two reasons. First, she asserts that it was incorrect to assume that Springer's contract would have been renewed until his projected retirement date. Second, Henry argues that Dr. Andrisani's testimony alone was insufficient to support the award. (D.I.126, pp. 19-20). She contends that the "sole evidence in support of plaintiff's claim for economic damages was the opinion testimony of John Andrisani, Ph.D." (D.I.126, p. 19).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Whether Springer's contract would have been renewed but for his memos was a question of fact properly before the jury. The court cannot conclude that the evidence was insufficient to support a finding that the DPC would have continued its practice of automatically renewing Springer's contract had he not drafted and disseminated the controversial memos.

Likewise, the court cannot conclude that Dr. Andrisani's testimony was insufficient to support the jury's award of economic damages. The only evidence the defendant presented to contradict Dr. Andrisani's testimony was their own expert, Dr. Link. The issue came down to a battle of experts. It is within the province of the jury to determine which expert is more credible. *See Lansdale v. Philadelphia Electric Co., 692 F.2d 307, 313 (3d Cir.1982)* ("The battle of the experts was waged in the trial court before the jury. The jury resolved the factual dispute. What Lansdale lost, fairly and squarely, at the hands of a jury cannot be retrieved by converting a factual controversy into an issue of law. *Id."* ). Upon review of the experts' testimony, the court concludes there was sufficient evidence to believe Dr. Andrisani's calculation of loss.[FN10]

> **FN10.** Henry raises no challenge to the qualifications of Springer's expert or the methodology that he employed in calculating the plaintiff's damages. Moreover, the court could discern no colorable issue in this regard.

### ii. General damages

The jury awarded Springer non-economic damages in the amount of $100,000 for harm to his reputation. Henry contends that there is no evidence in the record to support a finding of harm to Springer's reputation.

The court agrees with the defendant that a reasonable jury could not have concluded based on the evidence in the record that Springer has suffered any loss to his reputation. Springer cites to the fact that Henry discussed her frustrations regarding Springer's conduct

with Dr. Sylvester, a preeminent physician in the community, as the cause of the damage to his reputation. However, at trial, Dr. Sylvester testified that he had no reason to doubt that Springer is "committed to quality healthcare for patients" and that he is a "skilled clinician." (B0237). Even drawing all reasonable inferences from the evidence in a light most favorable to the plaintiff, a reasonable jury could not have arrived at the conclusion that Springer's reputation suffered.

### iii. Punitive damages

**\*8** The jury awarded Springer $25,000 in punitive damages. Henry contends that the record is insufficient to support a punitive award. Although the court may not have reached the same decision had this been a bench trial, it is not in a position to "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp., 732 F.2d at 893.* Therefore, the punitive award will stand.

Punitive damages are appropriate when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade, 461 U.S. 30, 56 (1983).* The record contains evidence to support a finding that Henry acted with, if not evil intent, then reckless indifference to Springer's federally protected rights. The trial record contains evidence that Henry was upset about Springer's memos. She felt that they preached "blatant mistruths." (B0746). Despite the pressure she was under to enforce the bidding process, Springer was the only independent contractor psychiatrist asked to submit a proposal that year. The timing of the non-renewal of his contract could be viewed as suspect given that it occurred in relatively close proximity to the drafting of his controversial memoranda. As well, Henry notified Springer only five days, at best, before the proposal deadline despite the fact that the position had been advertised for over a month. Springer testified he received her letter only two days before the proposal deadline. As such, the court will not upset the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 10
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

punitive award. A reasonable jury could have concluded that Henry was motivated by evil intent or reckless indifference.

In conclusion, the court reduces the damages award by $100,000. There is insufficient evidence in the record for a reasonable jury to conclude that Springer's reputation has been damaged. The remaining damages, economic and punitive, are preserved.

