IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| B. KURT PRICE, et al. | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. 04-956-GMS |
| v. | : | (Consolidated with C.A. No. 04-1207-GMS) |
| | : | |
| L. AARON CHAFFINCH, et al., | : | |
| | : | |
| Defendants. | : | |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, TO AMEND THE JUDGMENT OR FOR A NEW TRIAL**

Date: July 14, 2006

Noel C. Burnham (DE Bar No. 3483)
Richard M. Donaldson (DE Bar No. 4367)
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
(302) 504-7840

Edward T. Ellis (Admitted Pro Hac Vice)
Carmon M. Harvey (Admitted Pro Hac Vice)
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109
(215) 772-1500

*Counsel for Defendants L. Aaron Chaffinch, Thomas F. MacLeish, David B. Mitchell, and the Division of State Police, Department of Safety and Homeland Security, State of Delaware*

2092763v4

**TABLE OF CONTENTS**

Page

I. *GARCETTI V. CEBALLOS* REQUIRES ENTRY OF JUDGMENT IN FAVOR OF THE DEFENDANTS BECAUSE PRICE, WARREN, AND FORAKER REPORTED PROBLEMS AT THE FIRING RANGE PURSUANT TO THEIR OFFICIAL DUTIES AS MEMBERS OF THE FIREARMS TRAINING UNIT ............. 1

   A. The Plaintiffs' Official Duties Included Overall Responsibility For The Firing Range, Which Included Reporting To DSP Higher Management On The Condition Of The Building, Its Equipment And Its Occupants ..................... 1

      1. Every FTU Head Since 1998 Has Been Responsible For and Reported On Environmental Conditions In the Building, Including Problems With the HVAC System and the Bullet Trap ........................... 2

      2. Foraker's Job Included Reporting Up the Chain of Command on Firing Range Problems Because He Was the Manager of the Facility .................................................................................................. 6

      3. It is Always Within the Scope of an Employee's Official Duties to Discuss Workplace Events and Conditions With Management ................ 8

   B. The *Garcetti* Holding That A Public Employee's Speech Is Not Protected When It Occurs Pursuant To His Official Duties Is A Drastic Change In Third Circuit Law That Deprives Plaintiffs' Third Circuit Precedents Of Their Authority ...................................................................................................... 10

II. DEFENDANTS ARE ENTITLED TO JUDGMENT ON PLAINTIFFS' PETITION CLAUSE COUNTS BECAUSE PLAINTIFFS DID NOT ENGAGE IN ACTIVITY PROTECTED BY THE PETITION CLAUSE ..................................... 12

III. PLAINTIFF FORAKER HAS FAILED TO ESTABLISH A CLAIM OF DEFAMATION UNDER DELAWARE LAW .................................................................. 12

   A. None of Chaffinch's Statements Is Defamatory .................................................... 12

   B. Chaffinch Did Not Testify that the Statements at Issue Were False ..................... 14

   C. Injury To Reputation Is Necessary To Establish A Claim Of Defamation .......... 14

IV. DEFENDANTS ARE NOT INDEMNIFIED BY STATUTE FOR PUNITIVE DAMAGES .................................................................................................................. 16

V. CONCLUSION ............................................................................................................ 17

2092763v4

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Baldassare v. New Jersey*, 250 F.3d 188 (3d Cir. 1997) .................................................................. 1

*Brennan v. Norton*, 350 F.3d 399 (3d Cir. 2003) .......................................................................... 11

*Danias v. Fakis*, 261 A.2d 529 (Del. Super. Ct. 1969) ............................................................ 14, 15

*Doe v. Cahill*, 884 A.2d 451 (Del. 2005) ...................................................................................... 15

*Feldman v. Philadelphia Housing Authority*, 43 F.3d 823 (3d Cir. 1994) ..................................... 1

*Garcetti v. Ceballos*, --- U.S. ---, 126 S. Ct. 1951 (2006) ......................................................... 1, 2

*Interim Health Care v. Fournier*, Civ. A. No. 13003, 1994 Del. Ch. LEXIS 28
 (Feb. 28 1994) .......................................................................................................................... 15

*Johnson v. Campbell*, Civ. A. No. 00-510-JJF, 2001 U.S. Dist. LEXIS 25596
 (D. Del. Mar. 30, 2001) ........................................................................................................... 14

*Martin v. Widener Univ. Sch. of Law*, Civ. A. No. 91C-03-255, 1992 Del. Super. LEXIS 267
 (June 4, 1992) .......................................................................................................................... 15

