**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

B. KURT PRICE, et al.,                  :
                                        :
            Plaintiff,                  :
                                        :
                                        :    C.A. No. 04-956-GMS
        v.                              :    (Consolidated with C.A. No. 04-1207-GMS)
                                        :
L. AARON CHAFFINCH, et al.,             :
                                        :
            Defendants.                 :


**APPENDIX TO REPLY BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE
<u>ALTERNATIVE, FOR A NEW TRIAL</u>**


Date:  July 14, 2006              Noel C. Burnham (DE Bar # 3483)
                                  Richard M. Donaldson (DE Bar I.D. #4367)
                                  Montgomery, McCracken, Walker & Rhoads, LLP
                                  300 Delaware Avenue, Suite 750
                                  Wilmington, DE  19801
                                  (302) 504-7840

                                  Edward T. Ellis (Admitted Pro Hac Vice)
                                  Robert J. Fitzgerald (Admitted Pro Hac Vice)
                                  Carmon M. Harvey (Admitted Pro Hac Vice)
                                  Montgomery, McCracken, Walker & Rhoads, LLP
                                  123 South Broad Street
                                  Philadelphia, PA  19109
                                  (215) 772-1500

                                  *Counsel for Defendants L. Aaron Chaffinch,
                                  Thomas F. MacLeish, David B. Mitchell, and the
                                  Division of State Police, Department of Safety and
                                  Homeland Security, State of Delaware*

# TABLE OF CONTENTS

Excerpts from 5/23/06 Trial Transcript, *Price v. Chaffinch*,
C.A. No. 04-956-GMS (Consolidated with C.A. No. 04-1207-GMS) .................................C-1

Excerpts from 5/24/06 Trial Transcript, *Price v. Chaffinch*,
C.A. No. 04-956-GMS (Consolidated with C.A. No. 04-1207-GMS) .................................C-6

Excerpts from 5/25/06 Trial Transcript, *Price v. Chaffinch*,
C.A. No. 04-956-GMS (Consolidated with C.A. No. 04-1207-GMS) ...............................C-11

Excerpts from 5/26/06 Trial Transcript, *Price v. Chaffinch*,
C.A. No. 04-956-GMS (Consolidated with C.A. No. 04-1207-GMS) ...............................C-16

Excerpts from 6/18/03 Trial Transcript, *Foraker v. Division of State Police*,
C.A. No. 02-302-JJF ..................................................................................................C-24

Memorandum to Lt. Bryson from Sgt. FitzPatrick, dated 11/8/98 (Defs.' Ex. 48) .................C-34

Memorandum to Capt. DiNetta from Sgt. FitzPatrick, dated 12/3/98 (Defs.' Ex. 49) .............C-35

Memorandum to Capt. DiNetta from Sgt. FitzPatrick, dated 4/29/99 (Defs.' Ex. 50) .............C-37

Memorandum to Lt. Davis from Sgt. Parton, undated (Plfs.' Ex. 113) ....................................C-38

E-mail to Lt. Col. Waggaman from Sgt. Parton, dated 6/29/00 (Plfs.' Ex. 114) .......................C-39

Memorandum from Sgt. Ashley, undated (Plfs.' Ex. 115) ......................................................C-40

DSP Performance Appraisal Scoring Sheet for Sgt. Ashley, for period ending 9/30/03
(Defs.' Ex. 56) ........................................................................................................C-41

E-mail to Maj. Swiski from Sgt. Ashley, dated 1/22/03 (Defs.' Ex. 57) ..................................C-55

Notes from 12/3/03 Staff Meeting (Defs.' Ex. 14) ...............................................................C-56

E-mail to Lt. Col. MacLeish from Sgt. Foraker, dated 1/5/04 (Defs.' Ex. 15) .........................C-57

Notes from 12/12/03 Davis/Foraker Meeting (Defs.' Ex. 16) ................................................C-60

E-mail to Lt. Col. MacLeish from Capt. Warren, undated (Defs.' Ex. 17) ..............................C-61

E-mail to Capt. Warren from Sgt. Foraker, dated 1/9/04 (Defs.' Ex. 19)................................C-63

i

## TABLE OF CONTENTS (continued)

Sgt. Foraker's Notes from FTU Transition Meeting of 12/1/03 (Defs.' Ex. 11) ......................C-65

Lt. Davis' Notes from FTU Transition Meeting of 12/1/03 (Defs.' Ex. 12) ...........................C-68

DSP Annual Performance Appraisal for Sgt. Foraker, for period ending 9/3/04
    (Plfs.' Ex. 7)............................................................................................................................C-71

Stipulated Order, *Foraker v. Division of State Police*,
    C.A. No. 02-302-JJF, dated 11/20/03 ................................................................................C-80

*Interim Health Care v. Fournier*, Civ. A. No. 13003, 1994 Del. Ch. LEXIS 28
    (Feb. 28 1994)........................................................................................................................C-82

*Johnson v. Campbell*, Civ. A. No. 00-510-JJF, 2001 U.S. Dist. LEXIS 25596
    (D. Del. Mar. 30, 2001)....................................................................................................... C-91

*Martin v. Widener Univ. Sch. of Law*, Civ. A. No. 91C-03-255, 1992 Del. Super. LEXIS 267
    (June 4, 1992)...................................................................................................................... C-97

*Mills v. City of Evansville*, No. 05-3207, 2006 U.S. App. LEXIS 15082
    (7th Cir. June 20, 2006) ................................................................................................... C-116

1454

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             IN AND FOR THE DISTRICT OF DELAWARE

 3                         -  -  -

 4   B. KURT PRICE, WAYNE WARREN,   :     Civil Action
     and CHRISTOPHER D. FORAKER,    :
 5                                  :
                 Plaintiffs,        :
 6                                  :
          v.                        :
 7                                  :
     L. AARON CHAFFINCH,            :
 8   THOMAS F. MACLEISH,            :
     DAVID B. MITCHELL, and         :
 9   DIVISION OF STATE POLICE,      :
                                    :
10          Defendants.             :     No. 04-956-GMS

11

12                         -  -  -

13   CHRISTOPHER D. FORAKER,        :     Civil Action
                                    :
14                                  :
                 Plaintiff,         :
15                                  :
          v.                        :
16                                  :
     L. AARON CHAFFINCH,            :
17   THOMAS F. MACLEISH,            :
     DAVID B. MITCHELL, and         :
18   DIVISION OF STATE POLICE,      :
                                    :
19          Defendants.             :     No. 04-1207-GMS

