2188

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                         -  -  -

 4    B. KURT PRICE, WAYNE WARREN,    :    Civil Action
      and CHRISTOPHER D. FORAKER,     :
 5                                     :
                   Plaintiffs,         :
 6                                     :
             v.                        :
 7                                     :
      L. AARON CHAFFINCH,              :
 8    THOMAS F. MACLEISH,              :
      DAVID B. MITCHELL, and          :
 9    DIVISION OF STATE POLICE,        :
                                       :
10         Defendants.                 :    No. 04-956-GMS

11                         -  -  -

12    CHRISTOPHER D. FORAKER,          :    Civil Action
                                       :
13                 Plaintiff,          :
                                       :
14           v.                        :
                                       :
15    L. AARON CHAFFINCH,              :
      THOMAS F. MACLEISH,              :
16    DAVID B. MITCHELL, and           :
      DIVISION OF STATE POLICE,        :
17                                     :    No. 04-1207-GMS
                   Defendants.         :
18                         -  -  -

19                   Wilmington, Delaware
                     Friday, May 26, 2006
20                      9:00 a.m.
                     TENTH DAY OF TRIAL
21                         -  -  -

22
      BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury
23

24                         -  -  -

25
```

C-16

SHEET 2

2189

1  APPEARANCES:

2      THOMAS S. NEUBERGER, ESQ., and
       STEPHEN J. NEUBERGER, ESQ.
3      The Neuberger Law Firm
          -and-
4      MARTIN D. HAVERLY, ESQ.
       Law Offices of Martin D. Haverly
5
               Counsel for Plaintiffs
6
       R. MONTGOMERY DONALDSON, ESQ.
7      Montgomery, McCracken, Walker & Rhoads, LLP
          -and-
8      EDWARD T. ELLIS, ESQ., and
       CARMON M. HARVEY, ESQ.
9      Montgomery, McCracken, Walker & Rhoads
       (Philadelphia, PA)
10
               Counsel for Defendants
11
                    -  -  -
12

13      (Proceedings reconvene in court at 9:00 a.m.)

14      THE COURT:  Good morning, counsel.  Please be

15  seated.

16      Let's chat for a moment.  We're waiting for

17  Mr. Ellis?

18      MR. T. NEUBERGER:  He just stepped out, Your

19  Honor.

20      THE COURT:  Okay.

21      MR. T. NEUBERGER:  Could I hand to the Court

22  Exhibits 164 and 165 that were admitted yesterday?

23      THE COURT:  Great.

24      MR. T. NEUBERGER:  And, Your Honor, Mr. Ellis

25  and I were working out, he has some expert coming up from

2190

1  Baltimore and there could be traffic difficulties.  If so,

2  he may just play the two video depositions he took.

3      THE COURT:  Why don't we wait for Mr. Ellis to

4  get here.

5      MR. T. NEUBERGER:  Okay.

6      (Pause.)

7      THE COURT:  All right.

8      MR. ELLIS:  I'm sorry, Your Honor.  I had a

9  temporary emergency there.

10      THE COURT:  No problem.  Okay.  As to the --

11  please sit -- the discussion that the Court entertained with

12  counsel yesterday on issues, the Court is far from convinced

13  that the record would support the delivery of an instruction

14  enabling the jury to join an adverse inference as to the

15  issue of the wiping of the hard drive.  Counsel have both

16  cited the correct standards in their papers but I am not

17  convinced by counsel for plaintiffs' assertions that the

18  record will support, would support anything more than mere

19  speculation on this Court's part as to what was or was not,

20  may or may not have been.  And I don't agree with you,

21  Mr. Neuberger, young Neuberger that the Third Circuit would

22  permit the Court to entertain hypothetical renderings such

23  as the plaintiffs have submitted in their brief in an effort

24  to divine what evidence may or may not have existed.  Courts

25  of law don't operate that way and this one is not going to

2191

1  speculate in that regard.

2      Some prima facie level, it's clear the cases

3  require some prima facie sense of showing.  Cases I had to

4  decide in this regard in the past are factually quite

5  dissimilar to the facts that have been presented in this

6  case.  You have virtually no evidence, there is very

7  substantial dearth of evidence in the Court's view that

8  would enable the Court to conclude there was much use made

9  on a relative basis of this particular defendant, that is,

10  Defendant Chaffinch by computers, the computer in question

11  that was wiped, admittedly wiped, intentionally wiped,

12  inappropriately wiped at a time when the evidence should

13  have been preserved.  No doubt about it.

14      There is no question in this Court's mind,

15  particularly; and I want to say it again, and I know

16  Mr. Ellis, on behalf of your client, you took umbrage during

17  the pretrial conference at the Court's statement and its

18  written ruling regarding the fact we had a law enforcement

19  agency that should have known better, careless at the very

20  least, probably reckless with regard to the preservation of

21  evidence in a matter that was occurring in a federal court.

22  It's disappointing, to say the least.  I'll leave it there.

23      Having said that, the record, I am convinced,

24  does not support.  And when I say "the record," I'm talking

25  about what we've heard from this witness stand.  No e-mails,

2192

1  no testimony about any e-mails generated by Chaffinch.  The

2  only message that we seen, any message we've seen is the

3  Blackberry message.

4      So for me to take the serious step of using this

5  Court's offices and the imprimatur that a judge sway the

6  influence that a judge potentially can have on a jury in a

7  circumstance like this that in a case in my judgment as

8  close as this case would be inappropriate under these

9  circumstances morally.  It seems to me that plaintiffs had

10  at least one other source and opportunity to seek the

11  preservation of the evidence, the discovery of the evidence,

12  the possible evidence we're talking about and that is the

13  recipients of these phantom e-mails.

14      It is routine in organizations like this for

15  opponents who are suing organizations like the Delaware

16  State Police to issue discovery requests.  And those

17  organizations, I used to work in at least two, the

18  Department of Justice and a company known as Hercules where

19  routinely we were involved in litigation and e-mails would

20  come across from the General Counsel or from the Attorney

21  General of the United States, directing her attorneys or the

22  General Counsel directing his counsel in-house to take

23  certain steps to search records and preserve e-mails.  Those

24  requests emanate from a party suing the entities that are

25  named.  That wasn't done as far as I can tell in this case

2253

1 that correct?

2 "Answer: Leaded projectiles with nonleaded

3 primers.

4 "Question: Was there a point during the time

5 that you were in charge of the range that you changed from

6 leaded projectiles to what's called frangible ammunition?

7 "Answer: Yes, I did.

8 "Question: And were you involved in making the

9 decision to do that?

10 "Answer: Yes.

11 "Question: Can you tell us why you did that?

12 "Answer: We were all obviously concerned with

13 lead levels. Lead levels were the big tangible at that

14 point that, you know, you could really put your finger on.

