IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2003 NOV 20 AM 10: 38

| | |
|---|---|
| CHRISTOPHER D. FORAKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. 02-302-JJF |
| ) | |
| COLONEL L. AARON CHAFFINCH, ) | |
| individually and in his official capacity as ) | |
| Superintendent of the Delaware State Police, ) | |
| DIVISION OF STATE POLICE, ) | |
| DEPARTMENT OF PUBLIC SAFETY, ) | |
| STATE OF DELAWARE, ) | |
| ) | |
| Defendants. ) | |

## STIPULATED ORDER

The parties to this case, acting through their authorized counsel, hereby stipulate and agree as follows, subject to approval of the Court:

1. Sergeant Christopher D. Foraker is ordered reinstated to his prior position as the Non-Commissioned Officer-in-Charge of the Firearms Training Unit of the Delaware State Police with all of the rights, privileges, duties, responsibilities and supervisory authority previously held by him when he earlier occupied that position on February 20, 2002.

2. Plaintiff withdraws his post-trial motion for reinstatement.

3. The Court shall retain jurisdiction over this matter to enforce its order of reinstatement should that become necessary.



PLAINTIFF'S EXHIBIT 2

4. The judgment entered by the Court in this case on July 2, 2003 is vacated.

5. Plaintiff withdraws his two Rule 50 motions filed before the submission of the case to the jury.

Dated: November 18, 2003

_____
Thomas S. Neuberger, Esquire
Bar # 243
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
Counsel for Plaintiff

Dated: November 19, 2003

_____
W. Michael Tupman, Esquire
Bar # 3040
Deputy Attorney General
Department of Justice
102 West Water Street, 3rd Floor
Dover, DE 19904
(302) 739-7641
Counsel for Defendants

Dated: November 19, 2003

_____
Martin D. Haverly, Esquire
Bar # 3295
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 654-2255
Counsel for Plaintiff

IT IS SO ORDERED, this 20 day of November, 2003

_____
Joseph J. Farnan, Jr.
United States District Judge

I:\TUPMAN\Files\foraker.stip.ord.wpd

-2-

FOCUS - 1 of 3 DOCUMENTS

INTERIM HEALTH CARE, Plaintiff, v. ROSA E. FOURNIER, and NURSES 'N KIDS AT HOME, INC., a Delaware corporation, Defendants.

Civil Action No. 13003

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1994 Del. Ch. LEXIS 28*

October 8, 1993, Submitted
February 28, 1994, Decided

**NOTICE:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**COUNSEL:** [*1]

Richard G. Elliott, Jr. and Claudia A. DelGross, Esquires, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware; Attorneys for Plaintiff.

Mark Minuti, Esquire, of SAUL, EWING, REMICK & SAUL, Wilmington, Delaware; and Edward Mazurek, Esquire, of SAUL, EWING, REMICK & SAUL, Philadelphia, Pennsylvania; Attorneys for Defendant Nurses 'N Kids At Home, Inc.

C. Cullen Rooney, Esquire, of AMENT, LYNCH & CARR, Wilmington, Delaware; Attorney for Defendant Rosa E. Fournier.

**JUDGES:** JACOBS

**OPINIONBY:** JACOBS

**OPINION:**

MEMORANDUM OPINION

JACOBS, Vice Chancellor

The plaintiff, Interim Health Care ("Interim"), n1 is a pediatric in-home nursing care company doing business in New Castle County, Delaware. In this action Interim seeks to enforce the noncompetition provisions of an employment agreement with Rosa E. Fournier ("Fournier"), a former employee. The named defendants are Fournier and her present employer, Nurses 'N Kids At Home, Inc. ("NKH"), a Delaware corporation also engaged in the business of providing pediatric in-home nursing care.

> n1 The plaintiff's actual corporate name is H.C. Watson Corp., a New York Corporation conducting business in Delaware under the name "Interim Health Care." PS P 9a; Tr. 19. Interim was formerly known as "Medical Personnel Pool, Inc." when certain of the events relevant to this lawsuit occurred. For ease of reference, throughout this Opinion the plaintiff is referred to as "Interim."

[*2]

In its Amended Complaint filed on July 20, 1993, Interim alleged that Fournier breached the employment agreement by (i) soliciting and accepting present and potential patient-clients, and employees of Interim, and (ii) misappropriating Interim's confidential and proprietary information, all on behalf of NKH. NKH is charged with having aided and abetted Fournier in those breaches. Interim seeks damages to compensate it for the loss of patient-clients and employees who left Interim for NKH. The plaintiff also seeks an injunction prohibiting the defendants from further misappropriating its confidential and proprietary information.

In their answer the defendants denied any wrongdoing, and Fournier counterclaimed for defamation. Both parties ask the Court to award them the costs and attorneys' fees they incurred in defending this action and Fournier's counterclaim.

The case was tried on July 26 and 27, 1993, and the post-trial briefing was concluded on September 23, 1993. This is the Opinion of the Court, after trial, on the merits of Interim's claims and Fournier's counterclaim.

I. THE FACTS

The Court finds the pertinent facts to be as follows: Interim is a licensed Delaware [*3] agency that provides in-home nursing care to adults and children, and supplies temporary nurses to area hospitals and nursing homes. Tr. 18. n2 When Interim opened its Wilmington office in 1987, its clientele were primarily adults. Tr. 20. During the following year, Interim, under the direction of Regional Manager Lynda R. Kopishke ("Kopishke"), explored the possibility of expanding its pediatric care service to satisfy a then-unmet demand for pediatric in-home nursing care in Delaware. Tr. 20-21. Shortly thereafter, Interim became a provider of high-tech n3 in-home care to pediatric patients. Id.

 n2 As cited in this Opinion "Tr." refers to the trial transcript; "PS" refers to the Pretrial Stipulation; "PEx." refers to the plaintiff's trial exhibits; and DEx." refers to the defendants' trial exhibits.

 n3 The term "high-tech" refers to specialized technological services that pediatric patients require, such as ventilator operation, gastrostomy feeding, and oxygen therapy.

In 1988 Interim hired Fournier, who [*4] was a pediatric nurse, to perform in-home nursing duties. Tr. 32, 193-94. Fournier was promoted to the position of Home Care Supervisor in February, 1990. Her responsibilities included developing client referral sources such as Alfred I. duPont Institute ("AIDI"); performing initial patient assessments; supervising and evaluating field nurses and their treatment of in-home patients; communicating with physicians, therapists, referral sources and insurance carriers; visiting patient homes monthly; and performing periodic patient evaluations. Tr. 36-37, 39-40; PS PP 2, 9f.

