FOCUS - 2 of 3 DOCUMENTS

**JAMES L. MARTIN, Plaintiff, v. WIDENER UNIVERSITY SCHOOL OF LAW, ANTHONY J. SANTORO and MITCHELL S. BIERMAN, Defendants.**

**CIVIL ACTION NUMBER 91C-03-255**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1992 Del. Super. LEXIS 267*

**August 29, 1991, Submitted
June 4, 1992, Decided**

**DISPOSITION:** [*1]

Upon Motion of Plaintiff for Summary Judgment - DENIED. Upon Motion of Defendants to Dismiss - GRANTED

**COUNSEL:**

Mr. James L. Martin, of Wilmington, Delaware, Pro Se.

Somers S. Price, Jr., Esq., of Potter, Anderson & Corroon, attorney for defendants.

**JUDGES:** Herlihy

**OPINIONBY:** JEROME D. HERLIHY

**OPINION:**

*OPINION*

HERLIHY, Judge

Presently before the Court are two motions. The first motion filed is defendants' motion to dismiss for failure to state a claim under Superior Court Rule 12(b)(6). The second motion filed is plaintiff's motion for summary judgment.

Plaintiff James L. Martin [Martin] has filed suit in this Court against Widener University School of Law n1 [Widener], its dean Anthony J. Santoro [Santoro] and a Widener newspaper writer Mitchell S. Bierman [Bierman] [collectively "defendants"]. This last suit stems from a long-standing dispute between Martin and Widener.

n1 Formerly Delaware Law School.

When applying to Widener in 1979, Martin answered "no" to a question asking if he had ever been a patient in a mental, penal or correctional [*2] institution. This was not a correct answer as Martin had been institutionalized in 1975. n2 Widener later communicated to various state bar examiners Martin's incorrect answer. An avalanche of litigation, including this matter, has ensued.

n2 See *Martin v. Delaware Law School of Widener University, D.C.Del, 625 F. Supp. 1288, 1293 n. 1 (1985)* detailing litigation on this issue.

FACTS

Some of the claims raised in this litigation result from events which occurred in the last several years since Widener's communication to various boards of bar examiners. On July 14, 1989 Dr. Eric Copeland [Copeland], who refers to himself as a client of Martin, called Santoro and tape-recorded their phone conversation. Martin claims Santoro slandered him in this conversation. Martin supplied transcribed portions of the conversation with his complaint. The details of that conversation will be discussed as necessary to resolve the allegations.

On February 18, 1990, The *Philadelphia Inquirer [Inquirer]* [*3] published an article detailing the controversy, "1 answer thwarts his law career" [Appendix A]. The article was sympathetic to Martin in that it highlighted the opinion of professors from two other law schools who stated they would have overlooked Martin's lack of candor and would not have communicated any related facts to the various bar examiners. The article

also gave full detail to Martin's explanation of the events. Defendants claim Martin solicited the article by approaching the reporters. Martin denies he voluntarily sought the publicity.

The *Delaware Law Forum [Forum]* is a small topical newspaper with circulation to Widener's students, faculty, alumni and the local legal community. Staff writer Bierman authored an article that summarized the *Inquirer* article. Bierman quoted extensively from and repeatedly referenced the *Inquirer* article to the degree of precise page number per quote. *Delaware Law Forum,* May 1990, Vol. 17, No. 6 [Appendix B]. Pertinent portions of the article will be discussed as is necessary to resolve the issues herein.

Martin seeks various forms of relief: (1) an injunction against Widener preventing any further dissemination of information [*4] about him without his consent; (2) a "declaratory judgment" to purge Widener's files on him which he contends are defamatory; (3) damages for alleged libel by the defendants Widener and Bierman; (4) damages against Widener and Santoro for slander; and (5) damages from all defendants for invading his privacy.

The basis of Martin's action is that several or all of the defendants (1) falsely reported his Widener graduation date, (2) recast his personal and academic history, (3) misrepresented his litigation against the law school, (4) falsely wrote about his contacts with certain hospitals which are the subject matter of other litigation, (5) falsely described his high school career, (6) falsely wrote about police contacts he had, and (7) falsely described his litigation in New Jersey and his bar status there. These claims will be detailed later as is necessary to resolve them.

Defendants argue that the doctrine of *res judicata* or collateral estoppel and/or lack of merit to Martin's complaint entitle them to judgment in their favor. They also contend this Court lacks jurisdiction to grant Martin's request for equitable relief. Believing no genuine issues of material fact exist, [*5] Martin, in turn, contends he is entitled to summary judgment.

### STANDARD

A motion to dismiss for failure to state a claim upon which relief can be granted made pursuant to Superior Court Rule 12(b)(6) will not be granted if the plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint. *Spence v. Funk, Del.Supr., 396 A.2d 967 (1978).* In considering this motion, all well-pleaded allegations in the complaint must be accepted as true. *American Ins. Co. v. Material Transit, Inc., Del.Supr., 446 A.2d 1101 (1982).*

A motion for summary judgment may only be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Pullman, Inc. v Phoenix Steel Corp., Del.Supr., 304 A.2d 334 (1973).* All facts and inferences are considered in a light most favorable to the non-moving party. *Shultz v. Delaware Trust Co., Del.Supr., 360 A.2d 576 (1976).*

### RES JUDICATA

As noted, Martin has filed a number of law suits involving claims against Widener. The claims he brought against Widener in one of those [*6] suits are summarized as follows:

### BACKGROUND FACTS.

The relevant facts, as alleged by Plaintiff [Martin] in his Complaint and various briefs, are as follows. Plaintiff claims that Polyclinic and Philhaven admitted and detained him against his will without cause or herring. Apparently, this action occurred in 1975. Plaintiff alleges that Philhaven subsequently erroneously informed the Law Examiners that he had voluntarily admitted himself to Philhaven for psychiatric care. He alleges that L.V.C. [Lebanon Valley College], where Plaintiff had been an undergraduate student, falsified his transcripts and supplied "disinformation" to employees of Polyclinic and Philhaven, which was later given to the Law Examiners. Plaintiff alleges that Defendants James Reilly and John Feather, in their capacities as Lebanon County Legal Services attorneys, acted improperly by agreeing to represent Plaintiff in a proceeding against L.V.C., while they were associates of the law firm which was representing L.V.C. Plaintiff alleges that Defendants Judge Gates and Judge Walters improperly "issued orders against him" in his efforts to "get relief from the college's disinformation scheme". Plaintiff alleges [*7] that [Widener] refused to send his transcript to the U.S. Department of Justice, thus preventing him from obtaining full-time employment. Plaintiff alleges that [Widener] also erroneously concluded that he had falsified his law school application by denying that he had been committed to a mental hospital, and later sent this information to each of the State Boards of Law Examiners to which Plaintiff had applied for admittance. Plaintiff alleges that the Law Examiners refused to admit him to the Bar after he passed the Bar Examination. Plaintiff alleges that the [Pennsylvania] D.O.T. improperly revoked his driver's license in 1981 by relying upon "not [sic] existent medical reports about a neuropsychiatric condition", and that [Commonwealth National Bank] wrongfully dishonored his checks following his enrollment in law school after agreeing not to do so.

*Martin, 625 F. Supp. at 1293, aff'd. 884 F.2d 1384 (3rd Cir. 1989), cert. denied, 493 U.S. 966, 110 S. Ct. 411,*

*107 L. Ed. 2d 376 (1989), reh'g denied, 493 U.S. 1038, 110 S. Ct. 766, 107 L. Ed. 2d 781 (1990).*

In another action, filed in Pennsylvania, Martin made five claims against Widener and Santoro with their [*8] dispositions as follows:

[Widener] and [Santoro] are named, either specifically or as one of "the defendants" by plaintiff in five claims arising under federal statutes or the United States Constitution: the first claim (Rehabilitation Act of 1973 *29 U.S.C. § 794);* second claim (fourteenth amendment equal protection clause); third claim (first amendment right to freedom of association); fourth claim (fourteenth amendment guarantee of due process); and eleventh claim (Family Education Rights and Privacy Act *20 U.S.C. § 1232).*

These defendants argue that plaintiff is barred from pursuing these claims, *inter alia,* under the doctrine of res judicata [sic]. The claims recited in plaintiff's instant complaint are based on the law school's determination that plaintiff made a knowing misrepresentation on his law school application and communicated this finding to the Pennsylvania Board of Law Examiners.

In 1985 plaintiff initiated civil action No. 85-53 in the United States District Court for the District of Delaware naming, *inter alia,* [Widener] as a defendant and alleging virtually identical facts and claims recited in the instant complaint. (See plaintiff's complaint filed in [*9] CA 85-53 attached as court exhibit B). In particular, plaintiff alleged [Widener] violated his rights protected under the Rehabilitation Act of 1973, *29 U.S.C. § 794; Title 7, 42 U.S.C. § 2000e-2; 42 U.S.C. § § 1983,* 1985 and 1986; Fourteenth amendment; and the Family Education Rights and Privacy Act of 1976, *20 U.S.C. § 1232g.*

All of these claims were dismissed by the District Court in December of 1985, ( *Martin v. Delaware Law School of Widener University, 625 F. Supp. 1288, 1302 (D.Del. 1985)).* Plaintiff, however, was permitted to file an amended complaint. In October of 1986, the court held that the amended complaint "merely rehashes the allegations in the original Complaint, which this Court has found to be insufficient"[sic] *Martin v. Delaware Law School of Widener University.* [sic], No. 85-53 Civ. 3. (D.Del October 16, 1986). The Amended Complaint was dismissed with prejudice. An appeal was unsuccessful. *Martin v. Delaware Law School of Widener University, 625 F. Supp. 1288 (D.Del. 1985), aff'd 884 F.2d 1384 (3rd Cir. 1989), cert. denied 493 U.S. 966, 110 S. Ct. 411, 107 L. Ed. 2d 376, reh'g. denied,* [*10] *493 U.S. 1038, 110 S. Ct. 766, 107 L. Ed. 2d 781 (1990).*

While seeking appellate relief, plaintiff filed civil action 88-0768 on March 22, 1988 in the United States

District Court for the District of Columbia naming [Widener] and [Santoro], *inter alia,* as defendants (see court exhibit C). This complaint alleged facts and claims virtually identical to those averted in civil action 85-53 and was dismissed as "barred under the principles of res judicata [sic]." *Martin v. Delaware Law School of Widener University, Inc.,* et al., [sic] No. 88-0768 Civil (D. D.C. July 22, 1988).

*Martin v. Walmer, D.C.E.D.Pa., C.A.No. 90-2752, 1990 U.S. Dist. LEXIS 13285,* *12, Huyett, J. (September 26, 1990). All five claims were dismissed on grounds of claims or issue preclusion. *Id.* at 10-11; *Napier v. Thirty or More Unidentified Fed. Agents, 855 F.2d 1080 (3rd Cir. 1988).*

It is unnecessary to catalogue the multitude of state and federal law suits Martin has filed in Pennsylvania, New Jersey, Delaware, Virginia and the District of Columbia. See, *e.g., Martin v. Delaware Law School of Widener Univ., D.C.Del., C.A.No. 88-298-JJF* (December 14, 1990) (memorandum opinion); Martin's opening brief before Third Circuit, [*11] Appeal No. 91-3026, January 24, 1991 [Appendix C].

