# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE; :
CORPORAL WAYNE WARREN; and :
SERGEANT CHRISTOPHER D. FORAKER, :
 :
 Plaintiffs, :
 :
 v. : C.A.No.04-956-GMS
 :
COLONEL L. AARON CHAFFINCH, :
individually and in his official capacity as :
Superintendent of the Delaware State Police; :
LIEUTENANT COLONEL THOMAS F. :
MACLEISH, individually and in his official :
capacity as Deputy Superintendent of the :
Delaware State Police; DAVID B. MITCHELL, :
in his official capacity as the Secretary of the :
Department of Safety and Homeland Security of :
the State of Delaware; and DIVISION OF :
STATE POLICE, DEPARTMENT OF SAFETY :
AND HOMELAND SECURITY, STATE OF :
DELAWARE, :
 :
 Defendants. :

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR RENEWED MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR JUDGMENT AS A MATTER OF LAW ON THEIR PETITION CLAUSE COUNTS

THE NEUBERGER FIRM, P.A.  MARTIN D. HAVERLY, ATTORNEY
THOMAS S. NEUBERGER, ESQ. (#243) AT LAW
STEPHEN J. NEUBERGER, ESQ. (#4440) MARTIN D. HAVERLY, ESQ. (#3295)
Two East Seventh Street, Suite 302  Two East Seventh Street, Suite 201
Wilmington, DE 19801  Wilmington, DE 19801
(302) 655-0582  (302) 654-2255
TSN@NeubergerLaw.com  Martin@HaverlyLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiffs

Dated: July 14, 2006

**TABLE OF CONTENTS**

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING
OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES . . . . . . . . . . . . . . . . . . 1

     A.     The Big Picture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     B.     The Petition Clause Protects a Particular Type of Expressive Activity -
Expression Directed to the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     C.     The Forms of Expression That Constitute a 'Petition' . . . . . . . . . . . . . . . . . . . 4

          1.     Letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          2.     E-mails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          3.     Lawsuits and Grievances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          4.     Other Forms of Expression . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     D.     A Formal Mechanism is Not Needed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          1.     The Defense Focus on the Requirement of a Formal Mechanism
is a Red Herring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          2.     But Even if a Formal Mechanism is Required, One Existed and It
Was Invoked . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     E.     The Determination of What Constitutes a 'Petition' Does Not Depend on
the Status of the Speaker Either . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     F.     Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.    GARCETTI DOES NOT AFFECT PLAINTIFFS' FIRST AMENDMENT
PETITION CLAUSE CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     A.     Plaintiffs' Petitions Were Not Made Pursuant to their Job Duties . . . . . . . . . 14

     B.     Garcetti Has No Impact Upon Third Circuit Petition Clause Jurisprudence . . 15

          1.     Garcetti Was a Free Speech Case . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          2.     The Portion of the Free Speech Analysis Affected by Garcetti Has
No Analogue in Third Circuit Petition Clause Jurisprudence . . . . . . . 15

C.    The Sole Area Upon Which Plaintiffs and Defendants Agree . . . . . . . . . . . .  16

D.    Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

## TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page**

A.D. Bedell Wholesale Co., Inc., v. Philip Morris, Inc., 263 F. 3d 239 (3d Cir. 2001) . . . . . . . . . . . . 1-2

Adkins v. Rumsfeld, 389 F. Supp. 2d 579 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Anderson v. Davila, 125 F. 3d 148 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,4,6,13

Azzaro v. County of Allegheny, 110 F. 3d 968 (3d Cir. 1997) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . 8

Barnes Foundation v. Township of Lower Merion, 242 F. 3d 151 (3d Cir. 2001) . . . . . . . . . . . . . . . . . 5

Bieregu v. Reno, 59 F. 3d 1445 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Brennan v. Norton, 350 F. 3d 399 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,8,16

Brewster v. City of Poughkeepsie, 2006 WL 1676143 (S.D.N.Y. June 8, 2006) . . . . . . . . . . . . . . . . . 16

Briscoe v. LaHue, 460 U.S. 325 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F. 2d 155 (3d Cir. 1988) . . . . . . . . . . . 2,5,10

Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . 2

Connick v. Myers, 461 U.S. 138 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Eastern Railroad Presidents Conf. v. Noerr Motor Freight, 365 U.S. 127 (1961) . . . . . . . . . . . . . . . . 1

Eichenlaub v. Township of Indiana, 385 F. 3d 274 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Ferrone v. Onorato, 2006 WL 1669988 (W.D. Pa. June 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 2,4-5,10

Garcetti v. Ceballos, 126 S. Ct. 1951 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Green v. Phila. Hous. Auth., 105 F.3d 882 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Herr v. Pequea Township, 274 F. 3d 109 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Hill v. City of Scranton, 411 F. 3d 118 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,6,16

Lewis v. Casey, 518 U.S. 343 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Losch v. Borough of Parkesburg, Pa., 736 F. 2d 903 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 2,6-7

Mariana v. Fisher, 338 F. 3d 189 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

McDonald v. Smith, 472 U.S. 479 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2,4,10

McGreevy v. Stroup, 413 F. 3d 359 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Monteiro v. City of Elizabeth, 436 F.3d 397 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Mt. Healthy Sch. Dist. Bd. Of Educ. v. Doyle, 429 U.S. 274 (1977) . . . . . . . . . . . . . . . . . . . . . . . . 3

NAACP v. Button, 371 U.S. 415 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

New York Times v. Sullivan, 376 U.S. 254 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pickering v. Bd. of Educ., 391 U.S. 563 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,16

Price v. Chaffinch, 2006 WL 1313178 (D. Del. May 12, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

San Filippo v. Bongiovanni, 30 F. 3d 424 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Smith v. McDonald, 562 F. Supp. 829 (M.D.N.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5

Smith v. McDonald, 737 F. 2d 427 (4th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5

Swartzwelder v. McNeilly, 297 F.3d 228 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Terminiello v. City of Chicago, 337 U.S. 1 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F. 3d 392 (3d Cir. 2003) . . . . . . . . . . 2

United Mine Workers v. Pennington, 381 U.S. 657 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217 (1967) . . . . . . . . . . . . . . . . . . 2

Virginia v. Black, 538 U.S. 343 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Watters v. City of Phila., 55 F. 3d 886 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

We, Inc. v. City of Phila., 174 F. 3d 322 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,16

White v. Nicholls, 44 U.S. 266 (1845) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,6,10

White Plains Towing Corp. v. Patterson, 991 F.2d 1049 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 17

**Constitutions and Statutes**

U.S. Const., Amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Delaware Const. of 1897 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Delaware Const. of 1897, Art. 3 § 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Delaware Const. of 1897, Art. 3 § 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Delaware Const. of 1897, Art. 7 § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Delaware Const. of 1897, Sch. § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

29 Del.C. § 2901 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

29 Del.C. § 2906(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

29 Del.C. § 2907(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

29 Del.C. § 2909(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Law Reviews**

Julie M. Spanbauer, *The First Amendment Right to Petition Government for a Redress of Grievances: Cut From a Different Cloth*, 21 Hastings Const. L.Q. 15 (1993)  . . . . . . . . . . . . . 1

<u>ARGUMENT</u>

**I.    INTRODUCTION.**

The defense Answering Brief (DAB) has made clear what is not at issue.  The defense does not challenge the long history and independent pedigree of the petition clause.  The defense does not contest that the right to petition extends to all departments of government.  The defense does not contest that the right to petition even extends to petitioning Executive agencies like the Delaware State Police and quasi Executive or administrative agencies like the Delaware State Auditors Office.

Instead, defendants appear to only challenge two discrete issues.  First, whether plaintiffs' expressions constitute a 'petition.'  Second, even if plaintiffs did engage in protected petitioning, whether the recent free speech clause opinion in <u>Garcetti v. Ceballos</u>, – U.S. –, 126 S.Ct. 1951 (2006), nonetheless spells the end of plaintiffs' petition clause claims.

**II.    PLAINTIFFS ENGAGED IN FIRST AMENDMENT PROTECTED PETITIONING OF THE GOVERNMENT FOR REDRESS OF GRIEVANCES.**

**A.  The Big Picture.**  From the signing of the Magna Carta in 1215,[1] to the signing of the Bill of Rights demanded from William and Mary by Parliament in 1689,[2] from the Declaration of Rights and Grievances by the Stamp Act Congress of 1765 in the American Colonies,[3] to the enactment of the First Amendment as part of the Bill of Rights on December 15, 1791, from the Supreme Court's numerous decisions addressing the nature and scope of the petition clause,[4] to the Third Circuit's many decisions doing the same,[5] the long rich history of

---

[1]  <u>San Filippo v. Bongiovanni</u>, 30 F.3d 424, 443 n.22 (3d Cir. 1994); <u>A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.</u>, 263 F.3d 239, 252  (3d Cir. 2001) (citing Julie M. Spanbauer, *The First Amendment Right to Petition Government for a Redress of Grievances: Cut From a Different Cloth*, 21 Hastings Const. L.Q. 15, 17 (1993)).

[2]  <u>McDonald v. Smith</u>, 472 U.S. 479, 482 (1985); <u>San Filippo</u>, 30 F.3d at 443.

[3]  <u>McDonald</u>, 472 U.S. at 482.

[4]  <u>See, e.g.</u> <u>White v. Nicholls</u>, 44 U.S. 266 (1845); <u>Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127 (1961); <u>NAACP v. Button</u>, 371 U.S. 415 (1963); <u>United Mine Workers</u>

the petition clause is fully documented.

This long rich history is instructive in our present case.  Indeed, after analyzing much of this same history, the Third Circuit itself explained that "[t]here is no persuasive reason for the right of petition to mean less today than it was intended to mean in England three centuries ago." San Filippo, 30 F.3d at 443.  In other words, petition clause rights have not contracted over the years.  Instead, they should mean as much today as they did then.

**B.  The Petition Clause Protects a Particular Type of Expressive Activity - Expression Directed to the Government.**  Both the Supreme Court and the Third Circuit have consistently found that the petition clause protects expression of a particular type - expression directed to the government itself.  Although the "right to petition is cut from the same cloth as the other guarantees of [the First] Amendment, [it] is an assurance of a particular form of expression." McDonald, 472 U.S. at 482.  As the Third Circuit has explained,

> when one files a "petition" one is not appealing over government's head to the general citizenry:  when one files a "petition" one is addressing government and asking government to fix what ... government has broken or has failed in its duty to repair.

San Filippo, 30 F.3d at 442; accord Anderson, 125 F.3d at 162; Ferrone v. Onorato, 2006 WL 1669988, *5 (W.D.Pa. June 13, 2006).  The petition clause's exclusive focus on expression directed to the government is apparent from the text of the First Amendment itself.  See U.S. Const., Amend I. ("Congress shall make no law ... abridging ... the right of the people ... to

---

v. Pennington, 381 U.S. 657 (1965); United Mine Workers of America v. Ill. State Bar Ass'n, 389 U.S. 217 (1967); Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972); McDonald v. Smith, 472 U.S. 479 (1985).

[5] See, e.g. Losch v. Borough of Parkesburg, Pa., 736 F.2d 903 (3d Cir. 1984); Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155 (3d Cir. 1988); San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994); Bieregu v. Reno, 59 F.3d 1445 (3d Cir. 1995) (overruled on other grounds by Lewis v. Casey, 518 U.S. 343 (1996)); Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997); We, Inc., v. City of Phila., 174 F.3d 322 (3d Cir. 1999); A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc., 263 F.3d 239 (3d Cir. 2001); Herr v. Pequea Township, 274 F.3d 109 (3rd Cir.2001) (abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. Of Warrington, 316 F.3d 392, 400 (3rd Cir.2003)); Mariana v. Fisher, 338 F.3d 189 (3d Cir. 2003); Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003); Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005).

petition the Government for a redress of grievances."); <u>accord</u> <u>McDonald</u>, 472 U.S. at 482 (as

James Madison, the author of the First Amendment, explained more than 200 years ago, the

"people 'may communicate their will' through direct petitions to the legislature and government

officials.") (quoting 1 Annals of Cong. 738 (1789)).

 The petition clause's focus on expression directed to the government is contrasted with

the free speech clause's <u>original</u> focus on expression directed towards the public and citizenry at

large. <u>See, e.g.</u> <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 573 (1968) (noting the "public interest

in having free and unhindered debate on matters of public importance -- [is] the core value of the

Free Speech Clause of the First Amendment."); <u>cf.</u> <u>New York Times v. Sullivan</u>, 376 U.S. 254,

269 (1964) (non-public employee context - free speech exists "to assure unfettered interchange of

ideas for the bringing about of political and social changes desired by the people"). Many of the

early Supreme Court opinions make this clear. <u>See, e.g.</u> <u>Pickering</u>, 391 U.S. 563 (public

employee speech to newspaper); <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274

(1977) (public employee speech to a radio station); <u>N.Y. Times</u>, 376 U.S. 254 (non-public

employee speech in a newspaper).

 In keeping with the progressive expansion of the scope of the free speech clause by the

Supreme Court in the 20th Century, free speech protections were subsequently extended to

include speech made internally even if it was not released to the public. <u>See</u> <u>Givhan v. Western</u>

<u>Line Consol. Sch. Dist.</u>, 439 U.S. 410, 415-16 (1979) (the groundbreaking public employee free

speech case in this area). In other words, public employee speech could now be directed to the

government itself, and not just to the general citizenry, and it could still receive protection.

 Notwithstanding the Supreme Court's expansive interpretation of the free speech clause

over the last 40 years to include expressions that once were the sole province of the petition

clause, such an expansion does <u>not</u> mean that expression that would have otherwise been

protected by the petition clause in the past has now been stripped of that protection and any

remedy lies solely within the now retracting scope and protections of the free speech clause.[6]

The government audience for plaintiffs' expression about the broken FTU is key to understanding that plaintiffs engaged in petitioning. Plaintiffs did not go out and stand on a park bench and raise their health and safety concerns directly to the citizenry. If they had, only the free speech clause would provide them with First Amendment protection from retaliation. Instead, plaintiffs raised their concerns directly to the government, the very government that had caused the problems, and the very government that had the power to fix the problems. This is the key distinction which brings plaintiffs' expressions about the hazardous conditions at the FTU within the scope of First Amendment petition clause protection. See San Filippo, 30 F.3d at 442 ("when one files a 'petition' one is addressing government and asking government to fix what ... government has broken or has failed in its duty to repair."); Anderson, 125 F.3d at 162 (same).

**C. The Forms of Expression That Constitute a 'Petition.'** Contrary to the crabbed defense reading of the definition of a 'petition,' a wide variety of expressions have been recognized as being a 'petition.'

