IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORPORAL B. KURT PRICE, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A.No.04-956-GMS |
| | : | |
| COLONEL L. AARON CHAFFINCH, et al., | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFFS' FED.R.CIV.P. 15(b) MOTION TO AMEND THE FIRST AMENDED COMPLAINT TO CONFORM TO THE EVIDENCE PRESENTED AT TRIAL

Plaintiffs Move to Amend their First Amended Complaint (D.I. 45) to conform to the evidence as presented at trial pursuant to Federal Rule of Civil Procedure 15(b). The proposed Second Amended Complaint is attached hereto as Tab A.

**A. Introduction.** A party may move to amend the pleadings to conform to the evidence at any time, even after judgment. Fed.R.Civ.P. 15(b). The issues shall be treated as having been raised in the original pleadings when they are tried by express or implied consent of the parties. Id. Accordingly, plaintiffs move to amend their First Amended Complaint to conform to the evidence as presented at trial to include two additional counts - (1) that each plaintiff engaged in protected First Amendment free speech activity when they authorized their attorney Thomas S. Neuberger to speak to the media on their behalf about their extensive statements and other speech to the State Auditor and (2) that under an equal protection rational basis analysis, defendants' acts of singling plaintiffs out and refusing to apply historic policies and practices do not pass scrutiny. Accordingly, because defendants impliedly consented to a trial on these issues by not objecting to the admitted evidence, plaintiffs move to amend the complaint to include both aforementioned

counts.

**B. Plaintiffs' First Amendment Speech to the Media.** On May 31, 2006 a careful jury found that plaintiffs engaged in protected activity under the First Amendment by speaking out about the hazardous conditions at the Delaware State Police's Firearms Training Unit ("FTU"). Evidence admitted at trial demonstrated plaintiffs engaged in three essential categories of speech under the First Amendment. First, plaintiffs engaged in speech up the chain of command, second plaintiffs spoke out to the State Auditors, and third they spoke to the media through their attorney Thomas Neuberger. (*See* PX 28 and 29).

On May 31, 2006 the Supreme Court decided Garcetti v. Ceballos, 126 S.Ct. 1951 (2006). As discussed in post-trial briefing, even under Garcetti, plaintiffs' speech up the chain of command and to the Auditors remains protected since it was not made pursuant to their job duties as firearms instructors at the FTU.

However, in light of the defense request to apply Garcetti in such an overbroad fashion, plaintiffs also seek to amend the Complaint as discussed above. Plaintiffs' speech to the media can certainly not be seen as part of their essential job duties given that plaintiffs were operating under a draconian gag order issued by defendants. This gag order forbade plaintiffs from defending themselves in the media or speaking to the media in any way. Plaintiffs were left with no option but to authorize their attorney to speak as their agent in order to make the public aware of the problems with the FTU and expose the hazardous environmental conditions, mismanagement, waste, incompetence and corruption related to the facility.

Shortly after plaintiffs met with the State Auditors, plaintiffs authorized their attorney Thomas Neuberger to contact and communicate with Tom Eldred of the Delaware State News and Mary Allen of The News Journal and read verbatim their Auditors statements so they could

be published in the news media.  Immediate news stories ran in both the News Journal and

Delaware State News, informing the public of plaintiffs' speech to the Auditors, the health hazards

at the FTU and the root causes of those hazards. (PX28 and 29).  Plaintiffs were clearly not

speaking to the media as part of their job duties, but instead as concerned citizens.

It is clear that this speech to the media on plaintiffs' behalf played a substantial or

motivating role in the adverse action against plaintiffs since defendants themselves testified and

admitted that they were "unhappy," "displeased" and "dismayed" that plaintiffs had spoken to the

Auditors and that the media had reported on it.  (Chaffinch 1650-53; MacLeish 1759-60, 1762).

Defendants even drew the key distinction in this regard - that they had no problems with plaintiffs'

speech to the Auditor, but were instead admittedly angry that they spoke to the media.

I was not upset that they were talking to the auditors, no.  I was upset that it was bringing
negative light to the Division of State Police in the media.

(Chaffinch 1653).  I "was dismayed at how the media ran the story, dismayed that the media ran

the story."  (MacLeish 1760).  Defendants were "upset" and "not happy" that the Division was

being shown in a negative light in the press.  (MacLeish 1760, 1762; Chaffinch 1653 ).  MacLeish

admittedly thought plaintiffs were a "real pain in the ass" "at the time" their statements to the

Auditors were published in the newspapers. (MacLeish 1760).   Testimony from retired Major

David Baylor also demonstrated that both defendants Chaffinch and MacLeish were "not happy"

about plaintiffs' speech to the media, and instead were "frustrated" and "upset" with them.

(Baylor 554, 556-58).  He also witnessed MacLeish referring to each plaintiff as "a pain in the

ass."  (Baylor 556).  Further, the record is full of evidence of how defendants singled out plaintiffs

when other similarly situated Troopers were not singled out and that about a month after the

media reported on plaintiffs' speech to the Auditors plaintiffs were found unfit for duty, were

Case 1:04-cv-00956-GMS     Document 229     Filed 07/31/2006     Page 4 of 38

stripped of their police powers and subsequently Cpls. Price and Warren were forced out of the Division.

