# EXHIBIT 2

```
                                                                    2403

 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4   B. KURT PRICE, WAYNE WARREN,    :    Civil Action
     and CHRISTOPHER D. FORAKER,     :
 5                                   :
                 Plaintiffs,         :
 6                                   :
         v.                          :
 7                                   :
     L. AARON CHAFFINCH,             :
 8   THOMAS F. MACLEISH,             :
     DAVID B. MITCHELL, and          :
 9   DIVISION OF STATE POLICE,       :
                                     :
10               Defendants.         :    No. 04-956-GMS

11                          - - -

12   CHRISTOPHER D. FORAKER,         :    Civil Action
                                     :
13               Plaintiff,          :
                                     :
14       v.                          :
                                     :
15   L. AARON CHAFFINCH,             :
     THOMAS F. MACLEISH,             :
16   DAVID B. MITCHELL, and          :
     DIVISION OF STATE POLICE,       :
17                                   :
                 Defendants.         :    No. 04-1207-GMS
18
                            - - -
19
                     Wilmington, Delaware
20                 Tuesday, May 30, 2006
                          9:00 a.m.
21                  ELEVENTH DAY OF TRIAL

22                          - - -

23   BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury

24

25
```

2404

1  APPEARANCES:

2  THOMAS S. NEUBERGER, ESQ., and
   STEPHEN J. NEUBERGER, ESQ.
3  The Neuberger Law Firm
        -and-
4  MARTIN D. HAVERLY, ESQ.
   Law Offices of Martin D. Haverly
5
        Counsel for Plaintiffs
6
   R. MONTGOMERY DONALDSON, ESQ.
7  Montgomery, McCracken, Walker & Rhoads, LLP
        -and-
8  EDWARD T. ELLIS, ESQ., and
   CARMON M. HARVEY, ESQ.
9  Montgomery, McCracken, Walker & Rhoads
   (Philadelphia, PA)
10
        Counsel for Defendants
11
              - - -
12            INDEX

13     Preliminary Discussions  --------- Page 2404

14 GENE ROTHENBURGER

15     Direct examination    -------------- Page 2409
       Cross-examination     -------------- Page 2430
16     Redirect examination  ------------ Page 2453

17     Stipulation read      ---------------- Page 2454

18     Motions renewed at sidebar ------ Page 2456

19     Conference in Chambers ---------- Page 2460

20     Court's Charge to Jury ---------- Page 2477

21     Closing, Mr. T. Neuberger ------- Page 2506

22     Closing, Mr. Ellis -------------- Page 2565

23     Rebuttal, Mr. T. Neuberger ------ Page 2626
24
25

2405

1       THE COURT: Good morning. Please be seated.
2       As I understand it, we have two remaining,
3  dangling jury issues. One, the contention by the defense
4  that the jury should be instructed that Colonel Chaffinch
5  had a First Amendment right to comment -- well, the
6  instruction reads, "Colonel Chaffinch also has a right to
7  speak out on matters of public concerns. He is not liable
8  to the plaintiffs under the First Amendment for any
9  non-threatening statement he made about them while
10 discussing a matter of public concern."
11      That is submitted by the defense. Is that
12 correct?
13      MR. ELLIS: Yes, Your Honor.
14      THE COURT: Messrs. Neuberger, you resist the
15 rendering of that instruction.
16      MR. S. NEUBERGER: Yes, Your Honor.
17      THE COURT: I am looking into it or having it
18 looked into as we speak. I wanted to get started with the
19 jury.
20      MR. S. NEUBERGER: Your Honor, I filed a Bench
21 memo this morning on this topic addressing some law. I
22 could hand up a copy if it would help the Court.
23      THE COURT: Okay.
24      In light of the Court's ruling and request to
25 the defense and plaintiffs to get together, I understand

2406

1  there is agreement on the collateral source instruction.
2       MR. ELLIS: I think that's right, Your Honor.
3       MR. S. NEUBERGER: Yes, Your Honor.
4       THE COURT: Understanding the plaintiffs'
5  exception.
6       MR. T. NEUBERGER: Yes, Your Honor.
7       THE COURT: Then that leaves the research that
8  is ongoing with regard to this question of how the jury
9  should be instructed on the issue of joint tenancy
10 properties and how that is going to be addressed by the
11 Court.
12      I understand you have one more live witness?
13      MR. ELLIS: Yes, Your Honor. One more live
14 witness. Then I would like to read about 13 lines of a
15 deposition before the jury. I think we will have an issue
16 over that.
17      THE COURT: Let's talk about it for a minute.
18 Go ahead.
19      MR. ELLIS: Your Honor, Mr. Neuberger has agreed
20 to stipulate that Exhibit No. 11, which is in the defense
21 book, is a copy of the checklist that we have heard
22 testimony about that Sergeant Foraker appeared with on
23 December 1st when he had his transition meeting with Captain
24 Warren, Lieutenant Davis and Rich Ashley. And what I would
25 like to read is these few lines of testimony in which I

