IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE;                          :
CORPORAL WAYNE WARREN; and                       :
SERGEANT CHRISTOPHER D. FORAKER,                 :
                                                 :
          Plaintiffs,                            :
                                                 :
     v.                                          :     C.A.No.04-956-GMS
                                                 :
COLONEL L. AARON CHAFFINCH,                      :
individually and in his official capacity as     :
Superintendent of the Delaware State Police;     :
LIEUTENANT COLONEL THOMAS F.                     :
MACLEISH, individually and in his official       :
capacity as Deputy Superintendent of the         :
Delaware State Police; DAVID B. MITCHELL,        :
in his official capacity as the Secretary of the :
Department of Safety and Homeland Security of    :
the State of Delaware; and DIVISION OF           :
STATE POLICE, DEPARTMENT OF SAFETY               :
AND HOMELAND SECURITY, STATE OF                  :
DELAWARE,                                        :
                                                 :
          Defendants.                            :


PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR FED.R.CIV.P. 15(b) MOTION
TO AMEND THE FIRST AMENDED COMPLAINT TO CONFORM TO THE
EVIDENCE PRESENTED AT TRIAL

THE NEUBERGER FIRM, P.A.                 MARTIN D. HAVERLY, ATTORNEY
THOMAS S. NEUBERGER, ESQ. (#243)         AT LAW
STEPHEN J. NEUBERGER, ESQ. (#4440)       MARTIN D. HAVERLY, ESQ. (#3295)
Two East Seventh Street, Suite 302       Two East Seventh Street, Suite 201
Wilmington, DE 19801                     Wilmington, DE 19801
(302) 655-0582                           (302) 654-2255
TSN@NeubergerLaw.com                     Martin@HaverlyLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiffs

Dated: August 11, 2006

**TABLE OF CONTENTS**

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     DEFENDANTS IMPLICITLY CONSENTED TO TRIAL ON THE ISSUE OF
       PLAINTIFFS' FIRST AMENDMENT PROTECTED SPEECH TO THE MEDIA
       THROUGH THEIR ATTORNEY AGENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       A.     The Implicit Consent Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       B.     Defendants Recognized that the Unpleaded Issue Entered the Case at Trial . . . 1

              1.     Defendants Were Cross Examined on This Theory During Plaintiffs'
                     Case-in-Chief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

              2.     Plaintiffs Argued This Theory During Closing Arguments . . . . . . . . . 3

              3.     The Jury Interrogatory Encompassed This Speech . . . . . . . . . . . . . . . 4

              4.     Plaintiffs Took Discovery On This Issue . . . . . . . . . . . . . . . . . . . . . . . 4

       C.     The Evidence Supporting the Issue Was Introduced Without Objection . . . . . . 5

       D.     Defendants' Opportunity to Respond Was Not Prejudiced . . . . . . . . . . . . . . . 6

              1.     The Prejudice Pointed to By Defendants Also Fails as a Matter
                     of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       E.     Miscellaneous Issues Raised by Defendants . . . . . . . . . . . . . . . . . . . . . . . . 8

              1.     The Evidence and Argument Was Not Independently Relevant to
                     Any Other Issue in the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

              2.     Attorney Thomas Neuberger Spoke to the Media on Plaintiffs'
                     Behalf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

Arizona v. Fulminante, 499 U.S. 279 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Bedford v. SEPTA, 867 F.Supp. 288 (E.D.Pa. 1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

BMW of North America v. Gore, 517 U.S. 559 (1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Deakyne v. Commissioners of Lewes, 416 F.2d 290 (3d Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387 (M.D.Pa. 2003)  . . . . . . . . . . . . . . . . . . . . . . . . .  6

Douglas v. Owens, 50 F.3d 1226 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1,2,6

Howard v. Bd. of Educ. of City of East Orange, 90 Fed.Appx. 571 (3d Cir. 2003) . . . . . . . . . . . . . . .  7

In re Dinnan, 661 F.2d 426 (5th Cir. 1981)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Link v. Wabash R. Co., 370 U.S. 626 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Mitchell v. Street, 415 F.Supp.2d 490 (E.D.Pa. 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Monsanto Co. v. Aetna Casualty and Surety Co., 593 A.2d 1013 (Del.Super. 1990) . . . . . . . . . . . . .  10

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)  . . . . . . . . . . . . . . . . . . . . . . . . .  8

S.E.C. v. McNulty, 137 F.3d 732 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc)  . . . . . . . . . . 8,10

U.S. v. 7108 West Grand Ave., Chicago, Ill., 15 F.3d 632 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . .  9

Willow Inn, Inc. v. Public Service Mutual Ins. Co., 399 F.3d 224 (3d Cir. 2005) . . . . . . . . . . . . . . . .  4

**Constitutions and Rules**

U.S. Const., Amend. I  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  *passim*

Federal Rule of Civil Procedure 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  *passim*

Federal Rule of Civil Procedure 15(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  *passim*

Federal Rule of Evidence 402  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Model Rule of Professional Conduct 1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Model Rule of Professional Conduct 1.6(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Model Rule of Professional Conduct 1.6 cmt. 2  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

## **Other Sources**

6A C. Wright & A. Miller, Federal Practice and Procedure 2d § 1493 (1990) . . . . . . . . . . . . . . . . . . . .  6

## ARGUMENT

**I.    DEFENDANTS IMPLICITLY CONSENTED TO TRIAL ON THE ISSUE OF PLAINTIFFS' FIRST AMENDMENT PROTECTED SPEECH TO THE MEDIA THROUGH THEIR ATTORNEY AGENT.**

**A.  The Implicit Consent Test.**  In their Answering Brief, defendants have denied what was expected to be an uncontested issue on the First Amendment free speech to the media amendment based on defendants' own testimony.  Nonetheless, review of the case law and the facts as actually presented at trial and during discovery reflect that defendants did indeed impliedly consent to trial on this issue.  Implied consent occurs when:

> (1) the parties recognized that the unpleaded issue entered the case at trial;
>
> (2) the evidence that supports the unpleaded issue was introduced at trial without objection; and
>
> (3) a finding of trial by consent would not prejudice the opposing party's opportunity to respond.

Douglas v. Owens, 50 F.3d 1226, 1236 (3d Cir. 1995)

**B.  Defendants Recognized that the Unpleaded Issue Entered the Case at Trial.**  The Third Circuit has explained that as part of this inquiry, the court should consider whether the moving party "(1) advanced this theory to the jury while presenting his case-in-chief;  (2) argued this theory after the evidence was elicited during cross-examination;  (3) argued this theory to the jury in his closing arguments; or (4) asked that this alternative theory of liability be included in the special verdict questions."  Douglas, 50 F.3d at 1236 n.20 (emphasis added); see id. at 1234-35.  At least three of these disjunctive factors weigh in plaintiffs' favor.

