**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| B. KURT PRICE, WAYNE WARREN, AND CHRISTOPHER FORAKER, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civil Action No. 04-956 (GMS) |
| THOMAS MACLEISH, AND L. AARON CHAFFINCH, *et al.*, | ) ) ) |
| Defendants. | ) ) |
| CHRISTOPHER FORAKER, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action No. 04-1207 (GMS) |
| THOMAS MACLEISH, AND L. AARON CHAFFINCH, *et al.*, | ) ) ) |
| Defendants. | ) |

Thomas Neuberger, Esquire and Stephen Neuberger, Esquire, of THE NEUBERGER FIRM, Wilmington, Delware, and Martin Haverly, Esquire, Wilmington, Delaware. Attorneys for Plaintiffs.

Edward Ellis, Esquire, of MONTGOMERY, MCCRACKEN, WALKER & RHOADES, LLP, Cherry Hill, New Jersey, Carmon Harvey, Esquire of MONTGOMERY, MCCRACKEN, WALKER & RHOADES, LLP, Philadelphia, Pennsylvania, and Richard Donaldson, Esquire and Noel Burnham, Esquire of MONTGOMERY, MCCRACKEN, WALKER & RHOADES, LLP, Wilmington, Delaware. Attorneys for Defendants.

**OPINION**

August 14, 2006
Wilmington, Delaware

**SLEET, District Judge**

**I.     INTRODUCTION**

In Civil Action No. 04-956-GMS ("the Price case"), brought pursuant to 42 U.S.C.A. § 1983 (2003), three Delaware State Troopers – Corporal B. Kurt Price, Corporal Wayne Warren, and Sergeant Christopher Foraker – claim that they were unlawfully retaliated against in violation of their First Amendment rights to free speech and to petition the government for the redress of grievances by Colonel L. Aaron Chaffinch and Lieutenant Colonel Thomas MacLeish after the troopers spoke out about hazardous health conditions at the Division State Police's ("DSP") Firearms Training Unit facility ("FTU") in Smyrna, Delaware.  In Civil Action No. 04-1207-GMS ("the Foraker case"), also brought pursuant to § 1983, Foraker individually claims that Chaffinch and MacLeish unlawfully retaliated against him in violation of his First Amendment rights to free speech and to petition the government for redress of grievances in response to a previous First Amendment retaliation lawsuit he had filed against Chaffinch in 2002.  Foraker further claims that Chaffinch and MacLeish defamed him and unlawfully invaded his privacy in violation of state law.

Due to the substantial overlap between these two cases, they were consolidated for purposes of discovery on February 1, 2005, and for trial on April 18, 2006.  On May 12, 2006, the court denied the defendants' motion for summary judgment on both counts in the Price case (Free Speech Clause retaliation and Petition Clause retaliation), and denied the defendants' motion for summary judgment on three counts in the Foraker case (Free Speech Clause retaliation, Petition Clause retaliation, and defamation).  However, the court granted the defendants' motion for summary judgment on the fourth count in the Foraker case (invasion of privacy).

The court then held an eleven-day jury trial which began on May 15, 2006.  At the close of

1

the plaintiffs' case, the defendants moved for judgment as a matter of law on all counts in both cases pursuant to Fed. R. Civ. P. 50(a). That motion was denied. And thus, on May 30, 2006, the court charged the jury and deliberations were scheduled to commence the following morning. Meanwhile on May 30, the Supreme Court of the United States announced its highly-relevant First Amendment retaliation decision in *Garcetti v. Ceballos*, 547 U.S. ___, 126 S. Ct. 1951 (2006). Although the jury's deliberations began as previously scheduled, the parties were directed to appear before the court on the afternoon of May 31 to discuss the impact of *Garcetti* on the case at bar. Before that discussion began, however, the jury concluded its deliberations. The verdict – subsequently announced in open court in lieu of the planned *Garcetti* discussion – was against Chaffinch on all remaining counts in both cases, and against MacLeish on all remaining counts in both cases except Count III in the Foraker case (defamation).

