<u>PRECEDENTIAL</u>

THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 06-4086

*SERGEANT CHRISTOPHER D. FORAKER, individually
and in his official
capacity as Superintendent of the Delaware State Police

v.

COLONEL L. AARON CHAFFINCH; LIEUTENANT
COLONEL
THOMAS F. MACLEISH, individually and in his official
capacity as Deputy Superintendent of the Delaware
State Police; DAVID B. MITCHELL, in his official capacity
as
Secretary of the Department of Safety and Homeland Security
of the State of Delaware; DIVISION OF STATE POLICE
DEPARTMENT
OF SAFETY AND HOMELAND SECURITY STATE OF
DELAWARE

(D.C. Civil No. 04-cv-01207)

CORPORAL B. KURT PRICE; CORPORAL WAYNE
WARREN
*SERGEANT CHRISTOPHER D. FORAKER

v.

COLONEL L. AARON CHAFFINCH, individually and in his
official capacity as Superintendent of the Delaware
State Police; LIEUTENANT COLONEL THOMAS F.
MACLEISH,
individually and in his official capacity as Deputy
Superintendent of the Delaware State Police; DAVID B.
MITCHELL, in his official capacity as the Secretary
of the Department of Safety and Homeland Security of
the State of Delaware; DIVISION OF STATE POLICE,
DEPARTMENT
OF SAFETY AND HOMELAND SECURITY, STATE OF
DELAWARE

(D.C. Civil No. 04-cv-00956)

B. Kurt Price, Wayne Warren,
*Christopher D. Foraker,
Appellants

*Dismissed Per the Court's Order of 11/7/06

_____

On Appeal from the United States District Court
for the District of Delaware
District Court Nos.: 04-cv-1207, 04-cv-0956
District Judge: The Honorable Gregory M. Sleet

_____

2

Argued June 8, 2007

Before: SMITH and GREENBERG, *Circuit Judges,*
and POLLAK, *District Judge*[*]

(Filed: August 30, 2007 )

Counsel:
Martin D. Haverly
Thomas S. Neuberger
Stephen J. Neuberger (argued)
The Neuberger Firm
2 East 7th Street, Suite 302
Wilmington, DE 19801
         *Counsel for Appellants*

Edward T. Ellis (argued)
Carmon M. Harvey
Montgomery, McCracken, Walker & Rhoads
123 South Broad Street
Philadelphia, PA 19109
         *Counsel for Appellees*

_____

OPINION OF THE COURT

_____

[*]The Honorable Louis H. Pollak, Senior District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

———————————————

SMITH, *Circuit Judge*.

Appellants Corporal B. Kurt Price and Corporal Wayne Warren, both former Delaware State Troopers and instructors in the Delaware State Police Firearms Training Unit, appeal from the District Court's grant of judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). Price and Warren present two principal issues for review: (1) whether the activities they engaged in were protected by the Petition Clause, and (2) whether their speech is protected after the Supreme Court's decision in *Garcetti v. Ceballos*, --- U.S. ---, 126 S. Ct. 1951 (2006). We will affirm the judgment of the District Court.

I.

The origins of this case date to September 1998, when the Delaware State Police ("DSP") opened an indoor firing range in Smyrna, Delaware. The range became the locus of operations for the Firearms Training Unit ("FTU"), the unit to which Price and Warren were assigned as instructors during the time period relevant to this case. The range and those who used it encountered a number of difficulties from the outset, including problems with the heating, ventilation, and air conditioning ("HVAC") system.

Price and Warren were long-term members of the DSP at

4

the time of the events giving rise to this case. Price had been part of the FTU since 1996 and Warren had been assigned to the unit in 2001. Sergeant Christopher Foraker was the Section Chief of the FTU from August 1, 2001 through April 8, 2002, at which point he was moved to another unit. Foraker sued Colonel L. Aaron Chaffinch on April 24, 2002 for First Amendment retaliation, and won a jury verdict in his favor. The parties later agreed that Foraker would be reinstated to his position with the FTU and that the monetary judgment against Chaffinch would be vacated. Foraker returned to the firing range on December 1, 2003.

Price, Warren, and Foraker considered the range conditions intolerable, and were specifically concerned with health and safety issues there. The HVAC system did not work properly, the bullet trap was malfunctioning, and officers and students at the range were suffering the physical manifestations of contamination, including elevated levels of heavy metals in their blood. Foraker sent a number of e-mails regarding the deteriorating conditions at the range to his superiors, including Lieutenant Colonel Thomas F. MacLeish, Captain Greg Warren, and Lieutenant Ralph Davis. In an e-mail dated December 19, 2003 he explained that, due to a broken drive chain and damaged sprocket on the conveyor, the dredging system had been brought to a complete stop. He also outlined concerns about Price's and Warren's elevated blood levels.

In early December, Price, Warren, and Foraker decided

5

to suspend certain bullet trap maintenance because they considered carrying it out to be unsafe. At trial, Warren explained that their objective was to limit their exposure to lead and other unsafe metals. They continued to perform other forms of range maintenance, including removal of spent casings and trash. The three men had meetings to discuss the range with MacLeish, Captain Greg Warren, and the Division of Facilities Management. In March 2004, the DSP closed the range.

Following the closing of the range, the State Auditor reviewed the issues surrounding the closing. Price, Warren, and Foraker met with the Auditor on May 12, 2004. Their attorney later read their statements to the Auditor, verbatim, to the Delaware State News, a local newspaper. As troopers, Price, Warren, and Foraker were not permitted to speak to the press without the approval of superior officers. On May 13, 2004, they were ordered to submit to a hearing examination to determine whether they were fit for duty. On June 25, 2004, Price and Warren were placed on light duty. On August 19, 2004, Price, Warren, and Foraker filed this action.[1] Price, Warren, and Foraker amended their complaint on October 14, 2005 to include the two counts at issue here. Count One of the amended

---

[1]Foraker also filed a separate action on August 30, 2004 under 42 U.S.C. § 1983, which was consolidated with this suit for discovery purposes only on February 1, 2005. Foraker's independent action settled and was dismissed on October 11, 2006.

complaint alleged a violation of the plaintiffs' Free Speech rights, and Count Two alleged Petition Clause violations. Price and Warren retired from the DSP on April 7, 2006.

During discovery, Price, Warren, and Foraker sought to discover e-mail messages stored on Chaffinch's hard drive. Chaffinch retired in May 2005. Pursuant to routine DSP procedure, a technician at the DSP re-imaged the hard drive, destroying any messages saved there. The plaintiffs requested default judgment or an adverse inference instruction on the basis of spoliation of evidence. The District Court denied both motions.