### c. Whether, as a matter of law, the evidence is sufficient to support a finding of retaliation

In order to establish that his contract was not renewed in retaliation for exercising his First Amendment rights, Springer first had to demonstrate that his speech was protected. *See Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.1997). Next, he had to establish that his protected speech was a substantial or motivating factor behind the alleged retaliation. *See id.* Finally, if Springer established these two elements, the burden would then shift to the defendant to demonstrate that the same action would have been taken if the speech had not occurred. *Id.; see also Carter v. Del. State Univ.,* 2002 U.S. Dist. LEXIS 4721, at *5 (D.Del. Mar. 21, 2002).

Here, the court decided as a matter of law that Springer's memorandum dated November 23, 1999, and the report he prepared in preparation for the meeting with the Governing Body on March 1, 2000, constituted protected speech. (D.I.47). The jury determined that those materials, as well as the memo from the Executive Committee dated December 2, 1999, and the memo from Springer to the Governing Body outlining a proposed agenda for a future meeting dated December 16, 1999, constituted instances of protected activity that were a substantial or motivating factor in the decision to not renew Springer's contract. (B1585; D.I. 90). The jury also found that Henry failed to prove that regardless of Springer's protected speech, she would not or could not have renewed Springer's contract.

**\*9** Henry argues that "[p]laintiff's entire case regarding the substantive claim of First Amendment retaliation is based on the temporal relationship between his protected writings ... and Renata Henry's May 12, 2000 courtesy letter." (D.I.126, p. 22). She contends that the temporal relationship is not close enough according to the Supreme Court. *Id.* (citing *Clark County Sch. Dist. V. Breeden,* 532 U.S. 268 (2001)).

The court rejects this argument because, viewing the record as a whole, there was evidence other than the proximity in time of Springer's speech and Henry's non-renewal letter to suggest that the protected writings were the substantial and/or motivating factor in Henry's decision not to renew Springer's contract. The record indicates that Henry felt that Springer's conduct was insubordinate and disruptive. She felt he was obstructive to the credentialing process. This evidence viewed in conjunction with the temporal element, is substantial enough for a reasonable jury to conclude that Springer's protected speech was a motivating factor in Henry's decision not to renew his contract. As well, a reasonable jury could have concluded that Henry failed to prove that she would not or could not have renewed Springer's contract regardless of his exercise of protected speech.

### 2. Henry's Motion for a New Trial or, in the Alternative, Motion to Amend the Judgment or Other Relief

As stated above, a new trial may be granted where "the verdict is contrary to the great weight of the evidence." *Roebuck v. Drexel Univ.,* 852 F.2d 715, 735 (3d Cir.1988). For the reasons that follow, the court concludes that Henry is not entitled to a new trial.

### a. Whether the court failed to make required findings on the protected nature of Springer's communications and on the existence of qualified immunity, and thus failed to properly charge the jury on these issues; and, whether the court erred in refusing to permit Henry to testify about her belief as

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

to the falsity of Springer's statements and in excluding other critical evidence

(I) The protected nature of Springer's communications

With regard to plaintiff's exhibits two and five, at the pre-trial stage of the case, the court determined as a matter of law that these memoranda constituted protected speech. The court will not revisit this issue. As discussed above in relation to the Henry's motion for renewed judgment as a matter of law on whether she is entitled to qualified immunity, no additional evidence was presented at trial that would alter the court's prior ruling. In addition to those two exhibits, the defendant objects to the characterization of plaintiff's exhibits numbers one, three, and four as protected speech as reflected in the jury verdict form. Henry also argues that the court's failure to instruct the jury on which portions of the documents were protected is cause for a new trial.

Exhibits one, three, and four were, respectively, a memo from the DPC resident physicians dated October 21, 1999, a memo drafted by the Executive Committee, of which Springer was a signatory, dated December 2, 1999, and a memo from Springer to the Governing Body dated December 16, 1999. Even if the court were to determine that these exhibits did not constitute protected speech, the error is harmless.