*Mills v. City of Evansville*, No. 05-3207, 2006 U.S. App. LEXIS 15082
 (7th Cir. June 20, 2006) ........................................................................................................... 10

*Ramunno v. Cawley*, 705 A.2d 1029 (Del. 1998) ........................................................................ 15

*Saunders v. Bd. of Dirs., WHYY-TV*, 382 A.2d 257 (Del. Super. Ct. 1978) ................................ 15

*Spence v. Funk*, 396 A.2d 967 (Del. 1978) .................................................................................. 15

*Uniformed Sanitation Men Assn. v. Commissioner of Sanitation of the City of New York*,
 392 U.S. 280 (1968) ................................................................................................................... 9

**RULES**

Fed. R. Civ. P. 50(a) ...................................................................................................................... 14

**I.**   ***GARCETTI V. CEBALLOS* REQUIRES ENTRY OF JUDGMENT IN FAVOR OF THE DEFENDANTS BECAUSE PRICE, WARREN, AND FORAKER REPORTED PROBLEMS AT THE FIRING RANGE PURSUANT TO THEIR OFFICIAL DUTIES AS MEMBERS OF THE FIREARMS TRAINING UNIT.**

In their Opening Brief, the defendants demonstrated that *Garcetti v. Ceballos*, --- U.S. ---, 126 S. Ct. 1951 (2006), effected a drastic change in the law of governmental employee free speech. Employee statements during the course of their official duties, once protected by Third Circuit cases like *Feldman v. Philadelphia Housing Authority*, 43 F.3d 823 (3d Cir. 1994), and *Baldassare v. New Jersey*, 250 F.3d 188 (3d Cir. 1997), no longer enjoy First Amendment protection. Defendants set forth in some detail in their Opening Brief the factual record that supports the proposition that as to the statements that form the basis for Civ. No. 04-956-CMS (the "Price Action"), the plaintiffs spoke at all times as part of their official duties.

Plaintiffs' Answering Brief seeks to avoid the consequences of *Garcetti* by arguing that the official duties of the plaintiffs were very narrow, and that any speech beyond that made in a firearms training class was outside the perceived scope of their official duties. (*See* D.I. #216.) Neither *Garcetti* nor the trial record support this sort of reformation. In addition to the record evidence cited in their Opening Brief at pp. 14-16, the defendants ask the Court to consider the following record evidence that shows beyond any serious argument that when the plaintiffs spoke about problems at the firing range, they did so not as public citizens, but as state troopers assigned to the DSP Firearms Training Unit.

**A.   The Plaintiffs' Official Duties Included Overall Responsibility For The Firing Range, Which Included Reporting To DSP Higher Management On The Condition Of The Building, Its Equipment And Its Occupants.**

Plaintiff Chris Foraker was a management employee whose responsibility was far greater than the training of law enforcement officials in the use of weapons and force. It included a budget, equipment maintenance, certain building maintenance, and the overall operation of a

specialized training facility. It included safety and health responsibility for everyone who used the firing range. If Foraker identified a problem, he was responsible for fixing it, and if he could not fix it, he was responsible for notifying other officials in the DSP or the Delaware state government to get it fixed. Plaintiffs Price and Warren worked under Foraker in the FTU, shared responsibility for the building, and reported problems to Foraker, who in turn reported them "up the chain of command." The plaintiffs' effort to limit their job responsibility to teaching and certifying recruits, state troopers, and other law enforcement officers finds no support in the record they have themselves created.

The Supreme Court in *Garcetti* suggested that the trial court should, in determining whether an employee's statements are "within the scope of the employee's professional duties for First Amendment purposes," look to the actual job duties the employee performs. *Id.* at 1962. The employee's job description is undoubtedly relevant in this analysis, but the Supreme Court cautioned against accepting "excessively broad job descriptions" that might unduly restrict employees' rights. *Id.* at 1961-62. The testimony of the troopers who worked in the FTU over the years as well as numerous documents introduced in evidence in this case establish that the plaintiffs here were acting within the scope of their professional duties when they reported problems at the firing range.