20                         -  -  -

21                  Wilmington, Delaware
                  Tuesday, May 23, 2006
22                      9:00 a.m.
                  SEVENTH DAY OF TRIAL
23
                           -  -  -
24
     BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury
25
```

C-1

1455

1  APPEARANCES:

2

3  THOMAS S. NEUBERGER, ESQ., and
   STEPHEN J. NEUBERGER, ESQ.
4  The Neuberger Law Firm
       -and-
   MARTIN D. HAVERLY, ESQ.
5  Law Offices of Martin D. Haverly

6          Counsel for Plaintiffs

7  R. MONTGOMERY DONALDSON, ESQ.
   Montgomery, McCracken, Walker & Rhoads, LLP
8       -and-
   EDWARD T. ELLIS, ESQ., and
9  CARMON M. HARVEY, ESQ.
   Montgomery, McCracken, Walker & Rhoads
10 (Philadelphia, PA)

11         Counsel for Defendants

12              - - -

13             INDEX

14  CHRISTOPHER FORAKER (Continued)

15     Direct examination ------------ Page 1454
       Cross-examination ------------ Page 1540
16

17  JOSEPH M. FORESTER

18     Direct examination ------------ Page 1545
       Cross-examination ------------ Page 1563

19  RALPH H. DAVIS, III

20     Direct examination ------------ Page 1565
       Cross-examination ------------ Page 1580
21     Redirect examination ---------- Page 1587

22  L. AARON CHAFFINCH

23     Direct examination ------------ Page 1589
       Cross-examination ------------ Page 1656
24     Redirect examination ---------- Page 1682

25  PX-160   Medical Records -------------- Page 1479

1456

1  THE COURT: Good morning. The jury is ready.

2  They are at the door.

3        (Jury enters courtroom at 9:02 a.m.)

4  THE COURT: Good morning, members of the jury.

5        (Jury responds "Good morning.")

6  THE COURT: Please have your seats.

7        ... CHRISTOPHER FORAKER, having been previously

8  sworn as a witness was examined and testified further

9  as follows ...

10 THE COURT: Mr. Neuberger.

11      DIRECT EXAMINATION CONTINUED

12 BY MR. S. NEUBERGER:

13 Q.   Did you attend Commander and Section Chiefs' meetings

14 during your first tour at the FTU?

15 A.   Yes, I did.

16 Q.   How did you learn about those meetings during your

17 first tour at the FTU?

18 A.   I was sent monthly invitations, basically orders to

19 attend these meetings, through e-mails.

20 Q.   When you were transferred out of the FTU the first

21 time, did you continue to receive those monthly e-mail

22 invitations?

23 A.   No, sir. They immediately stopped.

24 Q.   Did you ever start receiving them again?

25 A.   As soon as I was reinstated December 1st, 2003, I

1457

1  resumed receiving those monthly.

2  Q.   Now, I want to focus on a particular meeting on July

3  20th of 2004. That's where my questions are going to be

4  focused on. Did you attend a Commanders' and Section

5  Chiefs' meeting on July 20, 2004?

6  A.   Yes, sir.

7  Q.   Why did you attend it?

8  A.   I received two e-mails from the Superintendent's

9  office, the Colonel's office, to make sure that I attend and

10 also bring my Class A uniform to have a photo taken.

11 Q.   Chris, could you open up the white book in front of

12 you, Volume No. 1, and turn to PX-45, please.

13 A.   Yes, sir, I have it.

14 Q.   Do you see how on the first page at the very bottom it

15 says A1495?

16 A.   Yes, sir.

17 Q.   Could you turn to the page that says A1502?

18 A.   I have it.

19 Q.   All right. What is this document?

20 A.   This is an e-mail sent to me from Albert J. Homiak.

21 It's to Section Chiefs sworn and Troop Commanders.

22 Q.   If you take a lot that body of the e-mail, is this

23 inviting you to attend anything?

24 A.   Yes, sir. It is inviting me to attend the July 20th

25 meeting at the Academy at 0900 hours.

1458

1  Q.   Now, did you attend that meeting?

2  A.   Yes, sir.

3  Q.   Did you stay for the entire meeting?

4  A.   No. Major MacLeish -- correction. Lieutenant Colonel

5  MacLeish at the time removed me from the meeting.

6  Q.   Could you describe the process by which that came

7  about, that you were removed from the meeting?

8  A.   When I arrived in the hallway, I ran into Captain Nate

9  McQueen. Captain Nate McQueen and myself, we discussed me

10 being his echo during the funeral procession two days after

11 that for one of our fallen troopers. I agreed to do that.

12 I said I would be glad to do that.

13       After we finished our conversation, I walked

14 into the big classroom that we have at the Academy. And the

15 door that I walked in is towards the front of the classroom.

16 And that's where the executive staff would sit. And then to

17 the right would be the rest of the seating where all the

18 Troop Commanders and Section Chiefs would sit. As I walked

19 in, as soon as I looked up, came through the threshold, I

20 saw defendant Chaffinch. And he gave me an absolutely evil

21 look, very angry look. And I actually paused. And I looked

22 over both of my shoulders to see if there was anyone else

23 that he could be looking at, and there was no one else

24 around me.

25       Then I proceeded to the right and walked to the

C-2

1575

1 Q. Now, Captain Davis, did there come a time when I took
2 your deposition in this case?
3 A. Yes, sir.
4 Q. I want to show you something to see if it will help
5 refresh your recollection.
6     MR. S. NEUBERGER: Your Honor, may I approach
7 the witness?
8     THE COURT: Yes.
9 BY MR. S. NEUBERGER:
10 Q. Captain Davis, could you just quietly to yourself,
11 could you read Lines -- Page 35, Lines 9 through 20.
12     (Pause.)
13 A. Okay, sir.
14 Q. You can close that.
15 Just to, again -- do you recall if Sergeant
16 Foraker was the Section Chief at the FTU?
17 A. Yes, he was. For all intents and purposes, he was the
18 Section Chief.
19 Q. Now, back to this meeting with Colonel MacLeish in the
20 Director of Training's office. Do you recall he referenced
21 Sergeant Foraker's first lawsuit at all during that
22 conversation?
23 A. I do not recall, sir. I recall he was saying he was
24 sensitive to the issues currently going on with Sergeant
25 Foraker. But no reference to the first lawsuit that I

1576

1 recall.
2 Q. Could you open up that deposition again to Page 34.
3 Just take a look at Page 34, Lines 21 through Page 35, Line
4 2 and quietly read that to yourself.
5     (Pause.)
6 A. All right, sir.
7 Q. Does that refresh your recollection at all as to what
8 Colonel MacLeish mentioned to you during that meeting?
9 A. It does. I think my interpretation of what he was
10 saying is he was sensitive to the fact that Sergeant Foraker
11 was brought back there as a result of the lawsuit and the
12 issues surrounding that.
13 Q. You gave your deposition a while back. Right?
14 A. Yes, sir.
15 Q. And a lot of things have happened since then?
16 A. Yes.
17 Q. You work in headquarters every day, you deal with a
18 lot of troopers?
19 A. Yes, sir.
20 Q. Now, I think you said you have been in the State
21 Police for approximately 20 years?
22 A. Yes, sir.
23 Q. Do you know my clients?
24 A. Yes, I do, very well.
25 Q. Had you served with them at any duty stations

1577

1 throughout the State Police?
2 A. Besides the Firearms Training Unit, I have served with
3 them in various different duties.
4 Q. Are you familiar with what my clients' professional
5 reputations were in the division prior to December of 2003?
6 A. Yes, I am.
7 Q. What were their professional reputations?
8 A. I think all three gentlemen are held in very high
9 regard. They are viewed as experts in firearms and related
10 issues. At one time or another they have all three served
11 on our Special Operations Response Team. And those are, if
12 you will, I would say the cream of the crop. They are
13 specially trained and they are only selected because of
14 their skills.
15 But I think they are viewed by junior members in
16 a very, very high regard. But they are also viewed that
17 same way by senior members.
18 Q. Are you familiar with what their professional
19 reputations are today?
20 A. Yes.
21 Q. Is it any different?
22 A. I don't believe so. I still believe people know who
23 they are and know what they have done, and they are still
24 held in high regard.
25 Q. Now, I think you said you served with a lot of

1578

1 troopers at headquarters?
2 A. Yes, sir.
3 Q. Do you recall a time around April 2004 when there was
4 some media coverage of the FTU?
5 A. Yes, sir, I do.
6 Q. Do you recall there being a front page story in the
7 Delaware State News?
8 A. I recall a front page article in the newspaper.
9 Q. Was that story, did you ever hear that story being
10 discussed at headquarters?
11 A. Quite often, yes, sir.
12 Q. Was it in a positive way or a negative way?
13 A. I think it was a negative way.
14 Q. Okay. Just to change gears again, do you know who
15 R.L. Hughes is?
16 A. Yes, sir, I am familiar with Major Hughes.
17 Q. So he is a Major?
18 A. Yes.
19 Q. As a Major does he serve on the executive staff?
20 A. He is a member of the executive staff, yes.
21 Q. Who heads the executive staff?
22 A. The Superintendent of the Delaware State Police, who
23 was Colonel MacLeish at the time.
24 Q. Do you know if he recently underwent any kind of a
25 medical procedure?

C-3

1633