15 You know, we get tested for lead on a periodic basis before

16 and after a shoot.

17 "When I refer to a shoot, an in-service training

18 event. And lead levels would rise and fall during those

19 periods.

20 "Some lead levels were higher than others. Cpl.

21 Cathell's was very high at one point and in an attempt to

22 reduce the lead levels, I elected to try the frangible

23 ammunition which had no lead in it.

24 "Question: Did the frangible ammunition have

25 the effect that you desired?

2254

1 "In other words, did it cause the blood lead

2 levels to drop?

3 "Answer: They stabilized. They were pretty

4 stable, I mean, throughout. I mean, we still had Cpl.

5 Cathell, that, you know, he was higher than everybody else,

6 but lead levels were pretty stable.

7 "Question: Did you, at the time that you

8 started using the frangible ammunition, know what was in the

9 frangible ammunition?

10 "Answer: I had a pretty good idea.

11 "Question: How did you know?

12 "Answer: We actually had SigArms came in -- I'm

13 sorry. Not SigArms, Blount. Speer ammunition is what we

14 were utilizing. They actually came in and gave us a short

15 presentation one day on ammunition and I believe we covered

16 frangible that day.

17 "Question: Now, a couple of minutes ago I asked

18 you some questions about shooting on the dry ramp. Were you

19 Supposed to shoot leaded -- I'm sorry. Were you supposed to

20 shoot the frangible ammunition on a dry ramp?

21 "Answer: I don't know that it ever said

22 anyplace that you couldn't do it. Do you know what I mean?

23 It was a wet ramp system so I preferred to use it wet.

24 "Question: Did you ever have occasion to

25 observe what happens when the frangible ammunition impacts

2255

1 with steel?

2 "Answer: Yeah. It breaks into small particles,

3 basically dust. It turns into just minute dust particles.

4 "Question: Now, when you were in charge of the

5 range, was there a point when you arranged for a maintenance

6 contract?

7 "Answer: Yes.

8 "Question: And do you remember when that was,

9 approximately?

10 "Answer: It was probably the summer of 2000

11 because I took over in October '99. I know it was in the

12 summertime because we were actually finished our, we

13 finished our fall in-service and spring in-service and so

14 I'm going to say it was probably in the summer of 2000.

15 "Question: What was the arrangement that you

16 reached and who do you reach it with?

17 "Answer: It was actually the manufacturer of

18 the bullet trap, Savage Range. They offered a cleanup

19 package, if you will, a maintenance package where they would

20 come in and actually clean the trap, do an inspection of the

21 trap, clean, change the filters, clean out the nozzles,

22 change the water, check the oil viscosity levels, that kind

23 of thing.

24 "Question: Why is it that you entered into that

25 arrangement with Savage?

2256

1 "Answer: Well, one thing we noticed with the

2 frangible ammunition was that there was a lot of residual

3 frangible materials back in the back side in the trough.

4 Where the water would recirculate, there's a large tube

5 that comes down to the trough. It was depositing all the

6 frangible residue in those positions and they basically

7 would start to form large cones underneath those openings.

8 "And if we didn't do something with it, it was

9 just going to continue to build up. And they offered a

10 method to come in and clean that out.

11 "Question: And on the part of the State Police,

12 whose responsibility was it to deal with that problem?

13 "Answer: It would have been mine to make sure

14 that I did something about it, I mean, or suggest it. I had

15 to go to Fiscal to get money to do that.

16 "Question: Now, during the time that you were

17 the person in charge of the Firearms Training Unit, did you

18 attend commanders and section chiefs meetings?

19 "Answer: No.

20 "Question: Did you consider yourself a section

21 chief?

22 "Answer: Yes.

23 "Question: Did you ever get announcements about

24 the section chiefs meetings?

25 "Answer: Yeah. There's an e-mail that comes

2257

1  out.  Again, I'm assuming you are referring to DICAT.
2       "Question:  I believe we are, yes.
3       "Answer:  Which was, well, it's DSP Stat now.
4  Yeah.  There's a blanket e-mail that comes out to all
5  section chiefs which I was on the section chief list, and
6  announcing when it was.
7       "Question:  Did you consider that an order to go
8  to the meeting?
9       "Answer:  No, I didn't, because I didn't, I
10  didn't particularly feel they needed me there, so...
11       "Question:  In any event, you never went?
12       "Answer:  No.
13       "Question:  One last series of questions I have
14  for you has to do with an exhibit that I'm going to slide
15  over and put in front of you, and it has a sticker on the
16  front that says Plaintiff's Exhibit 25.
17       "Answer:  Yes.
18       "Question:  That's an on-line version of a news
19  article that appeared in the Delaware State News in 2004.
20  Take a moment to review that and make sure you understand
21  what article that is.
22       "Answer:  Yes.  I'm familiar with the article.
23       "Question:  Now, did you see that article when
24  it appeared in the newspaper on April 7th, 2004?
25       "Answer:  I don't know if I read it on-line or

2258

1  in the newspapers.  I mean, I did read the article, yes.
2       "Question:  You notice that in the article,
3  there are comments made or at least there's a report of
4  comments made by Col. Chaffinch about Chris Foraker.  Have
5  you seen that?
6       "Answer:  Yes.
7       "Question:  Did any of the comments that Col.
8  Chaffinch made about Chris Foraker affect your opinion or
9  your view of Chris Foraker?
10       "Answer:  No.
11       "Question:  How long have you known Chris
12  Foraker?
13       "Answer:  Oh, for years.  I mean, we were on the
14  SORT team together, so at least 15 years.
15       "Question:  Do you consider yourself a friend of
16  Chris Foraker?
17       "Answer:  Yes.
18       "Question:  And the comments the colonel made
19  had no effect on your relationship with Chris Foraker?
20       "Answer:  No.
21       "Question:  Or your opinion of him?
22       "Answer:  No.
23       "Mr. Ellis:  Nothing further.  Thank you.
24       "Mr. S. Neuberger:  All right.  Let's take a
25  break."

2259

1       (Videotape deposition ends.)
2       MR. ELLIS:  Your Honor, we have a video
3  deposition of Richard Ashley that we would like to play at
4  this point as well.
5       MR. ELLIS:  Your Honor, just so --
6       THE COURT:  Hold on.
7       MR. ELLIS:  There are maybe one or two
8  objections that the plaintiffs are waiving, so we're just
9  going to play this right through.  The Court won't need to
10  rule on the objections and we'll play it through.
11       THE COURT:  Fine.
12       (Videotape deposition of Richard A. Ashley
13  played and reported as follows.)
14       "The videographer:  This is the videotape
15  deposition of Mr. Richard A. Ashley taken by the defendant
16  in the matter of Colonel B. Kurt Price, et al, plaintiffs
17  vs. Colonel L. Aaron Chaffinch, et al, Civil
18  Action 04-956; and Sgt. Christopher D. Foraker, plaintiff,
19  vs. Colonel L. Aaron Chaffinch, et al, defendants, Civil
20  Action No. 04-1207.
21       "This deposition is being held in the offices of
22  Montgomery McCracken Walker & Rhoads, Wilmington, Delaware
23  on May 11, 2006.  We are going on the record at
24  approximately 3:15 p.m.