As a condition of her supervisory promotion, Fournier signed an employment agreement dated February 19, 1990 ("Employment Contract"). PEx. 1. n4 Section 4 of that agreement provided that Fournier would not, during her employment at Interim and for eleven months after her employment terminated, directly or indirectly: (i) "solicit or accept" temporary personnel or home health care business from any person, firm or entity that was an Interim client or referral source at any time during the eleven months preceding the termination; or (ii) "solicit the employment, attempt to employ or employ" any employee on Interim's [*5] permanent staff on the date of the termination, or any individual who performed home health care or temporary work assignments at Interim for eleven months prior to the termination, or (iii) "disrupt or attempt to disrupt" Interim's employment relationship with any of its employees. PEx. 1 at P 4. Fournier further agreed (iv) not to disclose the names and addresses of Interim's employees and clients, or the details of Interim's manuals, forms, techniques and procedures, id. at P 5; and (v) to return all Interim's employee and customer lists, manuals, and any other proprietary information immediately upon the termination of her employment Id. at P 6.

 n4 Although the Employment Contract is dated February 19, 1990, the defendants contend that Fournier signed that agreement in August, 1991 without being afforded an opportunity to read it. Tr. 211, 213. That factual dispute relates to the defendants' claim that the Employment Contract is not a legally enforceable agreement. Because I have determined that that latter issue need not be decided, see *1994 Del. Ch. LEXIS 28,* *14, it becomes unnecessary to resolve the (subsidiary) factual dispute.

[*6]
In late October 1992, Fournier was interviewed by Ms. Janet Carroll ("Carroll") who had founded Nurses 'N Kids, Inc. ("NNK") in 1988. NNK is an established prescribed pediatric extended care ("PPEC") facility. Tr. 216, 403. Since 1988 Carroll had been considering expanding NNK's day care service by adding a pediatric in-home nursing service component. To further those exploratory efforts, Carroll obtained the assistance of Ms. Pat Droppleman ("Droppleman"), who operated an in-home nursing service in Cincinnati, Ohio. Because Ms. Droppleman was interested in obtaining information about PPECs, she and Carroll agreed to exchange information about their respective businesses. Accordingly, Carroll visited Droppleman's office in Ohio where she reviewed financial books and projections, and learned about staffing practices and programming computers. Also, when Droppleman's son visited the NNK office, he copied Droppleman's policies and procedures, manuals, and forms onto NNK's computer. Tr. 403-05.

During the latter half of 1992, Carroll continued preparing to start up the new pediatric in-home nursing service business, to be called "Nurses 'N Kids at Home." She drew up a business plan that, [*7] among other things, outlined how NKH intended to attract new patients. Tr. 405-07. n5 Carroll also created new business and patient care forms for NKH that drew heavily upon Droppleman's forms, NNK's own forms, and Carroll's years of nursing experience. Tr. 408. In addition, Carroll began recruiting staff through "word of mouth" and newspaper ads. Tr. 409.

n5 The business plan pertinently stated:

> [NKH] will only be targeting the pediatric population. This will be accomplished by networking with [NNK's] already established referral sources. These sources include area hospitals, mainly A.I. DuPont Institute, community and public health social workers, area clinics . . ., physicians and their offices and support groups. . . . The success of [NKH] will be phenomenal due to the reputation and success of [NNK]. We are offering a much needed service to this very special population, and to the families we are offering two viable choices of care.

DEx. 1 at 6.

Acting on Droppleman's advice to employ another nurse with [*8] pediatric experience, Carroll hired Fournier on November 2, 1992, after the initial interview. Two days later, Fournier formally submitted her resignation to Interim. Tr. 98-99, 216, 332-34.

Upon receiving Fournier's letter of resignation, Kopishke met with Fournier to discuss the terms of the Employment Contract with Interim. Tr. 43-44. Following their meeting, Kopishke handed Fournier a letter setting forth Interim's interpretation of the Employment Contract's noncompetition provisions. Ms. Kopishke's letter directed:

> 1. That [Fournier] . . . not contact any employees, clients, or referral sources that [she] had contact with during [her] employment with Interim HealthCare.
>
> 2. That [Fournier] return all proprietary items and information which are the property of Interim HealthCare.
>
> 3. That [Fournier] . . . not discuss proprietary information which [she] gained while under the employ of Interim HealthCare.

PEx. 5. The letter also noted that the noncompetition provisions did not prevent Fournier from working for an Interim competitor.

Interim's attorneys also advised NKH of the terms of the noncompetition provisions of the Employment Contract, in a letter dated November 25, [*9] 1992. PEx. 7. That information came as no surprise to Carroll, who had previously been told of those provisions by Fournier. Tr. 331. Immediately after learning about the noncompetition provisions, Carroll consulted an attorney for advice as to the procedures NKH should employ to avoid violating the noncompetition provisions. Tr. 410. On the advice of its counsel, NKH decided to (and did) erect an "imaginary wall" around Fournier to assure that she would not interview or hire Interim employees, or contact, solicit, or accept Interim clients. Tr. 411, 441, DEx. 9.

Fournier commenced her employment with NKH on November 30, 1992, as Assistant Administrator. PS P 9g. On December 1, 1992, the following day, NKH began conducting business. Tr. 330.

NKH's written policies and procedures for admitting a patient-client involved a three-step process: completing a referral form, obtaining billing information, and completing an assessment form to establish the patient's nursing care requirements. n6 PEx. 25. Between December 1, 1992 and May, 1993, NKH admitted four former Interim high-tech pediatric patient-clients: Sabar Harris ("Sabar"), Darion Frank ("Darion"), Joseph McCoy ("Joseph") and Vincent [*10] Brittingham ("Vincent"). PS P 9i, l, o, q. NKH also admitted several pediatric patients from AIDI referrals. PEx. 48. Contrary to Interim's position, the evidence establishes that none of these admissions resulted from any solicitation by, or other conduct of, Fournier.

n6 NKH's policies also stated that:

> The patient/client is admitted by the home care service when it appears that the service is capable of providing needed care at the level of intensity required by the patient's condition.

PEx. 22. NKH concedes that it does not strictly adhere to those policies and procedures, but looks to them merely for guidance. Tr. 334-35, 339, 416.

The evidence shows that Sabar's foster mother, Linda Hartzel, was dissatisfied with the care Interim was providing to Sabar. Tr. 380. Ms. Hartzel communicated her dissatisfaction to Sabar's pediatrician, Katherine

Esterly, M.D., who decided to transfer Sabar to the care of NKH. Tr. 381-82, 421. Dr. Esterly, who had originally encouraged Carroll to start her PPEC and was familiar [*11] with her nursing skills, testified that she moved Sabar to NKH because she knew that NKH would give him excellent care. Tr. 422-23, 429. I find credible Dr. Esterly's and Ms. Hartzel's uncontroverted testimony that Fournier never solicited them for Sabar's admission. Tr. 382-83, 421. n7

> n7 Interim points to Fournier's having accompanied Carroll to a meeting with Dr. Esterly, to discuss whether NKH could accommodate Sabar's needs. However, Dr. Esterly testified (and I find) that she had already decided to move Sabar out of Interim before that meeting took place. Tr. 387, 421-24.