Defendants assert that most of Martin's claims are barred by the principle of res judicata now also referred to as claim preclusion or by collateral estoppel, now also known as issue preclusion. The doctrine of claim preclusion holds that a final judgment upon the merits rendered by a court of competent jurisdiction operates as a bar and prevents relitigation of all grounds for, or defenses to, recovery that were then available to the parties before the particular court rendering the judgment in relation to the same claim regardless of whether all grounds for recovery or defenses were judicially determined. *Federated Dept. Stores v. Moitie, 452 U.S. 394, 398, 69 L. Ed. 2d 103, 101 S. Ct. 2424 (1981); Trans World Airlines, Inc. v. Hughes, Del.Ch., 317 A.2d 114, 118 (1974) aff'd, 336 A.2d 572 (1975).*

Defendants argue that the present action is grounded in the "basic transaction of his conduct in submitting his application, the related background and related events thereafter." Defendants contend this action is simply a repackaging of the old underlying claim concerning Widener's communication to various state [*12] bar examiners.

The modern transactional view of *res judicata* bars litigation between the same parties if the claims in the later litigation arose from the same "transaction" that formed the basis of the prior adjudication and not on the substantive legal theories or types of relief sought.

The modern transactional view of the doctrine . . . does not require that the claim subsequently asserted be based on a same cause of action to be barred, but permits

the doctrine to be invoked to bar litigation between the same parties if the claims in the later litigation arose from the same transaction that formed the basis of the prior adjudication . . . . The determination, therefore, whether the doctrine shall be invoked is now based on the underlying transaction and not on the substantive legal theories or types of relief which are sought. Under the modern rule, ordinarily, a transaction gives rise to only one claim regardless of the number of ways that the claim may be asserted.

*Maldonado v. Flynn, Del.Ch., 417 A.2d 378, 381 (1980); rev'd on other rounds sub nom., Del.Supr., 430 A.2d 779 (1981).* The *Restatement (Second) of Judgments § 24,* [*13] comment b (1982) describes a "transaction" as:

In general, the expression connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether taken together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of the trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held precluded.

Despite defendants' portrayal of these occurrences as "one lengthy transaction", this Court recognizes a new transaction having occurred upon publishing the article in the school newspaper. The libel and invasion of privacy claims against Widener and Bierman arise from that new transaction. The act of publishing the *Forum* article is remote in time from the initial transaction, creating a new origin for the defamation and invasion of privacy claims. Any attempt to relitigate [*14] the initial transaction concerning the Widener communication of Martin's negative response on the law school application is precluded by the doctrine of *res judicata.* Applying this principle, the prayers for injunctive and declaratory relief are barred.

### Injunctive Action

Martin seeks to enjoin Widener from issuing any statements concerning his medical condition, standing as an attorney or performance as a student. The basis for this claim stems from the initial transaction and despite repackaging with additional defendants and new forms of relief, the claim is precluded by the doctrine of claim preclusion. A court of competent jurisdiction rendered a final judgment upon the merits. *Martin v. Delaware Law School of Widener University, et al.,* D.Del., C.A.No. 85-53-JJF, Farnan, J. (October 16, 1986). "It is simply not

fair to require a defendant to return to court time and time again to defend against the same allegations as plaintiff moves from one theory of recovery to another." *Poe v. Kuyk, D.Del., 448 F. Supp. 1231, 1234 (1978), aff'd, 591 F.2d 1336 (3rd Cir. 1979), cert. denied, 442 U.S. 943, 61 L. Ed. 2d 313, 99 S. Ct. 2886 (1979).*

Further, [*15] Martin's request for injunctive relief is not within the jurisdiction of this Court. Delaware Constitution, Article IV, § § 7 and 10. While the request for such relief could be transferred to Chancery Court pursuant to *10 Del. C. § 1901,* claim preclusion, at a minimum, otherwise prevents it.

### Declaratory Judgment

Martin also seeks a declaratory judgment to alter and/or delete his school record "to show what actually occurred". "What actually occurred" has been litigated. *Martin v. Delaware Law School of Widener University, supra.* This claim, therefore, is barred by the doctrine of claim preclusion. Despite terming the relief requested as a declaratory judgment, Martin seeks affirmative mandatory relief by asking the Court to alter and/or delete portions of the record. Relief of this type is not within the subject matter jurisdiction of this Court. Further, Martin's request to purge Widener's files on him is in the nature of a request for a mandatory injunction. Such power lies in the Court of Chancery, not this Court. *Cf. Simmons v. Steiner, Del.Ch., 34 Del. Ch. 593, 108 A.2d 173 (1954),* rev'd on other grounds, *Del.Supr., 35 Del. Ch. 83, 111 A.2d 574 (1955).* [*16] However, as with his prayer for injunctive relief, claim preclusion prohibits transfer under *10 Del. C. § 1901.*

### COPELAND CONVERSATION

#### A

Martin seeks damages from Widener and Santoro. Martin argues that Santoro's remarks were defamatory *per se.* He argues Santoro "tried to justify [Widener's] view that I should not be certified for practicing law . . . imputed a mental disease upon me . . . and interfered with my law licenses by claiming I am also dishonest . . . ." It is clear that while the telephone conversation occurred in 1989, the underlying complaint against Santoro relates back to the fundamental, oft-litigated dispute between Widener and Martin. Martin has been uniformly Unsuccessful in all that litigation. Thus, on this ground alone, his claim against Santoro is issue barred. *Migra v. Warren City School Dist. Bd. of Ed., 465 U.S. 75, 104 S. Ct. 892, 79 L. Ed. 2d 56 (1984); Neoplan USA Corp. v. Taylor, D.C.Del., 604 F. Supp. 1540 (1985).*

#### B

Martin's complaint included portions of an apparent transcription of the Santoro-Copeland telephone conver-

sation. An alleged "authenticated", full transcription [*17] is included with Martin's motion for summary judgment. While there is insufficient authentication of the transcription, for purposes of the motions, the Court will view the transcription as full and accurate.

Copeland telephoned Santoro and asked to meet with him about alleged deficiencies in Widener's records on Martin. Santoro expressed a willingness to listen to Copeland but remarked that Widener was in litigation with Martin. There is a reference to a letter Copeland previously sent to Santoro with many people copied, including Delaware Governor Castle. n3 The conversation boils down to this alleged exchange:

Santoro: Basically, what is it you want?

Copeland: I want to know why the law school has not corrected misrepresentations about Mr. Martin's character. He did not lie on his answer to question number 6 [that is the question which inquired about prior mental institutionalization].

n3 This letter has not been made a part of the record.

Copeland repeated a number of allegations and claims Martin has made [*18] in his numerous law suits. As noted above, the issues Copeland raised have been explored exhaustively and rejected in Martin's prior law suits. *Martin v. Sparks,* D.C.Del, No. 90-235, Huyett, J. (August 16, 1991). They may not be relitigated now. The remaining issue under this claim arising out of the Santoro-Copeland telephone conversation is whether *anything* Santoro said was defamatory.

"Defamation generally is understood as a false publication calculated to bring one into disrepute." *Snavely v. Booth, Del.Super., 36 Del. 378, 176 A. 649, 654 (1935).* The gist of an action for defamation is the injury to reputation, business or occupation. It must expose a plaintiff to public contempt or ridicule or lower him in the estimation of the community in which he lives. *Danias v. Fakis, Del.Super., 261 A.2d 529, 531 (1969); Pierce v. Burns, Del.Supr., 55 Del. 166, 185 A.2d 477, 479 (1962).*

A plaintiff in a defamation action is presumed to have stated his claim in the best light. *Snavely, 176 A. at 654.* In determining whether words are defamatory, the Court must take their plain and natural meaning and understand them as would [*19] a person of average intelligence and perception. *Danias, 261 A.2d at 531.* The Court cannot find anything defamatory in what Santoro said to Copeland. The references to events which Martin claims are defamatory are by *Copeland* not Santoro.

Prior to Copeland's telephone call to Santoro, Martin had executed a release to Copeland to examine and copy "neuropsychiatric records about me" from Dr. Rebecca Jaffe [Appendix D]. Shortly after this telephone conversation, Martin signed a release in favor of Copeland Waiving "any confidentiality rights" to his Widener file [Appendix E]. The "Waiver" also included authority for Copeland to copy Martin's records.

It is inconceivable that with all the litigation occurring prior to the telephone conversation, Martin's relationship with Copeland n4 and the prior and subsequent releases that anything defamatory occurred during the conversation. Martin's claim against Widener and Santoro arising out of the Copeland-Santoro telephone conversation is utterly without merit. The defendant's motion to dismiss this claim will be **GRANTED**. Martin's motion for summary judgment on this claim is **DENIED**.

n4 Copeland was or is a co-plaintiff of Martin's in another lawsuit. *Copeland, et al. v. Omega Medical Center Associates,* D. C.Del. C.A.No. 91-193. Copeland is or was a co-plaintiff with Martin in a consolidated appeal involving the boards of bar examiners of several states, including Delaware and the New Jersey Supreme Court and Widener. *Martin, Copeland v Townsend,* No. 91-5085, (3rd Cir. June 3, 1991) (ORDER).

[*20]

FORUM ARTICLE

Martin seeks damages from Widener, Santoro and Bierman for an article Bierman authored which was published in the *Forum* [Appendix B]. As described earlier, *ante* at *3, this newspaper is circulated to Delaware Law School students, faculty, alumni and the local legal community. Martin claims that he was defamed by various specific portions of the article and by the thrust of the entirety of the article. Resolution of the motions on these claims, in turn, requires resolution of a series of threshold issues.

A

The first of these issues is to determine Martin's status. The United States Supreme Court and the Delaware Supreme Court have recognized that a public official may not recover in libel unless he or she can show that the media source printed a defamatory falsehood relating to official conduct with actual malice, that is, that the statement was made with knowledge it was false or with reckless disregard of whether or not it was false. *New York Times v. Sullivan, 376 U.S. 254, 84 S. Ct. 710,*

*11 L. Ed. 2d 686 (1964); Ross v. News Journal Co., Del.Supr., 228 A.2d 531 (1967).*

Martin is not **[*21]** a public official, However, the United States Supreme Court and the Delaware Supreme Court have recognized that in certain circumstances a non-public official can become a public figure. *See Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); Gannett Co., Inc. v. Re, Del.Supr., 496 A.2d 553 (1985).*

The original language defining a public figure is found in *Gertz:*

In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Gertz, 418 U.S. at 351, 94 S. Ct. at 3013, 41 L. Ed. 2d at 812.*

B

There can be no argument that Martin does not fit into the first category of public figure. The question is whether he fits into the second, "limited" category. There are several guidelines to answer this question. It is necessary **[*22]** to examine the nature and extent of Martin's participation in the controversy giving rise to alleged defamation. *Gertz, 418 U.S. at 352, 94 S. Ct. at 3013, 41 L. Ed. 2d at 812.* A collateral issue is how much did Martin engage the public in an attempt to influence the resolution of the issues involved. *Wolston v. Reader's Digest Ass'n. Inc., 443 U.S. 157, 168, 99 S. Ct. 2701, 2707, 61 L. Ed. 2d 450, 460 (1979).*

C

An integral question also to be answered is to determine whether Martin has injected himself into a public controversy. *See Gannett, 496 A.2d at 556.* More specifically, this Court must decide whether a dispute over whether the character traits of honesty and candor are relevant considerations in accepting or denying application to the bar is a matter of public controversy. "A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum v. Fairchild Publications, Inc., 201 U.S. App. D.C. 301, 627 F.2d 1287, 1296 (D.C.Cir. 1980), cert. denied* **[*23]** *449 U.S. 898, 101 S. Ct. 266, 66 L. Ed. 2d 128 (1980); Avins v White, 627 F.2d 637, 647 (3rd Cir. 1980), cert. denied 449 U.S. 982,*

*101 S. Ct. 398, 66 L. Ed. 2d 244 (1980)* (recognizing the accreditation of Delaware Law School as a public controversy).