**1. Letters.** In McDonald v. Smith, 472 U.S. 479 (1985), the petitions at issue were letters directed to the President, to a Presidential Adviser, several members of Congress and the Director of the FBI, urging them not to appoint a particular individual as U.S. Attorney. Id. at 481; see Smith v. McDonald, 562 F.Supp. 829, 832 (M.D.N.C. 1983); Smith v. McDonald, 737 F.2d 427, 427 (4th Cir. 1984). That the letters were petitions is a necessarily included part of the Court's holding in that case. Moreover, neither the district court, the Fourth Circuit nor the Supreme Court ever questioned or challenged that these letters were a 'petition' within the scope of the meaning of that word in the First Amendment. See San Filippo, 30 F.3d at 439 (noting that the "petition at issue in McDonald was a letter to the President."); Ferrone, 2006 WL

---

[6] As the recent Garcetti and other Supreme Court decisions from the last twenty-five years arguably reveal, the Court has begun to cut back on free speech protections for the subset of public employees.

1669988, *7 (noting that the Supreme Court's decision in <u>McDonald</u> "appear[s] to refute [d]efendants' argument that letters cannot be considered petitions under the Petition Clause").

In <u>White v. Nicholls</u>, 44 U.S. 266 (1845), the petitions at issue also were letters to the President and the Secretary of the Treasury, urging them not to appoint a particular individual as collector of customs. <u>Id.</u> at 267-75. Although a difficult opinion to parse, it is clear from the Supreme Court's discussion and citation of authorities, including early American state court and English common law decisions, that the letters were considered to be petitions of government. <u>Id.</u> at 289-91; <u>see</u> <u>Smith</u>, 562 F.Supp. at 839-40 (discussing the facts of <u>White</u> and noting that the Supreme Court ruled that the letters could be considered a petition for the redress of grievances); <u>Smith</u>, 737 F.2d at 428-29 (discussing <u>White</u> and noting that the Court therein recognized that the letters were petitions for the redress of grievances).

In <u>Brownsville</u>, 839 F.2d 155, the petitions at issue were letters to the President, the Governor, a U.S. Senator, legislative committees, the State Secretary of Health and others, urging them to crack down on appalling conditions at a nursing home for the elderly and remedy violations of the law at that facility. <u>Id.</u> at 156-58. The Third Circuit looked to petition clause precedent in holding that the letters were protected petitioning of government and could not be the basis of tort liability. <u>Id.</u> at 160; <u>see</u> <u>Barnes Foundation v. Township of Lower Merion</u>, 242 F.3d 151, 159-60 (3d Cir. 2001) (noting that the <u>Brownsville</u> decision rests on the petition clause).

Therefore, our written statements and other documents handed to the Auditors are the equivalent of the letters found in the case law and therefore constitute petitions.

   **2. E-mails.** In <u>Ferrone v. Onorato</u>, 2006 WL 1669988 (W.D.Pa. June 13, 2006), the Western District found petitions in the form of e-mails to be indistinguishable from the letters the Supreme Court had found to be protected in <u>McDonald</u>, and that the e-mails sent by the plaintiffs in that case to several County Council members were protected petitions. <u>Id.</u> at *7.

Therefore, our e-mails up the chain of command are the equivalent of the letters found in the case law and the e-mails found in <u>Ferrone</u> and therefore constitute petitions.

    **3. Lawsuits and Grievances.** In <u>San Filippo</u>, 30 F.3d 424, the petitions at issue were lawsuits and grievances. <u>Id.</u> at 439, 441. In <u>Anderson</u>, 125 F.3d 148, the petitions at issue were the filing of a charge of discrimination with the EEOC and the filing of lawsuit. <u>Id.</u> at 161. In <u>Hill</u>, 411 F.3d 118, the petition at issue was a lawsuit. <u>Id.</u> at 121. As the defense would concede, each of these qualifies as a petition.

Therefore, Sgt. Foraker's initial lawsuit before Judge Farnan constitutes a petition under this case law.

    **4. Other Forms of Expression.** In <u>Losch</u>, 736 F.2d 903, the petition at issue was in the form of an inartful note taped to the door of a police station by a citizen, telling a particular police officer (a state actor) to stop harassing him and his family. <u>Id.</u> at 906. The Third Circuit found that it was "clearly established" that the <u>Losch</u> plaintiff had the right to "petition the government in the manner that he did" and to be free of retaliation for doing so. <u>Id.</u> at 910.

The scope of the petition clause also was recently demonstrated in <u>Monteiro v. City of Elizabeth</u>, 436 F.3d 397 (3d Cir. 2006), where the Third Circuit noted that a city councilman was "exercising his constitutional right to petition the government on behalf of himself and his constituents" when he spoke out against the proposed budget at a city council meeting. <u>Id.</u> at 400.

If an inartful note taped to a door, a letter, or an e-mail, is a 'petition,' under this authority plaintiffs' written statements to the Auditor, oral statements, compendium of key concise documents, and eleven volumes of materials and Sgt. Foraker's e-mails up the chain of command on behalf of himself and his men are historic petitions to government for redress of grievances.

The defense claim that <u>Losch</u> was not asserting a violation of the petition clause is plainly wrong. (DAB at 4). First, the opinion itself states that in addition to a Fourth Amendment malicious prosecution claim against a police officer, Losch "further claims that defendants were penalizing him for the exercise of his First Amendment rights." <u>Losch</u>, 736 F.2d at 907. Later in the opinion, as part of its qualified immunity inquiry, the Court then had to determine "whether Losch had clearly established rights to petition the government in the manner that he did and to be free of [retaliatory] malicious prosecution for that exercise." <u>Id.</u> at 910. The Court next determined that Losch had clearly established rights and there "was no ambiguity in the law" in this regard. <u>Id.</u>[7]

**D.  A Formal Mechanism Is Not Needed.**  Although it is certainly an important case for public employees because of its unique holding, the breadth and scope of the petition clause did not begin or end with the Third Circuit's <u>San Filippo</u> decision. The nature of the petition clause is not limited by the scope of that decision and the particular issue which it addressed. The significance of <u>San Filippo</u> lies with its one of a kind holding among the Courts of Appeals - that the public concern limitation on public employee speech does not apply to public employee petitions. It also should have gone without saying that <u>San Filippo</u> must be read in light of the long history of the petition clause. Indeed, much of the decision itself talks about and addresses this long history in great detail as it searches for the historical scope and meaning of the clause. <u>See</u> <u>San Filippo</u>, 30 F.3d at 435-43.

**1.  The Defense Focus on the Requirement of a Formal Mechanism is a Red Herring.**  If anything, a careful reading of <u>San Filippo</u> and study of the decisional authority it cites reveals not that the petition clause only protects expression invoking a formal mechanism

---

[7]  The defense confusion apparently arises from a misunderstanding of the fact that both the free speech clause and petition clause each protect various types of comment and expression. As discussed above, the petition clause protects a particular type of expression when directed towards the government as part of an attempt to seek redress of grievances.

established by the government, but rather that expression invoking a formal mechanism was the initial rationale used by the Third Circuit for its decision not to impose a 'public concern' requirement on employee petitions.

This demonstrates that the repeated defense mantra that no formal mechanism was invoked is a red herring. Assuming *arguendo* that Third Circuit petition clause jurisprudence had developed along a different path and that a public concern analysis does in fact apply, because plaintiffs' petitions herein addressed health and safety issues affecting thousands of public employees, their petitions clearly were on a matter of public concern. Four cases strongly support this ruling and so the defense argument is immaterial. See Brennan v. Norton, 350 F.3d 399, 415 (3d Cir. 2003) (speech by a fireman addressing asbestos contamination in a firehouse clearly a matter of public concern); McGreevy v. Stroup, 413 F.3d 359, 365 (3d Cir. 2005) (speech by a school nurse addressing unlicensed pesticide spraying that was making students and teachers ill "were matters of true public concern"); Adkins v. Rumsfeld, 389 F.Supp.2d 579, 586 (D.Del. 2005) (speech by an Air Force staff sergeant addressing the administering of a tainted anthrax vaccine to military personnel is a matter of public concern); Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995) (speech by a police department employee addressing problems with mental health services for police officers is a matter of public concern because those problems could impair the delivery of police services).

Indeed, the Court has already held that plaintiffs "clearly engaged" in protected free speech activity when they spoke out about the health and safety problems plaguing the FTU, Price v. Chaffinch, 2006 WL 1313178, *3 (D.Del. May 12, 2006), and such a determination necessarily includes the lesser included finding that plaintiffs had spoke out on a matter of public concern. See Azzaro v. County of Allegheny, 110 F.3d 968, 976 (3d Cir. 1997) (en banc). Given that the subject matter of plaintiffs' petitions was the same as their already protected speech, it is clear that applying a public concern analysis to plaintiffs' petitions also results in their being

similarly protected.

**2. But Even if a Formal Mechanism is Required, One Existed and It Was Invoked.**  Although not necessary under the case law and long history of the petition clause discussed above, assuming *arguendo* the defense position that the adoption of a formal mechanism was in fact necessary, the defense argument is still without merit as the State has adopted such formal mechanisms that directly bear upon our present case.

First, the State Auditor's Office (formally known as the Auditor of Accounts) is a Constitutional office established under the Delaware Constitution of 1897, with many duties defined under the Delaware Code.  See Del. Const., Art. 3, § 11; id. at Art. 3, § 21; id. at Art. 7, § 2; id. at Schedule § 7; 29 Del.C. § 2901 et seq.  Its purpose is to ferret out various forms of impropriety in government and it is the very mechanism that plaintiffs invoked by their extensive participation in the Auditor's investigation.  For example, the Auditor is responsible for investigating "all the financial transactions of all state agencies" 29 Del.C. § 2906(a), such as the financial transactions of the DSP and the Division of Facilities Management which wasted millions of taxpayer dollars in building the broken FTU and which has subsequently required the expenditure of millions of additional taxpayer dollars to try to fix what was not done right the first time.

The law requires that the Auditor shall conduct audits to ensure "that all expenditures have been legal and proper" id. at § 2907(a) and is required to report "[a]ll illegal and unbusinesslike practices." Id. at § 2909(b)(3).  Plaintiffs participated fully in this process.  It is certainly no stretch to say that plaintiffs were lodging grievances with the Auditor about hazardous conditions caused by the misuse of public funds in building a broken facility.[8]

Second, the Governor and members of the legislature formally requested that the Auditor

---

[8]  Thus, it is clear that the defense's own purported requirement that petitions be directed to an entity "marked with the government's ... imprimatur" (DAB at 1), has been fulfilled.

9

investigate the conditions at the FTU - "to look at the complete range scenario from the building [process] right through to the actual [ ] close of the range"- thus establishing the specific mechanism that plaintiffs invoked by their extensive participation. (Rothenburger 2411).[9]

Third, and alternatively as to the e-mails and other expression sent by Sgt. Foraker, is the existence and adoption of a highly rigid and structured chain of command in the paramilitary DSP, (W. Warren 326; Baylor 515-16; G. Warren 1166-67; Foraker 1515-16; Yeomans 2088-89), an organization which "is run more like the military services" than a typical private employer. (G. Warren 1166-67). In such an organization, the formal grievance procedure is the chain of command itself - a procedure followed by plaintiffs. Plaintiff Cpl/3s Price and Warren raised their health and safety concerns to Sgt. Foraker. Sgt. Foraker on behalf of himself and his men then raised these same health and safety concerns to Lt. Davis and Capt. Warren. Plaintiffs followed the chain of command. Indeed, had they not, they would have been charged with insubordination and disciplined. In the DSP, where the chain of command is paramount, formal grievances are to be lodged by means of raising them up through the chain of command, as plaintiffs did in our present case.[10]  (See PX40-44; B236-243).[11]

---

[9]  Plaintiffs note that although not directly on point with testimony given to an Auditor, the Supreme Court has observed in the similarly helpful context of courtroom testimony, that "public policy ... requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." Briscoe v. LaHue, 460 U.S. 325, 333 (1983). That is why the Third Circuit has held that "court testimony, whether compelled or voluntary, is always a matter of public concern." Swartzwelder v. McNeilly, 297 F.3d 228, 238 (3d Cir. 2002). The Circuit has justified such holdings because of "[t]he utility of uninhibited testimony and the integrity of the judicial process would be damaged if we were to permit unchecked retaliation for appearance and truthful testimony." Green v. Phila. Hous. Auth., 105 F.3d 882, 887 (3d Cir. 1997). The "judicial interest in attempting to resolve disputes by arriving at the truth would be in jeopardy." Id. As a matter of public policy, plaintiffs respectfully submit that similar reasoning applies to their expressions to the Auditor, who also was trying to ascertain the truth.

[10]  The form of these grievances also is important. Plaintiffs lodged their grievances by e-mail as well as orally up the chain of command. Such e-mails are the functional equivalent, Ferrone, 2006 WL 1669988, *7, of the letters in McDonald, supra, White, supra, and Brownsville, supra, discussed in Argument II.C.1. above.

[11]  Appendix references are to Plaintiffs' 'Appendix to their Answering Brief in Opposition to the Defense Motion for Judgment as a Matter of Law or, in the Alternative, to Amend the Judgment or for a New Trial.' Because of its size, the Appendix was filed in hard copy only. It is the Appendix referenced

Plaintiffs do however agree with the defense assertion that petitions must be directed to those government individuals or agencies which appear to be in a position to help rectify the perceived grievance.  (DAB at 4).[12]  But under the facts of our case, both the State Auditor and the State Police plainly qualify as such agencies in a position to help rectify the many problems at the broken FTU.  The State Auditor was the government office empowered by the Constitution and state statute to investigate the abuse and misuse of public funds pertaining to fiascos like the FTU.  Similarly, the State Police was plaintiffs' employer.  From plaintiffs' vantage point at the low end of the chain of command, their employer and commanding officers in the chain of command who had placed them in such a hazardous working environment would be very first individuals to whom they would direct their grievances.

**E.  The Determination of What Constitutes a 'Petition' Does Not Depend on the Status of the Speaker Either.**  Contrary to the defense claims, it is clear that the determination of what constitutes a 'petition' does not depend on the status of the speaker of the expression at issue.

For example, it is well established that what constitutes 'speech' does not change depending on whether it is 'speech' by a public employee vs. 'speech' by a private citizen. Instead, the status of the speaker simply determines the applicable mode of analysis that attaches thereafter - the analysis which determines whether that 'speech' is ultimately going to be protected by the First Amendment against government retaliation.

Take for example a public employee who writes a letter to the editor of the local newspaper criticizing corruption in government.  Regardless of whether this 'speech' is ultimately found to be protected under the public concern vs. disruption <u>Pickering</u> balancing test, no one

---

by the Notice of Filing of Paper Documents, found at D.I. 218.

[12]  Presumably, a petition unreasonably made in bad faith to a government body not in a perceived position to help address the specific grievance at issue may fall under the 'sham' exception to petition clause protections.

would dispute that such a letter constitutes 'speech.'