**1. The Jury Interrogatory Already Encompasses This Speech.** Plaintiffs engaged in protected speech activity by speaking to the media through their attorney and this speech was a substantial or motivating factor in the adverse action taken against them. The interrogatory given to the jury asked them to determine whether plaintiffs have "proven that [their] protected activity under the First Amendment (speaking out about the conditions at the DSP indoor firing range) was a substantial or motivating factor in the adverse action taken against [them]?" Certainly plaintiffs speech to the media after their statements to the auditors is encompassed in their "speaking out about the conditions at the DSP indoor firing range." Thus, as a matter of law, there was sufficient evidence from which any reasonable jury could return a verdict for plaintiffs. The jury verdict should be upheld since there is abundant record evidence that plaintiffs' speech to the media through their attorney on May 12th played a role and could be found by any reasonable jury to have been a substantial or motivating factor in the adverse action taken against them.

**C. Equal Protection - Rational Basis.** Plaintiffs' constitutional right to the equal protection of the law also has been denied under the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983. Trial evidence brought to light defendants' historic policies and practices of always accommodating Troopers with hearing problems, always accommodating Troopers with more serious or comparable injuries as plaintiffs, and always giving Troopers two years of light duty before forcing them to burn their sick/vacation/injured time and then retire. Defendants created a suspect classification by refusing to apply them to plaintiffs. The classification and discrimination which the defendants created is unable to survive a rational basis

analysis.  There is no legitimate basis in fact for the treatment of plaintiffs nor is there any rational relationship to any legitimate governmental objective.

       **D.  Conclusion.**  Accordingly, plaintiffs move to amend their First Amended Complaint to include additional claims for First Amendment protection based on plaintiffs' protected activity by speaking to the media through their attorney and for Fourteenth Amendment equal protection under a rational basis analysis.

       Plaintiffs waive an opening brief in support of this Motion.


       Respectfully Submitted,


       **THE NEUBERGER FIRM, P.A.**

       /s/ Stephen J. Neuberger
       **THOMAS S. NEUBERGER, ESQ. (#243)**
       **STEPHEN J. NEUBERGER, ESQ. (#4440)**
       Two East Seventh Street, Suite 302
       Wilmington, Delaware 19801
       (302) 655-0582
       TSN@NeubergerLaw.com
       SJN@NeubergerLaw.com

Dated: July 31, 2006       Attorneys for Plaintiff


## LOCAL RULE 7.1.1 STATEMENT

       Counsel certifies that he contacted defense counsel to determine their position on this motion.  Defendants have yet to respond.  In the interests of judicial economy and to enable this motion to be addressed at the oral argument tomorrow, plaintiffs have filed this motion.


       /s/ Stephen J. Neuberger
       **STEPHEN J. NEUBERGER, ESQ.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CORPORAL B. KURT PRICE, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **C.A.No.04-956-GMS** |
| | : | |
| **COLONEL L. AARON CHAFFINCH, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

This _____ day of _____, 2006, it is hereby

ORDERED that plaintiffs' Motion to Amend their First Amended Complaint is GRANTED and

the Second Amended Complaint attached as Tab A to plaintiffs' motion is hereby considered filed

thus allowing the pleadings to conform to the evidence presented as trial pursuant to Fed.R.Civ.P.

15(b).

_____
**THE HONORABLE GREGORY M. SLEET, U.S.D.J.**

# Tab A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORPORAL B. KURT PRICE; | : | |
| CORPORAL WAYNE WARREN; and | : | |
| SERGEANT CHRISTOPHER D. FORAKER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A.No.04-956-GMS |
| | : | |
| COLONEL L. AARON CHAFFINCH, | : | |
| individually and in his official | : | |
| capacity as the Superintendent, | : | |
| Delaware State Police; LIEUTENANT | : | |
| COLONEL THOMAS F. MACLEISH, | : | |
| individually and in his official | : | Jury Trial Demanded |
| capacity as the Deputy | : | |
| Superintendent, Delaware State | : | |
| Police; DAVID B. MITCHELL, in his | : | |
| official capacity as Secretary of | : | |
| the Department of Safety and | : | |
| Homeland Security, State of | : | |
| Delaware; and DIVISION OF STATE | : | |
| POLICE, DEPARTMENT OF SAFETY AND | : | |
| HOMELAND SECURITY, STATE OF | : | |
| DELAWARE, | : | |
| | : | |
| Defendants. | : | |

## SECOND AMENDED COMPLAINT[1]

1.  This is a civil action for compensatory and punitive damages and injunctive relief for retaliatory violations of the free speech clause of the First Amendment of the United States Constitution.  Plaintiffs exercised their First Amendment rights

_____

[1]  Pursuant to Fed.R.Civ.P. 15(b), plaintiffs hereby amend their Complaint to conform to the evidence presented at trial. Counts III and IV have been added.

-1-

by: (1) reporting to defendants that the health and safety of
Delaware State Troopers and others were being endangered by
hazardous conditions at the Delaware State Police's Firearms
Training Unit ("FTU"); and (2) speaking to the Delaware State
Auditor's Office about health hazards, safety concerns and other
problems at the FTU, as well as the root causes of those
dangerous conditions.  Defendants retaliated against plaintiffs
for their protected activities, materially changed the conditions
of their employment and have made concerted retaliatory efforts
to create pretextual reasons to terminate their employment.