2407

1  asked Sergeant Foraker whether the handwriting on those
2  three pages was his. And he said, yes. And then I said in
3  the upper right-hand corner --
4       THE COURT: Who is the witness?
5       MR. ELLIS: Foraker, Your Honor.
6       "In the upper right-hand corner of the first
7  page there is some characters that I can't entirely make
8  out.
9       "Is that your handwriting, also?
10      "No, that isn't."
11      Then Mr. Tom Neuberger, says, "That looks like
12 SJN, co-counsel."
13      And I said, "That would be Stephen J.
14 Neuberger." And Mr. Neuberger said, "Yes, I think so. That
15 looks like his handwriting."
16      THE COURT: Do you want to read that in?
17      MR. ELLIS: Yes.
18      MR. S. NEUBERGER: Your Honor, this is basically
19 a relevance and a 403 issue. The initials written in the
20 top right-hand corner of the document are not in my
21 handwriting. This opens up the whole separate rabbit trail
22 of whose handwriting is it, things like that. We can
23 present witnesses on that, Your Honor.
24      THE COURT: No, we are not. You are not going
25 to be permitted to read that today, Mr. Ellis. I don't

2520

So what happens is -- and this was Exhibit 25, you have that in the book in front of you -- that on April 6, there is this media tour, and we have testimony that before the tour Colonel Chaffinch goes down and speaks with Captain Dixon, and indicates that today he is going to put it on F'g Foraker, that if you f-u-c-k with Aaron Chaffinch, I f-u-c-k back. That is a window into his mind at the same time as to what were his purposes on April 6th.

Then we know he did give the tour and the news story ran.

On the next exhibit here, I tried to excerpt the kinds of things that were said in the news article. You need to look at Plaintiffs' Exhibit 25 yourself, and don't forget 26, because 26 is the same story. But it is the one that went into the Police Beat Magazine, that periodical that goes to 55,000 police officers throughout the country.

The Delaware State News, this story goes to about 25,000 people every day.

The first statement, The previous Sergeant in charge did a good job.

Well, that means that -- you can interpret that to mean that the prior Sergeant wasn't doing a good job, and the prior Sergeant -- the current Sergeant Foraker, who is mentioned throughout.

Things changed in December when another Sergeant

2521

came in. That's a portion of where the ball was dropped.

Once again, he is saying here Chris Foraker dropped the ball on maintenance and the functionality of the range.

Here is another example. And you can read through the article yourself; I don't want to go over them all. But I think people in glass houses shouldn't throw stones. It is a lot dirtier now. Meaning that the people who are running it now are getting it dirtier than it used to be. Once again, that would be a false statement.

And just one more: When I was there in the fall, everything was going as well as previous times.

That's saying everything was okay in the fall. Even down here he is talking about one or more troopers under his command.

The kind of people he was talking about were Kurt and Wayne and Chris.

That articles gets published. That is enough for that. That article gets published. Then they are gagged. The press ace reporter, Tom Eldred, comes and wants to get some response to these charges that have been made. What happens? They are gagged and they are not allowed to give interviews.

And then what happens with these accusations? These accusations run in Police Beat Magazine. They run in

2522

the Delaware State News. And then there is that news story that we will talk about a little bit later that ran on WBOC TV on the Eastern Shore that has a viewing audience of approximately 500,000 people.

Then Colonel Chaffinch comes back from giving the story that runs the next day. You heard him say, then I got Tom Eldred on the phone and I followed up with some things. And then Major Baylor, we already talked about it, but he talked about what Colonel Chaffinch was saying when he got back, that I got my digs in, that people who live in glass houses shouldn't throw stones, and that in no way was he going to retract the accusations that were made that day.

I think Major Baylor said that he didn't want to hear it, this whole idea about retracting.

So that is April 6. They are gagged. All kinds of accusations are running against them.

We fast-forward to May 12. That is when the auditors first meet with my clients. They hold two interviews. It's July 20th, I think the evidence was, July 20th. May 12 is when they speak to the auditors, May 13th they were to undergo fitness-for-duty exams. June 18, they are declared unfit for duty. June 25th, their police powers are suspended.

The closeness in time here is remarkable. It is the next day. That is insight into their mind, also.

2523

They spoke to the auditors on the 12th -- you have their written statements in the book. They are Exhibits 22, 23 and 24 -- addressing the health and safety concerns of themselves, the health and safety concerns of other troopers and the other people using the facility. They gave oral statements. They delivered documents. You heard about that this morning. And then you know that a news story ran after that, after May 12. That is in the record, also. And we know that the fact, their hands had been tied behind their back. But the truth got out because I as their lawyer answered questions -- you can read the story -- answered questions after the interviews. And this angered the defendants.

You have heard testimony. Defendant Chaffinch, I believe, said he was unhappy with the fact that these news stories ran after May 12. MacLeish I think testified that he was dismayed by the fact that they had spoken to the auditor and the media had reported on it.

You saw from the stand, when Kurt testified, he explained, our hands were tied behind our backs, and being able to testify in trial and trying to redeem our honor is liberating. And the fact that some of the story got out while their hands were tied behind their back and they were gagged was liberating for them, also.

We even get more retaliation. And we will talk