**1.  Defendants Were Cross Examined on This Theory During Plaintiffs' Case-in-Chief.**  As part of their case-in-chief, plaintiffs called each defendant to testify.  And despite their belated denials, it is clear that defendants themselves opened the door to this issue at

trial through their own testimony.[1]

Defendants testified that they were "unhappy," "displeased" and "dismayed" that plaintiffs had spoken to the Auditors and that the media had reported on it. (Chaffinch 1650-53; MacLeish 1759-60, 1762). Defendants even drew the key distinction in this regard - that they had no problems with plaintiffs' speech to the Auditor, but were instead admittedly angry that they spoke to the media.

> I was not upset that they were talking to the auditors, no. I was upset that it was bringing negative light to the Division of State Police in the media.

(Chaffinch 1653). I "was dismayed at how the media ran the story, dismayed that the media ran the story." (MacLeish 1760). Defendants were "upset" and "not happy" that the Division was being shown in a negative light in the press. (MacLeish 1760, 1762; Chaffinch 1653 ). MacLeish testified that he thought plaintiffs were a "real pain in the ass" "at the time" their statements to the Auditors were published in the newspapers. (MacLeish 1760).[2] Testimony from retired Major David Baylor also demonstrated that both defendants Chaffinch and MacLeish were "not happy" about plaintiffs' speech to the media, and instead were "frustrated" and "upset" with them. (Baylor 554, 556-58). He also witnessed MacLeish referring to each plaintiff as "a pain in the ass." (Baylor 556).[3]

Defendants cannot now belatedly run from this testimony. Instead, it is apparent that defendants tried to play fast and loose with the facts at trial. They flatly denied retaliating

---

[1] Although not the determinative factor, the fact that defendants opened the door to the issue is a relevant consideration. See Douglas, 50 F.3d at 1236.

[2] The defense claim that they were only angry about the adverse media coverage of plaintiffs' speech and that there is no evidence of their anger over plaintiffs' speech is without merit. (DAB at 10). Such a fine line cannot be drawn on our present record which is discussed above. Without plaintiffs' speech to the media, there simply would have been no media coverage. Additionally, the defense assertion ignores, inter alia, MacLeish's own testimony that "at the time" plaintiffs' speech was published in the media, he thought plaintiffs were a "real pain in the ass" (MacLeish 1760), an attack clearly directed at plaintiffs.

[3] As discussed below, defendants never objected to or moved to strike this line of questioning or any of this testimony.

2

against plaintiffs because they spoke to the Auditor and then tried to 'wiggle' out, claiming that they instead were angry that plaintiffs' statements ended up on the front page of the newspapers via their retained attorney. Unfortunately for defendants, this also constituted protected speech and it also is illegal to retaliate because of it. Plaintiffs followed up on these defense admissions with pointed questioning and capitalized upon them during the presentation of the remainder of their case. Thus, this factor weighs in plaintiffs' favor.

      **2. Plaintiffs Argued This Theory During Closing Arguments.** In light of this compelling evidence elicited from defendants' own mouths, plaintiffs' counsel argued this theory during his closing.

> They spoke to the auditors on the 12th -- you have their written statements in the book. They are Exhibits 22, 23 and 24 -- addressing the health and safety concerns of themselves, the health and safety concerns of other troopers and the other people using the facility. They gave oral statements. They delivered documents. You heard about that this morning. And then you know that a news story ran after that, after May 12. That is in the record, also. And we know that the fact, their hands had been tied behind their back. But the truth got out because I as their lawyer answered questions -- you can read the story -- answered questions after the interviews. And this angered the defendants.

> You have heard testimony. Defendant Chaffinch, I believe, said he was unhappy with the fact that these news stories ran after May 12. MacLeish I think testified that he was dismayed by the fact that they had spoken to the auditor and the media had reported on it.

> You saw from the stand, when Kurt testified, he explained, our hands were tied behind our backs, and being able to testify in trial and trying to redeem our honor is liberating. And the fact that some of the story got out while their hands were tied behind their back and they were gagged was liberating for them, also.

(Neuberger Closing 2523) (emphasis added).[4] Yet once again, defendants did not object to

---

    [4] The defense effort to minimize this damaging portion of the closing argument (DAB at 11) is without merit and simply misrepresents what was actually argued during closing. During an earlier part of the closing, counsel argued that the one day temporal proximity between plaintiffs speech to the

counsel's argument during closing.[5]  Thus, this factor also weighs in plaintiffs' favor.

>   **3. The Jury Interrogatory Encompassed This Speech.**  Additionally, the jury interrogatory already encompassed this speech.  The jury was asked to determine whether plaintiffs have "proven that [their] protected activity under the First Amendment (speaking out about the conditions at the DSP indoor firing range) was a substantial or motivating factor in the adverse action taken against [them]?"  This interrogatory was in no way limited only to speech up the chain of command and speech to the Auditor.  Instead, it was significantly broader in scope and already encompassed their speech to the media.  Accordingly, this factor similarly weighs in plaintiffs' favor.

>   **4. Plaintiffs Took Discovery On This Issue.**  Defendant MacLeish also testified about these issues at his deposition.  He testified that based on his conversations with defendant Chaffinch, it was clear that Chaffinch was unhappy with plaintiffs for getting their speech into the media.  (MacLeish depo. at 218 - Tab A).  MacLeish felt the same way.

>>   [T]he manner in which they brought them to our attention through the media and, therefore, the division gets placed in a bad light.  That's what's been disappointing.

>   (MacLeish depo. at 218) (emphasis added).

>>   I was somewhat dismayed when, being told not to speak to the media, there was a way that - they found a way to get into the media.  But according to counsel, it was done through their counsel and it was okay to do it the way they did it, because the statements

---

Auditors on May 12th and the adverse action of being sent for fitness for duty exams on May 13th was compelling evidence of causation.  (Neuberger Closing 2522).  Continuing, "[t]he closeness in time here is remarkable.  It is the next day.  That is insight into their mind."  (Id.).  The "insight into their mind" statement referred to the temporal proximity, not to the speech to the media.

[5]  It was certainly not out of timidity that defendants did not object.  Instead, review of the transcript reveals that defense counsel had no qualms about improperly objecting during other portions of counsel's closing argument (Ellis - Tr. at 2561), even when clear and unequivocal Supreme Court and Third Circuit precedent explicitly permitted and supported the argument being made.  See BMW of North America v. Gore, 517 U.S. 559, 577 (1996) ("a recidivist may be punished more severely than a first offender" and "repeated conduct is more reprehensible than an individual instance of malfeasance" and may be considered in awarding punitive damages); Willow Inn, Inc. v. Public Service Mutual Ins. Co., 399 F.3d 224, 232 (3d Cir. 2005) (noting that "specific instances of similar conduct by the defendant in relation to other parties" not involved in the case may be considered).

were attributed to them, but were read by their attorneys.