Presently before the court is the defendants' renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), or in the alternative, motion to amend the judgment or for a new trial pursuant to Fed. R. Civ. P. 59. For the reasons discussed below, the court will grant the defendants' Rule 50(b) motion as to Counts I & II in the Price case (Free Speech Clause and Petition Clause), and Count III in the Foraker case (defamation). The court will also grant the defendants' Rule 59 motion as to Counts I & II in the Foraker case (Free Speech Clause and Petition Clause). The remainder of the defendants' motion, as well as all other outstanding motions, will be denied.

## II.   JURISDICTION

The court has subject matter jurisdiction in this matter pursuant to 28 U.S.C.A. §§ 1331 and 1367 (1993).

### III. STANDARD OF REVIEW

"[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-251, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. [*See* 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 299 (2d ed. 1995).] That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' *Id.* at 300." *Reeves*, 530 U.S. at 151.

### IV. BACKGROUND

A safely-constructed firing range must employ some means of stopping discharged ammunition. One such means is known as a wet bullet trap, which uses a water-coated ramp to direct hydroplaning ammunition into a deceleration chamber. The ammunition then spins around in the deceleration chamber, loses energy, drops to a conveyer belt below, and is carried away to a disposal bin. Indoor ranges also require adequate ventilation to prevent people inside the range from inhaling unsafe toxins, such as lead from the ammunition.

The FTU, which was designed with a wet bullet trap and ventilation system, became operational in September 1998. Not long thereafter, however, an environmental-assessment firm

hired in response to concerns expressed about the adequacy of the ventilation system concluded that the lead level in the air significantly exceeded the maximum acceptable level recommended by the Occupational Safety and Health Administration. By at least as early as June 14, 1999, the FTU's air-quality problems became the subject of public scrutiny after *The News Journal* – a local Delaware newspaper – publicized the firm's conclusions in an article entitled, "Shooting range under fire for lead: State police are exposed to levels of metal in air twice federal standard." By January 2001, the DSP had switched to lead-free disintegrating, or "frangible," ammunition for handguns used at the FTU.

      The switch to frangible ammunition was no panacea because it caused significant problems with the bullet trap. The trap was equipped with several sprayer heads to provide the ramp with a continuous coating of recycled water pumped up from a reservoir tank that collected the water as it cascaded off the ramp. As with any mechanical pump system, clogs from the collection of debris – in this case, bullet fragments and shotgun wadding – could disrupt the water flow and cause dry spots on the ramp. Dry spots were a problem with frangible ammunition because it, unlike regular ammunition, would burst into a cloud of heavy-metal particles on impact with the water-less portion of the ramp. And, because the ventilation system still did not function properly, the air within the range became potentially unsafe to breathe. Moreover, the disintegrated fragments left by the frangible ammunition caused much more frequent clogging, and therefore, the pump system required much more frequent cleaning. Since the cleaning was done by hand, the person performing that chore was exposed to water contaminated by the DSP's spent shotgun ammunition, which remained lead based even after the switch to the lead-free frangible handgun ammunition. The disintegrated fragments also had a deleterious effect on the conveyor belt because they often adhered themselves

into a concrete-like sludge which, if not promptly removed, would cause the belt to seize up. The responsibility for cleaning and maintaining the bullet trap belonged to the FTU staff, which consisted of several full-time troopers with expertise in firearms.