Trial began on May 15, 2006. The District Court charged the jury on May 30, 2006, the same day that the Supreme Court decided *Garcetti v. Ceballos*. The next day, the jury returned a verdict for Price, Warren, and Foraker.

After the District Court entered judgment on the verdict for Price, Warren, and Foraker, appellees Chaffinch, MacLeish, David Mitchell, and the DSP ("DSP defendants") moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). On August 14, 2006, the District Court granted the motion. The Court held that the First Amendment Speech and Petition Clauses did not protect Price and Warren because their reports up the DSP chain of command and statements to the Auditor were part of their official duties as Troopers and they had been ordered to cooperate. The Court denied the

motion of Price, Warren, and Foraker to amend the complaint to conform to the evidence at trial under Rule 15(b). Foraker settled with the DSP defendants shortly after the filing of this appeal, and the District Court entered an order of dismissal of his claims on October 11, 2006.

## II.

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the grant of a Rule 50(b) motion for judgment as a matter of law. *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005). In evaluating the grant of judgment as a matter of law, "we must look at the evidence in the light most favorable to ... the verdict winner[s], and draw all reasonable inferences in [their] favor." *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996). In *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993), we explained that "although the court draws all reasonable and logical inferences in the nonmovant's favor, we must affirm an order granting judgment as a matter of law if, upon review of the record, it is apparent that the verdict is not supported by legally sufficient evidence." *Id.* at 1166.

## III.

Price and Warren assert that their actions in bringing the problems at the firing range to the attention of the government

8

constitute protected petitioning activity under the First Amendment. In their amended complaint, they alleged that they suffered adverse employment action as a result of their petitions to the government for redress of grievances. The Petition Clause provides that "Congress shall make no law ... abridging ... the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. CONST. amend. I, cl. 6. The first question for our review is whether Price and Warren's expressions are petitions within the meaning of the First Amendment.

The history of the Petition Clause is instructive. Petitions were first utilized in America during the colonial era, when colonists petitioned the colonial assemblies for resolution of private disputes as well as for legislative action. *See* Stephen A. Higginson, Note, *A Short History of the Right to Petition Government for the Redress of Grievances*, 96 YALE L.J. 142, 144-55 (1986). By the time the Framers penned the First Amendment and the states ratified the right of people to petition the government, petitioning was already a firmly established–and highly valued–right in the common law tradition, and one that included the right to governmental consideration of the petition. *See id.* at 155-56 & n.92 (quoting the Declaration of Independence: "In every stage of these Oppressions We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury."); *see also* James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First Amendment*

9

*Right to Pursue Judicial Claims Against the Government*, 91 Nw. U. L. Rev. 899, 909 & n.36 (1997) ("Early practice on the 'petition of right,' which came to be seen as an important element of the common law, included a variety of features that would later characterize prerogative practice."); Julie M. Spanbauer, *The First Amendment Right to Petition Government for a Redress of Grievances: Cut From a Different Cloth*, 21 Hastings Const. L.Q. 15, 22-34 (1993).

James Madison included the right to assemble and to "apply[] to the Legislature by petitions" in his draft amendments of June 8, 1789, and separated these rights from the freedoms of religion, speech, and the press. *See* 1 *Annals of Cong.* 451 (Joseph Gales, ed. 1789); Spanbauer, *supra* at 39-40. In his endorsement of the amendments before the House, he called upon the representatives to "expressly declare the great rights of mankind secured under this constitution." 1 *Annals of Cong.* 449 (Joseph Gales, ed. 1789). The House of Representatives combined these rights into a single amendment in their modifications, and substituted the word "government" for "legislature." Spanbauer, *supra* at 39-40; 1 *U.S. House Journal* 85 (Aug. 21, 1789). The Senate changed the right of "application" to protect the right to "petition." Spanbauer, *supra* at 42; 1 *U.S. Senate Journal* 70-71 (Sept. 4, 1789). Acknowledging these historical roots, the Supreme Court stated:

> We have recognized this right to petition as one of "the most precious of the liberties safeguarded by

10

the Bill of Rights," and have explained that the right is implied by "[t]he very idea of a government, republican in form."

*BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 524-25 (2002) (internal citations omitted); *see also Adderley v. Florida*, 385 U.S. 39, 49 n.2 (1966) (Douglas, J., dissenting) (recounting a brief history of the right to petition in both Britain and America). However, the right to petition has undergone a significant transformation since its inclusion in the Bill of Rights. *See* Higginson, *supra* at 165 ("Despite the clear colonial practice that linked petitioning to a corollary duty of legislative response, the Southern 'gag' proponents [of states' rights with respect to slavery] successfully challenged this link and subsumed the right [to petition] within free expression."); *McDonald v. Smith*, 472 U.S. 479, 482 (1985) ("The right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression."); *id.* at 485 (ignoring the varied histories of the right to petition and the freedoms of speech, religion, and the press, and stating that "[t]he Petition Clause ... was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble."); *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 372 (9th Cir. 1999) (en banc) ("The protections afforded by the Petition Clause have been limited by the Supreme Court to situations where an individual's associational or speech interests are also implicated.").

11

In *San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir. 1994), we concluded that a public employee who has petitioned the government through a formal mechanism such as the filing of a lawsuit or grievance is protected under the Petition Clause from retaliation for that activity, even if the petition concerns a matter of solely private concern. In discussing the distinct origin of the Petition Clause, we distinguished the rule laid out in *Connick v. Myers*, 461 U.S. 138, 154 (1983) with respect to speech[2], and explained that "when one files a 'petition' one is not appealing over government's head to the general citizenry: when one files a 'petition' one is addressing government and asking government to fix what, allegedly, government has broken or has failed in its duty to repair." *Id.* at 442. Moreover, we noted that the argument that

the scope of the petition right depends upon the

─────────────────────

[2]In *San Filippo*, we wrote that

As applied to communications that are not petitions, the *Connick* rule means that a public employee who goes public–e.g., by writing to *The New York Times*–with an employment dispute that is not of "public concern" runs the risk of being disciplined by her public employer for undertaking to draw public attention to a private dispute.

*Id.* at 442.

context in which the right is exercised is particularly persuasive because the scope of the free speech right–a right that, like the petition right, is stated in unqualified terms in the first amendment–depends on the context in which that right is exercised.

*Id.* at 438.