**\*10** The Third Circuit has outlined a two-part test to determine whether a public employee's speech is protected. First, the speech must pertain to a matter of public concern. *See Azzaro v. County of Allegheny,* 110 F.3d 968, 976 (3d Cir.1997). Second, the court must balance the government's interest in effective administration against the employee's free speech rights. *See id.* This is commonly referred to as the *Pickering* balancing test. *See Pickering v. Board of Ed. of Tp. High School,* 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the

State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

Whether speech addresses a matter of public concern is an issue for the court to decide. *See Waters v. Churchill,* 511 U.S. 661, 668 (1994). To ascertain whether speech addresses a matter of public concern, the court must consider whether the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996) (citations omitted). In making this determination, the court can consider the "content, form, and context of a given statement." *Connick v. Myers,* 461 U.S. 138, 147-48 (1983).

It is a fair statement that the jury verdict form suggested to the jury that all of plaintiff's exhibits one through five were instances of protected activity under the First Amendment. *See* Jury Verdict Form, ¶ 1 (asking "Do you find that plaintiff has proven by a preponderance of the evidence that his protected activity under the First Amendment *reflected in Plaintiff's Exhibits 1, 2, 3, 4, and 5* was a substantial or motivating factor in the decision to not renew or offer [plaintiff] a new contract?" (emphasis added). The jury concluded that the memo drafted by the residents dated October 21, 1999, was not an instance of protected activity that was a substantial or motivating factor in the decision to not renew Springer's contract, therefore, its appearance in the jury verdict form is immaterial to the present motion. (B1586, D.I.90). To the contrary, the jury concluded that exhibits two through five were protected speech that was a substantial and motivating factor.

Exhibits two and five are discussed above. Exhibits three and four involve the following. On December 2, 1999, a number of Executive Committee Officers, including Springer, drafted a memo addressed "To Whom It May Concern." (B1160). The memo expressed the Executive Committee's frustration with the lack of initiative on the administration's part to remedy the issues previously raised. (B1160). The signatories proposed a list of actions that "may begin

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 12
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

us on the road to protecting and preserving patient care and safety." (B1160). On December 16, 1999, Springer individually addressed the DPC Governing Body Members in a memo entitled "Proposed Agenda for December 22, 1999 Governing Body Meeting." (B1162). In this memo, on behalf of the medical staff, Springer outlined a proposed plan of action. (B1162-63).

**\*11** The content of Springer's speech in plaintiff's exhibits three and four clearly addressed a matter of public concern. Speech may be characterized as a matter of political or social concern if the speech reveals "actual or potential wrongdoing." *See Holder v. City of Allentown,* 987 F.2d 188, 195 (3d Cir.1993). Health care issues are matters of public concern when addressed by medical professionals. *See Schneiner v. New York City Health and Hospitals,* 157 F.Supp.2d 487, 495-96 (S.D.N.Y.2001) (finding speech protected where physician wrote to Mayor Giuliani's office regarding problems at municipal hospital); *Kattar v. Three Rivers Area Hospital Auth.,* 52 F.Supp.2d 789, 799 (W.D.Mich.1999) ("In several cases, courts have held that statements by health care providers regarding patient care involved matters of public concern.") (collecting cases).

Springer was a health care provider who commented on the state of health care at the DPC facility. All of his statements concerned perceived deficiencies at the facility. Moreover, many of problems Springer, along with other members of the Executive Board, addressed involved danger to the lives of patients or the surrounding community (i.e. suicides and escapes). Thus, he raised concerns of a grave nature that would be relevant to the medical community, the community surrounding the DPC facility, the families of DPC patients, and the Delaware taxpayers who financed the operation. The court therefore concludes that the content of plaintiff's exhibits three and four addressed issues that would be of concern to many groups of Delaware residents.

Henry has asserted in prior communications with the court that Springer's comments were disruptive to the

DPC's operation and that Springer intended them to be disruptive. Indeed, plaintiff's exhibits three and four contain proposed solutions to the existing problems at the DPC. Therefore, the court is hard-pressed to believe that Springer intended to aggravate the conditions at the hospital. It is apparent that he was motivated by a desire to improve conditions at the DPC and was frustrated that, in his view, he was encountering resistance. Upon review of the record, there is no evidence that would permit the court to reasonably conclude that Springer's comments had any disruptive effect.