      **1.**      **Every FTU Head Since 1998 Has Been Responsible For and Reported On Environmental Conditions In the Building, Including Problems With the HVAC System and the Bullet Trap.**

The head of the firearms training unit after the indoor facility in Smyrna opened was William Bryson, who testified that he oversaw the construction of the facility on instructions from then-Colonel Alan Ellingsworth. (*See* Reply App. at C-13 (2/25/06 Trial Tr., Testimony of

W. Bryson, at 2173:1-15).)[1] Lt. Bryson testified that during construction he became aware of problems with the facility, including problems with the HVAC system. (*Id.* at C-14 (W. Bryson, at 2175:11 – 2176:16).) He testified that he reported these problems up the chain of command. (*Id.* (W. Bryson, at 2175:11 – 2176:20).) When asked to describe his duties as the officer in charge of the FTU, he gave the following testimony:

> *Oversee the operation of the facility, make sure the facility was maintained and running, operational.* Schedule the shoots, recertifications of the uniformed officers.

(*Id.* at C-13 (W. Bryson, at 2172:19-21) (emphasis added).) Bryson included within this responsibility maintenance the FTU troopers performed on the bullet trap and the use of the HEPA vac to remove contaminants from the floor of the range. (*Id.* at C-15 (W. Bryson, at 2178:6 – 2180:9).) He testified that, even though plaintiffs Price and Foraker did not like it, maintenance was part of their job. (*Id.* (W. Bryson, at 2180:16-22).)

Bryson's successor in charge of the FTU was Brian FitzPatrick, a sergeant. Although he did not testify, several of his memoranda are trial exhibits. In Defendants' Exhibit 48, a memorandum from FitzPatrick to Bryson dated November 8, 1998, FitzPatrick reported "that the ventilation system is causing a horizontal tornado" and that his efforts to fix the problem were as yet unsuccessful. (*See id.* at C-34.) FitzPatrick's memorandum was copied to Captain Thomas DiNetta, then the Director of Training for the DSP and Bryson's superior officer. (*See id.*)

A few weeks later, in what is now Defendants' Exhibit 49, FitzPatrick reported directly to Capt. DiNetta on range ventilation problems, noting that as of the date of the memorandum

---

[1] All references to "App." refer to the appendix relating to the Opening Brief in Support of Defendants' Motion For Judgment As A Matter Of Law or, In The Alternative, To Amend The Judgment Or For A New Trial. (*See* D.I. #196.) All references to "Reply App." refer to Defendants' supplemental appendix filed in connection with this Reply brief on July 14, 2006.

(December 3, 1998), the ranged was closed until the air handling system could be fixed. (*See id.* at C-35 – C-36.)

FitzPatrick is also the author of Defendants' Exhibit 50, a 1999 memorandum to Captain DiNetta and Major Kevin McDerby that details changes to the HVAC system, elevated blood lead levels in troopers assigned to the range, and the lack of cooperation the DSP was receiving from the Facilities Management organization. (*See id.* at C-37.) FitzPatrick obviously thought his responsibility went beyond training shooters.

Al Parton followed FitzPatrick at the FTU. He testified by deposition at trial. In Plaintiffs' Exhibit 113, a memorandum from Parton to Lieutenant Ralph Davis, Parton stated that while he was in charge of the FTU, he "reported continuously regarding lead contamination, personnel lead levels and the recurring problems with the ventilation." (*See id.* at C-38.) An example of Parton's communication with the chain of command on those subjects is Plaintiffs' Exhibit 114, an e-mail to the Deputy Superintendent, William Waggaman, the budget major, Swiski, and other DSP managers in which Parton complained about blood lead levels and the "ventilation and contamination problems" at the range. (*See id.* at C-39.)

The plaintiffs' assertion that their responsibility was limited to firearms and related instruction is further undercut by Parton's testimony that he was involved in and responsible for the decision to change from leaded to frangible ammunition in the firing range. (*See id.* at C-18 (5/26/06 Trial Tr., Deposition Testimony of A. Parton, at 2253:4 – 2254:6).) Retired Major Swiski, the budget major at the time Parton was the head of the FTU, confirmed in his testimony that:

> Sergeant Parton had researched it, felt that it was a good move, a
> viable option because it would reduce the amount of lead in the
> range. And he made a suggestion. I looked at the cost factors.

-4-

>    Presented that to the executive staff.  And they said, yes, please proceed.

(*See id.* at C-8 (5/24/06 Trial Tr., Testimony of J. Swiski, at 1717:13-17).)  In other words, in fulfilling his responsibility as the person in charge of the FTU, Parton identified a problem in the facility for which he was responsible (high blood lead levels caused by poor ventilation), researched a solution (frangible, lead-free ammunition), proposed it to the executive staff, and executed the staff's decision.  This is the behavior of a manager responsible for the facility as a whole – not the behavior of a mere instructor.