```
 1   Q.   Do you agree it had problems since it was built?
 2   A.   Yes, sir, I do.  Even before it was built.
 3   Q.   Do you remember the roof caving in?
 4   A.   I have heard about it.  I don't really have any
 5   firsthand knowledge of it.  I have heard a little bit about
 6   it.
 7   Q.   You have been in the building?
 8   A.   A few times, yes.
 9   Q.   You have seen the beam down the full length of the
10   middle of the building where they had to prop up the HVAC
11   unit from collapsing into the building?  You have seen that.
12   Right?
13   A.   Yes, I have seen the beam, yes.
14   Q.   And you understand there were cuts in the initial
15   budget which caused problems with the HVAC unit.  You know
16   that.  Right?
17   A.   I know that there was budget problems.  I am not sure
18   exactly which portions it caused problems with.
19   Q.   Let's look at Page 52 of your sworn testimony there.
20   Let's see if we can refresh your memory on something.  See
21   if you can find Page 52.
22   A.   I have it, sir.
23   Q.   Why don't you read quietly to yourself Lines 16
24   through the bottom of that page and through Line 6 on the
25   next page.
```

1632

```
 1   A.   Where did you want me to finish?
 2   Q.   Just the end of the text there, on Page 53, Line 6.
 3            (Pause.)
 4   A.   Yes, sir.
 5   Q.   Close that up and let me ask the question again and
 6   see if this has refreshed your memory.  Is it true that
 7   there were cuts in the budget when the range was built in
 8   the HVAC unit?
 9   A.   That's not what that says.  I said that there was
10   problems with the HVAC system from the beginning.  I also
11   said that there was budget cuts for different parts of which
12   I don't have knowledge of.  It's two separate entities.
13   Q.   Did you say that day, My understanding is it's had
14   problems with its HVAC system.  Apparently, there was some
15   cuts when it was built?
16   A.   When the building was built, yes.
17   Q.   You are saying that refers to the building and not the
18   HVAC system?
19   A.   That's correct.
20   Q.   You know in general there were problems with the HVAC
21   system even leading into the year 2004?
22   A.   Yes, sir.
23   Q.   And you know there were other problems, bullet traps,
24   all sorts of other problems in the building.  Right?
25   A.   I didn't know too much about the bullet trap.
```

1633

```
 1   Q.   But you knew there were questions about the armorer's
 2   room?
 3   A.   I heard that the armorer's room was initially too
 4   small.  And that might have been another reason, because of
 5   budget cuts, might have been why that was.  I am not sure.
 6   Q.   Originally, there wasn't even a woman's bathroom in
 7   there.  Isn't that true?
 8   A.   I heard something about that.
 9   Q.   But considering whatever you knew about the problems
10   at the range, you agree that my three clients did not cause
11   the range to shut down?
12   A.   Not the only thing that caused it to shut down, that's
13   correct.
14   Q.   My question is, did Sergeant Foraker, Corporal Price,
15   Corporal Warren cause the FTU to be shut down?
16   A.   I believe my answer was not that I am aware of.
17   Q.   Why don't we go back to that deposition you talked
18   about that day.  Okay?
19   A.   Yes, sir.
20   Q.   This was on August 30th of the year 2005?
21   A.   Yes, sir, it was.
22   Q.   Your lawyers were there.  Right?
23   A.   One of my lawyers was there.
24   Q.   One of your lawyers was there.  And you took an oath
25   to tell the truth that day.  Right?
```

1634

```
 1   A.   That's correct.
 2   Q.   Let's turn to Page 57 of your sworn testimony that
 3   day.  I am going to read you Lines 18 through 21.  Have you
 4   found it?
 5   A.   Yes.
 6   Q.   "Question:  In your opinion, did Sergeant Foraker,
 7   Master Corporal Price and Master Corporal Warren cause the
 8   FTU to be shut down?
 9           "Answer:  No, sir."
10           Was that your answer that day?
11   A.   Yes, sir, it was.
12   Q.   You don't know specifically who was responsible for
13   the problems at the ranch.  Is that a fair statement?
14   A.   That's correct.
15   Q.   It is not your position that Sergeant Foraker,
16   Corporal Price or Corporal Warren were incompetent?
17   A.   That's correct, it is not.
18   Q.   You don't claim that.
19           You do not care -- you don't claim that they
20   don't care about the safety of students, you don't make that
21   claim, do you?
22   A.   No, I do not.
23   Q.   You do not claim they don't care about the safety of
24   those who are being trained at the ranch, you don't make
25   that charge against them, do you?
```

C-4

1635

1    A.    No, sir, I do not.

2    Q.    In fact, it is your position that you have no idea how

3    to assign a percentage of blame or culpability for the

4    problems of the range.  Right?

5    A.    That's correct.

6    Q.    In fact, on this whole thing about maintenance and

7    suspending maintenance, you don't know one way or the other

8    if the decisions of my clients concerning maintenance was

9    justified one way or the other?

10   A.    I only know that the maintenance had been being done

11   ever since the building opened in 1998.  And I also know now

12   that it was not done as of December 1st, 2003.  It was

13   suspended.  So I assume that somebody made a decision to

14   suspend it.  Since Sergeant Foraker is the NCOIC of the

15   building, the Firearms Training Unit, I would assume he is

16   the one that made the decision.

17   Q.    Let me ask you the question again.  Do you know if the

18   decision to stop doing maintenance was justified?

19   A.    No, I do not.

20   Q.    You agree that any problems with the HVAC unit were

21   not caused by my clients?

22   A.    That's correct.

23   Q.    You agree that any problems with the bullet trap were

24   not caused by my clients?

25   A.    No, I do not agree.

1636

1    Q.    You don't agree with that.  Let's go back to that

2    sworn deposition that you gave in my offices on August 30th,

3    2005.  Do you still have it in front of you?

4    A.    Yes, sir, I do.

5    Q.    You had one of your lawyers present that day.  Right?

6    A.    Yes, sir, I did.

7    Q.    And you took an oath to tell the truth that day.

8    Right?

9    A.    Yes, sir, I did.

10   Q.    Let's look at Page 61 of your sworn testimony.  Let me

11   read to you from Lines 15 through 21:

12          "Question:  You also mentioned some problems

13   with the bullet trap.  Do you recall mentioning that?

14          "Answer:  Yes, sir.

15          "Question:  Do you think the problems with the

16   bullet trap were caused by Sergeant Foraker or Master

17   Corporals Price and Warren?

18          "Answer:  I don't believe so.  No, sir."

19          Was that your answer that day?

20   A.    That's correct.

21   Q.    And then you mentioned a little while ago about the

22   size of the armorer's room.  You agree that my clients

23   weren't at fault for that.  Right?

24   A.    That's correct.

25   Q.    In the month of April of 2004, you participated in two

1637

1    tours of the range with the media.  Is that correct?

2    A.    I went up there and represented the State Police.  But

3    it was tours given by the Secretary of the Division of

4    Administrative Services, yes.

5    Q.    For example, we saw earlier, way back in the beginning

6    of the trial, remember, we saw that little WBOC TV news

7    story from the evening news?

8    A.    Yes, sir.

9    Q.    You remember here when that was played?

10   A.    Yes, sir, I was.

11   Q.    It started off with the newscaster in the news room

12   saying we have got a story on the Firearms Training Unit at

13   the State Police.  Right?

14   A.    Yes, sir.

15   Q.    Then it zooms in on, we have got then Lieutenant

16   Colonel MacLeish was saying something.  Right?

17   A.    Yes.

18   Q.    Then there were some shots of Gloria Homer.  Right?

19   A.    Yes.

20   Q.    And you were standing next to her for those shots,

21   some of those shots?

22   A.    In the clip we watched here?

23   Q.    Yes.

24   A.    I believe I was, yes.

25   Q.    Then it ends up with Lieutenant Colonel MacLeish

1638

1    again.  Do you remember that?

2    A.    Yes, sir.

3    Q.    So you were participating in the interviews that were

4    going on with WBOC?

5    A.    Yes, I was there.

6    Q.    So Gloria Homer for one point in time was saying

7    things and you were standing next to her while she was

8    saying these things?

9    A.    Now, which one are you speaking about?  Which one of

10   the tours?

11   Q.    The one where WBOC TV was there.  They weren't there

12   for both of them, were they?

13   A.    I don't believe they were there for the first one, no.

14   Q.    We are talking about the second one?

15   A.    Okay.

16   Q.    My point is, when she was saying things about the

17   range you were standing next to her?

18   A.    I was standing in close proximity.  I don't know if I

19   was standing there or not, next to her or not.

20   Q.    You didn't say, stop, you made a mistake or anything?

21   A.    No, sir, I didn't.

22   Q.    For the first tour, ace reporter Tom Eldred of the

23   Delaware State News was there, do you remember that?  His

24   name is on the letterhead?

25   A.    Yes, I do.

C-5

1693

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                        -  -  -

 4   B. KURT PRICE, WAYNE WARREN,  :     Civil Action
     and CHRISTOPHER D. FORAKER,   :
 5                                  :
                  Plaintiffs,      :
 6                                  :
          v.                       :
 7                                  :
     L. AARON CHAFFINCH,           :
 8   THOMAS F. MACLEISH,           :
     DAVID B. MITCHELL, and        :
 9   DIVISION OF STATE POLICE,     :
                                    :
10          Defendants.            :     No. 04-956-GMS

11                        -  -  -

12   CHRISTOPHER D. FORAKER,       :     Civil Action
                                    :
13                  Plaintiff,      :
                                    :
14        v.                       :
                                    :
15   L. AARON CHAFFINCH,           :
     THOMAS F. MACLEISH,           :
16   DAVID B. MITCHELL, and        :
     DIVISION OF STATE POLICE,     :
17                                  :
            Defendants.            :     No. 04-1207-GMS
18
                          -  -  -
19
                  Wilmington, Delaware
20            Wednesday, May 24, 2006
                     9:00 a.m.
21               EIGHTH DAY OF TRIAL

22                        -  -  -

23   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury

24

25
```