25       "The court reporter is Kurt Fetzer from the firm

2260

1  of Wilcox & Fetzer, Wilmington, Delaware.
2       "My name is Lindsay DuPhily and I'm a videotape
3  specialist of Discovery Video Services in association with
4  Wilcox & Fetzer.
5       "Counsel will now introduce themselves and then
6  the court reporter will swear in the witness.
7       Mr. S. Neuberger:  Steve Neuberger of The
8  Neuberger Firm for plaintiffs.
9       Mr. Ellis:  Ed Ellis for defendants.
10       (Witness placed under oath.)
11       Direct Examination
12  By Mr. Ellis:
13       "Question:  Could you state your name for the
14  record, please?
15       "Answer:  Richard A. Ashley.
16       "Question:  And, Mr. Ashley, what is your
17  current occupation?
18       "Answer:  Self-employed.
19       "Question:  And what kind of business do you
20  run?
21       "Answer:  Farm.
22       "Question:  Where is the farm?
23       "Answer:  Kent County.
24       "Question:  Am I correct that you had a career
25  as a Delaware State Trooper?

2273

1  'we all,' Wayne, Kurt, myself, we would attend meetings at
2  the academy or they would come to our place and have
3  meetings in our conference.
4      "Question: How often did you interact with Greg
5  Warren as part of doing your job when he was the captain and
6  you were the sergeant at the firing range?
7      "Answer: Quite often. I went to the academy
8  not everyday but I would say a couple times a week. When
9  our mail was delivered there, you had to go there to get it.
10 Our clothing was delivered there. Most of the time, Cpt.
11 Warren got that on his way home. We were certainly always
12 in there.
13     "Question: Did you meet with Cpt. Warren when
14 you were there?
15     "Answer: At the academy?
16     "Question: Yes.
17     "Answer: Yes.
18     "Question: What sorts of things did you discuss
19 with Cpt. Warren?
20     "Answer: How we were making out on the
21 firearms, students, recruits, hard heads that were coming
22 through that weren't -- that were troopers that we had to
23 deal with, maintenance issues on the range, stuff that was
24 breaking, things that needed to be replaced.
25     "We were discussing -- when I say 'we,' Cpl.

2274

1  Warren and Cpl. Price and myself were discussing hosting an
2  IALEFI conference, an International Association of Law
3  Enforcement Firearms Instructors Conference at the range.
4      "Question: Is that something you discussed with
5  Cpt. Warren?
6      "Answer: Yes. He was all for it because he
7  actually got our professional organizations. When I say
8  'professional,' that's one of, getting our dues paid up to
9  bring us up to standard.
10     "Question: You spoke a few minutes ago about
11 replacing the belt that was in the bullet trap?
12     "Answer: Yes, sir.
13     "Question: And was that something that you
14 discussed with Cpt. Warren?
15     "Answer: Yes. Because we were at wit's end.
16 The belt that was there prior, you know, when I arrived
17 didn't work. It had froze up from the debris from this
18 ammunition. We couldn't shoot. This thing was weighing
19 tons. We tried changing clutches. We had the companies
20 come in and do that. It wouldn't function.
21     "So we talked to Mayfran and Savage, when I say
22 Savage Range Systems, to try to find something that would
23 meet our needs.
24     "Question: And did you communicate your
25 problems with the belt to Cpt. Warren?

2275

1      "Answer: Yes, I did.
2      "Question: And did you discuss it with him at
3  length?
4      "Answer: Yeah. We didn't have the money to fix
5  it. We were trying to see what we could, for lack of a
6  better term, we could rob Peter to pay Paul.
7      "Question: Did you ultimately find a way to pay
8  for the new belt in the bullet trap?
9      "Answer: Yes.
10     "Question: How was that done?
11     "Answer: It was utilized minor capital
12 improvement monies from facilities management.
13     "Question: So that was money that came out of
14 the facilities management budget and not the state police
15 budget?
16     "Answer: The State Police didn't have any of
17 the monies for it.
18     "Question: Now, in August of -- I'm sorry.
19     "Was Mjr. Eckrich also involved in the
20 discussions about getting a new belt put on the bullet trap?
21     "Answer: Absolutely. He was the Finance
22 Manager.
23     "Question: And why was Mjr. Eckrich involved?
24     "Answer: He was the Finance Manager. He was
25 the man in charge of the purse strings.

2276

1      "Question: Now, during the time that you
2  supervised Kurt Price, did you ever, in discussing the
3  bullet trap water system and discussing what was in the
4  bullet trap water system, make a statement to him 'you have
5  to die from something?'
6      "Answer: I never said anything about you have
7  to die from something, no.
8      "Question: Now, while you were in charge of the
9  firing range, were there HVAC problems, in other words,
10 ventilating system problems at the range?
11     "Answer: Yes, sir. Absolutely.
12     "Question: Can you describe the problem,
13 please?
14     "Answer: The system wouldn't work. Sometimes
15 we would go to start the system and you couldn't get it to
16 come up, so you had no airflow. Sometimes, it would quit in
17 the middle of a shoot and you had no airflow. Sometimes,
18 you would have, half of the range had airflow and the other
19 half wouldn't. It was a machine. There was always
20 something broke on it.
21     "Question: Did you complain about it?
22     "Answer: Yes. Actually, when the system -- in
23 the wintertime, it was actually designed for a hemisphere
24 further south than what we located. It had a freeze stat to
25 start the system. They actually showed Cpl. Warren how to

2277

1  go up on the roof to start this system.  There was a reset
2  you had to push.
3          Sometimes it would throw belts.  There was
4  actually -- there are motors up there and they're belt
5  driven and sometimes it would throw a belt and you would
6  have no air on one side of the range and the other side
7  would.
8      "We complained about different things.  They
9  actually, facilities went through and actually hired a
10  company to come in and rebalance the whole air system to try
11  to make what we had work as best we could.  As Cpl. Warren
12  was told by one of the folks that came to rebalance that
13  system, the system itself was a very good system, but it was
14  put together wrong.  And they were trying to make it the
15  right way to make it function as near correct as they could.
16      "Question:  Did they ever get it working to your
17  satisfaction?
18      "Answer:  It would work, but you would still
19  have malfunctions in it.  And when it malfunctioned, we
20  would stop shooting.  I used to catch a lot of -- I used to
21  catch the devil from one particular range, Mjr. Papili,
22  because a lot of times when we would go to shoot, I would,
23  we would cancel the shoot.
24      "It would put Wayne Warren in a bad position
25  because a lot of times it was when the SORT team was

2278

1  supposed to shoot and Wayne was part of the SORT team and
2  Mjr. Papili didn't like us making the SORT team go somewhere
3  else to shoot.
4      "Question:  Why is it that you would close the
5  range on those occasions?
6      "Answer:  The air system wasn't working.
7      "Question:  And why did that cause you to close
8  the range?
9      "Answer:  If you've got no air circulation and
10  you shoot in there, you're not removing the dust and the
11  debris from the air.  Everybody is breathing it in.  That's