Darion Frank, like Sabar Harris, switched to NKH because his mother was dissatisfied with Interim's services. Tr. 369. Ms. Frank testified (and I find) that Fournier did not solicit or otherwise cause Darion to stop using Interim's services or to retain NKH. n8 Tr. 369-70. Rather, Ms. Frank telephoned Carroll and expressed an interest in having her son become a patient of NKH. Since Darion was already a patient at the NNK PPEC, his mother felt [*12] comfortable that NKH would provide good care. Tr. 373.

> n8 Interim points to an entry in Fournier's calendar as evidence that Fournier met with Darion's pediatrician, Dr. Purcell, to solicit Darion as a patient. Although Dr. Purcell's name does appear in the January 29, 1993 calendar slot, there is no indication that any meeting was scheduled. PEx. 8. Fournier testified that she did not meet with Dr. Purcell, and that the calendar entry likely reflected a conversation she had with him regarding two other patients. Tr. 264-65. There is no evidence to the contrary.

Similarly, Diana Borgia, Joseph McCoy's grandmother and legal guardian, testified that she stopped using Interim because she was not satisfied with its services. Ms. Borgia also testified (and I find) that Fournier did not solicit her or otherwise influence her decision to leave Interim. Tr. 360-62. On the contrary, Ms. Borgia telephoned NKH to retain their services and asked to speak with Fournier. After learning that Ms. Borgia was calling her, Fournier [*13] became alarmed and told Ms. Borgia that she could not speak with her, and handed the telephone to Carroll. Tr. 363. Carroll spoke with Ms. Borgia, filled out a referral form based on information that she had received over the telephone, and Ms. Borgia became an NKH client. Tr. 362-63, 367-68. n9

> n9 Although Interim contends that Fournier solicited Borgia by taking Joseph's referral for NKH (Pl. Op. Br. at 8), it was Carroll, not Fournier, who took the referral. Fournier wrote some additional information on Joseph's referral form when she visited his home, after Carroll had already completed filling out the form. Tr. 269-70; PEx. 15.

Vincent Brittingham's mother, Brenda Brittingham, also initiated the contact with NKH by calling to request its services. Tr. 418. Vincent, like Darion, was a preexisting client of the NNK PPEC. Tr. 342, 417. Although Fournier filled out the assessment and admission consent forms for Vincent Brittingham (PExs. 18, 19, Tr. 270), there is no evidence that she solicited or accepted him as [*14] an NKH patient.

Interim also contends that Fournier solicited or accepted, on behalf of NKH, four former Interim nurses: Charles Veal, Ruth Fair, Marcia Schwarm and Susan Travaglini. The evidence shows, however, that these nurses sought employment--and initiated the employment discussions--with NKH because they wanted to continue caring for patients with whom they had relationships while those patients were clients at Interim.

Thus, when Mr. Veal learned that he would no longer be caring for Sabar because of Sabar's departure to NKH, he called Ms. Hartzel to ask whether he could continue providing care to Sabar. Tr. 154-55. Ms. Hartzel said yes, and gave Mr. Veal NKH's telephone number. Tr. 156. Mr. Veal then called NKH, and told Carroll that he had been caring for Sabar for the past several months and hoped to continue doing so as an NKH employee. Subsequently Mr. Veal filled out an application, and was interviewed by Carroll and hired by NKH, all on the same day. n10 Tr. 151-53, 156-57. Mr. Veal then informed Interim that he was moving to NKH because he was very attached to Sabar, and was being offered better compensation and benefits. Mr. Veal also testified (and I find) that he [*15] did not even know that Fournier was working at NKH until after he had been working there for about a week. Tr. 158-59. n11

> n10 Carroll did not feel the need to perform a lengthy background check on Mr. Veal, because Ms. Hartzel had previously told Carroll that she wanted Mr. Veal to continue caring for Sabar.

n11 Like Mr. Veal, Ms. Fair and Ms. Travaglini applied for positions with NKH mainly because they wanted to continue caring for Sabar. Tr. 169, 188. Both deny ever being solicited by Fournier on behalf of NKH. Id. Ms. Travaglini is still employed by Interim.

Similarly, Ms. Schwarm applied for a position with NKH in order to continue caring for a former Interim patient, Vincent Brittingham. She testified that neither Fournier nor anyone at NKH had contacted her about working for NKH. Ms. Schwarm had cared for Vincent for two years, wanted to continue doing so, and, accordingly, applied to NKH for employment. Tr. 176-77. Both Carroll and Fournier knew that Ms. Schwarm had been providing care to Vincent [*16] during the year that Vincent attended NNK's PPEC. Tr. 183.

## II. THE CONTENTIONS

The parties' claims are relatively straightforward. First, Interim claims that Fournier breached paragraph 4 of the Employment Contract by "soliciting or accepting" Interim clients, employees, and potential clients from Interim's referral sources. In particular, Interim contends that Fournier directly or indirectly solicited and accepted patient-clients Harris, McCoy, Brittingham and Frank; employees Veal, Fair, Schwarm, and Travaglini; and several business referrals from Bayada and AIDI. Second, Interim contends that Fournier breached the Employment Contract by taking and failing to return Interim confidential documents and papers (PEx. 2, 32, 33, 34) and patient care forms (PEx. 36, 38, 40, 42 and 44), and by disclosing to NKH confidential information contained in those documents. Finally, Interim claims that the defendants misappropriated its confidential and proprietary information in violation of the Delaware Uniform Trade Secrets Act, *6 Del. C. § § 2001-2009.* n12

n12 The alleged trade secrets included client lists, referral sources, and patient forms. Interim also claims that the defendants unlawfully conspired to (1) copy Interim's patient care forms and use them as their own; (2) solicit and accept Interim's patients and business from Interim's referral sources; and (3) use Fournier's knowledge of Interim's patients and their medical histories, and of Interim's referral sources.

[*17]

The defendants vigorously deny those allegations. They also contend that the Employment Contract is not a legally valid, enforceable contract because Fournier and Interim did not mutually assent to be bound by it, and because its noncompetition provisions were not needed to protect any legitimate business interest of Interim. See *Burris Foods, Inc. v. Razzano, 1984 Del. Ch. LEXIS 593,* *4, Del. Ch., C.A. No. 1077, Walsh, V.C. (July 18, 1984) (noting that covenants not to compete are enforceable "provided they are . . . essential for the protection of the employer's economic interests"). Alternatively, they contend that even if the Employment Contract is found to be valid and enforceable, Fournier did not breach it because she did not solicit or accept any Interim clients, employees, or referral sources on behalf of NKH.