Delaware has recognized "the interest of this State in matters pertaining to the admission and regulation of lawyers practicing before our courts is essential to the primary governmental function of administering justice, and in meeting our obligation to protect the public by assuring and maintaining high standards of conduct of persons admitted to this Bar." *In Re Green, Del.Supr., 464 A.2d 881, 885 (1983).* "Admission to the Bar . . . depends on three basic and unalterable prerequisites: good moral character, learning and demonstrated competence. . . . Good moral character has many attributes, but none are more important than honesty and candor. *Id.* "Moreover, the attributes of honesty and candor are absolute prerequisites to the admission to our Bar." *Kosseff v. Board of Bar Examiners, Del.Supr., 475 A.2d 349, 353 (1984).* **[*24]**

In recognizing the licensure of lawyers as a public controversy, this Court concludes that the licensing procedures affect "the general public or some segment of it in an appreciable way," meeting the *Waldbaum* standard. The unremitting duty of candor to all persons charged with investigating and passing upon an applicant's qualifications is "a dispute . . . between sides holding opposing views" and, thus, meets the controversy standard set forth in *Gannett. Gannett, 496 A.2d at 556.* This Court rejects the notion that merely because most people would agree that there is a duty of candor for Bar applicants, there is no "controversy" regarding this matter. *Marcone v. Penthouse Intern. Magazine for Men, 754 F.2d 1072, 1083 n. 8 (3rd Cir. 1985).* n5

n5 The Inquirer article itself indicates that a controversy exists over whether Widener should or should not have communicated to the various boards of bar examiners Martin's incorrect answer.

In *Connolly v. Labowitz, Del.Super., 519 A.2d 138 (1986)* **[*25]** this Court concluded that the dissemination of information concerning the qualification and performance of a particular physician is not a matter of public concern. The court considered whether applying traditional libel standards, instead of constitutional standards, would have a chilling effect on the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people". *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 762-63, 105 S. Ct. 2939, 2957, 86 L. Ed. 2d 593, 605 (1985).* The court reasoned that because *24 Del. C. § 1768* provided that the physician peer review mechanism

shall be private and not subject to public examination, the qualifications and performance of an individual physician is not a matter of public concern. This Court recognizes that to stifle discussion of the public controversy concerning the proper licensure of lawyers simply because the discussion relates to a specific individual would have a chilling effect upon the interchange of ideas necessary for bringing about social changes. The topic area is a public controversy regardless of Martin's or any other [*26] individual's specific involvement.

### D

Since it is clear that the alleged libel involves a public controversy, it is next necessary to examine the nature and extent of Martin's participation in that controversy. *Avins 627 F.2d at 647.* In general, to be a "limited" public figure, the plaintiff must thrust himself into the vortex of the dispute. *Marcone, 754 F.2d at 1083.* Martin has filed a multitude of litigation n6 concerning his dealings with Widener, various bar examiners and the mental hospitals. The filing of a lawsuit alone will not necessarily elevate a private plaintiff to public figure status. When the private plaintiff goes further than the courtroom in telling his side of the story, however, he may change his status by voluntarily injecting himself into the controversy. In *Street v. National Broadcasting Co., 645 F.2d 1227, 1235 (6th Cir. 1981),* plaintiff's status changed from private to limited public figure after granting press interviews to aggressively promote her version of the case outside of her actual courtroom testimony. Similarly, an agent who holds news conferences to attract media attention for himself [*27] and his client is a public figure in that context. *Woy v. Turner, N.D.Ga., 573 F. Supp. 35 (1983).*

n6 Refer to Appendix C.

Whether Martin actually solicited the attention by approaching the Inquirer reporter is a question of fact, however, it is not material as it is clear that, at a minimum, Martin acquiesced in granting a personal interview. He is quoted throughout the article. This Court notes that an individual who speaks with reporters may reasonably expect those comments to be disseminated to the press. Martin need not have solicited the reporters' attention to raise his status. "It may be sufficient that [plaintiff] engaged in a course of conduct that was bound to attract attention and comment." *Marcone, 754 F.2d at 1086; Rosanova v. Playboy Enterprises, Inc., 580 F.2d 859, 861 (5th Cir. 1978).* Martin cannot avoid the change in status by claiming he did not intend to voluntarily inject himself into the controversy. "The status of public figure *vel* [*28] *non* does not depend upon the desires of an individual. The purpose served by limited protec-

tion to the publisher of comment upon a public figure would often be frustrated if the subject of the publication could choose whether or not he would be a public figure." *Id.*

This Court recognizes that "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Wolston, 443 U.S. at 167, 99 S. Ct. at 2707, 61 L. Ed. 2d at 460.* The plaintiff in *Wolston* was dragged unwillingly into the controversy and "never discussed this matter with the press and limited his involvement to that necessary to defend himself. . . ." *Id.* Martin differs significantly in that while he may not have desired the original disclosure of his past history, he has discussed the matter with the press and, therefore, not limited his involvement to that necessary to defend himself.

This Court finds that although he is a private figure in most aspects, Martin is a limited public figure in the context of the controversy preceding and including the *Forum* article. [*29] The filing of a multitude of lawsuits concerning his past medical history, particularly repeated unsuccessful lawsuits, in combination with granting a personal interview with the Inquirer reporters cumulatively acts to voluntarily inject plaintiff into this public controversy. While neither filing an action by itself nor granting an interview to reporters would necessarily raise plaintiffs status, it is the combination of the two actions and the number of suits filed that changes Martin's status. This is the Court's finding whether Martin actually sought out the *Inquirer* reporters or merely acquiesced in answering their questions.

Martin has a limited public figure status. Under the rule of *New York Times v. Sullivan* and its progeny, he cannot recover for a defamatory falsehood unless he can show by clear and convincing evidence either knowledge of falsity or reckless disregard for the truth. *Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989); see Riley v. Moyed, Del.Supr., 529 A.2d 248, 250 (1987).* The application of this standard was recognized for limited [*30] public figures in Gertz. The burden of proof is upon the plaintiff to show the falsity of the statement even in a case of a limited public figure plaintiff suing a media defendant. *Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986).* Martin, therefore, bears the burden of showing falsity. *Riley, 529 A.2d at 251.* "Before there can be defamation of a public figure there must be a false statement of fact." *Ramada Inns, Inc. v. Dow Jones & Co., Del.Supr., 543 A.2d 313, 337 (1987),* citing *Old Dominion Branch No. 496, Nat'l. Ass'n. of Letter Carriers v. Austin, 418 U.S. 264, 283-84, 94 S. Ct. 2770, 2780-81, 41 L. Ed. 2d 745, 761 (1974).* "Libel plaintiffs who are

either public officials or public figures must prove both falsity and actual malice to recover." *Ramada, 543 A.2d at 337,* citing numerous United States Supreme Court decisions.

Martin alleges that he was defamed in the Forum article in two ways. First, he singles out individual passages. Second, he attacks as defamatory the gist of the article taken **[*31]** as a whole.

*Specific Portions*

*E*

The following live sentences are self-authored by Bierman:

James L. Martin, a 1983 graduate of Delaware Law School (DLS), is suing DLS. In 1979, Martin answered "no" to the following question which appeared on the DLS application for admission: "Have you ever been confined to a mental, penal, or correctional institution, or undergone mental treatment?"

Somehow, DLS found out that Martin had in fact been confined to an institution. . . . As of February of this year (1990), the case was pending before the New Jersey Supreme Court. . . Dean Santoro was asked to comment on this case, but was obviously not at liberty to do so.

*Forum,* May 1990, Vol. 17, No. 6 [Appendix B].

Martin's burden as a limited public figure has been stated, *ante* at *30. Before the Court reaches the issue of actual malice, it must, as a matter of law, determine two questions: (1) is the alleged statement an expression of fact or of an opinion and (2) is the statement capable of a defamatory meaning. *Slawik v. News-Journal Co., Del.Supr., 428 A.2d 15, 17 (1981).* If the Court answers either question against the plaintiff, it does not reach **[*32]** the actual malice issue. *Riley, 529 A.2d at 251.*

The Court, in the first instance, will determine whether the communication is capable of defamatory meaning. Martin first claims the 1983 graduation date is falsely reported "in an attempt to cast me as an unremarkable student". Martin officially graduated on December 31, 1982. Defendants raise the defense of substantial truth. "It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." *Restatement (Second) of Torts § 581A* comment (f). There is no liability for defamation when a statement is determined to be substantially true. If the alleged libel was no more damaging to plaintiff's reputation in the mind of the average reader than a truthful statement would have been, the statement is substantially true. *Gannett, 496 A.2d at 557.* In making the evaluation, the court considers whether the "gist"

or "sting" of the article was true. The gist or sting is true "if it produces the same effect on the mind of the recipient which the precise truth would have produced." **[*33]** *Riley, 529 A.2d at 253.*

This Court finds the substantial truth doctrine operates to preclude Martin from predicating his defamation claim upon the falsity of the statement that he graduated in 1983. This statement is no more damaging in the mind of the average reader than is the precise truth, *i.e.,* that he graduated December 31, 1982. It is unnecessary, therefore, to consider the issue of whether this statement is an expression of an opinion or fact.

The next statement Martin attacks is that "somehow, [Widener] found out that Martin had in fact been confined to an institution". Martin does not contend that he was not confined but rather infers the statement is false as he knows the circumstances that revealed his past medical history to the school. In effect, he alleges defamation in the word "somehow". Whether Martin or Widener know the specific manner how these facts came to be revealed is not at issue here. The statement is not false merely because it does not spell out the specific method the facts came to Widener's attention. Libel by omission is only actionable if the public figure plaintiff carries his burden of showing that the omission makes an **[*34]** already published material assertion of fact untrue. *Ramada Inns, 543 A.2d at 338.* Martin attaches too much to the word somehow. Again, it is unnecessary to reach the fact versus opinion analysis determination.

Martin also charges that the statement "as of February of this year (1990), the case was pending before the New Jersey Supreme Court" is false. He contends that the matter was pending before the (his label) "New Jersey Committee" which is appointed by the New Jersey Supreme Court. Again, the substantial truth doctrine operates to preclude Martin from predicating his defamation claim upon the falsity of this statement. The statement is no more damaging than is the precise truth, that the matter is pending before a committee. Arguably, the misstatement actually places Martin in a more favorable light in the mind of the average reader in that reaching the court itself would attribute more credence to the legitimacy of his claim than merely reaching a committee. With this determination, the Court need not weigh the issue of fact versus opinion.