Contrast that with a private citizen who writes the same letter to the editor. Such a letter also would constitute 'speech,' but would not be subject to any kind of balancing because of the differing governmental interests involved when a private citizen speaks. See, e.g. Eichenlaub v. Township of Indiana, 385 F.3d 274, 284 (3d Cir. 2004) (the "rationale for a public/private concern distinction that applies to public employees simply does not apply to citizens outside the employment context.").[13]

In the same way, what is recognized as being a 'petition' does not change depending on whether it is a 'petition' by a public employee vs. a 'petition' by a private citizen. The expression that constitutes a 'petition' does not change based on the source status of the speaker. Instead, the private citizen vs. public employee status distinction only becomes relevant when determining the applicable mode of analysis that applies to determine whether the 'petition' receives protection. Whereas a petition by a private citizen would presumably receive close to absolute protection against government retaliation because of the differing interests of the government involved, the same petition by a public employee is subject to the 'sham' exception test established by the Third Circuit in San Filippo.

Take for example a public employee who files a lawsuit, challenging government corruption. Regardless of whether this 'petition' is ultimately found to be protected from retaliation under the 'sham' petition test, it still unquestionably constitutes a 'petition,' albeit a possibly unprotected one. Similarly, consider a public employee who sends a letter to the FBI, asking them to investigate and root out government corruption in his local government employer. Regardless of whether this 'petition' is ultimately found to be protected under 'sham' petition test,

---

[13]  Absent some clear and present danger, Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949), or a true threat, Virginia v. Black, 538 U.S. 343, 359 (2003), contained in the letter from the private citizen, one would be hard pressed to imagine a situation where such a letter would not receive absolute First Amendment protection.

it still constitutes a 'petition.'

The status of the petitioner distinction is what was meant by the Third Circuit when it explained that "the scope of the petition right depends upon the context in which the right is exercised." San Filippo, 30 F.3d at 438; accord id. ("[t]he nature of the limitation upon the petition right depends upon context."). As explained in Argument **II.C.** above, the determination of whether an expression is a 'petition,' can be made from analyzing the nature of the expression itself and from analyzing the history of the petition clause. But as the San Filippo Court explained, the next step is whether that 'petition' receives protection, and the scope of that protection depend upon the context in which the petition occurs - such as a petition by a private citizen vs. a petition by a public employee.

Therefore the defense claim that the status of the petitioner determines whether a 'petition' is a 'petition' is misplaced. (DAB at 5). Whether a petitioner is a government employee or a citizen is immaterial to the question of whether a 'petition' has been made. Certainly plaintiffs' written statements to the Auditor, their oral statements, their concise packet of key documents and the eleven voluminous binders were historic petitions and their status as public employees does not alter this fact.

**F. Summary.** "[W]hen one files a "petition" one is addressing government and asking government to fix what ... government has broken or has failed in its duty to repair." San Filippo, 30 F.3d at 442; accord Anderson, 125 F.3d at 162.

Plaintiffs "sounded the alarm" (Foraker 1405) up the chain of command because of the health and safety problems at the FTU. (W. Warren 255, 220-22). "It was obviously dangerous ... [and] it was a Hazmat site." (Foraker 1485). They spoke out because they were concerned, not only for their own health and that of their families, but also for the health and safety of everyone who had to work, train or operate in the FTU, such as recruits, law enforcement officers and even the civilian citizens. (W. Warren 221-22). They were "trying to protect" those

who worked and trained there.  (Foraker 1484-85).

Plaintiffs spoke to the State Auditor because "[w]e were hopeful that the state auditor would help us fix our range."  (Foraker 1430).

> [I]n my heart, I knew it was the right thing to do.  We wanted them to come in, and we wanted, especially with these auditor investigators, we wanted to show them what was wrong with the range.  All we were asking for is that the state fix the problem so that we can work in a safe, healthy environment.  That's all we were asking for.

(Price 971).  Plaintiffs wanted to protect the health and safety of all who worked at the range.

> My plea is not solely for myself.  It is for every Delaware State Trooper as well as all other law enforcement officers that have participated and will participate in shooting activities at the range.

(PX22; B215).  Plaintiffs also were concerned because they were falsely "[b]eing blamed for the downfall of the operation" at the FTU and they wanted to defend themselves.  (W. Warren 307; PX22; B215).

The range was broken.  Plaintiffs wanted the government's help getting it fixed and protecting those who were being injured by the broken building.  They acted on those concerns and petitioned the government accordingly.  Thus, it is clear that plaintiffs engaged in First Amendment 'petitioning' when they spoke to the State Auditor and raised their grievances up the chain of command about the health and safety disaster at the FTU.  Moreover, because their petitions were not shams, they receive First Amendment protection from retaliation.

## III.    GARCETTI DOES NOT AFFECT PLAINTIFFS' FIRST AMENDMENT PETITION CLAUSE CLAIMS.

**A. Plaintiffs' Petitions Were Not Made Pursuant to their Job Duties.**  As explained in plaintiffs' recently filed Answering Brief on the merits, plaintiffs were firearms instructors, in charge of teaching recruits, Troopers and other law enforcement officers how to shoot various firearms and also teaching them tactical training.  (D.I. 216 at 2).  They were not in charge of the hazardous conditions at the FTU - such as the poisonous air quality - that was the admitted responsibility of the Department of Facilities Management.  (Furman 2343, 2348-50).  Plaintiffs

job duties did not require them to petition the government about hazardous working conditions - such as unsafe levels of lead, copper, zinc, tin, arsenic and nitroglycerine in the air that were being breathed in by all who trained at the FTU.  Instead, their job duties required them to teach people tactics and firearms training.  Accordingly, plaintiffs petitions to the government about hazardous working conditions were clearly not required by their job duties.

**B.  Garcetti Has No Impact Upon Third Circuit Petition Clause Jurisprudence.**  In the same way, the defense position that Garcetti impacts upon Third Circuit petition clause precedent does not withstand scrutiny.

**1.  Garcetti Was a Free Speech Case.**  First, as review of the Opinion makes clear, Garcetti was a free speech case and nowhere does it discuss, reference or otherwise make mention of the separate petition clause.  As discussed at length above, the petition clause has its own particular constitutional focus, as well as an independent pedigree and history, apart from its brother, the free speech clause.

**2.  The Portion of the Free Speech Analysis Affected by Garcetti Has No Analogue in Third Circuit Petition Clause Jurisprudence.**  Second, the portion of the free speech analysis affected by Garcetti has no analogue or parallel in Third Circuit petition clause law.

Defendants confusingly claim that Garcetti adds an additional third step to free speech protected activity analysis. In other words, in addition to (1) the 'public concern' determination and (2) the Pickering disruption balancing, there purportedly is now a third step, (3) a Garcetti speech as a citizen nuance, that comes before the public concern one.

But Garcetti itself explicitly rejects this.  The Supreme Court stated that the protected activity determination still contains only "two inquiries" and the Garcetti nuance is simply a part of the public concern analysis.  Garcetti, 126 S.Ct. at 1958.

> The first requires determining whether the employee spoke as a
> citizen on a matter of public concern.

<u>Id.</u>[14]  The second step still remains the <u>Pickering</u> balancing test.  <u>Id.</u>  Thus, as the Supreme Court has made clear, the speech as a citizen nuance is simply part of the public concern free speech analysis.

Consequently, as discussed in the opening brief (OB at 18-19) and as exhaustively explained by the Third Circuit in <u>San Filippo</u>, 30 F.3d at 434-43, <u>Garcetti</u> does not apply to the petition clause because there is no public concern analysis or disruption balancing under Third Circuit petition clause law. Instead, matters of purely private concern are protected, as long as the petition is not a sham. <u>See, e.g.</u> <u>id.</u> at 440, 443; <u>Hill</u>, 411 F.3d at 126; <u>Brennan</u>, 350 F.3d at 417; <u>We</u>, 174 F.3d at 330 n.2. Thus, because there is no public concern step - which is where the speech as a citizen requirement comes into play -  <u>Garcetti</u> is never triggered.

**C.  The Sole Area Upon Which Plaintiffs and Defendants Agree.**  Surprisingly, it appears that plaintiffs do in fact whole-heartedly agree with one assertion made by the defense. Defendants have asked the Court to be guided on the petition clause issue by a case currently pending in the Southern District of New York, captioned as <u>Brewster v. City of Poughkeepsie</u>, C.A.No. 04-4204-CM (S.D.N.Y.).  Plaintiffs urge the same.

Following on the heels of <u>Garcetti</u>, the <u>Brewster</u> court issued a written opinion, dismissing that plaintiff's free speech retaliation claim because the speech at issue was required by job duties.  <u>Brewster v. City of Poughkeepsie</u>, 2006 WL 1676143 (S.D.N.Y. June 8, 2006). No where in the written opinion did the <u>Brewster</u> court address or make mention of the petition clause.

Not to be deterred, defendants scavenged for the <u>Brewster</u> Complaint and appended it to their brief.  Taking a large logical leap, the defense represented to the Court that even though the

---

[14]  That this is part of the same step should come as no surprise.  The Supreme Court has repeatedly discussed the citizen speech requirement as being part of the public concern analysis since the 1960s.  <u>See, e.g.</u> <u>Pickering</u>, 391 U.S. at 568; <u>Connick v. Myers</u>, 461 U.S. 138, 142 (1983), 461 U.S. at 142.  <u>Garcetti</u> simply explained what 'speech as a citizen' means.

Southern District of New York repeatedly stated it was addressing the free speech claim, that somehow that court must also have dismissed <u>Brewster</u>'s petition clause claim because Brewster had a petition clause claim in her Complaint.

Unfortunately for defendants, plaintiffs have pulled the docket in <u>Brewster</u> off of Pacer and appended it to this Reply brief. (Tab A). The court docket tells a remarkably different story. The docket reveals that despite the dismissal of the free speech claim, contrary to defense representations, the petition clause claim survived and was submitted to the jury.

Although the jury ultimately returned a verdict against the plaintiff under the petition clause (presumably on a factual finding of a lack of causation), it is plainly apparent that the Southern District submitted the petition clause claim to the jury. This is evidenced by looking at the unmarked Minute Entry for June 23, 2006, and by looking at jury verdict itself, also on June 23rd. Accordingly, it is clear that the sole case cited by the defense in support of the proposition that <u>Garcetti</u> also applies to petition clause claims actually stands for the opposite proposition.[15]

**D. Summary.** For the aforementioned reasons, the recent <u>Garcetti</u> decision does not impact on plaintiffs' petition clause counts - which independently sustain the verdict.

<u>**CONCLUSION**</u>

For the reasons discussed above and in the opening brief, by petitioning the State Auditor's Office and the Divisional chain of command, plaintiffs clearly engaged in First Amendment protected petition clause activity. Similarly, Sgt. Foraker's earlier lawsuit also is entitled to petition clause protection.

---

[15] The defense argument in this regard also ignores the fact that the Second Circuit follows a different line of petition clause jurisprudence than the Third Circuit. <u>See, e.g.</u> <u>White Plains Towing Corp. v. Patterson</u>, 991 F.2d 1049, 1059 (2d Cir. 1993) (noting that petition clause claims in the Second Circuit receive the same analysis as free speech claims).

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**


/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com


**MARTIN D. HAVERLY, ESQ. (#3295)**
**MARTIN D. HAVERLY, ATTORNEY AT LAW**
Two East Seventh Street, Suite 201
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Dated: July 14, 2006                    Attorneys for Plaintiffs

18

# Unreported Opinions



--- F.Supp.2d ----                                                                    Page 1
--- F.Supp.2d ----, 2006 WL 1676143 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court,S.D. New York.
Ibis BREWSTER, Plaintiff,
v.
THE CITY OF POUGHKEEPSIE, Defendant.
**No. 04 CIV. 4204(CM).**

May 8, 2006.

**Background:** Former city parking enforcement agent brought action against city, alleging, inter alia, First Amendment retaliation claim on basis that city prevented her from filing criminal charges against citizens with whom she had confrontations, and ultimately terminated her because of her police officer husband's criticism of police chief's decision to dismiss two pending traffic summonses he had issued.

**Holding:** The District Court, McMahon, J., held that husband's criticism related to his daily professional activities, and, thus, it was not protected speech under the First Amendment.

Retaliation claim dismissed.

**Constitutional Law 92 ☞90.1(7.2)**

92 Constitutional Law
　92V Personal, Civil and Political Rights
　　92k90 Freedom of Speech and of the Press
　　　92k90.1 Particular Expressions and Limitations
　　　　92k90.1(7) Labor Matters
　　　　92k90.1(7.2) k. Public Employment.
Most Cited Cases

**Municipal Corporations 268 ☞185(1)**

268 Municipal Corporations
　268V Officers, Agents, and Employees

　　268V(B) Municipal Departments and Officers Thereof
　　　268k179 Police
　　　　268k185 Suspension and Removal of Policemen
　　　　　268k185(1) k. Grounds for Removal or Suspension. Most Cited Cases
Police officer's criticism of police chief's decision to dismiss two pending traffic summonses he had issued related to his daily professional activities, which included determining whether sufficient evidence existed to prosecute pending traffic tickets, and, thus, officer's criticism was not protected speech under the First Amendment. U.S.C.A. Const.Amend. 1.

Police officer's criticism of police chief's decision to dismiss two pending traffic summonses he had issued related to his daily professional activities, which included determining whether sufficient evidence existed to prosecute pending traffic tickets, and, thus, officer's criticism was not protected speech under the First Amendment. U.S.C.A. Const.Amend. 1.

Steven Thomas Sledzik, Jones Sledzik Garneau & Nardone, LLP, Scarsdale, NY, for Plaintiff.
David Lewis Posner, McCabe & Mack LLP, Poughkeepsie, NY, for Defendant.

**MEMORANDUM DECISION AND ORDER DISMISSING PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM**

MCMAHON, District Judge.
**\*1** Plaintiff Ibis Brewster, brings this action against the City of Poughkeepsie alleging, *inter alia,* First Amendment retaliation. She claims, *inter alia,* that she was prevented from filing criminal charges against citizens with whom she had confrontations, and ultimately was terminated from her position as a civilian Parking Enforcement Agent, as a result of her husband's (then fiancé's), criticism of the Police Chief's decision to dismiss two pending traffic summonses issued by her husband, Officer Joseph Brewster. In response to the Chief's January 28, 2003, verbal request that Officer

--- F.Supp.2d ----                                                                                              Page 2
--- F.Supp.2d ----, 2006 WL 1676143 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Brewster dismiss the tickets, and the Chief's February 25, 2003, written directive that the tickets be dismissed, Officer Brewster (by counsel) wrote a letter dated February 26, 2003, to the Chief and Deputy Chief of Police "strongly object[ing] to the dismissals." By a letter dated March 3, 2003, Officer Brewster (again by counsel) complained to the District Attorney that the Chief had "abuse[d] his discretion," and requested that the District Attorney's office investigate the matter to determine whether the Chief's actions constituted official misconduct.