## I.  <u>JURISDICTION</u>

2.  The jurisdiction of this Court is invoked pursuant to 28
U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and
2202, and the Fourteenth Amendment to the United States
Constitution.  The cause of action arises under 42 U.S.C. § 1983.
The claims arose in this judicial district.

## II.  <u>THE PARTIES</u>

3.  Plaintiff Corporal B. Kurt Price is a citizen of the
United States and a resident of Kent County, Delaware.  He is a
19 year veteran of the Delaware State Police ("DSP") assigned to
the FTU as a firearms instructor.  At all times material hereto,
his job performance has been outstanding.

4.  Plaintiff Corporal Wayne Warren is a citizen of the
United States and a resident of Sussex County, Delaware.  He is a

-2-

21 year veteran of the DSP assigned to the FTU as a firearms instructor.  At all times material hereto, his job performance has been outstanding.

5.    Plaintiff Sergeant Christopher D. Foraker is a citizen of the United States and a resident of New Castle County, Delaware.  He is a 19 year veteran of the DSP and is currently a section chief and the non-commissioned officer in charge ("NCOIC") of the FTU.  At all times material hereto, his job performance has been outstanding.

6.    Defendant Colonel L. Aaron Chaffinch is currently the Superintendent of the DSP and its highest ranking officer.  He is sued individually and in his official capacity.  Since his appointment in October of 2001 he has been a serial violator of the constitutional rights of the Troopers under his command.  For example, two federal juries have returned verdicts against him in favor of three separate troopers because of his civil rights abuses.

7.    Defendant Lieutenant Colonel Thomas F. MacLeish is currently the Deputy Superintendent of the DSP and its second-highest ranking officer.  He is sued individually and in his official capacity.

8.    Defendant David B. Mitchell is currently Secretary of the Department of Safety and Homeland Security of the State of Delaware and he is the superior to Chaffinch and MacLeish in the

chain of command.  He is sued in his official capacity to obtain injunctive relief which will prohibit Chaffinch and MacLeish from continuing to violate the constitutional rights of plaintiffs.

9.  Defendant Division of State Police, Department of Safety and Homeland Security, State of Delaware ("State Police" or "DSP") is an agency of the State of Delaware, which is only joined in this action for purposes of collecting attorneys' fees and costs.

### III.  FACTS GIVING RISE TO THE ACTION

#### A.  History of the FTU

10.  The FTU was built and eventually opened in September of 1998 at a cost of approximately $3.3 million dollars.  At the time, it was touted as a state of the art firearms facility. Until its closure, it was used annually by approximately 2,000 police officers from the DSP and other local agencies, as well as by agents from the FBI, DEA and other federal agencies.

11.  However, due to intentional wrongdoing by those responsible for its construction in the Department of Administrative Services of the State of Delaware and its Division of Facilities Management ("Facilities Management"), the FTU was knowingly and purposefully improperly and dangerously constructed without proper consideration for the health and welfare of the men and women who would work or train there.  For example, Facilities Management wrongfully awarded the construction

-4-

contract to a bidder which had not scored the highest in the application process.  Instead it intentionally miscounted the points awarded to various applicants and the project was awarded to the wrong bidder which constructed a facility which has been proven to be dangerous to the health and safety of all those who use the facility.

12.  A substandard facility was built as a result of improprieties, financial irregularities, breach of the public trust, fraud and/or corruption by public officials at the highest levels of state government.

13.  After its construction, no Certificate of Occupancy was ever issued for the facility by any properly designated independent governmental authority.  As a result, numerous problems with the facility were evident soon after its opening. For example, in November 1998, it was visually apparent that the HVAC air handling system was working improperly and was not removing lead and other bullet fragmentation from the air.

14.  As a result of the problems at the FTU, range staff began to suffer from physical symptoms, such as nasal secretions and also from elevated levels of lead in their bloodstream.

15.  From 1998-2003, thousands of taxpayer dollars were spent as numerous firms and state agencies attempted, and failed, to fix the problems at the FTU.  Facilities Management sought to hide these issues from public scrutiny, to the detriment of the

health and safety of the men and women who worked or trained there.

16.  In an attempt to reduce lead contamination caused by a perpetually defective HVAC system which did not remove lead contaminants from the air, and to try to make the range safer, in 2001, the DSP transitioned to the use of non-lead based, frangible handgun ammunition which was used at the firing range.

17.  However, the change to frangible ammunition eventually caused numerous additional problems at the FTU, which defendant Chaffinch and Facilities Management sought to cover-up and hide from public scrutiny.  For example, in the summer of 2003, the use of this new ammunition caused the bullet-trap to malfunction and ultimately break down because it had been specifically designed to handle lead-based ammunition and not frangible ammo which dissolves into dust particles upon impact.

18.  Because the bullet-trap had ceased to function, range personnel themselves, and not Facilities Management which was the landlord for the facility, were required by hand to attempt to clean up 'toxic goo' on a daily basis which consisted of various dangerous heavy metals, such as zinc and copper.  The landlord ignored such problems and instead by default range personnel were left to deal with the issue.  They were not given hazardous material training, protection or equipment to use while conducting this cleanup.  Nor were professional hazardous

-6-

material teams brought in to conduct cleanup, as is done at other firing ranges.

19.   As a result of the broken bullet-trap, malfunctioning air handling system and numerous other problems, the FTU was a hazardous place to work.  This was known at all times by defendants Chaffinch, MacLeish and Facilities Management.