(MacLeish depo. at 162) (emphasis added). MacLeish testified that he knew plaintiffs had used their attorney as their agent to circumvent the gag order, he was unhappy about it and he actually tried (but failed) to have them disciplined for doing so. This also weighs in plaintiffs' favor.

    **C. The Evidence Supporting the Issue Was Introduced Without Objection.** No where did defense counsel ever object to or move to strike the introduction and eliciting of this testimony from defendants themselves or from Major Baylor. Importantly, the now challenged evidence did not become part of the record as part of an isolated, rambling answer given by each defendant during cross-examination. Instead, review of defendants' own testimony reveals that they were thoroughly examined by plaintiffs on their reaction to plaintiffs' statements ending up on the front pages of the Delaware news media.

    Defendant Chaffinch was examined over the course of four pages of trial testimony about his reaction to plaintiffs' speech to the media. (See Chaffinch 1650-1653). Yet the record reveals nothing but defense silence with no objections to this entire line of questioning. Thus, they consented to its inclusion.

    Similarly, defendant MacLeish was next examined and was questioned over the course of at least three pages of trial testimony about this same issue. (See MacLeish 1759-1760, 1762). Again, the record is resoundingly silent on any objection from defendants about the relevance of this evidence.[6]

    Significantly, Major David Baylor also was questioned about his observations of Chaffinch and MacLeish's reaction to plaintiffs' speech in the newspapers. (See Baylor 553-554, 556-557). Once again, defendants failed to object to this line of questioning and implicitly consented to its inclusion.

---

    [6] In the same way, defendants also never objected to this line of questioning at MacLeish's deposition. (MacLeish 161-162, 218).

**D. Defendants' Opportunity to Respond Was Not Prejudiced.** "Prejudice under the rule means undue difficulty in prosecuting a lawsuit as a result of a change of tactics or theories on the part of the other party." Deakyne v. Commissioners of Lewes, 416 F.2d 290, 300 (3d Cir. 1969). Thus, in this context, prejudice means a party is not afforded an opportunity to prepare to meet the unpleaded issue. Douglas, 50 F.3d at 1236; 6A C. Wright & A. Miller, Federal Practice and Procedure 2d § 1493, pp. 36-40 (1990). Moreover, mere prejudice is insufficient "as a basis for denying an amendment to conform to issues that have been introduced without objection." 6A C. Wright & A. Miller, Federal Practice and Procedure 2d § 1493, pp. 40.

Here it was defendants themselves who introduced the evidence of a new claim of free speech retaliation. Plaintiffs then questioned and explored this theory with them. Plaintiffs next argued this theory to the jury. The jury interrogatory included this speech. Defendants had ample opportunity to attack this evidence during their case-in-chief and during their examinations of these same witnesses, but they chose not to do so. As discussed above, defendants were reasonably on notice and had the opportunity to offer evidence in this regard. Accordingly, defendants have suffered no legally cognizable prejudice.

**1. The Prejudice Pointed to By Defendants Also Fails As a Matter of Law.**

Defendants claim that they would have disciplined plaintiffs had they known about the speech to the media issue and that the Pickering disruption balancing would have been affected. (DAB at 8 n.2, 10). Such a claim is erroneous on several levels.

First, the Pickering disruption "balancing test comes into play only if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so." San Filippo v. Bongiovanni, 30 F.3d 424, 434 n.11 (3d Cir. 1994) (emphasis added).[7] But if the employer denies that it took the adverse action

---

[7]    Accord Dennison v. Pa. Dept. of Corr., 268 F.Supp.2d 387, 399 (M.D.Pa. 2003); Mitchell v. Street, 415 F.Supp.2d 490, 494 n.5 (E.D.Pa. 2005); Bedford v. SEPTA, 867 F.Supp. 288, 295 n.8 (E.D.Pa. 1994).

against the employee because of his protected speech, the balancing test "has no application."
Id.; accord Howard v. Bd. of Educ. of City of East Orange, 90 Fed.Appx. 571, 575 n.6 (3d Cir.
2003).  In our case, defendants have always flatly denied that any of their actions against
plaintiffs were caused in any way by plaintiff's protected speech.[8]  Accordingly, as a matter of
law, they are barred from asserting the Pickering disruption balancing test and claiming that the
actions they took were done in response to plaintiffs' speech.

This leads to the second flaw in the defense argument - it confuses the adverse action at
issue in this case.  Plaintiffs were never formally charged with any wrongdoing by the DSP.
Instead, it was sending plaintiffs for unprecedented fitness for duty exams, singling them out for
hearing testing, refusing to accommodate them, running them out of the division, reducing Sgt.
Foraker's job responsibilities, the public newspaper attacks and all of the other related retaliation
that were being challenged in this case as the adverse action at issue.

Third, as just discussed, defendants never brought plaintiffs up on any formal charges for
speaking to the media through their attorney.  The defense assertions that they would have done
so are flatly contradicted by MacLeish's own deposition testimony where he testified about this
specific issue.  MacLeish testified that he and Chaffinch actually wanted to discipline plaintiffs
for using their attorneys to speak to the media on their behalf, but their own assigned divisional
attorney (Deputy Attorney General Mike Tupman) told them that plaintiffs could not be brought
up on charges for using their attorney to circumvent the gag order and speak to the media.

> I was somewhat dismayed when, being told not to speak to the media, there was a way
> that - they found a way to get into the media.  But according to counsel, it was done
> through their counsel and it was okay to do it the way they did it, because the statements
> were attributed to them, but were read by their attorneys.

(MacLeish depo. at 162) (emphasis added).  Thus, the defense assertion that plaintiffs would

---

[8]  Instead, defendants have always claimed throughout the entire course of this litigation that all
'health' related adverse actions were caused by a deep, profound and caring concern for plaintiffs' well-
being, a claim that the jury obviously rejected as false.  (See, e.g. Ellis Opening 68-72; Ellis Closing
2566; MacLeish 1918; MacLeish depo. at 165-166).

have been brought up on charges is simply wrong, as is the defense claim that defendants "were acting under the assumption that the plaintiffs were observing the departmental restrictions on media contact." (DAB at 10).[9]

Last, and relatedly, this defense claim also is irrelevant. Because plaintiffs were never disciplined for speaking to the media and because defendants have never asserted that they took any action against plaintiffs because of their speech, any effort to present such evidence would be barred by Fed.R.Evid. 402 as irrelevant. Additionally, efforts to add such an allegation which would so fundamentally alter and contradict the position taken by defendants in this litigation also would demonstrate that defendants are playing fast and loose with the truth and have repeatedly perjured themselves during their testimony, both at trial and in depositions.