Corporal Price and then-Corporal Foraker were assigned to the FTU in 1996 and 1997, respectively, before the indoor range was operational. Corporal Eddie Cathell, a personal friend of Chaffinch, joined the FTU staff approximately six months after Foraker. Corporal Warren was brought on in 2001. On August 1, 2001, Foraker was simultaneously promoted both to the rank of Sergeant and to the position of non-commissioned officer in charge ("NCOIC") of the FTU. Foraker and Cathell had a rather rocky professional relationship, and on several occasions Foraker spoke out against Cathell within the DSP. Foraker's actions in this regard seem to have "ruffled [Chaffinch's] feathers" because in early 2002 Foraker was abruptly transferred away from the FTU and into what he considered to be a dead-end position. This transfer prompted Foraker to file a § 1983 action against Chaffinch for unlawful First Amendment retaliation. After a five-day trial, a jury found that Chaffinch had in fact retaliated against Foraker. The parties later agreed on settlement terms, pursuant to which Foraker was reinstated as the NCOIC of the FTU on December 1, 2003.

After his reinstatement, Foraker held several meetings with the FTU staff and others, including his superiors and the interim NCOIC, to discuss the status of the range. Foraker also initiated a related email correspondence with his superiors. At those meetings and in those emails, Foraker relayed his concerns, and those of Price and Warren, up the chain of command about the ventilation system and bullet trap. Additionally, because Foraker, Price, and Warren shared similar concerns about the health risks posed by their cleaning and maintaining of the bullet trap, they decided to suspend such activities until the necessary repairs had been made to the trap and

5

ventilation system. In March of 2004, the FTU's air quality remained poor and, as a result, the facility was formally closed.

Due to the public attention the FTU's closing generated, Chaffinch gave a media tour of the facility the following month. Afterwards, the following description of the tour appeared in both the *Delaware State News* and *American Police Beat Magazine*:

> Col. Chaffinch said that he had visited the range for a staff shoot in the fall and things had been a lot better in terms of clean-up and maintenance. Things weren't perfect, but the range wasn't in the state it is now.
>
> "There was some discoloration in the bullet trap but that was about it," Col. Chaffinch said as the group moved through the facility.
>
> "It's a lot dirtier now. The previous sergeant in charge did a good job. Things changed in December when another sergeant came in. That's at least a portion of where the ball was dropped," Chaffinch said.
>
> The previous sergeant was one Sgt. Roger [sic, Richard] Ashley, who was picked by Col. Chaffinch in April of 2002 to replace Sgt. Christopher D. Foraker as range supervisor. Sgt. Foraker sued the Col. successfully in District Court last year and got his position back by court order. At issue in the range's deterioration, according to Col. Chaffinch, was the difference in the way the two sergeants approached their duties.
>
> "Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning. Sgt. Ashley was willing to do that," Chaffinch told the Delaware State News in an interview.
>
> "I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel that cleaning was part of his purview. He felt that was putting him in harm's way."

(D.I. 196 at A292-A297.) Although Foraker was unable to respond to these allegations due to a gag order imposed by Chaffinch, all three plaintiffs gave subsequent statements to Delaware's Auditor of Accounts ("State Auditor" or "Auditor") in cooperation with a governor-ordered investigation of the FTU. The Auditor's investigation concluded that the inadequate ventilation system, the lack

6

of maintenance protocols, and the suspension of cleaning and maintenance under Foraker were the most-identifiable factors contributing to the closing of the range. In the wake of these events, the defendants retaliated against all three plaintiffs by taking various adverse actions against them.

## V.    DISCUSSION

### A.    First Amendment Claims (Counts I & II in Both Cases)

There is "a well-established three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment." *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005). The employee must show at step one – which is the only step at issue here – that the activity in question is protected by the First Amendment as a matter of law. *Id.*; *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004). "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 126 S. Ct. at 1957.[1] The contours of that protection are generally defined as follows:

> *Pickering* [*v. Board of Educ.*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)] and the cases decided in its wake identify two inquiries to guide

---

[1] "When [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Court's] announcement of the rule." *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993). As such, the court must decide the defendants' motion under the rule announced in *Garcetti*. Additionally, because the court's analysis of the defendants' motion for summary judgment was grounded in pre-*Garcetti* retaliation law, Part IV.A of the written opinion dated May 12, 2006 will be vacated. Furthermore, to the extent the plaintiffs' argue that application of *Garcetti* at this stage of the litigation is a deprivation of their due process rights, counsel for plaintiffs represented to the court that the summary judgment record was assembled in anticipation of the Supreme Court's decision. (Tr. 2646:11-2647:8.) Therefore, the plaintiffs were not deprived of their due process rights because their post-trial briefs provided them with an opportunity – of which they did not avail themselves – to point the court to evidence in the summary judgment record that was not adduced at trial.

> interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. *See id.*, at 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. *See Connick* [*v. Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)]. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. *See Pickering*, 391 U.S., at 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Garcetti*, 126 S. Ct. at 1958.

Although the *Pickering/Connick* inquiries are easy to recite, they can be considerably more difficult to answer due to "'the enormous variety of fact situations in which critical statements by . . . public employees may be thought by their superiors . . . to furnish grounds for dismissal,'" or other adverse action. *Garcetti*, 126 S. Ct. at 1958 (quoting *Pickering*, 391 U.S. at 569). Perhaps in an effort to ease this difficulty, the Supreme Court in its recent *Garcetti* decision drew a figurative line in the sand by holding "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 126 S. Ct. at 1960. Whether the water has been somewhat cleared or further muddied by *Garcetti* remains to be seen. Suffice it to say, many billable hours will likely be spent wrangling over the scope of every employee-plaintiff's "official duties." *See id.* at 1962 n.2 (Souter, J., dissenting). The *Garcetti* case itself provides rather vague guidance in this regard:

> [A]s indicated above, the parties in this case do not dispute that [the plaintiff] wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework for defining the scope of an

8

>    employee's duties in cases where there is room for serious debate. We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. . . . The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 1961-62..

That the scope of an employee's duties should not be discerned by blind reliance upon mere labels is not surprising. In *Bd. of County Comm'rs v. Umbehr* the Supreme Court rejected "a bright-line rule distinguishing independent contractors from employees" that would have given "the government *carte blanche* to terminate independent contractors for exercising First Amendment rights." 518 U.S. 668, 678 (1996). The Court reasoned in part "that [a] bright-line rule would leave First Amendment rights unduly dependent on whether state law labels a government service provider's contract as a contract of employment or a contract for services, a distinction which is at best a very poor proxy for the interests at stake." *Id.* at 679. *See also Rankin v. McPherson*, 483 U.S. 378, 380-81 (1987) (holding that the title "deputy constable" was meaningless where all employees were given that title "regardless of job function"). *Cf. O'Hare Truck Serv. v. City of Northlake*, 518 U.S. 712, 722 (1996) (explaining that, in the context of political patronage systems, a bright-line rule distinguishing employees from independent contractors "would invite manipulation by government, which could avoid constitutional liability simply by attaching different labels to particular jobs"); *Branti v. Finkel*, 445 U.S. 507, 518 (1980) (also in the context of political patronage systems, explaining that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the

9

public office involved").

Yet, to conclude from the Court's *dicta* in *Garcetti* that job descriptions are irrelevant and that the scope of an employee's official duties is strictly confined to the duties actually performed by that employee would be a mistake. "The proper inquiry is a practical one," and the court must look "to the duties an employee actually is *expected* to perform." *Garcetti*, 126 S. Ct. at 1961-62 (emphasis added). In the closely-related political patronage cases, the Third Circuit has explained the proper approach for evaluating whether an employee is a "policymaker":

> The character of this inquiry is inherently fact-specific in that it requires a court to examine the nature of the responsibilities of the particular job at issue. *See Zold v. Township of Mantua*, 935 F.2d 633, 635 (3d Cir. 1991). Importantly, this inquiry is focused on "the function of the public office in question and not the actual past duties of the particular employee involved." *Brown v. Trench*, 787 F.2d 167, 168 (3d Cir. 1986); *see also Waskovich v. Morgano*, 2 F.3d 1292, 1297 (3d Cir. 1993); *Burns v. County of Cambria, Pa.*, 971 F.2d 1015, 1022 (3d Cir. 1993); *cf. Furlong v. Gudknecht*, 808 F.2d 233, 236 (3d Cir. 1986). Other circuits have used a similar analysis, as we document in the margin. We have held, however, that evidence of past job duties may in some cases be informative. *See Peters v. Delaware River Port Auth.*, 16 F.3d 1346, 1353 (3d Cir. 1994); *Waskovich*, 2 F.3d at 1300.