Formal petitions are defined by their invocation of a formal mechanism of redress. Thus, "[l]awsuits, grievances, [and] workers compensation claims" are all examples of formal petitions. *Id.* at 439 n.18. Contrary to the requirements for speech protection discussed below, when a formal petition is made, the employee need not show that the subject matter of the petition involved a matter of public concern. *Id.* at 442. This distinction is legitimate because the Petition Clause is not merely duplicative of the Free Speech Clause. *Id.* at 441-42 ("[W]e believe that there is an independent reason–a reason of constitutional dimension–to protect an employee lawsuit or grievance if it is of the sort that constitutes a 'petition' within the meaning of the first amendment."); *see also Brennan v. Norton*, 350 F.3d 399, 417 (3d Cir. 2003) (contrasting the requirements for proof of retaliation for free expression with those for petitioning activity and noting that "a plaintiff need only show that his/her lawsuit was not frivolous in order to make out a prima facie claim for retaliation under the Petition Clause").

13

The Supreme Court has explained that "the values in the right of petition as an important aspect of self-government are beyond question." *McDonald*, 472 U.S. at 483. Although the Free Speech Clause also serves the interests of democracy, it does so in a unique manner. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 93 n.127 (1976) ("[T]he central purpose of the Speech and Press Clauses was to assure a society in which 'uninhibited, robust, and wide-open' public debate concerning matters of public interest would thrive, for only in such a society can a healthy representative democracy flourish." (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964))). Whereas the Free Speech Clause protects the right to "wide-open" debate, the Petition Clause encompasses only activity directed to a government audience. This distinction correlates to the separate analysis for each clause. Accordingly, the argument of the DSP defendants that because *Garcetti v. Ceballos*, --- U.S. ---, 126 S. Ct. 1951 (2006) bars plaintiffs' claims as speech, it also bars them as petitions is inaccurate–petitions are not synonymous with speech for purposes of constitutional analysis.

There are less formal mechanisms by which a petition may be made. *San Filippo*, 30 F.3d at 439-40. Informal petitions may include letters such as those at issue in *McDonald* and *Schalk v. Gallemore*, 906 F.2d 491 (10th Cir. 1990) (per curiam). Petitions made through informal channels may occasion a lesser degree of constitutional protection than their formal counterparts. *See, e.g.*, *San Filippo*, 30 F.3d at 439 (paraphrasing the Tenth Circuit's holding in *Schalk* that when

14

"the 'petition' at issue [is] simply a letter imposing on the government no obligation to respond, it [is] properly analyzable under the conventional *Connick* rubric applicable to speech"); *id.* at 442; *see also Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984) ("Nothing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues.").

In *Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006), we addressed the First Amendment claim of a former borough manager who made reports to the Borough Council that led to retaliation from the mayor, which eventually culminated in Hill's resignation. *Id.* at 230-32. We explained in a footnote that, although "[w]e have never held ... that a report of a superior's misconduct to a legislative body when the legislative body is also the reporter's employer constitutes 'petitioning activity,'" the complaints Hill made to the Pennsylvania Human Relations Commission and the EEOC "might well qualify as 'petitioning.'" *Id.* at 242 n.24. However, we declined to make this determination because Hill had not alleged retaliation based on his complaints to the PHRC or EEOC.

The distinction drawn in *Hill* between Hill's report to his employer and his complaints to the administrative bodies illustrates why the plaintiffs' complaints up the chain of command did not constitute petitioning activity. Price and

15

Warren complained internally; they did not petition a state agency qua agency. They appealed to their employer, which also happened to be a state agency, through informal channels. *See generally Herr v. Pequea Twp.*, 274 F.3d 109, 115 (3d Cir. 2001) (questioned on other grounds by *Mariana v. Fisher*, 338 F.3d 189, 199 (3d Cir. 2003); *United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir.2003)); *see also Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000) ("[T]he right to petition for redress of grievances [does not] imply a duty of the government to make every government employee [or entity] a petition receiver."). Thus, they cannot seek solace in the Petition Clause.

Price and Warren further assert that their speech to the State Auditor qualifies for protection under the Petition Clause. However, as the District Court found, although their statements to the State Auditor may be characterized as invoking a formal mechanism, "they were *ordered* to cooperate." Statements made under compulsion do not comport with the basic principle of freedom underlying the Petition Clause. Therefore, these statements do not fall within the constitutional protections for petitions to the government.

IV.

Price and Warren allege that they were retaliated against for their speech about hazardous conditions at the FTU and governmental corruption, misconduct, and mismanagement. In

16

particular, Price and Warren assert that their speech up the chain of command and to the State Auditor was protected by the First Amendment because it exposed serious health and safety concerns and exposed government incompetence and wrongdoing. They assert that the holding of *Garcetti v. Ceballos*, --- U.S. ---, 126 S. Ct. 1951 (2006) does not affect their claims because their job duty as expert firearms instructors was to teach students how to fire weapons, and speaking out about health and safety problems at the firing range was not part of their job function. They maintain that the District Court's grant of judgment as a matter of law was in error.[3] The DSP defendants claim that the speech in question is not protected because Price's and Warren's complaints up the chain of command fell within the scope of their duties as troopers in the FTU, and were thus foreclosed by *Garcetti*. The DSP defendants assert that Price and Warren's speech to the State Auditor was also within the scope of their job duties.

As noted above, the Supreme Court issued its opinion in *Garcetti* on May 30, 2006, the same day that the jury was charged in this case. After hearing argument on the DSP defendants' motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), the District Court

---

[3]Price and Warren also raise an argument as to spoliation of evidence. We have considered this argument, and conclude that it is without merit and compels no separate discussion.

correctly held that *Garcetti* must be applied in this case.[4]

In *Garcetti*, the Supreme Court addressed the question of "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties." *Id.* at 1955. Ceballos was a deputy district attorney in Los Angeles. While performing that role, a defense attorney approached him about inaccuracies in an affidavit that had been used to obtain a critical search warrant. Ceballos investigated and determined that there were inaccuracies that were still unresolved after consultation with the affiant. He informed his supervisors, composed a memo which recommended dismissal of the case, and met with his supervisors and the affiant to discuss the case. The prosecution proceeded, and Ceballos was called as a witness for the defense. Following the trial, Ceballos was reassigned, transferred to another courthouse, and denied a promotion. He filed an unsuccessful employment grievance, and then filed an action in federal court under 42 U.S.C. § 1983, alleging retaliation in violation of the First and Fourteenth Amendments.

Focusing on the distinction between employee-speech

---

[4]In *Garcetti*, the Court applied the rule it enunciated to Ceballos' claims. Thus, the rule announced was not purely prospective, and the District Court properly applied it in this case, which was pending at the time of the *Garcetti* decision. *See, e.g.*, *Linkletter v. Walker*, 381 U.S. 618, 622 (1965).