Consistent with the court's prior rulings, exhibits three and four were appropriately presented to the jury as instances of protected activity. Therefore, the court will not grant the defendant a new trial on this ground.

(ii) Qualified immunity

Again, in their motion for a new trial, Henry challenges the courts determination that she was not entitled to qualified immunity. Henry contends that given her allegations that Springer's memos contained falsehoods, the court should reconsider whether she reasonably failed to recognize the protected nature of Springer's speech. Alternatively, Henry argues, the court should have permitted her to testify about her belief that the memos contained untruths and instructed the jury on this point.

**\*12** In fact, the court did permit Henry to testify that she felt that some of Springer's statements were lies. However, the court did not permit the defense to present evidence as to the substance of the particular statements. Such testimony was irrelevant to the issues on trial. Regardless, although Henry testified that she felt that parts of the memos were not true, she also stated that "there are some parts ... I was not upset about because it was clear that they were known." B0745. As such, the jury was free to conclude that the memos were at least in part accurate, undisputed accounts of the conditions at the DPC. Furthermore, given Henry's testimony, even if the court were to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 13

reconsider its prior ruling on qualified immunity with the defendant's present arguments in mind, the outcome would not change. Certainly, Henry should have understood that by taking the actions which have been previously discussed, in light of Springer's memos, she was violating his clearly established right to free speech.

Henry also argues that certain rulings by the court impeded her ability to present evidence on whether Springer's speech obstructed DPC policy implementation and whether she could have reasonably believed under the circumstances that Springer was not exercising a clearly established right. Again, these issues were briefed and decided at the pre-trial stage of the proceedings. They will not be revisited at this time.

Henry also seeks to overturn the court's exclusion of proposed defense exhibits four, three, and six. Whereas, exhibit four was a compilation of sixteen letters terminating employment relationships with people unrelated to Springer or this case, the court concluded they were irrelevant. Whereas, proposed exhibits three and six were deemed to be settlement proposals, demand letters, and/or products of compromise negotiations, the court excluded them pursuant to Federal Rule of Evidence 408. (D.I.81).

The court has already addressed these arguments and affirms its evidentiary rulings related to these issues. Accordingly, Henry's motion for a new trial on the basis of her challenge to the court's evidentiary rulings as discussed above is denied.

#### b. Whether Springer's counsel's remarks during closing argument were racially inflammatory and require a new trial

Preliminarily, it should be noted that Henry is an African-American female and Springer is a white male. This fact would have been evident to all those who viewed the parties during the trial proceedings, including the jury. It should also be noted that race was never raised as an issue in this case by either party.

During closing arguments, plaintiff's counsel made a number of remarks that defendant' allege were racially inflammatory. For example, plaintiff's counsel repeatedly analogized the defendant' defense to an octopus emitting "black ink." Furthermore, plaintiff's counsel referred to his client as a forty-five year old white male. In his brief, plaintiff's counsel submits that the "black ink" analogy is a common theme. He cites to several cases in which it has been used.

**\*13** The court agrees with the defendant that plaintiff's counsel's choice of analogies and language was notable given the respective races of the parties. However, the court cannot conclude that counsel's remarks affected the jury's impartiality and, thereby, provoked a verdict in Springer's favor. The court is satisfied that the octopus and black ink analogy is common enough and did not likely confuse the issues for the jury. The court also concludes that counsel's remark that his client is a forty-five-year-old white male was innocuous when considered in the context in which it was uttered. Counsel was discussing the experts' testimony regarding the probability that Springer would maintain sixty-hour work weeks in the future. (B0980). Counsel may have been making a statistical reference, *i.e.,* the statistical probability that a forty-five year old white male would continue to work a sixty-hour week until the age of retirement. Although, given the context of the remark and the manner of its delivery, it is not unreasonable for the defendant to question whether counsel was attempting to appeal to some perceived or hoped for bigotry on the jury, and although the court agrees that counsel's choice of language was unfortunate, in light of the overall setting of the trial and the character of the evidence the court cannot conclude that the verdict was against the weight of the evidence. It would not be a miscarriage of justice to let the verdict stand. *Williamson,* 926 F.2d at 1352.