Richard Ashley was the head of the FTU from April 2002 to December 2003.  His testimony is that he was in charge of keeping the range operational, including maintenance of the bullet trap system, scrubbing the floor in the shooting area, ensuring that HVAC system was operational, and shutting the facility down when it was not safe.  (*See id.* at C-20 – C-21 (5/26/06 Trial Tr., Deposition Testimony of R. Ashley, at 2276:8 – 2278:20).)  He testified that he complained about the HVAC system to Facilities Management and raised the subject up the DSP chain of command.  (*See id.*)  He even shut down the facility when it was not operating properly.  Ashley was also responsible for the change in the conveyor belt within the bullet trap in the summer of 2003.  When he decided that the bullet recovery system was inoperable due to the deleterious effects of the frangible ammunition, he reported his finding to the executive staff and recommended that the DSP replace the conveyor belt with a "drag belt."  Like Parton before him, he implemented the staff's decision to do so.  (*See id.* at C-40 (Pls.' Ex. 115).)

The degree to which Ashley and others exercised managerial responsibility for the overall condition of the building is nowhere demonstrated more clearly than in Ashley's 2003 performance appraisal (Defendants' Exhibit 56), prepared by Plaintiff Foraker's friend and co-litigant Ralph Davis.  (*See id.* at C-56 – C54.)  Davis prepared Ashley's "objectives and plans

-5-

of action" in the Fall of 2003, before Ashley left the FTU. (*See id.* at C-52 – C54.) Contrary to plaintiffs' current assertion that their responsibility did not go beyond instruction, Ashley's responsibility extended to maintenance and repair of mechanical problems with the equipment at the range. (*See id.*) Ashley's plan of action for "a safe training environment" included the following items that far exceed the parameters of mere firearms instruction:

- On a daily basis clean and maintain the firearms training facility.
- Continually inspect the facility and identify deficiencies.
- Correct any identified deficiency or notify the proper entity, i.e., Facilities Management and ensure that the deficiency is correct [sic] properly and promptly.

(*See id.* at C-53.)

Like all his predecessors, Ashley reported to the chain of command on "the air movement or lack thereof" in the range. (*See id.* at C-55 (Defs.' Ex. 57, an e-mail from Ashley to Major Swiski dated January 22, 2003).) He also shut down the range when the HVAC system did not properly exhaust the dust and smoke from the facility.

### 2. Foraker's Job Included Reporting Up the Chain of Command on Firing Range Problems Because He Was the Manager of the Facility.

All the emails and other memoranda that plaintiffs introduced to establish their "whistleblowing" in late 2003 and early 2004 are reports on aspects of the firing range itself, the equipment inside or on top of the building, or the DSP staffing policies that affected the FTU. (*See id.* at C-56 – C-64 (Defs.' Exs. 14, 15, 16, 17, 19).) It was the trial testimony of the plaintiffs that they collectively reported these problems up the chain of command because the problems affected the unit and facility for which they had responsibility.

Defendants pointed out in their Opening Brief (D.I. #194), at pp. 13-14, that each of the plaintiffs received lavish praise on his 2003-2004 performance appraisal for reporting on

-6-

environmental conditions at the firing range.[2]  What matters in the *Garcetti* analysis is that Foraker and Ralph Davis – the supervisors preparing the performance appraisals – felt that reporting on environmental conditions was part of the plaintiffs' job responsibilities.  Otherwise how could they have included it in such a quintessentially job-related document?[3]  Indeed, how could Davis have included it in Rich Ashley's performance appraisal and goals a year earlier?

Perhaps the document most damaging to Foraker's post-trial effort to limit his official functions is the transition document that he prepared on his own when he knew he was to return to the range in December 2003.  (*See id.* at C-65 – C-67 (Defs.' Ex. 11.)  This document encompasses the full scope of Foraker's FTU responsibility.  In addition to weapons, ammunition, targets, body armor, and training, Foraker included items for "Budget" and "Facility."  His checklist for the "Facility" included the following concerns:

- Overall Building Conditions
- Roof Leaks
- HVAC - Heater & A/C Chiller System
- Fuel Oil Delivery on Same Schedule
- Trane-Air Handler System
- Lighting System

---

[2]   It is not surprising that they received such high praise, since Foraker was the author of the performance appraisals on Price and Warren, and co-litigant Ralph Davis prepared Foraker's performance appraisal.