**C-6**

1694

1  APPEARANCES:

2    THOMAS S. NEUBERGER, ESQ., and
     STEPHEN J. NEUBERGER, ESQ.
3    The Neuberger Law Firm
         -and-
4    MARTIN D. HAVERLY, ESQ.
     Law Offices of Martin D. Haverly
5
         Counsel for Plaintiffs
6
     R. MONTGOMERY DONALDSON, ESQ.
7    Montgomery, McCracken, Walker & Rhoads, LLP
         -and-
8    EDWARD T. ELLIS, ESQ., and
     CARMON M. HARVEY, ESQ.
9    Montgomery, McCracken, Walker & Rhoads
     (Philadelphia, PA)
10
         Counsel for Defendants
11
12                    - - -

                    INDEX
13  JOSEPH A. SWISKI

14     Direct examination ----------- Page 1695
15     Cross-examination ------------- Page 1714
       Redirect examination --------- Page 1723
16  THOMAS F. MacLEISH

17     Direct examination ----------- Page 1726
18     Cross-examination ------------- Page 1798
       Redirect examination --------- Page 1817
19     STIPULATION READ ------------- Page 1821

20  THOMAS F. MacLEISH (Recalled)

21     Direct examination ----------- Page 1840
22     Cross-examination ------------- Page 1919

23                    - - -
24
25

---

1695

1    THE COURT:  Good morning.

2        (Counsel respond "Good morning.")

3        (Jury enters courtroom at 9:03 a.m.)

4        THE COURT:  Good morning, ladies and gentlemen.

5  Please be seated.

6        Mr. Neuberger.

7        MR. T. NEUBERGER:  Your Honor, as my next

8  witness I would like to call retired Major Joseph Swiski to

9  the stand.

10       ... JOSEPH A. SWISKI, having been duly sworn as

11   a witness, was examine examined and testified as

12       follows ...

13            DIRECT EXAMINATION

14  BY MR. T. NEUBERGER:

15  Q.    Good morning.  Are you retired Major Joseph Swiski of

16  the Delaware State Police?

17  A.    Yes.

18  Q.    Who is your present employer?

19  A.    The State of Delaware.

20  Q.    Do you work for the Secretary of Homeland Security,

21  Mr. David Mitchell?

22  A.    Yes.

23  Q.    Are you on his staff?

24  A.    Yes.

25  Q.    Is Mr. Mitchell the boss of defendant Thomas MacLeish

---

1696

1  here?

2  A.    Yes.

3  Q.    When did you retire from the Delaware State Police?

4  A.    April 2003.

5  Q.    Okay.  When were you promoted to the position of Major

6  in the Delaware State Police?

7  A.    I believe it was April of 2000.

8  Q.    So you served for three years from April of 2000 to

9  April of 2003 as a Major?

10  A.   Yes.

11  Q.   Okay.  What was your job assignment as a Major?

12  A.   I was the Administrative Major.

13  Q.   You dealt with the budget, things like that?

14  A.   Yes.

15  Q.   You dealt with issues relating to, budget issues

16  relating to the Firearms Training Unit, do you remember

17  that?

18  A.   Yes.

19  Q.   When did you join the Delaware State Police?

20  A.   September 4th, 1979.

21  Q.   So you served 21 years?

22  A.   Twenty-four.

23  Q.   And did you have assignments upstate, downstate?  How

24  did your career go?

25  A.   Upon graduating from the Academy, I was assigned to

---

1697

1  Troop 6 in patrol.  I remained there for a few years.

2  Q.    Troop 6.  Where was that?

3  A.    Prices Corner.  Wilmington.  Then I became a Detective

4  at Troop 2, which is in New Castle.  Stayed at Troop 2 as a

5  Detective, a Sergeant and a Lieutenant.  Then I

6  transferred to Dover to Internal Affairs -- I am sorry, I

7  skipped a brief stint in the Drug Unit.  I was in the Drug

8  Unit for about 18 months.

9  Q.    Was that upstate or downstate?

10  A.   All over.

11  Q.   Downstate, too?

12  A.   Based out of Odessa.  But I worked at the beach.  I

13  worked in Wilmington.  And I worked all over the state.

14  Q.   Then you were in Internal Affairs?

15  A.   Right.  After being in Internal Affairs for about two

16  years, I went to Troop 6 Prices Corner as a Deputy Troop

17  Commander.  Then I was promoted to Captain and assigned to

18  Troop 2 as the Commander.  Then I was promoted to Major and

19  reported to headquarters.

20  Q.   Okay.  So that's April of 2000 when you were promoted

21  to Major.  Right?