12  a health issue.
13      "Question:  You consider that a health issue?
14      "Answer:  Absolutely.  We wouldn't shoot.  We
15  had other agencies that come to shoot, DNREC, others, and if
16  the system didn't work, we sent them on their way.  We hate
17  to do that because it caused problems for people, but there
18  was no sense in letting them being out there.  We wouldn't
19  go out there and work in it, so we didn't want them to work
20  in it.
21      "Question:  Now, I want to ask you a few
22  questions about the point when you left the range in
23  December of 2003.
24      "Answer:  Okay.
25      "Question:  I think you testified earlier that

2279

1  Chris Foraker replaced you; right?
2      "Answer:  Yes.
3      "Question:  Now, did you meet with him to brief
4  him on what was going on at the range at the point that he
5  returned?
6      "Answer:  We had a meeting the day he returned,
7  myself, Chris, Lt. Davis and Cpt. Warren.  We met in our
8  conference room right there at the Firearms Unit.
9      "Question:  Describe what happened in the
10  meeting.
11      "Answer:  Well, the meeting was there so we
12  could pass on the range to Chris, go through everything from
13  the coffee fund, which Cpl. Warren was holding at the time,
14  through our ammunition inventory, our weapons inventory,
15  through the range, et cetera.
16      "I had a little sheet that I was going to go in
17  order on.  I just wrote a handwritten sheet to go and order
18  on so I'd know where I was going to go down the line.  And
19  Chris had a checklist-type checklist, rather nice, with all
20  the information on it.  The first thing that comes to my
21  mind obviously was that his attorneys gave it to him.  So we
22  wanted to make sure we wanted to do everything the right
23  way, which we were ordered to do anyway.
24      "Question:  Did Chris Foraker go through the
25  checklist?

2280

1      "Answer:  Yes, we did.
2      "Question:  Did he give you a copy of the
3  checklist?
4      "Answer:  Nope.
5      "Question:  Did you ask him for a copy of the
6  checklist?
7      "Answer:  I asked for a copy between the three
8  folks that had a copy, Chris, Lt. Davis and Cpt. Warren.
9      "Question:  And did any of them give you a copy?
10      "Answer:  Nope.
11      "Question:  Did you actually walk through parts
12  of the range other than the conference room where the
13  meeting started?
14      "Answer:  We went through every bit of the
15  range.
16      "Question:  Who was with you when you went
17  through the range?
18      "Answer:  Chris and Lt. Davis.
19      "Question:  And did Cpt. Warren leave before you
20  went through the range?
21      "Answer:  If memory serves, he had some kind of
22  meeting.  He had to leave after we met in the conference
23  room.
24      "Question:  Did you go through the offices in
25  the range?

2329

Papili - direct

1  A.   The full-time units, I have a civilian that was a

2  civilian director of our Crime Lab Unit. She is an employee

3  of the division but not in a uniformed capacity.

4       Uncommissioned officer, Al Parton, he would head

5  up our SORT team and Chris Hennish would head up the Bomb

6  Team. He is a corporal.

7  Q.   All right. Do any of these noncommissioned officers,

8  attend the section chief and commanders meetings?

9  A.   Not regularly. But if necessary to present on a

10  particular topic, if there was an issue we were doing with

11  critical incident training or something like that and I

12  would need their expertise in there, they would be directed

13  to attend to present relevant to that topic.

14  Q.   All right. And why don't they regularly attend these

15  meetings?

16  A.   It's regularly the meetings are on command staff

17  level and they're designated for traditionally the captains,

18  the troops and the administrators of the different levels,

19  of the troop levels and the commanding officers of the

20  particular sections.

21  Q.   Does a noncommissioned officer in charge of the

22  Firearms Training Unit attend these meetings?

23  A.   Not usually, but I think there has been times in the

24  past where they had been present for those meetings.

25  Q.   All right. Was that to give presentation on a

---

2330

Papili - direct

1  specific topic like you were discussing?

2  A.   It could have been, yes.

3  Q.   Do you remember seeing Sgt. Foraker at the section

4  chiefs and commanders meetings during his first period at

5  the Firearms Training Unit from about July of 2001 to

6  March 2002?

7  A.   I'm not sure if I remember seeing him there but I

8  know at times Sgt. Foraker may have been at the meetings,

9  yes.

10  Q.   All right. And how about during his second

11  assignment from December 2003 to July 2005?

12  A.   I think during that period of time, I think we may

13  have streamlined more of the attendance to commanders and

14  assistant commanders at those particular troops and

15  sections.

16  Q.   So there was a change in the way --

17       MR. T. NEUBERGER: Objection, leading.

18  BY MS. HARVEY:

19  Q.   Was there a change in the way the commanders meetings

20  were set up?

21  A.   Yes. We've had some transition over the period of

22  time as to the way we ran our commanders meetings and the

23  content of what was discussed and facilitated during those

24  meetings.

25  Q.   All right. One last topic. How long have you known

---

2331

Papili - direct

1  Sgt. Foraker.

2  A.   We went through a training academy together. So

3  since 1985.

4  Q.   Do you know him well?

5  A.   Fairly well.

6  Q.   Would you call him a friend?

7  A.   Yes.

8  Q.   Do you believe that Sgt. Foraker is a competent

9  trooper?

10  A.   Absolutely.

11  Q.   Do you have a good opinion of him?

12  A.   Yes. Sgt. Foraker is — like I said, we went through

13  the training academy together. He was a hard worker. He,

14  when we went out on patrol, he was a dedicated patrol

15  officer. He was a very good K-9 handler; an exceptional

16  from my perception, exceptional firearms instructor.

17  Q.   Are you aware of anything negative that Col. MacLeish

18  has personally said about Sgt. Foraker?

19  A.   No, not in my presence.

20  Q.   Have you ever personally heard Col. Chaffinch say

21  anything negative about Sgt. Foraker?

22  A.   Not in my presence.

23  Q.   Are you familiar with the article that was printed in

24  approximately April 2004 regarding the visit at the Firearms

25  Training Unit when Col. Chaffinch was present?

---

2332

Papili - cross

1  A.   Yes.

2  Q.   Are you aware of some of the comments Col. Chaffinch

3  made in that article?

4  A.   From reading it and I guess conversation with another

5  staff officer, yes.

6  Q.   Did any of these statements affect your opinion of

7  Sgt. Foraker?

8  A.   No.

9  Q.   And why not?

10  A.   Because my opinions of Sgt. Foraker are based on my

11  observations and my dealings with him over the years. Not

12  someone else's opinions or comments.

13       MS. HARVEY: I have no further questions.

14       THE COURT: Mr. Neuberger, you may

15  cross-examine.

16       CROSS-EXAMINATION

17  BY MR. T. NEUBERGER:

18  Q.   How many times did you meet with the defendants

19  lawyers before testifying today?

20  A.   Twice.

21  Q.   Twice. Once this week?

22  A.   No, not this week.

23  Q.   Once last week?

24  A.   I think it was a couple weeks ago.

25  Q.   Their office is in Philadelphia or their office is in

---

C-22

SHEET 55

2401