The defendants also deny that Fournier materially breached the Employment Contract by failing to return certain documents (PEx. 2, 32, 33, 34) n13 after she resigned. They contend that Fournier kept some of those documents after her resignation, and she never disclosed any of the information contained in those documents to anyone. Finally, the defendants claim that they did [*18] not misappropriate any trade secrets of Interim, because (i) Interim's client lists, referral sources, and patient forms were not trade secrets; and (ii) even if that information constituted trade secrets, the defendants did not misappropriate it.

n13 Fournier denies that she retained any patient care forms after her resignation (PEx. 36, 38, 40, 42, 44), and there is no direct evidence that Fournier retained those forms after she resigned from Interim. Tr. 306. However, Fournier admits that she retained her weekly activity logs (PEx. 32; Tr. 236-37) and weekly activity reports (PExs. 33-34; Tr. 242-43) (together, "activity logs") after resigning from Interim. Interim required Fournier to maintain activity logs and to submit copies of them on a weekly basis. Tr. 236-37. Fournier testified that she gave copies of those documents to her supervisor, Judy Zeisloft, but retained the originals in her desk at home because she had previously been disciplined for deficient record-keeping, and wanted to keep records evidencing her compliance, in case similar accusations were made in the future. Tr. 237-38, 284-85; DEx. 8 at 48-50. Fournier testified that after she resigned she forgot that she possessed these documents, but also that she never showed these documents to anyone. Tr. 285-86.

[*19]

## III. THE BREACH OF CONTRACT CLAIM

A threshold dispute concerns the parties' dispute over the validity and enforceability of the Employment Contract. The defendants argue that the Employment Contract is not enforceable because Fournier and Interim

never mutually assented to its provisions. That argument rests critically upon Fournier's testimony that when she signed the Employment Contract, she was not afforded an opportunity to read it, and was told only that the agreement prohibited her from working for another employer while she was working for Interim. Tr. 305. Tr. 212. Interim disputes those contentions. It insists that Fournier had ample opportunity to review, and ask questions about, the two-page contract, and that Fournier's signature on the Employment Contract clearly establishes her assent to its terms. Tr. 35-36. However, I need not determine that issue, because assuming without deciding that the Employment Contract is valid and binding, Interim has not proved that the defendants breached it. n14

> n14 For that same reason, I need not (and do not) address the defendants' argument that the noncompetition provisions are invalid because they were not necessary to foster a legitimate economic interest of Interim. Def. Ans. Br. at 13-15.

[*20]

\* \* \*

Interim's breach of contract argument runs as follows: ever since Fournier started working for NKH in November of 1992, Interim has lost patients, employees, and referrals to NKH. Those losses could not have occurred without Fournier's willing and active participation. Therefore, Interim concludes, Fournier, aided and abetted by NKH, violated the noncompetition provisions of the Employment Contract.

Interim's argument is a classic example of the post hoc ergo propter hoc fallacy. As the plaintiff, Interim has the burden to prove by a preponderance of the evidence its entitlement to the relief it seeks. *Oberly v. Howard Hughes Medical Inst., Del. Ch., 472 A.2d 366, 386-87 (1984)*. But Interim has submitted no direct evidence that the defendants materially violated any provision in the Employment Contract. Interim's evidence is all circumstantial. The Court finds that the plaintiff's circumstantial evidence is insufficient to satisfy its burden of establishing that the defendants breached the noncompetition provisions of the Employment Contract.

The record establishes that patients left Interim, and went to NKH, because of Carroll's reputation [*21] and the patients' guardians' dissatisfaction with Interim's services. n15 See *1994 Del. Ch. LEXIS 28,* *10. The evidence also shows that Interim nurses became employees of NKH in order to be able to continue caring for their former Interim patients. See *1994 Del. Ch. LEXIS 28,*

*14. Moreover, Carroll hired those nurses not because of any conduct of Fournier, but because the patients' guardians had verified the skills of these licensed professionals. Id.; Tr. 348-49, 415. Furthermore (and contrary to Interim's position), Carroll had an established relationship with AIDI long before she hired Fournier to work at NKH. That preexisting relationship negates any suggestion that Fournier diverted AIDI patient referrals from Interim to NKH. Tr. 354, 407-08; DEx. 1 at 6. n16

> n15 Interim contends that the Court should rely upon NKH's policies and procedures to determine when a patient is deemed "accepted" by NKH. For example, Interim argues that because Fournier completed the assessment forms for Vincent Brittingham (which was one step of NKH's three-step admission process), she thereby participated in the acceptance of Vincent as a patient. I disagree. Although the record shows that NKH did not strictly adhere to its policies and procedures, NKH is not required by law to follow them. Most significantly, Fournier filled out the administrative forms after those patients had already become clients of NKH.

[*22]

> n16 Interim also claims that Fournier, on behalf of NKH, unlawfully solicited nurses from Bayada Nurses ("Bayada"), a referral source with which Interim had a relationship. Tr. 52-53. In support of that claim, Interim contends that Fournier and Carroll attended a "solicitation meeting" with Bayada. Fournier, however, testified that Bayada initiated that meeting, and Interim submitted no evidence controverting Fournier's testimony. Tr. 273.

Interim concedes that its noncompetition provisions did not prohibit Fournier from working for a competitor after terminating her employment with Interim. Pl. Op. Br. at 19. After NKH learned about those noncompetition provisions, NKH sought the advice of counsel to put into place procedures designed to assure that NKH would not violate them. On counsel's advice, NKH erected an imaginary wall" around Fournier to prevent her from soliciting Interim's patients and from participating in NKH's hiring process. The plaintiff has failed to prove that that procedure was not observed or was otherwise ineffective. Interim nonetheless cries foul, because shortly after [*23] Fournier left Interim, NKH captured a significant share of its in-home high-tech pediatric business. But that fact alone, without evidence of

wrongdoing, cannot establish a breach of the Employment Contract. Because Interim has failed to prove a breach of contract, it is not entitled to relief on that claim.

### IV. THE CLAIMED MISAPPROPRIATION OF INTERIM'S PROPRIETARY INFORMATION

#### A. For Violation of the Contract

Interim next claims that Fournier breached those Employment Contract provisions requiring her to return certain Interim documents in her possession, and not to disclose the confidential information contained therein. In support of that claim, Interim relies upon (i) Fournier's admission that after she left Interim she had in her possession several Interim documents, and (ii) the similarities between Interim's and NKH's forms.

Fournier admits that after she left Interim she retained "activity logs" and a memorandum from Judith Ziesloft, Fournier's supervisor, warning all Home Care Supervisors of the consequences of abusive reporting. Because Interim had requested only copies of the activity logs, and because Fournier was fearful of (again) being accused of deficient [*24] record-keeping, she kept the originals. Fournier testified that she forgot that those activity logs were at her home, but also that she did not show the documents (or disclose the information contained therein) to anyone. See supra note 13. Interim has not controverted Fournier's testimony, which I find to be credible. For that reason, although Fournier's retention of those Interim documents did, as a technical matter, violate Paragraph 6 of the Employment Contract, it caused no cognizable injury to Interim that would entitle it to relief. See *Restatement (Second) of Contracts § 236* cmt. a (1981); 4 Corbin on Contracts § 946, at 813 (1967). n17

> n17 Whether Fournier has returned these documents to Interim is unclear from the record. If she has not, she must do so, and Interim would be entitled to relief to that limited extent.