*F*

Martin also attempts to base his libel claim on the falsity of statements which are summaries of the *Inquirer* **[*35]** article. n7 Defendants err in arguing that a report of judicial proceedings is absolutely privileged even where there are allegations of malice or ill will. *See Read v. News Journal Co., Del.Supr., 474 A.2d 119 (1984).* While a judicial proceeding itself is protected by an ab-

solute privilege, the report of a judicial proceeding is only conditionally privileged. *Restatement (Second) of Torts § 611:*

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

        n7 There is no indication Martin sued the *Inquirer* for the article which formed the basis of the *Forum* article.

This Court must weigh if the conditional privilege is lost due to inaccuracy or incompleteness and whether the report is a fair abridgement of the proceedings. In making this evaluation, the Court [*36] notes that the decision in *Read* was hinged upon a direct comparison of the news article with the actual Court of Chancery letter opinion the article was discussing. *Read, 474 A.2d at 120.* The instant case differs in that the alleged defamatory article details the background of a multitude of lawsuits brought by Martin but does not actually refer to any specific case or court decision. Defendants attempt to invoke the privilege by referring to the plaintiff's tidal wave [see Appendix C] of litigation but cannot point to a specific court document of which the article is allegedly a report.

In a similar case, the Ninth Circuit held that a law review case note that was an accurate republication of an Arizona Supreme Court opinion denying plaintiff admission to the Arizona Bar due to his past mental history was privileged. *Ronwin v. Shapiro, 657 F.2d 1071 (9th Cir. 1981).* The Ronwin court not only directly compared the case note with the opinion but noted that "the bulk of it is a verbatim republication of language from the Arizona Supreme Court's opinion." *Id. at 1075.* The *Forum* article is not really an abridgement of [*37] judicial proceedings but rather is predominately an abridgement of the *Inquirer* article. On the evidence presented, this Court concludes that the article is not protected by being within the scope of the conditional privilege sheltering the right to report on an official proceeding.

The remainder of Martin's specific libel claims are based on allegedly false statements which are Bierman's abridgement of the *Inquirer* article. Martin contends the statement "Martin was admitted to Polyclinic Hospital in Harrisburg on February 2, 1975 and released on February 21, 1975" is false. He contends he was neither admitted nor released. Martin also claims the statement "the second admission, from April 2nd to May 10th, was to Phil-

haven Hospital" is false for the same reason. His defamation claim may not be based on this assertion of falsity for multiple reasons. First, Martin is attempting to relitigate the underlying claim from the origins transaction of Widener communicating that Martin had misrepresented that he had some type of experience with mental institutions to various bar examiners. This issue is precluded from relitigation by the doctrine of collateral estoppel. *Supra* [*38] at *11.*

Second, the burden is upon Martin to show by clear and convincing evidence both the falsity of the statement and Bierman's knowledge of falsity or reckless disregard for truth. *Riley, 529 A.2d at 250.* Martin has done neither. Furthermore, there is no set of circumstances that this Court can envision in which Martin could meet this burden. Finally, Martin's own pleadings establish that he was involuntarily confined to the hospitals. Quibbling over whether he was technically ever "admitted and released" or merely confined against his will does not change the substantial truth of the statement. The gist or sting of the statement is true.

Martin contends that the following *Forum* article passage is false and libelous: "The medical records indicate family problems. Martin claims he had announced to his parents that he was going to drop out of high school. Consequently, the police were called from whom Martin was attempting to escape." Martin asserts that he was never an aspiring high school drop out and was defamed by being labelled a potential high school and not a college drop out. The *Inquirer* article actually read, "The admission was prompted, he says, [*39] by a family dispute over his decision to drop out of college, and he ran from the house when police arrived to take him away." Comparing the *Inquirer* article with the *Forum* abridgement shows that Bierman erroneously stated Martin was considering dropping out of high school when, in fact, he was referring to college.

Again, the substantial truth doctrine is recognized in Delaware. *Riley, 529 A.2d 248; Ramada Inns, 543 A.2d 313.* "If the alleged libel was no more damaging to the plaintiff's reputation in the mind of the average reader than a truthful statement would have been, then the statement is substantially true." *Ramada Inns, 543 A.2d at 317,* citing *Riley 529 A.2d at 253* and *Gannett, 496 A.2d at 557.* The requirement of proving falsity necessary entails the burden of negating substantial truth. *Ramada Inns, 543 A.2d at 318.* Under this approach, the fact that Martin was considering dropping out of college and not high school in the context of this case is substantially true.

The *Forum* misstatement that Martin was thinking of dropping out of high school [*40] rather than college cannot be viewed as defamatory. As a matter of law, the

Court cannot find that Martin's reputation would be harmed or persons would be harmed from associating or dealing with him because he considered dropping out of high school rather than dropping out of college. Not every misstatement gives rise to a cause of action for libel. *Cf. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991).*

In addition, when the misstatement of high school is put in context with the balance of the paragraph, whatever "gist or sting" arises from the misstatement pales. Martin does not attack as defamatory the *Inquirer* reference to "the records note that, 'the patient screamed and rambled in his speech and around the house and said that he had been transformed and resurrected and had supernatural powers.'"

*G*

Martin also attempts to base the defamation count on the *Forum* statement "consequently, the police were called from whom Martin was attempting to escape." Martin now claims the police were called concerning his brother and that Martin himself never attempted to escape.

This Court will assume **[*41]** for purposes of this motion that Martin's current claim is truthful. This Court also finds that the statement concerning the police and escape is capable of a defamatory meaning. Furthermore, the statement is not protected as an opinion. That being so, it is next necessary, as a matter of law, to consider whether this allegation is sufficient to overcome the constitutional burden of actual malice. *Riley, 529 A.2d at 250.* Martin must show by clear and convincing evidence Bierman's knowledge of falsity or reckless disregard of truth. *Id.*

Bierman's abridgement was based on the Inquirer statement that "according to Martin, Polyclinic's account is 'inaccurate and greatly exaggerated.' The admission was prompted, he says, by a family dispute over his decision to drop out of college, and he ran from the house when police arrived to take him away." [Appendix A-3] Bierman clearly relied on the Inquirer which appears to be referencing Martin himself as the source. Further, there is nothing in the record to indicate that Martin has sued the *Inquirer* for that statement.

This Court holds, as a matter of law, that Martin has not shown Bierman's actual malice. *Harte-Hanks, 491 U.S. 657, 109 S. Ct. 2678, 105 L. Ed. 2d 562.* **[*42]**

*H*

Although he did not sue the *Inquirer*, Martin contends that the repetition from the *Inquirer* article of a quote by Mary Maudsley of the New Jersey Supreme Court's Committee on Character is defamatory. The

quote reads, "Any potential problem which Mr. Martin encountered in his life seems to be answered by a lawsuit rather than by any other method of attempting to deal with it." [*See* Appendix A and B]. The Maudsley comment gives rise to initially determine whether it is an expression of an opinion or a fact. *See, ante,* at *31.

A recent United States Supreme Court case has cast some doubt on the efficacy of the "opinion" protection afforded by the First Amendment. *Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).* "Thus we do not think this passage from *Gertz* was intended to create a wholesale defamation exemption from anything that might be labelled 'opinion'." *Id. at 18, 110 S. Ct. at 2705, 111 L. Ed. 2d at 17.*

As noted, *Riley* requires that before reaching the actual malice question, the court must determine two questions as a matter of law. One, **[*43]** is the statement capable of a defamatory meaning and, two, is it an expression of fact or opinion? *Riley, 529 A.2d at 251. Riley* was decided prior to *Milkovich.* There is no Delaware Supreme Court case on this issue since *Milkovich.*

*Riley* adopted a four-part test used to determine whether an average reader would view a statement as one of fact or one of opinion. *Riley, 529 A.2d at 251.* The test came from *Ollman v. Evans, 242 U.S. App. D.C. 301, 750 F.2d 970, 979 n. 16 (D.C. Cir. 1984), cert. denied, 471 U.S. 1127, 105 S. Ct. 2662, 86 L. Ed. 2d 278 (1985).*

While there is some doubt that there is a viable "opinion exception" to defamation actions, the *Ollman* four-part test is "still helpful for determining whether a statement implies actual facts that can be proven false." *Lund v. Chicago and Northwestern Transportation Company, Minn.Ct.App., 467 N.W.2d 366, 369 (1991).* n8 Whether an allegedly libelous statement constitutes a statement of fact or an expression of opinion is a question of law for the court to determine. *Slawik, 428 A.2d at 17; Lund, 467 N.W.2d at 369.* **[*44]**

---

n8 The *Lund* court referred to the four-part test found in *Janklow v. Newsweek, Inc., 788 F.2d 1300, 1302 (8th Cir. 1986),* cert. denied *479 U.S. 883, 107 S. Ct. 272, 93 L. Ed. 2d 249 (1986). Janklow* adopted the Ollman four-part test.

---

The four-part *Ollman* test asks: (1) considering the common usage or meaning of the specific language of the challenged statement, is the statement indefinite and ambiguous; (2) whether the statement is capable of being objectively characterized as true or false; (3) considering

the entire article in which the statement appears, to what extent will the unchallenged language surrounding the allegedly defamatory statement influence the average reader's readiness to infer that a particular statement has factual content, and (4) the broader social context into which the statement fits. *Riley, 529 A.2d at 251-52.* Applying this analysis, the statement is an opinion.

First, the common usage of the specific [*45] language is indefinite. The inclusion of the words "seems to be answered" injects a note of speculation or indefiniteness. Second, the challenged statement cannot be objectively verified. Attempting to analyze what constitutes "any potential problem in his life" necessarily entails a subjective decision. Third, the language surrounding the allegedly defamatory statement influences the average reader by clarifying the statement is an opinion. The immediately preceding line in the *Forum* article reads: "In addition to the 'knowing misrepresentation', the New Jersey bar examiners are also concerned with Martin's alleged propensity to file lawsuits." The specific use of the words "concerned with" and "alleged propensity" influences the average reader to infer this is an opinion, not a factual statement. Fourth, analyzed within the broader social context in which the article appeared, *i.e.,* that it addressed an issue of current controversy regarding the licensure of lawyers and the consideration of honesty and candor as proper criteria of licensure, "language which might otherwise be considered statements of fact have assumed the character of statements of opinion." *Riley, 529 A.2d at 253* [*46] [citations omitted]; *Ramada Inns, 543 A.2d at 327.*

Martin further alleges that the Maudsley quote is defamatory in that the *Forum* article did not note "that Maudsley herself is a defendant and is partially responsible for tampering with transcripts of the proceedings before the committee, so that what appears in the transcripts is not the same as what one hears from listening to the tape recordings of the same proceedings." The *Forum* article did not have to state that Maudsley was a defendant in some other suit (even assuming Bierman knew this) as libel by omission is only actionable if the omission makes an already published material assertion of fact untrue. *Ramada's Inns, 543 A.2d at 337-38.*

The allegation that Maudsley tampered with the transcripts to alter her statement fails to show an actionable libel against Bierman on the constitutional level. Even assuming what Martin alleges about Maudsley is true, that would not satisfy Martin's burden of proof to show "actual malice," *i.e.,* knowledge of falsity or reckless disregard of truth or falsity. Furthermore, this Court can envision no set of circumstances whereby Martin could [*47] meet this burden as Bierman had noted his source of this quote as the *Inquirer* article. Bierman's failure to compare the transcript with any tape recording

made of the proceedings does not amount to reckless disregard of truth or falsity. Malice may not be found merely by showing failure to investigate adequately before publication. *Curtis Publishing Co. v. Butts, 388 U.S. 130, 153, 87 S. Ct. 1975, 1990, 18 L. Ed. 2d 1094, 1110 (1967).*

The facts in the case before this Court differ from the U.S. Supreme Court decision in *Milkovich,* where the alleged defamatory statement itself concerned an allegation of perjury. In *Milkovich,* a high school wrestling coach testified in a hearing before an athletic association concerning a brawl and months later testified in court about the same incident. A local sports columnist inferred that Milkovich perjured himself by polishing and reconstructing his testimony in the second proceeding. Whether or not Milkovich had perjured himself was provable by comparing the transcript of the hearing with the transcript of the court testimony. Here it is Martin (not Bierman) who has raised the allegation [*48] of a third party's perjury (not Bierman's). Comparing the transcript of the Maudsley statement with a tape recording may establish some other party's tampering but it would not establish libel against Bierman on a constitutional level.