At the final pre-trial conference in this matter, held on June 2, 2006, I asked counsel to submit letter briefs addressing the implications of the Supreme Court's recent decision in *Garcetti v. Ceballos,* --- U.S. ----, 126 S.Ct. 1951, --- L.Ed.2d ----, 2006 WL 1458026 (May 30, 2006), on plaintiff's First Amendment retaliation claim. I now dismiss plaintiff's claim under the rule of law articulated in *Garcetti.*

In *Garcetti,* the Supreme Court held that, "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id. at ----, 2006 WL 1458026, at *8.* The controlling factor in the Court's decision was that Respondent Ceballos' expressions were made, not as a private citizen as "part of civic discourse," but rather pursuant to his official duties. *Id.*

The facts in *Garcetti* are striking similar to those in the case at bar. Ceballos, a deputy district attorney, recommended dismissal of a pending criminal matter, upon learning that an affidavit used to obtain a critical search warrant contained material misrepresentations. When his supervisors refused to dismiss the charge, Ceballos testified on behalf of the defense at a hearing on the defendant's motion to challenge the warrant. Thereafter, Ceballos was allegedly subjected to a series of retaliatory employment actions, including reassignment to a different position, transfer to another courthouse, and denial of a promotion.

Joseph Brewster was a police officer. His speech related to his supervisor's decision to dismiss two

pending traffic summonses he had issued. Officer Brewster's February 26 letter to the Chief and Deputy Chief of Police reiterated Brewster's opinion that the tickets should not be dismissed, and emphasized that the individual whose tickets he was directed to dismiss was "guilty of both violations," that the "charged individual acknowledged traveling more than double the posted speed limit and, according to the evidence available, clearly violated the provisions of law which prohibit crossing a double yellow line." Officer Brewster's March 3 letter to the District Attorney complained that, "Despite the operator's admission to speeding and video surveillance confirming that the operator crossed onto, if not over, the double yellow line in violation of the vehicle and traffic law, Chief Knapp has demanded that Officer Brewster dismiss the summons."

**\*2** Like Ceballos' memo expressing his position on the proper disposition of a pending criminal case, Officer Brewster's letters to the Chief and Deputy Chief of Police and to the District Attorney related to his "daily professional activities," *Garcetti,* --- U.S. at ----, 126 S.Ct. at ----, 2006 WL 1458026 at *8, which included determining whether sufficient evidence existed to prosecute pending traffic tickets. Accordingly, Officer Brewster's expressions are not protected speech, and cannot form the basis of a retaliation claim.

The only difference between the *Garcetti* case and this case is that Ceballos claimed that he was retaliated against on account of *his own* speech, while plaintiff Brewster asserts that she was retaliated against on account of *her husband's* speech. This distinction is of no moment. There is no question that, if Officer Brewster does not have a cause of action based on his own unprotected speech-and he does not-his wife certainly cannot state a claim for retaliation based on that same unprotected speech.

For the foregoing reasons, plaintiff's First Amendment retaliation claim is dismissed. Trial will proceed as scheduled on plaintiff's remaining claims.

This constitutes the decision and order of the Court.

S.D.N.Y.,2006.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                      Page 3
--- F.Supp.2d ----, 2006 WL 1676143 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**


Brewster v. City of Poughkeepsie
--- F.Supp.2d ----, 2006 WL 1676143 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1416633 (Trial Motion, Memorandum and
Affidavit) Memorandum of Law in Opposition of
Defendant's in Limine Motion (Apr. 6, 2006) Original
Image of this Document (PDF)
• 7:04cv04204 (Docket) (Jun. 4, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                              Page 1
Slip Copy, 2006 WL 1669988 (W.D.Pa.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,W.D. Pennsylvania.
Rock FERRONE and Rock Airport of Pittsburgh,
L.L.C., Plaintiff
v.
Dan ONORATO, individually and officially, Dennis
Davin, Individually and Officially, and Allegheny
County, Defendants
**No. CIVA 05-303.**

June 13, 2006.

Gianni Floro, Pittsburgh, PA, for Plaintiffs.
Caroline Liebenguth, Michael H. Wojcik, Allegheny
County Law Department, Pittsburgh, PA, for
Defendants.

Re: Doc. # 23

AMBROSE, J.

*ORDER*

**\*1** On March 9, 2005, this case was referred to United
States Magistrate Judge Ila Jeanne Sensenich for
pretrial proceedings in accordance with the Magistrates
Act, 28 U.S.C. §§ 636(b)(1)(A) and (B), and Rules
72.1.3 and 72.1.4 of the Local Rules for Magistrates.

The Magistrate Judge's Report and Recommendation
filed on May 19, 2006, recommended that the
Defendants' Motion to Dismiss (Doc. # 18) be granted
as to Counts II and III, denied as to Count I, and denied
without prejudice as to Counts IV, V, VI, VII and VIII.

The parties were allowed (10) days from the date of
service to file objections. Service was made on all
parties. Objections have not been filed to the Report
and Recommendation.

After de novo review of the pleadings and documents in

the case, together with the Report and
Recommendation, and objections thereto, the following
order is entered:

AND NOW, this 13th day of *June,* 2006;

IT IS HEREBY ORDERED that the Defendants'
Motion to Dismiss is granted as to Counts II and III,
denied as to Count I, denied without prejudice as to
Counts IV, V, VI, VII and VIII.

The Report and Recommendation of Magistrate Judge
Sensenich, dated, May 19, 2006 is adopted as the
opinion of the Court.

Doc. # 18

SENSENICH, Magistrate J.

*MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION*

*I. RECOMMENDATION*

It is recommended that Defendants' Motion to Dismiss
the complaint be granted as to Counts II and III; denied
as to Count I; and denied without prejudice as to Counts
IV, V, VI, VII and VIII.

*II. REPORT*

Rock Ferrone and Rock Airport of Pittsburgh, L.L.C.,
hereinafter "Plaintiffs", filed this case against
Allegheny County and two county officials, hereinafter
collectively "Defendants". (Compl., Doc. # 1 at ¶¶
17-30.) The two officials, Dan Onorato, the Chief
Executive of Allegheny County and Dennis Davin, the
Director of the Department of Economic Development
of Allegheny County, are named as Defendants in their
individual and official capacities. (*Id.* at ¶¶ 20-27).

Plaintiffs allege state and federal constitutional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 2
Slip Copy, 2006 WL 1669988 (W.D.Pa.)
**(Cite as: Slip Copy)**

violations, federal statutory claims, and various state tort claims. (*Id.* at ¶¶ 6-7, 101-156.) They seek injunctive relief and monetary damages. (*Id.* at ¶ 8.)

In their Motion to Dismiss, Defendants assert that Plaintiffs have failed to state a claim for relief under the Civil Rights Statutes, Sections 1983, 1985(3), and 1986, as codified in Title 42 of the United States Code. (Doc. # 18 at 2-5.) Defendants also argue that they are protected from suit on the state law claims by governmental immunity. (*Id.* at 4.) Thus, Defendants request that Plaintiffs' complaint be dismissed in its entirety. (*Id.* at 2.)

### A. *Factual Background*

Plaintiffs allege that Defendants' wrongful acts, omissions, and conspiracies began on January 4, 2005 and continued to approximately February 8, 2005. (Doc. # 1 at ¶ 31.) The complaint avers that electronic communications, hereinafter "e-mail," they sent to "several Allegheny County Council members" and "all the e-mails sent to any Allegheny County e-mail address" did not reach the intended recipients, but "were re-directed to one or more agents" of Defendants Davin and Onorato "for review, dissemination and/or censoring." (*Id.* at ¶¶ 48-50.) Plaintiffs further assert that the e-mails were intentionally re-directed:
**\*2** in an effort to limit the Plaintiffs' expression of their opinions regarding Allegheny County government[,] ... prevent information containing facts requested by the several members of Allegheny County Council from reaching their intended recipients[,] ... to limit and prevent the Plaintiffs from providing information to the several members of Allegheny County Council and other officials and employees of Allegheny County.

(*Id.* at ¶¶ 51-53.) Plaintiffs also claim that the e-mails were redirected to allow Defendants "to examine and utilize the information that the Plaintiffs provided ... for their own purposes" including "advising private parties who are not officials and employees of Allegheny County, so that said private parties could reap private gain from said information." (*Id.* at ¶¶ 54-55.)

Plaintiffs aver that they learned that their e-mails were

being diverted when Defendant Davin informed them that he had not received certain e-mails which had been sent by Plaintiff Ferrone. (*Id.* at ¶¶ 58-71.) This was confirmed when Mr. Davin and Mr. Ferrone attempted to send e-mails to each other, and Mr. Ferrone received Defendant Davin's e-mails, but Defendant Davin did not receive Mr. Ferrone's e-mails. (*Id.*) Plaintiffs claim that after this discovery, Defendant Davin "commented that 'Dan may have blocked your e-mail, if it was the e-mail address that those 'blast e-mails' were coming from.' " (*Id.* at ¶ 72.) Plaintiffs further allege that "Mr. Ferrone then contacted a member of the Allegheny County Council, who advised him that no e-mails had been received from him since before the meeting of January 4, 2005." (*Id.* at ¶ 76.)

After this discovery, Plaintiffs assert that Mr. Onorato, while on the radio, stated to the public that Mr. Ferrone had sent him "venomous" e-mails. (*Id.* at ¶ 118.) Allegedly, this statement was repeated to a reporter and a public official and similar statements were made to clients of Plaintiffs at a County holiday party. (*Id.* at ¶¶ 122, 124, 126.)

### B. *Standard for Motion to Dismiss*

In ruling on a motion to dismiss filed pursuant to Rule 12(b)(6), the Court is required to accept as true all allegations made in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the plaintiff. *See Blaw Knox Retirement Income Plan v. White Consol. Indus.,* 998 F.2d 1185, 1188 (3d Cir.1993); *Ditri v. Coldwell Banker Residential Affiliates,* 954 F.2d 869, 871 (3d Cir.1992).* The issue is not whether the plaintiff will ultimately prevail, but rather whether he can support his claim by proving *any* set of facts that would entitle him to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Dismissal is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations." *See Port Auth. v. Arcadian Corp.,* 189 F.3d 305, 311 (3d Cir.1999).

**\*3** To survive a motion to dismiss, the plaintiff must set forth information from which each element of a claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

may reasonably be inferred. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). It is the defendant who bears the burden of establishing that the complaint fails to state a claim upon which relief can be granted. *Gould Elecs., Inc. v. United States,* 220 F.3d 169, 178 (3d Cir.2000).

### C. *Discussion*

Plaintiffs' complaint lists eight counts. Counts I, II and III allege violations of the Civil Rights Statutes, codified at 42 U.S.C. §§ 1983, 1985(3), and 1986. (See Doc. # 1.) Counts VII and VIII assert invasion of privacy and civil conspiracy based on state law. Finally, Counts IV, V, and VI claim tortious conduct under state law, specifically slander, commercial disparagement, and conversion.

Defendants' Motion to Dismiss argues that the complaint fails to state a cause of action under the Civil Rights Statutes and that they are immune from suit on the remaining state law claims. (See Doc. # 19.)

### 1. Failure to State a Claim [FN1]

> **FN1.** Plaintiffs do not claim to have alleged a Fifth Amendment violation. (Doc. # 22 at 16-17.) Thus, Defendants' Motion to Dismiss based on this issue will not be addressed.(See Doc. # 19 at 9-10.)

#### a. Section 1983

Defendants argue that Plaintiffs' Section 1983 claim should be dismissed because Plaintiffs have failed to assert any valid underlying constitutional or statutory violation. (Doc. # 19 at 4.) Section 1983 provides a procedural tool that allows individuals to bring a federal cause of action against any person who, acting under color of state law, has deprived them of their federal rights. 42 U.S.C.A. § 1983 (West 2003). This Section states:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or

Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C.A. § 1983.

To state a claim under Section 1983, Plaintiffs must meet two threshold requirements. They must aver: (1) that the alleged misconduct was committed by a person acting under color of state law; and (2) that as a result, they were deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

Here, Plaintiffs allege that Defendants Onorato and Devin were acting under color of state law. (Doc. # 1 at 13-18.) Plaintiffs assert three constitutional violations. First, Plaintiffs aver that Defendants actions violated their First Amendment rights to freedom of speech and to petition the government for a redress of grievances. (Doc. # 1 at ¶¶ 78-83.) Second, Plaintiffs assert that Defendants violated their rights to privacy, to equal protection and to due process of the law under the Fourteenth Amendment of the United States Constitution. (*Id.* at ¶¶ 84-87, 92-98.) Finally, Plaintiffs argue that they were deprived of rights under the Fourth Amendment of the United States Constitution to be free from unreasonable searches and seizures because the e-mails sent to certain county officials were illegally "seized". (*Id.* at ¶ 84.)

**\*4** Defendants do not challenge Plaintiffs' allegation that Defendants Onorato and Devin were acting under color of state law. (See Doc. # 19.) Instead, Defendants move to dismiss for failure to state a claim on the ground that the conduct alleged does not violate the Constitution.(*Id.* at 4.) Defendants bear the burden of establishing that the complaint fails to state a claim. *See Gould Elecs.,* 220 F.3d at 178. Thus, Defendants must demonstrate that the Constitution is not implicated when state officials intercept and re-direct e-mail sent by a private party to other elected officials. Defendants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1669988 (W.D.Pa.)
**(Cite as: Slip Copy)**

fail to establish that Plaintiffs' claim is not viable under the Constitution.

Beginning with Plaintiffs' First Amendment claim, Defendants argue that Allegheny County's e-mail system is not a public forum and e-mail is not a form of communication that is protected by the Petition Clause.[FN2] (Doc. # 19 at 4-6.) Plaintiffs respond that Allegheny County's e-mail system is open to citizens at large and is thus a public forum, and that members of County Council encourage their constituents to contact them electronically for public discourse. (Doc. # 22 at 6.) Alternatively, Plaintiffs assert that even if e-mail is not a public forum, Defendants' actions in preventing public officials from receiving e-mails still violates the First Amendment because they were an unreasonable restriction on e-mail communications with public officials. (*Id.* at 7.)

> **FN2.** Defendants also argue that the subject matter of the e-mails was commercial in nature and therefore did not constitute a matter of public concern that is protected by the Petition Clause. (Doc. # 19 at 5.) Defendants' argument appears to confuse the First Amendment right to petition the government with the First Amendment right to freedom of expression. Government employees have a right to petition the government in matters which do not implicate a public concern but their right to free speech is limited to matters of public concern. See discussion of *San Filippo v. Bongiovanni,* 30 F.3d 424 (3d Cir.1994) and *Cooper v. Cape May County Bd. of Soc. Servs.,* 175 F.Supp.2d 732 (D.N.J.2001) *infra.*

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, ... or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I. The United States Supreme Court has explained that when evaluating a petition clause claim:

We start with the premise that the rights to assemble peaceably and to petition for a redress or [sic]

grievances are among the most precious of the liberties safeguarded by the Bill of Rights. These rights, moreover, are intimately connected, both in origin and in purpose, with the other First Amendment rights of free speech and free press. "All these, though not identical, are inseparable." ... The First Amendment would, however, be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such.