### B.  Plaintiffs Speak Out to Try to Fix the Problems at the Range

20.   On December 1, 2003, Sergeant Foraker was transferred to the FTU and became the NCOIC.

21.   For the previous 20 months defendant Chaffinch had appointed a personal friend as the NCOIC of the FTU.  During that person's tenure conditions at the range were allowed to steadily deteriorate.   Defendant Chaffinch knew of this deterioration and covered it up because otherwise it would have exposed the fact that through personal friendship he had placed an inexperienced person in charge of the FTU.

22.   On December 1st Sgt. Foraker began to immediately observe numerous problems and safety concerns that were impairing the safe and proper functioning of the FTU and were endangering the men and women who trained or worked there.

23.   Soon after, Corporals Price and Warren told Sgt. Foraker that when they had previously expressed their health and safety concerns about working at the FTU they were told by defendant Chaffinch's friend, "you have to die from something."

-7-

24.  Beginning December 1, 2003, and continuing through the present, on behalf of himself and Corporals Price and Warren, Sgt. Foraker began to speak out and relay their joint concerns up the chain of command about the hazardous health and physical conditions at the FTU, in an attempt to have those problems fixed and thus protect the health and safety of all those who came into contact with the range.

25.  Sgt. Foraker, on behalf of himself and Corporals Price and Warren, also spoke out and contacted Facilities Management in an attempt to have the problems at the range rectified.

26.  One example of their protected speech occurred on December 19, 2003, when Sgt. Foraker e-mailed defendant MacLeish and also Major Eckrich and reported that the health and safety of Troopers were being endangered by the problems at the FTU.

27.  But defendant MacLeish ignored their health and safety concerns and, for example, did not order plaintiffs to undergo medical or occupational testing to look into their health and well-being.

28.  Similarly, on February 20, 2004, Sgt. Foraker e-mailed Major Eckrich and expressed his concerns that the conditions at the range were contaminating the staff at the FTU.  Major Eckrich then relayed these concerns to defendants MacLeish and Chaffinch.

29.  But again, MacLeish and Chaffinch ignored their health and safety concerns and did not order plaintiffs to undergo

medical or occupational testing to look into their health and well-being.

30. All of plaintiffs' speech and concerns were relayed up the chain of command to defendants Chaffinch and MacLeish.

31. However, the DSP hierarchy dismissed plaintiffs' concerns. For example, in January 2004, defendant MacLeish told plaintiffs to "just put on a paper dust mask to protect yourself" and that it is expected that they would have health problems from working at a firing range. Likewise, defendants MacLeish and Chaffinch did not order plaintiffs to undergo medical or occupational testing to look into their health and well-being.

32. But plaintiffs were not the only ones concerned with or being adversely effected by the hazardous conditions at the FTU.

33. For example, in January 2004, police academy recruits training at the FTU complained of nosebleeds, sore throats, headaches and a "penny taste" in their mouths.

34. Despite having their concerns ignored by defendants in the DSP hierarchy, plaintiffs continued to speak out and diligently work to have the hazardous conditions at the FTU corrected. For example, they went and spoke out to a federal authority and defendants learned of this.

### C. The Range is Shut Down Due to Environmental Contamination

35. On March 19, 2004 the problems at the range finally came to a head and the FTU was shut down because of environmental contamination. A federal official who plaintiffs had located

-9-

demanded that the FTU be closed as a result of the building not
being fit for occupancy.  But again neither defendants
Chaffinch or MacLeish ordered plaintiffs to undergo medical or
occupational testing to look into their health or well-being.

36.  In a March 20, 2004 article in the Delaware State News,
a Captain, who was also the Director of Training for the DSP,
described the condition of the range as follows: "This pistol
range is the absolute epitome of a project from hell since its
very inception."  "At the end of this week, nobody will be
allowed in the building.  The building will be abandoned as of
Friday.  The entire building is contaminated with lead."

37.  The closing of and problems related to the FTU
attracted widespread media attention in both the downstate and
upstate newspapers.

**D.  Plaintiffs Also Speak to the State Auditor's Office**

38.  Because of the catastrophic condition of the FTU and
the various issues of paramount public importance which its
closing raised, on Tuesday, April 20, 2004, Governor Ruth Ann
Minner called upon the State Auditor to investigate the problems
at the FTU.  Leaders in the Delaware General Assembly made a
similar request.

39.  As part of this investigation, on May 12th and again on
July 28th, 2004 plaintiffs met with, were interviewed by and
turned over voluminous documentation to three investigators of
the State Auditor's office.  Plaintiffs also spoke out to the

Auditors in written form by submitting to them lengthy individual written statements which addressed numerous issues of public concern.

40.  Plaintiffs spoke to the auditors about health hazards, safety concerns and other problems at the range.  Plaintiffs also spoke out about the root causes of these problems, such as improprieties in the bidding and construction process of the FTU, which resulted in an unsafe building being constructed.

41.  At all times plaintiffs spoke out on issues of public concern under the First Amendment and sought to bring to light actual or potential wrongdoing or breach of the public trust by high public officials and also sought to bring to light and fix the hazardous conditions at a state facility which were endangering the health and safety of state employees and numerous others.