**E. Miscellaneous Issues Raised by Defendants.**

**1. The Evidence and Argument Was Not Independently Relevant to Any Other Issue In the Case.** Defendants also claim that this evidence was relevant to other issues in the case. (DAB at 10-11). But their position also is mistaken.

Defendants' testimony regarding their anger and unhappiness about plaintiffs' Auditor statements being read verbatim to the media was not relevant other issues in the case. Initially, plaintiffs only presented two claims for free speech retaliation - internal speech up the chain of command and speech to the State Auditors. Thus, defendants' testimony and the line of questioning in this regard about defendants' reaction to plaintiffs media speech was irrelevant and unnecessary to those two issues. Nonetheless, despite its irrelevance to the two initial claims, it was nevertheless introduced, examined and argued during the course of the case.

---

[9] These false defense assertions also have independent evidentiary value. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) (it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt."); Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1069 (3d Cir. 1996) (en banc) ("[r]esort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct.").

## 2. Attorney Thomas Neuberger Spoke to the Media on Plaintiffs' Behalf.

The defense claim that there was no record evidence that "plaintiffs directed or authorized their attorney to speak to the media or to read their statements to the media" is entirely unfounded. (DAB at 8). First, the media articles containing attorney Neuberger's statements to the media on behalf of his clients are in the record and they are unchallenged. (PX 28 and 29). As the articles themselves reveal, attorney Neuberger read plaintiffs' written statements to the Auditor "verbatim" to the media. (PX28).

Second, defendant MacLeish testified that he certainly understood that attorney Neuberger was speaking on his clients' behalf as a means of circumventing the gag order.

> I was somewhat dismayed when, being told not to speak to the media, there was a way that - they found a way to get into the media. But according to counsel, it was done through their counsel and it was okay to do it the way they did it, because the statements were attributed to them, but were read by their attorneys.

(MacLeish depo. at 162) (emphasis added).

Third, attorney Neuberger had no other reason to speak on the subject unless his clients had authorized him to do so. In the same way that defense counsel would not publicly comment to the media about DSP matters involving Chaffinch, MacLeish and the DSP if they were not retained and authorized to do so by their clients, so also plaintiffs' counsel would not publicly comment to the media about DSP matters involving plaintiffs Price, Warren and Foraker if they were not retained and authorized to do so on their clients' behalf. This is a basic principle of agency.[10]

For example, the Model Rules of Professional Conduct dictate that "[a] lawyer shall not

---

[10]    See, e.g. U.S. v. 7108 West Grand Ave., Chicago, Ill., 15 F.3d 632, 634 (7th Cir. 1994) ("The clients are principals, the attorney is an agent, and under the law of agency the principal is bound by his chosen agent's deeds."); S.E.C. v. McNulty, 137 F.3d 732, 739 (2d Cir. 1998) ("Normally, the conduct of an attorney is imputed to his client, for allowing a party to evade the consequences of the acts or omissions of his freely selected agent would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent.") (internal punctuation omitted) (quoting Link v. Wabash R. Co., 370 U.S. 626, 633-34 (1962)).

reveal information relating to the representation of a client unless the client gives informed consent."  MRPC 1.6(a); see MRPC 1.6 cmt. 2 ("A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation.").  "[A] lawyer shall abide by a client's decisions concerning the objectives of representation and ... shall consult with the client as to the means by which they are to be pursued." MRPC 1.2.  A "lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation." Id.    No attorney can act on his own whim and talk to the media about information learned in the course of their representation of the clients without first consulting with and obtaining the informed consent from the client. Instead, it is clear that as even defendant MacLeish recognized, attorney Neuberger was speaking on his client's behalf as their agent when he read their Auditor's statements verbatim to the media.

## **CONCLUSION**

If a trial is a search for the truth,[11] then the trial in this case revealed that there were three reasons which played a substantial part in the retaliation against plaintiffs.  This included the fact of the speech to the media which plaintiffs delivered through the vehicle of their counsel.

The defense would like to avoid the truth of this unpleasant fact because it prevents them from including this case behind the recent legal barrier constructed by the Garcetti decision.  But it was the testimony of the two individual defendants themselves which revealed this now unpleasant truth.

---

[11]  And that is what the judicial process is all about.  See Arizona v. Fulminante, 499 U.S. 279, 295 (1991) ("The search for truth is indeed central to our system of justice"); In re Dinnan, 661 F.2d 426, 427 (5th Cir. 1981) ("The basis of justice is the truth and our system frowns upon impediments to ascertaining that truth"); Sheridan, 100 F.3d at 1069 ("We routinely expect that a party give honest testimony in a court of law..."); Monsanto Co. v. Aetna Casualty and Surety Co., 593 A.2d 1013, 1022 (Del.Super. 1990) ("In the courts of Delaware, the hallmark of justice under law in civil litigation cannot be expediency marred by deception, but must rather be truth - to accept or require anything less would ... debase the system of justice and belittle all who serve it").

However, the simple operation of Rule 15 prevents the result of the defense attempt to run from the truth. This was a hard fought 12 day trial which revolved around volumes of causation evidence. That defense was resolved against defendants by the jury. So as a last grasp at straws the defense now seeks to change the focus to Garcetti, in a case where the legal question of protected conduct was never at issue.

The defense effort to change the nature of this hard fought case and to ignore the role of the jury in determining the truth is defeated because both defendants injected into the trial the fact that they also were antagonized by the speech of plaintiffs to the media through their attorney. When they injected this additional fact into the case they then fell within the clear parameters of the text of Rule 15 and the case law.

Consequently, for the reasons discussed above and in the opening motion, the Court should grant plaintiffs' motion to amend their First Amended Complaint to include a claim for First Amendment protection for their speech to the media because the civil rules seek to determine the truth of all matters. Accordingly, defendants' Garcetti defense fails because this third category of protected conduct does not fall within any barrier created by Garcetti.[12]


Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**


/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

---

[12] Upon further research and review of the law, plaintiffs withdraw their request to add an equal protection theory.