*Wetzel v. Tucker*, 139 F.3d 380, 383-84 (3d Cir. 1998) (footnote omitted). Thus, given the guidance provided by the cases above, the scope of an employee's official duties are defined by actions and expectations of the employer and/or supervisors, of others who have held the employee's position, and of the employee himself. While perhaps not tailored to suit every fact pattern that may arise, this list of considerations is more than sufficient for present purposes.

1.  **The Price Case**

    a.  **Free Speech Clause (Count I)**

At issue in the Price case is the plaintiffs' speech up the chain of command and to the State Auditor's Office regarding the conditions at the FTU. With respect to Foraker's speech up the chain of command, the expectations of his superiors are manifest from the high ratings and generous praise he was given in his performance appraisal:

> Upon returning to the DSP FTU, Sgt. Foraker immediately identified safety issues that placed the health of FTU staff in serious jeopardy. *Sgt. Foraker immediately brought this to the attention of the DSP Academy staff and continued to provide the Academy staff, as well as the DSP Executive Staff, with information concerning the conditions at the range.*

(Pls.' Ex. 7 at CF7 (emphasis added).)

> On December 1, 2003, Sergeant Foraker was reassigned to the DSP FTU. Sergeant Foraker immediately identified safety issues that placed the health and safety of the FTU staff and officers training at the DSP range in jeopardy. *Sergeant Foraker brought the conditions to the attention of the DSP Academy staff. After notifying the staff, Sergeant Foraker continued to provide updates of the range conditions, conducted research to identify the cause of the problems, and attempted to identify potential solutions. Sergeant Foraker made this information available to the DSP Academy and Executive staffs, the Department of Administrative Services, and the Delaware Auditor's Office.*

(Id. at CF9 (emphasis added).) Such expectations are consistent with the actions of every trooper who has ever been in charge of the FTU:

> (1) Lieutenant William Bryson, the officer in charge of the FTU in 1998, testified at trial that he had a duty to "[o]versee the operation of the facility, make sure the facility was maintained and running, operational." (Tr. at 2172:19-20.)[2] Bryson further testified that he notified the chain of command of problems with the HVAC system after he discovered that it was not functioning properly. (Id. at 2176:14-20.)

---

[2]"Tr." refers to the trial transcript.

(2)  Sergeant Brian Fitzpatrick, the NCOIC from 1998 to 1999, wrote at least three memoranda to his superiors reporting problems with the HVAC system and his concerns about the health of the FTU staff. (Defs.' Exs. 48-50.)

(3)  Sergeant Al Parton, the NCOIC from 1999 to 2001, also spoke out to his superiors regarding these same issues. (Pls.' Ex. 114.)

(4)  Foraker, during his first term as the NCOIC from 2001 to 2002, reported to his superiors that the FTU staff suffered from elevated levels of lead their blood. (Tr. at 1392:19-1393:1.)

(4)  Sergeant Richard Ashley – the interim NCOIC during Foraker's absence from early 2002 until December 2003 – also reported the range's problems up the chain of command. (Pls.' Ex. 115.) In fact, Ashley was explicitly instructed by his superiors to "[c]ontinually inspect the facility and *identify deficiencies*." (Defs.' Ex. 56 at 13 (emphasis added).)

(5)  Foraker, upon being reinstated as the NCOIC in 2003, "sounded the alarm for . . . the conditions of the range" in an attempt to "push it up the chain of command, to hopefully get the situation rectified." (Tr. at 1405:8-13.)