18

and citizen-speech, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 1960. The Court emphasized the importance of allowing government employers "sufficient discretion to manage their operations." *Id.*; *see also Waters v. Churchill*, 511 U.S. 661, 671-72 (1994) (plurality opinion) ("We have never explicitly answered this question, though we have always assumed that its premise is correct–that the government as employer indeed has far broader powers than does the government as sovereign.").[5] The Court relied on the undisputed fact that Ceballos wrote his memo pursuant to his job responsibilities in explaining that "[w]e ... have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate. ... The proper inquiry is a practical one." *Id.* at 1961.

---

[5]In rejecting "the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties," the majority opinion noted that the "powerful network of legislative enactments–such as whistle-blower protection laws and labor codes–available to those who seek to expose wrongdoing," protects employees. *Id.* at 1962. The Court embraced the notion that–at least in the context of statements made by "a public employee ... in the course of doing his or her job"–protection from retaliation and protection under the First Amendment are mutually exclusive considerations.

19

Accordingly, Price and Warren argue that they were not functioning within the scope of their employment duties either when they made their statements to the State Auditor or complained up the chain of command.

We briefly addressed the impact of *Garcetti* in *Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006). Hill, a Borough Manager, allegedly suffered retaliation following his reports of misconduct by the mayor to the Borough Council. He admitted to issuing this report "pursuant to his official duties" to protect Borough employees. *Id.* at 242. Accordingly, we concluded that "he was not speaking 'as a citizen' when he made these reports, and thus, as a matter of law, the reports are not protected speech [under *Garcetti*]." *Id.*

However, we reversed the dismissal of Hill's First Amendment retaliation claim to the extent that it concerned Hill's advocacy of ideas, principles and projects disfavored by the mayor on the grounds that "we cannot determine in this procedural posture whether the speech involved a matter of public concern." *Id.* We explained that "[t]hat determination must be made after an examination of 'the content, form, and context of [the] statement, as revealed by the whole record.'" *Id.* at 243 (quoting *Rankin v. McPherson*, 483 U.S. 378 (1987)). Thus, the *Hill* opinion followed the *Garcetti* approach by remanding to the District Court for an inquiry into whether the employee spoke as a citizen and, if so, "whether the [mayor] had an adequate justification for treating the employee differently

20

from any other member of the general public." *Garcetti*, 126 S. Ct. at 1958. In contrast to *Hill*, Price and Warren's claims were presented in detail at a jury trial, giving both the District Court and this Court comprehensive information from which to answer the question of whether Price and Warren spoke pursuant to their official duties.

Precedent in the Fifth and Ninth Circuit Courts of Appeals also points to the conclusion we reach here. In *Williams v. Dallas Independent School District*, 480 F.3d 689 (5th Cir. 2007) (per curiam), the Fifth Circuit applied *Garcetti* to foreclose the retaliation claim of a high school athletic director who was discharged after writing a memo to his principal concerning the handling of school athletic funds. Noting *Garcetti*'s injunction that First Amendment protection "does not invest [employees] with a right to perform their jobs however they see fit," the Court held that it was within Williams' "daily operations" to manage the athletic department, and because he needed information on the athletic accounts in order to be able to do that, his memorandum to his superior concerning accounts was necessary for him to complete his job. *Id.* at 694. The Court noted that this outcome was dictated by the fact that "Williams had *special knowledge* that $200 was raised at a basketball tournament," and that he was "*experienced* with standard operating procedures for athletic departments." *Id.* (emphasis added). Applying the Fifth Circuit's understanding, Price and Warren were acting within their job duties when they expressed their concerns up the chain of command because they needed to

21

have a functioning bullet trap to conduct their educational programs and it was their special knowledge and experience with the bullet trap[6] that demonstrated their responsibility for ensuring its functionality by reporting problems to their superiors.

Our result is also consistent with *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 1918 (Apr. 2, 2007). In *Freitag*, a female corrections officer was terminated after filing reports documenting sexual harassment by prisoners and inaction on the part of her superiors. Applying *Garcetti* to her First Amendment claims, the Ninth Circuit explained that the reports she submitted were pursuant to her official duties. *Id.* at 546. However, the Court declined to hold that a letter she wrote to the Director of the California Department of Corrections and Rehabilitation explaining the hostile work environment she had encountered was within her job duties, and remanded that issue to the District Court. *Id.* Apart from the minor factual distinctions between a prison guard's duty to write internal reports about prisoner misconduct and her supervisors' dilatory response and Price and Warren's responsibility to report

---

[6]We recognize that Price and Warren did not have the sort of specialized knowledge required to perform certain hazardous maintenance work on the bullet trap. The special knowledge and experience referenced here is their daily interaction with the equipment, which put them in the position to know when problems arose.

22

required bullet trap maintenance, *Freitag* helps to illustrate the connection between Price and Warren's speech and their job duties.

The Ninth Circuit's remand of the question whether Freitag's letter of complaint to the Director was within her job duties illustrates the fact-intensive nature of this inquiry. Unlike the question of whether speech is protected by the First Amendment, the question of whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law. Thus, as the Ninth Circuit held, the proper resolution of challenges to the designation of such speech is to defer to the district court, because "having presided over this and related litigation for several years, [it] may be in a better position to make the relevant factual determinations...." *Freitag*, 468 F.3d at 546. Accordingly, Price and Warren's claims of retaliation based on the First Amendment are foreclosed because, as the District Court found, reporting problems at the FTU was within their official job duties.[7]

_____

[7]The Sixth Circuit did not believe that the *Garcetti* inquiry required district court involvement. In *Haynes v. City of Circleville*, 474 F.3d 357 (6th Cir. 2007), the Court rejected a K-9 unit police officer's contention that his complaints regarding cuts to the K-9 program were protected following *Garcetti*. Characterizing the memo Haynes wrote to the Police Chief as "reflect[ing] nothing more than 'the quintessential employee beef': management has acted incompetently," the Court

As the Court explained in *Garcetti*, the facts that

explained that "[i]n lodging his protests to Chief Gray against the training cutbacks, Haynes was acting as a public employee carrying out his professional responsibilities." *Id.* at 364-65 (citation omitted). However, the Sixth Circuit also said that "[t]he fact that Haynes communicated solely to his superior also indicates that he was speaking 'in [his] capacity as a public employee....'" *Id.* at 364 (quoting *Mills v. City of Evansville, Ind.*, 452 F.3d 646, 646 (7th Cir. 2006)). As *Garcetti* explained, the inquiry is nuanced: the fact that an employee speaks privately is not conclusive as to whether the speech is within the scope of his or her job duties.

In *Mills*, the Seventh Circuit made a similar ruling. 452 F.3d at 648. The Court explained that:

> Mills was on duty, in uniform, and engaged in discussion with her superiors, all of whom had just emerged from Chief Gulledge's briefing [on personnel changes]. She spoke in her capacity as a public employee contributing to the formation and execution of official policy. Under *Garcetti* her employer could draw inferences from her statements about whether she would zealously implement the Chief's plans or try to undermine them; when the department drew the latter inference it was free to act accordingly.