#### B. SPRINGER'S MOTIONS

#### 1. Springer's Motion for Reinstatement to the Position of Residency Training Director at the Delaware Psychiatric Center

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 14
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Springer moves for an injunction ordering his
reinstatement to the position of Residency Training
Director at the DPC. Reinstatement is not a feasible
remedy in a case in which the desired position is no
longer available at the time of judgment. *Max v.
Sinclair Int'l, 766 F.2d 788, 796 (3d Cir.1985), cert.
denied, 474 U.S. 1057 (1986).* For the following
reasons, the court denies Springer's motion.

Springer was hired by the DPC as an independent
contractor physician. None of his contracts delegated
to him the position of Residency Training Director.
While employed at the DPC, one of his duties involved
serving as the Residency Training Director. Although
Springer served in that capacity from 1993 up until his
termination, the record is completely devoid of
evidence that he would have continued in that capacity
had his contract been renewed. In fact, the evidence
infers the opposite conclusion. The evidence calls into
doubt the continuing vitality of the residency training
program altogether. The evidence also indicates that
since the former Medical Director left, the residency
program has been completely revamped. (B0760-763).
Thus, it is quite probable that Springer's participation
in the program would have been entirely redefined if
he were even to have remained involved. Plaintiff's
counsel acknowledged as much in a sidebar
conference. When questioned by the court as to why he
was proceeding with what appeared to be an irrelevant
line of questioning, he responded:
**\*14** MR. T. NEUBERGER: I am seeking
reinstatement. I know I am going to have this problem.
I thought [the present Residency Training Director]
was Dr. Rosenbaum. He is an innocent third party. I
am trying to build up a record as far as who is in the
position. And we would have to address it posttrial
briefing, whether or not you would bump him. Now I
have been totally surprised and told there is somebody
else in the position as well as they have had a
reorganization. I am floundering around a little bit, in
all honesty, trying to figure out how that affects the
injunctive issues in my case.... Just for the sake of the
record, I think what has happened here is that it's too

late in the day for me to be challenging the bona fides
of a reorganization. And I will just probably leave the
record as is in my case, and may just in the end fail on
reinstatement and it's just an issue of what money
damages are. We will just have to see.

(B0763-764).

In essence, Springer is asking the court to draft a
provision into his hypothetical future contracts that
never before existed. As such, the court denies
Springer's motion for reinstatement.

2. Springer's Motion for Attorneys' Fees, Interest,
and Costs

Springer asks for attorneys fees in the amount of
$224,972.50 plus $27,748 for time expended on
post-trial motions. He asks for costs and expenses in
the amount of $6,988.59. He also seeks an award of
attorneys' fees for the services of a contract attorney in
the amount of $25,000. Finally, he seeks an award of
post-judgment interest on those amounts from the date
of the jury verdict on April 1, 2004, and an award of
pre-judgment interest on the liquidated and
unliquidated damages award between July 1, 2000 and
April 1, 2004.

a. Attorneys' fees

Springer moves for attorneys' fees, interest, and costs
pursuant to 42 U.S.C § 1988 and Rule 54. (D.I.103).
Section 1988 permits the court, in its discretion, to
award reasonable attorneys fees. Although the statute
gives a district court discretion to award attorneys'
fees, the Third Circuit has stated that a court *should*
award attorneys fees to a prevailing party absent
special circumstances. *Truesdell v. Philadelphia Hous.
Auth., 290 F.3d 159, 163 (3d Cir.2002).* Henry
challenges the request for attorneys' fees on two
grounds. First, she argues that Springer was not a
prevailing party. Second, Henry contends that the
amount sought is excessive.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 15
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Springer may recover fees under this section if (1) he is the "prevailing party," and (2) the attorneys' fees are reasonable. *Farrar v. Hobby,* 506 U.S. 103 (1992). A party is a prevailing party if he or she succeeds "on any significant issue in litigation which achieves some of the benefit [the party] sought in bringing the suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983). Reasonable fees are measured by the "lodestar" calculation which multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Hensley,* 461 U.S. at 433. A court may adjust the lodestar figure when appropriate under the circumstances. *Blum v. Stenson,* 465 U.S. 886, 897 (1984).