[3]   Plaintiffs suggest in their brief that these performance appraisals establish that reporting on conditions at the range was not within the plaintiffs' job duties because their supervisors rated them as having "far exceeded expected results."  (*See, e.g.*, Reply App. at C-71 – C-79 (Foraker's 2003-2004 appraisal, Pls.' Exhibit 7, pp. 6, 8).)  This interpretation of the performance appraisal scoring sheet is novel, to say the least.  The performance appraisal does not purport to rate Foraker on items not within the "objectives" part of the appraisal.  The relevant objective on the performance appraisal is "maintain a safe training environment."  Ralph Davis included environmental conditions at the range within the "safety issues" for which Foraker had responsibility.  The only conceivable explanation for Davis' appraisal is that Foraker did an outstanding job at identifying "safety issues that placed the health and safety of the FTU staff and officers training at the DSP range in jeopardy," and that he brought those conditions "to the attention of the DSP academy staff."  That is what Davis wrote.  If Foraker did a good job, he was not thereby doing someone else's job – he simply did his own job in an exemplary manner.  The same logic applies to Foraker's appraisals of Price and Warren.

- Target System
- Sound System
- Bullet Trap
- Water/Oil Pump System
- Conveyor Belt System
- Cleaning Supplies
- Floor Scrubber

(*See id.*)

At the bottom of the third page of the transition document is the handwritten statement : "Environmental Solutions Disposal of Contaminants." (*See id.* at C-67.)  It would be anomalous indeed for Foraker to have the responsibility for all these aspects of the firing range but not have the duty to report problems in any of these areas up the DSP chain of command.  The only possible conclusion is that Foraker's job included, in addition to teaching, the overall responsibility for the operation of the facility, which included the building and its equipment and reporting to management on the building, the equipment, and even the disposal of contaminants the facility produced.[4]

Price and Warren were Foraker's subordinates and they worked under his direction in reporting on problems at the range as well as the many other tasks necessary to operate the facility.  Like Foraker's activity, theirs is covered by *Garcetti*.

      **3.**      **It is Always Within the Scope of an Employee's Official Duties to Discuss Workplace Events and Conditions With Management.**

The plaintiffs seek to disavow their trial testimony that they had an official duty to speak to the state auditor about what caused the shutdown of the range in March 2004.  Their trial testimony, supported by that of other DSP troopers, is set forth in detail in the defendants'

---

[4]     This description of Foraker's duties at the FTU is consistent with Foraker's testimony at his first trial that: "I was in charge of the entire operations of the firearms training.  I basically managed the facility." (*See* Reply App. at C-26.)  In the 2003 trial, Foraker provided over seven pages of testimony detailing the extent of his official duties at the FTU. (*See id.* at C-26 – C32.)

Opening Brief at pp. 15-16.  Plaintiffs now suggest that had the *Garcetti* issue been in the case before the trial, they would have proved that it was their attorneys who arranged the meeting with the auditor on the plaintiffs' behalf and that counsel's involvement might somehow affect whether the meeting was within the scope of the plaintiffs' official duties.

The sequence of events that brought the plaintiffs face-to-face with the investigators employed by the State Auditor is irrelevant to whether the plaintiffs' job duties included cooperation with the investigators.  It was the plaintiffs' contention at trial that the auditors sought to interview them because Defendant MacLeish had identified them to the auditors and had found them 50% responsible for the shutdown of the range.  (*See* Reply App. at C-9 – C-10 (5/24/06 Trial Tr., Testimony of T. MacLeish, at 1777:22 – 1778:10).)

It is inherent in any employee's employment relationship that when the employer seeks to question the employee about the substance of his job, he is duty bound to respond.  *See Uniformed Sanitation Men Assn. v. Commissioner of Sanitation of the City of New York*, 392 U.S. 280, 285 (1968).

The plaintiffs are employees of the State of Delaware.  On the authority of the Governor of Delaware, the auditors sought to interview them on matters within the scope of their job duties, i.e., the conditions at the range and how they came about.  The plaintiffs had an obligation as state employees to respond to those questions as surely as they had a responsibility to show up for work every morning.  This is nothing more basic to the employment relationship than a conversation between the boss and the employee about his employment.  Employee speech in that situation is always within the scope of the employee's official duties.