22  A.   Right.

23  Q.   And you are assigned to the headquarters building in

24  Dover?

25  A.   Yes.

C-7

1716

1    Q.    Okay.  How many times did Mr. Ellis speak with you
2    about your anticipated testimony today?
3    A.    Maybe twice.
4    Q.    When did that occur?
5    A.    It was yesterday and briefly this morning.
6    Q.    I have never spoken to you about your anticipated
7    testimony today, have I, prior to today?
8    A.    I don't believe so.
9          MR. T. NEUBERGER:  Thank you.  I have no other
10   questions, Your Honor.
11         THE COURT:  I think Mr. Neuberger misspoke,
12   ladies and gentlemen, when he referred to Mr. Ellis as the
13   attorney for the state.  I don't think the state is at the
14   table.
15         MR. T. NEUBERGER:  I am sorry.  I apologize,
16   Your Honor.
17         MR. ELLIS:  Thank you, Your Honor.
18                CROSS-EXAMINATION
19   BY MR. ELLIS:
20   Q.    Major Swiski, you were asked some questions about
21   blood lead levels that you had studied, I think it was the
22   year 2000, approximately, involving Eddie Cathell?
23   A.    Yes.
24   Q.    Were you assigned during the time that you were the
25   Administrative Major to do a study on blood lead levels at

1715

1    the range?
2    A.    I think classifying it as a study is a little much.  I
3    was dispatched by the Lieutenant Colonel at that time,
4    Waggaman, to look into it because there was a concern raised
5    by the doctor at Health Works specific to Eddie Cathell's
6    blood lead level.
7    Q.    Was that specific to anybody other than Eddie Cathell?
8    A.    At that time it was specific to Eddie Cathell.
9    Q.    And what was the assignment the Lieutenant Colonel
10   gave you?
11   A.    Basically, look into this and see, you know, see
12   what's going on, what's the harm, potential harms, try to
13   reach out and find some expertise in the area.
14         I have no knowledge of medicine and lead levels,
15   so I needed to find somebody that did.
16   Q.    And what did you do in an effort to do that, an effort
17   to find things out about -- before I ask you that question,
18   what kind of ammunition was the State Police using at the
19   range at that point?
20   A.    It was lead ammunition with lead primers.
21   Q.    What did you do in an effort to learn something about
22   lead at the firing range?
23   A.    I first contacted Paul Shatick (phonetic), who was a
24   Sergeant in charge of the medics with the State Police.  I
25   assumed he would have some knowledge or a contact on where I

1717

1    could find this knowledge.
2          I also received documents from the range staff
3    about lead levels, Sergeant Shatick gave me documents.  And
4    I subsequently contacted Dr. Schwartz from Johns Hopkins
5    University Hospital.
6    Q.    And who was the head of the range at the point that
7    this all occurred?
8    A.    Sergeant Parton.
9    Q.    That is Al Parton?
10   A.    Yes.
11   Q.    What did you learn in your discussions with Dr.
12   Schwartz through Johns Hopkins?
13   A.    That there is various schools of thought and various
14   beliefs on what is a harmful level of lead in your
15   bloodstream.  Just a few notable points.  Lead doesn't
16   normally occur in your bloodstream, it is ingested.  Various
17   professions will have various different levels of blood lead
18   level, various levels of lead in their blood.  That he
19   believed anything between 10 and 15 for a prolonged exposure
20   could be a problem.
21         And he also said that he is in the minority in
22   that belief because there is others, like there was an OSHA
23   regulation, which is a lot higher than that.  And at first I
24   was, as I was going through this whole process, I was
25   learning.  Like I said, I have no knowledge whatsoever about

1717

1    it.  The first thing you see is the number.  That's, we are
2    all trained to look at numbers and identify number danger.
3    There is a factor also of prolonged exposure.  Prolonged
4    exposure, he related to me, is 15 years and above, defined
5    prolonged exposure, is what Dr. Schwartz told me.  Of
6    course, I was dealing with Facilities Management, also.
7    Q.    Now, during the course of the work you were doing on
8    blood lead levels, did you learn about lead-free ammunition?
9    A.    Yes.  It was brought to my attention by Sergeant
10   Parton.
11   Q.    And did you investigate the possibility of switching
12   to lead-free ammunition?
13   A.    Sergeant Parton had researched it, felt that it was a
14   good move, a viable option because it would reduce the
15   amount of lead in the range.  And he made a suggestion.  I
16   looked at the cost factors.  Presented that to the executive
17   staff.  And they said, yes, please proceed.
18   Q.    During the course of that work, did you attempt to
19   determine, or did you have somebody attempt to determine
20   whether the bullet trap that was in operation in the range
21   at that point was compatible with the lead-free ammunition?
22   A.    In the memorandum I prepared, I specifically spoke
23   with Sergeant Parton.  That is one of the questions I asked,
24   is -- you know, I am not very knowledgeable about firearms
25   and the potential impacts.  But I figure, well, we are

C-8

1  Q.    And the Governor attends, Secretary Mitchell attends,
2  this happens every year. Right?
3  A.    Yes, sir, it does. It's an annual event.
4  Q.    Is this third person here Major R.L. Hughes?
5  A.    Yes, it is.
6        MR. T. NEUBERGER: Could we blow that up,
7  please.
8  BY MR. T. NEUBERGER:
9  Q.    Okay. Do you see where he has got his gun belt on
10 here?
11 A.    Yes, sir, I do.
12 Q.    He is carrying his weapon. Isn't that correct?
13 A.    Yes, from what I can tell.
14       MR. T. NEUBERGER: We can take that off.
15 BY MR. T. NEUBERGER:
16 Q.    Okay. When my clients were put on light duty, they
17 were told they couldn't carry their weapons. Do you
18 remember that testimony in this case?
19 A.    Yes.
20 Q.    You signed a letter to that effect?
21 A.    No. I said they could -- they could carry their
22 weapons. They could not be in uniform.
23 Q.    You agree that they couldn't wear their uniforms?
24 A.    That's correct.
25 Q.    When you are not wearing your uniform, you are not

1  A.    If there was a specific event that was going on, he
2  was authorized to wear his uniform for that day or that
3  event. That's correct.
4  Q.    It's your testimony that those are the only exceptions
5  that have been granted to him?
6  A.    It is event-specific.
7  Q.    Beyond that, my question is, hasn't he worn his
8  uniform to the office for daily duties when he is on light
9  duty?
10 A.    On the day of the event, if he wore his uniform into
11 the office, if he came into the office, he would wear his
12 uniform, yes.
13 Q.    Aside from the day of the event, his office is on your
14 floor. Right?
15 A.    Yes, it is.
16 Q.    He is the Operations Commander for Kent and Sussex
17 County?
18 A.    Yes, he is.
19 Q.    He had the surgery more than a month ago?
20 A.    Yes, much more than a month ago.
21 Q.    He has been on light duty for several months?
22 A.    Yes, sir.
23 Q.    And isn't it true that he has come to the office to do
24 light-duty work on more than one occasion wearing his
25 uniform?

1  allowed to carry your weapon, are you?
2  A.    I am sorry. Your question again?
3  Q.    You can't wear your weapon when you don't have your
4  uniform?
5  A.    Absolutely, you can.
6  Q.    Okay. So they could have carried their weapons with
7  them. Is that your testimony?
8  A.    Yes.
9  Q.    We will get to that. But my clients weren't allowed
10 to wear their uniforms?
11 A.    No. They were prohibited from wearing -- anyone in a
12 light-duty capacity is required to not be in uniform.
13 Q.    Unless they get an exception?
14 A.    There is an exception built into the policy.
15 Q.    And Major Hughes, your testimony is Major Hughes
16 received an exception?
17 A.    For specific events.
18 Q.    Is it your testimony Major Hughes received an
19 exception?
20 A.    Yes.
21 Q.    For this event?
22 A.    Yes.
23 Q.    He has worn his uniform at other events, hasn't he?
24 A.    Yes, he has.
25 Q.    He has worn his uniform to the office, hasn't he?

1  A.    Yes.
2  Q.    And my clients were never allowed to wear their
3  uniform during the entire time they were on light duty. Is
4  that correct?
5  A.    That's correct.
6  Q.    You have heard about this auditors' report. Is that
7  correct?
8  A.    I have.
9  Q.    Is it true that the Auditor's representatives
10 interviewed you and Administrative Major Eckrich at your
11 offices?
12 A.    Yes.
13 Q.    And later on, before that report was issued to the
14 public, is it true that a special meeting was held with the
15 Auditor, the Homeland Security Secretary, David Mitchell,
16 and yourself at the Auditor's Offices to review the draft of
17 the report?
18 A.    Yes.
19 Q.    And is it true you did review the draft of the report
20 to give your input?
21 A.    Yes.
22 Q.    And, in fact, going back to when they interviewed you
23 at your office at the State Police headquarters, is it true
24 you indicated to them that Chris Foraker, Kurt Price, and
25 Wayne Warren were part of the problem at the range?