```
1           MR. ELLIS:  I've made myself clear, too, Your
2  Honor.
3           THE COURT:  All right.  I'll give it some
4  thought.
5           MR. T. NEUBERGER:  So could I respectfully ask,
6  Your Honor, you will make your decision, and then your
7  decision, maybe we'll get something on the e-mail?
8           THE COURT:  We have time on the verdict sheet.
9  We have more time on the verdict sheet than we have on the
10 instructions.
11          MR. T. NEUBERGER:  Right.
12          THE COURT:  Unfortunately, we won't be going
13 home early.  That's okay.
14          MR. T. NEUBERGER:  Thank you, Your Honor.
15          THE COURT:  Is there anything else?
16          MR. T. NEUBERGER:  I think that's it.
17          THE COURT:  From your perspective?
18          MR. ELLIS:  (Shaking head no.)  Enjoy your
19 weekend.
20          THE COURT:  You, too.
21          MR. ELLIS:  And to all your staff.
22          (Proceedings adjourn at 4:14 p.m.)
23
24
25
```

2402

```
1                    INDEX
2  DR. CAREN DeBERNARDO
3  DIRECT EXAMINATION BY MR. ELLIS              2196
   CROSS-EXAMINATION BY MR. WAVERLY            2222
4
   Deposition of Alfred W. Parton, Jr.         2241
5
   Deposition of Richard A. Ashley             2259
6
   DR. BRIAN SULLIVAN
7
   DIRECT EXAMINATION BY MR. ELLIS             2284
8  CROSS-EXAMINATION BY MR. WAVERLY            2300
   REDIRECT EXAMINATION BY MR. ELLIS           2315
9
   MJR. JOSEPH PAPILI
10
   DIRECT EXAMINATION BY MS. HARVEY            2317
11 CROSS-EXAMINATION BY MR. T. NEUBERGER       2332
   REDIRECT EXAMINATION BY MS. HARVEY          2339
12
   ROBERT FURMAN
13 DIRECT EXAMINATION BY MR. ELLIS             2341
   CROSS-EXAMINATION BY MR. S. NEUBERGER       2348
14
   PAUL ECKRICH
15
   DIRECT EXAMINATION BY MR. ELLIS             2351
16 CROSS-EXAMINATION BY MR. T. NEUBERGER       2359
   REDIRECT EXAMINATION BY MR. ELLIS           2361
17
   PRAYER CONFERENCE                           2364
18
19                 EXHIBITS
20
   Plaintiffs' Exhibit No. 166                 2339
```

1                         - VOLUME A -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                          - - -

5   CHRISTOPHER D. FORAKER, Sgt.,    :      CIVIL ACTION
                                     :
6            Plaintiff,              :
                                     :
7            v.                      :
                                     :
8   DIVISION OF  STATE POLICE,       :
    DEPARTMENT OF PUBLIC SAFETY,     :
9   STATE OF DELAWARE, L. AARON      :
    CHAFFINCH, Col., individually    :
10  and in his official capacity     :
    as the superintendent of the    :
11  Delaware State Police,           :
                                     :    NO. 02-302 (JJF)
12           Defendants.
                                - - -
13
                       Wilmington, Delaware
14           Wednesday, June 18, 2003 at 9:05 a.m.

15                         - - -

16  BEFORE:      HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.,
                                            and a jury
17                         - - -

    APPEARANCES:
18

19          THOMAS S. NEUBERGER, P.A.
            BY:  THOMAS S. NEUBERGER, ESQ.
20
                   and
21
            MARTIN DUANE HAVERLY, ATTORNEY AT LAW
22          BY:  MARTIN DUANE HAVERLY, ESQ.

23                   Counsel for Plaintiff

24
                          Brian P. Gaffigan
25                        Official Court Reporter