Interim also relies upon the similarities between its forms (PExs. 36, 38, 40, 42 and 44) and NKH's forms (PExs. 35, 37, 39, 41, 43) as proof that NKH copied Interim's forms, which [*25] (Interim claims) could only have been acquired from Fournier. The record, however, does not support this argument.

Although the forms do have some striking similarities, they are by no means identical. Both Carroll and Fournier denied that Fournier provided NKH with any Interim forms. Tr. 285-86, 411. The defendants presented credible testimony that health care institutions tend to have similar patient forms because the same patient information is universally "tracked." Tr. 161-68, 177-80. In addition, Carroll testified that the disputed forms used by NKH were modeled both upon forms she had received from Ms. Droppleman, and on other forms she had seen during her nursing career. Tr. 408.

Interim's circumstantial evidence is inadequate to overcome the force of this testimony, and to satisfy Interim's burden of proving that the defendants misappropriated NKH's patient forms or other Interim proprietary documents.

#### B. For Violations of the Trade Secret Statute

Finally, Interim claims that the defendants misappropriated trade secrets, specifically, its client lists, referral sources, and patient forms. That claim is also without merit.

The Delaware Trade Secrets Statute defines [*26] a "trade secret" as:

> ... information, including a formula, pattern, compilation, program, device, method, technique or process that:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*6 Del. C. § 2001(4)*. Thus, "to be a trade secret, information must be commercially valuable and derive independent economic value from its secrecy." *Meyer Ventures, Inc. v. Barnak, 1990 Del. Ch. LEXIS 186*, *9, Del. Ch., C.A. No. 11502, Allen, C. (Nov. 2, 1990) (quotation omitted). A determination of whether a trade secret was misappropriated involves a four-part inquiry: (1) did a trade secret exist; (2) was the trade secret communicated by the plaintiff to the defendant; (3) was there an express or implied understanding that the secrecy of the matter would be respected; and (4) was the secret information used or disclosed by the defendant to the plaintiff's detriment. *Wilmington Trust Co. v. Consistent Asset Mgt., 1987 Del. Ch. LEXIS 409*, *8, Del. Ch., [*27] C.A. No. 8867, Allen, C. (Mar. 25, 1987).

The parties dispute whether the identities of Interim's clients and referral sources are trade secrets.

However, I need not resolve that dispute. The protection that the law affords trade secrets is against their wrongful misappropriation. See *Meyer Ventures, Inc., 1990 Del. Ch. LEXIS 186,* *13. Wrongful misappropriation cannot occur if (as here) "there is an independent source which leads to discovery of the information. . . ." Id. (citations omitted). Assuming arguendo that the Interim client lists and referral sources were trade secrets, I am satisfied that the defendants discovered the trade secret information from independent sources. They therefore did not wrongfully misappropriate that information.

The defendants learned of the identities of the four Interim clients; Sabar Harris, Darion Frank, Joseph McCoy and Vincent Brittingham; when each of the client's representatives initiated contact with NKH. Carroll already knew two of these four children, because of their ongoing association with her PPEC. Nor were the referral sources that NKH utilized protected trade secrets of Interim. Carroll had been utilizing those same sources [*28] for her PPEC before she hired Fournier, consistent with NKH's preexisting business plan (developed before Carroll met Fournier), which provided that NKH would use "already established" referral sources, including area hospitals, AIDI, community and public health social workers, area clinics, and physicians. DEx. 1 at 6.

Interim argues that its patient care forms were also trade secrets misappropriated by the defendants. Even if they were trade secrets, I have earlier found that neither NKH nor Fournier misappropriated" those forms. See *1994 Del. Ch. LEXIS 28,* *16. Moreover, Interim has not proved that Fournier "used or disclosed" the proprietary information contained in them. See *Wilmington Trust Co., 1987 Del. Ch. LEXIS 409,* *13. For these reasons I conclude that Interim has failed to prove that the defendants misappropriated its trade secrets. n18

> n18 Because Interim has failed to prove by a preponderance of the evidence that the defendants misappropriated its proprietary and confidential information, it has also failed to establish that the defendants committed any unlawful acts in furtherance of a conspiracy. The plaintiff's civil conspiracy claim therefore fails. See *Nicolet, Inc. v. Nutt, Del. Supr., 525 A.2d 146, 149-50 (1987)* (holding that a civil conspiracy requires an underlying unlawful act).

[*29]

V. THE DEFAMATION COUNTERCLAIM

Lastly, I address Fournier's counterclaim for defamation. Fournier claims that Interim's employees made statements that maligned her professional reputation and imputed to her the commission of a crime. Such statements, she argues, were slanderous per se, and, therefore, actionable without proof of special damages. *Spence v. Funk, Del. Supr., 396 A.2d 967, 970 (1978).* The plaintiff vigorously denies that any defamatory statements were made.

The essence of defamation is injury to one's **reputation.** *Saunders v. Board of Directors, WHYY-TV, Del. Super, 382 A.2d 257, 259 (1978).* To constitute slander or **defamation per se,** the nature of the charge must be such that the Court can legally presume that the person defamed was injured in his **reputation** or business and occupation. *Danias v. Fakis, Del. Super., 261 A.2d 529, 531 (1969)* (Christie, J.).

To support her defamation counterclaim, Fournier relies upon three statements allegedly made by Interim employees. The first two statements were allegedly made by Fournier's supervisor, Judy Zeisloft, and relate [*30] to Fournier's professional reputation. The first statement, made to Ms. Frank, was that "Rosa was no longer with Interim," which Ms. Frank interpreted to mean that Interim had "terminated" Fournier. Tr. 376. The second statement, made to Ms. Hartzel, was that "the problems that they were having with Interim was because of Rosa." Tr. 376, 384.

Neither statement is sufficient, in my view, to constitute defamation, because both were vague and neither rose to a level sufficient to expose Fournier to the kind of public contempt or ridicule as to be actionable. *Saunders, 382 A.2d at 259.* In addition, the statement that Fournier was no longer with Interim was true; it therefore cannot form a basis for liability. W. Page Keeton et al., Prosser and Keeton on the law of Torts § 116, at 839 (5th ed. 1984) (liability for defamation requires the publication of matter that is both defamatory and false).

The third allegedly defamatory statement was a comment purportedly made by Interim employee, Karen Bowe. At the trial Ms. Colley n19 testified (hesitantly) that an unidentified third person had told her that Ms. Bowe had said "Rosa's license was in trouble and [*31] there was some medicaid fraud involved." Tr. 395. Ms. Bowe, however, denied having ever made that statement, and Ms. Colley herself testified that she was unsure that such a statement was made. Tr. 396, 449-50. If this is "evidence," it is wholly insufficient to support a finding that Interim defamed Fournier.

> n19 Ms. Colley works at the Division of Mental Retardation, and was in attendance at a meeting of state agencies at which Fournier claims Ms. Bowe made the defamatory remark. Tr. 388-90.

Because the defendants have failed to establish that any defamatory statements were made, Fournier's counterclaim is without merit.