Even under the possible *Milkovich* dilution of the "opinion exception", as a matter of law, the repetition of the Maudsley quote is constitutionally protected. Martin is required to prove Maudsley's statement as false before there can be liability. *Milkovich, 497 U.S. at 19-20, 110 S. Ct. at 2706, 111 L. Ed. 2d at 18.* Maudsley's words "any potential problem" and "seems to be answered" indicate that Martin frequently appears to litigate when confronted with barriers. A fair reading of the Maudsley quotation does not indicate that Martin litigates over *every* stumbling block he faces. In any event, his *own* listing of cases he has filed [Appendix C] shows a propensity to extensively litigate his personal life.

Further, the Court must determine whether the Maudsley quotation is capable of a defamatory meaning. The Court finds as a matter of law that it is not. In effect, the gist or sting is that Martin is accused of being litigious. In today's [*49] society where lawyers are under much criticism for being litigious and our society, as compared with other countries, is criticized for litigiousness, the Maudsley comment can hardly be viewed as defamatory. *Cf. Andres v. Williams, Del.Supr., 405 A.2d 121 (1979).*

Assuming, *arguendo,* that Maudsley's comment is not protected as opinion and is capable of a defamatory meaning, the Court must, as a matter of law, first determine if the statement was made with actual malice. *Milkovich, 497 U.S. at 16, 110 S. Ct. at 2705, 111 L. Ed. 2d at 17.* n9

n9 In *Harte-Hanks,* actual malice has been defined to include a high degree of awareness of probable falsity, or the media defendant entertained serious doubts as to the truth of his publication. *Harte-Hanks, 491 U.S. at 667; 109 S. Ct. at 2685-86, 105 L. Ed. 2d at 576.*

Martin cannot cross this initial constitutional threshold. One, the initial Maudsley quotation, [\*50] as the *Forum* article notes, is in the *Inquirer.* Martin has not sued the *Inquirer.* Two, there is no evidence Martin has sued Maudsley for defamation. Three, Martin's own recitation of extensive litigation, overwhelmingly unsuccessful [Appendix C], indicates that he could not meet his burden of proving falsity. Fourth, based on the record in this case, viewed most favorably to Martin, he could not show Bierman had a high degree of awareness of the probable falsity of Maudsley's quotation or underlying information she used in expressing her views or that she or Bierman entertained serious doubts as to the truth of the publication. n10

n10 See footnote 9, *supra.*

*Article as a Whole*

I

Martin claims the *Forum* article taken as a whole is libel *per se.* To constitute **defamation *per se,*** the nature of the charge must be such that the person has been injured in his **reputation,** business or occupation. *Danias, 261 A.2d at 531.* Martin alleges the article defames him in his [\*51] trade (lawyer) and imputes a loathsome disease (mental illness).

The term defamatory *per se* is misleading and a misnomer in that it infers the defamation is actionable in itself or taken alone. Falling within one of the four categories of defamation per se changes the common law requirement that plaintiff show damages to pursue a claim of slander. In some jurisdictions, a plaintiff had to show damages in order to pursue a claim of libel, unless the libel was *per se,* in which case the damage requirement was again waived. Delaware does not distinguish between libel *per se* and libel *per quod;* thus, any libel is actionable without a showing of special damages. *Spence v. Funk, Del. Supr., 396 A.2d 967, 971 (1978).* Simply waiving the damages' requirement does not make the libel actionable in itself, the claim is still subject to other defenses and the appropriate standards of proof. *Id. at 973.* Martin's pleadings fail to state a claim upon which relief may be granted regardless of qualifying as a

*per se* status and a showing or failure to show special damages.

Martin claims the *Forum* article is defamatory as a whole as it [\*52] implies "that I am a dangerous lunatic who sues innocent persons on account of a violent, psychotic temperament that renders me unfit for the practice of law." The article does not make such a statement in direct words, however, a libel by implication is actionable if "it imputes something which tends to disgrace a man, lower him in, or exclude him from society or bring him into contempt or ridicule." *Klein v. Sunbeam Corp., Del.Supr., 47 Del. 526, 94 A.2d 385, 390 (1952).* A libel need not be direct and open. "The publication must be judged by its general tenor; and if, taking their terms in their ordinary acceptation, it conveys a degrading imputation, however indirectly, it is a libel." *Rice v. Simmons, Del. Ct. of Error and Appeals, 2 Del. 417, 2 Harr. 417, 429 (1839); Spence, 396 A.2d at 971.* Whether the article suffices to meet state and common law libel requirements, Martin's claim fails first on the constitutional level.

The Court has found Martin to be a limited public figure. He faces the same threshold burdens as such a figure when he attacks the entire article as he does when attacking pieces of it. The sum of the article is not greater [\*53] than the whole. It is unnecessary to repeat the hurdles he faces under *New York Times, Gertz, Riley* and *Ramada Inns.* His attack on the whole article does not surmount constitutional hurdles.

*INVASION OF PRIVACY*

Martin's fifth claim is for invasion of privacy alleging the *Forum* article placed him in a false light in the public eye. The United States Supreme Court has held the actual malice standard applicable to a false light suit by private individuals when the subject of the article involved matters of public interest. *Time, Inc. v. Hill, 385 U.S. 374, 380-91, 87 S. Ct. 534, 538-43, 17 L. Ed. 2d 456, 462-68 (1967).* This Court holds that "when a plaintiff, who is a limited public figure with regard to a defamation claim, also sues under a false light theory that has as its factual basis the same allegedly false material, that plaintiff must prove actual malice in order to recover on the false light claim." *Fitzgerald v. Penthouse International, Ltd., D.Md., 525 F. Supp. 585, 603 (1981), aff'd in part, rev'd in part on other grounds, 691 F.2d 666 (4th Cir. 1982), cert. denied, 460 U.S. 1024, 103 S. Ct. 1277, 75 L. Ed. 2d 497 (1983).* [\*54] For all the reasons stated, supra, Martin has failed to carry his burden of proof in showing falsity or actual malice.

While this failure extinguishes the false light claim, an action for invasion of privacy upon public disclosure of private facts could survive this deficit. The right of privacy is not an absolute right but, rather is qualified by

the circumstances and also by the rights of others. *Guthridge v. Pen-Mod, Inc., Del.Super., 239 A.2d 709, 714 (1967).* The general purpose of protecting the right of privacy relates to one's private life, not when that life has become a matter of legitimate public interest. There are a number of limitations to this right: the freedom of the press, matters of legitimate public interest, matters involving public figures and the newsworthiness of the article. *Reardon v. News-Journal Co., Del. Supr., 53 Del. 29, 164 A.2d 263, 266-67 (1960).* The media has the right, guaranteed by the federal and state constitutions, to publish news and all matters of public concern. One who seeks the public eye cannot complain of publicity if the publication does not violate ordinary notions of decency *Barbieri v. News Journal Co., Del.Supr., 56 Del. 67, 189 A.2d 773, 774 (1963).* **[*55]**

Given the avalanche of litigation that Martin has pursued concerning his past medical history and his interaction with Widener and his disclosure to *Inquirer* reporters of his view of the events, he may not now complain of the publicity he himself has engendered. Martin did not sue the *Inquirer,* a newspaper of infinitely greater circulation than the *Forum,* which contained much of the same information. Martin has functionally invited the discussion and publicity to this part of his life and he may not now assert a right he has effectively waived. Martin had already transformed the private nature of the facts to public and the recitation of those public facts does not violate an ordinary decency.

While attending Widener, Martin received a standard administrative form concerning a student's consent to have personal data released or published in a student directory. Martin returned the form denying consent to publicize any personal information. Martin now contends that the form effectively prevents any disclosure of information by the school and is a basis for his invasion of privacy claim. For all the reasons stated *infra,* this Court finds that Martin's actions and behavior **[*56]** override the notice to the school and he may not now predicate an invasion of privacy claim upon that form.

*CONCLUSION*

Martin's causes of action for injunctive and declaratory relief are barred by the doctrine of claim preclusion. The slander claim based on the Copeland/Santoro telephone conversation is barred by the doctrine of claim preclusion, as well as being wholly lacking in substance. This Court concludes Martin has limited public figure status and, thus, bears the burden of showing falsity, as well as actual malice as to the *Forum* article. Martin has failed to show any false statement upon which to base his defamation claim. Therefore, this Court cannot envision any set of circumstances in which *Martin* could prove defendant's knowledge of falsity or reckless disregard of

truth. The claim for invasion of privacy based on a false light theory also fails for the same reasons. A claim for invasion of privacy based on public disclosure of private facts is precluded as Martin has effectively waived the private nature of those facts recited in the *Forum* article.

For the reasons stated herein, the motion of defendants Widener University School of Law, Anthony J. **[*57]** Santoro and Mitchell S. Bierman to dismiss is **GRANTED.** The motion of plaintiff James L. Martin for summary judgment is **DENIED.**

I ANSWER THWARTS HIS LAW CAREER

*This is not only an inappropriate question, this is a cruel question." said a Stanford law professor.*

By Mary Jane Fine

and Mark Fazlollah

*Inquirer Staff Writers*

On Dec. 17, 1979, James L. Martin, then 26 years old, filled out an application to the Delaware Law School of Widener University. His answers, neatly typed, informed school authorities, among other things, that his Law School Aptitude Test score was an above-average 582, that his draft status was 4-F and that he also planned to apply to the law school at the University of California at Davis.

The application's final seven questions called for a simple "yes" or "no" response. Jim Martin answered "no" to every one.

Three years later - after Martin graduated from Delaware Law School - Question Number Six came back to haunt him.

It is haunting him still.

Because of Question Number Six, Jim Martin believes, he has never been permitted to practice law. Because of that question, he is suing Delaware Law School and the New Jersey Bar Examiners, among **[*58]** others. Because of that question, Martin filed a complaint with the Office for Civil Rights of the U.S. Department of Education, which found the question to be in violation of federal law.