*United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). Plaintiffs generally allege that Defendants' conduct was directed toward them to discourage them from exercising their rights to free speech and to petition the government, rights which were described as intimately connected by the *United Mine Workers* Court. (See Doc. # 1 at ¶¶ 81-83.) Specifically, Plaintiffs aver:81. The official conduct engaged in by the Defendants was intentionally directed toward the Plaintiffs ... to discourage the Plaintiffs from engaging in a Constitutionally protected right, namely their rights under the First Amendment ... to freely participate in government *by providing their opinions, information and grievances to government* ...
**\*5** 82. The official conduct engaged in by the Defendants was intentionally directed toward the Plaintiffs ... to discourage the Plaintiffs from engaging in a Constitutionally protected right, namely their rights under the First Amendment ... *to freely voice objection to government policy, custom, procedure and actions* as carried out by government employees and officials under the color of law, or was in reckless or grossly negligent disregard of those rights.

(*Id.* at ¶¶ 81-82.) (Emphasis added.)

Defendants argue that the Petition Clause only applies to formal mechanisms for the redress of grievances and that the county e-mail system does not qualify as a formal mechanism. (Doc. # 19 at 5-6.) Further, Defendants seem to contend that the content of the e-mails must involve a matter of public concern to be protected under the Petition Clause. (*Id.* at 5.) As support for these arguments, Defendants cite two cases:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 5
Slip Copy, 2006 WL 1669988 (W.D.Pa.)
**(Cite as: Slip Copy)**

*San Filippo v. Bongiovanni,* 30 F.3d 424 (3d Cir.1994) and *Cooper v. Cape May County Bd. of Soc. Servs.,* 175 F.Supp.2d 732 (D.N.J.2003). However, these cases are distinguishable because they involved grievances and free speech rights of public employees rather than private citizens, as are Plaintiffs. On the other hand, they discussed important differences between the right to petition and the right to free speech which are relevant to this case because Plaintiffs allege that both rights have been violated.

In *San Filippo* the court vacated the district court's grant of summary judgment in the defendant's favor on the plaintiff's first amendment claim that his dismissal as a tenured professor at a state university was in retaliation for the exercise of his First Amendment rights to free speech and to petition the government. The court drew an important distinction between the First Amendment right to petition the government and the First Amendment right to free speech:

As explained above, one who alleges retaliatory discharge from governmental employment must establish that the conduct which triggered the discharge was protected under the first amendment. Where the alleged retaliation is based on expressive conduct constituting speech, a court must first determine whether or not the speech can be fairly characterized as addressing a "matter of public concern," for a governmental employee who makes public complaints about problems not of "public concern" has no first amendment immunity against employer discipline *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 ... (1983). But San Filippo's expressive conduct was not limited to speech. It included the filing both of law suits, and also of grievances under a collective bargaining agreement, against the University and University officials-activities that implicate the petition clause, rather than the free speech clause, of the first amendment.

*San Filippo,* 30 F.3d at 434-435. The Court of Appeals held that the district court had erred in granting the defendant's motion for summary judgment without allowing relevant discovery. The court recognized its struggle in dealing with a fact situation in which the alleged "petition" for which the plaintiff claimed he was discharged in retaliation, constituted speech. See *Id.* at

438, 440. One of San Filipo's alleged "petitions" was a letter complaining about dangerous conditions in the chemistry laboratories. After a long discussion of the difference between petitions and other writings claimed to be protected under the "petition" clause, the court set forth its distinction between the two:**\*6** As applied to communications that are not petitions, the *Connick* rule means that a public employee who goes public-e.g., by writing to The New York Times-with an employment dispute that is not of "public concern" runs the risk of being disciplined by her public employer for undertaking to draw public attention to a private dispute. But when one files a "petition" one is not appealing over government's head to the general citizenry: when one files a "petition" one is addressing the government and asking government to fix what, allegedly, government has broken or has failed in its duty to repair.

*Id.* at 442. The court did not resolve the issue as to which documents qualified as "petitions" but directed the district court, on remand to "consider which, if any, of San Filippo's grievances and lawsuits constituted a 'petition,' and whether any such 'petition' was non-sham." *Id.* at 443.

The *San Filippo* Court explained that there is no "public concern" requirement when the speaker is a private party:

The Supreme Court recently elaborated on the basis for authorizing the government as employer to exercise broader power in regulating the speech of its employees than the government as sovereign may exercise in regulating the speech of the general public:

The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a relatively significant one when it acts as employer. *The government cannot restrict speech of the public at large just in the name of efficiency.* But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 6
Slip Copy, 2006 WL 1669988 (W.D.Pa.)
**(Cite as: Slip Copy)**

well be appropriate.

*Id.* at 441, quoting *Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (emphasis added).

The critical difference between the two, *for public employees,* is that if the retaliation was for the public employee's speech he must show a public purpose but if the retaliation was for petitioning the government, the plaintiff need not show a public purpose. *San Filippo,* 30 F.3d at 440. On the other hand, private citizens can express their opinions freely without having to show a public purpose.

In a subsequent case, *WE, Inc. V. City of Philadelphia, Dep't of Licenses & Inspections,* 174 F.3d 322, 330, n. 2 (3d Cir.1999) the Court noted that its holding in *San Filippo* was confined to the public employment/retaliatory discharge context.

Plaintiff Ferrone is a private citizen and *from San Filippo* it would appear we can conclude that private citizens have a First Amendment right to petition the government and to express their concerns and interests to government officials without having to show a public interest.

In *Cooper,* cited by Defendant, the plaintiff was a clerk at the county board of social services. The defendants' motion for summary judgment was granted as to the plaintiff's claim under Section 1983 asserting he was denied a promotion in retaliation for his complaints about a co-worker. The court found that his speech did not implicate a public concern and therefore was not protected under the First Amendment. It distinguished retaliation for protected activity, such as filing a grievance, where no public concern is necessary, from retaliation based on speech, which is not protected unless there is a public concern. The court found that the plaintiff's speech-complaints about a co-worker-did not present a public concern. However, that case is not relevant here since private citizens can express their opinions freely without having to present a public concern.

*7 Next, Defendants assert that the right to petition

does not apply to Plaintiff's emails because the right to petition is only protected if a formal mechanism for filing grievances is utilized, quoting from *Cooper.* (Doc. # 19 at 5-6 quoting *Cooper,* 175 F.Supp. at 746.) They also argue that Plaintiffs have not alleged they were deprived of free speech under the First Amendment because they have not alleged a public interest. However, as noted above, *Cooper* is not applicable because Cooper was a public employee, not a private citizen, as are Plaintiffs.

In the case of *McDonald v. Smith,* 472 U.S. 479, 482-83, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985) the United States Supreme Court recognized the well established right of a private citizen to 'petition' the government for redress of grievances under the First Amendment, but held that the Petition Clause of the First Amendment does not grant absolute immunity from liability for libel. The Court evaluated a letter written to the President of the United States, under the Petition Clause. 472 U.S. at 483. This would appear to refute Defendants' argument that letters cannot be considered petitions under the Petition Clause. Defendants have not cited any authority suggesting that e-mails have less protection under the First Amendment than letters.

Defendants have not established that an e-mail communication to an elected official by a private party cannot be a petition protected by the First Amendment, or that their alleged diversion of Plaintiff Ferrone's e-mails did not violate his right to freedom of speech. As the *McDonald* Court noted, "James Madison made clear in the congressional debate on the proposed amendment that people 'may communicate their will' through direct petitions to the legislature and government officials." *Id.* at 482. Defendants have not cited any authority treating e-mails different from a letter in the First Amendment context. Therefore, Defendants have failed to establish that the Petition Clause is not applicable to Plaintiffs' e-mails.

Plaintiffs have alleged facts which, if true, could support a finding that their communications to governmental officials were intercepted by Defendants. Specifically, Plaintiffs allege that:
51. The re-directing of the Plaintiffs' e-mail was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

undertaken at the behest of Onorato and Davin, and other persons presently unknown to the Plaintiffs, in an effort to limit the Plaintiffs expression of their opinions regarding Allegheny County government.

52. The re-directing of the Plaintiffs' e-mail, undertaken at the behest of Onorato and Davin, and other persons presently unknown to the Plaintiffs, was also in an effort to prevent information containing facts requested by the several members of Allegheny County Council from reaching their intended recipients.

56. There was no reasonable basis for the re-directing of the Plaintiffs' e-mail.

83. The official conduct engaged in by the Defendants was intentionally directed toward the Plaintiffs ... to discourage the Plaintiffs from engaging in a Constitutionally protected right, and in retaliation for exercise of those rights, namely their rights under the First Amendment of the United States Constitution to petition the government for redress of grievances.

**\*8** (Doc. # 1 at ¶¶ 51-52, 56, 83.) Therefore, Plaintiffs have alleged facts sufficient for a [Section 1983](#) claim to proceed against the individual Defendants Onorato and Devin based upon a First Amendment violation.

Further, as to Defendant Allegheny County, the Supreme Court has held that only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [§ 1983](#)." [Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)](#). In alleging that Defendant Onorato, the Chief Executive of Allegheny County and Defendant Davin, the Director of the Department of Economic Development, have blocked e-mails they have sent to other County officials, Plaintiffs have alleged a government custom which implicates rights guaranteed to them under the First Amendment to the United States Constitution. (See Doc. # 1 at ¶¶ 89, 98.) Consequently, they have

alleged a cause of action against Defendant Allegheny County.

Accordingly, it is recommended that Defendants' Motion to Dismiss Count I be denied as to all Defendants.

b. Sections 1985/1986

Defendants assert that Plaintiffs' [Section 1985](#) conspiracy claim is flawed by their failure to allege that Defendants' actions were motivated by racial or class based animus, and because members of the same entity can not conspire with each other. (Doc. # 19 at 10-11.) Defendants further assert that claims based on [Section 1986](#) should be dismissed because of Plaintiffs' failure to allege a cause of action under [Section 1985(3)](#). (*Id.* at 12.)

Plaintiffs argue that they qualify as a class of one, and the conspiracy between the individual Defendants and unknown persons was motivated by a class based animus designed to deprive them of the equal protection of the laws. (Doc. # 22 at 17-18.) [Section 1985(3)](#) provides:

If two or more persons in any State or Territory conspire ..., for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons ... the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

[42 U.S.C.A. § 1985(3)](#). A [Section 1985(3)](#) claim includes four elements: a conspiracy which was "motivated by a racial or class based discriminatory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 8
Slip Copy, 2006 WL 1669988 (W.D.Pa.)
**(Cite as: Slip Copy)**

animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws" and an act to further the conspiracy which resulted in an injury or deprivation of another's rights or privileges secured by citizenship. See *Lake v. Arnold, 112 F.3d 682, 685 (3d Cir.1997)*. Plaintiffs argue that they are a class of one for equal protection purposes. (See Doc. # 22 at 18.) They do not further identify their class and they cite no authority for this novel theory. The case they cite, *Village of Willowbrook v. Olech, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)* involved a Fourteenth Amendment Equal Protection Clause claim, not a Section 1985(3) conspiracy claim. The Supreme Court has discussed the "class based animus" requirement:**\*9** To begin with, we reject the apparent conclusion of the District Court (which respondents make no effort to defend) that opposition to abortion constitutes discrimination against the "class" of "women seeking abortion." Whatever may be the precise meaning of a "class" for purposes of *Griffin*'s speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the "general federal tort law" it was the very purpose of the animus requirement to avoid.

*Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 269, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993)*. The Supreme Court's holding in *Bray* is instructive: a class is "something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray, 506 U.S. at 269*, Plaintiffs, as a class of one, are not a group that the Supreme Court would recognize as being subject to any legitimate class based animus which would support a Section 1985(3) claim. Therefore, it is recommended that the Section 1985(3) claim contained in Count II of Plaintiffs' complaint be dismissed.

Furthermore, in the absence of a valid claim for a Section 1985(3) violation, there can be no claim for

failure to prevent a civil rights conspiracy violation under Section 1986. *See Bieros v. Nicola, 839 F.Supp. 332 (E.D.Pa.1993)*. Therefore, it is also recommended that the Section 1986 claim contained in Count III of Plaintiffs' complaint be dismissed.

2. Governmental Immunity [FN3]

FN3. Plaintiffs state that they have not alleged state law claims against Allegheny County. (Docs. # 22 at 18.) Thus, Defendants' Motion to Dismiss on this issue will not be addressed. (See Doc. # 19 at 12.)

Defendants have asserted two theories in support of their claim that they are immune from the state law claims asserted against them. First, Defendants assert that Plaintiffs' state law defamation claims against Defendants Onorato and Davin in Counts IV and V must be dismissed because they are protected by the Pennsylvania Political Subdivision Tort Claims Act (PA PSTCA), 42 Pa. Cons.Stat. Ann. § 8546 (Doc. # 19 at 12.) The PA PSTCA provides absolute immunity to local agencies except for eight statutorily defined exceptions, which are inapplicable in this case. See 42 Pa. Cons.Stat. Ann. § 8542. In *Laverdure v. County of Montgomery, 324 F.3d 123 (2003)* the Court held that a county commissioner, as a high public official, was entitled to absolute immunity under Section 8546. (Doc. # 19 at 13.) But Plaintiffs argue that section does not apply because their defamation claims against Onorato and Davin involve wilful misconduct, and thus, the Pa PSTCA is unavailable to them. (Doc. # 22 at 19, citing 42 Pa. Cons.Stat. Ann. § 8550.) This provision states: In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 9
Slip Copy, 2006 WL 1669988 (W.D.Pa.)
**(Cite as: Slip Copy)**

**\*10** 42 Pa. Cons.Stat. Ann. § 8550 (West 1998). The Court of Appeals for the Third Circuit has discussed the PA PSTCA and the evidence necessary to find willful misconduct under Section 8550:Under the Act, individual defendants are immune from liability for acts within the scope of their employment to the same extent if their conduct amounts to actual fraud, crime, actual malice or willful misconduct.... "Willful misconduct," as used in section 8550, requires evidence that the defendants actually knew that their conduct was illegal.

*Sameric Corp. v. City of Philadelphia,* 142 F.3d 582, 600-601 (3d Cir.1998) (citations omitted, emphasis added). "Willful misconduct" is described in 42 Pa. Cons.Stat. Ann. § 8336(d) as:(d) Gross negligence or willful misconduct.-Nothing in this section shall be construed to limit or otherwise affect or preclude the liability of any person resulting from such person's gross negligence or intentional misconduct. Reckless, willful or wanton misconduct shall constitute gross negligence.