42.  The media reported on plaintiffs' May 12th remarks, which incensed and antagonized defendants Chaffinch and MacLeish when they learned of this.  They then decided to retaliate against plaintiffs, order them to fitness for duty exams, fabricate reasons to fire them and to drive them from their positions as State Troopers.

43.  By its content, form and context, at all times plaintiffs spoke out about matters of public concern.

44.  All of plaintiffs' speech was non-disruptive of any legitimate interest of their employer and was on matters of

-11-

public concern to their employer, as well as the General
Assembly, the Governor of Delaware, the news media, voters and
the public at large.  Their speech related to matters of
political, social and other concern to the community.

45.  Plaintiffs were acting in good faith and with honest
motives at all times when they exercised their First Amendment
rights to freedom of speech.  At all times, plaintiffs believed
their speech to be true and plaintiffs' speech is in fact true.
Plaintiffs were not being disloyal by speaking out.  Instead,
they were trying to protect their fellow Troopers and members of
the public who were being injured and otherwise placed in harms
way by the dangerous conditions at the FTU.

46.  The public concern in and value to the community at
large of being free to hear plaintiffs' speech outweighs any
asserted government interest in the effective and efficient
provision of services.

47.  Nothing plaintiffs said interfered with the regular
operations of the DSP.  Plaintiffs' speech did not interfere with
the DSP's interests in: crime fighting; fostering trust and
confidence among officers; protecting the safety of officers or
other members of the community.

48.  Plaintiffs' speech did not threaten the authority of
defendants to run the DSP.  Nothing plaintiffs said damaged
their relationship with defendants or with any of their superior
officers.  Plaintiffs did not impugn the integrity of their

-12-

supervisors.

49.  Plaintiffs' speech did not have a detrimental impact on
any close working relationship for which personal loyalty, trust
and confidence are necessary.  Plaintiffs are not the alter egos
of defendants.  Organizationally, plaintiffs are four and five
ranks below defendants in the chain of command.  Defendants are
the Colonel and Lieutenant Colonel.  Plaintiffs are a mere
sergeant and two corporals.

50.  Any disruption that was caused in the DSP was not
caused by plaintiffs' speech but was instead caused by the very
problems that plaintiffs' speech was in fact intended to address.

51.  In their positions as employees of DSP at the FTU,
plaintiffs did not make or formulate DSP policy.  Rather,
formulation of DSP policy is left up to the Superintendent and
Deputy Superintendent of the DSP.

### E.  Retaliation Against Plaintiffs

52.  The individual defendants were aware of plaintiffs'
protected speech, described above, and it antagonized them.

53.  Defendants then deliberately set out upon a course of
conduct designed to retaliate against plaintiffs because of their
protected speech and to dismiss them from the DSP at the cost of
their careers and livelihoods.  Defendants Chaffinch and MacLeish
did a 180 degree about face from blissful indifference to
plaintiffs' health to demanding that they undergo repeated
fitness for duty exams.  Defendants believed that this course of

retaliation would allow them to continue their practice of
ignoring and covering up the problems at the FTU, protecting
their friends at the expense of loyalty to all the men and women
who they command, and thus save themselves from further public
contempt and ridicule arising out of their failed leadership of
the State Police.

54.  For example, immediately after Corporal Price was
interviewed a second time on July 28th by State Auditor
investigators, defendant MacLeish ordered him to report to him so
he could be interrogated about his interview.  Plaintiff's legal
counsel then promptly sent an email directly to MacLeish and
demanded the right to accompany his client to that interrogation.
MacLeish ignored that demand, never replied, and then ordered
Price to be interrogated without his legal counsel present upon
penalty of severe punishment.  Nor would he even allow a Union
representative to attend the interrogation. MacLeish then
interrogated Price without counsel present.

55.  Throughout the course and as a result of plaintiffs'
protected speech, defendants retaliated against plaintiffs in
numerous ways, including:

> (a)  False charges of misconduct by each plaintiff were
> made to each investigator for the State Auditor's
> Office charging that it was the plaintiffs themselves
> and not Facilities Management and the leadership of the
> DSP who were responsible for all of the problems with
> the FTU.  These false charges were tantamount to
> threats or suggestions of discharge.

> (b)  They were forcibly and improperly sent for fitness

-14-

for duty examinations which were intended to be a
pretextual vehicle to dismiss them from the DSP.

(c)  Their job responsibilities were materially altered
and they have been placed on light duty status,
forbidden from wearing their police uniforms,
performing their regular duties and prohibited from
using a firearm to protect the public, enforcing laws
or otherwise protecting the public.

56.  False charges of misconduct and dereliction of duty
have been leveled against plaintiffs by defendants Chaffinch and
MacLeish.  Blame for the abysmal condition of the FTU has been
placed at their feet by defendants.

57.  Additionally, less than a week after initially speaking
to the Auditor's office, defendant MacLeish, acting on behalf of
and with the knowledge and consent of defendant Chaffinch,
ordered that plaintiffs be sent for trumped up fitness for duty
examinations.

58.  Fitness for duty examinations are a well-known tool for
eliminating whistleblowers in police agencies in the State of
Delaware.

59.  An officer who is found not to be fit for duty cannot
act as a police officer in the State of Delaware.

60.  An officer who is found to be unfit for duty is put on
temporary light duty status, where he is prohibited from using
his firearm, wearing a uniform, enforcing laws and protecting the
public.  Within one year, the officers then are forcibly retired
with resultant severe financial loss for their families due to
the deprivation of their salaries and reduced pensions.