11

**MARTIN D. HAVERLY, ESQ. (#3295)**
**MARTIN D. HAVERLY, ATTORNEY AT LAW**
Two East Seventh Street, Suite 201
Wilmington, DE 19801
(302) 654-2255
Martin@HaverlyLaw.com

Dated: August 11, 2006                    Attorneys for Plaintiffs

# Tab A



## W&F

### WILCOX & FETZER LTD.

In the Matter Of:

# Price, et al.
## v.
# Chaffinch, et al.

C.A. # 04-1207

------------------------------------------------------------------

Transcript of:

Thomas F. MacLeish

July 19, 2007

------------------------------------------------------------------

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  lhertzog@wilfet.com
Internet:  www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORPORAL B. KURT PRICE,        )
CORPORAL WAYNE WARREN,         )
and SERGEANT CHRISTOPHER       )
D. FORAKER,                    )
                               )
        Plaintiffs,            )
                               )
        v.                     )   C.A. No. 04-1207
                               )
COLONEL L. AARON CHAFFINCH,    )
individually and in his        )
official capacity as           )
Superintendent of the          )
Delaware State Police;         )
LIEUTENANT COLONEL THOMAS      )
F. MacLEISH, individually      )
and in his official            )
capacity as Deputy             )
Superintendent of the          )
Delaware State Police;         )
DAVID B. MITCHELL, in his      )
official capacity as the       )
Secretary of the Department)
of Safety and Homeland         )
Security of the State of       )
Delaware; and DIVISION OF      )
STATE POLICE, DEPARTMENT OF)
SAFETY AND HOMELAND            )
SECURITY, STATE OF             )
DELAWARE,                      )
                               )
        Defendants.            )

            Deposition of COLONEL THOMAS F. MacLEISH
taken pursuant to notice at the law offices of The
Neuberger Firm, P.A., 2 East 7th Street, Suite 302,
Wilmington, Delaware, beginning at 9:30 a.m., on Tuesday,
July 19, 2005, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Price, et al.                                               v.                                    Chaffinch, et al.
Thomas F. MacLeish                            C.A. # 04-1207                              July 19, 2007

Page 2

APPEARANCES:
    STEPHEN J. NEUBERGER, ESQUIRE
    MARTIN HAVERLY, ESQUIRE
    THE NEUBERGER FIRM, P.A.
      2 East 7th Street - Suite 302
      Wilmington, Delaware 19801
      for the Plaintiffs

    EDWARD T. ELLIS, ESQUIRE
    MONTGOMERY McCRACKEN WALKER & RHOADS, LLP
      123 South Broad Street
      Avenue of the Arts
      Philadelphia, Pennsylvania 19109
      for the Defendants
ALSO PRESENT:
    SERGEANT CHRISTOPHER D. FORAKER
    CORPORAL B. KURT PRICE
    ALISON LASSETER
              - - - - -

Page 3

1           COLONEL THOMAS F. MacLEISH,
2       the witness herein, having first been
3       duly sworn on oath, was examined and
4       testified as follows:
5   BY MR. NEUBERGER:
6       Q.  Colonel, my name is Steve Neuberger, and I'm an
7   attorney representing Master Corporal Price and Master
8   Corporal Wayne Warren.  Are you aware of that?
9       A.  Yes.
10      Q.  Have you ever testified in court before?
11      A.  Yes, I have.
12      Q.  Have you ever had your deposition taken before?
13      A.  Yes, I have.
14      Q.  I'm going to ask you some questions, and the
15  court reporter here is going to type up your answers to
16  those questions.  Okay?
17      A.  Yes.
18      Q.  We have to take turns talking because if we talk
19  at the same time, although the court reporter is very,
20  very good, she can't get everything down.  So we have to
21  take turns.
22      A.  I understand.
23      Q.  You have to verbalize your answers.  For
24  example, instead of nodding your head, just say yes.

Page 4

1   Instead of shaking your head, just say no.
2           Do you understand that?
3       A.  Yes, I do.
4       Q.  After we're done here today, you will have an
5   opportunity to review the transcript of the deposition to
6   correct any typographical errors that may be made.  Do
7   you understand that?
8       A.  Yes, I do.
9       Q.  If I ask you a question and you don't understand
10  the question, just ask me to rephrase that question.  I
11  will be more than happy to do that.  Do you understand?
12      A.  Yes.
13      Q.  Do you understand that I don't want you to guess
14  at any answers?
15      A.  Yes.
16      Q.  Are you taking any medications or is there
17  anything else that would prevent you from testifying
18  truthfully or remembering accurately today?
19      A.  No, I'm not.
20      Q.  If you need any breaks, if you need to go to the
21  john, need to stretch your back out, need to take five
22  minutes, let me know and I'll be happy to take a
23  five-minute break.
24      A.  Yes.

Page 5

1       Q.  You have taken an oath to tell the truth today?
2       A.  Yes, I have.
3       Q.  Do you understand the significance of that oath?
4       A.  Yes, I do.
5       Q.  You understand that I'm going to be asking you
6   questions today concerning events arising out of two
7   separate lawsuits?
8       A.  Yes.
9       Q.  Foraker v. Chaffinch, MacLeish, and the DSP?
10      A.  Yes.
11      Q.  And then Price, Warren, and Foraker versus
12  Chaffinch, MacLeish, and the DSP?
13      A.  Yes.
14      Q.  Your current position is Colonel of the Delaware
15  State Police; isn't that right?
16      A.  Yes, it is.
17      Q.  Is that the highest-ranking position in the
18  Delaware State Police?
19      A.  Yes, it is.
20      Q.  When were you promoted to colonel?
21      A.  May 6 of 2005.
22      Q.  What was your position prior to that?
23      A.  I was lieutenant colonel.
24      Q.  What are the job responsibilities of the

                                                2 (Pages 2 to 5)

Page 158

BY MR. NEUBERGER:
1   Q.   Did there come a time when you learned that
3   Sergeant Foraker and corporals Price and Warren had
4   spoken to the Auditor's Office?
5       A.   My understanding was they gave statements to the
6   State Auditor's Office.  They did not necessarily speak
7   to them.  Statements were given through this office.
8       Q.   Did you ever talk to Colonel Chaffinch about
9   that?
10      A.   Yes.
11      Q.   What did you say to Colonel Chaffinch about
12   that?
13      A.   I found it odd that when the Auditor's Office
14   met with them, that they would meet at an attorney's
15   office to give their statements and then they wouldn't
16   speak.  It would just be written statements handed over
17   by an attorney.  That was the crux of what we discussed.
18      Q.   What did Colonel Chaffinch say to you about
19   giving those statements to the State Auditor's Office, if
20   anything?
21      A.   I can't recall him saying anything specifically.
22      Q.   How about generally?
23      A.   Generally, it was the same thing.  I just
24   described what I said, the oddity of them giving

Page 159

1   statements at their attorney's office.  I guess that was
2   telling us at that point in time that there was -- that
3   there was going to be a lawsuit in the future and we were
4   heading down that road again.
5       Q.   Do you recall how soon after the men spoke to
6   the State Auditor's Office that you learned about it?
7       A.   I don't recall at this point.
8       MR. NEUBERGER:  I'd like to put another
9   exhibit in front of you.  We will call this MacLeish
10   Deposition Exhibit 17.
11      (MacLeish Deposition Exhibit No. 17 was
12   marked for identification.)
13   BY MR. NEUBERGER:
14      Q.   Colonel, do you have that document in front of
15   you?
16      A.   Yes, I do.
17      Q.   On page 1 does this appear to be a copy of the
18   front page of the Delaware State News for Friday,
19   May 14th, 2004?
20      A.   Yes, it does.
21      Q.   Does the top headline say in big bold letters,
22   "Shots traded over range"?
23      A.   Yes.
24      Q.   Underneath that does it say, "Troopers differ on