The inescapable conclusion from all of this evidence is that speaking out within the chain of command about any hazardous range conditions was squarely within Foraker's official duties. Lest there be any doubt, it is surely removed by Foraker's testimony regarding his responsibilities as the NCOIC:

Q   Now, fast forwarding from your time at the FTU in December of 2003 forward, were you trying to protect your men?

A   Absolutely.

Q   Why?

A   A leader is supposed to put his men above himself. A leader should lead from the front, not from the back. A leader should put his health concerns below the health concerns of . . . the men that he leads. And there is no way that I would want to put my men in harm's way deliberately with the situation back behind that bullet trap. It was obviously dangerous, as you saw when the men had to clean it up, it was a Hazmat site.

(Tr. at 1484:25-1485:12.) This leadership role of which Foraker speaks obviously arose from his employment with the DSP, and therefore, by his own admission, Foraker's speech up the chain of command was done pursuant to his official job duties. *See also Hill v. Marino*, No. 05-1356, 2006 U.S. App. LEXIS 18708 (3d Cir. 2006) (holding that a Borough Manager who reported complaints from his employees was not shielded by the First Amendment under *Garcetti*); *Mills v. City of Evansville*, No. 05-3207, 2006 U.S. App. LEXIS 15082 (7th Cir. 2006) (holding that a police sergeant was not speaking as a citizen under *Garcetti* by criticizing new police policy up the chain of command). Accordingly, that speech is not protected by the First Amendment.[3]

As to Price and Warren, they were also expected to speak out within the chain of command if they noticed any hazardous range conditions. Foraker, who was their superior, wrote performance appraisals of both men in which he applauded such speech:

> Cpl/3 Price aided his supervisors in identifying safety issues at the facility that placed the health and safety of his coworkers, our families, our students and their families at risk. Cpl/3 Price has reached out to experts in the field of ventilation, firing range design along with heavy metal exposure and contamination and established a rapport with these professionals to search out the root cause and contributing factors surrounding the dangers we face in exposure to heavy metal contamination. Cpl/3 Price contacted and established communication with the experts in those fields to obtain a greater understanding in an effort to help protect and inform all assigned instructors, all of those who train at the facility, the cleaning personnel and all of our family members as well as the Division of State Police.

(D.I. 196 at A-381.)

> Cpl/3 Warren aided his supervisors in identifying safety issues at the facility that placed the health and safety of his coworkers, our families, our students and their

---

[3] The defendants also point out that in his previous trial, Foraker testified that he "was in charge of the entire operations of the firearms training," and that he "basically managed the facility." (D.I. 223 at C-26.) Because this evidence is merely cumulative of the evidence cited above, the court does not believe it is necessary to decide whether such testimony is admissible. Nevertheless, his testimony certainly buttresses the court's conclusion vis-à-vis Foraker's official job duties.

> families at risk. Cpl/3 Warren has conducted much research in the areas contributing to the cause surrounding the dangers of heavy metal exposure and contamination along with contacting and establishing a rapport with experts in that field of understanding in an effort to help protect and inform all instructors assigned to the facility, all of those who train at the facility, the civilian cleaning personnel and all of our family members as well as the Division of State police.

(D.I. 196 at A-369.) And, as with Foraker, those expectations are consistent with the actions taken by both men as FTU staff members. The record is also rife with evidence that Price and Warren themselves believed it was their responsibility to speak out within the chain of command about conditions at the range. For example, both men acknowledged that they were expected to maintain the range, and that they met with various high-ranking DSP officials on several occasions for the purpose of discussing the hazardous conditions they discovered in the course of that maintenance. Again, the inescapable conclusion is that their chain-of-command speech was within the scope of their official duties.