*Id.* The Court further held that "[p]ublic employers must be able to change assignments in response to events (including statements) that reveal whether employees will be faithful agents of the decisions made by the politically accountable managers." *Id.*

24

"Ceballos expressed his views inside his office, rather than publicly," and that his memo concerned the subject matter of his employment, were non-dispositive. 126 S. Ct. at 1954. Thus, the controlling fact in the case at bar is that Price and Warren were expected, pursuant to their job duties, to report problems concerning the operations at the range up the chain of command. Price and Warren spoke internally with respect to the health conditions at their workplace. They were required to speak up the chain of command and were prevented from speaking to the press without prior approval. Price and Warren were likewise expected to report truthfully to the State Auditor upon being ordered to do so.

The result required by *Garcetti* illustrates how that opinion narrowed the Court's jurisprudence in the area of employee speech. Although under *Garcetti* an employee's right to protest matters of public concern is not automatically forfeited by his or her choice of a workplace forum, that right is limited. *Compare Connick v. Myers*, 461 U.S. 138, 148 n.8 (1983), *with Garcetti*, 126 S. Ct. at 1959 (identifying the "controlling factor" in removing speech from the First Amendment as being that the expressions were made pursuant to employment duties); *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 413 (1979).

Reporting problems at the firing range was among the tasks that Price and Warren were paid to perform. Their positions in the DSP required them to report up the chain of

25

command, and their positions as instructors who regularly used and performed light maintenance on the equipment at the range on a daily basis put any environmental concerns there within the scope of their routine operations. As the District Court noted, their annual performance reviews suggest that Price and Warren were involved in workplace safety issues–Price's report explains that he "aided his supervisors in identifying safety issues at the facility," and "reached out to experts in the field of ventilation [and] firing range design along with heavy metal exposure and contamination [experts] and established a rapport with these professionals to search out the root cause and contributing factors surrounding the dangers we face in exposure to heavy metal contamination." There is some suggestion in the record that Price's search for external assistance may have been motivated by personal concerns, but the fact that Price may have exceeded the expectations of his formal job description as a firearms instructor does not mean that they were not within the scope of his duties. *Garcetti*, 126 S. Ct. at 1961-62 ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform...."). Warren admitted at trial that he regularly dealt with the water in the bullet trap, unclogged the pumps, and replaced the filters.

Although voluntary efforts to engage in public discourse do not automatically remove internal workplace speech from constitutional protection, Price and Warren were required by the terms of their employment to maintain a safe learning environment at the FTU. *See Garcetti*, 126 S. Ct. at 1960

26

("Refusing to recognize First Amendment claims based on government employees' work product does not prevent them from participating in public debate. The employees retain the prospect of constitutional protection for their contributions to the civic discourse. This prospect of protection, however, does not invest them with a right to perform their jobs however they see fit."). In his evaluation, Price was "tasked" with "the safe execution of the Academy Patrol Procedures Program" and the creation of "a new and more applicable set of Firing Range Safety Rules." Similarly, one of Warren's "objectives" for the next evaluation period was "conduct[ing] a safe Firearms Training Program" for which the plan of action was identified to include "[e]nsur[ing] all students and instructors practice approved safety procedures." Warren's performance appraisal justification noted that one of the "accomplishments of the Firearms Training Unit" during the period from October 1, 2002 through September 30, 2003 was that the unit "[c]ompleted the alterations and modifications to the Bullet Recovery system." With respect to work habits, Price and Warren were both given high marks for their care of the equipment related to firearms training.[8] Notably, the plaintiffs did not identify anyone else

---

[8] In support of their contention that such reporting was not within the scope of their employment, Price and Warren direct us to the Eighth Circuit's holding in *Lindsey v. City of Orrick*, --- F.3d ---, 2007 WL 1814943 (8th Cir. June 26, 2007). Lindsey was the public works director for the City. In that role he maintained the City's parks, water systems, streets, and sewers

whose job might have included the sort of maintenance they performed, or who might have had responsibility to ensure the safety of the range.

We recognize that giving statements to the State Auditor was not part of their everyday duties and that *Garcetti* leaves open the possibility that speech within the workplace relating to non-job issues is protected. However, Price explained that he spoke to the auditors because "[i]t was my duty to speak to the auditors. The order came down from the executive office of the State of Delaware, meaning the Governor's office. I am bound by that order." Although this speech was compelled by their employer, this fact alone does not locate the speech within the realm of Price and Warren's job duties. Rather, what is

---

and reported about public works at City Council meetings. After attending a training session that included information on state sunshine law compliance, Lindsey questioned the Council's compliance with the open meetings requirement at a number of public meetings. He was later fired. The Court differentiated *Garcetti*, and held that Lindsey's speech was made "both as a citizen and on a matter of public concern." *Id.* at *5. The opinion in *Lindsey*, however, does not suggest that Price and Warren's speech should be protected by the First Amendment as the Court explained that "there is no evidence Lindsey's job duties even arguably included sunshine law compliance." *Id.* at *3. As demonstrated above, there is sufficient evidence that Price and Warren's jobs included reporting health and safety problems at the firing range.

dispositive is that the prior statements of Price and Warren within the chain of command prompted the order to speak with the State Auditor. Because the speech that motivated the order was within their job duties, the responsibility to respond to the subsequent order was also within the scope of their duties.

Because we agree with the District Court that Price and Warren were acting pursuant to their job duties when they made their complaints up the chain of command and gave their reports to the State Auditor, we need not examine whether their speech passes the remainder of the test established by *Pickering* and its progeny. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Givhan*, 439 U.S. at 410; *Connick*, 461 U.S. at 138; *see also Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004). As the Seventh Circuit explained, "*Garcetti* requires that before analyzing whether an employee's speech is of public concern, a court must determine whether the employee was speaking 'as a citizen' or, by contrast, pursuant to his duties as a public employee." *Sigsworth v. City of Aurora*, 487 F.3d 506, 509-10 (7th Cir. 2007); *see also Brammer-Hoelter v. Twin Peaks Charter Academy*, --- F.3d ---, 2007 WL 2007546, at *5 (10th Cir. 2007). In making their voices heard up the chain of command and reporting to the State Auditor under order, Price and Warren spoke pursuant to their duties as government employees at the FTU.