### (I) Springer is the prevailing party

**\*15** Specifically, the Henry argues that Springer is not a prevailing party because the Court of Appeals declined to affirm this court's March 11, 2002, decision that she was not entitled to qualified immunity. Henry mis-characterizes the procedural event. Rather, the Third Circuit dismissed the *defendant's* interlocutory appeal. Henry also argues that to the extent the court grants the defendant relief pursuant to her post-trial motions, Springer would not be the prevailing party. The court has granted partial relief to the defendant by determining that as a matter of law Springer is not entitled to non-economic damages for his alleged reputation injuries. However, Springer still succeeded on significant issues in his case and has achieved much of the benefit he sought in bringing the suit. *Hensley,* 461 U.S. at 433. Therefore, he is the prevailing party.

### (ii) The requested attorneys' fees are reasonable

Springer must also establish that the attorneys fees are reasonable. Here, his counsel submits that under the lodestar calculation he should be awarded attorneys' fees in the amount of $224,972.50. In addition, he seeks $27,748 for time spent on post-trial motions. The defendant generally objects to the requested amount on the grounds that the fees sought are excessive. She also raises a general objection to "a third party payment of attorneys fees in the amount of $100,000" but fails to expand upon that objection. Finally, Henry questions the plaintiff's calculation of the fees of the contract attorney, John M. LaRosa.

Although Springer bears the burden of proving that the requested fees are reasonable, the defendant must "present specific evidence challenging the reasonableness of the requested rates or the time expended." *Central Delaware Branch of NAACP v. Dover,* 123 F.R.D. 85, 88 (D.Del.1988) (citing *Blum,* 461 U.S. at 892). "[They] cannot rely upon conclusory denials of the applicant's prima facie proofs." *Id.*

Henry declined to object to the lodestar calculation other than to state that it is excessive. She contends that it was unreasonable for Springer's counsel to charge rates comparable to those of the Philadelphia market given that the case was not litigated in Philadelphia and that his counsel is not admitted to practice in Pennsylvania. However, Springer's counsel has submitted his own declarations as well as the declarations of other attorneys attesting to the reasonableness of the rates.

The court concludes that the plaintiff has satisfied the prima facie burden of proving the requested attorneys fees are reasonable. The defendant has declined to present any evidence that would contradict such a determination. With regard to the alleged miscalculation of the attorneys fees related to the work done by attorney John M. LaRosa, the court recognizes that there is an inconsistency between the invoices and the figure stated in the plaintiff's opening brief in support of his motion for attorneys' fees. (D.I. 113, p. 14; D.I. 113, Exhibit F). The plaintiff explains that the figure proposed in the opening brief represents Mr. LaRosa's current rate. Springer argues that under *Lanni v. New Jersey,* 259 F.3d 146, 149 (3d Cir.2001), the reasonable fee is the rate at the time of the petition rather that the rate at the time the services were performed. The defendant declined to address this issue in light of *Lanni,* nor has she presented any opposing case law. The plaintiff's motion for attorneys

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 16
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

fees will be granted as requested.

**\*16** It should also be noted that the court accepts plaintiff's counsel's supplemental fee request. It was filed on June 16, 2004. (D.I.125). Henry has not submitted any objection to the request. The court infers that Henry's silence on the matter indicates her acquiescence with the figure.

### b. Costs

Springer asks for costs and expenses in the amount of $6,988.59. Springer provided a detailed account of costs. Again, the defendant raises merely a conclusory objection. She states, "plaintiff is seeking expenses not recoverable under statutory costs." Henry failed to state her objections with any specificity. Nor did she present any evidence to contradict the requested amount. The court will grant the plaintiff's motion for costs.