> **B.     The *Garcetti* Holding That A Public Employee's Speech Is Not Protected When It Occurs Pursuant To His Official Duties Is A Drastic Change In Third Circuit Law That Deprives Plaintiffs' Third Circuit Precedents Of Their Authority.**

Defendants established in their Opening Brief that the Supreme Court in *Garcetti* overturned a series of Third Circuit cases holding that statements of public employees made in the course of their official duties were protected under the First Amendment. (Defs.' Opening Br., pp. 17-18.) In a case decided since the defendants filed their Opening Brief, the Court of Appeals for the Seventh Circuit characterized *Garcetti's* effect as follows:

> *Garcetti* … holds that before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking "as a citizen" or as part of her public job. Only when government penalizes speech that a plaintiff utters "as a citizen" must the court consider the balance of public and private interests, along with the other questions posed by *Pickering* and its successors, such as *Waters v. Churchill*, 511 U.S. 661, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994); *Connick v. Meyers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); and *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979).

*Mills v. City of Evansville*, No. 05-3207, 2006 U.S. App. LEXIS 15082, at *4 (7th Cir. June 20, 2006). In other words, *Garcetti* adds a preliminary inquiry to First Amendment judicial analysis; before the *Pickering* balancing of competing governmental and private interests comes a determination as to whether the speech is from a citizen or from an employee. Contrary to plaintiffs' assertions, this determination is not part of the *Pickering* public concern analysis, but comes before it. As set forth in Part I.A of this reply brief, and in Part IV.B.1.b of defendants' Opening Brief, the plaintiffs in this case made the statements at issue here entirely within the official responsibilities entrusted to them by the State of Delaware and consistent with the duties of their positions as performed by their predecessors at the firing range since the State opened it.

Plaintiffs' response to *Garcetti* is that "prior precedent was left undisturbed and the holding was a narrow one." (Pls.' Ans. Br., p. 14 (D.I. #216).) Plaintiffs proceed in their brief to recite limitations on *Garcetti* – none of which applies to this case – and then to recount the holdings in cases like *Pickering, Connick*, and *Givhan*, none of which applies unless the plaintiffs were speaking in their capacity as citizens rather than in their capacity as state troopers. Their argument culminates with a discussion of *Brennan v. Norton*, 350 F.3d 399 (3d Cir. 2003), even though Brennan pre-dates *Garcetti* by three years and cites as authority all the Third Circuit precedents that *Garcetti* has obviously called into question. Plaintiffs contend that *Brennan* is "dispositive."

*Brennan* cannot be dispositive because it contains no analysis of whether the plaintiff fireman made his complaints (five items, including a complaint to the New Jersey Department of Labor that a part of the firehouse in which his supervisor directed him to work contained asbestos) in his capacity as a citizen or in his capacity as an employee. *See* 350 F.3d at 413-14. Plaintiffs here focus on the asbestos part of the complaints, arguing that the asbestos in the firehouse is analogous to the lead, copper, zinc, and other contaminants in the DSP firing range. The asbestos may well be analogous to the firing range contaminants, but the non-supervisory firefighter in *Brennan* is not analogous to Price, Warren, and Foraker. Brennan was not in charge of the firehouse or its occupants. He had no responsibility for anyone in the building but himself, he had no responsibility for maintenance or upkeep of equipment, and he had no responsibility for reporting problems to his chain of command. Because Foraker, Price, and Warren – like their predecessors Bryson, FitzPatrick, Parton, and Ashley – had this responsibility, their speech about conditions at the firing range was part of their official duties

-11-

and was not the speech of an ordinary citizen.  *Brennan* provides no precedent.  *Garcetti* bars this action.

## II. DEFENDANTS ARE ENTITLED TO JUDGMENT ON PLAINTIFFS' PETITION CLAUSE COUNTS BECAUSE PLAINTIFFS DID NOT ENGAGE IN ACTIVITY PROTECTED BY THE PETITION CLAUSE.

Plaintiffs have failed to demonstrate that their Petition Clause claims involve activity protected by the Petition Clause of the First Amendment.  To further address this issue, defendants incorporate by reference their Answering Brief In Opposition To Plaintiffs' Renewed Motion for Summary Judgment or in the Alternative for Judgment as a Matter of Law on Plaintiffs' Petition Clause Counts, filed on July 7, 2006.  (*See* D.I. #212.)