C-9

1778

1    A.    Yes.

2    Q.    So the auditors received input from you that you

3    believe that these three men were contributors to the

4    problems at the range?

5    A.    Part of the problem, yes, sir.

6    Q.    So you put them on the trail of my clients. Would you

7    agree with that?

8    A.    I don't know if I necessarily put them on the trail,

9    or if they were already on the trail and I just stated that,

10   yes, they were part.

11   Q.    It's your position that my three clients are

12   50-percent responsible for the shutdown of the range?

13   A.    During my deposition, I stated that they were, they

14   had a factor in the shutdown of that range by the stopping

15   of the maintenance. When pushed by your son to assign a

16   percentage, I stated 50 percent.

17   Q.    And it's your position that the air-handling,

18   equipment failures, they are responsible for the other 50

19   percent?

20   A.    Would you restate the question, please?

21   Q.    Sure. Is it true it is your position that the

22   air-handling and equipment failures are responsible for the

23   other 50 percent in shutting down the range?

24   A.    Overall, the whole facility, the aging of the

25   equipment, yes. That is the other portion of that, yes,

1779

1    absolutely.

2    Q.    Now, talking about my clients' 50 percent, the

3    department brings charges against troopers who have

4    fender-benders in their patrol cars by bumping into

5    telephone poles. Is that correct?

6    A.    That's correct.

7    Q.    My men have never been brought up on charges, have

8    they?

9    A.    No, they won't be.

10   Q.    So you are saying that the State Police brings a

11   trooper up on charges for putting a dent in a $37,000 patrol

12   car. Right? Whatever it cost?

13   A.    Bring them up on charges -- everybody has to be

14   responsible, yes. So, yeah, we will investigate that. If

15   it is deemed appropriate, they will be disciplined.

16   Q.    But there are no charges that are being brought

17   against my clients?

18   A.    No, there is not.

19   Q.    Despite the fact that this was a multi-million-dollar

20   facility that had to be shut down?

21   A.    That's correct.

22   Q.    Is the reason that no charges have been brought

23   against my men the fact that they are not responsible in any

24   way whatsoever for shutting down the range?

25   A.    No, that's not correct.

1780

1    Q.    Is it true that no charges were brought against them

2    because the air-handling was two and a half times too small

3    to do the job of getting particulates out of the air?

4    A.    Now you are on the right track, yes. That because of

5    those other factors, that's why there will be no charges

6    brought against your clients.

7    Q.    Is it true that one of the reasons no charges are

8    being brought is the fact that pollution levels in the

9    facility were 700 times higher than acceptable risks?

10   A.    That could play a factor in it, also.

11   Q.    Is it true that these men were being brought against

12   them because one factor is that Sergeant Ashley in his

13   tinkering had destroyed the normal operation of the bullet

14   trap?

15   A.    That's not true.

16   Q.    Is it true that no charges have been brought against these

17   men because they could have demanded a public trial at which

18   they would have had the opportunity --

19   A.    That is not true.

20   Q.    Let me finish, please. Is it true no charges were

21   brought against these men because they could have demanded a

22   public trial at which they would have had the opportunity to

23   defend themselves?

24   A.    That is not true.

25   Q.    Now, when you gave this 50-percent estimate to my

1781

1    partner here about responsibility my men had for the closing

2    of the range -- do you remember that?

3    A.    Yes, I do.

4    Q.    Is it true you also told my partner here that my men

5    were not doing routine maintenance to the air handling of

6    the range?

7    A.    If I said that, I misspoke.

8    Q.    Let's look at Page 99 of your testimony and let's see

9    if we can refresh your recollection of saying that. Why

10   don't you just read Page 99 quietly to yourself and just

11   close it.

12        (Pause.)

13   A.    Okay. I have read it.

14   Q.    Close it, please.

15        Is it true that you have told my partner that

16   two things combined to create the problems at the range for

17   the 50 percent that my clients were responsibility for?

18   A.    Yes.

19   Q.    Is it true that one of those problems you have talked

20   about was the lack of routine maintenance to the

21   air-handling and to the bullet trap system? Isn't that what

22   you told my partner?

23   A.    Yes. If I could read the whole thing, it will be

24   clear, Mr. Neuberger, that the -- what I said was it was a

25   combination of factors. And I think I stated in there that

C-10

1941

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                        -   -   -

 4   B. KURT PRICE, WAYNE WARREN,    :      Civil Action
     and CHRISTOPHER D. FORAKER,     :
 5                                    :
                 Plaintiffs,         :
 6                                    :
          v.                         :
 7                                    :
     L. AARON CHAFFINCH,             :
 8   THOMAS F. MACLEISH,             :
     DAVID B. MITCHELL, and          :
 9   DIVISION OF STATE POLICE,       :
                                      :
10          Defendants.              :      No. 04-956-GMS

11                        -   -   -

12   CHRISTOPHER D. FORAKER,         :      Civil Action
                                      :
13               Plaintiff,          :
                                      :
14        v.                         :
                                      :
15   L. AARON CHAFFINCH,             :
     THOMAS F. MACLEISH,             :
16   DAVID B. MITCHELL, and          :
     DIVISION OF STATE POLICE,       :
17                                    :
            Defendants.              :      No. 04-1207-GMS
18
                          -   -   -
19
                     Wilmington, Delaware
20                   Thursday, May 25, 2006
                          9:00 a.m.
21                   NINTH DAY OF TRIAL

22                        -   -   -

23   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury

24

25
```

C-11

1942

```
 1  APPEARANCES:
 2     THOMAS S. NEUBERGER, ESQ., and
        STEPHEN J. NEUBERGER, ESQ.
 3     The Neuberger Law Firm
             -and-
 4     MARTIN D. HAVERLY, ESQ.
        Law Offices of Martin D. Haverly
 5
             Counsel for Plaintiffs
 6
        R. MONTGOMERY DONALDSON, ESQ.
 7     Montgomery, McCracken, Walker & Rhoads, LLP
             -and-
 8     EDWARD T. ELLIS, ESQ., and
        CARMON M. HARVEY, ESQ.
 9     Montgomery, McCracken, Walker & Rhoads
        (Philadelphia, PA)
10
             Counsel for Defendants
11
12                    - - -
13                   INDEX
```

```
14  THOMAS F. McLEISH (Continued)
15     Redirect examination ------------ Page 1944
16  DEIRDRE O'CONNELL
17     Direct examination ------------- Page 1950
        Cross-examination -------------- Page 1962
18     Redirect examination ------------ Page 1973
19  AARON GREEN
20     Direct examination ------------- Page 1976
        Cross-examination -------------- Page 2001
21     Redirect examination ------------ Page 2011
22  JOHN YEOMANS
23     Direct examination ------------- Page 2012
        Cross--examination ------------- Page 2086
24     Redirect examination ------------ Page 2124
25
```

1943

```
 1            INDEX CONTINUED
 2  THOMAS F. MARCIN
 3     Direct examination --------------- Page 2126
 4     Cross-examination ---------------- Page 2128
 5  STEVE D. SWAIN
 6     Direct examination --------------- Page 2130
 7     Cross-examination ---------------- Page 2134
        Redirect examination ------------- Page 2137
 8  ALBERT HOMIAK
 9     Direct examination --------------- Page 2139
        Cross-examination ---------------- Page 2157
10     Redirect examination ------------- Page 2159
11  RONALD HAGAN
12     Direct examination --------------- Page 2160
        Cross-examination ---------------- Page 2170
13
14  WILLIAM E. BRYSON
15     Direct examination --------------- Page 2171
        Cross-examination ---------------- Page 2184
16     Redirect examination ------------- Page 2187
17  DX-91   Letter to Corporal Price from
            Captain Yeomans ------------------ Page 2058
18  DX-76   List of Troopers who had been
            On Light Duty -------------------- Page 2082
19
20  PX-164  Document from Corporal Merritt's
            Personnel File ------------------ Page 2126
21  PX-165  Letter from RangeTech ---------- Page 2186
22
23                    - - -
24
25
```

1944