```
 1   APPEARANCES: (Continued)

 2
                      Delaware Department of Justice
 3                    BY:  ROSEMARY K. KILLIAN, ESQ.
                           Deputy Attorney General
 4
                           and
 5
                      Delaware Department of Justice
 6                    BY:  W. MICHAEL TUPMAN, ESQ.
                           Deputy Attorney General
 7                         (Dover, Delaware)

 8                            Counsel for Defendants

 9

10

11

12

13                           - oOo -

14                  P R O C E E D I N G S

15       (Proceedings began at 9:05 a.m.)

16       THE COURT:  Good morning.  Be seated, please.

17          The jury is on their way up.  I'm going to, once

18   I question the jury with my voir dire, I'm going to give

19   each of you an opportunity at side bar, after we're done

20   following up on anybody that has to be followed up on, to

21   select two or three jurors from the list that you would, if

22   you want to, that you may desire to question about any matter

23   that was in their paperwork or that you feel you'd like to

24   know a little bit about because they didn't respond at all

25   during the examination.  So you may want to look over a list
```

Foraker - direct

1  have one instructor to three students because you don't want

2  to spread your sight pattern out too far.  You want to be in

3  control of these people if something happens because they're

4  not accustomed to it.  They're just learning firearms.

5  Q.    Let's talk about, well, did all of these people

6  full-time or part-time report to you?

7  A.    Yes, sir.

8  Q.    Why don't you explain to the jury what your respons-

9  ibilities were.  What were the kinds of things that you did

10  as the noncommissioned officer in charge of the FTU?

11  A.    I was in charge of the entire operations of the

12  firearms training.  I basically managed the facility.  I

13  would also manage the $300,000 budget.  I would work with

14  Major Swiski who was the officer in charge of the budgets

15  for the Delaware State Police.  I would work directly with

16  him and with Faye Diehl (phonetic) in Purchasing to acquire

17  weapons, when necessary, and acquire ammunition when it was

18  needed.  I was also working on acquiring vests, bulletproof

19  or bullet resistant body armor when needed.  I was also in

20  charge of training and developing lesson plans and so forth

21  and updating training for in-service and recruits.

22  Q.    Well, let's talk about training.  You just mentioned

23  recruits.  What did you do for recruits, meaning people in

24  the Police Academy?  What does the FTU do for that?

25  A.    They come through the Academy and they receive a so

Foraker - direct

1  many hour course with us.  We take them in for, it averages

2  out about two and-a-half weeks altogether where we work with

3  them in firearms.  We teach them from the basics on up to

4  high speed type of shooting for their skills.  We teach them

5  handguns and shotgun training.

6  Q.     Well, if you are not a recruit, if you are one of the

7  several hundred troopers, I think you may have mentioned

8  recertification.  What do you mean by that?

9  A.     We have semiannual firearms training in certificat-

10  ions.  Okay?  Whoever is assigned, like say where I'm located

11  now in Troop 6, Prices Corner, I have a shift.  I run, I'm a

12  supervisor of a shift of personnel of nine other people and

13  they'll get an assignment to go down to the range and they'll

14  qualify together, will do some firearms training. They will

15  qualify together and any updated training that we find that

16  is out there, from different organizations like Sig Arms,

17  we incorporate that, new ideas, and implement that in our

18  training.

19  Q.     You say that is semiannually?

20  A.     Semiannually, yes.

21  Q.     Then you mentioned weapons.  What are your respons-

22  ibilities in the area of weapons?

23  A.     I would test and evaluate weapons.  In particular,

24  the most common weapons that we use are our handgun and

25  shotgun.  When I was in the unit, I conducted research on a

Foraker - direct

1    shotgun barrel. We were trying to get away from lead-based

2    ammunition.  We were trying to get a shotgun that was con-

3    ducive for everyone.  We had 18-inch barrels which makes it

4    a bit heavy for small stature people to carry and to fire.

5    We also want a sighting system that was similar or the same.

6    I did a number of researches on the particular barrel that we

7    would need, and it ended up where I tested a Remington barrel

8    with rifle night-sights that are just like and identical to

9    the hand-held sights or handgun.

10            We had five or six different sighting systems out

11   there, which is really not what you want to do because it's

12   a liability issue.  If I were outside and I needed to get a

13   shotgun out to defend myself from someone else that wasn't my

14   shotgun, that was someone else's, so I wasn't accustomed to

15   shooting that one, I would pick up the shotgun and it would

16   have maybe one of six different sighting systems.  Under high

17   stress, you don't want that.  So I worked towards getting the

18   same sighting system.

19            Eventually, the division was to -- through the

20   research I conducted and the testing and evaluation, we were

21   able to do several things with the new barrel system.  We

22   were able to go to a better sighting system and the same

23   sighting system across the board with everybody having the

24   same so you don't have that liability issue.

25   Q.    So you are involved with that process regarding the

Foraker - direct

1    shotguns?

2    A.    Yes, sir.

3    Q.    Would you have been involved in any process regarding

4    other weapons?

5    A.    The particular seven months that it was there, I

6    wasn't involved in any other weapon system, but from that

7    position, you're trusted to do research and make contacts

8    with outside agencies, outside manufacturers of firearms

9    and bring in any weapons to test and evaluate.

10   Q.    So, for example, for handguns, would you have to go

11   to gun shows or what?

12   A.    Yes.

13   Q.    I mean, what would you do?

14   A.    Yes, the division does consider the firearms

15   instructor to be a position that you do need to have

16   up-to-date training, and you do need to find the latest and