### VI. CONCLUSION

For the reasons discussed, judgment will be entered against the plaintiff and in favor of the defendants. Because neither party has provided a basis for the Court to grant their respective requests for costs and attorney fees (nor can the Court independently justify granting such relief), those requests are denied. Counsel shall submit an implementing form of order. [*32]

LEXSEE

STEVEN GREGORY JOHNSON, Plaintiff, v. ERIC CAMPBELL, et al., Defendants.

Civil Action No. 00-510-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2001 U.S. Dist. LEXIS 25596

March 30, 2001, Decided

**SUBSEQUENT HISTORY:** Summary judgment denied by Johnson v. Campbell, 215 F. Supp. 2d 423, 2002 U.S. Dist. LEXIS 16479 (D. Del., 2002)

**DISPOSITION:** [*1] Defendants' Motion for Summary Judgment denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a corporation, a hotel employee, a city, and a police officer, sought a motion for summary judgment in plaintiff coach's action seeking compensatory and punitive damages against defendants premised upon 42 U.S.C.S. §§ 1981 and 2000a and a state law defamation claim against the officer.

**OVERVIEW:** Defendants argued that the coach failed to show an intent to discriminate on the basis of race and that he suffered discrimination pursuant to 42 U.S.C.S. § 1981. The trial court found that there was evidence that the coach's race played a part in the employee's decision to have him investigated. The discrimination concerned an activity enumerated in § 1981, the making and enforcement of a contract. The coach offered evidence that defendants' legitimate reasons for the investigation were merely a pretext. Defendants' motion for summary judgment on the 42 U.S.C.S. § 2000a claim was denied as moot as the coach did not have a claim for injunctive relief, which was the sole remedy. The coach offered evidence that the employee made statements that he was a trespasser on the motel's property and that he was acting in a suspicious manner. The employee did not tell the officers that the coach was a guest and the officer concluded that he was not. The officer understood the employee's statements as indicating the coach committed the crime of trespass. Disputed issues of material fact existed as to whether the statements made by the employee were actionable as slander per se.

**OUTCOME:** Defendants' motion was denied.

**CORE TERMS:** motel, summary judgment, team, guest, defamation, van, contractual relationship, discriminate, favorable, slander, viewing, prima facie case, basis of race, enumerated, pretext, impute, intentional discrimination, coach, approached, suspicious, arrested, license, night, lobby, special damages, genuine issue, material fact, prima facie, burden-shifting, actionable

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Fed. R. Civ. P. 56 provides that summary judgment may be granted if the court determines that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In making this determination, courts are to resolve any doubts as to the existence of genuine issues of fact against the moving parties. Furthermore, any reasonable inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. Moreover, the summary judgment standard is to be applied in an even more stringent fashion where the movant bears the burden of proof on the issue being considered.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Parties*

Page 1

[HN2] 42 U.S.C.S. § 1981 claims are analyzed under the burden-shifting framework developed in Title VII cases. Accordingly, a plaintiff must first establish a prima facie case of discrimination by demonstrating that : (1) plaintiff is a member of a racial minority; (2) defendants intended to discriminate against plaintiff on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in § 1981. Upon a prima facie showing by plaintiff, the burden shifts to defendants to assert a legitimate, nondiscriminatory reason for their actions, which plaintiff may rebut with evidence of pretext.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > General Overview*
*Constitutional Law > Equal Protection > Full & Equal Benefit*
*Labor & Employment Law > Discrimination > Public Contracts > General Overview*
[HN3] 42 U.S.C.S. § 1981(a) prohibits race-based discrimination in the making and enforcement of contracts. Section 1981, as amended by the Civil Rights Act of 1991, provides that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. The coverage of the statute includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, 42 U.S.C.S. § 1981(b). These rights are protected from encroachment by both private and state actors, 42 U.S.C.S. § 1981(c).

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
[HN4] Once a plaintiff has established a prima facie case, the burden shifts to the defendants to articulate some legitimate nondiscriminatory reason for their actions. If defendant carries this burden, the presumption of discrimination drops from the case, and the plaintiff must cast sufficient doubt upon the proffered reasons with evidence of pretext.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*

[HN5] Courts have concluded that the ultimate determination of whether there was intentional discrimination against a protected class is considered a question of fact.

*Civil Procedure > Remedies > Damages > General Overview*
*Torts > Intentional Torts > Defamation > Defamation Per Se*
*Torts > Intentional Torts > Defamation > Elements > Slander*
[HN6] Under Delaware law, defamation consists of the twin torts of libel and slander; in the shortest terms, libel is written defamation, and slander is oral defamation. To establish a claim for slander, a plaintiff must prove: (1) a defamatory statement of fact that is false; (2) publication to a third party; and (3) special damages except in the case of slander per se. See id. There are four categories of defamation, commonly called slander per se, which are actionable without proof of special damages. In broad terms, these are statements which: (1) malign one in a trade, business or profession; (2) impute a crime; (3) imply that one has a loathsome disease; or (4) impute unchastity to a woman.

*Torts > Intentional Torts > Defamation > General Overview*
[HN7] It is not necessary that the charge be made in technical language. It is enough that the language used imputes to the other a criminal offense.

COUNSEL: Victor F. Battaglia and Philip B. Bartoshesky, Esquires, of BIGGS AND BATTAGLIA, Wilmington, Delaware. Attorneys for Plaintiff.
Dawn R. Courtney and Norman H. Brooks, Esquires, of MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C., Wilmington, Delaware. Attorneys for Defendants Campbell and Town of Dewey Beach.
Carol J. Antoff and Louis J. Rizzo, Jr., Esquires, of REGER & RIZZO, Wilmington, Delaware. Attorneys for Defendants Ocean Breeze, LLC and Price.

JUDGES: Farnan, District Judge.

OPINIONBY: Farnan

OPINION:
   MEMORANDUM OPINION

Wilmington, Delaware.

**Farnan, District Judge.**

Page 2

Presently before the Court is a Motion for Summary Judgment (D.I. 55) filed by Defendants Ocean Breeze, LLC and Christine Price ("Defendants"). For the reasons stated below, the Court will deny Defendants' Motion for Summary Judgment (D.I. 55).

**BACKGROUND**

Plaintiff Steven Gregory Johnson ("Plaintiff") filed this action on May 22, 2000, seeking compensatory and punitive damages against: Defendant Ocean Breeze, LLC, which operates a motel in Dewey Beach, Delaware, known as Sea Esta III; against Christine Price, an employee and agent [*2] of Ocean Breeze, LLC (collectively "the Ocean Breeze Defendants"); against the Township of Dewey Beach, Delaware; and against a police officer employed by Dewey Beach, Erik Campbell (collectively "the Dewey Beach Defendants").

Claims against the Ocean Breeze Defendants are premised upon 42 U.S.C. § 1981 and § 2000a and assert that Ocean Breeze Defendants impaired Plaintiff's ability to enjoy the benefits of a contractual relationship between Plaintiff and the motel. Plaintiff also asserts a state law defamation claim against Defendant Price.