Question Number Six - which Delaware Law School has since eliminated - asked: "Have you ever been confined to a mental, penal, or correctional institution, or undergone mental treatment?"

When James Martin answered "no" to Question Number Six, he set in motion a chain of events that continues to add link after link.

At some point prior to Martin's graduation, law school officials learned - it is not known precisely how -

that he had, indeed, been in a mental hospital briefly in 1975. The circumstances of his confinement remain somewhat clouded, and Martin disputes the legality of his confinement, but school officials took a hard line.

In a letter to Martin dated Feb. 2, 1983, then-Associate Professor Edward C. Smith wrote that "the misrepresentation raised a question as to your character and fitness for the practice of law, and accordingly that the matter should be brought to the attention of the Board of Examiners of any bar to which you applied."

Smith, who now works for a pharmaceutical [*59] firm in Cleveland, said that as far as he was concerned, the only issue was the appropriateness of the question, not Delaware law School's decision to notify bar examiners.

"I certainly don't see any problem with pointing out that someone told an untruth," he said in an interview.

Several other law schools, however, said that it was debatable whether they would have taken the same action.

"This is not only an inappropriate question, this is a cruel question," said Stanford University law Professor Robert Weisberg, former dean of faculty affairs at Stanford. "It's putting cruel pressure on people to lie. . . . I would be very, very reluctant to tell the bar."

Weisberg strongly questioned Delaware law School's contention that Martin's incorrect answer reflected on his character.

"It strikes me as a weird moral fastidiousness," he said.

Richard Lonsdorf, a professor of psychiatry and law at the University of Pennsylvania, said that although Martin's answer may have demonstrated "faulty judgment," Penn probably would not have pursued the matter.

"We probably would have decided that this is a kid," Lonsdorf said. "It was a stupid thing to have done, a foolish peccadillo."

[*60] *Legal paperwork*

Over the last six years since Delaware law School made its decision, the legal paperwork surrounding Martin's claims has grown mountainous. Working out of his neat, two-story brick home in Wilmington, Martin, now 36, does accounting work for a living. Over the years, he figures that he has filed about 20 lawsuits, four of them against Delaware Law School.

Somers S. Price, Jr., an attorney for Delaware Law School, says that two of the suits were dismissed and two - which Price says are similar to those dismissed - are pending. The suits seek unspecified damages and ask that the school be prohibited from continuing to disseminate information about his medical background and his response to Question Number Six. The law school says that its actions were proper.

Jim Martin grew up on a 150-acre farm in Palmyra, Lebanon County, the eighth of nine children. He describes his parents as strict Mennonites who rejected the ideas of higher education and participation in the wider world.

A fat looseleaf binder of personal memorabilia contains glimpses of the young Jim as a well-rounded boy who brought home A's and B's on his report cards and ribbons in soccer, science [*61] and wrestling. A letter written in 1970, when Jim was 16, congratulates his parents on his acceptance into the local chapter of the National Honor Society.

Later entries, however, chronicle a harsher period in his life, when he was a senior at Lebanon Valley College. On Feb. 2, 1975, according to medical records contained in the binder, Martin was admitted to Polyclinic Hospital in Harrisburg. The day before, the records say, "The patient screamed and rambled in his speech and around the house and said that he had been transformed and resurrected and had supernatural powers." The records quote Martin as saying, "I'm perfectly well, and it seemed like a bad dream. I was caught between my [parents'] Mennonite world and that of the school."

*Family dispute*

According to Martin, Polyclinic's account is "inaccurate and greatly exaggerated." The admission was prompted, he says, by a family dispute over his decision to drop out of college, and he ran from the house when police arrived to take him away.

On Feb. 21, the records note, Martin was discharged - "improved" - to outpatient care.

A second admission - this time to the local Philhaven Hospital - occurred on April 2. According [*62] to admission notes, Martin was escorted to Philhaven by a Lebanon Valley professor and two students "because he wanted to walk around in the nude, spoke about he and God having a mission to kill, was otherwise irrational, bizarre, hyperactive and violent."

Martin denies ever walking around in the nude and says, "There was no more truth to that [account] than what they wrote in Harrisburg."

He was discharged to his parents' custody, according to May 10 notes by John D. Walmer, a psychiatrist at Philhaven.

After his brief hospitalizations, Martin graduated from Lebanon Valley, and in March 1976 he gained membership in Phi Alpha Epsilon, a scholastic honor society.

### Accounting work

After working for accounting firms for several years, Martin applied to Delaware Law School. He gives two reasons for answering "no" to the question about psychiatric hospitalization and treatment on the school's application form.

First, he explains, he felt that his admissions constituted an illegal confinement - "bogus," he calls it - and, therefore, did not count. Second, he says, he was advised by Walmer to say that he had never been treated for mental illness.

Walmer, who retired in 1982, [*63] said in a telephone interview that, although he remembered Martin, he recalled no such conversation. "I'm just distressed to know that this [episode] is still bothering him," Walmer said.

Apart from the brouhaha over his application - which erupted just prior to graduation in December 1982 - Martin's law school career appears to have been unremarkable.

Although the school's current administrators declined to discuss his case because of pending litigation, Smith, the former professor, remembered Martin as a "fairly good" student with adequate grades - "not a superstar."

Smith said that Martin had been in his civil procedure class. Asked to characterize Martin at the time, Smith said, "I've had some students that thought were candidates for [mental] treatment; [Jim] just seemed eccentric."

Immediately after graduation, Martin applied to the Washington, D.C., bar. In the spring of 1983, he applied to the Pennsylvania and New Jersey bars and later to Maryland.

Each time, he passed the written section of the bar exam. But when Delaware Law School's letter was sent to the bar examining committees, the approval process slowed to a crawl.

The bars in Pennsylvania, Washington and Maryland [*64] refused to admit Martin. Though the Pennsylvania State Board of Law Examiners would not release records of the proceedings, documents from a related hearing indicated that the examiners' decision was based on Delaware Law School's report and on Martin's failure to undergo a current psychological evaluation.

Past treatment for mental illness would not prevent an individual from being allowed to practice law.

The bar examining committee in New Jersey, which has tabled consideration of Martin's applications pending the outcome of his federal suit against it, has been involved in a somewhat more complicated dispute.

Martin applied in the spring of 1983 and quickly passed the written section. In April 1984, it seemed his dream had come true. The clerk of the New Jersey Supreme Court issued him the official certificate, in Gothic print and sealed with the court's gold emblem.

"James Lee Martin was constituted and appointed an Attorney at Law of this State on April 2, 1984," it said.

David Johnson, director of the New Jersey Supreme Court's attorney ethics division, acknowledged that Martin had good reason to think he was a lawyer because "you don't get the certificate without being [*65] admitted."

### One-page letter

But at the end of April, Martin was devastated by a one-page letter from New Jersey Supreme Court Clerk Stephen Townsend.

There had been a mistake, the letter stated, and Martin's certificate was sent to him in error. It was void and he had no right to practice law. The bar's character committee was still reviewing whether he was fit to be an attorney, the letter stated.

Townsend declined to discuss the case other than saying that Martin's application was still pending before the state Supreme Court.

The transcript from a June 1985 hearing by the New Jersey Supreme Court's Committee on Character showed that Widener's letter was still a central issue blocking Martin's application.

Committee member Mary Maudsley told Martin that his answer to Question Number Six on Widener's law school admission form was "a knowing misrepresentation." In the hearing, Martin provided extensive information about his stay in the mental hospitals and there was no suggestion that he misled the examiners.

Maudsley also said she was concerned about Martin's inclination to file suits.

"Any potential problem which Mr. Martin has encountered in his life seems to be [*66] answered by a lawsuit rather than by any other method of attempting to deal with it," she told the committee.

Committee member Frank M. Lario Jr. then asked whether Martin's past mental health problems influenced

"your filing of lawsuits at the present time or your feeling of persecution that may be existing at this time."

Martin's response was that, "There is no feeling of persecution, that is for sure. There is an obvious injustice."

In a recent interview, Martin appeared rueful about the prolonged legal entanglement with his former school. He says he did not foresee it.

"It's like being out in the desert, and you think there's water out there," he said. "You know how the sun plays tricks on you and you see a mirage and you have the feeling that it's just up ahead and you can sit down and rest. . . . Then when it isn't, you have too much invested to turn around."

DLS: Defendant

Mitchell S. Bierman

Staff Writer

James L. Martin, a 1983 graduate of Delaware Law School (DLS), is suing DLS. In 1979, Martin answered "no" to the following question which appeared on the DLS application for admission: "Have you ever been confined to a mental, penal, or correctional institution, or undergone [*67] mental treatment?"

Somehow, DLS found out that Martin had in fact been confined to an institution. "Each time, [Martin] passed the written Section of the bar exam. But when [DLS]'s letter was sent to the bar examining committee, the approval process slowed to a crawl." (*The Philadelphia Inquirer,* Sunday February 18, 1990, Mary Jane Fine and Mark Fazollah, p.1 Section B.)

This happened in New Jersey, Washington, Maryland and Pennsylvania, Martin challenged DLS on the fairness and legality of the question by filing a complaint with the Office for Civil Rights of the U.S. Department of Education, The question was found to be a violation of federal law. Martin has filed four different lawsuits against DLS. Two were dismissed and two are pending.

As reported in the article in *The Philadelphia Inquirer,* Martin was admitted to Polyclinic Hospital in Harrisburg on February 2, 1975 and released on February 21, 1975. The medical records indicate family problems. Martin claims that he had announced to his parents that he was going to drop out of high school. Consequently, the police were called from whom Martin was attempting to escape, The records note that, "The patient screamed [*68] and rambled in his speech and around the house and said that he had been transformed and resurrected and had super-natural powers." ID p. 10-BJ, CITE [sic] Martin characterizes these records as "inaccurate and greatly exaggerated."

The second admission from April 2nd to May 10th was to Philhaven Hospital. This confinement allegedly was due to Martin's behavior which, at that time, was deemed, "[sic]. . irrational, bizarre, hyperactive and violent." ID. p. 10-BJ.

Martin claims that the attending psychiatrist at Philhaven advised him to answer no to the question, Martin also alleges that the confinements were illegal which he feels justifies his negative answer to the question.

To complicate matters, Martin is pursuing another federal lawsuit against the bar examining committee in New Jersey. Apparently, after passing the New Jersey bar, Martin was sent the official certificate recognizing him as an attorney in New Jersey in April, 1984. Shortly thereafter, however, Martin received a letter from the New Jersey Supreme Court clerk stating that the certificate issued was a mistake. The letter further explained that Martin's character was still under review, As of February of this year [*69] (1990), the case was pending before the New Jersey Supreme Court.

In addition to the "knowing misrepresentation," the New Jersey bar examiners are also concerned with Martin's alleged propensity to file law suits.

"Any potential problem which Mr. Martin has encountered in his life seems to be answered by a lawsuit rather than by any other method of attempting to deal with it, "[sic] said Mary Maudsley of the New Jersey Supreme Court's Committee on Character. ID. P. 10-BJ.