In *Ford v. Johnson,* 899 F.Supp. 227 (W.D.Pa.1995) Chief Judge Ambrose held that an allegation of "gross negligence" sufficiently alleged "willful misconduct" to prevent grant of the motion to dismiss filed by, *inter alia,* the defendant county commissioners. Plaintiffs have alleged "gross, wanton, reckless and outrageous conduct." (Compl., Doc. # 1 at ¶¶ 133, 138, 145, 146, and 156.) Therefore, Plaintiffs have sufficiently alleged facts which overcome the immunity available under Section 8546 and, as to Defendants' immunity under Section 8546, their motion to dismiss Counts IV-VIII would be denied but for the following section which addresses the common law doctrine of High Public Official Immunity.

Next, Defendants argue that the common law doctrine of High Public Official Immunity exempts them from suit for defamation related claims. (Doc. # 19 at 13.) Plaintiffs argue that Pennsylvania's High Public Official Immunity has been abrogated by the PA PSTCA and cite non-controlling federal case law as support for this argument.[FN4] (Doc. # 22 at 20.) The Pennsylvania Supreme Court has said that the Pa PSTCA does not abrogate high public official's absolute immunity to

civil suits for defamation related claims. *Lindner v. Mollan,* 544 Pa. 487, 677 A.2d 1194 (Pa.1996), accord *Osiris Enters. v. Borough of Whitehall,* 877 A.2d 560, 566 (Pa.Cmwlth.2005). Federal courts apply the law of the state as announced by the highest court when determining issues of state substantive law. See *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); see also *Harris v. Pennsylvania Turnpike Com.,* 410 F.2d 1332, 1334-35 (3d Cir.1969). (Immunity from tort liability is a question of state law, and the federal courts are bound to apply the law as announced by the Pennsylvania Supreme Court.) Therefore we will apply the law of Pennsylvania. The Pennsylvania Supreme Court explained that the doctrine of absolute privilege for high public officials:

> FN4. Although Defendants cite Chief Judge Ambrose opinion in *Ford v. Johnson,* 899 F.Supp. 227 (W.D.Pa.1995) in this section, in denying the defendants' motion to dismiss based on official immunity, she was actually addressing the immunity available under Section 8550. She did not address the common law doctrine of High Public Official Immunity addressed by Defendants in this section of their brief.

**\*11** [I]s unlimited and exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, provided the statements are made or the actions are taken in the course of the official's duties or powers and within the scope of his authority, or as it is sometimes expressed, within his jurisdiction. *Lindner v. Mollan,* 544 Pa. 487, 677 A.2d 1194, 1195 (Pa.1996). The purpose for the absolute immunity provided to high public officials is "to foreclose the possibility of suit." *Osiris Enterprises,* 877 A.2d at 567. Pennsylvania has determined that, "[a]bsolute immunity is thus a means of removing any inhibition which might deprive the public of the best service of its officers and agencies." *Id.* at 567. However, it has been explained that "given the great potential for harm, the privilege must be limited to those statements and actions which are in fact 'closely related' to the performance of those

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

official duties." *Id.,* quoting *McCormick v. Specter,* 220 Pa.Super. 19, 275 A.2d 688, 689 (Pa.Super.Ct.1971). Therefore, a court must determine: 1) whether each Defendant qualifies as a "high public official"; and 2) "whether Defendant's allegedly actionable behavior was made in the course of their official duties." *Osiris Enterprises,* 877 A.2d at 567. To decide this second element, the court evaluates certain factors to "determine whether the statements are closely related to the official's legitimate duties: (1) the formality of the forum in which the words were spoken or published; and (2) the relationship of the legitimate subject of governmental concern to the person seeking damages for the defamatory utterance." *Id.* at 568.

In *Lindner,* the court stated:
In *Montogmery,* we explained that the "determination of whether a particular public officer is protected by absolute privilege should depend on the nature of his duties, the importance of his office, and particularly whether or not he has policy-making functions.

*Linder,* 677 A.2d at 1198, quoting from *Montgomery v. City of Philadelphia,* 392 Pa. 178, 140 A.2d 100, 104 (Pa.1958). The court made clear in *Montgomery* that, absent statutory classification, the parameters establishing "high public official" status would be delineated by the judiciary on a case-by-case basis, rather than establishing a bright-line "of demarcation, if any there be, which separates offices which are protected by absolute privilege from those which are not."

*Linder,* 677 A.2d at 1198, quoting *Montgomery,* 140 A.2d at 105. The defense of official immunity is an affirmative defense which must be established by the defendants. Section 8546 provides:In any action brought against an employee of a local agency for damages ... the employee may assert on his own behalf, or the local agency may assert on his behalf:
(1) Defenses which are available at common law to the employee.

**\*12** 42 Pa. Con. Stat. Ann. § 8546, *see also Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). It is noted that the *Linder* case involved a motion for summary judgment. The record is not

sufficiently developed to determine whether Defendants are entitled to the High Public Official Immunity upheld in *Linder* and *Osiris.* Therefore as to Counts IV, V, VI, VII and VIII it is recommended that Defendants' motion to dismiss be denied without prejudice.

### III. *CONCLUSION*

For the foregoing reasons, it is recommended that Defendants' Motion to Dismiss be granted as to Counts II, III, of the Complaint; denied as to Count I; and denied without prejudice as to Counts IV, V, VI, VII and VIII.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

W.D.Pa.,2006.
Ferrone v. Onorato
Slip Copy, 2006 WL 1669988 (W.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3283941 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response to Motion to Dismiss (II) (Jun. 20, 2005)
• 2:05cv00303 (Docket) (Mar. 7, 2005)
• 2005 WL 3283943 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Brief in Opposition to Motion to Dismiss (II) (2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                              Page 1
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
B. Kurt PRICE, Wayne Warren, and Christopher D.
Foraker, Plaintiffs,
v.
L. Aaron CHAFFINCH, Thomas F. Macleish, David
B. Mitchell, and Division of State Police, Defendants.
Christopher D. FORAKER, Plaintiff,
v.
L. Aaron CHAFFINCH, Thomas F. Macleish, David
B. Mitchell, and Division of State Police, Defendants.
**No. 04-956 (GMS), 04-1207(GMS).**

May 12, 2006.

Martin D. Haverly, Esq., Thomas S. Neuberger,
Stephen J. Neuberger, The Neuberger Firm, P.A.,
Wilmington, DE, for Plaintiffs.
Richard Montgomery Donaldson, Noel C. Burnham,
Montgomery, McCracken, Walker & Rhoads,
Wilmington, DE, for Defendants.

*MEMORANDUM*
SLEET, J.

I. INTRODUCTION

*1 The above-captioned actions were consolidated on
April 18, 2006. In Civil Action No. 04-956 ("the Price
case"), three state troopers assigned to the Delaware
State Police's ("DSP") Firearms Training Unit facility
("FTU") allege that their First Amendment rights were
violated by two superiors who retaliated against them
for speaking out against hazardous health conditions at
the FTU. Thus, the Price complaint states one count of
Free Speech retaliation and one count of Petition Claim
retaliation, both pursuant to 42 U.S.C.A. § 1983 (2003).
In Civil Action No. 04-1207 ("the Foraker case"),
Sergeant Christopher Foraker individually alleges that
his First Amendment rights were violated by the same

two superiors after they retaliated against him for filing
(and winning) a First Amendment retaliation lawsuit in
2002. Thus, like the Price complaint, the Foraker
complaint also states one count of Free Speech
retaliation pursuant to § 1983, and one count of Petition
Clause retaliation pursuant to § 1983. Additionally, the
Foraker complaint states two state law causes of action:
defamation and false light invasion of privacy.
Presently before the court are the defendants' motions
for summary judgment on all counts in both cases. For
the following reasons, the court concludes that summary
judgment is inappropriate for all counts except
Foraker's false light claim.

II. STANDARD OF REVIEW

Evaluating a motion for summary judgment requires the
court to "review the record as a whole, 'draw[ing] all
reasonable inferences in favor of the non-moving
party[,]' [while refraining from] weighing the evidence
or making credibility determinations. *Reeves v.
Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150,
120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)' (citation
omitted). If [the court is able to] determine that 'there
is no genuine issue as to any material fact' and that the
movant is entitled to judgment as a matter of law,"
summary judgment must be granted. *Hill v. City of
Scranton,* 411 F.3d 118, 124-25 (3d Cir.2005) (quoting
Fed.R.Civ.P. 56(c)).

III. BACKGROUND

The FTU, a multi-million dollar indoor firing range for
the DSP, became operational in September of 1998. A
few months later, due to concerns about the ventilation
system, an environmental-assessment firm hired to
conduct a study of the air quality in the facility
concluded that the amount of lead in the air
significantly exceeded the maximum acceptable level
recommended by the Occupational Safety and Health
Administration. (D.I. 85 at A222.) [FN1] By at least as
early as June 14 of the following year, the FTU's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

air-quality problems became the subject of public scrutiny after *The News Journal*-a local Delaware newspaper-publicized the results of the study in an article entitled, "Shooting range under fire for lead: State police are exposed to levels of metal in air twice federal standard." (Id. at A2639-A2640, 189 A.2d 773.)

> FN1. "D.I. 85," which refers to Docket Item 85 in the Price case, was also filed as Docket Item 65 in the Foraker case.

Foraker became the non-commissioned officer in charge ("NCOIC") of the FTU on August 1, 2001. At that time, he supervised several firearms instructors, including Corporal B. Kurt Price and Corporal Wayne Warren. Foraker also supervised Corporal Eddie Cathell, who was a personal friend Colonel L. Aaron Chaffinch. Foraker and Cathell had a rather rocky professional relationship, and on several occasions Foraker spoke out against Cathell. On February 22, 2002, Foraker was involuntarily transferred from the FTU to another position within the DSP. In response, Foraker filed a § 1983 action against Chaffinch for unlawful First Amendment retaliation. After a five-day trial, a jury found that Chaffinch had in fact retaliated against Foraker. The parties later agreed on settlement terms, pursuant to which Foraker was reinstated as the NCOIC of the FTU on December 1, 2003. After his reinstatement, Foraker learned that the FTU had the same air-quality issues that it had prior to his involuntary transfer in 2002. Not surprisingly, the air quality weighed on the minds of Foraker, Price, and Warren. Foraker soon began to voice their concerns to their commanding officers, including Lieutenant Colonel Thomas MacLeish. Eventually, the trio's concerns worked their way up the chain of command to Chaffinch.

**\*2** In March of 2004, the FTU's air quality remained poor and, as a result, the facility was formally closed. Due to the public attention the FTU's closing generated, Chaffinch gave two media tours of the facility in April 2004. Before the first tour, however, Chaffinch revealed his intent to blame Foraker for the FTU's closing to Captain Glenn Dixon:

[Chaffinch] talked about the meeting that he was going

to at the range, and at that time he mentioned Sergeant Foraker and that he was going to put it on Foraker during the meeting. He had outlined that he had the newspaper people going [sic] to be present at the meeting and that he is going to put it on Foraker and lay a lot of the blame on Foraker for the range.

(Dixon Dep. at 8:7-13.) Consistent with this statement, Chaffinch was quoted during the tour as saying:The previous sergeant in charge did a good job. Things changed in December [2003] when another sergeant came in. That's at least a portion of where the ball was dropped.

...

Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning. [The previous sergeant] was willing to do that.... I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel that cleaning was part of his purview. He felt that was putting him in harm's way.

(D.I. 85 at A850.) Foraker was unable to respond to these allegations, which were printed in both the *Delaware State News* and *American Police Beat Magazine,* because Chaffinch placed a gag order on his troopers. Nevertheless, Foraker, Price, and Warren all gave statements in cooperation with an investigation by the State Auditor's Office. Shortly thereafter, Price and Warren were placed on light duty-ostensibly because they had disabilities rendering them unfit for regular duty-and Foraker was banned from attending Section Chief meetings he had attended in the past.

## IV. DISCUSSION

### A. First Amendment Retaliation (Counts I and II)

There is "a well-established three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment." Hill, 411 F.3d at 125. The employee must show at step one that the activity in question is protected by the First Amendment. Hill, 411 F.3d at 125. At step two, the employee must show "that the protected activity 'was a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 3
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

substantial factor in the alleged retaliatory action[s]." '
*Hill,* 411 F.3d at 125 (citations omitted). Step two also
requires the court to inquire whether the alleged
retaliatory actions were serious enough to be actionable.
*Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685
(4th Cir.2000) ("[N]ot every reaction made in response
to an individual's exercise of his First Amendment right
to free speech is actionable retaliation.") (cited by
*McKee v. Hart,* 436 F.3d 165, 170 (3d Cir.2006).
However, this is an extremely low hurdle to overcome:
**\*3** First Amendment retaliation claims are always
individually actionable, even when relatively minor.
Even "an act of retaliation as trivial as failing to hold a
birthday party for a public employee," if "intended to
punish her for exercising her free speech rights," may
be actionable if under the circumstances it would be
sufficient to "deter a person of ordinary firmness" from
exercising his or her First Amendment rights. *Suppan v.
Dadonna,* 203 F.3d 228, 234-35 (3d Cir.2000) (citing
*Rutan v. Republican Party,* 497 U.S. 62, 76 n. 8, 110
S.Ct. 2729, 111 L.Ed.2d 52 (1990)). A First
Amendment retaliation claim will lie for any individual
act which meets this "deterrence threshold," and that
threshold is very low: as we said in *Suppan,* a cause of
action is supplied by all but truly de minimis violations.
*Id.*

*O'Connor v. City of Newark,* 440 F.3d 125, 127-28 (3d
Cir.2006). Finally, at step three, "the employer may
defeat the employee's claim by demonstrating that the
same adverse action[s] would have taken place in the
absence of the protected conduct." [FN2] *Id. See also
Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

> FN2. The plaintiffs contend that the
> defendants waived this affirmative
> defense-familiarly known as the *Mount
> Healthy* defense-by failing to raise it in their
> pleadings. The defendants point out that the
> plaintiffs raised it in the complaints by
> alleging that "[t]he defendants cannot prove
> by a preponderance of the evidence that absent
> a constitutional violation they would have had
> grounds to adversely treat plaintiffs" (D.I. 45
> ¶ 94 (the Price case); D.I. 1 ¶ 84 (the Foraker

case)), and the defendants denied the
allegation in their answers. (D.I. 51 ¶ 94 (the
Price case); D.I. 7 ¶ 84 (the Foraker case).)
The court concludes that such denials were
sufficient to put the plaintiffs on notice that
the *Mount Healthy* defense would be at issue.

Here, all three plaintiffs clearly engaged in protected
First Amendment activity by speaking out about the
air-quality issues at the FTU,[FN3] and in Foraker's case,
by filing suit in 2002. Chaffinch had an obvious motive
to retaliate in response to the plaintiffs' activities, and a
jury could reasonably infer that MacLeish (who was
allegedly "joined at the hip" with Chaffinch) would be
similarly motivated to retaliate. Furthermore, the
allegedly retaliatory actions-publicly blaming the
plaintiffs for the FTU's poor air quality,[FN4] placing Price
and Warren on light duty, banning Foraker from
meetings, etc.-are more than *de minimis.* And, with
regard to the *Mount Healthy* defense, the plaintiffs
point to several similarly-situated troopers who were
not subject to the same allegedly retaliatory actions.
Thus, the plaintiffs have demonstrated a genuine issue
of material fact at each step of the analysis, thereby
rendering summary judgment inappropriate as to
Counts I and II.