-15-

61.   Fitness for duty examinations were conducted on plaintiffs by a DSP doctor soon after.

62.   On June 18th, plaintiff Corporals Price and Warren then were put on light duty status because they allegedly had failed their fitness for duty examinations due to hearing loss.  Price and Warren have since in writing been prohibited from using their firearms, wearing a uniform, enforcing the laws and protecting the public.  They have been explicitly ordered to run the other way if they observe a crime in progress, such as a crime of violence on another citizen who they are otherwise sworn to protect at the risk of their own lives.  They have been ordered to violate the very core of their code as police officers, to protect the public.

63.   On July 15, 2004, plaintiff Foraker passed his fitness for duty examination conducted by a DSP doctor.

64.   Instead of being happy that plaintiff Foraker had passed his fitness for duty exam and had been given a clean bill of health by DSP doctors, the DSP promptly scheduled him for a second opinion in the hopes that he would fail the second examination.

65.   By their actions described above and otherwise, defendants have made it clear that they intend to force plaintiff Foraker out of the DSP.  On a daily basis defendants continue to take actions against him designed to drive him out or force him to retire.

-16-

**F.  The Historic Practice in the DSP Regarding Hearing Loss**

66.  It is the historic policy, practice and custom of the DSP to stay away from, ignore and otherwise remain purposefully ignorant about the hearing ability of Troopers.

67.  This historic policy, practice and custom is driven by two concerns.  First, an inability to find medical hearing standards applicable to the work that police officers do.  Second, a fear that large numbers of Troopers have suffered hearing loss already.  Thus even if standards are available, it is feared that their application would result in the forced retirement of a large portion of the active force.

68.  Additionally, the DSP has historically overlooked or accommodated any Trooper when hearing loss issues have arisen.

69.  For example, it is well-known throughout the DSP that one Major's hearing was so bad that he had to wear a hearing aid in the course of his duties.  But this officer was not sent for a fitness for duty exam, placed on light duty, or forcibly retired from the DSP.

70.  Likewise, there are and have been numerous additional officers in the DSP whose hearing abilities are similar or worse than plaintiffs, but their hearing loss has been intentionally overlooked and ignored by defendants.  For example, one comparable trooper with hearing loss greater than Corporal Warren has been allowed to operate as a uniformed patrol officer with complete police powers.

71.  Additionally, it is virtually unprecedented for the DSP to inquire into medical issues for its Troopers.  Family physicians are allowed to sporadically certify medical fitness for duty.  Otherwise, medical fitness for duty is ignored by management.

72.  The totality of retaliatory adverse action taken by defendants against plaintiffs are sufficient to deter a person of ordinary firmness from exercising their First Amendment right to freedom of speech.

73.  A reasonable person of ordinary firmness would be deterred from exercising their First Amendment right to freedom of speech when threatened with false charges of misconduct, repeated fitness for duty examinations, severely diminished job responsibilities and discharge.

74.  There is a causal link between First Amendment protected activity on matters of public concern and the adverse action described above. This is demonstrated by:

(a)  The temporal proximity of events, as indicated above.  For example, less than a week after speaking to the Auditor's office, plaintiffs were singled out and sent for unprecedented fitness for duty examinations. There was no concern for such fitness for duty from December 2003 through March 2004 when plaintiffs repeatedly spoke out to defendants about the health dangers of the FTU and their own health problems.

-18-

There was no such concern when in January 2004 Police Academy recruits complained of health issues when they had served there only weeks, instead of the years plaintiffs were exposed.  There was no such concern when the range publically was shut down in March 2004. But only a few days after plaintiffs spilled the beans to the Auditors on May 12th by turning over to them voluminous documentation on the misdeeds involving Facilities Management and the range and gave lengthy written statements about conditions at the FTU, only then were plaintiffs allegedly unfit for duty.

(b)  Circumstantial evidence of a pattern of antagonism following protected activity, as demonstrated by Chaffinch going on WBOC-TV Salisbury and attacking plaintiffs on television; MacLeish's hostile remark that plaintiffs should "just put on a paper dust mask to protect yourself" and that it is expected that they would have health problems from working at a firing range; defendants incensed and antagonized reactions to media reports on plaintiffs' first interviews with the Auditors; and MacLeish's hostile interrogation and browbeating of Corporal Price and refusal to allow him to have his attorney present to defend him after Price had spoken to the Auditors.

c)  Personal knowledge and awareness of protected

-19-

activity by the individual defendants.  For example,
defendants knew plaintiffs had spoken out to a federal
authority which finally forced defendants' hand and
made them close the FTU.  Additionally defendants knew
of the heavy media coverage of plaintiffs' speech.

(d)  Violation of DSP policies, procedures,
practices and customs by ignoring the longstanding DSP
policy of purposeful ignorance regarding hearing loss
and other medical issues.  It is the policy of the DSP
once a Trooper has graduated from the Police Academy to
leave all medical issues relating to whether or not he
or she can serve in a police capacity in the ultimate
hands of the family physician of that Trooper and not
to independently inquire further if that physician
sporadically certifies that the Trooper is fit for
duty.