Page 160

1   blame for health woes at Smyrna site"?
2       A.   Yes.
3       Q.   Do you think you ever saw this article?
4       A.   Yes, I did.
5       Q.   When bad things about the Delaware State Police
6   are in the papers, are they usually brought to your
7   attention when you were either lieutenant colonel or when
8   you are colonel?
9       A.   Yes, they are.
10      Q.   For example, I think there was a story in The
11   News Journal about a month ago dealing with the trooper
12   holding up a noose that was on the front page of the
13   paper.  Was that brought to your attention?
14      A.   Yes, it was.
15      Q.   On the first page of this exhibit, there's a
16   front-page story of the State News, and that was brought
17   to your attention, also, wasn't it?
18      A.   Actually, I think I read this at home.
19      Q.   Do you think you read the entire article?
20      A.   Yes.
21      Q.   Could we turn to the very last page of this
22   exhibit?  Are you there?
23      A.   I'm there.
24      Q.   At the bottom right-hand corner of the page does

Page 161

1   it say "FTU2897"?
2       A.   Yes, it does.
3       Q.   Does this appear to be an article with the
4   title, "Troopers discuss firing range"?
5       A.   Yes.
6       Q.   Was it written by Mary Allen?
7       A.   Yes.
8       Q.   Is it dated May 13th, 2004?
9       A.   Yes.
10      Q.   Do you think you saw that article?
11      A.   May I look at it quickly?
12      A.   Absolutely.
13      A.   Yes, I probably read it.
14      Q.   You can put that document down.
15      Did you ever talk to Colonel Chaffinch
16   about these two articles?
17      MR. ELLIS:  About specifically these two
18   articles or the information that's in them?
19      MR. NEUBERGER:  Specifically these two
20   articles.
21      A.   I'm sure we did, but I don't recall the
22   specifics of whatever -- of what we discussed.  It didn't
23   involve anything that would have resulted in any action
24   we were going to take divisionally.

41 (Pages 158 to 161)

Price, et al.                                         v.                                    Chaffinch, et al.
Thomas F. MacLeish                           C.A. # 04-1207                              July 19, 2007

Page 162

1    Q.   Were you happy that the Delaware State Police
2   was back on the front pages of the Delaware State News,
3   for example?
4    A.   It was an article of ongoing interest over what
5   was occurring at the range.  And happy?  I was somewhat
6   dismayed when, being told not to speak to the media,
7   there was a way that -- they found a way to get into the
8   media.  But according to counsel, it was done through
9   their counsel and it was okay to do it the way they did
10  it, because the statements were attributed to them, but
11  they were read by their attorneys.
12   Q.   Did you ever talk to anyone on the executive
13  staff at the time about these two media articles?
14   A.   I'm sure in a general discussion way, yeah, it
15  was discussed the articles being in the paper, but
16  whether it was Major Papili -- I know Eckrich or Hughes
17  or Baylor at that point in time in a general sense were
18  staff officers.  You're going to discuss things that are
19  in the paper, positive and negative.
20   Q.   Did you ever discuss with the members of the
21  executive staff Sergeant Foraker, Corporal Price, or
22  Corporal Warren during this same time frame?
23       MR. ELLIS:  You're talking May 13th,
24  May 14th?

Page 163

1        MR. NEUBERGER:  I'll specify the time frame
2   a little better.
3   BY MR. NEUBERGER:
4    Q.   From December of 2003 through approximately July
5   of '04, did you ever talk to members of the executive
6   staff about Sergeant Foraker, Corporal Price, or Corporal
7   Warren?
8    A.   I'm sure that I did.
9    Q.   Do you remember what you said to them?
10   A.   Not specifically, no.
11   Q.   Do you recall if you said good things about them
12  or if you said bad things about them?
13   A.   Maybe a little bit of both.  During that period
14  of time hidden in here is when we became -- hidden in
15  here during this time frame is when we found that there
16  may be some hearing problems associated with people at
17  the range, although it wasn't specific, and there was
18  frustration in why weren't people forthcoming in telling
19  us about their hearing-related issues.  And that came out
20  I believe at the March 17th meeting.  And then we got the
21  specifics on that so we could act on that.
22       I may have discussed with members of the
23  staff the placement of Price and Warren -- because they
24  were going to be placed on light-duty status -- at that

Page 164

1   point in time they were on light-duty status, but what
2   should we do if their hearing is affected and we don't
3   know the extent of that hearing loss?  Was it a result of
4   recently being exposed to loud noises?  And I use the
5   example of myself working in the flight line when I was
6   in the service.  I worked a 3:00-to-11:00 shift and I
7   worked the flight line with planes coming in and going
8   out and different apparatus you used.
9        At night when I would go home, I'd listen
10  to my radio on the way back to the barracks.  The next
11  morning when I would get up to go and do something and
12  I'd start the car, the radio would be blaring.  Obviously
13  I had to turn it up that loud.  I didn't think it was
14  that loud the night before.  I use the example that my
15  hearing was deadened.
16       So where did we go?  Was it the appropriate
17  course of action to say once it was determined that Price
18  and Warren had suffered a hearing loss to put them back
19  in that same environment not knowing where or the extent
20  of their hearing loss?  So I think I discussed that with
21  members of staff and to get their ideas and thoughts
22  about it.
23   Q.   Did you ever say to any member of the staff that
24  these guys are a real pain in the rear?