With regard to the plaintiffs' statements to the State Auditor, all three were ordered to aid the investigation. Thus, that speech was also within the scope of their official duties. *Cf. Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 280, 285 (1968) (explaining that "public employees . . . subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights"). Accordingly, because none of the speech at issue in the Price case is protected by the Free Speech Clause under *Garcetti*, the defendants are entitled to judgment as a matter of law on Count I.

### b.     Petition Clause (Count II)

The Supreme Court's articulation of the nature of the relationship between the Free Speech Clause and the Petition Clause is clear: "First Amendment rights are inseparable, *Thomas v. Collins*, 323 U.S. 516, 530 (1945), and there is no sound basis for granting greater constitutional protection to statements made in a petition . . . than other First Amendment expressions." *McDonald v. Smith*, 472 U.S. 479, 485 (1985). Thus, under *McDonald*, the plaintiffs' speech up the chain of command and to the State Auditor is not entitled to a higher level of First Amendment protection merely because that speech is now labeled as a "petition." Moreover, the plaintiffs' reliance upon *San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir. 1994), is misplaced. In that case, the Third Circuit held that petitions, unlike speech, need not address a matter of public concern in order to qualify for First Amendment protection. *Id.* at 440. However, a crucial component of the court's reasoning distinguishes *San Filippo* from the case at bar:

> [N]either the United States nor the several states are required to recognize as a "petition" whatever particular communication is so characterized by one who chooses to protest governmental acts or omissions. But when government – federal or state – *formally adopts* a mechanism for redress of those grievances for which government is allegedly accountable, it would seem to undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious "petition" *invoking that mechanism* may be disciplined for such *invocation* by the very government that in compliance with the petition clause has given *the particular mechanism* its constitutional imprimatur.

*Id.* at 442 (emphasis added). Here, the plaintiffs' "petitions" up the chain of command were not through a formally-adopted mechanism. To the extent, however, that the plaintiffs' "petitions" to the State Auditor might be characterized as having been done through a formally-adopted mechanism, that mechanism was not *invoked* by the plaintiffs – they were *ordered* to cooperate. Clearly, the plaintiffs' petitioning activities do not fall under the safe harbor provided by *San*

*Filippo*. Therefore, the court holds that the defendants are entitled to judgment as a matter of law on Count II as well.

### 2. The Foraker Case

At issue in the Foraker case is the alleged retaliation in response to Foraker's 2002 lawsuit against Chaffinch. The defendants do not contend that judgment as a matter of law is appropriate as to these counts. Instead, the defendants argue that a new trial is warranted because the jury verdict is ambiguous in light of the JMOL ruling in the Price case. The court agrees. The verdict form asked the jurors whether the defendants took adverse action against Foraker in retaliation for his protected First Amendment activity generally. Thus, there is no way to deduce or infer whether the jury believed that the defendants were motivated by the speech that is the subject of the Price case, or by the speech that is the subject of the Foraker case. Therefore, a new trial is warranted as to Counts I & II in the Foraker case.

### B.   Defamation Claim (Count III in the Foraker Case)

On May 12, 2006, the court denied the defendants' motion for summary judgment as to Foraker's defamation claim, holding that he is a limited purpose public figure who needed to prove actual malice in order to recover. (D.I. 167 at 11.) Out of an abundance of caution and with no accompanying analysis, the court further held that "the record contains sufficient evidence for a reasonable jury to conclude that the defendants' statements were made with actual malice." (D.I. 167 at 11.) Although the evidence of actual malice adduced at trial was the same as the evidence of actual malice contained in the summary judgment record, the court deems it prudent to reconsider the sufficiency of that evidence.

"Where the plaintiff is a public figure, there is an additional constitutional requirement that

16

the defendant have acted with actual malice. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964). Actual malice exists where the declarant acts with 'knowledge that it was false or with reckless disregard of whether it was false or not.' *Id.*" *Gill v. Del. Park, LLC*, 294 F. Supp. 2d 638, 646 (D. Del. Dec. 2, 2003). Moreover, "a public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation." *Phila. Newspapers v. Hepps*, 475 U.S. 767, 775 (1986).