Price and Warren also assert that the release of their statements to the Auditor by their attorney was speech that was

29

not pursuant to their job duties, and therefore not foreclosed as a basis for recovery by *Garcetti*. As *Garcetti* explained, "[e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government." *Id.* at 1961 (citing writing a letter to a local newspaper or discussing politics with a co-worker as examples of speech that falls "outside the scope of official duties"). They raised this argument before the District Court in regard to their motion to amend the complaint to conform to the evidence presented at trial. *See* FED. R. CIV. P. 15(b). Although the release of their statements may have been outside the scope of their duties, and perhaps even in contravention of those duties, we need not reach this question because the District Court did not abuse its discretion in denying the motion to amend. *See Douglas v. Owens*, 50 F.3d 1226, 1235 (3d Cir. 1995) ("We review for abuse of discretion the district court's granting of leave to amend the complaint."). Moreover, the media speech theory was not presented to the District Court as a defense to the motion for judgment as a matter of law, but only in conjunction with their Rule 15(b) motion. *See, e.g.*, *Newark Morning Ledger Co. v. United States*, 539 F.2d 929, 932 (3d Cir. 1976) ("We generally refuse to consider issues that are raised for the first time on appeal.").

In their brief to the District Court challenging the motion for judgment, Price and Warren argued that their speech was internal, but still protected after *Garcetti* because it was not

pursuant to their job duties. They also argued that they had not received notice of any defense that their speech to the Auditor was not within their job duties because, if they had, they would have shown that "it was their attorneys, who also spoke out to the press on their behalf after the first Auditor meeting, who arranged the actual meeting with the Auditor on their clients' behalf so their clients could blow the whistle on DSP wrongdoing." Their brief to the District Court also alleged that their "*speech to the Auditor* was the means of responding to [the] gag order; responding to the defamatory attack on plaintiffs; and of informing the public of governmental mismanagement and corruption through the Auditor and the media." (emphasis added). They concluded that "plaintiffs engaged in protected speech when they raised their health and safety concerns *to the State Auditor*." (emphasis added).

We recognize that the parties did not have the benefit of the *Garcetti* opinion at the time of trial. *See North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 n.39 (3d Cir. 1995) ("[W]here a previously ignored legal theory takes on new importance due to an intervening development in the law, it is appropriate to exercise discretion to allow a party to revive that theory." (internal citations omitted)). However, Price and Warren did not ask the District Court for a partial new trial on the ground that *Garcetti* had changed the legal landscape, pursuant to Rule 59(a). *See* FED. R CIV. P. 59(a) ("A new trial may be granted to all or any of the parties and on all or part of the issues ... for any of the reasons for which new trials have

31

heretofore been granted in actions at law in the courts of the United States...."); *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 454 (3d Cir. 2001). Instead, they requested an amendment to conform the complaint to the evidence. The District Court correctly denied that request.

Price and Warren did not meet the requirements for an amendment pursuant to Rule 15(b), which allows amendment of pleadings if the claim was tried by the express or implied consent of the parties. The record makes clear that the DSP defendants did not give their express consent. In order to ascertain whether they gave implied consent, we look to "whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond." *Douglas*, 50 F.3d at 1236 (quoting *Portis v. First Nat'l Bank*, 34 F.3d 325, 332 (5th Cir.1994)); *see also Evans Prods. Co. v. West Am. Ins. Co.*, 736 F.2d 920, 924 (3d Cir. 1984) ("The primary consideration in determining whether leave to amend under Fed.R.Civ.P. 15(b) should be granted is prejudice to the opposing party. The principal test for prejudice in such situations is whether the opposing party was denied a fair opportunity to defend and to offer additional evidence on that different theory." (citation omitted)).

Price and Warren identify a May 14, 2004 newspaper

32

article that indicates that their counsel read their statements verbatim to the Delaware State News, and point to trial testimony regarding the article as support for the unpleaded issue. Admitted without objection, the newspaper article was relevant to and admitted for the purpose of proving Price and Warren's theory of retaliation and their defamation claim. Their attorney explained in a proffer to the District Court "why I am offering this," i.e., that the article "goes to the motive of the defendants to retaliate." He did not argue the possibility that the article might show that Price and Warren used their attorney to take their otherwise internal speech public. Indeed, in response to concerns raised by opposing counsel, he disclaimed altogether any connection his clients had with the article.[9]

---

[9]The following sidebar colloquy is illustrative:

| The Court: | What are you offering? |
|---|---|
| Mr. S. Neuberger: | The fact that the FTU, that the conditions at the FTU were all over the media in the beginning of 2004.... I am not offering, for example, Captain [Greg] Warren's quote that the FTU was, quote, the absolute epitome of a project from hell since its very inception, end quote – Captain Warren can testify about that in a couple of days when he is in here.... |
| Mr. Ellis: | If that is the case, it is really misleading, because the evidence |

33

would make it seem like these three people were responsible for what's in the paper. That is really misleading because it's not the case.

The Court:    That is a concern, the concern outlined by Mr. Ellis.

Mr. T. Neuberger:    I will be happy to have Corporal [Wayne] Warren testify that there is overlap in the subject matter, but *it wasn't him speaking to the media and giving them this information.* [emphasis added]

\*    \*    \*

Mr. T. Neuberger:    I think we are missing something that we are saying on motivation. ... This is a backdrop of pressure and concern about the range, which, even if that pressure is not talking about our clients, it is talking about the fact that the state has a broken-down facility. And we are saying that the motive to retaliate is because all this is going public. So any news story of any nature about the range contributes ... to a motive to retaliate. It doesn't have to be about our guys. ... Simply the [fact that the] range is now being

34

The sole occasion on which it is even arguable that Price

_____

covered again [by the news media shows the defendants' displeasure about the publicity].

     *   *   *

The Court:     Albeit these particular plaintiffs were not the source --

Mr. T. Neuberger:   No.

In direct examination of Warren, the plaintiffs introduced the news article in the following manner:

Q.    What were you concerned about?

A.    Being blamed for the downfall of the operation [at the FTU].

Q.    Do you recall seeing any news media coverage discussing your meetings with the auditors?

A.    Yes.

Q.    Do you recall what newspapers that coverage was in?

A.    I believe it was in both the News Journal and the State News.

Following this exchange, Warren identified the headline of the article in which their lawyer's reading of their statements was reported. Warren did not refer to the article again in his testimony. Several other references were made to the article during the plaintiffs' case, all in the context of showing the animosity of the defendants toward Price and Warren.

35

and Warren introduced unchallenged evidence of their media speech theory was during the direct examination of Major David Baylor, which came after the plaintiffs' explanation that the article was evidence of motivation for retaliation. Plaintiffs' counsel asked Baylor if it was correct "that both Lieutenant Colonel MacLeish and Colonel Chaffinch became angry about the newspaper reporting on statements my office had made on behalf of my clients?" Baylor responded that "[t]here was a level of frustration, yes." The subsequent line of inquiry focused on the frustration of MacLeish and Chaffinch about the news stories and their angry feelings toward Price and Warren. This single question is insufficient to satisfy the requirements of Rule 15(b). *See, e.g.*, *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 568 (7th Cir. 2006) (holding that the plaintiff's admission on cross-examination in an employment discrimination case that she did not go to work right away was "not sufficient to demonstrate that the defense had raised the issue of failure to mitigate").