### c. Prejudgment Interest

Springer seeks prejudgment interest on liquidated and unliquidated compensatory damages. It is within the court's discretion to award prejudgment interest. *Savarese v. Agriss,* 883 F.2d 1194, 1207 (3d Cir.1989).

Henry argues that Springer is not entitled to prejudgment interest because his "damages are unliquidated and could not be calculated prior to the jury's decision." As the plaintiff points out, only the non-economic damages in the amount of $100,000 are unliquidated. In view of the court's decision to grant in part the defendant's motion for renewed JMOL, the plaintiff will not be awarded non-economic damages. Therefore, the defendant's argument regarding the unliquidated nature of the damages is moot.

Henry further argues that "[i]t would be unjust to assign prejudgment interest ... where plaintiff's expert witness Paul Andrisani's testimony to the jury included

interest into the numbers presented." (D.I.121, p. 8). As the plaintiff points out in his reply brief, Dr. Andrisani did, in fact, provide a damages calculation that *excluded* interest and those figures were argued to the jury. (B0676-677; B0914).Thus, the court will grant the plaintiff's motion for prejudgment interest.

The plaintiff asks for a prejudgment interest rate "equal to the weekly average one year constant maturity treasury yield, as published by the Board of Governors of the Federal Reserve system." *See* 28 U.S.C. § 1961; (D.I.113, p. 26). Springer claims he is entitled to an award of prejudgment interest from the date of the expiration of his contract on July 1, 2000, through the entry of judgment on April 1, 2004, compounded semi-annually. Henry has raised no objection to the measure of prejudgment interest. Therefore, the court will grant the plaintiff's request. Prejudgment interest shall be calculated accordingly.

### V. CONCLUSION

For the reasons stated above, Henry's motion for judgment as a matter of law shall be granted in part. The court concludes as a matter of law that Springer is not entitled to $100,000 in non-economic damages. The remaining damages award shall stand. All other defense post-trial motions will be denied. Likewise, Springer's motion for reinstatement will be denied. The court will grant Springer's motion for attorneys fees, interest and costs.

### *ORDER*

**\*17** For the reasons stated in the corresponding Opinion, IT IS HEREBY ORDERED that:
1. Henry's motion for judgment as a matter of law and/or judgment notwithstanding the verdict is GRANTED IN PART, Springer is not entitled to $100,000 in non-economic damages.
2. Henry's motion for a new trial is DENIED.
3. Springer's motion for reinstatement (D.I.102) is DENIED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 17
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

4. Springer's motion for attorneys' fees, interest and costs is GRANTED:

a. Attorneys' fees will be awarded in the amount of $224,972.50. Supplemental attorneys fees will also be awarded in the amount of $27,804.

b. Attorneys fees will be awarded for the services of contract attorney John LaRosa in the amount of $25,000.

c. Costs will be awarded in the amount of $6,988.59.

d. Prejudgment interest shall be awarded on the liquidated damages at the rate equal to the weekly average one year constant maturity treasury yield, as published by the Board of Governors of the Federal Reserve system between July 1, 2000, through April 1, 2004, compounded semi-annually.

e. Springer shall not be awarded prejudgment interest on the unliquidated damages, to wit, the $100,000 non-economic damages.

f. Post-judgment interest shall be awarded on all amounts with the exception of the $100,000 non-economic damages.

D.Del.,2004.
Springer v. Henry
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 1065681 (Verdict and Settlement Summary) (Apr. 01, 2004)
• 1:00CV00885 (Docket) (Oct. 06, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on July 14, 2006, I electronically filed this **PLEADING** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

> Edward Ellis, Esquire
> Montgomery McCracken Walker & Rhoads, LLP
> 123 South Broad Street
> Philadelphia, PA 19109
>
> Richard M. Donaldson, Esquire
> Montgomery McCracken Walker & Rhoads, LLP
> 300 Delaware Avenue, Suite 750
> Wilmington, DE 19801

> /s/ Stephen J. Neuberger
> **STEPHEN J. NEUBERGER, ESQ.**

FTU\ atty fees\ Fees and Costs RB.FINAL