## III. PLAINTIFF FORAKER HAS FAILED TO ESTABLISH A CLAIM OF DEFAMATION UNDER DELAWARE LAW.

### A. None of Chaffinch's Statements Is Defamatory.

In addition to the statements listed and addressed beginning on page eight of the defendants' Opening Brief, plaintiffs raise as defamatory the following statements attributed to defendant Chaffinch by the *Delaware State News*:

- Col. Chaffinch acknowledged there were problems but indicated the blame lies with one or two troopers under his command; and

- We will work collectively with Administrative Services to make corrections and establish a standard operating procedure protocol . . .  If the people that are assigned here now don't feel that protocol is part of their protocol, they will be assigned elsewhere.

(*See* B229-32.)

-12-

2092763v4

Even assuming that Chaffinch was referencing Foraker when he made the former statement, the statement is substantially true and, therefore, not defamatory. Indeed, as the Auditor of Accounts later stated in his October 12, 2004 report:

> We can only surmise that with the failing of the conveyor system, no maintenance performed on the bullet recovery system, and no custodial maintenance being performed to clean the firing range, that these situations contributed to an unhealthy and unclean environment leading to the ultimate closing of the firing range.

(*See* App. at A-250.) Chaffinch's statement, read in context with his other statements in the April 7, 2004 *Delaware State News* article, indicate that Foraker dropped "a portion of . . . the ball" when he stopped doing maintenance at the range. Chaffinch's statements are fully consistent with the Auditor's findings, are substantially true, and are not defamatory.[5]

Plaintiff Foraker asserts that the latter statement "falsely impl[ies] that [he] is unwilling to follow protocols." *See* (Pls.' Ans. Br. at 7 (D.I. #216).) No such implication is evident or appropriate. Chaffinch's statement states that no "standard operating procedure protocol" is in place, that one needs to be developed, and that if those assigned to the FTU believe that the protocol to be established is not within their purview, then they will be assigned elsewhere so the protocol will be followed. The statement is not defamatory because if the protocols did not exist at the time of the statement, the statement cannot reasonably be read as a judgment about Foraker's general willingness to follow protocols.

Plaintiffs' reliance on the jury's "finding" that Chaffinch "published an untrue statement about Sgt. Foraker" (*see* Pls.' Ans. Br. at 29), misses the point. In deciding a motion for

---

[5] Moreover, from the context of the statement as printed in the *Delaware State News*, it is not clear precisely for what Chaffinch was assigning blame. The "blame" in the article could be merely for an unclean facility or for the "sludge-like goo" with which the bullet trap was mired, among other things. (*See* B229-32.) It is unreasonable to interpret this statement, which is not even Chaffinch's own quote, to be placing blame on Foraker for the shut-down of the entire range.

-13-

judgment as a matter of law, the court must assess whether "there is [a] legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). As discussed in defendants' Opening Brief and herein, the record evidence is insufficient to sustain the jury verdict on defamation. Accordingly, the Court should grant defendant's motion for judgment as a matter of law.

### B.     Chaffinch Did Not Testify that the Statements at Issue Were False.

Defendant Chaffinch did not testify that his statements in the April 7, 2004, *Delaware State News* article were false. In the article, Chaffinch assigned a "portion" of the blame for the shut down of the range – he did not state that Foraker was the sole cause of the shut-down of the range. (*See* B229-32.) Indeed, as Chaffinch stated in his deposition and again at trial, he does not believe that Foraker alone was *the* "cause" of the range's closure. (*See* Reply App. at C-4 – C-5 (5/23/06 Trial Tr., Testimony of A. Chaffinch, at 1634:6-9, 1636 15-18).) As the findings of the Auditor make clear, a "portion" of the blame for problems at the FTU rightfully falls on Foraker and the FTU staff for "suspending" maintenance at the range, but a host of other factors played into the mechanical problems at the FTU and ultimate demise of the range. (*See* App. at A-250.) Chaffinch's position that Foraker played a role in the shut-down of the range has been consistent from the beginning – and is substantially true. Accordingly, Chaffinch has never "admitted" that any of these statements is false.