```
 1      THE COURT:  Good morning.
 2      MR. T. NEUBERGER:  Your Honor, good morning.  If
 3  I could, did I revise the special verdict sheet that we had
 4  proposed?  I have it on a disc and also two or three short
 5  sentences on collateral sources for the damages instruction.
 6      THE COURT:  Mr. Ellis, have you found yours?
 7      MR. ELLIS:  I found it, Your Honor.  But I
 8  haven't had a chance to revise it.
 9      THE COURT:  I think at some point we probably
10  need to get on the phone with Bunting.  Perhaps during one
11  of the breaks or while we are in session -- I will check.  I
12  will take care of that.
13      Let's bring in the jury.
14      (Jury enters courtroom at 9:08 a.m.)
15      THE COURT:  Good morning, members of the jury.
16  Please be seated.
17      I think where we left off was Mr. Ellis was
18  about to redirect the Colonel.
19      ... THOMAS F. MacLEISH, having been previously
20      sworn as a witness, was examined and testified further
21      as follows ...
22          REDIRECT EXAMINATION
23  BY MR. ELLIS:
24  Q.   Colonel MacLeish, when you were being questioned
25  yesterday by Mr. Neuberger, he asked you whether you had
```

1945

```
 1  treated Kurt Price in a manner similar to how you treated
 2  Sergeant Steve Swain.  And I would like you to explain to
 3  the jury what you believe the differences are between Steve
 4  Swain and Kurt Price and why you have treated each of them
 5  in the way that you have.
 6  A.   Steve Swain is not on light duty.  He is not -- he is
 7  a full-duty trooper.  There has been nothing that has
 8  crossed my desk or have any doctors stated that he is
 9  limited in his function or in the scope of his duties.  If
10  Sergeant Swain needs to be put on the road, I can put him on
11  the road.  If I need to send him anywhere within the state,
12  I can do that with him.
13      In the case of Corporal Price, I have a doctor
14  saying that he is not fit for duty and no accommodation can
15  be made.  That binds me to not be able to keep him on the
16  force.
17  Q.   You were also asked about a David Citro, Captain David
18  Citro.  Could you explain what you believe to be the
19  differences between Citro's situation and Kurt Price's?
20  A.   Captain Citro, as you have heard testimony, he
21  suffered some type of injury in the eighties, mid-eighties.
22  I don't know the specific details.  But I know that he was
23  on regular duty.  He was a full-duty trooper up until the
24  very end of his career, when he could no longer take the
25  physical fitness test, and the application of the two-year
```

C-12

2172

1 Foraker from speaking at the graduation ceremony?
2 A.   No, ma'am.
3 Q.   Did Colonel MacLeish tell you to prevent Sergeant
4 Foraker from speaking at the graduation ceremony?
5 A.   No, ma'am.
6       MS. HARVEY:  No further questions.
7       THE COURT:  Mr. Neuberger, you may
8 cross-examine.
9            **CROSS-EXAMINATION**
10 BY MR. S. NEUBERGER:
11 Q.   Sir, you are currently a Lieutenant in the Delaware
12 State Police?
13 A.   Yes, sir.
14 Q.   You would like to retire one day from the Delaware
15 State Police?
16 A.   Certainly would.
17 Q.   Is that your boss, Colonel MacLeish, sitting at the
18 table right there?
19 A.   It certainly is.
20       MR. S. NEUBERGER:  No further questions, Your
21 Honor.
22       THE COURT:  Ms. Harvey.
23       MS. HARVEY:  No further questions, Your Honor.
24       THE COURT:  Thank you.
25       (Witness excused.)

2171

1       MR. ELLIS:  We call William Bryson.
2       ... WILLIAM E. BRYSON, having been duly
3 sworn as a witness, was examined and testified as
4 follows ...
5           **DIRECT EXAMINATION**
6 BY MR. ELLIS:
7 Q.   Are you currently employed, sir?
8 A.   Yes, I am.
9 Q.   And what is your job?
10 A.   Chief of Police for the Town of Camden.
11 Q.   Chief Bryson, have you in the past been employed at
12 the Delaware State Police?
13 A.   Yes, I have.
14 Q.   Why don't you give us some idea of the dates of your
15 employment there?
16 A.   October 1978, I left on terminal leave in November of
17 1998 and officially retired in March of '99.
18 Q.   What was the rank you held at the time you left?
19 A.   Lieutenant.
20 Q.   Did you retire?
21 A.   Yes.
22 Q.   What was the last assignment you had at the Delaware
23 State Police?
24 A.   Officer in charge of the Firearms Training Unit.
25 Q.   What years did you hold that position?

2173

1 A.   I believe it was '94 through '98.
2 Q.   Do you still have friends in the Delaware State
3 Police?
4 A.   Yes.
5 Q.   In particular, are you acquainted with the
6 Superintendent, Thomas MacLeish?
7 A.   Yes.
8 Q.   How do you know him?
9 A.   We started on the road together.  Actually, we knew
10 each other from Delaware Technical and Community College.
11 We started on the road together a year apart.  We were both
12 assigned to Troop 3 as young troopers, on the same shift,
13 became friends.  He was in fact the best man at our wedding
14 in 1984.
15 Q.   Do you still consider him a friend?
16 A.   Yes.
17 Q.   I want to ask you some questions about the Firearms
18 Training Unit.  What was your duty as the officer in charge?
19 A.   Oversee the operation of the facility, make sure the
20 facility was maintained and running, operational.  Schedule
21 the shoots, recertifications of the uniformed officers.
22 Q.   Now, during the time that you were the officer in
23 charge, were you involved with the new indoor range that was
24 eventually built in Smyrna?
25 A.   Yes.

1 Q.   Why don't you tell us what your involvement was.
2 A.   Before the project was started, I was contacted by
3 then Colonel Ellingsworth and was told I was going to be in
4 charge of the construction of that facility.
5 Q.   When you say in charge of the construction, what does
6 that mean?
7 A.   Basically, oversee it from the State Police
8 standpoint.
9 Q.   And what does that mean you did?  What did you have to
10 do to oversee the construction of the facility?
11 A.   I think it evolved into more than what was intended.
12 But initially, it was to review plans, attend meetings with
13 Facilities Management, attend regular progress meetings,
14 make sure that the interests of the State Police were met
15 during construction of the project.
16 Q.   When executive-level decisions had to be made
17 concerning the construction, who was responsible, who was
18 making the executive-level decisions?
19 A.   Primarily Colonel Ellingsworth.  There were probably
20 some decisions that I made that some may consider executive
21 level.
22 Q.   During the construction phase, was the bullet trap
23 that was originally identified to be used in that range
24 changed?
25 A.   There was a bullet trap identified in a feasibility

C-13

2174

1  study. And it was actually changed prior to construction

2  documents for the facility.

3  Q.  Can you explain why the bullet trap was changed?

4  A.  Myself and Sergeant Fitzpatrick and Sergeant Engler

5  looked at a number of different ranges, called a number of

6  different ranges as to the maintenance of the different

7  bullet traps and tried to find the one that would be the

8  least maintenance-intensive and the least costly for

9  maintenance, and selected one from Savage Range Systems.

10 Q.  Was there a prior design that used some type of rubber

11 magnet as the backstop?

12 A.  Yes.

13 Q.  And why did you reject the rubber magnet design?

14 A.  We talked to a couple of different ranges, one of

15 which was a private range, the other was a police department

16 in California. And they complained that doing target type

17 shooting, that they were constantly having to change the

18 rubber strips or the hole would get shot in the center of

19 the rubber strip and the top or the bottom of the strip

20 would be fine. But they had to change the strips. They

21 were hanging strips, I think they were 20-feet along. So

22 there was a lot of switching out and days that the range

23 would be closed down so that they could switch those out.

24 Q.  So you decided on the Savage bullet trap system?

25 A.  Yes.

2175

1  Q.  At the time you put the Savage system in, was it --

2  did you intend to fire leaded ammunition?

3  A.  Yes.

4  Q.  Now, were there problems that developed in the