17   greatest that's out there.  One thing in particular is body

18   armor.  You want the best body armor that is possible.  You

19   want the body armor that will top your own because statistics

20   will show that police officers that are shot in the line of

21   duty usually are shot with their own weapon.  There is a

22   greater percentage that are shot with their own weapon.  And

23   with that, the wrestling over the gun, they get it taken from

24   them and they get shot.  Well, you want a body armor that is

25   going to protect from your very own round so if somebody does

Foraker - direct

1     get a gun and they do shoot you, the best you will wear will

2     protect you.  So you always want to do research for the best

3     possible, the latest and greatest materials that are out

4     there.  So it's important that we get sent to these different

5     locations for that research.

6             If I may step back for a minute?

7     Q.     Sure.

8     A.     I did do research on a Glock pistol.  It's a Glock 33.

9     We were looking for a pistol that would be conducive for our

10    undercover officers.  I did the research on the Glock 23 and

11    brought weapons in to test and evaluate and that eventually

12    the division went up to that weapon for the undercover

13    officers.

14    Q.     You mentioned ammunition.  What were you doing in the

15    area of ammunition?

16    A.     We were conducting research on nontoxic ammunition.

17    Q.     What do you mean by that?

18    A.     Nontoxic ammunition is being used indoors at the

19    range.  The lead-based bullets, that's the issue where if

20    the air handling system isn't working properly, the lead dust

21    that comes from firing the weapon, firing that particular

22    round, you are going to inhale that lead dust if the facility

23    is not drawing it away from you and out into filters.  If you

24    go to nontoxic ammunition, it's lead free.  That's something

25    that we were able to do with handgun.  I was conducting

Foraker - direct

1   research on getting nontoxic shotgun ammunition and testing

2   and evaluating it.

3           At the time when I was doing the testing, they

4   were developing some new rounds that looked promising for the

5   new shotgun barrel that we're using.  The old shotgun barrel

6   that we were using, to explain the shotgun barrel itself, the

7   new shotgun barrel has a choke tube which means it restricts

8   the flow of the rounds that comes out of it.  That choke

9   tube is important if you are shooting rounds that may not

10  necessarily be accurate in other rounds with a smooth bore.

11  If you have a smooth bore, you have too much of a spread of

12  a pattern.  What you want is a shotgun barrel that is going

13  to restrict.  That is what we went to with the new shotgun

14  barrels that I did research on.

15  Q.    Well, just to finish up on your responsibility at the

16  FTU, did you have any other responsibilities in the area of

17  critical response or incident response?

18  A.    Yes.  I conducted First Responders Training.

19  Q.    What do you mean by First Responders Training?

20  A.    Critical incidents in like, say, a barricaded subject;

21  someone that is in your neighborhood that is shooting up a

22  house or something along that line, you have a barricaded

23  subject or you have a hostage situation, just as two examples

24  there.  You get the 911 call and the dispatcher calls the

25  troopers on the road and says you need to respond to this

A-142

Foraker - direct

1  particular location and explains to you "shots fired" or

2  something along this line or you get the idea that there is

3  a critical incident that has just developed where you may

4  have an active shooter or somebody that is holding somebody

5  else hostage.

6          You need to train people in how to respond to

7  that.  You don't want people just driving right up to the

8  front door and getting out and walking up to the front door.

9  That's definitely potentially dangerous, and you don't want

10  that to happen.  So First Responders Training, we got into

11  First Responders Training hot and heavy just after Columbine

12  and we did a lot of critical incident trainings out in the

13  field, not me directing that particularly but I directed it

14  while it was at the range.  We would do, I would explain to

15  them how you would respond, how to set up a perimeter, how

16  to contain, how to set up a stop line where you don't allow

17  somebody to get to a vehicle to drive off because then

18  you would have a vehicle pursued.  You don't allow it to

19  go mobile, explaining those types of things, in critical

20  incidents.

21  Q.    Let's move off of that.  During your seven months with

22  the FTU, did you ever receive any recognition for your work?

23  A.    Yes, as a matter of fact.

24  Q.    Let's go to the book, the exhibit book for awhile.

25  Let's turn to Plaintiff's Exhibit 2, behind the tab there,

Foraker - direct

1

2

3                         INDEX

4   PLAINTIFF'S TESTIMONY

5   MAJOR MARK W. SEIFERT

6   Direct by Mr. Neuberger................. 53
    Cross by Mr. Tupman..................... 94
7

    MAJOR JOSEPH A. PAPILI

8
    Direct by Mr. Neuberger............... 102
9   Cross by Ms. Killian.................. 105
    Redirect by Mr. Neuberger............. 113
10

    SGT. CHRISTOPHER D. FORAKER

11
    Direct by Mr. Neuberger............... 115
12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Memo

**To:**   Lt. William Bryson

**From:** Sgt. Brian FitzPatrick

**CC:**   Captain Thomas DiNetta

**Date:** 11/08/98

**Re:**   Range ventilation problem

---

Since the first day of the In-service shoot, the Firearms Training Staff occasionally noticed an excessive odor of gun smoke on the range. Whenever the odor was strong, we also noticed what felt like a reduction in the airflow. Gary Bivins from Facilities Management notified Seiberlich Trane, the company that installed the system of the problem. A first response did not identify nor fix the problem. On 11/05/98 Jim Ferguson of Trane responded and identified that the ventilation system is causing a horizontal tornado (best way to describe it) swirling the smoke from floor level to the ceiling. I contacted Ed Ide of the Jade Engineering firm and established a conference call allowing Mr. Ide to discuss the problem with Mr. Ferguson. Mr. Ide stated the problem is because the deflectors that were identified in the blue prints were not installed therefore the system is not working properly. The air is being forced to the ground causing the swirling effect. Mr. Ide also stated that at the final walk through for phase 1 of the range project it was decided to allow Delaware Mechanical not to install the deflectors, to wait and see if they were necessary. This was against Mr. Ide's recommendation. I checked the blue prints and it does clearly show the deflectors and verbally states how critical they are.