Plaintiff, who is a 43 year old black male, has been employed as a teacher and student advisor at William Penn High School since 1995. From 1995 until this year, Plaintiff was the Head Coach of the William Penn Boys Varsity Basketball Program. (D.I. 65, B-19).

The incident that is the subject matter of this lawsuit took place over the Christmas/New Year holiday in 1999. The William Penn Basketball team was a participant in the annual Slam Dunk to the Beach Tournament in Dewey Beach, Delaware. William Penn was scheduled to play on December 28 and December 30, 1999. (D.I. 65, B-21). Arrangements were made by the Tournament's [*3] sponsors to have the William Penn team stay at the Sea Esta III Motel in Dewey Beach. (D.I. 65, B-20). The motel is owned and operated by Defendant Ocean Breeze, LLC. (D.I. 57, Exh. B).

The team arrived at the Sea Esta III Motel on the evening of December 27th and checked into the motel. (D.I. 65, B-23). The team played a game on December 28th and returned home to the Wilmington area after the game. Plaintiff gave the motel their travel arrangements and schedule. (D.I. 65, B-24-26). The team returned on the evening of December 29, 1999.

After giving the team some brief instructions, Plaintiff then walked to a gas station for a cup of coffee and returned to the motel office lobby. (D.I. 65, B-27-30, B-46-48). Defendant Christine Price ("Price") was working as the desk clerk at the motel that night. (D.I. 57, Exh. D, at 14). Price is a retired State Police Officer. (D.I. 65, B-112). Plaintiff indicated to Price that he was a motel guest. (D.I. 65, B-122, 124-125). Defendants contend that Plaintiff did not identify himself as a motel guest. (D.I. 57, Exh. I, at 49). There was a brief exchange of pleasantries and both Plaintiff and Defendant, for a short time, watched a television show. [*4] Although Plaintiff spoke sparingly, Price acknowledged that Plaintiff was polite and courteous. (D.I. 65, B-124-125). After finishing his coffee, Plaintiff picked up one of the free newspapers that was in the office lobby and left the office.

According to Plaintiff, he did not want to go up to his room yet, so he went and sat in the team van to read the newspaper. (D.I. 65, B-31-32, B-60-63). After a few minutes, Plaintiff was joined in the school van by Assistant Coach Abblitt and they discussed team related matters. (D.I. 65, B-73-76).

Just after Plaintiff left, Price telephoned her husband and asked him to call the Dewey Beach Police Department and request that Sergeant Berry walk around the Sea Esta III Motel premises. (D.I. 57, Exh. E, at 42). Price claims that she did that because Plaintiff's behavior made her nervous. (D.I. 65, B-127, 131).

Earlier in 1999, Price had been robbed while working the desk at the Sea Esta III Motel. (D.I. 57, Exh. E, at 36). In this robbery, a man entered the office, engaged Price in a short conversation then left the office at which time another man entered, the first man returned and the two robbed her. (D.I. 57, Exh. E, at 37-39).

After the [*5] call from Price's husband, Sgt. George Berry and Defendant Campbell of the Dewey Beach Police responded to the suspicious person complaint. Price repeated to Sgt. Berry what she had told her husband. Sgt. Berry told Officer Campbell why Price said she thought Plaintiff was suspicious. (D.I. 65, B-98, B-132, 133). Price did not tell the officers that Plaintiff was a motel guest and Officer Campbell concluded that he was not a motel guest. (D.I. 65, B-89-92, 99). Due to Price's statements to the police, Officer Campbell considered Plaintiff to be a trespasser on the motel's grounds. (D.I. 65, B-109-110).

Sgt. Berry and Officer Campbell then went looking for the person Price described. Officer Campbell saw Plaintiff sitting in the school van and approached the van. Campbell told Plaintiff that he was being detained and demanded identification. (D.I. 65, B-100-101). Plaintiff initially disputed Officer Campbell's right to demand identification and asked why he was being questioned. Eventually, Officer Campbell told Plaintiff that Price had reported "suspiciousness" about Plaintiff. (D.I. 65, B-103).

During this exchange, Mr. Abblitt, who is white, left the passenger side of the van and [*6] approached Officer Campbell. Mr. Abblitt told Officer Campbell that

they were basketball coaches registered at the motel. According to Plaintiff, Officer Campbell completely ignored Abblitt and would not speak to him. (D.I. 65, B-44, B-80-83).

Plaintiff gave Officer Campbell his Delaware driver's license and the Officer attempted to make some verification of the license over his radio. At this point, Plaintiff used profanity toward Officer Campbell. Officer Campbell then placed Plaintiff under arrest for disorderly conduct in using profane language in public. (D.I. 65, B-42-43).

At some point after Officer Campbell approached the school van, a number of the William Penn team members came out from their rooms and witnessed much of the incident. Team members saw their coach arrested, handcuffed and led to the police station. (D.I. 65, B-53, 84-85). Though told by team members, whom Price knew were guests, that their coach had been arrested, Price did not contact the Dewey Beach Police to inform them that Plaintiff was a motel guest. (D.I. 65, B-138).

Plaintiff was taken to the Dewey Beach Police Station across the street, but he was not charged with any offense and was released in [*7] less than an hour by Sgt. Berry. (D.I. 65, B-93-94).

**STANDARD OF REVIEW**

Rule 56(c) of the Federal Rules of Civil Procedure [HN1] provides that summary judgment may be granted if the Court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, "'courts are to resolve any doubts as to the existence of genuine issues of fact against the moving parties.'" Hollinger v. Wagner Mining Equipment Co., 667 F.2d 402, 405 (3d Cir. 1981) (citations omitted). Furthermore, any reasonable inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. Spain v. Gallegos, 26 F.3d 439, 446 (3d Cir. 1994) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993)). Moreover, the Court of Appeals for the Third Circuit has instructed that the summary judgment standard is to be applied in an even more stringent fashion where the movant bears the burden of [*8] proof on the issue being considered. National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).

**DISCUSSION**

**I. Plaintiff's Claim Under 42 U.S.C. § 1981.**

[HN2] Section 1981 claims are analyzed under the burden-shifting framework developed in Title VII cases including McDonnell Douglas Corp v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993). Accordingly, Plaintiff must first establish a prima facie case of discrimination by demonstrating that : (1) Plaintiff is a member of a racial minority; (2) Defendants intended to discriminate against Plaintiff on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in Section 1981. Lewis v. J.C. Penney Co., 948 F. Supp. 367, 371 (D. Del. 1996). Upon a prima facie showing by Plaintiff, the burden shifts to Defendants to assert a "legitimate, nondiscriminatory" reason for their actions, which Plaintiff may rebut with evidence of pretext. See McDonnell Douglas, 411 U.S. at 802.

In support [*9] of their Motion for Summary Judgment, Defendants contend that Plaintiff fails to establish his prima facie case. Defendants concede that Plaintiff is a member of a racial minority. Defendants, however, contend that Plaintiff fails to show: (1) an intent to discriminate on the basis of race and (2) that Plaintiff suffered discrimination concerning one of the activities enumerated in Section 1981.