Other law schools are not certain whether they would have pursued the same course of action as that of DLS. Robert Weisberg, law professor and former dean of Stanford University was quoted by the Philadelphia Inquirer [sic] as saying, "This is not only an inappropriate question, this is cruel. It's putting cruel pressure on people to lie. I would be very reluctant to tell the bar." Id. 10-BJ. Dean Santoro was asked to comment on this case, but was obviously not at liberty to do so.

STATEMENT OF RELATED CASES

*Martin v. ETS, Inc.,* C3909-79, 179 N.J. Super. 317, 431 A.2d 868 (1981)

*Martin v. PA Real Estate Commission,* 9 C.D. 1983

*Martin v. PA State Real Estate Commission, et. al.,* 85-2349 [*70] ED

*Martin v. Mrvos and Sinibaldi,* 3rd Cir. 88-5005, IN RE: James Lee Martin, 87-6622, Man./Proh. den., 108 S. Ct. 1756 (1988), reh. den., 108 S. Ct. 2889 (1988) reh. den., 6-27-88.

*Martin v. PA State Real Estate Commission, et. al.,* 89-5271, cert. den., 110 S. Ct. 220 (1989) [Justice Bren-

nan took no part in the consideration or decision of this petition], *reh. den.,* 11-27-89, at *110 S. Ct. 532 (1989)*

*Martin v. PA State Real Estate Commission, et. al.,* --US--, *cert. pet. pending.*

*Martin v. Sample, et. al.,* 81-1114, filed on 9-25-81, Middle Dist. PA, *cert. den., 459 U.S. 850, reh. den., 459 U.S. 1024 (1982)*

*IN RE: APPEAL OF JAMES L. MARTIN from PennDOT Bureau of Traffick Safety Operations;* Civil Action-Law, Trust Book 47, p. 30, Lancaster County Court of Common Pleas, PA (2 cases).

*IN RE: James Lee Martin,* 87-278, DC Court of App., *den., reh. en banc pending.*

*Martin v. DC Court of App., et. al.,* 89-2789 (TPJ)

*Martin v. PA Board of Law Examiners,* 143 E.D.PA Sup. 84, *cert. den., 471 US 1022, 85 L. Ed. 2d 314, 105 S. Ct. 2032,* **[*71]** *reh. den., 471 U.S. 1120 (1985)*

*Martin v. PA Board of Law Examiners, et. al.,* 86-1363, E. Dist. PA., 3rd Cir. app. at 86-1719, *consolidated with DLS, et. al.,* 85-53 (JJF), *app.* to 3rd Cir. at 88-3428. Both *app. dis. w/o prejudice* for lack of juris. on 3-24-87, with *sua sponte* amendment on 4-22-87 to specify that dismissal related exclusively to DLS at 85-53. In interim, I wrote to Judge Huyett to request that the matter be finally resolved, but he refused, so I app. to 3rd Cir. at 87-1440. My app. was dismissed as "frivolous," but the recusal and disqualification on 12-7-87 rendered it rather dubious. Pet. for Writ of Cert. filed on 12-17-87 at 87-6072, *cert. den.,* 2-22-88; *reh. den.,* 3-28-88; supplemental brief was returned. Rule 60(b) Motion filed in E. Dist. of PA on 7-16-88. Huyett denied it on 8-15-88. [Motion for Reopen and to Certify for Interlocutory Appeal.]

*Martin v. Supreme Court of PA, et. al., app.* to 3rd Cir. at 89-1088, *877 F.2d 56,*

*cert. den.,* 89-5211, *110 S. Ct. 213 (1989), reh. den.,* 89-5211, 11-13-89, *493 U.S. 970, 110 S. Ct. 421, 107 L. Ed. 2d 385 (1989)*

2nd time, *cert. den.,* 89-7118, **[*72]** on 5-29-90, *reh. den.,* 89-7118, on 6-28-90.

*IN RE: James Lee Martin,* Misc. Dkt. 89-0207, E. Dist. of PA, Pet. for Writ of *Man./Proh.* against Kunz; app. to 3rd Cir. at 89-1618;

pet. for Man./Proh. in US on 1-24-90 at 89-6551, *man./proh. den.,* 3-19-90, *reh. den.,* 5-14-90,

pet. for cert. in US on 3-2-90 at 89-6839, *cert. den.,* 4-30-89, *reh. den.,* 6-11-90.

*IN RE: Application of James Lee Martin,* No. 17,835-17, NJ Committee on Character

*Martin v. Townsend, et. al.,* 86-1352, NJ DC, 87-5270, *826 F.2d 1056, cert. den., 108 S. Ct. 191 (1987)*

*Martin v. Townsend, et. al.,* 88-7435, *875 F.2d 311, cert. den., 493 U.S. 875, 110 S. Ct. 212, 107 L. Ed. 2d 165 (1989), reh. den., 110 S. Ct. 524 (1989).*

*IN RE: James L. Martin,* US, rec'd on 3-22-90 but returned to me on 3-23-90. I resubmitted it as a Writ of Cert. on 3-26-90, but it was returned to me again on 3-29-90. I resubmitted it on 3-30-90, but they were returned to me again on 4-4-90, without filing.

*Martin v. Townsend, et. al.,* Mot to Reinstate denied again, app. to 3rd Cir. 90-5417, *app. aff, reh. en banc den., cert. den.,* **[*73]** 90-6230, --US--, 1-7-91, *reh. pending.*

*Martin, et. al., v. Townsend, et. al.,* (CSF), 90-2616, NJ Dist., *dis., reh. pending.*

*IN RE Application of James M. for/dm. to MD Bar,* Misc. No. 3 - Sept. Term 1988, app. to US, 88-5084, appeal dis. for want of juris., reformed as cert. pet., *cert. den.,* 10-3-88, *reh. den.,* 11-7-88.

*MD Court of Appeals, et. al.,* 88-1999 DC MD, *app.* to 4th Cir., 88-1749 *870 F.2d 655;* 88-7103, *cert. den., 109 S. Ct. 3195, reh. den., 110 S. Ct. 14 (1989),* Motion for Stay rec'd on 7-3-89 is returned 7-7-89; stay motion resub. on 7-31-89 is returned on 7-19-89; resubmitted stay motion is returned for 3rd time on 8-11-89.

*IN RE: Application of James Lee Martin for Adm to VA Bar.* Passing score deemed failure.

*Martin v. VA Board of Bar Examiners, et. al.,* 88-0269-R, app. to 4th Cir. at 88-1752, consolidated with MD Court of Appeals for disposition in 4th Cir. *870 F.2d 655;* pet. for writ of cert, US, 88-7103, *cert. den., 109 S. Ct. 3195, reh. den., 110 S. Ct. 14 (1989),* Motion for Stay rec'd on 7-3-89 is returned 7-7-89; **[*74]** stay motion resub. on 7-31-89 is returned again on 7-19-89; resubmitted stay motion is returned for 3rd time on 8-11-89.

*IN RE Application of James Lee Martin to the DE Bar;*

(1) app. filed with DE Sup. on 4-19-89, 190,1989; *IN RE: James Lee Martin,* 88-7221, *Man./Proh. den., 110 S. Ct. 222 (1989), reh. den., 110 S. Ct. 420 (1989);*

(2) app. again filed with DE Sup. on 7-2-90, *app. dismissed* 10-22-90, reh. en banc den., 11-5-90, *cert. pending* at No. 90-6229, --US--.

*Martin v. Sparks, et. al,* 90-235, D.DE, pending.

*Martin v. DLS, et. al, 85-53 (JJF), 625 F. Supp. 1288, 884 F.2d 1384, cert. den., 110 S. Ct. 411 (1989), reh. den., 110 S. Ct. 766 (1990)*

*Martin v. DLS, et. al, 88-768 DC Dist, app. to DC Court of App. for DC Cir. at 89-7024, 89-5210, cert. den., 110 S. Ct. 212 (1989),* reh. den., *110 S. Ct. 421 (1990)*

IN RE: James L. Martin, 88-5988, --US--, *pet for man./proh. den.* on 2-21-89, motion for leave to file *reh. den.*, 11-6-89.

*Martin v. DLS, et. al, 88-3420, E.Dist. of PA., pend-ing.*

*Martin* **[\*75]** *v. Shank, et. al, 86-2205, Dist. of MD,*

(1) app. to 4th Cir. at 87-2039,

(2) app. to 4th Cir. at 87-2040,

(3) app. to 4th Cir. at 87-2100; pet. for writ of cert., 89-7126, *cert. den.,* 5-29-90, *reh. den.,* 6-28-90

(4) app. to 4th Cir. at 87-2162, *IN RE: James Lee Martin, 87-6616, Man./Proh. den., on 5-16-88, 108 S. Ct. 1757 (1988), reh. den.* on 6-27-88, *108 S. Ct. 2888 (1988).*

(5) app. to 4th Cir. at 87-2177, *838 F.2d 1210;*

(a) *IN RE: James Lee Martin, 87-6790, Man./Proh. den.* on *6-6-88, 108 S. Ct. 2045 (1988), reh. den.,* on 6-30-88, *108 S. Ct. 2921 (1988)*

(b) *Martin v. Shank, et al., 87-6903, cert. den.* 6-27-88, *reh. den.,* on 9-15-88

*Martin v. Shank, et. al, 86-1748, DC, app.* to DC Cir., 87-7088, pet. for writ of *cert. den.* on 10-3-88 at 87-7005; *reh. den.,* 11-7-88 at 87-7005

*Martin v. Shank, et. al.,* DC Cir. 87-7008, pet. for writ of *cert. den.* on 2-21-89 at 88-6145, *reh. den.* on 3-27-89 at 88-6145 [re costs for appendix and briefs]

*In the Matter of James Lee Martin,* Case Ref. No. 03852042, US Dept. of Education, *app.* **[\*76]** to DC Dist. 88-1788, app. to DC Cir., pet. for *cert.* 89-7669, *den.,* 10-1-90, *reh. den.*

*Martin v. US Dept. of Education,* No. 90-2492 (TPJ), DC Dist., *pending.*

*Martin v. Wilson, PA State Police, et. al.,* 88-2300 (ED Pa.), *pending.*

*Martin v. Faman,* 89-8008, 3rd Cir.; *IN RE: James Lee Martin,* 89-6594, *man./proh. den.,* 3-19-90; *reh. den.,* 4-30-90.

*Martin v. Faman,* 90-8035, 3rd Cir.;

(1) 89-7446, *cert. den.,* 6-28-90, *reh. den.*

(2) 89-7700, *cert. den.,* 10-1-90, *reh. pending.*

*Martin v. Farnan,* 89-8088, 3rd Cir.; *v. Farnan,* 89-7817, --US-- *pet.* for writ of *cert. den.,* 10-1-90, *reh. den.*

*Martin v. Farnan,* 90-8102, 3rd Cir., *man. den., reh. en banc pending.*

*Martin v. Huyett,* 89-8011, 3rd Cir.; *IN RE: James Lee Martin, 88-7157, Man./Proh. den., 109 S.Ct. 3231 (1988), reh. den., 110 S. Ct. 15 (1989)*

*Martin v. Huyett,* 89-8076, 3rd Cir.;

(1) *James Lee Martin v. US Court of Appeals for the 3rd Cir.,* 89-6098, *cert. den.,* 1-16-90, *reh. den.,* 3-5-90

(2) *Martin v. Huyett,* 89-7449,*cert. den.,* 6-28-90, *reh. den.,* 8-13-90;

*Martin* **[\*77]** *v. Huyett,* No. 90-8101, 3rd Cir., *man. den., reh. en banc pending.*

*Martin v. Fisher,* No. 90-8103, 3rd Cir., *man. den., reh. en banc pending.*

IN RE: James L. Martin, No. 4, 1989, Leb. Orphans Ct., app. to PA Super., 118 HBG 89, pet. for allow. of app. to PA Sup., 233 M.D. Alloc. Dkt. 89, *cert. den.* at 89-7119 on 5-29-90 in *Martin v. PA Supreme Court, reh. den.,* 6-28-90.