> FN3. The defendants argue that Price and
> Warren's Petition Clause claim (Count II) fails
> because their cooperation with the Auditor's
> investigation does not qualify, as a matter of
> law, as an attempt to petition the government
> under the First Amendment. Due to the
> number of disputed facts in this case,
> including facts regarding the nature of the
> plaintiffs' cooperation with the Auditor, the
> court believes the most prudent course of
> action at this stage is to deny summary
> judgment as to Count II and revisit the issue
> after trial.

> FN4. Although Chaffinch's comments to the
> media were explicitly directed at Foraker,
> there is evidence in the record suggesting that
> at least one trooper understood Chaffinch to
> be speaking about Price and Warren as well.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 4
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

B. Qualified Immunity

The defendants argue that, even if summary judgment in their favor is inappropriate, they are nevertheless entitled to qualified immunity with regard to Counts I and II. "Qualified immunity insulates government officials performing discretionary functions from suit insofar as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *McKee,* 436 F.3d at 169 (internal quotations omitted). "To determine whether an official has lost his or her qualified immunity, [the court] must first decide whether a constitutional right would have been violated on the facts alleged." *Id.* (internal quotations omitted). "If the answer to that question is 'yes,' [the court] must then consider whether the right was clearly established." *Id.* (internal quotations omitted). "If [the court] also answer[s] 'yes' to the second question, [the court] must conclude that the official does not have qualified immunity." *Id.*

**\*4** Because disputed issues of material fact exist regarding the constitutional violations alleged in Counts I and II, the answer to the first question depends upon the resolution of those factual disputes. Assuming *arguendo* that the answer to the first question turns out to be "yes," the court must inquire whether those rights, if violated, were clearly established. In *McKee,* the Third Circuit succinctly summarized the proper approach to such a query:

" 'Clearly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McLaughlin v. Watson,* 271 F.3d 566, 571 (3d Cir.2001). Put another way, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Id.* at 572. The Supreme Court has recently reiterated this point, stating that "it is important to emphasize that this [clearly established] inquiry 'must be undertaken *in light of the specific context of the case,* not as a broad general proposition.' " *Brosseau v. Haugen,* 543 U.S. 194, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (per curiam) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d

272 (2001) ] ) (emphasis added).

436 F.3d at 171. Although this inquiry "must be undertaken in light of the specific context of the case," *Brosseau,* 543 U.S. at 198, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). "Accordingly ... the salient question ... is whether the state of the law [at the time of the acts in question] gave [the defendants] fair warning that their alleged treatment of [the plaintiffs] was unconstitutional." *Id.*

In this case, the defendants admit that First Amendment retaliation is unlawful in general, but they argue that at the time of the alleged retaliation the state of the law did not give them fair warning that their treatment of Foraker was actionable. The court disagrees. In *Brennan v. Norton,* 350 F.3d 399 (3d Cir.2003)-a case decided before the retaliation in this case-the Third Circuit further defined the line between actionable and non-actionable retaliation. There, the court stated that, if there is a "nexus between [the] protected conduct and [the] alleged retaliation," an act as simple as affixing a sticker bearing the phrase "Department Asshole" on the plaintiff-firefighter's helmet "could rise to the level of a First Amendment violation." *Id.* at 419. The few retaliatory actions mentioned above are obviously more severe than the harassing sticker in *Brennan.* Therefore, the court holds that if the disputed issues of fact are resolved against the defendants, they will not be protected by qualified immunity.

C. Defamation (Count III)

"Under Delaware law, the tort of defamation has five elements: (1) the statement must be of a defamatory character; (2) publication to a third party; (3) the communication must refer to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury." *Gill v. Del. Park, LLC,* 294 F.Supp.2d 638, 646 (D.Del. Dec.2, 2003). Viewing the facts in the light most favorable to Foraker, Chaffinch's statements to the media easily satisfy the five elements of defamation: (1) assigning

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(allegedly) unwarranted blame to Foraker for the FTU's air quality is defamatory; (2) making a statement to a newspaper is publication to a third party; (3) mentioning Foraker by name obviously refers to him; (4) any person reading Chaffinch's statement would understand it to be defamatory; and (5) maligning a person in his profession is injurious *per se, Johnson v. Campbell,* No. 00-510-JJF, 2001 U.S. Dist. LEXIS 25596, at *14-*15 (D.Del. Mar. 30, 2001). Likewise, MacLeish's statements-the air-quality problems had begun only recently, and procedure had not been followed at the FTU-also satisfy all five elements. To be sure, MacLeish's statements present a closer case because he neither referred to Foraker by name, nor explicitly blamed the FTU's problems on him. Nevertheless, a reasonable jury could infer from the context of the controversy that MacLeish's statements were in fact defamatory of Foraker.

**\*5** The defendants argue that they cannot be held liable for defamation because they were merely stating their opinions. In *Milkovich v. Lorain Journal Co.,* the Supreme Court explained:
If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Here, the defendants' opinions "imply a knowledge of facts" leading to the conclusion that Foraker's performance as the NCOIC was inadequate. Accordingly, the defendants may not escape liability by hiding behind the "opinion" shield. The defendants also contend that they cannot be held liable for defamation because their statements were substantially true. However, as the defendants must understand, the question of who was at fault for the FTU's poor air quality is fraught with so many disputed facts that the court cannot determine the truth or falsity of the

defendants' statements at this stage.

The only remaining issue is whether Foraker is a public figure. "Where the plaintiff is a public figure, there is an additional constitutional requirement that the defendant have acted with actual malice. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).* Actual malice exists where the declarant acts with 'knowledge that it was false or with reckless disregard of whether it was false or not.' " *Id. Gill,* 294 F.Supp.2d at 646. The determination of whether a plaintiff is a public figure is a legal issue for the court to resolve. *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 938 (3d Cir.1990). *"Gertz [v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ] identified three classes of public figures: those who achieve such stature or notoriety that they are considered public figures in all contexts; those who become public figures involuntarily, but these are 'exceedingly rare'; and those who are deemed public figures only within the context of a particular public dispute." *U.S. Healthcare,* 898 F.2d at 938. The latter class-limited purpose public figures-comprise "individuals who voluntarily 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.' " *Id.* (quoting *Gertz,* 418 U.S. at 345). "Generally, two factors inform this determination. The first factor indicative of a [plaintiff's] status is his relative access to the media." *U.S. Healthcare,* 898 F.2d at 938. "The second factor is the manner in which the risk of defamation came upon [the plaintiff]." *Id.*

**\*6** Here, Foraker's access to the media was limited to the point of being non-existent by Chaffinch's imposition of a gag order. Certainly, that cuts against Foraker's public-figure status. On the other hand, the air quality at the FTU was a public controversy as early as 1999. And yet, Foraker, who was aware of the ongoing controversy, actively sought to be reinstated as the NCOIC of the FTU. Thus, Foraker knew or should have known that he was injecting himself into a situation in which, as the head of a controversial facility, there was a substantial risk of public scrutiny and defamation. The question the court must answer, then, is whether Chaffinch's gag order outweighs Foraker's voluntary assumption of risk. In *Sculimbrene v. Reno,* 158

F.Supp.2d 8 (D.D.C. Feb.16, 2001), the D.C. district court was confronted with a similar situation. In that case, the plaintiff was a former FBI Special Agent who became involved in the "Filegate" scandal as a result of his employment at the White House Liaison Office. After media commentator Lanny Davis made disparaging comments about the plaintiff on CNN and CNBC, the plaintiff sought permission to respond publicly. However, that request was denied by his superiors. *Id.* at 11-14; *id.* at 23. The plaintiff then sued Davis under a defamation-like federal statute. In spite of the FBI's refusal to allow the plaintiff to respond publicly, the court concluded that the plaintiff was a limited purpose public figure both because of the high public interest in "Filegate," and because of the plaintiff's significant role in determining the outcome of the controversy. *Id.* at 23-24. Likewise here, although Foraker was subject to a gag order, as the NCOIC of the FTU he was a significant player in a controversy with high (local) public interest. Moreover, unlike the plaintiff in *Sculimbrene,* Foraker sought the NCOIC position with advance knowledge of the attendant controversy. Therefore, as with the FBI agent in *Sculimbrene,* Foraker is a limited purpose public figure in this context, and therefore, he must prove his defamation case using the heightened "actual malice" standard. The court further holds that the record contains sufficient evidence for a reasonable jury to conclude that the defendants' statements were made with actual malice. Thus, summary judgment will be denied as to Count III.

### D. False Light Invasion of Privacy (Count IV)

The common law right of privacy was first recognized by the Delaware Supreme Court in *Barberi v. News-Journal Co.,* 56 Del. 67, 189 A.2d 773 (1963). "The general purpose of protecting the right of privacy relates to one's private life, not when that life has become a matter of legitimate public interest." *Martin v. Widener Univ. Sch. of Law,* No. 91C-03-255, 1992 Del.Super. LEXIS 267, at *54 (Del.Super. Ct. June 4, 1992). Thus, "[o]ne who seeks the public eye cannot complain of publicity if the publication does not violate ordinary notions of decency." *Barberi,* 56 Del. at 70, 189 A.2d 773.

*7 With those principles in mind, the defendants argue that "a public figure cannot sustain an action for false light invasion of privacy because someone has publicized his public activities." (D.I. 62 at 32.) The court agrees. Although the act of publicly shedding false light on a person's job performance can be deeply offensive and hurtful, there is simply no invasion of *privacy* when the person being criticized is a public figure and the performance being criticized is the very activity that gave rise to the person's public-figure status in the first place. *See Godbehere v. Phoenix Newspapers,* 162 Ariz. 335, 783 P.2d 781, 789 (Ariz.1989) (holding that "a plaintiff cannot sue for false light invasion of privacy if he or she is a public official and the publication relates to performance of his or her public life or duties"). Therefore, the court concludes that allegedly unwarranted criticism of Foraker's performance as the NCOIC at the controversial FTU does not give rise to a cause of action for false light invasion of privacy.

### V. CONCLUSION

For the reasons stated, the court will deny summary judgment as to Counts I, II, and III. The court will grant summary judgment as to Count IV.

### *ORDER*

IT IS HEREBY ORDERED THAT:
1. The defendants' motion for summary judgment in the Price case (D.I.80) be DENIED; and
2. The defendants' motion for summary judgment in the Foraker case (D.I.60) be DENIED as to Counts I, II, and III, and GRANTED as to Count IV.


D.Del.,2006.
Price v. Chaffinch
Slip Copy, 2006 WL 1313178 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1204468 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in Limine to Limit the Cross Examination of Captain Glenn Dixon (Mar. 21, 2006) Original Image of this Document (PDF)

• 2006 WL 1204472 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Mar. 21, 2006) Original Image of this Document (PDF)

• 2006 WL 1204467 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion to Strike Select Portions of Defendants' (1) Reply Brief in Support of their Motion for Summary Judgment and (2) Accompanying Appendix for Failure to Comply with Local Rule 7.1.3 and the Federal Rules of Civil Procedure (Mar. 20, 2006) Original Image of this Document (PDF)

• 2006 WL 1204466 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion to Strike Select Portions of Defendants' Reply Brief and Appendix (Mar. 10, 2006) Original Image of this Document (PDF)

• 2006 WL 809118 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Preclude Expert Testimony of Brian P. Sullivan (Feb. 28, 2006) Original Image of this Document (PDF)

• 2006 WL 809127 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Feb. 28, 2006) Original Image of this Document (PDF)

• 2006 WL 809128 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Preclude Expert Testimony of Brian P. Sullivan (Feb. 28, 2006) Original Image of this Document (PDF)

• 2006 WL 809116 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion to Strike Select Portions of Defendants' (1) Reply Brief in Support of their Motion for Summary Judgment and (2) Accompanying Appendix for Failure to Comply with Local Rule 7.1.3 and the Federal Rules of Civil Procedure (Feb. 24, 2006) Original Image of this Document (PDF)

• 2006 WL 809114 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Support of their Motion for Summary Judgment on Counts I and II (Feb. 17, 2006) Original Image of this Document (PDF)

• 2006 WL 809115 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants' Motion for Summary Judgment (Feb. 17, 2006)

Original Image of this Document (PDF)

• 2006 WL 809126 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants' Motion for Summary Judgment (Feb. 17, 2006) Original Image of this Document (PDF)

• 2006 WL 809112 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion to Consolidate the Trial of these Two Cases Pursuant to Fed.R.Civ.P. 42(a) (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 809113 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Brief in Support of their Motion for Sanctions and other Relief Due to Defendants' Intentional Destruction of Relevant Evidence (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 809124 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of their Motion to Consolidate the Trial of these Two Cases Pursuant to Fed.R.Civ.P. 42(a) (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 809125 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Support of their Motion for Sanctions and other Relief Due to Defendants' Intentional Destruction of Relevant Evidence (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 809108 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Sanctions and other Relief (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809109 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiffs' Motion to Consolidate the Trial of These Two Cases Pursuant to Rule 42(a), Fed.R.Civ.P. (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809110 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment on Counts I and II (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809111 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Summary Judgment (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809120 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment on Counts I and II (Feb.