(e)  Disparate treatment between plaintiffs and
other similarly situated State Troopers both past and
present.  For example, there is the trooper with
hearing loss greater than Corporal Warren who was
allowed to serve on patrol with full police powers.
There is the Major who had to wear a hearing aid who
never was sent for a fitness for duty exam or had his
status questioned.  There are numerous other Troopers
with significant hearing loss comparable to plaintiffs

who the defendants refuse to examine.

(e)  The actions of the defendants once they sent
plaintiffs for fitness for duty exams which reveal that
they were not looking for disinterested objective
medical advice but instead were seeking to create a
distorted and manufactured medical record to use
against plaintiffs.  For example, once Sgt. Foraker
passed his exam, he was ordered to submit to another in
a vain hope to find something to use against him.
Medical records also were withheld from medical
examiners if they would have favored plaintiffs.

(f)  The actions in falsely blaming plaintiffs for
problems at the FTU, when the record reveals that
problems were publically known to be historic and the
fault of Facilities Management and a friend of
defendant Chaffinch.

(g)  The evidence as a whole.

75.  First Amendment protected activity was a substantial or
motivating factor in the adverse action taken against plaintiffs.
The natural probative force of the evidence demonstrates
causation.

76.  The defendants cannot prove by a preponderance of the
evidence that absent a constitutional violation, plaintiffs would
have had adverse employment action taken against them anyway.

77.  As a direct and proximate result of the actions of the

-21-

defendants as detailed herein, plaintiffs have or will suffer lost wages, earnings and benefits, diminished earning capacity now and upon their retirement, loss of DSP pensions and benefits, decreased employment and earnings opportunities, and other pecuniary losses, emotional pain, suffering, disappointment, anger, inconvenience, mental anguish, loss of enjoyment of life, mental and physical pain, physical injury, anguish, humiliation, embarrassment, injury to reputation, and other non-pecuniary losses and injury.

### IV.   **ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT**

78.   The individual defendants' actions violated clearly established federal constitutional rights of which any reasonable official would have known, including more than three decades of Supreme Court and Third Circuit case law prohibiting retaliation against public employees for protected speech.

79.   At all times material hereto the individual defendants participated in, authorized, and sanctioned the federal constitutional deprivations described above which illegally retaliated against plaintiffs.

80.   At all times material hereto the individual defendants and their agents were acting under color of law.   The federal constitutional deprivations described herein are fairly attributable to the State.

81.   The actions of the defendants and their agents or employees were deliberately, intentionally, willfully,

purposefully, and knowingly done in violation of federal
constitutional rights and because of the exercise of those
rights.

82. The defendants either knew or showed a negligent or
reckless disregard for the matter of whether their conduct
violated federal constitutional rights.

83. Their actions were outrageous and taken with evil
motive, in bad faith, out of personal animus and without any
reasonable grounds to support them.

84. Their actions were wanton and malicious or taken with
reckless indifference to federal constitutional rights.

85. The exercise of rights under the U.S. Constitution made
a difference in all actions adverse to plaintiffs.

86. The exercise of these rights was a motivating,
substantial or determinative factor in all actions adverse to
plaintiffs.

87. The individual defendants' actions were willful,
reckless and oppressive.

88. The defendants' actions were motivated by bias, bad
faith, and improper motive.

89. The defendants' actions constitute an abuse of
governmental power.

90. The defendants did not reasonably believe that the
actions they took were necessary to accomplish any legitimate
governmental purpose.

-23-

91.  The defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

92.  The defendants' actions are not so reasonable as to further any governmental interest asserted and do not closely fit the goal of serving those governmental interests.

### COUNT I (FREE SPEECH CLAUSE)

93.  Plaintiffs repeat and reallege paragraphs 1 - 92 set forth above.

94.  The defendants took action adverse to plaintiffs as a direct and proximate result of and in retaliation for plaintiffs' First Amendment protected speech on matters of public concern. There is a temporal and causal relationship between plaintiffs' aforementioned protected speech, and adverse employment action. First Amendment protected activity was a substantial or motivating factor in the adverse employment action.  The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had grounds to adversely treat plaintiffs.

95.  Plaintiffs' constitutional right to freedom of speech has been denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

### COUNT II - (PETITION CLAUSE)

96.  Plaintiffs repeat and reallege paragraphs 1 - 95 set forth above.

97.  The defendants took action adverse to plaintiffs as a

-24-

direct and proximate result of and in retaliation for their
exercise of their First Amendment right to petition the
government for redress of grievances.  There is a temporal and
causal relationship between plaintiff's aforementioned protected
petitioning and adverse employment action.  First Amendment
protected activity was a substantial or motivating factor in the
adverse employment action.  The defendants cannot prove by a
preponderance of the evidence that absent a constitutional
violation they would have had grounds to adversely treat
plaintiffs.

98.  Plaintiffs' constitutional right to petition the
government for redress of grievances has been denied under the
First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

### COUNT III - (FIRST AMENDMENT - SPEECH TO THE MEDIA)

99.  Plaintiffs repeat and reallege paragraphs 1 - 98 set
forth above.

100.  Each plaintiff engaged in protected First Amendment
free speech activity when they authorized their attorney Thomas
S. Neuberger to speak to the media on their behalf after they
gave extensive statements and documents to the State Auditor
about hazardous environmental conditions at the FTU,
mismanagement, waste, incompetence and corruption.