Page 165

1    A.   I may have said that as I became frustrated in
2   dealing with getting information from them in this
3   regard.
4    Q.   Did you use the word "rear" or would you have
5   used another term such as "ass"?
6    A.   I have been known to use that word on occasion.
7    Q.   Do you recall which one you used at the time?
8    A.   It was probably the latter.
9    Q.   So you said these guys are a real pain in the
10  ass?
11   A.   You're saying did I say it.  I'm saying it's a
12  possibility I said it.  I don't recall saying it, but did
13  I feel that way?  Yes.  But you're the one saying that I
14  said that.  I don't specifically saying that I
15  said they were a pain in the rear.  But could I have said
16  that?  Yeah, I possibly could have.
17   Q.   You mentioned light duty.  I'm going to skip
18  around a little bit and ask you some general questions
19  about that.
20       As lieutenant colonel, and now it's
21  colonel, of the Delaware State Police, do you care about
22  the troopers under your command?
23   A.   I absolutely do.
24   Q.   Do you only care because you're colonel or

42 (Pages 162 to 165)

Price, et al.                                    v.                              Chaffinch, et al.
Thomas F. MacLeish                      C.A. # 04-1207                        July 19, 2007

Page 166

1  because you were the lieutenant colonel or have you
2  generally always cared for your subordinates?
3      A.  I care for all the men and women in this
4  division.
5      Q.  Do you care about their health and safety
6  specifically?
7      A.  Yes, I do.
8      Q.  Do you care deeply about their health and
9  safety?
10     A.  Every night I take them to bed with me.
11     Q.  How many times have you called Sergeant Foraker
12  and expressed your concern for his health, safety, and
13  general wellbeing?  To limit the time frame from December
14  of '03 forward.
15     A.  None.
16     Q.  How many times from December of '03 forward have
17  you called Corporal Warren and expressed concern for his
18  health, safety, and general wellbeing?
19     A.  Once.
20     Q.  When?
21     A.  It was in -- I believe it was 911 day in Sussex
22  County.  He was down at Sussex County Airport.  He was
23  there and I had a discussion with him and I expressed my
24  concern for him.

Page 167

1      Q.  I'm sorry.  This is when?
2      A.  It was in -- I believe it was May of '04.  I
3  think it was.  Whenever Sussex County's open house was, I
4  ran into him there.
5      Q.  Have you ever expressed concern for his health,
6  safety, and wellbeing since then to him?
7      A.  No, I have not.
8      Q.  How many times have you called Corporal Price
9  and expressed concern for his health, safety, and general
10  wellbeing?
11     A.  I did one time at the range that was in April of
12  '04, and then subsequent to that I called to inquire
13  that -- I had heard he was upset, so I was calling to
14  inquire what he was upset about, and subsequent to that I
15  received an e-mail from you, but I went ahead and talked
16  to him anyway.
17         During that conversation I asked how he was
18  doing.  But when I say it, I have 637 troopers that work
19  for me.  I don't call them up every night and ask them
20  how they're doing.  During any given time there are
21  different levels -- if they suffered injury, they may
22  have had surgery, I make every effort to try to express
23  my concerns if not personally, then through their
24  commanders, and my expectation is that the information

Page 168

1  keeps going down to them of how they're doing and making
2  sure that they're being taken care of through not just
3  myself but through my majors, my captains, and so forth.
4      Q.  You mentioned one time when you talked to
5  Corporal Price at the firing range.
6      A.  Yes.
7      Q.  Is that the FTU or was that at the National
8  Guard range?
9      A.  It was at the National Guard range.
10     Q.  I'm going to use some profanity right now.  I
11  want you to tell me if that's accurate.  I apologize if I
12  offend you.
13     A.  Yes.
14     Q.  Did you ever state to him that, quote, "I am not
15  going to fuck you," close quote?
16     A.  Perhaps, yes, I said that.  I don't recall
17  saying it, but if he wrote it down that I said it, then I
18  guess I did.  I'm not going to dispute the fact --
19     Q.  Would you take Corporal Price's word for it,
20  that if he later testifies that you made that statement,
21  would you disagree with that?
22     A.  In the context of that conversation, I was
23  trying to assure him that the reason why he wasn't
24  allowed on the range was for his safety and the

Page 169

1  division's interest and in the best interest of the
2  division to keep him away from an unknown at that point.
3  We knew he had suffered a hearing loss.  Was it
4  attributable to the range?  And I was the one that wanted
5  to keep him assigned to the Firearms Training Unit
6  because he's a good instructor.  There's classroom
7  instruction and he's also an armor.  I thought there
8  would be armor's work to be done there, also.
9      Q.  You're indicating you wanted him to work at the
10  Firearms Training Unit but not on the firing line?
11     A.  I didn't want him anywhere near that line.  That
12  was the information that was passed on to his captain
13  that I felt was relayed down through his chain of command
14  through Sergeant Foraker to him.
15     Q.  Did you ever say to Kurt, be it at this meeting
16  or any other meeting, that "Kurt, we just don't know what
17  to do with you because you have been at the range so
18  long"?
19     A.  If I had the whole conversation, I may be able
20  to recall it, Mr. Neuberger, but he had been at the range
21  since it opened.  He could always go back on the street.
22  He could always go back and work in patrol.
23     Q.  Is that a threat -- I'm sorry.  Go ahead.
24     A.  No.  None of that was meant as a threat.

43 (Pages 166 to 169)

Price, et al.                                    v.                                    Chaffinch, et al.
Thomas F. MacLeish                      C.A. # 04-1207                          July 19, 2007

Page 214

BY MR. NEUBERGER:
1
2    Q.   How about individually?  First Chris Foraker, do
3   you like the fact that he sued you, Chaffinch, and the
4   Delaware State Police?
5    A.   Do I like that, the fact that I'm sued?  No.
6    Q.   Does it make you angry?
7    A.   No.  It concerns me.
8    Q.   Are you displeased about it?
9    A.   I would rather not be in that position.  Do I
10  relish the thought of being sued?  No, I do not.
11   Q.   It's a rather unpleasant experience, isn't it?
12   A.   It is when you think of four children and
13  putting them through college and everything you work for,
14  your life, and you're personally named, yes.  It makes a
15  big difference.
16   Q.   Are you pissed off that they sued you?
17        MR. ELLIS:  I object to the form of the
18  question.
19  BY MR. NEUBERGER:
20   Q.   I'm sorry.  That Chris Foraker sued, are you
21  pissed off that Chris Foraker sued you?
22        MR. ELLIS:  My objection is that the term
23  "pissed off" is a little imprecise.
24

Page 215

BY MR. NEUBERGER:
1
2    Q.   Are you irritated that Chris Foraker sued you?
3    A.   I'm disappointed in being sued.
4    Q.   Are you equating irritation with disappointment?
5    A.   I'm disappointed in being sued.
6    Q.   But you're not irritated?
7    A.   I'm disappointed in being sued.
8    Q.   But are you irritated?
9    A.   I'm disappointed in being sued.
10   Q.   You're indicating that you're not irritated?
11   A.   I'm disappointed in being sued.
12   Q.   I think you're expressing you're disappointed in
13  being sued?
14   A.   I'm disappointed in being sued.
15   Q.   Are you peeved at being sued?
16   A.   I'm disappointed at being sued.
17   Q.   How about being disgusted?
18   A.   I'm disappointed in being sued.
19   Q.   Do you like the fact that Kurt Price filed a
20  lawsuit against you and Colonel Chaffinch and the
21  Delaware State Police?
22   A.   No, I do not like the fact that I'm being sued
23  personally.
24   Q.   Are you angry at him for it?