In the present case, after what appears to have been a thorough investigation, the State Auditor concluded as follows:

> On December 1, 2003, a new Sergeant [i.e., Foraker] took over command of the firing range. In an interview he informed us that shortly thereafter he met with the current staff and as a result of that meeting a decision was made not to perform any maintenance at the range. The staff made the decision not to continue performing maintenance and custodial functions due to health related issues and not being qualified to perform those functions.
> . . .
> We can only surmise that the failing of the conveyor system, no maintenance performed on the bullet recovery system, and no custodian maintenance being performed to clean the firing range, that these situations contributed to an unhealthy and unclean environment leading to the ultimate closing of the firing range.

(D.I. 196 at A-250.) These conclusions, which mirror Chaffinch's allegedly-defamatory statements reproduced above, demonstrate two things. First, Chaffinch's statements were likely substantially true. Second, even if there is evidence to dispute the accuracy of the State Auditor's conclusions, the investigation was doubtlessly done with care. Consequently, it cannot be said that Chaffinch's nearly-identical statements to the media were made with reckless disregard to falsity. Therefore, the evidence does not support the jury's conclusion that Chaffinch acted with actual malice. Accordingly, Chaffinch is entitled to judgment as a matter of law on Count III.

## VI. OTHER OUTSTANDING MATTERS

There are a few outstanding motions that warrant a brief comment. First, with regard to plaintiffs' motions for attorneys' fees and costs, the court will deny those motions as moot pending the outcome of the re-trial of the Foraker case. Second, with regard to Foraker's motion to find the defendants' in civil contempt for violating The Honorable Joseph J. Farnan, Jr.'s order in the 2002 case, the court will also deny that motion as moot pending the outcome of the re-trial in the Foraker case. Finally, with regard to the plaintiffs' motion to amend the complaint in order to conform to the evidence adduced at trial pursuant to Fed. R. Civ. P. 15(b), the motion must be denied because it is nothing more than an inappropriate attempt by the plaintiffs to mitigate for a failed strategic decision made early on in the litigation. *DRR, L.L.C. v. Sears, Roebuck & Co.*, 171 F.R.D. 162, 165 (D. Del. Feb. 19, 1997) ("[A] losing party, by motions to amend and rehear, [cannot] keep a case in court indefinitely, trying one theory of recovery or defense after another, in the hope of finally hitting upon a successful one.") (internal citations omitted).

## VII. CONCLUSION

For the reasons described above, the court will grant the defendants' Rule 50(b) motion as to Counts I & II (Free Speech Clause and Petition Clause) in the Price case, and Count III (defamation) in the Foraker case. The court will also grant the defendants' Rule 59(a) motion as to Counts I & II (Free Speech Clause and Petition Clause) in the Foraker case. The remainder of the outstanding motions will be denied.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| B. KURT PRICE, WAYNE WARREN, AND CHRISTOPHER FORAKER, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 04-956 (GMS) |
| THOMAS MACLEISH, AND L. AARON CHAFFINCH, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |
| CHRISTOPHER FORAKER, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 04-1207 (GMS) |
| THOMAS MACLEISH, AND L. AARON CHAFFINCH, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## **ORDER**

IT IS HEREBY ORDERED THAT:

1. The defendants' renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), or in the alternative, motion to amend the judgment or for a new trial pursuant to Fed. R. Civ. P. 59 (D.I. 193) be GRANTED in part and DENIED in part as moot;

2. All other outstanding motions (D.I. 179, 187, 189, 192, 197, and 229) be DENIED; and

3. The judgment of June 15, 2006 (D.I. 186), and Part IV.A of the written opinion dated May 12, 2006 (D.I. 167) be VACATED.


Dated: August 14, 2006         /s/ Gregory M. Sleet
                               UNITED STATES DISTRICT JUDGE