As we explained in *Douglas*, "an issue has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled, because the defendant does not have any notice that the implied claim was being tried." 50 F.3d at 1236. Having disclaimed any attempt to introduce the article for the purpose of showing that they were responsible for the statements or the release to the press, Price and Warren cannot now assert that they entered the unpleaded issue of media speech into the trial.

36

Nor did the defendants implicitly agree to the inclusion of the unpleaded issue in their testimony. Chaffinch testified that "I was not upset that your clients were talking to the auditors because, like I said, we were going to comply with the Auditor's Office in any way they needed to complete their investigation. I was not upset that they were talking to the auditors, no. I was upset that it was bringing a negative light to the Division of State Police in the media." Although Price and Warren now point to Chaffinch's testimony as evidence that the DSP defendants impliedly agreed that the issue of speech to the media was being tried, Chaffinch did not testify as to how the statements got into the media. Both he and MacLeish expressed their dismay at the negative coverage that the situation at the FTU had received, but neither stated that they were upset with Price and Warren for going to the media via their attorney and circumventing the universal DSP order prohibiting officers from talking to the media without approval.

The fact that there was no objection to the hearsay contained in the article further indicates that the defendants understood the introduction of the article and testimony regarding it to relate only to the adverse action prong of Price and Warren's retaliation claim. The DSP defendants did not implicitly consent to the trial of a claim that Price and Warren engaged in protected speech to the media. Accordingly, their

motion under Rule 15(b) fails on the merits.[10]

---

[10]We note that, although Price and Warren's Rule 15(b) motion fails, they may have had a valid claim under Rule 59(a) or Rule 60(b)(6) on the basis of the changed legal landscape after *Garcetti*. *See, e.g., Stanton by Brooks v. Astra Pharma. Prods., Inc.*, 718 F.2d 553, 557, 576 (3d Cir. 1983) (confirming that a change in the law is an appropriate basis for a partial retrial); FED. R. CIV. P. 60(b)(6) ("On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for ... any other reason justifying relief from the operation of the judgment."); *but see Agostini v. Felton*, 521 U.S. 203, 239 (1997) ("Intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)...."). However, Price and Warren did not seek a partial re-trial on the issue of media speech or relief from the judgment under Rule 60(b)(6). They sought only reinstatement of the verdict or default judgment as relief.

Although we are mindful that Rule 54(c) requires that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings," we note that the rule "addresses and cures a limited formal problem. It is not designed to allow plaintiffs to recover for claims they never alleged." *USX Corp. v. Barnhart*, 395 F.3d 161, 165 (3d Cir. 2004). Thus, we are unable to assist Price and Warren in salvaging their potentially meritorious, but unpleaded and untried, claims.

38

V.

Price and Warren's Petition Clause claim does not withstand scrutiny. Their complaints within the chain of command were not directed to the DSP as a governmental agency, but rather were directed to the DSP as their employer. Such complaints are not petitioning activity entitled to protection under the First Amendment.

The holding in *Garcetti* controls our analysis of the First Amendment speech claims. Under the rule established in *Garcetti*, Price and Warren spoke out about the maintenance of the bullet trap "pursuant to their official duties." First Amendment protection extends to government employees speaking as citizens, but it does not extend to workers who speak in the course of fulfilling their employment responsibilities. Price and Warren were speaking pursuant to their employment duties when they made their concerns known through the chain of command and when they spoke with the State Auditor. Accordingly, their First Amendment claims are foreclosed.

The District Court did not abuse its discretion in denying Price and Warren's motion under Rule 15(b).

We will affirm the judgment of the District Court.

39

GREENBERG, <u>Circuit</u> <u>Judge</u>, concurring.


Though I agree with the result the majority reaches on Price's and Warren's petition claim, I write separately to note my hesitation in finding that their e-mail complaints up the chain of command (as distinguished from their communications to the State Auditor), did not constitute petitioning activity. Rather, I would assume, <u>arguendo</u>, that the e-mails were petitioning activity, but conclude that the Supreme Court's opinion in <u>Garcetti v. Ceballos</u>, 126 S. Ct. 1951, 1960 (2006), barred their petitioning claim given that they sent their complaints up the chain of command "pursuant to their official duties."  <u>See</u> majority opinion at 25.

The majority finds that because Price's and Warren's "complaints within the chain of command were not directed to the DSP as a governmental agency, but rather were directed to the DSP as their employer," Price and Warren cannot seek solace now in the Petition Clause.  Majority opinion at 39; <u>see also</u> <u>id.</u> at 16 (noting Price and Warren "appealed to their employer, which also happened to be a state agency, through informal channels").  In <u>San Filippo v. Bongiovanni</u>, 30 F.3d 424, 449 (3d Cir. 1994), we held "that a public employee is protected under the Petition Clause against retaliation for having filed a petition . . . addressing a matter of purely private concern."[11]  We explained that the reason for our conclusion was

---

[11]We quote this language characterizing the majority opinion in <u>San Filippo</u> from Judge Becker's concurring and dissenting opinion in that case.

40

"[t]he first amendment's petition clause imposes on the United States an obligation to have at least some channel open for those who seek redress for perceived grievances.  Through its incorporation of the first amendment, the fourteenth amendment's guarantee of 'liberty' imposes the same obligation on the states."  Id. at 442.  Thus:

> [W]hen government–federal or state–formally adopts a mechanism for redress of those grievances for which government is allegedly accountable, it would seem to undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious 'petition' invoking that mechanism may be disciplined for such invocation by the very government that in compliance with the petition clause has given the particular mechanism its constitutional imprimatur.

Id.  Additionally, we distinguished retaliation claims based on speech, which are subject to the rule announced by the Supreme Court in Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690 (1983),[12] as follows:  "[W]hen one files a 'petition' one is not appealing over government's head to the general citizenry: when one files a 'petition' one is addressing government and asking government to fix what, allegedly, government has broken or has failed in its duty to repair."

---

[12] In Connick, the Supreme Court held that a government employee who goes public with an employment dispute that is not a "matter of public concern" does not have first amendment immunity against subsequent employer discipline.  Connick, 461 U.S. at 146, 103 S. Ct. at 1690.

41

San Filippo, 30 F.3d at 442.