### C.     Injury To Reputation Is Necessary To Establish A Claim Of Defamation.

Under Delaware law, statements that malign one in a trade, business, or profession are considered slander *per se*, for which a proof of special (monetary) damages is not required. *See Johnson v. Campbell*, Civ. A. No. 00-510-JJF, 2001 U.S. Dist. LEXIS 25596, at *14-15 (D. Del. Mar. 30, 2001); *Danias v. Fakis*, 261 A.2d 529, 531-32 (Del. Super. Ct. 1969) (citing

-14-

*Restatement of the Laws of Tort*, Ch. 24, Topic 6, § 575 cmt.b). While slander *per se* is actionable without proof of special damages, *see Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978), this does not relieve the defamation plaintiff of the obligation to establish harm to his reputation. Indeed, "[s]imply waiving the damages' requirement does not make the libel actionable in itself, the claim is still subject to other defenses and the appropriate standards of proof." *Martin v. Widener Univ. Sch. of Law*, Civ. A. No. 91C-03-255, 1992 Del. Super. LEXIS 267, at *51 (June 4, 1992).

Under Delaware law, in order to prove a claim of defamation, a plaintiff must prove that the defendant made a defamatory statement. *See Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005). A "statement is not defamatory unless it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998). "The *essence* of defamation is injury to one's reputation." *Interim Health Care v. Fournier*, Civ. A. No. 13003, 1994 Del. Ch. LEXIS 28, at *29 (Feb. 28 1994) (citing *Saunders v. Bd. of Dirs., WHYY*-TV, 382 A.2d 257, 259 (Del. Super. Ct. 1978) (emphasis added)). To constitute slander *per se*, "the nature of the charge must be such that the Court can legally presume that the person defamed has been injured in his reputation or business and occupation." *Danias*, 261 A.2d at 531.

Here, there is no basis for such a presumption. Foraker attempted to elicit testimony from witnesses regarding reputational harm, but was unable to show that he had been "lower[ed] in the estimation of the community" or that any third persons were deterred "from associating or dealing with him." Indeed, plaintiffs' own witness, Capt. Ralph Davis, testified unequivocally that Foraker continues to be held by his colleagues in a "very high regard." (*See* Reply App. at C-3 (5/23/06 Trial Tr., Testimony of R. Davis, at 1577:4-24).) Other witnesses offered the same

positive opinions of Foraker's reputation.  (*See id.* at C-19 (5/26/06 Trial Tr., Deposition Testimony of A. Parton, at 2257:13 – 2258:22); *see also id.* at C-22 (5/26/06 Trial Tr., Testimony of Joseph Papili, at 2330:25 – 2332:12).)

Foraker has failed to demonstrate that any of the statements at issue was defamatory – an essential element of his defamation claim.  A plaintiff may not establish a claim of defamation by merely alleging injury to professional reputation.  While a plaintiff need not establish special – i.e. monetary – damages to prove defamation, he must show that he has suffered reputational harm, the very "essence" of his claim.  Foraker has failed to do so.  Accordingly, Foraker's defamation claim cannot be sustained as a matter of law.

## IV.    DEFENDANTS ARE NOT INDEMNIFIED BY STATUTE FOR PUNITIVE DAMAGES.

The plaintiffs argue that, despite the disparity between the defendants' ability to pay and the jury's punitive damages award, the Court should uphold the award because of the Delaware indemnification statute for state employees, 10 Del. C. § 4002.  The statute, however, does not indemnify state officials against punitive damage awards.  Moreover, contrary to the plaintiffs' Answering Brief, the state did not indemnify Chaffinch for the verdict in the first Foraker trial.  In fact, the case settled with an agreement to vacate the punitive damages judgment.  (*See* Reply App. at C-80 – C-81 (Pls.' Ex. 2).)

As set forth in defendant's Opening Brief, the verdict so obviously exceeds the defendants' ability to pay that the Court should either grant a new trial or remit the excess portion of the verdict.

The remainder of plaintiffs' punitive damages arguments appears to address the ratio of compensatory to punitive damages, which is not an issue defendants have raised in their post-trial motion.

-16-

**V.     CONCLUSION**

For the reasons set forth above, defendants request that the Court (1) enter judgment for defendants with respect to the Price Action and the defamation claims against defendant Chaffinch in the Foraker Action, and (2) grant a new trial regarding the First Amendment claim in the Foraker Action, and regarding all claims not decided as a matter of law.

Respectfully submitted,

Date:  July 14, 2006

*/s/ Noel C. Burnham*
Noel C. Burnham (DE Bar No. 3483)
Richard M. Donaldson (DE Bar No. 4367)
Montgomery, McCracken, Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE  19801
Telephone:  (302) 504-7840
Facsimile:  (302) 504-7820

Edward T. Ellis
Carmon M. Harvey
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA  19109
(215) 772-1500

*Counsel for Defendants*