5  construction of the range?

6  A.  There were problems with the facility prior to

7  construction. From a design phase, there were problems with

8  that facility.

9  Q.  And did they continue through the construction phase?

10 A.  Yes.

11 Q.  Give us, without going into excruciating detail, give

12 us an idea of some of the problems that you had.

13 A.  Before the construction even started, the surveyors

14 apparently made an error, and where the architectural firm

15 chose to place the range turned out being four foot lower in

16 elevation than it actually was and required four foot of

17 fill before the building could be set there, which was a

18 cost that came out of our project. It was not a cost borne

19 by the surveyor or the engineering firm.

20     As it progressed, we found out we had doorways

21 that weren't big enough to bring the vehicles in that we

22 asked to be able to bring in.

23     We told the engineering firm that we wanted to

24 be able to bring ammunition in on pallet forks or by a

25 forklift. There was no ramp for a forklift. When they put

2176

1  all the curbing in, we had to climb an eight-foot curb to

2  get ammunition in and out of a tractor-trailer on a pallet.

3     A lot of the building that was originally in the

4  design by JAED Corporation was never built because of

5  funding problems. When they started to set the air

6  conditioning units, heating and air conditioning units on

7  the roof, the main beam in the building sagged, I think it

8  was an inch and a half, wouldn't hold the weight of the

9  units.

10 Q.  What did you have to do about that?

11 A.  They wound up welding additional beams underneath of

12 the main beams that were installed that were originally in

13 the engineering plan.

14 Q.  Did you learn that the HVAC system did not work as

15 well as you would have expected?

16 A.  Yes.

17 Q.  And are all these things that you reported up the

18 chain of command back during the time the building was being

19 constructed?

20 A.  Yes.

21 Q.  In connection with that construction, just to make

22 sure this is clear on the record, did Aaron Chaffinch have

23 anything to do with the construction of the range?

24 A.  No.

25 Q.  How about Thomas MacLeish?

2177

1  A.  No.

2  Q.  Now, at the time that the new range was being built,

3  where were you shooting?

4  A.  On Dennis (phonetic) road on an outdoor range, one

5  that had been used by the State Police for in excess of 20

6  years at that time.

7  Q.  When you are in an outdoor range of that type, what is

8  it that you are shooting at? What serves as the bullet trap

9  at an outdoor range?

10 A.  A dirt berm.

11 Q.  How high is the dirt berm?

12 A.  I think it was about 12 feet tall.

13 Q.  Are there times when the outdoor range becomes unsafe?

14 A.  There were a number of times. We had problems with

15 the actual area where the shooters would stand. It would

16 flood in the wintertime and it would freeze and it was

17 almost like standing on an ice ramp. The berm would freeze

18 so hard that bullets would not penetrate the dirt berm, they

19 would actually ricochet off it. We have had rounds escape

20 over the berm.

21 Q.  What is over the berm, by the way?

22 A.  Over 12 feet into the air.

23 Q.  At times when you believed that the outdoor range was

24 unsafe, did you believe you had the authority to close it

25 down?

C-14

2178

1  A.    Yes.

2  Q.    Did you do so?

3  A.    Yes.

4  Q.    Did anybody ever question your authority to do so?

5  A.    No.

6  Q.    When you opened the indoor range, now we are into the

7  actual opening of the range, was there maintenance that the

8  troopers were required to do at the point you opened the

9  range?

10  A.    Yes.

11  Q.    Describe what type of maintenance it was.

12  A.    There were filters on pumps that supply water to the

13  bullet trap.  The filters needed to be cleaned, probably

14  weekly.  The strainers that went into those pumps

15  occasionally had to be cleaned, removed, shotgun wadding,

16  cardboard residue from the targets, sweep or vacuum the

17  range floor.

18  Q.    When the range opened, did the company that made the

19  bullet trap come in and train you on what had to be done?

20  A.    Yes, as it was being built, actually.

21  Q.    Describe the training.

22  A.    They showed us what pumps -- where the pumps were

23  located, what had to be done to make sure that they were

24  clear, the pumps pumped a fluid mixture of oil and water

25  onto the bullet trap.  There were strainers on those supply

---

2179

1  lines that occasionally had to be emptied from cardboard

2  particles, shotgun wadding.  Just make sure that the

3  conveyor belt was running, that it didn't get jammed up with

4  anything.

5  Q.    How much time did the unit members, the Firearms

6  Training Unit members, spend doing maintenance on the range

7  at the point it opened?

8  A.    When it was in full use, if we were shooting every

9  day, it was probably two hours a day.

10  Q.    Now, who were -- one final question.  Did the State

11  Police have something called a HEPA vac when the range

12  opened in 1998?

13  A.    Yes.  It was supplied by Facilities Management.

14  Q.    Why don't you tell us what a HEPA vac is?

15  A.    It is a large vacuum cleaner, probably had a capacity

16  of about 60 gallons, that had high-filtration filters to

17  keep any particles that were sucked up into the vacuum from

18  getting back out into the air.

19  Q.    What is it supposed to be used for?

20  A.    Vacuuming the floor of the range.

21  Q.    How often did you use it?

22  A.    Probably once a week, maybe twice a week, depending

23  upon the type of shooting we were doing and the contaminants

24  that were on the floor.

25  Q.    Did your staff receive instruction as to how to use

---

2180

1  the HEPA vac?

2  A.    Yes.

3  Q.    Now, who gave you the instructions?

4  A.    The manufacturer when the vacuum was delivered gave us

5  instructions.  We also had the Department of Labor come down

6  at one point and, I don't remember the title of the

7  individual, but he was familiar with the vacuum and again

8  just showed us it was a relatively simple operation, pretty

9  much like using a home vacuum cleaner.

10  Q.    Who were the members of the staff that worked under

11  you at the Firearms Training Unit when the new range opened

12  in 1998?

13  A.    Myself, Sergeant Fitzpatrick, Sergeant Rhoads, I can't

14  remember if Sergeant Engler left prior to the range opening,

15  Corporal Price, and Corporal Foraker.

16  Q.    Now, at some point did you instruct then Corporal

17  Foraker that he was required to do maintenance on the bullet

18  trap?

19  A.    Yes.

20  Q.    And what was his response?

21  A.    Hesitant.  Didn't really want to do it.  None of us

22  wanted to do the maintenance.  But it was part of the job.

23  Q.    How about Kurt Price, what was his reaction?

24  A.    He was reluctant to do it.  But he did it.

25  Q.    Now, who did most of the maintenance work in the

---

2181

1  beginning?

2  A.    Myself and Sergeant Fitzpatrick.

3  Q.    At any time did Corporal Foraker or Corporal Price at

4  the time tell you they didn't want to do it because they had

5  health concerns?

6  A.    No.

7  Q.    What was their issue?

8  A.    It wasn't part of their job, they weren't custodians

9  or firearms instructors.

10  Q.    How long did you remain at the State Police after the

11  opening of the new range?

12  A.    About two months.

13  Q.    After you retired from the State Police, what did you

14  do?

15  A.    Did general contracting, remodeling, for about a year

16  and a half, then took the job with the Town of Camden.

17  Q.    As the Chief of Police in the Town of Camden, do you

18  bring your officers to the Delaware State Police firing

19  range to shoot?

20  A.    I did when it was open, yes.

21  Q.    And why do you need to have them shoot at the Delaware

22  State Police range?

23  A.    You are required by the Council on Police Training to

24  qualify semiannually.  So we had to find a location to do

25  that.  And that was a convenient location.  I was familiar

**C-15**