On 11/06/98 I contacted Ms. Elrita Annett, Project Manager, from facilities management and informed her of the problem. I also contacted Tim Murphy, Commonwealth Construction, about the problem. Both agencies were advised of the urgency to get this problem rectified. The week of the 11/9/98 would be the best time to fix the problem since no shooting is scheduled because of the Governor's conference. I also requested that on 11/16/98 air quality sample be conducted while we are shooting to determine if the range will be safe for use, Ms. Annett is checking into this. We feel that it should not be a problem for the students based on their limited exposure. However, the range staff is exposed daily and there is a potential for serious health problems

DEFENDANT'S
EXHIBIT
48

FTU2956

C-34

# *Delaware State Police*

# Firearms Training Unit

# Memorandum

**To:**    Captain Thomas DiNetta

**CC:**    Ms. Elritta Annett

**From:** Sgt. Brian FitzPatrick

**Date:** 12/03/98

**Re:**    Range Ventilation

---

      Sir, as a result of the meeting on 12/02/98 attended by Col. Ellingsworth, Secretary Bushweller, and Secretary Vince Meconi, Sgt. William Rhoades, myself and numerous members of Facilities Management the in-door range is closed until the air handling system can be fixed. Seiberlich Trane responded to the range on this date to correct the mechanical system.  A smoke test was conducted at 1600 hrs. and showed that a problem still exists but it may be good enough for us to finish our fall qualification.  Facilities management is scheduled to conduct another test for lead on Monday 12/07/98 during our next scheduled fall qualification shoot.  Further examination by the engineering firm will be required to properly fix this problem. Ms. Annett was also advised of our shooting schedule so that required work could be completed without interfering with training.

      A personal monitoring device was requested at the meeting to monitor the instructors for a full day of training to determine exactly how much we are effected.  Mr. Doyle Tiller of Facilities Management stated that

1



FTU2983

C-35

*December 7, 1998*

his division would monitor the range at static locations but would not monitor people. Mr. Robert Overmiller of Facilities Management relayed this to me. I contacted Ms. Elritta Annett and advised her of this problem and lack of cooperation. Ms. Annett stated that she would make arrangement s to have two instructors monitored on Monday. I am also going to contact Mrs. Kristy Tuxward and request that the Firearms Training Staff have another blood test conducted to determine if lead levels are within a safe range.

Col. Ellingsworth requested that I check into the availability of lead free primers and ammunition also that I make contact with the civic association next to the old range in case we were forced to re-open it. I contacted Mr. Russell Ellis of Speer ammunition. Mr. Ellis stated that Speer did not make nor did it intend to produce a .357 sig. round with a lead free primer. Mr. Ellis has been an excellent source of information and does not believe that any ammunition manufacture is making this round with a lead free primer and jacked bullet. Longbow Inc. is making a lead free frangible round that is having trouble with splash back and also can damage the barrel of the weapon with prolong use. I left messages with several major ammunition companies reference this request.

Sgt. Purcell provided me with Mr. Pieter Vree's information and stated that he was the only one in the development that constantly complained. Sgt. Purcell was not aware of a formal civic association. I did not contact Mr. Vree for I am confident that we will be able to complete the fall shoot at the new range. I did not think that we should stir Mr. Vree's emotions if it is not needed. Should the new test still require us to shut down, I will personally contact this individual.

2

FTU2984

C-36

# Firearms Training Unit

# Memorandum

**To:**   Captain Thomas Dinetta

**CC:**   Major McDerby

**From:**   Sgt. Brian J. FitzPatrick

**Date:**   April 29, 1999

**Re:**   Range Project

---

1.  On Monday April 12, 1999 contractors installed the sweeps at the 25 yard line as shown on the initial blue prints. Testing of this change could not be completed due to the Hepa filters were restricting air movement and needed to be changed.

2.  Gary Bivins of Facilities Management stated he was waiting for Mr. Doyle Tiller of Facilities Management to select a contractor that would be changing the filters.

3.  April 21,1999 Gary Bivins stated that the wrong filters had been ordered and the filters currently being used were wrong. A new order is being placed.  Lead testing was completed by Cpl/3 Cathell and Cpl./2 Price.

4.  April 26, 1999 the rear of the range was found to have a large amount of lead dust on the floor and equipment. Test results from Cpl./3 Cathell showed his level rose from a 14 to a 21 and Cpl./2 Price went from a 8 to 11.  I spoke with Ms. Elritta Annett and advised her of the on going problems with the filters, and the updated lead level of members of this section. Ms. Annett stated that on Monday May 4, 1999 at 0900 members from the National Guard would be at the range to evaluate all proposals being submitted to fix the range problem. This is being done at the request of Mr. Mark Devore from Facilities Management. Contractors from Delaware Mechanical and other firms would be having a meeting  to review all proposals.

5.  April 27, 1999 spoke with Mr. Doyle Tiller adressed my concern with the lack of cooperation that this project is receiving. I advised Mr. Doyle to respond to the range so he could see what a major problem now exists. Mr. Doyle responded with a representative from BATTA to take a sample of the dust that accumulated behind the bullet trap.  Mr. Doyle was also advised that the cleanup of the lead dust would have to be done when the filters are replaced.



**DEFENDANT'S EXHIBIT** 50

1

FTU3040

C-37