**A. Intent to Discriminate**

Defendants assert that Plaintiff has alleged no specific facts which suggest an intent to discriminate on the basis of race.

Upon viewing the evidence in a light most favorable to Plaintiff, the Court concludes that Plaintiff has offered sufficient evidence to support an inference of intentional discrimination on the part of Defendants. There is evidence in the record that Defendant Price caused the Dewey Beach Police to investigate Plaintiff. The description of Plaintiff given to the police by Price focused partly on the fact that Plaintiff is a black male. Thus, by Defendant Price's own description, Plaintiff's race played a part in her decision to have him investigated. Thus, the Court concludes that Plaintiff has made a prima facie showing of intentional [*10] discrimination.

**B. Whether the Discrimination Concerned an Activity Enumerated in Section 1981.**

Defendants also contend that Plaintiff has not established that the discrimination concerned one or more of the activities enumerated in Section 1981.

Section 1981 [HN3] prohibits race-based discrimination in the making and enforcement of contracts. 42 U.S.C. § 1981(a). Section 1981, as amended by the Civil Rights Act of 1991, provides that:

> All persons within the jurisdiction of the United States shall have the same right in

every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Id. The coverage of the statute "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). These rights are [*11] protected from encroachment by both private and state actors. See 42 U.S.C. § 1981(c).

For purposes of this motion, Defendants do not dispute the allegation that Plaintiff had a contractual relationship with Defendant Ocean Breeze, LLC, in that Ocean Breeze, LLC did agree to provide Sea Esta III motel rooms to participants in the Slam Dunk to the Beach Tournament, i.e., Plaintiff was a third-party beneficiary to the contract between Defendant Ocean Breeze, LLC and the organizers of the Slam Dunk to the Beach Tournament. Instead, Defendants contend that Plaintiff's contractual rights were not adversely affected by Defendants.

In this case, Plaintiff and his team were actually guests of the motel and used the rooms on the night of December 27, 1999. They then returned to their homes in New Castle County where they spent the night of December 28, 1999. On December 29, 1999, they returned to the same motel rooms. The contractual relationship did not change in the interim. Thus, the Court concludes that Plaintiff was entitled to enjoy the benefits of the contractual relationship between Ocean Breeze, LLC and the organizers of the basketball tournament. There [*12] is evidence in the record that Plaintiff's benefits under this contract were interfered with when he was stopped, investigated and arrested by police. It is undisputed that Defendant Price caused the Dewey Beach Police to investigate Plaintiff. Upon viewing the evidence in a light most favorable to Plaintiff, the Court finds that the discrimination concerned an activity enumerated in Section 1981, namely, the making and enforcement of a contract. Therefore, the Court concludes that Plaintiff has established a prima facie case under Section 1981.

[HN4] Once Plaintiff has established a prima facie case, the burden shifts to Defendants "to articulate some legitimate nondiscriminatory reason" for their actions. McDonnell Douglas, 411 U.S. at 802. If Defendant carries this burden, the presumption of discrimination drops from the case, and Plaintiff must "cast sufficient doubt" upon the proffered reasons with evidence of pretext. Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996).

Although Defendants' Memorandum of Law in Support of their Motion for Summary Judgment (D.I. 56) does not follow the burden-shifting framework, it appears [*13] to the Court that Defendants have cited "legitimate" reasons for their actions. Defendants contend that the reason the police were called in was due to Plaintiff's behavior in the motel lobby, not his color or his race. (D.I. 57, Exh. E, at 26, 28, 33, 36-37, 42). Plaintiff has countered with testimony that his behavior provided no justification for calling in the police. (D.I. 65, B-66-67). Thus, Plaintiff has offered evidence that Defendants' legitimate reasons are merely a pretext. [HN5] Courts have concluded that "the ultimate determination of 'whether there was intentional discrimination against a protected class is considered a question of fact.'" Hampton v. Dillard Department Stores, Inc., 18 F. Supp. 2d 1256, 1265 (D. Kansas 1998) (quoting EEOC v. Flasher, 986 F.2d 1312, 1317 (10th Cir. 1992)). Upon viewing the viewing the evidence in a light most favorable to Plaintiff, the Court concludes that a genuine issue of material facts exists as to whether Defendants intended to discriminate against Plaintiff on the basis of race in violation of Section 1981. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's Section 1981 claim will be denied.

[*14] **II. Plaintiff's Claim Under 42 U.S.C. § 2000a.**

Defendants move for summary judgment on Plaintiff's claim under 42 U.S.C. § 2000a. Plaintiff concedes, however, that after discovery, it appears that Plaintiff does not have a claim for injunctive relief, which is the sole remedy under Section 2000a. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's Section 2000a claim will be denied as moot.

**III. Plaintiff's Claim for Defamation.**

Defendant Price moves for summary judgment on Plaintiff's claim for defamation.

[HN6] Under Delaware law, "defamation consists of the twin torts of libel and slander; in the shortest terms, libel is written defamation, and slander is oral defamation." Spence v. Funk, 396 A.2d 967, 970 (Del. 1978). To establish a claim for slander, a plaintiff must prove: (1) a defamatory statement of fact that is false; (2) publication to a third party; and (3) special damages except in the case of slander per se. See id. There are four categories of defamation, commonly called slander per se, which are actionable without proof of special damages. Id. In broad terms, these [*15] are statements

which: (1) malign one in a trade, business or profession; (2) impute a crime; (3) imply that one has a loathsome disease; or (4) impute unchastity to a woman. Id.

Plaintiff asserts that Defendant Price made false statements that imputed a crime to him. Plaintiff offers evidence that Defendant Price made statements that Plaintiff was a trespasser on the motel's property and that Plaintiff was acting in a suspicious manner. (D.I. 65, B-96, 97, 101, 109). Price did not tell the officers that Plaintiff was a motel guest and Officer Campbell concluded that he was not a motel guest. (D.I. 65, B-89-92, 99). Defendant Campbell understood Defendant Price's statements as indicating Plaintiff committed the crime of trespass. (D.I. 65, at B-109-110). According to the Restatement (Second) of Torts, [HN7] "it is not necessary that the charge be made in technical language. It is enough that the language used imputes to the other a criminal offense." Restatement (Second) of Torts, § 571, comment (c). Defendant Price contends that her statements were truthful and that she merely told her husband and police that Plaintiff's behavior was making [*16] her nervous. (D.I. 57, Exh. E, at 34-35, 44).

Viewing the evidence in a light most favorable to Plaintiff, the Court concludes that disputed issues of material fact exist as to whether the statements made by Defendant Price imputed a crime to Plaintiff, i.e., whether those statements are actionable as slander per se. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's claim for defamation will be denied.

### CONCLUSION

For the reasons discussed, Defendants' Motion for Summary Judgment (D.I. 55) will be denied.

An appropriate Order will be entered.