*Martin v. Walmer, et. al.,* 90-2752 (E. Dist. of PA), *dis.* on 9/26/90, *recon. den.* (Huyett ignored unopposed Motion to Recuse), app. to 3rd Cir. pending at No. 91-1010.

*Joyce E. Richards and James L. Martin v. Medical Center of DE, Inc., et. al., No. 90-6373, 499 U.S. 913, 111 S. Ct. 1125, 113 L. Ed. 2d 233, pet. for writ of cert. pending.*

*Bucher, Martin, et. al. v. Omega Medical Center Assoc., L.P., No. 90-3461, 3rd Cir., aff., reh. en banc den., pet. for writ of cert.* for filing in US has been served.

I view the "related cases" section narrowly and therefore do not include many other cases that could oth-erwise be considered "related.".

## MEDICAL AUTHORIZATION AND RELEASE

I, James L. Martin, soc. sec. no. 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, 5/31/53 birthdate, hereby authorize Dr. Eric S. Copeland, 513 Twadell Mill Rd.; Wilm., **[\*78]** DE, 19807 to pro-cure any medical records pertaining to neuropsychiatric impairment about me from Rebecca Jaffe, M.D., 1941 Limestone Rd.; Suite 107; Wilmington, DE 19808. To the extent no such impairment has been diagnosed, this

1992 Del. Super. LEXIS 267, *

request may be satisfied with a signed statement suggested below.

This authorization is good for ninety (90) days.

June 24, 1989
DATE

James Lee Martin
JAMES LEE MARTIN

I have no reason to believe James Martin is mentally or neuropsychiatrically impaired and have been his doctor for the past five (5) years.

last seen 11/15/88
DATE
signed 7/5/89

Rebecca Jaffe, M.D.
REBECCA JAFFE, M.D.

WAIVER OF CONFIDENTIALITY

I, James L. Martin, at 912 McCabe Ave.; Wilm., DE 19802 (soc. Sec. #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) hereby waive any confidentiality rights to the file about me at the Delaware Law School (now Widener University School of Law) under *20 USC Sec. 1232* [Buckley Amendment], and that Dr. Eric S. Copeland may obtain copies of all such records and/or access to them at such time as may be aged between the School and him. This waiver shall remain effective for as long as may be necessary to access all such records.

DATED: August 30, 1989

BY:James  [*79]   L. Martin

C-115

LEXSEE 2006 U.S. APP. LEXIS 15082

**BRENDA MILLS, Plaintiff-Appellant, v. CITY OF EVANSVILLE, INDIANA, et al., Defendants-Appellees.**

**No. 05-3207**

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*2006 U.S. App. LEXIS 15082*

**April 3, 2006, Argued**
**June 20, 2006, Decided**

**PRIOR HISTORY:** [*1] Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. No. 3:03-cv-00183-JDT-WGH -- John Daniel Tinder, Judge.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a sergeant in a police department, sued defendants, a city and the individuals in the officer's chain of command, under *42 U.S.C.S. § 1983*, alleging defendants infringed the sergeant's First Amendment rights by retaliating on account of her speech. The United States District Court for the Southern District of Indiana, Indianapolis Division, granted summary judgment to defendants. The sergeant appealed.

**OVERVIEW:** Following a meeting in which the police chief announced a plan to reassign officers from community relations positions to active patrol, the sergeant expressed to others who had attended the meeting that the public would not accept the change. At least some of the listeners got the impression that the sergeant would enlisted the aid of the public to oppose the reassignments. Soon after that, the sergeant's captain placed in the sergeant's file a "Summary of Counseling" that disapproved the sergeant's attitude at the meeting, her choice of time and place for presenting her views, and her failure to work through the chain of command. In addition, the sergeant was reassigned, which caused her pay to increase but eliminated the benefit of having use of a departmental car. The sergeant sued, alleging retaliation in violation of the First Amendment. The district court properly granted summary judgment to defendants. Because the sergeant made her statements pursuant to her official duties, the sergeant was not speaking as a citizen for First Amendment purposes, and the Constitution did not insulate the sergeant's comments from employer discipline.

**OUTCOME:** The court affirmed the judgment of the district court.

**CORE TERMS:** duty, patrol, accountable, supervisory, public concern, bureaucracy, faithful, speaking, demote, chain of command, departmental, sergeant, assigned, managers

**LexisNexis(R) Headnotes**

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees*
*Labor & Employment Law > Discrimination > Retaliation > Elements > Protected Activities*
[HN1] When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Public Employees*

2006 U.S. App. LEXIS 15082, *

*Labor & Employment Law > Discrimination > Retaliation > Elements > Protected Activities*
[HN2] Before asking whether the subject-matter of particular speech is a topic of public concern, a court must decide whether the plaintiff was speaking "as a citizen" or as part of her public job. Only when government penalizes speech that a plaintiff utters "as a citizen" must the court consider the balance of public and private interests, along with the other questions posed by Pickering and its successors.

*Governments > General Overview*
[HN3] A public employer retains a powerful interest in ensuring that all positions are filled by workers who will stand behind rather than subvert the decisions made by politically accountable actors.

**COUNSEL:** For BRENDA MILLS, Plaintiff - Appellant: Virginia M. O'Leary, O'LEARY & ASSOCIATES, Oakland City, IN USA; Darlene Robinson, Oakland City, IN USA.

For CITY OF EVANSVILLE, EVANSVILLE POLICE DEPARTMENT, BRAD HILL, in his official and individual capacity, JOSEPH REED, KENT BURNWORTH, in his official and individual capacity, Defendants - Appellees: Robert W. Rock, BOWERS HARRISON, Evansville, IN USA.

**JUDGES:** Before EASTERBROOK, ROVNER, and WILLIAMS, Circuit Judges.

**OPINIONBY:** EASTERBROOK

**OPINION:**

EASTERBROOK, *Circuit Judge.* [HN1] "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for *First Amendment* purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos, 126 S. Ct. 1951, 2006 U.S. LEXIS 4341, slip op. *31 (U.S. 2006).* That principle resolves this appeal.

Brenda Mills was a sergeant of the Evansville, Indiana, police with responsibilities that included supervising "crime prevention officers" (CPOs) during the first shift [*2] in the City's west sector. According to Mills, "CPOs are part of the patrol division and are assigned throughout the city to, in part, interact with neighborhood associations in an effort to reduce the incidence of crime, foster good community relations and deal with quality of life issues."

Chief David Gulledge decided to move some officers from CPO duties to active patrol; the plan reduced by one the number of CPOs under Mills's supervision. In January 2002 Mills attended a meeting on departmental premises at which Chief Gulledge described this plan (not yet implemented) and other proposals to cope with a manpower shortage. After the meeting Mills and other officers, including Chief Gulledge, Deputy Chief Reed and Assistant Chief Burnsworth (but not Mills's immediate supervisor), discussed the subject in the building's lobby. Mills told these senior managers that the plan would not work, that community organizations would not let the change happen, and that sooner or later they would have to restore the old personnel assignment policies. Others present at the event got the impression that Mills would try to enlist community organizations against the plan rather than describe its [*3] virtues.

Two things happened to Mills during the next months: First, Captain Brad Hill put in her personnel file a "Summary of Counseling" that disapproved her attitude at the meeting, her choice of time and place for presenting her views, and her failure to work through the chain of command. Second, Mills was removed from her supervisory position and assigned to patrol duties. That step increased her pay by $ 1,200 per year (because of a shift differential) but cost her the use of a departmental car, which had been at her disposal 24 hours a day. After about a week on patrol she was moved back indoors to the support services division but did not regain supervisory responsibilities or personal use of a car. We must assume that the reassignment, like the "Summary of Counseling," was a consequence of her statements at the meeting.

Mills contends in this suit under *42 U.S.C. § 1983* that Evansville (and everyone superior to her in the department's chain of command) violated the Constitution by retaliating on account of her speech. In granting summary judgment to the defendants, the district judge stated that Mills's statements at the meeting are protected by the [*4] *first amendment* because she addressed issues of public concern but that the department's interest in efficient management of its operations must prevail. See *Pickering v. Board of Education, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).*

2006 U.S. App. LEXIS 15082, *

*Garcetti*, which was issued while this appeal was under advisement, holds that [HN2] before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking "as a citizen" or as part of her public job. Only when government penalizes speech that a plaintiff utters "as a citizen" must the court consider the balance of public and private interests, along with the other questions posed by *Pickering* and its successors, such as *Waters v. Churchill, 511 U.S. 661, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994); Connick v. Myers, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983);* and *Givhan v. Western Line Consolidated School District, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979).*

Mills was on duty, in uniform, and engaged in discussion with her superiors, all of whom had just emerged from Chief Gulledge's briefing. She spoke in her capacity as a public employee [*5]  contributing to the formation and execution of official policy. Under *Garcetti* her employer could draw inferences from her statements about whether she would zealously implement the Chief's plans or try to undermine them; when the department drew the latter inference it was free to act accordingly.

Quite apart from *Garcetti* is the fact that Evansville did not fire or demote Mills. When the Supreme Court held in *Elrod v. Burns, 427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976),* and *Rutan v. Republican Party of Illinois, 497 U.S. 62, 110 S. Ct. 2729, 111 L. Ed. 2d 52 (1990),* that the *first amendment* bars linking hiring, firing, and promotion decisions to the employee's politics, it did not doubt that [HN3] a public employer retains a powerful interest in ensuring that all positions are filled by workers who will stand behind rather than subvert the decisions made by politically accountable actors. If a chief of police can't fire or demote sergeants whose view simply less than enthusiastic support, what can he do to ensure faithful implementation? The answer must be a lateral transfer; that's how Evansville proceeded with Mills.

Public employers must be able to change assignments [*6]  in response to events (including statements) that reveal whether employees will be faithful agents of the decisions made by the politically accountable managers. It promotes rather than undermines *first amendment* values when those who make decisions, and are held accountable for them at the polls, can ensure their implementation within the bureaucracy. Chief Gulledge was entitled to insist that his subordinates not play the "Yes, Minister" game and undermine his directions. The power of transfer is essential if the top of the bureaucracy is to see its decisions through.

Mills also contends that the letter written to her file, and the removal of her supervisory responsibilities, amounted to sex discrimination. Of this she offered not an iota of proof. By 2002 Mills had been a police officer for 27 years; the department was hardly likely to start discriminating against her so late in her career. (She has since retired.) Summary judgment was properly granted against her.

AFFIRMED