Slip Copy                                                                                                    Page 8
Slip Copy, 2006 WL 1313178 (D.Del.)
**(Cite as: Slip Copy)**

8, 2006) Original Image of this Document (PDF)

• 2006 WL 809121 (Trial Motion, Memorandum and Affidavit) Answering Brief in Opposition to Plaintiffs' Motion for Sanctions and other Relief (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809122 (Trial Motion, Memorandum and Affidavit) Defendants Response to Plaintiffs' Motion to Consolidate the Trial of these Two Cases Pursuant to Rule 42(a), Fed.R.Civ.P. (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809123 (Trial Motion, Memorandum and Affidavit) Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment (Feb. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 809117 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine to Limit the Cross Examination of Captain Glenn Dixon (Jan. 23, 2006) Original Image of this Document (PDF)

• 2005 WL 3666813 (Trial Pleading) Defendants' Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint (Nov. 9, 2005) Original Image of this Document (PDF)

• 2005 WL 3666811 (Trial Pleading) First Amended Complaint%n1%n (Oct. 14, 2005) Original Image of this Document (PDF)

• 2005 WL 3666812 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of the Motion of the Defendants to Bar Certain Communications of Counsel Or, in the Alternative, to Disqualify Counsel (Oct. 14, 2005) Original Image of this Document (PDF)

• 2005 WL 3666815 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of the Motion of the Difendants to Bar Certain Communications of Counsel Or, in the Alternative, to Disqualify Counsel (Oct. 14, 2005) Original Image of this Document (PDF)

• 1:04cv01207 (Docket) (Aug. 30, 2004)

• 1:04cv00956 (Docket) (Aug. 19, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab A

ECF

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:04-cv-04204-CM

Brewster v. City of Poughkeepsie
Assigned to: Judge Colleen McMahon
Cause: 28:1983 Civil Rights

Date Filed: 06/04/2004
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Ibis Brewster**

represented by **Steven Thomas Sledzik**
Jones Sledzik Garneau & Nardone, LLP
670 White Plains Road, Penthouse
Scarsdale, NY 10583
914-472-2300
Fax: 914-472-2312
Email: ssledzik@adcuriam.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of Poughkeepsie**

represented by **David Lewis Posner**
McCabe & Mack LLP
63 Washington Street, P.O. Box 509
Poughkeepsie, NY 12602
845-486-6800
Fax: 845-486-7621
Email: dposner@mccm.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/04/2004 | 1 | COMPLAINT against City of Poughkeepsie. (Filing Fee $ 150.00, Receipt Number 504304)Document filed by Ibis Brewster.(mov, ) (Entered: 06/08/2004) |
| 06/04/2004 | | Magistrate Judge Lisa Margret Smith is so designated. (mov, ) (Entered: 06/08/2004) |
| 06/04/2004 | | Case Designated ECF. (mov, ) (Entered: 06/08/2004) |

| 06/24/2004 | 2 | ORDER RE SCHEDULING AND INITIAL PRETRIAL CONFERENCE:... If such a consent order is not filed within the time provided,... Initial Conference set for 7/30/2004 10:00 AM before Judge Colleen McMahon. (Signed by Judge Colleen McMahon on 06/24/04) (Attachments: # 1 Blank Scheduling Order)(fk, ) (Entered: 06/28/2004) |
| --- | --- | --- |
| 07/15/2004 | 3 | ANSWER to Complaint. Document filed by City of Poughkeepsie.(Posner, David) (Entered: 07/15/2004) |
| 07/16/2004 | 4 | AFFIDAVIT OF SERVICE of Summons and Complaint. City of Poughkeepsie served on 6/23/2004, answer due 7/13/2004. Service was accepted by Felica M. Santos, Deputy Clerk. Document filed by Ibis Brewster. (Sledzik, Steven) (Entered: 07/16/2004) |
| 08/02/2004 | 5 | SCHEDULING ORDER: Amended Pleadings due by 8/16/2004. Joinder of Parties due by 8/16/2004. Discovery due by 12/15/2004. (Signed by Judge Colleen McMahon on 07/30/04) (fk, ) (Entered: 08/04/2004) |
| 08/02/2004 | 6 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for General Pretrial. Referred to Magistrate Judge Lisa Margaret Smith. (Signed by Judge Colleen McMahon on 07/30/04) (fk, ) (Entered: 08/04/2004) |
| 08/17/2004 | | Minute Entry for proceedings held before Judge Lisa Margaret Smith : Pretrial Conference held on 8/17/2004. (Submitted by James Galvin). (mde, ) (Entered: 08/18/2004) |
| 08/17/2004 | 7 | ORDER: In order to facilitate the progress of pre-trial discovery of this litigation in a just, speedy and inexpensive manner, to insure compliance with the Case Management Plan, and to prevent the accumulation of unresolved discovery issues, the following procedures will be followed for the resolution of discovery disputes: See Document for Details. SO ORDERED: (Signed by Judge Lisa Margaret Smith on 08/17/04) Clerk's Office Mailed Copies..(dcr, ) (Entered: 08/18/2004) |
| 10/04/2004 | | Minute Entry for proceedings held before Judge Lisa Margaret Smith : Pretrial Conference held on 10/4/2004. (Submitted by James Galvin). (mde, ) (Entered: 10/05/2004) |
| 11/09/2004 | | Minute Entry for proceedings held before Judge Lisa Margaret Smith : Interim Pretrial Conference held on 11/9/2004. Adjourned date 12/2/04 at 9:15 a.m.. (pf, ) (Entered: 11/10/2004) |
| 11/30/2004 | 8 | LETTER addressed to Judge Colleen McMahon from Steven Sledzik dated 11/15/04 re: Discovery issues.. Document filed by Ibis Brewster.(fk, ) (Entered: 12/03/2004) |
| 11/30/2004 | 9 | ENDORSED LETTER addressed to Judge Colleen McMahon from David Posner dated 11/19/04 re: Objection to the Ruling of USMJ Smith. Endorsement: The Magistrate Judg's ruling of 10/04/04 - which was not timely appealed - controls this time, and in view of that ruling I cannot |

| | | find that Judge Smith's ruling with regard to the question addressed to Chief Knapp was clearly erroneous - The appeal is denied.. (Signed by Judge Colleen McMahon on 11/23/04) (fk, ) (Entered: 12/06/2004) |
|---|---|---|
| 12/01/2004 | | Minute Entry for proceedings held before Judge Lisa Margaret Smith : Interim Pretrial Conference held on 12/1/2004. Adjourned date 12/16/04 at 9:30 a.m. (pf, ) (Entered: 12/02/2004) |
| 12/16/2004 | | Minute Entry for proceedings held before Judge Lisa Margaret Smith : Interim Pretrial Conference held on 12/16/2004. Verification from deft. due 1/5/05. Discovery deadline extended to 1/7/05. Pre-trial order due 1/21/05 Adjourned date 1/10/05 at 9:30 am. Submitted by: James Galvin, Courtroom Deputy (ll, ) (Entered: 12/20/2004) |
| 12/20/2004 | 10 | ORDER:... The Clerk is directed to return the personnel records to counsel for dfts along with a copy of this order. So Ordered: (Signed by Judge Lisa Margaret Smith on 12/20/04) Copies sent by Clerk's Office.(pf, ) (Entered: 12/22/2004) |
| 01/10/2005 | | Minute Entry for proceedings held before Judge Lisa Margaret Smith : Interim Pretrial Conference held on 1/10/2005. Closed for Mag. purposes. Reference concluded. Adjourned date sine die. (pf, ) (Entered: 01/11/2005) |
| 01/10/2005 | | CASE NO LONGER REFERRED to Magistrate Judge Lisa Margaret Smith. (pf, ) (Entered: 01/11/2005) |
| 01/21/2005 | 11 | PRETRIAL MEMORANDUM. Document filed by Ibis Brewster.(Sledzik, Steven) (Entered: 01/21/2005) |
| 02/08/2005 | 12 | ENDORSED LETTER addressed to Judge Colleen McMahon from David L. Posner dated 1/31/05 re: Defendant requests to file its motion for summary judgment on or before 3/4/05; No summary judgment motion is allowed. If one is filed, it will be summarily denied as untimely (see my rules). (Signed by Judge Colleen McMahon on 2/7/05) "Copies Mailed By Chambers".(ae, ) (Entered: 02/09/2005) |
| 02/08/2005 | 13 | LETTER addressed to Judge Colleen McMahon from Steven T. Sledzik dated 2/4/05 re: Plaintiff writes in response to Defendant's 1/31/05 request to the Court to establish a briefing schedule as to a motion for summary judgment. Document filed by Ibis Brewster.(ae, ) (Entered: 02/09/2005) |
| 02/16/2005 | 14 | ENDORSED LETTER addressed to Judge Colleen McMahon from David L. Posner dated 2/10/05 re: Defendant's counsel writes in regards to Your Honor's objection of the 1/31 letter suggesting a briefing schedule for a summary judgment motion; I can consider all of this on a motion for directed verdict atthe close of plaintiff's case. (Signed by Judge Colleen McMahon on 2/14/05) (ae, ) (Entered: 02/18/2005) |
| 03/13/2006 | 15 | Calendar Notice: Final Pretrial Conference set for 6/2/2006 02:00 PM before Judge Colleen McMahon. Jury Trial set for 6/12/2006 09:30 AM before Judge Colleen McMahon. (Signed by Judge Colleen McMahon on |

| | | |
|---|---|---|
| | | 3/13/06) Copies Faxed By Chambers.(fk, ) (Entered: 03/14/2006) |
| 03/17/2006 | 16 | ENDORSED LETTER addressed to Dear Judge McMahon from David L. Posner dated 03/15/2006 re: request a brief extension to file an in limine motion...........ENDORSED, No problem.. (Signed by Judge Colleen McMahon on 03/16/2006) "Copies Faxed By Chambers".(jma, ) (Entered: 03/17/2006) |
| 03/24/2006 | 17 | MOTION in Limine. Document filed by City of Poughkeepsie. Return Date set for 6/2/2006 02:00 PM. (Posner, David) (Entered: 03/24/2006) |
| 03/24/2006 | 18 | AFFIDAVIT of David L. Posner, Esq. in Support re: 17 MOTION in Limine.. Document filed by City of Poughkeepsie. (Attachments: # 1 Exhibit # 2 # 3 # 4)(Posner, David) (Entered: 03/24/2006) |
| 03/24/2006 | 19 | MEMORANDUM OF LAW in Support re: 17 MOTION in Limine.. Document filed by City of Poughkeepsie. (Posner, David) (Entered: 03/24/2006) |
| 04/03/2006 | 20 | ENDORSED LETTER addressed to Judge Colleen McMahon from Steven Sledzik dated 3/29/06 re:.....to request an additional week, up to and including 4/17/06, to submit a respnse to motion in limine... ENDORSEMENT: Application Granted. So Ordered:. (Signed by Judge Colleen McMahon on 4/3/06) Copies sent by Chambers.(pf, ) (Entered: 04/03/2006) |
| 04/07/2006 | 21 | MOTION in Limine *Memorandum of Law in Opposition*. Document filed by Ibis Brewster. (Sledzik, Steven) (Entered: 04/07/2006) |
| 06/02/2006 | 22 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Jury Selection on 6/12/06 at 10:00 am.. Referred to Magistrate Judge Lisa Margaret Smith. (Signed by Judge Colleen McMahon on 6/2/06) (fk, ) (Entered: 06/05/2006) |
| 06/06/2006 | 23 | PRETRIAL ORDER: The parties having conferred among themselves and with the court pursuant to FRCP 16, the following statements, directions and agreements are adopted as the Pretrial Order Herein. See document for details. (Signed by Judge Colleen McMahon on 06/02/06) (dcr, ) (Entered: 06/06/2006) |
| 06/09/2006 | 24 | MEMORANDUM DECISION AND ORDER DISMISSING PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM... So Ordered. (Signed by Judge Colleen McMahon on 6/8/06) (fk, ) (Entered: 06/12/2006) |
| 06/12/2006 | | Minute Entry for proceedings held before Judge Lisa Margaret Smith : Jury Selection held on 6/12/2006. Adjourned date Sine Die. Close for Magistrate purposes. (pf, ) (Entered: 06/13/2006) |
| 06/12/2006 | | CASE NO LONGER REFERRED to Magistrate Judge Lisa Margaret Smith. (pf, ) (Entered: 06/13/2006) |

| 06/12/2006 | | Minute Entry for proceedings held before Judge Lisa Margaret Smith : Jury Selection held on 6/12/2006. (fk, ) (Entered: 06/26/2006) |
|---|---|---|
| 06/14/2006 | 25 | TRIAL MEMORANDUM. Document filed by City of Poughkeepsie.(Posner, David) (Entered: 06/14/2006) |
| 06/14/2006 | 26 | ENDORSED LETTER addressed to Judge Colleen McMahon from David Posner dated 6/13/06 re: Foundational requirements for exhibits. endorsement: It applies both ways. (Signed by Judge Colleen McMahon on 6/13/06) Copies Faxed By Chambers.(fk, ) (Entered: 06/15/2006) |
| 06/19/2006 | | Minute Entry for proceedings held before Judge Colleen McMahon : Jury Trial begun on 6/19/2006. Atty Steven T. Sledzik pres for plaintiff. Atty David Posner pres for defendant. (Court Reporter Mary Staten) (fk, ) (Entered: 06/26/2006) |
| 06/20/2006 | | Minute Entry for proceedings held before Judge Colleen McMahon : Jury Trial held on 6/20/2006. Atty Steven T. Sledzik pres for plaintiff. Atty David Posner pres for defendant (Court Reporter Mary Staten) (fk, ) (Entered: 06/26/2006) |
| 06/21/2006 | | Minute Entry for proceedings held before Judge Colleen McMahon : Jury Trial held on 6/21/2006. Atty Steven T. Sledzik pres for plaintiff. Atty David Posner pres for defendant (Court Reporter Christina Arends-Dieck) (fk, ) (Entered: 06/26/2006) |
| 06/22/2006 | | Minute Entry for proceedings held before Judge Colleen McMahon : Jury Trial held on 6/22/2006. Atty Steven T. Sledzik pres for plaintiff. Atty David Posner pres for defendant (Court Reporter Mary Staten) (fk, ) (Entered: 06/26/2006) |
| 06/23/2006 | | Minute Entry for proceedings held before Judge Colleen McMahon : Jury Trial completed on 6/23/2006. Atty Steven T. Sledzik pres for plaintiff. Atty David Posner pres for defendant. Verdict returned against Plaintiff on Right to Petition and Unlawful Termination claims, and in favor of Plaintiff on Hostile Work Environment claim, awarding damages in the amount of $12,500.00. Deft has ten business days from entry of judgment to file renewed motion; pla has ten business days to respond; deft has five business days to reply. (Court Reporter Mary Staten) (fk, ) (Entered: 06/26/2006) |
| 06/23/2006 | | JURY VERDICT. Verdict returned against Plaintiff on Right to Petition and Unlawful Termination claims, and in favor of Plaintiff on Hostile Work Environment claim, awarding damages in the amount of $12,500.00. (fk, ) (Entered: 06/26/2006) |
| 06/26/2006 | 27 | CLERK'S JUDGMENT # 06-0182WP in the amount of $ 12,500.00...ORDERED, ADJUDGED AND DECREED:...That the Plaintiff shall have judgment in the amount of $12,500.00, plus attorney's fees (to be determined), in respect of her claim for hostile work environment pursuant to 42 U.S.C. 1983; and defendant shall have |

| | | |
|---|---|---|
| | | judgment dismissing all of plaintiff's other cliams with prejudice and without costs. (Signed by Judge J. Michael McMahon on 06/26/2006) (gco, ) (Entered: 06/26/2006) |
| 07/07/2006 | 28 | MOTION for Judgment as a Matter of Law *Pursuant to F.R.Civ.P. Rule 59(b)*. Document filed by City of Poughkeepsie. (Attachments: # 1 Affidavit # 2 Exhibit # 3 # 4 # 5 # 6 Exhibit # 7 # 8 # 9)(Posner, David) (Entered: 07/07/2006) |

### PACER Service Center

#### Transaction Receipt

07/11/2006 13:16:16

| PACER Login: | tn0002 | Client Code: | FTU |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 7:04-cv-04204-CM |
| Billable Pages: | 4 | Cost: | 0.32 |

**CERTIFICATE OF SERVICE**

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

July 14, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF which

will send notification of such filing to the following:

Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

FTU / Briefs / Renewed SJ - Petition Clause.RB.final