101.  Their attorney did speak out on their behalf to Tom
Eldred of the Delaware State News and Mary Allen of the News
Journal about plaintiffs speech to the Auditors.  For example,

their attorney read their written Auditors statements to the reporters verbatim.

102. Each plaintiff used this speech by their attorney as a means of legally getting around the gag order which had been imposed by defendants to deprive the public of information about their broken government.

103. Immediate news stories ran in both the News Journal and Delaware State News, informing the public of plaintiffs' speech to the Auditors, the health hazards at the FTU and the root causes of those hazards.

104. Chaffinch and MacLeish each were angry about what plaintiffs exposed through the news stories.

105. Chaffinch and MacLeish tried to find a grounds to formally discipline plaintiffs because their attorney spoke on their behalf, but were unable to do so.

106. Chaffinch and MacLeish then singled plaintiffs Price and Warren out to be found unfit for duty on June 18th and to suspend their police powers on June 25th, when similarly situated officers in the past had not been so treated who had identical or comparable medical issues.

107. Written policies were then violated regarding plaintiffs, such as, for example, the rule requiring commanding officers to contact them weekly to ensure how they were holding up during their medical absences.

108. Long established policies and practices also were

-26-

violated by defendants.  For example:  always accommodating
Troopers with hearing problems; always accommodating Troopers
with more serious or comparable injuries; always giving Troopers
two years of light duty before forcing them to burn their
sick/vacation/injured time.

109.  The proffered justification for the treatment of
plaintiffs also is under-inclusive in that defendants did not
also test the hearing of other officers who worked at the range.

110.  There is abundant evidence of antagonism towards
plaintiffs, of a cover-up and intentional falsehoods which also
demonstrate causation.

111.  Price and Warren were subsequently prematurely forced
to retire by the DSP.

112.  Plaintiffs' constitutional right to freedom of speech,
specifically - to speak to the media about matters of the utmost
public concern - has been denied under the First Amendment of the
U.S. Constitution and 42 U.S.C. § 1983.

**COUNT IV - (FOURTEENTH AMENDMENT - RATIONAL BASIS)**

113.  Plaintiffs repeat and reallege paragraphs 1 - 112 set
forth above.

114.  Defendants have historic policies and practices of:
always accommodating Troopers with hearing problems; always
accommodating Troopers with more serious or comparable injuries;
always giving Troopers two years of light duty before forcing
them to burn their sick/vacation/injured time.

-27-

115.  Defendants singled plaintiffs out and refused to apply these historic policies and practices to plaintiffs.

116.  This classification and discrimination which the defendants created cannot survive rational basis analysis.

117. There is no legitimate basis in fact for the treatment of plaintiffs nor is there any rational relationship to any legitimate governmental objective.

118.  Plaintiffs' constitutional right to the equal protection of the law has been denied under the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

**Wherefore**, plaintiffs pray that the Court:

    A.   Enter judgment against the defendants.

    B.   Enter a declaratory judgment declaring the acts of the defendants to be a violation of plaintiffs' constitutional rights.

    C.   Enter a judgment against the defendants Chaffinch and MacLeish, jointly and severally, for compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation, embarrassment, and injury to reputation.

    D.   Enter separate judgments against defendants Chaffinch and MacLeish for punitive damages.

E.   Issue a mandatory injunction directing defendant
     Mitchell to closely monitor all contact between
     defendants Chaffinch or MacLeish and plaintiffs
     and to prohibit any retaliation against or
     harassment of the plaintiffs by Chaffinch or
     MacLeish, upon penalty of finding Mitchell in
     contempt of Court.

F.   Award back pay to compensate plaintiffs for the
     loss of overtime assignments due to their being
     placed on light duty.

G.   Issue a reparative injunction directing plaintiffs
     be taken off of light duty status and put back on
     full duty status at the FTU.

H.   Issue a mandatory injunction ending the continuing
     illegal actions of defendants Chaffinch and
     MacLeish and barring them from considering
     protected speech whenever considering taking any
     employment action concerning plaintiffs.

I.   Issue a reparative injunction directing that
     individual defendants Chaffinch and MacLeish place
     a signed document in each plaintiffs' personnel
     file apologizing for their illegal violations of
     plaintiffs' constitutional rights.

J.   Issue a reparative injunction directing that
     individual defendants Chaffinch and MacLeish issue

-29-

public written apologies to plaintiffs and run
their apologies in the Delaware State News, the
News Journal and on WBOC-TV Salisbury, MD.

K.    Enjoin the defendants from retaliating against
plaintiffs.

L.    Award plaintiffs attorneys' fees, costs and pre
and post judgment interest for this action.

M.    Require such other and further relief as the Court
deems just and proper under the circumstances.


**THE NEUBERGER FIRM, P.A.**


/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiffs


**Of Counsel:**

**JACOBS & CRUMPLAR, P.A.**
**THOMAS C. CRUMPLAR, ESQUIRE (#942)**
Two East Seventh Street
P.O. Box 1271
Wilmington, DE 19899
(302) 656-5445

Dated: July 31, 2006

Firearms Training Unit / Pleadings / Second Amended Complaint.FINAL

<u>**CERTIFICATE OF SERVICE**</u>

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

July 31, 2006, I electronically filed this **Motion** with the Clerk of the Court using CM/ECF which

will send notification of such filing to the following:


Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801


/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**


FTU /Briefs / Motion to Amend Complaint.final