Page 216

1    A.   No, I'm not.
2    Q.   Are you disappointed in him for it?
3    A.   I am disappointed in being sued.
4    Q.   Fair to say you're unhappy as a result of that?
5    A.   I'm disappointed in being sued.
6    Q.   How about Corporal Wayne Warren, are you happy
7   that he filed a lawsuit against you and Chaffinch and
8   Delaware State Police?
9    A.   No, I am not happy over it.
10   Q.   Would it be fair to say you're disappointed in
11  that action?
12   A.   I am disappointed in that action.
13   Q.   Isn't it true that you weren't happy that as a
14  result of Sergeant Foraker, Corporal Price, and
15  Corporal Warren speaking out about health and safety
16  issues, that negative publicity for the Delaware State
17  Police resulted?
18        MR. ELLIS:  I object to the form of the
19  question.  Which speaking out are you referring to, any
20  particular speaking out?
21        MR. NEUBERGER:  The entire course of
22  speaking out about the health and safety issues at the
23  Delaware State Police that are at issue in this lawsuit.
24  Entire course of conduct.

Page 217

1    A.   What was the first part of that question?
2    Q.   Isn't it true that you didn't like the negative
3   publicity that resulted from them speaking out about
4   health and safety issues?
5    A.   I would have preferred to have them bring those
6   issues to the division and we handle them and handle them
7   in-house and had the opportunity to address them, and we
8   were.  As it continued on and on, the dialog pretty much
9   stopped.  So I was disappointed in the fact that we
10  didn't get an opportunity to fully work through the
11  issues that they were presenting without going public
12  with them.  We were working on them.  We were addressing
13  them.
14   Q.   Today is July 19th of the year 2005; isn't that
15  right?
16   A.   That is correct.
17   Q.   Is the FTU fixed and operating?
18   A.   No.  We're still working at getting it fixed.
19   Q.   Has Colonel Chaffinch ever told you that he
20  bears animosity or ill will towards any of the plaintiffs
21  in this lawsuit, meaning Sergeant Foraker,
22  Corporal Price, or Corporal Warren?
23   A.   He has never told me he bears animosity toward
24  any one of them.

55 (Pages 214 to 217)

Price, et al.                                           v.                                    Chaffinch, et al.
Thomas F. MacLeish                            C.A. # 04-1207                              July 19, 2007

Page 218

1    Q.   Has he ever said he just doesn't like them very
2    much?
3    A.   Trying to remember conversations I have had with
4    Colonel Chaffinch and when he's talked about the members
5    of the FTU unit.  I know he hasn't been happy with
6    their -- some of their actions, but...
7    Q.   What actions was he unhappy with?
8    A.   Same type of things we just discussed, the
9    publicity -- the fact that they had issues with what was
10   going on out there.  Fine, bring them to our attention,
11   but the manner in which they brought them to our
12   attention through the media and, therefore, the division
13   gets placed in a bad light.  That's what's been
14   disappointing.
15   Q.   Now, has the colonel ever said anything to you
16   which either indicates or implies that he bears any type
17   of animosity, ill will, or anger towards Corporal Price,
18   Corporal Warren, or Sergeant Foraker?
19        MR. ELLIS:  I object to the form of the
20   question.
21        MR. HAVERLY:  Based on what?
22        MR. ELLIS:  It's the same question he asked
23   a couple minutes ago.  He just asked the exact same
24   question.

Page 219

1        MR. NEUBERGER:  I think I actually used
2    different words.
3        MR. ELLIS:  It's awful close.
4        MR. NEUBERGER:  Colonel?
5    A.   One more time with the question, please.  I'm
6    sorry.  It's been a long day for all of us.
7        MR. NEUBERGER:  Could you read that
8    question back?
9        (The reporter read back as instructed.)
10       THE WITNESS:  He's expressed, as I said,
11   disappointment in their actions, and he has never told me
12   he hates them, that he can't stand them.  I have never
13   heard him use those words around me.
14   BY MR. NEUBERGER:
15   Q.   Has he ever said to you that "I'm going to get
16   them"?
17   A.   No.
18   Q.   I'd like to change gears a little bit and talk
19   about a different topic.  Isn't it true that since
20   Chris Foraker was reinstated to the FTU on December 1st
21   of 2003, that his job duties as NCOIC of the FTU have
22   been changed?
23   A.   We have put him in a different facility, but
24   other than that, the basic duties are still there.

Page 220

1    Q.   So is it your position that his duties as of
2    today, with the exception of the facility change, are the
3    same duties he had as of April 8 of 2002?
4    A.   The unit did not fall under me on April the 8th
5    of 2002, but the duties and responsibilities that he
6    currently has are similar to what our firearms
7    instructors are required to do.
8    Q.   Isn't it true that his duties now are less than
9    what they once were?
10   A.   Not to my knowledge.
11   Q.   Isn't it true that you personally have
12   diminished his job duties?
13   A.   I don't believe that's true.
14   Q.   Isn't it true that you once publicly threw him
15   out of a commanders and section chiefs meeting?
16   A.   No.  I removed him from a commanders and section
17   chiefs meeting.  Publicly did so?  I went over and I
18   spoke to him one-on-one.  He was sitting in the back of
19   the room.  And commanders meetings are lieutenants and
20   captains and section chiefs.  And if a section chief of
21   the Firearms Training Unit falls under the academy staff,
22   I had talked to -- I think Lieutenant Davis was present
23   at that meeting.  I asked him if he had him there for a
24   specific reason.  He said he did not.  If one of my

Page 221

1    section chiefs or troop commanders is going to have a
2    specific reason to have someone there to address the
3    group, they're allowed to remain in the group.
4        When he was present he was -- and I did ask
5    him to leave because he didn't have anything to present.
6    He had his lieutenant and his direct line of command was
7    present in that room representing the DSP academy.
8    Q.   Was Sergeant Foraker a section chief as the
9    NCOIC of the FTU?
10   A.   That fell under the academy.  So no, he was not
11   in the intent -- with the intention of who was present in
12   that room.
13   Q.   So you're indicating that Sergeant Foraker
14   doesn't qualify as a section chief?
15   A.   Under the format of who's required to be at that
16   meeting, no, he did not.
17   Q.   Was that a commanders and section chiefs
18   meeting?
19   A.   Yes, it is section chiefs being those that stand
20   alone.  PIO, homicide unit stand alone.  They don't
21   report to a commander of one of those units.
22   Q.   Are you aware that Sergeant Foraker was
23   previously allowed to attend those meetings prior to
24   April 8 of 2002?

56 (Pages 218 to 221)

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

August 11, 2006, I electronically filed this **Brief** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

Robert Fitzgerald, Esquire
Montgomery McCracken Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Richard M. Donaldson, Esquire
Montgomery McCracken Walker & Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801


/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

FTU / Briefs / P's Motion to Amend - RB.final

13