Notwithstanding the above, both San Filippo and the majority concede that there also exist "less formal mechanisms by which a petition may be made," although they "may occasion a lesser degree of constitutional protection than their formal counterparts." Majority opinion at 14; see also McDonald v. Smith, 472 U.S. 479, 480, 105 S.Ct. 2787, 2788 (1985) (recognizing letters sent to President of United States by defendant charged with defaming plaintiff as petitions). The majority concludes, however, that because Price and Warren, in their capacity as public employees, "appealed to their employer, which also happened to be a state agency," their e-mails cannot constitute petitioning activity. Majority opinion typescript at 16. I find the result reached somewhat troubling. Specifically, given our broad characterization of a public employee's right to petition in San Filippo, it is unclear to me why Price's and Warren's complaints would constitute petitioning activity if they had contacted "a state agency qua agency," id., rather than the same agency as their employer. Indeed, if in both cases plaintiffs are asking government to fix what it "has broken or has failed in its duty to repair" through means the government has deemed acceptable,[13] San Filippo, 30 F.3d at 442, why should the activity be stripped of its constitutional protection in one instance but not the other?[14]

---

[13]This discussion assumes that e-mail was the typical means by which their employer expected Price and Warren – as well as other DSP employees – to communicate their concerns to it.

[14]Notably, although we observed in Hill v. Borough of Kutztown, 455 F.3d 225, 242 n.24 (3d Cir. 2006), that "[w]e have never held .

We can avoid the need to resolve the difficult question of whether a public employee ever can "petition" the government when the government is also the public employee's employer by looking, instead, to the Supreme Court's opinion in <u>Garcetti v. Ceballos</u>.[15]  In <u>Garcetti</u>, the Supreme Court held that when public employees speak "pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  126 S. Ct. at 1960.  While the Supreme Court did not address the question of whether the rule it announced in <u>Garcetti</u> applies to First Amendment retaliation claims based on a public employee's petitioning activities, as distinguished from his speech, there is good reason to believe that it does.

To be sure, "[t]he petition clause of the first amendment was not intended to be a dead letter–or a graceful but redundant appendage of the clauses guaranteeing freedom of speech and press." <u>San Filippo</u>, 30 F.3d at 442.  Rather, the right to petition "is an assurance of a particular freedom of expression," <u>McDonald</u>, 472 U.S. at 482, 105 S. Ct. at 2789, and "has a pedigree independent of–and substantially more ancient-than the freedoms of speech and

---

. . a report of a superior's misconduct to a legislative body when the legislative body is also the reporter's employer constitutes 'petitioning activity,'" so far as I am aware we similarly never have held to the contrary.

[15]Obviously, a public employee can petition his governmental employer regarding a matter completely unrelated to his employment and be in the position of any other petitioner for constitutional purposes.  But that situation is not present here.

43

press." <u>San Filippo</u>, 30 F.3d at 443.  Nonetheless, "[t]he right to petition is cut from the same cloth as the other guarantees of that Amendment." <u>McDonald</u>, 472 U.S. at 482, 105 S. Ct. at 2789.  To this end, the Supreme Court has plainly recognized that:

> The Petition Clause . . . was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble. . . . These First Amendment rights are inseparable . . . and there is no sound basis for granting greater constitutional protection to statements made in a petition . . . than other First Amendment expressions.

<u>Id.</u> at 485, 105 S. Ct. at 2791 (internal citations omitted); <u>see also</u> <u>San Filippo</u>, 30 F.3d at 450 (Becker, J., concurring and dissenting) (noting "even if all petitions now constitute speech (given the broad interpretation the Supreme Court has given to speech), I do not see why it matters that the guarantees overlap").  Given the above, it certainly would be plausible for us to believe that, if presented with the question, the Court is likely to find that when public employees petition the government pursuant to their official duties, the Constitution does not insulate such petitions from employer discipline.  <u>See</u> <u>Garcetti</u>, 126 S. Ct. at 1960; <u>see also</u> <u>D'Angelo v. School Bd. of Polk County, Fla.</u>, No. 06-13582, __ F.3d __, 2007 WL 2189099, at *7 (11th Cir. Aug. 1, 2007) (noting that, after <u>Garcetti</u>, the court must ask "whether the public employee made his petition both on a matter of public concern and as a citizen" and "[i]f the petition fails this threshold question, it is not protected under the First Amendment").

44

Assuming, <u>arguendo</u>, that Price and Warren's complaints up the chain of command did constitute petitioning activity, because I believe that <u>Garcetti</u> applies to their claim, I similarly would uphold the district court's order granting judgment against them as a matter of law for this reason. For the reasons the majority thoughtfully sets forth, it seems plain that Price and Warren acted "pursuant to their official duties," <u>Garcetti</u>, 126 S. Ct. at 1960, in voicing their complaints up the chain of command. Accordingly, their complaints cannot be the basis underlying a First Amendment claim against defendants.

POLLAK, District Judge, concurring:

I join the opinion and judgment of the court.

The opinion explains with precision that the free speech aspect (as distinct from the Petition Clause aspect) of this case dealing with the rights of public employees is squarely governed by the Supreme Court's recent decision in *Garcetti v. Ceballos*, --- U.S. ---- , 126 S. Ct. 1951 (2006): "The result required by *Garcetti* illustrates how that opinion narrowed the Court's jurisprudence in the area of employee speech. Although under *Garcetti* an employee's right to protest matters of public concern is not automatically forfeited by his choice of a workplace forum, that right is limited." As the court further observes, under *Garcetti*, "the 'controlling factor' in removing speech from the First Amendment [is] that the expressions were made pursuant to employment duties." In the case at bar, it is not surprising that reports made by Corporal B. Kurt Price and Corporal Wayne Warren within the chain of command of the Delaware State Police were regarded as "made pursuant to employment duties." Less clear is that the statements Price and Warren made to the State Auditor—statements ordered to be made to a high state official beyond the chain of state police command—were part of their employment duties. As the court notes, "giving statements to the State Auditor was not part of [appellants'] everyday duties." But, given the statements Price and Warren had made to their senior officers, it was not clear error for the District Court to find that the directive to Price and

Warren to aid the State Auditor's inquiry broadened the scope of their employment duties. *See Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002).

It may be expected that *Garcetti* will, to some extent, inhibit federal judicial micromanaging of public employment practices. It also may be expected that *Garcetti* will, to some extent, inhibit dissemination of information of arguable public interest about the operations of government agencies. How the balance will be struck may be expected to depend, to some extent, on the nuanced judgments of public employees and their superiors, and also of courts, on the scope of a public employee's employment duties. *Compare Garcetti*, 126 S. Ct. at 1961–62, *with id.* at 1963 (Stevens, J., dissenting), *and id.* at 1965, 1968 (Souter, J., dissenting).